No. 25-12873

In the United States Court of Appeals
for the Eleventh Circuit

FRIENDS OF THE EVERGLADES, INC., ET AL.,
*Plaintiffs-Appellees*,

v.

EXECUTIVE DIRECTOR,
FLORIDA DIVISION OF EMERGENCY MANAGEMENT,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Florida
No. 25-cv-22896-KMW

**TIME-SENSITIVE MOTION TO STAY
PRELIMINARY INJUNCTION PENDING APPEAL
AND FOR ADMINISTRATIVE STAY**

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa
  *Acting Solicitor General*
Nathan A. Forrester
  *Chief Deputy Solicitor General*
Kevin A. Golembiewski
  *Senior Deputy Solicitor General*
Robert S. Schenck
  *Assistant Solicitor General*
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

August 26, 2025

Jesse Panuccio
Evan Ezray
David Costello
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
jpanuccio@bsfllp.com

*Counsel for Kevin Guthrie, in
his official capacity as
Executive Director of the
Florida Division of Emergency
Management*

*FOE v. FDEM*
*Eleventh Circuit Case No. 25-12873*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management (FDEM), certifies that, to the best of his knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Ajizian, Christopher

2. Bennett, Elise Pautler

3. Boies Schiller Flexner LLP

4. Bonzon-Keenan, Geraldine

5. Burkhardt, Dominique

6. Carpenter, Hayley A.

7. Center for Biological Diversity

8. Chris Ajizian P.A.

9. Coe, Alisa

10. Coffey Burlington P.L.

11. Costello, David M.

12. DeSousa, Jeffrey Paul

C-1 of 3

*FOE v. FDEM*
*Eleventh Circuit Case No. 25-12873*

13.    Earthjustice

14.    Ezray, Evan M.

15.    Ficarelli, Dante

16.    Forrester, Nathan A.

17.    Friedman, Todd R.

18.    Friends of the Everglades, Inc.

19.    Galloni, Tania

20.    Golembiewski, Kevin A.

21.    Gustafson, Adam R.F.

22.    Guthrie, Kevin

23.    Hiaasen, Scott

24.    Lyons, Todd

25.    Martinez, Hon. Jose E.

26.    Miami-Dade County

27.    Murray, David M.

28.    Noem, Kristi

29.    O'Byrne, Hayden P.

30.    Panuccio, Jesse

*FOE v. FDEM*
*Eleventh Circuit Case No. 25-12873*

31.   Perez, Monica Rizo

32.   Piropato, Marissa

33.   Raurell, Carlos J.

34.   Quiñones, Jason A. Reding

35.   Sanchez, Hon. Eduardo I.

36.   Schenck, Robert S.

37.   Schwiep, Paul J.

38.   Singer, Frank

39.   The Miccosukee Tribe of Indians

40.   Todd R. Friedman P.A.

41.   Torres, Hon. Edwin G.

42.   Torstensen, Peter M.

43.   Totoiu, Jason Alexander

44.   Uthmeier, James

45.   Wahl, Christopher J.

46.   Williams, Hon. Kathleen M.

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

## INTRODUCTION

States "bear[] the brunt of the country's illegal immigration problem." *Arizona v. United States*, 567 U.S. 387, 436 (2012) (Scalia, J., dissenting in part). That is true for Florida, which declared a state of emergency due to the harms associated with the recent influx of illegal aliens. As part of its emergency response, the State converted a busy airport in Collier County (in the Middle District of Florida) into a temporary, one-stop detention and deportation facility, known as Alligator Alcatraz. The State controls the land on which the detention facility sits. The State funded its construction (though federal reimbursement is possible). The State accepts immigration detainees pursuant to 287(g) agreements with the federal government, but it exercises discretion over whether to accept any detainee. Thus, although the detention facility is used for immigration functions—like many facilities across Florida, including county jails—it remains a State facility under State control.

Since early July, the detention facility had been operational, housing thousands of detainees and alleviating overcrowding elsewhere. That is, until August 21, when a district court in the Southern District of

Florida preliminarily enjoined any additional detention or construction at the facility and required its closure within sixty days. The court based its injunction on the National Environmental Policy Act (NEPA)—a federal procedural statute that, through the APA, reaches only *federal* agency decisionmaking. The court entered this sweeping injunction even though (1) it lacked venue over this Middle District-based facility (as both Judges Altman and Ruiz recognized in other lawsuits); (2) NEPA does not reach State decisionmaking; (3) the court has no jurisdiction to enjoin federal immigration detention; and (4) the balance of harms tips decidedly against preliminary relief. This sweeping and unlawful injunction promises immediate disruption of critical law-enforcement activity, imposes significant financial and logistical burdens on the State, and undermines public safety.

Two decades ago, in a NEPA case, the Supreme Court counseled that a preliminary injunction is "an *extraordinary* remedy that may only be awarded upon a *clear showing*" that the plaintiff is "*likely* to succeed on the merits" and "*irreparable* injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008) (emphasis added). Here, Plaintiffs failed to make a "clear

showing" that merits success and immediate "irreparable" harm are "likely." Indeed, beyond the glaring venue defect, Plaintiffs cannot succeed on the merits because the funding and construction of the facility were State actions that NEPA does not reach, and federal immigration detention cannot be enjoined under 8 U.S.C. §§ 1226(e) and 1252(f) and the APA itself. Moreover, Plaintiffs only speculated about potential environmental harm years from now, not immediate and irreparable issues. Meanwhile, the harm to the State and federal governments is serious and imminent. The district court ignored these defects to exert expansive judicial control over a significant law-enforcement initiative.

In so doing, the district court ignored not only *Winter* but also the Supreme Court's recent warning about eschewing "the limits on judicial authority." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2561 (2025). The proceedings below have the hallmarks of such overreach. The venue issue was fully briefed on July 29. Rather than decide that threshold question of judicial power at the outset, the court deferred the question, entered a TRO on August 7, and held a four-day preliminary-injunction hearing. At that hearing, the district court repeatedly issued one-sided evidentiary rulings and invoked other cases, news stories, and social-

3

media posts not in evidence. *See infra* pp. 11-13 (documenting examples). In its order, the district court strayed well beyond arguments and facts presented by Plaintiffs, presumably because Plaintiffs' presentation alone was insufficient to support the injunction.

This Court should grant an administrative stay pending its decision on this motion, stay the preliminary injunction, and stay further proceedings in the district court until this appeal concludes.

