No. 25-12873

————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

————————————————

FRIENDS OF THE EVERGLADES and CENTER FOR BIOLOGICAL
DIVERSITY,
*Plaintiffs/Appellants,*

v.

KRISTI NOEM, et al.,
*Defendants/Appellees.*

————————————————

Appeal from the United States District Court for the Southern District of Florida
No. 1:25-cv-22896 (Hon. Katherine M. Williams)

————————————————

**TIME-SENSITIVE MOTION FOR STAY PENDING APPEAL**

————————————————

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

ROBERT STANDER
*Deputy Assistant Attorney General*

MARISSA A. PIROPATO
HAYLEY A. CARPENTER
ALLEN M. BRABENDER
*Attorneys*
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, DC 20044
(202) 532-3281
allen.brabender@usdoj.gov

*Friends of the Everglades v. Noem*, No. 25-12873

# CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel hereby certifies that the following is a complete list of all the known trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the case:

1. Ajizian, Christopher

2. Bennett, Elise Pautler

3. Boies Schiller Flexner LLP

4. Bonzon-Keenan, Geraldine

5. Brabender, Allen M.

6. Burkhardt, Dominique

7. Carpenter, Hayley A.

8. Center for Biological Diversity

9. Coe, Alisa

10. Coffey Burlington, P.L.

11. Costello, David

12. DeSousa, Jeffrey Paul

13. Earthjustice, Plaintiff

14. Ezray, Evan

15. Ficarelli, Dante

16. Forrester, Nathan A.

17. Friedman, Todd

18.    Friends of the Everglades, Inc.

19.    Galloni, Tania, Attorney

20.    Golembiewski, Kevin A.

21.    Gustafson, Adam R.F.

22.    Guthrie, Kevin

23.    Hiaasen, Scott

24.    Lyons, Todd

25.    Martinez, Hon. Jose E.

26.    Miami-Dade County

27.    Murray, David M.

28.    Noem, Kristi

29.    O'Byrne, Hayden P.

30.    Panuccio, Jesse

31.    Perez, Monica Rizo

32.    Piropato, Marissa

33.    Raurell, Carlos J.

34.    Quiñones, Jason A. Reding

35.    Sanchez, Hon. Eduardo I.

36.    Schenck, Robert S.

37.    Schwiep, Paul J.

38.    Singer, Frank

*Friends of the Everglades v. Noem*, No. 25-12873

39.    Stander, Robert

40.    The Miccosukee Tribe of Indians

41.    Todd R. Friedman P.A.

42.    Torres, Hon. Edwin G.

43.    Torstensen, Peter M.

44.    Totoiu, Jason Alexander

45.    Uthmeier, James

46.    Wahl, Christopher J.

47.    Williams, Hon. Kathleen M.

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ Allen M. Brabender
ALLEN M. BRABENDER

*Counsel for the Federal Defendants*

## TABLE OF CONTENTS

INTRODUCTION.................................................................................1

BACKGROUND ...............................................................................3

STANDARD OF REVIEW ...............................................................5

ARGUMENT ...................................................................................6

I.    The federal defendants are likely to succeed on appeal.....................6

    A.    Venue does not belong in the Southern District of Florida....................6

    B.    There is no reviewable final or major *federal* action at issue. ....................7

    C.    The district court's order violates the precedents of the Supreme Court and this Court. ............................................................12

    D.    Injunctive relief for the alleged NEPA violation is improper.......................................................................................14

    E.    Plaintiffs failed to prove a likelihood of irreparable harm. ....................15

II.    The equitable factors overwhelmingly favor a stay. .........................17

CONCLUSION...................................................................................21

**INTRODUCTION**

The State of Florida, on its own land and pursuant to its own sovereign authority, built and now operates a temporary detention center for illegal aliens on the site of an existing airport in Collier County. The district court entered a preliminary injunction ordering Florida and the United States to dismantle the facility within 60 days because the *federal* government allegedly failed to prepare an environmental report under the National Environmental Policy Act (NEPA). But NEPA does not apply to Florida, and Plaintiffs have identified no *federal* action, much less a "major federal action," that might trigger NEPA. Nor have Plaintiffs identified "final agency action" for purposes of a claim under the Administrative Procedure Act (APA).

Just months ago, the Supreme Court ordered a "course correction" to bring NEPA review "back in line with the statutory text and common sense." *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 145 S. Ct. 1497, 1514 (2025). "Congress did not design NEPA *for judges* to hamstring new infrastructure and construction projects." *Id.* Because NEPA is a "purely procedural" statute, courts must not vacate or enjoin agency action based on a mere NEPA deficiency without reason to believe the agency would have disapproved the project with more environmental review. *Id.* Here, such a conclusion does not pass muster: The district court did not and could not conclude that President Trump's administration would have decided not to construct this high-profile immigration-detention facility if only it had received further

1

briefing on the marginal effects of the facility's lights on the survival rate of the Florida panther in 2070.

Moreover, NEPA requires only that a federal agency analyze its own proposed action. *Seven County*, 145 S. Ct. at 1515. But here, no federal action requiring NEPA analysis has been undertaken. Even if this Court assumes that the relevant major federal action is a future decision to reimburse Florida for the facility's costs, that would not require the agency to consider the effects of building the facility because the construction was outside the agency's control—and happened in the past. *Id.* at 1515-18. It is therefore the paradigm of a project "separate in time." *Id.* at 1517.

In addition to the merits, the district court erred in finding irreparable harm and in balancing the equities. This site was already an active airport. Plaintiffs failed to establish that Florida's changes to the site are causing imminent irreparable injury and that any such injury outweighs Florida's interest in operating the facility and relieving overcrowding at other facilities.

At bottom, this case "is a testament to environmental review run amok." *Appalachian Voices v. FERC*, 139 F.4th 903, 919 (D.C. Cir. 2025) (Henderson, J., concurring). This Court should reject Plaintiffs' invitation to second-guess state government, conflate it with federal agencies, and enjoin this important facility under a purely procedure statute. The Court should grant a motion to stay.

## BACKGROUND

The Florida Division of Emergency Management (FDEM) has constructed a temporary detention facility for illegal aliens at the Dade-Collier Training and Transition Airport, a state-owned airfield. App.40, 43, 46. The facility opened on July 1, 2025, with the first group of detainees arriving two days later. Florida used state funds to build the facility. Federal officials did not order the state to construct the facility. App.46, 91. Nor did Florida seek federal permission to build it. *Id.*

State officials are detaining illegal aliens at the facility "under the authority delegated pursuant to section 287(g) of the Immigration and Nationality Act (INA), at 8 U.S.C. § 1357(g)." App.34. Section 287(g) authorizes the U.S. Department of Homeland Security (DHS) to enter into agreements with state and local law enforcement agencies to delegate authority to carry out immigration functions under federal law. 8 U.S.C. § 1357(g)(1). As such, "[t]he ultimate decision of who to detain at the [facility] belongs to Florida." App.34. Florida is solely responsible for funding, constructing, and operating this facility. App.29, 46-47, 91. Florida is seeking federal grant money to reimburse the state for some portion of the costs, but the federal defendants have made no decision to award funding. App.34, 46.

Plaintiffs filed a complaint in the Southern District of Florida seeking to declare the facility unlawful and to enjoin its construction and use. App.26. The complaint alleges violations of NEPA, the APA, and "provisions of Florida law." App.1.

3

Because the facility is in the Middle District of Florida and all the detention, construction, and decision-making that Plaintiffs challenge occurred outside the Southern District, the state and federal defendants moved to transfer venue to the Middle District. ECF 50; ECF 60. But rather than resolving the venue question first, the district court rushed ahead to temporarily enjoin the state's construction activities for 14 days, while it heard testimony and argument on Plaintiffs' preliminary injunction motion. ECF 104.

The district court then issued a preliminary injunction, indefinitely enjoining the state's construction activities at the site until the federal defendants fulfill NEPA's procedural requirements. App.188. It also prohibited holding new detainees at the facility and required the removal of fencing, lighting, generators and gas, sewage and waste receptacles within 60 days. App.189. In so doing, the district court identified no affirmative *federal* action taken by the federal defendants that might be subject to NEPA and reviewable under the APA. The court instead concluded that the reviewable final agency action under the APA was a failure to act since, in its view, the lack of an EIS or environmental assessment (EA) qualifies as final agency action. App.158-61. And although the facility is state owned and operated, the court concluded that NEPA applied to the facility's construction and operation because the federal government supposedly has decided to fund the facility and allegedly controls federally-deputized state officers under 287(g) agreements with the state. App.163-75.

The district court rejected the defendants' venue challenge, concluding that the state defendants had waived it by not raising their objections in their responses to emergency motions for a temporary restraining order and preliminary injunction. App.130-32. The district court nevertheless concluded that venue in the Southern District was proper. App.132-52.

The district court further concluded that the INA did not prohibit the ordered relief, App.125-29, that Plaintiffs would suffer irreparable harm in the absence of preliminary injunctive relief, App.175-83, and that the balance of harms and public interest supported an injunction, App.183-88.

The court required Plaintiff to post a $100 bond under Fed. R. Civ. P. 65(c), but made no findings that such amount was sufficient to pay the costs to the defendants of an unlawful injunction. *Id.* at 81. The federal defendants moved for a stay pending appeal. App.107-08; ECF 138. The district court did not act on it in time.

## STANDARD OF REVIEW

A party is entitled to a stay if it shows (1) it will likely succeed on the merits; (2) it will suffer irreparable injury absent a stay; (3) the stay will not substantially injure the other interested parties; and (4) a stay is in the public interest. *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1280 (11th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

## ARGUMENT

The Court should stay the preliminary injunction pending appeal for the reasons expressed by the state defendants in their motion and for the reasons below.

## I.  The federal defendants are likely to succeed on appeal.

In its haste to stop activities at the temporary detention center, the district court committed numerous errors of law. It disregarded the improper venue. It identified no major federal action subject to NEPA, 42 U.S.C. § 4332(C), and no final agency action for APA review, 5 U.S.C. § 704. It usurped the agencies' discretion on when to conduct a NEPA analysis as to the future federal actions that may yet happen regarding this facility. It failed to justify, as it must under recent Supreme Court precedent, why a putative violation of NEPA justifies enjoining construction and operation in the absence of any substantive violation of law. And it erred by enjoining the state's construction activities at, and operation of, the facility without a showing of likely irreparable harm to Plaintiffs.

### A.  Venue does not belong in the Southern District of Florida.

The Southern District of Florida is an improper venue for this suit for the reasons explained by the state defendants at 14-23. The district court also erred in concluding that venue is proper in the Southern District in part because a plaintiff resides there and a defendant is an officer or employee of the United States. App.132-36. Venue is proper under that theory only "if no real property is involved in the action." 28 U.S.C. § 1391(e)(1)(C). Because Plaintiffs request an injunction controlling

the use to which the land can be put, venue lies only in the Middle District where the underlying land sits.

### B.    There is no reviewable final or major *federal* action at issue.

Plaintiffs lack a valid cause of action. Because NEPA does not provide a private cause of action, NEPA claims must be brought challenging "final agency action" under the APA. *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355 n.2 (11th Cir. 2024); *Karst Env't Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007). The APA defines "agency" as certain authorities of the *federal* government. *See* 5 U.S.C. § 551(1). And the APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). But Plaintiffs have not challenged any discrete, affirmative *federal* action, so the district court concluded that the reviewable action is a "failure to act." App.158. In the district court's view, the lack of an EA or EIS qualifies as final agency action. App.158-61. This view is dead wrong.

"NEPA claims must … allege final agency action" separate from the "decision" to conduct NEPA review. *Karst*, 475 F.3d at 1297. As *Seven County* reiterates, courts "must keep in mind that review of an agency's EIS is not the same thing as review of the agency's final decision concerning the project." 145 S. Ct. at 1511. The district court takes advantage of some imprecise snippets in the caselaw, App.158, but each case was a challenge to a *separate* final agency action. Because there

is no reviewable final agency action presently before the federal courts, Plaintiffs cannot succeed on the merits of their NEPA claims.

Moreover, NEPA applies only to proposals for major federal action. *See* 42 U.S.C. § 4332(C). Plaintiffs simply fail to identify any major *federal* action regarding construction, operation, or funding of the detention center, let alone a final one. The federal defendants have not implemented, directed, or controlled the construction work. App.34. As the state defendants demonstrate at 25-37, there is insufficient federal control over the day-to-day operations of the detention facility to make its construction and operation a major federal action subject to NEPA or reviewable under the APA. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572. Mere federal influence or involvement is insufficient—there must be actual control over the non-federal activities. *Id.* But the federal government cannot control the size of the detention facility, how many beds it has, who it must house, when it will be built, who will build it, or what materials will be used.

The federal defendants also have sent no funds to Florida in connection with the temporary detention center. App.34-35, 38. While the state has expressed an interest in federal funding and federal officials have expressed an openness to funding requests from the state, the "possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573.

Contrary to the district court's assumption (App.171), no final federal funding decisions have been made. Federal officials still must decide on the source, timing, amount, purpose and limitations of such funding before any funding decisions become final. And the federal defendants fully intend to comply with NEPA before taking any final agency action to grant federal funding. *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007) (there is no final agency action on a NEPA claim until the agency decides to disburse funds, even where the funds have been earmarked for a specific purpose by Congress).[1]

The district court concluded that there is a final and major federal action here because state officials are acting under the color of federal law pursuant to the 287(g) agreements. App.163. This has several problems. At the outset, even if brought by a non-party to an agreement, decisions to enter contracts, such as a 287(g) agreement, are not reviewable in a federal district court under the APA. *See Albrecht v. Committee on Emp. Benefits of the Fed. Resv.*, 357 F.3d 62-67-68 (D.C. Cir. 2004).

Moreover, the decision to enter 287(g) agreements is not reviewable by federal courts under a jurisdiction-stripping provision for discretionary immigration activities. While Section 287(g) agreements include certain legal requirements, the decision to enter into one is discretionary. *See* 8 U.S.C. § 1357(g)(1) (Secretary "may enter into a

---

[1] Compliance with NEPA does not necessarily mean issuing an EIS, and the government notes that any funding decision would be a "separate project" from the decision to build the facility. *Seven County*, 145 S. Ct. at 1518.

written agreement"); *Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024) (limitation applies to statute that provides Secretary "may . . . revoke the approval of any [visa] petition").[2] In turn, Section 1252(a)(2)(B)(ii) of the INA states that "no court shall have jurisdiction to review . . .any other decision or action of the [Secretary] . . . the authority for which is specified under this subchapter to be in the discretion of the [Secretary]." 8 U.S.C. § 1252(a)(2)(B)(ii). As Section 287(g) falls within "this subchapter," 8 U.S.C. § 1357, agreements made under its provisions are within the jurisdictional limitation. *See Zafar v. United States Attorney General*, 461 F.3d 1357, 1360 (11th Cir. 2006) ("The phrase 'specified under this subchapter' refers to subchapter II of Chapter 12, 8 U.S.C. §§ 1151–1378."). And the limitation applies to an attempt to impose review of legal requirements on an ultimately discretionary decision, as here. *See Bouarfa*, 604 U.S. at 16, 18 ("In *Patel*, we held that § 1252(a)(2)(B)(i) precludes judicial review of . . . 'threshold requirements established by Congress' to access the relevant discretion"). The district court therefore erred in grounding judicial review or its jurisdiction on actions taken under these agreements.

The district court also thoroughly misunderstood the 287(g) agreements. Section 287(g) agreements apply to the signatory state agencies generally and not to any specific facility operated by those agencies. App.87-92. Under such agreements,

---

[2] The statute refers to the Attorney General, but Congress has transferred enforcement of immigration laws to the Secretary of Homeland Security. *See* Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002).

Immigration and Customs Enforcement (ICE) provides "direction and supervision" of state employees only to the extent the employees are executing "delegated immigration enforcement functions" set forth in the agreement. App.93 § III, App.96 § X. This includes various enforcement responsibilities that immigration officers perform under the INA such as arresting illegal aliens, preparing charging documents against such aliens for ICE to initiate removal proceedings, and overseeing the detention of aliens while removal proceedings are pending. App. 94 § IV. A 287(g) agreement does not give the federal government authority over the construction of any facility, the physical operations at any facility, or over the state employees in any other respect. Even with respect to a facility where a state detains aliens under 287(g) authority, the state maintains authority over the day-to-day operations of that facility including how big to make the facility, how many aliens to accept into a facility's population, when to accept such aliens, and for how long. App.90-91.

Insofar as district court's major federal action theory rests on Florida's assistance in executing general detention decisions as a "functionary" of DHS, that theory too fails because the decision to detain aliens cannot support a NEPA claim or injunctive relief, as the state defendants explain at 31-37. If mere assistance is federal action then virtually anything can be federal action and the APA's requirement of final agency action becomes meaningless.

11

**C.    The district court's order violates the precedents of the Supreme Court and this Court.**

Next, NEPA documents are only one input into an agency's decision. *See Seven County*, 145 S. Ct. at 1511. "The goal of the law is to inform agency decisionmaking," *id.* at 1507, which begs the question of what decision the court-forced NEPA analysis is supposed to inform. Here, there has not been a major federal action, and thus there is no decision to make; as a result, the court-ordered analysis is futile. *See S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573 ("NEPA does not require evaluation of hypothetical proposals, impacts and alternatives concerning a nonexistent federal proposal."). If hypothetically at the end of the court-forced NEPA analysis, the federal defendants conclude the state detention facility's environmental impacts are too great—then what? Neither Plaintiffs nor the district court identified any source of law giving the federal defendants the authority to, for example, order Florida to close the facility. The decision to site and operate the facility, including the decision to use it to detain illegal aliens, is Florida's alone. Certainly, after Florida seeks federal funding, then a NEPA analysis may inform that decision. But until that funding request is made or there is some other need for a federal decision, undertaking a costly and time-consuming NEPA analysis is a wasteful endeavor.

As to that future funding decision, the district court wrongfully pretermitted the agencies' discretion to determine when to prepare a NEPA document. The federal defendants do not contend that NEPA obligations could *never* arise relating to the

12

detention facility. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573. But the scope and timing of those future obligations are within the agencies' substantial discretion. *Id.*; *see also Seven County*, 145 S. Ct. at 1512-13 (courts owe deference to agency decisions on "whether and to what extent" to prepare a NEPA document). It is premature, and it would serve no useful purpose to undertake a NEPA analysis now when no specific federal action has been proposed. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573. Yet the district court has overruled the agencies on this "scope and timing" question, *id.*, contrary to the "bedrock principle" of deference that is supposed to govern judicial review in NEPA cases. *Seven County*, 145 S. Ct. at 1511, 1515.

For related reasons, the district court also violated *Seven County*'s teaching that an agency needs only to analyze its own proposed action. *Id.* at 1515. NEPA does not require an agency to consider the effects of actions that are outside the agency's regulatory authority. *Id.* at 1515-18. The federal defendants do not control Florida's decisions related to the construction of the facility including where to site it, how big to make it, or how to operate it. Those are state decisions about the use of state land, so the environmental impacts of such decisions are also outside NEPA's scope and do not federalize otherwise local operations. *See Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 399-400 (7th Cir. 2022). And whenever a future funding decision may be made, it will definitionally be "separate in time" from the construction decisions at issue in this case, which are in the past. *Seven County*, 145 S. Ct. at 1517.

13

### D.    Injunctive relief for the alleged NEPA violation is improper.

The supposed NEPA violation does not justify an injunction anyway.
"[R]eviewing court[s] must account for the fact that NEPA is a *purely procedural statute*."
*Seven County*, 145 S. Ct. at 1511 (original emphasis). The court's review is of the final
agency action, not the NEPA process divorced from it. *Id.* Accordingly, even if an
agency's NEPA compliance falls short, that deficiency does not justify coercive
sanctions like vacatur or an injunction of agency action, "at least absent reason to
believe that the agency might disapprove the project if it" undertook additional
NEPA process. *Id.* at 1514.[3] Here, there is no final federal agency action for the court
to review, which is why the court issued a sprawling injunction targeted at no specific
agency action. But even if, under the district court's view, the existence of the 287(g)
agreements means that some portion of the state's action could be incorrectly treated
as federal action, the statements that the district court relied on as evidence of a
preordained federal decision (App.169-71) also establish that the outcome of the
NEPA process is unlikely to influence the shuttering of the temporary decision facility
or its potential federal funding.

---

[3] Although vacatur and injunctive relief are doctrinally distinct remedies, their effects
are similar and both are "coercive" sanctions. *See Transportation Div. of the Int'l Ass'n of
Sheet Metal, Air, Rail & Transportation Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 874
(D.C. Cir. 2021) (declining to grant "coercive sanction" of vacatur); *WildEarth
Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d 1222, 1239 (10th Cir. 2017)
(comparing vacatur to a "form of injunctive relief").

One can scarcely imagine a more vivid set of facts to illustrate this principle. It is well known that immigration enforcement is a major priority of this administration. *See, e.g.*, *Protecting the American People Against Invasion*, Executive Order 14159 (Jan. 20, 2025). Indeed, it needs no citation that immigration enforcement has been a major priority of the current President since he first burst onto the political scene. And the detention center is a high-profile example of such enforcement. *See Trump Speaks at 'Alligator Alcatraz' in Florida Everglades*, FOX 13 Tampa Pay (July 1, 2025), https://youtu.be/KO6TByWi0w8?si=nVKzuVfhgxG6nuMf. Even if Florida's construction of this detention center somehow (counterfactually) were converted into ex ante federal action, it beggars belief that the federal government would have reached a different conclusion about the wisdom of building this facility based on further study of the marginal effect of the facility's lights on the survival rate of Florida panthers in 2070. *Seven County*, 145 S. Ct. at 1514.

## E.    Plaintiffs failed to prove a likelihood of irreparable harm.

The district court entered a preliminary injunction without finding imminent, irreparable harm. To obtain an injunction, a plaintiff must show irreparable harm to their concrete interests is likely, not merely possible. *See Winter v. NRDC*, 555 U.S. 7, 22-24 (2008). A procedural violation of NEPA alone, even after final judgment, does not prove irreparable harm or automatically warrant injunctive relief. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) "No such thumb on the scales is warranted." *Id.*

But the district court did exactly that, placing its thumb on the scale. It found that a putative NEPA violation relieved Plaintiffs of their burden to prove the probability, quantity, and imminence of their irreparable harm. App.177 ("Plaintiffs are not required to prove harms of a particular probability or quantity") & App.178 n.31 ("the harms Plaintiffs fear take time to accrue; and time and access for study is precisely what NEPA procedures are meant to afford"). That is clear and reversible error. *Winter*, 555 U.S. at 22; *Siegel*, 234 F.3d at 1176 ("the asserted irreparable injury must be neither remote nor speculative, but actual and imminent").

While the district court identified potential environmental harms, it identified no likely, imminent, or irreparable harms. For instance, the district court identified habitat loss, noise, light pollution, and lost access as potential harms caused by the facility. App.178-80. But these harms are not irreparable—lights, for instance, can be turned off—and do not support the drastic and extraordinary remedy of a preliminary injunction. Besides being based on pure speculation as the state defendants explain at 39-41, they are entirely reparable because the harm disappears if the temporary facility disappears after final judgment.

The identified impacts to wetlands also are insufficient to sustain a preliminary injunction. Wetlands are resilient biological systems that can recover from kinds of disturbances Plaintiffs allege, such as slight increases in runoff in unusual circumstances. But the district court relieved Plaintiffs of proving that any potential wetlands impacts rose to the level of irreparable harms, and thus Plaintiff failed to

16

"clearly establish" the required showing. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). And, importantly, the showing that Plaintiffs did make was that there was potential for impacts over the "long-term." App.177; *see also* App.178 n.31 ("the harms Plaintiffs fear take time to accrue"). Thus, even if any impacts may someday rise to the level of irreparable, those impacts are not imminent.

Like wetlands, wildlife species are also resilient. As such, it is well-established that a party seeking a preliminary injunction based on alleged harms to wildlife must demonstrate a likelihood of imminent, irreparable harm to the whole species—not just a few individuals. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 986-87 (D.C. Cir. 1975) (the "loss of only one [animal] is [not a] sufficient injury to warrant a preliminary injunction"); *Idaho Rivers United v. U.S. Army Corps of Eng'rs*, 156 F. Supp. 3d 1252, 1262 (W.D. Wash. 2015) (citing cases). The district court erred because it failed to find any likely species-level harms.

## II.    The equitable factors overwhelmingly favor a stay.

When the United States is a party, the balance of the equities and public interest factors merge because the United States' interest is the public interest. *See Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020). The remaining equitable factors overwhelmingly favor staying the injunction, while the defendants appeal to correct the numerous errors identified above. The district court's erroneous order threatens significant and irreparable harm to the public good, *see Nken*, 556 U.S. at 435, which greatly outweighs any claimed injury to Plaintiffs.

17

A stay is in the public interest. There is a significant national interest in combatting unlawful immigration, which favors allowing Florida to continue the development and use of its facility. App.195-97. As the President explained, "[e]nforcing our Nation's immigration laws is critically important to the national security and public safety of the United States." *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025); s*ee also Trump Speaks, supra*, at 4:30 (President Trump: "This enormous, country destroying invasion has swamped communities nationwide with massive crime, crippling costs, and burdens far beyond what any nation could withstand."); *id.* at 14:25 (Secretary Noem: "[The facility] is exactly what we need"). If the facility is forced to wind down while the state and federal defendants seek to overturn the district court's mistaken order, this critical national interest will be hindered. App.34-35, 195.

Maintaining detention flexibility and capacity in south Florida is crucial. App.195-97. It is estimated that, among the millions of aliens that entered during the previous administration, one in four provided a release address in Florida. App.197. DHS's Miami field office for Enforcement and Removal Operations consistently accounts for a staggering 10-15% of ICE arrests nationwide. *Id.* As a result, all detention facilities in the Miami area have been operating at or above their maximum capacity. App.195. Florida's temporary detention facility is mission "essential," as its up to 2,000 beds permit DHS to keep pace with increased and often unpredictable detention needs. *Id.* Its shuttering within 60 days as ordered by the district court

would cause irreparable harm and compromise the state and federal government's ability to enforce immigration laws, safeguard the public, protect national security, and maintain border security. *Id.*. Without access to the facility's detention space, DHS Miami's ability to detain criminal aliens, including those with violent histories, will be diminished. App.195-96. The reduced capacity also would negatively affect other law enforcement agencies who, without sufficient detention space, would be unable to pursue arrests of criminal aliens, gang members, wanted fugitive felons, and aliens with removal orders. App.196.

Florida's temporary detention facility therefore is a vital tool for maintaining a lawful immigration and detention environment, as it has alleviated over-crowding and allowed DHS and its partners to fulfill their public-safety mission by taking violent criminal aliens off the street. App.196-97. The district court's injunction irreparably harms this mission because, without this facility, many criminal aliens would either be released back into the community or not arrested at all. App.197. The district court's injunction is therefore contrary to the public interest, and it must be stayed. *See Winter*, 555 U.S. at 26 (holding that it is an abuse of discretion to issue a preliminarily injunction that is contrary to the public interest).

At the same time, a stay will not substantially injure Plaintiffs' environmental interests. Before becoming a detention facility, the site served as an active airfield, supporting approximately 28,000 flights in the last 6 months. App.30, 43-44. The site had bright lights and pre-existing buildings. And it was "very loud" with noise

"reverberat[ing] well beyond the airport itself." App.44. In fact, aircraft noise was

substantial as it was "loud enough to jolt most humans" and "surrounding wildlife."

*Id.* Compared to the impacts of the site's previous use as an airport, the impacts from

the construction or operation of the detention facility are minimal. App.31.

 As discussed *supra* at 15-17, Plaintiffs' contrary claims of harm to their

environmental interests are too distant, reparable, and speculative to support a

preliminary injunction. Plus, FDEM has taken actions to prevent any environmental

harm from occurring. App.45. It has initiated studies to ensure that there would be no

meaningful impact on local wildlife. *Id.* It only has paved over land that was

previously filled and leveled *Id.* It also has instituted a rigorous waste management

program, constructed speed bumps to slow traffic, and installed new silt fencing to

prevent debris from falling into surrounding wetlands. *Id.* And FDEM plans to build a

drainage basin to further prevent wetland impacts. *Id.*

 In sum, the balance of harms and public interest factors favor a stay. The

harms to the state and federal defendants and the public are far more concrete and

imminent compared to the distant, reparable, and speculative harms claimed by

Plaintiffs, particularly where the district court has refused to require an adequate bond

to cover the costs of being wrongfully enjoined. *See Dep't of Educ. v. Cali.,* 145 S. Ct.

966, 969 (2025) (granting stay in part because of insufficient bond).

# CONCLUSION

For the foregoing reasons as well as those presented by the state defendants, the motion for stay should be granted.

Respectfully submitted,

/s/ *Allen M. Brabender*
ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

ROBERT STANDER
*Deputy Assistant Attorney General*

MARISSA A. PIROPATO
HAYLEY A. CARPENTER
ALLEN M. BRABENDER
*Attorneys*
U.S. Department of Justice
Environment and Natural Resources Division
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3281
allen.brabender@usdoj.gov

August 26, 2025
DJ # 90-1-4-16145

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion satisfies the type-volume requirements set out in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,096 words. This motion was prepared using Microsoft Word in Garmond, 14-point font, a proportionally spaced typeface.

*/s/ Allen M. Brabender*

No. 25-12873

────────────────────

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

────────────────────

FRIENDS OF THE EVERGLADES and CENTER FOR BIOLOGICAL
DIVERSITY,
*Plaintiffs/Appellants*,

v.

KRISTI NOEM, et al.,
*Defendants/Appellees*.

────────────────────

Appeal from the United States District Court for the Southern District of Florida
No. 1:25-cv-22896 (Hon. Katherine M. Williams)

────────────────────

**FEDERAL DEFENDANTS' APPENDIX
IN SUPPORT OF TIME-SENSITIVE MOTION TO STAY**

────────────────────

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

ROBERT STANDER
*Deputy Assistant Attorney General*

MARISSA A. PIROPATO
HAYLEY A. CARPENTER
ALLEN M. BRABENDER
*Attorneys*
P.O. Box 7415
Washington, DC 20044
(202) 514-5316
allen.brabender@usdoj.gov

## INDEX TO FEDERAL DEFENDANTS' APPENDIX
## IN SUPPORT OF TIME-SENSITIVE MOTION TO STAY

| Description | ECF No. | Page |
|---|---|---|
| Complaint | 1 | 1 |
| Affidavit of Keith Pruett | 16-1 | 29 |
| Giles Declaration | 21-1 | 31 |
| Richardson Declaration | 21-2 | 37 |
| Gadea-Guidicelli Declaration | 116-1 | 39 |
| Signed Fuentes Supplemental Declaration | 118-1 | 87 |
| Memorandum of Agreement between DHS and FNG under 287(g), Case 1:25-cv-22896-JEM Document 24-3 (Pl. Exhibit 9 of the Admitted Exhibit List) | 123 | 93 |
| Transcript of Aug. 13, Hearing (excerpt) | 130 | 107 |
| Order Granting Preliminary Injunction | 131 | 109 |
| Notice of Appeal | 136 | 191 |
| Ripa Declaration | 138-1 | 193 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. _____

FRIENDS OF THE EVERGLADES, INC., a Florida
501(c)(3) not-for-profit corporation, and CENTER
FOR BIOLOGICAL DIVERSITY, a 501(c)(3)
nonprofit organization,

       Plaintiffs,

vs.

KRISTI NOEM, in her official capacity
as Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT; KEVIN
GUTHRIE, in his official capacity as Executive
Director of the Florida Division of Emergency
Management; and MIAMI-DADE COUNTY, a
political subdivision of the State of Florida,

       Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     This is an action for declaratory and injunctive relief under the National

Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*; the Administrative Procedure Act

(APA), 5 U.S.C. § 701 *et seq.*; and applicable provisions of Florida law, to halt the unlawful

construction of a mass federal detention facility for up to 5,000 noncitizen detainees, which the

Defendants are calling "Alligator Alcatraz," at the Dade-Collier Training and Transition Airport

("TNT Site"), a limited-use pilot training facility within the Greater Everglades, the Big Cypress National Preserve and Big Cypress Area.

2.    The TNT Site is owned by defendant Miami-Dade County and located within or directly adjacent to the Big Cypress National Preserve and the Big Cypress Area, a nationally and State protected, and ecologically sensitive, area that serves as habitat for endangered and threatened species like the Florida panther, Florida bonneted bat, Everglade Snail kite, wood stork, and numerous other species.

3.    Defendant Florida Division of Emergency Management (the "Division"), through its Executive Director, has entered into an arrangement, the details of which have not been made public, with the Defendants U.S. Department of Homeland Security ("USDHS") and U.S. Immigration and Customs Enforcement ("ICE") to transform the TNT Site into a mass migrant detention and deportation center. The decision to construct a mass migrant detention and deportation center at the TNT Site was made without conducting any environmental reviews as required under NEPA, without public notice or comment, and without compliance with other federal statutes such as the Endangered Species Act, or state or local land-use laws.

4.    Defendant Miami-Dade County is a political subdivision of the State of Florida and is the owner of the TNT Site.

5.    Plaintiffs seek an injunction and declaratory relief to halt pre-construction activities, construction, and related operations at the TNT Site unless and until Defendants comply with NEPA and related state, federal and local environmental laws and regulations. Simultaneous with the filing of this Complaint, Plaintiffs have filed their Expedited Motion for Temporary Restraining Order and Preliminary Injunctive Relief under Rules 65(a) and (b), of the Federal Rules of Civil Procedure, and respectfully request its expedited consideration.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701–706 (APA), 42 U.S.C. § 4321 *et seq.* (NEPA), and supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims.

7.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b) & 1391(e)(1)(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and because the TNT Site is owned by defendant Miami-Dade County, which is located in this district.

**PARTIES**

8.      Plaintiff, Friends of the Everglades, Inc., is a Florida non-profit organization with members and directors in Miami-Dade County, Florida. Its mission includes protecting and restoring the Greater Everglades ecosystem, including the Big Cypress National Preserve and Everglades National Park.

9.      Friends' members regularly visit and use the Big Cypress National Preserve for recreational, aesthetic, scientific, and spiritual purposes, and intend to continue using the area in this manner, and will suffer irreparable harm if the detention facility is constructed and operated at the TNT Site. Friends and its members will suffer procedural harm if the detention center is constructed without compliance with the procedural requirements of NEPA.

10.      Friends was founded in 1969 by Marjory Stoneman Douglas, a renowned journalist and environmental activist, to protect the Everglades from development and degradation. In an striking echo, the organization's founding focus was on stopping the construction of the proposed "Everglades Jetport" at the precise spot where the TNT is located. Since that time Friends' mission has expanded to include preserving, protecting, and restoring

the entire Everglades ecosystem. Now, history is repeating itself as Friends once again must act to prevent destructive development in the heart of the Everglades ecosystem in the same location. Just as Friends did in the 1960s to stop the ill-conceived Jetport, Friends now finds itself in a familiar fight—resisting renewed threats to the Everglades posed by the construction of a mass detention and deportation facility at the TNT Site.

11.     Ironically, the 1968 proposal to build the "Everglades Jetport"—now the TNT Site—contributed to the January 1, 1970 adoption of NEPA, and its requirement to evaluate reasonably anticipated environmental impacts that could result from federal action **before** acting. After construction on the Everglades Jetport commenced, and the environmental outcry— spearheaded by Friends' founder Marjory Stoneman Douglas—ensued, the Department of Interior commissioned a 1969 report led by ecologist Luna Leopold to assess the ecological impacts of the proposal. The report became one of the first *de facto* environmental impact statements assessing impacts of federal action, and illustrated the utility of evaluating environmental impacts **before** acting. Nathaniel "Nat" Reed, who served as then Florida Governor Claude Kirk's senior advisor, used the Leopold report to persuade the Governor, who had initially supported the Jetport plan, to reverse course and oppose the project—a position later adopted by President Richard Nixon. The Jetport plan was ultimately scuttled, and only the runway—which is expressly limited to use for aviation training—remains. The Nathaniel P. Reed Visitor Center at Big Cypress National Preserve now sits nearby the TNT Site.

