Case No. 25-12873

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

FRIENDS OF THE EVERGLADES, INC., *et al.*,
*Plaintiffs-Appellees*,

v.

EXECUTIVE DIRECTOR,
FLORIDA DIVISION OF EMERGENCY MANAGEMENT, *et al.*
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:25-cv-22896-KMW
(Hon. Kathleen M. Williams, Dist. Judge)

## APPELLEES' CONSOLIDATED OPPOSITION TO APPELLANTS' TIME-SENSITIVE MOTIONS TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND FOR ADMINISTRATIVE STAY

Tania Galloni, FBN 619221
Dominique Burkhardt, FBN 100309
**EARTHJUSTICE**
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5434
tgalloni@earthjustice.org
dburkhardt@earthjustice.org

*Counsel for Friends of the Everglades*

Paul J. Schwiep, FBN 823244
Scott A. Hiaasen, FBN 103318
Jeffrey B. Crockett, FBN 347401
**COFFEY BURLINGTON, P.L.**
2601 S. Bayshore Drive, PH-1
Miami, Florida  33133
Telephone:  (305) 858-2900
pschwiep@coffeyburlington.com
shiaasen@coffeyburlington.com
jcrockett@coffeyburlington.com
yvb@coffeyburlington.com
service@coffeyburlington.com

*Counsel for Appellees*

Case No. 25-12873

Elise Pautler Bennett, FBN 106573
**CENTER FOR BIOLOGICAL**
    **DIVERSITY**
Post Office Box 2155
St. Petersburg, Florida  33731
Telephone:  (727) 623-9797
ebennett@biologicaldiversity.org
jtotoiu@biologicaldiversity.org

*Counsel for Center for Biological*
*Diversity*

Case No. 25-12873

## <u>CERTIFICATE OF INTERESTED PERSONS</u>
## <u>AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Appellees, FRIENDS OF THE EVERGLADES, INC., a Florida not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization, hereby state the following individuals and entities have an interest in the outcome of this appeal:

1.      Ajizian, Christopher

2.      Bennett, Elise Pautler

3.      Boies Schiller Flexner LLP

4.      Bonzon-Keenan, Geraldine

5.      Burkhardt, Dominique

6.      Carpenter, Hayley A.

7.      Center for Biological Diversity

8.      Chris Ajizian P.A.

9.      Coe, Alisa

10.     Coffey Burlington P.L.

11.     Costello, David M.

12.     Crockett, Jeffrey B.

13.     DeSousa, Jeffrey Paul

14.   Earthjustice

15.   Ezray, Evan M.

16.   Ficarelli, Dante

17.   Forrester, Nathan A.

18.   Friedman, Todd R.

19.   Friends of the Everglades, Inc.

20.   Galloni, Tania

21.   Golembiewski, Kevin A.

22.   Gustafson, Adam R.F.

23.   Guthrie, Kevin

24.   Hiaasen, Scott

25.   Lyons, Todd

26.   Martinez, Hon. Jose E.

27.   Miami-Dade County

28.   Murray, David M.

29.   Noem, Kristi

30.   O'Byrne, Hayden P.

31.   Perez, Monica Rizo

32.   Piropato, Marissa

33.   Raurell, Carlos J.

Case No. 25-12873

34.    Quiñones, Jason A. Reding

35.    Sanchez, Hon. Eduardo I.

36.    Schenck, Robert S.

37.    Schwiep, Paul J.

38.    Singer, Frank

39.    The Miccosukee Tribe of Indians

40.    Todd R. Friedman P.A.

41.    Torres, Hon. Edwin G.

42.    Torstensen, Peter M.

43.    Totoiu, Jason Alexander

44.    Uthmeier, James

45.    Wahl, Christopher J.

46.    Williams, Hon. Kathleen M.

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure, there are no parent corporation or publicly held corporation that owns more than 10% of either Appellees' stock.

Case No. 25-12873

## **TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS AND
    CORPORATE DISCLOSURE STATEMENT ................................1

TABLE OF CONTENTS.................................................... i

TABLE OF CITATIONS ................................................. iii

INTRODUCTION ........................................................1

FACTUAL BACKGROUND..............................................4

PROCEDURAL HISTORY...............................................7

LEGAL STANDARDS ..................................................11

I.  APPELLANTS ARE NOT LIKELY TO SUCCEED ON APPEAL............12

    A.  Appellants' Venue Objection Has No Bearing on Their Likelihood of
        Success on Appeal.................................................12

        1.  The District Court Had Jurisdiction to Enter the Preliminary
            Injunction.................................................12

        2.  This Court Lacks Interlocutory Appellate Jurisdiction
            OverVenue.................................................13

        3.  Appellants Waived Their Objection to Venue.................15

        4.  Venue is Proper in the Southern District of Florida. ........................16

    B.  The Construction and Operation of the Detention Center Without NEPA
        Compliance is a Major Federal Action Subject to NEPA.......................20

    C.  The Construction and Operation of the Detention Center is Final Agency
        Action Under the APA. ...........................................29

    D.  The INA Does Not Defeat Appellees' Claims.......................32

        1.  Section 1226(e) Does Not Apply to This Action..............................33

        2.  Section 1252(a)(2)(B)(ii) Does Not Strip the Court of Jurisdiction. 34

        3.  Section 1252(f) Is Inapplicable. .........................36

    E.  Appellants' Vacatur Arguments are Unsupported and Wrong. .............38

II.  PLAINTIFFS ESTABLISHED IRREPARABLE HARM ..........................41

III.DEFENDANTS HAVE NOT ESTABLISHED IRREPARABLE HARM;
    THE BALANCE OF EQUITIES MILITATES AGAINST A STAY ..........50

CERTIFICATE OF COMPLIANCE.......................................56

i

Case No. 25-12873

CERTIFICATE OF SERVICE ..................................................................57

Case No. 25-12873

# TABLE OF CITATIONS

Page(s)

## Cases

*Alliance for the Wild Rockies v. Cottrell*,
 632 F. 3d 1127 (9th Cir. 2011) ..........................................................46

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n*,
 988 F.2d 146 (D.C. Cir. 1993) ...........................................................38

*Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*,
 364 F.3d 884 (7th Cir. 2004) ........................................................ 15, 16

*Amoco Prod. Co. v. Village of Gambell, AK*,
 480 U.S. 531 (1987).......................................................................43, 49

*Arizona v. United States*,
 567 U.S. 387 (2012)............................................................................26

*Bennett v. Spear*,
 520 U.S. 154 (1997)......................................................................29, 30

*Biderman v. Morton*,
 497 F.2d 1141 (2d Cir. 1974).............................................21, 22, 28, 30

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
 781 F.3d 1271 (11th Cir. 2015) ......................................................38, 39

*Bonillo v. Sec'y, U.S. Dept. of Homeland Sec.*,
 497 Fed. Appx. 913 (11th Cir. 2012)..................................................35

*Carillon Imps., Ltd. v. Frank Pesce Int'l Grp.*,
 112 F.3d 1125 (11th Cir. 1997) .........................................................54

*Catron Cnty. Bd. of Com'rs, New Mexico v. U.S. Fish & Wildlife Serv.*,
 75 F.3d 1429 (10th Cir. 1996) ...........................................................31

*Citizens for Smart Growth v. Sec'y of Dept. of Transp.*,
 669 F.3d 1203 (11th Cir. 2012) .........................................................20

*City of Port Isabel v. FERC*,
130 F.4th 1034 (D.C. Cir. 2025) ........................................................ 38, 39, 41, 42

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,
942 F.3d 1119 (Fed. Cir. 2019) ...........................................................16

*Davis v. Morton*,
469 F.2d 593 (10th Cir. 1972) ...........................................................26

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ...........................................................11

*Dine Citizens Against Ruining Our Env't v. Klein*,
676 F.Supp.2d 1198 (D. Colo. 2009) ...................................................31

*Equity Lifestyle Props., Inc v. Fla. Mowing & Landscape Serv.*,
556 F.3d 1232 (11th Cir. 2009) .................................................. passim

*Fla. Key Deer v. Brown*,
386 F.Supp.2d 1281 (S.D. Fla. 2005) ............................ 42, 44, 45, 46

*Florida Immigrant Coal. v. Attorney Gen.*,
No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025)........................ 52, 53

*Flowers Indus. v. FTC*,
835 F.2d 775 (11th Cir. 1987) ...........................................................14

*Franklin v. Massachusetts*,
505 U.S. 788 (1992).............................................................................29

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1976).............................................................48

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022).............................................................................37

*Garner v. Wolfinbarger*,
433 F.2d 117 (5th Cir. 1970) .............................................................13

*Gonzales v. Dep't of Homeland Sec.*,
508 F.3d 1227 (9th Cir. 2007) ...........................................................37

iv

*Goodwyn, Mills & Canood, Inc. v. Black Swamp, Inc.*,
   956 F.Supp.2d 1323 (M.D. Ala. 2012) ................................................................18

*Greater Yellowstone Coal. v. Flowers*,
   321 F.3d 1250 (10th Cir. 2003) ............................................................. 46, 47, 48

*Gulf States Reg'l Ctr., LLC v. Jaddou*,
   No. 23-CV-1354, 2024 WL 3553533 (E.D. La. July 25, 2024) ........................15

*Hall v. Norton*,
   266 F.3d 969 (9th Cir. 2001) .............................................................................31

*Harris Corp. v. Nat'l Iranian Radio & Television*,
   691 F.2d 1344 (11th Cir. 1982) ........................................................................12

*Harrison Cnty., Miss. v. U.S. Army Corps of Engineers*,
   63 F.4th 458 (5th Cir. 2023) .............................................................................31

*Home Ins. Co. v. Thomas Indus., Inc.*,
   896 F.2d 1352 (11th Cir. 1990) ........................................................................17

*Jenkins Brick Co. v. Bremer*,
   321 F.3d 1366 (11th Cir. 2003) .................................................................. passim

*Jones v. InfoCure Corp.*,
   310 F.3d 529 (7th Cir. 2002) ............................................................................14

*Karst Environmental Educ. and Protection, Inc. v. E.P.A.*,
   475 F.3d 1291 (D.C. Cir. 2007) .......................................................................32

*Kucana v. Holder*,
   558 U.S. 233 (2010).........................................................................................34

*Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund*,
   967 F.2d 688 (1st Cir. 1992)............................................................................15

*Manley v. Engram*,
   755 F.2d 1463 (11th Cir. 1985) ........................................................................15

*Marsh v. Oregon Natural Resources Council*,
   490 U.S. 360 (1989).........................................................................................40

*Maryland Conservation Council, Inc. v. Gilchrist*,
808 F.2d 1039 (4th Cir. 1986) ............................................................ 21, 24, 28

*Matter of Macon Uplands Venture*,
624 F.2d 26 (5th Cir. 1980) .................................................................13

*Middlebrooks v. Smith*,
735 F.2d 431 (11th Cir. 1984) ............................................................13

*Mills v. Hamm*,
102 F.4th 1245 (11th Cir. 2024) ........................................................11

