IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 25-12873
DISTRICT COURT DOCKET NO. 25-22896-CV-WILLIAMS

FRIENDS OF THE EVERGLADES, INC., et al.,

*Plaintiffs-Appellees,*

v.

EXECUTIVE DIRECTOR, FLORIDA DIVISION OF EMERGENCY
MANAGEMENT, et al.

*Defendants-Appellants.*

**APPELLEE THE MICCOSUKEE TRIBE OF INDIANS OF FLORIDA'S
RESPONSE TO THE MOTIONS FOR STAY PENDING APPEAL**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Elliot B. Kula
Elaine D. Walter
KULA & ASSOCIATES, P.A.
12000 Biscayne Blvd., Ste. 221
Miami, Florida 33181
Telephone: (305) 354-3858
eservice@kulalegal.com
elliot@kulalegal.com
elaine@kulalegal.com

Christopher Ajizian
CHRISTOPHER AJIZIAN P.A.
1101 Brickell Ave., Ste. 700
Miami, Florida 33131
Telephone: (305) 699-5001
chris@ajizianlaw.com

Todd R. Friedman
TODD R. FRIEDMAN P.A.
1101 Brickell Ave., Ste. S-700
Miami, Florida 33131
Telephone: (786) 536-7190
todd@toddfriedmanpa.com

*Co-Counsel for The Miccosukee Tribe of Indians of Florida*

*Friends Of The Everglades, Inc., et al. v. FDEMA, et al.*

<u>**Case No. 25-12873**</u>

**CERTIFICATE OF INTERESTED PERSONS
AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**

Plaintiff-Appellee, The Miccosukee Tribe Of Indians Of Florida, submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this review:

1. Ajizian, Christopher

2. Ajizian, Christopher, Esq.

3. Bennett, Elise Pautler, Esq.

4. Boies Schiller Flexner LLP

5. Bonzon-Keenan, Geraldine

6. Brabender, Allen M., Esq.

7. Burkhardt, Dominique, Esq.

8. Carpenter, Hayley A., Esq.

9. Center for Biological Diversity

10. Chris Ajizian P.A.

11. Coe, Alisa, Esq.

12. Coffey Burlington P.L.

13. Costello, David M., Esq.

14. Crockett, Jeffrey B., Esq.

*G.D.M. v. City of Oviedo, Fla.*

**Case No. 24-13732-H**

**CERTIFICATE OF INTERESTED PERSONS**
**AND**
**CORPORATE DISCLOSURE STATEMENT**
(Continued)

15.  DeSousa, Jeffrey Paul, Esq.

16.  Earthjustice

17.  Ezray, Evan M., Esq.

18.  Ficarelli, Dante, Esq.

19.  Florida Division of Emergency Management

20.  Forrester, Nathan A., Esq.

21.  Friedman, Todd R., Esq.

22.  Friends of the Everglades, Inc.

23.  Galloni, Tania, Esq.

24.  Golembiewski, Kevin A., Esq.

25.  Gustafson, Adam R.F., Esq.

26.  Guthrie, Kevin

27.  Hiaasen, Scott, Esq.

28.  Kula & Associates, P.A.

29.  Kula, Elliot B, Esq.

30.  Lyons, Todd

31.  Martinez, Hon. Jose E.

*G.D.M. v. City of Oviedo, Fla.*

<u>**Case No. 24-13732-H**</u>

**CERTIFICATE OF INTERESTED PERSONS
AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**
(Continued)

32.  Miami-Dade County

33.  Miccosukee Tribe of Indians

34.  Murray, David M., Esq.

35.  Noem, Kristi

36.  O'Byrne, Hayden P., Esq.

37.  Panuccio, Jesse Michael, Esq.

38.  Perez, Monica Rizo

39.  Piropato, Marissa, Esq.

40.  Raurell, Carlos J., Esq.

41.  Rizo, Monica, Esq.

42.  Quiñones, Jason A. Reding, Esq.

43.  Sanchez, Hon. Eduardo I.

44.  Schenck, Robert S., Esq.

45.  Schwiep, Paul J., Esq.

46.  Singer, Frank

47.  Stander, Robert, Esq.

48.  Todd R. Friedman P.A.

*G.D.M. v. City of Oviedo, Fla.*

<u>Case No. 24-13732-H</u>

**CERTIFICATE OF INTERESTED PERSONS**
**AND**
<u>**CORPORATE DISCLOSURE STATEMENT**</u>
(Continued)

49.  Torres, Hon. Edwin G.

50.  Torstensen, Peter M., Esq.

51.  Totoiu, Jason Alexander, Esq.

52.  United States Department of Homeland Security

53.  United States Immigration and Customs Enforcement

54.  Uthmeier, James, Esq.

55.  Wahl, Christopher J., Esq.

56.  Walter, Elaine D., Esq.

57.  Williams, Hon. Kathleen M.

Pursuant to Federal Rule of Appellate Procedures 26.1 and Eleventh Circuit Rules 26.101 through 26.1-3, Plaintiff-Appellee, The Miccosukee Tribe Of Indians Of Florida, makes the following statement as to corporate ownership: No publicly traded company or corporation has an interest in the outcome of this case or appeal.

