In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 25-12873
_____

FRIENDS OF THE EVERGLADES, INC.,
   a Florida 501(c)(3) not-for-profit corporation,
CENTER FOR BIOLOGICAL DIVERSITY,
   a 501(c)(3) nonprofit organization,

*Plaintiffs-Appellees,*

MICCOSUKEE TRIBE OF INDIANS OF
FLORIDA,

*Plaintiff-Intervenor-Appellee,*

*versus*

SECRETARY OF THE UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
ACTING DIRECTOR, OF THE UNITED STATES
IMMIGRATION AND CUSTOMS ENFORCEMENT,
EXECUTIVE DIRECTOR, OF THE FLORIDA DIVISION
OF EMERGENCY MANAGEMENT,

*Defendants-Appellants,*

MIAMI-DADE COUNTY,
   a political subdivision of the State of Florida,

2                    Order of the Court                    25-12873

*Defendant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:25-cv-22896-KMW

_____

Before JORDAN, BRANCH, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

On August 21, 2025, the district court issued a preliminary injunction barring Florida and the United States from engaging in any additional construction at the detention facility known as "Alligator Alcatraz" and ordering the site closed and dismantled within sixty days.[1] DE 131 at 80–81.[2] The State and Federal Defendants have filed motions to stay that injunction pending appeal. After careful consideration, we **GRANT** the Defendants' motions, and we **STAY** the preliminary injunction and the underlying case itself pending appeal.[3]

_____

[1] The Plaintiffs did not seek preliminary relief under the sole count asserted against Miami-Dade County, and the preliminary injunction does not order any relief relating to Miami-Dade County.

[2] Citations correspond to the district court's docket below.

[3] "Because an 'order concerning a stay is not a final adjudication of the merits of the appeal, the tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case." *League of Women Voters of Fla., Inc., v. Fla. Sec'y of State*, 32 F.4th 1363, 1369 n.1 (11th Cir. 2022) (alterations adopted) (quoting *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1280 n.1 (11th Cir. 2020)).

## I.    FACTUAL AND PROCEDURAL HISTORY

### A.    *Governor DeSantis Declares a State of Emergency*

On January 6, 2023, Governor Ron DeSantis declared a state of emergency in the State of Florida, directing state law enforcement agencies and other state agencies to "take necessary actions" to protect Floridians from the impacts of mass illegal migration into the State.  DE 116-1 at 11.  "[U]nauthorized alien interdictions in and around Florida ha[d] risen to alarming levels not seen for decades," and, within the first two months of 2023, U.S. Customs and Border Protection had "encountered over 460,000 persons attempting entry along the Southwest Border."  *Id*.  Governor DeSantis thus declared that this heightening immigration crisis was overburdening local law enforcement and creating danger for Floridians all over the State.  *Id*. at 12–13.

As part of the statewide emergency, and as authorized under Fla. Stat. § 252.36, Governor DeSantis empowered the Florida Division of Emergency Management ("FDEM") to:

- Seek direct assistance and enter into agreements with any and all agencies of the federal government as may be needed to meet this emergency;

- Direct all state, regional, and local governmental agencies, including law enforcement agencies, to identify personnel needed from those agencies to assist in meeting the response, recovery, and mitigation needs created by this emergency, and to place all such personnel under the direct command and coordination of the FDEM to meet this emergency; and

- Suspend the effect of any statute, rule, or order that would in any way prevent, hinder, or delay any mitigation, response, or recovery action necessary to cope with this emergency.

*Id.* at 13–14.

B.    *Construction of the Facility Begins on the TNT Site*

On June 23, 2025, FDEM used its emergency powers to commandeer the Dade-Collier Training and Transition Airport (the "TNT Site") to build a detention-and-deportation facility for illegal immigrants thereon (the "Facility"). Before FDEM assumed control of the Site, TNT was a small but bustling working airport. DE 116-1 ¶ 6. According to flight logs, the airport saw 27,997 landings and take offs in the approximately six months prior to the Site's conversion, or around 137 flights per day. *Id.* ¶ 11. Of those 27,997 flights, 4,349 involved multi-engine planes, 391 involved business jets, 137 involved private helicopters, 521 involved military planes, and 199 involved military helicopters. *Id.* ¶ 12. Most of these flights occurred during the day, but the airport was open at night upon request. *Id.*

Individuals familiar with the operations of the airport, including Ian Gadea-Guidicelli, the State Emergency Response Team Chief and Response Bureau Chief for FDEM, have explained that flights taking off from and landing at TNT were "obviously[ ] very loud," reverberating "well beyond the airport" into the surrounding flat land. *Id.* ¶ 14. Every time a flight took off or landed at night, lights illuminated along the runway. *Id.* ¶ 16. Existing

buildings on the Site also had "outdoor lights" that were "lit 24/7," and that were "bright enough to light both the buildings and the surrounding area." *Id*. Indeed, in spite of TNT's relatively small size, several factors made the airport *more* disruptive to the surrounding area than a commercial airport might have been. According to Mark Moore, an FDEM employee and pilot who has flown between 40 and 50 times into and out of TNT, TNT created extra "noise pollution" because it was a "popular airport for aviation students . . . . practicing takeoffs and landings," with student pilots flying at "lower altitudes . . . closer to humans and animals." DE 116-3 ¶¶ 1, 2, 5. Additionally, unlike most airports, TNT did not make pilots follow noise-abatement procedures, or any procedures designed to "mitigate the noise from approaching airplanes" or "limit[ ] the impact that . . . noise [would] have on the surrounding environment."[4] *Id*. ¶ 5.

The TNT Site is owned by Miami-Dade County, DE 1 ¶ 20, and is located "within or directly adjacent to the Big Cypress

---

[4] In its order granting the motion for preliminary injunction, the district court concluded that the Plaintiffs established associational standing based on "their members' aesthetic, conservational, and recreational interests" being adversely affected by the Facility's operations. DE 131 at 16 n.10. The district court specifically noted "light pollution affecting members' ability to observe the night skies" and "noise pollution impacting members' ability to observe and interact with wildlife." *Id*. In reaching this conclusion, the district court did not mention that, although located in the Big Cypress National Preserve and near the Everglades, the Site was a working airport with close to 28,000 landings and takeoffs in the prior six months alone, bright lights kept on "24/7," and a lack of noise abatement requirements before the Site's conversion to a detention center. *See id*. While this seems like a significant omission

National Preserve and the Big Cypress Area, a nationally and State protected, and ecologically sensitive, area" near the Everglades, *id.* ¶¶ 2, 29.  Only 2.02% of the commandeered land—a "tiny grass extension of [an] airport runway," DE 116-1 ¶ 6—lies in Miami-Dade County, *see* DE 86-1 ¶ 7, whereas the entirety of the Facility itself is located in Collier County, *see* DE 86-2; DE 116-1 ¶ 8.  Miami-Dade County lies within the Southern District of Florida, Collier in the Middle District.

Construction of the Facility started immediately, and "kitchen facilities, restrooms, housing facilities, portable industrial lighting, and other infrastructure" began to be installed at the TNT Site.  DE 1 ¶ 39.  At some point after construction began, U.S. Department of Homeland Security ("DHS") Secretary Kristi Noem posted on Facebook that the Facility, dubbed "Alligator Alcatraz," "will be funded largely by [the Federal Emergency Management Agency ("FEMA")] Shelter and Services Program[.]"  *Id.* ¶ 34; DE 25-1.  Governor DeSantis also expressed at a June 25 press conference that the Facility was "requested by the federal government," and that Florida "will be fully reimbursed by the federal government" for the costs.  DE 1 ¶ 35.  However, Florida has not filed an application for federal funds, and neither DHS nor FEMA has formally "approved a federal award" providing funds for the

---

from the district court's analysis, it is not necessary for us to resolve for purposes of the stay motions, and we leave it to the merits panel whether to address any possible deficiencies in the Plaintiffs' standing.

construction of the Facility or reimbursing Florida.  *See* DE 21-2 ¶ 4; DE 21-1 ¶ 5; *see generally* 44 C.F.R. § 206.202.

C.    *The Plaintiffs Move to Enjoin Further Construction*

On June 27, Friends of the Everglades, Inc. ("FOE") and the Center for Biological Diversity ("CBD") sued Secretary Noem, Acting Director of U.S. Immigration and Customs Enforcement ("ICE") Todd Lyons (collectively, the "Federal Defendants"), FDEM Executive Director Kevin Guthrie, and Miami-Dade County in the U.S. District Court for the Southern District of Florida, seeking "to halt the unlawful construction" of the Facility.  DE 1 ¶ 1.  The Miccosukee Tribe of Indians of Florida later intervened as a plaintiff in the action.  DE 84; DE 85.  As relevant here, the Plaintiffs allege that the Federal Defendants were required to prepare an environmental-impact statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), Pub. L. No. 91-190, 83 Stat. 852 (1970), before commencing construction of the Facility.  DE 1 ¶¶ 61–74. By failing to do so, the Plaintiffs maintain, the Federal Defendants have violated the Administrative Procedure Act ("APA"), Pub. L. 79-404, 60 Stat. 237 (1946).  DE 1 ¶¶ 75–79.  The Plaintiffs thus sought a temporary restraining order and preliminary injunction to enjoin the Defendants from further developing the TNT Site or using the Facility until they complied with NEPA and the APA.  DE 5.

On July 17, the Plaintiffs filed a renewed request for a temporary restraining order, explaining that, since they filed suit, "as many as 900 people" have been detained at the TNT Site.  DE 40 at 2.  The Plaintiffs also modified their request for injunctive relief,

asking the district court to order the Defendants to cease further construction at the TNT Site and "any operations related to detaining or preparing for the detention" of additional detainees. *Id*. at 6. In supplemental responses to the Plaintiffs' renewed request, the Defendants asserted, in addition to the arguments they had already raised, that venue was also improper in the Southern District of Florida, and they requested that the case be transferred to the Middle District of Florida. DE 50 at 5; DE 60 at 1–2.

