No. 25-12873

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

FRIENDS OF THE EVERGLADES and CENTER FOR BIOLOGICAL
DIVERSITY,
*Plaintiffs/Appellants*,

v.

KRISTI NOEM, Secretary of the Department of Homeland Security, et al.,
*Defendants/Appellees*.

_____

Appeal from the United States District Court for the Southern District of Florida
No. 1:25-cv-22896 (Hon. Katherine M. Williams)

_____

**OPENING BRIEF FOR THE FEDERAL DEFENDANTS**

_____

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT STANDER
*Deputy Assistant Attorney General*

MARISSA A. PIROPATO
HAYLEY A. CARPENTER
ALLEN M. BRABENDER
*Attorneys*
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, DC 20044
(202) 532-3281
allen.brabender@usdoj.gov

*Friends of the Everglades v. Noem*, No. 25-12873

# CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel hereby certifies that the following is a complete list of all the known trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the case:

1.      Ajizian, Christopher

2.      Bailey, Andrew

3.      Barta, James A.

4.      Bennett, Elise Pautler

5.      Bird, Brenna

6.      Boies Schiller Flexner LLP

7.      Bonzon-Keenan, Geraldine

8.      Brabender, Allen M.

9.      Burkhardt, Dominique

10.     Carpenter, Hayley A.

11.     Carr, Christopher M.

12.     Center for Biological Diversity

13.     Coe, Alisa

14.     Coffey Burlington, P.L.

15.     Coleman, Russel

16.     Commonwealth of Kentucky

17.     Costello, David

*Friends of the Everglades v. Noem*, No. 25-12873

18.    Crockett, Jeffrey B.

19.    Curran, Rachel

20.    DeNardi, Betsy

21.    DeSousa, Jeffrey Paul

22.    Drummond, Gentner F.

23.    Earthjustice

24.    Ezray, Evan

25.    Ficarelli, Dante

26.    Florida Immigration Coalition

27.    Florida Department of Emergency Management

28.    Florida Wildlife Federation

29.    Forrester, Nathan A.

30.    Friedman, Todd

31.    Friends of the Everglades, Inc.

32.    Galloni, Tania

33.    Golembiewski, Kevin A.

34.    Griffin, Time

35.    Gustafson, Adam R.F.

36.    Guthrie, Kevin

37.    Hiaasen, Scott

38.    Hilgers, Michael T.

*Friends of the Everglades v. Noem*, No. 25-12873

39.   Issac Walton League of America's Florida Chapter

40.   Jackley, Marty

41.   Kautz, Keith G.

42.   Knudsen, Austin

43.   Kobach, Kris

44.   Kula and Associates, P.A.

45.   Kula, Elliot Burt

46.   Labrador, Raul

47.   Lopez, Jaclyn

48.   Lyons, Todd

49.   Marshall, Steve

50.   Martinez, Hon. Jose E.

51.   McCuskey, John B.

52.   Miami-Dade County

53.   Muehlhoff, Jason

54.   Murray, David M.

55.   Murrill, Liz

56.   Noem, Kristi

57.   O'Byrne, Hayden P.

58.   Panuccio, Jesse

59.   Paxton, Ken

*Friends of the Everglades v. Noem*, No. 25-12873

60.     People's Economic and Environmental Resiliency Group, Inc.

61.     Perez, Monica Rizo

62.     Piropato, Marissa

63.     Raurell, Carlos J.

64.     Rizo, Monica

65.     Rokita, Theodore E.

66.     Quiñones, Jason A. Reding

67.     Sanchez, Hon. Eduardo I.

68.     Schenck, Robert S.

69.     Schwiep, Paul J.

70.     Sharpless, Rebecca A.

71.     Singer, Frank

72.     Skrmetti, Jonathan

73.     Stander, Robert

74.     State of Alabama

75.     State of Alaska

76.     State of Arkansas

77.     State of Georgia

78.     State of Idaho

79.     State of Indiana

80.     State of Iowa

81.    State of Kansas

82.    State of Louisiana

83.    State of Missouri

84.    State of Montana

85.    State of Nebraska

86.    State of North Dakota

87.    State of Ohio

88.    State of Oklahoma

89.    State of South Carolina

90.    State of South Dakota

91.    State of Tennessee

92.    State of Texas

93.    State of West Virginia

94.    State of Wyoming

95.    Taylor, Treg

96.    The Miccosukee Tribe of Indians

97.    Todd R. Friedman P.A.

98.    Torres, Hon. Edwin G.

99.    Torstensen, Peter M.

100.    Totoiu, Jason Alexander

101.    Tropical Audubon Society

102.    United States Department of Homeland Security

103.    United States Immigration and Customs Enforcement

104.    University of Miami School of Law

105.    Uthmeier, James

106.    VoteWater, Inc.

107.    Wahl, Christopher J.

108.    Walter, Elaine Dawn

109.    Wilson, Alan

110.    Williams, Hon. Kathleen M.

111.    Wrigley, Drew H.

112.    Yost, David A.

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ Allen M. Brabender
ALLEN M. BRABENDER

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would assist this Court because this case involves important issues of national concern.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................1

STATEMENT REGARDING ORAL ARGUMENT ..............................................i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ...........................................................................v

INTRODUCTION............................................................................................1

STATEMENT OF JURISDICTION ..................................................................2

STATEMENT OF THE ISSUES.......................................................................3

STATEMENT OF THE CASE...........................................................................3

    A.    The National Environmental Policy Act (NEPA)...................................3

    B.    Factual background ..............................................................................6

        1.    There is a national emergency at the southern border. .....................................................................................6

        2.    Florida constructs a temporary detention facility to help abate an illegal immigration emergency................................6

        3.    State officials operate the facility under Section 287(g) agreements with the federal government. ..........................7

    C.    Procedural history.................................................................................9

        1.    The district court grants a temporary restraining order instead of addressing the objections to venue. ...................9

        2.    The district court grants a preliminary injunction. ......................10

3.   This Court grants a stay of the preliminary injunction and the district-court proceeding pending appeal. ................................................................11

SUMMARY OF THE ARGUMENT ....................................................13

STANDARD OF REVIEW ...................................................................15

ARGUMENT ..........................................................................................15

I.   The district court committed numerous legal errors when concluding that Plaintiffs are likely to succeed on the merits.............................16

   A.   There is no reviewable federal agency action. ........................16

      1.   Plaintiffs fail to challenge final agency action.............................16

         a.   The lack of an EA or EIS is not final agency action. ............................................................17

         b.   Everyday agency functions or future agency plans are not final agency actions. ....................................19

      2.   There is no proposed major federal action at issue. ...................22

      3.   Potential future funding is not a major federal action and any challenge to future funding is not ripe. .........................25

      4.   The decisions to enter 287(g) agreements are not major federal actions or reviewable under the APA....................28

   B.   The district court's injunction violates *Seven County*. ............................30

      1.   The district court is forcing NEPA analysis of a non-existent federal proposal.............................................................30

      2.   The district court usurped agency discretion on the timing and scope of their NEPA analyses...................................31

3.    The supposed NEPA violation does not justify an
      injunction. ...................................................................33

C.    Venue does not belong in the Southern District of Florida..................35

      1.    The defendants did not waive their venue objection..................35

      2.    The district court erred in concluding that venue lies
            in the Southern District of Florida under 28 U.S.C.
            § 1391(b)(2) and 28 U.S.C. § 1391(e)(1)(B). ...........................36

      3.    28 U.S.C. § 1391(e)(1)(C) does not confer venue in
            the Southern District of Florida. .................................39

II.   The district court abused its discretion by failing to require
      Plaintiffs to prove a likelihood of irreparable harm. ..............................44

III.  The equitable factors overwhelmingly weigh against an injunction. ..................47

CONCLUSION.....................................................................50

# TABLE OF AUTHORITIES

## Cases

*Albrecht v. Committee on Emp. Benefits of the Fed. Resv.*,
357 F.3d 62 (D.C. Cir. 2004) ..................................................................28

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) .............................................................15

*Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) ...............................................................................44

*Appalachian Voices v. FERC*,
139 F.4th 903 (D.C. Cir. 2025) .......................................................... 5, 45

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................................6

*Atlanta Coal. on Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*,
599 F.2d 1333 (5th Cir. 1979) ................................................23, 26, 38

*Badger Helicopters, Inc. v. FAA*,
Nos. 24-1065, 24-1066, 154 F.4th 902 (8th Cir. 2025) ...............32

*Bennett v. Spear*,
520 U.S. 154 (1997) ...............................................................................16

*Biden v. Texas*,
597 U.S. 785 (2022) ...............................................................................21

*Big Bend Conservation All. v. FERC*,
896 F.3d 418 (D.C. Cir. 2018) .............................................................32

*Bouarfa v. Mayorkas*,
604 U.S. 6 (2024) ............................................................................ 28, 29

*C.M. v. Noem*,
2025 WL 2400953 (S.D. Fla. Aug. 18, 2025) .................................36

*Cascadia Wildlands v. BLM*,
    No. 24-4542, 153 F.4th 869 (9th Cir. 2025) ....................................................32

*Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*,
    75 F.3d 1429 (10th Cir. 1996) ........................................................................18

*Citizens for Smart Growth v. USDOT*,
    669 F.3d 1203 (11th Cir. 2012) ......................................................................38

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*,
    304 F.3d 1167 (11th Cir. 2002) ......................................................................27

*Earth Island Inst. v. Quinn*,
    56 F. Supp. 3d 1110 (N.D. Cal. 2014) ...........................................................43

*Environmental Def. Fund, Inc. v. U.S. Army Corps of Eng'rs*,
    325 F. Supp. 728 (E.D. Ark 1971) .................................................................43

*Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
    441 F.2d 560 (5th Cir. 1971) ..........................................................................47

*Florida Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ...............................................................................20, 24

*Flowers Indus., Inc. v. FTC*,
    835 F.2d 775 (11th Cir. 1987) ........................................................................38

*Friends of Earth v. Haaland*,
    No. 21-2317, 2022 WL 185196 (D.D.C. Jan. 20, 2022)................................39

*Fund for Animals, Inc. v. BLM*,
    460 F.3d 13 (D.C. Cir. 2006)..........................................................................19

