No. 25-12873

# In the United States Court of Appeals for the Eleventh Circuit

FRIENDS OF THE EVERGLADES, INC., ET AL.,
*Plaintiffs-Appellees,*

V.

EXECUTIVE DIRECTOR, FLORIDA DIVISION OF
EMERGENCY MANAGEMENT, ET AL.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Florida
No. 25-cv-22896-KMW

## APPELLANT FDEM'S OPENING BRIEF

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa
  *Acting Solicitor General*
Nathan A. Forrester
  *Chief Deputy Solicitor General*
Kevin A. Golembiewski
  *Senior Deputy Solicitor General*
Robert S. Schenck
  *Assistant Solicitor General*
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

December 16, 2025

Jesse Panuccio
Evan Ezray
David Costello
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL  33301
jpanuccio@bsfllp.com

*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

## ORAL ARGUMENT STATEMENT

The Court has set oral argument for the week of April 6, 2026.

# TABLE OF CONTENTS

**Page**

ORAL ARGUMENT STATEMENT ............................................................. i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF JURISDICTION........................................................... xiii

ISSUES PRESENTED ............................................................................... 1

INTRODUCTION ..................................................................................... 2

BACKGROUND......................................................................................... 6

STANDARD OF REVIEW...................................................................... 16

SUMMARY OF ARGUMENT ............................................................... 17

ARGUMENT ........................................................................................... 21

I.    Plaintiffs Are Unlikely To Succeed on the Merits ......................... 21

    A.    The Southern District of Florida Is an Improper Venue...... 21

    B.    NEPA Does Not Apply to Florida's Detention Facility ........ 34

        1.    The District Court Erred in Finding Final Federal
Agency Action................................................................. 35

            a.    Failure to Issue an EIS for State Construction
or Detention Is Not Final Agency Action ........... 36

            b.    Federal Funding Was Not a Proper Basis for
the Injunction...................................................... 37

            c.    There Has Been No Federal Construction ......... 39

            d.    There Is No Relevant Final Federal Detention
Decision ............................................................... 43

          2.     The District Court Erred in Finding "Major" Federal Action .............................................................. 49

                a.    Because There Is No Federal Control Over the Facility, There Is No Major Federal Action ........ 50

                b.    Federal Funding Is Not a Major Federal Action ..................................................................... 53

                c.    Immigration Enforcement Is Not a Major Federal Action ..................................................... 55

       C.    Plaintiffs Are Unlikely to Obtain the Injunctive Relief They Seek ............................................................. 56

II.    Plaintiffs Did Not Establish Irreparable Harm ............................ 59

III.   The Balance of Equities Did Not Support an Injunction .............. 65

CONCLUSION ...................................................................... 68

CERTIFICATE OF COMPLIANCE ........................................ 70

CERTIFICATE OF SERVICE .................................................. 71

# TABLE OF AUTHORITIES

**Cases**                                                                          **Pages**

*Abramoff v. Shake Consulting, LLC,*
   288 F. Supp. 2d 1 (D.D.C. 2003).................................................29, 32

*Alden v. Maine,*
   527 U.S. 706 (1999)..................................................................... 45

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531 (1987)..................................................................... 65

*Arizona v. United States,*
   567 U.S. 387 (2012).............................................................2, 5, 66

*Atl. Coal. on Transp. Crisis, Inc. v. Atl. Reg'l Comm'n,*
   599 F.2d 1333 (5th Cir. 1979)........................................................ 41

*Awad v. Mayorkas,*
   2022 WL 1215521 (M.D. Fla. Apr. 7, 2022) ....................................... 22

*Bautista-Perez v. Holder,*
   681 F. Supp. 2d 1083 (N.D. Cal. 2009)............................................. 26

*Bennett v. Spear,*
   520 U.S. 154 (1997)................................................................38, 40

*Big Bend Conservation All. v. FERC,*
   896 F.3d 418 (D.C. Cir. 2018)....................................................35-36

*Bigham v. Envirocare of Utah, Inc.,*
   123 F. Supp. 2d 1046 (S.D. Tex. 2000)............................................. 32

*C.M. v. Noem,*
   796 F. Supp. 3d 1198 (S.D. Fla. 2025)................................4, 23, 29-30

*Chapman v. Procter & Gamble Distrib., LLC,*
   766 F.3d 1296 (11th Cir. 2014)...................................................... 62

iv

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) ....................................................... 57

*City of Austin v. Kinder Morgan Tex. Pipeline, LLC*,
  447 F. Supp. 3d 558 (W.D. Tex. 2020) ......................................... 62

*City of Port Isabel v. FERC*,
  130 F.4th 1034 (D.C. Cir. 2025) .................................................. 56

*Clark v. Sweeney*,
  No. 25-52, 2025 WL 3260170 (U.S. Nov. 24, 2025)..................... 27

*Coal. for Underground Expansion v. Mineta*,
  333 F.3d 193 (D.C. Cir. 2003) ..................................................... 37

*Cottman Transmission Sys., Inc. v. Martino*,
  36 F.3d 291 (3d Cir. 1994) .......................................................... 31

*Ctr. for Biological Diversity v. Salazar*,
  2010 WL 2493988 (D. Ariz. June 17, 2010) ............................... 55

*Ctr. for Biological Diversity v. U.S. Dept. of Hous. & Urban Dev.*,
  541 F. Supp. 2d 1091 (D. Ariz. 2008) ......................................... 38

*Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*,
  141 F.4th 976 (9th Cir. 2025) ..................................................... 58

*Dacostagomez-Aguilar v. U.S. Att'y Gen.*,
  40 F.4th 1312 (11th Cir. 2022) ................................................... 50

*Day v. Shalala*,
  23 F.3d 1052 (6th Cir. 1994).................................................. 43-44

*Delong Equip. Co. v. Wash. Mills Abrasive Co.*,
  840 F.2d 843 (11th Cir. 1988).................................................... 23

*Demore v. Kim*,
  538 U.S. 510 (2003) ...................................................................... 7

*Fed. Trade Comm'n v. On Point Cap. Partners LLC*,
  17 F.4th 1066 (11th Cir. 2021) ................................................... 39

v

*Flowers Indus., Inc. v. FTC*,
    835 F.2d 775 (11th Cir. 1987)........................................................18, 29

*Food & Water Watch v. FERC*,
    28 F.4th 277 (D.C. Cir. 2022) .............................................................57

*\*Friends of Earth v. Haaland*,
    2022 WL 185196 (D.D.C. Jan. 20, 2022)............................22, 28, 31-34

*\*Friends of the Everglades, Inc. v. Noem (FOE)*,
    2025 WL 2598567 (11th Cir. Sept. 4, 2025)............................................

    ....................................................2-4, 15, 23-25, 50-51, 53, 56-58, 66-67

*Garcia v. Guthrie*,
    No. 25-cv-23136 (S.D. Fla. July 16, 2025).......................................4, 23

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ......................................................................46-48

*Geo Grp., Inc. v. Newsom*,
    50 F.4th 745 (9th Cir. 2022) ...............................................................48

*Gutierrez v. Wells Fargo Bank, NA*,
    889 F.3d 1230 (11th Cir. 2018)...........................................................26

*Harbert v. United States*,
    206 F. App'x 903 (11th Cir. 2006) ......................................................40

*Hoffman v. U.S. Dep't of Treasury*,
    2025 WL 1809994 (D. Kan. July 1, 2025) .....................................51, 54

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ...............................................................................67

*Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*,
    2005 WL 8176727 (E.D. Cal. July 7, 2005)....................................22, 33

*\*Jenkins Brick Co. v. Bremer*,
    321 F.3d 1366 (11th Cir. 2003)................................ 17-18, 21-22, 30-32

*Jennings v. Rodriguez*,
 583 U.S. 281 (2018) .............................................................. 45

*Johnson v. Masselli*,
 2008 WL 111057 (N.D. Ind. Jan. 4, 2008).......................... 25

*Ka Makani 'O Kohala Ohana Inc. v. Water Supply*,
 295 F.3d 955 (9th Cir. 2002)................................................ 43

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
 475 F.3d 1291 (D.C. Cir. 2007) ........................................... 34

*Lamont v. Haig*,
 590 F.2d 1124 (D.C. Cir. 1978) ........................................... 31

*Lane v. XYZ Venture Partners*,
 322 F. App'x 675 (11th Cir. 2009) ....................................... 24

*Lebron v. Nat'l R.R. Passenger Corp.*,
 513 U.S. 374 (1995) .............................................................. 44

*Leroy v. Great W. United Corp.*,
 443 U.S. 173 (1979).......................................................31-32

*Lithia Ramsey-T, LLC v. City Line Auto Sales, LLC*,
 2023 WL 1883355 (D.N.J. Feb. 9, 2023) ............................ 26

*Manchester KnittedFashions, Inc. v. Amalgamated Cotton Garment and Allied Industry Fund*,
 967 F.2d 688 (1st Cir. 1992) ................................................ 26

*Mashpee Wampanoag Tribe v. Zinke*,
 2019 WL 2569919 (D.D.C. June 21, 2019).......................... 22

*Miccosukee Tribe of Indians of Fla. v. United States*,
 6 F. Supp. 2d 1346 (S.D. Fla. 1998)..................................... 55

*Nat'l Ass'n of Home Builders v. EPA*,
 675 F. Supp. 2d 173 (D.D.C. 2009) ................................22, 28

*Nat'l Org. for the Reform of Marijuana L. v. DEA*,
 545 F. Supp. 981 (D.D.C. 1982) .....................................40, 43

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
  896 F.2d 1283 (11th Cir. 1990) .......................................................... 59

*Nielsen v. Preap*,
  586 U.S. 392 (2019) ........................................................................... 46

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................. 36

*Norwegian Cruise Line Holdings v. Fla. Dep't of Health*,
  50 F.4th 1126 (11th Cir. 2022) ..................................................... 17, 21

*Nw. Ctr. for Alts. to Pesticides v. DHS*,
  552 F. Supp. 3d 1078 (D. Or. 2021) ................................................... 55

*Odouk v. St. Leo Univ.*,
  2010 WL 11507608 (N.D. Ga. Mar. 10, 2010) .................................... 24

*Ouachita Watch League v. Jacobs*,
  463 F.3d 1163 (11th Cir. 2006) .......................................................... 34

*Payne v. Savannah Coll. of Art & Design, Inc.*,
  81 F.4th 1187 (11th Cir. 2023) .......................................................... 25

*Pickett v. City of Houston*,
  2009 WL 1158842 (S.D. Tex. Apr. 29, 2009) ..................................... 26

*Protect Our Parks, Inc. v. Buttigieg*,
  10 F.4th 758 (7th Cir. 2021) .............................................................. 36

*Protect Our Parks, Inc. v. Buttigieg*,
  2021 WL 3566600 (N.D. Ill. Aug. 12, 2021) ....................................... 42

*Pub. Citizen v. Nuclear Regul. Comm'n*,
  845 F.2d 1105 (D.C. Cir. 1988) .......................................................... 39