## BACKGROUND

**1.** Rampant illegal immigration has created a national emergency.[1] Due to a federal non-enforcement policy beginning in 2021, over two million illegal aliens flooded through the southern border each year until early 2025.[2] That rush inundated Florida with "dangerous criminal aliens," Fed. Ex.7 ¶6; FDEM Ex.60 at 11-12, and overburdened detention facilities, Vol. IV 193:24-194:1-2, 195:12-15, 195:20-22, 202:20-25, 205:19-

---

[1] *Fact Sheet: President Donald J. Trump Declares a National Emergency at the Southern Border*, The White House (Jan. 22, 2025), https://tinyurl.com/yr3j33he.

[2] *Southwest Land Border Encounters*, U.S. Customs and Border Protection, https://tinyurl.com/mwnx26f8.

22.[3]  When the national crisis spiraled into a "major disaster" for the State, Governor DeSantis declared a state of emergency.  FDEM Ex.60 at 11-20.  The Governor authorized the Florida Division of Emergency Management (FDEM) to coordinate State and local agencies to abate the emergency.  *Id.*  That is not unusual:  FDEM is the statewide emergency-response agency and routinely coordinates with law enforcement to respond to emergencies.  *See* Fla. Stat. § 252.35.

**2.**    One key challenge in combatting the harms from illegal immigration is insufficient detention capacity.  Vol. IV 195:12-15, 195:20-22; FDEM Ex.30 ¶11; *see also Demore v. Kim*, 538 U.S. 510, 519 (2003) ("[O]ne of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings.").  To address that problem, Florida built a State-run detention facility at the Dade-Collier Training and Transition Airport (TNT).  FDEM Ex.60 ¶20; Fed. Ex.7 ¶17; FDEM Ex.30 ¶11.

---

[3] Transcripts are cited by volume: August 6 (Vol. I); August 7 (morning) (Vol. II); August 7 (afternoon) (Vol. III); August 12 (Vol. IV); and August 13 (Vol. V).

Before its conversion into a temporary detention facility, TNT was an active airport used for hundreds of training flights each week. FDEM Ex.60 ¶¶4, 11. Though Miami-Dade County owns TNT, the airport itself lies in Collier County, with only an unused sliver of grass extending into Miami-Dade County. *Id.* ¶¶6-10. This schematic shows the airport's layout:



*Id.* at 24. The thin blue line reflects the airport's preexisting fenced perimeter. *Id.* ¶7. The fence is roughly eight feet tall, has barbed wire, and encloses the airport. *Id.* The red line on the right represents the divide between Collier and Miami-Dade counties. *Id.* ¶8. The Collier

County side contains the airport's two-mile-long lighted runway, taxiway, administrative buildings with outdoor lighting, retention ponds, and service roads. *Id.* ¶¶8, 16.

Before its conversion, TNT was a busy airport that "routinely host[ed] over 150 aviation operations each day." FDEM Ex.62 ¶¶2-3. From January 1 through July 23, 2025, nearly 28,000 takeoffs and landings, involving aircraft of all sizes—including jets and military helicopters—occurred at TNT. FDEM Ex.60 ¶¶11-12 & pp.34-36; FDEM Ex.63 ¶2.

On June 23, 2025, FDEM exercised its State-law authority to commandeer the TNT airport to build a temporary detention facility. FDEM Ex.60 at 22. The red shading below reflects the commandeered area:



DADE-COLLIER TRANSITION AIRPORT
54575 TAMIAMI TRL E, OCHOPEE, FL

*Id.* ¶9, p.32.   Roughly 98% of the commandeered area lies in Collier
County, including all the detention facility's buildings, improvements,
and operations.   *Id.*

The detention facility "was entirely State constructed."   *Id.* ¶21;
Fed. Ex.7 ¶19; Pls.' Ex.4 ¶2.   FDEM oversaw its development, and it was
built by State vendors, paid with State dollars.   FDEM Ex.60 ¶21.   The
only federal involvement in construction was a routine ICE compliance
check, which occurs at all State and local facilities used to house
immigration detainees.   *Id.*   To date, the State has no legally enforceable
right to reimbursement from the federal government for funds spent on

8

the facility, and the federal government has not, in fact, reimbursed FDEM.  *Id.* ¶22; Pls.' Ex.4 ¶3; FDEM Ex.44 ¶4.

FDEM has been careful to protect the environment in constructing and operating the detention facility.  It "paved exclusively over land that was previously filled and leveled" as part of the original airport development; erected protective "silt fencing" to "block sediment runoff"; instituted a "rigorous waste-management policy"; and commissioned a wildlife study that identified no "meaningful impacts" on native species.  FDEM Ex.60 ¶¶18-19.  FDEM also ensured that all the facility's infrastructure was temporary and removable.  *Id.* ¶17.

FDEM coordinates management of the facility with State law-enforcement agencies that have agreements with the federal government under section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g).  *Id.* ¶23.  About four ICE officers are on-site to provide guidance and handle detainee transportation.  *Id.* ¶24; Fed. Ex.7 ¶19.  But those officers "do not control the site."  FDEM Ex.60 ¶24.  Rather, State officials "operate[] th[e] facility," *id.* ¶25, and exercise "complete discretion in deciding" whether to accept detainees, Fed. Ex.7 ¶18.

9

**3.**  On June 27, 2025, two advocacy groups sued FDEM and the federal government, alleging that they violated NEPA by failing to prepare an environmental-impact statement (EIS) before constructing the facility.  Doc. 1 ¶¶61-74.[4]  Plaintiffs sought a TRO and preliminary injunction barring Defendants from constructing the facility or using it for immigration detention.  Doc. 5 at 13-14.  After Judge Martinez's recusal, the case was reassigned to Judge Williams.  Doc. 37.  The court permitted the Miccosukee Tribe to intervene over FDEM's objection. Docs. 33, 58, 73.

Responding to Plaintiffs' injunction request, Defendants argued NEPA does not apply to the State-built and -operated detention facility because that statute governs only *federal* actions.  Docs. 16, 21.  After that response, Plaintiffs supplemented their motion several times, Docs. 25-27, 34, 38, 47, 49, and twice renewed their requests for injunctive relief, Docs. 31, 40.  Replying to one of those supplements—and before the district court conducted any substantive hearing—Defendants asserted that venue was improper in the Southern District because the

---

[4] Plaintiffs sued Miami-Dade County but did not seek preliminary relief against it.

facility lies in the Middle District and no relevant decisionmaking occurred in the Southern District.  Docs. 50, 65.

**4.**  The court initially denied Plaintiffs' request for a TRO and instead, at Plaintiffs' request, scheduled a one-day evidentiary hearing. Doc. 54.  Plaintiffs then disclosed thirteen witnesses and hundreds of exhibits, such that the hearing extended into a four-day affair, almost all of which was used by Plaintiffs to speculate about potential environmental harm far in the future.  Docs. 102-03, 119, 121.  Midway through that hearing, and before Defendants presented their case, Plaintiffs again moved for a TRO, which the court granted.  The TRO barred Defendants from "installing any additional industrial-style lighting … or doing any paving, filling, excavating, or fencing; or doing any other site expansion, including placing or erecting any additional buildings, tents, dormitories, or other residential or administrative facilities on the TNT site."  Doc. 104 at 12.