12.     Friends' member and Executive Director Eve Samples has personally visited the site and is familiar with the area. Friends' members enjoy recreating in the Everglades and Big Cypress area, including in panther habitat. They enjoy hiking, camping, fishing, kayaking, canoeing, birdwatching, and viewing and photographing nature and wildlife. Since the proposal

to build a mass detention facility in the Big Cypress National Preserve first surfaced, an astonishing 18,000 supporters of Friends have voiced their opposition to the plan. This opposition springs from a desire to preserve and protect the Everglades, and the Big Cypress National Preserve specifically, among Friends' members who use, fish, recreate, observe wildlife or otherwise enjoy the area.

13.     Plaintiff Center for Biological Diversity (the "Center") is a national, nonprofit conservation organization that works through science, law, and policy to protect all species— great and small—hovering on the brink of extinction. The Center has offices throughout the United States, including in Florida, and more than 93,000 active members across the country.

14.     The Center's members and staff derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from visiting Big Cypress National Preserve and observing the ecosystems and species who live there. The Center's members and staff live near or regularly visit Big Cypress National Preserve and the Greater Everglades Ecosystem.

15.     For example, one Center member, Tierra Curry, is a scientist committed to protecting intact ecosystems and preventing biodiversity loss. She plans to visit Big Cypress National Preserve this fall 2025 to hike, paddle, and observe wildlife. Another Center member, Amber Crooks is a conservationist who regularly visits Big Cypress National Preserve to enjoy the quiet peace of nature, to observe wildlife like red-cockaded woodpecker, and to appreciate remarkably dark night skies—among the darkest east of the Mississippi.

16.     Friends of the Everglades' and the Center's members are being injured by Defendants' unlawful actions, which threaten the integrity of Big Cypress National Preserve's waters and pristine night skies, the wellbeing of the plants and wildlife living there, and thus the

Plaintiffs' interests in them. Friends and the Center are also injured by being deprived of critical information and a public process to analyze and address significant environmental impacts associated with the detention center.  NEPA is a procedural statute and "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Okeelanta Corp. v. United States Army Corps of Eng'rs*, 132 F.4th 1320, 1332 (11th Cir. 2025) (quoting *Massachusetts v. E.P.A.,* 549 U.S. 497, 517 (2007)).

17.     The injuries described are actual, concrete injuries presently suffered by Plaintiffs and their members, and they will continue to occur unless this Court grants immediate relief. The relief sought herein would redress those harms. Plaintiffs have no other adequate remedy at law.

18.     Defendant Kevin Guthrie is the Executive Director of the Florida Division of Emergency Management and is sued solely in his official capacity.

19.     Defendants Secretary Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security ("USDHS"), and Director Todd Lyons, in his official capacity as Director of the United States Immigration and Customs Enforcement ("ICE") agency, are federal officials responsible for immigration enforcement and detention and have authority over the arrangements for the use of the TNT Site as a mass detention center.

20.     Defendant Miami-Dade County (the "County") owns the TNT Site and, on information and belief, has acquiesced in the other Defendants transformation of the TNT Site into a mass detention center even though County rules do not permit use of the TNT Site for this purpose.

## COMMON ALLEGATIONS

21.     The Dade-Collier Training and Transition Airport is a publicly owned airfield located within environmentally sensitive lands at the border of Miami-Dade and Collier counties, within the Big Cypress National Preserve, and within the Big Cypress Area as defined in Fla. Stat. § 380.055. At over 17,000 acres, the TNT Site is the largest parcel of land within the Big Cypress National Preserve not owned by the federal government.

22.     The Big Cypress National Preserve was established in 1974, and has been expanded since its creation. *see* Big Cypress National Preserve Act, Pub. L. No. 93-440, as amended by Pub. L. No. 100-301 (the Big Cypress National Preserve Addition Act of 1988); 16 U.S.C. § 698f.  The Preserve was created "in order to assure the preservation, conservation and protection of the natural, scenic, hydrologic, floral and faunal and recreational values in the Big Cypress Watershed." Pub. L. No. 93-440(a). The Preserve is managed as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity' in accordance with the provisions of this Act and with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1-4), as amended and supplemented." Pub. L. No. 100-301 § 4(a), Big Cypress National Preserve Addition Act of 1988.

23.     The Big Cypress National Preserve area where the TNT Site is located is known for its wetlands, critical wildlife habitat, and protected species, including the threatened wood stork, and endangered Florida bonneted bat and the Florida panther. The Site is within an environmentally sensitive freshwater wetland ecosystem of ecological significance for wildlife habitat. The Site is important for drinking water supply and Everglades water quality.

24.     The Big Cypress Preserve is home to various listed threatened or endangered species including the Florida bonneted bat, the Florida panthers, wood stork, Everglade snail

kite, and others, as documented in the Big Cypress National Preserve website. *See*, https://www.nps.gov/bicy/learn/nature/animals.htm, last visited June 25, 2025. Florida panthers have been geolocated on the TNT Site on many occasions. The map below shows Florida panthers geolocated on the TNT Site:



25.     Florida bonneted bats have also been documented in the Big Cypress National Preserve. *See* 78 Fed. Reg. 61004, 61008, 61011 (Oct. 2, 2013).

26.     In the Big Cypress Conservation Act of 1973, Fla. Stat. § 380.055, the Florida Legislature determined that "the Big Cypress Area is an area containing and having a significant impact upon environmental and natural resources of regional and statewide importance and that designation of the area as an area of critical state concern is desirable and necessary to accomplish the purposes of 'The Florida Environmental Land and Water Management Act of 1972' and to implement s. 7, Art. II of the State Constitution." Fla. Stat. § 380.055(2).

27.     The TNT Site is within the Big Cypress National Preserve as illustrated below:



28.    The TNT Site's location within the Big Cypress National Preserve is further illustrated by the below GIS map:



29.     The TNT Site is also proximate to Everglades National Park, and part of the historic Everglades. Since the passage of the Comprehensive Everglades Restoration Plan ("CERP") in 2000, the federal government and the State of Florida have jointly committed to one of the most ambitious ecosystem restoration efforts in the world. Authorized by Section 601 of the Water Resources Development Act of 2000 (WRDA 2000), Pub. L. No. 106-541, 114 Stat. 2572, CERP provides a framework for restoring, preserving, and protecting the South Florida ecosystem, including the Everglades, over multiple decades. The Plan encompasses more than 60 projects designed to improve water quality, restore hydrologic flow, and protect critical habitat.

30.     Under CERP, the federal government, through the U.S. Army Corps and Engineers ("USACE") and the Department of the Interior ("DOI"), fund half the costs of restoration. The State of Florida contributes the other half, with each partner committing billions

of dollars to implementation. As of 2024, total appropriations for Everglades restoration from both federal and state sources exceed $20 billion—much of which has been allocated since 2019—reflecting a sustained, bipartisan commitment to safeguarding the ecological integrity of the Everglades and adjacent areas like Big Cypress National Preserve.

31.    These investments are reinforced by successive authorizations and appropriations through subsequent federal legislation, including the Water Resources Development Acts of 2007, 2014, 2016, 2018, 2020, 2022, and 2024 each of which reauthorized and expanded CERP components. The State of Florida has likewise demonstrated its ongoing commitment to Everglades restoration through substantial state funding, including over $3.5 billion committed between 2019 and 2024 alone under Florida's "Everglades Restoration Strategy." These efforts support not only environmental protection, but also flood control, drinking water supply, and biodiversity, and endangered species habitat preservation and conservation across South Florida.

32.    One recent component of CERP is the Western Everglades Restoration Plan ("WERP"), which will use a series of active and passive water management features, water quality features, and alterations to existing canals and levees with a goal of improving the quantity, quality, timing and distribution of water in the Western Everglades in the effort to re-establish ecological connectivity, reduce the severity and frequency of wildfires, and restore low nutrient conditions.  The TNT sits within the WERP footprint as illustrated below:



33.     The Dade-Collier Training and Transition Airport site, which is within and/or borders the Big Cypress National Preserve, lies within the broader Everglades ecosystem restoration footprint, and any development at that site that disrupts hydrologic connectivity or degrades environmental conditions threatens to undermine the very objectives that these federal and state investments were intended to achieve.

34.     The Division has recently entered into an arrangement with DHS to allow the use of the TNT Site as a mass detention facility for ICE.  DHS has advised that it intends to detain up to 5,000  for federal immigration purposes. In a statement, DHS advised that Federal Emergency Management Agency ("FEMA") shelter program funds would be used to pay the Division approximately $450 million a year to operate the detention centers, which the Division has dubbed "Alligator Alcatraz."

35.     During a press conference on June 25, 2025, Governor DeSantis noted that federal agencies would fully fund the detention center, stating: "This is fully funded by the federal government"; "This is something that was requested by the federal government, and this is something that the federal government is going to fully fund"; "From a state taxpayer perspective, we are implementing it ... but that will be fully reimbursed by the federal government."   https://www.youtube.com/watch?v=gJfG7L9reHU&ab_channel=FOX35Orlando, (at 6:01 timemark), last visited June 27, 2025.

36.     As these public statements confirm, the Division is acting as the agent of federal immigration enforcement agencies in transporting and detaining noncitizens to the TNT Site, and facilitating the deportation of noncitizens from the Site.

37.     In correspondence with Miami-Dade County, Mr. Guthrie stated that the Division intends to use the Site "to assist the federal government with immigration enforcement." Florida

Attorney General James Uthemeier has been quoted that the TNT Site, with its runway, is intended to be used to "detain, deport and get people out of this country." In correspondence to the County, Division Executive Director Guthrie states that the Division, "has identified the [Site] as a critical asset for ongoing and future emergency response, aviation logistics, and staging operations," suggesting that the TNT Site will be used for deportation flights.

38.     The planned use of the TNT Site includes the installation of prefabricated housing, water and sewage infrastructure, security fencing, high-intensity security lighting, and other structures. In addition, numerous fill laden dump trucks have been observed entering the Site. As noted, the Division has also expressed a desire to utilize the runway in connection with receiving and deporting detainees from the Site.

39.     Construction on the detention center has unfolded at a breakneck pace, and is ongoing. The Division took control of the Site only on June 23, 2025. Since then kitchen facilities, restrooms, housing facilities, portable industrial lighting, and other infrastructure have been positioned on site, and heavy vehicular traffic on and out of the site has been observed, and is ongoing. A steady stream of fill-laden dump trucks have been observed entering and exiting the Site in recent days. State officials have publicly stated that they expect to begin housing detainees at the TNT Site by July 1, 2025.

40.     The photo below shows dump trucks with covered cargo entering the TNT Site earlier this week:



41.     Below is an image published in the *Miami Herald* and taken on or about June 24,

2025, of industrial, high intensity lighting units being delivered to the TNT site:



42.    Below are images of portable generators, also published in the *Miami Herald*, depicting industrial generators being delivered to the site:



43.    To Plaintiffs' knowledge, no environmental assessment or environmental impact statement has been prepared under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321, *et seq.*, nor has the Division conducted any environmental review under Florida law.

44.    Defendant Miami-Dade County, while unlawfully allowing its TNT Site to be occupied by agencies seeking to enforce federal immigration laws, has questioned the lack of any environmental analyses regarding the project. On June 23, 2025, Miami-Dade County Mayor Daniella Levine Cava wrote to the Division and stated: "With the federal and state government investing well over $10 billion since 2019 in Everglades restoration and protection, we would appreciate a detailed analysis and report on environmental impacts of this facility to the

Everglades. We would also value input from the appropriate federal agencies on their environmental reviews and analyses prior to proceeding."

45.     To Plaintiffs' knowledge, Defendants have not conferred with the USACE, DOI, U.S. Fish and Wildlife Service, or any other federal or local agency regarding potential impacts from the construction of a detention center for 5,000 individuals at the TNT Site.

46.     To Plaintiffs' knowledge, no categorical exclusion from NEPA has been invoked by the Defendants, nor does any apply.

47.     To Plaintiffs' knowledge, no exemption or waiver of NEPA requirements has been invoked by Defendants, and none exist.

48.     There is no emergency that would warrant departure from NEPA's requirements, as NEPA contains no exception for emergencies. Even if an emergency existed, none of the Defendants have made alternative arrangements as was required under NEPA regulations, which, in any event, have recently been withdrawn.

49.     No public notice or hearing has been conducted in connection with the use of the TNT Site for migrant detention.

50.     The property is subject to intergovernmental agreements and historical land use restrictions related to its location within the footprint of the Big Cypress National Preserve and State Big Cypress Area.

51.     The hasty transformation of the Site into a mass detention facility, which includes the installation of housing units, construction of sanitation and food services systems, industrial high-intensity lighting infrastructure, diesel power generators, substantial fill material altering the natural terrain, and provision of transportation logistics (including apparent planned use of the runway to receive and deport detainees) poses clear environmental impacts. The Defendants,

in their rush to build the center, have unlawfully bypassed the required environmental reviews. The direct and indirect harm to nearby wetlands, wildlife, and air and water quality, and feasible alternatives to the action, ***must*** be considered under NEPA ***before*** acting.

52.     The TNT Site is highly susceptible to flooding and no feasible plan has been studied to evacuate center detainees and personnel in the event of a hurricane or major flooding event.

53.     DHS also violated the Endangered Species Act by, among other things, failing to consult with USFWS.  Plaintiffs intend to amend this Complaint to add the ESA claims after the required 60-day pre-suit notice, 16 U.S.C. § 1540(g)(2)(A)(i), period has expired.

54.     Additionally, to Plaintiffs' knowledge, the Secretary of the Interior, acting through the Director of the National Park Service, has taken no action to regulate the use of the Big Cypress National Preserve in such manner and by such means that will leave the Preserve unimpaired by the environmental impacts of the TNT Site and associated operations.

55.     The National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)), states, "The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

56.     This "non-impairment" mandate was reaffirmed by Congress in the 1978 amendments to the Act. The 1978 Reaffirmation states: "Congress reaffirms, declares, and

directs that the promotion and regulation of the various System units shall be consistent with and founded in the purpose by subsection (a), to the common benefit of all the people of the United States. The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress." 54 U.S.C. § 100101(b).

57.     The Big Cypress National Preserve was established to "assure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral, and faunal, and recreational values of the Big Cypress Watershed in the State of Florida and to provide for the enhancement and public enjoyment thereof." Pub. L. No. 93-440(a).

58.     The TNT facility and associated operations will use and impair the Big Cypress National Preserve by causing direct and indirect harm to its wetlands, wildlife, and air and water quality. These impacts will result in the degradation of the natural, scenic, hydrologic, floral, and faunal, and recreational values for which the Preserve was created.

59.     The Secretary of the Interior and the National Park Service's apparent acquiescence in DHS and ICE's funding and operating the TNT facility in a manner that will result in significant environmental harm to the Preserve, does not comport with the Act's non-impairment mandate, is in derogation of the values and purposes for which the Preserve was established, and is not otherwise directly and specifically allowed by Congress. Plaintiffs reserve the right to amend this Complaint to add the Secretary of Interior.

60.     All conditions precedent to the maintenance of this action have occurred, been waived, or both.

<u>**COUNT I**</u>
**(VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT (NEPA))**
**(Against the DIVISION, DHS and ICE)**

61.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

62.     The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment, or an Environmental Assessment (EA) if the agency action does not have reasonably foreseeable significant effects on the human environment, or if the significance of such effect is unknown.

63.     Major federal actions include any action that is subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10).

64.     The construction of an immigration detention center is an action that is necessarily subject to federal control and responsibility. The State of Florida has no authority or jurisdiction to enforce federal immigration law. *See Arizona v. United States*, 567 U.S. 387 (2012) (holding federal law preempts state immigration law enforcement). In *Arizona*, the Supreme Court reaffirmed "the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409. The Court explained that "decision[s] on removability [of noncitizens] requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice." *Id.* (quoting *Galvan v. Press,* 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are ... entrusted exclusively to Congress ...")).

65.     In Fla. Stat. § 908.13, the Florida legislature authorized the Division to facilitate the transport of detainees on the condition that ICE "specifically request assistance from the

division with the transport of unauthorized aliens pursuant to specific federal legal authority." *Id.* § 908.13(2)(a). Additionally, ICE "must reimburse the state for the actual cost of assisting with the transport of unauthorized aliens." *Id.* § 908.13(2)(b). Any such transport "must occur under the ***direct control and supervision*** of" ICE. *Id.* § 908.13(2)(c) (emphasis added). Because state law requires that the Division's transportation of detainees to and from the detention center occur under the "direct control and supervision" of ICE, the TNT detention center project is statutorily required to be under "Federal control and responsibility," 42 U.S.C. § 4336e(10), thereby triggering NEPA. In this way, the Division is acting as agent for DHS and ICE.

66.     Florida Attorney General Uthmeier has announced that the TNT Site will be used "in support of the Trump administration" in federal immigration law enforcement. The Attorney General has posted on social media that "Alligator Alcatraz [is] the one-stop shop to carry out President Trump's mass deportation agenda." He accompanied the post with a video of the TNT Site runway. Governor DeSantis has been quoted as stating the TNT Site is to "facilitate the federal government in immigration enforcement."

67.     Under 42 U.S.C. § 4336e(10), Congress identified *non*-major federal actions as actions conducted with "no or minimal Federal funding." Conversely, infrastructure projects like this one that are funded and/or approved by the Federal government, require federal agencies to prepare an EIS for actions that significantly affect the quality of the human environment or an EA if the agency action does not have reasonably foreseeable significant effect on the human environment or if the significance of such effect is unknown. The evaluation must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects. NEPA is a procedural statute that requires federal agencies to prepare an environmental impact statement, or EIS, identifying significant environmental effects

of the projects, as well as feasible alternatives. The law ensures that the agency and the public are aware of the environmental consequences of proposed projects. Properly applied, NEPA helps agencies to make better decisions and to ensure good project management.

68.     Specifically, an EIS must include a "detailed statement" addressing the following: (i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented. 42 U.S.C. §§ 4332(C)((i)-(v).

69.     Moreover, NEPA requires that "[p]rior to making any detailed statement," the head of the lead agency "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* § 4332(C). Because actions associated with the construction and operation of the detention center at the TNT Site are within a national preserve that includes primary habitat for the Florida panther and critical habitat for the Florida bonneted bat, at a bare minimum federal law requires USDHS to consult with the National Park Service, and the U.S. Fish and Wildlife Service in assessing the environmental impacts of its proposed project.

70.     NEPA contains no exceptions for emergency actions, and no emergency exists. NEPA regulations provided that in cases of emergencies such as a hurricane, flood or wildfire, a federal agency should consult with the Council about alternative arrangements. These arrangements must be limited to actions necessary to control the immediate impacts of the emergency." 40 C.F.R. § 1506.12. These regulations, however, have been withdrawn. In any event, there is no emergency and, even if there was, no alternative arrangements have been implemented.

71.     The arrangements between the Division, USDHS and ICE to transform the TNT Site into a mass detention and deportation facility constitute major federal action, as it involves the use of federal authority, approvals, funding and resources, and will have significant environmental impacts on an ecologically sensitive area. Those impacts, which to date have gone unevaluated, could logically include impacts to listed species, impacts to wetlands and surface waters, impacts due to increased activities at the Site, including traffic to and from the Site, hurricane and flooding preparedness, etc.

72.     To Plaintiffs' knowledge, no EA or EIS has been prepared by DHS, ICE, the Division, or any cooperating agency.

73.     The failure to conduct the required environmental review under NEPA violates federal law and deprives the public and affected stakeholders, including Plaintiffs, of required procedures and procedural environmental protections.

74.     Plaintiffs are entitled to injunctive and declaratory relief requiring compliance with NEPA before any further activity occurs at the TNT Site.

## COUNT II
## (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (APA)
### (Against DHS and ICE))

75.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

76.     The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, permits judicial review of final agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

77.     USDHS and ICE have approved or are implementing the use of the TNT Site without providing Plaintiffs and the public with an opportunity for notice and comment, and without adhering to required environmental review procedures under NEPA and other federal laws, including the Endangered Species Act, and the National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)).

78.     The decision to proceed without notice, comment and without an EA or EIS constitutes final agency action and is subject to judicial review.

79.     Plaintiffs are entitled to a declaration that the agency's conduct is unlawful, directing vacatur of the agency action, as well as an injunction preventing further activity until NEPA compliance is achieved.

## COUNT III
## (ULTRA VIRES ACTION (Against the Division))

80.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

81.     The Division of Emergency Management is governed by Chapter 252, Florida Statutes.

82.     Nothing in Chapter 252 authorizes the Division to convert county-owned property into a federal detention center without legislative authority, environmental review, or compliance with local land use requirements.

83.     Moreover, Florida law requires that, before the State of Florida may construct a correctional facility, it must consult with local governments with jurisdiction over the proposed site to determine if the proposed facility would comply with applicable local land use laws.  Fla. Stat. § 944.095(2). Florida law further provides that local governments have 90 days to review any proposed correctional facility to determine if it complies with the applicable land use laws. The Division has not complied with these legal requirements.

84.     The Division has no independent legislative authority to construct and manage a correctional facility.  Under Florida law, a correctional facility means any "prison, road camp … prison forestry camp … prison farm [whether] temporary or permanent." Section 944.02(8), Fla. Stat. "Prisoner" includes any person "under civil or criminal arrest [and committed] to the custody of the department pursuant to lawful authority." *Id.* § 944.02(6). These provisions apply to the Florida Department of Corrections, however, not the Division which has no authority to detain persons under Florida law.

85.     Defendant's actions exceed the scope of authority granted by Florida law.

86.     Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201 that the Division's arrangement with DHS is *ultra vires* and void, and the construction of the TNT Site detention center is being conducted in derogation of state law.

87.     Plaintiffs are further entitled to injunctive relief preventing further construction or operation at the site.

## COUNT IV
### (Violation of Miami-Dade County Code and CDMP (against Miami-Dade County))

88.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

89.     Pursuant to the County's Operational Directive No. 15-02, the TNT Site is governed by Chapter 25 of the Miami-Dade County Code, pertaining to aviation operations.

90.     The TNT Site is permitted only for aviation uses including pilot flight training, pilot proficiency checks, and aircraft maintenance flight checks.

91.     In addition, the Site, or a portion of it, is designated Environmentally Protected Parks under Miami-Dade Counties Comprehensive Development Master Plan due to its environmental sensitivity.

92.     The Site is not permitted or authorized for use for non-flight purposes.

93.     The County's agreement or acquiescence in allowing the TNT Site for use as a mas detention center is in violation of the County code and permitting regimes.

94.     Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the County may not authorize or allow use of the TNT Site for purposes other than that allowed under the County Code and existing permits and authorizations.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Friends of the Everglades respectfully requests that the Court:

A.     Declare that Defendants' actions violate NEPA and the APA;

B.     Enjoin any further pre-construction activities, construction, conversion, or use of the TNT Site for purposes of immigration detention unless and until Defendants comply with NEPA and the APA;

C.     Declare that Defendant Guthrie's actions exceed lawful authority under Florida law and violate state environmental and land use laws;

D.     Enjoin Defendant Guthrie from authorizing or permitting further development or use of the TNT Site for purposes related to a mass detention center;

E.     Enjoin the County from permitting the use of property limited to aviation activities as a mass detainment center.

F.     Award Plaintiffs their attorneys' fees and costs as allowed by law;

G.     Grant such other relief as the Court deems just and proper.

Dated:   June 27, 2025

Respectfully submitted,

EARTHJUSTICE                                     COFFEY BURLINGTON, P.L.
4500 Biscayne Boulevard, Suite 201               2601 South Bayshore Drive, Penthouse One
Miami, Florida  33137                            Miami, Florida  33133
Telephone:  (305) 440-5432                       Telephone:  (305) 858-2900

By:_____s/  Tania Galloni_____             By:_____s/   Paul J. Schwiep_____
    Tania Galloni, Fla. Bar No. 619221               Paul J. Schwiep, Fla. Bar No. 823244
    tgalloni@earthjustice.org                        PSchwiep@CoffeyBurlington.com
    Dominique Burkhardt, Fla. Bar No. 100309         Scott Hiaasen, Fla. Bar No. 103318
    dburkhardt@earthjustice.org                      SHiaasen@CoffeyBurlington.com
                                                     YVB@CoffeyBurlington.com
*Counsel for Friends of Everglades*                  LPerez@CoffeyBurlington.com
                                                     service@CoffeyBurlington.com

                                                 *Counsel for All Plaintiffs*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-JEM**

FRIENDS OF THE EVERGLADES, INC., et al.

      Plaintiffs,

v.

KRISTI NOEM, et al.,

      Defendants.

_____/

**DECLARATION OF KEITH PRUETT IN SUPPORT OF DEFENDANT KEVIN
GUTHRIE'S OPPOSITION TO PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER**

      I, Keith Pruett, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct based upon my personal knowledge and review of the relevant records maintained in the ordinary course of business:

      1.     I am Deputy Executive Director for the Florida Division Emergency .  I make this declaration in support of Defendant Kevin Gutherie's opposition to Plaintiffs' motion for a temporary restraining order.  If called as a witness, I could and would competently testify to the matters set forth herein.

      2.     The State of Florida is funding the construction and operation of a temporary detention facility at the Dade-Collier Training and Transition Airport.

      3.     Florida plans to seek reimbursement of its expenses from the federal government. But Florida has yet to receive any such reimbursement and the precise source and amount of any such reimbursement is unknown.

4.      The Dade-Collier Training and Transition Airport is an active airfield. My understanding is that the airfield is used daily, including by large aircraft. In the last six months, there have been about 28,000 flights.

5.      There is also two buildings on the site that are lit 24 hours a day.

6.      Compared to the current uses of the Dade-Collier Training and Transition Airport, any environmental impact from the construction or operation of a temporary detention and deportation facility is likely to be minimal.


Executed on June 30, 2025, in Tallahassee, Florida.

Keith Pruett, Executive Deputy Director

# Exhibit 1
# Giles Declaration

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC., and
CENTER FOR BIOLOGICAL DIVERSITY,

      *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his
official capacity as Executive Director of the
Florida Division of Emergency Management,
and MIAMI-DADE COUNTY, a political
subdivision of the State of Florida

      *Defendants*.

Civil Action No. 1:25-cv-22896

## DECLARATION OF THOMAS P. GILES

      Pursuant to the authority of 28 U.S.C. § 1746, I, Thomas P. Giles, declare that, to the best

of my knowledge, information, and belief, and under the penalty of perjury, the following is true

and correct:

1.      I am currently both the Acting Deputy Executive Associate Director (D-EAD) for the

United States Department of Homeland Security (DHS), Immigration and Customs Enforcement

1

App.32

(ICE), Enforcement and Removal Operations (ERO) and the Interim Assistant Director for Field Operations within ERO. I have been the Acting D-EAD of ERO since June 30, 2025, and the Interim Assistant Director for Field Operations since May 2025.

2.      As the Acting D-EAD of ERO, I oversee the mission of ERO's eight headquarters divisions: Enforcement, Removal, Non-Detained Management, Custody Management, Field Operations, ICE Health Service Corps, Law Enforcement Systems and Analysis, and Operations Support. As the interim Assistant Director for Field Operations, I oversee and direct all ERO field operations activities nationwide and ensure coordination among all ERO field offices. I have principal oversight over the full scope of immigration enforcement activities and programs through which ERO identifies, arrests, refers for prosecution, and removes illegal aliens from the United States.

3.      I began my career in federal law enforcement in 2001 as a Deportation Officer in the Seattle field office and was eventually promoted to Supervisory Detention and Deportation Officer and Assistant Field Office Director. In 2012, I was selected to serve as a Deputy Chief of Staff for ERO at ICE headquarters in Washington, D.C., and the following year, I served as the Chief of Staff. Following that, I served as the Field Office Director for the Atlanta and Los Angeles ERO field offices. In the Los Angeles field office, I oversaw 505 authorized positions and managed an annual budget of $110 million dollars. Prior to serving as the Acting Assistant Director for Field Operations, I served as the Assistant Director for the Non-Detained Management Division within ERO.

4.      I am familiar with the allegations made by plaintiffs in the instant lawsuit regarding the detention facility being constructed at the Dade-Collier Training and Transition Airport near the Big Cypress National Preserve (TNT Detention Facility).

5.      ICE is not providing any funding for the construction of the TNT Detention Facility. The State of Florida is responsible for the funding and construction of the facility. ICE's role concerning the development of the TNT Detention Facility has been limited to touring the facility to ensure compliance with ICE detention standards, and meeting with officials from the State of Florida to discuss operational matters.

6.      The ultimate decision of who to detain at the TNT Detention Facility belongs to Florida.

7.      If Florida decides to detain any illegal aliens at the TNT Detention Facility, they would do so under the authority delegated pursuant to section 287(g) of the Immigration and Nationality Act, codified at 8 U.S.C. § 1357(g).

8.      Many Florida entities have entered 287g agreements since President Trump took office, including the Florida National Guard and several Florida law enforcement entities. Those agreements, including the date they were signed, are available on ICE's website. *See* participatingAgencies07012025pm.xlsx. The agreements generally authorize those entities to detain aliens under the immigration laws. ICE's understanding is that Florida intends to operate its 287(g) facilities under those existing agreements.

9.      When ICE procures detention space from a state or local entity, it pays for that space via its appropriation for Operations and Support, which includes funding for enforcement, detention and removal operations. When it does so, the aliens are detained by a contractor on behalf of ICE.

10.     ICE has not purchased or otherwise procured any detention space from Florida for the detention of illegal aliens at the TNT Detention Facility.

11.     While the TNT Detention Facility is a concern of the State of Florida, its use in detaining aliens operationally benefits ICE as it will maximize detention capacity in furtherance of ICE's

3

App.34

immigration enforcement mission. Ultimately, the TNT Detention Facility will serve to

decompress other detention facilities used to house aliens throughout the United States.

Signed this 2nd day of July, 2025.



THOMAS P GILES
DN: cn=THOMAS P GILES, o=U.S.
Government, ou=People,
email=Thomas.P.Giles@ice.dhs.gov,
c=US
Date: 2025-07-02T21:17:38-0400

Thomas P. Giles
Acting Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

4

# Exhibit 2
# Richardson Declaration

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, *et al.*,

     Plaintiffs,

*v.*

KRISTI NOEM in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al*.,

     Defendants.

Civil Action No.
1:25-cv-22896-JEM

## DECLARATION OF DAVID RICHARDSON

I, David Richardson, declare as follows:

1. I am the Senior Official Performing the Duties of the Administrator at the Federal Emergency Management Agency ("FEMA" or "agency"). FEMA is a component within the U.S. Department of Homeland Security ("DHS"). As the Senior Official Performing the Duties of the FEMA Administrator, I am the DHS official responsible for being the principal advisor to the President and Secretary of Homeland Security ("Secretary") for all matters related to emergency management in the United States. I am also vested with the authority to manage and administer the various grant programs assigned to FEMA directly by statute or through delegation from the Secretary. I am familiar with the grant programs administered by FEMA and the policies and procedures governing these programs.

2. My statements in this Declaration are based on my personal knowledge, on information provided to me in my official capacity; on reasonable inquiry; information obtained from various records, systems, databases, DHS, or FEMA employees and information portals maintained and relied upon by the DHS in the regular course of business; and on my evaluation of that information.

3.  DHS/FEMA announced $600 million in federal funding for the Detention Support Grant Program (DSGP). The DSGP will provide financial assistance through a federal award to support sheltering of illegal aliens in a detention environment and related activities to avoid overcrowding in U.S. Customs and Border Protection short-term holding facilities. The only eligible applicant under the DSGP is the Florida Division of Emergency Management.

4.  Once the DSGP is finalized, DHS/FEMA will send the Florida Division of Emergency Management a grant notification letter. The grant notification letter is the official communication from DHS/FEMA that explains the grant application process and will include proposed terms and conditions of the grant including allowable costs. The Florida Department of Emergency Management must then apply for a DSGP federal award. The Florida Department of Emergency Division has not yet applied for a DSGP award, and DHS/FEMA has not yet approved a federal award.  I am not aware of any other grant applications that Florida has submitted to FEMA in connection with the temporary detention center at issue in this case.

5.  Costs for constructing new, permanent buildings are not allowable under the DSGP.

I, David Richardson, declare under penalty of perjury that the foregoing is true and correct.

Executed on July 2 2025

*Richardsonde*

_____
David Richardson
Senior Official Performing the Duties of the
Administrator
Federal Emergency Management Agency

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### No. 25-cv-22896-KMW

FRIENDS OF THE EVERGLADES, INC., et al.,

     Plaintiffs,

v.

KRISTI NOEM, et al.,

     Defendants.

### <u>DECLARATION OF IAN GADEA-GUIDICELLI</u>

I, Ian Gadea-Guidicelli, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct based upon my personal knowledge and review of the relevant records.  If called as a witness, I could and would competently testify to the matters set forth herein.

1.    I am the State Emergency Response Team (SERT) Chief and Bureau Chief of Response at the Florida Division of Emergency Management (FDEM).  I hold a bachelor's degree in International Affairs from Florida State University and a Master's degree in Public Administration from the University of Central Florida.  I have worked at FDEM for the past nine years.

2.    In my role as SERT Chief and Bureau Chief of Response, I lead the State's preparedness and response to emergencies and disasters.  My duties require that I oversee the operations of multiple bureaus and governmental agencies; direct high-level policy and logistical decisions; coordinate with internal and external stakeholders to ensure a unified and effective

emergency response; and work closely with Executive Director Guthrie to carry out his mission to protect our State from both natural and man-made disasters and emergencies.

3.      In 2023, Governor Ron DeSantis declared that the illegal immigration crisis affecting our Nation poses a statewide emergency.  Ex. 1.  Governor DeSantis has extended that emergency declaration to the present date.  Ex. 2.  Those orders have empowered FDEM to direct the State's response to that emergency and, among other things:

- Seek direct assistance and enter into agreements with any and all agencies of the federal government as may be needed to meet this emergency.

- Direct all state, regional, and local governmental agencies, including law enforcement agencies, to identify personnel needed from those agencies to assist in meeting the response, recovery, and mitigation needs created by this emergency, and to place all such personnel under the direct command and coordination of the FDEM to meet this emergency.

- Suspend the effect of any statute, rule, or order that would in any way prevent, hinder, or delay any mitigation, response, or recovery action necessary to cope with this emergency.  Ex. 1.

4.      In June 2025, Executive Director Guthrie used his emergency powers to assume control over the Dade-Collier Training and Transition Airport (TNT) to build a detention facility for illegal aliens pending deportation.  Ex. 3.  As SERT Chief and Bureau Chief of Response, I am charged with supervising and coordinating FDEM's day-to-day operations at the site.  Though I conduct my business primarily from FDEM headquarters in Tallahassee, I have visited the facility several times and am deeply familiar with its operation, physical layout, and on-site structures.

5.      To effectively carry out my responsibilities, it is essential that I understand the airport's prior operations and condition to determine the most appropriate use of the site in response to the immigration emergency.  Accordingly, I have familiarized myself with the site's historical condition and operations through, among other things, discussions with Joseph Kinnebrew, TNT Airport Manager for Miami-Dade County, and by reviewing business records he provided.

6.      TNT is a small airport owned by Miami-Dade County that is almost entirely located in the town Ochopee,  in Collier County, Florida.  A tiny grass extension of the airport runway lies in Miami-Dade County.  The attached schematic, Ex. 4, which I received during the course of my ordinary duties at FDEM, outlines TNT before the detention facility was built:



7.      In this image, the pale blue line surrounding the runway reflects the airport's fenced perimeter.  This fence line extends around the entire airport.  The images attached here were taken

by me and accurately reflect the perimeter fence.  Comp. Ex. 5.  It is roughly eight feet tall and is topped with barbed wire.  The fence existed at the airport long before the detention facility was built.

8.      The red line on the right side of the above image reflects the county line dividing Collier County on the left and Miami-Dade County on the right.  The red line on the left side of the image reflects the service road that leads to the airport's main gate from Tamiami Trail.  The trapezoidal structure in the center of the image reflects the airport runway and taxiway.  The square structure immediately above the runway and taxiway is an aircraft loading area, which currently houses the detention facility.