*Nat'l Org. for the Reform of Marijuana Laws v. U.S. Drug Enf't Admin.*,
545 F. Supp. 981 (D.D.C. 1982) ........................................................25

*Natural Res. Def. Council, Inc. v. Tennessee Val. Auth.*,
340 F. Supp. 400 (S.D.N.Y. 1971) .....................................................17

*New Jersey Conserv. Found. v. FERC*,
111 F.4th 42, 64 (D.C. Cir. 2024) .....................................................41

*Nielsen v. Preap*,
586 U.S. 392 (2019) ...........................................................................33

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................... 11, 50

*Oglala Sioux Tribe v. Nuclear Regul. Comm'n*,
896 F.3d 520 (D.C. Cir. 2018) ..........................................................49

*Okeelanta Corp. v. United States Army Corps of Engineers*,
132 F.4th 1320 (11th Cir. 2025) ................................................. 22, 26

*Prutehi Litekyan: Save Ritidian v. United States Department of Airforce*,
128 F.4th 1089 (9th Cir. 2025) ................................................... 32, 35

*Roberston v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ...........................................................................40

*Robinson v. Giarmarco & Bill, P.C.*,
74 F.3d 253 (11th Cir. 1996) ..............................................................16

*Rosenzweig v. Azurix Corp.*,
  332 F.3d 854 (5th Cir. 2003) .................................................................54

*Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*,
  626 F.3d 973 (7th Cir. 2010) .................................................................14

*San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.*,
  657 F.Supp.2d 1233 .................................................................42

*Schultz v. Alabama*,
  42 F.4th 1298 (11th Cir. 2022) ....................................................... 13, 16

*Scottsdale Mall v. Indiana*,
  549 F.2d 484 (7th Cir. 1977) ....................................................... 21, 28

*SE Prop. Holdings, LLC v. Welch*,
  65 F.4th 1335 (11th Cir. 2023) ....................................................... 37, 44

*Seven County Infrastructure Coalition v. Eagle Cnty., Colo.*,
  145 S.Ct. 1497 (2025).................................................... 3, 24, 30, 40

*Sierra Club v. Martin*,
  71 F.Supp.2d 1268 (N.D. Ga. 1996) .................................................................46

*Sierra Club v. U.S. Army Corps. of Eng'rs*,
  295 F.3d 1209 (11th Cir. 2002) ....................................................... 49, 51

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
  985 F.3d 1032 (D.C. Cir. 2021).................................................................38

*Stelly v. Employers Nat'l Ins. Co.*,
  431 F.2d 1251 (5th Cir. 1970) .................................................................13

*Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*,
  243 F.3d 2709 (6th Cir. 2001 ....................................................... 23, 26

*Swain v. Junior*,
  958 F.3d 1081 (11th Cir. 2020) .................................................................11

*Texas v. United States Dep't of Homeland Sec.*,
  123 F.4th 186 (5th Cir. 2024) ....................................................... 36, 37

*Ukiah Adventist Hosp. v. F.T.C.*,
  981 F.2d 543 (D.C. Cir. 1992) ...................................................................15

*United States v. S. Fla. Water Mgmt. Dist.*,
  28 F.3d 1563 (11th Cir. 1994) ............................................................ passim

*United States v. Texas*,
  97 F.4th 268 (5th Cir. 2024) ....................................................................26

*Weinberger v. Romero–Barcelo*,
  456 U.S. 305 (1982)........................................................................... 42, 45

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008).......................................................................................52

*Zafar v. U.S. Atty. Gen.*,
  461 F.3d 1357 (11th Cir. 2006) ........................................................ 35, 37

## Statutes

5 U.S.C. § 551(13) ........................................................................... 29, 31

5 U.S.C. § 701 ......................................................................................1

5 U.S.C. § 704 ....................................................................................29

5 U.S.C. § 706(1)&(2)(A)....................................................................29

8 U.S.C. § 1103 ............................................................................ 33, 37

8 U.S.C. § 1226(e) .............................................................................33

8 U.S.C. § 1252(a)(2)(B)(ii) .......................................................... 34, 35

8 U.S.C. § 1252(a)(2)(B) ....................................................................34

8 U.S.C. § 1252(a)(2)(B)(i)..................................................................34

8 U.S.C. § 1252(f)........................................................................ 36, 37

8 U.S.C. § 1292(a)(a), 28 U.S.C ..........................................................13

8 U.S.C. § 1391....................................................................................18

8 U.S.C. § 1226 ............................................................................ 33, 34

Case No. 25-12873

8 U.S.C. § 1252 ................................................................................ 34, 36

8 U.S.C. § 1252(f)(1) ........................................................................ 36, 37

8 U.S.C. § 1357(g)(7)-(8) ......................................................................26

8 U.S.C. § 1357(g)(3) ............................................................................25

8 U.S.C. § 1357(g)(5) ............................................................................26

8 U.S.C. §§ 1151-1378 ..........................................................................35

16 U.S.C. § 698f(a) (1974) .......................................................................4

16 U.S.C. § 698j ......................................................................................4

16 U.S.C. § 1538(a)(1)(B) .....................................................................47

28 U.S.C. § 1391 (e)(1)(B) ....................................................................17

28 U.S.C. § 1391(e)(1)(C) .....................................................................17

42 U.S.C. § 4321-4370h ...........................................................................1

42 U.S.C. § 4332(C) ..............................................................................20

42 U.S.C. § 4336(a)(1) ..........................................................................29

42 U.S.C. § 4336e(10)(A) ......................................................................27

Fla. Stat. § 944.10 .................................................................................25

Pub. L. No. 118-272 .................................................................................5

## **Rules**

Federal Rule of Civil Procedure 65 ....................................................9, 10

Federal Rule of Appellate Procedure 26.1 ...........................................1, 3

Federal Rule of Appellate Procedure 32(a)(5)........................................56

Federal Rule of Appellate Procedure 32(a)(6)........................................56

Federal Rule of Appellate Procedure 32(f).............................................56

Case No. 25-12873

**<u>Regulations</u>**

50 C.F.R. § 17.3 ................................................................................47

Case No. 25-12873

## **INTRODUCTION**

After a four-day evidentiary hearing, the district court entered a preliminary injunction to forestall irreparable environmental harm from an immigration detention center built in the heart of the Everglades without any prior review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4370h. Appellants seek to stay the preliminary injunction pending appeal, but have not met the demanding standard for such relief.

To start, Appellants have not established that they are likely to succeed on the merits of their appeal. Their lead argument rests on a venue objection that has no bearing on the merits, over which this Court has no jurisdiction, and which is both waived and wrong.

Their argument that there is no major Federal action triggering NEPA review is wrong because the decision to open an immigration detention center is both final agency action for purposes of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), and a major federal action under NEPA. Plaintiffs Friends of the Everglades and Center for Biological Diversity ("Friends") presented compelling evidence, which the district court properly credited, that the detention center was

1

Case No. 25-12873

"requested" by the U.S. Department of Homeland Security ("DHS"), Fla.App.1402,[1]

the result of a "partnership" between U.S. Immigration and Customs Enforcement

("ICE") and Florida, which the Federal Government will fund, *id.* 1401, designed

and operated to comply with ICE standards, *id.* 1381, 1396, and serving an

exclusively federal function, *viz.,* immigration detention under the direction and

control of ICE, *id.* 1395-98.

Citing this Court's decision in *United States v. S. Fla. Water Mgmt. Dist.*, 28

F.3d 1563, 1572 (11th Cir. 1994), where this Court held "[m]ajor federal action

[triggering NEPA] can exist when the primary actors are not federal agencies," the

district court found that Friends had a substantial likelihood of proving that the level

of federal involvement was sufficient to require NEPA compliance. Fla.App.1394-

99. Accordingly, Defendants were not permitted to ***completely*** disregard their

obligations under NEPA as they concededly did. *See id.* 1406 ("Here, there weren't

'deficiencies' in the agency's process. There was no process").

Next, Appellants advance the remarkable argument that they are likely to

succeed in overturning the injunction because, even where the Federal Government

completely disregards NEPA, courts are powerless to enforce compliance.

---

[1] "Fla.App." cites are to the Appendix filed by Florida. Dkt. 9-2. "Fed.App." cites
are to the Appendix filed by the Federal Defendants. Dkt. 20 at 28-266. "Pls.App."
cites are to Appellees' Supplemental Appendix filed with this Response.

2

Case No. 25-12873

Appellants string together a handful of out-of-context snippets from *Seven County Infrastructure Coalition v. Eagle Cnty., Colo.*, 145 S.Ct. 1497 (2025), to all but read NEPA out of existence. Fed.Mot. 1-2, 7, 9, 12-15; Fla.Mot. 38. *Seven County* did not concern—much less endorse—an agency's wholesale failure to comply with NEPA.

Finally, Appellants contend that Plaintiffs failed to establish irreparable harm. After considering testimony from nine witnesses for Friends and Plaintiff-Intervenor the Miccosukee Tribe of Indians, and Appellants' single (irrelevant) witness, the district court made detailed factual findings on imminent irreparable harm, including to wetlands, Fla.App.1407, Tribal members, *id.* 1410&1412, and endangered species, *id.* 1410-12.

Even if Appellants could show a strong likelihood of success on appeal, they have not met the other stay requirements. They have "offered little to no evidence why this detention camp, in this particular location, is uniquely suited and critical to [the immigration enforcement] mission." Fla.App.1416. Even ***before*** the preliminary injunction, Federal Defendants had reduced the number of detainees from approximately 900 to 336, and, after the injunction, Florida announced that ICE would reduce the population to zero ***in days***.[2] The district court found Florida

---

[2] *See infra* at n.6.

3

Case No. 25-12873

waived any claim of financial harm—raised for the first time after the preliminary injunction—finding the claim "speculative," "conclusory" and entitled to "little weight." Pls.App.426. Appellants' absence of harm, coupled with the court's finding that Plaintiffs would suffer irreparable harm, defeats Appellants' motions.

## FACTUAL BACKGROUND

The Big Cypress National Preserve was created "to assure the … protection of the natural, scenic, hydrologic, floral and faunal, and recreational values of the Big Cypress Watershed … and to provide for the enhancement and public enjoyment thereof." 16 U.S.C. § 698f(a) (1974). The Big Cypress is located within the Greater Everglades and comprised of interconnected cypress swamps, wet prairies and hardwood hammocks, and is habitat for numerous endangered species including Florida panther and the Florida bonneted bat. Fla.App.1094-97. It is also home to the Miccosukee whose traditional rights to hunt, fish, trap and observe religious ceremonies were expressly protected in the Preserve's enabling legislation, and practiced currently. 16 U.S.C. § 698j; Fla.App.741.