<u>/s/ Elliot B. Kula</u>
Elliot B. Kula

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ....................................................C-1

TABLE OF CONTENTS ..........................................................................................i

PRELIMINARY STATEMENT ..............................................................................1

THE DISTRICT COURT PROCEEDING ...............................................................3

THE GOVERNING STANDARD FOR STAY .......................................................6

ARGUMENT ...........................................................................................................8

    I.    THE GOVERNMENTAL DEFENDANTS-
        APPELLANTS HAVE FAILED TO IDENTIFY ANY
        IRREPARABLE INJURY THAT WILL BE VISITED
        ON THEM IN THE ABSENCE OF A STAY PENDING
        APPEAL. ......................................................................................9

    II.    THE BALANCE OF THE EQUITIES FAVOR
        DENYING A STAY. ....................................................................20

    III.    THE COURT'S CONSTRAINING STANDARD OF
        REVIEW COMPELS AFFIRMANCE ON THE
        MERITS. ......................................................................................24

CONCLUSION .......................................................................................................25

## PRELIMINARY STATEMENT

Under Federal Rule of Appellate Procedure 27(a)(3) and Eleventh Circuit Rules No. 8-1 and 27-1, Plaintiff-Appellee The Miccosukee Tribe of Indians of Florida submits this response in opposition to the motions filed by the State and Federal Defendants-Appellants [Doc. Nos. 9 & 20] seeking a stay of the district court's preliminary injunction [DE:131 (the 82-page Omnibus Order)] pending appeal. In its well-reasoned 82-page Omnibus Order, upon extensive findings of fact and conclusions of law, the district court granted a preliminary injunction that ultimately requires the Defendants-Appellants to wind down its operations on the Dade-Collier Training and Transition Airport site in the everglades, which operations have been commonly referred to as Alligator Alcatraz.[1]

To be clear: The preliminary injunction has nothing to do with immigration; it has to do with the Defendants-Appellants' failure to comply with environmental safeguards in their haste to commence the Alligator Alcatraz operations. *See* DE:130 at 50 ("It could have been a carnival. It could have been a Girl Scout convention. It doesn't matter ... when you have that level of unnatural human activity in the area...."). And that gives rise to the irreparable, permanent harm to the Miccosukee Tribe of Indians of Florida's sovereignty, property rights, water quality, and right overall to a life of dignity, self-determination, and self-subsistence on Tribal lands—which lands adjacent to or downstream of the facility.

---

[1] Citations in this response refer to district court docket items as "DE:" and this Court docket items as "Doc. No." Additionally, in this response, reference will be made to the appendix to the consolidated response filed by the environmental groups.

1

Appellants-Defendants mistake the applicable standard; they fail to articulate (or even mention in passing) any irreparable harm absent a stay by this Court. Instead, they make the conclusory claim that the Tribe will not suffer irreparable harm if a stay is entered. But of course, after a four-day evidentiary hearing, the District Court found irreparable harm absent a stay.

Appellants-Defendants complain about the mere inconvenience of having to comply with applicable laws before hastily erecting a detention center in the middle of protected preserve. Requiring compliance with the law should not and cannot constitute irreparable harm. And the absence of arguing, let alone showing irreparable harm *to the Appellants-Defendants* is dispositive of their request for stay relief.

## THE DISTRICT COURT PROCEEDING

### COMMENCEMENT OF THE LITIGATION

Environmental groups sued the State and Federal defendants (the Defendants)[2], seeking declaratory and injunctive relief, in part—(i) declaring that Defendants' actions violate the National Environmental Policy Act (NEPA) and the Administrative Procedures Act (APA); (ii) enjoining any further pre-construction activities, construction, conversion, or use of the Dade-Collier Training and Transition Airport (TNT) for immigration detention without first complying with NEPA (42 U.S.C. § 4321 *et seq.*) and the APA (5 U.S.C. § 701 *et seq.* [DE:1].