The district court held an evidentiary hearing on the Plaintiffs' motions. Over four days, the district court heard from ten witnesses and viewed over one hundred exhibits. During the hearing, the Plaintiffs again renewed their request for a limited temporary restraining order, suggesting that the Defendants planned to add paving and other infrastructure over the weekend, while the evidentiary hearing was in recess. After the Defendants were unwilling to represent that no construction would occur during the weekend recess, the district court granted the Plaintiffs' request, halting further expansion of the Site for fourteen days. DE 104.

D.     *The District Court Grants the Plaintiffs' Motion*

The district court ultimately granted the Plaintiffs' motion for preliminary injunction as it related to their APA claim. On August 21, the district court entered a preliminary injunction, prohibiting the Defendants from doing further construction on the Facility and from bringing additional detainees there. The order also required the Defendants to remove, within 60 days, all fencing,

lighting, and utilities that were installed to support the Facility.  DE 131 at 80–81.

Both FDEM and the Federal Defendants timely filed a notice of interlocutory appeal.  DE 132; DE 136.  On August 23, the Defendants also filed motions with the district court to stay the preliminary injunction pending appeal, asking the district court to rule on those motions by 5:00 p.m. on August 25.  DE 137; DE 138.  When the district court failed to rule on the stay motions by that date, the Defendants, on August 26, filed before this Court motions to stay the preliminary injunction pending appeal, as well as a motion for administrative stay.  The district court has since denied the stay motions filed below.  DE 147.  We consider the Defendants' August 26 motions to stay here.

## II.    STANDARD OF REVIEW

In considering whether to stay a preliminary injunction, we apply the usual standards of review governing our review of the merits of the preliminary injunction.  *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020).  Accordingly, we examine the district court's grant of the preliminary injunction for abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact.  *Id.*

## III.    ANALYSIS

The Defendants request that we stay the district court's order enjoining the further construction and use of the Facility.  In determining whether a stay is warranted, we "consider[ ] four factors: '(1) whether the stay applicant has made a strong showing that

he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Swain*, 958 F.3d at 1088 (quoting *Nken v. Holder*, 556 U.S. 418, 425–26 (2009)). "The first two factors"—likelihood of success on the merits and irreparable injury—"are the most critical." *Id.*

Before considering these factors, however, we find it necessary to discuss the nature of the Plaintiffs' claim on appeal here. The Plaintiffs sought and obtained injunctive relief based on an alleged violation of NEPA. In *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. ___, 145 S. Ct. 1497 (2025), the Supreme Court recently addressed what NEPA does—and does not—require, as well as the role of the federal judiciary when considering a claim asserting a violation of that statute. Inexplicably, other than a passing citation using a "see also" signal on page 46, the district court's order does not mention the Supreme Court's most recent decision about the statute lying at the heart of this case.

NEPA was the first of "several landmark environmental laws enacted by Congress in the 1970s," including the Clean Air Amendment, the Clean Water Act, and the Endangered Species Act. *Id.* at 1507. As the Supreme Court stated:

> Unlike those later-enacted laws, however, NEPA imposes no substantive environmental obligations or restrictions. NEPA is a purely procedural statute that . . . simply requires an agency to prepare an EIS—in essence, a report. Importantly, NEPA does

> not require the agency to weigh environmental consequences in any particular way.  Rather, an agency may weigh environmental consequences as the agency reasonably sees fit under its governing statute and any relative substantive environmental laws.
>
> Simply stated, NEPA is a procedural cross-check not a substantive roadblock.  The goal of the law is to inform agency decisionmaking, not to paralyze it.

*Id.*  Because NEPA is "purely procedural," *id.* at 1510, and the EIS is "only one input into an agency's decision," *id.* at 1511, the EIS that NEPA requires "does not itself require any substantive outcome," *id.* at 1511, nor is an agency "constrained by NEPA from deciding that other values outweigh the environmental costs," *id.* at 1510 (quotation omitted).

And we are mindful that the Supreme Court intended *Seven County* to act as a "course correction" to bring "judicial review under NEPA back in line with the statutory text and common sense." *Id.* at 1514.  The Court noted the potential for abuse inherent in judicial treatment of NEPA as something other than a procedural statute: "NEPA has transformed from a modest procedural requirement into a blunt and haphazard tool employed by project opponents (who may not always be entirely motivated by concern for the environment) to try to stop or at least slow down new infrastructure and construction projects." *Id.* at 1513.

True, the issue on appeal here is whether an EIS was required in the first place, not whether a particular EIS is deficient.  But the Supreme Court emphasized in *Seven County* that

"courts . . . must keep in mind that review of an agency's EIS is not the same thing as review of the agency's final decision concerning the project." *Id.* at 1514.  In other words, and as relevant here, because an EIS is "only one input," *id.* at 1511, out of many that relate to an agency's decision, the EIS is not itself the "agency's final decision concerning the project," *id.* at 1514.  Moreover, "[e]ven if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Id.*  Thus, the appropriate subject of an APA claim involving NEPA is a federal agency's "final decision regarding" a "project," and whether it would be changed by a modified EIS, not an EIS divorced from that context.

With these precepts in mind, we turn to the four factors governing a stay.

### A.    **Likelihood of Success on the Merits**

The Defendants are likely to demonstrate on appeal that the Plaintiffs have failed to state a viable claim based on the Federal Defendants' alleged violation of NEPA and the APA.

NEPA requires that federal agencies issue a report regarding the environmental impact of certain proposed agency actions.  *See Seven Cnty.*, 145 S. Ct. at 1510; *Lowman v. FAA*, 83 F.4th 1345, 1349–50 (11th Cir. 2023).  Under NEPA, "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" must be accompanied by an EIS describing the potential environmental

consequences of the proposal. 42 U.S.C. § 4332(C); *see Lowman*, 83 F.4th at 1349–50. In 2023, Congress amended NEPA to add a statutory definition for "major federal action." As relevant here:

> **(A) In general**
>
> The term "major Federal action" means an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility.
>
> **(B) Exclusion**
>
> The term "major Federal action" does not include--
>
>> (i) a non-Federal action--
>>
>>> (I) with no or minimal Federal funding; or
>>>
>>> (II) with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project . . . .

42 U.S.C. § 4336e(10)(A)–(B)(i).

NEPA does not include a private cause of action, so "plaintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act." *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006). The APA grants federal courts jurisdiction to review and "hold unlawful and set aside" a federal agency action "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see also Doe ex rel. Doe Sr. v. Bush*, 261 F.3d 1037, 1055 (11th Cir. 2001) ("[T]he federal APA clearly does not apply to state

agencies." (citing 5 U.S.C. § 701(b)(1))).  And because review under
the APA is limited to "final" agency actions, 5 U.S.C. § 704, "[i]n the
NEPA context, the 'final agency action' required by the APA must
also be a 'major federal action' under NEPA," *Karst Env't Educ. &
Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) (citing *Found.
on Econ. Trends v. Lyng*, 943 F.2d 79, 85 (D.C. Cir. 1991)); *see also Lujan
v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as here, re-
view is sought not pursuant to specific authorization in the sub-
stantive statute, but only under the general review provisions of
the APA, the 'agency action' [challenged] must be [a] 'final agency
action.'" (quoting 5 U.S.C. § 704)).

Here, the Plaintiffs allege that "[t]he decision to proceed
without notice, comment and without an . . . EIS constitutes final
agency action" subject to review under the APA. DE 1 ¶ 78.  But
the Federal Defendants' failure "to prepare an EIS is not *itself* a final
agency action for purposes of APA review." *Pub. Citizen v. Off. of
U.S. Trade Reps.*, 970 F.2d 916, 918 (D.C. Cir. 1992) (emphasis added)
(citing *Lyng*, 943 F.2d at 85).  While the "failure to act" can consti-
tute a reviewable final agency action, *see* 5 U.S.C. §§ 551(13), 706(1),
that is only the case if the "agency failed to take a *discrete* agency
action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542
U.S. 55, 64 (2004); *cf. Sw. Williamson Cnty. Cmty. Ass'n v. Slater* (*Slater
I*), 173 F.3d 1033, 1037 (6th Cir. 1999) ("Since there was n[ot] an EIS
. . . , 'final agency action' has not occurred as required under the
terms of 5 U.S.C. § 704.").  And these cases are consistent with *Seven
County*'s emphasis that an EIS is merely an "input" into an agency
decision, and not an agency action in and of itself.  *Seven Cnty.*, 145

S. Ct. at 1511.  Thus, the Plaintiffs must point to a "major Federal action[ ] . . . triggering the agency's obligation to prepare an impact statement" in the first place.  *Pub. Citizen*, 970 F.2d at 918–19 (quoting *Lyng*, 943 F.2d at 85).

The Plaintiffs identify the "arrangements" between FDEP, DHS, and ICE "to transform the TNT Site into a mass detention and deportation facility" as the "major federal action" triggering NEPA's procedural requirements.  DE 1 ¶ 71.  But neither the "construction" nor the "use" of the Facility constitutes a "major federal action" under NEPA.  DE 131 at 46.