*Fund for Animals, Inc. v. Rice*,
    85 F.3d 535 (11th Cir. 1996) ..........................................................................24

*Garcia v. Guthrie*,
    No. 25-cv-23136 (S.D. Fla. July 16, 2025) ....................................................37

*Gonzalez v. Governor of Ga.*,
  978 F.3d 1266 (11th Cir. 2020) .......................................................47

*Hall v. Norton*,
  266 F.3d 969 (9th Cir. 2001) ...........................................................18

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
  530 U.S. 1 (2000) ............................................................................41

*Hill v. Boy*,
  144 F.3d 1446 (11th Cir. 1998) .......................................................18

*In re MDL-1824 Tri-State Water Rights Litig.*,
  644 F.3d 1160 (11th Cir. 2011) ..................................................22, 50

*Jenkins Brick Co. v. Bremer*,
  321 F.3d 1366 (11th Cir. 2003) ..................................................37, 39

*Karst Env't Educ. & Prot., Inc. v. EPA*,
  475 F.3d 1291 (D.C. Cir. 2007) ......................................................17

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ........................................................................21

*Manitoba v. Zinke*,
  849 F.3d 1111 (D.C. Cir. 2017) ......................................................17

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................................44

*Munaf v. Geren*,
  553 U.S. 674 (2008) ........................................................................50

*Nat'l Ass'n of Home Builders v. EPA*,
  675 F. Supp. 2d 173 (D.D.C. 2009) ................................................37

*Norton v. SUWA*,
  542 U.S. 55 (2004) ............................................................17, 18, 20

*NRDC v. TVA,*
    340 F. Supp. 400 (S.D.N.Y. 1971) ...................................................................43

*NTEU v. Vought,*
    149 F.4th 762 (D.C. Cir. 2025) ...............................17, 20, 21, 23, 26, 27, 29

*Ohio Forestry Ass'n. v. Sierra Club,*
    523 U.S. 726 (1998) ......................................................................................27

*Ouachita Watch League v. Jacobs,*
    463 F.3d 1163 (11th Cir. 2006) ...................................................................16

*Pierce v. North Carolina State Bd. of Elections,*
    97 F.4th 194 (4th Cir. 2024) ........................................................................47

*Protect Our Parks, Inc. v. Buttigieg,*
    10 F.4th 758 (7th Cir. 2021) ........................................................................32

*Protect Our Parks, Inc. v. Buttigieg,*
    39 F.4th 389 (7th Cir. 2022) ........................................................................33

*Pub. Citizen v. Off. of U.S. Trade Representatives,*
    970 F.2d 916 (D.C. Cir. 1992) ...............................................................17, 18

*Pub. Citizen v. U.S. Trade Representative,*
    5 F.3d 549 (D.C. Cir. 1993) .........................................................................17

*Rattlesnake Coal. v. EPA,*
    509 F.3d 1095 (9th Cir. 2007) ...............................................................26, 27

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ........................................................................................4

*Sabine River Auth. v. U.S. Dep't of Interior,*
    745 F. Supp. 388 (E.D. Tex. 1990) ..............................................................29

*Seven County Infrastructure Coal. v. Eagle County, Colorado,*
    605 U.S. 168 (2025) ...........................................1-3, 5, 11, 17, 23, 30, 31, 32, 33, 34, 35

*Siegel v. LePore,*
    234 F.3d 1163 (11th Cir. 2000) .................................................. 43, 44

*Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater,*
    243 F.3d 270 (6th Cir. 2001) ..........................................................23

*Toilet Goods Ass'n, Inc. v. Gardner,*
    387 U.S. 158 (1967) ........................................................................26

*Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.,*
    10 F.4th 869 (D.C. Cir. 2021) ........................................................34

*United States v. S. Fla. Water Mgmt. Dist.,*
    28 F.3d 1563 (11th Cir. 1994) .............................. 25, 26, 30, 32

*United States v. Craft,*
    535 U.S. 274 (2002) ........................................................................42

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020) ........................................................................37

*Village of Bald Head Island v. U.S. Army Corps of Eng'rs,*
    714 F.3d 186 (4th Cir. 2013) ..................................................19-20

*Western Watersheds Project v. Schneider,*
    No. 16-83, 2019 WL 4863483 (D. Idaho Oct. 2, 2019) ................43

*Wild Fish Conservancy v. Jewell,*
    730 F.3d 791 (9th Cir. 2013) .................................................. 19, 20

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.,*
    870 F.3d 1222 (10th Cir. 2017) .....................................................34

*Winter v. NRDC,*
    555 U.S. 7 (2008) ...........................................15, 43, 44, 47, 48

*Woodke v. Dahm,*
    70 F.3d 983 (8th Cir. 1995) ...........................................................39

*Zafar v. U.S. Attorney General*,
461 F.3d 1357 (11th Cir. 2006) .......................................................... 29

## Statutes

5 U.S.C. § 551(1) ............................................................................... 16, 20

5 U.S.C. § 706 .......................................................................................... 20

8 U.S.C. § 1252 ............................................................................. 29, 30, 38

8 U.S.C. § 1357 ................................................................................ 7, 8, 28

28 U.S.C. § 1292 ........................................................................................ 2

28 U.S.C. § 1331 ........................................................................................ 2

28 U.S.C. § 1391 ........................................................... 11, 14, 36, 40, 41, 43

42 U.S.C. § 4332 .................................................................... 1, 4, 22, 30

42 U.S.C. § 4336 ................................................................................. 5, 16

42 U.S.C. § 4336e .............................................................. 4, 5, 12, 23, 25, 30

Fla. Stat. § 680.309(1)(a) ......................................................................... 42

## Rules

Fed. R. App. P. 4 ........................................................................................ 3

Fed. R. Civ. P. 7 ..................................................................................... 36

Fed. R. Civ. P. 12 ................................................................................... 36

Fed. R. Civ. P. 65 ................................................................................... 11

## Regulations

40 C.F.R. § 1508.25 (2022) ..................................................................... 32

## Other Authorities

90 Fed. Reg. 10,610 (Feb. 25, 2025) ....................................................32

Black's Law Dictionary (5th ed. 1951) .............................................42

Exec. Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025) ...........................................5

Oxford English Dictionary (1st ed. 1933) .........................................41

Proclamation No. 10886, 90 Fed. Reg. 8327 (Jan. 29, 2025)...........................................5

*Protecting the American People Against Invasion*,
  Exec. Order 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025)........................................ 34, 48

Webster's New School and Office Dictionary (1st ed. 1943).........................................41

## INTRODUCTION

The State of Florida, on its own land and pursuant to its own sovereign authority, built and now operates a temporary detention facility for illegal aliens on the site of an existing airport in Collier County. The district court entered a preliminary injunction ordering Florida to dismantle the facility within 60 days because the *federal* government allegedly failed to prepare an environmental report under the National Environmental Policy Act (NEPA). But NEPA applies only to "major *Federal* actions." 42 U.S.C. § 4332(2)(C) (emphasis added). It does not apply to state construction projects unless a federal agency "determines" the project is "subject to substantial Federal control and responsibility." *Id.* § 4336e(10).

This was one of many errors the district court committed when justifying its order shutting down the facility, which is why this Court has stayed the injunction pending appeal. Many of these errors were avoidable had the district court followed *Seven County Infrastructure Coal. v. Eagle County, Colorado*, 605 U.S. 168 (2025), which the court instead disparaged as "hardly a meaningful guide." Appendix (App.1433).

For instance,

- *Seven County* clarifies that NEPA claims cannot stand alone because a NEPA document is only one input in a *separate* decision. Yet the district court said that the reviewable final agency action under the Administrative Procedure Act (APA) was the stand-alone failure to prepare a NEPA document.

1

- *Seven County* emphasizes that courts owe substantial deference to agencies on the scope and timing of their NEPA analyses. Yet the district court hijacked that scope-and-timing question, enjoining the facility until the federal defendants complete a NEPA analysis on some unidentified decision and on a scope of activities that are purely controlled by the state.

- *Seven County* explains that NEPA deficiencies do not justify vacatur of agency action unless a court has reason to believe an agency might disapprove a project if it undertook additional process. Yet the district court enjoined the facility's construction and operation despite Florida's facility having the full public support of the President of the United States and his cabinet.

In addition, the district court also ignored the improper venue, failed to hold Plaintiffs to their burden for proving irreparable harm, and insufficiently considered the public interest. The preliminary injunction cannot stand.

## STATEMENT OF JURISDICTION

(a)    The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under federal law, specifically the APA, 5 U.S.C. §§ 701-706. App.1090.

(b)    This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from the entry of a preliminary injunction. App.1435.

(c)    The district court entered the preliminary injunction on August 21, 2025. *Id.* The federal defendants filed their notice of appeal on August 23, 2025, or 2 days later. App.1439. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

Whether the district court abused its discretion in entering an order enjoining construction at the temporary detention facility and requiring its closure, including the following issues:

I.    Whether Plaintiffs challenge a final agency action under the APA or major federal action under NEPA.

II.    Whether venue is proper in the Southern District of Florida.

III.    Whether Plaintiffs have shown they are likely to suffer imminent, concrete and irreparable harm in the absence of a preliminary injunction.

IV.    Whether Plaintiffs have established that the injunction entered by the district court is in the public interest.

## STATEMENT OF THE CASE

### A.    The National Environmental Policy Act (NEPA)

NEPA establishes the process by which federal agencies must evaluate the environmental effects of certain proposed federal actions. *See Seven County*, 605 U.S. at 177. It is a purely procedural statute that requires evaluation of a proposal's environmental effects but does not tell the decision-maker what course of action to

3

choose. *Id.* "In ultimately deciding whether to build, fund, or approve a project, an 'agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.'" *Id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). At is core, NEPA requires that federal agencies prepare a "detailed statement" known as an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

Not every federal action is "major" and not every federal action has "significant" environmental impacts requiring an EIS. In fact, less than 1% of federal projects require an EIS. *See* GAO Report 14-369 on NEPA at 7 (Apr. 2014).[1] A "major Federal action" encompasses only those actions "that the agency carrying out such action determines is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). Further, the statutory definition of major federal action excludes any non-federal action "(I) with no or minimal Federal funding; or (II) with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project." *Id.* § 4336e(10)(B)(i). Nor does major federal action include "forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action." *Id.* § 4336e(10)(B)(iii).