*Rattlesnake Coal. v. EPA*,
  509 F.3d 1095 (9th Cir. 2007) ............................................................ 38

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003) ............................................................ 40

*Ritter v. Cecil Cnty. Office of Hous. & Cmty. Dev.*,
   33 F.3d 323 (4th Cir. 1994) ................................................................43-44

*Seal v. Riverside Fed. Sav. Bank*,
   825 F. Supp. 686 (E.D. Pa. 1993) ........................................................ 24

*\*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025) ................................................................3, 56-58

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ................................................59, 62

*Sierra Club v. FERC*,
   145 F.4th 74 (D.C. Cir. 2025) .............................................................. 34

*Sierra Club v. Penfold*,
   857 F.2d 1307 (9th Cir. 1988) .............................................................. 41

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   803 F.3d 31 (D.C. Cir. 2015) .............................................................. 35

*Sinclair v. Att'y Gen.*,
   198 F. App'x 218 (3d Cir. 2006) .......................................................... 48

*Steen v. Murray*,
   770 F.3d 698 (8th Cir. 2014) ..............................................18, 29, 33

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020) ......................................................16, 21

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019) .............................................................................. 55

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ................................................................................ 5

*United States v. Brignoni-Ponce*,
   422 U.S. 873 (1975) .............................................................................. 66

*United States v. S. Fla. Water Mgmt. Dist.*,
   28 F.3d 1563 (11th Cir. 1994) ...........................................37, 39, 44, 52

*United States v. Sineneng-Smith,*
   590 U.S. 371 (2020) ....................................................... 26-27

*United States v. Texas,*
   599 U.S. 670 (2023) .......................................................... 48

*Verlo v. Martinez,*
   820 F.3d 1113 (10th Cir. 2016) ......................................... 39

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) .......................................................... 66

*Willie R. Etheridge Seafood Co. v. Pritzker,*
   2015 WL 4425659 (E.D.N.C. July 17, 2015) ....................... 63

*\*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..................................... 5, 17, 20, 59, 62-63, 65

*Woodke v. Dahm,*
   70 F.3d 983 (8th Cir. 1995) .............................................. 32

**Statutes**

5 U.S.C. § 701 .................................................................... 48

5 U.S.C. § 706 .................................................................... 44

8 U.S.C. § 1357(g) ............................................................. 11

8 U.S.C. § 1357(g)(9) ......................................................... 52

8 U.S.C. § 1226 ............................................................. 47-48

8 U.S.C. § 1226(a) ............................................................. 45

8 U.S.C. § 1226(e) ........................................................ 4, 45-46

8 U.S.C. § 1226(f) ............................................................... 4

8 U.S.C. § 1231 .................................................................. 48

8 U.S.C. § 1231(g) ............................................................. 47

8 U.S.C. § 1231(g)(1) ................................................................47-48

8 U.S.C. § 1252(f) ................................................................4, 46-48

8 U.S.C. § 1252(f)(1) ................................................................46

28 U.S.C. § 1391(b)(2) ................................................................21

42 U.S.C. § 4332(C) ................................................................34, 49

42 U.S.C. § 4336e(10)(A) ................................................................49

42 U.S.C. § 4336e(10)(B) ................................................................50

42 U.S.C. § 4336e(10)(B)(i) ................................................................16

42 U.S.C. § 4336e(10)(B)(ii) ................................................................51

42 U.S.C. § 4336e(10)(B)(iii) ................................................................51, 54

42 U.S.C. § 4336e(10)(B)(v) ................................................................55

Fla. Stat. § 252.35 ................................................................7

**Rules**

Fed. R. Civ. P. 7(a) ................................................................25

Fed. R. Evid. 701(c) ................................................................63

**Other Authorities**

2 Pub. Nat. Resources L. § 17:4.10 (2d ed.) ................................................................52

Christopher Flavelle, *How Biden Ignored Warnings and Lost Americans' Faith in Immigration*, N.Y. TIMES (Dec. 7, 2025) ................2

Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025) ................66

Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002) ................................................................45

*Southwest Land Border Encounters*, U.S. Customs and Border Protection, https://perma.cc/3BXX-QQKF ................6

*Fact Sheet: President Donald J. Trump Declares a National Emergency at the Southern Border*, The White House (Jan. 22, 2025), https://perma.cc/ETY5-KVV4 ................................................................ 6

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under federal law.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from the entry of a preliminary injunction.

## ISSUES PRESENTED

**1.**    Whether venue is proper in the Southern District of Florida.

**2.**    Whether Plaintiffs are likely to succeed on their claim that the National Environmental Policy Act applies to a State-funded, State-built, and State-operated detention facility.

**3.**    If NEPA applies here, whether the proper remedy would be remand without vacatur, rather than an injunction.

**4.**    Whether Plaintiffs established the imminent, irreparable harm necessary for preliminary injunctive relief.

**5.**    Whether the balance of the equities favored preliminary injunctive relief.

1

## INTRODUCTION

States "bear[] the brunt of the country's illegal immigration problem." *Arizona v. United States*, 567 U.S. 387, 436 (2012) (Scalia, J., dissenting in part). That is true for Florida, which declared a state of emergency due to the harms associated with the massive influx of illegal aliens in the early 2020s. *See* Christopher Flavelle, *How Biden Ignored Warnings and Lost Americans' Faith in Immigration*, N.Y. TIMES (Dec. 7, 2025) (reporting that the Biden Administration was warned of "chaos" that would result from refusal to enforce the immigration laws, "failed to act," and then the "warnings came true, and then some," with "overwhelmed" cities across the nation).

As part of its emergency response, the State converted a "bustling working airport" in Collier County (in the Middle District of Florida) into a temporary, one-stop immigration detention and deportation facility known as Alligator Alcatraz. *Friends of the Everglades, Inc. v. Noem (FOE)*, 2025 WL 2598567, at *1 (11th Cir. Sept. 4, 2025). The State controls the land on which the detention facility sits. The State funded its construction. The State exercises discretion over which, if any, detainees to accept at its facilities. Thus, although the detention facility

is used for immigration functions pursuant to 287(g) agreements, it—like many facilities across Florida, including county jails—remains a State facility under State control.

The Collier County detention facility opened in early July 2025, housing thousands of detainees and alleviating overcrowding elsewhere. That is, until August 21, when a district court in the Southern District of Florida preliminarily enjoined any additional detention or construction at the facility and required its closure within sixty days. The court based its injunction against the State on the National Environmental Policy Act (NEPA)—a modest procedural statute that, through the APA, reaches only federal agency decisionmaking. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 172 (2025).

This Court stayed that order and further proceedings below. *See FOE*, 2025 WL 2598567, at *1-13. First, the Court noted the district court's "cursory analysis" of venue—a shortcoming that "undermine[d]" "confidence in the district court's reasoning" and bolstered the "conclusion that the Defendants are likely to prevail on appeal." *Id.* at *9-10 & n.9. Indeed, the "entirety of the Facility" "is located in Collier County … in the Middle District." *Id.* at *2. For just that reason, two

3

Southern District judges have held that their district is an improper venue for challenges to the detention facility. *See C.M. v. Noem*, 796 F. Supp. 3d 1198, 1225-32 (S.D. Fla. 2025); *Garcia v. Guthrie*, No. 25-cv-23136 (S.D. Fla. July 16, 2025), Doc. 5 at 1. The same is true here, meaning Plaintiffs have no likelihood of success on the merits.

Next, this Court correctly concluded that Plaintiffs' NEPA claim is likely to fail on the merits because Plaintiffs did not identify any "major federal action" below. *FOE*, 2025 WL 2598567, at *5-9. The State-built and State-operated detention facility did not qualify because the facility had neither received "federal funding" nor been subject to "federal control" when the injunction issued. *Id.* at *6-9 & n.7. Rather, the facility was "built, led, operated, and funded unilaterally by a state government." *Id.* at *9 n.7. And beyond those problems, Plaintiffs did not identify a final agency action challengeable under the APA, and, in any event, federal courts cannot enjoin detention operations at the facility under 8 U.S.C. §§ 1226(e), 1252(f), and the APA.

This Court also previously concluded that "the balance of equities and … concern for the public interest tip … in favor of the Defendants." *FOE*, 2025 WL 2598567, at *12. Like the federal government, Florida

"bear[s] many of the consequences of unlawful immigration," and "if the injunction were to stay in place, it would bring the State's already stressed and overcrowded [detention] system to a breaking point." *Id.* (quoting *Arizona*, 567 U.S. at 397). Plaintiffs, by contrast, offered only speculative harm that might occur, if at all, long after this case concludes. Plaintiffs identified no immediate and irreparable harm, as required for a preliminary injunction. Conversely, "the injuries facing the Defendants and the public are critical, immediate, and concrete." *Id.*

Two decades ago, in a NEPA case, the Supreme Court counseled that a preliminary injunction is "an *extraordinary* remedy that may only be awarded upon a *clear showing*" that the plaintiff is "*likely* to succeed on the merits" and "*irreparable* injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008) (emphasis added). Here, Plaintiffs failed to make a "clear showing" that merits success, and immediate "irreparable" harm, are "likely." *Id.* In holding otherwise, the district court ignored not only *Winter* but also the Supreme Court's recent warning about eschewing "the limits on judicial authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025). The proceedings below have the hallmarks of such overreach.

The venue issue was fully briefed on July 29. Rather than decide that threshold question of judicial power at the outset, the court deferred the question, entered a TRO on August 7, and held a four-day preliminary-injunction hearing. At that hearing, the district court repeatedly issued one-sided evidentiary rulings and invoked other cases, news stories, and social-media posts not in evidence. *See infra* 13-14 (documenting examples).

This Court, consistent with the reasoning and conclusions of its stay order—which analyzed the same factors at issue here—should vacate the preliminary injunction and order that the case be transferred to the Middle District of Florida.

## BACKGROUND

**1.** Due to a federal non-enforcement policy beginning in 2021, over two million illegal aliens flooded through the southern border annually until early 2025, creating a national emergency.[1] That rush inundated Florida with "dangerous criminal aliens," App.1477 ¶6, 1524-25, and

---

[1] *Southwest Land Border Encounters*, U.S. Customs and Border Protection, https://perma.cc/3BXX-QQKF; *Fact Sheet: President Donald J. Trump Declares a National Emergency at the Southern Border*, The White House (Jan. 22, 2025), https://perma.cc/ETY5-KVV4.

overburdened detention facilities, App.826:24-827:2, 828:12-15, 828:20-22, 835:20-25, 838:19-22; *see also* Flavelle, *supra*. Governor DeSantis declared a state of emergency. App.1524-33. The Florida Division of Emergency Management (FDEM) is the statewide emergency-response agency and coordinates law-enforcement and other agencies to respond to emergencies. *See* Fla. Stat. § 252.35. Accordingly, the Governor authorized FDEM to coordinate State and local agencies in responding to the illegal-immigration emergency. App.1524-33.