During the evidentiary hearing, the court:

- permitted Plaintiffs to introduce voluminous hearsay evidence through live witnesses (Vol I 324:2-23 (permitting witness to report what a receptionist on the citizen's line at the Governor's Office said in response to a question about the detention facility); *see also* Vol. I 96:9-15, 101:4-19, 324:18-20; Vol. II 27:4-6, 27:14-15; Vol. IV 13:22-14:1, 232:13-24), while

barring defendants from doing the same (Vol. IV 199:5-9 (disallowing Executive Director of Florida Highway Patrol from testifying about actions of his officers));

- interposed its policy views on immigration (Vol. IV 194:18-21 ("[T]here is a housing issue because nobody is being given bond under the INA.")); Vol. V 68:17-21 (opining that immigration detainees are "carpenters and agricultural workers");

- overruled nearly all Defendants' objections (Vol. I 29:9-20, 85:1-19, 88:7-24, 96:9-15, 101:4-19; Vol. II 68:23-69:3, 75:4-10; Vol. IV 33:5-7, 38:12-19, 48:17-22, 50:3-7, 117:22-118:4, 130:17-25, 146:18-21, 172:13-14, 219:12-15, 223:15-19; 232:13-24),

- but sustained most of Plaintiffs' (Vol. I 42:8-44:12; 65:21-69:11, 73:1-74:3, 75:2-21, 118:21-119:13, 182:9-10, 253:12-254:23, 324:15-23; Vol. IV 190:23-191:3, 191:22-23, 192:4-8, 199:5-9);

- interposed its own objections and "sustained" objections that Plaintiffs did not make (Vol. I 65:1-5, 72:18-24, 75:9-21, 120:14-21, 177:18-24);

- prohibited Defendants' attempt to cross-examine witnesses with impeachment exhibits if they were not already in evidence (Vol. I 42:8-44:12; 65:21-69:11, 73:1-74:3);

- sharply curtailed Defendants' attempt to introduce evidence on how the immigration crisis harmed Florida (Vol. IV 190:4-191:3, 191:11-23, 191:25-193:19, 199:5-200:4, 200:6-202:10);

- permitted Plaintiffs' lay witnesses to offer expert environmental-impact testimony (Vol. I 156:3-25);

- allowed Plaintiffs' experts to opine on scientific matters not raised in their expert reports (Vol. II 14:25-15:14, 22:12-18);

12

- let Plaintiffs submit an untimely hydrology expert report (Vol. I 13:1-12; Vol. II 68:22-69:8); and

- repeatedly referenced facts outside the record, including "litigation in Illinois" (Vol. III 48:12-17); an email from an ICE representative from a different case (Vol. V 63:8-13); and an interview from Florida's Attorney General that the court sua sponte raised after evidence had closed as a formal "invitation" to visit the facility (Vol. IV 244:2-246:2).

The parties delivered extensive closings. *See generally* Vol. V. Defendants also requested that the court stay any preliminary injunction pending appeal.

At 8:47 p.m. on August 21—the last day of the TRO period—the court entered a preliminary injunction requiring Defendants to (i) immediately cease bringing new detainees to the facility, (ii) immediately cease new construction, and (iii) remove all new lighting, fencing, and utilities within sixty days—effectively shuttering the facility. Doc. 131 80-81. The court did not rule on the stay request, so on August 23 FDEM and the federal government renewed that motion with declarations explaining the immediate and irreparable harm the injunction will impose. Docs. 137, 138. Defendants requested a ruling by 5 p.m. on August 25. Because the district court did not rule by August 25, and because waiting additional time would be impracticable given the

13

immediate harm the district court's injunction is causing, FDEM now seeks a stay from this Court. *See* Fed. R. App. P. 8.

## ARGUMENT

## I. DEFENDANTS ARE LIKELY TO SUCCEED IN OVERTURNING THE PRELIMINARY INJUNCTION

A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Here, Plaintiffs did not come close to justifying this extraordinary and drastic interruption of the government's response to a State and federal law-enforcement emergency.

### A. The Southern District of Florida Is an Improper Venue

Under 28 U.S.C. § 1391(b), venue is proper only in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." The "relevant … acts and omissions" in that analysis are those with "a close nexus to the wrong" alleged. *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003).

The wrong alleged here, as the district court recognized, is that Defendants violated NEPA by building the detention facility without conducting an EIS. Doc. 131 at 50-51. That targeted claim has an equally

14

targeted universe of relevant acts or omissions. *See Friends of Earth v. Haaland*, 2022 WL 185196, at *2-5 (D.D.C. Jan. 20, 2022). The relevant acts are the facility's construction, operation, and decisionmaking related to those acts. *Id.* at *3 ("In cases brought under the APA, courts generally focus on where the decisionmaking process occurred to determine where the claims arose."); *Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009) (collecting cases). And the "relevant omission [i]s the lack of a decision to conduct" an EIS. *Friends of Earth*, 2022 WL 185196, at *4.

None of that occurred in the Southern District. All decisions governing the facility's construction and lack of an EIS were made by government leaders in Tallahassee (or on Plaintiffs' theory, Washington, D.C.). FDEM Ex.31 ¶4.[5] All the detention facility's operations and infrastructure lie in Collier County, which is in the Middle District. *Garcia v. Guthrie*, No. 25-cv-23136 (S.D. Fla. July 16, 2025), Doc. 5 at 1. And all decisions related to those operations are made on-site in Collier

---

[5] The district court labeled this evidence "conclusory." Doc. 131 at 40. But it was grounded in an FDEM supervisor's extensive knowledge. FDEM Ex.60 ¶2. And besides, *Plaintiffs* must establish venue. *See Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988). So, any ambiguity only hinders Plaintiffs' venue claim.

or by FDEM leadership in Tallahassee. FDEM Exs. 31 ¶4, 60 ¶10. For that reason, two Judges in the Southern District have held that it is an improper venue for facility-related claims. *See C.M. v. Noem*, 2025 WL 2400953, at \*20-23 (S.D. Fla. Aug. 18, 2025); *Garcia*, Doc. 5 at 1.

To nonetheless find venue, and create an untenable intra-district split, the district court erred multiple times over.