9.      The full extent of the airport area that has been commandeered for FDEM's operations is reflected in red in the image below, which was created by FDEM staff, at my direction, using a standard GIS application:



4

Ex. 6.

10.     The line that bisects the image above again reflects the county line dividing Collier

County on the left and Miami-Dade County on the right.  As reflected in the box above the image's

legend, the total area reflected in red amounts to roughly 1119 acres.  Of that acreage, 1096 acres

are in Collier County and 23 acres are in Miami-Dade County.  As a percentage, 98% of the land

commandeered by FDEM exists in Collier; just 2% exists in Miami-Dade.  The small portion of

the airport that exists in Miami-Dade is unpaved and devoid of critical infrastructure.  As a result,

none of FDEM's operations have taken or will take place in the Miami-Dade portion of the airport.

FDEM's day-to-day operations at TNT have been, and will remain, confined to Collier County.

11.     In the course of my duties managing the detention facility, I have received flight

logs for the airport from Joseph Kinnebrew, TNT's Airport Manager.  Ex. 7.  These logs contain

detailed flight data for the airport from January 1, 2025 to July 23, 2025.  The data reflects that

27,997 landings and take offs occurred during that time span—roughly 137 operations a day.

However, this data likely underestimates the average number of daily operations in the past several

months because it includes a month of data from *after* the State commandeered the airport on June

23, 2025.  During that period, public flights at the airport quickly ceased, meaning that the overall

average flight activity from January 1 to July 23 would be much higher if the detention facility had

not been built.

12.     The flight logs reflect that, of the 27,997 operations at TNT in the past several

months, 4,349 involved multi-engine planes; 391 involved business jets; 137 involved helicopters;

521 involved military planes; and 199 involved military helicopters.  Many of these flights

occurred in the daytime, but the airport also was open for night flights upon request.

13.     Before the detention facility opened at the site, training pilots typically used TNT to practice "touch and gos."  In a touch and go, a pilot will take off, fly a short distance, land, and then take off again without coming to a complete stop or deplaning.  It is my understanding that Miami-Dade County's flight-tracking software did not log touch and go operations until November 2024.  Accordingly, the flight data recorded in that software severely underreported the total flight operations occurring at the airport on a daily basis.  In other words, it is inaccurate.

14.     I have personally seen flights land and take off at the airport.  They are, quite obviously, very loud.  Because the surrounding land is flat and there are no nearby buildings, the sound tends to reverberate well beyond the airport itself.  In my experience, the sound of planes landing at and taking off from the airport would be loud enough to jolt most humans, let alone surrounding wildlife.

15.     Since FDEM has assumed control of the airport, about two to three flights land or take off from the airport each day, though there are days when no flights land or take off.  Flight traffic at the airport has thus decreased approximately 98% since the detention facility opened based on the flight data discussed above.

16.     Turning to the facility's grounds, there were structures at the site even before the detention facility was built.  The airport has two buildings on-site.  These buildings have outdoor lights that are lit 24/7 and are bright enough to light both the buildings and the surrounding area. The airport also has runway lights that would turn on during night landings and take offs.

17.     The detention facility contains several types of structures, including tarped detention tents, lights, generators, fencing, and paved roads.  Each of those pieces of infrastructure are critical to secure the safety of both the facility's detainees and operators.  Importantly, all

infrastructure at the facility is temporary and can be removed once FDEM's operations cease at the airport.

18.     FDEM has worked hard to ensure that the facility does not inadvertently harm the surrounding environment.  It has instituted a rigorous waste-management policy that ensures waste is securely removed from the facility daily.  Ex. 8.  It has paved exclusively over land that was previously filled and leveled when the airport was first built in the 1970s.  It has installed new silt fencing—black plastic fencing designed to block sediment runoff—around newly paved areas to stop debris or other materials from inadvertently falling into the surrounding wetlands.  Ex. 9 (identifying areas in which silt fencing has been installed).  And, at least until the Court entered a temporary restraining order barring further construction of infrastructure at the site, FDEM was building a drainage basin to provide further protection for surrounding wetlands.  That work is now on hold to comply with the Court's order.

19.     FDEM has also endeavored to ensure that the detention facility does not meaningfully affect local wildlife.  It commissioned a preliminary study that determined there would not be meaningful impacts on species native to the area, like panther, bonneted bat, wood stork, or snail kite.  Ex. 10.  It has also installed roughly forty speed bumps along the preexisting service road leading to the airport's main gate to slow the speed of traffic, as reflected in the attached picture, which I took.  Ex. 11.  The speed limit on many roads in and surrounding the airport is 15 MPH, which further mitigates any effect additional traffic will have on the area.  In all events, the preexisting service road leading to the airport was traveled even before the detention facility was built, as it was used by training pilots to reach the airport.  And State Road 41—which vehicles must travel across to reach the facility—has long been a heavily used road, as it connects the east and west portions of the State.

20.     As for the facility's origins, the facility was developed by the State to assist in enforcing federal immigration law.  FDEM has considered TNT as a possible staging area for the State's response to a South Florida hurricane given its location and active runway, so it was a natural fit for responding to the illegal immigration emergency.  So far as I am aware, at no point did federal officials order the State to construct the site, nor did Florida seek federal permission to build the site.

21.     To that end, the facility was entirely State constructed.  It was built pursuant to the emergency powers Governor DeSantis conferred to FDEM in his orders declaring a statewide illegal immigration emergency.  And it was constructed by state-paid vendors and funded solely with state dollars.  The only federal involvement with the construction process at the site was a post-construction compliance check by ICE to ensure the site met federal standards for housing federal immigration detainees.  It is my understanding that ICE ran the same compliance check that it runs for other state facilities that house federal immigration detainees, like county jails and correctional facilities.

22.     FDEM does not know whether FEMA will reimburse state funding used for the facility, how much funding FEMA may provide, or how long it will take FEMA to issue reimbursement.

23.     FDEM and its sister state agencies—including Florida Department of Corrections; Florida Department of Business & Professional Regulation, Division of Alcoholic Beverages and Tobacco; Florida Department of Law Enforcement; Florida Department of Financial Services; Florida Department of Highway Safety and Motor Vehicles, Division of Highway Patrol; Florida Wildlife Conservation Commission; Florida Department of Environmental Protection; Florida

Lottery; Florida National Guard; and Florida State Guard—operate the site with assistance from FDEM's vendors.

24.     On any given day, there are about 115 state officials and between 800-1000 state contractors carrying out various activities at the site.  In comparison, there are just four ICE officers present for the limited purpose of coordinating the transportation and physical custody of the detainees.  The ICE officers do not control the site, nor do they have any infrastructure on site.  Construction and day-to-day maintenance of the site is handled exclusively by state officials.

25.     Because the State operates this facility of its own volition, it has significant control over whom it houses there.  For example, the State may turn down detainees from the federal government.  If the State no longer wishes to hold a detainee, it can require the federal government to reassume custody.  The State has in fact declined to hold entire classes of persons, including women, children, and illegal aliens of high medical risk, though it could choose to house those individuals in its discretion.  If so, they would be separated from the general, adult male population.

26.     Given my experience with the facility, I am aware that many illegal aliens at the facility are violent criminals with dangerous criminal records.  I am also aware that many of these illegal aliens were apprehended in Florida before they were placed in this facility.


Executed on August 11, 2025, in Tallahassee, Florida.

_____
Ian Gadea-Guidicelli, SERT Chief

# EXHIBIT 1

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 23-03
### (Emergency Management – Illegal Migration)

**WHEREAS**, on September 28, 2021, I issued Executive Order 21-223, directing state law enforcement agencies and other state agencies to take necessary actions to protect Floridians from the dangerous impacts of the Biden Border Crisis; and

**WHEREAS**, in recent months, the numbers of individuals attempting to come to the United States and unauthorized alien interdictions in and around Florida have risen to alarming levels not seen for decades; and

**WHEREAS**, in the first two months of the current fiscal year, U.S. Customs and Border Protection (CBP) has encountered over 460,000 persons attempting entry along the Southwest Border;

**WHEREAS**, during the last fiscal year, over 2.3 million encounters with unauthorized aliens occurred at the Southwest Border; and

**WHEREAS**, as the lawlessness at the Southwest Border continues unabated and the Biden Administration has repeatedly demonstrated its ineptitude at managing the crisis it created, more migrants are seeking entry into the United States; and

**WHEREAS**, from August 2022 to the present, federal, state, and local officials have interdicted approximately 8,042 migrants in Florida's territorial waters alone; and

**WHEREAS**, approximately 300 unauthorized aliens unlawfully entered the Dry Tortugas National Park in the Florida Keys on January 1, 2023; and

County Exhibit A

1

**WHEREAS**, reports indicate an additional 45 unauthorized aliens unlawfully entered Key West on the evening of January 5, 2023; and

**WHEREAS**, intelligence reports reveal additional vessels are en route to Florida shores; and

**WHEREAS**, such a mass migration of unauthorized aliens, including the associated abandonment of vessels, without appropriate support from the federal government, has created an unmanageable strain on local resources and will continue to overburden the capabilities of local governments throughout the state; and

**WHEREAS**, mass migration by sea or land is extremely dangerous and must be discouraged; and

**WHEREAS**, the response from the Biden Administration on this crisis is inadequate and presents an undue burden on local law enforcement to prevent the mass migration that is now occurring and only likely to worsen; and

**WHEREAS**, given the magnitude of this situation, which is further exacerbated by the Biden Administration's failure to secure the border, central coordination, direction, and state resources are needed to identify and respond to the anticipated large influx of unauthorized aliens immigrating from foreign countries to Florida; and

**WHEREAS**, Florida's history of assisting refugees, including Cubans and others fleeing communist regimes, has previously involved support from the federal government and a coordinated effort among federal, state, and local governments; and

**WHEREAS**, as Governor, I am responsible to meet the dangers presented to Florida and its people by this emergency.

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section 1(a) of the Florida Constitution and by the Florida

Emergency Management Act, as amended, and all other applicable laws, promulgate the following

Executive Order, to take immediate effect:

Section 1. Because of the foregoing conditions, I hereby find that the migration of

unauthorized aliens to the State of Florida is likely to constitute a major disaster. I therefore declare

that a state of emergency exists in the State of Florida.

Section 2. I designate the Director of the Division of Emergency Management as the State

Coordinating Officer for the duration of this emergency and direct him to execute the State's

Comprehensive Emergency Management Plan and other response, recovery, and mitigation plans

necessary to cope with the emergency. Pursuant to section 252.36(1)(a), Florida Statutes, I delegate

to the State Coordinating Officer the authority to exercise those powers delineated in sections

252.36(6)-(12), Florida Statutes, which he shall exercise as needed to meet this emergency, subject

to the limitations of section 252.33, Florida Statutes. In exercising the powers delegated by this

Executive Order, the State Coordinating Officer shall confer with the Governor to the fullest extent

practicable. The State Coordinating Officer shall also have the authority to:

A. Invoke and administer the Emergency Management Assistance Compact

("EMAC") (sections 252.921-252.9335, Florida Statutes) and other compacts and agreements

existing between the State of Florida and other states, and the further authority to coordinate the

allocation of resources from such other states that are made available to Florida under such

compacts and agreements so as to best meet this emergency.

B. Seek direct assistance and enter into agreements with any and all agencies of

the federal government as may be needed to meet this emergency.

C. Direct all state, regional, and local governmental agencies, including law

enforcement agencies, to identify personnel needed from those agencies to assist in meeting the

response, recovery, and mitigation needs created by this emergency, and to place all such personnel

3

under the direct command and coordination of the State Coordinating Officer to meet this emergency.

D. Direct the actions of any state agency as necessary to implement the Federal Emergency Management Agency's National Disaster Recovery Framework.

E. Designate Deputy State Coordinating Officers and Deputy State Disaster Recovery Coordinators, as necessary.

F. Suspend the effect of any statute, rule, or order that would in any way prevent, hinder, or delay any mitigation, response, or recovery action necessary to cope with this emergency. In accordance with section 252.3611(1), Florida Statutes, any order, declaration, or other action suspending a statute or rule shall specify each statute or rule being amended or waived, if applicable, and the expiration date for the order or action.

G. Enter orders as may be needed to implement any of the foregoing powers; however, the requirements of sections 252.46 and 120.54(4), Florida Statutes, do not apply to any such orders issued by the State Coordinating Officer. No such order shall remain in effect beyond the expiration of this Executive Order, including any extension thereof.

Section 3. I order the Adjutant General to activate the Florida National Guard, as needed, to deal with this emergency.

Section 4. I find that the special duties and responsibilities resting upon some state, regional, and local agencies and other governmental bodies in responding to this emergency may require them to suspend or waive the effect of certain statutes, rules, ordinances, and orders they administer. Therefore, I issue the following authorizations:

A. Pursuant to section 252.36(6)(a), Florida Statutes, the Executive Office of the Governor may suspend all statutes and rules affecting budgeting to the extent necessary to provide budget authority for state agencies to cope with this emergency. The requirements of sections

252.46 and 120.54(4), Florida Statutes, do not apply to any such suspension issued by the Executive Office of the Governor. No such suspension shall remain in effect beyond the expiration of this Executive Order, including any extension thereof.

B.  Each state agency may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of that agency, if strict compliance with the provisions of any such statute, order, or rule would in any way prevent, hinder, or delay necessary action in coping with the emergency.  This includes, but is not limited to, the authority to suspend any and all statutes, rules, ordinances, or orders which affect leasing, printing, purchasing, travel, and the condition of employment and the compensation of employees. In accordance with section 252.3611(1), Florida Statutes, any agency order, declaration, or other action suspending a statute or rule shall specify each statute or rule being amended or waived, if applicable, and the expiration date for the order or action.  The requirements of sections 252.46 and 120.54(4), Florida Statutes, shall not apply to any such suspension issued by a state agency. No such suspension shall remain in effect beyond the expiration of this Executive Order, including any extension thereof.

C.  In accordance with section 252.38(3), Florida Statutes, each political subdivision within the State of Florida may waive the procedures and formalities otherwise required of the political subdivision by law pertaining to:

1)  Performance of public work and taking whatever prudent action is necessary to ensure the health, safety, and welfare of the community;

2)  Following local procurement and contracting policies;

3)  Entering into contracts; however, political subdivisions are cautioned against entering into time and materials contracts without a ceiling as defined by 2 C.F.R. 200.318(j) or cost plus percentage contracts as defined by 2 C.F.R. 200.324(d);

App.53

4)  Incurring obligations;

5)  Employment of permanent and temporary workers;

6)  Utilization of volunteer workers;

7)  Rental of equipment;

8)  Acquisition and distribution, with or without compensation, of supplies, materials, and facilities; and

9)  Appropriation and expenditure of public funds.

D.  All agencies whose employees are certified as disaster service volunteers within the meaning of section 110.120(2)(d), Florida Statutes, may, in accordance with section 110.120(3), Florida Statutes, release any such employees for such service as requested by the employee to meet this emergency.

Section 5.  I find that the demands placed upon funds specifically appropriated to state and local agencies for disaster relief or response are unreasonably great and that such funds may be inadequate to pay the costs of coping with this emergency.  In accordance with section 252.37(2)(b), Florida Statutes, I direct that sufficient funding be made available, as needed, by transferring and expending moneys from the Emergency Preparedness and Response Fund created under section 252.3711, Florida Statutes.

In accordance with section 252.37(2)(a), Florida Statutes, state agencies responding to this emergency must first spend funds specifically appropriated for disaster relief or response. If no specifically appropriated funds exist, or if funds specifically appropriated are exhausted, state agencies are authorized to spend funds from the Emergency Preparedness and Response Fund through the procedures outlined in Memorandum No. 22-046, Emergency Preparedness and Response.

App.54

Case 1:25-cv-22896-KMW   Document 116-1   Entered on FLSD Docket 08/02/2025   Page 7 of 7
Case 1:25-cv-22896-KMW   Document 116-1   Entered on FLSD Docket 08/12/2025   Page 17 of 48
USCA11 Case: 25-12873   Document: 2048   Date Filed: 08/26/2025   Page: 84 of 226

Section 6.  All state agencies entering emergency orders, emergency declarations, or other emergency actions in response to this emergency shall advise the State Coordinating Officer contemporaneously or as soon as practicable thereafter, and, pursuant to section 252.36(3)(b), Florida Statutes, shall submit the order or declaration to the Division of Administrative Hearings within five days of issuance.

Section 7.  Medical professionals and workers, social workers, and counselors with good and valid professional licenses issued by states other than the State of Florida may render such services in Florida during this emergency for persons affected by this emergency with the condition that such services be rendered to such persons free of charge, and with the further condition that such services be rendered under the auspices of the American Red Cross or the Florida Department of Health.

Section 8.   All actions taken by the Director of the Division of Emergency Management with respect to this emergency before the issuance of this Executive Order are ratified.

Section 9.   This Executive Order is effective immediately and shall expire sixty (60) days from this date unless extended.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 6th day of January, 2023.

_____
RON DESANTIS, GOVERNOR

ATTEST:

_____
SECRETARY OF STATE

2023 JAN -6 PM 2:24
SECRETARY OF STATE
TALLAHASSEE, FL
FILED

7

EXHIBIT 2

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 25-120

(Emergency Management – Extension of Executive Order 23-03 – Illegal Immigration)

**WHEREAS,** on January 6, 2023, I issued Executive Order 23-03, declaring a state of emergency in Florida due to the mass migration of illegal aliens to Florida; and

**WHEREAS,** Executive Order 23-03, as subsequently extended by Executive Order 25-75, expires on June 3, 2025, unless extended; and

**WHEREAS,** an extension of Executive Order 23-03 is necessary because the large influx and number of illegal aliens within the State remains and the response from the Biden Administration was inadequate; and

**WHEREAS,** this ongoing crisis continues to strain local resources and requires the continued coordination, direction, and resources of the State of Florida.

**NOW, THEREFORE, I, RON DESANTIS,** as Governor of Florida, by virtue of the authority vested in me by Article IV, Section l(a) of the Florida Constitution and by the Florida Emergency Management Act, as amended, and all other applicable laws, promulgate the following Executive Order, to take immediate effect:

Section 1. The state of emergency and all provisions of Executive Order 23-03 are renewed for sixty (60) days following the date of this Executive Order.

Section 2. Except as amended herein, Executive Order 23-03 is ratified and reaffirmed.

County Exhibit B

Section 3. This Executive Order is effective immediately.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 2nd day of June, 2025.

_____
RON DESANTIS, GOVERNOR

ATTEST:

_____
SECRETARY OF STATE

2025 JUN -2 AM 9:20
DEPARTMENT OF STATE
TALLAHASSEE, FL
FILED

EXHIBIT 3

# STATE OF FLORIDA
# DIVISION OF EMERGENCY MANAGEMENT

**Ron DeSantis**, *Governor*                                    **Kevin Guthrie**, *Executive Director*

**VIA ELECTRONIC MAIL**

June 23, 2025

The Honorable Daniella Levine Cava
Mayor, Miami-Dade County
Stephen P. Clark Center
111 NW 1st Street
Miami, FL 33128

**Re: Notice of Intent to Utilize the Dade-Collier Training and Transition Airport (TNT)**

Dear Mayor Levine Cava,

I am in receipt of your "Response to Letter of Intent for Purchase of TNT" dated June 23, 2025. On behalf of the State of Florida and the Florida Division of Emergency Management (the "Division"), this letter serves as notice that the Division intends to utilize the Dade-Collier Training and Transition Airport, located at 54575 Tamiami Trail E, Ochopee, Florida, 34141 (the "Property"), pursuant to Governor DeSantis's emergency powers under section 252.36(6)(b) and (i), Florida Statutes, and delegated to me as the State Coordinating Officer in Executive Order 23-03, which remains in effect and was most recently extended by Executive Order 25-120. The Division's utilization of the Property will last no longer than the duration of the state of emergency.

While the negotiations to purchase the property are underway, the Division will begin immediate utilization of the improved area of the site, as I now deem it necessary to meet the Division's current operational demands in coping with the emergency. Time is of the essence. We must act swiftly to ensure readiness and continuity in our statewide operations to assist the federal government with immigration enforcement. The Division remains committed to working collaboratively with all appropriate authorities.

I appreciate your support of statewide emergency operations and your commitment to our shared mission to safeguard the people of Florida. I request that your team coordinate with the Division's General Counsel, Stephanie Houp, Esq., should there be any questions or concerns regarding this matter.

Thank you for your partnership and prompt attention.

Sincerely,

Kevin Guthrie
**Kevin Guthrie**
**Executive Director**
Florida Division of Emergency Management
Kevin.Guthrie@em.myflorida.com
(850) 294-8250

County Exhibit E

**DIVISION HEADQUARTERS**
2555 Shumard Oak Boulevard
Tallahassee, FL 32399-2100

Telephone: 850-815-4000
www.FloridaDisaster.org

**STATE LOGISTICS RESPONSE CENTER**
2702 Directors Row
Orlando, FL 32809-5631

App. 60

EXHIBIT 4



App.62

EXHIBIT 5



App. 64



App.65



App.66



App. 57



App.68

EXHIBIT 6



# EXHIBIT 7

# virtower
Airport Operations Tracking

Virtower LLC
13721 Jetport Commerce Pkwy, Suite 2
Fort Myers FL 33913
Phone +1 888 31 70 747
virtower.com | info@virtower.com

**Airport Operations**
**Snapshot Local Time**
Start Date    01/01/2025 00:00 LT
End Date      07/23/2025 23:59 LT

Creation      07/24/2025 20:38
User          _KTNT_user
Customer ID   KTNT

## Summary

| Landings | | Take-Offs | | Totals | |
|---|---|---|---|---|---|
| Single Engine | 11664 | Single Engine | 10253 | Single Engine | 21917 |
| Single Engine Turbine | 47 | Single Engine Turbine | 48 | Single Engine Turbine | 95 |
| Multi Engine | 2192 | Multi Engine | 2056 | Multi Engine | 4248 |
| Multi Engine Turbine | 51 | Multi Engine Turbine | 50 | Multi Engine Turbine | 101 |
| Business Jet | 201 | Business Jet | 190 | Business Jet | 391 |
| Helicopter | 59 | Helicopter | 78 | Helicopter | 137 |
| Military | 260 | Military | 261 | Military | 521 |
| Military Helicopter | 77 | Military Helicopter | 122 | Military Helicopter | 199 |
| Light Sport Aircraft | 216 | Light Sport Aircraft | 156 | Light Sport Aircraft | 372 |
| Other | 9 | Other | 7 | Other | 16 |
| **TOTAL** | **14776** | **TOTAL** | **13221** | **TOTAL** | **27997** |

## FAA AAC/ADG Summary

| Landings | | Take-Offs | | Totals | |
|---|---|---|---|---|---|
| A1 | 13550 | A1 | 11980 | A1 | 25530 |
| A2 | 34 | A2 | 35 | A2 | 69 |
| B1 | 362 | B1 | 355 | B1 | 717 |
| B2 | 97 | B2 | 90 | B2 | 187 |
| B3 | 241 | B3 | 242 | B3 | 483 |
| C1 | 53 | C1 | 49 | C1 | 102 |
| C2 | 17 | C2 | 17 | C2 | 34 |
| C3 | 6 | C3 | 5 | C3 | 11 |
| C4 | 2 | C4 | 2 | C4 | 4 |
| D2 | 8 | D2 | 8 | D2 | 16 |
| D4 | 1 | D4 | 1 | D4 | 2 |
| HEL | 136 | HEL | 200 | HEL | 336 |
| UKN | 269 | UKN | 237 | UKN | 506 |
| **TOTAL** | **14776** | **TOTAL** | **13221** | **TOTAL** | **27997** |

## Operations by Aircraft Type

| Single Engine | | Single Engine Turbine | | Multi Engine | | Multi Engine Turbine | | Business Jet | | Jet 2 | | Jet NB | | Jet 4 | | Jet WB | | Helicopter | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AA5A | 8 | C208 | 21 | AC50 | 4 | B300 | 18 | BAE125 | 4 | | | | | | | | | A109 | 34 |
| BE33 | 19 | M600 | 6 | B200 | 18 | B350 | 38 | BE40 | 16 | | | | | | | | | A139 | 2 |
| BE35 | 26 | PC12 | 32 | B58 | 15 | B90 | 6 | C500 | 2 | | | | | | | | | AS350 | 21 |
| BE36 | 125 | TBM7 | 2 | BE18 | 24 | BE20 | 13 | C501 | 2 | | | | | | | | | AS50 | 1 |
| C150 | 81 | TBM8 | 12 | BE55 | 97 | BE30 | 2 | C510 | 18 | | | | | | | | | AW139 | 8 |
| C152 | 1537 | TMB7 | 22 | BE58 | 52 | BE9L | 2 | C550 | 3 | | | | | | | | | B06 | 1 |
| C162 | 11 | | | BE76 | 1183 | CVLT | 2 | C55B | 8 | | | | | | | | | B407 | 2 |
| C172 | 13323 | | | BE95 | 4 | MU2 | 16 | C680 | 2 | | | | | | | | | B429 | 2 |
| C177 | 109 | | | C337 | 18 | SF34 | 2 | C68A | 4 | | | | | | | | | B505 | 2 |
| C182 | 159 | | | C401 | 12 | | | C700 | 2 | | | | | | | | | BK117 | 1 |
| C206 | 50 | | | C402 | 25 | | | E505 | 15 | | | | | | | | | EC20 | 9 |
| C207 | 2 | | | C404 | 4 | | | E50P | 108 | | | | | | | | | H60 | 1 |
| C210 | 6 | | | C414 | 12 | | | E545 | 4 | | | | | | | | | R22 | 4 |
| C240 | 32 | | | C421 | 45 | | | E55P | 2 | | | | | | | | | R44 | 14 |
| COL3 | 2 | | | DA42 | 16 | | | F2000 | 2 | | | | | | | | | R66 | 6 |
| CTLS | 12 | | | DA62 | 379 | | | F2TH | 12 | | | | | | | | | S76 | 14 |

App.72

**virtower**
Airport Operations Tracking

VirTower LLC
Airport Operations Tracking
Fort Myers FL 33913
Phone +1 888 31 70 747
virtower.com | info@virtower.com

Airport Operations
**Snapshot Local Time**
Start Date        01/01/2025 00:00 LT
End Date          07/23/2025 23:59 LT

Creation      07/24/2025 20:38
User          _KTNT_user
Customer ID   KTNT

| Single Engine | | Single Engine Turbine | | Multi Engine | | Multi Engine Turbine | | Business Jet | | Jet 2 | | Jet NB | | Jet 4 | | Jet WB | | Helicopter | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DA20 | 5 | | | G690 | 8 | | | G550 | 5 | | | | | | | | | Others | 15 |
| DA40 | 311 | | | G695 | 22 | | | GIV | 4 | | | | | | | | | | |
| DHC2 | 8 | | | P2006 | 297 | | | GLF4 | 12 | | | | | | | | | | |
| J250 | 10 | | | P2006T | 2 | | | GLF5 | 6 | | | | | | | | | | |
| Kitfox | 2 | | | P68 | 10 | | | GV | 4 | | | | | | | | | | |
| KODI | 31 | | | P68C | 5 | | | H25B | 10 | | | | | | | | | | |
| Lancair | 4 | | | PA23 | 8 | | | HA420 | 10 | | | | | | | | | | |
| LibertyXL2 | 464 | | | PA30 | 63 | | | HDJT | 18 | | | | | | | | | | |
| M20 | 34 | | | PA31 | 28 | | | LJ31 | 2 | | | | | | | | | | |
| M600 | 33 | | | PA34 | 1501 | | | LJ60 | 102 | | | | | | | | | | |
| M7 | 2 | | | PA44 | 408 | | | SF50 | 14 | | | | | | | | | | |
| NG5 | 2 | | | | | | | | | | | | | | | | | | |
| P2008 | 61 | | | | | | | | | | | | | | | | | | |
| PA28 | 1896 | | | | | | | | | | | | | | | | | | |
| PA32 | 80 | | | | | | | | | | | | | | | | | | |
| PA38 | 4 | | | | | | | | | | | | | | | | | | |
| PA46 | 91 | | | | | | | | | | | | | | | | | | |
| R114 | 20 | | | | | | | | | | | | | | | | | | |
| RV12 | 236 | | | | | | | | | | | | | | | | | | |
| RV14 | 8 | | | | | | | | | | | | | | | | | | |
| RV6 | 16 | | | | | | | | | | | | | | | | | | |
| S22T | 106 | | | | | | | | | | | | | | | | | | |
| SLG2 | 16 | | | | | | | | | | | | | | | | | | |
| SLING | 22 | | | | | | | | | | | | | | | | | | |
| SR20 | 1425 | | | | | | | | | | | | | | | | | | |
| SR22 | 1334 | | | | | | | | | | | | | | | | | | |
| T11 | 23 | | | | | | | | | | | | | | | | | | |
| T240 | 4 | | | | | | | | | | | | | | | | | | |
| T28 | 4 | | | | | | | | | | | | | | | | | | |
| TB-20 | 32 | | | | | | | | | | | | | | | | | | |
| TB-20 | 54 | | | | | | | | | | | | | | | | | | |
| TB9 | 4 | | | | | | | | | | | | | | | | | | |
| V1 | 17 | | | | | | | | | | | | | | | | | | |
| V1.0 | 42 | | | | | | | | | | | | | | | | | | |
| VIRUS SW100 | 14 | | | | | | | | | | | | | | | | | | |
| XS | 2 | | | | | | | | | | | | | | | | | | |

| Military | | Military Helicopter | | Light Sport Aircraft | | Glider | | UAV | | Blimp | | Balloon | | GND Emergency | | GND Vehicle A | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C17 | 2 | A565 | 199 | A5 | 9 | | | | | | | | | | | | | Others | 16 |
| C27J | 28 | | | BRISTELL | 6 | | | | | | | | | | | | | | |
| C30J | 4 | | | Cavalon | 2 | | | | | | | | | | | | | | |
| CN35 | 481 | | | CTLS | 20 | | | | | | | | | | | | | | |
| TEX2 | 4 | | | IconA5 | 2 | | | | | | | | | | | | | | |
| Others | 2 | | | PIAT | 2 | | | | | | | | | | | | | | |
| | | | | SLG2 | 13 | | | | | | | | | | | | | | |
| | | | | SLH4 | 217 | | | | | | | | | | | | | | |
| | | | | Sling | 101 | | | | | | | | | | | | | | |

**Activity Summary**

| | |
|---|---|
| LANDING RWY 09 | 12422 |
| LANDING RWY 27 | 2354 |

App.73

# virtower

Airport Operations Tracking

VirTower LLC
Airport Operations www.virtower.net
Fort Myers FL 33913
Phone +1 888 31 70 747
virtower.com | info@virtower.com

Airport Operations
**Snapshot Local Time**
Start Date          01/01/2025 00:00 LT
End Date           07/23/2025 23:59 LT

Creation          07/24/2025 20:38
User              _KNT_user
Customer ID       KTNT

| | |
|---|---|
| TAKEOFF RWY 09 | 10987 |
| TAKEOFF RWY 27 | 2234 |
| T&G RWY 09 | 2186 |
| T&G RWY 27 | 433 |

*This report was generated using sensors monitoring aircraft operations at the selected airport and may not contain aircraft that do not have ADS-B. Airports that have multiple sensors deployed will also feature aircraft fitted with transponders only. The information presented is correct to the best of our knowledge from available sensors at the time: Les Goldsmith, President VirTower LLC*

App.74

EXHIBIT 8

# TDF Waste Management Plan Overview

## Overview

This plan if for the initial waste management of the temporary detention facility and will be expanded as site build out allows for more comprehensive permanent solutions to be implemented. The goal of the Division and contracted vendors is to ensure a robust, proactive logistics and installation plan that fully eliminates the potential for environmental issues related to waste production, solid waste management, recycling, construction and demolition debris, and potable water management for all on-site restroom, shower, and laundry trailers by integrating high-capacity containment, secure plumbing, secondary spill containment, solid waste management, recycling, construction and demolition debris handling, and robust monitoring, this plan addresses and eliminates environmental risks, ensuring compliance and safe conditions for site occupants.

### Monitoring, Evaluation and Compliance

On-site personnel will monitor biowaste and solid waste storage, potable water systems, dumpster, recycling, and C&D debris areas for leaks, spills, overflow, or contamination. Preventive maintenance schedules will be followed, including pump-outs of frac tanks and timely waste, recycling, and debris hauling. All procedures will comply with federal, state, and local environmental regulations.

## Wastewater and Potable Water

### Wastewater

Shower, restroom, and laundry units, as well as administrative and billeting trailers produce graywater, blackwater, and lint waste. Each waste-producing trailer will be hard-plumbed directly to designated 22,000-gallon frac tanks, reducing frequency of tank exchanges and minimizing transfer points. Frac tanks will be maintained at less than 50% of capacity. To secure connection points, all waste discharge lines will utilize 2-inch camlock connections. All connection points, hoses, and storage tanks will be within containment trays for spill protection. A trained team will inspect all plumbing and containment systems daily to maintain zero environmental impact.

### Potable Water

Potable water will be delivered by 2,000-gallon and 6,000-gallon tanker trucks and transferred via secure plumbing to ensure safe transport and storage. To provide sealed connections, all potable water hookups will use 2-inch camlock fittings for a closed system. Water tanks will be sanitized, flushed, and water quality tested regularly.

## Solid Waste

Appropriately sized roll-off dumpsters will be strategically placed throughout the site to handle all solid waste generated by operations and personnel. All dumpsters will be equipped with lids or tarps to prevent littering, wind dispersal, and animal intrusion. Dumpsters will be placed on stable ground with adequate clearance for truck access. A daily swap schedule for removal and replacement will be maintained to prevent overflow and ensure site cleanliness. Waste haulers will be responsible for safe transport and disposal at permitted facilities.

### Recycling

Clearly marked recycling containers will be placed next to general waste dumpsters and throughout common areas to encourage source separation of recyclable materials. Materials such as cardboard, plastic, metal, and paper will be collected separately to reduce contamination and maximize recycling efficiency. A dedicated recycling hauler will collect and transport recyclable materials to an approved recycling facility on a routine schedule.

**C&D Debris Management**

Dedicated roll-off containers will be provided specifically for construction and demolition debris to avoid mixing with general waste and recyclables. Materials such as wood, metal, concrete, and drywall will be separated where practical to facilitate recycling and reuse opportunities. All C&D debris will be removed by licensed haulers and transported to permitted disposal or recycling facilities in compliance with local regulations.

## Biowaste

Health and Medical vendor will ensure biohazard waste management involves proper containment, labeling, segregation, and disposal to prevent the spread of infection and environmental contamination. This includes using designated leak-proof, puncture-resistant containers, ensuring proper labeling with the biohazard symbol, and following specific disposal protocols for different types of biohazardous materials, such as sharps and liquid waste.

*Containment*
Biohazard waste will be placed in sturdy, leak-proof containers that are resistant to punctures. Sharps will be disposed of in designated sharps containers.

*Labeling*
All containers must be clearly labeled with the universal biohazard symbol and appropriate warnings, such as "Biohazardous Waste" or "Infectious Waste".

*Segregation*
Different types of biohazardous waste (e.g., sharps, liquid waste, pathological waste) will be segregated into separate containers to minimize risks and facilitate proper treatment.

*Disposal*
Biohazard waste from the site will be picked up by a certified and registered Biohazard disposal company and disposed of in accordance with Florida regulations.

 Exhibit 2 to Declaration of Eve Samples

EXHIBIT 9



EXHIBIT 10

116 East Indiana Avenue
DeLand, FL 32724

**Corporate Headquarters**
6575 West Loop South, Suite 300
Bellaire, TX 77401
Main: 713.520.5400

# MEMORANDUM

| | |
|---|---|
| **TO:** | Carlos D. Rodriguez, Lemoine CDR Logistics |
| **FROM:** | Tom Roberts |
| **COPIES:** | |
| **SUBJECT** | Everglades Detention Center Preliminary Ecological Assessment |
| **DATE:** | August 04, 2025 |
| **PROJECT NUMBER:** | PRJ113094 |

The Florida Division of Emergency Management (FDEM) began construction of the Everglades Detention Center (EDC) also known as "Alligator Alcatraz" on June 25, 2025. EDC is entirely situated within the Dade-Collier Training and Transition Airport (DCTTA) located at 54575 East Tamiami Trail, Ochopee, Collier County, Florida. For the purposes of this evaluation, the project area, including the existing DCTTA and an additional 500-foot buffer, was assessed to determine potential environmental impacts. This preliminary ecological evaluation is based on a database review of the project area and a site visit conducted by Resource Environmental Solutions, LLC (RES) staff on July 29, 2025.