The creation of the Preserve was catalyzed by a 1960s Miami-Dade County plan for a new "jetport."[3] In 1968, a single runway was built, but the jetport plan was

---

[3] *See generally* https://www.nps.gov/bicy/learn/historyculture/worlds-largest-jetport.htm

4

Case No. 25-12873

scuttled after a 1969 "environmental impact report" chronicled the environmental impacts the jetport would cause. Fla.App.51-52. The legacy runway was restricted to a training facility (the Dade-Collier Training and Transition Airport ("TNT Site")) owned by Miami-Dade County and, now wholly within the Big Cypress Preserve. The Site is now lightly used primarily by single engine aircraft for touch and go's. *See* https://www.gao.gov/assets/ced-82-54.pdf; Fla.App.1414. Before the detention facility, four employees worked at the site, mostly mowing the grass. Fla.App.1414. A witness who worked for the Tribe for 19 years two miles from the Site testified that she occasionally saw small planes, which she could not hear. (Fla.App.708:3 & 665:4-14.)

Friends was founded in 1969 by then 79-year-old Marjory Stoneman Douglas, author of *The Everglades: River of Grass* (Alfred A. Knopf 1947), in response to the jetport plan. Fla.App.51-53. Ever since, Friends has advocated to protect, preserve, and restore the Everglades, including the Big Cypress. *Id.*53. For example, Friends participated in the planning process for the "Western Everglades Restoration Plan" ("WERP"), which recently received ***$2.115 billion*** in congressional funding for restoration projects near the TNT Site. Pub. L. No. 118-272 (Jan. 4, 2025); *see also* Fla.App.61-62. Friends filed its Complaint here on June 27 to vindicate its rights under NEPA—a law that, ironically, Friends' advocacy in the late 1960s helped birth. Fla.App.63.

5

Case No. 25-12873

Over a four-day hearing, Friends and the Tribe presented nine witnesses and over 100 exhibits.[4] The district court found that Plaintiffs were likely to succeed on their claim that the construction of an immigration detention center within a national preserve constituted major federal action significantly affecting the environment. *Id.*1386, 1392, 1395-96, 1402. The district court found that Appellants wholly failed to comply with NEPA. *Id.*1406. Reviewing the extensive evidence presented, the court found that Plaintiffs and the Tribe were irreparably harmed, *id.*1407-13, and that Appellants failed to show that they could not achieve their immigration detention needs other than in a National Preserve. *Id.*1415-18.

The court emphasized that "Plaintiffs challenge neither the fact nor the manner of detention or removal." *Id.*1358-61 & 1358. Appellants, however, "offered little to no evidence why this detention camp, in this particular location, is uniquely suited and critical" to their mission. *Id.*1416. Appellants introduced ***no*** evidence regarding (i) actual detention capacity in Florida, much less nationwide (immigration enforcement is a federal endeavor); (ii) the infeasibility of utilizing

_____

[4] While Appellants complain about the court's evidentiary rulings, they make no "clear showing of abuse of discretion," *Equity Lifestyle Props., Inc v. Fla. Mowing & Landscape Serv.*, 556 F.3d 1232, 1243 (11th Cir. 2009), nor do they even argue the rulings prejudiced them. Florida's claim that the court "interposed its policy views on immigration," Fla.Mot.12, is contradicted by its own admission that "the [c]ourt is focused on the NEPA issues." Fla.App.147; Fla.App.983 ("Whether or not immigration needs to be addressed" are questions "for another court").

alternate sites *not* within a national preserve;[5] or (iii) information regarding individuals held at the TNT Site. Meanwhile, Plaintiffs presented ample evidence of irreparable harm, discussed below, which the court properly credited. *See, e.g., id.*1378, 1392, 1407-13.

Based on the conclusion that major federal action significantly affecting the environment was undertaken without ***even a nod towards*** NEPA compliance, and the evidence of irreparable environmental harm, combined with the absence of evidence from Appellants that a detention facility in this location was necessary to achieve their immigration enforcement goals, the court entered a preliminary injunction establishing a "well-ordered transition" to phase out operations at the site until compliance with NEPA is achieved. Fla.App.1419.

## PROCEDURAL HISTORY

On June 19, Florida's Attorney General announced plans to build an immigration detention center in the Big Cypress National Preserve. Fla.App.1135. DHS Secretary Noem confirmed that DHS proposed the detention center and agreed to largely fund it. Fla.App.1402.[6] Four days later, Defendant Guthrie notified

---

[5] The court observed that Florida has announced plans for another federally funded immigration detention center to function like the TNT Site. Fla.App.1416 n.36.
[6] Recently, a June 20 email emerged from DHS General Counsel James Percival to Uthmeier's Chief of Staff stating DHS would "work with" Florida on "detain[ing] aliens under 287g in facilities provided by Florida," and that DHS "will work out …

Case No. 25-12873

Miami-Dade County of Florida's intent to purchase the TNT Site and associated land for "future emergency response." Pls.App.809. In response, the County requested "additional information and details particularly regarding environmental safeguards [because] the impacts to the Everglades ecosystem could be devastating." Pls.App.804. Miami-Dade noted that Florida and the Federal Government had invested "well over $10 billion since 2019 in Everglades restoration and protection" and therefore asked for "a detailed analysis and report on environmental impacts of this facility to the Everglades." *Id.* Florida responded the same day that it would commandeer the site "to assist the federal government with immigration enforcement." Pls.App.808. FDEM stated it was acting pursuant to a two-and-one-half-year-old state executive order declaring an emergency regarding the "migration of unauthorized aliens" and directing FDEM to "enter into agreements with … the federal government" to address the emergency. Fla.App.1456-62. Eight days later, after an ICE compliance inspection, Pls.App.1261, the facility opened. Fla.App.1410 n.31. Florida announced that the facility was constructed "in coordination" with Federal Defendants. Fla.App.1552.

---

reimbursement." Pls.App.1284. DHS's confirmation was forwarded to FDEM Director Guthrie. *Id.*

Case No. 25-12873

On June 27 Friends filed a Complaint alleging that the agreement between Florida and the Federal Defendants to construct a mass immigration detention center in Big Cypress National Preserve without complying with NEPA was unlawful. Fla.App.1107-11. Friends simultaneously moved for a temporary restraining order and preliminary injunction under Fed.R.Civ.P. 65. Fla.App.1116 (the "PI Motion"). On June 30, Florida filed its opposition to the motion, and argued, as it does here, that NEPA is inapplicable because the center "was approved by the *State* and is being built by the *State*." Fla.App.1139. Florida raised no venue objection, although it now contends the purported venue problem was "glaring." Fla.Mot. 3. The Federal Defendants filed their opposition on July 3, Fla.App.1155, and also did not contest venue.

Florida submitted two additional filings in opposition to Plaintiffs' PI Motion, neither raising venue. Pls.App.258&262. After the Tribe moved for intervention, Judge Martinez recused, and the case was reassigned to Judge Williams. Two business days later, Florida filed a "supplement" to its opposition arguing, for the first time, that venue was lacking. Fla.App.1241-46. Florida did not seek transfer, instead arguing that Plaintiffs were unlikely to succeed on the merits of their motion because of venue. *Id.*1245. The court conducted a hearing on venue on July 30 during which Federal Defendants conceded that a venue defect was not jurisdictional and that the court possessed jurisdiction to rule. Pls.App.480:2-5.

9

Case No. 25-12873

After ordering limited discovery, Pls.App.276, granting the Tribe leave to intervene, Pls.App.281, and requiring a staggered exchange of witness and exhibit lists, *id.*, the district court conducted a four-day evidentiary hearing over eight days, hearing from nine witnesses from Plaintiffs and the Tribe. Appellants disclosed three witnesses, Pls.App.283&289, however, called only one, Fla.App.813, relying instead on declarations.

The district court held Friends was likely to prevail on its claim that the Federal Defendants acted arbitrarily, capriciously and contrary to law under the APA in partnering with Florida on the construction of an immigration detention center funded and overseen by the Federal Government to perform a federal function under the direction of ICE, without complying with NEPA. Fla.App.1389-1405. Finding Plaintiffs irreparably harmed and that the balance of harm favors relief, the court issued a preliminary injunction requiring a "well-ordered transition" of the detention center over a two-month period. *Id.* 1419. The court ordered that no new detainees be brought on site, and, "once the population attrition allows for safe implementation," removal of environmentally harmful temporary fencing, lighting and gas and sewage infrastructure.[7] *Id.*1421.

---

[7] According to U.S. Rep. Maxwell Frost, the number of detainees on site even before preliminary relief was 336. Pls.App.372. Defendant Guthrie further stated on August 22 that the population would be "down to zero" within days. Ndonwie, *Alligator*

10

Case No. 25-12873

## **LEGAL STANDARDS**

When a party requests a stay of a preliminary injunction, this Court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). The first and second factors "are the most critical." *Id.* at 434. "[T]he party seeking the stay must show more than the mere possibility of success on the merits or of irreparable injury." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019).

"In considering whether to stay a preliminary injunction ... [the Court] examine[s] the district court's grant of the preliminary injunction for abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (internal citation omitted). The Court "must accept the findings of fact if they are 'plausible,' even if [it] would weigh the evidence differently." *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir. 2024).

---

*Alcatraz's last days? DHS says it is following judge's shutdown order*, Aug. 28, 2025, https://www.miamiherald.com/news/local/article311884510.html.

Case No. 25-12873

## **ARGUMENT**

## I.   **APPELLANTS ARE NOT LIKELY TO SUCCEED ON APPEAL**

Appellants argue that (1) the court erred in finding venue proper; (2) the creation of the immigration detention center is not federal or final action; (3) Plaintiffs' claims are barred under the Immigration and Nationality Act (INA); and (4) Plaintiffs have not established irreparable harm.  These arguments lack merit.

### A.   **Appellants' Venue Objection Has No Bearing on Their Likelihood of Success on Appeal.**

The district court had jurisdiction to enter the preliminary injunction regardless of whether venue lay in the Southern or Middle District of Florida (or both). Moreover, the district court's venue ruling is a non-appealable interlocutory decision. Appellants' attempt to shoehorn their venue objection into the "likelihood of success on appeal" analysis therefore fails. Further, the district court properly found that Appellants waived the objection and that venue was proper in the Southern District.

### 1.   The District Court Had Jurisdiction to Enter the Preliminary Injunction.

Florida is wrong to claim venue is a "threshold question of judicial power." Fla.Mot.3. "Venue is not a jurisdictional prerequisite and its presence or absence does not affect a court's authority to adjudicate." *Harris Corp. v. Nat'l Iranian Radio & Television,* 691 F.2d 1344, 1349 (11th Cir. 1982). Indeed, Federal Defendants

conceded that their request that the court resolve venue before considering preliminary relief, was a matter of preference, not jurisdiction. Pls.App.479:2-480:23. The venue objection has no bearing on the likelihood of success on appeal.

### 2. This Court Lacks Interlocutory Appellate Jurisdiction Over Venue.

Appellants are also not likely to succeed here on venue because the district court's venue ruling is a non-appealable interlocutory decision. *See Stelly v. Employers Nat'l Ins. Co.,* 431 F.2d 1251, 1252-54 (5th Cir. 1970) (preliminary rulings are non-appealable as interlocutory orders because movant is "still in the federal court although in a different room."); *Middlebrooks v. Smith*, 735 F.2d 431, 432 (11th Cir. 1984) (citing *Stelly*).