The district court allowed the Miccosukee Tribe of Indians of Florida (the Tribe) to intervene. [DE:33; 73]. And the Tribe then filed its intervenor complaint and joined in the environmental groups' pending motions. [DE:84; 85].

### PRELIMINARY INJUNCTION PROCEEDINGS

The environmental groups moved for an expedited temporary restraining order and preliminary injunction, seeking to:

1.  Restrain and enjoin Noem, Lyons and Guthrie and their respective agencies from engaging in any pre-construction activities, construction, conversion, or use of the TNT Site for purposes of immigration detention unless and until they comply with NEPA and the APA;

---

[2] The complaint named Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security (DHS); Todd Lyons, in his official capacity as Acting Director of the United States Immigration and Customs Enforcement (ICE); Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management (FDEM); and Miami-Dade County (the County).

3

2. Restrain and enjoin Noem, Lyons and Guthrie and their respective agencies from authorizing or permitting further development or use of the TNT site for purposes related to a noncitizen detention center; and

3. Restrain and enjoin the County and other Defendants from authorizing or otherwise allowing the use of the TNT site limited to aviation activities as a detainment center for noncitizens or related activities.

[DE:5; 13; 14].

The County, FDEM, and the federal Defendants submitted their opposition. [DE:12; 16; 21; 28; 60].  The environmental groups replied.  [DE:24].

The district court presided over a **four-day evidentiary hearing**, which proceeded on an expedited basis, following which the district court entered an Omnibus Order granting a preliminary injunction.  [DE:131].[3]

## THE PRELIMINARY INJUNCTION

The district court—after a four-day evidentiary hearing—entered its 82-page Omnibus Order—with extensive findings of fact based upon the evidence presented and discussion of law—ruling that venue is proper and granting the preliminary injunction in part.  [DE:131].  Specifically, with respect to its preliminary injunction, the district court prohibited the following conduct on a going forward basis:

> **(1)** installing any additional industrial-style lighting (described by witnesses as "Sunbelt" lighting); or doing any paving, filling, excavating, or fencing; or doing any other site expansion, including placing or erecting any additional buildings, tents, dormitories, or other residential or administrative facilities on the TNT site; and **(2)** bringing

---

[3] The evidence presented at the hearing are discussed in the argument section that follows, supported by pinpoint citations.

any additional persons onto the TNT site who were not already being detained at the site at the time of this Order going into effect.

[DE:131 at 80].  And the district court directed the following actions within 60 days:

the Defendants shall remove 1) the temporary fencing installed by Defendants to allow Tribe members access to the site consistent with the access they enjoyed before the erection of the detention camp; 2) the Sunbelt lighting fixtures and any additional lighting installed for the use of the property as a detention facility; and 3) all generators, gas, sewage, and other waste and waste receptacles that were installed to support this project.

[DE:131 at 81].

### THE DENIAL OF A STAY PENDING APPEAL

The defendants, upon the district court's fulsome order denying their requests for stay pending this appeal [DE:147], have come to this Court for a stay.

## THE GOVERNING STANDARD FOR STAY

It has long been held, generally, that "[a] stay is not a matter of right" but rather "an exercise of judicial discretion." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672, 47 S. Ct. 222, 71 L. Ed. 463 (1926).  And "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Florida v. U.S.*, Nos. 23-11528 & 23-116445, 2023 U.S. App. LEXIS 13863 *1, *5, 2023 WL 3813774 (11th Cir. Jun. 5, 2023) (citing *Nken v. Holder*, 556 U.S. 418, 433-34 (2009)).

When "considering whether to stay a preliminary injunction," the Court "examine[s] the district court's grant of the preliminary injunction for abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019) (denying motion to stay because risk of irreparable injury was "significantly overstated" and the movant had not demonstrated a "strong likelihood of success on the merits of appeal .... "); *accord*, *e.g.*, *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th. Cir. 2024) ("We review the denial of a preliminary injunction for abuse of discretion" and "[u]nder that deferential standard, the district court may reach a 'range' of permissible conclusions.").  Importantly, the Court **must** "accept the findings of fact if they are 'plausible,' even if [it] would weigh the evidence differently." *Mills*, 102 F.4th at 1248.