NEPA's definition of "major federal action" "does not include . . . a non-Federal action [(1)] with no or minimal Federal funding; *or* [(2)] with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project[.]"  42 U.S.C. § 4336e(10)(B)(i) (emphasis added).  By that subsection's plain text, *either* the absence of federal funding *or* the absence of federal control is sufficient to take a project outside the definition of "major federal action."  *See Dacostagomez-Aguilar v. U.S. Att'y Gen.*, 40 F.4th 1312, 1316 (11th Cir. 2022) ("Congress connected the two notice paragraphs with 'or,' not 'and.'  In doing so, it signaled that the two are alternatives and not a linked pair.  The use of the disjunctive 'or' indicates alternatives and requires that those alternatives be treated separately." (internal quotation marks omitted)); A. Scalia & B.A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives.").  The district court,

however, misinterpreted § 4336e(10)(B)(i) as excluding only those actions "'with no or minimal Federal funding' *and* 'no or minimal Federal involvement [and control].'" DE 131 at 53 (emphasis added) (quoting 42 U.S.C. § 4336e(10)(B)(i). Based on this misreading, the district court believed it was not "compelled to focus on the funding decision" since, in its view, the Federal Defendants' "intimate involvement in, and control over, the detention facility" was a sufficient basis for finding a major federal action.[5] *Id.* (citing *Sw. Williamson Cnty. Cmty. Ass'n v. Slater* (*Slater II*), 243 F.3d 270, 279 (6th Cir. 2001)).

---

[5] The district court also relied on a Council on Environmental Quality ("CEQ") regulation defining "major federal action" as "actions with effects that may be major and which are potentially subject to Federal control and responsibility." *See* DE 131 at 53 (quoting 40 C.F.R. § 1508.18). For three reasons, we need not follow that alternative definition. First, "an agency's interpretation of a statute cannot bind a court." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) (internal quotation marks omitted). Second, to the extent an agency interpretation is nonetheless entitled to "a measure of deference . . . proportional to . . . it[s] power to persuade," *Rafferty v. Denny's Inc.*, 13 F.4th 1166, 1188 (11th Cir. 2021) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012)), none is warranted here given that CEQ's definition contradicts that provided by Congress, *see, e.g., Am. Bar Ass'n v. FTC*, 636 F.3d 641, 645 (D.C. Cir. 2011). Third, CEQ's regulatory definition is no longer on the books: After the D.C. Circuit found that CEQ has "no lawful authority to promulgate . . . regulations," *Marin Audubon Soc. v. FAA*, 121 F.4th 902, 914 (D.C. Cir. 2024); *see also id.* at 912 ("No statute confers rulemaking authority on CEQ."), CEQ removed its "existing implementing regulations" for NEPA, *see* Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10610, 10611 (Feb. 25, 2025); Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 12690 (Mar. 19, 2025).

Prior to the 2023 amendments to NEPA, the district court might have been correct. NEPA initially did not define what constitutes a "major federal action" triggering the EIS requirement. *See generally* Pub. L. No. 91-190, 83 Stat. 852. Lacking "clear standards for defining the point at which federal participation transforms a state project into federal action," our Circuit focused on the extent of "a federal agency's authority to influence nonfederal activity." *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994). Other circuits looked to now-repealed regulations, *see supra* note 5, to conclude that "major federal actions need not be federally funded to invoke NEPA requirements." *Slater II*, 243 F.3d at 279; *see Md. Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1043 (4th Cir. 1986). However, those cases were decided *before* Congress amended § 4336e to clarify "the amount of federal involvement necessary to trigger the applicability of NEPA." *See S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572 (quotation omitted). As such, their judicial gloss on an obsolete version of the statute has little value here. *See, e.g.*, *United States v. Woodard*, 938 F.2d 1255, 1258 n.4 (11th Cir. 1991) ("[W]e have no doubt that a clear change in the law by Congress could also justify a panel of this court in not following an earlier panel's decision, where the prior panel's decision was based on legislation that had been changed or repealed." (citing *Davis v. Estelle*, 529 F.2d 437, 441 (5th Cir. 1976))); Scalia & Garner, *supra*, at 257 ("The new text is the law, and where it clearly makes a change, that governs."). In its operative form, NEPA makes clear that the absence of federal funding renders an action "non-Federal," and thus not subject to the EIS requirement. 42 U.S.C.

§ 4336e(10)(B)(i).

Here, no federal dollars have been expended on the construction or use of the Facility.  DE 21-2 ¶ 4; DE 21-1 ¶ 5.  DHS has "announced" that it would commit $600 million to a "Detention Support Grant Program," which would help fund state efforts to house illegal aliens in "short-term holding facilities."  But that planned program has not been "finalized" yet, and DHS has not received, processed, or approved any applications for funding, let alone any regarding the Facility.  DE 21-2 ¶¶ 3–4.  Even so, the district court concluded that construction of the Facility was "fully funded by the federal government."  DE 131 at 52.  In reaching that conclusion, the district court largely relied on public statements by DHS Secretary Noem and Governor DeSantis, as well as a court filing by the Department of Justice in another case, representing that the Facility would be funded by the federal government.  *Id*. at 62–63, 62 n.27.

To the extent the district court took these statements to mean that Florida may one day be reimbursed for its expenditures on the Facility, such an expectancy is insufficient as a matter of law to "federalize" the action.  *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573 ("The possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely." (citing *Atlanta Coal. on the Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979))); *see also Boston v. Volpe*, 464 F.2d 254, 258 (1st Cir. 1972) (a State's "present intention eventually to seek federal funds" does not make action "a federal

project"); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 197 (D.C. Cir. 2003) ("That the parties anticipate, even intend, future federal funding does not ensure it will come about." (citation omitted)). Nor does it matter that FDEM was once the "only eligible applicant" that could potentially receive funding.[6] DE 21-2 ¶ 3; DE 131 at 64. Given the uncertainties inherent to grant allocations and the "wide gulf between what a state may want and what the federal government is willing to provide," *Macht v. Skinner*, 916 F.2d 13, 17 (D.C. Cir. 1990), courts have resisted deeming a state-initiated project "federal" before a "decision had been made" on a "formal application for the funds," *Indian Lookout All. v. Volpe*, 484 F.2d 11, 17 (8th Cir. 1973) (citing *Boston*, 464 F.2d at 259); *see Boston*, 464 F.2d at 259 ("[A] tentative allocation, followed by an application for airport development aid, does not so federalize a project that all work must stop until a satisfactory environmental impact statement has been issued by a putative federal grantor."); *Atlanta Coal.*, 599 F.2d at 1347 (finding no federal action in absence of a "commitment by any federal agency to fund" the project); *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1135 (5th Cir. 1992) (finding no federal action where, "[i]n actuality, no federal funds have been requested or spent, and no federal approvals have been

---

[6] Other States have since announced their intent to open facilities to detain illegal aliens. *See* Press Release, U.S. Dep't of Homeland Sec., Cornhusker Clink: A New Partnership with DHS and the State of Nebraska to Expand Detention Space (Aug. 19, 2025); Press Release, U.S. Dep't of Homeland Sec., The Speedway Slammer: A New Partnership with DHS and the State of Indiana to Expand Detention Space (Aug. 5, 2025).

given"). We will do the same.

And to the extent the district court credited those "public assertions of federal funding" as establishing by a preponderance that "the reimbursement funding decision has in fact been made," we have no trouble concluding that its finding was clearly erroneous. DE 131 at 63; *see Lee*, 915 F.3d at 1317. We do not do so lightly: Clear error is "an exacting standard" under which we are required to accept the district court's finding of fact so long as the "the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metropolitan Dade County*, 122 F.3d 895, 904 (11th Cir. 1997) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). It is simply not plausible on this evidence, however, that a funding decision with any legal effect has been made here.

To receive funding under the Detention Support Grant Program, FDEP will need to send an application to FEMA and comply with a host of regulatory prerequisites in support of that application. *See* DE 21-2 ¶ 4; *cf.* 44 C.F.R. § 206.202(e)(1) ("Before [FEMA] obligate[s] any funds to the State, the recipient must complete and send to the Regional Administrator a Standard Form (SF) 424, Application for Federal Assistance, and a SF 424D, Assurances for Construction Programs."). It is undisputed that FDEP has not done that. DE 21-2 ¶ 3. Without an application, there is simply nothing on which a decision can be made. *See* 44 C.F.R. § 206.202(b)(4) (obligating the State to submit "documents *necessary* for the award of grants" (emphasis added)); *cf. Save Barton Creek*, 950 F.2d at 1136

("Until there has been a 'proposal,' and until there has been a 'rec-
ommendation or report' on that proposal, there is no requirement
for an EIS." (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 405–06
(1976))).

None of the statements on which the district court relied
changes that.  Again, obtaining funding from the federal govern-
ment for a state project requires completing a formal and technical
application process; a governor cannot apply for FEMA aid via
press conference, *see* 44 C.F.R. § 206.202(c) (outlining procedure for
requesting grant), and a Facebook post does not somehow transfer
funds from the federal fisc to Florida, *see* 2 C.F.R. § 200.211 (outlin-
ing complex procedure for Federal award notices); 2 C.F.R. pt. 200,
app. I, § (b)(7)(i) (same); *see also Nat'l Parks Conservation Ass'n v. Nor-
ton*, 324 F.3d 1229, 1238 (11th Cir. 2004) ("[N]othing that the
[agency] has done (or refused to do) to date can be deemed the
'consummation' of its decisionmaking process . . . [if there re-
mained] several administrative steps that necessarily would be
taken before the application, once filed, would be conclusively ap-
proved or denied." (first citing *City of San Diego v. Whitman*, 242 F.3d
1097, 1101 (9th Cir. 2001); then citing *Mobil Expl. & Producing U.S.,
Inc. v. Dep't of Interior*, 180 F.3d 1192, 1198 (10th Cir. 1999)); *Schism
v. United States*, 316 F.3d 1259, 1283 (Fed. Cir. 2002) (suggesting "an
officer or employee of the United States government" may not be
able to "obligate the government to spend monies that had not yet
been appropriated unless such contract or obligation was author-
ized by law").  It is wholly unreasonable to conclude from the na-
ked assurances of politicians and lawyers that the Facility *is*

federally funded when not only is the record devoid of credible evidence that a legally binding payment decision has been made, but the record undisputedly contradicts that finding. DE 21-2 ¶ 3. We are thus "left with a definite and firm conviction" that the district court clearly erred in finding that the funding decision has been made. *Eng'g Contractors*, 122 F.2d at 904 (quoting *Anderson*, 470 U.S. at 573).