---

[1] *See* GAO Report, https://www.gao.gov/products/gao-14-369

To assess whether an action is likely to have a significant impact on the human environment and thus whether an EIS is needed for a major federal action, NEPA allows agencies first to prepare an environmental assessment (EA). *Id.* § 4336(b)(2). An EA is a concise public document setting forth the basis for an agency's finding of no significant impact or determination that an EIS is necessary. *Id.* If a finding of no significant impact or FONSI is reached after an agency analyzes its proposed action's potential impacts in an EA, NEPA does not require the agency to prepare an EIS, even for a major federal action. *Id.* § 4336e(7).

NEPA does not require an agency to prepare any environmental report if the proposed action is not final agency action under the APA, *id.* § 4336(a)(1), or if the action is subject to a categorical exclusion from NEPA, *id.* § 4336(a)(2).

In *Seven County*, the Supreme Court recently addressed judicial review of the sufficiency of agency decision making under NEPA. The Court emphasized that "[w]hen reviewing compliance with NEPA, courts are to play only a limited role." 605 U.S. at 179 n.2. The Court underscored that the "bedrock principle of judicial review in NEPA cases . . . [is] deference." *Id.* at 185. Such deference must include reverence on "whether and to what extent to prepare an EIS" in the first place. *Id.* at 181. Ultimately, the Court declared, "NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not to paralyze it." *Id.* at 173; *see also generally Appalachian Voices v. FERC*, 139 F.4th 903, 917-30 (D.C. Cir. 2025) (Henderson, concurring).

### B.    Factual background

#### 1.    There is a national emergency at the southern border.

Millions of unchecked illegal aliens have entered the United States through its southern border, including cartel and gang members, known terrorists, human traffickers, smugglers, and unvetted military-age males from foreign adversaries. *See* Exec. Order No. 14287, 90 Fed. Reg. 18761 (Apr. 28, 2025); Proclamation No. 10886, 90 Fed. Reg. 8327 (Jan. 29, 2025). "This invasion has caused widespread chaos and suffering in our country." 90 Fed. Reg. at 8327. It has resulted in murders and attacks on innocent Americans, hundreds of thousands of deaths from drug overdoses, risks to national security, and a loss of sovereignty to criminal cartels. *Id.* This chaos led the President to declare a national emergency and to prioritize the removal of criminal illegal aliens within our borders. *Id.*[2]

#### 2.    Florida constructs a temporary detention facility to help abate an illegal immigration emergency.

The states generally, and Florida especially, "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). About one quarter of the millions of aliens who entered the United States in recent years provided a release address in Florida. App.1465. The problems in Miami are particularly acute, as it "consistently accounts for 10-15 percent of all ICE arrests nationwide." App.1463. This volume has created a shortage of bedspace at detention

---

[2] *See also* https://www.ice.gov/identify-and-arrest/criminal-alien-program

facilities in the Miami area, which have been operating at or above their maximum capacity. *Id.* This lack of capacity, in turn, compromises law enforcement's capacity to apprehend criminal aliens, gang members, wanted fugitive felons, and individual illegal aliens with prior criminal removals. App.1464.

Due to effects of illegal immigration on his state, Florida's governor has declared a state of emergency. App.1515. He authorized the Florida Division of Emergency Management (FDEM) to take actions to abate the emergency. *Id.*

In one such action, FDEM commandeered the Dade-Collier Training and Transition Airport, a busy existing airfield in Collier County. On that site, FDEM has built and operates using state funds a temporary detention facility for illegal aliens known as the South Florida Soft-Sided Facility South ("the facility"). App.1494, 1503, 1515, 1518, 1521, 1571. Federal officials did not order the state to construct the facility, and Florida did not seek federal permission to build it. App.1480, 1521. But with its 2,000 detention beds, the facility provides U.S. Immigration and Customs Enforcement (ICE) and its partners in south Florida the flexibility needed to perform their national security and public safety missions. App.1464-65.

### 3. State officials operate the facility under Section 287(g) agreements with the federal government.

State officials are detaining illegal aliens at the facility "under the authority delegated pursuant to section 287(g) of the Immigration and Nationality Act (INA), at 8 U.S.C. § 1357(g)." App.1494. Section 287(g) authorizes the U.S. Department of

Homeland Security (DHS) to enter into agreements with state and local law enforcement agencies to delegate authority to carry out immigration functions under federal law. 8 U.S.C. § 1357(g)(1). Section 287(g) agreements apply to the signatory state or local agencies generally, not to any specific facility. App.1476-81.

Under such agreements, ICE provides "direction and supervision" of state employees only to the extent the employees are executing "delegated immigration enforcement functions" set forth in the agreement. App.1165 § III; 1168, § X. This includes various enforcement responsibilities that immigration officers perform under the INA such as arresting illegal aliens, preparing charging documents against such aliens for ICE to initiate removal proceedings, and overseeing the detention of aliens while removal proceedings are pending. App.1166 § IV.

A 287(g) agreement does not give the federal government authority over the construction of any facility, the physical operations at any facility, or over the state employees in any other respect. App.1479-80. Even as to a facility where a state detains aliens under 287(g) authority, the state maintains authority over the day-to-day operations of that facility including how big to make the facility, how many aliens to accept into a facility's population, when to accept such aliens, which classes of aliens to accept, and for how long. *Id.*

As such, "[t]he ultimate decision of who to detain at the [facility] belongs to Florida." App.1494. Florida is solely responsible for funding, constructing, and operating the facility. App.1464, 1494, 1521-22, 1571.[3]

### C.    Procedural history

Plaintiffs filed a complaint against the state and federal defendants in the Southern District of Florida seeking to declare the facility unlawful and to enjoin its construction and use. App.1113. The complaint alleges violations of NEPA, the APA, and "provisions of Florida law." App.1088.

### 1.    The district court grants a temporary restraining order instead of addressing the objections to venue.

Because the facility is in the Middle District of Florida and all the detention, construction, and decision-making that Plaintiffs challenge occurred outside the Southern District, the state and federal defendants moved to transfer venue to the Middle District. App.1256-61; App.20 (DE 60). But rather than resolving the threshold venue question first, the district court rushed ahead to temporarily enjoin

---

[3] On September 30, 2025, the Federal Emergency Management Agency (FEMA)—a nonparty to this lawsuit—issued a letter approving the FDEM's eligibility for financial assistance under the Detention Support Grant Program to relieve overcrowding in U.S. Customs and Border Protection's short-term holding facilities. *See* https://www.miamiherald.com/news/local/immigration/article312370946.html. But that potential financial assistance is not specific to this facility, and no funds have been dispersed for this facility at the time of the filing of this brief. Ultimately, FEMA's letter is irrelevant to this preliminary injunction appeal because FEMA's letter was issued *after* the complaint's filing and the district court's injunction, it is not specific to this detention facility, and it is not final agency action.

the state's construction activities for 14 days, while it conducted a four-day evidentiary hearing on Plaintiffs' preliminary injunction motion. App.31-1058, 1347.

### 2. The district court grants a preliminary injunction.

The district court then issued a preliminary injunction, indefinitely enjoining the state's construction activities at the site until the federal defendants fulfill NEPA's procedural requirements. App.1435. It also prohibited holding new detainees at the facility and required the removal of fencing, lighting, generators and gas, sewage and waste receptacles within 60 days, effectively closing the facility. App.1436.

The district court identified no affirmative *federal* action taken by the federal defendants that might be subject to NEPA and reviewable under the APA. The court instead concluded that the reviewable final agency action under the APA was a failure to act since, in its view, the lack of an EA or EIS qualifies as final agency action. App.1405-08. And although the facility is state owned and operated, the court concluded that NEPA applied to the facility's construction and operation because the federal government supposedly had decided to fund the facility and allegedly controls federally-deputized state officers under 287(g) agreements with the state. App.1410-22.

The district court rejected the defendants' venue challenge, concluding that the state defendants had waived it by not raising their objections in their initial responses to emergency motions for a temporary restraining order. App.1377-79. The district

court nevertheless concluded that venue in the Southern District was proper under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1)(B)-(C). App.1379-99.

The district court further concluded that the INA did not prohibit the ordered relief, App.1372-76, that Plaintiffs may suffer future harm in the absence of preliminary injunctive relief, App.1422-30, and that the balance of harms and public interest supported an injunction, App.1430-34.

The district court required Plaintiffs to post a $100 bond under Fed. R. Civ. P. 65(c), but made no findings that such amount was sufficient to pay the costs to the defendants of an unlawful injunction. App.1436.

### 3. This Court grants a stay of the preliminary injunction and the district-court proceeding pending appeal.

The state and federal defendants appealed and moved for a stay of the preliminary injunction pending appeal. This Court granted a stay because the district court had misread NEPA as recently amended by Congress and as recently interpreted by the Supreme Court in *Seven County*. 11th Cir. DE 42-1 at 12-27.

Initially, this Court rebuffed, as inconsistent with *Seven County* and other case law, the district court's erroneous conclusion that the failure to prepare an EA or EIS itself is the reviewable final agency action under the APA. *Id.* at 14. Rather, the Court explained, the reviewable action must be a *separate* major federal action triggering the duty to prepare an EA or EIS. *Id.* at 15. That separate action, the Court further added,

cannot be either the facility's construction or operation because those actions are state actions with no or minimal federal involvement and thus are non-federal. *Id.*

This Court then turned to NEPA's recently amended definition of "major Federal action," which excludes non-federal actions from its definition with (1) no or minimal federal funding; **or** (2) no or minimal federal involvement. *Id.* (citing 42 U.S.C. § 4336e(10)(B)(i)). This Court observed that the district court had misinterpreted this statute as excluding only those actions with no or minimal federal funding **and** no or minimal federal involvement and thus the court mistakenly had failed to focus on the facility's lack of federal funding. *Id.* at 16. Because no federal dollars have been expended on the facility's construction or operation and unrealized plans to provide federal funding are legally insufficient, this Court concluded that there is no major federal action at issue triggering NEPA. *Id.* at 16-23. And to the extent the district court found that federal funding had been provided at the time of the complaint's filing, this Court rejected that finding as "clearly erroneous" and "implausible." *Id.* at 20.