2.    A key impediment to combatting illegal immigration is insufficient detention capacity. App.828:12-15, 828:20-22, 1494-95 ¶11; *see Demore v. Kim*, 538 U.S. 510, 519 (2003) ("[O]ne of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings."). To address that problem, Florida officials in Tallahassee decided to build a State-run detention facility at the Dade-Collier Training and Transition Airport (TNT). App.1521 ¶20, 1480 ¶17, 1494-95 ¶11, 1499 ¶4.

Before its conversion into a temporary detention facility, TNT was an active airport used for hundreds of training flights each week. App.1515 ¶4, 1518 ¶11. Though Miami-Dade County owns the larger

7

plot that contains TNT, the airport itself lies in Collier County, with only an unused sliver of grass extending into Miami-Dade. App.1516-18 ¶¶6-10. This schematic shows the airport's layout:



App.1537. The thin blue line reflects the airport's preexisting fenced perimeter. App.1516-17 ¶7. The fence is roughly eight feet tall, has barbed wire, and encloses the airport. *Id.* The red line on the right represents the border between Collier and Miami-Dade counties. App.1517 ¶8. The Collier County side contains the airport's two-mile-long lighted runway, taxiway, administrative buildings with outdoor lighting, retention ponds, and service roads. App.1517 ¶8, 1519 ¶16.

Prior to its conversion, TNT "routinely host[ed] over 150 aviation operations each day." App.1563-64 ¶¶2-3.  From January 1 through July 23, 2025, TNT hosted nearly 28,000 takeoffs and landings—involving aircraft of all sizes, including jets and military helicopters.  App.1518 ¶¶11-12, 1547-49, 1566 ¶2.  And "unlike most airports, TNT d[id] not require that pilots follow noise-abatement procedures."  App.1564 ¶5.

On June 23, 2025, FDEM exercised its State-law authority to commandeer the TNT airport (but not the larger plot of land on which it sits) to build a temporary detention facility.  App.1535.  The red shading below reflects the commandeered area:



App.1517 ¶9, 1545. Roughly 98% of the commandeered area lies in Collier County, including all the detention facility's buildings, improvements, hardscape, and operations. App.1518 ¶10.

The detention facility "was entirely State constructed." App.1521 ¶21, 1480 ¶19, 1571 ¶2. FDEM oversaw its development, and it was built by State vendors paid with State dollars. App.1521 ¶21. The only federal involvement in construction was a routine ICE compliance check, which occurs at all State and local facilities housing immigration detainees. *Id.*

When the district court issued its injunction, the State had no legally enforceable right to reimbursement from the federal government for funds spent on the facility, and the federal government had not, in fact, reimbursed FDEM. App.1521 ¶22, 1571 ¶3, 1503 ¶4. Since then, the federal government has granted—but not dispersed—funds to reimburse FDEM for detention operations at the facility.

FDEM has been careful to protect the environment in constructing and operating the detention facility. It "paved exclusively over land that was previously filled and leveled" as part of the original airport development; erected protective "silt fencing" to "block sediment runoff"; instituted a "rigorous waste-management policy"; and commissioned a

wildlife study that identified no "meaningful impacts" on native species. App.1520 ¶¶18-19. FDEM also ensured that all the facility's infrastructure was temporary and removable. App.1519-20 ¶17.

FDEM coordinates management of the facility with State law-enforcement agencies that have agreements with the federal government under section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g). App.1521-22 ¶23. There are roughly 900-1100 state employees and contractors on-site each day. App.1522 ¶24. In contrast, about four ICE officers are on-site to provide guidance and handle detainee transportation. *Id.*; App.1480 ¶19. But those officers "do not control the site." App.1522 ¶24. Rather, State officials "operate[] th[e] facility," *id.* ¶25, and exercise "complete discretion in deciding" whether to accept detainees, App.1480 ¶18.

**3.** On June 27, 2025, two advocacy groups sued FDEM and the federal government, alleging that they violated NEPA by failing to prepare an environmental-impact statement (EIS) before the detention facility was constructed. App.1107-10 ¶¶61-74.[2] Plaintiffs sought a TRO

---

[2] Plaintiffs sued Miami-Dade County but did not seek preliminary relief against it.

and preliminary injunction barring Defendants from constructing the facility or using it for immigration detention. App.1128-29. After Judge Martinez's recusal, the case was reassigned to Judge Williams. App.1230. The court permitted the Miccosukee Tribe to intervene over FDEM's objection. App.1204-23, 1266-76, 1327-28.

Because Plaintiffs sought an emergency TRO, FDEM filed an initial response within three days, explaining that NEPA does not apply to state actions. App.1132-53. Plaintiffs then supplemented their motion several times, App.1180-93, 1225-28, 1232-35, 1246-54, and twice renewed their requests for injunctive relief, App.1195-202, 1237-44. In a supplemental response to Plaintiffs' amendments—and before the district court took any substantive action or conducted any hearing—Defendants asserted that venue was improper in the Southern District because the facility lies in the Middle District and no relevant decisionmaking occurred in the Southern District. App.1256-61, 1278-89. As explained below (at 24), the district court ultimately accepted all supplemental filings as part of the original motion and response. App.1298:11, 1327.

**4.** The court initially denied Plaintiffs' request for a TRO and, at Plaintiffs' request, scheduled an evidentiary hearing that Plaintiffs said

should take one day.  App.1263-64, 1300:18-20.  Plaintiffs then disclosed thirteen witnesses and hundreds of exhibits, such that the hearing extended into a four-day mini-trial over two weeks, almost all of which was used by Plaintiffs to speculate about potential environmental harm far in the future.  App.1329-34, 1350-51, 1353-54.  Midway through that hearing, and before Defendants presented their case, Plaintiffs again moved for a TRO, App.538:19, which the court granted, App.1336-48.  The TRO barred Defendants from "installing any additional industrial-style lighting … or doing any paving, filling, excavating, or fencing; or doing any other site expansion, including placing or erecting any additional buildings, tents, dormitories, or other residential or administrative facilities on the TNT site."  App.1347.

The evidentiary hearing was plagued by procedural and substantive irregularities.  During the hearing, the court:

- permitted Plaintiffs to introduce voluminous hearsay evidence through live witnesses, App.354:3-23 (permitting witness to report what a receptionist at the Governor's Office said); *see also* App.126:9-15, 131:4-19, 354:18-20, 441:4-6, 441:14-15, 646:22-647:1, 865:13-24, while barring Defendants from doing the same, App.832:5-9 (prohibiting Executive Director of Florida Highway Patrol from testifying about actions of his officers);

- interposed its policy views on immigration enforcement, App.827:18-21 ("[T]here is a housing issue because nobody is being given bond under the INA."); App.983:17-21 (opining that detainees are "carpenters and agricultural workers");

- overruled nearly all of Defendants' objections,[3] but sustained nearly all of Plaintiffs' objections[4];

- interposed its own objections and "sustained" objections that Plaintiffs did not make, App.95:1-5, 102:18-24, 105:9-21, 150:14-21, 207:18-24;

- prohibited Defendants' attempt to cross-examine witnesses with impeachment exhibits if the exhibits were not already in evidence, App.72:8-74:12, 95:21-99:11, 103:1-104:3;

- sharply curtailed Defendants' attempt to introduce balance-of-harms evidence on how the immigration crisis affected Florida, App.823:4-824:3, 824:11-23, 824:25-826:19, 832:5-833:4, 833:6-835:10;

- permitted Plaintiffs' lay witnesses to offer expert environmental-impact testimony, App.186:3-25;

- allowed Plaintiffs' experts to opine on scientific matters not timely raised in their pre-hearing disclosures, App.43:1-12, 428:25-429:14, 436:12-18, 482:22-483:8; *see also* App.1327.

- repeatedly referenced facts outside the parties' presentation of evidence, including "litigation in Illinois," App.613:12-17, an email from an ICE representative from a different case, App.978:7-13, and a media interview from Florida's Attorney General that the court raised sua sponte, after evidence had

---

[3] App.59:9-20, 115:1-19, 118:7-24, 126:9-15, 131:4-19, 354:15-23, 482:23-483:3, 489:4-10, 666:5-7, 671:12-19, 681:17-22, 683:3-7, 750:22-751:4, 763:17-25, 779:18-21, 805:13-14, 852:12-15, 856:15-19, 865:13-24.

[4] App.72:8-74:12, 95:21-99:11, 103:1-104:3, 105:2-21, 148:21-149:13, 212:9-10, 283:12-284:23, 823:23-824:3, 824:22-23, 825:4-8, 832:5-9.

closed, as a formal "invitation" to visit the facility, App.877:2-879:2.

The parties delivered closings on August 13, 2025. *See generally* App.916-1086. At 8:47 p.m. on August 21—the last day of the TRO period—the court entered a preliminary injunction requiring Defendants to (i) immediately cease bringing new detainees to the facility, (ii) immediately cease new construction, and (iii) remove all new lighting, fencing, and utilities within sixty days. App.1435-36. The order, in other words, aimed to depopulate the facility through "attrition," App.1468, and dismantle it so severely that it would be impossible to safely house detainees there after sixty days.

**5.** Defendants appealed, App.1439-40, 1835-36, and moved this Court for a stay of both the preliminary injunction and the proceedings below. CA11 Docs. 9, 20. In a lengthy order, this Court analyzed the equitable factors at issue here and granted those stays. *See Friends of the Everglades, Inc. v. Noem (FOE)*, 2025 WL 2598567 (11th Cir. Sept. 4, 2025). Holding that Defendants were likely to succeed on appeal, this Court concluded that neither constructing nor operating the detention facility constitutes "major federal action" under NEPA. *Id.* at *6-9 & n.7. "NEPA's definition of 'major federal action,'" the Court explained, "does

15

not include a non-Federal action (1) with no or minimal Federal funding; *or* (2) with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project." *Id.* at \*6 (quoting 42 U.S.C. § 4336e(10)(B)(i)) (alterations accepted). As a result, "*either* the absence of federal funding *or* the absence of federal control is sufficient to take a project outside the definition of 'major federal action.'" *Id.* And here, the Court held, Plaintiffs had not shown either that the federal government had funded (*id.* at \*6-9), or controlled (*id.* at \*9 n.7), the State's construction and operation of the TNT facility.

Merits aside, this Court "question[ed]" the district court's "cursory [venue] analysis," which only strengthened its "conclusion that the Defendants are likely to prevail on appeal." *Id.* at \*9 & n.9. This Court also determined that a stay would prevent irreparable harm to Defendants and was justified by the equities. *See id.* at \*10-13.[5]

## STANDARD OF REVIEW

This Court reviews a "preliminary injunction for abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact." *Swain v. Junior*, 958 F.3d 1081, 1088

---

[5] Judge Jordan dissented. *Id.* at \*13-23.

(11th Cir. 2020). A preliminary injunction, however, is "an *extraordinary* remedy that may only be awarded upon a *clear showing*" that all the requisite elements are met. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008) (emphasis added). Thus, to justify the preliminary injunction, Plaintiffs had to "clearly establish" (1) "a substantial likelihood of success on the merits," (2) "irreparable injury," (3) that their injury "outweighs" the harm that the injunction causes Defendants, and (4) that the injunction is in "the public interest." *Norwegian Cruise Line Holdings v. Fla. Dep't of Health*, 50 F.4th 1126, 1134-35 (11th Cir. 2022). These are the same factors this Court reviewed and determined in granting the stay of the order on appeal.