**1.** The court concluded that raising venue in a supplemental response to a TRO motion, and before any adjudication, "is sufficient for a finding of waiver" and "to foreclose venue as an issue" under Rule 12. Doc. 131 at 22-24. The court, however, appears not to have relied on this finding because "the Court addresse[d] the merits of all Defendants' venue challenges, as both Parties requested." *Id.* at 24. Even so, the conclusion is wrong.

First, at the first status conference in this case (the parties' first court appearance), the court accepted all parties' supplemental filings related to the original TRO motion. Doc. 65-1 at 7; Doc. 73. The venue argument thus merged into FDEM's initial TRO response, so there could be no waiver. *E.g.*, *Seal v. Riverside Fed. Sav. Bank*, 825 F. Supp. 686, 692 n.10 (E.D. Pa. 1993) (argument raised in supplement accepted before

16

court resolved motion was deemed "part of the original motion" and thus not waived).

Second, even if FDEM had omitted venue in its initial TRO response, its venue objection would not have been waived. By rule, waiver occurs only if venue is omitted from either a "responsive pleading" or a Rule 12 motion. Fed. R. Civ. P. 12(h)(1)(B)(i)-(ii). A brief in opposition to an emergency TRO motion is neither. Fed. R. Civ. P. 7(a). In fact, FDEM's response to the complaint was not even due when the court issued the preliminary injunction.

Third, the district court's contrary view conflicts with the Rule's text and is in tension with this Court's precedent. In the analogous arbitration context, the "waiver doctrine is typically implicated when parties have 'invoked the litigation machinery' before reversing course and claiming that arbitration was the proper avenue all along." *Payne v. Savannah Coll. of Art & Design, Inc.*, 81 F.4th 1187, 1201 (11th Cir. 2023). Under that test, there was no waiver. FDEM did not invoke litigation in the Southern District. On the contrary, FDEM's limited action before raising venue was a defensive response to Plaintiffs' request for an *immediate* TRO. *See Johnson v. Masselli*, 2008 WL 111057, at *3

(N.D. Ind. 2008) (no waiver when defendant failed to raise venue in TRO response). FDEM raised its venue defense at an "early stage," permitting Plaintiffs and the court to "manage the litigation" appropriately. *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018). That is not waiver. *See Lithia Ramsey-T, LLC v. City Line Auto Sales, LLC*, 2023 WL 1883355, at *5 (D.N.J. Feb. 9, 2023) (defendant's conduct in fast-moving injunction proceedings did not establish waiver); *Pickett v. City of Houston*, 2009 WL 1158842, at *2 (S.D. Tex. Apr. 29, 2009) (same).[6]

**2.** On the merits, the court also erred.

**a.** The court grounded its venue holding in a series of acts and omissions that Plaintiffs never raised. *Compare* Doc. 131 at 30 (Plaintiffs' venue arguments), *with* 34-37 (raising new venue arguments).

---

[6] The district court's contrary citations miss the mark. In *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Industry Fund*, the defendant raised venue months after the complaint was filed and after stipulating to pre-hearing discovery. 967 F.2d 688, 692-93 (1st Cir. 1992). And in *Bautista-Perez v. Holder*, venue was raised after the court ruled on a preliminary-injunction motion. 681 F. Supp. 2d 1083, 1091-92 (N.D. Cal. 2009). By contrast, FDEM raised venue before its response to the complaint was due, before any hearing, a month before the preliminary injunction issued, and before any discovery was ordered.

That violates the "party presentation principle." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Courts may not "sally forth each day looking for" new arguments to make. *Id.* at 376. Though "a modest initiating role for a court is appropriate," the district court's wholesale "takeover" of Plaintiffs' venue defense "scarcely fits that bill." *Id.* at 375-76, 379.

**b.** In any case, none of the acts or omissions that the court identified bears a "close nexus" to Plaintiffs' NEPA claim. Doc. 131 at 33. Plaintiffs narrowly assert that Defendants violated NEPA by building the detention facility without conducting an EIS. Doc. 1 ¶73. The acts relevant to that claim include the facility's construction and operation and related "decisionmaking." *Friends of Earth*, 2022 WL 185196, at *3. And the "relevant omission" is the "lack of a decision to conduct" an EIS. *Id.* at *4. The conduct the district court identified fits none of those categories. *See* Doc. 131 at 34-37.

Still other problems plague the district court's venue theories. It held, for instance, that ICE's Miami-based efforts to supervise detention at the facility were closely related to the claim. *Id.* at 35-36. But Plaintiffs sued *before* detention operations began at the facility, Doc. 1,

19

and "venue must be determined based on the facts at the time of filing," *Flowers Indus., Inc. v. FTC*, 835 F.2d 775, 776 n.1 (11th Cir. 1987). Nor is ICE's Miami-based general supervision closely tied to Plaintiffs' NEPA claim, which focuses on the facility itself and activities "at the facility." *C.M.*, 2025 WL 2400953, at *20. Indeed, the decision to supervise, such as it is, would not require a NEPA analysis.

The court also wrongly held that transporting illegal aliens from Miami-based facilities to the TNT site is a relevant act. Doc. 131 at 36. That, too, occurred after the complaint. *See Flowers*, 835 F.2d at 776 n.1. And regardless, an illegal alien's location before reaching the facility is irrelevant to the administrative and environmental wrongs asserted in Plaintiffs' NEPA count. Otherwise, venue would be proper *wherever* a detainee was previously apprehended or held. Such a theory, if accepted, would eviscerate any meaning for "close nexus."

Letters FDEM sent to Miami-Dade to commandeer TNT do not establish venue, either. Doc. 131 at 35. Those letters—and more importantly, the decisions conveyed in them—were issued in Tallahassee. *E.g.*, FDEM Ex. 60 at 22. The location where Miami-Dade officials may have opened the letters is irrelevant to the NEPA claim. *See*

20

*Jenkins Brick*, 321 F.3d at 1371-72 (Venue "focus[es] on relevant activities of *the defendant*[.]").

Even less persuasive are the district court's selected *omissions*. It claimed that FDEM's "failure" to consult with Miami-Dade and the Tribe about the facility's potential impacts were relevant omissions in Miami-Dade. Doc. 131 at 35-38. But that omission did not "give rise" to the decision not to conduct an EIS, *Jenkins Brick*, 321 F.3d at 1371; it was, at best, the *result of* the decision not to conduct an EIS, *see Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 295 (3d Cir. 1994); *Friends of Earth*, 2022 WL 185196, at *4. Nor would those discussions have made up a "substantial part" of the EIS, 28 U.S.C. § 1391(b), which would have considered many other data points, *see Friends of Earth*, 2022 WL 185196, at *4. Were that not so, venue in a NEPA case would, contrary to the law, lie anywhere the government might have "conduct[ed] … [EIS-related] research." *Id.*

Last, even if the district court's identified acts and omissions were relevant, they are "insubstantial" compared to the core acts and omissions driving Plaintiffs' NEPA claim (i.e., the facility's on-site construction and operation and related decisionmaking and the decision

21

not to conduct an EIS). *Lamont v. Haig*, 590 F.2d 1124, 1134 n.62 (D.C. Cir. 1978). They thus do not establish a "substantial nexus" to the Southern District. *Friends of Earth*, 2022 WL 185196, at *4.