**Existing Conditions**

DCTTA is centrally located within an approximately 4700-acre parcel owned by Dade County. Florida Land Use and Cover Classification System (FLUCCS) data was used to determine land use in the project area. Land use within or adjacent to the DCTTA includes Upland Hardwood Forests (FUCCS 420), Reservoirs (FLUCCS 530), Cypress (FLUCCS 621), Wetland Scrub (FLUCCS 631), Freshwater/Prairie Marsh (FLUCCS 641), and Airports (FLUCCS 811). DCTTA was historically constructed as the Big Cypress Swamp Jetport in 1968 to accommodate supersonic aircraft including the Boeing 2707, also known as the Boeing SST (Supersonic Transport). Much of the airport footprint was cleared and filled, with runways and some roadways paved. Filled areas not paved were maintained through mowing. The airport currently includes one 10,499-foot-long runway that is 150 feet wide, with a parallel taxiway 75 feet wide.

The EDC footprint is located entirely within the DCTTA land use area that was filled in 1968 and has been maintained since that time. Two grass-covered areas were graded, stabilized with additional road base, and topped by asphalt. The first is an approximately 8-acre area south of the former aircraft parking apron, now used for the detention facility and supporting services. The second is an approximately 30-acre area near the west end of the runway, currently used for employee badging and parking. In addition to the newly added structures, numerous generators are in operation to power the facility, including numerous portable lights.

**Wetlands and Surface Waters**

The areas modified to facilitate operation of the EDC were inspected to determine if work had been conducted outside of the original airport footprint. Current and historic aerials were reviewed prior to the site visit on July 29, 2025. Based on this review and field observations, no direct impacts to wetland areas were identified. Best Management Practices (BMPs) for work near wetlands appear to have been implemented. Most work occurred at least 25 feet from wetlands, though some areas were as close as 15 feet.  To minimize potential secondary or indirect impacts, silt fencing and metal fencing were installed. Silt fence helps reduce turbidity and prevents stormwater runoff and associated contaminants from entering the wetland areas. Metal fencing restricts human access and limits windblown trash and debris. Regular removal of effluent and castoff potable water reduces the likelihood of leaks and provides for regular inspections of those systems.

*Everglades Detention Center*
*Preliminary Ecological Assessment*
RES Project Number 113094

**Protected Species**

A literature and historic aerial review were conducted to identify those species classified by the United States Fish and Wildlife Service (USFWS) and Florida Fish and Wildlife Conservation Commission (FWC) as being Endangered or Threatened (collectively recognized as "protected species") within the DCTTA. In addition to the literature review, species lists were obtained using the USFWS Information for Planning and Consultation (IPaC) web-based mapping tool. The IPaC database indicates there are 10 federally protected wildlife species: Florida bonneted bat (*Eumops floridanus*), Florida panther (*Puma concolor coryi*), crested caracara (*Caracara plancus*), Eastern black rail (*Laterallus jamaicensis jamaicensis*), Everglade snail kite (*Rostrhamus sociabilis plumbeus*), red-cockaded woodpecker (*Leuconotopicus borealis*), wood stork (*Mycteria americana*), American alligator (*Alligator mississippiensis*), Eastern indigo snake (*Drymarchon couperi*), and monarch butterfly (*Danaus plexippus*). There is also the potential for two plant species to occur: Florida prairie-clover (*Dalea carthagenensis var. floridana*) and Garber's spurgewith (*Chamaesyce garberi*). The project is not located within an area designated by the USFWS as critical habitat.

The project area is located within the Big Cypress National Preserve, established on October 11, 1974, as the nation's first national preserve. However, direct impacts and many of the secondary impacts occurred earlier, during the construction of the Big Cypress Swamp Jetport in 1968. Inspection of these areas on July 29, 2025 confirmed that no additional impacts to previously natural habitat resulted from modifications initiated in June 2025. Therefore, the following protected species secondary/indirect impact assessment is considered preliminary and subject to change as further research and literature reviews are conducted.

*Eastern Black Rail*
The Eastern black rail is listed by the USFWS as Threatened due to habitat loss, destruction, and modification; sea level rise and tidal flooding; and incompatible land management. They are wetland-dependent birds and are primarily associated with herbaceous, persistent emergent plant cover. They require dense overhead perennial herbaceous cover with underlying moist to saturated soils with or adjacent to very shallow water. No suitable Eastern black rail habitat was impacted by the project. However, potential suitable habitat may exist adjacent to the project area, but further assessment is needed. Until that assessment is complete, potential indirect impacts cannot be fully determined, and an effects determination cannot be made.

*Crested Caracara*
Crested caracara is a large species of raptor that is listed as Threatened by the USFWS. They have a dark brown to black belly, wings and back with a white lower belly, head and throat.  Their bill is bluish gray to white, red facial skin and a white tail.  This species inhabits wet prairies with cabbage palms but may also be found in wooded areas with saw palmetto, cypress, and scrub oaks. They will also inhabit pastures.  None of this habitat was impacted by the project.  Further review will determine if a "**no effect**" a "**may affect, or not likely to adversely affect**" determination may be justified.

*Florida Bonneted Bat*
Bonneted bats are known to roost in both natural and artificial structures with potential roosting structures. Natural roosting sites may include mature live or dead trees, snags, and trees with cavities, hollows, or crevices. Artificial roosting structures may include rock crevices, buildings, bridges, utility poles, and bat houses. Potential bonneted bat roosting trees include those that are equal to or greater than 34 feet tall and snags equal to or greater than 28 feet tall with a Diameter at Breast Height (DBH) equal to or greater than 7.4 inches. Artificial structures equal to or greater than 15 feet in height can also be considered potential bonneted bat roosting structures. Foraging habitat for bonneted bats is characterized by relatively open (e.g. few obstacles) areas with prey sources and water. Examples of bonneted bat foraging habitats include open fresh water, permanent or seasonal freshwater wetlands, wetlands and upland forests, wetland and upland shrubs, agricultural lands, golf courses, parking lots, parks, and relatively small patches of natural habitat. No trees and no structures were removed within the project area so there were no direct impacts to roosting structures. Indirect impacts are still being evaluated but there are two main factors to be considered: lights and noise. It is anticipated that the additional lighting will bring more insects to the area for foraging. The effects of current noise levels on bat echolocation to navigate and find food in the dark have not been determined. However, this species is known to do well in urban environments. Therefore, a "**may affect, not likely to adversely affect**" determination may be justified.

App.82

*Everglade Detention Center*
*Preliminary Ecological Assessment*
*RES Project Number 113094*

## Everglade Snail Kite

The Everglade snail kite, listed as endangered by the USFWS, is a mid-sized raptor that can reach a length of 14.2-15.4 inches.  Males are slate gray with red eyes and orange legs, which turn more reddish during breeding season.  Females are brown with red eyes and yellow to orange legs, with varying amounts of white streaking on the face, neck, and chest.  The Everglade snail kite feeds almost exclusively on apple snails (Pomacea), which are captured at or near the water's surface. Snail kites hunt for snails by flying slowly or perching over sparsely vegetated lake shores or marshes and grabbing snails with their feet that are within six inches of the water's surface.  There were no direct impacts to snail kite habitat. However, there may be potential suitable habitat adjacent to the project area, but further assessment is needed. Until that assessment is complete potential indirect effects cannot be determined at this time.

## Wood Stork

The wood stork is a long-legged wader and a large bodied white bird with black in the wings and tail. Wood storks nest in colonies in a variety of inundated forested wetlands such as cypress swamps, sloughs or mangroves.  Foraging habitat includes shallow freshwater marshes, ponds, ditches or pastures.  The USFWS and FWC list the wood stork as Threatened. The project area is located within two miles of four different documented wood stork colonies. However, the current activity status of these colonies has not been determined.  No wood storks were observed during the site visit and there were no direct impacts to wood stork foraging habitat.  However, potential secondary impacts from the adjacent facility, such as increased lighting, human activity, and noise, may have indirect effects on nearby foraging or nesting behavior. While these effects are expected to be minimal given the absence of suitable habitat within the project area, proximity to multiple wood stork colonies justifies a "may affect, not likely to adversely affect" determination for the wood stork, pending further coordination and review.

## Eastern Indigo Snake

The Eastern indigo snake is listed by both the USFWS and FWC as Threatened.  This large, stout-bodied, shiny black snake can reach 8 feet in length and will utilize a wide range of habitats from scrub and sandhills to wetlands throughout Florida. They are known to winter in gopher tortoise burrows.  Eastern indigo snakes require large tracts of natural land to survive, typically foraging in more hydric habitats. The altered and maintained infield at DCTTA did not provide refuge for this species prior to the modifications. Therefore, no direct impacts are anticipated. Indirect effects could include noise and light pollution into the adjacent habitat, however, there may also be beneficial effects such as an increase in rodent population due to human presence. Because of the potential of indirect impacts to potential foraging habitat a "**may affect, not likely to adversely affect**" determination may be justified.

## Florida Panther

The Florida panther (*Puma concolor coryi*), listed by the USFWS as endangered, is a large, long-tailed cat with a great deal of color variation: pale brown or rusty upper parts, dull white or buffy under parts; tail tip, back of ears, and sides of nose are dark brown or blackish. Florida panthers occur in peninsular Florida primarily south of Orlando.  They will use all habitat types to some degree but rely upon forested areas that provide dense understory vegetation for rest sites, den sites and stalking cover. Suitable panther habitat was not impacted by the project and no panthers have been documented within the project area. While traffic has increased within the project area, the speed limit is 15 miles per hour (mph) through most of the area with some small stretches of 35 mph along the entry road. However, much of this is fenced and there are frequent speed bumps to dampen speed. Based on this a "**may affect, not likely to adversely affect**" determination may be justified.

## Red-Cockaded Woodpecker

Red-cockaded Woodpecker (RCW) require mature, open-canopy longleaf pine or slash pine forest for nesting and foraging habitat. This habitat is not present in the project area, therefore there will be "**no effect**" on this species.

## Monarch Butterfly

This large colorful butterfly that is identified by its orange and black markings is a Candidate species but has not yet been listed or proposed for listing by the USFWS.  Monarch butterfly habitat includes roadsides and open fields which are available within the airport infield. If the listing status of the monarch butterfly is elevated by USFWS, consultation with the USFWS to determine potential effects can be initiated at that time. Therefore, impacts to this species are not anticipated.

*August 04, 2025| 3*

*Everglades Detention Center*
*Preliminary Ecological Assessment*
*RES Project Number 113094*

*American alligator*

After being legally protected for many years, the alligator, listed by the USFWS as Threatened (due to similarity of appearance), has made a remarkable comeback, and is now common in areas that will support it. Alligators can be found in most types of wetlands that have standing water and ample food supplies. No alligator habitat was impacted by the project. Therefore, it is anticipated that the project will have "**no effect**" on the species.

*Protected Plants*

Two federally protected plant species, Florida prairie-clover and Garber's spurgewith have the potential to occur within habitats found adjacent to the project area. However, there was no suitable habitat within the EDC. Therefore, there should be "**no effect**" on these species.

End of Memorandum.

EXHIBIT 11



App.86

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC., and
CENTER FOR BIOLOGICAL DIVERSITY,

      *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his
official capacity as Executive Director of the
Florida Division of Emergency Management,
and MIAMI-DADE COUNTY, a political
subdivision of the State of Florida

      *Defendants*.

Civil Action No. 1:25-cv-22896

## DECLARATION OF SANTIAGO FUENTES

      Pursuant to the authority of 28 U.S.C. § 1746, I, Santiago Fuentes, declare that, to the best

of my knowledge, information, and belief, and under the penalty of perjury, the following is true

and correct:

1.     I am the Assistant Field Office Director (AFOD) for the United States Department of

Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal

Operations (ERO) Miami field office. I have been the AFOD of ERO Miami since 2024.

2.      As the AFOD, I oversee the Criminal Alien Program (CAP), ERO Criminal Prosecutions (ECP), and 287(g) programs for the Miami area of responsibility.

3.      I began my federal career in June 2003 as a clerk with U.S. Citizenship and Immigration Services in the Miami office. In February 2004, I was a Customs and Border Protection Officer in Miami, Florida. In March 2006, I entered on duty with ICE as an Immigration Enforcement Agent and was promoted to Deportation Officer and then Supervisory Detention and Deportation Officer in 2016.

4.      I am familiar with the allegations made by plaintiffs in the instant lawsuit regarding the South Florida Soft-Sided Facility South detention center (SFSSFS).

### Overview of the 287(g) Program

5.      Since 1996, 8 U.S.C. § 1357 (g) has authorized ICE to delegate immigration enforcement authority to state and local law enforcement by way of an agreement between the state law enforcement agency and ICE, to perform certain immigration functions as outlined in the agreement. Practically this means that local law enforcement can perform immigration enforcement actions under the direction and supervision of ICE.

6.      The purpose of the 287(g) program is to enhance the safety and security of communities by identifying and processing for removal criminal aliens who pose a threat to public safety or a danger to the community. This collaboration fosters better communication between federal and state/local law enforcement agencies. This coordinated enforcement effort allows for the swift and safe removal of dangerous criminal aliens.

7.      ICE implemented the first 287(g) agreement in 2002. Since then, to participate in the 287(g) program, local law enforcement officers must be nominated by a chief officer of the law enforcement agency, must have at least two years of law enforcement work experience, complete a training and certification program, be approved by ICE, and be able to qualify for appropriate

federal security clearances. The mandatory training focuses on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed, followed by an examination. Officers who are nominated and successfully complete the training and certification are authorized to participate in the 287(g) program for a period of two years from the date of authorization. After this, local training on relevant issues are provided on an ongoing basis by ICE supervisors or a designated team leader.

8.     There are currently 167 Florida entities that have entered 287(g) agreements since President Trump took office, including the Florida National Guard and several Florida law enforcement entities.

9.     Since 2024, I have overseen the 287(g) agreements in the Miami area of responsibility. Those agreements, including the date they were signed, are available on ICE's website. The agreements generally authorize those entities to detain aliens under federal immigration laws.

10.     287(g) agreements have several different models, the Task Force Model, the Jail Enforcement Model and Warrant Service Officer model. The Task Force Model authorizes designated state or local law enforcement officers to perform immigration enforcement functions in the field, such as during patrols or traffic stops, allowing them to question individuals about immigration status and initiate removal proceedings outside of a custodial setting. In contrast, the Jail Enforcement Model limits these functions to the secure environment of a jail or correctional facility, where trained officers screen individuals already under arrest to determine immigration status, lodge detainers, and commence removal proceedings. The Warrant Service Officer Model restricts designated officers to serving ICE administrative warrants and detainers on individuals already in their custody, without granting the broader investigative or processing authority available under the Jail Enforcement Model.

**Implementation of 287(g)**

11.     When a state enters into a 287(g) program, state and local law enforcement are given the authority to serve and execute immigration administrative warrants of arrest, to arrest without a warrant any alien entering or attempting to unlawfully enter the United States in the officers view, any alien unlawfully present in the United States with probable cause if the alien is likely to escape before a warrant can be obtained, or any person committing an immigration related felony with probable cause if the alien is likely to escape before a warrant can be obtained. They may also prepare charging documents for the signature of an ICE officer, process arrested aliens for immigration violations, issue immigration detainers, take and maintain custody of aliens arrested by ICE or another local law enforcement agency on behalf of ICE, and transport arrested aliens to ICE approved facilities.

12.     DHS provides credentials and guidance to local law enforcement partners, and signs warrants for service as needed. DHS is required to provide direction and supervision to local law enforcement officers when taking immigration enforcement actions.

13.     State and local law enforcement officers make the decision to detain an alien under the authority given to them through the 287(g) agreements. DHS does not have the authority to order any state to detain an alien, however, DHS will confirm an alien is amenable to arrest and provide direction and supervision on questions of immigration law, as required under the 287(g) agreement. The authority to direct and supervise law enforcement officers acting under a 287(g) agreement in all matters aside from those described above, to include personnel and employment matters and operational concerns pertaining to Florida detention facilities, are retained by the State of Florida. For example, the 287(g) law enforcement agency partner is responsible for providing officer salaries, benefits, uniforms; responsible for all personnel decisions such as hiring, firing, and any disciplinary actions; sets work hours, manages officer assignments, assigns supervisors; and sets policies and procedures for their agency.

## South Florida Soft-Sided Facility South Detention Facility

14.     The SFSSFS detention facility is in Collier County, Florida. DHS and Collier County have had a 287(g) agreement since 2007. This agreement confers federal immigration authority onto Collier County law enforcement officials per the terms of the agreement, as generally explained under paragraph 11.

15.     Collier County currently has two 287(g) agreements, to include the Jail Enforcement Model and the Task Force Management model.

16.     When ICE procures detention space from a state or local entity, it pays for that space via its appropriation for Operations and Support, which includes funding for enforcement, detention and removal operations. When it does so, the aliens are detained by the state or local entity or their contractor on behalf of ICE.

17.     ICE did not and has not purchased or otherwise procured any detention space from Florida for the detention of illegal aliens at the SFSSFS detention facility. ICE did not and has not ordered, supervised, or directed the construction of the facility. ICE did not and has not weighed in on the number of detainees to be held at the facility.

18.     The State of Florida has complete discretion in deciding who is detained at this facility.

19.     ICE continues to provide supervision to local law enforcement at the SFSSFS detention facility for delegated immigration officer functions as required under the 287(g) program. This includes signing off on charging documents, reviewing detainers issued, running federal database system checks, and providing guidance any time immigration authority is exercised.  ICE did not designate or plan the site as a detention facility.  ICE does not direct or supervise construction or physical maintenance activities at the SFSSFS detention facility.

20.     Deportation Officers normally assigned to various units throughout South Florida have been temporarily reassigned to intermittently perform work at the SFSSFS facility. This reassignment

includes first line supervisors as well as deportation officers. Officers interact with detained aliens as needed. Visits to the facility by ICE personnel are conducted several times a week but may occur as often as daily.

Signed this 12th day of August 2025.

SANTIAGO R FUENTES

Digitally signed by SANTIAGO R FUENTES
DN: cn=SANTIAGO R FUENTES, o=U.S. Government, ou=People, email=Santiago.R.Fuentes@ice.dhs.gov, c=US
Date: 2025-08-12T09:57:02-0400

Santiago Fuentes
Assistant Field Office Director
 Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement (MOA) constitutes an agreement between United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and the Florida National Guard (FLNG)    , pursuant to which ICE delegates to nominated, trained, and certified officers or employees of the FLNG    (hereinafter interchangeably referred to as "Law Enforcement Agency" (LEA)), to perform certain immigration enforcement functions as specified herein. The LEA represents    the Florida National Guard (FLNG) in the implementation and administration of this MOA.  The  Florida National Guard (FLNG) and ICE enter into this MOA in good faith and agree to abide by the terms and conditions contained herein. The ICE and LEA points of contact for purposes of this MOA are identified in Appendix A.

### I.      PURPOSE

The purpose of this MOA is to set forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and thereafter be approved by ICE to perform certain functions of an immigration officer under the direction and supervision of ICE within the LEA's jurisdiction. This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority granted under this MOA to participating LEA personnel shall occur only as provided in this MOA. This MOA also describes the complaint procedures available to members of the public regarding immigration enforcement actions taken pursuant to this agreement by participating LEA personnel.

### II.     AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1357(g), as amended by the Homeland Security Act of 2002, Public Law 107-276, authorizes the Secretary of Homeland Security, or her designee, to enter into written agreements with a State or any political subdivision of a State so that qualified officers and employees can perform certain functions of an immigration officer. This MOA constitutes such a written agreement.

### III.    POLICY

This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. It sets forth with specificity the duration of the authority conveyed and the specific lines of authority, including the requirement that participating LEA personnel be subject to ICE direction and supervision while performing delegated immigration officer functions pursuant to this MOA. For the purposes of this MOA, ICE officers will provide direction and supervision for participating LEA personnel only as to immigration enforcement functions as authorized in this MOA. The LEA retains supervision of all other aspects of the employment and performance of duties of participating LEA personnel.

Revised 02/12/2025

## IV.        TRAINING AND ASSIGNMENTS

Before participating LEA personnel receive authorization to perform immigration officer functions granted under this MOA, they must successfully complete mandatory training on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed as provided by ICE instructors and thereafter pass examinations equivalent to those given to ICE officers. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE. Only participating LEA personnel who are nominated, trained, certified, and authorized, as set out herein, have authority pursuant to this MOA to conduct the delegated immigration officer functions, under ICE direction and supervision, enumerated in this MOA.

Upon the LEA's agreement, participating LEA personnel performing immigration-related duties pursuant to this MOA will be assigned to various units, teams, or task forces designated by ICE.

## V.        DESIGNATION OF AUTHORIZED FUNCTIONS

For the purposes of this MOA, participating LEA personnel are authorized to perform the following functions pursuant to the stated authorities, subject to the limitations contained in this MOA:

- The power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(l)) and to process for immigration violations those individuals who have been arrested for State or Federal criminal offenses.

- The power and authority to arrest without a warrant any alien entering or attempting to unlawfully enter the United States in the officer's presence or view, or any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(2) and 8 C.F.R. § 287.5(c)(1). Subsequent to such arrest, the arresting officer must take the alien without unnecessary delay for examination before an immigration officer having authority to examine aliens as to their right to enter or remain in the United States.

- The power to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(4) and 8 C.F.R. § 287.5(c)(2).

- The power to serve and execute warrants of arrest for immigration violations under INA § 287(a) and 8 C.F.R. § 287.5(e)(3).

- The power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2)) to complete required alien processing to include fingerprinting, photographing, and interviewing, as well as the preparation of affidavits and the taking of

Revised 02/12/2025

sworn statements for ICE supervisory review.

- The power and authority to prepare charging documents (INA § 239, 8 C.F.R. § 239.1; INA § 238, 8 C.F.R § 238.1; INA § 241(a)(5), 8 C.F.R § 241.8; INA § 235(b)(l), 8 C.F.R § 235.3) including the preparation of the Notice to Appear (NTA) or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors.

- The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for aliens in categories established by ICE supervisors.

- The power and authority to take and maintain custody of aliens arrested by ICE, or another State or local law enforcement agency on behalf of ICE. 8 C.F.R. § 287.5(c)(6)

- The power and authority to take and maintain custody of aliens arrested pursuant to the immigration laws and transport (8 C.F.R. § 287.5(c)(6)) such aliens to ICE-approved detention facilities.

## VI.      RESOLUTION OF LOCAL CHARGES

The LEA is expected to pursue to completion prosecution of any state or local charges that caused the alien to be taken into custody. ICE may assume custody of aliens who have been convicted of a state or local offense only after such aliens have concluded service of any sentence of incarceration. The ICE Enforcement and Removal Operations Field Office Director or designee shall assess on a case-by-case basis the appropriate actions for aliens who do not meet the above criteria based on special interests or other circumstances after processing by the LEA.

After notification to and coordination with the ICE supervisor the alien who participating LEA personnel have determined to be a removable alien, the alien will be arrested on behalf of ICE by participating LEA personnel and be transported by the LEA on the same day to the relevant ICE detention office or facility.

## VII.     NOMINATION OF PERSONNEL

The chief officer of the LEA will nominate candidates for initial training and certification under this MOA. For each candidate, ICE may request any information necessary for a background check and to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA. All candidates must be United States citizens. All candidates must have at least two years of LEA work experience. All candidates must be approved by ICE and must be able to qualify for appropriate federal security clearances and access to appropriate DHS and ICE databases/systems and associated applications.

Should a candidate not be approved, a substitute candidate may be submitted if time permits such substitution to occur without delaying the start of training. Any subsequent expansion in the number of participating LEA personnel or scheduling of additional training classes may be based on an oral agreement of the parties but will be subject to all the requirements of this MOA.

Revised 02/12/2025

## VIII.     TRAINING OF PERSONNEL

ICE will provide participating LEA personnel with the mandatory training tailored to the immigration functions to be performed. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE.

Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy; (v) civil rights laws (vi) the detention of aliens; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law, including applicable treaties or international agreements, to make proper notification upon the arrest or detention of a foreign national.

Approximately one year after the participating LEA personnel are trained and certified, ICE may provide additional updated training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions, unless either party terminates this MOA pursuant to Section XVIII below. Local training on relevant issues will be provided on an ongoing basis by ICE supervisors or a designated team leader.

## IX.     CERTIFICATION AND AUTHORIZATION

ICE will certify in writing the names of those LEA personnel who successfully complete training and pass all required testing. Upon receipt of the certification, ICE will provide the participating LEA personnel with a signed authorization to perform specified functions of an immigration officer for an initial period of two years from the date of the authorization. ICE will also provide a copy of the authorization to the LEA. The ICE supervisory officer, or designated team leader, will evaluate the activities of all personnel certified under this MOA.

Authorization of participating LEA personnel to act pursuant to this MOA may be revoked at any time and for any reason by ICE or the LEA. Such revocation will require notification to the other party to this MOA within 48 hours. The chief officer of the LEA and ICE will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA, pursuant to Section XVIII below, shall constitute revocation of all immigration enforcement authorizations delegated herein.

## X.     COSTS AND EXPENDITURES

Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue material. Whether or not the LEA receives financial reimbursement for such costs through a federal grant or other funding mechanism is not material to this MOA.

ICE is responsible for the installation and maintenance of the Information Technology (IT) infrastructure. The use of the IT infrastructure and the DHS/ICE IT security policies are defined in the Interconnection Security Agreement (ISA). The ISA is the agreement between ICE's Chief Information Security Officer and the LEA's Designated Accreditation Authority.

Revised 02/12/2025

The LEA agrees that each of its sites using an ICE-provided network access or equipment will sign the ISA, which defines the DHS ICE 4300A Sensitive System Policy and Rules of Behavior for each user granted access to the DHS network and software applications. Failure to adhere to the terms of the ISA could result in the loss of all user privileges.

The LEA is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material used in the execution of the LEA's mission. ICE will provide instructors and training materials. The LEA is responsible for the salaries and benefits, including any overtime, of all its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating LEA personnel while they are receiving training. ICE is responsible for the costs of the LEA personnel's travel expenses while in a training status, as authorized by the Federal Travel Regulation and the ICE Travel Handbook. These expenses include housing, per diem and all transportation costs associated with getting to and from training. ICE is responsible for the salaries and benefits of all ICE personnel, including instructors and supervisors.

The LEA is responsible for providing all administrative supplies (e.g. paper, printer toner) necessary for normal office operations. The LEA is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints, etc.

## XI.    ICE SUPERVISION

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE.

When operating in the field, participating LEA personnel shall contact an ICE supervisor at the time of exercising the authority in this MOA, or as soon as is practicable thereafter, for guidance. The actions of participating LEA personnel will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for additional training or guidance for that specific individual.

For the purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law unless doing so would violate federal law.

Revised 02/12/2025

If a conflict arises between an order or direction of an ICE supervisory officer and LEA rules, standards, or policies, the conflict shall be promptly reported to ICE, and the chief officer of the LEA, or designee, when circumstances safely allow the concern to be raised. ICE and the chief officer of the LEA shall attempt to resolve the conflict.

Whenever possible, the LEA will deconflict all addresses, telephone numbers, and known or suspected identities of violators of the INA with ICE's Homeland Security Investigations or ICE's Enforcement and Removal Operations prior to taking any enforcement action. This deconfliction will, at a minimum include wants/warrants, criminal history, and a person's address, and vehicle check through TECS II or any successor system.

LEA participating personnel authorized pursuant to this MOA may be assigned and/or co-located with ICE as task force officers to assist ICE with criminal investigations.

## XII.      REPORTING REQUIREMENTS

The LEA will be responsible for tracking and maintaining accurate data and statistical information for their 287(g) program, including any specific tracking data requested by ICE. Upon ICE's request, such data and information shall be provided to ICE for comparison and verification with ICE's own data and statistical information, as well as for ICE's statistical reporting requirements and to assess the progress and success of the LEA's 287(g) program.

## XIII.     RELEASE OF INFORMATION TO THIRD PARTIES

The LEA may, at its discretion, communicate the substance of this agreement to the media and other parties expressing an interest in the law enforcement activities to be engaged in under this MOA. It is the practice of ICE to provide a copy of this MOA, only after it has been signed, to requesting media outlets; the LEA is authorized to do the same.

The LEA hereby agrees to coordinate with ICE prior to releasing any information relating to, or exchanged under, this MOA. For releases of information to the media, the LEA must coordinate in advance of release with the ICE Office of Public Affairs, which will consult with ICE Privacy Office for approval prior to any release. The points of contact for ICE and the LEA for this purpose are identified in Appendix C. For releases of information to all other parties, the LEA must coordinate in advance of release with the FOD or the FOD's representative.

Information obtained or developed as a result of this MOA, including any documents created by the LEA that contain information developed or obtained as a result of this MOA, is under the control of ICE and shall not be disclosed unless: 1) permitted by applicable laws, regulations, or executive orders; and 2) the LEA has coordinated in advance of release with (a) the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval, prior to any release to the media, or (b) an ICE officer prior to releases to all other parties. LEA questions regarding the applicability of this section to requests for release of information shall be directed to an ICE officer.

Revised 02/12/2025

Nothing herein limits LEA's compliance with state public records laws regarding those records that are solely state records and not ICE records.

The points of contact for ICE and the LEA for the above purposes are identified in Appendix C.

## XIV.    LIABILITY AND RESPONSIBILITY

Except as otherwise noted in this MOA or allowed by federal law, and to the extent required by 8 U.S.C. § 1357(g)(7) and (8), the LEA will be responsible and bear the costs of participating LEA personnel regarding their property or personal expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will be treated as Federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. *See* 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE authorized by this MOA will be considered acting under color of federal authority for purposes of determining liability and immunity from suit under federal or state law. *See* 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as personal-capacity defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. *See* 28 C.F.R. § 50.15. Absent exceptional circumstances, such requests must be made in writing. LEA personnel who wish to submit a request for representation shall notify the local ICE Office of the Principal Legal Advisor (OPLA) field location at ADDRESS. OPLA, through its headquarters, will assist LEA personnel with the request for representation, including the appropriate forms and instructions. Unless OPLA concludes that representation clearly is unwarranted, it will forward the request for representation, any supporting documentation, and an advisory statement opining whether: 1) the requesting individual was acting within the scope of his/her authority under 8 U.S.C. § 1357(g) and this MOA; and, 2) such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Tort Litigation Section, Civil Division, Department of Justice (DOJ). Representation is granted at the discretion of DOJ; it is not an entitlement. *See* 28 C.F.R. § 50.15.

The LEA agrees to cooperate with any federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and documents. Failure to do so may result in the termination of this MOA. Failure of any participating LEA employee to cooperate in any federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The LEA agrees to cooperate with federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and documents necessary to complete such compliance review. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

Revised 02/12/2025

As the activities of participating LEA personnel under this MOA derive from federal authority, the participating LEA personnel will comply with federal standards relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

The LEA and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. § 552a, DHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices regarding data collection and use of information under this MOA.

## XV.     COMPLAINT PROCEDURES

The complaint reporting and resolution procedure for allegations of misconduct by participating LEA personnel, regarding activities undertaken under the authority of this MOA, is included at Appendix B.

## XVI.     CIVIL RIGHTS STANDARDS

Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all applicable federal civil rights statutes and regulations.

Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA as needed.

## XVII.     MODIFICATION OF THIS MOA

Modifications of this MOA must be proposed in writing and approved by the signatories.

## XVIII.     EFFECTIVE DATE, SUSPENSION, AND TERMINATION OF THIS MOA

This MOA becomes effective upon signature of both parties and will remain in effect until either party terminates or suspends the MOA. Termination by the LEA shall be provided, in writing, to the local Field Office.

In instances where serious misconduct or violations of the terms of the MOA come to the attention of ICE, the ICE Director may, upon recommendation of the Executive Associate Director for Enforcement and Removal Operations, elect to immediately suspend the MOA pending investigation of the misconduct and/or violations.

Notice of the suspension will be provided to the LEA, and the notice will include, at a minimum, (1) an overview of the reason(s) that ICE is suspending the 287(g) agreement, (2) the length of the temporary suspension, and (3) how the LEA can provide ICE with information regarding the alleged misconduct and/or violations, as well as any corrective measures it has undertaken.

Revised 02/12/2025

ICE shall provide the LEA with a reasonable opportunity to respond to the alleged misconduct and/or violations and to take actions to implement corrective measures (e.g., replace the officer(s) who are the focus of the allegations). ICE will provide the LEA timely notice of a suspension being extended or vacated.

If the LEA is working to take corrective measures, ICE will generally not terminate an agreement. The termination of an agreement is generally reserved in instances involving problems that are unresolvable and detrimental to the 287(g) Program.

If ICE decides to move from suspension to termination, ICE will provide the LEA a 90-day notice in advance of the partnership being terminated. The notice will include, at a minimum: (1) An overview of the reason(s) that ICE seeks to terminate the 287(g) agreement; (2) All available data on the total number of aliens identified under the 287(g) agreement; and (3) Examples of egregious criminal aliens identified under the 287(g) agreement. ICE's decision to terminate a MOA will be published on ICE's website 90 days in advance of the MOA's termination.

This MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

**For the LEA:**

Date: _2 APRIL 2025_

Signature: _____

Major General John D. Haas

Title: _The Adjutant General_

**For ICE:**

Date: _April 2, 2025_

Signature: _____

Title: _Acting Director_

Revised 02/12/2025

**APPENDIX A**

**POINTS OF CONTACT**

The ICE and LEA points of contact for purposes of implementation of this MOA are:

For ICE:    Department of Homeland Security

Immigration and Customs Enforcement

Enforcement and Removal Operations

Assistant Director for Enforcement Washington DC


For the LEA:    The Adjutant General, MG John Haas, john.d.haas.mil@army.mil

State Aviation Officer, COL Brett Rhodenizer, brett.s.rhodenizer.mil@army.mil

General Counsel, Col Jeffrey Pozen, jeffrey.m.pozen.mil@army.mil

Revised 02/12/2025

## APPENDIX B

## COMPLAINT PROCEDURE

This MOA is an agreement between ICE and the                    , hereinafter referred to as the "Law Enforcement Agency" (LEA), in which selected LEA personnel are authorized to perform immigration enforcement duties in specific situations under federal authority. As such, the training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for individuals' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

If any participating LEA personnel are the subject of a complaint or allegation involving the violation of the terms of this MOA the LEA shall, to the extent allowed by state law, make timely notification to ICE.

Further, if the LEA is aware of a complaint or allegation of any sort that may result in that individual receiving professional discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall remove the designated LEA personnel from the program, until such time that the LEA has adjudicated the allegation.

The LEA will handle complaints filed against LEA personnel who are not designated and certified pursuant to this MOA but are acting in immigration functions in violation of this MOA. Any such complaints regarding non-designated LEA personnel acting in immigration functions must be forwarded to the ICE Office of Professional Responsibility (OPR) at ICEOPRIntake@ice.dhs.gov.

## 1. Complaint Reporting Procedures

Complaint reporting procedures shall be disseminated as appropriate by the LEA within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that individuals are aware of the availability of such procedures. Complaints will be accepted from any source (e.g., ICE, LEA, participating LEA personnel, inmates, and the public).

Complaints may be reported to federal authorities as follows:

    A.    Telephonically to the ICE OPR at the toll-free number 1-833-4ICE-OPR; or

    B.    Via email at ICEOPRIntake@ice.dhs.gov.

Complaints may also be referred to and accepted by any of the following LEA entities:

    A.    The LEA Internal Affairs Division; or
    B.    The supervisor of any participating LEA personnel.

Revised 02/12/2025

## 2. Review of Complaints

All complaints (written or oral) reported to the LEA directly, which involve activities connected to immigration enforcement activities authorized under this MOA, will be reported to the ICE OPR. The ICE OPR will verify participating personnel status under the MOA with the assistance of ICE. Complaints received by any ICE entity will be reported directly to the ICE OPR as per existing ICE policies and procedures.