Section 1292(a)(a), 28 U.S.C., jurisdiction over a preliminary injunction appeal does not confer appellate jurisdiction over a venue ruling. *Garner v. Wolfinbarger*, 433 F.2d 117, 120 (5th Cir. 1970). *See also Matter of Macon Uplands Venture*, 624 F.2d 26, 27–28 (5th Cir. 1980) (interlocutory appeal of injunction was reviewable; related transfer order was not). Pendant appellate jurisdiction is also unavailable because the issues relating to venue and the preliminary injunction are not "inextricably intertwined." *Cf. Schultz v. Alabama*, 42 F.4th 1298, 1313 (11th

Case No. 25-12873

Cir. 2022) (exercising pendant jurisdiction over otherwise non-appealable rulings necessary for preliminary injunction to issue).[8]

Here, although the district court considered venue and the preliminary injunction in one order,[9] the legal issues are independent. *Compare Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010) (rulings on venue and preliminary injunction inextricably intertwined where both hinged on whether litigation should occur in Illinois or Virginia) *with Jones v. InfoCure Corp.*, 310 F.3d 529, 537 (7th Cir. 2002) (no appellate jurisdiction where rulings on venue and injunction could be "resolved without reference to each other").

The venue determination involved the location of Friends' place of business, whether real property was involved in the action, and where a substantial part of the acts or omissions giving rise to the claims occurred. The preliminary injunction determination involved whether Plaintiffs were likely to show that a state-federal partnership to build and operate the center constituted a federal action triggering NEPA, along with issues of irreparable harm, and the equities. There is no

---

[8] In *Flowers Indus. v. FTC*, 835 F.2d 775, 778 (11th Cir. 1987), the Court vacated a preliminary injunction for improper venue without addressing its interlocutory appellate jurisdiction over venue, so it is unclear whether the Court reviewed venue because the district court certified the appeal, or because the issues were inextricably intertwined.

[9] The district court treated defendants' supplemental filings raising an objection to venue as 12(b)(3) motions to dismiss for improper venue. Fla.App.1341 n.1.

14

Case No. 25-12873

interlocutory appellate jurisdiction over venue here. *See Ukiah Adventist Hosp. v. F.T.C.*, 981 F.2d 543, 548 (D.C. Cir. 1992) (no appellate jurisdiction where venue ruling only addressed proper court whereas injunction implicated scope of wholly unrelated statute).

      3.    Appellants Waived Their Objection to Venue.

Even if venue were subject to interlocutory appeal, the district court properly found that Appellants waived it. Fla.App.1364. *Manley v. Engram*, 755 F.2d 1463, 1468 (11th Cir. 1985) ("defects of venue may be waived"). Because an objection to venue "can be raised so easily," courts "strictly apply the waiver rule" and require that defendants raise venue in their "first defensive move," including in response to a motion for injunctive relief. *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund*, 967 F.2d 688, 692 (1st Cir. 1992); *see also Gulf States Reg'l Ctr., LLC v. Jaddou*, No. 23-CV-1354, 2024 WL 3553533, at *4 (E.D. La. July 25, 2024) (failure to raise venue objection over period of two weeks while litigating preliminary injunction constituted waiver). If a defendant "stalls in pleading improper venue" to "find out which way the wind is blowing, then conventional principles of waiver and equitable estoppel" apply. *Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 888 (7th Cir. 2004). "[A] district court's decision to exercise . . . its inherent power to find waiver" as to venue is

15

reviewed for abuse of discretion. *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1132 (Fed. Cir. 2019).

Here, the district court found that Florida made several defensive moves without objecting to venue. *See* Fla.App.1344-46. It was not until nearly four weeks into the litigation, and after three opposition briefs, that Florida objected to what it now calls a "glaring" venue problem, *id.*1346-47; *see* Fla.Mot.3, and then only after the case was reassigned to Judge Williams. Pls.App.265. Florida calculatedly sat on the venue objection to "find out which way the wind is blowing." *Am. Patriot Ins. Agency, Inc*, 364 F.3d at 888.

Florida's venue objection cannot be deemed "part of its original motion," as Florida posits, Fla. Mot.16–17, because Florida filed no prior motion. Florida's Rule 12(b)-based argument, Fla.Mot.17, disregards the rule's plain language (it does not say there is only one way to waive venue) and is not supported by any caselaw. Florida's reliance on arbitration cases, *id.*17, 18, fails because here the choice is not between arbitration or litigation, but between two districts. None of the out-of-Circuit district court decisions Florida cites shows that the district court abused its discretion under the facts here. *See also* Fla.App.1363-64 (distinguishing cases).

### 4.    Venue is Proper in the Southern District of Florida.

Appellants have not shown that the district court clearly abused its discretion in finding venue to be proper, nor could they. *Robinson v. Giarmarco & Bill, P.C.*,

74 F.3d 253, 255 (11th Cir. 1996) ("district court's refusal to change venue will only be disturbed for a clear abuse of discretion"); *see also Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990) (reviewing order dismissing for improper venue for abuse of discretion).

As to Federal Defendants, venue is proper in the district where "the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1)(C). Friends resides in the Southern District. Fla.App.1364.  No "real property is involved in the action" because that limitation only to disputes over real property interests. *Natural Res. Def. Council, Inc. v. Tennessee Val. Auth.*, 340 F. Supp. 400, 406 (S.D.N.Y. 1971) ("real property" venue provision refers to legal property interests such as title, leases, and mineral rights), *rev'd on other grounds*, 459 F.2d 255 (2d Cir. 1972). Courts universally endorse this interpretation, Fla.App.1364-68, and Appellants identify no contrary authority.

As to all Appellants, venue is proper in "any" district where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391 (e)(1)(B).[10] For events or omissions to "give rise to a claim" they must have "a close nexus to the wrong," but need not be wrongful in and of themselves. *Jenkins Brick*

---

[10] On appeal, Federal Defendants do not raise, and have therefore waived, any objection to venue on this basis.

Case No. 25-12873

*Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003). Section 1391 "contemplates some cases in which venue will be proper in two or more districts." *Id.* at 1371. The Court "is not required to weigh the events" that occurred in one district versus another or "choose which venue is more proper." *Goodwyn, Mills & Canood, Inc. v. Black Swamp, Inc.*, 956 F.Supp.2d 1323, 1326 (M.D. Ala. 2012).

Here, the district court found several events and omissions in the Southern District which gave rise to Friends' NEPA claim. Fla.App.1375-80. These include: Florida's notice of intent to Miami-Dade to commandeer the site for an immigration detention center; Florida's failure to answer the County's concerns, or seek County information about environmental impacts; and ICE's Miami Office's oversight of the center. *Id.*1375-76. Key omissions include: Appellants' failure to engage with the Tribe (headquartered in Miami-Dade) and Miami-Dade, and Appellants' failure to consult with Everglades National Park.[11] *Id.*1377-78.

Because Friends' NEPA claim is based on Appellants' failure to consider the impacts of a major federal action that "significantly affect[s] the quality of the human environment," the locus of the environmental harm was also relevant. *Id.*1378. These include: runoff from 800,000 square feet of new pavement threatening wetlands, wildlife, and water quality in Miami-Dade, where 80% of Tribal members reside;

---

[11] *See* https://www.nps.gov/ever/index.htm (headquartered in Miami-Dade).

18

harm to the massive state-federal investment in WERP; light pollution into Miami-Dade from "intense industrial lighting"; and the disruption of access to trails the Tribe uses for hunting, cultural, and ceremonial activities. *Id.*1378-79, 1392 n.25.

Florida does not argue, much less show, that any of these factual findings were clearly erroneous or that the district court abused its discretion in finding venue in the Southern District. Florida's argument that the district court's ruling turned on "acts and omissions that Plaintiffs never raised," Fla.Mot.18-19, disregards that the court simply summarized Friends' arguments, Fla.App.1370, and also referred to evidence adduced at the evidentiary hearing. *See, e.g.*, Fla.App.943:10-29; 952:13-25; 955:12-41:5; 959:15-45:20; 1054:17-140:8 (Friends' closing argument citing events and omissions affecting the Tribe). The district court also addressed the cases on which Florida continues to rely, *compare* Fla.Mot.21-23 *with* Fla.App.1370-74, 1379.

Florida's argument that the only relevant events for venue are NEPA decision-making and construction, Fla.Mot.19, 21-22, ignores that the venue statute was specifically amended to allow "for additional play in the venue joints." *Jenkins Brick Co.*, 321 F.3d at 1371 (illustrating how statute allows for more than one acceptable venue to avoid "arbitrary" determinations regarding where claim "arose"). Florida is wrong to argue that Appellants' failure to consult with Miami-Dade and the Tribe "did not 'give rise' to the decision not to conduct an EIS." Fla.Mot. 21. The evidence

showed that those entities would have demonstrated that the proposed action "significantly affect[s] the quality of the human environment," thereby requiring an EIS.[12]

### B. The Construction and Operation of the Detention Center Without NEPA Compliance is a Major Federal Action Subject to NEPA.

NEPA requires the federal government to assess the environmental impacts of any "proposals for legislation or other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "Major Federal action" is defined as an action "subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A). After reviewing the evidence of federal participation and supervision of the construction and operation of this immigration facility, the district court correctly found that the project constituted a "major Federal action" subject to NEPA. Fla.App.1393-1407. The court's findings are not clearly erroneous.

"Major federal action can exist when the primary actors are not federal agencies." *S. Florida Water Mgmt. Dist.*, 28 F.3d at 1572. *See also Citizens for Smart Growth v. Sec'y of Dept. of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (agency

---

[12] Florida's reference to other transfers, Fla.Mot.20, has no bearing, since those cases involved detainee rights and were therefore limited to the four corners of the facility.

"working in tandem with federal agencies" could be enjoined for NEPA claim).[13]
Where "non-federal entities have entered into a partnership or joint venture with the
Federal Government," they are subject to NEPA. *Biderman v. Morton*, 497 F.2d
1141, 1147 (2d Cir. 1974).

"There are no clear standards for defining the point at which federal
participation transforms a state project into federal action" for NEPA purposes. *S.
Florida Water Mgmt. Dist.*, 28 F.3d at 1572. "The touchstone of major federal
activity" in this analysis is a "federal agency's authority to influence" nonfederal
activity. *Id.* (internal citation omitted) ("[t]he federal agency must possess actual
power to control the nonfederal activity"). *See also Maryland Conservation Council,
Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir. 1986) ("a non-federal project is
considered a 'federal action' if it cannot 'begin or continue without prior approval
by a federal agency'"). Ultimately, where a project is "sufficiently federal in
character," NEPA applies. *Scottsdale Mall v. Indiana*, 549 F.2d 484, 489 (7th Cir.
1977).

---

[13] In its Motion, Florida recognizes that the district court correctly relied on *Citizens for Smart Growth* but states its intent to "challenge that precedent" on appeal. Fla.Mot. 23 n.7. While that is Florida's prerogative, it cannot seriously argue at this stage that it is *likely* to succeed on this ground.