And of course, the traditional factors that the Court considers are well-established: (1) whether the moving party has made a "strong showing" it is likely to succeed on the merits; (2) whether the moving party "will be irreparably injured"

6

if a stay is not granted; (3) "whether issuance of the stay will substantially injure the other parties" to the proceeding; and (4) "where the public interest lies." *HM Fla.-ORL, LLC v. Governor of Fla*., No. 23-12160, 2023 U.S. App. LEXIS 28905 *1, *4, 2023 WL 6785071(11th Cir. Oct. 11, 2023) (citing *Nken,* 556 U.S. at 426, 434 (2009)).   And this Court has recognized that "[t]he first two factors are the most critical.  It is not enough that the chance of success on the merits be better than negligible. ... By the same token, simply showing some possibility of irreparable injury ... fails to satisfy the second factor. *HM Fla.-ORL, LLC* at *4.  *See also Nken*, 556 U.S. at 426, 434 (2009) (discussing factors considered in evaluating whether to stay a preliminary injunction and dubbing the first two factors the "most critical"). *And see also Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (recognizing that that these considerations are not merely suggested, but are "required" elements for a stay of a preliminary injunction).

That said with respect to the standard overall, this Court's discussion in *Florida v. United States*, Case No. 23-11528, 2023 WL 3813774, at *3 (11th Cir. June 5, 2023) is instructive with respect to the prominence of the "irreparable harm" factor.  *See also Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)) (reaffirming *Nken* holding that irreparable harm is one of "the most critical" factors in the stay analysis, explaining that ).  **Indeed,  failure by the party moving for a stay to establish irreparable harm alone warrants denial of a motion to stay pending appeal**. *Id*. at 2023 WL 3813774, at *3 ("Because DHS therefore has failed to establish one of the two 'most critical' factors, we do not find a stay pending appeal to be warranted....").

# ARGUMENT

The Court should deny the requested stay, and it need look no further than the failure of Defendants-Appellants to show they "will be irreparably injured" if a stay is not granted. *Nken*, 556 U.S. at 426. Indeed, Defendants-Appellants across their various stay motions are silent on the showing of any irreparable harm, which is because there is none to show. They have instead directed their focus to the merits of the preliminary injunction and a discussion of immigration policy undergirding the facility's operation, noting only the purported burden and cost associated with compliance. And that misses the point in three marks. First of all, cost and burden do not equate with irreparable harm. Second, considering the harms to the respective parties, a balancing of the equities, weighs overwhelmingly against a stay given the substantial environmental impact that the district court's injunction is intending to avert. And third, not to be overlooked, the Defendants-Appellants have already proceeded to comply with the district court's preliminary injunction, showing a ready ability to persist in the underlying mission with respect to immigration enforcement, belying any suggestion of irreparable harm.

In sum, the contrast is striking between the permanency of the irreparable harm to the environment and the Tribe's rights versus the mere inconvenience that will be visited on the government, requiring its compliance with well-established environmental protection laws. The failure to make this most critical showing of irreparable harm is alone enough to deny the stay motions. And to avoid burdening the Court with extensive discussion on the merits of the appeal (covered amply by the response filed on behalf of the environmental Plaintiffs-Appellees), the Tribe

will focus its responsive arguments on the critical irreparable-harm and equities factors. But if this Court were inclined to reach the "likely to succeed on the merits," which it need not given the wholesale failure with respect to the "irreparable harm" factor, it will see that the government Defendants cannot make the "strong showing" necessary to win on that factor. *Nken*, 556 U.S. at 426-27. The district court in its 82-page Omnibus Order faithfully applied the law to the facts—and of course, the findings of fact after an evidentiary hearing are unassailable.

## I.   THE GOVERNMENTAL DEFENDANTS-APPELLANTS HAVE FAILED TO IDENTIFY ANY IRREPARABLE INJURY THAT WILL BE VISITED ON THEM IN THE ABSENCE OF A STAY PENDING APPEAL.

### THE IRREPARABLE HARM STANDARD MORE PRECISELY DEFINED

Irreparable harm is defined as "harm of a particular or peculiar nature for which compensation, in money damages, cannot make the injured party whole again." *Hochstein v. City of Miami Beach*, 758 F. Supp. 3d 1348, 1357 (S.D.Fla. 2024); *see also* Wagstaffe Prac Guide: Fed Civil Proc Before Trial § 31-XIII ("Irreparable harm has been defined as "the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction.").

An irreparable injury "must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 243 F.3d 1163, 1176 (11th Cir. 2000). *And see Nken*, 556 U.S. at 434 (noting that mere "possibility of irreparable injury" is insufficient).

At bottom, the failure to allege any irreparable harm is fatal. *See*, *e.g*., *Miller v. Comm'r, Ala. Dep't of Corr.*, No. 22-13136, 2022 U.S. App. LEXIS 26689 *1,

9

*22 (11th Cir. Sept. 2022) (denying motion to stay preliminary injunctive relief where defendant "completely failed to argue (much less show) that it will suffer irreparable harm").