We can also conclude that the "operations" of the Facility are not federally funded either. When ICE procures detention space from a State facility, "it pays for that space via its appropriation for Operations and Support, which includes funding for enforcement, detention and removal operations." DE 21-1 ¶ 9. It is undisputed that ICE has not procured any detention space from Florida at the TNT Site. *Id*. ¶ 10. Nor are any ICE contractors operating the Facility. *Id*. ¶¶ 9–10. Rather, the Facility is wholly run by Florida State troopers who draw their salary from the Florida State treasury. *See* DE 119. So, the Florida-funded and Florida-operated detention activities occurring at the Site do not conceive a "major federal project" either.[7]

---

[7] Both the district court and the Plaintiffs claim that certain 287(g) agreements between DHS and Florida law enforcement place DHS in effective control of the "operations" of the Facility because the State immigration operations taking place at the Site are subject to DHS standards, supervision, and direction, transforming the Facility into major federal action. We need not address this argument in any depth, because the absence of federal funding addressed by our analysis above disposes of this case in accordance with clear congressional command. Nevertheless, we note that the "minimal Federal involvement" created by the 287(g) agreements does not afford any federal agency "control

There may come a time when FDEP applies for FEMA funding. If the Federal Defendants ultimately decide to approve that request and reimburse Florida for its expenditures related to the Facility, they may need to first conduct an EIS. *See Macht*, 916 F.2d at 17 ("An adequate EIS would, of course, be a necessary prerequisite for the expenditure of federal funds on the project."). But, having not yet formally "committed to funding that project," the Federal Defendants have taken no "major federal action" subjecting them to the procedural requirements of NEPA. *Atlanta Coal.*, 599 F.2d at 1340. And because the Federal Defendants were not "required" to complete an EIS, the Plaintiffs' APA claim based on the Federal Defendants' failure to do so is foreclosed as a matter of law. *Norton*, 542 U.S. at 64. For the foregoing reasons, we conclude that the Defendants are substantially likely to succeed on the merits of this claim.

*    *    *

We flag an additional aspect of the district court's order that further undermines our confidence in the district court's reasoning

---

[over] the outcome of the project," in this case the Facility as constructed and operated at the state's discretion. 42 U.S.C. § 4336e(10)(B)(i); *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573 ("NEPA applies only when there is federal decision-making, not merely federal involvement in nonfederal decision-making.") (although abrogated on other grounds by Congressional statute, *see supra* at 17, this quote is persuasive as it is consistent with Congress's amendment). The Facility is a site built, led, operated, and funded unilaterally by a state government—in accordance with the state's laws—at which the state retains discretionary control over who is detained at the facility, all of which adds up to *state* control over the project's outcome, not federal control.

and provides support for our conclusion that the Defendants are likely to prevail on appeal.

Specifically, we think the district court erred in finding that the defense of improper venue was waived by the Defendants' failure to argue it in their initial responses to the motion for a temporary restraining order.[8] No one disputes that the Defendants did

---

[8] The Plaintiffs assert that we lack jurisdiction to review the venue issue on interlocutory appeal. The Plaintiffs are incorrect. To support that argument, they cite to a handful of out-of-circuit or otherwise inapposite cases. *See Middlebrooks v. Smith*, 735 F.2d 431, 433 (11th Cir. 1984) (holding transfer orders, standing alone, are "non-appealable interlocutory orders" (citing *Stelly v. Emps. Nat'l Ins. Co.*, 431 F.2d 1251 (5th Cir. 1970))); *In re Macon Uplands Ventures*, 624 F.2d 26, 27–28 (5th Cir. 1980) (holding separate "[o]rders of transfer and consolidation are interlocutory and are not appealable" (first citing *Garber v. Randell*, 477 F.2d 711, 714–15 (2d Cir. 1973); then citing *Stelly*, 431 F.2d at 1253)); *Jones v. InfoCure Corp.*, 310 F.2d 529, 537 (7th Cir. 2002) (declining to exercise pendent appellate jurisdiction over transfer order that was "not sufficiently closely related" to the preliminary injunction); *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 548 (D.C. Cir. 1992) (explaining review of transfer order available discretionarily when closely related to the injunction). What they do not cite to is our binding precedent recognizing that it "is settled that an appellate court that has jurisdiction over an interlocutory order containing injunctive relief may reach and decide other aspects of that order even though the others would not be reviewable independently by interlocutory appeal." *Myers v. Gilman Paper Corp.*, 544 F.2d 837, 847 (5th Cir. 1977) (first citing *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 287 (1940); then citing *Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1091 (5th Cir. 1973); and then citing Chas. A. Wright, *Law of Federal Courts* § 102 (2d ed. 1970))); *see Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.2d 1499, 1509 (11th Cir. 1990) ("Pendent jurisdiction is properly exercised over nonappealable decisions of the district court when the reviewing court already has jurisdiction over one issue in the case." (first citing *Myers*, 544 F.2d at 847; then citing *Broughton v. Courtney*, 861 F.2d 639, 641 n.1 (11th Cir.1988); and then citing 9 J.W. Moore, *Moore's Federal Practice*

not raise the issue of venue in their initial responses to the Plaintiffs' motion for a temporary restraining order. DE 16; DE 21. The Defendants, however, argued venue in supplemental responses to the motion, in which they separately asked the district court to either dismiss the claims for which venue in the Southern District of Florida was improper or transfer them to the Middle District. DE 50; DE 60. The Defendants thus properly asserted the defense of improper venue "by motion" under Fed. R. Civ. P. 12(b)(3). And, at the parties' first court appearance, the district court accepted as much, stating on the record that both parties' "supplemental responses" were "not technically supplements," and, a result, "everyone's supplement is going to be recognized." DE 65-1 at 8.

Under Rule 12, a party waives the defense of venue by "failing to either: (i) make it by motion under this rule; or (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course." Fed. R. Civ. P. 12(h)(1)(B). The district court, citing an out-of-circuit district court case from California, determined that an "opposition to a motion for preliminary injunction" counts as a "first responsive pleading." DE 131 at 22–

---

¶ 110.25)); *cf. Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (noting that decisions of the former Fifth Circuit rendered prior to close of business on September 30, 1981, are binding on the Eleventh Circuit); *see also* Chas. A. Wright & A.R. Miller, *Federal Practice and Procedure* § 3921.1 (3d ed. 2025) ("A wide variety of other matters [have] been reviewed as within the proper scope of an interlocutory injunction appeal. . . . Issues of personal jurisdiction, venue, transfer, and abstention may be reviewed."). We remain duty-bound to apply *Myers* and its progeny.

23.  But the district court misread or misapplied the plain text of the Federal Rules of Civil Procedure.

There is a closed universe of documents that constitute pleadings within the plain meaning of Rule 7: "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer." Fed. R. Civ. P. 7(a). In case the Rule is not clear enough, we've also held that "[u]nder the well-settled doctrine of *inclusio unius, exclusio alterius*, the listing of some things implies that all things not included in the list were purposefully excluded. [Therefore,] Rule 7 explicitly excludes everything else [not enumerated] from its definition of pleadings." *Burns v. Lawther*, 53 F.3d 1237, 1241 (11th Cir. 1995) (citation omitted).  A response to a motion for a temporary restraining order is not a pleading under the Rules, and a party's decision not to challenge venue therein does not amount to waiver.  The district court's finding to the contrary was erroneous.

In light of the district court's erroneous conclusion on waiver, we are skeptical of its cursory analysis of the merits of the venue issue.[9]  That said, we refrain here from wading into the

---

[9] For example, we are concerned that the district court did not properly construe the import of *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366 (11th Cir. 2003) in analyzing "whether a substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of Florida.  *See* 28 U.S.C § 1391(b)(2).  Specifically, we note that a number of the activities and omissions the district court relied on to find a sufficient nexus to the Southern

Defendants' likelihood of success on their venue defense and leave this matter to the merits panel.

### B.    Irreparable Injury and the Balance of the Equities

In addition to the likelihood of success on the merits, a court considering whether to stay a preliminary injunction must also consider whether the party seeking a stay will be irreparably injured in the absence of one, whether the stay will substantially injure the opposing parties, and the public interest. *Nken*, 556 U.S. at 434; *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1280 (11th Cir. 2020). Where the government is the party opposing the preliminary injunction, the balance of the equities and the public interest "merge." *Nken*, 556 U.S. at 435. We conclude that the Defendants have satisfied all remaining factors of this traditional stay inquiry.

The Defendants have shown that they will suffer irreparable harm absent a stay. As the Supreme Court has noted, a State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see also Trump v. CASA, Inc.*, 606 U.S. ___, 145 S. Ct. 2540, 2562 (2025) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers))). Here, the district court's

---

District do not appear to "directly give rise" to the Plaintiffs' NEPA claim. *Jenkins Brick Co.*, 321 F.3d at 1371. And we question the district court's implication that the location of the Site itself is somehow peripheral to the events giving rise to the claim.

injunction stymies Florida's obligation to carry out its statutorily mandated duty to "use best efforts to support the enforcement of federal immigration law," Fla. Stat. § 908.104(1), and hamstrings its ability to "meet[ ] the dangers presented to th[e] state and its people by emergencies," *see id*. § 252.36(1)(a), (6)(b) (authorizing the Governor to "[u]tilize all available resources of the state government and of each political subdivision of the state, as reasonably necessary to cope with the emergency"). Florida will undoubtedly be harmed if it cannot "apply its own laws" to respond to an immigration crisis and serve the public interest. *See Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018).

For similar reasons, the Federal Defendants will likewise be irreparably injured absent a stay. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). The Federal Defendants have established that the district court's injunction will inevitably compromise DHS's ability to keep criminal aliens detained, protect the law-abiding public, enforce immigration laws, and maintain border security. We think that is enough to show irreparable harm. *See Swain*, 958 F.3d at 1090 (holding that the government defendants had shown irreparable injury where, absent a stay, they would "lose the discretion vested in them" by law to "allocate scarce resources among different county operations necessary to fight the pandemic").