This Court also flagged the district court's erroneous conclusion that the defendants had waived their objection to venue by not raising it in their initial responses to the motion for a temporary restraining order. *Id.* at 23-27. This Court noted that, while venue can be waived by not objecting to it in the first responsive pleading, a response to a motion for a temporary restraining order is not a "pleading."

*Id.* at 25-26. This erroneous conclusion on waiver, said the Court, made it "skeptical" of the district court's "cursory analysis of the merits of the venue issue." *Id.* at 26.

Because this Court concluded that the state and federal defendants are likely to prevail on appeal and they had shown that that they will suffer irreparable harm in the absence of a stay and that a stay is in the public interest, this Court stayed the preliminary injunction and the district court proceedings pending appeal. *Id.* at 27-33.

## SUMMARY OF THE ARGUMENT

The district court repeatedly erred when granting a preliminary injunction ordering the immediate dismantling of a detention center that the *state* built and operated because of an alleged failure by the *federal* government to prepare an environmental report under NEPA. The district court lacked jurisdiction, and Plaintiffs lack a cause of action, because Plaintiffs have not challenged any discrete "final agency action" for purposes of a claim under the APA. The alleged failure to conduct a NEPA analysis is not final agency action in itself, and decisions to enter 287(g) agreements are unreviewable. Moreover, Plaintiffs have identified no *federal* action, much less a "major Federal action," that might trigger NEPA. Indeed, because the facility is purely state funded and operated, it is excluded from NEPA by the statute's definition of "major Federal action."

The district court's injunction also violates the principles of judicial review in NEPA cases that the Supreme Court set forth in *Seven County*. The district court, for instance, has improperly forced a futile NEPA analysis in the absence of any

13

proposed separate federal decision. The court has usurped the agency's discretion on the scope and timing of an environmental report on any future decision. And the court wrongly has ordered the facility's closure based on a mere procedural NEPA deficiency without any reason to believe the federal defendants would have disapproved of the project with more environmental review—if the state built and operated facility were assumed to be a federal facility.

The district court also erred by enjoining the facility when venue is improper in the Southern District of Florida. The defendants timely objected to the improper venue, seeking to transfer the case to the Middle District of Florida where the facility is located. Venue is improper in the Southern District under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1)(B) because neither a substantial part of the property lies in, nor a substantial part of the events or omission giving rise to the claims occurred in, the district. Moreover, the case involves real property in the Middle District, so venue also is not proper in the Southern District under 28 U.S.C. § 1391(e)(1)(C).

The district court erred still further by entering a preliminary injunction in the absence of a required showing of irreparable harm. The site was already an active airport. Plaintiffs failed to establish that Florida's changes to the site are likely to cause imminent, concrete, and irreparable injury without a preliminary injunction, so the district court erroneously lowered the burden to relieve Plaintiffs of their evidentiary obligations.

And on top of all its other errors, the district court granted a preliminary injunction that is manifestly contrary to the public interest.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quotation marks omitted)). Preliminary injunctions generally are reviewed for an abuse of discretion, but any legal conclusions are reviewed *de novo*. *Id.* "A district court may grant [preliminary] injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Id.*; *see also Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

The district court committed numerous errors of law in its zeal to shut down the temporary detention facility. It entered a preliminary injunction even though Plaintiffs did not challenge a final agency action as required by the APA or a major federal action subject to NEPA. It acted inconsistently with the Supreme Court's recent course-correcting decision in *Seven County*, denigrating it as "hardly a meaningful guide." App.1433. It disregarded the improper venue. And the court erred

by enjoining the state's construction activities at, and requiring the affirmative

dismantling of, the facility without finding likely irreparable harm to Plaintiffs, and

against the public interest. A preliminary injunction requires a movant to satisfy all

four *Winter* factors; the district court's injunction satisfies none.

## I.    The district court committed numerous legal errors when concluding that Plaintiffs are likely to succeed on the merits.

### A.    There is no reviewable federal agency action.

#### 1.    Plaintiffs fail to challenge final agency action.

Because NEPA does not provide a private cause of action, NEPA claims must

challenge "final agency action" under the APA. *See Ouachita Watch League v. Jacobs*, 463

F.3d 1163, 1173 (11th Cir. 2006). Moreover, only final agency action under the APA

triggers NEPA obligations. *See* 42 U.S.C. § 4336(a)(1).

Each word in the phrase "final agency action" has meaning. The APA defines

"agency" as certain authorities of the *federal* government. *See* 5 U.S.C. § 551(1). And

the APA defines "agency action" as an "agency rule, order, license, sanction, relief, or

the equivalent or denial thereof, or failure to act." *Id.* § 551(13). And the courts have

defined "final" to mean that "the action must mark the consummation of the agency's

decisionmaking process" and that it "must be one by which rights or obligations have

been determined, or from which 'legal consequences will flow." *Bennett v. Spear*, 520

U.S. 154, 177-78 (1997) (internal quotations and citations omitted).

16

### a.    The lack of an EA or EIS is not final agency action.

Plaintiffs have not challenged any discrete, affirmative final agency action satisfying these definitions. So the district court concluded that the reviewable action under the APA is a "failure to act." App.1405. In its view, the lack of an EA or EIS qualifies as final agency action. App.1405-08. As this Court observed in granting the motion to stay, the district court's view is erroneous. 11th Cir. DE 42-1 at 14-15.

A "refusal to prepare an EIS is not itself a final agency action for purposes of APA review." *Pub. Citizen v. Off. of U.S. Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992). "[A]n agency's failure to prepare an EIS, by itself, is not sufficient to trigger APA review in the absence of identifiable substantive agency action." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993). *Accord Seven County*, 605 U.S. at 185 ("an agency's EIS is not the same thing as review of the agency's final decision concerning the project"); *Karst Env't Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007) ("NEPA claims must … allege 'final agency action'" separate from the "decision" to conduct NEPA review).  It is typically the issuance of a record of decision cementing the substantive action that the agency plans to take that constitutes final agency action. *See Manitoba v. Zinke*, 849 F.3d 1111, 1115 (D.C. Cir. 2017). But, here, as the district court observed—but failed to understand— "Plaintiffs do not challenge a new rule or Record of Decision, which may be traceable to discrete moments of decision-making." App.1394-95.

17

The district court takes advantage of some imprecise snippets in the caselaw that imply without analysis that the failure to prepare an EIS alone is sufficient to constitute a final agency action under the APA. App.1405. But each case identified by the district court *was* a challenge to a *separate* final agency action. *See, e.g., Hill v. Boy*, 144 F.3d 1446 (11th Cir. 1998) (challenge to granting of license); *Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429 (10th Cir. 1996) (challenge to rule designating habitat); *Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001) (challenge to a land-exchange order). The lack of an EA or EIS alone is not a "final agency action" under the APA. *Pub. Citizen*, 970 F.2d at 918.

Even if the district court could have identified some final agency action on which to base its jurisdiction, the preliminary injunction would have been improper because the absence of an EIS in this case does not reflect any "failure to act," 5 U.S.C. § 551(13), that would allow a court with jurisdiction to "compel agency action unlawfully withheld," *id.* § 706(1). Notably, Plaintiffs never contended that the reviewable final agency action here was a "failure to act"—and for good reason: a claim under the APA to compel a failure-to-act "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. SUWA*, 542 U.S. 55, 64 (2004). And such claims are proper only where an agency completely lacks discretion over the decision. *Id.* at 64. There is no "failure to act" in this case because there is no major federal action for which NEPA requires environmental review. *See infra* pages 22-30.

18

### b. Everyday agency functions or future agency plans are not final agency actions.

Instead of identifying a discrete final agency action subject to judicial review under the APA apart from the failure to write an EA or EIS, the district court relied on a constellation of everyday agency functions or future plans that are at most tangentially related to the detention facility. Those functions or plans include implementing existing 287(g) agreements, ensuring satisfactory detention standards, transporting detainees, requesting that the state build additional detention facilities (although not this facility), and speaking favorably about potential future decisions on state requests for federal funding. App.1420. But these everyday functions or plans do not constitute "final agency action" under the APA concerning this facility.

"The term 'action' as used in the APA is a term of art that does not include all conduct such as, for example, constructing a building, operating a program, or performing a contract." *Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). "Rather, the APA's definition of agency action focuses on an agency's determination of rights and obligations, whether by rule, order, license, sanction, relief, or similar action." *Id*.; *see Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800-01 (9th Cir. 2013); *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 19 (D.C. Cir. 2006). Quite simply, none of the functions or plans identified by the district court fall within this definition. They fall instead within the types of conduct like operating a program

19

or performing a contract that are not reviewable under the APA. *See Village of Bald Head Island*, 714 F.3d at 193.

Plaintiffs have faulted the defendants for disassembling what they call "the district court's factual findings into granular parts." 11th Cir. DE 35 at 22. This accusation shows Plaintiffs' deep misunderstanding of the APA.

The APA confines judicial review to the administrative record. *See* 5 U.S.C. § 706. Courts do not conduct de novo review on the merits of APA claims. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). That limit on judicial review shows the folly of the district court's approach here, where it held a multi-day evidentiary hearing in part on a fruitless attempt to identify the final agency action before it. *See NTEU v. Vought*, 149 F.4th 762, 781 n.4 (D.C. Cir. 20025). But the question of what counts as final agency action under the APA is not subject to "factual finding" reviewable under the clearly erroneous standard; it is a legal question to which this Court owes no deference to the district court. *Id.* at 783.