## SUMMARY OF ARGUMENT

**I.** The venue issue resolves this appeal. Though Plaintiffs sued in the Southern District of Florida, none of the "relevant … acts and omissions" underlying their NEPA claim occurred in that district. *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003). The TNT facility sits in the Middle District of Florida. State decisions related to that facility are made on-site or in the Northern District of Florida. And any relevant federal decisionmaking occurs in Washington, D.C.

17

The district court's contrary holding rests on (i) a misguided waiver finding that this Court has already rejected and (ii) a smorgasbord of equally unavailing arguments that the district court improperly injected into the proceeding.  Among its many errors, the court wrongly relied on acts that occurred *after* the complaint was filed.  *See Flowers Indus., Inc. v. FTC*, 835 F.2d 775, 776 n.1 (11th Cir. 1987).  It mistakenly deemed certain acts relevant to the venue analysis "simply because the alleged wrongful" conduct "would have been impossible without [them]."  *Steen v. Murray*, 770 F.3d 698, 704 (8th Cir. 2014).  And it defied this Court's instruction to "focus on relevant activities of the defendant" by fixating on where "the plaintiff[s]" might one day feel the effects of those activities.  *Jenkins Brick*, 321 F.3d at 1371-72.  The Court should thus reverse and remand with instructions to transfer this case to the Middle District.

**II.**     As this Court already concluded, the district court erred in concluding that Plaintiffs were likely to succeed on their NEPA claim. NEPA is a procedural statute that applies only to federal agency decisionmaking.  The statute does not reach this State project.  To reach the contrary conclusion, the district court erred multiple times over.

First, the district court failed to identify the relevant final agency decision.  When the preliminary injunction was issued, there had been no federal funding decision, so funding could not be the final action.  Nor could construction be the final action because the State (and only the State) built the detention facility.  That leaves detention at the facility.  But that, too, is not final federal action because the State has ultimate authority to determine who is detained at its facility.  And even if detention is federal action, both the INA and the APA forbid courts from reviewing the federal government's discretionary decision to detain.

Second, the district court improperly found *major* federal action.  As this Court already recognized, an action is major only if it is both controlled and funded by the federal government.  Here, however, there was neither: the State controls all aspects of the facility and there was no funding.

Last, the district court erred in assuming the remedy for a NEPA violation here would be an injunction.  NEPA errors do not invariably require agencies to abandon their policy choices; often, the agency may proceed while it performs any required environmental review.  Here, this facility is critically important to vital national security interests and

poses no new, imminent environmental risks. Under these circumstances, there is no reason for an injunction.

**III.** Plaintiffs also did not establish irreparable harm. Their so-called experts (none of whom faced a *Daubert* inquiry) could only speculate about potential and far-off environmental harm. Moreover, these experts failed to consider the environmental baseline, comparing the facility to a wetland rather than the busy airport it temporarily displaces. The district court nonetheless credited this speculative and unreliable testimony, holding that Plaintiffs did not need to show likely harm. That holding is irreconcilable with binding precedent. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy.").

**IV.** Finally, as this Court already concluded, the balance of equities did not support an injunction. On one side of the ledger is an immigration crisis that both the federal and State governments are working to address. On the other side are speculative allegations of minor environmental harm decades in the future—assuming (without factual support) that this temporary facility remains in place that long.

20

The result is no contest. The balance of the equities strongly undermines preliminary injunctive relief.

## ARGUMENT

In granting a stay, this Court already decided that Plaintiffs were unlikely to prevail on the very same showings they need to make to support a preliminary injunction. *Compare Swain*, 958 F.3d at 1088 (outlining the stay factors), *with Norwegian*, 50 F.4th at 1134-35 (same factors for preliminary injunction). The Court was correct then and should reaffirm its conclusions here.

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A. The Southern District of Florida Is an Improper Venue

The district court held venue was proper under 28 U.S.C. § 1391(b)(2). Venue lies under that provision only in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." The "relevant … acts and omissions" are those with "a close nexus to the wrong" alleged. *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003).

The "wrong" alleged here, as the district court recognized, is that Defendants violated NEPA by building and operating the detention facility without conducting an EIS. App.1405-06. That targeted claim

21

has a finite universe of relevant acts or omissions. *See Friends of Earth v. Haaland*, 2022 WL 185196, at *2-5 (D.D.C. Jan. 20, 2022). The relevant acts are the facility's construction, operation, and associated decisionmaking. *Id.* at *3 ("In cases brought under the APA, courts generally focus on where the decisionmaking process occurred to determine where the claims arose."); *Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009) (collecting cases).[6] The "relevant omission [i]s the lack of a decision to conduct" an EIS. *Friends of Earth*, 2022 WL 185196, at *4.

None of those acts or omissions occurred in the Southern District, "much less a substantial part of them." *Jenkins Brick*, 321 F.3d at 1372. Facility construction occurred in Collier County (in the Middle District), and decisions governing the facility's construction were made by government leaders in Tallahassee (or, even on Plaintiffs' theory of federal action, Washington, D.C.). App.1499 ¶4.[7] All the detention

---

[6] *Accord Awad v. Mayorkas*, 2022 WL 1215521, at *2 (M.D. Fla. Apr. 7, 2022); *Mashpee Wampanoag Tribe v. Zinke*, 2019 WL 2569919, at *7 (D.D.C. June 21, 2019); *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 2005 WL 8176727, at *3 (E.D. Cal. July 7, 2005).

[7] The district court labeled this evidence "conclusory." App.1395. But it was grounded in an FDEM supervisor's extensive knowledge.

facility's operations occur in Collier County. And all decisions related to those operations are made on-site in Collier County or by FDEM leadership in Tallahassee. App.1499 ¶4, 1518 ¶10. Accordingly, two Judges in the Southern District have correctly held that it is an improper venue for facility-related claims. *See C.M. v. Noem*, 796 F. Supp. 3d 1198, 1225-32 (S.D. Fla. 2025); *Garcia v. Guthrie*, No. 25-cv-23136 (S.D. Fla. July 16, 2025), Doc. 5 at 1.

To nonetheless find venue was proper in the Southern District, and create an untenable intra-district split, the court below erred multiple times over, as this Court recognized in granting the stay. *See FOE*, 2025 WL 2598567, at *9-10 & n.9.

**1.** The district court first concluded that raising venue in a supplemental response to a TRO motion, and before any adjudication, "is sufficient for a finding of waiver" under Rule 12. App.1377-79. The court, however, appears not to have relied on this finding because it nevertheless "addresse[d] the merits of all Defendants' venue challenges, as both Parties requested." App.1379. Regardless, "the district court

---

App.1514-15 ¶2. And besides, *Plaintiffs* must affirmatively establish venue. *See Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988).

erred in finding that the defense of improper venue was waived." *FOE*, 2025 WL 2598567, at *9.

First, "at the parties' first court appearance," the court accepted all parties' supplemental filings related to the original TRO motion. *Id.*; *see also* App.1298, 1327-38. "[E]veryone's supplement," the court declared, "is going to be recognized." *FOE*, 2025 WL 2598567, at *9. The venue argument thus merged into FDEM's initial TRO response, so there could be no waiver. *See id.*; *see also, e.g.*, *Seal v. Riverside Fed. Sav. Bank*, 825 F. Supp. 686, 692 n.10 (E.D. Pa. 1993) (argument raised in supplement accepted before court resolved motion was deemed "part of the original motion" and thus not waived).

Second, even if FDEM's venue objection had not merged into its initial TRO response, there would have been no waiver. Under Rule 12(h)(1)(B)'s plain text, a venue "waiver is only accomplished if the defense is not asserted in the first motion made under Rule 12 or responsive pleading." *Lane v. XYZ Venture Partners*, 322 F. App'x 675, 678 (11th Cir. 2009); *see also FOE*, 2025 WL 2598567, at *10; *Odouk v. St. Leo Univ.*, 2010 WL 11507608, at *3 (N.D. Ga. Mar. 10, 2010) (Carnes, C.J.). FDEM's initial "response to [the] motion for a temporary

24

restraining order [wa]s not a pleading" under Rule 7(a). *FOE*, 2025 WL 2598567, at *10; *see* Fed. R. Civ. P. 7(a) (limiting "pleadings" to "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer"). Nor was it a motion to dismiss under Rule 12.[8]

Third, the district court's contrary view conflicts with this Court's analogous arbitration precedent. In that context, the "waiver doctrine is typically implicated when parties have 'invoked the litigation machinery' before reversing course and claiming that arbitration was the proper avenue all along." *Payne v. Savannah Coll. of Art & Design, Inc.*, 81 F.4th 1187, 1201 (11th Cir. 2023). Under that test, there was no waiver. FDEM did not invoke litigation in the Southern District. Instead, FDEM's limited action before raising venue was an emergency, defensive response to Plaintiffs' request for an immediate TRO. *See Johnson v.*

---

[8] To the extent the supplemental filing is construed as a motion to dismiss for lack of venue, *but see* App.1260 n.5 (noting that a motion to dismiss was *forthcoming*), it was the first Rule 12 motion and FDEM "properly asserted the defense of improper venue," *FOE*, 2025 WL 2598567, at *9.

*Masselli*, 2008 WL 111057, at *3 (N.D. Ind. Jan. 4, 2008) (no waiver when defendant failed to raise venue in TRO response).  FDEM raised its venue defense at an "early stage," permitting Plaintiffs and the court to "manage the litigation" appropriately.  *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018).  That is not waiver.  *See Lithia Ramsey-T, LLC v. City Line Auto Sales, LLC*, 2023 WL 1883355, at *5 (D.N.J. Feb. 9, 2023) (defendant's conduct in fast-moving injunction proceedings did not establish waiver); *Pickett v. City of Houston*, 2009 WL 1158842, at *2 (S.D. Tex. Apr. 29, 2009) (same).[9]

**2.**  The district court also erred on the merits of venue.

**a.**  In violation of the "party presentation principle," *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020), the district court grounded its venue holding in a series of acts and omissions that Plaintiffs never

---

[9] The district court's contrary citations are inapposite.  In *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Industry Fund*, the defendant raised venue months after the complaint was filed and after stipulating to pre-hearing discovery.  967 F.2d 688, 692-93 (1st Cir. 1992).  And in *Bautista-Perez v. Holder*, venue was raised after the court ruled on a preliminary-injunction motion.  681 F. Supp. 2d 1083, 1091-92 (N.D. Cal. 2009).  By contrast, FDEM raised venue before its response to the complaint was due, before any hearing, a month before the preliminary injunction issued, and before any discovery was ordered.

raised.  *Compare* App.941:17-944:15, 1054:15-1055:8 (Plaintiffs' venue arguments at the preliminary-injunction hearing); App.1822-31 (Plaintiffs' venue briefing); *and* App.1385 (district court order cataloguing Plaintiffs' venue arguments), *with* App.1389-94 (district court's new venue arguments).  The court held, for instance, that ICE's Miami-based detention activities gave rise to Plaintiffs' NEPA claim—an argument Plaintiffs never asserted.  App.1390-92.  Yet courts may not "sally forth each day looking for" new arguments to make.  *Sineneng-Smith*, 590 U.S. at 376.  Though "a modest initiating role for a court is appropriate," the district court's wholesale "takeover" of Plaintiffs' venue presentation "scarcely fits that bill."  *Id.* at 375-76, 379; *see also Clark v. Sweeney*, No. 25-52, 2025 WL 3260170, at *1-2 (U.S. Nov. 24, 2025) (per curiam) (summarily reversing Fourth Circuit decision that "transgressed the party-presentation principle by granting relief on a claim that [the plaintiff] never asserted and that the [defendant] never had the chance to address").  For this reason alone, the court's venue finding was improper.