**c.** Finally, the district court wrongly relied on harms the facility will allegedly inflict in the Southern District at some undetermined point in the future. Doc. 131 at 32-33, 38-40. Venue turns on where the defendants' relevant acts or omissions occurred, not where plaintiffs may feel some down-the-line "impact." *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 186 (1979); *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1048 (S.D. Tex. 2000).

This Court affirmed this position in *Jenkins Brick*, which held that, in assessing venue, "Congress … meant to require courts to focus on relevant activities of the defendant, not of the plaintiff." 321 F.3d at 1371-72. This Court expressly "approve[d] of," *id.*, the Eighth Circuit's holding in *Woodke v. Dahm*, 70 F.3d 983 (8th Cir. 1995). There, the court rejected the notion that the owner of an infringed trademark could establish venue "in the district of his residency because that [wa]s" where he would feel the infringement's "ultimate effect." 70 F.3d at 985. The

court thus held that a wrong's "effect" is not a relevant "action or omission" when assessing venue.  *Id.*

So too here.  In a NEPA challenge, venue is proper where the relevant action takes place or where the decisions are made, not wherever an environmental effect is felt.  *Friends of Earth*, 2022 WL 185196, at *5.

## B.    NEPA Does Not Apply to Florida's Detention Facility

Plaintiffs are unlikely to prevail on their NEPA claim.  "[P]laintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act."  *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006).  To sue "under the APA," a plaintiff "must show that there has been a final agency action."  *Id.*  And because the APA regulates only the federal government, the final action must be federal.  *E.g.*, *Sierra Club v. FERC*, 2025 WL 2178519, at *10 (D.C. Cir. Aug. 1, 2025).  A NEPA claim thus turns on identifying final federal decisionmaking.[7]

---

[7] Though the district court recognized that "state agencies are not subject to the APA," it relied on this Court's precedent to conclude that an APA claim sometimes can be brought against a State.  Doc. 131 at 80 n.39.  FDEM reserves the right to challenge that precedent.

23

## 1. *The District Court Misapplied the Final-Agency Action Test*

"In the NEPA context, the 'final agency action' required by the APA must also be a 'major federal action' under NEPA." *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007). So, to plead a NEPA claim, Plaintiffs must allege some final federal agency action that triggers NEPA. *Big Bend Conservation All. v. FERC*, 896 F.3d 418, 424 (D.C. Cir. 2018). The NEPA analysis then asks whether *that* final agency action—not some other related action—violated NEPA. *E.g.*, *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (asking whether planned rail expansion, not rail system generally, required NEPA analysis).

The district court did not clearly identify the final agency action that is the subject of its order. Instead, it appears to have relied on a sort of gestalt feeling—based on the anti-segmentation rule—that somehow it must be able to review this facility. Doc. 131 at 55 n.26. But such an intuition is not law. Under the anti-segmentation rule, "an agency cannot segment NEPA review of projects … *when the entire project at issue is subject to federal review*." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 50 (D.C. Cir. 2015) (emphasis added).

24

"[S]egmentation," in other words, "refers only to the situation that arises when an agency arbitrarily separates related *federal* actions from one another." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021). The anti-segmentation principle "does not require the aggregation of federal and non-federal actions." *Big Bend Conservation*, 896 F.3d at 424; *see also Missouri ex rel. Bailey v. Dep't of Interior*, 73 F.4th 570, 580 (8th Cir. 2023) (same).

It was thus incumbent on Plaintiffs and the district court to identify a specific final federal agency action that was subject to NEPA. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (final agency action must be "circumscribed [and] discrete"). Seemingly recognizing this requirement, the order alternatively and inconsistently suggests the final federal action was (1) the "decision to refrain from issuing an EIS," Doc. 131 at 50, (2) the "decision to construct and operate the detention camp," *id.* at 51, (3) construction alone, *id.* at 50, or perhaps (4) federal funding, *id.* at 62-64. None of these formulations work.

## 2.    *Failure to Issue an EIS Is Not Final Agency Action*

When an agency considers a major federal project and issues a reasoned decision declining to issue an EIS, that may be final agency

action.  Doc. 131 at 51.  But, as the district court recognized, when there is "no 'NEPA-triggering' major federal action," then there is no "decision" not to issue an EIS—the agency's views were never implicated in the first place.  *Id.* at 51 n.24.  Thus, the "decision" not to issue an EIS cannot underlie a NEPA claim unless some other final agency action is on the table.  *E.g.*, *Coal. for Underground Expansion*, 333 F.3d at 196 n.6.  Said differently, the decision to issue an EIS must be paired with some other major federal action to be final agency action.  Here, there was no other major federal action.

### 3.    *There Has Been No Federal Funding*

Plaintiffs also cannot ground their claim in federal funding because there has been none.  FDEM Exs. 30 ¶5, 44 ¶4; Pls.' Ex.4 ¶¶2-3.  Though the federal government may one day reimburse Florida, "[t]he possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely."  *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1573 (11th Cir. 1994).

The district court nonetheless relied on yet-to-be-issued funding, reasoning that the federal government had decided, at some unspecified point, to issue funds.  Doc. 131 at 62-64.  That view cannot be squared

with precedent. Even "likely" funding does not federalize a project. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573. The district court dismissed this Court's caselaw by concluding that funds were not just likely, but (based largely on a series of press conferences and social-media posts) already "earmarked." Doc. 131 at 64. But even if true, saying funding is "earmarked" is just another way to say it is "likely." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573. That is why even a "congressional appropriation … of funds for a particular project does not" trigger NEPA "until the [agency] has reviewed a grant application and decided to disburse the funds." *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007).

The district court's reasoning also makes a hash of the APA. To bring an APA claim, Plaintiffs must point to *final* agency action, not an intended or promised one. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Even if federal funding alone could trigger NEPA,[8] there has been no violation because the federal government could conduct a NEPA analysis before distributing the funds. *Rattlesnake Coal.*, 509 F.3d at 1104. The

---

[8] It could not. *See Ctr. for Biological Diversity v. U.S. Dept. of Hous. & Urban Dev.*, 541 F. Supp. 2d 1091, 1098 (D. Ariz. 2008) ("[F]unding alone is not enough[.]").

district court's contrary conclusion is the type of judicial guesswork the final-agency-action requirement is meant to avoid.