In all instances, the ICE OPR, as appropriate, will make an initial determination regarding DHS investigative jurisdiction and refer the complaint to the appropriate office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to the ICE OPR will be shared with the LEA's Internal Affairs Division when the complaint involves LEA personnel. Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

## 3. Complaint Resolution Procedures

Upon receipt of any complaint the ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting requirements. As stated above the ICE OPR will adhere to existing ICE reporting requirements as they relate to the OHS OIG and/or another legally required entity. Complaints will be resolved using the existing procedures, supplemented as follows:

A. Referral of Complaints to LEA Internal Affairs Division.

The ICE OPR will refer complaints, as appropriate, involving LEA personnel to the LEA's Internal Affairs Division for resolution. The Internal Affairs Division Commander will inform ICE OPR of the disposition and resolution of any complaints referred by ICE OPR.

B. Interim Action Pending Complaint Resolution

Whenever any participating LEA personnel are under investigation and subject to interrogation by the LEA for any reason that could lead to disciplinary action, demotion, or dismissal, the policy requirements of the LEA shall he honored. If appropriate, an individual may he removed from participation in the activities covered under the MOA pending resolution of an inquiry.

C. Time Parameters for Resolution of Complaints

It is expected that any complaint received will be resolved within 90 days. However, this will depend upon the nature and complexity of the substance of the complaint itself.

Revised 02/12/2025

D. Notification of Resolution of a Complaint

ICE OPR will coordinate with the LEA's Internal Affairs Division to ensure notification as appropriate to the subject(s) of a complaint regarding the resolution of the complaint.

Revised 02/12/2025

**APPENDIX C**

**PUBLIC INFORMATION POINTS OF CONTACT**

Pursuant to Section XIII of this MOA, the signatories agree to coordinate any release of information to the media regarding actions taken under this MOA. The points of contact for coordinating such activities are:

**For the LEA:**

Executive Officer, COL (Ret) Allison Reinwald, allison.reinwald2.nfg@army.mil

Public Affairs Officer, Lt Col Caitlin Brown, mary.c.brown26.mil@army.mil


**For ICE:**

Department of Homeland Security
Immigration and Customs Enforcement
Office of Public Affairs

Revised 02/12/2025

1  again, we are on the merits of do you have final federal agency

2  action.  But if we're just balancing -- if we're in the harm,

3  at the end of the day, if they're going to show harm, they

4  can't just say, well, we could have known harm if you did the

5  NEPA but you didn't and therefore we get NEPA.

6         They have to say, here is the harm.  That is a Winter

7  factor and they have to bring the evidence forward.

8         THE COURT:  Okay.

9         MR. PANUCCIO:  Let me make -- I have my final point,

10  Your Honor, and it is very brief.  And that is if, and I don't

11  think the Court would do this, but if the Court enters a

12  preliminary injunction, I think it's fair to say that either

13  side may appeal this decision either way.

14         I would like to put forth now our request for a stay

15  pending appeal.  It's all of the same factors we just went

16  through, likelihood of success, irreparable harm.  I think my

17  argument would be much the same.  So, if the Court were to

18  issue a preliminary injunction, we would ask that the stay be

19  adjudicated in that same order, if possible, to streamline

20  things.  Although, let me wishcast, Your Honor, and say we hope

21  that eventuality doesn't come around because I think we have

22  shown there is no entitlement to a preliminary injunction.

23         THE COURT:  I'm not going to give -- I haven't even

24  decided this yet, so I won't give an advisory opinion.  But

25  should either side, I don't think they would, but if a stay is

1    requested, I would like that in writing.  But you can reference

2    all of the arguments that you have set forth here and in the

3    papers that you've submitted.

4        MR. PANUCCIO:  Great.

5        Thank you, Your Honor.  Thank you for your indulgence

6    on time.  I probably went over.  I appreciate you letting me

7    get through the whole presentation.

8        THE COURT:  All right.  But let's take -- since we are

9    going to hear a little further, let's just take a five-minute

10   break for everyone.

11       Are we still okay on --

12       MR. GUSTAFSON:  Your Honor, I just wanted to add that

13   the Federal Defendants join the State Defendants' request.

14       THE COURT:  But you're okay on time as far as travel?

15       MR. GUSTAFSON:  Yes, thank you.

16       (Recess.)

17       THE COURT:  All right.  Mr. Schwiep, are you doing

18   rebuttal for both the Tribe and the Friends?

19       MR. SCHWIEP:  No, Your Honor.  I will just have the

20   rebuttal for the plaintiffs Friends and Center for Biological

21   Diversity.  And then the Tribe lawyers will enter their own

22   rebuttal.

23       MR. AJIZIAN:  I have no more than two or three minutes.

24       THE COURT:  Okay.

25       Do you have two to three minutes, Mr. Schwiep, or more?

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 25-22896-CV-WILLIAMS**

FRIENDS OF THE EVERGLADES, INC., *et al.*,

      Plaintiffs,

v.

KRISTI NOEM, *et al.*,

      Defendants.

_____/

**<u>OMNIBUS ORDER</u>**

**THIS MATTER** is before the Court on Plaintiffs Friends of the Everglades, Inc. ("***Friends***") and Center for Biological Diversity's ("***CBD***") (together, "***Plaintiffs***") Expedited Motion for Preliminary Injunction (DE 5) ("***Motion for Preliminary Injunction***"). The Court will also address Defendant Kevin Guthrie (the "***State***") and Defendants Kristi Noem and Todd Lyons' (together, "***Federal Defendants***") venue challenges. (DE 50; DE 60; DE 65).[1] Both Motions are fully briefed.[2] On July 30, 2025, the Parties presented oral argument on the State and Federal Defendants' improper venue challenge, (DE 72) ("***Hearing on Venue***"), and on August 6, 7, 12, and 13, 2025, the Parties presented evidence and oral argument on the merits of Plaintiffs' request for injunctive relief.

---

[1] Though Defendants' venue challenges were advanced in the form of supplemental briefings to Plaintiffs' Renewed Motion for TRO, the Court "will treat Defendants' response[s] as a 12(b)(3) motion to dismiss based on 'improper venue.'" *Doe 1 v. Bondi*, -- F. Supp. 3d --, 2025 WL 1482733, at *4 (N.D. Ga. May 2, 2025).

[2] All Defendants responded in opposition to Plaintiffs' Motion for Preliminary Injunction, (DE 12; DE 16; DE 21), and Plaintiffs replied (DE 24). Plaintiffs also replied to Defendants' improper venue Motions. (DE 61; DE 66).

(DE 102; DE 103; DE 119; DE 121 (together, the "***Preliminary Injunction Hearing***")). For the reasons set forth below, the Court finds that venue in the Southern District of Florida ("***S.D. Fla.***") is proper as to the State and Federal Defendants, and the Motion for Preliminary Injunction (DE 5) is **GRANTED IN PART AND DENIED IN PART**.

## I.   BACKGROUND

According to the Complaint, on June 23, 2025, the Florida Division of Emergency Management ("***FDEM***") took control of the Dade-Collier Training and Transition Airport ("***TNT***"), in order to construct a mass migrant detention and deportation camp. (DE 1 ¶¶ 1, 39).[3] Two days later, Florida Governor Ron DeSantis announced that the detention center was requested and would be fully funded by the federal government. (*Id*. ¶ 35). Pre-construction and construction activities at TNT began that week, (*Id*. ¶¶ 40–42), according to Plaintiffs, without any environmental assessment or impact statement having been prepared. (*Id*. ¶ 43).

The TNT site is located within the Big Cypress National Preserve ("***BCNP***") and the Big Cypress Area, which the Florida legislature has designated as "an area of critical state concern" with the intention to "conserve and protect the [area's] natural resources and scenic beauty." Fla. Stat. § 380.055(1)–(2); (DE 1 ¶¶ 21–22). The project site is "within an environmentally sensitive freshwater wetland ecosystem of ecological significance for wildlife," such as the "threatened wood stork, and the endangered Florida bonneted bat and the Florida panther." (DE 1 ¶ 23). The site is also "near Everglades National Park and part of the historic Everglades," and within the footprint of the Western

---

[3] Throughout this Order, the Court will refer to the detention facility at the TNT site as "facility" or "camp." The Court declines to use the moniker "Alligator Alcatraz."

Everglades Restoration Plan ("*WERP*"). (*Id.* ¶¶ 29, 32). The WERP is part of a multi-billion dollar joint federal-state effort to "restor[e], preserv[e], and "protect[] the South Florida ecosystem," and uses a complex network of active and passive water management features to "re-establish ecological connectivity, reduce the severity and frequency of wildfires, and restore low nutrient conditions" in the Western Everglades. (*Id.* ¶¶ 29–32). According to Plaintiffs, the detention camp's construction and operation risks harming the wetlands, wildlife, aquifer, and air and water quality in this sensitive area, and degrading the "natural, scenic, hydrologic, floral, and faunal, and recreational values for which the Preserve was created." (*Id.* ¶ 58).

On June 27, 2025, non-profit environmental organizations Friends and CBD filed this suit seeking declaratory and injunctive relief to halt the camp's construction and operation until the project complied with federal, state, and local laws. (*Id.* ¶¶ 1, 8, 13). Most notably, Plaintiffs claim the project is being built and operated in violation of the National Environmental Policy Act ("*NEPA*"), which requires that major federal actions significantly affecting the human environment undergo environmental review processes. (*Id.* ¶¶ 61–74) (Count I). Because no such review had been done, Plaintiffs claim, the approval and use of the camp by the United States Department of Homeland Security ("*DHS*"), including Immigration and Customs Enforcement ("*ICE*"), should be held unlawful under the Administrative Procedure Act ("*APA*"). (*Id.* ¶¶ 75–79) (citing 5 U.S.C. § 701 *et seq.*) (Count II). Plaintiffs further claim the State's participation in the project through FDEM exceeds the department's authority under Florida Statutes Chapters 252 and 944. (*Id.* ¶¶ 80–87) (Count III). Finally, Plaintiffs allege Defendant Miami-Dade County ("*Miami-Dade*") unlawfully acquiesced in allowing its property, TNT, to be used as a

detention camp without the proper permitting and in violation of county code. (*Id.* ¶¶ 88–94) (Count IV). The case was initially assigned to another judge in this district. (DE 2).

On that same day, Plaintiffs filed their Motion for Preliminary Injunction (DE 5), requesting that the Court enjoin the State and the Federal Defendants from developing or using the TNT site as an immigration detention camp "unless and until Defendants comply with NEPA and the APA." (DE 5 at 1–2, 14).[4] Within the following week, all Defendants responded, challenging Plaintiffs' likelihood of success on the merits, (DE 12; DE 16; DE 21), *inter alia*, and Plaintiffs replied. (DE 24). No Defendant raised venue as an issue.

The State's response included an affidavit from Keith Pruett, the FDEM Deputy Executive Director, stating that Florida is funding the project, though it expects to seek reimbursement from the federal government, and that the project's environmental impact is likely to be minimal,[5] as TNT was already an active airfield with two buildings on site lit

---

[4] In their Motion for Preliminary Injunction, Plaintiffs also requested that the Court enjoin the State and Federal Defendants "from authorizing or permitting further development or use of the TNT [s]ite for purposes related to a noncitizen detention center," regardless of what procedures they follow. (DE 5 at 14). That request is apparently tied to Count III, which challenges the FDEM's authority to build and operate a correctional camp. (DE 1 ¶¶ 82–85). However, Plaintiffs did not develop any arguments nor provide any evidence related to Count III in the Motion for Preliminary Injunction, their subsequent briefing, or during the Preliminary Injunction Hearing. Therefore, Plaintiffs have waived this request. *See Fernandez v. Hotwire Commc'ns, Ltd.*, No. 21-cv-60115, 2022 WL 4598638, at *17 (S.D. Fla. Sept. 30, 2022) (holding plaintiffs had waived their disparate impact theory by failing to advance any arguments on the issue at summary judgment (citing *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue")). Similarly, Plaintiffs initially sought injunctive relief against Miami-Dade but subsequently withdrew that request. (DE 31 at 3 n.2). Consequently, the Court considers only Plaintiffs' request for an injunction tied to their NEPA allegations.

[5] Director Pruett's declaration provided no background regarding his education, prior work experience, or familiarity with environmental sciences, the Everglades ecosystem, or NEPA. (DE 16-1 at 2–3). It is entirely unclear in what capacity Director Pruett purports to

24-hours a day. (DE 16-1). For their part, the Federal Defendants attached declarations from Thomas Giles, Acting Deputy Executive Associate Director for ICE's Enforcement and Removal Operations ("***ERO***"), (DE 21-1), and David Richardson, acting Administrator of the Federal Emergency Management Agency ("***FEMA***"). (DE 21-2).[6] Giles stated that ICE's role in the development of the detention camp has been "limited to touring the camp to ensure compliance with ICE detention standards, and meeting with officials from the State of Florida to discuss operational matters." (DE 21-1 ¶ 5). He further declared Florida would have final decision-making authority over who to detain at the camp, but that any detentions at the camp would be pursuant to "section 287(g) of the Immigration and Nationality Act [("***INA***")], codified at 8 U.S.C § 1357(g)." (*Id*. ¶¶ 6–7). Even so, Richardson admitted that the facility would be funded by the federal government, stating that "DHS/FEMA announced $600 million in federal funding for the Detention Support Grant Program [("***DSGP***")]" and that "[t]he only eligible applicant under the DSGP is [FDEM]." (DE 21-2 ¶ 3).

Over the next two weeks through July 16, 2025, the Parties filed notices with additional affidavits and other evidence, and they made additional arguments on the merits of Plaintiffs' preliminary injunction request. *See* (DE 14; DE 20; DE 25; DE 26; DE 27; DE 34; DE 35; DE 38; DE 47; DE 48). This included two filings by the State, which, in part, reiterated its merits argument that "NEPA does not apply" to the TNT camp.

---

possess the knowledge required to determine the likely environmental impacts of a detention center on the Everglades.

[6] Throughout this Order, the Court will identify exhibits either through reference to their docket entry numbers or their exhibit numbers on the Parties' Final Lists of Admitted Exhibits (DE 123; DE 124). When doing the latter, Plaintiffs' exhibits will be identified as "Pl. Ex. #", the Tribe's exhibits as "Tribe Ex. #", and Defendants' exhibits as "D. Ex. #".

(DE 28 at 2; DE 35 at 1 ("No matter how many times Plaintiffs poke and prod at the Court, they are unable to show their complaint presents a justiciable controversy under NEPA.")). Still, no Defendant challenged or raised the question of venue.

Also during that period, on July 14, 2025, the Miccosukee Tribe of Indians of Florida ("**Tribe**") moved to intervene as plaintiffs based on its long-standing ties to the lands around TNT and the environmental risks the project poses to the Tribe's food and water supply.[7] (DE 33). Then on July 16, 2026, the presiding judge recused from the case, and it was reassigned to the undersigned. (DE 37).

The next day, Plaintiffs filed a Renewed Motion for TRO, explaining that since they filed suit, the "State and Federal Defendants commenced transporting immigration detainees to the TNT [s]ite," that, according to State officials, "as many as 900 people are now being detained at the [s]ite, and that the State has plans to expand the number of detainees to as many as 4,000." (DE 40 at 2). Given the completion of the detention camp's first phase of construction and its ongoing operations, Plaintiffs modified their request for injunctive relief, now seeking a "halt to any further construction on the TNT [s]ite . . ., [a] pause[ to] the transport of additional detainees to the [s]ite, and [the] ceasing [of] any operations related to detaining or preparing for the detention of anyone not [already] detained at the [s]ite[.]" (*Id.* at 6).

On July 21, 2025, the State filed a Supplemental Response to Plaintiffs' Requests for a Temporary Restraining Order ("**Supplemental Response on Venue**") arguing for

---

[7] Only the State opposed the Tribe's intervention in the suit. *See* (DE 58; DE 59). The Court granted the Tribe's request on July 30, 2025. (DE 73). The Tribe has since filed an Intervenor Complaint, (DE 84), and joined Friends and CBD's Motion for Preliminary Injunction. (DE 85).

the first time that "venue is not proper in this Court." (DE 50 at 1). At a Status Conference that day, the Court set a briefing schedule on the issue and oral arguments for July 30, 2025. (DE 54). "'Where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue,' district courts must hold an evidentiary hearing on the propriety of injunctive relief." *Farmworker Ass'n of Fla. v. Moody*, 734 F. Supp. 3d 1311, 1320–21 (S.D. Fla. 2024) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998). Therefore, the Court also set an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction for August 6, 2025. (DE 54).

### A. *Preliminary Injunction Hearing*

Over four days of evidentiary presentation and oral argument between August 6 and August 13, 2025, the Court heard testimony from ten witnesses and viewed over a hundred exhibits. Plaintiffs first called Friends Executive Director Eve Samples, who spoke both of her personal, and the 50,000-member organization's commitment to preserving the Everglades and the procedural harms they have faced due to Defendants' failure to consult with Friends before building the detention camp. State Representative Anna Eskamani recounted a July 12, 2025 tour of the facility led by Director Guthrie. She testified that on the tour, Director Guthrie informed her that the facility was the product of a DHS request, that there would be a federal reimbursement to the state for the facility's costs, that detainees are dropped off at the site by federal agents, and that ICE inspects the facility. CBD member Amber Crooks described hiking, camping, stargazing, and animal-watching in the preserved areas around the TNT site, shared her fears that the light pollution, increased traffic, and wastewater associated with the project will frustrate

her future enjoyment of the area, and stated her readiness to engage with any future NEPA process. Next, 27-year veteran of the Florida Fish and Wildlife Conservation Commission, ecologist, and panther expert Randy Kautz explained how increased light, sound, vehicular traffic, and other human activity from the project risks loss of habitat and increased mortality for the estimated 120 to 230 remaining Florida panthers. The final witness on August 6 was Friends member Jessica Namath, an avid outdoorswoman and animal watcher, who described regularly hiking and driving in the areas surrounding the TNT site before the camp's construction. Since then, Ms. Namath testified to spending nearly every day at the access gate to the TNT site to bear witness to its transformation. She described the site's industrial lighting and her observation of heavy construction materials and machinery coming and going to and from the site, and of federal law enforcement vehicles entering the site daily.

On August 7, Plaintiffs called soil physicist, hydrologist, and wetland ecologist Dr. Christopher McVoy. After touring the project with site Incident Commander Dr. Frank E. Lumm, and reviewing photos and soil reports, Dr. McVoy opined that over 800,000 square feet of new paving had been introduced at the site, which risked disrupting the nutrient balance of the surrounding, connected wetlands by increasing runoff. Next, former Miami-Dade County Department of Environmental Regulatory Management geologist Dillon Reio presented an analysis concluding that the Defendants' 800,000 square feet of new paving could lead to large increases in runoff contaminated with polycyclic aromatic hydrocarbons ("**PAH**") and other carcinogens into the surrounding wetlands. He also testified that the project did not appear to have any meaningful stormwater management system, based on his review of permitting databases and the camp's engineering plans.

On August 12, the Tribe called two members of its environmental team, Director of Water Resources Amy Castaneda and Fish and Wildlife Department Director Dr. Marcel Bozas.[8] Castaneda testified that eighty percent of the Tribe's residences, two schools, and the Tribal governmental building, are all located in the Miccosukee Reserved Area a few miles southeast of the TNT site in Miami-Dade County. She explained that any uncontained wastewater or run-off leaving the TNT site will likely flow into the BCNP, Everglades National Park, and eventually into the Miccosukee Reserved Area. She further testified that the multi-billion-dollar water management projects associated with the recently enacted WERP—which was the culmination of an almost decade-long planning—were based on the TNT site's old usage as a training airport, and that WERP's preservation efforts in the area could be hindered by high-nutrient runoff from the detention camp. Dr. Bozas testified about the site's current and potential harmful impacts on the environment and the Tribe's use of the lands. He testified about the Tribe's traditions of hunting, fishing, and collection of medicinal or other culturally important plants around the site. He pointed out off-road trails with trailheads on the camp's fence line, which had served as the Tribe's access points to BCNP and which are now inaccessible. He also discussed how the increased human activity, traffic, noise, and light from the project is likely to disrupt wildlife in the area, including the endangered panther, bonneted bat, and wood stork.

The only witness called by Defendants was Florida Department of Highway Safety

---

[8] Castaneda earned a bachelor's degree of science in natural resource conservation and has worked in the Tribe's Water Resources Division for nineteen years. (DE 129 at 12). Dr. Bozas holds a Ph.D. in earth system science and natural resources and conducted a study for his dissertation of wildlife movement in the Miccosukee Water Conservation Area and Everglades National Park. (*Id.* at 96–97).

and Motor Vehicles ("**FDHSMV**") Executive Director David Kerner. Director Kerner, who also oversees the Florida Highway Patrol ("**FHP**"), discussed FHP's coordination with ICE under their 287(g) agreement. He explained how FHP troopers contact ICE to make a detention determination after stopping an individual on state law violations and then suspecting that individual of lacking lawful status. He said that it is federal agencies and agents, not FHP troopers, who transport detainees to the TNT site, and federal agencies who carry out deportations using federal aircraft. Director Kerner also discussed the importance of immigration enforcement in Florida generally, referencing an uptick in human and narcotics trafficking across the border, and the importance of increasing detention capacity to those enforcement priorities. Director Kerner testified that his knowledge of who was being detained at the TNT site was limited, though he knew all detainees were there solely on immigration violations, none on state criminal charges. Finally, Director Kerner said he had been on a tour of the facility before it became operational and that he was not aware of any other sites that had been considered for the facility. Defendants also introduced evidence that the TNT site had been in active use as a training airport for decades before the project, and questioned witnesses about how risk of harms from its use as a detention camp compare to those of its prior use facilitating training flights. And throughout the Hearing, Defendants cross-examined witnesses about their failure to collect data proving that the detention camp was having the harmful effects they described in their testimony.

Although the Court heard testimony into the early evening of August 6, the Parties agreed the Preliminary Injunction Hearing would not conclude that day. At that time, counsel for the State and Federal Defendants informed the Court that they had absolute

scheduling conflicts which would preclude resumption of the proceedings until the following Tuesday. After some discussion with the Court, the Parties agreed that the Hearing could proceed the next day for just a half day, to be resumed the following Tuesday.

At the close of the half day of testimony on August 7, Plaintiffs renewed their request for a limited TRO, citing evidence suggesting that Defendants planned to add paving and other infrastructure over the weekend, while the Hearing was in recess. Specifically, Plaintiffs requested that the Court prevent any additional industrial-style lighting, paving, filling, excavating, site preparation, or fencing from being introduced to the site. The Court inquired as to whether Defendants would agree that no such construction would take place over the five-day hiatus. Defendants were unwilling to make this representation. Consequently, after hearing additional argument, the Court granted Plaintiffs' narrow request for a TRO, halting further expansion of the site for fourteen days. (DE 104). The Court then concluded the evidentiary presentation on August 12, 2025, and heard closing remarks the following day.

### B. *287(g) Agreements*

"For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power." *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024). However, "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer[,]" such as through a formal agreement under § 1357(g)(1). *Arizona v. United States*, 567 U.S. 387, 408–09 (2012). As mentioned above, the Federal Defendants concede that the camp operates pursuant to such "287(g)" agreements

between DHS (through ICE) and relevant Florida law enforcement agencies, along with the aid of on-site federal agents. (DE 105 at 34). In a separate case raising constitutional challenges to particular practices at the camp, the State and Federal Defendants produced several of the operative 287(g) agreements, including those between ICE and nine Florida agencies: Florida Department of Alcoholic Beverages and Tobacco Bureau of Law Enforcement ("*FDABT*"); Florida Department of Corrections ("*FDOC*"); Florida Department of Law Enforcement ("*FDLE*"); Florida Department of Financial Services Criminal Investigations Division ("*DFS*"); FDHSMV, Division of FHP; Florida Fish & Wildlife Conservation Commission ("*FWC*") (DE 53-1 at 78), Florida Department of Lottery Division of Security ("*FDL*"), the Florida National Guard ("*FNG*"), and Florida Department of Environmental Protection Division of Law Enforcement ("*FDEP"*). *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 53-1 at 2, 17, 32, 47, 62, 78, 93, 108, 123 (collectively, the "*287(g) Agreements*").[9] Each of those agreements contains essentially identical sections, titled "Ice Supervision" and "Liability and Responsibility". *Id.* at 6–9, 19–20, 29, 36–39, 51–54*,* 67–70, 82–85, 97–100, 112–15, 127–30. Those sections include the following language:

### XI. ICE SUPERVISION

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized

---

[9] "A district court may take judicial notice of public records within its files relating to the particular case before it or other related cases." *Cash Inn of Dade, Inc. v. Metro. Dade Cnty.*, 938 F.2d 1239, 1243 (11th Cir. 1991); *see also Lockett v. Experian Info. Sols., Inc.,* 2021 WL 4815898, at *1, *12 n.9 (N.D. Ga. June 30, 2021) ("The Court may take judicial notice of public records, such as court filings on public dockets.") (citing *Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006))); *Ohio Cas. Ins. Co. v. Beall*, No. 23-cv-00060, 2024 WL 3993851, at *5 (M.D. Ga. Aug. 29, 2024) (explaining contract was not hearsay because its language was legally operative, not used to prove the truth of another matter).

to perform immigration officer functions except when working under the supervision or direction of ICE.

For the purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy.

## XIV. LIABILITY AND RESPONSIBILITY

Participating LEA personnel will be treated as Federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(l), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. See 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. **In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE authorized by this MOA will be considered acting under color of federal authority for purposes of determining liability and immunity from suit under federal or state law. See 8 U.S.C. § 1357(g)(8).**

These provisions are replete with express references to the statutory framework that governs 287(g) agreements. Section 1357(g) allows states or localities to enter into agreements with the Attorney General to deputize state or local officers to perform functions of federal immigration officers when they are "determined by the Attorney General to be qualified to perform" those functions after receiving training and certification "regarding the enforcement of relevant Federal immigration laws." § 1357(g)(1)–(2). When acting under a 287(g) agreement, the deputized officer "shall be subject to the direction and supervision of the Attorney General." § 1357(g)(3). Further, any 287(g) agreement must specify the deputized officer's powers and duties, the duration of delegated authority, and the federal agency official who is "required to supervise and direct the individual[.]" § 1357(g)(5). Finally, the deputized officer is treated as a federal

employee for purposes of compensation for injury and tort liability, and the officer "shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit[.]" § 1357(g)(7)–(8).

## II.   LEGAL STANDARDS

"Under Federal Rule of Civil Procedure 12(b)(3), a party may assert the defense of improper venue." *Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*, 669 F. Supp. 2d 1353, 1356 (S.D. Fla. 2009). When a defendant does, "the plaintiff bears the burden of showing that the venue selected is proper." *Id.* (citing *Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988)); *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004) ("On a motion to dismiss based on improper venue, the plaintiff has the burden of showing that venue in the forum is proper."). A court "must accept all allegations of the complaint as true, unless contradicted by the defendants' evidence, and the court "may examine facts outside of the complaint" when factual disputes arise. *Id.* (citations omitted). In reviewing the allegations and evidence, "the court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Hemispherx*, 669 F. Supp. 2d at 1356; *see also Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990) (when reviewing a Rule 12(b)(3) motion and the parties' "affidavits conflict, the court is inclined to give greater weight to the plaintiff's version of the jurisdictional facts and to construe such facts in the light most favorable to the plaintiff."). Finally, "venue must be proper as to each defendant and each claim." *Doe 1 v. Congregation of the Sacred Heart of Jesus and Mary*, No. 23-cv-5294, 2024 WL 4276174, at *2 (E.D.N.Y. Sept. 24, 2024); *see also Williams v. Apple Inc.*, No. 23-3901, 2024 WL 2721630, at *2 (D.D.C. May 27, 2024) ("Where a case involves more than one

cause of action, as is true here, 'venue must be proper as to each claim[.]'") (quoting *Relf v. Gasch*, 511 F.2d 804, 807 n.12 (D.C. Cir. 1975)).

Even if venue is proper, a court may transfer a case to another district in which venue lies "in the interest of justice." 28 U.S.C. § 1404. The court should consider "convenience of parties and witnesses, the 'locus of operative facts,' and other concerns related to 'trial efficiency[.]'" *Bryant v. Sheriff, Saint Lucie Cnty., Fla.*, 2024 WL 4458382, at *8 (11th Cir. Oct. 10, 2024) (quoting *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005)). Additionally, the court should weigh "various public-interest considerations," including "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 62 n.6 (2013) (internal quotations omitted).

Rule 65 of the Federal Rules of Civil Procedure authorizes courts to grant a preliminary injunction before final judgment in limited circumstances. The purpose of this injunctive relief is to "preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005) (citation omitted). To merit a preliminary injunction, Plaintiffs must show:

> (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest.

*Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015) (quoting *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1263 (11th Cir. 2014)).

Plaintiffs "bear[] the burden of persuasion to clearly establish all four of these prerequisites." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotations omitted).

## III.   DISCUSSION

Defendants levy several objections to the propriety of the Court's adjudication of this matter. First, Defendants argue that 8 U.S.C. 1252(a) and (f) strip the Court of subject-matter jurisdiction over any aspect of Plaintiffs' NEPA claim that relates to federal immigration detention activities. (DE 16 at 12; DE 21 at 5–6). Next, Defendants contest whether the S.D. Fla. is the proper district for Plaintiffs' claims against Defendant Guthrie and the Federal Defendants. The Court will address these threshold issues before discussing the merits of the Motion for Preliminary Injunction.[10]

---

[10] Although Defendants do not contest Plaintiffs' standing, a "district court [is] not empowered to reach any merits question" without first establishing its jurisdiction. *See Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1311 (11th Cir. 2024). So, the Court will briefly address Plaintiffs' standing to seek injunctive relief. Plaintiffs may establish standing through either their own injury in fact or through associational standing by virtue of injuries posed to or suffered by their members. *City of S. Mia. v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023). "To establish associational standing, an organization must prove that its members 'would otherwise have standing to sue in their own right.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020) (citations omitted). To this end, Plaintiffs must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Here, Plaintiffs allege (and have supported through evidence) that their members' aesthetic, conservational, and recreational interests are adversely impacted by the detention camp's operations. From light pollution affecting members' ability to observe the night skies, to noise pollution impacting members' ability to observe and interact with wildlife, the Court finds that Plaintiffs have sufficiently alleged the injuries to their members and, therefore, have established associational standing. *See Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170–73 (11th Cir. 2006) (plaintiff environmental groups "easily" had associational standing when alleging that an agency "shirked its duties under NEPA . . ., with the result that already vulnerable species and their habitats are now more vulnerable," and the group's members use the area to recreate and engage with the environment).

**A. Section 1252 does not strip the Court of subject-matter jurisdiction over this NEPA claim.**

**1. Section 1252(a)(2)(B)(ii)**

Section 1252(a)(2)(b)(ii) provides that "[n]o court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subsection to be in the discretion of the Attorney General or the Secretary of Homeland Security[.]" The statute "precludes [the Court's] review of discretionary decisions of the [Secretary] in *only* th[os]e specific circumstances." *Zafar v. United States Attorney General*, 461 F.3d 1357, 1360 (11th Cir. 2006) (emphasis in original); *see also Bakran v. Sec'y United States Dep't of Homeland Sec.*, 894 F.3d 557, 562 (3d Cir. 2018) ("The INA's jurisdiction-stripping language . . . applies not to all decisions the [Secretary] is entitled to make, but to a narrower category of decisions where Congress has taken the additional step to specify that the sole authority for the action is in the [Secretary]'s decision.") (citations and quotations omitted). "The statute requires us to look at the *particular* decision being made and to ascertain whether *that* decision is one that Congress has designated to be discretionary." *Mejia Rodriguez v. United States Dep't of Homeland Sec.*, 562 F.3d 1137, 1143 (11th Cir. 2009) (emphasis in original).

As the Eleventh Circuit has clarified, "[t]he phrase 'specified under this subchapter' refers to subchapter II of Chapter 12, 8 U.S.C. §§ 1151–1378." *Zafar*, 461 F.3d at 1360. "Thus, to avoid judicial review, the [government] must rely on an explicit, Congressionally-defined, discretionary *statutory* power . . . articulated within sections 1151 through 1378[.]" *Belegradek v. Gonzales*, 523 F. Supp. 2d 1364, 1367 (N.D. Ga. 2007) (emphasis in original; citation and quotations omitted).

Defendants rely on §§ 1226 and 1231, which address the Attorney General's authority to detain and remove noncitizens. However, Plaintiffs challenge neither the fact nor the manner of detention or removal. Rather, Plaintiffs seek injunctive relief compelling Defendants to comply with NEPA, which ensures "federal agencies . . . adequately assess the environmental impacts of actions they undertake." *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir. 2005). This relief does not implicate, much less interfere with, any decision "specified . . . to be in the discretion" of the Secretary or the Attorney General. Because NEPA compliance is not a decision specified to be in the discretion of the Attorney General or Secretary, § 1252(a)(2)(b)(ii) simply does not apply. Defendants conflate two very distinct types of relief. An injunction requiring NEPA compliance would, at most, prevent the use of the facility until a lawful NEPA review is done. This is not the same thing as the Court dictating where or how the government must house immigration detainees, which Congress has specified to be within the Secretary's discretion. Plaintiffs seek only the former type of relief.[11]

Defendants' cited cases—nearly all of which feature individual plaintiffs challenging their own detentions or removals—confirm this distinction. Defendants selectively quote language from these cases to suggest that § 1252(a)(2)(b)(ii) is broader than it is. Plaintiffs do not dispute that the Attorney General and Secretary possess authority over detention and removal as those cases recognize. But those decisions arose in entirely different factual and legal contexts. None address NEPA, none involve the

---

[11] In *C.M. v. Noem*, the court drew a similar conclusion when analyzing whether another jurisdiction-stripping provision of the INA, § 1252(g), precluded review of claims by detainees at the TNT site alleging the manner of their detentions unduly restricted their access to counsel. 25-cv-23182 (S.D. Fla.), ECF 86 at 31–32; *see also infra* n.14.

APA, and none interpret § 1252(a)(2)(B)(ii) in a way that would bar review of Plaintiffs' claims. *See, e.g., Sinclair v. Att'y Gen. of United States*, 198 F. App'x 218, 222 (3d Cir. 2006) (reaffirming attorney general's discretion under § 1231(g)(1) to determine place of detention); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (holding district court lacked jurisdiction to enjoin attorney general's discretionary transfer of aliens in a Bivens class action); *Comm. of Cent. Am. Refugees v. Immigr. & Naturalization Serv.*, 795 F.2d 1434, 1441 (9th Cir. 1986) (confirming that district court could not supervise attorney general's day-to-day discretion over detention placement); *Jane v. Rodriguez*, No. 20-5922, 2020 WL 10140953, at *2 (D.N.J. May 22, 2020) (recognizing DHS' discretion to detain and set detention locations and transfers during COVID-19); *Lway Mu v. Whitaker*, 18-cv-06924 2019 WL 2373883, at *5 (W.D.N.Y. June 4, 2019) (declining to order DHS to house petitioner in a specific facility, citing § 1231(g)(1)); *Salazar v. Dubois*, 17-cv-2186, 2017 WL 4045304, at *1 (S.D.N.Y. Sept. 11, 2017) (same, absent constitutional violation); *Tercero v. Holder*, No. 12-cv-0246, 2012 WL 8667571, at *3 (D.N.M. Oct. 4, 2012) (court lacked jurisdiction under § 1231(g)(1) over attorney general's decision to detain aliens in New Mexico pending proceedings in Texas); *Kapiamba v. Gonzalez*, No. 07-cv-335, 2007 WL 3346747, at *1 (W.D. Mich. Nov. 7, 2000) (finding that attorney general's decision to detain petitioner in a particular facility unreviewable under § 1231(g)(1)); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (neither discussing § 1252 nor the APA).