Case No. 25-12873

The district court correctly applied these authorities to find that the creation of this immigration detention center was the result of a "joint, multi-step decision making process" that constituted major federal action. *See* Fla.App.1375, 1393-94. *See also Biderman*, 497 F.2d at 1147 ("joint venture" with federal government is major federal action). The court credited evidence that: (1) the facility was constructed to serve "exclusively as an immigration detention facility" and operated under the supervision and control of ICE under 287(g) agreements; (2) the facility follows "ICE detention standards" and employs technology systems installed and maintained by ICE; (3) ICE controls the detainee population by deciding who is subject to detention for immigration violations and who may be housed at the site, transporting detainees to and from the facility; (4) the facility was "built at the Federal Defendants' request"; and (5) the Federal Defendants promised federal funding for the project. Fla.App.1395-1405. While Appellants discount the evidence, they cannot show that the factual findings were clearly erroneous. For this reason alone, the motions should be denied.

Instead, Appellants attempt to disassemble the district court's factual findings into granular parts to try to avoid NEPA's reach. But, as the district court said, "NEPA's pragmatic paradigm does not allow for evasion of responsibility by parsing agency actions in this artificially atomistic way." Fla.App.1395 (citing *Okeelanta*

*Corp. v. United States Army Corps of Engineers*, 132 F.4th 1320, 1344 (11th Cir. 2025)).

For example, Appellants disclaim federal action on the basis that Florida has not yet received federal funding (Fla.Mot.26-28; Fed.Mot.8-9)—though, as the district court recognized, "major federal actions need not be federally funded to invoke NEPA requirements." Fla.App.1393 (citing *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 279 (6th Cir. 2001)). Nevertheless, the district court found that the facility was "built with a promise of full federal funding."[14] Fla.App.1405. This finding was based on Defendant Noem's own statement that the facility "will be funded" by a federal grant—for which Florida is the "***only eligible applicant***." *Id.* 1402-04 (emphasis in original); 1555-56. Gov. DeSantis confirmed that the federal government will "fully fund" the facility. *Id.* 1402. Based on this, the court found that "the reimbursement funding decision has in fact been made." *Id.* 1403. As the district court explained, these facts are distinguishable from *S. Florida Water Mgmt. Dist.* and Appellants' similar cases, where federal action was premised on "the *possibility* of federal funding" and "instances where the grantors had not made final decisions as to the grants." *Id.* 1404-05 (emphasis included).

--------

[14] This conclusion is further supported by the June 20 email confirming "DHS's interest in working with" Florida on the facility and stating: "If you go forward, we will work out a method of partial reimbursement." *Supra* n.6.

The Federal Defendants' reliance on *Seven County* (Fed.Mot. 12-13) fails for the same reason. Their argument that the injunction is a "premature" intrusion on their authority to make "future" funding decisions presupposes that the decision has not already been made; the district court found, as a factual matter, that it had. Fla.App.1403.

*Seven County* is inapposite anyway: That case concerned a challenge to the **sufficiency** of an environmental impact statement prepared **in accordance with NEPA**. 145 S.Ct. at 1510.  While *Seven County* holds that "courts should defer to agencies' decisions about where to draw the line" in analyzing "indirect environmental effects" when preparing a NEPA-mandated assessment, it stops well short of permitting Defendants to ignore NEPA entirely.  *Id.* at 1513.

As the district court recognized, adopting Appellants' rationale would allow the Appellants to "launder[] federal control or federal approval" and evade the reach of NEPA. Fla.App.1404. "Nonfederal actors may not be permitted to evade NEPA by completing a project without an EIS and then presenting the responsible federal agency with a *fait accompli*." *Gilchrist*, 808 F.2d at 1042.

Appellants also emphasize Florida's responsibility for construction of the facility and insist that this forecloses a finding of major federal action. Fed.Mot. 8; Fla.Mot.28-30. This myopic argument requires the Court to ignore the very **purpose** for which the facility was built: to house individuals detained **by and for ICE** for

alleged violations of *federal* immigration laws.[15] As the district court found, "Defendants ignore the reality that all immigration enforcement activities associated with the camp—key drivers of the project's environmental impact—are entirely under federal control and pursuant to federal law." Fla.App.1395.

It is undisputed that the facility "acts exclusively as an immigration detention facility.'" *Id.* In fact, it cannot operate as anything *other* than an immigration detention facility, as FDEM commandeered the land for an immigration "emergency," Fla.App.1456-62, and only the Florida Department of Corrections operates Florida prisons. Fla. Stat. § 944.10. Appellants assert that detention functions at the facility are performed pursuant to 287(g) agreements with ICE. Fed.Mot.3 (citing Fed.App.34); Fla.Mot.1. *See also* Fla.App.1375-76. As the district court found, these functions are performed under the supervision and direction of federal officers under federal law. Fla.App.1351-54, 1376. *See also* 8 U.S.C. § 1357(g)(3) ("[i]n performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and

---

[15] Florida insists that the Federal Defendants' "voluntary request" for an immigration facility is irrelevant to the NEPA analysis, but none of the cases they cite says anything of the sort. *See* Fla.Mot.29. To the contrary, *Nat'l Org. for the Reform of Marijuana Laws v. U.S. Drug Enf't Admin.*, 545 F. Supp. 981 (D.D.C. 1982) (Fla.Mot.29), noted that "go-ahead signals" from a federal agency could suffice to find federal action under NEPA. *Id.* at 984. The Federal Defendants provided express "go-ahead" here. *See supra* n.14.

supervision of the Attorney General") (governing 287(g) agreements); *Arizona v. United States*, 567 U.S. 387, 408 (2012). This is because immigration enforcement is "***exclusively*** a federal power." Fla.App.1351 (citing *United States v. Texas*, 97 F.4th 268, 278-79 (5th Cir. 2024)) (emphasis included).

Moreover, the 287(g) agreements expressly state that "[i]mmigration enforcement activities … will be supervised and directed by ICE," and any such agreement must specifically identify the "federal agency official who is required to supervise and direct" local law enforcement officers. Fla.App.1352-53 (citing 8 U.S.C. § 1357(g)(5)). Any local officer deputized under a 287(g) agreement "is treated as a federal employee …, and the officer shall be considered to be acting under color of Federal authority …."[16] *Id.* at 1353-54 (citing § 1357(g)(7)-(8)). And local law enforcement may only detain individuals at "ICE-approved detention facilities." Pls.App.258.

Additional evidence confirms the Federal Defendants' "control and responsibility over material aspects of the specific project." Fla.App.1394. ICE and DHS are responsible for transporting detainees to the facility. *Id.* at 1396-97; *see also id.* at 127; *id.* at 342-45. The facility was built to ICE standards and compliance

---

[16] The potential for federal liability further weighs in favor of federal action. *Davis v. Morton*, 469 F.2d 593, 596 (10th Cir. 1972).

inspected by ICE. Fla.App.1331; Pls.App.1261-62. And, contrary to Appellants' conclusory declarations, it is ICE that determines who may be detained at the facility.[17] *Id.* 1396. *See also* 127-28; 846-47; Pls.App.3973-74.

Appellants insist that none of this evidence matters because the 287(g) agreements do not specifically address construction of the facility, and therefore the Federal Defendants have no control over it. The premise of this argument strains credulity: Appellants cannot seriously argue that Florida would have built a 4,000-bed detention center in a federally protected *national preserve* to serve a federal function absent partnership with, and the promise of reimbursement from, the federal government.

Beyond that, Appellants ignore the applicable standard: NEPA applies to actions "subject to *substantial* Federal control and responsibility," not *absolute* control. 42 U.S.C. § 4336e(10)(A) (emphasis added). Where a federal agency has "control and responsibility over *material* aspects of the specific project," NEPA applies. *S. Florida Water Mgmt. Dist.*, 28 F.3d at 1572 (emphasis added). The immigration detention functions of the facility—its only function—are surely

---

[17] Florida's governor confirmed this fact yet again in public statements made Aug. 27, after Defendants filed their motions, stating: "***DHS determines who goes into those facilities and who goes out of those facilities.***" *See https://thefloridachannel.org/videos/8-27-25-governors-press-conference-on-investigative-subpoenas-for-orange-county-government/* (34:20-25).

Case No. 25-12873

material, and they are decidedly under the direction and control of ICE and DHS. Without federal approval, the facility would accomplish nothing—making this federal action.[18] *See Gilchrist,* 808 F.2d at 1042 (finding federal action based on federal "monitoring role" and "inevitability of the need for at least one federal approval").

Indeed, Florida cannot ***legally*** operate an immigration detention center without federal approval, necessarily making this federal action subject to NEPA. *See S. Florida Water Mgmt. Dist.*, 28 F.3d at 1572 (where federal approval is a "legal precondition for implementation," NEPA applies); *Biderman*, 497 F.2d at 1147 (where non-federal entity "would be acting unlawfully" absent federal approval, its conduct constitutes federal action).

The district court's finding that the creation and operation of the facility constitutes major federal action under NEPA was not clearly erroneous.[19]

_____

[18] Florida insists that it "makes little sense" for NEPA to apply here because it could have developed the site for a "different sovereign purpose." Fla.Mot.30-31. But that is not what happened. Also, it is hardly unusual that projects launched for state or local government purposes are subject to NEPA based on federal involvement. In *Scottsdale Mall*, for example, the state could have built a highway for its own "sovereign purposes" without federal assistance, but this did not foreclose NEPA. 549 F.2d at 488.

[19] This is not to say that every local jail that also houses immigration detainees is subject to NEPA; the TNT center, in a National Preserve, is likely to significantly affect the human environment triggering NEPA.

Case No. 25-12873

**C.    The Construction and Operation of the Detention Center is Final Agency Action Under the APA.**

Equally unavailing is Appellants' argument that their joint decision to create and operate an immigration detention center was not a final agency action under the APA.

The APA (which governs NEPA claims) permits review of "final agency action." 5 U.S.C. § 704; *see also* 42 U.S.C. § 4336(a)(1). "Preliminary, procedural or intermediate" actions are not reviewable. *Id.* "Agency action" includes the "failure to act." 5 U.S.C. § 551(13); Fla.App.1390. A reviewing court "shall (1) compel agency action unlawfully withheld [and] (2) hold unlawful and set aside agency action, findings or conclusions found to be (A) arbitrary, capricious … or otherwise not in accordance with law." 5 U.S.C. § 706(1)&(2)(A). The Supreme Court defines "final agency action" as follows: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997), *cited in* Fla.App.1388; *Franklin v. Massachusetts,* 505 U.S. 788, 797 (1992) ("The core question … is

29

Case No. 25-12873

whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties").

The district court correctly applied *Bennett* here. DHS requested, and Florida agreed, to create an immigration detention center compliant with ICE criteria, funded by DHS, and operated under the direction and supervision of ICE under 287(g) agreements. *See* Fla.App.1375 (describing Appellants' "joint, multi-step decision making process"); *id.*1552 (Florida's admission that the facility was built "in coordination with" Federal Defendants). The decision was hardly "tentative"; it has resulted, literally, in concrete impact. *Id.* 1386-87. Based on the ample evidence in the record, the district court's finding of final agency action was not clearly erroneous. *Id.* 1388-93.