### FACIAL FAILURE OF THE ALLEGATIONS

This Court's decision in *Florida v. United States*, 2023 WL 3813774, is instructive. There, DHS sought a stay pending appeal of two orders, one vacating a DHS alien parole policy designed to "decompress the border" and the other enjoining DHS's policy of allowing alien parole with conditions in certain circumstances. *Id.* at *1. In support of its stay request, DHS argued that absent a stay pending appeal, the district court's orders would (i) "undermine the Executive Branch's constitutional and statutory authority to implement its immigration priorities and secure the border"; (ii) cause " 'overcrowding [of] CBP facilities during increases in border encounters,' which would threaten the 'health, safety, and security' of USBP officers and aliens" and could "cause [DHS] to have to release some aliens without adequate monitoring measures"; and (iii) in the "worst-case scenario, prevent [DHS] form apprehending some aliens entirely." *Id.* at *2. And "[e]ach of these potential consequences," DHS argued, "would have negative downstream effects on public safety and national security." *Id.*

This Court rejected the irreparable harm claims, initially noting that DHS had a "track record of overstating similar threats in the underlying proceedings," which overstatements ultimately did not bear out, concluding that the DHS's "ability to ascertain future harm is uncertain at best." *Id.* at *2. Moreover, this Court found that DHS's "catastrophic predictions" in support of its purported "irreparable injury

10

argument" were doubtful based on "[r]ecent data from the border" (showing that boarder encounters continued to fall even after the district court's order), which DHS could not explain away. *Id*.

Apply that analysis here, and the same result prevails. First of all, Defendants-Appellants do not argue irreparable harm whatsoever (they don't make even the doubtful argument raised by the DHS in *Florida v. United States*), and that alone warrants denial of the requested stay. But to the extent nods to *potential* harm have been advanced, they mirror the sorts of injuries DHS asserted and this Court rejected in *Florida v. United States*. The Court should similarly reject as overstatement the potential for "overcrowding elsewhere," "releas[ing] detainees," "risk[ing] public safety," and "compromise[ing] the government's ability to enforce immigration laws." *See* Doc. No. 9-1, at 1, 38, 44; Doc. No. 20 at 2, 19; Doc No. 20, at App. 193 ¶¶ 11-13. Such speculative concerns fall short of the mark here, just as they fell short of the mark in *Florida v. United States*.

Additionally, recent statements by various officials and agents of Defendants-Appellants confirm that the purported harms alluded to are not presently being realized, nor are any even imminent. For example, FDEM Director Guthrie's statement that no detainees will be present at the facility by the time this response is filed has been widely reported. *See* https://abcnews.go.com/US/immigration-facility-alligator-alcatraz-detainees-days-florida-official/story?id=125039860. And Governor DeSantis repeatedly has confirmed the State's intention and ready ability to develop similar detention and deportation facilities around the State, unequivocally confirming that the district court's preliminary injunction order has

not affected the State's efforts to implement the federal government's immigration agenda.  *See* https://www.politico.com/news/2025/08/22/desantis-alligator-alcatraz-ruling-wont-deter-florida-immigration-enforcement-00519721.

The point is, the conclusory statements in the affidavits attached to the respective stay motions recite speculation or conjecture that cannot support a finding of irreparable harm, *see Florida v. United States*, 2023 WL 3813774, at *2 ("This Court will not find irreparable harm based on mere conjecture."), but even taking the statements at face value, they cannot be reconciled with the reality, and the stay motion by Defendants-Appellants should fail scrutiny just like the stay motion in *Florida v. United States* failed scrutiny.

It is highly improbable, and defies reason, that closing the TNT site will compromise immigration and deportation efforts because shuttering this single detention center will not derail the immigration detention and deportation machinery operational throughout the state and country.  Alternative locations are available— either operational at present or in line to be operational soon; suitable alternative sites are available, and this TNT site was built in just eight days, so it is not a burden to build temporary sites at other locations.

**IRREPARABLE HARM TO THE TRIBE
IF THE TNT SITE REMAINS OPEN
IS PROVEN BASED ON THE EVIDENCE PRESENTED BELOW**

*First*, operation of the detention facility deprives Tribal members of access to their ancestral lands.