Additionally, the forced shuttering and dismantling of the Facility will come at a significant cost to the State. According to

Ian Gadea-Guidicelli, FDEM's State Emergency Response Team Chief and Response Bureau Chief, complying with the district court's order to dismantle fencing, Sunbelt lighting fixtures, and "all generators, gas, sewage, and other waste and waste receptacles that were installed to support th[e] project" will cost the State between $15 and 20 million.  If the project is dismantled, FDEM would need to spend the same amount to reinstall those same structures—a pointless endeavor if the injunction is ultimately dissolved. DE 137-2 ¶¶ 2–3; *see Rostker v. Goldberg*, 448 U.S. 1306, 1310 (1980) (assigning "palpable weight" to the consideration that "preparations will have to be replicated at considerable expense" if the government were to prevail on the merits).  The Facility has been operational since July of this year, and, as we've already discussed, no federal funds have passed into Florida's hands for its construction.  Any funds that have been spent are, therefore, unrecoverable, weighing in favor of a stay.  *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. ___, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025) (per curiam) ("[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'" (quoting *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers))); *Mori v. Boilermakers*, 454 U.S. 1301, 1303 (1981) (Rehnquist, J., in chambers) (granting application for stay of mandate where the applicants had a reasonable probability of success on the merits and "funds held in escrow . . . would be very difficult to recover should applicants' stay not be granted"); *Georgia v. President of the U.S.*, 46

F.4th 1283, 1302 (11th Cir. 2022) ("[U]nrecoverable monetary loss is an irreparable harm.").

It is entirely unclear to us, moreover, how the district court concluded that it could order the proactive dismantling of the Facility by way of a mandatory preliminary injunction. If there were a substantial likelihood that the Plaintiffs would succeed on their NEPA claim (and as we've already explained, there isn't), the appropriate remedy at this stage might, at most, have been to enjoin the further use of or construction at the Facility pending completion of an EIS, not the affirmative expenditure of public monies to take it apart. *See Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) (holding that a "mandatory [preliminary] injunction" affirmatively ordering a party to act, especially one "restrain[ing] an agency . . . from exercising its statutory functions," "should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party"); *Cable Holdings of Battlefield, Inc. v. Cooke*, 764 F.2d 1466, 1474 (11th Cir. 1985) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper."). This is particularly true in light of the Supreme Court's admonition to the federal judiciary that "[e]ven if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS," *Seven Cnty.*, 145 S. Ct. at 1514, and not to "'interject itself within the [agency's] area of discretion . . . as to the choice of the action' to be taken by the agency," *id.* (quoting *Strycker's Bay Neighborhood*

*Council, Inc. v. Karlen*, 444 U.S. 223, 227–28 (1980) (per curiam)). For these reasons, the irreparable-harm factor weighs heavily in favor of a stay.

Finally, the balance of equities and our concern for the public interest tip also in favor of the Defendants. As to the Federal Defendants, "[d]iscretion in the enforcement of immigration law embraces immediate human concerns," *Arizona*, 567 U.S. at 396, and the "problems posed" by the "influx of illegal migration," including risks to safety, "must not be underestimated," *id.* at 398. The Supreme Court has held that "the public interest demands effective measures to prevent the illegal entry of aliens" at the border, in light of the "significant economic and social problems" stemming from illegal immigration. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Given that the federal government has an undisputed and wide-reaching interest in combatting illegal immigration, and that illegal immigration is a matter of national security and public safety, we think the injunction issued below goes against the public interest.

While the power to determine immigration policy lies with the Federal government, "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[ ] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. Many of those harmful consequences are present here. Governor DeSantis has declared a state of emergency under Florida law because Florida is experiencing an "immigration crisis of unprecedented magnitude." DE 137-

1 ¶ 3.   According to Joseph Harrison, a Lieutenant Colonel and Deputy Director for the Florida Highway Patrol ("FHP"), forcing Florida to shutter the detention facility will lead to overcrowding and will kneecap the State's immigration-enforcement efforts.  *Id.* ¶¶ 5, 6.  Furthermore, he offers non-speculative evidence that insufficient detention space will lead to detainees being released back into the community: "[B]efore the detention facility at the Dade-Collier Training and Transition Airport was established," he explains, "ICE regularly informed FHP officers that the federal government lacked sufficient detention capacity to detain illegal aliens intercepted by FHP," and, "[i]n those instances, FHP was forced to let those illegal aliens go."  *Id.* ¶ 5.  We are convinced that, if the injunction were to stay in place, it would bring the State's already stressed and overcrowded system to a breaking point.

On the other hand, the Plaintiffs have submitted declarations indicating that the conversion of the Site from a working airport into a detention center will have a range of deleterious effects on the environment, including "light, water, and noise pollution, increased vehicular traffic, wildlife habitat degradation, and waste management issues."  These declarations assert that these effects may "negatively impact" the ecosystem of the Everglades and the survival of various threatened or endangered species, although it is unclear whether these declarations have accounted for the Site's former use as an airport in order to establish a reliable baseline to evaluate possible future environmental impacts.  DE 5-2 ¶¶ 13–14. We need not, however, wade into that issue here.  As the Supreme Court reminds, there is no governmental project, especially one

enacted in exigent circumstances, that does not pose some coun-tervailing risk.  *Cf. Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (holding that the balance of equities and consideration of overall public interest weighed in favor of the Navy, in spite of the fact that the Navy's use of "mid-frequency active" sonar might cause "harm to an unknown number of the marine mammals," be-cause blocking the Navy from using this technology would jeop-ardize the "safety of the fleet").  Our job, at this stage, is to balance the equities, as well as the overall public interest, and we are com-pelled in this case to conclude that these factors favor the Defend-ants: While the environmental effects mentioned by the Plaintiffs may result in down-the-line harm, the injuries facing the Defend-ants and the public are critical, immediate, and concrete.

We conclude that the balance of the harms and our consid-eration of the public interest favor a stay of the preliminary injunc-tion.

## IV.    CONCLUSION

For the reasons stated, we **GRANT** the Defendants' motions to stay the August 21, 2025, preliminary injunction pending appeal, and **STAY** further merits proceedings below until resolution of this appeal.

The Florida Division of Emergency Management's motion for administrative stay is **DENIED as moot**.

25-12873                JORDAN, J., Dissenting                1

JORDAN, Circuit Judge, Dissenting:

Given the applicable burden on litigants who move for a stay, the deferential abuse of discretion standard that governs review of a preliminary injunction, and the clearly erroneous standard that limits appellate review of factual findings, the stay motion filed by the state and federal defendants should be a relatively simple denial. The majority, however, essentially ignores the burden borne by the defendants, pays only lip service to the abuse of discretion standard, engages in its own factfinding, declines to consider the district court's determination on irreparable harm, and performs its own balancing of the equities. I therefore respectfully dissent from its decision to grant a stay of the preliminary injunction.

## I

I start with an overview of the applicable legal principles and then pivot to a summary of the relevant facts.

### A

The National Environmental Policy Act requires a federal agency to prepare an environmental impact statement (an EIS) "with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). To trigger the EIS requirement, the action in question must be a "major [f]ederal action" and "a final agency action" under the Administrative Procedure Act. *See* §§ 4332(C), 4336(a)(1). A "major federal action" is "an action that the agency . . . determines is subject to substantial [f]ederal control and responsibility,"

but does not include "a non-[f]ederal action . . . with no or minimal [f]ederal funding; . . . or . . . with no or minimal [f]ederal involvement where a [f]ederal agency cannot control the outcome of the project." § 4336e(10)(A)–(B).

NEPA does not provide for a private right of action. But an agency's failure to prepare an EIS can be challenged under the APA, 5 U.S.C. § 706(2)(A), as an action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See, e.g.,* 5 U.S.C. § 551(13) (providing that "agency action" includes a "failure to act"); *Lowman v. F.A.A.*, 83 F.4th 1345, 1356 n.12 (11th Cir. 2023) ("NEPA challenges are brought under the [APA]."). [1]

As a general matter, the failure of a federal agency to prepare an EIS can constitute final agency action under the APA. *See Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (explaining that the "alleged failure to comply with NEPA constitutes 'final agency action'" if the agency determines that it was "not required to comply"). And "[w]hen a federal agency is found to have reached a decision on a proposed construction project without complying with NEPA-mandated procedures, the normal remedy afforded by the courts, where appropriate, is an injunction prohibiting construction and maintaining the status quo

---

[1] Apparently seeking to minimize the importance (and/or significance) of the plaintiffs' claims, the majority spends some time explaining that the NEPA's requirement that an EIS be prepared in certain scenarios is a procedural, and not a substantive, right. But then the majority acknowledges that this case is not about whether an EIS is sufficient, but rather about the failure to prepare an EIS.

until the agency has complied with the statutorily-required procedures." *Richland Park Homeowners Ass'n, Inc. v. Clark*, 671 F.2d 935, 941 (5th Cir. 1982). *See also* 16 Melanie B. Rother et al., Business and Commercial Litigation in the Federal Courts § 176:22 (5th ed. & Nov. 2024 update) ("[T]he general remedy for a NEPA violation is a remand to the agency to stay the proposed project until it prepares and considers an adequate environmental analysis.").

## B

The Big Cypress National Preserve, located in the Greater Everglades west of Miami along Tamiami Trail, was created by Congress in the 1970s "to assure the . . . protection of the natural scenic, hydrologic, floral and faunal, and recreational values of the Big Cypress Watershed . . . and to provide for the enhancement and public enjoyment thereof." 16 U.S.C. § 698f(a). It is home to the Miccosukee Tribe, whose traditional rights to hunt, fish, and trap, and to observe religious ceremonies, were expressly protected in the Preserve's enabling legislation. *See* § 698j.