As noted, the APA also allows challenges only to *discrete* agency actions, specifically those actions that constitute a "rule, order, license, sanction, relief, or the equivalent, or denial thereof, or failure to act." 5 U.S.C. § 551(13); *SUWA*, 542 U.S. at 64; *Wild Fish Conservancy*, 730 F.3d at 800-01. Even if any of these everyday functions or plans arguably satisfies the definition of agency action, "an APA challenge may not bundle together discrete actions in order to challenge them all together." *NTEU*, 149 F.4th at 789. The recasting of numerous individual actions as a single decision to

manufacture judicial review of a wholesale program is precisely what the APA's limit on review to only discrete action is intended to prevent. *Id.* at 784 (discussing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990)). Taking everyday actions or making plans in support of a state-operated detention facility is no more an identifiable final agency action than a land-withdrawal, weapons-procurement, or drug-interdiction program and judicial review of such everyday actions is improper under the APA for the same reasons. *See Nat'l Wildlife Fed'n*, 497 U.S. at 893.

The district court used a gestalt "walks like a duck" test to conclude that collectively the implementation of these everyday functions or plans is evidence of some abstract and unwritten agency decision. App.1420. But "the APA does not authorize review of 'abstract decision[s] apart from specific agency action, as defined in the APA.'" *NTEU*, 149 F.4th at 783 (quoting *Biden v. Texas*, 597 U.S. 785, 809 (2022)). A court errs, as the district court did, "by postulating the existence of an agency decision wholly apart from any agency statement of general or particular applicability designed to implement that decision." *Id.* (quoting *Biden*, 597 U.S. at 809) (cleaned up). In terms of the district court's "duck" test, it is not enough under the APA for a putative decision to act like a duck, a decision *must be* a physical duck for judicial review to be proper.

In *NTEU*, the D.C. Circuit rejected the notion that "the APA permits review of an unrecorded rule—the existence of which the agency denies—inferred from a collection of disparate agency actions." *Id.* at 789. Here too, there was no evidence

21

that the federal defendants had funded, controlled, or otherwise taken any final agency action related to Florida's construction and operation of the detention center. Any purported "fact finding" otherwise is beyond the district court's authority under the APA, and "clearly erroneous" on this record, as this Court held when granting the stay. 11th Cir. DE 42-1 at 20. Florida alone built this facility on its own land, using its own funds, and the state operates the facility under its own sovereign authority. App.1493-94, 1503. The district court's attempt to manufacture federal action to justify its injunction at this pre-decisional stage is a clear abuse of its authority. *See also infra* § I.A.3 (explaining that there is no federal funding decision at issue).

Because there is no reviewable final agency action before the federal courts, Plaintiffs cannot succeed on the merits of their NEPA claims. In fact, this Court considers the failure to challenge "final agency action" to be a jurisdictional defect. *See In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1181 (11th Cir. 2011). Therefore, this Court should dismiss this case for lack of jurisdiction.

## 2. There is no proposed major federal action at issue.

Even if the APA provides jurisdiction and a cause of action, Plaintiffs' claims still fail. NEPA applies only to proposals for "major Federal action." *See* 42 U.S.C. § 4332(2)(C). NEPA is therefore inapplicable to the detention facility because the federal defendants have not taken any major federal action regarding the facility.

In 2023, Congress amended NEPA to add a statutory definition for "major Federal action." It defined the phrase as "an action that the *agency* carrying out such

action *determines* is subject to substantial Federal control and responsibility." *Id.*

§ 4336e(10)(A) (emphasis added).[4] Thus, Congress provided *agencies* with the threshold

task of determining whether any proposed action is "subject to substantial Federal

control and responsibility." Such discretion is prevalent in NEPA. *See Seven County*,

605 U.S. at 180. And judicial review of the exercise of that discretion in NEPA cases

must adhere to the "bedrock principle" of "deference." *Id.* at 185.

Yet the district court entirely ignored the pertinent statutory language and the

deference it owed to the federal defendants. Instead, the district court decided for

itself whether NEPA was triggered, even purporting to make fact findings in this

APA case that a major federal action triggering NEPA existed. App.1418, 1420. This

usurpation of agency decision-making through improper fact finding was error.

The question of what counts as major federal action—like the question of what

counts as final agency action—is a legal question. *See NTEU*, 149 F.4th at 783. The

---

[4] Before the 2023 amendments, NEPA regulations defined "major Federal action" as
an action "with effects that may be major and which are potentially subject to Federal
control and responsibility." *See Atlanta Coal. on Transp. Crisis, Inc. v. Atlanta Reg'l
Comm'n*, 599 F.2d 1333, 1347 n.19 (5th Cir. 1979). The new statutory definition adds
one modifier ("substantial"), omits another ("potentially"), and gives "major"
meaning independent of an action's "effects." The district court erroneously applied
the former definition when it stated incorrectly that the defendants "do not dispute
that the camp and its operations have a sufficient impact on the quality of the human
environment to be considered 'major,' justifying the need for an EIS." App.1401. The
district court also mistakenly relied on repealed regulations defining major federal
action and connected actions. App.1408, 1410 n.26. And the court further erroneously
cited cases decided using the former definition, such as *Sw. Williamson Cnty. Cmty.
Ass'n v. Slater*, 243 F.3d 270 (6th Cir. 2001), that are no longer good law.

purely legal nature of the inquiry arises because NEPA claims are reviewable only under the APA's arbitrary-or-capricious standard "based on the record the agency presents to the reviewing court." *Florida Power*, 470 U.S. at 743-44. Under the APA, courts must review agency action based on the existing administrative record, not by creating a new one, and they may not conduct de novo fact-finding. *Id.* at 744. If the record is too incomplete to allow proper review, the court's ordinary remedy is to remand the matter to the agency for further explanation or investigation rather than supplementing the record itself. *Id.*

The district court overlooked these basic principles governing APA review. True, because the facility's construction and operation are exclusively state actions without substantial federal involvement, there is no written decision or record from the agencies for the courts to review. But if such a decision were necessary to evaluate any claimed NEPA violation (which it isn't), the proper course would be to seek such an explanation from the agencies. *Id.* That explanation would then be reviewed under the APA's "exceedingly deferential" standard of review. *See Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996).

There is no reason, however, to seek an explanation from the agencies because there is no major federal action. Congress excluded from the definition of major federal action "a non-Federal action—(I) with no or minimal Federal funding; or (II) with no or minimal Federal involvement where a Federal agency cannot control the

24

outcome of the project." *Id.* § 4336e(10)(B)(i).[5] Because the detention facility is a state

action that has received no federal funding, it is excluded from NEPA's definition of

major federal action. App.1493-94, 1503.

This is true even if there is more than minimal federal involvement at the

state's facility, because the amended statute's use of the disjunctive "or" indicates that

the lack of federal funding for the state action alone takes the facility outside of

NEPA's confines. 11th Cir. DE 42-1 at 13, 15-16 (discussing 42 U.S.C.

§ 4336e(10)(A)-(B)(i)). But there is insufficient federal involvement with the facility

construction and operation in any event. For NEPA to apply, the federal government

must have actual control over the non-federal activities. *United States v. S. Fla. Water*

*Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994). Here the federal defendants had no

control over the size of the detention facility, how many beds it has, who it must

house, where and when it will be built, who will build it, or what materials will be

used. Those decisions are all controlled by the state. *Supra* pages 7-9.

In sum, there is no major federal action relating to the facility triggering NEPA.

### 3.   Potential future funding is not a major federal action and any challenge to future funding is not ripe.

The facility is exclusively state funded, in both its construction and operation.

App.1493-94, 1503, 1515. 1518, 1521, 1571. The district court nevertheless

---

[5] Also excluded from the definition are "forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action." 42 U.S.C. § 4336e(10)(B)(iii).

counterfactually claimed that a funding decision without an accompanying NEPA analysis had been made. To the extent the district court thought it was making a fact finding, such a finding was both beyond the district court's authority under the APA and clearly erroneous on this record.

At most, the district court identifies nonbinding statements addressing potential future federal funding decisions. But such statements are not major federal actions subject to NEPA, and they are not final agency action under the APA until the federal defendants act to grant such funding. *See NTEU*, 149 F.4th at 779 (a court cannot review under the APA a "nonbinding statement of something the agency intends to do in the future"). The "possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely." *S. Fla. Water Mgmt.* Dist., 28 F.3d at 1573; *see also Atlanta Coal.*, 599 F.2d at 1347. Even where Congress has earmarked funds for a specific purpose, there is no final agency action on a NEPA claim until the agency decides to disburse funds. *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007).

Relatedly, the challenge to the posited funding decision was unripe at the time of the district court's order. *See NTEU*, 149 F.4th at 785-86. While federal officials had expressed an openness to funding requests from the state, they had not decided on the source, timing, amount, purpose, and limitations of such funding. Because the exact scope of the funding was unclear, judicial review was premature. *Id.* (citing *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967)). Moreover, the district court's

premature involvement led to it interfere in the administrative process by wrongly usurping the agency's discretion on the scope and timing of the NEPA analysis. *Id.* (citing *Ohio Forestry Ass'n. v. Sierra Club*, 523 U.S. 726, 733 (1998)). Accordingly, any challenge to a future funding decision is not ripe and must be dismissed. *See Rattlesnake Coal.*, 509 F.3d at 1104 ("if the claimants sue before the agency has made a final decision to disburse the funds, the [NEPA] suit will be dismissed for lack of subject matter jurisdiction").

Finally, there is a mismatch between the supposed funding decision and the district court's preliminary injunction. If a federal funding decision is the reviewable action,[6] the remedy must be limited to that decision. *See NTEU*, 149 F.4th at 790. The district court could "set aside" the funding decision pending a NEPA analysis. *Id.* But finding a federal funding decision to be arbitrary or capricious without a NEPA analysis does not authorize an injunction against *state* funded construction and operational activities at the facility. *See Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1178 (11th Cir. 2002) (injunctions "must be 'narrowly tailored to fit specific legal violations'"). Thus, if federal funding is the reviewable final agency action, the preliminary injunction must be vacated because it is overbroad.

---

[6] As discussed *supra* page 9 n.3, FEMA's post-preliminary injunction obligation of funding to FDEM is not before the Court.

### 4. The decisions to enter 287(g) agreements are not major federal actions or reviewable under the APA.

To the extent the district court concluded that there is a final and major federal action here because state officials are acting under the color of federal law under the 287(g) agreements (App.1410), that theory has several problems. At the outset, even if brought by a non-party to an agreement, decisions to enter contracts, such as a 287(g) agreement, are not reviewable in a federal district court under the APA. *See Albrecht v. Committee on Emp. Benefits of the Fed. Resv.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004).