  **b.**  Regardless, none of the acts or omissions that the court identified bear a "close nexus" to Plaintiffs' NEPA claim.  App.1388.

Plaintiffs narrowly assert that Defendants violated NEPA by building and operating the detention facility without conducting an EIS. App.1110 ¶73. The acts relevant to that claim include the facility's construction, operation, and related "decisionmaking." *Friends of Earth*, 2022 WL 185196, at *3; *see also Nat'l Ass'n of Home Builders*, 675 F. Supp. 2d at 179. And the "relevant omission" is the "lack of a decision to conduct" an EIS. *Friends of Earth*, 2022 WL 185196, at *4. The conduct the district court identified fits none of those categories. *See* App.1389-92.

Still other problems plague the court's venue theories. It held, for example, that ICE's Miami-based efforts to supervise detention at the facility were closely related to the claim. App.1390-92. But Plaintiffs sued *before* detention operations began at the facility, App.1088, and "venue must be determined based on the facts at the time of filing," *Flowers*, 835 F.2d at 776 n.1. Nor is ICE's Miami-based general supervision closely tied to Plaintiffs' NEPA claim. ICE officials in Miami, after all, neither ordered the State to build the detention facility nor direct its operations. *See, e.g.*, App.1521-22 ¶¶21-25, 1480 ¶18; *see also C.M.*, 796 F. Supp. 3d at 1232-33 (rejecting similar venue theory when

28

nothing suggested that "State Defendants have engaged in acts or omissions pursuant to [ICE's] instructions"). And ICE's role in the decision to detain generally (as opposed to the location of detention) "ha[s] nothing to do with" the NEPA claim. *C.M.*, 796 F. Supp. 3d at 1233.

The district court also incorrectly held that transporting illegal aliens from Miami-based facilities to the Collier County facility is a relevant act. App.1391. First, those acts occurred after the filing of the complaint, making them irrelevant to venue. *See Flowers*, 835 F.2d at 776 n.1. Second, an illegal alien's location before reaching the facility is irrelevant to the administrative and environmental wrongs asserted in Plaintiffs' NEPA count. The act of transporting aliens does not "give rise to" the NEPA claim "simply because the alleged wrongful" detention "would have been impossible without [it]." *Steen v. Murray*, 770 F.3d 698, 704 (8th Cir. 2014); *see also Abramoff v. Shake Consulting, LLC*, 288 F. Supp. 2d 1, 5 (D.D.C. 2003) (mere fact that a signed agreement "was a prerequisite" to a breach-of-contract claim did not establish venue in jurisdiction where signing occurred). Otherwise, venue would be proper anywhere a detainee previously resided, was apprehended, or was held.

29

Such a theory, if accepted, would transform the "close nexus" restriction into a permissive and amorphous "any-nexus" standard.

Letters FDEM sent to Miami-Dade officials to commandeer the Collier County facility do not establish venue, either. App.1390. Those letters—and more importantly, the decisions conveyed in them—were issued in Tallahassee. *E.g.*, App.1535. Where the landowner may have opened those letters is irrelevant to venue, which "focus[es] on relevant activities of *the defendant*." *Jenkins Brick*, 321 F.3d at 1371-72 (emphasis added). "Relying on" state communications sent to the Southern District to "manufacture venue would not only redefine the 'close nexus' standard but also introduce a 'minimum contacts' personal jurisdiction analysis to venue that this circuit has expressly disclaimed." *C.M.*, 796 F. Supp. 3d at 1233; *see also Jenkins Brick*, 321 F.3d at 1372 (rejecting argument that would reduce venue to a "flavor" of "minimum contacts").

The district court's selected omissions are likewise unavailing. The court claimed that FDEM's "failure" to consult with Miami-Dade and the Tribe about the facility's potential impacts were relevant omissions in Miami-Dade. App.1392-93. But that omission did not "give rise" to the

decision not to conduct an EIS, *Jenkins Brick*, 321 F.3d at 1371; it was, at best, the *result of* the decision not to conduct an EIS, *see Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 295 (3d Cir. 1994); *Friends of Earth*, 2022 WL 185196, at *4 (the failure to conduct "additional [EIS] research" was not a "relevant omission" in a NEPA claim).  Were that not so, venue would lie not just in the Southern District, but wherever anyone with relevant Everglades knowledge might reside, be it a panther expert in Tallahassee, App.1804-15, or an Everglades enthusiast in Kentucky, App.1793-801. *Contra Leroy v. Great W. United Corp.*, 443 U.S. 173, 186-87 (1979) (rejecting construction of a venue statute that "would subject the [state] officials to suit in almost every district in the country").

Last, even if the district court's identified acts and omissions were relevant, they are "insubstantial" compared to the core acts and omissions driving Plaintiffs' NEPA claim (i.e., the facility's construction and operation, related decisionmaking, and the decision not to conduct an EIS).  *Lamont v. Haig*, 590 F.2d 1124, 1134 n.62 (D.C. Cir. 1978); *see also Jenkins Brick*, 321 F. 3d at 1371 ("[O]f the places where the events have taken place, only those locations hosting a 'substantial part' of the

31

events are to be considered."). They thus do not establish a "substantial nexus" to the Southern District. *Friends of Earth*, 2022 WL 185196, at *4.

**c.** Finally, the district court improperly relied on harms the Middle District facility will allegedly project into the Southern District at some undetermined point in the future. App.1387-88, 1393-95. But venue turns on where the defendants' acts or omissions occurred, not where plaintiffs may someday feel some "impact." *Leroy*, 443 U.S. at 186; *see also Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1048 (S.D. Tex. 2000) ("[T]hat a plaintiff residing in a given judicial district feels the effects of a defendant's conduct in that district does not mean that the events or omissions occurred in that district."); *Abramoff*, 288 F. Supp. 2d at 5 (similar).

This Court affirmed this principle in *Jenkins Brick*, which held that, in assessing venue, "Congress … meant to require courts to focus on relevant activities of the defendant, not of the plaintiff." 321 F.3d at 1371-72. *Jenkins Brick* also expressly "approve[d] of," *id.*, the Eighth Circuit's holding in *Woodke v. Dahm*, 70 F.3d 983 (8th Cir. 1995). There, the court rejected the notion that the owner of an infringed trademark

32

could establish venue "in the district of his residency because that [wa]s" where he would feel the infringement's "ultimate effect." 70 F.3d at 985. The court thus held that a wrong's "effect" is not a relevant "action or omission" when assessing venue. *Id.*; *see also Steen*, 770 F.3d at 703 ("[T]he court's focus must be on relevant activities of the defendant in the forum state, not on the effect of those activities on the plaintiff in the forum state.").

This well-established principle has foreclosed Plaintiffs' "impact" theory in cases like this one. In *Friends of Earth*, for example, Louisiana argued that venue was proper in the Western District of Louisiana because "the impacts of the challenged administrative action [would] be felt" there. 2022 WL 185196, at *5. The court agreed that the district would "certainly feel some of the impacts" of the agency's decision, yet it still rejected the claim because "impacts alone cannot create proper venue." *Id.* Nor does *Friends of Earth* stand alone. The Central District of California reached a similar result in a case challenging a land regulation on "critical habitat[s]." *Home Builders Ass'n*, 2005 WL 8176727, at *1-3. The relevant "actions or omissions" for venue purposes, held the court, were the "Defendants' rule-making activities," not the "the

33

critical habitat determinations that [were] the product of the rule[.]" *Id.* at *3.

So too here. In a NEPA challenge, venue is proper where the relevant action takes place or where the decisions are made, not wherever an environmental effect is felt. *See Friends of Earth*, 2022 WL 185196, at *5.

## B.    NEPA Does Not Apply to Florida's Detention Facility

Even if Plaintiffs can clear the venue hurdle, their success on the merits is doomed for several reasons. "[P]laintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act." *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006). To sue "under the APA," a plaintiff "must show that there has been a final agency action." *Id.* And because the APA regulates only the federal government, the final action must be federal. *E.g.*, *Sierra Club v. FERC*, 145 F.4th 74, 89-90 (D.C. Cir. 2025). NEPA itself adds one more hurdle: it applies only to "major Federal action." 42 U.S.C. § 4332(C); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).

So, to prevail on a NEPA claim, Plaintiffs must pinpoint a violative action that was (i) federal, (ii) final, and (iii) major. *Big Bend Conservation All. v. FERC*, 896 F.3d 418, 424 (D.C. Cir. 2018).[10] Plaintiffs' claims falter at every step of this analysis. There was no final federal agency action—and, even if there were, it was not "major."

### 1. *The District Court Erred in Finding Final Federal Agency Action*

The district court did not clearly identify a final agency action in its order. Instead, the court seems to have relied on a gestalt feeling—based on the "anti-segmentation rule"—that somehow NEPA must reach this facility. App.1410 n.26. But instinct is not law. Under the anti-segmentation rule, "an agency cannot segment NEPA review of projects … *when the entire project at issue is subject to federal review*." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 50 (D.C. Cir. 2015) (emphasis added). "[S]egmentation," in other words, "refers only to the situation that arises when an agency arbitrarily separates related *federal*

---

[10] Though the district court recognized that "state agencies are not subject to the APA," it relied on this Court's precedent to conclude that an APA claim sometimes can be brought against a State. App.1435 n.39. Though addressing that issue is unnecessary to resolve this appeal, FDEM reserves the right to challenge that precedent in this litigation.

actions from one another." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021).  The anti-segmentation principle "does not require the aggregation of federal and non-federal actions." *Big Bend Conservation*, 896 F.3d at 424.

It was thus incumbent on Plaintiffs and the district court to identify a specific final federal agency action that was subject to NEPA.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (final agency action must be "circumscribed [and] discrete").  Seemingly recognizing this requirement, the injunction order alternatively and inconsistently suggests the final federal action was (1) the "decision to refrain from issuing an EIS," App.1405, (2) the "decision to construct and operate the detention camp," App.1406, (3) construction alone, App.1405, or perhaps (4) federal funding, App.1417-19.  None of these formulations work.