### 4. *There Has Been No Federal Construction*

Plaintiffs also cannot ground final agency action in the detention facility's construction. There is no evidence that the federal government had "actual power to control" construction. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572. To the contrary, the evidence shows that a *State* agency commandeered the site from a *State* municipality using *State* emergency powers. FDEM Ex.7. The *State* took control of the site. FDEM Ex.60 ¶21. The *State* paid and directed the construction contractors. FDEM Ex.60 ¶22; Pls.' Exs. 107-126. And the *State* managed all construction. FDEM Exs. 30 ¶5, 60 ¶21.

Ignoring all this, the district court relied on "evidence" that the facility "was constructed at the request of the federal government." Doc. 131 at 64. As a factual matter, DHS inquired whether Florida would build *a* facility, but Florida decided to build *this* facility. Vol. I 108:22-109:3. As a legal matter, a federal request for voluntary action by a non-federal actor is not final federal agency action, which must either determine rights or obligations or give rise to legal consequences.

*Bennett*, 520 U.S. at 177-78. A voluntary request does neither; it simply asks a question. *E.g.*, *Harbert v. United States*, 206 F. App'x 903, 908 (11th Cir. 2006); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003). Nor does a voluntary request trigger NEPA. The "impetus" for a project is irrelevant under NEPA; what matters is whether the federal government acts, not whether a project was its idea. *Nat'l Org. for the Reform of Marijuana L. v. DEA*, 545 F. Supp. 981, 984-85 (D.D.C. 1982).

It adds nothing that Florida's construction meets ICE's minimum requirements. Doc. 131 at 56. "The adoption of certain federal standards … cannot transform a state … project into a federal one." *Atl. Coal. on Transp. Crisis, Inc. v. Atl. Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979). When a State chooses to follow federal standards to advance its own purposes, it has not surrendered its decisionmaking to federal authorities. If it were otherwise, thousands of state projects that meet federal standards would be transformed into federal actions requiring NEPA analyses.

ICE's inspections do not change that result. Doc. 131 at 7. ICE inspects to ensure the facility satisfies minimum detention standards.

29

FDEM Ex.60 ¶21.  But those mine-run "compliance inspections" do not trigger NEPA.  *Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (9th Cir. 1988).

Lastly, nothing about "immigration enforcement activities" at the facility reaches back in time to make the construction that preceded immigration enforcement a federal project.  Doc. 131 at 55.  No immigration law permits the federal government to direct states to build immigration detention facilities or to oversee such construction.  And because DHS had "no authority to choose an alternative site to" TNT "or to force" Florida "to build" a detention center in another location, there were no construction-related decisions for the federal government to consider under NEPA. *Protect Our Parks, Inc.*, 2021 WL 3566600, at *13.

A hypothetical proves the point.  If, next week, a major hurricane forms and Florida converts the TNT site to an emergency hurricane logistics hub (as FDEM has considered, FDEM Ex.60 ¶20), then it could do so (including paving, lighting, tenting, etc.) without complying with NEPA.  It makes little sense to say NEPA applies to that same conduct if the State chooses to pursue a different sovereign purpose, such as

permitting its facility to be used temporarily for immigration detention. NEPA, said differently, regulates federal *decisions*, not federal *purposes*.

### 5. *Detention Cannot Be the Basis for Merits Success*

Plaintiffs' and the district court's last option was to say the decision to detain is the final federal agency action that triggers NEPA. This, too, fails.

**a.** If the focus is on the decision *where* to detain—i.e., specifically at the TNT facility—that is Florida's choice. *See* FDEM Ex.30 ¶6. Florida may decline (and indeed has declined) to accept any illegal alien for detention at the facility. *See* FDEM Ex.60 ¶25; Fed. Ex.7 ¶18. Florida thus has "final decision-making power" over this issue. *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 961 (9th Cir. 2002). And because Florida maintains its "state law authority to make the decisions concerning the project," "the federal government does not possess the requisite control to federalize [the] project." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573.

The fact that Florida's ability to detain flows from a 287(g) agreement does not change this result. Doc. 131 at 55. The APA applies only to federal *agencies*, not to all entities that exercise delegated federal

power.  5 U.S.C. § 706.  For example, although Amtrak exercises federal power, it is not subject to the APA.  *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995).  Likewise, thousands of state and local governments also administer federal programs but are not subject to the APA.  *E.g.*, *Ritter v. Cecil Cnty. Office of Hous. & Cmty. Dev.*, 33 F.3d 323, 327 (4th Cir. 1994); *Day v. Shalala*, 23 F.3d 1052, 1064 (6th Cir. 1994).  Florida's voluntary participation in a 287(g) program therefore does not trigger the APA.

**b.**  The district court suggested that major federal action is present because Florida is carrying out ICE's general detention decisions as a "functionary" of ICE.  Doc. 131 at 56-59.  Even if that were so, Plaintiffs could not prevail because detention decisions cannot support a NEPA claim.

First, federal courts lack authority to review detention decisions under 8 U.S.C. § 1226(e)—an INA provision that the district court ignored, despite FDEM repeatedly raising it.  Vol. III 19:19-20:17; Vol. V 109:19-111:9.  Section 1226(a) grants DHS the discretion to detain aliens

pending a removal decision.[9]  Section 1226(e), in turn, states that the "discretionary judgment regarding the application of this section shall not be subject to review," and "[n]o court may set aside any action or decision by [DHS] under this section regarding the detention of any alien."  Section 1226(e) thus "precludes" challenges to "a decision … regarding [an alien's] detention or release." *Jennings v. Rodriguez*, 583 U.S. 281, 295 (2018).

Under section 1226(e), Plaintiffs cannot succeed if the final agency action they attack is ICE's decision to detain the aliens who are housed in the TNT facility under section 1226.  No Court has authority to "review" those decisions, 8 U.S.C. § 1226(e), and thus no court can say DHS "exercised its statutory authority in an unreasonable fashion" because it acted without first performing an EIS, *Nielsen v. Preap*, 586 U.S. 392, 401 (2019).

The district court trampled that limitation.  Although it nodded to the idea that courts cannot decide "where or how the government must house immigration detainees," Doc. 131 at 18, it nonetheless prohibited

---

[9] Although the statute refers to the Attorney General, Congress reallocated the power to DHS under the Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002).

DHS from housing "additional persons [at] the TNT site," *id.* at 80. That is the precise type of judicial takeover that section 1226(e) prohibits.

Second, 8 U.S.C. § 1252(f) bars Plaintiffs' claim. Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." Section 1252(f) thus "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Those specified provisions include two powers relevant here: the authority for detention in section 1226 and the authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal" in section 1231(g)(1).