At best, Defendants' cases establish that § 1252(a)(2)(b)(ii) bars judicial review over individual detention and removal decisions, issues that are not present here. To expand § 1252(a)(2)(B)(ii) to NEPA-based claims unspecified in the statute would expand

its reach far beyond what Congress explicitly intended and legislated. *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 488 (11th Cir. 2015) ("As the Supreme Court has instructed time again, courts presume Congress says in a statute what it means and means in a statute what it says there.") (citations and quotations omitted); *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) ("We will not do to the statutory language what Congress did not do with it, because the role of the judicial branch is to apply statutory language, not to rewrite it.") (citations omitted).

### 2.  Section 1252(f)(1)

Defendants also rely on § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." In other words, "[i]t prohibits federal courts from granting classwide injunctive relief" against certain provisions of the INA, specifically §§ 1221–1231. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999); *see also Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) ("§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."). "Those provisions charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Id.* at 549–50.

Here, Plaintiffs' requested relief does not fall within that bar. They do not seek to halt, suspend, or alter the "operation" of any INA provision, nor do they challenge the Defendants' authority to implement or enforce immigration laws. An order compelling NEPA compliance does not "enjoin or restrain" immigration operations; it simply requires

Defendants to follow the environmental procedures that Congress imposed. *See generally Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 401 F. Supp. 3d 1298, 1309 (S.D. Fla. 2005) ("NEPA establishes important action-forcing procedures to ensure that the broad national commitment to protecting and promoting environmental quality is infused into the actions of the federal government.") (citations and quotations omitted). Thus, to the extent Defendants argue otherwise based on detention decisions under § 1226, that reliance is misplaced. Plaintiffs do not challenge any detention decision, and § 1226 contains no language suggesting that NEPA compliance is shielded from judicial review. "Congress legislated which sections are covered by § 1252(f)(1). The Executive Branch does not get to propose additions." *Texas* v. *U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 210 (5th Cir. 2024).

And if NEPA compliance has a "collateral effect" on immigration operations, that is insufficient to trigger § 1252(f)(1). *Id.* at 209 ("[A] court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision.") (emphasis in original; citation omitted); *see also United Farm Workers v. Noem*, -- F. Supp. 3d -- 2025 WL 1235525, at *22 (E.D. Cal. Apr. 29, 2025) ("Courts maintain authority to enter injunctions addressing other provisions of the INA even if there may be collateral effects upon a provision covered by Section 1252(f)(1) . . . . Thus, even if an injunction could have a collateral effect on the provisions identified by Defendants, the Court has the jurisdiction and the authority to issue an injunction."). Therefore, neither § 1252(a)(2)(B)(ii) nor § 1252(f)(1) deprive the Court of jurisdiction to require Defendants' compliance with NEPA.

B. *The Southern District of Florida is the appropriate venue for this suit.*

Next, the State and Federal Defendants each argue that venue in the S.D. Fla. is improper.[12] (DE 50 at 1; DE 60 at 1). Plaintiffs assert that the State waived its venue challenge. Plaintiffs go on to argue that regardless, venue in the S.D. Fla. is proper as to the Federal Defendants under § 1391(e)(1)(B) and § 1391(e)(1)(C), (DE 66 at 3), and is proper as to the State under 28 U.S.C. § 1391(b)(2). (DE 61 at 8). The Court will address each issue in turn.

1. **Waiver**

Plaintiffs initially argue that the State waived any venue challenge by litigating this case on the merits for almost a month—including filing three merits briefs in opposition to Plaintiffs' requests for injunctive relief—before raising venue. (DE 16; DE 28; DE 35). "A party waives [improper venue] by . . . failing to . . . include it in a responsible pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course." Fed. R. Civ. P. 12(h)(1)(B)(ii). It may also be waived by other "conduct amounting to waiver as a matter of law." *Manley v. Engram*, 755 F.2d 1463, 1468 (11th Cir. 1985). "Because a motion to dismiss for lack of venue . . . can be raised so easily, [courts] strictly apply the waiver rule[.]" *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Indus. Fund*, 967 F.2d 688, 692 (1st Cir. 1992) (describing Rule 12 as requiring venue to be raised in a defendant's "first defensive move" and affirming a finding of waiver when defendant had requested a hearing on plaintiff's TRO motion, moved to appear *pro hac vice*, and stipulated to expedited discovery and preliminary injunction hearing without raising venue). An "opposition to a motion for preliminary injunction can be such a 'first

---

[12] Defendant Miami-Dade County has not challenged venue.

responsive pleading' or defensive move." *Bautista-Perez v. Holder*, 681 F. Supp. 2d 1083, 1091 (N.D. Cal. 2009) (venue was waived when defendants filed two opposition motions to plaintiff's preliminary injunction request, including a declaration on the case's merits).

Here, the State filed notices of appearance on the same day the Complaint was filed. (DE 10; DE 11). Then, over the course of almost a month, the State filed three merits briefs, including a declaration from FDEM Executive Director Guthrie. (DE 16; DE 28; DE 35). The State also filed a motion for extension of time to respond to the Complaint in order to align its deadline with the Federal Defendants', all without mentioning venue. (DE 39). In short, the State failed to raise venue in any of its first *three* defensive moves, despite the opportunity. This is sufficient for a finding of waiver.

The State argues that the above cited cases are distinguishable because in those cases preliminary injunction hearings were held without mention of waiver. (DE 65 at 4–5). But none of those courts discuss that fact as relevant to their decisions. The State then offers a series of inapposite cases where courts rejected waiver in completely different scenarios to the one presented here. See *Lithia Ramsey-T, LLC v. City Line Auto Sales, LLC*, No. 22-03592, 2023 WL 1883355, at *5 (D.N.J. Feb. 9, 2023) (personal jurisdiction was not waived by complying with the court's order to show cause and appear for preliminary injunction hearing a week after complaint filed); *Bartlett v. Bartlett*, No. 16-cv-6595, 2017 WL 106043, at *2 (N.D. Ill. Jan. 11, 2017) (filing motion to disqualify opposing counsel, followed by 12(b)(3) motion before briefing closed on the disqualification motion, did not waive venue defense); *Pickett v. City of Houston*, No. H-08-2734, 2009 WL 1158842, at *2 (S.D. Tex. Apr. 29, 2009) (insufficient service defense not waived by appearing at TRO hearing the morning after complaint filed and

then moving to dismiss in its first filing); *Johnson v. Masselli*, No. 2:07-cv-214, 2008 WL 111057, at *3 (N.D. Ind. 2008) (rejecting waiver argument after defendant appeared at TRO hearing, briefed the non-merits issue of necessity of a security bond for the TRO, and then raised venue in their first merits pleadings—their answer and a motion to dismiss); *Friedberg v. Mut. Holdings, Ltd.*, No. 02-3193, 2005 WL 1213282, at *3 (E.D. Pa. May 19, 2005) (defendants' 12(b)(6) motion based on forum selection clause was not waivable, but even if construed as a 12(b)(3) motion, no waiver when defendants stipulated to TRO as a part of settlement negotiations and did not litigate on the merits).

In sum, for a month, Defendants disregarded an issue they now describe as obviously correct, "an important issue," and a "leading legal argument." DE 89 at 13–14, 16 (arguing "it would be impossible to say" venue is valid under 1391(e)(1)(C) and any arguments for venue under 1391(b)(2) are "easily dispatched"). Though Defendants' waiver of venue is sufficient to foreclose venue as an issue, the Court addresses the merits of all Defendants' venue challenges, as both Parties requested.

## 2. Section 1391(e)(1)(C)

When "a defendant is an officer or employee of the United States or any agency thereof" a civil action may "be brought in any judicial district in which . . . the plaintiff resides if no real property is involved in the action." § 1391(e)(1)(C). For venue purposes, a plaintiff entity resides "only in the judicial district in which it maintains its principal place of business[.]" § 1391(c)(2). Friends has its principal place of business in Stuart, FL, within the S.D. Fla. (DE 61-1). The Federal Defendants do not dispute that this satisfies the first requirement of § 1391(e)(1)(C). They argue that "Plaintiffs' suit centers on the temporary detention center, which is a collection of buildings and pavement on real property[,]" and

"[t]hus, real property is a center component of this action[.]" (DE 60 at 4). But the Federal Defendants' far-reaching interpretation runs counter to decades of authority and the purpose of § 1391(e), which is "to broaden the venue of civil actions" against federal defendants. *Schlanger v. Seamans*, 401 U.S. 487, 490 n.4 (1971). As Judge Constance Baker Motley sagely wrote:

> Gravity being what it is, the vast bulk of human activities take place on the face of the earth. Consequently, almost any dispute over public or private decisions will in some way "involve real property," taken literally. The touchstone for applying § 1391(e)(4) [(the prior, identical version of § 1391(e)(1)(C))] cannot sensibly be whether real property is marginally affected by the case at issue. Rather, the action must center directly on the real property, as with actions concerning the right, title or interest in real property.

*Nat. Res. Def. Council, Inc. v. Tenn. Val. Auth.*, 340 F. Supp. 400, 406 (S.D.N.Y. 1971) (holding NEPA challenge to federally-owned utility's practice of buying strip-mined coal did not involve real property, despite the suit affecting "contracts with third-parties for production of coal," because the plaintiffs did "not seek an adjudication of the validity of defendants' title, leases, or mineral rights"), *rev'd on other grounds*, 459 F.2d 255 (2d Cir. 1972); *see also Env. Defense Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 325 F. Supp. 728, 732 (E.D. Ark. 1971) (NEPA challenge to dam project met prior version of § 1391(e)(1)(C) because "[n]othing need[ed] to be done in [t]he action with respect to the real estate under and adjacent to the [river] or upon which defendants contemplated[] constructing the dam[, and] [t]he action d[id] not put in issue the title to, or possession of, such lands, or any interest therein").

Other courts nationwide have echoed Judge Motley's statutory interpretation and held that NEPA suits similar to Plaintiffs' did not involve real property within the meaning of § 1391(e)(1)(C). For example, in *Earth Island Institute v. Quinn*, the court held real

property was not involved in a NEPA challenge to a federal restoration project to "conduct salvage harvest of fire-killed trees, remove hazardous trees, and engage in tree planting in areas affected by" recent fires. *Earth Island Inst. v. Quinn*, 56 F.Supp.3d 1110, 1112, 1116 (N.D. Cal. 2014). The court began its analysis by pointing out that, "by using the legal term 'real property[]' . . . Congress seems to have indicated that it intended mainly to cover disputes over legal interests in real property." *Id.* at 1115–16. Indeed, the court found, "[m]ost authority appears to have followed [Judge Motley's] logic, generally finding that actions 'involve real property' when they involve disputes over real property interests—and perhaps not even then if the real property dispute is peripheral to the central cause of action." *Id.* at 1116 (first citing Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3815 n.33 (4th ed.); and then *Animal Legal Def. Fund v. U.S. Dep't of Agric*, No. 12-cv-4407, 2013 WL 120185, at *2 (N.D. Cal. Jan. 8, 2013)). Even though the case related to the use of "a specific area of land," the court concluded this was insufficient to bring the suit within the category of real property disputes triggering the exception, as it was more centrally a suit about "personal property interests in timber and regulatory and environmental policy issues." *Id.* at 1116.

Next, in *Western Watersheds Project v. Schneider*, the court reaffirmed its interpretation of "§ 1391(e)(1)(C) to mean that 'real property' is not 'involved' in a lawsuit challenging an agency's compliance with NEPA[.]" *W. Watersheds Project v. Schneider,* 2019 WL 4863483, at *2–3 (D. Id. Oct. 2, 2019) (citing *WWP v. Salazar*, No. 08-0516, 2009 WL 1299626 (D. Id. May 7, 2009)). Before the court was a challenge to Bureau of Land Management ("**BLM**") land-use plans in several western states, which Plaintiffs say unlawfully "relax[ed] restrictions on oil and gas development in sage grouse habitat." *Id.*

at *1. Though plaintiff's suit implicated third-party property rights as an ancillary matter, plaintiffs were not disputing any party's "right, title or interest in real property." *Id.* at *3. Instead, the court held, like the court in *Earth Island v. Quinn*, that plaintiffs were merely "challeng[ing] an agency's compliance with statutory mandates." *Id.*

Here, Plaintiffs' suit likewise centers on non-compliance with "statutory mandates"—namely the Federal Defendants' approval, construction, funding, and use of the detention camp without conducting environmental analyses required by NEPA—*not* who possesses any given property right to the TNT site. Therefore, even though the suit involves real property in a colloquial sense, it does not fit within the meaning of § 1391(e)(1)(C).

Resisting this conclusion, Defendants point to a single case in which a court held a suit under NEPA involved real property within § 1391(e)(1)(C). (DE 65 at 6 (citing *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 08-05646, 2009 WL 1025606, (N.D. Cal. Apr. 14, 2009)); DE 89 at 10, 51 (same)). But that single authority relied on another case in which "the plaintiff alleged that [BLM] improperly rejected [its] oil and gas lease applications." *Ctr. for Biological Diversity,* 2009 WL 1025606, at *2 (citing *Ferguson v. Lieurance*, 565 F. Supp. 1013, 1015 (D. Nev. 1983)). In that distinguishable context— where "the obvious and undeniable purpose" of plaintiff's action was to "acquire the real property interest he seeks"—the *Ferguson* court reasoned that the action did involve real property. *Id.* (quoting *Ferguson*, 565 F. Supp. at 1015). The *Center for Biological Diversity* court may have been swayed by the sheer "range of real property issues" at play in the challenged plan before it, "including access to public and private lands, rights of way and easements across these lands, land withdrawals, and land exchanges and acquisitions."

*Id.* at \*1. Consequently, several courts have since found the *Center for Biological Diversity* court's decision is confined to its facts and inapplicable in the NEPA context. *See Earth Island Inst. v. Nash*, No. 19-cv-05792, 2019 WL 11023709, at \*5 (N.D. Cal. Oct. 7, 2019) (finding *Center for Biological Diversity* "is distinguishable" from the case at hand, where "[p]laintiffs' lawsuit certainly involves public land, [but] the claims focus on compliance with NEPA and other environmental statutes"); *W. Watersheds*, 2019 WL 4863483, at \*2 (finding *Earth Island v. Quinn* "more persuasive" than *Center for Biological Diversity*). This Court does as well.[13]

Therefore, the Court finds that this suit does not involve real property within the meaning of § 1391(e)(1)(C), and the S.D. Fla. is a proper venue for this suit with regard to the Federal Defendants under that subsection. The Court will now address whether this district is a proper venue for the State and Federal Defendants as a locus of the substantial part of the events or omissions giving rise to their claims.[14]

---

[13] Finally, Defendants argue that even accepting the stricter interpretation of the phrase, this action *does* involve real property, because Count IV challenges Miami-Dade's acquiescence to the State's use of the TNT site for the project. (DE 89 at 11, 49–52; DE 65 at 6 ("[E]ven under Plaintiffs' test, real property interests are involved: Plaintiffs allege Defendants wrongfully commandeered Miami-Dade's property[.]")). But again, Plaintiffs are not seeking to vindicate any property right of Miami-Dade's or their own—they object to the site's use as a detention camp in violation of certain procedural mandates. *See* (DE 1 ¶ 93 (claiming "[Miami-Dade's] agreement or acquiescence in allowing the TNT [s]ite for use as a mas[s] detention center is in violation of the County code and permitting regimes")).

[14] Defendants filed a Notice of Supplemental Authority (DE 128) citing an order in *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 86. The undersigned is aware that an esteemed colleague recently issued this order in a separate litigation involving detainees housed at the TNT facility. In that case, Plaintiffs raised First and Fifth Amendment constitutional challenges to their conditions of confinement at the facility. As Defendants point out, the order recognizes the "distinct procedural posture" of this case in its discussion of venue, *C.M.*, 25-cv-23182, ECF 86 at 33 n.14, although it should be noted that the Federal Defendants claim that venue was improper pursuant to § 1391(e) was resoundingly rejected in the *C.M.* order. *Id.* at 35–38. In any event, because, as acknowledged in that

### 3.  Sections 1391(b)(2) and (e)(1)(B)

"A civil action may [also] be brought in [any] judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]" § 1391(b)(2); *see also* § 1391(e)(1)(B) (providing transactional venue for federal defendants on the same basis). Venue is not confined to one district but may be proper "in two or more districts." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). "Only the events that directly give rise to a claim are relevant[,]" and "of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." *Id.*

However, the Court "is not required to weigh the events that occurred in" a plaintiff's chosen district "against those that took place in" other districts and "choose which venue is more proper; rather, even though 'a substantial part of the events or omissions giving rise to' the claim" may have occurred in another district, "so long as the same can be said as to" a plaintiff's chosen district, "venue is proper" there. *Goodwyn, Mills & Canood, Inc. v. Black Swamp, Inc.*, 956 F. Supp. 2d 1323, 1326 (M.D. Ala. 2012); *see also Morgan v. N. MS Medical Ctr., Inc.*, 403 F. Supp. 2d 1115, 1123 (S.D. Ala. 2005) ("[A] plaintiff does not have to select the venue with the *most* substantial nexus to the dispute, as long as she chooses a venue where a substantial part of the events giving rise to the claim occurred.").[15] Further, "'[s]ubstantiality' for venue purposes is more a qualitative than a

---

order, the legal and procedural postures of the two cases are entirely distinct, the determination as to venue in *C.M.* does not control or subvert the analysis here.

[15] Therefore, it is irrelevant to the §1391(b)(2) analysis that the Middle District of Florida, where the majority of the detention camp is located, would also have been a proper venue for Plaintiffs' suit.

quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Russo v. Raimondo*, No. 24-0186, 2024 WL 4571431, *5 (S.D. Ala. Oct. 24, 2024) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432–33 (2d Cir. 2005)).

Plaintiffs argue that there are substantial events and omissions which occurred in this district, making venue here a proper choice. Specifically, they point to: (1) TNT's partial location in[16] and ownership by Miami-Dade, (DE 61 at 9–10 (citing DE 12-3; DE 12-4; DE 12-5)); (2) the State and Federal Defendants' failure to conduct environmental assessments and provide opportunity for notice and comment regarding the environmental impacts of the project, which would have taken place, in large part, in Miami-Dade, (*id.* at 10–11); and (3) the current and feared impacts of the project on Miami-Dade, its residents, threatened and endangered species within the county, and Tribal sites and activities within Miami-Dade. (*Id.* at 13–15).

Defendants argue that a substantial part of the events or omissions here could not have taken place in the S.D. Fla. because "all the detention facilities, all the buildings, and all the paving at issue" are located in Collier County, in the Middle District of Florida ("*M.D. Fla.*"), and "all relevant decision[-]making was made or is being made by officials in Washington, DC; in Tallahassee, Florida; or onsite at the camp [.]" (DE 50 at 3–4); *see*

---

[16] Through dueling GIS maps and expert affidavits, the Parties aggressively dispute what percentage of the property is within Miami-Dade, 2% or 28%. (DE 79; DE 80; DE 86). It does appear that around 2% of the jetport is in Miami-Dade, while 28% of the total developed and as yet undeveloped land is within Miami-Dade. The real disagreement is over which areas within the property are relevant to Plaintiffs' claims and to what degree. But, as will be explained, the answer to that question impacts venue little, so the Court will not wade into this contestation.

*also* (DE 60 at 1). Defendants reject the notion that Miami-Dade's ownership of the property has any relevance to the analysis, because, since "FDEM took control of the [s]ite . . . [Miami-Dade's] activities . . . 'do not have a close nexus with the cause of action.'" (DE 50 at 4–5 (quoting *Jenkins Brick*, 321 F.3d at 1373)). Finally, Defendants insist that only Defendants' actions, not Plaintiff's injuries, should be taken into account. (DE 65 at 9–11).

Much of the dispute stems from the Parties' disagreement over how *Jenkins Brick*—the Eleventh Circuit's most detailed discussion of transactional venue—should be understood. The decision in *Jenkins Brick* arose from a dispute involving a breach of a non-compete agreement between an Alabama-based company and a Georgia-based employee. 321 F.3d at 1368. The contract had been executed in Georgia, was intended to be performed in Savannah, Georgia to protect the Alabama-based company's emerging Georgia activities, and was breached when the Georgie employee was hired by a competitor in Savannah. *Id.* at 1372. Arguing that venue was nonetheless proper in Alabama, the plaintiff-employee noted that sales and training meetings had been held in Alabama, his salary and benefits came from Alabama, and the executed non-compete agreement had been sent by the plaintiff back to Alabama. *Id.* at 1372–73. The Eleventh Circuit discounted these connections to Alabama, finding "they did not have a close nexus with the cause of action for breach of contract." *Id.* at 1373. Because "all of the events 'giving rise to'" the claims occurred in Georgia, the court held Alabama was an improper forum. *Id.*

In its analysis, the Eleventh Circuit cited an Eighth Circuit case, *Woodke v. Dahm*, 70 F.3d 983 (8th Cir. 1995), in which a plaintiff who sold and designed semi-trailers

claimed the defendant was passing off trailers under an identical trademark. *Id.* at 1371. The plaintiff filed the case "in the state of his residency, Iowa, even though he had no evidence of wrongdoing in that state." *Id.* (citing *Woodke* 70 F.3d at 985). To support venue in Iowa, the plaintiff argued Iowa is "the location of the ultimate effect of the passing off." *Woodke*, 70 F.3d at 985. He also proffered the fact that the trailers were manufactured in Iowa, before having the trademarks altered elsewhere. *Id.* Assessing the venue claim, the *Woodke* court found the initial manufacturing of the trailers was too causally remote from "the kinds of events that give rise to a claim" to be factored into the analysis. *Id.* Without any other relevant connections to Iowa, the court "reject[ed the plaintiff's] argument that venue lies in [Iowa] simply because that was where he was residing when the passing off occurred." *Id.* As the *Woodke* court explained,

> While the present venue statute was certainly intended to expand the number of venues available to a plaintiff, we are reluctant to impute to Congress an intent to abandon altogether the protection of defendants as a relevant consideration in venue matters. We think it far more likely that . . . Congress meant to require courts to focus on relevant activities of the defendant, not the plaintiff.

*Id.*

Two guiding principles emerge from a more than cursory review of these cases and their reasoning. First, while the Court must "focus" the inquiry on the acts and omissions of the Defendant, these cases do not stand for the drastic proposition that the Court must "ignore the place of injury altogether. They simply hold that the place of . . . injury is not *alone* sufficient to create venue." *Am. Action Network, Inc. v. Cater Am., LLC*, No. 12-cv-1972, 2014 WL 12675253, at *2 (D.D.C. Feb. 12, 2014) (discussing *Jenkins Brick and Woodke*, among other cases). Indeed, courts within the Eleventh Circuit have regularly factored the location of injury into their analyses since *Jenkins Brick* was

decided. *See e.g., Exist Inc. v. Starr Indem. & Liab. Co.*, No. 23-cv-61511, 2023 WL 11969904 at *1, *3 (S.D. Fla. Nov. 2, 2023) (venue for suit challenging New York-based insurer's denial of claim was proper in Florida because "one of the losses giving rise to" the claim occurred there); *AutoNation, Inc. v. Hall*, No. 19-cv-60291, 2019 WL 3712008, at *8 (S.D. Fla. May 29, 2019) (stating that courts have "held that substantial events occurred within a venue when harm or injury was suffered in that venue" (quoting *Mobile Diagnostic Imaging, Inc. v. Gormezano,* No. 12-cv-60888, 2012 WL 3244664, at *2 (S.D. Fla. Aug. 9, 2012))); *United States v. Sec'y, Fla. Dep't of Corr.*, No. 12-cv-22958, 2012 WL 6626818, at *2 (Dec. 19, 2012) (in suit challenging a Florida policy—decided in Tallahassee—to deny kosher meals to prisoners, venue was proper in the Southern District of Florida because "several prisoners in [the district] ha[d] been denied kosher meals[, and] [t]hus, harm ha[d] occurred" there).[17]

Second, for acts or omissions to "give rise to a claim," they must "have a close nexus to the wrong," but they need not be wrongful acts (or omissions) themselves. *Jenkins Brick*, 321 F.3d at 1373. In *Jenkins Brick*, the court found relevant the location where the non-compete agreement was executed and intended to be performed. *Id*. As long as the events are not too causally remote from the wrongful acts, these events are

---

[17] The *Jenkins Brick* court acknowledged that harm may be relevant, when discussing Congress's rationale for amending the venue statute. The court noted that "[t]he old language was problematic because it was oftentimes difficult to pinpoint the single district in which a 'claim arose.'" *Jenkins Brick*, 321 F.3d at 1371. The court gave the example of "a toxic tort case in which the defendant's factories in Colorado and Missouri pollute a river, causing injury to Arkansas and Louisiana citizens who ingest the water." *Id*. Under the old statute allowing venue in only one district, a court would have been forced to "pick a district in an arbitrary fashion," since any of the locations provide a reasonable forum. *Id*. The court's identification of Arkansas and Louisiana—districts where the harm occurred in the hypothetical—as examples of possible venues, indicates the court's understanding that harm is not wholly irrelevant to the analysis.

relevant as "part of the 'historical predicate' of the claim." *MacDermid Printing Sols., LLC v. Clear Stamp, Inc.*, 2013 WL 3176887, at *5 (N.D. Ind. June 21, 2013). For example, in *North MS Medical Center*, the court held venue for an Emergency Medical Treatment and Active Labor Act ("EMTALA") claim was appropriate in Alabama, even though the decedent was injured, hospitalized, treated, and eventually prematurely discharged in Mississippi. 403 F. Supp. 2d at 1123. The court found that the hospital's transportation of the decedent in an ambulance back to his home in Alabama, where he later died of untreated injuries, bore a "close nexus to the wrong," even though "the alleged EMTALA violation may have been satisfied the moment that [the defendant] wheeled [the decedent] out the front door of the [h]ospital[.]" *Id.* In part, this was because the Alabama occurrences would be part of "the proof at trial." *Id.*

Turning back to this case, Plaintiffs' Complaint alleges that Defendants' construction and operation of the TNT site as an immigration detention camp violates various federal, state, and county laws. The NEPA claim asserts that because the project creates major environmental impacts and is subject to significant federal control, Defendants were required to conduct certain environmental reviews beforehand and did not. These claims implicate a broad range of Defendants' conduct, and the scope of relevant acts and omissions is equally broad, and includes: Defendants' efforts to take control of the TNT site and failure to obtain critical information from the site's owner; aspects of Defendants' decision-making process regarding the facilities' construction and operations; and, critically, any of Defendants' detainee transportation, detention, and deportation activities related to the project. A substantial portion of these events took place and are taking place in Miami-Dade, within the S.D. Fla.

First, because Miami-Dade owns the TNT site, Director Guthrie began the project's execution by sending a notice of intent to purchase the TNT site and associated lands to Miami-Dade Mayor Daniella Levine Cava. (DE 12-3). Defendant Miami-Dade, through Mayor Levine Cava, responded by alerting Director Guthrie to Miami-Dade's concerns that Defendants must "understand the scope and scale of the proposed use of the site and what will be developed, as the impacts [on] the Everglades ecosystem could be devastating." (DE 12-4 at 1). The State did not heed Miami-Dade's warnings or ask for any additional information from Miami-Dade to educate itself on scope, scale, and impacts. This interaction was an initial act—or failure to act—in the joint, multi-step decision-making process by Defendants, which is a necessary predicate to NEPA compliance, and which gave rise to Plaintiffs' NEPA claim. *See Russo*, 2024 WL 4571431, at *2–4 (in APA claim challenging a final rule promulgated by a federal agency, an antecedent meeting and vote by a regional council to send a proposed rule to the agency for approval "qualifies as an event that directly g[a]ve[] rise to the plaintiff's claims" even though it was not the actionable event). The State then responded to Miami-Dade's letter, notifying the County of the State's intent to commandeer the property for use as a detention camp. (DE 12-5).

Next, Defendants' use of the site includes actions currently taking place in the S.D. Fla. Most importantly, ICE's Miami field office is responsible for coordinating and supervising immigration enforcement functions conducted by deputized state law enforcement agency officials. (DE 21-1 ¶ 5, 8 (declaration from ICE Interim Assistant Director of Field Operations Thomas Giles confirming that the detention camp operates under Florida agencies' 287(g) agreements with ICE); DE 118-1 ¶ 9 (declaration from ICE

Miami field office director stating that he oversees the relevant 287(g) agreements)). In a different case raising constitutional challenges to detainee treatment on the TNT site, the Federal Defendants filed a declaration by another ICE Miami field office official, Juan Lopez Vega, in which he attested that his responsibilities "include overseeing [Enforcement and Removal Operations], and detention facility operations within the Miami [Area of Responsibility], including those at the South Florida Soft Sided Facility South (SFSSFS). . . . which is also known as Alligator Alcatraz." *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 50-1 ¶¶ 3–4.[18] Given that the sole use of the site is to detain those in federal immigration custody, all activities on the site are supervised and directed by the Miami ICE field office. *See supra* Section I.B. (quoting language from 287(g) agreements stating, "[i]mmigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE."). Additionally, the Federal Defendants bring detainees from other Miami-Dade detention facilities to the TNT site. (DE 114 at 312–14). In fact, in another case involving the detention camp, Federal Defendants recently filed a notice that "the Executive Office for Immigration Review (EOIR) has designated Krome North Service Processing Center (Krome) as the immigration court with administrative responsibility over the Alligator Alcatraz detention facility." *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 83. These core actions are alone sufficient to make venue proper in the S.D. Fla. *See Managed Care Sols., Inc. v. Cmty Health Sys., Inc.*, No. 10-cv-60170, 2011 WL 6024572 at *3–4 (S.D. Fla. Dec. 2, 2011) (in a breach of contract case, venue was

---

[18] *See Cash Inn of Dade*, 938 F.2d at 1243 ("A district court may take judicial notice of public records within its files relating to the particular case before it or other related cases); *Lockett,* 2021 WL 4815898, at *1, *12 n.9 ("The Court may take judicial notice of public records, such as court filings on public dockets.") (citing *Universal Express, Inc.*, 177 F. App'x at 53)).

proper in the district where the parties performed the contract, even though the defendant's operations were not based there and that may not be "the venue with the most substantial nexus to the dispute") (internal quotations omitted).

However, Defendants' allegedly wrongful omissions in this case also have close ties to this district. When conducting a NEPA-triggering project in the Everglades area, the federal government is required to coordinate with the Tribe, who has occupancy rights in BCNP, conducts preservation and restoration activities in the area, and historically has aided federal agencies with their environmental reviews. *See* (Tribe Ex. 21 at IV-7; Tribe Ex. 22 at 209, 213, 216; Tribe Ex. 23 at 193; DE 129 at 73, 113 (testifying about the Tribe's occupancy rights in BCNP and the Everglades National Park)). Over the past decade, the Army Corps of Engineers has faithfully followed these protocols during the planning and execution of WERP. When notices of NEPA projects go to the Tribe, they are sent to the Tribe's administration building, located in Miami-Dade County. The Tribe's environmental divisions work out of that building in coordination with federal agencies to create environmental impact statements ("***EIS***"). The same holds true for ICE's consultation of other relevant environmental groups. *See* (Pl. Ex. 154 (describing ICE's consultation with the Everglades National Park regarding its proposed expansion of the ICE Krome SPC detention facility)). In this case, proof of the facts that no EIS was created and the Tribe was never consulted comes from the testimony of Tribal members and employees, whose employment is based in Miami-Dade. (DE 129 at 33–34, 45 (testifying to Defendants' failure to contact the Tribe before moving forward with the project, in contrast to agencies' usual protocol of consultation)). *See Morgan*, 403 F. Supp. 2d at 1123 (recognizing that the source of the proof at trial is an indicator of the location of

substantial events and omissions giving rise to a claim).

Next, though not a dispositive consideration on its own, the locus of possible environmental harms within this district is relevant, particularly where Plaintiffs must show that the project "significantly affect[s] the quality of the human environment" in order to prevail on their NEPA claim. *S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994) (quoting § 4332(a)(C)). To begin with, increased runoff from the 800,000 square feet of new paving and any wastewater from the site is likely to flow southeast, where just a few miles from the site in Miami-Dade, eighty percent of Tribal members reside, Tribal schools are located, and the Tribe's administration building sits. (DE 113 at 24, 79; DE 129 at 16, 34, 45; Tribe Ex. 6 (tribal villages map)). This increased runoff creates risks of carcinogens entering the Tribe's water supply and of sediment and nutrients impacting the plant and wildlife in the areas within Miami-Dade that the Tribe uses for hunting, fishing, and gathering certain plants. (DE 113 at 79; DE 129 at 107–08, 118–19). This change to the quantity and consistency of runoff also risks disrupting the $20 billion WERP, which involves culverts and other infrastructure to manage the flow of water into sensitive wetlands conservation areas in Miami-Dade and Broward Counties. (Pl. Ex. 34; DE 129 at 22–30).

Other harms in Miami-Dade include light pollution from the camp's intense industrial lighting, which obstructs views of the night sky in Miami-Dade. *See* (DE 24-4 (depicting the light emanating from the site from 15 miles away in Miami-Dade); DE 114 at 309 ("it looks like we have a sports stadium in our backyard now"); Tribe Ex. 9 at 8–35 (measuring and documenting the increased sky brightness due to the project)). This light pollution impacts the endangered bonneted bat's critical habitat zone, which is located

partially in Miami-Dade. (DE 129 at 132, 138–41). Further, since Defendants have altered the site's use, Tribal members have also been unable to access the main trails leading into the BCNP lands within Miami-Dade for hunting and cultural and ceremonial activities, as those trailheads are directly adjacent to the site. (*Id.* at 122–27, 133, 164, 175). These harms and others giving rise to Plaintiffs' NEPA claim, are relevant to the request for injunctive relief, and support venue in this district.

Defendants argue that *Friends of Earth v. Haaland*, counsels against this result. (DE 65 at 8 (discussing *Friends of Earth v. Haaland*, 2022 WL 185196, at *2-4 (D.D.C. Jan. 20, 2022))). As that court noted, "[i]n cases brought under the APA, courts generally focus on where the decision[-]making process occurred to determine where claims arose." *Friends of Earth*, 2022 WL 185196, at *3. But in that case, as in most NEPA cases, the court was reviewing a single discrete agency decision—a Record of Decision made in Washington, D.C. rescinding agency approval for new oil and natural gas leases in the Gulf of Mexico—and its relationship to the Western District of Louisiana. *Id.* at *1. Also in that case, as in most NEPA cases, the court was tasked with reviewing a significant record of meetings, studies, and EIS's to decide whether the decision-making process was sufficient under NEPA. *Id.* at *3–4 (discussing the locations of the agency's public comment process, issuances of multiple EISs and a Record of Decision, and of dozens of studies). Under those circumstances, because nearly all of the acts comprising the NEPA process took place outside of the district in question, the court in *Friends of Earth* concluded venue there was improper. *Id.* at *4.

But this case is *not* the usual NEPA case. Here, Plaintiffs do not challenge a new rule or Record of Decision, which may be traceable to discrete moments of decision-

making, but a project comprised of many "systematic and connected agency decisions[.]" 40 C.F.R. § 1508.18(3) (describing the adoption of programs as a category of major federal action). Here, there is no record of a NEPA process taking place in other districts because Defendants did not engage with a single step of the environmental review process in any district. Consequently, the Court's review under NEPA necessarily focuses on where studies should have been done and where interested parties should have been consulted but were not.[19]

Defendants say the Court's inquiry should be confined to Defendants' decisions about project construction, which they say took place in either Washington D.C., Tallahassee, Florida, or Collier County. This may be true (though the only supporting evidence Defendants have provided is one conclusory statement from a FDEM employee saying "[a]ll substantial decision-making about the detention facility has occurred at either State offices in Tallahassee, Florida, or on-site in Collier County, Florida"). (DE 50-1 ¶ 4 (declaration of Ian Gadea-Guidicelli)). Yet other decisions relating to the setup of the camp and its ongoing operations likely took place and continue to take place at the Miami field office, which coordinates ICE's oversight of the project's immigration functions and

---

[19] Defendants' reliance on *Rodriguez-Diaz v. Donald* is similarly misplaced. (DE 65 at 6, 8, 9, 11 (citing *Rodriguez-Diaz v. Donald*, No. 14-cv-23055, 2015 WL 11217234 (S.D. Fla. Apr. 1, 2015)). In that copyright infringement case, this Court applied in a straightforward manner the rule from *Jenkins Brick* that the focus of a Court's inquiry under § 1391(b)(2) should be on a defendant's actions with a close nexus to the wrong. *Rodriguez-Diaz*, 2015 WL 11217234, at *2. And because the defendant DJ had performed and sold records in the S.D. Fla. while using an allegedly infringing nickname, venue was proper even though those actions comprised a small share of the DJ's overall sales and performances. *Id.* *1–2. Similarly, here, the Court has identified numerous actions and omissions by Defendants with a close nexus to the alleged NEPA violation, making venue proper even while many other aspects of the claim took place in other districts.

the facilities' compliance with ICE standards. *See infra* pp. 35–36.