In their motions, Appellants profess confusion over the precise "final agency action" addressed in the order. Fla.Mot. at 24-25; Fed.Mot. at 8. This is sophistry. The order states that the "decision to construct and operate the detention camp" ***and*** the "decision not to issue an EIS or conduct an EA" were ***both*** final agency actions under the APA. Fla.App.1390-91. Indeed, the district court specifically held that, because the facility had been completed, the "decision to construct and operate the detention camp…cannot be considered 'merely tentative or interlocutory.'" *Id.* 1391 (quoting *Bennett,* 520 U.S. at 177).

Appellants ignore this and insist that the *only* final agency action addressed in the 82-page order was the failure to conduct an environmental assessment. Fed.Mot. 7-8; Fla.Mot.25-26. Even if that were the case, Appellants' argument that failure to comply with NEPA cannot itself be a "final agency action" is incorrect.

First, as the court recognized, the "failure to act" is agency action under the APA. Fla.App.1390 (citing 5 U.S.C. § 551(13)). Thus, if an agency's failure to act is "final"—that is, its decisionmaking process has concluded with legal consequences resulting—then it may be challenged under NEPA and the APA. *See Catron Cnty. Bd. of Com'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) ("alleged failure to comply with NEPA constitutes 'final agency action'" where agency determined that it was "not required to comply" with NEPA); *Hall v. Norton*, 266 F.3d 969, 975 n.5 (9th Cir. 2001) (defendant's "decision not to prepare an EIS is a final agency action"); *Harrison Cnty., Miss. v. U.S. Army Corps of Engineers*, 63 F.4th 458, 462 (5th Cir. 2023) ("'[a]gency action' can encompass agency *inaction* as well, and the [APA] provides redress to plaintiffs aggrieved by an agency's failure to act by requiring courts to compel agency action unlawfully withheld") (emphasis included); *Dine Citizens Against Ruining Our Env't v. Klein*, 676 F.Supp.2d 1198, 1214 (D. Colo. 2009) ("failure to otherwise comply with NEPA constitutes 'final agency action' satisfying this prerequisite to judicial review under the APA").

31

Case No. 25-12873

Appellants challenge this conclusion relying largely on *Karst Env't Educ. & Prot., Inc. v. E.P.A.*, but there local governments partnered on a transportation hub to serve a local purpose built to local plans. 475 F.3d 1291 (D.C. Cir. 2007). The EPA only provided "advice" on the project—insufficient to find NEPA final action. *Id.* at 1294.

This case more closely resembles *Prutehi Litekyan: Save Ritidian v. United States Dep't of Air Force*, in which the military disregarded NEPA entirely before requesting a permit to dispose of hazardous materials on an environmentally sensitive beach. 128 F.4th 1089, 1099, 1108 (9th Cir. 2025). The *Prutehi Litekyan* court held that this established final agency action. *Id.* at 1108-09. Here, the district court held that the Federal Defendants entered into an agreement with Florida to create the detention center and also failed to comply with NEPA. Fla.App.1375, 1390-91. Even under the Appellants' rationale, these "separate" decisions satisfy the APA. The Federal Defendants cannot evade NEPA by turning a blind eye to it, as the State (alone) argues.

### D.    The INA Does Not Defeat Appellees' Claims.

Appellants argue that the district court improperly enjoined immigration enforcement "operations" or "detention" decisions in violation of INA provisions governing ***individual*** detention and removal decisions. These arguments mischaracterize the injunction and misapprehend the INA. At bottom, Appellants

32

argue that NEPA is unenforceable against DHS and ICE. This is nonsense: If Congress intended to exclude immigration detention centers from NEPA, surely it would have said so, as it has for construction of border barriers. 8 U.S.C. § 1103 note.

### 1.    Section 1226(e) Does Not Apply to This Action.

First, Florida argues that the creation of the facility is a discretionary "detention decision" precluded from judicial review under 8 U.S.C. § 1226(e).[20] Fla.Mot.32-34. By its terms, § 1226 governs the "apprehension and detention of aliens." Section 1226(e) states that any "discretionary judgment" regarding the apprehension and "detention ... of any alien is not subject to judicial review." 8 U.S.C. § 1226(e). As confirmed by the very authority cited by Florida, this restriction "applies only to 'discretionary' decisions about the 'application' of § 1226 *to individual cases*. It does not block lawsuits over the extent of the Government's detention authority under the 'statutory framework' as a whole." *Nielsen v. Preap*, 586 U.S. 392, 401 (2019) (emphasis added). The district court correctly rejected Section 1226(e)'s application here: "Plaintiffs do not challenge any detention

---

[20] Florida never raised this argument in its written responses to Appellees' injunction motion. *See* Pls.App.130&267.

decision, and § 1226 contains no language suggesting that NEPA compliance is shielded from judicial review."[21]  Fla.App.1361.

2.  Section 1252(a)(2)(B)(ii) Does Not Strip the Court of Jurisdiction.

The Federal Defendants assert that the district court lacked jurisdiction by virtue of 8 U.S.C. § 1252(a)(2)(B)(ii). Fed.Mot.10-11. This argument—referenced once in passing at the injunction hearing and never raised in their written response to the injunction motion, *see* Pls.App.155—fails too.

As its title makes clear, § 1252 addresses "judicial review *of orders of removal*." 8 U.S.C. § 1252 (emphasis added). Section 1252(a)(2)(B) addresses "denials of discretionary relief." 8 U.S.C. § 1252(a)(2)(B). *See also Kucana v. Holder*, 558 U.S. 233, 245 (2010). Section 1252(a)(2)(B)(i) limits jurisdiction over certain "substantive decisions…that involve whether aliens can stay in the country or not." *Id.* at 247. Section 1252(a)(2)(B)(ii), on which the Federal Defendants rely, is a "catchall" provision that shields from judicial review other decisions "of a like kind" specified by statute "to be in the discretion of" DHS.  *Id.* at 248.

The Federal Defendants attempt to shoehorn this case into § 1252(a)(2)(B)(ii) by falsely claiming that the district court enjoined their "decision to enter [into]

---

[21] Though Florida claims the district court "ignored" this issue, obviously it did not.

287(g) agreements." Fed.Mot.9.  But nowhere in its order did the district court rule that the Federal Defendants could not enter into a 287(g) agreement with any local agency it chooses.

Rather, the district court held that § 1252(a)(2)(B)(ii) limits only those *specific* discretionary statutory powers referenced in subchapter II of Chapter 12, 8 U.S.C. §§ 1151-1378. Fla.App.1357 (citing *Zafar v. U.S. Atty. Gen.*, 461 F.3d 1357, 1360 (11th Cir. 2006)). And the injunctive relief here "does not implicate, much less interfere with" the Federal Defendants' discretionary authority to "remove and detain noncitizens." *Id.* 1358. "Because NEPA compliance is not a decision specified to be in the discretion of the Attorney General or Secretary, § 1252(a)(2)(b)(ii) simply does not apply." *Id. See also Bonillo v. Sec'y, U.S. Dept. of Homeland Sec.*, 497 Fed. Appx. 913, 916 (11th Cir. 2012) (§ 1252(a)(2)(B)(ii) did not strip court of jurisdiction to determine whether agency complied with its own mandatory regulations). The district court correctly rejected this argument.[22]

---

[22] Florida does not challenge the district court's § 1252(a)(2)(B)(ii) ruling in its Motion.

Case No. 25-12873

### 3. Section 1252(f) Is Inapplicable.

Finally, Florida argues that Appellees' claim for injunctive relief is barred under 8 U.S.C. § 1252(f), Fla.Mot.34-36, while the Federal Defendants abandon this argument in their motion.

As discussed above, § 1252 addresses "judicial review *of orders of removal*." 8 U.S.C. § 1252 (emphasis added). The Section "prohibits federal courts from granting classwide injunctive relief against certain provisions of the INA, specifically §§ 1221–1231." Fla.App.1360. Florida attempts to expand this provision beyond its text to effectively exempt its co-Defendants from NEPA.

Florida's expansive view of § 1252(f)(1) is wrong. The anti-injunction provision "does not encompass an injunction against statutes it does not cross-reference." *Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 209 (5th Cir. 2024). It only prevents orders enjoining the "operation of any of the provisions listed in § 1252(f)(1)." *Id.*

Relying in part on *Texas*, the district court correctly held that the requested injunction to prevent Defendants violation of NEPA was not barred under § 1252(f)(1). Fla.App.1360-61. As the court stated: "An order compelling NEPA compliance does not 'enjoin or restrain' immigration operations; it simply requires Defendants to follow the environmental procedures that Congress imposed." *Id.*

36

Case No. 25-12873

Even if the injunction has a "collateral effect" on statutory provisions within § 1252(f)(1), this does not preclude injunctive relief.[23]  *Id.* at 1361.  *See also Texas*, 123 F.4th at 210 (citing *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022)); *Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007) (where the effect on operations within § 1252(f)(1) is "one step removed from the relief sought," injunction is not barred).

If Congress intended to immunize the Federal Defendants from injunctions to enforce NEPA, it would have said so. Indeed, in the same legislation creating § 1252(f)(1), Congress granted DHS the discretion to waive NEPA *only* for installing border barriers. 8 U.S.C. § 1103 note. The exclusion of NEPA from § 1252(f)(1) was by design, and the Court cannot rewrite the statute as Florida requests.  *SE Prop. Holdings, LLC v. Welch*, 65 F.4th 1335, 1344 (11th Cir. 2023).  Moreover, the fact that the Federal Defendants have elsewhere complied with NEPA in constructing detention facilities (Fla.App.1400; Pls.App.1425&1512) is a tacit acknowledgment that Florida's interpretation of the INA is misguided. The district court did not err in rejecting these arguments, and Florida is not likely to prevail on this issue on appeal.

---

[23] To the extent that Florida argues that the injunction inhibits its ability to operate under its 287(g) agreements (Fla.Mot. 32), such agreements are governed by § 1357(g) and not within §§ 1221–1231, and therefore not barred under § 1252(f).

Case No. 25-12873

### E.    Appellants' Vacatur Arguments are Unsupported and Wrong.

Appellants argue that Friends are unlikely to obtain permanent relief in the form of vacatur. Fla.Mot. 38-39; Fed.Mot. 14-15. Even assuming questions of ultimate relief could be relevant at the preliminary injunction stage, Appellants are wrong.

"[V]acatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). Courts depart from this remedy only after consideration of "'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Appellants falter on both steps.

As Appellants' cited cases make clear, "when an agency bypasses a fundamental procedural step," courts "assess the seriousness of an order's deficiencies by asking 'not whether the ultimate action could be justified, but whether the agency could, with further explanation, justify its decision to skip that procedural step.'" *City of Port Isabel v. FERC*, 130 F.4th 1034, 1037 (D.C. Cir. 2025); Fla.Mot.38. Otherwise, agencies would have "an incentive to 'build first and conduct comprehensive reviews later." *Id.* (quoting *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1052 (D.C. Cir. 2021)). The district

Case No. 25-12873

court concluded there was zero NEPA compliance, Fla.App.1406-07, and thus the first factor "weighs in favor of vacatur when there is no way for an agency to rehabilitate its decision to skip a procedural step." *Port Isabel*, 130 F.4th at 1037.