For example, the Tribe used the Dade-Collier Jetport Road[4] as a primary point to access Big Cypress National Preserve.  [DE:129 at 122-27 (discussing trailheads and Tribal villages observable in Pltf.. Ex. 81), 133 (confirming the inability to access trailheads near the facility), 164-65 (confirming there are no other alternative access points aside from the trailheads near the facility), 175 (confirming the trailheads near the facility are the "primary method by which Tribal members access Big Cypress National Preserve for traditional activities")].  But the presence of law enforcement, newly-installed checkpoints, and additional fencing and gates have physically precluded Tribe members from accessing the Big Cypress National Preserve.  [DE:129 at 151, 170-71, 175].

---

[4] The Dade-Collier Jetport Road intersects U.S. 41/Tamiami Trail, and is sole access road to the detention facility.

And the Tribe showed well-tread paths and trails from the Dade-Collier Jetport Road, north into Big Cypress National Preserve, as the "primary method by which Tribal members access" the Preserve.  [DE:129 at 175 (discussing Pltf. Ex. 81].  *And see below*:



These trails are no longer accessible.  [DE:129 at 122-27, 133, 164-65, 170-71, 175].

14

Moreover, the checkpoints, gates, and other physical restraints aside),
common sense dictates that the Tribe will no longer visit the premises of the
detention facility to avoid obvious risks. As the Tribe's Director of Wildlife, Marcel
Bozas, Ph.D., testified, he would caution Tribal members to no longer approach the
detention facility armed with firearms for hunting as they had done in the past.
[DE:129 at 170-71].

And, yet another example, Tribal members also avoid the detention facility
and surrounding areas due to the large amount human activity and presence. Tribal
members engage in traditional activities and customs in the areas surrounding the
detention facility, such as hunting and foraging flora for medicinal, cultural, and
other purposes. The Tribe also has many cultural sites and points of interest in the
vicinity of the detention facility. *See* DE:129 at 119-20, 127-28 (confirming that the
Tribe has cultural sites and tree islands that are not depicted on Tribe Ex. 7), 133-
34, 14, 155-56, 170). *And see below*:



*Id*.

In addition, the introduction of industrial lighting has introduced a substantial amount of light pollution into the theretofore International Dark Sky designated area, which harms the Tribe's ecotourism businesses, causes wildlife to flee the area harming, displaced wildlife impose burdens on the Tribe's efforts to management its adjacent landholdings, and the Tribe's right to self-subsistence and self-determination through hunting, and harms the natural environment, such as causing the protected bonneted bat to avoid the area. *See* DE:129 at 129-33, 139-41 (discussing the area depicted in Pltf. Ex. 34), 145. *And see below*:



(Tribe Ex. 9).

Also, the endangered eastern black rail (a marsh bird) has been detected in the area around the site and the TNT site is within the bonneted bat's critical habitat zone. [DE:129 at 142]. Both of these species are nocturnal, and the increased lighting from the project "will push" those animals "out of the area. They do not use illuminated habitats." *Id.* at 132. Moreover, the increased noise from additional construction and ongoing human activity on the site also disrupts the bats' "ability to [echolocate] prey." *Id.*

In addition, there are several Tribal villages within close proximity of the detention facility, some as close as 400 meters, as shown below:



(Tribe Ex. 6; Appendix at 1639). *See also* Pltf. Ex. 81 (Panther-Osceola Village visible during facility flyover); DE:129 at 15-16 (confirming that Panther-Osceola Village is "about a quarter mile away" from the facility), 126-27 (testifying that it is "not even [] a mile" from the facility).

17

The light pollution from the facility is visible from the Miccosukee Reserved Area, as shown below:



(Tribe Ex. 9; Appendix at 1660).

Furthermore, runoff and wastewater discharge from the detention facility risks polluting the water supply in the Miccosukee Water Conservation Area 3A, which supplies underground aquifers with drinking water for millions of South Florida residents [DE:129 at 22], and the Miccosukee Reserved Area—where 80 percent of Tribal members reside—just a few miles downstream from the TNT site, and beyond. [DE:129 at 16, 24]. The area surrounding the detention center has a naturally very low nutrient level, and the introduction of nutrients, like phosphorous, nitrogen, and potassium, disturbs the ecosystem drastically because it is an extremely sensitive area with low nutrient hydrology. [DE:113 at 46-47]. The possible contaminants in any runoff come "from a number of different sources" on the site. [DE:129 at 41]. It could come from the newly paved material itself, petroleum products on-site to fuel generators, vehicles traveling to and from the detention center, and the operations necessary to support thousands of detainees and

18

staff on the site, doing laundry, cooking, cleaning, or using restrooms.  [*Id.* at 41-42].  Beyond contaminants entering the water, "increased sediment ... in the wetlands often times leads to increased turbidity ... [and] decrease[d] dissolved oxygen," which can kill aquatic animals.  [DE:129 at 42, 136].