The Dade-Collier Training and Transition Airport (the TNT Site), which is owned by Miami-Dade County and is located within the Preserve, contains a legacy runway. The runway is used mainly by training pilots for touch and go maneuvers. *See* D.E. 116-1 ¶ 13.[2]

---

[2] Unlike the district court, the majority emphasizes some other facts about the use of the legacy runway (e.g., the number of training flights in the six months prior to the construction of the detention center) in an effort to suggest that the plaintiffs' lawsuit and environmental concerns are much ado about

In June of 2025, Florida decided to build an immigration detention facility, dubbed "Alligator Alcatraz," in a portion of the TNT Site in the Big Cypress Preserve to "assist the federal government with immigration enforcement." Pls.' Exh. 51. Significantly, testimony at the evidentiary hearing before the district court indicated that "the facility was the product of a [Department of Homeland Security] request, that there would be a federal reimbursement to [Florida] for the facility's costs, that detainees are dropped off at the site by federal agents, and that [Immigration and Customs Enforcement] inspects the facility." *Friends of the Everglades v. Noem*, ___ F.3d ___, 2025 WL 2423258, at *3 (S.D. Fla. Aug. 21, 2025).

DHS Secretary Kristi Noem announced that the detention facility "will be funded" by the federal government. *See* Pls.' Exh. 44. Governor Ron DeSantis echoed Secretary Noem's pronouncement, confirming prior to construction that the federal government will "fully fund" the facility. *See Noem*, 2025 WL 2423258, at *26 (referring to remarks Governor DeSantis made at a press conference).[3]

---

nothing. Again, this case is not about the content or sufficiency of an EIS, but rather about the failure of a federal agency to prepare an EIS.

[3] The remarks of Secretary Noem and Governor DeSantis are admissible as the admissions of party opponents under Federal Rule of Evidence 801(d)(2). Secretary Noem and Governor DeSantis are obviously agents of the United States and Florida, which are party opponents of the plaintiffs. *See United States v. Pacchioli*, 718 F.3d 1294, 1305 (11th Cir. 2013) (explaining that Rule 801(d)(2) applies to the "agents of party opponents").

Secretary Noem and Governor DeSantis were not the only officials who said that the federal government will pay for the construction of the detention facility. David Richardson, the Acting Administrator of the Federal Emergency Management Agency, submitted a declaration stating that "DHS/FEMA announced $600 million in federal funding for the Detention Support Grant Program" and that "[t]he only eligible applicant" under the DSGP is Florida. *See* D.E. 21-2 ¶ 3.

Miami-Dade County requested an EIS, but none was forthcoming and construction proceeded. The detention facility became operative by July 1, 2025, following an inspection by Immigration and Customs Enforcement. *See* Pls.' Exh. 44. Florida officials explained that the facility was built "in coordination with" the federal government. *See id.*

The detention facility is sprawling. It covers 800,000 square feet (about 18.3 acres) in new paving, can house thousands of detainees, and accommodates up to 1,000 staff members. *See* D.E. 113 at 28, 78. The facility cost nearly $250 million to build. *See* D.E. 130 at 53. "[F]ederal agencies and agents, not [Florida Highway Patrol] troopers, . . . transport detainees to the TNT [S]ite, and federal agencies . . . carry out deportations using federal aircraft." *Noem*, 2025 WL 2423258, at *4.

Testimony at the evidentiary hearing established that the detention center "did not appear to have any meaningful stormwater management system," and that the new paving "risked disrupting the nutrient balance of the surrounding, connected wetlands by

increasing runoff," and "could lead to large increases in runoff contaminated with polycyclic aromatic hydrocarbons . . . and other carcinogens into the surrounding wetlands." *Id.*  In addition, there was evidence that 80% of the Miccosukee Tribe's "residences, two schools, and the Tribal governmental building, are all located in the Miccosukee Reserved Area a few miles southeast of the TNT [S]ite in Miami-Dade County." *Id.*  "[U]ncontained wastewater or run-off leaving the TNT [S]ite will likely flow into the [Big Cypress Preserve], Everglades National Park, and eventually into the Miccosukee Reserved Area." *Id.*[4]

The district court issued an injunction against the state and federal defendants after finding that the plaintiffs and the intervenor, the Miccosukee Tribe (whom I refer to collectively as the plaintiffs), had demonstrated a substantial likelihood of success on their claim that the federal defendants violated NEPA by failing to prepare an EIS for the construction of the detention center.  *See id.* at *19–*33.  The injunction forbade new construction or installation of things like paving, fencing, and lighting at the TNT Site; prohibited new detainees from being admitted to and housed in the detention center; and required the removal, within 60 days, of the

---

[4] The majority completely omits these possible environmental consequences in its description of the facts, and mentions them only in a single paragraph at the end of its order while saying it does "need not . . . wade into" those consequences because every governmental project entails some "countervailing risk."  This is, in my view, improper *de novo* weighing and balancing of the facts and equities by an appellate court which is supposed to be conducting deferential abuse of discretion review.  More on this later.

temporary fencing installed (to allow Miccosukee Tribe members access to the TNT Site consistent with the access they enjoyed before the erection of the detention facility), certain lighting fixtures and any additional lighting installed for the use of the property as a detention facility, and all generators, gas, sewage, and other waste receptacles that were installed to support the detention facility. *See id.* at *34.[5]

## II

"In reviewing a motion to stay a preliminary injunction pending appeal, we consider the following factors: (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies." *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1176 (11th Cir. 2020) (internal quotation marks and citation omitted). Although the majority doesn't mention this point, the

---

[5] The state and federal defendants do not take issue with the scope of the preliminary injunction in their motion for a stay, so there is no need to address the district court's chosen remedy. Given the state and federal defendants' failure to challenge the remedy, I do not understand why the majority suggests that the remedy may be overbroad. We operate in an adversarial system, and it seems odd (and improper) to raise an issue *sua sponte* (and provide an advisory opinion) in favor of the parties which bear the burden of obtaining extraordinary stay relief. *See United States v. Campbell*, 26 F.4th 860, 893–99 (11th Cir. 2022) (en banc) (Newsom & Jordan, JJ., dissenting). Moreover, a panel should only raise an issue *sua sponte* in "extraordinary circumstances," *see id.* at 873 (majority opinion), and no such circumstances exist here.

state and federal defendants, as the parties seeking a stay, "bear[ ] the burden of showing that the circumstances justify an exercise of [our] discretion." *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). And the issuance of a stay, even if the applicable criteria are satisfied, is not a matter of right but one of discretion. *See id*. at 433 ("A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case.") (alteration deleted and internal quotation marks and citations omitted).

The grant or denial of a preliminary injunction is a "discretionary decision." *Benisek v. Lamone*, 585 U.S. 155, 160 (2018). The abuse of discretion standard, which governs our review of the preliminary injunction, is therefore "deferential." *United States v. Tsarnaev*, 595 U.S. 302, 323 (2022). In practice this means that the district court is given a "wide range of choice." *BLOM Bank SAL v. Honickman*, 145 S.Ct. 1612, 1623 (2025). *See also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002) ("We begin our review by noting how deferential it is. Preliminary injunctions are, by their nature, products of an expedited process often based upon an underdeveloped and incomplete evidentiary record. . . . The expedited nature of preliminary injunction proceedings often creates not only limits on the evidence available but also pressure to make difficult judgments without the luxury of abundant time for reflection. Those judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them

aside unless the district court has abused its discretion in making them.") (citations omitted).

So the state and federal defendants have to make a strong showing that the district court abused its discretion in concluding, among other things, that the plaintiffs established a substantial likelihood of success on the merits and a likelihood of irreparable harm, and that the other preliminary injunction factors weighed in their favor.  *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 934 (1975) (finding no abuse of discretion in the district court's grant of a preliminary injunction, and explaining that "[t]his is the extent of our appellate inquiry, and we therefore 'intimate no view as to the ultimate merits of respondents' contentions'") (alteration deleted and citation omitted); *Cafe 207, Inc. v. St. Johns Cnty.*, 989 F.2d 1136, 1137 (11th Cir. 1993) ("Whether the district court's determination of this point is right or wrong, the record before us indicates no abuse of discretion.  Therefore, we will not disturb the decision of the district court.  We emphasize that '[t]his affirmance is based solely upon the breadth of the district court's discretion in this type of matter.'  As a result of the limited scope of our review, '[w]e express no opinion as to the likelihood that [the plaintiff] will or will not succeed on the merits.'") (citations omitted); *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1320 (11th Cir. 2010) ("[T]he district court's conclusion as to the likelihood of irreparable harm was not an abuse of discretion.").  Needless to say, this is a difficult burden.

The majority cites the abuse of discretion standard in its order, but its analysis is devoid of any deference to the decision of the

district court.  On the contrary, the majority's order reads like that of a trial-level factfinder exercising discretion in the first instance.

Our review is even narrower when it comes to the district court's factual findings.  We can set those findings aside only if they are clearly erroneous.  *See Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir. 2024).  "Under that standard, we may not reverse just because we 'would have decided the [matter] differently.'  A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern."  *Cooper v. Harris*, 581 U.S. 285, 293 (2017) (citations omitted).  The majority's failure to properly apply the clear error standard leads me to repeat what I said a few years ago: "If this trend continues, the bench and bar will be forgiven for thinking that a district court's factual findings are only inconvenient speed bumps on the road to reversal."  *Otto v. City of Boca Raton, Fla.*, 41 F.4th 1271, 1285 (11th Cir. 2022) (Jordan, J., dissenting from the denial of rehearing en banc).[6]

In my view, the district court did not abuse its discretion in issuing a preliminary injunction.  Based on the evidence presented,

---

[6] As some of our sister circuits have explained, in reviewing the grant or denial of a preliminary injunction appellate courts view the record in the light most favorable to the prevailing party.  *See Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 316 n.1 (3d Cir. 2015); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 840 (9th Cir. 2001); *Medtronic, Inc. v. Catalyst Rsch. Corp.*, 664 F.2d 660, 665 (8th Cir. 1981).  This view is consistent with our ability to "infer[ ] from a district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated."  *United States v. $242,484.00*, 389 F.3d 1149, 1154 (11th Cir. 2004) (en banc).

the court did not clearly err in its factual findings or otherwise commit a "clear error of judgment," *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc), in concluding (a) that the plaintiffs (i) demonstrated a substantial likelihood of success on their NEPA claim and (ii) showed that they would likely suffer irreparable harm absent preliminary injunctive relief, and (b) that the balance of equities and the public interest favored the plaintiffs.