Second, the decision to enter 287(g) agreements is not reviewable by federal courts under a provision that divests courts of their jurisdiction over suits challenging discretionary immigration activities. While Section 287(g) agreements include certain legal requirements, the decision to enter one is discretionary. *See* 8 U.S.C. § 1357(g)(1) (Secretary "may enter into a written agreement"); *Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024) (limitation applies to statute that provides Secretary "may . . . revoke the approval of any [visa] petition").[7] In turn, Section 1252(a)(2)(B)(ii) of the INA states that "no court shall have jurisdiction to review . . .any other decision or action of the [Secretary] . . . the authority for which is specified under this subchapter to be in the discretion of the [Secretary]." 8 U.S.C. § 1252(a)(2)(B)(ii). As Section 287(g) falls within "this subchapter," 8 U.S.C. § 1357, agreements made under its provisions are

---

[7] The statute refers to the Attorney General, but Congress has transferred enforcement of immigration laws to the Secretary of Homeland Security. *See* Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002).

within the jurisdictional limitation. *See Zafar v. U.S. Attorney General*, 461 F.3d 1357, 1361 (11th Cir. 2006) ("The phrase 'specified under this subchapter' refers to subchapter II of Chapter 12, 8 U.S.C. §§ 1151–1378."). And the limitation applies to an attempt to impose review of legal requirements on an ultimately discretionary decision, as here. *See Bouarfa*, 604 U.S. at 16, 18 ("In *Patel*, we held that § 1252(a)(2)(B)(i) precludes judicial review of . . . 'threshold requirements established by Congress' to access the relevant discretion"). The district court therefore erred if it grounded judicial review or its jurisdiction on actions taken under these agreements.

Third, the 287(g) agreements—which apply to the signatory state agencies generally and not to any specific facility operated by those agencies—are not "major Federal actions." They merely delegate to state agencies the notional authority to fulfill certain immigration functions on behalf of DHS and do not themselves authorize any ground-disturbing actions or "change the status quo of the physical environment." *Sabine River Auth. v. U.S. Dep't of Interior*, 745 F. Supp. 388, 393 (E.D. Tex. 1990).

Fourth, there is another mismatch between the challenged action and the remedy provided. If the decisions to enter 287(g) agreements are reviewable actions, the remedy must be directed at those agreements. *See NTEU*, 149 F.4th at 790. The district court cannot enjoin other activities beyond the entry of the 287(g) agreements because the APA does not allow courts to leverage review from one discretionary action to another. *Id.* Moreover, if the 287(g) agreements are the reviewable actions,

then the injunction is improper under 8 U.S.C. § 1252(f)(1), which reserves such coercive power only for the Supreme Court.

Finally, to the extent the district court concluded that the reviewable actions were the discretionary decisions to detain and transport individual aliens to the facility, that conclusion suffers from the same flaws as any putative challenge to the 287(g) agreements themselves. Plus, decisions to bring civil immigration actions are excluded from the definition of major federal action. *See* 42 U.S.C. § 4336e(10)(B)(v). Thus, neither the 287(g) agreements nor individual detention decisions are reviewable.

## B.    The district court's injunction violates *Seven County*.

Just months ago, the Supreme Court ordered a "course correction" to bring NEPA review "back in line with the statutory text and common sense." *Seven County*, 605 U.S. at 184. Yet the district court "[i]nexplicably" barely mentions *Seven County*, 11th Cir. DE 42-1 at 10, brushing it aside as "hardly a meaningful guide." App.1433. Unsurprisingly then, the district court's decision runs counter to *Seven County* in important ways.

### 1.    The district court is forcing NEPA analysis of a non-existent federal proposal.

NEPA applies to actual "proposals" for major federal action. 42 U.S.C. § 4332(C). "NEPA does not require evaluation of hypothetical proposals, impacts and alternatives concerning a nonexistent federal proposal." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573. That is because "[t]he goal of the law is to inform agency decision-

30

making." *Seven County*, 605 U.S. at 173. And, as *Seven County* explains, NEPA documents are "only one input into an agency's decision." *Id.* at 180.

These tenets beg the question of what *decision* the court-forced NEPA analysis is supposed to inform. There was no "proposal" for major federal action when this case commenced, and thus there is no decision to make. The district court is forcing NEPA analysis of a hypothetical, which is the opposite of a "common sense" application of NEPA. *Id.* at 184. If hypothetically at the end of the court-forced NEPA analysis, the federal defendants conclude the state detention facility's environmental impacts are too great—then what? Neither Plaintiffs nor the district court identify any decision for the federal defendants to make. Nor do they identify any source of law giving the federal defendants the authority to, for example, order Florida to close the facility or move it elsewhere. The decision to site and operate the facility, including the decision to use it to detain illegal aliens, is Florida's alone. In enjoining the state facility's construction and operation until the federal defendants make some unidentified decision, the district court failed to wrestle with the maxim underlying *Seven County* that a NEPA analysis is only one input into a *separate* decision.

### 2. The district court usurped agency discretion on the timing and scope of their NEPA analyses.

*Seven County* further emphasizes that the judiciary owes substantial deference to agency decisions on "whether and to what extent to prepare an EIS." 605 U.S. at

181.[8] Deference to the decision of "whether" to prepare an EIS includes deference to decisions to wait to perform a NEPA analysis until a major federal action such as a funding request is proposed. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573. In the agencies' judgment, it would be premature, and it would serve no useful purpose to undertake a NEPA analysis when no specific federal action has been proposed. Yet the district court has overruled the agencies on this "timing" question, *id.*, contrary to the "bedrock principle" of deference that is supposed to govern judicial review in NEPA cases. *Seven County*, 605 U.S. at 180, 185.

For related reasons, the district court also violated *Seven County*'s teachings on NEPA's scope. It faulted the defendants for disaggregating the facility's initial construction from its ongoing operations, citing the anti-segmentation rule of a repealed NEPA regulation defining "connected" actions. App.1410 n.26 (citing 40 C.F.R. § 1508.25(a)(1) (2022)); *see also* 90 Fed. Reg. 10,610 (Feb. 25, 2025) (interim final rule removing CEQ regulations). But "segmentation refers only to the situation that arises when an agency arbitrarily separates related *federal* actions from one another." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021). "The connected-actions doctrine does not require the aggregation of federal and non-federal actions." *See Big Bend Conservation All. v. FERC*, 896 F.3d 418, 424 (D.C. Cir.

---

[8] The discretion extends beyond EISs. *See Cascadia Wildlands v. BLM*, 153 F.4th 869, 903 (9th Cir. 2025); (finding *Seven County*'s "teachings fully applicable" beyond review of an EIS's sufficiency); *Badger Helicopters, Inc. v. FAA*, 154 F.4th 902, 915 (8th Cir. 2025) (under *Seven County*'s rationale, substantial deference is owed on EAs).

2018). Thus, even if the regulation was still in place, the scope of the federal defendants' environmental analysis does not need to consider the impacts of a state constructed facility.

Under *Seven County*, an agency needs only to analyze its own proposed action. 605 U.S. at 186. NEPA does not require an agency to consider the effects of actions that are outside the agency's regulatory authority. *Id.* at 186-92. The federal defendants do not control Florida's decisions on where to site the facility, how big to make it, or how to operate it. Those are state decisions about the use of state land, so the environmental impacts of such decisions are also outside NEPA's scope. *See Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 399-400 (7th Cir. 2022). And the state's initial construction decision is definitionally "separate in time" from any future federal decision to potentially fund some of the facility's operations, and therefore the two decisions would be properly disaggregated. *Seven County*, 605 U.S. at 189.

### 3. The supposed NEPA violation does not justify an injunction.

The district court also ignored *Seven County*'s instruction that NEPA deficiencies do not justify coercive sanctions like vacatur or an injunction of agency action, "at least absent reason to believe that the agency might disapprove the project

if it" undertook additional NEPA process.[9] *Id.* at 185. This case provides a perfect example of a situation where the NEPA process will make no difference.

In acting otherwise, the district court disregarded reality and, once again, failed to give NEPA a common-sense application. *Id.* Both the President and the Secretary of Homeland Security have expressed unwavering support for Florida's project such that it defies all logic to conclude that "the agency might disapprove the project" after it completes its court-forced NEPA analysis of the unidentified future proposal for major federal action. *Id.* Indeed, it is common knowledge that immigration enforcement is a major priority for the President and his cabinet. *See, e.g.*, *Protecting the American People Against Invasion*, Exec. Order 14159, 90 Fed. Reg. 8443 (Jan. 29, 2025); App.1578. And the detention center is a high-profile example of such enforcement. *See Trump Speaks at 'Alligator Alcatraz' in Florida Everglades*, FOX 13 Tampa Bay (July 1, 2025).[10] Even if Florida's construction of this facility somehow were converted into ex ante federal action, it beggars belief that the federal government would have reached a different conclusion about the wisdom of building this facility based on further study of the marginal effect of the facility's lights on the survival rate of Florida panthers in

---

[9] Although vacatur and injunctive relief are doctrinally distinct remedies, their effects are similar and both are "coercive" sanctions. *See Transportation Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transportation Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 874 (D.C. Cir. 2021) (declining to grant "coercive sanction" of vacatur); *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1239 (10th Cir. 2017) (comparing vacatur to a "form of injunctive relief").

[10] https://youtu.be/KO6TByWi0w8?si=nVKzuVfhgxG6nuMf.

2070. *Seven County*, 605 U.S. at 185; App.316. The district court's injunction in these circumstances offends one of *Seven County*'s core principles.

***

In sum, the district court's disregard of *Seven County* justifies reversal of the injunction for reasons related to, yet independent of, the lack of a challenge to final agency or major federal action.

### C.　　Venue does not belong in the Southern District of Florida.

The preliminary injunction also should be reversed and vacated because the Southern District of Florida is an improper venue for this suit. This suit belongs in the Middle District of Florida where the facility is located.