### a.    Failure to Issue an EIS for State Construction or Detention Is Not Final Agency Action

When a federal agency considers a major federal project and issues a reasoned decision declining to issue an EIS, that may be final agency action.  App.1405.  But, as the district court recognized, when there is "no 'NEPA-triggering' major federal action," then there is no "decision" not to issue an EIS because the agency's views were never implicated in the

36

first place.  App.1406 n.24.  Thus, the "decision" not to issue an EIS cannot underlie a NEPA claim unless some other final agency action is on the table.  *E.g.*, *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 196 n.6 (D.C. Cir. 2003).

### b. Federal Funding Was Not a Proper Basis for the Injunction

**1.**  Plaintiffs could not ground their claim for preliminary injunctive relief in federal funding because there was none.  Instead, State dollars funded construction of the detention facility.  App.1494 ¶5, 1503 ¶4, 1571 ¶¶2-3.  The district court nonetheless relied on potential federal funding, reasoning that the federal government, at some unspecified point in the past, had decided to issue reimbursements at some unspecified point in the future.  App.1417-19.  But the "possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely."  *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1573 (11th Cir. 1994).  The district court waved aside this binding precedent, stating that—based largely on press conferences and social-media posts—funds were "earmarked."  App.1419.  But even if a social-media post somehow counts as an "earmark," that term is just another way of saying funding is possible but has not occurred.  That is

why even a "congressional appropriation … of funds for a particular
project does not" trigger NEPA "until the [agency] has reviewed a grant
application and decided to disburse the funds." *Rattlesnake Coal. v. EPA*,
509 F.3d 1095, 1103 (9th Cir. 2007).  If the certainty of a statutory
appropriation cannot trigger NEPA before the money is expended, then
ephemeral promises on social media surely cannot.

The district court's reasoning also contravenes the APA.  To bring
an APA claim, Plaintiffs must point to *final* agency action, not agency
intent or an agency promise.  *Bennett v. Spear*, 520 U.S. 154, 177-78
(1997).  Finally, even if future federal funding alone could trigger
NEPA,[11] there has been no violation because the federal government
could conduct a NEPA analysis before distributing the funds.
*Rattlesnake Coal.*, 509 F.3d at 1104.  The district court's contrary
conclusion is the type of judicial guesswork the final-agency-action
requirement seeks to avoid.

**2.**    After the entry of the preliminary injunction, the federal
government conditionally granted—but has not disbursed—funding to

---

[11] *But see Ctr. for Biological Diversity v. U.S. Dept. of Hous. &
Urban Dev.*, 541 F. Supp. 2d 1091, 1098 (D. Ariz. 2008) ("[F]unding alone
is not enough[.]").

Florida for operations of the facility. But this Court need not reach that issue because its "review is limited to the evidence before the district court at the time of the preliminary injunction hearing." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016). Thus, "in this appeal from the preliminary injunction order," the Court reviews "only whether [Plaintiffs] made a 'proper showing' at the time of the order to support the District Court's grant of the preliminary injunction." *Fed. Trade Comm'n v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1079 n.9 (11th Cir. 2021). Because there was not even a conditional funding decision at that time, this later development cannot support the injunction. *Cf. Pub. Citizen v. Nuclear Regul. Comm'n*, 845 F.2d 1105, 1107 (D.C. Cir. 1988) ("[P]remature suits for review of agency decisions must be dismissed even when the passage of time supplies the item missing at the time of filing."). But even if the Court did reach this issue, this funding would not trigger NEPA. *See infra* 53-54.

### c.   <u>There Has Been No Federal Construction</u>

Plaintiffs also cannot ground final agency action in the detention facility's construction. There is no evidence that the federal government had "actual power to control" construction. *S. Fla. Water Mgmt. Dist.*, 28

F.3d at 1572.  To the contrary, the evidence shows that a State agency commandeered the site from a State municipality using State emergency powers.  App.1483-89.  The State took control of the site.  App.1521 ¶21. The State paid and directed the construction contractors.  *Id.* ¶22; App.1583-1791.  The State managed all construction.  App.1494 ¶5, 1521 ¶21.

Ignoring this, the district court relied on "evidence" that the facility "was constructed at the request of the federal government."  App.1419. That assertion is wrong factually: DHS inquired whether Florida would build *a* facility; Florida decided to build *this* facility.  App.138:22-139:3. Regardless, a federal request for voluntary action by a non-federal actor is not final federal agency action, which must either determine rights or obligations or give rise to legal consequences.  *Bennett*, 520 U.S. at 177-78.  A voluntary request does neither; it simply asks a question.  *E.g.*, *Harbert v. United States*, 206 F. App'x 903, 908 (11th Cir. 2006); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).  Nor does a voluntary request trigger NEPA.  The "impetus" for a project is irrelevant under NEPA; what matters is whether the federal government acts, not whether it had an idea.  *Nat'l*

40

*Org. for the Reform of Marijuana L. v. DEA*, 545 F. Supp. 981, 984-85 (D.D.C. 1982).

It changes nothing that Florida's construction meets ICE's minimum requirements. App.1411. "The adoption of certain federal standards … cannot transform a state … project into a federal one." *Atl. Coal. on Transp. Crisis, Inc. v. Atl. Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979). When a State chooses to follow federal standards to advance its own purposes, it has not surrendered its decisionmaking to federal authorities. Otherwise, thousands of state and local projects that meet federal standards would be transformed into federal actions requiring NEPA analyses.

Nor do ICE's inspections change this result. App.1362. ICE inspects to ensure the facility satisfies minimum detention standards. App.1521 ¶21. But those mine-run "compliance inspections" do not trigger NEPA. *Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (9th Cir. 1988). Again, if it were otherwise, any facility subject to a federal inspection (such as a workplace subject to OSHA) would be transformed into a federal project subject to NEPA.

41

Lastly, nothing about federal immigration enforcement at the facility reaches back in time to make the construction that preceded immigration enforcement a federal project. App.1410. No immigration law permits the federal government to direct states to build immigration detention facilities or to oversee such construction. And because DHS had "no authority to choose an alternative site to" TNT "or to force" Florida "to build" a detention center in another location, there were no construction-related decisions for the federal government to consider under NEPA. *Protect Our Parks, Inc. v. Buttigieg*, 2021 WL 3566600 (N.D. Ill. Aug. 12, 2021).

A hypothetical proves the point. If, next June, a major hurricane forms and Florida converts the TNT site to an emergency hurricane logistics hub (as FDEM has considered, App.1521 ¶20), then it could do so (including paving, lighting, tenting, etc.) without complying with NEPA. It makes little sense to say NEPA applies to that same conduct if the State chooses to pursue a different sovereign purpose, such as permitting its facility to be used temporarily for immigration detention. Said differently, NEPA regulates federal *decisions*, not federal *purposes*. Indeed, across the nation, thousands of state and local governments run

42

innumerable programs and facilities consistent with, or even under, federal priorities. But no court has held the APA (or NEPA) reaches those actions. *E.g.*, *Ritter v. Cecil Cnty. Office of Hous. & Cmty. Dev.*, 33 F.3d 323, 327 (4th Cir. 1994); *Day v. Shalala*, 23 F.3d 1052, 1064 (6th Cir. 1994). The State, as a sovereign, can choose to support federal policies. When it does so, the State is pursuing its own sovereign ends; it is not a junior-varsity federal government. *See Nat'l Org. for the Reform of Marijuana L.*, 545 F. Supp. at 984.

### d. There Is No Relevant Final Federal Detention Decision

The last option is to say the decision to detain is the final federal agency action that triggers NEPA. This, too, fails.

**1.** If the focus is on the decision *where* to detain—i.e., specifically at the TNT facility—that is Florida's choice. *See* App.1494 ¶6. Florida may decline to accept any illegal alien for detention at the facility (discretion Florida has exercised). App.1522 ¶25, 1480 ¶18. Florida thus has "final decision-making power" over this issue. *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 961 (9th Cir. 2002). And because Florida maintains its "state law authority to make the decisions concerning the project," "the federal government does not possess the

requisite control to federalize [the] project." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573.

That Florida's authorization to detain may flow from a 287(g) agreement does not change this result. App.1410. The APA applies only to federal *agencies*, not to all entities that exercise delegated federal power. 5 U.S.C. § 706. For example, although Amtrak exercises federal power, it is not subject to the APA. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995). Likewise, thousands of state and local governments administer federal programs but fall outside the APA. *E.g.*, *Ritter*, 33 F.3d at 327 (local housing authority administering federal funds not subject to APA); *Day*, 23 F.3d at 1064 (same for state agency). Florida's voluntary participation in a 287(g) program therefore does not trigger the APA.

**2.** The district court suggested that NEPA applies because Florida is carrying out ICE's general detention decisions as a "functionary." App.1411-14. That characterization eviscerates the constitutional distinction between the State and federal governments, which exists even when they are engaged in cooperative federalism. *See Alden v. Maine*, 527 U.S. 706, 748 (1999) ("[O]ur federalism requires that Congress treat

44

the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation."). But even on the district court's characterization, Plaintiffs could not prevail because federal detention cannot support a NEPA claim.

First, federal courts lack authority to review detention decisions under 8 U.S.C. § 1226(e)—an INA provision that the district court ignored, despite FDEM repeatedly raising it.    App.584:19-585:17, 1024:19-1026:9.  Section 1226(a) grants DHS the discretion to detain aliens pending a removal decision.[12]  Section 1226(e), in turn, states that the "discretionary judgment regarding the application of this section shall not be subject to review," and "[n]o court may set aside any action or decision by [DHS] under this section regarding the detention of any alien."  Section 1226(e) thus "precludes" challenges to "a decision … regarding [an alien's] detention or release."  *Jennings v. Rodriguez*, 583 U.S. 281, 295 (2018).

Accordingly, under section 1226(e), Plaintiffs cannot succeed if the final agency action they attack is ICE's general decision to detain the

---

[12] Although the statute refers to the Attorney General, Congress reallocated the power to DHS under the Homeland Security Act of 2002, Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2178 (2002).

aliens housed at the TNT facility. No court has authority to "review" those decisions, 8 U.S.C. § 1226(e), and thus no court can say DHS "exercised its statutory authority in an unreasonable fashion" because it acted without first performing an EIS, *Nielsen v. Preap*, 586 U.S. 392, 401 (2019).

The district court trampled that limitation. Although it nodded to the idea that courts cannot decide "where or how the government must house immigration detainees," App.1373, it nonetheless prohibited DHS from housing "additional persons [at] the TNT site," App.1435. That is the very judicial takeover section 1226(e) prohibits.

Second, 8 U.S.C. § 1252(f) also bars Plaintiffs' claim. Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." Section 1252(f) thus "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Those specified provisions include two powers relevant here: the authority for detention in section

46

1226 and the authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal" in section 1231(g)(1).

Section 1252(f) forecloses Plaintiffs' claim because they ask to "[e]njoin any … use of the TNT Site for purposes of immigration detention." App.1113. Plaintiffs thus want an injunction that requires the federal government "to refrain from" detaining aliens at a facility that the government believes is appropriate for detention. *Aleman Gonzalez*, 596 U.S. at 550. That would "interfere with the Government's efforts to operate" sections 1226 and 1231(g) by narrowing its authority. *Id.* at 551. The preliminary injunction proves the point. It bars the federal government from deeming the TNT facility an "appropriate place[] of detention" and forces it to use other facilities or release detainees. *See* App.1465 ¶17.