Section 1252(f) forecloses Plaintiffs' claim because they ask to "[e]njoin any … use of the TNT Site for purposes of immigration detention." Doc. 1 at 26. Plaintiffs thus want an injunction that requires the federal government "to refrain from" detaining aliens at a facility that the government believes is appropriate for detention. *Aleman Gonzalez*,

596 U.S. at 550. That would "interfere with the Government's efforts to operate" sections 1226 and 1231(g) by narrowing its authority. *Id.* The preliminary injunction proves the point. It strips the federal government of the power to deem the TNT facility an "appropriate place[] of detention" and forces it to use other facilities or release detainees. *See* Doc. 138-1 ¶17.

The district court concluded section 1252(f) is irrelevant because "it prohibits" injunctions only "against certain provisions of the INA" and Plaintiffs ask for "NEPA compliance." Doc. 131 at 20-21. But section 1252(f) does not "depend on the nature of the claim in question," *Aleman Gonzalez*, 596 U.S. at 553, and bars injunctive relief if it will "restrain the operation" of the INA "[r]egardless of the nature of the action," 8 U.S.C. § 1252(f). And contra the district court's characterizations, Doc. 131 at 20-21, the preliminary injunction "restrain[s]" DHS's ability to enforce sections 1226 and 1231 as DHS deems appropriate. To be sure, the district court believes DHS can enforce the immigration laws despite the injunction. *Id.* at 77. But that is the kind of judicial second-guessing the statute forbids: Section 1252(f) applies when an injunction requires

officials "to refrain from actions that (… in the Government's view) are allowed by § 1231." *Aleman Gonzalez*, 596 U.S. at 551.

Third, detention decisions cannot ground a NEPA claim because they are committed to agency discretion by law. 5 U.S.C. § 701; *United States v. Texas*, 599 U.S. 670, 679 (2023) (immigration enforcement committed to executive discretion); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) ("Section 1231(g)(1) gives … broad discretion to the Secretary to choose the place of detention for deportable aliens."). This discretionary power cannot be superintended by the courts. *E.g.*, *Sinclair v. Att'y Gen.*, 198 F. App'x 218, 222 (3d Cir. 2006).

The district court did not dispute that point. Doc. 131 at 59. It reasoned, however, that the relevant decision was the "decision not to comply with NEPA." *Id*. But a NEPA claim must point to final agency action. And the "decision" not to conduct a NEPA analysis, as the district court elsewhere recognized, is not final agency action unless it is paired with major federal action. *Id*. at 51 n.24. The district court's reasoning thus collapses on itself: some agency action must be the "major federal action," and detention cannot be it because it is committed to agency discretion.

Fourth, any decision related to detention is definitionally not subject to NEPA. NEPA applies only to "major federal actions," 42 U.S.C. § 4332(C), but specifically excluded is "bringing ... administrative civil or criminal enforcement actions," *id.* § 4336e(10)(B)(v). Thus, decisions to "enforce" the "laws"—like the immigration enforcement here—never require NEPA review. *See Nw. Ctr. for Alternatives to Pesticides v. DHS*, 552 F. Supp. 3d 1078, 1091 (D. Or. 2021).

The district court rejected that limitation, reasoning that "[t]he construction and operation of an immigration detention facility is plainly not an enforcement action." Doc. 131 at 59. That reasoning highlights the district court's irreconcilable rationales. When it came to defining the federal decision for APA purposes, the district court relied on "immigration enforcement activities." *Id.* at 55. But to avoid NEPA's limitation, the district court shifted away from that focus. It cannot be both: if detention is the federal decision, then there is no major federal action. If detention is not the federal decision, then detention plays no role in the analysis.

### C.    Plaintiffs Are Unlikely to Obtain Injunctive Relief

NEPA errors "may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1514 (2025).  In deciding whether to vacate, courts balance "the disruptive consequences of vacatur" and "the seriousness of the order's deficiencies." *City of Port Isabel v. FERC*, 130 F.4th 1034, 1036 (D.C. Cir. 2025).

Vacatur would be "disruptive" because the TNT site is "operational." *Food & Water Watch v. FERC*, 28 F.4th 277, 292 (D.C. Cir. 2022).  Halting the project forces Florida and DHS to release detainees or send them to overcrowded facilities.  Doc. 138-1 ¶¶12, 17.  The district court did not disagree: it based its decision on the second factor.  *See* Doc. 131 at 66-67.

But that factor supports remand.  Any deficiency in DHS's decisionmaking was minor because DHS had good reason to believe that NEPA did not apply given the minimal federal involvement here.  Nor is there any reason to think that additional NEPA process would change the outcome.  *Seven Cnty.*, 145 S. Ct. at 1514.  The project has the support

of the President and the DHS Secretary, promotes a critical federal policy, and risks minimal environmental impact.  It blinks reality to think that DHS would forgo a "blueprint for detention facilities" that detains the "worst of the worst," Pls.' Ex.44 at 5, if only some national security specialist spent more time poring over panther telemetry.

### D.    Plaintiffs Did Not Establish Irreparable Harm

Plaintiffs failed to establish irreparable harm.  *Siegel*, 234 F.3d at 1176.  Irreparable harm must be "neither remote nor speculative, but actual and imminent."  *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).  Establishing irreparable harm requires a showing that "irreparable injury is *likely*"—a mere "possibility" of harm is not enough for the extraordinary remedy of injunctive relief.  *Winter*, 555 U.S. at 22.

Plaintiffs presented only speculation.  Consider Plaintiffs' so-called experts:

- Kautz testified that the combination of habitat loss and global warming might harm panther populations *by 2070*.  But he did not study the relative impact this facility would have on that baseline loss.  Vol. I 286:17-20.  And he did not study whether *this* project would result in additional panther take.  *Id.* 287:10-12.

- McVoy testified that the Everglades is an interconnected ecosystem that could be harmed if nutrient-dense water

enters it. But he conceded that FDEM's construction was occurring on developed land, Vol. II 52:15-18, and he did not examine whether discharge from this site would produce nutrient-dense water, *id.* 58:12-16.

- Reio testified that paving would cause more runoff in a 100-year, 72-hour storm. And he opined that runoff might increase polycyclic aromatic hydrocarbons (PAH) levels. But he neither examined pre-existing PAH levels, *id.* 88:17-25, nor compared PAH production between airport and detention-facility uses, *id.* 89:5-14.