Finally, it is noteworthy that the *Friends of Earth* court did credit the location of the impact of the agency's decision as relevant, but said "impacts alone cannot create proper venue. . . .[,] [p]articularly . . . where the impacts of any decision will be felt nationwide." *Id.* at 5. In this case, impacts are localized to Miami-Dade (and some other counties), and these impacts are but one of the many relevant ties to the district. Therefore, the Court finds that Plaintiffs' claims against the State and Federal Defendants are properly in this district.

### 4. Discretionary transfer under section 1404(a)

Federal Defendants alternatively ask the Court to transfer the case to the M.D. Fla., where the majority of the TNT site is located. (DE 60 at 6). They rightly argue that venue is also appropriate there under § 1391(e)(1). (*Id.* at 6–7). But Federal Defendants are wrong in their assertions that the only important factor to weigh is "the local interest in having localized controversies decided at home," (*id.* at 7 n.4), and that this factor cuts in favor of venue in M.D. Fla. (*Id.* at 8).

"[A] plaintiff's choice of forum should be honored so long as venue is proper there, unless substantial countervailing considerations militate to the contrary." *Bartronics, Inc. v. Power-One, Inc.*, 510 F. Supp. 2d 634, 637 (S.D. Ala. 2007) (citing *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.")); *see also Managed Care Sols.*, 2011 WL 6024572 at *4 ("In the Eleventh Circuit, the plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.") (citation omitted). When considering transferring a case, the court

should consider "convenience of parties and witnesses, the 'locus of operative facts,' and other concerns related to 'trial efficiency[.]'" *Bryant*, 2024 WL 4458382, at *8 (quoting *Convergys Corp.*, 430 F.3d at 1135 n.1). Additionally, the court should weigh "various public-interest considerations," including "the administrative difficulties flowing from court congestion [and] the local interest in having localized controversies decided at home[.]" *Atl. Marine Constr. Co.*, 571 U.S. at 62 n.6 (2013) (internal quotations omitted).

Federal Defendants argue that NEPA cases "are resolved on an [a]dministrative [r]ecord and therefore" convenience of parties and witnesses and other trial efficiency considerations "do not play a significant role for purposes of the venue analysis." (DE 60 at 7 n.4). That may be true in a typical NEPA case, where the Parties agree that a given agency action was subject to NEPA, and the agency conducted some environmental analysis under NEPA, so there is an administrative record for the Court's review. But again, this is not a typical NEPA case. Here, the Parties dispute whether the project is even a federal action, and no Defendant conducted any environmental analysis prior to building and operating the project; the merits of the NEPA claim will require fact-finding as there is no administrative record to rely upon. Additionally, Plaintiffs request permanent injunctive relief. As the case progress, Plaintiffs will need to marshal testimony from witnesses and other discovery related to irreparable harm and equities, making convenience of witnesses and access to evidence relevant considerations. And both of these considerations—convenience and access—weigh in favor of keeping the case in the S.D. Fla. For one, the S.D. Fla. provides the closest federal courthouse to the TNT

site by 50 miles.[20] Moreover, eighty percent of Tribal members live in Miami-Dade and their environmental resources division and tribal headquarters are based here. (DE 129 at 16, 34, 45; Tribe Ex. 6). Much of the evidence of environmental harms would also be derived from Miami-Dade. Further, Miami-Dade County owns the TNT site; property records, past site plans, ecological studies, and surveys are presumably located in Miami-Dade.

Next, Defendants posit, without any support, that "the resolution of this case . . . will have the *greatest* impact on the people and local governments of the Middle District[.]" (DE 60 at 8). But this is far from clear. Miami-Dade and other adjacent counties in the S.D. Fla. have similar, if not more compelling interests in the resolution of this case. Again, it cannot be overstated that Miami-Dade **owns** the site and certainly has a strong interest in how it is used. Some Miami-Dade residents live relatively close to the site and use the surrounding areas for recreation. Tribal members have perhaps the most compelling interest of any one demographic in how these claims are decided, and they are almost entirely local to Miami-Dade. This is not to say that residents in Collier County may not also have a stake in the proceedings, but this factor does not clearly cut in favor of venue in the M.D. Fla.

Given that the S.D. Fla. is undoubtedly the more convenient forum and public-

---

[20] According to a google maps search, the closest M.D. Fla. courthouse is 103 miles from TNT, while the closest S.D. Fla. courthouse is 54 miles away. Driving Directions from the Ft. Myers Division U.S. Courthouse & Federal Building to the TNT site and from the Wilkie D. Ferguson Jr. U.S. Courthouse to the TNT site, Google Maps, http://maps.google.com. *See Borozny v. Inn*, No. 19-cv-112-J-39PDB, 2019 WL 13272267, at *2 n.2 (M.D. Fla. Feb 25, 2019) ("Courts routinely rely on and take judicial notice of Google Maps." (citing *Perimeter v. Fedex Freight, Inc.,* No. 14-cv-104, 2016 WL 878496, at *2 (M.D. Ga. Mar. 7, 2016)).

interest considerations are in equipoise, the Court will not disturb Plaintiffs' choice of venue in the S.D. Fla. Having established that the case will remain in this district, the Court will proceed to analyze the merits of Plaintiffs' request for a preliminary injunction.

### C. *Plaintiffs have met the criteria for issuance of a preliminary injunction.*

As stated above, to succeed on a motion for preliminary injunction Plaintiffs must show: "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Gissendaner*, 779 F.3d at 1280 (citation omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction [in a NEPA case] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.") (citations omitted). The Court addresses each requirement in turn.

### 1. Likelihood of success on the merits

Plaintiffs base their request for preliminary injunctive relief solely on their NEPA claim,[21] encompassed within Counts I and II.[22] *See supra* n.4. NEPA does not contain a

---

[21] Though the APA provides the cause of action for the relevant claim, for ease and consistency, the Court will refer to the claim as a "NEPA claim," since it hinges on whether Defendants complied with NEPA.

[22] Plaintiffs originally requested injunctive relief against Miami-Dade but withdrew that request. (DE 31 at 3 n.2). Therefore, the Court will not address Miami-Dade's response. (DE 12).

"private right of action." *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355 n.2 (11th Cir. 2024). Instead, a plaintiff must sue under the APA provision, "5 U.S.C. § 706(2)(A), which provides a cause of action to challenge final agency action as (among other things) arbitrary and capricious." *Id.* (citing *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 1130 (2014) (explaining that the APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action")); *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1356 n.12 (11th Cir. 2023) ("NEPA challenges are brought under the [APA]"); *see also* § 706(2)(A) (requiring a "reviewing court [to] . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

NEPA was passed in recognition of "the profound impact of [hu]man[] activity on the interrelations of all components of the natural environment[.]" 42 U.S.C. § 4331(a). It is meant, among other goals, to "fulfill the responsibilities of each generation as trustee of the environment[,]" and "preserve important historic, cultural, and natural aspects of our national heritage[.]" § 4331(b)(1),(4). To those ends, NEPA requires that any "major Federal action significantly affecting the quality of the human environment" be preceded by and EIS, which studies foreseeable environmental impacts of the project, feasible alternatives, and other factors impacting the balance between NEPA's objectives and the benefits of the project. § 4332(C).[23] The EIS process must be done in consultation with

---

[23] The agency may prepare a less intensive "environmental assessment [("*EA*")]" for "proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown[.]" § 4336(b)(2). But even when an EA is appropriate, the decision to prepare an EA along with the reasons for making this decision, must be articulated and published. *Id.* (providing

any Federal agency with expertise relevant to any environmental impact involved in the project, must seek comments from relevant State and local agencies, and must release all these views and comments to the public. *Id.*

Tying together the statutory language, the NEPA claim requires Plaintiffs to show that the construction and/or use of the detention camp involves (1) a final agency action, and (2) a major Federal action, (3) without Defendants conducting a compliant EIS. *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (describing a court's "review of agency decisions" under APA and NEPA as "determin[ing] whether the action to be taken constitutes a 'major Federal action'—that is, an action 'significantly affecting the quality of the human environment'"— and reviewing for the presence and sufficiency of an EIS under the APA's arbitrary and capricious standard); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025) (describing a NEPA claim as "argu[ing] that an agency action was arbitrary and capricious due to a deficiency in an EIS").

Defendants do not dispute that the camp and its operations have a sufficient impact on the quality of the human environment to be considered "major," justifying the need for an EIS. Indeed, the Court reviewed plans and photos showing that operation of the camp, to date, has involved paving approximately 800,000 square feet of land, installation of industrial lighting impacting the night sky at least 20 to 30 miles away, and enough residential infrastructure to house thousands of detainees and on-site staff. (Pl. Exs. 22, 90–92 (Dr. McVoy report of new asphalting and TNT site plans); Tribe Ex. 9

that an EA "shall be a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary").

(lighting report)). The camp employs as many as 1,000 staff members, many of whom reside on site, and can house multiple thousands of detainees at any given time. (DE 113 at 28, 33–34). Additionally, the project involves the daily movement of human waste, sewage, jet fuel, and significant vehicular traffic. (DE 38-5 (TDF Waste Management Plan)). In fact, several environmental experts opined that they expect the project will have considerable environmental impacts and would have required review by relevant federal agencies, such as the U.S. Fish and Wildlife Service. (DE 113 at 49 (Dr. McVoy opining that he would have expected an EIS to be done before the facility's construction based on his experience with NEPA); DE 114 at 240 (testimony from Kautz that he "would have expected consultation with the U.S. Fish and Wildlife Service for impacts, potential impacts on the Florida panther, as well as other listed species in the area."); DE 129 at 130, 141 (testimony from Dr. Bozas that he expects there to be "effects on wildlife in the area" based "on the current level of human activity at the TNT [s]ite" and that the project's increased lighting would have required review by Fish and Wildlife Service due to its impact on the bonneted bat's critical habitat zone)); *see also Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir. 1972) (rejecting GSA's claim that a 450-person jail, even though not constructed in one of the country's most protected environments, would have "no adverse effects on the environment" and requiring it to undergo a proper NEPA evaluation).

Next, Defendants do not purport to have produced an EIS or conducted any environmental assessment prior to constructing or commencing operations of the camp. The fact of this failure to act is supported by testimony from Friends staff and Tribe employees who are routinely notified of new projects in the area, so they can consult and collaborate during the NEPA process. These witnesses unanimously attest to the fact that

they were never notified of the project until news of the site became public. (Tribe Ex. 4 ¶¶ 3–4 (declaration of Jason Daniel) ("I am responsible for receiving, and responding to consultation requests submitted by federal and state agencies with respect to proposed undertakings on or affecting historic properties or lands . . . which are culturally significant to the Miccosukee people. . . . [T]o the best of my knowledge, I have not received a request from any governmental agency . . . with respect to the project or undertaking located at TNT [s]ite."); DE 129 at 169 (Dr. Bozas stating that he "had no notice of the facility" even though "it is generally part of the protocol when there is large State or Federal programs that the Tribe is consulted with"); DE 129 at 33–34 (Tribal Water Resources Director testifying that no governmental entity contacted her before construction of the camp)). Avoiding a discussion of environmental impacts and notice, the Defendants instead say that there has been no <u>final</u> <u>federal</u> agency action. The Court takes up these two issues next.

### a. Final Agency Action

Courts employ a two-part test to determine whether an agency action is "final" (and therefore reviewable) under the APA. "First, the action must mark the consummation of the agency's decision[-]making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted). To be a final agency action, the challenged action must be one that represents "the agency's definitive position, affects the parties' legal rights or obligations, and immediately impacts the regulated parties' daily operations." *RB Jai Alai, LLC v. Sec'y of Fla. Dep't of Transp.*, 47 F. Supp. 3d 1353, 1365

(M.D. Fla. 2014); *see also Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003) ("The finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." (quoting *Darby v. Cisneros*, 509 U.S. 137, 144 (1993))); *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question" in the finality determination is whether the result of the agency's decision[-]making process "will directly affect the parties"); *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 288 (5th Cir. 1999) (characterizing a non-final decision "as one that does not itself adversely affect [a plaintiff] but only affects his rights adversely on the contingency of future administrative action"). A decision with an impact that is "sufficiently direct and immediate" or with a "direct effect on day-to-day business" qualifies as a final agency action. *Franklin*, 505 U.S. at 797 (alterations accepted and internal quotations omitted). The question before the Court is whether the decision-making process, with respect to the detention camp, has advanced to the point where it has had a sufficiently direct and immediate impact on the parties' rights and therefore qualifies as a reviewable final agency action. As discussed below, the Court concludes that it has.

As a threshold matter, the construction of the camp does not represent a preliminary, procedural, or intermediate agency action or ruling. Although it apparently lacks basic forethought in many ways, the facility has undergone substantial construction and is currently operational. Indeed, as Plaintiffs allege, the State and Federal Defendants coordinated to "construct a mass migrant detention and deportation center" and have completed "the installation of housing units, construction of sanitation and food services systems, industrial high-intensity lighting infrastructure, [and] diesel power generators."

(DE 1 at 17).

Prior to such construction, however, the Defendants were required, under NEPA, to issue an EIS or conduct an EA. The Defendants chose not to do so. Under the APA, the "failure to act" qualifies as an "agency action." 5 U.S.C. § 551(13). The Defendants' decision to refrain from issuing an EIS or conducting an EA, and then building a detention camp, represents a determinative position on the matter and has adversely affected Plaintiffs' recreational, conservational, and aesthetic interests. Accordingly, the Defendants' decision to not issue an EIS or conduct an EA and then construct a detention camp qualifies as a final agency action. *See Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001) (explaining that a "decision not to prepare an EIS is a final agency action"); *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998) ("We review an agency's decision not to prepare an EIS under an 'arbitrary and capricious' standard of review."); *Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (alleged failure to comply with NEPA constitutes "final agency action"); *Citizens for Clean Energy v. U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264, 1280–81 (D. Mont. 2019) ("Federal Defendants further initiated a final agency action in their decision not to begin the NEPA process."); *Dine Citizens Against Ruining Our Env't v. Klein*, 676 F. Supp. 2d 1198, 1214 (D. Colo. 2009) (explaining that an agency's failure to prepare an environmental assessment or "failure to otherwise comply with NEPA constitutes final agency action"); *San Juan Citizens' Alliance v. Babbitt*, 228 F.Supp.2d 1224, 1229 (D. Colo. 2002) ("A failure to prepare an EIS is a final agency action within the meaning

of the APA.").[24]

The decision to construct and operate the detention camp, despite Defendants' characterization of the camp as "temporary," cannot be considered "merely tentative or interlocutory" because the EIS or EA must **precede** any "major Federal actions significantly affecting the quality of the human environment." § 4332(C). Under the statutory language, the Defendants cannot put the cart before the horse—they cannot construct a facility and, then only in response to litigation such as the instant case, decide to fulfill their legal obligations.

Next, the decision not to issue an EIS or conduct an EA has directly impacted the rights of the Parties in this matter. As part of the EIS process, members of the public are afforded opportunities to comment on the proposed environmental action. During the Preliminary Injunction Hearing, Friends members and Tribe employees emphatically stated that they would have provided such comments. Instead, they lost the right to do so when Defendants refused to comply with their statutory obligations. *See* (DE 114 at

---

[24] Under wholly disparate circumstances, some courts have stated that an "agency's decision not to prepare an EIS pursuant to the NEPA does not constitute a final agency action." *Karst,* 403 F. Supp. 2d at 81 n.3 (citing *Pub. Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992)); *see also Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 196 n.6 (D.C. Cir. 2003) (when challenged Metrolink project had not yet been built or federally funded, Federal Transit Administration's decision not to conduct an environmental review did not "itself" constitute a final agency action). These cases stand for the unremarkable proposition that an EIS alone is not a final agency action where no "NEPA-triggering" major federal action has already occurred and where administrative processes are ongoing. *Citizens for Clean Energy*, 384 F. Supp. 3d at 1280–81; *see Public Citizen*, 970 F.2d at 918 (Trade Representative's failure to conduct an EIS prior to engaging in trade negotiations was "not itself a final agency action" in the absence of some "specific proposal for legislation or other action at least arguably triggering the agency's obligation to prepare an impact statement") (internal quotation omitted). By contrast, here, the detention camp's construction and existence are undisputed. In this context, the decision not to issue an EIS or conduct an EA is a final agency action.

55–56, 74). Besides this lost engagement opportunity, Plaintiffs' relationship to the Preserve—recreationally, or as conservationists—was also compromised by Defendants' failure to issue an EIS or conduct an EA. For example, Plaintiffs' expert, Randy Kautz testified that the Florida panther has lost 2,000 acres of habitat as a result of the facility's construction and use of intense lights disturbing the habitats of these nocturnal creatures. *See* (DE 114 at 232). Moreover, several witnesses testified about how the facility's light pollution has adversely affected their ability to observe the night sky.[25] (*Id.* at 34). Accordingly, because the decision to construct the detention camp without issuing an EIS or conducting an EA is a definitive position which has caused actual, concrete injury to the Plaintiffs' recreational and conservational interests, the Court finds that the action was a final agency action.

No Defendant has endeavored to explain their decision to abstain from issuing an EIS or conducting an EA. Instead, the Federal Defendants contend that "[n]either ICE nor FEMA has implemented, directed, or controlled the construction work at the temporary detention center." (DE 21 at 3). This contention runs contrary to significant evidence Plaintiffs have adduced that the facility's construction was requested and fully funded by the federal government. *See infra* Section III.C.1.b. Instead of addressing the failure to issue an EIS or conduct an EA as a final agency action, Defendants attempt to reframe the issue as one involving the detention camp's ultimate funding. Defendants point to the fact that the detention camp's construction costs have been initially shouldered by Florida

---

[25] Big Cypress National Preserve is recognized as an International Dark Sky Park and offers visitors a unique opportunity to observe the Milky Way with their naked eyes. *Big Cypress International Dark Sky Place*, Florida Nat'l Parks Ass'n, https://perma.cc/6CWV-KBC6; *see also* (DE 114 at 34).

to be submitted to the federal government for reimbursement. Accordingly, Defendants argue that the "reimbursement decision . . . has not yet been made . . . [and] there cannot be final agency action." (DE 16 at 11). However, the Court does not, and is not, compelled to focus on the funding decision, since the lack of an EIS and EA qualifies as final agency action given Federal Defendants' intimate involvement in, and control over, the detention facility. *See Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 279 (6th Cir. 2001) ("major federal actions need not be federally funded to invoke NEPA requirements").

> b.  *Major Federal Action*

Section 4336e(10) of NEPA defines "major federal action" as an action that "is subject to substantial Federal control and responsibility." It excludes non-federal action "with no or minimal Federal funding" and "no or minimal Federal involvement where a Federal agency cannot control the outcome of the project[.]" 42 U.S.C. § 4336e(10)(B)(i). NEPA implementing regulations promulgated by the Council on Environment Quality reiterate this definition in the affirmative, defining "Major Federal action [as] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. §1508.18. According to that regulation, federal actions "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies[.]" § 1508.18(a).

Though "federal courts have not agreed on the amount of federal involvement necessary to trigger the applicability of NEPA," the Eleventh Circuit has had occasion to analyze the issue. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572. In that case, the Eleventh Circuit analyzed whether the Federal government negotiating and administering a

settlement agreement with Florida agencies responsible for insuring water quality in the Everglades constituted major federal action. *Id.* at 1568, 1572 ("We must determine whether . . . sufficient federal involvement exists in what is proposed in the Settlement Agreement to constitute major federal action affecting the environment under NEPA."). The focus of the court's analysis was "on the federal agencies' control and responsibility over material aspects of the specific project." *Id.* at 1572. As the court explained, "[t]he touchstone of major federal activity constitutes a federal agency's authority to influence nonfederal activity. 'The federal agency must possess actual power to control the nonfederal activity.'" *Id.* (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988)); *see also Goos v. I.C.C.*, 911 F.2d 1283, 1294 (8th Cir. 1990) ("In deciding whether a federal agency exercises legal control, we must therefore consider whether some federal action is a legal condition precedent to accomplishment of an entire nonfederal project.") (internal quotations omitted).

The Eleventh Circuit rejected the notion that the federal government's power to influence state action through "advocacy and negotiation" in litigation or "invok[ing] dispute resolution mechanisms" in resulting settlements is "synonymous with a federal agency's authority to exercise control over a nonfederal project." *Id.* at 1572–73. Instead, what matters is whether the "state agencies retain their state law authority to make the decisions concerning the project," or, in other words, whether project or program in question is implemented "pursuant to existing authority under Florida law[.]" *Id.* at 1573.

Defendants argue that the decision in *S. Fla. Water Mgmt. Dist.* advises against finding major federal action here because the Federal Defendants have not yet reimbursed the State for construction costs of the project and "Plaintiffs offer no evidence

that the federal government is controlling the State's construction on State land." (DE 16 at 8). The Court will discuss the Defendants' untenable claims regarding funding shortly. *See infra* pp. 62–64. But more critically, Defendants ignore the reality that all immigration enforcement activities associated with the camp—key drivers of the project's environmental impact—are entirely under federal control and pursuant to federal law.[26]

Given that the camp acts exclusively as "an immigration detention facility," (DE 105 at 18), any state officials working on site with detainees are doing so as deputized federal immigration officers pursuant to 287(g) agreements. *See* (Pl. Ex. 144 at 5 (official post of *FDHSMV* announcing 287(g) agreement and deputized FHP troopers "ICE Task Force Officers")). Those officers "are not authorized to perform immigration officer functions except when working under the supervision and direction of ICE personnel." *Supra* Section I.B. Under the agreements, the actions of those officials "will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures." *Id.* This alone provides the requisite "federal authority" over the project required under *S. Fla. Water Mgmt. Dist.*

---

[26] To the extent Defendants seek to disaggregate the camp's initial authorization and construction from its ongoing operations and argue that the project is not federal if the initial aspects of the project were state-run, NEPA's pragmatic paradigm does not allow for evasion of responsibility by parsing agency actions in this artificially atomistic way. *See e.g.*, *Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, 132 F.4th 1320, (11th Cir. 2025) ("An agency cannot evade its responsibilities under [NEPA] by artificially dividing a major federal action into smaller components") (internal quotations omitted); *Chilkat v. Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 825 F. App'x 425,429 (9th Cir. 2020) (considering whether the exploration for and construction of a mine were "connected actions" under NEPA and explaining that "[t]he critical question is whether each of two projects would have taken place with or without the other") (internal quotations omitted); 40 C.F.R. § 1508.18(3) (including "programs, such as a group of concerted actions to implement a specific policy or plan" and "systematic and connected agency decisions" among the types of major federal actions); § 1508.25 (defining "connected actions" and requiring an EIS to discuss all connected actions).

Additional facts support this conclusion. The camp operates using "ICE detention standards." (DE 21-1 ¶ 5); *see also supra* Section I.B. (documenting the requirement in the operative 287(g) agreements that "the policies and procedures to be utilized by the participating [state] personnel in exercising [immigration functions] shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy"); *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 57 at 272 (facility's visitation policy stating it adheres to ICE/ERO policy and operates in "in coordinate with ICE/ERO's public affairs objectives). In all of its 287(g) agreements with Florida agencies, ICE is also "responsible for the installation and maintenance of the Information Technology (IT) infrastructure" and requires that any agency with access to its systems follow its "Sensitive System Policy and Rules of Behavior." *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 53-1 at 5, 19, 50, 66, 81, 96, 111, 126. Consequently, the IT systems at the camp were installed by ICE and are under federal control.

Further, ICE directs arresting law enforcement officers whether to take people into custody on suspicion of immigration violations, (DE 129 at 187, 213); ICE "makes decisions regarding transfer into [the facility] based on the posture of aliens' immigration proceedings," *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 50-1 ¶ 6 (declaration of Juan Lopez Vega); ICE "maintains custody" of the detainees, (Pl. Ex. 43 at 4 (SERT South Florida Detention Facility Continuity of Operations Plan)); and it is federal officials who physically transport detainees on and off site and conduct deportations using federally-owned aircraft. *See* (DE 114 at 97 (testimony of Representative Eskamani that she observed ICE vehicles dropping off detainees and that Director Guthrie confirmed this was the standard protocol); *id.* at 312–14 (testimony of Jessica Namath that she observed

ICE-contracted and Customs and Border Protection vehicles transporting between ICE Krome SPC detention facility and the TNT site); DE 129 at 203, 214–15 (testimony of Director Kerner that either federal agencies or contractors, not state agencies, transport detainees to and from the TNT site, and federal agencies are conducting the deportations using federally-owned airplanes); Pl. Ex. 59 (video of Customs and Border Protection vans leaving the site); DE 24-2 (photo of DHS transport bus exiting the TNT site)).

That the deputized officers' regular salaries are paid, required uniforms are bought, and standard work hours are controlled by their state agency supervisors is not germane to questions involving the TNT facility, because their status there as deputized officers and their activities at the camp are controlled by ICE. *See e.g.,* (DE 129 at 225–27 (testimony of Director Kerner); DE 118-1 ¶ 13 (describing the ways in which state agency supervisors retain control for non-immigration aspects of deputized officers' employment); DE 118-1 ¶ 12 ("DHS provides credentials and guidance to local law enforcement partners, and signs warrants for service as needed. DHS is required to provide direction and supervision to local law enforcement officers when taking immigration enforcement actions")); *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 53-1 at 32–33 ("ICE officers will provide direction and supervision for participating LEA personnel only as to the immigration enforcement functions . . . . The LEA retains supervision of all other aspects of the employment and performance of duties of participating LEA personnel."); *id.* at 33 (providing that deputized officers "performing immigration-related duties pursuant to [the 287(g) agreement] will be assigned to various units, teams, or task forces designated by ICE"); *id.* at 34 (requiring that all candidates to become deputized immigration officers "must be approved by ICE"); *id.* at 35 ("The ICE supervisory officer . . . will evaluate the

activities of all personnel certified under [a 287(g)].").

Nationwide, Courts have recognized the legal and practical reality that "'ICE is in complete control of detainees' admission and release,' while the [287(g) agreement] 'places the [deputized state agents] in the role of a mere functionary.'" *Masingene v. Martin*, 424 F. Supp. 3d 1298, 1302–03 (S.D. Fla. 2020) (quoting *Calderon v. Sessions*, 330 F. Supp. 3d 944, 952 (S.N.D.Y. 2018) (holding that the proper respondent to plaintiff's habeas petition is the Director of the Miami Field Office for ICE, who is responsible for supervising federal immigrant detainees at a county detention center); *see also Roman v. Ashcroft*, 340 F.3d 314, 320 (6th Cir. 2003); *Khody v.* Adduci, 697 F. Supp. 3d 774, 776 (E.D. Mich. 2010); Abner *v. Sec'y of Dep't of Homeland Sec.*, No. 06CV308, 2006 WL 1699607 at *3–4 (D. Conn. June 19, 2006); *Zabadi v. Chertoff*, No. 05-01796, 2005 WL 1514122, at *3 (N.D. Cal. June 17, 2005).

Defendants next claim that "the ultimate decision of who to detain at the" camp "belongs to Florida," and this precludes the project from being a federal action. (DE 21-1 ¶ 6); DE 105 at 18 (positing that the State can "turn down anyone they want")). For one, to be a major federal action, a project need not be under complete control by federal authorities in all respects, but merely "subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10(B)(i). In fact, NEPA's statutory language contemplates projects that are led in large part by state entities but still trigger NEPA. § 4332 (G)(i) (allowing an EIS for certain "major Federal action[s]" to be prepared by a state agency official if "the State agency or official has statewide jurisdiction and has the responsibility for such action[.]"). Second, it is ICE that decides whether and where an apprehended person will be detained for not having legal status. (DE 129 at 187). And if

Florida began unilaterally rejecting large swaths of detainees, ICE is contractually authorized to terminate the 287(g) agreement, which would lead to the shuttering of the facility. *See e.g.*, (DE 24-3 at 8–9 (287(g) agreement with FHP detailing the process for ICE to terminate the agreement)). Even if Florida has some authority to reject a prospective detainee, the fact that the federal government is responsible for selecting the pool of prospective detainees and transporting them to the camp gives the federal government significant control over who is housed there.

Defendants make a few additional arguments in their ill-considered attempt to avoid the implications of the project's federal activities, but each fails. First, Defendants say the detention activities are not reviewable under the APA, § 702(a)(2), because DHS secretary has discretion over detainees' detention locations under 8 U.S.C. § 1231(g)(1). (DE 16 at 12). But "[t]he question for §701(a)(2) purposes is whether there is 'no law to apply' *for the exercise of discretion being challenged*." *Mass. Coal. for Immgr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 37 (D.D.C. 2023). It "does not matter whether the Government has discretion [over detention locations] or not. That question is not before the Court" in a NEPA claim. *Id.* "What is before the Court is the decision *not to comply with NEPA*" . . . . [a]nd on that, the Government has no discretion." *Id.* (citing *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)).

Next, Defendants argue the operations of the site fall into a NEPA exemption for "bringing judicial or administrative civil or criminal enforcement actions[.]" § 4336e(10)(B)(v); *see also* (DE 105 at 21). The construction and operation of an immigration detention facility is plainly not an enforcement action. *Compare Mass. Coal.*

*for Immgr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 20 (D.D.C. 2023) (DHS's "return to Mexico" immigration policy did not meet the NEPA "enforcement action[]" exemption because it "goes well beyond the decision whether to enforce the law in individual cases"), *with Sierra Club v. Penfold*, 857 F.2d 1037, 1313 (9th Cir. 1988) (describing the agency's right to "issue notices of noncompliance" and then "commence enforcement proceedings" as coming within the enforcement action exemption), Civil Action, Black's Law Dictionary (10th ed. 2014) (a legal action "brought to enforce, redress, or protect a private or civil right"). In recognition of this, in 2024 DHS performed a NEPA evaluation before ICE's expansion of the Krome detention facility. *See* (Pl. Ex. 154).

Finally, Defendants argue that "even if Florida is exercising federal power when it decides where to detain, the APA turns on whether a federal agency is making the decision not whether federal power is being exercised." (DE 130 at 108). But Defendants' premise fails. The evidence and legal framework governing deputized state law enforcement agents' immigration activities make clear that they are not only exercising federal authority; their conduct is controlled by ICE. Consequently, the cases Defendants cite have no bearing on the issue. Neither applies NEPA's major federal action standard nor discusses the state-federal relationship in immigration enforcement. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397, 399 (1995) (holding Amtrak was "part of the Government for purposes of the First Amendment"); *Ritter v. Cecil Cnty. Off. of Hous. and Comm. Dev.*, 33 F.3d 323, 327–28 (4th Cir. 1994) (interpretation of HUD regulation by local housing board is reviewed under something like *Skidmore* deference, not the APA's arbitrary and capricious standard). Defendants attempt to seize on dicta, in which Justice Scalia mentioned that an entity's status as a federal agency *can* be defined by

statute "for purposes of . . . whether it is subject to statutes that impose obligations or confer powers upon Government entities, such as the [APA][.]" *Id.* at 392. The closest analog to this situation is § 1357(g)(7)–(8), where Congress specified that deputized officers *are* "acting under color of Federal authority" when performing immigration functions under a 278(g) agreement. But it is worth noting Justice Scalia's pronouncement in *Lebron* that "[i]t surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron*, 513 U.S. at 397.

The Federal Defendants' control over operations at the camp should suffice to end the analysis. However, evidence that the project was built at the Federal Defendants' request and that federal funding has been committed to the State for the entire cost of the project both support the conclusion that the Federal Defendants were "so intimately involved in the discussion and planning" of the project that they "cannot now claim to have no responsibility under NEPA[.]" *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 13 (D.D.C. 1998).

FDEM has acknowledged in its own written materials about the camp that it was built after "DHS and [FEMA] request[ed] the State of Florida to supplement [its immigration enforcement] capacity with a temporary detention facility." (Pl. Ex. 43 at 4). According to Representative Eskamani, Director Guthrie confirmed to her directly while leading a tour of the camp that the project was the result of DHS's written request. (DE 114 at 96). These statements align with those of other high level public officials. ICE Field Officer Director Garrett Rippa described the project as "state, local, and federal partners working in unison, working as one" and promised that ICE "will continue to utilize

th[e] facility." (Pl. Ex. 61 at 0:25–1:01). DHS Secretary Noem explained that the project was conceived when her general counsel "called up Florida's Attorney General and Governor" and requested they partner with DHS to build the detention center. (Pl. Ex. 63 at 0:05–0:32). Governor DeSantis said the same: the project was "requested by the federal government."[27] Defendants argue that "a local plan does not become a major federal action subject to NEPA regulations merely upon its approval by a federal agency." *Rattlesnake*, 509 F.3d at 1102. But Defendants fail to recognize that the situation in *Rattlesnake*—"[t]he development and improvement of sewage treatment by a municipality[—]is intrinsically a local matter under the responsibility of local government." *Id.* Here, it is beyond peradventure that the detention of undocumented persons and decision as to their ongoing status is a uniquely federal question under the authority, control, and supervision of the federal government.

Additionally, the Federal Defendants acknowledge that DHS "announced $600 million in federal funding for the Detention Support Grant Program" and the "**only eligible applicant** . . . is the Florida Division of Emergency Management." (DE 21-2 at 2) (declaration of David Richardson) (emphasis added). Governor DeSantis confirmed that the federal government will "fully fund" the facility.[28] And Secretary Noem posted on social media that "Alligator Alcatraz will be funded largely by FEMA's Shelter and Services

---

[27] Fox 35 Orlando, 'Alligator Alcatraz': Florida Gov. DeSantis speaks on immigration project, YOUTUBE (June 25, 2025), https://www.youtube.com/watch?v=gJfG7L9reHU. *See Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 nn.4, 6–7 (N.D. Cal. 2017) (taking notice of government officials' statements during press conferences and interviews); *McLoughlin v. People's United Bank, Inc.*, 586 F. Supp. 2d 70, 73 (D. Conn. 2008) ("The Court may take judicial notice of the press releases of government agencies.").

[28] *See supra* n.27.

Program." (Pl. Ex. 144 ¶ 5). Furthermore, Assistant United States Attorneys made representations in court that "[t]he Everglade[s] detention facility is being funded from a continuing resolution for [fiscal year] 2025" of the Shelter and Services Program. *See City of Chicago v. DHS*, 25-cv-05463 (N.D. Ill.), ECF 35 at 1–2.

Despite these clear and unequivocal public assertions of federal funding, Defendants would have this Court find that a "reimbursement decision . . . has not yet been made." To reach this conclusion, however, would require the Court to disregard these unambiguous statements from government representatives. Instead, taking all of this context into consideration, it is apparent that the reimbursement funding decision has in fact been made.

In *Scottsdale Mall v. State of Indiana*, the court had no difficulty in concluding the highway project at issue was a major federal action when "the record indicate[d] federal participation in the programming, location, design, preliminary engineering, and right of way acquisition stages." *Scottsdale Mall v. Indiana*, 549 F.2d 484, 489 (7th Cir. 1977). In that case, the state claimed it would "refund" monies to the federal government that had been committed to a segment of the project. *Id.* at 487. This, the state argued, gave it the "prerogative to avoid compliance with NEPA." *Id.* at 488. The court rejected this argument, noting that "[s]uch accounting transfer of federal funds from one state project to another under the guise of 'refund' have been viewed with disfavor[.]" *Id.* at 487 n.5. The court found that where a state takes "substantial steps" to program a project for federal assistance, it cannot "withdraw the program from federal funding consideration with a resulting avoidance of complying with federal environmental statutes." *Id.* at 488. Similarly, the Defendants' legal legerdemain regarding funding does not convince the

Court. As the Tribe's counsel argued: "If this is allowed, effectively, the [f]ederal [g]overnment is laundering federal control or federal approval through a grant program with only one applicant who's eligible to receive the money. And if that's allowed, then [NEPA] is effectively useless[.]" (DE 130 at 131).