Appellants' argument that their failure to comply with NEPA "was minor" because they "had good reason to believe NEPA did not apply," Fla.Mot.38, ignores the court's factual findings regarding the extent of federal involvement and, regardless, Appellants have not offered any argument about how remand without vacatur would let them correct the error.

And Defendants' self-serving suggestion that the "NEPA process is unlikely to influence" the outcome of their "preordained federal decision" because they are already committed to operating a detention facility in the Everglades regardless of the environmental impacts, Fed.Mot.14-15; Fla.Mot.38-39, gets the vacatur analysis backwards. Courts evaluate "the extent of doubt as to whether the agency chose correctly," in view of the seriousness of the legal violation, *Black Warrior Riverkeeper*, 781 F.3d at 1290—not the extent of doubt as to whether the agency has the common-sense benefit from this process by giving impacts and alternatives good-faith consideration. "[E]ven if the additional procedure is unlikely to change the agency's bottom line," vacatur is required where the agency skipped required fundamental steps. *City of Port Isabel*, 130 F.4th at 1037-39.

*Seven County* does not require a different approach. Defendants claim it held that NEPA errors do "not justify coercive sanctions like vacatur or an injunction . . . 'at least absent reason to believe that the agency might disapproved the project if it' undertook additional NEPA process.'" Fed.Mot.14 (quoting *Seven County*, 145 S.Ct. at 1511). But they cut the quote short. The Supreme Court said that errors "may not *necessarily* require" such a result when the agency has completed an EIS, unless there is "reason to believe that the agency might disapprove the project *if it added more to the EIS*." 145 S. Ct. at 1511 (emphasis added). The total lack of any NEPA analysis here, Fla.App.1406-07, is a far cry from the 3,600-page EIS conducted in *Seven County*, as the district court noted. Fla.App.1418.

It would flip NEPA on its head to presume that the bypassed NEPA review could have no effect. Rather, there is every reason to believe that NEPA review may indeed have an effect, by "focusing . . . attention on the environmental effects of the proposed action." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989); *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA's entire point is to prevent the premeditated "overlook[ing] or underestimat[ing]" of the "environmental consequences of a proposed project" that Defendants propose here. *Roberston*, 490 U.S. at 349. There is nothing in *Seven County* that would—or could—support such an extreme result. 145 S.Ct. at 1511 (affirming "obligation to prepare an adequate report"). NEPA has never allowed

Case No. 25-12873

agencies to skirt their obligations just by making a claim that they would proceed with their preferred course regardless of compliance with NEPA.

Given this fundamental error, claims of disruptive consequences generally could not save the action from vacatur. *See City of Port Isabel*, 130 F.4th at 1037-38; *New Jersey Conserv. Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024) ("Where a pervasively deficient agency action is remanded, only in rare instances do the disruptive consequences alone determine whether the order is vacated").

Even so, Defendants produced little, if any, credible evidence in the district court to demonstrate that vacatur "would be 'disruptive'" or that winding down the facility "forces Florida and DHS to release detainees or send them to overcrowded facilities." Fla.Mot.38; *see* Fla.App.1415-16. Indeed, Florida's suggestion that the district court did not "disagree" with its suggestion of disruptive consequences, Fla.Mot.38, makes no sense given that the district court has now twice determined—first in the preliminary injunction order and second in rejecting Florida's request for a stay—that Defendants had not established that "[h]alting the project" would cause them harm. *Id.*

## II.    PLAINTIFFS ESTABLISHED IRREPARABLE HARM

Friends and the Tribe presented evidence via lay and expert witnesses and documents—of actual and imminent irreparable harm from the operation of the

detention center. The district court made multiple findings of irreparable harm, including:

- 800,000 square feet of new pavement that will "increase runoff into the surrounding, interconnected wetlands, which threatens the 'extremely sensitive . . .[,] low nutrient' hydrology of the Everglades" and threaten[] nearby communities' water supply. Fla.App.1407-10.

- The installation of industrial 24-hour lighting, and increased vehicular traffic, which results in habitat loss and increased mortality to endangered species, including the Florida panther. *Id.*1411-12.

- Over four miles of new fencing and increases in human activity, which interfere with the Tribe's access to trails, hunting, and medicinal and other traditional activities previously enjoyed. *Id.* 1412-13.

Irreparable harm exists in a NEPA action where a project will cause "soil disturbance and dust" impacting water resources, noise and "bright lights" impacting aesthetic interests, and potential adverse impact on endangered species. *San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv.*, 657 F.Supp.2d 1233, 11240 (D. Col. 2009)—all of which were proven and found here. "[W]here injury to an endangered species is threatened, legal remedies are necessarily inadequate." *Fla. Key Deer v. Brown*, 386 F.Supp.2d 1281, 1285 (S.D. Fla. 2005), *aff'd sub nom. Fla. Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008) (citing *Weinberger v. Romero–*

*Barcelo,* 456 U.S. 305, 314 (1982)). "[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable." *Amoco Prod. Co. v. Village of Gambell, AK,* 480 U.S. 531, 545 (1987).

The TNT Site sits within a national preserve, which is an environmentally sensitive freshwater ecosystem within the Greater Everglades that provides habitat for protected species, including the threatened wood stork, the endangered Florida bonneted bat, the endangered Everglade snail kite, and the highly endangered Florida panther. Fla.App.1094-95 ¶ 24; Pls.App.99 ¶ 4. The site is important to the water supplies of Miami-Dade, Pls.App.806, the interconnected Everglades and the Tribe, of which eighty percent of its members reside just a few miles downstream of the site. Fla.App.1407.

Against this backdrop was a dramatic and sudden uptick in late June of "frenetic human activity," Fla.App.1414, attributable to the construction of a detention center, in sharp contrast to the site's prior life as a small plane touch-and-go training runway, which employees who worked close by rarely heard or noticed. Fla.App.1414. From 2020-2024, the runway averaged only about six flights per day (not double-counting takeoffs and landings), almost 80% of which were by single engine aircraft. *Id.* Regardless, the district court found that the specific flight data mattered little where even "Defendants' version of the [flight frequency] data does

Case No. 25-12873

not support the notion that the airport use caused similar harms as those posed by the detention camp." *Id*. The court credited testimony that previously the site had only "four employees, most of whom … mow[ed] the grass." *Id*.

By comparison, over a short span of time, there was increased traffic transporting construction material, supplies, staff, fuel, and up to ***one thousand*** detainees; the addition of 800,000 square feet of pavement; the addition of miles of fencing, lighting, and generators; and waste generation. *Id*.1348, 1378, 1386-87, 1389-90, 1407-10. Contrary to Florida's characterization of Plaintiffs' expert witness testimony as "speculative," Fla.Mot. 39, or Federal Defendants' claim that the district court's findings of harm are based on the "procedural violation of NEPA alone," Fed.Mot. 15, the district court found that Plaintiffs presented "extensive evidence supporting their claims of ***significant ongoing and likely future*** environmental harms ***from the project***." Fla.App.1416 (emphasis added).

For example, the new pavement at the site "will increase" runoff into the surrounding wetlands. *Id*. 1407-08. According to Plaintiffs' expert Dr. McVoy—a soil physicist, hydrologist, and wetland ecologist—"anything that falls in th[ose] 20 acres will go directly into the wetlands." *Id*. 1408. The court credited Dr. McVoy's testimony regarding how runoff in a low-nutrient freshwater ecosystem will drastically disturb it and the wildlife dependent on it. *Id*. As the district court found, "[t]he possible contaminants in any runoff come from a number of different sources

44

Case No. 25-12873

on the site. . . . from the paved material itself, from petroleum products on-site to fuel generators, from the vehicles and from thousands of detainees and staff doing laundry, cooking, cleaning, using restrooms." *Id*. (quotes and citations omitted). "Beyond contaminants entering the water, increased sediment . . . in the wetlands oftentimes leads to increased turbidity . . . [and] decrease[d] dissolved oxygen, which can kill aquatic animals," including the endangered Everglade snail kite. *Id*. (quotes and citations omitted).

Contrary to Florida's assertion that the paving would cause more runoff only in a 100-year, 72-hour storm event, Fla.Mot.40, the 100-year, 72-hour model estimates "***peak***" runoff volume, not the existence of runoff from the pavement in the first instance, as explained by Plaintiffs' expert, geologist Dillon Reio. *See* Fla.App.49:7-10, 1409 (emphasis added). The unrebutted testimony from Reio and other experts about insufficient mitigation in the form of silt fencing—which is porous and unstable, and is a grossly inadequate substitute for a soil geologist-designed stormwater management system—further contributed to the court's finding of likely irreparable harm to the surrounding wetlands of Big Cypress. *See id*.474:3-13, 531:25-532:8, 1409. These factors, coupled with Defendants' "imminent plans" to lay down significantly more asphalt paving onsite, *id*. 1410, led to the court's conclusion that "there is sufficient likelihood that increased runoff will harm the surrounding wetlands." *Id*. 1409.

45

Regarding endangered species, Plaintiffs established that the TNT Site sits within the Florida panther's primary habitat and the bonneted bat's critical habitat. Fla.App.245:20-246:3, 1410-11. Expert Randy Kautz—a 27-year veteran of the Florida Fish and Wildlife Conservation Commission, ecologist, and panther expert—testified that the detention facility "immediately reduces the panther habitat by 2,000 acres." *Id*. 1411. The Tribe's witness and Fish and Wildlife Department Director Dr. Bozas testified that bright lighting and increased noise from the detention center displaces the bonneted bat and disrupts its ability to echolocate prey. *Id*.

This habitat loss represents irreparable environmental harm, particularly when tied to Plaintiffs' recreational interests in the area around the TNT Site and threatened losses to the already low panther population. *Id*. (*citing Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1135 (9th Cir. 2011) (loss of 1,652 acres of forest caused sufficient irreparable harm to plaintiffs' ability to enjoy the area, despite representing only 6% of the relevant area); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1257-58 (10th Cir. 2003) (finding irreparable harm from adverse impacts on bald eagles' aquatic ecosystem); *Sierra Club v. Martin*, 71 F.Supp.2d 1268, 1327 (N.D. Ga. 1996).

To argue speculative harm, Florida zeroes in on Kautz's testimony about other factors that threaten panthers in the long-term, and asserts that Kautz did not

establish panther "take"[24] from this project. Fla.Mot. 39. These circumscribed arguments overlook Kautz's testimony that **actual and ongoing** habitat loss from the detention center increases the likelihood of panther deaths (irreparable harms) through intraspecific aggression, and how increased traffic around the TNT site increases the risk of deaths by vehicular strikes, the number one cause of panther mortality.[25] Fla.App.1411.