Based on the general direction of water flow in the area around the project, water from the TNT site is likely to flow into the Tribe's water supply, risking contaminating the water of Tribal residences, schools, the Tribe's government building, and businesses.  [DE:129 at 24-25].  *And see below*:



(Tribe Ex. 8; Appendix at 1642).

All of the forgoing evidence adduced below reflects the present and immediate irreparable harms to the Tribe, in sharp contrast to the purported harms asserted by the Defendants-Appellants, which harms are being readily overcome.

## II.  THE BALANCE OF THE EQUITIES FAVOR DENYING A STAY.

### CONSIDER THE FAILURE OF ANY ENVIRONMENTAL STUDY

The problem at issue was created by the Defendants-Appellants when they proceeded with the construction and operations on the TNT site without conducting any environmental study. *See* Tribe Ex. 4 ¶¶ 3–4; Appendix at 1591-92 (declaration of Jason Daniel) ("I am responsible for receiving, and responding to consultation requests submitted by federal and state agencies with respect to proposed undertakings on or affecting historic properties or lands ... which are culturally significant to the Miccosukee people....  [T]o the best of my knowledge, I have not received a request from any governmental agency ... with respect to the project or undertaking located at TNT [s]ite."). *And see* DE:129 at 169 (Dr. Bozas stating that he "had no notice of the facility" even though "it is generally part of the protocol when there is large State or Federal programs that the Tribe is consulted with"), 33-34 (Ms. Castaneda testifying that no governmental entity contacted her before construction of the camp)).

**CONSIDER THE PRESENTLY ONGOING EVERGLADES RESTORATION PROJECTS**

The Federal and State governments have already declared their intentions—through a "multi-billion, multi-decade" program—to protect and restore this precise area through the $20 billion Comprehensive Everglades Restoration Plan (CERP) and its subcomponent, the $2 billion Western Everglades Restoration Project (WERP), which are funded 50/50 by the Federal and State governments. [DE:129 at 28-29]. WERP's plan to restore the natural flow of water in this precise area was planned with the idea that the jetport would remain a low-use, low activity training facility, where single turbine aircraft are used to train pilots. [DE:129 at 28-30]. *And see below*:



(Pltf. Ex. 34; Appendix at 759 — arrows added to demonstrate water flow direction).

21

And more to this point, in the planning of CERP and WERP, which the Tribe had a prominent role, the Tribe requested the removal of all levees, canals, and other infrastructure that impeded the natural flow of water in the area.  It was the State (South Florida Water Management District) and the Federal government (US Army Corp of Engineers) that proposed constructing bidirectional gates and culverts, designed to allow water to flow west-to-east and north-to-south onto the Miccosukee WCA 3A and the Miccosukee Reserved Area as a compromise in response to the Tribe's request for complete removal of water-inhibiting infrastructure.  [DE:129 at 28-29].

### CONSIDER THAT ALTERNATIVES NEVER WERE EXPLORED

*Third*, Defendants failed to consider any alternative site for the detention facility. The State's representative testified that the jetport was "[t]he only site that I looked at, yes."  [DE:129 at 223-24].  Defendants offered little to no evidence why this detention camp, in this particular location, is uniquely suited and critical to that mission. Director Kerner did state that his troopers "have encountered and apprehended people that have active warrants for murder in other countries" and offered his belief that some of those individuals might be detained at the detention camp.  *Id.* at 202.  Director Kerner could not, however, offer any statistics or reports specifying how many individuals actually housed at the facility had such a criminal background.  [*Id.* at 206].  He could not directly testify that even one of the detainees had a criminal record, much less a record of violent crimes necessitating their seclusion from society in the Everglades.  [*Id.* at 206, 219].

### CONSIDER THE ABRUPT AND HAPHAZARD CONSTRUCTION ON THE TNT SITE

Make no mistake, Defendants-Appellants haphazardly and abruptly erected the site in just eight days.  The State's sole witness confirmed the structures as "soft-sided", and when asked whether the site was temporary or permanent, evasively answered, "I don't know how long it would take for those items to be past their useful life to need to be replaced."  [DE:129 at 223].  In other words, a "soft-sided" facility erected in 8 days should not be excused as a Trojan horse for permanency.