## III

In order to prevail on their stay petition, the state and federal defendants must make a strong showing that the district court abused its discretion in evaluating this case—the first of its kind anywhere in the country—and I do not believe they have done so. As explained below, the majority errs in concluding that the federal government's failure to conduct an EIS prior to building and operating the detention facility was neither final agency action nor major federal agency action.

## A

A federal action is major if it "significantly affect[s] the quality of the human environment[.]" 42 U.S.C. § 4332(C). The parties do not dispute that the construction and operation of the detention facility constitutes a "major" action because it required paving around 800,000 square feet of land, installed lighting impacting the sky at least 20 to 30 miles away, created housing infrastructure to accommodate thousands of detainees and many of the nearly 1,000 staff members, and required the daily movement of human waste, sewage, jet fuel, and significant traffic through the area. *See*

*Noem*, 2025 WL 2423258, at *20. The state defendants contend, however, that this major action is not "federal" given Florida's role in initiating construction and operation of the detention facility. *See* FDEM Mot. to Stay at 28–31.

**1**

NEPA only imposes procedural requirements on "major [f]ederal action," which is action "subject to substantial [f]ederal control and responsibility." 42 U.S.C. § 4336e(10)(A). Congress amended NEPA in 2023 to clarify that non-federal actions "with no or minimal [f]ederal funding," or "no or minimal [f]ederal involvement where a [f]ederal agency cannot control the outcome of the project," do not qualify as "major federal action[s]." § 4336e(10)(B)(i). Whether there was "no or minimal federal funding," and "no or minimal federal involvement where a federal agency cannot control the outcome of the project," turn on the evidence in the record and the district court's factual finding. *See Kleppe v. Sierra Club*, 427 U.S. 390, 400 (1976) (finding no factual predicate in the form of a proposal triggering NEPA requirements).

The district court held a four-day evidentiary hearing to answer precisely this question. It heard testimony from nine witnesses for the plaintiffs and one witness for the state defendants and federal defendants, and reviewed hundreds of pages of exhibits that detailed discussions between state and federal officials, contained statements by federal officials about having made a funding decision, and detailed agreements showing federal supervision over state officers in the facility enforcing federal immigration laws.

From this evidence the court concluded that the state action was sufficiently federalized to trigger NEPA requirements. *See Noem*, 2025 WL 2423258, at *3–*6. The court found that there was indeed a federal funding decision—DHS committed up to $600 million in federal grant money to fund state facilities housing immigrant detainees who are to be deported. State and federal officials (including FEMA's Acting Administrator) confirmed that the detention facility would be fully funded by the federal government and explained that Florida was the only qualified grant applicant. *See id.* at *2.

The district court's factual finding that a funding determination was in fact made by the federal government is reviewed only for clear error. *See Humble Gas Transmission Co. v. Miss. Power & Light Co.*, 430 F.2d 1003, 1005–06 (5th Cir. 1970) (district court's factual finding that the parties terminated their written contract by way of an oral agreement was subject to clear error review). The majority says that this determination was clearly erroneous, but a "finding that is plausible in light of the full record—even if another is equally or more so—must govern." *Cooper*, 581 U.S. at 293 (internal quotation marks and citation omitted). When high-ranking officials from the state and federal governments—Governor DeSantis, Secretary Noem, and FEMA Acting Administrator Richardson—confirm that federal dollars will completely pay for the detention facility, it is at the very least plausible to find that the federal government is footing the bill to the tune of up to $600 million. Federal funding also makes sense because DHS requested that Florida build the detention facility. The majority improperly

substitutes its own view of the evidence, and does not even attempt to apply the clear error standard.

The majority, moreover, mistakenly characterizes the lack of a formal state application for federal reimbursement as "nothing on which a [federal] decision can be made." This characterization ignores the unique factual circumstances of the case, which were laid out in detail in the evidentiary hearing before the district court. The 2023 NEPA amendments exempt non-federal actions if they involve "no or minimal [f]ederal funding." 42 U.S.C. § 4336e(10)(B)(i)(I). But they do not require the federal funds to have actually been formally awarded or disbursed by the federal government to the state prior to its undertaking the action in question, and no court has interpreted the new statutory language to impose such an extra-textual requirement. Although federal grant funding is typically awarded upon evaluation of an application for funds, the fact that there is a process to be followed does not foreclose all other circumstances in which a funding decision may in actuality have been made—which is exactly what the district court found had occurred here. The notion that Florida decided to build the detention facility without a concrete funding commitment from the federal government is squarely contradicted by the pre-construction statements of Secretary Noem and Governor DeSantis that the United States will pay for the facility in full.

Significantly, the district court also relied on evidence that "[t]he . . . detention facility is being funded from a continuing resolution for [fiscal year] 2025." *Noem*, 2025 WL 2423258, at *3

(citation omitted).  Congress has authorized $45 billion in funding through FY2029 to ICE for detention capacity; over $2 billion in funding for immigration and enforcement activities, state and local participation in homeland security efforts, and information technology investments to support immigration purposes; and over $29 billion for ICE purposes, including "expanding, facilitating, and implementing agreements" with state officials.  *See* Act of July 24, 2025, Pub. L. No. 119-21, 139 Stat. 72, 358–89.

If this were not enough, ICE policies and procedures specifically make the federal government "responsible for the installation and maintenance of the Information Technology (IT) infrastructure" that is up and running at the facility.  *See Noem*, 2025 WL 2423258, at *24 (citation omitted).  The district court found that "the IT systems at the [detention facility] were installed by ICE and are under federal control," and it is certainly plausible that a funding decision was made, at minimum, with regard to the information technology operations at the facility.  *See id.*

We have long viewed an action that may arise out of a state–federal partnership as "federal action" for NEPA purposes where it is based on "a federal agency's authority to influence nonfederal activity."  *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994).  What we said in *South Florida Water Management District*, reviewing an earlier version of NEPA, remains true today: "There are no clear standards for defining the point at which federal participation transforms a state project into federal action."  *Id.*

## 2

The majority relies on a number of cases concluding that no federal funding decision had been made when the state merely expected to be reimbursed for expenditures at some point in the future. These cases, however, are factually distinguishable because they involve general funding programs for which there were multiple eligible applicants, or projects in which the federal government was involved solely in planning or advising on construction, or in funding the planning process.

For example, in *Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission*, 599 F.2d 1333 (5th Cir. 1979), the former Fifth Circuit concluded that a plan developed by state and local authorities for which federal funds were used *solely* in the planning process did not federalize the project, even with "the presence of federal financial assistance" having been preserved further down the line. *See id.* at 1347. It ruled that future disbursement of federal funds did not sufficiently constitute federal action. *See id.*

Similarly, in *City of Boston v. Volpe*, 464 F.2d 254 (1st Cir. 1972), the First Circuit emphasized that under NEPA "responsible officials would think about environment *before* a significant project was launched; that what would be assessed was a *proposed* action, not a fait accompli; that alternatives to such action would be seriously canvassed and assayed; and that any irreversible effects of the proposed action would be identified." *Id.* at 257. It then reviewed an airport construction project and addressed whether the project was sufficiently federal. In that case, some federal funds were used in

the development of the project, which the First Circuit clarified is a frequent occurrence "at an exploratory stage." *Id.* at 258. The project, however, was "then completed through wholly local or state funding." *Id.* The First Circuit concluded that the tentative allocation of federal funds for a project, upon request by the state, did not rise to the level of federal involvement because it depended on "a single decision to fund or not to fund a project." *Id.* at 259 (citing 49 U.S.C. § 1716).

In *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193 (D.C. Cir. 2003), the D.C. Circuit determined that the *expectation* of funding *after* the construction of a rail extension was insufficient to federalize the project. *See id.* at 197. Instead, the federal government needed to have "irretrievably committed to providing funds" for the project in order for it to constitute major federal action. *See id.* (internal quotation marks and citation omitted).

Finally, in *Save Barton Creek Ass'n v. Federal Highway Administration*, 950 F.2d 1129 (5th Cir. 1992), the Fifth Circuit found no federal involvement in a case where the state had neither requested nor spent federal funds, and had received no federal approvals. *See id.* at 1135. As a result, the state was "simply building some highways for its own use." *Id.* Moreover, "the federal authorities strongly disavow[ed] any interest in these highways." *Id.*

The facts here could not be further from the circumstances presented in these cases. First, the detention facility at the TNT Site was built at the request of DHS and used for a federal purpose—to house federal immigration detainees. *See Noem*, 2025 WL

2423258, at *23–*24.  Second, public statements regarding the federal government's commitment to fund the facility—including some made pre-construction—permitted the district court to find as a matter of fact that a concrete federal funding decision had indeed been made.  This was not a project that remained "in the planning stage"—it actually advanced to the post-construction stage.  *See Atlanta Coal. on the Transp. Crisis, Inc.*, 599 F.2d at 1346.