### 1.　　The defendants did not waive their venue objection.

Initially, both the state and federal defendants timely raised objections to venue early in this case before the first responsive pleadings (i.e., answers to the complaint), which were not due to be filed until months later. App.19-21 (DE 50, 56, 60, 65), 28 (DE 142), 1256-60. Nevertheless, the district court concluded that the defendants waived their objections to venue by failing to object to venue in their initial responses to the motion for a temporary restraining order. App.1377-79. As this Court determined when granting the stay, the district court misapplied the law in reaching this conclusion. 11th Cir. DE 42-1 at 24-27.

Under Rule 12(b), every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required, but certain defenses such as

35

objections to venue also may be asserted by motion. Fed. R. Civ. P. 12(b). A party waives the defense of venue by failing to either make it by motion or include it in a responsive pleading. *See* Fed. R. Civ. P. 12(h)(1)(B). Under Rule 7, there is a closed universe of documents that constitute a "responsive pleading," *i.e.*, answers to complaints, counterclaims, cross-claims, or third-party complaints. Fed. R. Civ. P. 7(a). An opposition to a motion for a temporary restraining order is not a responsive "pleading." Therefore, not challenging venue in such a filing does not constitute waiver. 11th Cir. DE 42-1 at 24-27. The district court's contrary conclusion is erroneous.

### 2. The district court erred in concluding that venue lies in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1)(B).

Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2) & (e)(1)(B). Here, all buildings and pavement at the facility are in Collier County, which is in the Middle District. App.1258, 1498-99. Because no substantial part of the facility is located in the Southern District, and because Plaintiffs have identified no significant activity that took place within the district before the filing of the complaint, venue is not proper in the Southern District. *See C.M. v. Noem*, 2025 WL 2400953, at *20-23 (S.D. Fla. Aug. 18, 2025) (venue for challenges to activities at the temporary detention center is not

36

proper in the Southern District); *Garcia v. Guthrie*, No. 25-cv-23136 (S.D. Fla. July 16, 2025), Doc. 5 at 1 (same).

The district court's contrary venue ruling is erroneous. To begin with, it should be noted that the district court found venue to be proper in the Southern District based on acts or omissions that Plaintiffs never raised, in violation of the party-presentation principle. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375-79 (2020).

Beyond that, the district court did not properly apply *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366 (11th Cir. 2003), which requires the relevant acts or emissions bearing on venue to have a "close nexus" to the cause of action. 321 F.3d at 1373. In NEPA cases brought under the APA, the cause of action requires a challenge to final agency action, which is lacking here. *See supra* pages 16-22. But assuming for the sake of the venue analysis, that the decisions to construct and operate the facility were final agency actions or that the failure to conduct an EA or EIS qualified as an actionable failure to act under the APA, it is those decisions or omissions that are relevant to the venue inquiry. *See Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009) ("In cases brought under the APA, courts generally focus on where the decisionmaking process occurred to determine where the claims arose."). None of those decisions or omissions occurred in the Southern District.

Instead of focusing on the locus of the decision-making for a discrete final agency action, the district court focused on acts or omissions that have no "close nexus" to the cause of action. For example, the district court noted that a substantial

portion of the decisions to detain, transport, and remove individual illegal aliens occur in the Southern District. App.1389-91. But these discretionary immigration-enforcement decisions relating to individual illegal aliens are, depending on the circumstances, excluded from judicial review under 8 U.S.C. § 1252(a)(2)(B)(ii). They are therefore not closely related to the alleged environmental impacts of constructing and operating a state detention facility in the Middle District. Moreover, Plaintiffs sued before detention operations began so these immigration-enforcement decisions are irrelevant for that reason too because "venue must be determined based on the facts at the time of filing." *Flowers Indus., Inc. v. FTC*, 835 F.2d 775, 776 n.1 (11th Cir. 1987).

The district court also observed that the state sent letters to Miami-Dade commandeering the site. App.1390. But the state is not subject to the APA or NEPA. *See Citizens for Smart Growth v. USDOT*, 669 F.3d 1203, 1210 (11th Cir. 2012) ("[T]he APA does not apply to state agencies."); *Atlanta Coal.*, 599 F.2d at 1344 ("Congress did not intend NEPA to apply to state, local, or private actions"). And the decisions memorialized in those letters were made in Tallahassee in any event. Like the discretionary immigration decisions, those letters also have little nexus to the environmental impacts of a facility in the Middle District.

Next, the district court noted that the federal defendants' alleged failure to consult with Miami-Dade and the Tribe occurred in the Southern District. App.1392. But the failure to consult did not give rise to any supposed decision not to conduct an

EIS; if anything, it would be an effect of not conducting an EIS. Assessing venue based on an alleged wrong's "ultimate effect" rather than a defendant's acts or omissions inverts the proper analysis. *See Jenkins Brick*, 321 F.3d at 1371-72 (venue "focus[es] on relevant activities of the defendant, not of the plaintiff"); *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995) (rejecting an argument that venue is appropriate in a district where plaintiff would feel an "ultimate effect"); *Friends of Earth v. Haaland*, No. 21-2317, 2022 WL 185196, at *5 (D.D.C. Jan. 20, 2022) ("impacts alone cannot create proper venue").

Relatedly, the district court concluded that the locus of the "possible" future environmental impacts—though recognizing those impacts are not dispositive of venue on their own—supported a finding that venue was proper in the Southern District. App.1393-95. But while these possible future impacts "may be appropriately considered when balancing whether the interests of justice favor transfer, they do not independently create a proper venue." *See Friends of Earth*, 2022 WL 185196, at *5. Because none of the relevant decisions or omissions occurred in the Southern District, the district court erred in concluding venue is proper there.

### 3.    28 U.S.C. § 1391(e)(1)(C) does not confer venue in the Southern District of Florida.

The district court also erred in concluding that venue is proper in the Southern District because a plaintiff resides there and a defendant is an officer or employee of the United States. App.1379-83. Venue is proper under that theory only "if no real

39

property is involved in the action." 28 U.S.C. § 1391(e)(1)(C). Because Plaintiffs requested and the district court ordered relief involving real property, including an injunction controlling the use to which the land can be put, venue lies only in the Middle District where the underlying land sits.

This is not a case where the land is just peripherally involved, or where Plaintiffs sought only a declaratory judgment about the sufficiency of an EIS. Plaintiffs alleged that the defendants wrongfully commandeered the property. App.1103, 1113. They sought a declaration that the facility violates state "land-use laws." App.1113¶C. And Plaintiffs explicitly sought an injunction restricting the use to which the real property can be put by prohibiting its "further development" as a detention facility. *Id.* ¶¶B, D, E.

The district court obliged in granting the requested relief. Its injunction confirms that this case involves real property by prohibiting the state from improving the real property with new buildings or other facilities, by prohibiting it from being used as a detention center, or by forbidding any new paving, filling, or excavating. App.1435. The district court also forbade the state from installing new lighting or fencing on the real property and it ordered the removal of the property's existing fencing, lighting, sewage and other infrastructure. App.1436. By restricting the use to which the land may be put, forbidding its improvement, and requiring the removal of its fixtures, the district court's injunction shows this case is one "involving real property."

40

The district court thought that "involving real property" only encompasses cases essentially affecting title to, or possession of, the land. App.1380. But statutes must be interpreted according to their plain language and applied consistent with their terms, and § 1391(e)(1)(C) is not so narrowly limited to title disputes. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (cleaned up).

"Involve" is a broad term meaning "to include; or contain, imply." THE OXFORD ENGLISH DICTIONARY at 466 (1st ed. 1933); *see also id.* (defining "involved" to include "[c]ontained by implication, implicit"); WEBSTER'S NEW SCHOOL AND OFFICE DICTIONARY at 402 (1st ed. 1943) (involve means "to complicate; entangle; surround; embroil; include or contain"). The breadth of this definition shows that the term "involved" captures both primary relationships (the land and how it is used) and secondary relationships (its fixtures and improvements). Indeed, in everyday usage, something that "involves" a subject does not need to be the subject itself. For example, contracts involving real estate often address other subjects such as financing, insurance, or management, not just the physical transfer of land. Congress's deliberate use of the broad term "involved" signals an intent to sweep in a broader range of cases embroiling land in disputes than those just involving title or possession.

41

The district court also misunderstood the definition of "real property." Real property not only includes the land, but also the fixtures and improvements such as the buildings, fencing, lighting, sewage, and other infrastructure. *See* Black's Law Dictionary (5th ed. 1951) (defining real property as "[l]and, and generally what is erected or growing upon or affixed to the land"); Fla. Stat. § 680.309(1)(a) ("Goods are 'fixtures' when they become so related to particular real estate that an interest in them arises under real estate law."). The definition of real property therefore encompasses more than just title to land.

More fundamentally, real property is also defined by the collection of rights that attach to it. *See United States v. Craft*, 535 U.S. 274, 283 (2002) (analyzing whether a tenant holds "property" by analyzing the "rights" given tenets under state law). Courts described these rights as a "bundle of sticks," including the rights to exclude, use, possess, alienate, inherit, and to enjoy its fruits. *Id.* A core stick in that bundle is the right to "use" real property. Therefore, cases in which one party seeks to restrict the right of another to use one's real property are necessarily cases "involving real property" within the meaning of § 1391(e)(1)(C). A land-use restriction always involves real property because it governs what can or cannot be done with the land.

The out-of-circuit district court cases relied on by the district court either do not support the court's conclusion that this case does not involve real property or are not persuasive because they are inconsistent with venue provision's language. Unlike here, the relief sought in those cases did not directly affect property interests. *See, e.g.,*

42

*NRDC v. TVA*, 340 F. Supp. 400, 406 (S.D.N.Y. 1971) (explaining that the suit did not affect "mineral rights"); *Environmental Def. Fund, Inc. v. U.S. Army Corps of Eng'rs*, 325 F. Supp. 728, 732 (E.D. Ark 1971) (noting that "[t]he action does not put in issue the title to, or possession of, such lands, or any interest therein"); *Western Watersheds Project v. Schneider*, No. 16-83, 2019 WL 4863483, at *3 (D. Idaho Oct. 2, 2019) (noting that this "action does not involve the right, title or interest in real property"); *Earth Island Inst. v. Quinn*, 56 F. Supp. 3d 1110, 1116 (N.D. Cal. 2014) (noting that "the present action does not involve any dispute over real property interests").