The district court concluded section 1252(f) is irrelevant because "it prohibits" injunctions only "against certain provisions of the INA" and Plaintiffs ask for "NEPA compliance." App.1375-76. But section 1252(f) does not "depend on the nature of the claim in question," *Aleman Gonzalez*, 596 U.S. at 553; it bars injunctive relief that would "restrain

47

the operation" of the INA "[r]egardless of the nature of the action," 8 U.S.C. § 1252(f). And contra the district court's characterizations, App.1375-76, the preliminary injunction "restrain[s]" DHS's ability to enforce sections 1226 and 1231 as DHS deems appropriate. The district court reasoned that DHS can enforce the immigration laws despite the injunction, App.1432, but that is the kind of judicial second-guessing the statute forbids. Section 1252(f) applies when an injunction requires officials "to refrain from actions that (… in the Government's view) are allowed by § 1231." *Aleman Gonzalez*, 596 U.S. at 551.

Third, detention decisions cannot ground a NEPA claim because they are committed to agency discretion by law. 5 U.S.C. § 701; *United States v. Texas*, 599 U.S. 670, 679 (2023) (immigration enforcement committed to executive discretion); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) ("Section 1231(g)(1) gives … broad discretion to the Secretary to choose the place of detention for deportable aliens."). This discretionary power cannot be superintended by the courts. *E.g.*, *Sinclair v. Att'y Gen.*, 198 F. App'x 218, 222 (3d Cir. 2006).

The district court did not dispute this point, App.1414, but reasoned that the relevant decision was the "decision not to comply with NEPA."

48

*Id.* That is circular. A challenge to a decision not to comply with NEPA will always involve a decision not to comply with NEPA. A NEPA claim must point to some other final agency action. As the district court elsewhere recognized, the lack of an EIS is not final agency action unless it is paired with major federal action. App.1406 n.24.

### 2. *The District Court Erred in Finding "Major" Federal Action*

NEPA applies only to "major" federal action. 42 U.S.C. § 4332(C). Major federal action is a defined term, which means "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A). The term excludes:

> (i) a non-Federal action—
>
> > (I) with no or minimal Federal funding; or
> >
> > (II) with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project;
>
> …
>
> (iii) loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action;
>
> …

49

(v) bringing judicial or administrative civil or criminal enforcement actions;

*Id.* § 4336e(10)(B).

> **a.**   Because There Is No Federal Control Over the Facility, There Is No Major Federal Action

**1.**  A non-federal action can only be a major federal action when the federal government both provides funding and exercises control. *FOE*, 2025 WL 2598567, at *6. That conclusion flows from the "plain text" of the statute. *Id.* Congress, after all, chose to link funding and control with "or," not "and." That choice "indicates alternatives and requires that those alternatives be treated separately." *Dacostagomez-Aguilar v. U.S. Att'y Gen.*, 40 F.4th 1312, 1316 (11th Cir. 2022) (quotation omitted). Treating the definitional clauses separately, NEPA excludes from the definition of major federal action both (1) non-federal actions with no or minimal federal funding, and (2) non-federal actions with no or minimal federal involvement where a federal agency cannot control the outcome of the project.

That interpretation fits the broader statutory scheme. Indeed, other provisions of the act exclude certain types of federal funding decisions from the definition of major federal action when funding does

not come with control. *E.g.*, 42 U.S.C. § 4336e(10)(B)(ii) (excluding "funding assistance solely in the form of general revenue sharing funds which do not provide Federal agency compliance or enforcement responsibility over the subsequent use of such funds"); *id.* § 4336e(10)(B)(iii) (excluding "loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action"). It would be strange if federal funding itself was excluded from NEPA when it did not provide control, but funding alone could convert a state project into a federal one. "The reach of the major federal action" thus "stops where the federal control stops." *Hoffman v. U.S. Dep't of Treasury*, 2025 WL 1809994, at *7 (D. Kan. July 1, 2025).

That interpretation also fits Congress's purpose. The major-federal-action definition was adopted in 2023. *FOE*, 2025 WL 2598567, at *5. The goal of the 2023 amendments was "to streamline the NEPA process in response to claims that it was delaying the approval of infrastructure and other important projects." 2 Pub. Nat. Res. L.

51

§ 17:4.10 (2d ed.).    Against that backdrop, courts should read the amendments to constrict—rather than expand—NEPA's reach.

2.    To establish control, Plaintiffs must prove the federal government "possess[es] actual power to control the nonfederal activity." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572.  That test is strict and is failed if "state agencies retain their state law authority to make the decisions concerning the project."  *Id.* at 1573.  Here, Plaintiffs point to nothing overriding Florida's "state law authority."    Far from it.    Florida commandeered the land under state law and constructed the facility using its own funds, with its own designs, and with its own contractors. App.1521 ¶¶21-22, 1583-1791.  Florida can change the facility's use at any time.  Operations are a similar story.  Florida decides whether to cooperate with the federal government on immigration and Florida can back out at any time. *See* 8 U.S.C. § 1357(g)(9).  Consistent with that power, Florida ultimately decides whether any detainee is admitted to its facility.  App.1522 ¶25, 1480 ¶18.[13]  And on the ground, there are only

_____

[13] Plaintiffs argue (at Pls. Stay Resp.27 & n.17) that ICE decides who enters the facility.  Both Florida and ICE explained that Florida makes that decision.  App.1522 ¶25, 1480 ¶18.  Of course, ICE has a role to play.  It must ask Florida to detain in the first instance.  But ICE does

four ICE officers at the site, and they "do not control the site"; instead, they coordinate transportation.  *See* App.1522 ¶24.  Or, as this Court previously concluded, "[t]he Facility is a site built, led, operated, and funded unilaterally by a state government—in accordance with the state's laws—at which the state retains discretionary control over who is detained at the facility, all of which adds up to *state* control over the project's outcome, not federal control." *FOE*, 2025 WL 2598567, at *9 n.7.

> **b.** <u>Federal Funding Is Not a Major Federal Action</u>

**1.**  As explained above, the federal government had not funded anything related to the TNT facility when the district court entered its injunction.  Accordingly, federal funding could not support the injunction when issued, and this Court's review is restricted to that record. *Supra* 38-39.

**2.**  But even if the district court's guesses about future funding are considered, they were inaccurate and did not support the injunction. First, the district court assumed that the federal government would fund construction, App.1419, but there was no evidence the federal

---

not sneak detainees into Florida's facilities.  Florida has the ultimate say on whether to accept detainees.

government had done so. Indeed, the federal government has now granted (but not disbursed) reimbursement funding for detention. But, as explained above, federal district courts lack jurisdiction to enjoin immigration detention operations.

Second, such funding (if ever disbursed) will not be a major federal action. NEPA exempts "loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action." 42 U.S.C. § 4336e(10)(B)(iii). Here, the federal government has structured its funding as a reimbursement: FEMA will reimburse Florida on a per detainee/night basis. Because that type of reimbursement is definitionally backwards-looking, FEMA cannot exercise control "over the subsequent use of such financial assistance." *See Hoffman*, 2025 WL 1809994, at *7 n.8 (suggesting that "an after-the-fact tax credit may not statutorily represent an agency's ability to exercise control and responsibility over the funds").

Third, in all events, the federal government does not control the TNT site, such that funding alone cannot trigger NEPA. *Supra* 50-53.

54

**c.** Immigration Enforcement Is Not a Major Federal Action

NEPA excludes "bringing … administrative civil or criminal enforcement actions." 42 U.S.C. § 4336e(10)(B)(v). That definition traces back to old NEPA regulations, which likewise excluded, "bringing judicial or administrative civil or criminal enforcement actions." *Ctr. for Biological Diversity v. Salazar*, 2010 WL 2493988, at *6 (D. Ariz. June 17, 2010). The statute thus "brings the old soil with it." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019). And under the old regulatory regime decisions to "enforce" the "laws"—like the immigration enforcement here—did not require NEPA review. *See Nw. Ctr. for Alts. to Pesticides v. DHS*, 552 F. Supp. 3d 1078, 1091 (D. Or. 2021) ("[T]he decision to send reinforcement personnel to a temporary hotspot to respond to criminal activity, protect people and property from criminal activity, and enforce criminal laws, falls within NEPA's exception for criminal enforcement actions."); *Miccosukee Tribe of Indians of Fla. v. United States*, 6 F. Supp. 2d 1346, 1349 (S.D. Fla. 1998) (entry into settlement agreement "may also fall within the statutory exception for activities related to enforcement actions").

The district court rejected that limitation, reasoning that "[t]he construction and operation of an immigration detention facility is plainly not an enforcement action." App.1414. That reasoning highlights the district court's irreconcilable rationales. When it came to defining the federal decision for APA purposes, the district court relied on "immigration enforcement activities." App.1410. But to avoid NEPA's limitation, the district court shifted away from that focus. It cannot be both: if detention is the federal decision, then there is no major federal action. If detention is not the federal decision, then detention plays no role in the analysis and any remaining activity is entirely State activity.

### C.    Plaintiffs Are Unlikely to Obtain the Injunctive Relief They Seek

As the stay panel recognized, *FOE*, 2025 WL 2598567, at *11, NEPA errors "may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS," *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 185 (2025). In deciding whether to vacate, courts balance "the disruptive consequences of vacatur" and "the seriousness of the order's deficiencies." *City of Port Isabel v. FERC*, 130 F.4th 1034, 1036 (D.C. Cir. 2025).

Vacatur would be "disruptive" because the detention facility is "operational." *Food & Water Watch v. FERC*, 28 F.4th 277, 292 (D.C. Cir. 2022). Judicial closure of the detention facility will force Florida and DHS to release detainees or send them to overcrowded facilities. App.1463-65 ¶¶12, 17. And that risks catastrophic consequences: "forcing Florida to shutter the detention facility will lead to overcrowding and will kneecap the State's immigration-enforcement efforts." *FOE*, 2025 WL 2598567, at *12. The district court did not disagree; it based its decision on the second factor. *See* App.1421-22.

But that factor also supports remand. To begin, many NEPA errors do not require vacatur. NEPA, after all, imposes only a "modest procedural requirement" and should not be "employed by project opponents (who may not always be entirely motivated by concern for the environment) to try to stop or at least slow down new infrastructure and construction projects." *Seven Cnty.*, 605 U.S. at 183; *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (Thomas, J.) ("Just as NEPA is not a green Magna Carta, federal judges are not the barons at Runnymede."). By its nature then, NEPA is concerned with process, not substance. *Seven Cnty.*, 605 U.S. at 184-85. And so NEPA

errors often require only additional process, not substantive change. *Id.*
That is especially true here because any deficiency in DHS's
decisionmaking was minor: DHS had good reason to believe that NEPA
did not apply given the minimal federal involvement here. *See Ctr. for*
*Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th
976, 1015-16 (9th Cir. 2025) (declining to vacate for "procedural" error).
Nor is there any reason to think that additional NEPA process would
change the outcome. *Seven Cnty.*, 605 U.S. at 184-85. The project has
the support of the President and the DHS Secretary, promotes a critical
federal policy, and risks minimal environmental impact. It blinks reality
to think that DHS would forgo a "blueprint for detention facilities" that
detains the "worst of the worst," App.1578, if only some national security
specialist spent more time poring over panther telemetry. Or, as this
Court previously put it, the project is critical to "DHS's ability to keep
criminal aliens detained, protect the law-abiding public, enforce
immigration laws, and maintain border security." *FOE*, 2025 WL
2598567, at *11. It would violate DHS's duty to protect the homeland if
it gave all that up to prioritize Plaintiffs' recreational interests and
speculation about harms far off in the future.