The district court nonetheless excused that lackluster showing, reasoning that "Plaintiffs are not required to prove harms of a particular probability or quantity." Doc. 131 at 69; *id.* at 68 ("possible contaminant"); *id.* at 69 ("could be"); *id.* at 71 ("may well"). That is precisely the view *Winter* rejected. *See* 555 U.S. at 22 ("[T]he Ninth Circuit's 'possibility' standard is too lenient."). Even in a NEPA case (like *Winter*), "plaintiffs seeking preliminary relief" must make a "clear showing" that "irreparable injury is *likely*." *Id.* By relying on speculative and unlikely injuries, the district court erred.

Plaintiffs' harm analysis also started from the wrong place. None of the experts had an ecological baseline because they did not consider the preexisting effects of an active airport with 28,000 flights in the last six months. Vol. I 253:8-21; Vol. II 65:1-13, 88:12-89:14. As a result, none of the experts could opine on the expected effect of the facility. *E.g.*, *City*

*of Austin v. Kinder Morgan Tex. Pipeline, LLC*, 447 F. Supp. 3d 558, 569 (W.D. Tex. 2020) (determining environmental effects requires "analysis of the environmental baseline").

But even if they had opined from a true baseline, Plaintiffs' experts offered such long-tailed harms that nothing they pointed to was "imminent." *Siegel*, 234 F.3d at 1176. Even the district court recognized as much: "the harms Plaintiffs fear take time to accrue." Doc. 131 at 70 n.31. But that is just another way of saying that Plaintiffs' harms were neither "imminent" nor "*likely* in the absence" of a pre-judgment injunction. *Winter*, 555 U.S. at 22.

Plaintiffs' fact witnesses fared no better. They testified that they would like to recreate in the Big Cypress National Preserve. But the Preserve is 729,000 acres. And Plaintiffs' fact witnesses did not testify that *this* site is where they would like to recreate. Indeed, no one could credibly claim that they want to enjoy nature at a busy, noisy airport, surrounded by barbed wire.

### E.    The Balance of Equities Did Not Support an Injunction

In considering a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of

41

the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

*Winter* is instructive. There, under NEPA, a district court required "the Navy to shut down its MFA sonar" in the presence of marine mammals. 555 U.S. at 27. The Supreme Court reversed, explaining that the balance was "strongly in favor" of the government because "harm to an unknown number of the marine mammals" could not outweigh the national security interests in "the safety of the fleet." *Id.* at 26. Here, likewise, the speculative and far-off environmental concerns raised by Plaintiffs from the conversion of a busy airport to a temporary detention facility are outweighed by the very real and immediate need for additional, effective detention space to stem a national and state emergency. "The problems posed … by illegal immigration" from "crime" and "safety risks" "must not be underestimated." *Arizona*, 567 U.S. at 398. Thus, the "public interest demands effective measures to prevent

the illegal entry of aliens." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

Here, both the federal and State governments have declared an unprecedented illegal immigration emergency. As Governor DeSantis explained, "unauthorized alien interdictions in and around Florida have risen to alarming levels." FDEM Ex.7 at 1; *see* Doc. 137-1 ¶3. President Trump added that "[m]any of these aliens unlawfully within the United States present significant threats to national security and public safety." Exec. Order No. 14159, Protecting the American People Against Invasion (Jan. 20, 2025). "Enforcing our Nation's immigration laws is" thus "critically important." *Id.*

Enjoining Florida's detention facility imperils those immigration-enforcement efforts. Florida's facility "operationally benefits ICE as it … maximize[s] detention capacity … [and] serve[s] to decompress other detention facilities." FDEM Ex.30 ¶11. Put differently, immigration enforcement currently faces a bottleneck. Though the country has an unprecedented number of unlawfully present aliens, effective enforcement is cabined by scarce detention capacity. Vol. IV 193:24-194:2, 195:12-15, 195:20-22, 202:20-25; Doc. 137-1 ¶5; Doc. 138-1. That

is why the federal government asked if Florida could provide additional

State capacity.  Enjoining the creation or operation of that additional bed

space forces federal and state officials to either release aliens or hold

them in overcrowded facilities.  Doc. 137-1 ¶6; Doc. 138-1 ¶13.  Both

options risk immediate public safety harm.  Vol. IV 191:7-19, 203:1-3.

## II.  THE EQUITIES SUPPORT A STAY

A stay is necessary to avoid irreparable harm to the State.  For one,

the injunction irreparably harms the State because it stops Florida's

executive branch from taking action that Florida law empowers it to take.

*CASA*, 145 S. Ct. at 2562; *Maryland v. King*, 567 U.S. 1301, 1303 (2012).

For another, the injunction risks harm to the public, law enforcement,

and detainees.  By requiring the State to cease taking new detainees and

ultimately shutter the facility, the injunction will lead to either harmful

overcrowding, *Rosa v. McAleenan*, 583 F. Supp. 3d 850, 864 (S.D. Tex.

2019), or to the release of additional illegal aliens, which risks public

safety, *see* Doc. 137-1 ¶¶4-5; Doc. 138-1 ¶17.  Finally, the injunction forces

Florida to incur irrecoverable costs.  *See* Doc. 137-2 ¶¶3-4; *Nat'l Insts. of*

*Health v. Am. Pub. Health Ass'n*, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025).

## CONCLUSION

For these reasons, FDEM respectfully requests that this Court:

(1)    grant an immediate administrative stay of the preliminary injunction until this motion is briefed and decided (because the district court immediately enjoined new detention at the facility);

(2)    stay enforcement of the preliminary injunction until this appeal is decided (because FDEM has met the stay factors);

(3)    stay further merits proceedings until this appeal is decided (because the district court lacks venue and further proceedings are improper);

(4)    expedite the response and reply deadlines for this motion and rule as soon as practicable; and

(5)    if the Court does not stay the preliminary injunction and merits proceedings, expedite briefing, argument, and decision of this appeal.

Dated: August 26, 2025

Respectfully submitted,

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa (FBN 110951)
  *Acting Solicitor General*
Nathan A. Forrester (FBN 1045107)
  *Chief Deputy Solicitor General*
Kevin A. Golembiewski (FBN 1002339)
  *Senior Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
  *Assistant Solicitor General*
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

s/ *Jesse Panuccio*
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
David Costello (FBN 1004952)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
jpanuccio@bsfllp.com

*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

## CERTIFICATE OF COMPLIANCE

1.   Given   the   urgency   of   this   proceeding,   FDEM   has contemporaneously filed a motion to enlarge the word count to 8,700 words.   Assuming that motion is granted, this document complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 8,653 words.

2.   This   document   complies   with   the   typeface   and   type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

s/ *Jesse Panuccio*
Jesse Panuccio

47

## CERTIFICATE OF SERVICE

I certify that on August 26, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

s/ *Jesse Panuccio*
Jesse Panuccio