In light of the conclusion that the funding decision has been made, the Defendants' cases are unpersuasive. In *S. Fla. Water Mgmt. Dist.*, for example, the Eleventh Circuit stated, "[t]he possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely." 28 F.3d at 1573. Thus, Defendants argued at the Preliminary Injunction Hearing that the *possibility* of federal funding for the detention camp precludes any finding of a reviewable, final federal agency action. As the Court explained *supra*, however, the instant matter goes well beyond a possibility. Unlike *S. Fla. Water Mgmt. Dist.*, this case does not involve hypothetical proposals that may never materialize. Instead, the evidence demonstrates that the detention camp was constructed at the request of the federal government, with its cooperation and counsel, and with specifically earmarked funds to reimburse any state expenditures. The instant matter is not a situation where the State is applying to a general program from which it may or may not receive reimbursement since, as the "only eligible applicant," the only "competition" they face in receiving the award is the State's decision on when it will be conferred.[29]

---

[29] Defendants point the Court to cases involving grant programs that were generally open to applicants and instances where the grantors had not made final decisions as to the grants. *See, e.g.*, *Karst Envtl. Educ. & Prot., Inc. v. EPA,* 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (concluding that there was no final agency action where HUD had yet to consider and approve a grant application for disbursal of appropriated funds because "the federal money is but an expectancy that has not yet materialized") (citation and internal quotation marks omitted); *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007)

Defendants essentially tell the Court that the project is purely state action because its employees (presumably) wear uniforms bearing state agency logos, and because the federal government seems to have held back on sending its reimbursement until some unidentified impediment (perhaps, this litigation) has abated. Meanwhile, the project was requested by the federal government; built with a promise of full federal funding; constructed in compliance with ICE standards; staffed by deputized ICE Task Force Officers acting under color of federal authority and at the direction and supervision of ICE officials; and exists for the sole purpose of detaining and deporting those subject to federal immigration enforcement. Detainees are brought onto the site by federal agents and deported from the site by federal agents on federally owned aircraft. In concluding the camp is a major federal action, the Court will "adhere to the time-tested adage: if it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck." *Van Antwerp*, 526 F.3d at 1359.

Defendants make a final argument that, even if the Court finds Defendants have violated NEPA, Plaintiffs should not receive the injunction they request because the Court may "call for a remand without vacatur." (DE 16 at 13–14). "[V]acatur is the ordinary APA

(explaining that "[t]he congressional appropriation to the EPA of funds for a particular project does not constitute a final agency action by the EPA until the EPA has reviewed a grant application and decided to disburse the funds.") The Court finds that these cases are factually inapposite. *Karst*, for instance, involved the award of a federal grant to a state agency for the purpose of developing an industrial complex. In *Karst*, HUD representatives explained that "it had taken some action with respect to the grant application, but that it ha[d] not yet 'obligated' the money." *Karst*, 403 F. Supp.2d at 81. Accordingly, the federal funding was "but an expectancy that [had] not yet materialized." *Id.* Unlike the instant case, however, that grant program did not appear to be designed specifically for the grantee but was a general program from which the grantee sought disbursement. In the instant case, there is not just an "expectancy" of federal funding— elected officials stated in unambiguous terms that the reimbursement *would* happen.

remedy," but the Court has discretion to remand an agency action without vacatur, leaving the agency's action in place while it completes a satisfactory NEPA evaluation. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (alterations accepted) (quoting *Antwerp*, 526 U.S. at 1369). The considerations courts weigh in this decision make clear why a vacatur without remand is inappropriate here. Those are "the seriousness of the [agency] order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.*

Here, there weren't "deficiencies" in the agency's process. There was no process. The Defendants consulted with no stakeholders or experts and did no evaluation of the environmental risks and alternatives from which the Court may glean the likelihood that the agency would choose the same course if it had done a NEPA-compliant evaluation. It will come as no surprise that every case Defendants cite where the court remanded without vacatur involved a meaningful evaluative process by the agency before their final action. *See e.g.*, *Port Isabel v. Fed. Energy Regul. Comm'n*, 130 F.4th 1034, 1037 (D.C. Cir. 2025) ("The Commission has already issued extensive final environmental impact statements reflecting more than three years of review and public comment."); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1012, 1015 (9th Cir. 2025) ("BLM conducted a biological assessment of several listed species" and "only failed to explain whether or why its adopted alternative complied with the full field development standard at the ROD stage"); *Cal. Cmtys. Against Toxics v. E.P.A.*, 688 F.3d 989, 993–94 (9th Cir. 2012) (EPA conducted a rulemaking process but had "flaws in its reasoning"). Further, given Defendants' commitments to protecting the Everglades,

backed by tens of billions of dollars in funding for preservation and restoration projects near the TNT site, the Court assumes a thorough review of environmental impacts and alternatives could yield meaningful insights.

### 2. Irreparable injury

Even when Plaintiffs show they likely suffered the procedural harm of a NEPA violation, they must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). "An injury is irreparable only if it cannot be undone through monetary remedies." *Ferrero v. Assoc. Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (internal quotation omitted). And "[o]ngoing harm to the environment[,]" including "when a project may significantly degrade some human environmental factor," "constitutes irreparable harm warranting an injunction." *Env. Prot. Inf. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (internal quotation omitted); *see also Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable.").

Plaintiffs identify a myriad of risks from the project to the wetlands and endangered species whose habitats include the area around the site. Plaintiffs also proved that runoff and wastewater discharge from the camp risks polluting the water supply in the Miccosukee Reserved Area—where eighty percent of Tribe members reside—just a few miles downstream from the TNT site, and beyond. Finally, Plaintiffs show ongoing harms to organizational and Tribal members' enjoyment of the preserved areas due to the project's industrial lighting, noise, traffic, and security perimeter.

First, the creation of 800,000 square feet of new impervious surface will increase

runoff into the surrounding, interconnected wetlands, which threatens the "extremely sensitive . . .[,] low nutrient" hydrology of the Everglades. (DE 113 at 46–47). Dr. McVoy testified that the Everglades and BCNP are peculiar and particularly sensitive in at least two ways: first they are interconnected wetlands that require "sheet flow," meaning water flows with little obstruction across large areas, impacting the entire ecosystem;[30] and second, they are "naturally very low nutrient level, and when you introduce nutrients, particularly . . . phosphorous, nitrogen, potassium, it disturbs the ecosystem drastically." (*Id.*). According to Dr. McVoy, the legal requirement for water introduced into the wetlands is quite low and that requirement is the result of "a lot of science that clearly demonstrated the link that anything higher than that disturbs the system." (*Id.* at 47). With the newly paved surface, "anything that falls in th[ose] 20 acres will go directly into the wetlands." (*Id.* at 49). The possible contaminants in any runoff come "from a number of different sources" on the site. (DE 129 at 41). It could come from the paved material itself, from petroleum products on-site to fuel generators, from the vehicles and from thousands of detainees and staff doing laundry, cooking, cleaning, using restrooms. (*Id.* at 41–42). Beyond contaminants entering the water, "increased sediment . . . in the wetlands oftentimes leads to increased turbidity . . . [and] decrease[d] dissolved oxygen," which can kill aquatic animals. (DE 129 at 42, 136); *see also* (DE 5-2 ¶ 18 (declaring that the endangered Everglade snail kite relies on the "preserve's aquatic ecosystem for survival" and would be harmed by the project's wastewater and runoff)).

Defendants argue that they have mitigated these risks by installing silt fencing.

---

[30] Plaintiffs introduced aerial footage of the natural wetlands surrounding the TNT site, which followed the unbreaking sheen of contiguous water below the thin layer of swamp vegetation, until the natural landscape was interrupted by TNT site. (Pl. Ex. 145).

But multiple Plaintiffs' experts provided unrebutted testimony that that silt fencing "is not suitable in the long-term to be able to reduce any storm water runoff that could potentially affect neighboring areas." (DE 113 at 108). Especially in a large storm event, those "temporary structures . . . could be easily . . . toppled and allow for sediment and storm water to pass through." (*Id.* at 118). Given Defendants' complete lack of other stormwater management features, silt fencing is not "an appropriate substitute for a soil geologist designed storm water management system." (*Id.*). Defendants also quibble with geologist Dillon Reio's calculation that the 800,000 square feet of new pavement would increase runoff by almost "10 million gallons over a 72-hour, 100-year storm event[,]" attacking his assumptions regarding how permeable the now-paved area had originally been, given that some of that area was compacted when the jetport was originally built. (*Id.* at 80, 95–104). But even if Defendants are correct that the true increase in peak discharge could be some unknown lesser amount, there is sufficient likelihood that the increased runoff will harm the surrounding wetlands given the ecosystem's interconnectedness and sensitivity to warrant preliminary injunctive relief. Plaintiffs are not required to prove harms of a particular probability or quantity, as "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." *Winter*, 555 U.S. at 23; *see also Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1362 (S.D. Fla. 2005) ("A fundamental purpose of NEPA is to ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been

committed or the die otherwise cast.") (internal quotations omitted).[31] To make matters worse, it appears Defendants have imminent plans to expand this paving significantly, as they have already contracted to purchase 1.8 million square feet of asphalt. (Pl. Ex. 126 at 1 (purchase order for 200,000 square yards of asphalt)).[32]

These risks impact the wetlands ecosystem, but they also present direct risks to communities who depend on water from the Everglades for their water supply, including the Tribe. As the Court has discussed, the overwhelming majority of Tribal life is enjoyed and experienced just a few miles southeast of the TNT site. Based on the general direction of water flow in the area around the project, water from TNT site is likely to flow into the Tribe's water supply, risking contaminating the water of Tribal residences, schools, the Tribe's government building, and businesses. Water also "flows from the jetport into Monroe County" and "Dade County" due to the connective features of the L28 Canal that were built under WERP. (DE 129 at 24–25).

Next, the project creates irreparable harm in the form of habitat loss and increased mortality to endangered species in the area. For example, Dr. Bozas testified that the

---

[31] Defendants repeat this same argument with regard to nearly every harm Plaintiffs identify. Defendants cross-examined Plaintiffs' witnesses on the fact that few had data showing baselines from before the site was constructed or data showing developments since the project came online. Of course, because Defendants did not consult with Plaintiffs or any other research group before constructing the project in eight days, there was no opportunity to collect baseline data. And since Defendants have refused access to nearly everyone seeking to visit the site, Plaintiffs' experts have been unable to take any samples or collect other data useful for empirical study. Further, the harms Plaintiffs fear take time to accrue; and time and access for study is precisely what NEPA procedures are meant to afford. *See Fund for Animals v. Rice*, 85 F.3d 535, 546 (11th Cir. 1996) ("NEPA 'works' by requiring that the environmental consequences of an action be studied before the proposed action is taken.").

[32] This and other evidence of Defendants' expansion plans undermines Defendants' argument that "Plaintiffs point to harm that is too late to prevent[.]" (DE 16 at 16).

endangered eastern black rail has been detected in the area around the site and that the TNT site is within the bonneted bat's critical habitat zone.[33] (DE 129 at 142). Both of these species are nocturnal, and the increased lighting from the project "will push" those animals "out of the area. They do not use illuminated habitats." (*Id.* at 132). Moreover, the increased noise from additional construction and ongoing human activity on the site also disrupts the bats' "ability to [echolocate] prey." (*Id.*)

Additionally, the lighting from the site immediately reduces the panther habitat by 2,000 acres, as studies suggest panthers are unlikely to come within 500 meters of a large artificial light source. (DE 114 at 232). Defendants dismiss this habitat loss as merely a minuscule share of the total few 3.11 million acres of significant panther habitat. (*Id.* at 262). But 2,000 acres is "hardly a de minimus injury" from one project to those hoping to see panthers in the area and to preserve and maintain panthers' habitats. *Alliance for the Wild Rockeies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (loss of 1,652 acres of forest caused sufficient irreparable harm to plaintiffs' ability to enjoy the area undisturbed to warrant injunction, despite representing only 6% of the relevant area); *see* (DE 114 at 158–60 (Amber Crooks testimony about her efforts to track panthers in the area); *id.* at 229–34 (Kautz testifying that a 2,000-acre loss may well reduce the panther population due to, among other impacts, inter-species aggression)). Further, vehicular strikes are the number one cause of panther mortality, and stretches of the highway close to the TNT site are known "hot spots" for panther strikes. (DE 114 at 161, 194; DE 38-6 at 24–25 (showing that 20 to 35 Florida panthers die per year from roadkills and documenting the

---

[33] Critical habit zones are a "formal designation that the U.S. Fish and Wildlife makes for some listed species." (DE 114 at 243).

mortality records near the site)).[34]

The ongoing light pollution from the project also harms Plaintiff members' enjoyment of the night sky—for which BCNP has received certification as an International Dark Sky Park. *See supra* n.25; (DE 113 at 20–21 (describing what is required to maintain a dark sky designation); DE 114 at 34 (discussing the impact the site will have on area's dark sky designation); *id.* at 303 (describing the "pitch black darkness with beautiful [views of the] Milky Way and sky where you can see all of the stars")). As the Court has discussed, Plaintiffs provide empirical data proving that the project meaningfully increases the brightness for miles around the site. *See e.g.,* (Tribe Ex. 9 at 8–35). This data factors in the prior existence of a few small, lit buildings on the jetport site.

Finally, the Tribe provided testimony that Tribal members have lost access to the off-road trails leading into the BCNP lands for hunting and other activities due to the camp's operations. (DE 129 at 122–27, 133 164, 175). Furthermore, Tribal members had previously harvested plants from the areas directly adjacent to the TNT site for ceremonial and medicinal purposes, but the camp's new human activity erodes the cultural

---

[34] Defendants also maintain that telemetry data acquired by tracking a sample of panthers' movements over time, suggest that panthers have not been seen within a few miles of the site for many years. (Pl. Ex. 25 at 19, 26). In Defendants' view, this proves that no panther-related harm will be caused by the project, as the area was not in use by the panther population even before the project's construction. Defendants distort the significance of this data. Only some unknown fraction of the panther population was affixed with tracking collars, as researchers' goal was "not to monitor every place within the range of panthers that panthers occur." (DE 114 at 279). Collection of data from the radio collars also ceased in 2014 due to budget cuts. (*Id.* at 275). And several of Plaintiffs' witnesses had either seen panthers in the area or knew others who had. *See e.g.,* (DE 129 at 143 (testifying to having captured recent panther presence in the area of the site on trail cameras)). The fact that the data shows that panthers were detected within a four-mile radius of the TNT site 1,164 times in the few decades between 1982 and 2014 proves that the area was a functioning panther habitat despite airport activity at the TNT site. (Pl. Ex. 25 at 19).

significance of the plant life. (*Id.* at 120, 134, 155–56); *see also Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 524, 536 (D.C. Cir. 2018) (reversing agency finding of no irreparable harm where tribe challenged uranium mining project that risked destruction of cultural, historical, and religious sites in the project area); *Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1197 (D. Az. 2024) (holding that plaintiff Indian tribe met the irreparable harm requirement "because it has shown that damage to . . . a culturally significant site for the [t]ribe[] is likely").[35]

Defendants' rejoinder to all this is that the TNT site was already in use as a training airport, and Plaintiffs have not proven that the detention camp creates harms above and beyond those already wrought by the site's prior use. Specifically, Defendants point to flight logs showing that over the seven months starting in January 2025, there were about 28,000 "flight operations" from the site, or 137 per day. (DE 116-1 ¶ 11). In other words, over that period there were approximately 14,000 takeoffs and landings each. (*Id.* at 34).

---

[35] The *Hualapai* case is particularly instructive. The Hualapai tribe filed for a preliminary injunction to enjoin drilling for lithium on property adjacent to a sacred hot spring, "Ha'Kamwe'." *Hualapai*, 755 F. Supp. 3d at 1173. The tribe alleged that BLM failed to consider any reasonable alternative before approving the project; prematurely terminated its consultation process with the tribe; and failed to take a hard look at impacts in its EA by not analyzing geologic faults that could pollute the aquifers feeding Ha'Kamwe'. *Id.* at 1186. The court decided an injunction was appropriate, finding that under NEPA "[c]onsideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account *all* possible approaches to, and potential environmental impacts of, a particular project." *Id.* at 1192 (internal quotation omitted). As the court explained, the defendants had failed to consider alternatives, such as approving fewer drilling sites located farther away from Ha'Kamwe'. *Id.* at 1193. Finally, the court found the tribe was likely to suffer irreparable harm if the drilling project went forward "through its impact to Ha'Kamwe's character." *Id.* at 1198–99 (citing *Winter*, 555 U.S. at 22). The decision in *Hualapai* supports the entry of a preliminary injunction in this case where no reasonable alternatives were considered, no environmental assessment of any kind was conducted and no consideration of any type of impact was undertaken. In sum, not only did Defendants fail to take a "hard look" as required by NEPA, they failed to take any look.

Almost 80% of these were by single engine aircraft. (*Id.*) Defendants say these aircrafts surely would have been sufficiently noisy to scare off animals and impede any recreation in the nearby areas. (DE 16 at 5–6). Plaintiffs present their own flight data from 2020-2024, documenting around 11,600 flights total, or about 6 per day (not double-counting takeoffs and landings). (Pl. Ex. 33).

The Court need not parse which Party's interpretation of the flight data presents a more accurate picture of the site's prior activity, because even Defendants' version of the data does not support the notion that the airport use caused similar harms as those posed by the detention camp. For one, several witnesses testified under oath that they worked or recreated in that area for years leading up to the camp's construction and noticed little or no noise from the airport. *E.g.*, (DE 114 at 176–77; DE 129 at 32, 87, 130). Defendants discount these individual experiences as less accurate than flight data, but this misconstrues the import of these eyewitnesses' testimony. An irreparable harm inquiry is focused on how an event, in this case noise, impacts the effected individuals. Beyond this, many harms separate from noise undisputably were created or are exacerbated by the detention camp. The light pollution is far worse now than before the camp's construction. (Tribe Ex. 9). The addition of 800,000 square feet of asphalt paving (with another 1 million planned) increases harmful water runoff relative to the areas previously paved. (Pl. Exs. 22, 90–92, 126 at 1). The frenetic human activity, including vehicular traffic and wastewater from thousands of people daily, was essentially absent prior to the detention camp's construction. *See* (DE 113 at 27 (Dr. McVoy recounting a statement by the TNT site's Incident Commander Dr. Frank E. Lumm that prior to the detention center the airport had "four employees, most of whom were involved in mowing the grass")). In

short, Plaintiffs have provided substantial evidence to prove that irreparable harm from the detention camp is ongoing and likely to worsen absent injunctive relief. The Court will next consider the balance between these harms and the Government's interest in continuing detention operations at this site before conducting the required NEPA analysis.

### 3. Balance of equities and public interest

For similar reasons, the balance of equities and the public interest favor granting a preliminary injunction. "These two factors merge when, as here, the government is the opposing party." *Farmworker Ass'n of Fla. v. Moody,* 734 F. Supp. 3d 1311, 1342 (S.D. Fla. 2024) (internal quotations omitted). The Court has discussed the ongoing and possible future irreparable harms caused by Defendants' NEPA violation. When irreparable environmental harms are sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Vill. of Gambell,* 480 U.S. at 545. The Court acknowledges Defendants' unchallenged position that the government's interest in immigration enforcement is significant. Immigration is at the forefront of national and state politics: as the swell of people seeking refuge and opportunities in our nation steadily increases, the government is under a corresponding pressure to respond and regulate.

The Federal Defendants argue that "the significant national interest in combatting unlawful immigration favors allowing Florida to continue the development and use of [the detention camp]." (DE 21 at 7). To this end, the Federal Defendants rely on Thomas Giles' declaration that the detention camp's function in detaining aliens "operationally benefits ICE and furthers its immigration enforcement mission." *Id.* Giles goes on to state that the detention camp serves to "decompress other detention facilities used to house aliens

throughout the United States." (DE 21-1 at 5).

This position, however, flounders when confronted with the weight of evidence as to the irreparable harm posed by Defendants' flouting NEPA protocols. Plaintiffs have provided extensive evidence supporting their claims of significant ongoing and likely future environmental harms from the project. *See supra* Section III.C.2. By contrast, while the Defendants repeatedly espouse the importance of immigration enforcement, they offered little to no evidence why this detention camp, in this particular location, is uniquely suited and critical to that mission. Director Kerner did state that his troopers "have encountered and apprehended people that have active warrants for murder in other countries" and offered his belief that some of those individuals might be detained at the detention camp. (DE 129 at 202). Director Kerner could not, however, offer any statistics or reports specifying how many individuals actually housed at the facility had such a criminal background. (*Id.* at 206). He could not directly testify that even one of the detainees had a criminal record, much less a record of violent crimes necessitating their seclusion from society in the Everglades. (*Id.* at 206, 219).

Director Kerner further asserted that the detention camp is necessary because other immigration facilities are at capacity. (*Id.* at 205). This need, however, again fails to explicate the decision to place the detention camp in the Everglades.[36] Counsel for the

---

[36] Any detention capacity issue also appears will be mitigated by the State's recent announcement of a second temporary immigration detention facility with "the same services as Alligator Alcatraz" also with costs to be "reimbursed by federal partners." Press Release, Executive Office of the Governor, Governor Ron Desantis Announces Expansion of Florida's Capacity to Detain and Deport Illegal Aliens (Aug. 14, 2025), https://perma.cc/3HXE-73VY. *See Santa Clara*, 250 F. Supp. 3d at 520 nn.4, 6–7 (taking notice of government officials' statements during press conferences and interviews); *McLoughlin*, 586 F. Supp. 2d at 73 ("The Court may take judicial notice of the press releases of government agencies."); *Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins.*

Federal Defendants opined that the detention camp housed "all sorts of people from all walks of life" and claimed that the camp's remoteness is "relevant to the national security and public safety interest at play here." (DE 130 at 68, 77-78). When pressed by this Court, however, the Federal Defendants conceded that they actually had no opinion on the efficacy of the detention camp's location, saying that the location "is a question for Florida to decide." (*Id.* at 69). The Federal Defendants further conceded that there was no issue with the operation of other ICE detention facilities in populated areas like Jacksonville and Boca Raton. (*Id.* at 78). Thus, at least for the Federal Defendants, the remoteness of the detention camp seems to be an inconsequential consideration.

The State Defendants also insisted that the detention camp's remoteness was an important consideration. The State presented testimony from Director Kerner that the detention camp's site was "ideal" because "first and foremost," it is "far removed." (DE 129 at 225). Director Kerner also pointed to the site's "very long runway[,] which is a very critical piece of the deportation process." (*Id.*) But aside from their use of adjectives, neither the State nor Director Kerner could explain why such a place needs to be in the Everglades. What is apparent, however, is that in their haste to construct the detention camp, the State did not consider alternative locations. Indeed, Director Kerner testified that the current detention camp is the "only site that [he] looked at." (*Id.* at 223).

Allowing the detention camp to continue expanding its infrastructure and operations poses an even more formidable challenge than maintaining the status quo because "it is difficult to change that course" if the Court eventually decides that NEPA

*Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018). ("The Court may take judicial notice of government publications and website materials.").

assessments are required. *Sierra Club v. Marsh*, 872 F.2d 497, 500, 505 (1st Cir. 1989) (vacating district court's denial of preliminary injunction related to NEPA claim and remanding). Defendants brush aside this concern by pointing to Justice Kavanaugh's remark in *Seven County* that "NEPA has transformed from a modest procedural requirement into a blunt and haphazard tool employed by project opponents." 145 S. Ct. at 1513. But while the *Seven County* case cited by counsel for the State is instructive, it is not for the phrases parsed by counsel. While the Court did discuss how NEPA requisites could sometimes be an impediment to critical projects, the comment was made in the context of that particular case: a 3,600-page EIS generated over a year-long period with the input of six public meetings and more than 1,900 public comments. *Id.* at 1508. This is hardly a meaningful guide in a matter where there was no consultation with the public and no reports of any page length regarding a project that was erected in eight days. Instead, this case exemplifies why NEPA's modest mandate that an "agency [take] a 'hard look' at the environmental consequences of [a] proposed action" before saddling communities and future generations with unknown environmental risks is still an important procedural check. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ("Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."). In light of the foregoing, the Court finds that the equities weigh in favor of granting a preliminary injunction.

Nonetheless, the Court recognizes the unique and unprecedented situation

presented by this case. The Court fully understands the interests of the Defendants and the importance of a well-ordered transition while Defendants modify the facility to perform the necessary environmental assessments. The construction of the facility may have taken only eight days, but the capacity of the Defendants to remedy the NEPA violations outlined will involve a longer period of time. The Court has endeavored to provide that temporal accommodation in its Order.

## IV.   CONCLUSION

In 1947, President Harry Truman dedicated Everglades National Park observing:

> Not often in these demanding days are we able to lay aside the problems of the time, and turn to a project whose great value lies in the enrichment of the human spirit. Today we make the achievement of another great conservation victory. We have permanently safeguarded an irreplaceable primitive area. We have assembled to dedicate to the use of all people for all time, the Everglades National Park.[37]

Twenty years later, a proposal for construction of the world's largest jetport—at the site discussed in this case—was abandoned, and the Big Cypress National Preserve was created to protect this area.[38] Since that time, every Florida governor, every Florida senator, and countless local and national political figures, including presidents, have publicly pledged their unequivocal support for the restoration, conservation, and protection of the Everglades. This Order does nothing more than uphold the basic requirements of legislation designed to fulfill those promises.

---

[37] Harry S. Truman, Address on Conservation at the Dedication of Everglades National Park (Dec. 6, 1947), https://perma.cc/C392-4LE4.

[38] *Worlds Largest Jetport*, Big Cypress, Nat'l Park Serv. (last visited Aug. 21, 2025), https://perma.cc/6BHR-X25W.

For the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. For the purposes of Defendants becoming compliant with their obligations under NEPA, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for a Preliminary Injunction (DE 5), as follows:

2. The Court **ENTERS** a Preliminary Injunction prohibiting the State and Federal Defendants[39] and their officers, agents, employees, attorneys, and any person who is in active concert or participation with them from **(1)** installing any additional industrial-style lighting (described by witnesses as "Sunbelt" lighting); or doing any paving, filling, excavating, or fencing; or doing any other site expansion, including placing or erecting any additional buildings, tents, dormitories, or other residential or administrative facilities on the TNT site; and **(2)** bringing any additional persons onto the TNT site who were not already being detained at the site at the time of this Order going into effect. The Preliminary Injunction does not prohibit modification or repairs to existing facilities, which are solely for the purpose of increasing safety or mitigating environmental or other risks at the site.

3. The Preliminary Injunction shall include among those "who are in active concert or participation with" the State or Federal Defendants or their officers, agents, employees, or attorneys, and thus prohibited from conducting the activities specified above, any contractors, subcontractors, or any other individuals or

---

[39] Though state agencies are not subject to the APA, when "state and federal [actions] are sufficiently interrelated," the Court may enjoin state entities from acting in violation of NEPA. *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (citation omitted) (exercising jurisdiction over the Florida Department of Transportation Secretary in a NEPA case because the project in question featured FDOT "working in tandem with federal agencies").

entities authorized to conduct work on the TNT site or provide detainee transportation or detention services. *See* Fed. R. Civ. P. 65(d)(2)(C) (including "other persons who are in active concert or participation with" the parties or the parties' officers, agents, servants, employees, and attorneys among those bound by any injunction).

4. No later than **sixty (60)** days from the date of this order, and once the population attrition allows for safe implementation of this Order,[40] the Defendants shall remove 1) the temporary fencing installed by Defendants to allow Tribe members access to the site consistent with the access they enjoyed before the erection of the detention camp; 2) the Sunbelt lighting fixtures and any additional lighting installed for the use of the property as a detention facility; and 3) all generators, gas, sewage, and other waste and waste receptacles that were installed to support this project.

5. Finally, Plaintiffs shall post a bond of $100. See *BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (internal citations omitted) ("the amount of security required by the rule is a matter within the discretion of the trial court").

---

[40] Based on Defendants' representation that the site is currently being used as a transportation spoke to other facilities, the Court is relying on programmatic attrition of the camp's population within the next sixty days. *See C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 50-1 ¶¶ 10 (stating that the detention facility on the TNT site "provides short-term housing while longer term housing or removal arrangements are secured for aliens"). This attrition will allow Defendants time to remove the newly installed fencing, lighting, and other fixtures and utilities apparatus in a safe, humane, and responsible manner. The housing and detention dormitory facilities may remain and be maintained to prevent deterioration or damage.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>21st</u> day of August,

2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-JEM**

FRIENDS OF THE EVERGLADES, INC., et al.

      Plaintiffs,

and

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,

      Plaintiff-Intervenor,

v.

KRISTI NOEM, et al.,

      Defendants.

_____

**FEDERAL DEFENDANTS' NOTICE OF INTERLOCUTORY APPEAL**

      Federal Defendants Kristi Noem and Todd Lyons, in their official capacities, hereby give notice that they appeal under 28 U.S.C. § 1292(a)(1) to the United States Court of Appeals for the Eleventh Circuit from the Order issued in this case on August 21, 2025, Dkt. 131. A copy of the August 21, 2025 Order is attached as Exhibit 1.

      Respectfully submitted on August 23, 2025.

                         ADAM R.F. GUSTAFSON
                         Acting Assistant Attorney General

                         PETER M. TORSTENSEN, JR.
                         Deputy Assistant Attorney General

                         *s/   Hayley A. Carpenter*
                         HAYLEY A. CARPENTER
                         (CA Bar No.  312611)
                         Trial Attorney
                         Natural Resources Section
                         Environment and Natural Resources
                         Division

United States Department of Justice
Ben Franklin Station

P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0242
hayley.carpenter@usdoj.gov

*Counsel for Kristi Noem, in her official
capacity as Director of Homeland
Security; and Todd Lyons, in his official
capacity as Acting Director of the United
States Immigration and Customs
Enforcement*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC., and
CENTER FOR BIOLOGICAL DIVERSITY,

         *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his
official capacity as Executive Director of the
Florida Division of Emergency Management,
and MIAMI-DADE COUNTY, a political
subdivision of the State of Florida

         *Defendants*.

Civil Action No. 1:25-cv-22896

## DECLARATION OF GARRETT RIPA

Pursuant to the authority of 28 U.S.C. § 1746, I, Garrett Ripa, declare that, to the best of

my knowledge, information, and belief, the following is true and correct:

1.     I am the Field Office Director (FOD) for the U.S. Department of Homeland Security (DHS),

U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO)

Miami field office (ERO Miami). I have been the FOD of ERO Miami since September of 2022.

2.      As the FOD, I am responsible for managing ERO Miami, encompassing a total of 652 authorized positions, 16 sub-offices, and four detention facilities.  ERO Miami's area of responsibility (AOR) covers enforcement operations throughout the State of Florida, Puerto Rico, and the U.S. Virgin Islands, as well as the Migrant Operations Center in Guantanamo Bay, Cuba.

3.      I began my federal career in 1996 with legacy Immigration and Naturalization Service (INS) as a Detention Enforcement Officer in Miami, Florida.  I was promoted to a Deportation Officer (DO) in 2002, and after the formation of DHS and ICE in March 2003, I rose through the ranks of ERO with promotions to Supervisory Detention and Deportation Officer (SDDO), Assistant FOD (AFOD), Deputy FOD (DFOD), and FOD of ERO Miami.  In 2022, I became a member of the Senior Executive Service as FOD for ERO Miami.  In January 2025, I held the position of Acting Assistant Director for ICE Field Operations.  From February 2025 through May 2025, I served as the Acting Deputy Executive Associate Director for ICE ERO.  Responsible for a budget of approximately $5.1 billion dollars, I directed the operations of more than 7,800 employees assigned to 25 ERO field offices and headquarters, in over 180 domestic locations and 30 overseas locations. In June 2025, I resumed my role as FOD for ERO Miami.

4.      I am familiar with the allegations made by Plaintiffs in the instant lawsuit regarding the South Florida Soft-Sided Facility South (SFSSFS) Detention Center.  Additionally, I am familiar with immigration enforcement activities and programs nationwide, including detention facility capacities and their operational impacts.

5.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records and other DHS and ICE employees in the regular course of business.

### Operational Impact of the Closure of the SFSSFS Detention Center

6.      Although only one of ERO's 25 AORs, ERO Miami consistently accounts for 10-15 percent of all ICE arrests nationwide.

7.      ERO Miami oversees one of the largest non-detained ICE dockets in the nation, managing approximately 1.5 million active cases involving aliens in various stages of the immigration process.

8.      ICE ERO, specifically ERO Miami also maintains a network of detention beds throughout its AOR, through a mixture of ICE-owned, privately owned, and state and local facilities.

9.      Since January 2025, all detention facilities under ERO Miami have been operating at or above their maximum capacity.

10.     ERO Miami strives to maintain sufficient bedspace to support its law enforcement operations, including the arrests of aliens with criminal histories (criminal aliens) from prisons and jails, as well as aliens at-large who pose threats to national security and public safety within the United States.   Additionally, ERO Miami accommodates fluctuating referrals from U.S. Customs and Border Protection.  What sets ERO Miami apart from other ERO field offices is its dual responsibility of managing interior arrests while also addressing the unpredictable nature of maritime ventures, which can result in hundreds of arrests at a time.

11.     The expanded detention capacity Florida created with SFSSFS Detention Center is essential for ERO Miami's operations, as it permits ERO Miami to keep pace with increased and often unpredictable detention needs. Its removal would compromise the government's ability to enforce immigration laws, safeguard public safety, protect national security, and maintain border security.

12.     Without access to the 2,000 detention beds at the SFSSFS Detention Center, ERO Miami

would lose the ability to detain criminal aliens (to include aliens with violent criminal records), as all of the aforementioned ERO Miami facilities are at or above capacity. The SFSSFS Detention Center is a critical component necessary to prevent operational failure and potentially avert a national crisis.

13.    A disruption in the use or suspension of the SFSSFS Detention Center would also severely impact coordination with State, County, and Federal partners, who hold Title 8 (immigration enforcement) authority and maintain daily immigration arrest rates comparable to ERO Miami. Without sufficient bedspace, these partners would ostensibly lose the ability to carry out arrests, significantly affecting the various task forces focusing on apprehending criminal aliens, gang members, wanted fugitive felons, and individuals with prior criminal removals. This would pose a substantial risk to community safety.

14.    The United States, including ERO Miami, is legally required to detain certain aliens. Eliminating the use of the SFSSFS Detention Center would result in delays or the inability to pursue arrests of criminal aliens solely due to insufficient bedspace. This would severely undermine the consistent enforcement of immigration laws.

15.    The SFSSFS Detention Center is thus a vital tool for maintaining a lawful immigration process and detention environment. Before its establishment, ERO Miami faced significant overcrowding in its detention facilities, which placed the government in a challenging position to ensure compliance with ICE detention standards. The SFSSFS Detention Center has effectively alleviated these issues.

16.    The cornerstone of ICE's enforcement mission is the promotion of public safety through the removal of criminal aliens from the United States. The ability to detain criminal aliens ensures ICE's ability to eventually effectuate their removal from our communities. Continued strain on detention capacity greatly increases the possibility that criminal aliens, a priority target

for immigration enforcement, will remain at large and able to continue committing crimes. Aliens detained at the SFSSFS Detention Center included those with serious crimes to include robbery with a deadly weapon, sexual battery, and lewd and lascivious molestation of a child.

17.    The SFSSFS Detention Center has been instrumental in supporting the government's robust immigration enforcement efforts by enabling the detention of criminal aliens.  Without this facility and its detention capacity, many of these individuals would either be released back into the community or not arrested at all, placing significant strain on local communities.  The inability to detain criminal aliens due solely to a lack of detention space creates a serious public safety risk. Notably, it is estimated that among the millions of aliens who entered the United States under the previous administration, one in four provided a release address in the State of Florida.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 23rd day of August, 2025

GARRETT
J RIPA

_____
Garrett Ripa
Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security