In the face of extensive evidence of environmental harms, Federal Defendants' citation-lacking assurance that wetlands and wildlife are "resilient" rings hollow. *See* Fed.Mot.16-17. Nor are Plaintiffs required to show harm at a

---

[24] Florida apparently conflates the "take" standard for liability under the Endangered Species Act (ESA) with the irreparable harm standard for a preliminary injunction. *See* 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 17.3; *Greater Yellowstone Coal.*, 321 F.3d at 1257-58 (distinguishing between harm in the ESA context and irreparable harm in the NEPA context).

[25] *See, e.g.*, Fla.App.242:6-7 (panther population estimated at 120-230, not including kittens); 247:13-17 (protecting primary zone "essential" to panther conservation); 256:10-227:25 (prior to detention center, panthers continued to be present and thriving in the area); 261:22-263:7 (lighting causes immediate habitat loss); 265:7-24 (threat of vehicle mortality from increased traffic); 268:18-25 (detention center immediately reduces available habitat, increases risk of intraspecific aggression from displacement); 269:14-20 (high likelihood that panthers will avoid about 2,000 acres of habitat); 267:15-19 (change in illumination evident from NASA images before and after detention center); 266:15-297:25 (effects of increase of human activity, traffic; habitat loss is number one threat); 328:4-7 (habitat loss affects population viability).

Case No. 25-12873

species-wide level to show irreparable harm, *see id*. 17.[26] Federal Defendants'
reliance on *Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1976), is
misplaced. *Frizzell* involved a "reasonably abundant" waterfowl game species
"[that] was not threatened or endangered," and petitioners argued destruction of
"only one bird [was] sufficient to warrant a preliminary injunction." *Id*. at 987;
*Greater Yellowstone Coal*., 321 F.3d at 1256-58 (distinguishing *Frizzell* and finding
an abuse of discretion to the extent a district court denied a preliminary injunction
based on plaintiffs' failure to establish harm to species as a whole in a case involving
a threatened species).

Seeking to minimize these irreparable harms, Federal Defendants point to a
declaration by FDEM employee Ian Gadea-Guidicelli, who, though listed as a
witness, never testified. Fed.Mot.20; Fed.App.45. Gadea-Guidicelli's declaration
references speed bumps, silt fencing, and a drainage basin. But he is no expert in
***any*** environmental matter, and does not purport to be. Fed.App.45. Defendants
declined to call him, or any expert, to testify about environmental impacts.
Moreover, these isolated and ineffective measures do not counteract the substantial
irreparable harms found in this case.

---

[26] Though Plaintiffs presented evidence that habitat loss affects panther population
viability. Fla.App.328:4-7

Case No. 25-12873

Additionally, the district court correctly gave no weight to an August 4, 2025, "preliminary" report cited by Gadea-Guidicelli to argue minimal environmental impacts. Fed.Mot.20; Fed.App.81-84. This report consisted of ***three-and-a-quarter pages*** of conclusory statements authored by an individual who did not testify in court, disclose his methods, or establish qualifications and a foundation to opine on these issues. Fed.App.81-84. This conclusory document, prepared long after the facility opened, is no substitute for NEPA. *See Sierra Club v. U.S. Army Corps. of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002) (requiring agencies to take a "hard look" at the environmental consequences of a proposed action).

As to the so-called "rigorous" waste management program, Federal Defendants cite a ***one-and-a-half-page*** document describing how FDEM intends to manage waste at the TNT Site, from solid waste to construction and demolition debris to waste spills. Fed.Mot.20; Fed.App.76-77. If there is a rigorous waste plan, this breezy document does not memorialize it. In sum, the minimal and incomplete evidence put forward by Defendants does not overcome the irreparable harms established by Plaintiffs.

The harms the court found in this case represent the very types of environmental harm that cannot be remediated absent an injunction. *See Amoco*, 480 U.S. at 545; *Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 524, 536 (D.C. Cir. 2018). The district court carefully weighed and thoughtfully considered

49

the extensive record evidence to make multiple findings of irreparable harm—reiterated in the court's denial of Defendants' stay requests—a correct determination that is owed deference.

## III. DEFENDANTS HAVE NOT ESTABLISHED IRREPARABLE HARM; THE BALANCE OF EQUITIES MILITATES AGAINST A STAY

To warrant a stay, Defendants must show that they will be irreparably harmed from the preliminary injunction pending this Court's review. *Nken*, 556 U.S. at 432. They must further show that any such harm outweighs the irreparable harm to Plaintiffs. *See id.* at 435. As the district court correctly found in denying a stay, Defendants have shown neither. Pls.App.425-27.

To establish harm, Defendants rely on their overarching interest in enforcing immigration law in Florida. Fla.Mot.42-43; Fed.Mot.18. But the preliminary injunction does not forbid immigration enforcement. Nor does it forbid Defendants from detaining aliens. Instead, the preliminary injunction order halts further construction and operations at this location, providing a 60-day period for compliance that encompasses the rate at which detainees would otherwise leave the facility ("programmatic attrition"). Fla.App.1420-21.

Without evidence, Defendants baldly assert that the TNT facility is needed because the rate of apprehensions exceeds "scarce detention capacity," and because "many … aliens unlawfully within the United States present significant threats to national security …." Fla.Mot.43 (emphasis added) (citations omitted); Fed.Mot.18-

50

19 (similar). The district court found that "this position flounders when confronted with the weight of evidence as to the irreparable harm posed by Defendants' flouting NEPA protocols." Fla.App.1414-15. The district court also noted another planned detention facility in Florida, mitigating "[a]ny detention capacity issue" here. *Id*. 1416 n.36. Ultimately, Defendants did not show this detention center in this location was uniquely critical to immigration enforcement—and such evidence remains lacking in their motions before this Court. Fla.App.1416 (emphasis added); *see also* Pls.App.425, 427. Finally, the court's determination was further reinforced by evidence that Defendants had already reduced the detainee population at the TNT facility to about 300 individuals ***before*** the preliminary injunction. Pls.App.427&372.

And notwithstanding Defendants' scattershot references to "national security," "public safety," and "criminal aliens," *e.g.*, Fla.Mot.43; Fed.Mot.19. Defendants have not shown that the TNT facility is essential to detaining dangerous criminals, and they have provided no data about the population detained there. Federal Defendants conceded that the facility housed "all sorts of people from all walks of life." Fla.App.1417. Defendants' only live witness at the preliminary injunction hearing, Florida Highway Patrol head David Kerner, had no knowledge of the criminal backgrounds, if any, of individuals detained at the TNT site—not "even [of] one of the detainees." *Id*. 1416.

51

Case No. 25-12873

Defendants' new declarations filed with their stay motions merely repeated sweeping generalities about the importance of immigration enforcement. Fla.App.1424-33, 1438-47; Pls.App.427. The district court, in denying Defendants' stay motions, found these declarations unpersuasive since they provided "no new evidence or argument about the particular dangerousness of the detainee population at the TNT site[,]" and why a detention center was needed at this location. Pls.App.427.

Florida also relies on *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008). Fla.Mot.42. But in *Winter*, a significant factor weighing against a preliminary injunction was that the active sonar at issue, used in Navy training, was "the only reliable technology for detecting and tracking enemy diesel-electric submarines," and training with this technology was accordingly "essential to national security." *Winter,* 555 U.S. at 26. Here, Defendants come nowhere close to demonstrating why ***this*** facility is of crucial importance to national security as the Navy training in *Winter*. Just as Florida was unable to show how state law SB4-C could decisively mitigate any alleged harms from illegal immigration to warrant the stay of an injunction, Defendants are unable to do so here with this detention center. *See Florida Immigrant Coal. v. Attorney Gen.*, No. 25-11469, 2025 WL 1625385, at *6 (11th Cir. June 6, 2025). Not to mention that in *Winter* the Navy produced a NEPA EIS.

52

Case No. 25-12873

Meanwhile, the district court found Plaintiffs proved irreparable harms to wetlands, endangered species, and Tribal members. Fla.App.1407-14. The court thus correctly concluded—after considering the same arguments about immigration enforcement and the need for detention capacity—that the balance of the equities weighed heavily in Plaintiffs' favor. *See* Fla.App.1416. The preliminary injunction upholds the application of NEPA and enjoins further harm to this delicate environmental ecosystem—which is part of multibillion dollar federal-state restoration effort, and whose preservation is in the public interest. Fla.App.1342-43; Pls.App.759&859.

Finally, ***after*** the preliminary injunction, Defendants for the first time asserted that the injunction "forces Florida to incur irrecoverable costs" and that the $100 "bond was inadequate." Fla.App.1424; *see also* Fla. Mot.44; Fed.Mot.20. But as the court explained in denying the stay, "Defendants made no argument related to the cost of deconstructing the facility, ceasing its operations, or reinstalling infrastructure, despite Plaintiffs' specific request for relief encompassing these actions." Pls.App.426. Having identified this waiver, the court accordingly gave "little weight to the after-the fact" claims of financial harm to the State. *Id*. This Court should likewise disregard Defendants' forfeited arguments as to the sufficiency of the bond and financial harms in the proceedings below. Pls.App.366-67. "As with a motion for reconsideration, a motion to stay should not be used to .

. . raise arguments which could, and should, have been made before the judgment issued." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003).

Alternatively, the Court should affirm the district court's determination that Defendants' claim of financial harm was insufficient. *See* Pls.App.426 (explaining that the declaration's "speculative comments do not outweigh Defendants' weak showing of likelihood of success on the merits or the ongoing harms Plaintiffs documented during the Preliminary Injunction hearing"). The Court should similarly reject Defendants' belated to objection to the adequacy of the bond Plaintiffs requested. *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp.*, 112 F.3d 1125, 1127 (11th Cir. 1997) (finding no abuse of discretion as to the amount of an injunction bond, particularly where "no objection was made in the district court as to sufficiency of the bond").

## CONCLUSION

WHEREFORE, for the reasons stated herein, Defendants motions should be denied. Defendants' request for a stay of the action in the district court should also be denied.

Date: September 2, 2025

Case No. 25-12873

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida 33137
Telephone: (305) 440-5432

By:＿＿＿ s/ Tania Galloni＿＿＿
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No.
    100309
    dburkhardt@earthjustice.org

*Counsel for Appellee Friends of the*
*Everglades*


CENTER FOR BIOLOGICAL
DIVERSITY
Elise Pautler Bennett, Fla. Bar No.
106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No.
871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone: (727) 755-6950

*Counsel for Appellee Center for*
*Biological Diversity*


COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive
Penthouse One
Miami, Florida 33133
Telephone: (305) 858-2900

By:＿＿＿ s/ Paul J. Schwiep＿＿＿
    Paul J. Schwiep, Fla. Bar No.
    823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for Plaintiffs-Appellees*

Case No. 25-12873

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    On August 28, Friends filed a time-sensitive request to file a consolidated response not to exceed 12,000 words, which this Court granted today. Dkt. 32. This consolidated response complies with the permitted type-volume limit because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,815 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Paul J. Schwiep*
Paul J. Schwiep

56

Case No. 25-12873

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 2, 2025, I electronically filed the foregoing

document with the Clerk of the Court using the Court's CM/ECF system, which will

send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Paul J. Schwiep*_____
Paul J. Schwiep