### CONSIDER THAT THE CONSTRUCTION AND OPERATIONS DISRUPTED THE TNT SITE'S PEACEFUL ENVIRONMENT

Keep in mind, with respect to the TNT site's prior use, several witnesses testified under oath that they worked or recreated in that area for years leading up to the camp's construction and noticed little or no noise from the airport.  [DE:114 at 176–77; DE:129 at 32, 87, 130].  More specifically, the addition of 800,000 square feet of asphalt paving (with another 1 million planned) increases harmful water runoff relative to the areas previously paved.  (Pltf. Exs. 22, 90–92, 126 at 1; Appendix at 693-705, 938-45, 946-54, 955-66, 1216-27).  And the frenetic human activity, including vehicular traffic and wastewater from thousands of people daily, was essentially absent prior to the detention camp's construction.  All of which is to the point that the pollution—noise, light, human, nutrient, etc.—from the increased human activity at the detention facility is substantial.  The light pollution is far worse now than before the camp's construction.  (Tribe Ex. 9).

23

## III.  THE COURT'S CONSTRAINING STANDARD OF REVIEW COMPELS AFFIRMANCE ON THE MERITS.

The Court's evaluation of the "likelihood of success on the merits" factor cannot be divorced from the standard of review, which is highly deferential and bears repeating.  That is, when "considering whether to stay a preliminary injunction," the Court "examine[s] the district court's grant of the preliminary injunction for abuse of discretion," and while it reviews de novo any legal rulings, it reviews for "clear error any findings of fact."  *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1317 (denying stay because risk of irreparable injury was "significantly overstated" and the movant had not demonstrated a "strong likelihood of success on the merits of appeal .... "); *accord*, *e.g.*, *Mills*, 102 F.4th at 1248 (recognizing the Court "review[s] the denial of a preliminary injunction for abuse of discretion" and "[u]nder that deferential standard, the district court may reach a 'range' of permissible conclusions"; and **must** "accept the findings of fact if they are 'plausible,' even if [it] would weigh the evidence differently").

Suffice to say, the factual findings by the district court set forth in the 82-page Omnibus Order supported by citations to the evidence throughout are unassailable on appeal, and resoundingly defeating the suggestion by the Defendants-Appellants of a likelihood of success on the merits under the constraining standard.

## CONCLUSION

The Court should deny the stay motions and allow the district court to enforce its preliminary injunction pending appeal. The failure to identify any irreparable harm alone compels denial, but also balancing the relative harms and the equities show environmental hazards far outweighing the inconvenience and costs visited on Defendants-Appellants. The detention center at the TNT site was intended to be temporary and its relocation now presents no unexpected burden or expense, and the present compliance belies any allegation of irreparable harm.

Respectfully submitted,

<table>
<tr><td>Elliot B. Kula<br>Florida Bar No. 003794<br>Elaine D. Walter<br>Florida Bar No. 873381<br>KULA & ASSOCIATES, P.A.<br>12000 Biscayne Blvd., Ste. 221<br>Miami, Florida 33181<br>Telephone: (305) 354-3858<br>eservice@kulalegal.com<br>elliot@kulalegal.com<br>elaine@kulalegal.com<br><br>By: /s/ Elliot B. Kula<br>Elliot B. Kula<br><br>By: /s/ Elaine D. Walter<br>Elaine D. Walter</td><td>Christopher Ajizian<br>Florida Bar No. 1010170<br>CHRISTOPHER AJIZIAN P.A.<br>1101 Brickell Ave., Ste. 700<br>Miami, Florida 33131<br>Telephone: (305) 699-5001<br>chris@ajizianlaw.com<br><br>By: /s/ Christopher Ajizian<br>Christopher Ajizian<br><br>Todd R. Friedman<br>Florida Bar No. 97919<br>TODD R. FRIEDMAN P.A.<br>1101 Brickell Ave., Ste. S-700<br>Miami, Florida 33131<br>Telephone: (786) 536-7190<br>todd@toddfriedmanpa.com<br><br>By: /s/ Todd R. Friedman<br>Todd R. Friedman</td></tr>
</table>

*Co-Counsel for The Miccosukee Tribe of Indians of Florida*

25

**CERTIFICATE OF COMPLIANCE**

I certify that this Response complies with the type-volume limitation set forth in Rule 27(d)(2)(A) of the Federal Rules of Appellate Procedure.  This Response uses Times New Roman 14-point typeface and contains  4,918  words.

/s/ Christopher Ajizian
Christopher Ajizian


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 2, 2025, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system.  I also hereby certify that the foregoing document is being served this day on all counsel of record identified on the Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Christopher Ajizian
Christopher Ajizian