In sum, this is not a situation where there is "no or minimal federal involvement."  *See Okeelanta Corp.*, 132 F.4th at 1344 (discussing anti-segmentation principles to prevent evasion of NEPA responsibilities "by artificially dividing a major federal action into smaller components").  Because this is a case in which the federal involvement is "so massive, so pervasive, that the acts of the state are in reality federal actions," it is subject to NEPA's procedural requirements.  *See Atlanta Coal. on the Transp. Crisis, Inc.*, 599 F.2d at 1346 (internal quotation marks and citation omitted).

**B**

The district court concluded that defendants' failure to issue an EIS prior to commencing construction constituted a final agency action under the APA.  In reaching this conclusion, the court did not commit any factual or legal error.

**1**

The APA, under which NEPA claims are brought, permits review of "final agency action[.]"  5 U.S.C. § 704.  *See also* 42 U.S.C. § 4336(a) ("An agency is not required to prepare an environmental document with respect to a proposed agency action if . . . the

proposed agency action is not a final agency action within the meaning of such term in chapter 5 of Title 5[.]")).  As noted, "[a]gency action" includes the "failure to act."  5 U.S.C. § 551(13). And a reviewing court "shall (1) compel agency action unlawfully withheld or unreasonably delayed [and] (2) hold unlawful and set aside agency action, findings or conclusions found to be (A) arbitrary, capricious . . . or otherwise not in accordance with law." § 706(1), (2)(A).  In order to be final, the "action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and it must also "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

When an agency is undertaking a major federal action that "has a reasonably foreseeable significant effect on the quality of the human environment," it must issue an EIS.  *See* 42 U.S.C. §§ 4336(b)(1), 4332(C).  Otherwise, the agency must prepare an environmental assessment (an EA) explaining why there is no "reasonably foreseeable significant effect on the quality of the human environment" such that an environmental impact statement is not necessary.  *See* § 4336(b)(2).  But an agency undertaking a major federal action cannot evade NEPA's environmental reporting requirements by simply refusing to issue an environmental document prior to undertaking the action.  *See generally Sw. Williamson Cnty. Cmty. Ass'n v. Slater*, 173 F.3d 1033, 1037 (6th Cir. 1999) ("[A]

federal agency cannot avoid application of the APA simply by re-fusing to act.").[7]

The Supreme Court has explained that an agency's failure to issue an EIS becomes ripe for judicial review at "the time at which it makes a recommendation or report on a proposal for federal ac-tion." *Kleppe*, 427 U.S. at 406 (emphasis deleted and quotation marks and citation omitted). So the failure to prepare an EIS is not a final action "during the germination process of a potential pro-posal[,]" *see id.*, or where the underlying agency action is merely a tentative agreement, as in *Pub. Citizen v. Off. of U.S. Trade Represent-atives*, 970 F.2d 916, 289–90 (D.C. Cir. 1992). But where a proposal has been agreed upon—and construction is significantly underway or completed—the time has long passed for the agency to issue an EIS or an EA, and failure to do so constitutes final agency action. *See Kleppe*, 427 U.S. at 406 n.15. *See also Catron Cnty. Bd. of Comm'rs*, 75 F.3d at 1433–34 (holding that an "alleged failure to comply with NEPA constitutes 'final agency action'" where the agency deter-mined that it was "not required to comply" with its requirements); *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007) ("[A]n

---

[7] It is worth noting that NEPA exists because "Congress recognized . . . that complex environmental cases often require exceptionally sophisticated scien-tific determinations, and that agency decisions should not be made on the basis of incomplete information." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 183 (2010) (Stevens, J., dissenting) (internal quotation marks and citation omit-ted). Failure to do so before a project commences runs the risk "that im-portant effects will . . . be overlooked or underestimated only to be discovered after . . . the die [has been] cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

agency's decision not to issue an EIS concludes the agency's proce-
dural inquiry into the environmental impact of a proposed project
and therefore constitutes a final agency action[.]").

Miami-Dade County asked for an EIS, but none was forth-
coming.  The detention facility was constructed and began operat-
ing in July of 2025 without any federal agency (e.g., DHS or FEMA)
issuing an EIS or preparing an EA.  The failure of the federal de-
fendants to prepare an EIS or EA for the construction of the deten-
tion facility constituted final agency action.  It is sophistry to pre-
tend otherwise.

**2**

There is also final agency action under the test set out in
*Spear*, 520 U.S. at 177–78.

First, the district court found that "the [detention] facility
has undergone substantial construction," including "the installa-
tion of housing units, construction of sanitation and food services
systems, industrial high-intensity lighting infrastructure, and diesel
power generators" and is "currently operational." *Noem*, 2025 WL
2423258, at *21 (alterations omitted).  This factual finding is uncon-
tested.  Based on this finding, and NEPA's requirement that an
agency prepare an EIS or EA *before* commencing construction, the
court reasonably concluded that the decision not to issue an EIS or
prepare an EA was not tentative or interlocutory.

Second, the district court found that the actions of the fed-
eral defendants adversely affected the plaintiffs.  For example, those
actions deprived the plaintiffs of the opportunity to comment on

22                        JORDAN, J., Dissenting                25-12873

the proposed action, and caused light pollution that interfered with their ability to observe the night sky. *See id*. at *22. I cannot see how this was error.

"[T]he purpose of an EIS is to provide decision makers with the information required to evaluate the environmental impact of their decision *before* they make it," and agencies must prepare an EIS prior to implementing an action so that they have time to consider any less environmentally damaging alternatives. *See Friedman Bros Inv. Co. v. Lewis*, 676 F.2d 1317, 1320 (9th Cir. 1982) (emphasis added). *See also* 42 U.S.C. § 4332(C). By declining to issue an EIS or an EA prior to initiating or substantially completing construction, the federal defendants have effectively "spoken [their] last word on the project's environmental impact," and this constitutes a final action. *See Friedman Bros Inv. Co.*, 676 F.2d at 1319. *See also Aberdeen & Rockfish R. Co. v. Students Challenging Regul. Agency Procs.*, 422 U.S. 289, 319 (1975) ("When agency or departmental consideration of environmental factors in connection with that 'federal action' is complete, notions of finality and exhaustion do not stand in the way of judicial review of the adequacy of such consideration, even though other aspects of the [action] are not ripe for review.").

## IV

Determinations about irreparable harm are reviewed for abuse of discretion. *See Gonzalez v. Gov. of Ga.*, 978 F.3d 1266, 1271–73 (11th Cir. 2020). The district court's determination that the plaintiffs will likely suffer irreparable harm if a preliminary injunction is not issued was reasonable and should be given appropriate

25-12873               JORDAN, J., Dissenting             23

deference. Environmental injury is "often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). And if such injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment. *See id.*

Based on the testimony of Dr. Christopher McVoy, a soil physicist, hydrologist, and wetland ecologist, the district court found that there was harm to the Everglades from the detention facility project through "increase[d] runoff into the surrounding, interconnected wetlands," which threatens the "extremely sensitive" hydrology of the Everglades. *See Noem*, 2025 WL 2423258, at *29. It further found that such runoff would also present risks to communities dependent on the Everglades for their water supply. *See id.* at *30.

Next, relying on the testimony of Dr. Marcel Bozas, the Fish and Wildlife Department Director for the Miccosukee Tribe, the district court found that the detention facility project would lead to habitat loss and increased mortality to endangered species. *See id.* The court further found that the increased light pollution would harm enjoyment of the night sky, undermining Big Cypress Preserve's designation as an International Dark Sky Park. *See id.* at *31. And finally, the court found that the Tribe had lost access to trails leading to the Preserve's lands for hunting and other activities due to the detention facility's operations. *See id.* (citing *Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 524, 536 (D.C. Cir.

2018), and *Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1197 (D. Az. 2024)).

The majority ignores the district court's determinations on irreparable harm and concludes that the state and federal defendants will themselves suffer irreparable harm if a stay is not granted. I will assume that the majority is right in concluding that the state and federal defendants will suffer *some* harm absent a stay. But this cannot be the end of the analysis. Where a plaintiff will suffer irreparable harm if a preliminary injunction is not issued, and the defendant will suffer harm if a stay of the preliminary injunction is not granted, a court must necessarily analyze the balance of the equities and the public interest, which merge when the government is the party opposing injunctive relief. *See Nken*, 556 U.S. at 435. *See also Trump v. Wilcox*, 145 S.Ct. 1415, 1415 (2025) (staying a preliminary injunction in part because "the Government [the defendant] faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty").

The district court properly balanced the equities and the public interest. The court considered the significant ongoing and likely future environmental harms to the plaintiffs from the detention facility, as well as the importance of immigration enforcement to the state and federal defendants. It explained that where "irreparable environmental harms are sufficiently likely, 'the balance of harms will usually favor the issuance of an injunction to protect the

environment.'" *Noem*, 2025 WL 2423258, at \*32 (quoting *Gambell*, 480 U.S. at 545). And it noted that although the state and federal defendants "repeatedly espouse the importance of immigration enforcement, they offered little to no evidence why this detention [facility], in this particular location, is uniquely suited and critical to that mission." *Id.*

The majority's inexplicable answer to the district court's irreparable harm analysis is that it "need not . . . wade into [a balancing of the equities] here" because "the injuries facing the [state and federal defendants] and the public are critical, immediate, and concrete." That cannot be right. First, the balancing of equities is a quintessential judgment call based on the exercise of discretion. *See Cumulus Media, Inc.*, 304 F.3d at 1171. The majority—whose analysis is devoid of any deference—cannot conduct abuse of discretion review by simply ignoring the determinations of the district court. Second, even if the majority could ignore those determinations, it cannot balance the equities by removing all of the weight from one side of the scales. *See Robinson*, 957 F.3d at 1176 (requiring a court reviewing a stay request to consider "whether the issuance of the stay will substantially injure the other parties in the proceeding"). That is essentially what the majority has done by refusing to acknowledge the irreparable harm faced by the plaintiffs.

## V

I respectfully dissent from the majority's decision to grant a stay of the preliminary injunction issued by the district court.