Nor is the district court's excessively narrow and erroneous reading of the statutory language necessary to fulfill the statute's purpose of "broaden[ing] the venue of civil actions" against federal defendants. App.1380. Not all cases against the federal government involve real property, but this one most certainly does.

In sum, because Plaintiffs seek relief restricting the use of real property by prohibiting its "further development" as a detention facility, App.1113 ¶¶B, D, E, this case is one "involving real property." That the district court's injunction also forbad the property's improvement and required the removal of its fixtures further underscores that this case is one involving real property. Venue therefore is not proper in the Southern District under 28 U.S.C. § 1391(e)(1)(C).

43

## II.    The district court abused its discretion by failing to require Plaintiffs to prove a likelihood of irreparable harm.

"A showing of irreparable injury is the 'sine qua non of injunctive relief.'" *Siegel v. LePore*, 234 F.3d 1163, 1176-77 (11th Cir. 2000) (en banc). Moreover, the irreparable harm must be "likely" to occur, not merely possible. *See Winter*, 555 U.S. at 22-24. And "the asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Siegel*, 234 F.3d at 1176. Yet the district court entered a preliminary injunction—including a mandatory preliminary injunction— without requiring a showing of likely, imminent, concrete, and irreparable harm. It therefore abused its discretion.

There is no presumption of irreparable harm in environmental cases. *See Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987). Even a proven NEPA violation does not prove irreparable harm: "No such thumb on the scales is warranted." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).

But the district court did exactly that, placing its thumb on the scale. It found that a putative NEPA violation relieved Plaintiffs of their burden to prove the probability, quantity, and imminence of their irreparable harm. App.1424 ("Plaintiffs are not required to prove harms of a particular probability or quantity") & App.1425 n.31 ("the harms Plaintiffs fear take time to accrue; and time and access for study is precisely what NEPA procedures are meant to afford"). That is clear and reversible error. *See Winter*, 555 U.S. at 22-24; *Siegel*, 234 F.3d at 1176.

44

There is a reason the district court lowered the threshold. Plaintiffs' and Intervenor's witnesses and evidence utterly failed to satisfy their mandatory burden. The district court identified this evidence as showing potential harm by way of wetlands impacts, habitat loss, noise, light pollution, and lost access. App.1425-27. But these harms are preexisting from the airport and are in no way "irreparable." For instance, lights can be turned off and access can be restored on final judgment. And the harms also are not imminent or concrete. Plaintiffs' witnesses only speculated that harm may occur by 2070, or in a 100-year, 72-hour storm. App.316, 505-07. And thus, the district court only found that there was potential for impacts over the "long-term." App.1424; *see also* App.1425 n.31 ("the harms Plaintiffs fear take time to accrue"). Such distant harms do not justify the extraordinary and drastic remedy of a preliminary injunction. *See Appalachian Voices*, 139 F.4th at 929-30 (Henderson, concurring).

Moreover, none of the witnesses considered the baseline ecological impacts of the facility site. App.317, 494, 502-03, 697-98, 1034. Before becoming a detention facility, the site served as an active airfield, supporting approximately 28,000 flights in the last 6 months. App.1518-19, 1572. The site had bright lights and pre-existing buildings. App.1519. And it was "very loud" with noise "reverberat[ing] well beyond the airport itself." *Id.* In fact, aircraft noise was "loud enough to jolt most humans" and "surrounding wildlife." *Id.* Compared to the impacts of the site's previous use as

an airport, the impacts from the construction or operation of the detention facility are minimal. App.1572.

The district court's assertions of harm are also greatly exaggerated. For example, the district court noted the "800,000 square feet of new impervious surface." App.1422. But 800,000 square feet is only about 18 acres. The Big Cypress National Preserve is 729,000 acres, and Everglades National Park is 1.5 million acres.[11] So the paving here is only 0.003% of the size of the Big Cypress National Preserve, and 0.00001% of the Everglades. And the "new pavement" area was already disturbed land, was already fenced in, and was adjacent to an operating airport runway. App.1518-20. The ground disturbance here is exceedingly modest, and does not establish harm.

Plus, FDEM has taken actions to prevent any environmental harm from occurring. App.1520. It has initiated studies to ensure that there would be no meaningful impact on local wildlife. *Id.* It only has paved over land that was previously filled and leveled. *Id.* It also has instituted a rigorous waste management program, constructed speed bumps to slow traffic, and installed new silt fencing to prevent debris from falling into surrounding wetlands. *Id.* And FDEM plans to build a drainage basin to further prevent wetland impacts. *Id.*

---

[11] *See* Big Cypress National Preserve, https://www.nps.gov/bicy/index.htm; Everglades National Park, http://nps.gov/ever/planyourvisit/basicinfo.htm.

Finally, the district court further erred by granting a mandatory preliminary injunction ordering the removal of fencing, lighting, generators, gas, sewage and other waste receptacles to facilitate the facility's closure within 60 days. App.1436. Only in rare instances is the issuance of a mandatory preliminary injunction proper. *See Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561-62 (5th Cir. 1971); *see also Pierce v. North Carolina State Bd. of Elections,* 97 F.4th 194, 209 (4th Cir. 2024). As this Court concluded when granting the stay, this case is not one of the rare instances where a mandatory preliminary injunction is proper. 11th Cir. DE 42-1 at 30.

In sum, the district court erred by entering a mandatory preliminary injunction without a showing of likely, concrete, imminent, and irreparable harm.

## III. The equitable factors overwhelmingly weigh against an injunction.

When the United States is a party, the balance of the equities and public interest factors merge because the United States' interest is the public interest. *See Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020). The remaining equitable factors overwhelmingly disfavor an injunction. The district court's erroneous order threatens significant and irreparable harm to the public good, which greatly outweighs any claimed injury to Plaintiffs.

The district court's injunction contravenes the public interest and is therefore an abuse of discretion. *See Winter*, 555 U.S. at 26. There is a significant national interest in combatting unlawful immigration, which favors allowing Florida to continue the development and use of its facility. App.1463-65. As the President

47

explained, "[e]nforcing our Nation's immigration laws is critically important to the national security and public safety of the United States." 90 Fed. Reg. at 8443; s*ee also Trump Speaks*, *supra*, at 4:30 (President Trump: "This enormous, country destroying invasion has swamped communities nationwide with massive crime, crippling costs, and burdens far beyond what any nation could withstand."); *id.* at 14:25 (Secretary Noem: "[The facility] is exactly what we need"). If the facility is forced to shut down while the parties litigate this flawed case to final judgment, this critical national interest will be hindered. App.1464, 1494-95.

Maintaining detention flexibility and capacity in south Florida is crucial. App.1463-65. It is estimated that, among the millions of aliens that entered during the previous administration, one in four provided a release address in Florida. App.1465. DHS's Miami field office for Enforcement and Removal Operations consistently accounts for a staggering 10-15% of ICE arrests nationwide. *Id.* As a result, all detention facilities in the Miami area have been operating at or above their maximum capacity. App.1463. Florida's temporary detention facility is mission "essential," as its up to 2,000 beds permit DHS to keep pace with increased and often unpredictable detention needs. *Id.* Its shuttering within 60 days as ordered by the district court would cause irreparable harm and compromise the state and federal government's ability to enforce immigration laws, safeguard the public, protect national security, and maintain border security. *Id.* Without access to the facility's detention space, DHS Miami's ability to detain criminal aliens, including those with violent histories, will be

diminished. App.1463-64. The reduced capacity also would negatively affect other law enforcement agencies who, without sufficient detention space, would be unable to pursue arrests of criminal aliens, gang members, wanted fugitive felons, and aliens with removal orders. App.1464.

Florida's temporary detention facility therefore is a vital tool for maintaining a lawful immigration and detention environment, as it has alleviated over-crowding and allowed DHS and its partners to fulfill their public-safety mission by taking violent criminal aliens off the street. App.1464-65. The district court's injunction irreparably harms this mission because, without this facility, many criminal aliens would either be released back into the community or not arrested at all. App.1465. The district court's injunction is therefore contrary to the public interest, and it must be vacated. *See Winter*, 555 U.S. at 26 (holding that it is an abuse of discretion to issue a preliminarily injunction that is contrary to the public interest).

Plaintiffs have not shown their environmental interests outweigh the public's interest in combatting unlawful immigration. As discussed *supra* pages 44-47, Plaintiffs' contrary claims of harm to their environmental interests are too distant, reparable, and speculative to support a preliminary injunction. And FDEM has taken actions to prevent any environmental harm from occurring in any event. App.1520.

In sum, the harm to the state and federal defendants and the public is far more concrete and imminent compared to the distant, reparable, and speculative harms

claimed by Plaintiffs. The balance of harms and public interest factors show the district court committed error in granting the preliminary injunction.

## CONCLUSION

For the foregoing reasons, the order granting the preliminary injunction should be reversed and vacated. This case should be remanded to the district court with instructions directing the district court either to dismiss Counts I and II for lack of subject-matter jurisdiction, s*ee In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d at 1181, or, alternatively, to enter judgment for the defendants on those counts, *see Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("Review of a preliminary injunction is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it.") (internal quotations, brackets, and citation omitted). The Court should also instruct the district court to transfer the remaining or future counts to the Middle District of Florida.

Respectfully submitted,

/s/ *Allen M. Brabender*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT STANDER
*Deputy Assistant Attorney General*

MARISSA A. PIROPATO
HAYLEY A. CARPENTER
ALLEN M. BRABENDER
*Attorneys*
U.S. Department of Justice
Environment and Natural Resources Division
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3281
allen.brabender@usdoj.gov

December 16, 2025
DJ # 90-1-4-17960

51

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 12,607 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Garmond font.

/s/  *Allen M. Brabender*
ALLEN M. BRABENDER
*Counsel for the Federal Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 16, 2025, this brief was filed with the Clerk of the Court through the appellate CM/ECF system, which will send notice to all registered CM/ECF users.

/s/ Allen M. Brabender