58

## II. PLAINTIFFS DID NOT ESTABLISH IRREPARABLE HARM

Plaintiffs also failed to establish that they would suffer irreparable harm prior to obtaining a final judgment. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Establishing irreparable harm requires a showing that "irreparable injury is *likely*"—a mere "possibility" of harm is not enough for extraordinary injunctive relief. *Winter*, 555 U.S. at 22.

**1.** Plaintiffs presented only unsound speculation. Consider Plaintiffs' so-called experts. First, Randy Kautz, a panther biologist, testified about the alleged impact of the facility on panther populations. But he employed a methodology that he had never used in fifty years as a biologist, App.281:10-19, based on undisclosed news reports and Wikipedia, App.279:21-280:13, 282:17-18, to conclude that the combination of habitat loss, global warming, and this temporary facility might harm panther populations ***by 2070***, App.315:22-316:3. That timing alone undermines any claim that his testimony supported *preliminary* relief in 2025.

59

But it gets worse: Kautz did not study the relative impact the detention facility would have on the baseline loss, App.316:17-20, other than to assert that the facility would have a "small" effect, App.316:21-317:6.  And he did not study whether *this* project would result in additional panther take.  App.317:10-12.  Far from it, he admitted that "airports" are not "typically good natural habitats for panthers," App.302:24-25, which likely explains why no panthers were detected within four miles of the site during a five-year period when panthers in the general area were tracked with radio collars, App.305:8-22.

Second, Dr. McVoy, a soil ecologist, testified that the Everglades is an interconnected ecosystem that could be harmed by the infiltration of nutrient-dense water.  But he could not connect that conclusion to *this* project.  He conceded that FDEM's construction was occurring on developed land, App.466:15-18, noting that the "wetlands had been disturbed at an earlier time," App.466:17-18.  And he did not examine whether discharge from this site would produce nutrient-dense water. App.472:12-16.

Third, Dillon Reio, a professional geologist, testified that new paving would cause about "two percent" more runoff from the site if it

was hit by a 100-year, 72-hour storm.  App.519:2-4.  That analysis, however, was based on a simulation that Reio did not perform: he "personally" had no "context" for this simulation, App.510:12-13, and he "did not have any involvement" in selecting the numbers that fed the model, App.515:12-18.  Worse, the numbers Reio relied on were historical outliers: compared to past analyses done at the site, Reio's numbers were designed to boost projected runoff.  App.516:12-517:11.  Based on that rigged third-party simulation, Reio opined that increased runoff might increase polycyclic aromatic hydrocarbons (PAH) levels.  But he did not study whether PAH levels would actually increase.  To determine true PAH levels, as Reio admitted, an expert would need to collect soil samples and test them, which Reio failed to do.  App.519:20-24.  Likewise, Reio neither examined pre-existing PAH levels, App.502:17-503:1, nor compared PAH production between airport and detention-facility uses, App.503:5-14.

The district court nonetheless excused these lackluster showings, reasoning that "Plaintiffs are not required to prove harms of a particular probability or quantity."  App.1424; App.1423 ("possible"); App.1424 ("could be"); App.1426 ("may well").  That is precisely the view *Winter*

61

rejected. *See* 555 U.S. at 22. Indeed, *Winter* itself was a NEPA case, and the Supreme Court held that "plaintiffs seeking preliminary relief" must make a "clear showing" that "irreparable injury is *likely*." *Id*. By relying on speculative and unlikely injuries—and using a standard of less than "likely"—the district court erred.

**2.** Plaintiffs' harm analysis also started from the wrong place. None of their experts had an appropriate ecological baseline because none considered the preexisting effects of an active airport with 28,000 flights in the six months before conversion to a detention facility. App.283:8-21, 479:1-13, 502:12-503:14. As a result, no expert could opine on the expected differential effect of the facility. *E.g.*, *City of Austin v. Kinder Morgan Tex. Pipeline, LLC*, 447 F. Supp. 3d 558, 569 (W.D. Tex. 2020) (determining environmental effects requires "analysis of the environmental baseline"); *cf. Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1307-08 (11th Cir. 2014) (affirming exclusion of causation experts because of failure to consider "baseline" risk).

**3.** Plaintiffs' experts offered such long-tailed harms that nothing they pointed to was "imminent." *Siegel*, 234 F.3d at 1176. Even the district court recognized as much: "the harms Plaintiffs fear take time to

accrue." App.1425 n.31. In other words, Plaintiffs' harms were neither "imminent" nor "*likely* in the absence" of a pre-judgment injunction. *Winter*, 555 U.S. at 22.

**4.** Plaintiffs' fact witnesses fared no better. As fact witnesses, they could not offer scientific opinions on the alleged effects the detention facility could have on the environment. Fed. R. Evid. 701(c) (a fact witness cannot offer an opinion based on "scientific" knowledge). Instead, they testified that they would like to enjoy the Big Cypress National Preserve. But the Preserve is 729,000 acres. And Plaintiffs' fact witnesses did not testify that *this* site is where they would like to recreate. Indeed, no one could credibly claim that they want to enjoy nature at a busy, noisy airport, surrounded by barbed wire.

**5.** That leaves the Tribe's complaint that its members have lost access to traditional off-road trails leading into the detention center. App.1427. But that kind of alleged "cultural harm[]" untethered to the environment is not within NEPA's zone of interests. *Willie R. Etheridge Seafood Co. v. Pritzker*, 2015 WL 4425659, at *3 (E.D.N.C. July 17, 2015).

Regardless, the Tribe's factual claim is wrong. The only area fenced off by the TNT Facility is the airport, which has always been fenced off,

63

and an access road to the airport. But the access road is not the only access point to the Preserve. Far from it. There are many access points to the Big Cypress Preserve. In the image below, the facility's access road is the large road along the left-hand side. One of the buildings in the middle of the image along the top is owned by the Tribe, App.760:2-5, and the trails leading down from those buildings enter the Preserve. Likewise, the trails along the top right side of the image run perpendicularly into Tamiami Trail, which remains accessible. Losing access to one of many trail heads—especially the one closest to a busy airport—does not limit access to the Preserve in any meaningful way.



App.1838. And the Tribe failed to explain why it needed to use the access point closest to a busy airport.

64

## III.   THE BALANCE OF EQUITIES DID NOT SUPPORT AN INJUNCTION

In considering a preliminary injunction, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).  Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

*Winter* is instructive.  There, under NEPA, a district court required "the Navy to shut down its MFA sonar" in the presence of marine mammals.  555 U.S. at 27.  The Supreme Court reversed, explaining that the balance was "strongly in favor" of the government because "harm to an unknown number of the marine mammals" could not outweigh the national security interests in "the safety of the fleet."  *Id.* at 26.  Similarly, here, the speculative and far-off environmental concerns raised by Plaintiffs from the conversion of a busy airport to a temporary detention facility (that may be removed before any speculative harm manifests, App.1519-20) are outweighed by the very real and immediate need for additional, effective detention space to stem a national and state

65

emergency.  As this Court already concluded:  "While the environmental effects mentioned by the Plaintiffs may result in down-the-line harm, the injuries facing the Defendants and the public are critical, immediate, and concrete."  *FOE*, 2025 WL 2598567, at \*12.  Indeed, the "problems posed … by illegal immigration" from "crime" and "safety risks" "must not be underestimated."  *Arizona v. United States*, 567 U.S. 387, 398 (2012).  Thus, the "public interest demands effective measures to prevent the illegal entry of aliens."  *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

Both the federal and State governments have declared an unprecedented illegal immigration emergency.  As Governor DeSantis explained, "unauthorized alien interdictions in and around Florida have risen to alarming levels."  App.1483, 1448-49 ¶3.  President Trump added that "[m]any of these aliens unlawfully within the United States present significant threats to national security and public safety."  Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025).  "Enforcing our Nation's immigration laws is" thus "critically important."  *Id.*

Enjoining Florida's detention facility imperils those immigration-enforcement efforts.  Florida's facility "operationally benefits ICE as it …

66

maximize[s] detention capacity … [and] serve[s] to decompress other detention facilities." App.1494-95 ¶11. Put differently, immigration enforcement currently faces a bottleneck. The country has an unprecedented number of unlawfully present aliens, and effective enforcement is cabined by scarce detention capacity. App.826:24-827:2, 828:12-15, 828:20-22, 835:20-25, 1449 ¶5, 1461-65. That is why the federal government asked if Florida could provide additional State detention capacity. Enjoining the creation or operation of that additional bed space forces federal and State officials to either release aliens or hold them in overcrowded facilities. App.1450 ¶6, 1464 ¶13. Both options risk immediate public safety harm. App.824:7-19, 836:1-3. Or, as this Court explained, "if the injunction were to stay in place, it would bring the State's already stressed and overcrowded system to a breaking point." *FOE*, 2025 WL 2598567, at *12.

To be sure, the district court claimed the mantle of detention expertise and asserted that "Defendants' immigration enforcement goals will not be thwarted by a pause in operations at the TNT site." App.1473. But in areas of "national security and foreign affairs," the "evaluation of the facts by the Executive … is entitled to deference." *Holder v.*

67

*Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010).  District courts may not elevate their own immigration-policy judgments over those of the executive elected to enforce the law.  *Id.* at 34.  Here, both State and federal law-enforcement officials have explained that the injunction will cause harm.  *See id.* at 33-34 (deferring to affidavit from executive branch).  That showing is owed deference and tilts the equities far in favor of Florida.

## CONCLUSION

For these reasons, the Court should reverse the order granting a preliminary injunction and remand with instructions to transfer the case to the Middle District of Florida.

Dated: December 16, 2025

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa (FBN 110951)
  *Acting Solicitor General*
Nathan A. Forrester (FBN 1045107)
  *Chief Deputy Solicitor General*
Kevin A. Golembiewski (FBN 1002339)
  *Senior Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
  *Assistant Solicitor General*
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

Respectfully submitted,

s/ *Jesse Panuccio*
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
David Costello (FBN 1004952)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
jpanuccio@bsfllp.com

*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

69

## CERTIFICATE OF COMPLIANCE

**1.** This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,993 words.

**2.** This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

s/ *Jesse Panuccio*
Jesse Panuccio

## CERTIFICATE OF SERVICE

I certify that on December 16, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

s/ *Jesse Panuccio*
Jesse Panuccio
