No. 25-12873

# In the United States Court of Appeals for the Eleventh Circuit

FRIENDS OF THE EVERGLADES, INC., ET AL.,
*Plaintiffs-Appellees,*

V.

EXECUTIVE DIRECTOR, FLORIDA DIVISION OF
EMERGENCY MANAGEMENT, ET AL.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Florida
No. 25-cv-22896-KMW

## APPELLANTS' JOINT
## APPENDIX VOLUME I OF III

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa
  *Acting Solicitor General*
Nathan A. Forrester
  *Chief Deputy Solicitor General*
Kevin A. Golembiewski
  *Senior Deputy Solicitor General*
Robert S. Schenck
  *Assistant Solicitor General*
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

December 16, 2025

Jesse Panuccio
Evan Ezray
David Costello
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
jpanuccio@bsfllp.com

*Counsel for Kevin Guthrie, in
his official capacity as
Executive Director of the
Florida Division of Emergency
Management*

(*Additional counsel listed
below*)

App. 1

Adam R.F. Gustafson
*Principal Deputy Assistant*
*Attorney General*
Robert Stander
*Deputy Assistant Attorney General*
Marissa A. Piropato
Hayley A. Carpenter
Allen M. Brabender
*Attorneys*
U.S. Department of Justice
Environment & Natural Resources
Division
P.O. Box 7415
Washington, DC 20044
(202) 532-3281
allen.brabender@usdoj.gov

*Counsel for the Federal Defendants*

# INDEX FOR VOLUME I

Docket/Tab#

District Court Docket Sheet ............................................................. Tab A

Hearing Transcript of August 6, 2025 ........................................ Tr. Vol. I

Hearing Transcript of August 7, 2025 (Morning) ....................... Tr. Vol. II

Hearing Transcript of August 7, 2025 (Afternoon) .................. Tr. Vol. III

Hearing Transcript of August 12, 2025 ..................................... Tr. Vol. IV

Hearing Transcript of August 13, 2025 ...................................... Tr. Vol. V

Complaint ........................................................................................ Doc. 1

Plaintiffs' Expedited Motion for Temporary Restraining Order and Preliminary Injunction ..................................................................... Doc. 5

Defendant Kevin Guthrie's Opposition to Plaintiffs' Motion for a Temporary Restraining Order ......................................................... Doc. 16

Federal Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order .......................................................................... Doc. 21

Memorandum of Agreement Between ICE and FLNG ............... Doc. 24-3

Defendant Kristi Noem's Social Media Post .................................. Doc. 25

Declaration of Ralph Arwood ........................................................ Doc. 26

Declaration of Christopher W. McVoy .......................................... Doc. 27

Plaintiffs' Expedited Motion for Ruling on Motion for a Temporary Restraining Order and Preliminary Injunction .............................. Doc. 31

The Tribe's Motion to Intervene .................................................... Doc. 33

Declaration of Dr. Anna Eskamani .............................................. Doc. 34

Order of Recusal ............................................................................ Doc. 37

App. 3

Plaintiffs' Notice of Filing Notice of Intent to Sue .........................Doc. 38

Plaintiffs' Renewed Motion for Temporary Restraining Order and Request for Evidentiary Hearing....................................................Doc. 40

Declaration of Jessica Namath .......................................................Doc. 47

Declaration of Christopher W. McCoy ...........................................Doc. 49

Defendant Kevin Guthrie's Supplemental Response to Plaintiffs' Requests for a Temporary Restraining Order ...............................Doc. 50

Omnibus Order (July 22, 2025).....................................................Doc. 54

Defendant FDEM's Opposition to The Miccosukee Tribes Motion to Intervene .....................................................................................Doc. 58

Defendant FDEM's Supplemental Reply in Opposition to Plaintiffs' Motion for a Temporary Restraining Order ...................................Doc. 65

Hearing Transcript of July 21, 2025.............................................Doc. 65-1

Omnibus Order (July 30, 2025).....................................................Doc. 73

Minute Entry for Proceedings Held Before Judge Williams ........Doc. 102

Minute Entry for Proceedings Held Before Judge Williams ........Doc. 103

Order Granting in Part and Denying in Part Plaintiffs' Renewed Motion for TRO .........................................................................Doc. 104

Minute Entry for Proceedings Held Before Judge Williams ........Doc. 119

Minute Entry for Proceedings Held Before Judge Williams ........Doc. 121

Omnibus Order Granting and Denying in Part Plaintiffs' Motion for Preliminary Injunction.................................................................Doc. 131

Federal Defendants' Notice of Interlocutory Appeal ...................Doc. 136

Defendant FDEM's Expedited Motion to Stay .............................Doc. 137

Declaration of Joseph C. Harrison (August 22, 2025)...............Doc. 137-1

2

App. 4

Declaration of Ian Gadea-Guidicelli (August 23, 2025) ............Doc. 137-2

Federal Defendants' Expedited Motion to Stay Preliminary Injunction Pending Interlocutory Appeal ......................................................Doc. 138

Declaration of Garrett Ripa (August 23, 2025) ........................Doc. 138-1

Omnibus Order (August 27, 2025) ...............................................Doc. 147

Declaration of Santiago Fuentes (August 12, 2025) ................. Fed. Ex. 7

Executive Order 23-03............................................................FDEM Ex. 7

Declaration of Thomas P. Giles (July 2, 2025) ....................FDEM Ex. 30

Declaration of Ian Gadea-Guidicelli (July 21, 2025) ...........FDEM Ex. 31

Declaration of David Richardson (July 2, 2025)..................FDEM Ex. 44

3

App. 5

# INDEX FOR VOLUME II

Docket/Tab#

Declaration of Ian Gadea-Guidicelli (August 11, 2025) .......FDEM Ex. 60

Declaration of Mark Moore (August 11, 2025) ....................FDEM Ex. 62

Declaration of Joseph Kinnebrew (August 6, 2025) ............FDEM Ex. 63

Declaration of Keith Pruett (June 30, 2025) ..............................Pls' Ex. 4

Declaration of Miranda Daviduk (July 31, 2025) .....................Pls' Ex. 44

SERT Order No. PO-010162 ....................................................Pls' Ex. 107

SERT Order No. PO-010177 ....................................................Pls' Ex. 108

PO-010174 ...............................................................................Pls' Ex. 109

SERT Order No. PO-010181 ....................................................Pls' Ex. 110

SERT Order No. PO-010182 ....................................................Pls' Ex. 111

SERT Order No. PO-010183 ....................................................Pls' Ex. 112

SERT Order No. PO-010201 ....................................................Pls' Ex. 113

App. 6

# INDEX FOR VOLUME III

Docket/Tab#

SERT Order No. PO-010199 ..................................................... Pls' Ex. 114

SERT Order No. PO-010200 ..................................................... Pls' Ex. 115

SERT Order No. PO-010198 ..................................................... Pls' Ex. 116

SERT Order No. PO-010197 ..................................................... Pls' Ex. 117

SERT Order No. PO-010195 ..................................................... Pls' Ex. 118

SERT Order No. PO-010196 ..................................................... Pls' Ex. 119

SERT Order No. PO-010307 ..................................................... Pls' Ex. 120

SERT Order No. PO-010306 ..................................................... Pls' Ex. 121

SERT Order No. PO-010305 ..................................................... Pls' Ex. 122

SERT Order No. PO-010304 ..................................................... Pls' Ex. 123

SERT Order No. PO-010303 ..................................................... Pls' Ex. 124

SERT Order No. PO-010302 ..................................................... Pls' Ex. 125

SERT Order No. PO-010326 ..................................................... Pls' Ex. 126

Declaration of Tierra Curry (June 27, 2025) .............................. Pls' Ex. 2

Curriculum Vitae of Randy Kautz ........................................... Pls' Ex. 26

Plaintiffs' Reply to Defendant Guthrie's Supplemental Response Objecting to Venue .......................................................... Doc. 61

Defendant Guthrie's Notice of Appeal ......................................... Doc. 132

Dade-Collier Training and Transition Airport .......................... Pls' Ex. 81

App. 7

Dated: December 16, 2025                    Respectfully submitted,

James Uthmeier                              s/ *Jesse Panuccio*
  *Attorney General of Florida*             Jesse Panuccio (FBN 31401)
Jeffrey Paul DeSousa (FBN                   Evan Ezray (FBN 1008228)
110951)                                     David Costello (FBN 1004952)
  *Acting Solicitor General*                **BOIES SCHILLER FLEXNER LLP**
Nathan A. Forrester (FBN                    401 East Las Olas Blvd.
1045107)                                    Suite 1200
  *Chief Deputy Solicitor General*          Fort Lauderdale, Florida 33301
Kevin A. Golembiewski (FBN                  jpanuccio@bsfllp.com
1002339)
  *Senior Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
  *Assistant Solicitor General*
**Office of the Attorney General**          *Counsel for Kevin Guthrie, in his*
The Capitol, PL-01                          *official capacity as Executive*
Tallahassee, FL 32399                       *Director of the Florida Division*
jeffrey.desousa@myfloridalegal.com          *of Emergency Management*


Adam R.F. Gustafson
*Principal Deputy Assistant*
*Attorney General*
Robert Stander
*Deputy Assistant Attorney General*
Marissa A. Piropato
Hayley A. Carpenter
Allen M. Brabender
*Attorneys*
U.S. Department of Justice
Environment & Natural Resources
Division
P.O. Box 7415
Washington, DC 20044
(202) 532-3281
allen.brabender@usdoj.gov

*Counsel for the Federal Defendants*

6

App. 8

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2025, the foregoing was filed with the Clerk of Court using CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

<u>s/ *Jesse Panuccio*</u>
Jesse Panuccio

APPEAL,JG,STAYED

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:25-cv-22896-KMW

Friends of the Everglades, Inc. et al v. Noem et al          Date Filed: 06/27/2025
Assigned to: Judge Kathleen M. Williams                      Jury Demand: None
Case in other court: USCA, 25-12873-J                        Nature of Suit: 893 Environmental Matters
Cause: 30:0181 Environment: Review of Agency Action           Jurisdiction: Federal Question

**Plaintiff**

**Friends of the Everglades, Inc.**          represented by     **Alisa Ann Coe**
*a Florida 501(c)(3) not-for-profit*                            Earthjustice Legal Defense Fund
*corporation*                                                   111 S Martin Luther King Jr. Blvd
                                                                Tallahassee, FL 32301
                                                                850-681-0031
                                                                Fax: 850-681-0020
                                                                Email: acoe@earthjustice.org
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Dominique Rebecca Kate Burkhardt**
                                                                Earthjustice
                                                                4500 Biscayne Blvd.
                                                                Suite 201
                                                                Miami, FL 33137
                                                                305-440-5435
                                                                Email: dburkhardt@earthjustice.org
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Scott Andrew Hiaasen**
                                                                Coffey Burlington, P.L.
                                                                2601 S. Bayshore Drive
                                                                PH 1
                                                                Miami, FL 33133
                                                                305-858-2900
                                                                Email: shiaasen@coffeyburlington.com
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Tania Galloni**
                                                                4500 Biscayne Blvd
                                                                Suite 201
                                                                Miami, FL 33134
                                                                850-681-0031
                                                                Fax: 850-681-0020
                                                                Email: tgalloni@earthjustice.org
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Paul Joseph Schwiep**

Coffey Burlington, P.L.
2601 S Bayshore Drive
Penthouse
Miami, FL 33133
305-858-2900
Fax: 305-858-5261
Email: pschwiep@coffeyburlington.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| **Center for Biological Diversity** | represented by | **Elise Pautler Bennett** |
| *a 501(c)(3) nonprofit organization* | | Center for Biological Diversity |

Center for Biological Diversity
PO Box 2155
St. Petersburg, FL 33731
7277556950
Fax: 7277556950
Email: ebennett@biologicaldiversity.org
*ATTORNEY TO BE NOTICED*

**Jason Alexander Totoiu**
Center for Biological Diversity
3857 Osprey Pointe Circle
Winter Haven, FL 33884
561-568-6740
Email: jtotoiu@biologicaldiversity.org
*ATTORNEY TO BE NOTICED*

**Scott Andrew Hiaasen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul Joseph Schwiep**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

| **Miccosukee Tribe of Indians of Florida** | represented by | **Christopher Ara Ajizian** |
| | | Christopher Ajizian P.A. |

Christopher Ajizian P.A.
1101 Brickell Ave
Suite 700
33131, Ste 700
Miami, FL 33131
305-699-5001
Email: chris@ajizianlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Rapp Friedman**
1101 Brickell Ave
Suite S-700
Miami, FL 33131

Email: todd@toddfriedmanpa.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kristi Noem**                                represented by    **Adam R.F. Gustafson**
*in her official capacity as Secretary of the*                   U.S. Department of Justice
*UNITED STATES DEPARTMENT OF*                                    950 Pennsylvania Ave. NW
*HOMELAND SECURITY*                                              Washington, DC 20530
                                                                (202) 616-3088
                                                                Email: adam.gustafson@usdoj.gov
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Hayley A. Carpenter**
                                                                United States Department of Justice
                                                                150 M St. NE
                                                                Washington, DC 20002
                                                                (202) 305-0242
                                                                Email: hayley.carpenter@usdoj.gov
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Carlos Javier Raurell**
                                                                United States Attorney's Office
                                                                99 NE 4 Street
                                                                Miami, FL 33132
                                                                305-961-9243
                                                                Fax: 305-530-7139
                                                                Email: carlos.raurell@usdoj.gov
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Marissa A. Piropato**
                                                                U.S. Department of Justice
                                                                150 M St. NE
                                                                Washington, DC 20002
                                                                (202) 305-0470
                                                                Email: marissa.piropato@usdoj.gov
                                                                *ATTORNEY TO BE NOTICED*

**Defendant**

**Todd Lyons**                                 represented by    **Adam R.F. Gustafson**
*in his official capacity as Acting Director of*                 (See above for address)
*the UNITED STATES IMMIGRATION AND*                              *LEAD ATTORNEY*
*CUSTOMS ENFORCEMENT*                                            *ATTORNEY TO BE NOTICED*

                                                                **Hayley A. Carpenter**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

App. 12

**Carlos Javier Raurell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marissa A. Piropato**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kevin Guthrie**
*in his official capacity as Executive Director of the Florida Division of Emergency Management*

represented by **Dante C. Ficarelli**
Boies Schiller Flexner LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011
Email: dficarelli@bsfllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Matthew Costello**
Boies Schiller Flexner LLP
401 E Las Olas Blvd
Suite 1200
Fort Lauderdale, FL 33301
954-356-0011
Email: dcostello@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Evan Matthew Ezray**
Boies Schiller Flexner LLP
401 E. Las Olas Blvd.
Suite 1200
Ft. Lauderdale, FL 33301
954-377-4237
Email: eezray@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Jeffrey Paul DeSousa**
Florida Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3830
Email: jeffrey.desousa@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**Jesse Michael Panuccio**
Foley & Lardner LLP
2 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
(305) 482-8400
Fax: (305) 482-8600
Email: jpanuccio@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Nathan Andrew Forrester**
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32301
850-414-3300
Email:
nathan.forrester@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**Robert Scott Schenck**
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
8504143300
Fax: 850-410-2672
Email: robert.schenck@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Miami-Dade County**<br>*a political subdivision of the State of Florida* | represented by | **Christopher J. Wahl**<br>Miami-Dade County Attorney's Office<br>111 NW 1st Street<br>Suite 2810<br>Miami, FL 33128<br>(305) 375-3925<br>Email: wahl@miamidade.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Monica Rizo**
Miami-Dade County Attorney's Office
111 NW 1st Street, Suite 2810
Miami, FL 33128
(305) 375-4791
Fax: (305) 375-5634
Email: rizo@miamidade.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Marion Murray**
Miami-Dade County Attorney's Office
Aviation Division
Post Office Box 025504
Miami, FL 33102-5504
305-876-7040
Fax: 305-876-7294
Email: dmmurray@miami-airport.com
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Florida Immigrant Coalition** | represented by | **Rebecca Ann Sharpless**<br>Immigration Clinic<br>University of Miami School of Law |

P311 Miller Dr.
B400
Coral Gables, FL 33146
305-284-6092
Email: rsharpless@law.miami.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/27/2025 | 1 | COMPLAINT against Kevin Guthrie, Todd Lyons, Miami-Dade County, Kristi Noem. Filing fees $ 405.00 receipt number AFLSDC-18571530, filed by Friends of the Everglades, Inc., Center for Biological Diversity. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s) Kristi Noem, # 3 Summon(s) Todd Lyons, # 4 Summon(s) Kevin Guthrie, # 5 Summon(s) Miami-Dade County)(Schwiep, Paul) (Entered: 06/27/2025) |
| 06/27/2025 | 2 | Clerks Notice of Judge Assignment to Judge Jose E. Martinez. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Eduardo I. Sanchez is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (blc) (Entered: 06/27/2025) |
| 06/27/2025 | 3 | Summons Issued as to Kevin Guthrie, Miami-Dade County. (blc) (Entered: 06/27/2025) |
| 06/27/2025 | 4 | Clerk's Notice to Filer re: Summons(es) will not be issued. Multiple parties cannot be listed on a single summons. One summons is required for each party. Filer may file a Notice of Filing Proposed Summons(es) with the corrected summons attached. (blc) (Entered: 06/27/2025) |
| 06/27/2025 | 5 | EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit Ex A - Declaration of Eve Samples, # 2 Exhibit Ex B - Declaration of Tierra Curry, # 3 Exhibit Ex C - Declaration of Amber Crooks, # 4 Text of Proposed Order)(Schwiep, Paul) (Entered: 06/27/2025) |
| 06/27/2025 | 6 | NOTICE of Filing Proposed Summons(es) by Center for Biological Diversity, Friends of the Everglades, Inc. re 4 Clerk's Notice to Filer re: Electronic Case, Summons(es), (Attachments: # 1 Summon(s), # 2 Summon(s)) (Schwiep, Paul) (Entered: 06/27/2025) |
| 06/27/2025 | 7 | Summons Issued as to Todd Lyons, Kristi Noem.(drz) (Entered: 06/27/2025) |
| 06/27/2025 | 8 | NOTICE of Attorney Appearance by Nathan Andrew Forrester on behalf of Kevin Guthrie. Attorney Nathan Andrew Forrester added to party Kevin Guthrie(pty:dft). (Forrester, Nathan) (Entered: 06/27/2025) |
| 06/27/2025 | 9 | NOTICE of Attorney Appearance by Alisa Ann Coe on behalf of Friends of the Everglades, Inc.. Attorney Alisa Ann Coe added to party Friends of the Everglades, Inc. (pty:pla). (Coe, Alisa) (Entered: 06/27/2025) |
| 06/27/2025 | 10 | NOTICE of Attorney Appearance by Jeffrey Paul DeSousa on behalf of Kevin Guthrie. Attorney Jeffrey Paul DeSousa added to party Kevin Guthrie(pty:dft). (DeSousa, Jeffrey) (Entered: 06/27/2025) |
| 06/27/2025 | 11 | NOTICE of Attorney Appearance by Robert Scott Schenck on behalf of Kevin Guthrie. Attorney Robert Scott Schenck added to party Kevin Guthrie(pty:dft). (Schenck, Robert) (Entered: 06/27/2025) |

| | | |
|---|---|---|
| 06/30/2025 | 12 | RESPONSE in Opposition re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, *Response Brief* filed by Miami-Dade County. Attorney Christopher J. Wahl added to party Miami-Dade County(pty:dft). Replies due by 7/7/2025. (Attachments: # 1 Exhibit Exhibit A - EO 23-03, # 2 Exhibit Exhibit B - EO 25-120, # 3 Exhibit Exhibit C - FDEM Letter, # 4 Exhibit Exhibit D - MDC Response, # 5 Exhibit Exhibit E - FDEM Response)(Wahl, Christopher) (Entered: 06/30/2025) |
| 06/30/2025 | 13 | NOTICE of Attorney Appearance by Jesse Michael Panuccio on behalf of Kevin Guthrie. Attorney Jesse Michael Panuccio added to party Kevin Guthrie(pty:dft). (Panuccio, Jesse) (Entered: 06/30/2025) |
| 06/30/2025 | 14 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. re 7 Summons Issued as to USA, 1 Complaint, 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint,, 3 Summons Issued (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Schwiep, Paul) (Entered: 06/30/2025) |
| 06/30/2025 | 15 | ORDER OF RECUSAL AND ORDER OF REASSIGNMENT. Magistrate Judge Eduardo I. Sanchez recused. Case reassigned to Ch. Magistrate Judge Edwin G. Torres for all further proceedings. Signed by Magistrate Judge Eduardo I. Sanchez on 6/27/2025. *See attached document for full details.* (vjk) (Entered: 06/30/2025) |
| 06/30/2025 | | Magistrate Judge Eduardo I. Sanchez no longer referred on the case. (vjk) Modified text/status per Chambers on 7/1/2025 (sk). (Entered: 06/30/2025) |
| 06/30/2025 | 16 | RESPONSE in Opposition re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, filed by Kevin Guthrie. Replies due by 7/7/2025. (Attachments: # 1 Affidavit of Keith Pruett) (Panuccio, Jesse) (Entered: 06/30/2025) |
| 07/01/2025 | 17 | Clerk's Notice of Docket Correction re Magistrate Judge Eduardo I. Sanchez no longer referred on the case. Case reassigned to Ch. Magistrate Judge Edwin G. Torres for all further proceedings. See Order 15 . (sk) (Entered: 07/01/2025) |
| 07/01/2025 | 18 | NOTICE of Attorney Appearance by Carlos Javier Raurell on behalf of Todd Lyons, Kristi Noem. Attorney Carlos Javier Raurell added to party Todd Lyons(pty:dft), Attorney Carlos Javier Raurell added to party Kristi Noem(pty:dft). (Raurell, Carlos) (Entered: 07/01/2025) |
| 07/02/2025 | 19 | NOTICE of Attorney Appearance by Hayley A. Carpenter on behalf of Todd Lyons, Kristi Noem. Attorney Hayley A. Carpenter added to party Todd Lyons(pty:dft), Attorney Hayley A. Carpenter added to party Kristi Noem(pty:dft). (Carpenter, Hayley) (Entered: 07/02/2025) |
| 07/02/2025 | 20 | Notice of Pending, Refiled, Related or Similar Actions by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - complaint, Van Schaick v. Ron DeSantis, et al., case no. 4:25-cv-00271-RH-MJF) (Schwiep, Paul) (Entered: 07/02/2025) |
| 07/03/2025 | 21 | RESPONSE in Opposition re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, filed by Todd Lyons, Kristi Noem. Replies due by 7/10/2025. (Attachments: # 1 Exhibit Giles Declaration, # 2 Exhibit Richardson Declaration)(Carpenter, Hayley) (Entered: 07/03/2025) |
| 07/03/2025 | 22 | Unopposed MOTION for Leave to File Excess Pages by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Text of Proposed Order Order on |

| 07/03/2025 | 23 | PAPERLESS ORDER granting 22 Plaintiffs' Unopposed Motion for Leave to File Fifteen Page Reply. Signed by Judge Jose E. Martinez on 7/3/2025. (knu) (Entered: 07/03/2025) |
| 07/03/2025 | 24 | Plaintiff's REPLY in Support of Motion re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint,. filed by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit A - Florida Immigration Enforcement Plan, # 2 Exhibit B - federal vehicles, # 3 Exhibit C - Memorandum of Agreement between DHS & FNG, # 4 Exhibit D - 2025.07.03 Declaration of Betty Osceola, # 5 Errata E - 2025.07.02 Declaration of Ra Schooley and Laura Reynolds)(Schwiep, Paul) (Entered: 07/03/2025) |
| 07/07/2025 | 25 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - Noem Facebook post) (Schwiep, Paul) (Entered: 07/07/2025) |
| 07/07/2025 | 26 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - Declaration of Ralph Arwood) (Schwiep, Paul) (Entered: 07/07/2025) |
| 07/08/2025 | 27 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - Declaration of Christopher W. McVoy) (Schwiep, Paul) (Entered: 07/08/2025) |
| 07/11/2025 | 28 | RESPONSE to 26 Notice (Other), 25 Notice (Other), 27 Notice (Other) by Kevin Guthrie. (Panuccio, Jesse) (Entered: 07/11/2025) |
| 07/11/2025 | 29 | NOTICE of Change of Address/Contact Information; by Dominique Rebecca Kate Burkhardt (Burkhardt, Dominique) (Entered: 07/11/2025) |
| 07/11/2025 | 30 | CLERK'S NOTICE - Attorney Admissions has not updated address and/or email information for attorney Dominique Rebecca Kate Burkhardt re 29 Notice of Change of Address, Email or Law Firm Name. Attorney Dominique Rebecca Kate Burkhardt has not completed the required procedures for updating their information with the Court. After filing something in any pending cases, Attorney is instructed to go to their PACER account, Manage My Account, to complete the process of updating their information. The Court is NOT responsible for updating secondary email addresses. See the Courts website for detailed instructions. www.flsd.uscourts.gov/updating-your-information (pt) (Entered: 07/11/2025) |
| 07/11/2025 | 31 | EXPEDITED MOTION expedited ruling on preliminary injunction motion re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, by Center for Biological Diversity, Friends of the Everglades, Inc.. (Schwiep, Paul) (Entered: 07/11/2025) |
| 07/14/2025 | 32 | CLERK'S NOTICE - Attorney Admissions has updated the address information as submitted through attorneys PACER account for attorney Dominique Rebecca Kate Burkhardt re 29 Notice of Change of Address, Email or Law Firm Name (pt) (Entered: 07/14/2025) |
| 07/14/2025 | 33 | MOTION to Intervene by Miccosukee Tribe of Indians of Florida. Attorney Christopher Ara Ajizian added to party Miccosukee Tribe of Indians of Florida(pty:intvp). (Attachments: # 1 Exhibit 1 - Villages Map, # 2 Exhibit 2 - Tribal Site Map, # 3 Exhibit 3 - Water Flow Map)(Ajizian, Christopher) (Entered: 07/14/2025) |

| | | |
|---|---|---|
| 07/15/2025 | 34 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - Declaration of Dr. Anna V. Eskamani) (Schwiep, Paul) (Entered: 07/15/2025) |
| 07/16/2025 | 35 | RESPONSE to Motion re 31 EXPEDITED MOTION expedited ruling on preliminary injunction motion re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, filed by Kevin Guthrie. Replies due by 7/23/2025. (Panuccio, Jesse) (Entered: 07/16/2025) |
| 07/16/2025 | 36 | MOTION for Leave to File *Amicus Brief* by Florida Immigrant Coalition. Attorney Rebecca Ann Sharpless added to party Florida Immigrant Coalition(pty:am). (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Sharpless, Rebecca) (Entered: 07/16/2025) |
| 07/16/2025 | 37 | ORDER OF RECUSAL. Judge Jose E. Martinez recused. Case reassigned to Judge Kathleen M. Williams for all further proceedings. Signed by Judge Jose E. Martinez on 7/16/2025. *See attached document for full details.* (vjk) (Entered: 07/16/2025) |
| 07/16/2025 | 38 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - Notice of Intent to Sue, # 2 Exhibit Appendices Cover Page, # 3 Exhibit Appx A - Oblique Aerial Photos of Ongoing Construction at Dade Collier T&T Airport, # 4 Exhibit Appx B - Brief Analysis of Assertion of Pre-Existing Cement Pad Underlying Newly Asphalted Area at Jetport Site, # 5 Exhibit Appx C - TDF Waste Management Plan Overview, # 6 Exhibit Appx D - Kautz 2025 - Impacts of the Big Cypress Detention Center on the Florida Panther and Its Habitat, # 7 Exhibit Appx E - Curriculum Vitae of Randy Kautz, # 8 Exhibit Appx F - Letter from Robert A Frakes, Ph.D., to Jason Totoiu, CBD Diversity, Re opinion on impacts of construction and operation of migrant detention facili, # 9 Exhibit Appx G - Curriculum Vitae of Robert A. Frakes, Ph.D, # 10 Exhibit Appx H - Report Strategic searches for Florida bonneted bat (Eumops floridanus) roosts in Big Cypress National Preserve (BCNP) (March 19, 2019)) (Schwiep, Paul) (Entered: 07/16/2025) |
| 07/17/2025 | 39 | Unopposed MOTION for Extension of Time to Respond to Plaintiffs' Complaint by Kevin Guthrie. Responses due by 7/31/2025. (Attachments: # 1 Text of Proposed Order) (Panuccio, Jesse) (Entered: 07/17/2025) |
| 07/17/2025 | 40 | EXPEDITED MOTION Temporary Restraining Order re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit Ex 1 - 25-cv-23182 - Complaint, # 2 Text of Proposed Order) (Schwiep, Paul) (Entered: 07/17/2025) |
| 07/17/2025 | 41 | NOTICE of Attorney Appearance by Todd Rapp Friedman on behalf of Miccosukee Tribe of Indians of Florida. Attorney Todd Rapp Friedman added to party Miccosukee Tribe of Indians of Florida(pty:intvp). (Friedman, Todd) (Entered: 07/17/2025) |
| 07/17/2025 | 42 | Notice of Court Practices and Procedures. Signed by Judge Kathleen M. Williams on 7/17/2025. *See attached document for full details.* (cgd) (Entered: 07/17/2025) |
| 07/18/2025 | 43 | PAPERLESS ORDER. **THIS MATTER** is before the Court *sua sponte*. It is **ORDERED AND ADJUDGED** that a Status Conference is **SET** for **July 21, 2025 at 1:00 p.m.** before the Honorable Kathleen M. Williams via videoconference. Videoconference details will be emailed to the Parties prior to the Status Conference. Signed by Judge Kathleen M. Williams on 7/18/2025. (cgd) (Entered: 07/18/2025) |
| 07/18/2025 | 44 | PAPERLESS ORDER. **THIS MATTER** is before the Court on Defendant Kevin Guthrie's ("Guthrie") Unopposed Motion to Extend Time (DE 39 ) ("Motion"). In the Motion, Guthrie requests an extension of his deadline to respond to Plaintiffs' Complaint |

| | | |
|---|---|---|
| | | (DE 44) until August 26, 2025, to align his response deadline with that of the federal Defendants. Upon review of the Motion and the record, and in light of the fact that the Motion is unopposed, it is **ORDERED AND ADJUDGED** that the Motion is **GRANTED**. Guthrie shall file a response to Plaintiffs' Complaint on or before **August 26, 2025**, which complies with the Court's Practices and Procedures (DE 42 ). Signed by Judge Kathleen M. Williams on 7/18/2025. (cgd) (Entered: 07/18/2025) |
| 07/18/2025 | 45 | NOTICE of Attorney Appearance by Evan Matthew Ezray on behalf of Kevin Guthrie. Attorney Evan Matthew Ezray added to party Kevin Guthrie(pty:dft). (Ezray, Evan) (Entered: 07/18/2025) |
| 07/18/2025 | | Reset Response/Answer Due Deadline per DE#44: Kevin Guthrie response/answer due 8/26/2025. (scn) (Entered: 07/18/2025) |
| 07/18/2025 | 46 | MOTION for Leave to File *to File Video Clip Conventionally* by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Text of Proposed Order) (Schwiep, Paul) (Entered: 07/18/2025) |
| 07/18/2025 | 47 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - Declaration of Jessica Namath) (Schwiep, Paul) (Entered: 07/18/2025) |
| 07/18/2025 | 48 | NOTICE of Attorney Appearance by Monica Rizo on behalf of Miami-Dade County. Attorney Monica Rizo added to party Miami-Dade County(pty:dft). (Rizo, Monica) (Entered: 07/18/2025) |
| 07/21/2025 | 49 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit A - 2025.07.21 Declaration of Christopher W. McVoy, Ph.D.) (Schwiep, Paul) (Entered: 07/21/2025) |
| 07/21/2025 | 50 | RESPONSE in Opposition re 40 EXPEDITED MOTION Temporary Restraining Order re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint,, 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, filed by Kevin Guthrie. Replies due by 7/28/2025. (Attachments: # 1 Exhibit 1)(Panuccio, Jesse) (Entered: 07/21/2025) |
| 07/21/2025 | 51 | PAPERLESS ORDER. **THIS MATTER** is before the Court *sua sponte*. After receiving requests from members of the public, the Court is publicizing the dial-in information for today's Status Conference (DE 43). The Court notes that recording the contents of the Status Conference is prohibited. *See* S.D. Fla. L.R. 77.1. Dial by your location 833 435 1820 US Toll-free 833 568 8864 US Toll-free Meeting ID: 161 763 6984 Passcode: 981904 Signed by Judge Kathleen M. Williams on 7/21/2025. (cgd) (Entered: 07/21/2025) |
| 07/21/2025 | 52 | PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams. **Zoom Status Conference held on 7/21/2025.** |

| | | |
|---|---|---|
| | | Counsel of record present! |
| | | Court Reporter: Patricia Sanders, 305-523-5548 / Patricia_Sanders@flsd.uscourts.gov. |
| | | (mso) (Entered: 07/21/2025) |
| 07/21/2025 | 53 | NOTICE of Attorney Appearance by David Marion Murray on behalf of Miami-Dade County. Attorney David Marion Murray added to party Miami-Dade County(pty:dft). (Murray, David) (Entered: 07/21/2025) |
| 07/22/2025 | 54 | OMNIBUS ORDER denying 36 Motion for Leave to File. Hearing on Venue set for 7/30/2025 10:00 AM in Miami Division before Judge Kathleen M. Williams. Hearing on Plaintiff's Expedited Motion for TRO and preliminary Injunction set for 8/6/2025 09:00 AM in Miami Division before Judge Kathleen M. Williams. Responses due by 7/25/2025. Replies due by 7/29/2025. Signed by Judge Kathleen M. Williams on 7/21/2025. *See attached document for full details.* (ar24) Modified on 7/22/2025 (ar24). (Entered: 07/22/2025) |
| 07/24/2025 | 55 | EXPEDITED MOTION expedite discovery re 40 EXPEDITED MOTION Temporary Restraining Order re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint,, 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit 1 - 2025.07.23 Pls' Request for Production to FEDERAL Defs, # 2 Exhibit 2 - 2025.07.23 Pls' Request for Production to STATE Def, # 3 Exhibit 3 - 2025.07.23 Pls' Request for Interrogatories to DHS, # 4 Exhibit 4 - 2025.07.23 Pls' Request for Interrogatories to Guthrie, # 5 Exhibit 5 - 2025.07.23 Pls' Request for Inspection to STATE Def, # 6 Exhibit 6 - Dade-Collier Training and Transition Airport) (Schwiep, Paul) (Entered: 07/24/2025) |
| 07/25/2025 | 56 | RESPONSE in Opposition re 55 EXPEDITED MOTION expedite discovery re 40 EXPEDITED MOTION Temporary Restraining Order re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complain filed by Kevin Guthrie. Replies due by 8/1/2025. (Panuccio, Jesse) (Entered: 07/25/2025) |
| 07/25/2025 | 57 | REPLY to 50 Response in Opposition to Motion, by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit 1 - FOE Principal Place of Business, # 2 Exhibit 2 - July 25 Miami Dade Letter)(Schwiep, Paul) (Entered: 07/25/2025) |
| 07/25/2025 | 58 | RESPONSE in Opposition re 33 MOTION to Intervene filed by Kevin Guthrie. Replies due by 8/1/2025. (Panuccio, Jesse) (Entered: 07/25/2025) |
| 07/25/2025 | 59 | NOTICE *of Position* by Todd Lyons, Kristi Noem re 33 MOTION to Intervene (Carpenter, Hayley) (Entered: 07/25/2025) |
| 07/25/2025 | 60 | RESPONSE in Opposition re 40 EXPEDITED MOTION Temporary Restraining Order re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, *(supplemental response regarding venue)* filed by Todd Lyons, Kristi Noem. Replies due by 8/1/2025. (Carpenter, Hayley) (Entered: 07/25/2025) |
| 07/25/2025 | 61 | REPLY to 50 Response in Opposition to Motion, by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit 1 - FOE Principal Place of Business, # 2 Exhibit 2 - July 25 Miami Dade Letter)(Schwiep, Paul) (Entered: 07/25/2025) |

App. 20

| 07/28/2025 | 62 | REPLY to 55 EXPEDITED MOTION expedite discovery re 40 EXPEDITED MOTION Temporary Restraining Order re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complain by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit Ex 1 - DE 21 - ACLU who has authority, # 2 Exhibit Ex 2 - Public Records Request)(Schwiep, Paul) (Entered: 07/28/2025) |
|---|---|---|
| 07/28/2025 | 63 | NOTICE of Attorney Appearance by David Matthew Costello on behalf of Kevin Guthrie. Attorney David Matthew Costello added to party Kevin Guthrie(pty:dft). (Costello, David) (Entered: 07/28/2025) |
| 07/28/2025 | 64 | ORDER ON PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY (DE 55 ). Signed by Judge Kathleen M. Williams on 7/28/2025. *See attached document for full details.* (cgd) (Entered: 07/28/2025) |
| 07/29/2025 | 65 | RESPONSE in Opposition re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, *and REPLY in Support of 50 RESPONSE in Opposition* filed by Kevin Guthrie. Replies due by 8/5/2025. (Attachments: # 1 Exhibit 1)(Panuccio, Jesse) (Entered: 07/29/2025) |
| 07/29/2025 | 66 | REPLY to 60 Response in Opposition to Motion, by Center for Biological Diversity, Friends of the Everglades, Inc.. (Schwiep, Paul) (Entered: 07/29/2025) |
| 07/29/2025 | 67 | REPLY to 58 Response in Opposition to Motion by Miccosukee Tribe of Indians of Florida. (Friedman, Todd) (Entered: 07/29/2025) |
| 07/29/2025 | 68 | NOTICE of Attorney Appearance by Marissa A. Piropato on behalf of Todd Lyons, Kristi Noem. Attorney Marissa A. Piropato added to party Todd Lyons(pty:dft), Attorney Marissa A. Piropato added to party Kristi Noem(pty:dft). (Piropato, Marissa) (Entered: 07/29/2025) |
| 07/29/2025 | 69 | EXPEDITED MOTION FOR LIMITED RECIPROCAL DISCOVERY by Kevin Guthrie. (Attachments: # 1 Exhibit 1)(Panuccio, Jesse). Added MOTION for Discovery on 7/30/2025 (cwc). (Entered: 07/29/2025) |
| 07/29/2025 | 70 | Notice of Supplemental Authority re 60 Response in Opposition to Motion, by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - US v Secretary Florida Dept of Corrections) (Schwiep, Paul) (Entered: 07/29/2025) |
| 07/29/2025 | 71 | RESPONSE to 70 Notice of Supplemental Authority, by Kevin Guthrie. (Panuccio, Jesse) (Entered: 07/29/2025) |
| 07/30/2025 | 72 | PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams. **Miscellaneous Hearing held on 7/30/2025.** Counsel of record present. Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov. (mso) (Entered: 07/30/2025) |
| 07/30/2025 | 73 | OMNIBUS ORDER: The Miccosukee Tribe of Indians of Florida's Motion to Intervene (DE 33 ) is GRANTED. Plaintiffs shall disclose to Defendants their witness and exhibit lists for the August 6, 2025 Hearing on or before August 1, 2025 at 11:59 p.m. Defendants shall disclose to Plaintiffs any witness and exhibit lists for that Hearing on or before August 4, 2025 at 5:00 p.m. Signed by Judge Kathleen M. Williams on 7/30/2025. *See attached document for full details.* (wce) (Entered: 07/30/2025) |

| | | |
|---|---|---|
| 07/30/2025 | 74 | PAPERLESS ORDER. **THIS MATTER** is before the Court on Plaintiffs' Motion for Leave to File Video Clip Conventionally (DE 46 ) ("Motion"). In the Motion, Plaintiffs request leave to file a video clip via USB thumb drive. Defendants have not filed a response. Upon review of the record and the Motion, it is **ORDERED AND ADJUDGED** that the Motion (DE 46 ) is **GRANTED**. Plaintiffs may file the video clip via USB thumb drive. Signed by Judge Kathleen M. Williams on 7/30/2025. (cgd) (Entered: 07/30/2025) |
| 07/30/2025 | 75 | NOTICE of Change of Email; by David Matthew Costello (Costello, David) (Entered: 07/30/2025) |
| 07/31/2025 | 76 | CLERK'S NOTICE - Attorney Admissions has updated the email information as submitted through attorneys PACER account for attorney David Matthew Costello re 75 Notice of Change of Address, Email or Law Firm Name (pt) (Entered: 07/31/2025) |
| 07/31/2025 | 77 | NOTICE of Attorney Appearance by Adam R.F. Gustafson on behalf of Todd Lyons, Kristi Noem. Attorney Adam R.F. Gustafson added to party Todd Lyons(pty:dft), Attorney Adam R.F. Gustafson added to party Kristi Noem(pty:dft). (Gustafson, Adam) (Entered: 07/31/2025) |
| 07/31/2025 | 78 | NOTICE OF CONVENTIONALLY FILING 46 MOTION for Leave to File. (wce) (Entered: 07/31/2025) |
| 08/01/2025 | 79 | Notice of Supplemental Authority re 50 Response in Opposition to Motion, by Kevin Guthrie (Attachments: # 1 Exhibit 1) (Panuccio, Jesse) (Entered: 08/01/2025) |
| 08/01/2025 | 80 | RESPONSE to 79 Notice of Supplemental Authority by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit A - 2025.08.01 Declaration of Curt Bradley)(Schwiep, Paul) (Entered: 08/01/2025) |
| 08/01/2025 | 81 | Exhibit and Witness List *Preliminary Witness & Exhibit List for August 6, 2025 Hearing* by Center for Biological Diversity, Friends of the Everglades, Inc... (Schwiep, Paul) (Entered: 08/01/2025) |
| 08/01/2025 | 82 | Exhibit List by Miccosukee Tribe of Indians of Florida.. (Friedman, Todd) (Entered: 08/01/2025) |
| 08/01/2025 | 83 | Witness List by Miccosukee Tribe of Indians of Florida.. (Friedman, Todd) (Entered: 08/01/2025) |
| 08/01/2025 | 84 | Intervenor COMPLAINT , filed by Miccosukee Tribe of Indians of Florida. (Attachments: # 1 Exhibit)(Friedman, Todd) (Entered: 08/01/2025) |
| 08/01/2025 | 85 | NOTICE *of Joinder* by Miccosukee Tribe of Indians of Florida re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, (Friedman, Todd) (Entered: 08/01/2025) |
| 08/03/2025 | 86 | Notice of Supplemental Authority re 79 Notice of Supplemental Authority *Corrected Notice of Supplemental Authority* by Kevin Guthrie (Attachments: # 1 Exhibit 1 (Declaration of Ian Gadea-Guidicelli), # 2 Exhibit 2 (Updated Map)) (Panuccio, Jesse) (Entered: 08/03/2025) |
| 08/03/2025 | 87 | Exhibit List *SUPPLEMENT* by Center for Biological Diversity, Friends of the Everglades, Inc... (Schwiep, Paul) (Entered: 08/03/2025) |
| 08/04/2025 | 88 | MOTION to Bring Electronic Equipment into the courtroom by Center for Biological Diversity, Friends of the Everglades, Inc.. Responses due by 8/18/2025. (Attachments: # 1 Text of Proposed Order)(Schwiep, Paul) (Entered: 08/04/2025) |

| Date | No. | Description |
|---|---|---|
| 08/04/2025 | 89 | TRANSCRIPT of Motion Hearing held on 07/30/2025 before Judge Kathleen M. Williams, 1-86 pages, Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/25/2025. Redacted Transcript Deadline set for 9/4/2025. Release of Transcript Restriction set for 11/3/2025. (pdz) (Entered: 08/04/2025) |
| 08/04/2025 | 90 | Exhibit and Witness List by Kevin Guthrie.. (Panuccio, Jesse) (Entered: 08/04/2025) |
| 08/04/2025 | 91 | Exhibit and Witness List by Todd Lyons, Kristi Noem.. (Piropato, Marissa) (Entered: 08/04/2025) |
| 08/04/2025 | 92 | PAPERLESS ORDER. **THIS MATTER** is before the Court on Plaintiffs' Motion to Allow Electronic Equipment into the Courtroom at August 6 Injunction Hearing. (DE 88 ). Plaintiffs request permission for Paul Schwiep, Scott Hiaasen, Tania Galloni, Dominique Burkhardt, Elise Bennett, and Juan Hernandez to bring laptop computers, cellular phones, and supporting trial presentation equipment into the courtroom on August 6, 2025. Upon review of the record and the Motion, it is **ORDERED AND ADJUDGED** that the Motion (DE 88 ) is **GRANTED**. Signed by Judge Kathleen M. Williams on 8/4/2025. (cgd) (Entered: 08/04/2025) |
| 08/04/2025 | 93 | RESPONSE to 69 EXPEDITED MOTION FOR LIMITED RECIPROCAL DISCOVERY MOTION by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit 1 - 2025.08.04 Pls' Responses and Objections to FDEM's First Set of Requests for Production (served 07.29.25))(Schwiep, Paul) (Entered: 08/04/2025) |
| 08/05/2025 | 94 | MOTION to Bring Electronic Equipment into the courtroom by Kevin Guthrie. Responses due by 8/19/2025. (Attachments: # 1 Text of Proposed Order)(Panuccio, Jesse) (Entered: 08/05/2025) |
| 08/05/2025 | 95 | PAPERLESS ORDER. **THIS MATTER** is before the Court on Defendant Kevin Guthrie's Motion to Allow Electronic Equipment into the Courtroom at August 6 Injunction Hearing. (DE 94 ). Guthrie requests permission for Jesse Panuccio, Evan Ezray, David Costello, and Dante Ficarelli to bring laptop computers, cellular phones, and supporting trial presentation equipment into the courtroom on August 6, 2025. Upon review of the record and the Motion, it is **ORDERED AND ADJUDGED** that the Motion (DE 94 ) is **GRANTED**. Signed by Judge Kathleen M. Williams on 8/5/2025. (cgd) (Entered: 08/05/2025) |
| 08/05/2025 | 96 | MOTION to Bring Electronic Equipment into the courtroom by Miccosukee Tribe of Indians of Florida. Responses due by 8/19/2025. (Attachments: # 1 Text of Proposed Order)(Ajizian, Christopher) (Entered: 08/05/2025) |
| 08/05/2025 | 97 | PAPERLESS ORDER. **THIS MATTER** is before the Court on the Miccosukee Tribe's Motion to Allow Electronic Equipment into the Courtroom at August 6 Injunction Hearing. (DE 96 ). The Tribe requests permission for Christopher Ajizian, Todd Friedman, and Curtis Osceola to bring laptop computers, cellular phones, and supporting trial presentation equipment into the courtroom on August 6, 2025. Upon review of the record and the Motion, it is **ORDERED AND ADJUDGED** that the Motion (DE 96 ) is **GRANTED**. Signed by Judge Kathleen M. Williams on 8/5/2025. (cgd) (Entered: 08/05/2025) |
| 08/05/2025 | 98 | Notice of Supplemental Authority by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - CoreCivic Inc v Governor of New Jersey) (Schwiep, Paul) (Entered: 08/05/2025) |

App. 23

| 08/05/2025 | 99 | TRIAL BRIEF *PLAINTIFFS' PRE-HEARING BRIEF* by Center for Biological Diversity, Friends of the Everglades, Inc., Miccosukee Tribe of Indians of Florida. (Schwiep, Paul) (Entered: 08/05/2025) |
|---|---|---|
| 08/05/2025 | 100 | Defendant's MOTION to Strike */ Exclude Plaintiffs' Expert Dillon N. Reio* by Kevin Guthrie. Responses due by 8/19/2025. (Panuccio, Jesse) (Entered: 08/05/2025) |
| 08/05/2025 | 101 | Defendant's MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Dante Ficarelli. *Exhibit A* Filing Fee $ 250.00 Receipt # AFLSDC-18678665 by Kevin Guthrie. Responses due by 8/19/2025. (Attachments: # 1 Exhibit B - Proposed Order Granting Motion to Appear Pro Hac Vice)(Costello, David) (Entered: 08/05/2025) |
| 08/06/2025 | 102 | PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams.<br><br>**Miscellaneous Hearing held on 8/6/2025. Court heard witness testimony and reviewed admitted exhibits. Court adjourned. Hearing will reconvene on 8/7/2025 at 9:00 am.**<br><br>Counsel of record present.<br><br>Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov.<br><br>(mso) (Entered: 08/07/2025) |
| 08/07/2025 | 103 | PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams.<br><br>**Miscellaneous Hearing held on 8/7/2025. Court heard witness testimony, reviewed admitted exhibits and oral arguments of counsel. Court adjourned. Hearing to reconvene on Tuesday, 8/12/2025 at 10:00 am.**<br><br>Counsel of record present.<br><br>Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov.<br><br>(mso) (Entered: 08/07/2025) |
| 08/07/2025 | 104 | ORDER denying as moot 31 Expedited Motion; granting in part and denying in part 40 Expedited Motion. Signed by Judge Kathleen M. Williams on 8/7/2025. *See attached document for full details.* (cgd) (Entered: 08/07/2025) |
| 08/08/2025 | 105 | TRANSCRIPT of Motion Hearing held on 08/07/2025 before Judge Kathleen M. Williams, 1-67 pages, Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/29/2025. Redacted Transcript Deadline set for 9/8/2025. Release of Transcript Restriction set for 11/6/2025. (pdz) (Entered: 08/08/2025) |
| 08/08/2025 | 106 | NOTICE of Compliance by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - Friends of the Everglades v Noem _ attached is Mike Radford's (SCS Engineers) resume, # 2 Exhibit 2 - Radford_Mike_resume) (Schwiep, Paul) (Entered: 08/08/2025) |
| 08/08/2025 | 107 | PAPERLESS ORDER. **THIS MATTER** is before the Court on David Costello's Motion for Leave to Appear *Pro Hac Vice* for Dante Ficarelli (DE 101) ("Motion"). Per the Clerk's Office, the Motion fails to include a certification that movant studied the Local Rules, is a member in good standing of a qualifying bar, and has not filed more than three |

USCA11 Case: 25-12873    Document: 83-1    Date Filed: 12/16/2025    Page: 25 of 1503

|  |  |  |
|---|---|---|
|  |  | pro hac vice motions in different cases in this District within the last 365 days. See S.D. Fla. L.R. 4(b)(1). Accordingly, upon review of the record and the Motion, it is **ORDERED AND ADJUDGED** that the Motion (DE 101 ) is **DENIED WITHOUT PREJUDICE**. The Court also notes that "[a]ttorneys residing within this District and practicing before this Court are expected to be members of the bar of this Court." S.D. Fla. L.R. 4(a). Signed by Judge Kathleen M. Williams on 8/8/2025. (cgd) (Entered: 08/08/2025) |
| 08/08/2025 | 108 | Exhibit List *for August 12, 2025 Hearing* by Center for Biological Diversity, Friends of the Everglades, Inc... (Schwiep, Paul) (Entered: 08/08/2025) |
| 08/08/2025 | 109 | Exhibit List by Miccosukee Tribe of Indians of Florida.. (Ajizian, Christopher) (Entered: 08/08/2025) |
| 08/09/2025 | 110 | Defendant's MOTION to Amend/Correct , Defendant's MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Dante Ficarelli. Filing Fee $ 250.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed - Filing Fees Previously Paid. See 101 Motion to Appear Pro Hac Vice, by Kevin Guthrie. Responses due by 8/25/2025. (Attachments: # 1 Certification of Dante Ficarelli, # 2 Text of Proposed Order Granting Corrected Motion to Appear Pro Hac Vice)(Costello, David) (Entered: 08/09/2025) |
| 08/10/2025 | 111 | Exhibit List by Miccosukee Tribe of Indians of Florida.. (Ajizian, Christopher) (Entered: 08/10/2025) |
| 08/11/2025 | 112 | PAPERLESS ORDER. **THIS MATTER** is before the Court on the Corrected Motion to Appear *Pro Hac Vice*, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing (DE 110 ) ("Motion") on behalf of Dante Ficarelli. Upon review of the record and the Motion, it is **ORDERED AND ADJUDGED** that the Motion (DE 110 ) is **GRANTED**. Dante Ficarelli may appear and participate in this action. The Clerk shall provide electronic notification of all electronic filings to Dante Ficarelli, at dficarelli@bsfllp.com. Signed by Judge Kathleen M. Williams on 8/11/2025. (cgd) (Entered: 08/11/2025) |
| 08/11/2025 | 113 | TRANSCRIPT of Preliminary Injunction Hearing held on 08/07/2025 before Judge Kathleen M. Williams, 1-150 pages, Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/2/2025. Redacted Transcript Deadline set for 9/11/2025. Release of Transcript Restriction set for 11/10/2025. (pdz) (Entered: 08/11/2025) |
| 08/11/2025 | 114 | TRANSCRIPT of Preliminary Injunction Hearing held on 08/06/2025 before Judge Kathleen M. Williams, 1-383 pages, Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/2/2025. Redacted Transcript Deadline set for 9/11/2025. Release of Transcript Restriction set for 11/10/2025. (pdz) (Entered: 08/11/2025) |
| 08/11/2025 | 115 | Exhibit List *SUPPLEMENT to Cross-Exam Exhibit List* by Center for Biological Diversity, Friends of the Everglades, Inc... (Schwiep, Paul) (Entered: 08/11/2025) |

App. 25

USCA11 Case: 25-12873    Document: 83-1    Date Filed: 12/16/2025    Page: 26 of 1503

| | | |
|---|---|---|
| 08/12/2025 | 116 | Exhibit List *Supplemental Exhibit List for August 12, 2025 Hearing* by Kevin Guthrie.. (Attachments: # 1 Exhibit 60 - Declaration of I. Gadea-Guidicelli, # 2 Exhibit 61 - Declaration of D. Kerner, # 3 Exhibit 62 - Declaration of M. Moore, # 4 Exhibit 63 - Declaration of J. Kinnebrew, # 5 64 - Picture of Roadway)(Panuccio, Jesse) (Entered: 08/12/2025) |
| 08/12/2025 | 117 | Exhibit and Witness List *Supplemental* by Todd Lyons, Kristi Noem.. (Attachments: # 1 Supplement Declarationm of S. Fuentes)(Piropato, Marissa) (Entered: 08/12/2025) |
| 08/12/2025 | 118 | Exhibit List *Supplemental* by Todd Lyons, Kristi Noem.. (Attachments: # 1 Exhibit Signed Declaration of S. Fuentes)(Carpenter, Hayley) (Entered: 08/12/2025) |
| 08/12/2025 | 119 | PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams. **Miscellaneous Hearing held on 8/12/2025. Court heard further witness testimony, reviewed admitted exhibits. Court adjourned. Hearing will reconvene Wednesday, 8/13/2025 at 10:30 am.** Counsel of record present. Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov. (mso) (Entered: 08/12/2025) |
| 08/13/2025 | 120 | Notice of Supplemental Authority re 86 Notice of Supplemental Authority, by Kevin Guthrie (Attachments: # 1 Exhibit Supplemental Declaration of Ian Gadea-Guidicelli) (Panuccio, Jesse) (Entered: 08/13/2025) |
| 08/13/2025 | 121 | PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams. **Miscellaneous Hearing held on 8/13/2025. Court heard oral arguments.** Counsel of record present. Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov. (mso) (Entered: 08/13/2025) |
| 08/14/2025 | 122 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit Plaintiffs' Closing PowerPoint Presentation) (Schwiep, Paul) (Entered: 08/14/2025) |
| 08/15/2025 | 123 | Exhibit List *ADMITTED* by Center for Biological Diversity, Friends of the Everglades, Inc., Miccosukee Tribe of Indians of Florida.. (Schwiep, Paul) (Entered: 08/15/2025) |
| 08/15/2025 | 124 | Exhibit List *ADMITTED* by Kevin Guthrie, Kristi Noem.. (Panuccio, Jesse) (Entered: 08/15/2025) |
| 08/15/2025 | 125 | MOTION for Leave to File *Amicus Curiae Brief* by Mark Robert Schlakman. Attorney Mark Robert Schlakman added to party Mark Robert Schlakman(pty:ip). (Schlakman, Mark) (Entered: 08/15/2025) |
| 08/18/2025 | 126 | Plaintiff's Request for Judicial Notice in Support of Plaintiffs' Expedited Motion for Preliminary Injunction (D.E. 5) re 5 EXPEDITED MOTION (1) Request for Hearing; (2) Temporary Restraining Order; and (3) Preliminary Injunction re 1 Complaint, by Center for Biological Diversity, Friends of the Everglades, Inc.. (Attachments: # 1 Exhibit 1 - Maton v Mordant - Motion to Dismiss)(Schwiep, Paul) Modified Text on 8/18/2025 (wce). (Entered: 08/18/2025) |

App. 26

USCA11 Case: 25-12873 Document: 83-1 Date Filed: 12/16/2025 Page: 27 of 1503

| | | |
|---|---|---|
| 08/18/2025 | 127 | NOTICE *of Confirmation Regarding the Admission of Tribe's Exhibits 10, 13, and 14* by Miccosukee Tribe of Indians of Florida (Ajizian, Christopher) (Entered: 08/18/2025) |
| 08/20/2025 | 128 | Notice of Supplemental Authority by Kevin Guthrie (Attachments: # 1 Exhibit 1 - CM v Noem - Order Transferring Venue) (Panuccio, Jesse) (Entered: 08/20/2025) |
| 08/21/2025 | 129 | TRANSCRIPT of Preliminary Injunction Hearing held on 08/12/25 before Judge Kathleen M. Williams, 1-281 pages, Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/11/2025. Redacted Transcript Deadline set for 9/22/2025. Release of Transcript Restriction set for 11/19/2025. (pdz) (Entered: 08/21/2025) |
| 08/21/2025 | 130 | TRANSCRIPT of Preliminary Injunction Hearing held on 08/13/2025 before Judge Kathleen M. Williams, 1-171 pages, Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/11/2025. Redacted Transcript Deadline set for 9/22/2025. Release of Transcript Restriction set for 11/19/2025. (pdz) (Entered: 08/21/2025) |
| 08/21/2025 | 131 | ORDER granting in part and denying in part 5 Expedited Motion. Signed by Judge Kathleen M. Williams on 8/21/2025. *See attached document for full details.* (cgd) (Entered: 08/21/2025) |
| 08/21/2025 | 132 | Notice of Interlocutory Appeal re 131 Order by Kevin Guthrie. Filing fee $ 605.00 receipt number AFLSDC-18724978. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Attachments: # 1 Exhibit A)(Panuccio, Jesse) Modified text on 8/22/2025 (jgo). (Entered: 08/21/2025) |
| 08/21/2025 | 133 | Clerk's Notice to Filer re 132 Notice of Interlocutory Appeal,. **Document Not Linked**; ERROR - The filed document was not linked to the related docket entry. The correction was made by the Clerk. It is not necessary to refile this document. (jgo) (Entered: 08/22/2025) |
| 08/22/2025 | | Transmission of Notice of Appeal, Order under appeal, and Docket Sheet to US Court of Appeals re 132 Notice of Interlocutory Appeal. Notice has been electronically mailed. (jgo) (Entered: 08/22/2025) |
| 08/22/2025 | 134 | NOTICE *of Filing Proof of Payment of Injunction Bond* by Center for Biological Diversity, Friends of the Everglades, Inc. re 131 Order on Expedited Motion (Attachments: # 1 Exhibit A) (Hiaasen, Scott) (Entered: 08/22/2025) |
| 08/22/2025 | 135 | Joint MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint, 84 Intervenor Complaint by Kevin Guthrie. (Attachments: # 1 Text of Proposed Order) (Panuccio, Jesse) (Entered: 08/22/2025) |

App. 27

USCA11 Case: 25-12873    Document: 83-1    Date Filed: 12/16/2025    Page: 28 of 1503

| | | |
|---|---|---|
| 08/23/2025 | 136 | Notice of Interlocutory Appeal re 131 Order by Todd Lyons, Kristi Noem. Filing fee $ 605.00. USA/FPD Filer - No Filing Fee Required. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Attachments: # 1 Exhibit August 21, 2025 Court Order)(Carpenter, Hayley) Modified text on 8/25/2025 (jgo). (Entered: 08/23/2025) |
| 08/23/2025 | 137 | Defendant's EXPEDITED MOTION To Stay Preliminary Injunction Pending Appeal re 131 Order on Expedited Motion by Kevin Guthrie. (Attachments: # 1 Exhibit 1 - Declaration of Joseph C. Harrison, # 2 Exhibit 2 - Declaration of Ian Gadea-Guidicelli) (Panuccio, Jesse) (Entered: 08/23/2025) |
| 08/23/2025 | 138 | EXPEDITED MOTION to Stay Preliminary Injunction Pending Interlocutory Appeal by Todd Lyons, Kristi Noem. (Attachments: # 1 Exhibit Declaration of Garrett Ripa) (Carpenter, Hayley) (Entered: 08/23/2025) |
| 08/23/2025 | 139 | Clerk's Notice to Filer re 136 Notice of Interlocutory Appeal,. **Document Not Linked**; ERROR - The filed document was not linked to the related docket entry. The correction was made by the Clerk. It is not necessary to refile this document. (jgo) (Entered: 08/25/2025) |
| 08/25/2025 | | Transmission of Notice of Appeal, Order under appeal, and Docket Sheet to US Court of Appeals re 136 Notice of Interlocutory Appeal. Notice has been electronically mailed. (jgo) (Entered: 08/25/2025) |
| 08/25/2025 | 140 | TRANSCRIPT ORDER FORM filed by Kevin Guthrie re 132 Notice of Interlocutory Appeal,, filed by Kevin Guthrie. No Transcript Requested. (Panuccio, Jesse) (Entered: 08/25/2025) |
| 08/25/2025 | 141 | MOTION to Strike 138 EXPEDITED MOTION to Stay Preliminary Injunction Pending Interlocutory Appeal , 137 Defendant's EXPEDITED MOTION To Stay Preliminary Injunction Pending Appeal re 131 Order on Expedited Motion by Center for Biological Diversity, Friends of the Everglades, Inc., Miccosukee Tribe of Indians of Florida. Responses due by 9/8/2025. (Schwiep, Paul) (Entered: 08/25/2025) |
| 08/25/2025 | 142 | PAPERLESS ORDER. **THIS MATTER** is before the Court on Plaintiffs and Defendants Director Guthrie, Secretary Noem, and Director Lyons' Joint Motion to Extend Time (DE 135 ). In the Motion Plaintiffs and Defendants Guthrie, Noem, and Lyons request an extension of time to respond to Plaintiffs' Complaint until October 27, 2025, to allow Plaintiffs to file their planned amended complaint. Upon review of the Motion and the record, it is **ORDERED AND ADJUDGED** that the Motion (DE 135 ) is **GRANTED**. Defendants Guthrie, Noem, and Lyons shall file a response to the operative complaint on or before **October 27, 2025**, which complies with the Court's Practices and Procedures regarding joint filings where there are multiple Defendants. (DE 42 at 1-2.) Signed by Judge Kathleen M. Williams on 8/25/2025. (cgd) (Entered: 08/25/2025) |
| 08/25/2025 | 143 | PAPERLESS ORDER. **THIS MATTER** is before the Court on Defendant Kevin Guthrie's Expedited Motion for Limited Reciprocal Discovery (DE 69 ) and Emergency Motion to Strike Plaintiffs' Expert Dillon Reio (DE 100 ), Robert Schlakman's Motion for Leave to File Amicus Curiae Brief (DE 125 ), and Plaintiffs' Request for Judicial Notice (DE 126 ) (collectively, "Motions"). The Motions request relief relevant to Plaintiffs' Motion for Preliminary Injunction (DE 5 ). In light of the fact that the Preliminary Injunction Hearing has concluded, and the Motion for Preliminary Injunction has been ruled upon, the Motions (DE 69 ; DE 100 ; DE 125 ; DE 126 ) are **DENIED AS MOOT**. Signed by Judge Kathleen M. Williams on 8/25/2025. (cgd) (Entered: 08/25/2025) |

App. 28

USCA11 Case: 25-12873 Document: 83-1 Date Filed: 12/16/2025 Page: 29 of 1503

| | | |
|---|---|---|
| 08/25/2025 | 144 | RESPONSE in Opposition re 138 EXPEDITED MOTION to Stay Preliminary Injunction Pending Interlocutory Appeal , 137 Defendant's EXPEDITED MOTION To Stay Preliminary Injunction Pending Appeal re 131 Order on Expedited Motion filed by Center for Biological Diversity, Friends of the Everglades, Inc., Miccosukee Tribe of Indians of Florida. Replies due by 9/2/2025. (Attachments: # 1 Exhibit A - 2025.08.25 Declaration of Maxwell Frost, # 2 Exhibit B - 2025.08.25 Declaration of Miranda McNeil)(Schwiep, Paul) (Entered: 08/25/2025) |
| 08/25/2025 | 146 | Acknowledgment of Receipt of NOA from USCA re 136 Notice of Interlocutory Appeal, filed by Kristi Noem, Todd Lyons. Date received by USCA: 08/25/2025. USCA Case Number: 25-12873-J. (jgo) (Entered: 08/26/2025) |
| 08/26/2025 | 145 | Clerk's Receipt for deposit into registry of the court per order (DE#131) received on 8/25/2025 in the amount of $ 100.00, receipt number FLS306985. (vt) (Entered: 08/26/2025) |
| 08/27/2025 | 147 | ORDER denying 137 Expedited Motion; denying 138 Expedited Motion; denying 141 Motion to Strike. Signed by Judge Kathleen M. Williams on 8/27/2025. *See attached document for full details.* (cgd) (Entered: 08/27/2025) |
| 08/29/2025 | 148 | NOTICE by Center for Biological Diversity, Friends of the Everglades, Inc. (Attachments: # 1 Exhibit 1 - Declaration of Dr Anna V Eskamani) (Schwiep, Paul) (Entered: 08/29/2025) |
| 09/16/2025 | 149 | TRANSCRIPT ORDER FORM filed by Todd Lyons, Kristi Noem re 136 Notice of Interlocutory Appeal,, filed by Kristi Noem, Todd Lyons. No Transcript Requested. (Raurell, Carlos) (Entered: 09/16/2025) |
| 10/06/2025 | | Case Stayed per 25-12873, ECF 42. (cgd) (Entered: 10/06/2025) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/21/2025 10:40:44 | | |
| **PACER Login:** | danteficarelli98 | **Client Code:** | 507730001/DF |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-22896-KMW |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |

App. 29

# Tr. Vol. I

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
                     CASE NO. 25-22896-CV-KMW
 3

 4   FRIENDS OF THE EVERGLADES, et al.,    Miami, Florida

 5        Plaintiffs,                      August 6, 2025

 6           vs.                           9:07 a.m. to 6:30 p.m.

 7   KRISTI NOEM, et al.,

 8        Defendants.                      Pages 1 to 383
     _____
 9

10                    PRELIMINARY INJUNCTION HEARING
               BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
11                   UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14
     FOR THE PLAINTIFFS:       PAUL SCHWIEP, ESQ.
15                             SCOTT HIAASEN, ESQ.
                               COFFEY BURLINGTON
16                             2601 S. Bayshore Drive
                               Penthouse 1
17                             Miami, Florida 33133
                                   -and-
18                             TANIA GALLONI, ESQ.
                               DOMINIQUE BURKHARDT, ESQ.
19                             EARTHJUSTICE
                               4500 Biscayne Boulevard
20                             Suite 201
                               Miami, Florida 33134
21                                 -and-
                               ELISE PAUTLER BENNETT, ESQ.
22                             JASON TOTOUI, ESQ.
                               CENTER FOR BIOLOGICAL DIVERSITY
23                             PO Box 2155
                               Saint Petersburg, FL 33731-2155,
24

25
```

App. 31

```
 1   FOR INTERVENOR PLAINTIFF:

 2                             TODD R. FRIEDMAN, ESQ.
                              TODD R. FRIEDMAN, P.A.
 3                             CHRISTOPHER AJIZIAN, ESQ.
                              CHRISTOPHER AJIZIAN, ESQ.
 4                             1101 Brickell Avenue
                              Suite 700
 5                             Miami, Florida 33131

 6
     STATE DEFENDANT GUTHRIE:
 7
                              JESSE PANUCCIO, ESQ.
 8                             EVAN EZRAY, ESQ.
                              DANTE FICARELLI, ESQ.
 9                             DAVID COSTELLO, ESQ.
                              BOIES SCHILLER FLEXNER, LLP
10                             401 East Las Olas Boulevard
                              Suite 1200
11                             Miami, Florida 33301

12
     FOR Federal Defendants
13   KRISTI NOEM and TODD LYONS:

14                             CARLOS J. RAUREL, ESQ.
                              UNITED STATES ATTORNEY'S OFFICE
15                             99 NE 4 Street
                              Miami, Florida 33132
16                                  -and-
                              ADAM R.F. GUSTAFSON, ESQ.
17                             ACTING ASSISTANT ATTORNEY GENERAL
                              FRANK SINGER, ESQ.
18                             U.S. DEPARTMENT OF JUSTICE
                              950 Pennsylvania Ave N.W.
19                             Washington, DC 20530
                                    -and-
20                             MARISSA A. PIROPATO, ESQ.
                              U.S. DEPARTMENT OF JUSTICE
21                             150 M St. NE
                              Washington, DC 20002
22
     FOR DEFENDANT MIAMI-DADE COUNTY:
23
                              DAVID M. MURRAY, ESQ.
24                             MIAMI-DADE COUNTY ATTORNEY'S OFFICE
                              P.O. Box 025504
25                             Miami, Florida 33102
```

```
 1    STENOGRAPHICALLY REPORTED BY:

 2                           PATRICIA DIAZ, FCRR, RPR, FPR
                            Official Court Reporter
 3                           United States District Court
                            400 North Miami Avenue
 4                           11th Floor
                            Miami, Florida 33128
 5                           (305) 523-5178

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      INDEX OF EXAMINATION

 2
      WITNESS                      DIRECT    CROSS    REDIRECT
 3

 4    EVE SAMPLES

 5    BY MR. SCHWIEP                  18                76
      BY MR. PANUCCIO                          35
 6

 7    ANNA ESKAMANI

 8    BY MR. HIAASEN                  89                135
      BY MR. AJIZIAN                           99
 9    BY MR. PANUCCIO                          104
      BY MR. SINGER                            125
10

11    AMBER CROOKS
      (Via teleconference)
12
      BY MS. BURKHARDT               141                194
13    BY MR. FRIEDMAN                          165
      BY MR. COSTELLO                          169
14    BY MR. GUSTAFSON                         191

15
      RANDY KAUTZ
16
      BY MS. GALLONI                 200                293
17    BY MR. AJIZIAN                           240
      BY MR. EZRAY                             249
18    BY MR. GUSTAFSON                         287

19
      JESSICA NAMATH
20
      BY MR. HIAASEN                 299                324
21    BY MR. FICARELLI                         316

22

23

24

25
```

App. 34

1

<u>INDEX OF EXHIBITS</u>

2

3    <u>PLAINTIFFS' EXHIBITS</u>                <u>MARKED</u>      <u>ADMITTED</u>

| Exhibit | MARKED | ADMITTED |
|---|---|---|
| 34 | 27 | 30 |
| 33 | 78 | |
| 44 | 82 | 87 |
| 45 | | 87 |
| 19 | | 128 |
| 3 | 163 | 164 |
| 26 | 210 | 211 |
| 25 | 213 | 214 |
| 53, 54, 55, 56 | 309 | 311 |
| 59 | 315 | 315 |
| 65 | 315 | 315 |

4    34                              27        30
     33                              78
5    44                              82        87
     45                                        87
6    19                                        128
     3                              163       164
7    26                             210       211
     25                             213       214
8    53, 54, 55, 56                 309       311
     59                             315       315
9    65                             315       315

10

     <u>TRIBE'S EXHIBITS</u>                   <u>MARKED</u>      <u>ADMITTED</u>
11

12

     <u>DEFENSE EXHIBITS</u>                   <u>MARKED</u>      <u>ADMITTED</u>
13

     14                              42
14   24                                        57
     45                              65
15   52                              72
     36                             271
16

17

18

19

20

21

22

23

24

25

App. 35

```
 1              (Call to the Order of the Court.)

 2          COURTROOM DEPUTY:  Calling case 25-CV-22896, Friends of

 3    the Everglades, Inc., et al., versus Noem, et al.

 4          Counsel, please state your appearances for the record,

 5    starting with the plaintiff.

 6          MR. SCHWIEP:  Good morning, Your Honor.  Paul Schwiep

 7    from Coffey Burlington.

 8          MR. HIAASEN:  Good morning, Your Honor.  Scott Hiaasen

 9    from Coffey Burlington.

10          MS. GALLONI:  Good morning, Your Honor.  Tania Galloni

11    from EarthJustice on behalf of Plaintiff Friends of the

12    Everglades, and I have with me Dominic Burkhardt.

13          MS. BURKHARDT:  Good morning.

14          THE COURT:  Good morning.

15          MS. BENNETT:  Good morning, Your Honor.  Elise Pottner

16    Bennett on behalf of the Center for Biological Diversity, and I

17    have Jason Totoui here with me as well.

18          MR. AJIZIAN:  Good morning, Your Honor.  Chris Ajizian

19    and Todd Friedman on behalf of the Miccosukee Tribe of Indians

20    of Florida, Intervenor/Plaintiff.

21          MR. FRIEDMAN:  Good morning, Your Honor.  Todd

22    Friedman, and with us is Curtis Osceola from the Miccosukee

23    Tribe.

24          THE COURT:  Good morning.

25          MR. SCHWIEP:  Your Honor, I should have introduced Eve
```

App. 36

1    Samples as well, who is the Executive Director of Friends of

2    the Everglades.  She is here with us.

3         THE COURT:  Good morning.  Getting a little tight over

4    there.

5         All right.  Let's turn now to the defendants.

6         MR. PANUCCIO:  Good morning, Your Honor.  Jesse

7    Panuccio for Executive Director Guthrie, Florida Department of

8    Emergency Management.

9         THE COURT:  Good morning, Mr. Panuccio.

10        MR. EZRAY:  Good morning, Your Honor.  Evan Ezray for

11   Director Guthrie.

12        MR. FICARELLI:  Good morning, Your Honor.  Dante

13   Ficarelli for Executive Director Guthrie.

14        THE COURT:  Good morning.

15        MR. COSTELLO:  Good morning, Your Honor.  David

16   Costello for Executive Director Guthrie.

17        MR. GUSTAFSON:  Good morning, Your Honor, Adam

18   Gustafson for the Federal Defendants.

19        MS. PIROPATO:  Good morning, Your Honor.  Marisa

20   Piropato for the Federal Defendants.  I also have with me here

21   Frank Singer who is in the process of getting ECF approved.

22        He has finished all the requirements.  He is waiting

23   for his special number to be able to officially enter an

24   appearance.

25        THE COURT:  Good morning.

App. 37

1          MR. RAURELL:  Good morning, Your Honor.  Carlos Raurell

2     on behalf of the Federal Defendants here from the U.S.

3     Attorney's Office in Miami.

4          THE COURT:  Good morning.  We seem to be missing a

5     defendant.  No?

6          MR. RAURELL:  Dade County.

7          THE COURT:  Right.

8          What have you all done with Dade County?

9          MR. PANUCCIO:  Well, I'm not sure, Your Honor.  The

10    motion is not against Dade County, so perhaps they are not

11    here, but there is no relief sought against them today, I

12    suppose.

13         THE COURT:  Right.  I assumed a level of interest, but

14    you are correct, Mr. Panuccio.

15         So, I guess we are all ready to proceed and everyone

16    may be seated.

17         MR. RAURELL:  Forgive me, Your Honor.  I did speak with

18    Mr. Murray the day before yesterday, and he did appear to

19    indicate that the County would be here although in a somewhat

20    passive role, so I don't know what to make of that.

21         THE COURT:  Okay.  Thank you, Mr. Raurell.

22         Unless someone sees some infirmity with us going ahead

23    without Dade County, I think Mr. Panuccio has the right of it,

24    that this is not a motion directed to their status or capacity

25    to remedy, but I'll go ahead if you think -- if anyone is

App. 38

1    concerned and wants to wait a few moments.  I will do that.

2        MR. SCHWIEP:  On behalf of the plaintiffs, we are not

3    concerned, and to be clear on the record, we are not seeking

4    any injunctive relief as against Defendant Miami-Dade County.

5        THE COURT:  Right.

6        MR. AJIZIAN:  Your Honor, the Miccosukee Tribe joins.

7        THE COURT:  All right.  We won't tell Mr. Murray no one

8    was concerned about his absence.

9        All right.  We are here today on the plaintiffs' motion

10   for preliminary injunction against the Federal and State

11   defendants, as noted.  I have read all of your submissions.  I

12   don't think I need any opening statements.  I will, obviously,

13   allow you all at the end of the proceedings, which doesn't look

14   like it's going to be today, but hope springs eternal.

15       To sum up and emphasize the more salient points, I

16   think we can go directly to testimony.  So, if there is no

17   objection, I think we should begin.

18       MR. PANUCCIO:  Just a few preliminary points, Your

19   Honor.  I guess you might call them logistical points today.

20       We would like to invoke the rule for sequestration for

21   witnesses today.

22       THE COURT:  Yes.

23       MR. PANUCCIO:  Our opinion would be that's everyone who

24   is going to testify because the organizations themselves are

25   not testifying.  Everyone is testifying as an individual fact

1    witness, so we think that applies to all witnesses, Your Honor.

2        THE COURT:  I think you are right with the exception of

3    experts, which I am sure you are going to talk to me about in a

4    moment.  But, yes, any fact witness who is in the courtroom

5    needs to absent him or herself or the, I guess -- so, you are

6    saying the representatives of the organizations you don't think

7    should be here?

8        MR. PANUCCIO:  Well, that's right, Your Honor.  They're

9    not testifying for the organization.  So, if you take

10    Ms. Samples, for example, and her declaration, it's all

11    personal.  It's not the organization is saying this.  She said,

12    I have this fear.  This is personal to me.  I am the one who is

13    providing standing or irreparable harm.

14        So, if she is going to testify to any of those personal

15    issues, she would have to leave.  If she is going to testify as

16    to what the organization knows, and they are willing to

17    stipulate that she is only testifying in the organizational

18    capacity, then it might be a different case.  Then she might be

19    the party, but she is not the party as an individual.

20        THE COURT:  Okay.

21        MR. SCHWIEP:  Judge, I think we can cut through it.

22        She is going to be the first witness.  She is the

23    representative of the organization, so she is entitled to be

24    here, but it's going to be a moot problem because she will

25    testify first and she will be done.

1          THE COURT:  All right.  Any other persons who are here,

2     if they are testifying in any capacity, save expert, it's

3     cleaner to have them wait outside, but since that only

4     apparently applies to your first witness, that will be taken

5     care of.

6          MR. SCHWIEP:  Just to be clear, Judge, the rule of

7     sequestration does not apply to experts?

8          THE COURT:  It does not.

9          MR. PANUCCIO:  Your Honor, on that, I'm sorry, I mean,

10    there are no experts, per se.  We have not had a Daubert

11    process.  These are just declarations they put in.

12          Many times what the purported experts are saying are no

13    different than what the purported fact witnesses are saying.

14    They are just speculating on what they think their harm will

15    be.

16          It's not clear to me we have experts.  There has been

17    no expert process, Your Honor.  There are just declarations.

18          THE COURT:  All right.  Do you have witnesses that you

19    have deemed as experts and going forward will be experts in

20    your case?

21          MR. SCHWIEP:  Yes, Your Honor.

22          THE COURT:  And have you identified them as such to

23    Mr. Panuccio and Mr. Gustafson and the rest?

24          MR. SCHWIEP:  Yes, Judge.  We have two, Mr. Chris

25    McVoy.  He is a soil physicist, an expert in Everglades

App. 41

1   restoration.  He has been disclosed.

2          And then we have Dillon Reio, who is a soil geologist.

3          THE COURT:  Okay.

4          MR. SCHWIEP:  He is an expert, as well, and they will

5   be providing opinion testimony.

6          I'm sorry, I left off, Randy Kautz is also an expert in

7   the Florida panther.  Randy Kautz, K-a-u-t-z.  He was disclosed

8   as well.

9          THE COURT:  Okay.

10         MR. PANUCCIO:  Your Honor, just to respond to that, we

11  haven't had any formal kind of expert disclosure.  I mean, they

12  are saying they're an expert but one of them, and we will argue

13  this, one of them was, quote-unquote, disclosed to us something

14  like 48 hours ago or very recently.

15         There has been no formal disclosure.  They are just

16  saying they are experts, but we have not had any normal expert

17  process with these folks, no depositions, no reports we can

18  cross.

19         THE COURT:  Well, yes, preliminary injunction and we

20  are kind of in a different posture, but let me ask you,

21  Mr. Schwiep, have you given the CV?

22         Have you told the defendants the other cases these

23  persons may have testified, the usual panoply of expert

24  accouterment?

25         MR. SCHWIEP:  Yes, they have all that.

1      THE COURT:  All right.  Then we have the question that

2  was raised last night by Mr. Panuccio as to the late-breaking

3  disclosure.  What I intend to do, Mr. Panuccio, is we're going

4  to go ahead because I don't know what these persons are going

5  to say or really how much more time you and your very capable

6  team -- one, two three, four -- seven, would need, but we can

7  talk about a brief delay.

8      As I said, I don't know that we are going to get done

9  today.  So, at the very least, you would have until tomorrow

10  and then with that, Mr. Schwiep, I would expect that the

11  witness would be available to come back should that occasion

12  arise.

13      MR. SCHWIEP:  Yes, Your Honor.

14      THE COURT:  Okay.  So, any other housekeeping matters

15  before we proceed?

16      MR. PANUCCIO:  I guess just we will come back to Reio

17  then when the testimony comes up.

18      I think our late-breaking hydrology expert, so we would

19  at least need the opportunity to rebut which we have not had.

20      THE COURT:  Okay.

21      MR. PANUCCIO:  So we have not been able to have time to

22  get our own expert in hydrology, giving the late-breaking

23  nature of it.

24      THE COURT:  Okay.  We will take that up after his

25  testimony and when and if it's necessary.

App. 43

1          Yes, Mr. Hiaasen.

2          MR. HIAASEN:  Thank you, Your Honor.

3          Myself and our co-parties wanted to address an issue on

4    our exhibit list and on the Tribe's exhibit list, I think also

5    on the defendants' exhibit list are declarations that have

6    already been filed on the case by various individuals.  Some of

7    them are going to be testifying witnesses; a handful of them

8    are not.  Some of them are declarants only for purposes of

9    authenticating documents.

10         The plaintiffs would like to move all of those into

11   evidence for the Court's consideration.  As the Court has

12   acknowledged, the evidentiary standard at a preliminary

13   injunction hearing is a little more relaxed, particularly as

14   with regard to hearsay.  Our understanding is that defendants

15   have an opposition to that, and I will turn it over to my

16   colleague, who I think has a separate argument about his

17   witnesses, Your Honor.

18         MR. FRIEDMAN:  Yes, Your Honor, on behalf of the Tribe,

19   we have five additional witnesses who have all submitted

20   affidavits, declarations to the defense.

21         What we'd like to do is rely on those declarations and

22   not have the witnesses come in live.  We have some case law

23   that supports that, which I'm happy to get into but.

24         THE COURT:  Five additional witnesses to the exhibit

25   and witness list I received on the 1st.

App. 44

```
 1            MR. FRIEDMAN:  No, the five witnesses --

 2            THE COURT:  Oh, Kevin Donaldson, Amy Castaneda,

 3   Marcel --

 4            MR. FRIEDMAN:  Correct.

 5            THE COURT:  Okay.  Here they are.

 6            MR. FRIEDMAN:  Now, given the amount of parties here,

 7   given the amount of witnesses that we anticipate, our

 8   co-parties believe that if everything goes according to plan,

 9   they may be done around 4:00 p.m. today with the presentation

10   of the Friends and Center's --

11            THE COURT:  Nothing ever, ever, goes according to plan.

12            MR. FRIEDMAN:  Which was going to be my next point.

13            So at a preliminary injunction, of course, there are

14   relaxed evidentiary standards.

15            We have a Levy case.  I can give you the cite.

16            THE COURT:  Well, let me press pause because I am

17   thinking about the time.  I don't see a reason why I should not

18   be allowed to consider appropriately sworn affidavits and

19   documents from the plaintiffs and from the defendants.  If

20   there is objection, I expect the parties to provide me case law

21   supporting their position.

22            I don't need a memo.  I just need citations.

23            You can send it to chamber's e-mail, and I will review

24   it over lunch, but I'm not going to worry about that now.  And

25   I don't think it is a problem, again, as long as it is an
```

1    appropriately attested to documents.

2            Briefly, Mr. Panuccio.

3            MR. PANUCCIO:  Yes, I want to make one point, Your

4    Honor.

5            THE COURT:  Yes.

6            MR. PANUCCIO:  In general, we don't have an objection

7    to the Court considering a declarations appropriately sworn on

8    preliminary injunction.  However, I would note, you know,

9    plaintiffs had a choice.  They could have done sort of a paper

10   preliminary injunction, but they have asked for an evidentiary

11   hearing.

12           What I would object to is if they try to move in an

13   declaration, sworn testimony, without our ability to cross at

14   this point now that we are having a hearing.

15           I would just note, the Tribe, for example, they

16   submitted five declarations after our opposition briefs came

17   in.  So, not only have we not had a chance to cross them, we

18   have not even had a chance to make argument about them.  So, if

19   they don't want to call their declarants for some reason on

20   direct, that's their choice, but we would like to reserve the

21   right to cross them on those declarations because there will be

22   testimony.

23           THE COURT:  All right.

24           Well, I understand the desire to have a live witness to

25   cross but, again, I think I'm in a posture where I can

1  appropriately assess the value of a declaration without having

2  had the opportunity to have that person put under

3  cross-examination, and in reviewing the declarations, I'm

4  certainly not going to ask that all five be made available, but

5  you can also tell me, Mr. Panuccio, if there is someone you

6  think is critical to your theory of this matter, you can talk

7  to your friend across the aisle and see if that person might

8  not be available and then come back to me but we are going to

9  sort this out as we go.

10        MR. SCHWIEP:  We are ready to call our witness, Your

11  Honor.

12        THE COURT:  Okay.  Before you do, let me -- I neglected

13  to give my public service announcement.

14        Lawyers, you need to use microphones and you need to

15  speak slowly and clearly for our court reporter, and witnesses

16  as well.  I hope you have advised them.  The standard

17  conversational run-on is not something that court reporters are

18  very fond of, and we need our witnesses to speak clearly and

19  into microphones.

20        MR. SCHWIEP:  Thank you.

21        THE COURT:  All right.  Call your first witness.

22        MR. SCHWIEP:  We call Eve Samples, Executive Director

23  of the Friends of the Everglades

24        Judge, if I may, while she is approaching on the point

25  in terms of Mr. Panuccio talking about the choice that's made,

1    I'd just like to cite the Bancorp Group versus Rodriguez case.

2    That's a Magistrate Judge Torres decision on the relaxed

3    evidentiary standards that apply at an injunction hearing that

4    permit the Court to consider declarations if a witness -- a

5    witness's live testimony is preferable, and certainly if

6    witnesses are not available for cross-examination certainly the

7    Court can consider the weight to be afforded to that

8    declaration, but our position is the declaration should come in

9    for all parties.

10          THE COURT:  Well, we are going to take that up in a

11   more fulsome manner and I'll need a cite because not all

12   knowing and all seeing.  I wish.

13          Please swear the witness in.

14          COURTROOM DEPUTY:  Please raise your right hand.

15          (The witness, Eve Samples, was duly sworn.)

16          COURTROOM DEPUTY:  Thank you.  Please have a seat.

17          You can speak closely into the mic.  State your full

18   name for the record and spell it out for our court reporter

19   slowly.

20          THE WITNESS:  Eve Samples, E-V-E, S-A-M-P-L-E-S.

21          COURTROOM DEPUTY:  Thank you.

22                        DIRECT EXAMINATION

23   BY MR. SCHWIEP:

24   Q.  Ms. Samples, how are you today?

25   A.  I'm doing okay.  Thank you.

1  Q.  How are you employed?

2  A.  I'm Executive Director of Friends of the Everglades.

3  Q.  How long have you worked for Friends?

4  A.  Since February of 2020.

5  Q.  As Executive Director of Friends, what are your duties?

6  A.  I oversee our staff of nine full-time employees.  I work

7  with various contractors and consultants who support our

8  mission.  I also coordinate with our board of directors, which

9  helps us set strategic goals to help us achieve our mission.

10  Q.  How many employees does Friends have?

11  A.  Nine full-time employees, and we have additional

12  contractors, including scientists who consult with us, a number

13  of other consultants.  We are a science-driven organization.

14  Q.  Does Friends employ and contract with consultants that

15  provide advice on science and policy issues?

16  A.  Yes, we do, frequently.

17  Q.  Do you have employees that have specific responsibility on

18  scientific issues?

19  A.  Yes, we have a science and policy analyst full-time

20  employee.  We have a senior science advisor, who is a

21  consultant, and we also have a science and policy committee, a

22  group of experts who meet with us once a month to help ensure

23  that we're taking sound policy position on the complex nature

24  of Everglades restoration and other issues that arise.

25  Q.  You have to slow down a little bit.

App. 49

1    A.    Apologies.

2    Q.    What's your educational background?

3    A.    I have a BA in journalism from University of North Carolina

4    at Chapel Hill.  I worked as a journalist for 20 years.

5    Q.    Before becoming the Executive Director of Friends, what did

6    you do?

7    A.    I worked for daily newspapers and -- 20 years full-time

8    daily newspapers and for the last 10 of those 20 years I wrote

9    quite a bit about environmental issues.

10   Q.    How did you become interested in Everglades restoration

11   issues?

12   A.    I was working in Stuart for a newspaper in that area where

13   we were afflicted by a really urgent water-quality crisis,

14   starting in 2013, at least in terms of my direct involvement,

15   and I wrote about that.  That issue relates --

16           THE COURT STENOGRAPHER:  I'm sorry, you need to slow

17   down.

18           THE COURT:  You need to slow down.

19           THE WITNESS:  Yes, Your Honor.

20           THE COURT:  Just take a breath every fourth word.  Slow

21   down.

22           THE WITNESS:  The water quality crisis that I covered

23   as a journalist related to discharges of polluted water from

24   Lake Okeechobee, and that is a problem directly related to

25   Everglades restoration.  So, I developed some expertise as a

App. 50

1    journalist, and that led me to be deeply interested in the

2    issues that I work on today.

3    BY MR. SCHWIEP:

4    Q.   Have you always been interested in Everglades issues?

5    A.   I have.  I grew up in Miami, and I had the opportunity,

6    like so many kids growing up in Miami, to take field trips out

7    into nature.  And it caught my interest, I remember, after

8    Hurricane Andrew when we had no power, making a little

9    environmental newsletter with my best friend to pass time.

10   Q.   What is the Friends of the Everglades?

11   A.   Friends of the Everglades is a 501(c)(3) nonprofit.

12   Q.   How and when was it founded?

13   A.   It was founded in 1969 by Marjorie Stoneman Douglas.

14        Marjorie Stoneman Douglas had written the book, the

15   Everglades River of Grass in 1947.  She was also on the

16   committee to establish Everglades National Park the same year

17   in 1947, and it wasn't until 1969, when she was 79 years old,

18   that she began to work on the front lines of Everglades

19   restoration, and that was because of the proposed Everglades

20   jetport.

21   Q.   Let me stop you there.

22        What was the 1969 jetport proposal?

23   A.   The 1969 jetport proposal was a plan to build what would

24   have been the largest airport in what is now Big Cypress

25   National Preserve and it raised a number of alarm bells in the

1  scientific community, in the environmental community.  And
2  there were people working to battle this issue when Marjorie
3  was enlisted to help everyday Floridians to engage in the
4  battle and she drew on scientific expertise, and that is why
5  she founded Friends of the Everglades.
6  Q.  So, what happened in connection with that 1969 jetport
7  battle that led to the creation of Friends?
8  A.  So, in 1969 as Marjorie was founding Friends of the
9  Everglades, an important report was published called the
10  Leopold Report that articulated scientific and ecological
11  issues that would have caused harm to the Great Everglades
12  ecosystem.  Remember, this was a time when Everglades National
13  Park existed but Big Cypress National Preserve had not been
14  protected.
15      So, the proposal to building a massive airport out there,
16  the time of Concord jets and sonic boom would have caused
17  serious harm to the species, the unique ecosystem there.  That
18  Leopold Report led to intense scrutiny of the project and
19  ultimately the project was called off after one runway was
20  built.
21      The one runway that existed out there today is a fraction
22  of what could have occurred.
23  Q.  And the jetport site and that runway, that's the site
24  that's being litigated in this lawsuit.
25  A.  That's right.  It's very near and dear to our heart.  I

1   actually have a framed picture of that runway in my office.  I

2   have --

3           THE COURT STENOGRAPHER:  I'm sorry.  I'm sorry, I can't

4   keep up.

5           THE COURT:  You really -- no coffee for the rest of the

6   day.

7   BY MR. SCHWIEP:

8   Q.  Are you nervous, Ms. Samples?

9   A.  Yes.  I have never been called as a witness in a federal

10  case or any case.

11  Q.  And do you get excited when you're talking about Marjorie

12  Stoneman Douglas?

13  A.  I do.

14  Q.  You can finish your answer, slowly.

15  A.  I have a framed picture in my office of that one runway out

16  there surrounded by Everglades wetlands that I look at often as

17  a testament to how much worse it could have been and also how

18  victories are sometimes imperfect in the Everglades.  It's our

19  origin story.

20  Q.  What are Friends' current goals and mission?

21  A.  Our mission is to preserve, protect and restore the only

22  Everglades in the world, and we have three goals under that

23  mission.  Our first goal is to compel government agencies to

24  comply with existing environmental laws and to resist efforts

25  to weaken such environmental laws.

App. 53

1    Our second goal is to encourage politicians to recognize

2    the long consequences of their actions, and our third is to

3    spread awareness about the importance of the Everglades

4    ecosystem.

5    Q.  How many members does Friends have?

6    A.  Friends of the Everglades has more than 50,000 Friends.

7    Q.  And have Friends members expressed support for Friends'

8    participation in this lawsuit?

9    A.  Yes, they have.  More than 40,000 people have filled out a

10   form on our website to express opposition to the proposed

11   Everglades detention center.  That's 40,000 submissions, I

12   should clarify.

13   Q.  By the way, if I asked you this already, I apologize.  Big

14   Cypress National Preserve was created after the jetport fight

15   ended in 1969?

16   A.  That's right.  This was really a period of environmental

17   awakening in the country.  So, after that 1969 battle, Big

18   Cypress National Preserve was created to protect the area.

19   That was in 1974, but this was also the time that the National

20   Environmental Policy Act was created, the Clean Water Act was

21   created, a number of environmental laws that we rely on today

22   to protect the Everglades and other ecosystems.

23   Q.  Does the jetport site sit within the boundaries of Big

24   Cypress National Preserve?

25   A.  It is completely surrounded by Big Cypress National

1    Preserve.

2    Q.  Have you had occasion yourself, Ms. Samples, to camp, hike,

3    recreate in the area around the jetport site?

4    A.  I have.

5        My first time out in Big Cypress was when I was a teenager

6    biking in the Bear Island area, also done a swamp walk in the

7    Ochopee, which is about six miles west of the jetport site.

8    I've driven Loop Road.  I've picnicked in the area, gone on

9    airboat rides east of the area.

10   Q.  Are you aware of NEPA, the National Environmental Policy

11   Act?

12   A.  Yes, I am.

13   Q.  Has Friends had occasion to engage in NEPA processes in the

14   past?

15   A.  Yes, it has.

16   Q.  Tell the Court about that.

17   A.  We have engaged in NEPA processes mean, many times.  A

18   couple included the proposal after Hurricane Andrew to develop

19   Homestead Air Force Base, as it was known then, into a

20   commercial airport.  So, at that time Friends of the Everglades

21   submitted comments into an Environmental Impact Statement

22   process that became important as the Air Force, which was the

23   lead agency, considered whether to allow that reuse of that

24   site, and ultimately because of the impacts to Biscayne

25   National Park to the east, Everglades National Park to the

1    west, the government decided not to convert that into a

2    commercial airport.

3         We also have engaged in NEPA-review processes as part of

4    the Everglades Agricultural Area Reservoir Project, and we

5    submitted comments with regard to our water quality concerns

6    about the configuration of that project.  That's part of the

7    Comprehensive Everglades Restoration Plan.

8         And we've also engaged in others.  A couple I will mention

9    is the new Lake Okeechobee water management plan.  It's called

10   the Lake Okeechobee System Operating Manual.  In fact, my first

11   earliest days on the job I worked on attending public meetings,

12   giving comments, providing input as to what plan, what

13   alternative that the Army Corps of Engineers was considering

14   would be less damaging to the environment and most beneficial.

15        In that case we did get an alternative that for the first

16   time ever recognized the threat of toxic algae in moving Lake

17   Okeechobee water, also recognized the need of the Everglades to

18   receive clean freshwater.

19        Then finally, we were engaged in a NEPA-review process

20   related to the Western Everglades Restoration Project.

21   Q.  Has Friends' engagement in NEPA-review processes ended up

22   affecting the ultimate decisions that were made?

23   A.  Yes, notably, the Homestead Air Force Base was an important

24   decision that was influenced by our comments and input among

25   others, also the Lake Okeechobee management plan that I just

App. 56

1    mentioned.

2    Q.   Okay.  I'd like to show you -- this is Plaintiffs'

3    Exhibit 4?

4            THE COURT:  The computer, ELMO, how are we going to

5    bring it up, on the computer?

6            IT TECH:  Yes.

7            MR. SCHWIEP:  I can't see it.

8            COURTROOM DEPUTY:  I'm working on it.

9            THE COURT:  It takes a minute.

10           MR. SCHWIEP:  Judge, is it convenient for the Court if

11   we begin numbering sequentially?

12           Do you want us to retain the numbers from our exhibit

13   list?

14           THE COURT:  Well, my question only is, is which exhibit

15   list?

16           Is it an original exhibit list?  Is it an updated?

17           If you tell me what exhibit list it is, I'd like to

18   adhere to that so I can assess what has come in and what

19   hasn't.

20           MR. SCHWIEP:  Yes, Judge.  This is Plaintiffs'

21   Exhibit 34 from our August 1st exhibit list.  I think the title

22   is WERP map.

23           THE COURT:  Yes, okay.

24           (Plaintiffs' Exhibit 34 was marked for identification.)

25   BY MR. SCHWIEP:

1    Q.   Can you see that, Ms. Samples?

2    A.   Yes.

3    Q.   What are we looking it?

4    A.   This is the Western Everglades Restoration Project map of

5    proposed improvements.  Again, this is part of the

6    Comprehensive Everglades Restoration Plan, one element of it.

7    Q.   Okay.

8              MR. PANUCCIO:  Your Honor.

9              THE COURT:  Yes.

10             MR. PANUCCIO:  May I object?

11             It sounds like this is veering into -- this is a fact

12    witness, a lay witness.  This looks like we might be veering

13    into some kind of expert testimony about a map.  I'm not sure

14    that Ms. Samples is qualified to testify to that.

15             THE COURT:  Well --

16             MR. SCHWIEP:  I don't intend to ask about an expert

17    opinion.

18             THE COURT:  Right.  She can read the map.  If she

19    misreads the map or something comes up that shows that this is

20    not viable, I will, of course, not consider it, but is this

21    like a Google Earth map, Mr. Schwiep?

22             MR. SCHWIEP:  Well, can I ask the witness, Judge?

23             THE COURT:  Sure.  Go ahead.

24    BY MR. SCHWIEP:

25    Q.   What is the map that we're looking at that is marked for

App. 58

 1  identification as Plaintiffs' Exhibit 34?

 2  A.  It shows the features of the Western Everglades Restoration

 3  Project.  This is a map that would be shown to the public when

 4  the government, the Army Corps in this case, is soliciting

 5  input on projects.

 6  Q.  Is this the Army Corps of Engineers' map of the Western

 7  Everglades projects for the recommended plan?

 8  A.  It is.  I see the Army Corps logo on the right there.

 9          MR. PANUCCIO:  Again, objection, Your Honor.  This is

10  the lay witness.  She has no expertise in the Army Corps of

11  Engineers.  There has been no foundation laid as to why she

12  would know it's an Army Corps map.  It looks like an --

13          THE COURT:  Right, because she was protesting the --

14  right.  No, I'm -- it's going to be a long day, Mr. Panuccio.

15          MR. PANUCCIO:  I understand, but then I guess my

16  objection is what relevance is this map to the fact witness on

17  the stand?

18          She only knows personal facts.

19          THE COURT:  I don't know.  She is going to tell me in a

20  few moments, so I'm going to overrule that objection.

21          MR. SCHWIEP:  We'd move the admission of the map, Your

22  Honor.

23          THE COURT:  Okay.  And with the ability to Mr. Panuccio

24  move to strike if the testimony forthcoming is not illuminating

25  or in any way relevant.  Go ahead.

1          (Plaintiffs' Exhibit 34 was admitted in evidence.)

2    BY MR. SCHWIEP:

3    Q.   When you said earlier, Ms. Samples, that Friends of the

4    Everglades had submitted public comments in a NEPA process

5    regarding WERP, the Western Everglades Restoration Plan.

6          Is this the plan to which the Friends submitted comments?

7    A.   Correct.

8    Q.   Do you see the jetport depicted on the Army Corps of

9    Engineers' Western Everglades Restoration Plan map?

10   A.   I do.

11   Q.   Okay.  And where is the jetport in relation to this map?

12   A.   It's right here.

13         THE COURT:  You can use your finger on the screen and

14   it should --

15         THE WITNESS:  Right here.

16         THE COURT:  Oh, Michael, do we have that feature?

17         COURTROOM DEPUTY:  Yes, she just has to press the

18   screen.

19         THE COURT:  Press the screen, okay.

20         THE WITNESS:  Are you able to see that, Your Honor?

21         THE COURT:  No, it's not working again.

22         COURTROOM DEPUTY:  The little yellow --

23         THE COURT:  Oh, there it is.  There we go.

24   BY MR. SCHWIEP:

25   Q.   So, has the Army Corps of Engineers planned Western

App. 60

1   Everglades restoration features in the vicinity of the airport?

2   A.   Yes, it has.

3   Q.   Tell the Court about what's planned in terms of restoring

4   the Western Everglades by the Army Corps as reflected in the

5   Western Everglades Restoration Plan map?

6   A.   On this map you see a number of culverts.  Those are the

7   small triangles.  These are indicated on the legend or the key

8   on the left.  This is designed for members of the public to

9   understand the project, this map, and also bidirectional water

10  control structures just to the right of the jetport.

11  Q.   Do you know how far those structures are from the jetport?

12  A.   Less than two miles, according to the scale on the map.

13  Q.   Do you know what the total investment in WERP is?

14  A.   I do.  We track Everglades restoration spending closely,

15  and it's more than $2 billion estimated for this project.

16  Q.   Why did Friends submit comments about the work plan?

17  A.   I mentioned our goals at Friends of the Everglades are

18  essentially to hold decision makers accountable, and we see an

19  immense interest in restoring the Everglades and an investment

20  in doing so.  And water quality is really at the heart of our

21  work, and has been since our founding.

22       The comments we submitted in two different letters pertain

23  to water quality.  Again, we drafted these with scientific

24  input.  There originally were two storm water treatment

25  areas -- these are manmade marshes -- proposed in WERP.  One of

1    those STAs, as they're known, was removed.  We were concerned

2    about the water quality impacts, so we submitted letters

3    reflecting that.

4    Q.  Has this area, the Big Cypress National Preserve been

5    important to Friends in fulfilling its mission to protect,

6    restore, and preserve the Everglades?

7    A.  Very important.  Some people mistakenly think that the

8    Everglades are just Everglades National Park, but the Greater

9    Everglades are vast and include Big Cypress National Preserve.

10   Certainly, it's a big interconnected system of wetlands and

11   other ecological features.

12   Q.  When did you become aware, Ms. Samples, of the proposal to

13   build a detention center at the jetport?

14   A.  I remember this day well because I was driving back from

15   the Keys on a work-related trip with a colleague who was

16   looking at social media and saw a social media post on

17   June 17th about this proposal.

18   Q.  Prior to that, had Friends received any notice or

19   opportunity to comment about the proposal?

20   A.  We had not received any, and I was so surprised to hear

21   this news that I initially didn't believe it because knowing

22   the intense scrutiny of any kind of development in the

23   Everglades footprint that was typically required, I was certain

24   we would have had some kind of heads-up.

25   Q.  Had you received notice or opportunity to comment, and by

1   you I mean Friends of the Everglades, would Friends have

2   availed itself of the opportunity to participate in a public

3   process?

4   A.   Absolutely.  We feel very strongly about protecting this

5   region.  Again, the one runway that sits out there is -- was

6   lightly used before the detention center was built starting on

7   June 23rd, and we are -- we would have submitted comments,

8   absolutely, articulating our concerns about water quality and

9   other potential environmental impacts.

10  Q.   Why has Friends filed this case?

11  A.   Because we have used the National Environmental Policy Act

12  to exercise our rights and our members' rights to engage in

13  proposals to make sure that environmental harm does not occur

14  unnecessarily and to ensure that alternatives are evaluated.

15       We didn't receive that opportunity in this instance and we

16  believe it's our legal right.

17            MR. SCHWIEP:  May I have a moment, Your Honor?

18            THE COURT:  You may.

19  BY MR. SCHWIEP:

20  Q.   You mentioned that you have recreated in the area of the

21  jetport site?

22  A.   Yes.

23  Q.   How has the activity that is going on at the detention

24  center now affected your appreciation, the aesthetic values of

25  recreating in that area?

1    A.    Ever since we saw construction starting at the site

2    June 23rd, there have been visible impact, and we at Friends of

3    the Everglades have engaged our scientific experts and other

4    observers to document those impacts.

5        They include about 20 acres of new asphalt in the area.    We

6    are very concerned about potential impacts from runoff.    When I

7    say, "in the area," I mean on the site.    Also, large new

8    industrial style lights that are visible from up to 15 miles

9    away, so that certainly impacts the ability for our members to

10   stargaze and enjoy the night skies of Big Cypress.    This is an

11   area that has invested an international dark sky designation.

12       There aren't too many places in South Florida you can see

13   night skies.

14       We are also concerned about impact to endangered species

15   related to that.

16       I will just say, driving out there myself many times since

17   this construction started the increased traffic is visible.    I

18   actually saw two dead gators on the side of the road driving

19   over there the last time I visited, so definitely a difference

20   in the area.

21       MR. SCHWIEP:    I don't have any further questions,

22   Judge.

23       THE COURT:    Thank you, Mr. Schwiep.

24       Cross-examination, Mr. Panuccio?

25       MR. PANUCCIO:    Yes, Your Honor.

App. 64

```
 1                         CROSS-EXAMINATION

 2   BY MR. PANUCCIO:

 3   Q.   Good morning, Ms. Samples.

 4   A.   Good morning.

 5   Q.   I'm Jesse Panuccio.  I represent the Florida Department of

 6   Emergency Management.  I will try to speak slowly, and again,

 7   just remind you try to do that as well for everyone's benefits.

 8        First of all, who did you speak to to prepare for your

 9   testimony today?

10   A.   Our staff, as I normally would, our attorneys, our team of

11   experts that are on our policy and science committee, some of

12   them, various people.

13   Q.   Aside from conversations with your attorneys, with anyone

14   else, what did you talk about to prepare for testimony today?

15   A.   So, I'm always talking about the Everglades with many

16   people.  It's hard to isolate exactly what you're looking for.

17   Q.   Well, did you speak about this testimony that you would

18   provide today with anyone other than your lawyers?

19   A.   No.

20   Q.   You didn't talk about this testimony with anyone other than

21   your lawyers?

22   A.   No.  We engaged in, I think, typical attorney-client

23   preparation, but I can't think of anyone else I spoke to about

24   this testimony.

25   Q.   No one on your staff?
```

1   A.   Well, I did mention that I spoke to my staff.

2   Q.   About this testimony?

3   A.   This testimony relates to our daily and ongoing work of

4   Friends of the Everglades, NEPA-review processes.  All of that

5   is work that I speak to staff and our experts on our policy and

6   science committee regularly, as well as our members.

7   Q.   Did you speak to any of your staff about your goals for

8   your testimony today?

9   A.   Our goals are to prevail in our legal right for NEPA to be

10  complied with under the law.

11  Q.   Did you speak about what you would say in this testimony?

12  A.   As it relates to goals, I don't think so.  As I said, our

13  goals are pretty clear here and on the record.

14  Q.   In your declaration you testify that you're afraid the

15  detention hearing will harm the Everglades freshwater ecosystem

16  and freshwater ecosystem and wildlife.

17       Is that correct?

18  A.   Right.

19  Q.   You also alleged that those issues should be subject to

20  study by environmental experts.  Correct?

21  A.   Yes.

22  Q.   Are you testifying as an environmental or scientific expert

23  today?

24  A.   I'm not a scientist.  I enjoy the environment.  I have

25  learned a lot about the environment.  I don't think my

App. 66

1  testimony is considered expert, but you would have to ask our

2  attorneys to confirm that.

3  Q.  Have you submitted any kind of expert report?

4  A.  No.

5  Q.  Do you have a degree in hydrology?

6  A.  No.

7  Q.  Do you have a degree or any studies in wildlife

8  preservation?

9  A.  No.

10  Q.  Do you have any sort of formal education on environmental

11  science?

12  A.  No, nor did Marjorie Stoneman Douglas.

13  Q.  Okay.  Just try to answer the question I ask you.  Okay?

14     Thank you.

15     For your career you were a journalist.  Correct?

16  A.  Yes.

17  Q.  And, specifically, you were an opinion columnist?

18  A.  Yes.  For part of the time, to clarify.  I was also a

19  reporter for ten years.

20  Q.  And for a significant period of time you were an opinion

21  columnist?

22  A.  Yes.

23  Q.  So, for your job, you were paid to have opinions on public

24  issues of the day.  Correct?

25  A.  Yes.

App. 67

1    Q.   And as a journalist or former journalist, you are not

2    qualified to testify about whether the facility will harm the

3    surrounding wildlife and ecosystem?

4    A.   I'm not currently a journalist.

5    Q.   Your journalism background doesn't qualify you as an expert

6    of any kind in this subject; does it?

7    A.   I have been working for five years as executive director --

8    Q.   Your journalism background I'm asking about.

9    A.   That's not for me to quantify.

10   Q.   You didn't gain any expertise in this issue as a

11   journalist, did you?

12   A.   I did.  I wrote about Everglades restoration issues and

13   spoke to many scientists.  Just like Marjorie Stoneman Douglas

14   relied on her experts around her and scientist to formulate

15   positions that became very consequential to protecting the

16   Everglades, I rely on my experts around me in my work.

17   Q.   You spoke to them as an opinion columnist?

18   A.   Prior to my five years as executive director of Friends of

19   the Everglades, yes, I spoke to many experts.

20   Q.   And all you can do here today, because you're not

21   testifying as an expert, all you can do is speculate as a

22   layperson about whether the facility will harm the Everglades.

23        Is that right?

24   A.   I can speak to -- as someone who has been quite involved in

25   NEPA-review processes, I can speak to the opportunity that we

1    were not afforded because there was no NEPA review allowed at

2    the jetport.

3    Q.   In terms of the actual harm, you can only speculate as a

4    layperson?

5    A.   I can observe harms like light pollution.  I can observe

6    harms like toxic algae in the water, as I did as a journalist

7    and after my time as a journalist.  Much of our work relates to

8    helping everyday people understand environmental harm, and

9    that's very important --

10   Q.   Have you observed toxic algae --

11         THE COURT:  Let her finish.  Slow down.

12         I think you're getting a little zippy as well,

13   Mr. Panuccio.

14         MR. PANUCCIO:  Okay.  I'm sorry.  It's just some of

15   these answers are not responsive to my answers, so I'm just

16   trying to keep it tight given the time.

17         THE COURT:  Well, if that's the case, you call on me.

18   They pay me for this, to assess whether it's responsive or not,

19   but both of you listen to the other, answer his questions, and

20   Mr. Panuccio, let her finish.

21         I can't remember what the last question was, so go

22   ahead and repeat it and let's see where we go.

23   BY MR. PANUCCIO:

24   Q.   Well, I was asking, you said you are not an expert on any

25   of these issues.  Correct?

App. 69

1  A.   I wouldn't put it that way.

2  Q.   So, the bottom line is you are here as a lay witness.  The

3  best you can do is as a layperson speculate about these harms

4  that you have cited in your declarations.  Is that right?

5  A.   I wouldn't put it that way.

6  Q.   How would you put it?

7  A.   I would say that I have been involved in NEPA-review

8  processes that were very important to the mission of the

9  Friends of the Everglades, and that in this case I'd know for a

10  fact, due to my years of involvement in the NEPA-review

11  process, that we were not afforded our opportunity to weigh in.

12  Q.   Okay.  Putting aside the lack of opportunity to weigh in,

13  the actual environmental harms that you said you were afraid

14  of, you have nothing but a lay opinion about those.  Correct?

15  A.   Friends -- I wouldn't put it that way, and if I can

16  explain, Friends of the Everglades often communicates about

17  environmental harm, scientific impacts and translates it so

18  that everyday Floridians can understand what is happening.

19       THE COURT:  I think the problem here is, you are not

20  here as a legal expert.  Is that correct?

21       You are not here as a designated expert by the

22  plaintiffs?

23       THE WITNESS:  Correct, Your Honor.

24  BY MR. PANUCCIO:

25  Q.   Thank you.

1        By the way, you mentioned that you can observe toxic algae.

2        Have you observed toxic algae leaking out of the detention

3    facility?

4    A.  I observed toxic algae somewhere else in the system.   Toxic

5    algae is not necessarily something we would expect to see in

6    that area.

7    Q.  So the answer is no?

8    A.  Correct.

9    Q.  Let's talk about some of the harms you hypothesize in your

10   declaration.

11       You've noted the facility will harm your, quote, aesthetic

12   interest, end quote, in viewing the night sky near the site

13   because of the alleged light and sound pollution.

14       Is that right?

15   A.  Yes.

16   Q.  When is the last time you visited the airport facility at

17   night?

18   A.  I have never been there at night.

19   Q.  Never been there at night?

20   A.  Correct.

21   Q.  How often -- scratch that.

22       Did you know that this site, before the detention facility

23   being put there, has long been an active airport?

24   A.  I spoke earlier about the battle to halt the massive

25   jetport from being constructed at the site.   The one runway

App. 71

1   that was built before we prevailed in that battle was lightly

2   used as a training airport, the Dade-Collier Training and

3   Transition Airport.

4   Q.  "Lightly used," that's your testimony?

5   A.  Yes.

6       (Defense Exhibit 14 was marked for identification.)

7   BY MR. PANUCCIO:

8   Q.  I'd like to show you an exhibit, this is Exhibit 14 on our

9   list.

10  A.  Okay.

11  Q.  We're going to pull it up.  You should be able to see this.

12  Let me know.

13  A.  I'm not seeing anything.

14  Q.  Just give us one second.  I think we're connecting.

15          THE COURT:  Is this 14 at Docket Entry 90,

16  Mr. Panuccio?

17          MR. PANUCCIO:  Let me just check, Your Honor.

18          THE COURT:  All right.

19          MR. PANUCCIO:  Yes.

20          If it's easier for the Court, I can bring it up because

21  the type is small, although it looks better on the screen than

22  on my hands.

23          THE COURT:  No, I'm good.

24          So, this is the flight logs.  Is that correct?

25          MR. PANUCCIO:  Yes, Your Honor.

1          THE COURT:  Any objection, Mr. Schwiep?

2          MR. SCHWIEP:  Yes, Your Honor.

3          MR. PANUCCIO:  I haven't moved to admit it yet, Your

4     Honor.  I was impeaching.

5          THE COURT:  Okay.  Well, I was trying to move things

6     along.

7          You have never seen this, Ms. Samples?

8          THE WITNESS:  No.

9     BY MR. PANUCCIO:

10    Q.  That's what I wanted to know.  You have never seen this

11    document before?

12    A.  I have not.

13    Q.  Now, you've testified you're the Executive Director at

14    Friends of the Everglades; you're concerned about what happens

15    in or around Big Cypress.  Is that right?

16    A.  Right.

17    Q.  You've never looked at the flight logs for the airport

18    before?

19    A.  I have seen flight data.  I have not seen this specific

20    document.

21    Q.  And you have testified it's a lightly used airport?

22         THE COURT:  Well, we can take it down because it's not

23    in evidence and she hasn't seen it.

24         MR. PANUCCIO:  There is something I do want to ask her

25    about, Your Honor.

1        THE COURT:  Well, then you do want to admit it into

2   evidence.

3        MR. PANUCCIO:  I don't want to admit it.  I just want

4   to ask her a question about it.

5        THE COURT:  You can't ask her about something that's

6   not in evidence, so take it down.

7        MR. PANUCCIO:  Okay.

8        Your Honor, for the record, I think we can impeach on

9   something we don't plan to admit.

10        THE COURT:  You can impeach her, but it doesn't have to

11   be up on the screen being read as if it is in evidence.

12        So, go ahead and impeach.

13   BY MR. PANUCCIO:

14   Q.   Okay.  Were you aware that the flight logs show that in the

15   six months before the detention facility there were 28,000

16   takeoffs and landings from the jetport?

17   A.   We have heard reports --

18        THE COURT:  Yes or no?  Yes or no, were you aware of

19   28,000 flights coming in and out?

20        THE WITNESS:  I was aware that the State cited that

21   number, but we have questions about that number.

22   BY MR. PANUCCIO:

23   Q.   Are you aware that the flight logs showed, on average, 150

24   takeoffs and landings per day?

25   A.   No.

1  Q.  Are you aware that military aircraft took off and landed on

2  the jetport before it was a detention facility?

3  A.  I'm aware that that happened about twice a year.

4  Q.  That's your testimony, twice a year?

5  A.  I'm loosely -- remember, I'm not an expert, and I'm loosely

6  aware that there were infrequent military training exercises in

7  the area.

8  Q.  Okay.  What if I told you that in the six months before,

9  the six to seven months before --

10         THE COURT:  Well, there is a difference between

11  impeaching and testifying.

12         MR. PANUCCIO:  Well, I'm going to ask if she's aware.

13  BY MR. PANUCCIO:

14  Q.  Were you aware that there were actually 199 -- excuse me,

15  521 military takeoff and landings in the six months before the

16  detention facility was put up?

17  A.  I was not aware of that number.

18  Q.  And, again, the Friends of the Everglades holds itself out

19  as having expertise about what's happening in the Big Cypress

20  area.  Correct?

21  A.  Yes.

22  Q.  You said -- you testified you recreated in the area around

23  the airport facility.  Is that right?

24  A.  Yes.

25  Q.  How often did you recreate there?

App. 75

1  A.  On occasion, from time to time.

2  Q.  Less than once a month?

3  A.  Sure.

4  Q.  Less than once a year?

5  A.  It depends.  I have been more than once a month recently.

6  Q.  All right.  Before it was on the news as a detention

7  facility, how often did you recreate there?

8  A.  I actually looked back at my calendar recently and there

9  were probably a dozen or so instances in the last few years.

10  Q.  The last five years?

11  A.  I'd have to look at my calendar.

12  Q.  So, less than once a year in the last five years.

13      Would that be fair?

14  A.  It depends on what is going on in the ecosystem.  I may go

15  very frequently to the Florida bay if there is an issue there.

16  If there is an issue in Big Cypress, I would go frequently

17  there, so I wouldn't say it's a consistent pattern.

18  Q.  When you say you recreated in the area, how close to the

19  airport facility were you when you went there?

20  A.  When I went on a swamp walk in Big Cypress I was six miles

21  west of the site.  I also have driven Loop Road, which is

22  closer to the site.

23  Q.  Were you close enough to see or hear an airplane when you

24  recreated in the area?

25  A.  I have seen airplanes in the area, yes.

App. 76

1  Q.  Have you seen airplanes take off or land from that

2  facility?

3  A.  I don't think so.

4  Q.  So, perhaps you weren't recreating close enough to see

5  whether an airplane was taking off or landing?

6  A.  It could have been time of day, time of visit.

7  Q.  If there were 150 takeoffs and landings per day, do you

8  think you would have seen them if you were recreating close

9  enough?

10  A.  I don't know.

11  Q.  Did you know that there are -- before it was a detention

12  facility, the airport facility had runway lights all along the

13  runway?

14  A.  I was aware of some lighting, limited lighting.

15  Q.  Did you know that there were buildings on the airport

16  facility before it was a detention facility?

17  A.  Limited facilities, very limited.

18  Q.  Did you know that those buildings were lit 24/7?

19  A.  I don't know the extent of the lighting there, but I know

20  it did not look like a stadium from 15 miles away.

21  Q.  How do you know that?

22  A.  Because I know -- I have spoken to people who have

23  documented the changes, and I've also looked at NASA imagery

24  documenting the change in light pollution before and after.

25  Q.  You are not an expert on NASA imagery, are you?

1   A.   No, I'm just answering your question.

2   Q.   You testified you have never been there at night.  Correct?

3   A.   Correct.

4   Q.   So, you actually can't compare the lighting situation

5   pre-detention facility to the lighting situation today, can

6   you?

7   A.   Other than looking at NASA data and information from other

8   sources I can't independently confirm that.

9   Q.   Okay.  Have you ever been close to an airplane when it

10  takes off or lands outside, in other words, not with a building

11  in between but have you been outside in the presence of an

12  airplane when it takes off or lands?

13  A.   Yes.

14  Q.   Was it loud?

15  A.   Yes.

16  Q.   Very loud?

17  A.   I suppose.  That depends on the aircraft.

18  Q.   A jet engine.  If you were in the presence of a jet engine

19  that was thrusting, would you have to shout to be heard over

20  it?

21  A.   Yes.

22  Q.   Would you say airplanes are so loud taking off or landing

23  that it can become uncomfortable to the human ear?

24  A.   Sure.

25  Q.   How about helicopters, same thing?

App. 78

1  A.  I would imagine so.

2  Q.  And animals don't particularly like very loud noises, do

3  they?

4  A.  I would want to have a more specific question about the

5  species and impacts.  I don't know quite how to answer that.

6  Q.  You think the Florida panther -- based on your experience

7  at the Friends of the Everglades, do you think the Florida

8  panther is scared by the sound of a jet engine in close

9  proximity?

10  A.  I don't feel qualified to speak to that, but we have

11  panther experts who can.

12  Q.  But you're not qualified to speak to what kinds of noise

13  affects the Florida panther?

14  A.  Again, we rely on scientific experts to formulate our

15  policy positions, and I'm not here to speak about that.  I'm

16  here to speak about our NEPA rights.

17  Q.  The answer to that is no.  Correct?

18  A.  Can you repeat the question?

19  Q.  You are not qualified to speak to the kinds of noise that

20  affects the Florida panther, you personally?

21  A.  Correct.

22  Q.  Have you ever gone to observe and enjoy nature and recreate

23  at a site that hosts approximately 150 takeoffs and landings of

24  aircraft per day?

25  A.  No.

1   Q.   So that's not the kind of place that you would go to enjoy

2   nature?

3   A.   I wouldn't put it that way.

4   Q.   How would you put it?

5   A.   Depending on a site, the proximity to nature, and the type

6   of aircraft it could still be a place to enjoy nature.

7   Q.   But you haven't done so previously?

8   A.   I have been to Big Cypress.  I don't know the number of

9   flights a day that were occurring prior to the construction of

10  the detention center.  You asked me about the numbers that the

11  State cited.  I have questions about those numbers.

12  Q.   Why didn't you take this kind of public interest in the

13  activity at the airport before it was an immigration detention

14  facility?

15  A.   I do have interest -- we do have interest at Friends of the

16  Everglades in that region.  Again, it's our origin story.  My

17  son has recreated out there, actually, on the jetport property

18  along with my stepfather.  It's a place I visited as a teenager

19  growing up in Miami.  It was a real privilege to have proximity

20  to incredible nature so close to the urban area.

21  Q.   You said your family has recreated inside the fence line of

22  the jetport property?

23  A.   My son and my father did visit the site of the jetport

24  property, uh-huh.

25  Q.   Inside the fence line?

App. 80

1    A.    Yes.

2    Q.    How did they get inside?

3    A.    It was for some kind of training exercise that happened

4    there that they went to visit.

5    Q.    It was for a training exercise?

6    A.    Yes.

7    Q.    For aircraft?

8    A.    Yes.

9    Q.    So, they were recreating with aircraft?

10   A.    Yes.

11   Q.    The loud aircraft we just spoke about?

12   A.    It was a visit for recreational purposes where they also

13   stayed at a nearby hunting camp -- I should say Everglades

14   camp.  It's not so much a hunting camp where the night skies

15   were pretty incredible nearby too.

16   Q.    And those airplanes, by the way, in addition to being

17   noisy, they can be quite dirty too.  Right?

18   A.    I'm not in a position to speak about the cleanliness of the

19   aircraft at the site.

20   Q.    Potential for fumes from jet fuel?

21   A.    Sure.

22   Q.    Potential for debris being kicked up when a plane lands at

23   several hundred miles per hour?

24   A.    I would imagine.

25   Q.    And your family members would have been part of those

App. 81

1   effects because they were engaged in aircraft training

2   activities.  Right?

3   A.   I mentioned that a couple of times a year there are

4   training activities on the site that people, some people,

5   members of the public attend.

6   Q.   Given all that potential environmental harm from airplanes

7   taking off and landing, why hasn't Friends of the Everglades

8   sued to stop the jetport activities before it was an

9   immigration detention facility?

10  A.   There is a big difference between a training facility that

11  is used infrequently for training exercises, including military

12  exercises, and a facility where jet fuel is being trucked in,

13  human waste is being trucked out, industrial lighting has been

14  installed, and thousands of people are now on site with the

15  associated impacts.

16  Q.   But the assumption there is infrequency.  Right?

17  A.   I think -- I have seen with my own eyes the increase in

18  traffic.

19  Q.   You could be wrong about the frequency of how often that

20  airport facility was used as an airport.  Right?

21  A.   I have seen an increase in intensity of people on the

22  ground, and that is a huge concern for us, the traffic on the

23  ground, jet fuel tankers.  I have noticed multiple times --

24       MR. PANUCCIO:  I'm sorry, Ms. Samples, I'm just going

25  to interrupt for a moment.

1          MR. SCHWIEP:  Objection.

2          (Cross-talk.)

3          THE COURT:  Stop.

4          I think your cross purposes, Mr. Panuccio, I understood

5     the witness's testimony to be the increases she was saying of

6     people, thousands of people, as opposed to the air traffic but,

7     go ahead, let's sort that out and make sure we are on whatever.

8          MR. PANUCCIO:  I think we were at cross purposes.  I'm

9     just trying -- I understand what the witness is trying to say.

10    I'm just trying to get an answer to this.

11    BY MR. PANUCCIO:

12    Q.  You could be wrong about the frequency of aircraft activity

13    at the site prior to its use as detention facility.  Is that

14    right?

15    A.  Wrong about --

16          THE COURT:  How many planes were coming in and out,

17    would you say?

18          THE WITNESS:  I do not have that number clear in my

19    mind in terms of the data, but I do believe there has been

20    intensified use of the property.  I'm not qualified to testify

21    to flight data changes.

22    BY MR. PANUCCIO:

23    Q.  Okay.  Thank you.

24          Let's turn to hydrology.  You mentioned this in your

25    declaration as well.  You say because Big Cypress is a

1    continuous ecosystem, any disruption to the flow of fresh water

2    or, quote, pollution to that water, would harm the entire

3    ecosystem.  That's generally what you testified to in your

4    declaration.  Right?

5    A.   That's correct.

6    Q.   First, let me ask you, did you study whether the previously

7    existing airport facility created any disruption to the flow of

8    fresh water in the continuous ecosystem?

9    A.   Well, Friends of the Everglades was involved in the fight

10   against the construction of that single runway that exists out

11   there, and we were involved in the fight because we knew it did

12   cause harm.  And unfortunately, the airport was only halted

13   after the one runway was built.

14   Q.   What year was that?

15   A.   That was in 1969.  President Nixon halted the airport in

16   1970.

17   Q.   In our lifetimes, have you personally studied whether the

18   activity of the jetport in the last few years had any effect on

19   the continuous ecosystem by disruption of flow of fresh water?

20   A.   I have not personally studied that.

21   Q.   Has Friends?

22   A.   Not to my knowledge.

23   Q.   So, why did Friends only start caring about this issue in

24   the last couple of months?

25   A.   When there is a federal action and significant activities

App. 84

1   related to the Federal Government in a sensitive ecosystem, we

2   take very seriously our role to examine the potential

3   environmental impacts.

4   Q.  You only care if it's a federal action, and not if it's a

5   State action or a private party action?

6   A.  I wouldn't put it that way.

7   Q.  How would you put it?

8   A.  We care when there is a federal action because that grants

9   us the right to provide comment under NEPA and to look at

10  alternatives that could be less damaging.

11      We do occasionally weigh in on State actions and other

12  actions, and in the case of the jetport site, I'm aware that

13  there were some permitting issues involved in work out there in

14  the past.  It went through a permitting process in the past,

15  which would have involved opportunity for input too.

16  Q.  In fact, in this very lawsuit, you brought State law claims

17  and I think county law claims about this site.  Right?

18  A.  That is in the complaint that was filed.

19  Q.  So, you have tools available to you other than federal law

20  for federal agencies.

21      Is that right?

22  A.  We do weigh in from time to time at different levels of

23  government.

24  Q.  But to be clear, in the last, let's say, decade, you

25  haven't weighed in at all on the activities at the jetport

1    prior to it becoming a detention facility?

2    A.   Well, the Western Everglades Restoration Project does

3    include the jetport site, and our public comments on that

4    matter I would say qualifies as providing official input into

5    impacts in the area, especially on water quality.

6    Q.   Have you sued under any law to stop the airport activity

7    that's been occurring over the last ten years at the jetport?

8    A.   No.

9    Q.   Have you conducted any water surveys to assess whether the

10   facility is disrupting the flow of freshwater today?

11   A.   Can you repeat the question?

12   Q.   Have you personally conducted any studies to determine

13   whether the facility is disrupting the flow of freshwater?

14   A.   I personally have not.

15          THE COURT:  The one that exists now?

16          MR. PANUCCIO:  Yes.

17          THE COURT:  The detention center?

18          MR. PANUCCIO:  Yes.  I'm just asking if she has done

19   any studies about the --

20          THE COURT:  Well, I was under the impression no one can

21   get in to do that.  So, am I incorrect in that?

22          MR. PANUCCIO:  Well, I'm asking, Your Honor, because if

23   you recall, at the beginning of this, I noted paragraph six of

24   Ms. Samples' declaration where she notes that some of the harm

25   she is afraid of is freshwater flow and I'm pointing

1    out that --

2              THE COURT:  Oh, you are talking about downstream?

3              You are not talking about immediately on the site.

4              MR. PANUCCIO:  I understand her declaration to say I'm

5    worried about the downstream water flow effects of the site,

6    and I'm asking what studies she has done for having a basis for

7    that view.

8              THE COURT:  Okay.  I got it.

9              MR. SCHWIEP:  Your Honor, just to be clear, we are not

10   offering Ms. Samples as a hydrologist or expert on hydrology or

11   water quality.

12             THE COURT:  Okay.  All right.

13   BY MR. PANUCCIO:

14   Q.  Just to be clear, do you have any training in waste

15   management?

16   A.  I do not.

17   Q.  Is it true that the facility could avoid polluting

18   freshwater by securing any pollutant at the site?

19   A.  I'm not qualified to evaluate that.

20   Q.  Do you know whether the State has put in place substantial

21   waste security measures to avoid contaminating surrounding

22   environment?

23   A.  I don't know.

24   Q.  You don't know one way or the other?

25   A.  No.

1  Q.  Now, let me show you an exhibit from your declaration.  I

2  believe this is Exhibit 3 from your declaration.

3          THE COURT:  Is there a cross reference to plaintiffs'

4  exhibit list that we --

5          MR. PANUCCIO:  It's actually the same number for both.

6          It happens to be our Exhibit 3 and Ms. Samples's

7  Exhibit 3 of her declaration.

8          THE COURT:  Okay.  But it's on as Exhibit 24, that's

9  what I was -- isn't it, Mr. Hiaasen, TDF Waste Management Plan

10  Overview, Plaintiffs' Exhibit 24, and I believe it's on the

11  defense exhibit list as well.

12          MR. HIAASEN:  I believe that's correct, Your Honor.

13          THE COURT:  Okay.  Everybody seems to want it to be in

14  evidence, so I will allow it.

15          (Defense Exhibit 24 was admitted in evidence.)

16          MR. PANUCCIO:  Sorry about the confusing on the

17  numbering.

18          THE COURT:  No, that's okay.

19  BY MR. PANUCCIO:

20  Q.  This document was attached to your declaration.  Correct?

21  A.  I know it was filed with the lawsuit.  I can't remember if

22  it was specifically attached to my declaration.

23  Q.  You signed your declaration.  Right?

24  A.  Yes.

25  Q.  But you don't remember whether you included this as an

App. 88

1  exhibit?

2  A.  I do not remember.

3  Q.  Okay.  Does this document appear to outline the State's

4  waste management plan for the detention facility?

5  A.  It does appear to.  I have seen this document.  With an

6  intense development with thousands of people on site, we would

7  have expected more than a page-and-a-half review of waste

8  management impacts.

9  Q.  Just try to answer the questions I ask.  It will go a lot

10  faster for both of us.

11      Look at the second line of the document.  It provides that

12  the Division's goal is to quote, fully eliminate the potential

13  environmental issues related to waste production.

14      Did I read that correctly?

15  A.  Can you read it again, please?

16  Q.  Yes.  The second line provides that the Division's goal is,

17  quote, to fully eliminate the potential environmental issues

18  related to waste production, end quote.

19      Did I read that correctly?

20  A.  I'm reading this differently.  The second line of the

21  document, "The goal of the Division and contracted vendors is

22  to ensure a robust, proactive logistics."  That line?

23  Q.  Yes.

24  A.  It's not exactly what you just said.

25  Q.  Okay.  Take a look at the section titled, Monitoring

1    Evaluation and Compliance.  Do you see that?

2    A.  Yes.

3    Q.  That section provides that on-site personnel will monitor

4    water facilities for leaks, spills, overflow, and

5    contamination.  Correct?

6    A.  I'm reading --

7         THE COURT:  He just wants to know if that's what it

8    says.

9         THE WITNESS:  Will monitor, yes.

10   BY MR. PANUCCIO:

11   Q.  Is it fair to say that when you signed your declaration you

12   weren't particularly familiar with this document?

13   A.  I actually have a copy of this document on my desk in the

14   office, and I'm familiar with it.  Again, I was surprised it

15   was just a page-and-a-half when you have thousands of people on

16   site.

17   Q.  All right.  Let's move on to traffic.  You previously

18   testified about the potential harms to wildlife from increased

19   traffic.  Right?

20   A.  Yes.

21   Q.  In fact, I think you said you saw two dead alligators?

22   A.  I did.

23   Q.  What road did you see that on?

24   A.  Tamiami Trail.

25   Q.  Tamiami Trail.

App. 90

1    Now, what is Tamiami Trail?

2  A.  Tamiami Trail is the primary road that people would use to

3  access the jetport site.  It's the only road you could use to

4  get to the jetport site.

5  Q.  Is Tamiami Trail used for anything else?

6  A.  Other traffic, certainly.

7  Q.  In fact, it's one of the main roads across the Everglades.

8  Is it not?

9  A.  Yes.

10  Q.  How many cars and trucks drive on that Tamiami Trail every

11  day?

12  A.  I don't have that number, but I can tell I've spent hours

13  at the entry to the jetport site and seen convoys of vehicles

14  going into the jetport site and they have no other reason to

15  travel Tamiami Trail than to enter the site when they're

16  turning there.

17  Q.  What about someone from the east coast of Florida who

18  wanted to get to the west coast of Florida, might they take

19  Tamiami Trail?

20  A.  It's one option.

21  Q.  As a Floridian, you know thousands of people do that every

22  day.  Right?

23  A.  I would imagine the numbers are in the thousands.

24  Q.  How many times have you taken Tamiami Trail in your life?

25  A.  I don't have that number.

1   Q.   Hundreds?

2   A.   I don't know.

3   Q.   More than ten?

4   A.   I think that's safe to say.

5   Q.   In all those times that you have been in Tamiami Trail

6   before the detention facility was built, did you ever see a

7   dead animal on the side of the road?

8   A.   I'm searching my memory.  I'm not sure.  I can't recall.  I

9   have never seen a dead alligator, much less two, before the

10  last week that I was out there.

11  Q.   Did you know that people would drive to the airport

12  facility to engage in training activities there before it was a

13  detention facility?

14  A.   To engage in training activities?

15  Q.   Yeah.

16  A.   I don't know the details of that, but that sounds right.

17  Q.   I think you said your husband and son at least once or

18  maybe twice engaged in training activities there.  How did they

19  get there?

20  A.   My stepfather and son recreate in the Everglades, and they

21  did drive to the camp where they recreate and there was an

22  event at the site.

23  Q.   Do you know if there were speed limits at the time when

24  they drove to the airport?

25  A.   There are speed limits on Tamiami Trail.  I don't know what

1    the speed limits are on the access road.  I tried to access

2    that road but was turned down at the checkpoint.

3    Q.  When your stepfather and son drove, did they tell you

4    whether there were speed humps installed at the airport

5    facility road itself?

6    A.  I don't know.

7    Q.  Did you know that the speed limit through much of the

8    facility right now is 15 miles per hour?

9    A.  I did not know.  It may be in our court filings, though.

10   Q.  Have you personally conducted any studies to identify

11   whether wildlife have been affected by traffic related at the

12   site?

13   A.  I have not personally conducted any studies.

14   Q.  Okay.  Thank you.

15       Have you personally conducted any study comparing the

16   airport traffic at the -- or the, excuse me, scratch that.

17       Have you personally conducted any studies comparing the

18   traffic at the airport before it was a detention facility to

19   the traffic at the facility now at the detention center?

20   A.  I have not personally conducted any studies.

21   Q.  Thank you.

22       Are you at all worried that traffic created by protest of

23   the detention facility is going to cause any harm to animals?

24   A.  I'm not aware of that.

25   Q.  Are you worried about it?

App. 93

1   A.   I'm always worried about potential harm to animals and the

2   Everglades ecosystem.

3   Q.   So, it's possible that protests at the site, the traffic

4   from that could cause harm as well?

5   A.   It would have been great if we don't have to protest.

6   Q.   And you never protested -- in the last ten years before it

7   was a detention facility, you never protested the airport.

8   Correct?

9   A.   There were not thousands of people and jet fuel moving into

10  the site regularly, waste leaving the site and industrial-style

11  lighting installed in addition to new fencing, so we did not

12  have a level of concern entirely that would prompt a protest.

13  Q.   So the answer is no?

14  A.   Correct.

15  Q.   All right.  Let's talk about panthers.  In your declaration

16  you testified about the presence of a Florida panther around

17  the airport.  Correct?

18  A.   Yes.

19  Q.   Have you ever seen a panther inside the fence line?

20  A.   No, I have not.

21  Q.   Have you ever seen a panther within three miles of the

22  airport?

23  A.   No, I have not.

24  Q.   Have you ever seen a Florida panther in the wild?

25  A.   No, but I sincerely hope to some day.

App. 94

1  Q.  Based on your experience, do panthers generally like noisy

2  airports as a habitat?

3         THE COURT:  I think we have covered that about, oh, I

4  don't know, 40 minutes ago.

5         Asked and answered.  Move on.

6  BY MR. PANUCCIO:

7  Q.  Did you know that prior to being a detention facility the

8  airport was entirely fenced in?

9  A.  I was aware of fencing at the site.  I did not know the

10 exact extent of it.

11 Q.  Did you know the height of it?

12 A.  No.

13 Q.  Did you know there was barbed wire at the top of it?

14 A.  I didn't know the details of the fencing.

15 Q.  Do you know whether panthers typically leap over

16 barbed-wire fences?

17 A.  I don't know the answer to that.  Depends on the height,

18 I'd imagine.

19        (Defense Exhibit 45 was marked for identification.)

20 BY MR. PANUCCIO:

21 Q.  I also want to show you another exhibit.  This is 45.

22        As it's coming up, I just want to tell you what it's going

23 to be.  It's a screen grab from -- you included in your

24 declaration a link to panther telemetry?

25 A.  Yes.

App. 95

1    Q.  So this is a screen grab from your link?

2         THE COURT:  Is there corresponding number on the

3    plaintiffs' list, just so we --

4         MR. PANUCCIO:  I believe the answer is no, Your Honor.

5         THE COURT:  So this was just --

6         MR. SCHWIEP:  I don't believe there is, Judge.

7         THE COURT:  Okay.  Do you have any objection,

8    Mr. Schwiep?

9         This was -- it's represented as part of something that

10   was affixed to Ms. Samples' declaration.

11        MR. SCHWIEP:  We object because we are just not

12   familiar with what it is, Judge.

13        THE COURT:  Okay.

14        MR. PANUCCIO:  Well, Your Honor, it's the link -- you

15   know, it's the picture from the link that Ms. Samples included

16   in her declaration.  So if they don't want it, we can strike

17   the link from the declaration, I suppose, but we have to be

18   able to cross her on what's on that site.

19        THE COURT:  They're just -- this is going to be so much

20   fun.  They are just saying they don't know this.

21        So, here is what we will do.

22        Do you have the original link, Mr. Panuccio?

23        Show that, and then this is a screen grab from that.

24   It's a variation which Mr. Schwiep, if, you know, you can find

25   another variation, if you want, but I think it's fair for

1   Mr. Panuccio to be allowed to ask the witness about this since

2   it was part of her declaration.

3           But could we start with the original?

4           MR. PANUCCIO:  Yes.  And as they are pulling it up, I

5   can ask some questions that are sort of preliminary that don't

6   require looking at the screen itself.

7   BY MR. PANUCCIO:

8   Q.  Okay.  The first question is, what training do you have in

9   panther telemetry?

10  A.  I'm not an expert in panther telemetry.

11  Q.  What is telemetry?

12  A.  It's the use of radio collars to track locations, as I

13  understand it.

14  Q.  How does it work?

15  A.  In the case of panthers, some panthers, a very limited

16  number of panthers are collared, and the radio signals from

17  those collars are used to track their locations.

18  Q.  And you've never personally engaged in panther telemetry?

19  A.  No, but there is a public facing website so that the public

20  can gain information.  And, again, part of our cause at Friends

21  of the Everglades is to help the public understand what is

22  happening in the ecosystem.

23          MR. PANUCCIO:  I believe -- let me check with my

24  colleague -- this is now the live version of the exhibit.

25          Your Honor, this is from the website that was in the

App. 97

1    declaration.

2          I'd like to use the exhibit version only because we

3    have highlighted a few things for ease of review.

4          We can certainly put them up side by side or toggle

5    between them.

6          MR. SCHWIEP:  Judge, there is, attached to her

7    declaration as an exhibit is similar but it's not identical

8    data.  We just prefer to use the one attached to the

9    declaration.  I think Mr. Panuccio can work with that.

10         THE COURT:  Well, as I understand it -- is this live?

11   Are we live streaming the panthers?

12         MR. PANUCCIO:  Yes, it is a live website of old

13   telemetry data.

14         THE COURT:  Okay.  So why don't -- then Mr. Schwiep's

15   point is well taken.

16         Let's start with the one that she attested to in her

17   declaration, and then we can move on to a variation that you

18   wish to discuss.

19         So, let's start with what she had.

20         MR. PANUCCIO:  I have to see if we can pull that up,

21   Your Honor.

22         MR. SCHWIEP:  I don't know whether this helps or hurts,

23   but we will have a panther expert that will be testifying and

24   this is far beyond the scope of the direct testimony that

25   Ms. Samples provided.

1          She did put a panther map in her declaration but we

2     haven't offered her as an expert on panthers.

3          THE COURT:  So, this was not affixed to her original

4     declaration?

5          MR. SCHWIEP:  There is a panther telemetry map affixed

6     to her declaration, yes.

7          THE COURT:  Then let's -- since we are going to have a

8     panther expert, since Ms. Samples has said she is not a panther

9     expert in the legal term as we've all been discussing, then

10    let's just talk about what she has affixed, that's it, and then

11    you can ask her questions, Mr. Panuccio.

12    BY MR. PANUCCIO:

13    Q.  Okay.  We will start with what you have attached.

14         What are the dates of this -- first of all, where is the

15    airport on this telemetry map that you attached to your

16    declaration?

17    A.  The jetport is the runway that's shaded in gray in the top

18    third of the map.

19    Q.  Okay.  And what are the dates of -- what's the scale of

20    this map?  How many miles are we talking about from end to end?

21    A.  I don't know the answer to that, but I know that the runway

22    is about 10,000 feet.

23    Q.  Okay.  What is the most recent panther sighting reflected

24    on this map?

25    A.  My use of this data relates to live interaction with the

1    site.  So, if I wanted to look at the date of a specific point,

2    a tracking point, I would click on that point and pull up the

3    data.

4    Q.  Did you do that before you submitted your declaration?

5    A.  I have looked at the telemetry data, yes, and looked at it

6    before submitting it, yes.

7    Q.  Did you look for the most recent citing of this map?

8    A.  I looked at the dates.  I'm not sure if I thought about it

9    that way, but I did look at the dates in close proximity to the

10   map.

11   Q.  Would it ring a bell if I told you the most recent panther

12   citing of this on this map that you submitted is June 2007?

13   A.  That sounds familiar.

14   Q.  So, for almost 20 years no panther has been identified near

15   the airport.  Correct?

16   A.  FWC has had funding cuts that has lead to panthers, fewer

17   panthers being collared and less data being collected so that

18   the lack of a telemetry point does not mean that panthers

19   aren't using the area.  But we did recognize that some of this

20   was not from the last year or so.

21   Q.  So, just to go back to the question, for the last 20 years

22   no panther has been identified near the airport site from

23   telemetry.  Correct?

24   A.  I think you said 2007.

25   Q.  So, 18 years, 17 years.  I mean, in the last -- I will make

1    it easier.  In the last decade do you have any telemetry data

2    that shows a panther sighting near the airport?

3    A.   I would have to go back and look at all the points, and

4    when you say near, I'm not sure how close you mean.

5    Q.   On these maps are any of these data points from the last

6    ten years?

7    A.   I would need to consult a panther expert to analyze that

8    data, and no, if any of them were the last ten years.

9    Q.   So, is it fair to say that even though this was attached to

10   your declaration, you don't have full knowledge of what your

11   map shows?

12   A.   There is an interactive link that I have used, and if I'm

13   allowed to pull it up, I would certainly be able to access the

14   dates of the sighting.  And we also know that the panther

15   population fortunately --

16          THE COURT:  No.  No.

17          THE WITNESS:  Apologies, Your Honor.

18          THE COURT:  As you sit here today, do you know, not

19   having the interactive capacity, the last date that map shows a

20   panther sighting?

21          THE WITNESS:  I don't know out of all those dots on the

22   map what the recent date is.

23   BY MR. PANUCCIO:

24   Q.   Okay.  Let's take this down, and I will move on from this.

25   I think the point is established.

1      Ms. Samples, you're president of Friends of the Everglades.

2  We have established that.  Is that correct?

3  A.  I'm executive director, not president.  That's a different

4  role on our board of directors.

5  Q.  Apologies.  Executive director is the head person, the

6  person in charge?

7  A.  On staff, yes.

8  Q.  And Friends is a plaintiff in this case?

9  A.  Correct.

10  Q.  Let me show you one more document.  These are going to be

11  Friends' discovery responses that we recently received.

12          THE COURT:  Okay.  But what exhibit number is it?

13          MR. PANUCCIO:  We received it after we had put in our

14  exhibit list, Your Honor, so we don't have a number.

15          THE COURT:  Okay.  So it would be Exhibit 52.

16          (Defense Exhibit 52 was marked for identification.)

17  BY MR. PANUCCIO:

18  Q.  Do you recognize this as the Friends' discovery responses

19  that were submitted to us a few days ago?

20  A.  I think so.  It's been difficult to keep up with all the

21  documents flying and our lawyers do a good job of that.

22  Q.  Fair enough.  I share that concern, Ms. Samples.

23      I move to admit this as their discovery responses.

24          THE COURT:  No.  Overruled.

25  BY MR. PANUCCIO:

1   Q.   Do you recognize this document?

2   A.   I actually don't.

3   Q.   Did you have any role in verifying or helping with the

4   plaintiff responding to our discovery request?

5   A.   I did provide letters with regard to the Western Everglades

6   Restoration Project, our NEPA work.  I submitted documents with

7   relation to that.

8   Q.   Did your attorneys tell you that we submitted discovery

9   requests?

10  A.   Yes.

11       MR. HIAASEN:  Objection, Your Honor.

12       THE COURT:  Right.  We are getting afield here.  Is

13  there something where she signed this document?

14       MR. PANUCCIO:  Well, no, but as I understood it, there

15  was a whole half hour of testimony on the organization's

16  interest and what they know, and the point I'm going to make,

17  I'm just going to get there, Your Honor, is what they say they

18  don't have is important to this hearing.

19       THE COURT:  Right.  But that's a legal matter you will

20  take up with me and counsel.

21       Unless she signed that, no, we are not going to get

22  into attorney-client privilege.

23       MR. PANUCCIO:  I won't ask about attorney-client.  I'm

24  just trying to verify from apparently their main organizational

25  witness, whether what they've said here about what they don't

1   have is correct.

2          THE COURT:  Right.  We will take that up with the

3   lawyers, and I will discuss that, but move on.

4   BY MR. PANUCCIO:

5   Q.  Okay.  Is it fair to say you oppose this detention facility

6   as unnecessary?

7   A.  We oppose the detention facility because the environmental

8   harm that has already been documented on site and also because

9   we have not had the opportunity under the National

10  Environmental Policy Act to provide public comments and to look

11  at alternatives as we typically would.

12  Q.  What kind of training or background do you have on law

13  enforcement?

14  A.  None.

15  Q.  What kind of training or background do you have in

16  immigration enforcement?

17  A.  None.

18  Q.  What kind of training or background do you have in

19  detention facilities?

20  A.  None.

21  Q.  What kind of training or background do you have in

22  facilities management, generally?

23  A.  Other than our offices at Friends of the Everglades, none.

24          MR. PANUCCIO:  Just give me one moment, Your Honor.

25          THE COURT:  Sure.

1    BY MR. PANUCCIO:

2    Q.  Aside from your stated environmental concerns, do you have

3    any objection to the authorities apprehending and detaining

4    persons who have entered and remain in the United States

5    illegally?

6         MR. SCHWIEP:  Objection, Your Honor.

7         THE COURT:  Sustained.

8    BY MR. PANUCCIO:

9    Q.  Do you have any objections to this facility existing other

10   than environmental concerns?

11        THE COURT:  Sustained.

12        That is all I'm here about.  If you want to get into

13   matters, I think there's going to be a hearing across the hall

14   sometime soon.  We are here about NEPA.

15        MR. PANUCCIO:  Your Honor, if I may just proffer why

16   I'm asking the question is because I'm trying to probe bias of

17   witnesses and whether the things they are saying about their

18   environmental concerns are accurate and truthful and the real

19   reason for their testimony.

20        THE COURT:  Yeah, I don't think we're going to go down

21   that road.  So, sustained.

22        MR. PANUCCIO:  Okay.  Let me just check with my

23   co-counsel, Your Honor, and we should wrap it up.

24        THE COURT:  Of course.

25        MR. PANUCCIO:  Thank you, Ms. Samples.  No further

1    questions, Your Honor.

2          THE COURT:  There are other people that may want -- not

3    you.

4          Any questions, Mr. Gustafson?

5          MR. GUSTAFSON:  Your Honor, the Federal Defendants have

6    no questions.

7          THE COURT:  Very well.

8          Now, Mr. Schwiep.

9                    REDIRECT EXAMINATION

10   BY MR. SCHWIEP:

11   Q.   Real quick.  You were asked some questions on cross about

12   whether you had personally engaged in any water quality studies

13   or wildlife studies or traffic assessment or waste management

14   plan reviews or endangered species impacts, panther impacts,

15   specifically.

16        You recall those questions on cross?

17   A.   Yes.

18   Q.   In your experience with Friends and participating in NEPA

19   processes, would you have anticipated that those were exactly

20   the kinds of impacts that would have been analyzed through a

21   comprehensive NEPA review prior to building this detention

22   center?

23   A.   Yes, absolutely.  Our staff, our science staff, our science

24   and policy committee would have looked in detail at those

25   issues and I would have been part of that.

1    Q.   Have you requested an opportunity to have Friends as

2    experts inspect the site since it's been built?

3    A.   Yes, I have.

4    Q.   What was the response to that request?

5    A.   We were denied.

6    Q.   You were asked some questions about your personal

7    experiences in that area.

8         Do you plan to recreate in the Big Cypress National

9    Preserve in the future?

10   A.   I do, absolutely.

11   Q.   And how has your enjoyment of the Big Cypress National

12   Preserve been impacted by the operation or the continued

13   construction of this site?

14   A.   It is a bustling, highly trafficked area since the

15   detention center was proposed.  You can't -- previously passing

16   this entry road on Tamiami Trail you wouldn't have seen a lot

17   of traffic on a typical day, but now there's traffic, there's

18   intense activity that creates a different aesthetic in the area

19   now.

20        MR. SCHWIEP:  I think we will let Ms. Samples off the

21   hook at this stage, Your Honor.

22        THE COURT:  Thank you.  You may step down.

23        MR. HIAASEN:  Good morning, Your Honor.  Before we call

24   our next witness, there were a couple of evidentiary matters we

25   we were hoping to introduce real fast.

App. 107

1          They're demonstrative exhibits we'd like to introduce

2     to help the Court.

3          THE COURT:  Oh, okay.  If you have demonstratives, have

4     you --

5          MR. HIAASEN:  I misspoke, my apologies.  They're

6     exhibits on our list, but we want to display them for the Court

7     before we call our next witness and move them into evidence.

8          THE COURT:  Oh, I see.

9          MR. HIAASEN:  The first we want to bring in is

10    Plaintiffs' Exhibit 33.

11         (Plaintiffs' Exhibit 33 was marked for identification.)

12         THE COURT:  Okay.  Wait, wait, wait.

13         The MDAD?

14         MR. HIAASEN:  Yes.  My apologies.  With that, Your

15    Honor, this is just -- as a predicate for the Court, this is

16    data from obtained from Miami-Dade Aviation Department

17    regarding arrival and departure data maintained by the county,

18    and just last night -- and I apologize to counsel, I will hand

19    it around now -- we received a declaration from Miami-Dade, a

20    co-party here, just attesting to the authenticity of the data.

21    And I will hand the hard copy.  If the Court would like a hard

22    copy of the declaration, I will hand it out.

23         I don't have that as an image, but I will also hand it

24    to my colleagues on the other side.

25         THE COURT:  All right.

App. 108

1           MR. PANUCCIO:  Your Honor, we object to the admission

2      of free-floating exhibits.

3           If they want to put an exhibit in front of a witness

4      and we can assess relevance and authenticity and any other

5      issues, we're happy to do that, but we don't think exhibits

6      should be introduced on the testimony of counsel.

7           THE COURT:  Well, there is a declaration with it.

8      Right?

9           MR. PANUCCIO:  For authenticity, Your Honor, but

10     relevance needs to go before a witness.

11          THE COURT:  Didn't we just spend -- well, go ahead,

12     Mr. Hiaasen.

13          MR. HIAASEN:  I was just about to say, the relevance

14     has been established because Mr. Panuccio just asked the last

15     witness about the frequency of air travel or aircraft arriving

16     and departing at the facility.  The database and the

17     declaration attesting to its authenticity speak to the issue of

18     just how often aircraft actually fly from the site.  That's the

19     only purpose that we're introducing this at this time.

20          And, Your Honor, if I could hand up a hard copy of the

21     declaration.

22          THE COURT:  I will look at the declaration.  Is this

23     issue something our next witness will be talking about?

24          MR. HIAASEN:  No, Your Honor.  This is more of a

25     response to the cross-examination of Ms. Samples.

1          THE COURT:  Okay.  All right.  Let me take a look at

2    the declaration.

3          Mr. Panuccio, you did make an issue of the comings and

4    goings.  I was a little surprised because if, indeed, military

5    operations were being had out there, nobody was going to have

6    that data unless you managed to extract it.  And if you did,

7    you could introduce it and I would expect plaintiffs to give

8    you the same latitude in terms of a declaration that's being

9    shown here.

10          But we don't have to take it up now, Mr. Hiaasen.

11    Mr. Panuccio and his team can have a chance to look at the

12    declaration and I know that that is relative to Exhibit 33.

13          MR. HIAASEN:  Yeah.  So, Exhibit 33, just for the

14    record, is an Excel spreadsheet provided by the County, but by

15    itself it doesn't bear any information to show its authenticity

16    and the fact that it's a County document, that's why we sought

17    and received the declaration.  But unfortunately we only

18    received it last night.

19          MR. PANUCCIO:  Your Honor, just to be clear, though,

20    this is a response to my cross on the frequency of the flight

21    data, but they objected to us putting the flight data in, and

22    now they want to put in evidence about the flight data.

23          I don't think they can have it both ways.

24          THE COURT:  No, no, Mr. Schwiep.

25          Mr. Hiaasen, one at a time.

App. 110

1        They objected, I thought, because this witness didn't

2   have any knowledge of it, but Mr. Panuccio makes a point.

3        Mr. Panuccio, what exhibit in your list would you have

4   wanted to introduce relative to the air traffic?

5        MR. PANUCCIO:  14, Your Honor.

6        MR. HIAASEN:  Your Honor, just for the record, in

7   addition to the fact that he was asking the witness who was not

8   familiar with that data about it, there's nothing else that is

9   in evidence that speaks to its reliability or authenticity.

10       I'm not sure where -- it's a private vendor.  I don't

11  know if -- if in their case in chief they intended to introduce

12  that and have a witness testify to how that data was collected,

13  that would be one thing.  But as we sit here, that's the basis

14  for our objection to Exhibit 14 coming into evidence.

15       THE COURT:  Okay.  Mr. Panuccio, can you get a

16  declarant about the maintenance of the logs, who has recorded

17  this information contemporaneously with the event, the standard

18  business record.

19       MR. PANUCCIO:  Well, I will proffer, Your Honor, that

20  the witness from FDEM is going to testify that FDEM requested

21  this from the County in its normal course of collecting

22  business records.  So, it is, at this point, a business record

23  of FDEM that they've relied on.

24       So, yes, it comes from the county itself.  These are

25  available logs.  But, again, Your Honor, I don't see how they

App. 111

1    can introduce a response to an exhibit that they say shouldn't

2    come in.

3         THE COURT:  Well, because this doesn't say -- as I

4    recall it said Vera something.  It didn't say Miami-Dade

5    County, but you know what, gentlemen, you're going to work this

6    out in your off hours, not mine.

7         What I need, if I'm going to be even in my approach,

8    I'm going to look at this declaration.  I'm inclined to allow

9    Exhibit 33 to come in, but I would also like, Mr. Panuccio,

10   maybe it's the same fellow at Miami-Dade or the person at Vera,

11   whatever it was, it was V-E-R, that's all I remember, to give

12   you that these are our records, and then we will have a

13   complete set of logs.

14        With that, Mr. Hiaasen, do you have your next witness

15   available?

16        MR. HIAASEN:  Your Honor, my apologies, I have one more

17   declaration with some attached exhibits.

18        (Plaintiffs' Exhibit 44 was marked for identification.)

19        MR. HIAASEN:  It's Plaintiffs' Exhibit 44, and if we

20   could display Exhibit 44 for the Court, and I will provide some

21   background.

22        Plaintiffs' Exhibit 44 is a declaration from Miranda

23   Daviduk, D-A-V-I-D-U-K.  She is with the Center for Biological

24   Diversity.  Attached to her declaration is a series of screen

25   grabs, and if you read the declaration, the screen grabs are

App. 112

1    all images from social media accounts and websites maintained

2    by the defendant parties, specifically by the Federal and State

3    Defendant parties, that includes statements made by these

4    defendants about this entity, about the TNT center.

5         So, if you scroll to the next page, for instance, this

6    is a screen grab from the Department of Emergency Management's

7    Twitter account, I believe, dated July 3rd, and it says, the

8    first group has arrived at Alligator Alcatraz, stood up in

9    record time under Governor Ron DeSantis' leadership.

10        THE COURT:  You need to slow down.

11        MR. HIAASEN:  In coordination with DHS and ICE.

12        THE COURT:  Okay.  So these are party admissions?

13        MR. HIAASEN:  These are party admissions, Your Honor.

14        THE COURT:  Okay.  Do these party admissions go to what

15   this next witness --

16        MR. HIAASEN:  We're offering these independently, Your

17   Honor, just as evidence for this hearing.

18        THE COURT:  All right.  Any objection?

19        MR. GUSTAFSON:  Your Honor, I don't believe that we've

20   seen these.

21        THE COURT:  Well, it's listed on the exhibit list.

22        That's a good question.  When you listed things on your

23   exhibit list, did you actually exchange exhibits?

24        MR. SCHWIEP:  We provided a share file.

25        MR. HIAASEN:  We provided a share file that has all of

1    our listed exhibits in our exhibit list.

2            MS. PIROPATO:  Which number of exhibit is it?

3            THE COURT:  It's 44, Declaration of Miranda Daviduk and

4    social media posts.

5            All right.  I'm going to admit Plaintiffs' Exhibit 44.

6            (Plaintiffs' Exhibit 44 was admitted in evidence.)

7            MR. HIAASEN:  One last item, Your Honor.  In

8    Exhibit 44, Miranda Daviduk's declaration, you will see in

9    Exhibit 9 she references a recording -- it's on YouTube -- of a

10   press conference involving the Defendant, Secretary Noem, taken

11   on July 31st, actually a press conference at the facility, the

12   TNT Site.  That recording is Exhibit 45.  We provided a --

13   actually, I will contest that we had a link.  We didn't have a

14   clip at the time we submitted an exhibit list to the opposing

15   party.  But we have created an MP4 file, a video file that we

16   would like to publish to the Court and admit as Plaintiffs'

17   Exhibit 45.

18           THE COURT:  Now?

19           MR. HIAASEN:  Yes, it's only three minutes.

20           THE COURT:  I should have seen this.

21           I think it's important to get our live witnesses in or

22   out.  They have other obligations.  So, if we can -- if over

23   lunch you all can confer about evidentiary matters, which we

24   might be able to put some other time and let the witnesses

25   proceed.

App. 114

1          But, Mr. Panuccio, what's your objection to 45?

2          MR. PANUCCIO:  On all of these I'm going to object on

3     relevance.

4          I don't think we've heard an explanation of what the

5     relevance of these statements is to the legal issues in this

6     case.

7          THE COURT:  I believe it has to do with who is running

8     the show.

9          Is that right, Mr. Hiaasen?

10         MR. HIAASEN:  Yes.

11         MR. PANUCCIO:  I will say, a statement on Twitter

12    cannot have a legal effect on who's running it.  If there is

13    going to be witness testimony on this and there are formal

14    legal documents, but tweets are not formal legal documents,

15    Your Honor.

16         MR. HIAASEN:  Your Honor, we can --

17         THE COURT:  They're not formal legal documents, but

18    they are -- and I think courts around the country have

19    acknowledged -- party admissions and the Court will allow it.

20         But, Mr. Gustafson, what do you have to say?

21         MR. GUSTAFSON:  Well, you ruled, Your Honor, but I

22    think it would be helpful to have a witness to provide some

23    context for this.  Otherwise, I think it's hard to --

24         THE COURT:  Ms. Noem, I don't think she's coming, and

25    the declaration is to -- and I'm not being glib.

App. 115

1          I mean, the declaration is with regard to somebody who

2    has viewed this and has taken it off social media.  If you

3    believe that it has been contrived or made up, then I will

4    consider that and anything you would say as to the

5    authenticity, but if it indeed is a social media post or a

6    mention, then I will take it for whatever relevance it provides

7    the Court.

8          I'm not ruling on what it means not having heard it or

9    seen it.  I'm just saying as a matter, evidentiary wise, under

10   a party admission theory, I would allow it to be admitted.

11         MR. FRIEDMAN:  Your Honor.  Over here.

12         THE COURT:  I know, I know.  You need to send up a

13   flare every now and again.

14         MR. FRIEDMAN:  The same category of exhibits on behalf

15   of the Tribe, we would also ask that our Exhibits 12 through

16   14 --

17         THE COURT:  Well, when you -- you will have an

18   opportunity after Mr. Schwiep, Mr. Hiaasen put on their case,

19   you will put on your case.  The defendants will respond, but I

20   need to have some semblance of what might look like order in

21   getting this hearing going.

22         Okay.  Everybody needs a break.  So, queue it up.

23         MR. HIAASEN:  My apologies.  Just in the interest of

24   time, Your Honor, if you have had admitted 44 and 45 in

25   evidence, we can forgo actually playing the recording and we

1  can provide it to the clerk and move on to the next witness,

2  but I understand if you want to take a comfort break --

3         THE COURT:  That will be great.  I will admit 44 and

4  45.  I will allow for any challenge to the authenticity that

5  these are actually the screenshots or statements.

6         We will take five minutes and then we will return.

7         (Plaintiffs' Exhibits 44 and 45 were admitted in

8  evidence.)

9         THE COURT:  Who is your next witness, please?

10        MR. HIAASEN:  Anna Eskamani.

11        THE COURT:  Thank you.

12        COURTROOM DEPUTY:  All rise.

13        (Recess.)

14        COURT SECURITY OFFICER:  All rise.

15        THE COURT:  Please be seated.  I'm reminded by the

16  court security officers and the marshals, it didn't occur to me

17  but there can be no recording of these proceedings.

18        Anyone found to be doing so will be escorted out by

19  security and have other things happen.

20        Oh, yes.

21        MR. MURRAY:  Just briefly, Dave Murray for Miami-Dade

22  County.

23        I apologize about the delay.  There was a minor mishap,

24  but I have been here for most of the morning.

25        THE COURT:  They talked about you, but that's all

App. 117

1    right.

2           All right.  Everyone is here then.

3           Perhaps counsel might be talking to you about

4    authentication of some records during the break.

5           THE COURT:  Mr. Hiaasen, you may proceed.

6           MR. HIAASEN:  Your Honor, we call Anna Eskamani.

7           MR. PANUCCIO:  I would like to state an objection to

8    this witness appearing at all.

9           THE COURT:  Okay.

10          MR. PANUCCIO:  Under 403, the Court can exclude a

11   witness if there is a danger of unfair prejudice, confusing the

12   issues, undue delay, waste of time, needlessly presenting

13   cumulative evidence.

14          I would note that Dr. Eskamani is not a plaintiff.  She

15   is not a member of the plaintiff organization.  She is a

16   leader.  She is an elected politician from a different county,

17   who certainly has political views on this thing, but I think

18   this would be highly prejudicial and turn this more into the

19   nature of a press conference than adducing facts that matter to

20   narrow legal issues of this case.

21          THE COURT:  Yes.  Well, we wouldn't want to have any

22   more press attendant to this, but since I'm not really sure

23   what she is going to say, I will take the cumulative and under

24   advisement, Mr. Panuccio.

25          Mr. Hiaasen, hopefully we will be focused and

App. 118

1    streamlined and I will allow the witness to come forward and be

2    sworn in, and we will see where this goes, Mr. Panuccio.

3          COURTROOM DEPUTY:  Ma'am, please raise your right hand.

4          (The witness, Anna Eskamani, was duly sworn.)

5          COURTROOM DEPUTY:  Thank you.

6          Please have a seat.  Speak closely into the mic.

7          State your name for the record and spell it off slowly

8    for our court reporter.

9          THE WITNESS:  Thank you so much.  Anna Eskamani,

10   A-N-N-A, last name is E-S-K-A-M-A-N-I.

11         COURTROOM DEPUTY:  Thank you.

12                        DIRECT EXAMINATION

13   BY MR. HIAASEN:

14   Q.  Good morning, Ms. Anna Eskamani.  Can you state, for the

15   Court, your occupation?

16   A.  Yes, Your Honor.  I'm a State House Representative serving

17   District 42 in the Florida State Legislature.

18   Q.  How long have you served in the Florida Legislature?

19   A.  I was first elected in 2018.

20   Q.  What is your educational background?

21   A.  I am a graduate of the University of Central Florida.  I

22   hold two BAs, two masters and recently completed my Ph.D. in

23   Public Administration last year.

24   Q.  As you know, the hearing today concerns the detention

25   center at the Dade-Collier Training and Transition Airport.  We

1    will call it TNT Site for purposes of your testimony.

2          Are you familiar with this facility?

3    A.   Yes, I am.

4    Q.   Have you ever been to the site of the detention center

5    facility?

6    A.   Yes, I have.

7    Q.   Do you recall when you were there?

8    A.   Yes, my first attempted visit was July 3rd.

9          My second visit, which was a curated tour facilitated by

10   the Florida Department of Emergency Management via the State of

11   Florida was on Saturday, July 12th.

12   Q.   If you can just slow down your testimony a little bit, I

13   think the court reporter would appreciate it.

14   A.   Will do.

15   Q.   I need to do the same.

16   A.   Thank you.

17   Q.   I believe you said July 12th was when you were on the site?

18   A.   Correct.

19   Q.   Were you alone or with other people?

20   A.   This was a scheduled tour via the State of Florida where

21   members of Congress and elected state legislators were invited

22   to see the site itself as it was active with detainees.

23          So, I was accompanied by different employees, including

24   staff members of the Florida Department of Emergency

25   Management, other lawmakers, members of Congress, and private

1  contractors who were there throughout the tour as well.

2  Q.  Roughly, how many lawmakers and members of Congress were

3  with you on the tour that day?

4  A.  So, we received a list of group breakdowns the day prior,

5  so we were going to be separated into different cohesive

6  groups, but the day of things were a little bit more mixed, if

7  you will.  So, different groups got combined.  So I would say

8  in our group it was decently sized, I mean, potentially

9  anywhere from 20 to 25 of the dignitaries, and then, of course,

10 accompanied by 30 different staff members and entities that

11 were there.

12 Q.  As part of this tour you were allowed to enter the facility

13 and tour the grounds.  Is that correct?

14 A.  In a very structured manner, yes.

15 Q.  Can you describe to the Court what you observed upon entry

16 into the facility?

17 A.  Absolutely.  Upon arriving to the intersection where the

18 main entrance is to the Everglades detention camp, it's a long

19 and winding road, and there is several security checkpoints.

20     So, when you get past the checkpoints, you find yourself in

21 a large parking lot, and it does have new asphalt.  Some of the

22 roads are also newly developed as well.

23     This is a parking lot where we were told to park but also

24 staff park here as well.  We then walked to get checked in with

25 tents that were outside, kind of like tailgate tents.

1        We were wanded.  We were told to leave all of our
2    electronic devices in a bin on location, and then we were
3    escorted into large buses.
4        We basically waited in these large buses for about 30 or
5    40 minutes as more dignitaries arrived, and then we were
6    transferred into smaller vans being told that this was an
7    active construction site, and we wouldn't be able to move
8    around in the large buses.
9        So, once we were in the vans we started driving towards the
10   actual facility upon newly paved roads, also Sunbelt lights
11   that peppered across the roadway, and we got through different
12   security gate features, and then eventually unloaded for the
13   start of the walking tour.
14   Q.  I'd just like to stop you there for a second.  You
15   mentioned Sunbelt lights?
16   A.  Yes.
17   Q.  Can you describe what those look like?
18   A.  For sure.
19       So, Sunbelt is a brand, but they're these big kind of green
20   floodlights that are often used in construction projects.
21       So, they were basically peppered along the roadways as if
22   they were, like, traffic lights.
23       Every maybe -- maybe every 15 feet you would have one of
24   these Sunbelt lights, so it's just a base and then a pole that
25   extends into the air with bright floodlights shining down.

1   Q.   So, was the illumination, the way you described it, and I
2   don't want to put words into your mouth, it was on some
3   pedestal or something like that?
4   A.   Correct.  This was daytime for me, so the lights were not
5   on, but that's how they were situated was a giant base.  I'm
6   sure that's where the power source is and then a giant pole to
7   elevate the lamps and the lamps themselves shining down.
8   Q.   How tall would one of these devices be, to your estimation?
9   A.   I mean, several yards into the air.  They're attempting to
10  mimic, I assume, like traffic lights you would find if you're
11  driving down a highway.
12  Q.   I think you also mentioned fencing.  Was the road from
13  U.S. 41, from the entryway, was that road fenced going north?
14  A.   That's a good question.  The fencing that I recollect from
15  my experience on the ground was surrounding the facility
16  itself, including with barbed wire.
17       When you're driving through that main intersection, there
18  is a lot of traffic and, of course, you have FHP and the
19  national guard who were there at different security
20  checkpoints.  So, I can't recollect fence necessarily in the
21  very front entrance, but when you get to the facility, the
22  facility, itself, was surrounded by fencing and there were many
23  moments where we had to wait for a gate to open and a gate to
24  close.
25  Q.   Did you observe any electrical power equipment on the site

App. 123

1   when you arrived?

2   A.  As noted, we were told this was an active construction

3   cite, and there were many moments where we were walking over

4   cords upon cords upon cords, wires upon wires.

5       We were also told that there is no running water or power

6   lines in this facility.  Everything is operated by portable

7   devices, portable heavy equipment.  So, I did see Macro fuel

8   trucks, multiple generators.  We were told that there is also

9   backup systems in place as it pertains to generators, and we

10  were told that water and waste is being carried in and out of

11  the facility because there is not infrastructure that is

12  currently there for this.

13  Q.  Can you estimate how many generators you observed on the

14  site?

15  A.  It's going to be hard to give a good estimation.  I mean,

16  it was generators upon generators and large diesel fuel trucks

17  as well.

18  Q.  Ms. Eskamani, you said you were given a tour of the

19  facility?

20  A.  The tour was provided through Director Kevin Guthrie of

21  FDEM.

22  Q.  So he was part of the tour personally?

23  A.  Yes.

24  Q.  Did he personally speak to you?

25  A.  Yes, he was given a microphone and it was almost like a

1    walking tour.  It was a walking tour, so he was given a

2    microphone with a portable speaker to talk to us as we went

3    from section to section of the scheduled tour.

4    Q.  During the tour, did you have an opportunity to speak to

5    him one-on-one just the two of you?

6    A.  Yes.  I mean, there were many occasions where I would

7    either talk to him directly and get a question to him and see

8    what his response would be and, of course, getting, try to get

9    questions answered from other staff.

10        I mean, he was accompanied by multiple staff members of

11   FDEM, including their number two and General Counsel, Stephanie

12   Houp.  So, there were many attempts while the tour was going on

13   and other folks were also asking questions, not only would I

14   ask questions to other individuals of authority but, of course,

15   also to ask questions about him in front of this public

16   audience of republican and democratic lawmakers and members of

17   Congress to try to get clarity on the operation of the facility

18   and so forth.

19   Q.  Prior to July 12th, did you know Mr. Guthrie?

20   A.  Of course, yes.

21   Q.  You have spoken to him before?

22   A.  Of course, yes.  I mean, I think historically Director

23   Guthrie is seen as the hurricane guy, and whenever there is a

24   situation impacting our communities, we put away any type of

25   partisanship and we focus on delivering results for our

1    constituents.  And Director Guthrie will host legislative

2    emergency calls.  We will be able to speak with him one-on-one.

3    He has, of course, testified in my committees before, so there

4    is a pre-established relationship.

5    Q.  Now, on that day, on July 12th, did Mr. Guthrie discuss

6    with you or with the group any -- did he provide any

7    information about who is running the facility and who has any

8    responsibilities at the facility?

9        MR. GUSTAFSON:  Objection, Your Honor, on hearsay

10   ground and I will note that there is no indication that the

11   Federal Defendants were present for this conversation.

12       THE COURT:  Overruled.

13       MR. PANUCCIO:  We just join the hearsay objection, for

14   the record, Your Honor.

15       THE COURT:  All right.  Overruled.

16       THE WITNESS:  So, during the tour, we asked many

17   questions of Director Guthrie of the operations and the origin

18   story, if you will, of this facility, and more than once he

19   reported to us directly that the State of Florida received a

20   request from DHS to open up a facility.

21       In fact, we asked for a copy of that e-mail.  We have

22   yet to receive it, but there was a conscious effort by him and

23   his team to assert a few different points.  One was that DHS

24   made the request for this facility, for a facility, I should

25   say, to be established, and this was the product of that

1    facility.

2         There was also assertions made regarding ICE's

3    inspectation (sic) -- ICE's inspecting of the facility because,

4    of course, there were questions that we had regarding human

5    safety, environmental concerns, just the daily operations of

6    this facility.

7         So, they kept asserting to us that we follow all

8    federal and state prison and jail guidelines, and ICE inspects

9    our facility.  They also said that when individuals arrive at

10   the facility for intake, they are dropped off by ICE, and I

11   have witnessed this myself, of a white windowless vehicle, a

12   bus, pulling into the facility with FHP escorting.  But I was

13   told by Kevin Guthrie that FHP provides the escort but the

14   detainees bus itself is ICE.

15        Then he also asserted that when detainees arrive,

16   they're given a manifest, a folder of backgrounds, and that's

17   how they know the different denotations of risk associated with

18   a detainee, which is then translated to different colored

19   wristbands that they receive.

20        So, those are some of the points that were made to us

21   based on questions we ask.  We are trying to get a better grasp

22   of the management of this facility and, of course, the

23   involvement of federal officials.

24   BY MR. HIAASEN:

25   Q.  Just to clarify, these folders you said were provided to

App. 127

1   the staff of the center, did Mr. Guthrie say those were

2   provided by ICE?

3   A.   His language he used with us was that they received -- if I

4   remember correctly, the language was manifesto, almost, that

5   they received a file folder, they receive evidence, some sort

6   of backgrounds from the federal government on the stories of

7   these individuals.

8        I mean, he also told us that every person there has final

9   deportation orders.  He would not be able to know that unless

10  there was some communication with the federal government.

11       He also made the point that individuals are --

12       MR. PANUCCIO:  Objection, Your Honor.  Witness is

13  speculating as to what other people may or may not know and how

14  they would know it.

15       THE COURT:  Agreed.  I will strike that.

16       Just what you were told.

17       THE WITNESS:  Okay.  Thank you, Your Honor.

18       So, we were told by Director Guthrie that when

19  individuals arrive, they are accompanied with information from

20  DHS, from ICE, about their identity and about their background.

21  BY MR. HIAASEN:

22  Q.   Did you have an opportunity to speak to any detainees to

23  confirm any of this information?

24  A.   We were not allowed to speak to any detainee.  However, we

25  were allowed to gaze into one of the occupied cages.

1    Q.   Now, since July 12th, have you had any additional

2    communications with anybody at FDEM about the management of the

3    detention center?

4    A.   Yes.  I have made many requests for information, especially

5    through e-mail, and in some cases seeking a follow-up answer to

6    something that was stated during the tour, new questions that

7    have come up.  So I tried to maintain an active and transparent

8    communication with the agency as much as I can.

9            MR. HIAASEN:  Can I have one moment, Your Honor?

10           THE COURT:  Yes, of course.

11           MR. HIAASEN:  We have no further questions at this

12   time, Your Honor.

13           THE COURT:  All right.

14           MR. AJIZIAN:  Your Honor, the Tribe has a few

15   questions.

16           My understanding is that this would be cross since it's

17   not our witness.

18           THE COURT:  Yes, it is.

19           Thank you, Mr. Panuccio.  I'll let the Tribe go first,

20   then you, then Mr. Gustafson.

21                          CROSS-EXAMINATION

22   BY MR. AJIZIAN:

23   Q.   Good morning, ma'am.

24   A.   Good morning.

25   Q.   Do you recall testifying that when you arrived at the site

1    you observed new roads and, I'm sorry, parking lots that were

2    paved?

3    A.  Yes.

4    Q.  How could you tell that those were newly paved?

5    A.  You could -- not only was the asphalt a more original color

6    in the sense of fresh black asphalt, and of course, in Florida

7    summer the color changes very quickly.  But you could still see

8    on the edges the crumbles of the asphalt, and it was also

9    complemented by almost like a guardrail around it.  And it was

10   also, just based on conversations I had with some of the

11   employees, newly paved.

12   Q.  Did it look to you like fresh asphalt on a regular

13   pedestrian roadway that you've seen in your ordinary

14   experience?

15   A.  Yes.  The color was the same you would see of new asphalt

16   in a neighborhood setting.  It was a black, a deep black color

17   with lines painted on it.

18   Q.  Thank you.

19       Do you recall testifying that someone told you that it was

20   an active construction site?

21   A.  Yes.

22   Q.  Did you see any construction activities on site?

23   A.  Yes.

24   Q.  Could you tell me about those?

25   A.  I would love to.

1      So, this was near the end of the -- the beginning statement

2   that this is an active construction site was made to us as we

3   were transporting from larger buses to small vans.

4          MR. GUSTAFSON:  Your Honor, we don't know who said

5   this, and it's hearsay.

6          THE COURT:  Well, I'm admitting it because I think it's

7   party admissions, but if you could, I know we have spoken about

8   Mr. Guthrie in particular.  You said you spoke to members of

9   his coterie and the like.

10          If you recall who was telling you these things and if

11   you can't recall the names, maybe you can describe him or her.

12          THE WITNESS:  Absolutely, Your Honor.

13   BY MR. AJIZIAN:

14   Q.  To be clear, I will withdraw the question based on the

15   objection, but I'm asking specifically about your observations

16   on site of construction activities.

17          THE COURT:  No, no.  She can testify to what people

18   told her.  She just needs a little more specificity, about

19   tall, round, male, female, name.

20          THE WITNESS:  Thank you, Your Honor.  I can do both.

21          The statement of, "this is an active construction

22   site," came from a staff member of FDEM, an individual wearing

23   an FDEM-branded polo.  And to the point of my observations,

24   near the end of this tour -- so, I mentioned we were not

25   allowed to speak to any detainees, but we were able to gaze

1    into one of the tents of detainees.

2          Following that, we were brought to a tent under

3    construction, and we were told by Kevin Guthrie that this is

4    all under construction and to be careful because we're walking

5    through an active construction site.

6          We were not given hardhats, but we were all wearing

7    closed-toe shoes, and we were walking, as I mentioned, just

8    wires kind of just moving in every direction.  There were

9    stacks of construction material, stacks of fences, stacks

10   linoleum for the flooring.  So, we were needing to be careful,

11   be cautious about walking this environment because they were

12   actually expanding.

13         And we were also told by Kevin Guthrie that the goal

14   was to extend then by August to have the capacity of 4,000

15   detainees.  I was told many times that this was an active

16   construction site where there was more construction taking

17   place and I witnessed the raw material itself.

18   BY MR. AJIZIAN:

19   Q.  The freshly paved parking lot, did you observe the entirety

20   of what was freshly paved?

21   A.  This is a good question.  We were not allowed to take any

22   photos during the actual tour, but while I still had my phone,

23   I took landscape images of the parking lot and tried to see how

24   far it went, so I basically did a 360 of the parking lot that I

25   was parking in to kind of get a better grasp on how large it

1  was.

2  Q.  How large would you describe the freshly paved parking lot?

3  A.  If I was going to guess on the number of cars that were

4  parked, I mean, it was 150 to 200 cars parked.

5       We were told by Kevin Guthrie and by Jake Felder who also

6  works for FDEM, that this facility has, at least, a thousand

7  employees, and these employees -- many are driving in and out,

8  but they also have facilities, they have small kind of

9  dormitory trailers on site.

10      So, there are folks living on premise as well, but there is

11  also a lot of commuters coming in and out, and that's where

12  they are parking their cars.

13  Q.  Do you recall testifying about, I believe, Director Guthrie

14  discussing an origin story for the facility?

15  A.  Yes.

16  Q.  In connection with that origin story, did anybody mention

17  the Miccosukee Tribe?

18  A.  No, not to my knowledge.

19  Q.  Was the Miccosukee Tribe invited to attend the tour?

20  A.  No.

21  Q.  Whether an individual representative or extending and

22  invite to the Tribe itself?

23  A.  Based on my knowledge, the invite was only extended to

24  Congressional elected officials and legislators.  Even staff

25  were told they could not attend.

App. 133

1    Q.   Who extended that invitation?

2    A.   It came from the Florida Department of Emergency Management

3    and Meigs Lamb, who is the legislative liaison was one of the

4    individuals who e-mailed us about it.

5         MR. AJIZIAN:  Thank you, very much.  We have no further

6    questions.

7         THE COURT:  Thank you.

8         Mr. Panuccio.

9                        CROSS-EXAMINATION

10   BY MR. PANUCCIO:

11   Q.   Thank you, Your Honor.

12        Dr. Eskamani, you testified that your doctorate is in

13   public administration.  Is that right?

14   A.   Correct.

15   Q.   What training do you have in environmental science?

16   A.   Well, as a legislator serving now seven years, I have done

17   a lot of engagement with environmental policy, working with

18   different organizations and other colleagues on state park

19   protection on water restoration projects.

20        We've secured millions of dollars of water restoration

21   projects in our district, working with organizations like

22   Friends of Loch Haven to ensure that our water bodies in my

23   district are going to have the resources and investment needed

24   to clean up and to be healthy and secure for future

25   generations.

App. 134

1  Q.  I have no doubt that you have engaged on issues as a

2  legislator.  I'm asking what scientific training do you have in

3  environmental science?

4  A.  Well, ultimately as an environmental science major at UF

5  but I switched to the soft sciences.

6  Q.  So the answer is none?

7  A.  I am a public administrator and a lawmaker.

8  Q.  Okay.  And what formal training do you have in law

9  enforcement?

10  A.  Well, I work with law enforcement very closely.  Of course,

11  I engage with my local law enforcement in different capacities.

12      I have a lot of experience in crisis communications with

13  law enforcement and in my Ph.D. background, but I'm not a

14  formal law enforcement officers.

15  Q.  No educational training in law enforcement?

16  A.  Nothing formal.  I have done ride-alongs.  I've engaged

17  with law enforcement in different capacities to put myself in

18  their shoes, but I did not go to school for law enforcement.

19  Q.  For detention, do you have any formal training in detention

20  of persons?

21  A.  I have a lot of knowledge in detention from the capacity of

22  a legislator who has worked on these topics and has toured

23  state prisons and toured municipal jails, but I'm not a

24  professional in the day-to-day operations.  But I work very

25  closely whether it's with the unions that interact with the

1  correctional institutions or directly with families who have

2  folks that are detained.  That's my engagement.

3  Q.  Have you ever been responsible for managing a large

4  facility?

5  A.  I have been responsible for managing a large number of

6  staff.

7  Q.  A facility, not people, but a place?

8  A.  Places, but nothing to the size of a detention facility,

9  no.

10  Q.  Do you have any training in the management of facilities,

11  any formal educational training?

12  A.  I have a lot of management training, Your Honor.  I manage

13  tons of people every single day, and I have managed large

14  budgets, but as it pertains to --

15  Q.  Facilities?

16  A.  I wonder, Your Honor, if facilities can be more defined.

17  Q.  Places, locations, buildings?

18       THE COURT:  Brick and mortar.  Although we're not

19  really talking about brick and mortar, but akin to that.

20       THE WITNESS:  I manage a legislative office that's in a

21  physical building and I manage other apparatuses that exist in

22  physical buildings, yes.

23  BY MR. PANUCCIO:

24  Q.  Do you manage your physical legislative office, not DMS?

25  A.  I have a legislative aid and I have a district aid that I

 1   have to manage as people, and then our district office we have
 2   a property owner that we work with.  We maintain the operations
 3   of our district office, yes.
 4   Q.  Outside of a legislative office, you have never engaged in
 5   any facilities management?
 6   A.  I've been at health centers --
 7        THE COURT STENOGRAPHER:  Can you repeat that?
 8        THE WITNESS:  Before I ran for office, I worked at
 9   Planned Parenthood of Southwest and Central Florida, and we had
10   11 health centers that I would help to manage in different
11   capacities.
12   BY MR. PANUCCIO:
13   Q.  How many times did you visit the TNT Site before July of
14   this year?
15   A.  Before July of this year I have not had a chance to visit
16   the site.
17   Q.  Where do you live?
18   A.  I live in Orlando, Florida.
19   Q.  Not in Dade County?
20   A.  No.
21   Q.  Not in Collier County?
22   A.  No.
23   Q.  And you don't represent the people of those counties?
24   A.  I represent 188 some thousand people in Orange County and I
25   vote on issues that impact the whole state.

1  Q.  You testified and also in our declaration on paragraph ten

2  you testified about statements that you say Director Guthrie

3  made and you say that he said the facility was requested by

4  DHS.  Is that right?

5  A.  Correct.

6  Q.  When exactly during your tour did he say that to you?

7  A.  Very -- we were gathering as legislators, members of

8  Congress in the tour.  If I remember directly, it was indoors

9  in one of the tents.  As you can imagine, it was very hot so

10  there was only one or two moments where we were standing

11  outside asking questions.  So, I believe it was in the legal

12  library but, of course, I don't have a map of the facility but

13  we were standing in a semicircle.

14      I remember this very visibly, Your Honor, because

15  Congresswoman Deborah Wasserman Shultz followed up and also

16  asked him for a copy of that e-mail, so it very much stood out

17  to me as an important comment that he made.

18  Q.  Who did he specifically say made this request?

19  A.  He would not give a specific.  He referred to it as DHS.

20  He never gave us -- you know, we asked questions but he never

21  gave us a specific.

22  Q.  Did he say that this specific site was requested by the

23  federal government?

24  A.  Based on what I can recollect, it was stated that DHS asked

25  us to -- e-mailed us to build a facility.  I can't recollect if

1  it was, you know, if they said build a facility in the

2  Everglades, per se, but it was to build a facility, and this

3  was the product of that ask.

4  Q.  Do you know whether FDEM has a 287(g) agreement with the

5  federal government?

6  A.  Based on what I know in that tour, because we asked that

7  question many times, it was very unclear.  One of the

8  discussions myself and Kevin -- and Director Guthrie had, was

9  over the transportation of detainees because he basically told

10 us that it wasn't necessarily a state cost.  And then I

11 countered and said, isn't FHP transporting individuals, and he

12 said FHP is escorting individuals, but the bus, itself, is DHS,

13 is ICE, a federal entity.

14 Q.  What is the total amount of federal funding used to build

15 the facility so far?

16 A.  My understanding is that there is still a debate of this

17 timeline of reimbursement.  So, my understanding is right now

18 it's state dollars being expended with the expectation of

19 reimbursement.

20 Q.  Zero federal dollars so far?

21 A.  I mean, that -- unfortunately, that question was never

22 answered on the tour, and I can only speak to what was provided

23 to me on this tour.

24 Q.  You just stated you are not aware of any more federal

25 funding for this facility as of today?

1    A.  We were told by Director Guthrie that there would be

2    reimbursements but there was just no clarity on what timeline

3    or how.

4    Q.  Now, you testified extensively a few moments ago that you

5    spoke to a number of state officials on the site.

6        Correct?

7    A.  We were accompanied by legislative colleagues and staff of

8    different departments, yes.

9    Q.  Were the state officials in charge of your tour?

10   A.  Kevin -- Director Guthrie was the main facilitator of your

11   tour.

12   Q.  How many state officials did you see overall on this site?

13   A.  May I ask a clarifying question.  Elected officials or

14   staff or both?

15   Q.  Good clarification.  Not the people who were visiting to

16   tour but the people who were there to operate or work at the

17   facility?

18   A.  Okay.  So, Director Guthrie actually made the point that

19   there was more FDEM staff than usual because of the tour.  So,

20   there were at least six or seven different staff members from

21   FDEM that were there.

22       Then there were also a lot of private contractors, folks

23   wearing, like, all black for security, for example.  So, these

24   were individuals that are through some sort of contractual

25   agreement with the private sector.

App. 140

 1       We did see upon arrival National Guard was providing, I

 2   guess, perimeter security, so that was another entity that was

 3   there as well.

 4   Q.  Did state officials choose the specific site for this

 5   detention center?

 6   A.  It's hard for me to answer that question because, again, I

 7   never saw what this e-mail from DHS was.

 8   Q.  Did you know that the site, the TNT facility site was

 9   previously flagged by state officials as a possible staging

10   area for hurricane response?

11       MR. HIAASEN:  Objection.  Lack of foundation, Your

12   Honor.

13       THE COURT:  Overruled.

14       THE WITNESS:  That was shared with us on a tour that

15   this was a site that was in the past potentially used as

16   staging is one of the explanations for why the State was

17   defending its use today.

18   BY MR. PANUCCIO:

19   Q.  And in paragraph ten of your declaration, you testified

20   that Director Guthrie told you that the facility is operating

21   under, quote-unquote, ICE guidelines.

22       Do you remember saying that in your declaration?

23   A.  Yes, I do.

24   Q.  Do you know what those guidelines are?

25   A.  We actually asked him for that clarity as well.

 1          There were several times where -- and this was grounded in
 2     some of our questions around the concerns we have heard about
 3     the environment, about the management of the environment
 4     regarding things like water, food, etcetera.
 5          So, we were told many times that this facility follows all
 6     of the state and federal prison and jail guidelines and that
 7     ICE inspects the facility to ensure it reflects ICE's standards
 8     so that was shared with us many times as we asked many
 9     questions about the management and the structures and the
10     safety of the facility.
11     Q.   As a state legislator with experience in law enforcement
12     policy and detention policy, do you know whether any jail or
13     other facility that is used to hold detainees under a 287(g)
14     agreement has to comply with ICE guidelines?
15     A.   If there is a 287(g) agreement, there is going to be
16     standards established.
17     Q.   For any facility around the state that's used to hold
18     immigration detainees?
19     A.   In that agreement there would be some sort of standards
20     established, and I have visited other facilities that also
21     either they're detaining individuals for ICE and so forth.
22          I will say that I do have -- I wasn't able to ask these
23     questions because the time was limited, but I do have questions
24     about just the construction process and how it intersects with
25     national guidelines, and I just didn't have the time to ask

1    those questions.

2    Q.  Have you ever visited any other facilities in the state

3    where individuals are held under a 287 agreement?

4    A.  I visited the Orange County Jail, yes.

5    Q.  Did it strike you that Orange County Jail was a federal

6    facility?

7    A.  The Orange County Jail facility has a 287(g) agreement and

8    is only detaining individuals for immigration that have no

9    criminal charges because of ICE requiring them to do that.

10   Q.  Is the Orange County Jail a federal facility?

11   A.  The Orange County Jail is a county facility that is

12   following a federal relationship in maintaining these

13   individuals based on federal law.

14   Q.  You testified, this is paragraph 13 of your declaration,

15   you said, essentially, Director Guthrie said emergency services

16   are called to the site at least once a day.

17       Am I reflecting your declaration correctly?

18   A.  Yes, Director Guthrie, again, in anticipation of our

19   questions about medical services and medical needs told us

20   proactively that there are ambulances on location and that it's

21   not uncommon for there to be medical calls, and that it happens

22   at least once a day, if not more.

23       And then he asserted that no one stays overnight.  He was

24   trying to basically address our concerns that were shared by

25   many individuals on the tour about health and safety of

14

1    detainees.

2    Q.   Understood.  He said the ambulances are on site already.

3    They are not coming from somewhere else?

4    A.   What I understand is he told me there is that there is some

5    kind of civil contractor where there is at least two ambulances

6    on the property that are driving in and coming back, is my

7    understanding.

8    Q.   You testified both in your declaration and on direct that

9    you've identified freshly paved or you identified freshly paved

10   roads and new construction on the site.  Correct?

11   A.   Correct.

12   Q.   Do you have any formal training in construction?

13   A.   I have a lot of experience in construction sites in my

14   capacity as a legislator, and I also sought counsel from

15   individuals on the tour who have a lot of experience in this

16   capacity, including Congressman Jared Moskowitz, who was a

17   former FDEM director.

18   Q.   Putting aside legislative experience, you have no

19   educational training or professional experience in

20   construction?

21   A.   Unfortunately, I do not.

22   Q.   Did you know whether any of the land inside this TNT

23   facility, inside the fence line, was previously filled and

24   leveled prior to it being used as a detention facility?

25   A.   So, my understanding is that the parking lot, the new

App. 144

145

1    asphalt may have been gravel prior to being paved with asphalt,

2    but I was also told by a staff member that the roads we were

3    driving on were all new.

4    Q.   Were you told one way or the other whether what was under

5    that road was previously fill material?

6    A.   That was not verified or confirmed by anyone on site.

7    Q.   Did you -- were you told anything about silt fencing on the

8    property?

9    A.   Nothing was told to us, but there was fencing.  I'm not

10   sure, to be honest.  The definition of silt fencing is

11   important to me because there was on the ground almost like a

12   plastic border around where all the new asphalt was.

13   Q.   You mentioned before that you never visited the site before

14   it became a detention facility.  More generally, what do you

15   know about the site before it was converted from an airport to

16   a detention facility?

17   A.   Well, I know there is a long history of activism around the

18   potential construction of an airport, but the area is quite

19   remote as you --

20            THE COURT:  Hold off.  Turn them off.  I'm sorry for

21   the interruption.  Go ahead.

22            Activism associated with the site.

23            THE WITNESS:  Thank you, Your Honor.

24            So, the area is overwhelmingly remote, as you likely

25   know, but prior to the signs changing it was labeled as

App. 145

1    Dade-Collier Training Facility.

2    BY MR. PANUCCIO:

3    Q.   Do you know whether prior to it becoming a detention

4    facility this site was an active airport?

5    A.   Your Honor, I can't say I'm tracking all the flights, but I

6    assume that especially in cases of emergencies that there would

7    be some sort of use of that facility but not to the flight

8    patterns and the traffic patterns we are seeing today.

9        I mean, even just standing at that intersection, the main

10   job of the FHP officer is traffic management because there is a

11   lot of trucks coming in and out of this facility right now.

12   Q.   Have you ever been in the presence of within a few hundred

13   feet of an airplane outside while it's taking off for landing?

14       THE COURT:  If it will move this along, I will take

15   jurisdictional notice that airplanes are really, really loud

16   because I think -- would you agree?

17       THE WITNESS:  Yes, Your Honor.

18       THE COURT:  Okay.  Let's go on.

19   BY MR. PANUCCIO:

20   Q.   Did you ever raise any concerns about the environmental

21   impact of the TNT Site when it was functioning as an airport?

22       MR. HIAASEN:  Object as to beyond the scope of direct,

23   Your Honor.

24       THE COURT:  It is, but I will allow it and then we will

25   be done with this hopefully.

App. 146

1          THE WITNESS:  Thank you, Your Honor.

2          Unfortunately, as you noted earlier, I don't serve this

3  district day-to-day, so if those complaints were made, I assume

4  they were made to their elected official in this area.  But

5  there are complaints made to me about my executive airport

6  that's in my district.  I get many complaints about noise,

7  about noise and a few other types of airport-related issues.  I

8  do have an executive airport in my district.

9  BY MR. PANUCCIO:

10  Q.  So that's a long way of saying no to my question, you

11  haven't raised any concerns prior to this?

12  A.  I have never been told that there were concerns because I

13  don't represent this district.

14          MR. PANUCCIO:  Your Honor, I want to avoid having to

15  cross the witness on this, so I want to move to strike

16  paragraph 12 of Dr. Eskamani.  That is the paragraph in which

17  she is testifying to what she says are inhumane conditions on

18  the site.  It has to do with the treatment of detainees.

19          I think Your Honor has said before, the Court is

20  focused on the NEPA issues.  If we can strike it, then I'm

21  happy not to cross.  Otherwise, I think I need to cross in good

22  faith to my case.

23          MR. HIAASEN:  Your Honor, we think it's relevant to the

24  density of the site and the use of the site.

25          THE COURT:  I agree that the numbers of people out

App. 147

1    there are germane, but anything other than the science and the

2    failure of any study before the site was erected is not for me.

3    It's for others.

4         So, let me -- you will not cross about the

5    representative's thoughts on immigration, and I will take a

6    look at the declaration.  And I will agree to excise anything

7    that goes into conditions as to those persons there.  Although,

8    Representative and others, if you observed anything that had to

9    do with ecosystem and the number of persons, you were talking

10   about water and sewage, that, of course, remains an open

11   question.

12        All right.

13        MR. PANUCCIO:  Okay.  Your Honor, the last set of

14   questions I have, I want to preface this because I expect I may

15   get an objection, but, obviously, one of the things the Court

16   needs to do is balance the equities.  If it's considering a

17   preliminary injunction that is a factor.

18        So, one of the things I want to ask the representative

19   about is the equities for the State and Federal Government.

20        One, do you believe that --

21        MR. HIAASEN:  Your Honor, this is cross.  There was no

22   direct testimony about the equities.

23        THE COURT:  Right.  Plus, I'm not even sure what

24   you're -- whatever balancing, of course, as you say, I will

25   engage inappropriately, but the representative's opinions would

1  be like any other legal opinion which would be inappropriate.

2        MR. PANUCCIO:  Well, Your Honor, if I understand it,

3  the testimony here was, for example, about the lights, is about

4  harm from the lights.  It's trying to establish that there is

5  an equity on their side.

6        I'm just asking if that is the testimony, has the

7  representative considered counterbalancing equities which will

8  be important in what knowledge she has of those based on her

9  tour.

10        THE COURT:  No.  Plus, the lights weren't on when she

11  was there, so she can't tell you about that.  But, no, we

12  aren't going to engage on that, so I will sustain the

13  objection.

14        MR. PANUCCIO:  That's a good additional question, Your

15  Honor.

16  BY MR. PANUCCIO:

17  Q.  I just want to make sure -- those lights you testified to,

18  you didn't see them on because it was the daytime?

19  A.  Correct.  Yes, I said that earlier.

20  Q.  Oh, I'm sorry, I should have asked this at the beginning.

21        Other than your lawyers, who did you speak to to prepare

22  for this testimony?

23  A.  Your Honor, just my lawyer.

24  Q.  Just your personal lawyer?

25  A.  Well, my lawyer is present.  He is my personal lawyer as

```
 1    well for this case.

 2    Q.  You have retained the plaintiffs' lawyers as your personal

 3    lawyer?

 4    A.  I have retained Scott Hiaasen as my lawyer for this, yes,

 5    to prepare.

 6    Q.  You didn't speak to anyone else about your testimony today?

 7    A.  Definitely not.

 8    Q.  Did you speak to any political consultants?

 9    A.  No, definitely not.  I did tell constituents that I would

10    be here because I don't have my phone, so that's a concern for

11    people like me, but besides that, just let them know I was

12    going to be out-of-pocket for a few hours because of being

13    here.

14    Q.  Have you issued any fundraising solicitations based on this

15    detention facility?

16           THE COURT:  Really, do you want to open that up because

17    if we go there, Mr. Panuccio, we go everywhere with merchandise

18    and fundraising, and I don't think that's really what I'm here

19    to talk to all of you about.

20           I know all of you seem to have an idea and a fixation,

21    but I'm going to sustain the objection.  No.

22           Let's just talk about the facility and the ecosystem

23    and be done with it.

24           MR. PANUCCIO:  Thank you, Your Honor.  Just for the

25    record, I'm just impeaching as to credibility and motivation of
```

App. 150

1    the testimony.

2         THE COURT:  Correct, but then we open it up is what I'm

3    telling you, Mr. Panuccio, to all manner of things that are

4    happening with regard to fundraising, and I really don't want

5    to do that.

6         MR. PANUCCIO:  I understand, Your Honor.  I'm not

7    trying to fight.  I just want to say what we had right before

8    this testimony was they're trying to introduce a series of

9    Tweets from politicians, etcetera, so if they're going to come

10   in on one side, I'd like to be able to ask on the other side --

11        THE COURT:  You can ask for social media posts.  I

12   didn't know what I had admitted were fundraising impetus.  I

13   thought it was just as has been discussed on other cases

14   political beings having political discussions with their

15   constituency.  But if those are fundraisers, then I guess we'll

16   have to consider it.

17        MR. HIAASEN:  Your Honor, just to clarify the record,

18   and the declaration speaks to this, Exhibit 44 is screen grabs

19   from government websites.  If they're being used for

20   fundraising, then that's a different issue, but we introduced

21   them as statements of a party opponent who are government

22   defendants using a government website to communicate.

23        THE COURT:  Right.  That's what I'm saying.

24        If there is -- if you're aware of, Mr. Panuccio, the

25   representative's social media feed or something and you want to

1    ask her about comments she made, that's fine.

2    BY MR. PANUCCIO:

3    Q.   Do you have an official government social media feed?

4    A.   No, just personal ones that are managed just by me.

5    Q.   You don't have a Representative Eskamani Twitter?

6    A.   It's @annaforflorida, and then I have another one that's

7    @annaforOrlando, but they're not managed by public staff.  We

8    don't have that much staff in our offices so I manage all our

9    social media.

10   Q.   Do you post any official positions on those sites, on those

11   accounts?

12   A.   I will issue personal viewpoints and statements, yes.

13   Q.   In your official capacity?

14   A.   In my personal viewpoints, yes, but they come directly from

15   -- I mean, I use my Florida House e-mail account to send out

16   press releases that are more formal, but then on social media

17   it's going to have more of a casual feel to it because it's

18   social media.

19   Q.   Okay.  Last question about this.

20        In your capacity as a representative, have you put out any

21   public statements, whether through social media or otherwise,

22   about the facility, the detention facility at the TNT Site?

23   A.   Can you clarify press releases versus just postings?

24   Q.   Either one?

25   A.   Either one.

App. 152

1       Okay.  On press releases, Your Honor, there was an

2   attempted visit that myself and four other lawmakers made about

3   a week prior.  So, there is a colleague that manages press for

4   that.  So, I did not send out those press releases, but she did

5   and they were joint statements made by myself and four other

6   lawmakers.

7       As it pertains specifically to me sending out statements

8   regarding, I mean, this lawsuit, for example, I can't recollect

9   because I just -- I didn't -- first, I think it's really

10  important to try to create objectivity here, so I was never

11  planning to be a witness.  It just happened quite organically,

12  so it's not something that I remember sending out a press

13  release specifically for.

14      But, of course, I have shared a lot of information on

15  social media.  For example, information that loved ones have

16  shared with me about someone who is detained.  Information

17  about the folks who are watching the site outside by images and

18  photos, so I definitely have amplified and shared that type of

19  content, yes.

20  Q.  Last question on this.  You just mentioned you wanted to

21  provide an air of objectivity today in your testimony.  On that

22  question, did you put out a press release where you called this

23  site a half-a-billion-dollar anti-immigrant grift?

24  A.  I don't remember that was a press release, but I can

25  definitely see myself saying that on social media.

1    Q.   Okay.  Let me just check with my colleagues, Your Honor.

2         I believe I'm finished.

3         THE COURT:  All right.

4    BY MR. PANUCCIO:

5    Q.   Last question, are you testifying today in your official

6    capacity as a legislator?

7    A.   I'm testifying as my official capacity as someone who

8    visited the site as a lawmaker, so I would think yes.

9         MR. PANUCCIO:  Thank you very much.  Nothing further.

10        THE COURT:  Any questions?

11        MR. SINGER:  If I could --

12        THE COURT:  You aren't --

13        MR. SINGER:  I'm not formally admitted yet.  I have put

14   in the papers.  I have the training.  I'm waiting for the user

15   name and password, but I did get the temporary number for ECF

16   for me.

17        THE COURT:  Okay.

18        MR. SINGER:  But I will defer to Your Honor whether

19   that is sufficient.

20        THE COURT:  No, no, I trust that you've done it and

21   hopefully it will manifest soon.

22        MR. SINGER:  I do not intend to file any ECF notices on

23   the stand so hopefully we will not put that training to the

24   test.

25        THE COURT:  Well, it just has to do with your actually

App. 154

1    being officially appearing on this case, but go ahead.

2            MR. SINGER:  I will file a notice of appearance.

3            THE COURT:  There is a button that makes --

4            MR. SINGER:  Oh, the podium.

5                    CROSS-EXAMINATION

6    BY MR. SINGER:

7    Q.  Good morning still.

8        Just a couple of questions.  I'd like to focus on that

9    testimony of what Director Guthrie talked with you when you

10   were on your site visit to the TNT Site?

11   A.  Your Honor, can he just remind me who he is again, sorry?

12   Q.  I'm sorry?

13           THE COURT:  Could you introduce yourself to the

14   representative?

15   BY MR. SINGER:

16   Q.  Oh, of course.  My name is Frank Singer.  I am a trial

17   attorney with the United States Justice Department out of

18   Washington, DC.

19   A.  Okay.

20   Q.  I just got installed Invisalign so I may slur my speech a

21   little because I'm trying to get used to it, and I apologize,

22   and to the court reporter as well.  But I will try to enunciate

23   my Ss as carefully as I can.

24   A.  They're worth it.  Don't worry.

25   Q.  I'd like to focus a little bit on your discussion of what

```
1    Director Guthrie told you on your site visit.

2    A.  Okay.

3    Q.  My understanding from your testimony is that Director

4    Guthrie told you that DHS told Florida that a detention

5    facility was needed?

6    A.  Yes, that is what we were told.  Correct.

7    Q.  Not specifically that a detention center at the TNT Site

8    was required.  Is that fair?

9    A.  I would say that is fair.  We never -- that specificity was

10   not provided.

11   Q.  Very good.

12        Now, you filed a declaration in this lawsuit.  Correct?

13   A.  Correct.

14   Q.  Did you, yourself, write that declaration?

15   A.  I had the support of my legal counsel to do that.

16   Q.  And then you read it and signed it at the end?

17   A.  That's correct.

18   Q.  Let's go ahead and pull up that declaration.

19        We are going to put the focus right there on paragraph ten

20   to start with.  First of all, we can scroll down to the bottom.

21        Do you recognize the document that's shown on the screen in

22   front of you?

23   A.  Yes, I do.

24   Q.  Do you want to see your signature at the bottom or you are

25   comfortable proceeding?
```

App. 156

1    A.    I'm comfortable proceeding.

2    Q.    Very good.  Focusing on that paragraph ten, it reads,

3    "Director Guthrie stated on more than one occasion that

4    construction of the facility was requested by the Federal

5    Department of Homeland Security, DHS."

6         Do you see that first sentence?

7    A.    I do.

8    Q.    Would it be more fair to say that construction of "a"

9    facility was requested?

10   A.    I think just based on what I can recollect that would be

11   fair.

12   Q.    Okay.  And if we scroll down to paragraph 14, we have a

13   similar statement, "We were told many times that DHS requested

14   that 'this' facility be built."

15        It would be more fair to say that "a" facility would be

16   built.  Is that right?

17   A.    I would agree.  The only addendum I would add is there was

18   a deep sense of pride in this facility.  So, Director Guthrie

19   referenced this facility, because he was speaking there.  So, I

20   don't want to misinterpret his words, and if I can provide

21   clarity to Her Honor on how I recollected this affidavit.  As

22   soon as I -- of course, during the site visit I took notes,

23   meticulous notes, as much as I could.

24        And then I also recorded for myself a voice memo when I

25   left the facility of what I retained, and then that's what

1    converted into notes, and notes are what converted to an

2    affidavit.  So, I did my best to be as accurate as possible,

3    but to your point, and to the earlier discussion, I don't

4    want -- I never got a copy of this e-mail.  So, it is hard for

5    me to assert that the DHS said build something in the

6    Everglades.

7        But what I do know is that DHS, based on what Director

8    Guthrie told me requested that Florida build a facility and

9    this was the facility they decided to build.

10   Q.  So, to my question on 14, the answer is, yes, the term

11   "this facility" would be better substituted with "a facility."

12   Correct?

13   A.  Your Honor, I think that's fair because I can't -- I don't

14   want to speak out of turn.

15       THE COURT:  Also, now, just to be clear, you've

16   admitted Plaintiffs' Exhibit 19, the declaration, and I will

17   admit it, but I will also excise that one sentence that

18   Mr. Panuccio was concerned about.

19       (Plaintiffs' Exhibit 19 was admitted in evidence.)

20   BY MR. SINGER:

21   Q.  Very good.

22       We can take down the declaration and speak more broadly

23   about the communications with Director Guthrie at your site

24   visit, if we could.

25       Do you know when DHS had a discussion with Florida about

1    the need for a facility?

2    A.   Your Honor, we made that request for communication.  The

3    tour was July 12th.  This facility opened up, if I remember

4    correctly, July 2nd, 3rd, and it was built in about eight days

5    with this type of infrastructure of tents and flooring and so

6    forth.  So, unfortunately, I'm not going to have that

7    information.  I wasn't cc'd on that e-mail, but I have

8    requested a copy of that e-mail so I can't get that clarity.

9    Q.   So the answer to my question is you don't know when DHS

10   purportedly told Florida for the need for a facility.

11       Is that right?

12   A.   Director Guthrie never gave us the specifics, and he said

13   he would give us a copy of that e-mail because many of us

14   requested it.  We have yet to see it.

15   Q.   You don't know.  Correct?

16   A.   I'm not privy to that information.

17   Q.   And you've referenced an e-mail.  You weren't privy to this

18   e-mail.  Correct?

19   A.   Correct.  I wish I was, but I wasn't.

20   Q.   Did Director Guthrie specifically state e-mail in his

21   communication or did he say that it was relayed to him?

22   A.   E-mail.

23   Q.   He said e-mail?

24   A.   Right.

25   Q.   Did he say who the sender of the e-mail was?

App. 159

1    A.   He referred to it as DHS.

2    Q.   No individual, though?

3    A.   No, he was not very forward with information, and I will

4    tell you, Counsel, that unless I asked a very specific question

5    I wouldn't get a direct answer, much like this, I'm sure.  So,

6    it was very frustrating at times in that experience.

7    Q.   Okay.  So, you don't know and you weren't told who from DHS

8    might have sent the e-mail.  Is that fair?

9    A.   He would not give us specifics.

10   Q.   And do you know who the recipient was of this e-mail?

11   A.   Based on what Director Guthrie told us, it was FDEM, and

12   that would include Director Guthrie.

13   Q.   Did he say he received directly the e-mail, or no?

14   A.   He spoke in the royal we, so he said DHS contacted us.

15   Q.   That's what I'm trying to understand.

16        Did Director Guthrie say I received an e-mail from DHS or

17   did he say my department received an e-mail from DHS?

18   A.   He --

19   Q.   Or was it not clarified?

20        MR. HIAASEN:  Asked and answered, Your Honor.

21        THE COURT:  Why do we -- I mean, do we think it

22   happened without him knowing?  I mean, why is that --

23        MR. SINGER:  Well, because I'm trying to see how many

24   levels of hearsay we are dealing with, Your Honor.

25        THE COURT:  I know how you can.

App. 160

1          MR. SINGER:  Please.

2          THE COURT:  We can get the e-mail, all of us.

3          MR. SINGER:  Okay.

4          THE COURT:  I mean, that's simply the way to do it, but

5    it certainly isn't -- the director knew about it, so I don't

6    know why we, us.  I really think it's -- let's move onto a

7    different area that the representative can be valuable in

8    telling us what she saw or who talked to her.

9    BY MR. SINGER:

10   Q.  Okay.

11       Are you aware of any communication from anyone at DHS to

12   anyone at Florida specifically directing the opening of a

13   detention facility at the TNT Site?

14   A.  So, Your Honor, I've made many records request about this

15   point, including contractual agreements with the federal

16   government, but none of those requests have been fulfilled

17   despite making them at this point nearly 30 days ago.

18   Q.  So the answer is no, you're not aware of such

19   communication?

20   A.  I have made that request.  They have not been shared with

21   me.

22   Q.  I'm not asking you whether you made request for

23   communications.  I'm asking whether you are aware of

24   communication.

25   A.  I'm aware of communications based on Director Guthrie

1  saying there were communications to me and a large group of

2  other dignitaries, but I do not have a copy of that

3  communication, so I don't know timeline.

4  Q.  I think we're missing it again, because your communication

5  with Director Guthrie were about "a facility."  Correct?

6  A.  As we discussed, he was referring to the Everglades as "the

7  facility," but never clarified the specifics of the e-mail.

8  Q.  All right.  I'm asking whether you're aware of a specific

9  communication from DHS to a Floridian official directing the

10  opening of the facility on the TNT Site?

11  A.  I can't speculate on that.  I don't have that information,

12  but, I mean, based on Director Guthrie, they saw this site as

13  ideal for what DHS was requesting.  That's what I know.

14  Q.  You talked about the asphalt and the overhead lighting as

15  well.  Correct?

16  A.  Correct.

17  Q.  And I thought I heard you say perhaps on the cross, prior

18  cross, you personally did not visit the TNT Site prior to June

19  of 2025.  Correct?

20  A.  Correct.

21  Q.  So, when you testified --

22  A.  I think it was July, but correct.

23  Q.  So, when you testified that the new asphalt and the Sunbelt

24  lights, do you know when those were installed?

25  A.  Your Honor, if I may, I've seen the contracts of asphalt

App. 162

33

1    expenses.  I think it was upwards of $22 million in asphalt

2    contract specific to TNT Site, and I've also seen a contract

3    for fencing unique to the TNT Site.  That's information that

4    also affirmed what I witnessed.

5         THE COURT:  But the question is, when you reviewed

6    those documents, did it tell you when they were requested and

7    when they were performed?

8         MR. SINGER:  Thank you, Your Honor.

9         THE WITNESS:  Thank you, Your Honor, for the clarity.

10        They're recent contracts, so they were issued in June

11   or July, very recent.

12   BY MR. SINGER:

13   Q.  Was DHS a party to those contracts that you reviewed?

14   A.  These contracts are on the -- or they were on the Facts and

15   Flare website, which is with the State of Florida.

16   Q.  And the Sunbelt lights -- is Sunbelt the company that

17   leases equipment?

18   A.  Your Honor, my understanding is that Sunbelt is a company

19   that does lease equipment, but based on the nature of

20   contractors and subcontractors, I would assume that there is a

21   contractor that is subbing, subbing, subbing, subbing, but just

22   the brand and name was Sunbelt.

23        Does that mean Sunbelt was directly involved, it's hard for

24   me to speculate on that.

25   Q.  But you don't know who might have leased the Sunbelt

App. 163

1  equipment that you observed.  Is that fair?

2  A.  I know that there are several large contractors who sub out

3  but, unfortunately, despite me asking Director Guthrie for

4  these specifics, that information has not been provided to me.

5  Q.  So the answer is you don't know.  Correct?

6  A.  All I can say is that there are Sunbelt lights that are

7  peppered across the facility but the money stream, if you will,

8  is hard for me to speculate on, because I don't have those

9  specifics.

10  Q.  No, I understand.  The money stream is hard, and the who

11  ordered it is hard.  Correct?

12  A.  I mean, I don't want to make assumptions on who ordered it.

13  If it's State or Fed, I don't want to make assumptions on that,

14  but what I did see are Sunbelt lights that were there.

15  Q.  Right.  And you certainly can't testify that the Federal

16  Government arranged that those Sunbelt lights be brought on

17  site.  Correct?

18  A.  Absence of evidence is --

19  Q.  I'll move as nonresponsive on that, Your Honor, and

20  argumentative from the witness.

21        THE COURT:  Well --

22        THE COURT STENOGRAPHER:  I couldn't get it because it

23  was too fast.

24        THE COURT:  I know.  That's what I was going to say,

25  and I'm just going to ask you to move on to the next.

1      Since our intrepid court reporter couldn't get it

2   because you two are speaking so quickly, just move on to the

3   next series of questions.

4      MR. SINGER:  That was actually my last question, Your

5   Honor, so the objection is overruled?

6      THE COURT:  It won't be part of the record because we

7   didn't get it, and my memory is not that good so don't worry

8   about it.

9      MR. SINGER:  That is good.  I will rest easy tonight.

10      Thank you, Your Honor, and thank you.

11      THE WITNESS:  Thank you, Counsel.

12      THE COURT:  Redirect.

13      MR. HIAASEN:  Thank you, Your Honor.  I will be very,

14   very brief.

15                    REDIRECT EXAMINATION

16   BY MR. HIAASEN:

17   Q.  Ms. Eskamani, you were asked on cross-examination, I

18   believe Mr. Panuccio asked you about if you had any knowledge

19   about a 287(g) agreement with Florida Department of Emergency

20   Management.

21      Do you recall those questions?

22   A.  I do, Counsel.

23   Q.  And I believe you testified that you have been asking for

24   information from FDEM.  Is that correct?

25   A.  Correct, Counsel, and we asked questions on location about

App. 165

136

1    the tour about this as well.

2    Q.  Can you clarify what you meant by that?  I'm not quite sure

3    what you mean?

4    A.  During the tour -- so, I never had an opportunity to

5    explain the locations we visited, so this might feel out of

6    context, but near the end of the scheduled tour we visited what

7    was a new tent that was just constructed with eight cages

8    inside, 32 beds per cage, three metal toilets per cage so this

9    was an empty tent that we were allowed to walk through.  And it

10   was in this environment where we had another Q and A session

11   with Director Guthrie.

12        So, we were trying to better understand the relationship

13   with the federal government on this facility, especially as it

14   pertains to a 287(g) agreement because my understanding is that

15   287(g) agreements are typically with law enforcement, not

16   necessarily an emergency management entity.

17        So, there was a back and forth in us trying to get clarity

18   on what contracts were signed with DHS, what does this

19   agreement look like.  So, we had that conversation.  It didn't

20   lead to a lot of clear answers, but we had that conversation on

21   the tour alongside other dignitaries.

22   Q.  What is your recollection of what Mr. Guthrie did say about

23   whether or not there is a 287(g) agreement between his

24   department or any other state department with the federal

25   government?

1  A.  My recollection is that law enforcement, like FHP and FDLE

2  and law enforcement of FWC, for example, have 287(g) agreements

3  and due to the fact they are state law enforcement agencies,

4  they have a hundred percent compliance with their officers.

5       And as it pertained to FDEM, it was very unclear, but based

6  on what we were told at this time, there was not a 287(g)

7  agreement with FDEM that it was somehow through FHP that they

8  were managing this.

9       I mean, honestly, it was very unclear.  It's a question I

10  don't know the answer to.

11       MR. GUSTAFSON:  Your Honor, I would just object on

12  hearsay grounds again.  She said she was told, but we don't

13  know who told her.

14       MR. HIAASEN:  I was about to follow up on that, Your

15  Honor.

16       THE COURT:  Okay.  Let's see what Mr. Hiaasen says.

17  BY MR. HIAASEN:

18  Q.  Just so I'm clear, when you say you were told that FDEM

19  didn't have a 287(g) agreement, who exactly would have told you

20  that?

21  A.  There was Director Guthrie, and to provide more clarity to

22  this, Your Honor, Kevin Guthrie accompanied us for the entire

23  tour, and then he also offered to make himself available post

24  tour for additional questions.  Unfortunately, it started to

25  rain and that opportunity never presented itself for additional

1    questions, but the majority of my recollections are based on

2    the conversations that we were having with Director Guthrie in

3    the public setting, if you will, of him talking on the

4    microphone to the group of those in the tour and the staff that

5    accompanied him.  And then also occasionally while we're

6    walking trying to ask him questions in front of others but the

7    questions coming directly from me to him.  But he was present

8    the entire tour.

9    Q.  Just to clarify, you testified a second ago that there was

10   an reference to the 287(g) agreement with the Florida Highway

11   Patrol.  Again, was that something Mr. Guthrie specifically

12   said?

13   A.  Correct, yes.

14   Q.  You testified -- and I don't want to dwell on it, but you

15   sought records from FDEM.  Correct?

16   A.  Yes, I've made several requests of the department and no

17   D-O-C.

18   Q.  Has FDEM provided you with any 287(g) agreement either with

19   FDEM and any other state entity in response to your request?

20   A.  Counsel, and Your Honor, I have yet to receive any beyond

21   just the acknowledgment e-mail then that's not even consistent

22   across all my requests, I have not received any results of any

23   of my public records request at this time.

24        MR. HIAASEN:  I have no more questions, Your Honor.

25        THE COURT:  All right.  Thank you, Representative.  You

1    may step down.

2            THE WITNESS:  Thank you, Your Honor.

3            THE COURT:  My understanding, Mr. Schwiep, is that we

4    have a 1 o'clock witness scheduled for our Zoom, so it would

5    probably be best if we broke for lunch and then started again

6    with that Zoom witness.

7            MR. SCHWIEP:  As you wish, Your Honor.  We have another

8    witness that we can call now before the 1:00 p.m. witness, but

9    I suspect his testimony on direct will be between 45 minutes to

10   an hour.

11           THE COURT:  No.  No, no, we're going to break for lunch

12   and then we will see that gentleman this afternoon.

13           All right, everyone --

14           MR. HIAASEN:  Just a point of clarification.

15           The witness who is available at 1 o'clock is available

16   the rest of the day, so it's not as if she has to testify at

17   1:00.  It's that her availability starts at 1:00.

18           THE COURT:  Well, I'm happy to proceed the way the

19   parties wish.

20           I need to know, though, when because we need to set up.

21   So, right now I have 1 o'clock.  If you rather do it another

22   time, make that decision and let me know but we can't --

23   contrary to popular belief, we can't just push a button and

24   have it happen.

25           MR. SCHWIEP:  What's the Court's pleasure to the length

1    of a lunch break?

2         THE COURT:  An hour.

3         MR. SCHWIEP:  Okay.  We can have the Zoom witness keyed

4    up and ready to go at 1:00 or 1:10.

5         THE COURT:  Okay.  It's ten after.  Let's all resume

6    and maybe you could text your witness and say, we are going to

7    be ten minutes late, but we will be back at ten after 1:00 to

8    have that witness.

9         MR. SCHWIEP:  Thank you, Your Honor.

10        THE COURT:  All right.  I'll see everybody back at ten

11   after 1:00.

12        COURTROOM DEPUTY:  All rise.

13        (Lunch Recess.)

14        THE COURT:  A reminder.  After the caffeine at lunch,

15   speak slowly, speak into the microphone, and this is such an

16   odd view.

17        I think Mr. Santorufo needs to let everybody into the

18   room.

19        MR. SCHWIEP:  One quick housekeeping matter, Your

20   Honor.

21        Plaintiffs' Exhibit 1, which is the declaration of the

22   examples, I think we have the stipulation that that should be

23   admitted.

24        THE COURT:  Okay.  Thank you so much.

25        Good afternoon, ma'am.  Counsel, if you can call your

1    next witness.

2              MS. BURKHARDT:  Yes, Your Honor, at this time the

3    plaintiffs call Amber Crooks.  Just because of the situation

4    remotely, I will be asking questions from the table.

5              THE COURT:  Yes, I think that's best.

6              I think it's best if cross-examination is taken at the

7    table as well.  You will notice that it's hard, especially for

8    our taller counsel, to be speaking into the microphone, so

9    everyone stay seated as you do this.

10             Ma'am, please raise your right hand to be sworn as a

11   witness.

12             COURTROOM DEPUTY:  Thank you.

13             (The witness, Amber Crooks, was duly sworn.)

14             State your full name for the record.

15             THE WITNESS:  Yes, it's Amber Crooks.

16             THE COURT:  And you may proceed, Counsel.

17             MS. BURKHARDT:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19   BY MS. BURKHARDT:

20   Q.  Good afternoon, Ms. Crooks.  Are you a member of the Center

21   for Biological Diversity?

22   A.  Yes, I'm a member of the Center.  I was a member since

23   around 2017.

24   Q.  Why did you become a member of the Center?

25   A.  Yeah, I became a member of the Center for Biological

App. 171

1   Diversity for a number of reasons.

2       I had seen for many years their upending spectacular work,

3   their impressive work protecting all of the listed species and

4   all the wild places, particularly in Florida, and specifically

5   in my region, Southwest Florida, I had seen work that they done

6   to protect Big Cypress from oil exploration and drilling, and I

7   had seen the work they have done to protect panther habitat in

8   that region, as well as the lands adjacent to Big Cypress.

9       It was around the last, say, five to ten years, where I

10  really tried to not only in my local community do more as far

11  as volunteering, becoming a member of my local community

12  preserves, but also to become members of national groups like

13  the Center.

14  Q.   Thank you, Ms. Crooks.

15      So, how do you participate as a member in the Center's

16  activities?

17  A.   Yeah, there would be a number of things that I would do.

18  The things that come to mind would be their actual alerts.  I

19  receive their actual alerts in my e-mail.  I'm faithful for

20  when I do get those actual alerts to take action, especially if

21  the actual alert is pertaining to Florida matters or South

22  Florida matters.

23      I do receive their newsletter as well on a regular basis,

24  so when that is in my mailbox, I'm flipping through that,

25  reading the articles.

1      I have seen comment letters that they've done or social

2  media posts as well from the Center, so I'll be, you know,

3  staying tuned into what they're doing through those outlets.

4  Q.   And you mentioned that you joined because of the work the

5  Center is doing on behalf of wildlife or species.

6      Can you name some of the species that you are personally

7  interested in?

8  A.   Yeah, sure.

9      Yeah, near and dear to my heart would be Florida panther

10  from day one, but one of the reasons I also like the Center's

11  work is because they are kind of not just looking out for the

12  charismatic species but also species that maybe not everybody

13  has heard of.  So, I was really impressed with the work that

14  they were doing for protection of the Florid bonneted bat,

15  trying to establish critical habitat.  That would be another

16  one.

17      I also, personally, when I'm out recreating, I'm trying to

18  do wildlife photography, plant photography, and I'd be looking

19  for any unusual birds, caracara, snail kite, wood stork,

20  perhaps an interesting, you know, migratory song bird, just

21  kind of run the gamut of the wildlife here in South Florida.

22  Q.   Can you share with us about your educational background?

23  A.   Sure.

24      I got my Bachelor's in Political Science from Stetson

25  University.  I graduated there in 2003, and then I went on to

44

1    get my master's degree from Florida Gulf Coast University, and

2    that was a Master's of Public Administration and the

3    concentration was environmental policy and planning, and that

4    was in -- I graduated with that in 2011.

5    Q.   Thank you.

6         What do you do for a living?

7    A.   Yeah, I work for a regional nonprofit environmental

8    organization, and I worked with that organization I think going

9    on 18 years now.

10   Q.   Does your role with that organization involve Big Cypress

11   National Preserve?

12   A.   Yes, it has, and it continues to.  You know, wearing that

13   professional hat, I have become familiar with Big Cypress and

14   all the resources there within the Preserve and in the

15   watershed at large, and some of that work also entails

16   protection of the Big Cypress from inappropriate oil

17   exploration and drilling, amongst other things.

18   Q.   And I know you are here today in your personal capacity,

19   but briefly, if I may ask, does your role also involve

20   protecting wildlife within Big Cypress?

21        MR. COSTELLO:  Objection, Your Honor.  Outside the

22   scope of this witnesses's testimony.  She's not testifying

23   today as the representative of the Center.  She's testifying as

24   a lay witness.

25        THE COURT:  Right.

1            I thought -- clarify that for me, Counsel.

2            I thought Ms. Crooks said she worked for a nonprofit

3    environmental group.

4            What is your could question focused on, Counsel?

5            MS. BURKHARDT:  Yes, Your Honor, my question goes to

6    her briefly laying her background, introducing how her role

7    might involve wildlife within Big Cypress.

8            THE COURT:  Her role in her professional life or her

9    role as a member of the Center?

10           MS. BURKHARDT:  In her professional life.  It's really

11   for background purposes.

12           THE COURT:  Let's rephrase it.

13           If you would, Ms. Crooks, tell us what your

14   responsibilities are at the nonprofit you work for.

15           THE WITNESS:  Yes, with the nonprofit I do work in the

16   advocacy and outreach realm.  That work could pertain to

17   anything from wetland protection to listed species protections.

18   So, we have focused a lot on Florida panthers amongst other

19   wildlife.  It could pertain to local land use planning,

20   transportation planning, and things of that nature, if that

21   helps.

22   BY MS. BURKHARDT:

23   Q.  Last question on this, approximately how long have you been

24   in your role at the nonprofit where you work?

25   A.  Yes, I just celebrated my 18th year anniversary.

1    Q.   Have you engaged in any volunteer activities related to

2    environmental conservation?

3    A.   Oh, yeah.  Oh, yeah.  A couple of things come to my mind.

4    I did spend ten years volunteering with the Friends of the

5    Panther Refuge.  That is, again, a nonprofit organization where

6    the focus is to support the Panther National Wildlife Refuge.

7        I volunteered as a refuge volunteer, and also as a board

8    member and volunteered for the Friends for about ten years, as

9    it was, and that's just to support the importance of the

10   refuge, the species that are there, supporting the refuge staff

11   to conduct some of the science-based research that they're

12   doing on the refuge, and that refuge is a property that's

13   adjacent to the Big Cypress.

14       Other things that do come to my mind as well would be some

15   field volunteering, trying to eradicate some of the invasive

16   species that are in the area.  So, just maybe last year it was

17   there was a special workday to try to deal with invasive

18   papyrus, papyrus invasive plants down the street from the TNT

19   detention center at the Clyde Butcher Swamp.  That was a

20   volunteering experience that was hosted by the Florida Native

21   Plant Society, so it's been a number of those things in my

22   recent memory.

23   Q.   Thank you.

24       Do you visit Big Cypress National Preserve to recreate?

25   A.   Yes.

App. 176

1  Q.  Where have you visited and what are some of the things you

2  do when you do visit?

3         MR. COSTELLO:  Objection.  Compound question.

4         THE COURT:  Hold on.  Hold on, and use your microphone.

5         MR. COSTELLO:  I'm sorry.  I pressed the microphone.

6         THE COURT:  That's okay.

7         MR. COSTELLO:  Objection.  Compound question, two

8  questions there.

9         THE COURT:  Okay.  Let's go ahead and break it down

10  there.

11  BY MS. BURKHARDT:

12  Q.  Ms. Crooks, can you tell us some of the locations where you

13  visited in Big Cypress?

14  A.  Okay.  Yeah, you know, my personal interest is to try to go

15  to as many places within the Preserve as possible, so I have

16  tried to go into pretty much every one of the major access

17  points.  Things that come to my memory as sort of significant

18  visits or maybe even some recent visits would be places like

19  the 11 Mile Road area, which is just down the road from the TNT

20  detention center.

21      I want to say it's maybe a mile-and-a-half or maybe two

22  miles to the west, and that comes to mind because that might

23  have been my very first visit to the Preserve.  It was maybe

24  about 20 years ago, but as a budding young professional,

25  someone who is getting interested in conservation here in

1    Southwest Florida, I had a special opportunity to go into the

2    Big Cypress there at that location and participate in a

3    citizens science field trip where they provided us telemetry

4    science equipment and they let us kind of look for these

5    imperilled Big Cypress fox squirrel that's there.

6        In that area, there is also Florida bonneted bat now being

7    recorded and R.C.W., a endangered red-cockaded woodpecker, in

8    cavity trees in that same area of the Preserve.  And I just

9    kind of have like a foundational memory of exploring the swamp

10    that day, kind of getting lost in Cypress dome, you know,

11    coming eye-to-eye with an owl and just being really at peace.

12    And that was really a foundational memory of mine that then

13    kind of inspired for future visits to the Preserve and future

14    visits to adjacent properties as well.

15        The other locations that's come to mind to answer your

16    question, would be a visit that I just had about a month ago

17    and that was to the Loop Road scenic drive.  This is a 24-mile

18    scenic ride that you start in Collier County, and you kind of

19    start on this rugged unpaved road, and as you make your way

20    through the Preserve, you are exiting onto U.S. 41.

21        I think it's probably maybe less than ten miles from the

22    TNT detention center to the east, so then we will drive back on

23    U.S. 41.  And whether we are on the scenic drive or U.S. 41,

24    we're always looking for wildlife as we go through the Preserve

25    and all the surrounding environmentally sensitive lands.

1   Q.   Thank you.

2   A.   I could go on.  I have many stories and memories of the

3   Preserve so.

4        THE COURT:  No.  No, no.  Let's wait for a question.

5   BY MS. BURKHARDT:

6   Q.   Thank you, Ms. Crooks.

7        Ms. Crooks, aside from 11 Mile Road area that you said was

8   a mile-and-a-half from the TNT Site, and then Loop Road about

9   ten miles from the site, are there any other locations you

10  visited and recreated that are near the TNT Site?

11  A.   So, there is other sites that come to mind.

12       You know, to the west of that site there is the Monument

13  Lake Campground.  That is where I've camped before.  I have

14  fond memories with friends camping in that spot and, of course,

15  once the sun goes down, you're looking to the skies for the

16  stars.

17       At that same location in a subsequent year, I also had

18  another special opportunity to go out at dusk to some of the

19  back-country areas that are to the north of Monument Lake, and

20  it was a special experience to be able to, again, observe the

21  red-cockaded woodpecker, and then I just distinctly remember,

22  if that wasn't cool enough, that once the sun went down, we

23  were kind of traveling back to get to the vehicles and to head

24  on home that you're there in the wonders of Big Cypress and

25  you're seeing the spectacular skies above you.

App. 179

150

1        So, I do distinctly remember that, and a lot of fireflies

2   as well that day.

3        I have hiked out of the Oasis Visitor's Center, which I

4   think that might be less than ten miles away from the TNT

5   detention center site.  I've done a number of hikes and visits

6   out of there, and those are the ones that primarily come to

7   mind.

8        I mean, we visited -- me and my friends visited the Shark

9   Valley so many times as well, which I know is not necessarily,

10  you know, within the Preserve but close to the detention center

11  site to the east about ten miles, and I can tell you more about

12  that as well.

13  Q.  Can you tell us what county the Shark Valley location is?

14  A.  Yeah, Shark Valley, I believe it's in Miami-Dade County.

15  Q.  And then with Loop Road --

16  A.  It's part of Everglades National Park, that one.

17  Q.  Do you know what county Loop Road goes through?

18  A.  Yes, it starts in Collier County, and then as you are going

19  those 24 miles, I do believe it then takes you into Monroe

20  County, and then when you exit, I believe you are far enough

21  east where you are then in Miami-Dade County as well, so I

22  believe it then goes --

23        THE COURT:  Okay.  Someone, if you have a cell phone

24  and it's on and it's near the mic, turn it off and take it away

25  from --

App. 180

1          THE WITNESS:  Mine?

2          THE COURT:  No, Ms. Crooks, not you.

3          I'm talking about the people in the courtroom.  You're

4    doing fine.

5          Mr. Santorufo, if it continues we will need to take a

6    break to identify the exact culprit, but let's hope that

7    doesn't happen again.

8          It's not you.

9          All right.  I don't know what the last question was

10   because my head was --

11   BY MS. BURKHARDT:

12   Q.  My question was, Ms. Crooks, if you could state the

13   counties that Loop Road travels to?

14   A.  Yes, I think I was saying that -- at least the path, the

15   way that we went, we started in Collier.  Of course, you could

16   do the reverse, but we started in Collier County, and as you

17   make your way 24 miles of the scenic drive, it does pass

18   through Monroe County.  And if you go far enough east, where I

19   think you are in Miami-Dade County, and then we traverse back

20   to the west again into Collier County.

21   Q.  Thank you.

22          Can you tell us about the dark skies of Big Cypress?

23   A.  Yeah, that was -- that, to me, is one of the most special

24   places -- and it's hard to limit it down to that one because,

25   obviously, I go there to recreate and canoe, kayak, camp, you

1    know, do wildlife photography and the whole gamut.  But the

2    star gazing and the astronomy programs that we've participated

3    in, me and my friends, you know, that was a constant draw to

4    the Preserve and the surrounding lands.

5        I think we probably visited the ranger-held astronomy

6    programs three, four, five times.  I know that we also went out

7    there to stargaze on our own, and then, of course, during the

8    camping experience, I would also look -- and any time I was out

9    there at night look to the stars because the Big Cypress is the

10   darkest skies east of the Mississippi.  You know, I've heard

11   rangers speak to that in presentations.

12       I do know that it's a designated dark sky spot, and I think

13   there may be only just 200 of those types of designations.  So,

14   it's a significant aspect of why Big Cypress is special.  In

15   fact, in my office I have a poster of the Big Cypress and it

16   says half the park is after dark.

17       So, for all the reasons that we go there during the day and

18   hike and look for wildlife, do photography, half of that it is

19   true, I think half of that experience of why we can

20   aesthetically appreciate the Big Cypress is actually because of

21   the stars and the dark skies.

22   Q.  Thank you.

23       Have you gone stargazing at any locations in Big Cypress

24   near the TNT Site?

25   A.  I think that the closest one that comes to memory would be

App. 182

1    during the camping experience at Monument Lake.  The other

2    experience that would be a little close would be actually

3    technically in the Everglades National Park there at Shark

4    Valley, if it's okay to speak to that.

5    Q.  Well, approximately, how many miles is Monument Lake from

6    the TNT Site, if you know?

7    A.  I think it's between like maybe around 10 or 11 miles to

8    the west.

9    Q.  Approximately, how far from the TNT Site is Shark Valley?

10   A.  Yeah, I think that's also about ten miles.

11   Q.  How many times, approximately, have you recreated in Big

12   Cypress in the past five years or so?

13   A.  Okay.  Well, you know, just in the last year or two I

14   can -- at least a half a dozen within the Big Cypress, and then

15   if I'm including like the panther refuge or the Fakahatchee or

16   Shark Valley at Everglades National Park and sort of adjacent

17   properties, that might be another half dozen, but that's just

18   in the last two years.

19       If I start thinking a little bit more of within the last

20   five years, I can easily double that or triple that, but I

21   don't know that I have a specific number for you, but we do,

22   you know, try to go out there regularly and that's usually

23   about once a season to do some sort of activity within the

24   Preserve.

25   Q.  Thank you.

App. 183

1    And approximately how many times have you recreated in the

2    Everglades National Park within the past five years or so?

3    A.  Okay.  Yeah, I'm thinking mostly it's been at Shark Valley,

4    which is probably the closest site to the TNT detention center.

5    I definitely have explored other parts of Everglades National

6    Park but have gone to do the Shark Valley bicycle ride, which

7    is a 14-mile loop, oh, probably, two, three, four, five times.

8    In the past, you know, five years, I probably have gone to

9    the Shark Valley site maybe about three times, I'm guessing.

10   Q.  Do you intend to go back to the locations that you visited

11   in Big Cypress in the future?

12   A.  Yeah, I would like to go back.  Typically, in the fall and

13   winter they hold the astronomy programs.  So, I know this last

14   season I didn't make it because they got kind of clouded out or

15   rained out, so I was looking, you know, hoping to attend but

16   the weather got in the way.  So, it's definitely on the list

17   for me to attend this next season, this fall or winter, so that

18   would be up there on the bucket list for me, and some other

19   spots as well within the Big Cypress.

20   One of the kind of places that I have not yet been to and I

21   really would like to go and I'm planning to the next time we go

22   camping would be the Midway Campground, and that is on U.S. 41.

23   And I think it's kind of between Monument Lake and the TNT

24   Site.  I don't know the exact mileage, but I would fathom a

25   guess of maybe about six or seven miles to the west for that

185

1    particular campsite.

2    Q.   So, you intend to go back to sites that are also near the

3    TNT Site that you previously mentioned?

4    A.   Yes.

5    Q.   Do you intend to go back to Everglades National Park to

6    recreate?

7    A.   Yes.  You know, one experience that I had that I hope to do

8    again, would be great to do it this winter, if I could, would

9    be the moonlight-guided bicycle trek.  So, in the past I've

10   been able to do these pretty awesome Shark Valley bicycle loop,

11   which I mentioned I have done during the day multiple times,

12   times, two, three, four, five times but there was one

13   experience that I had where they hosted it at dusk and you were

14   still kind of out there bicycling long after the sun had gone

15   down.  And you can't really see too far ahead of you, it's so

16   dark, but you are still kind of looking up to the stars anyway

17   as you are bicycling, and so I think that would be neat to do

18   again.

19   Q.   Thank you, Ms. Crooks.

20        Can you tell us about the connection between Big Cypress

21   and the Greater Everglades ecosystem?

22   A.   Sure.  Big Cypress, as I understand it, is part of that

23   Greater Everglades ecosystem.  They're tied together.  I've

24   seen facts regarding Big Cypress watershed providing about

25   40 percent of the freshwater overland flows that end up in

1    Everglades National Park, so I view them as one and the same of

2    that Greater Everglades ecosystem.

3    Q.  Does Big Cypress serve as the habitat of any endangered of

4    threatened species?

5    A.  Yes, many.  I think in terms of biodiversity, I think there

6    are hundreds and hundreds of different flora and fauna that are

7    within Big Cypress.  In terms of imperilled or enlisted

8    species, Florida panther comes to mind, Florida bonneted bats,

9    wood stork, snail kite, wood stork, indigo snake.  I'm sure I'm

10   forgetting more, but it's known for, you know, being a refuge

11   and, you know, hotspot for a lot of these species.  That

12   red-cockaded woodpecker is another one I forget.

13        For a panther, for example, it is one of the last remaining

14   habitats for that species.  There is only about 130 to 120.

15   MR. COSTELLO:  Your Honor, we are going to have to object.

16   This witness is not testifying as an expert witness.  She's

17   testifying as a lay witness.  I understand that she has

18   background with this, but she is talking about things that have

19   to relate to the scientific nature of this preserve and she's

20   not qualified to testify to that.

21        THE COURT:  Well, I'm not sure that is the case, but

22   I'm going to give plaintiffs leeway, and also because of this

23   witness's background, she can speak of what she knows of Big

24   Cypress and the species there, and then you can vigorously

25   cross-examine.

57

1              MR. COSTELLO:  Thank you, Your Honor.

2              THE COURT:  Well, let's do another question.

3              MS. BURKHARDT:  Sure.

4    BY MS. BURKHARDT:

5    Q.  Ms. Crooks, is the TNT Site within the habitat of the

6    Florida panther?

7    A.  Yes, it is.  I've seen maps where I believe it's primary

8    zone panther habitat and that there is telemetry indicating

9    panther presence due to the collared panthers that's being

10   recorded in the area.

11   Q.  Thank you.

12              To your knowledge, is the TNT Site within the habitat of

13   the bonneted bats?

14   A.  Yes.  I've also seen maps that show that some of the

15   designated critical habitat does fall within that site

16   boundary.

17   Q.  Thank you.

18              Have you ever seen a Florida panther when recreating in Big

19   Cypress or the Everglades?

20   A.  I have seen a panther.  It was at the Fakahatchee Strand

21   Preserve State Park, which again is adjacent property to Big

22   Cypress.  And it was kind of a life bucket list for me.  I have

23   gone to Fakahatchee and Panther Refuge and Big Cypress so many

24   times with the expressed purpose of seeing wildlife like the

25   Florida panther, and I did see that Florida panther around 2020

App. 187

1    I think it was.  I was pretty lucky to see it that day because

2    they are pretty elusive.

3    Q.  If I may, Ms. Crooks, let me ask the next question.

4        What are some of the reasons it might be difficult to see a

5    panther in the wild?

6    A.  Yeah.  You have to be quite lucky.  There is, like I

7    mentioned, I hope it's okay to say it, only 120 to 130 panthers

8    left in the wild.  I think that's a pretty well-known

9    established fact available on public web pages, which is a very

10   small number, so that might be one reason that would be

11   difficult to see a panther in the wild.

12       Another is, you know, like bears or other species, they

13   avoid humans.  If they can remain undetected, they tend to be

14   elusive and secretive, and also they tend to be more active in

15   the kind of overnight hours from dusk until dawn.

16       So, again, those might be kinds of factors that would come

17   into play with your success of whether or not you see a panther

18   and also just maybe pure luck.

19   Q.  Thank you.

20       When you have not seen a panther when recreating, can you

21   tell us about any times you've seen signs of a panther?

22   A.  Yeah.  Yeah, we are looking for signs of wildlife, whether

23   it be a track, pawprint, you know, scat even.

24       Me and my friends have been known to dissect scat and be

25   pretty nerdy about what we're seeing in the wild and in the

App. 188

1    field, so we would look for all those types of signs of any

2    imperilled species and, of course, if we come across something

3    that we find could be attributable to a panther, that would be

4    exciting.

5    Q.   I think you alluded to this earlier, but whenever you visit

6    Big Cypress, do you hope to see a panther?

7    A.   Yes, any time I am recreating in the Big Cypress or even on

8    U.S. 41 on the way to a trail head, I will be looking for

9    wildlife, including panther.

10   Q.   Do you also hope to see a panther when visiting Everglades

11   National Park?

12   A.   Yeah.  Yeah, I would be looking for a panther, wood stock,

13   anything that would present itself.

14   Q.   Have you ever seen a bonneted bat when recreating at Big

15   Cypress or the Everglades?

16   A.   I have not seen a bonneted bat while recreating there no,

17   but I did have a special experience at the panther refuge.

18   That's the Florida Panther National Wildlife Refuge, which is

19   the adjacent property to the Big Cypress.  And that was a

20   special volunteering opportunity where I was able to help with

21   citizen signs, going out to a Florida bonneted bat roost and

22   get to see the emergence at sunset and kind of help count the

23   number of bats that were in the roost to add to the

24   scientific-known information at the time.

25   Q.   What are some of the reasons that it might be difficult to

App. 189

```
 1   see a bonneted bat in the wild?
 2   A.   Yeah, as I understand it, you know, your best chance might
 3   be if you know where some of the documented roosts are and be
 4   able to see them as they're emerging, your best bet would be
 5   something like that because you may not know where those --
 6   where they are roosting.
 7   Q.   Do you hope to see a bonneted bat when visiting Big
 8   Cypress?
 9   A.   Yeah, that would be great.  That would be awesome.
10   Q.   Do you hope to see a bonneted bat when visiting Everglades
11   National Park?
12   A.   Yeah, same answer.
13   Q.   You mentioned recreating near the TNT Site.  How does the
14   current detention center at the site affect your enjoyment of
15   the Big Cypress?
16   A.   Yeah.  I have, you know, ample concern and have seen -- you
17   know, based on what I've seen, some of the things that would
18   rise to a threat to the Big Cypress or my recreational
19   opportunities would be things like the lighting.  The lighting
20   for me is probably the number one concern I have.
21        I have seen stories in the news regarding lighting and for
22   me the dark skies particularly is of interest to me, and I do
23   know that dark skies are also really important for the Florida
24   bonneted bat.  It's my understanding that they require
25   darkness, and so I would have worries that that amount of
```

1   artificial lighting in the area would be risking changing the

2   natural behavior of these bats, as well as potentially

3   diminishing my stargazing opportunities.

4       Other kinds of threats or concerns that I would have from

5   what I know of the activities that the TNT Site would be how

6   the waste water and fuel, other types of potential pollutants

7   would be handled, being transported on and off site or how they

8   would be handled on site.

9       I would have worries and concerns and would believe that if

10  they are not handled properly the adjacent wetlands could be

11  impacted.  Other things that come to my mind would be the

12  traffic, traffic that would be coming on and off the site.  I

13  would have a concern, and it would stand to reason that, you

14  know, additional traffic that's entering that site on a

15  entering and exiting the site on a place like U.S. 41

16  particularly could lead to more wildlife mortality like for the

17  Florida panther where I do know that their number one cause of

18  documented mortality is vehicle strikes.

19      I'm sure there is other concerns, but those are the ones

20  that kind of stand out for me.

21  Q.  Ms. Crooks, are you familiar, generally, with the NEPA

22  process?

23  A.  I am.

24  Q.  Did you receive or see any kind of notice of plans to use

25  the TNT Site as an immigration detention center?

1    A.   Wait, Dominic -- Ms. Burkhardt, can you repeat the

2    question?

3    Q.   Yes.  Did you receive any kind of notice about plans to use

4    the TNT Site as an immigration detention center?

5    A.   No.  The first I heard was through the YouTube video and

6    the subsequent news article.

7    Q.   If a NEPA process had been followed with regards to this

8    detention facility, what would you have done?

9    A.   Yes, probably one of the first things I would have done is

10   to see if the Center for Biological Diversity is putting out

11   the action alerts.  You know, I do know they have one out now,

12   and I've completed it, but as it pertains to maybe any kind of

13   permitting process or public commenting opportunity, I would be

14   looking for those things from CBD in their communications.  So,

15   I would be looking in their web page and action alerts.

16       I would also personally be looking to participate in any

17   kind of process that would arise.  I have attended scoping

18   meetings before, and I have written comment letters about

19   different projects in my personal capacity.  So, I would, you

20   know, be engaged in every opportunity available.

21   Q.   How have you been affected by the fact that there was no

22   NEPA process here?

23   A.   Yeah, I would like -- I think this is a critical issue.  I

24   hope it's clear.  I have a deep love and affection for the Big

25   Cypress and the surrounding area and all the wildlife that are

1    there, and I would want to participate in any process that was

2    available for the public.  And I do think given the nature of

3    this, what's going on in the detention center and how it could

4    impact natural resources, that I would have participated in any

5    opportunity.

6    Q.  So, the fact that there was not a NEPA process means you

7    did not have that opportunity to participate?

8    A.  Correct.

9    Q.  In this litigation, do you provide a declaration in support

10   of the Center for Biological Diversity?

11   A.  Yes, I did.

12        MS. BURKHARDT:  Your Honor, at this time can we please

13   enable plaintiffs' source two so that we can do a share screen

14   with Ms. Crooks?

15        THE COURT:  I think so.  I'd have to ask Mr. Santorufo.

16        Can they do that?

17        COURTROOM DEPUTY:  Wait.  What are they asking for, to

18   share your exhibit in Zoom?

19        MS. BURKHARDT:  Yes.

20        COURTROOM DEPUTY:  You have to do it from there.

21        THE COURT:  What is the exhibit on your exhibit list?

22        MS. BURKHARDT:  It would be Plaintiffs' Exhibit 3, Your

23   Honor.  That's Ms. Crooks' declaration.

24        THE COURT:  Oh, yes.  Okay.

25        (Plaintiffs' Exhibit 3 was marked for identification.)

1    BY MS. BURKHARDT:

2    Q.  Ms. Crooks, can you see your declaration in front of you?

3    A.  Yes, I do.

4    Q.  Mr. Hernandez, if you could please scroll to the end.

5         Thank you.

6         Ms. Crooks, is that your signature at the bottom of the

7    declaration?

8    A.  Yes, it is.

9    Q.  And this is what you signed and provided on June 27th of

10   this year in support of this litigation?

11   A.  Correct.

12   Q.  Is this declaration a true and accurate statement by you?

13   A.  Yes.

14        MS. BURKHARDT:  Your Honor, if there is no objection, we

15   would like to move into evidence Plaintiffs' Exhibit 3, which

16   is Ms. Crooks' declaration.

17        MR. COSTELLO:  No objection from the executive

18   director.

19        THE COURT:  All right.  Exhibit 3 will be admitted.

20        (Plaintiffs' Exhibit 3 was admitted in evidence.)

21        MS. BURKHARDT:  One minute, Your Honor.

22        No further questions at this time.

23        MR. FRIEDMAN:  Just briefly, Your Honor.

24        THE COURT:  You really, you need like a flag or

25   something.

App. 194

 1          MR. FRIEDMAN:  Yeah.

 2          THE COURT:  Something to remind me.  Cross-examination,

 3   go ahead, Counsel.

 4          MR. FRIEDMAN:  Thank you.

 5          THE COURT:  If you could, identify yourself for

 6   Ms. Crooks.

 7                        CROSS-EXAMINATION

 8   BY MR. FRIEDMAN:

 9   Q.  Ms. Crooks, I don't know if you can see me.  I'm waving my

10   hand.  I'm here, I promise.

11   A.  It's okay.  I hear you.

12   Q.  My name is Todd Friedman.  I represent the Miccosukee

13   Tribe.

14       Okay.  So, it sounds like you have been almost everywhere

15   in Everglades National Park and Big Cypress.

16       Are there places you avoid as a result of harm to the

17   environment?

18          THE COURT:  Could you be, in Everglades or Big Cypress

19   or both?

20   BY MR. FRIEDMAN:

21   Q.  In both.  You recall you mentioned light pollution.  You

22   mentioned waste water runoff.

23       When there is instances of harm to the environment, do you

24   avoid those places in Big Cypress or Everglades National Park?

25   A.  Just to be clear, sir, you're talking about prior instances

                            App. 195

66

1    of environmental harm?

2    Q.  Sure.

3    A.  Okay.  I can't think of a specific example, but certainly

4    if, for example, there is an oil accident at one of the oil

5    pads off of 11 Mile Road, that would be an area, but that's not

6    something I've experienced.  But in the hypothetical, yes, I

7    would avoid the area.

8    Q.  Okay.  So, how about locations near the jetport, the TNT

9    Site, are you planning on visiting the locations near there in

10   the future?

11   A.  Yes.  Yes, I mentioned a little bit that I have plans to

12   go -- next time I go camping, I would love to go to the Midway

13   Campground, and that -- I'm trying to think of how close it is

14   but I want to say it's probably somewhere around six, seven, or

15   eight miles to the west.

16       I do believe it is one of the closer campgrounds on U.S. 41

17   to the TNT Site, and I would like to do some type of dark skies

18   event this fall or winter when they pick back up again, whether

19   that be at the Nathaniel Reed Visitor Center or at the Shark

20   Valley Everglades National Park to do the bicycling ranger-led

21   bicycle trip by moonlight again.  That would be cool.

22   Q.  Okay.  Now, when you're out there visiting, do you see

23   the -- do you see the Miccosukee Tribe in any type of form?

24   A.  I know where some of villages, some of the structures, some

25   of the community buildings are off of U.S. 41, but I don't

1    think beyond that.

2    Q.   Okay.

3        Are you aware that the Miccosukee Tribe has various

4    businesses in the areas near the jetport site?

5    A.   Yes.  In fact, I think I have used for the airboat rides in

6    the past.  I believe I have been on the water conservation

7    area, and I don't want to say that -- I can't remember

8    specifically, but I do believe it was a Tribal business and

9    that was in the last year or two that I did that.

10   Q.   Did you ever use gas stations owned by the Miccosukee Tribe

11   or its members?

12   A.   I do frequent off Alligator Alley I-75, the exit there on

13   Snake Road.

14   Q.   How about restaurants of the Miccosukee Tribe?

15   A.   In the past I have -- no, wait, I'm sorry, that might not

16   be the Miccosukee Tribe.  I may be thinking of the Seminole

17   Tribe, I'm sorry.  I have gone to the Billie Swamp Safari and

18   some of the restaurants there.

19       To answer your question, I can't think of anything

20   specifically.

21   Q.   Okay.  But you have seen the Miccosukee Tribe has

22   restaurants?

23   A.   (No verbal response.)

24   Q.   Now, you mentioned light pollution concerns.

25       Do you recall?

1   A.   Yeah.

2   Q.   Are you -- and you also mentioned that Big Cypress is a

3   dark sky international designated area?

4   A.   Right.

5   Q.   So light pollution will, obviously, impact that dark sky

6   international certification.

7        Is that correct?

8   A.   It certainly could.  That would be my worry.  Not only that

9   it would threaten the certification, but it does threaten

10  literally the dark skies and the wildlife's ability to have

11  darkness and my ability to recreate in the darkness and to

12  observe the starry skies.

13  Q.   Okay.  So, there are secondary impacts I think you

14  mentioned like wildlife fleeing the area?

15  A.   Well, I know that for the designation of the critical

16  habitat for the Florida bonneted bat, one of the attributes is

17  the adequate darkness for that species.  I also think that

18  given the amount of presence, light, noise, human density on

19  the TNT detention site now with these activities, that panthers

20  also could avoid that area.

21       There are publications available for anyone to read that

22  speak to the panther presence being reduced or diminished as

23  human density and presence increases in those lands, generally

24  in panther habitat.

25  Q.   So, in other words, ecotourism is likely to suffer in areas

App. 198

1  where there is light pollution?

2  A.  I don't think I could, you know, give any, you know,

3  factoids or experience about that, but that sounds like it

4  would be a good assumption.

5      I don't know that I could offer too much in the way of --

6          MR. COSTELLO:  Objection, Your Honor.  Speculation.

7          THE COURT:  Right.  I think this witness is talking

8  about mostly the eco effects as opposed to the ecotourism

9  effects.

10          Am I right, Ms. Crooks?

11          THE WITNESS:  Yeah, I can't think of anything to offer

12  in terms of the question about ecotourism.

13          THE COURT:  All right.  So, we'll move on.

14          THE WITNESS:  Okay.

15          MR. FRIEDMAN:  Just a moment, Your Honor.

16          THE COURT:  Sure.

17          THE WITNESS:  I have one question.

18          THE COURT:  No.  No, no there is not a question.

19          That's not how it works.

20          MR. FRIEDMAN:  Nothing further, Your Honor.  Thank you.

21          THE COURT:  Cross-examination.

22                          CROSS-EXAMINATION

23  BY MR. COSTELLO:

24  Q.  Good afternoon, do you see me in the back of the courtroom?

25  A.  I do see a waving hand.  How are you?

70

1    Q.   I'm well, how you are you?

2    A.   I'm okay.

3    Q.   My name is David Costello.  I'm an attorney for Executive

4    Director Guthrie.  I'm new to this technology and process as

5    well, so if at any point I'm speaking too fast or you can't

6    hear me, please let me know and I will re-ask the question.

7    A.   Okay.

8    Q.   Ms. Crooks, how did you come to become a witness in this

9    case?

10   A.   Yeah, well, as I mentioned today and in my declaration,

11   I've been a member of CBD since 2017.  For this particular case

12   they did reach out to me as a member to inquire if I -- to what

13   degree I recreated and enjoyed the Big Cypress and I told them

14   some of my memories and some of my fondness for the areas and

15   my experience and it sounded like it was a match.

16   Q.   Without getting into communications with any attorneys in

17   the case, who have you talked to about your testimony today?

18   A.   About the testimony today it was Ms. Burkhardt and maybe

19   Ms. Galloni.

20   Q.   I think Ms. Galloni is the attorney in the case.  I think

21   Ms. Burkhardt is as well.  Anyone not attorneys in the case?

22   A.   The gentleman from Coffey, and that is also an attorney for

23   the case, and that's it.

24   Q.   Very good.  Did you work for the Center for Biological

25   Diversity at one point in your career?

1   A.   No, I did not.

2   Q.   Did you work with them in your conservation efforts?

3   A.   You mean wearing my professional hat?

4   Q.   Yes.

5   A.   Yes.

6   Q.   You'd say you have worked with them pretty closely on some

7   projects?

8   A.   Yes, and that's how I came to know of their spectacular

9   work.  I often rely on them both in my personal capacity as a

10  member and in my professional capacity as being the experts for

11  effects to species, care for species and biodiversity.

12       So, they're highly regarded in all those aspects.

13  Q.   You say you are deeply sympathetic to their conservation

14  efforts generally?

15  A.   Yes.

16  Q.   You've testified that you're afraid that the facility is

17  going to harm the Everglades ecosystem and wildlife.  Is that

18  right?

19  A.   Yes.

20  Q.   You've also alleged that those issues should be subject to

21  study by environmental experts.  Is that right?

22  A.   Yes.

23  Q.   You're not testifying as an environmental expert today, are

24  you?

25  A.   No.

1  Q.  You haven't submitted any sort of expert report?

2  A.  No, just my declaration about my membership.

3  Q.  You don't have a degree in hydrologist?

4  A.  I don't.

5  Q.  Wildlife preservation?

6  A.  No.

7  Q.  Environmental science?

8  A.  Not environmental science, environmental policy.

9  Q.  Sure.

10     So, if I have it right, you allege here that you are harmed

11  because the Everglades that you want to experience is going to

12  be harmed, but you're not qualified to even testify whether the

13  Everglades may be harmed?

14     THE COURT:  No, you see, I think that might be my

15  decision, and that's arguing with her.  So, no, rephrase.

16     MR. COSTELLO:  Understood, Your Honor, I'll move on.

17  BY MR. COSTELLO:

18  Q.  Let's talk about some of the harms that you have alleged in

19  the case.

20     You've noted that facility will harm your interest in

21  viewing the night sky near the sight because of alleged light

22  and sound pollution.  Right?

23  A.  Correct.

24  Q.  Have you ever visited the airport at night?

25  A.  The TNT Site at night, no, I have not.  I did not realize

App. 202

1    that I could.

2    Q.  Sure.

3        So, you haven't seen the lighting up close?

4    A.  The lighting currently up close, no.

5    Q.  When was the last time that you were within 15 miles of the

6    airport at night?

7    A.  Yeah, there was an opportunity in 2019 for me to do the

8    sunset red-cockaded woodpecker citizen's science project.  That

9    also involved me being in the Preserve after dark.  I think

10   that area would be, you know, maybe approximately ten miles

11   away from the TNT detention center.

12       After the birds came into roost at sunset, there was the

13   travel back to the vehicles, and there was definitely a lot of

14   stargazing happening at that time as well as fireflies and

15   looking for eye shine of Florida panther or bobcat after dark

16   there.

17   Q.  So, you haven't been near or around the airport facility

18   for six years.  Is that right?

19   A.  You specifically asked about after dark.

20   Q.  After dark, excuse me, yes, I will rephrase.

21       You haven't been at or around the airport facility after

22   dark for about six years?

23   A.  Yeah, I think that's probably about right.

24       The Shark Valley experience at nighttime was probably

25   around the same time as well.  I have done other nighttime

74

1    activities that are more recent, but not within your 15 miles

2    that you mentioned.

3    Q.   So, you actually haven't seen the lighting from the

4    detention facility in person, have you?

5    A.   You're talking about the current lighting?

6    Q.   Correct, the detention facility?

7    A.   Uh-huh.  No, I have not.

8         The information that I'm seeing is from folks that do live

9    close by or have recreated close by, sharing that information.

10   It's also been on some news articles, and from some of those

11   experiences that I've been reading, that glare from the

12   lighting currently could extend -- I think I saw one article

13   30 miles away.  So, that's the information that I'm seeing.

14   Q.   Sure.

15        But to be clear, you haven't seen it in person.  Correct?

16   A.   Correct.

17   Q.   All right.  Did you know that the airport has long been an

18   active airport?

19   A.   I did know that there were some uses of the existing

20   tarmac, yes.

21   Q.   Did you know that even before the detention facility was

22   created, there were buildings with lights at the airport on

23   24/7?

24        MS. BURKHARDT:  Objection, Your Honor.  Facts not in

25   evidence.

App. 204

75

 1              THE COURT:  Well, no, and I assume at some point we are
 2      going to get these facts.
 3              I mean, are we talking about a hut or are we talking
 4      about a three-story building?
 5              But I don't think that need interfere.
 6              Counsel can ask if the witness is aware.
 7              Are you aware of any buildings that have lights on
 8      24/7?
 9              THE WITNESS:  I'm not aware of that, no.
10              MR. COSTELLO:  To be clear, Your Honor, we do intend to
11      bring this out on direct.
12              THE WITNESS:  Right.
13      BY MR. COSTELLO:
14      Q.  Did you know that there were runway lights at the airport
15      even before the detention facility was built?
16      A.  No, I'm not aware of that.
17      Q.  Did you know that in the past six months there have been
18      about 20,000 flights at the airport facility?
19      A.  I'm not aware of that.
20      Q.  Did you know over 4,000 of those flights were from
21      multi-engine airplanes?
22      A.  No, I didn't know that.
23      Q.  Or that 400 were from business jet planes?
24      A.  No.
25      Q.  That 236 were from helicopters?

76

1  A.  I'm not sure how I would know these facts, but, no, I did

2  not know that.

3  Q.  Sure.  Sure.

4      In your experience, animals generally stay away from noisy

5  airports.  Right?

6  A.  Well, I'm not sure about that being a blanket statement.

7      I definitely think that the increasing noise, the

8  increasing human presence -- let me just speak to what I do

9  know from a publication that was in regards to human density.

10 It didn't speak to airport uses specifically, but it did say as

11 human density increases, even a marginal increase, say, like

12 the 4,000 folks that are there up to that amount or others that

13 have coming and going to that facility, that increasing human

14 density can diminish and reduce panther presence.

15 Q.  Given your experience, you would agree, would you not, that

16 part of that has to do with the noise that is created by human

17 density?

18 A.  I would imagine that would be part of it, yes.

19 Q.  And you agree that airplanes are pretty loud.  Right?

20 A.  Yes.

21 Q.  On any of trips near the TNT airport site, have you ever

22 been disturbed by air traffic flying overhead?

23 A.  Repeat the question if you wouldn't mind.

24 Q.  During your many trips near the airport site that you

25 testified to on direct, have you ever been disturbed by air

App. 206

1    traffic overhead?

2    A.  Not that I can recall.

3    Q.  Were you aware, though, that this was an active airport?

4    A.  I knew it was active.  To the degree it was active, like

5    how frequent these planes were or what type of planes they

6    were, that was not something I knew about, but generally

7    speaking, I was familiar that it was used at least sparingly,

8    you know, over the last few years.

9    Q.  Did you ever object to aircraft use at the TNT Site?

10   A.  Not that I can recall.

11   Q.  Why not?

12   A.  I think if I had more information about the use that might

13   have arisen, you know, for me to write a comment letter.  It

14   just was not something I was knowledgeable about to investigate

15   further to take action about.

16   Q.  Do you generally get to observe nature at a site hosting

17   over 150 takeoffs and landings per day?

18        THE COURT:  Well, we are going to just press pause and

19   put a bookmark until we get all that information, so no,

20   Mr. Panuccio, I'm sustaining an objection and I hear it in my

21   head.  I know you didn't hear it, but it is ten after 2:00.  We

22   are talking about things the witnesses haven't done and haven't

23   seen and haven't been a part of, so let's move onto what they

24   have done, have seen and have been a part of.

25        MR. COSTELLO:  Court's indulgence, Your Honor.

1            THE WITNESS:  Of course.

2   BY MR. COSTELLO:

3   Q.  All right.  Thank you, Ms. Crooks.

4       Let's turn to waste.

5       So, you testified today, and I believe in your declaration

6   as well, that transporting in pollutants risk contaminating the

7   Big Cypress if it is not handled appropriately.  That's

8   paragraph 24 of your declaration.

9       Do you remember that?

10  A.  Yes, I do.

11  Q.  All right.  First of all, did you study whether the

12  previous existing airport facility polluted the surrounding

13  ecosystem?

14  A.  That's not something that I know of.

15  Q.  Have you conducted -- let's fast forward to today now.

16      Have you conducted any water surveys to assess whether

17  there are any pollutants escaping the detention facility?

18  A.  No, but I think that's a good idea.

19  Q.  Sure, but you have not?

20  A.  No.

21  Q.  Any soil surveys?

22  A.  Not from me.

23  Q.  You'd agree, based on your statement in paragraph 24 of

24  your declaration, that a facility can avoid polluting the

25  environmental with adequate pollutant management standards.

App. 208

1  Right?

2  A.  Could you repeat the question one more time?

3  Q.  Sure.  You believe that a facility can avoid polluting the

4  environment with adequate pollution management standards.

5  Correct?

6  A.  If the -- well, I think in part.  If the standards are

7  adequate and adequately followed, I also think once you start

8  beginning transporting things by truck, there is always a

9  chance for accidents and things you can't control.

10      I mean, even on the site, you know, if the standards were

11  good and being implemented well and you are in a spot where

12  there can be extreme weather, it's a very wet area.  So, I

13  think that there is a potential for, you know, storm water to

14  leave the site even if that's not how that is designed.

15      So, I think what you are saying is, it could go a long way

16  if there is good standards and they are being followed but

17  there is always the X factor of weather, accidents, so in

18  general there is still a risk.

19  Q.  Are you aware that the State has a policy that outlines

20  measures to prevent waste from polluting the surrounding

21  environment?

22      MS. BURKHARDT:  Objections, Your Honor.  This is

23  outside the scope of her lay witness testimony today.

24      MR. COSTELLO:  Your Honor.

25      THE COURT:  I take it we're talking about the

App. 209

1  one-and-a-half page we are going to follow appropriate

2  protocols, that one?

3          Technology.

4          It's already in evidence so you can ask if she has seen

5  that, and if she hasn't, then we're done.  We go on to the next

6  topic.

7  BY MR. COSTELLO:

8  Q.  Very good.  If I can just re-ask the question for the

9  record.

10         Are you aware that the State has a policy that outlines

11  measures to prevent waste from polluting the surrounding

12  environment?

13  A.  Are you meaning like storm water standards?

14  Q.  I'm referring to waste created at the site.

15         THE COURT:  Just, are you aware if the State has any,

16  any protocol, yes or no?

17         THE WITNESS:  I'm aware of some protocols, but I don't

18  know the ones he is specifically asking me about.

19         THE COURT:  Okay.  What protocols are you aware of?

20         THE WITNESS:  Yeah, I know that typically if there is a

21  permit process --

22         THE COURT:  Oh, no.  No, no, not typically.

23         Are you aware of a protocol out at TNT about waste?

24         THE WITNESS:  Oh, specific to that site, no.

25         THE COURT:  Okay.  Very good.  Let's move on.

App. 210

1          MR. COSTELLO:  Thank you, Your Honor.

2     BY MR COSTELLO:

3     Q.  Let's talk about traffic if we can.

4          You previously testified that you are afraid that there

5     will be harms to wildlife from increased traffic at the

6     facility.  Do you know how many --

7     A.  Yeah.

8     Q.  Do you know how many people would drive to the airport site

9     each day before the facility was built?

10    A.  No, I don't know that fact.

11    Q.  Are you aware that the State has laid down speed bumps on

12    the main drive of the airport facility right now?

13    A.  No, I don't know that.

14    Q.  Do you know what the speed limit is on the road surrounding

15    the airport?

16    A.  Do you mean on U.S. 41?

17    Q.  No, that's a good question.  I mean off of Tamiami Trail,

18    the road that loops around towards the airport.

19    A.  No.

20    Q.  Have you seen any wildlife killed by traffic since

21    construction began at the detention facility?

22    A.  I can't think of any that I observed, no.

23    Q.  You mentioned that you recreate a good bit in the

24    Everglades.  How many cars, in your experience, typically are

25    traveling Tamiami Trail each day?

1   A.   That's a good question.  I wouldn't want to guess an

2   estimate, but I know you can find that answer on the DOT web

3   page.

4   Q.   In your experience, do you think it's a fair amount of car

5   trafficking through Tamiami Trail?

6   A.   A fair amount is -- I'm not sure what that is defined as

7   but I would say, yeah.

8   Q.   A hundred cars each hour?

9           MS. BURKHARDT:  Objection, Your Honor.

10          THE COURT:  Let's move on.  She doesn't know.

11          MR. COSTELLO:  Your Honor, I --

12          THE COURT:  She doesn't know how many cars traverse

13  Tamiami Trail.  I don't know how many cars traverse Tamiami

14  Trail, a lot, depending on whether it's tourism season, if it's

15  not.  So let's move on.

16  BY MR. COSTELLO:

17  Q.   Ms. Crooks, you testified that you look for panthers while

18  you are driving on U.S. 41.  Right?

19  A.   Yes.

20  Q.   Are you concerned that tourist vehicular traffic from

21  tourists like yourself threatens the Florida panther?

22  A.   Can you repeat the question?

23  Q.   Are you concerned that tourist vehicular traffic from

24  tourists like yourselves threatens the Florida panther?

25          THE COURT:  Technically, she is not a tourist, but

App. 212

1   okay, same point, are you concerned about people like yourself

2   going to visit imperilling the panther with your car traffic?

3           THE WITNESS:  I think it could add to the cumulative

4   aspect of traffic on the roadway.  I could see that.

5   BY MR. COSTELLO:

6   Q.  But you are still going to visit the Florida panther,

7   right, or visit the Preserve, excuse me, to try to see the

8   Florida panther?

9   A.  Yes, I do.  It is internal conflict, for sure.  I do try to

10  be very careful when I'm driving.  I have, you know, kind of

11  like -- it would be very devastating to me personally if I run

12  over anything, let alone an imperilled species.  So, I do take

13  great care when I'm traveling anywhere on panther habitat,

14  whether it be on U.S. 41 near the detention center or even a

15  town in Naples, I'm very diligent.

16  Q.  You mentioned earlier you visit gas stations inside the

17  Preserve?

18  A.  There are gas stations along U.S. 41 that I have visited

19  before over the years.  I'm imagining a few in the back of my

20  mind.

21  Q.  You visited restaurants inside the Preserve?

22  A.  No, I don't think I have, restaurants, but I'm aware of

23  them.  I think that's the question I was asked.

24  Q.  Well, to be clear, I asked if you had visited, not if

25  you're aware.

1          MS. BURKHARDT:  Your Honor, objection.  Asked and

2     answered.

3          THE COURT:  No, but it will be soon.

4          No, she was just clarifying that that's the response

5     she gave to the other gentleman about the restaurants that she

6     knew of them but she hadn't visited them.

7          So you haven't visited any restaurants?

8          THE WITNESS:  Not the restaurants, no.

9     BY MR. COSTELLO:

10    Q.  Do gas stations and restaurants have a negative impact on

11    the Everglades' environment?

12         THE COURT:  Well, we're not here to eliminate the gas

13    stations, the restaurants, and you will have to take that up

14    with the Tribe.  Do they have a negative impact -- these human

15    interactions and facilities, do they have a negative impact on

16    the ecosystem?

17         THE WITNESS:  It's possible.

18    BY MR COSTELLO:

19    Q.  All right.  Ms. Crooks, I'd like to talk about your

20    experience with the Florida panther.

21    A.  Sure.

22    Q.  First, what papers have you reviewed that have given you

23    background or expertise on the Florida panther?

24         THE COURT:  You mean like general knowledge because,

25    again, we have been clear that she is not an expert.  She just

1   has been testifying because of her professional background but

2   you want to know what types of materials she has reviewed over

3   her professional life or for this hearing?

4          MR. COSTELLO:  No, excuse me, I'd like to know what

5   type of some materials have you reviewed in your personal life

6   that have given you a background with the Florida panther.

7          THE COURT:  All right.  All right.  Try to be as

8   exhaustive as you can.

9          THE WITNESS:  Well, I have worked on Florida Panther

10  Conservation with my professional hat on for like 18 years, so

11  things that come to my mind as far as what I reviewed would be

12  the Florida panther, recovery plan.  I have reviewed science

13  that pertains to habitat modeling, like the Kautz, et al.,

14  2006; the Frakes, et al., 2015; the Frakes and Night

15  Provocation from 2021.

16         I would have the F.W.C. annual reports.  I have

17  reviewed publications that speak to panther population

18  viability assessments, species status assessment drafts, and

19  there is more, but those will be a good number of the ones that

20  come immediately to my head.

21  BY MR. COSTELLO:

22  Q.  Have you ever seen a panther inside the airport facility?

23  A.  No, I have not ever visited the site there.

24  Q.  Have you ever seen a panther near the airport fence line?

25  A.  No, I wish.

1    Q.   You said that you saw a panther at a state park?

2    A.   Correct.

3    Q.   How far is that park, approximately, from the airport?

4    A.   It is on the west side of the Big Cypresses.  It's the

5    Fakahatchee Strand safe preserve.

6         That's, I'm going to guess, probably about 20 miles from

7    the TNT Site.

8    Q.   And to be clear, the TNT Site is closer to the east side of

9    the Big Cypress Preserve?

10   A.   Correct.

11   Q.   You testified that panthers generally avoid humans?

12   A.   Uh-huh.

13   Q.   So you'd agree that they also avoid active airports.

14   Right?

15   A.   I think you asked me that question a little bit earlier

16   today, and I said I'm not sure about as a blanket statement

17   because I'm aware that there is telemetry very much around the

18   TNT Site.  We have a telemetry that's been collected over the

19   years, so even though I do think it is correct that, you know,

20   increasing light pollution, noise pollution, human density,

21   more people on the site, more traffic would lend itself to

22   panther presence being reduced.

23        I do think that over the years there has been panther

24   telemetry in and around the site even when the pavement was

25   existing.

App. 216

 1        So, I don't know about a blanket statement there.

 2   Q.  Ms. Crooks, are you referring to the publicly available

 3   panther telemetry on the Fish and Wildlife websites?

 4   A.  Correct.  There is a couple of different ways I have seen

 5   and obtained that data or reviewed it, but, yes, that panther

 6   telemetry that's been collected since 1981 is available on the

 7   Florida Official Fish and Wildlife conservation commission web

 8   page through QuickBooks.

 9   Q.  You have visited that website before?

10   A.  I have.

11   Q.  All right.  Ms. Crooks, I'm going to show you that website,

12   if you don't mind.

13   A.  Okay.

14        MR. COSTELLO:  Could we share that on the screen?

15        MS. BURKHARDT:  Your Honor, we'd like to know if this

16   is an exhibit?

17        THE COURT:  Can we know the Defendants' Exhibit,

18   Counsel?

19        MR. COSTELLO:  This was attached as a link to

20   Ms. Crooks testified that was admitted in evidence.

21   Ms. Samples' link.

22        THE COURT:  I know Ms. Samples' declaration is in

23   evidence.  I know that there was a screen shot that we all

24   talked about, but I don't know that the website in toto is in

25   evidence, although if somebody wants me to take judicial notice

1    of it, I'm happy to do so, but what exactly are we going to

2    talk to Ms. Brooks about?

3         MR. COSTELLO:  We are going to talk about how the span

4    of time that has elapsed since a panther has been identified at

5    or near the airport using radio telemetry.

6         THE COURT:  Okay.  Is that going to be evident from the

7    paper or what it is you show her?

8         MR. COSTELLO:  Yes, it will be evident on the website

9    itself.

10        MR. SCHWIEP:  Your Honor, just for the record what

11   Ms. Samples did was the screen short and she provided the

12   source.  She didn't link to the website but I think a lot of

13   this will be cleared up when the panther expert actually

14   testifies.

15        THE COURT:  Yeah, that might be, I don't know, next

16   month, but --

17        MR. SCHWIEP:  Next witness.

18        THE COURT:  Okay.

19        Okay.  Thank you.

20        I'm going to allow this.  I'm not going to admit it

21   into evidence.  Right now whatever it is you are going to show

22   her would be a demonstrative, and Ms. Crooks, I want you to

23   tell me once you see it, do you recognize it, how do you

24   recognize it and maybe then you can answer some questions.  So

25   bring it up, Counsel.

App. 218

```
 1              THE WITNESS:  Okay.

 2    BY MR. COSTELLO:

 3    Q.  All right.  Ms. Crooks, can you see this okay?

 4    A.  I can, uh-huh.

 5    Q.  Do you recognize this website?

 6    A.  That would be a different one that I use but it looks like

 7    telemetry.

 8              MS. BURKHARDT:  Your Honor, objection if Ms. Crooks has

 9    no knowledge or familiarity with this site, we'd object to this

10    line of questioning.

11              THE COURT:  What's different?  What cite do you use?

12              I thought FWC is different --

13              THE WITNESS:  It may very well be the same data but the

14    site I was referencing was a state and this one it look likes

15    the U.S. Fish and Wildlife Service.

16              THE COURT:  Okay.  Can we get the FWC, Counsel, the one

17    that we heard about earlier?

18              MR. COSTELLO:  Well, Your Honor, this is actually the

19    data that Ms. Samples linked in her declaration and took a

20    screenshot of, so we are unaware that Ms. Crooks has been

21    relying on any other data in her declaration.  She said she was

22    relying on Florida panther telemetry, which I understood to be

23    this website.

24              THE COURT:  What we are going to do is we're not going

25    to talk about this anymore.  Take it down.
```

1          Ask Ms. Crooks some more questions, if this becomes

2     unclear or is not resolved once and for all by the panther

3     experts, then, Ms. Crooks, we may need to have you back on Zoom

4     again to talk to us about the figures, but let's go onto a

5     different area.

6     BY MR. COSTELLO:

7     Q.   Okay.  Ms. Crooks, let's move on to the bonneted bat.

8          Have you ever seen a bonneted bat at the airport?

9     A.   Not the airport.

10    Q.   Do you know of any bonneted bat roosts near the airport?

11    A.   Yes.  Actually, I have seen some maps provided, like

12    different scientific studies that have been done where it

13    showed there was a roost for Florida bonneted bats off the 11

14    Mile Road.  And, again, that 11 Mile Road is -- you enter there

15    about one mile, maybe a mile-and-a-half to the west of the TNT

16    Site.

17    Q.   Do you know what the name of that study is?

18    A.   Oh, not off the top of my head, I apologize.

19    Q.   So, bonneted bats, they generally roost in trees.

20         Is that right?

21    A.   They can roost in bat houses as well as under tile, but I

22    would -- you know, in my region I would typically, you know,

23    see that they would be roosting in a tree, yes.

24    Q.   Do you know of any tree that has been taken down due to

25    construction at the detention facility?

1   A.   I'm not aware of any.   I hope not.

2   Q.   Did you ever check to see if there was a roost immediately

3   surrounding the airport site before it became a detention

4   facility?

5   A.   I mean, I'm not sure what you mean by immediately

6   surrounding, but I'm not familiar with any on the site.

7        Thank you, Ms. Crooks.

8        Nothing further, Your Honor.

9            THE COURT:   Thank you.

10           Anything from the Federal Defendants?

11                    CROSS-EXAMINATION

12  BY MR. GUSTAFSON:

13  Q.   Just a couple of questions.

14       Good afternoon, Ms. Crooks.   I'm Adam Gustafson with the

15  Department of Justice representing the Federal Government in

16  this case.

17  A.   Hello.

18  Q.   Your declaration states on paragraph 23 that you understand

19  that Florida and the Federal Government are working to

20  construct and operate an immigration detention center.

21       Am I right in assuming that you don't have any firsthand

22  basis for that understanding?

23  A.   Not firsthand, I guess, as far as, like, having in hand any

24  kind of --

25  Q.   Thank you.   Thank you.

App. 221

1    A.    Oh, okay.

2    Q.    Did you go to Big Cypress on Saturday to protest the

3    detention center?

4    A.    Saturday, June 29th?

5    Q.    Did you?

6    A.    Yes, I did, and my sign was Save the Dark Skies.

7    Q.    Your declaration says, paragraph 17, that thousands of

8    acres have been approved for developments in recent years in

9    South Florida.

10        Did you travel to protest any of that development?

11   A.    Yes -- yes, there were different events that I attended to

12   participate in the public processing.

13   Q.    Did you travel to protest?

14        THE COURT:  Wait a minute, Mr. Gustafson, don't

15   interrupt her when she is answering, and speak up a little

16   louder so we can all hear.

17        So, the question was, did you go to any other places to

18   demonstrate and --

19        THE WITNESS:  Yes, specifically with regard to the

20   development in the area?

21        THE COURT:  Correct.

22        THE WITNESS:  Right.

23        THE COURT:  Right, development in any area that you

24   thought was imperilling.

25        THE WITNESS:  Can you hear me okay?

App. 222

```
1              THE COURT:  Are you hearing me?

2              THE WITNESS:  Am I still connected?

3              THE COURT:  Can you hear me?  Hello.

4              MR. COSTELLO:  Can you hear me, Ms. Crooks?

5              MS. BURKHARDT:  Your Honor, we actually planned for

6      this scenario, so we think she will likely be joining on her

7      phone now.

8              THE COURT:  Did it time out?

9              MS. BURKHARDT:  I think it fell off.  I'm going to ask

10     her to rejoin.

11             (The witness, Ms. Crooks, reconnected.)

12             THE COURT:  Can you hear us?

13             THE WITNESS:  Yes.

14             THE COURT:  The question was asked, did you have

15     occasion to protest at other sites where there was development

16     which you thought imperilled the ecosystem?

17             THE WITNESS:  Yes.  Yes, I have with regards to oil

18     development in the Big Cypress and attended events to

19     participate in the public process, provide comments in regards

20     to developmental threats, yes.

21             THE COURT:  Okay.

22             THE WITNESS:  Sorry about that technology problem.

23             MR. GUSTAFSON:  I have no further questions.

24             THE COURT:  Redirect?

25             MS. BURKHARDT:  Yes, Your Honor.  We hope to be brief.
```

1                    REDIRECT EXAMINATION

2  BY MS. BURKHARDT:

3  Q.  Ms. Crooks, are you aware there has been an increase in the

4  amount of cars, vans and trucks traveling to the TNT Site based

5  on its current use?

6  A.  Yes.  Although I don't have a number, I don't know if

7  anybody does, but when I was out there on June 28th or 29th, I

8  personally observed a lot of traffic, trucks coming in and out.

9  There was quite a lot of traffic and vehicular comings and

10  goings.

11  Q.  With all the new traffic going to and from the detention

12  center, do you expect that panthers are at a greater risk of

13  being killed by cars in the area?

14  A.  Yes.  You know, I think the traffic along U.S. 41, which

15  has a number of known mortality hot spots, combined with that

16  additional traffic, yes, could threaten more panther vehicle

17  strikes and mortalities and that is the number one documented

18  cause of death in the endangered Florida panther.

19  Q.  Is it fair to say that that would injure your interest and

20  enjoyment in seeing panthers in the area?

21  A.  Yes.  There is only so many left, so as they continue to

22  try to survive and recover, the fewer of them, the less

23  opportunity I have to see that panther again somewhere in the

24  Big Cypress.

25  Q.  Based on your understanding of the past use of the TNT Site

1    and your understanding of its current use as a detention

2    center, do you expect that your ability to see panthers will be

3    harmed, and, specifically, as it relates to density of people?

4    A.   Yeah, I'm aware of that publication where it spoke to

5    increasing human density resulting in less panther presence.

6    So, it could stand to reason that I would have less opportunity

7    in those areas to see a panther.

8    Q.   And you testified earlier that the TNT Site is within

9    primary panther habitat?

10   A.   Yes, I believe so.

11   Q.   And you also testified earlier that you do have plans to go

12   back to Big Cypress and nearby Shark Valley after dark.

13   Correct?

14   A.   Correct.

15   Q.   You mentioned that panthers are rare and difficult to see.

16       Do you expect that increased lighting from the current use

17   of the TNT Site would make it easier or harder to see them?

18   A.   Oh, wait.  Can you repeat that question, please?

19   Q.   You mentioned that panthers are difficult to see.

20       Do you expect that increased lighting from the current use

21   of the detention center, would that affect your ability to see

22   a panther?

23   A.   It's possible.

24       MS. BURKHARDT:  Your Honor, I have no further

25   questions.

App. 225

```
1            THE COURT:  Let me ask one question, Ms. Crooks.
2            You just mentioned a few moments ago mortality hot
3    spots.
4            What are you talking about?
5            THE WITNESS:  This is an additional publication that I
6    failed to mention earlier as to ones I have reviewed.  This is
7    a publication that speaks to segments of roadways where there
8    are hot spots, meaning kind of areas where a number of panthers
9    have been hit and struck by vehicles.  So, this is an
10   additional study that's looking at panther vehicle mortalities,
11   and along U.S. 41 there are a number of those designated hot
12   spots.
13           THE COURT:  All right.
14           Any other?
15           All right.  Thank you so much, and we're going to take
16   a brief moment.  Thank you.
17           THE WITNESS:  Okay.  Thank you so much.
18           THE COURT:  I'm going to ask IT to come up and make
19   sure that that awful, awful sound doesn't happen any time soon.
20           Our next witness is?
21           MS. GALLONI:  Plaintiffs will be calling Randy Kautz.
22           THE COURT:  Okay.  It's 20 to 3:00.  I wrote it down,
23   if all goes according to plan, the plaintiffs will be done at
24   4:00 and you should think about revising so that we all know.
25   And I think some counsel are here from, you know, elsewhere.
```

App. 226

1          So, talk amongst yourselves, but let me know how much

2     more we think we will need tomorrow because I don't intend to

3     keep you all here until midnight.

4          MR. SCHWIEP:  Thanks, Judge.

5          THE COURT:  All right.  I'm going to get IT up here and

6     we will take like a ten-minute recess.

7          COURTROOM DEPUTY:  All rise.

8          (Recess.)

9          THE COURT:  All right.  Everyone is here.

10         You may call your next witness.

11         MR. PANUCCIO:  Your Honor, before we do that, may I

12    address two housekeeping issues?

13         One is, Your Honor had asked earlier in the day for us

14    to clean up and authenticate the airport data issue.  We now

15    have a declaration for the same declarant that they submitted

16    for theirs, so I'd like to submit that with Defendants'

17    Exhibit 14, which is the airport data.  It's a signed

18    declaration.

19         THE COURT:  Okay, and so counsel --

20         MR. SCHWIEP:  We haven't seen it.  We'd like to look at

21    it.

22         THE COURT:  Sure.  Go ahead and look at it and if it is

23    in order, then I will allow the respective airport information

24    to come in from both sides.

25         MR. PANUCCIO:  Thank you, Your Honor.

1          Then issue two, Your Honor has alluded, I think, just
2     before to coming back tomorrow.  I wanted to raise the issue of
3     the schedule because we have multiple conflicts on the defense
4     side with tomorrow.  We had planned for a one-day hearing.  We
5     have witness issues, counsel issues.  We are all clear to come
6     back starting Tuesday of next week for the rest of the week,
7     but we have multiple issues with that and when this was
8     scheduled, you may remember at the scheduling conference, it
9     was, how long do you need?  One day.

10         We all cleared for that.  We have prepped for it, but
11    there are some real hardships on our side coming back tomorrow.

12         We are prepared to stay late tonight as well.  Don't
13    want to burden the Court with that.  We also have some
14    proposals for eliminating witnesses.  We had had this dispute
15    about -- with the Tribe about their witnesses being live.  We
16    can do them by deposition so Your Honor just has a cross-
17    designated record.  We are willing to make all that work, but
18    we do have some issues, Your Honor.

19         MR. SCHWIEP:  Can we make a suggestion, Judge?

20         THE COURT:  Sure.

21         MR. SCHWIEP:  Can we put a pin on the issue and see

22    where we are at the end of the day?

23         THE COURT:  Okay.  Let me first address a few matters.

24         It's not me that has a problem being here because even

25    if you are not here, chances are that I'm going to be.

99

1          It is the CSOs and the support staff who do not plan to
2     work beyond the time they are duly compensated and, so, that's
3     what I meant by staying late.

4          Let us put a pin in it.  Tuesday I don't think is a
5     viable restart date, but I think we can work with any
6     scheduling issues and maybe, you know, half days or remote
7     appearances, but I think everyone should work together.

8          It comes as a surprise to me that I'm the only one in
9     the room that looked at your respective list and thought, oh,
10    no, that's not going to happen because I assume everyone has
11    experience in this, but here we are.

12         I'm not going to go on because I'm wasting time.  Let's
13    put on a witness and we will talk after this witness.

14         MS. GALLONI:  Thank you, Your Honor.  Plaintiffs call
15    Randy Kautz.

16         (The witness, Randy Kautz, was duly sworn.)

17         COURTROOM DEPUTY:  Please have a seat.  State your full
18    name for the record and spell it out for our court reporter.

19         THE WITNESS:  My name is Randy Kautz.  R-A-N-D-Y,
20    K-A-U-T-Z.

21         THE COURT:  All right.

22         Mr. Kautz, you are going to have to speak into the
23    microphone.

24         I was told that this had to do with someone still
25    having their cell phone open next to a microphone, and I know I

App. 229

1  don't.

2          If you would, sir, into the microphone and also, I can

3  tell, just from your telling us your name, that you are a rapid

4  speaker.  So you are going to have to -- I'm going to throw my

5  patience rock at someone.

6          You are going to have to speak slowly, sir.  And,

7  Michael, I know IT told us everything was fine.

8          Get them up here, please.

9          COURT SECURITY OFFICER:  All rise.

10          (Brief recess.)

11          THE COURT:  Let's try this again.

12          Into the microphone slowly.

13          Counsel, you may proceed and everyone may be seated.

14                          DIRECT EXAMINATION

15  BY MS. GALLONI:

16  Q.  How are you, Mr. Kautz?

17  A.  I'm good.

18  Q.  What is your profession?

19  A.  I'm a wildlife ecologist.

20  Q.  Where are you based?

21  A.  Tallahassee, Florida.

22  Q.  Could you give us a brief description of your educational

23  background?

24  A.  I have a Bachelor's Degree of Wildlife Ecology from

25  University of Florida in 1974, and about 20 hours of graduate

1    work towards a Master's Degree in Environmental Biology.

2    Q.  I'm going to ask you a few questions about your employment

3    and your profession experience.

4        Have you had occasion to work for the State of Florida?

5    A.  Yes.

6    Q.  In what capacity was that?

7    A.  Two capacities, three capacities maybe.  One was I was a

8    research project director at a University of Florida for two

9    different projects for three years.

10       One was in a wildlife lab.

11       Then I worked for 27 years for the Florida Fish and

12   Wildlife Conservation Commission.  I was hired there in 1977

13   into the environmental office.  My primary responsibility there

14   was to review development projects in northeast Florida,

15   ranging in size from like bulkheads along the St. John's River

16   to tens of thousands of acres of projects, looking at impacts

17   on mostly endangered species, endangered and threatened species

18   of wildlife.

19       Go ahead.

20   Q.  Where did you go to from there?

21   A.  In 1984, I was promoted to become the first administrator

22   also in the Office of Environmental Services of the habitat

23   protection planning section of the non-game wildlife program

24   within the --

25            THE COURT STENOGRAPHER:  I'm sorry?

App. 231

```
 1              THE WITNESS:  Non-game, sorry, non-game species.
 2   BY MS. GALLONI:
 3   Q.  And did you have occasion to work on environmental impact
 4   statements at any time?
 5   A.  I worked on EISs during my first seven years with the
 6   Commission, when I was working, you know, mostly reviewing
 7   projects in northeast Florida.
 8   Q.  In the 25 years or so that you worked for the State of
 9   Florida, did you have occasion to work on biological opinions
10   related to the Endangered Species Act?
11   A.  I'm trying to remember.  Most of that work came after my
12   employment with the Fish and Wildlife Conservation Commission.
13   Q.  Did you engage and focus on the Florida panther?
14   A.  Yes.
15   Q.  Tell us about that.
16   A.  Okay.  In my capacity as the administrator of the non-game
17   section and habitat protection planning section, the first
18   thing we did was create a statewide map of vegetation and
19   wildlife habitats, the first one we created from satellite
20   imaginary.  We used that data along with the currents
21   information of rare and endangered species in plant and animal
22   communities in GIS format, too.  We did some population
23   viability modeling, and we use all that -- combined all that
24   information to create maps of strategic habitats around the
25   State that, if were protected, would ensure the long-term
```

1    viability of most, if not all components of biodiversity in

2    Florida.

3         One of the species we covered in that effort was the

4    Florida panther, and in 1998 or 1999, I was invited, because of

5    that work, to serve -- invited by the Fish and Wildlife Service

6    to serve on the panther sub-team of the multi-species ecosystem

7    recovery team, but working on basically a plan to assist and

8    guide the recovery of the Florida panther.

9         That effort resulted in ultimately a big report, but also

10   in the publication Kautz, et al., 2006, How Much is Enough?

11   Landscape-Scale Conservation For the Florida Panther.  That

12   publication, that journal article has been used a bunch of

13   different ways but, anyway, that was a product of my experience

14   working on panthers in that capacity with the Fish and Wildlife

15   Commission.

16   Q.   What was your last position with the Fish and Wildlife

17   Commission?

18   A.   It was -- I spent for maybe eight months I was the director

19   of the new office called Office of Data Portal for the Florida

20   Fish and Wildlife Conservation Commission.

21        The idea was to collate all of the Commission's data

22   digitally and then make it available internally into the public

23   via the Internet.

24   Q.   After you left that position, that was about 2005?

25   A.   Right.

```
 1   Q.   Where did you go from there?
 2   A.   I went to work as a biological consultant for a consulting
 3   company located in Winter Park called Breedlove Dennis &
 4   Associates.
 5   Q.   Slow down.
 6   A.   And I worked there for nine years, and working --
 7   Q.   What were your --
 8   A.   Right, my several jobs there, one was to create -- I worked
 9   remotely most of the time, was to create a GIS database of
10   known locations of rare and endangered species of plants and
11   animals, and then to use that database to review development
12   projects and write multiple reports on potential impacts of
13   proposed developments on endangered and threatened species.
14        One of the projects I worked on there was the East Collier
15   rural land stewardship area.
16        We were hired to do what is called the habitat protection
17   plan, to review the habitat protection plan for the Florida
18   panther proposed by the landowners.  That's 180,000 acres in
19   Collier County that has been under plans for development for
20   years, still under planning.
21        But we -- me and five other panther biologists teamed up to
22   write a report to assess the plans for protection of panthers.
23        Go ahead.
24   Q.   Did you review small projects as well while you were with
25   Breedlove?
```

App. 234

1  A.  Oh, absolutely, many small projects, mostly in Central

2  Florida, but also in South Florida as well.

3  Q.  And that was to assess the impacts on panthers?

4  A.  A lot of those projects were any number of listed species.

5  Most of my panther work had to do with the projects in South

6  Florida panther habitat.

7      The three main ones I can remember, I already mentioned

8  one.  There was another one, I can't remember the name of it

9  where we looked at it.  It was a project where we ultimately

10  ended up having a wildlife crossing built for panthers.

11      The other one I was asked to review the Turkey Point

12  expansion, nuclear power plant expansion in southeast Florida

13  for Florida Power & Light, and review that for impacts of that

14  and some associated transmission lines on Florida panthers.

15  Q.  Where did you work after Breedlove?

16  A.  I left Breedlove.  I thought I retired for the second time

17  in 2014.  Subsequently, my phone rang, Florida Power & Light

18  called me and asked me to assist them in planning and getting

19  permitted new solar electric generating facilities in South

20  Florida, in landscapes that were occupied by Florida panthers.

21  Q.  And what types of work did you do for FPL during that

22  period?

23  A.  Again, most of that was researching, researching the site

24  designs for solar facilities that would accommodate Florida

25  panthers, and then going and many of the -- most of those

1  projects involved consultation with the Fish and Wildlife

2  Service.  So I went and had multiple meetings with the Fish and

3  Wildlife Service to basically calculate mitigation requirements

4  for panthers, and then help them find different ways to

5  mitigate impacts of new solar facilities on panthers and their

6  habitats.

7  Q.  To make sure I understood, was part of that work on the

8  front end to assess the impacts to the panthers of the proposed

9  projects?

10  A.  Yes.  Right, right.

11  Q.  Okay.  Did you also work for the State Fish and Wildlife

12  Commission --

13  A.  Yes.

14  Q.  -- as a biological consultant?

15  A.  Right, in the last 11 -- well, starting in 2018, for about

16  two years, the Fish and Wildlife Service, the federal agency,

17  started a new process called species status assessments.

18  Q.  Can you explain for everyone's benefit what a species

19  status assessment is?

20  A.  Sure.  I'm going to do a sidebar for a moment.

21  Typically, every endangered and threatened species listed

22  by the Federal Government requires a five-year status review.

23  At that time, in 2017, 2018, they implemented a new process

24  called species status assessment and that's a comprehensive

25  assessment of everything anybody, everybody knows about all the

App. 236

1    list -- there is one for each listed species, but the idea is

2    everything we know about in this case, Florida panthers, is all

3    gathered together in one place and one report, and that is

4    supposed to be a living document, that is not a decision-making

5    document, it's a science document that decision makers can then

6    refer to to figure out what decision they ought to make about

7    when it comes to regulatory or listing status of a species, and

8    they would consult that to see what, you know, how that might

9    lead them in their decision-making process.

10   Q.  Is that often what's considered the most available science

11   in a species?

12   A.  Yes, that's the intention.  And it's also intended to be a

13   living document that is updated routinely and also used as a

14   course of information, for then, a recovery status review, the

15   5-year status review, which hasn't been done for ten or more

16   years.

17   Q.  Well, before we get there, let's go back to, I think you

18   said 2018.

19   A.  Right.  Right.

20   Q.  You are beginning work on a species status assessment for

21   the panthers.  Correct?

22   A.  Correct.

23   Q.  Can you tell us about what that entailed?

24   A.  What they asked me to do was to essentially do a

25   comprehensive literature review on Florida panthers, everything

1   from historical range, life history, ecology, population size,
2   abundance, threats, future threats from, you know, future
3   development, diseases.  I'm not sure if I can think of all the
4   topics, but all those subjects that would be -- would have to
5   be addressed.  They asked me to do literature reviews and then
6   to write, you know, first drafts of the species status
7   assessment.
8        So, eventually, that species status assessment was released
9   to the public in 2020 and I wrote half, two-thirds of it.  I
10  also did all the GIS analysis for, you know, habitats,
11  identifying habitats for Florida panther, not only in South
12  Florida but statewide throughout Florida, where are there other
13  potential habitats that could be occupied in the future for
14  panther recovery.
15       Yeah, so I did all the, you know, wrote bunches of it, I
16  did the GIS analysis, created the figures, tables, and those
17  reports are maybe 300 pages long or so.
18  Q.  You mentioned what they asked you to do was -- who was the
19  "they" that asked you to form this work?
20  A.  They was the U.S. Fish and Wildlife Service and the Florida
21  Fish and Wildlife Conservation Commission.
22       Essentially, it was a service process but the funding was
23  funneled through the Fish and Wildlife Commission, so I was
24  working with the Fish and Wildlife Commission's principal
25  research biologist, essentially their policy manager biologist,

1    as well as the U.S. Fish and Wildlife Service panther

2    biologist.

3    Q.   You mentioned the report was published, I think you said in

4    2021?

5    A.   2020.

6    Q.   Was that report peer reviewed?

7    A.   Yes, it was peer reviewed before it was released to the

8    public.

9    Q.   Did there come a time that you then went to work with the

10   U.S. Fish and Wildlife Service as a biological consultant?

11   A.   Yes, the idea, again, for a species status assessment is

12   that it's a living, breathing document.

13         Several years had passed since the original databases we

14   used for Version 1.0, they called it.  So, in 2022, I was

15   contracted, again, to update Version 1 to a Version 2.0.

16         So, essentially, I did comprehensive literature reviews of

17   literature that had come out in the meantime to rewrite all the

18   sections pertaining to panthers that I had responsibility for.

19         I also created new habitat models for panthers in South

20   Florida, as well as statewide.

21         I looked at growth models, some growth modeling had been

22   done by the University of Florida that had shown where future

23   growth would be likely to occur in Florida through 2040 and

24   again in 2070.

25         I also looked at sea level rise and sea level rise data and

1   combined those two sources of potential impact to overlay them

2   on habitat models and show locations of and calculate

3   essentially acreages or how much habitat would be lost to

4   development and sea level rise in 2040, and again in 2070, and

5   then use that information to assess how would that affect the

6   panther population and then, ultimately, its ability to expand

7   into other areas in Florida in the future.

8       That Version 2.0, the draft is complete.  It's been through

9   peer review.  It is currently undergoing internal review within

10  the Fish and Wildlife Service.  As far as I know, it could be

11  released any day.

12  Q.  So that work started -- your work on that started around

13  2022 and continues to the present?

14  A.  Right.  The last work I did on that was back in January of

15  this year.

16      (Plaintiffs' Exhibit 26 was marked for identification.)

17  BY MS. GALLONI:

18  Q.  I'd like to show Plaintiffs' Exhibit 26, if we can get that

19  up on the screen.  I don't see it on my screen, I don't know if

20  it's up yet.

21      Okay.  If you could flip to the second page of that

22  document.  Do you recognize this document?

23  A.  Yes, that's my CV.

24  Q.  Did you create this CV?

25  A.  Yes.

App. 240

1  Q.  Is it a true and accurate copy of your CV describing your

2  education and experience?

3  A.  Yes.

4      MS. GALLONI:  Your Honor, I'd like to move Plaintiffs'

5  Exhibit 26 into evidence.

6      THE COURT:  Any objection?

7      MR. PANUCCIO:  None from the State, Your Honor.

8      MR. GUSTAFSON:  None from the Federal Defendants.

9      (Plaintiffs' Exhibit 26 was marked for identification.)

10  BY MS. GALLONI:

11  Q.  Mr. Kautz, have you ever testified before as an expert

12  witness?

13  A.  Multiple times.

14  Q.  In what context?

15  A.  Almost every time has been in a State administrative

16  hearing.

17  Q.  And who did you testify on behalf of?

18  A.  I have testified on behalf of the Fish and Wildlife

19  Conservation Commission.  I testified on behalf of -- when I

20  worked with Breedlove Dennis & Associates, various clients'

21  projects, and then, again, for the Turkey Point nuclear power

22  plant expansion for Florida Power & Light.  I was an expert for

23  Florida Power & Light.

24  Q.  Just to be clear, when you testified for Breedlove clients,

25  those would have been developers, the clients?

1   A.   Yes.  Yes.

2   Q.   Moving now to the panther itself, could you give us a quick

3   overview of the status of the species, meaning the population

4   size?  We will get into some of the maps and so on, but if we

5   can get into population size.

6   A.   The estimated population size is between 120 to 230

7   individuals.  That would be adults and sub-adults, not kittens.

8   Q.   What would it take to consider the species recovered?

9   A.   The current recovery plan, I think the most recent one was

10  from 2008, provides for down-listing to threatened, I believe

11  that's the way it goes, with two populations somewhere of 240

12  individuals each within the range, the historic range of the

13  panther, and complete delisting of the panther if we could

14  somewhere find three populations of 240 adults and sub-adults

15  somewhere, three separate populations of 240.

16  Q.   Turning now to this case, did you have an occasion to

17  consider the impacts of the Everglades Detention Center on the

18  Florida panther?

19  A.   Yes.

20  Q.   What types of documents did you review?

21  A.   Well, I saw what the facility, you know, facility

22  infrastructure, whatever you want to call it, the tents and the

23  generators and the lighting generally from just public news

24  stories, you know, Google searches.

25       When it comes to the panther itself, you know, I have --

App. 242

1    we've talked about the telemetry database.  I've got that

2    entire telemetry database on my computer, along with panther

3    habitat models.  So coming and looking at where panthers are

4    and location of the site in relation to what we know about

5    panthers and where they occur.

6        I also looked at -- it's hard to say what sources of

7    literature in a way because I have looked at maybe hundreds of

8    articles in the last five or six years as part of my panther

9    species status assessment work that -- boiling that information

10   down to this individual project is kind of hard to say.

11   Q.   Is it fair to say that the literature cited, and we will

12   get to the report you prepared, but the literature cited in

13   that report gives that overview of the literature that you

14   considered?

15   A.   That is in the report that I submitted for this project?

16   Q.   Yes.

17   A.   Yes, that's a minute subset of the literature I reviewed.

18   Q.   And I didn't ask you this earlier, but in all the projects

19   that you have reviewed to assess impacts to panthers, have you

20   always traveled to the site to do that review?

21   A.   No.

22        (Plaintiffs' Exhibit 25 was marked for identification.)

23   BY MS. GALLONI:

24   Q.   I'm going to show you Plaintiffs' Exhibit 25.

25        THE COURT:  All right.  Is there any objection?

 1          MR. AJIZIAN:  There is, Your Honor.  We don't think

 2     that this report should be qualified as expert evidence because

 3     we think that it is speculative and unreliable.  I recognize

 4     the Court may want us to have that drawn out on cross, but we

 5     would to preserve the objection.  We are happy to talk about it

 6     after cross.

 7          THE COURT:  Well, I have heard the doctor's

 8     credentials, so I believe he has expert status and I will allow

 9     you to cross on particulars of the report and whether or not it

10     meets the doctor's high standards, but I'm going to overrule

11     the objection.

12          MS. GALLONI:  So 25 is admitted, Your Honor?

13          THE COURT:  Yes.

14          (Plaintiffs' Exhibit 25 was admitted in evidence.)

15     BY MS. GALLONI:

16     Q.  Before we get into some of the maps that you have provided,

17     could you give us your understanding of the detention center

18     site and its surrounding landscape?

19     A.  Sure.

20          So, the detention center site, based on what I have seen

21     from aerial photography and also in GIS databases, the paved

22     areas -- this is pre-project, if you will, the paved areas

23     associated with the runway and the taxiways surrounding the

24     site is essentially herbaceous.  And mostly herbaceous wetlands

25     with some rockier outcrops or rises that support more like

1   tropical hammock type, but more uplandy species in this pretty

2   wet environment.

3   Q.   Is the site located within the Big Cypress Swamp?

4   A.   Oh, yes.  Physiographically -- physiography refers to

5   essentially the topography, the elevation, the vegetative, the

6   geology, the geologic characteristics of the site.  From a

7   physiographic standpoint, the site is located in the Big

8   Cypress province of the Southeastern Flat Woods District as

9   mapped by a guy named Brooks in 1981.

10       The soils around the site, if you look at U.S. Soil

11   Conservation Service site, the soils around the site and within

12   one mile of the site, I don't remember the exact names of the

13   soil types, but they are types that would predominantly support

14   herbaceous wetlands vegetation with, again, some low rises that

15   also could support some upland species, tropical hardwood

16   species, pond apple, and then, of course, from a soil

17   standpoint there is a disturbed portion of the site that has

18   been filled and then disturbed due to the previous efforts to

19   create the jetport.

20   Q.   All right.  I would like to turn to Figure 1 of your

21   report, if we could bring up that image.  This is on page 20 of

22   the report, but I also have it as a demonstrative.  It might be

23   a little bit clearer to see.  It's Figure 1.

24       And the question that goes with this is whether you

25   determined the extent of panther habitat and occurrence near

1    the detention center site?

2    A.   Yes.  What this map shows is the location of the project

3    within the primary zone.

4         It also shows the location of the project before the U.S.

5    Fish and Wildlife Service consultation area for the Florida

6    panthers.

7    Q.   Could I stop you for a second?

8         First of all, what is the U.S. Fish and Wildlife

9    consultation area?  What do you mean by that?

10   A.   Under the Endangered Species Act, at least with respect to

11   the Florida panther, they describe or proscribe a geographic

12   area within which if you have a project that falls within this

13   geographic area and you meet certain criteria, the service

14   would expect you to bring that project to them to review it for

15   potential impacts on that listed species.

16        In this case, the different colors on this map indicate the

17   consultation area for Florida panthers in South Florida.

18   Q.   And that is because it is in primary zone habitat or for

19   some other reason?

20   A.   Well, in this case because it could be anywhere in this

21   map, any project anywhere in this map would be subject to

22   review for panthers if it met one test:  It's over one acre in

23   size.

24   Q.   And this project meets that test?

25   A.   It meets that test.

1   Q.   The next thing I wanted to ask is you mentioned panther

2   primary zone.

3        So could you explain for everybody what is meant by primary

4   zone?

5   A.   I'm sorry.

6        I mentioned previously that I worked with the panther sub-

7   team of Mara with the Fish and Wildlife Service and we

8   published this paper in 2006 called, How Much is Enough?

9   Landscape-Scale Conservation Planning For the Florida Panther.

10       In that paper we identified the primary zone, the secondary

11  zone and a dispersal as important habitats for the Florida

12  panther.

13       The primary zone is that landscape that is occupied by

14  Florida panthers.  It's essential for panther conservation and

15  it is the only areas where we can really count on for panthers

16  to occur.  If we want to conserve panthers into the future,

17  primary zone is the place.

18  Q.   Is this a map that you created?

19  A.   I created this.  I mean, I pretty much drew all the lines,

20  not the pink lines, but I drew all the lines in yellow, green

21  and blue, and then those were refined in coordination with my

22  other 11 co-authors.

23  Q.   Other than what is depicted in this map in the orange, is

24  there a primary zone Florida panther habitat anywhere else in

25  the world?

1    A.   No.

2    Q.   I'd like to take us now to Figure 2, which is on page 21 of

3    the report.

4         Can you tell us what this image shows, what the red part

5    shows?

6    A.   In 2015, Bob Frakes and Chris Belden and another person, I

7    can't remember, published a new -- they did a new GIS analysis

8    of panther habitats in South Florida.  The idea was they

9    wanted -- the primary zone captures landscapes that could be

10   used by dispersing panthers, you know, all panthers regardless

11   of where they might occur.

12        Their intention was to map the landscape that would be --

13   that we know is or would be breeding males and females, where

14   reproduction is most likely to occur as opposed to dispersal as

15   well.

16   Q.   Does the red here then reflect breeding habitat

17   specifically?

18   A.   Yes.

19   Q.   Have you identified where the detention center is located

20   with regard to the panther habitat?

21   A.   It's located -- it doesn't look as clear, it wasn't when I

22   created it, I thought it did.

23   Q.   Is it what is marked with that circle, and then I think

24   there is actually an arrow that says "project site"?

25   A.   Yes, it says "project site" and an arrow, yes.

1    Q.   Is there any other occupied breeding habitat for the

2    Florida panther anywhere else in the world?

3    A.   Breeding habitat.  There is a little bit in Glades and

4    Charlotte County.  Beginning in 2017, for the first time in I

5    don't know how many years, two females were located up in

6    Charlotte and Glades Counties and we have seen kittens up

7    there.

8        We have seen females -- they have been captured on trail

9    cameras in the company of males.  So, there is, there is

10   presumed to be two or three breeding females up there.  So

11   right now, there is an occupation, you know, occupied habitat

12   but it's kind of tenuous at the moment just because of the

13   size, the small size, the subpopulation up there.

14   Q.   Because it's just such a small number of individuals?

15   A.   Yes, right.

16   Q.   Is there any particular importance to the panther for -- is

17   breeding habitat of any particular importance?  That might seem

18   like a obvious question, but is it particularly important to

19   the panther?

20   A.   Well, in the sense you have to have it, yes.

21   Q.   Let me take you now to Figure 5, and I will point everybody

22   to that.  It's on page 24.  This looks sort of similar.  It's

23   more red.

24       What does this map show us with the red?

25   A.   This map is the result of more recent habitat modeling for

App. 249

1    the Florida panther that we did as part of Version 2 of the

2    Florida panther species status assessment.  This is a map right

3    out of the report that is in internal review.  Like I said,

4    it's been through peer review, but it's in internal review

5    right now with the Fish and Wildlife Service.

6         What this map shows is a more recent, with more recent data

7    a new map, land cover base map of essentially the range of

8    Florida panther or -- let me put it differently, habitats in

9    Florida that most likely would support Florida panthers.

10        The difference in colors in this map, the red is this is

11   the areas where we know Florida panthers do occur.  It is about

12   4,955 square kilometers.

13        We know that the population there currently occupying that

14   landscape is considered to be viable on the basis of population

15   viability modeling, and this is considered source habitat.

16        If panthers are to recover in the future, you have got to

17   have a place where they start from and then disperse to.  So,

18   the areas in green then, these are other habitats outside of

19   the source habitat of southwest Florida that could support

20   small subpopulations.

21        The areas in green are not large enough on their own to

22   support panthers, but they could support a handful of panthers

23   and if they can remain connected, the landscape can remain

24   connected, they can continue to -- the green areas could

25   support panthers as well.

App. 250

1      So, the area in red would be considered in population

2   biology a source.  They're source and sink habitats.

3      Source is basically described as a population or habitat

4   area that supports a population that is typically growing and

5   can supply dispersin individuals to elsewhere.

6      Sink habitats are generally areas where the population is

7   small enough that there is usually a negative growth rate, but

8   they can sustain themselves as long as there is dispersal from

9   other source areas, other areas large enough to support animals

10  in the future.

11  Q.  To bring this back to the detention center site, and just

12  to recap with these images, is the detention center in and

13  surrounded by primary zone panther habitat?

14  A.  It's in the primary zone.  It's in breeding adult habitat

15  in our most current models.  It's part of the source population

16  area.

17  Q.  And it is surrounded on all sides by that habitat?

18  A.  Yes.

19  Q.  I'd now like to turn to Figure 7, which is page six of the

20  report.

21      Did you create this image as well?

22  A.  I did.

23  Q.  Can you tell us what the green shows?  Well, first, I'm

24  sorry, let's start with the yellow, which is marked, but what

25  is the yellow in the center?

1  A.   Oh, the line, that is a buffer around the site.  I

2  extracted the site, essentially, the runway, taxiway areas from

3  the Florida Fish and Wildlife Commission's land use land

4  coverage database from December 2024.  I extracted that from

5  their GIS database.

6      I put a buffer of 6,700 meters, which is something like

7  4.1, 4.2 miles, something like that, around the -- dang

8  scientists, they're always using meters and kilometers and

9  stuff.

10      Anyway, it's 6,700 meters around the site.  6,700 meters is

11  the mean distance that a male will travel in the dry season.

12      I was trying to capture what animals might occur, what

13  panthers might occur in close proximity in this site based on

14  our historical record of panther use, you know, of habitats

15  within this area.

16  Q.   A quick question on that.  So, this 6,700 meters or four or

17  so miles, you said that was the mean travel distance --

18  A.   That's the mean travel distance.

19  Q.   -- for an individual panther, is that in a day?

20  A.   In one day.

21  Q.   In a single day?

22  A.   In a single day.

23      The idea was, how are you going to figure out what panthers

24  occur around here.  My thought was, let's look at how far a

25  panther can travel in a day and let's look within there, any of

1    these panthers that were reflected by these telemetry locations

2    could come near the site within a single day.

3    Q.   Let's talk about telemetry.

4    A.   Okay.

5    Q.   What do you mean by telemetry?

6    A.   Okay.  Well, on this image, for what it's worth, all the

7    red dots, all the green dots are telemetry records.  They are

8    locations where a panther has been observe -- recorded.

9         In this case, telemetry, what the panther biologists do is

10   they capture individual panthers, they put a collar on them,

11   and on that collar, in this case, they are radio collars.  In

12   other words, the collar transmits a radio signal and

13   every Monday, Wednesday, Friday between 6 and 10:00 a.m.,

14   whether -- as long as the weather is good, the panther

15   biologist will fly over the landscape and they will locate that

16   signal and they will circle, they will circle the site until

17   they are able to plot on a map where that location is.

18        Now there is a location error associated with that of about

19   125 meters, something like that.

20        So, these are not exact, but they are close.

21   Q.   Are all Florida panthers -- have they been collared to be

22   recorded in this way?

23   A.   No.  Not no, but heck no.  No.

24   Q.   Is this -- I'm sorry, you talked about the buffer, that

25   yellow line and the green dots represent panthers that have

App. 253

1  been located by telemetry --

2  A.  That's correct.

3  Q.  -- to have occurred in that place?

4  A.  Right.

5  Q.  Can you tell us about this dataset overall?  How many years

6  of data does the telemetry reflect?

7  A.  Well, these telemetry data are from 1981 up to 2024, I

8  believe, June of 2024.

9  Q.  Is it --

10  A.  That's the most current -- yeah, that's the most current

11  database that I have grabbed ahold of was through June of 2024.

12  I'm going to add a little bit to that.  You said telemetry,

13  okay.

14  Q.  Yes.

15  A.  There is another type of telemetry, GPS telemetry where the

16  panther biologists, they put a radio -- not a radio collar, a

17  GPS collar or panthers and they follow GPS locations.  They can

18  program the GPS to take a -- record a record every two or three

19  hours.  So, you get much -- you get a lot more data, but you

20  get a lot more fine information on where they are actually

21  occurring.

22  Q.  But this map reflects which --

23  A.  This map --

24          THE COURT:  Wait.  Wait.  No, no.  Doctor, you have to

25  wait until she asks a question and wait until the doctor is

App. 254

1    done.

2         I know, because our court reporter is all ready to

3    leave us all here.

4         THE WITNESS:  Okay.  My bad.

5         THE COURT:  Start again.

6         Go ahead.

7    BY MS. GALLONI:

8    Q.  I wanted to clarify, this data refers to the GPS collars or

9    radio dollars?

10   A.  These are all only radio collars.

11   Q.  And the radio collaring of panthers ended about when?

12   Maybe that's not a good way --

13   A.  You are talking in this vicinity?

14   Q.  Yes, let's say in this vicinity?

15   A.  Okay.  Yeah.  So, in this vicinity the last records were in

16   2014.  In this, I created a table.  The green dots within one

17   day's walk of a male panther on average, there are, if I

18   remember right, 12 males, ten females, one Texas female from

19   the introduction, you know, genetics project to introduce new

20   genes into the population.  There was something like 1,164

21   total telemetry records.

22        Those males and females are of all age classes.  There are

23   some juveniles.  There is young adults.  There is older adults,

24   and those records were over a 30-year period, essentially from

25   1981 or 2, right through 2014, within this one day's walk of

App. 255

1    the site for a panther.

2    Q.   That was my question.

3         So within this yellow circle, it covers a 30-year period of

4    data --

5    A.   Correct.

6    Q.   -- involving males, females, juveniles, I think you said --

7    A.   Right.

8    Q.   -- over time.

9         What's the significance of that, from your perspective?

10   A.   It's that there has been a stable reproducing population of

11   panthers in this area, in this portion of their range, at least

12   over a 30-year period of record.  It's pretty obvious that the

13   panthers have been here and have succeeded and prospered here.

14   Q.   So, do you consider that reliable for purposes of

15   considering present day circumstances?

16   A.   Oh, absolutely, yes.  The reason why there are not more

17   data since 2024 in this area is because of budget cuts at Big

18   Cypress National Preserve.  The Big Cypress had -- that was

19   federal budget cuts mandated in 2011, and that resulted, there

20   were some follow-up surveys of panthers.  They were following

21   the animals.  They still had collars on, but eventually the

22   funds dried up and there was no more opportunity to put radio

23   collars on panthers in this portion of their range, just

24   budgetary constraints.

25   Q.   And can I point you for a minute to Figure 6, if we can

1   pull that up.

2       Figure 6 is another -- is this another dataset?

3   A.   It's a bigger -- it's a similar dataset but it's throughout

4   most of the range of panthers in southwest Florida.  The

5   message for this in blue -- on hindsight, I'm not the artist I

6   think I am with the colors -- but, anyway, with blue here,

7   those are all GPS and VHF telemetry records, that's all the

8   telemetry records from essentially 1981 through June of 2024 in

9   southwest Florida.

10      The red dots show locations of mortality where we know that

11  a panther died, either due to roadkill or intraspecific

12  aggression or some other -- those are the two primary reasons,

13  or another reason.  There are also locations of panther dens.

14  Den records are hard to come by, but there's locations of dens

15  as well as occurrence records of verified sightings.

16  Q.   Going back to your overall review, what, if anything, did

17  you assess to be the likely impacts on the Florida panther from

18  the detention center?

19  A.   Well, to summarize this, the project site is right at the

20  core of the panther habitat.  Panthers have been present around

21  this site historically.  I'm confident they are still there,

22  just because they haven't been studied there, they are still

23  there.

24      This is a place where -- again, it's a core range of

25  panthers.

1      The reviews that I did for this site, I concluded there

2  were, you know, five main potential effects on panthers.

3      One had to do with the increased presence of human

4  activity; one with increased artificial lighting; one with

5  increased risk of roadkill due to increased traffic; one

6  related to fencing, the increase of fencing would impair

7  panther movement, even preventing them from using some habitats

8  they had previously; and fifth, in relation to future growth

9  and development of the human population.

10     So, the cumulative impact of this project in the context of

11  future development projected for South Florida.

12  Q.  Let's take those one at a time.  What did you assess -- you

13  mentioned first, I think, increased human presence.

14     What did you assess to be the likely impacts from increased

15  human presence on the site?

16  A.  Well, the literature that's available suggests that in

17  daytime pumas, and some of these studies come from elsewhere,

18  from mountain lions out west, same species, that in the daytime

19  pumas tend to stay further than 270 meters from human

20  developments.

21     In the nighttime, they will come a little closer, up to

22  210 meters.  So that kind of suggests, and this is where you

23  get increased human population, human activity, whether it's

24  residential, urbanized, this seems like more of an -- more

25  human presence than was there previously.

1    Panthers are likely to, you know, not -- start coming not

2    closer than 200 meters of this site.

3    That's not a hundred percent statement.  It's kind of a

4    gradient, but in general, and not every panther.  Some behave,

5    you know, individually, have individual behavior patterns, but

6    in most of the cases, most of the panthers aren't going to come

7    closer than a couple hundred meters.

8    Q.  What is the impact of that, the staying away from the

9    property, what sort of impact does that have on the panther?

10    A.  Well, it pushes panthers that used to come closer, further

11    away.  It displaces those panthers.  It basically precludes

12    their opportunity to use this portion of their former range.

13    Q.  So, would that affect their use of the habitat and to what

14    extent?

15    A.  There would be fewer opportunities to find prey.  You know,

16    in a bigger picture, those displaced panthers are going to

17    have -- if they are no longer using this portion of the range,

18    then they are going to go somewhere else looking for resources.

19    That means mates and food and shelter, primarily.

20    So, the further they go, they are likely to, ultimately

21    from a population perspective, increase the chances of

22    intraspecific aggression because, you know, you say, well, why

23    don't they just go somewhere else?  Well, we have already seen,

24    the somewhere else is here.  There is no somewhere else.  This

25    is it, and there is a concept within ecology called carrying

1  capacity, and that means this landscape of panthers can carry a

2  certain number of individuals, a population of a certain size.

3      So, as you remove some habitat from this landscape, that

4  means there is the chance that some -- there will be some loss

5  in carrying capacity of this landscape of all of South Florida

6  for panthers.

7      It's a small population.  It's -- and there is the chance

8  that it will, that will help contribute to placing this

9  population at risk in the future.

10 Q.  Did you calculate how much panther habitat would be

11 affected at the increased human presence at the detention

12 center site?

13 A.  I did.  That's around a thousand acres.

14 Q.  And is that using the 200 meters sort of around --

15 A.  That's the 200 meters around the site, correct.

16 Q.  Around the site.

17     Can you explain for everyone's benefit what you mean by

18 intraspecific aggression?

19 A.  One panther killing another.

20     From a population stand -- you didn't ask me that, sorry.

21 Q.  What do you -- I'm just going to move on to the next area

22 which is, you mentioned increased fencing.  What do you assess

23 to be likely impacts from increased fencing?

24 A.  What we know about fencing, and I learned a lot of this

25 having to do with designing facilities, the panther-friendly

App. 260

1    facilities for solar electric generating projects for Florida

2    Power & Light, essentially 4-foot farm field fencing, a panther

3    can leap over that easily.  So can white-tailed deer, their

4    primary prey species.

5        Six-foot fencing, panthers generally can leap over that.

6    Deer generally do not.  And then you put barbwire or outriggers

7    on top of a 6-foot or 8-foot, whatever high it is, that type of

8    fencing, you have precluded any panthers or their prey won't

9    move through that.

10   Q.  Now, if fencing existed that would otherwise preclude the

11   panther because of its height or barbed wire, but there were

12   openings within the fencing or open gates, would that allow the

13   panther to move?

14   A.  Well, sure.  Sure.  If there are gaps in the fencing, if

15   the fencing is discontinuous.  If the gate -- I have seen sites

16   where the gates across the road are lower.  Panthers and deer

17   can jump those fences.

18       I have also seen projects where the fencing, chain-link

19   fencing has been breached by wild hog up in Babcock property in

20   Charlotte County.  To the irritation of FPL site managers, hogs

21   are breaching the fence and getting on-site.

22   Q.  Moving on to the next area, what did you assess to be the

23   likely impacts from artificial lighting?

24   A.  Some fairly recent studies and out west of pumas out west,

25   a long story short, shows that pumas really are staying pretty

1    much beyond 500 meters from strong sources of artificial

2    lighting.

3         That's been tested against natural skylight, moonlight.

4         You know, moonlight, not a problem, but artificial

5    lighting, in general, and, again, this is not a hundred percent

6    statement, but, in general, pumas will not come closer.

7         In fact, there is evidence that prey will come closer

8    because they realize their primary predator will not come as

9    close because of the presence of the artificial light and, in

10   fact, where the pumas are making kills is in dark spots.  If

11   there are some dark spots within that 500 meters, that's where

12   they will try to make their kills, is in the darkest regions

13   around the artificial lighting.

14   Q.   Did you calculate what the affected area would be from this

15   detention center?

16   A.   Yes, that would be around 2,000 meters -- I'm sorry, 2,000

17   acres, my bad.

18   Q.   Around 2,000 acres extending around the detention center?

19   A.   Right, 500 meters around -- I'm sorry, yes, 500 meters

20   around the jetport site adds up to 2,000 acres.

21   Q.   Would avoidance of artificial light affect panther foraging

22   and breeding?

23   A.   Yes.

24   Q.   Why is that?

25   A.   Well, they are less likely to leave to pursue prey in that

App. 262

1    lighted area, and then the other -- I already talked about

2    carrying capacity and the loss of habitat and the increase

3    chances for intraspecific aggression, you know, some population

4    dynamics of the larger scale that are just site specific.

5    Q.    Are panthers primarily nocturnal?

6    A.    Primarily.  Dawn, dusk, crepuscular, nocturnal, sometimes

7    active in the day, but generally not.

8    Q.    I know you have mentioned carrying capacity and I think you

9    have mentioned density, but can you explain the concept of

10   density as it relates to panthers?

11   A.    Sure, and it relates to carrying capacity, essentially

12   panthers, all animals, they occur at a current density.

13         I will give you some units.

14         In this case, the measurements of population density in

15   South Florida for panthers are somewhere around 1.3 per hundred

16   square kilometers to four per hundred square kilometers.

17         That means, in this amount of landscape, you know, the

18   density or the number of individuals that can occur are in that

19   range, somewhere between 1.3 and four panthers per hundred

20   square kilometers.

21   Q.    What is the relevance of that when you consider a loss of

22   habitat, like these 2,000 acres you have been talking about in

23   the detention center area?

24   A.    Well, again, it has to do with you may well reduce the

25   total population.  It really depends, it really depends on how

1    much habitat is lost and what those population dynamics are

2    like as animals move and avoid this area.

3        It also has to do with other habitat loss going in other

4    areas within the range.

5        This is kind of a cumulative effect, and as well as a

6    potential loss of individuals to the population from increased

7    roadkill mortality.

8    Q.   That brings me to my next question, which is, I think maybe

9    the last area that you covered in your report, which is, what

10   you assessed to be -- before we get to cumulative impacts, what

11   you assessed to be the likely impacts of increased traffic as a

12   result of the detention center.

13   A.   Right, I have looked at some data.  The fact is there is

14   something like 14 records of roadkill mortality between State

15   Road 29 and the entrance to the jetport site.  Those records, I

16   believe, range from 1998 to about 2015.  There hasn't been a

17   record since 2015, at least in the data that I have seen.

18       The studies that I have seen suggest that there is not

19   exactly a one-to-one relationship between increase in, say,

20   AADT, average annual daily traffic counts, increase in traffic,

21   put it that way, increase in the number of vehicles traveling,

22   and risk to panthers.

23       That type of information really isn't available but there

24   are some ranges.  If you have got a road and there is no

25   traffic, the risk is really close to zero.

1     Somewhere up to around a thousand AADT, there is a risk.

2     The risk bumps up between, say, a thousand and, say, 8,000, and

3     above that, up around 18, you are getting into interstate

4     speeds and there is high risk or you might actually see the

5     risk drop off because they don't cross it because there is so

6     much traffic.

7     Q.   In regards to this facility, would you expect an increased

8     risk -- an increase in traffic to increase the risk of vehicle

9     strikes on the panther?

10    A.   Yes.

11    Q.   To be clear, a vehicle strike -- let me just say, on Figure

12    6, those red triangles mark road fatalities.   Correct?

13    A.   That's correct.

14         Well, no, those are -- those are all mortalities, not just

15    road.

16    Q.   All mortalities.   Thank you.

17    A.   Some are intraspecific aggression, where you see red marks

18    out in the middle of nowhere, those would be intraspecific

19    aggression.

20    Q.   And what I wanted to ask is:   Are panthers also sometimes

21    hit by cars and it's not a fatal hit but it's still a harm to

22    the panther?

23    A.   Yes, and there are also panthers that are hit that aren't

24    recovered.

25    Q.   That aren't recovered.

App. 265

1    Let me point you to Figure 4 for a minute on page 23 of the

2    report that I think has more of this roadkill records.

3    A.   That's correct.  Right.

4    Q.   What can you tell us about this image in relation to the

5    detention center site?

6    A.   Well, you can see the locations of roadkill records that

7    are in the database available from Fish and Wildlife

8    Commission.

9    Also, all the spaghetti you see on there is work that, when

10   I was still with Fish and Wildlife Commission that we did where

11   we did some least-cost path modeling to try to identify paths

12   that panthers would most likely follow moving from Big Cypress

13   to Everglades to like Long Pine Key and Everglades National

14   Park, and then to use those spaghetti models to identify road

15   segments that would most likely might be considered candidates

16   for crossing locations based on likely paths the panthers would

17   follow.

18   Q.   And those are the sort of --

19   A.   Then the yellow in this map are those red segments that

20   might be of concern, based on modeled potential travel-ways.

21   Q.   But there aren't road crossings where -- are there road

22   crossings?

23   A.   Not that I'm aware of, no.

24   Q.   You were talking about the least-cost path.  Those are the,

25   like you said, the spaghetti straps, the green, that's where

1    you would expect panthers to move?

2    A.   Right, it's a model of where they most likely would move

3    based on what we know about habitat characteristics and how

4    panthers move.

5    Q.   And like with the telemetry data, do the mortality records

6    reflect sort of an aggregate of time?

7    A.   Those are all the ones that are available since at least

8    1981, and maybe some are even earlier.

9    Q.   Is that data still used today --

10   A.   Oh, yes.

11   Q.   -- to consider the risk of road fatality?

12   A.   Sure.

13        THE COURT:  Wait until she finishes her question.  It's

14   getting late.

15        MS. GALLONI:  Apologies to the court reporter.

16   BY MS. GALLONI:

17   Q.   So we talked about increased human presence, artificial

18   lighting, additional fencing, the risk of road fatalities, an

19   impact of 2,000 acres of habitat loss.

20        What would you assess to be the likely combined impact of

21   these effects on the panther?

22   A.   I discussed some of the increased potential for

23   intraspecific aggression and range adjustments.

24        If I look in the -- if you look in the context of the

25   bigger picture and longer term, like up through 2070, our

App. 267

1    models suggested that a worst-case scenario for panther

2    habitats in southwest Florida showed that the corkscrew

3    regional swamp area of panther habitat would likely no longer

4    be used by panthers by 2070, worst-case scenario.

5         The amount of habitat available, there would be essentially

6    a 19 percent reduction in the landscape that supports panthers,

7    future worst-case growth scenarios in this entire range would

8    result in a 19 percent reduction in habitat.

9         When we look at density data and then population viability

10   modeling, you put all that together, by 2070, the range of

11   populations that this landscape could support would be

12   somewhere around 55 to 162, which is lower than what we think

13   is occurring there now.

14        This project, if it continues, would add to that another

15   brick in the wall, if you will.

16   Q.  I know we are talking a little bit about the long-term

17   consequences.

18        In the immediate, does the project reduce habitat available

19   to the panther?

20   A.  Yes, in the immediate, yes.

21   Q.  And does it reduce the carrying capacity for the panther?

22   A.  I think it does.

23   Q.  And it creates a risk of -- it's likely to increase the

24   risk of intraspecific aggression because of that displacement?

25   A.  Yes, as the population adjusts to less habitat.

App. 268

1  Q.  So, would you say that there are risks at the individual

2  level to panthers?

3        MR. GUSTAFSON:  Objection, Your Honor.  The last few

4  questions have been leading.  This is another leading question.

5        THE COURT:  Yes, and don't lead your witness, but it is

6  a quarter after four and I know we are trying to move along.

7        So I'm going to let him answer that question but with

8  the admonition, Counsel, don't lead your expert.

9        I think the question was, are there individual risks to

10  panthers in your estimation.

11        THE WITNESS:  I think there is risk to individual

12  panthers but I don't know which ones.

13  BY MS. GALLONI:

14  Q.  Would you expect the risks to panthers from the detention

15  site to be limited to the immediate detention site itself?

16  A.  If I understand that question, you know, as I said, I think

17  that the panthers that are in this region are less likely to

18  come within about 2,000 acres of the site.

19        As I said before, that's not a hundred percent statement

20  but I think the likelihood is high.

21  Q.  Based on your professional experience, would you have

22  expected there to have been an assessment of impacts to the

23  panther before this project was undertaken?

24        MR. EZRAY:  Objection, Your Honor.  This is a legal

25  question.

1          MS. GALLONI:  Mr. Kautz has experience with EISs and

2    biological opinions he's testified to.

3          THE COURT:  Right, and I appreciate that objection.

4          So we are not asking, or counsel can't be asking for

5    any legal, but from your experience with the many projects

6    you've outlined, would you have expected some assessment of

7    environmental impact before the facility was erected?

8          THE WITNESS:  I would have expected consultation with

9    the U.S. Fish and Wildlife Service for impacts, potential

10   impacts on the Florida panther, as well as other listed species

11   in the area.

12         But I'm only here for panthers.

13         MS. GALLONI:  Thank you, may I have a moment, Your

14   Honor?

15         THE COURT:  Yes.

16         MS. GALLONI:  Thank you, Your Honor.  No further

17   questions at this time.

18         THE COURT:  Counsel for the Tribe.

19                        CROSS-EXAMINATION

20   BY MR. AJIZIAN:

21   Q.  Good afternoon, Doctor.  Is it Kautz?

22   A.  Kautz, and it's not doctor.

23   Q.  Not doctor.  Well, you got a degree today.

24   A.  Thanks.

25   Q.  Okay.  I will try to be quick, but I want to touch on a

1    topic that my colleague just left on.

2        You were previously involved in environmental impact

3    studies -- or let me broaden it.

4        Were you previously involved in NEPA compliance when you

5    worked for Florida Fish and Wildlife?

6    A.  I have worked on EISs.  I'm not enough of an expert to know

7    if that's NEPA compliance or not.

8    Q.  Can you give me an example of an EIS that you worked on

9    with Florida Fish and Wildlife?

10   A.  It's been too long.

11   Q.  All related to panthers, though?

12   A.  No, probably not related to panthers.

13   Q.  Understood.  Do you recall what the EIS with Florida Fish

14   and Wildlife would have related to?

15   A.  If I remember right, there was a project to drain a huge

16   wetlands system up in northeast Florida for timber that

17   involved EPA and an EIS.

18   Q.  That was going to be my next questions, was there a federal

19   agency involved in that project as well?

20   A.  Yes.

21   Q.  More than one?

22   A.  I don't remember.

23   Q.  But definitely the EPA?

24   A.  I believe so -- well, the Corps of Engineers.

25   Q.  Understood.

1    When you were with FP&L, were you involved in any sort of

2    EIS or other environmental impact studies?

3    A.   I have certainly done environmental impact studies but I

4    don't remember in the formal EIS sense working for FP&L -- with

5    FP&L, I never worked with for them, but with them.

6    I don't remember any that were formal EISs.

7    Q.   Let me re-ask the question:  When you were with FP&L, did

8    you do any EIS or other environmental assessment for purposes

9    of compliance?

10   A.   Not that I recall.

11   Q.   Understood.

12   MR. AJIZIAN:  Can I get Figure 1, please it?

13   BY MR. AJIZIAN:

14   Q.   Can you see that?

15   A.   Yes.

16   Q.   This is Figure 1 to your report?

17   A.   Yes.

18   Q.   And the orange, I will call it orange, is what you

19   designated as the primary zone for the Florida panther?

20   A.   That's correct.

21   Q.   Are you familiar with the term "critical habitat"?

22   A.   Yes.

23   Q.   Is there an overlap between the designation of the primary

24   zone for the Florida panther and the requirements for the

25   designated critical habitats?

1          Well, let me back up.

2          What is your understanding of what critical habitat means?

3     A.   Critical habitat is a formal designation that the U.S. Fish

4     and Wildlife makes for some listed species.

5          There has been no critical habitat designated for the

6     Florida panther.

7     Q.   Do you know why?

8     A.   No.

9     Q.   Is the primary zone shown here, does that area have the

10    same or similar characteristics as the formal critical habitat

11    designated by the EPA?

12    A.   I don't know the answer to that one.

13    Q.   Fair enough.

14          MR. AJIZIAN:  Can we go to Figure 7.

15    BY MR. AJIZIAN:

16    Q.   All right, sir, this is Figure 7 to your report?

17    A.   Yes.

18    Q.   This shows, I believe you said, telemetry data for Florida

19    panthers?

20    A.   Florida panther.

21    Q.   This is the data that was collected from sometime in the

22    early '80s until 2014.  And is it correct that you testified

23    that only some portion of Florida panthers were, I believe,

24    collared was the term?

25    A.   Yes.

1    Q.   And the collaring is what allows scientists or people like

2    yourself to monitor the telemetry data?

3    A.   That's correct.

4    Q.   Do you have an understanding of how many more panthers are

5    out there that are uncollared?

6    A.   I do not.

7    Q.   I want to ask you about the yellow dots on the left side of

8    this image or what would be westward oriented land with respect

9    to what's been marked in this figure as the Big Cypress

10   Detention Center.

11        My understanding of the legend is that the yellow dots,

12   there is three on the left and one due south, are panther dens.

13        Do you see that?

14   A.   Yes.

15   Q.   What is a panther den?

16   A.   That is a location where a female denned to have kittens.

17        They essentially go under some heavy brush or cover or

18   something, birth the kittens, and they remain there until the

19   kittens are able to, you know, get up and start moving around,

20   at least a week, if not more.

21   Q.   And the green dots within the yellow circle -- well, let

22   me strike that.

23        The yellow circle here shows the one day's range for

24   Florida panther walking centered on the detention center?

25   A.   That's correct.

App. 274

1    Q.  If you centered that circle or that analysis on one of

2    these dens, would it also include the detention center, in

3    whole or in part?

4    A.  It looks like it.

5    Q.  If a den is disturbed, do you have an understanding of what

6    is the likely effect of that disturbance?

7    A.  What kind of disturbance?

8    Q.  Sure.  Let's say, increased human activity in the area.

9    A.  Chance -- well, if there was an effect on a den, you know,

10    my guess is that if there was a female, she could abandon the

11    den but I don't know that for a fact.

12    Q.  Have you read any literature or personally been involved in

13    any study or analysis of panther dens generally?

14    A.  I have read the habitat characteristics on females going to

15    den, the number of kittens they typically have, how long they

16    generally stay there.

17        I don't know that I have all of that right off the top of

18    my head.

19    Q.  Sure, let me ask a general question then.

20        Based on your understanding of the habitat characteristics

21    of where panthers like to den, would you say that panthers are

22    more or less likely to den in the area surrounding the Big

23    Cypress Detention Center at its current occupational capacity?

24    A.  I would say they are probably less likely to den.

25    Q.  Thank you.

App. 275

1    Is it possible to determine if there are existing panther

2    dens within, let's see, the range here is 10 kilometers, let's

3    double it, within 20 kilometers of the Big Cypress Detention

4    Center?

5    A.  Is it possible?

6    Q.  Yes.

7    A.  I wouldn't say it's impossible, but very difficult.

8    Q.  Do you know what's involved in --

9    A.  Well, when these dens are identified, they are typically

10   because they know that it's a female at first, and they do

11   multiple flights.

12       Again, these flights happen every two days, every three

13   days, depends on the weather, and they see this female staying

14   in the same location for multiple days, which is not normal

15   behavior otherwise.

16       So then they go into this location and they wait until the

17   female is away because they have got a collar on her, so they

18   wait until she is gone to feed, to make a kill, to bring food

19   back to the kittens, so the biologist will then go in there and

20   find the den.  Generally, they will handle the kittens, count

21   them, sex them, and usually give them shots, vaccination shots.

22   Q.  Understood.

23       Is it possible to determine or identify the presence of a

24   panther den without telemetry data?

25   A.  You have to stumble across them.

1   Q.   Okay.  Is it your opinion, Mr. Kautz, that to a reasonable

2   degree of professional certainty, the operation of the TNT Site

3   as a detention center will cause harm to the Florida panther

4   population?

5   A.   I think it will in the sense that it will result in the

6   exclusion of panthers within, again, at least 500 meters of the

7   site.  As I said before, that's not a hundred percent but I

8   think, in general, those panthers are going to remain further

9   away than that.

10          MR. AJIZIAN:  Your Honor, can I have a moment?

11          THE COURT:  Yes.

12          MR. AJIZIAN:  No further questions.  Thank you.

13          THE COURT:  All right.

14          MS. PIROPATO:  Your Honor, may I just quickly

15   interject.  The United States witness has been sequestered, and

16   I was wondering, Your Honor, if perhaps he can go home to his

17   family since it seems very unlikely that he is going to be

18   appearing today.

19          THE COURT:  Okay.  I was going to ask that.

20          So, you all are going to have witnesses, because it

21   isn't just the plaintiffs that are way over their time, but you

22   all, when we all agreed on a date, you all have witnesses as

23   well; yes?

24          MS. PIROPATO:  The United States has one witness, Your

25   Honor, correct.

App. 277

```
 1            MR. PANUCCIO:  And we have two.
 2            THE COURT:  Two.  Okay.  I think it's pretty certain --
 3    do we have a witness after --
 4            MR. SCHWIEP:  We have one more witness, Your Honor,
 5    that I think will be pretty short, and we would like to get on
 6    and off, if we can today.
 7            THE COURT:  Okay.  I don't know that we will get to
 8    this gentleman today.  I wanted to talk about that.
 9            I don't want to let him go and then have some blazingly
10    quick examination where we are all saying, why didn't we keep
11    the gentleman here?
12            Is he local?
13            MS. PIROPATO:  He is local, Your Honor, yes, but it's
14    just he would be -- he would be following Florida's witness,
15    two witnesses.
16            THE COURT:  Okay.  And I take it they are not quick?
17            MR. PANUCCIO:  Yeah, just on timing, Your Honor, I
18    think Mr. Ezray is going to do the cross here.  He thinks he
19    has about 45 minutes, although it would depend on how it guess.
20            Our witnesses --
21            THE COURT:  All right.  Well, let's just deal --
22            MR. PANUCCIO:  They are probably an hour each.
23            THE COURT:  Okay.  Yes.
24            MS. PIROPATO:  Thank you, Your Honor.  I appreciate it.
25            THE COURT:  Yes.
```

App. 278

```
1              So, cross-examination, Mr. Ezray.
2              MR. EZRAY:  Yes, Your Honor.  We just wanted to make
3    sure, I think probably between myself and our Federal friends,
4    we have about 45 minutes.  I know we are going to hit probably
5    5:30 then.  I just want to be sensitive to staff and make
6    sure --
7              THE COURT:  I think that's -- thank you, but I think we
8    can go until around that time.
9              MR. EZRAY:  Excellent.  Thank you, Your Honor.
10                        CROSS-EXAMINATION
11   BY MR. EZRAY:
12   Q.  Good afternoon, Mr. Kautz.
13   A.  Hi.
14   Q.  I want to start by asking you some questions about your
15   methodology.
16        Did I hear you correctly that you have not visited the
17   site?
18   A.  I have not visited the site.
19   Q.  Ever?
20   A.  Never.
21   Q.  And the way that you learned about what's going on on the
22   site, I think you said that you generally read some public
23   news.
24        Is that right?
25   A.  I saw it on the news, correct.
```

App. 279

1   Q.  Which news did you read?

2   A.  That's a little -- I can't remember.

3   Q.  How many articles?

4   A.  I can't remember that either.  I saw it on the news.

5   Q.  Do you remember when you were reading those articles?

6   A.  Somewhere, I'm guessing somewhere around July 1st, I guess.

7   Q.  July 1st, have you read articles since then?

8   A.  I have.

9   Q.  How long have you kept reading articles?

10  A.  Up to today.

11  Q.  Did you list the articles that you read in the material

12  that you relied on in your report?

13  A.  No.

14  Q.  Now, you said that when you do environmental reviews, you

15  don't always go to the site.

16      Is that right?

17  A.  That's correct.

18  Q.  When you do those reviews and you don't go to the site, how

19  do you typically learn about what's going on at the site?

20  A.  Well, I'd say probably two or three ways.  One is it's been

21  all over Florida one time or another, so I know the context of

22  most sites, where they are, what the habitats are in the

23  region.

24      Then I look at the development project, the site plans for

25  a project, and then I look at the GIS databases that I have on

1  hand, and they -- they cover a variety of different topics

2  related to the environment, whether it's physiography, soils,

3  species occurrences, habitat requirements, range maps.

4  Q.  So I think the second one you said there is you typically

5  look at site plans.

6      Is that right?

7  A.  Right.

8  Q.  You did not do that here.  Right?

9  A.  I did not, no.

10  Q.  Have you ever done a species review where the only way that

11  you learned about the project was reading from the public news?

12  A.  I don't think so.

13  Q.  And how long have you been doing this?

14  A.  About 50 years.

15  Q.  And in those 50 years, you have never done a review like

16  the one you did here?

17  A.  I don't remember having seen that -- a project where I did

18  not see the footprint for the development, the actual where you

19  put the tents and generators and lighting.

20  Q.  Did you find out how many generators are there?

21  A.  No.

22  Q.  How many lights are there?

23  A.  No.

24  Q.  How much fencing is there?

25  A.  Fencing?

App. 281

1  Q.  Yeah.

2  A.  No.

3  Q.  Now, on page one of your report you give some background on

4  the site.  You say the site has seen limited use as a training

5  facility for commercial aircraft.

6      Why was it important for you to examine the preexisting use

7  of the site as part of your environmental analysis?

8  A.  That's just something I always do is look at what's the

9  current site conditions, context.

10  Q.  Why is that important for engaging in an environmental

11  analysis?

12  A.  So that you know what is, so that you know you can assess

13  what's different.

14  Q.  And you said that there was limited use as a training

15  facility.  Right?

16  A.  That's as I understand it, correct.

17  Q.  What's the basis for that opinion?

18  A.  I believe I did a Wikipedia search.

19  Q.  And what was the Wikipedia page that you read?

20  A.  The Everglades jetport site.

21  Q.  And as a scientist, do you typically rely on Wikipedia when

22  you do environmental impact studies?

23  A.  Not usually.

24  Q.  Have you ever used Wikipedia for environmental impact

25  studies?

1   A.   I don't remember having done that before.

2   Q.   Did you search for any official data on the use of the

3   facility for commercial aircraft?

4   A.   I don't understand the question.

5   Q.   So beyond Wikipedia, you understand that there is an

6   aircraft authority at the site.  Right?

7   A.   I don't know.

8   Q.   Okay.  If I told you that in the last six months, so,

9   January to July, there had been 28,000 flights at the site,

10  would that impact your expectations of the panther population

11  in the area immediately around the site?

12       MS. GALLONI:  Objection, Your Honor.  We have gone

13  through this before with the volume, but we have seen no

14  evidence to substantiate that.

15       MR. EZRAY:  Your Honor, we put in the flight data.

16       THE COURT:  Give me a moment.

17       MR. EZRAY:  Yes, Your Honor.

18       THE COURT:  I know, it's all in, but we haven't talked

19  about the data yet.

20       But let me ask, have you seen the data?

21       THE WITNESS:  No.

22       THE COURT:  Okay.  So, I think that's the

23  cross-examination question, he hasn't seen the data, and he

24  didn't rely on it.

25       MR. EZRAY:  Can I make one point, and I don't want to

App. 283

1    belabor the issue, Your Honor, but I believe we just heard that

2    it's important to find out what the baseline is, and what I

3    would like to know is if the baseline is off, whether that

4    impacts the rest of the determinations in the report.

5        THE COURT:  Right.  The baseline -- but you have the

6    baseline.  He didn't look at the report.

7        MR. EZRAY:  His report says, "limited," and my question

8    is would it matter if it was more than limited.

9        THE COURT:  We don't know anything yet and that's my

10   problem and I'm actually one everyone should be focussed on,

11   but not so much.

12       We don't know if it's puddle jumpers.  We don't know if

13   it's Black Hawks.  We don't know if they come down or not.  We

14   don't know if there are passengers.  We don't know how big the

15   building is.  We don't know anything.

16       We know there are flights.  We know that there are

17   logs, and we know that there is data which this gentleman

18   hasn't seen, and I think that is sufficient for you to argue at

19   some point that his assessment was bereft of this.

20       But until I get a better idea of what it is, all of

21   that is, I don't think we need to spend time with people who

22   haven't seen it.

23       MR. EZRAY:  Understood.  Thank you, Your Honor.

24   BY MR. EZRAY:

25   Q.  Now, later on page one of your report you said proposed

1  projects in the PFA.  And just so I'm following, the PFA, what

2  is that?

3  A.  Panther focus area, which is the consultation area that the

4  U.S. Fish and Wildlife Service uses.

5  Q.  Are typically reviewed by U.S. Fish and Wildlife to assess

6  potential impacts.

7      Do you see that?

8  A.  I do.

9  Q.  Only typically?

10  A.  I say typically in the sense that there are projects that

11  go under the radar, if you will.  They're usually like half

12  acre or somebody puts a trailer on the site and doesn't bother.

13      So, but typically, yes, they do.

14  Q.  And you say potential impacts?

15  A.  Yes.

16  Q.  Why only potential?

17  A.  That's a word that I use to describe what the Fish and

18  Wildlife Service, it says there are -- this project may cause

19  impacts, potentially may cause impacts, we want to look at it.

20  Q.  And that's because we typically don't know the actual

21  impact when we do the assessment?

22  A.  Correct.

23  Q.  Now, on page two of your report you say, "If current levels

24  of panther activity are sustained and recruitment can be

25  documented at BRP."

App. 285

1      What's BRP?

2   A.   BRP?

3   Q.   For context, this is where you are talking about the new

4   panther population in Charlotte County and Glades County.

5   A.   Oh, that's Babcock, I believe that's Babcock Reserve.

6        Is that right?

7   Q.   I think so.  I'll skip over it.

8        You list two sites and then you say, "It would suggest

9   eastern Charlotte County and western Glades County" --

10  A.   Okay.

11  Q.   -- "may support a reproductively viable portion of the

12  panther population."

13  A.   Right.

14  Q.   Is that right?

15  A.   Yes.

16  Q.   Have you seen evidence that panthers could reproduce north

17  of the Caloosahatchee River?

18  A.   Caloosahatchee --

19  Q.   Sorry about that.

20  A.   And the answer is yes.

21  Q.   If that were the case -- well, let me back up for a second.

22       You said that you have seen evidence that there have been

23  kittens found there?

24  A.   Yes.

25  Q.   Females?

App. 286

1  A.  Yes.

2  Q.  Males?

3  A.  Yes.

4  Q.  Okay.  And if that's the case that there is reproduction

5  going on in that area, that would expand the available habitat

6  of panthers.  Correct?

7  A.  I'm going to put this in a -- I'm going to answer it the

8  way I know how.

9      There is a lot of habitat in Florida that can support

10  panthers, but panthers aren't in a lot of habitat that could

11  support them.  A lot of that has to do with human presence.

12      In this case, there is the landscape in Charlotte and

13  Glades County, a lot of it is in public ownership or it's in

14  large, private land ownership where the habitat conditions, the

15  quality and such, is enough to support a few panthers and

16  that's happening.

17  Q.  And do you have an opinion on whether panthers are likely

18  able to survive there, the current population that is there?

19  A.  I have an opinion but, yes.

20  Q.  What is that opinion?

21  A.  They can survive there as long as there is continued

22  recruitment and connection to the population in South Florida.

23  Q.  Okay.  Now, I think you have testified earlier today and

24  you say in your report that the current panther population you

25  estimate is between 120 and 230 adults and sub-adults.

```
 1        Is that right?
 2   A.   I didn't estimate it, but that's the number.
 3   Q.   Who estimated it?
 4   A.   The Fish and Wildlife Commission in concert with Fish and
 5   Wildlife Service, I believe.  I know the Commission has done
 6   it.  It's just an accepted number since at least 2017.
 7   Q.   Okay.  And you think that number is correct?
 8   A.   To the best of my knowledge.
 9   Q.   Is that a stable population level?
10   A.   It is -- basically, the current population viability models
11   suggest that the current population is stable --
12   Q.   In fact --
13   A.   -- however, however --
14        THE COURT:  Wait, wait, wait and then --
15        THE WITNESS:  Sorry.
16   BY MR. EZRAY:
17   Q.   In fact, you have written that even 80 panthers would be a,
18   quote, stable population likely for 100 years.
19        Is that right?
20   A.   Was that a 2006 paper?
21   Q.   Yes, sir.
22   A.   I wrote that, yes.
23   Q.   And you wrote that a greater than 240 panther population
24   would have a high probability of persistence.
25        Is that right?
```

App. 288

1    A.   That's correct.

2    Q.   And right now we are at somewhere between those two

3    numbers, between 120 and 230?

4    A.   Yes.

5    Q.   So you would expect that we have a stable population for

6    the next 100 years?

7    A.   I do, but not based on the number of 80 anymore.  There has

8    been subsequent, more recent population viability modeling that

9    would change that number, I think.

10   Q.   Well, let's talk about the population viability analysis.

11       In your report you cite analyses from two authors, and I'll

12   only give credit to the first authors for time, but Van de Kerk

13   and Hostetler.

14       Is that right?

15   A.   Uh-huh.

16           THE COURT:  You have to say yes or no.

17           THE WITNESS:  What's that?

18           THE COURT:  You said "uh-huh."  You have to say yes or

19   no.

20           THE WITNESS:  Oh, yes.  I'm sorry.

21   BY MR. EZRAY:

22   Q.   Sorry, it's a very unnatural way of speaking, I understand.

23       Who is Van de Kerk?

24   A.   She was a graduate student at the University of Florida

25   working under Madan Oli, Dr. Oli there.

1   Q.  Who is Hostetler?

2   A.  He was a graduate student at the University of Florida who

3   now got his Ph.D. and works now with the Florida Fish and

4   Wildlife Commission in their research lab in St. Pete.

5   Q.  You think both Van de Kerk and Hostetler know what they are

6   doing when they do population viability analyses?

7   A.  I do.

8   Q.  I'm sorry, I think we talked over each other a second just

9   for the court reporter.

10   A.  Yes.

11   Q.  That's why you cited them.  Right?

12   A.  Yes.

13   Q.  So do you agree that population viability analyses models,

14   quote, present a favorable picture for the future of the

15   panther in South Florida, end quote?

16   A.  Yes.

17   Q.  Now, in your report you don't estimate take from the

18   construction or operation of the TNT Site.  Correct?

19   A.  I do not.

20   Q.  Now, on page three of the report you state that panther

21   population peaked in 2016 and panther numbers declined between

22   2016 and 2020.

23       Is that correct?

24   A.  That's correct.

25   Q.  Do you know why panther numbers declined between 2016 and

1  2020?

2  A.  I do not.

3  Q.  That wouldn't have anything to do with the construction or

4  operation of this site.  Right?

5  A.  Not that I -- I would not think so, but I don't know.

6  Q.  Do you think it's possible that the construction or

7  operation of this site in 2025 impacted the decline in 2016 to

8  2020?

9  A.  No.

10  Q.  No?

11  A.  If I heard you correctly, this recent project would have

12  contributed to a decline in the past?

13  Q.  Correct.  Well, I think your report --

14  A.  I don't think so.

15  Q.  -- says that the population declined between 2016 and 2020.

16  A.  That's correct.

17  Q.  My question is:  That has nothing to do with the

18  construction and operation of this site in 2025.  Correct?

19  A.  Yes.

20  Q.  And you don't know why the population declined between 2016

21  and 2020.  Right?

22  A.  I do not.

23  Q.  That's because it's very complicated.  Correct?

24  A.  Yes.

25  Q.  Now, on page four of your report, you say that about

1    3.11 million acres in Florida is significant panther habitat.

2       Is that right?

3    A.   Correct.

4    Q.   Do you know how big the detention facility is?

5    A.   You saw the numbers that I have, what, 350 acres?  I don't

6    know.

7    Q.   That's what you say at page nine of your report.  That's

8    right.

9    A.   Right.

10   Q.   Is 350 acres out of 3.11 million acres significant?

11   A.   Is it significant?

12      It's not a big number.

13   Q.   Now, on page five of your report, you say that, quote, road

14   density was of medium importance to predicting the suitability

15   of panther habitats in Florida.

16      Is that your view?

17   A.   Is of medium importance?  Oh, yes, I know what you're

18   saying.

19      Yes, I think that's what the road density, which is the

20   number of miles of road per square mile, if you will, that that

21   in Frakes, et al., 2015, they found that that variable is kind

22   of midland importance, if you will.  It's not high but it's not

23   low.  It's kind of in the middle.

24   Q.   I think I got part of this, but I just want to make sure

25   that I understand.  What is road density?

1    A.   I just said it, but it is a measure of the length of road

2    per unit area, often as miles per square mile or kilometers per

3    square kilometer.

4    Q.   Okay.  And that's different from traffic volume?

5    A.   Yes.

6    Q.   Now, you opined earlier on your direct about impact on

7    panthers from traffic volume.

8         Is that right?

9    A.   Right.

10   Q.   Have you studied traffic volume in and around the TNT

11   detention facility?

12   A.   I have only looked at numbers.

13   Q.   What numbers did you look that?

14   A.   You know, average -- AADT numbers.

15   Q.   When did you look at those numbers?

16   A.   Somewhere before July 10th.  Around July 5th, maybe.

17   Q.   Do you recall what the AADT number was on Tamiami Trail

18   just near the facility?

19   A.   It was around 3,800 AADT vehicles.  That's average annual

20   daily traffic, 3,800, around the facility.  It was between

21   3,300 and 3,800 from State Road 29 to the facility.

22   Q.   I think on direct you testified that there is not a

23   one-to-one ratio between increased AADT and panther mortality.

24        Is that correct?

25   A.   To the best of my understanding, that's correct.

1    Q.   You said that there is -- and I don't want to put words in

2    your mouth, so tell me if I am getting this wrong --

3    essentially buckets of AADT, where if there is very low AADT,

4    there is basically no risk, and as you go higher at thresholds,

5    there will be increased risk.

6        Is that right?

7    A.   Essentially, yes.

8    Q.   And if you stick with my sort of bucket metaphor, what

9    bucket is 3,800 AADT in?

10   A.   I think I said low, medium, high.  This would be medium.

11   Q.   Have you done a study on what the increase in traffic

12   around the site is likely to be as a result of the detention

13   center?

14   A.   I have not.

15   Q.   You are not a traffic expert?

16   A.   I am not.

17   Q.   So, when you opined that there would be increased traffic

18   that would harm the panther, what is that based on?

19   A.   It seems fairly obvious to me that there is more vehicles

20   traveling those roads and panthers are in the vicinity.

21   Q.   Okay.  But you didn't do any formal study?

22   A.   I did not.

23   Q.   And you wouldn't be qualified to do any formal study

24   because you are not a traffic expert?

25   A.   I'd like to think that as somebody who knows something

1  about panthers, I understand risks and the threats to the

2  population based on years of literature review and research of

3  others.

4  Q.  Let me make my question a little clearer.  I think you have

5  identified it was a bad question.

6      As a panther expert, if someone told you that traffic was

7  increasing, you would say that may increase panther mortality

8  but not at a one-to-one ratio.  Right?

9  A.  Something along those lines, yes.

10 Q.  But as a panther expert, you are not qualified to opine

11 that traffic has actually increased.  Correct?

12 A.  I do not know for sure that traffic has increased.

13 Q.  You actually don't know at all.  You haven't looked at it

14 one way or the other.  Right?

15 A.  I do not know.

16 Q.  Now, is it true that a comprehensive literature review of

17 human puma interactions revealed that puma use of areas with

18 residential development is commonplace?

19 A.  Yes.

20 Q.  Now, is that true for panthers as well?

21 A.  Yes.

22 Q.  So, panthers can live in areas where people live?

23 A.  They can.

24 Q.  Okay.  And is it also true that pumas can and do find their

25 way through some intensely developed areas, often using thin

1    strips of vegetation?

2    A.   That's correct.

3    Q.   Is it true that pumas tend to avoid areas with artificial

4    light, especially bright or unpredictable lighting?

5    A.   Yes.

6    Q.   That's true for the Florida panther as well?

7    A.   To the best of my knowledge.

8    Q.   The Florida panther doesn't care if the artificial light

9    comes from a detention facility or an airport.  Right?

10   A.   They don't care where it comes from, or town or anywhere

11   else.

12   Q.   Sorry, I cut you off.

13   A.   Or town.  I cut you off, sorry.

14   Q.   No, no, no, I'm sorry, it's a bit of an unnatural way to

15   talk.  I will do my best not to cut you off.

16        Now, you talked about the risk to the panther from

17   increased lighting.  Right?

18   A.   (No verbal response.)

19   Q.   Sorry, we need a verbal yes or no.

20   A.   Oh, yes.

21   Q.   Do you know how much light has increased at the site?

22   A.   I do not.

23   Q.   Do you know what the light levels at the site were before

24   it became a detention facility?

25   A.   Do I get to ask questions?

```
 1              THE COURT:  No.  You just have to answer them.
 2              THE WITNESS:  Okay.  If -- okay.  Here we go.  If the
 3      question is do I know how many lumens or candle powers of light
 4      were on the site before and are there now, I do not know the
 5      answer to that question.
 6              I have seen the results of some studies just -- that I
 7      have come across since I did my work.
 8              What looks like the lighting, I think the Miccosukee
 9      Tribe did a lighting study, I have seen that, but when it comes
10      to the units, I don't know them.
11      Q.  Okay.  So, when you wrote your report, you didn't know?
12      A.  I did not, that's correct.
13      Q.  And you did not know what the light was in, let's say,
14      2020, the light levels were in 2020?
15      A.  What I did do was I went to the NASA world view site and
16      went into the past and looked at that site, and prior to, I
17      forget what the exact date was, July 6th or so, the landscape
18      was dark, and all of a sudden there was a bright spot as you
19      move forward in time where the jetport is at night.
20      Q.  How many days of data did you look at on the NASA website?
21      A.  Oh, probably no more than a month.
22      Q.  No more than a month.  And which month did you look at?
23      A.  Just prior to roughly July 10th.
24      Q.  Okay.  So you were looking, let's say, June 15th to
25      July 10th?
```

1  A.  I mean, you said it.

2  Q.  Okay.  And you have no idea, let's say, then in May?

3  A.  I don't remember how far back I looked exactly, a little

4  before the project went into place.

5  Q.  And did you list the NASA website in the --

6  A.  I did not.

7  Q.  You didn't list it in your report?

8  A.  No.

9  Q.  You didn't list it in the documents that you relied on in

10  formulating your opinions?

11  A.  No.

12  Q.  Do you agree that the combined effects of population growth

13  and sea level rise models predict a loss of 638 kilometers

14  squared, 12.9 percent of panther habitat in the southwest --

15        THE COURT STENOGRAPHER:  Can you repeat that?

16        THE COURT:  Yeah, really.  Start from the beginning.

17        MR. EZRAY:  I'll start from the beginning.  I'm very

18  sorry.

19  BY MR. EZRAY:

20  Q.  Do you agree that the combined effects of population growth

21  and sea level rise models predict the loss of 638 kilometers

22  squared, paren, 12.9 percent, end paren, of panther habitat in

23  the southwest by 2070?

24  A.  Yes.

25  Q.  And that is 157,653 acres of land loss.  Right?

1    A.   You did the math, I didn't.

2    Q.   Does that sound about right?

3    A.   I'm going to stick with the square kilometers, if you will.

4    Q.   Absolutely.

5         Just for comparison sake, you said that it was about a

6    2,000 kilometer loss of population habitat in your view based

7    on this site?

8    A.   Right.

9    Q.   That pales in comparison to 638 kilometers squared.  Right?

10   A.   It is a small amount comparatively, yes.

11   Q.   Substantially small?

12   A.   I said it's small comparatively.

13   Q.   And even with that 12.9 percent habitat loss, you still

14   think that the panther population may remain viable in 2070.

15   Right?

16   A.   In 2070?

17   Q.   Yes, sir.

18   A.   What I said -- my report says it depends.  It essentially

19   depends on the qualities of remaining habitats.  If generally

20   the quality of what is remaining in 2070 is poor, then the

21   viability of the population is in jeopardy.

22        If the habitat quality is high than what remains, if it's

23   like what is in panther or national wildlife refuge,

24   Fakahatchee Strand, if that was the quality of the panther

25   habitat throughout the range, then there is a very high

App. 299

1  probability that the population would remain viable.

2  Q.  Got it.  So if the habitat remains of high quality, the

3  panther could lose 12.9 percent of its current habitat and the

4  population would still remain viable?

5  A.  That's what I believe is true.

6  Q.  Okay.  On page one of your report you say that limited

7  monitoring of some panthers in BCNP -- what's BCNP?

8  A.  Big Cypress National Preserve.

9  Q.  Great.  Continued through June 2018, but the panthers that

10  were monitored were not in the vicinity of the project site

11  between 2014 and 2018.

12      Is that right?

13  A.  That's correct.

14  Q.  So over four years of telemetry data you did not find a

15  panther in the vicinity of the site.

16      Is that right?

17  A.  Yes, because those panthers that were monitored just

18  weren't in that area.

19  Q.  So, am I right that you have no telemetry evidence that a

20  panther visited the site since 2014?

21  A.  That's correct.

22  Q.  And do you agree that no panthers have been recorded on the

23  paved area of the panther site?

24  A.  I would agree with that.

25  Q.  How many years of telemetry data did you say you had?

App. 300

1  A.  Whatever 1981 to 2024 is, what's that, 40 years?

2  Q.  Something like that.

3  A.  45 years.

4  Q.  And in that time, you've never found a panther on the paved

5  area of the site.  Right?

6  A.  When you say I, they have never been recorded on the paved

7  area of the site.

8  Q.  Did you consider whether the current site was fenced, in

9  drafting your report?

10  A.  I did not.

11  Q.  Okay.  But you did talk today about how if additional

12  fencing was added, that could limit panther habitat.  Right?

13  A.  That's correct.

14  Q.  So if there was already fencing there, the habitat would

15  have already been limited.  Correct?

16  A.  It depends on the fencing, yes.

17      MR. EZRAY:  All right.  Can you pull up Defense Exhibit

18  36?

19      (Defense Exhibit 36 was marked for identification.)

20  BY MR. EZRAY:

21  Q.  Now, this is a picture of a gate at the facility.  You can

22  see it says Dade Collier Airport taken --

23      MS. GALLONI:  Objection, Your Honor.  I don't think

24  this has been admitted into evidence.  We don't know the

25  source.

1      THE COURT:  Well, we don't need source.  We just need
2   someone to say it truly and accurately represents the site.
3   This gentleman hasn't been to the site, so he can't say that.
4        But, really, is anyone here to argue that that's not a
5   picture of a gate?
6        MS. GALLONI:  We don't know, Your Honor.  It's dated
7   2011.  I don't think we know who took this picture or when.
8        THE COURT:  Oh, okay.  Oh, this isn't a recent --
9        MS. GALLONI:  No.
10       THE COURT:  Okay.  So, let's just -- I'm going to allow
11  you to ask our witness about the gate, but I don't want any
12  editorializing about where it is or what it is because we don't
13  know.  No one can tell us.
14       MR. EZRAY:  One question about it, not any of that.
15       THE COURT:  Yes.
16  BY MR. EZRAY:
17  Q.  Would this be the type of gate, barb wire on the top, that
18  would prevent a panther from entering into a facility?
19  A.  Yes.
20  Q.  And you don't know, one way or the other, whether the
21  facility was gated or, excuse me, was fenced before the
22  detention site was built.  Correct?
23  A.  I do not.
24  Q.  Are airports typically good natural habitats for panthers?
25  A.  I would say no.

1    Q.   And you talked about the importance of breeding grounds.

2         Would an airport be a good location for panther breeding?

3    A.   If you are talking about -- in my opinion, you'd have to

4    identify what you mean by airport.  If you mean the paved area,

5    no.  If you mean other natural areas adjacent to the paved

6    areas, potentially so.

7         If you mean like Miami jetport, you know, the Miami

8    Airport, I'd probably go with a no.

9    Q.   Let's just say an area with lots of flights.

10   A.   I'm sorry?

11   Q.   An area with lots of flights.

12        MS. GALLONI:  Objection, Your Honor.

13        MR. EZRAY:  Your Honor, he is qualified as a panther

14   expert.  I think we can ask him --

15        THE COURT:  Right, he is not qualified as an airport

16   expert.  And we still don't know, I still have no idea of what

17   is going on or what went on or what's happening, so we can save

18   that for the defense case.  But, generally speaking, generally

19   speaking, you may ask our witness about airports and panthers.

20   BY MR. EZRAY:

21   Q.   If there was an airport with lots of flights, would that be

22   a good breeding ground for panthers?

23        MS. GALLONI:  Objection, Your Honor, just to it being

24   vague.  I mean, lots of flights, I don't know how you can --

25        MR. EZRAY:  I will fix the question.

App. 303

1    BY MR. EZRAY:

2    Q.   If there was an airport with 28,000 takeoffs and landings

3    in a six-month period, would that be a good location for

4    panther breeding?

5    A.   I would think not, on the paved areas.

6              MR. EZRAY:  Can we pull up Table 3 of the report?

7              THE COURT:  In case it's not clear, somebody at some

8    point needs to tell me, were we talking little passenger

9    planes; are we talking military transports; are we talking

10   about people just learning to go up and land?

11             Somebody needs to give some substance to the numbers.

12             MR. EZRAY:  It is in Exhibit 14 that will come in

13   through our witness, Your Honor.

14             THE COURT:  All right.

15             MR. EZRAY:  Table 3.

16   BY MR. EZRAY:

17   Q.   While we wait to keep this moving along, you spent a lot of

18   time on your direct talking about Figure 7, which was a map of

19   telemetry in which you drew the yellow circle around it and, if

20   you recall it, if not, we will wait to pull up the table, is

21   Table 3 the data that populated the map that was Figure 7?

22   A.   Yes, those are the records within that perimeter.

23   Q.   Okay.  This shows then the results of the panther telemetry

24   from 1982 to present.  Correct?

25   A.   Correct.

1   Q.  And when we looked at that map, we saw lots of dots.

2   Right?

3   A.  1,164.

4   Q.  Each of those dots is not an individual panther.  Right?

5   A.  No.

6   Q.  That's an individual ping from the radio?

7   A.  An individual panther location.

8   Q.  So, in the 22 -- roughly 40-year period, excuse me, that

9   the telemetry data measures, there were only 23 panthers in

10  total within 6,700 meters of the site.

11      Is that right?

12  A.  That had radio collars on, yes.

13  Q.  And I think you said before, but just to make sure my math

14  is right, that's about four miles, 6,700 meters?

15  A.  That's right.

16  Q.  And looking at that data, no panther was detected within

17  four miles of the site between 2009 and 2014.  Right?

18  A.  That's correct.

19  Q.  So that's a five-year period when there was no detected

20  panther activity within four miles of the site.

21      Is that right?

22  A.  Yes.

23  Q.  Okay.  And then in 2014, two panthers, one male and one

24  female, over the course of the entire year, appear within the

25  four-mile circle three times.  Right?

1   A.   You said what range, what date range again, please?

2   Q.   In 2014, so that's FP 192 and FP 230.

3   A.   Okay.  Right, there is two.

4   Q.   Two panthers, three pings?

5   A.   Correct.

6   Q.   Okay.  So, since 2009, there have been two panthers, a

7   grand total of three times, have appeared within four miles of

8   the project site, according to the telemetry data?

9   A.   That's correct.

10  Q.   Okay.  And since then, we have no telemetry data showing a

11  panther near the site.  Correct?

12  A.   That's correct.

13  Q.   Okay.  Now, you say that studies in Florida and elsewhere

14  have demonstrated that the presence of pumas decreases with

15  increasing human presence.

16       Is that right?

17  A.   Yes.

18  Q.   What studies were those?

19  A.   The ones that -- would you repeat that again, please?

20  Q.   You say that studies in Florida and elsewhere have

21  demonstrated that the presence of pumas decreases with

22  increasing human presence.

23       Is that right?

24  A.   Okay.  Yes.

25  Q.   My question was, which studies are those?

1  A.  They are listed in the literature citing section of my

2  report.

3  Q.  Okay.

4  A.  Hopefully, I don't have to repeat them off the top of my

5  head.

6  Q.  Not a quiz, I just wanted to make sure they were all in the

7  literature cited section.

8      Did any of those studies examine population density

9  associated with detention facilities?

10 A.  Not that I am aware of.

11 Q.  And would you agree that a detained population uses land

12 differently than an undetained population?

13     MS. GALLONI:  Objection, Your Honor.

14     THE COURT:  Do you know?

15     THE WITNESS:  I do not know.  I can surmise.

16     THE COURT:  No, no, if you don't know and you haven't

17 studied it, then --

18     THE WITNESS:  No.

19     THE COURT:  -- let's move on.

20 BY MR. EZRAY:

21 Q.  Do you have a study that talks about how panthers would

22 respond to the population at the detention facility?

23 A.  Yes.  The presence of humans, yes, and the increase of

24 human population at the detention center compared to what was

25 there before, yes.

1    Q.   But have you no study that analyzes how a panther responds

2    to being near a detention facility?

3    A.   Not specifically a detention facility, that's correct.

4    Q.   Okay.  Now, at page nine of your report you say, "Panthers,

5    nevertheless, likely cross the paved areas of the site in

6    search of prey or during their normal movement patterns."

7    Right?

8    A.   That's correct.

9    Q.   If the airport were fenced before it became a detention

10   facility, that would not be true.  Correct?

11   A.   It depends.

12   Q.   What if it was a fence like the one that we just talked

13   about?

14   A.   If it was a fence like that that completely surrounded the

15   site, there were no breaches, no wild hogs had created a gap in

16   it, nobody left the gate open, if it was a perfect fence of

17   those circumstances, then I would think panthers would not use

18   the site.

19   Q.   Now, when you talked about lighting, you say panthers would

20   typically avoid an area within five kilometers of a bright

21   light source.  Right?

22   A.   I said, in most circumstances, pumas, including panthers,

23   would not use that habitat.

24   Q.   Okay.  And I think you were getting at this but that varies

25   by individual panthers.  Correct?

1   A.   Correct.

2   Q.   And I think as we just discussed, oftentimes, there would

3   either be no or very few panthers in the vicinity of the site.

4   Right?

5   A.   That's what you said.

6   Q.   That's what the telemetry data shows.  Right?

7   A.   No.

8   Q.   Why not?

9   A.   Because not all the panthers that occur in that region have

10  collars on them.  The way that researchers decide -- they

11  decide what panthers and what regions they want to study

12  panthers in, and that means that they weren't necessarily

13  studying panthers here.

14       The panthers that were in this region, apparently did not

15  have collars.  And, of course, as I said earlier, they quit

16  studying panthers after 2018, and the panthers that were being

17  studied just weren't in this area.

18       The researchers, their business is to figure out -- not to

19  monitor every place within the range of panthers that panthers

20  occur, but they have other research goals like what habitats do

21  they use, how many kittens are produced, how long do they live,

22  when does intraspecific aggression occur?

23       They are trying to answer questions about the life history

24  and ecology of panthers, and they're not necessarily trying to

25  determine where is every panther, what is every square inch of

App. 309

1   the range of panther, is it all being used now.  That's not the

2   goal.

3        So, it's very likely that -- and I don't know this for a

4   fact -- but the panthers that are in this area just weren't

5   being studied.  I'm confident that panthers are still in this

6   area and have been.

7   Q.  You don't know that for a fact, though?

8   A.  Based on this evidence, I could not say for a fact, no.

9        I have talked to the panther biologists and they say yes.

10  Q.  Which panther biologist?

11  A.  I've talked to David Shindle.

12  Q.  When?

13  A.  Within the last week.

14  Q.  Was that disclosed in your report?

15  A.  My report was July 10th.

16  Q.  Did you disclose that you talked to him at any time since

17  then?

18  A.  No, because I hadn't talked to him then, although I've

19  talked to Dave multiple times.  I mean, he is the co-author of

20  the panther species status assessment.

21  Q.  Did you talk to him about the testimony that you were going

22  to give today?

23  A.  I talked to him -- I told him I was going to give

24  testimony.

25  Q.  Anything else?

1   A.  And I asked him about, is there anything I should know.

2   Basically, the answer was no.

3   Q.  Okay.  Now, when you are examining the potential for

4   decrease of habitat on account of light, you conclude that

5   there would be a loss of 18 -- I'm sorry, 1,895 acres,

6   including the paved area of the site.  Right?

7   A.  That's correct.

8   Q.  That's 1,895 acres out of 3.11 million acres of critical

9   panther habitat.  Right?

10  A.  That's correct.

11      MS. GALLONI:  Objection to the use of the word

12  "critical."  It's a term of art.

13      THE COURT:  Well, he is an expert so he will tell me.

14  Overruled.

15      THE WITNESS:  I'm trying to remember.  That's within

16  the whole range of the panther as described by the primary

17  zone, secondary zone, and dispersal zone.  Correct?

18  BY MR. EZRAY:

19  Q.  I believe you said on page -- I can get you the exact page

20  of your report -- that the critical habitat was 3.11 million

21  acres.

22  A.  I probably -- did I say critical?  I probably didn't say

23  critical habitat.

24  Q.  Significant.  Sorry, significant panther habitat.

25      THE COURT:  Could you -- just before, is there a

1    difference between significant and critical?

2         THE WITNESS:  Yes, critical implies from a U.S. Fish

3    and Wildlife Services standpoint, critical is a specific

4    designation applied to the habitats of certain species, and

5    there is no critical habitat been declared.

6         So I don't want to -- that's a confusing term to use in

7    this circumstance.

8    BY MR. EZRAY:

9    Q.  No, that's a fair point.  Let me re-ask that question.

10        The 1,895 acres, that's out of 3.11 million acres of

11   significant panther habitat.  Right?

12   A.  That was -- okay, yes.

13   Q.  And you arrived at that 1,895 acres of habitat loss, even

14   though you don't know the current amount of lighting at the

15   facility.  Correct?

16   A.  That's correct.

17   Q.  Okay.  You say increased vehicular traffic to and from the

18   site, particularly from the west, is likely to increase the

19   danger to panthers.

20        Is that right?

21   A.  That's correct.

22   Q.  How did you determine that there would be increased

23   vehicular traffic to and from the site, particularly from the

24   west?

25   A.  I did not determine.  I just said if there was.

App. 312

1   Q.  So you don't know one way or the other whether there would

2   be increased traffic?

3   A.  I do not.

4   Q.  Do you know Robert Frakes?

5   A.  I do.

6   Q.  And you rely on him in your report.  Correct?

7   A.  Yes.  Yes.

8   Q.  Okay.  So, do you think you know -- do you think he knows

9   what he is talking about when he talks about panthers?

10  A.  Most of the time.

11  Q.  Have you read the letter he submitted in this case?

12  A.  I did.

13  Q.  I just want to ask you about a couple of the statements in

14  the letter.

15      On page one he writes, quote, the lack of detailed

16  information on the construction, possible expansion, and

17  current and future operation activities is problematic and

18  makes it difficult to assess the full extent of impacts to

19  panthers.

20          MS. GALLONI:  Objection, Your Honor.

21          THE COURT:  Right.  So, I don't know if this is -- what

22  is this, impeachment or refresh recollection, or are we going

23  to admit this letter into evidence?

24          MR. EZRAY:  I'm going to ask him if he agrees with the

25  statement of another panther expert that they put forward, so I

1   believe it's impeachment.

2           MS. GALLONI:  Could he tell us where he is looking at?

3           THE COURT:  He is looking at a letter from Mr. Frakes.

4           MR. EZRAY:  You can pull it up.  It's Exhibit 27.

5           THE COURT:  Your Exhibit 27 or their Exhibit 27?

6           MR. EZRAY:  Yes, Your Honor.  Our Exhibit 27.  I am not

7   trying to admit it.  I just want to show it to the witness.

8           THE COURT:  Okay.  Well, you are just going to ask if

9   he agrees with a statement, so --

10          MR. EZRAY:  Correct.

11          THE COURT:  -- let's do that.  We don't want to go

12  through the whole letter.

13          MR. EZRAY:  I have just a couple statements that I want

14  to ask about.

15          THE COURT:  You know what, let's admit it.

16          MR. EZRAY:  Okay.  We would just -- we don't believe

17  that it is true, but I just want to ask him about the opinions.

18          THE COURT:  Well, if you don't believe it's true and

19  you are trying to impeach him because you think that he is

20  going to disagree with what's not true, where are we going with

21  that?

22          MR. EZRAY:  I want to know -- he is drawing some very

23  strong conclusions in his report and Frakes draws some

24  conclusions as well, I don't agree with those conclusions, but

25  Frakes also limits his ability to draw conclusions because he

1    says there is insufficient data and I want to ask him about

2    that.

3            THE COURT:  Okay.  Then, no, let's not do that.

4            And let's not do it with it on the screen.

5            You can pinpoint that one -- that one statement that's

6    made about I don't have enough data and ask this gentleman if

7    he agrees with it or has any issue with it and then we will

8    move on.

9            MR. EZRAY:  Yes, Your Honor.  Thank you.

10   BY MR. EZRAY:

11   Q.  Do you agree with the statement that the lack of detailed

12   information on the construction, possible expansion, and

13   current and future operation activities is problematic and

14   makes it difficult to assess the full extent of impacts to

15   panthers?

16   A.  I agree with part of it but not all of it.  I think in my

17   opinion, if you read my report, you would conclude that I

18   relied on a whole lot more information than he did.  So, in my

19   opinion, he didn't have as much information so, therefore, he

20   was able to draw that conclusion, that it's problematic lacking

21   information.

22   Q.  Okay.  I want to ask about the very end of your report.

23           You say that the combined effects of habitat loss,

24   degradation, and fragmentation have the potential to jeopardize

25   the viability of the panther population in the future,

1  depending on the quality of habitats remaining by 2070.

2      Is that your opinion?

3  A.  I did, yes.

4  Q.  I want to ask you about a couple terms there.  You say "has

5  the potential."

6  A.  Right.

7  Q.  What do you mean by "has the potential"?

8  A.  How much time you got?

9      Okay.  So, what I mean by that is we talked about density.

10  We talked about carrying capacity.  We talked -- I didn't talk

11  about fragmentation so much, but if you look at all those

12  factors working together and you think about densities and

13  qualities of habitats and those, all those factors remaining in

14  2070, then there is the potential that this contributes to the

15  loss of the -- or degradation of the viability of the

16  population.

17  Q.  Now, in the context of all of those things, did you analyze

18  what the relative effect of this facility would be on the

19  potential viability of the panther by 2070?

20  A.  No.

21  Q.  And on your direct, I think you said it was another brick

22  in the wall.  Right?

23  A.  That's correct.

24  Q.  Do you know how big a brick it is?

25  A.  It's a small one.

1    Q.   How small?

2    A.   Small.

3    Q.   Would it be even smaller if you knew the facility was

4    temporary?

5    A.   I don't know that it's temporary.  Temporary is an

6    undefined word.

7    Q.   Okay.  And you didn't reach any conclusions on effects on

8    any individual panthers.  Correct?

9    A.   Not on individual panthers, that's correct.

10   Q.   And you didn't reach any conclusions on the risk of take to

11   any panther.  Correct?

12   A.   I did not do that either.

13            MR. EZRAY:  Your Honor, could I have one minute?

14            THE COURT:  You may.

15            MR. EZRAY:  Thank you, Your Honor.

16            Nothing further from us.  Thank you for your time.

17            THE COURT:  Thank you.

18                         CROSS-EXAMINATION

19   BY MR. GUSTAFSON:

20   Q.   Good afternoon, Dr. Kautz.  I appreciate your patience.  I

21   will try to be brief.

22       I'm not a scientist.  I just want to ask you some questions

23   that I think are going to rather general -- to untangle your

24   conclusions about your -- about the population at large and

25   general habitat -- general population trends and this facility.

App. 317

 1        Is it fair to say that the future of the Florida panther is

 2   uncertain for reasons that have nothing to do with the

 3   temporary detention facility in this case?

 4        Maybe I should be more specific.

 5        You have identified a range of factors that are relevant to

 6   the future of the panther.

 7        Isn't that right?

 8   A.   Correct.

 9   Q.   Would you say that those factors include the quality of

10   habitat, the quality of other habitat that's lost?

11        You mentioned that?

12   A.   Yes.

13   Q.   Would you say it includes additional roadkill?  That's one

14   of the factors you mentioned?

15   A.   Yes.

16   Q.   Is it fair to say there are probably other factors that you

17   didn't study that are also relevant to the future --

18   A.   I would say the primary factor is habitat loss.

19   Q.   Would you say that factors relating to the population of

20   prey species would be relevant?

21   A.   Yes.

22   Q.   Would weather patterns be relevant?

23   A.   I don't know.

24   Q.   Would potentially self-driving vehicle technology be

25   relevant?

```
 1   A.   I don't know.
 2   Q.   You have no idea whether those might be relevant to the
 3   future of the Florida panther?
 4   A.   That's speculation.
 5   Q.   I agree.
 6        In terms of geography, help me understand, the population,
 7   I think you have said, is expanding in a northwesterly
 8   direction for reasons completely independent of the temporary
 9   detention facility.  Is that right?  You mentioned Charlotte.
10   A.   Refresh my memory.  I don't remember that.  Oh, okay.
11   Q.   Charlotte and Glades Counties?
12   A.   That refers to the individuals I talk about about the
13   couple of females that are now in Charlotte and Glades County
14   and there are some males there, and there has been some
15   evidence of reproduction and, apparently, yes, the population
16   is expanding to the north, a few individuals, and reproducing.
17   Q.   And that has nothing to do with the temporary detention
18   facility in this case, this is a trend --
19   A.   No.
20   Q.   -- that occurred before any work was done?
21   A.   That's correct.
22   Q.   If I understand your Figure 6 correctly, it looks like
23   panther dens are more numerous in areas to the northwest of the
24   habitat for reasons that have nothing to do with the temporary
25   detention facility in this case?
```

App. 319

1  A.   It has to do with research effort, not the absence of dens

2  but the research effort involved in locating dens and where

3  most panthers have been monitored, which is not in the vicinity

4  of this site.

5  Q.   And genetic diversity has improved for reasons independent

6  of the temporary detention facility, the introduction of the

7  Texas puma?

8  A.   That's correct.

9  Q.   Your model predicts 9.8 percent habitat loss in South

10  Florida by 2070.  Am I understanding that correctly?

11  A.   What was the number again, please?

12  Q.   9.8 percent.

13  A.   That is habitat loss before you factor in fragmentation,

14  yes.

15  Q.   And that has nothing to do with the temporary detention

16  facility that -- you have identified the causes of that habitat

17  loss as roadkill and fragmentation.

18       Is that right?

19  A.   Roadkill isn't a -- does not affect habitat loss.

20  Q.   Let's see.  Sorry, you attributed that 9.8 percent habitat

21  loss, if I'm understanding correctly, in part to sea level

22  rise.

23       Is that right?

24  A.   To sea level rise plus future development which could

25  include -- could include the detention facility, could include.

1    Q.   Well, specifically, you --

2    A.   But that wasn't in the models that were created by the

3    University of Florida that show the future growth.

4    Q.   And to put a finer point on it, the model predicts an

5    increase of just over a million humans?

6    A.   Yeah, right.

7    Q.   So, again, that's independent of the -- any population

8    change in the detention facility?

9    A.   To the best of my knowledge.

10   Q.   Your analysis doesn't disentangle those two things, does

11   it, the sea level rise and the increase in human population?

12   A.   There is very little overlap between the locations of

13   habitat lost to sea level rise and human population growth so

14   those, you know, disentangling, I'm not so sure because they

15   are almost not coincident.  There is a little bit of overlap

16   that is quite marginal.

17   Q.   What is the percentage that you would attribute to sea

18   level rise versus population?

19   A.   I don't remember.  It's smaller than development.

20   Q.   Wouldn't you agree that any estimate of population change

21   in the species over a period of 45 years involving, as it does,

22   so many factors, including, as you said, prey species which you

23   didn't consider, involves a significant degree of speculation,

24   I think that was the word you used?

25   A.   Would you repeat the question, please?

1   Q.  Wouldn't you say that any estimate of a population-wide

2   change, over 40 years, between now and 2070, involves a

3   significant degree of speculation?

4   A.  I don't know if I said -- I may have said speculation in

5   relation to another question, I'm not sure, but I would say

6   based on our best guesses, speculation is guesses, based on the

7   best modeling we have where future growth might occur, where

8   sea level rise is likely to occur, based on our best

9   information, these are the results.

10  Q.  Well, I think in response to the Miccosukee Tribe you said

11  the effect of habitat loss would, quote, really depend on other

12  factors, independent of the ones that you identified.

13       Is that right?

14  A.  I don't remember the question.  Could you refresh my

15  memory?

16  Q.  Okay.  Turning to that temporary detention facility, am I

17  understanding correctly, the only harm that you've identified

18  is a reduction of proximity of the panther to the facility

19  within a 500-meter buffer zone?

20       Is that right?

21  A.  That's the principal one, yes.

22       MR. GUSTAFSON:  All right.  I have no further questions.

23  Thank you.

24            THE WITNESS:  Thank you.

25            THE COURT:  Thank you, Counsel.

App. 322

1        Redirect.

2        MS. GALLONI:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4   BY MS. GALLONI:

5   Q.  Mr. Kautz, you were asked on cross about when you first

6   learned of the detention center, you talked about reading news

7   reports.

8        Is that correct?

9   A.  Yes.

10  Q.  Did you learn about the detention center from any other

11  sources?  Was any other information provided?

12  A.  Yes, I mean, it was mostly the news.  It's also information

13  I received from the Center.

14  Q.  Did you receive any other reports from the Center, any

15  images?

16  A.  Yes, there is definitely some aerial photography that I

17  have seen from the Center.

18  Q.  You were asked about whether you reviewed site plans for

19  the facility.  Are you aware of any public notices that --

20  issued from any agency announcing this project that provided

21  site plans or any of that sort of information?

22  A.  No.

23  Q.  You were asked about panthers and airports.  Does noise, in

24  and of itself, deter panthers?

25  A.  As the best information I have on that, which from the

App. 323

1    studies I've read is if it's immediate noise, sudden noises,

2    pumas will flee from that.  But if it's noises, even loud

3    noises that are continuance, they may habituate to that.

4    Q.  If the prior use -- you were asked about the prior use of

5    the site as a jetport, and I believe there were some questions

6    about fencing.

7        If there were fencing that completely surrounded the site

8    and excluded panthers, would you have expected the telemetry

9    points that you found near and around the detention center?

10   A.  Well, I would expect those, assuming -- I'm going to

11   assume, because I don't know, that the fencing surrounding the

12   site was panther unfriendly, panthers couldn't cross it, then,

13   of course, you wouldn't expect to see telemetry points on the

14   jetport.

15   Q.  You were asked about sort of all forms of habitat that

16   would be available to the panther.  Can I put Figure 1 back on?

17       I think you were asked about 3.1 million acres, or

18   something to that effect.

19       Is the location of the habitat important in terms of the

20   significance of the species?

21   A.  Well, yes, that 3.1 million acres, that's everything,

22   including secondary zone, dispersal zone.  That's not the

23   primary zone.  I forget the exact number for the primary zone,

24   the area in orange, but that 3.1 million concludes the green,

25   and blue and the orange there.

App. 324

1    Q.   And of that orange primary zone habitat, is that type of

2    habitat -- a new equivalent to that habitat easy to come by?

3    A.   No.

4    Q.   Is the adult breeding habitat where panthers live and

5    breed, are new types of that habitat easy to come by?

6    A.   No, especially in this region.  If it was, it would be

7    used.

8    Q.   You were asked about the telemetry data I think with

9    reference to the radio collars.  Was that telemetry data the

10   only source that you used to determine the occurrence of

11   panthers near the detention site?

12   A.   Well, yes, and no.  Yes, in the sense that the telemetry

13   data shows you what panthers have been there and over what

14   period of record.  Then, using that data, I inferred panthers

15   are still there, and, then, again, talking to panther

16   biologists who say that panthers are still in that region, just

17   haven't been studied.

18   Q.   Was there information related to where panther mortalities

19   occur also part of your calculation or assessment?

20   A.   Yes.

21   Q.   I think you had a question about paved areas.  Are panthers

22   able to, and even likely to cross paved areas, if they have

23   access to that and it's within their habitat?

24   A.   Well, sure, they wouldn't get killed on the road otherwise.

25   Q.   When it comes to fencing, would the fencing have to be of a

App. 325

1    certain height or type to totally exclude panthers?

2    A.    Yes.

3    Q.    How high can a panther clear a fence or how high a fence

4    can a panther clear by jumping?

5    A.    About six feet -- yes, everything I know about panthers,

6    they can clear a 6-foot fence.

7         I think maybe I said in my report four feet, definitely

8    four feet, but six feet as well.

9    Q.    But not the deer?

10   A.    But not deer, no.

11   Q.    You were asked about the radio telemetry ending in 2014.

12   Why is there no radio telemetry data after 2014?

13   A.    Again, budget cuts and there just are no panthers in that

14   region that are collared that are being studied.

15   Q.    You were asked about the increase of human presence.  What

16   types of activities did you consider might be associated with

17   operating the Center?

18   A.    Obviously -- I say obviously -- the coming and going, I

19   mean, there is housing -- well, I say there's housing -- the

20   staff, the prison guards, the -- gosh, the people who do

21   laundry, the people who do the food, the dining, just all the

22   people that -- all the staffing it takes to make that operation

23   go, just all that presence, not to mention the detainees being

24   present.

25   Q.    And when you talk about human presence increasing, does

App. 326

1   that include the vehicles they travel in or is that literally

2   just their physical --

3   A.   I tend to think of that separately, as a separate impact.

4   Q.   You were asked about this being a temporary detention

5   center but as long as it operates, are the adverse impacts that

6   you have assessed to be likely continuing, ongoing?

7   A.   Yes.

8   Q.   You were asked about whether you had quantified take.  Is

9   intraspecific aggression considered take?

10  A.   Not to my knowledge.

11  Q.   Is harassment of the panther considered take?

12  A.   Yes.

13  Q.   You were asked about jeopardy, jeopardy to the species.

14  Are the adverse effects that you have talked about, do you

15  consider them to be serious even if they don't rise to the

16  level of jeopardy?

17  A.   Well, I do in the sense that it is a habitat loss.  I

18  consider what's the effects of the project, habitat loss for

19  panther, which, again, as I have said, is probably the number

20  one threat to the future persistence of panthers.

21  Q.   And regardless of all the other factors you have been asked

22  about that could adversely affect the panther, does the habitat

23  loss caused by this detention center contribute to those harms

24  to the panther?

25  A.   Yes.

1          MS. GALLONI:  Could I have a minute, Your Honor?

2          THE COURT:  Yes.

3     BY MS. GALLONI:

4     Q.  One last question:  Does the reduction in habitat loss

5     that's available affect the viability of the population?

6     A.  I think I understand the question.

7          Yes.

8          MS. GALLONI:  Thank you.  No further questions.

9          THE COURT:  Thank you, sir, you may step down.

10          (Witness excused.)

11          THE COURT:  All right.  Ladies and gentlemen, now let's

12     talk about what we are going to do.

13          MR. SCHWIEP:  We have one more witness and we think the

14     direct will be about 20 minutes.  She has been here all day,

15     Judge.  Her father, Joe Namath, has been here, too, I am

16     thinking maybe he can like teach us to run a 2-minute drill and

17     get it done rapidly, if it is possible.  We think it will go

18     quick.

19          THE COURT:  Well, I don't know.  If the direct is

20     20 minutes, do we know -- have reports been given to the

21     defense, or how long --

22          MR. HIAASEN:  This is just a fact witness, Your Honor.

23          THE COURT:  It's a fact witness.  All right.

24     Mr. Schwiep, as you know, I have personnel here, so make that

25     direct 15 minutes, or Mr. Hiaasen, 15, and I don't expect to

App. 328

1    here from the Tribe, I don't expect to hear from two defense

2    attorneys.

3          MR. HIAASEN:  May it please the Court, Your Honor, the

4    plaintiffs call Jessica Namath.

5          COURTROOM DEPUTY:  Raise your right hand.

6          (The witness, Jessica Namath, was duly sworn.)

7          COURTROOM DEPUTY:  Please have a seat.

8          State your full name for the record, and spell it out

9    for the court reporter.

10          THE WITNESS:  Jessica Namath, J-E-S-S-I-C-A,

11    N-A-M-A-T-H.

12                      DIRECT EXAMINATION

13    BY MR. HIAASEN:

14    Q.  Good afternoon, Ms. Namath.  Thank you for coming.

15          What's your occupation?

16    A.  I'm in public relations.

17    Q.  Are you a member of Friends of the Everglades?

18    A.  Yes, since March of '23.

19    Q.  And in your free time, do you participate in recreational

20    activities, is that one of the things you like to do?

21    A.  Yes, very much so.

22    Q.  Can you explain to the Court what types of recreational

23    activities you like to do?

24    A.  I'm a paddler, a horseback rider, I do a lot of hiking, a

25    lot of camping, photography, bird watching, animal watching.

1  Q.  Do you do these activities with your children?

2  A.  I do, yes.

3  Q.  And how old are your children?

4  A.  14, 8 and 4.

5  Q.  Have you participated in these recreational activities you

6  described in the Big Cypress area and in Everglades National

7  Park?

8  A.  Yes, I have for years.

9  Q.  In both of those places?

10 A.  Yes, in both.

11 Q.  And where exactly in Big Cypress National Preserve have you

12 done these recreational activities?

13 A.  Well, technically, I have walked all of 41, basically.  So,

14 I have been everywhere from Nat Reed to the Oasis Center to

15 Loop Road, and have been on Jetport Road.  I have been to the

16 Miccosukee Indian Village and on swamp buggy rides and airboat

17 rides, and pretty much everywhere there is to recreate there.

18 Q.  Are you familiar with -- I need to say the name here -- are

19 you familiar with the Dade-Collier Training and Transition

20 Airport, which I will now call the TNT Site?

21 A.  Yes, I am.

22 Q.  I believe you just testified of something called Jetport

23 Road.  What are you referring to there?

24 A.  I'm referring to the road off of 41 where we have for, you

25 know, on multiple occasions gone with groups of people.  I've

301

 1   taken my children, but it's a road that we have been able to

 2   pull off on and park the car and get out and have a picnic or

 3   go hiking out into the Everglades or when I've been, you know,

 4   going between places, I can safely pull off and get the kids

 5   out and figure out what we need.

 6       So it's an area that's safely off 41 that we have accessed

 7   many times.

 8   Q.  I assume when you say you have accessed that road, that was

 9   prior to June 22nd of this year?

10   A.  Yes, to my knowledge, the gates have never been closed

11   prior to that day, prior to, a few days before.

12   Q.  Okay.  So, my apologies, Madam Court Reporter.

13       So, in your experience, there was -- was there a gate at

14   the entrance off of U.S. 41 into the jetport --

15   A.  Yes, but it's been kind of pushed back all the way into the

16   side.  It's an open entrance.

17       There is a gate that says the TNT, the Dade-Collier

18   Training and Transition Airport, but they were never closed, to

19   my knowledge.

20   Q.  So in your recreational activities, you would drive down

21   that road?

22   A.  Yes.

23   Q.  And you would park your car?

24   A.  Yes, yes.  Because there weren't fences there then either,

25   so we would park -- just pull off onto the grass, kind of on

App. 331

1    the side.

2    Q.   I think you answered my next question.  So prior to

3    June 2025, when you had been on that site, there was no fencing

4    along the Jetport Road north to south?

5    A.   No, there was not and you now see, you know, almost

6    200 yards of fencing, black kind of -- yes, fencing straight

7    down the Jetport Road on both sides.

8    Q.   Was there any type of lighting on Jetport Road, in your

9    experience, prior to June 2025?

10   A.   Not on the portion of the entrance road that I could see.

11   No, there is no lighting prior to that.

12   Q.   Just for clarity, can you describe for the Court what types

13   of recreational activities you took part in from the Jetport

14   Road, when you parked on Jetport Road?

15   A.   Numerous, everything from bird watching, so -- we've seen

16   wood stork and snail kites and spoonbills and osprey and heron

17   and everything to hiking out into, you know, the water there,

18   to walking.  You know, I've prayer walked that whole road there

19   with Miccosukee, so I have walked out of Jetport and left my

20   car there to go walk 41 and come back to it.

21        Photography.

22   Q.   And have you ever been out at Jetport Road prior to

23   June 2025 at night?

24   A.   Yes, I've certainly been in that -- yes.  I'm not sure

25   about on the road at night because that's a great road to look

1    down, so across from the road or in that vicinity, yes,

2    certainly.

3    Q.   And can you describe for the Court what the sky, what the

4    night sky looks like?

5    A.   That was the draw for us as campers.  I've stayed out

6    there, you know, multiple times, I think three or four, at

7    Trail Lakes and at the Everglades Conservation and Sportsman

8    Camp out there.  It's just pitch black darkness with beautiful

9    Milky Way and a sky where you can see all of the stars.

10   Q.   In your experience at the -- parking along the Jetport

11   Road, did you see any artificial light coming from the -- down

12   the road where the airstrip is?

13   A.   No, no.

14   Q.   And in your experience on Jetport Road, did you encounter

15   any aircraft taking off and landing?

16   A.   I had never, prior to June 22nd or 23rd, no, I had never

17   and, again, I've spent over a year walking a whole portion of

18   that road, too, so I have never, in my experience, seen planes

19   coming and going.

20   Q.   How many times do you think you have been on Jetport Road?

21   A.   You know -- I'm not sure.  I've been in that community so

22   much and, again, it's an easy spot for me to pull off but we

23   have had multiple events with groups of people there in the

24   past.

25   Q.   Have you observed other people doing recreational

1    activities off of Jetport Road?

2    A.   Yes.  Yes, I have.

3    Q.   Have you seen any eco tours using that road?

4    A.   Yes, absolutely.

5    Q.   You described some of the wildlife you have seen hiking off

6    the road.  Have you ever seen any Florida panthers?

7    A.   I have not, unfortunately.  I know somebody that has seen

8    one 13 miles from there, so we have been on the lookout.  My

9    daughter is a cat lover so my daughter is always looking for

10   them as well, and bear, of course.

11   Q.   Ms. Namath, have you been back to the Jetport Road and TNT

12   sites since June 22, 2025?

13   A.   I have.

14   Q.   And why did you go there in June?

15   A.   Well, I was coming -- I had been asked to come help.  I

16   have a group of -- I have a group called Floridians for Public

17   Land and we advocate for public land.  So when we heard that

18   the gates were closed and we lost access to that site, we were

19   wanting to support the Miccosukee community and those who had

20   lost access.

21       So I had gone down with my kids to join Betty Osceola and

22   pray down there, and once I saw what was happening, it was hard

23   to leave.  It was summertime.  My kids are out of school so I

24   had a place to stay nearby and I have been there almost every

25   day.

App. 334

1    Q.   Can you tell the Court what you have observed from -- when

2    you say "there," you have been outside of the facility.

3    Correct?

4    A.   Yes, we had to park on the south side of the -- well, I

5    park on the south side of the road across from the entrance,

6    and there is like a little pullout area there, but there is --

7    we were on the south side of 41.  I'm not able to go on Jetport

8    Road.

9    Q.   And can you just tell the Court what you have observed in

10   the many days you have spent out there from -- across the road

11   from the entrance to the TNT Site?

12   A.   I have seen everything from -- in the beginning, there

13   were, you know, that first week there had to have been 50

14   trucks that look like they have some sort of fill, you know,

15   the netting that kind of covers so what's in it and sometimes

16   we can see, you know, like an aggregate or, you know, some sort

17   of something that looks like fill.

18        I have seen Senar Milling & Paving, and I have seen asphalt

19   trucks.  I have seen Mosquito Joe's.  I've seen reticulated or

20   giant dump trucks and excavators and asphalt stripper and soil

21   compactor and a lot of just heavy, heavy material and jet fuel

22   and wastewater treatment trucks.

23        It's just kind of a constant flow of machinery, in addition

24   to all of the people coming and going.

25   Q.   Would you say this flow of machinery is a daily occurrence?

1   A.   I think that there are certain -- we see certain types

2   of -- you know, I don't see the giant excavators coming in

3   every day.  I have only seen kind of each of those go in and I

4   have not seen those come out, but I see fill trucks and

5   wastewater and, you know, what looks like -- it says "top

6   water" on the side.  I don't know if that's the potable water.

7   I see jet fuel.

8        Those are all daily comings and going, certainly.  The fill

9   trucks and the asphalt.  The mosquito trucks are not daily.  I

10   have only seen those on a couple of occasions earlier on.

11   Q.  Ms. Namath, I believe you said -- at some point, you said

12   you saw something like 30 fill trucks.

13       Is that your testimony?

14   A.  Well, in the first, I want to say, two or three weeks, they

15   were upwards.  I record videos and I have that group Floridians

16   for Public Lands, so I will do videos and, yes, we saw 50,

17   upwards of 50 in the first few weeks, but just last week they

18   kind of started rolling back in again and there are, yes,

19   absolutely, like 30 an hour, 40 -- I mean, in the beginning it

20   was 50 an hour.  Now we are seeing around 30, but it's still

21   quite a significant amount of fill coming in.

22   Q.  This was just last week?

23   A.  Yes, and I think it was a few days ago, I saw -- I thought

24   it was an asphalt roller but I looked up the machine number

25   that was on the side of the vehicle I saw going in and it was a

App. 336

1    soil compactor.

2    Q.  And I apologize, I hope I didn't ask this question before.

3    Have you seen any new fencing on the site that you did not see

4    in your previous visits there?

5    A.  Yes, I have seen, of course, there is fencing that's lining

6    the jetport that looks like it's over eight feet tall black

7    fencing, and it has the green, I think, Sunbelt, you know,

8    signs on it.

9    Then I watched them install the fencing at the front

10    entrance.  They replaced the gates that were there originally,

11    so I watched them, Guaranteed Fence, I think it was, I saw

12    putting those in and, you know, everything that we have been

13    able to see at that front entrance has been -- there are two

14    canals right there, so for me, I worry about what goes into the

15    water.

16    Q.  Did you see any materials going into those canals?

17    A.  One day when they -- I was there the day they installed the

18    new Alligator Alcatraz sign at the entrance, the blue one.  I

19    believe that was Weber, the company that was doing that, but

20    they were -- and actually, I think it was the day that all of

21    the representatives I think had been trying to get there

22    because it was a little chaotic.  There was a lot going on but

23    they were just digging out a hole to put in two large concrete

24    cylinders that the poles that the sign are mounted onto were

25    going into the ground and the excavator, whatever machinery was

308

1    scooping out the fill and just dumping it right into the canal.

2         So, you know, and the work that they were doing on the new

3    front gate installation was 2 o'clock in the morning or

4    3 o'clock.  It was very late so -- and that's one of they --

5    they brought out a giant generator light to do that and that's

6    still at the front entrance.

7    Q.  And have you been there at night since June 22nd?

8    A.  I have, yes.

9    Q.  How many times?

10   A.  Many, many, many times.  I don't know exactly how many.

11   Q.  Can you describe for the Court what the light at the

12   facility looks like at night now?

13   A.  At the -- from what I see on the road or from where I have

14   been staying three miles away?

15   Q.  From when you are across the street from TNT.

16   A.  Blindingly bright.  I mean, there is -- it's not just

17   bright.  It's noisy because those generators are so loud, but

18   there are, I think at least ten different large generator base

19   with the tall pole that has four big lights coming off of it

20   and sometimes not all of the lights are working.  I think at

21   the front gate right now there are three that are on but they

22   are so bright and the police sit there with their bright

23   lights.

24        It's almost kind of like they don't want us to be able see

25   in, it's so bright.

1   Q.  So, is it a little different than what it looked like the

2   other times you had been out there?

3   A.  Heartbreakingly different, yes.

4   Q.  Now, you said sometimes you stay someplace about three

5   miles away?

6   A.  Yes, I have been fortunate to stay at a camp nearby, and

7   from there we can see it.  I can see it when I have driven

8   home, I'm from northern Palm Beach County.  When I come back

9   you can see it.  Last night, I thought it was 20 miles.

10      I mean, you can see it from quite a distance, the glow, but

11  from the house that I have been staying at, it looks like we

12  have a sports stadium in our backyard now.

13  Q.  Ms. Namath, I'd like to show you some photographs.

14  Hopefully, we will call these up very quickly.

15      MR. HIAASEN:  Can we call up Exhibits 53 through 56,

16  Plaintiffs' exhibits.

17      (Plaintiffs' Exhibits 53-56 were marked for identification.)

18  BY MR. HIAASEN:

19  Q.  Ms. Namath, do you recognize this photograph?

20  A.  Yes.

21  Q.  Did you take this photograph?

22  A.  Yes.

23  Q.  Is this an accurate representation of the construction

24  equipment that you saw going into the TNT Site?

25  A.  Yes.

```
 1            THE COURT:  That's 53?

 2            MR. HIAASEN:  This is Exhibit 53.  Is that correct?

 3            THE COURT:  Okay.

 4   BY MR. HIAASEN:

 5   Q.  Now turning to Exhibit 54.

 6       Ms. Namath, did you take this photograph?

 7   A.  Yes.

 8   Q.  Is this an accurate representation of the equipment that

 9   you saw going into the TNT Site?

10   A.  Yes.

11   Q.  Do you know when you took these photographs?  I know you

12   take a lot of photographs.

13   A.  You know, I'm not sure of the exact date.  I would have to

14   look at my phone, which I don't have.

15   Q.  After June 22, 2025?

16   A.  Yes, yes.  Certainly.

17            MR. HIAASEN:  Can we turn to Exhibit 55, please.

18   BY MR. HIAASEN:

19   Q.  Did you take this photograph, Ms. Namath?

20   A.  Yes, I did.

21            MR. HIAASEN:  Exhibit 56, please.

22   BY MR. HIAASEN:

23   Q.  Did you take this photograph, Ms. Namath?

24   A.  Yes, I did.

25   Q.  Do you know what C&R Milling and Paving is?
```

App. 340

1    A.   Only from seeing.  That was the first time I had seen it on

2    that machine, but I frequently -- I mean, that is in and out

3    frequently with different size vehicles and asphalt -- asphalt

4    trucks, I've learned are the ones that have the steam coming

5    out of them because they are bubbling, but they are frequently

6    on and off site.

7    Q.   Now, Ms. Namath --

8              THE COURT:  Are you offering 53 --

9              MR. HIAASEN:  Yes, my apologies, Your Honor.  Yes, I'm

10   offering Plaintiffs' Exhibit 53 through 56 into evidence.

11             THE COURT:  Any objection?

12             MR. FRIEDMAN:  No objection.

13             THE COURT:  All right.  53 through 56 are admitted.

14             (Plaintiffs' Exhibits 53-56 were admitted in evidence.)

15   BY MR. HIAASEN:

16   Q.   Ms. Namath, do you have plans to return to the Big Cypress

17   area for recreational activities?

18   A.   I mean, absolutely.  We frequently are in that area, at the

19   Miccosukee Indian village and we just did Loop Road the other

20   night but, you know, we -- yes, we -- yes, I do.

21        You know, the Florida Trail is something that I've been

22   looking forward to and, you know, I'm in a solo female hiker

23   group and there are concerns about safety of going out

24   sometimes at night now on some of those trails, but I certainly

25   intend to recreate while we are still able to.

1  Q.  Do you believe this facility is going to negatively impact

2  your ability to enjoy some of those areas?

3  A.  It's -- yes, it is.  As a mom, you know, it's made things a

4  lot more dangerous just because there are a lot of very big

5  vehicles and then a lot of fast vehicles.

6      It's a busy road -- not busy but, you know, there is a lot

7  of recreation, I guess, on the weekends and the number of

8  workers that we see driving in and out who often are doing it

9  dangerously fast, you know, make things a lot more dangerous

10  than they used to be in that area.

11  Q.  Just a few more questions.

12      In your observations of when you have been out both day and

13  night outside the TNT Center, have you observed any vehicles

14  coming in and out of the facility with marks of the Department

15  of Homeland Security?

16  A.  Yes.

17  Q.  How often do you see that?

18  A.  Well, I -- again, it's been, I want to say, maybe a week or

19  so, maybe since like the 16th or -- the 16th, maybe, that I

20  have seen the DHS and Customs and Border Patrol marked

21  vehicles, but prior to that, they had been, sometimes multiple

22  times a day, certainly multiple days, in addition to the

23  other -- there is a bus that has Washington state plates on it

24  that drives in and out.

25      There are a lot of different kind of transport style

App. 342

1   vehicles and so -- but the DHS, the Department of Homeland

2   Security, was hard to miss, of course.

3   Q.   How about Customs and Border Patrol, have you seen any

4   vehicles --

5   A.   Yes.  They accompany that Homeland Security.

6   Q.   Are those cars?  Are they vans?  Are they buses?

7   A.   No, they are vans.  Sometimes they have a green stripe.

8   Sometimes they have a blue stripe.  I have seen both.

9   Q.   Have you seen any vehicles with the marking of Immigration

10  and Customs Enforcement, or ICE?

11  A.   No, I have not seen that particular logo, but I had seen a

12  transport vehicle with a name on the side, I've been used to

13  seeing Geo Transport, and then just the past few days, I

14  noticed this AIP that I had not recognized and, so, I, sitting

15  out there, will often enter in the DOT numbers just to see what

16  these vehicles are coming back registered to, because I'm

17  reading all the news articles and trying to figure things out

18  myself, since we don't have very many answers, and that came

19  back registered to a company called Akima, and when I Googled

20  it, it certainly was an ICE-contracted vehicle, so it's not the

21  logo but I think that I've seen a vehicle that is affiliated

22  with them, yes.

23  Q.   What did you do after you saw that Akeema vehicle?

24  A.   Well, I -- the bus that was -- the two, the AIP transport

25  vans I had noticed -- I have also noticed that if there are two

1    vehicles on either side of the buses, they are transporting

2    people, I believe, having an escort.  So, I saw that kind of

3    three caravan bus approaching, and that particular bus driver

4    is in the habit of honking at me when he sees me sitting across

5    the road recording, and it was daytime, like a safe hour, and I

6    actually just decided to pull out and follow them to see where

7    they are going, just because I had heard from some family

8    members or people, you know, that they might have been taking

9    people to Krome, and it's not very far away.

10         So I just rode behind them and did watch them drive all the

11   way and turn into the Krome Detention Center.

12   Q.   And you are referring to the Krome Detention Center in

13   Miami?

14   A.   Where 41 hits Krome Avenue there, and you go right and it

15   was just a little ways down on the right-hand side there.

16   Q.   Ms. Namath, I'm going to briefly show you a couple more

17   exhibits.

18         THE COURT:  You know what, you are at 20 minutes,

19   Mr. Hiaasen, so you better be really quick.

20         What do you want to show this witness?

21         MR. HIAASEN:  Two videos she made on her phone.  They

22   are both 30 seconds long.

23         THE COURT:  And we are going to see the videos?

24         No, Mr. Hiaasen, you can -- she can authenticate it,

25   but we can see it the next time we meet.

1    BY MR. HIAASEN:

2    Q.   Ms. Namath, did you video record --

3    A.   Yes.

4    Q.   -- ICE and D -- or, excuse me, DHS and Customs trucks going

5    in and out of the facility?

6    A.   I have, yes.

7              THE COURT:  And which, just so we know for the future?

8              (Plaintiffs' Exhibit 59 was marked for identification.)

9              (Plaintiffs' Exhibit 65 was marked for identification.)

10             MR. HIAASEN:  Exhibit 65 and Exhibit 59, Your Honor.

11             THE COURT:  Okay.

12             MR. HIAASEN:  No further questions, Your Honor.

13             THE COURT:  No, and cross-examination.

14             MR. HIAASEN:  Actually, may I retract that?

15             If we can move the admissions of 59 and 65.

16             THE COURT:  Yes, unless counsel wants to see the

17   videos, but I'm trying to move this along for their benefit.

18             MR. PANUCCIO:  These are the two videos, Your Honor?

19             THE COURT:  Yes, that this witness took.

20             MR. PANUCCIO:  No objection, Your Honor.

21             THE COURT:  All right.  So Plaintiffs' Exhibit 59 and

22   65 are admitted.

23             (Plaintiffs' Exhibit 59 was admitted in evidence.)

24             (Plaintiffs' Exhibit 65 was admitted in evidence.)

25             Thank you, Mr. Panuccio.

App. 345

1          MR. HIAASEN:  I tender the witness.

2          MR. FICARELLI:  Hi, Your Honor.

3          THE COURT:  Hello.

4          MR. FICARELLI:  I would just note that my pro hac vice

5    is pending, if that's okay with you, Your Honor.

6          THE COURT:  Why is everybody -- that's fine.

7          We are just going to go.

8                         CROSS-EXAMINATION

9    BY MR. FICARELLI:

10   Q.  Hi, Ms. Namath.

11   A.  Hi.

12   Q.  My name is Dante Ficarelli.  I represent defendant Guthrie.

13   I will be asking you some questions.

14   A.  All right.

15   Q.  How often have you been to the TNT Site since July 1, 2025?

16   A.  Almost, I would say 15 to 20 days of the month.  I mean, I

17   have been there a lot.  I don't know the exact number but I

18   have been there almost daily.

19   Q.  Okay.  And you have attached a video to your declaration.

20   Is that correct?

21   A.  Yes, I believe.

22   Q.  And have you taken any other videos?

23   A.  I have.

24   Q.  And have you taken any other photos?

25   A.  Just in general or --

1  Q.  Yes, have you taken any other photos of the TNT Site since

2  July 1st?

3  A.  Yes.

4  Q.  Did you submit those videos with the declaration?

5  A.  I submitted the ones we have seen.

6  Q.  And did you submit any of those other photos with your

7  declarations?

8          THE COURT:  What is the relevance?

9          THE WITNESS:  I'm confused.

10         THE COURT:  This isn't discovery.  What's the

11  relevance?  We have the videos, we have the photos.

12         Why are we talking about this?

13         MR. FICARELLI:  I'm just asking the witness why those

14  weren't presented in the declaration.

15         THE COURT:  Talk to counsel about that.  Let's get to

16  the facts with this witness.

17  BY MR. FICARELLI:

18  Q.  Okay.  Ms. Namath, how did you decide to go film on

19  July 16th?

20  A.  I have been filming for days, since I think June 22nd or

21  23rd.  I was out there on the 22nd with a group of people.

22  Once the gates shut to the jetport, I have been there so I have

23  been there many days.

24  Q.  Yeah, but on July 16th, how did you decide to go film

25  there?  What was the decision-making process to go film?

App. 347

1    A.  I had been going almost daily, leading up to July 16th.

2    Q.  Why were you going almost daily up until July 16th?

3    A.  To see what was happening and to see what was going on on

4    and off site.  I mean, to see the impacts and what was going

5    on.

6    Q.  Okay.  So, how long were you at the site before you started

7    filming on July 16th?

8    A.  I normally take pictures the whole time I'm there, usually.

9    There is a lot to see or film or I will do videos, live videos

10   for the group that I have online.

11   Q.  Okay.  What time did you arrive on the site on July 16th?

12   A.  I don't recall.

13   Q.  Okay.  Do you recall what time you began videoing on

14   July 16th?

15   A.  I would have to -- I mean, sometimes I'm there at 9:00 a.m.

16   Sometimes I'm there until 2:00 a.m.  Sometimes I -- you know, I

17   don't recall the exact times that day, no.

18   Q.  Okay.  Did you see any other DHS vehicles then?

19        THE COURT:  Than the ones in the video she -- are we

20   talking about a video that's in evidence now or are we talking

21   about generally the video?

22        Is this designed to demonstrate that this witness did

23   not do a continuance video from the time she got there to the

24   time she left?

25        MR. FICARELLI:  I will move on, Your Honor.

App. 348

```
 1              THE COURT:  I mean, you can ask her that and she did

 2     not video everything that happened.  So, it's not a complete

 3     pictorial essay of July 16th.

 4              THE WITNESS:  I might have a complete one, I just

 5     didn't -- but I don't know.

 6              THE COURT:  All right.  But as you sit here today, do

 7     you know if you continuously filmed?

 8              THE WITNESS:  Not the whole entire day, no.

 9              THE COURT:  Okay.

10              MR. FICARELLI:  Okay, Your Honor, I would like to show

11     the witness a clip from that video attached to her declaration.

12              Can we bring that up?

13              THE COURT:  Okay.  Mr. Hiaasen, queue it up for

14     redirect.

15              Did I give you a time limit?  I should have, shouldn't

16     I have?

17              Yes, I'm going to be thinking 15 or 20 minutes with you

18     as well, but let's go ahead.

19     BY MR. FICARELLI:

20     Q.  Ms. Namath, you mentioned that the site was blindingly

21     bright.  Does this look blindingly bright to you?

22     A.  Well, this does not, no.  However, there is usually a light

23     behind that bus, so right where that is turning it would block

24     it.  I don't know.

25              I think this was still before they switched out the new
```

App. 349

1    front gates.  So there isn't the newest generator that's

2    sitting at the front of that entrance that's there now.

3    Q.  Okay.  And other than the police sirens and headlights, do

4    you see any other light?

5    A.  Yes, if you see in front of the red lights, you can see the

6    lights kind of in the distance that line the road on either

7    side, the lights that are taller than the police cars on the

8    far left, those are all the generator lights lining the road.

9    Q.  Okay.  I'm going to pull up another clip from your video.

10   That's Clip 2.

11       Okay.  Ms. Namath, would you describe this photo as

12   blindingly light -- bright?

13   A.  No, but again, this is before they changed.  Those are

14   still the old gates and you can see the barbed wires at the top

15   of those very front gate, how they are still a little -- they

16   were not taut.  It was when they put those new gates in that

17   they brought the generator light to this front right behind

18   that.

19       So this is not the most recent.  This is not what it looks

20   like right now.

21   Q.  All right.  I will pull up one more clip from that video.

22   This is Clip Number 3.

23       Ms. Namath, other than the police sirens and headlights, do

24   you see any other light in this photo?

25   A.  Yes, in front of the white van, you know, and above that

App. 350

1   car on the left-hand side, the headlights coming towards me,

2   the lights that are above it are the generator lights, and the

3   road goes back three miles so it's -- I mean, I know that they

4   are there.  There are about ten of them lining that road.

5        The one at the front entrance, though, is not there because

6   it has not been placed there yet, but it is there now.

7   Q.   Okay.  And you say in your declaration, "I visit and

8   recreate in the Big Cypress National Preserve."

9   A.   Uh-huh.

10  Q.   When was the last time you visited the site?

11  A.   Which site, Big Cypress or the jetport?

12  Q.   TNT Site.

13        THE COURT:  Before the detention center was built.

14        THE WITNESS:  I mean, I have been out there in April

15  or -- I mean, I have been out there.  I regular -- we have an

16  Earth Day event out there in April, and I have been out

17  numerous times over the past six months to a year.

18  BY MR. FICARELLI:

19  Q.   And when you visit, do you go to the airport?

20  A.   Well, we are not allowed on the airport.  I mean, the

21  road -- it's just, again, an easy pull-off that we are able to

22  kind of pull onto the jetport entrance road, but not obviously

23  back where the airport is, I've never been on the airport.

24  Q.   And you are aware that there were about 155 flights a day

25  at the airport before the site became a detention center?

1    A.   Oddly --

2         MR. HIAASEN:  Objection, Your Honor.  I don't think

3    there is any testimony to that effect?

4         THE COURT:  Right, but I will allow it.

5         THE WITNESS:  In all of my hours and days and years

6    that I have been out there, I never saw planes, certainly not

7    150 a day landing there and taking off.

8    BY MR. FICARELLI:

9    Q.   And you are aware that that site is fully fenced in?

10   A.   Well, I'm aware a portion of it is.  I mean, the road has

11   been open and there was never fencing.  You could walk off to

12   the rock ponds and go hiking.  I know people that have led eco

13   tours, but the actual runway itself is enclosed, but that's

14   three miles or whatever down the road.

15        I mean, only the runway and the landing strip is fenced

16   off.  Everything else is opened.

17        MR. FICARELLI:  Thank you.

18        May I have a moment, Your Honor?

19        THE COURT:  You may.

20   BY MR. FICARELLI:

21   Q.   Ms. Namath, you saw trucks covered with netting and you

22   surmised they were covered with fill.  You don't know that for

23   sure.  Correct?

24   A.   Not covered in netting.  They are dump trucks that have the

25   metal arm that stretches over that has netting just covering

App. 352

1    the top and, again, sometimes there is aggregate you can see

2    under it.  It's not always below that.  So, and then when they

3    come back out, those screens that are holding things under are

4    pushed all the way forward, not extended out.  It's not like a

5    truck covered in netting.

6    Q.  But you don't know for sure that they were carrying fill.

7    Correct?

8    A.  I can see what they are carrying.  I just don't know if

9    it's lime -- I don't want to say the incorrect type of fill but

10   I can see that it's some sort of a material and the dust from

11   it is all over the trucks, the white you know, dust currently.

12       Before it looked like -- there have been different kinds of

13   material.  Sometimes it looks like a fine gravel.  Sometimes it

14   was a thinner something that I wouldn't opine on, but they are

15   dump trucks that have the cover to hold whatever they are

16   carrying from flying out.

17           MR. FICARELLI:  Thank you.

18           No further questions, Your Honor.

19           THE COURT:  All right.  Anything from the Federal

20   Defendants?

21           MR. GUSTAFSON:  No, thank you, Your Honor.

22           THE COURT:  All right.  One question, Mr. Hiaasen,

23   maybe two.

24           MR. HIAASEN:  Okay.

25           THE COURT:  No film.

App. 353

```
 1                      REDIRECT EXAMINATION

 2   BY MR. HIAASEN:

 3   Q.  Ms. Namath, has the detention center affected your ability

 4   to enjoy your recreation and view wildlife in the areas around

 5   the TNT Site that you have used in the past?

 6   A.  Yes, to the point that I've called the Governor's office to

 7   ask when I would have access to being able to recreate there as

 8   recently as last week, yes.

 9   Q.  And what did the Governor's office tell you?

10   A.  I was told the same thing I have been told the many times

11   that I have called over the course of this, that this is a

12   Federal -- that this is Federal and that DHS is in charge and,

13   as such, we probably would not have access to the site and if I

14   had concerns to --

15            MR. FICARELLI:  Objection.  Outside the course of

16   cross.

17            THE WITNESS:  -- call Scott or Moody.

18            MR. GUSTAFSON:  Hearsay.

19            MS. PIROPATO:  Hearsay, Your Honor.

20            THE COURT:  Just shout it out, everybody.

21            No.  I will allow you, because this wasn't covered, I

22   will allow the Federal Defendants an opportunity to cross, but

23   go ahead, Mr. Hiaasen.

24            MR. HIAASEN:  I would just ask if the witness can

25   finish her testimony, I think she was still speaking.
```

App. 354

 1          THE COURT:  Okay.  I thought she had.

 2          THE WITNESS:  Just that when I call, I'm told to call

 3   Rick Scott or Ashley Moody because it's a Federal issue.

 4          MR. HIAASEN:  Okay.  Thank you.

 5          THE COURT:  Okay.  Federal Defendants only.

 6          Call Mr. Scott or who?

 7          THE WITNESS:  Ashley Moody.

 8          THE COURT:  Oh, Ms. Moody, yes.

 9                        CROSS-EXAMINATION

10   BY MR. SINGER:

11   Q.  Good evening.

12   A.  Hi.

13   Q.  My name is Frank Singer.  I'm with the Justice Department.

14          That last question that you were asked and you gave the

15   answer of what the Governor's office told you.

16          Do you know specifically who at the Governor's office you

17   talked with?

18   A.  I call -- I know the number by now.

19   Q.  Do you know who that person spoke with about -- what their

20   basis was for invoking the Federal Government?

21   A.  I have no idea.

22   Q.  Okay.  Do you know --

23   A.  I'm just repeating what I was told.

24   Q.  And you don't know exactly who told it to you.  Correct?

25   A.  Whoever answers to take the messages for the Governor,

1    850-717-9337, I think.

2    Q.  And did you have to go through multiple people or was this

3    the frontline person?

4    A.  No, you just press to speak to somebody.

5    Q.  So a frontline person you called told you the Federal

6    Government is responsible, but you don't know what their basis

7    was for saying that.

8        Is that fair?

9    A.  I suppose they were answering my question, I guess.

10   Q.  No, but my recitation is fair.

11       Is that right?

12       THE COURT:  The gentleman is asking, you don't know who

13   told that person the information.

14       THE WITNESS:  I have no idea, no.  Of course not.

15   BY MR. SINGER:

16   Q.  Not only who told that person or what their basis was

17   whatsoever.  Correct?

18   A.  That's just the message I have gotten when I have called

19   every time the past month, and that's what I have been told.

20       MR. SINGER:  Okay.  No further questions, Your Honor.

21   Thank you.

22       THE COURT:  All right.  Thank you.

23       You may step down, Ms. Namath.

24       THE WITNESS:  Thank you.

25       (Witness excused.)

App. 356

```
 1          THE COURT:  No more witnesses, Mr. Schwiep.

 2          MR. SCHWIEP:  No.

 3          THE COURT:  No, no, no.

 4          So, now, let's talk about scheduling.  I am able, I

 5   think, to rearrange my schedule.  Tell me what is an absolute

 6   can't do, Mr. Panuccio, I don't know if you are going to speak

 7   for everyone, if you have consulted but --

 8          MR. PANUCCIO:  I have a fairly good sense for our side,

 9   Your Honor, but my friends will correct me if I'm wrong.

10          THE COURT:  Okay.

11          MR. PANUCCIO:  Our side is clear, again, starting on

12   Tuesday of the next week for the rest of the week, if needed.

13   We have significant attorney and witness issues between now and

14   Monday evening.

15          THE COURT:  Let me ask, you have -- I understand the

16   witness issue.  What about attorney issue?  Can you be here --

17   I mean, I imagine our Federal friends aren't jumping out

18   tonight.

19          Could we do a half-day tomorrow with whomever

20   Mr. Schwiep has on board and then break for your witnesses, or

21   someone could --

22          MR. PANUCCIO:  Break for our witnesses -- so, finish

23   their witnesses?

24          THE COURT:  Correct.  Correct.

25          And maybe one of the Federal persons would *se fué* and
```

1    one would stay, and maybe if you have a conflict, one of your

2    colleagues could do the witnesses tomorrow.

3         Let me pause by saying, how long will that be,

4    Mr. Schwiep?

5         MR. SCHWIEP:  Well, I can speak to the directs.  The

6    crosses have gone on longer than I anticipated.

7         Dr. McVoy will be probably an hour, hour and a half,

8    just to guess high.

9         Dylan Reio will be shorter.  He should be 45 minutes to

10   an hour.

11        THE COURT:  Why did you tell me a day?  Just out of

12   curiosity, why did you tell me that, a day, that this would

13   last a day?

14        MR. SCHWIEP:  Well, Judge, one, we didn't anticipate

15   the crosses would be longer than the directs, which is unusual,

16   and we didn't expect --

17        THE COURT:  Oh, no, not in the Southern District of

18   Florida, it isn't.

19        MR. SINGER:  Your Honor, just to be clear, I have to

20   object.

21        MR. SCHWIEP:  And we didn't -- may I just finish -- and

22   we didn't expect that the Tribe, which had been granted leave

23   to intervene at the time would be questioning our witnesses as

24   well.

25        THE COURT:  Well, that's something that should have

App. 358

1    really been apparent by the time you were all filing the

2    numerous supplements and whatnot on Monday.  But that seems to

3    be, we are talking, Mr. Panuccio, until -- it would be I think

4    until 2 or 3 with cross.

5         Do we have a team that can do that tomorrow and then we

6    could break for all of you until next Tuesday?

7         MR. PANUCCIO:  Well, Your Honor, I'm sure we have

8    individual attorneys, but I'm the lead attorney for the State

9    and need to be here, and I will just be candid with you.  I

10   have to prepare for this.  I have pushed every other case

11   deadline preparation away for this day's hearing, but I'm sort

12   of out of leeway for that.

13        Like I said, I can clear.  I finish an Eleventh Circuit

14   oral argument Monday at, I think p.m.  I will get back on the

15   flight from Atlanta.  I will come back down and immediately

16   start Tuesday morning.

17        But, just candidly, I do have turn to these other

18   matters or I can't do them competently.

19        So it's just -- it's a resource question for us, Your

20   Honor, and we did not expect this to go a day and, in all

21   fairness, I have to respond to this, just to take the witness

22   before Ms. Namath, they did 87 minutes of direct, we did less

23   than an hour of cross.  So this is not on us, Your Honor.

24   Their directs have been long.

25        THE COURT:  Okay.  Let us do this then.  I understand

App. 359

```
1    if you are prepping for oral argument, why don't we reconvene
2    tomorrow morning at nine and let's see how much we can get down
3    by lunch, and if perhaps things free up for you or your fellow
4    friends, maybe we work through that.  Maybe we go a little
5    later, but let's see if we can't get the morning for this, and
6    understanding -- and I'm not going to -- you will let me know
7    at lunchtime whether we need to break or go forward, and Friday
8    we will stay free, Monday we will stay free, even Tuesday,
9    perhaps, we can start later in the day.
10           MR. PANUCCIO:  If we can truly stop at lunch tomorrow,
11   I'm here, Your Honor, I will do it, I will stay tonight.  I
12   appreciate that.
13           THE COURT:  Okay.
14           Mr. Gustafson, you --
15           MR. GUSTAFSON:  Well, Your Honor, I'm trying to be
16   flexible.  I need to be back by 2:30 in D.C. for a leadership
17   meeting, but I need to be here while the proceeding is
18   happening here, so if we could, you know, be done by 11:30,
19   that would be helpful.
20           THE COURT:  Probably noon, and I'm sure co-counsel
21   could cover that half-hour period or you could ask your
22   leadership folks to put it back a half-hour but just give me
23   that three-hour block and I will try to work with everybody on
24   their schedules.
25           MS. PIROPATO:  Your Honor, is it possible to meet at
```

App. 360

1   8:30, convene tomorrow at 8:30?

2          THE COURT:  Oh, no, that's just no.  No, no, no, no.

3          MS. PIROPATO:  I had to ask, Your Honor.

4          THE COURT:  I understand but, you know, too much of all

5   of you is just too much fun for any one person to have.

6          So, 9 o'clock and -- but everybody, like, be ready at

7   nine to go.

8          I don't want to talk tomorrow about exhibits or this or

9   that.  I want testimony so that we can get everybody on the

10  planes they need to be on.

11         MS. PIROPATO:  Your Honor, to clarify, we should

12  anticipate being here on Tuesday, because we have our witness

13  ready for Tuesday.

14         We ensured his schedule is cleared, so I just want to

15  confirm that with you.

16         THE COURT:  Yes, I checked.  Actually, I had confused

17  one day with the week after, but I checked it and the matters

18  that I do have scheduled, I can reschedule.

19         The only question Tuesday will be, Mr. Panuccio,

20  whether we start at 9 or 10 or 11 because of his commitment the

21  day before.

22         MR. PANUCCIO:  Your Honor, I will look at flights

23  tonight and see what's feasible and report back tomorrow.

24         THE COURT:  All right.

25         MS. PIROPATO:  And, Your Honor, one final question.

1    The Tribal witnesses, would they be available on Tuesday, as

2    well, and again, that will be dependent on your client's

3    availability, obviously.

4              MR. AJIZIAN:  Tentatively, yes, Your Honor, we have

5    five witnesses and, just for clarification, I understand that

6    tomorrow will be limited to presenting the remainder of

7    plaintiffs' witnesses.

8              THE COURT:  Correct.

9              MR. AJIZIAN:  I will do my best and I will confirm, we

10    will meet and confer with you for Tuesday but, Your Honor, I

11    think the whole point can be mooted if you can provide a ruling

12    on the request to submit the Tribe's witnesses' declarations.

13              We are willing to stand on the declarations and avoid

14    calling the witnesses live.  We were not party to the parties'

15    discussion on how to proceed in this hearing.  At the time, we

16    were not in the case.

17              THE COURT:  Didn't I ask you all to talk about that?  I

18    have a vague memory of that.

19              MR. AJIZIAN:  Yes, but we were not in the case at that

20    time.

21              THE COURT:  No, no, earlier in the day.  You were right

22    there.  I saw you.

23              MR. AJIZIAN:  We did, and the solution was there was an

24    offer to depose our witnesses and go by depo designations.

25    That's not conducive or efficient to --

1      THE COURT:  No, we are not going to do depositions, so

2  if you can't come up with a compromise, I will take it under

3  advisement as to whether I'm just going to rely on the Tribe's

4  declarations.

5      Mr. Schwiep, what are you standing for?

6      MR. SCHWIEP:  Well, Judge, thank you for your time and

7  thank you for your court staff for staying late and we will

8  look forward to seeing you tomorrow at 9:00 a.m.

9      MS. PIROPATO:  Your Honor, what the Tribe's one other

10  option would be that if we can't have the depositions, that we

11  just cross-examine them on -- the Tribal witnesses on their

12  declaration without them proffering them for affirmative

13  testimony if they really want to rely on the declarations.

14      But we would like the opportunity to test some of the

15  statements on the declarations.

16      THE COURT:  What?

17      MS. PIROPATO:  One option is if they do not want to

18  present the testimony live, we would like the opportunity to at

19  least cross-examine them, so they can --

20      THE COURT:  So they don't put them on for direct, but

21  they put them on for you to cross.

22      MS. PIROPATO:  If that's what they prefer.  That's the

23  other option.

24      MR. AJIZIAN:  We stand by the position that the Court

25  can properly take the declarations at the preliminary

App. 363

1    injunction stage, they can consider them, but if there is going

2    to be live testimony, then we absolutely will reserve the right

3    to fully conduct a direct examination.

4        THE COURT:  Okay.

5        MR. SCHWIEP:  And, Judge, I hate to do this, but just

6    so that the plaintiffs' position is clear about this issue,

7    that is declarations, we think all the parties' declarations

8    should be admitted into evidence and the Court can afford them

9    whatever weight you think is appropriate and live witnesses,

10   obviously, I think have more probative value than a

11   declaration, but -- and you ask did us to submit case law on

12   the issue, we all have.

13       THE COURT:  I did.  And I have it.

14       MR. SCHWIEP:  I think that is where you will land,

15   Judge, when you read it.

16       THE COURT:  All right.  Again, I was wondering if there

17   was one Tribe witness that the Government was interested in as

18   opposed to all five, perhaps you can come to some rapprochement

19   but it's apparent you can't, so I will take it up and I will

20   see you all back here at 9:00 a.m.

21       COURT SECURITY OFFICER:  All rise.

22

23

24

25

```
 1                     C E R T I F I C A T E

 2

 3            I hereby certify that the foregoing is an

 4    accurate transcription of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9    August 11, 2025          /s/Patricia Diaz_____
      DATE                     PATRICIA DIAZ, FCRR, RPR, FPR
10                             Official Court Reporter
                               United States District Court
11                             400 North Miami Avenue, 11th Floor
                               Miami, Florida 33128
12                             (305) 523-5178

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$22** [1] - 133:1

## '

**'23** [1] - 299:19
**'80s** [1] - 243:20
**'this'** [1] - 127:14

## /

**/s/Patricia** [1] - 335:9

## 0

**025504** [1] - 2:24

## 1

**1** [13] - 1:8, 1:16, 139:4, 139:15, 139:21, 140:21, 209:14, 215:19, 215:22, 242:10, 242:14, 294:17, 316:16
**1,164** [2] - 225:19, 275:4
**1,895** [3] - 281:7, 282:12, 282:15
**1,985** [1] - 281:10
**1.0** [1] - 209:13
**1.3** [2] - 233:14, 233:18
**10** [4] - 20:8, 153:7, 245:25, 331:21
**10,000** [1] - 69:22
**100** [2] - 258:16, 259:4
**104** [1] - 4:9
**10:00** [1] - 223:12
**10th** [4] - 263:15, 267:23, 267:25, 280:17
**11** [11] - 107:10, 147:19, 149:7, 153:7, 166:5, 190:13, 190:14, 206:15, 217:21, 331:21, 335:9
**1101** [1] - 2:4
**11:30** [1] - 330:19
**11th** [2] - 3:4, 335:11
**12** [3] - 86:15, 117:16, 225:17
**12.9** [4] - 268:14, 268:22, 269:13, 270:3
**120** [4] - 156:14, 158:7, 212:5, 259:1
**1200** [1] - 2:10

**125** [2] - 4:9, 223:18
**128** [1] - 5:6
**12th** [6] - 90:11, 90:17, 95:19, 96:5, 99:1, 129:3
**13** [2] - 113:14, 304:9
**130** [3] - 156:14, 158:7, 257:23
**135** [1] - 4:8
**14** [13] - 5:13, 42:6, 42:8, 42:15, 81:5, 81:14, 86:16, 127:12, 128:10, 197:17, 234:13, 274:13, 300:5
**14-mile** [1] - 154:7
**141** [1] - 4:12
**15** [10] - 34:8, 47:20, 63:8, 92:23, 173:5, 174:1, 299:1, 316:17, 319:18
**150** [7] - 2:21, 44:23, 47:7, 49:23, 103:4, 177:17, 322:8
**155** [1] - 321:25
**157,653** [1] - 268:25
**15th** [1] - 267:24
**162** [1] - 238:10
**163** [1] - 5:6
**164** [1] - 5:6
**165** [1] - 4:13
**169** [1] - 4:13
**16th** [10] - 312:20, 317:20, 317:25, 318:2, 318:3, 318:8, 318:12, 318:15, 319:4
**17** [2] - 70:25, 192:7
**17th** [1] - 32:17
**18** [6] - 4:5, 70:25, 144:9, 185:10, 235:2, 281:7
**180,000** [1] - 204:18
**188** [1] - 107:24
**18th** [1] - 145:25
**19** [5] - 5:6, 128:16, 128:19, 238:4, 238:6
**191** [1] - 4:14
**192** [1] - 276:3
**194** [1] - 4:12
**1947** [2] - 21:15, 21:17
**1969** [9] - 21:13, 21:17, 21:22, 21:23, 22:6, 22:8, 24:15, 24:17, 54:15
**1970** [1] - 54:16
**1974** [2] - 24:19, 200:25
**1977** [1] - 201:12
**1981** [7] - 187:6, 215:8, 224:6, 225:24,

**227:7, 237:6, 271:2
1982** [1] - 274:25
**1984** [1] - 201:21
**199** [1] - 45:14
**1998** [2] - 203:4, 234:15
**1999** [1] - 203:4
**1:00** [6] - 139:8, 139:17, 140:4, 140:7, 140:11
**1:10** [1] - 140:4
**1st** [5] - 14:25, 27:21, 250:4, 250:5, 317:3

## 2

**2** [7] - 31:15, 218:1, 219:25, 225:24, 308:4, 320:11, 329:5
**2,000** [8] - 232:15, 232:17, 232:19, 233:21, 237:17, 239:16, 269:6
**2-minute** [1] - 298:17
**2.0** [2] - 209:14, 210:7
**20** [19] - 20:4, 20:7, 20:8, 34:5, 70:14, 70:21, 91:9, 147:24, 186:6, 196:22, 200:25, 215:20, 246:1, 298:15, 298:21, 309:10, 314:19, 316:17, 319:18
**20,000** [1] - 175:18
**200** [7] - 4:16, 103:4, 152:13, 229:1, 230:13, 230:14, 302:7
**20002** [1] - 2:21
**2003** [1] - 143:25
**2005** [1] - 203:24
**2006** [4] - 185:14, 203:10, 217:7, 258:18
**2007** [2] - 70:12, 70:24
**2008** [1] - 212:9
**2009** [2] - 275:18, 276:7
**201** [1] - 1:20
**2011** [3] - 144:4, 226:18, 272:7
**2013** [1] - 20:14
**2014** [11] - 205:17, 225:15, 225:24, 243:20, 270:12, 270:21, 275:18, 275:24, 276:3, 296:12, 296:13
**2015** [5] - 185:14,

**218:5, 234:15, 234:16, 262:20
2016** [6] - 260:19, 260:20, 260:23, 261:5, 261:13, 261:19
**2017** [5] - 141:23, 170:11, 206:23, 219:3, 258:4
**2018** [7] - 89:19, 206:15, 206:23, 207:18, 270:10, 270:12, 279:18
**2019** [1] - 173:7
**2020** [11] - 19:4, 157:25, 208:9, 209:4, 260:20, 260:24, 261:6, 261:14, 261:20, 267:14
**2021** [2] - 185:15, 209:3
**2022** [2] - 209:13, 210:12
**2024** [7] - 222:3, 224:6, 224:7, 224:10, 226:16, 227:7, 271:2
**2025** [11] - 1:5, 132:19, 261:5, 261:17, 302:4, 302:10, 302:24, 304:13, 310:16, 316:16, 335:9
**2040** [2] - 209:22, 210:3
**20530** [1] - 2:19
**2070** [14] - 209:23, 210:3, 237:23, 238:2, 238:8, 268:23, 269:14, 269:16, 269:20, 286:3, 286:15, 286:20, 290:11, 292:3
**21** [1] - 218:1
**210** [2] - 5:7, 228:21
**211** [1] - 5:7
**213** [1] - 5:7
**214** [1] - 5:7
**2155** [1] - 1:23
**22** [3] - 275:9, 304:13, 310:16
**22nd** [5] - 301:10, 303:17, 308:8, 317:21, 317:22
**23** [3] - 191:18, 235:25, 275:10
**230** [4] - 212:5, 257:23, 259:1, 276:3
**236** [1] - 175:25
**23rd** [4] - 33:7, 34:2, 303:17, 317:22
**24** [9] - 5:14, 58:8,

**58:10, 58:15, 150:19, 151:17, 178:8, 178:23, 219:21
24-mile** [1] - 148:17
**24/7** [3] - 47:18, 174:23, 175:8
**240** [5] - 4:17, 212:10, 212:13, 212:14, 258:21
**249** [1] - 4:17
**25** [5] - 5:7, 91:9, 202:8, 213:21, 213:23, 214:11, 214:13
**25-22896-CV-KMW** [1] - 1:2
**25-CV-22896** [1] - 6:2
**26** [5] - 5:7, 210:15, 210:17, 211:4, 211:8
**2601** [1] - 1:16
**27** [6] - 5:4, 201:11, 284:6, 284:7, 284:8
**270** [1] - 228:18
**271** [1] - 5:15
**27th** [1] - 164:9
**28,000** [4] - 44:15, 44:19, 253:7, 274:3
**287** [2] - 4:18, 113:3
**287(g** [13] - 109:4, 112:13, 112:15, 113:7, 135:19, 136:14, 136:15, 136:23, 137:2, 137:6, 137:19, 138:10, 138:18
**28th** [1] - 194:7
**29** [2] - 234:14, 263:20
**293** [1] - 4:16
**299** [1] - 4:20
**29th** [2] - 192:4, 194:7
**2:00** [2] - 177:21, 318:17
**2:30** [1] - 330:17
**2nd** [1] - 129:4

## 3

**3** [15] - 5:6, 58:2, 58:6, 58:7, 163:22, 163:25, 164:15, 164:19, 164:20, 274:7, 274:16, 274:22, 308:5, 320:23, 329:5
**3,800** [4] - 263:18, 263:19, 264:9
**3.1** [3] - 294:18,

294:22, 294:25
**3.11** [5] - 261:25, 262:9, 281:10, 281:22, 282:12
**30** [9] - 5:4, 91:10, 92:4, 131:17, 174:13, 306:13, 306:20, 306:21, 314:23
**30-year** [3] - 225:23, 226:2, 226:11
**300** [1] - 208:17
**305** [2] - 3:5, 335:12
**309** [1] - 5:8
**311** [1] - 5:8
**315** [4] - 5:8, 5:9
**316** [1] - 4:21
**31st** [1] - 84:11
**32** [1] - 136:8
**324** [1] - 4:20
**33** [6] - 5:4, 78:10, 78:11, 80:12, 80:13, 82:9
**33102** [1] - 2:25
**33128** [2] - 3:4, 335:11
**33131** [1] - 2:5
**33132** [1] - 2:15
**33133** [1] - 1:17
**33134** [1] - 1:20
**33301** [1] - 2:11
**33731-2155** [1] - 1:23
**34** [5] - 5:4, 27:21, 27:24, 29:1, 30:1
**35** [1] - 4:5
**350** [2] - 262:4, 262:9
**36** [3] - 5:15, 271:18, 271:19
**360** [1] - 102:24
**3:00** [1] - 196:22
**3rd** [3] - 83:7, 90:8, 129:4

## 4

**4** [4] - 2:15, 27:3, 235:25, 300:5
**4,000** [1] - 102:14, 175:20, 176:12
**4,955** [1] - 220:11
**4-foot** [1] - 231:1
**4-mile** [1] - 276:1
**4.1** [1] - 222:6
**4.2** [1] - 222:6
**40** [6] - 65:4, 92:5, 155:25, 271:2, 292:3, 306:20
**40,000** [2] - 24:9, 24:11
**40-year** [1] - 275:9
**400** [3] - 3:3, 175:23,

335:11
**401** [1] - 2:10
**403** [1] - 88:10
**41** [22] - 93:13, 148:20, 148:23, 154:22, 159:8, 161:15, 166:16, 166:25, 181:16, 182:18, 183:14, 183:18, 194:14, 196:11, 300:14, 300:25, 301:7, 301:15, 302:21, 305:8, 314:15
**42** [2] - 5:13, 89:17
**44** [13] - 5:5, 82:18, 82:19, 82:20, 82:22, 84:3, 84:5, 84:6, 84:8, 86:24, 87:3, 87:7, 121:18
**45** [16] - 5:5, 5:14, 65:19, 65:21, 84:12, 84:17, 85:1, 86:24, 87:4, 87:7, 139:9, 248:17, 249:2, 271:4, 291:22, 328:10
**4500** [1] - 1:19
**48** [1] - 12:14
**4:00** [2] - 15:9, 196:24

## 5

**5** [2] - 219:20, 262:12
**5-year** [2] - 207:15, 275:20
**50** [6] - 251:12, 251:13, 305:14, 306:17, 306:18, 306:21
**50,000** [1] - 24:6
**500** [5] - 231:25, 232:10, 232:18, 247:4
**500-meter** [1] - 292:20
**501(c)(3** [1] - 21:11
**52** [3] - 5:15, 72:15, 72:16
**521** [1] - 45:15
**523-5178** [2] - 3:5, 335:12
**53** [7] - 5:8, 309:16, 310:2, 310:3, 311:9, 311:11, 311:14
**53-56** [2] - 309:18, 311:15
**54** [2] - 5:8, 310:6
**55** [3] - 5:8, 238:10, 310:18
**56** [5] - 5:8, 309:16,

310:22, 311:11, 311:14
**57** [1] - 5:14
**59** [6] - 5:8, 315:9, 315:11, 315:16, 315:22, 315:24
**5:30** [1] - 249:3
**5th** [1] - 263:15

## 6

**6** [6] - 1:5, 223:12, 226:24, 227:1, 235:11, 289:23
**6,700** [6] - 222:5, 222:9, 222:15, 275:11, 275:15
**6-foot** [2] - 231:6, 296:7
**6-month** [1] - 274:4
**638** [3] - 268:13, 268:21, 269:9
**65** [7] - 5:9, 5:14, 315:10, 315:11, 315:16, 315:23, 315:25
**6:30** [1] - 1:6
**6th** [1] - 267:17

## 7

**7** [5] - 221:18, 243:12, 243:14, 274:19, 274:22
**700** [1] - 2:4
**72** [1] - 5:15
**76** [1] - 4:5
**78** [1] - 5:4
**79** [1] - 21:17

## 8

**8** [1] - 300:5
**8,000** [1] - 235:1
**8-foot** [1] - 231:6
**80** [2] - 258:15, 259:5
**82** [1] - 5:5
**850-717-9337** [1] - 326:2
**87** [3] - 5:5, 5:5, 329:23
**89** [1] - 4:8
**8:30** [2] - 331:2

## 9

**9** [6] - 84:9, 262:6, 270:6, 278:5, 331:7, 331:21
**9.8** [3] - 290:10,

290:13, 290:21
**90** [1] - 42:15
**950** [1] - 2:18
**99** [2] - 2:15, 4:8
**9:00** [3] - 318:16, 333:9, 334:21
**9:07** [1] - 1:6

## A

**a.m** [6] - 1:6, 223:12, 318:16, 318:17, 333:9, 334:21
**AADT** [9] - 234:19, 234:25, 263:13, 263:16, 263:18, 263:22, 264:3, 264:9
**abandon** [1] - 245:8
**ability** [1] - 16:13, 29:23, 34:9, 168:10, 168:11, 195:2, 195:21, 210:5, 285:2, 312:3, 324:4
**able** [30] - 7:23, 13:21, 30:20, 42:11, 66:18, 71:13, 84:24, 92:7, 96:2, 98:9, 101:25, 112:22, 121:10, 149:20, 155:10, 159:20, 160:4, 223:16, 244:17, 257:16, 285:22, 295:23, 301:2, 305:8, 307:14, 308:25, 312:1, 321:22, 324:8, 327:5
**above-entitled** [1] - 335:5
**Absence** [1] - 134:18
**absence** [2] - 9:8, 290:2
**absent** [1] - 10:5
**absolute** [1] - 327:6
**absolutely** [13] - 33:4, 33:8, 76:23, 77:10, 91:17, 101:12, 205:1, 226:15, 269:4, 304:5, 306:20, 311:19, 334:3
**abundance** [1] - 208:2
**accepted** [1] - 258:4
**access** [10] - 61:3, 63:1, 71:13, 147:16, 295:24, 304:19, 304:21, 324:8, 324:14
**accessed** [2] - 301:7, 301:9
**accident** [1] - 166:4
**accidents** [2] -

179:9, 179:17
**accommodate** [1] - 205:24
**accompanied** [7] - 90:23, 91:10, 95:10, 98:19, 110:7, 137:22, 138:5
**accompany** [1] - 313:6
**according** [5] - 15:8, 15:11, 31:12, 196:23, 276:9
**account** [2] - 83:7, 122:15, 281:6
**accountable** [1] - 31:18
**accounts** [2] - 83:1, 122:11
**accouterment** [1] - 12:24
**accurate** [7] - 75:18, 128:2, 164:12, 210:25, 309:24, 310:9, 335:4
**accurately** [1] - 272:2
**achieve** [1] - 19:9
**acknowledged** [2] - 14:12, 85:19
**acknowledgment** [1] - 138:21
**acre** [2] - 216:21, 255:9
**acreages** [1] - 210:2
**acres** [25] - 34:5, 192:8, 201:16, 204:18, 230:12, 232:16, 232:17, 232:19, 233:21, 237:17, 239:16, 261:25, 262:4, 262:9, 268:25, 281:7, 281:10, 281:23, 282:12, 282:15, 294:18, 294:22
**Act** [7] - 24:20, 25:11, 33:11, 74:10, 202:10, 216:9
**ACTING** [1] - 2:17
**action** [9] - 54:25, 55:4, 55:5, 55:8, 142:20, 162:11, 162:15, 177:15
**actions** [3] - 24:2, 55:2, 55:12
**active** [18] - 41:23, 90:22, 92:7, 94:2, 99:7, 100:20, 101:2, 101:21, 102:5, 102:15, 116:4,

158:14, 174:18,
177:3, 177:4, 186:13,
233:6
**activism** [2] -
115:17, 115:22
**activities** [27] - 52:2,
52:4, 52:8, 54:25,
55:25, 62:12, 62:14,
62:18, 100:22,
101:16, 142:16,
146:1, 161:5, 168:19,
174:1, 283:19,
285:15, 296:17,
299:21, 299:24,
300:2, 300:6, 300:13,
301:21, 302:14,
304:2, 311:18
**activity** [12] - 33:23,
50:13, 53:12, 54:18,
56:6, 77:18, 153:23,
228:3, 228:22, 245:6,
255:21, 275:21
**actual** [11] - 39:3,
40:13, 92:10, 102:22,
142:18, 142:19,
142:20, 142:21,
251:16, 255:17,
322:14
**ADAM** [1] - 2:16
**Adam** [2] - 7:17,
191:14
**add** [5] - 127:17,
159:23, 183:3,
224:11, 238:12
**added** [1] - 271:13
**addendum** [1] -
127:17
**addition** [5] - 51:16,
64:11, 81:7, 305:24,
312:23
**additional** [14] -
14:19, 14:24, 19:11,
99:1, 119:14, 137:24,
137:25, 161:14,
194:16, 196:5,
196:10, 237:16,
271:12, 288:14
**address** [4] - 14:3,
113:24, 197:12,
198:23
**addressed** [1] -
208:5
**adds** [1] - 232:19
**adducing** [1] - 88:19
**adequate** [4] -
168:17, 178:25,
179:4, 179:7
**adequately** [1] -
179:7
**adhere** [1] - 27:18

**adjacent** [8] - 142:8,
146:13, 148:14,
153:16, 157:21,
159:19, 161:10, 273:5
**adjustments** [1] -
237:21
**adjusts** [1] - 238:23
**Administration** [2] -
89:23, 144:2
**administration** [1] -
104:13
**administrative** [1] -
211:14
**administrator** [3] -
105:7, 201:21, 202:16
**admission** [3] -
29:21, 79:1, 86:10
**admissions** [6] -
83:12, 83:13, 83:14,
85:19, 101:7, 315:16
**admit** [13] - 43:3,
44:1, 44:3, 44:9,
72:23, 84:5, 84:16,
87:3, 128:17, 188:20,
283:25, 284:9, 284:17
**ADMITTED** [3] - 5:3,
5:10, 5:12
**admitted** [23] - 30:1,
58:15, 84:6, 86:10,
86:24, 87:7, 121:12,
124:13, 128:16,
128:19, 140:23,
164:19, 164:20,
187:20, 214:11,
214:13, 271:24,
311:14, 311:15,
315:23, 315:24,
315:25, 334:9
**admitting** [1] - 101:6
**admonition** [1] -
239:6
**adult** [2] - 221:13,
295:5
**adults** [8] - 212:6,
212:13, 225:22,
257:23
**adverse** [2] - 297:6,
297:15
**adversely** [1] -
297:23
**advice** [1] - 19:15
**advised** [1] - 17:16
**advisement** [2] -
88:24, 333:4
**advisor** [1] - 19:20
**advocacy** [1] -
145:16
**advocate** [1] -
304:18
**aerial** [2] - 214:20,

293:17
**aesthetic** [3] - 33:24,
41:11, 77:18
**aesthetically** [1] -
152:20
**affect** [8] - 160:14,
195:21, 210:4,
229:12, 232:20,
290:20, 297:23, 298:6
**affected** [6] - 33:24,
162:21, 162:21,
230:10, 232:13, 324:4
**affecting** [1] - 26:22
**affection** [1] - 162:24
**affects** [2] - 49:13,
49:20
**affidavit** [2] - 127:21,
128:2
**affidavits** [2] - 14:20,
15:18
**affiliated** [1] - 313:22
**affirmed** [1] - 133:4
**affixed** [4] - 66:10,
69:3, 69:5, 69:10
**afflicted** [1] - 20:13
**afford** [1] - 334:9
**afforded** [3] - 18:7,
39:1, 40:11
**afield** [1] - 73:12
**afraid** [5] - 36:14,
40:13, 56:25, 171:16,
181:4
**afternoon** [9] -
139:12, 140:25,
141:20, 169:24,
191:14, 240:19,
249:10, 287:21,
299:15
**age** [1] - 225:21
**agencies** [3] - 23:23,
55:20, 137:3
**agency** [5] - 25:23,
99:8, 206:16, 241:17,
293:21
**aggregate** [3] -
237:4, 305:17, 323:2
**aggression** [10] -
227:11, 229:21,
230:17, 233:2,
235:16, 235:18,
237:21, 238:22,
279:24, 297:10
**ago** [10] - 12:14,
65:4, 72:19, 110:4,
131:17, 138:9,
147:24, 148:16,
196:2, 306:24
**agree** [1] - 116:16,
117:25, 118:6,
127:17, 176:15,

176:19, 178:23,
186:13, 260:11,
268:12, 268:20,
270:23, 270:25,
277:12, 285:1,
285:13, 285:18,
289:6, 291:21
**agreed** [2] - 98:15,
247:20
**agreement** [15] -
109:4, 110:25,
112:14, 112:15,
112:19, 113:3, 113:7,
135:19, 136:14,
136:19, 136:23,
137:7, 137:19,
138:10, 138:18
**agreements** [3] -
131:15, 136:15, 137:2
**agrees** [3] - 284:1,
284:11, 285:9
**Agricultural** [1] -
26:4
**ahead** [21] - 8:22,
8:25, 13:4, 28:23,
29:25, 39:22, 44:12,
53:7, 79:11, 115:21,
125:1, 126:18, 147:9,
155:15, 165:3,
197:22, 201:19,
204:23, 225:5,
319:19, 324:24
**ahold** [1] - 224:10
**aid** [2] - 106:25
**AIP** [2] - 313:15,
313:25
**air** [8] - 53:6, 79:15,
81:4, 92:25, 93:9,
123:21, 176:22,
176:25
**Air** [3] - 25:19, 25:22,
26:23
**airboat** [3] - 25:9,
167:5, 300:17
**aircraft** [17] - 45:1,
48:17, 49:24, 50:6,
51:7, 51:9, 51:11,
51:19, 52:1, 53:12,
79:15, 79:18, 177:9,
252:3, 253:1, 253:4,
303:16
**airplane** [5] - 46:23,
47:5, 48:9, 48:12,
116:13
**airplanes** [8] - 46:25,
47:1, 48:22, 51:16,
52:6, 116:15, 175:21,
176:19
**Airport** [6] - 42:3,
89:25, 271:22, 273:8,

300:21, 301:19
**airport** [82] - 21:24,
22:15, 25:20, 26:2,
31:1, 41:16, 41:23,
42:2, 43:17, 43:21,
45:23, 46:19, 47:12,
47:15, 50:13, 52:20,
54:7, 54:12, 54:15,
56:6, 62:11, 62:24,
63:4, 63:16, 63:18,
64:7, 64:17, 64:22,
65:8, 69:15, 70:15,
70:22, 71:2, 115:15,
115:18, 116:4,
116:21, 117:5, 117:7,
117:8, 172:24, 173:6,
173:17, 173:21,
174:17, 174:18,
174:22, 175:14,
175:18, 176:10,
176:21, 176:24,
177:3, 178:12, 181:8,
181:12, 181:15,
181:18, 185:22,
185:24, 186:3, 188:5,
190:8, 190:9, 190:10,
191:3, 197:14,
197:17, 197:23,
266:9, 273:2, 273:4,
273:15, 273:22,
274:3, 278:10,
321:20, 321:21,
321:24, 322:1
**airport-related** [1] -
117:7
**airports** [6] - 65:2,
176:5, 186:13,
272:24, 273:20,
293:24
**airstrip** [1] - 303:13
**aisle** [1] - 17:7
**Ajizian** [1] - 6:18
**AJIZIAN** [24] - 2:3,
2:3, 4:8, 4:17, 6:18,
9:6, 99:14, 99:22,
101:13, 102:18,
104:5, 213:25,
240:18, 242:10,
242:11, 243:12,
243:13, 247:8,
247:10, 332:5,
332:10, 332:20,
332:24, 333:25
**Akeema** [1] - 313:24
**Akima** [1] - 313:20
**akin** [1] - 106:19
**al** [8] - 1:4, 1:7, 6:3,
185:13, 185:14,
203:10, 262:20
**alarm** [1] - 21:25

**Alcatraz** [2] - 83:8, 307:19
**alert** [1] - 142:21
**alerts** [5] - 142:18, 142:19, 142:20, 162:11, 162:15
**algae** [7] - 26:16, 39:6, 39:10, 41:1, 41:2, 41:4, 41:5
**Ali** [2] - 259:23
**allege** [1] - 172:10
**alleged** [5] - 36:19, 41:13, 171:20, 172:18, 172:21
**Alley** [1] - 167:12
**alligator** [1] - 62:9
**Alligator** [3] - 83:8, 167:12, 307:19
**alligators** [1] - 60:21
**allow** [17] - 9:13, 25:23, 58:14, 82:8, 85:19, 86:10, 87:4, 89:1, 116:24, 188:20, 197:23, 214:7, 231:11, 272:10, 322:5, 324:22, 324:23
**allowed** [11] - 15:18, 39:1, 67:1, 71:13, 91:12, 98:24, 98:25, 101:25, 102:21, 136:9, 321:21
**allows** [1] - 243:24
**alluded** [2] - 159:5, 198:1
**almost** [15] - 70:14, 94:25, 98:4, 100:9, 115:11, 165:14, 211:14, 291:16, 302:6, 304:25, 308:25, 316:17, 316:19, 318:2, 318:3
**alone** [2] - 90:19, 183:12
**alongs** [1] - 105:16
**alongside** [1] - 136:21
**alternative** [2] - 26:13, 26:15
**alternatives** [3] - 33:14, 55:10, 74:11
**Amber** [3] - 141:3, 141:13, 141:15
**AMBER** [1] - 4:11
**ambulances** [3] - 113:20, 114:2, 114:5
**amount** [14] - 15:6, 15:7, 109:14, 160:25, 168:18, 176:12, 182:4, 182:6, 194:4, 233:16, 238:3,

269:10, 282:16, 306:22
**ample** [1] - 160:16
**amplified** [1] - 123:18
**Amy** [1] - 15:2
**analyses** [3] - 259:9, 260:4, 260:11
**analysis** [9] - 208:10, 208:16, 218:6, 244:24, 245:11, 252:5, 252:9, 259:8, 291:11
**analyst** [1] - 19:19
**analyze** [2] - 71:7, 286:18
**analyzed** [1] - 76:20
**analyzes** [1] - 278:2
**Andrew** [2] - 21:8, 25:18
**animal** [3] - 62:7, 202:21, 300:1
**animals** [10] - 49:2, 63:23, 64:1, 176:4, 204:11, 221:8, 222:11, 226:20, 233:11, 234:1
**ANNA** [2] - 4:7, 89:10
**Anna** [5] - 87:10, 88:6, 89:4, 89:9, 89:14
**annaforflorida** [1] - 122:6
**annaforOrlando** [1] - 122:7
**anniversary** [1] - 145:25
**announcement** [1] - 17:13
**announcing** [1] - 293:21
**annual** [3] - 185:16, 234:19, 263:18
**answer** [35] - 23:14, 37:13, 39:19, 41:7, 49:5, 49:17, 53:10, 59:9, 64:13, 65:17, 66:4, 69:21, 99:5, 105:6, 111:6, 128:10, 129:9, 130:5, 131:18, 134:5, 137:10, 148:15, 160:12, 167:19, 182:2, 188:24, 239:5, 243:10, 256:17, 257:4, 267:1, 267:5, 279:25, 281:4, 325:16
**answered** [6] - 65:5, 95:9, 109:22, 130:20, 184:2, 302:3

**answering** [3] - 48:1, 192:15, 326:10
**answers** [5] - 39:15, 136:20, 313:19, 326:1
**anti** [1] - 123:23
**anti-immigrant** [1] - 123:23
**anticipate** [3] - 15:7, 328:15, 331:13
**anticipated** [2] - 76:19, 328:7
**anticipation** [1] - 113:18
**anyway** [4] - 155:16, 203:13, 222:9, 227:5
**apologies** [9] - 20:1, 71:17, 78:5, 78:14, 82:16, 86:23, 237:13, 301:13, 311:10
**Apologies** [1] - 72:5
**apologize** [6] - 24:13, 78:18, 87:23, 125:21, 190:18, 307:3
**apparatuses** [1] - 106:21
**apparent** [2] - 329:2, 334:20
**appear** [4] - 8:18, 59:3, 59:5, 275:25
**appearance** [2] - 7:24, 125:2
**APPEARANCES** [1] - 1:13
**appearances** [2] - 6:4, 199:7
**appeared** [1] - 276:8
**appearing** [3] - 88:8, 125:1, 247:16
**apple** [1] - 215:15
**applied** [1] - 282:6
**applies** [2] - 10:1, 11:4
**apply** [2] - 11:7, 18:3
**appreciate** [6] - 90:13, 152:20, 240:1, 248:22, 287:21, 330:13
**appreciation** [1] - 33:24
**apprehending** [1] - 75:3
**approach** [1] - 82:7
**approaching** [2] - 17:24, 314:4
**appropriate** [2] - 180:1, 334:10
**appropriately** [5] - 15:18, 16:1, 16:7, 17:1, 178:7
**approved** [2] - 7:21,

192:8
**April** [2] - 321:15, 321:17
**Area** [1] - 26:4
**area** [100] - 20:12, 24:18, 25:3, 25:6, 25:8, 25:9, 32:4, 33:20, 33:25, 34:5, 34:7, 34:11, 34:20, 41:6, 45:7, 45:20, 45:22, 46:18, 46:24, 46:25, 50:20, 56:5, 70:19, 77:7, 77:14, 77:18, 111:10, 115:18, 115:24, 117:4, 131:7, 146:16, 147:19, 148:6, 148:8, 149:7, 157:10, 161:1, 162:25, 166:5, 166:7, 167:7, 168:3, 168:14, 168:20, 173:10, 179:12, 190:5, 192:20, 192:23, 194:13, 194:20, 204:15, 216:4, 216:7, 216:11, 216:12, 216:16, 220:25, 221:3, 221:15, 222:14, 226:10, 226:16, 230:20, 231:21, 232:13, 232:25, 233:22, 234:1, 234:8, 238:1, 240:9, 243:7, 245:6, 245:20, 253:9, 254:25, 257:2, 263:1, 270:19, 270:24, 271:6, 271:8, 273:4, 273:9, 273:11, 278:21, 279:19, 280:6, 280:8, 281:8, 294:25, 300:7, 301:7, 305:7, 311:18, 311:19, 312:11
**areas** [33] - 31:25, 149:19, 167:4, 168:25, 170:14, 195:7, 196:8, 210:6, 214:21, 217:14, 220:10, 220:17, 220:20, 220:23, 221:5, 221:8, 222:1, 234:3, 265:17, 265:22, 265:25, 266:3, 273:5, 273:6, 274:6, 278:6, 289:24, 295:22, 295:23, 312:3, 324:5
**argue** [3] - 12:12, 254:15, 272:4

**arguing** [1] - 172:15
**argument** [4] - 14:16, 16:18, 329:15, 330:2
**argumentative** [1] - 134:20
**arise** [3] - 13:12, 19:24, 162:17
**arisen** [1] - 177:13
**arm** [1] - 323:1
**Army** [9] - 26:13, 29:4, 29:6, 29:8, 29:10, 29:12, 30:8, 30:25, 31:4
**arranged** [1] - 134:16
**arrival** [2] - 78:17, 111:1
**arrive** [4] - 97:9, 97:15, 98:19, 318:12
**arrived** [5] - 83:8, 92:5, 94:1, 99:25, 282:15
**arriving** [2] - 79:15, 91:17
**arrow** [2] - 218:23, 218:24
**art** [1] - 281:14
**article** [3] - 162:6, 174:12, 203:12
**articles** [9] - 142:25, 174:10, 213:7, 250:1, 250:3, 250:5, 250:7, 250:9, 313:18
**articulated** [1] - 22:10
**articulating** [1] - 33:8
**artificial** [13] - 161:1, 228:3, 231:22, 231:25, 232:3, 232:8, 232:12, 232:20, 237:15, 266:3, 266:4, 266:8, 303:12
**artist** [1] - 227:4
**Ashley** [2] - 325:4, 325:8
**aside** [5] - 35:13, 40:12, 75:2, 114:18, 149:7
**aspect** [2] - 152:14, 183:4
**aspects** [1] - 171:12
**asphalt** [20] - 34:5, 91:21, 100:5, 100:6, 100:8, 100:12, 100:15, 115:1, 115:12, 132:14, 132:23, 132:25, 133:1, 305:19,

305:21, 306:10, 306:25, 311:4
**assert** [2] - 96:23, 128:5
**asserted** [2] - 97:15, 113:23
**asserting** [1] - 97:7
**assertions** [1] - 97:2
**assess** [21] - 17:1, 27:18, 39:18, 56:9, 79:4, 178:16, 204:22, 205:3, 206:8, 210:4, 213:18, 227:16, 228:11, 228:13, 230:21, 231:21, 237:18, 252:10, 255:2, 283:20, 285:16
**assessed** [3] - 234:9, 234:10, 297:7
**assessment** [18] - 76:13, 185:18, 206:19, 206:24, 206:25, 207:20, 208:7, 208:8, 209:10, 213:8, 220:1, 239:20, 240:4, 242:6, 254:16, 255:18, 280:22, 295:20
**assessments** [2] - 185:18, 206:17
**assist** [2] - 203:7, 205:18
**ASSISTANT** [1] - 2:17
**associated** [8] - 52:15, 97:17, 115:22, 205:14, 214:22, 223:17, 277:10, 296:17
**Associates** [2] - 204:4, 211:19
**assume** [8] - 93:10, 116:6, 117:3, 133:20, 175:1, 199:10, 294:12, 301:9
**assumed** [1] - 8:13
**assuming** [2] - 191:21, 294:11
**assumption** [2] - 52:16, 169:4
**assumptions** [2] - 134:12, 134:13
**astronomy** [3] - 152:2, 152:5, 154:13
**Atlanta** [1] - 329:16
**attached** [12] - 58:20, 58:22, 68:6, 68:8, 69:13, 69:15, 71:9, 82:17, 82:24, 187:19, 316:20, 319:12

**attempted** [2] - 90:8, 123:2
**attempting** [1] - 93:9
**attempts** [1] - 95:12
**attend** [5] - 52:5, 103:19, 103:25, 154:15, 154:17
**attendant** [1] - 88:22
**attended** [3] - 162:17, 192:11, 193:18
**attending** [1] - 26:11
**attested** [2] - 16:1, 68:16
**attesting** [2] - 78:20, 79:17
**ATTORNEY** [1] - 2:17
**attorney** [10] - 35:22, 73:22, 73:23, 125:17, 170:3, 170:20, 170:22, 327:14, 327:17, 329:9
**Attorney's** [1] - 8:3
**ATTORNEY'S** [2] - 2:14, 2:24
**attorney-client** [3] - 35:22, 73:22, 73:23
**attorneys** [8] - 35:10, 35:13, 37:2, 73:8, 170:16, 170:21, 299:3, 329:9
**attributable** [1] - 159:3
**attribute** [1] - 291:18
**attributed** [1] - 290:21
**attributes** [1] - 168:16
**audience** [1] - 95:16
**August** [4] - 1:5, 27:21, 102:14, 335:9
**authenticate** [2] - 197:14, 314:25
**authenticating** [1] - 14:9
**authentication** [1] - 88:4
**authenticity** [8] - 78:20, 79:4, 79:9, 79:17, 80:15, 81:9, 86:5, 87:4
**author** [1] - 280:21
**authorities** [1] - 75:3
**authority** [2] - 95:14, 253:4
**authors** [3] - 217:21, 259:9, 259:10
**availability** [2] - 139:17, 332:4

**available** [28] - 13:11, 17:4, 17:8, 18:6, 55:19, 81:25, 82:15, 137:23, 139:15, 158:9, 162:20, 163:2, 168:21, 187:2, 187:6, 203:22, 207:10, 228:15, 234:22, 236:6, 237:5, 238:3, 238:16, 257:2, 294:17, 298:6, 332:2
**availed** [1] - 33:2
**Ave** [1] - 2:18
**Avenue** [4] - 2:4, 3:3, 314:15, 335:11
**average** [5] - 44:23, 225:16, 234:19, 263:13, 263:18
**Aviation** [1] - 78:16
**avoid** [16] - 57:17, 57:21, 117:14, 158:13, 165:16, 165:24, 166:7, 168:20, 178:24, 179:3, 186:11, 186:13, 234:1, 266:3, 278:21, 332:14
**avoidance** [1] - 232:20
**awakening** [1] - 24:17
**aware** [49] - 25:10, 32:12, 44:14, 44:18, 44:20, 44:23, 45:1, 45:3, 45:6, 45:12, 45:14, 45:17, 47:14, 55:12, 63:24, 65:9, 109:24, 121:24, 131:11, 131:18, 131:23, 131:25, 132:8, 167:3, 175:6, 175:7, 175:9, 175:16, 175:19, 177:3, 179:19, 180:10, 180:15, 180:17, 180:19, 180:23, 181:11, 183:22, 183:25, 186:17, 191:1, 194:3, 195:4, 236:21, 277:11, 293:20, 321:25, 322:10, 322:11
**awareness** [1] - 24:3
**awesome** [2] - 155:10, 160:9
**awful** [2] - 196:19

## B

**BA** [1] - 20:3
**Babcock** [3] - 231:18, 256:2
**bachelor's** [1] - 200:24
**Bachelor's** [1] - 143:24
**back-country** [1] - 149:19
**background** [21] - 20:2, 38:5, 38:8, 74:12, 74:15, 74:18, 74:21, 82:21, 89:20, 98:20, 105:13, 143:22, 145:6, 145:11, 156:18, 156:23, 184:23, 185:1, 185:6, 200:23, 252:1
**backgrounds** [2] - 97:16, 98:6
**backup** [1] - 94:9
**backyard** [1] - 309:13
**bad** [3] - 225:3, 232:16, 265:5
**balance** [1] - 118:16
**balancing** [1] - 118:24
**Bancorp** [1] - 18:1
**barb** [1] - 272:17
**barbed** [5] - 65:13, 65:16, 93:16, 231:10, 320:15
**barbed-wire** [1] - 65:16
**barbwire** [1] - 231:5
**BAs** [1] - 89:22
**base** [4] - 92:24, 93:5, 220:6, 308:19
**Base** [2] - 25:19, 26:23
**based** [40] - 49:6, 65:1, 97:21, 100:10, 101:14, 103:23, 108:24, 109:6, 113:13, 119:8, 120:14, 127:10, 128:7, 130:11, 131:25, 132:12, 133:19, 137:5, 138:1, 146:11, 160:17, 178:23, 194:4, 194:25, 200:20, 214:19, 222:12, 236:14, 236:18, 237:1, 239:19, 245:18, 259:5,

264:18, 265:2, 269:6, 280:10, 292:7, 292:9
**baseline** [4] - 253:24, 253:25, 254:2, 254:3
**basis** [9] - 57:6, 81:13, 142:23, 191:22, 220:13, 252:15, 325:21, 326:7, 326:17
**bat** [14] - 143:14, 148:6, 159:14, 159:16, 159:21, 160:1, 160:7, 160:10, 160:24, 168:16, 190:7, 190:8, 190:10, 190:21
**bats** [6] - 156:8, 157:13, 159:23, 161:2, 190:13, 190:19
**battle** [6] - 22:2, 22:4, 22:7, 24:17, 41:24, 42:1
**bay** [1] - 46:15
**Bayshore** [1] - 1:16
**BCNP** [2] - 270:7, 270:8
**Beach** [1] - 309:9
**bear** [2] - 80:15, 304:11
**Bear** [1] - 25:6
**bears** [1] - 158:12
**beautiful** [1] - 303:9
**became** [8] - 25:22, 38:15, 115:14, 141:25, 191:3, 266:24, 278:10, 322:1
**become** [6] - 20:10, 32:12, 48:23, 141:24, 142:12, 144:13, 170:8, 201:21
**becomes** [1] - 190:1
**becoming** [4] - 20:5, 56:1, 116:3, 142:11
**beds** [1] - 136:8
**BEFORE** [1] - 1:10
**began** [3] - 21:18, 181:21, 318:14
**begin** [2] - 9:17, 27:11
**beginning** [10] - 56:23, 101:1, 119:20, 179:8, 207:20, 219:3, 268:16, 268:17, 305:13, 306:20
**behalf** [11] - 6:11, 6:16, 6:19, 8:2, 9:2, 14:18, 86:14, 143:5, 211:16, 211:17, 211:18

**behave** [1] - 229:3
**behavior** [3] - 161:2, 229:4, 246:13
**behind** [3] - 314:11, 319:24, 320:18
**beings** [1] - 121:14
**belabor** [1] - 253:23
**Belden** [1] - 218:5
**belief** [1] - 139:23
**bell** [1] - 70:11
**bells** [1] - 21:25
**below** [1] - 323:3
**beneficial** [1] - 26:14
**benefit** [3] - 206:18, 230:16, 315:18
**benefits** [1] - 35:7
**BENNETT** [2] - 1:21, 6:15
**Bennett** [1] - 6:16
**bereft** [1] - 254:16
**best** [18] - 21:9, 40:3, 128:2, 139:5, 141:5, 141:6, 160:2, 160:4, 258:6, 263:25, 266:7, 266:15, 291:10, 292:7, 292:8, 292:9, 294:1, 332:10
**bet** [1] - 160:4
**better** [7] - 42:21, 97:21, 102:25, 128:11, 136:12, 254:17, 314:20
**Betty** [1] - 304:22
**between** [32] - 45:10, 48:11, 52:10, 68:5, 136:23, 139:9, 153:7, 154:23, 155:20, 212:5, 223:12, 233:18, 234:13, 234:18, 235:1, 242:21, 249:1, 257:23, 258:25, 259:1, 260:19, 260:23, 261:13, 261:19, 263:22, 270:12, 275:18, 282:3, 291:13, 292:3, 301:5, 327:14
**beyond** [7] - 68:24, 116:22, 138:20, 167:1, 199:2, 231:25, 253:3
**bias** [1] - 75:16
**bicycle** [4] - 154:6, 155:9, 155:10, 166:21
**bicycling** [3] - 155:14, 155:17, 166:20
**bidirectional** [1] - 31:9

**Big** [84] - 21:24, 22:13, 24:13, 24:17, 24:23, 24:25, 25:5, 32:4, 32:9, 34:10, 43:15, 45:19, 46:16, 46:20, 50:8, 53:25, 77:8, 77:11, 142:6, 142:8, 144:10, 144:13, 144:16, 144:20, 145:7, 146:13, 146:24, 147:13, 148:2, 148:5, 149:24, 151:22, 152:9, 152:14, 152:15, 152:20, 152:23, 153:11, 153:14, 154:11, 154:19, 155:20, 155:22, 155:24, 156:3, 156:7, 156:23, 157:18, 157:21, 157:23, 159:6, 159:7, 159:14, 159:19, 160:7, 160:15, 160:18, 162:24, 165:15, 165:18, 165:24, 168:2, 170:13, 178:7, 186:4, 186:9, 192:2, 193:18, 194:24, 195:12, 215:2, 215:6, 226:16, 226:17, 236:10, 244:7, 245:20, 246:1, 270:9, 300:7, 300:12, 311:17, 321:9, 321:12
**big** [10] - 32:10, 52:10, 92:19, 203:9, 254:11, 262:3, 262:11, 286:25, 308:20, 312:5
**bigger** [3] - 227:2, 229:15, 237:23
**biking** [1] - 25:6
**Billie** [1] - 167:17
**billion** [2] - 31:15, 123:23
**bin** [1] - 92:2
**biodiversity** [3] - 156:5, 171:11, 203:1
**Biological** [7] - 6:16, 82:23, 141:21, 141:25, 162:10, 163:10, 170:24
**BIOLOGICAL** [1] - 1:22
**biological** [5] - 202:9, 204:2, 206:14, 209:9, 239:25
**biologist** [6] - 208:25, 209:1,

233:14, 246:17, 280:12
**biologists** [5] - 204:21, 223:8, 224:15, 280:11, 295:17
**biology** [2] - 201:1, 221:1
**bird** [3] - 143:20, 300:1, 302:16
**birds** [2] - 143:19, 173:12
**birth** [1] - 244:16
**Biscayne** [2] - 1:19, 25:24
**bit** [15] - 19:25, 20:9, 90:12, 91:6, 125:25, 153:19, 166:11, 181:23, 186:15, 215:22, 219:2, 224:11, 238:14, 266:14, 291:16
**Black** [1] - 254:10
**black** [7] - 100:6, 100:16, 110:23, 302:7, 303:9, 307:7
**blanket** [3] - 176:6, 186:16, 187:1
**blazingly** [1] - 248:7
**blindingly** [4] - 308:17, 319:21, 319:22, 320:13
**block** [2] - 319:24, 330:24
**blue** [6] - 217:20, 227:4, 227:5, 295:1, 307:19, 313:9
**board** [4] - 19:8, 72:4, 146:7, 327:21
**Bob** [1] - 218:5
**bobcat** [1] - 173:15
**bodies** [1] - 104:22
**BOIES** [1] - 2:9
**boiling** [1] - 213:8
**bonneted** [17] - 143:14, 148:6, 156:8, 157:13, 159:14, 159:16, 159:21, 160:1, 160:7, 160:10, 160:24, 168:16, 190:7, 190:8, 190:10, 190:13, 190:19
**book** [1] - 21:14
**bookmark** [1] - 177:19
**boom** [1] - 22:16
**border** [1] - 115:12
**Border** [2] - 312:21, 313:4
**bother** [1] - 255:9

**bottom** [4] - 40:2, 126:20, 126:24, 164:6
**Boulevard** [2] - 1:19, 2:10
**boundaries** [1] - 24:23
**boundary** [1] - 157:16
**Box** [2] - 1:23, 2:24
**brand** [2] - 92:19, 133:22
**branded** [1] - 101:23
**breached** [1] - 231:18
**breaches** [1] - 278:16
**breaching** [1] - 231:20
**break** [11] - 86:22, 87:2, 88:4, 139:11, 140:1, 147:9, 151:6, 327:21, 327:23, 329:7, 330:8
**breakdowns** [1] - 91:4
**breaking** [3] - 13:2, 13:18, 13:22
**breath** [1] - 20:20
**breathing** [1] - 209:11
**breed** [1] - 295:6
**breeding** [13] - 218:12, 218:15, 218:25, 219:2, 219:9, 219:16, 221:13, 232:21, 273:1, 273:2, 273:23, 274:5, 295:5
**Breedlove** [6] - 204:3, 204:25, 205:15, 205:16, 211:19, 211:23
**brick** [5] - 106:18, 106:19, 238:13, 286:22, 286:25
**Brickell** [1] - 2:4
**brief** [6] - 13:7, 135:14, 193:25, 196:16, 200:22, 287:22
**Brief** [1] - 200:10
**briefly** [6] - 16:2, 87:21, 144:19, 145:6, 164:23, 314:17
**briefs** [1] - 16:16
**bright** [12] - 92:25, 266:4, 267:18, 278:21, 308:17, 308:18, 308:23, 309:1, 319:22, 320:13
**bring** [10] - 27:5,

42:20, 78:9, 175:11, 188:25, 215:20, 216:13, 221:10, 246:16, 319:13
**brings** [1] - 234:7
**broaden** [1] - 241:1
**broadly** [1] - 128:22
**broke** [1] - 139:5
**brooks** [1] - 188:2
**Brooks** [1] - 215:8
**brought** [5] - 55:16, 102:2, 134:16, 308:6, 320:18
**BRP** [3] - 255:22, 255:23, 255:24
**brush** [1] - 244:15
**bubbling** [1] - 311:6
**bucket** [4] - 154:18, 157:22, 264:8, 264:9
**buckets** [1] - 264:3
**budding** [1] - 147:24
**budget** [3] - 226:16, 226:18, 296:14
**budgetary** [1] - 226:23
**budgets** [1] - 106:14
**buffer** [4] - 221:25, 222:5, 223:23, 292:20
**buggy** [1] - 300:17
**build** [9] - 21:23, 32:13, 108:25, 109:1, 109:2, 109:14, 128:5, 128:8, 128:9
**building** [6] - 22:15, 48:10, 76:21, 106:21, 175:4, 254:12
**buildings** [7] - 47:15, 47:18, 106:17, 106:22, 166:25, 174:22, 175:7
**built** [14] - 22:20, 33:6, 42:1, 54:13, 62:6, 77:2, 127:14, 127:16, 129:4, 175:15, 181:9, 205:10, 272:22, 321:14
**bulkheads** [1] - 201:15
**bumps** [2] - 181:11, 235:1
**bunch** [1] - 203:12
**bunches** [1] - 208:15
**burden** [1] - 198:13
**Burkhardt** [4] - 6:12, 162:1, 170:18, 170:21
**BURKHARDT** [31] - 1:18, 4:12, 6:13, 141:2, 141:17, 141:19, 145:5,

145:10, 145:22, 147:11, 149:5, 151:11, 157:3, 157:4, 163:12, 163:19, 163:22, 164:1, 164:14, 164:21, 174:24, 179:22, 182:9, 184:1, 187:15, 189:8, 193:5, 193:9, 193:25, 194:2, 195:24

**Burlington** [2] - 6:7, 6:9

**BURLINGTON** [1] - 1:15

**bus** [8] - 97:12, 97:14, 109:12, 312:24, 313:25, 314:4, 319:24

**buses** [6] - 92:3, 92:4, 92:8, 101:3, 313:7, 314:2

**business** [6] - 81:18, 81:22, 167:8, 175:23, 279:20

**businesses** [1] - 167:4

**bustling** [1] - 77:14

**busy** [2] - 312:7

**Butcher** [1] - 146:19

**button** [2] - 125:3, 139:23

**BY** [141] - 3:1, 4:5, 4:5, 4:8, 4:8, 4:9, 4:9, 4:12, 4:13, 4:13, 4:14, 4:16, 4:17, 4:17, 4:18, 4:20, 4:21, 18:23, 21:3, 23:7, 27:25, 28:24, 30:2, 30:24, 33:19, 35:2, 39:23, 40:24, 42:7, 43:9, 44:13, 44:22, 45:13, 53:11, 53:22, 57:13, 58:19, 60:10, 65:6, 65:20, 67:7, 69:12, 71:23, 72:17, 72:25, 74:4, 75:1, 75:8, 76:10, 89:13, 97:24, 98:21, 99:22, 101:13, 102:18, 104:10, 106:23, 107:12, 111:18, 116:2, 116:19, 117:9, 119:16, 122:2, 124:4, 125:6, 125:15, 128:20, 131:9, 133:12, 135:16, 137:17, 141:19, 145:22, 147:11, 149:5, 151:11, 157:4, 164:1, 165:8, 165:20,

169:23, 172:17, 175:13, 178:2, 180:7, 181:2, 182:16, 183:5, 184:9, 184:18, 185:21, 189:2, 190:6, 191:12, 194:2, 200:15, 202:2, 210:16, 211:9, 213:22, 214:14, 225:6, 237:14, 239:11, 240:18, 242:11, 243:13, 249:9, 254:21, 258:14, 259:19, 268:19, 271:20, 272:16, 273:21, 274:2, 274:17, 277:21, 281:20, 282:10, 285:12, 287:20, 293:5, 298:4, 299:14, 309:19, 310:5, 310:19, 310:23, 311:16, 315:2, 316:10, 317:18, 319:20, 321:19, 322:9, 322:21, 324:3, 325:11, 326:16

---

## C

**C&R** [1] - 311:1

**caffeine** [1] - 140:14

**cage** [2] - 136:8

**cages** [2] - 98:25, 136:7

**calculate** [4] - 206:3, 210:1, 230:9, 232:13

**calculation** [1] - 295:20

**calendar** [2] - 46:8, 46:11

**Caloosahatchee** [2] - 256:14, 256:15

**cameras** [1] - 219:8

**camp** [8] - 25:2, 51:13, 51:14, 62:21, 91:18, 151:25, 309:7

**Camp** [1] - 303:9

**camped** [1] - 149:13

**campers** [1] - 303:6

**Campground** [3] - 149:13, 154:22, 166:13

**campgrounds** [1] - 166:16

**camping** [6] - 149:14, 152:8, 153:1, 154:22, 166:12, 300:1

**campsite** [1] - 155:1

**canal** [1] - 308:2

**canals** [2] - 307:15, 307:17

**candid** [1] - 329:10

**candidates** [1] - 236:13

**candidly** [1] - 329:18

**candle** [1] - 267:3

**cannot** [1] - 85:12

**canoe** [1] - 151:25

**capable** [1] - 13:5

**capacities** [5] - 105:11, 105:17, 107:11, 201:7

**capacity** [27] - 8:24, 10:18, 11:2, 71:19, 102:14, 105:21, 114:14, 114:16, 122:13, 122:20, 124:6, 124:7, 144:18, 162:19, 171:9, 171:10, 201:6, 202:16, 203:14, 229:25, 230:4, 233:1, 233:7, 233:10, 238:19, 245:21, 286:12

**capture** [1] - 222:11, 223:9

**captured** [1] - 219:7

**captures** [1] - 218:8

**car** [6] - 182:4, 183:2, 301:3, 301:24, 302:21, 321:2

**caracara** [1] - 143:19

**caravan** [1] - 314:4

**care** [7] - 11:5, 55:4, 55:8, 171:11, 183:13, 266:8, 266:10

**career** [2] - 37:15, 170:25

**careful** [3] - 102:4, 102:10, 183:10

**carefully** [1] - 125:23

**caring** [1] - 54:23

**CARLOS** [1] - 2:14

**Carlos** [1] - 8:1

**Carolina** [1] - 20:3

**carried** [1] - 94:10

**carry** [1] - 229:25

**carrying** [10] - 229:24, 230:4, 233:1, 233:7, 233:10, 238:19, 286:12, 323:7, 323:9, 323:17

**cars** [13] - 61:10, 103:3, 103:4, 103:12, 181:24, 182:8, 182:12, 182:13, 194:4, 194:13,

235:20, 313:7, 320:8

**CASE** [1] - 1:2

**case** [58] - 6:2, 10:18, 11:20, 14:6, 14:22, 15:15, 15:20, 18:1, 23:10, 26:15, 29:4, 33:10, 39:17, 40:9, 55:12, 67:15, 72:8, 81:11, 85:6, 86:18, 86:19, 88:20, 117:22, 120:1, 125:1, 156:21, 170:9, 170:11, 170:17, 170:20, 170:21, 170:23, 172:19, 191:16, 207:2, 212:15, 216:15, 216:19, 223:8, 223:10, 233:13, 237:24, 238:2, 238:5, 256:18, 257:1, 257:10, 273:18, 274:8, 283:13, 288:4, 289:19, 290:1, 329:11, 332:17, 332:20, 334:12

**cases** [5] - 12:22, 99:5, 116:6, 121:13, 229:5

**Castaneda** [1] - 15:2

**casual** [1] - 122:17

**cat** [1] - 304:10

**category** [1] - 86:14

**caught** [1] - 21:7

**caused** [2] - 22:11, 22:16, 297:24

**causes** [1] - 290:17

**cautious** [1] - 102:11

**cavity** [1] - 148:8

**CBD** [2] - 162:14, 170:11

**cc'd** [1] - 129:7

**celebrated** [1] - 145:25

**cell** [2] - 150:23, 199:25

**center** [60] - 24:11, 32:13, 33:6, 33:24, 50:10, 56:17, 63:19, 76:22, 77:15, 83:4, 89:25, 90:4, 98:1, 99:3, 111:5, 126:7, 146:19, 147:20, 148:22, 150:5, 150:10, 154:4, 160:14, 161:25, 162:4, 163:3, 173:11, 183:14, 191:20, 192:3, 194:12, 195:2, 195:21, 214:16,

214:19, 215:25, 218:18, 221:10, 221:11, 221:24, 227:17, 230:11, 232:14, 232:17, 233:22, 234:11, 236:4, 244:22, 244:25, 247:1, 264:13, 277:25, 293:7, 293:11, 294:10, 297:6, 297:24, 321:14, 322:1, 324:4

**CENTER** [1] - 1:22

**Center** [28] - 6:16, 82:23, 141:20, 141:22, 141:24, 141:25, 142:13, 143:2, 143:5, 144:23, 145:9, 150:3, 162:10, 163:10, 166:19, 170:24, 212:16, 244:8, 245:21, 246:2, 293:14, 293:15, 293:18, 296:18, 300:15, 312:14, 314:12, 314:13

**Center's** [3] - 15:10, 142:15, 143:10

**centered** [2] - 244:22, 244:24

**centers** [2] - 107:6, 107:10

**Central** [3] - 89:21, 107:9, 205:1

**certain** [9] - 32:23, 216:12, 230:1, 247:25, 282:6, 296:2, 306:2

**certainly** [21] - 17:4, 18:5, 18:6, 34:9, 61:6, 68:4, 71:13, 88:17, 131:5, 134:15, 166:3, 168:8, 242:1, 302:25, 303:3, 306:9, 310:17, 311:25, 312:23, 313:21, 322:7

**Certainly** [1] - 32:10

**certainty** [1] - 246:25

**certification** [2] - 168:6, 168:9

**certify** [1] - 335:3

**chain** [1] - 231:17

**chain-link** [1] - 231:17

**challenge** [1] - 87:4

**chamber's** [1] - 15:23

**chance** [9] - 16:17, 16:18, 80:11, 107:15,

160:2, 179:9, 230:3,
230:6, 245:7
**chances** [3] -
198:25, 229:20, 233:2
**change** [5] - 47:24,
259:7, 291:9, 291:21,
292:3
**changed** [1] - 320:14
**changes** [3] - 47:23,
53:21, 100:7
**changing** [2] -
115:25, 161:1
**chaotic** [1] - 307:23
**Chapel** [1] - 20:4
**characteristics** [5] -
215:5, 237:1, 243:8,
245:12, 245:18
**charge** [3] - 72:6,
110:9, 324:13
**charges** [1] - 113:9
**charismatic** [1] -
143:12
**Charlotte** [9] - 219:3,
219:5, 231:19, 256:1,
256:6, 257:10,
289:10, 289:12,
289:14
**check** [5] - 42:17,
67:23, 75:22, 124:1,
191:2
**checked** [3] - 91:24,
331:17, 331:18
**checkpoint** [1] - 63:2
**checkpoints** [3] -
91:19, 91:20, 93:20
**chief** [1] - 81:11
**children** [3] - 300:2,
300:4, 301:2
**choice** [3] - 16:9,
16:20, 17:25
**choose** [1] - 111:4
**Chris** [3] - 6:18,
11:24, 218:5
**CHRISTOPHER** [2] -
2:3, 2:3
**circle** [9] - 218:22,
223:15, 226:2,
244:19, 244:21,
244:24, 274:20, 276:1
**Circuit** [1] - 329:14
**circumstance** [1] -
282:9
**circumstances** [3] -
226:14, 278:18,
278:23
**citations** [1] - 15:22
**cite** [6] - 15:15, 18:1,
18:11, 94:3, 189:11,
259:9
**cited** [7] - 40:4,

44:20, 50:11, 213:10,
213:11, 260:9, 277:8
**citing** [3] - 70:7,
70:12, 277:2
**citizen** [1] - 159:21
**citizen's** [1] - 173:8
**citizens** [1] - 148:3
**civil** [1] - 114:5
**claims** [2] - 55:16,
55:17
**clarification** [3] -
110:15, 139:14, 332:6
**clarified** [2] - 130:19,
132:7
**clarify** [10] - 24:12,
37:18, 97:25, 121:17,
122:23, 136:2, 138:9,
145:1, 225:7, 331:12
**clarifying** [2] -
110:13, 184:4
**clarity** [9] - 95:17,
110:2, 111:25,
127:21, 129:8, 133:9,
136:17, 137:21,
302:13
**classes** [1] - 225:21
**Clean** [1] - 24:20
**clean** [3] - 26:18,
104:24, 197:14
**cleaner** [1] - 11:3
**cleanliness** [1] -
51:18
**clear** [32] - 9:3, 11:6,
11:16, 36:13, 53:18,
55:24, 57:9, 57:14,
80:19, 101:14,
128:15, 136:20,
137:18, 162:24,
165:25, 174:15,
175:10, 183:24,
184:25, 186:8, 198:5,
211:23, 218:20,
235:10, 274:8, 296:4,
296:5, 296:7, 327:12,
328:20, 329:14, 334:7
**cleared** [3] - 188:13,
198:10, 331:15
**clearer** [2] - 215:22,
265:4
**clearly** [2] - 17:15,
17:18
**clerk** [1] - 87:1
**click** [1] - 70:2
**client** [3] - 35:22,
73:22, 73:23
**client's** [1] - 332:3
**clients** [2] - 211:23,
211:24
**clients'** [1] - 211:19
**Clip** [2] - 320:11,

320:23
**clip** [4] - 84:14,
319:12, 320:10,
320:22
**close** [21] - 46:18,
46:23, 47:4, 47:8,
48:9, 49:8, 50:20,
70:9, 71:4, 93:24,
150:10, 153:2,
166:13, 173:3, 173:4,
174:9, 222:12,
223:19, 232:8, 234:24
**closed** [4] - 102:7,
301:11, 301:19,
304:19
**closed-toe** [1] -
102:7
**closely** [6] - 18:17,
31:14, 89:6, 105:10,
105:25, 171:6
**closer** [9] - 46:22,
166:16, 186:8,
228:20, 229:1, 229:6,
229:9, 232:5, 232:6
**closest** [2] - 152:25,
154:4
**clouded** [1] - 154:14
**Clyde** [1] - 146:19
**co** [7] - 14:3, 15:8,
75:23, 78:20, 217:21,
280:21, 330:21
**co-author** [1] -
280:21
**co-authors** [1] -
217:21
**co-counsel** [2] -
75:23, 330:21
**co-parties** [2] - 14:3,
15:8
**co-party** [1] - 78:20
**Coast** [1] - 144:1
**coast** [2] - 61:17,
61:18
**cockaded** [4] -
148:7, 149:21,
156:12, 173:8
**coffee** [1] - 23:5
**Coffey** [3] - 6:7, 6:9,
170:22
**COFFEY** [1] - 1:15
**cohesive** [1] - 91:5
**coincident** [1] -
291:16
**collar** [6] - 223:9,
223:10, 223:11,
224:15, 224:16,
246:15
**collared** [6] - 67:16,
67:17, 157:9, 223:20,
243:22, 296:15

**collaring** [2] -
225:10, 243:24
**collars** [11] - 67:12,
67:17, 223:10, 225:7,
225:9, 226:20,
226:22, 275:13,
279:11, 279:16,
295:10
**collate** [1] - 203:21
**colleague** [5] -
14:16, 32:15, 67:24,
123:3, 240:24
**colleagues** [5] -
78:24, 104:18, 110:7,
124:1, 328:3
**collected** [5] - 70:17,
81:12, 186:18, 187:6,
243:19
**collecting** [1] - 81:21
**Collier** [14] - 42:2,
89:25, 107:21, 116:1,
148:18, 150:18,
151:15, 151:16,
151:20, 204:14,
204:19, 271:22,
300:20, 301:18
**color** [4] - 100:5,
100:7, 100:15, 100:16
**colored** [1] - 97:18
**colors** [3] - 216:15,
220:9, 227:5
**columnist** [3] -
37:17, 37:21, 38:17
**combined** [8] - 91:7,
194:15, 202:23,
209:25, 237:18,
268:12, 268:20,
285:25
**comfort** [1] - 87:2
**comfortable** [2] -
126:25, 127:1
**coming** [31] - 44:19,
53:16, 65:22, 81:14,
85:24, 103:11, 114:3,
114:6, 116:11, 138:7,
148:11, 161:12,
176:13, 194:8, 198:2,
198:11, 213:2,
228:25, 296:19,
299:15, 303:12,
303:20, 304:16,
305:25, 306:3,
306:22, 308:20,
311:5, 312:15,
313:17, 321:2
**comings** [3] - 80:3,
194:9, 306:9
**comment** [7] - 32:19,
32:25, 55:9, 108:17,
143:1, 162:18, 177:13

**commenting** [1] -
162:13
**comments** [13] -
25:21, 26:5, 26:12,
26:24, 30:4, 30:6,
31:16, 31:22, 33:7,
56:3, 74:10, 122:1,
193:19
**commercial** [4] -
25:20, 26:2, 252:3,
253:1
**commission** [2] -
187:7, 258:3
**Commission** [14] -
201:12, 202:6,
202:12, 203:15,
203:17, 203:20,
206:12, 208:21,
208:23, 211:18,
236:6, 236:8, 258:2,
260:2
**Commission's** [3] -
203:21, 208:24, 222:2
**commitment** [1] -
331:21
**committee** [5] -
19:21, 21:16, 35:11,
36:6, 76:24
**committees** [1] -
96:3
**commonplace** [1] -
265:18
**communicate** [1] -
121:22
**communicates** [1] -
40:16
**communication** [10]
- 98:10, 99:8, 129:2,
129:21, 131:11,
131:19, 131:24,
132:3, 132:4, 132:9
**communications** [8]
- 99:2, 105:12,
128:23, 131:23,
131:25, 132:1,
162:14, 170:16
**communities** [2] -
95:24, 202:22
**community** [7] -
22:1, 142:10, 142:11,
166:25, 303:22,
304:20
**commuters** [1] -
103:11
**compactor** [2] -
305:22, 307:2
**company** [6] -
133:16, 133:18,
204:3, 219:8, 307:20,
313:20

**comparatively** [2] - 269:10, 269:12

**compare** [1] - 48:4

**compared** [1] - 277:25

**comparing** [2] - 63:15, 63:17

**comparison** [2] - 269:5, 269:9

**compel** [1] - 23:23

**compensated** [1] - 199:2

**competently** [1] - 329:19

**complaint** [1] - 55:18

**complaints** [3] - 117:3, 117:5, 117:6

**complemented** [1] - 100:9

**complete** [5] - 82:13, 210:7, 212:12, 319:3, 319:5

**completed** [2] - 89:22, 162:12

**completely** [4] - 24:25, 278:15, 289:9, 294:8

**complex** [1] - 19:23

**compliance** [4] - 137:4, 241:2, 241:5, 242:7

**Compliance** [1] - 60:1

**complicated** [1] - 261:22

**complied** [1] - 36:10

**comply** [2] - 23:24, 112:14

**components** [1] - 203:1

**compound** [2] - 147:3, 147:7

**Comprehensive** [2] - 26:7, 28:6

**comprehensive** [5] - 76:21, 206:24, 207:25, 209:15, 265:16

**compromise** [1] - 333:3

**computer** [3] - 27:4, 27:5, 213:1

**concentration** [1] - 144:3

**concept** [2] - 229:24, 233:8

**concern** [8] - 52:22, 64:12, 72:22, 120:10, 160:16, 160:20, 161:13, 236:18

**concerned** [11] - 9:1, 9:3, 9:8, 32:1, 34:6, 34:14, 43:14, 128:18, 182:20, 182:23, 183:1

**concerns** [18] - 26:5, 33:8, 75:2, 75:10, 75:18, 89:24, 97:5, 112:2, 113:24, 116:20, 117:11, 117:12, 161:4, 161:9, 161:19, 167:24, 311:24, 324:15

**concert** [1] - 258:2

**conclude** [2] - 281:6, 285:19

**concluded** [1] - 227:25

**concludes** [1] - 294:25

**conclusion** [1] - 285:22

**conclusions** [7] - 284:25, 285:1, 285:2, 287:8, 287:11, 287:25

**Concord** [1] - 22:16

**concrete** [1] - 307:24

**conditions** [4] - 117:17, 118:7, 252:7, 257:12

**conducive** [1] - 333:1

**conduct** [2] - 146:11, 334:4

**conducted** [9] - 56:9, 56:12, 63:10, 63:13, 63:15, 63:17, 63:20, 178:15, 178:16

**confer** [2] - 84:23, 332:11

**conference** [4] - 84:10, 84:11, 88:19, 198:8

**confident** [2] - 227:20, 280:7

**configuration** [1] - 26:6

**confirm** [5] - 37:2, 48:8, 98:23, 331:16, 332:10

**confirmed** [1] - 115:6

**conflict** [2] - 183:9, 328:2

**conflicts** [1] - 198:3

**confused** [2] - 317:10, 331:17

**confusing** [3] - 58:16, 88:11, 282:8

**Congress** [5] - 90:21, 90:25, 91:2,

95:17, 108:8

**Congressional** [1] - 103:24

**Congressman** [1] - 114:16

**Congresswoman** [1] - 108:15

**connected** [3] - 193:2, 220:22, 220:23

**connecting** [1] - 42:14

**connection** [4] - 22:6, 103:16, 155:20, 257:20

**conscious** [1] - 96:22

**consequences** [2] - 24:2, 238:15

**consequential** [1] - 38:15

**Conservation** [10] - 185:10, 201:12, 202:12, 203:11, 203:20, 208:21, 211:18, 215:10, 217:8, 303:8

**conservation** [7] - 146:2, 147:25, 167:6, 171:2, 171:13, 187:7, 217:13

**conserve** [1] - 217:15

**consider** [17] - 15:18, 18:4, 18:7, 28:20, 86:4, 121:16, 212:7, 212:16, 226:13, 233:20, 237:9, 271:9, 291:24, 296:17, 297:16, 297:19, 334:2

**consideration** [1] - 14:11

**considered** [11] - 25:23, 37:1, 119:7, 207:10, 213:13, 220:13, 220:14, 220:25, 236:13, 297:10, 297:12

**considering** [4] - 16:7, 26:13, 118:16, 226:14

**consistent** [2] - 46:17, 138:21

**constant** [2] - 152:3, 305:24

**constituency** [1] - 121:15

**constituents** [2] - 96:1, 120:9

**constraints** [1] -

226:23

**construct** [1] - 191:20

**constructed** [2] - 41:25, 136:7

**construction** [36] - 34:1, 34:17, 50:9, 54:10, 77:13, 92:7, 92:20, 94:2, 100:20, 100:22, 101:2, 101:16, 101:21, 102:3, 102:4, 102:5, 102:9, 102:16, 112:24, 114:10, 114:12, 114:13, 114:20, 115:18, 127:4, 127:8, 181:21, 190:25, 260:16, 261:1, 261:4, 261:17, 283:18, 285:14, 309:24

**consult** [3] - 19:12, 71:7, 207:8

**consultant** [4] - 19:21, 204:2, 206:14, 209:9

**consultants** [4] - 19:7, 19:13, 19:14, 120:8

**consultation** [6] - 206:1, 216:4, 216:7, 216:16, 240:6, 254:25

**consulted** [1] - 327:8

**consulting** [1] - 204:2

**contacted** [1] - 130:14

**contaminating** [2] - 57:21, 178:6

**contamination** [1] - 60:5

**contemporaneously** [1] - 81:17

**content** [1] - 123:19

**contest** [1] - 84:13

**context** [9] - 85:23, 136:6, 211:13, 228:9, 237:22, 250:19, 252:7, 255:25, 286:18

**continuance** [2] - 294:4, 318:24

**continue** [2] - 194:21, 220:23

**continued** [3] - 77:12, 257:19, 270:10

**continues** [4] - 144:12, 151:5, 210:12, 238:12

**continuing** [1] - 297:7

**continuous** [3] - 54:1, 54:8, 54:19

**continuously** [1] - 319:8

**contract** [3] - 19:14, 133:2

**contracted** [3] - 59:21, 209:14, 313:21

**contractor** [2] - 114:5, 133:21

**contractors** [6] - 19:7, 19:12, 91:1, 110:22, 133:20, 134:2

**contracts** [5] - 132:25, 133:10, 133:13, 133:14, 136:18

**contractual** [2] - 110:24, 131:15

**contrary** [1] - 139:23

**contribute** [2] - 230:7, 297:24

**contributed** [1] - 261:10

**contributes** [1] - 286:16

**contrived** [1] - 86:3

**control** [2] - 31:10, 179:9

**convene** [1] - 331:2

**convenient** [1] - 27:10

**conversation** [3] - 96:11, 136:19, 136:20

**conversational** [1] - 17:17

**conversations** [3] - 35:13, 100:10, 138:2

**convert** [1] - 26:1

**converted** [3] - 115:15, 128:1

**convoys** [1] - 61:13

**cool** [2] - 149:22, 166:21

**coordinate** [1] - 19:8

**coordination** [2] - 83:11, 217:20

**copy** [11] - 60:13, 78:21, 78:22, 79:20, 96:21, 108:16, 128:4, 129:8, 129:13, 132:2, 210:25

**cords** [3] - 94:4

**core** [2] - 227:19, 227:23

**corkscrew** [1] - 237:25

**Corps** [10] - 26:13, 29:4, 29:6, 29:8, 29:10, 29:12, 30:8,

30:25, 31:4, 241:22

**correct** [150] - 8:14, 36:17, 36:20, 37:15, 37:24, 39:25, 40:14, 40:20, 40:23, 41:8, 41:20, 42:24, 45:20, 48:2, 48:3, 49:17, 49:21, 54:5, 58:12, 58:20, 60:5, 64:8, 64:14, 64:17, 70:15, 70:23, 72:2, 72:9, 74:1, 90:18, 91:13, 93:4, 104:14, 108:5, 110:6, 114:10, 114:11, 119:19, 121:2, 126:6, 126:12, 126:13, 126:17, 128:12, 129:15, 129:18, 129:19, 132:5, 132:15, 132:16, 132:19, 132:20, 132:22, 134:5, 134:11, 135:24, 135:25, 138:13, 138:15, 163:8, 164:11, 168:7, 172:23, 174:6, 174:15, 174:16, 179:5, 186:2, 186:10, 186:19, 187:4, 192:21, 195:13, 195:14, 207:21, 207:22, 224:1, 226:4, 230:14, 235:11, 235:12, 236:2, 242:18, 243:20, 244:1, 244:23, 247:23, 249:23, 250:15, 252:14, 255:19, 257:3, 258:5, 258:24, 260:16, 260:21, 260:22, 261:11, 261:15, 261:17, 261:22, 262:2, 263:24, 263:25, 265:11, 266:2, 267:12, 270:14, 270:22, 271:14, 271:16, 272:22, 274:25, 275:1, 275:19, 276:6, 276:10, 276:12, 276:13, 278:4, 278:9, 278:11, 279:1, 279:2, 281:9, 281:19, 282:17, 282:18, 282:23, 283:8, 284:12, 286:24, 287:9, 287:10, 287:12, 288:9, 289:22, 290:9, 293:9,

305:4, 310:3, 316:21, 322:24, 323:8, 325:25, 326:18, 327:10, 327:25, 332:9

**Correct** [3] - 15:4, 30:7, 134:17

**correctional** [1] - 106:1

**correctly** [11] - 59:14, 59:19, 98:4, 113:17, 129:4, 249:14, 261:9, 289:23, 290:11, 290:22, 292:18

**corresponding** [1] - 66:2

**cost** [3] - 109:10, 236:9, 236:22

**COSTELLO** [37] - 2:9, 4:13, 7:15, 144:21, 147:3, 147:5, 147:7, 156:15, 157:1, 164:17, 169:6, 169:23, 172:16, 172:17, 175:10, 175:13, 177:25, 178:2, 179:24, 180:7, 181:1, 181:2, 182:11, 182:16, 183:5, 184:9, 184:18, 185:4, 185:21, 187:14, 187:19, 188:3, 188:8, 189:2, 189:18, 190:6, 193:4

**Costello** [2] - 7:16, 170:3

**coterie** [1] - 101:9

**Counsel** [14] - 95:11, 130:4, 135:11, 135:22, 135:25, 141:16, 145:1, 145:4, 165:3, 187:18, 188:25, 189:16, 239:6, 293:1

**counsel** [21] - 6:4, 73:20, 75:23, 78:18, 79:6, 88:3, 114:14, 126:15, 138:20, 140:25, 141:8, 175:6, 196:25, 197:19, 198:5, 200:13, 240:2, 240:16, 315:17, 317:16, 330:21

**count** [3] - 159:22, 217:14, 246:18

**counterbalancing** [1] - 119:7

**countered** [1] - 109:11

**Counties** [2] - 219:5,

289:12

**counties** [2] - 107:23, 151:13

**country** [3] - 24:17, 85:18, 149:19

**counts** [1] - 234:19

**county** [7] - 55:17, 78:17, 81:24, 88:16, 113:11, 150:13, 150:17

**County** [38] - 8:6, 8:8, 8:10, 8:19, 8:23, 9:4, 80:14, 80:16, 81:21, 82:5, 87:22, 107:19, 107:21, 107:24, 113:4, 113:5, 113:7, 113:10, 113:11, 148:18, 150:14, 150:18, 150:20, 150:21, 151:16, 151:18, 151:19, 151:20, 204:19, 219:3, 231:19, 256:1, 256:6, 257:11, 289:14, 309:9

**COUNTY** [2] - 2:22, 2:24

**couple** [16] - 25:18, 26:8, 52:3, 54:24, 77:24, 125:8, 146:3, 187:4, 191:13, 229:6, 283:15, 284:15, 286:6, 289:14, 306:11, 314:17

**course** [38] - 15:13, 28:20, 75:24, 81:21, 91:9, 93:18, 95:8, 95:14, 95:20, 95:22, 96:3, 97:4, 97:22, 99:10, 100:6, 105:10, 108:12, 118:10, 118:24, 123:14, 125:16, 127:22, 149:14, 151:15, 152:7, 159:2, 178:1, 207:14, 215:15, 275:25, 279:17, 294:14, 304:11, 307:6, 313:3, 324:12, 324:16, 326:15

**COURT** [392] - 1:1, 6:14, 6:24, 7:3, 7:9, 7:14, 7:25, 8:4, 8:7, 8:13, 8:21, 9:5, 9:7, 9:22, 10:2, 10:20, 11:1, 11:8, 11:18, 11:22, 12:3, 12:9, 12:19, 13:1, 13:14, 13:20, 13:24, 14:24, 15:2, 15:5, 15:11,

15:16, 16:5, 16:23, 17:12, 17:21, 18:10, 20:16, 20:18, 20:20, 23:3, 23:5, 27:4, 27:9, 27:14, 27:23, 28:9, 28:15, 28:18, 28:23, 29:13, 29:19, 29:23, 30:13, 30:16, 30:19, 30:21, 30:23, 33:18, 34:23, 39:11, 39:17, 40:19, 42:15, 42:18, 42:23, 43:1, 43:5, 43:22, 44:1, 44:5, 44:10, 44:18, 45:10, 53:3, 53:16, 56:15, 56:17, 56:20, 57:2, 57:8, 57:12, 58:3, 58:8, 58:13, 58:18, 60:7, 65:3, 66:2, 66:5, 66:7, 66:13, 66:19, 68:10, 68:14, 69:3, 69:7, 71:16, 71:18, 72:12, 72:15, 72:24, 73:12, 73:19, 74:2, 74:25, 75:7, 75:11, 75:20, 75:24, 76:2, 76:7, 77:22, 78:3, 78:8, 78:12, 78:25, 79:7, 79:11, 79:22, 80:1, 80:24, 81:15, 82:3, 83:10, 83:12, 83:14, 83:18, 83:21, 84:3, 84:18, 84:20, 85:7, 85:17, 85:24, 86:12, 86:17, 87:3, 87:9, 87:11, 87:14, 87:15, 87:25, 88:5, 88:9, 88:21, 96:12, 96:15, 98:15, 99:10, 99:13, 99:18, 101:6, 101:17, 104:7, 106:18, 107:7, 111:13, 115:20, 116:14, 116:18, 116:24, 117:25, 118:23, 119:10, 120:16, 121:2, 121:11, 121:23, 124:3, 124:10, 124:12, 124:17, 124:20, 124:25, 125:3, 125:13, 128:15, 130:21, 130:25, 131:2, 131:4, 133:5, 134:21, 134:22, 134:24, 135:6, 135:12, 137:16, 138:25, 139:3, 139:11, 139:18, 140:2, 140:5, 140:10, 140:14,

140:24, 141:5, 141:16, 144:25, 145:8, 145:12, 147:4, 147:6, 147:9, 149:4, 150:23, 151:2, 156:21, 157:2, 163:15, 163:21, 163:24, 164:19, 164:24, 165:2, 165:5, 165:18, 169:7, 169:13, 169:16, 169:18, 169:21, 172:14, 175:1, 177:18, 179:25, 180:15, 180:19, 180:22, 180:25, 182:10, 182:12, 182:25, 184:3, 184:12, 184:24, 185:7, 187:17, 187:22, 188:6, 188:15, 188:18, 189:11, 189:16, 189:24, 191:9, 192:14, 192:21, 192:23, 193:1, 193:3, 193:8, 193:12, 193:14, 193:21, 193:24, 196:1, 196:13, 196:18, 196:22, 197:5, 197:9, 197:19, 197:22, 198:20, 198:23, 199:21, 200:9, 200:11, 201:25, 211:5, 213:24, 214:6, 214:12, 224:23, 225:4, 237:11, 239:3, 240:1, 240:13, 240:16, 247:9, 247:11, 247:17, 247:25, 248:5, 248:14, 248:19, 248:21, 248:23, 249:5, 253:14, 253:16, 253:19, 254:2, 254:6, 258:12, 259:14, 259:16, 267:1, 268:15, 268:16, 272:1, 272:8, 272:10, 272:15, 273:15, 274:8, 274:15, 277:15, 277:17, 277:20, 281:15, 282:2, 283:23, 284:5, 284:7, 284:10, 284:13, 284:17, 284:20, 285:5, 287:15, 287:18, 293:1, 298:3, 298:10, 298:12,

298:20, 298:24,
310:2, 310:4, 311:9,
311:12, 311:14,
314:19, 314:24,
315:8, 315:12,
315:14, 315:17,
315:20, 315:22,
316:4, 316:7, 317:9,
317:11, 317:16,
318:20, 319:2, 319:7,
319:10, 319:14,
321:14, 322:5,
322:20, 323:20,
323:23, 324:1,
324:21, 325:2, 325:6,
325:9, 326:13,
326:23, 327:2, 327:4,
327:11, 327:16,
327:25, 328:12,
328:18, 329:1, 330:1,
330:14, 330:21,
331:3, 331:5, 331:17,
331:25, 332:9,
332:18, 332:22,
333:2, 333:17,
333:21, 334:5,
334:14, 334:17,
334:22

**court** [15] - 17:15,
17:17, 18:18, 63:9,
87:16, 89:8, 90:13,
125:22, 135:1,
199:18, 225:1,
237:13, 260:7,
299:10, 333:8

**Court** [38] - 3:2, 3:3,
6:1, 14:11, 16:7, 18:4,
18:7, 25:16, 27:10,
31:3, 42:20, 78:2,
78:6, 78:15, 78:21,
82:20, 84:16, 85:19,
86:7, 88:10, 89:15,
91:15, 117:19,
118:15, 198:13,
214:3, 299:4, 299:23,
301:13, 302:13,
303:4, 305:2, 305:10,
308:12, 333:25,
334:9, 335:10, 335:10

**Court's** [2] - 14:11,
139:25

**court's** [1] - 177:25
**courtroom** [3] - 10:4,
151:3, 169:24
**COURTROOM** [19] -
6:2, 18:14, 18:16,
18:21, 27:8, 30:17,
30:22, 87:12, 89:3,
89:5, 89:11, 140:12,
141:12, 163:17,

163:20, 197:7,
199:17, 299:6, 299:8
**courts** [1] - 85:18
**cover** [5] - 220:6,
244:15, 250:24,
323:16, 330:22
**coverage** [1] - 222:2
**covered** [9] - 20:22,
65:3, 203:3, 234:8,
322:22, 322:23,
322:25, 323:6, 324:22
**covering** [1] - 323:1
**covers** [2] - 226:2,
305:16
**create** [8] - 123:10,
202:18, 202:24,
204:8, 204:9, 210:23,
215:18, 221:20
**created** [19] - 24:14,
24:18, 24:20, 24:21,
54:7, 63:22, 84:15,
174:22, 176:16,
180:14, 202:19,
208:16, 209:18,
217:17, 217:18,
218:21, 225:15,
278:16, 291:3
**creates** [2] - 77:18,
238:21
**creation** [1] - 22:7
**credentials** [1] -
214:7
**credibility** [1] -
120:25
**credit** [1] - 259:10
**crepuscular** [1] -
233:5
**criminal** [1] - 113:9
**crisis** [3] - 20:13,
20:22, 105:12
**criteria** [1] - 216:12
**critical** [20] - 17:6,
143:15, 157:15,
162:23, 168:15,
242:19, 242:23,
242:25, 243:1, 243:3,
243:8, 281:10,
281:14, 281:22,
281:24, 282:3, 282:4,
282:5, 282:7
**CROOKS** [1] - 4:11
**Crooks** [11] - 141:3,
141:15, 141:15,
141:20, 155:19,
157:5, 158:3, 161:21,
178:3, 191:14, 193:11
**crooks** [31] - 142:14,
145:2, 145:13,
147:12, 149:6, 149:7,
151:2, 151:12,

163:14, 164:2, 164:6,
165:6, 165:9, 169:10,
170:8, 182:17,
184:19, 187:2,
187:11, 187:20,
188:22, 189:3, 189:8,
189:20, 190:1, 190:3,
190:7, 191:7, 193:4,
194:3, 196:1
**crooks'** [2] - 163:23,
164:16
**CROSS** [13] - 4:2,
35:1, 99:21, 104:9,
125:5, 165:7, 169:22,
191:11, 240:17,
249:8, 287:19, 316:9,
325:10
**cross** [49] - 12:18,
16:13, 16:17, 16:21,
16:25, 17:3, 18:6,
34:24, 53:4, 53:8,
58:3, 66:18, 76:11,
76:16, 79:25, 80:20,
99:16, 117:15,
117:21, 118:4,
118:21, 132:17,
132:18, 135:17,
141:6, 156:25, 165:2,
169:21, 198:16,
214:3, 214:5, 214:8,
235:4, 248:16,
248:24, 253:20,
278:6, 293:6, 294:13,
295:23, 315:14,
324:17, 324:23,
329:5, 329:24,
333:12, 333:20,
333:22
**Cross** [1] - 53:2
**CROSS-
EXAMINATION** [12] -
35:1, 99:21, 104:9,
125:5, 165:7, 169:22,
191:11, 240:17,
249:8, 287:19, 316:9,
325:10
**cross-examination**
[11] - 17:3, 18:6,
34:24, 79:25, 135:17,
141:6, 165:2, 169:21,
248:24, 253:20,
315:14
**cross-examine** [3] -
156:25, 333:12,
333:20
**Cross-talk** [1] - 53:2
**crosses** [2] - 328:7,
328:16
**crossing** [2] -
205:10, 236:14

**crossings** [2] -
236:19, 236:20
**crumbles** [1] - 100:8
**CSOs** [1] - 199:1
**culprit** [1] - 151:6
**culverts** [1] - 31:6
**cumulative** [6] -
88:13, 88:23, 183:3,
228:9, 234:4, 234:9
**curated** [1] - 90:9
**curiosity** [1] - 328:13
**current** [24] - 23:20,
160:14, 174:5, 194:5,
195:1, 195:16,
195:20, 212:8,
221:14, 224:9,
233:11, 245:21,
252:7, 255:20,
257:16, 257:22,
258:8, 258:9, 270:3,
271:9, 282:16,
283:19, 285:15
**currents** [1] - 202:20
**Curtis** [1] - 6:22
**Customs** [4] -
312:21, 313:4,
313:11, 315:5
**cut** [4] - 10:21,
266:12, 266:13,
266:15
**cuts** [4] - 70:16,
226:16, 226:18,
296:14
**CV** [4] - 12:21,
210:22, 210:23,
210:25
**cylinders** [1] -
307:25
**Cypress** [84] - 21:24,
22:13, 24:14, 24:18,
24:24, 24:25, 25:5,
32:4, 32:9, 34:10,
43:15, 45:19, 46:16,
46:20, 50:8, 53:25,
77:8, 77:11, 142:6,
142:8, 144:10,
144:13, 144:16,
144:20, 145:7,
146:13, 146:24,
147:13, 148:2, 148:5,
148:10, 149:24,
151:22, 152:9,
152:14, 152:15,
152:20, 152:23,
153:12, 153:14,
154:11, 154:19,
155:20, 155:22,
155:24, 156:3, 156:7,
156:24, 157:19,
157:22, 157:23,

159:6, 159:7, 159:15,
159:19, 160:8,
160:15, 160:18,
162:25, 165:15,
165:18, 165:24,
168:2, 170:13, 178:7,
186:9, 192:2, 193:18,
194:24, 195:12,
215:2, 215:6, 226:17,
236:10, 244:7,
245:21, 246:1, 270:9,
300:7, 300:12,
311:17, 321:9, 321:12
**Cypresses** [1] -
186:4

## D

**D-A-V-I-D-U-K** [1] -
82:23
**D-O-C** [1] - 138:17
**D.C** [1] - 330:17
**DADE** [2] - 2:22, 2:24
**Dade** [20] - 8:6, 8:8,
8:10, 8:23, 9:4, 42:2,
78:16, 78:19, 82:4,
82:10, 87:21, 89:25,
107:19, 116:1,
150:14, 150:21,
151:19, 271:22,
300:20, 301:18
**Dade-Collier** [5] -
42:2, 89:25, 116:1,
300:20, 301:18
**daily** [12] - 20:7,
20:8, 36:3, 97:5,
234:19, 263:19,
306:1, 306:9, 306:10,
316:19, 318:2, 318:3
**damaging** [2] -
26:14, 55:10
**dang** [1] - 222:6
**danger** [2] - 88:11,
282:21
**dangerous** [2] -
312:5, 312:10
**dangerously** [1] -
312:10
**DANTE** [1] - 2:8
**Dante** [2] - 7:12,
316:13
**Dark** [1] - 192:6
**dark** [21] - 34:11,
151:22, 152:12,
152:16, 152:21,
155:16, 160:22,
160:23, 166:17,
168:3, 168:5, 168:10,
173:9, 173:15,
173:19, 173:20,

App. 376

173:22, 195:12,
232:9, 232:10, 267:18
**darkest** [2] - 152:10,
232:11
**darkness** [5] -
160:25, 168:11,
168:17, 303:9
**data** [69] - 43:19,
48:7, 53:19, 53:21,
68:8, 68:13, 69:25,
70:3, 70:5, 70:17,
71:1, 71:5, 71:8,
78:16, 78:17, 78:20,
80:6, 80:21, 80:22,
81:8, 81:12, 187:5,
189:13, 189:19,
189:21, 197:14,
197:17, 202:20,
203:21, 209:24,
220:5, 224:5, 224:6,
224:18, 225:7, 226:3,
226:16, 234:12,
234:16, 237:3, 237:7,
238:7, 243:16,
243:19, 243:25,
246:22, 252:25,
253:13, 253:17,
253:20, 254:14,
267:20, 270:15,
271:1, 274:22,
275:10, 275:17,
276:9, 276:11, 279:7,
285:3, 285:8, 295:9,
295:10, 295:14,
295:15, 296:13
**Data** [1] - 203:19
**database** [9] - 79:16,
204:9, 204:11,
212:25, 213:1, 222:3,
222:4, 224:10, 236:6
**databases** [3] -
209:12, 214:20,
250:23
**dataset** [3] - 224:4,
227:1, 227:2
**date** [8] - 70:1,
71:19, 71:22, 199:5,
247:20, 267:17,
276:2, 310:14
**DATE** [1] - 335:9
**dated** [2] - 83:7,
272:6
**dates** [5] - 69:14,
69:19, 70:8, 70:9,
71:14
**Daubert** [1] - 11:10
**daughter** [2] -
304:10
**Dave** [1] - 87:21,
280:21

**DAVID** [2] - 2:9, 2:23
**David** [3] - 7:15,
170:3, 280:13
**Daviduk** [2] - 82:23,
84:3
**Daviduk's** [1] - 84:8
**dawn** [2] - 158:15,
233:5
**day's** [4] - 225:16,
225:24, 244:21,
329:12
**day-to-day** [2] -
105:24, 117:3
**days** [18] - 26:11,
72:19, 129:4, 131:17,
199:6, 246:10,
246:11, 246:12,
267:20, 301:12,
305:11, 306:24,
312:23, 313:14,
316:17, 317:21,
317:24, 322:6
**daytime** [5] - 93:4,
119:18, 228:16,
228:17, 314:6
**DC** [3] - 2:19, 2:21,
125:18
**de** [3] - 259:10,
259:21, 260:3
**dead** [4] - 34:18,
60:21, 62:7, 62:9
**deadline** [1] - 329:12
**deal** [2] - 146:17,
248:19
**dealing** [1] - 130:24
**dear** [2] - 22:25,
143:9
**death** [1] - 194:18
**debate** [1] - 109:16
**Deborah** [1] - 108:15
**debris** [1] - 51:22
**decade** [2] - 55:24,
71:1
**December** [1] -
222:3
**decently** [1] - 91:8
**decide** [4] - 279:11,
279:12, 317:19,
317:25
**decided** [3] - 26:1,
128:9, 314:7
**decision** [10] - 18:2,
26:24, 31:18, 139:22,
172:15, 207:4, 207:5,
207:6, 207:9, 318:1
**decision-making** [3]
- 207:4, 207:9, 318:1
**decisions** [1] - 26:22
**declarant** [2] - 81:16,
197:15

**declarants** [2] - 14:8,
16:19
**Declaration** [1] -
84:3
**declaration** [91] -
10:10, 16:13, 17:1,
18:8, 36:14, 41:10,
53:25, 54:4, 56:24,
57:4, 58:1, 58:2, 58:7,
58:20, 58:22, 58:23,
60:11, 64:15, 65:24,
66:10, 66:16, 66:17,
67:2, 68:1, 68:7, 68:9,
68:17, 69:1, 69:4,
69:6, 69:16, 70:4,
71:10, 78:19, 78:22,
79:7, 79:17, 79:21,
79:22, 80:2, 80:8,
80:12, 80:17, 82:8,
82:17, 82:22, 82:24,
82:25, 84:8, 85:25,
86:1, 108:1, 111:19,
111:22, 113:14,
113:17, 114:8, 118:6,
121:18, 126:12,
126:14, 126:18,
128:16, 128:22,
140:21, 163:9,
163:23, 164:2, 164:7,
164:12, 164:16,
170:10, 172:2, 178:5,
178:8, 178:24,
187:22, 189:19,
189:21, 191:18,
192:7, 197:15,
197:18, 316:20,
317:5, 317:15,
319:12, 321:8,
333:13, 334:12
**declarations** [20] -
11:11, 11:17, 14:5,
14:20, 14:21, 16:7,
16:16, 16:21, 17:3,
18:4, 40:4, 317:8,
332:13, 332:14,
333:5, 333:14,
333:16, 334:1, 334:8
**declared** [1] - 282:7
**decline** [2] - 261:5,
261:10
**declined** [4] -
260:19, 260:23,
261:13, 261:19
**decrease** [1] - 281:6
**decreases** [2] -
276:15, 276:22
**deemed** [1] - 11:19
**deep** [3] - 100:16,
127:18, 162:24
**deeply** [2] - 21:1,

171:13
**deer** [5] - 231:2,
231:5, 231:15,
296:10, 296:11
**defendant** [3] - 8:5,
83:2, 316:13
**Defendant** [3] - 9:4,
83:3, 84:10
**DEFENDANT** [2] -
2:6, 2:22
**defendants** [9] - 1:8,
7:5, 9:11, 12:22,
14:14, 15:19, 83:4,
86:19, 121:22
**Defendants** [11] -
2:12, 7:18, 7:20, 8:2,
76:5, 96:11, 191:10,
211:7, 323:21,
324:23, 325:6
**Defendants'** [2] -
187:17, 197:16
**defendants'** [1] -
14:5
**defending** [1] -
111:17
**Defense** [6] - 42:6,
58:15, 65:19, 72:16,
271:18, 271:19
**defense** [6] - 14:20,
58:11, 198:3, 273:18,
298:22, 299:2
**DEFENSE** [1] - 5:12
**defer** [1] - 124:18
**defined** [2] - 106:16,
182:6
**definitely** [12] -
34:19, 120:7, 120:9,
123:18, 123:25,
154:5, 154:16,
173:13, 176:7,
241:21, 293:17, 296:8
**definition** [1] -
115:10
**degradation** [2] -
286:1, 286:17
**degree** [12] - 37:5,
37:7, 144:1, 170:13,
172:3, 177:4, 200:24,
201:1, 240:21,
246:25, 291:24, 292:4
**delay** [3] - 13:7,
87:23, 88:12
**delisting** [1] - 212:12
**delivering** [1] - 95:25
**democratic** [1] -
95:16
**demonstrate** [2] -
192:18, 318:23
**demonstrated** [2] -
276:15, 276:22

**demonstrative** [3] -
78:1, 188:22, 215:21
**demonstratives** [1] -
78:3
**den** [11] - 227:13,
244:13, 245:3, 245:7,
245:9, 245:13,
245:19, 245:20,
245:22, 246:18,
246:22
**denied** [1] - 77:5
**denned** [1] - 244:14
**Dennis** [2] - 204:3,
211:19
**denotations** [1] -
97:17
**dens** [10] - 227:12,
227:13, 244:10,
244:25, 245:11,
245:25, 246:7,
289:24, 290:2, 290:3
**densities** [1] -
286:14
**density** [21] - 117:24,
168:18, 168:23,
176:9, 176:11,
176:14, 176:17,
186:20, 195:3, 195:5,
233:8, 233:9, 233:11,
233:13, 233:17,
238:7, 262:13,
262:18, 262:24,
277:9, 286:11
**departing** [1] - 79:16
**DEPARTMENT** [2] -
2:18, 2:20
**department** [4] -
130:17, 136:24,
138:16
**Department** [14] -
7:7, 35:5, 78:16, 83:6,
90:10, 90:24, 104:2,
125:17, 127:5,
135:19, 191:15,
312:15, 313:2, 325:14
**departments** [1] -
110:8
**departure** [1] - 78:17
**dependent** [1] -
332:3
**depicted** [2] - 30:8,
217:22
**depo** [1] - 332:25
**deportation** [1] -
98:9
**depose** [1] - 332:25
**deposition** [1] -
198:16
**depositions** [3] -
12:17, 333:2, 333:11

**DEPUTY** [19] - 6:2, 18:14, 18:16, 18:21, 27:8, 30:17, 30:22, 87:12, 89:3, 89:5, 89:11, 140:12, 141:12, 163:17, 163:20, 197:7, 199:17, 299:6, 299:8

**DeSantis'** [1] - 83:9

**describe** [10] - 91:15, 92:17, 101:11, 103:2, 216:10, 255:14, 302:13, 303:4, 308:12, 320:12

**described** [5] - 93:1, 221:2, 281:18, 300:7, 304:6

**describing** [1] - 210:25

**description** [1] - 200:22

**designated** [10] - 40:21, 152:12, 157:15, 168:3, 196:11, 198:17, 242:17, 242:23, 243:3, 243:9

**designation** [5] - 34:11, 168:15, 242:21, 243:1, 282:6

**designations** [2] - 152:13, 332:25

**designed** [3] - 31:8, 179:14, 318:23

**designing** [1] - 230:24

**designs** [1] - 205:24

**desire** [1] - 16:24

**desk** [1] - 60:13

**despite** [2] - 131:17, 134:3

**detail** [1] - 76:24

**detailed** [2] - 283:17, 285:13

**details** [2] - 62:16, 65:14

**detained** [3] - 106:2, 123:16, 277:12

**detainee** [2] - 97:18, 98:24

**detainees** [13] - 90:22, 97:14, 97:15, 98:22, 101:25, 102:1, 102:15, 109:9, 112:13, 112:18, 114:1, 117:18, 296:24

**detaining** [3] - 75:3, 112:21, 113:8

**detected** [2] - 275:17, 275:20

**detention** [127] - 24:11, 32:13, 33:6, 33:23, 36:15, 41:2, 41:22, 44:15, 45:2, 45:16, 46:6, 47:11, 47:16, 48:5, 50:10, 50:13, 52:9, 53:13, 56:1, 56:17, 59:4, 62:6, 62:13, 63:18, 63:19, 63:23, 64:7, 65:7, 74:5, 74:7, 74:19, 76:21, 77:15, 89:24, 90:4, 91:18, 99:3, 105:19, 105:21, 106:8, 111:5, 112:12, 114:24, 115:14, 115:16, 116:3, 120:15, 122:22, 126:4, 126:7, 131:13, 146:19, 147:20, 148:22, 150:5, 150:10, 154:4, 160:14, 161:25, 162:4, 162:8, 163:3, 168:19, 173:11, 174:4, 174:6, 174:21, 175:15, 178:17, 181:21, 183:14, 190:25, 191:3, 191:20, 192:3, 194:11, 195:1, 195:21, 214:16, 214:19, 215:25, 218:18, 221:10, 221:11, 227:17, 230:10, 232:14, 232:17, 233:22, 234:11, 236:4, 239:12, 239:13, 244:22, 244:25, 247:1, 262:3, 263:10, 264:12, 266:9, 266:24, 272:22, 277:10, 277:23, 277:25, 278:3, 278:4, 278:10, 288:4, 289:10, 289:18, 290:1, 290:7, 290:16, 291:1, 291:9, 292:17, 293:7, 293:11, 294:10, 295:12, 297:5, 297:24, 321:14, 322:1, 324:4

**Detention** [6] - 212:16, 244:8, 245:21, 246:1, 314:12, 314:13

**deter** [1] - 293:25

**determinations** [1] - 254:1

**determine** [7] - 56:12, 245:24, 246:21, 280:2, 282:24, 283:2, 295:11

**determined** [1] - 215:24

**devastating** [1] - 183:11

**develop** [1] - 25:18

**developed** [3] - 20:25, 91:22, 265:25

**developers** [1] - 211:24

**development** [19] - 32:22, 59:6, 192:10, 192:20, 192:23, 193:15, 193:18, 201:14, 204:11, 204:19, 208:3, 210:3, 228:8, 228:10, 250:22, 251:16, 265:18, 290:25, 291:20

**developmental** [1] - 193:20

**developments** [3] - 192:8, 204:13, 228:19

**devices** [2] - 92:2, 93:8, 94:7

**DHS** [31] - 83:11, 96:20, 96:23, 98:20, 108:4, 108:19, 108:24, 109:12, 111:7, 126:4, 127:5, 127:13, 128:5, 128:7, 128:25, 129:9, 130:1, 130:7, 130:14, 130:16, 130:17, 131:11, 132:9, 132:13, 133:13, 136:18, 312:21, 313:2, 315:5, 318:19, 324:13

**DIAZ** [2] - 3:2, 335:9

**Diaz** [1] - 335:9

**died** [1] - 227:10

**diesel** [1] - 94:16

**difference** [5] - 34:19, 45:10, 52:10, 220:9, 282:3

**different** [47] - 10:18, 11:13, 12:20, 31:22, 55:22, 72:3, 77:18, 88:16, 90:23, 91:5, 91:7, 91:10, 92:11, 93:19, 96:23, 97:17, 97:18, 104:18, 105:11, 105:17, 107:10, 110:8, 110:20, 121:20, 131:7, 156:6, 162:19, 187:4, 189:6, 189:11, 189:12, 190:5, 190:12, 192:11, 201:9, 203:13, 206:4, 216:15, 250:24, 252:11, 263:3, 308:19, 309:2, 309:4, 311:4, 313:1, 323:13

**differently** [3] - 59:20, 220:7, 277:13

**difficult** [9] - 72:20, 158:4, 158:11, 159:25, 195:15, 195:19, 246:5, 283:20, 285:16

**digging** [1] - 307:24

**digitally** [1] - 203:22

**dignitaries** [4] - 91:9, 92:5, 132:2, 136:21

**diligent** [1] - 183:15

**Dillon** [1] - 12:2

**diminish** [1] - 176:14

**diminished** [1] - 168:22

**diminishing** [1] - 161:3

**dining** [1] - 296:22

**DIRECT** [6] - 4:2, 18:22, 89:12, 141:18, 200:14, 299:13

**direct** [20] - 16:20, 20:14, 68:24, 114:8, 116:22, 118:22, 130:5, 139:9, 175:11, 176:25, 263:5, 263:21, 274:19, 286:22, 298:15, 298:20, 299:1, 329:23, 333:21, 334:4

**directed** [1] - 8:24

**directing** [2] - 131:12, 132:9

**direction** [2] - 102:8, 289:9

**directly** [10] - 9:16, 20:24, 95:7, 96:19, 106:1, 108:8, 122:14, 130:13, 133:23, 138:7

**director** [9] - 38:7, 38:18, 72:3, 72:5, 114:17, 131:5, 164:18, 201:8, 203:18

**Director** [44] - 7:1, 7:7, 7:11, 7:13, 7:16, 17:22, 19:2, 19:5, 20:5, 43:13, 94:20, 95:22, 96:1, 96:17, 98:18, 103:13, 108:2, 109:8, 110:1, 110:10, 110:18, 111:20, 113:15, 113:18, 125:9, 126:1, 126:3, 127:3, 127:18, 128:7, 128:23, 129:12, 129:20, 130:11, 130:12, 130:16, 131:25, 132:5, 132:12, 134:3, 136:11, 137:21, 138:2, 170:4

**directors** [2] - 19:8, 72:4

**directs** [3] - 328:6, 328:16, 329:25

**dirty** [1] - 51:17

**disagree** [1] - 284:22

**discharges** [1] - 20:23

**disclose** [1] - 280:18

**disclosed** [4] - 12:1, 12:7, 12:13, 280:16

**disclosure** [3] - 12:11, 12:15, 13:3

**discontinuous** [1] - 231:14

**discovery** [6] - 72:11, 72:18, 72:23, 73:4, 73:8, 317:11

**discuss** [3] - 68:18, 74:3, 96:5

**discussed** [4] - 121:13, 132:6, 237:20, 279:3

**discussing** [2] - 69:9, 103:14

**discussion** [4] - 125:25, 128:3, 128:25, 332:16

**discussions** [2] - 109:8, 121:14

**diseases** [1] - 208:3

**disentangle** [1] - 291:11

**disentangling** [1] - 291:15

**dispersal** [5] - 217:10, 218:13, 221:7, 281:19, 294:23

**disperse** [1] - 220:16

**dispersin** [1] - 221:4

**dispersing** [1] - 218:9

**displaced** [1] - 229:15

**displacement** [1] - 238:22

**displaces** [1] - 229:10

**display** [2] - 78:6,

82:20

**dispute** [1] - 198:14
**disrupting** [2] - 56:10, 56:13
**disruption** [3] - 54:1, 54:7, 54:19
**dissect** [1] - 158:24
**distance** [5] - 222:10, 222:16, 222:17, 309:11, 320:7
**distinctly** [2] - 149:21, 150:1
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district** [9] - 104:21, 104:23, 106:25, 107:1, 107:3, 117:3, 117:6, 117:8, 117:13
**District** [5] - 3:3, 89:17, 215:7, 328:18, 335:10
**disturbance** [2] - 245:4, 245:5
**disturbed** [5] - 176:22, 176:25, 215:16, 215:17, 245:3
**diversity** [1] - 290:6
**DIVERSITY** [1] - 1:22
**Diversity** [7] - 6:16, 82:24, 141:21, 142:1, 162:10, 163:10, 170:25
**Division** [1] - 59:21
**DIVISION** [1] - 1:2
**Division's** [2] - 59:12, 59:16
**DMS** [1] - 106:24
**Docket** [1] - 42:15
**Doctor** [1] - 240:19
**doctor** [4] - 224:23, 224:24, 240:20, 240:21
**doctor's** [2] - 214:6, 214:9
**doctorate** [1] - 104:12
**document** [22] - 34:4, 43:11, 43:20, 58:20, 59:3, 59:5, 59:11, 59:21, 60:12, 60:13, 72:10, 73:1, 73:13, 80:16, 126:21, 207:4, 207:5, 207:13, 209:11, 210:21
**documented** [6] - 47:23, 74:8, 160:3, 161:18, 194:17, 255:22
**documenting** [1] - 47:24

**documents** [11] - 14:9, 15:19, 16:1, 72:21, 73:6, 85:14, 85:17, 133:6, 212:19, 268:9
**dollar** [1] - 123:23
**dollars** [4] - 104:20, 109:18, 109:20, 225:8
**dome** [1] - 148:10
**Dominic** [2] - 6:12, 162:1
**DOMINIQUE** [1] - 1:18
**Donaldson** [1] - 15:2
**done** [40] - 8:8, 10:25, 13:8, 15:9, 16:9, 25:6, 50:7, 56:18, 57:6, 104:16, 105:16, 116:25, 120:23, 124:20, 142:5, 142:7, 143:1, 150:5, 155:11, 162:8, 162:9, 173:25, 177:22, 177:24, 180:5, 190:12, 196:23, 207:15, 209:21, 224:25, 242:1, 251:8, 251:13, 252:24, 258:3, 264:11, 289:21, 298:18, 300:13, 330:19
**dormitory** [1] - 103:9
**DOT** [2] - 182:2, 313:16
**dots** [11] - 71:21, 223:6, 223:24, 225:15, 227:9, 244:5, 244:9, 244:19, 275:2, 275:5
**double** [2] - 153:20, 246:1
**doubt** [1] - 105:1
**Douglas** [5] - 21:13, 21:14, 23:12, 37:12, 38:13
**down** [47] - 19:25, 20:17, 20:18, 20:21, 39:11, 43:22, 44:6, 63:2, 71:24, 75:20, 77:22, 83:10, 90:12, 92:25, 93:7, 93:11, 126:20, 127:12, 128:22, 139:1, 146:18, 147:9, 147:19, 149:15, 149:22, 151:24, 155:15, 181:11, 189:25, 190:24, 196:22, 204:5, 212:9,

213:9, 254:10, 298:10, 301:21, 302:8, 303:2, 303:12, 304:22, 304:23, 314:16, 322:15, 326:24, 329:16, 330:3
**down-listing** [1] - 212:9
**downstream** [2] - 57:2, 57:5
**dozen** [3] - 46:9, 153:14, 153:17
**Dr** [6] - 88:14, 104:12, 117:16, 259:23, 287:21, 328:8
**draft** [1] - 210:7
**drafted** [1] - 31:23
**drafting** [1] - 271:10
**drafts** [2] - 185:18, 208:6
**drain** [1] - 241:13
**draw** [4] - 152:3, 285:2, 285:22, 303:6
**drawing** [1] - 284:24
**drawn** [1] - 214:3
**draws** [1] - 284:25
**drew** [4] - 22:4, 217:18, 217:19, 274:20
**dried** [1] - 226:21
**drill** [1] - 298:17
**drilling** [2] - 142:6, 144:17
**drive** [11] - 61:10, 62:11, 62:21, 148:17, 148:22, 148:23, 151:17, 181:8, 181:12, 301:21, 314:11
**Drive** [1] - 1:16
**driven** [4] - 19:13, 25:8, 46:21, 309:8
**driver** [1] - 314:4
**drives** [1] - 312:25
**driving** [13] - 32:14, 34:16, 34:18, 92:9, 93:11, 93:17, 103:7, 114:6, 115:3, 182:18, 183:10, 288:25, 312:9
**drop** [1] - 235:4
**dropped** [1] - 97:10
**drove** [2] - 62:24, 63:3
**dry** [1] - 222:10
**due** [8] - 40:10, 137:3, 157:9, 190:24, 215:17, 227:10, 228:4, 244:10
**duly** [6] - 18:15, 89:4, 141:13, 199:2,

199:16, 299:7
**dump** [3] - 305:21, 322:25, 323:16
**dumping** [1] - 308:2
**during** [16] - 88:4, 95:4, 96:16, 99:6, 102:22, 108:6, 127:22, 136:4, 152:7, 152:17, 153:1, 155:11, 176:24, 202:5, 205:21, 278:7
**dusk** [1] - 149:18, 155:13, 158:15, 233:5
**dust** [2] - 323:11, 323:12
**duties** [1] - 19:5
**dwell** [1] - 138:14
**Dylan** [1] - 328:10
**dynamics** [2] - 233:3, 233:25

## E

**e-mail** [25] - 15:23, 96:21, 99:5, 108:16, 111:7, 122:15, 128:4, 129:7, 129:8, 129:13, 129:17, 129:18, 129:20, 129:22, 129:23, 129:25, 130:8, 130:10, 130:13, 130:16, 130:17, 131:2, 132:7, 138:21, 142:19
**e-mailed** [2] - 104:4, 108:25
**E-S-K-A-M-A-N-I** [1] - 89:10
**ear** [1] - 48:23
**earliest** [1] - 26:11
**early** [1] - 243:20
**Earth** [2] - 28:21, 321:17
**EARTHJUSTICE** [1] - 1:19
**EarthJustice** [1] - 6:11
**ease** [1] - 68:3
**easier** [3] - 42:20, 71:1, 195:17
**easily** [2] - 153:20, 231:2
**east** [9] - 25:9, 25:25, 61:17, 148:22, 150:11, 150:21, 151:18, 152:10, 186:8
**East** [2] - 2:10, 204:14
**eastern** [1] - 256:6
**easy** [5] - 135:9,

295:3, 295:6, 303:23, 321:22
**ECF** [3] - 7:21, 124:15, 124:22
**eco** [3] - 169:8, 304:4, 322:13
**ecological** [2] - 22:10, 32:11
**ecologist** [1] - 200:19
**ecology** [4] - 200:24, 208:1, 229:24, 280:1
**ecosystem** [24] - 22:12, 22:17, 24:4, 36:15, 36:16, 38:3, 46:14, 54:1, 54:3, 54:8, 54:19, 55:1, 64:2, 67:22, 118:9, 120:22, 155:21, 155:23, 156:2, 171:17, 178:13, 184:16, 193:16, 203:6
**ecosystems** [1] - 24:22
**ecotourism** [3] - 168:25, 169:8, 169:12
**edges** [1] - 100:8
**editorializing** [1] - 272:12
**education** [2] - 37:10, 211:1
**educational** [7] - 20:2, 89:20, 105:15, 106:11, 114:19, 143:22, 200:22
**effect** [9] - 54:18, 85:12, 234:4, 245:4, 245:7, 286:19, 292:12, 294:19, 322:4
**effects** [13] - 52:1, 57:5, 169:8, 169:9, 171:11, 228:1, 237:19, 268:12, 268:20, 285:25, 287:8, 297:15, 297:19
**efficient** [1] - 333:1
**effort** [5] - 96:22, 203:3, 203:9, 290:2, 290:3
**efforts** [4] - 23:24, 171:2, 171:14, 215:17
**eight** [5] - 129:4, 136:7, 166:15, 203:18, 307:7
**EIS** [6] - 241:6, 241:11, 241:15, 241:25, 242:2, 242:6
**EISs** [4] - 202:5, 239:24, 241:4, 242:4
**either** [12] - 95:7,

112:21, 122:24, 122:25, 138:18, 227:10, 250:2, 279:4, 287:13, 301:25, 314:2, 320:7

**elapsed** [1] - 188:4
**elected** [6] - 88:16, 89:19, 90:21, 103:24, 110:13, 117:4
**electric** [2] - 205:19, 230:25
**electrical** [1] - 93:25
**electronic** [1] - 92:2
**element** [1] - 28:6
**elevate** [1] - 93:7
**elevation** [1] - 215:4
**Eleventh** [1] - 329:14
**eliminate** [3] - 59:12, 59:17, 184:12
**eliminating** [1] - 198:14
**Elise** [1] - 6:15
**ELISE** [1] - 1:21
**ELMO** [1] - 27:4
**elsewhere** [5] - 196:25, 221:4, 228:16, 276:14, 276:21
**elusive** [2] - 158:2, 158:14
**emergence** [1] - 159:22
**emergencies** [1] - 116:6
**emergency** [3] - 96:2, 113:15, 136:16
**Emergency** [7] - 7:8, 35:6, 83:6, 90:10, 90:24, 104:2, 135:19
**emerging** [1] - 160:4
**emphasize** [1] - 9:15
**employ** [1] - 19:14
**employed** [1] - 19:1
**employee** [1] - 19:20
**employees** [8] - 19:6, 19:10, 19:11, 19:17, 90:23, 100:11, 103:7
**employment** [2] - 201:2, 202:12
**empty** [1] - 136:9
**enable** [1] - 163:13
**enclosed** [1] - 322:14
**encounter** [1] - 303:15
**encourage** [1] - 24:1
**end** [16] - 9:13, 41:12, 59:18, 69:20, 101:1, 101:24,

126:16, 136:6, 155:25, 164:4, 198:22, 206:8, 260:13, 268:22, 285:24

**Endangered** [2] - 202:10, 216:9
**endangered** [11] - 34:14, 76:14, 148:7, 156:3, 194:18, 201:17, 202:21, 204:10, 204:13, 206:21
**ended** [4] - 24:15, 26:21, 205:10, 225:10
**ending** [1] - 296:12
**Enforcement** [1] - 313:11
**enforcement** [15] - 74:13, 74:16, 105:9, 105:10, 105:11, 105:13, 105:14, 105:15, 105:17, 105:18, 112:11, 136:15, 137:1, 137:2, 137:3
**engage** [9] - 22:3, 25:13, 33:12, 62:12, 62:14, 105:11, 118:25, 119:12, 202:13
**engaged** [15] - 25:17, 26:3, 26:8, 26:19, 34:3, 35:22, 52:1, 62:18, 67:18, 76:12, 105:1, 105:16, 107:4, 146:1, 162:20
**engagement** [3] - 26:21, 104:17, 106:2
**engaging** [1] - 252:8
**engine** [4] - 48:18, 49:8, 175:21
**Engineers** [4] - 26:13, 29:11, 30:25, 241:22
**Engineers'** [2] - 29:6, 30:9
**enjoy** [7] - 34:10, 36:24, 49:22, 50:1, 50:6, 312:3, 324:5
**enjoyed** [1] - 170:13
**enjoyment** [3] - 77:11, 160:14, 194:20
**enlisted** [2] - 22:3, 156:7
**ensure** [6] - 19:22, 33:14, 59:22, 104:22, 112:7, 202:25
**ensured** [1] - 331:15
**entailed** [1] - 207:23

**entails** [1] - 144:15
**enter** [5] - 7:23, 61:15, 91:12, 190:14, 313:16
**entered** [1] - 75:4
**entering** [3] - 161:14, 161:15, 272:18
**entire** [7] - 54:2, 137:22, 138:8, 213:1, 238:5, 275:25, 319:9
**entirely** [2] - 64:12, 65:8
**entirety** [1] - 102:19
**entities** [1] - 91:10
**entitled** [2] - 10:23, 335:5
**entity** [5] - 83:4, 109:13, 111:2, 136:16, 138:19
**entrance** [15] - 91:18, 93:21, 234:14, 301:15, 301:17, 302:11, 305:6, 305:12, 307:11, 307:14, 307:19, 308:7, 320:3, 321:6, 321:23
**Entry** [1] - 42:15
**entry** [3] - 61:13, 77:16, 91:15
**entryway** [1] - 93:13
**enunciate** [1] - 125:22
**environment** [16] - 26:14, 36:24, 36:25, 57:22, 102:11, 112:3, 136:10, 165:17, 165:23, 179:4, 179:21, 180:12, 184:11, 215:1, 250:25
**Environmental** [6] - 24:20, 25:10, 25:21, 33:11, 74:10, 201:22
**environmental** [53] - 20:9, 21:9, 22:1, 23:24, 23:25, 24:16, 24:21, 33:9, 33:13, 36:20, 36:22, 37:10, 39:8, 40:13, 40:17, 52:6, 55:3, 59:13, 59:17, 74:7, 75:2, 75:10, 75:18, 97:5, 104:15, 104:17, 105:3, 105:4, 116:20, 144:3, 144:7, 145:3, 146:2, 166:1, 171:21, 171:23, 172:7, 172:8, 178:25, 201:1, 201:13, 202:3, 240:5, 240:25, 241:25,

242:1, 242:6, 250:12, 252:5, 252:8, 252:20, 252:22
**environmentally** [1] - 148:25
**EPA** [3] - 241:15, 241:21, 243:9
**equipment** [8] - 93:25, 94:7, 133:17, 133:19, 134:1, 148:4, 309:25, 310:9
**equities** [4] - 118:16, 118:19, 118:22, 119:7
**equity** [1] - 119:5
**equivalent** [1] - 295:3
**eradicate** [1] - 146:15
**erected** [2] - 118:2, 240:5
**error** [1] - 223:17
**escaping** [1] - 178:17
**escort** [2] - 97:13, 314:3
**escorted** [2] - 87:18, 92:3
**escorting** [2] - 97:12, 109:12
**ESKAMANI** [1] - 4:7
**Eskamani** [11] - 87:10, 88:6, 88:14, 89:4, 89:9, 89:14, 94:18, 104:12, 117:16, 122:5, 135:17
**especially** [8] - 56:5, 99:4, 116:6, 136:13, 141:7, 142:20, 266:4, 295:7
**ESQ** [18] - 1:14, 1:15, 1:18, 1:18, 1:21, 1:22, 2:2, 2:3, 2:3, 2:7, 2:8, 2:8, 2:9, 2:14, 2:16, 2:17, 2:20, 2:23
**essay** [1] - 319:4
**essential** [1] - 217:13
**essentially** [20] - 31:18, 113:15, 207:24, 208:22, 208:25, 209:15, 210:2, 214:23, 215:4, 220:6, 222:1, 225:23, 227:7, 231:1, 233:10, 238:3, 244:15, 264:3, 264:7, 269:18
**establish** [3] - 21:16, 119:4, 143:15
**established** [8] - 71:25, 72:2, 79:14,

96:4, 96:25, 112:16, 112:20, 158:9
**estimate** [1] - 94:13, 182:2, 257:23, 257:25, 260:15, 291:21, 292:2
**estimated** [3] - 31:15, 212:5, 258:1
**estimation** [3] - 93:8, 94:15, 239:8
**et** [8] - 1:4, 1:7, 6:3, 185:13, 185:14, 203:10, 262:20
**etcetera** [2] - 112:4, 121:9
**eternal** [1] - 9:14
**evaluate** [1] - 57:19
**evaluated** [1] - 33:14
**Evaluation** [1] - 60:1
**Evan** [1] - 7:10
**EVAN** [1] - 2:8
**Eve** [4] - 6:25, 17:22, 18:15, 18:20
**EVE** [2] - 4:4, 18:20
**evening** [2] - 325:12, 327:15
**event** [4] - 62:22, 81:17, 166:18, 321:17
**events** [3] - 192:11, 193:18, 303:24
**eventually** [3] - 92:12, 208:8, 226:20
**EVERGLADES** [1] - 1:4
**Everglades** [111] - 6:3, 6:12, 7:2, 11:25, 17:23, 19:2, 19:24, 20:10, 20:25, 21:4, 21:10, 21:11, 21:15, 21:16, 21:18, 21:19, 22:5, 22:9, 22:11, 22:12, 23:16, 23:18, 23:22, 24:3, 24:6, 24:11, 24:22, 25:20, 25:25, 26:4, 26:7, 26:17, 26:20, 28:4, 28:6, 29:2, 29:7, 30:4, 30:5, 30:9, 31:1, 31:4, 31:5, 31:14, 31:17, 31:19, 32:6, 32:8, 32:9, 32:23, 33:1, 34:3, 35:15, 36:4, 36:15, 38:12, 38:16, 38:19, 38:22, 40:9, 40:16, 43:14, 45:18, 49:7, 50:16, 51:13, 52:7, 54:9, 56:2, 61:7, 62:20, 64:2, 67:21, 72:1, 73:5, 74:23, 91:18, 109:2, 128:6,

132:6, 150:16, 153:3, 153:16, 154:2, 154:5, 155:5, 155:21, 155:23, 156:1, 156:2, 157:19, 159:10, 159:15, 160:10, 165:15, 165:18, 165:24, 166:20, 171:17, 172:11, 172:13, 181:24, 212:16, 236:11, 252:18, 299:18, 300:7, 301:4, 303:8

**Everglades'** [1] - 184:11

**everyday** [3] - 22:3, 39:8, 40:18

**everywhere** [4] - 120:17, 165:14, 300:15, 300:18

**evidence** [46] - 14:11, 30:1, 43:23, 44:2, 44:6, 44:11, 58:14, 58:15, 78:7, 80:22, 81:9, 81:14, 83:17, 84:6, 86:25, 87:8, 88:13, 98:5, 128:19, 134:18, 164:15, 164:20, 174:25, 180:4, 187:20, 187:23, 187:25, 188:21, 211:4, 214:1, 214:13, 232:6, 253:12, 256:13, 256:19, 270:20, 271:24, 280:10, 283:25, 289:16, 311:11, 311:15, 315:24, 315:25, 318:21, 334:9

**evident** [2] - 188:6, 188:8

**evidentiary** [7] - 14:12, 15:14, 16:10, 18:3, 77:24, 84:23, 86:9

**exact** [11] - 65:10, 151:6, 154:24, 215:11, 223:19, 267:17, 281:21, 294:24, 310:14, 316:18, 318:18

**exactly** [11] - 35:16, 59:24, 76:19, 108:6, 137:19, 188:1, 234:18, 268:3, 300:12, 308:11, 325:25

**examination** [13] - 17:3, 18:6, 34:24,

79:25, 135:17, 141:6, 165:2, 169:21, 248:8, 248:24, 253:20, 315:14, 334:4

**EXAMINATION** [23] - 4:1, 18:22, 35:1, 76:9, 89:12, 99:21, 104:9, 125:5, 135:15, 141:18, 165:7, 169:22, 191:11, 194:1, 200:14, 240:17, 249:8, 287:19, 293:4, 299:13, 316:9, 324:2, 325:10

**examine** [6] - 55:2, 156:25, 252:4, 277:9, 333:12, 333:20

**examining** [1] - 281:5

**example** [11] - 10:10, 16:15, 110:23, 119:3, 123:8, 123:15, 137:2, 156:13, 166:3, 166:4, 241:6

**examples** [1] - 140:22

**excavator** [1] - 308:1

**excavators** [2] - 305:21, 306:3

**Excel** [1] - 80:14

**excellent** [1] - 249:7

**exception** [1] - 10:2

**exchange** [1] - 83:23

**excise** [2] - 118:6, 128:17

**excited** [1] - 23:11

**exciting** [1] - 159:4

**exclude** [2] - 88:10, 296:2

**excluded** [1] - 294:9

**exclusion** [1] - 247:4

**excuse** [8] - 45:14, 63:16, 173:20, 183:7, 185:4, 272:21, 275:9, 315:5

**excused** [2] - 298:11, 327:1

**executive** [7] - 38:7, 38:18, 72:3, 72:5, 117:5, 117:8, 164:17

**Executive** [10] - 7:1, 7:7, 7:13, 7:16, 17:22, 19:2, 19:5, 20:5, 43:13, 170:3

**exercise** [3] - 33:12, 51:3, 51:5

**exercises** [3] - 45:6, 52:11, 52:12

**exhaustive** [1] -

185:8

**Exhibit** [69] - 27:3, 27:21, 27:24, 29:1, 30:1, 42:6, 42:8, 58:2, 58:6, 58:7, 58:8, 58:10, 58:15, 65:19, 72:15, 72:16, 78:10, 78:11, 80:12, 80:13, 81:14, 82:9, 82:18, 82:19, 82:20, 82:22, 84:5, 84:6, 84:8, 84:9, 84:12, 84:17, 121:18, 128:16, 128:19, 140:21, 163:22, 163:25, 164:15, 164:19, 164:20, 187:17, 197:17, 210:15, 210:17, 211:4, 211:8, 213:21, 213:23, 214:13, 271:18, 271:19, 274:13, 284:6, 284:7, 284:8, 310:3, 310:6, 310:18, 310:22, 311:11, 315:9, 315:10, 315:11, 315:22, 315:24, 315:25

**exhibit** [32] - 14:4, 14:5, 14:24, 27:12, 27:14, 27:16, 27:17, 27:21, 42:8, 58:1, 58:4, 58:11, 59:1, 65:21, 67:24, 68:2, 68:7, 72:12, 72:14, 79:3, 81:3, 82:1, 83:21, 83:23, 84:1, 84:2, 84:14, 163:18, 163:21, 187:16

**Exhibits** [5] - 86:15, 87:7, 309:16, 309:18, 311:15

**EXHIBITS** [4] - 5:1, 5:3, 5:10, 5:12

**exhibits** [11] - 78:1, 78:6, 79:2, 79:5, 82:17, 83:23, 84:1, 86:14, 309:17, 314:18, 331:9

**exist** [1] - 106:21

**existed** [3] - 22:13, 22:21, 231:9

**existing** [7] - 23:24, 54:7, 75:9, 174:19, 178:12, 186:25, 245:24

**exists** [2] - 54:10, 56:15

**exit** [2] - 150:20, 167:12

**exiting** [2] - 148:20, 161:15

**expand** [2] - 210:5, 257:2

**expanding** [3] - 102:12, 289:8, 289:17

**expansion** [5] - 205:12, 211:21, 283:18, 285:14

**expect** [21] - 13:10, 15:20, 41:5, 80:7, 118:14, 194:12, 195:2, 195:16, 195:20, 216:13, 235:6, 236:24, 239:12, 259:3, 294:11, 294:14, 299:1, 299:2, 328:17, 328:23, 329:21

**expectation** [1] - 109:18

**expectations** [1] - 253:8

**expected** [5] - 59:7, 239:20, 240:4, 240:6, 294:9

**expended** [1] - 109:18

**expenses** [1] - 133:1

**experience** [42] - 49:6, 65:1, 76:18, 93:15, 100:14, 105:12, 112:11, 114:13, 114:15, 114:18, 114:19, 130:6, 146:20, 149:20, 152:8, 152:19, 153:1, 153:2, 155:7, 155:13, 159:17, 169:3, 170:15, 172:11, 173:24, 176:4, 176:15, 181:24, 182:4, 184:20, 199:11, 201:3, 203:13, 211:1, 239:19, 239:24, 240:3, 301:14, 302:10, 303:11, 303:15, 303:19

**experienced** [1] - 166:6

**experiences** [2] - 77:7, 174:11

**expert** [49] - 11:2, 11:17, 11:25, 12:4, 12:6, 12:11, 12:12, 12:16, 12:23, 13:18, 13:22, 28:13, 28:16, 36:22, 37:1, 37:3,

38:5, 38:21, 39:24, 40:20, 40:21, 45:5, 47:25, 57:10, 67:10, 68:23, 69:2, 69:8, 69:9, 71:7, 156:16, 171:23, 172:1, 184:25, 188:13, 211:10, 211:21, 214:1, 214:7, 239:6, 241:4, 264:15, 264:24, 265:6, 265:10, 273:14, 273:16, 281:15, 284:2

**expertise** [6] - 20:25, 22:4, 29:10, 38:10, 45:19, 184:23

**experts** [22] - 10:3, 11:7, 11:10, 11:12, 11:16, 11:19, 12:16, 19:22, 34:3, 35:11, 36:5, 36:20, 38:14, 38:16, 38:19, 49:11, 49:14, 77:2, 171:10, 171:21, 190:3

**explain** [7] - 40:16, 136:5, 206:18, 217:2, 230:16, 233:8, 299:23

**explanation** [1] - 85:4

**explanations** [1] - 111:16

**exploration** [2] - 142:6, 144:17

**explored** [1] - 154:5

**exploring** [1] - 148:9

**express** [1] - 24:10

**expressed** [2] - 24:7, 157:24

**extend** [2] - 102:14, 174:12

**extended** [3] - 103:23, 104:1, 323:5

**extending** [2] - 103:21, 232:17

**extends** [1] - 92:25

**extensively** [1] - 110:4

**extent** [6] - 47:19, 65:10, 215:24, 229:13, 283:20, 285:16

**extract** [1] - 80:6

**extracted** [2] - 222:1, 222:3

**extreme** [1] - 179:12

**eye** [3] - 148:11, 173:15

**eye-to-eye** [1] - 148:11

**eyes** [1] - 52:17

**EZRAY** [43] - 2:8, 4:17, 7:10, 239:22, 248:25, 249:7, 249:9, 253:13, 253:15, 253:22, 254:4, 254:20, 254:21, 258:14, 259:19, 268:17, 268:19, 271:18, 271:20, 272:14, 272:16, 273:13, 273:21, 274:1, 274:2, 274:7, 274:13, 274:16, 274:17, 277:21, 281:20, 282:10, 284:1, 284:6, 284:8, 284:12, 284:15, 284:18, 284:24, 285:11, 285:12, 287:14, 287:16

**Ezray** [3] - 7:10, 248:16, 248:24

## F

**F.W.C** [1] - 185:16
**facilitated** [1] - 90:9
**facilitator** [1] - 110:10
**facilities** [18] - 47:17, 60:4, 74:19, 74:22, 103:8, 106:10, 106:15, 106:16, 107:5, 112:20, 113:2, 184:15, 205:19, 205:24, 206:5, 230:24, 230:25, 277:10
**facility** [189] - 38:2, 38:22, 41:3, 41:11, 41:16, 41:22, 44:15, 45:2, 45:16, 45:23, 46:7, 46:19, 47:2, 47:12, 47:16, 48:5, 50:14, 52:9, 52:10, 52:12, 52:20, 53:13, 54:7, 56:1, 56:10, 56:13, 57:17, 59:4, 62:6, 62:12, 62:13, 63:5, 63:8, 63:18, 63:19, 63:23, 64:7, 65:7, 74:5, 74:7, 75:9, 79:16, 84:11, 90:2, 90:5, 91:12, 91:16, 92:10, 93:15, 93:21, 93:22, 94:6, 94:11, 94:19, 95:17, 96:7, 96:8, 96:18, 96:20, 96:24, 97:1, 97:3, 97:6, 97:9, 97:10, 97:12, 97:22, 103:6,

103:14, 106:4, 106:7, 106:8, 108:3, 108:12, 108:25, 109:1, 109:2, 109:15, 109:25, 110:17, 111:8, 111:20, 112:5, 112:7, 112:10, 112:13, 112:17, 113:6, 113:7, 113:10, 113:11, 114:23, 114:24, 115:14, 115:16, 116:4, 116:7, 116:11, 120:15, 120:22, 122:22, 126:5, 127:4, 127:9, 127:14, 127:15, 127:18, 127:19, 127:25, 128:8, 128:9, 128:11, 129:1, 129:3, 129:10, 131:13, 132:5, 132:7, 132:10, 134:7, 136:13, 162:8, 171:16, 172:20, 173:17, 173:21, 174:4, 174:6, 174:21, 175:15, 175:18, 176:13, 178:12, 178:17, 178:24, 179:3, 181:6, 181:9, 181:12, 181:21, 185:22, 190:25, 191:4, 212:20, 235:6, 240:5, 252:3, 252:13, 253:1, 262:3, 263:10, 263:17, 263:19, 263:20, 266:9, 266:24, 271:21, 272:18, 272:21, 277:23, 278:3, 278:4, 281:16, 282:17, 286:19, 287:4, 288:1, 288:4, 289:10, 289:19, 290:1, 290:7, 290:17, 291:1, 291:9, 292:17, 292:19, 293:20, 305:3, 308:13, 312:2, 312:15, 315:6
**Facility** [1] - 116:1
**facing** [1] - 67:19
**fact** [31] - 9:25, 10:4, 11:13, 26:10, 28:11, 29:16, 40:10, 55:16, 60:21, 61:7, 80:16, 81:7, 96:21, 137:3, 152:15, 158:9, 162:21, 163:6, 167:5, 181:10, 232:6, 232:9, 234:12, 245:9, 258:10, 258:15, 280:6, 280:9, 280:10,

298:23, 298:24
**factoids** [1] - 169:3
**factor** [4] - 118:17, 179:17, 288:19, 290:14
**factors** [11] - 158:16, 286:13, 286:15, 288:6, 288:10, 288:15, 288:17, 288:20, 291:23, 292:13, 297:22
**Facts** [1] - 133:14
**facts** [7] - 29:18, 88:19, 155:24, 174:24, 175:2, 176:1, 317:17
**failed** [1] - 196:6
**failure** [1] - 118:2
**fair** [24] - 46:13, 60:11, 66:25, 71:9, 72:22, 74:5, 126:8, 126:9, 127:8, 127:11, 127:15, 128:13, 130:8, 134:1, 182:4, 182:6, 194:19, 213:10, 243:11, 282:11, 288:2, 288:17, 326:9, 326:11
**fairly** [3] - 231:23, 264:19, 327:9
**fairness** [1] - 329:22
**faith** [1] - 117:22
**faithful** [1] - 142:19
**Fakahatchee** [5] - 153:15, 157:20, 157:23, 186:5, 269:24
**fall** [4] - 154:12, 154:17, 157:15, 166:18
**falls** [1] - 216:11
**familiar** [13] - 60:12, 60:14, 66:12, 70:13, 81:8, 90:2, 144:13, 161:21, 177:7, 191:6, 242:19, 300:19, 300:20
**familiarity** [1] - 189:9
**families** [1] - 106:1
**family** [4] - 50:21, 51:25, 247:15, 314:8
**far** [18] - 31:11, 68:24, 102:24, 109:15, 109:20, 142:10, 150:20, 151:18, 153:9, 155:15, 185:11, 186:3, 191:23, 210:9, 222:23, 268:3, 314:10, 320:9
**farm** [1] - 231:1

**fast** [6] - 77:25, 134:23, 170:5, 178:15, 312:6, 312:10
**faster** [1] - 59:10
**fatal** [1] - 235:20
**fatalities** [2] - 235:11, 237:16
**fatality** [1] - 237:9
**father** [2] - 50:23, 298:16
**fathom** [1] - 154:24
**fauna** [1] - 156:6
**favorable** [1] - 260:12
**FCRR** [2] - 3:2, 335:9
**FDEM** [21] - 81:20, 81:23, 94:21, 95:11, 99:2, 101:22, 101:23, 103:6, 109:4, 110:19, 110:21, 114:17, 130:11, 135:24, 137:5, 137:7, 137:18, 138:15, 138:18, 138:19
**FDEM-branded** [1] - 101:23
**FDLE** [1] - 137:1
**fear** [1] - 10:12
**feasible** [1] - 331:24
**feature** [1] - 30:16
**features** [4] - 29:2, 31:1, 32:11, 92:12
**February** [1] - 19:4
**Fed** [1] - 134:13
**federal** [27] - 23:9, 54:25, 55:4, 55:8, 55:19, 55:20, 97:8, 97:23, 98:6, 98:10, 108:23, 109:5, 109:13, 109:14, 109:20, 109:24, 112:6, 113:5, 113:10, 113:12, 113:13, 131:15, 136:13, 136:24, 206:16, 241:16
**Federal** [28] - 2:12, 7:18, 7:20, 8:2, 9:10, 55:1, 76:5, 83:2, 96:11, 118:19, 127:4, 134:15, 191:10, 191:15, 191:19, 206:22, 211:7, 249:1, 323:20, 324:13, 324:23, 325:4, 325:6, 325:21, 326:6, 327:18, 328:1
**feed** [3] - 121:25, 122:3, 246:16
**feet** [8] - 69:22,

92:23, 116:13, 296:6, 296:8, 296:9, 307:7
**Felder** [1] - 103:5
**fell** [1] - 193:9
**fellow** [2] - 82:10, 330:4
**female** [9] - 101:19, 225:17, 244:14, 245:8, 246:8, 246:11, 246:15, 275:25, 311:23
**females** [10] - 218:12, 219:4, 219:7, 219:9, 225:17, 225:21, 226:5, 245:12, 256:22, 289:14
**Fence** [1] - 307:12
**fence** [13] - 50:21, 50:25, 64:19, 93:20, 114:23, 185:24, 231:20, 278:13, 278:15, 278:17, 296:4, 296:7
**fenced** [7] - 65:8, 93:13, 271:9, 272:21, 278:10, 322:10, 322:16
**fences** [4] - 65:16, 102:9, 231:16, 301:25
**fencing** [43] - 64:11, 65:9, 65:14, 93:12, 93:14, 93:22, 115:7, 115:9, 115:10, 133:3, 228:5, 230:21, 230:22, 230:23, 231:1, 231:4, 231:7, 231:9, 231:11, 231:13, 231:14, 231:17, 231:18, 237:16, 251:22, 251:23, 271:13, 271:15, 271:17, 294:7, 294:8, 294:12, 296:1, 302:4, 302:7, 307:4, 307:6, 307:8, 307:10, 322:12
**few** [27] - 9:1, 9:18, 29:20, 46:9, 54:18, 68:3, 72:19, 96:23, 99:14, 110:4, 116:12, 117:7, 120:12, 177:8, 183:19, 196:2, 198:23, 201:2, 239:1, 257:13, 279:4, 289:17, 301:12, 306:18, 306:24, 312:12, 313:14
**fewer** [3] - 70:16, 194:22, 229:14

**FHP** [8] - 93:18, 97:12, 97:13, 109:11, 109:12, 116:10, 137:1, 137:7

**FICARELLI** [17] - 2:8, 4:21, 7:12, 316:3, 316:5, 316:10, 317:14, 317:18, 319:1, 319:11, 319:20, 321:19, 322:9, 322:18, 322:21, 323:18, 324:16

**Ficarelli** [2] - 7:13, 316:13

**field** [5] - 21:6, 146:15, 148:3, 159:1, 231:1

**fifth** [1] - 228:7

**fight** [4] - 24:14, 54:9, 54:11, 121:7

**Figure** [16] - 215:19, 215:22, 218:1, 219:20, 221:18, 226:24, 235:10, 235:25, 242:10, 242:14, 243:12, 243:14, 274:19, 274:22, 289:23, 294:17

**figure** [7] - 207:6, 222:22, 227:1, 244:7, 279:20, 301:6, 313:18

**figures** [2] - 190:4, 208:16

**file** [7] - 83:24, 83:25, 84:15, 98:5, 124:22, 125:2

**filed** [5] - 14:6, 33:10, 55:18, 58:21, 126:12

**filing** [1] - 329:2

**filings** [1] - 63:9

**fill** [11] - 115:5, 305:15, 305:18, 306:5, 306:9, 306:13, 306:22, 308:2, 322:23, 323:7, 323:10

**filled** [3] - 24:9, 114:23, 215:17

**film** [5] - 317:19, 317:25, 318:1, 318:10, 324:1

**filmed** [1] - 319:8

**filming** [2] - 317:21, 318:8

**final** [2] - 98:8, 332:1

**finally** [1] - 26:19

**fine** [6] - 122:1, 151:4, 200:7, 224:19,

316:7, 323:14

**finer** [1] - 291:5

**finger** [1] - 30:13

**finish** [7] - 23:14, 39:11, 39:20, 325:1, 327:23, 328:22, 329:14

**finished** [2] - 7:22, 124:2

**finishes** [1] - 237:11

**fireflies** [2] - 150:1, 173:14

**first** [42] - 10:22, 10:25, 11:4, 17:21, 23:23, 25:5, 26:10, 26:15, 35:8, 54:6, 67:8, 69:14, 78:9, 83:8, 89:19, 90:8, 99:19, 123:9, 126:20, 127:6, 147:23, 162:5, 162:9, 178:11, 184:22, 198:23, 201:21, 202:5, 202:17, 202:19, 208:6, 216:6, 219:3, 221:22, 228:12, 246:8, 259:10, 293:6, 305:14, 306:15, 306:18, 311:2

**firsthand** [2] - 191:21, 191:23

**Fish** [40] - 187:3, 187:7, 189:15, 201:11, 202:12, 203:5, 203:14, 203:16, 203:20, 206:1, 206:2, 206:11, 206:16, 208:20, 208:21, 208:23, 208:24, 209:1, 209:9, 210:9, 211:17, 216:4, 216:7, 217:6, 220:4, 222:2, 236:6, 236:8, 240:7, 241:3, 241:7, 241:11, 243:1, 255:1, 255:2, 255:14, 258:2, 260:1, 282:4

**five** [25] - 14:19, 14:24, 15:1, 16:16, 17:4, 38:7, 38:18, 46:10, 46:12, 87:6, 142:9, 152:6, 153:12, 153:20, 154:2, 154:7, 154:8, 155:12, 204:21, 206:22, 213:7, 228:1, 278:21, 332:6, 334:19

**five-year** [1] - 206:22

**fix** [1] - 274:1

**fixation** [1] - 120:20

**FL** [1] - 1:23

**flag** [1] - 164:24

**flagged** [1] - 111:9

**Flare** [1] - 133:15

**flare** [1] - 86:13

**Flat** [1] - 215:7

**flee** [1] - 294:3

**fleeing** [1] - 168:14

**flexible** [1] - 330:17

**FLEXNER** [1] - 2:9

**flight** [12] - 42:24, 43:17, 43:19, 44:14, 44:23, 53:21, 80:20, 80:21, 80:22, 116:7, 253:13, 329:16

**flights** [15] - 44:19, 50:9, 116:5, 175:18, 175:20, 246:9, 246:10, 253:7, 254:13, 273:9, 273:11, 273:22, 273:25, 321:25, 331:23

**flip** [1] - 210:20

**flipping** [1] - 142:24

**floating** [1] - 79:2

**floodlights** [2] - 92:20, 92:25

**Floor** [2] - 3:4, 335:11

**flooring** [2] - 102:10, 129:5

**flora** [1] - 156:6

**Florid** [1] - 143:14

**FLORIDA** [1] - 1:1

**Florida** [180] - 1:4, 1:17, 1:20, 2:5, 2:11, 2:15, 2:25, 3:4, 6:20, 7:7, 12:7, 34:12, 35:5, 46:15, 49:6, 49:7, 49:13, 49:20, 61:17, 61:18, 64:16, 64:24, 89:17, 89:18, 89:21, 90:10, 90:11, 90:20, 90:24, 96:19, 100:6, 104:2, 107:9, 107:18, 122:15, 126:4, 128:8, 128:25, 129:10, 131:12, 133:15, 135:19, 138:10, 142:4, 142:5, 142:21, 142:22, 143:9, 143:21, 144:1, 145:18, 146:20, 148:1, 148:6, 156:8, 157:6, 157:18, 157:25, 159:18, 159:21, 160:23, 161:17, 168:16, 173:15, 182:21,

182:24, 183:6, 183:8, 184:20, 184:23, 185:6, 185:9, 185:12, 187:7, 189:22, 190:13, 191:19, 192:9, 194:18, 200:21, 200:25, 201:4, 201:8, 201:11, 201:14, 202:7, 202:9, 202:13, 203:2, 203:4, 203:8, 203:11, 203:19, 204:17, 205:2, 205:6, 205:12, 205:13, 205:14, 205:17, 205:20, 205:24, 207:2, 207:25, 208:11, 208:12, 208:20, 209:19, 209:21, 209:22, 210:6, 211:21, 211:22, 212:17, 216:4, 216:10, 216:16, 217:8, 217:10, 217:13, 217:23, 218:7, 219:1, 219:25, 220:1, 220:7, 220:8, 220:10, 220:18, 222:2, 223:20, 227:3, 227:8, 227:16, 228:10, 230:4, 230:25, 233:14, 237:25, 240:8, 241:3, 241:7, 241:11, 241:14, 242:17, 242:22, 243:4, 243:16, 243:18, 243:21, 244:22, 247:1, 250:19, 257:6, 257:20, 259:22, 259:25, 260:1, 260:13, 261:25, 262:14, 266:6, 266:8, 276:14, 276:21, 288:2, 289:4, 290:11, 291:4, 304:7, 311:22, 328:19, 335:11

**Florida's** [1] - 248:12

**Floridian** [2] - 61:21, 132:9

**Floridians** [4] - 22:3, 40:18, 304:17, 306:16

**flow** [9] - 54:1, 54:7, 54:19, 56:10, 56:13, 56:25, 57:5, 305:24, 306:1

**flows** [1] - 155:25

**fly** [2] - 79:18, 223:14

**flying** [3] - 72:21, 176:22, 323:17

**focus** [7] - 95:25, 125:8, 125:25, 126:19, 146:6, 202:13, 254:25

**focused** [4] - 88:25, 117:20, 145:4, 145:18

**focusing** [1] - 127:2

**focussed** [1] - 254:7

**folder** [2] - 97:16, 98:5

**folders** [1] - 97:25

**folks** [9] - 12:17, 95:13, 103:10, 106:2, 110:22, 123:17, 174:8, 176:12, 330:23

**follow** [9] - 97:7, 99:5, 137:14, 180:1, 224:16, 226:19, 236:10, 236:15, 314:7

**follow-up** [1] - 99:5, 226:19

**followed** [4] - 108:15, 162:7, 179:7, 179:16

**following** [5] - 102:2, 113:12, 226:19, 248:12, 254:23

**follows** [1] - 112:5

**fond** [2] - 17:18, 149:14

**fondness** [1] - 170:14

**food** [4] - 112:4, 229:18, 246:16, 296:22

**foot** [1] - 231:4

**footprint** [2] - 32:23, 251:16

**FOR** [5] - 1:14, 1:22, 2:1, 2:12, 2:22

**foraging** [1] - 232:20

**Force** [3] - 25:19, 25:22, 26:23

**foregoing** [1] - 335:3

**forget** [3] - 156:12, 267:17, 294:24

**forgetting** [1] - 156:10

**forgive** [1] - 8:17

**forgo** [1] - 86:25

**form** [3] - 24:10, 166:23, 208:19

**formal** [19] - 12:11, 12:15, 37:10, 85:13, 85:14, 85:17, 105:8, 105:14, 105:16, 105:19, 106:11, 114:12, 122:16, 242:2, 242:4, 243:1, 243:8, 264:21, 264:23

**formally** [1] - 124:13

**format** [1] - 202:22

**former** [2] - 38:1, 114:17, 229:11

**forms** [1] - 294:16

**formulate** [2] - 38:14, 49:14

**formulating** [1] - 268:10

**forth** [4] - 95:18, 112:21, 129:6, 136:17

**forthcoming** [1] - 29:24

**fortunate** [1] - 309:7

**fortunately** [1] - 71:15

**forward** [10] - 11:19, 89:1, 130:3, 178:15, 267:19, 284:2, 311:23, 323:5, 330:8, 333:9

**foundation** [2] - 29:11, 111:11

**foundational** [2] - 148:9, 148:12

**founded** [3] - 21:12, 21:13, 22:5

**founding** [2] - 22:8, 31:21

**four** [20] - 13:6, 123:2, 123:5, 152:6, 154:7, 155:12, 222:15, 233:15, 233:18, 239:4, 261:24, 270:15, 275:15, 275:18, 275:21, 276:8, 296:8, 296:9, 303:7, 308:20

**fourth** [1] - 20:20

**fox** [1] - 148:5

**FP** [2] - 276:3

**FP&L** [4] - 241:24, 242:2, 242:3, 242:5

**FPL** [2] - 205:21, 231:19

**FPR** [2] - 3:2, 335:9

**fraction** [1] - 22:21

**fragmentation** [4] - 286:1, 286:13, 290:14, 290:18

**Frakes** [8] - 185:14, 218:5, 262:20, 283:6, 284:5, 284:25, 285:2

**framed** [2] - 23:1, 23:15

**Frank** [3] - 7:21, 125:16, 325:14

**FRANK** [1] - 2:17

**free** [5] - 79:2, 299:20, 330:4, 330:9

**free-floating** [1] - 79:2

**frequency** [4] - 52:19, 53:12, 79:15, 80:20

**frequent** [2] - 167:12, 177:5

**frequently** [7] - 19:16, 46:15, 46:16, 311:3, 311:4, 311:6, 311:19

**fresh** [5] - 54:1, 54:8, 54:19, 100:6, 100:12

**freshly** [5] - 102:19, 102:20, 103:2, 114:9

**freshwater** [8] - 26:18, 36:15, 36:16, 56:10, 56:13, 56:25, 57:18, 155:25

**Friday** [2] - 223:12, 330:8

**Friedman** [3] - 6:19, 6:22, 165:12

**FRIEDMAN** [19] - 2:2, 2:2, 4:13, 6:21, 14:18, 15:1, 15:4, 15:6, 15:12, 86:11, 86:14, 164:23, 165:1, 165:4, 165:8, 165:20, 169:15, 169:20, 311:13

**friend** [2] - 17:7, 21:9

**friendly** [1] - 230:24

**friends** [8] - 149:14, 150:8, 152:3, 158:24, 249:1, 327:10, 327:18, 330:5

**Friends** [55] - 6:2, 6:11, 7:1, 15:10, 17:23, 19:2, 19:3, 19:5, 19:10, 19:14, 20:5, 21:10, 21:11, 22:5, 22:7, 22:8, 24:5, 24:6, 24:7, 25:13, 25:20, 30:3, 30:6, 31:16, 31:17, 32:5, 32:18, 33:1, 33:10, 34:2, 36:4, 38:18, 40:9, 40:15, 40:16, 43:14, 45:18, 49:7, 50:15, 52:7, 54:9, 54:21, 54:23, 67:20, 72:1, 72:8, 74:23, 76:18, 77:1, 104:22, 146:4, 146:8, 299:18

**FRIENDS** [1] - 1:4

**Friends'** [5] - 23:20, 24:7, 26:21, 72:11, 72:18

**front** [20] - 21:18,

79:3, 93:21, 95:15, 126:22, 138:6, 164:2, 206:8, 307:10, 307:14, 308:4, 308:7, 308:22, 320:2, 320:3, 320:6, 320:16, 320:18, 321:1, 321:6

**frontline** [2] - 326:4, 326:6

**frustrating** [1] - 130:6

**fuel** [9] - 51:20, 52:12, 52:23, 64:9, 94:7, 94:16, 161:6, 305:22, 306:8

**fulfilled** [1] - 131:16

**fulfilling** [1] - 32:5

**full** [11] - 18:17, 19:6, 19:11, 19:19, 20:7, 71:10, 141:14, 199:17, 283:20, 285:16, 299:9

**full-time** [4] - 19:6, 19:11, 19:19, 20:7

**fully** [4] - 59:12, 59:17, 322:10, 334:4

**fulsome** [1] - 18:11

**fumes** [1] - 51:20

**fun** [2] - 66:20, 331:6

**functioning** [1] - 116:21

**funding** [4] - 70:16, 109:14, 109:25, 208:22

**fundraisers** [1] - 121:15

**fundraising** [5] - 120:14, 120:18, 121:4, 121:12, 121:20

**funds** [1] - 226:21

**funneled** [1] - 208:23

**future** [31] - 77:9, 104:24, 148:13, 154:11, 166:10, 208:2, 208:13, 209:21, 210:6, 217:15, 220:15, 221:9, 228:7, 228:10, 230:8, 238:5, 260:12, 283:19, 285:15, 286:2, 288:2, 288:7, 288:18, 289:4, 290:25, 291:4, 292:8, 297:21, 315:8

**FWC** [4] - 70:16, 137:2, 189:12, 189:16

---

**G**

**gain** [2] - 38:10,

67:20

**Galloni** [3] - 6:10, 170:19, 170:20

**GALLONI** [35] - 1:18, 4:16, 6:10, 196:21, 199:14, 200:15, 202:2, 210:16, 211:3, 211:9, 213:22, 214:11, 214:14, 225:6, 237:13, 237:14, 239:11, 239:24, 240:11, 240:14, 253:10, 271:23, 272:6, 272:9, 273:12, 273:24, 277:14, 281:13, 283:22, 284:4, 293:3, 293:5, 298:2, 298:4, 298:9

**game** [4] - 201:23, 202:1, 202:16

**gamut** [2] - 143:21, 152:1

**gap** [1] - 278:16

**gaps** [1] - 231:13

**gas** [5] - 167:10, 183:16, 183:18, 184:10, 184:12

**gate** [14] - 92:12, 93:23, 231:14, 271:21, 272:5, 272:11, 272:17, 278:17, 301:14, 301:18, 308:4, 308:22, 320:16

**gated** [1] - 272:21

**gates** [9] - 231:11, 231:15, 301:11, 304:19, 307:11, 317:23, 320:2, 320:15, 320:17

**gathered** [1] - 207:3

**gathering** [1] - 108:7

**gators** [1] - 34:18

**gaze** [2] - 98:25, 101:25

**gazing** [1] - 152:2

**GENERAL** [1] - 2:17

**general** [12] - 16:6, 179:18, 184:24, 229:3, 232:4, 232:5, 245:17, 247:6, 287:24, 288:1, 317:1

**General** [1] - 95:11

**generally** [25] - 54:3, 65:1, 74:22, 115:14, 161:21, 168:23, 171:14, 176:4, 177:6, 177:16, 186:11, 190:19, 212:22,

221:5, 231:4, 231:5, 233:6, 245:11, 245:14, 246:18, 249:20, 269:19, 273:18, 273:19, 318:22

**generating** [2] - 205:19, 230:25

**generations** [1] - 104:25

**generator** [6] - 308:6, 308:19, 320:2, 320:9, 320:18, 321:3

**generators** [9] - 94:8, 94:9, 94:13, 94:16, 212:22, 251:17, 251:18, 308:18

**genes** [1] - 225:19

**genetic** [1] - 290:6

**genetics** [1] - 225:18

**gentleman** [9] - 139:12, 170:22, 184:5, 248:6, 248:9, 254:14, 272:3, 285:8, 326:13

**gentlemen** [2] - 82:5, 298:12

**Geo** [1] - 313:14

**geographic** [2] - 216:10, 216:12

**geography** [1] - 289:7

**geologic** [1] - 215:5

**geologist** [1] - 12:2

**geology** [1] - 215:5

**germane** [1] - 118:1

**giant** [5] - 93:5, 93:6, 305:21, 306:3, 308:6

**GIS** [8] - 202:22, 204:9, 208:10, 208:16, 214:20, 218:6, 222:3, 250:23

**given** [16] - 12:21, 15:6, 15:7, 39:16, 52:6, 94:18, 94:25, 95:1, 97:16, 102:6, 163:2, 168:18, 176:15, 184:22, 185:6, 298:21

**Glades** [7] - 219:2, 219:5, 256:1, 256:6, 257:11, 289:12, 289:14

**glare** [1] - 174:11

**glib** [1] - 85:25

**glow** [1] - 309:11

**goal** [7] - 23:23, 24:1, 59:12, 59:16, 59:21, 102:13, 280:4

**goals** [9] - 19:9, 23:20, 23:22, 31:17, 36:7, 36:9, 36:12, 36:13, 279:22
**goings** [2] - 80:4, 194:10
**Google** [2] - 28:21, 212:23
**Googled** [1] - 313:20
**gosh** [1] - 296:21
**government** [15] - 23:23, 26:1, 29:4, 55:23, 98:6, 98:10, 108:23, 109:5, 121:19, 121:21, 121:22, 122:3, 131:16, 136:13, 136:25
**Government** [9] - 55:1, 118:19, 134:16, 191:15, 191:19, 206:22, 325:21, 326:7, 334:18
**Governor** [2] - 83:9, 326:1
**Governor's** [4] - 324:7, 324:10, 325:16, 325:17
**GPS** [6] - 224:14, 224:16, 224:17, 225:7, 227:6
**grab** [4] - 65:23, 66:1, 66:23, 83:6
**grabbed** [1] - 224:10
**grabs** [2] - 82:25, 121:18
**gradient** [1] - 229:3
**graduate** [4] - 89:21, 200:25, 259:22, 259:25
**graduated** [2] - 143:25, 144:4
**grand** [1] - 276:7
**granted** [1] - 328:23
**grants** [1] - 55:8
**grasp** [2] - 97:21, 102:25
**Grass** [1] - 21:15
**grass** [1] - 302:1
**gravel** [2] - 115:1, 323:14
**gray** [1] - 69:17
**great** [7] - 64:5, 87:3, 155:8, 160:9, 183:13, 270:10, 303:1
**Great** [1] - 22:11
**greater** [2] - 194:12, 258:21
**Greater** [4] - 32:8, 155:21, 155:23, 156:2

**green** [14] - 92:19, 217:19, 220:17, 220:20, 220:23, 221:22, 223:6, 223:24, 225:15, 236:23, 244:19, 294:25, 307:8, 313:8
**grew** [1] - 21:5
**grift** [1] - 123:23
**ground** [7] - 52:22, 52:23, 93:15, 96:10, 115:11, 273:23, 308:1
**grounded** [1] - 112:1
**grounds** [3] - 91:13, 137:12, 273:1
**Group** [1] - 18:1
**group** [14] - 19:22, 83:8, 91:4, 91:8, 96:6, 132:1, 138:4, 145:3, 304:17, 306:16, 311:24, 317:22, 318:11
**groups** [5] - 91:6, 91:7, 142:12, 301:1, 303:24
**growing** [3] - 21:6, 50:19, 221:3
**growth** [11] - 209:20, 209:22, 221:6, 228:7, 238:5, 268:12, 268:20, 291:4, 291:14, 292:8
**Guaranteed** [1] - 307:12
**guard** [1] - 93:19
**Guard** [1] - 111:1
**guardrail** [1] - 100:9
**guards** [1] - 296:21
**guess** [18] - 8:15, 9:19, 10:5, 13:16, 29:15, 103:3, 111:2, 121:15, 154:25, 182:1, 186:6, 191:23, 245:8, 248:17, 250:4, 312:8, 326:10, 328:9
**guesses** [2] - 292:7
**guessing** [2] - 154:9, 250:4
**guide** [1] - 203:8
**guided** [1] - 155:9
**guidelines** [6] - 97:8, 111:21, 111:24, 112:6, 112:14, 112:25
**Gulf** [1] - 144:1
**Gustafson** [8] - 7:18, 11:23, 76:4, 85:20, 99:20, 191:14, 192:14, 330:15
**GUSTAFSON** [19] - 2:16, 4:14, 4:18, 7:17,

76:5, 83:19, 85:21, 96:9, 101:4, 137:11, 191:12, 193:23, 211:7, 239:1, 287:20, 292:23, 323:22, 324:19, 330:16
**Guthrie** [50] - 7:7, 7:11, 7:13, 7:16, 94:20, 95:19, 95:23, 96:1, 96:5, 96:17, 97:13, 98:1, 98:18, 101:8, 102:3, 102:13, 103:5, 103:13, 108:2, 109:8, 110:1, 110:10, 110:18, 111:20, 113:15, 113:18, 125:9, 126:1, 126:4, 127:3, 127:18, 128:8, 128:23, 129:12, 129:20, 130:11, 130:12, 130:16, 131:25, 132:5, 132:12, 134:3, 136:11, 136:22, 137:21, 137:22, 138:2, 138:11, 170:4, 316:13
**GUTHRIE** [1] - 2:6
**guy** [2] - 95:23, 215:8

# H

**habit** [1] - 314:5
**habitat** [110] - 65:2, 142:7, 143:15, 156:3, 157:5, 157:8, 157:12, 157:15, 168:16, 168:24, 183:13, 185:13, 195:9, 201:22, 202:17, 204:16, 204:17, 205:6, 209:18, 210:1, 210:2, 213:2, 215:24, 216:17, 217:23, 218:15, 218:19, 218:25, 219:2, 219:10, 219:16, 219:24, 220:14, 220:18, 221:2, 221:12, 221:13, 221:16, 227:19, 229:12, 230:2, 230:9, 233:1, 233:21, 233:25, 234:2, 237:1, 237:17, 238:1, 238:3, 238:6, 238:16, 238:23, 242:19, 242:25, 243:1, 243:3, 243:8, 245:12, 245:18, 251:1, 257:2,

257:6, 257:7, 257:12, 261:25, 268:14, 268:22, 269:6, 269:13, 269:22, 269:25, 270:2, 270:3, 271:13, 271:15, 278:24, 281:6, 281:11, 281:22, 281:25, 282:1, 282:7, 282:13, 282:15, 285:25, 288:1, 288:11, 288:19, 289:25, 290:10, 290:14, 290:17, 290:20, 290:21, 291:14, 292:12, 294:16, 294:20, 295:2, 295:3, 295:5, 295:6, 295:24, 297:18, 297:19, 297:23, 298:5
**habitats** [25] - 156:14, 202:19, 202:24, 206:6, 208:10, 208:11, 208:13, 217:10, 218:7, 220:7, 220:17, 221:1, 221:5, 222:13, 228:6, 237:25, 242:23, 250:20, 262:14, 269:19, 272:24, 279:22, 282:6, 286:3, 286:15
**habituate** [1] - 294:4
**hac** [1] - 316:5
**half** [20] - 59:7, 60:15, 73:15, 123:23, 147:21, 149:8, 152:16, 152:18, 152:19, 153:14, 153:17, 180:1, 190:15, 199:6, 208:9, 255:8, 327:20, 328:8, 330:22, 330:23
**half-a-billion-dollar** [1] - 123:23
**half-day** [1] - 327:20
**half-hour** [2] - 330:22, 330:23
**hall** [1] - 75:13
**halt** [1] - 41:24
**halted** [2] - 54:12, 54:15
**hammock** [1] - 214:25
**hand** [15] - 18:14, 78:18, 78:21, 78:22, 78:23, 79:20, 89:3, 141:10, 165:10, 169:25, 191:23,

250:24, 299:6, 314:16, 321:2
**handful** [2] - 14:7, 220:21
**handle** [1] - 246:18
**handled** [4] - 161:7, 161:8, 161:10, 178:7
**hands** [1] - 42:22
**happy** [6] - 14:23, 79:5, 117:21, 139:18, 188:1, 214:4
**harassment** [1] - 297:12
**hard** [19] - 35:16, 78:21, 79:20, 85:23, 94:15, 111:6, 128:4, 133:23, 134:8, 134:10, 134:11, 141:7, 151:24, 213:5, 213:9, 227:13, 304:23, 313:3
**harder** [1] - 195:17
**hardhats** [1] - 102:6
**hardships** [1] - 198:11
**hardwood** [1] - 215:14
**harm** [30] - 10:13, 11:14, 22:11, 22:17, 33:13, 36:15, 38:2, 38:22, 39:3, 39:8, 40:17, 41:11, 52:6, 54:2, 54:12, 56:24, 63:23, 64:1, 64:4, 74:8, 119:4, 165:16, 165:23, 166:1, 171:17, 172:20, 235:20, 247:1, 264:18, 292:18
**harmed** [4] - 172:10, 172:12, 172:13, 195:3
**harms** [9] - 39:5, 39:6, 40:3, 40:13, 41:9, 60:18, 172:18, 181:5, 297:24
**hat** [3] - 144:13, 171:3, 185:10
**hate** [1] - 334:6
**Haven** [1] - 104:22
**Hawks** [1] - 254:10
**head** [9] - 72:5, 149:23, 151:10, 159:8, 177:21, 185:20, 190:18, 245:16, 277:6
**headlights** [3] - 320:4, 320:24, 321:2
**heads** [1] - 32:24
**heads-up** [1] - 32:24
**health** [3] - 107:6,

107:10, 113:25
**healthy** [1] - 104:24
**hear** [13] - 32:20, 46:23, 165:11, 170:6, 177:20, 177:21, 192:16, 192:25, 193:3, 193:4, 193:12, 249:14, 299:2
**heard** [15] - 44:17, 48:19, 85:4, 86:8, 112:2, 132:17, 143:13, 152:10, 162:5, 189:17, 214:6, 253:23, 261:9, 304:18, 314:8
**hearing** [16] - 14:13, 16:11, 16:14, 18:3, 36:15, 73:18, 75:13, 83:17, 86:21, 89:24, 185:3, 193:1, 198:4, 211:15, 329:12, 332:16
**HEARING** [1] - 1:10
**hearsay** [8] - 14:14, 96:9, 96:13, 101:5, 130:24, 137:12, 324:19, 324:20
**heart** [3] - 22:25, 31:20, 143:9
**heartbreakingly** [1] - 309:4
**heavy** [4] - 94:7, 244:15, 305:22
**heck** [1] - 223:22
**height** [4] - 65:11, 65:17, 231:10, 296:2
**held** [2] - 113:3, 152:5
**helicopters** [2] - 48:25, 175:25
**hello** [3] - 191:17, 193:3, 316:4
**help** [12] - 19:9, 19:22, 22:3, 67:21, 78:2, 107:10, 159:20, 159:22, 206:4, 230:7, 289:7, 304:16
**helpful** [2] - 85:22, 330:20
**helping** [2] - 39:8, 73:3
**helps** [3] - 19:9, 68:22, 145:21
**herbaceous** [3] - 214:23, 215:13
**hereby** [1] - 335:3
**Hernandez** [1] - 164:4
**heron** [1] - 302:17
**herself** [1] - 10:5

**hi** [5] - 249:11, 316:3, 316:11, 316:12, 325:13
**Hiaasen** [19] - 6:8, 14:1, 58:9, 79:12, 80:10, 80:25, 82:14, 85:9, 86:18, 88:5, 88:25, 120:4, 137:16, 299:1, 314:20, 314:25, 319:14, 323:23, 324:24
**HIAASEN** [69] - 1:15, 4:8, 4:20, 6:8, 14:2, 58:12, 73:11, 77:23, 78:5, 78:9, 78:14, 79:13, 79:24, 80:13, 81:6, 82:16, 82:19, 83:11, 83:13, 83:16, 83:25, 84:7, 84:19, 85:10, 85:16, 86:23, 87:10, 88:6, 89:13, 97:24, 98:21, 99:9, 99:11, 111:11, 116:22, 117:23, 118:21, 121:17, 130:20, 135:13, 135:16, 137:14, 137:17, 138:24, 139:14, 298:23, 299:4, 299:14, 309:16, 309:19, 310:3, 310:5, 310:18, 310:19, 310:22, 310:23, 311:10, 311:16, 314:22, 315:2, 315:11, 315:13, 315:15, 316:2, 322:3, 322:25, 324:3, 324:25, 325:5
**high** [13] - 214:9, 231:6, 235:3, 239:18, 258:22, 262:21, 264:10, 269:22, 269:25, 270:2, 296:4, 328:9
**higher** [1] - 264:4
**highlighted** [1] - 68:3
**highly** [3] - 77:14, 88:18, 171:12
**highway** [1] - 93:11
**Highway** [1] - 138:10
**hike** [2] - 25:2, 152:18
**hiked** [1] - 150:3
**hiker** [1] - 311:23
**hikes** [1] - 150:5
**hiking** [5] - 299:25, 301:4, 302:18, 304:6, 322:13

**Hill** [1] - 20:4
**himself** [1] - 137:23
**hindsight** [1] - 227:4
**hired** [2] - 201:12, 204:16
**historic** [1] - 212:11
**historical** [2] - 208:1, 222:13
**historically** [2] - 95:22, 227:20
**history** [3] - 115:17, 208:1, 279:25
**hit** [5] - 196:9, 235:20, 235:22, 249:2
**hits** [1] - 314:15
**hog** [1] - 231:18
**hogs** [2] - 231:19, 278:16
**hold** [9] - 31:18, 89:22, 112:13, 112:17, 115:20, 147:4, 154:13, 323:16
**holding** [1] - 323:4
**holds** [1] - 45:18
**hole** [3] - 149:24, 247:14, 309:9
**Homeland** [4] - 127:5, 312:16, 313:2, 313:6
**Homestead** [2] - 25:19, 26:23
**honest** [1] - 115:10
**honestly** [1] - 137:9
**honking** [1] - 314:5
**Honor** [251] - 6:6, 6:8, 6:10, 6:15, 6:18, 6:21, 6:25, 7:6, 7:10, 7:12, 7:15, 7:17, 7:19, 8:1, 8:9, 8:17, 9:6, 9:19, 10:1, 10:8, 11:9, 11:17, 11:21, 12:10, 13:13, 14:2, 14:17, 14:18, 16:4, 17:11, 20:19, 28:8, 29:9, 29:22, 30:20, 33:17, 34:25, 40:23, 42:17, 42:25, 43:2, 43:4, 43:25, 44:8, 56:22, 57:9, 58:12, 66:4, 66:14, 67:25, 68:21, 71:17, 72:14, 73:11, 73:17, 74:24, 75:6, 75:15, 75:23, 76:1, 76:5, 77:21, 77:23, 78:15, 79:1, 79:9, 79:20, 79:24, 80:19, 81:5, 81:6, 81:19, 81:25, 82:16, 83:13, 83:17, 83:19, 84:7,

85:15, 85:16, 85:21, 86:11, 86:24, 88:6, 89:16, 96:9, 96:14, 98:12, 98:17, 99:9, 99:12, 99:14, 101:4, 101:12, 101:20, 104:11, 106:12, 106:16, 108:14, 111:12, 115:23, 116:5, 116:17, 116:23, 117:1, 117:14, 117:19, 117:23, 118:13, 118:21, 119:2, 119:15, 119:23, 120:24, 121:6, 121:17, 123:1, 124:1, 124:18, 125:11, 127:21, 128:13, 129:2, 130:20, 130:24, 131:14, 132:25, 133:8, 133:9, 133:18, 134:19, 135:5, 135:10, 135:13, 137:11, 137:15, 137:22, 138:20, 138:24, 139:2, 139:7, 140:9, 140:20, 141:2, 141:17, 144:21, 145:5, 156:15, 157:1, 163:12, 163:23, 164:14, 164:21, 164:23, 169:6, 169:15, 169:20, 172:16, 174:24, 175:10, 177:25, 179:22, 179:24, 181:1, 182:9, 182:11, 184:1, 187:15, 188:10, 189:8, 189:18, 191:8, 193:5, 193:25, 195:24, 197:11, 197:13, 197:25, 198:1, 198:16, 198:18, 199:14, 211:3, 211:6, 213:25, 214:11, 239:1, 239:22, 240:12, 240:14, 247:8, 247:12, 247:14, 247:23, 248:2, 248:11, 248:15, 248:22, 248:25, 249:7, 253:10, 253:13, 253:15, 253:23, 254:20, 271:23, 272:6, 273:12, 273:13, 273:24, 274:14, 277:14,

283:22, 284:8, 285:11, 287:14, 287:16, 293:3, 298:2, 298:23, 299:4, 311:10, 315:11, 315:13, 315:19, 315:21, 316:3, 316:6, 319:1, 319:11, 322:3, 322:19, 323:19, 323:22, 324:20, 326:21, 327:10, 328:20, 329:8, 329:21, 329:24, 330:12, 330:16, 331:1, 331:4, 331:12, 331:23, 332:1, 332:5, 332:11, 333:10
**HONORABLE** [1] - 1:10
**hook** [1] - 77:21
**hope** [14] - 9:14, 17:16, 64:25, 151:6, 155:7, 158:7, 159:6, 159:10, 160:7, 160:10, 162:24, 191:1, 193:25, 307:3
**hopefully** [6] - 88:25, 116:25, 124:21, 124:23, 277:5, 309:15
**hoping** [2] - 77:25, 154:15
**horseback** [1] - 299:25
**host** [1] - 96:1
**hosted** [2] - 146:20, 155:13
**Hostetler** [3] - 259:11, 259:24, 260:3
**hosting** [1] - 177:16
**hosts** [1] - 49:23
**hot** [5] - 108:9, 194:15, 196:2, 196:8, 196:11
**hotspot** [1] - 156:11
**Houp** [1] - 95:12
**hour** [17] - 51:23, 63:8, 73:15, 139:10, 140:2, 182:8, 248:20, 306:20, 306:21, 314:6, 328:8, 328:11, 329:24, 330:22, 330:23, 330:24
**hours** [8] - 12:14, 61:12, 82:6, 120:12, 158:15, 200:25, 224:18, 322:6
**House** [2] - 89:16, 122:15
**house** [1] - 309:12
**housekeeping** [3] -

13:14, 140:19, 197:12
**houses** [1] - 190:21
**housing** [2] - 296:20
**huge** [2] - 52:22,
241:13
**human** [33] - 48:23,
52:13, 97:4, 168:18,
168:23, 176:8, 176:9,
176:11, 176:13,
176:16, 184:14,
186:20, 195:5, 228:2,
228:8, 228:12,
228:14, 228:18,
228:22, 228:24,
230:10, 237:15,
245:6, 257:8, 265:17,
276:16, 276:23,
277:24, 291:12,
291:14, 296:16, 297:1
**humans** [4] - 158:13,
186:11, 277:24, 291:6
**humps** [1] - 63:4
**hundred** [12] - 51:23,
116:12, 137:4, 182:8,
229:2, 229:6, 232:4,
233:14, 233:15,
233:18, 239:17, 247:5
**hundreds** [4] - 62:1,
156:6, 213:6
**hunting** [2] - 51:13,
51:14
**Hurricane** [2] - 21:8,
25:18
**hurricane** [2] -
95:23, 111:10
**hurts** [1] - 68:22
**husband** [1] - 62:17
**hut** [1] - 175:3
**hydrologist** [2] -
57:10, 172:3
**hydrology** [5] -
13:18, 13:22, 37:5,
53:24, 57:10
**hypothesize** [1] -
41:9
**hypothetical** [1] -
166:6

**I**

**I-75** [1] - 167:12
**ICE** [15] - 83:11,
97:8, 97:10, 97:14,
98:2, 98:20, 109:13,
111:21, 112:7,
112:14, 112:21,
113:9, 313:11,
313:21, 315:5
**ICE's** [3] - 97:2, 97:3,
112:7

**ICE-contracted** [1] -
313:21
**idea** [13] - 120:20,
178:18, 203:21,
207:1, 209:10, 218:7,
222:22, 254:17,
268:2, 273:16, 289:3,
325:22, 326:15
**ideal** [1] - 132:13
**identical** [1] - 68:7
**identification** [15] -
27:24, 29:1, 42:6,
65:19, 72:16, 78:11,
82:18, 163:25,
210:15, 211:8,
213:21, 271:19,
309:18, 315:9, 315:10
**identified** [14] -
11:22, 70:14, 70:22,
114:9, 188:4, 217:9,
218:18, 246:7, 265:5,
288:6, 290:17,
292:13, 292:18
**identify** [7] - 63:10,
151:6, 165:5, 236:9,
236:12, 246:21, 273:4
**identifying** [1] -
208:11
**identity** [1] - 98:20
**illegally** [1] - 75:5
**illuminating** [1] -
29:24
**illumination** [1] -
93:1
**image** [7] - 78:23,
215:20, 218:3,
221:20, 223:5, 236:3,
244:6
**imagery** [2] - 47:23,
47:25
**images** [5] - 83:1,
102:23, 123:17,
221:11, 293:16
**imaginary** [1] -
202:20
**imagine** [7] - 49:1,
51:24, 61:23, 65:18,
108:9, 176:18, 327:18
**imagining** [1] -
183:19
**immediate** [4] -
238:16, 238:18,
239:13, 294:2
**immediately** [6] -
57:3, 185:20, 191:2,
191:5, 253:9, 329:16
**immense** [1] - 31:19
**immigrant** [1] -
123:23
**immigration** [9] -

50:13, 52:9, 74:16,
112:18, 113:8, 118:5,
161:25, 162:4, 191:20
**Immigration** [1] -
313:10
**impact** [27] - 34:2,
34:14, 107:25,
116:21, 163:4, 168:5,
184:10, 184:14,
184:15, 202:3,
209:25, 228:9, 229:7,
229:8, 237:17,
237:18, 240:5,
240:25, 241:25,
242:1, 252:20,
252:22, 253:8,
255:18, 263:5, 297:4,
312:2
**Impact** [1] - 25:21
**impacted** [3] - 77:12,
161:11, 261:5
**impacting** [1] - 95:24
**impacts** [43] - 25:24,
32:2, 33:9, 34:4, 34:6,
34:9, 40:17, 49:5,
52:15, 55:3, 56:5,
59:8, 76:14, 76:20,
168:13, 201:16,
204:12, 205:3,
205:13, 206:5, 206:8,
212:16, 213:18,
216:14, 227:16,
228:13, 230:22,
231:22, 234:9,
234:10, 239:20,
240:7, 254:1, 255:3,
255:11, 255:16,
283:20, 285:16,
297:6, 318:5
**impair** [1] - 228:5
**impeach** [4] - 44:8,
44:10, 44:12, 284:21
**impeaching** [3] -
43:4, 45:11, 120:25
**impeachment** [2] -
283:24, 284:3
**imperfect** [1] - 23:18
**imperilled** [5] -
148:5, 156:7, 159:2,
183:12, 193:16
**imperilling** [2] -
183:2, 192:24
**impetus** [1] - 121:12
**implemented** [2] -
179:11, 206:23
**implies** [1] - 282:4
**importance** [8] -
24:3, 146:9, 219:15,
219:16, 262:13,
262:16, 262:21, 273:1

**important** [20] - 22:9,
25:22, 26:23, 32:5,
32:7, 39:9, 40:8,
73:18, 84:21, 108:17,
115:11, 119:8,
123:10, 160:23,
217:10, 219:17,
252:4, 252:8, 253:24,
294:20
**impossible** [1] -
246:5
**impressed** [1] -
143:13
**impression** [1] -
56:20
**impressive** [1] -
142:3
**improved** [1] - 290:6
**improvements** [1] -
28:5
**inappropriate** [2] -
119:1, 144:16
**inappropriately** [1] -
118:25
**Inc** [1] - 6:3
**inch** [1] - 280:2
**inclined** [1] - 82:8
**include** [10] - 32:9,
34:5, 56:3, 130:12,
244:25, 288:10,
291:1, 297:2
**included** [4] - 25:18,
58:25, 65:23, 66:15
**includes** [2] - 83:3,
288:14
**including** [13] -
19:12, 52:11, 90:23,
93:16, 95:11, 114:16,
131:15, 153:15,
159:9, 278:23, 281:8,
291:23, 294:23
**incorrect** [2] - 56:21,
323:10
**increase** [20] - 52:17,
52:21, 176:11, 194:3,
228:5, 229:20, 233:1,
234:18, 234:19,
234:20, 235:7,
238:21, 264:11,
265:7, 277:24,
282:20, 291:6,
291:12, 296:16
**increased** [31] -
34:17, 60:18, 181:5,
195:16, 195:20,
228:2, 228:3, 228:4,
228:12, 228:13,
228:22, 230:10,
230:21, 230:22,
234:5, 234:10, 235:6,

237:15, 237:20,
245:6, 263:22, 264:5,
264:17, 265:11,
265:12, 266:17,
266:21, 282:19,
282:24, 283:4
**increases** [3] - 53:5,
168:23, 176:11
**increasing** [9] -
176:7, 176:8, 176:13,
186:20, 195:5, 265:7,
276:16, 276:23, 297:1
**incredible** [2] -
50:20, 51:15
**indeed** [2] - 80:4,
86:5
**independent** [4] -
289:9, 290:6, 291:8,
292:13
**independently** [2] -
48:8, 83:16
**INDEX** [2] - 4:1, 5:1
**Indian** [2] - 300:17,
311:20
**Indians** [1] - 6:19
**indicate** [2] - 8:19,
216:15
**indicated** [1] - 31:7
**indicating** [1] - 157:8
**indication** [1] - 96:10
**indigo** [1] - 156:9
**individual** [19] -
9:25, 10:19, 101:22,
103:21, 130:2, 213:9,
222:18, 223:9, 229:4,
238:24, 239:7, 239:9,
275:5, 275:7, 275:8,
279:1, 287:9, 287:10,
329:9
**individually** [1] -
229:4
**individuals** [25] -
14:6, 95:14, 97:9,
98:7, 98:11, 98:19,
104:4, 109:11,
109:12, 110:24,
112:21, 113:3, 113:8,
113:13, 113:25,
114:15, 212:6,
212:11, 219:13,
221:4, 230:1, 233:17,
234:5, 289:13, 289:17
**indoors** [1] - 108:8
**indulgence** [1] -
177:25
**industrial** [3] - 34:8,
52:13, 64:10
**industrial-style** [1] -
64:10
**inferred** [1] - 295:15

**infirmity** [1] - 8:22
**influenced** [1] - 26:24
**information** [44] - 48:7, 67:20, 80:15, 81:17, 96:7, 98:19, 98:23, 99:4, 123:14, 123:15, 123:16, 129:7, 129:16, 130:3, 132:11, 133:3, 134:4, 135:24, 159:24, 174:8, 174:9, 174:13, 177:12, 177:19, 197:23, 202:21, 202:24, 207:14, 210:4, 213:8, 224:19, 234:22, 283:18, 285:14, 285:20, 285:21, 285:23, 292:10, 293:12, 293:13, 293:22, 294:1, 295:19, 326:14
**infrastructure** [3] - 94:11, 129:5, 212:21
**infrequency** [1] - 52:16
**infrequent** [1] - 45:6
**infrequently** [1] - 52:11
**inhumane** [1] - 117:17
**INJUNCTION** [1] - 1:10
**injunction** [9] - 9:10, 12:19, 14:13, 15:13, 16:8, 16:10, 18:3, 118:17, 334:2
**injunctive** [1] - 9:4
**injure** [1] - 194:19
**input** [6] - 26:12, 26:24, 29:5, 31:24, 55:15, 56:4
**inquire** [1] - 170:12
**inside** [10] - 50:21, 50:25, 51:2, 64:19, 114:22, 114:23, 136:8, 183:16, 183:21, 185:22
**inspect** [1] - 77:2
**inspectation** [1] - 97:3
**inspecting** [1] - 97:3
**inspects** [2] - 97:8, 112:7
**inspired** [1] - 148:13
**install** [1] - 307:10
**installation** [1] - 308:4
**installed** [6] - 52:14, 63:4, 64:11, 125:20,

132:24, 307:18
**instance** [2] - 33:15, 83:5
**instances** [3] - 46:9, 165:23, 165:25
**institutions** [1] - 106:1
**insufficient** [1] - 285:3
**intake** [1] - 97:10
**intend** [9] - 13:3, 28:16, 124:22, 154:10, 155:2, 155:5, 175:10, 197:2, 312:1
**intended** [2] - 81:11, 207:12
**intense** [4] - 22:18, 32:22, 59:6, 77:18
**intensely** [1] - 265:25
**intensified** [1] - 53:20
**intensity** [1] - 52:21
**intention** [2] - 207:12, 218:11
**interact** [1] - 105:25
**interaction** [1] - 69:25
**interactions** [2] - 184:15, 265:17
**interactive** [2] - 71:12, 71:19
**interconnected** [1] - 32:10
**interest** [13] - 8:13, 21:7, 31:19, 41:12, 50:12, 50:15, 73:16, 147:14, 160:22, 172:20, 194:19
**interested** [6] - 20:10, 21:1, 21:4, 143:7, 147:25, 334:18
**interesting** [1] - 143:20
**interfere** [1] - 175:5
**interject** [1] - 247:13
**internal** [4] - 183:9, 210:8, 220:2, 220:3
**internally** [1] - 203:22
**international** [3] - 34:11, 168:3, 168:6
**Internet** [1] - 203:23
**interrupt** [2] - 52:25, 192:15
**interruption** [1] - 115:21
**intersection** [3] - 91:17, 93:17, 116:9

**intersects** [1] - 112:24
**interstate** [1] - 235:2
**intervene** [1] - 328:24
**INTERVENOR** [1] - 2:1
**Intervenor/Plaintiff** [1] - 6:20
**intraspecific** [10] - 227:10, 229:21, 230:17, 233:2, 235:16, 235:17, 237:21, 238:22, 279:24, 297:10
**intrepid** [1] - 135:1
**introduce** [9] - 77:25, 78:1, 80:7, 81:4, 81:11, 82:1, 121:8, 125:13, 225:18
**introduced** [3] - 6:25, 79:6, 121:20
**introducing** [2] - 79:19, 145:6
**introduction** [2] - 225:18, 290:7
**invasive** [3] - 146:15, 146:17, 146:18
**invested** [1] - 34:11
**investigate** [1] - 177:14
**investment** [3] - 31:13, 31:19, 104:23
**Invisalign** [1] - 125:20
**invitation** [1] - 104:1
**invite** [2] - 103:22, 103:23
**invited** [4] - 90:21, 103:19, 203:4, 203:5
**invoke** [1] - 9:20
**invoking** [1] - 325:21
**involve** [3] - 144:10, 144:19, 145:7
**involved** [17] - 38:24, 40:7, 54:9, 54:11, 55:13, 55:15, 133:23, 173:9, 206:1, 240:25, 241:2, 241:15, 241:17, 241:24, 245:10, 246:6, 290:3
**involvement** [3] - 20:14, 40:10, 97:23
**involves** [2] - 291:24, 292:3
**involving** [3] - 84:10, 226:5, 291:22
**irreparable** [1] - 10:13
**irritation** [1] - 231:19

**Island** [1] - 25:6
**isolate** [1] - 35:16
**issue** [24] - 14:3, 20:15, 22:2, 38:10, 46:15, 46:16, 54:23, 79:17, 79:23, 80:3, 121:20, 122:12, 162:23, 197:14, 198:1, 198:2, 198:21, 253:23, 285:9, 325:4, 327:17, 334:7, 334:13
**issued** [3] - 120:14, 133:10, 293:21
**issues** [33] - 10:15, 19:15, 19:18, 19:24, 20:9, 20:11, 21:2, 21:4, 22:11, 36:19, 37:24, 38:12, 39:25, 55:13, 59:13, 59:17, 76:25, 79:5, 85:5, 88:12, 88:20, 105:1, 107:25, 117:7, 117:20, 171:20, 197:12, 198:5, 198:7, 198:18, 199:6, 327:14
**IT** [4] - 27:6, 196:18, 197:5, 200:7
**item** [1] - 84:7
**itself** [22] - 33:2, 45:18, 63:5, 67:6, 80:15, 81:24, 90:22, 93:16, 93:22, 97:14, 102:17, 103:22, 109:12, 137:25, 159:13, 186:21, 188:9, 212:1, 212:24, 239:13, 293:25, 322:14

**J**

**Jail** [5] - 113:4, 113:5, 113:7, 113:10, 113:11
**jail** [3] - 97:8, 112:6, 112:12
**jails** [1] - 105:23
**Jake** [1] - 103:5
**January** [2] - 210:13, 253:7
**Jared** [1] - 114:16
**JASON** [1] - 1:22
**Jason** [1] - 6:17
**jeopardize** [1] - 286:1
**jeopardy** [4] - 269:21, 297:14, 297:17
**JESSE** [1] - 2:7
**Jesse** [2] - 7:6, 35:5

**Jessica** [3] - 299:5, 299:7, 299:11
**JESSICA** [2] - 4:19, 299:11
**jet** [10] - 48:18, 49:8, 51:20, 52:12, 52:23, 64:9, 175:23, 305:22, 306:8
**jetport** [48] - 21:20, 21:22, 21:23, 22:6, 22:23, 24:14, 24:23, 25:3, 25:7, 30:8, 30:11, 31:10, 31:11, 32:13, 33:21, 39:2, 41:25, 44:16, 45:2, 50:17, 50:22, 50:23, 52:8, 54:18, 55:12, 55:25, 56:3, 56:7, 61:3, 61:4, 61:13, 61:14, 69:17, 166:8, 167:4, 215:18, 232:19, 234:14, 252:18, 267:19, 273:7, 294:6, 294:15, 301:15, 307:7, 317:23, 321:12, 321:23
**Jetport** [15] - 300:16, 300:23, 302:5, 302:8, 302:9, 302:14, 302:15, 302:20, 302:23, 303:11, 303:15, 303:21, 304:2, 304:12, 305:8
**jets** [1] - 22:16
**job** [4] - 26:11, 37:23, 72:21, 116:10
**jobs** [1] - 204:8
**Joe** [1] - 298:16
**Joe's** [1] - 305:20
**John's** [1] - 201:15
**join** [2] - 96:13, 304:22
**joined** [1] - 143:4
**joining** [1] - 193:6
**joins** [1] - 9:6
**joint** [1] - 123:5
**journal** [1] - 203:12
**journalism** [3] - 20:3, 38:5, 38:8
**journalist** [10] - 20:4, 20:23, 21:1, 37:15, 38:1, 38:4, 38:11, 39:6, 39:7
**Judge** [19] - 10:21, 11:6, 11:24, 17:24, 18:2, 27:10, 27:20, 28:22, 34:22, 66:6, 66:12, 68:6, 197:4, 198:19, 298:16,

328:15, 333:7, 334:6, 334:16
**JUDGE** [1] - 1:11
**judicial** [1] - 187:25
**July** [33] - 83:7, 84:11, 90:8, 90:11, 90:17, 95:19, 96:5, 99:1, 107:13, 107:15, 129:3, 129:4, 132:22, 133:11, 250:4, 250:5, 253:7, 263:15, 267:17, 267:23, 267:25, 280:17, 316:16, 317:3, 317:20, 317:25, 318:2, 318:3, 318:8, 318:12, 318:15, 319:4
**jump** [1] - 231:16
**jumpers** [1] - 254:9
**jumping** [2] - 296:5, 327:18
**June** [24] - 32:17, 33:7, 34:2, 70:12, 132:18, 133:10, 164:9, 192:4, 194:7, 224:7, 224:10, 227:7, 267:24, 270:10, 301:10, 302:4, 302:10, 302:24, 303:17, 304:13, 304:15, 308:8, 310:16, 317:21
**jurisdictional** [1] - 116:15
**Justice** [3] - 125:17, 191:15, 325:14
**JUSTICE** [2] - 2:18, 2:20
**juveniles** [2] - 225:22, 226:5

### K

**K-a-u-t-z** [1] - 12:7
**K-A-U-T-Z** [1] - 199:20
**KATHLEEN** [1] - 1:10
**Kautz** [18] - 12:6, 12:7, 185:13, 196:21, 199:15, 199:16, 199:19, 199:22, 200:16, 203:10, 211:10, 239:24, 240:19, 240:20, 246:24, 249:10, 287:21, 293:6
**KAUTZ** [1] - 4:15
**kayak** [1] - 151:25
**keep** [6] - 23:4,

39:16, 72:20, 197:3, 248:8, 274:18
**kept** [2] - 97:7, 250:7
**Kerk** [3] - 259:10, 259:21, 260:3
**Kevin** [9] - 15:2, 94:20, 97:13, 102:3, 102:13, 103:5, 109:8, 110:10, 137:22
**Key** [1] - 236:11
**key** [1] - 31:7
**keyed** [1] - 140:3
**Keys** [1] - 32:15
**kicked** [1] - 51:22
**kids** [4] - 21:6, 301:5, 304:22, 304:24
**kill** [1] - 246:16
**killed** [3] - 181:20, 194:13, 295:25
**killing** [1] - 230:18
**kills** [2] - 232:9, 232:11
**kilometer** [2] - 263:2, 269:6
**kilometers** [13] - 220:11, 222:7, 233:15, 233:19, 245:25, 246:1, 263:1, 268:13, 268:21, 269:3, 269:9, 278:21
**kind** [64] - 12:11, 12:20, 28:13, 32:22, 32:24, 37:3, 38:6, 50:1, 50:12, 51:3, 74:12, 74:15, 74:18, 74:21, 91:25, 92:19, 102:8, 102:25, 103:8, 114:5, 143:11, 143:21, 148:4, 148:9, 148:10, 148:13, 148:18, 149:23, 154:14, 154:20, 155:14, 155:14, 155:16, 157:22, 158:15, 159:22, 161:20, 161:24, 162:3, 162:12, 162:17, 183:10, 191:24, 196:8, 213:9, 219:11, 228:21, 229:2, 234:4, 245:5, 262:20, 262:22, 301:16, 302:1, 302:7, 305:16, 305:24, 306:4, 306:19, 308:25, 313:1, 314:3, 320:7, 321:23
**kinds** [6] - 49:12, 49:19, 76:20, 158:16, 161:4, 323:13

**kite** [2] - 143:19, 156:9
**kites** [1] - 302:17
**kittens** [10] - 212:6, 219:5, 244:14, 244:16, 244:17, 245:13, 246:17, 246:18, 256:20, 279:23
**knowing** [3] - 18:12, 32:21, 130:22
**knowledge** [17] - 54:22, 71:10, 81:2, 103:18, 103:23, 105:21, 119:8, 135:18, 157:12, 184:24, 189:9, 258:6, 266:7, 291:10, 297:11, 301:11, 301:20
**knowledgeable** [1] - 177:14
**known** [8] - 25:19, 32:1, 156:10, 158:8, 158:24, 159:24, 194:15, 204:10
**knows** [6] - 10:16, 29:18, 156:23, 206:25, 264:25, 283:10
**KRISTI** [2] - 1:7, 2:13
**Krome** [4] - 314:10, 314:12, 314:13, 314:15

### L

**lab** [2] - 201:10, 260:2
**labeled** [1] - 115:25
**lack** [5] - 40:12, 70:18, 111:11, 283:17, 285:13
**lacking** [1] - 285:22
**ladies** [1] - 298:12
**laid** [2] - 29:11, 181:11
**Lake** [10] - 20:24, 26:9, 26:10, 26:16, 26:25, 149:13, 149:19, 153:1, 153:5, 154:23
**Lakes** [1] - 303:8
**Lamb** [1] - 104:3
**lamps** [2] - 93:7
**land** [14] - 47:1, 114:22, 145:19, 204:15, 220:6, 222:2, 244:6, 257:12, 268:25, 274:11,

277:12, 304:18, 334:15
**Land** [1] - 304:18
**landed** [1] - 45:1
**landing** [7] - 47:5, 48:22, 52:7, 116:13, 303:16, 322:8, 322:16
**landings** [7] - 44:16, 44:24, 45:15, 47:7, 49:23, 177:17, 274:3
**landowners** [1] - 204:18
**Lands** [1] - 306:17
**lands** [7] - 48:10, 48:12, 51:22, 142:8, 148:25, 152:4, 168:23
**Landscape** [2] - 203:11, 217:7
**landscape** [15] - 102:23, 214:17, 217:12, 218:11, 220:13, 220:22, 223:14, 229:25, 230:2, 230:4, 233:16, 238:4, 238:9, 257:10, 267:17
**Landscape-Scale** [2] - 203:11, 217:7
**landscapes** [2] - 205:20, 218:8
**language** [2] - 98:3, 98:4
**large** [20] - 34:7, 91:21, 92:3, 92:4, 92:8, 94:16, 102:25, 103:2, 106:3, 106:5, 106:13, 132:1, 134:2, 144:15, 220:20, 221:8, 257:11, 287:25, 307:24, 308:19
**larger** [2] - 101:3, 233:3
**largest** [1] - 21:24
**Las** [1] - 2:10
**last** [61] - 13:2, 20:8, 34:19, 39:21, 41:16, 46:9, 46:10, 46:12, 54:18, 54:24, 55:24, 56:7, 62:10, 64:6, 70:20, 70:21, 70:25, 71:1, 71:5, 71:8, 71:19, 78:18, 79:14, 80:18, 84:7, 89:10, 89:23, 118:13, 122:19, 123:20, 124:5, 135:4, 142:9, 145:23, 146:16, 151:9, 153:13, 153:18, 153:19,

154:13, 156:13, 167:9, 173:5, 177:8, 203:16, 206:15, 210:13, 213:7, 225:14, 234:8, 239:1, 253:6, 280:15, 298:5, 306:18, 306:23, 309:10, 321:11, 324:9, 325:15, 328:14
**late** [9] - 13:2, 13:18, 13:22, 140:7, 198:12, 199:3, 237:12, 308:5, 333:8
**late-breaking** [3] - 13:2, 13:18, 13:22
**latitude** [1] - 80:8
**laundry** [1] - 296:22
**law** [23] - 14:22, 15:20, 36:10, 55:16, 55:17, 55:19, 56:6, 74:12, 105:8, 105:10, 105:11, 105:13, 105:14, 105:15, 105:17, 105:18, 112:11, 113:13, 136:15, 137:1, 137:2, 137:3, 334:12
**lawmaker** [2] - 105:7, 124:8
**lawmakers** [5] - 90:25, 91:2, 95:16, 123:2, 123:6
**laws** [3] - 23:24, 23:25, 24:21
**lawsuit** [6] - 22:24, 24:8, 55:16, 58:21, 123:8, 126:12
**lawyer** [6] - 119:23, 119:24, 119:25, 120:3, 120:4
**lawyers** [7] - 17:14, 35:18, 35:21, 72:21, 74:3, 119:21, 120:22
**lay** [7] - 28:12, 29:10, 40:2, 40:14, 144:24, 156:17, 179:23
**laying** [1] - 145:6
**layperson** [3] - 38:22, 39:4, 40:3
**lead** [8] - 25:23, 70:16, 136:20, 161:16, 207:9, 239:3, 239:6, 329:9
**leader** [1] - 88:16
**leadership** [3] - 83:9, 330:17, 330:23
**leading** [3] - 239:2, 318:2
**leaking** [1] - 41:2
**leaks** [1] - 60:4

**leap** [3] - 65:15, 231:2, 231:4

**learn** [2] - 250:17, 293:11

**learned** [6] - 36:25, 230:23, 249:19, 251:9, 293:7, 311:5

**learning** [1] - 274:11

**lease** [1] - 133:19

**leased** [1] - 133:25

**leases** [1] - 133:17

**least** [23] - 13:9, 13:19, 20:14, 62:17, 103:6, 110:20, 113:16, 113:22, 114:5, 151:14, 153:14, 177:7, 216:9, 226:10, 234:16, 236:9, 236:22, 237:5, 244:18, 247:4, 258:4, 308:19, 333:20

**least-cost** [2] - 236:9, 236:22

**leave** [7] - 10:15, 92:1, 179:14, 225:2, 232:24, 304:24, 328:23

**leaving** [1] - 64:10

**led** [5] - 21:1, 22:7, 22:18, 166:20, 322:13

**leeway** [2] - 156:22, 329:13

**left** [15] - 12:6, 31:8, 127:25, 158:8, 194:21, 203:24, 205:16, 240:24, 244:5, 244:10, 278:17, 302:20, 318:25, 320:9, 321:2

**left-hand** [1] - 321:2

**legal** [16] - 33:16, 36:9, 40:20, 69:9, 73:19, 85:5, 85:12, 85:14, 85:17, 88:20, 108:11, 119:1, 126:15, 239:22, 240:3

**legend** [2] - 31:7, 244:9

**legislative** [8] - 96:1, 104:3, 106:20, 106:24, 106:25, 107:4, 110:7, 114:18

**legislator** [6] - 104:16, 105:2, 105:22, 112:11, 114:14, 124:6

**legislators** [3] - 90:21, 103:24, 108:7

**Legislature** [2] - 89:17, 89:18

**lend** [1] - 186:21

**length** [2] - 139:25, 262:25

**Leopold** [2] - 22:10, 22:18

**less** [19] - 26:14, 31:12, 46:2, 46:4, 46:12, 55:10, 62:9, 70:17, 148:21, 150:4, 194:22, 195:5, 195:6, 232:24, 238:23, 239:15, 245:20, 245:22, 329:23

**letter** [6] - 177:13, 283:13, 283:16, 283:25, 284:5, 284:14

**letters** [5] - 31:22, 32:2, 73:5, 143:1, 162:18

**level** [16] - 8:13, 64:12, 209:24, 210:3, 238:25, 258:7, 268:13, 268:21, 290:22, 290:25, 291:12, 291:14, 291:19, 292:9, 297:17

**leveled** [1] - 114:24

**levels** [5] - 55:22, 130:24, 255:20, 266:23, 267:14

**Levy** [1] - 15:15

**liaison** [1] - 104:3

**library** [1] - 108:12

**life** [8] - 61:24, 145:8, 145:10, 157:22, 185:3, 185:5, 208:1, 279:25

**lifetimes** [1] - 54:17

**Light** [5] - 205:13, 205:17, 211:21, 211:22, 231:1

**light** [29] - 39:5, 41:13, 47:24, 165:21, 167:24, 168:5, 168:18, 169:1, 172:21, 186:20, 232:8, 232:20, 266:4, 266:8, 266:21, 266:23, 267:3, 267:13, 267:14, 278:22, 281:6, 303:12, 308:6, 308:12, 319:23, 320:5, 320:13, 320:18, 320:25

**lighted** [1] - 232:25

**lighting** [35] - 47:14, 47:19, 48:4, 48:5, 52:13, 64:11, 132:14, 160:19, 160:21,

161:1, 173:3, 173:4, 174:3, 174:5, 174:12, 195:16, 195:20, 212:22, 228:3, 231:22, 232:1, 232:4, 232:12, 237:16, 251:17, 266:4, 266:17, 267:8, 267:9, 278:20, 282:16, 302:9, 302:12

**lightly** [4] - 33:6, 42:1, 42:4, 43:21

**lights** [30] - 34:8, 47:12, 92:10, 92:15, 92:22, 92:24, 93:4, 93:10, 119:3, 119:4, 119:10, 119:17, 132:24, 133:16, 134:6, 134:14, 134:16, 174:22, 175:7, 175:14, 251:20, 308:20, 308:21, 308:24, 320:6, 320:7, 320:8, 320:9, 321:3

**likelihood** [1] - 239:18

**likely** [34] - 115:24, 168:25, 193:6, 209:22, 218:13, 220:8, 227:16, 228:13, 228:25, 229:19, 230:22, 231:22, 232:24, 234:10, 236:10, 236:13, 236:14, 236:25, 237:18, 238:1, 238:21, 239:15, 245:4, 245:20, 245:22, 257:15, 258:16, 264:12, 278:6, 280:5, 282:20, 292:9, 295:23, 297:7

**lime** [1] - 323:10

**limit** [5] - 63:7, 151:24, 181:14, 271:13, 319:16

**limited** [13] - 47:14, 47:17, 67:15, 112:23, 239:13, 252:2, 252:12, 254:4, 254:5, 270:6, 271:16, 332:7

**limits** [4] - 62:23, 62:25, 63:1, 285:2

**line** [14] - 40:2, 50:21, 50:25, 59:11, 59:16, 59:20, 59:22, 64:19, 114:23, 185:24, 189:10,

221:25, 223:24, 320:7

**lines** [8] - 21:18, 94:6, 100:17, 205:14, 217:18, 217:19, 265:9

**lining** [3] - 307:6, 320:9, 321:5

**link** [12] - 65:24, 66:1, 66:14, 66:15, 66:17, 66:22, 71:12, 84:13, 187:19, 187:21, 188:12, 231:17

**linked** [1] - 189:19

**linoleum** [1] - 102:10

**lions** [1] - 228:17

**list** [32] - 14:4, 14:5, 14:25, 27:13, 27:15, 27:16, 27:17, 27:21, 42:9, 58:4, 58:11, 66:3, 72:14, 78:6, 81:3, 83:21, 83:23, 84:1, 84:14, 91:4, 154:16, 154:18, 157:22, 163:21, 199:9, 207:1, 250:9, 256:5, 268:5, 268:7, 268:9

**listed** [12] - 83:21, 83:22, 84:1, 142:3, 145:17, 205:4, 206:21, 207:1, 216:14, 240:8, 243:2, 277:2

**listen** [1] - 39:19

**listing** [1] - 207:7, 212:9

**lit** [1] - 47:18

**literally** [1] - 168:10, 297:2

**literature** [15] - 207:25, 208:5, 209:15, 209:16, 213:6, 213:10, 213:11, 213:12, 213:16, 228:15, 245:10, 265:2, 265:16, 277:2, 277:8

**litigated** [1] - 22:24

**litigation** [2] - 163:9, 164:10

**live** [22] - 14:22, 16:24, 18:5, 67:24, 68:10, 68:11, 68:12, 69:25, 84:21, 107:17, 107:18, 174:8, 198:15, 265:22, 279:23, 295:5, 318:10, 332:15, 333:19, 334:3, 334:10

**living** [5] - 103:10,

144:6, 207:4, 207:13, 209:11

**LLP** [1] - 2:9

**local** [6] - 105:11, 142:10, 142:11, 145:19, 248:10, 248:11

**locate** [1] - 223:14

**located** [7] - 204:3, 215:2, 215:6, 218:18, 218:20, 219:4, 223:25

**locating** [1] - 290:3

**location** [18] - 92:2, 113:20, 135:25, 148:2, 149:17, 150:13, 213:3, 216:1, 216:3, 223:16, 223:17, 244:14, 246:12, 246:14, 273:2, 274:4, 275:8, 294:20

**locations** [22] - 67:12, 67:17, 106:17, 136:5, 147:12, 148:15, 149:9, 152:23, 154:10, 166:8, 166:9, 204:10, 210:1, 222:25, 223:7, 224:16, 227:9, 227:12, 227:13, 236:5, 236:14, 291:13

**Loch** [1] - 104:22

**logistical** [1] - 9:19

**logistics** [1] - 59:22

**logo** [3] - 29:8, 313:12, 313:22

**logs** [8] - 42:24, 43:17, 44:14, 44:23, 81:16, 81:25, 82:13, 254:13

**long-term** [2] - 202:25, 238:14

**look** [54] - 9:13, 23:16, 46:11, 47:20, 55:9, 59:11, 59:25, 70:1, 70:7, 70:9, 71:3, 74:10, 79:22, 80:1, 80:11, 82:8, 86:20, 92:17, 100:12, 118:6, 136:19, 148:4, 152:8, 152:9, 152:18, 159:1, 182:17, 189:14, 197:20, 197:22, 215:9, 218:20, 222:23, 222:24, 237:22, 238:7, 250:22, 250:23, 251:3, 252:6, 254:3, 255:16, 263:12, 263:14, 267:20,

267:22, 286:13,
303:1, 305:15,
310:15, 319:22,
331:23, 333:9

**looked** [22] - 43:17,
46:8, 47:23, 70:5,
70:8, 76:24, 199:9,
205:9, 209:20,
209:24, 213:5, 213:6,
234:12, 263:11,
265:13, 267:16,
268:3, 275:2, 306:25,
309:2, 323:13

**looking** [29] - 28:3,
28:25, 32:16, 35:16,
48:7, 67:6, 143:11,
143:18, 148:24,
149:15, 154:15,
155:16, 158:22,
159:8, 159:12,
162:14, 162:15,
162:16, 173:15,
196:10, 201:16,
213:2, 229:17,
267:24, 275:17,
284:4, 284:5, 304:10,
311:23

**lookout** [1] - 304:9

**looks** [16] - 28:12,
29:12, 42:21, 189:6,
219:21, 245:2, 267:8,
289:23, 303:5,
305:18, 306:6, 307:7,
308:13, 309:12,
320:20, 323:14

**Loop** [9] - 25:8,
46:21, 148:17, 149:8,
150:15, 150:17,
151:13, 300:16,
311:20

**loop** [2] - 154:7,
155:10

**loops** [1] - 181:18

**loosely** [2] - 45:5

**lose** [1] - 270:3

**loss** [25] - 230:3,
233:1, 233:20, 234:2,
234:5, 237:17,
268:13, 268:21,
269:6, 269:13, 281:7,
282:15, 285:25,
286:16, 288:19,
290:10, 290:14,
290:18, 290:20,
290:22, 292:12,
297:18, 297:19,
297:24, 298:5

**lost** [8] - 148:10,
210:2, 233:25,
268:25, 288:11,

291:14, 304:19,
304:21

**loud** [9] - 48:14,
48:16, 48:22, 49:2,
51:11, 116:15,
176:19, 294:3, 308:18

**louder** [1] - 192:16

**love** [3] - 100:25,
162:24, 166:12

**loved** [1] - 123:15

**lover** [1] - 304:10

**low** [4] - 215:13,
262:22, 264:3, 264:10

**lower** [2] - 231:15,
238:10

**luck** [1] - 158:18

**lucky** [2] - 158:1,
158:6

**lumens** [1] - 267:3

**Lunch** [1] - 140:13

**lunch** [8] - 15:24,
84:23, 139:5, 139:11,
140:1, 140:14, 330:4,
330:11

**lunchtime** [1] - 330:8

**LYONS** [1] - 2:13

## M

**ma'am** [4] - 89:3,
99:23, 140:25, 141:10

**machine** [2] -
306:25, 311:3

**machinery** [3] -
305:24, 306:1, 308:1

**Macro** [1] - 94:7

**Madam** [1] - 301:13

**Magistrate** [1] - 18:2

**mail** [25] - 15:23,
96:21, 99:5, 108:16,
111:7, 122:15, 128:4,
129:7, 129:8, 129:13,
129:17, 129:18,
129:20, 129:22,
129:23, 129:25,
130:8, 130:10,
130:13, 130:16,
130:17, 131:2, 132:7,
138:21, 142:19

**mailbox** [1] - 142:24

**mailed** [2] - 104:4,
108:25

**main** [9] - 61:7,
73:24, 91:18, 93:17,
110:10, 116:9,
181:12, 205:7, 228:1

**maintain** [2] - 99:7,
107:2

**maintained** [2] -
78:17, 83:1

**maintaining** [1] -
113:12

**maintenance** [1] -
81:16

**major** [2] - 105:4,
147:16

**majority** [1] - 138:1

**makers** [2] - 31:18,
207:5

**male** [4] - 101:19,
222:10, 225:16,
275:24

**males** [7] - 218:12,
219:8, 225:17,
225:21, 226:5,
256:24, 289:15

**manage** [7] - 106:12,
106:20, 106:21,
106:24, 107:1,
107:10, 122:8

**managed** [4] - 80:6,
106:13, 122:4, 122:7

**management** [18] -
26:9, 26:25, 57:15,
59:4, 59:8, 74:22,
76:13, 97:22, 99:2,
106:10, 106:12,
107:5, 112:3, 112:9,
116:10, 136:16,
178:25, 179:4

**Management** [7] -
7:8, 35:6, 58:9, 90:10,
90:25, 104:2, 135:20

**Management's** [1] -
83:6

**manager** [1] - 208:25

**managers** [1] -
231:19

**manages** [1] - 123:3

**managing** [3] -
106:3, 106:5, 137:8

**mandated** [1] -
226:18

**manifest** [2] - 97:16,
124:21

**manifesto** [1] - 98:4

**manmade** [1] - 31:25

**manner** [3] - 18:11,
91:14, 121:3

**Manual** [1] - 26:10

**map** [53] - 27:22,
28:4, 28:13, 28:18,
28:19, 28:21, 28:25,
29:3, 29:6, 29:12,
29:16, 29:21, 30:9,
30:11, 31:5, 31:6,
31:9, 31:12, 69:1,
69:5, 69:15, 69:18,
69:20, 69:24, 70:7,
70:10, 70:12, 71:11,

71:19, 71:22, 108:12,
202:18, 216:1,
216:15, 216:20,
217:17, 217:22,
218:11, 219:23,
219:24, 220:1, 220:5,
220:6, 220:9, 223:16,
224:21, 224:22,
236:17, 274:19,
274:22, 275:2

**mapped** [1] - 215:7

**maps** [8] - 71:5,
157:7, 157:14,
190:11, 202:24,
212:3, 214:15, 251:1

**Mara** [1] - 217:6

**Marcel** [1] - 15:3

**March** [1] - 299:19

**marginal** [2] -
176:11, 291:17

**Marisa** [1] - 7:19

**MARISSA** [1] - 2:20

**Marjorie** [7] - 21:13,
21:14, 22:2, 22:8,
23:11, 37:12, 38:13

**mark** [1] - 235:11

**MARKED** [5] - 5:3,
5:10, 5:12

**marked** [19] - 27:24,
28:25, 42:6, 65:19,
72:16, 78:11, 82:18,
163:25, 210:15,
211:8, 213:21,
218:22, 221:23,
244:7, 271:19,
309:18, 312:21,
315:9, 315:10

**marking** [1] - 313:10

**marks** [2] - 235:16,
312:15

**marshals** [1] - 87:16

**marshes** [1] - 31:25

**massive** [2] - 22:15,
41:24

**Master's** [1] - 144:2

**master's** [2] - 144:1,
201:1

**masters** [1] - 89:22

**match** [1] - 170:15

**material** [7] - 102:9,
102:17, 115:5, 250:9,
305:22, 323:11,
323:14

**materials** [3] - 185:2,
185:5, 307:17

**mates** [1] - 229:18

**math** [2] - 269:1,
275:14

**matter** [8] - 17:6,
56:4, 73:19, 86:9,

88:19, 140:19, 254:5,
335:5

**matters** [9] - 13:14,
75:13, 77:24, 84:23,
142:21, 142:22,
198:23, 329:19,
331:18

**McVoy** [2] - 11:25,
328:8

**MDAD** [1] - 78:13

**mean** [72] - 11:9,
12:11, 15:17, 33:1,
34:7, 70:18, 70:25,
71:4, 86:1, 91:8, 93:9,
94:15, 95:6, 95:10,
95:22, 98:8, 103:4,
109:21, 116:9,
122:15, 123:8,
130:21, 130:22,
131:4, 132:12,
133:23, 134:12,
136:3, 137:9, 150:8,
171:3, 175:3, 179:10,
181:16, 181:17,
184:24, 191:5, 216:7,
217:18, 222:10,
222:16, 222:17,
223:4, 230:16, 268:1,
273:4, 273:5, 273:7,
273:25, 280:21,
286:9, 286:11,
293:13, 296:20,
306:20, 308:17,
309:11, 311:3,
311:19, 316:17,
318:5, 318:16, 319:2,
321:4, 321:15,
321:16, 321:21,
322:11, 322:16,
327:18

**meaning** [3] -
180:13, 196:8, 212:2

**means** [8] - 86:8,
163:6, 229:18,
229:25, 230:3,
233:16, 242:25,
279:13

**meant** [3] - 136:2,
199:3, 217:2

**meantime** [1] -
209:16

**measure** [1] - 262:25

**measurements** [1] -
233:13

**measures** [4] -
57:21, 179:20,
180:11, 275:10

**media** [16] - 32:16,
83:1, 84:4, 86:2, 86:5,
121:11, 121:25,

122:3, 122:9, 122:16, 122:18, 122:21, 123:15, 123:25, 143:2
**medical** [3] - 113:19, 113:21
**medium** [4] - 262:13, 262:16, 264:10
**meet** [5] - 19:22, 216:12, 315:1, 331:1, 332:11
**meeting** [1] - 330:18
**meetings** [3] - 26:11, 162:18, 206:2
**meets** [3] - 214:9, 216:23, 216:24
**Megan** [1] - 259:23
**Meigs** [1] - 104:3
**member** [16] - 88:15, 101:22, 115:2, 141:20, 141:22, 141:24, 141:25, 142:11, 142:15, 145:9, 146:8, 170:11, 170:12, 171:10, 299:18
**members** [20] - 24:5, 24:7, 31:8, 34:9, 36:6, 51:25, 52:5, 90:21, 90:24, 90:25, 91:2, 91:10, 95:10, 95:16, 101:8, 108:7, 110:20, 142:12, 167:11, 314:9
**members'** [1] - 33:12
**membership** [1] - 172:2
**memo** [2] - 15:22, 127:24
**memories** [3] - 149:2, 149:14, 170:14
**memory** [10] - 62:8, 135:7, 146:22, 147:17, 148:9, 148:12, 152:25, 289:11, 292:16, 332:19
**mention** [6] - 26:8, 36:1, 86:6, 103:16, 196:6, 296:24
**mentioned** [43] - 27:1, 31:17, 33:20, 41:1, 52:3, 53:24, 92:15, 93:12, 101:24, 102:7, 115:13, 123:20, 143:4, 155:3, 155:11, 158:7, 160:13, 165:21, 165:22, 166:11, 167:24, 168:2, 168:14, 170:10, 174:2, 181:23,

183:16, 195:15, 195:19, 196:2, 205:7, 208:18, 209:2, 216:25, 217:5, 228:12, 230:21, 233:7, 233:8, 288:12, 288:15, 289:10, 319:21
**merchandise** [1] - 120:17
**message** [2] - 227:4, 326:19
**messages** [1] - 326:1
**met** [1] - 216:21
**metal** [2] - 136:8, 323:1
**metaphor** [1] - 264:8
**meters** [20] - 222:5, 222:7, 222:9, 222:15, 223:18, 228:18, 228:21, 229:1, 229:6, 230:13, 230:14, 231:25, 232:10, 232:15, 232:18, 247:4, 275:11, 275:15
**methodology** [1] - 249:13
**meticulous** [1] - 127:23
**MIAMI** [3] - 1:2, 2:22, 2:24
**Miami** [27] - 1:4, 1:17, 1:20, 2:5, 2:11, 2:15, 2:25, 3:3, 3:4, 8:3, 9:4, 21:5, 21:6, 50:19, 78:16, 78:19, 82:4, 82:10, 87:21, 150:14, 150:21, 151:19, 273:7, 314:14, 335:11, 335:11
**MIAMI-DADE** [2] - 2:22, 2:24
**Miami-Dade** [9] - 9:4, 78:16, 78:19, 82:4, 82:10, 87:21, 150:14, 150:21, 151:19
**mic** [3] - 18:17, 89:6, 150:24
**Miccosukee** [18] - 6:19, 6:22, 9:6, 103:17, 103:19, 165:12, 166:23, 167:3, 167:10, 167:14, 167:16, 167:21, 267:8, 292:11, 300:17, 302:20, 304:20, 311:20

**Michael** [2] - 30:16, 200:7
**microphone** [11] - 94:25, 95:2, 138:4, 140:15, 141:8, 147:4, 147:5, 199:23, 199:25, 200:2, 200:12
**microphones** [2] - 17:14, 17:19
**middle** [2] - 235:17, 262:22
**midland** [1] - 262:21
**midnight** [1] - 197:3
**Midway** [2] - 154:22, 166:12
**might** [39] - 9:19, 10:18, 17:7, 28:12, 61:18, 84:24, 86:20, 88:3, 130:8, 133:25, 136:5, 145:7, 147:22, 150:4, 153:17, 158:4, 158:10, 158:16, 159:25, 160:2, 167:15, 172:14, 177:12, 188:15, 207:8, 215:21, 218:10, 219:16, 222:11, 222:12, 235:3, 236:13, 236:18, 289:3, 292:8, 296:17, 314:9, 319:5
**migratory** [1] - 143:20
**Mile** [5] - 147:19, 149:7, 166:5, 190:14
**mile** [7] - 147:21, 149:8, 190:15, 215:11, 262:19, 263:1
**mile-and-a-half** [3] - 147:21, 149:8, 190:15
**mileage** [1] - 154:24
**miles** [40] - 25:7, 31:12, 34:8, 46:20, 47:20, 51:23, 63:8, 64:21, 69:20, 147:22, 148:21, 149:9, 150:4, 150:11, 150:19, 151:17, 153:5, 153:7, 153:10, 154:25, 166:15, 173:5, 173:10, 174:1, 174:13, 186:6, 222:6, 222:16, 262:19, 263:1, 275:15, 275:18, 275:21, 276:8, 304:9, 308:15, 309:6, 309:10, 321:4, 322:15
**military** [6] - 45:1, 45:6, 45:15, 52:11,

80:4, 274:10
**Milky** [1] - 303:10
**Milling** [2] - 305:19, 311:1
**million** [10] - 133:1, 261:25, 262:9, 281:10, 281:22, 282:12, 291:6, 294:18, 294:22, 294:25
**millions** [1] - 104:20
**mimic** [1] - 93:10
**mind** [14] - 53:19, 142:18, 146:3, 146:14, 147:22, 148:15, 149:11, 150:7, 156:8, 161:11, 176:23, 183:20, 185:11, 187:12
**mine** [3] - 82:6, 148:12, 151:1
**minor** [1] - 87:23
**minute** [7] - 27:9, 164:21, 192:14, 197:6, 213:16, 226:24, 235:25, 287:14, 298:2
**minutes** [15] - 65:4, 84:19, 87:6, 92:5, 139:9, 140:7, 248:17, 249:2, 298:15, 298:21, 299:1, 314:19, 319:18, 328:10, 329:23
**Miranda** [3] - 82:22, 84:3, 84:8
**mishap** [1] - 87:23
**misinterpret** [1] - 127:20
**misreads** [1] - 28:19
**miss** [1] - 313:3
**missing** [2] - 8:4, 132:4
**mission** [7] - 19:8, 19:9, 23:20, 23:21, 23:23, 32:5, 40:8
**Mississippi** [1] - 152:10
**misspoke** [1] - 78:5
**mistakenly** [1] - 32:7
**mitigate** [1] - 206:5
**mitigation** [1] - 206:3
**mixed** [1] - 91:6
**model** [3] - 236:25, 290:10, 291:5
**modeled** [1] - 236:18
**modeling** [9] - 185:13, 202:23, 209:20, 219:24, 220:14, 236:9, 238:8,

259:6, 292:8
**models** [12] - 209:18, 209:20, 210:1, 213:2, 221:14, 236:12, 237:24, 258:8, 260:11, 268:13, 268:21, 291:3
**mom** [1] - 312:4
**moment** [13] - 10:4, 33:17, 52:25, 74:24, 99:9, 169:15, 196:16, 206:20, 219:11, 240:11, 247:8, 253:14, 322:19
**moments** [7] - 9:1, 29:20, 93:23, 94:3, 108:10, 110:4, 196:2
**Monday** [5] - 223:12, 327:15, 329:3, 329:15, 330:9
**money** [2] - 134:7, 134:10
**monitor** [4] - 60:3, 60:9, 243:25, 279:21
**monitored** [3] - 270:11, 270:18, 290:4
**Monitoring** [1] - 59:25
**monitoring** [1] - 270:7
**Monroe** [2] - 150:19, 151:18
**month** [10] - 19:22, 46:2, 46:5, 148:16, 188:16, 267:21, 267:22, 316:17, 326:20
**months** [9] - 44:15, 45:8, 45:9, 45:15, 54:24, 175:17, 203:18, 253:6, 321:18
**Monument** [5] - 149:12, 149:19, 153:1, 153:5, 154:23
**moody** [1] - 325:9
**Moody** [5] - 324:18, 325:4, 325:8
**moonlight** [4] - 155:9, 166:21, 232:2, 232:3
**moonlight-guided** [1] - 155:9
**moot** [1] - 10:24
**mooted** [1] - 332:12
**morning** [33] - 6:6, 6:8, 6:10, 6:13, 6:14, 6:15, 6:18, 6:21, 6:24, 7:3, 7:6, 7:9, 7:10, 7:12, 7:14, 7:15, 7:17, 7:19, 7:25, 8:1, 8:4,

35:3, 35:4, 77:23, 87:24, 89:14, 99:23, 99:24, 125:7, 308:4, 329:17, 330:3, 330:6

**mortalities** [5] - 194:17, 196:10, 235:13, 235:15, 295:19

**mortality** [10] - 161:16, 161:18, 194:15, 196:2, 227:9, 234:6, 234:13, 237:3, 263:23, 265:7

**mortar** [2] - 106:18, 106:19

**Moskowitz** [1] - 114:16

**Mosquito** [1] - 305:20

**mosquito** [1] - 306:10

**most** [30] - 26:14, 69:23, 70:7, 70:11, 87:24, 151:23, 202:11, 203:1, 204:9, 205:5, 205:23, 205:25, 207:10, 212:8, 218:13, 220:8, 221:14, 224:9, 227:3, 229:5, 236:10, 236:13, 236:25, 250:20, 278:23, 283:12, 290:4, 320:20

**mostly** [7] - 154:3, 169:8, 201:16, 202:6, 205:1, 214:23, 293:13

**motion** [3] - 8:10, 8:24, 9:9

**motivation** [1] - 120:25

**mountain** [1] - 228:17

**mounted** [1] - 307:25

**mouth** [2] - 93:2, 264:2

**move** [43] - 14:10, 16:12, 29:21, 29:24, 43:5, 60:17, 65:5, 68:17, 71:24, 72:23, 74:3, 78:7, 87:1, 92:7, 116:14, 117:15, 131:6, 134:19, 134:25, 135:2, 164:15, 169:13, 172:16, 177:23, 180:25, 182:10, 182:15, 190:7, 211:3, 230:20, 231:8, 231:12, 234:1, 236:24, 236:25,

237:2, 239:4, 267:19, 277:20, 285:10, 315:16, 315:18, 319:1

**moved** [1] - 43:3

**movement** [2] - 228:6, 278:7

**moving** [8] - 26:16, 64:9, 102:8, 212:1, 231:21, 236:10, 244:17, 274:18

**MP4** [1] - 84:15

**MR** [420] - 4:5, 4:5, 4:8, 4:8, 4:9, 4:9, 4:13, 4:13, 4:14, 4:17, 4:17, 4:18, 4:20, 4:21, 6:6, 6:8, 6:18, 6:21, 6:25, 7:6, 7:10, 7:12, 7:15, 7:17, 8:1, 8:6, 8:9, 8:17, 9:2, 9:6, 9:18, 9:23, 10:8, 10:21, 11:6, 11:9, 11:21, 11:24, 12:4, 12:10, 12:25, 13:13, 13:16, 13:21, 14:2, 14:18, 15:1, 15:4, 15:6, 15:12, 16:3, 16:6, 17:10, 17:20, 17:22, 18:23, 21:3, 23:7, 27:7, 27:10, 27:20, 27:25, 28:8, 28:10, 28:16, 28:22, 28:24, 29:9, 29:15, 29:21, 30:2, 30:24, 33:17, 33:19, 34:21, 34:25, 35:2, 39:14, 39:23, 40:24, 42:7, 42:17, 42:19, 42:25, 43:2, 43:3, 43:9, 43:24, 44:3, 44:7, 44:13, 44:22, 45:12, 45:13, 52:24, 53:1, 53:8, 53:11, 53:22, 56:16, 56:18, 56:22, 57:4, 57:9, 57:13, 58:5, 58:12, 58:16, 58:19, 60:10, 65:6, 65:20, 66:4, 66:6, 66:11, 66:14, 67:4, 67:7, 67:23, 68:6, 68:12, 68:20, 68:22, 69:5, 69:12, 71:23, 72:13, 72:17, 72:25, 73:11, 73:14, 73:23, 74:4, 74:24, 75:1, 75:6, 75:8, 75:15, 75:22, 75:25, 76:5, 76:10, 77:20, 77:23, 78:5, 78:9, 78:14, 79:1, 79:9, 79:13, 79:24, 80:13, 80:19,

81:5, 81:6, 81:19, 82:16, 82:19, 83:11, 83:13, 83:16, 83:19, 83:24, 83:25, 84:7, 84:19, 85:2, 85:10, 85:11, 85:16, 85:21, 86:11, 86:14, 86:23, 87:10, 87:21, 88:6, 88:7, 88:10, 89:13, 96:9, 96:13, 97:24, 98:12, 98:21, 99:9, 99:11, 99:14, 99:22, 101:4, 101:13, 102:18, 104:5, 104:10, 106:23, 107:12, 111:11, 111:18, 116:2, 116:19, 116:22, 117:9, 117:14, 117:23, 118:13, 118:21, 119:2, 119:14, 119:16, 120:24, 121:6, 121:17, 122:2, 124:4, 124:9, 124:11, 124:13, 124:18, 124:22, 125:2, 125:4, 125:6, 125:15, 128:20, 130:20, 130:23, 131:1, 131:3, 131:9, 133:8, 133:12, 135:4, 135:9, 135:13, 135:16, 137:11, 137:14, 137:17, 138:24, 139:7, 139:14, 139:25, 140:3, 140:9, 140:19, 144:21, 147:3, 147:5, 147:7, 156:15, 157:1, 164:17, 164:23, 165:1, 165:4, 165:8, 165:20, 169:6, 169:15, 169:20, 169:23, 172:16, 172:17, 175:10, 175:13, 177:25, 178:2, 179:24, 180:7, 181:1, 181:2, 182:11, 182:16, 183:5, 184:9, 184:18, 185:4, 185:21, 187:14, 187:19, 188:3, 188:8, 188:10, 188:17, 189:2, 189:18, 190:6, 191:12, 193:4, 193:23, 197:4, 197:11, 197:20, 197:25, 198:19, 198:21, 211:6, 211:7, 213:25, 239:1, 239:22, 240:18,

242:10, 242:11, 243:12, 243:13, 247:8, 247:10, 247:24, 248:2, 248:15, 248:20, 248:25, 249:7, 249:9, 253:13, 253:15, 253:22, 254:4, 254:20, 254:21, 258:14, 259:19, 268:17, 268:19, 271:18, 271:20, 272:14, 272:16, 273:13, 273:21, 274:1, 274:2, 274:7, 274:13, 274:16, 274:17, 277:21, 281:20, 282:10, 284:1, 284:6, 284:8, 284:12, 284:15, 284:18, 284:24, 285:11, 285:12, 287:14, 287:16, 287:20, 292:23, 298:14, 298:23, 299:4, 299:14, 309:16, 309:19, 310:3, 310:5, 310:18, 310:19, 310:22, 310:23, 311:10, 311:13, 311:16, 314:22, 315:2, 315:11, 315:13, 315:15, 315:19, 315:21, 316:2, 316:3, 316:5, 316:10, 317:14, 317:18, 319:1, 319:11, 319:20, 321:19, 322:3, 322:9, 322:18, 322:21, 323:18, 323:22, 323:25, 324:3, 324:16, 324:19, 324:25, 325:5, 325:11, 326:16, 326:21, 327:3, 327:9, 327:12, 327:23, 328:6, 328:15, 328:20, 328:22, 329:8, 330:11, 330:16, 331:23, 332:5, 332:10, 332:20, 332:24, 333:7, 333:25, 334:6, 334:15

**MS** [79] - 4:12, 4:16, 6:10, 6:13, 6:15, 7:19, 84:2, 141:2, 141:17, 141:19, 145:5, 145:10, 145:22, 147:11, 149:5,

151:11, 157:3, 157:4, 163:12, 163:19, 163:22, 164:1, 164:14, 164:21, 174:24, 179:22, 182:9, 184:1, 187:15, 189:8, 193:5, 193:9, 193:25, 194:2, 195:24, 196:21, 199:14, 200:15, 202:2, 210:16, 211:3, 211:9, 213:22, 214:11, 214:14, 225:6, 237:13, 237:14, 239:11, 239:24, 240:11, 240:14, 247:12, 247:22, 248:11, 248:22, 253:10, 271:23, 272:6, 272:9, 273:12, 273:24, 277:14, 281:13, 283:22, 284:4, 293:3, 293:5, 298:2, 298:4, 298:9, 324:20, 331:1, 331:4, 331:12, 332:1, 333:10, 333:18, 333:23

**multi** [2] - 175:21, 203:6

**multi-engine** [1] - 175:21

**multi-species** [1] - 203:6

**multiple** [18] - 52:23, 94:8, 95:10, 155:11, 198:3, 198:7, 204:12, 206:2, 211:12, 246:9, 246:12, 280:21, 301:1, 303:7, 303:24, 312:22, 312:23, 326:3

**municipal** [1] - 105:23

**Murray** [3] - 8:18, 9:7, 87:21

**MURRAY** [2] - 2:23, 87:21

---

## N

**N-A-M-A-T-H** [1] - 299:12

**N.W** [1] - 2:18

**namath** [4] - 309:14, 309:20, 317:19, 322:22

**Namath** [21] - 298:16, 299:5, 299:7, 299:11, 299:15, 304:12, 306:12,

App. 393

310:7, 310:20,
310:24, 311:8,
311:17, 314:17,
315:3, 316:11,
319:21, 320:12,
320:24, 324:4,
326:24, 329:23

**NAMATH** [1] - 4:19

**name** [21] - 18:18,
89:7, 89:10, 101:19,
124:15, 125:16,
133:22, 141:14,
143:6, 165:12, 170:3,
190:17, 199:18,
199:19, 200:3, 205:8,
299:9, 300:19,
313:13, 316:13,
325:14

**named** [1] - 215:8

**names** [2] - 101:11,
215:11

**Naples** [1] - 183:15

**narrow** [1] - 88:20

**NASA** [6] - 47:23,
47:25, 48:7, 267:15,
267:20, 268:5

**Nat** [1] - 300:15

**Nathaniel** [1] -
166:19

**national** [4] - 93:19,
112:25, 142:12,
269:23

**National** [42] - 21:16,
21:25, 22:12, 22:13,
24:14, 24:18, 24:19,
24:24, 24:25, 25:10,
25:25, 32:4, 32:8,
32:9, 33:11, 74:9,
77:8, 77:11, 111:1,
144:11, 146:6,
146:24, 150:16,
153:3, 153:16, 154:2,
154:5, 155:5, 156:1,
159:11, 159:18,
160:11, 165:15,
165:24, 166:20,
226:17, 236:11,
270:9, 300:7, 300:12,
321:9

**Native** [1] - 146:20

**natural** [5] - 161:2,
163:4, 232:2, 272:24,
273:5

**nature** [14] - 13:23,
19:23, 21:7, 49:22,
50:2, 50:5, 50:6,
50:20, 88:19, 133:19,
145:20, 156:19,
163:2, 177:16

**NE** [2] - 2:15, 2:21

**near** [33] - 22:25,
41:12, 70:14, 70:22,
71:2, 71:4, 101:1,
101:24, 136:6, 143:9,
149:10, 150:24,
152:24, 155:2,
160:13, 166:8, 166:9,
167:4, 172:21,
173:17, 176:21,
176:24, 183:14,
185:24, 188:5,
190:10, 215:24,
223:1, 263:17,
276:12, 278:3,
294:10, 295:12

**nearby** [5] - 51:13,
51:15, 195:12,
304:25, 309:7

**nearly** [1] - 131:17

**neat** [1] - 155:17

**necessarily** [7] -
41:5, 93:20, 109:10,
136:16, 150:9,
279:13, 280:1

**necessary** [1] -
13:25

**need** [40] - 9:12,
13:6, 13:19, 15:22,
17:14, 17:18, 18:11,
20:16, 20:18, 26:17,
71:7, 82:7, 83:10,
86:12, 86:20, 90:15,
117:21, 129:1,
129:10, 139:20,
151:5, 164:24, 175:5,
190:3, 197:2, 198:9,
254:18, 266:19,
272:1, 300:19, 301:6,
329:10, 330:8,
330:17, 330:18,
331:11

**needed** [3] - 104:23,
126:5, 327:13

**needing** [1] - 102:10

**needlessly** [1] -
88:12

**needs** [9] - 10:5,
79:10, 86:22, 101:18,
113:19, 118:16,
140:17, 274:9, 274:12

**negative** [4] -
184:10, 184:14,
184:15, 221:6

**negatively** [1] -
312:2

**neglected** [1] - 17:12

**neighborhood** [1] -
100:16

**NEPA** [26] - 25:10,
25:13, 25:17, 26:3,

26:19, 26:21, 30:4,
36:4, 36:9, 38:25,
39:1, 40:7, 40:10,
49:16, 55:9, 73:6,
75:14, 76:18, 76:21,
117:20, 161:21,
162:7, 162:22, 163:6,
241:2, 241:5

**NEPA-review** [7] -
26:3, 26:19, 26:21,
36:4, 38:25, 40:7,
40:10

**nerdy** [1] - 158:25

**nervous** [1] - 23:8

**netting** [5] - 305:16,
322:22, 322:25,
323:1, 323:6

**never** [38] - 23:9,
41:18, 41:19, 43:7,
43:10, 43:17, 48:2,
62:9, 64:6, 64:7,
67:18, 107:4, 108:20,
109:21, 111:7,
115:13, 117:12,
123:10, 126:9, 128:4,
129:12, 132:7, 136:4,
137:25, 242:3,
249:18, 251:13,
271:5, 271:7, 301:11,
301:19, 303:17,
303:19, 321:24,
322:7, 322:12

**nevertheless** [1] -
278:6

**new** [34] - 26:9, 34:5,
34:7, 64:11, 91:21,
99:6, 100:1, 100:15,
114:10, 114:25,
115:3, 115:12,
132:23, 136:7, 170:4,
194:11, 203:19,
205:19, 206:5,
206:17, 206:23,
209:18, 218:6, 220:6,
225:18, 255:25,
295:3, 295:6, 307:4,
307:19, 308:3, 320:1,
320:17

**newest** [1] - 320:2

**newly** [4] - 91:22,
92:10, 100:4, 100:11

**news** [14] - 32:21,
46:6, 160:21, 162:6,
174:10, 212:22,
249:21, 249:23,
249:24, 250:2, 251:9,
293:7, 293:13, 313:18

**newsletter** [2] - 21:9,
142:23

**newspaper** [1] -

20:12

**newspapers** [2] -
20:7, 20:8

**next** [33] - 15:12,
77:24, 78:7, 79:23,
82:14, 83:5, 83:15,
87:1, 87:9, 134:25,
135:3, 141:1, 154:17,
154:21, 158:3,
166:12, 180:5,
188:15, 188:17,
196:20, 197:10,
198:6, 199:25,
216:25, 230:20,
231:21, 234:7,
241:16, 259:4, 302:3,
315:1, 327:13, 329:7

**Night** [1] - 185:14

**night** [26] - 13:2,
34:10, 34:13, 41:12,
41:17, 41:18, 41:19,
48:2, 51:14, 78:18,
80:18, 152:9, 172:21,
172:24, 172:25,
173:6, 267:19,
302:24, 303:1, 303:5,
308:8, 308:13,
309:10, 311:21,
311:25, 312:14

**nighttime** [3] -
173:24, 173:25,
228:20

**nine** [3] - 19:6,
19:11, 204:6, 330:3,
331:8

**Nixon** [1] - 54:15

**NO** [1] - 1:2

**nobody** [2] - 80:5,
278:17

**nocturnal** [2] -
233:4, 233:5

**NOEM** [2] - 1:7, 2:13

**Noem** [3] - 6:3,
84:10, 85:24

**noise** [10] - 49:12,
49:19, 117:6, 117:7,
168:18, 176:7,
176:16, 186:20,
293:24, 294:2

**noises** [4] - 49:2,
294:2, 294:3, 294:4

**noisy** [4] - 51:17,
65:1, 176:4, 308:18

**non** [4] - 201:23,
202:1, 202:16

**non-game** [4] -
201:23, 202:1, 202:16

**none** [8] - 74:14,
74:17, 74:20, 74:23,
105:6, 131:16, 211:6,

211:7

**nonprofit** [7] - 21:11,
144:7, 145:2, 145:14,
145:15, 145:24, 146:5

**nonresponsive** [1] -
134:19

**noon** [1] - 330:21

**normal** [4] - 12:16,
81:21, 246:12, 278:7

**normally** [2] - 35:10,
318:9

**North** [3] - 3:3, 20:3,
335:11

**north** [5] - 93:13,
149:19, 256:13,
289:17, 302:5

**northeast** [3] -
201:14, 202:7, 241:14

**northern** [1] - 309:9

**northwest** [1] -
289:24

**northwesterly** [1] -
289:8

**notably** [1] - 26:23

**note** [5] - 16:8,
16:15, 88:14, 96:10,
316:5

**noted** [6] - 9:11,
41:11, 56:23, 94:2,
117:2, 172:20

**notes** [5] - 56:24,
127:22, 127:23, 128:1

**nothing** [15] - 15:11,
40:14, 81:8, 105:16,
106:8, 115:9, 124:9,
169:20, 191:8,
261:16, 287:17,
288:3, 289:18,
289:25, 290:16

**notice** [8] - 32:18,
32:25, 116:15, 125:2,
141:7, 161:24, 162:3,
187:25

**noticed** [4] - 52:23,
313:15, 314:1

**notices** [2] - 124:22,
293:20

**nowhere** [1] - 235:17

**nuclear** [2] - 205:12,
211:20

**Number** [1] - 320:23

**number** [60] - 7:23,
19:12, 21:25, 24:21,
31:6, 44:21, 45:17,
50:8, 53:18, 58:5,
61:12, 61:25, 66:2,
67:16, 72:12, 72:14,
84:2, 95:11, 103:3,
106:5, 110:5, 118:9,
124:15, 142:1,

142:17, 146:21,
150:5, 153:21,
158:10, 159:23,
160:20, 161:17,
185:19, 194:6,
194:15, 194:17,
196:8, 196:11, 205:4,
219:13, 230:1,
233:17, 234:20,
245:13, 257:25,
258:4, 258:5, 259:5,
259:7, 262:11,
262:19, 263:16,
290:12, 294:24,
297:20, 306:25,
312:8, 316:18, 325:19
**numbering** [2] -
27:11, 58:17
**numbers** [15] -
27:12, 50:10, 50:11,
61:23, 117:25, 259:1,
260:19, 260:23,
262:4, 263:11,
263:12, 263:13,
263:14, 274:12,
313:16
**numerous** [4] -
289:24, 302:16,
321:18, 329:3

## O

**o'clock** [6] - 139:4,
139:15, 139:21,
308:4, 308:5, 331:7
**Oasis** [2] - 150:3,
300:15
**object** [11] - 16:12,
28:10, 66:11, 79:1,
85:2, 116:22, 137:11,
156:15, 177:9, 189:9,
328:21
**objected** [2] - 80:21,
81:1
**objection** [51] - 9:17,
15:20, 16:6, 29:9,
29:16, 29:20, 43:1,
53:1, 66:7, 75:3, 75:6,
81:14, 83:18, 85:1,
88:7, 96:9, 96:13,
98:12, 101:15,
111:11, 118:15,
119:13, 120:21,
135:5, 144:21, 147:3,
147:7, 164:14,
164:17, 169:6,
177:20, 184:1, 189:8,
211:5, 213:24, 214:4,
214:10, 239:1,
239:22, 240:1,
253:10, 271:23,

273:12, 273:24,
277:14, 281:13,
283:22, 311:12,
311:13, 315:21,
324:16
**Objection** [4] -
73:11, 174:24, 182:9,
322:3
**objections** [2] - 75:9,
179:22
**objectivity** [2] -
123:10, 123:21
**obligations** [1] -
84:22
**observations** [3] -
101:15, 101:23,
312:13
**observe** [10] - 39:5,
41:1, 49:22, 93:25,
102:19, 149:20,
168:12, 177:16, 223:7
**observed** [14] -
39:10, 41:2, 41:4,
91:15, 94:13, 100:1,
118:8, 134:1, 181:22,
194:8, 304:1, 305:2,
305:10, 312:14
**observers** [1] - 34:4
**obtained** [2] - 78:16,
187:5
**obvious** [3] - 219:17,
226:11, 264:19
**obviously** [9] - 9:12,
118:15, 151:25,
168:5, 296:19,
321:23, 332:4, 334:11
**occasion** [10] -
13:11, 25:2, 25:13,
46:1, 127:3, 193:15,
201:4, 202:3, 202:9,
212:15
**occasionally** [2] -
55:11, 138:5
**occasions** [3] - 95:6,
301:1, 306:11
**occupation** [3] -
89:15, 219:10, 299:16
**occupational** [1] -
245:21
**occupied** [6] - 98:25,
205:20, 208:13,
217:12, 218:25,
219:10
**occupying** [1] -
220:12
**occur** [19] - 33:13,
87:16, 209:22, 213:4,
217:15, 218:10,
218:13, 220:10,
222:11, 222:12,

222:23, 233:11,
233:17, 279:10,
279:22, 279:24,
292:8, 292:9, 295:20
**occurred** [3] - 22:22,
224:2, 289:21
**occurrence** [4] -
215:24, 227:14,
295:11, 306:1
**occurrences** [1] -
251:1
**occurring** [4] - 50:9,
56:7, 224:20, 238:11
**Ochopee** [1] - 25:7
**odd** [1] - 140:16
**oddly** [1] - 322:2
**OF** [6] - 1:1, 1:4,
2:18, 2:20, 4:1, 5:1
**offer** [3] - 169:5,
169:11, 332:25
**offered** [2] - 69:2,
137:23
**offering** [4] - 57:10,
83:16, 311:9, 311:11
**office** [16] - 23:1,
23:15, 60:14, 106:20,
106:24, 107:1, 107:3,
107:4, 107:8, 152:15,
201:13, 203:19,
324:7, 324:10,
325:16, 325:17
**OFFICE** [2] - 2:14,
2:24
**Office** [3] - 8:3,
201:22, 203:19
**officer** [1] - 116:10
**OFFICER** [3] - 87:14,
200:9, 334:22
**officers** [3] - 87:16,
105:14, 137:4
**offices** [2] - 74:23,
122:8
**Official** [2] - 187:7,
335:10
**official** [10] - 3:2,
56:4, 117:4, 122:3,
122:10, 122:13,
124:5, 124:7, 132:9,
252:25
**officially** [2] - 7:23,
125:1
**officials** [8] - 97:23,
103:24, 110:5, 110:9,
110:12, 110:13,
111:4, 111:9
**often** [16] - 23:16,
40:16, 41:21, 45:25,
46:7, 52:19, 79:18,
92:20, 171:9, 207:10,
263:1, 265:25, 312:9,

312:18, 313:16,
316:16
**oftentimes** [1] -
279:3
**oil** [5] - 142:6,
144:16, 166:4, 193:17
**Okeechobee** [5] -
20:24, 26:9, 26:10,
26:17, 26:25
**Olas** [1] - 2:10
**old** [4] - 21:17,
68:12, 300:4, 320:15
**older** [1] - 225:22
**on-site** [2] - 60:3,
231:20
**once** [18] - 19:22,
46:2, 46:4, 46:5,
46:12, 62:17, 92:9,
96:18, 113:16,
113:22, 149:15,
149:22, 153:23,
179:7, 188:23, 190:2,
304:23, 317:23
**one** [179] - 9:7,
10:12, 12:12, 12:13,
13:6, 16:3, 22:19,
22:21, 23:15, 28:6,
31:25, 33:5, 35:25,
41:25, 42:14, 54:13,
56:15, 56:20, 57:24,
61:7, 61:20, 68:8,
68:16, 72:10, 74:24,
80:25, 81:13, 82:16,
84:7, 92:23, 93:8,
95:5, 96:2, 96:23,
98:25, 99:9, 102:1,
104:3, 108:9, 108:10,
109:7, 111:16,
113:23, 115:4,
118:15, 118:18,
118:20, 121:10,
122:6, 122:24,
122:25, 127:3,
128:17, 140:19,
143:10, 143:16,
147:16, 150:16,
151:23, 151:24,
152:25, 154:20,
155:7, 155:12, 156:1,
156:12, 156:13,
158:10, 160:20,
161:17, 162:9,
162:11, 164:21,
166:4, 166:16,
168:16, 169:17,
170:25, 174:12,
179:2, 180:1, 180:2,
189:6, 189:14,
189:16, 190:15,
194:17, 196:1,

197:13, 198:4, 198:9,
199:8, 201:7, 201:10,
202:19, 203:3, 204:8,
204:14, 205:8,
205:11, 207:1, 207:3,
212:8, 215:11,
216:21, 222:19,
225:15, 225:17,
225:24, 228:2, 228:3,
228:4, 228:11,
230:18, 234:18,
241:19, 243:10,
244:10, 244:21,
244:24, 247:22,
248:2, 250:18,
250:19, 251:2,
251:14, 252:1,
253:22, 254:7,
254:22, 263:22,
265:8, 265:14,
272:13, 272:14,
272:20, 275:24,
278:13, 283:3,
283:17, 285:7, 287:1,
287:14, 288:14,
292:22, 297:21,
298:5, 298:14,
299:21, 304:9,
307:18, 307:19,
308:5, 319:5, 320:22,
321:6, 323:23, 328:1,
328:2, 328:15, 331:6,
331:18, 332:1,
333:10, 333:18,
334:18
**one-and-a-half** [1] -
180:1
**one-day** [1] - 198:4
**one-on-one** [2] -
95:5, 96:2
**one-to-one** [3] -
234:18, 263:22, 265:8
**ones** [15] - 122:4,
123:15, 150:6,
161:19, 180:18,
185:19, 196:6, 205:7,
237:5, 239:10,
276:20, 292:13,
311:5, 317:6, 318:20
**ongoing** [2] - 36:3,
297:7
**online** [1] - 318:11
**open** [10] - 93:23,
96:20, 118:10,
120:16, 121:2,
199:25, 231:11,
278:17, 301:17,
322:12
**opened** [2] - 129:3,
322:17

**opening** [3] - 9:12, 131:12, 132:10

**openings** [1] - 231:11

**operate** [2] - 110:16, 191:20

**operated** [1] - 94:6

**operates** [1] - 297:6

**operating** [2] - 111:20, 296:18

**Operating** [1] - 26:10

**operation** [10] - 77:12, 95:17, 246:25, 260:16, 261:2, 261:5, 261:17, 283:19, 285:15, 296:23

**operations** [5] - 80:5, 96:17, 97:5, 105:24, 107:2

**opine** [2] - 265:10, 323:15

**opined** [2] - 263:5, 264:17

**opinion** [17] - 9:23, 12:5, 28:17, 37:17, 37:20, 38:17, 40:14, 119:1, 246:24, 252:15, 257:15, 257:17, 257:18, 273:3, 285:19, 285:21, 286:4

**opinions** [6] - 37:23, 118:25, 202:9, 239:25, 268:10, 284:19

**opponent** [1] - 121:21

**opportunities** [3] - 160:19, 161:3, 229:14

**opportunity** [33] - 13:19, 17:2, 21:5, 32:19, 32:25, 33:2, 33:15, 38:25, 40:11, 40:12, 55:15, 74:9, 77:1, 86:18, 95:4, 98:22, 136:4, 137:25, 148:1, 149:18, 159:20, 162:13, 162:20, 163:5, 163:7, 173:7, 194:23, 195:6, 226:21, 229:11, 324:23, 333:15, 333:19

**oppose** [2] - 74:5, 74:7

**opposed** [4] - 53:6, 169:8, 218:13, 334:19

**opposing** [1] - 84:14

**opposition** [3] - 14:15, 16:16, 24:10

**option** [4] - 61:20, 333:11, 333:18, 333:24

**oral** [2] - 329:15, 330:2

**orange** [6] - 217:22, 242:16, 294:25, 295:1, 295:2

**Orange** [6] - 107:24, 113:4, 113:5, 113:7, 113:10, 113:11

**Order** [1] - 6:1

**order** [2] - 86:20, 197:23

**ordered** [2] - 134:11, 134:12

**orders** [1] - 98:9

**ordinary** [1] - 100:13

**organically** [1] - 123:11

**organization** [10] - 10:9, 10:11, 10:16, 10:23, 19:13, 88:15, 144:8, 144:10, 146:5

**organization's** [1] - 73:15

**organizational** [2] - 10:17, 73:24

**organizations** [4] - 9:24, 10:6, 104:18, 104:21

**oriented** [1] - 244:6

**origin** [5] - 23:19, 50:16, 96:17, 103:14, 103:16

**original** [6] - 27:16, 66:22, 67:3, 69:3, 100:5, 209:12

**originally** [2] - 31:24, 307:11

**Orlando** [1] - 107:18

**Osceola** [2] - 6:22, 304:22

**osprey** [1] - 302:17

**otherwise** [6] - 85:23, 117:21, 122:21, 231:9, 246:13, 295:25

**ought** [1] - 207:6

**out-of-pocket** [1] - 120:12

**outcrops** [1] - 214:24

**outlets** [1] - 143:3

**outline** [1] - 59:3

**outlined** [1] - 240:4

**outlines** [2] - 179:19, 180:10

**outreach** [1] - 145:16

**outriggers** [1] -

231:5

**outside** [14] - 11:3, 48:10, 48:11, 91:25, 107:4, 108:11, 116:13, 123:17, 144:21, 179:23, 220:17, 305:3, 312:14, 324:16

**overall** [3] - 110:12, 224:4, 227:15

**overflow** [1] - 60:4

**overhead** [3] - 132:14, 176:22, 177:1

**overland** [1] - 155:25

**overlap** [3] - 242:21, 291:13, 291:16

**overlay** [1] - 209:25

**overnight** [2] - 113:23, 158:15

**overrule** [2] - 29:20, 214:9

**overruled** [6] - 72:24, 96:12, 96:15, 111:13, 135:5, 281:16

**oversee** [1] - 19:6

**overview** [2] - 212:2, 213:12

**Overview** [1] - 58:10

**overwhelmingly** [1] - 115:24

**owl** [1] - 148:11

**own** [4] - 13:22, 52:17, 152:7, 220:20

**owned** [1] - 167:10

**owner** [1] - 107:2

**ownership** [2] - 257:11, 257:12

## P

**P.A** [1] - 2:2

**p.m** [4] - 1:6, 15:9, 139:8, 329:15

**P.O** [1] - 2:24

**paddler** [1] - 299:25

**pads** [1] - 166:5

**page** [26] - 59:7, 60:15, 83:5, 162:15, 180:1, 182:3, 187:8, 210:20, 215:20, 218:1, 219:21, 221:18, 235:25, 252:1, 252:17, 254:22, 255:20, 260:18, 261:24, 262:6, 262:12, 270:6, 278:5, 281:21, 283:17

**page-and-a-half** [2] - 59:7, 60:15

**pages** [2] - 158:9,

208:17

**Pages** [1] - 1:8

**paid** [1] - 37:23

**painted** [1] - 100:17

**pales** [1] - 269:9

**Palm** [1] - 309:9

**panoply** [1] - 12:23

**Panther** [7] - 146:5, 146:6, 157:23, 159:18, 185:9, 203:11, 217:8

**panther** [235] - 12:7, 49:6, 49:8, 49:11, 49:13, 49:20, 64:16, 64:19, 64:21, 64:24, 65:24, 67:9, 67:10, 67:18, 68:23, 69:1, 69:5, 69:8, 69:23, 70:11, 70:14, 70:22, 71:2, 71:7, 71:14, 71:20, 76:14, 142:7, 143:9, 153:15, 156:8, 156:13, 157:6, 157:8, 157:9, 157:18, 157:20, 157:25, 158:5, 158:11, 158:17, 158:20, 158:21, 159:3, 159:6, 159:9, 159:10, 159:12, 159:17, 161:17, 168:22, 168:24, 173:15, 176:14, 182:21, 182:24, 183:2, 183:6, 183:8, 183:13, 184:20, 184:23, 185:6, 185:12, 185:17, 185:22, 185:24, 186:1, 186:22, 186:23, 187:3, 187:5, 188:4, 188:13, 189:22, 190:2, 194:16, 194:18, 194:23, 195:5, 195:7, 195:9, 195:22, 196:10, 202:13, 203:4, 203:6, 203:8, 204:18, 204:21, 205:5, 205:6, 208:11, 208:14, 209:1, 210:5, 212:1, 212:12, 212:17, 212:24, 213:1, 213:7, 215:24, 216:10, 216:25, 217:5, 217:11, 217:13, 217:23, 218:7, 218:19, 219:1, 219:15, 219:18, 219:25, 220:1, 220:7,

221:12, 222:13, 222:18, 222:24, 223:7, 223:8, 223:13, 224:15, 225:16, 225:25, 227:10, 227:12, 227:16, 227:19, 228:6, 229:3, 229:8, 230:9, 230:18, 230:24, 231:1, 231:10, 231:12, 232:20, 235:8, 235:21, 237:19, 237:24, 238:1, 238:17, 238:19, 239:21, 240:8, 242:17, 242:22, 243:4, 243:18, 244:10, 244:13, 244:22, 245:11, 245:24, 246:22, 247:1, 253:8, 254:25, 255:21, 256:1, 256:9, 257:22, 258:21, 260:13, 260:18, 260:19, 260:23, 261:25, 262:14, 263:22, 264:18, 265:6, 265:7, 265:10, 266:6, 266:8, 266:16, 268:14, 268:22, 269:14, 269:23, 269:24, 270:3, 270:16, 270:21, 270:24, 271:5, 271:13, 272:18, 273:2, 273:13, 274:4, 274:24, 275:5, 275:8, 275:17, 275:21, 276:11, 278:2, 280:2, 280:3, 280:11, 280:12, 280:22, 281:11, 281:18, 282:1, 282:13, 284:2, 286:2, 286:20, 287:12, 288:2, 288:7, 289:4, 289:24, 292:19, 294:13, 294:17, 295:16, 295:19, 296:4, 296:5, 297:12, 297:20, 297:23, 297:25

**panther-friendly** [1] - 230:24

**panthers** [174] - 64:15, 65:1, 65:15, 67:15, 67:16, 68:11, 69:2, 70:16, 70:17, 70:18, 145:18, 157:9, 158:7, 168:19, 182:17, 186:11, 194:12, 194:20,

App. 396

195:2, 195:15, 195:19, 196:8, 203:14, 204:22, 205:3, 205:10, 205:14, 205:20, 205:25, 206:4, 206:5, 206:8, 207:2, 207:21, 207:25, 209:17, 209:18, 213:2, 213:4, 213:18, 216:5, 216:16, 216:21, 217:13, 217:14, 217:15, 218:9, 220:8, 220:10, 220:15, 220:21, 220:24, 222:12, 222:22, 222:25, 223:9, 223:20, 223:24, 224:16, 225:10, 226:10, 226:12, 226:19, 226:22, 227:3, 227:19, 227:24, 228:1, 228:25, 229:5, 229:9, 229:10, 229:15, 229:25, 230:5, 231:4, 231:7, 231:15, 233:4, 233:9, 233:11, 233:14, 233:18, 234:21, 235:19, 235:22, 236:10, 236:14, 236:24, 237:2, 238:2, 238:4, 238:25, 239:8, 239:10, 239:12, 239:15, 240:10, 241:9, 241:10, 243:17, 243:21, 244:2, 245:19, 247:4, 247:6, 256:13, 257:3, 257:7, 257:13, 257:15, 258:15, 263:6, 264:20, 265:1, 265:20, 265:22, 270:7, 270:10, 270:18, 270:23, 272:24, 273:20, 273:23, 275:10, 275:24, 276:5, 276:7, 277:22, 278:5, 278:18, 278:20, 278:23, 279:1, 279:4, 279:10, 279:12, 279:13, 279:14, 279:15, 279:17, 279:18, 279:21, 280:1, 280:6, 280:7, 282:21, 283:11, 283:21, 285:17, 287:9, 287:10, 290:4, 293:24, 293:25,

294:9, 294:13, 295:5, 295:12, 295:14, 295:15, 295:17, 295:22, 296:2, 296:6, 296:14, 297:21, 304:7

**Panuccio** [44] - 7:7, 7:9, 8:14, 8:23, 11:23, 13:2, 13:3, 16:2, 17:5, 17:25, 29:14, 29:23, 34:24, 35:5, 39:13, 39:20, 42:16, 53:4, 66:22, 67:1, 68:9, 69:11, 79:14, 80:3, 80:11, 81:2, 81:3, 81:15, 82:9, 85:1, 88:24, 89:2, 99:19, 104:8, 120:17, 121:3, 121:24, 128:18, 135:18, 177:20, 316:1, 327:7, 329:4, 331:20

**PANUCCIO** [113] - 2:7, 4:5, 4:9, 7:6, 8:9, 9:18, 9:23, 10:8, 11:9, 12:10, 13:16, 13:21, 16:3, 16:6, 28:8, 28:10, 29:9, 29:15, 34:25, 35:2, 39:14, 39:23, 40:24, 42:7, 42:17, 42:19, 42:25, 43:3, 43:9, 43:24, 44:3, 44:7, 44:13, 44:22, 45:12, 45:13, 52:24, 53:8, 53:11, 53:22, 56:16, 56:18, 56:22, 57:4, 57:13, 58:5, 58:16, 58:19, 62:10, 62:24, 65:20, 66:4, 66:14, 67:4, 67:7, 67:23, 68:12, 68:20, 69:12, 71:23, 72:13, 72:17, 72:25, 73:14, 73:23, 74:4, 74:24, 75:1, 75:8, 75:15, 75:22, 75:25, 79:1, 79:9, 80:19, 81:5, 81:19, 85:2, 85:11, 88:7, 96:13, 98:12, 104:10, 106:23, 107:12, 111:18, 116:2, 116:19, 117:9, 117:14, 118:13, 119:2, 119:14, 119:16, 120:24, 121:6, 122:2, 124:4, 124:9, 197:11, 197:25, 211:6, 247:24, 248:15, 248:20, 315:19, 315:21, 327:9,

327:12, 327:23, 329:8, 330:11, 331:23

**pANUCCIO** [1] - 88:10

**paper** [5] - 16:9, 188:7, 217:7, 217:9, 258:18

**papers** [2] - 124:14, 184:22

**papyrus** [2] - 146:18

**paragraph** [13] - 56:23, 108:1, 111:19, 113:14, 117:16, 126:19, 127:2, 127:12, 178:8, 178:23, 191:18, 192:7

**paren** [2] - 268:22

**Parenthood** [1] - 107:9

**Park** [21] - 21:16, 22:13, 25:25, 32:8, 150:16, 153:3, 153:16, 154:2, 154:6, 155:5, 156:1, 157:21, 159:11, 160:11, 165:15, 165:24, 166:20, 204:3, 236:12, 300:8

**park** [11] - 91:23, 91:24, 104:18, 152:16, 186:1, 186:3, 301:3, 301:24, 302:1, 305:5, 305:6

**parked** [3] - 103:4, 302:15

**parking** [11] - 91:21, 91:23, 100:1, 102:19, 102:23, 102:24, 102:25, 103:2, 103:12, 114:25, 303:11

**part** [31] - 26:3, 26:6, 28:5, 37:18, 51:25, 66:9, 67:2, 67:20, 76:25, 91:12, 94:22, 135:6, 150:16, 155:22, 176:16, 176:18, 177:23, 177:24, 179:6, 206:7, 213:7, 218:3, 219:25, 221:14, 245:1, 252:5, 262:23, 285:18, 290:22, 295:20, 302:14

**participate** [9] - 33:2, 142:15, 148:2, 162:16, 163:1, 163:7, 192:12, 193:19, 299:20

**participated** [3] -

152:2, 163:4, 300:6

**participating** [1] - 76:18

**participation** [1] - 24:8

**particular** [7] - 101:8, 155:1, 170:11, 219:15, 219:16, 313:12, 314:4

**particularly** [9] - 14:13, 49:2, 60:12, 142:4, 160:22, 161:16, 219:17, 282:20, 282:25

**particulars** [1] - 214:8

**parties** [8] - 14:3, 15:6, 15:8, 15:20, 18:9, 83:2, 83:3, 139:19

**parties'** [2] - 332:15, 334:8

**partisanship** [1] - 95:25

**parts** [1] - 154:5

**party** [14] - 10:19, 55:5, 78:20, 83:12, 83:13, 83:14, 84:15, 85:19, 86:10, 101:7, 121:21, 133:13, 332:15

**pass** [2] - 21:9, 151:17

**passed** [1] - 209:12

**passenger** [1] - 274:9

**passengers** [1] - 254:11

**passing** [1] - 77:15

**passive** [1] - 8:20

**password** [1] - 124:15

**past** [20] - 25:14, 55:14, 91:20, 111:15, 153:12, 154:2, 154:8, 155:9, 167:6, 167:15, 175:17, 194:25, 261:10, 267:16, 303:25, 313:14, 321:18, 324:6, 326:20

**path** [3] - 151:14, 236:9, 236:22

**paths** [2] - 236:9, 236:14

**patience** [2] - 200:5, 287:21

**PATRICIA** [2] - 3:2, 335:9

**Patrol** [3] - 138:11, 312:21, 313:4

**pattern** [1] - 46:17

**patterns** [5] - 116:8, 229:4, 278:7, 288:23

**PAUL** [1] - 1:14

**Paul** [1] - 6:6

**pause** [3] - 15:16, 177:18, 328:4

**PAUTLER** [1] - 1:21

**paved** [22] - 92:10, 100:2, 100:4, 100:11, 102:19, 102:20, 103:2, 114:9, 115:1, 214:20, 214:21, 270:24, 271:5, 271:7, 273:4, 273:5, 274:6, 278:6, 281:8, 295:22, 295:23

**pavement** [1] - 186:24

**Paving** [2] - 305:19, 311:1

**pawprint** [1] - 158:23

**pay** [1] - 39:18

**peace** [1] - 148:11

**peaked** [1] - 260:19

**pedestal** [1] - 93:3

**pedestrian** [1] - 100:13

**peer** [4] - 209:5, 209:6, 210:8, 220:3

**pending** [1] - 316:6

**Pennsylvania** [1] - 2:18

**Penthouse** [1] - 1:16

**people** [54] - 22:2, 24:9, 32:7, 35:12, 35:16, 39:8, 47:22, 52:4, 52:14, 52:21, 53:6, 59:6, 60:15, 61:2, 61:21, 62:11, 64:9, 76:2, 90:19, 98:13, 101:17, 106:7, 106:13, 107:1, 107:23, 107:24, 110:15, 110:16, 117:25, 120:11, 151:3, 181:8, 183:1, 186:21, 195:3, 243:24, 254:18, 265:22, 274:11, 296:21, 296:22, 296:23, 301:1, 303:24, 304:1, 305:25, 314:3, 314:9, 314:10, 317:22, 322:13, 326:3

**peppered** [3] - 92:11, 92:21, 134:7

**per** [17] - 11:10, 44:24, 47:7, 49:24,

51:23, 63:8, 109:2, 136:8, 177:17, 233:14, 233:15, 233:18, 262:19, 263:1
**percent** [15] - 137:4, 155:25, 229:2, 232:4, 238:4, 238:6, 239:17, 247:5, 268:14, 268:22, 269:13, 270:3, 290:10, 290:13, 290:21
**percentage** [1] - 291:18
**perfect** [1] - 278:17
**performed** [1] - 133:7
**perhaps** [9] - 8:10, 47:4, 88:3, 132:17, 143:20, 247:14, 330:4, 330:10, 334:19
**perimeter** [2] - 111:2, 274:23
**period** [12] - 24:16, 37:20, 205:22, 225:23, 226:2, 226:11, 274:4, 275:9, 275:20, 291:22, 295:15, 330:22
**permit** [2] - 18:4, 180:21
**permitted** [1] - 205:19
**permitting** [3] - 55:13, 55:14, 162:13
**persistence** [2] - 258:22, 297:21
**person** [15] - 17:2, 17:7, 72:5, 72:6, 82:10, 98:8, 174:4, 174:15, 218:5, 325:20, 326:4, 326:6, 326:14, 326:17, 331:6
**personal** [16] - 10:11, 10:12, 10:14, 29:18, 77:6, 119:24, 119:25, 120:2, 122:4, 122:12, 122:14, 144:18, 147:14, 162:19, 171:9, 185:5
**personally** [21] - 49:20, 54:17, 54:20, 56:12, 56:14, 63:10, 63:13, 63:15, 63:17, 63:20, 67:18, 76:12, 94:22, 94:24, 132:18, 143:6, 143:17, 162:16, 183:11, 194:8, 245:10
**personnel** [2] - 60:3, 298:25

**persons** [8] - 11:1, 12:23, 13:4, 75:4, 105:20, 118:7, 118:9, 328:1
**perspective** [2] - 226:8, 229:20
**pertain** [3] - 31:22, 145:16, 145:19
**pertained** [1] - 137:5
**pertaining** [2] - 142:21, 209:17
**pertains** [6] - 94:9, 106:14, 123:7, 136:14, 162:12, 185:13
**Pete** [1] - 260:2
**Petersburg** [1] - 1:23
**PFA** [2] - 254:23
**Ph.D** [3] - 89:22, 105:13, 260:1
**phone** [8] - 102:22, 120:10, 150:23, 193:7, 199:25, 205:17, 310:15, 314:22
**photo** [2] - 320:12, 320:25
**photograph** [5] - 309:20, 309:22, 310:7, 310:20, 310:24
**photographs** [3] - 309:14, 310:12, 310:13
**photography** [8] - 143:18, 152:1, 152:18, 214:20, 293:17, 300:1, 302:22
**photos** [6] - 102:22, 123:18, 316:25, 317:2, 317:7, 317:12
**physical** [4] - 106:21, 106:22, 106:24, 297:3
**physicist** [1] - 11:25
**physiographic** [1] - 215:6
**physiographically** [1] - 215:3
**physiography** [2] - 215:3, 250:25
**pick** [1] - 166:18
**picnic** [1] - 301:3
**picnicked** [1] - 25:8
**pictorial** [1] - 319:4
**picture** [9] - 23:1, 23:15, 66:15, 229:15, 237:23, 260:12, 271:21, 272:5, 272:7
**pictures** [1] - 318:9
**pin** [2] - 198:21,

199:4
**Pine** [1] - 236:11
**ping** [1] - 275:7
**pings** [1] - 276:5
**pink** [1] - 217:19
**pinpoint** [1] - 285:7
**Piropato** [1] - 7:20
**PIROPATO** [15] - 2:20, 7:19, 84:2, 247:12, 247:22, 248:11, 248:22, 324:20, 331:1, 331:4, 331:12, 332:1, 333:10, 333:18, 333:23
**pitch** [1] - 303:9
**place** [16] - 50:1, 50:6, 50:18, 57:20, 94:9, 102:17, 106:7, 161:15, 207:3, 217:16, 220:16, 224:2, 227:23, 268:4, 279:21, 304:25
**placed** [1] - 321:7
**places** [13] - 34:12, 106:8, 106:17, 142:4, 147:15, 147:18, 151:24, 154:20, 165:16, 165:24, 192:17, 300:10, 301:5
**placing** [1] - 230:7
**PLAINTIFF** [1] - 2:1
**plaintiff** [5] - 6:5, 72:8, 73:4, 88:14, 88:15
**Plaintiff** [1] - 6:11
**Plaintiffs** [2] - 1:5, 196:21
**plaintiffs** [12] - 9:2, 14:10, 15:19, 16:9, 40:22, 80:7, 141:3, 156:22, 196:23, 199:14, 247:19, 299:5
**PLAINTIFFS** [1] - 1:14
**Plaintiffs'** [38] - 27:2, 27:20, 27:24, 29:1, 30:1, 58:10, 78:10, 78:11, 82:18, 82:19, 82:22, 84:5, 84:6, 84:16, 87:7, 128:16, 128:19, 140:21, 163:22, 163:25, 164:15, 164:20, 210:15, 210:17, 211:3, 211:8, 213:21, 213:23, 214:13, 309:17, 309:18, 311:11, 311:15, 315:9, 315:10,

315:22, 315:24, 315:25
**plaintiffs'** [7] - 9:9, 58:3, 66:3, 120:2, 163:13, 332:8, 334:7
**PLAINTIFFS'** [1] - 5:3
**Plan** [6] - 26:7, 28:6, 30:5, 30:9, 31:5, 58:9
**plan** [20] - 15:8, 15:11, 21:23, 26:9, 26:12, 26:25, 29:7, 30:6, 31:16, 44:9, 59:4, 76:14, 77:8, 185:12, 196:23, 199:1, 203:7, 204:17, 212:8
**plane** [1] - 51:22
**planes** [8] - 53:16, 175:23, 177:5, 274:10, 303:19, 322:7, 331:11
**Planned** [1] - 107:9
**planned** [4] - 30:25, 31:3, 193:5, 198:4
**planning** [10] - 123:11, 144:3, 145:19, 145:20, 154:21, 166:9, 201:23, 202:17, 204:20, 205:18
**Planning** [1] - 217:8
**plans** [11] - 161:24, 162:3, 166:11, 195:11, 204:19, 204:22, 250:22, 251:3, 293:19, 293:22, 311:17
**plant** [4] - 143:18, 202:21, 205:12, 211:21
**Plant** [1] - 146:21
**plants** [2] - 146:18, 204:10
**plastic** [1] - 115:12
**plates** [1] - 312:24
**play** [1] - 158:17
**playing** [1] - 86:25
**pleasure** [1] - 139:25
**plot** [1] - 223:16
**plus** [3] - 118:23, 119:10, 290:25
**PO** [1] - 1:23
**pocket** [1] - 120:12
**podium** [1] - 125:4
**Point** [2] - 205:11, 211:20
**point** [35] - 15:12, 16:3, 16:14, 17:24, 68:15, 70:1, 70:2,

70:18, 71:25, 73:16, 81:2, 81:22, 98:11, 101:23, 110:18, 128:3, 131:15, 131:17, 139:14, 170:5, 170:25, 175:1, 183:1, 219:20, 226:24, 235:25, 253:22, 254:16, 274:9, 282:11, 291:5, 306:12, 324:7, 332:12
**pointing** [1] - 56:25
**points** [10] - 9:15, 9:18, 9:19, 71:3, 71:5, 96:23, 97:20, 147:17, 294:10, 294:14
**pole** [3] - 92:24, 93:6, 308:20
**poles** [1] - 307:25
**police** [4] - 308:23, 320:4, 320:8, 320:24
**policy** [16] - 19:15, 19:19, 19:21, 19:23, 35:11, 36:5, 49:15, 76:24, 104:17, 112:12, 144:3, 172:8, 179:19, 180:10, 208:25
**Policy** [4] - 24:20, 25:10, 33:11, 74:10
**Political** [1] - 143:24
**political** [4] - 88:17, 120:8, 121:14
**politician** [1] - 88:16
**politicians** [2] - 24:1, 121:9
**pollutant** [2] - 57:18, 178:25
**pollutants** [3] - 161:6, 178:6, 178:17
**polluted** [2] - 20:23, 178:12
**polluting** [5] - 57:17, 178:24, 179:3, 179:20, 180:11
**pollution** [12] - 39:5, 41:13, 47:24, 54:2, 165:21, 167:24, 168:5, 169:1, 172:22, 179:4, 186:20
**polo** [1] - 101:23
**pond** [1] - 215:15
**ponds** [1] - 322:13
**poor** [1] - 269:20
**popular** [1] - 139:23
**populated** [1] - 274:22
**population** [78] - 71:15, 185:17, 202:22, 208:1, 210:5,

212:2, 212:4, 212:5, 220:12, 220:13, 220:25, 221:2, 221:3, 221:5, 221:14, 225:19, 226:9, 228:8, 228:22, 229:20, 230:1, 230:6, 230:8, 230:19, 233:2, 233:13, 233:24, 233:25, 234:5, 238:7, 238:23, 247:2, 253:8, 256:1, 256:9, 257:16, 257:20, 257:22, 258:7, 258:8, 258:9, 258:16, 258:21, 259:3, 259:6, 259:8, 260:4, 260:11, 260:19, 261:13, 261:19, 265:2, 268:12, 268:20, 269:6, 269:14, 269:21, 270:1, 270:4, 277:9, 277:12, 277:13, 277:23, 277:25, 286:2, 286:17, 287:25, 288:1, 288:20, 289:7, 289:16, 291:8, 291:12, 291:14, 291:19, 291:21, 292:2, 298:6

**population-wide** [1] - 292:2

**populations** [4] - 212:10, 212:13, 212:14, 238:9

**portable** [3] - 94:6, 94:7, 95:2

**Portal** [1] - 203:19

**portion** [10] - 215:16, 226:10, 226:22, 229:11, 229:16, 243:21, 256:8, 302:11, 303:18, 322:11

**position** [8] - 15:21, 18:8, 19:23, 51:18, 203:16, 203:24, 333:25, 334:7

**positions** [3] - 38:15, 49:15, 122:10

**possible** [14] - 64:3, 111:9, 128:2, 147:15, 184:17, 195:23, 245:24, 246:3, 246:21, 261:4, 283:18, 285:14, 298:18, 331:1

**post** [5] - 32:16, 86:5, 122:10, 137:23,

261:13

**poster** [1] - 152:15

**postings** [1] - 122:23

**posts** [3] - 84:4, 121:11, 143:2

**posture** [2] - 12:20, 16:25

**potable** [1] - 306:7

**potential** [31] - 33:9, 34:6, 51:20, 51:22, 52:6, 55:2, 59:12, 59:17, 60:18, 64:1, 115:18, 161:6, 179:13, 204:12, 208:13, 209:25, 216:14, 228:1, 234:5, 236:18, 237:20, 240:7, 255:3, 255:11, 255:13, 281:5, 286:1, 286:7, 286:9, 286:16, 286:20

**potentially** [6] - 91:8, 111:15, 161:2, 255:16, 273:6, 288:25

**Pottner** [1] - 6:15

**Power** [5] - 205:13, 205:17, 211:21, 211:22, 231:1

**power** [4] - 21:8, 93:6, 93:25, 94:5, 205:12, 211:20

**powers** [1] - 267:3

**pray** [1] - 304:23

**prayer** [1] - 302:19

**pre** [3] - 48:5, 96:4, 214:21

**pre-detention** [1] - 48:5

**pre-established** [1] - 96:4

**pre-project** [1] - 214:21

**preclude** [1] - 231:9

**precluded** [1] - 231:7

**precludes** [1] - 229:10

**predator** [1] - 232:7

**predicate** [1] - 78:15

**predict** [2] - 268:13, 268:21

**predicting** [1] - 262:13

**predicts** [2] - 290:10, 291:5

**predominantly** [1] - 215:12

**preexisting** [1] - 252:4

**preface** [1] - 118:14

**prefer** [2] - 68:8,

333:23

**preferable** [1] - 18:5

**prejudice** [1] - 88:11

**prejudicial** [1] - 88:18

**PRELIMINARY** [1] - 1:10

**preliminary** [10] - 9:10, 9:18, 12:19, 14:12, 15:13, 16:8, 16:10, 67:5, 118:17, 334:1

**premise** [1] - 103:10

**preparation** [2] - 35:23, 329:12

**prepare** [5] - 35:8, 35:14, 119:21, 120:5, 329:11

**prepared** [2] - 198:12, 213:11

**prepped** [1] - 198:10

**prepping** [1] - 330:2

**presence** [29] - 48:11, 48:18, 64:16, 116:12, 157:9, 168:18, 168:22, 168:23, 176:8, 176:14, 186:22, 195:5, 228:2, 228:12, 228:14, 228:24, 230:10, 232:8, 237:15, 246:21, 257:9, 276:15, 276:16, 276:22, 276:23, 277:24, 296:16, 296:24, 297:1

**present** [11] - 96:11, 119:25, 138:7, 159:13, 210:12, 226:14, 227:19, 260:12, 274:25, 296:25, 333:19

**presentation** [1] - 15:9

**presentations** [1] - 152:11

**presented** [2] - 137:25, 317:15

**presenting** [2] - 88:12, 332:7

**preservation** [2] - 37:8, 172:5

**preserve** [5] - 23:21, 32:6, 156:19, 186:5, 214:4

**Preserve** [33] - 21:25, 22:13, 24:14, 24:18, 24:24, 25:1, 32:4, 32:9, 77:9, 77:12, 144:11,

144:14, 146:24, 147:15, 147:23, 148:8, 148:13, 148:20, 148:24, 149:3, 150:10, 152:4, 153:24, 157:21, 173:9, 183:7, 183:17, 183:21, 186:9, 226:17, 270:9, 300:12, 321:9

**preserves** [1] - 142:12

**president** [3] - 54:15, 72:1, 72:3

**press** [16] - 15:16, 30:17, 84:10, 84:11, 88:19, 88:22, 122:16, 122:23, 123:1, 123:3, 123:4, 123:12, 123:22, 123:24, 177:18, 326:5

**Press** [1] - 30:19

**pressed** [1] - 147:5

**presumed** [1] - 219:9

**pretty** [17] - 36:13, 51:15, 147:16, 155:10, 158:1, 158:2, 158:8, 158:25, 171:6, 176:19, 214:25, 217:18, 226:11, 231:24, 247:25, 248:3, 300:18

**prevail** [1] - 36:9

**prevailed** [1] - 42:1

**prevent** [3] - 179:20, 180:11, 272:18

**preventing** [1] - 228:6

**previous** [3] - 178:12, 215:17, 307:5

**previously** [14] - 50:7, 54:6, 60:17, 77:15, 111:9, 114:23, 115:5, 155:3, 181:4, 217:5, 228:7, 228:24, 240:25, 241:2

**prey** [8] - 229:14, 231:3, 231:7, 232:6, 232:24, 278:7, 288:21, 291:23

**pride** [1] - 127:18

**primarily** [4] - 150:6, 229:18, 233:4, 233:5

**primary** [26] - 61:2, 157:7, 195:9, 201:13, 216:2, 216:17, 217:1, 217:2, 217:9, 217:12, 217:16, 217:23, 218:8, 221:12, 221:13, 227:11,

231:3, 232:7, 242:17, 242:21, 243:7, 281:18, 288:19, 294:24, 295:2

**principal** [2] - 208:24, 292:22

**prison** [3] - 97:8, 112:6, 296:21

**prisons** [1] - 105:23

**private** [6] - 55:5, 81:10, 90:25, 110:22, 110:25, 257:12

**privilege** [2] - 50:19, 73:22

**privy** [2] - 129:16, 129:17

**pro** [1] - 316:5

**proactive** [1] - 59:22

**proactively** [1] - 113:20

**probability** [2] - 258:22, 270:1

**probative** [1] - 334:11

**probe** [1] - 75:16

**problem** [8] - 10:24, 15:25, 20:24, 40:19, 193:22, 198:24, 232:3, 254:7

**problematic** [3] - 283:19, 285:15, 285:22

**proceed** [6] - 8:15, 13:15, 84:25, 88:5, 139:18, 141:16, 200:13, 332:16

**proceeding** [3] - 126:25, 127:1, 330:18

**proceedings** [3] - 9:13, 87:17, 335:4

**process** [26] - 7:21, 11:11, 11:17, 12:17, 25:22, 26:19, 30:4, 33:3, 40:11, 55:14, 112:24, 161:22, 162:7, 162:13, 162:17, 162:22, 163:1, 163:6, 170:4, 180:21, 193:19, 206:17, 206:23, 207:9, 208:22, 318:1

**processes** [8] - 25:13, 25:17, 26:3, 26:21, 36:4, 38:25, 40:8, 76:19

**processing** [1] - 192:12

**produced** [1] - 279:23

**product** [3] - 96:25,

109:3, 203:13
**production** [2] -
59:13, 59:18
**profession** [2] -
200:18, 201:3
**professional** [13] -
105:24, 114:19,
144:13, 145:8,
145:10, 147:24,
171:3, 171:10, 185:1,
185:3, 185:10,
239:19, 246:25
**proffer** [2] - 75:15,
81:19
**proffering** [1] -
333:13
**program** [2] -
201:23, 224:17
**programs** [3] -
152:2, 152:6, 154:13
**project** [37] - 22:18,
22:19, 26:6, 31:9,
31:15, 173:8, 201:8,
205:9, 213:9, 213:14,
214:21, 216:1, 216:3,
216:11, 216:13,
216:20, 216:23,
218:23, 218:24,
225:18, 227:18,
228:9, 238:12,
238:16, 239:21,
241:13, 241:17,
250:22, 250:23,
251:9, 251:15,
255:15, 261:9, 268:4,
270:11, 293:21,
297:19
**Project** [6] - 26:4,
26:20, 28:4, 29:3,
56:2, 73:6
**projected** [1] -
228:10
**projects** [26] - 29:5,
29:7, 92:20, 104:19,
104:21, 162:19,
171:7, 201:9, 201:14,
201:16, 202:7,
204:12, 204:14,
204:24, 205:1, 205:4,
205:5, 206:1, 206:9,
211:20, 213:17,
230:25, 231:17,
240:3, 254:23, 255:7
**promise** [1] - 165:10
**promoted** [1] -
201:21
**prompt** [1] - 64:12
**properly** [2] -
161:10, 334:1
**properties** [2] -

148:14, 153:17
**property** [12] - 50:17,
50:22, 50:24, 53:20,
107:2, 114:6, 115:8,
146:12, 157:21,
159:19, 229:8, 231:18
**proposal** [7] - 21:22,
21:23, 22:15, 25:18,
32:12, 32:17, 32:19
**proposals** [2] -
33:13, 198:14
**proposed** [9] -
21:19, 24:10, 28:5,
31:25, 77:15, 204:13,
204:18, 206:8, 254:22
**proscribe** [1] -
216:10
**prospered** [1] -
226:12
**protect** [6] - 23:21,
24:18, 24:22, 32:5,
142:6, 142:7
**protected** [2] -
22:14, 202:25
**protecting** [4] - 33:4,
38:15, 142:3, 144:20
**protection** [9] -
104:19, 143:14,
144:16, 145:17,
201:23, 202:17,
204:16, 204:17,
204:22
**protections** [1] -
145:17
**protest** [7] - 63:22,
64:5, 64:12, 192:2,
192:10, 192:13,
193:15
**protested** [2] - 64:6,
64:7
**protesting** [1] -
29:13
**protests** [1] - 64:3
**protocol** [2] -
180:16, 180:23
**protocols** [3] -
180:2, 180:17, 180:19
**provide** [16] - 15:20,
19:15, 35:18, 55:9,
73:5, 74:10, 82:20,
85:22, 87:1, 96:6,
123:21, 127:20,
137:21, 163:9,
193:19, 332:12
**provided** [19] -
68:25, 80:14, 83:24,
83:25, 84:12, 94:20,
97:25, 98:2, 109:22,
126:10, 134:4,
138:18, 148:3, 164:9,

188:11, 190:11,
214:15, 293:12,
293:21
**provides** [6] - 59:11,
59:16, 60:3, 86:6,
97:13, 212:9
**providing** [6] -
60:13, 12:5, 26:12,
56:4, 111:1, 155:24
**province** [1] - 215:7
**Provocation** [1] -
185:15
**proximity** [6] - 49:9,
50:5, 50:19, 70:9,
222:12, 292:19
**Public** [4] - 89:23,
144:2, 304:17, 306:17
**public** [36] - 17:13,
26:11, 29:3, 30:4,
31:8, 33:2, 37:23,
50:12, 52:5, 56:3,
67:19, 67:21, 74:10,
95:15, 104:13, 105:7,
122:7, 122:21, 138:3,
138:23, 158:9,
162:13, 163:2,
192:12, 193:19,
203:22, 208:9, 209:7,
212:22, 249:20,
251:9, 257:11,
293:20, 299:17,
304:18
**publication** [6] -
176:9, 195:4, 196:5,
196:7, 203:10, 203:12
**publications** [2] -
168:21, 185:17
**publicly** [1] - 187:2
**publish** [1] - 84:16
**published** [4] - 22:9,
209:2, 217:6, 218:6
**puddle** [1] - 254:9
**pull** [19] - 42:11,
68:20, 70:2, 71:13,
126:18, 226:25,
271:18, 274:7,
274:21, 284:6, 301:3,
301:5, 302:1, 303:23,
314:7, 320:10,
320:22, 321:22,
321:23
**pull-off** [1] - 321:22
**pulling** [2] - 67:4,
97:12
**pullout** [1] - 305:7
**puma** [3] - 265:17,
290:8
**pumas** [12] - 228:16,
228:18, 231:23,
231:24, 232:5, 232:9,

265:24, 266:3,
276:15, 276:22,
278:23, 294:3
**pure** [1] - 158:18
**purported** [2] -
11:12, 11:13
**purportedly** [1] -
129:10
**purpose** [2] - 79:19,
157:24
**purposes** [8] - 14:8,
51:12, 53:4, 53:8,
90:1, 145:11, 226:13,
242:6
**pursue** [1] - 232:24
**push** [1] - 139:23
**pushed** [3] - 301:16,
323:5, 329:11
**pushes** [1] - 229:9
**put** [53] - 11:11, 17:2,
40:1, 40:5, 40:6,
40:15, 41:23, 45:16,
50:3, 50:4, 55:6, 55:7,
57:20, 68:4, 69:1,
72:13, 79:3, 80:22,
84:24, 86:18, 86:19,
93:2, 95:24, 105:17,
122:20, 123:22,
124:13, 124:23,
126:19, 177:19,
198:21, 199:4,
199:13, 220:7, 222:5,
223:9, 224:15,
226:21, 231:5,
234:20, 238:8,
251:17, 253:13,
257:4, 264:1, 284:2,
291:5, 294:17,
307:24, 320:17,
330:23, 333:21,
333:22
**puts** [1] - 255:9
**putting** [5] - 40:12,
80:21, 114:18,
162:10, 307:13

## Q

**qualified** [14] -
28:14, 38:2, 49:10,
49:12, 49:19, 53:20,
57:19, 156:20,
172:12, 214:1,
264:23, 265:10,
273:13, 273:15
**qualifies** [1] - 56:4
**qualify** [1] - 38:5
**qualities** [2] -
269:19, 286:14
**quality** [18] - 20:13,

20:22, 26:5, 31:20,
31:23, 32:2, 33:8,
56:5, 57:11, 76:12,
257:13, 269:20,
269:22, 269:24,
270:2, 286:3, 288:10,
288:11
**quantified** [1] - 297:9
**quantify** [1] - 38:9
**quarter** [1] - 239:4
**questioning** [2] -
189:10, 328:24
**questions** [68] -
34:21, 39:19, 44:21,
50:11, 59:9, 67:5,
69:11, 76:1, 76:4,
76:6, 76:11, 76:16,
77:6, 95:9, 95:13,
95:14, 95:15, 96:17,
97:4, 97:21, 99:6,
99:11, 99:15, 104:6,
108:11, 108:20,
112:2, 112:9, 112:23,
113:1, 113:19,
118:14, 124:10,
125:8, 135:3, 135:21,
135:25, 137:24,
138:1, 138:6, 138:7,
138:24, 141:4, 147:8,
164:22, 188:24,
190:1, 191:13,
193:23, 195:25,
201:2, 239:2, 240:15,
241:16, 247:10,
249:12, 266:25,
279:25, 287:23,
292:23, 294:6, 298:9,
312:12, 315:13,
316:14, 323:19,
326:21
**queue** [2] - 86:22,
319:14
**quick** [9] - 76:11,
140:19, 212:1,
222:15, 240:23,
248:8, 248:14,
298:19, 314:20
**QuickBooks** [1] -
187:8
**quickly** [4] - 100:7,
135:2, 247:12, 309:15
**quit** [1] - 279:17
**quite** [12] - 20:9,
38:24, 49:5, 51:17,
115:18, 123:11,
136:2, 158:6, 194:9,
291:17, 306:22,
309:11
**quiz** [1] - 277:7
**quote** [14] - 12:13,

41:11, 41:12, 54:2, 59:12, 59:17, 59:18, 111:21, 258:16, 260:12, 260:13, 262:12, 283:17, 292:12
**quote-unquote** [2] - 12:13, 111:21

## R

**R.C.W** [1] - 148:7
**R.F** [1] - 2:16
**radar** [1] - 255:8
**radio** [16] - 67:12, 67:16, 188:5, 223:10, 223:11, 224:15, 225:8, 225:9, 225:10, 226:21, 275:7, 275:13, 295:10, 296:12, 296:13
**rain** [1] - 137:25
**rained** [1] - 154:15
**raise** [6] - 18:14, 89:3, 116:20, 141:10, 198:2, 299:6
**raised** [3] - 13:2, 21:25, 117:11
**ran** [1] - 107:8
**RANDY** [2] - 4:15, 199:19
**Randy** [6] - 12:6, 12:7, 196:21, 199:15, 199:16, 199:19
**rang** [1] - 205:17
**range** [26] - 208:1, 212:11, 220:6, 226:10, 226:22, 227:3, 227:23, 229:11, 229:16, 233:18, 234:3, 234:15, 237:21, 238:5, 238:8, 244:21, 245:25, 251:1, 269:25, 276:2, 279:21, 280:3, 281:18, 288:6
**ranger** [2] - 152:5, 166:20
**ranger-held** [1] - 152:5
**ranger-led** [1] - 166:20
**rangers** [1] - 152:11
**ranges** [1] - 234:23
**ranging** [1] - 201:14
**rapid** [1] - 200:3
**rapidly** [1] - 298:18
**rapprochement** [1] - 334:19

**rare** [3] - 195:15, 202:21, 204:10
**rate** [1] - 221:6
**rather** [2] - 139:21, 287:24
**ratio** [2] - 263:22, 265:8
**RAUREL** [1] - 2:14
**RAURELL** [3] - 8:1, 8:6, 8:17
**Raurell** [2] - 8:1, 8:21
**raw** [1] - 102:17
**re** [4] - 170:6, 180:8, 242:5, 282:11
**re-ask** [4] - 170:6, 180:8, 242:5, 282:11
**reach** [3] - 170:12, 287:8, 287:11
**read** [20] - 9:11, 28:18, 44:11, 59:14, 59:15, 59:19, 82:25, 126:16, 168:21, 245:10, 245:12, 249:20, 249:24, 250:5, 250:9, 252:17, 283:13, 285:19, 294:2, 334:16
**reading** [9] - 59:20, 60:6, 142:25, 174:11, 250:3, 250:7, 251:9, 293:7, 313:18
**reads** [1] - 127:2
**ready** [6] - 8:15, 17:10, 140:4, 225:1, 331:7, 331:14
**real** [5] - 50:19, 75:18, 76:11, 77:25, 198:11
**realize** [2] - 172:25, 232:7
**really** [35] - 13:5, 20:13, 23:5, 24:16, 31:20, 88:22, 106:19, 116:15, 120:16, 120:18, 121:4, 123:9, 131:6, 142:10, 143:13, 145:10, 148:11, 148:12, 154:21, 155:15, 160:23, 164:24, 217:14, 231:24, 233:24, 234:22, 234:24, 268:16, 272:4, 292:12, 314:20, 329:2, 333:14
**realm** [1] - 145:16
**rearrange** [1] - 327:6
**reason** [10] - 15:17, 16:19, 61:14, 75:19, 158:10, 161:13,

195:6, 216:18, 226:15, 227:12
**reasonable** [1] - 246:24
**reasons** [10] - 142:1, 143:10, 152:17, 158:4, 159:25, 227:11, 288:3, 289:9, 289:25, 290:6
**rebut** [1] - 13:19
**recap** [1] - 221:11
**receive** [11] - 26:18, 33:15, 96:22, 97:19, 98:5, 138:20, 142:19, 142:23, 161:24, 162:3, 293:15
**received** [18] - 14:25, 32:18, 32:20, 32:25, 72:11, 72:13, 78:19, 80:17, 80:18, 91:4, 96:19, 98:3, 98:5, 130:13, 130:16, 130:17, 138:22, 293:14
**recent** [19] - 69:23, 70:7, 70:11, 71:22, 133:10, 133:11, 146:22, 147:18, 174:1, 192:8, 212:8, 219:24, 220:5, 231:23, 259:6, 261:9, 272:8, 320:20
**recently** [6] - 12:14, 46:5, 46:8, 72:11, 89:22, 324:9
**recess** [3] - 197:6, 197:8, 200:10
**Recess** [2] - 87:13, 140:13
**recipient** [1] - 130:10
**recitation** [1] - 326:11
**recognize** [11] - 24:1, 70:19, 72:18, 73:1, 126:21, 188:23, 188:24, 189:5, 210:21, 214:2, 309:20
**recognized** [3] - 26:16, 26:17, 313:15
**recollect** [6] - 93:14, 93:20, 108:24, 108:25, 123:8, 127:10
**recollected** [1] - 127:21
**recollection** [3] - 136:22, 137:1, 283:24
**recollections** [1] - 138:1
**recommended** [1] - 29:7

**reconnected** [1] - 193:11
**reconvene** [1] - 330:2
**record** [29] - 6:4, 9:3, 18:18, 36:13, 44:8, 80:14, 81:6, 81:18, 81:22, 83:9, 89:7, 96:14, 120:25, 121:17, 135:6, 141:14, 180:9, 188:10, 198:17, 199:18, 222:13, 224:17, 226:11, 234:16, 295:15, 299:9, 306:16, 315:3
**recorded** [8] - 81:16, 127:24, 148:7, 157:10, 223:7, 223:21, 270:23, 271:7
**recording** [5] - 84:12, 86:25, 87:17, 314:6
**records** [20] - 81:22, 82:12, 88:4, 131:14, 138:15, 138:23, 223:6, 225:14, 225:20, 225:23, 227:6, 227:7, 227:13, 227:14, 234:13, 234:14, 236:1, 236:5, 237:3, 274:23
**recover** [2] - 194:22, 220:15
**recovered** [3] - 212:7, 235:23, 235:24
**recovery** [6] - 185:12, 203:7, 203:8, 207:14, 208:14, 212:8
**recreate** [16] - 25:3, 45:25, 46:7, 49:22, 62:20, 62:21, 77:8, 146:24, 151:25, 155:6, 168:11, 181:23, 300:18, 312:1, 321:9, 324:8
**recreated** [11] - 33:20, 45:22, 46:18, 46:24, 50:17, 50:21, 149:10, 153:11, 154:1, 170:13, 174:9
**recreating** [11] - 33:25, 47:4, 47:8, 51:9, 143:17, 157:18, 158:20, 159:7, 159:14, 159:16, 160:13
**recreation** [2] - 312:8, 324:5
**recreational** [10] -

51:12, 160:18, 299:20, 299:23, 300:6, 300:13, 301:21, 302:14, 304:1, 311:18
**recruitment** [2] - 255:21, 257:20
**red** [16] - 148:7, 149:21, 156:12, 173:8, 218:3, 218:15, 219:22, 219:23, 220:9, 220:25, 223:6, 227:9, 235:11, 235:16, 236:17, 320:6
**red-cockaded** [4] - 148:7, 149:21, 156:12, 173:8
**redirect** [4] - 135:12, 193:24, 293:2, 319:15
**REDIRECT** [6] - 4:2, 76:9, 135:15, 194:1, 293:4, 324:2
**reduce** [4] - 176:14, 233:23, 238:16, 238:19
**reduced** [2] - 168:22, 186:22
**reduction** [4] - 238:4, 238:6, 292:19, 298:5
**Reed** [2] - 166:19, 300:15
**refer** [1] - 207:6
**reference** [3] - 58:3, 138:10, 295:10
**referenced** [2] - 127:19, 129:17
**references** [1] - 84:9
**referencing** [1] - 189:14
**referred** [2] - 108:19, 130:1
**referring** [6] - 132:6, 180:14, 187:2, 300:24, 300:25, 314:13
**refers** [3] - 215:3, 225:7, 289:13
**refined** [1] - 217:20
**reflect** [3] - 218:15, 224:5, 237:4
**reflected** [3] - 31:4, 69:23, 222:25
**reflecting** [2] - 32:3, 113:17
**reflects** [2] - 112:7, 224:21
**refresh** [3] - 283:24, 289:11, 292:15
**Refuge** [4] - 146:5,

146:6, 157:23, 159:18
**refuge** [9] - 146:7,
146:10, 146:12,
153:15, 156:10,
159:17, 269:23
**regard** [7] - 14:14,
26:5, 73:5, 86:1,
121:4, 192:19, 218:19
**regarded** [1] -
171:12
**regarding** [8] - 30:5,
78:17, 97:2, 97:4,
112:4, 123:8, 155:24,
160:21
**regardless** [2] -
218:9, 297:22
**regards** [5] - 162:7,
176:9, 193:17,
193:19, 235:6
**region** [12] - 33:5,
50:16, 142:5, 142:8,
190:22, 239:15,
250:21, 279:10,
279:15, 295:7,
295:17, 296:15
**regional** [2] - 144:7,
238:1
**regions** [2] - 232:11,
279:12
**registered** [2] -
313:17, 313:20
**regular** [3] - 100:12,
142:23, 321:16
**regularly** [3] - 36:6,
64:10, 153:22
**regulatory** [1] -
207:7
**reimbursement** [2] -
109:17, 109:19
**reimbursements** [1]
- 110:2
**Reio** [3] - 12:2,
13:16, 328:10
**rejoin** [1] - 193:10
**relate** [1] - 156:19
**related** [18] - 20:23,
20:24, 26:20, 32:15,
34:15, 55:1, 59:13,
59:18, 63:11, 117:7,
146:1, 202:10, 228:5,
241:9, 241:10,
241:12, 250:25,
295:19
**relates** [8] - 20:15,
36:3, 36:12, 39:7,
69:25, 195:3, 233:9,
233:10
**relating** [1] - 288:20
**relation** [6] - 30:11,
73:7, 213:3, 228:7,

236:3, 292:6
**relations** [1] - 299:17
**relationship** [4] -
96:4, 113:12, 136:12,
234:18
**relative** [3] - 80:12,
81:4, 286:19
**relaxed** [3] - 14:13,
15:14, 18:2
**relayed** [1] - 129:21
**release** [3] - 123:13,
123:22, 123:24
**released** [3] - 208:8,
209:6, 210:10
**releases** [4] -
122:16, 122:23,
123:1, 123:4
**relevance** [10] -
29:16, 79:4, 79:10,
79:13, 85:3, 85:5,
86:6, 233:20, 317:9,
317:12
**relevant** [8] - 29:25,
117:23, 288:6,
288:18, 288:21,
288:23, 289:1, 289:3
**reliability** [1] - 81:9
**reliable** [1] - 226:13
**relied** [5] - 38:14,
81:23, 250:10, 268:9,
285:20
**relief** [2] - 8:11, 9:4
**rely** [10] - 14:21,
24:21, 38:16, 49:14,
171:9, 252:19,
253:21, 283:8, 333:4,
333:14
**relying** [2] - 189:21,
189:22
**remain** [9] - 75:4,
158:13, 220:22,
244:16, 247:6,
269:14, 270:1, 270:4
**remainder** [1] -
332:7
**remaining** [5] -
156:13, 269:19,
269:20, 286:3, 286:15
**remains** [3] - 118:10,
269:22, 270:2
**remedy** [1] - 8:25
**remember** [41] -
21:7, 22:12, 32:14,
39:21, 45:5, 58:21,
58:25, 59:2, 82:11,
98:4, 108:8, 108:14,
111:22, 123:12,
124:22, 129:3,
149:21, 150:1, 167:7,
178:9, 198:8, 202:11,

205:7, 205:8, 215:11,
218:6, 225:17,
241:13, 241:20,
242:2, 242:4, 249:25,
250:2, 250:3, 251:15,
252:24, 268:3,
281:17, 289:11,
291:20, 292:15
**remind** [3] - 35:7,
125:11, 165:2
**reminded** [1] - 87:15
**reminder** [1] -
140:14
**remote** [3] - 115:19,
115:24, 199:6
**remotely** [2] - 141:4,
204:9
**remove** [1] - 230:2
**removed** [1] - 32:1
**repeat** [13] - 39:22,
49:18, 56:11, 107:7,
162:1, 176:23, 179:2,
182:22, 195:18,
268:15, 276:20,
277:5, 292:1
**repeating** [1] -
325:24
**rephrase** [3] -
145:12, 172:15,
173:20
**replaced** [1] - 307:11
**report** [54] - 22:9,
37:3, 172:1, 203:9,
204:22, 207:3, 209:2,
209:5, 213:11,
213:12, 213:14,
214:1, 214:8, 215:20,
215:21, 218:2, 220:2,
221:19, 234:8, 236:1,
242:14, 243:14,
250:10, 252:1, 254:1,
254:3, 254:4, 254:22,
255:20, 257:22,
259:9, 260:15,
260:18, 261:11,
261:24, 262:6,
262:12, 267:11,
268:7, 269:18, 270:6,
271:10, 274:7, 277:3,
278:5, 280:16,
280:17, 281:22,
283:8, 284:25,
285:19, 285:24,
296:8, 331:24
**Report** [2] - 22:10,
22:18

**REPORTED** [1] - 3:1
**reported** [1] - 96:19
**reporter** [12] - 17:15,
18:18, 37:19, 89:8,

90:13, 125:22, 135:1,
199:18, 225:1,
237:13, 260:7, 299:10
**Reporter** [3] - 3:2,
301:13, 335:10
**reporters** [1] - 17:17
**reports** [8] - 12:17,
44:17, 185:16,
204:12, 208:17,
293:8, 293:15, 298:21
**represent** [7] - 35:5,
107:23, 107:24,
117:13, 165:12,
223:24, 316:13
**representation** [2] -
309:24, 310:9
**representative** [8] -
10:23, 103:21,
118:18, 119:7,
122:20, 125:14,
131:7, 144:23
**Representative** [4] -
89:16, 118:8, 122:5,
138:25
**representative's** [3]
- 118:5, 118:25,
121:25
**representatives** [2] -
10:6, 307:22
**represented** [1] -
66:9
**representing** [1] -
191:15
**represents** [1] -
272:2
**reproduce** [1] -
256:13
**reproducing** [2] -
226:9, 289:17
**reproduction** [3] -
218:13, 257:1, 289:16
**reproductively** [1] -
256:8
**republican** [1] -
95:16
**request** [12] - 73:4,
77:4, 96:20, 96:24,
108:18, 129:2,
131:14, 131:20,
131:22, 138:19,
138:23, 332:13
**requested** [11] -
77:1, 81:20, 108:3,
108:22, 127:4, 127:9,
127:13, 128:8, 129:8,
129:14, 133:6
**requesting** [1] -
132:13
**requests** [5] - 73:9,
99:4, 131:16, 138:16,

90:13, 125:22, 135:1,
199:18, 225:1,
237:13, 260:7, 299:10
138:22
**require** [2] - 67:6,
160:24
**required** [2] - 32:23,
126:8
**requirements** [4] -
7:22, 206:3, 242:22,
251:1
**requires** [1] - 206:22
**requiring** [1] - 113:9
**reschedule** [1] -
331:19
**research** [8] -
146:11, 201:8,
208:25, 260:2, 265:2,
279:22, 290:2, 290:3
**researchers** [2] -
279:11, 279:20
**researching** [1] -
205:23
**reserve** [2] - 16:20,
334:3
**Reserve** [1] - 256:2
**Reservoir** [1] - 26:4
**residential** [2] -
228:23, 265:18
**resist** [1] - 23:24
**resolved** [1] - 190:2
**resource** [1] - 329:20
**resources** [4] -
104:23, 144:14,
163:4, 229:17
**respect** [2] - 216:9,
244:6
**respective** [2] -
197:23, 199:9
**respond** [4] - 12:10,
86:19, 277:23, 329:22
**responding** [1] -
73:4
**responds** [1] - 278:2
**response** [11] - 77:4,
79:25, 80:20, 82:1,
95:8, 111:10, 138:19,
167:23, 184:4,
266:18, 292:11
**responses** [3] -
72:11, 72:18, 72:23
**responsibilities** [2] -
96:8, 145:14
**responsibility** [3] -
19:17, 201:13, 209:17
**responsible** [3] -
106:3, 106:5, 326:7
**responsive** [2] -
39:15, 39:18
**rest** [7] - 11:23, 23:5,
135:9, 139:16, 198:6,
254:1, 327:13
**restart** [1] - 199:5

**restaurants** [10] - 167:14, 167:18, 167:22, 183:21, 183:22, 184:5, 184:7, 184:8, 184:10, 184:13

**Restoration** [10] - 26:7, 26:20, 28:4, 28:6, 29:2, 30:5, 30:9, 31:5, 56:2, 73:6

**restoration** [10] - 12:1, 19:24, 20:10, 20:25, 21:19, 31:1, 31:14, 38:12, 104:19, 104:20

**restore** [2] - 23:21, 32:6

**restoring** [2] - 31:3, 31:19

**result** [6] - 165:16, 219:24, 234:11, 238:6, 247:3, 264:12

**resulted** [2] - 203:9, 226:18

**resulting** [1] - 195:5

**results** [5] - 95:25, 138:22, 267:6, 274:24, 292:10

**resume** [1] - 140:5

**retain** [1] - 27:12

**retained** [3] - 120:2, 120:4, 127:25

**reticulated** [1] - 305:20

**retired** [1] - 205:16

**retract** [1] - 315:15

**return** [2] - 87:6, 311:17

**reuse** [1] - 25:23

**revealed** [1] - 265:17

**reverse** [1] - 151:16

**review** [36] - 15:23, 26:3, 26:19, 26:21, 36:4, 38:25, 39:1, 40:7, 40:10, 59:7, 68:3, 76:21, 201:14, 204:11, 204:17, 204:24, 205:11, 205:13, 206:22, 207:14, 207:15, 207:25, 210:8, 212:19, 213:19, 216:13, 216:21, 220:2, 220:3, 227:15, 251:8, 251:13, 265:2, 265:16

**reviewed** [16] - 133:5, 133:13, 184:22, 185:2, 185:5, 185:11, 185:12, 185:17, 187:5, 196:6,

209:5, 209:6, 213:16, 213:18, 255:2, 293:19

**reviewing** [2] - 17:3, 202:6

**reviews** [6] - 76:14, 208:5, 209:15, 227:25, 250:12, 250:16

**revising** [1] - 196:24

**rewrite** [1] - 209:16

**Rick** [1] - 325:4

**ride** [3] - 105:16, 148:18, 154:6

**ride-alongs** [1] - 105:16

**rider** [1] - 299:25

**rides** [4] - 25:9, 167:5, 300:17, 300:18

**right-hand** [1] - 314:16

**rights** [3] - 33:12, 49:16

**ring** [1] - 70:11

**rise** [19] - 87:12, 87:14, 140:12, 160:18, 197:7, 200:9, 209:24, 210:3, 268:13, 268:21, 290:23, 290:25, 291:12, 291:14, 291:19, 292:9, 297:16, 334:22

**rises** [2] - 214:24, 215:13

**risk** [23] - 97:17, 178:6, 179:18, 194:12, 228:4, 230:8, 234:21, 234:24, 234:25, 235:1, 235:3, 235:4, 235:7, 237:9, 237:16, 238:21, 238:22, 239:9, 264:4, 264:5, 266:16, 287:11

**risking** [1] - 161:1

**risks** [4] - 238:24, 239:7, 239:12, 265:1

**River** [3] - 21:15, 201:15, 256:14

**Road** [31] - 25:8, 46:21, 147:19, 148:17, 149:7, 149:8, 150:15, 150:17, 151:13, 166:5, 167:13, 190:14, 234:14, 263:20, 300:16, 300:24, 302:5, 302:8, 302:9, 302:15, 302:23, 303:12, 303:15, 303:21, 304:2,

304:12, 305:9, 311:20

**road** [59] - 34:18, 60:23, 61:2, 61:3, 62:7, 63:1, 63:2, 63:5, 75:21, 77:16, 91:19, 93:12, 93:13, 115:5, 147:19, 148:19, 181:14, 181:18, 231:15, 234:23, 235:11, 235:14, 236:12, 236:19, 237:9, 237:16, 262:12, 262:18, 262:19, 262:24, 262:25, 295:25, 300:25, 301:2, 301:9, 301:22, 302:11, 302:19, 303:1, 303:2, 303:13, 303:19, 304:4, 304:7, 305:6, 305:14, 308:14, 312:7, 314:6, 320:7, 320:9, 321:4, 321:5, 321:22, 321:23, 322:11, 322:15

**roadkill** [9] - 227:10, 228:4, 234:6, 234:13, 236:1, 236:5, 288:14, 290:18, 290:20

**roads** [7] - 61:7, 91:22, 92:10, 100:1, 114:10, 115:2, 264:20

**roadway** [3] - 92:11, 100:13, 183:4

**roadways** [2] - 92:21, 196:7

**Robert** [1] - 283:6

**robust** [1] - 59:22

**rock** [2] - 200:5, 322:13

**rockier** [1] - 214:24

**rode** [1] - 314:11

**Rodriguez** [1] - 18:1

**role** [10] - 8:20, 55:2, 72:4, 73:3, 144:10, 144:19, 145:6, 145:8, 145:9, 145:24

**roller** [1] - 306:25

**rolling** [1] - 306:19

**Ron** [1] - 83:9

**room** [2] - 140:18, 199:9

**roost** [7] - 159:21, 159:23, 173:12, 190:13, 190:19, 190:21, 191:2

**roosting** [2] - 160:6, 190:23

**roosts** [2] - 160:3, 190:10

**roughly** [3] - 91:2, 267:23, 275:9

**round** [1] - 101:19

**routinely** [1] - 207:13

**royal** [1] - 130:14

**RPR** [2] - 3:2, 335:9

**rugged** [1] - 148:19

**rule** [2] - 9:20, 11:6

**ruled** [1] - 85:21

**ruling** [2] - 86:8, 332:12

**run** [4] - 17:17, 143:21, 183:11, 298:17

**run-on** [1] - 17:17

**running** [4] - 85:7, 85:12, 94:5, 96:7

**runoff** [2] - 34:6, 165:22

**runway** [18] - 22:19, 22:21, 22:23, 23:1, 23:15, 33:5, 41:25, 47:12, 47:13, 54:10, 54:13, 69:17, 69:21, 175:14, 214:22, 222:1, 322:14, 322:16

**rural** [1] - 204:15

## S

**S-A-M-P-L-E-S** [1] - 18:20

**Safari** [1] - 167:17

**safe** [4] - 62:4, 186:5, 314:6, 328:1

**safely** [2] - 301:5, 301:7

**safety** [4] - 97:5, 112:10, 113:25, 311:24

**Saint** [1] - 1:23

**sake** [1] - 269:5

**salient** [1] - 9:15

**Samples** [2] - 7:1, 17:22, 18:15, 18:20, 18:24, 23:8, 28:1, 28:14, 32:12, 35:3, 43:7, 52:24, 57:10, 66:15, 68:25, 69:8, 72:1, 72:22, 75:25, 77:20, 79:25, 188:11, 189:19

**samples** [3] - 10:10, 25:2, 30:3

**SAMPLES** [1] - 4:4

**samples'** [1] - 187:21

**Samples'** [3] - 56:24, 66:10, 187:22

**Samples's** [1] - 58:6

**Santorufo** [3] -

140:17, 151:5, 163:15

**satellite** [1] - 202:19

**Saturday** [3] - 90:11, 192:2, 192:4

**Save** [1] - 192:6

**save** [2] - 11:2, 273:18

**saw** [27] - 32:16, 34:1, 34:18, 60:21, 111:7, 131:8, 132:12, 174:12, 186:1, 212:20, 249:23, 250:2, 262:4, 275:2, 304:23, 306:13, 306:17, 306:24, 307:1, 307:12, 309:25, 310:10, 313:24, 314:3, 322:7, 322:22, 332:23

**Scale** [2] - 203:11, 217:7

**scale** [3] - 31:12, 69:19, 233:3

**scared** [1] - 49:8

**scat** [2] - 158:23, 158:24

**scenario** [3] - 193:6, 237:24, 238:22

**scenarios** [1] - 238:5

**scenic** [4] - 148:17, 148:18, 148:23, 151:17

**schedule** [3] - 198:3, 327:6, 331:15

**scheduled** [6] - 90:20, 95:3, 136:6, 139:4, 198:8, 331:19

**schedules** [1] - 330:25

**scheduling** [2] - 198:8, 199:6, 327:5

**SCHILLER** [1] - 2:9

**school** [2] - 105:18, 304:24

**Schwiep** [17] - 6:6, 12:21, 13:10, 28:21, 34:23, 43:1, 66:8, 66:24, 76:8, 80:24, 86:18, 139:3, 298:25, 327:2, 327:21, 328:5, 333:6

**SCHWIEP** [63] - 1:14, 4:5, 6:6, 6:25, 9:2, 10:21, 11:6, 11:21, 11:24, 12:4, 12:25, 13:13, 17:10, 17:20, 17:22, 18:23, 21:3, 23:7, 27:7, 27:10, 27:20, 27:25, 28:16, 28:22, 28:24,

29:21, 30:2, 30:24, 33:17, 33:19, 34:21, 43:2, 53:1, 57:9, 66:6, 66:11, 68:6, 68:22, 69:5, 75:6, 76:10, 77:20, 83:24, 139:7, 139:25, 140:3, 140:9, 140:19, 188:10, 188:17, 197:4, 197:20, 198:19, 198:21, 248:2, 298:14, 327:3, 328:6, 328:15, 328:22, 333:7, 334:6, 334:15

**Schwiep's** [1] - 68:14

**Science** [1] - 143:24

**science** [23] - 19:13, 19:15, 19:19, 19:20, 19:21, 35:11, 36:6, 37:11, 76:23, 104:15, 105:3, 105:4, 118:1, 146:11, 148:3, 148:4, 172:7, 172:8, 173:8, 185:12, 207:5, 207:10

**science-based** [1] - 146:11

**science-driven** [1] - 19:13

**sciences** [1] - 105:5

**scientific** [13] - 19:18, 22:1, 22:4, 22:10, 31:23, 34:3, 36:22, 40:17, 49:14, 105:2, 156:19, 159:24, 190:12

**scientific-known** [1] - 159:24

**scientist** [4] - 36:24, 38:14, 252:19, 287:23

**scientists** [4] - 19:12, 38:13, 222:7, 243:24

**scooping** [1] - 308:2

**scope** [4] - 68:24, 116:22, 144:22, 179:23

**scoping** [1] - 162:17

**SCOTT** [1] - 1:15

**Scott** [5] - 6:8, 120:4, 324:18, 325:4, 325:7

**scratch** [2] - 41:21, 63:16

**screen** [21] - 30:13, 30:18, 30:19, 42:21, 44:11, 65:23, 66:1, 66:23, 67:6, 82:24, 82:25, 83:6, 121:18, 126:21, 163:13, 187:14, 187:23,

188:11, 210:18, 285:6

**screens** [1] - 323:4

**screenshot** [1] - 189:20

**screenshots** [1] - 87:5

**scroll** [4] - 83:5, 126:20, 127:12, 164:4

**scrutiny** [2] - 22:18, 32:22

**se** [2] - 11:10, 109:2

**sea** [11] - 209:24, 210:3, 268:13, 268:21, 290:22, 290:25, 291:12, 291:14, 291:18, 292:9

**search** [3] - 252:16, 252:25, 278:7

**searches** [1] - 212:23

**searching** [1] - 62:8

**season** [5] - 153:23, 154:14, 154:17, 182:14, 222:10

**seat** [4] - 18:16, 89:6, 199:17, 299:8

**seated** [4] - 8:16, 87:15, 141:9, 200:13

**second** [14] - 24:1, 42:14, 59:11, 59:16, 59:20, 90:9, 92:14, 138:9, 205:16, 210:20, 216:6, 251:2, 256:18, 260:6

**secondary** [4] - 168:13, 217:9, 281:19, 294:23

**seconds** [1] - 314:23

**Secretary** [1] - 84:10

**secretive** [1] - 158:14

**section** [9] - 59:25, 60:3, 95:3, 201:23, 202:17, 277:2, 277:8

**sections** [1] - 209:17

**sector** [1] - 110:25

**secure** [1] - 104:24

**secured** [1] - 104:20

**securing** [1] - 57:18

**SECURITY** [3] - 87:14, 200:9, 334:22

**security** [8] - 57:21, 87:16, 87:19, 91:19, 92:12, 93:19, 110:23, 111:2

**Security** [4] - 127:5, 312:16, 313:3, 313:6

**see** [136] - 15:17, 17:7, 27:7, 28:1, 29:8, 30:8, 30:20, 31:6,

31:18, 34:12, 39:22, 41:5, 42:11, 46:23, 47:4, 60:1, 60:23, 62:6, 68:20, 78:8, 81:25, 84:8, 89:2, 90:22, 94:7, 95:7, 100:7, 100:15, 100:22, 102:23, 110:12, 111:1, 119:18, 123:25, 126:24, 127:6, 129:14, 130:23, 134:14, 137:16, 139:12, 140:10, 155:15, 157:25, 158:1, 158:4, 158:11, 158:17, 159:6, 159:10, 159:22, 160:1, 160:4, 160:7, 160:10, 161:24, 162:10, 164:2, 165:9, 166:22, 166:23, 169:24, 169:25, 172:14, 183:4, 183:7, 188:23, 189:3, 190:23, 191:2, 194:23, 195:2, 195:7, 195:15, 195:17, 195:19, 195:21, 198:21, 207:8, 210:18, 215:22, 235:3, 235:16, 236:5, 236:7, 242:12, 244:11, 245:25, 246:11, 251:16, 255:4, 271:22, 290:21, 294:14, 302:6, 302:11, 303:10, 303:12, 305:17, 306:2, 306:3, 306:5, 306:8, 307:4, 307:14, 307:17, 308:14, 308:25, 309:8, 309:10, 309:11, 312:9, 312:18, 313:16, 314:7, 314:24, 315:1, 315:17, 318:4, 318:5, 318:10, 318:19, 320:5, 320:6, 320:15, 320:25, 323:2, 323:9, 323:11, 330:3, 330:6, 331:24, 334:21

**seeing** [13] - 18:12, 42:13, 116:8, 149:25, 157:24, 158:25, 174:8, 174:13, 194:20, 306:21, 311:2, 313:14, 333:9

**seeking** [2] - 9:3, 99:5

**seem** [3] - 8:4, 120:20, 219:16

**sees** [2] - 8:22, 314:5

**segments** [3] - 196:7, 236:13, 236:17

**self** [1] - 288:25

**self-driving** [1] - 288:25

**semblance** [1] - 86:20

**semicircle** [1] - 108:13

**Seminole** [1] - 167:16

**Senar** [1] - 305:19

**send** [4] - 15:23, 86:12, 122:15, 123:4

**sender** [1] - 129:25

**sending** [2] - 123:7, 123:12

**senior** [1] - 19:20

**sense** [9] - 100:6, 127:18, 219:19, 242:2, 247:3, 255:7, 295:13, 297:18, 327:9

**sensitive** [1] - 55:1, 148:25, 249:3

**sent** [1] - 130:8

**sentence** [2] - 127:6, 128:17

**separate** [3] - 14:16, 212:14, 297:4

**separated** [1] - 91:5

**separately** [1] - 297:4

**sequentially** [1] - 27:11

**sequestered** [1] - 247:13

**sequestration** [2] - 9:20, 11:7

**series** [3] - 82:24, 121:8, 135:3

**serious** [2] - 22:17, 297:16

**seriously** [1] - 55:2

**serve** [4] - 117:2, 156:3, 203:5, 203:6

**served** [1] - 89:18

**service** [4] - 17:13, 208:22, 209:9, 216:12

**Service** [16] - 189:15, 203:5, 206:2, 206:3, 206:16, 208:20, 209:1, 210:9, 215:10, 216:4, 217:6, 220:4, 240:7, 255:1, 255:15, 258:3

**Services** [2] - 201:22, 282:5

**services** [2] - 113:15, 113:19

**serving** [2] - 89:16, 104:16

**session** [1] - 136:10

**set** [4] - 19:9, 82:13, 118:13, 139:20

**setting** [2] - 100:16, 138:3

**seven** [7] - 13:6, 45:9, 104:16, 110:20, 154:25, 166:14, 202:5

**several** [8] - 51:23, 91:19, 93:9, 112:1, 134:2, 138:16, 204:8, 209:12

**sewage** [1] - 118:10

**sex** [1] - 246:19

**shaded** [1] - 69:17

**share** [7] - 72:22, 83:24, 83:25, 143:22, 163:13, 163:18, 187:14

**shared** [7] - 111:14, 112:8, 113:24, 123:14, 123:16, 123:18, 131:20

**sharing** [1] - 174:9

**Shark** [13] - 150:8, 150:13, 150:14, 153:3, 153:9, 153:16, 154:3, 154:6, 154:9, 155:10, 166:19, 173:24, 195:12

**shelter** [1] - 229:18

**Shindle** [1] - 280:13

**shine** [1] - 173:15

**shining** [2] - 92:25, 93:7

**shoes** [2] - 102:7, 105:18

**short** [3] - 188:11, 231:24, 248:3

**shorter** [1] - 328:10

**shot** [1] - 187:23

**shots** [2] - 246:19

**shout** [1] - 48:19, 324:21

**show** [24] - 27:2, 42:8, 44:14, 58:1, 65:21, 66:23, 72:10, 80:15, 85:8, 157:14, 187:11, 188:7, 188:21, 210:1, 210:17, 213:23, 219:23, 227:9, 284:9, 291:4, 309:14, 314:17, 314:21, 319:11

**showed** [3] - 44:23,

190:13, 237:25
**showing** [1] - 276:11
**shown** [5] - 29:3, 80:9, 126:21, 209:21, 243:7
**shows** [17] - 28:19, 29:2, 71:2, 71:11, 71:19, 216:1, 216:3, 218:3, 218:4, 220:5, 221:22, 231:24, 243:16, 244:21, 274:24, 279:7, 295:14
**Shultz** [1] - 108:15
**shut** [1] - 317:23
**sic** [1] - 97:3
**side** [27] - 34:18, 62:7, 68:4, 78:24, 119:5, 121:10, 186:4, 186:8, 198:4, 198:11, 244:5, 301:17, 302:2, 305:5, 305:6, 305:8, 306:7, 307:1, 313:13, 314:2, 314:16, 320:8, 321:2, 327:9, 327:12
**sidebar** [1] - 206:20
**sides** [3] - 197:24, 221:16, 302:8
**sight** [1] - 172:21
**sighting** [4] - 69:23, 71:2, 71:14, 71:20
**sightings** [1] - 227:14
**sign** [3] - 192:6, 307:19, 307:25
**signal** [2] - 223:11, 223:15
**signals** [1] - 67:16
**signature** [2] - 126:24, 164:6
**signed** [8] - 58:23, 60:11, 73:13, 73:21, 126:16, 136:18, 164:9, 197:17
**significance** [3] - 226:8, 282:3, 294:21
**significant** [14] - 37:20, 54:25, 147:17, 152:14, 261:25, 262:9, 262:10, 282:1, 282:13, 291:24, 292:4, 306:22, 327:14
**signs** [6] - 115:25, 158:21, 158:22, 159:1, 159:21, 307:9
**silt** [2] - 115:7, 115:10
**similar** [5] - 68:7, 127:13, 219:21, 227:2, 243:8
**simply** [1] - 131:4

**sincerely** [1] - 64:25
**SINGER** [23] - 2:17, 4:9, 124:11, 124:13, 124:18, 124:22, 125:2, 125:4, 125:6, 125:15, 128:20, 130:23, 131:1, 131:3, 131:9, 133:8, 133:12, 135:4, 135:9, 325:11, 326:16, 326:21, 328:20
**Singer** [3] - 7:21, 125:16, 325:14
**single** [5] - 54:10, 106:13, 222:20, 222:21, 223:1
**sink** [2] - 221:1, 221:5
**sirens** [2] - 320:4, 320:24
**sit** [5] - 24:23, 71:18, 81:13, 308:23, 319:7
**site** [234] - 22:23, 24:23, 25:3, 25:7, 25:24, 33:21, 34:1, 34:7, 41:12, 41:22, 41:25, 46:21, 46:22, 49:23, 50:5, 50:23, 51:19, 52:4, 52:14, 53:13, 55:12, 55:17, 56:3, 57:3, 57:5, 57:18, 59:6, 60:3, 60:16, 61:3, 61:4, 61:13, 61:14, 61:15, 61:22, 63:12, 64:3, 64:10, 65:9, 66:18, 70:1, 70:22, 74:8, 77:2, 77:13, 79:18, 90:4, 90:17, 90:22, 92:7, 93:25, 94:14, 99:25, 100:20, 100:22, 101:2, 101:16, 101:22, 102:5, 102:16, 103:9, 107:16, 108:22, 110:5, 110:12, 111:4, 111:8, 111:15, 113:16, 114:2, 114:10, 115:6, 115:13, 115:15, 115:22, 116:4, 117:18, 117:24, 118:2, 123:17, 123:23, 124:8, 125:10, 126:1, 127:22, 128:23, 132:12, 134:17, 149:9, 149:12, 150:5, 150:11, 154:4, 154:9, 157:15, 160:14,

161:7, 161:8, 161:12, 161:14, 161:15, 167:4, 168:19, 176:21, 176:24, 177:16, 179:10, 179:14, 180:14, 180:24, 181:8, 185:23, 186:21, 186:24, 189:9, 189:14, 191:3, 191:6, 205:23, 213:3, 213:19, 214:17, 214:19, 214:23, 215:2, 215:5, 215:6, 215:9, 215:10, 215:11, 215:16, 215:25, 218:23, 218:24, 221:10, 221:25, 222:1, 222:9, 222:12, 223:1, 223:15, 225:25, 227:18, 227:20, 227:25, 228:14, 229:1, 230:11, 230:14, 230:15, 231:19, 231:20, 232:19, 233:3, 234:14, 236:4, 239:13, 239:16, 247:5, 249:15, 249:16, 249:20, 250:13, 250:16, 250:17, 250:22, 251:3, 252:2, 252:5, 252:7, 252:18, 253:4, 253:7, 253:9, 255:9, 261:2, 261:5, 261:17, 264:12, 266:21, 266:23, 267:4, 267:15, 267:16, 269:7, 270:11, 270:16, 270:21, 270:24, 271:6, 271:8, 271:9, 272:2, 272:3, 272:22, 275:11, 275:18, 275:21, 276:8, 276:12, 278:6, 278:16, 278:19, 279:4, 281:8, 282:20, 282:25, 290:5, 293:19, 293:22, 294:6, 294:8, 294:13, 295:12, 302:4, 304:19, 307:4, 311:7, 318:5, 318:7, 318:12, 319:21, 321:11, 321:12, 322:1, 322:10, 324:14
**Site** [47] - 84:12, 90:1, 107:13, 116:21, 122:22, 125:10,

126:7, 131:13, 132:10, 132:18, 133:2, 133:3, 149:8, 149:10, 152:24, 153:6, 153:9, 154:24, 155:3, 157:5, 157:12, 160:13, 161:5, 161:25, 162:4, 166:9, 166:17, 172:25, 177:9, 186:7, 186:8, 186:18, 190:16, 194:4, 194:25, 195:8, 195:17, 246:25, 260:16, 300:21, 305:12, 309:25, 310:10, 316:16, 317:2, 321:13, 324:6
**sites** [9] - 114:13, 122:10, 149:11, 155:2, 193:15, 231:14, 250:20, 256:5, 304:13
**sits** [1] - 33:5
**sitting** [3] - 313:15, 314:5, 320:3
**situated** [1] - 93:5
**situation** [4] - 48:4, 48:5, 95:24, 141:3
**six** [20] - 25:7, 44:15, 45:8, 45:9, 45:15, 46:20, 56:23, 110:20, 154:25, 166:14, 173:18, 173:22, 175:17, 213:7, 221:18, 231:4, 253:6, 296:6, 296:9, 321:18
**six-foot** [1] - 231:4
**size** [11] - 106:8, 201:15, 208:1, 212:3, 212:4, 212:5, 216:22, 219:12, 230:1, 311:4
**sized** [1] - 91:8
**skies** [13] - 34:10, 34:13, 51:14, 149:15, 149:25, 151:22, 152:10, 152:21, 160:22, 160:23, 166:17, 168:10, 168:12
**Skies** [1] - 192:6
**skip** [1] - 256:4
**sky** [9] - 34:11, 41:12, 152:12, 168:3, 168:5, 172:21, 303:4, 303:5, 303:10
**skylight** [1] - 232:2
**slow** [7] - 19:25, 20:16, 20:18, 39:11, 83:10, 90:12, 204:5
**Slow** [1] - 20:20

**slowly** [8] - 17:15, 18:19, 23:14, 35:6, 89:7, 140:15, 200:6, 200:12
**slur** [1] - 125:20
**small** [18] - 31:7, 42:21, 101:3, 103:8, 158:10, 204:24, 205:1, 219:12, 219:13, 220:19, 221:6, 230:6, 269:10, 269:11, 269:12, 287:1, 287:2, 287:3
**smaller** [3] - 92:6, 287:4, 291:20
**snail** [3] - 143:19, 156:9, 302:17
**snake** [1] - 156:9
**Snake** [1] - 167:13
**social** [16] - 32:16, 83:1, 84:4, 86:2, 86:5, 121:11, 121:25, 122:3, 122:9, 122:16, 122:18, 122:21, 123:15, 123:25, 143:1
**Society** [1] - 146:21
**soft** [1] - 105:5
**soil** [7] - 11:25, 12:2, 178:21, 215:12, 215:15, 305:21, 307:2
**Soil** [1] - 215:9
**soils** [3] - 215:9, 215:10, 250:25
**solar** [4] - 205:19, 205:24, 206:5, 230:25
**solicitations** [1] - 120:14
**soliciting** [1] - 29:4
**solo** [1] - 311:23
**solution** [1] - 332:24
**someone** [14] - 8:22, 17:5, 38:24, 61:17, 100:19, 123:16, 124:7, 147:25, 150:23, 199:24, 200:5, 265:6, 272:2, 327:22
**someplace** [1] - 309:5
**sometime** [2] - 75:14, 243:19
**sometimes** [16] - 23:18, 233:5, 235:19, 305:16, 308:21, 309:5, 311:25, 312:22, 313:8, 313:9, 318:16, 318:17, 323:2, 323:14
**somewhat** [1] - 8:19
**Somewhere** [1] -

263:15
**somewhere** [18] - 41:4, 114:3, 166:14, 194:23, 212:10, 212:13, 212:14, 229:17, 229:22, 229:23, 233:14, 233:18, 234:25, 238:10, 250:4, 258:25
**son** [5] - 50:17, 50:23, 62:17, 62:20, 63:3
**song** [1] - 143:20
**sonic** [1] - 22:16
**soon** [5] - 75:14, 124:21, 127:22, 184:3, 196:19
**Sorry** [1] - 58:16
**sorry** [38] - 11:9, 12:6, 20:16, 23:3, 39:14, 52:24, 100:1, 115:20, 119:20, 125:11, 125:12, 147:5, 167:15, 167:17, 193:22, 201:25, 202:1, 217:4, 221:23, 223:23, 230:19, 232:15, 232:18, 256:16, 258:13, 259:18, 259:20, 260:6, 266:12, 266:13, 266:14, 266:19, 268:18, 273:10, 281:7, 282:1, 290:21
**sort** [26] - 16:9, 17:9, 37:10, 53:7, 67:5, 98:5, 110:24, 112:19, 116:7, 147:17, 153:16, 153:23, 172:1, 219:21, 229:8, 230:13, 236:16, 237:4, 241:24, 264:8, 293:22, 294:16, 305:15, 305:17, 323:11, 329:12
**sought** [4] - 8:11, 80:16, 114:14, 138:15
**sound** [6] - 19:23, 41:13, 49:8, 172:22, 196:19, 269:2
**sounded** [1] - 170:15
**sounds** [5] - 28:11, 62:16, 70:13, 165:14, 169:3
**source** [14] - 93:6, 163:13, 188:12, 220:14, 220:18, 221:1, 221:2, 221:8, 221:14, 271:25,

272:1, 278:22, 295:11
**sources** [5] - 48:8, 209:25, 213:5, 231:25, 293:12
**south** [5] - 244:10, 302:5, 305:5, 305:6, 305:8
**South** [17] - 34:12, 142:21, 143:21, 192:9, 205:2, 205:5, 205:19, 208:11, 209:18, 216:16, 218:7, 228:10, 230:4, 233:14, 257:20, 260:13, 290:10
**southeast** [1] - 205:12
**Southeastern** [1] - 215:7
**Southern** [1] - 328:18
**SOUTHERN** [1] - 1:1
**Southwest** [3] - 107:9, 142:5, 148:1
**southwest** [6] - 220:18, 227:3, 227:8, 237:25, 268:14, 268:23
**spaghetti** [3] - 236:7, 236:12, 236:23
**span** [1] - 188:3
**sparingly** [1] - 177:7
**speaker** [2] - 95:2, 200:4
**speaking** [9] - 127:19, 135:2, 141:8, 170:5, 177:7, 259:20, 273:19, 325:1
**speaks** [3] - 81:9, 121:18, 196:7
**special** [9] - 7:23, 146:17, 148:1, 149:20, 151:23, 152:14, 159:17, 159:20
**species** [65] - 22:17, 34:14, 49:5, 76:14, 142:3, 143:5, 143:6, 143:12, 145:17, 146:10, 146:16, 156:4, 156:8, 156:11, 156:14, 156:24, 158:12, 159:2, 168:17, 171:11, 183:12, 185:18, 201:17, 202:1, 202:21, 203:3, 203:6, 204:10, 204:13, 205:4, 206:17, 206:18, 206:21,

206:24, 207:1, 207:7, 207:11, 207:20, 208:6, 208:8, 209:10, 212:2, 212:7, 213:8, 214:25, 215:14, 215:15, 216:14, 220:1, 228:17, 231:3, 240:8, 243:2, 251:1, 251:8, 280:22, 282:6, 288:21, 291:22, 291:23, 294:21, 297:14
**Species** [2] - 202:10, 216:9
**specific** [17] - 19:17, 43:19, 49:4, 70:1, 108:19, 108:21, 108:22, 111:4, 130:4, 132:8, 133:2, 153:21, 166:3, 180:24, 233:3, 282:5, 288:5
**specifically** [24] - 37:17, 58:22, 76:15, 83:2, 101:15, 108:18, 123:7, 123:13, 126:7, 129:20, 131:12, 138:11, 142:4, 167:8, 167:20, 173:19, 176:10, 180:18, 192:19, 195:3, 218:16, 278:4, 291:2, 325:17
**specificity** [2] - 101:18, 126:9
**specifics** [5] - 129:12, 130:9, 132:7, 134:4, 134:9
**spectacular** [3] - 142:2, 149:25, 171:8
**speculate** [6] - 38:21, 39:3, 40:3, 132:11, 133:24, 134:8
**speculating** [2] - 11:14, 98:13
**speculation** [6] - 169:6, 289:5, 291:24, 292:4, 292:5, 292:7
**speculative** [1] - 214:2
**speech** [1] - 125:20
**speed** [7] - 62:23, 62:25, 63:1, 63:4, 63:7, 181:11, 181:14
**speeds** [1] - 235:3
**spell** [4] - 18:18, 89:7, 199:18, 299:9
**spend** [3] - 79:11, 146:4, 254:18
**spending** [1] - 31:14
**spent** [5] - 61:12,

203:18, 274:18, 303:18, 305:11
**spills** [1] - 60:4
**spoken** [3] - 47:22, 95:21, 101:7
**spoonbills** [1] - 302:17
**sports** [1] - 309:13
**Sportsman** [1] - 303:8
**spot** [5] - 149:14, 152:12, 179:11, 267:18, 303:23
**spots** [7] - 154:19, 194:15, 196:3, 196:8, 196:12, 232:9, 232:10
**spread** [1] - 24:3
**spreadsheet** [1] - 80:14
**springs** [1] - 9:14
**square** [9] - 220:11, 233:15, 233:19, 262:19, 263:1, 263:2, 269:3, 280:2
**squared** [2] - 268:14, 269:9
**squares** [1] - 268:22
**squirrel** [1] - 148:5
**Ss** [1] - 125:23
**St** [3] - 2:21, 201:15, 260:2
**stable** [5] - 226:9, 258:7, 258:9, 258:16, 259:3
**stacks** [3] - 102:9
**stadium** [2] - 47:20, 309:13
**staff** [31] - 19:6, 35:10, 35:25, 36:1, 36:5, 36:7, 72:7, 76:23, 90:24, 91:10, 91:24, 95:9, 95:10, 98:1, 101:22, 103:24, 106:6, 110:7, 110:14, 110:19, 110:20, 115:2, 122:7, 122:8, 138:4, 146:10, 199:1, 249:3, 296:21, 333:8
**staffing** [1] - 296:23
**stage** [2] - 77:21, 334:2
**staging** [2] - 111:9, 111:16
**stand** [8] - 29:17, 124:23, 161:13, 161:20, 195:6, 230:19, 332:14, 333:25
**standard** [3] - 14:12, 17:16, 81:17

**standards** [12] - 15:14, 18:3, 112:7, 112:16, 112:19, 178:25, 179:4, 179:6, 179:10, 179:16, 180:13, 214:9
**standing** [5] - 10:13, 108:10, 108:13, 116:9, 333:6
**standpoint** [3] - 215:6, 215:16, 282:5
**star** [1] - 152:2
**stargaze** [2] - 34:10, 152:7
**stargazing** [3] - 152:23, 161:3, 173:14
**starry** [1] - 168:12
**stars** [5] - 149:16, 152:9, 152:21, 155:16, 303:10
**start** [22] - 54:23, 67:3, 68:16, 68:19, 69:13, 92:13, 126:20, 148:18, 148:19, 153:19, 179:7, 220:16, 221:23, 225:4, 228:25, 244:17, 249:12, 268:16, 268:17, 329:17, 330:10, 331:21
**started** [11] - 34:17, 92:9, 137:24, 139:5, 151:15, 151:16, 206:17, 210:11, 306:19, 318:7
**starting** [7] - 6:5, 20:14, 33:6, 34:1, 198:6, 206:15, 327:12
**starts** [2] - 139:17, 150:18
**STAs** [1] - 32:1
**STATE** [1] - 2:6
**State** [36] - 9:10, 18:17, 44:20, 50:11, 55:5, 55:11, 55:16, 57:20, 83:2, 89:7, 89:16, 89:17, 90:10, 90:20, 96:19, 111:16, 118:19, 133:15, 134:13, 141:14, 157:21, 179:19, 180:10, 180:15, 181:11, 199:17, 201:4, 202:8, 202:25, 206:11, 211:6, 211:14, 234:13, 263:20, 299:9, 329:9
**state** [28] - 6:4, 88:7, 89:14, 90:21, 97:8,

App. 406

104:18, 105:23, 107:25, 109:10, 109:18, 110:5, 110:9, 110:12, 111:4, 111:9, 112:6, 112:11, 112:17, 113:2, 129:20, 136:24, 137:3, 138:19, 151:12, 186:1, 189:14, 260:18, 312:24

**State's** [1] - 59:3

**statement** [16] - 85:11, 101:1, 101:21, 127:13, 164:12, 176:6, 178:23, 186:16, 187:1, 229:2, 232:5, 239:17, 284:2, 284:11, 285:7, 285:13

**Statement** [1] - 25:21

**statements** [14] - 9:12, 83:3, 85:5, 87:5, 108:2, 121:21, 122:12, 122:21, 123:5, 123:7, 202:4, 283:15, 284:15, 333:16

**States** [6] - 3:3, 75:4, 125:17, 247:13, 247:22, 335:10

**states** [1] - 191:18

**STATES** [3] - 1:1, 1:11, 2:14

**statewide** [3] - 202:18, 208:12, 209:19

**stations** [5] - 167:10, 183:16, 183:18, 184:10, 184:13

**status** [18] - 8:24, 185:18, 206:17, 206:19, 206:22, 206:24, 207:7, 207:14, 207:15, 207:20, 208:6, 208:8, 209:10, 212:2, 213:8, 214:7, 220:1, 280:22

**stay** [12] - 141:9, 176:4, 198:12, 228:18, 245:14, 304:25, 309:5, 309:7, 328:2, 330:9, 330:12

**stayed** [2] - 51:13, 303:6

**staying** [8] - 143:3, 199:3, 229:7, 231:24, 246:11, 308:15, 309:12, 333:8

**stays** [1] - 113:23

**steam** [1] - 311:5

**STENOGRAPHER** [6] - 20:16, 23:3, 107:7, 134:22, 201:25, 268:15

**STENOGRAPHICA LLY** [1] - 3:1

**step** [4] - 77:22, 139:1, 298:10, 326:24

**stepfather** [3] - 50:18, 62:20, 63:3

**Stephanie** [1] - 95:11

**Stetson** [1] - 143:24

**stewardship** [1] - 204:15

**stick** [2] - 264:8, 269:3

**still** [32] - 50:6, 100:7, 102:22, 109:16, 125:7, 155:14, 155:16, 179:18, 183:6, 193:2, 199:24, 204:20, 226:20, 227:20, 227:21, 235:20, 236:8, 237:7, 269:13, 270:4, 273:16, 280:7, 295:16, 295:17, 306:21, 308:7, 312:1, 320:1, 320:15, 320:16, 325:1

**stipulate** [1] - 10:17

**stipulation** [1] - 140:22

**stock** [1] - 159:12

**Stoneman** [5] - 21:13, 21:14, 23:12, 37:12, 38:13

**stood** [2] - 83:8, 108:16

**Stop** [1] - 53:3

**stop** [6] - 21:21, 52:8, 56:6, 92:14, 216:6, 330:11

**stories** [4] - 98:6, 149:2, 160:21, 212:23

**stork** [4] - 143:19, 156:9, 302:17

**storm** [3] - 31:24, 179:13, 180:13

**story** [7] - 23:19, 50:16, 96:18, 103:14, 103:16, 175:4, 231:24

**straight** [1] - 302:7

**Strand** [3] - 157:20, 186:5, 269:24

**straps** [1] - 236:23

**strategic** [2] - 19:9, 202:24

**stream** [2] - 134:7,

134:10

**streaming** [1] - 68:11

**streamlined** [1] - 89:1

**street** [2] - 146:18, 308:16

**Street** [1] - 2:15

**stretches** [1] - 323:1

**strike** [8] - 29:24, 66:16, 98:15, 113:5, 117:15, 117:20, 235:10, 244:20

**strikes** [3] - 161:18, 194:17, 235:8

**strip** [1] - 322:16

**stripe** [2] - 313:8, 313:9

**stripper** [1] - 305:21

**strips** [1] - 266:1

**strong** [2] - 231:25, 284:25

**strongly** [1] - 33:4

**struck** [1] - 196:9

**structured** [1] - 91:14

**structures** [4] - 31:10, 31:11, 112:9, 166:24

**Stuart** [1] - 20:12

**student** [2] - 259:22, 259:25

**studied** [9] - 54:17, 54:20, 227:21, 263:9, 277:18, 279:18, 280:7, 295:18, 296:15

**studies** [26] - 37:7, 56:12, 56:19, 57:6, 63:10, 63:13, 63:17, 63:20, 76:12, 76:13, 190:12, 228:16, 231:23, 234:17, 241:1, 241:25, 242:1, 252:20, 252:23, 267:6, 276:14, 276:19, 276:21, 277:1, 277:9, 294:2

**study** [17] - 36:20, 54:6, 63:15, 118:2, 171:21, 178:11, 190:17, 196:10, 245:11, 264:11, 264:21, 264:23, 267:9, 277:22, 278:2, 279:12, 288:18

**studying** [2] - 279:14, 279:17

**stuff** [1] - 222:8

**stumble** [1] - 246:23

**style** [3] - 34:8, 64:10, 313:1

**sub** [6] - 134:2, 203:6, 212:6, 212:13, 217:5, 257:23

**sub-adults** [3] - 212:6, 212:13, 257:23

**sub-team** [1] - 203:6

**subbing** [4] - 133:21

**subcontractors** [1] - 133:20

**subject** [4] - 36:19, 38:6, 171:20, 216:20

**subjects** [1] - 208:4

**submissions** [2] - 9:11, 24:11

**submit** [6] - 31:16, 197:16, 317:5, 317:7, 332:13, 334:12

**submitted** [21] - 14:19, 16:16, 25:21, 26:5, 30:4, 30:6, 31:22, 32:2, 33:7, 37:3, 70:4, 70:12, 72:19, 73:6, 73:8, 84:14, 172:1, 197:15, 213:14, 283:13, 317:6

**submitting** [1] - 70:6

**subpopulation** [1] - 219:12

**subpopulations** [1] - 220:19

**subsequent** [3] - 149:17, 162:6, 259:6

**subsequently** [1] - 205:17

**subset** [1] - 213:16

**substance** [1] - 274:12

**substantial** [1] - 57:20

**substantially** [1] - 269:11

**substantiate** [1] - 253:12

**substituted** [1] - 128:11

**succeeded** [1] - 226:12

**success** [1] - 158:17

**sudden** [2] - 267:18, 294:2

**sued** [2] - 52:8, 56:6

**suffer** [1] - 168:25

**sufficient** [2] - 124:19, 254:15

**suggest** [3] - 234:17, 256:5, 258:9

**suggested** [1] - 237:24

**suggestion** [1] - 198:19

**suggests** [2] - 228:15, 228:21

**suitability** [1] - 262:13

**Suite** [3] - 1:20, 2:4, 2:10

**sum** [1] - 9:15

**summarize** [1] - 227:18

**summer** [1] - 100:7

**summertime** [1] - 304:24

**sun** [3] - 149:15, 149:22, 155:14

**Sunbelt** [15] - 92:10, 92:15, 92:19, 92:24, 132:23, 133:16, 133:18, 133:22, 133:23, 133:25, 134:6, 134:14, 134:16, 307:8

**sunset** [3] - 159:22, 173:8, 173:12

**supplements** [1] - 329:3

**supply** [1] - 221:4

**support** [23] - 19:7, 24:7, 126:15, 146:6, 146:9, 163:9, 164:10, 199:1, 214:24, 215:12, 215:14, 220:8, 220:18, 220:21, 220:24, 221:8, 238:9, 256:8, 257:6, 257:8, 257:13, 304:20

**supporting** [2] - 15:21, 146:10

**supports** [3] - 14:23, 221:3, 238:4

**suppose** [4] - 8:12, 48:17, 66:17, 326:10

**supposed** [1] - 207:4

**surmise** [1] - 277:16

**surmised** [1] - 322:23

**surprise** [1] - 199:8

**surprised** [3] - 32:20, 60:14, 80:4

**surrounded** [7] - 23:16, 24:25, 93:22, 221:12, 221:16, 278:15, 294:8

**surrounding** [16] - 38:3, 57:21, 93:15, 148:25, 152:4, 162:25, 178:12, 179:20, 180:11, 181:14, 191:3, 191:6, 214:17, 214:22,

245:20, 294:12
**surveys** [4] - 56:9, 178:16, 178:21, 226:19
**survive** [3] - 194:22, 257:16, 257:19
**suspect** [1] - 139:9
**sustain** [3] - 119:12, 120:21, 221:7
**sustained** [4] - 75:7, 75:11, 75:21, 255:21
**sustaining** [1] - 177:20
**Swamp** [3] - 146:19, 167:17, 215:2
**swamp** [5] - 25:6, 46:20, 148:9, 238:1, 300:17
**swear** [1] - 18:13
**switched** [2] - 105:5, 320:1
**sworn** [10] - 15:18, 16:7, 16:13, 18:15, 89:2, 89:4, 141:10, 141:13, 199:16, 299:7
**sympathetic** [1] - 171:13
**System** [1] - 26:10
**system** [3] - 32:10, 41:4, 241:14
**systems** [1] - 94:9

**T**

**table** [5] - 141:4, 141:7, 225:15, 274:16, 274:21
**Table** [2] - 274:7, 274:22
**tables** [1] - 208:16
**tailed** [1] - 231:2
**tailgate** [1] - 91:25
**takeoff** [1] - 45:15
**takeoffs** [6] - 44:16, 44:24, 47:7, 49:23, 177:17, 274:3
**talks** [2] - 277:22, 283:11
**tall** [4] - 93:8, 101:19, 307:7, 308:20
**Tallahassee** [1] - 200:21
**taller** [2] - 141:8, 320:8
**Tamiami** [18] - 60:24, 60:25, 61:1, 61:2, 61:5, 61:10, 61:15, 61:19, 61:24, 62:5, 62:25, 77:16, 181:17, 181:25, 182:5,

182:13, 263:16
**TANIA** [1] - 1:18
**Tania** [1] - 6:10
**tankers** [1] - 52:23
**tarmac** [1] - 174:20
**taut** [1] - 320:17
**taxiway** [1] - 222:1
**taxiways** [1] - 214:22
**TDF** [1] - 58:9
**teach** [1] - 298:17
**team** [8] - 13:6, 35:10, 80:11, 96:23, 203:6, 203:7, 217:6, 329:6
**teamed** [1] - 204:21
**TECH** [1] - 27:6
**technically** [3] - 153:3, 182:25, 300:14
**technology** [4] - 170:4, 180:3, 193:22, 288:25
**teenager** [2] - 25:5, 50:18
**teleconference** [1] - 4:11
**telemetry** [57] - 65:24, 67:9, 67:10, 67:11, 67:18, 68:13, 69:5, 69:15, 70:5, 70:18, 70:23, 71:1, 148:3, 157:8, 186:17, 186:18, 186:24, 187:3, 187:6, 188:5, 189:7, 189:22, 212:25, 213:1, 222:25, 223:2, 223:4, 223:6, 223:8, 223:25, 224:5, 224:6, 224:11, 224:14, 225:20, 227:6, 227:7, 237:3, 243:16, 243:25, 246:22, 270:15, 270:20, 274:20, 274:24, 275:10, 276:9, 276:11, 279:7, 294:9, 294:14, 295:9, 295:10, 295:13, 296:12, 296:13
**temporary** [12] - 124:15, 287:5, 287:6, 288:4, 289:9, 289:18, 289:25, 290:7, 290:16, 292:17, 297:5
**ten** [29] - 37:19, 56:7, 62:3, 64:6, 71:6, 71:8, 108:1, 111:19, 126:19, 127:2, 140:5, 140:7, 140:10, 142:9, 146:4, 146:8, 148:21, 149:9, 150:4, 150:11,

153:10, 173:10, 177:21, 197:6, 207:15, 225:17, 308:19, 321:5
**ten-minute** [1] - 197:6
**tend** [5] - 158:13, 158:14, 228:18, 266:3, 297:4
**tender** [1] - 316:2
**tens** [1] - 201:15
**tent** [3] - 102:2, 136:7, 136:9
**tentatively** [1] - 332:5
**tents** [7] - 91:25, 102:1, 108:9, 129:5, 212:21, 251:17
**tenuous** [1] - 219:11
**term** [9] - 69:9, 128:10, 202:25, 237:23, 238:14, 242:19, 243:22, 281:14, 282:8
**terms** [12] - 17:25, 20:14, 31:3, 39:3, 53:19, 80:8, 156:5, 156:7, 169:12, 286:6, 289:7, 294:20
**test** [5] - 124:24, 216:21, 216:23, 216:24, 333:15
**testament** [1] - 23:17
**tested** [1] - 232:2
**testified** [40] - 12:23, 43:13, 43:21, 45:22, 48:2, 54:3, 60:18, 64:16, 96:3, 104:12, 108:1, 108:2, 110:4, 111:19, 113:14, 114:8, 119:17, 132:21, 132:23, 135:23, 138:9, 138:14, 171:16, 176:25, 178:5, 181:4, 182:17, 186:11, 187:20, 195:8, 195:11, 211:10, 211:17, 211:18, 211:23, 239:25, 243:20, 257:21, 263:21, 300:23
**testifies** [1] - 188:14
**testify** [16] - 9:24, 10:14, 10:15, 10:25, 28:14, 36:14, 38:2, 53:20, 81:12, 81:20, 101:17, 134:15, 139:16, 156:20, 172:12, 211:16

**testifying** [22] - 9:25, 10:9, 10:17, 11:2, 14:7, 36:22, 38:21, 45:11, 68:23, 99:25, 100:19, 103:13, 117:17, 124:5, 124:7, 144:22, 144:23, 156:16, 156:17, 171:23, 185:1
**testimony** [53] - 9:16, 12:5, 13:17, 13:25, 16:13, 16:22, 18:5, 28:13, 29:24, 35:9, 35:14, 35:17, 35:20, 35:24, 36:2, 36:3, 36:8, 36:11, 37:1, 42:4, 45:4, 53:5, 68:24, 73:15, 75:19, 79:6, 85:13, 90:1, 90:12, 118:22, 119:3, 119:6, 119:22, 120:6, 121:1, 121:8, 123:21, 125:9, 126:3, 139:9, 144:22, 170:17, 170:18, 179:23, 280:23, 281:1, 306:14, 322:4, 325:1, 331:10, 333:14, 333:19, 334:3
**Texas** [2] - 225:17, 290:8
**text** [1] - 140:6
**THE** [470] - 1:4, 1:10, 1:14, 6:14, 6:24, 7:3, 7:9, 7:14, 7:25, 8:4, 8:7, 8:13, 8:21, 9:5, 9:7, 9:22, 10:2, 10:20, 11:1, 11:8, 11:18, 11:22, 12:3, 12:9, 12:19, 13:1, 13:14, 13:20, 13:24, 14:24, 15:2, 15:5, 15:11, 15:16, 16:5, 16:23, 17:12, 17:21, 18:10, 18:20, 20:16, 20:18, 20:19, 20:20, 20:22, 23:3, 23:5, 27:4, 27:9, 27:14, 27:23, 28:9, 28:15, 28:18, 28:23, 29:13, 29:19, 29:23, 30:13, 30:15, 30:16, 30:19, 30:20, 30:21, 30:23, 33:18, 34:23, 39:11, 39:17, 40:19, 40:23, 42:15, 42:18, 42:23, 43:1, 43:5, 43:8, 43:22, 44:1, 44:5, 44:10, 44:18, 44:20, 45:10, 53:3, 53:16, 53:18, 56:15,

56:17, 56:20, 57:2, 57:8, 57:12, 58:3, 58:8, 58:13, 58:18, 60:7, 60:9, 65:3, 66:2, 66:5, 66:7, 66:13, 66:19, 68:10, 68:14, 69:3, 69:7, 71:16, 71:7, 71:18, 71:21, 72:12, 72:15, 72:24, 73:12, 73:19, 74:2, 74:25, 75:7, 75:11, 75:20, 75:24, 76:2, 76:7, 77:22, 78:3, 78:8, 78:12, 78:25, 80:1, 80:24, 81:15, 82:3, 83:10, 83:12, 83:14, 83:18, 83:21, 84:3, 84:18, 84:20, 85:7, 85:17, 85:24, 86:12, 86:17, 87:3, 87:9, 87:11, 87:15, 87:25, 88:5, 88:9, 88:21, 89:9, 96:12, 96:15, 96:16, 98:15, 98:17, 99:10, 99:13, 99:18, 101:6, 101:12, 101:17, 101:20, 104:7, 106:18, 106:20, 107:7, 107:8, 111:13, 111:14, 115:20, 115:23, 116:14, 116:17, 116:18, 116:24, 117:1, 117:25, 118:23, 119:10, 120:16, 121:2, 121:11, 121:23, 124:3, 124:10, 124:12, 124:17, 124:20, 124:25, 125:3, 125:13, 128:15, 130:21, 130:25, 131:2, 131:4, 133:5, 133:9, 134:21, 134:22, 134:24, 135:6, 135:11, 135:12, 137:16, 138:25, 139:2, 139:3, 139:11, 139:18, 140:2, 140:5, 140:10, 140:14, 140:24, 141:5, 141:15, 141:16, 144:25, 145:8, 145:12, 145:15, 147:4, 147:6, 147:9, 149:4, 150:23, 151:1, 151:2, 156:21, 157:2, 163:15, 163:21, 163:24, 164:19, 164:24,

165:2, 165:5, 165:18, 169:7, 169:11, 169:13, 169:14, 169:16, 169:17, 169:18, 169:21, 172:14, 175:1, 175:9, 175:12, 177:18, 178:1, 179:25, 180:15, 180:17, 180:19, 180:20, 180:22, 180:24, 180:25, 182:10, 182:12, 182:25, 183:3, 184:3, 184:8, 184:12, 184:17, 184:24, 185:7, 185:9, 187:17, 187:22, 188:6, 188:15, 188:18, 189:1, 189:11, 189:13, 189:16, 189:24, 191:9, 192:14, 192:19, 192:21, 192:22, 192:23, 192:25, 193:1, 193:2, 193:3, 193:8, 193:12, 193:13, 193:14, 193:17, 193:21, 193:22, 193:24, 196:1, 196:5, 196:13, 196:17, 196:18, 196:22, 197:5, 197:9, 197:19, 197:22, 198:20, 198:23, 199:19, 199:21, 200:11, 201:25, 202:1, 211:5, 213:24, 214:6, 214:12, 224:23, 225:3, 225:4, 237:11, 239:3, 239:9, 240:1, 240:6, 240:13, 240:16, 247:9, 247:11, 247:17, 247:25, 248:5, 248:14, 248:19, 248:21, 248:23, 249:5, 253:14, 253:16, 253:18, 253:19, 254:2, 254:6, 258:12, 258:13, 259:14, 259:15, 259:16, 259:18, 267:1, 267:2, 268:15, 268:16, 272:1, 272:8, 272:10, 272:15, 273:15, 274:8, 274:15, 277:15, 277:16, 277:17, 277:19, 277:20, 281:15, 281:17, 282:2, 282:4, 283:23,

284:5, 284:7, 284:10, 284:13, 284:17, 284:20, 285:5, 287:15, 287:18, 292:25, 293:1, 298:3, 298:10, 298:12, 298:20, 298:24, 299:11, 310:2, 310:4, 311:9, 311:12, 311:14, 314:19, 314:24, 315:8, 315:12, 315:14, 315:17, 315:20, 315:22, 316:4, 316:7, 317:9, 317:10, 317:11, 317:16, 318:20, 319:2, 319:5, 319:7, 319:9, 319:10, 319:14, 321:14, 321:15, 322:5, 322:6, 322:20, 323:20, 323:23, 324:1, 324:18, 324:21, 325:2, 325:3, 325:6, 325:8, 325:9, 326:13, 326:15, 326:23, 326:25, 327:2, 327:4, 327:11, 327:16, 327:25, 328:12, 328:18, 329:1, 330:1, 330:14, 330:21, 331:3, 331:5, 331:17, 331:25, 332:9, 332:18, 332:22, 333:2, 333:17, 333:21, 334:5, 334:14, 334:17
**theirs** [1] - 197:16
**themselves** [3] - 9:24, 93:7, 221:7
**theory** [2] - 17:6, 86:10
**therefore** [1] - 285:21
**they've** [3] - 73:25, 81:23, 143:1
**thin** [1] - 265:25
**thinking** [6] - 15:17, 153:19, 154:3, 167:16, 298:17, 319:18
**thinks** [1] - 248:16
**thinner** [1] - 323:15
**third** [2] - 24:2, 69:18
**thirds** [1] - 208:9
**thoughts** [1] - 118:5
**thousand** [5] - 103:6, 107:24, 230:12, 234:25, 235:1
**thousands** [9] -

52:14, 53:6, 59:6, 60:15, 61:21, 61:23, 64:9, 192:7, 201:16
**threat** [3] - 26:16, 160:18, 297:21
**threaten** [3] - 168:9, 194:16
**threatened** [5] - 156:4, 201:17, 204:13, 206:21, 212:9
**threatens** [2] - 182:21, 182:24
**threats** [5] - 161:4, 193:20, 208:2, 265:1
**three** [33] - 13:6, 23:22, 64:21, 84:19, 136:8, 152:6, 154:7, 154:9, 155:12, 175:4, 201:7, 201:9, 205:7, 212:13, 212:14, 219:9, 224:17, 244:10, 246:10, 250:18, 260:18, 276:1, 276:5, 276:8, 303:7, 306:15, 308:15, 308:22, 309:5, 314:4, 321:4, 322:15, 330:24
**three-hour** [1] - 330:24
**three-story** [1] - 175:4
**thresholds** [1] - 264:4
**throughout** [4] - 91:1, 208:12, 227:2, 269:25
**throw** [1] - 200:4
**thrusting** [1] - 48:19
**tied** [1] - 155:23
**tight** [2] - 7:3, 39:16
**tile** [1] - 190:21
**timber** [1] - 241:14
**timeline** [3] - 109:17, 110:2, 132:3
**timing** [1] - 248:15
**title** [1] - 27:21
**titled** [1] - 59:25
**TNT** [64] - 83:4, 84:12, 90:1, 107:13, 111:8, 114:22, 116:21, 122:22, 125:10, 126:7, 131:13, 132:10, 132:18, 133:2, 133:3, 146:18, 147:19, 148:22, 149:8, 149:10, 150:4, 152:24, 153:6, 153:9, 154:4, 154:23, 155:3,

157:5, 157:12, 160:13, 161:5, 161:25, 162:4, 166:8, 166:17, 168:19, 172:25, 173:11, 176:21, 177:9, 180:23, 186:7, 186:8, 186:18, 190:15, 194:4, 194:25, 195:8, 195:17, 246:25, 260:16, 263:9, 300:21, 301:18, 304:12, 305:12, 308:16, 309:25, 310:10, 312:14, 316:16, 317:2, 321:13, 324:6
**today** [47] - 8:11, 9:9, 9:14, 9:19, 9:21, 13:9, 15:9, 18:24, 21:2, 22:21, 24:21, 35:9, 35:14, 35:18, 36:8, 36:23, 38:20, 48:5, 56:10, 71:18, 89:24, 109:25, 111:17, 116:8, 120:6, 123:21, 124:5, 144:18, 144:23, 170:10, 170:17, 170:18, 171:23, 178:5, 178:15, 179:23, 186:16, 237:7, 240:21, 247:16, 248:4, 248:6, 250:8, 257:21, 271:12, 280:24, 319:7
**TODD** [3] - 2:2, 2:2, 2:13
**Todd** [3] - 6:19, 6:21, 165:12
**toe** [1] - 102:7
**together** [5] - 155:23, 199:7, 207:3, 238:8, 286:14
**toggle** [1] - 68:4
**toilets** [1] - 136:8
**tomorrow** [15] - 13:9, 197:2, 198:2, 198:4, 198:11, 327:20, 328:3, 329:6, 330:3, 330:11, 331:2, 331:9, 331:24, 332:7, 333:9
**tonight** [5] - 135:9, 198:12, 327:19, 330:12, 331:24
**tons** [1] - 106:13
**took** [9] - 45:1, 102:23, 127:22, 189:19, 268:4, 272:7, 302:14, 310:12,

315:20
**tools** [1] - 55:19
**top** [10] - 65:13, 69:17, 190:18, 231:6, 245:15, 272:17, 277:5, 306:6, 320:15, 323:2
**topic** [2] - 180:6, 240:24
**topics** [3] - 105:22, 208:4, 250:24
**topography** [1] - 215:4
**Torres** [1] - 18:2
**total** [7] - 31:13, 109:14, 225:20, 233:24, 271:1, 275:11, 276:7
**totally** [1] - 296:2
**toto** [1] - 187:24
**TOTOUI** [1] - 1:22
**Totoui** [1] - 6:17
**touch** [1] - 240:23
**tour** [42] - 90:9, 90:20, 91:1, 91:3, 91:12, 91:13, 92:13, 94:18, 94:20, 94:22, 95:1, 95:3, 95:4, 95:12, 96:16, 99:6, 101:24, 102:22, 103:19, 108:6, 108:8, 109:6, 109:22, 109:23, 110:9, 110:11, 110:16, 110:19, 111:14, 113:25, 114:15, 119:9, 129:3, 136:1, 136:4, 136:6, 136:21, 137:23, 137:24, 138:4, 138:8
**toured** [1] - 105:22, 105:23
**tourism** [1] - 182:14
**tourist** [3] - 182:20, 182:23, 182:25
**tourists** [2] - 182:21, 182:24
**tours** [2] - 304:4, 322:14
**towards** [4] - 92:9, 181:18, 201:1, 321:2
**town** [3] - 183:15, 266:10, 266:13
**toxic** [7] - 26:16, 39:6, 39:10, 41:1, 41:2, 41:4
**track** [4] - 31:14, 67:12, 67:17, 158:23
**tracking** [2] - 70:2, 116:5

**traffic** [61] - 34:17, 52:18, 52:22, 53:6, 60:17, 60:19, 61:6, 63:11, 63:16, 63:18, 63:19, 63:22, 64:3, 76:13, 77:17, 81:4, 92:22, 93:10, 93:18, 116:8, 116:10, 161:12, 161:14, 176:22, 177:1, 181:3, 181:5, 181:20, 182:20, 182:23, 183:2, 183:4, 186:21, 194:8, 194:9, 194:11, 194:14, 194:16, 228:4, 234:10, 234:19, 234:24, 235:5, 235:7, 263:3, 263:6, 263:9, 263:19, 264:11, 264:15, 264:17, 264:24, 265:6, 265:11, 265:12, 282:19, 282:25, 283:4

**trafficked** [1] - 77:14
**trafficking** [1] - 182:5
**Trail** [20] - 60:24, 60:25, 61:1, 61:2, 61:5, 61:10, 61:15, 61:19, 61:24, 62:5, 62:25, 77:16, 181:17, 181:25, 182:5, 182:13, 182:14, 263:16, 303:8, 311:22
**trail** [2] - 159:8, 219:7
**trailer** [1] - 255:9
**trailers** [1] - 103:9
**trails** [1] - 311:25
**training** [31] - 42:2, 45:6, 51:3, 51:5, 52:1, 52:4, 52:10, 52:11, 57:14, 62:12, 62:14, 62:18, 67:8, 74:12, 74:15, 74:18, 74:21, 104:15, 105:2, 105:8, 105:15, 105:19, 106:10, 106:11, 106:12, 114:12, 114:19, 124:14, 124:23, 252:2, 252:12
**Training** [5] - 42:2, 89:25, 116:1, 300:20, 301:19
**transcription** [1] - 335:4
**transferred** [1] - 92:6
**Transition** [4] - 42:3, 89:25, 300:20, 301:19

**translated** [1] - 97:18
**translates** [1] - 40:17
**transmission** [1] - 205:14
**transmits** [1] - 223:11
**transparent** [1] - 99:7
**transport** [3] - 313:1, 313:13, 313:25
**Transport** [1] - 313:14
**transportation** [2] - 109:9, 145:20
**transported** [1] - 161:7
**transporting** [5] - 101:3, 109:11, 178:6, 179:8, 314:2
**transports** [1] - 274:10
**travel** [11] - 61:15, 79:15, 173:13, 192:10, 192:13, 222:10, 222:16, 222:17, 222:24, 236:18, 297:2
**travel-ways** [1] - 236:18
**traveled** [1] - 213:19
**traveling** [6] - 149:23, 181:25, 183:13, 194:4, 234:20, 264:20
**travels** [1] - 151:13
**traverse** [3] - 151:19, 182:12, 182:13
**treatment** [3] - 31:24, 117:18, 305:23
**tree** [2] - 190:23, 190:24
**trees** [2] - 148:8, 190:19
**trek** [1] - 155:9
**trend** [1] - 289:19
**trends** [1] - 288:1
**trial** [1] - 125:16
**triangles** [2] - 31:7, 235:11
**Tribal** [3] - 167:8, 332:2, 333:12
**Tribe** [27] - 6:19, 6:23, 9:6, 14:18, 16:15, 86:15, 99:14, 99:19, 103:17, 103:19, 103:22, 165:13, 166:23, 165:17, 167:10, 167:14, 167:16, 167:17, 167:21,

184:14, 198:15, 240:16, 267:9, 292:11, 299:2, 328:23, 334:18
**Tribe's** [4] - 14:4, 332:13, 333:4, 333:10
**TRIBE'S** [1] - 5:10
**tried** [5] - 63:1, 99:7, 102:23, 142:10, 147:16
**trip** [3] - 32:15, 148:3, 166:21
**triple** [1] - 153:20
**trips** [3] - 21:6, 176:21, 176:24
**tropical** [2] - 214:25, 215:14
**truck** [2] - 179:8, 323:6
**trucked** [2] - 52:12, 52:13
**trucks** [20] - 61:10, 94:8, 94:16, 116:11, 194:4, 194:8, 305:15, 305:20, 305:21, 305:23, 306:5, 306:10, 306:13, 311:5, 315:5, 322:22, 322:25, 323:12, 323:16
**true** [14] - 57:17, 152:19, 164:12, 210:25, 265:16, 265:20, 265:24, 266:3, 266:6, 270:5, 278:11, 284:19, 284:20, 284:22
**truly** [2] - 272:2, 330:11
**trust** [1] - 124:20
**truthful** [1] - 75:18
**try** [22] - 16:12, 35:6, 35:7, 37:13, 59:9, 95:8, 95:17, 123:10, 125:22, 146:17, 147:14, 153:22, 183:7, 183:9, 185:7, 194:22, 200:11, 232:11, 236:9, 240:23, 287:22, 330:24
**trying** [34] - 39:16, 43:5, 53:9, 53:10, 73:24, 75:16, 97:21, 113:24, 119:4, 121:7, 121:8, 125:21, 130:15, 130:23, 136:12, 136:17, 138:6, 143:15, 143:17, 146:15,

166:13, 202:11, 222:11, 239:4, 279:25, 280:1, 281:17, 284:9, 284:21, 307:22, 313:18, 315:18, 330:16
**Tuesday** [1] - 198:6, 199:4, 327:13, 329:7, 329:17, 330:9, 331:13, 331:14, 331:20, 332:2, 332:11
**tuned** [1] - 143:3
**Turkey** [2] - 205:11, 211:20
**turn** [13] - 7:5, 14:15, 53:24, 88:18, 115:20, 128:14, 150:24, 178:4, 215:19, 221:18, 310:18, 314:12, 329:18
**turned** [1] - 63:2
**turning** [6] - 61:16, 212:15, 292:17, 310:6, 319:24
**tweets** [1] - 85:14
**Tweets** [1] - 121:9
**twice** [3] - 45:3, 45:4, 62:18
**Twitter** [3] - 83:7, 85:11, 122:5
**two** [58] - 11:24, 13:6, 31:12, 31:22, 31:24, 34:18, 60:21, 62:9, 89:22, 95:5, 95:11, 108:10, 114:5, 135:2, 147:7, 147:21, 153:13, 153:18, 154:7, 155:12, 163:13, 167:9, 197:12, 198:1, 201:7, 201:8, 206:16, 208:9, 209:25, 212:10, 219:4, 219:9, 224:17, 227:11, 246:10, 247:24, 247:25, 248:13, 250:18, 255:20, 256:5, 258:25, 259:9, 275:24, 276:4, 276:5, 276:7, 291:11, 299:2, 306:15, 307:14, 307:24, 313:25, 314:1, 314:22, 315:19, 323:24
**two-thirds** [1] - 208:9
**type** [18] - 42:21, 50:5, 95:24, 123:18, 129:5, 166:17,

166:23, 177:5, 185:5, 214:25, 224:14, 231:6, 234:22, 272:17, 295:2, 296:2, 302:9, 323:10
**types** [14] - 117:7, 152:13, 159:1, 161:6, 185:2, 205:21, 212:19, 215:12, 295:6, 296:17, 299:23, 302:13, 306:2
**typical** [2] - 35:22, 77:17
**typically** [23] - 32:23, 65:15, 74:11, 136:15, 154:12, 180:20, 180:22, 181:24, 190:22, 206:21, 221:3, 245:13, 246:7, 250:17, 251:2, 252:19, 255:2, 255:6, 255:7, 255:10, 255:17, 272:24, 278:21

## U

**U.S** [31] - 2:18, 2:20, 8:2, 93:13, 148:20, 148:23, 154:22, 159:8, 161:15, 166:16, 166:25, 181:16, 182:18, 183:14, 183:18, 189:15, 194:14, 196:11, 208:20, 209:1, 209:9, 215:9, 216:3, 216:7, 240:7, 243:1, 255:1, 255:2, 282:4, 301:15
**UF** [1] - 105:4
**ultimate** [1] - 26:22
**ultimately** [7] - 22:19, 25:24, 105:4, 203:9, 205:9, 210:5, 229:19
**unaware** [1] - 189:20
**uncertain** [1] - 288:3
**unclear** [4] - 109:7, 137:5, 137:9, 190:2
**uncollared** [1] - 244:3
**uncomfortable** [1] - 48:23
**uncommon** [1] - 113:21
**undefined** [1] - 287:7
**under** [27] - 17:2, 23:22, 36:10, 55:9, 56:6, 56:20, 74:9,

83:9, 86:9, 88:10, 88:23, 102:2, 102:4, 111:21, 112:13, 113:3, 115:4, 190:21, 204:19, 204:20, 216:9, 244:15, 255:8, 259:23, 323:3, 323:4, 333:3

**undergoing** [1] - 210:8

**understood** [11] - 53:4, 73:14, 114:2, 172:16, 189:22, 206:7, 241:11, 241:23, 242:9, 246:20, 254:20

**undertaken** [1] - 239:21

**undetained** [1] - 277:13

**undetected** [1] - 158:13

**undue** [1] - 88:12

**unfair** [1] - 88:11

**unfortunately** [9] - 54:12, 80:17, 109:21, 114:21, 117:2, 129:6, 134:3, 137:24, 304:8

**unfriendly** [1] - 294:13

**unions** [1] - 105:25

**unique** [2] - 22:17, 133:3

**unit** [1] - 263:1

**UNITED** [3] - 1:1, 1:11, 2:14

**united** [1] - 3:3

**United** [5] - 75:4, 125:17, 247:13, 247:22, 335:10

**units** [2] - 233:12, 267:10

**University** [10] - 20:3, 89:21, 143:25, 144:1, 200:25, 201:8, 209:21, 259:22, 259:25, 291:4

**unless** [6] - 8:22, 73:21, 80:6, 98:9, 130:4, 315:17

**unlikely** [1] - 247:15

**unloaded** [1] - 92:12

**unnatural** [2] - 259:20, 266:14

**unnecessarily** [1] - 33:14

**unnecessary** [1] - 74:6

**unpaved** [1] - 148:19

**unpredictable** [1] -

266:4

**unquote** [2] - 12:13, 111:21

**unreliable** [1] - 214:2

**untangle** [1] - 287:24

**unusual** [2] - 143:19, 328:16

**up** [103] - 9:15, 13:17, 13:24, 18:10, 21:5, 21:6, 23:4, 26:21, 27:5, 28:19, 32:24, 34:8, 42:11, 42:20, 44:11, 45:16, 50:19, 51:22, 65:22, 67:4, 68:4, 68:20, 70:2, 71:13, 72:20, 73:20, 74:2, 75:23, 79:20, 80:10, 83:8, 86:3, 86:12, 86:22, 96:20, 99:5, 99:7, 104:24, 108:15, 120:16, 121:2, 126:18, 129:3, 137:14, 139:20, 140:4, 154:18, 155:16, 155:25, 166:18, 173:3, 173:4, 176:12, 184:13, 188:13, 188:25, 192:15, 196:18, 197:5, 197:14, 200:8, 204:21, 205:10, 210:18, 210:19, 215:20, 219:4, 219:5, 219:9, 219:12, 224:6, 226:19, 226:21, 226:25, 228:20, 231:18, 232:19, 234:25, 235:1, 235:2, 237:23, 241:14, 242:24, 244:17, 250:8, 256:18, 271:18, 274:7, 274:11, 274:21, 284:6, 306:25, 309:15, 309:16, 318:2, 318:3, 319:13, 319:14, 320:10, 320:22, 330:4, 333:3, 334:20

**update** [1] - 209:14

**updated** [2] - 27:16, 207:13

**upending** [1] - 142:2

**upland** [1] - 215:14

**uplandy** [1] - 214:25

**upwards** [3] - 133:1, 306:16, 306:18

**urban** [1] - 50:20

**urbanized** [1] -

228:23

**urgent** [1] - 20:13

**user** [1] - 124:14

**uses** [4] - 174:19, 176:10, 255:1, 277:12

**usual** [2] - 12:23, 110:19

---

## V

**vaccination** [1] - 246:19

**vague** [2] - 273:25, 332:19

**Valley** [13] - 150:9, 150:13, 150:14, 153:4, 153:9, 153:16, 154:3, 154:6, 154:9, 155:10, 166:20, 173:24, 195:12

**valuable** [1] - 131:7

**value** [2] - 17:1, 334:11

**values** [1] - 33:24

**van** [1] - 321:1

**Van** [3] - 259:10, 259:21, 260:3

**vans** [7] - 92:6, 92:9, 101:3, 194:4, 313:7, 313:8, 314:1

**variable** [1] - 262:20

**variation** [3] - 66:24, 66:25, 68:17

**varies** [1] - 278:25

**variety** [1] - 250:24

**various** [5] - 14:6, 19:7, 35:12, 167:3, 211:19

**vast** [1] - 32:9

**veering** [2] - 28:11, 28:12

**vegetation** [3] - 202:18, 215:13, 266:1

**vegetative** [1] - 215:4

**vehicle** [12] - 97:11, 161:18, 194:16, 196:10, 235:7, 235:10, 288:25, 307:1, 313:13, 313:21, 313:22, 313:24

**vehicles** [19] - 61:13, 149:23, 173:13, 196:9, 234:20, 263:18, 264:19, 297:2, 311:4, 312:6, 312:14, 312:22, 313:2, 313:5, 313:10, 313:17, 314:2, 318:19

**vehicular** [5] - 182:20, 182:23, 194:9, 282:19, 282:25

**vendor** [1] - 81:10

**vendors** [1] - 59:21

**VER** [1] - 82:11

**Vera** [2] - 82:4, 82:10

**verbal** [3] - 167:23, 266:18, 266:19

**verified** [2] - 115:6, 227:14

**verify** [1] - 73:24

**verifying** [1] - 73:3

**Version** [5] - 209:13, 209:14, 210:7, 219:25

**version** [2] - 67:24, 68:2

**versus** [4] - 6:3, 18:1, 122:23, 291:19

**VHF** [1] - 227:6

**via** [3] - 90:10, 90:20, 203:23

**Via** [1] - 4:11

**viability** [15] - 185:18, 202:23, 203:1, 220:14, 238:7, 258:8, 259:6, 259:8, 260:4, 260:11, 269:21, 286:2, 286:17, 286:20, 298:6

**viable** [7] - 28:20, 199:5, 220:13, 256:8, 269:14, 270:1, 270:4

**vice** [1] - 316:5

**vicinity** [10] - 31:1, 225:12, 225:13, 225:14, 264:20, 270:11, 270:16, 279:4, 290:4, 303:2

**victories** [1] - 23:18

**video** [12] - 84:15, 162:5, 315:3, 316:20, 318:20, 318:21, 318:22, 318:24, 319:3, 319:12, 320:10, 320:22

**videoing** [1] - 318:14

**videos** [1] - 306:16, 306:17, 314:22, 314:24, 315:18, 315:19, 316:23, 317:5, 317:12, 318:10

**view** [1] - 57:7, 140:16, 156:1, 262:15, 267:15, 269:6, 324:5

**viewed** [1] - 86:2

**viewing** [2] - 41:12, 172:21

**viewpoints** [2] -

122:12, 122:14

**views** [1] - 88:17

**vigorously** [1] - 156:24

**Village** [1] - 300:17

**village** [1] - 311:20

**villages** [1] - 166:24

**visible** [3] - 34:2, 34:8, 34:17

**visibly** [1] - 108:14

**visit** [25] - 47:6, 50:23, 51:4, 51:12, 90:8, 90:9, 107:13, 107:15, 123:2, 125:10, 126:1, 127:22, 128:24, 132:18, 146:24, 147:2, 147:23, 148:16, 159:5, 183:2, 183:6, 183:7, 183:16, 321:8, 321:20

**visited** [29] - 34:19, 41:16, 50:18, 112:20, 113:2, 113:4, 115:13, 124:8, 136:5, 136:6, 147:1, 147:13, 149:10, 150:8, 152:5, 154:10, 172:24, 183:18, 183:21, 184:6, 184:7, 185:23, 187:9, 249:14, 249:16, 270:21, 321:11

**visiting** [6] - 110:15, 159:10, 160:7, 160:10, 166:9, 166:22

**Visitor** [1] - 166:19

**Visitor's** [1] - 150:3

**visits** [6] - 147:18, 148:13, 148:14, 150:5, 307:5

**voice** [1] - 127:24

**volume** [4] - 253:11, 263:3, 263:6, 263:9

**volunteer** [2] - 146:1, 146:7

**volunteered** [2] - 146:7, 146:8

**volunteering** [5] - 142:11, 146:4, 146:15, 146:20, 159:20

**vote** [1] - 107:25

**vs** [1] - 1:6

---

## W

**wait** [23] - 9:1, 11:3, 78:12, 93:23, 149:4, 162:1, 163:17,

167:15, 192:14, 195:18, 224:23, 224:24, 237:11, 246:14, 246:16, 258:12, 274:18, 274:21

**Wait** [1] - 78:12

**waited** [1] - 92:4

**waiting** [2] - 7:22, 124:14

**walk** [7] - 25:6, 46:20, 136:9, 225:16, 225:24, 302:21, 322:12

**walked** [4] - 91:24, 300:14, 302:19, 302:20

**walking** [11] - 92:13, 94:3, 95:1, 102:4, 102:7, 102:11, 138:6, 244:22, 302:19, 303:18

**wall** [2] - 238:13, 286:23

**wanded** [1] - 92:1

**wants** [4] - 9:1, 60:7, 187:25, 315:17

**Washington** [4] - 2:19, 2:21, 125:18, 312:24

**Wasserman** [1] - 108:15

**Waste** [1] - 58:9

**waste** [18] - 52:13, 57:14, 57:21, 59:4, 59:7, 59:13, 59:18, 64:10, 76:13, 88:12, 94:10, 161:6, 165:22, 178:4, 179:20, 180:11, 180:14, 180:23

**wastewater** [2] - 305:23, 306:6

**wasting** [1] - 199:12

**watch** [1] - 314:11

**watched** [2] - 307:10, 307:12

**watching** [4] - 123:17, 300:1, 302:16

**Water** [1] - 24:20

**water** [40] - 20:13, 20:22, 20:23, 26:5, 26:9, 26:17, 31:9, 31:20, 31:23, 31:24, 32:2, 33:8, 39:6, 54:1, 54:2, 54:8, 54:19, 56:5, 56:9, 57:5, 57:11, 60:4, 76:12, 94:5, 94:10, 104:19, 104:20, 104:22,

112:4, 118:10, 161:6, 165:22, 167:6, 178:16, 179:13, 180:13, 302:18, 306:7, 307:16

**water-quality** [1] - 20:13

**watershed** [2] - 144:15, 155:24

**waving** [2] - 165:9, 169:25

**ways** [7] - 80:23, 187:4, 203:13, 206:4, 236:18, 250:18, 314:16

**weaken** [1] - 23:25

**wearing** [5] - 101:22, 102:6, 110:23, 144:12, 171:3

**weather** [6] - 154:16, 179:12, 179:17, 223:13, 246:11, 288:23

**web** [4] - 158:9, 162:15, 182:2, 187:7

**Weber** [1] - 307:20

**website** [15] - 24:10, 67:19, 67:25, 68:12, 121:22, 133:15, 187:9, 187:11, 187:24, 188:8, 188:12, 189:5, 189:23, 267:20, 268:5

**websites** [3] - 83:1, 121:19, 187:3

**Wednesday** [1] - 223:12

**week** [14] - 62:10, 123:3, 198:6, 244:18, 280:15, 305:14, 306:18, 306:23, 312:19, 324:9, 327:13, 331:18

**weekends** [1] - 312:8

**weeks** [2] - 306:15, 306:18

**weigh** [4] - 40:11, 40:12, 55:11, 55:22

**weighed** [1] - 55:25

**weight** [2] - 18:7, 334:10

**well-known** [1] - 158:8

**WERP** [4] - 27:22, 30:5, 31:13, 31:25

**west** [17] - 25:7, 26:1, 46:21, 61:18, 147:22, 149:12, 151:20, 153:8, 154:25, 166:15,

186:4, 190:15, 228:17, 231:23, 282:20, 283:1

**Western** [11] - 26:20, 28:4, 29:2, 29:6, 30:5, 30:9, 30:25, 31:4, 31:5, 56:2, 73:5

**western** [1] - 256:6

**westward** [1] - 244:6

**wet** [2] - 179:12, 215:1

**wetland** [1] - 145:17

**wetlands** [6] - 23:16, 32:10, 161:10, 214:23, 215:13, 241:14

**whatnot** [1] - 329:3

**whatsoever** [1] - 326:18

**white** [4] - 97:11, 231:2, 321:1, 323:12

**white-tailed** [1] - 231:2

**whole** [12] - 73:15, 107:25, 152:1, 245:1, 281:18, 284:14, 285:20, 302:19, 303:18, 318:9, 319:9, 332:12

**wide** [1] - 292:2

**Wikipedia** [5] - 252:16, 252:17, 252:19, 252:22, 253:3

**wild** [9] - 64:24, 142:4, 158:5, 158:8, 158:11, 158:25, 160:1, 231:18, 278:16

**Wildlife** [42] - 146:6, 159:18, 187:3, 187:7, 189:15, 201:11, 202:12, 203:5, 203:14, 203:16, 203:20, 206:1, 206:3, 206:11, 206:16, 208:20, 208:21, 208:23, 208:24, 209:1, 209:9, 210:9, 211:17, 216:4, 216:7, 217:6, 220:4, 222:2, 236:6, 236:8, 240:7, 241:3, 241:7, 241:12, 243:2, 255:1, 255:2, 255:15, 258:2, 258:3, 260:2, 282:5

**wildlife** [35] - 36:16, 37:7, 38:3, 60:18, 63:11, 76:13, 143:5, 143:18, 143:21, 144:20, 145:7, 145:19, 148:24,

152:1, 152:18, 157:24, 158:22, 159:9, 161:16, 162:25, 168:14, 171:17, 172:5, 181:5, 181:20, 200:19, 200:24, 201:10, 201:18, 201:23, 202:19, 205:10, 269:23, 304:6, 324:5

**wildlife's** [1] - 168:10

**WILLIAMS** [1] - 1:10

**willing** [3] - 10:16, 198:17, 332:14

**winding** [1] - 91:19

**windowless** [1] - 97:11

**winter** [4] - 154:13, 154:17, 155:8, 166:18

**Winter** [1] - 204:3

**wire** [5] - 65:13, 65:16, 93:16, 231:10, 272:17

**wires** [4] - 94:4, 102:8, 320:15

**wise** [1] - 86:9

**wish** [6] - 18:12, 68:18, 129:19, 139:7, 139:19, 185:25

**withdraw** [1] - 101:14

**Witness** [2] - 298:11, 327:1

**WITNESS** [80] - 4:2, 18:20, 20:19, 20:22, 30:15, 30:20, 40:23, 43:8, 44:20, 53:18, 60:9, 71:17, 71:21, 89:9, 96:16, 98:17, 101:12, 101:20, 106:20, 107:8, 111:14, 115:23, 116:17, 117:1, 133:9, 135:11, 139:2, 141:15, 145:15, 151:1, 169:11, 169:14, 169:17, 175:9, 175:12, 178:1, 180:17, 180:20, 180:24, 183:3, 184:8, 184:17, 185:9, 189:1, 189:13, 192:19, 192:22, 192:25, 193:2, 193:13, 193:17, 193:22, 196:5, 196:17, 199:19, 202:1, 225:3, 239:9, 240:6, 253:18, 258:13, 259:15, 259:18, 267:2,

277:16, 277:19, 281:17, 282:4, 292:25, 299:11, 317:10, 319:5, 319:9, 321:15, 322:6, 324:18, 325:3, 325:8, 326:15, 326:25

**witness** [102] - 10:1, 10:4, 10:22, 11:4, 13:11, 14:25, 16:24, 17:10, 17:21, 18:4, 18:13, 18:15, 23:9, 28:12, 28:22, 29:10, 29:16, 40:2, 53:9, 67:1, 73:25, 77:24, 78:7, 79:3, 79:10, 79:15, 79:23, 81:1, 81:7, 81:12, 81:20, 82:14, 83:15, 85:13, 85:22, 87:1, 87:9, 88:8, 88:11, 89:1, 89:4, 98:12, 99:17, 117:15, 123:11, 134:20, 139:4, 139:6, 139:8, 139:15, 140:3, 140:6, 140:8, 141:1, 141:11, 141:13, 144:24, 156:16, 156:17, 169:7, 170:8, 175:6, 179:23, 188:17, 193:11, 196:20, 197:10, 198:5, 199:13, 199:16, 211:11, 239:3, 247:13, 247:22, 248:1, 248:2, 248:12, 272:11, 273:19, 274:14, 284:9, 298:14, 298:23, 298:24, 299:7, 314:21, 315:20, 316:2, 317:14, 317:17, 318:23, 319:12, 324:25, 327:14, 327:17, 329:22, 331:13, 334:18

**witness's** [3] - 18:5, 53:5, 156:23

**witnessed** [3] - 97:11, 102:17, 133:4

**witnesses** [37] - 9:21, 10:1, 11:13, 11:18, 14:7, 14:17, 14:19, 14:22, 14:24, 15:1, 15:7, 17:15, 17:18, 18:6, 75:17, 84:21, 84:24, 177:22, 198:14, 198:15, 247:18, 247:20, 248:13, 248:18,

327:2, 327:21, 327:23, 327:24, 328:3, 328:24, 332:2, 332:6, 332:8, 332:15, 332:25, 333:12, 334:10

**witnesses'** [1] - 332:13

**witnesses's** [1] - 144:22

**wonder** [1] - 106:16

**wondering** [2] - 247:14, 334:17

**wonders** [1] - 149:24

**wood** [5] - 143:19, 156:9, 159:12, 302:17

**woodpecker** [4] - 148:7, 149:21, 156:12, 173:8

**Woods** [1] - 215:7

**word** [5] - 20:20, 255:14, 281:13, 287:7, 291:25

**words** [6] - 48:10, 93:2, 127:20, 168:25, 223:11, 264:1

**work-related** [1] - 32:15

**workday** [1] - 146:17

**workers** [1] - 312:9

**works** [3] - 103:6, 169:19, 260:1

**world** [4] - 23:22, 217:24, 219:1, 267:15

**worried** [4] - 57:5, 63:22, 63:25, 64:1

**worries** [2] - 160:25, 161:9

**worry** [5] - 15:24, 125:24, 135:7, 168:8, 307:15

**worse** [1] - 23:17

**worst** [3] - 237:24, 238:2, 238:5

**worst-case** [3] - 237:24, 238:2, 238:5

**worth** [2] - 125:24, 223:5

**wrap** [1] - 75:23

**wristbands** [1] - 97:19

**write** [5] - 126:14, 177:13, 204:12, 204:22, 208:6

**writes** [1] - 283:17

**written** [3] - 21:14, 162:18, 258:15

**wrote** [9] - 20:8, 20:15, 38:12, 196:22, 208:9, 208:15,

258:20, 258:21, 267:11

---

## Y

**yards** [2] - 93:9, 302:7

**year** [23] - 21:16, 45:3, 45:4, 46:4, 46:12, 52:3, 54:14, 70:20, 89:23, 107:14, 107:15, 145:25, 146:16, 149:17, 153:13, 164:10, 167:9, 206:22, 210:14, 275:25, 301:10, 303:18, 321:18

**years** [65] - 20:4, 20:7, 20:8, 21:17, 37:19, 38:7, 38:18, 40:10, 46:9, 46:10, 46:12, 54:18, 56:7, 64:6, 70:14, 70:21, 70:25, 71:6, 71:8, 104:16, 142:2, 142:9, 144:9, 146:4, 146:8, 147:24, 153:12, 153:18, 153:20, 154:2, 154:8, 173:18, 173:22, 177:8, 183:19, 185:10, 186:19, 186:23, 192:8, 201:9, 201:11, 202:5, 202:8, 204:6, 204:20, 206:16, 207:16, 209:12, 213:7, 219:4, 224:4, 251:12, 251:13, 258:16, 259:4, 265:2, 270:15, 271:1, 271:2, 271:4, 291:22, 292:3, 300:9, 322:6

**yellow** [12] - 30:22, 217:19, 221:23, 221:24, 223:24, 226:2, 236:17, 244:5, 244:9, 244:19, 244:21, 274:20

**yesterday** [1] - 8:18

**young** [2] - 147:24, 225:22

**yourself** [8] - 25:2, 91:20, 125:13, 126:14, 165:5, 182:21, 183:1, 243:25

**yourselves** [2] - 182:24, 197:1

**YouTube** [2] - 84:9, 162:5

---

## Z

**zero** [2] - 109:20, 234:24

**zippy** [1] - 39:12

**zone** [25] - 157:8, 216:2, 216:17, 217:1, 217:3, 217:9, 217:10, 217:12, 217:16, 217:23, 218:8, 221:12, 221:13, 242:17, 242:22, 243:7, 281:18, 281:19, 292:20, 294:23, 294:24, 295:2

**Zoom** [5] - 139:4, 139:6, 140:3, 163:18, 190:3

# Tr. Vol. II

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION
                    CASE NO. 25-22896-CV-KMW
 3

 4   FRIENDS OF THE EVERGLADES, et al.,    Miami, Florida

 5        Plaintiffs,                       August 7, 2025

 6            vs.                           9:01 a.m. to 12:15 p.m.

 7   KRISTI NOEM, et al.,                   MORNING SESSION

 8        Defendants.                       Pages 1 to 150

 9   _____

10                   PRELIMINARY INJUNCTION HEARING
             BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
11                 UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14
     FOR THE PLAINTIFFS:        PAUL SCHWIEP, ESQ.
15                              COFFEY BURLINGTON
                                2601 S. Bayshore Drive
16                              Penthouse 1
                                Miami, Florida 33133
17                                   -and-
                                TANIA GALLONI, ESQ.
18                              DOMINIQUE BURKHARDT, ESQ.
                                EARTHJUSTICE
19                              4500 Biscayne Boulevard
                                Suite 201
20                              Miami, Florida 33134
                                     -and-
21                              ELISE PAUTLER BENNETT, ESQ.
                                JASON TOTOUI, ESQ.
22                              CENTER FOR BIOLOGICAL DIVERSITY
                                PO Box 2155
23                              Saint Petersburg, FL 33731-2155,

24

25
```

```
 1   FOR INTERVENOR PLAINTIFF:

 2                              TODD R. FRIEDMAN, ESQ.
                               TODD R. FRIEDMAN, P.A.
 3                              CHRISTOPHER AJIZIAN, ESQ.
                               CHRISTOPHER AJIZIAN, ESQ.
 4                              1101 Brickell Avenue
                               Suite 700
 5                              Miami, Florida 33131

 6
     STATE DEFENDANT GUTHRIE:
 7
                               JESSE PANUCCIO, ESQ.
 8                              EVAN EZRAY, ESQ.
                               DANTE FICARELLI, ESQ.
 9                              DAVID COSTELLO, ESQ.
                               BOIES SCHILLER FLEXNER, LLP
10                              401 East Las Olas Boulevard
                               Suite 1200
11                              Miami, Florida 33301

12
     FOR FEDERAL DEFENDANTS
13   KRISTI NOEM and TODD LYONS:

14                              CARLOS J. RAUREL, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
15                              99 NE 4 Street
                               Miami, Florida 33132
16                                      -and-
                               ADAM R.F. GUSTAFSON, ESQ.
17                              ACTING ASSISTANT ATTORNEY GENERAL
                               FRANK SINGER, ESQ.
18                              U.S. DEPARTMENT OF JUSTICE
                               950 Pennsylvania Ave N.W.
19                              Washington, DC 20530
                                       -and-
20                              MARISSA A. PIROPATO, ESQ.
                               U.S. DEPARTMENT OF JUSTICE
21                              150 M St. NE
                               Washington, DC 20002
22

23   FOR DEFENDANT MIAMI-DADE COUNTY:

24                              DAVID M. MURRAY, ESQ.
                               MIAMI-DADE COUNTY ATTORNEY'S OFFICE
25                              P.O. Box 025504
                               Miami, Florida 33102
```

App. 416

```
1    STENOGRAPHICALLY REPORTED BY:

2
                             PATRICIA DIAZ, FCRR, RPR, FPR
3                            Official Court Reporter
                             United States District Court
4                            400 North Miami Avenue
                             11th Floor
5                            Miami, Florida 33128
                             (305) 523-5178
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX OF EXAMINATION

2    WITNESS                      DIRECT    CROSS    REDIRECT

3    CHRIS McVOY

4    BY MR. SCHWIEP                  7                  67
     BY MR. COSTELLO                        50
5
     DILLON REIO
6
     BY MR. SCHWIEP                 69                 116
7    BY MR. EZRAY
     BY MS. PIROPATO                       111
8

9                           INDEX OF EXHIBITS

10
     PLAINTIFFS' EXHIBITS          MARKED    ADMITTED
11
     23                             13        14
12   88                             17        18
     85                             25        26
13   81                                       29
     82                             36        37
14   22                             41        41
     89                             42        43
15   83                             45        46
     14                             54        55
16   39                             73        74
     79                             76        76
17   90                             81        82
     92                                       83
18   91                             85        85
     94                             91        92
19   93                                      109

20
     TRIBE'S EXHIBITS              MARKED    ADMITTED
21
     8                              23        24
22

23   DEFENSE EXHIBITS             MARKED    ADMITTED

24   12                             51        52
     18                             52        53
25

App. 418

```
 1              (Call to the Order of the Court.)

 2              COURTROOM DEPUTY:  Calling case 25-CV-22896, Friends of

 3    the Everglades, et al. versus Noem, et al.

 4              Counsel, please state your appearances for the record,

 5    starting with the plaintiffs.

 6              MR. SCHWIEP:  Good morning, Your Honor, Paul Schwiep

 7    for the plaintiffs.

 8              THE COURT:  Good morning.

 9              MS. GALLONI:  Good morning, Your Honor.  Tania Galloni

10    from EarthJustice on behalf of Friends of the Everglades.  I

11    have with me Dominic Burkhardt.

12              THE COURT:  Good morning.

13              MS. BENNETT:  Good morning, Your Honor.  Elise Paulter

14    Bennett on behalf of the Center for Biological Diversity, and

15    with me I have Jason Totoui.

16              THE COURT:  Good morning.

17              MR. AJIZIAN:  Good morning, Your Honor.  Chris Ajizian

18    on behalf of Miccosukee Tribe of Indians of Florida, the

19    intervenor plaintiffs.

20              THE COURT:  Good morning.

21              MR. FRIEDMAN:  Good morning, Your Honor.  Todd Friedman

22    on behalf of the Miccosukee Tribe.

23              MR. PANUCCIO:  Good morning, Your Honor.  Jesse

24    Panuccio on behalf of the Executive Director of the Florida

25    Department of Emergency Management.
```

```
 1              THE COURT:  Good morning, Mr. Panuccio.
 2              MR. EZRAY:  Good morning, Your Honor.  Evan Ezray on
 3    behalf of Executive Director Guthrie.
 4              THE COURT:  Good morning, Mr. Ezray.
 5              MR. FICARELLI:  Good morning, Your Honor.  Dante
 6    Ficarelli on behalf of Defendant Guthrie.
 7              MR. COSTELLO:  Good morning, Your Honor.  David
 8    Costello for Executive Director Guthrie.
 9              THE COURT:  Good morning, Gentlemen.
10              MR. GUSTAFSON:  Good morning, Your Honor.  Adam
11    Gustafson for the Federal Defendants.
12              MS. PIROPATO:  Good morning, Your Honor.  Marissa
13    Piropato for the Federal Defendants.
14              THE COURT:  Good morning.
15              MR. SINGER:  Good morning.  Frank Singer for the
16    Federal Defendants.
17              MR. RAURELL:  Good morning, Your Honor.  Carlos Raurell
18    for the Federal Defendants.
19              MR. MURRAY:  Good morning, Your Honor.  Dave Murray,
20    Miami-Dade County.
21              THE COURT:  You're here.  Good morning.
22              All right.  Everyone may be seated.
23              All right.  We have some airline schedules to try to
24    get ahead of.  Call your next witness, Mr. Schwiep.
25              MR. SCHWIEP:  Your Honor, the plaintiffs would call
```

1    Dr. Chris McVoy.

2         (The witness, Christopher McVoy, was duly sworn.)

3         COURTROOM DEPUTY:  Thank you.

4         Please have a seat.  State your full name for the

5    record and spell it out slowly for our court reporter, please.

6         THE WITNESS:  Dr. Christopher McVoy,

7    C-H-R-I-S-T-O-P-H-E-R, M-c-V-O-Y.

8         COURTROOM DEPUTY:  Thank you.

9                        DIRECT EXAMINATION

10   BY MR. SCHWIEP:

11   Q.  Dr. McVoy, what is your profession?

12   A.  I am a soil physicist hydrologist and wetland ecologist.

13   Q.  What is a soil physicist hydrologist and wetlands

14   ecologist?

15   A.  That's somebody who has a broad background and broad

16   experience.  So, physics and hydrology deal with the movement

17   of water.  So, physics more through porous media in the soils;

18   hydrology, surface waters or ground waters.  I don't do ground

19   water that much but surface water --

20        THE COURT:  Doctor, I'm going to ask you to slow down a

21   little.  You have so many things in that sentence, and we need

22   to keep up.

23        THE WITNESS:  And I was going to say that I followed

24   your admonitions on no cafe con leche, so I will speak quickly

25   for the schedule and slowly for the court reporter.

App. 421

1          THE COURT:  Right.

2   BY MR. SCHWIEP:

3   Q.   When and where did you obtain your undergraduate degree and

4   what was it in?

5   A.   It was in system ecology at Cornell University.

6   Q.   And what is your Master's of Science in?

7   A.   That was at the University of Florida in soil physics.

8   Q.   What was your master's thesis about?

9   A.   It was about tracing water movement through structured

10  soils, preferential flow and structured soils in Costa Rica.

11  Q.   Did you publish your thesis?

12  A.   No, it's not published.

13  Q.   Where did you obtain your doctorate?

14  A.   I obtained my doctorate at Cornell University also in soil

15  physics.

16  Q.   What was your dissertation on?

17  A.   It was on spatial variability of water movement through

18  soils.

19  Q.   And what did that mean?

20       (Cross-talk.)

21          THE COURT:  Could you -- I'm sorry, I got confused.

22          THE COURT STENOGRAPHER:  There was cross-talk.

23          THE COURT:  Right.  Stop that.

24          It was on spatial --

25          THE WITNESS:  Spatial variability of water movement in

App. 422

1    agricultural soils.

2    BY MR. SCHWIEP:

3    Q.   And the question was what does that mean?

4    A.   That means that when you do modeling there's a real issue

5    of obtaining parameters, and if your field of, you know, you go

6    out in an agricultural field, and if you can measure something

7    one or two places and that's a very good representation, then

8    you have low spatial variability.

9        If you have high spatial variabilities, you need a lot more

10   samples.  So, we were measuring in the field at a lot of

11   locations instrumenting that to try to get at that question.

12   Q.   After obtaining your doctorate, did you have occasion to do

13   any post-doctoral work in the same field?

14   A.   I did.  I was a post-doc for three years at the Technical

15   University Braunschweig in Northern Germany in a Department of

16   Soil, Science and Systems Ecology.  So, it actually matched

17   with both of my backgrounds.

18   Q.   What did your post-doctoral work focus on?

19   A.   That was a large national-sponsored project working with

20   agricultural systems and movements of -- again, my portion of

21   it was water, water management, water measurement and movement

22   of compounds in the soils.

23   Q.   Did there come a time when you began to focus your

24   scientific interest on specifically Everglades soil physics?

25   A.   Not too much on soil physics, but soil or hydrology of the

App. 423

10

```
1    Everglades, yes.  I started coming to South Florida,
2    approximately, 1995, and have been professionally involved with
3    the Everglades ever since.
4    Q.  Can you explain to the Court your expertise in Everglades
5    soils?
6    A.  Yes, although I would not restrict it to soils.  It goes to
7    vegetation, hydrology and soils.
8        My involvement was initially through a national nonprofit
9    that parked me at the South Florida Water Management District.
10       We had permission for a scientist to be on site to work, in
11   fact, on what eventually became this book, Landscapes and
12   Hydrology of the Predrainage Everglades.  That was a long
13   project -- it wasn't envisioned as a long project but became
14   one -- to validate the model that describes movement of water
15   through the Everglades and surrounding areas prior to any
16   manmade influences on it.
17   Q.  Okay.  You referenced and you held up a copy of your book.
18   What is the book about?
19   A.  Very much what the title says.  It's not a very catchy
20   title, but it is accurate, Landscapes and Hydrology of the Pre
21   Drainage Everglades.  So, basically looking at what the
22   different components of vegetation landscapes, soil landscapes
23   and what hydrology was happening prior to about 1850.
24   Q.  And why is that important?
25   A.  That's important because if you're going to restore
```

App. 424

1   something but you don't know what it was, then you are not

2   really doing restoration, you are somewhat doing designer

3   ecology or designer hydrology.  There were a lot of people who

4   felt it was important to know, as best could be known from the

5   available information, what the system was like originally.

6   Q.  Did you publish that book on your own?

7   A.  I had several other authors.  I was the principal writer

8   and the principal researcher.  It was published in 2011 by the

9   University Press of Florida.

10  Q.  How has the book been received?

11  A.  Well, I, you know, I beg to -- it's on every street corner.

12      It is very widely used in folks who are in agencies or

13  other organizations that are involved with Everglades

14  restoration.  It is widely recognized as the compendium of what

15  the system was like.

16  Q.  Have you continued to work on Everglades issues while

17  publishing the book?

18  A.  Yes, I eventually became employed by the South Florida

19  Water Management District for quite a while, and I had

20  basically two main focus areas.  One was what the system was

21  like originally, and the other is what kind of flow processes

22  were happening, are happening, and were happening in the

23  Everglades and how those relate to landscape patterning in the

24  system.

25  Q.  Are you currently working on any Everglades restoration

App. 425

1    issues?

2    A.   I am, but in a different capacity.  I no longer work for

3    the South Florida Water Management District.  I work for a

4    small engineering consulting firm, and informally I do quite a

5    bit of consulting for different Everglades-related groups.

6    Q.   Who are you consulting for?

7    A.   Probably -- well, consulting is a big word because I'm not

8    usually paid for it, but I most recently helped the National

9    Academy of Sciences, as I have a number of other occasions.

10   They have a committee, and don't hold me to exact name, but

11   it's something like the Committee on Independent Review of

12   Everglades Restoration Progress or similar to that.  It's a

13   long name, CISRERP, and that's a group of academics, scientists

14   and other disciplines from around the country who come and do

15   oversight of Everglades restoration.

16       As a 10 to 20-billion dollar project, there is a thought

17   that there ought to be -- and it very much is a science-based

18   restoration so there is some thought that there should be an

19   outside review of that, and I have been asked frequently

20   recently to work with that group.

21   Q.   Are you familiar with the National Environmental Policy

22   Act, which goes by the acronym NEPA?

23   A.   I have familiarity with it both from graduate school and

24   from more recent employment.  I have been involved in a NEPA

25   process in the chain of lakes in Florida.

App. 426

1  Q.   When you say in the process, have you had occasion to work
2  on Environmental Impact Statements prepared on the NEPA?
3  A.   Yes.  Both for the field work for them and the writing and
4  analysis.
5  Q.   All right.  I want to show you what's marked as Plaintiffs'
6  Exhibit 23.
7       (Plaintiffs' Exhibit 23 was marked for identification.)
8            THE WITNESS:  And I trust somebody will remind me if I
9  go too fast.
10           THE COURT:  Oh, yes.  Oh, yes.
11           THE WITNESS:  Thank you.  I'm trying to keep an eye.
12           THE COURT STENOGRAPHER:  You are doing great right now.
13           THE COURT:  High praise.
14  BY MR. SCHWIEP:
15  Q.   Is this a copy of your --
16  A.   It was.  There it is.
17  Q.   Is that your CV?
18  A.   It is.
19  Q.   Is that an accurate list of your professional credentials
20  and publications?
21  A.   It is, although as I was updating it recently, I realized I
22  did not list on it expert witness experience because I don't
23  have a lot, but I have done that before and I was thinking sort
24  of academically so I didn't think to list that.
25  Q.   Is it an accurate description of your academic?

14

1    A.  Yes.

2         MR. SCHWIEP:  We will request the admission of

3    Plaintiffs' Exhibit 23.

4         THE COURT:  Any objection?

5         MR. COSTELLO:  No objection.

6         THE COURT:  All right.  Plaintiffs' Exhibit 23 is

7    admitted.

8         (Plaintiffs' Exhibit 23 was admitted in evidence.)

9    BY MR. SCHWIEP:

10   Q.  Are you familiar, Dr. McVoy, with the Comprehensive

11   Everglades Restoration Plan, which sometimes goes by the

12   acronym CERP?

13   A.  I'm very familiar with CERP.  I was intimately involved

14   during the development.  Prior to the approval of the Water

15   Research Development Act of 2000 that started it off

16   officially, I was involved for the previous five or so years

17   very much in the scientific discussions that were driving what

18   should we do for restoration, what should we do in different

19   areas.

20   Q.  Is CERP one project or many projects?

21   A.  At that point it was about 60 some and now it's about 80

22   projects.

23   Q.  When you say that time?

24   A.  At that time prior to initial approval.

25   Q.  What is the overall CERP investment to date?

1   A.   To date, I believe is a little under 10 --

2        MR. COSTELLO:  Your Honor, Your Honor, we're going to

3   have to object to this line of questioning.  It's outside the

4   scope of Dr. McVoy's expert reports in this case.  Dr. McVoy

5   submitted many declarations, but the only expert analysis that

6   he has provided is to give the opinion that there is not cement

7   concrete pad underneath the land at the airport facility.

8        He has not submitted any expert report about hydrology

9   broadly in the Everglades.  We've had no ability to assess his

10  conclusions, so we don't believe he should be able to testify

11  to it today.

12       THE COURT:  All right.  I'm going to overrule the

13  objection.

14       Go ahead, Doctor.

15       THE WITNESS:  Could you repeat the question?

16  BY MR. SCHWIEP:

17  Q.   Yes.  If you know the amount of the investment in the

18  Comprehensive Everglades Restoration Plan?

19  A.   Today I believe it's a little over 10 billion.  The latest

20  prediction I have seen is it will hit 20 billion.

21  Q.   Are you familiar with the plaintiff in this case Friends of

22  the Everglades?

23  A.   I am.  I've been a member of the organization since 2020,

24  and I was asked to join the board last year, 2024.

25  Q.   And did you join the board?

1   A.   I did.

2   Q.   Why?

3   A.   A number of reasons, passion for this environment.  I have

4   spent 20 years very much studying it from any form of remote

5   sensing but also very much being in the Everglades.  I have

6   walked many miles of it.  I have a personal interest in this

7   environment, both Big Cypress and the Everglades.  So, I'm

8   passionate about that.

9        I have a passion for one of the central features of

10  Everglades restoration, which is it's a science-based process,

11  and Friends of the Everglades struck me as an organization that

12  is very committed to their advocacy based on science, so that

13  fits with me.  And my experience of 30 years being involved

14  suggests that you need a lot of different components to make

15  sure a project this big keeps going.

16       You, obviously, need the agency, State and Federal.  You

17  need legal support, and you need advocacy groups, non NGOs

18  provided added benefit, so I joined for that reason.

19  Q.   Is Friends compensating you for your time in this case?

20  A.   No.

21  Q.   Do you hold that against them?

22       You don't have to answer that.

23  A.   No, I don't.  I'm happy to do it.  If my expertise can be

24  useful to protection of the Everglades, I'm happy to do it.

25  Q.   Let me show you what's been previously marked for

App. 430

1    identification as Plaintiffs' Exhibit 88.

2         What are we looking at Dr. McVoy?

3         (Plaintiffs' Exhibit 88 was marked for identification.)

4              THE COURT:  Exhibit 88?

5              MR. SCHWIEP:  Yes, 88.  It's on the supplemental list,

6    Your Honor.

7              THE COURT:  Oh, the supplemental.  I always love it

8    when I have multiple lists.

9              Okay.  I will take your word for it.

10             THE WITNESS:  We are looking at a map of Big Cypress

11   Wildlife Management Area.

12             I would note that it's a little bit smaller than Big

13   Cypress National Park, what's shown on there.  Although you can

14   make out pretty much the outline of Big Cypress National

15   Preserve if you include it down through the zone one, two,

16   three and four on the bottom, and if you included the area that

17   goes up to the border between Hendry and Collier at the top.

18   BY MR. SCHWIEP:

19   Q.  Okay.  So, if I understand that, all of what's depicted on

20   the map is within Big Cypress National Preserve?

21   A.  Correct.

22   Q.  But Big Cypress National Preserve is larger?

23   A.  Correct.

24   Q.  Can you point out where the jetport is in this map?

25             THE COURT:  Any objection to admission of Plaintiffs'

1   88?

2          MR. COSTELLO:  Your Honor, we object, again, for the

3   same reason as before.  This is outside the scope of

4   Dr. McVoy's expert reports.

5          THE COURT:  Okay.  Overruled.

6          88 will be admitted then.

7          (Plaintiffs' Exhibit 88 was admitted in evidence.)

8          THE WITNESS:  I believe the scheme is I circle with my

9   finger on the screen?

10         THE COURT:  Yes.

11         THE WITNESS:  Okay.  That is the runway and taxiway,

12  and the extent of the property.  And pardon my finger in here,

13  but the cross-shaded northwest to southeast area is the jetport

14  property.

15  BY MR. SCHWIEP:

16  Q.  The jetport property straddles Collier County and

17  Miami-Dade County?

18  A.  Correct.

19  Q.  Have you had occasion to camp or hike or recreate within

20  the area that's depicted on this map?

21  A.  I have, over a number of years -- actually, since the first

22  I got here, a person who had one of the camps in Big Cypress

23  kindly took me out to that, wanted to make sure that I knew

24  what I was -- you know, knew something about what I was going

25  to be talking about.

1      I have hiked a good portion of the Florida National Scenic

2   Trail or Scenic National Trail that runs not quite the middle

3   of that map, the little triangles moving north to 75.

4   Q.   Okay.  Let me stop you there, and don't forget where you're

5   going.

6      You said you hiked the Florida -- is it called the Florida

7   National Scenic Trail?

8   A.   I seen it both called the Florida Trail, which is a little

9   more convenient, and the Florida Scenic National Trail or

10  something close to that.

11  Q.   Is that trail depicted on this map?

12  A.   Yes.

13  Q.   Can you point that out?

14  A.   It is basically the boundary between Turner River Unit and

15  Corn Dance Unit.  I haven't gone back to check that, but I'm

16  pretty sure that's the trail.

17  Q.   Can you show it on there?

18  A.   Oh, sure.  It actually started at the bottom of the Loop

19  Road, and goes up to I-75.  I hiked from 41, Tamiami Trail

20  north.

21  Q.   Anything memorable about that hike?

22  A.   Very much so.  My father years ago gave me a very nice pair

23  of Austrian hiking boots.  They delaminated on that hike

24  because we were in water most of the time.

25  Q.   Have you had occasion to camp on the Big Cypress area?

App. 433

1    A.   Many times.  I've marked on the Pinecrest campground,

2    primitive campground.  I camped at Burns Lake.

3         Pinecrest is on the Loop Road and Burns Lake is further

4    west, and Monument Lake is on the middle.

5         I have also -- I don't think it's shown on there.  That may

6    not have been constructed at that time.  There is something

7    called the Kirby Starter Roadside Park, I believe, on the south

8    side of U.S. 41.  My wife is from -- I think she was wife at

9    that point -- is from Kendall, and I managed to talk the whole

10   family into coming out just for an evening, and we cooked a

11   camp dinner at the Roadside Park, walked the boardwalk and

12   stayed for the night skies, which are very impressive.

13   Q.   What did you notice about the night skies in the area?

14   A.   Absence of light other than the stars, and the same I did

15   talk her into camping at Pinecrest as well, and we had the same

16   experience, very dark skies, huge number of stars.  It's part

17   of what it's known for.

18   Q.   Do you know if the Big Cypress National Preserve is the

19   designated dark sky park?

20   A.   I do know.  I actually was a local chapter member of Dark

21   Skies International for a period of time, and I'm aware that

22   Big Cypress Park applied for and received, eventually,

23   certification as a dark skies compliant national park.

24   Q.   What's involved, generally, in obtaining certification as a

25   dark sky international park?

App. 434

1   A.   Kind of what you might expect.  You have to, A, be dark to

2   start with, and then you have to commit as an organization or

3   an institution that you are going to do everything possible to

4   maintain that.  So, you have to agree that all of your lighting

5   will be done with dark skies compliance fixtures that don't

6   shine upwards, only shine downwards, have limited lights just

7   in an amount that you need for safety, and they did all those

8   things.

9   Q.   It might be obvious to you, but for all of us, what's the

10  significance of it being a dark sky park?

11  A.   Simply that is in a planet that has fewer and fewer places

12  where you can actually see the original sky and stars that the

13  Greeks saw or other navigators saw, there are not that many

14  places you can do that, and this is an area that is one of the

15  least roaded areas, lowest density of roads, and very low

16  density of human activity.  So, it's naturally dark and people

17  recognize that that was worth protecting.

18  Q.   Do you plan to visit the Big Cypress National Preserve

19  again in the future?

20  A.   It is a beautiful area, both day and night, and I certainly

21  will be coming back and dragging along different members of the

22  family.

23  Q.   On your visits to the area depicted on the map that's now

24  in evidence as Plaintiffs' Exhibit 88, have you had occasion to

25  see planes landing or taking off from the runway at the jetport

1    site?

2    A.  I have not, and I should say that prior to the activities

3    now, I did not -- I knew of the jetport.  I knew of the history

4    of it, but I have never been on that property.

5    Q.  Have you had occasion to observe any traffic entering or

6    exiting the jetport property from the trail on your prior

7    visits to the area?

8    A.  Going by the area, no.  It was a very quiet area that had

9    seemed to have almost no activity in it.

10         (Tribe's Exhibit 8 was marked for identification.)

11   BY MR. SCHWIEP:

12   Q.  Okay.  Let me show you what's marked as the Tribe's Exhibit

13   Number 8.

14        What are we looking at, Dr. McVoy?  Do you recognize it?

15   A.  Let me look.  My copy of the book has got a tab for flow

16   diagrams.  It's probably the same one.

17        That model, the Natural System Model, NSRSM, the latest

18   version of that, that's less related -- that looks like a

19   little different timing or different model run, but it looks

20   very similar to what's in my book.  It's long-term average flow

21   vectors for the Greater Everglades.

22        THE COURT:  I think if you tab the top of your screen,

23   it will erase the --

24        MR. SCHWIEP:  Oh, there are some stray marks on the map

25   that don't belong there.

1          THE WITNESS:  Yes, those don't relate to the current

2    exhibit.

3          MR. SCHWIEP:  They're the marks from the previous

4    exhibit.  They remained there.

5          THE COURT:  Also, is this your Exhibit 8?

6          MR. SCHWIEP:  It's the Tribe's Exhibit 8, Your Honor.

7          THE COURT:  The Tribe's Exhibit 8.

8    BY MR. SCHWIEP:

9    Q.  You got it?

10   A.  We got it.  Much better, we don't need that.

11         MR. SCHWIEP:  We will move the admission of the Tribe's

12   Exhibit 8.

13         THE COURT:  All right.  Any objection?

14         MR. COSTELLO:  Yes, Your Honor.  We object for the same

15   reason as before as being outside of the scope of Dr. McVoy's

16   expert report.  This doesn't appear to be the document that

17   Dr. McVoy reviewed in preparing for today's testimony, so we

18   object for those reasons.

19         THE COURT:  I'm going to overrule the objection, but

20   let me say, it appears the doctor is operating in a dual

21   function today, not only as a witness who has experienced the

22   area but intends to recreate and enjoy it in the future, but as

23   an expert in the topic that is the subject of his report.

24         MR. COSTELLO:  Of course, Your Honor.  We object to any

25   effort by Dr. McVoy to give opinion testimony that stems from

1   his factual knowledge and not his expert knowledge.

2         THE COURT:  It's hard to de-link, but, okay.

3         So, we will allow Tribe's Exhibit 8.

4         (Tribe's Exhibit 8 was admitted in evidence.)

5   BY MR. SCHWIEP:

6   Q.  Is it correct, Dr. McVoy, that the flow of water from the

7   jetport site would be to the south and the east into Monroe

8   County?

9   A.  It would certainly be south into Monroe County.  In

10  general, I would not say east, but I would point out that one

11  of the unusual features of South Florida is that it's very

12  flat, very level.  So, local variations in the past history on

13  the site, recent history, and local variations in storms can

14  give you quite different flow directions.  These are average

15  flow directions over time, so we can come back to that.

16  Q.  Have you had occasion to visit the jetport area since the

17  detention center construction commenced?

18  A.  I have.  On June 28th, I was in the area there late in the

19  afternoon.  It was quiet, and I thought, as I'm a longtime

20  Everglades scientist, I've known about the jetport but never

21  had the opportunity to go in and I'm here.

22  Q.  Let me just stop you there.

23        Did you have occasion to walk in the area prior to going

24  onto the jetport site?

25  A.  Yes, I've walked south of Tamiami Trail, and I've walked

1    north of Tamiami Trail along the north, south entrance road to

2    the east and west.

3    Q.  What did you observe as a scientist?

4    A.  As a scientist, I observed typical wetlands, typical of Big

5    Cypress.  So, part of it is open herbaceous area with probably

6    about ten -- at that time, about ten inches of water in it and

7    very clear water, which is typical for big Cypress and Cypress

8    trees, very characteristic of Big Cypress, where it gets its

9    name.

10   Q.  And on that visit to the site on June 28th, 2025, did you

11   have occasion to actually go onto the jetport property?

12   A.  I did.  I had asked for the possibility of visiting the

13   site and they said let's check and, eventually, the incident

14   commander, Dr. Frank E. Lumm, arrived in his vehicle and

15   introduced himself as another doctor, and he liked the idea

16   that some doctor, in this case soil science, was interested and

17   said hop in and I will show you around.

18       (Plaintiffs' Exhibit 85 was marked for identification.)

19   BY MR. SCHWIEP:

20   Q.  Okay.  Let me show you what's been marked for

21   identification as Plaintiffs' Exhibit 85.  What are we looking

22   at here, Dr. McVoy?

23   A.  You're looking at probably a satellite image base, almost

24   certainly a satellite image base, and the blue line is the

25   trace of -- I guess the red pin is probably where I parked my

1    car and then walked over toward the entrance, and then from the

2    green point forward, that is me in the incident commander's

3    vehicle and where he took me around.

4    Q.  So, how did you do that, the blue line trace?

5    A.  Oh, as a field scientist, I'm very interested in GPS units,

6    of being able to know where you are in the world, and then over

7    the years many times I have then used that data laying it on

8    things like Google Earth imagery so I can see where I have

9    been.  And I happened to have had that on my phone so I was

10   lucky to be able to record where I had gone.

11   Q.  Is this report your effort to document your observations

12   during the tour of the site that was provided to you by the

13   incident commander?

14   A.  It is.  I did not ask for permission to take photographs, I

15   just didn't.  But I did -- after leaving I thought let me write

16   down, while I'm still, you know, fresh in my mind, things that

17   I was told by the incident commander.

18          MR. SCHWIEP:  I would move the admission of 85, Your

19   Honor.

20          THE COURT:  All right.  Any objection?

21          MR. COSTELLO:  No objection, Your Honor.

22          THE COURT:  Thank you.

23          All right.  Plaintiffs' 85 is admitted.

24          (Plaintiffs' Exhibit 85 was admitted in evidence.)

25   BY MR. SCHWIEP:

App. 440

1  Q.  What did the incident commander say about the use of the

2  site before his work started?

3  A.  He -- Dr. Lumm was, I think, very proud of the effort of --

4         MR. COSTELLO:  Objection, Your Honor.  Hearsay.

5         THE COURT:  Well, no, but don't speculate as to what

6  you thought the doctor felt.

7         THE WITNESS:  No, he said --

8         THE COURT:  What did he say?

9         THE WITNESS:  He was clear that he was, you know, he

10  was positive about having put the place together quickly, and

11  in that context said that when he got there, there were

12  basically about four employees, most of whom were involved in

13  mowing the grass for the place.

14         MR. COSTELLO:  Objection, Your Honor.  Hearsay.

15         THE COURT:  Right, I have overruled that.

16  BY MR. SCHWIEP:

17  Q.  Dr. McVoy, it's important that you just tell us what the

18  incident commander said as opposed to what you thought he was

19  thinking.

20  A.  Okay.

21  Q.  What did he say with regard to the number of employees that

22  were working on the site before he began to work on the

23  detention center?

24  A.  He said that there was almost nobody there, about four

25  employees, most of whom were involved in mowing of the grass

1   areas.

2   Q.  Did he say whether there was any -- there were any fuel

3   facilities on the site?

4   A.  No, he did not say.

5   Q.  Did he tell you that they had paved portions of the site in

6   connection with the detention center work?

7   A.  He did.  As we were going north, it's a little faint on

8   there, but there is a curved road that runs straight east

9   straight to the runway.  As we were going by that, he pointed

10  out -- and you could see trucks.  He pointed out that they

11  were, at that moment, paving that area, newly paving it.

12  Q.  Did he tell you how many on-site employees would be working

13  at the site now that it is a detention center?

14  A.  Yes, he specifically mentioned a thousand employees.

15  Q.  Would you, Dr. McVoy, expect an increase in traffic in the

16  area, vehicular traffic with the number of workers on the site

17  moved from 4 to 1,000 or so?

18          MR. COSTELLO:  Objection, Your Honor.

19          No expertise in this area.

20          THE COURT:  Well, repeat the question.

21          Would you expect it to what?

22  BY MR. SCHWIEP:

23  Q.  Would you expect an increase in the traffic, vehicular

24  traffic to the site if the employees went from four to a

25  thousand?

App. 442

1              THE COURT:  Really?

2              MR. SCHWIEP:  Yes.

3              THE COURT:  Sustained.  Let's go.

4    BY MR. SCHWIEP:

5    Q.  Did you personally observe an increase in traffic onto and

6    off to the jetport site from your prior visit to the visit that

7    you made on June 28th?

8    A.  Night and day.

9         The times that I have been there, there is traffic going in

10   and out all the time and that was not the case in any other

11   visits I had prior to this.

12   Q.  Have you had occasion to review an aerial video of the site

13   taken by Ralph Arwood?

14   A.  I have.

15             MR. SCHWIEP:  Your Honor, at this time I would like to

16   play that video.  It's Plaintiffs' Exhibit 81.  It's short and

17   Dr. McVoy will comment on any observations.

18             THE COURT:  Any objection to Plaintiffs' Exhibit 81?

19             MR. COSTELLO:  No objection, Your Honor.

20             (Plaintiffs' Exhibit 81 was admitted in evidence.)

21   BY MR. SCHWIEP:

22   Q.  First, so we have the groundwork, this says on the top

23   left-hand corner July 18th, 2025.  Is this a video that

24   Mr. Arwood, Dr. Arwood took on or about July 18th, 2025?

25   A.  Yes, it is.

1    Q.   How do you know that?

2    A.   I know that because it happens to be my birthday, and I

3    have received that document -- the video from Mr. Arwood and he

4    is very conscientious about labeling all of his photography.

5    He is a professional aerial photographer.

6    Q.   Did he tell you he took it on July 18th?

7    A.   Yeah.

8    Q.   All right.  So, what do you see or observe from what we are

9    looking at right now?

10   A.   Okay.  Hold it to view it as still for just a moment.

11        What you see is large expanse of vegetation.  Much of it is

12   herbaceous wetland vegetation and some of it that rises up a

13   little more, darker green, can be a little higher if it's

14   hammock vegetation or can be a little lower if it's cypress.

15        But the thing that I wanted to draw your attention, which

16   is not apparent from anywhere, but the middle of the photograph

17   is everything that you see there is wetland and at that time

18   had water on it.  The way that you can know that is partly from

19   professional experience, and being out there, but also if you

20   look in the middle of the photograph or of the video, the still

21   version of it, you see a bright area.  And if you look in the

22   center of that area, you can actually see a bit of a round

23   circle.  That is -- we are oriented east at this point.

24        The sun is ahead of him, and that is a reflection of the

25   sun not off of vegetation but off of water.  And as we proceed

App. 444

1    with the video, you will see that that reflection is visible

2    and you can see it kind of moving someplaces.  It's coming up

3    between cypress trees.  There is a little variation depending

4    on the vegetation, but there is a reflection of that water

5    throughout that area.  And if he had been flying a few miles to

6    the north, a few miles to the south, you'd see the same thing.

7         You'd also see when this reflection goes over the roadway

8    it briefly disappears, and then you are back in the wetland

9    again.  I should point out that particular area is manmade

10   drainage, but now we are on natural wetlands.

11   Q.   Okay.  The road that we're looking at that's just to the

12   south, right, to the right of where the sun is reflected off

13   the water --

14   A.   Correct.

15   Q.   And did you detect anything about the road?

16   A.   At the bottom of the still right now where the road curves

17   off of the north south road that runs left to right in the

18   picture, that is where the incident commander pointed out that

19   they were currently paving.  And as you look down the length of

20   that road that eventually gets to the runway you can see the

21   new paving and new striping.

22   Q.   Okay.

23   A.   And you see the continual reflection, so you get an idea

24   that wetlands are throughout this area except now it

25   disappears.  Now you're on the area that was raised in the

App. 445

1  original construction.  We're now going over the main runway,

2  and if you could, stop right there.

3      So, in the middle is the wider that goes up and down and

4  the image is the main runway.  To the left is the taxiway.

5  Then there are cross connections at an angle between runway and

6  taxiway, and to the right is an area that you can see looks

7  like open construction or scraped area, and then a distinct

8  rectangle that's darker and shows white striping as you would

9  find in a parking lot.

10  Q.  That's what you call area one, that parking lot?

11  A.  Correct.

12  Q.  Okay.  We will come back to that.

13  A.  And those are vehicles -- I've looked at other imagery that

14  was even more high resolution.  Those are vehicles on there,

15  vehicles and larger trucks.

16      Again, you can see wetland even in the area between the

17  taxiway and the runway, and a little bit more, a little bit

18  more.  Let's stop there.

19  Q.  Yeah.  What are we looking at on the left-hand side, or the

20  north side of the video now?

21  A.  So, if you compare this to the blue trace of the tour that

22  I took with the incident commander, we came in on the very left

23  of the photograph coming up the photograph on the main

24  entrance, turned right and came in.  This -- I don't know if I

25  can draw anything but there is a large rectangle there with

1   white tents on it.  At the time that I was there on June 28th,

2   only the far north, the left side set of four tents was there.

3        He pointed out that each tent was a capacity of 250

4   detainees, that they were in units of, I believe, 32 and 8 beds

5   or something or 8.  There was an 8 and a 32 involved in that.

6        We did not go inside any areas, so I did not see the inside

7   but he pointed out that was the capacity for a thousand that

8   was already on site and that they were planning to go to 3,000.

9   Q.   It's hard to orient but --

10  A.   North is to the left.  East is to the top in this --

11  Q.   Well, there is the -- it looks like a tent that you said

12  were the tents where the actual tents are where people were

13  being held?

14  A.   Yes, according to the incident commander.

15  Q.   Yes.  And to the right of that, is that -- there seems to

16  be like four rectangular tents that are positioned, I guess,

17  north south.

18  A.   North south, yes.

19  Q.   Yes.

20  A.   That was not there at the time that I did the tour.  That

21  area is what I refer in my report to area two.

22  Q.   We will come back to area two.

23  A.   We will come back to that.

24       I would point out that the green to the east of the set of

25  2,000 detainee tents are either, which he pointed out, portable

1    generators or AC units or both.

2    Q.  You can continue.

3    A.  And now I will just draw your attention to the taxiway, to

4    the left of your two strips.

5        What you are seeing there from what he is pointing out is

6    what seems like an endless number of trailers that he said was

7    staff -- area for either visiting dignitaries or visiting

8    officials, and then further down was for the thousand employees

9    that he mentioned.

10   Q.  Further down being further east?

11   A.  Further east, yeah.  It will extend pretty much to the end

12   of the taxiway, I believe, and you see the wetlands again

13   throughout in between.

14   Q.  The glint of the water, is that reflective of the fact that

15   there is wetlands in the area?

16   A.  Open water, yes, wetlands.

17       You can see the trailers extend all the way to the east end

18   and then again the gleam picks up again off the end of the

19   runway and taxiway.

20       It goes on further.  He turns around and flies it east to

21   west.  You don't get the same sun reflection.  Then he flies it

22   I believe it's south to north, the same information.

23       MR. SCHWIEP:  Your Honor, I'm not sure if I moved the

24   admission of 81.

25       THE COURT:  Yes, you did.  81 is admitted.  We wouldn't

1   be talking about it.

2   BY MR. SCHWIEP:

3   Q.   Are the wetlands in this area interconnected?

4   A.   Very much so.  It's one of the things that makes South

5   Florida --

6           MR. COSTELLO:  Your Honor, we raise our standing

7   objection again.

8           THE COURT:  Okay.  You can have a standing objection.

9           MR. COSTELLO:  Very good.  Thank you, Your Honor.

10          THE COURT:  Go ahead, Doctor.

11          THE WITNESS:  Okay.  Thank you.

12          It's one of the things that is very unusual to

13  hydrologist that come from other parts of the country.  They

14  get here and after a few weeks they keep asking about what is

15  this sheet flow that I'm hearing about.  Where I come from up

16  west and up north or wherever it is we have rivers and the

17  water is in the rivers and then there is dry land around it.

18  Well, Florida is very different.  It's very flat and it is

19  characterized by this sheet flow that you have wetlands that

20  are not individually isolated wetlands.  And we have, in fact,

21  studies of isolated wetlands to distinguish from that that

22  occur in other parts of the state.

23          Sheet flow means that these wetlands are continuous and

24  water flows as a sheet across the landscape.  That can vary

25  somewhat seasonally.  In the dry season sometimes it

App. 449

1   disconnects a little bit, and in the wet season it reconnects

2   as a sheet over the whole thing.

3        And that's true both in the Everglades, itself, and in

4   the Greater Everglades that includes Big Cypress.

5   BY MR. SCHWIEP:

6   Q.   What's the significance of the Big Cypress wetlands being

7   interconnected?

8   A.   And I'm not even sure I'd even say interconnected.  I would

9   just say continuous.  The significance means that you have

10  surface water with whatever there is to filter it or clean it.

11  Once something is in that water, it keeps moving with that

12  sheet flow, so that -- the same is the true of rivers, but

13  rivers are very concentrated on a riverbed.  Here the river is

14  the whole area.

15  Q.   Dr. McVoy, do you have occasion to analyze how much

16  pavement has been laid at the detention center since

17  construction there commenced since July 20, 2025?

18  A.   Yes, I do.

19       (Plaintiffs' Exhibit 82 was marked for identification.)

20  BY MR. SCHWIEP:

21  Q.   I would like to show you what's previously been marked as

22  Plaintiffs' Exhibit 82.

23       Is that an analysis of possible new areas of new pavement

24  at the TNT site that you prepared on or about July 20, 2025?

25  A.   Correct.

1        MR. SCHWIEP:  Judge, we would move the admission of

2   Plaintiffs' Exhibit 82.

3        THE COURT:  Any objection?

4        MR. COSTELLO:  No objection, Your Honor.

5        THE COURT:  All right.  Exhibit 82 is admitted.

6        (Plaintiffs' Exhibit 82 was admitted in evidence.)

7   BY MR. SCHWIEP:

8   Q.  Okay.  I can direct your attention to figure six, which

9   appears on page five of the PDF.

10       What are we looking at there, Dr. McVoy?

11  A.  We are looking at a time sequence of images of the area.

12  The top right and the lower two are all aerial photographs

13  taken by Mr. Arwood.

14       The upper left is a Google Earth satellite image where I've

15  worked with Google Earth to try to make the view angle similar

16  to what you would see from the airplane so that you can compare

17  it.  And what you are seeing there is in the Google Earth image

18  from February of 2025 is that area, the only paving on it is a

19  very small -- for orientation I would point out -- I call it

20  the parabolic nose up at the top of the image, which you can

21  see in all four images to help orient yourself.

22       Right underneath that nose is a little bright white spot, a

23  very small portion of the area, that's the cement plant for the

24  instrument landing system.

25  Q.  Can you mark that with your finger, where that is on the

1  upper left-hand photo?

2  A.  I didn't do it very well.  It's a little further to the

3  north of that, and now I've blocked it off so you can't see it.

4  Q.  What conclusions did you draw in comparing photos from

5  February of 2025 through July 18, 2025?

6  A.  It seemed very apparent to me that there has been new

7  paving at the area, new asphalt paving.

8      You can see in the July 5 image that's probably very

9  recently after it was paved and you get the dark coloration,

10  that seems to be consistent with all the observations of fill

11  trucks and asphalt trucks going into the place.

12      On July 11th, you see that it's been striped for parking,

13  and on July 18th you see that it's being used for parking.

14  Q.  This is the area you call area one?

15  A.  Correct.

16  Q.  Did you calculate how much new pavement was applied in area

17  one?

18  A.  I did.  Google Earth has a very helpful feature that you

19  can draw rectangles or polygons or whatever you want and lines,

20  and measure the area or length, and so I did that.

21  Q.  And your conclusion was?

22  A.  My conclusion was that we're looking at what you see most

23  clearly in July 5th and the same in the other ones, you are

24  looking at 11 acres of new pavement, a little more than 11.

25  Q.  Let me draw your attention to figure ten which appears on

App. 452

1    page nine of the PDF.

2         What are we looking at there, Dr. McVoy?

3    A.   Very similar thing except for what I call area two.  So,

4    your upper left photo is Google Earth.  That is prior to any

5    construction -- oh, how did we get that cleared thing?

6         Thank you.

7         The upper left image is the satellite imagery prior to

8    any construction at the site.  You can see a few buildings -- I

9    will go ahead and circle that.  That's the only buildings that

10   appear to have been on the site prior.  There might be a little

11   bit over in this area or maybe that's just storage.  And you

12   see a large rectangle.  That was there from the construction

13   back in the late 60s, early 70s.  And you see an area -- I'll

14   go ahead.  Well, I don't know if you need to help me.  I will

15   try and find it.

16        This is somewhat approximate but that's what I call

17   area two.  Again, when you look at the satellite imagery when

18   you go back you can go into the historical satellite imagery

19   with Google Earth that lets you see what was there in previous

20   years, and it gives you the year.

21        You see the same thing that it's similar to area one.

22   It was open area.  Actually, if you zoom in more, you will see

23   the mowing patterns on it.  It seems to be consistent with what

24   the incident commander reported.

25        And if you look on July 5th, a portion of that area

1    seems to be scraped already.  On July 11th, the area seems to

2    have all been paved, and on July 18th it's got tents on it and

3    the generators and AC from the looks of things.

4    BY MR. SCHWIEP:

5    Q.  Did you calculate to see the amount of paving in area two?

6    A.  I did the same exercise with Google Earth.

7    Q.  What did you conclude?

8    A.  Seven plus acres.

9    Q.  Let me ask you to look at figure four, which is on page

10   three of the PDF.

11   A.  Can you do the clear again?

12       Thank you.

13   Q.  Figure four is the one that's on the bottom of this page.

14   We can expand that a little bit.

15   A.  There you go.

16   Q.  Thank you.

17       So, what are we looking at here?

18   A.  I simply made a locator diagram.  Areas one and two are the

19   large paved areas that we've mentioned and looked at the

20   analysis.  Area four is that road going east west that the

21   incident commander mentioned that they were paving at that

22   time, and five, six and seven are smaller areas that I think in

23   this report I didn't actually try to quantify it.  I did later,

24   and it comes out to about another two acres.  Probably that's

25   an under estimate because I didn't do all of it.

App. 454

1   Q.   What was the total in new pavement that you concluded had

2   been applied?

3   A.   At least 20 acres.

4       (Plaintiffs' Exhibit 22 was marked for identification.)

5   BY MR. SCHWIEP:

6   Q.   Let me ask you to look at Plaintiffs' Exhibit 22.

7       Is this a report you prepared to analyze the assertion that

8   asphalt was only applied over a preexisting cement pad on or

9   about July 8th, 2025?

10  A.   It is.

11      MR. SCHWIEP:   Okay.   We would move the admission of 22,

12  Your Honor.

13      THE COURT:   Any objection?

14      MR. COSTELLO:   No objection, Your Honor.

15      THE COURT:   All right.   22 is admitted.

16      (Plaintiffs' Exhibit 22 was admitted in evidence.)

17  BY MR. SCHWIEP:

18  Q.   What was the purpose of this report, Dr. McVoy?

19  A.   I was forwarded a question from a reporter that asked

20  about -- apparently had been interested in paving at the site

21  and had received an e-mail from the Florida Department of

22  Emergency Management indicating that any new paving was only on

23  areas that had been previously a cement pad, and referred to,

24  that they were there for 50 years or something, apparently

25  referring to the original construction in the late 60s.

1  Q.  What did your analysis conclude with respect to the paving

2  18 acres that you detected in areas one and area two?

3  A.  I found no evidence to support the conclusion that there

4  was a preexisting cement pad.

5      (Plaintiffs' Exhibit 89 was marked for identification.)

6  BY MR. SCHWIEP:

7  Q.  Okay.  Let me show you Plaintiffs' Exhibit 89.  Hold on

8  that page a minute.

9      What are we looking at here, Dr. McVoy?

10 A.  We are looking at I don't know if the technical term is

11 construction drawings.  Well, these were not construction

12 drawings.  These were boring, a report on soil borings that

13 were made in the area, as is typically done for paving where

14 you need to check out the substrate before you proceed.

15 Q.  And you see the date on the bottom left-hand side, July 22,

16 2025?

17 A.  I do.

18 Q.  This is a record that was provided by the Division of

19 Emergency Management?

20 A.  Yes.

21 Q.  And I would note, we may see that later and the

22 individual -- although the report is dated July 22nd, the

23 borings, which we can point out on there, they both occur only

24 in areas, what I labeled areas one and two, and those borings

25 were made on June 27th and 28th according to the drawings.

App. 456

1          MR. SCHWIEP:  We move the admission of Plaintiffs' 89.

2          THE COURT:  Any objection?

3          MR. COSTELLO:  No objection.

4          THE COURT:  All right.  Plaintiffs' Exhibit 89 is

5    admitted.

6          (Plaintiffs' Exhibit 89 was admitted in evidence.)

7    BY MR. SCHWIEP:

8    Q.  What do we see here in terms of the soil borings, where the

9    soil borings were conducted?

10   A.  Yes.  We are seeing that they are in what I refer to as

11   area one and two, and they go a little bit outside of the area

12   that I mentioned in the other report was paved for area one.

13   There is a couple that are a little further east of it, and for

14   area two they are all within area two.

15   Q.  Okay.  And area one is the area on this lower left-hand

16   side?

17   A.  Yeah.

18   Q.  If we can turn to the next page, did you draw any

19   conclusion after reviewing the soil boring results?

20   A.  I did.  I actually did a little graphical work with these

21   images so I could put the borings next to each other and then

22   connect the different strata so I could get an idea of how

23   similar they were across the borings, and they were quite

24   similar.

25          What they show is about four or five inches, a thin layer

44

1    of topsoil.  Then in most cases two feet of fill.  That fill

2    was reported as sand with lime rock, which is typical fill for

3    construction, and then underneath that was the original geology

4    limestone.  And that was pretty similar across all the borings.

5         The significant part here is that if these -- since these

6    borings had been made in the area that was asserted to have had

7    a cement pad, you would see that in at least some of them, if

8    not presumably all of them, as a distinct layer.  It's not

9    there.

10   Q.  Is the fill that you mentioned, is that porous and

11   permeable?

12   A.  Yes.

13   Q.  Would the asphalt be permeable?

14   A.  No.

15   Q.  What's the significance?

16   A.  Or very, very minorly permeable.

17   Q.  What's the significance of that?

18   A.  Anything that's permeable allows water, rainfall that falls

19   on it to go down through that.  If there is any filtering

20   capacity to that material, it will filter things out.

21        When it's pervious, it doesn't.  It just, the water

22   accumulates and runs off.

23   Q.  Sasha, if you could blow up, zoom into note five.  It's on

24   the right-hand side.

25   A.  And then down a little.

App. 458

1  Q.  Just down the page.

2      Okay.  Note five here, the final sentence says, these

3  limestone layers are also -- sorry, I'm looking at the wrong

4  one.

5  A.  No, you are on the right one, I believe.

6  Q.  "These limestone layers are also difficult to dewater due

7  to its high porosity and permeability."

8      Do you see that?

9  A.  I do see that.

10  Q.  What does that mean?

11  A.  Porosity and permeability are slightly different.  Porosity

12  says this limestone has a lot of holes in it.  Permeability

13  says those holes are interconnected, so that means that ground

14  water can move easily through this material.

15  Q.  Do you agree with that conclusion?

16  A.  I do.

17      (Plaintiffs' Exhibit 83 was marked for identification.)

18  BY MR. SCHWIEP:

19  Q.  Okay.  Now I'm going to show you Exhibit 83.

20      What are we looking at here, Dr. McVoy?

21  A.  This is a map of the Western Everglades Restoration

22  Project, which is one of the projects of CERP, the

23  Comprehensive Everglades Restoration Plan.

24  Q.  This map also has some text on it.  Did you prepare this?

25  A.  The map I did not prepare.  That's straight screenshot from

App. 459

1    the website.

2    Q.  Sorry, the paragraph above the map?

3    A.  Yes, I did.

4         MR. SCHWIEP:  I would move the admission of 83.

5         THE COURT:  Any objection?

6         MR. COSTELLO:  Our standing objection, Your Honor.

7         THE COURT:  Thank you.

8         83 will be admitted.

9         (Plaintiffs' Exhibit 83 was admitted in evidence.)

10   BY MR. SCHWIEP:

11   Q.  What is the Western Everglades Restoration Plan?

12   A.  It is an acknowledgement that the Western Everglades, in

13   this case a substantial portion of Big Cypress, maybe even all

14   of it, is an integral part of the hydrology of the Everglades,

15   and for that reason the same goals that are present in overall

16   Everglades restoration of trying to restore the appropriate

17   quantity, quantity, timing and distribution of water, and more

18   specifically sheet flow, are important in this area as well.

19   And that the goal -- the water quality goals of keeping that

20   water as low nutrient as possible is also an important goal.

21   Q.  So why is low nutrient important?

22   A.  That's one of the peculiarities of the Everglades and Big

23   Cypress that nutrients we tend to think of as fertilizers that

24   you put on agricultural fields that's a good thing you want

25   your crops to grow.  Unfortunately, this ecosystem is one that

1    is extremely sensitive.  It's naturally very low nutrient

2    level, and when you introduce nutrients, particularly the

3    macronutrients, phosphorus, nitrogen, potassium, it disturbs

4    the ecosystem drastically, even at quite -- for the Everglades

5    the legal requirement is that the water we introduce into it

6    needs to be ten parts per billion of phosphorus.  That's pretty

7    clean.

8         That was the result of a lot of science that clearly

9    demonstrated the link that anything higher than that disturbs

10   the system.  That criteria probably wouldn't apply right here

11   in Big Cypress but similar.  The concept is the same.

12   Q.  Did you have occasion to investigate the features of the

13   Western Everglades Restoration Plan that are in the area of the

14   jetport specifically?

15   A.  I did, and I believe my report zooms in for convenience.

16        There you go.  That's simply a zoom-in of the previous

17   figure.  You can see the jetport.  I think the labeling is

18   pretty clear there.

19        The blue teal line is U.S. 41, Tamiami Trail, the one

20   running left to right across the photograph, and there is

21   another blue area, which is part of the L-28 canal and -- the

22   Tie Back canal and levee.

23   Q.  Let me stop you there.

24        What are the features of the Western Everglades Restoration

25   Plan that are proposed for the jetport area?

App. 461

1    A.   If you look closely there are little white arrows or golf

2    tees that are symbols, traditional symbols for culverts.  I

3    will come back to that, and then quite interestingly on the

4    east side of the photograph or the map, there are three, not

5    very typical structures but these are design truck structures.

6    They're called bidirectional control structures, and the

7    culverts are straightforward.  That's to allow sheet flow to go

8    under the manmade impediments to sheet flow, in this case

9    Tamiami Trail, and the 11-mile Road.

10    I would point out that those culverts under Tamiami Trail

11    are in addition to the already existing bridges and culverts.

12    So, there was a recognition that sheet flow is difficult to not

13    interrupt if you put manmade structures, so we have decided to

14    add more.

15    The bidirectional structures are interesting and a

16    reflection of typical South Florida level topography, which

17    means that if there is a big storm in Big Cypress water levels

18    may rise in that area more than in the Everglades and the water

19    will flow east.  If there is a big storm in the Everglades and

20    not in Big Cypress, because they tend to be quite localized, it

21    can flow west, and that's the bidirectional aspect.

22    All of these structures are -- excuse me, I correct myself.

23    Most of those culverts and the bidirectional ones are

24    within about a half-a-mile of the jetport.  Some of them are

25    two miles away, and the ones on the Loop Road are probably

```
 1   about seven miles away.

 2   Q.   Does this reflect that surface waters in the area of

 3   jetport are interconnected?

 4   A.   Very much so, and that we're trying -- that's part of the

 5   goal of WERP and CERP, in general, is do as much as possible to

 6   remove the impediments to that sheet flow and try to get it

 7   going in the right direction and with low -- not low water

 8   quality, low nutrient levels, high water quality.

 9   Q.   Does the addition of 20 acres of impervious pavement at the

10   jetport site pose a risk to surrounding wetlands?

11   A.   In the sense that anything that falls in the 20 acres will

12   go directly into the wetlands.

13   Q.   How is it likely to impact those wetlands?

14   A.   Even the addition of concentrated water is not necessarily

15   a help to those wetlands, but the bigger concern would be any

16   either nutrients or contaminants that might be in that water

17   that runs off of the paved areas.

18   Q.   Given your experience in NEPA processes and having worked

19   on Environmental Impact Statements, would you have expected the

20   agencies to study these impacts and effects before building the

21   detention center?

22   A.   I would, definitely.

23           MR. SCHWIEP:  Can I have a moment, Your Honor?

24           THE COURT:  Yes.

25           MR. COSTELLO:  Your Honor, we just want to get on the
```

App. 463

1    record -- again, I know we have the standing objection, but

2    because this is the first time that we are hearing these

3    conclusions and these opinions from Dr. McVoy that we are

4    unable to effectively cross him on these matters today, and we

5    ask him for the opportunity to cross him next week after we

6    have had an opportunity to assess his testimony.

7            THE COURT:  No, you'll start today.

8            MR. COSTELLO:  Understood.  Thank you.

9            THE WITNESS:  I assume if I haven't heard anything

10    otherwise I'm speaking at the right speed.

11           THE COURT:  I think so.  But our subject expert, Madam

12    Court Reporter, would be --

13           THE WITNESS:  I'm getting a thumbs up.

14           THE COURT:  Okay.

15           MR. SCHWIEP:  Nothing further, Judge.

16           THE COURT:  All right.  Anything from co-plaintiffs?

17           MR. AJIZIAN:  No, Your Honor.

18           THE COURT:  Cross-examination.

19           MR. COSTELLO:  Thank you, Your Honor.

20           MR. PANUCCIO:  Is the Tribe crossing or no?

21           MR. AJIZIAN:  No.

22           MR. PANUCCIO:  Okay.

23                        CROSS-EXAMINATION

24    BY MR. COSTELLO:

25    Q.  Good afternoon, Dr. -- good morning, Dr. McVoy.  How are

App. 464

1   you doing?

2   A.  Thank you.  Hope you're doing well as well.

3   Q.  My name is David Costello.  I'm going to ask you a few

4   questions.

5       You testified now about the new parking lot area that you

6   describe as area one.  I'd like to ask you a few questions

7   about that.

8       Could we pull up Defendants' Exhibit 12?

9       All right.  Have you seen this page before?

10      (Defense Exhibit 12 was marked for identification.)

11  A.  Yeah, it looks like part of my report, if I'm not mistaken.

12  BY MR. COSTELLO:

13  Q.  Yes, that's right.  This is a page from your declaration

14  that you submitted in this case.

15  A.  Yeah.  You get a great view of the original cement pad

16  there just under the parabolic nose.

17  Q.  Sure, yes.  Well, thank you, Dr. McVoy.

18      This depicts what you called area one.  Right?

19  A.  Yes.

20      MR. COSTELLO:  I'd like to move this into the record.

21      THE COURT:  All right.  It's Defendants' 12, the Google

22  Earth imagery.  Any objection?

23      MR. SCHWIEP:  No, Your Honor.

24      THE COURT:  All right.  Defendants' Exhibit 12 is

25  admitted.

App. 465

1         (Defense Exhibit 12 was admitted in evidence.)

2  BY MR. COSTELLO:

3  Q.  Dr. McVoy, you agree that this plat appears to have been

4  leveled.  Right?

5  A.  My guess is that it was leveled at the time of the original

6  construction of the jetport.  Based on the borings that showed

7  fill and just the appearance, it's clearly been an area that's

8  been worked.

9  Q.  Sure.  So on that score, you'd also agree that it was

10  previously filled with lime rock?

11  A.  With lime rock and sand, some form of fill.

12  Q.  And you'd agree that this area has previously been mowed?

13  A.  As to the best of my ability to determine that from the

14  imagery, yes.

15  Q.  So, this isn't pristine wetlands that is untouched by

16  humans.  Right?

17  A.  At that point the wetlands had been disturbed at an earlier

18  time.

19       (Plaintiffs' Exhibit 18 was marked for identification.)

20  BY MR. COSTELLO:

21  Q.  I'd like to talk to you about area two.

22       Can we pull up Plaintiffs' Exhibit 18, page 20?

23       Can we zoom in on the top image?

24       All right.  Is this area two?

25  A.  Correct.

1  Q.  And this is -- are you familiar with this page?

2  A.  Yes, part of my report.

3  Q.  It's part of your report.

4     Your Honor, I'd like to move this into evidence?

5         THE COURT:  Okay.

6         Are we just moving the picture or are we moving all of

7  Plaintiffs' Exhibit 18?

8         MR. COSTELLO:  I don't think that my friends would have

9  an objection to a plaintiffs' exhibit.

10        MR. SCHWIEP:  No, but for completeness it should be the

11  entire exhibit, Plaintiffs' Exhibit 18.

12        MR. COSTELLO:  We have no objection.

13        THE COURT:  That was my question.

14        Plaintiffs' 18 is admitted.

15        (Plaintiffs' Exhibit 18 was admitted in evidence.)

16  BY MR. COSTELLO:

17  Q.  You'd agree that this plat also appears to have been

18  leveled.  Right?

19  A.  Yes.

20  Q.  And you'd agree that it was previously filled with lime

21  rock and sand?

22  A.  Based on the borings, correct.

23  Q.  And you agree that this area has previously been mowed.

24  Right?

25  A.  It certainly appears to be.

1   Q.  So this area is not untouched pristine wetlands.  Correct?

2   A.  No, not at this -- again, from looking at the historical

3   imagery this goes back to the original jetport construction.

4   Q.  All right.  I'd like to ask you about some of the paved --

5   A.  I might point out that the dark area surrounding it is

6   still wetlands.

7   Q.  Yes.  Thank you, Dr. McVoy.

8       I'd like to talk to you about some of the paved roads that

9   you have identified.

10      Can we pull up Plaintiffs' Exhibit 14, at page 22?

11      Dr. McVoy, are you familiar with this image?

12      (Plaintiffs' Exhibit 14 was marked for identification.)

13  A.  Yes.

14  BY MR. COSTELLO:

15  Q.  This was a picture submitted with a declaration of yours on

16  this case.  Right?

17  A.  Yes.

18      MR. COSTELLO:  We'd like to move this whole exhibit in

19  evidence.

20      THE COURT:  What exhibit -- is this not part of his

21  declaration?

22      MR. COSTELLO:  No, it is.  His declaration is

23  Plaintiffs' Exhibit 14.

24      MR. SCHWIEP:  No objection.

25      THE COURT:  Okay.

App. 468

1                 (Plaintiffs' Exhibit 14 was admitted in evidence.)

2      BY MR. COSTELLO:

3      Q.  All right.  So, this image shows two what you call new

4      roads that connect to the main public road surrounding the

5      airport.  Right?

6      A.  I can't attest to whether they are public roads but to the

7      main entrance road, correct.

8      Q.  Sure.  Just to be clear, I'm saying that -- you see that

9      big road looping around the airport?

10     A.  Yes, that's the main entrance road.

11     Q.  All right.  Keep those roads in mind.  I'm going to show

12     you another image.

13          Can we turn to Plaintiffs' Exhibit 18, at page six?

14          Can we go to the bottom image of that page and zoom in on

15     it?  Thank you.

16          All right.  Dr. McVoy, do you see the lines numbered five

17     and four on this image?

18     A.  I do.

19     Q.  Are those the areas of the roads in the image that I just

20     identified for you in Plaintiffs' Exhibit 14?

21     A.  They are.

22     Q.  Okay.  Don't those clearly depict that these two areas were

23     roads even before the new paving?

24     A.  They were clearly some form of transportation.  What I

25     would make out of looking at the, as best as I can, out of the

1    Google Earth imagery, including the historicals, they do not

2    appear to have been paved.

3        There is some uncertainty to that, to what degree they were

4    paved, whether they were lightly paved at one point and then it

5    degraded and never been maintained or whether it was just a

6    dirt road from the beginning.

7    Q.  You can't assess from this image, though, whether they were

8    paved or not, can you?

9    A.  Not a hundred percent.

10   Q.  You also identified other what you called new pavings at

11   the site aside from four and five and let's put aside for the

12   moment one and two.

13       Did you assess whether those new pavings were placed on

14   land that was previously filled and leveled?

15   A.  Six, it's a small turnaround area for the entrance, for the

16   vehicles coming in, and that one my recollection is that

17   appeared to be completely new area.

18       Three, I would have to go back and look.  I don't remember

19   whether that looked like it had been cleared or not.

20       Seven, my recollection is that it may or may not have been

21   newly cleared.  It was clearly an expansion of the area along

22   the taxiway that had not been paved.  Whether it was wetland or

23   not, I'd have to go back and look.

24   Q.  You didn't mention any of that in the declaration you

25   mentioned in this case?

App. 470

1    A.   No, because those were small areas, so I ran out of steam

2    as a volunteer just trying to understand what was happening

3    there.   I figured it was smaller areas.

4    Q.   You didn't conduct any subterranean investigation to assess

5    whether those areas were previously filled or leveled.   Right?

6    A.   I believe we were -- nobody was allowed on the site at that

7    point.

8    Q.   You testified a good bit about the interconnectedness of

9    the Everglades.   Did you submit an expert report on that?

10   A.   In the sense of referring to CERP and WERP, the Western

11   Everglades Restoration Program, yes.

12   Q.   Do you recall what exhibit you included that testimony in?

13   A.   I don't know the exhibit number.   Perhaps the counsel will

14   know that, but it's the WERP report.

15   Q.   Let me direct you to Plaintiffs' Exhibit 49 -- excuse me,

16   Plaintiffs' Exhibit 18 and to the first page.

17        All right.   Can you scroll down to the first page of 49-1?

18   Keep going.   Down.   Down, please.   Right there.

19        Can we zoom in on that, into the bullets numbered one, two

20   and three, please?

21        All right.   Dr. McVoy, this is an expert report you

22   submitted in this case.   Right?

23   A.   Correct.

24   Q.   And this report says the report analyzes three questions.

25   Right?

1  A.  Correct.

2  Q.  The first relates to new paving at the facility.  Right?

3  A.  Correct.

4  Q.  The second relates to how many acres of new paving are in

5  the facility.  Right?

6  A.  Correct.

7  Q.  And the third relates to whether original soil rests under

8  the new pavings or whether the new pads do.  Right?

9  A.  Well -- yes, cement pad.

10 Q.  Do any of those questions have to do with

11 interconnectedness of the wetlands?

12 A.  Only in the sense that the interest in paving is because

13 that paving is surrounded by continuous wetlands and paving

14 will run runoff into those wetlands, so, yes.

15     In this report, I did not -- I was not trying to say

16 anything about continuous wetlands, no.

17 Q.  All right.  So, sticking with the interconnectedness of the

18 wetlands, would a wetland -- you mentioned that the

19 interconnectedness of the wetlands can be blocked by paving, is

20 that right?

21 A.  By many things, by paving, by levees, by construction.

22 Anything that rises up and is less pervious than the original

23 wetland.

24 Q.  So you'd say that -- would wetland that is fully encircled

25 by pavings, let's say an airport, be disconnected from the rest

1   of the Everglades environment?

2   A.   That depends.  Obviously -- well, it depends on several

3   things.  One is recall that South Florida is a very seasonal

4   hydrology, so the average water elevation changes throughout

5   the year.

6        Typical swing is on the order of two feet, variations

7   depending whether it's above or below ground.  So, an area that

8   might have no surface connection in the dry season may have

9   water flowing over pavement and reconnecting on those wetlands

10  depending on levels.

11       Big Cypress is known to have water levels as high as four

12  feet of your average sheet flow area.

13       So, could they be connected during the wet parts of the

14  year or wet season?  Yes, very much so.

15       Second, South Florida is characterized by a very strong

16  surface water/ground water interaction.  So, you may have a

17  wetland that say north, upstream from the taxiway, and its

18  surface water is connected to ground water.  That ground water

19  is, in turn, connected to the surface water in that area

20  between the taxiway and the runway.  So, I could not say that

21  they are not connected at all.  They are, obviously, not as

22  visually connected and the connection is not as strong as it

23  was in the natural system.

24  Q.   Okay.  So, you would agree that's not as strong as it was

25  in the natural system?

1    A.   In those wetlands that are between the taxiway and runway,

2    certainly.

3    Q.   Dr. McVoy, do you know if the State has erected silt

4    fencing around any new pavings at the site?

5    A.   I did see silt fencing in some areas.

6    Q.   Wouldn't that help mitigate the ill effects of any storm

7    water runoff into the surrounding wetlands?

8    A.   Recall the name of silt fencing.  Silt fencing is to stop

9    material, particular erosion.  So, when you are doing

10   construction, you expect to be loosening up the soil substrate

11   and if you have any rainfall it will wash and the purpose of

12   the silt fence is simply to stop the particulate, not to stop

13   the water runoff.  Those are porous fences.

14   Q.   Dr. McVoy, I'd like to talk about your tour at the site.

15   Is it true that you are on the board of Friends of the

16   Everglades?

17   A.   Correct.

18   Q.   Friends of the Everglades filed this lawsuit on June 27th

19   of this year.  Right?

20   A.   I don't recall the exact date.

21   Q.   Can we pull up Exhibit Number 1, please -- or excuse me,

22   Docket Entry Number 1.

23        All right.  Dr. McVoy, this is Friends of the Everglades'

24   complaint in this case.

25        Do you see the date at the top of the page?

1  A.  In the blue text?

2  Q.  Yes.

3  A.  Yeah.

4  Q.  Does that say June 27th?

5  A.  It does.

6  Q.  Does that refresh your recollection of when Friends of the

7  Everglades filed this lawsuit?

8  A.  Yes and no.  I mean, clearly, it was filed on that date.  I

9  don't argue with that.  I didn't have particular awareness of

10  that one way or the other at the time that I was involved in

11  the tour.

12  Q.  Okay.  So Friends of the Everglades, of which you are a

13  board member, filed this lawsuit on June 27th, and isn't it

14  true that you contacted Dr. Lumm on June 28th to set up your

15  tour?

16  A.  No.

17  Q.  I'm sorry, when?

18  A.  I did not contact anybody in advance.

19  Q.  Isn't it true that you had your tour with Dr. Lumm on

20  June 28th?

21  A.  Correct.

22  Q.  Are you aware that Dr. Lumm is a State employee?

23  A.  I don't know that for a fact.  It was unclear whether he

24  was a contractor or whether he was a State employee.  I don't

25  recall that he specified.  I, very clearly, recall that he said

1    he was the incident commander at that time for the site.

2         (Plaintiffs' Exhibit 85 was marked for identification.)

3    BY MR. COSTELLO:

4    Q.  Could we pull up Plaintiffs' Exhibit 85?

5         Let's scroll down to the image, please.

6         Dr. McVoy, you said you like to perform geo locations when

7    you go on hikes and that's why you did it here?

8    A.  Yes.  For years I owned personally what were then called

9    GPS units.  More recently I've given up with trying to keep up

10   with them because the phone has perfectly good GPS unit in it,

11   and if you add an application, in this case, Easy Trails, you

12   can keep track of where you've gone.

13        So, as I mentioned, I have done that for years for

14   fieldwork.  I even do it for personal travel just to learn

15   areas.  So, I often have it on.

16   Q.  And I noticed that you didn't travel throughout the airport

17   here.  Is that because you were given a tour of the main

18   detention facility and surrounding operations?

19   A.  I was on the vehicle.  I was invited into the vehicle of

20   Dr. Lum's vehicle, and I believe he stepped out at some point

21   but I stayed in the vehicle.

22   Q.  Are you aware that the entirety of this tour took place in

23   Collier County?

24   A.  I would have to go back and look and see where the line is

25   exactly.  It's somewhere near the east end of the runway, but I

```
 1   couldn't tell you exactly where it is.
 2   Q.  Can we please pull up Plaintiffs' Exhibit 18 at page 12?
 3       Can you zoom in to the top left-hand image, please, all the
 4   way if you don't mind?
 5   A.  It will get blurry.
 6   Q.  I understand, Dr. McVoy, and this questioning will be
 7   brief.
 8       This is an image of area two.  Right?
 9   A.  Correct.
10   Q.  And next to area two is a paved area.  Right?
11   A.  Not in that image, no.
12   Q.  Excuse me, next to area two there is a square image.
13   Right?
14   A.  Oh, the older area, yes.  The rectangle that has the plane
15   on it, yes.  That's been paved since the late '60s.
16   Q.  And if I heard you right, there is a plane on that path.
17   Is that right?
18   A.  That certainly appears to be a plane at that particular
19   time.
20   Q.  And this was before construction began at the detention
21   facility.  Correct?
22   A.  Correct.
23           MR. COSTELLO:  Just a moment, Your Honor.
24           THE COURT:  Of course.
25   BY MR. COSTELLO:
```

1    Q.   Okay.  Dr. McVoy, let's talk first about geo location and

2    your tour.  You said you like to pay careful attention to where

3    you are and track it, but you don't know which county you were

4    in when you took this tour?

5    A.   Looking at the image, I know that the Miami-Dade Collier

6    County line runs north south.  It runs within the overall

7    footprint of the jetport, and it's on the east end of the

8    runway of the paved area.

9         Exactly where that line falls, I don't know.

10        If I had to guess, I think you're probably correct that the

11   blue trace is all within Collier County, if I had to guess.

12   Q.   Okay.  Thank you.

13        Is the Everglades ecosystem sensitive to runoff from

14   airplane fuel?

15   A.   It certainly would be.

16   Q.   And you noted that in the image I showed you previously

17   there was an airplane on the concrete pad next to area two.

18   Correct?

19   A.   Yes.

20   Q.   And that was before construction began?

21   A.   Yes, correct.

22   Q.   Did it seem like a large airplane to you?

23   A.   Yes, it did.  I'm not an aviation specialist, but it looks

24   very big to me.  It's not a general aviation personal aircraft.

25   Q.   Nor am I, nor am I.

App. 478

 1       What analysis have you performed regarding

 2  interconnectivity of the wetlands of the jetport prior to

 3  June 2025?

 4  A.   As part of my overall many decades of involvement with

 5  Everglades restoration and research, I'm involved in reading

 6  reports and fieldwork and things that -- so, I'm familiar with

 7  the nature of those connected wetlands, and I know that the

 8  jetport sits right in the middle of some of that.  So, I don't

 9  have specific things about the jetport, but I am familiar with

10  the context.

11  Q.   So you didn't conduct any specific analyses about the

12  jetport area itself.  Right?

13  A.   No.

14  Q.   Have you examined conditions at the jetport as of

15  August 2025?

16  A.   August 2025?  Exactly what do you mean by examine?

17       I have looked at aerial imagery that extends into

18  August 1st.

19  Q.   Sure.  All of your opinions in the case are referencing

20  data that you found prior to August 2025.  Right?

21       I will rephrase the question.

22       Have you relied on any data in August 2025 to form your

23  opinions today?

24  A.   Data that was gathered in August or --

25  Q.   Data that -- yeah, data that was --

1    A.   I'm not sure I understand the question.

2    Q.   Sure.  Data that was gathered in August 2025.  You

3    relied --

4    A.   I have looked at Ralph Arwood's photography.  He has flown

5    a number of times.  I looked at all of the imagery.  The latest

6    I believe that I looked at was from August 1st, so I don't know

7    if that answers your question.

8    Q.   And was that imagery included in any of your expert

9    reports?

10   A.   No, because they were dated before that.

11   Q.   Did you ask Friends of the Everglades' counsel to contact

12   State counsel before -- to arrange a tour of --

13            MR. SCHWIEP:  Objection, Your Honor.  That would be

14   privileged.

15            THE COURT:  Okay.  Is that an invitation, Counsel?

16            We can set it up now, the tour.

17            MR. COSTELLO:  No, Your Honor.  It's not an invitation.

18            THE COURT:  Okay.  Then let's move on.

19            MR. COSTELLO:  No further questions.

20            THE COURT:  Any redirect, Mr. Schwiep?

21            Oh, I'm sorry, I'm sorry, federal defendants?

22            MS. PIROPATO:  No questions from Federal Defendants,

23   Your Honor.

24            THE COURT:  I'm sorry.

25                         REDIRECT EXAMINATION

1    BY MR. SCHWIEP:

2    Q.  Just to be clear, your conclusions with respect to area one

3    and area two, is it correct that your conclusion is those areas

4    were previously pervious, porous, and after the pavement are

5    now impervious?

6    A.  Correct.

7    Q.  And the concern with respect to that conclusion is what?

8    A.  Impervious surfaces are known to be a problem for runoff

9    that by definition water -- you know, it's like pouring water

10   on formica or glass, the water doesn't go in.  It runs off, and

11   wherever it's running off into is potentially a concern.

12        If it's a wetland, it's almost always a concern.  That's

13   why urban areas have strict, and the water management district

14   has strict requirements, if you are going to create new

15   impervious surface, you need to have a plan of how you are

16   going to detain and treat that water.

17   Q.  Are the wetlands in the area, including on the site,

18   because you talked about some wetlands on site, hydrologically

19   interconnected?

20   A.  Yes.

21   Q.  Your conclusions on area one and area two are 17 acres of

22   new pavement.  Is that correct?

23   A.  Eleven -- no, 18.  11 plus 7.

24   Q.  18.  My math is bad.

25        You were here yesterday when Jessica Namath testified about

App. 481

1    the 30 fill trucks and the soil compactor that she saw driving

2    on to the site on Friday of last week?

3    A.   Yes.

4    Q.   Do you know how many additional acres of new pavement you

5    could lay with that many fill trucks?

6    A.   I could calculate, make an estimate.  It would depend how

7    thick the pavement and so on.  I thought, you know, that might

8    not be a bad thing to do, but I have not done that.

9              MR. SCHWIEP:  No further questions, Your Honor.

10             THE COURT:  Thank you, Doctor.  You may step down.

11             THE WITNESS:  Thank you.

12             THE COURT:  Understanding Mr. Gustafson has flight

13   plans, do we have a witness that we think we can get on or off

14   by 11:30?

15             MR. SCHWIEP:  11:30 or --

16             THE COURT:  Noon, but it would be better, as we

17   discussed yesterday, the sooner we can let him go.

18             MR. SCHWIEP:  I don't think -- I think the direct can

19   be 30 minutes.

20             THE COURT:  Okay.  Let's do it then.  Call your next

21   witness.

22             MR. SCHWIEP:  We would call Mr. Dillon Reio.

23             MR. EZRAY:  Your Honor, and we just renew our objection

24   to this testimony.  We'd also raise a 702 objection.  We don't

25   believe he is required to testify to this, and we don't believe

App. 482

1   that his report meets the standards of Daubert.

2          THE COURT:  Okay.  I have that objection, but I'm going

3   to overrule it and allow Mr. Reio to testify.

4          If something arises during the course of his testimony

5   that reflects your caution should be delved into further, I

6   will do so.

7          MR. EZRAY:  Thank you, Your Honor.

8          THE COURT:  All right.

9          COURTROOM DEPUTY:  Please raise your right hand.

10          (The witness, Dillon Reio, was duly sworn.)

11          COURTROOM DEPUTY:  State your name for the record and

12   spell it slowly for the court reporter.

13          THE WITNESS:  Good morning.  My name is Dillon Reio,

14   D-I-L-L-O-N, R-E-I-O.

15                    DIRECT EXAMINATION

16   BY MR. SCHWIEP:

17   Q.  How are you this morning, Mr. Reio?

18   A.  I'm well, thank you.

19   Q.  What is your profession?

20   A.  I'm a professional geologist in the State of Florida.

21   Q.  Do you have any expertise in geological sciences?

22   A.  Yes, I do.  The nature of my job is to apply my knowledge

23   of geological sciences to protect human health and the

24   environment.

25   Q.  And how are you employed?

1    A.   I'm employed by SCS Engineers, which is an environmental

2    consulting company.

3    Q.   What is the nature of your work for SCS Engineers?

4    A.   Primarily we perform site assessments, investigations for

5    large scale to mid-size redevelopment projects, which would

6    involve the advancement of soil borings, monitoring wells,

7    collection of soil samples, ground water samples for chemical

8    analysis to determine the presence or absence of any

9    contamination.

10   Q.   If you could keep your voice up, I'd appreciate it.

11           THE COURT:  And slow down just --

12           THE WITNESS:  Yes.  Yes, Your Honor.

13           THE COURT:  Okay.

14   BY MR. SCHWIEP:

15   Q.   You have never had occasion to testify before.  Is that

16   right?

17   A.   No, I have never testified before.

18   Q.   As an employee of SCS Engineers, have you ever had occasion

19   to do any work for Miami-Dade County's Department of

20   Environmental Regulatory Management, known as DERM?

21   A.   Yes, I have.  That's the primary agency that I conduct work

22   with, and I have a history with Miami-Dade County DERM.  I was

23   employed with them for two years prior to engaging with SCS

24   Engineers.

25   Q.   What did you do for DERM?

App. 484

1    A.   I was a hydrogeologist where I reviewed technical reports

2    for sufficiency according to Chapter 62-780, as well as Chapter

3    24, code of Miami-Dade County, whereby we would evaluate

4    redevelopment projects and determine the, again, absence or

5    presence of contamination.

6    Q.   And you've been retained by Friends to provide help in this

7    case?

8    A.   Yes, I have.

9    Q.   Could you tell the Court about your educational background?

10   A.   Yes.  I received my bachelor of geosciences from Florida

11   International University in 2015.  I followed that up with my

12   master's degree in environmental studies with a focus on

13   hydrogeology in 2017, and after completing a minimum of five

14   years of experience, I sat for the professional geologist

15   examination in the State of Florida.

16   Q.   We will come back to that.

17   A.   Okay.

18   Q.   Where did you get your Master's of Science?

19   A.   From Florida International University.

20   Q.   And did you have occasion to write a master's thesis?

21   A.   Yes, I did.

22   Q.   What was your thesis about?

23   A.   My thesis was on the quantification of evapotranspiration

24   and water chemistry in a remediated agricultural area within

25   Everglades National Park, otherwise known as the

1    Hole-in-the-Donut.

2    Q.   I think I understood all the words, but what did that

3    involve?

4    A.   I, essentially, created ground water flow maps to evaluate

5    the changes resulting from that historical agricultural

6    activity, and then I evaluated water chemistry samples that I

7    collected from within the Hole-in-the-Donut and outside the

8    Hole-in-the-Donut to determine if there were any significant

9    differences in the concentrations of total nutrients,

10   specifically CAD ions, N ions, and how that interaction played

11   out.

12   Q.   Was your master's thesis peer reviewed and published?

13   A.   Yes, it was in 2023.

14   Q.   Congratulations.

15   A.   Thank you.

16   Q.   Have you had occasion to do fieldwork in the Everglades?

17   A.   Yes, I have.  During my masters thesis, I collected ground

18   water samples from monitoring wells from within Everglades

19   National Park.

20   Q.   And you mentioned you are a licensed professional

21   geologist.  Is that correct?

22   A.   That's correct.

23   Q.   What does that entail, obtaining a license to be

24   professional geologist?

25   A.   You're required to complete a minimum of 120 hours of

App. 486

1  coursework in geological sciences, and then you're required to

2  take two examinations; the first examination being a

3  fundamentals of geology, which essentially is what you have

4  learned throughout your schooling, and then subsequently after

5  a minimum of five years of experience you sit for the practice

6  of geology examination, which essentially is what you've

7  learned during the course of practice under the supervision of

8  a licensed professional engineer or a professional geologist in

9  the State of Florida.

10  Q.  When did you obtain your license?

11  A.  In 2023 after I met the minimum five-year requirement.

12      (Plaintiffs' Exhibit 39 was marked for identification.)

13  BY MR. SCHWIEP:

14  Q.  I'm going to show you what's been marked for identification

15  as Plaintiffs' Exhibit 39.  Take a look at that.

16      Mr. Reio, is that what we are looking at on the screen,

17  Plaintiffs' Exhibit for Identification 39, a true and accurate

18  summary of your professional and educational experience?

19  A.  Yes, it is.

20      MR. SCHWIEP:  We would move the admission of 39?

21      THE COURT:  Understanding the other objection, is there

22  an objection to this document being admitted?

23      MR. EZRAY:  You anticipated exactly what I was going to

24  say, Your Honor.  Subject to our other objection, no objection

25  here.

 1          THE COURT:  All right.  I understand.  That is a

 2    standing objection, and your agreement doesn't alter that at

 3    all.

 4          MR. EZRAY:  Thank you, Your Honor.

 5          THE COURT:  So, 39 is admitted.

 6          (Plaintiffs' Exhibit 39 was admitted in evidence.)

 7    BY MR. SCHWIEP:

 8    Q.  Did you have occasion, Mr. Reio, to review the report of

 9    Dr. Chris McVoy dated July 20th, 2025?

10    A.  Yes, I did.

11    Q.  Did you independently evaluate the extent of the paving at

12    the jetport site since the detention center has been

13    constructed, through July 2025?

14    A.  Yes, I did.

15    Q.  What was your conclusion?

16    A.  That approximately 20 plus acres had been newly paved at

17    the site.

18    Q.  Do you have experience with the process of obtaining

19    environmental resource permits, that is, ERP permits with the

20    South Florida Water Management District?

21    A.  Yes, that is something my firm regularly does.

22    Q.  What is a ERP permit?

23    A.  It is, essentially, a permit that is required during the

24    construction of -- construction and filling in wetlands for

25    storm water management systems, and they are there,

1    essentially, to provide a level of protection resulting from

2    the change to the storm water management system.

3    Q.   Why is that important?

4         MR. EZRAY:  Objection, relevance.  This case is not

5    about local water permitting.  They're bringing a NEPA claim.

6         THE COURT:  Understood, but I think -- Mr. Schwiep, are

7    you going to tie this up?

8         MR. SCHWIEP:  Yes.

9         THE COURT:  I'm going to allow it.  Let's tie it up in

10   the next two questions.

11        THE WITNESS:  Can you repeat the question, please?

12   BY MR. SCHWIEP:

13   Q.   Yes, why is the permitting regime for an environmental

14   resource permit when someone is changing the landscape

15   important?

16   A.   There needs to be a level of protection from the resultant

17   runoff generated from the new construction activities.

18   Q.   Were ERP permits publicly available?

19   A.   Yes, they are.

20   Q.   How would one search for the ERP payments?

21   A.   You would look through the South Florida Water Management

22   District database, which in this case is the water management

23   district having jurisdiction.  They have online tools that

24   you're able to search via GIS, and you're able to select the

25   different features that you're interested in investigating, and

1    ERP permits are one of those components.

2    Q.  Did you make an effort to look for any ERP permits for the

3    paving documented in the McVoy July 20, 2025, report?

4    A.  Yes, I did.

5    Q.  Did you find any?

6    A.  I did not.

7        (Plaintiffs' Exhibit 79 was marked for identification.)

8    BY MR. SCHWIEP:

9    Q.  Let me show you what's been marked for identification as

10   Plaintiffs' Exhibit 79.

11       What are we looking at, Mr. Reio?

12   A.  This is my expert disclosure report.

13   Q.  You prepared this?

14   A.  Yes, I did.

15       MR. SCHWIEP:  We would move the admission of 79.  I

16   understand there is a standing objection.

17       THE COURT:  There is, and with that I will allow 79.

18       (Plaintiffs' Exhibit 79 was admitted in evidence.)

19   BY MR. SCHWIEP:

20   Q.  Why did you prepare this?

21   A.  To evaluate the potential environmental concerns resulting

22   from the newly applied asphalt pavement.

23   Q.  Okay.  Let me ask you to look at page 19.

24       What does that depict?

25   A.  This depicts a post-development basin schematic.  So,

1    essentially, it outlines the newly paved areas from the

2    July 8th, 2025, engineering plans that I reviewed.  So,

3    essentially this was incorporated into a storm water management

4    model to evaluate the potential increase in discharge and

5    runoff resulting from the newly paved areas.

6    Q.   Okay.  We will come back to that.  Let's look at page three

7    of the report.

8        In Roman numeral 3 of your report, did you make an effort

9    to summarize the conclusions that you reached?

10   A.   Yes, I did.

11   Q.   What was the conclusion that you reached as reflected in

12   Section 3A of your report?

13   A.   In 3A I essentially reviewed Dr. McVoy's report as well as

14   the soil boring profiles that were presented, and I concurred

15   there was no evidence of a preexisting cement pad.  That was

16   evident from the soil boring pathologies that I reviewed as a

17   soil geologist.

18       Those areas were previously permeable and porous which

19   allows rainwater infiltration and, further, the placement of

20   the borings appeared to assess any potential soil

21   hetorogeneities that may have been encountered.

22   Q.   So, in other words, the regime of the soil boring, that

23   scheme, you thought was adequate to determine whether there had

24   been a cement pad in those areas?

25   A.   Absolutely, yes.

1    Q.   And you concluded there wasn't?

2    A.   No.

3    Q.   What is the conclusion reflected in Section 3B of your

4    report?

5    A.   This, essentially, is related to application of the ERP

6    permit, and in the State of Florida that's a permit that's

7    required when you're doing work within wetlands in the

8    construction of the storm water management system.

9         I reviewed the publicly available files and was not able to

10   locate any ERP permit.

11        This is interesting, though, because when I was going

12   through the historical records, I found previous ERP

13   applications for construction activities on the site that were

14   much smaller in scale than what's been observed currently.

15        Specifically, I located two permits, one in 2005 and 2008

16   that showed construction activity somewhere on the magnitude of

17   2,000 square feet, and based on our evaluation -- based on our

18   evaluation, this newly paved area is, essentially, you know,

19   almost 800,000 square feet.  So, it would stand to reason that

20   you would have a ERP application for something of this

21   magnitude.

22   Q.   So, what is the conclusion reflected in Section 3C of your

23   report?

24   A.   In 3C I'm referring to the storm water management system.

25        Based on my review of the plans that were provided, there

79

1    is not a cohesive storm water management system that's been

2    designed for the site.  This is important because runoff is

3    known to transport potentially harmful contaminants into the

4    subsurface and the surrounding environment, and without some

5    way to capture and treat that via the storm water management

6    system you could potentially have off-site impacts.

7    Q.   What are the contaminants that would be of concern?

8    A.   Specifically, polycyclic aromatic hydrocarbons.

9    Q.   Can we use the acronym PAH?

10   A.   Please.

11   Q.   So, I think you address that in Section C of your report.

12       What is the concern with respect to PAH runoff from new

13   pavement?

14   A.   They're known carcinogens and damaging to aquatic and

15   terrestrial life.

16   Q.   What is the point of a storm water management system?

17   A.   Is to capture and treat and store the storm water generated

18   out of site so that there is not any potential off-site

19   impacts.

20   Q.   Was there an effort made to calculate the volume of storm

21   water runoff from the pavement applied through July 20, 2025?

22   A.   Yes, there was.

23   Q.   What was the conclusion?

24   A.   Are you referring to D?

25   Q.   Yes, Section D?

App. 493

1   A.   Section D, we essentially completed an ICPR model, which is

2   a storm water management model when you're designing and

3   performing storm water analysis.   So, essentially what we found

4   was that the preconditions, which are the existing conditions,

5   are significantly different than the post conditions.

6   Q.   By how much?

7   A.   So, the increase in the peak discharge was approximately

8   169 cubic feet per second, and the runoff volume was increased

9   by almost 10 million gallons over the 72-hour, 100-year storm

10  event.

11  Q.   Why would you model this 72-hour, 100-year storm event?

12  A.   That's the most conservative storm event.   Our systems in

13  South Florida are designed to be -- you know, they need to be

14  resilient and efficient, so you have to account for the

15  worst-case scenario to be able to maintain and treat your storm

16  water within your property boundaries.

17  Q.   How does that compare to the preconstruction condition?

18       Is the baseline zero?

19  A.   Well, from what I can tell, there are previously existing

20  storm water management features on the site.   In the middle of

21  the runway, they have those depressions.   So that's -- what I

22  can infer is that was the existing storm water management

23  system that they had, but you would need to add to that when

24  you're placing down new impervious surface to be able to

25  capture that additional runoff.

App. 494

1  Q.  So the additional runoff that's reflected in your

2  conclusion D is new runoff from the new pavement?

3  A.  That's correct.

4  Q.  What is the conclusion reflected in Subsection E?

5  A.  That based on my review of the scientific literature that

6  PAHs have the potential to negatively impact the environment.

7      They are known to be associated with increased vehicular

8  traffic.  They can accumulate in lakes and wetlands, which this

9  area is, and based on the strong hydrological connectivity

10 between the surface and ground waters like we experience in the

11 Everglades, it can be particularly damaging.

12     I would note, though, that this has to be empirically

13 confirmed with soil and ground water testing to evaluate the

14 extent of any potential contamination.

15 Q.  So, if I understand that answer, it would be likely to

16 be -- you would expect but you'd have to actually test to

17 empirically determine?

18 A.  Yes, to determine the extent and degree.  Yes.

19     (Plaintiffs' Exhibit 90 was marked for identification.)

20 Q.  Okay.  Let me ask you to look at Plaintiffs' Exhibit 90.

21     What are we looking at, Mr. Reio?

22 A.  This is an engineering plan set for the emergency

23 infrastructure at the TNT Dade-Collier Airport.

24 Q.  And this has a date, I think, on the far right-hand side in

25 about the middle.  Can you read the date?

82

1    A.   June 30th, 2025.

2         MR. SCHWIEP:  We would move the admission of 90.

3         THE COURT:  Any objection?

4         MR. EZRAY:  No objection, Your Honor.

5         THE COURT:  All right.

6         (Plaintiffs' Exhibit 90 was admitted in evidence.)

7    BY MR. SCHWIEP:

8    Q.   All right.  Let me direct your attention to page six.

9         Is that the area that we have been calling area one?

10   A.   Yes, it is.

11   Q.   What did you observe in looking at this engineering plan

12   from June 30, 2025, about area one?

13   A.   Am I able to draw on this?

14        THE COURT:  You are.

15   BY MR. SCHWIEP:

16   Q.   Oh, yeah.

17   A.   Let me see, I'm going to try it out.

18        What I observed was the outline of the new impervious

19   surface roughly depicted here, and then that's followed by what

20   appears to be a dry retention basin right here, which is also

21   noted in the legend, right here.

22   Q.   So, one thing we've learned is you can draw better than

23   Dr. McVoy?

24   A.   Maybe a bit.

25   Q.   Okay.  So, let's move to page seven.

1    A.   I don't know how to clear this, though.

2         Oh, thank you.

3    Q.   Is that the area that we were calling area two?

4    A.   Yes, it is.  Although, I will note on this specific

5    drawing, this is what is denoted as asphalt pavement, and then

6    there are two dry retention basins here.  However, in later and

7    subsequent plans the asphalt area is increased.

8    Q.   Okay.  We will come back.

9         The key map on the top to the right shows you where this

10   area is and where the planned dry retention areas are?

11   A.   Yes.

12   Q.   Okay.  Let me ask you now to look at Plaintiffs'

13   Exhibit 90.  What are we looking at now?

14   A.   This is an updated plan sheet for the emergency

15   infrastructure at the airport.

16   Q.   Can you read the date on the side?  This from July 8th?

17   A.   Yes, from July 8th.

18   Q.   So, this is a little over a week later?

19   A.   Yes.

20        MR. SCHWIEP:  We would move for the admission of 92.

21        THE COURT:  Any objection?

22        MR. EZRAY:  No objection.

23        THE COURT:  All right.  92 is admitted.

24        (Plaintiffs' Exhibit 92 was admitted in evidence.)

25   BY MR. SCHWIEP:

1    Q.  Okay.  Let me direct your attention to page six.  What are

2    we looking at now, Mr. Reio?

3    A.  We are looking at the same essential area one, which

4    depicts, again, the asphalt pavement here.  However, missing is

5    the dry retention area that was previously depicted in the

6    June 30th plans.

7    Q.  What conclusions did you draw from that?

8    A.  Essentially that they are not managing storm water -- the

9    runoff that's produced from this area.

10   Q.  Let me direct your attention to page seven.

11       Do you recognize that?

12   A.  Yes, this is area two.

13   Q.  What did you observe in reviewing the July 8th engineering

14   plans as concerns area two?

15   A.  Like I mentioned, so, this is now the proposed asphalt

16   area, the new asphalt that they applied.  However, missing,

17   again, are the previously planned dry retention basins to

18   capture storm water runoff.

19   Q.  Why is that important to you as a professional soil

20   geologist?

21   A.  If you are not able to manage and capture your runoff, you

22   have a potential to contaminate other areas.

23   Q.  Is this area prone to flooding?

24   A.  Yes.

25   Q.  By the way, were you able to look at aerial photographs to

App. 498

1    confirm that the dry retention area depicted on the June 30

2    plans that are dated from -- June 30 plans that are Plaintiffs'

3    Exhibit 90 have not been constructed?

4    A.   That's correct.  Based on the aerial photographs that I

5    observed up through July 25th, 2025, I was not able to observe

6    these storm water management features.

7    Q.   So, without a storm water management feature, where does

8    the storm water go?

9    A.   It would run off into the surrounding area.

10              MR. SCHWIEP:  Can I have a moment, Judge?

11              THE COURT:  Yes, you may.

12              (Plaintiffs' Exhibit 91 was marked for identification.)

13   BY MR. SCHWIEP:

14   Q.   Can we pull up Exhibit 91?

15         What are we looking at here?

16   A.   These are the same engineering plans but from July 7th,

17   2025.

18              MR. SCHWIEP:  We would move the admission of 91.

19              MR. EZRAY:  No objection.

20              THE COURT:  All right.  Exhibit 91 is admitted.

21              (Plaintiffs' Exhibit 91 was admitted in evidence.)

22              MR. SCHWIEP:  No further questions.

23              THE COURT:  Anything from co-counsel?

24              MR. AJIZIAN:  No, Your Honor.

25              THE COURT:  All right.  Cross-examination.

App. 499

```
 1                          CROSS-EXAMINATION
 2   BY MR. EZRAY:
 3   Q.  Good morning, Mr. Reio.  I'm going to ask you a couple of
 4   questions about the work you've done on this case.
 5   A.  Good morning.
 6   Q.  I just want to ask you first about the methodology that you
 7   employed here.
 8   A.  Okay.
 9   Q.  You haven't been to the site.  Correct?
10   A.  I have not been to the site, but I requested a site visit.
11   Q.  You reviewed architectural plans.  Right?
12   A.  Those are engineering drawings, not architectural.
13   Q.  Excuse me, engineering drawings?
14   A.  Yes.
15   Q.  How did you access those engineering drawings?
16   A.  They were provided to me by counsel in this case.
17   Q.  You have been sitting here throughout the entire
18   proceedings.  Correct?
19   A.  Yes, I was here yesterday, unfortunately.
20   Q.  And you heard the testimony of Mr. Kautz?
21   A.  Did I hear the testimony of Mr. Kautz?  Yes.
22   Q.  Mr. Kautz said there were no plans available for him to
23   review.  Do you recall that?
24   A.  I do not recall that specifically.
25   Q.  Okay.  But you did get plans?
```

App. 500

1   A.   I was able to review the engineering drawings provided,

2   yes.

3   Q.   And you reviewed pictures?

4   A.   Aerial photographs?

5   Q.   Yes, sir.

6   A.   Yes.

7   Q.   And you reviewed one soil sample.  Correct?

8   A.   Can you explain what that is?  What do you mean?

9   Q.   Have you reviewed any soil samples from the site?

10  A.   Not soil samples.  No, I reviewed the soil boring profiles,

11  the geo technical investigation.

12  Q.   What is the distinction that you would draw between a

13  sample and a boring profile?

14  A.   A sample is something that's basically collected and sent

15  to a lab for analysis.  The soil boring profile is advanced and

16  you can evaluate the lithology.  It's not technically a

17  sample --

18  Q.   Understood.

19  A.   -- in my the context in the contamination perspective.

20  Q.   And you did not personally examine drainage on the site?

21  A.   No, I was not permitted to access the site to evaluate

22  drainage features.

23  Q.   And you personally did not conduct any water samples?

24  A.   I was not able to access the site to collect any water

25  samples.

1  Q.  You didn't personally do any water samples?

2  A.  No.

3  Q.  No sediment samples?

4  A.  No.

5  Q.  Now, on page three of your report, you indicate that

6  increased traffic is associated with increased PAH levels.

7  Right?

8  A.  Yeah, that's typically resulting from the combustion of

9  gasoline.  It produces aerosol particulates that then make

10  their way up to the atmosphere and then eventually settle back

11  down.

12  Q.  Planes would also cause increased PAH levels?

13  A.  Presumably, yes.

14  Q.  If there are less flights now on the site that would

15  decrease PAH levels on the runway.  Right?

16  A.  Potentially.

17  Q.  Did you examine PAH levels from airplane takeoffs at the

18  site?

19  A.  No.

20  Q.  Did you examine PAH levels from airplane landings at the

21  site?

22  A.  No.

23  Q.  That wasn't relevant to create a baseline PAH level?

24  A.  I wasn't able to access the site or collect any samples, so

25  I wouldn't be able to give you an empirical analytical

1   perspective of that without collecting those samples.

2   Q.  Did you look at historic flight data?

3   A.  I was not provided with any historical flight data to

4   review.

5   Q.  Would it make a difference in assessing the baseline what

6   the existing PAH levels were?

7   A.  Potentially, yes, evaluating what the existing conditions

8   were, yes.

9   Q.  And if you increase vehicular traffic but decrease planes,

10  do you know one way or the other whether that would increase or

11  decrease PAH levels?

12  A.  I can't quantify that for you without being able to

13  actually physically collect the samples and provide them for

14  laboratory analysis.

15  Q.  Now, you also opine in your report about a storage tank on

16  the site.  Right?

17        THE COURT:  Slow down, Counsel.

18  A.  Yes, that's based on comments made by Florida officials.

19  BY MR. EZRAY:

20  Q.  And you opined that that could be harmful.  Correct?

21  A.  Yes, so storage tanks are heavily regulated in the State of

22  Florida, above ground, underground for obvious reasons.  There

23  could potentially be leaks or spills from these types of tanks.

24  So, typically there is best management practices that are put

25  in place to mitigate any potential impacts from those tanks.

1   Q.   Right, and I think you said that the two best practices are

2   either double walling the tank or placing it in secondary

3   containment.  Correct?

4   A.   That's accurate, yes.

5   Q.   You didn't examine the storage tank on the site?

6   A.   I wasn't permitted access to observe anything on the site.

7   Q.   Do you know if the tank is double walled?

8   A.   I don't know.

9   Q.   Do you know if it's placed in secondary containment?

10  A.   I don't know that because I was wasn't able to access the

11  site.

12  Q.   So you don't know one way or the other whether best

13  practices were used with respect to the storage tank?

14  A.   I don't.  I hope they are, but I do not.

15  Q.   Okay.  Am I correct that your opinions about increased

16  runoff from the site are based on the simulation that you ran?

17  A.   Primarily, yes.

18  Q.   And in your report you say that the simulation was a

19  preliminary interconnected channel and pond routing ICPR model.

20  Right?

21  A.   Correct.

22  Q.   Why preliminary?

23  A.   Because we don't have any specific -- we utilized

24  engineering drawings provided to us, but those don't appear to

25  us to be final.  Typically, to create a comprehensive model you

1    need the relevant CAD files, which are engineering files that

2    are able to be input into a computer system, and then you would

3    utilize that to create your final model.

4         So, we had to just, essentially, go off of what was

5    provided in the drawings referenced to which were just plan

6    sheets.

7    Q.   Okay.  So the model isn't what you would do normally in the

8    field?

9    A.   It's what you would complete.  We had to make assumptions

10   based on the data available to us.

11   Q.   Okay.  In the simulation, you assumed a 100-year, 72-hour

12   storm.  Right?

13   A.   That's correct.

14   Q.   And I think you testified that that was the most

15   conservative assumption you could make?

16   A.   Correct.

17   Q.   And what you mean by most conservative is that's the most

18   rainfall that you would --

19   A.   Reasonably expect.

20   Q.   Right.

21        Can we pull up Exhibit 94.  Stay on this first page for a

22   second.

23        (Plaintiffs' Exhibit 94 was marked for identification.)

24   BY MR. EZRAY:

25   Q.   You testified that the reason that you used the most

1    conservative estimate is because in South Florida we are prone

2    to rain events.  Correct?

3    A.  Yes, intense rain events.  Yes.

4    Q.  And this is a permit application that you reviewed in the

5    course of preparing your report.  Correct?

6    A.  Correct.

7         MR. EZRAY:  Your Honor, we move this into evidence.

8         THE COURT:  Any objection?

9         MR. SCHWIEP:  No objection.

10        THE COURT:  All right.  Plaintiffs' Exhibit 94 is

11   admitted.

12        (Plaintiffs' Exhibit 94 was admitted in evidence.)

13   BY MR. EZRAY:

14   Q.  Could you bring up page four?

15        So, this is a rain modeling exercise.  Correct?

16   A.  That's correct.

17   Q.  And this is a permit application.  Correct?

18   A.  That's correct.

19   Q.  And you see that the model here is using a 25-year 72-hour

20   storm?

21   A.  Yes, I do.

22   Q.  So why did you choose a hundred year storm when the permit

23   applications that you said that you rely on and they're the

24   standard for protecting the environment used a 25-year storm?

25   A.  So, this is completed in 2008.  I believe the standards

1   have been updated since then.  That could be my best estimate

2   for why they use a 25-year 72-hour storm and we use the 72,

3   100-year storm.

4   Q.  You don't know if the regulations have changed?

5   A.  I can't say for certain.

6   Q.  And using the 100-year storm would make your results appear

7   a lot worse, right, show a lot more runoff?

8   A.  It would produce more runoff, but even with the 25, 72 hour

9   you would still produce more runoff resulting from the lack of

10  infiltration because of the asphalt pavement.

11  Q.  You can take this down.  Thank you.

12      Am I right that a 100-year storm, what that means is that

13  it would have a one percent chance of occurring any year?

14  A.  That's accurate, yes.

15  Q.  And you're aware that the site is supposed to be temporary.

16  Right?

17  A.  Yes.  You mean the detention center itself?

18  Q.  Correct.

19  A.  Yes.

20  Q.  And then I'm going to talk a little bit more about the

21  simulation that you do.

22      So, as I understand your report, the way that you simulate

23  permeability in the water, or excuse me, permeability on the

24  land is with something called a CN number.  Is that right?

25  A.  Yes, that's a curve number.  Yes.

App. 507

1   Q.   What is a curve number?

2   A.   It is essentially a ratio.  So, what it does is it's taking

3   -- like you have a high curve number for more impervious

4   material like asphalt, and you have a lower curve number for

5   more permeable and porous.

6        So, what our simulation does is we calculated what the

7   specific areas are that were paved, and we apply the relevant

8   curve number for those.

9        We had to make some assumptions for the gravel out there.

10       Again, we weren't able to physically go on the site to

11  confirm all of this, but based on the engineering drawings we

12  had, we did the best that we could.

13  Q.   Okay.  And there is a lot there.  You are, obviously, more

14  expert in this than I am, so I want to break it down a little

15  bit.

16  A.   Okay.

17  Q.   I appreciate you for indulging me.  On the CN scale, a zero

18  is the most porous and a hundred is the least.  Right?

19  A.   No, I think it's opposite.  I think -- wait, can you say

20  that again, please?

21  Q.   Yeah.  A zero would mean it absorbs all the water?

22  A.   Yes.

23  Q.   And 100 means it absorbs no water.  Correct?

24  A.   Correct.

25  Q.   You talked on direct about a porous surface.  Right?

App. 508

1   A.   Yes, and you are referring to area one and area two?

2   Q.   Correct.

3   A.   Yes.

4   Q.   Okay.  But porous is actually a scale.  Right?

5        The CN number says it runs from zero to a hundred?

6   A.   Yes, there are materials that are more or less porous.

7        For instance, clays are porous but not very permeable,

8   whereas limestone material is porous and permeable.

9   Q.   And you selected for all of the asphalt on the site a CN

10  number of 98.  Correct?

11  A.   That's correct.

12  Q.   Why?

13  A.   That was based on -- I worked with a professional engineer

14  to create the model.  This is somebody who has great experience

15  doing this work, so I relied on his analysis of the computation

16  of the model and the assumptions made within the model to

17  produce the output.

18       I concurred with the output that was produced.  I did not

19  physically produce it.

20  Q.   Did you select the number 98?

21  A.   I did not select the number 98.  He selected it based on

22  his experience completing these ICPR models that he does on a

23  daily base is.  And, again, this is a licensed professional in

24  the State of Florida.

25  Q.   Is all asphalt the same?

1    A.   Can you be more specific?

2    Q.   Is all asphalt equally porous?

3    A.   I would imagine that degraded asphalt could have

4    potentially greater permeabilities and porosity.

5    Q.   Are you aware that there are modern types of asphalt that

6    have greater permeability than traditional asphalt?

7    A.   Not particularly.

8    Q.   You don't know, one way or the other, why the engineer

9    chose 98 for every paved site at the facility?

10   A.   That's based on his experience completing these models on a

11   regular basis, so I don't have the context for that.

12   Q.   So you personally don't have the context for that?

13   A.   That's correct.

14   Q.   You can't speak to why he chose 98 across the board?

15   A.   I think it's based on, again, his experience and probably

16   what's been done on previous examples of this type of model

17   that he has completed that have been submitted to agencies and

18   likely approved.

19   Q.   And then you coded each unpaved surface as a 50.  Right?

20   A.   That's correct.  That was another assumption we had to

21   make.  Again, we were not able to go on site to evaluate the

22   conditions, and we had incomplete plan sets.

23        You know, typically when you're doing these models, again,

24   you have CAD drawings which are engineering drawings that you

25   are able to input into your computer system, and it gives you

```
 1   very exact information on this.
 2        We were only able to go off of planned sets.  So, we had
 3   to, you know, do the best that we can with those assumptions.
 4   Q.  By the way, does someone publish CN tables?
 5   A.  I'm not aware of what.
 6   Q.  So, you don't know where these numbers come from at all.
 7   Right?
 8   A.  Again, I believe that they were selected based on my
 9   engineer's experience with these type of projects.  He's done
10   work on similar asphalt pavement for landfills, other work that
11   my firm does, and these are, I believe, generally accepted
12   numbers.
13   Q.  Do you know whether the CN level of an open field is the
14   same as a CN level of a dirt road?
15   A.  I think the CN level might be slightly different because
16   the dirt road is probably compacted.  The open field likely is
17   not compacted.
18   Q.  And you said you were sitting here through all of the
19   testimony.  Right?
20   A.  Unfortunately, yes.
21   Q.  So, you heard Representative Eskamani testify that one of
22   the sites was previously gravel.  Right?
23   A.  Correct.
24   Q.  Does gravel have a different CN number than an open field?
25   A.  Likely, yes.
```

App. 511

1   Q.   And you were sitting here earlier today for Dr. McVoy's

2   testimony.  Right?

3   A.   That's correct.

4   Q.   And he testified that two of the newly paved areas were

5   previously roadways.  Right?

6   A.   Roadways?  Can you be more specific, please?

7   Q.   Correct.  I was looking at images four and five in his

8   testimony that he said there was a provide roadway that's now

9   paved?

10  A.   Yes.

11  Q.   And he said it might have been partially paved before?

12  A.   Yes.  It was very hard to tell.  I reviewed the aerials.  I

13  couldn't make heads or tails of it.  Without actually being on

14  the site it would be hard to tell.

15  Q.   Would a roadway have a different CN number than an open

16  field?

17  A.   Yes.

18  Q.   Okay.  Let's pull up Defendants' Exhibit 22, which is also

19  Plaintiffs' Exhibit 89, which I believe is already in evidence.

20        THE COURT:  Yes, it is.

21  BY MR. EZRAY:

22  Q.   Do you recognize this document as the soil boring document

23  that you reviewed?

24  A.   I do.

25  Q.   If you can, go to page two and if you can zoom in for me on

App. 512

1    note six.

2        Can you just read that note for me?

3        We've lost it.  Go to six, please.  There you go.

4    A.   "The sand strata encountered in this area is sometimes

5    mixed with cemented sand and limestone that could offer high

6    resistance and lead to caving soils.  Special equipment and/or

7    procedures may be required to excavate and stabilize

8    excavation."

9    Q.   Would cemented sand have a higher CN level, CN number than

10   an open field?

11   A.   When you say "open field," are you just referring to just

12   unconsolidated soils because there can be open fields that have

13   cemented components to it?

14   Q.   Let me ask this question; what does 50 represent?

15       You chose 50 for all the --

16   A.   50 in the model represents a dirt road, essentially.

17   Q.   Oh, 50 represents a dirt road?

18   A.   I believe so, yes, in the model.

19   Q.   Okay.  Dante, could you pull up the CN tables exhibit?

20       Go to the first page, please.

21       You are familiar with this document?

22   A.   No.

23   Q.   Do you see that the four pages in this section are

24   reproduced from the SCS, now NRCS, report Urban Hydrology?

25   A.   Yes.

1   Q.   And you see that the report is commonly known as TR-55?

2   A.   Yes.

3   Q.   Are you aware that that is the report that provides CN

4   numbers for all types of soil?

5        MR. SCHWIEP:  Your Honor, can we get the exhibit

6   number?

7        MR. EZRAY:  There is no exhibit number.  You disclosed

8   the report of this after --

9        THE COURT:  Well, if you want the court reporter to

10  know what you're saying, Counsel, you have to talk into the

11  microphone, and if it's not an exhibit number then it's not in

12  evidence so take it down.

13       MR. EZRAY:  Yes, Your Honor.  We would note that this

14  report was disclosed to us this Sunday evening before the

15  disclosure after the plaintiffs' disclosure.

16       THE COURT:  I don't even know what you just said, but

17  this is not in evidence, so take it down.

18       MR. EZRAY:  Okay.

19       THE COURT:  You need to ask him about what he has

20  testified to and any background he has as to this but --

21       MR. EZRAY:  Your Honor, this is a government document.

22  We'd move to admit it into evidence.  We'd give it the next

23  number on our exhibit list.

24       THE COURT:  All right.  Well, saying it's a government

25  document is like saying it's on the Google.  There is no way

App. 514

1    for me to evaluate.  So, I will not admit it, but if you have

2    questions based on a treatise or a document or even, you know,

3    as they say about impeachment, a tissue paper, you may go ahead

4    and ask the witness about it.

5    BY MR. EZRAY:

6    Q.   Okay.  You said that a CN number of 50 represented a dirt

7    road.  Correct?

8    A.   I believe that's what was applied in our model.

9    Q.   Are you aware that the government document that creates CN

10   numbers grades dirt roads as anywhere between a 72 and 89 based

11   on the hydraulic soil group they are found?

12   A.   Again, I didn't assign these numbers.  I worked with my

13   professional engineer who completed the model simulation.  I

14   interpreted the data from the simulation, but I did not have

15   any involvement of the specific CN numbers, but based on my

16   experience with him and these types of projects I trust him in

17   the sense that he applied numbers that he believed were

18   appropriate to characterize the site in the absence of any --

19           THE COURT:  Okay.  But the question is, are you aware,

20   did you know of any kind, any document, it doesn't have to be

21   government.  Are you aware of any other learned treatise that

22   says dirt roads are between 72 and 89?

23           THE WITNESS:  No, I was not aware of that.

24           THE COURT:  Okay.

25   BY MR. EZRAY:

1    Q.   Can you pull up Plaintiffs' Exhibit 94, please?

2         While we are pulling that up, if the CN numbers for the

3    unpaved sections was higher, that would result in less

4    runoff -- in increased runoff.   Correct?

5    A.   In increased runoff, that's right.

6    Q.   Can we go to page four.

7         This is the permit application you pulled in reviewing your

8    report.   Correct?

9    A.   Correct.

10   Q.   And it's on the same site?

11   A.   Yes.

12   Q.   Do you see on the second line where it says SCS curve

13   number?

14   A.   Yes, 83 and 98.

15   Q.   Correct.   So the pre here was 83.   Correct?

16   A.   Right, but I'm not sure if that was for concrete that they

17   applied.   These were specific to, I believe, concrete pads that

18   may have been in place.

19   Q.   This was the installation of the concrete plan.   Right?

20   A.   From my understanding, yes.

21   Q.   So that's the post.   That's the 98.   Do you know what the

22   83 represents?

23   A.   Oh, I see what you're saying.

24        Okay.   Yes, so they're applying the 83.

25   Q.   So, did you consider applying an 83 when that was what was

1  previously applied to unpaved lands in this area?

2  A.  I personally did not consider that in the simulations.

3  Q.  But you reviewed this document as part of your report?

4  A.  I did review it, yes.

5  Q.  Why did you choose to use a substantially lower curve

6  number when previously the number 83 that had been used on this

7  exact site?

8  A.  Again, I'd have to confer with my engineer on that.

9  Q.  Okay.  You didn't ask him about that?

10  A.  When we -- when we were going through it, that did not come

11  up, no.

12  Q.  You just blindly trusted the number?

13  A.  No, I wouldn't say that.

14  Q.  Okay.  What would you say?

15  A.  I would say that I relied on his expertise in the area of

16  engineering and completion of these types of models to produce

17  the model itself.

18  Q.  Did you ask him any questions about choosing the number 50?

19  A.  No, he explained to me that there was some assumptions that

20  were made in it and they seemed reasonable to me when we were

21  going through it.

22  Q.  What assumptions did he tell you that he made?

23  A.  Specifically, that he had to make an assumption based on

24  the gravel -- or the dirt road, what the CN number would be.

25  Q.  But you did not ask any questions about the assumptions?

1   A.   The assumption, itself, was made to be that number.

2   Q.   But you didn't ask him any question about how he got to 50?

3   A.   In that context, no.

4   Q.   Okay.  And you didn't do any independent investigation of

5   how he got to 50?

6   A.   Not for this, no.

7   Q.   Ever?  Have you ever calculated a CN number yourself?

8   A.   I have not -- again, I did not produce the model myself,

9   no.

10  Q.   Are you aware that the U.S.D.A. technical directives on

11  hydrology water sheds say that, quote, curve numbers describe

12  average conditions that are useful for design purposes.  If the

13  rainfall event used is a historic storm, the modelling accuracy

14  decreases?

15  A.   I was not aware of that, no.

16  Q.   But you still used a curve number for a 100-year, 72-hour

17  storm?

18  A.   That was the storm event that we believed would be

19  applicable for this wetland area.

20  Q.   Okay.  And in the 100-year storm that you simulated, you

21  hypothesized that airport before FDEM would discharge 7,713.74

22  cubic feet per second.  Right?

23  A.   That's correct.

24  Q.   And after construction you estimate that that number rises

25  to 7,883.18 cubic feet per second.  Right?

1  A.  Correct.

2  Q.  So, in a hundred year storm that lasts for three days, your

3  simulation shows a two percent increase in runoff.  Right?

4  A.  Essentially.

5  Q.  And you didn't examine what effect that two percent

6  increase in runoff would have on the surrounding environment.

7  Right?

8  A.  Can you be more specific?

9  Q.  Yeah, you agree -- well, let me ask you this; the only

10  environmental effect that you highlight in your report is PAH

11  exposure.  Correct?

12  A.  PAH exposure, but there is no -- from what I reviewed from

13  the documents there is no storm water management system in

14  place to capture any storm water that is resultant from the

15  additional impervious surface that's been laid down.

16  Q.  Right.  But the only effect is that you say that the

17  addition to storm water is going to expand PAH exposure.

18  Right?

19  A.  It has the potential to, yes.

20  Q.  Okay.  And you agree that to actually determine whether PAH

21  levels increase you, quote, would need to be empirically

22  confirmed by the collection and analytical testing of soil,

23  sediment and ground water samples.  Right?

24  A.  That's accurate.

25          THE COURT:  You have to slow down.

App. 519

1          MR. EZRAY:  Apologies, Your Honor.

2          I'll do my best, thank you.

3    BY MR. EZRAY:

4    Q.   If additional drainage systems were installed near the

5    newly paved sites, would that change your analysis?

6    A.   It would.  Again, but I went based off of the information

7    that I was able to review and, again, I wasn't able to access

8    the site to review any of those features but it certainly might

9    improve, yes, the conditions.

10   Q.   I just want to make sure that I have one thing correct

11   about the simulation.  The simulation assumes 100-year, 72-hour

12   storm.  Right?

13   A.   That's correct.

14   Q.   And then the delta between the old site and the new site is

15   explained by the change in the CN number.  Right?

16   A.   Not the change -- yes, in the model itself, yes, but the

17   overall number is a change in discharge between the pre and the

18   post.

19   Q.   Right, and how you get to that number is by varying the CN

20   number.

21   A.   Right.

22   Q.   What you did was you said, the unpaved sections are 50.

23   Now, they're 98, and that explains the delta in the model?

24   A.   Correct.

25   Q.   So if you're wrong about the 50, if that 50 should have

1   been higher, then you have actually shown too much additional

2   discharge.  Correct?

3   A.  I think that if the numbers were changed it likely would

4   have still shown some type of runoff.  It might not have been

5   to the magnitude that this other, that the number we used

6   produced.  But, again, this was a preliminary model that we

7   evaluated.

8        We would need the, you know, full site drawings in CAD to

9   be able to produce, you know, a comprehensive model.

10  Q.  Let me ask it this way just to make it simple.

11       If I took your model, and I changed 50 for unpaved

12  portions, and I made it a 70, you would then show less of an

13  increase in discharge.  Correct?

14  A.  Less of an increase but likely still an increase.

15  Q.  And if I made it an 80 still less?

16  A.  Likely, yes.

17  Q.  Okay.  Now, you did not study where the overflow from the

18  paved areas would go.  Correct?

19  A.  No.

20  Q.  Is it possible that it would go into the existing retaining

21  ponds?

22  A.  It's unlikely.  I mean, based upon what I have seen from

23  the aerials and plans that I reviewed, those existing features

24  would not be able to accommodate all of the additional storm

25  water generated from a potentially intense rainstorm event.

App. 521

08

1   And further, what I reviewed is that there is only temporary

2   silt fencing that is not suitable in the long-term to be able

3   to reduce any storm water runoff that could potentially affect

4   neighboring areas.

5   Q.   I think we are talking past each other slightly, so let me

6   ask a better question.

7        You testified on your direct that there are existing storm

8   water management systems on the site.  Right?

9   A.   What I inferred to be detention basins, yes.

10  Q.   And you did not study whether increased discharge from the

11  additional paving would flow into those discharge basins.

12  Correct?

13  A.   I don't believe.

14  Q.   Now, you mentioned silt fencing.  What is silt fencing?

15  A.   Silt fencing is a temporary measure used to reduce sediment

16  runoff into surrounding areas during construction.

17  Q.   And you are aware there is silt fencing on the site?

18  A.   I'm aware.  I observed it on the aerial photographs but I

19  did not, you know, physically put my eyes on it on the ground.

20  Q.   On page three of your report you suggest that an ERP permit

21  was needed.

22       You're not a lawyer.  Right?

23  A.   I'm not a lawyer.

24  Q.   You are not intending to offer a legal opinion?

25  A.   I don't think so, no.

1          (Plaintiffs' Exhibit 93 was marked for identification.)

2     BY MR. EZRAY:

3     Q.  Can you pull up Plaintiffs' Exhibit 93?

4          We can do it with papers.

5          THE COURT:  I just want to make sure we didn't turn

6     everything off.  Is it on our end or yours?

7          MR. PANUCCIO:  No, Your Honor, we're just having

8     trouble locating the electronic file.  We will go to paper for

9     this one.

10          IT TECH:  Do you want me to bring it up?

11          MR. EZRAY:  That would be great.  Much appreciated.

12          THE COURT:  Exhibit 93?

13          MR. EZRAY:  Yes, Your Honor.

14          THE COURT:  Are you offering it into evidence, and if

15     so, Mr. Schwiep, do you have an objection?

16          MR. EZRAY:  I am.

17          MR. SCHWIEP:  To 93, no.

18          THE COURT:  All right.  Then it will be admitted and

19     it's up on the screen.

20          (Plaintiffs' Exhibit 93 was admitted in evidence.)

21     BY MR. EZRAY:

22     Q.  Thank you, and sorry about that.

23          This is one of the permit applications for the site that

24     you reviewed in preparing your report.  Correct?

25     A.  Correct.

1    Q.   Can you go to page eight for me?

2         Do you see in the paragraph right before the chart it says,

3    mount MALSR, M-A-L-S-R, lights?  It's the paragraph right above

4    the table in the middle of the page.

5    A.   Yes.

6    Q.   Do you know what an MALSR lights are?

7    A.   No, I don't know what that is.  Go ahead.

8    Q.   Okay.  Can you go to page 11, please?

9         And if you could zoom in on the notes for me, please.

10        Can you just read note one for me on the top of the page?

11   We may have to zoom in a little more.  The font is very small

12   on this.

13   A.   Install new steady burning lights from STA 0 plus 07

14   through STA 14 plus 10.

15   Q.   Can you go to page 12 for me, please?

16        Do you understand this page to be a depiction of

17   installation of runway lights?

18   A.   Yes.  I'm not familiar with this type of drawing but -- can

19   somebody zoom in?  Am I able to zoom in?

20        Yes, it's a profile depicting, yes, the installation of

21   lights.

22   Q.   Where was this application made?

23   A.   Was this a --

24   Q.   I think you can see it on the left-hand side.  There is a

25   stamp there with the date.

App. 524

```
 1   A.   Is this the 2005?  Is that July 2005?

 2             MR. EZRAY:  Can I just have a minute, Your Honor?

 3             THE COURT:  Yes.

 4             MR. EZRAY:  No further questions from the State, Your

 5   Honor.

 6             THE COURT:  From the Federal Defendants?

 7             MS. PIROPATO:  A very short cross, Your Honor.

 8             THE COURT:  Sure.

 9             MS. PIROPATO:  I have a plane to catch.

10             THE COURT:  I'm trying.

11             THE WITNESS:  Hey, I think have I been the quickest.

12             THE COURT:  I think you're right.

13                         CROSS-EXAMINATION

14   BY MS. PIROPATO:

15   Q.   This will be very brief.

16        Good morning, Mr. Reio.  My name is Marissa Piropato.  I'm

17   with the Department of Justice.

18   A.   All right.

19   Q.   I have just have a few questions for you.

20        I believe you testified on cross-examination that you

21   relied on a civil engineer to adopt certain assumptions that

22   you used in your modeling.  Is that correct?

23   A.   That is correct.

24   Q.   Did you reference this civil engineer in your report?

25   A.   No, he was not referenced.  I can give you his name if
```

App. 525

1   that's helpful.

2   Q.  Sure.  Who is this individual?

3   A.  Michael Radford.  He's a professional engineer with SCS.

4   Q.  Is that the company you work for, SCS Engineers?

5   A.  Yes, it is.

6   Q.  Did the civil engineer provide you with any data?

7   A.  He provided me with the model output and we reviewed the

8   drawings together, yes.

9   Q.  Did you communicate with the civil engineer in electronic

10  or written format?

11  A.  No, we did -- we did Teams meetings we exchanged.

12  Q.  Okay.  How often did you communicate with this civil

13  engineer, Mr. Radcliffe?

14  A.  It's Radford, actually.

15  Q.  Radford, sorry.

16  A.  We communicated several times.  This was a very fast-moving

17  process.  We had about two weeks kind of to look at everything

18  and digest it, but I would say half or a dozen times or so.

19  Q.  And when did you start working with Mr. Radford on the

20  content in your report?

21  A.  When I was engaged by Friends of the Everglades.

22  Q.  For clarity of the record, when were you engaged again?

23  A.  I believe it was the 22nd or 23rd.  I don't have the date

24  specifically in my head, but it's around that time.

25  Q.  And 22nd of July?

1  A.  That's correct, yes.

2  Q.  Okay.  Just to clarify for the record.

3       Just, again, for the clarity of the record, did the civil

4  engineer, Mr. Radford, provide written comments on your report?

5  A.  In what way?

6  Q.  Any -- did he review your report?  Let's start there.

7  A.  Oh, my expert testimony?

8  Q.  Yes.

9  A.  No, he didn't review it.

10  Q.  Okay.  Did he -- did you retain copies of your

11  communications with Mr. Radford?

12       THE COURT:  Oh, no.  But we are going to need a CV from

13  Mr. Radford, Mr. Schwiep, and I expect you to give that to the

14  defendants, post haste.

15       MR. SCHWIEP:  Will do, Your Honor.

16  BY MS. PIROPATO:

17  Q.  Were you the one who identified the need to retain a civil

18  engineer?

19  A.  I work with civil engineers on a daily basis, so whenever I

20  have questions on these types of things, we work as a team.

21  So, yes, it's very typical for me to, you know, engage with my

22  engineers on these specific topics.

23  Q.  Have you worked with Mr. Radford before this time?

24  A.  Yes.

25  Q.  So you have worked with Mr. Radford often?

1    A.   Yes, often.

2    Q.   Okay.  What do you mean by "often," just to clarify for the

3    record?

4    A.   We worked on several projects together over the course of

5    the last few years.

6    Q.   And also for the clarity of the record, when you say

7    Mr. Radford provided you modeling, what does that mean for

8    someone like me?

9    A.   He completed the actual model simulations, the model runs.

10   He has the software on his computer to be able to run this ICPR

11   model.

12   Q.   Okay.  And what's the name of the software?

13   A.   It's the Interconnected Channel and Pipe, ICPR modeling

14   software.

15   Q.   Okay.  Thank you.

16        If you know, how much time did Mr. Radford spend on this

17   project?

18   A.   I would imagine between six to eight hours probably.

19   Q.   Did you provide Mr. Radford with any assumptions?

20   A.   No, I did not provide him with any assumptions.  I provided

21   him with the plan drawings that were provided by FDEM for us to

22   review and then he took it from there and completed his

23   analysis.

24   Q.   How did he know which absorption assumptions to use?

25   A.   Can you be more -- absorption for what?

15

1    Q.  For, I believe, the modeling?

2         THE COURT:  The CN?

3         MS. PIROPATO:  The CN, correct.

4         THE WITNESS:  I believe he would have referenced his

5    material and his experience of completing for other types of

6    projects.

7    BY MR. EZRAY:

8    Q.  When you say you believe he would have referenced his

9    materials, what do you mean by that?

10   A.  So, the typical engineering documents that he has completed

11   on similar types of projects to evaluate the potential for

12   runoff.

13   Q.  So, that is to say, just to make sure I understand, that

14   Mr. Radford looked at other similar projects to inform his

15   assumptions in this case.  Is that correct?

16   A.  As well as, I believe, the engineering literature to help

17   support those numbers that he assigned.

18   Q.  And do you know what other projects Mr. Radford looked at

19   to inform his assumptions?

20   A.  Not specifically for this, no.  But I know he has worked on

21   other roadway designs, specifically in the context of

22   landfills.

23        You know, they build new roads along landfills, so he would

24   have had some context for what those type of CN numbers would

25   be.

1          MS. PIROPATO:  Okay.  I have nothing further, Your

2    Honor.  Thank you.

3          THE COURT:  Thank you.

4          Redirect, Mr. Schwiep.

                    REDIRECT EXAMINATION

6    BY MR. SCHWIEP:

7    Q.  Why did you and your team conclude that the 100-year,

8    72-hour storm event was the most appropriate model for this

9    particular site?

10   A.  Because it's in a wetlands, a low-lying area, one that's

11   prone to flooding, and again, our storm water management

12   systems need to be resilient and be able to effectively drain

13   sites.

14         So, this is typical in these wetland environments and these

15   low-lying basins to use the most conservative storm water

16   event.

17   Q.  It's standard practice in your industry?

18   A.  Yes.

19   Q.  Is it common in your area of expertise to rely on a

20   professional engineer to actually run the model results?

21   A.  Yes, absolutely.

22   Q.  Is that the sort of data that you would typically rely on

23   in rendering your own opinions as a soil geologist?

24   A.  Yes, that's correct.

25   Q.  You were asked about the 2008 and 2005 permit applications

1   able, Plaintiffs' 94 and 93, respectively, and the storm events

2   that were used to model those.

3   A.   Correct.

4   Q.   How much impervious surface was involved with those permit

5   applications?

6   A.   Much less, apparently 2,000 square feet.

7   Q.   How does that compare to the 18 acres that were analyzed in

8   area one and area two?

9   A.   That's approximately, you know, almost 800,000 square feet,

10  so it's a much bigger number than the 2,000 that was used in

11  the previous permit applications.

12  Q.   By how many times?

13  A.   I think we calculated it was like 180 times, give or take.

14  Q.   And the numbers that you were asked about, those are

15  porosity numbers.  Right?

16  A.   The CN numbers?

17  Q.   Yes.

18  A.   Based on my understanding, yes.

19  Q.   Whether it's 90 or 70, new asphalt is going to have less

20  porosity than either an open field, gravel, an old roadway?

21  A.   Yes.

22  Q.   Would this project have gotten an ERP permit without a

23  storm water management plan?

24  A.   I don't believe so, no.

25  Q.   With regard to the silt fencing, would the silt fencing

18

1    capture any storm water runoff?

2    A.   It would mitigate to some extent, but you would still have

3    some flowthrough.  Especially in any intense storm event, those

4    are temporary structures so it could easily be, you know, over

5    toppled and allow for sediment and storm water to pass through.

6    Q.   Is silt fencing an appropriate substitute for a soil

7    geologist designed storm water management system?

8    A.   No.

9    Q.   Can we just pull up your report, which is in evidence as

10   Exhibit 79, and if we look at page 19, we can blow that up.

11        Just focusing on areas one, which is that bottom left-hand

12   side with the nose in it, Dr. McVoy called it a parabolic

13   input, and area two, the new pavement kind of in the center at

14   the top, would storm water runoff from those areas make its way

15   into the retention areas between the taxiway and the runway?

16   A.   It's unlikely, but it would be based on how they grade it

17   and built up the pavement there.

18        Typically, when asphalt pavement is built, there is a crown

19   that goes over it, so there is a high point and then it slopes

20   down.  So some of it could potentially make its way there but

21   not all of it.

22        MR. SCHWIEP:  That's all I have, Your Honor.

23        THE COURT:  All right.  Thank you.

24        And, yes, you were probably the fastest.  You may step

25   down.

App. 532

1          All right.  I would like counsel, to invite counsel for

2    the Federal Defendants to leave.

3          Local counsel will tell you.  We're going to do

4    scheduling now, so you can stay if you want, but if you're

5    trying to get to MIA and on a flight, I'd say go.

6          MS. PIROPATO:  I think I will be okay.  My flight is

7    delayed until 2:00 p.m., so I might be okay, Your Honor.

8          THE COURT:  All right.  We will break now.

9          I don't know, if you have additional witnesses,

10   Mr. Schwiep, we will take them next week, but we have flights

11   and other matters, so we did the best you could.

12         MR. PANUCCIO:  Your Honor, just before we break or go

13   to scheduling, we just want to renew our 702 based on the

14   testimony, so Mr. Ezray will present that quickly.

15         MR. EZRAY:  Your Honor, I think what we heard is that

16   the expert did not understand his own model and relied entirely

17   on an undisclosed expert, who we received neither disclosure of

18   who he was or any of his information until today from the

19   witness stand, and we move to exclude the expert on that basis.

20         THE COURT:  I'm not going to grant the motion.  I am

21   going to require the plaintiffs to provide you with

22   Mr. Radford's vitae, any other information that he has.  I

23   think the evidence is Mr. Reio works that way and relies upon

24   the engineers to assist him in putting together the models.

25         That goes to weight, and we will take that into account

1    when you argue your case.

2           Is there anything other than scheduling?

3           MR. SCHWIEP:  I'm sorry, Judge?

4           THE COURT:  Is it anything other than scheduling?

5           MR. SCHWIEP:  It is.

6           THE COURT:  Okay.

7           MR. SCHWIEP:  I'd like to renew our request for a site

8    visit and, Judge, we do have -- we had a TRO motion that we

9    filed June 27th.  We've heard testimony that there are

10   additional fill trucks coming on to the site that appears that

11   there have been an uptick in activity recently.

12          I understand there is a scheduling problem and we can't

13   come back until Tuesday.  We have asked the State and the

14   Federal Defendants to stipulate that there will be no further

15   construction activities over the weekend.  They're unwilling to

16   do that, and we think it's appropriate for Your Honor to just

17   put in a pause, to enter a TRO until we can reconvene so that

18   there isn't any further filling, construction activity, and new

19   people coming on to the site before we can get back together.

20          So, we would renew our request for a TRO in the

21   interim.  We hope we can finish.  No we can't.  We understand

22   the scheduling issue, but we don't think that that pause should

23   be used as an opportunity to increase the amount of

24   construction, and we are concerned that it's ongoing.

25          We filed this case June 27 --

App. 534

1        THE COURT:  Mr. Panuccio, to say that I would be

2   unhappy if I gave all of you an extension of time because I was

3   trying to be sensitive to your competing professional interest

4   only to have the site in question altered materially in the

5   intervening days, that would be an understatement to say I

6   would be unhappy.  So, it would give me great solace if you

7   would just say, no, don't worry about that, you know, and we

8   will continue to discuss the merits next week.

9        MR. PANUCCIO:  Well, Your Honor, I can say, it's an

10  operational site and it continues to operate.  I can't speak to

11  everything that's going to happen on the site, Your Honor,

12  but --

13       THE COURT:  Well, that's too bad.

14       MR. PANUCCIO:  Your Honor, the plaintiffs have -- you

15  may recall, at the status conference the plaintiffs said they

16  needed one day.  Then they disclosed 13 witnesses.

17       THE COURT:  No.  No.  Let's not do this, Mr. Panuccio.

18  Let's not do apples and oranges and 4 o'clock and 5 o'clock.

19  This is the case we have.  This is what we are discussing.

20       All right.  If you think that this is a ridiculous fear

21  on the part of the plaintiffs, then tell me that.  If it is

22  not, then maybe flights are going to be delayed and we are

23  going to move forward because I don't want to find out when I

24  wake up Monday that the site has been altered when this is

25  going on.  That should not be a concern.

App. 535

22

1          MR. PANUCCIO:  Your Honor, I guess what is their

2     particular fear?

3               There is an active detention facility at the site.

4               THE COURT:  Of course, there is.

5               That there is more asphalt, more pavement, more

6     erection of other facilities.  That is the fear.

7          MR. SCHWIEP:  Judge, we're not asking -- it's a limited

8     and very narrow request.  We are not suggesting they need to

9     shut down the facility or move anything out or any of that.

10    Just that we don't want to see any construction activity.

11         THE COURT:  No construction activity seems to be a

12    pretty reasonable request in light of what we have been talking

13    about and, again, in light of the fact that as an accommodation

14    I said fine.

15              We could go today.  We could go tomorrow.  We could

16    keep going.

17         MR. PANUCCIO:  Well, Your Honor, I'd have to ask the

18    client.  I'm not an expert in detention.  So, for example, I

19    don't know if as we stand here today, they are putting in

20    hygiene facilities, a toilet for someone to appropriately care

21    for them.  So, I can't tell you.

22         THE COURT:  Well, I would hope that they had thought of

23    that, I don't know, before they shipped the people.

24         MR. PANUCCIO:  I understand that, Your Honor, and of

25    course, they have.  But if what you're saying is can I stand

App. 536

1    here and say nothing, not one feature of the site will change

2    in any iota, how could I possibly say that?  It's an active

3    detention center.  You couldn't even say that about this

4    courthouse, Your Honor.

5        THE COURT:  Oh, no.  Oh no, no.  We could very easily

6    say it.  There are people coming in and out of the courthouse,

7    but no one is building a patio.  No one is reconfiguring the

8    water site which has been broken for ten years.

9        I could very easily say, oh, yes, the business of the

10   courthouse will go on but there will be no additional

11   construction.

12       MR. PANUCCIO:  Well, you could have landscapers.  You

13   could have a plumber.  A lot of things can happen in the

14   operation of the facility.  That's the point I'm making.

15       THE COURT:  Okay.  This seems to be the key of this

16   litigation.  I said the word "construction," meaning erecting,

17   building, amplifying the already facility footprint, not

18   shrubs, not cleaning up, not fixing a plumbing issue,

19   construction.

20       I'm going to step out.  I'm sorry you may actually miss

21   your plane.  I'm going to step out and allow you to talk, and

22   if you can tell me there will be no construction, there may be

23   people coming in and out and operation and all of that, that's

24   fine, but if there is going to be further construction, then

25   there is going to be further hearing.

App. 537

1          I will give you five minutes.

2          MS. PIROPATO:  Your Honor, can I ask a clarifying

3     question, even though this is not our equities, but just so we

4     understand.

5          Are you asking in terms of asphalt and permanent

6     construction or are you talking -- I just think -- I just want

7     to be sure is that what you're saying about construction, Your

8     Honor.

9          THE COURT:  That's why you are going to talk for a

10    moment.

11         COURT SECURITY OFFICER:  All rise.

12         (Recess.)

13         THE COURT:  All right.  There are I don't know how many

14    options right now.

15         I hoped that the parties could come to some accord

16    about the site while we were litigating this, and if they have,

17    I'm happy to hear it.

18         MR. SCHWIEP:  Yes, Your Honor.

19         We do renew our request for a TRO, and I really don't

20    mean to put my colleague, Mr. Panuccio, on the spot, and I'm

21    not because I raised this yesterday.  I said, you know, we will

22    accommodate the schedule, but we don't want any more additional

23    activities, construction activities to occur, and what I was

24    told was not, no, absolutely no.

25         I said why don't you just confer with the client, maybe

1   the client would agree to something like that, and what I was

2   advised was it wasn't necessary to confer with the client, the

3   answer was no.

4        And that if we were to obtain a TRO they would

5   immediately seek an appeal and a TRO is not appealable in any

6   event.

7        THE COURT:  Not that I was aware of but, you know, who

8   knows.

9        MR. SCHWIEP:  A very limited and narrow request, Judge,

10  and we are narrowing it to the following items.

11       THE COURT:  Well, is Mr. Schwiep correct, there is no

12  agreement?

13       MR. PANUCCIO:  Mr. Schwiep is not correct in what he is

14  testifying to about what I said, but he is correct that the

15  State -- this is an extraordinary hearing.  Preliminary relief

16  is, of course, extraordinary.  The status quo is that the State

17  and Federal Government have significant law enforcement

18  interest that they are carrying out and they cannot agree to

19  stop those interests based on a case that, one --

20       THE COURT:  Nobody is asking law enforcement to stop.

21  No one is saying this is anything other than what it is, which

22  I am hoping, Mr. Panuccio, in your experience at Boies Schiller

23  you understand is a preliminary injunction.

24       I bypassed the TRO because I wanted to set a hearing

25  where all parties would have an opportunity to adduce evidence,

App. 539

1    cross-examine witnesses and then argue to me their positions.

2    It seems like that is not doable.  It seems like people have

3    other obligations, which they think they need to fulfill and

4    not stay here to continue with the preliminary injunction.

5        That's fine.  That takes us back into temporary

6    restraining territory, and I could avoid that if there could be

7    limited agreement just about what is happening, akin to what is

8    at Docket Entry 40, page six, but we don't have an agreement.

9        So, you are renewing your request for a TRO, is that

10   correct, Mr. Schwiep?

11   MR. SCHWIEP:  Yes, Your Honor.  And we would limit the

12   request that the defendant State be enjoined or temporarily

13   restrained under Rule 65 from installing any additional

14   lighting, paving, filling, excavating, or fencing.

15   THE COURT:  Okay.  Now, the other option, of course, is

16   we continue, and I am happy to do so.

17   MR. SCHWIEP:  And we are prepared to do that as well,

18   Judge.

19   MR. PANUCCIO:  Your Honor, if I may, when this was

20   brought up in open court yesterday, and we were going to

21   continue today and they were going to finish their

22   case-in-chief and then come back Tuesday.

23       Counsel did not make a request for TRO at that time.

24   We released our witnesses back to Tallahassee, Your Honor.

25   Lawyers have left.  We have relied on that, Your Honor, but if

1    we are arguing a TRO motion today, then I would like to argue

2    the law on this because the Court does not have jurisdiction to

3    enter that.

4         They have not demonstrated legal entitlement.  Putting

5    aside all of this testimony, there are questions of law that

6    are quite serious at issue that I would like the chance to

7    argue if this motion is now being entertained again, Your

8    Honor, despite the agreement to come back Tuesday.

9         THE COURT:  The agreement to come back Tuesday was

10   predicated on the defendants' scheduling issues.

11        Mr. Panuccio, I'm not going to even begin to delve into

12   what you would do for your retained clients if there was a

13   preliminary injunction or a TRO because I know, having been

14   there, and I know as a government lawyer as well, if you need

15   to be someplace and it runs over as things are wont to do, you

16   make accommodations.

17        You ask the Court, and you did.  And I said fine, we

18   would -- I first said -- when you first brought it up I said,

19   oh, no, not next week because I had things.  I said maybe

20   Thursday or Friday, but then it was brought up again.  I

21   cleared up my calendar.  I said fine, but I perhaps naively

22   assumed that since we are litigating this and since I was

23   waiting for an opportunity to hear your evidence, you wouldn't

24   continue your construction efforts out there, especially in

25   light of the questions on cross that basically suggest once

App. 541

1    there is some presence, then, you know, we are stuck with it

2    for all time in eternity.

3           We were stuck with it in 1969, and if it happens now

4    we'll be stuck with it now.  So, I don't have any choice,

5    Mr. Panuccio, unless you want to go forward with witnesses and

6    evidence, you say they've been released.  Okay.  Then I will

7    break for lunch and I will give each side 20 minutes to argue

8    the TRO and I will consider that.

9           It does seem to me to be a total waste of resources and

10   time since we are arguing the preliminary injunction as of next

11   week, and I already know what your argument is about venue and

12   jurisdiction because you have presented it.  But if you would

13   like additional time, I am perfectly happy to do that today.

14          MR. PANUCCIO:  Okay, Your Honor.  Thank you.  We will

15   take that.

16          THE COURT:  All right.  Let's break for 1:15 and

17   counsel can perhaps have local counsel designated to remain as

18   to the argument and there would be no issue with that.

19          COURT SECURITY OFFICER:  All rise.

20          (Lunch recess.)

21

22

23

24

25

129

1                    C E R T I F I C A T E

2

3            I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8

9    <u>August 10, 2025</u>        <u>/s/Patricia Diaz</u>
     DATE                     PATRICIA DIAZ, FCRR, RPR, FPR
10                            Official Court Reporter
                              United States District Court
11                            400 North Miami Avenue, 11th Floor
                              Miami, Florida 33128
12                            (305) 523-5178

13

14

15

16

17

18

19

20

21

22

23

24

25

**'** [1]

**'60s** [1] - 63:15

---

**/**

**/s/Patricia** [1] - 129:9

---

**0**

**0** [1] - 110:13
**025504** [1] - 2:25
**07** [1] - 110:13

---

**1**

**1** [4] - 1:8, 1:16, 60:21, 60:22
**1,000** [1] - 28:17
**10** [6] - 12:16, 15:1, 15:19, 80:9, 110:14, 129:9
**100** [2] - 93:13, 94:23
**100-year** [10] - 80:9, 80:11, 91:11, 93:3, 93:6, 93:12, 104:16, 104:20, 106:11, 116:7
**109** [1] - 4:19
**11** [4] - 38:24, 67:23, 110:8
**11-mile** [1] - 48:9
**1101** [1] - 2:4
**11:30** [2] - 68:14, 68:15
**11th** [4] - 3:4, 38:12, 40:1, 129:11
**12** [8] - 4:24, 51:8, 51:10, 51:21, 51:24, 52:1, 63:2, 110:15
**120** [1] - 72:25
**1200** [1] - 2:10
**12:15** [1] - 1:6
**13** [2] - 4:11, 121:16
**14** [8] - 4:11, 4:15, 54:10, 54:12, 54:23, 55:1, 55:20, 110:14
**150** [1] - 2:21
**169** [1] - 80:8
**17** [2] - 4:12, 67:21
**18** [16] - 4:12, 4:24, 38:5, 42:2, 52:19, 52:22, 53:7, 53:11, 53:14, 53:15, 55:13, 57:16, 63:2, 67:23, 67:24, 117:7
**180** [1] - 117:13
**1850** [1] - 10:23
**18th** [5] - 29:23, 29:24, 30:6, 38:13, 40:2

**19** [2] - 76:23, 118:10
**1969** [1] - 128:3
**1995** [1] - 10:2
**1:15** [1] - 128:16
**1st** [2] - 65:18, 66:6

---

**2**

**2,000** [4] - 33:25, 78:17, 117:6, 117:10
**20** [12] - 15:20, 16:4, 36:17, 36:24, 41:3, 49:9, 49:11, 52:22, 74:16, 76:3, 79:21, 128:7
**20-billion** [1] - 12:16
**2000** [1] - 14:15
**20002** [1] - 2:21
**2005** [4] - 78:15, 111:1, 116:25
**2008** [3] - 78:15, 92:25, 116:25
**201** [1] - 1:19
**2011** [1] - 11:8
**2015** [1] - 71:11
**2017** [1] - 71:13
**2020** [1] - 15:23
**2023** [2] - 72:13, 73:11
**2024** [1] - 15:24
**2025** [27] - 1:5, 25:10, 29:23, 29:24, 36:17, 36:24, 37:18, 38:5, 41:9, 42:16, 65:3, 65:15, 65:16, 65:20, 65:22, 66:2, 74:9, 74:13, 76:3, 77:2, 79:21, 82:1, 82:12, 85:5, 85:17, 129:9
**20530** [1] - 2:19
**20th** [1] - 74:9
**2155** [1] - 1:22
**22** [9] - 4:14, 41:4, 41:6, 41:11, 41:15, 41:16, 42:15, 54:10, 98:18
**22nd** [3] - 42:22, 112:23, 112:25
**23** [7] - 4:11, 4:21, 13:6, 13:7, 14:3, 14:6, 14:8
**23rd** [1] - 112:23
**24** [2] - 4:21, 71:3
**25** [2] - 4:12, 93:8
**25-22896-CV-KMW** [1] - 1:2
**25-CV-22896** [1] - 5:2
**25-year** [3] - 92:19,

92:24, 93:2
**250** [1] - 33:3
**25th** [1] - 85:5
**26** [1] - 4:12
**2601** [1] - 1:15
**27** [1] - 120:25
**27th** [5] - 42:25, 60:18, 61:4, 61:13, 120:9
**28th** [7] - 24:18, 25:10, 29:7, 33:1, 42:25, 61:14, 61:20
**29** [1] - 4:13
**2:00** [1] - 119:7

---

**3**

**3** [1] - 77:8
**3,000** [1] - 33:8
**30** [6] - 16:13, 68:1, 68:19, 82:12, 85:1, 85:2
**305** [2] - 3:5, 129:12
**30th** [2] - 82:1, 84:6
**32** [2] - 33:4, 33:5
**33102** [1] - 2:25
**33128** [2] - 3:5, 129:11
**33131** [1] - 2:5
**33132** [1] - 2:15
**33133** [1] - 1:16
**33134** [1] - 1:20
**33301** [1] - 2:11
**33731-2155** [1] - 1:23
**36** [1] - 4:13
**37** [1] - 4:13
**39** [7] - 4:16, 73:12, 73:15, 73:17, 73:20, 74:5, 74:6
**3A** [2] - 77:12, 77:13
**3B** [1] - 78:3
**3C** [2] - 78:22, 78:24

---

**4**

**4** [3] - 2:15, 28:17, 121:18
**40** [1] - 126:8
**400** [2] - 3:4, 129:11
**401** [1] - 2:10
**41** [5] - 4:14, 19:19, 20:8, 47:19
**42** [1] - 4:14
**43** [1] - 4:14
**45** [1] - 4:15
**4500** [1] - 1:19
**46** [1] - 4:15
**49** [1] - 57:15
**49-1** [1] - 57:17

**5**

**5** [2] - 38:8, 121:18
**50** [14] - 41:24, 96:19, 99:14, 99:15, 99:16, 99:17, 101:6, 103:18, 104:2, 104:5, 106:22, 106:25, 107:11
**51** [1] - 4:24
**52** [2] - 4:24, 4:24
**523-5178** [2] - 3:5, 129:12
**53** [1] - 4:24
**54** [1] - 4:15
**55** [1] - 4:15
**5th** [2] - 38:23, 39:25

---

**6**

**60** [1] - 14:21
**60s** [2] - 39:13, 41:25
**62-780** [1] - 71:2
**65** [1] - 126:13

---

**7**

**7** [2] - 1:5, 67:23
**7,713.74** [1] - 104:21
**7,883.18** [1] - 104:25
**70** [2] - 107:12, 117:19
**700** [1] - 2:4
**702** [2] - 68:24, 119:13
**70s** [1] - 39:13
**72** [4] - 93:2, 93:8, 101:10, 101:22
**72-hour** [8] - 80:9, 80:11, 91:11, 92:19, 93:2, 104:16, 106:11, 116:8
**73** [1] - 4:16
**74** [1] - 4:16
**75** [1] - 19:3
**76** [2] - 4:16
**79** [7] - 4:16, 76:7, 76:10, 76:15, 76:17, 76:18, 118:10
**7th** [1] - 85:16

---

**8**

**8** [12] - 4:21, 22:10, 22:13, 23:5, 23:6, 23:7, 23:12, 24:3, 24:4, 33:4, 33:5
**80** [2] - 14:21, 107:15
**800,000** [2] - 78:19, 117:9

**81** [7] - 4:13, 4:17, 29:16, 29:18, 29:20, 34:24, 34:25
**82** [7] - 4:13, 4:17, 36:19, 36:22, 37:2, 37:5, 37:6
**83** [13] - 4:15, 4:17, 45:17, 45:19, 46:4, 46:8, 46:9, 102:14, 102:15, 102:22, 102:24, 102:25, 103:6
**85** [10] - 4:12, 4:18, 25:18, 25:21, 26:18, 26:23, 26:24, 62:2, 62:4
**88** [9] - 4:12, 17:1, 17:3, 17:4, 17:5, 18:1, 18:6, 18:7, 21:24
**89** [9] - 4:14, 42:5, 42:7, 43:1, 43:4, 43:6, 98:19, 101:10, 101:22
**8th** [5] - 41:9, 77:2, 83:16, 83:17, 84:13

---

**9**

**90** [8] - 4:17, 81:19, 81:20, 82:2, 82:6, 83:13, 85:3, 117:19
**91** [7] - 4:18, 4:18, 85:12, 85:14, 85:18, 85:20, 85:21
**92** [5] - 4:17, 4:18, 83:20, 83:23, 83:24
**93** [7] - 4:19, 109:1, 109:3, 109:12, 109:17, 109:20, 117:1
**94** [7] - 4:18, 91:21, 91:23, 92:10, 92:12, 102:1, 117:1
**950** [1] - 2:18
**98** [8] - 95:10, 95:20, 95:21, 96:9, 96:14, 102:14, 102:21, 106:23
**99** [1] - 2:15
**9:01** [1] - 1:6

---

**A**

**a.m** [1] - 1:6
**ability** [2] - 15:9, 52:13
**able** [32] - 15:10, 26:6, 26:10, 75:24, 78:9, 80:15, 80:24, 82:13, 84:21, 84:25, 85:5, 87:1, 87:24, 88:24, 88:25, 89:12, 90:10, 91:2, 94:10,

96:21, 96:25, 97:2, 106:7, 107:9, 107:24, 108:2, 110:19, 114:10, 116:12, 117:1

**above-entitled** [1] - 129:5

**absence** [4] - 20:14, 70:8, 71:4, 101:18

**absolutely** [3] - 77:25, 116:21, 124:24

**absorbs** [2] - 94:21, 94:23

**absorption** [2] - 114:24, 114:25

**AC** [2] - 34:1, 40:3

**academic** [1] - 13:25

**academically** [1] - 13:24

**academics** [1] - 12:13

**Academy** [1] - 12:9

**accepted** [1] - 97:11

**access** [7] - 86:15, 87:21, 87:24, 88:24, 90:6, 90:10, 106:7

**accommodate** [2] - 107:24, 124:22

**accommodation** [1] - 122:13

**accommodations** [1] - 127:16

**accord** [1] - 124:15

**according** [3] - 33:14, 42:25, 71:2

**account** [2] - 80:14, 119:25

**accumulate** [1] - 81:8

**accumulates** [1] - 44:22

**accuracy** [1] - 104:13

**accurate** [8] - 10:20, 13:19, 13:25, 73:17, 90:4, 93:14, 105:24, 129:4

**acknowledgement** [1] - 46:12

**acres** [12] - 38:24, 40:8, 40:24, 41:3, 42:2, 49:9, 49:11, 58:4, 67:21, 68:4, 74:16, 117:7

**acronym** [3] - 12:22, 14:12, 79:9

**Act** [2] - 12:22, 14:15

**ACTING** [1] - 2:17

**active** [2] - 122:3, 123:2

**activities** [6] - 22:2,

75:17, 78:13, 120:15, 124:23

**activity** [8] - 21:16, 22:9, 72:6, 78:16, 120:11, 120:18, 122:10, 122:11

**actual** [2] - 33:12, 114:9

**ADAM** [1] - 2:16

**Adam** [1] - 6:10

**add** [3] - 48:14, 62:11, 80:23

**added** [1] - 18:4

**addition** [4] - 48:11, 49:9, 49:14, 105:17

**additional** [14] - 68:4, 80:25, 81:1, 105:15, 106:4, 107:1, 107:24, 108:11, 119:9, 120:10, 123:10, 124:22, 126:13, 128:13

**address** [1] - 79:11

**adduce** [1] - 125:25

**adequate** [1] - 77:23

**admission** [14] - 14:2, 17:25, 23:11, 26:18, 34:24, 37:1, 41:11, 43:1, 46:4, 73:20, 76:15, 82:2, 83:20, 85:18

**admit** [2] - 100:22, 101:1

**ADMITTED** [3] - 4:10, 4:20, 4:23

**admitted** [35] - 14:7, 14:8, 18:6, 18:7, 24:4, 26:23, 26:24, 29:20, 34:25, 37:5, 37:6, 43:6, 46:8, 46:9, 51:25, 52:1, 53:14, 53:15, 55:1, 73:22, 74:5, 74:6, 76:18, 82:6, 83:23, 83:24, 85:20, 85:21, 92:11, 92:12, 109:18, 109:20

**admonitions** [1] - 7:24

**adopt** [1] - 111:21

**advance** [1] - 61:18

**advanced** [1] - 87:15

**advancement** [1] - 70:6

**advised** [1] - 125:2

**advocacy** [2] - 16:12, 16:17

**aerial** [8] - 29:12, 30:5, 37:12, 65:17, 84:25, 85:4, 87:4,

108:18

**aerials** [2] - 98:12, 107:23

**aerosol** [1] - 88:9

**affect** [1] - 108:3

**afternoon** [2] - 24:19, 50:25

**agencies** [3] - 11:12, 49:20, 96:17

**agency** [2] - 16:16, 70:21

**ago** [1] - 19:22

**agree** [13] - 21:4, 45:15, 52:3, 52:9, 52:12, 53:17, 53:20, 53:23, 59:24, 105:9, 105:20, 125:1, 125:18

**agreement** [6] - 74:2, 125:12, 126:7, 126:8, 127:8, 127:9

**agricultural** [6] - 9:1, 9:6, 9:20, 46:24, 71:24, 72:5

**ahead** [8] - 6:24, 15:14, 30:24, 35:10, 39:9, 39:14, 101:3, 110:7

**aircraft** [1] - 64:24

**airline** [1] - 6:23

**airplane** [6] - 37:16, 64:14, 64:17, 64:22, 88:17, 88:20

**airport** [7] - 15:7, 55:5, 55:9, 58:25, 62:16, 83:15, 104:21

**Airport** [1] - 81:23

**Ajizian** [1] - 5:17

**AJIZIAN** [6] - 2:3, 2:3, 5:17, 50:17, 50:21, 85:24

**akin** [1] - 126:7

**al** [4] - 1:4, 1:7, 5:3

**allow** [7] - 24:3, 48:7, 69:3, 75:9, 76:17, 118:5, 123:21

**allowed** [1] - 57:6

**allows** [2] - 44:18, 77:19

**almost** [7] - 22:9, 25:23, 27:24, 67:12, 78:19, 80:9, 117:9

**alter** [1] - 74:2

**altered** [2] - 121:4, 121:24

**amount** [4] - 15:17, 21:7, 40:5, 120:23

**amplifying** [1] - 123:17

**analyses** [1] - 65:11

**analysis** [13] - 13:4,

15:5, 36:23, 40:20, 42:1, 65:1, 70:8, 80:3, 87:15, 89:14, 95:15, 106:5, 114:23

**analytical** [2] - 88:25, 105:22

**analyze** [2] - 36:15, 41:7

**analyzed** [1] - 117:7

**analyzes** [1] - 57:24

**angle** [2] - 32:5, 37:15

**answer** [3] - 16:22, 81:15, 125:3

**answers** [1] - 66:7

**anticipated** [1] - 73:23

**Apologies** [1] - 106:1

**apparent** [2] - 30:16, 38:6

**appeal** [1] - 125:5

**appealable** [1] - 125:5

**appear** [5] - 23:16, 39:10, 56:2, 90:24, 93:6

**appearance** [1] - 52:7

**APPEARANCES** [1] - 1:13

**appearances** [1] - 5:4

**appeared** [2] - 56:17, 77:20

**apples** [1] - 121:18

**applicable** [1] - 104:19

**application** [7] - 62:11, 78:5, 78:20, 92:4, 92:17, 102:7, 110:22

**applications** [6] - 78:13, 92:23, 109:23, 116:25, 117:5, 117:11

**applied** [11] - 20:22, 38:16, 41:2, 41:8, 76:22, 79:21, 84:16, 101:8, 101:17, 102:17, 103:1

**apply** [3] - 47:10, 69:22, 94:7

**applying** [2] - 102:24, 102:25

**appreciate** [2] - 70:10, 94:17

**appreciated** [1] - 109:11

**appropriate** [5] - 46:16, 101:18, 116:8,

118:6, 120:16

**appropriately** [1] - 122:20

**approval** [2] - 14:14, 14:24

**approved** [1] - 96:18

**approximate** [1] - 39:16

**aquatic** [1] - 79:14

**architectural** [2] - 86:11, 86:12

**Area** [1] - 17:11

**area** [129] - 17:16, 18:13, 18:20, 19:25, 20:13, 21:14, 21:20, 21:23, 22:7, 22:8, 23:22, 24:16, 24:18, 24:23, 25:5, 28:11, 28:16, 28:19, 30:21, 30:22, 31:5, 31:9, 31:24, 31:25, 32:6, 32:7, 32:10, 32:16, 33:21, 33:22, 34:7, 34:15, 35:3, 36:14, 37:11, 37:18, 37:23, 38:7, 38:14, 38:16, 38:20, 39:3, 39:11, 39:13, 39:17, 39:21, 39:22, 39:25, 40:1, 40:5, 40:20, 42:2, 42:13, 43:11, 43:12, 43:14, 43:15, 44:6, 46:18, 47:13, 47:21, 47:25, 48:18, 49:2, 51:5, 51:6, 51:18, 52:7, 52:12, 52:21, 52:24, 53:23, 54:1, 54:5, 56:15, 56:17, 56:21, 59:7, 59:12, 59:19, 63:8, 63:10, 63:12, 63:14, 64:8, 64:17, 65:12, 67:2, 67:3, 67:17, 67:21, 71:24, 78:18, 81:9, 82:9, 82:12, 83:3, 83:7, 83:10, 84:3, 84:5, 84:9, 84:12, 84:14, 84:16, 84:23, 85:1, 85:9, 95:1, 99:4, 103:1, 103:15, 104:19, 116:10, 116:19, 117:8, 118:13

**areas** [38] - 10:15, 11:20, 14:19, 21:15, 28:1, 33:6, 36:23, 40:18, 40:19, 40:22, 41:23, 42:2, 42:24, 49:17, 55:19, 55:22, 57:1, 57:3, 57:5, 60:5, 62:15, 67:3, 67:13,

77:1, 77:5, 77:18, 77:24, 83:10, 84:22, 94:7, 98:4, 107:18, 108:4, 108:16, 118:11, 118:14, 118:15

**argue** [6] - 61:9, 120:1, 126:1, 127:1, 127:7, 128:7

**arguing** [2] - 127:1, 128:10

**argument** [2] - 128:11, 128:18

**arises** [1] - 69:4

**aromatic** [1] - 79:8

**arrange** [1] - 66:12

**arrived** [1] - 25:14

**arrows** [1] - 48:1

**Arwood** [5] - 29:13, 29:24, 30:3, 37:13

**Arwood's** [1] - 66:4

**aside** [1] - 56:11, 127:5

**aspect** [1] - 48:21

**asphalt** [23] - 38:7, 38:11, 41:8, 44:13, 76:22, 83:5, 83:7, 84:4, 84:15, 84:16, 93:10, 94:4, 95:9, 95:25, 96:2, 96:3, 96:5, 96:6, 97:10, 117:19, 118:18, 122:5, 124:5

**asserted** [1] - 44:6

**assertion** [1] - 41:7

**assess** [6] - 15:9, 50:6, 56:7, 56:13, 57:4, 77:20

**assessing** [1] - 89:5

**assessments** [1] - 70:4

**assign** [1] - 101:12

**assigned** [1] - 115:17

**assist** [1] - 119:24

**ASSISTANT** [1] - 2:17

**associated** [2] - 81:7, 88:6

**assume** [1] - 50:9

**assumed** [2] - 91:11, 127:22

**assumes** [1] - 106:11

**assumption** [4] - 91:15, 96:20, 103:23, 104:1

**assumptions** [13] - 91:9, 94:9, 95:16, 97:3, 103:19, 103:22,

103:25, 111:21, 114:19, 114:20, 114:24, 115:15, 115:19

**atmosphere** [1] - 88:10

**attention** [8] - 30:15, 34:3, 37:8, 38:25, 64:2, 82:8, 84:1, 84:10

**attest** [1] - 55:6

**ATTORNEY** [1] - 2:17

**ATTORNEY'S** [2] - 2:14, 2:24

**August** [9] - 1:5, 65:15, 65:18, 65:20, 65:22, 65:24, 66:2, 66:6, 129:9

**august** [1] - 65:16

**Austrian** [1] - 19:23

**authors** [1] - 11:7

**available** [5] - 11:5, 75:18, 78:9, 86:22, 91:10

**Ave** [1] - 2:18

**Avenue** [3] - 2:4, 3:4, 129:11

**average** [5] - 22:20, 24:14, 59:4, 59:12, 104:12

**aviation** [2] - 64:23, 64:24

**avoid** [1] - 126:6

**aware** [16] - 20:21, 61:22, 62:22, 93:15, 96:5, 97:5, 100:3, 100:19, 101:19, 101:21, 101:23, 104:10, 104:15, 108:17, 108:18, 125:7

**awareness** [1] - 61:9

## B

**bachelor** [1] - 71:10

**background** [3] - 7:15, 71:9, 100:20

**backgrounds** [1] - 9:17

**bad** [3] - 67:24, 68:8, 121:13

**base** [3] - 25:23, 25:24, 95:23

**based** [30] - 12:17, 16:10, 16:12, 52:6, 53:22, 78:17, 78:25, 81:5, 81:9, 85:4, 89:18, 90:16, 91:10, 94:11, 95:13, 95:21,

96:10, 96:15, 97:8, 101:2, 101:10, 101:15, 103:23, 106:6, 107:22, 117:18, 118:16, 119:13, 125:19

**baseline** [3] - 80:18, 88:23, 89:5

**basin** [2] - 76:25, 82:20

**basins** [5] - 83:6, 84:17, 108:9, 108:11, 116:15

**basis** [2] - 96:11, 113:19, 119:19

**Bayshore** [1] - 1:15

**beautiful** [1] - 21:20

**became** [3] - 10:11, 10:13, 11:18

**beds** [1] - 33:4

**BEFORE** [1] - 1:10

**beg** [1] - 11:11

**began** [4] - 9:23, 27:22, 63:20, 64:20

**begin** [1] - 127:11

**beginning** [1] - 56:6

**behalf** [7] - 5:10, 5:14, 5:18, 5:22, 5:24, 6:3, 6:6

**belong** [1] - 22:25

**below** [1] - 59:7

**benefit** [1] - 16:18

**Bennett** [1] - 5:14

**BENNETT** [2] - 1:21, 5:13

**best** [11] - 11:4, 52:13, 55:25, 89:24, 90:1, 90:12, 93:1, 94:12, 97:3, 106:2, 119:11

**better** [4] - 23:10, 68:16, 82:22, 108:6

**between** [16] - 17:17, 19:14, 31:3, 32:5, 32:16, 34:13, 59:20, 60:1, 81:10, 87:12, 101:10, 101:22, 106:14, 106:17, 114:18, 118:15

**bidirectional** [4] - 48:6, 48:15, 48:21, 48:23

**Big** [21] - 16:7, 17:10, 17:12, 17:14, 17:20, 17:22, 18:22, 19:25, 20:18, 20:22, 21:18, 25:4, 25:8, 36:4, 36:6, 46:13, 46:22, 47:11, 48:17, 48:20, 59:11

**big** [7] - 12:7, 16:15, 25:7, 48:17, 48:19, 55:9, 64:24

**bigger** [2] - 49:15, 117:10

**billion** [3] - 15:19, 15:20, 47:6

**Biological** [1] - 5:14

**BIOLOGICAL** [1] - 1:22

**birthday** [1] - 30:2

**Biscayne** [1] - 1:19

**bit** [13] - 12:5, 17:12, 30:22, 32:17, 36:1, 39:11, 40:14, 43:11, 57:8, 82:24, 93:20, 94:15

**blindly** [1] - 103:12

**blocked** [2] - 38:3, 58:19

**blow** [2] - 44:23, 118:10

**blue** [7] - 25:24, 26:4, 32:21, 47:19, 47:21, 61:1, 64:11

**blurry** [1] - 63:5

**board** [5] - 15:24, 15:25, 60:15, 61:13, 96:14

**boardwalk** [1] - 20:11

**Boies** [1] - 125:22

**BOIES** [1] - 2:9

**book** [8] - 10:11, 10:17, 10:18, 11:6, 11:10, 11:17, 22:15, 22:20

**boots** [1] - 19:23

**border** [1] - 17:17

**boring** [9] - 42:12, 43:19, 77:14, 77:16, 77:22, 87:10, 87:13, 87:15, 98:22

**borings** [13] - 42:12, 42:23, 42:24, 43:8, 43:9, 43:21, 43:23, 44:4, 44:6, 52:6, 53:22, 70:6, 77:20

**bottom** [7] - 17:16, 19:18, 31:16, 40:13, 42:15, 55:14, 118:11

**Boulevard** [2] - 1:19, 2:10

**boundaries** [1] - 80:16

**boundary** [1] - 19:14

**Box** [2] - 1:22, 2:25

**Braunschweig** [1] - 9:15

**break** [5] - 94:14,

119:8, 119:12, 128:7, 128:16

**Brickell** [1] - 2:4

**bridges** [1] - 48:11

**brief** [2] - 63:7, 111:15

**briefly** [1] - 31:8

**bright** [2] - 30:21, 37:22

**bring** [2] - 92:14, 109:10

**bringing** [1] - 75:5

**broad** [2] - 7:15

**broadly** [1] - 15:9

**broken** [1] - 123:8

**brought** [3] - 126:20, 127:18, 127:20

**build** [1] - 115:23

**building** [3] - 49:20, 123:7, 123:17

**buildings** [2] - 39:8, 39:9

**built** [2] - 118:17, 118:18

**bullets** [1] - 57:19

**Burkhardt** [1] - 5:11

**BURKHARDT** [1] - 1:18

**BURLINGTON** [1] - 1:15

**burning** [1] - 110:13

**Burns** [2] - 20:2, 20:3

**business** [1] - 123:9

**BY** [69] - 3:1, 4:4, 4:4, 4:6, 4:7, 4:7, 7:10, 8:2, 9:2, 13:14, 14:9, 15:16, 17:18, 18:15, 22:11, 23:8, 24:5, 25:19, 26:25, 27:16, 28:22, 29:4, 29:21, 35:2, 36:5, 36:20, 37:7, 40:4, 41:5, 41:17, 42:6, 43:7, 45:18, 46:10, 50:24, 51:12, 52:2, 52:20, 53:16, 54:14, 55:2, 62:3, 63:25, 67:1, 69:16, 70:14, 73:13, 74:7, 75:12, 76:8, 76:19, 82:7, 82:15, 83:25, 85:13, 86:2, 89:19, 91:24, 92:13, 98:21, 101:5, 101:25, 106:3, 109:2, 109:21, 111:14, 113:16, 115:7, 116:6

**bypassed** [1] - 125:24

## C

**CAD** [4] - 72:10, 91:1, 96:24, 107:8
**cafe** [1] - 7:24
**calculate** [4] - 38:16, 40:5, 68:6, 79:20
**calculated** [3] - 94:6, 104:7, 117:13
**calendar** [1] - 127:21
**camp** [3] - 18:19, 19:25, 20:11
**camped** [1] - 20:2
**campground** [2] - 20:1, 20:2
**camping** [1] - 20:15
**camps** [1] - 18:22
**canal** [2] - 47:21, 47:22
**cannot** [1] - 125:18
**capacity** [4] - 12:2, 33:3, 33:7, 44:20
**capture** [7] - 79:5, 79:17, 80:25, 84:18, 84:21, 105:14, 118:1
**car** [1] - 26:1
**carcinogens** [1] - 79:14
**care** [1] - 122:20
**careful** [1] - 64:2
**CARLOS** [1] - 2:14
**Carlos** [1] - 6:17
**carrying** [1] - 125:18
**case** [27] - 5:2, 15:4, 15:21, 16:19, 25:16, 29:10, 46:13, 48:8, 51:14, 54:16, 56:25, 57:22, 60:24, 62:11, 65:19, 71:7, 75:4, 75:22, 80:15, 86:4, 86:16, 115:15, 120:1, 120:25, 121:19, 125:19, 126:22
**CASE** [1] - 1:2
**case-in-chief** [1] - 126:22
**cases** [1] - 44:1
**catch** [1] - 111:9
**catchy** [1] - 10:19
**caution** [1] - 69:5
**caving** [1] - 99:6
**cement** [10] - 15:6, 37:23, 41:8, 41:23, 42:4, 44:7, 51:15, 58:9, 77:15, 77:24
**cemented** [2] - 99:5, 99:9, 99:13
**Center** [1] - 5:14
**CENTER** [1] - 1:22
**center** [11] - 24:17,

27:23, 28:6, 28:13, 30:22, 36:16, 49:21, 74:12, 93:17, 118:13, 123:3
**central** [1] - 16:9
**CERP** [7] - 14:12, 14:13, 14:20, 14:25, 45:22, 49:5, 57:10
**certain** [2] - 93:5, 111:21
**certainly** [8] - 21:20, 24:9, 25:24, 53:25, 60:2, 63:18, 64:15, 106:8
**certification** [2] - 20:23, 20:24
**certify** [1] - 129:3
**chain** [1] - 12:25
**chance** [2] - 93:13, 127:6
**change** [6] - 75:2, 106:5, 106:15, 106:16, 106:17, 123:1
**changed** [3] - 93:4, 107:3, 107:11
**changes** [2] - 59:4, 72:5
**changing** [1] - 75:14
**Channel** [1] - 114:13
**channel** [1] - 90:19
**chapter** [1] - 20:20
**Chapter** [2] - 71:2
**characteristic** [1] - 25:8
**characterize** [1] - 101:18
**characterized** [2] - 35:19, 59:15
**chart** [1] - 110:2
**check** [3] - 19:15, 25:13, 42:14
**chemical** [1] - 70:7
**chemistry** [2] - 71:24, 72:6
**chief** [1] - 126:22
**choice** [1] - 128:4
**choose** [2] - 92:22, 103:5
**choosing** [1] - 103:18
**chose** [3] - 96:9, 96:14, 99:15
**CHRIS** [1] - 4:3
**Chris** [3] - 5:17, 7:1, 74:9
**CHRISTOPHER** [3] - 2:3, 2:3, 7:7
**Christopher** [2] - 7:2, 7:6
**circle** [3] - 18:8,

30:23, 39:9
**CISRERP** [1] - 12:13
**civil** [8] - 111:21, 111:24, 112:6, 112:9, 112:12, 113:3, 113:17, 113:19
**claim** [1] - 75:5
**clarify** [2] - 113:2, 114:2
**clarifying** [1] - 124:2
**clarity** [3] - 112:22, 113:3, 114:6
**clays** [1] - 95:7
**clean** [2] - 36:10, 47:7
**cleaning** [1] - 123:18
**clear** [7] - 25:7, 27:9, 40:11, 47:18, 55:8, 67:2, 83:1
**cleared** [4] - 39:5, 56:19, 56:21, 127:21
**clearly** [8] - 38:23, 47:8, 52:7, 55:22, 55:24, 56:21, 61:8, 61:25
**client** [4] - 122:18, 124:25, 125:1, 125:2
**clients** [1] - 127:12
**close** [1] - 19:10
**closely** [1] - 48:1
**CN** [26] - 93:24, 94:17, 95:5, 95:9, 97:4, 97:13, 97:14, 97:15, 97:24, 98:15, 99:9, 99:19, 100:3, 101:6, 101:9, 101:15, 102:2, 103:24, 104:7, 106:15, 106:19, 115:2, 115:3, 115:24, 117:16
**co** [2] - 50:16, 85:23
**co-counsel** [1] - 85:23
**co-plaintiffs** [1] - 50:16
**code** [1] - 71:3
**coded** [1] - 96:19
**COFFEY** [1] - 1:15
**cohesive** [1] - 79:1
**colleague** [1] - 124:20
**collect** [3] - 87:24, 88:24, 89:13
**collected** [3] - 72:7, 72:17, 87:14
**collecting** [1] - 89:1
**collection** [2] - 70:7, 105:22
**Collier** [6] - 17:17, 18:16, 62:23, 64:5,

64:11, 81:23
**coloration** [1] - 38:9
**combustion** [1] - 88:8
**coming** [10] - 10:1, 20:10, 21:21, 31:2, 32:23, 56:16, 120:10, 120:19, 123:6, 123:23
**commander** [11] - 25:14, 26:13, 26:17, 27:1, 27:18, 31:18, 32:22, 33:14, 39:24, 40:21, 62:1
**commander's** [1] - 26:2
**commenced** [2] - 24:17, 36:17
**comment** [1] - 29:17
**comments** [2] - 89:18, 113:4
**commit** [1] - 21:2
**committed** [1] - 16:12
**committee** [1] - 12:10
**Committee** [1] - 12:11
**common** [1] - 116:19
**commonly** [1] - 100:1
**communicate** [2] - 112:9, 112:12
**communicated** [1] - 112:16
**communications** [1] - 113:11
**compacted** [2] - 97:16, 97:17
**compactor** [1] - 68:1
**company** [2] - 70:2, 112:4
**compare** [4] - 32:21, 37:16, 80:17, 117:7
**comparing** [1] - 38:4
**compendium** [1] - 11:14
**compensating** [1] - 16:19
**competing** [1] - 121:3
**complaint** [1] - 60:24
**complete** [2] - 72:25, 91:9
**completed** [7] - 80:1, 92:25, 96:17, 101:13, 114:9, 114:22, 115:10
**completely** [1] - 56:17
**completeness** [1] - 53:10

**completing** [4] - 71:13, 95:22, 96:10, 115:5
**completion** [1] - 103:16
**compliance** [1] - 21:5
**compliant** [1] - 20:23
**components** [4] - 10:22, 16:14, 76:1, 99:13
**compounds** [1] - 9:22
**Comprehensive** [3] - 14:10, 15:18, 45:23
**comprehensive** [2] - 90:25, 107:9
**computation** [1] - 95:15
**computer** [3] - 91:2, 96:25, 114:10
**con** [1] - 7:24
**concentrated** [2] - 36:13, 49:14
**concentrations** [1] - 72:9
**concept** [1] - 47:11
**concern** [7] - 49:15, 67:7, 67:11, 67:12, 79:7, 79:12, 121:25
**concerned** [1] - 120:24
**concerns** [2] - 76:21, 84:14
**conclude** [3] - 40:7, 42:1, 116:7
**concluded** [2] - 41:1, 78:1
**conclusion** [14] - 38:21, 38:22, 42:3, 43:19, 45:15, 67:3, 67:7, 74:15, 77:11, 78:3, 78:22, 79:23, 81:2, 81:4
**conclusions** [7] - 15:10, 38:4, 50:3, 67:2, 67:21, 77:9, 84:7
**concrete** [5] - 15:7, 64:17, 102:16, 102:17, 102:19
**concurred** [2] - 77:14, 95:18
**condition** [1] - 80:17
**conditions** [7] - 65:14, 80:4, 80:5, 89:7, 96:22, 104:12, 106:9
**conduct** [4] - 57:4, 65:11, 70:21, 87:23

conducted [1] - 43:9
confer [3] - 103:8, 124:25, 125:2
conference [1] - 121:15
confirm [2] - 85:1, 94:11
confirmed [2] - 81:13, 105:22
confused [1] - 8:21
congratulations [1] - 72:14
connect [2] - 43:22, 55:4
connected [6] - 59:13, 59:18, 59:19, 59:21, 59:22, 65:7
connection [3] - 28:6, 59:8, 59:22
connections [1] - 32:5
connectivity [1] - 81:9
conscientious [1] - 30:4
conservative [5] - 80:12, 91:15, 91:17, 92:1, 116:15
consider [3] - 102:25, 103:2, 128:8
consistent [2] - 38:10, 39:23
constructed [3] - 20:6, 74:13, 85:3
construction [39] - 24:17, 32:1, 32:7, 36:17, 39:5, 39:8, 39:12, 41:25, 42:11, 44:3, 52:6, 54:3, 58:21, 60:10, 63:20, 64:20, 74:24, 75:17, 78:8, 78:13, 78:16, 104:24, 108:16, 120:15, 120:18, 120:24, 122:10, 122:11, 123:11, 123:16, 123:19, 123:22, 123:24, 124:6, 124:7, 124:23, 127:24
consulting [5] - 12:4, 12:5, 12:6, 12:7, 70:2
contact [2] - 61:18, 66:11
contacted [1] - 61:14
containment [2] - 90:3, 90:9
contaminants [3] - 49:16, 79:3, 79:7
contaminate [1] -

84:22
contamination [4] - 70:9, 71:5, 81:14, 87:19
content [1] - 112:20
context [8] - 27:11, 65:10, 87:19, 96:11, 96:12, 104:3, 115:21, 115:24
continual [1] - 31:23
continue [6] - 34:2, 121:8, 126:4, 126:16, 126:21, 127:24
continued [1] - 11:16
continues [1] - 121:10
continuous [4] - 35:23, 36:9, 58:13, 58:16
contractor [1] - 61:24
control [1] - 48:6
convenience [1] - 47:15
convenient [1] - 19:9
cooked [1] - 20:10
copies [1] - 113:10
copy [1] - 10:17, 13:15, 22:15
Corn [1] - 19:15
Cornell [2] - 8:5, 8:14
corner [2] - 11:11, 29:23
Correct [3] - 86:9, 94:23, 102:4
correct [85] - 17:21, 17:23, 18:18, 24:6, 31:14, 32:11, 36:25, 38:15, 48:22, 52:25, 53:22, 54:1, 55:7, 57:23, 58:1, 58:3, 58:6, 60:17, 61:21, 63:9, 63:21, 63:22, 64:10, 64:18, 64:21, 67:3, 67:6, 67:22, 72:21, 72:22, 81:3, 85:4, 86:18, 87:7, 89:20, 90:3, 90:15, 90:21, 91:13, 91:16, 92:2, 92:5, 92:6, 92:15, 92:16, 92:17, 92:18, 93:18, 94:24, 95:2, 95:10, 95:11, 96:13, 96:20, 97:23, 98:3, 98:7, 101:7, 102:8, 102:9, 102:15, 104:23, 105:1, 105:11, 106:10, 106:13, 106:24,

107:2, 107:13, 107:18, 108:12, 109:24, 109:25, 111:22, 111:23, 113:1, 115:3, 115:15, 116:24, 117:3, 125:11, 125:13, 125:14, 126:10
Costa [1] - 8:10
Costello [2] - 6:8, 51:3
COSTELLO [39] - 2:9, 4:4, 6:7, 14:5, 15:2, 18:2, 23:14, 23:24, 26:21, 27:4, 27:14, 28:18, 29:19, 35:6, 35:9, 37:4, 41:14, 43:3, 46:6, 49:25, 50:8, 50:19, 50:24, 51:12, 51:20, 52:2, 52:20, 53:8, 53:12, 53:16, 54:14, 54:18, 54:22, 55:2, 62:3, 63:23, 63:25, 66:17, 66:19
Counsel [3] - 66:15, 89:17, 100:10
counsel [12] - 5:4, 57:13, 66:11, 66:12, 85:23, 86:16, 119:1, 119:3, 126:23, 128:17
country [2] - 12:14, 35:13
county [1] - 64:3
COUNTY [2] - 2:23, 2:24
County [10] - 6:20, 18:16, 18:17, 24:8, 24:9, 62:23, 64:6, 64:11, 70:22, 71:3
County's [1] - 70:19
couple [2] - 43:13, 86:3
course [10] - 23:24, 63:24, 69:4, 73:7, 92:5, 114:4, 122:4, 122:25, 125:16, 126:15
coursework [1] - 73:1
COURT [138] - 1:1, 5:8, 5:12, 5:16, 5:20, 6:1, 6:4, 6:9, 6:14, 6:21, 7:20, 8:1, 8:21, 8:22, 8:23, 13:10, 13:12, 13:13, 14:4, 14:6, 15:12, 17:4, 17:7, 17:25, 18:5, 18:10, 22:22, 23:5, 23:7, 23:13, 23:19,

24:2, 26:20, 26:22, 27:5, 27:8, 27:15, 28:20, 29:1, 29:3, 29:18, 34:25, 35:8, 35:10, 37:3, 37:5, 41:13, 41:15, 43:2, 43:4, 46:5, 46:7, 49:24, 50:7, 50:11, 50:14, 50:16, 50:18, 51:21, 51:24, 53:5, 53:13, 54:20, 54:25, 63:24, 66:15, 66:18, 66:20, 66:24, 68:10, 68:12, 68:16, 68:20, 69:2, 69:8, 70:11, 70:13, 73:21, 74:1, 74:5, 75:6, 75:9, 76:17, 82:3, 82:5, 82:14, 83:21, 83:23, 85:11, 85:20, 85:23, 85:25, 89:17, 92:8, 92:10, 98:20, 100:9, 100:16, 100:19, 100:24, 101:19, 101:24, 105:25, 109:5, 109:12, 109:14, 109:18, 111:3, 111:6, 111:8, 111:10, 111:12, 113:12, 115:2, 116:3, 118:23, 119:8, 119:20, 120:4, 120:6, 121:1, 121:13, 121:17, 122:4, 122:11, 122:22, 123:5, 123:15, 124:9, 124:11, 124:13, 125:7, 125:11, 125:20, 126:15, 127:9, 128:16, 128:19
court [5] - 7:5, 7:25, 69:12, 100:9, 126:20
Court [10] - 3:3, 3:3, 5:1, 10:4, 50:12, 71:9, 127:2, 127:17, 129:10, 129:10
courthouse [3] - 123:4, 123:6, 123:10
COURTROOM [5] - 5:2, 7:3, 7:8, 69:9, 69:11
create [5] - 67:14, 88:23, 90:25, 91:3, 95:14
created [1] - 72:4
creates [1] - 101:9
credentials [1] - 13:19
criteria [1] - 47:10
crops [1] - 46:25

Cross [1] - 8:20
CROSS [4] - 4:2, 50:23, 86:1, 111:13
cross [11] - 8:22, 18:13, 32:5, 50:4, 50:5, 50:18, 85:25, 111:7, 111:20, 126:1, 127:25
cross-examination [3] - 50:18, 85:25, 111:20
CROSS-EXAMINATION [3] - 50:23, 86:1, 111:13
cross-examine [1] - 126:1
cross-shaded [1] - 18:13
Cross-talk [1] - 8:20
cross-talk [1] - 8:22
crossing [1] - 50:20
crown [1] - 118:18
cubic [3] - 80:8, 104:22, 104:25
culverts [5] - 48:2, 48:7, 48:10, 48:11, 48:23
current [1] - 23:1
curve [9] - 93:25, 94:1, 94:3, 94:4, 94:8, 102:12, 103:5, 104:11, 104:16
curved [1] - 28:8
curves [1] - 31:16
CV [2] - 13:17, 113:12
cypress [2] - 30:14, 31:3
Cypress [23] - 16:7, 17:10, 17:13, 17:14, 17:20, 17:22, 18:22, 19:25, 20:18, 20:22, 21:18, 25:5, 25:7, 25:8, 36:4, 36:6, 46:13, 46:23, 47:11, 48:17, 48:20, 59:11

**D**

Dade [7] - 6:20, 18:17, 64:5, 70:19, 70:22, 71:3, 81:23
DADE [2] - 2:23, 2:24
Dade-Collier [1] - 81:23
daily [2] - 95:23, 113:19
damaging [2] - 79:14, 81:11
Dance [1] - 19:15

**DANTE** [1] - 2:8
**Dante** [2] - 6:5, 99:19
**dark** [10] - 20:16, 20:19, 20:23, 20:25, 21:1, 21:5, 21:10, 21:16, 38:9, 54:5
**Dark** [1] - 20:20
**darker** [2] - 30:13, 32:8
**data** [13] - 26:7, 65:20, 65:22, 65:24, 65:25, 66:2, 89:2, 89:3, 91:10, 101:14, 112:6, 116:22
**database** [1] - 75:22
**date** [11] - 14:25, 15:1, 42:15, 60:20, 60:25, 61:8, 81:24, 81:25, 83:16, 110:25, 112:23
**DATE** [1] - 129:9
**dated** [4] - 42:22, 66:10, 74:9, 85:2
**Daubert** [1] - 69:1
**Dave** [1] - 6:19
**DAVID** [2] - 2:9, 2:24
**David** [2] - 6:7, 51:3
**days** [2] - 105:2, 121:5
**DC** [2] - 2:19, 2:21
**de** [1] - 24:2
**de-link** [1] - 24:2
**deal** [1] - 7:16
**decades** [1] - 65:4
**decided** [1] - 48:13
**declaration** [5] - 51:13, 54:15, 54:21, 54:22, 56:24
**declarations** [1] - 15:5
**decrease** [3] - 88:15, 89:9, 89:11
**decreases** [1] - 104:14
**Defendant** [1] - 6:6
**defendant** [1] - 126:12
**DEFENDANT** [2] - 2:6, 2:23
**defendants** [3] - 1:8, 66:21, 113:14
**Defendants** [8] - 6:11, 6:13, 6:16, 6:18, 66:22, 111:6, 119:2, 120:14
**DEFENDANTS** [1] - 2:12
**Defendants'** [4] - 51:8, 51:21, 51:24, 98:18

**defendants'** [1] - 127:10
**DEFENSE** [1] - 4:23
**Defense** [2] - 51:10, 52:1
**definitely** [1] - 49:22
**definition** [1] - 67:9
**degraded** [2] - 56:5, 96:3
**degree** [4] - 8:3, 56:3, 71:12, 81:18
**delaminated** [1] - 19:23
**delayed** [2] - 119:7, 121:22
**delta** [2] - 106:14, 106:23
**delve** [1] - 127:11
**delved** [1] - 69:5
**demonstrated** [2] - 47:9, 127:4
**denoted** [1] - 83:5
**density** [2] - 21:15, 21:16
**DEPARTMENT** [2] - 2:18, 2:20
**Department** [5] - 5:25, 9:15, 41:21, 70:19, 111:17
**depict** [2] - 55:22, 76:24
**depicted** [7] - 17:19, 18:20, 19:11, 21:23, 82:19, 84:5, 85:1
**depicting** [1] - 110:20
**depiction** [1] - 110:16
**depicts** [3] - 51:18, 76:25, 84:4
**depressions** [1] - 80:21
**DEPUTY** [5] - 5:2, 7:3, 7:8, 69:9, 69:11
**DERM** [3] - 70:20, 70:22, 70:25
**describe** [2] - 51:6, 104:11
**describes** [1] - 10:14
**description** [1] - 13:25
**design** [2] - 48:5, 104:12
**designated** [2] - 20:19, 128:17
**designed** [3] - 79:2, 80:13, 118:7
**designer** [2] - 11:2, 11:3
**designing** [1] - 80:2

**designs** [1] - 115:21
**despite** [1] - 127:8
**detain** [1] - 67:16
**detainee** [1] - 33:25
**detainees** [1] - 33:4
**detect** [1] - 31:15
**detected** [1] - 42:2
**detention** [14] - 24:17, 27:23, 28:6, 28:13, 36:16, 49:21, 62:18, 63:20, 74:12, 93:17, 108:9, 122:3, 122:18, 123:3
**determine** [8] - 52:13, 70:8, 71:4, 72:8, 77:23, 81:17, 81:18, 105:20
**development** [2] - 14:14, 76:25
**Development** [1] - 14:15
**dewater** [1] - 45:6
**diagram** [1] - 40:18
**diagrams** [1] - 22:16
**DIAZ** [2] - 3:2, 129:9
**Diaz** [1] - 129:9
**difference** [1] - 89:5
**differences** [1] - 72:9
**different** [17] - 10:22, 12:2, 12:5, 14:18, 16:14, 21:21, 22:19, 24:14, 35:18, 43:22, 45:11, 75:25, 80:5, 97:15, 97:24, 98:15
**difficult** [2] - 45:6, 48:12
**digest** [1] - 112:18
**dignitaries** [1] - 34:7
**Dillon** [3] - 68:22, 69:10, 69:13
**DILLON** [2] - 4:5, 69:14
**dinner** [1] - 20:11
**direct** [8] - 37:8, 57:15, 68:18, 82:8, 84:1, 84:10, 94:25, 108:7
**DIRECT** [3] - 4:2, 7:9, 69:15
**direction** [1] - 49:7
**directions** [2] - 24:14, 24:15
**directives** [1] - 104:10
**directly** [1] - 49:12
**Director** [3] - 5:24, 6:3, 6:8
**dirt** [9] - 56:6, 97:14, 97:16, 99:16, 99:17, 101:6, 101:10,

101:22, 103:24
**disappears** [2] - 31:8, 31:25
**discharge** [8] - 77:4, 80:7, 104:21, 106:17, 107:2, 107:13, 108:10, 108:11
**disciplines** [1] - 12:14
**disclosed** [3] - 100:7, 100:14, 121:16
**disclosure** [4] - 76:12, 100:15, 119:17
**disconnected** [1] - 58:25
**disconnects** [1] - 36:1
**discuss** [1] - 121:8
**discussed** [1] - 68:17
**discussing** [1] - 121:19
**discussions** [1] - 14:17
**dissertation** [1] - 8:16
**distinct** [2] - 32:7, 44:8
**distinction** [1] - 87:12
**distinguish** [1] - 35:21
**distribution** [1] - 46:17
**District** [7] - 3:3, 10:9, 11:19, 12:3, 74:20, 75:22, 129:10
**DISTRICT** [3] - 1:1, 1:1, 1:11
**district** [2] - 67:13, 75:23
**disturbed** [1] - 52:17
**disturbs** [2] - 47:3, 47:9
**Diversity** [1] - 5:14
**DIVERSITY** [1] - 1:22
**DIVISION** [1] - 1:2
**Division** [1] - 42:18
**doable** [1] - 126:2
**doc** [1] - 9:14
**Docket** [2] - 60:22, 126:8
**doctor** [5] - 7:20, 23:20, 25:15, 25:16, 27:6
**Doctor** [3] - 15:14, 35:10, 68:10
**doctoral** [2] - 9:13, 9:18
**doctorate** [3] - 8:13,

8:14, 9:12
**document** [13] - 23:16, 26:11, 30:3, 73:22, 98:22, 99:21, 100:21, 100:25, 101:2, 101:9, 101:20, 103:3
**documented** [1] - 76:3
**documents** [2] - 105:13, 115:10
**dollar** [1] - 12:16
**Dominic** [1] - 5:11
**DOMINIQUE** [1] - 1:18
**done** [8] - 13:23, 21:5, 42:13, 62:13, 68:8, 86:4, 96:16, 97:9
**Donut** [1] - 72:1, 72:7, 72:8
**double** [2] - 90:2, 90:7
**down** [28] - 7:20, 17:15, 26:16, 31:19, 32:3, 34:8, 34:10, 44:19, 44:25, 45:1, 57:17, 57:18, 62:5, 68:10, 70:11, 80:24, 88:11, 89:17, 93:11, 94:14, 100:12, 100:17, 105:15, 105:25, 118:20, 118:25, 122:9
**downwards** [1] - 21:6
**dozen** [1] - 112:18
**Dr** [50] - 7:1, 7:6, 7:11, 14:10, 15:4, 17:2, 18:4, 22:14, 23:15, 23:17, 23:25, 24:6, 25:14, 25:22, 27:3, 27:17, 28:15, 29:17, 29:24, 36:15, 37:10, 39:2, 41:18, 42:9, 45:20, 50:3, 50:25, 51:17, 52:3, 54:7, 54:11, 55:16, 57:21, 60:3, 60:14, 60:23, 61:14, 61:19, 61:22, 62:6, 62:20, 63:6, 64:1, 74:9, 77:13, 82:23, 98:1, 118:12
**dragging** [1] - 21:21
**drain** [1] - 116:12
**drainage** [4] - 31:10, 87:20, 87:22, 106:4
**Drainage** [1] - 10:21
**drastically** [1] - 47:4

**draw** [11] - 30:15, 32:25, 34:3, 38:4, 38:19, 38:25, 43:18, 82:13, 82:22, 84:7, 87:12

**drawing** [2] - 83:5, 110:18

**drawings** [15] - 42:11, 42:12, 42:25, 86:12, 86:13, 86:15, 87:1, 90:24, 91:5, 94:11, 96:24, 107:8, 112:8, 114:21

**Drive** [1] - 1:15

**driving** [2] - 14:17, 68:1

**dry** [9] - 35:17, 35:25, 59:8, 82:20, 83:6, 83:10, 84:5, 84:17, 85:1

**dual** [1] - 23:20

**due** [1] - 45:6

**duly** [2] - 7:2, 69:10

**during** [8] - 14:14, 26:12, 59:13, 69:4, 72:17, 73:7, 74:23, 108:16

## E

**e-mail** [1] - 41:21

**early** [1] - 39:13

**Earth** [10] - 26:8, 37:14, 37:15, 37:17, 38:18, 39:4, 39:19, 40:6, 51:22, 56:1

**EarthJustice** [1] - 5:10

**EARTHJUSTICE** [1] - 1:18

**easily** [4] - 45:14, 118:4, 123:5, 123:9

**East** [1] - 2:10

**east** [17] - 24:7, 24:10, 25:2, 28:8, 30:23, 33:10, 33:24, 34:10, 34:11, 34:17, 34:20, 40:20, 43:13, 48:4, 48:19, 62:25, 64:7

**Easy** [1] - 62:11

**ecologist** [2] - 7:12, 7:14

**Ecology** [1] - 9:16

**ecology** [2] - 8:5, 11:3

**ecosystem** [3] - 46:25, 47:4, 64:13

**educational** [2] - 71:9, 73:18

**effect** [3] - 105:5, 105:10, 105:16

**effectively** [2] - 50:4, 116:12

**effects** [2] - 49:20, 60:6

**efficient** [1] - 80:14

**effort** [6] - 23:25, 26:11, 27:3, 76:2, 77:8, 79:20

**efforts** [1] - 127:24

**eight** [2] - 110:1, 114:18

**either** [5] - 33:25, 34:7, 49:16, 90:2, 117:20

**electronic** [2] - 109:8, 112:9

**elevation** [1] - 59:4

**Eleven** [1] - 67:23

**ELISE** [1] - 1:21

**Elise** [1] - 5:13

**emergency** [2] - 81:22, 83:14

**Emergency** [3] - 5:25, 41:22, 42:19

**empirical** [1] - 88:25

**empirically** [3] - 81:12, 81:17, 105:21

**employed** [5] - 11:18, 69:25, 70:1, 70:23, 86:7

**employee** [3] - 61:22, 61:24, 70:18

**employees** [7] - 27:12, 27:21, 27:25, 28:12, 28:14, 28:24, 34:8

**employment** [1] - 12:24

**encircled** [1] - 58:24

**encountered** [2] - 77:21, 99:4

**end** [6] - 34:11, 34:17, 34:18, 62:25, 64:7, 109:6

**endless** [1] - 34:6

**enforcement** [2] - 125:17, 125:20

**engage** [1] - 113:21

**engaged** [2] - 112:21, 112:22

**engaging** [1] - 70:23

**engineer** [14] - 73:8, 95:13, 96:8, 101:13, 103:8, 111:21, 111:24, 112:3, 112:6, 112:9, 112:13, 113:4, 113:18, 116:20

**engineer's** [1] - 97:9

**engineering** [17] - 12:4, 77:2, 81:22, 82:11, 84:13, 85:16, 86:12, 86:13, 86:15, 87:1, 90:24, 91:1, 94:11, 96:24, 103:16, 115:10, 115:16

**engineers** [2] - 113:19, 113:22, 119:24

**Engineers** [5] - 70:1, 70:3, 70:18, 70:24, 112:4

**enjoined** [1] - 126:12

**enjoy** [1] - 23:22

**entail** [1] - 72:23

**enter** [2] - 120:17, 127:3

**entering** [1] - 22:5

**entertained** [1] - 127:7

**entire** [2] - 53:11, 86:17

**entirely** [1] - 119:16

**entirety** [1] - 62:22

**entitled** [1] - 129:5

**entitlement** [1] - 127:4

**entrance** [6] - 25:1, 26:1, 32:24, 55:7, 55:10, 56:15

**Entry** [2] - 60:22, 126:8

**environment** [8] - 16:3, 16:7, 59:1, 69:24, 79:4, 81:6, 92:24, 105:6

**Environmental** [4] - 12:21, 13:2, 49:19, 70:20

**environmental** [6] - 70:1, 71:12, 74:19, 75:13, 76:21, 105:10

**environments** [1] - 116:14

**envisioned** [1] - 10:13

**equally** [1] - 96:2

**equipment** [1] - 99:6

**equities** [1] - 124:3

**erase** [1] - 22:23

**erected** [1] - 60:3

**erecting** [1] - 123:16

**erection** [1] - 122:6

**erosion** [1] - 60:9

**ERP** [5] - 74:19, 74:22, 75:18, 75:20, 76:1, 76:2, 78:5, 78:10, 78:12, 78:20, 108:20, 117:22

**Eskamani** [1] - 97:21

**especially** [2] - 118:3, 127:24

**ESQ** [17] - 1:14, 1:17, 1:18, 1:21, 1:21, 2:2, 2:3, 2:3, 2:7, 2:8, 2:8, 2:9, 2:14, 2:16, 2:17, 2:20, 2:24

**essential** [1] - 84:3

**essentially** [17] - 72:4, 73:3, 73:6, 74:23, 75:1, 77:1, 77:3, 77:13, 78:5, 78:18, 80:1, 80:3, 84:8, 91:4, 94:2, 99:16, 105:4

**estimate** [5] - 40:25, 68:6, 92:1, 93:1, 104:24

**et** [4] - 1:4, 1:7, 5:3

**eternity** [1] - 128:2

**evaluate** [1] - 71:3, 72:4, 74:11, 76:21, 77:4, 81:13, 87:16, 87:21, 96:21, 101:1, 115:11

**evaluated** [2] - 72:6, 107:7

**evaluating** [1] - 89:7

**evaluation** [2] - 78:17, 78:18

**Evan** [1] - 6:2

**EVAN** [1] - 2:8

**evapotranspiration** [1] - 71:23

**evening** [2] - 20:10, 100:14

**event** [10] - 80:10, 80:11, 80:12, 104:13, 104:18, 107:25, 116:8, 116:16, 118:3, 125:6

**events** [3] - 92:2, 92:3, 117:1

**eventually** [6] - 10:11, 11:18, 20:22, 25:13, 31:20, 88:10

**EVERGLADES** [1] - 1:4

**Everglades** [55] - 5:3, 5:10, 9:24, 10:1, 10:3, 10:4, 10:12, 10:15, 10:21, 11:13, 11:16, 11:23, 11:25, 12:5, 12:12, 12:15, 14:11, 15:9, 15:18, 15:22, 16:5, 16:7, 16:10, 16:11, 16:24, 22:21, 24:20, 36:3, 36:4, 45:21, 45:23,

46:11, 46:12, 46:14, 46:16, 46:22, 47:4, 47:13, 47:24, 48:18, 48:19, 57:9, 57:11, 59:1, 60:16, 60:18, 61:7, 61:12, 64:13, 65:5, 71:25, 72:16, 72:18, 81:11, 112:21

**Everglades'** [2] - 60:23, 66:11

**Everglades-related** [1] - 12:5

**evidence** [35] - 14:8, 18:7, 21:24, 24:4, 26:24, 29:20, 37:6, 41:16, 42:3, 43:6, 46:9, 52:1, 53:4, 53:15, 54:19, 55:1, 74:6, 76:18, 77:15, 82:6, 83:24, 85:21, 92:7, 92:12, 98:19, 100:12, 100:17, 100:22, 109:14, 109:20, 118:9, 119:23, 125:25, 127:23, 128:6

**evident** [1] - 77:16

**exact** [4] - 12:10, 60:20, 97:1, 103:7

**exactly** [5] - 62:25, 63:1, 64:9, 65:16, 73:23

**examination** [6] - 50:18, 71:15, 73:2, 73:6, 85:25, 111:20

**EXAMINATION** [8] - 4:1, 7:9, 50:23, 66:25, 69:15, 86:1, 111:13, 116:5

**examinations** [1] - 73:2

**examine** [7] - 65:16, 87:20, 88:17, 88:20, 90:5, 105:5, 126:1

**examined** [1] - 65:14

**example** [1] - 122:18

**examples** [1] - 96:16

**excavate** [1] - 99:7

**excavating** [1] - 126:14

**excavation** [1] - 99:8

**except** [2] - 31:24, 39:3

**exchanged** [1] - 112:11

**exclude** [1] - 119:19

**excuse** [6] - 48:22, 57:15, 60:21, 63:12, 86:13, 93:23

**Executive** [3] - 5:24,

6:3, 6:8
**exercise** [2] - 40:6, 92:15
**Exhibit** [89] - 13:6, 13:7, 14:3, 14:6, 14:8, 17:1, 17:3, 17:4, 18:7, 21:24, 22:10, 22:12, 23:5, 23:6, 23:7, 23:12, 24:3, 24:4, 25:18, 25:21, 26:24, 29:16, 29:18, 29:20, 36:19, 36:22, 37:2, 37:5, 37:6, 41:4, 41:6, 41:16, 42:5, 42:7, 43:4, 43:6, 45:17, 45:19, 46:9, 51:8, 51:10, 51:24, 52:1, 52:19, 52:22, 53:7, 53:11, 53:15, 54:10, 54:12, 54:23, 55:1, 55:13, 55:20, 57:15, 57:16, 60:21, 62:2, 62:4, 63:2, 73:12, 73:15, 73:17, 74:6, 76:7, 76:10, 76:18, 81:19, 81:20, 82:6, 83:13, 83:24, 85:3, 85:12, 85:14, 85:20, 85:21, 91:21, 91:23, 92:10, 92:12, 98:18, 98:19, 102:1, 109:1, 109:3, 109:12, 109:20, 118:10
**exhibit** [13] - 23:2, 23:4, 53:9, 53:11, 54:18, 54:20, 57:12, 57:13, 99:19, 100:5, 100:7, 100:11, 100:23
**EXHIBITS** [4] - 4:9, 4:10, 4:20, 4:23
**existing** [9] - 48:11, 80:4, 80:19, 80:22, 89:6, 89:7, 107:20, 107:23, 108:7
**exiting** [1] - 22:6
**expand** [2] - 40:14, 105:17
**expanse** [1] - 30:11
**expansion** [1] - 56:21
**expect** [8] - 21:1, 28:15, 28:21, 28:23, 60:10, 81:16, 91:19, 113:13
**expected** [1] - 49:19
**experience** [19] - 7:16, 13:22, 16:13, 20:16, 30:19, 49:18, 71:14, 73:5, 73:18, 74:18, 81:10, 95:14,

95:22, 96:10, 96:15, 97:9, 101:16, 115:5, 125:22
**experienced** [1] - 23:21
**expert** [19] - 13:22, 15:4, 15:5, 15:8, 18:4, 23:16, 23:23, 24:1, 50:11, 57:9, 57:21, 66:8, 76:12, 94:14, 113:7, 119:16, 119:17, 119:19, 122:18
**expertise** [6] - 10:4, 16:23, 28:19, 69:21, 103:15, 116:19
**explain** [2] - 10:4, 87:8
**explained** [2] - 103:19, 106:15
**explains** [1] - 106:23
**exposure** [3] - 105:11, 105:12, 105:17
**extend** [2] - 34:11, 34:17
**extends** [1] - 65:17
**extension** [1] - 121:2
**extent** [5] - 18:12, 74:11, 81:14, 81:18, 118:2
**extraordinary** [2] - 125:15, 125:16
**extremely** [1] - 47:1
**eye** [1] - 13:11
**eyes** [1] - 108:19
**EZRAY** [34] - 2:8, 4:7, 6:2, 68:23, 69:7, 73:23, 74:4, 75:4, 82:4, 83:22, 85:19, 86:2, 89:19, 91:24, 92:7, 92:13, 98:21, 100:7, 100:13, 100:18, 100:21, 101:5, 101:25, 106:1, 106:3, 109:2, 109:11, 109:13, 109:16, 109:21, 111:2, 111:4, 115:7, 119:15
**Ezray** [3] - 6:2, 6:4, 119:14

# F

**facilities** [3] - 28:3, 122:6, 122:20
**facility** [10] - 15:7, 58:2, 58:5, 62:18, 63:21, 96:9, 122:3, 122:9, 123:14, 123:17

**fact** [5] - 10:11, 34:14, 35:20, 61:23, 122:13
**factual** [1] - 24:1
**faint** [1] - 28:7
**falls** [3] - 44:18, 49:11, 64:9
**familiar** [10] - 12:21, 14:10, 14:13, 15:21, 53:1, 54:11, 65:6, 65:9, 99:21, 110:18
**familiarity** [1] - 12:23
**family** [2] - 20:10, 21:22
**far** [2] - 33:2, 81:24
**fast** [2] - 13:9, 112:16
**fast-moving** [1] - 112:16
**fastest** [1] - 118:24
**father** [1] - 19:22
**FCRR** [2] - 3:2, 129:9
**FDEM** [2] - 104:21, 114:21
**fear** [3] - 121:20, 122:2, 122:6
**feature** [3] - 38:18, 85:7, 123:1
**features** [10] - 16:9, 24:11, 47:12, 47:24, 75:25, 80:20, 85:6, 87:22, 106:8, 107:23
**February** [2] - 37:18, 38:5
**federal** [1] - 66:21
**Federal** [10] - 6:11, 6:13, 6:16, 6:18, 16:16, 66:22, 111:6, 119:2, 120:14, 125:17
**FEDERAL** [1] - 2:12
**feet** [10] - 44:1, 59:6, 59:12, 78:17, 78:19, 80:8, 104:22, 104:25, 117:6, 117:9
**felt** [2] - 11:4, 27:6
**fence** [1] - 60:12
**fences** [1] - 60:13
**fencing** [13] - 60:4, 60:5, 60:8, 108:2, 108:14, 108:15, 108:17, 117:25, 118:6, 126:14
**fertilizers** [1] - 46:23
**few** [8] - 31:5, 31:6, 35:14, 39:8, 51:3, 51:6, 111:19, 114:5
**fewer** [2] - 21:11
**FICARELLI** [2] - 2:8, 6:5
**Ficarelli** [1] - 6:6

**field** [14] - 9:5, 9:6, 9:10, 9:13, 13:3, 26:5, 91:8, 97:13, 97:16, 97:24, 98:16, 99:10, 99:11, 117:20
**fields** [2] - 46:24, 99:12
**fieldwork** [3] - 62:14, 65:6, 72:16
**figure** [5] - 37:8, 38:25, 40:9, 40:13, 47:17
**figured** [1] - 57:3
**file** [1] - 109:8
**filed** [6] - 60:18, 61:7, 61:8, 61:13, 120:9, 120:25
**files** [3] - 78:9, 91:1
**fill** [10] - 38:10, 44:1, 44:2, 44:10, 52:7, 52:11, 68:1, 68:5, 120:10
**filled** [4] - 52:10, 53:20, 56:14, 57:5
**filling** [3] - 74:24, 120:18, 126:14
**filter** [2] - 36:10, 44:20
**filtering** [1] - 44:19
**final** [3] - 45:2, 90:25, 91:3
**fine** [5] - 122:14, 123:24, 126:5, 127:17, 127:21
**finger** [3] - 18:9, 18:12, 37:25
**finish** [2] - 120:21, 126:21
**firm** [3] - 12:4, 74:21, 97:11
**first** [13] - 18:21, 29:22, 50:2, 57:16, 57:17, 58:2, 64:1, 73:2, 86:6, 91:21, 99:20, 127:18
**fits** [1] - 16:13
**five** [13] - 14:16, 37:9, 40:22, 43:25, 44:23, 45:2, 55:16, 56:11, 71:13, 73:5, 73:11, 98:7, 124:1
**five-year** [1] - 73:11
**fixing** [1] - 123:18
**fixtures** [1] - 21:5
**FL** [1] - 1:23
**flat** [2] - 24:12, 35:18
**FLEXNER** [1] - 2:9
**flies** [2] - 34:20, 34:21
**flight** [5] - 68:12,

89:2, 89:3, 119:5, 119:6
**flights** [3] - 88:14, 119:10, 121:22
**flooding** [2] - 84:23, 116:11
**Floor** [2] - 3:4, 129:11
**FLORIDA** [1] - 1:1
**Florida** [43] - 1:4, 1:16, 1:20, 2:5, 2:11, 2:15, 2:25, 3:5, 5:18, 5:24, 8:7, 10:1, 10:9, 11:9, 11:18, 12:3, 12:25, 19:1, 19:6, 19:8, 19:9, 24:11, 35:5, 35:18, 41:21, 48:16, 59:3, 59:15, 69:20, 71:10, 71:15, 71:19, 73:9, 74:20, 75:21, 78:6, 80:13, 89:18, 89:22, 92:1, 95:24, 129:11
**flow** [21] - 8:10, 11:21, 22:15, 22:20, 24:6, 24:14, 24:15, 35:15, 35:19, 35:23, 36:12, 46:18, 48:7, 48:8, 48:12, 48:19, 48:21, 49:6, 59:12, 72:4, 108:11
**flowing** [1] - 59:9
**flown** [1] - 66:4
**flows** [1] - 35:24
**flowthrough** [1] - 118:3
**flying** [1] - 31:5
**focus** [4] - 9:18, 9:23, 11:20, 71:12
**focusing** [1] - 118:11
**folks** [1] - 11:12
**followed** [3] - 7:23, 71:11, 82:19
**following** [1] - 125:10
**font** [1] - 110:11
**footprint** [2] - 64:7, 123:17
**FOR** [5] - 1:14, 1:22, 2:1, 2:12, 2:23
**foregoing** [1] - 129:3
**forget** [1] - 19:4
**form** [4] - 16:4, 52:11, 55:24, 65:22
**format** [1] - 112:10
**formica** [1] - 67:10
**forward** [3] - 26:2, 121:23, 128:5
**forwarded** [1] - 41:19

**four** [18] - 17:16, 27:12, 27:24, 28:24, 33:2, 33:16, 37:21, 40:9, 40:13, 40:20, 43:25, 55:17, 56:11, 59:11, 92:14, 98:7, 99:23, 102:6
**FPR** [2] - 3:2, 129:9
**Frank** [2] - 6:15, 25:14
**FRANK** [1] - 2:17
**frequently** [1] - 12:19
**fresh** [1] - 26:16
**Friday** [2] - 68:2, 127:20
**Friedman** [1] - 5:21
**FRIEDMAN** [3] - 2:2, 2:2, 5:21
**friends** [1] - 53:8
**Friends** [13] - 5:2, 5:10, 15:21, 16:11, 16:19, 60:15, 60:18, 60:23, 61:6, 61:12, 66:11, 71:6, 112:21
**FRIENDS** [1] - 1:4
**fuel** [2] - 28:2, 64:14
**fulfill** [1] - 126:3
**full** [2] - 7:4, 107:8
**fully** [1] - 58:24
**function** [1] - 23:21
**fundamentals** [1] - 73:3
**future** [2] - 21:19, 23:22

### G

**Galloni** [1] - 5:9
**GALLONI** [2] - 1:17, 5:9
**gallons** [1] - 80:9
**gasoline** [1] - 88:9
**gathered** [2] - 65:24, 66:2
**GENERAL** [1] - 2:17
**general** [3] - 24:10, 49:5, 64:24
**generally** [2] - 20:24, 97:11
**generated** [3] - 75:17, 79:17, 107:25
**generators** [2] - 34:1, 40:3
**Gentlemen** [1] - 6:9
**geo** [3] - 62:6, 64:1, 87:11
**geological** [3] - 69:21, 69:23, 73:1
**geologist** [9] - 69:20,

71:14, 72:21, 72:24, 73:8, 77:17, 84:20, 116:23, 118:7
**geology** [3] - 44:3, 73:3, 73:6
**geosciences** [1] - 71:10
**Germany** [1] - 9:15
**GIS** [1] - 75:24
**given** [3] - 49:18, 62:9, 62:17
**glass** [1] - 67:10
**gleam** [1] - 34:18
**glint** [1] - 34:14
**goal** [3] - 46:19, 46:20, 49:5
**goals** [2] - 46:15, 46:19
**golf** [1] - 48:1
**Google** [11] - 26:8, 37:14, 37:15, 37:17, 38:18, 39:4, 39:19, 40:6, 51:21, 56:1, 100:25
**Government** [1] - 125:17
**government** [5] - 100:21, 100:24, 101:9, 101:21, 127:14
**GPS** [3] - 26:5, 62:9, 62:10
**grade** [1] - 118:16
**grades** [1] - 101:10
**graduate** [1] - 12:23
**grant** [1] - 119:20
**graphical** [1] - 43:20
**grass** [2] - 27:13, 27:25
**gravel** [5] - 94:9, 97:22, 97:24, 103:24, 117:20
**great** [5] - 13:12, 51:15, 95:14, 109:11, 121:6
**greater** [2] - 96:4, 96:6
**Greater** [2] - 22:21, 36:4
**Greeks** [1] - 21:13
**green** [3] - 26:2, 30:13, 33:24
**ground** [14] - 7:18, 45:13, 59:7, 59:18, 70:7, 72:4, 72:17, 81:10, 81:13, 89:22, 105:23, 108:19
**groundwork** [1] - 29:22
**group** [3] - 12:13, 12:20, 101:11

**groups** [2] - 12:5, 16:17
**grow** [1] - 46:25
**guess** [6] - 25:25, 33:16, 52:5, 64:10, 64:11, 122:1
**GUSTAFSON** [2] - 2:16, 6:10
**Gustafson** [2] - 6:11, 68:12
**GUTHRIE** [1] - 2:6
**Guthrie** [3] - 6:3, 6:6, 6:8

### H

**half** [2] - 48:24, 112:18
**half-a-mile** [1] - 48:24
**hammock** [1] - 30:14
**hand** [11] - 29:23, 32:19, 38:1, 42:15, 43:15, 44:24, 63:3, 69:9, 81:24, 110:24, 118:11
**happy** [5] - 16:23, 16:24, 124:17, 126:16, 128:13
**hard** [4] - 24:2, 33:9, 98:12, 98:14
**harmful** [2] - 79:3, 89:20
**haste** [1] - 113:14
**head** [1] - 112:24
**heads** [1] - 98:13
**health** [1] - 69:23
**hear** [3] - 86:21, 124:17, 127:23
**heard** [6] - 50:9, 63:16, 86:20, 97:21, 119:15, 120:9
**HEARING** [1] - 1:10
**hearing** [5] - 35:15, 50:2, 123:25, 125:15, 125:24
**hearsay** [2] - 27:4, 27:14
**heavily** [1] - 89:21
**held** [2] - 10:17, 33:13
**help** [6] - 37:21, 39:14, 49:15, 60:6, 71:6, 115:16
**helped** [1] - 12:8
**helpful** [2] - 38:18, 112:1
**Hendry** [1] - 17:17
**herbaceous** [2] - 25:5, 30:12

**hereby** [1] - 129:3
**heterogeneities** [1] - 77:21
**high** [8] - 9:9, 32:14, 45:7, 49:8, 59:11, 94:3, 99:5, 118:19
**High** [1] - 13:13
**higher** [5] - 30:13, 47:9, 99:9, 102:3, 107:1
**highlight** [1] - 105:10
**hike** [3] - 18:19, 19:21, 19:23
**hiked** [3] - 19:1, 19:6, 19:19
**hikes** [1] - 62:7
**hiking** [1] - 19:23
**himself** [1] - 25:15
**historic** [2] - 89:2, 104:13
**historical** [5] - 39:18, 54:2, 72:5, 78:12, 89:3
**historicals** [1] - 56:1
**history** [4] - 22:3, 24:12, 24:13, 70:22
**hit** [1] - 15:20
**hold** [4] - 12:10, 16:21, 30:10, 42:7
**Hole** [3] - 72:1, 72:7, 72:8
**Hole-in-the-Donut** [3] - 72:1, 72:7, 72:8
**holes** [2] - 45:12, 45:13
**Honor** [86] - 5:6, 5:9, 5:13, 5:17, 5:21, 5:23, 6:2, 6:5, 6:7, 6:10, 6:12, 6:17, 6:19, 6:25, 15:2, 17:6, 18:2, 23:6, 23:14, 23:24, 26:19, 26:21, 27:4, 27:14, 28:18, 29:15, 29:19, 34:23, 35:6, 35:9, 37:4, 41:12, 41:14, 46:6, 49:23, 49:25, 50:17, 50:19, 51:23, 53:4, 63:23, 66:13, 66:17, 66:23, 68:9, 68:23, 69:7, 70:12, 73:24, 74:4, 82:4, 85:24, 92:7, 100:5, 100:13, 100:21, 106:1, 109:7, 109:13, 111:2, 111:5, 111:7, 113:15, 116:2, 118:22, 119:7, 119:12, 119:15, 120:16, 121:9, 121:11, 121:14,

122:1, 122:17, 122:24, 123:4, 124:2, 124:8, 124:18, 126:11, 126:19, 126:24, 126:25, 127:8, 128:14
**HONORABLE** [1] - 1:10
**hop** [1] - 25:17
**hope** [4] - 51:2, 90:14, 120:21, 122:22
**hoped** [1] - 124:15
**hoping** [1] - 125:22
**hour** [1] - 93:8
**hours** [2] - 72:25, 114:18
**huge** [1] - 20:16
**human** [2] - 21:16, 69:23
**humans** [1] - 52:16
**hundred** [5] - 56:9, 92:22, 94:18, 95:5, 105:2
**hydraulic** [1] - 101:11
**hydrocarbons** [1] - 79:8
**hydrogeologist** [1] - 71:1
**hydrogeology** [1] - 71:13
**hydrological** [1] - 81:9
**hydrologically** [1] - 67:18
**hydrologist** [3] - 7:12, 7:13, 35:13
**Hydrology** [3] - 10:12, 10:20, 99:24
**hydrology** [10] - 7:16, 7:18, 9:25, 10:7, 10:23, 11:3, 15:8, 46:14, 59:4, 104:11
**hygiene** [1] - 122:20
**hypothesized** [1] - 104:21

### I

**I-75** [1] - 19:19
**ICPR** [5] - 80:1, 90:19, 95:22, 114:10, 114:13
**idea** [3] - 25:15, 31:23, 43:22
**Identification** [1] - 73:17
**identification** [22] - 13:7, 17:1, 17:3, 22:10, 25:18, 25:21,

36:19, 41:4, 42:5, 45:17, 51:10, 52:19, 54:12, 62:2, 73:12, 73:14, 76:7, 76:9, 81:19, 85:12, 91:23, 109:1
**identified** [4] - 54:9, 55:20, 56:10, 113:17
**ill** [1] - 60:6
**image** [23] - 25:23, 25:24, 32:4, 37:14, 37:17, 37:20, 38:8, 39:7, 52:23, 54:11, 55:3, 55:12, 55:14, 55:17, 55:19, 56:7, 62:5, 63:3, 63:8, 63:11, 63:12, 64:5, 64:16
**imagery** [12] - 26:8, 32:13, 39:7, 39:17, 39:18, 51:22, 52:14, 54:3, 56:1, 65:17, 66:5, 66:8
**images** [4] - 37:11, 37:21, 43:21, 98:7
**imagine** [2] - 96:3, 114:18
**immediately** [1] - 125:5
**Impact** [2] - 13:2, 49:19
**impact** [2] - 49:13, 81:6
**impacts** [4] - 49:20, 79:6, 79:19, 89:25
**impeachment** [1] - 101:3
**impediments** [2] - 48:8, 49:6
**impervious** [9] - 49:9, 67:5, 67:8, 67:15, 80:24, 82:18, 94:3, 105:15, 117:4
**important** [11] - 10:24, 10:25, 11:4, 27:17, 46:18, 46:20, 46:21, 75:3, 75:15, 79:2, 84:19
**impressive** [1] - 20:12
**improve** [1] - 106:9
**inches** [2] - 25:6, 43:25
**incident** [12] - 25:13, 26:2, 26:13, 26:17, 27:1, 27:18, 31:18, 32:22, 33:14, 39:24, 40:21, 62:1
**include** [1] - 17:15
**included** [3] - 17:16,

57:12, 66:8
**includes** [1] - 36:4
**including** [2] - 56:1, 67:17
**incomplete** [1] - 96:22
**incorporated** [1] - 77:3
**increase** [14] - 28:15, 28:23, 29:5, 77:4, 80:7, 89:9, 89:10, 105:3, 105:6, 105:21, 107:13, 107:14, 120:23
**increased** [10] - 80:8, 81:7, 83:7, 88:6, 88:12, 90:15, 102:4, 102:5, 108:10
**Independent** [1] - 12:11
**independent** [1] - 104:4
**independently** [1] - 74:11
**INDEX** [2] - 4:1, 4:9
**Indians** [1] - 5:18
**indicate** [1] - 88:5
**indicating** [1] - 41:22
**individual** [2] - 42:22, 112:2
**individually** [1] - 35:20
**indulging** [1] - 94:17
**industry** [1] - 116:17
**infer** [1] - 80:22
**inferred** [1] - 108:9
**infiltration** [2] - 77:19, 93:10
**influences** [1] - 10:16
**inform** [2] - 115:14, 115:19
**informally** [1] - 12:4
**information** [6] - 11:5, 34:22, 97:1, 106:6, 119:18, 119:22
**infrastructure** [2] - 81:23, 83:15
**initial** [1] - 14:24
**injunction** [4] - 125:23, 126:4, 127:13, 128:10
**INJUNCTION** [1] - 1:10
**input** [3] - 91:2, 96:25, 118:13
**inside** [2] - 33:6
**install** [1] - 110:13
**installation** [3] - 102:19, 110:17,

110:20
**installed** [1] - 106:4
**installing** [1] - 126:13
**instance** [1] - 95:7
**institution** [1] - 21:3
**instrument** [1] - 37:24
**instrumenting** [1] - 9:11
**integral** [1] - 46:14
**intending** [1] - 108:24
**intends** [1] - 23:22
**intense** [3] - 92:3, 107:25, 118:3
**interaction** [2] - 59:16, 72:10
**interconnected** [7] - 35:3, 36:7, 36:8, 45:13, 49:3, 67:19, 90:19
**Interconnected** [1] - 114:13
**interconnectedness** [4] - 57:8, 58:11, 58:17, 58:19
**interconnectivity** [1] - 65:2
**interest** [5] - 9:24, 16:6, 58:12, 121:3, 125:18
**interested** [4] - 25:16, 26:5, 41:20, 75:25
**interesting** [2] - 48:15, 78:11
**interestingly** [1] - 48:3
**interests** [1] - 125:19
**interim** [1] - 120:21
**International** [2] - 20:21, 71:11, 71:19
**international** [1] - 20:25
**interpreted** [1] - 101:14
**interrupt** [1] - 48:13
**intervening** [1] - 121:5
**INTERVENOR** [1] - 2:1
**intervenor** [1] - 5:19
**intimately** [1] - 14:13
**introduce** [2] - 47:2, 47:5
**introduced** [1] - 25:15
**investigate** [1] - 47:12

**investigating** [1] - 75:25
**investigation** [3] - 57:4, 87:11, 104:4
**investigations** [1] - 70:4
**investment** [2] - 14:25, 15:17
**invitation** [2] - 66:15, 66:17
**invite** [1] - 119:1
**invited** [1] - 62:19
**involve** [2] - 70:6, 72:3
**involved** [13] - 10:2, 11:13, 12:24, 14:13, 14:16, 16:13, 20:24, 27:12, 27:25, 33:5, 61:10, 65:5, 117:4
**involvement** [3] - 10:8, 65:4, 101:15
**ions** [2] - 72:10
**iota** [1] - 123:2
**isolated** [2] - 35:20, 35:21
**issue** [5] - 9:4, 120:22, 123:18, 127:6, 128:18
**issues** [3] - 11:16, 12:1, 127:10
**IT** [1] - 109:10
**items** [1] - 125:10
**itself** [3] - 36:3, 65:12, 93:17, 103:17, 104:1, 106:16

**J**

**Jason** [1] - 5:15
**JASON** [1] - 1:21
**Jesse** [1] - 5:23
**JESSE** [1] - 2:7
**Jessica** [1] - 67:25
**jetport** [27] - 17:24, 18:13, 18:16, 21:25, 22:3, 22:6, 24:7, 24:16, 24:20, 24:24, 25:11, 29:6, 47:14, 47:17, 47:25, 48:24, 49:3, 49:10, 52:6, 54:3, 64:7, 65:2, 65:8, 65:9, 65:12, 65:14, 74:12
**job** [1] - 69:22
**join** [2] - 15:24, 15:25
**joined** [1] - 16:18
**Judge** [8] - 37:1, 50:15, 85:10, 120:3, 120:8, 122:7, 125:9,

126:18
**JUDGE** [1] - 1:11
**July** [28] - 29:23, 29:24, 30:6, 36:17, 36:24, 38:5, 38:8, 38:12, 38:13, 38:23, 39:25, 40:1, 40:2, 41:9, 42:15, 42:22, 74:9, 74:13, 76:3, 77:2, 79:21, 83:16, 83:17, 84:13, 85:5, 85:16, 111:1, 112:25
**June** [18] - 24:18, 25:10, 29:7, 33:1, 42:25, 60:18, 61:4, 61:13, 61:14, 61:20, 65:3, 82:1, 82:12, 84:6, 85:1, 85:2, 120:9, 120:25
**jurisdiction** [3] - 75:23, 127:2, 128:12
**Justice** [1] - 111:17
**JUSTICE** [2] - 2:18, 2:20

**K**

**KATHLEEN** [1] - 1:10
**Kautz** [3] - 86:20, 86:21, 86:22
**keep** [9] - 7:22, 13:11, 35:14, 55:11, 57:18, 62:9, 62:12, 70:10, 122:16
**keeping** [1] - 46:19
**keeps** [2] - 16:15, 36:11
**Kendall** [1] - 20:9
**key** [2] - 83:9, 123:15
**kind** [6] - 11:21, 21:1, 31:2, 101:20, 112:17, 118:13
**kindly** [1] - 18:23
**Kirby** [1] - 20:7
**knowledge** [3] - 24:1, 69:22
**known** [11] - 11:4, 20:17, 24:20, 59:11, 67:8, 70:20, 71:25, 79:3, 79:14, 81:7, 100:1
**knows** [1] - 125:8
**KRISTI** [2] - 1:7, 2:13

**L**

**L-28** [1] - 47:21
**lab** [1] - 87:15
**labeled** [1] - 42:24

**labeling** [2] - 30:4, 47:17

**laboratory** [1] - 89:14

**lack** [1] - 93:9

**laid** [2] - 36:16, 105:15

**Lake** [3] - 20:2, 20:3, 20:4

**lakes** [2] - 12:25, 81:8

**land** [4] - 15:7, 35:17, 56:14, 93:24

**landfills** [3] - 97:10, 115:22, 115:23

**landing** [2] - 21:25, 37:24

**landings** [1] - 88:20

**lands** [1] - 103:1

**landscape** [3] - 11:23, 35:24, 75:14

**landscapers** [1] - 123:12

**Landscapes** [2] - 10:11, 10:20

**landscapes** [2] - 10:22

**large** [7] - 9:19, 30:11, 32:25, 39:12, 40:19, 64:22, 70:5

**larger** [2] - 17:22, 32:15

**Las** [1] - 2:10

**last** [3] - 15:24, 68:2, 114:5

**lasts** [1] - 105:2

**late** [4] - 24:18, 39:13, 41:25, 63:15

**latest** [3] - 15:19, 22:17, 66:5

**law** [4] - 125:17, 125:20, 127:2, 127:5

**lawsuit** [2] - 60:18, 61:7, 61:13

**lawyer** [3] - 108:22, 108:23, 127:14

**lawyers** [1] - 126:25

**lay** [1] - 68:5

**layer** [2] - 43:25, 44:8

**layers** [2] - 45:3, 45:6

**laying** [1] - 26:7

**lead** [1] - 99:6

**leaks** [1] - 89:23

**learn** [1] - 62:14

**learned** [4] - 73:4, 73:7, 82:22, 101:21

**least** [4] - 21:15, 41:3, 44:7, 94:18

**leave** [1] - 119:2

**leaving** [1] - 26:15

**leche** [1] - 7:24

**left** [19] - 29:23, 31:17, 32:4, 32:19, 32:22, 33:2, 33:10, 34:4, 37:14, 38:1, 39:4, 39:7, 42:15, 43:15, 47:20, 63:3, 110:24, 118:11, 126:25

**left-hand** [8] - 29:23, 32:19, 38:1, 42:15, 43:15, 63:3, 110:24, 118:11

**legal** [4] - 16:17, 47:5, 108:24, 127:4

**legend** [1] - 82:21

**length** [2] - 31:19, 38:20

**less** [10] - 22:18, 58:22, 88:14, 95:6, 102:3, 107:12, 107:14, 107:15, 117:6, 117:19

**levee** [1] - 47:22

**levees** [1] - 58:21

**level** [10] - 24:12, 47:2, 48:16, 75:1, 75:16, 88:23, 97:13, 97:14, 97:15, 99:9

**leveled** [5] - 52:4, 52:5, 53:18, 56:14, 57:5

**levels** [12] - 48:17, 49:8, 59:10, 59:11, 88:6, 88:12, 88:15, 88:17, 88:20, 89:6, 89:11, 105:21

**license** [2] - 72:23, 73:10

**licensed** [3] - 72:20, 73:8, 95:23

**life** [1] - 79:15

**light** [4] - 20:14, 122:12, 122:13, 127:25

**lighting** [2] - 21:4, 126:14

**lightly** [1] - 56:4

**lights** [6] - 21:6, 110:3, 110:6, 110:13, 110:17, 110:21

**likely** [8] - 49:13, 81:15, 96:18, 97:16, 97:25, 107:3, 107:14, 107:16

**lime** [1] - 44:2, 52:10, 52:11, 53:20

**limestone** [6] - 44:4, 45:3, 45:6, 45:12, 95:8, 99:5

**limit** [1] - 126:11

**limited** [4] - 21:6, 122:7, 125:9, 126:7

**line** [8] - 15:3, 25:24, 26:4, 47:19, 62:24, 64:6, 64:9, 102:12

**lines** [2] - 38:19, 55:16

**link** [1] - 24:2, 47:9

**list** [5] - 13:19, 13:22, 13:24, 17:5, 100:23

**lists** [1] - 17:8

**literature** [2] - 81:5, 115:16

**lithology** [1] - 87:16

**litigating** [2] - 124:16, 127:22

**litigation** [1] - 123:16

**LLP** [1] - 2:9

**local** [6] - 20:20, 24:12, 24:13, 75:5, 119:3, 128:17

**localized** [1] - 48:20

**locate** [1] - 78:10

**located** [1] - 78:15

**locating** [1] - 109:8

**location** [1] - 64:1

**locations** [2] - 9:11, 62:6

**locator** [1] - 40:18

**long-term** [2] - 22:20, 108:2

**longtime** [1] - 24:19

**look** [23] - 22:15, 30:20, 30:21, 31:19, 39:17, 39:25, 40:9, 41:6, 48:1, 56:18, 56:23, 62:24, 73:15, 75:21, 76:2, 76:23, 77:6, 81:20, 83:12, 84:25, 89:2, 112:17, 118:10

**looked** [9] - 32:13, 40:19, 56:19, 65:17, 66:4, 66:5, 66:6, 115:14, 115:18

**looking** [31] - 10:21, 17:2, 17:10, 22:14, 25:21, 25:23, 30:9, 31:11, 32:19, 37:10, 37:11, 38:22, 38:24, 39:2, 40:17, 42:9, 42:10, 45:3, 45:20, 54:2, 55:25, 64:5, 73:16, 76:11, 81:21, 82:11, 83:13, 84:2, 84:3, 85:15, 98:7

**looks** [7] - 22:18, 22:19, 32:6, 33:11, 40:3, 51:11, 64:23

**Loop** [3] - 19:18, 20:3, 48:25

**looping** [1] - 55:9

**loosening** [1] - 60:10

**lost** [1] - 99:3

**love** [1] - 17:7

**low** [10] - 9:8, 21:15, 46:20, 46:21, 47:1, 49:7, 49:8, 116:10, 116:15

**low-lying** [2] - 116:10, 116:15

**lower** [5] - 30:14, 37:12, 43:15, 94:4, 103:5

**lowest** [1] - 21:15

**lucky** [1] - 26:10

**Lum's** [1] - 62:20

**Lumm** [5] - 25:14, 27:3, 61:14, 61:19, 61:22

**lunch** [1] - 128:7

**Lunch** [1] - 128:7

**lying** [2] - 116:10, 116:15

**LYONS** [1] - 2:13

**M-c-V-O-Y** [1] - 7:7

**macronutrients** [1] - 47:3

**Madam** [1] - 50:11

**magnitude** [3] - 78:16, 78:21, 107:5

**mail** [1] - 41:21

**main** [8] - 11:20, 32:1, 32:4, 32:23, 55:4, 55:7, 55:10, 62:17

**maintain** [2] - 21:4, 80:15

**maintained** [1] - 56:5

**MALSR** [3] - 110:3, 110:6

**manage** [1] - 84:21

**managed** [1] - 20:9

**management** [22] - 9:21, 67:13, 74:25, 75:2, 75:22, 77:3, 78:8, 78:24, 79:1, 79:5, 79:16, 80:2, 80:20, 80:22, 85:6, 85:7, 89:24, 105:13, 108:8, 116:11, 117:23, 118:7

**Management** [10] - 5:25, 10:9, 11:19, 12:3, 17:11, 41:22, 42:19, 70:20, 74:20,

**managing** [1] - 84:8

**manmade** [4] - 10:16, 31:9, 48:8, 48:13

**map** [14] - 17:10, 17:20, 17:24, 18:20, 19:3, 19:11, 21:23, 22:24, 45:21, 45:24, 45:25, 46:2, 48:4, 83:9

**maps** [1] - 72:4

**MARISSA** [1] - 2:20

**Marissa** [2] - 6:12, 111:16

**mark** [1] - 37:25

**MARKED** [3] - 4:10, 4:20, 4:23

**marked** [26] - 13:5, 13:7, 16:25, 17:3, 20:1, 22:10, 22:12, 25:18, 25:20, 36:19, 36:21, 41:4, 42:5, 45:17, 51:10, 52:19, 54:12, 62:2, 73:12, 73:14, 76:7, 76:9, 81:19, 85:12, 91:23, 109:1

**marks** [2] - 22:24, 23:3

**Master's** [2] - 8:6, 71:18

**master's** [4] - 8:8, 71:12, 71:20, 72:12

**masters** [1] - 72:17

**matched** [1] - 9:16

**material** [6] - 44:20, 45:14, 60:9, 94:4, 95:8, 115:5

**materially** [1] - 121:4

**materials** [2] - 95:6, 115:9

**math** [1] - 67:24

**matter** [1] - 129:5

**matters** [2] - 50:4, 119:11

**mcVoy** [1] - 15:4

**McVoy** [39] - 4:3, 7:1, 7:2, 7:6, 7:11, 14:10, 17:2, 22:14, 23:17, 23:25, 24:6, 25:22, 27:17, 28:15, 29:17, 36:15, 37:10, 39:2, 41:18, 42:9, 45:20, 50:3, 50:25, 51:17, 52:3, 54:7, 54:11, 55:16, 57:21, 60:3, 60:14, 60:23, 62:6, 63:6, 64:1, 74:9, 76:3, 82:23, 118:12

App. 554

**McVoy's** [5] - 15:4, 18:4, 23:15, 77:13, 98:1

**mean** [14] - 8:19, 9:3, 45:10, 61:8, 65:16, 87:8, 91:17, 93:17, 94:21, 107:22, 114:2, 114:7, 115:9, 124:20

**meaning** [1] - 123:16

**means** [7] - 9:4, 35:23, 36:9, 45:13, 48:17, 93:12, 94:23

**measure** [3] - 9:6, 38:20, 108:15

**measurement** [1] - 9:21

**measuring** [1] - 9:10

**media** [1] - 7:17

**meetings** [1] - 112:11

**meets** [1] - 69:1

**member** [3] - 15:23, 20:20, 61:13

**members** [1] - 21:21

**memorable** [1] - 19:21

**mention** [1] - 56:24

**mentioned** [12] - 28:14, 34:9, 40:19, 40:21, 43:12, 44:10, 56:25, 58:18, 62:13, 72:20, 84:15, 108:14

**merits** [1] - 121:8

**met** [1] - 73:11

**methodology** [1] - 86:6

**MIA** [1] - 119:5

**MIAMI** [3] - 1:2, 2:23, 2:24

**Miami** [17] - 1:4, 1:16, 1:20, 2:5, 2:11, 2:15, 2:25, 3:4, 3:5, 6:20, 18:17, 64:5, 70:19, 70:22, 71:3, 129:11, 129:11

**Miami-Dade** [6] - 6:20, 18:17, 64:5, 70:19, 70:22, 71:3

**MIAMI-DADE** [2] - 2:23, 2:24

**Miccosukee** [2] - 5:18, 5:22

**Michael** [1] - 112:3

**microphone** [1] - 100:11

**mid** [1] - 70:5

**mid-size** [1] - 70:5

**middle** [9] - 19:2, 20:4, 30:16, 30:20, 32:3, 65:8, 80:20,

**might** [12] - 21:1, 21:9, 39:10, 49:16, 54:5, 59:8, 68:7, 97:15, 98:11, 106:8, 107:4, 119:7

**mile** [1] - 48:24

**miles** [5] - 16:6, 31:5, 31:6, 48:25, 49:1

**million** [1] - 80:9

**mind** [3] - 26:16, 55:11, 63:4

**minimum** [4] - 71:13, 72:25, 73:5, 73:11

**minorly** [1] - 44:16

**minute** [2] - 42:8, 111:2

**minutes** [3] - 68:19, 124:1, 128:7

**miss** [1] - 123:20

**missing** [2] - 84:4, 84:16

**mistaken** [1] - 51:11

**mitigate** [3] - 60:6, 89:25, 118:2

**mixed** [1] - 99:5

**model** [35] - 10:14, 22:17, 22:19, 77:4, 80:1, 80:2, 80:11, 90:19, 90:25, 91:3, 91:7, 92:19, 95:14, 95:16, 96:16, 99:16, 99:18, 101:8, 101:13, 103:17, 104:8, 106:16, 106:23, 107:6, 107:9, 107:11, 112:7, 114:9, 114:11, 114:18, 116:20, 117:2, 119:16

**Model** [1] - 22:17

**modeling** [6] - 9:4, 92:15, 111:22, 114:7, 114:13, 115:1

**modelling** [1] - 104:13

**models** [5] - 95:22, 96:10, 96:23, 103:16, 119:24

**modern** [1] - 96:5

**moment** [7] - 28:11, 30:10, 49:23, 56:12, 63:23, 85:10, 124:10

**Monday** [1] - 121:24

**monitoring** [2] - 70:6, 72:18

**Monroe** [2] - 24:7, 24:9

**Monument** [1] - 20:4

**morning** [29] - 5:6, 5:8, 5:9, 5:12, 5:13,

**5:16**, 5:17, 5:20, 5:21, 5:23, 6:1, 6:2, 6:4, 6:5, 6:7, 6:9, 6:10, 6:12, 6:14, 6:15, 6:17, 6:19, 6:21, 50:25, 69:13, 69:17, 86:3, 86:5, 111:16

**MORNING** [1] - 1:7

**most** [15] - 12:8, 19:24, 27:12, 27:25, 38:22, 44:1, 48:23, 80:12, 91:14, 91:17, 91:25, 94:18, 116:8, 116:15

**motion** [4] - 119:20, 120:8, 127:1, 127:7

**mount** [1] - 110:3

**move** [22] - 23:11, 26:18, 37:1, 41:11, 43:1, 45:14, 46:4, 51:20, 53:4, 54:18, 66:18, 73:20, 76:15, 82:2, 82:25, 83:20, 85:18, 92:7, 100:22, 119:19, 121:23, 122:9

**moved** [2] - 28:17, 34:23

**movement** [6] - 7:16, 8:9, 8:17, 8:25, 9:21, 10:14

**movements** [1] - 9:20

**moving** [6] - 19:3, 31:2, 36:11, 53:6, 112:16

**mowed** [2] - 52:12, 53:23

**mowing** [3] - 27:13, 27:25, 39:23

**MR** [185] - 4:4, 4:4, 4:6, 4:7, 5:6, 5:17, 5:21, 5:23, 6:2, 6:5, 6:7, 6:10, 6:15, 6:17, 6:19, 6:25, 7:10, 8:2, 9:2, 13:14, 14:2, 14:5, 14:9, 15:2, 15:16, 17:5, 17:18, 18:2, 18:15, 22:11, 22:24, 23:3, 23:6, 23:8, 23:11, 23:14, 23:24, 24:5, 25:19, 26:18, 26:21, 26:25, 27:4, 27:14, 27:16, 28:18, 28:22, 29:2, 29:4, 29:15, 29:19, 29:21, 34:23, 35:2, 35:6, 35:9, 36:5, 36:20, 37:1, 37:4, 37:7, 40:4, 41:5, 41:11, 41:14, 41:17, 42:6, 43:1,

43:3, 43:7, 45:18, 46:4, 46:6, 46:10, 49:23, 49:25, 50:8, 50:15, 50:17, 50:19, 50:20, 50:21, 50:22, 50:24, 51:12, 51:20, 51:23, 52:2, 52:20, 53:8, 53:10, 53:12, 53:16, 54:14, 54:18, 54:22, 54:24, 55:2, 62:3, 63:23, 63:25, 66:13, 66:17, 66:19, 67:1, 68:9, 68:15, 68:18, 68:22, 68:23, 69:7, 69:16, 70:14, 73:13, 73:20, 73:23, 74:4, 74:7, 75:4, 75:8, 75:12, 76:8, 76:15, 76:19, 82:2, 82:4, 82:7, 82:15, 83:20, 83:22, 83:25, 85:10, 85:13, 85:18, 85:19, 85:22, 85:24, 86:2, 89:19, 91:24, 92:7, 92:9, 92:13, 98:21, 100:5, 100:7, 100:13, 100:18, 100:21, 101:5, 101:25, 106:1, 106:3, 109:2, 109:7, 109:11, 109:13, 109:16, 109:17, 109:21, 111:2, 111:4, 113:15, 115:7, 116:6, 118:22, 119:12, 119:15, 120:3, 120:5, 120:7, 121:9, 121:14, 122:1, 122:7, 122:17, 122:24, 123:12, 124:18, 125:9, 125:13, 126:11, 126:17, 126:19, 128:14

**MS** [13] - 4:7, 5:9, 5:13, 6:12, 66:22, 111:7, 111:9, 111:14, 113:16, 115:3, 116:1, 119:6, 124:2

**multiple** [1] - 17:8

**Murray** [1] - 6:19

**MURRAY** [2] - 2:24, 6:19

**N**

**N.W** [1] - 2:18

**naively** [1] - 127:21

**Namath** [1] - 67:25

**name** [11] - 7:4, 12:10, 12:13, 25:9, 51:3, 60:8, 69:11, 69:13, 111:16,

**narrow** [2] - 122:8, 125:9

**narrowing** [1] - 125:10

**national** [3] - 9:19, 10:8, 20:23

**National** [14] - 12:8, 12:21, 17:13, 17:14, 17:20, 17:22, 19:1, 19:2, 19:7, 19:9, 20:18, 21:18, 71:25, 72:19

**national-sponsored** [1] - 9:19

**Natural** [1] - 22:17

**natural** [3] - 31:10, 59:23, 59:25

**naturally** [2] - 21:16, 47:1

**nature** [3] - 65:7, 69:22, 70:3

**navigators** [1] - 21:13

**NE** [2] - 2:15, 2:21

**near** [2] - 62:25, 106:4

**necessarily** [1] - 49:14

**necessary** [1] - 125:2

**need** [23] - 7:21, 9:9, 16:14, 16:16, 16:17, 21:7, 23:10, 39:14, 42:14, 67:15, 80:13, 80:23, 91:1, 100:19, 105:21, 107:8, 113:12, 113:17, 116:12, 122:8, 126:3, 127:14

**needed** [2] - 108:21, 121:16

**needs** [2] - 47:6, 75:16

**negatively** [1] - 81:6

**neighboring** [1] - 108:4

**NEPA** [5] - 12:22, 12:24, 13:2, 49:18, 75:5

**never** [5] - 22:4, 24:20, 56:5, 70:15, 70:17

**new** [37] - 31:21, 36:23, 38:6, 38:7, 38:16, 38:24, 41:1, 41:22, 51:5, 55:3, 55:23, 56:10, 56:13, 56:17, 58:2, 58:4, 58:8, 60:4, 67:14,

67:22, 68:4, 75:17, 79:12, 80:24, 81:2, 82:18, 84:16, 106:14, 110:13, 115:23, 117:19, 118:13, 120:18
**newly** [9] - 28:11, 56:21, 74:16, 76:22, 77:1, 77:5, 78:18, 98:4, 106:5
**next** [14] - 6:24, 43:18, 43:21, 50:5, 63:10, 63:12, 64:17, 68:20, 75:10, 100:22, 119:10, 121:8, 127:19, 128:10
**NGOs** [1] - 16:17
**nice** [1] - 19:22
**night** [4] - 20:12, 20:13, 21:20, 29:8
**nine** [1] - 39:1
**nitrogen** [1] - 47:3
**NO** [1] - 1:2
**nobody** [3] - 27:24, 57:6, 125:20
**Noem** [1] - 5:3
**NOEM** [2] - 1:7, 2:13
**non** [1] - 16:17
**nonprofit** [1] - 10:8
**noon** [1] - 68:16
**normally** [1] - 91:7
**north** [17] - 19:3, 19:20, 25:1, 28:7, 31:6, 31:17, 32:20, 33:2, 33:10, 33:17, 33:18, 34:22, 35:16, 38:3, 59:17, 64:6
**North** [2] - 3:4, 129:11
**Northern** [1] - 9:15
**northwest** [1] - 18:13
**nose** [4] - 37:20, 37:22, 51:16, 118:12
**note** [10] - 17:12, 42:21, 44:23, 45:2, 81:12, 83:4, 99:1, 99:2, 100:13, 110:10
**noted** [2] - 64:16, 82:21
**notes** [1] - 110:9
**nothing** [3] - 50:15, 116:1, 123:1
**notice** [1] - 20:13
**noticed** [1] - 62:16
**NRCS** [1] - 99:24
**NSRSM** [1] - 22:17
**number** [43] - 12:9, 16:3, 18:21, 20:16, 27:21, 28:16, 34:6, 57:13, 66:5, 93:24,

93:25, 94:1, 94:3, 94:4, 94:8, 95:5, 95:10, 95:20, 95:21, 97:24, 98:15, 99:9, 100:6, 100:7, 100:11, 100:23, 101:6, 102:13, 103:6, 103:12, 103:18, 103:24, 104:1, 104:7, 104:16, 104:24, 104:15, 106:17, 106:19, 106:20, 107:5, 117:10
**Number** [3] - 22:13, 60:21, 60:22
**numbered** [2] - 55:16, 57:19
**numbers** [19] - 97:6, 97:12, 100:4, 101:10, 101:12, 101:15, 101:17, 102:2, 104:11, 107:3, 115:17, 115:24, 117:14, 117:15, 117:16
**numeral** [1] - 77:8
**nutrient** [4] - 46:20, 46:21, 47:1, 49:8
**nutrients** [4] - 46:23, 47:2, 49:16, 72:9

**O**

**o'clock** [2] - 121:18
**object** [5] - 15:3, 18:2, 23:14, 23:18, 23:24
**objection** [47] - 14:4, 14:5, 15:13, 17:25, 23:13, 23:19, 26:20, 26:21, 27:4, 27:14, 28:18, 29:18, 29:19, 35:7, 35:8, 37:3, 37:4, 41:13, 41:14, 43:2, 43:3, 46:5, 46:6, 50:1, 51:22, 53:9, 53:12, 54:24, 66:13, 68:23, 68:24, 69:2, 73:21, 73:22, 73:24, 74:2, 75:4, 76:16, 82:3, 82:4, 83:21, 83:22, 85:19, 92:8, 92:9, 109:15
**obligations** [1] - 126:3
**observations** [3] - 26:11, 29:17, 38:10
**observe** [8] - 22:5, 25:3, 29:5, 30:8, 82:11, 84:13, 85:5,

90:6
**observed** [5] - 25:4, 78:14, 82:18, 85:5, 108:18
**obtain** [4] - 8:3, 8:13, 73:10, 125:4
**obtained** [1] - 8:14
**obtaining** [5] - 9:5, 9:12, 20:24, 72:23, 74:18
**obvious** [2] - 21:9, 89:22
**obviously** [4] - 16:16, 59:2, 59:21, 94:13
**occasion** [17] - 9:12, 13:1, 18:19, 19:25, 21:24, 22:5, 24:16, 24:23, 25:11, 29:12, 36:15, 47:12, 70:15, 70:18, 71:20, 72:16, 74:8
**occasions** [1] - 12:9
**occur** [3] - 35:22, 42:23, 124:23
**occurring** [1] - 93:13
**OF** [6] - 1:1, 1:4, 2:18, 2:20, 4:1, 4:9
**off-site** [2] - 79:6, 79:18
**offer** [2] - 99:5, 108:24
**offering** [1] - 109:14
**OFFICE** [2] - 2:14, 2:24
**OFFICER** [2] - 124:11, 128:19
**official** [1] - 3:3
**Official** [1] - 129:10
**officially** [1] - 14:16
**officials** [2] - 34:8, 89:18
**often** [66] - 9:7, 10:14, 11:20, 14:20, 16:9, 17:15, 18:22, 21:14, 22:16, 24:10, 32:10, 35:4, 35:12, 38:14, 38:17, 39:21, 40:13, 40:18, 42:2, 42:24, 43:11, 43:12, 43:15,

45:4, 45:5, 45:22, 46:22, 46:25, 47:19, 51:6, 51:18, 56:4, 56:12, 56:16, 57:19, 59:3, 61:10, 67:2, 67:21, 75:20, 76:1, 78:15, 82:9, 82:12, 82:22, 84:3, 87:7, 89:10, 90:12, 95:1, 96:8, 97:21, 106:10, 109:9, 109:23, 110:10, 113:17, 116:10, 117:8, 118:11, 121:16, 123:1, 123:7, 125:19, 125:21
**ones** [3] - 38:23, 48:23, 48:25
**ongoing** [1] - 120:24
**online** [1] - 75:23
**open** [13] - 25:5, 32:7, 34:16, 39:22, 97:13, 97:16, 97:24, 98:15, 99:10, 99:11, 99:12, 117:20, 126:20
**operate** [1] - 121:10
**operating** [1] - 23:20
**operation** [2] - 123:14, 123:23
**operational** [1] - 121:10
**operations** [1] - 62:18
**opine** [1] - 89:15
**opined** [1] - 89:20
**opinion** [3] - 15:6, 23:25, 108:24
**opinions** [5] - 50:3, 65:19, 65:23, 90:15, 116:23
**opportunity** [6] - 24:21, 50:5, 50:6, 120:23, 125:25, 127:23
**opposed** [1] - 27:18
**opposite** [1] - 94:19
**option** [1] - 126:15
**options** [1] - 124:14
**oranges** [1] - 121:18
**order** [1] - 59:6
**Order** [1] - 5:1
**organization** [3] - 15:23, 16:11, 21:2
**organizations** [1] - 11:13
**orient** [2] - 33:9, 37:21
**orientation** [1] - 37:19
**oriented** [1] - 30:23

**original** [9] - 21:12, 32:1, 41:25, 44:3, 51:15, 52:5, 54:3, 58:7, 58:22
**originally** [2] - 11:5, 11:21
**otherwise** [2] - 50:10, 71:25
**ought** [1] - 12:17
**outline** [2] - 17:14, 82:18
**outlines** [1] - 77:1
**output** [3] - 95:17, 95:18, 112:7
**outside** [6] - 12:19, 15:3, 18:3, 23:15, 43:11, 72:7
**overall** [5] - 14:25, 46:15, 64:6, 65:4, 106:17
**overflow** [1] - 107:17
**overrule** [3] - 15:12, 23:19, 69:3
**overruled** [2] - 18:5, 27:15
**oversight** [1] - 12:15
**own** [3] - 11:6, 116:23, 119:16
**owned** [1] - 62:8

**P**

**P.A** [1] - 2:2
**p.m** [2] - 1:6, 119:7
**P.O** [1] - 2:25
**pad** [10] - 15:7, 41:8, 41:23, 42:4, 44:7, 51:15, 58:9, 64:17, 77:15, 77:24
**pads** [2] - 58:8, 102:17
**page** [39] - 37:9, 39:1, 40:9, 40:13, 42:8, 43:18, 45:1, 51:9, 51:13, 52:22, 53:1, 54:10, 55:13, 55:14, 57:16, 57:17, 60:25, 63:2, 76:23, 77:6, 82:8, 82:25, 84:1, 84:10, 88:5, 91:21, 92:14, 98:25, 99:20, 102:6, 108:20, 110:1, 110:4, 110:8, 110:10, 110:15, 110:16, 118:10, 126:8
**pages** [1] - 99:23
**Pages** [1] - 1:8
**PAH** [14] - 79:9, 79:12, 88:6, 88:12, 88:15, 88:17, 88:20,

88:23, 89:6, 89:11, 105:10, 105:12, 105:17, 105:20
**PAHs** [1] - 81:6
**paid** [1] - 12:8
**pair** [1] - 19:22
**Panuccio** [8] - 5:24, 6:1, 121:1, 121:17, 124:20, 125:22, 127:11, 128:5
**PANUCCIO** [15] - 2:7, 5:23, 50:20, 50:22, 109:7, 119:12, 121:9, 121:14, 122:1, 122:17, 122:24, 123:12, 125:13, 126:19, 128:14
**paper** [2] - 101:3, 109:8
**papers** [1] - 109:4
**parabolic** [3] - 37:20, 51:16, 118:12
**paragraph** [3] - 46:2, 110:2, 110:3
**parameters** [1] - 9:5
**pardon** [1] - 18:12
**Park** [6] - 17:13, 20:7, 20:11, 20:22, 71:25, 72:19
**park** [4] - 20:19, 20:23, 20:25, 21:10
**parked** [2] - 10:9, 25:25
**parking** [5] - 32:9, 32:10, 38:12, 38:13, 51:5
**part** [13] - 20:16, 25:5, 44:5, 46:14, 47:21, 49:4, 51:11, 53:2, 53:3, 54:20, 65:4, 103:3, 121:21
**partially** [1] - 98:11
**particular** [6] - 31:9, 60:9, 61:9, 63:18, 116:9, 122:2
**particularly** [3] - 47:2, 81:11, 96:7
**particulate** [1] - 60:12
**particulates** [1] - 88:9
**parties** [2] - 124:15, 125:25
**partly** [1] - 30:18
**parts** [4] - 35:13, 35:22, 47:6, 59:13
**pass** [1] - 118:5
**passion** [2] - 16:3, 16:9
**passionate** [1] - 16:8

**past** [2] - 24:12, 108:5
**path** [1] - 63:16
**pathologies** [1] - 77:16
**patio** [1] - 123:7
**PATRICIA** [2] - 3:2, 129:9
**patterning** [1] - 11:23
**patterns** [1] - 39:23
**PAUL** [1] - 1:14
**Paul** [1] - 5:6
**Paulter** [1] - 5:13
**pause** [2] - 120:17, 120:22
**PAUTLER** [1] - 1:21
**paved** [27] - 28:5, 38:9, 40:2, 40:19, 43:12, 49:17, 54:4, 54:8, 56:2, 56:4, 56:8, 56:22, 63:10, 63:15, 64:8, 74:16, 77:1, 77:5, 78:18, 94:7, 96:9, 98:4, 98:9, 98:11, 106:5, 107:18
**pavement** [23] - 36:16, 36:23, 38:16, 38:24, 41:1, 49:9, 59:9, 67:4, 67:22, 68:4, 68:7, 76:22, 79:13, 79:21, 81:2, 83:5, 84:4, 93:10, 97:10, 118:13, 118:17, 118:18, 122:5
**paving** [25] - 28:11, 31:19, 31:21, 37:18, 38:7, 40:5, 40:21, 41:20, 41:22, 42:1, 42:13, 55:23, 58:2, 58:4, 58:12, 58:13, 58:19, 58:21, 74:11, 76:3, 108:11, 126:14
**pavings** [5] - 56:10, 56:13, 58:8, 58:25, 60:4
**pay** [1] - 64:2
**payments** [1] - 75:20
**PDF** [3] - 37:9, 39:1, 40:10
**peak** [1] - 80:7
**peculiarities** [1] - 46:22
**peer** [1] - 72:12
**Pennsylvania** [1] - 2:18
**Penthouse** [1] - 1:16
**people** [8] - 11:3, 21:16, 33:12, 120:19, 122:23, 123:6,

123:23, 126:2
**per** [4] - 47:6, 80:8, 104:22, 104:25
**percent** [4] - 56:9, 93:13, 105:3, 105:5
**perfectly** [2] - 62:10, 128:13
**perform** [2] - 62:6, 70:4
**performed** [1] - 65:1
**performing** [1] - 80:3
**perhaps** [3] - 57:13, 127:21, 128:17
**period** [1] - 20:21
**permanent** [1] - 124:5
**permeabilities** [1] - 96:4
**permeability** [6] - 45:7, 45:11, 45:12, 93:23, 96:6
**permeable** [8] - 44:11, 44:13, 44:16, 44:18, 77:18, 94:5, 95:7, 95:8
**permission** [2] - 10:10, 26:14
**permit** [6] - 74:22, 74:23, 75:14, 78:6, 78:10, 92:4, 92:17, 92:22, 102:7, 108:20, 109:23, 116:25, 117:4, 117:11, 117:22
**permits** [6] - 74:19, 75:18, 76:1, 76:2, 78:15
**permitted** [2] - 87:21, 90:6
**permitting** [2] - 75:5, 75:13
**person** [1] - 18:22
**personal** [3] - 16:6, 62:14, 64:24
**personally** [7] - 29:5, 62:8, 87:20, 87:23, 88:1, 96:12, 103:2
**perspective** [2] - 87:19, 89:1
**pervious** [3] - 44:21, 58:22, 67:4
**Petersburg** [1] - 1:23
**phone** [2] - 26:9, 62:10
**phosphorus** [2] - 47:3, 47:6
**photo** [2] - 38:1, 39:4
**photograph** [6] - 30:16, 30:20, 32:23, 47:20, 48:4
**photographer** [1] -

30:5
**photographs** [6] - 26:14, 37:12, 84:25, 85:4, 87:4, 108:18
**photography** [2] - 30:4, 66:4
**photos** [1] - 38:4
**physically** [4] - 89:13, 94:10, 95:19, 108:19
**physicist** [2] - 7:12, 7:13
**physics** [6] - 7:16, 7:17, 8:7, 8:15, 9:24, 9:25
**picks** [1] - 34:18
**picture** [3] - 31:18, 53:6, 54:15
**pictures** [1] - 87:3
**pin** [1] - 25:25
**Pinecrest** [3] - 20:1, 20:3, 20:15
**Pipe** [1] - 114:13
**Piropato** [2] - 6:13, 111:16
**PIROPATO** [12] - 2:20, 4:7, 6:12, 66:22, 111:7, 111:9, 111:14, 113:16, 115:3, 116:1, 119:6, 124:2
**place** [7] - 27:10, 27:13, 38:11, 62:22, 89:25, 102:18, 105:14
**placed** [2] - 56:13, 90:9
**placement** [1] - 77:19
**places** [3] - 9:7, 21:11, 21:14
**placing** [1] - 80:24, 90:2
**PLAINTIFF** [1] - 2:1
**plaintiff** [1] - 15:21
**Plaintiffs** [1] - 1:5
**plaintiffs** [9] - 5:5, 5:7, 5:19, 6:25, 50:16, 119:21, 121:14, 121:15, 121:21
**PLAINTIFFS** [1] - 1:14
**plaintiffs'** [3] - 53:9, 53:14, 100:15
**Plaintiffs'** [71] - 13:5, 13:7, 14:3, 14:6, 14:8, 17:1, 17:3, 17:25, 18:7, 21:24, 25:18, 25:21, 26:23, 26:24, 29:16, 29:18, 29:20, 36:19, 36:22, 37:2, 37:6, 41:4, 41:6,

41:16, 42:5, 42:7, 43:1, 43:4, 43:6, 45:17, 46:9, 52:19, 52:22, 53:7, 53:11, 53:15, 54:10, 54:12, 54:23, 55:1, 55:13, 55:20, 57:15, 57:16, 62:2, 62:4, 63:2, 73:12, 73:15, 73:17, 74:6, 76:7, 76:10, 76:18, 81:19, 81:20, 82:6, 83:12, 83:24, 85:2, 85:12, 85:21, 91:23, 92:10, 92:12, 98:19, 102:1, 109:1, 109:3, 109:20, 117:1
**PLAINTIFFS'** [1] - 4:10
**plan** [10] - 21:18, 67:15, 81:22, 82:11, 83:14, 91:5, 96:22, 102:19, 114:21, 117:23
**Plan** [6] - 14:11, 15:18, 45:23, 46:11, 47:13, 47:25
**plane** [5] - 63:14, 63:16, 63:18, 111:9, 123:21
**planes** [3] - 21:25, 88:12, 89:9
**planet** [1] - 21:11
**planned** [2] - 83:10, 84:17, 97:2
**planning** [1] - 33:8
**plans** [13] - 68:13, 77:2, 78:25, 83:7, 84:6, 84:14, 85:2, 85:16, 86:11, 86:22, 86:25, 107:23
**plant** [1] - 37:23
**plat** [2] - 52:3, 53:17
**play** [1] - 29:16
**played** [1] - 72:10
**plumber** [1] - 123:13
**plumbing** [1] - 123:18
**plus** [5] - 40:8, 67:23, 74:16, 110:13, 110:14
**PO** [1] - 1:22
**point** [20] - 14:21, 17:24, 19:13, 20:9, 24:10, 26:2, 30:23, 31:9, 33:24, 37:19, 42:23, 48:10, 52:17, 54:5, 56:4, 57:7, 62:20, 79:16, 118:19, 123:14
**pointed** [6] - 28:9,

28:10, 31:18, 33:3,
33:7, 33:25
**pointing** [1] - 34:5
**Policy** [1] - 12:21
**polycyclic** [1] - 79:8
**polygons** [1] - 38:19
**pond** [1] - 90:19
**ponds** [1] - 107:21
**porosity** [6] - 45:7,
45:11, 96:4, 117:15,
117:20
**porous** [13] - 7:17,
44:10, 60:13, 67:4,
77:18, 94:5, 94:18,
94:25, 95:4, 95:6,
95:7, 95:8, 96:2
**portable** [1] - 33:25
**portion** [5] - 9:20,
19:1, 37:23, 39:25,
46:13
**portions** [2] - 28:5,
107:12
**pose** [1] - 49:10
**positioned** [1] -
33:16
**positions** [1] - 126:1
**positive** [1] - 27:10
**possibility** [1] -
25:12
**possible** [5] - 21:3,
36:23, 46:20, 49:5,
107:20
**possibly** [1] - 123:2
**post** [8] - 9:13, 9:14,
9:18, 76:25, 80:5,
102:21, 106:18,
113:14
**post-development**
[1] - 76:25
**post-doc** [1] - 9:14
**post-doctoral** [2] -
9:13, 9:18
**potassium** [1] - 47:3
**potential** [10] -
76:21, 77:4, 77:20,
79:18, 81:6, 81:14,
84:22, 89:25, 105:19,
115:11
**potentially** [10] -
67:11, 79:3, 79:6,
88:16, 89:7, 89:23,
96:4, 107:25, 108:3,
118:20
**pouring** [1] - 67:9
**practice** [3] - 73:5,
73:7, 116:17
**practices** [3] - 89:24,
90:1, 90:13
**praise** [1] - 13:13
**pre** [2] - 102:15,

106:17
**Pre** [1] - 10:20
**preconditions** [1] -
80:4
**preconstruction** [1]
- 80:17
**predicated** [1] -
127:10
**prediction** [1] -
15:20
**Predrainage** [1] -
10:12
**preexisting** [3] -
41:8, 42:4, 77:15
**preferential** [1] -
8:10
**preliminary** [8] -
90:19, 90:22, 107:6,
125:15, 125:23,
126:4, 127:13, 128:10
**PRELIMINARY** [1] -
1:10
**prepare** [3] - 45:24,
45:25, 76:20
**prepared** [5] - 13:2,
36:24, 41:7, 76:13,
126:17
**preparing** [3] -
23:17, 92:5, 109:24
**presence** [3] - 70:8,
71:5, 128:1
**present** [2] - 46:15,
119:14
**presented** [2] -
77:14, 128:12
**Preserve** [5] - 17:15,
17:20, 17:22, 20:18,
21:18
**Press** [1] - 11:9
**presumably** [2] -
44:8, 88:13
**pretty** [7] - 17:14,
19:16, 34:11, 44:4,
47:6, 47:18, 122:12
**previous** [7] - 14:16,
23:3, 39:19, 47:16,
78:12, 96:16, 117:11
**previously** [19] -
16:25, 36:21, 41:23,
52:10, 52:12, 53:20,
53:23, 56:14, 57:5,
64:16, 67:4, 77:18,
80:19, 84:5, 84:17,
97:22, 98:5, 103:1,
103:6
**primarily** [2] - 70:4,
90:17
**primary** [1] - 70:21
**primitive** [1] - 20:2
**principal** [2] - 11:7,

11:8
**pristine** [2] - 52:15,
54:1
**privileged** [1] - 66:14
**problem** [2] - 67:8,
120:12
**procedures** [1] -
99:7
**proceed** [2] - 30:25,
42:14
**proceedings** [2] -
86:18, 129:4
**process** [5] - 12:25,
13:1, 16:10, 74:18,
112:17
**processes** [2] -
11:21, 49:18
**produce** [7] - 93:8,
93:9, 95:17, 95:19,
103:16, 104:8, 107:9
**produced** [2] - 84:9,
95:18, 107:6
**produces** [1] - 88:9
**profession** [2] -
7:11, 69:19
**professional** [17] -
13:19, 30:5, 30:19,
69:20, 71:14, 72:20,
72:24, 73:8, 73:18,
84:19, 95:13, 95:23,
101:13, 112:3,
116:20, 121:3
**professionally** [1] -
10:2
**profile** [3] - 87:13,
87:15, 110:20
**profiles** [2] - 77:14,
87:10
**Program** [1] - 57:11
**Progress** [1] - 12:12
**project** [8] - 9:19,
10:13, 12:16, 14:20,
16:15, 114:17, 117:22
**Project** [1] - 45:22
**projects** [12] - 14:20,
14:22, 45:22, 70:5,
71:4, 97:9, 101:16,
114:4, 115:6, 115:11,
115:14, 115:18
**prone** [3] - 84:23,
92:1, 116:11
**property** [7] - 18:12,
18:14, 18:16, 22:4,
22:6, 25:11, 80:16
**proposed** [2] -
47:25, 84:15
**protect** [1] - 69:23
**protecting** [2] -
21:17, 92:24
**protection** [3] -

16:24, 75:1, 75:16
**proud** [1] - 27:3
**provide** [9] - 71:6,
75:1, 89:13, 98:8,
112:6, 113:4, 114:19,
114:20, 119:21
**provided** [14] - 15:6,
16:18, 26:12, 42:18,
78:25, 86:16, 87:1,
89:3, 90:24, 91:5,
112:7, 114:7, 114:20,
114:21
**provides** [1] - 100:3
**public** [2] - 55:4,
55:6
**publications** [1] -
13:20
**publicly** [2] - 75:18,
78:9
**publish** [3] - 8:11,
11:6, 97:4
**published** [3] - 8:12,
11:8, 72:12
**publishing** [1] -
11:17
**pull** [13] - 51:8,
52:22, 54:10, 60:21,
62:4, 63:2, 85:14,
91:21, 98:18, 99:19,
102:1, 109:3, 118:9
**pulled** [1] - 102:7
**pulling** [1] - 102:2
**purpose** [2] - 41:18,
60:11
**purposes** [1] -
104:12
**put** [9] - 27:10,
43:21, 46:24, 48:13,
56:11, 89:24, 108:19,
120:17, 124:20
**putting** [2] - 119:24,
122:19, 127:4

**Q**

**quality** [3] - 46:19,
49:8
**quantification** [1] -
71:23
**quantify** [2] - 40:23,
89:12
**quantity** [2] - 46:17
**questioning** [2] -
15:3, 63:6
**questions** [18] -
51:4, 51:6, 57:24,
58:10, 66:19, 66:22,
68:9, 75:10, 85:22,
86:4, 101:2, 103:18,
103:25, 111:4,

111:19, 113:20,
127:5, 127:25
**quickest** [1] - 111:11
**quickly** [3] - 7:24,
27:10, 119:14
**quiet** [2] - 22:8,
24:19
**quite** [9] - 11:19,
12:4, 19:2, 24:14,
43:23, 47:4, 48:3,
48:20, 127:6
**quo** [1] - 125:16
**quote** [2] - 104:11,
105:21

**R**

**R-E-I-O** [1] - 69:14
**R.F** [1] - 2:16
**radcliffe** [1] - 112:13
**Radford** [14] - 112:3,
112:14, 112:15,
112:19, 113:4,
113:11, 113:13,
113:23, 113:25,
114:7, 114:16,
114:19, 115:14,
115:18
**Radford's** [1] -
119:22
**rain** [3] - 92:2, 92:3,
92:15
**rainfall** [4] - 44:18,
60:11, 91:18, 104:13
**rainstorm** [1] -
107:25
**rainwater** [1] - 77:19
**raise** [3] - 35:6,
68:24, 69:9
**raised** [2] - 31:25,
124:21
**Ralph** [2] - 29:13,
66:4
**ran** [2] - 57:1, 90:16
**ratio** [1] - 94:2
**RAUREL** [1] - 2:14
**RAURELL** [1] - 6:17
**Raurell** [1] - 6:17
**reached** [2] - 77:9,
77:11
**read** [4] - 81:25,
83:16, 99:2, 110:10
**reading** [1] - 65:5
**real** [1] - 9:4
**realized** [1] - 13:21
**really** [3] - 11:2,
29:1, 124:19
**reason** [6] - 16:18,
18:3, 23:15, 46:15,
78:19, 91:25

**reasonable** [2] - 103:20, 122:12

**reasonably** [1] - 91:19

**reasons** [3] - 16:3, 23:18, 89:22

**received** [6] - 11:10, 20:22, 30:3, 41:21, 71:10, 119:17

**recent** [2] - 12:24, 24:13

**recently** [6] - 12:8, 12:20, 13:21, 38:9, 62:9, 120:11

**recess** [2] - 124:12, 128:20

**recognition** [1] - 48:12

**recognize** [4] - 21:17, 22:14, 84:11, 98:22

**recognized** [1] - 11:14

**recollection** [3] - 56:16, 56:20, 61:6

**reconfiguring** [1] - 123:7

**reconnecting** [1] - 59:9

**reconnects** [1] - 36:1

**reconvene** [1] - 120:17

**record** [12] - 5:4, 7:5, 26:10, 42:18, 50:1, 51:20, 69:11, 112:22, 113:2, 113:3, 114:3, 114:6

**records** [1] - 78:12

**recreate** [2] - 18:19, 23:22

**rectangle** [4] - 32:8, 32:25, 39:12, 63:14

**rectangles** [1] - 38:19

**rectangular** [1] - 33:16

**red** [1] - 25:25

**redevelopment** [2] - 70:5, 71:4

**redirect** [2] - 66:20, 116:4

**REDIRECT** [3] - 4:2, 66:25, 116:5

**reduce** [2] - 108:3, 108:15

**refer** [2] - 33:21, 43:10

**reference** [1] - 111:24

**referenced** [5] -

10:17, 91:5, 111:25, 115:4, 115:8

**referencing** [1] - 65:19

**referred** [1] - 41:23

**referring** [6] - 41:25, 57:10, 78:24, 79:24, 95:1, 99:11

**reflect** [1] - 49:2

**reflected** [6] - 31:12, 77:11, 78:3, 78:22, 81:1, 81:4

**reflection** [7] - 30:24, 31:1, 31:4, 31:7, 31:23, 34:21, 48:16

**reflective** [1] - 34:14

**reflects** [1] - 69:5

**refresh** [1] - 61:6

**regard** [2] - 27:21, 117:25

**regarding** [1] - 65:1

**regime** [2] - 75:13, 77:22

**regular** [1] - 96:11

**regularly** [1] - 74:21

**regulated** [1] - 89:21

**regulations** [1] - 93:4

**Regulatory** [1] - 70:20

**REIO** [1] - 4:5

**Reio** [13] - 68:22, 69:3, 69:10, 69:13, 69:17, 73:16, 74:8, 76:11, 81:21, 84:2, 86:3, 111:16, 119:23

**relate** [2] - 11:23, 23:1

**related** [3] - 12:5, 22:18, 78:5

**relates** [3] - 58:2, 58:4, 58:7

**released** [2] - 126:24, 128:6

**relevance** [1] - 75:4

**relevant** [3] - 88:23, 91:1, 94:7

**relied** [7] - 65:22, 66:3, 95:15, 103:15, 111:21, 119:16, 126:25

**relief** [1] - 125:15

**relies** [1] - 119:23

**rely** [3] - 92:23, 116:19, 116:22

**remain** [1] - 128:17

**remained** [1] - 23:4

**remediated** [1] - 71:24

**remember** [1] - 56:18

**remind** [1] - 13:8

**remote** [1] - 16:4

**remove** [1] - 49:6

**rendering** [1] - 116:23

**renew** [5] - 68:23, 119:13, 120:7, 120:20, 124:19

**renewing** [1] - 126:9

**repeat** [3] - 15:15, 28:20, 75:11

**rephrase** [1] - 65:21

**report** [52] - 15:8, 23:16, 23:23, 26:11, 33:21, 40:23, 41:7, 41:18, 42:12, 42:22, 43:12, 47:15, 51:11, 53:2, 53:3, 57:9, 57:14, 57:21, 57:24, 58:15, 69:1, 74:8, 76:3, 76:12, 77:7, 77:8, 77:12, 77:13, 78:4, 78:23, 79:11, 88:5, 89:15, 90:18, 92:5, 93:22, 99:24, 100:1, 100:3, 100:8, 100:14, 102:8, 103:3, 105:10, 108:20, 109:24, 111:24, 112:20, 113:4, 113:6, 118:9

**REPORTED** [1] - 3:1

**reported** [2] - 39:24, 44:2

**reporter** [5] - 7:5, 7:25, 41:19, 69:12, 100:9

**Reporter** [3] - 3:3, 50:12, 129:10

**reports** [5] - 15:4, 18:4, 65:6, 66:9, 71:1

**represent** [1] - 99:14

**representation** [1] - 9:7

**Representative** [1] - 97:21

**represented** [1] - 101:6

**represents** [3] - 99:16, 99:17, 102:22

**reproduced** [1] - 99:24

**request** [10] - 14:2, 120:7, 120:20, 122:8, 122:12, 124:19, 125:9, 126:9, 126:12, 126:23

**requested** [1] - 86:10

**require** [1] - 119:21

**required** [6] - 68:25,

72:25, 73:1, 74:23, 78:7, 99:7

**requirement** [2] - 47:5, 73:11

**requirements** [1] - 67:14

**Research** [1] - 14:15

**research** [1] - 65:5

**researcher** [1] - 11:8

**resilient** [2] - 80:14, 116:12

**resistance** [1] - 99:6

**resolution** [1] - 32:14

**resource** [2] - 74:19, 75:14

**resources** [1] - 128:9

**respect** [5] - 42:1, 67:2, 67:7, 79:12, 90:13

**respectively** [1] - 117:1

**rest** [1] - 58:25

**restoration** [9] - 11:2, 11:14, 11:25, 12:15, 12:18, 14:18, 16:10, 46:16, 65:5

**Restoration** [9] - 12:12, 14:11, 15:18, 45:21, 45:23, 46:11, 47:13, 47:24, 57:11

**restore** [2] - 10:25, 46:16

**restrained** [1] - 126:13

**restraining** [1] - 126:6

**restrict** [1] - 10:6

**rests** [1] - 58:7

**result** [2] - 47:8, 102:3

**resultant** [2] - 75:16, 105:14

**resulting** [6] - 72:5, 75:1, 76:21, 77:5, 88:8, 93:9

**results** [3] - 43:19, 93:6, 116:20

**retain** [2] - 113:10, 113:17

**retained** [2] - 71:6, 127:12

**retaining** [1] - 107:20

**retention** [7] - 82:20, 83:6, 83:10, 84:5, 84:17, 85:1, 118:15

**review** [14] - 12:19, 29:12, 74:8, 78:25, 81:5, 86:23, 87:1, 89:4, 103:4, 106:7,

106:8, 113:6, 113:9, 114:22

**Review** [1] - 12:11

**reviewed** [21] - 23:17, 71:1, 72:12, 77:2, 77:13, 77:16, 78:9, 86:11, 87:3, 87:7, 87:9, 87:10, 92:4, 98:12, 98:23, 103:3, 105:12, 107:23, 108:1, 109:24, 112:7

**reviewing** [3] - 43:19, 84:13, 102:7

**Rica** [1] - 8:10

**ridiculous** [1] - 121:20

**right-hand** [2] - 44:24, 81:24

**rise** [3] - 48:18, 124:11, 128:19

**rises** [3] - 30:12, 58:22, 104:24

**risk** [1] - 49:10

**river** [1] - 36:13

**River** [1] - 19:14

**riverbed** [1] - 36:13

**rivers** [4] - 35:16, 35:17, 36:12, 36:13

**road** [19] - 25:1, 28:8, 31:11, 31:15, 31:16, 31:17, 31:20, 40:20, 55:4, 55:7, 55:9, 55:10, 56:6, 97:14, 97:16, 99:16, 99:17, 101:7, 103:24

**Road** [4] - 19:19, 20:3, 48:9, 48:25

**roaded** [1] - 21:15

**roads** [10] - 21:15, 54:8, 55:4, 55:6, 55:11, 55:19, 55:23, 101:10, 101:22, 115:23

**Roadside** [2] - 20:7, 20:11

**roadway** [5] - 31:7, 98:8, 98:15, 115:21, 117:20

**roadways** [2] - 98:5, 98:6

**rock** [4] - 44:2, 52:10, 52:11, 53:21

**Roman** [1] - 77:8

**roughly** [1] - 82:19

**round** [1] - 30:22

**routing** [1] - 90:19

**RPR** [2] - 3:2, 129:9

**Rule** [1] - 126:13

**run** [5] - 22:19,

App. 559

58:14, 85:9, 114:10, 116:20

**running** [2] - 47:20, 67:11

**runoff** [32] - 58:14, 60:7, 60:13, 64:13, 67:8, 75:17, 77:5, 79:2, 79:12, 79:21, 80:8, 80:25, 81:1, 81:2, 84:9, 84:18, 84:21, 90:16, 93:7, 93:8, 93:9, 102:4, 102:5, 105:3, 105:6, 107:4, 108:3, 108:16, 115:12, 118:1, 118:14

**runs** [11] - 19:2, 28:8, 31:17, 44:22, 49:17, 64:6, 67:10, 95:5, 114:9, 127:15

**runway** [17] - 18:11, 21:25, 28:9, 31:20, 32:1, 32:4, 32:5, 32:17, 34:19, 59:20, 60:1, 62:25, 64:8, 80:21, 88:15, 110:17, 118:15

## S

**safety** [1] - 21:7
**Saint** [1] - 1:23
**sample** [4] - 87:7, 87:13, 87:14, 87:17
**samples** [15] - 9:10, 70:7, 72:6, 72:18, 87:9, 87:10, 87:23, 87:25, 88:1, 88:3, 88:24, 89:1, 89:13, 105:23
**sand** [6] - 44:2, 52:11, 53:21, 99:4, 99:5, 99:9
**Sasha** [1] - 44:23
**sat** [1] - 71:14
**satellite** [6] - 25:23, 25:24, 37:14, 39:7, 39:17, 39:18
**saw** [3] - 21:13, 68:1
**scale** [4] - 70:5, 78:14, 94:17, 95:4
**scenario** [1] - 80:15
**Scenic** [4] - 19:1, 19:2, 19:7, 19:9
**schedule** [2] - 7:25, 124:22
**schedules** [1] - 6:23
**scheduling** [7] - 119:4, 119:13, 120:2, 120:4, 120:12, 120:22, 127:10

**schematic** [1] - 76:25
**scheme** [2] - 18:8, 77:23
**SCHILLER** [1] - 2:9
**Schiller** [1] - 125:22
**school** [1] - 12:23
**schooling** [1] - 73:4
**Schwiep** [11] - 5:6, 6:24, 66:20, 75:6, 109:15, 113:13, 116:4, 119:10, 125:11, 125:13, 126:10
**SCHWIEP** [91] - 1:14, 4:4, 4:6, 5:6, 6:25, 7:10, 8:2, 9:2, 13:14, 14:2, 14:9, 15:16, 17:5, 17:18, 18:15, 22:11, 22:24, 23:3, 23:6, 23:8, 23:11, 24:5, 25:19, 26:18, 26:25, 27:16, 28:22, 29:2, 29:4, 29:15, 29:21, 34:23, 35:2, 36:5, 36:20, 37:1, 37:7, 40:4, 41:5, 41:11, 41:17, 42:6, 43:1, 43:7, 45:18, 46:4, 46:10, 49:23, 50:15, 51:23, 53:10, 54:24, 66:13, 67:1, 68:9, 68:15, 68:18, 68:22, 69:16, 70:14, 73:13, 73:20, 74:7, 75:8, 75:12, 76:8, 76:15, 76:19, 82:2, 82:7, 82:15, 83:20, 83:25, 85:10, 85:13, 85:18, 85:22, 92:9, 100:5, 109:17, 113:15, 116:6, 118:22, 120:3, 120:5, 120:7, 122:7, 124:18, 125:9, 126:11, 126:17
**science** [5] - 12:17, 16:10, 16:12, 25:16, 47:8
**Science** [3] - 8:6, 9:16, 71:18
**science-based** [2] - 12:17, 16:10
**Sciences** [1] - 12:9
**sciences** [3] - 69:21, 69:23, 73:1
**scientific** [3] - 9:24, 14:17, 81:5
**scientist** [5] - 10:10, 24:20, 25:3, 25:4, 26:5

**scientists** [1] - 12:13
**scope** [3] - 15:4, 18:3, 23:15
**score** [1] - 52:9
**scraped** [2] - 32:7, 40:1
**screen** [4] - 18:9, 22:22, 73:16, 109:19
**screenshot** [1] - 45:25
**scroll** [2] - 57:17, 62:5
**SCS** [8] - 70:1, 70:3, 70:18, 70:23, 99:24, 102:12, 112:3, 112:4
**search** [2] - 75:20, 75:24
**season** [4] - 35:25, 36:1, 59:8, 59:14
**seasonal** [1] - 59:3
**seasonally** [1] - 35:25
**seat** [1] - 7:4
**seated** [1] - 6:22
**second** [7] - 58:4, 59:15, 80:8, 91:22, 102:12, 104:22, 104:25
**secondary** [2] - 90:2, 90:9
**Section** [5] - 77:12, 78:3, 78:22, 79:11, 79:25
**section** [2] - 80:1, 99:23
**sections** [2] - 102:3, 106:22
**SECURITY** [1] - 124:11, 128:19
**sediment** [4] - 88:3, 105:23, 108:15, 118:5
**see** [55] - 21:12, 21:25, 26:8, 28:10, 30:8, 30:11, 30:17, 30:21, 30:22, 31:1, 31:2, 31:6, 31:7, 31:20, 31:23, 32:6, 32:16, 33:6, 34:12, 34:17, 37:16, 37:21, 38:3, 38:8, 38:12, 38:13, 38:22, 39:8, 39:12, 39:13, 39:19, 39:21, 39:22, 40:5, 42:15, 42:21, 43:8, 44:7, 45:8, 45:9, 47:17, 55:8, 55:16, 60:5, 60:25, 62:24, 82:17, 92:19, 99:23, 100:1, 102:12, 102:23, 110:2,

110:24, 122:10
**seeing** [3] - 34:5, 37:17, 43:10
**seek** [1] - 125:5
**seem** [2] - 64:22, 128:9
**select** [3] - 75:24, 95:20, 95:21
**selected** [3] - 95:9, 95:21, 97:8
**sense** [4] - 49:11, 57:10, 58:12, 101:17
**sensing** [1] - 16:5
**sensitive** [3] - 47:1, 64:13, 121:3
**sent** [1] - 87:14
**sentence** [2] - 7:21, 45:2
**sequence** [1] - 37:11
**serious** [1] - 127:6
**SESSION** [1] - 1:7
**set** [6] - 33:2, 33:24, 61:14, 66:16, 81:22, 125:24
**sets** [2] - 96:22, 97:2
**settle** [1] - 88:10
**seven** [6] - 40:8, 40:22, 49:1, 56:20, 82:25, 84:10
**several** [4] - 11:7, 59:2, 112:16, 114:4
**shaded** [1] - 18:13
**sheds** [1] - 104:11
**sheet** [13] - 35:15, 35:19, 35:23, 35:24, 36:2, 36:12, 46:18, 48:7, 48:8, 48:12, 49:6, 59:12, 83:14
**sheets** [1] - 91:6
**shine** [2] - 21:6
**shipped** [1] - 122:23
**short** [2] - 29:16, 111:7
**show** [15] - 13:5, 16:25, 19:17, 22:12, 25:17, 25:20, 36:21, 42:7, 43:25, 45:19, 55:11, 73:14, 76:9, 93:7, 107:12
**showed** [3] - 52:6, 64:16, 78:16
**shown** [4] - 17:13, 20:5, 107:1, 107:4
**shows** [4] - 32:8, 55:3, 83:9, 105:3
**shrubs** [1] - 123:18
**shut** [1] - 122:9
**side** [13] - 20:8, 32:19, 32:20, 33:2, 42:15, 43:16, 44:24,

48:4, 81:24, 83:16, 110:24, 118:12, 128:7
**significance** [5] - 21:10, 36:6, 36:9, 44:15, 44:17
**significant** [3] - 44:5, 72:8, 125:17
**significantly** [1] - 80:5
**silt** [13] - 60:3, 60:5, 60:8, 60:12, 108:2, 108:14, 108:15, 108:17, 117:25, 118:6
**similar** [12] - 12:12, 22:20, 37:15, 39:3, 39:21, 43:23, 43:24, 44:4, 47:11, 97:10, 115:11, 115:14
**simple** [1] - 107:10
**simply** [4] - 21:11, 40:18, 47:16, 60:12
**simulate** [1] - 93:22
**simulated** [1] - 104:20
**simulation** [10] - 90:16, 90:18, 91:11, 93:21, 94:6, 101:13, 101:14, 105:3, 106:11
**simulations** [2] - 103:2, 114:9
**SINGER** [2] - 2:17, 6:15
**Singer** [1] - 6:15
**sit** [1] - 73:5
**site** [85] - 10:10, 22:1, 24:7, 24:13, 24:24, 25:10, 25:13, 26:12, 27:2, 27:22, 28:3, 28:5, 28:12, 28:13, 28:16, 28:24, 29:6, 29:12, 33:8, 36:24, 39:8, 39:10, 41:20, 49:10, 56:11, 57:6, 60:4, 60:14, 62:1, 67:17, 67:18, 68:2, 70:4, 74:12, 74:17, 78:13, 79:2, 79:6, 79:18, 80:20, 86:9, 86:10, 87:9, 87:20, 87:21, 87:24, 88:14, 88:18, 88:21, 88:24, 89:16, 90:5, 90:6, 90:11, 90:16, 93:15, 94:10, 95:9, 96:9, 96:21, 98:14, 101:18, 102:10, 103:7, 106:8, 106:14, 107:8, 108:8, 108:17, 109:23, 116:9, 120:7, 120:10, 120:19,

App. 560

121:4, 121:10, 121:11, 121:24, 122:3, 123:1, 123:8, 124:16

**sites** [3] - 97:22, 106:5, 116:13

**sits** [1] - 65:8

**sitting** [3] - 86:17, 97:18, 98:1

**six** [10] - 37:8, 40:22, 55:13, 56:15, 82:8, 84:1, 99:1, 99:3, 114:18, 126:8

**size** [1] - 70:5

**skies** [5] - 20:12, 20:13, 20:16, 20:23, 21:5

**Skies** [1] - 20:21

**sky** [4] - 20:19, 20:25, 21:10, 21:12

**slightly** [3] - 45:11, 97:15, 108:5

**slopes** [1] - 118:19

**slow** [4] - 7:20, 70:11, 89:17, 105:25

**slowly** [3] - 7:5, 7:25, 69:12

**small** [6] - 12:4, 37:19, 37:23, 56:15, 57:1, 110:11

**smaller** [4] - 17:12, 40:22, 57:3, 78:14

**software** [3] - 114:10, 114:12, 114:14

**soil** [36] - 7:12, 7:13, 8:7, 8:14, 9:24, 9:25, 10:22, 25:16, 42:12, 43:8, 43:9, 43:19, 58:7, 60:10, 68:1, 70:6, 70:7, 77:14, 77:16, 77:17, 77:20, 77:22, 81:13, 84:19, 87:7, 87:9, 87:10, 87:15, 98:22, 100:4, 101:11, 105:22, 116:23, 118:6

**Soil** [1] - 9:16

**soils** [11] - 7:17, 8:10, 8:18, 9:1, 9:22, 10:5, 10:6, 10:7, 99:6, 99:12

**solace** [1] - 121:6

**someone** [4] - 75:14, 97:4, 114:8, 122:20

**someplace** [1] - 127:15

**someplaces** [1] - 31:2

**sometimes** [3] -

14:11, 35:25, 99:4

**somewhat** [3] - 11:2, 35:25, 39:16

**somewhere** [2] - 62:25, 78:16

**sooner** [1] - 68:17

**sorry** [11] - 8:21, 45:3, 46:2, 61:17, 66:21, 66:24, 109:22, 112:15, 120:3, 123:20

**sort** [2] - 13:23, 116:22

**south** [12] - 20:7, 24:7, 24:9, 24:25, 25:1, 31:6, 31:12, 31:17, 33:17, 33:18, 34:22, 64:6

**South** [13] - 10:1, 10:9, 11:18, 12:3, 24:11, 35:4, 48:16, 59:3, 59:15, 74:20, 75:21, 80:13, 92:1

**southeast** [1] - 18:13

**SOUTHERN** [1] - 1:1

**spatial** [5] - 8:17, 8:24, 8:25, 9:8, 9:9

**speaking** [1] - 50:10

**special** [1] - 99:6

**specialist** [1] - 64:23

**specific** [11] - 65:9, 65:11, 83:4, 90:23, 94:7, 96:1, 98:6, 101:15, 102:17, 105:8, 113:22

**specifically** [12] - 9:24, 28:14, 46:18, 47:14, 72:10, 78:15, 79:8, 86:24, 103:23, 112:24, 115:20, 115:21

**specified** [1] - 61:25

**speculate** [1] - 27:5

**speed** [1] - 50:10

**spell** [2] - 7:5, 69:12

**spend** [1] - 114:16

**spent** [1] - 16:4

**spills** [1] - 89:23

**sponsored** [1] - 9:19

**spot** [2] - 37:22, 124:20

**square** [5] - 63:12, 78:17, 78:19, 117:6, 117:9

**St** [1] - 2:21

**STA** [2] - 110:13, 110:14

**stabilize** [1] - 99:7

**staff** [1] - 34:7

**stamp** [1] - 110:25

**stand** [4] - 78:19,

119:19, 122:19, 122:25

**Stop** [1] - 8:23

**storage** [5] - 39:11, 89:15, 89:21, 90:5, 90:13

**store** [1] - 79:17

**storm** [56] - 48:17, 48:19, 60:6, 74:25, 75:2, 77:3, 78:8, 78:24, 79:1, 79:5, 79:16, 79:17, 79:20, 80:2, 80:3, 80:9, 80:11, 80:12, 80:15, 80:20, 80:22, 84:8, 84:18, 85:6, 85:7, 85:8, 91:12, 92:20, 92:22, 92:24, 93:2, 93:3, 93:6, 93:12, 104:13, 104:17, 104:18, 104:20, 105:2, 105:13, 105:14, 105:17, 106:12, 107:24, 108:3, 108:7, 116:8, 116:11, 116:15, 117:1, 117:23, 118:1, 118:3, 118:5, 118:7, 118:14

**storms** [1] - 24:13

**straddles** [1] - 18:16

**straight** [3] - 28:8, 28:9, 45:25

**straightforward** [1] - 48:7

**strata** [2] - 43:22, 99:4

**stray** [1] - 22:24

**street** [1] - 11:11

**Street** [1] - 2:15

**strict** [2] - 67:13, 67:14

**striped** [1] - 38:12

**striping** [2] - 31:21, 32:8

**strips** [1] - 34:4

**strong** [4] - 59:15, 59:22, 59:24, 81:9

**struck** [1] - 16:11

**structured** [2] - 8:9, 8:10

**structures** [7] - 48:5, 48:6, 48:13, 48:15, 48:22, 118:4

**stuck** [3] - 128:1, 128:3, 128:4

**studies** [1] - 35:21, 71:12

**study** [3] - 49:20, 107:17, 108:10

**studying** [1] - 16:4

125:19, 125:20

**subject** [3] - 23:23, 50:11, 73:24

**submit** [1] - 57:9

**submitted** [6] - 15:5, 15:8, 51:14, 54:15, 57:22, 96:17

**Subsection** [1] - 81:4

**subsequent** [1] - 83:7

**subsequently** [1] - 73:4

**substantial** [1] - 46:13

**substantially** [1] - 103:5

**substitute** [1] - 118:6

**substrate** [2] - 42:14, 60:10

**subsurface** [1] - 79:4

**subterranean** [1] - 57:4

**sufficiency** [1] - 71:2

**suggest** [2] - 108:20, 127:25

**suggesting** [1] - 122:8

**suggests** [1] - 16:14

**suitable** [1] - 108:2

**Suite** [3] - 1:19, 2:4, 2:10

**summarize** [1] - 77:9

**summary** [1] - 73:18

**sun** [4] - 30:24, 30:25, 31:12, 34:21

**Sunday** [1] - 100:14

**supervision** [1] - 73:7

**supplemental** [2] - 17:5, 17:7

**support** [3] - 16:17, 42:3, 115:17

**supposed** [1] - 93:15

**surface** [16] - 7:18, 7:19, 36:10, 49:2, 59:8, 59:16, 59:18, 59:19, 67:15, 80:24, 81:10, 82:19, 94:25, 96:19, 105:15, 117:4

**surfaces** [1] - 67:8

**surrounded** [1] - 58:13

**surrounding** [10] - 10:15, 49:10, 54:5, 55:4, 60:7, 62:18, 79:4, 85:9, 105:6, 108:16

**sustained** [1] - 29:3

**swing** [1] - 59:6

**sworn** [2] - 7:2,

69:10

**symbols** [2] - 48:2
**System** [1] - 22:17
**system** [20] - 8:5,
11:5, 11:15, 11:20,
11:24, 37:24, 47:10,
59:23, 59:25, 75:2,
78:8, 78:24, 79:1,
79:6, 79:16, 80:23,
91:2, 96:25, 105:13,
118:7
**Systems** [1] - 9:16
**systems** [6] - 9:20,
74:25, 80:12, 106:4,
108:8, 116:12

## T

**tab** [2] - 22:15, 22:22
**table** [1] - 110:4
**tables** [2] - 97:4,
99:19
**tails** [1] - 98:13
**takeoffs** [1] - 88:17
**Tallahassee** [1] -
126:24
**Tamiami** [6] - 19:19,
24:25, 25:1, 47:19,
48:9, 48:10
**Tania** [1] - 5:9
**TANIA** [1] - 1:17
**tank** [5] - 89:15,
90:2, 90:5, 90:7,
90:13
**tanks** [3] - 89:21,
89:23, 89:25
**taxiway** [12] - 18:11,
32:4, 32:6, 32:17,
34:3, 34:12, 34:19,
56:22, 59:17, 59:20,
60:1, 118:15
**teal** [1] - 47:19
**team** [2] - 113:20,
116:7
**Teams** [1] - 112:11
**TECH** [1] - 109:10
**Technical** [1] - 9:14
**technical** [4] - 42:10,
71:1, 87:11, 104:10
**technically** [1] -
87:16
**tees** [1] - 48:2
**temporarily** [1] -
126:12
**temporary** [5] -
93:15, 108:1, 108:15,
118:4, 126:5
**ten** [5] - 25:6, 38:25,
47:6, 123:8
**tend** [2] - 46:23,

48:20
**tent** [2] - 33:3, 33:11
**tents** [7] - 33:1, 33:2,
33:12, 33:16, 33:25,
40:2
**term** [2] - 22:20,
42:10, 108:2
**terms** [2] - 43:8,
124:5
**terrestrial** [1] - 79:15
**territory** [1] - 126:6
**test** [1] - 81:16
**testified** [10] - 51:5,
57:8, 67:25, 70:17,
91:14, 91:25, 98:4,
100:20, 108:7, 111:20
**testify** [5] - 15:10,
68:25, 69:3, 70:15,
97:21
**testifying** [1] -
125:14
**testimony** [15] -
23:17, 23:25, 50:6,
57:12, 68:24, 69:4,
86:20, 86:21, 97:19,
98:2, 98:8, 113:7,
119:14, 120:9, 127:5
**testing** [2] - 81:13,
105:22
**text** [2] - 45:24, 61:1
**THE** [160] - 1:4, 1:10,
1:14, 5:8, 5:12, 5:16,
5:20, 6:1, 6:4, 6:9,
6:14, 6:21, 7:6, 7:20,
7:23, 8:1, 8:21, 8:22,
8:23, 8:25, 13:8,
13:10, 13:11, 13:12,
13:13, 14:4, 14:6,
15:12, 15:15, 17:4,
17:7, 17:10, 17:25,
18:5, 18:8, 18:10,
18:11, 22:22, 23:1,
23:5, 23:7, 23:13,
23:19, 24:2, 26:20,
26:22, 27:5, 27:7,
27:8, 27:9, 27:15,
28:20, 29:1, 29:3,
29:18, 34:25, 35:8,
35:10, 35:11, 37:3,
37:5, 41:13, 41:15,
43:2, 43:4, 46:5, 46:7,
49:24, 50:7, 50:9,
50:11, 50:13, 50:14,
50:16, 50:18, 51:21,
51:24, 53:5, 53:13,
54:20, 54:25, 63:24,
66:15, 66:18, 66:20,
66:24, 68:10, 68:11,
68:12, 68:16, 68:20,
69:2, 69:8, 69:13,

70:11, 70:12, 70:13,
73:21, 74:1, 74:5,
75:6, 75:9, 75:11,
76:17, 82:3, 82:5,
82:14, 83:21, 83:23,
85:11, 85:20, 85:23,
85:25, 89:17, 92:8,
92:10, 98:20, 100:9,
100:16, 100:19,
100:24, 101:19,
101:23, 101:24,
105:25, 109:5,
109:12, 109:14,
109:18, 111:3, 111:6,
111:8, 111:10,
111:11, 111:12,
113:12, 115:2, 115:4,
116:3, 118:23, 119:8,
119:20, 120:4, 120:6,
121:1, 121:13,
121:17, 122:4,
122:11, 122:22,
123:5, 123:15, 124:9,
124:13, 125:7,
125:11, 125:20,
126:15, 127:9, 128:16
**thesis** [7] - 8:8, 8:11,
71:20, 71:22, 71:23,
72:12, 72:17
**they've** [1] - 128:6
**thick** [1] - 68:7
**thin** [1] - 43:25
**thinking** [2] - 13:23,
27:19
**third** [1] - 58:7
**thousand** [4] - 28:14,
28:25, 33:7, 34:8
**three** [11] - 9:14,
17:16, 40:10, 48:4,
56:18, 57:20, 57:24,
77:6, 88:5, 105:2,
108:20
**throughout** [7] -
31:5, 31:24, 34:13,
59:4, 62:16, 73:4,
86:17
**thumbs** [1] - 50:13
**Thursday** [1] -
127:20
**tie** [2] - 75:7, 75:9
**Tie** [1] - 47:22
**timing** [2] - 22:19,
46:17
**tissue** [1] - 101:3
**title** [2] - 10:19,
10:20
**TNT** [2] - 36:24,
81:23
**today** [13] - 15:11,
15:19, 23:21, 50:4,

50:7, 65:23, 98:1,
119:18, 122:15,
122:19, 126:21,
127:1, 128:13
**today's** [1] - 23:17
**Todd** [1] - 5:21
**TODD** [3] - 2:2, 2:2,
2:13
**together** [5] - 27:10,
112:8, 114:4, 119:24,
120:19
**toilet** [1] - 122:20
**tomorrow** [1] -
122:15
**took** [9] - 18:23,
26:3, 29:24, 30:6,
32:22, 62:22, 64:4,
107:11, 114:22
**tools** [1] - 75:23
**top** [12] - 17:17,
22:22, 29:22, 33:10,
37:12, 37:20, 52:23,
60:25, 63:3, 83:9,
110:10, 118:14
**topic** [1] - 23:23
**topics** [1] - 113:22
**topography** [1] -
48:16
**toppled** [1] - 118:5
**topsoil** [1] - 44:1
**total** [3] - 41:1, 72:9,
128:9
**Totoui** [1] - 5:15
**TOTOUI** [1] - 1:21
**tour** [13] - 26:12,
32:21, 33:20, 60:14,
61:11, 61:15, 61:19,
62:17, 62:22, 64:2,
64:4, 66:12, 66:16
**toward** [1] - 26:1
**TR-55** [1] - 100:1
**trace** [4] - 25:25,
26:4, 32:21, 64:11
**tracing** [1] - 8:9
**track** [2] - 62:12,
64:3
**traditional** [2] - 48:2,
96:6
**traffic** [10] - 22:5,
28:15, 28:16, 28:23,
28:24, 29:5, 29:9,
81:8, 88:6, 89:9
**Trail** [11] - 19:2, 19:7,
19:8, 19:9, 19:19,
24:25, 25:1, 47:19,
48:9, 48:10
**trail** [3] - 19:11,
19:16, 22:6
**trailers** [2] - 34:6,
34:17

**Trails** [1] - 62:11
**transcription** [1] -
129:4
**transport** [1] - 79:3
**transportation** [1] -
55:24
**travel** [2] - 62:14,
62:16
**treat** [4] - 67:16,
79:5, 79:17, 80:15
**treatise** [2] - 101:2,
101:21
**trees** [2] - 25:8, 31:3
**triangles** [1] - 19:3
**Tribe** [3] - 5:18, 5:22,
50:20
**Tribe's** [7] - 22:10,
22:12, 23:6, 23:7,
23:11, 24:3, 24:4
**TRIBE'S** [1] - 4:20
**TRO** [12] - 120:8,
120:17, 120:20,
124:19, 125:4, 125:5,
125:24, 126:9,
126:23, 127:1,
127:13, 128:8
**trouble** [1] - 109:8
**truck** [1] - 48:5
**trucks** [7] - 28:10,
32:15, 38:11, 68:1,
68:5, 120:10
**true** [6] - 36:3, 36:12,
60:15, 61:14, 61:19,
73:17
**trust** [2] - 13:8,
101:16
**trusted** [1] - 103:12
**try** [7] - 6:23, 9:11,
37:15, 39:15, 40:23,
49:6, 82:17
**trying** [9] - 13:11,
46:16, 49:4, 57:2,
58:15, 62:9, 111:10,
119:5, 121:3
**Tuesday** [4] -
120:13, 126:22,
127:8, 127:9
**turn** [4] - 43:18,
55:13, 59:19, 109:5
**turnaround** [1] -
56:15
**turned** [1] - 32:24
**Turner** [1] - 19:14
**turns** [1] - 34:20
**two** [49] - 9:7, 11:20,
17:15, 33:21, 33:22,
34:4, 37:12, 39:3,
39:17, 40:5, 40:18,
40:24, 42:2, 42:24,
43:11, 43:14, 44:1,

48:25, 52:21, 52:24,
55:3, 55:22, 56:12,
57:19, 59:6, 63:8,
63:10, 63:12, 64:17,
67:3, 67:21, 70:23,
73:2, 75:10, 78:15,
83:3, 83:6, 84:12,
84:14, 90:1, 95:1,
98:4, 98:25, 105:3,
105:5, 112:17, 117:8,
118:13

**type** [5] - 96:16,
97:9, 107:4, 110:18,
115:24

**types** [8] - 89:23,
96:5, 100:4, 101:16,
103:16, 113:20,
115:5, 115:11

**typical** [10] - 25:4,
25:7, 44:2, 48:5,
48:16, 59:6, 113:21,
115:10, 116:14

**typically** [7] - 42:13,
88:8, 89:24, 90:25,
96:23, 116:22, 118:18

## U

**U.S** [4] - 2:18, 2:20,
20:8, 47:19

**U.S.D.A** [1] - 104:10

**unable** [1] - 50:4

**uncertainty** [1] -
56:3

**unclear** [1] - 61:23

**unconsolidated** [1] -
99:12

**under** [8] - 15:1,
40:25, 48:8, 48:10,
51:16, 58:7, 73:7,
126:13

**undergraduate** [1] -
8:3

**underground** [1] -
89:22

**underneath** [3] -
15:7, 37:22, 44:3

**understatement** [1] -
121:5

**Understood** [1] -
50:8

**understood** [3] -
72:2, 75:6, 87:18

**undisclosed** [1] -
119:17

**unfortunately** [3] -
46:25, 86:19, 97:20

**unhappy** [2] - 121:2,
121:6

**Unit** [2] - 19:14,

19:15

**unit** [1] - 62:10

**UNITED** [3] - 1:1,
1:11, 2:14

**United** [1] - 129:10

**united** [1] - 3:3

**units** [4] - 26:5, 33:4,
34:1, 62:9

**University** [7] - 8:5,
8:7, 8:14, 9:15, 11:9,
71:11, 71:19

**unless** [1] - 128:5

**unlikely** [2] - 107:22,
118:16

**unpaved** [5] - 96:19,
102:3, 103:1, 106:22,
107:11

**untouched** [2] -
52:15, 54:1

**unusual** [2] - 24:11,
35:12

**unwilling** [1] -
120:15

**up** [52] - 7:22, 10:17,
17:17, 19:19, 30:12,
31:2, 32:3, 32:23,
34:18, 35:15, 35:16,
37:20, 44:23, 50:13,
51:8, 52:22, 54:10,
58:22, 60:10, 60:21,
61:14, 62:4, 62:9,
63:2, 66:16, 70:10,
71:11, 75:7, 75:9,
85:5, 85:14, 88:10,
91:21, 92:14, 98:18,
99:19, 102:1, 102:2,
103:11, 109:3,
109:10, 109:19,
118:9, 118:10,
118:17, 121:24,
123:18, 126:20,
127:18, 127:20,
127:21

**updated** [2] - 83:14,
93:1

**updating** [1] - 13:21

**upper** [4] - 37:14,
38:1, 39:4, 39:7

**upstream** [1] - 59:17

**uptick** [1] - 120:11

**upwards** [1] - 21:6

**Urban** [1] - 99:24

**urban** [1] - 67:13

**useful** [2] - 16:24,
104:12

**utilize** [1] - 91:3

**utilized** [1] - 90:23

## V

**validate** [1] - 10:14

**variabilities** [1] - 9:9

**variability** [3] - 8:17,
8:25, 9:8

**variation** [1] - 31:3

**variations** [3] -
24:12, 24:13, 59:6

**vary** [1] - 35:24

**varying** [1] - 106:19

**vectors** [1] - 22:21

**vegetation** [7] - 10:7,
10:22, 30:11, 30:12,
30:14, 30:25, 31:4

**vehicle** [6] - 25:14,
26:3, 62:19, 62:20,
62:21

**vehicles** [4] - 32:13,
32:14, 32:15, 56:16

**vehicular** [4] - 28:16,
28:23, 81:7, 89:9

**venue** [1] - 128:11

**version** [2] - 22:18,
30:21

**versus** [1] - 5:3

**via** [2] - 75:24, 79:5

**video** [7] - 29:12,
29:16, 29:23, 30:3,
30:20, 31:1, 32:20

**view** [3] - 30:10,
37:15, 51:15

**visible** [1] - 31:1

**visit** [7] - 21:18,
24:16, 25:10, 29:6,
86:10, 120:8

**visiting** [1] - 25:12,
34:7

**visits** [3] - 21:23,
22:7, 29:11

**visually** [1] - 59:22

**vitae** [1] - 119:22

**voice** [1] - 70:10

**volume** [2] - 79:20,
80:8

**volunteer** [1] - 57:2

**vs** [1] - 1:6

## W

**wait** [1] - 94:19

**waiting** [1] - 127:23

**wake** [1] - 121:24

**walk** [1] - 24:23

**walked** [5] - 16:6,
20:11, 24:25, 26:1

**walled** [1] - 90:7

**walling** [1] - 90:2

**wash** [1] - 60:11

**Washington** [2] -

2:19, 2:21

**waste** [1] - 128:9

**Water** [6] - 10:9,
11:19, 12:3, 14:14,
74:20, 75:21

**water** [102] - 7:17,
7:19, 8:9, 8:17, 8:25,
9:21, 10:14, 19:24,
24:6, 25:6, 25:7,
30:18, 30:25, 31:4,
31:13, 34:14, 34:16,
35:17, 35:24, 36:10,
36:11, 44:18, 44:21,
45:14, 46:17, 46:19,
46:20, 47:5, 48:17,
48:18, 49:7, 49:8,
49:14, 49:16, 59:4,
59:9, 59:11, 59:16,
59:18, 59:19, 60:7,
60:13, 67:9, 67:10,
67:13, 67:16, 70:7,
71:24, 72:4, 72:6,
72:18, 74:25, 75:2,
75:5, 75:22, 77:3,
78:8, 78:24, 79:1,
79:5, 79:16, 79:17,
79:21, 80:2, 80:3,
80:16, 80:20, 80:22,
81:13, 84:8, 84:18,
85:6, 85:7, 85:8,
87:23, 87:24, 88:1,
93:23, 94:21, 94:23,
104:11, 105:13,
105:14, 105:17,
105:23, 107:25,
108:3, 108:8, 116:11,
116:15, 117:23,
118:1, 118:5, 118:7,
118:14, 123:8

**water/ground** [1] -
59:16

**waters** [4] - 7:18,
49:2, 81:10

**website** [1] - 46:1

**week** [7] - 50:5, 68:2,
83:18, 119:10, 121:8,
127:19, 128:11

**weekend** [1] - 120:15

**weeks** [2] - 35:14,
112:17

**weight** [1] - 119:25

**wells** [2] - 70:6,
72:18

**WERP** [5] - 49:5,
57:10, 57:14

**west** [6] - 20:4, 25:2,
34:21, 35:16, 40:20,
48:21

**Western** [6] - 45:21,
46:11, 46:12, 47:13,

47:24, 57:10

**wet** [3] - 36:1, 59:13,
59:14

**wetland** [13] - 7:12,
30:12, 30:17, 31:8,
32:16, 56:22, 58:18,
58:23, 58:24, 59:17,
67:12, 104:19, 116:14

**wetlands** [38] - 7:13,
25:4, 31:10, 31:24,
34:12, 34:15, 34:16,
35:3, 35:19, 35:20,
35:21, 35:23, 36:6,
49:10, 49:12, 49:13,
49:15, 52:15, 52:17,
54:1, 54:6, 58:11,
58:13, 58:14, 58:16,
58:18, 58:19, 59:9,
60:1, 60:7, 65:2, 65:7,
67:17, 67:18, 74:24,
78:7, 81:8, 116:10

**whereas** [1] - 95:8

**whereby** [1] - 71:3

**white** [4] - 32:8, 33:1,
37:22, 48:1

**whole** [4] - 20:9,
36:2, 36:14, 54:18

**widely** [2] - 11:12,
11:14

**wider** [1] - 32:3

**wife** [1] - 20:8

**Wildlife** [1] - 17:11

**WILLIAMS** [1] - 1:10

**witness** [9] - 6:24,
7:2, 13:22, 23:21,
68:13, 68:21, 69:10,
101:4, 119:19

**WITNESS** [23] - 4:2,
7:6, 7:23, 8:25, 13:8,
13:11, 15:15, 17:10,
18:8, 18:11, 23:1,
27:7, 27:9, 35:11,
50:9, 50:13, 68:11,
69:13, 70:12, 75:11,
101:23, 111:11, 115:4

**witnesses** [5] -
119:9, 121:16, 126:1,
126:24, 128:5

**word** [3] - 12:7, 17:9,
123:16

**words** [2] - 72:2,
77:22

**workers** [1] - 28:16

**works** [1] - 119:23

**world** [1] - 26:6

**worry** [1] - 121:7

**worse** [1] - 93:7

**worst** [1] - 80:15

**worst-case** [1] -
80:15

**worth** [1] - 21:17
**write** [2] - 26:15, 71:20
**writer** [1] - 11:7
**writing** [1] - 13:3
**written** [2] - 112:10, 113:4

## Y

**year** [9] - 15:24, 39:20, 59:5, 59:14, 60:19, 73:11, 92:22, 93:13, 105:2
**years** [16] - 9:14, 14:16, 16:4, 16:13, 18:21, 19:22, 26:7, 39:20, 41:24, 62:8, 62:13, 70:23, 71:14, 73:5, 114:5, 123:8
**yesterday** [5] - 67:25, 68:17, 86:19, 124:21, 126:20
**yourself** [2] - 37:21, 104:7

## Z

**zero** [4] - 80:18, 94:17, 94:21, 95:5
**zone** [1] - 17:15
**zoom** [12] - 39:22, 44:23, 47:16, 52:23, 55:14, 57:19, 63:3, 98:25, 110:9, 110:11, 110:19
**zoom-in** [1] - 47:16
**zooms** [1] - 47:15

# Tr. Vol. III

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                      CASE NO. 25-22896-CV-KMW
 3

 4   FRIENDS OF THE EVERGLADES, et al.,   Miami, Florida

 5        Plaintiffs,                     August 7, 2025

 6           vs.                          1:13 p.m. to 2:45 p.m.

 7   KRISTI NOEM, et al.,                 AFTERNOON SESSION

 8        Defendants.                     Pages 1 to 67

 9   _____

10                    CONTINUED MOTION HEARING
             BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
11                  UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14
     FOR THE PLAINTIFFS:       PAUL SCHWIEP, ESQ.
15                             COFFEY BURLINGTON
                               2601 S. Bayshore Drive
16                             Penthouse 1
                               Miami, Florida 33133
17                                  -and-
                               TANIA GALLONI, ESQ.
18                             DOMINIQUE BURKHARDT, ESQ.
                               EARTHJUSTICE
19                             4500 Biscayne Boulevard
                               Suite 201
20                             Miami, Florida 33134
                                    -and-
21                             ELISE PAUTLER BENNETT, ESQ.
                               JASON TOTOUI, ESQ.
22                             CENTER FOR BIOLOGICAL DIVERSITY
                               PO Box 2155
23                             Saint Petersburg, FL 33731-2155

24

25
```

```
 1   FOR INTERVENOR PLAINTIFF:

 2                           TODD R. FRIEDMAN, ESQ.
                            TODD R. FRIEDMAN, P.A.
 3                           CHRISTOPHER AJIZIAN, ESQ.
                            CHRISTOPHER AJIZIAN, ESQ.
 4                           1101 Brickell Avenue
                            Suite 700
 5                           Miami, Florida 33131

 6
     STATE DEFENDANT GUTHRIE:
 7
                            JESSE PANUCCIO, ESQ.
 8                           EVAN EZRAY, ESQ.
                            DANTE FICARELLI, ESQ.
 9                           DAVID COSTELLO, ESQ.
                            BOIES SCHILLER FLEXNER, LLP
10                           401 East Las Olas Boulevard
                            Suite 1200
11                           Miami, Florida 33301

12
     FOR FEDERAL DEFENDANTS
13   KRISTI NOEM and TODD LYONS:

14                           CARLOS J. RAUREL, ESQ.
                            UNITED STATES ATTORNEY'S OFFICE
15                           99 NE 4 Street
                            Miami, Florida 33132
16                                 -and-
                            ADAM R.F. GUSTAFSON, ESQ.
17                           ACTING ASSISTANT ATTORNEY GENERAL
                            FRANK SINGER, ESQ.
18                           U.S. DEPARTMENT OF JUSTICE
                            950 Pennsylvania Ave N.W.
19                           Washington, DC  20530
                                   -and-
20                           MARISSA A. PIROPATO, ESQ.
                            U.S. DEPARTMENT OF JUSTICE
21                           150 M St. NE
                            Washington, DC  20002
22

23   FOR DEFENDANT MIAMI-DADE COUNTY:

24                           DAVID M. MURRAY, ESQ.
                            MIAMI-DADE COUNTY ATTORNEY'S OFFICE
25                           P.O. Box 025504
                            Miami, Florida 33102
```

App. 567

```
1    STENOGRAPHICALLY REPORTED BY:

2
                              PATRICIA DIAZ, FCRR, RPR, FPR
3                             Official Court Reporter
                              United States District Court
4                             400 North Miami Avenue
                              11th Floor
5                             Miami, Florida 33128
                              (305) 523-5178
6
     S
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (Call to the Order of the Court.)

2              THE COURT:  All right.  Everybody may be seated.

3              Sorry, there is another matter that -- so, we have to

4    be out of here, you know, in about an hour or so.  So, I'm

5    going to give each side ten minutes.  Okay.

6              MR. SCHWIEP:  Thank you, Judge, and thank you for

7    taking the time for us this afternoon.

8              May it please the Court, Paul Schwiep on behalf of the

9    plaintiffs.

10             THE COURT:  Oh, wait, are any of the federal -- oh,

11   there they are.  I'm sorry, I didn't even --

12             MR. PANUCCIO:  We were just taking note of that, Your

13   Honor.  Sorry, we were about to say something.

14             THE COURT:  No, I just assumed the seats were full.

15   Sorry.

16             MR. RAURELL:  I'm sorry if we were late.  I thought we

17   were reconvening at 10:15.

18             THE COURT:  You know, that's the problem, and I'm not

19   going to get into GSA today because it's going to make me

20   cranky.

21             The clocks haven't been all adjusted.  So, you're

22   right.  I was wrong to start, apologies.

23             MR. SINGER:  We do have Ms. Piropato, who is making a

24   quick rest run and she will be back momentarily.  So, if we can

25   wait, we would be grateful, Your Honor.

```
 1            THE COURT:  Yes, we can.

 2            MR. SINGER:  Thank you, Your Honor.

 3            THE COURT:  No problem.

 4            MS. PIROPATO:  Thank you, Your Honor.  My apologies.

 5            THE COURT:  No, no, your colleagues told me to wait.

 6            You may proceed, Mr. Schwiep.

 7            MR. SCHWIEP:  Thank you, Judge.

 8            The plaintiffs would renew their motion for a TRO

 9    that's reflected in their expedited TRO motion that's at DE-40,

10    with a slight modification that I will come to in a moment.

11            In terms of the legal standards, Your Honor, the

12    standards for a TRO are similar to an injunction standard under

13    Rule 65.  We are obliged to show a substantial likelihood of

14    success, irreparable harm, and that the balance of the equities

15    favors the entry of TRO.

16            We are moving for a TRO on our NEPA and APA counts,

17    only, incidentally, against the Federal and State Defendants.

18            As we laid out in our pre-hearing brief, the remedy for

19    a NEPA violation is under the APA, it's arbitrary, capricious

20    and contrary to law, and that's the Wild Earth decision 137

21    F.4th 1068.  In terms of substantial likelihood of success,

22    what does NEPA require?

23            Typically, in a NEPA case it's a loosely characterized

24    look-before-you-leap requirement.  That is, that the federal

25    agency must consider alternatives, obtain public input,
```

App. 570

1   evaluate the environmental impacts of the proposed action,

2   where endangered or threatened species are implicated consult

3   with the Fish and Wildlife Service, consider the impacts on

4   travel resources, which are relevant here, to generally take a

5   hard look before acting.

6          Now, this is an unusual case because a lack of NEPA

7   compliance is conceded.  There has been a flagrant disregard,

8   in our view, of what NEPA requires.

9          It's remarkable to me that over the last day and a half

10  the plaintiffs have been criticized for the strength of their

11  evidence on environmental impacts, when it's these agencies

12  that should have studied environmental impacts before building

13  a detention center in eight days in the heart of the

14  Everglades.

15         And there is a great irony in the fact, Your Honor,

16  that the law that prohibits this kind of build first ask

17  questions later approach, NEPA, arose exactly out of this site,

18  out of a proposed development on this property, and that led a

19  retired journalist, Marjorie Stoneman Douglas, to come out of

20  retirement at 79 and to work to defeat that proposal.

21         And you've heard testimony from another retired

22  journalist in her image, Eve Samples, how Friends has been

23  dedicated to preserving this site since its founding in 1969.

24         So, what are the elements that we need to show?

25         The first, and, really, it seems to be the nub of the

1    contention is is whether federal action is involved, and what

2    that means under the statute is that there is substantial

3    federal control and responsibility over the action.

4         We've put into evidence Plaintiffs' Exhibit 44, which

5    is a declaration of Miranda Daviduk, which outlines social

6    media posts and other information from both the State and

7    Federal Defendants.

8         We have Secretary Noem, herself, saying that this

9    facility was prompted by her office.  She says in -- and this

10   is Exhibit 45, that Jimmy Percival, in her office, who was a

11   former lawyer with the State, worked in Ashley Moody's office

12   when she was at the Attorney General's Office, contacted the

13   State of Florida, proposed building a detention center, DHS

14   loved the idea, partnered with the State to build this

15   facility, and that's in Exhibit 45.

16        You also heard testimony from Representative Eskamani

17   that she was told directly by executive director of the

18   division, Mr. Guthrie, that this was requested by ICE, it was

19   built for ICE, it was approved by ICE.

20        You heard testimony and received into evidence Exhibits

21   53 through 56 from Jessica Namath that on a regular basis DHS

22   vehicles enter and exit the site to drop off people that are

23   being detained by ICE.

24        Now, let's just end the mystery here, Judge.

25        You had ordered the defendants to produce any 287(g)

1    agreement between the Division and the Federal Government, and

2    there isn't one.

3            What was provided to us Monday at 5:00 p.m. was a

4    agreement between ICE and the Florida Highway Patrol that's at

5    defendant -- State Defendants' Exhibit 28, and an agreement

6    between ICE and the Federal -- FDLE, Federal Law Enforcement.

7    That's Exhibit 24.

8            There isn't a 287(g) agreement that we've been provided

9    as between the Division and ICE, but that is of no moment,

10   Judge, because the State has no authority or ability to detain

11   undocumented immigrants except under color of federal law, and

12   I would cite here Your Honor's opinion in C.F.C. versus

13   Miami-Dade County.  That's 349 F.Supp 3d 1236, where you wrote,

14   Only when acting under color of federal authority, that is, as

15   directed, supervised, trained, certified and authorized by the

16   Federal Government, may State officers effect constitutionally

17   reasonable seizures for civil immigration violations.

18           So, there is really only two options here.  Either the

19   State is operating this detention center under color of federal

20   authority, which is what the evidence shows, or -- and, Judge,

21   this is a conclusion that's less desirable for anyone here, is

22   that they are operating a completely rogue facility that's

23   unregulated and unlawful for the State to operate.

24           We have presented evidence that this involves federal

25   action as NEPA defines it.  We don't need to prove it's a

1    federal facility.  What we need to prove, and this is the Goos,

2    G-o-o-s, decision, 911 F.2d 1283, is that the undertaking is

3    conducted with the affirmative conduct, a condition precedent

4    to proceeding is that a federal actor is involved.

5          In terms of demonstrating final agency action, which

6    the defendants have contested, there are two elements under

7    Bennett versus Spears.

8          Number one, that the decision is not tentative,

9    preliminary, interlocutory, and that it have concrete effects.

10   Wherein this case the defendants have actually built a

11   facility, there is nothing that's tentative or preliminary

12   about it.  The concrete effects are visible for all to see.

13         Then with respect to irreparable harm, we have

14   presented evidence that this entire ecosystem is

15   interconnected.  You heard this morning from Dr. McVoy of the

16   hydrological connections among the wetlands in this area, it's

17   one system Amber Crooks testified, and because it's one system

18   where you pave 20 acres, at least, and apply fresh pavement --

19   and this is in the McVoy report, which is Exhibit 82, the

20   runoff from that payment will run off into that system.

21         And you heard testimony this morning from Mr. Reio that

22   there is no storm water management that has been built for the

23   new pavement that was applied in areas one and two, that's 18

24   acres, that no permits, which are designed to protect the

25   public, were obtained; and that they couldn't have gotten

App. 574

1    permits Mr. Reio said because of the way this has been built,

2    and the contaminants from vehicles now parked on that new

3    pavement will run off into the surrounding interconnected

4    wetlands.

5        You also heard testimony from Mr. Kautz that the

6    panther, which are a federally listed endangered species, have

7    lost 2,000 acres of habitat as a result of this activity.  His

8    report is in the record.  It's Plaintiffs' Exhibit 25.  He

9    testified to a likelihood of panther mortality from

10   interspecific aggression as panthers must flee that area and

11   are huddled into a smaller area.

12       So what we need to show, and this is Sierra Club versus

13   Marsh 872 F.2d 497, it's a First Circuit decision.

14       THE COURT STENOGRAPHER:  I'm sorry, can you repeat that

15   case cite?

16       MR. SCHWIEP:  872 F.2d 497.  In that case, the Court

17   held, The risk implied by a NEPA violation is that real

18   environmental harm will occur through inadequate foresight and

19   deliberation.  And the Eleventh Circuit recently relied on

20   Marsh in its Okeelanta decision.

21       Judge Moore held, and this is the Florida Key Deer

22   case, 386 F.Supp 1281, he wrote this, "Environmental injury by

23   its nature can seldom be adequately remedied by money damages

24   and is often permanent or at least of long duration."

25       There is no monetary relief that could be provided.

App. 575

1    This harm is that we presented evidence exists is irreparable.

2        We are gravely concerned, Your Honor.

3        You heard testimony yesterday afternoon from Ms. Namath

4    who hung around all day.  She happened to -- and it shocked me,

5    I've been married for 40 years and I can't remember my wife's

6    cell phone number.  She knows the governor's cell phone number

7    by heart.  She has been calling about this facility and she's

8    been told you need to contact the federal authorities and

9    specifically your U.S. senators, Senator Moody and Senator

10   Scott.

11       She testified that on Friday she saw 30 trucks of fill

12   and a soil compactor driving onto that site, and it's as though

13   the defendants have proceeded like if you are not here and that

14   this proceeding is not going on.  So, under those circumstances

15   and where the defendants are unwilling to agree to a pause,

16   which is what a TRO is designed to do, protect the status quo,

17   we think it's appropriate that you enter a TRO.

18       To be clear, we are not seeking a TRO that in any way

19   would enjoin enforcement activities, law enforcement

20   activities.  We are not seeking a TRO to enjoin any immigration

21   enforcement activities.  We are not seeking a TRO to enjoin any

22   immigration activity.  We are not seeking a restraining order

23   on the apprehension, detention, removal of immigrations.

24       We don't think that we are in any way in the territory

25   of 8 U.S.C. 1251(f), but we do believe that a limited TRO,

1    until we could conclude this hearing, is appropriate.

2         And to finish, the TRO that we are requesting, which is

3    a slight modification from the TRO as stated in our motion, is

4    a TRO prohibiting any additional lighting, paving, filling,

5    excavating, fencing or site preparation work.

6         THE COURT:  Thank you, Mr. Schwiep.

7         MR. SCHWIEP:  I think that was within ten minutes.

8         THE COURT:  I think you did.

9         I don't know who -- oh, does the Tribe wish to be heard

10   on this?

11        MR. AJIZIAN:  Your Honor, we just wish to join the

12   motion, that's all.

13        THE COURT:  Thank you very much.

14        Who wishes to proceed first?

15        MR. PANUCCIO:  I will, Your Honor.

16        THE COURT:  Okay.

17        MR. PANUCCIO:  Thank you, Your Honor.

18        I'd like to begin -- I will try to keep this as short

19   as possible, but the bottom line is that the plaintiffs have

20   not demonstrated entitlement to a TRO for multiple legal

21   reasons alone, so I will focus a lot of this on likelihood of

22   success on the merits, but I will briefly reach the other

23   factors as well, Your Honor, although we have not had the full

24   presentation on harm yet.

25        First, let me just renew -- we argued it, I'll just

App. 577

1    renew that our position is the Court does not have venue over

2    this case.  The only thing I will add to my previous argument

3    is we've now heard from witnesses who have testified.

4          Dr. McVoy, for example, was shown his map where he took

5    the walk and said I geolocated everything, and he could not

6    testify that any of that walk was in Miami-Dade County.  Every

7    facility, everything just mentioned in the injunction, the TRO

8    that they're seeking, for example, lighting, paving,

9    excavating, all of that is in Collier County, in the Middle

10   District, Your Honor.

11        Let me then turn to the remainder of the likelihood of

12   success on the merits.  So, let me start with baseline NEPA

13   law, and that's the only claim.  They do have a few claims in

14   their complaint.  The only one Mr. Schwiep said here was NEPA,

15   and that, of course, is the only claim that or cause of action

16   the Court could issue an injunction under because any state law

17   claims or municipal claims the Court would be barred by the

18   Penhurst Doctrine for enjoining under state law.

19        So, we are focused on NEPA.  I think that's common

20   ground.

21        I think it's also common ground in the briefing they've

22   put in before the Court that NEPA provides itself no private

23   right of action.  The claims must be challenged through the

24   APA.  So, we're dealing not only with NEPA law, but also with

25   all applicable requirements of the APA.  Again, plaintiffs

App. 578

1  conceded this, but just to give the Court a citation, this is

2  the K-A-R-S-T, Karst case, 475 F.3d 1291 at 1297, DC Circuit,

3  2007.  There are other cases as well but that's a well-cited

4  case out of the DC Circuit, and it's also bedrock APA law that

5  it does not apply to state agencies.  So, the APA and NEPA only

6  apply to federal agencies.

7          A citation for that is, Your Honor, is the Doe case,

8  261 F.3d at 1055.  That's Eleventh Circuit 2001.  APA only

9  applies to state agencies.  Thus, plaintiffs must identify

10  under the APA a final federal agency action.  All of those

11  words are important and they fail on all of them, Your Honor.

12          Now, I will note that the temporary injunction -- it's

13  been a little hard to pin down what is the action they say is

14  at issue here, and you heard my friend just say, well, we're

15  not -- we're not challenging detention.

16          So, what they must be challenging and what they're

17  seeking in the TRO is they're challenging construction.

18  They're challenging the construction of this detention

19  facility, but just to round it out, and I'll go through all

20  three.  The possibilities are they're challenging the

21  construction of the detention facility.  They're challenging

22  the funding of that construction or they're charging detention,

23  immigration detention.

24          Any way they cut it on any of those three, and I'll go

25  through all of them as quickly as possible, they do not have a

1    likelihood of success on the merits, and here is why, Your

2    Honor.

3         Let's start with funding.  I think that's the easiest

4    one.

5         No witness has testified, and there is no evidence in

6    the record that $1 of federal funds has been used to construct

7    this detention facility, and we have declarations submitted

8    with the TRO papers early on that say, in fact, there is no

9    federal funding.  And Representative Eskamani when asked about

10   this, and she claimed to be, you know, very knowledgeable about

11   all matters of state law and policy and her many years in the

12   legislature.  I asked her to identify the federal dollars.  She

13   said she is aware of none.  So that's out of their witness's

14   own testimony, no federal dollars to date at this cite.

15        The absence -- so, therefore, it cannot be -- the

16   federal funding cannot be the basis of the federal action

17   because there is none.

18        More importantly, I believe plaintiffs have cited to

19   the possibility of federal funding.  There is an Eleventh

20   Circuit binding precedent directly on point.  This is United

21   States versus South Florida Water Management District, 28

22   F.3d 1563 at 1573, 1994-case.

23        And it says, quote, The possibility that federal

24   funding will be provided in the future is not sufficient to

25   federalize a State project even when such funding is likely,

 1    end quote.  That's a NEPA case, so that's a directly on-point

 2    controlling precedent out of the Eleventh Circuit.

 3            So, that's funding, Your Honor.

 4            Let me turn to the second possibility, which is what I

 5    think -- excuse me one minute, Your Honor.

 6            THE COURT:  Do you have water, Mr. Panuccio?

 7            MR. PANUCCIO:  Sure, just catching my breath.

 8            THE COURT:  Okay.  Just wanted to make sure you had it.

 9            MR. PANUCCIO:  Second possibility is construction, and

10    I believe that's what plaintiffs at the podium now said they

11    are focused on, that the action they are focused on is

12    construction.  Construction of this facility does not trigger

13    NEPA because the evidence shows and will show this facility was

14    planned, executed, and is being managed by the State of Florida

15    and funded by the State of Florida.  It was the State, through

16    FDEM, that commandeered the TNT site under the jetport itself

17    under State emergency powers.

18            The Pruett declaration at Docket Entry 16-1, and the

19    Giles declaration at Docket Entry 21-1 both explain that all

20    construction projects at the site were paid for by the State,

21    organized by the State and carried out by the State.

22            I'd also note that all the witnesses we heard from the

23    plaintiffs said that when they went to the site, who did they

24    interact with, who was in charge, who gave them the tour?

25            It was Director Guthrie that gave them the tour.

1    Director Guthrie is in charge.

2         Their witness, Dr. McVoy said, he believes it was a

3    State official in charge who toured him around the facility.

4    We've had no witness say that the Federal Government is in

5    charge of the construction decision or the -- the overall

6    construction decision or the daily decisions on what gets

7    constructed.

8         So, the last possibility, Your Honor, and maybe we

9    don't need to get to it because Mr. Schwiep has disclaimed it,

10   but I think it's important to round out the argument, the last

11   thing they can be challenging is the decision to detain or

12   actual detention, and there are a host of reasons why that

13   cannot be on the merits a basis for a TRO or injunction in this

14   case.

15        First of all, the decision of who to detain at the site

16   is the State's.  The ultimate decision of any person is the

17   State's.  This is the Giles declaration.  Again, Docket Entry

18   21-1, at paragraph six, says, the ultimate decision of who to

19   detain at the TNT detention facility belongs to Florida.  And

20   what Your Honor will hear in further evidence is that the State

21   does turn down detentions, and in fact, it turns down entire

22   categories of detainees.  It does not take, for example, women

23   and children at the site.  That is the State's decision

24   entirely.

25        THE COURT:  But it's not a jail, yes?

App. 582

1          MR. PANUCCIO:  It's a detention facility.

2          THE COURT:  So the State -- maybe I'm wrong.  I would

3     have liked to have heard from the defendants, but do you house

4     pretrial detainees in criminal matters there?

5          MR. PANUCCIO:  It is not a jail -- it is not a jail for

6     -- if you are asking is it a jail for other purposes, no, it's

7     an immigration detention facility.

8          THE COURT:  Right.  And so -- people that have already

9     been sentenced by state court judges, that's not where they

10    serve their state sentence?

11         MR. PANUCCIO:  No.

12         THE COURT:  So, they are all there on federal

13    immigration orders?

14         MR. PANUCCIO:  Yes.

15         THE COURT:  Okay.

16         MR. PANUCCIO:  So that's reason one, Your Honor, the

17    actual location decision is the State's.  They can turn down

18    anyone they want, State decision, but there is many other

19    reasons equally important, perhaps more important.

20         Second, even if it could be said Florida is exercising

21    federal power when it detains, the APA turns on who is making

22    the decision, not whether federal power is exercised, and I'll

23    give the Court two citations for that.  The first is Lebron

24    versus NRPC, 513 U.S. at 392.  It's a 1995 Supreme Court case.

25    That case, for example, said, Amtrak exercises federal power,

1   but it is not subject to the APA because it is not a federal

2   agency.

3          So, the mere exercise of federal power alone is not

4   enough.  It must still be a federal agency that is acting, and

5   of course, we know state agencies are not federal agencies

6   under binding case law.

7          Another example of this is Ritter versus Cecil, and

8   that's Cecil with a C, Cecil County, 33 F.3d at 327.  It's a

9   Fourth Circuit case from 1994, and that said, a local housing

10  board administering a federal housing program is not an

11  agency -- not committing agency action that is subject to the

12  APA.

13         So, again, the question here is who is deciding if

14  these detainees should be housed at the TNT facility.  It is

15  the State.  The State, even if it's operating under a 287(g),

16  is not a federal agency for the APA purposes.  So, that's the

17  second reason, Your Honor.

18         Let me provide a third reason.

19         Even if we discount everything I just said, even if the

20  decision were federal, you know, if we could say the location

21  decision is federal, the INA -- at that point we do get into

22  the INA, and it has withdrawn jurisdiction to consider those

23  decisions, two different ways, 8 U.S.C. 1226(a).

24         It says, the Federal Government may detain an arrested

25  alien pending removal, and then 1226(e) says that the

1    government's discretionary judgment regarding the application

2    of this section shall not be subject to review.  No court may

3    set aside any action or decision under this section regarding

4    the detention of any alien or the revocation or denial of bond

5    or parole.  That's 1226's jurisdiction stripping provision, but

6    there's a second one, 8 U.S.C. 1252(f) says that no court other

7    than the Supreme Court shall have jurisdiction or authority to

8    enjoin or restrain the operation of the provisions of Part 4 of

9    this subchapter, and Part 4 of that subchapter include

10   Section 1226, which authorizes detention, and also it includes

11   1231(g) which grants the power to, quote, arrange for

12   appropriate places of detention for aliens detained pending

13   removal or a decision on removal.

14        So, even the decision, if we were going to say this was

15   a federal decision, the decision to arrange for appropriate

16   places of detention is outside of the Court's jurisdiction

17   pursuant to 8 U.S.C. 1252(f).

18        The fourth reason, Your Honor, even if the decision to

19   detain at the site were a Federal decision, and this Court were

20   not jurisdiction stripped, counter assumptions because both of

21   those things are true, but even if they weren't true, the

22   choice not to detain would not be subject to the APA, the only

23   cognizable cause of action here, because it is committed to

24   agency discretion by law.  Congress vested the DHS secretary

25   with the power to arrange for appropriate places of detention,

1    as I said, and that power includes the discretionary power to

2    transfer aliens from one locale to another, as she deems

3    appropriate.

4         That is Van Dinh v Reno, 197 F.3d at 433, Tenth

5    Circuit, 1999, and there is a host of other cases for that,

6    Your Honor.  I will just give you another example.  SDNY,

7    Salazar v. DuBois, 217 WL 4045304, at star page one, is just

8    another example, but we have cited a number of district court

9    cases in our briefing for that proposition.

10        A fifth reason, Your Honor, an individual decision to

11   detain -- so, if we're getting down from the level of the

12   overall decision to detain like multiple persons to every

13   individual decision, that is not a, quote, major federal

14   action, end quote, under NEPA.  And NEPA only applies to that

15   more federal actions 43 U.S.C. 4332.  And what the law says, is

16   administrative civil or criminal enforcement actions are not

17   major federal actions.  That's 42 U.S.C. 4336(e)(10)(B)(v).

18   It's easier to write that out, Your Honor, but I hope that's

19   clear for the court reporter.

20        Let me say it one more time 4336(e)(10)(B)(v).

21        Here, detention is civil enforcement, which falls

22   outside of NEPA.  This case is the -- a case for this citation

23   is Northwest Center for Alternatives to Pesticides, 553 F.Supp

24   3d at 1091.  It's a 2021 case out of the District of Oregon,

25   and here is what the Court said, The decision to send

1    reinforcement personnel to a temporary hotspot to respond to

2    criminal activity, protect people and property from criminal

3    activity, and enforce criminal laws, falls within NEPA's

4    exception for criminal enforcement actions.  But criminal

5    enforcement isn't the only thing in that provision.  There is

6    also administrative and civil enforcement that are defined out

7    of major federal action under NEPA itself.

8          So, Your Honor, let me end there.  I know I'm running

9    out of my time here.  So, on the merits for, I think I just

10   gave five or six different reasons, including venue, they will

11   fail on this case as a matter of law on the merits and,

12   therefore, any kind of preliminary relief cannot be issued.

13         Let me just speak to harm briefly, Your Honor, because

14   we haven't put on our case on harm yet, but even what we saw on

15   cross, I will just make two points.  One, no witness has

16   compared, fact or expert, has compared this site to what was

17   immediately happening at the cite beforehand, and that is

18   substantial jetport activity.

19         So, even in terms of harm, Your Honor.  Harm is of

20   course a relative term.  It's quite possible that if you reduce

21   landings and takeoffs by hundreds of flights per day, you might

22   be reducing ecological harm on the site not increasing it.  I

23   think we can all agree, airplanes are loud.  They are dirty.

24   They are destructive to the environment.  We have a declaration

25   now from Miami-Dade County, the director of the airport saying

App. 587

1    there were 28,000 flights in six months, 150 a day, military

2    aircrafts, helicopters, prop jets with the loud propellers, jet

3    engine planes.

4          And we saw -- we asked Dr. McVoy, even his picture that

5    he relied on, we said what is that.  He said that's a very

6    large airplane sitting there at the jetport.  So as a relative

7    basis they haven't shown an increase in harm.

8          And then secondly, the harms they point to are

9    long-term ecological harms.  For example, their panther expert

10   testified that, well, he's talking about 45 years for now.  So

11   if we are talking about a five-day TRO, Your Honor, the harms

12   they are pointing to will not be addressed by a five-day TRO,

13   so they haven't shown a need to preserve the status quo because

14   they're looking at very long-term harms.

15         And then let me close, Your Honor, something that often

16   gets lost in preliminary injunction and TRO cases, especially

17   with the government is, we look at likelihood of success on the

18   merits, and then we talk about irreparable harm to plaintiffs,

19   but there is one more fact -- there is actually two more but

20   they merged, but it's the public interest and the harm to the

21   government.

22         It's important to go back to the seminal case on

23   preliminary injunctions, Your Honor.  Of course it would apply

24   to TROs too, but that's the Winter case.  Everybody cites

25   Winter for the four factors, and that's 555 U.S. 7, and here is

```
 1    what's so interesting about Winters.  What Winters is cited for
 2    is here are the factors and here are the standards the Court
 3    should use under the factors, but the ultimate holding of
 4    Winter -- and you may recall, Your Honor, this was a case about
 5    Navy sonar, and I think the claim was sonar can harm animals in
 6    the ocean.  But what the Court said was that may well be true,
 7    may well be true, but there are significant equities on the
 8    government's side.  And that sonar training is very important
 9    to the military and the District Court erred in not taking
10    seriously the government equities.
11         And the government equities, Your Honor, as recognized
12    in multiple cases on immigration enforcement are significant.
13    There are executive orders from the president and the governor
14    of the state that say we are in an immigration crisis, that
15    detention facilities are overcrowded, that there are many
16    knock-on harmful effects to society that come from the presence
17    of illegally present individuals in the country, including
18    those who have committed crime, who are some of the people who
19    are detained in this facility.
20         So, those government interests, Your Honor, must be
21    taken into account by the Court, and I think that's the clear
22    holding of the Winter case.
23         So, with that, Your Honor, let me just look at my notes
24    for a second.
25              THE COURT:  Sure.
```

App. 589

1          MR. SCHWIEP:  May I have a brief rebuttal, Your Honor?

2          MR. PANUCCIO:  That's everything, Your Honor.  Thank

3     you.

4          THE COURT:  Thank you, Mr. Panuccio.

5          MS. PIROPATO:  Good afternoon, Your Honor.

6          Good afternoon.  My name is Marisa Piropato for the

7     United States.  I first want to note that I wasn't supposed to

8     be doing this argument today.  My Acting Assistant Attorney

9     General, Adam Gustafson, was supposed to do it.  However, he is

10    on a plane right now because the proceedings have taken a

11    different turn than we expected.

12         And I want to start with saying we first joined the

13    State's argument in full, and I will try not to repeat what

14    they said too much, but I want to start with a proposition that

15    we all agree about.  This is a NEPA case.  Plaintiffs agree.

16    This Court has reminded the parties several times, that this is

17    a NEPA case, and NEPA does not apply here because the

18    construction and operation of the federal detention facility is

19    controlled by Florida.  There is no federal final agency action

20    because the Federal Government has no actual power to control

21    the non-federal activity.

22         And what did plaintiffs have to show over the past two

23    days?

24         The Eleventh Circuit has articulated what plaintiffs

25    have to show in South Florida Water Management District, which

1    is at 28 F.3d 1562.  I believe Mr. Panuccio cited this case,

2    but I'm going to provide some highlights.

3            THE COURT:  Could I pause?

4            MS. PIROPATO:  Sure.

5            THE COURT:  So, I just want to be clear, the

6    non-federal activity, so you are making a distinction between

7    whoever built the facility and the purpose and the day-to-day

8    operation of the facility, and if you aren't, then, are you

9    telling me that the State could bond out or parole anybody in

10   that facility at any time they wanted to?

11           MS. PIROPATO:  I think in terms of bond out control,

12   you mean, send them to a state prison?

13           THE COURT:  Let them go.

14           MS. PIROPATO:  I think they could.

15           THE COURT:  The State?

16           MS. PIROPATO:  I believe they could -- I mean, I

17   think -- the State can, and correct me if I'm wrong --

18           MR. PANUCCIO:  I'm happy to answer that if you want.

19           MS. PIROPATO:  Yes, you should answer that because this

20   goes to the State's power.

21           MR. PANUCCIO:  The State can reject at any time or turn

22   back at any time.

23           THE COURT:  No, no, once they are in and the lawyer

24   finally makes his or her way and says, you got to let this

25   person go, out they go.

1        MR. PANUCCIO:  The State can tell ICE we are no longer

2   keeping this person and you need to take them, and ICE would

3   have to find another place to put them.  It is ultimately the

4   State's decision who's in the detention facility.

5        THE COURT:  So, the State has on-site decision makers

6   about who gets to stay and who gets to go?

7        MR. PANUCCIO:  I can't say whether every person who may

8   be involved in the chain of decision is on-site.  I don't know

9   that for -- I don't know exactly how that works, Your Honor.

10  There may be people in Tallahassee or elsewhere, but the State

11  ultimately will accept or deny those proposed for detention

12  there and could ultimately say this person or this group of

13  persons we will not detain them here anymore, so here they are,

14  DHS, figure it out.

15       THE COURT:  So lawyers should be directing any

16  petitions they have or requests about their clients to state

17  officers.

18       MR. PANUCCIO:  Well, Your Honor, to be fair, I'm only

19  here to discuss the NEPA issues so I cannot --

20       THE COURT:  But that is the NEPA issue, who is running.

21  I repeat, who is running the show and if -- because I need to

22  know and I think other people would be interested, but I

23  definitely need to know if Bob Jones went in and said you have

24  my client, and he needs to leave today, and there would be a

25  state official that would say, okay, out you go.  We will just

1    let ICE know and give us an address, ICE can come find you

2    there.

3          MS. PIROPATO:  I think the question is what show, Your

4    Honor.  This is why I think I'm struggling.

5          THE COURT:  It's only one show, detention.

6          MS. PIROPATO:  Right, the detention decision, as

7    Mr. Panuccio explained, whether or not to house them in the

8    facility, lies with Florida.  That's the housing.  Right?

9          I think that's -- if that's what your question is.  If

10   your question is, are you meeting certain thresholds

11   determination of whether or not this person should be detained,

12   I believe that right rests with ICE.  Those are two separate

13   questions.

14         THE COURT:  Are they really?

15         I mean, I know that's the way you all have been

16   presenting then.

17         I'm not sure Arizona v. United States and all the other

18   decisions about detention and who operates detention in the INA

19   would agree, but I understand that's what you're telling me.

20   So, okay --

21         MS. PIROPATO:  So, if we go back to the Eleventh

22   Circuit decision, federal involvement in non-federal decision

23   making is not enough.  That's the first standard.

24         The Eleventh Circuit has also held that the promise of

25   federal funding is not enough, even when that funding is very

App. 593

29

1   likely.  And the capstone that captures the funding and

2   autonomy point is that NEPA only applies when there is a

3   federal decision making and mere federal involvement in non

4   federal-making decisions is not enough.

5       Again, we are doing this through the lens of the

6   facility because NEPA applies to the facility, and that is why

7   I am looking at it through that lens, Your Honor.  And this is

8   where plaintiffs have a problem.  They have not made the

9   threshold showing of a final agency action by the Federal

10  Government, which is what you need before you raise a viable

11  NEPA claim.  There is not control of the facility.

12      And what have plaintiffs shown to establish final

13  agency action?

14      First, they have some tweets and some social media

15  postings applauding the facility.  Federal Government officials

16  told the facility is a good idea.  You heard testimony about

17  that.  That's not enough.  Second --

18      THE COURT:  What about the White House Deputy Chief of

19  Staff saying the TNT site is an ICE facility; is that enough?

20      MS. PIROPATO:  Saying it's an ICE facility?

21      THE COURT:  It is a, quote, ICE facility, end quote.

22      MS. PIROPATO:  I mean, again, the question is, is ICE

23  controlling it?

24      The detainees there were brought to the facility by the

25  Federal Government, but the Federal Government doesn't control

1    who goes there in the sense that Florida can say, we don't take

2    this person.  We turn them away.

3         They make the decisions about that.

4         Florida built the facility.  They don't -- plaintiffs

5    didn't offer any evidence that the United States Government

6    funded the facility or they constructed the facility.

7         THE COURT:  If AUSAs in another court said that money

8    is earmarked for this facility and told a federal judge that it

9    wasn't available in that case, would that be an acknowledgment

10   of funding?

11        MS. PIROPATO:  Under the Eleventh Circuit decision that

12   we just cited, no.  That's the promise of federal funding.

13   Earmarking is the promise, Your Honor.  It's no more than a

14   promise.  Things can be earmarked.

15        THE COURT:  It apparently doesn't mean a whole hell of

16   a lot, but okay.

17        MS. PIROPATO:  So then you also heard the testimony of

18   a state representative, Dr. Eskamani, that State Defendant

19   Guthrie told her that the Federal Government told Florida to

20   build a detention facility.  Right?

21        And you are even lifting up your eyes now because it's

22   hearsay.  Right?

23        And not this facility as she admitted but a facility,

24   and this is where we get into problems.  Right?

25        Because she made clear why relying on hearsay can be so

App. 595

1   fraught, because it came out on the record that she provided

2   information to someone who helped her draft the declaration,

3   and Director Guthrie's statement about "a facility" became

4   "this facility" in her declaration.

5        THE COURT:  Does that make a difference?

6        MS. PIROPATO:  Yes.

7        THE COURT:  Because?

8        MS. PIROPATO:  It's a question of federal control.

9        The Federal Government didn't tell her -- they didn't

10  tell the State of Florida which facility to build, where to

11  build it, how to build it, how many detainees should be there.

12  So, that is not control, Your Honor.

13       THE COURT:  So -- okay.

14       MS. PIROPATO:  If there was a federal funding, Your

15  Honor, if there was a grant given, then that's a very

16  different -- that's a final agency action, but that hasn't

17  happened yet.

18       THE COURT:  Okay.  So, just so we're clear, the

19  emergency and the inability of anyone to assure me for the next

20  five days there will be no construction is an entirely

21  State-involved emergency, it's got nothing to do with the

22  federal issues or federal immigration or federal demands.

23  That's all the State and --

24       MS. PIROPATO:  If you're asking me, Your Honor, what is

25  this Court going to enjoin, what is there to enjoin of the

1    Federal Government right now.  I mean, that is the question

2    based on the construction activities.

3         There has been no testimony that the Federal Government

4    has controlled, directed or otherwise led the construction

5    activities.  That is what is before this Court right now.  The

6    question is, are you going to enjoin the construction

7    activities for the next five days.  And, yes, it is a case that

8    the Federal Government does not control that.

9         THE COURT:  Okay.

10        MS. PIROPATO:  But I want to point out again, with

11   Dr. Eskamani, they're asking you to trust a game of telephone

12   that they didn't even get right in their own declaration.

13        So, this is why hearsay is fraught.

14        Third, they had testimony which is a double hearsay,

15   maybe triple hearsay.  It's not even clear because of the

16   vagueness of the testimony that a member of the Friends of the

17   Everglades, Jessica Namath, called an unidentified front office

18   line person that is a receptionist at the state government's

19   office who told her it was a federal project.

20        But we know nothing about who provided her with that

21   information or what her basis was for claiming that it was a

22   federal project.

23        And, again, what plaintiffs haven't shown is equally

24   damaging to their case.  They have not shown that the Federal

25   Government engaged, ordered, or controlled any construction

App. 597

1    activities.

2        Florida built the facility.  The testimony has been

3    clear on this point.

4        THE COURT:  What about the -- what is the

5    representative?

6        I think it was the representative where she said

7    Director Guthrie told her he received an e-mail from DHS saying

8    you must build the facility.

9        MS. PIROPATO:  I thought it was "a facility," not "this

10   facility," Your Honor.

11       THE COURT:  A facility, this facility.  Wouldn't we

12   obviate all of this, you know, vagueness problem if we had, oh,

13   say, the e-mail.

14       MS. PIROPATO:  Your Honor, I do not know what e-mail

15   she is referring to.

16       THE COURT:  Well, somebody could have asked, I don't

17   know, someone in DHS or the director, but that doesn't seem to

18   be the way to go because when people ask these direct questions

19   about the facility, they get no answers.

20       What they are compelled to do is talk to unnamed

21   receptionist and chat on tours, and then that evidence is

22   challenged, is unreliable because it's not from the deciders

23   but the deciders are decidedly silent.

24       MS. PIROPATO:  Well, Your Honor, I would again submit

25   that any testimony that an e-mail said to build a facility is

1    not federal control, Your Honor.

2         It's encouragement, but it's not control, and the

3    Eleventh Circuit has been clear that the encouragement is not

4    enough to have that final agency action.

5         I do want to make clear there has been some testimony

6    or suggestion that the operative 287(g) agreements have not

7    been produced.  They were produced on Monday, but there is no

8    agreement with FDEM.  So if that's -- there is no 287(g)

9    agreement between the State of Florida's Emergency Management

10   and ICE.

11        THE COURT:  So, I'm going to keep asking, so who's

12   running the show?  I mean, when all of the celebs and reporters

13   and legislators, when they all go home, and there are just

14   detainees, who is there on site?

15        MS. PIROPATO:  It's Florida.

16        THE COURT:  It's Florida prison guards, Florida law

17   enforcement, Florida wardens?

18        There are no federal law enforcement personnel watching

19   the detention center?

20        MS. PIROPATO:  There are federal employees, and there

21   will be testimony about this when we have the PI hearing.

22        THE COURT:  We're having it.  I could have heard it.

23        MS. PIROPATO:  But the testimony will come out that

24   there are federal agents.  They're line agents who come and

25   will go to the facility, but they're not supervising the

1    facility on a daily basis.  They are not there all the time, if

2    that's your question.

3        THE COURT:  Yeah, my question is under the INA a civil

4    detention facility, not a penal institution, is according to

5    everything I've read to be run by trained immigration personnel

6    from the Federal Government, who's taking care of the

7    detainees.

8        MS. PIROPATO:  So, they are designated officials from

9    Florida that are trained by ICE.

10       THE COURT:  Under the 287(g)?

11       MS. PIROPATO:  Under the 287(g) agreement, Your Honor.

12       THE COURT:  Which 287(g) agreement governs that?  Which

13   agency is signed up?

14       MS. PIROPATO:  My understanding it's between DHS, ICE

15   and the Florida Department of Law Enforcement or FDLE.  That

16   will be the agreement that you will hear testimony about, Your

17   Honor.

18       THE COURT:  Okay.

19       MS. PIROPATO:  Again, they're trained.  There is

20   protocols.  My understanding, it's not like a modest training.

21   It's a pretty robust training.

22       THE COURT:  Okay.  So, 287(g) does govern the operation

23   of the facility.

24       MS. PIROPATO:  It provides the operative agreement that

25   gives Florida the ability to operate the facility, Your Honor.

1          THE COURT:  And governs the operation of the facility?

2          MS. PIROPATO:  It provides threshold requirements, Your

3     Honor.

4          THE COURT:  Okay.  Have it your way.

5          MS. PIROPATO:  Finally, and I think I'm going to end

6     here because I think this is appropriate based on what we've

7     been just talking about.  Plaintiffs have not shown that ICE

8     can compel Florida to detain anyone.

9          As Florida's counsel, Jesse Panuccio just explained to

10    you, his client, not the Federal Government, decides who to

11    detain at the facility.  Florida can turn detainees away, and

12    we are talking about a NEPA decision for this facility.  Not

13    the decision to detain but the facility and its environmental

14    impacts.

15         Thank you, Your Honor.

16         THE COURT:  Thank you.

17         All right.  Mr. Schwiep.

18         MR. SCHWIEP:  So, Your Honor, let me begin with the

19    point that the Federal Defendant just made.

20         If the facility is being operated under 287(g)

21    agreement, which strikes me as the only conceivable option

22    because the Division of Emergency Management is not the

23    Department of Corrections.  They do not have authority to

24    detain people.  So how is this occurring?

25         It's occurring, apparently, under 287(g) agreement with

App. 601

1    FDLE, which means necessarily under 287(g) it is under the

2    color of Federal law, so that should put an end to the issue of

3    whether federal action is involved.

4        You've heard a lot of argument both by the State and

5    the Federal Government about funding.  You never heard me

6    mention once in our motion funding.  There are cases that arise

7    mostly in the context of highway funding that say that the

8    prospect of federal funding does not amount to actual federal

9    action.

10       We are in a completely different realm here, Your

11   Honor, because what is occurring is exclusively a federal

12   function that is enforcement of immigration law by operating a

13   detention center that serves only one purpose.  It necessarily

14   implicates federal law.

15       The evidence we presented is that this facility was

16   requested by ICE.  ICE delivers individuals to the facility.

17   If ICE requested individuals and the State declines to hold

18   someone there, they are returned to ICE and ICE ultimately

19   would deport folks from that facility.

20       And Your Honor is right to reference the representation

21   from White House Policy Advisor Steve Miller, where he says,

22   this is an ICE facility, and it must be because the functions

23   it is performing are fundamentally, exclusively ICE immigration

24   enforcement.

25       And that's clear under Arizona.  It's clear under Your

App. 602

1    Honor's decision.  The facility can't exist only for

2    immigration enforcement purposes, and you're hearing this wild

3    two-step among the defendants that it's not the division, it's

4    not the Federal Government.  It's not -- ultimately, what is

5    occurring on site is immigration enforcement that's exclusively

6    -- and Your Honor held this in the C.T.C. case, which I cited,

7    a federal function.

8         And the standard is not whether -- I heard counsel for

9    defendants say, well, there's been no final federal decision.

10   That's really the standard here.  This doesn't have to be a

11   federal facility.  It can be a State facility.  The standard

12   is whether -- and this is the South Florida Water Management

13   District case everyone cited, 28 F.3d 1563, there is NEPA

14   federal action if the federal agencies' authority to influence

15   a non-federal activity is the touchstone.  That's the

16   touchstone of federal activity.

17        And certainly, everything that's occurring on that

18   property, from the moment a DHS bus turns north off of the

19   trail onto that site, is a federal function.  It doesn't have

20   to be a federal facility.  It has to be there because it's

21   serving a federal function, and that's the only reason it's

22   there.  These are not individuals that are being held under

23   Florida law or in a federal law for a criminal violation.

24        THE COURT:  So, what you are arguing is the funding may

25   be a persuasive component, but it is not the sine qua non of

1    whether or not it is a federal project.

2         MR. SCHWIEP:  That was the phrase I would have used if

3    I was confident I could have pronounced it correctly.

4         Exactly, Your Honor.  Funding hasn't been apparently

5    promised, but I gather there may be some contingencies there.

6         They haven't written the check yet.  They haven't

7    gotten the check yet.  The existence of this lawsuit may have

8    something to do with that but funding is not determinative.

9         THE COURT:  Even if that alone were to be considered,

10   and let's take immigration out of the equation.

11        It's a, I don't know, it's a training facility for

12   scientists.  It's out there, and State folks have put up the

13   building but there is a promise of reimbursement.

14        Isn't that the way to avoid your legal obligation under

15   NEPA?

16        MR. SCHWIEP:  Yes, Your Honor.

17        THE COURT:  I mean, to me it's kind of, you know, the

18   streets of New York.  Where is the -- where is the peanut?

19        I mean, it's not a -- it's not what was contemplated

20   when the strictures of NEPA were designed.  The law is to

21   protect the environment and it addresses federal agencies, but

22   you can't just like hold back for six months and then é voilà

23   the check.  But I think that's why funding isn't the only thing

24   to look at in the analysis.

25        MR. SCHWIEP:  I think, Judge, it's a totality of the

1    circumstances, and funding is one of the issues.  And in our

2    Exhibit 44 you will see the quotes, both from the state's side

3    and from Secretary Noem side saying, the Federal Government is

4    going to be funding this.  The fact that the check hasn't been

5    written yet is not determinative.

6        But aside from the funding, the fact that this facility

7    is serving a function that as a matter of law can only be a

8    federal function, and I appreciate counsel's concession under

9    287(g), because they haven't had -- this isn't Wallace, I hope.

10   So if there is some agreement, some authority, if it's 287(g)

11   then that makes it clear under the statute.  It's done under

12   color of federal law.

13       THE COURT:  Again, this is not about -- this is not

14   about detention, apprehension and all but 287(g) allows under

15   law State agencies to perform the functions of -- that had been

16   exclusively given to federal immigration officials with

17   training and, you know, appropriate supervision, but the

18   statute said, ultimately, the decisions are all flowing to the

19   United States Attorney General.

20       That's who is in charge in a 287(g) context.

21       MR. SCHWIEP:  Starting with Arizona --

22       THE COURT:  Yeah.

23       MR. SCHWIEP:  -- courts have made clear, these are

24   exclusively federal functions, and the point of the 287(g)

25   agreement is to empower the State's law enforcement agencies to

1  perform these federal functions.  Under color of federal law,

2  the officers must be trained.  So, therefore, all of that is

3  occurring, counsel said, under 287(g) agreement which means it

4  has to be federal action.  What's occurring there is federal

5  action.  And to be clear --

6        THE COURT:  Let me quote, 8 U.S.C. 1357(g)(3), in

7  performing a function under this subsection an officer or

8  employee of a State or political subdivision of a State shall

9  be subject to the direction and supervision of the Attorney

10 General.

11       MR. SCHWIEP:  And that language, Your Honor, mirrors

12 almost perfectly with the Goos decision, Bidderman, the South

13 Florida Water Management district, which are NEPA cases that

14 are thinking about what is federal action to trigger a NEPA.

15 If it happens under federal direction, federal supervision,

16 NEPA applies.  And if you are building a 3,000 person detention

17 center within the boundaries of a national preserve, that's

18 Federal action that's going to impact the environment and the

19 agency should have taken the hard look that NEPA requires

20 before actually moving forward.

21       And if it's a 287(g) agreement, which they've said it

22 is, that means there is federal approval, federal government

23 has concluded it's appropriate.  There have been lots of

24 federal actions or decisions along the way.

25       And to my colleague from the State's point, there

1    should be no confusion about what we are seeking in terms of

2    the TRO.  We're seeking a TRO to prevent ongoing construction

3    in this facility, which is serving exclusively a federal

4    function.  And this is just a temporary pause until we can come

5    back next week, early next week and finish this hearing.

6         And, Judge, just on the 1252(f) point, I'm going to

7    cite Garland versus Aleman Gonzalez.  That's 596 U.S. 543.

8    That's a 2002-case, where the Court held -- what 1252(f) is

9    designed to do is prohibit lower courts from entering an

10   injunction, and this is not a quote.  This is my reading of the

11   case, that an injunction that would prohibit immigration

12   enforcement activities; so, apprehension, detention, removal,

13   but the quote went on to say and this is in the opinion at --

14   well, it's in the opinion.  A Court may enjoin unlawful

15   operation that is not specified in 1252(f) even if the

16   injunction may have some collateral effect on the operation of

17   a covered provision.  So, again, we are not seeking any relief

18   to enjoin any subsection four operations.

19        THE COURT:  Right.

20        MR. SCHWIEP:  The Federal Defendants can apprehend,

21   detain, deport.

22        THE COURT:  Right.

23        And to be clear, let's assume the facility, as we all

24   saw in the screen, and there are dormitories there and there

25   are dormitories with available bed space, then people are going

1    to be coming in and out.  That's not what we are talking about

2    at all.

3          MR. SCHWIEP:  We are not seeking to enjoin that.  So,

4    at most, any TRO, which would be temporary, limited to preserve

5    the status quo, which the Court has the authority to do would

6    have, at most, a collateral effect.  And we think it's

7    appropriate to until this hearing concludes.

8          Thank you for your time, Your Honor.

9          THE COURT:  Okay.  I'm going to take a break because

10    it's after lunch.  I'm going to take a break and I will be back

11    in five minutes.  Okay.

12          COURT SECURITY OFFICER:  All rise.  Recess.

13          (Recess.)

14          COURT SECURITY OFFICER:  All rise.

15          THE COURT:  You may all be seated and we have about ten

16    minutes, so, let me briefly say how we got here.

17          We started -- was it only two days ago -- and at the

18    beginning of our proceedings Mr. Schwiep renewed, asked for a

19    temporary restraining order.  I kind of brushed him off.  We

20    didn't need to address.  We were here under preliminary

21    injunction, and he referenced the motion he filed, which I

22    think is Docket Entry 40 -- that could be wrong -- and then we

23    proceeded yesterday -- it was just yesterday -- and we went

24    until 6:30.

25          Indeed, Mr. Schwiep had said it was one day back last

1    week when we had our status conference as the week wore on and

2    exhibit and witness lists were exchanged and the Tribe's motion

3    was granted, I wondered was I the only person who knew it

4    wouldn't last a day, and, apparently, I was the only person.

5         But we agreed last night that we would go this morning

6    because of travel plans that defense counsel had.  Then when we

7    went to break, Mr. Schwiep renewed his motion for TRO, citing

8    Ms. Namath's testimony of yesterday about the many trucks she

9    had seen coming in on Friday.

10        I had said this before.  Perhaps if it's naiveté on my

11   part or it can be chocked up to plain ignorance, but I thought

12   that this issue could be readily and easily handled by the

13   defendants agreeing that for the ensuing five days there would

14   be no construction, no paving, no -- and I believe it's in the

15   proposed order that Mr. -- filling, installation of additional

16   infrastructure, not gardening, not fixing plumbing, all of

17   those things.

18        That agreement could not be had, so we have now had

19   oral argument on the TRO.  Let me first start with the issues

20   raised by the defendant, the 8 U.S.C. 1252, I had said at the

21   beginning of these proceedings that was not an issue before the

22   Court, and I still believe it is not an issue.  It governs

23   Congress's comprehensive scheme for judicial review of removal

24   orders, Canela Media Holding 964 F.3d 1250.

25        Plaintiffs are not asking this Court, nor would this

App. 609

1    Court enter an order stopping or suspending immigration

2    enforcement on this record.  The injunctive relief requested is

3    compliance with based on violation of NEPA requirements.

4         I would also direct the parties to Wallace versus

5    Secretary of Homeland Security, 616 F. Appx 958.  1252(g) is

6    not to be construed broadly as a zipper clause applying to the

7    full universe of deportation-related claims but instead as

8    applying narrowly only to the three discrete government actions

9    enumerated, and while other decisions may be part of that

10   process, only claims that arise from one of the covered actions

11   are excluded.

12        We are not challenging the plaintiffs, say, the

13   Attorney General's decision to commence removal proceedings,

14   follow through on removal proceedings, any decision about that.

15   This is a claim that the facility as it is presently

16   constituted and its construction violated NEPA, so that's not

17   applicable.

18        As to venue, let's see, Mr. Gustafson said, you'll

19   agree venue isn't a jurisdictional question.  That's correct,

20   venue is non jurisdictional, Harris versus National Iranian

21   Radio and Television, 691 F.2d 1344, venue is not a

22   jurisdictional prerequisite.  Its presence or absence doesn't

23   affect a Court's authority to adjudicate, and that was in a

24   preliminary injunction context.

25        I would also direct the parties to Arval Service Lease,

1  2014 WL 12614422, where the Court addressed the preliminary

2  injunction before deciding venue because of the urgency of the

3  issue raised, and then there is Southern Vision versus Red

4  Diamond, and that's out of the Northern District of Georgia

5  finding venue was improper but ruling on the injunction in the

6  interest of justice and judicial economy.

7        I, again, was hoping that we were going to be able to

8  handle this all next week, but we can't and so here we are and

9  there is no obstacle as to venue.

10        As to whether or not a TRO should issue, obviously, my

11  points are going to be somewhat scattered, as you can see,

12  based on my notes, but it seems to me that on this record the

13  plaintiffs have introduced evidence of ongoing and material

14  environmental harms posed by the operation of the site, and

15  that comes from Dr. McVoy and Mr. Kautz -- I didn't pronounce

16  his name correctly -- and Mr. Reio.  They discussed,

17  respectively, and I'd have to go back to my notes for the

18  particulars, but the potential adverse impact to the panther

19  community and habitat, the danger caused by the water runoff

20  from the construction on the site, and the paving activities.

21  And I think that that evidence is sufficient to support the

22  plaintiffs' claims.

23        The four requisites, obviously, are substantial

24  likelihood of success, TRO necessary to prevent irreparable

25  injury, the threatened injury outweighs the harm, and it would

1    not be adverse to public interest.

2          I think the irreparable harm is clear.

3          Now, I'm asked by counsel for the defendants to talk

4    about the equities to the government, and it's hard to

5    ascertain what sovereign I'm speaking to, but I think the

6    better interpretation of the evidence is that this is, at

7    minimum, a joint partnership to trigger any APA obligation.

8          Is it Goos or Goos versus ICC 911 F.2d 1283, and

9    whether federal -- and then a Fund for Animals versus Clark as

10    to the legal control and whether the federal action is a legal

11    condition or precedent.  There has been a lot of talk about

12    287(g) which my understanding has been that's ultimate

13    authority for any kind of partnership with the Federal

14    Government and specifically the Attorney General, but there is

15    also State law SB 168 which requires the State to honor ICE

16    detainers.

17          There is a lot of litigation about that and that

18    ultimately inured to the view that the State had promulgated

19    about compliance with that.

20          The idea that women and children aren't being held at

21    the facility being a State decision, I don't -- there is no

22    decision.  There is no institution, penal or otherwise, that

23    would house women and children with men in a detention context.

24    There would be some separation, and since we're not clear yet

25    of the dormitory situation, I'm not sure how meaningful that

1    is.  But I don't think it demonstrates that this is a State

2    operation.

3         I think there are the many statements by high ranking

4    and responsible government officials that this is an ICE

5    operation, and this is an ICE facility, and we have witnesses

6    who were advised by Director Guthrie who -- I don't think there

7    was any attempt to obscure that issue by the director.  I think

8    the director was being forthcoming and by the, as yet, unknown

9    and unnamed receptionist for Governor DeSantis.

10        But I take that with whatever grain of salt the

11   defendants wish me to apply to this stew.

12        I don't think funding, as I said, is the sine qua nom.

13   I think, obviously, it's a matter that the federal agencies

14   appropriately have pointed to but, again, if there -- I believe

15   there is litigation in Illinois, where officials of the

16   Government had advised that money was unavailable because it is

17   being directed to this particular facility.

18        So, for all of these reasons and for all of the

19   evidence that has been adduced on the record and because there

20   is no assurance that even as we litigate this very important

21   issue about a park and about an area which I'd have to ask

22   people to check, but since its establishment, Everglades Park

23   in 1947, and Big Cypress in the '70s, I don't think there has

24   been one senator, one governor, one president, who has not

25   lauded the beauty and the importance of the Everglades and the

1    importance of it being maintained in as pristine a fashion as

2    possible.  And because of that I'm going to enter this

3    afternoon a written TRO directing that no further activity in

4    the context I just discussed be conducted in the next 14 days.

5         That will give us room for next week.

6         I consider this announcement an order of the Court, but

7    I will follow up this afternoon with a written order, and this

8    is now 2:34 p.m. for anyone who really cares about that.  I'm,

9    of course, saddened that I have to say that my ruling is, in

10   fact, an order of the Court, but we have to do what we must do.

11   But I do appreciate counsel's request earlier in the

12   proceedings would like something in writing and I will provide

13   something in writing.

14        So, with that, we will adjourn because we must and let

15   me ask the defendants, you have your oral argument,

16   Mr. Panuccio, and I hadn't thought -- are you in

17   Fort Lauderdale?

18        Would you like to start later?

19        That is my long way of going about this.

20   MR. PANUCCIO:  Yes, I will answer that, and then I have

21   one question just for clarification case from the other.  I

22   don't live in Lauderdale, I live north of that.  Right now I'm

23   scheduled to arrive at Palm Beach 9:00 p.m., Monday night.

24        I can get down here when the Court wants to start.

25   Although, if we wanted to start an hour later than normal that

1    would be appreciated, but if the Court wants to start at 9:00,

2    I'll be here.

3

4          THE COURT:  I don't know if you do Brightline.

5          MR. PANUCCIO:  Yes.

6          THE COURT:  So would it be easier for you if we start

7    at 10:00 or 10:30?

8          MR. PANUCCIO:  10:00 would be great, if it's okay with

9    my Friends from the Federal Government.

10          MS. PIROPATO:  Ten is fine.

11          THE COURT:  So, we will start at 10:00 a.m. on Tuesday.

12          I can't tell if there was another witness you had,

13    Mr. Schwiep, or were done.

14          MR. SCHWIEP:  We are done with our witnesses.  We may

15    have some exhibits that we want to move in but would like some

16    time to look in our notes, and if we can take care of that

17    Monday morning we will confer with counsel to see if we can

18    avoid any disputes about it.

19          THE COURT:  Okay.  I also know that we have the matter

20    of the Tribe's declaration.

21          Counsel, you now have a lot of time to prepare at least

22    one or two witnesses who are local.  So, I will tell you right

23    now, I'm not going to accept all five.  I may -- I might change

24    my mind if I have one or two live witnesses, and when you

25    decide or if you decide, you will bring in one or two live

1  witnesses.  Immediately advise, I know I'm going to butcher

2  your name.

3          MR. SINGER:  Singer.

4          MS. PIROPATO:  You will be in very esteemed company if

5  you butcher my name, it's Piropato.

6          THE COURT:  Them, tell them that the names of the

7  persons that you are going to call and then you will come after

8  Mr. Schwiep on Tuesday.

9          MR. AJIZIAN:  Understood, Your Honor, and we will let

10  you know by tomorrow.

11          MR. PANUCCIO:  One point of clarification, I appreciate

12  that the Court is going to issue a written order.

13          But one thing I wanted to clarify.  Mr. Schwiep had a

14  very particular ask, and the Court, I think, shorthanded and

15  then just said, the TRO will relate to the issues discussed

16  but, obviously, when we are dealing with having to call our

17  clients and say stop this, could the Court just read, if it's

18  available, the particular activities.

19          THE COURT:  I will tell you, that's why I did not

20  because I may expand, but so I will say these activities but

21  not limited to -- now I have lost my page.  Here it is.

22          At the very least, filling, paving, installation of

23  additional infrastructure, and I was a little -- the reason I

24  paused by lighting, Mr. Schwiep, is because I didn't -- I

25  didn't think that was really part of what Ms. Namath had talked

1    about but, I mean...

2         MR. SCHWIEP:  Well, Mr. Kautz talked about how the

3    lighting has impacted panther and we ask for no additional

4    lighting.  The lighting that's there we understand is there.

5         THE COURT:  All right.  So, no additional, the poles

6    and the bases that were described as there now.

7         MR. SCHWIEP:  That's what was intended, Your Honor.

8         THE COURT:  Okay.  The tall -- maybe you should send me

9    and send Mr. Panuccio specific description of that lighting.

10        MR. SCHWIEP:  There is a photo in the complaint and

11   Representative Eskamani talked about the Sunbelt-driven

12   generators but we can confer.

13        THE COURT:  Okay.  Is there any particular thing,

14   Mr. Panuccio, that you are -- that you wondered about?

15        Again, if the hypothetical that I had thought of is the

16   facility, as it is right now, may have occupancy for persons

17   appropriately detained there, then it does.  Then, busses and

18   there will be movement, and that is, of course, that is the

19   defendants' prerogative but no additional tents as they were,

20   as we've seen them.  No additional paving.

21        MR. PANUCCIO:  Thank you for the clarification, Your

22   Honor.

23        MR. MURRAY:  Your Honor.

24        THE COURT:  You are like winning, so I don't want you

25   to snatch defeat from the jaws of victory, but go ahead.

```
 1          MR. MURRAY:  It's under advisement.

 2          I just want to make sure, we have not been the subject

 3   of any preliminary request for injunctive relief in this

 4   matter.

 5          THE COURT STENOGRAPHER:  I'm sorry.  Can you use the

 6   microphone?

 7          THE COURT:  Right.

 8          MR. MURRAY:  We have not been subject to any request

 9   for preliminary injunction relief in this matter.  I just want

10   to be sure.

11          THE COURT:  No.

12          MR. MURRAY:  And I want to clarify that the Court's

13   order directing such relief is not directed at the county

14   facially.

15          THE COURT:  No, but that brings up an excellent point,

16   which I had to deal with recently and I want to make clear.

17   This injunction is directed to the parties, the Federal and

18   State defendant parties.  Those parties' officers, agents,

19   servants, employees and attorneys and other persons who are in

20   active concert or participation with anyone described in

21   Rule 65.

22          And as I understand that from the requested relief that

23   would include Sunbelt contractors, subcontractors, people who

24   have been engaged to do filling, paving, lighting and

25   installation.  I think I got it all.
```

```
1              All right.  Thank you all safe travels.

2              MR. PANUCCIO:  One more scheduling.

3              We start Tuesday at 10:00?

4              THE COURT:  Right.

5              MR. PANUCCIO:  Given how things have gone, I assume

6     we -- we may go onto another day.  Is the Court free later in

7     the week?

8              THE COURT:  I have cleared.

9              MR. PANUCCIO:  Okay.  And we will do the same.  Thank

10    you.

11             THE COURT:  But I'm not going to clear it for months.

12             MR. PANUCCIO:  I understand.

13             THE COURT:  I just cleared for next week.  So, yes,

14    Tuesday, Wednesday, if need be, Thursday.

15             MR. PANUCCIO:  Thank you, Your Honor.

16             THE COURT:  Thank you.  Safe travels.  I will see you

17    next week.

18             MR. SCHWIEP:  Thank you, Judge.  See you Tuesday.

19             (Proceedings were adjourned at 2:45 p.m.)

20

21

22

23

24

25
```

App. 619

```
 1                    C E R T I F I C A T E

 2

 3            I hereby certify that the foregoing is an

 4    accurate transcription of the proceedings in the

 5    above-entitled matter.

 6

 7

 8

 9    August 8, 2025          /s/Patricia Diaz_____
      DATE                    PATRICIA DIAZ, FCRR, RPR, FPR
10                            Official Court Reporter
                              United States District Court
11                            400 North Miami Avenue, 11th Floor
                              Miami, Florida 33128
12                            (305) 523-5178

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**'**

'70s [1] - 48:23

**/**

/s/Patricia - 55:9

**0**

025504 [1] - 2:25

**1**

1 [3] - 1:8, 1:16, 15:6
1055 [1] - 14:8
1068 [1] - 5:21
1091 [1] - 21:24
10:00 [4] - 50:7, 50:8, 50:11, 54:3
10:15 [1] - 4:17
10:30 [1] - 50:7
1101 [1] - 2:4
11th [2] - 3:4, 55:11
1200 [1] - 2:10
1226 [1] - 20:10
1226's [1] - 20:5
1226(a) [1] - 19:23
1226(e [1] - 19:25
1231(g [1] - 20:11
1236 [1] - 8:13
1250 [1] - 44:24
1251(f [1] - 11:25
1252 [1] - 44:20
1252(f [4] - 20:6, 42:6, 42:8, 42:15
1252(f) [1] - 20:17
1252(g [1] - 45:5
12614422 [1] - 46:1
1281 [1] - 10:22
1283 [2] - 9:2, 47:8
1291 [1] - 14:2
1297 [1] - 14:2
1344 [1] - 45:21
1357(g)(3 [1] - 41:6
137 [1] - 5:20
14 [1] - 49:4
150 [2] - 2:21, 23:1
1562 [1] - 26:1
1563 [2] - 15:22, 38:13
1573 [1] - 15:22
16-1 [1] - 16:18
168 [1] - 47:15
18 [1] - 9:23
1947 [1] - 48:23
1969 [1] - 6:23
197 [1] - 21:4
1994 [1] - 19:9
1994-case [1] - 15:22

1995 [1] - 18:24
1999 [1] - 21:5
1:13 [1] - 1:6

**2**

2,000 [1] - 10:7
20 [1] - 9:18
20002 [1] - 2:21
2001 [1] - 14:8
2002-case [1] - 42:8
2007 [1] - 14:3
201 [1] - 1:19
2014 [1] - 46:1
2021 [1] - 21:24
2025 [2] - 1:5, 55:9
20530 [1] - 2:19
21-1 [2] - 16:19, 17:18
2155 [1] - 1:22
217 [1] - 21:7
24 [1] - 8:7
25 [1] - 10:8
25-22896-CV-KMW [1] - 1:2
2601 [1] - 1:15
261 [1] - 14:8
28 [4] - 8:5, 15:21, 26:1, 38:13
28,000 [1] - 23:1
287(g [20] - 7:25, 8:8, 19:15, 34:6, 34:8, 35:10, 35:11, 35:12, 35:22, 36:20, 36:25, 37:1, 40:9, 40:10, 40:14, 40:20, 40:24, 41:3, 41:21, 47:12
2:34 [1] - 49:8
2:45 [2] - 1:6, 54:19

**3**

3,000 [1] - 41:16
30 [1] - 11:11
305 [2] - 3:5, 55:12
327 [1] - 19:8
33 [1] - 19:8
33102 [1] - 2:25
33128 [2] - 3:5, 55:11
33131 [1] - 2:5
33132 [1] - 2:15
33133 [1] - 1:16
33134 [1] - 1:20
33301 [1] - 2:11
33731-2155 [1] - 1:23
349 [1] - 8:13
386 [1] - 10:22
392 [1] - 18:24
3d [2] - 8:13, 21:24

**4**

4 [3] - 2:15, 20:8, 20:9
40 [2] - 11:5, 43:22
400 [2] - 3:4, 55:11
401 [1] - 2:10
4045304 [1] - 21:7
42 [1] - 21:17
43 [1] - 21:15
433 [1] - 21:4
4332 [1] - 21:15
4336(e)(10)(B)(v) [2] - 21:17, 21:20
44 [2] - 7:4, 40:2
45 [3] - 7:10, 7:15, 23:10
4500 [1] - 1:19
475 [1] - 14:2
497 [2] - 10:13, 10:16

**5**

513 [1] - 18:24
523-5178 [2] - 3:5, 55:12
53 [1] - 7:21
543 [1] - 42:7
553 [1] - 21:23
555 [1] - 23:25
56 [1] - 7:21
596 [1] - 42:7
5:00 [1] - 8:3

**6**

616 [1] - 45:5
65 [2] - 5:13, 53:21
691 [1] - 45:21
6:30 [1] - 43:24

**7**

7 [2] - 1:5, 23:25
700 [1] - 2:4
79 [1] - 6:20

**8**

8 [7] - 11:25, 19:23, 20:6, 20:17, 41:6, 44:20, 55:9
82 [1] - 9:19
872 [2] - 10:13, 10:16

**9**

911 [2] - 9:2, 47:8
950 [1] - 2:18
958 [1] - 45:5

964 [1] - 44:24
99 [1] - 2:15
9:00 [2] - 49:23, 50:1

**A**

a.m [1] - 50:11
ability [2] - 8:10, 35:25
able [1] - 46:7
above-entitled [1] - 55:5
absence [2] - 15:15, 45:22
accept [2] - 27:11, 50:23
according [1] - 35:4
account [1] - 24:21
accurate [1] - 55:4
acknowledgment [1] - 30:9
acres [3] - 9:18, 9:24, 10:7
acting [3] - 6:5, 8:14, 19:4
ACTING [1] - 2:17
Acting [1] - 25:8
action [29] - 6:1, 7:1, 7:3, 8:25, 9:5, 13:15, 13:23, 14:10, 14:13, 15:16, 16:11, 19:11, 20:3, 20:23, 21:14, 22:7, 25:19, 29:9, 29:13, 31:16, 34:4, 37:3, 37:9, 38:14, 41:4, 41:5, 41:14, 41:18, 47:10
actions [7] - 21:15, 21:16, 21:17, 22:4, 41:24, 45:8, 45:10
active [1] - 53:20
activities [11] - 11:19, 11:20, 11:21, 32:2, 32:5, 32:7, 33:1, 42:12, 46:20, 51:18, 51:20
activity [10] - 10:7, 11:22, 22:2, 22:3, 22:18, 25:21, 26:6, 38:15, 38:16, 49:3
actor [1] - 9:4
actual [4] - 17:12, 18:17, 25:20, 37:8
ADAM [1] - 2:16
Adam [1] - 25:9
add [1] - 13:2
additional [7] - 12:4, 44:15, 51:23, 52:3, 52:5, 52:19, 52:20
address [2] - 28:1,

43:20
addressed [2] - 23:12, 46:1
addresses [1] - 39:21
adduced [1] - 48:19
adequately [1] - 10:23
adjourn [1] - 49:14
adjourned [1] - 54:19
adjudicate [1] - 45:23
adjusted [1] - 4:21
administering [1] - 19:10
administrative [2] - 21:16, 22:6
admitted [1] - 30:23
adverse [2] - 46:18, 47:1
advise [1] - 51:1
advised [2] - 48:6, 48:16
advisement [1] - 53:1
Advisor [1] - 37:21
affect [1] - 45:23
afternoon [4] - 4:7, 11:3, 25:5, 25:6, 49:3, 49:7
AFTERNOON [1] - 1:7
agencies [10] - 6:11, 14:5, 14:6, 14:9, 19:5, 39:21, 40:15, 40:25, 48:13
agencies' [1] - 38:14
agency [5] - 5:25, 9:5, 14:10, 19:2, 19:4, 19:11, 19:16, 20:24, 25:19, 29:9, 29:13, 31:16, 34:4, 35:13, 41:19
agents [3] - 34:24, 53:18
aggression [1] - 10:10
ago [1] - 43:17
agree [6] - 11:15, 22:23, 25:15, 28:19, 45:19
agreed [1] - 44:5
agreeing [1] - 44:13
agreement [17] - 8:1, 8:4, 8:5, 8:8, 34:8, 34:9, 35:11, 35:12, 35:16, 35:24, 36:21, 36:25, 40:10, 40:25, 41:3, 41:21, 44:18

App. 621

**agreements** [1] - 34:6
**ahead** [1] - 52:25
**aircrafts** [1] - 23:2
**airplane** [1] - 23:6
**airplanes** [1] - 22:23
**airport** [1] - 22:25
**AJIZIAN** [4] - 2:3, 2:3, 12:11, 51:9
**al** [2] - 1:4, 1:7
**Aleman** [1] - 42:7
**alien** [2] - 19:25, 20:4
**aliens** [2] - 20:12, 21:2
**allows** [1] - 40:14
**almost** [1] - 41:12
**alone** [3] - 12:21, 19:3, 39:9
**Alternatives** [1] - 21:23
**alternatives** [1] - 5:25
**Amber** [1] - 9:17
**amount** [1] - 37:8
**Amtrak** [1] - 18:25
**analysis** [1] - 39:24
**Animals** [1] - 47:9
**animals** [1] - 24:5
**announcement** [1] - 49:6
**answer** [3] - 26:18, 26:19, 49:20
**answers** [1] - 33:19
**APA** [14] - 5:16, 5:19, 13:24, 13:25, 14:4, 14:5, 14:8, 14:10, 18:21, 19:1, 19:12, 19:16, 20:22, 47:7
**apologies** [2] - 4:22, 5:4
**APPEARANCES** [1] - 1:13
**applauding** [1] - 29:15
**applicable** [2] - 13:25, 45:17
**application** [1] - 20:1
**applied** [1] - 9:23
**applies** [5] - 14:9, 21:14, 29:2, 29:6, 41:16
**apply** [6] - 9:18, 14:5, 14:6, 23:23, 25:17, 48:11
**applying** [2] - 45:6, 45:8
**appreciate** [2] - 40:8, 49:11, 51:11
**appreciated** [1] - 50:1

**apprehend** [1] - 42:20
**apprehension** [3] - 11:23, 40:14, 42:12
**approach** [1] - 6:17
**appropriate** [10] - 11:17, 12:1, 20:12, 20:15, 20:25, 21:3, 36:6, 40:17, 41:23, 43:7
**appropriately** [2] - 48:14, 52:17
**approval** [1] - 41:22
**approved** [1] - 7:19
**Appx** [1] - 45:5
**arbitrary** [1] - 5:19
**area** [4] - 9:16, 10:10, 10:11, 48:21
**areas** [1] - 9:23
**argued** [1] - 12:25
**arguing** [1] - 38:24
**argument** [7] - 13:2, 17:10, 25:8, 25:13, 37:4, 44:19, 49:15
**arise** [2] - 37:6, 45:10
**Arizona** [3] - 28:17, 37:25, 40:21
**arose** [1] - 6:17
**arrange** [3] - 20:11, 20:15, 20:25
**arrested** [1] - 19:24
**arrive** [1] - 49:23
**articulated** [1] - 25:24
**Arval** [1] - 45:25
**ascertain** [1] - 47:5
**Ashley** [1] - 7:11
**aside** [2] - 20:3, 40:6
**Assistant** [1] - 25:8
**ASSISTANT** [1] - 2:17
**assume** [2] - 42:23, 54:5
**assumed** [1] - 4:14
**assumptions** [1] - 20:20
**assurance** [1] - 48:20
**assure** [1] - 31:19
**attempt** [1] - 48:7
**Attorney** [6] - 7:12, 25:8, 40:19, 41:9, 45:13, 47:14
**ATTORNEY** [1] - 2:17
**ATTORNEY'S** [2] - 2:14, 2:24
**attorneys** [1] - 53:19
**August** [2] - 1:5,

55:9
**AUSAs** [1] - 30:7
**authorities** [1] - 11:8
**authority** [10] - 8:10, 8:14, 8:20, 20:7, 36:23, 38:14, 40:10, 43:5, 45:23, 47:13
**authorized** [1] - 8:15
**authorizes** [1] - 20:10
**autonomy** [1] - 29:2
**available** [3] - 30:9, 42:25, 51:18
**Ave** [1] - 2:18
**Avenue** [3] - 2:4, 3:4, 55:11
**avoid** [2] - 39:14, 50:18
**aware** [1] - 15:13

## B

**balance** [1] - 5:14
**barred** [1] - 13:17
**based** [4] - 32:2, 36:6, 45:3, 46:12
**baseline** [1] - 13:12
**bases** [1] - 5:2
**basis** [6] - 7:21, 15:16, 17:13, 23:7, 32:21, 35:1
**Bayshore** [1] - 1:15
**Beach** [1] - 49:23
**beauty** [1] - 48:25
**became** [1] - 31:3
**bed** [1] - 42:25
**bedrock** [1] - 14:4
**BEFORE** [1] - 1:10
**beforehand** [1] - 22:17
**begin** [2] - 12:18, 36:18
**beginning** [2] - 43:18, 44:21
**behalf** [1] - 4:8
**believes** [1] - 17:2
**belongs** [1] - 17:19
**BENNETT** [1] - 1:21
**Bennett** [1] - 9:7
**better** [1] - 47:6
**between** [7] - 8:1, 8:4, 8:6, 8:9, 26:6, 34:9, 35:14
**Bidderman** [1] - 41:12
**Big** [1] - 48:23
**binding** [2] - 15:20, 19:6
**BIOLOGICAL** [1] - 1:22

**Biscayne** [1] - 1:19
**board** [1] - 19:10
**Bob** [1] - 27:23
**BOIES** [1] - 2:9
**bond** [3] - 20:4, 26:9, 26:11
**bottom** [1] - 12:19
**Boulevard** [2] - 1:19, 2:10
**boundaries** [1] - 41:17
**Box** [2] - 1:22, 2:25
**break** [3] - 43:9, 43:10, 44:7
**breath** [1] - 16:7
**Brickell** [1] - 2:4
**brief** [2] - 5:18, 25:1
**briefing** [2] - 13:21, 21:9
**briefly** [3] - 12:22, 22:13, 43:16
**Brightline** [1] - 50:4
**bring** [1] - 50:25
**brings** [1] - 53:15
**broadly** [1] - 45:6
**brought** [1] - 29:24
**brushed** [1] - 43:19
**build** [8] - 6:16, 7:14, 30:20, 31:10, 31:11, 33:8, 33:25
**building** [4] - 6:12, 7:13, 39:13, 41:16
**built** [7] - 7:19, 9:10, 9:22, 10:1, 26:7, 30:4, 33:2
**BURKHARDT** [1] - 1:18
**BURLINGTON** [1] - 1:15
**bus** [1] - 38:18
**busses** [1] - 52:17
**butcher** [2] - 51:1, 51:5
**BY** [1] - 3:1

## C

**C.F.C** [1] - 8:12
**C.T.C** [1] - 38:6
**Canela** [1] - 44:24
**cannot** [5] - 15:15, 15:16, 17:13, 22:12, 27:19
**capricious** [1] - 5:19
**capstone** [1] - 29:1
**captures** [1] - 29:1
**care** [2] - 35:6, 50:16
**cares** [1] - 49:8
**CARLOS** [1] - 2:14
**carried** [1] - 16:21

**case** [35] - 5:23, 6:6, 9:10, 10:15, 10:16, 10:22, 13:2, 14:2, 14:4, 14:7, 16:1, 17:14, 18:24, 18:25, 19:6, 19:9, 21:22, 21:24, 22:11, 22:14, 23:22, 23:24, 24:4, 24:22, 25:15, 25:17, 26:1, 30:9, 32:7, 32:24, 38:6, 38:13, 42:11, 49:21
**CASE** [1] - 1:2
**cases** [7] - 14:3, 21:5, 21:9, 23:16, 24:12, 37:6, 41:13
**catching** [1] - 16:7
**categories** [1] - 17:22
**caused** [1] - 46:19
**Cecil** [3] - 19:7, 19:8
**celebs** [1] - 34:12
**cell** [2] - 11:6
**Center** [1] - 21:23
**center** [6] - 6:13, 7:13, 8:19, 34:19, 37:13, 41:17
**CENTER** [1] - 1:22
**certain** [1] - 28:10
**certainly** [1] - 38:17
**certified** [1] - 8:15
**certify** [1] - 55:3
**chain** [1] - 27:8
**challenged** [2] - 13:23, 33:22
**challenging** [8] - 14:15, 14:16, 14:17, 14:18, 14:20, 14:21, 17:11, 45:12
**change** [1] - 50:23
**characterized** [1] - 5:23
**charge** [5] - 16:24, 17:1, 17:3, 17:5, 40:20
**charging** [1] - 14:22
**chat** [1] - 33:21
**check** [5] - 39:6, 39:7, 39:23, 40:4, 48:22
**Chief** [1] - 29:18
**children** [3] - 17:23, 47:20, 47:23
**chocked** [1] - 44:11
**choice** [1] - 20:22
**CHRISTOPHER** [2] - 2:3, 2:3
**Circuit** [14] - 10:13, 10:19, 14:2, 14:4, 14:8, 15:20, 16:2,

App. 622

19:9, 21:5, 25:24, 28:22, 28:24, 30:11, 34:3

**circumstances** [2] - 11:14, 40:1

**citation** [3] - 14:1, 14:7, 21:22

**citations** [1] - 18:23

**cite** [5] - 8:12, 10:15, 15:14, 22:17, 42:7

**cited** [8] - 14:3, 15:18, 21:8, 24:1, 26:1, 30:12, 38:6, 38:13

**cites** [1] - 23:24

**citing** [1] - 44:7

**civil** [5] - 8:17, 21:16, 21:21, 22:6, 35:3

**claim** [5] - 13:13, 13:15, 24:5, 29:11, 45:15

**claimed** [1] - 15:10

**claiming** [1] - 32:21

**claims** [7] - 13:13, 13:17, 13:23, 45:7, 45:10, 46:22

**clarification** [3] - 49:21, 51:11, 52:21

**clarify** [1] - 51:13, 53:12

**Clark** [1] - 47:9

**clause** [1] - 45:6

**clear** [20] - 11:18, 21:19, 24:21, 26:5, 30:25, 31:18, 32:15, 33:3, 34:3, 34:5, 37:25, 40:11, 40:23, 41:5, 42:23, 47:2, 47:24, 53:16, 54:11

**cleared** [2] - 54:8, 54:13

**client** [2] - 27:24, 36:10

**clients** [2] - 27:16, 51:17

**clocks** [1] - 4:21

**close** [1] - 23:15

**Club** [1] - 10:12

**COFFEY** [1] - 1:15

**cognizable** [1] - 20:23

**collateral** [2] - 42:16, 43:6

**colleague** [1] - 41:25

**colleagues** [1] - 5:5

**Collier** [1] - 13:9

**color** [6] - 8:11, 8:14, 8:19, 37:2, 40:12, 41:1

**coming** [2] - 43:1,

44:9

**commandeered** [1] - 16:16

**commence** [1] - 45:13

**committed** [2] - 20:23, 24:18

**committing** [1] - 19:11

**common** [2] - 13:19, 13:21

**community** [1] - 46:19

**compactor** [1] - 11:12

**company** [1] - 51:4

**compared** [2] - 22:16

**compel** [1] - 36:8

**compelled** [1] - 33:20

**complaint** [2] - 13:14, 52:10

**completely** [2] - 8:22, 37:10

**compliance** [3] - 6:7, 45:3, 47:19

**component** [1] - 38:25

**comprehensive** [1] - 44:23

**conceded** [2] - 6:7, 14:1

**conceivable** [1] - 36:21

**concerned** [1] - 11:2

**concert** [1] - 53:20

**concession** [1] - 40:8

**conclude** [1] - 12:1

**concluded** [1] - 41:23

**concludes** [1] - 43:7

**conclusion** [1] - 8:21

**concrete** [2] - 9:9, 9:12

**condition** [2] - 9:3, 47:11

**conduct** [1] - 9:3

**conducted** [2] - 9:3, 49:4

**confer** [2] - 50:17, 52:12

**conference** [1] - 44:1

**confident** [1] - 39:3

**confusion** [1] - 42:1

**Congress** [1] - 20:24

**Congress's** [1] - 44:23

**connections** [1] - 9:16

**consider** [4] - 5:25, 6:3, 19:22, 49:6

**considered** [1] - 39:9

**constituted** [1] - 45:16

**constitutionally** [1] - 8:16

**construct** [1] - 15:6

**constructed** [2] - 17:7, 30:6

**construction** [20] - 14:17, 14:18, 14:21, 14:22, 16:9, 16:12, 16:20, 17:5, 17:6, 25:18, 31:20, 32:2, 32:4, 32:6, 32:25, 42:2, 44:14, 45:16, 46:20

**construed** [1] - 45:6

**consult** [1] - 6:2

**contact** [1] - 11:8

**contacted** [1] - 7:12

**contaminants** [1] - 10:2

**contemplated** [1] - 39:19

**contention** [1] - 7:1

**contested** [1] - 9:6

**context** [5] - 37:7, 40:20, 45:24, 47:23, 49:4

**contingencies** [1] - 39:5

**CONTINUED** [1] - 1:10

**contractors** [1] - 53:23

**contrary** [1] - 5:20

**control** [11] - 7:3, 25:20, 26:11, 29:11, 29:25, 31:8, 31:12, 32:8, 34:1, 34:2, 47:10

**controlled** [3] - 25:19, 32:4, 32:25

**controlling** [2] - 16:2, 29:23

**correct** [2] - 26:17, 45:19

**Corrections** [1] - 36:23

**correctly** [2] - 39:3, 46:16

**COSTELLO** [1] - 2:9

**counsel** [7] - 36:9, 38:8, 41:3, 44:6, 47:3, 50:17, 50:21

**counsel's** [2] - 40:8, 49:11

**counter** [1] - 20:20

**country** [1] - 24:17

**counts** [1] - 5:16

**COUNTY** [2] - 2:23, 2:24

**County** [5] - 8:13, 13:6, 13:9, 19:8, 22:25

**county** [1] - 53:13

**course** [3] - 13:15, 19:5, 22:20, 23:23, 49:9, 52:18

**Court** [39] - 3:3, 3:3, 4:1, 4:8, 10:16, 13:1, 13:16, 13:17, 13:22, 14:1, 18:23, 18:24, 20:7, 20:19, 21:25, 24:2, 24:6, 24:9, 24:21, 25:16, 31:25, 32:5, 42:8, 42:14, 43:5, 44:22, 44:25, 45:1, 46:1, 49:6, 49:10, 49:24, 50:1, 51:12, 51:14, 51:17, 54:6, 55:10, 55:10

**court** [6] - 18:9, 20:2, 20:6, 21:8, 21:19, 30:7

**COURT** [86] - 1:1, 4:2, 4:10, 4:14, 4:18, 5:1, 5:3, 5:5, 10:14, 12:6, 12:8, 12:13, 12:16, 16:6, 16:8, 17:25, 18:2, 18:8, 18:12, 18:15, 24:25, 25:4, 26:3, 26:5, 26:13, 26:15, 26:23, 27:5, 27:15, 27:20, 28:5, 28:14, 29:18, 29:21, 30:7, 30:15, 31:5, 31:7, 31:13, 31:18, 32:9, 33:4, 33:11, 33:16, 34:11, 34:16, 34:22, 35:3, 35:10, 35:12, 35:18, 35:22, 36:1, 36:4, 36:16, 38:24, 39:9, 39:17, 40:13, 40:22, 41:6, 42:19, 42:22, 43:9, 43:12, 43:14, 43:15, 50:4, 50:6, 50:11, 50:19, 51:6, 51:19, 52:5, 52:8, 52:13, 52:24, 53:5, 53:7, 53:11, 53:15, 54:4, 54:8, 54:11, 54:13, 54:16

**Court's** [3] - 20:16, 45:23, 53:12

**courts** [2] - 40:23, 42:9

**covered** [2] - 42:17, 45:10

**cranky** [1] - 4:20

**crime** [1] - 24:18

**criminal** [8] - 18:4, 21:16, 22:2, 22:3, 22:4, 38:23

**crisis** [1] - 24:14

**criticized** [1] - 6:10

**Crooks** [1] - 9:17

**cross** [1] - 22:15

**cut** [1] - 14:24

**Cypress** [1] - 48:23

## D

**Dade** [3] - 8:13, 13:6, 22:25

**DADE** [2] - 2:23, 2:24

**daily** [2] - 17:6, 35:1

**damages** [1] - 10:23

**damaging** [1] - 32:24

**danger** [1] - 46:19

**DANTE** [1] - 2:8

**date** [1] - 15:14

**DATE** [1] - 55:9

**DAVID** [2] - 2:9, 2:24

**Daviduk** [1] - 7:5

**day-to-day** [1] - 26:7

**days** [7] - 6:13, 25:23, 31:20, 32:7, 43:17, 44:13, 49:4

**DC** [4] - 2:19, 2:21, 14:2, 14:4

**DE-40** [1] - 5:9

**deal** [1] - 53:16

**dealing** [2] - 13:24, 51:16

**decide** [2] - 50:25

**decidedly** [1] - 33:23

**deciders** [2] - 33:22, 33:23

**decides** [1] - 36:10

**deciding** [2] - 19:13, 46:2

**decision** [45] - 5:20, 9:2, 9:8, 10:13, 10:20, 17:5, 17:6, 17:11, 17:15, 17:16, 17:18, 17:23, 18:17, 18:18, 18:22, 19:20, 19:21, 20:3, 20:13, 20:14, 20:15, 20:18, 20:19, 21:10, 21:12, 21:13, 21:25, 27:4, 27:5, 27:8, 28:6, 28:22, 29:3, 30:11, 36:12, 36:13, 38:1, 38:9, 41:12, 45:13, 45:14, 47:21, 47:22

**decisions** [8] - 17:6, 19:23, 28:18, 29:4, 30:3, 40:18, 41:24, 45:9

**declaration** [9] - 7:5, 16:18, 16:19, 17:17, 22:24, 31:2, 31:4, 32:12, 50:20

**declarations** [1] - 15:7

**declines** [1] - 37:17

**dedicated** [1] - 6:23

**deems** [1] - 21:2

**Deer** [1] - 10:21

**defeat** [2] - 6:20, 52:25

**DEFENDANT** [2] - 2:6, 2:23

**Defendant** [2] - 30:18, 36:19

**defendant** [3] - 8:5, 44:20, 53:18

**Defendants** [3] - 5:17, 7:7, 42:20

**defendants** [13] - 1:8, 7:25, 9:6, 9:10, 11:13, 11:15, 18:3, 38:3, 38:9, 44:13, 47:3, 48:11, 49:15

**DEFENDANTS** [1] - 2:12

**Defendants'** [1] - 8:5

**defendants'** [1] - 52:19

**defense** [1] - 44:6

**defined** [1] - 22:6

**defines** [1] - 8:25

**definitely** [1] - 27:23

**deliberation** [1] - 10:19

**delivers** [1] - 37:16

**demands** [1] - 31:22

**demonstrated** [1] - 12:20

**demonstrates** [1] - 48:1

**demonstrating** [1] - 9:5

**denial** [1] - 20:4

**deny** [1] - 27:11

**DEPARTMENT** [2] - 2:18, 2:20

**Department** [2] - 35:15, 36:23

**deport** [2] - 37:19, 42:21

**deportation** [1] - 45:7

**deportation-related** [1] - 45:7

**Deputy** [1] - 29:18

**DeSantis** [1] - 48:9

**described** [2] - 52:6, 53:20

**description** [1] - 52:9

**designated** [1] - 35:8

**designed** [4] - 9:24, 11:16, 39:20, 42:9

**desirable** [1] - 8:21

**destructive** [1] - 22:24

**detain** [15] - 8:10, 17:11, 17:15, 17:19, 19:24, 20:19, 20:22, 21:11, 21:12, 27:13, 36:8, 36:11, 36:13, 36:24, 42:21

**detained** [5] - 7:23, 20:12, 24:19, 28:11, 52:17

**detainees** [8] - 17:22, 18:4, 19:14, 29:24, 31:11, 34:14, 35:7, 36:11

**detainers** [1] - 47:16

**detains** [1] - 18:21

**detention** [6] - 6:13, 7:13, 8:19, 11:23, 14:15, 14:18, 14:21, 14:22, 14:23, 15:7, 17:12, 17:19, 18:1, 18:7, 20:4, 20:10, 20:12, 20:16, 20:25, 21:21, 24:15, 25:18, 27:4, 27:11, 28:5, 28:6, 28:18, 30:20, 34:19, 35:4, 37:13, 40:14, 41:16, 42:12, 47:23

**detentions** [1] - 17:21

**determination** [1] - 28:11

**determinative** [2] - 39:8, 40:5

**development** [1] - 6:18

**DHS** [8] - 7:13, 7:21, 20:24, 27:14, 33:7, 33:17, 35:14, 38:18

**Diamond** [1] - 46:4

**Diaz** [1] - 55:9

**DIAZ** [2] - 3:2, 55:9

**difference** [1] - 31:5

**different** [5] - 19:23, 22:10, 25:11, 31:16, 37:10

**Dinh** [1] - 21:4

**direct** [1] - 33:18,

45:4, 45:25

**directed** [5] - 8:15, 32:4, 48:17, 53:13, 53:17

**directing** [2] - 27:15, 49:3, 53:13

**direction** [2] - 41:9, 41:15

**directly** [3] - 7:17, 15:20, 16:1

**Director** [5] - 16:25, 17:1, 31:3, 33:7, 48:6

**director** [5] - 7:17, 22:25, 33:17, 48:7, 48:8

**dirty** [1] - 22:23

**disclaimed** [1] - 17:9

**discount** [1] - 19:19

**discrete** [1] - 45:8

**discretion** [1] - 20:24

**discretionary** [2] - 20:1, 21:1

**discuss** [1] - 27:19

**discussed** [3] - 46:16, 49:4, 51:15

**disputes** [1] - 50:18

**disregard** [1] - 6:7

**distinction** [1] - 26:6

**DISTRICT** [3] - 1:1, 1:1, 1:11

**District** [9] - 3:3, 3:10, 15:21, 21:24, 24:9, 25:25, 38:13, 46:4, 55:10

**district** [2] - 21:8, 41:13

**DIVERSITY** [1] - 1:22

**division** [2] - 7:18, 38:3

**DIVISION** [1] - 1:2

**Division** [3] - 8:1, 8:9, 36:22

**Docket** [4] - 16:18, 16:19, 17:17, 43:22

**Doctrine** [1] - 13:18

**Doe** [1] - 14:7

**dollars** [2] - 15:12, 15:14

**DOMINIQUE** [1] - 1:18

**done** [3] - 40:11, 50:13, 50:14

**dormitories** [2] - 42:24, 42:25

**dormitory** [1] - 47:25

**double** [1] - 32:14

**Douglas** [1] - 6:19

**down** [6] - 14:13, 17:21, 18:17, 21:11, 49:24

**Dr** [7] - 9:15, 13:4, 17:2, 23:4, 30:18, 32:11, 46:15

**draft** [1] - 31:2

**Drive** [1] - 1:15

**driven** [1] - 52:11

**driving** [1] - 11:12

**drop** [1] - 7:22

**DuBois** [1] - 21:7

**duration** [1] - 10:24

### E

**e-mail** [4] - 33:7, 33:13, 33:14, 33:25

**early** [2] - 15:8, 42:5

**earmarked** [2] - 30:8, 30:14

**earmarking** [1] - 30:13

**Earth** [1] - 5:20

**EARTHJUSTICE** [1] - 1:18

**easier** [2] - 21:18, 50:6

**easiest** [1] - 15:3

**easily** [1] - 44:12

**East** [1] - 2:10

**ecological** [2] - 22:22, 23:9

**economy** [1] - 46:6

**ecosystem** [1] - 9:14

**effect** [3] - 8:16, 42:16, 43:6

**effects** [3] - 9:9, 9:12, 24:16

**eight** [1] - 6:13

**either** [1] - 8:18

**elements** [2] - 6:24, 9:6

**Eleventh** [9] - 10:19, 14:8, 15:19, 16:2, 25:24, 28:21, 28:24, 30:11, 34:3

**ELISE** [1] - 1:21

**elsewhere** [1] - 27:10

**Emergency** [2] - 34:9, 36:22

**emergency** [3] - 16:17, 31:19, 31:21

**employee** [1] - 41:8

**employees** [2] - 34:20, 53:19

**empower** [1] - 40:25

**encouragement** [2] - 34:2, 34:3

**end** [7] - 7:24, 16:1, 21:14, 22:8, 29:21, 36:5, 37:2

**endangered** [2] - 6:2, 10:6

**enforce** [1] - 22:3

**Enforcement** [2] - 8:6, 35:15

**enforcement** [18] - 11:19, 11:21, 21:16, 21:21, 22:4, 22:5, 22:6, 24:12, 34:17, 34:18, 37:12, 37:24, 38:2, 38:5, 40:25, 42:12, 45:2

**engaged** [2] - 32:25, 53:24

**engine** [1] - 23:3

**enjoin** [10] - 11:19, 11:20, 11:21, 20:8, 31:25, 32:6, 42:14, 42:18, 43:3

**enjoining** [1] - 13:18

**ensuing** [1] - 44:13

**enter** [4] - 7:22, 11:17, 45:1, 49:2

**entering** [1] - 42:9

**entire** [2] - 9:14, 17:21

**entirely** [2] - 17:24, 31:20

**entitled** [1] - 55:5

**entitlement** [1] - 12:20

**entry** [1] - 5:15

**Entry** [4] - 16:18, 16:19, 17:17, 43:22

**enumerated** [1] - 45:9

**environment** [3] - 22:24, 39:21, 41:18

**environmental** [6] - 6:1, 6:11, 6:12, 10:18, 36:13, 46:14

**Environmental** [1] - 10:22

**equally** [2] - 18:19, 32:23

**equation** [1] - 39:10

**equities** [5] - 5:14, 24:7, 24:10, 24:11, 47:4

**erred** [1] - 24:9

**Eskamani** [5] - 7:16, 15:9, 30:18, 32:11, 52:11

**especially** [1] - 23:16

**ESQ** [17] - 1:14, 1:17, 1:18, 1:21, 1:21, 2:2, 2:3, 2:3, 2:7, 2:8, 2:8, 2:9, 2:14, 2:16, 2:17, 2:20, 2:24

**establish** [1] - 29:12

establishment [1] - 48:22
esteemed [1] - 51:4
et [2] - 1:4, 1:7
evaluate [1] - 6:1
EVAN [1] - 2:8
Eve [1] - 6:22
EVERGLADES [1] - 1:4
Everglades [4] - 6:14, 32:17, 48:22, 48:25
evidence [17] - 6:11, 7:4, 7:20, 8:20, 8:24, 9:14, 11:1, 15:5, 16:13, 17:20, 30:5, 33:21, 37:15, 46:13, 46:21, 47:6, 48:19
exactly [3] - 6:17, 27:9, 39:4
example [8] - 13:4, 13:8, 17:22, 18:25, 19:7, 21:6, 21:8, 23:9
excavating [2] - 12:5, 13:9
excellent [1] - 53:15
except [1] - 8:11
exception [1] - 22:4
exchanged [1] - 44:2
excluded [1] - 45:11
exclusively [6] - 37:11, 37:23, 38:5, 40:16, 40:24, 42:3
excuse [1] - 16:5
executed [1] - 16:14
executive [2] - 7:17, 24:13
exercise [1] - 19:3
exercised [1] - 18:22
exercises [1] - 18:25
exercising [1] - 18:20
Exhibit [8] - 7:4, 7:10, 7:15, 8:5, 8:7, 9:19, 10:8, 40:2
exhibit [1] - 44:2
exhibits [1] - 50:15
Exhibits [1] - 7:20
exist [1] - 38:1
existence [1] - 39:7
exists [1] - 11:1
exit [1] - 7:22
expand [1] - 51:20
expected [1] - 25:11
expedited [1] - 5:9
expert [2] - 22:16, 23:9
explain [1] - 16:19
explained [2] - 28:7, 36:9

eyes [1] - 30:21
EZRAY [1] - 2:8

F

F.2d [5] - 9:2, 10:13, 10:16, 45:21, 47:8
F.3d [8] - 14:2, 14:8, 15:22, 19:8, 21:4, 26:1, 38:13, 44:24
F.4th [1] - 5:21
F.Supp [3] - 8:13, 10:22, 21:23
facially [1] - 53:14
facilities [1] - 24:15
facility [78] - 7:9, 7:15, 8:22, 9:1, 9:11, 11:7, 13:7, 14:19, 14:21, 15:7, 16:12, 16:13, 17:3, 17:19, 18:1, 18:7, 19:14, 24:19, 25:18, 26:7, 26:8, 26:10, 27:4, 28:8, 29:6, 29:11, 29:15, 29:16, 29:19, 29:20, 29:21, 29:24, 30:4, 30:6, 30:8, 30:20, 30:23, 31:3, 31:4, 31:10, 33:2, 33:8, 33:9, 33:10, 33:11, 33:19, 33:25, 34:25, 35:1, 35:4, 35:23, 35:25, 36:1, 36:11, 36:12, 36:13, 36:20, 37:15, 37:16, 37:19, 37:22, 38:1, 38:11, 38:20, 39:11, 40:6, 42:3, 42:23, 45:15, 47:21, 48:5, 48:17, 52:16
fact [8] - 6:15, 15:8, 17:21, 22:16, 23:19, 40:4, 40:6, 49:10
factors [4] - 12:23, 23:25, 24:2, 24:3
fail [2] - 14:11, 22:11
fair [1] - 27:18
falls [2] - 21:21, 22:3
fashion [1] - 49:1
favors [1] - 5:15
FCRR [2] - 3:2, 55:9
FDEM [2] - 16:16, 34:8
FDLE [3] - 8:6, 35:15, 37:1
FEDERAL [1] - 2:12
Federal [32] - 5:17, 7:7, 8:1, 8:6, 8:16, 17:4, 19:24, 20:19, 25:20, 29:9, 29:15,

29:25, 30:19, 31:9, 32:1, 32:3, 32:8, 32:24, 35:6, 36:10, 36:19, 37:2, 37:5, 38:4, 40:3, 41:18, 42:20, 47:13, 50:9, 53:17
federal [97] - 4:10, 5:24, 7:1, 7:3, 8:11, 8:14, 8:19, 8:24, 9:1, 9:4, 11:8, 14:6, 14:10, 15:6, 15:9, 15:12, 15:14, 15:16, 15:19, 15:23, 18:12, 18:21, 18:22, 18:25, 19:1, 19:3, 19:4, 19:5, 19:10, 19:16, 19:20, 19:21, 20:15, 21:13, 21:15, 21:17, 22:7, 25:18, 25:19, 25:21, 26:6, 28:22, 28:25, 29:3, 29:4, 30:8, 30:12, 31:8, 31:14, 31:22, 32:19, 32:22, 34:1, 34:18, 34:20, 34:24, 37:3, 37:8, 37:11, 37:14, 38:7, 38:9, 38:11, 38:14, 38:15, 38:16, 38:19, 38:20, 38:21, 38:23, 39:1, 39:21, 40:8, 40:12, 40:16, 40:24, 41:1, 41:4, 41:14, 41:15, 41:22, 41:24, 42:3, 47:9, 47:10, 48:13
federal-making [1] - 29:4
federalize [1] - 15:25
federally [1] - 10:6
fencing [1] - 12:5
few [1] - 13:13
FICARELLI [1] - 2:8
fifth [1] - 21:10
figure [1] - 27:14
filed [1] - 43:21
fill [1] - 11:11
filling [4] - 12:4, 44:15, 51:22, 53:24
final [8] - 9:5, 14:10, 25:19, 29:9, 29:12, 31:16, 34:4, 38:9
finally [2] - 26:24, 36:5
fine [1] - 50:10
finish [1] - 12:2, 42:5
first [11] - 6:16, 6:25, 12:14, 12:25, 17:15, 18:23, 25:7, 25:12, 28:23, 29:14, 44:19

First [1] - 10:13
Fish [1] - 6:3
five [8] - 22:10, 23:11, 23:12, 31:20, 32:7, 43:11, 44:13, 50:23
five-day [2] - 23:11, 23:12
fixing [1] - 44:16
FL [1] - 1:23
flagrant [1] - 6:7
flee [1] - 10:10
FLEXNER [1] - 2:9
flights [2] - 22:21, 23:1
Floor [2] - 3:4, 55:11
FLORIDA [1] - 1:1
Florida [37] - 1:4, 1:16, 1:20, 2:5, 2:11, 2:15, 2:25, 3:5, 7:13, 8:4, 10:21, 15:21, 16:14, 16:15, 17:19, 18:20, 25:19, 25:25, 28:8, 30:1, 30:4, 30:19, 31:10, 33:2, 34:15, 34:16, 34:17, 35:9, 35:15, 35:25, 36:8, 36:11, 38:12, 38:23, 41:13, 55:11
Florida's [2] - 34:9, 36:9
flowing [1] - 40:18
focus [1] - 12:21
focused [2] - 13:19, 16:11
folks [1] - 37:19, 39:12
follow [2] - 45:14, 49:7
FOR [5] - 1:14, 1:22, 2:1, 2:12, 2:23
foregoing [1] - 55:3
foresight [1] - 10:18
former [1] - 7:11
Fort [1] - 49:17
forthcoming [1] - 48:8
forward [1] - 41:20
founding [1] - 6:23
four [3] - 23:25, 42:18, 46:23
fourth [1] - 20:18
Fourth [1] - 19:9
FPR [2] - 3:2, 55:9
FRANK [1] - 2:17
fraught [2] - 31:1, 32:13
free [1] - 54:6
fresh [1] - 9:18
Friday [2] - 11:11,

44:9
FRIEDMAN [2] - 2:2, 2:2
friend [1] - 14:14
FRIENDS [1] - 1:4
Friends [3] - 6:22, 32:16, 50:9
front [1] - 32:17
full [4] - 4:14, 12:23, 25:13, 45:7
function [1] - 37:12, 38:7, 38:19, 38:21, 40:7, 40:8, 41:7, 42:4
functions [4] - 37:22, 40:15, 40:24, 41:1
Fund [1] - 47:9
fundamentally [1] - 37:23
funded [2] - 16:15, 30:6
funding [26] - 14:22, 15:3, 15:9, 15:16, 15:19, 15:24, 15:25, 16:3, 28:25, 29:1, 30:10, 30:12, 31:14, 37:5, 37:6, 37:7, 37:8, 38:24, 39:4, 39:8, 39:23, 40:1, 40:4, 40:6, 48:12
funds [1] - 15:6
future [1] - 15:24

G

GALLONI [1] - 1:17
game [1] - 32:11
gardening [1] - 44:16
Garland [1] - 42:7
gather [1] - 39:5
GENERAL [1] - 2:17
General [4] - 25:9, 40:19, 41:10, 47:14
General's [2] - 7:12, 45:13
generally [1] - 6:4
generators [1] - 52:12
geolocated [1] - 13:5
Georgia [1] - 46:4
Giles [2] - 16:19, 17:17
given [3] - 31:15, 40:16, 54:5
Gonzalez [1] - 42:7
Goos [4] - 9:1, 41:12, 47:8
GOOS [1] - 9:2
govern [1] - 35:22
government [9] -

23:17, 23:21, 24:10, 24:11, 24:20, 41:22, 45:8, 47:4, 48:4
**Government** [24] - 8:1, 8:16, 17:4, 19:24, 25:20, 29:10, 29:15, 29:25, 30:5, 30:19, 31:9, 32:1, 32:3, 32:8, 32:25, 35:6, 36:10, 37:5, 38:4, 40:3, 47:14, 48:16, 50:9
**government's** [3] - 20:1, 24:8, 32:18
**Governor** [1] - 48:9
**governor** [2] - 24:13, 48:24
**governor's** [1] - 11:6
**governs** [3] - 35:12, 36:1, 44:22
**grain** [1] - 48:10
**grant** [1] - 31:15
**granted** [1] - 44:3
**grants** [1] - 20:11
**grateful** [1] - 4:25
**gravely** [1] - 11:2
**great** [2] - 6:15, 50:8
**ground** [2] - 13:20, 13:21
**group** [1] - 27:12
**GSA** [1] - 4:19
**guards** [1] - 34:16
**Gustafson** [2] - 25:9, 45:18
**GUSTAFSON** [1] - 2:16
**GUTHRIE** [1] - 2:6
**Guthrie** [6] - 7:18, 16:25, 17:1, 30:19, 33:7, 48:6
**Guthrie's** [1] - 31:3

## H

**habitat** [2] - 10:7, 46:19
**half** [1] - 6:9
**handle** [1] - 46:8
**handled** [1] - 44:12
**happy** [1] - 26:18
**hard** [4] - 6:5, 14:13, 41:19, 47:4
**harm** [16] - 5:14, 9:13, 10:18, 11:1, 12:24, 22:13, 22:14, 22:19, 22:22, 23:7, 23:18, 23:20, 24:5, 46:25, 47:2
**harmful** [1] - 24:16
**harms** [5] - 23:8, 23:9, 23:11, 23:14,

46:14
**Harris** [1] - 45:20
**hear** [2] - 17:20, 35:16
**heard** [18] - 6:21, 7:16, 7:20, 9:15, 9:21, 10:5, 11:3, 12:9, 13:3, 14:14, 16:22, 18:3, 29:16, 30:17, 34:22, 37:4, 37:5, 38:8
**HEARING** [1] - 1:10
**hearing** [6] - 5:18, 12:1, 34:21, 38:2, 42:5, 43:7
**hearsay** [5] - 30:22, 30:25, 32:13, 32:14, 32:15
**heart** [2] - 6:13, 11:7
**held** [7] - 10:17, 10:21, 28:24, 38:6, 38:22, 42:8, 47:20
**helicopters** [1] - 23:2
**hell** [1] - 30:15
**helped** [1] - 31:2
**hereby** [1] - 55:3
**herself** [1] - 7:8
**high** [1] - 48:3
**highlights** [1] - 26:2
**highway** [1] - 37:7
**Highway** [1] - 8:4
**hold** [2] - 37:17, 39:22
**holding** [2] - 24:3, 24:22
**Holding** [1] - 44:24
**home** [1] - 34:13
**Homeland** [1] - 45:5
**Honor** [68] - 4:13, 4:25, 5:2, 5:4, 5:11, 6:15, 11:2, 12:11, 12:15, 12:17, 12:23, 13:10, 14:7, 14:11, 15:2, 16:3, 16:5, 17:8, 17:20, 18:16, 19:17, 20:18, 21:6, 21:10, 21:18, 22:8, 22:13, 22:19, 23:11, 23:15, 23:23, 24:4, 24:11, 24:20, 24:23, 25:1, 25:2, 25:5, 27:9, 27:18, 28:4, 29:7, 30:13, 31:12, 31:15, 31:24, 33:10, 33:14, 33:24, 34:1, 35:11, 35:17, 35:25, 36:3, 36:15, 36:18, 37:11, 37:20, 38:6, 39:4, 39:16, 41:11, 43:8, 51:9, 52:7, 52:22, 52:23, 54:15

**honor** [1] - 47:15
**Honor's** [2] - 8:12, 38:1
**HONORABLE** [1] - 1:10
**hope** [1] - 21:18, 40:9
**hoping** [1] - 46:7
**host** [2] - 17:12, 21:5
**hotspot** [1] - 22:1
**hour** [2] - 4:4, 49:25
**House** [2] - 29:18, 37:21
**house** [3] - 18:3, 28:7, 47:23
**housed** [1] - 19:14
**housing** [3] - 19:9, 19:10, 28:8
**huddled** [1] - 10:11
**hundreds** [1] - 22:21
**hung** [1] - 11:4
**hydrological** [1] - 9:16
**hypothetical** [1] - 52:15

## I

**ICC** [1] - 47:8
**ICE** [30] - 7:18, 7:19, 7:23, 8:4, 8:6, 8:9, 27:1, 27:2, 28:1, 28:12, 29:19, 29:20, 29:21, 29:22, 34:10, 35:9, 35:14, 36:7, 37:16, 37:17, 37:18, 37:22, 37:23, 47:15, 48:4, 48:5
**idea** [3] - 7:14, 29:16, 47:20
**identify** [2] - 14:9, 15:12
**ignorance** [1] - 44:11
**illegally** [1] - 24:17
**Illinois** [1] - 48:15
**image** [1] - 6:22
**immediately** [2] - 22:17, 51:1
**immigrants** [1] - 8:11
**immigration** [18] - 8:17, 11:20, 11:22, 14:23, 18:7, 18:13, 24:12, 24:14, 31:22, 35:5, 37:12, 37:23, 38:2, 38:5, 39:10, 40:16, 42:11, 45:1
**immigrations** [1] - 11:23
**impact** [2] - 41:18,

46:18
**impacted** [1] - 52:3
**impacts** [5] - 6:1, 6:3, 6:11, 6:12, 36:14
**implicated** [1] - 6:2
**implicates** [1] - 37:14
**implied** [1] - 10:17
**importance** [2] - 48:25, 49:1
**important** [7] - 14:11, 17:10, 18:19, 23:22, 24:8, 48:20
**importantly** [1] - 15:18
**improper** [1] - 46:5
**INA** [4] - 19:21, 19:22, 28:18, 35:3
**inability** [1] - 31:19
**inadequate** [1] - 10:18
**incidentally** [1] - 5:17
**include** [2] - 20:9, 53:23
**includes** [2] - 20:10, 21:1
**including** [2] - 22:10, 24:17
**increase** [1] - 23:7
**increasing** [1] - 22:22
**indeed** [1] - 43:25
**individual** [2] - 21:10, 21:13
**individuals** [4] - 24:17, 37:16, 37:17, 38:22
**influence** [1] - 38:14
**information** [3] - 7:6, 31:2, 32:21
**infrastructure** [2] - 44:16, 51:23
**injunction** [15] - 5:12, 13:7, 13:16, 14:12, 17:13, 23:16, 42:10, 42:11, 42:16, 43:21, 45:24, 46:2, 46:5, 53:9, 53:17
**injunctions** [1] - 23:23
**injunctive** [2] - 45:2, 53:3
**injury** [3] - 10:22, 46:25
**input** [1] - 5:25
**installation** [3] - 44:15, 51:22, 53:25
**instead** [1] - 45:7
**institution** [2] - 35:4,

47:22
**intended** [1] - 52:7
**interact** [1] - 16:24
**interconnected** [2] - 9:15, 10:3
**interest** [3] - 23:20, 46:6, 47:1
**interested** [1] - 27:22
**interesting** [1] - 24:1
**interests** [1] - 24:20
**interlocutory** [1] - 9:9
**interpretation** [1] - 47:6
**interspecific** [1] - 10:10
**INTERVENOR** [1] - 2:1
**introduced** [1] - 46:13
**inured** [1] - 47:18
**involved** [5] - 7:1, 9:4, 27:8, 31:21, 37:3
**involvement** [2] - 28:22, 29:3
**involves** [1] - 8:24
**Iranian** [1] - 45:20
**irony** [1] - 6:15
**irreparable** [5] - 5:14, 9:13, 11:1, 23:18, 46:24, 47:2
**issue** [12] - 13:16, 14:14, 27:20, 37:2, 44:12, 44:21, 44:22, 46:3, 46:10, 48:7, 48:21, 51:12
**issued** [1] - 22:12
**issues** [5] - 27:19, 31:22, 40:1, 44:19, 51:15
**itself** [3] - 13:22, 16:16, 22:7

## J

**jail** [4] - 17:25, 18:5, 18:6
**JASON** [1] - 1:21
**jaws** [1] - 52:25
**JESSE** [1] - 2:7
**Jesse** [1] - 36:9
**Jessica** [2] - 7:21, 32:17
**jet** [1] - 23:2
**jetport** [3] - 16:16, 22:18, 23:6
**jets** [1] - 23:2
**Jimmy** [1] - 7:10
**join** [1] - 12:11
**joined** [1] - 25:12

joint [1] - 47:7
Jones [1] - 27:23
journalist [2] - 6:19, 6:22
JUDGE [1] - 1:11
Judge [9] - 4:6, 5:7, 7:24, 8:10, 8:20, 10:21, 39:25, 42:6, 54:18
judge [1] - 30:8
judges [1] - 18:9
judgment [1] - 20:1
judicial [2] - 44:23, 46:6
jurisdiction [5] - 19:22, 20:5, 20:7, 20:16, 20:20
jurisdictional [3] - 45:19, 45:20, 45:22
justice [1] - 46:6
JUSTICE [2] - 2:18, 2:20

### K

KARST [1] - 14:2
Karst [1] - 14:2
KATHLEEN [1] - 1:10
Kautz [3] - 10:5, 46:15, 52:2
keep [2] - 12:18, 34:11
keeping [1] - 27:2
Key [1] - 10:21
kind [5] - 6:16, 22:12, 39:17, 43:19, 47:13
knock [1] - 24:16
knock-on [1] - 24:16
knowledgeable [1] - 15:10
knows [1] - 11:6
KRISTI [2] - 1:7, 2:13

### L

lack [1] - 6:6
laid [1] - 5:18
landings [1] - 22:21
language [1] - 41:11
large [1] - 23:6
Las [1] - 2:10
last [6] - 6:9, 17:8, 17:10, 43:25, 44:4, 44:5
late [1] - 4:16
lauded [1] - 48:25
Lauderdale [2] - 49:17, 49:22

Law [2] - 8:6, 35:15
law [28] - 5:20, 6:16, 8:11, 11:19, 13:13, 13:16, 13:18, 13:24, 14:4, 15:11, 19:6, 20:24, 21:15, 22:11, 34:16, 34:18, 37:2, 37:12, 37:14, 38:23, 39:20, 40:7, 40:12, 40:15, 40:25, 41:1, 47:15
laws [1] - 22:3
lawsuit [1] - 7:14
lawyer [2] - 7:11, 26:23
lawyers [1] - 27:15
leap [1] - 5:24
Lease [1] - 45:25
least [4] - 9:18, 10:24, 50:21, 51:22
leave [1] - 27:24
Lebron [1] - 18:23
led [2] - 6:18, 32:4
legal [5] - 5:11, 12:20, 39:14, 47:10
legislators [1] - 34:13
legislature [1] - 15:12
lens [2] - 29:5, 29:7
less [1] - 8:21
level [1] - 21:11
lies [1] - 28:8
lifting [1] - 30:21
lighting [8] - 12:4, 13:8, 51:24, 52:3, 52:4, 52:9, 53:24
likelihood [8] - 5:13, 5:21, 10:9, 12:21, 13:11, 15:1, 23:17, 46:24
likely [2] - 15:25, 29:1
limited [3] - 11:25, 43:4, 51:21
line [3] - 12:19, 32:18, 34:24
listed [1] - 10:6
lists [1] - 44:2
litigate [1] - 48:20
litigation [2] - 47:17, 48:15
live [4] - 49:22, 50:24, 50:25
LLP [1] - 2:9
local [2] - 19:9, 50:22
locale [1] - 21:2
location [2] - 18:17, 19:20
long-term [2] - 23:9,
23:14
look [7] - 5:24, 6:5, 23:17, 24:23, 39:24, 41:19, 50:16
look-before-you-leap [1] - 5:24
looking [2] - 23:14, 29:7
loosely [1] - 5:23
lost [3] - 10:7, 23:16, 51:21
loud [2] - 22:23, 23:2
loved [1] - 7:14
lower [1] - 42:9
lunch [1] - 43:10
LYONS [1] - 2:13

### M

mail [4] - 33:7, 33:13, 33:14, 33:25
maintained [1] - 49:1
major [3] - 21:13, 21:17, 22:7
makers [1] - 27:5
managed [1] - 16:14
management [1] - 9:22
Management [6] - 15:21, 25:25, 34:9, 36:22, 38:12, 41:13
map [1] - 13:4
Marisa [1] - 25:6
MARISSA [1] - 2:20
Marjorie [1] - 6:19
married [1] - 11:5
Marsh [2] - 10:13, 10:20
material [1] - 46:13
matter [8] - 4:3, 22:11, 40:7, 48:13, 50:19, 53:4, 53:9, 55:5
matters [2] - 15:11, 18:4
McVoy [6] - 9:15, 9:19, 13:4, 17:2, 23:4, 46:15
mean [9] - 26:12, 26:16, 28:15, 29:22, 30:15, 32:1, 34:12, 39:17, 39:19
mean.. [1] - 52:1
meaningful [1] - 47:25
means [4] - 7:2, 37:1, 41:3, 41:22
Media [1] - 44:24
media [2] - 7:6, 29:14

meeting [1] - 28:10
member [1] - 32:16
men [1] - 47:23
mention [1] - 37:6
mentioned [1] - 13:7
mere [2] - 19:3, 29:3
merged [1] - 33:20
merits [7] - 12:22, 13:12, 15:1, 17:13, 22:9, 22:11, 23:18
MIAMI [3] - 1:2, 2:23, 2:24
Miami [14] - 1:4, 1:16, 1:20, 2:5, 2:11, 2:15, 2:25, 3:4, 3:5, 8:13, 13:6, 22:25, 55:11, 55:11
Miami-Dade [3] - 8:13, 13:6, 22:25
MIAMI-DADE [2] - 2:23, 2:24
microphone [1] - 53:6
Middle [1] - 13:9
might [2] - 22:21, 50:23
military [1] - 23:1, 24:9
Miller [1] - 37:21
mind [1] - 50:24
minimum [1] - 47:7
minute [1] - 16:5
minutes [4] - 4:5, 12:7, 43:11, 43:16
Miranda [1] - 7:5
mirrors [1] - 41:11
modest [1] - 35:20
modification [2] - 5:10, 12:3
moment [1] - 5:10, 8:9, 38:18
momentarily [1] - 4:24
Monday [4] - 8:3, 34:7, 49:23, 50:17
monetary [1] - 10:25
money [3] - 10:23, 30:7, 48:16
months [2] - 23:1, 39:22, 54:11
Moody [1] - 11:9
Moody's [1] - 7:11
Moore [1] - 10:21
morning [4] - 9:15, 9:21, 44:5, 50:17
mortality [1] - 10:9
most [2] - 43:4, 43:6
mostly [1] - 37:7
motion [8] - 5:8, 5:9, 12:3, 12:12, 37:6,

43:21, 44:2, 44:7
MOTION [1] - 1:10
move [1] - 50:15
movement [1] - 52:18
moving [2] - 5:16, 41:20
MR [55] - 4:6, 4:12, 4:16, 4:23, 5:2, 5:7, 10:16, 12:7, 12:11, 12:15, 12:17, 16:7, 16:9, 18:1, 18:5, 18:11, 18:14, 18:16, 25:1, 25:2, 26:18, 26:21, 27:1, 27:7, 27:18, 36:18, 39:2, 39:16, 39:25, 40:21, 40:23, 41:11, 42:20, 43:3, 49:20, 50:5, 50:8, 50:14, 51:3, 51:9, 51:11, 52:2, 52:7, 52:10, 52:21, 52:23, 53:1, 53:8, 53:12, 54:2, 54:5, 54:9, 54:12, 54:15, 54:18
MS [34] - 5:4, 25:5, 26:4, 26:11, 26:14, 26:16, 26:19, 28:3, 28:6, 28:21, 29:20, 29:22, 30:11, 30:17, 31:6, 31:8, 31:14, 31:24, 32:10, 33:9, 33:14, 33:24, 34:15, 34:20, 34:23, 35:8, 35:11, 35:14, 35:19, 35:24, 36:2, 36:5, 50:10, 51:4
multiple [3] - 12:20, 21:12, 24:12
municipal [1] - 13:17
MURRAY [5] - 2:24, 52:23, 53:1, 53:8, 53:12
must [12] - 5:25, 10:10, 13:23, 14:9, 14:16, 19:4, 24:20, 33:8, 37:22, 41:2, 49:10, 49:14
mystery [1] - 7:24

### N

N.W [1] - 2:18
naïveté [1] - 44:10
Namath [4] - 7:21, 11:3, 32:17, 51:25
Namath's [1] - 44:8
name [4] - 25:6, 46:16, 51:2, 51:5

**names** [1] - 51:6
**narrowly** [1] - 45:8
**national** [1] - 41:17
**National** [1] - 45:20
**nature** [1] - 10:23
**Navy** [1] - 24:5
**NE** [2] - 2:15, 2:21
**necessarily** [2] - 37:1, 37:13
**necessary** [1] - 46:24
**need** [13] - 6:24, 8:25, 9:1, 10:12, 11:8, 17:9, 23:13, 27:2, 27:21, 27:23, 29:10, 43:20, 54:14
**needs** [1] - 27:24
**NEPA** [39] - 5:16, 5:19, 5:22, 5:23, 6:6, 6:8, 6:17, 8:25, 10:17, 13:12, 13:14, 13:19, 13:22, 13:24, 14:5, 16:1, 16:13, 21:14, 21:22, 22:7, 25:15, 25:17, 27:19, 27:20, 29:2, 29:6, 29:11, 36:12, 38:13, 39:15, 39:20, 41:13, 41:14, 41:16, 41:19, 45:3, 45:16
**NEPA's** [1] - 22:3
**never** [1] - 37:5
**New** [1] - 39:18
**new** [2] - 9:23, 10:2
**next** [9] - 31:19, 32:7, 42:5, 46:8, 49:4, 49:5, 54:13, 54:17
**night** [2] - 44:5, 49:23
**NO** [1] - 1:2
**Noem** [2] - 7:8, 40:3
**NOEM** [2] - 1:7, 2:13
**nom** [1] - 48:12
**non** [7] - 25:21, 26:6, 28:22, 29:3, 38:15, 38:25, 45:20
**non-federal** [4] - 25:21, 26:6, 28:22, 38:15
**none** [2] - 15:13, 15:17
**normal** [1] - 49:25
**north** [2] - 38:18, 49:22
**North** [2] - 3:4, 55:11
**Northern** [1] - 46:4
**Northwest** [1] - 21:23
**note** [4] - 4:12, 14:12, 16:22, 25:7

**notes** [4] - 24:23, 46:12, 46:17, 50:16
**nothing** [3] - 9:11, 31:21, 32:20
**NRPC** [1] - 18:24
**nub** [1] - 6:25
**number** [4] - 9:8, 11:6, 21:8

## O

**obligation** [2] - 39:14, 47:7
**obliged** [1] - 5:13
**obscure** [1] - 48:7
**obstacle** [1] - 46:9
**obtain** [1] - 5:25
**obtained** [1] - 9:25
**obviate** [1] - 33:12
**obviously** [4] - 46:10, 46:23, 48:13, 51:16
**occupancy** [1] - 52:16
**occur** [1] - 10:18
**occurring** [7] - 36:24, 36:25, 37:11, 38:5, 38:17, 41:3, 41:4
**ocean** [1] - 24:6
**OF** [4] - 1:1, 1:4, 2:18, 2:20
**offer** [1] - 30:5
**OFFICE** [2] - 2:14, 2:24
**office** [5] - 7:9, 7:10, 7:11, 32:17, 32:19
**Office** [1] - 7:12
**OFFICER** [2] - 43:12, 43:14
**officer** [1] - 41:7
**officers** [4] - 8:16, 27:17, 41:2, 53:18
**Official** [1] - 55:10
**official** [3] - 3:3, 17:3, 27:25
**officials** [5] - 29:15, 35:8, 40:16, 48:4, 48:15
**often** [2] - 10:24, 23:15
**Okeelanta** [1] - 10:20
**Olas** [1] - 2:10
**on-point** [1] - 16:1
**on-site** [2] - 27:5, 27:8
**once** [2] - 26:23, 37:6
**one** [30] - 8:2, 9:8, 9:17, 9:23, 13:14,

15:4, 16:5, 18:16, 20:6, 21:2, 21:7, 21:20, 22:15, 23:19, 28:5, 37:13, 40:1, 43:25, 45:10, 48:24, 49:21, 50:22, 50:24, 50:25, 51:11, 51:13, 54:2
**ongoing** [2] - 42:2, 46:13
**operate** [2] - 8:23, 35:25
**operated** [1] - 36:20
**operates** [1] - 28:18
**operating** [4] - 8:19, 8:22, 19:15, 37:12
**operation** [10] - 20:8, 25:18, 26:8, 35:22, 36:1, 42:15, 42:16, 46:14, 48:2, 48:5
**operations** [1] - 42:18
**operative** [2] - 34:6, 35:24
**opinion** [3] - 8:12, 42:13, 42:14
**option** [1] - 36:21
**options** [1] - 8:18
**oral** [2] - 44:19, 49:15
**Order** [1] - 4:1
**order** [9] - 11:22, 43:19, 44:15, 45:1, 49:6, 49:7, 49:10, 51:12, 53:13
**ordered** [2] - 7:25, 32:25
**orders** [3] - 18:13, 24:13, 44:24
**Oregon** [1] - 21:24
**organized** [1] - 16:21
**otherwise** [2] - 32:4, 47:22
**outlines** [1] - 7:5
**outside** [2] - 20:16, 21:22
**outweighs** [1] - 46:25
**overall** [2] - 17:5, 21:12
**overcrowded** [1] - 24:15
**own** [2] - 15:14, 32:12

## P

**P.A** [1] - 2:2
**p.m** [6] - 1:6, 8:3, 49:8, 49:23, 54:19

**P.O** [1] - 2:25
**page** [2] - 21:7, 51:21
**Pages** [1] - 1:8
**paid** [1] - 16:20
**Palm** [1] - 49:23
**panther** [5] - 10:6, 10:9, 23:9, 46:18, 52:3
**panthers** [1] - 10:10
**Panuccio** [8] - 16:6, 25:4, 26:1, 28:7, 36:9, 49:16, 52:9, 52:14
**PANUCCIO** [27] - 2:7, 4:12, 12:15, 12:17, 16:7, 16:9, 18:1, 18:5, 18:11, 18:14, 18:16, 25:2, 26:18, 26:21, 27:1, 27:7, 27:18, 49:20, 50:5, 50:8, 51:11, 52:21, 54:2, 54:5, 54:9, 54:12, 54:15
**papers** [1] - 15:8
**paragraph** [1] - 17:18
**park** [1] - 48:21
**Park** [1] - 48:22
**parked** [1] - 10:2
**parole** [2] - 20:5, 26:9
**part** [2] - 44:11, 45:9, 51:25
**Part** [2] - 20:8, 20:9
**participation** [1] - 53:20
**particular** [4] - 48:17, 51:14, 51:18, 52:13
**particulars** [1] - 46:18
**parties** [5] - 25:16, 45:4, 45:25, 53:17, 53:18
**parties'** [1] - 53:18
**partnered** [1] - 7:14
**partnership** [2] - 47:7, 47:13
**past** [1] - 25:22
**PATRICIA** [2] - 3:2, 55:9
**Patrol** [1] - 8:4
**Paul** [1] - 4:8
**PAUL** [1] - 1:14
**pause** [3] - 11:15, 26:3, 42:4
**paused** [1] - 51:24
**PAUTLER** [1] - 1:21
**pave** [1] - 9:18
**pavement** [3] - 9:18,

9:23, 10:3
**paving** [7] - 12:4, 13:8, 44:14, 46:20, 51:22, 52:20, 53:24
**payment** [1] - 9:20
**peanut** [1] - 39:18
**penal** [2] - 35:4, 47:22
**pending** [2] - 19:25, 20:12
**Penhurst** [1] - 13:18
**Pennsylvania** [1] - 2:18
**Penthouse** [1] - 1:16
**people** [11] - 7:22, 18:8, 22:2, 24:18, 27:10, 27:22, 33:18, 36:24, 42:25, 48:22, 53:23
**per** [1] - 22:21
**Percival** [1] - 7:10
**perfectly** [1] - 41:12
**perform** [2] - 40:15, 41:1
**performing** [2] - 37:23, 41:7
**perhaps** [2] - 18:19, 44:10
**permanent** [1] - 10:24
**permits** [2] - 9:24, 10:1
**person** [11] - 17:16, 26:25, 27:2, 27:7, 27:12, 28:11, 30:2, 32:18, 41:16, 44:3, 44:4
**personnel** [2] - 22:1, 34:18, 35:5
**persons** [5] - 21:12, 27:13, 51:7, 52:16, 53:19
**persuasive** [1] - 38:25
**Pesticides** [1] - 21:23
**Petersburg** [1] - 1:23
**petitions** [1] - 27:16
**phone** [2] - 11:6
**photo** [1] - 52:10
**phrase** [1] - 39:2
**PI** [1] - 34:21
**picture** [1] - 23:4
**pin** [1] - 14:13
**PIROPATO** [35] - 2:20, 5:4, 25:5, 26:4, 26:11, 26:14, 26:16, 26:19, 28:3, 28:6, 28:21, 29:20, 29:22, 30:11, 30:17, 31:6,

31:8, 31:14, 31:24, 32:10, 33:9, 33:14, 33:24, 34:15, 34:20, 34:23, 35:8, 35:11, 35:14, 35:19, 35:24, 36:2, 36:5, 50:10, 51:4

**Piropato** [3] - 4:23, 25:6, 51:5

**place** [1] - 27:3

**places** [3] - 20:12, 20:16, 20:25

**plain** [1] - 44:11

**PLAINTIFF** [1] - 2:1

**plaintiffs** [21] - 4:9, 5:8, 6:10, 12:19, 13:25, 14:9, 15:18, 16:10, 16:23, 23:18, 25:15, 25:22, 25:24, 29:8, 29:12, 30:4, 32:23, 36:7, 44:25, 45:12, 46:13

**Plaintiffs** [1] - 1:5

**PLAINTIFFS** [1] - 1:14

**plaintiffs'** [1] - 46:22

**Plaintiffs'** [2] - 7:4, 10:8

**plane** [1] - 25:10

**planes** [1] - 23:3

**planned** [1] - 16:14

**plans** [1] - 44:6

**plumbing** [1] - 44:16

**PO** [1] - 1:22

**podium** [1] - 16:10

**point** [13] - 15:20, 16:1, 19:21, 23:8, 29:2, 32:10, 33:3, 36:19, 40:24, 41:25, 42:6, 51:11, 53:15

**pointed** [1] - 48:14

**pointing** [1] - 23:12

**points** [2] - 22:15, 46:11

**poles** [1] - 52:5

**policy** [1] - 15:11

**Policy** [1] - 37:21

**political** [1] - 41:8

**posed** [1] - 46:14

**position** [1] - 13:1

**possibilities** [1] - 14:20

**possibility** [5] - 15:19, 15:23, 16:4, 16:9, 17:8

**possible** [4] - 12:19, 14:25, 22:20, 49:2

**postings** [1] - 29:15

**posts** [1] - 7:6

**potential** [1] - 46:18

**power** [10] - 18:21, 18:22, 18:25, 19:3, 20:11, 20:25, 21:1, 25:20, 26:20

**powers** [1] - 16:17

**pre** [1] - 5:18

**pre-hearing** [1] - 5:18

**precedent** [4] - 9:3, 15:20, 16:2, 47:11

**preliminary** [10] - 9:9, 9:11, 22:12, 23:16, 23:23, 43:20, 45:24, 46:1, 53:3, 53:9

**preparation** [1] - 12:5

**prepare** [1] - 50:21

**prerequisite** [1] - 45:22

**prerogative** [1] - 52:19

**presence** [2] - 24:16, 45:22

**present** [1] - 24:17

**presentation** [1] - 12:24

**presented** [4] - 8:24, 9:14, 11:1, 37:15

**presenting** [1] - 28:16

**presently** [1] - 45:15

**preserve** [3] - 23:13, 41:17, 43:4

**preserving** [1] - 6:23

**president** [2] - 24:13, 48:24

**pretrial** [1] - 35:21

**pretty** [1] - 35:21

**prevent** [2] - 42:2, 46:24

**previous** [1] - 13:2

**prison** [2] - 26:12, 34:16

**pristine** [1] - 49:1

**private** [1] - 13:22

**problem** [4] - 4:18, 5:3, 29:8, 33:12

**problems** [1] - 30:24

**proceed** [2] - 5:6, 12:14

**proceeded** [2] - 11:13, 43:23

**proceeding** [2] - 9:4, 11:14

**Proceedings** [1] - 54:19

**proceedings** [7] - 25:10, 43:18, 44:21, 45:13, 45:14, 49:12,

55:4

**process** [1] - 45:10

**produce** [1] - 7:25

**produced** [2] - 34:7

**program** [1] - 19:10

**prohibit** [2] - 42:9, 42:11

**prohibiting** [1] - 12:4

**prohibits** [1] - 6:16

**project** [4] - 15:25, 32:19, 32:22, 39:1

**projects** [1] - 16:20

**promise** [5] - 28:24, 30:12, 30:13, 30:14, 39:13

**promised** [1] - 39:5

**prompted** [1] - 7:9

**promulgated** [1] - 47:18

**pronounce** [1] - 46:15

**pronounced** [1] - 39:3

**prop** [1] - 23:2

**propellers** [1] - 23:2

**property** [5] - 6:18, 22:2, 38:18

**proposal** [1] - 6:20

**proposed** [5] - 6:1, 6:18, 7:13, 27:11, 44:15

**proposition** [2] - 21:9, 25:14

**prospect** [1] - 37:8

**protect** [4] - 9:24, 11:16, 22:2, 39:21

**protocols** [1] - 35:20

**prove** [2] - 8:25, 9:1

**provide** [3] - 19:18, 26:2, 49:12

**provided** [6] - 8:3, 8:8, 10:25, 15:24, 31:1, 32:20

**provides** [3] - 13:22, 35:24, 36:2

**provision** [3] - 20:5, 22:5, 42:17

**provisions** [1] - 20:8

**Pruett** [1] - 16:18

**public** [4] - 5:25, 9:25, 23:20, 47:1

**purpose** [2] - 26:7, 37:13

**purposes** [3] - 18:6, 19:16, 38:2

**pursuant** [1] - 20:17

**put** [6] - 7:4, 13:22, 22:14, 27:3, 37:2, 39:12

**Q**

**qua** [2] - 38:25, 48:12

**questions** [3] - 6:17, 28:13, 33:18

**quick** [1] - 4:24

**quickly** [1] - 14:25

**quite** [1] - 22:20

**quo** [3] - 11:16, 23:13, 43:5

**quote** [10] - 15:23, 16:1, 20:11, 21:13, 21:14, 29:21, 41:6, 42:10, 42:13

**quotes** [1] - 40:2

**R**

**R.F** [1] - 2:16

**Radio** [1] - 45:21

**raise** [1] - 29:10

**raised** [2] - 44:20, 46:3

**ranking** [1] - 48:3

**RAUREL** [1] - 2:14

**RAURELL** [1] - 4:16

**reach** [1] - 12:22

**read** [2] - 35:5, 51:17

**readily** [1] - 44:12

**reading** [1] - 42:10

**real** [1] - 10:17

**really** [6] - 6:25, 8:18, 28:14, 38:10, 49:8, 51:25

**realm** [1] - 37:10

**reason** [7] - 18:16, 19:17, 19:18, 20:18, 21:10, 38:21, 51:23

**reasonable** [1] - 8:17

**reasons** [5] - 12:21, 17:12, 18:19, 22:10, 48:18

**rebuttal** [1] - 25:1

**received** [2] - 7:20, 33:7

**recently** [2] - 10:19, 53:16

**receptionist** [3] - 32:18, 33:21, 48:9

**recess** [1] - 43:12

**Recess** [1] - 43:13

**recognized** [1] - 24:11

**reconvening** [1] - 4:17

**record** [6] - 10:8, 15:6, 31:1, 45:2, 46:12, 48:19

**Red** [1] - 46:3

**reduce** [1] - 22:20

**reducing** [1] - 22:22

**reference** [1] - 37:20

**referenced** [1] - 43:21

**referring** [1] - 33:15

**reflected** [1] - 5:9

**regarding** [2] - 20:1, 20:3

**regular** [1] - 7:21

**reimbursement** [1] - 39:13

**reinforcement** [1] - 22:1

**Reio** [3] - 9:21, 10:1, 46:16

**reject** [1] - 26:21

**relate** [1] - 51:15

**related** [1] - 45:7

**relative** [2] - 22:20, 23:6

**relevant** [1] - 6:4

**relied** [2] - 10:19, 23:5

**relief** [8] - 10:25, 22:12, 42:17, 45:2, 53:3, 53:9, 53:13, 53:22

**relying** [1] - 30:25

**remainder** [1] - 13:11

**remarkable** [1] - 6:9

**remedied** [1] - 10:23

**remedy** [1] - 5:18

**remember** [1] - 11:5

**reminded** [1] - 25:16

**removal** [8] - 11:23, 19:25, 20:13, 42:12, 44:23, 45:13, 45:14

**renew** [3] - 5:8, 12:25, 13:1

**renewed** [2] - 43:18, 44:7

**Reno** [1] - 21:4

**repeat** [3] - 10:14, 25:13, 27:21

**report** [2] - 9:19, 10:8

**REPORTED** [1] - 3:1

**reporter** [1] - 21:19

**Reporter** [2] - 3:3, 55:10

**reporters** [1] - 34:12

**representation** [1] - 37:20

**Representative** [3] - 7:16, 15:9, 52:11

**representative** [3] - 30:18, 33:5, 33:6

**request** [3] - 49:11,

53:3, 53:8
**requested** [5] - 7:18, 37:16, 37:17, 45:2, 53:22
**requesting** [1] - 12:2
**requests** [1] - 27:16
**require** [1] - 5:22
**requirement** [1] - 5:24
**requirements** [3] - 13:25, 36:2, 45:3
**requires** [3] - 6:8, 41:19, 47:15
**requisites** [1] - 46:23
**resources** [1] - 6:4
**respect** [1] - 9:13
**respectively** [1] - 46:17
**respond** [1] - 22:1
**responsibility** [1] - 7:3
**responsible** [1] - 48:4
**rest** [1] - 4:24
**restrain** [1] - 20:8
**restraining** [2] - 11:22, 43:19
**rests** [1] - 28:12
**result** [1] - 10:7
**retired** [2] - 6:19, 6:21
**retirement** [1] - 6:20
**returned** [1] - 37:18
**review** [2] - 20:2, 44:23
**revocation** [1] - 20:4
**rise** [2] - 43:12, 43:14
**risk** [1] - 10:17
**Ritter** [1] - 19:7
**robust** [1] - 35:21
**rogue** [1] - 8:22
**room** [1] - 49:5
**round** [2] - 14:19, 17:10
**RPR** [2] - 3:2, 55:9
**Rule** [2] - 5:13, 53:21
**ruling** [2] - 46:5, 49:9
**run** [4] - 4:24, 9:20, 10:3, 35:5
**running** [4] - 22:8, 27:20, 27:21, 34:12
**runoff** [1] - 9:20, 46:19

**S**

**saddened** [1] - 49:9
**safe** [2] - 54:1, 54:16
**Saint** [1] - 1:23

**Salazar** [1] - 21:7
**salt** [1] - 48:10
**Samples** [1] - 6:22
**saw** [4] - 11:11, 22:14, 23:4, 42:24
**SB** [1] - 47:15
**scattered** [1] - 46:11
**scheduled** [1] - 49:23
**scheduling** [1] - 54:2
**scheme** [1] - 44:23
**SCHILLER** [1] - 2:9
**Schwiep** [13] - 4:8, 5:6, 12:6, 13:14, 17:9, 36:17, 43:18, 43:25, 44:7, 50:13, 51:8, 51:13, 51:24
**SCHWIEP** [20] - 1:14, 4:6, 5:7, 10:16, 12:7, 25:1, 36:18, 39:2, 39:16, 39:25, 40:21, 40:23, 41:11, 42:20, 43:3, 50:14, 52:2, 52:7, 52:10, 54:18
**scientists** [1] - 39:12
**Scott** [1] - 11:10
**screen** [1] - 42:24
**SDNY** [1] - 21:6
**seated** [2] - 4:2, 43:15
**seats** [1] - 4:14
**Second** [1] - 29:17
**second** [6] - 16:4, 16:9, 18:20, 19:17, 20:6, 24:24
**secondly** [1] - 23:8
**Secretary** [3] - 7:8, 40:3, 45:5
**secretary** [1] - 20:24
**section** [2] - 20:2, 20:3
**Section** [1] - 20:10
**SECURITY** [2] - 43:12, 43:14
**Security** [1] - 45:5
**see** [6] - 9:12, 40:2, 45:18, 46:11, 50:17, 54:16
**See** [1] - 54:18
**seeking** [10] - 11:18, 11:20, 11:21, 11:22, 13:8, 14:17, 42:1, 42:2, 42:17, 43:3
**seem** [1] - 33:17
**seizures** [1] - 8:17
**seldom** [1] - 10:23
**seminal** [1] - 23:22
**Senator** [2] - 11:9
**senator** [1] - 48:24

**senators** [1] - 11:9
**send** [4] - 21:25, 26:12, 52:8, 52:9
**sense** [1] - 30:1
**sentence** [1] - 18:10
**sentenced** [1] - 18:9
**separate** [1] - 28:12
**separation** [1] - 47:24
**seriously** [1] - 24:10
**servants** [1] - 53:19
**serve** [1] - 18:10
**serves** [1] - 37:13
**Service** [2] - 6:3, 45:25
**serving** [3] - 38:21, 40:7, 42:3
**SESSION** [1] - 1:7
**set** [1] - 20:3
**several** [1] - 25:16
**shall** [3] - 20:2, 20:7, 41:8
**shocked** [1] - 11:4
**short** [1] - 12:18
**shorthanded** [1] - 51:14
**show** [10] - 5:13, 6:24, 10:12, 16:13, 25:22, 25:25, 27:21, 28:3, 28:5, 34:12
**showing** [1] - 29:9
**shown** [7] - 13:4, 23:7, 23:13, 29:12, 32:23, 32:24, 36:7
**shows** [2] - 8:20, 16:13
**side** [4] - 4:5, 24:8, 40:2, 40:3
**Sierra** [1] - 10:12
**signed** [1] - 35:13
**significant** [2] - 24:7, 24:12
**silent** [1] - 33:23
**similar** [1] - 5:12
**sine** [2] - 38:25, 48:12
**singer** [1] - 51:3
**SINGER** [4] - 2:17, 4:23, 5:2, 51:3
**site** [21] - 6:17, 6:23, 7:22, 11:12, 12:5, 16:16, 16:20, 16:23, 17:15, 17:23, 20:19, 22:16, 22:22, 27:5, 27:8, 29:19, 34:14, 38:5, 38:19, 46:14, 46:20
**sitting** [1] - 23:6
**situation** [1] - 47:25
**six** [4] - 17:18, 22:10,

23:1, 39:22
**slight** [2] - 5:10, 12:3
**smaller** [1] - 10:11
**snatch** [1] - 52:25
**social** [2] - 7:5, 29:14
**society** [1] - 24:16
**soil** [1] - 11:12
**someone** [3] - 31:2, 33:17, 37:18
**somewhat** [1] - 46:11
**sonar** [3] - 24:5, 24:8
**Sorry** [1] - 4:13
**sorry** [6] - 4:3, 4:11, 4:15, 4:16, 10:14, 53:5
**South** [4] - 15:21, 25:25, 38:12, 41:12
**SOUTHERN** [1] - 1:1
**Southern** [1] - 46:3
**sovereign** [1] - 47:5
**space** [1] - 42:25
**speaking** [1] - 47:5
**Spears** [1] - 9:7
**species** [2] - 6:2, 10:6
**specific** [1] - 52:9
**specifically** [2] - 11:9, 47:14
**specified** [1] - 42:15
**St** [1] - 2:21
**Staff** [1] - 29:19
**standard** [5] - 5:12, 28:23, 38:8, 38:10, 38:11
**standards** [3] - 5:11, 5:12, 24:2
**star** [1] - 21:7
**start** [13] - 4:22, 13:12, 15:3, 25:12, 25:14, 44:19, 49:18, 49:24, 49:25, 50:1, 50:6, 50:11, 54:3
**started** [1] - 43:17
**starting** [1] - 40:21
**State** [49] - 5:17, 7:6, 7:11, 7:13, 7:14, 8:5, 8:10, 8:16, 8:19, 8:23, 15:25, 16:14, 16:15, 16:17, 16:20, 16:21, 17:3, 17:20, 18:2, 18:18, 19:15, 26:9, 26:15, 26:17, 26:21, 27:1, 27:5, 27:10, 30:18, 31:10, 31:21, 31:23, 34:9, 37:4, 37:17, 38:11, 39:12, 40:15, 41:8, 47:15, 47:18, 47:21, 48:1, 53:18

**STATE** [1] - 2:6
**state** [14] - 13:16, 13:18, 14:5, 14:9, 15:11, 18:9, 18:10, 19:5, 24:14, 26:12, 27:16, 27:25, 30:18, 32:18
**State's** [9] - 17:16, 17:17, 17:23, 18:17, 25:13, 26:20, 27:4, 40:25, 41:25
**state's** [1] - 40:2
**State-involved** [1] - 31:21
**statement** [1] - 31:3
**statements** [1] - 48:3
**States** [7] - 3:3, 15:21, 25:7, 28:17, 30:5, 40:19, 55:10
**STATES** [3] - 1:1, 1:11, 2:14
**status** [4] - 11:16, 23:13, 43:5, 44:1
**statute** [3] - 7:2, 40:11, 40:18
**stay** [1] - 27:6
**STENOGRAPHER** [2] - 10:14, 53:5
**STENOGRAPHICALLY** [1] - 3:1
**step** [1] - 38:3
**Steve** [1] - 37:21
**stew** [1] - 48:11
**still** [2] - 19:4, 44:22
**Stoneman** [1] - 6:19
**stop** [1] - 51:17
**stopping** [1] - 45:1
**storm** [1] - 9:22
**Street** [1] - 2:15
**streets** [1] - 39:18
**strength** [1] - 6:10
**strictures** [1] - 39:20
**strikes** [1] - 36:21
**stripped** [1] - 20:20
**stripping** [1] - 20:5
**struggling** [1] - 28:4
**studied** [1] - 6:12
**subchapter** [2] - 20:9
**subcontractors** [1] - 53:23
**subdivision** [1] - 41:8
**subject** [7] - 19:1, 19:11, 20:2, 20:22, 41:9, 53:2, 53:8
**submit** [1] - 33:24
**submitted** [1] - 15:7
**subsection** [2] - 41:7, 42:18

App. 630

**substantial** [5] -
5:13, 5:21, 7:2, 22:18,
46:23

**success** [7] - 5:14,
5:21, 12:22, 13:12,
15:1, 23:17, 46:24

**sufficient** [2] - 15:24,
46:21

**suggestion** [1] - 34:6

**Suite** [3] - 1:19, 2:4,
2:10

**Sunbelt** [2] - 52:11,
53:23

**Sunbelt-driven** [1] -
52:11

**supervised** [1] - 8:15

**supervising** [1] -
34:25

**supervision** [3] -
40:17, 41:9, 41:15

**support** [1] - 46:21

**supposed** [2] - 25:7,
25:9

**Supreme** [2] - 18:24,
20:7

**surrounding** [1] -
10:3

**suspending** [1] -
45:1

**system** [3] - 9:17,
9:20

**T**

**takeoffs** [1] - 22:21

**tall** [1] - 52:8

**Tallahassee** [1] -
27:10

**TANIA** [1] - 1:17

**telephone** [1] - 32:11

**Television** [1] -
45:21

**temporary** [5] -
14:12, 22:1, 42:4,
43:4, 43:19

**ten** [4] - 4:5, 12:7,
43:15, 50:10

**tentative** [2] - 9:8,
9:11

**Tenth** [1] - 21:4

**tents** [1] - 52:19

**term** [3] - 22:20,
23:9, 23:14

**terms** [6] - 5:11,
5:21, 9:5, 22:19,
26:11, 42:1

**territory** [1] - 11:24

**testified** [6] - 9:17,
10:9, 11:11, 13:3,
15:5, 23:10

**testify** [1] - 13:6

**testimony** [19] -
6:21, 7:16, 7:20, 9:21,
10:5, 11:3, 15:14,
29:16, 30:17, 32:3,
32:14, 32:16, 33:2,
33:25, 34:5, 34:21,
34:23, 35:16, 44:8

**THE** [86] - 1:4, 1:10,
1:14, 4:2, 4:10, 4:14,
4:18, 5:1, 5:3, 5:5,
10:14, 12:6, 12:8,
12:13, 12:16, 16:6,
16:8, 17:25, 18:2,
18:8, 18:12, 18:15,
24:25, 25:4, 26:3,
26:5, 26:13, 26:15,
26:23, 27:5, 27:15,
27:20, 28:5, 28:14,
29:18, 29:21, 30:7,
30:15, 31:5, 31:7,
31:13, 31:18, 32:9,
33:4, 33:11, 33:16,
34:11, 34:16, 34:22,
35:3, 35:10, 35:12,
35:18, 35:22, 36:1,
36:4, 36:16, 38:24,
39:9, 39:17, 40:13,
40:22, 41:6, 42:19,
42:22, 43:9, 43:15,
50:4, 50:6, 50:11,
50:19, 51:6, 51:19,
52:5, 52:8, 52:13,
52:24, 53:5, 53:7,
53:11, 53:15, 54:4,
54:8, 54:11, 54:13,
54:16

**therefore** [3] - 15:15,
22:12, 41:2

**they've** [2] - 13:21,
41:21

**thinking** [1] - 41:14

**third** [2] - 19:18,
32:14

**threatened** [2] - 6:2,
46:25

**three** [3] - 14:20,
14:24, 45:8

**threshold** [2] - 29:9,
36:2

**thresholds** [1] -
28:10

**Thursday** [1] - 54:14

**TNT** [4] - 16:16,
17:19, 19:14, 29:19

**today** [3] - 4:19,
25:8, 27:24

**TODD** [3] - 2:2, 2:2,
2:13

**tomorrow** [1] - 51:10

**took** [1] - 13:4

**totality** [1] - 39:25

**TOTOUI** [1] - 1:21

**touchstone** [2] -
38:15, 38:16

**tour** [2] - 16:24,
16:25

**toured** [1] - 17:3

**tours** [1] - 33:21

**trail** [1] - 38:19

**trained** [5] - 8:15,
35:5, 35:9, 35:19,
41:2

**training** [5] - 24:8,
35:20, 35:21, 39:11,
40:17

**transcription** [1] -
55:4

**transfer** [1] - 21:2

**travel** [2] - 6:4, 44:6

**travels** [2] - 54:1,
54:16

**Tribe** [1] - 12:9

**Tribe's** [2] - 44:2,
50:20

**trigger** [3] - 16:12,
41:14, 47:7

**triple** [1] - 23:12

**TRO** [31] - 5:8, 5:9,
5:12, 5:15, 5:16,
11:16, 11:17, 11:18,
11:20, 11:21, 11:25,
12:2, 12:3, 12:4,
12:20, 13:7, 14:17,
15:8, 17:13, 23:11,
23:12, 23:16, 42:2,
43:4, 44:7, 44:19,
46:10, 46:24, 49:3,
51:15

**TROs** [1] - 23:24

**trucks** [2] - 11:11,
44:8

**true** [4] - 20:21, 24:6,
24:7

**trust** [1] - 32:11

**try** [2] - 12:18, 25:13

**Tuesday** [5] - 50:11,
51:8, 54:3, 54:14,
54:18

**turn** [8] - 13:11, 16:4,
17:21, 18:17, 25:11,
26:21, 30:2, 36:11

**turns** [2] - 17:21,
18:21, 38:18

**tweets** [1] - 29:14

**two** [14] - 4:18, 9:6,
9:23, 18:23, 19:23,
22:15, 23:19, 25:22,
28:12, 38:3, 43:17,
50:22, 50:24, 50:25

**two-step** [1] - 38:3

**typically** [1] - 5:23

**U**

**U.S** [6] - 2:18, 2:20,
11:9, 18:24, 23:25,
42:7

**U.S.C** [8] - 11:25,
19:23, 20:6, 20:17,
21:15, 21:17, 41:6,
44:20

**ultimate** [4] - 17:16,
17:18, 24:3, 47:12

**ultimately** [7] - 27:3,
27:11, 27:12, 37:18,
38:4, 40:18, 47:18

**unavailable** [1] -
48:16

**under** [41] - 5:12,
5:19, 7:2, 8:11, 8:14,
8:19, 9:6, 11:14,
13:16, 13:18, 14:10,
16:16, 16:17, 19:6,
19:15, 20:3, 21:14,
22:7, 24:3, 30:11,
35:3, 35:10, 35:11,
36:20, 36:25, 37:1,
37:25, 38:22, 39:14,
40:8, 40:11, 40:14,
41:1, 41:3, 41:7,
41:15, 43:20, 53:1

**understood** [1] -
51:9

**undertaking** [1] - 9:2

**undocumented** [1] -
8:11

**unidentified** [1] -
32:17

**UNITED** [3] - 1:1,
1:11, 2:14

**united** [1] - 3:3

**United** [6] - 15:20,
25:7, 28:17, 30:5,
40:19, 55:10

**universe** [1] - 45:7

**unknown** [1] - 48:8

**unlawful** [2] - 8:23,
42:14

**unnamed** [2] - 33:20,
48:9

**unregulated** [1] -
8:23

**unreliable** [1] - 33:22

**unusual** [1] - 6:6

**unwilling** [1] - 11:15

**up** [6] - 30:21, 35:13,
39:12, 44:11, 49:7,
53:15

**urgency** [1] - 46:2

**V**

**vagueness** [2] -
32:16, 33:12

**Van** [1] - 21:4

**vehicles** [2] - 7:22,
10:2

**venue** [9] - 13:1,
22:10, 45:18, 45:19,
45:20, 45:21, 46:2,
46:5, 46:9

**versus** [12] - 8:12,
9:7, 10:12, 15:21,
18:24, 19:7, 42:7,
45:4, 45:20, 46:3,
47:8, 47:9

**vested** [1] - 20:24

**viable** [1] - 29:10

**victory** [1] - 52:25

**view** [2] - 6:8, 47:18

**violated** [1] - 45:16

**violation** [4] - 5:19,
10:17, 38:23, 45:3

**violations** [1] - 8:17

**visible** [1] - 9:12

**Vision** [1] - 46:3

**voilà** [1] - 39:22

**vs** [1] - 1:6

**W**

**wait** [3] - 4:10, 4:25,
5:5

**walk** [2] - 13:5, 13:6

**Wallace** [2] - 40:9,
45:4

**wants** [2] - 49:24,
50:1

**wardens** [1] - 34:17

**Washington** [2] -
2:19, 2:21

**watching** [1] - 34:18

**Water** [4] - 15:21,
25:25, 38:12, 41:13

**water** [3] - 9:22,
16:6, 46:19

**ways** [1] - 19:23

**Wednesday** [1] -
54:14

**week** [9] - 42:5, 44:1,
46:8, 49:5, 54:7,
54:13, 54:17

**well-cited** [1] - 14:3

**wetlands** [2] - 9:16,
10:4

**wherein** [1] - 9:10

**White** [2] - 29:18,
37:21

**whole** [1] - 30:15

**wife's** [1] - 11:5

**Wild** [1] - 5:20
**wild** [1] - 38:2
**Wildlife** [1] - 6:3
**WILLIAMS** [1] - 1:10
**winning** [1] - 52:24
**Winter** [4] - 23:24, 23:25, 24:4, 24:22
**Winters** [2] - 24:1
**wish** [3] - 12:9, 12:11, 48:11
**wishes** [1] - 12:14
**withdrawn** [1] - 19:22
**witness** [6] - 15:5, 17:2, 17:4, 22:15, 44:2, 50:12
**witness's** [1] - 15:13
**witnesses** [7] - 13:3, 16:22, 48:5, 50:14, 50:22, 50:24, 51:1
**WL** [2] - 21:7, 46:1
**women** [3] - 17:22, 47:20, 47:23
**wondered** [2] - 44:3, 52:14
**words** [1] - 14:11
**wore** [1] - 44:1
**works** [1] - 27:9
**write** [1] - 21:18
**writing** [2] - 49:12, 49:13
**written** [5] - 39:6, 40:5, 49:3, 49:7, 51:12
**wrote** [2] - 8:13, 10:22

**Y**

**years** [3] - 11:5, 15:11, 23:10
**yesterday** [4] - 11:3, 43:23, 44:8
**York** [1] - 39:18

**Z**

**zipper** [1] - 45:6

**É**

**é** [1] - 39:22

App. 632

# Tr. Vol. IV

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                     CASE NO. 25-22896-CV-KMW
 3

 4   FRIENDS OF THE EVERGLADES, et al.,    Miami, Florida

 5        Plaintiffs,                      August 12, 2025

 6             vs.                         10:00 a.m. to 4:55 p.m.

 7   KRISTI NOEM, et al.,

 8        Defendants.                      Pages 1 to 281

 9   _____

10                    PRELIMINARY INJUNCTION HEARING
               BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
11                    UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14

15   FOR THE PLAINTIFFS:       PAUL SCHWIEP, ESQ.
                               ROBERT BURLINGTON, ESQ.
16                             COFFEY BURLINGTON
                               2601 S. Bayshore Drive
17                             Penthouse 1
                               Miami, Florida 33133
18                                  -and-
                               TANIA GALLONI, ESQ.
19                             DOMINIQUE BURKHARDT, ESQ.
                               EARTHJUSTICE
20                             4500 Biscayne Boulevard
                               Suite 201
21                             Miami, Florida 33134
                                    -and-
22                             ELISE PAUTLER BENNETT, ESQ.
                               CENTER FOR BIOLOGICAL DIVERSITY
23                             PO Box 2155
                               Saint Petersburg, FL 33731-2155,
24

25
```

```
 1   FOR INTERVENOR PLAINTIFF:

 2                            TODD R. FRIEDMAN, ESQ.
                             TODD R. FRIEDMAN, P.A.
 3                            CHRISTOPHER AJIZIAN, ESQ.
                             CHRISTOPHER AJIZIAN, ESQ.
 4                            1101 Brickell Avenue
                             Suite 700
 5                            Miami, Florida 33131

 6
     STATE DEFENDANT GUTHRIE:
 7
                             JESSE PANUCCIO, ESQ.
 8                            EVAN EZRAY, ESQ.
                             DANTE FICARELLI, ESQ.
 9                            DAVID COSTELLO, ESQ.
                             BOIES SCHILLER FLEXNER, LLP
10                            401 East Las Olas Boulevard
                             Suite 1200
11                            Miami, Florida 33301

12
     FOR FEDERAL DEFENDANTS
13   KRISTI NOEM and TODD LYONS:

14                            CARLOS J. RAURELL, ESQ.
                             UNITED STATES ATTORNEY'S OFFICE
15                            99 NE 4 Street
                             Miami, Florida 33132
16                                 -and-
                             ADAM R.F. GUSTAFSON, ESQ.
17                            ACTING ASSISTANT ATTORNEY GENERAL
                             FRANK SINGER, ESQ.
18                            U.S. DEPARTMENT OF JUSTICE
                             950 Pennsylvania Ave N.W.
19                            Washington, DC 20530
                                   -and-
20                            MARISSA A. PIROPATO, ESQ.
                             U.S. DEPARTMENT OF JUSTICE
21                            150 M St. NE
                             Washington, DC 20002
22

23   FOR DEFENDANT MIAMI-DADE COUNTY:

24                            CHRISTOPHER WAHL, ESQ.
                             MIAMI-DADE COUNTY ATTORNEY'S OFFICE
25                            P.O. Box 025504
                             Miami, Florida 33102
```

```
1    STENOGRAPHICALLY REPORTED BY:

2                          PATRICIA DIAZ, FCRR, RPR, FPR
                           Official Court Reporter
3                          United States District Court
                           400 North Miami Avenue
4                          11th Floor
                           Miami, Florida 33128
5                          (305) 523-5178

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    INDEX OF EXAMINATION

2    WITNESS                    DIRECT    CROSS    REDIRECT

3
     AMY CASTANEDA
4
     BY MR. FRIEDMAN              12                   89
5    BY MS. PIROPATO                      63
     BY MR. EZRAY                         86
6

7    MARCEL BOZAS

8    BY MR. AJIZIAN              96                   169
     BY MS. GALLONI                      145
9    BY MR. SINGER                       147
     BY MR. EZRAY                        167
10

11   DAVID KERNER

12   BY MR. PANUCCIO            180                   224
     BY MS. BURKHARDT                    203
13   BY MR. FRIEDMAN                     222

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      INDEX OF EXHIBITS

2
      PLAINTIFFS' EXHIBITS          FOR ID     ADMITTED
3
      Exhibit 7                                  10
4     Exhibit 9                                  10
      Exhibit 43                                 10
5     Exhibit 51                                 10
      Exhibit 52                                 10
6     Exhibits 98-145                            178
      Exhibits 146-158                           178
7     Exhibit 47                                 232
      Exhibit 48                                 233
8     Exhibit 49                                 233
      Exhibit 58                                 233
9     Exhibit 10                     237
      Exhibit 87                     237
10    Exhibit 44                     237
      Exhibit 144                    237
11    Exhibit 146                    237
      Exhibit 2                      237
12    Exhibit 4                      238

13
      TRIBE'S EXHIBITS              FOR ID     ADMITTED
14
      Exhibit 2                      13          14
15    Exhibit 6                      14          15
      Exhibit 7                      16          17
16    Exhibit 22 (Pgs 209-211)      44          45
      Exhibit 22 (Pgs 213-215)      44          50
17    Exhibit 22 (Pgs 216-219)      44          53
      Exhibit 23 (Pgs 193-194)      56          57
18

19    DEFENSE EXHIBITS             FOR ID     ADMITTED

20    State Exhibit 28              208         209
      State Exhibit 7               216         221
21    State Exhibits 31-32          236
      State Exhibits 60, 62, 63     236
22    State Exhibit 30              236
      State Exhibit 44              236
23
      Federal Exhibit 7             238
24

25
```

App. 638

```
 1              (Call to the Order of the Court.)

 2         COURTROOM DEPUTY:  Calling case 25-CV-22896, Friends of

 3    the Everglades, Inc., et al., versus Noem, et al.

 4         Counsel, please state your appearances for the record,

 5    starting with the plaintiffs.

 6         MR. SCHWIEP:  Good morning, Your Honor.  Paul Schwiep

 7    on behalf of Friends of the Everglades and the Center for

 8    Biological Diversity.

 9         And I should have mentioned last week that my

10    colleague, Scott Hiaasen, is on vacation out of the country.

11    That's why he is not with us, Judge.

12         THE COURT:  Well, somebody is on vacation, that's nice.

13         MS. GALLONI:  Good morning, Your Honor.  Tania Galloni

14    on behalf of plaintiff, Friends of the Everglades.  I have with

15    me Dominique Burkhardt and Eve Samples, executive director, is

16    here as well.

17         THE COURT:  Good morning.

18         MS. BENNETT:  Good morning, Your Honor, Elise Pautler

19    Bennett here on behalf of the Center for Biological Diversity.

20         THE COURT:  Good morning.

21         MR. AJIZIAN:  Good morning, Your Honor, Chris Ajizian

22    with Miccosukee Tribe of Indians of Florida, Intervenor

23    Plaintiff.

24         MR. FRIEDMAN:  Good morning, Your Honor, Todd Friedman

25    also on behalf of the Miccosukee Tribe, and with us today is
```

1   Curtis Osceola on behalf of the Tribe.

2          THE COURT:  Good morning.

3          MR. PANUCCIO:  Good morning, Your Honor.  Jesse

4   Panuccio for the Florida Department of Emergency Management.

5          THE COURT:  Good morning.

6          MR. EZRAY:  Good morning, Your Honor.  Evan Ezray for

7   the Florida Department of Emergency Management.

8          MR. FICARELLI:  Good morning, Your Honor.  Dante

9   Ficarelli on behalf of the Florida Department of Emergency

10  Management.

11         MR. COSTELLO:  Good morning, Your Honor.  David

12  Costello for the Florida Department of Emergency Management.

13         THE COURT:  Good morning, gentlemen.

14         MR. GUSTAFSON:  Good morning, Your Honor.  Adam

15  Gustafson for the Federal Defendants.

16         MS. PIROPATO:  Good morning, Your Honor.  Marissa

17  Piropato for the Federal Defendants.

18         THE COURT:  Piropato.  I'm going to say that a couple

19  times, I'm going to get that name down.  Good morning.

20         MR. SINGER:  This one is easier.  Good morning, Your

21  Honor, Frank Singer for Federal Defendants.

22         THE COURT:  Mr. Singer.

23         MR. RAURELL:  Good morning.  Carlos Raurell for the

24  Federal Defendants.

25         THE COURT:  Good morning.

App. 640

1          MR. WAHL:  Good morning, Your Honor.  Christopher Wahl,

2    Miami-Dade County.

3          THE COURT:  Good morning.

4          Everyone may be seated.

5          This is a continuation -- we are here on a continuation

6    of the preliminary injunction hearing that was commenced last

7    week.

8          I believe, although I'm not clear, I believe we had

9    heard all of the Plaintiff, Friends of the Everglades,

10   witnesses.

11         Is that right, Mr. Schwiep?

12         MR. SCHWIEP:  That is correct, Your Honor, that we have

13   concluded the presentation of our live witnesses.  I do have a

14   number of exhibits that I would like to submit as part of our

15   case.

16         THE COURT:  Okay.  Is it something that's been agreed

17   on by the parties because, if it's not, maybe we can continue

18   with witness testimony and then deal with that so we don't have

19   witnesses -- how many -- well, let me pause.  It's early for a

20   pause but I'm going to pause.

21         How many plaintiff witnesses do we have?

22         Yes, Mr. Friedman.

23         MR. FRIEDMAN:  The Tribe has two witnesses today.

24         THE COURT:  Okay.

25         And do we have out-of-town State or Federal witnesses

1    here?

2            MR. PANUCCIO:  Your Honor, we do have potential

3    witnesses but part of our calculus on whether we are going to

4    call them live depends on what the Court's rulings are on these

5    declarations coming in without cross.  So, we may or may not

6    call all of them depending on whether declarations are going to

7    come in without cross.

8            THE COURT:  Okay.

9            MR. SCHWIEP:  Judge, to your question, we have a number

10   of exhibits.  We have conferred.  I provided counsel with a

11   list on Friday, and they were kind enough to advise us to a

12   number of exhibits as to which there is no objection, so I can

13   put those on the record now if convenient, Your Honor.

14           THE COURT:  Okay.  Let me find.  I have so many.  Let's

15   start with the preliminary plaintiffs' list that goes up to 78.

16   Let's start there.

17           MR. SCHWIEP:  So Numbers 7, 9, 43, 51 and 52, I believe

18   there is no objection as to those exhibits.

19           THE COURT:  Okay.  All right.

20           MR. SCHWIEP:  We have some others we'd like to submit

21   but understand the Court wishes to reserve on that issue until

22   after the live testimony concludes.

23           THE COURT:  Okay.

24           So, 24 -- is it all of 24, 24-1 through 5?

25           MR. EZRAY:  No, Your Honor, we have objections to parts

App. 642

1  of 24.

2      THE COURT:  Wait a minute.  I was looking at the

3  wrong -- I'm so confused.  Plaintiffs' preliminary witness and

4  exhibit list, which is Docket Entry 81, Plaintiffs' 24, I was

5  looking at the right side of the exhibit list as opposed to the

6  left side.

7      Plaintiffs' 24, the TDF Waste Management, that's

8  already been admitted.

9      MR. SCHWIEP:  Yes, Your Honor.  Looking at the left

10  side on the preliminary exhibit list, that's Docket Entry 81,

11  the exhibits as to which there is no objection are 7, 9, 43, 51

12  and 52.

13      THE COURT:  Okay.  7, 9, 43, 51 and 52 will then be

14  admitted.

15      (Plaintiffs' Exhibit 7 was admitted in evidence.)

16      (Plaintiffs' Exhibit 9 was admitted in evidence.)

17      (Plaintiffs' Exhibit 43 was admitted in evidence.)

18      (Plaintiffs' Exhibit 51 was admitted in evidence.)

19      (Plaintiffs' Exhibit 52 was admitted in evidence.)

20      MR. SCHWIEP:  Thank you, Your Honor.

21      THE COURT:  All right, then.

22      So, I think the Center and the Friends of the

23  Everglades, that concludes your witness testimony.  So we will

24  turn to the Tribe.

25      MR. SCHWIEP:  Your Honor, I think the rule of

App. 643

1    sequestration has been invoked.

2         I don't know if any of the defense witnesses are in the

3    room.

4         MR. PANUCCIO:  We do not have any witnesses in the

5    room.

6         THE COURT:  Thank you, Mr. Panuccio.

7         MR. FRIEDMAN:  The Tribe calls Amy Castaneda.

8         THE COURT:  Okay.

9         (The witness, Amy Castaneda, was duly sworn.)

10        COURTROOM DEPUTY:  Thank you.  Please have a seat and

11   if you can speak closely into the mic, state your full name for

12   the record and spell it out slowly for our court reporter.

13        THE WITNESS:  Spell it out.

14        COURTROOM DEPUTY:  Yes, state your full name.

15        THE WITNESS:  My name is Amy Castaneda, A-M-Y,

16   C-A-S-T-A-N-E-D-A.

17        THE COURT:  Ms. Castaneda, you are very soft-spoken.

18   So if you would, please, speak into the microphone slowly and

19   clearly.

20        Again, my public service announcement, know what you

21   are going to do but it should be done slowly and clearly and

22   into the microphone.

23        MR. FRIEDMAN:  Understood.

24        THE COURT:  All right.  You may proceed, Counsel.

25        MR. FRIEDMAN:  Thank you.

App. 644

```
 1                         DIRECT EXAMINATION
 2   BY MR. FRIEDMAN:
 3   Q.   Thank you.
 4        Ms. Castaneda, would you please introduce yourself to the
 5   court?
 6   A.   Yes, good morning, my name is Amy Castaneda.  I'm the
 7   Tribe's Water Resources Director.
 8   Q.   What is your highest level of education?
 9   A.   I have a bachelor degree of science from the University of
10   Florida in natural resource conservation.
11   Q.   How long have you worked for the Tribe?
12   A.   I have been with the Tribe for 19 years.
13   Q.   What was your first position with the Tribe?
14   A.   I started out as Water Quality Technician.
15   Q.   How long were you in that position?
16   A.   I was there for a number of years and then I moved up to
17   Water Quality Manager.
18   Q.   How many years were you a Water Quality Manager?
19   A.   Another number of years and then a couple of years ago I
20   was promoted to Water Resources Director.
21   Q.   How many years have you been Water Resources Director for
22   the Tribe?
23   A.   Almost three years.
24   Q.   Okay.  What do you do as the Director of Water Resources
25   for the Tribe?
```

App. 645

1    A.   I oversee the monitoring programs.  We have water quality

2    monitoring, water level monitoring, and non-point source

3    monitoring on Tribal lands.

4         MR. FRIEDMAN:  I'd like to pull up Tribe's Exhibit 2.

5         (Tribe's Exhibit 2 was marked for identification.)

6    BY MR. FRIEDMAN:

7    Q.   Thank you.  What is this, Ms. Castaneda?

8    A.   That is my affidavit.

9    Q.   Could we scroll to page 4?

10        Do you see a signature there?

11   A.   Yes, I do.

12   Q.   Whose signature is that?

13   A.   That's mine.

14        MR. FRIEDMAN:  Okay.  The Tribe moves its Exhibit 2

15   into evidence.

16        THE COURT:  Okay.  Is that -- the most recent Docket

17   Entry 1-111, is that part of Ms. Castaneda's declaration or is

18   it a separate --

19        MR. FRIEDMAN:  That is part of the Tribe's original

20   exhibit list, Docket Entry 82.

21        THE COURT:  Okay.  Any objection to Tribe's 2?

22        MS. PIROPATO:  Yes, objection, Your Honor.  They are

23   preventing live testimony.  This is hearsay.  They have the

24   live testimony here.  That's the purpose of the live testimony.

25        THE COURT:  Okay.  If hearsay is the only objection, I

 1   will overrule.

 2             (Tribe's Exhibit 2 was admitted in evidence.)

 3             MR. FRIEDMAN:  Okay.  You can take that down, thank

 4   you.

 5             I'd like to get oriented with regard to Tribal lands.

 6   Can we pull up the Tribe's Exhibit 6, please?

 7             (Tribe's Exhibit 6 was marked for identification.)

 8             MR. FRIEDMAN:  If we can go to page 2, please.

 9             Okay.  Thank you.

10   BY MR. FRIEDMAN:

11   Q.   What is this document, Ms. Castaneda?

12   A.   This is a map showing the Tribal villages along U.S. 41.

13   Q.   You are actually able to draw on your screen.  Could you

14   point out where the jetport is on this map?

15             THE COURT:  Well, are you admitting --

16             MR. FRIEDMAN:  Oh, sorry.

17             THE COURT:  Right, that pesky evidence rule.

18             MR. FRIEDMAN:  Right.

19   BY MR. FRIEDMAN:

20   Q.   Does this map fairly and accurately depict the Tribal

21   villages as depicted on the map?

22   A.   Yes, it does.

23             MR. FRIEDMAN:  Okay.  We'd move Exhibit 6 into

24   evidence.

25             THE COURT:  Any objection?

1         Hold on.  I don't know if there is an objection.

2         MS. PIROPATO:  No objection, Your Honor.

3         THE COURT:  All right.  Tribe 6 will be admitted.

4         (Plaintiffs' Exhibit 6 was admitted in evidence.)

5         THE COURT:  Going back to 2, I looked on Docket 83, it

6    says declaration of Amy Castaneda.  I thought -- are you trying

7    to introduce her CV or her declaration?

8         MR. FRIEDMAN:  Her declaration.

9         THE COURT:  Well, I think counsel for the Government

10   has a good point since Ms. Castaneda is here, but until I

11   understand what exactly the issue is with declarations and

12   whether or not there is live witnesses, I will provisionally

13   still allow it into evidence, but you may continue.

14        MR. FRIEDMAN:  Thank you, Your Honor.

15   BY MR. FRIEDMAN:

16   Q.  On this map, Ms. Castaneda, can you circle where the

17   jetport is.

18   A.  (Indicating.)

19   Q.  And the purple or red dots, who do they depict?

20   A.  Those are the Tribal villages.

21   Q.  Who live in the Tribal villages?

22   A.  Tribal members.

23   Q.  What is the approximate distance of the, let's say the

24   Panther Osceola Village to the jetport?

25   A.  The entrances are about a quarter mile away from one

App. 648

1    another.

2    Q.   And how about the JTP Village?

3    A.   A little further south.

4    Q.   Okay.  On the bottom right of the screen, what is depicted

5    there?

6    A.   That's the Miccosukee reserved area.

7    Q.   What is located within the Miccosukee reserved area?

8    A.   That's where 80 percent of the Tribal members live, the

9    Tribal government building is there, the schools, the

10   preschools and the health centers are there.

11   Q.   Where are the -- where is the Miccosukee reserved area --

12   strike that.

13        What county is the Miccosukee reserved area located in?

14   A.   Dade County.

15        MR. FRIEDMAN:  If we could take that down, please.

16        Could we pull up Tribe's Exhibit 7.

17        (Tribe's Exhibit 7 was marked for identification.)

18        MR. FRIEDMAN:  Thank you.

19   BY MR. FRIEDMAN:

20   Q.   What is this, Ms. Castaneda?

21   A.   This is a map showing the traditional tree islands on

22   Tribal property.

23   Q.   Does this map fairly and accurately depict those tree

24   islands and points of interest for the Tribe?

25   A.   Yes.

1          MR. FRIEDMAN:  We'd move Tribe's Exhibit 7 into

2    evidence.

3          THE COURT:  Any objection?

4          MS. PIROPATO:  Your Honor, I'm not really sure of the

5    basis for her admitting it.

6          How is this a regularly conducted business record?  How

7    does she acknowledge?

8          This was not initially attached to her declaration.  I

9    believe this deals with panthers, and I don't believe that's in

10   the wheelhouse for the expertise or the factual knowledge of

11   this particular witness.

12         If I'm incorrect, please let me know.

13         THE COURT:  Well, I think she is saying it's a picture

14   probably from the Google, but I do have -- the State of Florida

15   in its legislative period has said that pictures from Google,

16   if offered, and a witness says it truly and accurately

17   represents the area in question, are admissible into evidence.

18         So I'm going to admit Tribal 7.  I think it's 90 --

19   it's 908.  I will have to go get it but, anyway, you may

20   proceed.

21         (Tribe's Exhibit 7 was admitted in evidence.)

22         MR. FRIEDMAN:  Thank you.

23   BY MR. FRIEDMAN:

24   Q.  There are a number of black boxes on this map.

25         Do you see those?

1   A.   Yes.

2   Q.   What are these black boxes?

3   A.   Those are the names of the tree islands.

4   Q.   What are they -- are they redacted?

5   A.   Yes.

6   Q.   Why are they redacted?

7   A.   The Tribe doesn't usually share their sacred grounds and

8   since this is a public document, they have blacked out the

9   names of the islands.

10  Q.   By the way, at the bottom right of this document, what does

11  that say under the Miccosukee seal?

12  A.   It says, "Published by the Water Resources Department."

13  Q.   And you are the director of what?

14  A.   The Water Resources Department.

15  Q.   Where are these tree islands and points of interest

16  located?

17  A.   The southern ones are located in Miami-Dade County and the

18  northern are located in Broward County.

19  Q.   Are these all of the Tribe's tree islands and points of

20  interest?

21  A.   No, there is many more tree islands but these are the ones

22  that we display on this map.

23  Q.   Are there tree islands in Monroe County?

24  A.   Yes.

25  Q.   What value does the Tribe ascribe to these tree islands and

1  points of interest?

2  A.   The Tribe has a long history with these and many more tree

3  islands.  There are still a number of Tribal members that were

4  born and alive today that were born on the islands.

5       The Tribal members lay their rest, the people that die, on

6  these tree islands.  A lot of them still have traditional camps

7  on them.  They take their kids out to teach them their history.

8  They hunt, they fish in these areas, and just practice their

9  cultural beliefs.

10  Q.   Does the Tribe share those cultural beliefs or practices

11  with the public?

12  A.   No.

13  Q.   Why not?

14  A.   Because they are sacred to them.

15  Q.   Okay.  What are Tribal lands?

16  A.   On this map there is a few different types of Tribal lands.

17  The rectangle on the top left-hand corner is the Miccosukee

18  Federal Reservation.

19  Q.   Could you mark that, Ms. Castaneda?

20  A.   (Indicating.)

21       It's held in trust for the Tribe.

22       That bluish in the middle is the Miccosukee water

23  conservation area 3A.  That's where a number of those tree

24  islands are depicted on the map.

25       To the left bottom -- well, the entire left side is --

App. 652

1  Q.  Ms. Castaneda, could you also circle that area you just

2  referenced, the 3A?

3  A.  (Indicating.)

4      Yes.

5  Q.  Thank you.

6  A.  The left side off the map is Big Cypress National Preserve

7  and at the bottom is Everglades National Park.  The Tribe has

8  occupancy, hunting, gathering rights in those lands as well.

9  Q.  Can you maybe mark an X were the Big Cypress National

10 Preserve is on this map and another X on Everglades National

11 Park?

12 A.  (Indicating.)

13     And then the bottom right red rectangle is the Miccosukee

14 reserved area.

15 Q.  Could you circle that if there is any space left?

16 A.  (Indicating.)

17 Q.  And one more item, could you circle the jetport on this

18 map?

19 A.  (Indicating.)

20 Q.  Okay.  So, Tribal lands refers to a variety of different

21 types of lands?

22 A.  Yes.

23     MR. FRIEDMAN:  If you could pull up, Sasha, Plaintiffs'

24 Exhibit 34 and if you could clear that, Ms. Castaneda.  This

25 has been admitted into evidence.

```
 1          THE COURT:  Oh, it's Plaintiff's Friends?

 2          MR. FRIEDMAN:  Yes.

 3          THE COURT:  Okay.  Thank you.

 4   BY MR. FRIEDMAN:

 5   Q.  Are you familiar with this map?

 6   A.  Yes.

 7   Q.  What is this map?

 8   A.  This is the map of the Western Everglades Restoration Plan.

 9   Q.  When was the -- that's what WERP stand for?

10   A.  Yes, WERP.

11   Q.  When did -- did Congress pass any legislation related to

12   WERP?

13   A.  Yes, in WRDA 24.  Water Resources Development Act 24.

14   Q.  Approximately, when was that?

15   A.  About a year ago.

16          MR. FRIEDMAN:  Now, if we can scroll down to the bottom

17   half of the map and enlarge that, please?

18   BY MR. FRIEDMAN:

19   Q.  You mentioned the 3A, right?

20   A.  Yes.

21   Q.  What does WCA 3A stand for?

22   A.  Water Conservation Area 3A.

23   Q.  Was the name recently changed?

24   A.  Yes, it was changed to Miccosukee Water Conservation Area

25   3A.
```

App. 654

1   Q.   Why did the name change?

2   A.   Because of the significance of the area to the Tribe.  It's

3   also leased to the Tribe in perpetuity.

4   Q.   By whom?

5   A.   By the State.

6   Q.   Who changed the name of the WCA to the Miccosukee WCA?

7   A.   The Tribe requested it and the State passed it.

8   Q.   Okay.  Which county is the Miccosukee WCA located in?

9   A.   The southern part is in Miami-Dade County and the northern

10  part is in Broward County.

11  Q.   You mentioned it's a water conservation area?

12  A.   Yes.

13  Q.   Why were these water conservation areas originally

14  established?

15  A.   There were a lot of canals that were dredged in the area to

16  drain the swamp to allow agricultural practices.  Once that

17  came to a halt, they saw the importance of the wetlands, so

18  they became water conservation areas to help with flood

19  protection in developed areas of the east, and also to recharge

20  the groundwater and aquifer for drinking water supply for

21  millions of people in South Florida.

22        MR. FRIEDMAN:  Okay.  We can take that down, please.

23        Could you pull up Tribe's Exhibit 8, which has already

24  been admitted into evidence?

25  BY MR. FRIEDMAN:

App. 655

23

1   Q.   Okay.  Since we are in August, I will ask you to work on

2   the right-hand side of this map.

3        Are you familiar with this map?

4   A.   Yes.

5   Q.   What does this map depict?

6   A.   This map shows the general direction of water flow in the

7   Everglades.

8        MR. FRIEDMAN:  Okay.  Sasha, could you zoom in on the

9   right side?  Thank you.

10  BY MR. FRIEDMAN:

11  Q.   Where is the jetport on this map?

12  A.   (Indicating.)

13  Q.   Okay.

14       I see a yellow line below it.  What's that yellow line?

15  A.   That's the Tamiami Trail.

16  Q.   What about the red line going north-south?

17  A.   That's the L-28 South Canal.

18  Q.   What, if anything, does this map show about water flowing

19  from the TNT Site?

20  A.   It shows that it moves in the general direction of south-

21  southwest.

22  Q.   Are there Tribal lands located south of the jetport site?

23  A.   Yes.

24  Q.   What does this map show us about water flowing from the

25  jetport onto Tribal lands?

App. 656

1    A.    That it moves in the direction and eventually flows through

2    the Tribal lands.

3    Q.    What Tribal lands does it flow onto?

4    A.    In this map, definitely Big Cypress National Preserve,

5    Everglades National Park, eventually making its way potentially

6    into the Miccosukee reserved area and, depending on the

7    direction of flow, could be to the Miccosukee Water

8    Conservation Area 3A.

9    Q.    And you say the Miccosukee reserved area is where

10   approximately 80 percent of the Tribe lives?

11   A.    Yes.

12   Q.    And there are schools there?

13   A.    Yes.

14   Q.    Does water flow from the jetport into Monroe County?

15   A.    Yes.

16   Q.    Okay.  Now, you used the word "general," I believe?

17   A.    Yes.

18   Q.    Why did you use the word "general water flow"?

19   A.    There is a potential that the water could flow in different

20   directions depending on the headwater pressure.

21   Q.    What are those conditions that would change the general

22   water flow?

23   A.    So, in certain situations if the head pressure is higher on

24   the west side, then the water would flow to the east side or

25   vice versa.  If the water levels are higher on the east side,

1    then the water would flow to the west side.

2    Q.   What conditions are present this season?

3    A.   This season we have a low water year so, generally

4    speaking, this is the way the water flows.

5        There have been certain instances this summer where there

6    has been a backflow and the water has flowed north into Water

7    Conservation Area 3A.

8    Q.   From the jetport?

9    A.   From the Tamiami Canal.

10   Q.   And the Tamiami Canal is located south of the jetport?

11   A.   Yes.

12   Q.   Can you identify the L-28 Canal on this map?

13   A.   The south?

14   Q.   Yeah.

15   A.   (Indicating.)

16   Q.   What, if any, water flows from the jetport to the L-28

17   Canal south?

18   A.   So, the canals were designed to drain the wetlands in the

19   surrounding area, so some of the water in Big Cypress makes its

20   way into the L-28 south, and from there it travels down to the

21   Tamiami Canal.

22   Q.   Which county does that water end up in?

23   A.   Dade County.

24   Q.   What role does the Tribe play in protecting and preserving

25   water quality in this area?

App. 658

1  A.   In every way.   They are involved in all of the Everglades

2  restoration projects, in general water management of these

3  areas.   It's written into their Constitution to protect the

4  Everglades because the Everglades protected them when they were

5  being hunted by the Government.

6          MR. FRIEDMAN:   Could we take this down, please.

7          And if we could pull up Plaintiffs' Exhibit 34 again,

8  please.

9          You can keep it there.   Thanks.   And just scroll down,

10  please.

11  BY MR. FRIEDMAN:

12  Q.   We see in the middle of the screen L-28 tieback.

13      Do you see that?

14  A.   Yes.

15  Q.   Can you tell the Court what this L-28 tieback is?

16  A.   That's a portion of the canal and levee on the L-28 South

17  that is planned to be removed as part of WERP.

18  Q.   What does the blue line represent?

19  A.   That represents the L-28 South Canal.

20  Q.   What does the red line surrounded by yellow represent?

21  A.   That's an area where the canal plans to be backfilled.

22  Q.   What does that mean, backfilled?

23  A.   Depending on how much material is left over, the Tribe

24  would like that entire levee and canal to be backfilled to

25  marsh grade, but depending on how much fill is available, it

1  will be filled up to that amount.

2  Q.  Why would the Tribe want the L-28 South Canal to be

3  backfilled, and I believe you said made back to marsh?

4  A.  This area has lost wetland connectivity and flow

5  connectivity, so in order to reconnect the east and west side

6  of that canal, the Tribe would like those levees and canals to

7  be filled in.

8  Q.  What happens to the water when the canal and levee are

9  backfilled?

10      Sorry, let me ask you, what happens to the flow of water

11  when the levee and canal are backfilled?

12  A.  In this area, it would be restored.

13  Q.  So water can flow from one side?

14  A.  East to west, west to east, and down south.

15  Q.  What are these -- I see three boxes with two arrows.

16      Do you see those?

17  A.  Yes.

18  Q.  What are those?

19  A.  Those are bidirectional structures that are being installed

20  into the L-28 South levee.

21  Q.  Bidirectional structures?

22  A.  Yes.

23  Q.  What does that mean?

24  A.  That means that, depending on the water levels on the east

25  and west side of that levee, the water can move either from

App. 660

1    east to west or west to east.

2    Q.   What plan is this being conducted under?

3    A.   This is under WERP, the Western Everglades Restoration

4    Plan.

5    Q.   So you said depending on the head pressure, the water can

6    flow east to west or west to east?

7    A.   Yes.

8    Q.   What does that mean, the head pressure?

9    A.   So if the water levels are higher in Big Cypress, then the

10   water is going to push through into 3A, or if the water levels

11   are higher in 3A, then the water is going to push that water

12   west into the Big Cypress.

13   Q.   What did the Tribe originally ask with respect to the L-28

14   tieback, the canal and levee?

15   A.   For them to be completely removed and restore that area.

16   Q.   What ended up happening?

17   A.   The Army Corps is charged with flood protection and there

18   was a fear that the jetport would be flooded out.  So this was

19   a compromise to reconnect the east and west flows without

20   removing entirely the canal and the levee.

21   Q.   Who proposed the compromise of the bidirectionals?

22   A.   The Federal and State agencies.

23   Q.   By the way, who funds WERP?

24   A.   So, WERP is part of CERP, which is the Comprehensive

25   Everglades Restoration Plan, and WERP is under CERP and it's a

1    50/50 cost share between Federal and State agencies.  So the

2    Army Corps and the South Florida Water Management District.

3    Q.  So it was the Army Corps and the South Florida Water

4    Management District that proposed these bidirectionals?

5    A.  Yes.

6    Q.  And, in part, the purpose was to not flood the jetport?

7    A.  Yes.

8    Q.  What activity was going on at the jetport at the time that

9    this compromise was effectuated?

10   A.  It was a small training facility.

11   Q.  Did the Tribe agree to this compromise?

12   A.  Yes.

13   Q.  What are these funnels on 11-Mile Road and U.S. 41?

14   A.  Those are new culverts or boxed culverts or small profile

15   bridges to allow for water to flow from the north side of the

16   road to the south side of the road.

17   Q.  So it's not a bidirectional?

18   A.  No, but, depending, again, there could, in certain

19   circumstance, be a backflow but, generally speaking, the water

20   is going to flow from the north side of the road to the south

21   side of the road.

22   Q.  If you are talking about the U.S. 41 Tamiami Trail?

23   A.  Yes.

24   Q.  And generally the water is going -- you said the water is

25   going to flow from north to south?

App. 662

1  A.  Of the road, but generally the direction is south-

2  southwest.

3  Q.  Okay.  And, again, with the funnels on the 11-Mile Road,

4  which direction do those culverts assist with water flow?

5  A.  Usually from east to west.

6  Q.  So, these funnels are also part of WERP?

7  A.  Yes.

8  Q.  What activity level was going on at the jetport when these

9  culverts were proposed?

10  A.  Minor training, small planes in and out.  It was a pretty

11  quiet area.

12  Q.  Well, let's -- and, again, in Everglades National Park we

13  see Loop Road.  There are a few funnels on that road?

14  A.  Yes.

15  Q.  What's the story with those?

16  A.  The same --

17      MS. PIROPATO:  Your Honor, I don't think he has

18  established a foundation why she -- it seems like she is

19  talking about Army Corps work, and I don't believe there is a

20  foundation laid as to why she can speak to work that the Army

21  Corps and maybe its partners are doing.

22      THE COURT:  Overruled.

23  BY MR. FRIEDMAN:

24  Q.  What's the story with the culverts on Loop Road?

25  A.  To reconnect the hydrology on the north side of Loop Road

App. 663

1  to the south side of Loop Road.

2  Q.  What are all these black dots on U.S. 41 and Loop Road?

3  A.  Those are the existing culverts or bridges.

4  Q.  Do those allow for water flow from the jetport south or

5  west?

6  A.  Yes.

7       MR. FRIEDMAN:  Okay.  You can take that down, please.

8  BY MR. FRIEDMAN:

9  Q.  So, let's talk about the construction of the detention

10  facility at the jetport.

11       MR. FRIEDMAN:  Can you pull up Tribe's Exhibit 6,

12  please.

13  BY MR. FRIEDMAN:

14  Q.  Where is your office in relation to the jetport?

15  A.  It's in the Miccosukee reserved area.

16  Q.  Could you circle that for us?

17  A.  (Indicating.)

18  Q.  How long have you been working at that office?

19  A.  For 19 years.

20  Q.  Have you had the occasion to view the jetport over the past

21  19 years?

22  A.  Yes.

23  Q.  Have you observed aircraft taking off and landing at this

24  jetport?

25  A.  From time to time, yes.

App. 664

```
 1   Q.   What kind of aircraft have you observed at the jetport?

 2   A.   Small planes, one, two passenger.  Nothing big.

 3   Q.   By the way, what's the name of the jetport?

 4   A.   The Dade-Collier Transition and Training Facility.

 5   Q.   What is training in this context?

 6   A.   Learning to fly a plane.

 7   Q.   Okay.  How would you -- what kind -- sorry.

 8        What kind of planes did you observe at this airport?

 9   A.   Usually just small planes.

10   Q.   And how would you describe the noise associated with those

11   planes?

12   A.   You don't really hear the noise.

13   Q.   Do you hear the planes from your office?

14   A.   No.

15   Q.   So, for the 19 or so years before June of 2025, how would

16   you describe the activity levels at the jetport?

17   A.   Minimal.

18   Q.   How many people would you observe on-site?

19   A.   Rarely any.

20   Q.   How many aircraft would you observe taking off or landing?

21   A.   Minimal.

22   Q.   How was the activity level at the jetport -- has that

23   activity level remained the same over the past 19 years?

24   A.   Before the construction?

25   Q.   Yes, before it.
```

App. 665

1  A.  No, it has not.

2  Q.  Before June of 2025, how would you describe the consistency

3  of the activity level at the jetport?

4  A.  Consistent --

5       MR. EZRAY:  Objection.  Foundation.  Calls for

6  speculation.

7       THE COURT:  Overruled.

8       THE WITNESS:  Consistently it's a quiet area.

9  BY MR. FRIEDMAN:

10  Q.  Is there any noticeable changes in activity in those

11  19 years before the construction of the detention facility?

12  A.  No.

13  Q.  Now, how would you compare those 19 years to the activity

14  levels after June of 2025?

15  A.  There is much more activity there.

16  Q.  What sort of activity there?

17  A.  Vehicles going in and out of the entrance of the jetport.

18  There is cars usually isolated on the south side of Tamiami

19  Trail taking pictures with the sign Alligator Alcatraz, tanker

20  trucks in and out, fill trucks in and out, protestors, media,

21  people setting up a tent to sell merch for Alligator Alcatraz,

22  just different levels.

23  Q.  Before the construction of the detention facility, did

24  anyone from the Federal Government contact the Tribe?

25  A.  No.

1  Q.  What about the State Government?

2  A.  No.

3  Q.  What about any governmental entity?

4  A.  No.

5  Q.  How do you know that?

6  A.  When there is contact made about activities going on near

7  Tribal lands, it generally goes through the Chairman's office

8  and down to the environmental offices, so that's how we

9  generally receive notifications.

10  Q.  Is the Water Resources Department an environmental office

11  of the Tribe?

12  A.  Yes.

13  Q.  Did the Tribe have any say in how many people are currently

14  on-site at the detention facility?

15  A.  No.

16  Q.  So, we see a number of Tribal villages close to the

17  detention facility on this map.  Right?

18  A.  Uh-huh, yes.

19  Q.  What else is out there besides Tribal villages?

20  A.  There is a few private homes that were grandfathered into

21  Big Cypress before it became a preserve.  Then after that, the

22  closest would be the Miccosukee reserved area where there is

23  more Tribal homes.  The administration building is there.  We

24  have a school and a preschool there and a health center.

25         MR. FRIEDMAN:  Okay.  You can take that down.

App. 667

1    Thank you.

2  BY MR. FRIEDMAN:

3  Q.  I'd like to shift our discussion to water quality and

4  testing.

5      Do you conduct water quality testing for the Tribe?

6  A.  Our department does, yes.

7  Q.  What does the term "baseline testing" mean?

8  A.  Usually you are collecting the general condition of an area

9  before there is a change.

10  Q.  Why do you do that?

11  A.  So that you can reference those changes back to the

12  baseline data.

13  Q.  Did you have an opportunity to conduct baseline testing in

14  the area surrounding the jetport before the construction of

15  detention facility?

16  A.  No.

17  Q.  Why not?

18  A.  We were not aware that there was going to be any changes to

19  the facility.

20  Q.  What do you do with the baseline test?

21  A.  Once those are conducted, then there is a long-term

22  monitoring that occurs so that you can reference those baseline

23  data to the new information to see what spikes there are in

24  certain parameters or where those spikes are coming from.

25  Q.  Would the Tribe have conducted baseline testing in advance

App. 668

1    of the construction of the detention facility if it knew that

2    it was coming?

3    A.   Yes.

4    Q.   So, since the construction of the detention facility, have

5    you had the opportunity to conduct any testing?

6    A.   We've collected some samples downstream of the TNT Site.

7    Q.   Why downstream?

8    A.   We don't have access to the site.

9    Q.   Okay.  What samples are you collecting?

10   A.   Physical parameters like temperature, dissolved oxygen,

11   turbidity, nutrient samples like phosphorus, nitrogen and some

12   biological assessments, E. coli, feces, and we took some PAH

13   samples.

14   Q.   Did you say PAH?

15   A.   PAH.

16        MR. EZRAY:  Your Honor, we are going to object to this

17   line of questioning.  This is starting to sound like expert

18   testimony and the results of the sampling were not included in

19   the declaration that was submitted.

20        MS. PIROPATO:  And I will further add, that none of

21   this has been disclosed, Your Honor.  This is all new.

22        THE COURT:  Yes, isn't it though, all of it.

23        Do we have any results from the test?

24        MR. FRIEDMAN:  No, Your Honor.

25        THE COURT:  Okay.  Overruled.

App. 669

1          When will we have results from the test?

2    BY MR. FRIEDMAN:

3    Q.  When will we have results from the test?

4    A.  That's a very good question.  We were hoping to have them

5    Friday or today but, hopefully, in the next couple of days.

6          THE COURT:  So, it could be today, it could be

7    tomorrow?

8          Okay.  You will know then.

9    BY MR. FRIEDMAN:

10   Q.  Does your inability to access the jetport site impact your

11   testing ability?

12   A.  Testing around the facility, yes.

13   Q.  Why is that?

14   A.  Without access we can't scoop up a cup of water.

15   Q.  Okay.  What do you do with the information you receive from

16   this testing?

17   A.  We analyze if there is any spikes in certain parameters.

18   We share it with the Council for decision-making.

19   Q.  Okay.  I'd like to break down these different parameters.

20       If we could start with the biological, can you tell the

21   Court what the biological parameters are that you are looking

22   for?

23   A.  So, we sampled for E. coli and feces.

24   Q.  Why do you do that?

25   A.  To see if there is an influx of human activity, wastewater,

App. 670

1  sewage in the wetlands.

2  Q.  What impact does E. coli and feces in the wetlands have on

3  the environment?

4  A.  So, there would be a nutrient shift in vegetation.  There

5  could also be health issues.

6      The Tribe collects and hunts in the area so, if there is

7  human feces in there, then that's a health concern.

8  Q.  Where does the E. coli and feces potentially come from?

9  A.  From the waste of the facility.

10  Q.  What kind of waste is at this facility?

11  A.  Sewage waste.

12      MR. EZRAY:  Objection.  Calls for speculation.  She

13  hasn't been to the facility or examined the facility's water

14  structures.

15      THE COURT:  Right, but she is testing for something and

16  we just want to know, for the record -- I know what waste is

17  but it's sewage, that's what we are talking about?

18      THE WITNESS:  Sewage.

19      THE COURT:  Okay.  Overruled.

20  BY MR. FRIEDMAN:

21  Q.  How many people are at this detention facility?

22  A.  From what I have heard, it was designed for 3,000-plus

23  officers.  So, 3,000 plus.

24  Q.  Okay.  Let's talk about your nutrient parameters.  What are

25  those?

1  A.  So, we tested for phosphorus and nitrogen, and if those

2  make it into the wetlands, again, there is a shift of

3  vegetation which causes a shift in wildlife in the area.

4  Q.  How does that work?

5  A.  So, the plants uptake the nutrients at an unnatural level

6  which causes them to grow at an unnatural rate, and then that

7  area is basically unpenetrable by the wildlife or they don't

8  have the right foraging.  It could also cause a decrease in

9  dissolved oxygen if the light can't penetrate down into the

10  water for the aquatic vegetation to photosynthesize.

11      At that point, it's also the Tribe that gets shifted, they

12  can no longer hunt or gather in that area.

13      MS. PIROPATO:  Your Honor, I'm going to object to this

14  line of testimony.  Again, this is expert testimony -- an area.

15  She is a water quality person.  She is talking about nutrients

16  and other things that are -- first of all, there is no

17  foundation that she has this knowledge.

18      Two, is she a fact witness or an expert witness?  It

19  sounds like expert testimony.

20      THE COURT:  Well, I'm sure it does to you, but I'm

21  overruling that.  She is a fact witness and she is telling us

22  why she tests and what she tests for, which, I mean, makes an

23  abundant amount of sense or else she would be out there testing

24  for no good reason.

25      Overruled.  You may continue.

App. 672

1  BY MR. FRIEDMAN:

2  Q.  Thank you.  Okay.  So in my mind nutrients are a good

3  thing.

4      Can you explain to the Court what nutrients are in this

5  context?

6  A.  So, nutrients are a good thing in their right amounts.

7      The Everglades is a low nutrient wetland so if there is a

8  flux of nutrients, it's like eating McDonald's all day, every

9  day, it's not good for you and it becomes obese in a sense.

10     The vegetation in that area grows in an unnatural way, so

11  it's not good in the wetlands.

12         MR. FRIEDMAN:  Sasha, can we pull up Plaintiffs'

13  Exhibit 34.  Could you scroll in on the triangle.

14  BY MR. FRIEDMAN:

15  Q.  What is the triangle?

16  A.  The triangle is a part of the Federal Reservation.  It's

17  shaped by the L-28 interceptor and the L-28 North canals.

18  Q.  What is the relationship between the triangle and

19  nutrients?

20  A.  So, the L-28 interceptor on the west side brings a lot of

21  nutrients into Tribal lands.  There is a lot of agricultural

22  practices to the north, and that squiggly green line is over

23  4,000 acres of unnatural vegetation growth due to those

24  nutrients coming into the canal.

25  Q.  What does the unnatural vegetation growth -- what impact

1    does this unnatural vegetation growth have on those

2    4,000 acres?

3    A.   They are basically not penetrable.  It starts with the

4    grasses and then it goes to the woody species, so humans can't

5    really make it through there unless you cut a trail by hand.

6    The wildlife is displaced from that area.  The species makeup

7    is different in that area so it's basically a taking of land.

8    Q.   Okay.  So this is a consequence of nutrient loading?

9    A.   Yes.

10         MR. FRIEDMAN:  Okay.  You can take that down, please.

11   BY MR. FRIEDMAN:

12   Q.   Where do nutrients come from?

13   A.   There are many sources.  It could be applied as

14   fertilizers.  It could be runoff from the road.  It could be

15   from a number of different source.

16   Q.   What about showering at a detention facility?

17   A.   Yes.  Soaps usually have phosphates so if those runoffs are

18   not managed and they make it into the wetland, then those are

19   an influx of nutrients in that area.

20   Q.   What about cooking and cleaning for 4,000 people at a

21   detention facility?

22   A.   Yes, again, you have to clean those dishes and water is

23   necessary for cooking and with that comes waste.

24   Q.   What about laundry services for thousands of people at a

25   detention facility?

1  A.  Yes, you have detergents, again, carrying phosphates.

2  Q.  What about vehicles or generators operating at a detention

3  facility?

4  A.  So there could be runoff from paved areas that's no longer

5  pervious so you have runoff of different nutrients, petroleum

6  products that would make its way into the wetland.

7  Q.  Why did you take physical parameters?

8  A.  To get an idea of what the current conditions are, the

9  temperature of the water, dissolved oxygen, turbidity, how

10  turbid and clear the water is, if the area is turbid, light

11  can't penetrate down to the aquatic species for photosynthesis

12  so the dissolved oxygen in the water can decrease, which is the

13  availability for aquatic species to uptake.

14  Q.  What happens when the oxygen dissolves in the water for

15  aquatic life?

16  A.  If the dissolved oxygen decreases or drops drastically,

17  there could be fish kills.

18      The wildlife would move on to other areas where it's better

19  suited.

20  Q.  Do Tribal members fish?

21  A.  Yes.

22  Q.  Do they do it for subsistence?

23  A.  Yes.

24  Q.  How much time do you anticipate needing to capture any

25  changes in your baseline test?

1    A.   Depending on the levels that are introduced into the

2    wetlands, generally it's a long-term program, so once we start

3    testing an area, we continue to test it just to note changes,

4    either in nutrient levels or dissolved oxygen or vegetation.

5    Q.   Okay.  I'd like to talk about the NEPA process.

6         Are you familiar with the NEPA process?

7    A.   Yes.

8    Q.   How are you familiar with that process?

9    A.   The Tribe's involved in a lot of Everglades restoration

10   projects and the Federal Government has a trust responsibility

11   to the Tribe for government-to-government consultation.  So,

12   whenever any of those projects are ongoing and ready for a

13   tentatively selected plan, the Tribe is involved in those NEPA.

14   Q.   Have you participated in those NEPA processes on behalf of

15   the Tribe?

16   A.   Yes.

17   Q.   What's an example of a NEPA process where you and the Tribe

18   participated in recently?

19   A.   I would say WERP.

20   Q.   And WERP stands for?

21   A.   Western Everglades Restoration Project.

22         MR. FRIEDMAN:  Okay.  I'd like to pull up Tribe's

23   Supplemental Exhibit 22, at page 209.  Your Honor, this can be

24   found on the Tribe's corrected Supplemental Exhibit list,

25   Docket Entry 111.

```
 1                (Tribe's Exhibit 22 was marked for identification.)

 2                THE COURT:  Okay.  So, you are not introducing the

 3      entire exhibit, you are introducing this piece of

 4      correspondence which is in the exhibit, or endeavoring to?

 5                MR. FRIEDMAN:  Correct.  And we have notified the

 6      defendants of the specific page that we are intending to

 7      introduce.

 8                THE COURT:  Okay.  Let's see what the witness has to

 9      say and then we will talk about admissibility.

10      BY MR. FRIEDMAN:

11      Q.  Okay.

12          What is this, Ms. Castaneda?

13      A.  This is a letter from the Army Corps inviting the Tribe to

14      participate in NEPA for WERP.

15                MR. FRIEDMAN:  Could we turn to page 211, which is

16      marked C-3-209.

17      BY MR. FRIEDMAN:

18      Q.  Do you see your name on that letter?

19      A.  Yes.

20      Q.  Can you point it out?

21      A.  (Indicating.)

22      Q.  Do you recognize this letter?

23      A.  Yes.

24                MR. FRIEDMAN:  We move Tribe's Supplemental Exhibit 22

25      from pages 209 to 211 into evidence.
```

App. 677

1          MS. PIROPATO:  We object on the grounds of relevance.

2     This deals with a different project.  They want to get one

3     letter.  They are not even doing the whole exhibit.

4          I'm not sure how a different project is relevant to

5     what is happening here, Your Honor.

6          THE COURT:  Are you introducing -- counsel's point of

7     relevance, are you endeavoring to introduce this to contrast

8     the absence of consultation?

9          MR. FRIEDMAN:  Correct, as well as admissions from the

10    Federal Defendants.

11         THE COURT:  Well, if they are admissions then -- all

12    right.  I will allow this two-page letter to be introduced and

13    I will assign to it whatever relevance it's worth as we examine

14    its content to these proceedings but, go ahead, Counsel.

15         MR. FRIEDMAN:  Thank you, Your Honor.

16         If we can go back to 209, please.

17      (Tribe's Exhibit 22, Pages 209 to 211 were admitted in

18    evidence.)

19    BY MR. FRIEDMAN:

20    Q.  Who is this letter addressed to?

21    A.  The Chairman.

22    Q.  Where is the Chairman's office located?

23    A.  In the administration building.

24    Q.  Which county is that in?

25    A.  Miami-Dade County.

1  Q.   Okay.

2       THE COURT:  Could I have a date because I can't see it.

3  It's still too small for my glasses.

4       MR. FRIEDMAN:  It's July 6, 2016.

5       THE COURT:  Okay.  Thank you.

6  BY MR. FRIEDMAN:

7  Q.   Could you clear your screen, Ms. Castaneda?

8       Okay.  Thank you.

9       What does the first sentence read?

10 A.   "The purpose of this letter is to invite you and/or your

11 representative to participate on the project delivery team for

12 the Western Everglades Project, WERP, and to formally initiate

13 government-to-government consultation between the Miccosukee

14 Tribe of Indians of Florida, and the Jacksonville District U.S.

15 Army Corps of Engineers.

16 Q.   What is a project delivery team?

17 A.   It's a team that meets frequently to discuss different

18 parts of the project.

19 Q.   Was a project delivery team assembled with respect to the

20 construction of a detention facility at the jetport?

21 A.   No.

22 Q.   What is government-to-government consultation?

23      MS. PIROPATO:  Your Honor, again, this testimony is

24 calling for a legal conclusion.  Government-to-government

25 consultation is a very specific legal concept.

1    THE COURT:  Well, there is so much I could say but, no,

2    overruled.

3    THE WITNESS:  So the Tribe is a sovereign nation so the

4    U.S. Government consults with the Tribe when any activities are

5    going to be done within the Tribal lands.

6    BY MR. FRIEDMAN:

7    Q.  Was there any government-to-government consultation

8    conducted with respect to the construction of a detention

9    facility at the jetport?

10   A.  No.

11   Q.  The first paragraph -- sorry, the first sentence of the

12   second paragraph, what does that state?

13   A.  "The Everglades ecosystem, including Lake Okeechobee,

14   encompasses a system of diverse wetland landscapes that are

15   hydrologically and ecologically connected across more than

16   200 miles from north to south, and across 18,000 square miles

17   of Southern Florida."

18   Q.  What impact does the construction and operation of a

19   detention facility have on the hydrologically and ecologically

20   connected wetlands in South Florida?

21   MS. PIROPATO:  Again, Your Honor, I'm going to object.

22   This calls for --

23   THE COURT:  Sustained.

24   MS. PIROPATO:  -- expert conclusion.

25   THE COURT:  Sustained.

1    BY MR. FRIEDMAN:

2    Q.  What does the next sentence read?

3    A.  "In 2000, the U.S. Congress authorized the Federal

4    Government, in partnership with the State of Florida, to embark

5    upon a multi-decade, multibillion dollar comprehensive

6    Everglades Restoration Plan to further protect and restore the

7    remaining Everglades ecosystem, while providing for other

8    water-related needs of the region."

9    Q.  What is the Tribe involved in the planning of the

10   comprehensive Everglades Restoration Plan?

11   A.  Yes.

12   Q.  What is the Tribe's position on whether the construction

13   and operation of a detention facility is consistent with the

14   federally authorized, multi-decade, multibillion dollar program

15   to protect and restore the Everglades?

16   A.  The Tribe is not in favor --

17        MR. EZRAY:  Objection.  Calls for speculation.

18   Relevance.

19        MS. PIROPATO:  Compound.

20        THE COURT:  You have to shout it out.  That's not

21   actually how we do it, but...

22        Overruled.  She is, I imagine, in a position of

23   privity, learned that word, with the Tribal council because of

24   the environmental concerns.  So the answer is?

25        THE WITNESS:  The Tribe is not in favor of a facility

1    and construction activities within the footprint of WERP.

2         MR. FRIEDMAN:  Okay.  If we can go to the next page,

3    please, which is marked C-3-208.

4    BY MR. FRIEDMAN:

5    Q.  What does the first sentence of that third paragraph

6    beginning with, "The Corps" read?

7    A.  "The Corps will hold a public meeting on August 16th from

8    6:30 to 9:00 p.m. at the John Boy Auditorium, 1200 South WC

9    Owen Avenue, Clewiston, Florida, 33440."

10   Q.  Were there any public meetings which the Tribe was invited

11   to with respect to the construction and operation of the

12   detention facility at the jetport?

13   A.  No.

14         MR. FRIEDMAN:  If we could move on to page 13, please.

15   BY MR. FRIEDMAN:

16   Q.  Ms. Castaneda, what is this document?

17   A.  It's a letter from the Army Corps to the Chairman, the

18   Tribal Chairman, thanking him for the participation in WERP.

19   Q.  Do you recognize this document?

20   A.  Yes.

21   Q.  How do you recognize it?

22   A.  I've seen it.  I've read it.

23   Q.  Were you involved in these communications with the Army

24   Corps on behalf of the Tribe?

25   A.  Yes.

App. 682

1          MR. FRIEDMAN:  We'd move Tribe's exhibit, Supplemental

2    Exhibit 22, pages 213 to 215 into evidence.

3          MS. PIROPATO:  Your Honor, the same objection of

4    relevance.

5          THE COURT:  Relevance.

6          MS. PIROPATO:  Thank you.

7          THE COURT:  I'm going to overrule but I will, again,

8    state that I will give the weight to this correspondence that

9    it deserves and it, again, I take it is an exemplar of what had

10   happened in the past versus what has transpired here.

11         Is that right, Counsel?

12         MR. FRIEDMAN:  Correct.

13         THE COURT:  Okay.

14         (Tribe's Supplemental Exhibit 22, Pages 213-215 were

15   admitted in evidence.)

16   BY MR. FRIEDMAN:

17   Q.   What does that first sentence read?

18   A.   "Thank you for accepting the invitation from your staff and

19   others to participate in the November 22, 2019, meeting at the

20   Department of Interiors, Office of Everglades Initiatives, in

21   Davie, Florida, in which the Western Everglades Restoration

22   Project was discussed."

23   Q.   Does the Tribe exercise its right to participate in the

24   NEPA process?

25   A.   Yes.

App. 683

1  Q.  What does the next sentence read?

2  A.  "The number of Miccosukee Tribe members and staff present,

3  and the engagement by those same individuals continue to

4  demonstrate your strong commitment toward restoration in the

5  western basins."

6  Q.  What level of commitment does the Tribe have today towards

7  the restoration of the Greater Everglades area?

8  A.  They are fully committed.  It's in their Constitution to

9  protect the Everglades.

10         MR. FRIEDMAN:  If we could turn to the next page,

11  please, which is marked C-3-212.  Would you -- oops.  Thank

12  you.

13  BY MR. FRIEDMAN:

14  Q.  Would you please read that first full paragraph, beginning

15  with "Please know"?

16  A.  "Please know that the Corps fully acknowledges and respects

17  the Tribe's self-determination, sovereignty and statutory

18  rights within Big Cypress National Preserve.  We also

19  acknowledge that there remains considerable concern over

20  obtaining legal interests in real estate necessary to return a

21  more natural flow of water across the landscape.  If this study

22  is to progress, we wish to be fully transparent of its benefits

23  and potential effects."

24  Q.  What impact does the construction and operation of a

25  detention facility have on the Tribe's self-determination,

1    sovereignty and statutory rights within the Big Cypress

2    National Preserve?

3           MS. PIROPATO:  Your Honor, if I may object.

4           THE COURT:  Yes, you may.

5           MS. PIROPATO:  As an initial matter, it calls for a

6    legal conclusion.

7           THE COURT:  Sustained.

8           MS. PIROPATO:  One other objection.

9           THE COURT:  Well, you won.

10          MS. PIROPATO:  I'm sorry, right, we won, you are right,

11   I won, I should sit down.

12          MR. FRIEDMAN:  Nicely done.

13          Okay.  I'd like to move on to page 216.

14   BY MR. FRIEDMAN:

15   Q.   What is this document, Ms. Castaneda?

16   A.   This is a letter from the Tribe to the Army Corps of

17   Engineers, supporting WERP hybrid plan.

18   Q.   Do you recognize this document?

19   A.   Yes.

20   Q.   What is a letter of support?

21   A.   Part of the NEPA processes, there is a comment period where

22   State, Federal, Tribal stakeholders can comment on the project,

23   whether they support or don't support the project or pieces of

24   it.

25          MR. FRIEDMAN:  At this time, the Tribe would move its

1    Supplemental Exhibit 22 from pages 216 to 219 into evidence.

2         THE COURT:  Relevance.

3         MS. PIROPATO:  Thank you, Your Honor.

4         THE COURT:  Okay.  I will continue to have it.

5         I'm also admitting these as business records of the

6    Tribe, but go ahead.

7         (Tribe's Supplemental Exhibit 22, Pages 216-219 were

8    admitted in evidence.)

9         MR. FRIEDMAN:  Thank you, Your Honor.

10   BY MR. FRIEDMAN:

11   Q.  How does the letter of support work in the NEPA process?

12        THE COURT:  Well, how did it work here?

13        What do you know about this?

14        THE WITNESS:  So, before the comment period, there are

15   many, many, many meetings, site visits, chances for questions

16   and answers.

17        There would have been consultation between the

18   Government agencies, Federal and State with the Tribe, and then

19   once a plan was selected, there would have been a number of

20   plans discussed up until this point.

21        Once a plan is selected, then the comment period of

22   time opens and that's when the letter of support is either sent

23   or a letter of not support is sent.

24   BY MR. FRIEDMAN:

25   Q.  So it's a letter of support or a letter of no support?

1  A.  Yes.

2  Q.  Does it have to be one or the other or can it be a hybrid?

3  A.  It can be a hybrid.

4  Q.  Does the Tribe exercise its right to issue letters of

5  support or letters of no support?

6  A.  Yes.

7  Q.  Did the Tribe have an opportunity to issue a letter of

8  support or no support with respect to the detention facility at

9  the jetport?

10  A.  No.

11  Q.  Now, in that introduction, do you see the sentence

12  beginning with, "The entire way of life"?

13        THE COURT:  In the middle.

14        THE WITNESS:  Yes.

15  BY MR. FRIEDMAN:

16  Q.  Could you read those two sentences?

17  A.  "The entire way of life of the Tribe and its members,

18  including their cultural, religious, economic and historical

19  identity, is based upon the Everglades and upon the

20  preservation of the Everglades in its natural state.

21        "The Tribe" -- keep going?

22  Q.  Please.

23  A.  "The Tribe and its members rely upon the Everglades in its

24  natural state to support both subsistence and commercial

25  activities.  Subsistence activities include gathering of

1    materials, hunting and fishing within the Everglades.

2    Commercial activities include frogging, airboat and other

3    guided towers and recreational and tourism facilities within

4    the Everglades."

5    Q.  Thank you.

6        MR. FRIEDMAN:  If we could turn to page 219.

7    BY MR. FRIEDMAN:

8    Q.  The last sentence on that second paragraph beginning with,

9    "The Miccosukee Constitution."  Could you read that, please?

10   A.  "The Miccosukee Constitution prohibits the Tribe to accept

11   money for its lands and no amount of money can compensate the

12   Tribe for the loss of its land and the right to practice its

13   cultural belief."

14   Q.  What impact does the operation of this construction

15   facility have on the Tribe's ability to access its lands?

16   A.  So, the Tribe can no longer access the facility itself and

17   around the facility.  That's within Big Cypress.  They have

18   rights to hunt and gather and fish in the area so they no

19   longer have those accesses.

20   Q.  Are those points of interest and tree islands that we

21   discussed earlier, are those within the vicinity of the

22   jetport?

23   A.  The traditional islands are south of the jetport.

24   Q.  Could you read the next sentence for me, please?

25   A.  I'm sorry, can you point me where we are?

App. 688

1   Q.  Yes, I'm sorry, the first sentence of the last paragraph.

2   A.  "The Miccosukee Tribe will continue to be involved in all

3   efforts aimed at restoration of the Everglades, the Tribe's

4   homeland."

5   Q.  Okay.  Is that true today?

6   A.  Yes.

7   Q.  Okay.  Thank you.  We can put that down.

8       MR. FRIEDMAN:  Then, Sasha, if you can please pull up

9   Tribe Supplemental Exhibit 23, at page 193.

10      (Tribe's Exhibit 23 was marked for identification.)

11  BY MR. FRIEDMAN:

12  Q.  What is this document?

13      MS. PIROPATO:  Again, Your Honor, I'm going to object

14  on relevance grounds.

15      THE COURT:  All right.  Go ahead and identify the

16  document, if you would.

17  BY MR. FRIEDMAN:

18  Q.  Go ahead.

19  A.  The document is a letter from the Army Corps to the

20  Chairman of the Tribe.

21  Q.  Do you recognize this document?

22  A.  Yes.

23  Q.  What is it?

24      THE COURT:  She just told us.

25      MR. FRIEDMAN:  Fair enough.  We will move it into

1    evidence.

2          THE COURT:  Is this another compare and contrast?

3          MR. FRIEDMAN:  Last one.

4          THE COURT:  Okay.  All right.

5          Well, I will allow it but for whatever relevance it may

6    possibly afford.

7          MR. FRIEDMAN:  Could we scroll to the next page,

8    please, which is 194 on Tribe's Supplemental Exhibit 23.

9    BY MR. FRIEDMAN:

10   Q.  Do you see your name there?

11   A.  Yes.

12         MR. FRIEDMAN:  Okay.  We'd move this exhibit into

13   evidence, pages 193 to 194?

14         THE COURT:  Yes.

15         MR. FRIEDMAN:  Okay.

16         (Tribe's Supplemental Exhibit 23, Pages 193-194 was

17   admitted in evidence.)

18   BY MR. FRIEDMAN:

19   Q.  Do you see the first sentence?

20        Could you read that, please, "in accordance" -- oh, I'm

21   sorry, the first page, 193.

22   A.  "In accordance with the National" -- excuse me.

23        "In accordance with the National Environmental Policy Act,

24   NEPA, this letter constitutes the notice of availability of the

25   Western Everglades Restoration Project, WERP, draft project

1    implementation report and environmental impact statement, the

2    PIR/EIS."

3    Q.   What is a notice of availability in this context?

4    A.   So, this is notifying that the Tribe has the option to --

5    no, this is a notice to the Tribe that the PIR/EIS is ready to

6    be read and commented on.

7    Q.   What is the PIR and the EIS?

8    A.   The PIR is the Project Implementation Report.  That's what

9    gets sent to Congress for approval of the plan, so once the

10   tentatively selected plan is done, which in this case is the

11   hybrid natural flow, that's what's included in the PIR.

12        The EIS is the Environmental Impact Statement.

13   Q.   And in the middle of that next paragraph, beginning with

14   the word "enclosed," after the URL, would you read that

15   sentence, please?

16   A.   "Enclosed for your review and comment is the copy of the

17   WERP draft PIR/EIS."

18   Q.   Does the Tribe -- did the Tribe have an opportunity to

19   review and comment on a draft Environmental Impact Statement

20   and Project Implementation Report with respect to this project?

21   A.   No.

22   Q.   Let me ask my question a little better.

23        Did the Tribe have the opportunity to comment and review a

24   draft PIR/EIS with respect to the construction or operation of

25   the detention facility at the jetport?

1   A.   No.

2   Q.   Okay.  The last sentence, if you can read the first

3   sentence of the third paragraph, which is now on your screen?

4   A.   "We intend to pursue an open and public process and

5   recognize the Federal obligations that we have to our Tribal

6   partners."

7           MR. FRIEDMAN:  Okay.  Thank you.

8           You can take that down.

9   BY MR. FRIEDMAN:

10  Q.   In the context of NEPA, what does the phrase "three by

11  three" mean?

12          MS. PIROPATO:  Your Honor, this may call for a legal

13  conclusion because he is saying in the context of NEPA, not in

14  the context of this project.

15          THE COURT:  Well, this project, what we are talking

16  about here, didn't have a NEPA.

17          MR. FRIEDMAN:  Correct.

18          THE COURT:  Right.  So kind of --

19          MS. PIROPATO:  I meant the WERP, Your Honor.  Sorry for

20  the lack of clarity.

21          THE COURT:  Are we talking about the WERP?

22          MR. FRIEDMAN:  I can withdraw the question.

23          THE COURT:  Or rephrase it.  Keep it within the

24  day-to-day experience of our witness.

25  BY MR. FRIEDMAN:

1    Q.   Do you know what the term "three by three" means?

2    A.   When the Federal Government is conducting a restoration

3    project, the three by three refers to $3 million and

4    three years to plan the project.

5    Q.   So, in other words, there is $3 million spent in three

6    years to plan a project in the Everglades?

7    A.   Yes.

8    Q.   Is this a part of the process of NEPA?

9    A.   NEPA would be involved in that three-by-three process.

10   Q.   Are you aware of any three-by-three process in relation to

11   the detention facility?

12   A.   No.

13   Q.   All right.  So, let me just ask you about the environmental

14   harms caused by the detention facility.

15        Does the operation or construction of the detention

16   facility have an impact on the surrounding environment?

17        MS. PIROPATO:  Your Honor, objection.  Calls for an

18   expert conclusion.

19        THE COURT:  Sustained.

20   BY MR. FRIEDMAN:

21   Q.   Is wastewater being generated at the detention facility?

22        MR. SCHWIEP:  Objection.  Foundation.  I believe she

23   testified that she doesn't know one way or the other what's

24   going on at the detention facility.

25        THE COURT:  Exactly.

App. 693

1          But, do you know if -- I mean, other than assuming that

2     a thousand people are going to generate some type of -- do you

3     know?

4          THE WITNESS:  Other than expecting 4,000 people to

5     generate wastewater, sewage, showering, eating, laundry,

6     dishes, no, I do not.

7          THE COURT STENOGRAPHER:  I didn't hear.  Did somebody

8     say something?

9          THE COURT:  Nothing that we have on the record.  And I

10    would advise anyone not a lawyer and not a witness to speak.

11         Next question.

12    BY MR. FRIEDMAN:

13    Q.  Do people generate wastewater?

14    A.  I'm sorry, can you repeat that?

15    Q.  Do people generate wastewater?

16    A.  Yes.

17    Q.  Examples of wastewater are what?

18    A.  Again, showering, bathing, using the restroom, cooking,

19    cleaning, laundry, driving.  So, that would be runoff from the

20    roads.

21    Q.  Where does runoff come from with respect to the detention

22    facility?

23         MS. PIROPATO:  Your Honor, I'm going to object.  This

24    is asked and answered.

25         THE COURT:  Is that the map?

```
 1          MR. FRIEDMAN:  Yes.

 2          THE COURT:  I think we -- yeah.

 3   BY MR. FRIEDMAN:

 4   Q.  Have you reviewed whether there are any permits pulled in

 5   connection with the detention facility?

 6   A.  I checked the Miami-Dade County, Collier County, FDEP and

 7   Army Corps websites.

 8   Q.  What did you find?

 9   A.  There were two permits that were requested, one for a

10   chain-link fence around the facility, and one for wells and

11   both were denied.

12   Q.  What concerns, if any, do you have about the status of

13   permitting at the detention facility?

14   A.  It seems like there is no permitting for the facility.

15   Q.  What is the significance of unpermitted construction and

16   operation of a detention facility with thousands of people?

17   A.  There is no management plan for stormwater runoff,

18   wastewater runoff.  If there is construction activities, there

19   is no best management practices that are decided in that permit

20   and all of that runoff makes its way into the wetlands.

21   Q.  What happens to the wetlands when that runoff flows into

22   them?

23   A.  There is a nutrient load and, again, the vegetation changes

24   which causes the wildlife to change, which causes the Tribe to

25   not access those properties or use them how they have been
```

App. 695

1   authorized to use them.

2           MR. FRIEDMAN:  Okay.  If I can just have a minute, Your

3   Honor.

4           THE COURT:  Yes.

5           MR. FRIEDMAN:  Thank you.

6           Nothing further, Your Honor.

7           THE COURT:  Okay.

8           Cross-examination, Mr. Schwiep, or --

9           MR. SCHWIEP:  We don't have any questions, Your Honor.

10          THE COURT:  And none from the Center?

11          MS. BENNETT:  No, Your Honor.

12          THE COURT:  All right.

13          Oh, Federal Defendants first.  Okay.

14                          CROSS-EXAMINATION

15  BY MS. PIROPATO:

16  Q.  Good morning, Ms. Castaneda.  My name is Marissa Piropato.

17  I represent the United States.

18          You have not provided a résumé in this case.  Correct?

19  A.  To the attorneys but I don't know if it was exhibited in

20  the paperwork.

21  Q.  Okay.  But you provided a résumé to your attorneys.

22          Is that right?

23  A.  Yes.

24  Q.  And you are not a hydrologist.  Correct?

25  A.  No.

1   Q.  And you are not a civil engineer.  Correct?

2   A.  No.

3   Q.  You are not a structural engineer.  Correct?

4   A.  (No verbal response.)

5   Q.  Just let me finish my question, so we can help the court

6   reporter.

7       You over -- you testified that you oversee, supervise and

8   conduct water monitoring programs for the Tribe.  Correct?

9   A.  Yes.

10  Q.  You have done that for about 19 years.  Right?

11  A.  Yes.

12  Q.  And you testified that you, as part of that job, you

13  conduct baseline testing.  Is that correct?

14  A.  Yes.

15  Q.  And did you do baseline testing in the area around the TNT

16  Site in 2024?

17  A.  No.

18  Q.  And did you do baseline testing in the area around the TNT

19  Site in 2023?

20  A.  No.

21  Q.  Did you conduct baseline testing in the area around the TNT

22  Site in 2022?

23  A.  No.

24  Q.  Did you conduct baseline testing in the area around the TNT

25  Site in the past five years?

1  A.  No.

2  Q.  Okay.  You described some baseline testing that you have

3  done recently, and when did you do that testing that you are

4  awaiting the results on?

5  A.  Last week.

6  Q.  Last week.

7      Okay.  Why did you wait -- what day last week, like

8  August 4th or 5th?

9  A.  Some of them was done Wednesday, so I think that was

10  August 6th and then Friday, August 8th.

11  Q.  Why did you wait until August 5th or August 8th to conduct

12  that baseline testing?

13  A.  We did not know that there was going to be a change in use

14  at the facility.

15  Q.  Okay.  But you learned there was a change in use in the

16  facility around the end of June 2025.  Right?

17  A.  Yes.

18  Q.  Okay.  So, you describe how you monitor water in the

19  reservation.

20      Is that right?

21  A.  Yes.

22  Q.  It's fair to say that also includes monitoring water

23  quality in the Reservation?

24  A.  Yes.

25  Q.  And because it's your job, you have a pretty good idea of

1    the quality of the water on the Reservation.  Correct?

2    A.  Yes.

3    Q.  And sitting here today, you do not have data showing how

4    water quality has changed during 2025 within the Reservation.

5        Is that right?

6    A.  I'm sorry, can you reword the question?

7    Q.  Sure.

8        Would it be fair to say that you do not have data how the

9    water quality has changed in the area around the Reservation

10   since June 2025?

11   A.  On the Federal Reservation?

12   Q.  Yes.

13   A.  We do conduct monitoring on the Federal Reservation so I do

14   have water quality data showing those changes.

15   Q.  Have you submitted those changes -- and were those changes

16   that you talk about, what particular dates are you describing?

17   A.  We do that on a monthly basis but those are upstream from

18   the TNT Site.

19   Q.  And you don't have any data showing how water quality has

20   changed downstream from the TNT Site.  Correct?

21   A.  No, we have only taken one sampling event so in order to

22   see change, we would have to have more than one sampling event.

23   Q.  So, is it fair to say that you normally do water testing

24   upstream from the TNT Site?

25       Is that right?

App. 699

1  A.  We do testing north of the TNT Site, east, east-southeast

2  of the TNT Site.

3  Q.  But you historically don't do water testing downstream of

4  the TNT Site.

5      Is that correct?

6  A.  We don't do water testing straight downstream of the TNT

7  Site, no.

8  Q.  But in August of 2025, you decided to do downstream

9  testing.

10     Is that right?

11  A.  Yes.

12  Q.  Would it be fair to say you don't have any data showing any

13  differences in the water quality downstream from the TNT Site

14  from 2025 or 2024?

15  A.  No.

16  Q.  Would it be also fair to say that you don't have any data

17  showing that the water quality downstream from the TNT Site has

18  changed since June 2025.  Correct?

19  A.  No, we have only taken one sampling event.

20  Q.  Okay.  Let's turn to some of the other things you testified

21  to today.  Let's first talk about wastewater.

22     What do you mean by wastewater?

23  A.  Wastewater is the water discharged from human use.  So, it

24  could be showering, you know, runoff from the road, sewage.

25  Q.  Okay.  Is there anything else besides water -- I'm sorry,

App. 700

1    showering, runoff from the road or sewage?

2    A.  Cooking, cleaning.

3    Q.  Cooking, cleaning.

4        Okay.  Would it also include laundry?

5    A.  Yes.

6    Q.  Okay.  You testified about some of your concerns about

7    wastewater at the detention facility.

8        Do you remember that testimony?

9    A.  Yes.

10   Q.  Is it fair to say that you have no personal knowledge as to

11   how Florida is managing wastewater at the TNT facility?

12   A.  No, we have not received any information how water is being

13   managed at the TNT facility.

14   Q.  So the answer is no?

15   A.  The answer is no.

16   Q.  You have not seen any improper treatment of wastewater at

17   the TNT detention facility.  Correct?

18   A.  Correct.

19   Q.  And you have -- you don't have any data indicating that the

20   TNT detention facility improperly treated wastewater.

21       Correct?

22   A.  Correct.

23   Q.  You have not measured water from the airport facility

24   before June 2025.

25       Is that correct?

1   A.   Yes.

2   Q.   And you have not measured the change in wastewater before

3   and after detention operations began in June 2025.

4        Is that correct?

5   A.   That is correct.

6   Q.   Again, that includes from laundry?

7   A.   Uh-huh.  Yes.

8   Q.   And it includes from showering?

9   A.   Yes.

10  Q.   And the other things that you talked about.  Correct?

11  A.   Yes.

12  Q.   Let's talk a little bit about sewage.

13       You testified about your concerns about sewage.

14       Is it fair to say that you have not seen sewage coming from

15  the TNT detention facility?

16  A.   Correct.

17  Q.   And you don't have any data indicating that the TNT

18  detention facility improperly released sewage.

19       Is that correct?

20  A.   That's correct.

21  Q.   Do you know if there is a septic system on the detention

22  facility?

23  A.   I would imagine no because there is no permit pulled for a

24  septic system at the TNT Site.

25  Q.   But sitting here today, you have no precise knowledge or

App. 702

1    exactly knowledge of whether or not there is a septic system?

2    A.  No.

3    Q.  And you have not measured whether there was sewage coming

4    from the airport facility before June 2025.

5         Is that correct?

6    A.  That's correct.

7    Q.  And you have not measured the change in the release of

8    sewage before and after detention --

9              THE COURT STENOGRAPHER:  I'm sorry.

10             MS. PIROPATO:  I'm sorry if I'm going too quickly.

11             THE COURT:  Yes.

12             MS. PIROPATO:  I will repeat it, and please stop me if

13   I go to quickly.

14             THE COURT STENOGRAPHER:  You are doing good.

15             MS. PIROPATO:  I'm trying my best.  I'm a New Yorker.

16   BY MS. PIROPATO:

17   Q.  You have not measured the change in the release of sewage

18   before and after detention operations began in June 2025.

19   Correct?

20   A.  Correct.

21   Q.  So, let's talk a little bit about stormwater runoff.

22        You have not observed stormwater runoff coming from the TNT

23   detention facility.  Correct?

24   A.  I've seen water flow from the downstream of the TNT Site

25   for a number of years.

1  Q.  Okay.  When you say you've seen water coming from the TNT

2  Site for a number of years, how many years ago was that?

3  A.  I've worked for the Tribe for 19 years, so 19 years.

4  Q.  Okay.  Now, let's talk specifically about the TNT detention

5  facility.  Since June 2025, you have not observed stormwater

6  runoff coming from the TNT detention facility.  Correct?

7  A.  No.

8  Q.  Okay.  You do not have any data indicating that there was

9  stormwater runoff coming from the TNT detention facility.

10  Correct?

11  A.  It has rained since June 2025 so there has been stormwater

12  coming off of the facility.

13  Q.  Okay.  So, you said that there has been stormwater coming

14  from the facility.

15      Now, let's turn to my specific question.

16      You have not measured since June 2025 the stormwater runoff

17  coming from the facility.  Correct?

18  A.  Correct.

19  Q.  Okay.  And you have also not measured the change in

20  stormwater before and after detention operations began in

21  June 2025.  Correct?

22  A.  Correct.

23  Q.  So, sitting here today, you do not know if there has been

24  stormwater runoff from the TNT facility since June 2025.

25  Correct?

```
 1   A.   It has rained since June 2025 so there has been runoff from
 2   the facility.
 3   Q.   But, again, you have no specific data about the extent of
 4   that stormwater runoff?
 5   A.   I do not.
 6   Q.   Okay.  Let's turn to the tree islands that you discussed.
 7   I believe that was Exhibit 7, but I don't think we need to
 8   discuss, have the exhibit up, but if we do, let me know.  Okay?
 9        Are there tree islands in Collier County?
10   A.   Yes.
11   Q.   Do you know how many tree islands there are in Collier
12   County?
13   A.   There are hundreds of tree islands.
14   Q.   Is the TNT Site on Tribal lands?
15   A.   No.  Well, it's within Big Cypress which is -- it's within
16   Big Cypress.
17   Q.   But the TNT Site is not specifically on Tribal land.
18   Correct?
19   A.   Not specifically.
20   Q.   Is the access road or Jetport Road, is that on Tribal
21   lands?
22   A.   It's within Big Cypress.
23   Q.   But, again, the access road is not on Tribal lands.
24   Correct?
25   A.   Big Cypress is Tribal lands.
```

1      The Tribe has access to Big Cypress and the Tribe

2  traditionally used that access road as access into Big Cypress.

3  Q.  Does the Tribe have occupancy rights on the TNT Site?

4  A.  Within Big Cypress, it does.

5  Q.  But on the TNT Site, does the Tribe have occupancy rights?

6  A.  The TNT Site is within Big Cypress, which the Tribe has

7  occupancy rights.

8  Q.  So you are saying today that the Tribe has occupancy rights

9  to the TNT Site?

10  A.  The Tribe has access historically through the TNT Site into

11  to Big Cypress and now they no longer have access.

12  Q.  But that's historic access to the TNT Site?

13  A.  Prior to June 2025.

14  Q.  The Tribe doesn't have an easement that gives it access to

15  the TNT Site?

16      THE COURT:  Well, you are asking her for a legal

17  conclusion which we have all established is not in her purview,

18  so let's move on.

19  BY MS. PIROPATO:

20  Q.  Fair enough.  You talked about hunting rights.  Correct?

21  A.  Yes.

22  Q.  Does the Tribe have hunting rights on the TNT Site?

23  A.  They have hunting rights within Big Cypress National

24  Preserve.

25  Q.  But the hunting right you are talking about are just for

App. 706

1    Big Cypress National Preserve.  Correct?

2    A.  Yes.

3    Q.  So whatever rights they have on the Jetport Road are

4    derivative of their rights from the Big Cypress Preserve.

5    Correct?

6    A.  Yes.

7    Q.  Whatever rights they have to Jetport Road are derivative to

8    whatever rights they have for the Big Cypress Preserve.

9        Is that correct?

10   A.  Correct.

11       MS. PIROPATO:  So, can we put up Plaintiffs'

12   Exhibit 34.

13       Is that possible, Dante?

14       Thank you.

15   BY MS. PIROPATO:

16   Q.  Can we look at the area that was marked, I think, WCA 3A?

17   Is that on here?  I believe it is.  Yes.

18       Do you see that area?

19   A.  Yes.

20   Q.  You testified about the WCA area earlier.  Correct?

21   A.  Correct.

22   Q.  How far is that area from the TNT Site?

23   A.  A few miles.

24   Q.  A few miles?

25   A.  Over the L-28 South.

App. 707

1   Q.   You talked about your office.   How far is your office from

2   the TNT Site?

3   A.   It's a couple of miles.

4   Q.   A couple of miles.

5       So, it's fair to say that your office is not located on the

6   TNT Site.   Correct?

7   A.   Correct.

8   Q.   You testified that you observed --

9       MS. PIROPATO:   This can come down now.   Thank you.

10  BY MS. PIROPATO:

11  Q.   You testified that you observed small planes coming from

12  the TNT -- from the airport facility?

13  A.   Correct.

14  Q.   What is the precise timeline when you observed the planes

15  that you testified about?

16  A.   No precise timeline, just within the time frame of working

17  for the Tribe.

18  Q.   So that's over the course of 19 years.

19      Is that correct?

20  A.   Correct.

21  Q.   How much time have you spent observing the flights landing

22  and taking off from the Collier airport facility?

23  A.   When I look up and there is a plane over my head, that's

24  when I've noticed them.

25  Q.   That's whatever you see a plane.   But planes can fly in

App. 708

1  many directions.  Correct?

2  A.  Sure.

3  Q.  So it could be a plane flying in a different direction and

4  you do not observe it going overhead.  Correct?

5  A.  Correct.

6  Q.  And you have not inventoried the flights coming to and from

7  the TNT Site.  Correct?

8  A.  Correct.

9  Q.  How many times were you actually at the TNT Site counting

10  the number of flights before June of 2025?

11  A.  Zero.

12  Q.  How many times were you at the TNT Site counting the number

13  of people working at the airport facility before June 2025?

14  A.  Zero.

15  Q.  And you haven't worked at the TNT airport facility.

16  Correct?

17  A.  Correct.

18  Q.  I heard you testify that there are going to be 3,000

19  officers at the site.  Correct?

20  A.  What I have heard is 3,000 detainees.

21  Q.  Okay.  There will be 3,000 detainees at the site.  Correct?

22  A.  Correct.

23  Q.  And I think you said 1,000 officers.  Correct?

24  A.  I said plus, 3,000-plus.

25  Q.  But you just heard that number.  Correct?

1    A.   Yes.

2    Q.   You have no personal knowledge?

3    A.   No.

4         MS. PIROPATO:  Can we put up Plaintiffs' Exhibit 34.

5         Thank you.

6    BY MS. PIROPATO:

7    Q.   You've discussed on this exhibit the triangle, I think it's

8    on here?

9    A.   Yes.

10        MS. PIROPATO:  Yeah, scroll up.

11   BY MS. PIROPATO:

12   Q.   You mentioned that there are agricultural practices near

13   the triangle.  Correct?

14   A.   Yes, north of the triangle.

15   Q.   North of the triangle.

16        And those practices include the emission of phosphorus.

17   Correct?

18   A.   Correct.

19   Q.   And phosphorus can be a problem in the Everglades.

20   Correct?

21   A.   Correct.

22   Q.   And you also discussed other fertilizers that come from

23   those agricultural processes.  Correct?

24   A.   Yes.

25   Q.   You are not claiming that the TNT facility is emitting

1  phosphorus.  Correct?

2  A.  I am claiming that it could but we have to test for that to

3  see if it is.

4  Q.  But you are not claiming that the TNT facility is engaging

5  in agricultural practices.  Correct?

6  A.  I'm sorry.  Repeat that.

7  Q.  You are not claiming that the TNT facility is engaging in

8  agricultural practices.  Correct?

9  A.  Correct.

10  Q.  Just to clarify, you talked about some concerns that you

11  had from showering and laundry.  You don't really know how the

12  State of Florida is treating wastewater from showering at the

13  facility.  Correct?

14  A.  Correct.  We haven't seen any permitting for that.

15  Q.  And you don't know how the State of Florida is treating

16  laundry that is coming -- wastewater from laundry that is

17  coming from the facility.  Correct?

18  A.  Correct.  We have not seen a water management plan from the

19  facility.

20  Q.  So that's a no.  Right?

21  A.  That's a no.

22  Q.  And just to clarify for the record, you do not know how the

23  State of Florida is treating stormwater off paved surfaces

24  being treated at the facility.  Correct?

25  A.  Correct.

1    Q.  Has the Tribe done any construction in the Big Cypress

2    National Preserve?

3    A.  The Tribe has occupancy rights, so there are homes within

4    the Big Cypress National Preserve.

5    Q.  Do you know how many homes are within the Big Cypress

6    National Preserve?

7    A.  Not exactly.

8    Q.  Does the Tribe have an ecotourism business in the Preserve?

9    A.  In the Preserve, no.

10   Q.  Does the Tribe have an ecotourism business near the

11   Preserve?

12   A.  When you say near --

13   Q.  In the general vicinity.

14   A.  They have in Water Conservation Area 3A.

15   Q.  They have an ecotour business in the water area 3A.

16   Correct?

17   A.  Yes.

18   Q.  Do they have a gas station?

19   A.  Yes.

20   Q.  Restaurants?

21   A.  Are we talking about Big Cypress or are we still talking

22   about 3A?

23   Q.  3A.

24   A.  Yes.

25   Q.  And they have restaurants.  Do you know how many

1   restaurants?

2   A.  There are no restaurants currently.

3   Q.  There are no restaurants.  But are there restaurants in the

4   general area around 3A?

5   A.  No, maybe small food trucks but no restaurants currently.

6   Q.  There might be some small food trucks around water area 3A?

7   A.  Yes.

8   Q.  Are there any service areas with restrooms around 3A?

9   A.  Yes.

10  Q.  Are there any other business entities that the Tribe

11  operates around Water Conservation Area 3A?

12  A.  Yes.

13  Q.  What are those businesses?

14  A.  The administration building is there.  There is airboat

15  tours.  There is a gas station.  It's -- there's a museum.

16  Q.  A museum.  Okay.

17      Do you remember your discussion about the WERP?

18  A.  Yes.

19  Q.  That's a program sponsored by the Army Corps of Engineers.

20  Correct?

21  A.  It's a 50/50 sponsor between the Army Corps and the South

22  Florida Water Management District.

23  Q.  But one of the project sponsors is the Army Corps of

24  Engineers for the WERP.  Correct?

25  A.  Correct.

1  Q.  And the WERP is a multiyear restoration program.  Correct?

2  A.  Yes.

3  Q.  There is billions of dollars going into that program.

4  Correct?

5  A.  Hopefully.

6  Q.  And the Army Corps of Engineers is an agency of the Federal

7  Government.  Correct?

8  A.  Correct.

9  Q.  So, is it fair to say the WERP was spearheaded, at least in

10  part, by the Federal Government?

11  A.  It was a 50/50 share.  So, yes, the Federal Government and

12  the South Florida Water Management District.

13  Q.  Okay.  So it would be fair to say that WERP had significant

14  Federal involvement.  Correct?

15  A.  Significant, yes.

16  Q.  And the TNT Site was built by the State of Florida.

17  Correct?

18        THE COURT:  Okay.  So, this is going to be my area to

19  decide, so we are not going to ask any of them these questions,

20  I think.

21        MS. PIROPATO:  Okay.

22  BY MS. PIROPATO:

23  Q.  But you don't believe that the TNT facility is part of the

24  WERP.  Do you?

25  A.  It's within the footprint of WERP.

1   Q.  Okay.

2   A.  And there is flood protection accounted for the jetport.

3  So, yes.

4   Q.  So the WERP accounted for the jetport.

5     Is that correct?

6  A.  Correct.

7   Q.  And the impacts that may come from the jetport.  Correct?

8       MR. FRIEDMAN:  Objection.  It's a vague question.

9       THE COURT:  No, I think we're -- you can go ahead and

10  answer.

11      THE WITNESS:  Can you repeat the question, please?

12  BY MS. PIROPATO:

13   Q.  And the WERP also accounted for whatever impacts that might

14  have come from the jetport.  Correct?

15      THE COURT:  Back in the day --

16      MS. PIROPATO:  Back in the day.

17      THE COURT:  -- before this.

18      THE WITNESS:  When WERP was written, it accounted for

19  what the use of that land was at the time.

20  BY MS. PIROPATO:

21   Q.  And by use of that land, that would include whatever

22  environment impacts of the jetport.  Correct?

23  A.  For its current use at the time.

24   Q.  Okay.  Just to get a clear record, the WERP accounted for

25  the use, the impacts coming from the jetport when it was being

1    used as an airport facility.  Correct?

2           THE COURT:  Before June of 2025?

3           THE WITNESS:  Correct.

4    BY MS. PIROPATO:

5    Q.  You talked a lot about water flows.

6           MS. PIROPATO:  Can you put up Exhibit 8?

7           MR. FICARELLI:  Plaintiffs' or --

8           MS. PIROPATO:  I think it's the Plaintiffs' Exhibit 8.

9    Thank you.

10          THE COURT:  Right, it's the Tribe's 8.

11          MS. PIROPATO:  The Tribe's 8.

12   BY MS. PIROPATO:

13   Q.  You talked a lot about water flows.  You have not measured

14   the extent of the water that is currently flowing to the

15   Tribe's Reservation from the TNT Site.

16          Is that right?

17   A.  That's right.

18   Q.  You have not measured how the water flows have changed

19   since June of 2025.

20          Is that right?

21   A.  That's right.

22   Q.  And you have not compared how the water flows have changed

23   from 2024 to 2025.

24          Is that right?

25   A.  Right.

1    Q.   And you testified that water levels can direct which

2    direction water is flowing.  Right?

3    A.   Uh-huh.  Correct.

4    Q.   And backflow can affect which direction the water is

5    running?

6    A.   Correct.

7    Q.   And the levees that you discussed can also affect the

8    direction of which the water is flowing.  Right?

9    A.   Correct.

10   Q.   And storm events can affect which direction the water is

11   running?

12   A.   Correct.

13   Q.   Would it be fair to say that there are numerous factors

14   which affect the way which water might be running?

15   A.   Yes.

16   Q.   You also discussed the L-28 canal.  How far is that from

17   the TNT Site?

18   A.   Not very far.

19   Q.   What do you mean by "not very far"?

20   A.   A couple miles.

21   Q.   So it would be fair to say that the L-28 canal is a couple

22   of miles from the TNT Site?

23   A.   Yes.

24        MS. PIROPATO:  Give me a moment, Your Honor.

25        THE COURT:  Yes.

1      MS. PIROPATO:  Your Honor, I just want to clarify one

2 thing with the witness.

3      THE COURT:  Sure.

4 BY MS. PIROPATO:

5 Q.  You testified that there is no restaurant in Water Area 3A

6 currently.  Correct.

7 A.  Currently.  Correct.

8 Q.  Were there restaurants historically in Area 3A?

9 A.  There was one restaurant along Tamiami Trail but it's

10 closed.

11 Q.  When did that restaurant close?

12 A.  A couple of years ago.

13 Q.  So, that would be like the restaurant closed around 2023.

14      Is that correct?

15 A.  A couple of years ago.  I can't give you an exact date.

16 Q.  But before then, there was a restaurant operating in Water

17 Area 3A.

18      Is that correct?

19 A.  Yes.

20 Q.  How long was that restaurant operating in Water Area 3A?

21 A.  A long time.

22 Q.  By "a long time" do you mean decades?

23 A.  As long as I worked there.

24 Q.  So, there was a restaurant operating in Water Area 3A at

25 least for 19 years.  Is that correct?

 1   A.   Correct.  Well, less because it closed a couple of years

 2   ago.

 3   Q.   Thank you for the correction.

 4        So, there was a restaurant operating in Water Area 3A for

 5   at least 16 years?

 6   A.   When I say in 3A, it was on Tamiami Trail so that is the

 7   southern boundary of 3A, yes.

 8   Q.   Yes, but just to clear the record, the restaurant was, that

 9   was historically operated in that area, was on Tamiami Trail in

10   Water Area 3A.  Correct?

11   A.   On the southern boundary of 3A, yes.

12   Q.   But that's in Water Area 3A.  Correct?

13   A.   Sure.

14        MS. PIROPATO:  Thank you, Your Honor.

15        THE COURT:  All right.

16                        CROSS-EXAMINATION

17   BY MR. EZRAY:

18   Q.   Good morning, Ms. Castaneda.  I'm just going to ask you a

19   couple of questions.

20        In your declaration, you said that you have witnessed

21   trucks bringing loads of fill to the TNT Site.  Right?

22   A.   Yes.

23   Q.   Does the use of fill inherently harm water quality?

24   A.   It could, yes.

25   Q.   But the Tribe uses fill for its own construction projects.

1    Right?

2    A.  Yes.  With the correct BMPs in place, yes.

3    Q.  So if the correct processes are in place, fill does not

4    harm the water quality.  Right?

5    A.  And the Tribe also goes through the permitting process to

6    get those fill permits.

7    Q.  Understood.  I'd just like an answer to my question, so if

8    the correct practice is --

9         THE COURT:  That is an answer to your question.

10        MR. EZRAY:  Thank you, Your Honor.

11   BY MR. EZRAY:

12   Q.  Now, you talked a little bit about airport traffic earlier

13   this morning.

14   A.  Yes.

15   Q.  Did you review any data on the number of flights going into

16   the old airport?

17   A.  No.

18   Q.  And you testified that the way that you were observing

19   airplanes was that you would hear them going over your office?

20   A.  No.  I said I would see them in the sky.  I rarely heard

21   them.

22   Q.  How many feet above your head were they?

23   A.  A couple of hundred.

24   Q.  Now, the Tribe has a casino and hotel adjacent to the

25   Everglades.  Correct?

1    A.   Yes.

2    Q.   How does the Tribe manage water quality, particularly

3    wastewater, coming from its hotel and casino?

4    A.   The hotel and casino is hooked up to the Miami sewage

5    system, and for stormwater there is a berm that goes along the

6    perimeter of the casino, so any stormwater is contained

7    on-site.

8    Q.   And wastewater?

9    A.   Wastewater is hooked up to the Miami-Dade system.

10   Q.   So it's possible to effectively manage wastewater from a

11   large site?

12   A.   Yes.

13   Q.   And stormwater?

14   A.   Yes.

15         MR. EZRAY:  Can I have one second, Your Honor?

16         THE COURT:  Yes.

17   BY MR. EZRAY:

18   Q.   I just want to ask you a couple more additional questions

19   about the planes.  I just want to make sure I have your

20   testimony right.

21        Your testimony is you wouldn't hear a plane a couple of

22   hundred feet above your office.  Correct?

23   A.   I can't hear any planes from my office.

24   Q.   Have you ever been on a runway when a plane is taking off

25   or landing?

App. 721

1    A.   Yes.

2    Q.   Is it pretty loud?

3    A.   Yes, the size of the plane.  I mean, I've been there at the

4    Miami International Airport.

5         Yes, the planes are loud.

6              MR. EZRAY:  Thank you.  No further questions.

7              THE COURT:  Redirect.

8                         REDIRECT EXAMINATION

9    BY MR. FRIEDMAN:

10   Q.   Hello again.

11   A.   Hello.

12   Q.   Is the casino of the Tribe, is that located in the

13   Everglades?

14   A.   It's located on the outskirts of the Everglades.

15   Q.   What is located next to the casino?

16   A.   There is a gas station and there is a tobacco shop.

17   Q.   Is there a detention facility?

18   A.   Yes, on 8th Street and Krome.

19   Q.   Does the detention facility there follow best management

20   practices with respect to water management?

21   A.   I have --

22             MS. PIROPATO:  Objection, Your Honor.

23             MR. EZRAY:  Objection.

24             MS. PIROPATO:  Lack of foundation and beyond the scope.

25             THE COURT:  Well, do you know?

App. 722

```
 1              I mean, from your work with the Tribe and the casino,
 2    do you know?
 3              THE WITNESS:  I do not.
 4              THE COURT:  Okay.
 5    BY MR. FRIEDMAN:
 6    Q.  Do the Tribe's supplemental's businesses follow best
 7    management practices?
 8    A.  Yes.
 9    Q.  Is the Tribe entitled to conduct businesses to sustain
10    itself and its members?
11    A.  Yes.
12    Q.  You were asked a lot of questions about whether you have
13    information on how water is being managed at the detention
14    facility at the jetport.
15              Do you recall?
16    A.  Yes.
17    Q.  Has the Tribe had any opportunity to get information about
18    water management at the detention facility at the jetport?
19    A.  No.
20    Q.  Were there 4,000 people on-site before June 2025?
21    A.  I don't think so.
22    Q.  Did the Tribe have a need to conduct testing at the jetport
23    before June of 2025?
24    A.  No, we did not know that there would be a change of use for
25    the area.
```

App. 723

1    Q.  Is part of the NEPA process, does the Tribe get information

2    about new developments in the Greater Everglades ecosystem?

3    A.  Yes.

4    Q.  But not in the case of the detention facility?

5    A.  Correct.

6    Q.  You were asked a lot of questions about whether the jetport

7    is on Tribal land or in Big Cypress, etcetera.

8        Do you recall?

9    A.  I do.

10   Q.  Are the wetlands in the Everglades ecosystem connected?

11   A.  Yes.

12   Q.  Does water observe property boundary lines?

13   A.  No.

14   Q.  Does the Tribe have its own water quality standards?

15   A.  Yes, it does.

16   Q.  Did the Tribe have an opportunity to determine whether the

17   detention facility is meeting its water standards?

18   A.  No.

19        MR. FRIEDMAN:  Okay.  Nothing further.  Thank you.

20        THE COURT:  Thank you.  You may step down, ma'am.

21   Thank you.

22        THE WITNESS:  Thank you.

23        (Witness excused.)

24        THE COURT:  Counsel, how long do you suppose your next

25   witness will be on direct, at the very least?

App. 724

 1          MR. AJIZIAN:  Your Honor, I'm hoping, and he should be

 2    much faster than Ms. Castaneda, but I don't think I can get him

 3    done in seven minutes before lunch.

 4          THE COURT:  No, if it's a quick witness, then we would

 5    be wrapped up by 12:30 or even a quarter of one, we can wait,

 6    but if it's going to be longer than 40 minutes --

 7          MR. AJIZIAN:  If I can manage to get it done as fast as

 8    possible, I would say 30 minutes, but I was planning on closer

 9    to 45 to an hour.

10          THE COURT:  Okay.  Then we will break for lunch and

11    once -- and that will be your final witness?

12          MR. AJIZIAN:  Yes, Your Honor.

13          THE COURT:  All right.  So the State and/or Federal

14    Defendants should have their witnesses available in -- I'd say

15    around 2:15 to start.

16          Yes, Mr. Schwiep.

17          MR. SCHWIEP:  We had asked if they would provide us the

18    order in which they intend to call their witnesses.

19          THE COURT:  Okay.

20          If you would let Mr. Schwiep know over lunch the order.

21    Do you think we will be done today or are we going to roll into

22    tomorrow?

23          MR. PANUCCIO:  Your Honor, I think we need to get into

24    this issue of declarations.  If the Court is going to allow --

25    our position, from the beginning, has been if declarations are

1    going to come in from the plaintiffs, they should be available

2    to cross by us.  Either in their case or in our case-in-chief

3    we should be able to call them and examine them on

4    declarations.

5         If the Court is going to allow declarations in and

6    uncrossed, that's fine, we just want the rule to apply to both

7    sides and we may, after we see the close of evidence, rest on

8    our declarations.  We will make that determination once

9    plaintiffs have closed their case.

10        THE COURT:  Well, I'm actually not sure I'm following

11   your argument, Mr. Panuccio, but then that's kind of been my

12   problem.

13        We had this discussion with the Federal Defendants last

14   week.  They wanted to cross.  I told the Tribe, if we are going

15   to have any declarations admitted, I would need some witnesses.

16   They couldn't rely entirely on their declarations.

17        We have two witnesses.

18        I really don't know what that does to the other -- I

19   think you submitted five.

20        MR. AJIZIAN:  Yes, Your Honor, five.

21        THE COURT:  So, it may really cover most of what the

22   other three do or not, but no witnesses means no declarations.

23   That was basically what I told the Tribe.

24        So, there you go.

25        Unless all of you can agree that certain declarations

App. 726

1    are appropriate and come in, and then I'm happy to have that.

2    Okay.

3          MR. SCHWIEP:  May I be heard just on that narrow point,

4    Your Honor?  Because our position has been consistent that,

5    because we are in the preliminary injunction world with relaxed

6    evidentiary standards, the Court can rely on declarations.  We

7    are having a hearing.  We presented live witnesses because we

8    thought it was important that the Court hear from live

9    witnesses so we have relied on live testimony.

10         If the defendants wish to rely on declarations, then

11   they had identified some declarations on their exhibit list and

12   they can certainly do that.

13         And then it's up to the Court to decide the evidentiary

14   value to give to declarations from witnesses that

15   haven't submitted themselves to cross-examination.

16         There is a separate issue which is that, actually, this

17   morning, at 12:15 a.m., the State submitted declarations from

18   two of the witnesses that they had planned to call,

19   Mr. Gadea-Guidicelli and Mr. Kerner, and then this morning at

20   10:00 a.m., the Federal Defendants filed the declaration from

21   the witness they intended to call, Mr. Fuentes.

22         So if the Court decides to allow those late-filed

23   declarations and the defendants want to stand on those

24   declarations, we can live with that.  We would like to be heard

25   as to why we don't think those declarations should be accorded

App. 727

1    much weight but we can take that up after lunch, Judge.

2         THE COURT:  All right.  We can.  Because this all

3    started with the Federal Defendants stating they couldn't

4    possibly proceed unless the Tribe offered some live witnesses

5    as the Friends and the Center have done.  So, I took that into

6    account and I told the Tribe, quite sternly, they needed to

7    have live witnesses.

8         Now it appears that means that the Federal Government

9    and the State Government doesn't want to bring anyone live

10   after making such an impassioned plea, but I don't understand

11   it, but I'm going to lunch and I will let you-all sort this

12   out.

13        MR. SCHWIEP:  What time are we back, Judge?

14        THE COURT:  1:15.

15        (Lunch recess.)

16        COURTROOM DEPUTY:  All rise.

17        THE COURT:  Everyone may be seated.

18        Gentlemen, call your next witness.

19        MR. AJIZIAN:  Your Honor, the Tribe calls Marcel Bozas.

20        (The witness, Marcel Bozas, was duly sworn.)

21        COURTROOM DEPUTY:  Please have a seat, please state

22   your full name for the record and spell it out slowly for our

23   court reporter.

24        THE WITNESS:  Marcel Andres Bozas.  M-A-R-C-E-L, and

25   the middle name is A-N-D-R-E-S, last name B-O-Z-A-S.

App. 728

```
 1                      DIRECT EXAMINATION
 2   BY MR. AJIZIAN:
 3   Q.  Good afternoon, Mr. Bozas.  How are you?
 4   A.  Great, thank you.
 5   Q.  Can you please introduce yourself to the Court?
 6   A.  My name is Marcel Bozas, I'm the Director for the
 7   Miccosukee Tribe's Fish and Wildlife Department.
 8   Q.  Thank you, sir.  What is your highest level of education?
 9   A.  A Ph.D.
10   Q.  In what subject did you get your Ph.D.?
11   A.  Earth system science, natural resources track.
12   Q.  Do you recall when you matriculated into the Ph.D. program?
13   A.  I completed it approximately -- slightly more than a year
14   ago.
15   Q.  Okay.
16       Do you recall when you started the Ph.D. program?
17   A.  Five years ago.
18   Q.  So, if you finished sometime last year, then you would have
19   started in 2019.  Does that sound right?
20   A.  Sounds right.
21   Q.  My math is not very good so correct me if I'm wrong.
22       What school were you studying at?
23   A.  Florida International University.
24   Q.  That was for the entire duration of the Ph.D. program?
25   A.  Correct.
```

1  Q.   In connection with the Ph.D. program at FIU, did you

2  prepare or defend a dissertation?

3  A.   I did.

4  Q.   Can you tell me what the dissertation was about?

5  A.   Essentially, it was studying wildlife's movement using

6  trail cameras in the Everglades, a particular habitat type,

7  tree islands, and seeing what are the drivers of their

8  distribution and relative abundancies on the landscape.

9  Q.   Distribution and abundancies, can you explain that?

10  A.   Sure, distribution is basically the geographic area in

11  which the species are located, and then I wouldn't say relative

12  abundancies, it's essentially the population, the density in a

13  given area or the best index for that.

14  Q.   Understood.   Thank you.

15       Where did you conduct the study for your dissertation?

16  A.   Water Conservation Area 3A and Everglades National Park.

17  Q.   Water Conservation Area 3A, is that now known as the

18  Miccosukee Water Conservation Area?

19  A.   Yes, the portion of it is.

20  Q.   Was any part of your study for your dissertation done in

21  connection with the Tribe?

22  A.   Yes.

23  Q.   How long did the study take you to complete?

24  A.   Four and a half to five years.

25  Q.   Roughly, the entire duration of the Ph.D. program.

App. 730

1      Is that fair?

2   A.   Correct.

3   Q.   If you can, do you know what counties Water Conservation

4   Area 3A South is located?

5   A.   Miami-Dade County and Broward Counties.

6   Q.   Thank you.

7      Prior to starting the Ph.D. program, were you employed or

8   studying anywhere?

9   A.   Yes, I was employed by the Miccosukee Tribe, Fish and

10  Wildlife Department, and I was doing my undergraduate at

11  Florida International University as well.

12  Q.   It was the same situation where you were studying at FIU

13  and working for the Tribe --

14  A.   Correct.

15  Q.   -- prior to 2018.  Is that right?

16  A.   Yes, I started with the Tribe May 2018.  Prior to that, I

17  was in a research lab at the university.

18  Q.   Let's start with May 2018.  You said you started with the

19  Tribe.  What was your role in May of 2018?

20  A.   Initially I was an intern for the summer doing research,

21  and then at the end of the summer they hired me part-time as a

22  wildlife biologist.

23  Q.   End of the summer, would that be around now?

24  A.   Yeah, similar time.

25  Q.   And how long did you hold the position of wildlife

App. 731

1    biologist?

2    A.  Six to seven years.

3    Q.  And as a wildlife biologist, what were your

4    responsibilities?

5    A.  A lot of fieldwork.  So, conducting surveys of wildlife,

6    their habitats, vegetation, other environmental parameters,

7    taking that data that's collected in the field, entering that

8    data, running different statistical analyses, reporting.

9        That's the general nature of it.

10   Q.  You are currently the director of the Department of Fish

11   and Wildlife?

12   A.  Correct.

13   Q.  Is the position of wildlife biologist, is that within your

14   department?

15   A.  Yes.

16   Q.  When did you become the director?

17   A.  Approximately a year ago.

18   Q.  How many people are currently in the Department, employees?

19   A.  Five to seven, depending on the seasonal employees.

20   Q.  Are they all wildlife biologists?

21   A.  We have one administrative assistant and another person who

22   is more specifically just botany, and then people that have

23   different specialties within.

24   Q.  Are the wildlife biologists that are currently in the

25   Department or working with the Department, do they go out in

1   the field to perform their duties?

2   A.   Nearly daily.

3   Q.   When I say "the field," what does that mean to you?

4   A.   Out into natural areas, primarily the Everglades, other

5   South Florida environments as well.

6   Q.   Is the Department of Fish and Wildlife responsible for

7   monitoring or fulfilling its duties in Tribal lands?

8   A.   Yes.

9   Q.   Does Tribal lands include Water Conservation Area 3A South?

10  A.   Yes.

11  Q.   Does it include the Federal Miccosukee Reservation?

12  A.   Yes.

13  Q.   Does it include the Miccosukee reserved area?

14  A.   Yes.

15  Q.   Does it include anywhere else?

16  A.   We also do co-stewardship in Everglades National Park, Big

17  Cypress, and we provide management input across the Greater

18  Everglades regions, which extends up into Kissimmee.

19  Q.   What does that mean, provide management input?

20  A.   We have multiagency meetings, we meet with different State,

21  Federal agencies, nonprofits, all who play a role in Everglades

22  conservation, restoration and management.

23  Q.   Thank you.

24       What are your responsibilities as the Director of Fish and

25  Wildlife?

App. 733

1   A.   I'm responsible with prioritizing the projects that our

2   department is implementing for conservation, research and

3   management of wildlife.  So once we come up with what these

4   priorities are, what's the next best way to go about studying

5   them and collecting the information that we need.

6        Once we come up with that -- well, actually, I will assist

7   with the designing, the surveys, acquiring funding for them,

8   carrying out logistical setup and I will assist with technical

9   implementation for a lot of these programs.

10       The field crew will do a lot of the actual surveying and

11  analyses, and then I will take that and do a lot of the

12  reporting and take those findings and share them with other

13  agencies, through, as I mentioned, kind of multiagency

14  meetings.

15  Q.   Great.  Thank you.

16       You described them as the field crew.

17       Are those the wildlife biologists in the Department?

18  A.   Yes.

19  Q.   Do you oversee their day-to-day activities?

20  A.   Yes.

21  Q.   Are you aware of what the field crew or the individual

22  biologists are doing on a day-to-day basis?

23  A.   Yes.

24  Q.   Is that by virtue of the fact that you are the director?

25  A.   Correct.

1   Q.   Do you have any responsibility in assigning or developing

2   the scope of work for these individuals?

3   A.   I do that, yes.

4   Q.   Do you go out in the field?

5   A.   I do.

6   Q.   When was the last time you were out in the field?

7   A.   Last Thursday.

8   Q.   And where were you?

9   A.   Water Conservation Area 3A South.

10  Q.   For what purpose?

11  A.   We were assessing field conditions to plan logistics for

12  upcoming surveys.

13  Q.   Thank you, sir.

14       Does the Tribe have any sort -- sorry, does the Department

15  have any formal responsibility with respect to all the

16  activities you just described in Big Cypress National Preserve?

17  A.   We do.  We have management input and Tribal interest.

18  Q.   But does the Department conduct any surveys in Big Cypress?

19  A.   We can, but we coordinate with Big Cypress National

20  Preserve when we do that.

21  Q.   Let me back up.  What are surveys in the Department of Fish

22  and Wildlife?

23  A.   So, we cover a wide range of topics; birds, fish, reptiles,

24  their habitats, pretty much any types that you can think of

25  depending on what the management goals are, conservation needs

App. 735

1    or concerns, we will address -- well, we will come up with

2    specific questions, determine what is the appropriate way to

3    answer that question through surveying, and then implement

4    that.

5    Q.   How often is the Department engaged in survey activity?

6    A.   Year-round, constantly.

7    Q.   And in Big Cypress, did you say NPS -- well, let me ask,

8    who does the surveying in Big Cypress?

9    A.   Big Cypress has their own staff who do surveys, but we can

10   coordinate with them, right, if there is a joint interest, a

11   joint project, or if there is something that we are interested

12   in that they are not, we can just ask for permission, right,

13   whatever sort of permission that is needed to access it for our

14   staff.

15   Q.   Do you have access to the survey data produced by the Big

16   Cypress staff?

17   A.   Yes, we do regular data sharing.

18   Q.   Do you regularly review that data in your responsibilities

19   as the director?

20   A.   I do.

21        MR. AJIZIAN:  Can we pull up Tribe's Exhibit 7.

22   BY MR. AJIZIAN:

23   Q.   Mr. Bozas, I'm going to show you a map and ask you a few

24   questions about it.

25        Just as a general matter, the screen in front of you, I

App. 736

1  don't know exactly how it works but you should be able to touch

2  it and draw, so if that helps or I may ask you to identify

3  certain areas on the document.

4  A.  Okay.

5       MR. AJIZIAN:  Could we get the full screen?

6  BY MR. AJIZIAN:

7  Q.  Mr. Bozas, have you ever seen this document before?

8  A.  Yes.

9  Q.  What is depicted here in this map?

10 A.  Water Conservation Area 3A South is in the center, kind of

11 the blue-green highlighted polygon, and then in the upper left-

12 hand, you will see a kind of orange-ish red polygon, kind of

13 rectangular.  That's the Tribe's Federal Reservation.  All

14 those yellow points are tree islands of known Tribal

15 significance.

16 Q.  Is the Miccosukee reserved area shown on this map?

17 A.  It is.

18 Q.  Can you mark it for me?

19 A.  (Indicating.)

20 Q.  Is this the area generally where you did your Ph.D. study?

21 A.  Yes.

22 Q.  Is this the area generally where you fulfill your

23 obligations or duties as the Director of Fish and Wildlife?

24 A.  Yes.

25 Q.  Are you familiar with the habitat for fish and wildlife in

1   this area?

2   A.   Yes.

3   Q.   How is that?

4   A.   I conducted surveys in these exact environments on

5   different habitat types for more than seven years.  That's

6   primarily seeing it firsthand, and then studying and knowing a

7   lot of the literature around it.

8   Q.   Understood.  Do you review -- what kind of literature do

9   you review about this area in specific?

10  A.   Nowadays, it's pretty much any new science that's coming

11  out, and prior to that, right, we have to have a good baseline

12  of all the past studies that have come out.

13       So a pretty well-rounded wide range of topics that has to

14  do with the Everglades regionally.

15  Q.   Are you monitoring the literature in connection with your

16  role as the director?

17  A.   Yes.

18  Q.   It's not pleasure reading?

19  A.   No.

20  Q.   On the map, do you have an understanding of what the yellow

21  dots represent?

22  A.   Yes.

23  Q.   What is that?

24  A.   They are tree islands.

25  Q.   Does this map show every tree island in the area here

App. 738

1  depicted on the map?

2  A.  No.

3  Q.  What about cultural sites, Tribal cultural sites?

4  A.  It's not all of them.

5  Q.  Not all of the cultural sites are depicted?

6  A.  Correct.

7  Q.  Does this map depict any tree islands and cultural sites in

8  Big Cypress?

9  A.  No.

10  Q.  Do you know if there are any tree islands or cultural sites

11  in Big Cypress?

12  A.  There are many.

13  Q.  And they are not depicted on the map?

14  A.  Correct.

15  Q.  Understood.  Thank you.

16      And I use the term Tamiami Training and Transition Jetport,

17  do you know what I am referring to?

18  A.  Yes.

19  Q.  If I refer to the TNT Site, can we agree that that refers

20  to the Tamiami, etcetera, etcetera?

21  A.  Yes.

22  Q.  Can you mark that on the map here, if you know?

23  A.  (Indicating.)

24  Q.  Thank you, sir.

25      Do you know approximately how far the TNT Site is from the

```
 1   Tribe's lands and Water Conservation Area 3A South?
 2   A.  A couple miles, two, three, maybe.
 3   Q.  On the map just to the east of where you marked the TNT
 4   Site, do you see that blue line that runs vertically?
 5   A.  Yes.
 6   Q.  Do you have an understanding of what that line represents?
 7   A.  Yes.
 8   Q.  What is it?
 9   A.  It's the L-28 canal.
10   Q.  Do you know what county the L-28 canal is in?
11   A.  I believe that's Miami-Dade.
12   Q.  Is the entirety of the canal in Miami-Dade?
13   A.  The very top portion of that that kind of bends is in
14   Broward.
15   Q.  Is this the horizontal line kind of cutting across the
16   middle of the map, is that the divider for Miami-Dade and
17   Broward?
18   A.  It appears so.
19   Q.  Have you ever visited the TNT Site?
20   A.  Yes.
21   Q.  Personally?
22   A.  Yes.
23   Q.  When?
24   A.  Probably a year ago, maybe slightly more.
25   Q.  Are you aware of Tribal members visiting the TNT Site?
```

App. 740

1    A.   Yes.

2    Q.   In what capacity?

3    A.   Primarily for traditional hunting, fishing and plant

4    collection for medicinal and ceremonial purposes.

5    Q.   Are the Tribal members doing those activities on the TNT

6    Site itself?

7    A.   Immediately around the actual runway strip, natural areas.

8    Q.   We will get to that in a second, but I think I understand.

9         Before we move on, are you familiar with the Big Cypress

10   "dark sky" designation?

11   A.   Yes.

12   Q.   How are you familiar with that?

13   A.   I've seen online publications.

14   Q.   What kind of publications?

15   A.   I've seen the application that Big Cypress National

16   Preserve submitted to register as a dark sky site, and since

17   the application, it's my understanding that they did receive

18   that criteria or recognition.

19   Q.   Let me try and break that down.

20        Did Big Cypress apply for the dark sky designation?

21   A.   Yes.

22   Q.   When you say Big Cypress, are you referring to -- what are

23   you referring to?

24   A.   Big Cypress National Preserve, which is part of the

25   National Park Service.

App. 741

1    Q.   So did the National Park Service, Big Cypress division,

2    apply?

3    A.   I'm not sure on the exact technical language but, yeah, the

4    document says National Park Service and Big Cypress National

5    Preserve.

6    Q.   Thank you.  Did you review the application?

7    A.   Yes.

8    Q.   Do you recall any lighting restrictions that were in the

9    application, NPS's application for the dark sky designation?

10   A.   I do.

11   Q.   Can you tell me about that?

12        MR. SINGER:  Your Honor, I'm going to object, if I

13   could.  I think we are getting into a best evidence where the

14   witness is relaying the contents of a document that's not

15   before the Court.

16        So I think -- I understand that Plaintiffs probably

17   heard -- or the Tribe will probably say it's a party admission

18   because it's a National -- it's a Parks document, but I do

19   think we are having a witness articulate a document and the

20   document speaks for itself.

21        THE COURT:  Counsel?

22        MR. AJIZIAN:  Well, he has testified that -- I can ask

23   him if he has been there at night, but it is a very important

24   factor of Big Cypress for multiple Tribal interests, the dark

25   skies.

1          He has reviewed the application in connection with his

2     role as the director and it's directly related to him filling

3     his responsibilities, so he has personal knowledge of it.

4          THE COURT:  So, would the Federal Defendants offer the

5     document?

6          MR. SINGER:  I don't have the document, Your Honor, to

7     be honest.

8          THE COURT:  I know, but you --

9          MR. SINGER:  The royal we, we could look at a break to

10    see whether we could locate the document and whether we deal

11    with it that way, but I think that having the witness relay the

12    contents of a document without the document here is not a

13    particularly useful exercise.

14         THE COURT:  Well, I think he is discussing it in the

15    context of his role, but what I'm going to do is I'm going to

16    allow the Federal Defendants to inquire as to how long it might

17    take to retrieve the application document because that's not on

18    the website itself, is it?

19         It's not on the Big Cypress Preserve website?

20         THE WITNESS:  I don't recall.

21         THE COURT:  I think it's just the dark sky designation,

22    per se, but I'm going to have you check.

23         You can ask this gentleman a few questions about his

24    experience and, you know, what -- in his line of work, what the

25    dark sky designation means and what he has seen, but let's hold

1  off on the document until we can get a better answer from our

2  Federal Defendants.

3           Thank you.

4           MR. AJIZIAN:  Sure.

5  BY MR. AJIZIAN:

6  Q.  Mr. Bozas, have you been in or around the TNT Site at

7  night?

8  A.  Yes, I have been near it, not in it, at night.

9  Q.  Do you recall the lighting conditions at the TNT Site at

10 night?

11 A.  I do.

12 Q.  Can you describe them for me?

13 A.  There is not really any visible lighting being emitted from

14 the facility at night, and that's from the roadway immediately

15 adjacent the facility.

16 Q.  Have you ever driven by Miami International Airport at

17 night?

18 A.  Yes.

19 Q.  Is the TNT Site similar in any way to Miami International

20 Airport at night from a lighting perspective?

21 A.  No, the TNT Site is pretty much nondetectable to the human

22 eye based off lighting at night.

23 Q.  Why is it important that -- I will strike that.

24           Let me move on.

25           As the Director of Fish and Wildlife --

App. 744

1          THE COURT:  Well, roll back a little.  The dark sky

2    designation, what does that mean?

3          THE WITNESS:  Sure.

4          So, you'd have to apply for a dark sky designation,

5    right, and it's really a criteria that says you don't exceed a

6    certain amount of light pollution and it's kind of a title that

7    these national areas earn for being very dark and being very

8    pristine and that's kind of the premise of it.

9          THE COURT:  Thank you.

10   BY MR. AJIZIAN:

11   Q.  Do you know if there are any other dark sky designated

12   areas in South Florida?

13   A.  In South Florida, I'm not sure.

14       I don't believe so.

15   Q.  What about Florida generally?

16   A.  In Florida, yes.

17   Q.  Do you know where the other ones are?

18   A.  I believe up in Central Florida, but I couldn't tell you

19   exactly.

20   Q.  Thank you.

21       Pivoting to your role as the director, are you familiar

22   with the different species of wildlife that live on Tribal

23   lands?

24   A.  Yes.

25   Q.  When I say "Tribal lands," I will define that for you.

1     Can you still see the map?

2   A.   Yes.

3   Q.   This is generally what I'm talking about when I say Tribal

4   lands.

5     Do you have a different understanding of what Tribal lands

6   means?

7   A.   It's all the areas pictured here and beyond that where the

8   Tribe had historical use and occupancy, and continue to

9   co-steward some of these areas today.

10  Q.   Thank you.

11    How are you aware of different species of wildlife that are

12  on Tribal lands?

13  A.   Studying them directly and the literature.

14  Q.   The studies, is that the surveys?

15  A.   Yes.

16  Q.   Does the Department also survey or monitor plant life?

17  A.   We do.

18  Q.   Let me ask you:  Does plant life, is that included in

19  wildlife?

20  A.   Not in the term wildlife, but to properly study and

21  understand wildlife, we have to understand their habitats.

22    So that's where the plants come in.

23  Q.   What's the connection between the plants and the animals?

24  A.   The plants are the cover, shelter, food, and habitat,

25  otherwise.

1    Q.   What's the goal of surveying the plant and wildlife species

2    on Tribal lands?

3    A.   So, studying the plants is primarily to figure out

4    specifics as to how different species of wildlife respond

5    spatially, behavioral or in other aspects of their life to the

6    environmental conditions, and then the purpose of that is so

7    that we can better conserve and manage those species and

8    wildlife across our area of interest.

9    Q.   Is there a connection between the vitality of the different

10   species of plants and wildlife and the broader Everglades

11   ecosystem?

12   A.   Yes.

13   Q.   Can you explain that?

14   A.   The vitality of the plants and animals is tied to the

15   overall, I guess what you can consider the ecosystem health,

16   right, which also expands and encompasses hydrologic

17   characteristics, temperature, a lot of these other abiotic

18   factors that all together kind of influence the wildlife and

19   the plant species, distributions and populations that we have

20   today.

21   Q.   And do the results of the surveys inform the Department's

22   future course of action?

23   A.   They do.

24   Q.   Can you give me an example?

25   A.   Sure.  So, if we are monitoring -- a common tool we use is

1    trail cameras.  If we are using trail cameras and we notice

2    that in one particular year the deer population appears to be

3    going down, we want to know why that is.  Right?

4        Perhaps it's due to increased water levels or something of

5    that nature.

6        We can look at all the different environmental variables

7    that we survey for and apply that to a statistical model and

8    figure out which is the driver of that cause and then, from

9    there, we understand what the problem is.  Now we can determine

10   what is the next appropriate course of action so that we can

11   improve the condition for that particular species.

12   Q.  Thank you.

13       Does the Department study or survey the effects of human

14   activity on plants and animals on Tribal lands?

15   A.  We do.

16   Q.  Tell me about that.

17   A.  We look at the effects of humans.  Oftentimes, there is a

18   variable that we include in our models for wildlife.

19       Commonly, that's using distance from our survey site to the

20   nearest human disturbance location, and we can also use other

21   categorical or quantitative measures of human activity.

22   Q.  Generally, is there a relationship between the presence of

23   human activity and the proximity of plants and wildlife?

24   A.  The general relationship is that native species of wildlife

25   are negatively impacted by human disturbance and activity.

App. 748

16

1    Q.   What about invasive species?

2    A.   It's usually the opposite where exotic invasive species

3    usually benefit or can utilize that disturbance provided by

4    humans to kind of capitalize on the native ecosystem.

5    Q.   Thank you.

6         Does the Department monitor or survey protected species,

7    and when I say protected species, I'm talking about Endangered

8    Species Act, threatened or endangered.  Do you have an

9    understanding of what that means?

10   A.   Yes, and we do.

11   Q.   Do you know what species are present on Tribal lands?

12   A.   Yes.

13   Q.   What protected species are present on Tribal lands?

14   A.   Yes.

15   Q.   Can you give me some examples?

16   A.   The Crested Caracara, snail kite, wood stork, eastern black

17   rail, Florida panther, Florida bonneted bat, eastern Indigo

18   snake.  Those are the primary ones coming to mind.

19   Q.   Are there any protected plant species on Tribal lands?

20   A.   There are.  We have detected more than 80 threatened or

21   endangered plant species that are on Tribal lands.

22   Q.   Eight-zero?

23   A.   Correct.

24   Q.   How do you or the Department know that these protected

25   plants and wildlife are on Tribal lands?

App. 749

1  A.  We have detected their presence during surveys.

2  Q.  Thank you.

3       Does the Tribe or the Department have any obligation to

4  protect threatened or endangered species of plants or wildlife?

5       MR. SINGER:  I will object.  It calls for a legal

6  conclusion, Your Honor.

7       THE COURT:  Overruled.

8       MR. AJIZIAN:  You can answer.

9       THE WITNESS:  Can you repeat the question?

10  BY MR. AJIZIAN:

11  Q.  Sure.  Does the Tribe or the Department have any obligation

12  to protect threatened or endangered plants or wildlife?

13  A.  Yes.  It's a priority that we research, conserve and manage

14  for those species for their preservation into the future.

15  Q.  Are you familiar with the concept of "take"?

16  A.  Yes.

17  Q.  Can you tell me what that is?

18  A.  Take is a term that's generally used around threatened and

19  endangered species that is referring to the harm, harassment or

20  even killing of a listed species.

21  Q.  Harm or harassment, what does that mean, if you know?

22       MR. SINGER:  Your Honor, I am making a standing

23  objection on calling for a legal confusion, when we are asking

24  how the ESA characterizes the taking of species.

25       THE COURT:  Well, I don't think we heard that, and now

App. 750

1    we know.  It was just this gentleman's familiarity with the

2    term and in his day-to-day what it meant, but you may have a

3    standing objection on that ground.

4         Go ahead, sir.  The harm or harassment --

5    BY MR. AJIZIAN:

6    Q.  What does harm or harassment mean in connection with take?

7    A.  Harm or harassment is human actions that disturb the

8    natural behavior or presence of species, of those species,

9    where they are currently located.

10   Q.  Understood.

11        Separate from plants and wildlife, are you aware of Tribal

12   members using Big Cypress for, I believe you called them,

13   traditional activities earlier?

14   A.  Yes.

15   Q.  Remind me, what are traditional activities?

16   A.  Typically, we are referring to hunting, fishing or gigging,

17   as the typical means of fishing, and collection of medicinal or

18   other culturally important plants.

19   Q.  How are you aware of Tribal members' usage of Big Cypress?

20   A.  I've seen them using this area for these purposes in direct

21   communication with those travel members.

22   Q.  Thank you.

23        Are you aware of Tribal members using the lands surrounding

24   the TNT Site for these traditional activities?

25   A.  Yes.

19

1    Q.   Okay.  Did you observe them doing those activities in the

2    area surrounding the TNT Site?

3    A.   I have in the past.

4    Q.   Okay.  When Tribal members are hunting in Big Cypress, do

5    you know what they are hunting for?

6    A.   Typically, it's for white-tailed deer.

7    Q.   All right.  Is that a protected species?

8    A.   No, it's not.  It's regulated.

9    Q.   Do you have an understanding if the Tribal members' hunting

10   practice are for subsistence?

11   A.   They are for subsistence.

12   Q.   Do they also hunt for cultural purposes?

13   A.   Yes.

14   Q.   What's your understanding of that?

15   A.   When we say cultural, it's usually in the context of they

16   are required for ceremonial purposes.

17   Q.   Thank you.

18        What about fishing, do they fish in the area surrounding

19   the TNT Site?

20   A.   Yes, they do.

21   Q.   Have you observed that?

22   A.   Yes.

23   Q.   What are they fishing for?

24   A.   Typically it's for Florida gar, bowfin, or also known as

25   mudfish, and large mouth bass, those are some of the common

App. 752

1    species.

2    Q.  Is that all on a subsistence basis?

3    A.  Yes.

4    Q.  Any cultural purposes for the fishing?

5    A.  Yes, same as the hunting, similar to that.

6    Q.  Did you mention -- well, let me back up.

7        Are you aware of Tribal members using the lands around the

8    TNT Site to gather or harvest plants?

9    A.  Yes.

10   Q.  Do you know what kind of plants?

11   A.  Not specific species.  That's cultural sensitive

12   information.

13   Q.  Understood.  Are you aware of how often Tribal members are

14   going out into the land surrounding the TNT Site for purposes

15   of gathering or harvesting various plants?

16   A.  Yeah, it's a year-round activity but it does have seasonal

17   increases that correspond to ceremonial purposes.

18           MR. AJIZIAN:  Can we get to Plaintiffs' 81.

19           Your Honor, this is a video and I want to hit on a few

20   stopping points in it.

21           I do not plan to show the entire video.

22           THE COURT:  Okay.  Well, let's start with what is the

23   video?  Is there no objection to the video?  Which of the many

24   exhibit lists do I find it on?

25           MR. AJIZIAN:  It's Plaintiffs' Exhibit 81, which is the

App. 753

21

1   original, and my understanding is it's already in evidence.

2        THE COURT:  Okay.  Well, then, let's go.

3   BY MR. AJIZIAN:

4   Q.  Before we roll the tape, Mr. Bozas, can you see this on the

5   screen?

6   A.  Yes.

7   Q.  Do you know where we are situated here based on the frame?

8   A.  Yes, it looks like we are facing the western edge of the

9   TNT facility.

10  Q.  And on the top right corner of the screen, do you see a

11  line that runs to the top right corner and kind of disappears?

12  A.  Yes.

13  Q.  Do you have an understanding what that feature is?

14  A.  It looks like an off-road vehicle trail.

15  Q.  We will come back to that.

16      You can go ahead and play the tape and we are going to stop

17  in 30 seconds.

18      (Video being played in open court.)

19  BY MR. AJIZIAN:

20  Q.  Mr. Bozas, do you see the winding line through the

21  landscape that's below the camera?

22  A.  Yes.

23  Q.  Do you have an understanding of what that is?

24  A.  Off-road vehicle trail.

25  Q.  Do you see the sun reflecting, or do you see the white spot

App. 754

1    in the center of the screen?

2    A.  Yes.

3    Q.  Is that the sun's reflection?

4    A.  Yes.

5        MR. AJIZIAN:  You can go ahead and pause it there.

6        (Video paused.)

7    BY MR. AJIZIAN:

8    Q.  You already said that you are familiar with the land

9    surrounding the TNT Site?

10   A.  Yes.

11   Q.  Is it a wetland?

12   A.  Yes.

13   Q.  Does that mean that it's all covered in water?

14   A.  Seasonally or year-round, yes.

15   Q.  The off-road vehicle trail that you identified seems to

16   have a terminus here at the feature that runs horizontally

17   coming in from the right-hand side of the screen.

18       Do you know what that gray line is?

19   A.  That looks like it's the access road to the TNT facility.

20   Q.  And access from where?

21   A.  From Tamiami Trail, U.S. 41.

22   Q.  Do you know if Tribal members use that trail that we

23   identified at the beginning of the video that ends here at the

24   access road for traditional activities?

25   A.  They do.

1   Q.   Have you seen them use it?

2   A.   Yes.

3   Q.   And they use the TNT access road to access this trail?

4   A.   Correct.

5        MR. AJIZIAN:  Can we to two minutes and 15 seconds,

6   please, and it you want to do, like, double time, that would be

7   helpful.  2:15, please.

8        All right.  We will pause here.

9   BY MR. AJIZIAN:

10  Q.   Mr. Bozas, do you recognize what we are looking at here?

11  A.   That looks like the eastern boundary of the TNT facility.

12  Q.   Okay.  Do you recognize that as the runway at the TNT Site?

13  A.   Yes.

14  Q.   And do you know what vantage we have in this frame, like

15  which direction we are heading?

16  A.   It looks like we are heading west.

17       MR. AJIZIAN:  Okay.  Go ahead and play it.

18       (Video being played in open court.)

19  BY MR. AJIZIAN:

20  Q.   Based on your understanding and familiarity with the

21  surrounding land of the TNT, everything we are seeing to the

22  right, is that all wetlands?

23  A.   Yes.

24  Q.   What is the different patches of green?

25  A.   Those are Cypress domes.

App. 756

1   Q.   Is that a native or invasive species?

2   A.   That's native.

3          MR. AJIZIAN:   Go ahead a few more seconds.

4          Go ahead and stop.

5   BY MR. AJIZIAN:

6   Q.   Mr. Bozas, do you recognize what you are seeing here?

7   A.   Yes.

8   Q.   What are we looking at?

9   A.   The right side of the asphalted area is the northern

10  boundary of the TNT facility.

11  Q.   Do you see any off-road vehicle access trails in this

12  frame?

13  A.   Yes, extending from the corner of the TNT facility right

14  where the road kind of curves, and then heading to the lower

15  right-hand corner of the screen is the off-road vehicle trail.

16  Q.   The gray rectangle, we will call it, have you ever been in

17  that area of the TNT Site?

18  A.   Yes, I have.

19  Q.   Does that provide access to the trail, you just identified?

20  A.   Yes.

21  Q.   Is that area open to the public normally?

22  A.   Yes.

23  Q.   Is that a parking area?

24  A.   Yeah, and there are swamp buggies and stuff there as well.

25  Q.   Okay.  Are we still heading west?

1   A.   Yes.

2   Q.   And on the right-hand side, that road, do you have an

3   understanding of what that road is?

4   A.   That's the northern boundary road of the facility.

5        MR. AJIZIAN:   Okay.   One second.   Go ahead and pause.

6   BY MR. AJIZIAN:

7   Q.   Mr. Bozas, do you recognize any off-road vehicle trails

8   here in the frame?

9   A.   Yes, in the same fashion as before, extending from the

10  cemented area to the lower right-hand corner of the frame.

11  Q.   And where the trail that you just identified meets the

12  road, do you see a green patch?

13  A.   Yes.

14  Q.   Is that a yes?

15  A.   Yes.

16  Q.   Does that green patch lead to the trail?

17  A.   Yes.

18  Q.   Have you ever been there?

19  A.   Yes.

20  Q.   Keep going.

21       Do you have an understanding of what our vantage is now as

22  we are turning?

23  A.   Yeah, now we are beginning to head south.

24  Q.   What we are seeing here on the screen, is this the off-

25  road vehicle trail that you identified at the beginning of the

App. 758

1    video?

2    A.   Yes.

3    Q.   So where it ends on the left-hand side, that would be the

4    TNT access road?

5    A.   Correct.

6    Q.   Which provides access from Tamiami Trail.

7         Is that right?

8    A.   Correct.

9              MR. AJIZIAN:   Go ahead.

10             (Video being played in open court.)

11             MR. AJIZIAN:   And pause.

12             (Video paused.)

13   BY MR. AJIZIAN:

14   Q.   Mr. Bozas, the horizontal line running across the screen or

15   diagonal line, do you have an understanding of what that is?

16   A.   Yes.

17   Q.   What is it?

18   A.   U.S. 41, Tamiami Trail.

19   Q.   Did the vertical line, same color, is that -- do you know

20   what that is?

21   A.   That is the access road.

22   Q.   And do you see what I will call three structures?

23   A.   Yes.

24   Q.   Is that a fair characterization?

25   A.   Yeah.

1  Q.  Do you know what these are?

2  A.  One of them is the Tribe's Panther Camp and the other two

3  are additional camps.  I believe the other two are non-Tribal.

4  Q.  Which one of these three is the panther camp?

5  A.  The lower right, which has the more structures.

6          THE COURT:  Circle that, please.

7          THE WITNESS:  Sure.  I don't know if I can.

8          Here we go, it does work.

9          (Indicating.)

10  BY MR. AJIZIAN:

11  Q.  Have you ever been to the panther camp?

12  A.  Yes.

13  Q.  Do you have an understanding of just how far the panther

14  camp is from the TNT access road?

15  A.  From the access road, it may not even be a mile.

16  Q.  So the various trails that you just identified, how far do

17  they extend into Big Cypress?

18  A.  Tens of miles.

19  Q.  Tens of miles.  And you have observed Tribal members using

20  each of those trails to access Big Cypress?

21  A.  Yeah.

22  Q.  And it's your understanding that they do so for the

23  traditional activities you described earlier?

24  A.  Correct.

25  Q.  Do Tribal members use those trails to access cultural sites

1    or tree islands?

2    A.   They do.

3    Q.   And are those cultural sites or tree islands in Big Cypress

4    or are they on the map that we saw earlier?

5    A.   In Big Cypress, not the map.

6    Q.   So if they are on in Big Cypress, they are not on the map?

7    A.   They are not displayed on the map.

8    Q.   Thank you.

9         MR. AJIZIAN:  You can take it down.

10   BY MR. AJIZIAN:

11   Q.   Mr. Bozas, I believe you said you were with the Tribe for

12   about eight years?

13   A.   Approximately.

14   Q.   When you are out on the field performing your research or

15   survey or studies, have you had occasion to observe the level

16   of activity at the TNT Site prior to June of 2025?

17   A.   Yes.

18   Q.   How would you describe that human activity?

19   A.   Minimal.

20   Q.   Have you observed any flights or airplanes taking off and

21   landing at the TNT Site?

22   A.   I have.

23   Q.   Well, let me back up.

24        When you are out on the field doing research or surveys,

25   how long are you exactly out there time-wise, how many hours?

App. 761

```
 1    A.   It, of course, varies, but five to eight to ten hours.
 2    Q.   Are you in one particular place the entire time or are you
 3    moving around?
 4    A.   Typically moving around.
 5    Q.   When you were out in the field near the TNT Site, on a
 6    normal day, how many planes would you see?
 7    A.   Zero to one.
 8    Q.   What kind of planes are they?
 9    A.   The majority of them are what you consider smaller, single
10    engine aircraft.
11    Q.   Have you ever seen any commercial jet planes, a 747 or
12    something?
13    A.   No.
14    Q.   How about military aircraft?
15    A.   No.
16    Q.   When you observed the aircraft, what brings your attention
17    to their presence?
18    A.   Usually looking up and seeing them or hearing them
19    slightly.
20    Q.   Is it happenstance or is there something about the airplane
21    that alerts you to the fact that it's there?
22    A.   More happenstance.
23    Q.   Since June of 2025, have you observed an increase in human
24    activity at the TNT Site?
25    A.   Yes.
```

1    Q.   How have you observed that?

2    A.   Substantial increase in human activity.

3    Q.   Okay.  What kind of activities?

4    A.   People driving down the road, going to and from the

5    facility.  I've seen them turning into the facility, and a lot

6    more noise and traffic around there.

7    Q.   What about light?

8    A.   Yes.  Right, as well.  I have driven by the facility at

9    nighttime and it's very evident, the light.

10   Q.   Is it brighter than it was before?

11   A.   Yes.

12   Q.   Based on the current level of human activity at the TNT

13   Site, do you know or do you expect there to be any effects on

14   wildlife in the area?

15   A.   I do.

16   Q.   What are those effects?

17        MR. SINGER:  Your Honor, I will now object.  This is

18   now venturing into expert opinion and projecting the impacts to

19   wildlife now.

20        THE COURT:  All right.  Well, I'm going to allow a

21   limited discussion.  I'm going to overrule the objection.  I do

22   not want counsel to elicit what would be expert opinion, but

23   based on your six to seven years experience in this area, what

24   might you expect in terms of effect to the wildlife in the

25   area.

1          MR. AJIZIAN:  Your Honor, specifically where I'm going

2     with it is --

3          THE COURT:  Well, I don't need to know where you are

4     going.

5          I need to know what he says.

6          MR. AJIZIAN:  Fair enough.

7          THE WITNESS:  The major changes that have occurred at

8     the facility are increased human activity, traffic, noise and

9     light.  All three of those things are known to impact wildlife,

10    just in general.  That's been well-studied and established for

11    the species that we have down here in South Florida.

12          Things like the Florida panther, an endangered species,

13    they tend to avoid areas that have a lot of human activity,

14    they are very reclusive in that way.

15          So, of course, the understanding based off the past

16    research and monitoring, and monitoring that the Tribe does as

17    well, is that they will avoid those areas, right, or they will

18    get pushed out from where they -- historically, right, prior to

19    this activity, they will get pushed out of that area into the

20    surrounding area.  Right?

21          So, in the case of the Florida panther, they are very

22    competitive and they will be more limited on resources, space,

23    mates and you will expect an increase in mortality.  That's

24    been well-established in the literature.

25          Similar --

1  BY MR. AJIZIAN:

2  Q.  With respect to species other than the Florida panther, is

3  it generally true that this dispersion effect is for all of the

4  animals or is it just the Florida panther?

5  A.  It's a general rule for our native species.

6      Another phenomenon, right, especially for nocturnal

7  species.  Right?

8      The Florida bonneted bat increased light, right, will push

9  those bats out of the area.  They do not use illuminated

10  habitats.  That's another well-established fact in the

11  literature.

12      They also avoid areas with a lot of noise because it

13  disturbs them, it messes up their ability to echo locate prey.

14  So, they have become also, right, not able to use that habitat

15  and that's, again, true for the native nocturnal species that

16  we have.

17      So those are the kind of general trends that we are

18  expecting to see as monitoring would continue.

19  Q.  As a result of this dispersion, do you expect additional

20  species, protected, unprotected, any kind of species on Tribal

21  lands?

22  A.  Yes.

23  Q.  Does that place a burden on the Department or the Tribe to

24  manage them?

25  A.  Yes, it can because as those species become concentrated,

33

1   right, it is going to throw the ecosystem balance kind of out

2   of whack.

3        It can mess up the food web, distribution of energy and

4   nutrients, and it becomes for more of a management concern that

5   now we are responsible for monitoring, managing and, if we need

6   to, implement some sort of corrective action to help the

7   ecosystem.

8   Q.  Thank you.

9        Have you noticed any changes in the manner that Tribal

10  members use the lands surrounding the TNT Site, since June of

11  2025?

12  A.  Yes.

13  Q.  What have you observed?

14  A.  They do not use the area anymore.

15  Q.  Do you know if any Tribal members or Tribal employees, such

16  as yourself, are able to access the TNT Site?

17  A.  We cannot.

18  Q.  Does that prevent access to the trails that you identified

19  in the video earlier?

20  A.  Correct.  All three trails that we pointed out are no

21  longer accessible?

22  Q.  Aside from access, do you know of any other reason why

23  Tribal members are not using the land surrounding the TNT Site?

24  A.  The concerns for wildlife I mentioned, Tribal members are

25  concerned that the wildlife that they would formerly be hunting

App. 766

1    for is no longer going to be in the area, and then also for the

2    medicinal plants.

3       Again, the medicinal plants are very culturally sensitive

4    matter.  Tribal members are not able to go to a site that has a

5    lot of human activity for the sake of breaching their privacy,

6    but then also because it just kind of breaks some of the

7    cultural practices to harvest plants from in areas that are

8    impacted as such.

9    Q.  With respect to the cultural practices, the effect of human

10   activity on cultural practices, do you have an understanding

11   of -- let me back up.

12      Do you know if any human activity would cause the cultural

13   aversion to the area?

14      MR. SINGER:  Your Honor, I'm going to object.  We are

15   now venturing into anthropology, the witness is not an

16   anthropologist and this is expert testimony beyond the

17   witness's expertise.

18      MR. EZRAY:  Your Honor, I think we are also venturing

19   pretty far beyond NEPA as well.

20      THE COURT:  Generally speaking, or just this witness?

21      MR. EZRAY:  With respect to this testimony, I think we

22   are pretty far outside the type of harms that NEPA is

23   addressing.

24      THE COURT:  Okay.  I do think we are a little afield,

25   so I will sustain the objection.

App. 767

1            MR. AJIZIAN:  Thank you, Your Honor.

2    BY MR. AJIZIAN:

3    Q.  Do the effects of the TNT Site on wildlife have knockdown

4    effects to Tribal members' use of the area surrounding the TNT

5    Site?

6    A.  Repeat the question, please.

7    Q.  The effects on wildlife, the dispersion, does that affect

8    Tribal members' ability to use the land surrounding the TNT

9    Site for traditional activities?

10   A.  Yes, it does.

11           MR. AJIZIAN:  Can we do Plaintiffs' 34.

12   BY MR. AJIZIAN:

13   Q.  Are you familiar with WERP?

14   A.  Yes.

15   Q.  What does that mean?

16   A.  Western Everglades Restoration Project.

17   Q.  And have you seen this map before?

18   A.  Yes.

19   Q.  I want to zoom in on WCA 3A.

20       Do you see the L-28 canal?

21   A.  I do.

22   Q.  Do you see the three boxes with two arrows coming out on

23   each side?

24   A.  Yes.

25   Q.  Do you have an understanding of what -- the legend

App. 768

 1   identifies these figures as bidirectional control structures.

 2      Do you have an understanding of what a bidirectional

 3   control structure is?

 4   A.  Yes.

 5   Q.  Can you tell me?

 6   A.  It's a structure designed to allow water to flow, right,

 7   controlled, so they can close the structure to stop the water

 8   from flowing or they can open it to allow it to passively flow

 9   from one side to the other, depending on what the head of the

10   water is.

11   Q.  Thank you.

12      If polluted or contaminated water is flowing via one of

13   these control structures into WCA 3A, is there a potential

14   effect on wildlife as a result?

15   A.  Certainly.

16   Q.  Can you tell me about that?

17   A.  It depends what is the contaminant, so to speak, in the

18   water.  If it's increased sediment, sedimentation in the

19   wetlands oftentimes leads to increased turbidity, degradation

20   of water quality, could decrease dissolved oxygen.

21      MR. SINGER:  Your Honor, we are starting to venture now

22   into hydrology with this witness.  This is, again, beyond the

23   expertise.

24      MR. AJIZIAN:  The effects --

25      THE COURT:  You have asked the gentleman for a clear

App. 769

37

1    hypothetical, not even.

2          So, he is not an expert here today, although I do

3    afford him deference as to his general experience expertise,

4    but let's not lead the witness.  Let's not propose

5    hypotheticals.  Let's just ask this gentleman what he knows.

6          MR. AJIZIAN:  Fair enough.

7    BY MR. AJIZIAN:

8    Q.  Directly above the L-28 canal, do you see those green

9    blobs?

10   A.  Yes.

11   Q.  Do you have an understanding of what that represents?

12   A.  Yes.

13   Q.  What does it represent?

14   A.  Those are two areas that have unnaturally high levels of

15   nutrient, primarily phosphorus, that leads to eutrophication.

16   Q.  And are you or the Department currently working with

17   respect to these areas?

18   A.  Yes.

19   Q.  What are you working on?

20   A.  We are working on strategies to manage the water quality in

21   those areas and improve the habitat in the water quality or

22   chemistry.

23   Q.  Are these areas -- well, let me back up.

24          Are Tribal members able to access these areas?

25   A.  Yes.

App. 770

1   Q.  What about wildlife?

2   A.  They are able to, it's just so difficult because it's so

3   overgrown with vegetation.

4   Q.  Is it naturally or unnaturally overgrown?

5   A.  Very unnaturally.

6   Q.  Why is it unnatural?

7   A.  The two primary species that you get in those green blobs

8   are willow and cattail, which, although they are native, they

9   do become invasive, similar effects to exotic invasive species

10  because the nutrients allow those two species to thrive, such

11  that they out compete, in the sense they choke out all other

12  native vegetation, shifting the habitat such that it's no

13  longer useable to the native fish and wildlife.

14  Q.  And as Director of Fish and Wildlife, is the Department

15  responsible for trying to manage those species in these green

16  overgrown areas?

17  A.  We are.

18  Q.  And does the Department work with any other department at

19  the Tribe in performing those functions?

20  A.  Yes.  The Water Resources Department and the Land Resources

21  Department.

22  Q.  Currently, and, I guess, the Reservation is partly in WCA

23  3A South, but in the areas that are not highlighted yellow here

24  that are WCA 3A South, are there any overgrown areas like the

25  two that are identified here on the map?

1   A.   Not to the same severity, but there are patches where there

2   is overgrowth because of the same increased nutrient problem.

3   Q.   Is it easier to manage the smaller patches?

4   A.   Yes.

5   Q.   Thank you.

6        Do you recall testifying earlier about some protected

7   species that are in the area?

8   A.   I do.

9        MR. AJIZIAN:  You can take that exhibit down.

10  BY MR. AJIZIAN:

11  Q.   Are you familiar by virtue of your role as Director of Fish

12  and Wildlife with U.S. Forest Service critical habitat zones?

13  A.   U.S. Fish and Wildlife Service but, yes.

14  Q.   Fish and Wildlife, my apologies.

15       Why are you familiar with the critical habitat zones?

16  A.   It's relevant to us from a management perspective to know

17  where that we can essentially think of as the core of their

18  habitat area or important habitat areas for the species, but

19  then it also has ramifications for us in terms of permitting

20  and monitoring activities that could potentially impact.

21  Right?  That's what it has to be surveyed for.

22  Q.   Are there any -- I took down the map.

23       Are there any critical habitat zones in the area -- well,

24  let's put up the map again.

25       Are there any critical habitat zones in the area depicted

App. 772

1    here in the map?

2    A.  Yes.

3    Q.  How do you know that?

4    A.  By getting the direct critical habitat layer from the U.S.

5    Fish and Wildlife Service database, and overlaying that to the

6    type of map that we see here with the different property

7    boundaries.

8    Q.  Is that something that you ordinarily do in fulfilling your

9    responsibilities as the Director of Fish and Wildlife?

10    A.  Yes.

11    Q.  Thank you.

12        What is the critical habitat zone in this area, for what

13    species?

14    A.  The Florida bonneted bat is pretty much smack in the middle

15    of the screen here.

16        There is also a couple, two plant species that are in the

17    area, a couple of other species as well.

18        I can't think exactly.

19    Q.  Do you know generally where the critical habitat zone is

20    with respect to the area shown here?

21    A.  Yeah.

22    Q.  Would you be able to draw it?

23    A.  Yes.

24    Q.  Can you do so?

25    A.  (Indicating.)

App. 773

1  Q.  Does the critical habitat zone overlap with some portion of

2  the TNT Site?

3  A.  Yes, for the bonneted bat.

4  Q.  Thank you.

5      Why is this area, if you know, a critical habitat zone for

6  the Florida bonneted bat?

7  A.  The criteria that's used for critical habitat is that the

8  species is typically present in the area.

9      It also has enough space for that species to have a

10 sustaining population where those individuals can display

11 normal behavior.  And what does that entail?

12     Well, they have to have suitable habitat, shelter, as well

13 as foraging and they need to have the biological and

14 physiological resources, right, generally food, water, other

15 nutrients that may accompany that, and it's typically in the

16 historic range of the species.  Or, if that is not available,

17 it will be in the natural habitat of the species.

18 Q.  Are the Florida bonneted bat nocturnal?

19 A.  They are.

20 Q.  And would an increase in lighting ordinarily be allowed in

21 the critical habitat zone for the Florida bonneted bat?

22 A.  It would require consultation with the Fish and Wildlife

23 Service and, generally, no.

24 Q.  Thank you.

25     Are you familiar with the eastern black rail?

App. 774

1    A.   Yes.

2    Q.   What is that?

3    A.   It's a small marsh bird, approximately this big bird, that

4    they live out in the marsh and they require dense but short,

5    kind of shrubby grasses as their kind of canopy.  They don't

6    like forest areas generally, very shallow water depths.

7         That's the kind of habitat that they inhabit.

8    Q.   Are they also nocturnal?

9    A.   They are.

10   Q.   Does the eastern back rail have habitats in about WCA 3A

11   South?

12   A.   Yes, and we have detected them in there.

13   Q.   Thank you.

14        Are you familiar with the Florida panther?

15   A.   Yes.

16   Q.   Do you know if -- strike that.

17        Are you aware of panther presence in the area surrounding

18   the TNT Site?

19   A.   Yes.

20   Q.   How do you know?

21   A.   Data that's been shared with us, and then we also have

22   trail cameras where we have captured them on camera in recent

23   years in the surrounding region.

24   Q.   Thank you.

25        Are you familiar with the wood stork?

1    A.   Yes.

2    Q.   Is that a protected species?

3    A.   It is.

4    Q.   The same question for the panther, the eastern black rail

5    and I believe the bonneted bat, are those all protected

6    species?

7    A.   They are.

8    Q.   Back to the wood stork, are the wood stork currently --

9    well, let me back up.

10        Do wood storks have habitat in the area shown here?

11   A.   They do.

12   Q.   When are they roosting in this area?

13   A.   So, they will shift across the landscape seasonally.  In

14   the area close to the jetport, they are typically going to

15   start arriving in the area September to a little bit later.  It

16   depends on the water level, but later in the year.

17   Q.   Thank you.

18        So, is my understanding correct that they are here, here

19   being in the area shown on the map, for part of the year and

20   then they fly somewhere else the rest of the year?

21   A.   Correct.

22   Q.   When they come back here, do they typically come back to

23   the same area?

24   A.   Generally, yes.

25   Q.   Are you familiar with a core foraging area?

1   A.   Yes.

2   Q.   Tell me what that is.

3   A.   That's the U.S. Fish and Wildlife Service criteria that

4   says when a wood stork roost is detected, generally a colony of

5   these individuals, they have a foraging area of, I believe it

6   is 18.6 miles, which is basically the radius that they will not

7   travel further from to forage, so they will be foraging for

8   that the area surrounding the roost.

9   Q.   Is the core foraging area centered on the roost or on their

10  typical area where they come back to roost?

11  A.   It's centered around the roost where they are located.

12  Q.   That was a horrible question.

13       So, the flock comes back, they roost right here.  Where is

14  the core foraging area from where they roost today?

15  A.   Yes, it's from where they are detected at that time.

16  Typically, it's for the breeding season.  That's when we are

17  surveying for them.  That's the period of the life history

18  where it is most valuable to know where they are at and what

19  will determine their well-being.

20       So once they are breeding, we identify those colonies'

21  locations, and then that's when the core foraging habitat is

22  established.

23  Q.   It's not a fixed area like the critical habitat zone that

24  you drew for the bonneted bat?

25  A.   Correct.

```
 1              MR. AJIZIAN:  Give me one second, Your Honor.

 2              THE COURT:  Yes.

 3              MR. AJIZIAN:  No further questions.

 4              THE COURT:  Cross-examination -- let me ask one

 5    question because I got confused.

 6              So, the foraging area is 18.6 miles radius from the

 7    roost?

 8              THE WITNESS:  Correct.

 9              THE COURT:  Okay.

10                         CROSS-EXAMINATION

11    BY MS. GALLONI:

12    Q.  Good afternoon, Mr. Bozas.  I'm Tania Galloni, I am one of

13    the attorneys for Plaintiff, Friends of the Everglades.

14    A.  Good afternoon.

15    Q.  Good afternoon.  I have just a couple of clarifying

16    questions for you.

17              You testified earlier that you had been to the TNT Site

18    before at night and that it was basically not detectable at

19    night due to light.

20              Is that correct?

21    A.  Correct.

22    Q.  And that was before this detention center was erected?

23    A.  Correct.

24    Q.  You also testified after looking at the video that's

25    Plaintiffs' Exhibit 81, you pointed to several areas where
```

1    Tribal members had accessed roads, access roads, trails.  That

2    was before the detention center came into place?

3    A.  Yes, and the trails are still present.

4    Q.  And you had been to where the tents are you testified.

5    Correct?

6    A.  Not when the tents were there, but, yes.

7    Q.  That was my question.

8        So when you had been in that area, that was before the

9    tents were there?

10   A.  Correct.

11   Q.  Is that area accessible to you or the Tribal members now?

12   A.  No.

13   Q.  You testified about bonneted bats.  Is it true that

14   mosquitoes -- that bonneted bats feed off mosquitoes?

15   A.  They can, yes.

16   Q.  And would you expect mosquito spraying to affect the

17   availability of that food source for the bat?

18       MR. SINGER:  Objection.  Leading, Your Honor.

19       THE COURT:  She is on cross.

20       MR. SINGER:  Well, it's a friendly cross, Your Honor.

21       THE COURT:  She is still on cross.  Overruled.

22       THE WITNESS:  Yes, it would impact the mosquitoes

23   negatively and other insects as well.

24   BY MS. GALLONI:

25   Q.  And, therefore, it would adversely affect the bat as well

```
 1   as its food source?

 2   A.  Correct.

 3        MS. GALLONI:  Just one second, Your Honor.

 4   BY MS. GALLONI:

 5   Q.  And you are aware that where there is increased human

 6   presence and activity, there is likely to be more mosquito

 7   spraying.  Correct?

 8   A.  Yes.

 9   Q.  And that would be at a site like the Everglades Detention

10   Center?

11   A.  Yes.

12        MS. GALLONI:  Thank you.  No further questions.

13        THE COURT:  All right.  Any more cross on this side of

14   the aisle?

15        Okay, Mr. Singer.

16                    CROSS-EXAMINATION

17   BY MR. SINGER:

18   Q.  Good afternoon, Dr. Bozas.

19   A.  Good afternoon.

20   Q.  Am I pronouncing it close enough?

21   A.  Yes.

22   Q.  My name is Frank Singer.  And I'm a trial attorney with the

23   Justice Department.

24   A.  Nice to meet you.

25   Q.  I'm going to ask you a couple questions following up on
```

1    those two rounds of questions you just received.

2        My first question will be, you did provide a declaration in

3    this lawsuit.  Correct?

4    A.  I did.

5    Q.  You have not provided a copy of your résumé or your

6    curriculum vitae with your declaration.  Correct?

7    A.  I did.

8    Q.  It was not attached to your declaration.  Correct?

9    A.  No, I submitted the résumé at a later date.

10   Q.  To your counsel?

11   A.  Yes.

12   Q.  But you don't know whether it's actually been offered as --

13   designated as an exhibit of any kind in this case.  Correct?

14   A.  I'm unaware.  I submitted it late.

15   Q.  You mentioned your dissertation on direct examination.

16   Correct?

17   A.  Yes.

18   Q.  And I actually skimmed your dissertation in advance of

19   today.

20       Would it be fair to say that the dissertation focused on

21   bear movement in the Everglades tree lands?

22   A.  No, there are three chapters.  One chapter focused on

23   bears.

24   Q.  Okay.

25       You also testified on direct examination about cultural

1    uses Tribal members make of Big Cypress and adjacent Tribal

2    lands.  Correct?

3    A.   Correct.

4    Q.   You, yourself, are not an anthropologist.

5         Is that right?

6    A.   Correct.

7    Q.   You talked about the Department's -- I will short cite the

8    Tribe's Fish and Wildlife as "the Department."

9         Is that fair?

10   A.   Yes.

11   Q.   You talked about the Department's regular monitoring

12   efforts for flora and fauna.  Correct?

13   A.   Correct.

14   Q.   You are not presenting data showing how flora and fauna

15   have changed before and after a construction activity at the

16   TNT Site in June of 2025.  Correct?

17   A.   It would take a longer time span to get a reliable dataset.

18   Q.   So the answer is no, you are not presenting that at this

19   time?

20   A.   Correct.

21   Q.   You are also not presenting data showing how flora and

22   fauna changed before and after construction of the original

23   airport facilities at the TNT Site back in the '60s.  Correct?

24   A.   Correct.

25   Q.   You also, in addition to talking about flora and fauna, you

1   talked about the Department's efforts monitoring wildlife.

2   Correct?

3   A.   Correct.

4   Q.   Does the Tribe's department use camera trapping for

5   monitoring?

6   A.   As one component of our monitoring, yes.

7   Q.   How about geolocators?

8   A.   Yes, we have.

9   Q.   How about radiotelemetry?

10  A.   Yes, we have.

11  Q.   And physiological measurements?

12  A.   Can you be more specific?

13  Q.   Not really.  Are there other measurements -- I will use

14  that language -- are there other measurements that you use to

15  track wildlife?

16  A.   We can do mark recapture studies which essentially if you

17  capture an individual you can mark it in a specific way, or

18  nowadays you can use photographs to detect the same individual

19  and it's the same premise.

20  Q.   So, with all this monitoring, today you do not have data

21  showing how wildlife activity has changed before and after the

22  construction activities in June of 2025 at the TNT Site.

23       Is that fair?

24  A.   That's fair.  We need more time.

25  Q.   You don't have data showing how the wildlife activities

App. 783

1    changed before and after the original construction activities

2    for the original airport at the TNT Site back in the 1960s.

3         Is that fair?

4    A.   That's fair, but there is data in between those time spans.

5    Q.   Understood, but if I want to do a before and after

6    analysis, you haven't done that analysis.  Correct?

7    A.   Correct.

8    Q.   I believe you testified on direct that the Tribe and its

9    members are not hunting or fishing in the immediate vicinity of

10   the detention facility at the TNT Site.  Correct?

11   A.   Not within the fenced boundary, but the immediate

12   surrounding area of the fence line, yes.

13   Q.   So there is hunting and gathering going in the -- outside

14   the fenced area.

15        Is that fair?

16   A.   Correct.

17   Q.   But within the fenced area there is not.  Correct?

18   A.   Correct.

19   Q.   Other than the fencing, is there any other obstacle that

20   prevents Tribal members from hunting and gathering within the

21   fenced area, that you are aware of?

22   A.   Currently?  Now there's a checkpoint that prevents them

23   from accessing the access road and the trails.

24   Q.   So then I will include that, the checkpoint.

25        Other than the checkpoint and the fencing, any other

1    obstacles to Tribal members hunting and gathering within the

2    fenced area at the TNT Site?

3    A.   Within the fenced area, you are not allowed to trespass it.

4    Q.   Who owns the TNT Site, do you know?

5    A.   Formerly, I believe it was Miami-Dade County.

6    Q.   But you would agree the Tribe does not own it?

7    A.   Correct.

8    Q.   And the gate that you mentioned, is that -- that's manned

9    by people, I assume?

10   A.   The checkpoint or the gate?

11   Q.   The checkpoint.

12   A.   Yes.

13   Q.   And do you know who is operating that checkpoint?

14   A.   I do not.

15   Q.   Were hunting and fishing activities limited by the airport

16   operations that occurred at the TNT Site before detention

17   operations began in June of 2025?

18   A.   Not in the area surrounding on the outside of the fence.

19   Q.   Right, but within the fence, was it similar that where

20   there was the core improvements and the active air operations

21   before June of 2025, there was a limitation on hunting and

22   gathering then?

23   A.   There is not Tribal interest to be inside that boundary.

24   It is the outside boundary that is of interest and that is now

25   impacted to the Tribal members.

1  Q.  How much more area was fenced before and after 2025, if you

2  know?

3  A.  I assume that the fence stayed the same.

4  Q.  So, there was a fence before detention operations began in

5  2025.  Correct?

6  A.  Yes.

7  Q.  And that fence kept Tribal members, the Tribe and its

8  members, out of the fenced areas before June of 2025.  Correct?

9  A.  Correct.

10 Q.  We talked a little bit about the checkpoint but the

11 checkpoint is somewhere on the access road leading off Tamiami

12 Trail.  Correct?

13 A.  Correct.

14 Q.  And historically, that road where the checkpoint is now was

15 a service road for the TNT airport.  Correct?

16 A.  That's my understanding, yes.

17 Q.  Do you know whether the Tribe owns the land on which the

18 service road is constructed?

19 A.  They do not own it but they have access.

20 Q.  And how did -- what is your understanding of the nature of

21 the Tribe's access on that service road?

22 A.  That they would drive down the service road to access the

23 trails that we discussed earlier and other parts of the

24 interior of Big Cypress.

25 Q.  Did the Tribe share access along with the rest of the

1    public, to your knowledge, or are you aware of the Tribe having

2    special access rights over that service road?

3    A.   The Tribe does have special access in general, but I

4    believe some people permitted by Big Cypress have access to

5    those off-road trails as well if they go through the

6    educational course.

7    Q.   Well, I'm actually not asking about the off-road trails at

8    this time.

9    A.   Okay.

10   Q.   I am just focusing on that service road.

11   A.   Understood.

12   Q.   That's okay.  Go ahead.

13   A.   Sure.  I believe that was open to the public.

14   Q.   So your understanding is that the Tribe's access to just

15   that service road was the same access that all the other

16   members of the public held.

17        Is that fair?

18   A.   Yes.

19   Q.   Now, you also talked about harvesting traditional and

20   ceremonial plants on your direct.  Correct?

21   A.   Correct.

22   Q.   And you talked about a limited access to harvesting those

23   plants.  Correct?

24   A.   Correct.

25   Q.   Is the limitation on harvesting those plants, again,

App. 787

55

1  defined by the fence line we talked about earlier?

2  A.  No.

3  Q.  So there is a restriction on harvesting plants outside of

4  the fence line?

5  A.  Yes.

6  Q.  Was there a restriction on harvesting plants outside the

7  fence line before June 2025?

8  A.  No.

9  Q.  How is this prohibition of harvesting plants outside of the

10  fence line being enforced?

11  A.  It's Tribal, cultural.

12  Q.  So the Tribe is prohibiting the harvesting?

13  A.  Not through policy but the culture and ceremonial practice,

14  they are not, for lack of a better term, able to collect plants

15  that have been impacted as such.

16  Q.  I see.  So I was misunderstanding.

17      So, you are saying that if certain plants that have

18  cultural value are impacted, then they can't be used for these

19  cultural purposes?

20  A.  Being non-Tribal ourselves, I guess a good way to think

21  about it is that they lose their medicinal or ceremonial or

22  cultural value, that they can no longer be utilized.

23  Q.  What's your understanding as to whether the vicinity of

24  these plants to the operating airport that existed before June

25  of 2025 affected the cultural value of these plants?

App. 788

1   A.   Are you asking if it affected --

2   Q.   Yes, let's start with, do you know whether it did?

3   A.   That has been what has been unanimously reported upon by

4   Tribal members, that it has been impacted since the activity

5   began.

6   Q.   Then after June of 2025, because of the detention facility,

7   now they cannot be accessed?

8   A.   Correct.

9   Q.   But it's not that they can't physically be accessed, it's

10  that they culturally have lost their value.

11       Is that fair?

12  A.   Correct.

13  Q.   You referenced what you call a significant increase in

14  human activity at the TNT Site in your direct.  Correct?

15  A.   Repeat the question.

16  Q.   Sure, you referenced what you call a significant increase

17  in human activity at the TNT Site.  Correct?

18  A.   Yes.

19  Q.   Has the Tribe's department kept a log of this significant

20  increase?

21  A.   Nobody to my knowledge does that, but it's a matter of when

22  I was there previously, you'd see zero to maybe one or two

23  people there, and now it's established that the facility can

24  support thousands of people.

25  Q.   Okay.  Let me make sure I understand that answer.

1      When you say "there," are you talking the fenced-in portion

2   of the TNT Site?

3   A.   And en route to the facility.  The net increase because of

4   the people who are going to the facility, traveling exclusively

5   along Tamiami Trail, so that increased human traffic is also

6   along that stretch, not just within the facility boundaries.

7   Q.   Okay.  So when you are saying there, you are saying the

8   fenced-in portion of the TNT Site, the service road that leads

9   from Tamiami Trail up to the TNT Site and the Tamiami -- is it

10  Tamiami?

11          THE COURT:  Tamiami.

12          MR. SINGER:  Tamiami.

13          THE COURT:  Tamiami.

14          MR. SINGER:  I'm sorry.

15          THE COURT STENOGRAPHER:  I got a little messed up.

16  BY MR. SINGER:

17  Q.   It is the fenced-in portion of the TNT Site.  Correct?

18  A.   Uh-huh.

19  Q.   The access road from Tamiami Trail to the TNT Site.

20  Correct?

21  A.   Correct.

22  Q.   And then the Tamiami Trail itself.  Correct?

23  A.   Those are all areas where we are seeing the impact, yes.

24  Q.   Do you know if -- let's focus on the Tamiami Trail itself.

25      Are all of those impacts due to activity that is or -- some

App. 790

1   of those activities related to protest activities, for example?

2   A.   Yes, some are.

3   Q.   And the Tribe is not actually logging or inventorying those

4   changes over time.  Correct?

5   A.   Correct.

6   Q.   Had the Tribe kept a log or inventory of the activities

7   along this stretch of Tamiami Trail, the access road and the

8   TNT Site prior to June of 2025?

9        MR. AJIZIAN:  Your Honor, I'm going to interpose a

10  foundation question because he is asking about the Tribe.

11       Mr. Bozas is the Director of Fish and Wildlife.  He has

12  no knowledge beyond that of what the Tribe generally, or what I

13  think the question is asking Tribal members do or don't do.

14       THE COURT:  Well, I gave a little latitude on direct,

15  but I'm actually confused.

16       Counsel, you are not suggesting, maybe you are, that

17  someone can -- a group of, say, Tribe members on off-road

18  vehicles or a group coming up to harvest plants can come up to

19  the fence line without any security repercussions, like

20  someone, I don't know, armed who was guarding the camp?

21       I'm just trying to understand that.  The argument is

22  they can still go right there and no one is going to brush them

23  back.

24       MR. SINGER:  I'm trying to understand factually, Your

25  Honor, whether or not people have been brushed back from

App. 791

1  outside of the area of the fenced area.  That's what I'm trying

2  to explore.

3      THE COURT:  Well, I don't think they want to try, but

4  okay.  Go ahead.

5      Could you read back that last question before I --

6  before the objection and before I said anything.  Sorry.

7      (A portion of the record was read by the reporter.)

8      THE COURT:  So you are asking the gentleman if every

9  time the Tribe went out to harvest plants or use whatever off-

10  road vehicle, if they logged it.

11      MR. SINGER:  I'm actually asking whether the activity

12  that they are observing now and saying it's a substantial

13  increase, whether there is actual data to show what the delta

14  is between -- before June of 2025 and after June of 2025.

15      THE COURT:  Right, other than his testimony, is there a

16  corresponding log?

17      MR. SINGER:  Yes, some evidentiary basis for it.

18      THE COURT:  Other than his testimony?

19      MR. SINGER:  Other than his testimony.

20      THE COURT:  When people went out, did they log it?

21      THE WITNESS:  I'm unaware.

22      THE COURT:  Okay.

23  BY MR. SINGER:

24  Q.  I believe a couple of answers back you mentioned one or two

25  people.

App. 792

1      Is that right?

2   A.   In terms of the personnel at the facility prior to the

3   operations, that's what you are referring to?

4   Q.   It is indeed, yes.

5   A.   I would say that's a fair characterization, yes.

6   Q.   I'd like to understand the basis for you saying -- first of

7   all, I would like to understand what that answer means.

8      Are you saying there was only one or two people at the TNT

9   facility to make it operational prior to June of 2025?

10  A.   That's what I witnessed when I was inside the facility one-

11  plus year ago.

12  Q.   How many times had you visited the TNT facility prior to

13  June of 2025?

14  A.   Inside the boundary, only the one time.  But I have been

15  outside the boundary adjacent to it multiple times prior.

16  Q.   Do you have a sense on a daily basis of how many people

17  worked at the TNT facility prior to June 2025?

18  A.   I have not seen the employment logs.

19  Q.   Now, on direct examination you were asked to talk about

20  anticipated trends that you expect to see in wildlife from the

21  detention activities going on at the TNT Site.

22      Do you remember that?

23  A.   Correct.

24  Q.   Now, there are ways for scientists -- can I label you as a

25  biologist?

1      Is that fair?

2  A.  Yes.

3  Q.  There are ways, for example, for a biologist to monitor

4  changes of wildlife populations over time.  Correct?

5  A.  Yes.

6  Q.  And similarly, there are ways for biologists to monitor

7  changes in wildlife migration patterns over time.  Correct?

8  A.  Correct.

9  Q.  And we have talked about some of the tools that can be used

10  like camera trappings and other methods.  Correct?

11  A.  Correct.

12  Q.  You have not been able to perform these methods to monitor

13  wildlife changes before and after construction of detention

14  facilities at the TNT Site.  Correct?

15  A.  Correct.  There would need to be more time.

16  Q.  Now, when scientists propose an explanation for a

17  phenomenon that can be tested through research and

18  experimentation, that's called a hypothesis.

19      Is that right?

20  A.  That is a fair characterization.

21  Q.  Would it be fair to say that your testimony that what you

22  believe is the trend is currently a hypothesis?

23  A.  No, because there has been past literature that has studied

24  this exact sort of impact on these species in this region of

25  South Florida.

62

1   Q.   Understood.  So the literature you are talking about is

2   literature involving other areas and other independent

3   variables that would cause a change in wildlife.

4        Is that fair?

5   A.   No, I would say it's comparable areas, if not the exact

6   same habitat type, very similar, using the same variables or

7   proxies for those.

8   Q.   But certainly not -- you didn't find another researched

9   area that had a detention facility akin to the TNT Site.

10  Correct?

11  A.   I don't think the type of facility is relevant.  It's the

12  impact that the facility is causing -- I could give an example.

13  Q.   Let's not do that.

14       I'm just asking, can you point me to a research effort that

15  evaluated changes to wildlife before and after the creation of

16  a detention facility like the TNT Site?

17  A.   Again, it's not about the detention facility.  It's about

18  the impacts emitted from the facility.

19       So, noise, for example, there are studies that have

20  measured the impact on bats such as the Florida bonneted bat

21  before and after noise impacts, and they have concretely

22  determined that there are negative impacts.

23  Q.   I understand that there is analogies that can create noise.

24       Correct?

25  A.   Noise is just one example, yes.

App. 795

1  Q.  But in order for that other area to be designated as a test

2  of the hypothetical, it would have to be really close to the

3  activity that you are evaluating here; wouldn't not?

4  A.  Not in terms of the facility.  Again, the variable that's

5  important is the impact.  So whether it be noise, human

6  disturbance, whichever one of those things is directly

7  impacting the species, that's what is the variable we would

8  want to isolate and measure.

9  Q.  And you would want to also account for the preexisting

10  airport that was at the TNT Site before the detention facility

11  to make sure that changes from the airport are not being

12  blending with changes from the TNT detention facility.

13      Is that right?

14  A.  That would be a good covariant area to include, although

15  not necessary to detect the signal of the strength of the given

16  variable of interest as long as you have before and after data.

17  Q.  We saw an aerial photograph which was marked as PX 81.

18      Do you remember that aerial photograph that was examined

19  during your direct examination?

20  A.  I don't remember which one was PX 81.

21  Q.  That's fair enough, but you remember, there was only one

22  over flight aerial video?

23  A.  The video, yes.

24  Q.  There were a number of manmade improvements shown on the

25  flight overview.  Correct?

1   A.   Yes.

2   Q.   Do you know what county those improvements at the TNT Site

3   were located?

4   A.   No, I do not know.

5   Q.   And you discussed the trail in conjunction with that over

6   flight map.  Correct?

7   A.   Yes.

8   Q.   Or over flight video.  Correct?

9   A.   Correct.

10  Q.   Do you know what county the portions of the trail you were

11  discussing was in?

12  A.   The trail passes through Miami-Dade and Collier.

13  Q.   But the portions of the trail you discussed on direct were

14  going through the improved areas of the TNT Site.

15       Is that right?

16  A.   Yes.

17  Q.   You also discussed access point to the trails at or near

18  the TNT Site.  Correct?

19  A.   Yes.

20  Q.   And you just noted that the trails are tens of miles long.

21       Correct?

22  A.   Yes.

23  Q.   Are there other access points to those trails?

24  A.   To those trails, no.

25  Q.   The only access points to your understanding is at the TNT

1    Site?

2    A.   For those trails.   There are additional trails in the Big

3    Cypress National Preserve.

4    Q.   You talked as well on direct about the National Park

5    Service receiving a dark sky designation.

6         Is that right?

7    A.   Yes.

8    Q.   Now, the dark sky is granted by a private organization.

9    Correct?

10   A.   Yes.

11   Q.   And that organization advocates for dark sky.   Correct?

12   A.   Yes.

13   Q.   Are you personally familiar with the criteria for earning a

14   dark sky designation?

15   A.   I forget what the exact numbers that they are looking for

16   but I understand the premises behind it.

17   Q.   Do you know whether the National Park Service's dark sky

18   designation has been revoked?

19   A.   Since the operation of the facility?

20   Q.   Since June of 2025.

21   A.   I'm unaware.

22   Q.   You are not an expert in photometry?

23   A.   No.

24   Q.   Or astronomy?

25   A.   No.

766

1    Q.  There was a map of, I believe it was the WERP.  I will put

2    the number in for the record, but you won't remember this, PX

3    34.

4        It was the map that showed the light green areas.

5        Do you remember that?

6    A.  Yes.

7    Q.  And I believe those light green areas were vegetation

8    restoration areas?

9    A.  Yes.

10   Q.  Those vegetation restoration areas were to the north of the

11   TNT Site.  Correct?

12   A.  Correct.

13   Q.  And I believe you testified that willow and cattail were in

14   overabundance to the north of the TNT Site?

15   A.  Correct.

16   Q.  Did this overabundance occur prior to June of 2025?

17   A.  Yes.

18   Q.  And I believe you also stated there were smaller patches of

19   overabundance of willow and cattails to the south?

20   A.  Correct.

21   Q.  Closer to the TNT Site?

22   A.  Correct.

23   Q.  Did those smaller patches of overabundant willow and

24   cattail exist prior to June of 2025?

25   A.  Yes.

1          MR. SINGER:  Your Honor, if I could just have a moment.

2          THE COURT:  Sure.

3          MR. SINGER:  Thank you, Dr. Bozas, those were all my

4    questions.

5          THE WITNESS:  Thank you.

6          THE COURT:  Cross from -- yes, Mr. Ezray.

7          MR. EZRAY:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9    BY MR. EZRAY:

10   Q.  Thank you, Dr. Bozas.

11        Good afternoon.  I'm going to aim to be the fastest one to

12   ask you questions here.

13        In forming your opinions about what the pre-detention

14   facility use of the airport was, did you review any flight

15   data?

16   A.  Yes.

17   Q.  What flight data did you review?

18   A.  It's essentially a log explaining how many flights coming

19   in and out of there and what the general type of aircraft is.

20   I believe those were for the prior year.

21   Q.  Who provided you that log?

22   A.  My counsel.

23   Q.  Your counsel provided you that log.

24        Was it noted in your declaration?

25   A.  No.

App. 800

1    Q.  When did you review that log?

2    A.  I don't recall.

3    Q.  Do you remember when the data in that log ended?

4    A.  The exact date, no.

5    Q.  Did it include 2025 data?

6    A.  I don't recall.

7         MR. EZRAY:  Can I have one second, Your Honor?

8         THE COURT:  Yes, of course.

9    BY MR. EZRAY:

10   Q.  Do you recall if the logs that you reviewed showed only one

11   or two flights a day?

12   A.  They did not.

13   Q.  Did they show more flights?

14   A.  Yes.

15   Q.  So they showed more flights than your personal

16   observations.  Right?

17   A.  Yes, because my personal observations were limited time

18   span and we were not going to see every single plane that goes

19   in and out.

20   Q.  Right.  So compared to your personal observations, you

21   would prefer the flight data to get an accurate picture of what

22   was happening at the site.  Correct.

23        MR. AJIZIAN:  Objection, Your Honor.

24        THE COURT:  I will give it the weight it's deserving

25   of.  He has answered.

1              MR. EZRAY:  Thank you, no further questions.

2              THE COURT:  Redirect.

3                          REDIRECT EXAMINATION

4    BY MR. AJIZIAN:

5    Q.  Mr. Bozas, do you recall being asked questions on cross

6    about conducting surveys to evaluate the before and after

7    effects of the TNT Site?

8    A.  Yes.

9    Q.  Was that before and after effects with respect to wildlife?

10   A.  I believe so, yes.

11   Q.  Did you have any opportunity to conduct surveys in advance

12   of the TNT Site specific to the human activity at the TNT Site

13   that would allow you to develop that baseline?

14   A.  We had no notice of the facility.

15   Q.  Would you expect to get notice of the facility?

16   A.  Yes.

17   Q.  Why is that?

18   A.  It's generally part of the protocol when there is large

19   State or Federal programs that the Tribe is consulted with for

20   matters that would affect, in my case, Fish and Wildlife.

21   Q.  Thank you.

22       How long do you expect it will take for the Tribe, the

23   Department of Fish and Wildlife, or any other competent entity

24   to determine that before and after effect on wildlife caused by

25   the TNT Site?

70

1   A.   A couple of months if sufficient data can be collected.

2   Q.   Thank you.

3        Do you recall being asked about Tribal members' use of the

4   immediate surrounding areas of the TNT Site?

5   A.   Yes.

6   Q.   Do you recall your answer, that they don't use the areas

7   within the fencing?

8   A.   Yes.

9   Q.   Are you aware of Tribal members using the areas outside the

10  fencing for traditional activities?

11  A.   Yes.

12  Q.   And during what time period are you aware of them using the

13  areas outside the fencing for traditional activities?

14  A.   All prior to the presence of the facility.

15  Q.   How often did they use the areas outside the TNT fencing

16  for traditional activities?

17  A.   Year-round.

18  Q.   Do you recall being asked about obstacles at the TNT Site?

19  A.   Yes.

20  Q.   Is the Tribe's cultural aversion to the area due to the

21  human activity at the TNT Site an obstacle to Tribal members'

22  use of the surrounding lands outside the fence line?

23  A.   Yes.

24  Q.   Thank you.

25       In addition to that, there is also checkpoints and guards

1   that you have testified about?

2   A.   Correct.

3   Q.   How are you aware of those physical obstacles?

4   A.   I've seen them firsthand.

5   Q.   Have you attempted to access the TNT Site yourself?

6   A.   No.

7   Q.   Why not?

8   A.   Because I assume the answer is no when I see the

9   checkpoint.

10   Q.   Would you go and ask a security guard if you can hunt in

11   the area?

12   A.   No.

13   Q.   Would you advise a Tribal member to approach the security

14   guards armed prepared for hunt?

15   A.   No.

16   Q.   Do you recall testifying about the presence of fencing at

17   the TNT Site prior to June of 2025?

18   A.   Yes.

19   Q.   And my recollection is that you said that there was fencing

20   that blocked off a certain area of the site?

21   A.   Yes.

22   Q.   What area of the site was blocked by the fencing pre-

23   June 2025?

24   A.   Essentially, the runway and the adjacent kind of parking

25   lot and strips that are part of the airport.

1  Q.  And do you recall the video that we looked at?

2  A.  Yes.

3  Q.  Do you recall me asking you questions about what looked

4  like the parking lot?

5  A.  Yes.

6  Q.  Next to one of the trail heads?

7  A.  Yes.

8  Q.  Was that area blocked by the fencing that you are

9  discussing here?

10  A.  Not from the TNT facility.

11  Q.  Is it fair to say that pre-June 2025, the existing fencing

12  protected the airport section of the TNT Site?

13        MR. SINGER:  Objection.  Leading.

14        THE COURT:  It is, but I will allow it.

15        THE WITNESS:  Yes.

16        MR. AJIZIAN:  Okay.  Thank you.

17  BY MR. AJIZIAN:

18  Q.  There wasn't a detention center on the airport or fenced in

19  area of the TNT Site before June 2025, was there?

20  A.  Correct.

21  Q.  With respect to the Tribe's or Tribal members' cultural

22  aversion due to the human activity, do you have an

23  understanding of whether the specific activity at the TNT Site

24  matters to Tribal members for cultural purposes?

25  A.  The fact that it's a detention facility does not matter.

1    It's just the level of human activity.

2    Q.   So it could be a county fair and there would still be a

3    cultural aversion?

4    A.   Correct.

5    Q.   Do you recall testifying on cross about the Tribe

6    unanimously doing something?

7    A.   Yes.

8    Q.   What was that testimony?  Can you repeat it?

9    A.   Unanimously not practicing cultural practices there,

10    hunting, fishing, collecting medicinal plants.

11    Q.   Did you become aware of that unanimous position before or

12    after the establishment of the TNT Site?

13    A.   After.

14    Q.   Thank you.

15        Do you recall being asked questions about other facilities,

16    similar to this one, your knowledge of other facilities similar

17    to this one?

18    A.   Yes.

19    Q.   Are you aware of any other national preserve in this

20    country that operates a detention facility from the Preserve?

21    A.   Not aware of any.

22    Q.   Is the operation of a detention facility in a natural

23    preserve consistent with purposes for a natural preserve?

24    A.   No.

25    Q.   Thank you.

App. 806

1    Do you recall being asked about the location or what

2    counties the TNT trails are located in?

3    A.   Yes.

4    Q.   And do you recall testifying about the trails extending for

5    tens of miles?

6    A.   Yes.

7    Q.   Do you know if the trails extend into Water Conservation

8    Area 3A South?

9    A.   Some of them would, yes.

10   Q.   Do you know what county Water Conservation Area 3A South is

11   located?

12   A.   Miami-Dade and Broward.

13   Q.   Thank you.

14   Finally, do you recall being asked questions about the

15   flights in the TNT Site?

16   A.   Yes.

17   Q.   Was your prior testimony on direct based on flight data or

18   your personal knowledge?

19   A.   Personal knowledge.

20   Q.   Did you review the flight logs?

21   A.   I did.

22   Q.   Are they -- the number of flights shown in the logs, is

23   that consistent with your observation of flight activity in the

24   area over the last eight years?

25   A.   I have not witnessed that many flights coming in and out of

1   there.

2   Q.  Would you describe the current level of human activity at

3   the TNT Site to include a heavy law enforcement presence?

4   A.  Yes.

5   Q.  Do you, the Department, or the Tribe have any reason to log

6   access to anyone accessing the TNT Site before June of 2025?

7   A.  No.

8   Q.  The trails at the TNT Site, is that the primary method by

9   which Tribal members access Big Cypress for traditional

10  activities?

11  A.  Yes.

12          MR. AJIZIAN:  Thank you.  No further questions.

13          THE COURT:  Thank you.

14          You may step down, sir.

15          Thank you.

16          (Witness excused.)

17          THE COURT:  All right.  Plaintiffs, and I say that in

18  the plural, any additional witnesses?

19          MR. AJIZIAN:  Not for the Tribe, Your Honor.

20          MR. SCHWIEP:  Not from Friends or the Center, Your

21  Honor.

22          THE COURT:  All right.  All right, then.

23          So, we can take a brief break, but then let me ask the

24  defendants, again, how many witnesses we have so I can plan our

25  afternoon and tomorrow.

App. 808

 1          MR. PANUCCIO:  Thank you, Your Honor.  I think we have

 2    reached an agreement on what to do with declarations.

 3          If that's acceptable to the Court, then I think we

 4    would have one live witness.

 5          THE COURT:  All right.  I can't see a reason why I

 6    wouldn't accept something that all of you had had input in and

 7    agreed to.

 8          MR. PANUCCIO:  I believe we are there.  We will hash it

 9    out one more time at the break, but I think that's where we

10    are.

11          THE COURT:  All right.  So then the State Defendant

12    would have one live witness and the Federal Defendants?

13          MS. PIROPATO:  We have one declaration, Your Honor,

14    that we would rely on that's been submitted today.

15          THE COURT:  Really?

16          You have no live witnesses after all of that Sturm and

17    Drang last week about confrontation and cross-examination, no

18    live witness.

19          MS. PIROPATO:  Well, we have come to an agreement with

20    the parties, Your Honor, and it's really the most efficient way

21    to proceed at this time.  At that time, we wanted the whole

22    proceeding to be live witnesses and no declarations, but now we

23    have a hybrid proceeding.

24          In light of that fact, we think it's appropriate to

25    proceed this way.

App. 809

1          THE COURT:  Okay.

2          MS. PIROPATO:  And, frankly, a lot of it will be

3     cumulative of what's going to be happening for Florida.

4          So at this point in time, we think it's more efficient

5     to have the declaration, Your Honor.

6          THE COURT:  It would have been, in point of fact, more

7     efficient to have that conversation, I don't know, last week

8     but, okay, if everyone has come to a place of mutual

9     satisfaction and accord, it's good for me.

10          So we will take five minutes and hear from the State's

11     witness.

12          (Recess taken.)

13          MR. SCHWIEP:  Thank you, Judge, thank you for the time.

14     I think we have made some progress and here is what I think the

15     agreement that has been reached among counsel, and my colleague

16     will modify this if he needs to.

17          We have agreed that the declarations on the parties'

18     exhibit list, including supplemental exhibit list and the ones

19     served early this morning can all come in, with the exception

20     of Mr. Kerner, who is going to testify live now.

21          THE COURT:  Okay.

22          MR. SCHWIEP:  So the declarations will come in.

23          The plaintiffs, Your Honor, had noticed numerous

24     exhibits they intended to use in cross-examining

25     Mr. Gadea-Guidicelli and Mr. Fuentes, and the defendants have

1    agreed that those exhibits on our designated cross supplemental

2    exhibit list can come in.

3         THE COURT:  Okay.

4         MR. SCHWIEP:  And that's on DE 108, which was served on

5    August 8th, Exhibits 98 through 145, and on DE 115, which we

6    served yesterday, those are Exhibits 146 through 158.

7         So, those will come in as admitted.

8         (Defense Exhibits 98-145 were admitted in evidence.)

9         (Defense Exhibits 146-158 were admitted in evidence.)

10        THE COURT:  I'm going to ask all parties when we

11   conclude, like a trial, but to give me your exhibit lists with

12   the admitted indication of these exhibits and you will, of

13   course, confer with your friend across the aisle to make sure

14   we are all on the same page as literally what was agreed upon

15   by the parties and what came in through the witness testimony

16   but, you know, you can use the several lists but indicate in

17   some way admitted, admitted, admitted.

18        MR. SCHWIEP:  Will do, Your Honor.

19        THE COURT:  Okay.

20        MR. SCHWIEP:  If a share file link or something like

21   that works to get them to the Court, we can do that.

22        THE COURT:  Whatever link you'd mentioned in your

23   exhibit list is not something the Court can access.  You-all

24   can, but just as long as it's either -- so, for example, if you

25   wanted to put things on a thumb drive with the videos, that's

1    fine, but I just need to know what precisely has been adduced.

2        MR. SCHWIEP:  Okay.  We can do that, Your Honor, and

3    confer to make sure there is no discrepancies or disagreements

4    with that.

5        I don't think there will be.

6        THE COURT:  Bless you.

7        MR. SCHWIEP:  We have four other exhibits that we want

8    to move in, of which there is an objection.

9        THE COURT:  Can I ask this because we are not going to

10   conclude today, as Mr. Panuccio foresaw last week when he asked

11   me if I would have Wednesday available.  I know Mr. Kerner must

12   be busy.

13       Can we get our live witnesses on and then we can have

14   this discussion at a later time?

15       MR. SCHWIEP:  You started us out last Wednesday by

16   saying hope springs eternal.  I think that applies today.  I

17   think we will be able to finish today.

18       THE COURT:  Don't say it, though, you are tempting fate

19   and all the rest.

20       Call your witness, Mr. Panuccio.

21       MR. PANUCCIO:  Thank you, Your Honor.

22       COURTROOM DEPUTY:  Please raise your right hand.

23       (The witness, David Kerner, was duly sworn.)

24       COURTROOM DEPUTY:  Please have a seat, state your full

25   name for the record, and spell it for the court reporter,

 1   please.

 2        THE WITNESS:  David Michael Kerner.  Last name is

 3   K-E-R-N-E-R.

 4                    DIRECT EXAMINATION

 5   BY MR. PANUCCIO:

 6   Q.  Good afternoon, Director Kerner.

 7   A.  Good afternoon.

 8   Q.  As you know, I'm Jesse Panuccio, counsel for the State.  I

 9   will be asking you a few questions this afternoon and then

10   there will be potentially some cross-examination.

11        Thank you for being with us.  Can you let us know your

12   current job title?

13   A.  Yes, sir.  I am the executive director of the Florida

14   Department of Highway Safety and Motor Vehicles.

15   Q.  How long have you occupied that role?

16   A.  Since January of 2023, so about two and a half years.

17   Q.  What are your responsibilities as the executive director of

18   the Department of Highway Safety and Motor Vehicles, and before

19   you answer that, I may shorten that either to "department" or

20   "Highway Safety and Motor Vehicles" but you will know what I'm

21   talking about.

22        But what are your responsibilities in that role?

23   A.  Yes, sir.  So I serve on behalf of the Governor and cabinet

24   in an appointed position and I'm responsible for the day-to-day

25   operations of the Department that numbers about 4,500

81

1    employees.  There are two main subject matters of the

2    Department, which is highway safety, motor vehicles.

3        My primary duties on a day-to-day basis tend to the highway

4    safety side which is the Florida Highway Patrol or the Division

5    of Florida Highway Patrol.

6        THE COURT:  Can I ask you, Mr. Kerner, to just pull the

7    microphone a little closer.

8        THE WITNESS:  Yes, Your Honor.

9        THE COURT:  Thank you very much.

10       MR. PANUCCIO:  How's the pacing?  Are we doing okay?

11       THE COURT:  It's pretty good.  I can see where we might

12   start revving up, but it's good as it is now.

13       Thank you.

14   BY MR. PANUCCIO:

15   Q.  So you haven't been here, but we have a court reporter who

16   has been working hard all day.  So we try to keep our pace at

17   about the way I'm talking now, so that -- and also so the judge

18   and everyone in the court can hear.  So far, you have been

19   great, and we will slow you down if we need to.

20       You were discussing your responsibilities within the

21   Department.  You mentioned the Highway Patrol, also known as

22   State troopers?

23   A.  That's correct.

24   Q.  About how many troopers are under your command?

25   A.  We are authorized 1,982.  We currently have about 1,800 to

App. 814

1    1,850.

2    Q.  They have statewide jurisdiction?

3    A.  They do.

4    Q.  Can you walk me through your career before becoming the

5    executive director of the Department?

6    A.  Yes, sir.  I graduated from the University of Florida,

7    graduated from the University of Florida College of Law in

8    2010.  I also attended the police academy in 2004 and served as

9    law enforcement officer.  I have served as a special

10   prosecutor.  I served as a civil litigation attorney.

11        Concurrent to those duties, I have also served an elected

12   office prior as a State representative, county commissioner in

13   Palm Beach County and county mayor for a period of time.

14   Q.  Either in your current role or your prior roles, do you

15   have experience with the State's immigration enforcement

16   efforts?

17   A.  Yes, sir, primarily in my current role as executive

18   director.

19   Q.  What experience do you have?

20   A.  As the head of the Department, as far back as I think

21   shortly after I was appointed in 2023, the Government initiated

22   an emergency order directing State troopers and other parties

23   in law enforcement, State law enforcement, including the

24   national guard, to deploy to Texas.

25        So, I have spent, I would say a significant amount of time

1  on the border personally in Texas, but I have been there on

2  several occasions.  Have managed that process on behalf of the

3  Governor in terms of the State troopers' duties there,

4  assisting the Department of Public Safety in Texas and most

5  recently by way of our entrance into the 287(g) enforcement

6  arena.

7  Q.  Does your agency -- does your agency participate in the

8  287(g) agreement?

9  A.  Yes, sir, we do, and we were the first agency in the nation

10  to execute an agreement.

11  Q.  And what is a 287(g) agreement, in your experience?

12  A.  It's essentially a delegation of authority from the

13  Department of Homeland Security to willing agencies, both at

14  the State and local level, and when I say agencies, I mean law

15  enforcement agencies, and it empowers them to enforce Title 8

16  immigration law.

17        THE COURT:  I'm sorry, did I hear correctly, did you

18  say you were the first agency in the nation to ever execute a

19  287?

20        THE WITNESS:  If I may, Your Honor, I will clarify.

21  Since the executive order under President Trump was initiated,

22  we were the first one to execute a 287(g) agreement.

23        THE COURT:  In 2025?

24        THE WITNESS:  Yes, Your Honor.

25        THE COURT:  All right.  Thank you so much.

App. 816

1          MR. PANUCCIO:  Thanks for the clarification, Your

2    Honor.

3    BY MR. PANUCCIO:

4    Q.  Does the Department, and, here, again, I'm referring to

5    your department, I know we are talking about Federal

6    departments, too, but does Highway Safety and Motor Vehicle

7    detain illegal aliens pursuant to a 287(g) agreement?

8    A.  We do.  If I may clarify my prior answer.  We were the

9    first agency to execute in 287(g) in the task force models.

10   There are several different models that exist.  The one that we

11   are discussing now is the task force model, or the one where

12   you enforce and detain under the law out on the street, if you

13   will, versus the jail model, for example.

14   Q.  Okay.  So the task force model goes beyond a detention

15   facility alone?

16   A.  Correct.

17   Q.  But with respect to detention, does the party detain

18   illegal aliens pursuant to 287(g)?

19   A.  We do, yes, sir.

20   Q.  When it does, does ICE instruct the Department to detain

21   those aliens in a particular location?

22   A.  Not in my experience, no.

23   Q.  So the State chooses what location to carry out the

24   detention function?

25   A.  If I may clarify, we are talking post apprehension, post

App. 817

1    arrest on the side of the road is the question, where do we

2    bring them or how do we decide?

3    Q.   Yes.

4    A.   Yes, we generally -- we have the ability to bring them to

5    various facilities at our choosing.

6    Q.   And these detainees, what kind of facilities are they

7    typically detained at within the State of Florida?

8    A.   I can speak generally to our experience at the Florida

9    Highway Patrol because we are primarily an apprehension or

10   enforcement agency, but, in my experience, we would bring them

11   either to an IGSA jail, which is an Intergovernmental Service

12   Agreement jail.  There is a few of them in Florida.  We would

13   bring them to a basic ordering agreement jail, which I believe

14   all 67 counties have that, or we'd bring them to a Federal

15   facility of some sort, whether it would be an ICE ERO facility

16   or it could be, depending on location in Florida, it could be

17   even Krome directly.

18        THE COURT:  Sorry.  You talked about the side of the

19   road arrest, apprehension.  Would you bring these individuals

20   to the IGSA facility after they had been processed in the local

21   jail on the local charges?

22        THE WITNESS:  Your Honor, it depends on the context of

23   the apprehension.  There are apprehensions that occur that are

24   strictly immigration-related that do not involve State

25   violation law, State violation of State laws.

App. 818

1          So in those instances where there were underlying State

2    charges, we would bring them to a jail, to a county jail as we

3    normally would.

4          THE COURT:  Okay.  And the other instances are

5    predicated how, that aren't predicated on State violation

6    charges?

7          THE WITNESS:  It would be confirmation by the Federal

8    Government that the person does not have legal status in the

9    United States.

10         THE COURT:  And based on that, Florida Highway Patrol

11   will pull a car over or detain someone?

12         THE WITNESS:  Can you clarify the question, Your Honor?

13         THE COURT:  Right.  So I understand that Florida

14   Highway Patrol, somebody goes across five lanes of traffic or

15   doesn't have a taillight, stops the car -- or speeding, stops

16   the car based on the probable cause of impairing traffic, you

17   know, whatever that charge is.  That person will be charged and

18   they are taken to a local facility where their status is found

19   out within 48 hours and then they are moved to one of these

20   IGSAs, I guess.

21         Then you said there was another where that process

22   wasn't the process and I'm trying to figure out what that other

23   is.

24         THE WITNESS:  I understand, Your Honor.  So, a typical

25   scenario could be a trooper sees a violation of the traffic

App. 819

1   code and pulls over the violator.

2          As part of that interaction, they determine that there

3   is not lawful presence but there is no underlying criminal

4   charge.

5          For example, if somebody was pulled over for speeding.

6          THE COURT:  Right.

7          THE WITNESS:  And then the trooper interacts with the

8   violator, he or she doesn't have a license.  They present a

9   passport, for example, from a different country.

10          The violator admits on some instances that I'm not here

11   legally or we contact ICE and they determine that, there would

12   be no underlying criminal charge to bring them to jail for

13   speeding.  They would get simply a citation, a uniform traffic

14   citation, but as a result of our knowledge and determination

15   that they do not have lawful presence, they would be

16   apprehended under Title 8 and be brought to one of those many

17   facilities we discussed.

18          THE COURT:  So they would be apprehended on the Federal

19   immigration detainer.

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Okay.  Thank you.

22   BY MR. PANUCCIO:

23   Q.  That's the task force model that you were earlier

24   describing?

25   A.  That's correct.  Yes, sir.


App. 820

1    Q.  Now, just to go back, just before the Court had a few

2    questions you were describing to me three types of facilities

3    that your troopers might bring someone to for detention after

4    apprehension.

5        The last facility you mentioned was a Federal facility but

6    the first two, are those State facilities?

7    A.  They are either State or county facilities.

8    Q.  But not Federal?

9    A.  No, sir.

10   Q.  So it's State officials running those facilities?

11   A.  Yes, sir.

12   Q.  Does ICE require that Florida detention facilities used for

13   detention of illegal aliens meet any minimum standards?

14   A.  My general understanding is there are requirements that

15   must be meet.

16   Q.  Is that true for all types of facilities -- well, scratch

17   that.

18       You mentioned three types of facilities.  The third was

19   Federal.  You just testified the first two are State or county

20   facilities.

21       MS. BURKHARDT:  Objection, Your Honor.  This is outside

22   the scope of Director Kerner's experience.  He is not working

23   in detention.  He works with FHP.

24       THE COURT:  Well, I mean, I think I'm going to allow

25   him to answer these questions.  Although -- although we are

App. 821

1    getting a little afield of the whole detention facility, but I
2    think context is appropriate so I'm going to give Mr. Panuccio
3    some latitude.
4          MR. PANUCCIO:  Thank you, Your Honor.
5    BY MR. PANUCCIO:
6    Q.   To rephrase my question, the State and county facilities
7    you mentioned that your troopers would sometimes bring
8    detainees to, do the ICE standards apply to these facilities?
9    A.   They do if they are being held strictly on Federal
10   immigration charges or detainers.
11   Q.   Do those standards apply to preexisting facilities as well
12   as new facilities?
13   A.   They do.
14   Q.   In your experience as executive director, is it important
15   that your agency participates in immigration enforcement?
16   A.   Yes, sir, I do.
17   Q.   Why?
18   A.   Well, first and foremost, we have been directed to by our
19   chain of command through the governor.  All State and local
20   agencies are required under statutory law to give best efforts.
21         From a personal, professional perspective outside of that
22   requirement, I see that part of our public safety efforts and
23   duties require us to, from a professional standpoint, enforce
24   immigration law.  It's part of the larger picture of public
25   safety.

App. 822

1    Q.   And the Government has declared a state of emergency with

2    respect to illegal immigration.   Is that correct?

3    A.   Yes, sir.

4    Q.   In your experience, have you seen a state of emergency on

5    the ground in Florida from illegal immigration?

6    A.   Absolutely.

7    Q.   In what way?

8          THE COURT:  And this is going to what issue before me,

9    Counsel?

10          MR. PANUCCIO:  The equities, Your Honor, as I mentioned

11    the other day, *Winter* says the Court must balance harm that

12    would flow from a preliminary injunction to the State and if

13    the Court would just give me a little latitude, I'm getting to

14    that.

15          The point being if the facility were closed by

16    preliminary injunction what would be the effects on the State

17    and on law enforcement and on public safety.

18          THE COURT:  Okay.

19          MR. PANUCCIO:  Thank you, Your Honor.

20          THE WITNESS:  So I think that the first item or issue

21    that I would phrase -- or I would couch this issue in is my

22    experience in Texas on the border.

23          MS. BURKHARDT:  Objection, Your Honor.  Relevance.

24          THE COURT:  Sorry, Mr. Kerner.  No, Texas on the border

25    is, you know, Texas.

```
 1          Lord knows they wouldn't allow me to opine on anything
 2     out there, so I think we should just stick to the State of
 3     Florida.
 4          Thank you.
 5     BY MR. PANUCCIO:
 6     Q.   Let me try to redirect you, Director Kerner.
 7          Within the State of Florida, based on what your experience,
 8     what you know from the Department's record, from interacting
 9     with troopers, what public safety impact has the illegal
10     immigration crisis had here?
11     A.   We have certainly experienced in our own enforcement
12     efforts here in Florida, even prior to 287(g), a large uptick
13     in the amount of people being trafficked, the amount of people
14     being smuggled, the types of narcotics and amounts of narcotics
15     being brought to the State of Florida with a nexus from outside
16     of this country.  As part of our investigations, we can see
17     remittances.  We can see through investigation where the drugs
18     originated, where they crossed.  We see all of that affect our
19     community.
20          Our troopers experience it as well on a more personal level
21     here.  Most recently --
22          MS. BURKHARDT:  Objection, Your Honor.
23          THE COURT:  Sustained.
24     BY MR. PANUCCIO:
25     Q.   Has your department experienced violent crime associated
```

App. 824

1    with individuals illegally present in the country?

2    A.  We have.

3    Q.  Can you please describe that?

4         MS. BURKHARDT:  Objection, Your Honor.

5         THE COURT:  Unless you are going to tell me that these

6    folks are at the detention facility which, of course, I think

7    would be germane, no, I don't think this line of questioning is

8    appropriate.

9         Plus, there is the data about, you know, that

10   80 percent of what comes into the country comes through

11   recognized ports and not through porous borders and the violent

12   crime also predominant percentage of native citizens and not

13   illegal immigrants, but that's not really what I'm about.

14        So let's --

15        MR. PANUCCIO:  Fair.

16        Your Honor, just for the record, so I have one --

17        THE COURT:  Okay.

18        MR. PANUCCIO:  -- what I'm proffering here, Plaintiffs

19   have spent three to four days, most of their testimony has been

20   on the harm that they say the lack of an injunction will cause.

21        THE COURT:  Right.

22        MR. PANUCCIO:  I'm trying to present one witness on the

23   harm to the Government and to public safety and to the public

24   interest if there is not sufficient detention capacity in the

25   State.  I'm building up to whether violent criminals are held

 1   at the detention facility and I will get there, but I'm trying

 2   to establish a basis that, in fact, there is violent crime,

 3   public safety, drugs and other issues associated with illegal

 4   immigration in the Director of Highway Safety and Motor

 5   Vehicle's experience.

 6          THE COURT:  No, no, and I agree that that's somewhat

 7   pertinent, but it's not really to what we are talking about

 8   because the question isn't whether immigration matters should

 9   be enforced, do people commit crimes.

10          The question is should people on their way be housed in

11   the middle of the Everglades as opposed to other places?

12          So, if there is something that connects to that, then,

13   yes, I think you could develop but, generally speaking,

14   crimes -- I don't think that's pertinent necessarily, but you

15   can do an overview.

16          You can do like just an if -- if the director and,

17   Mr. Kerner, it's not as if you are not listening to this, if

18   immigration issues in your experience has led to an increase in

19   crimes across the board.

20   BY MR. PANUCCIO:

21   Q.  Let me come back to that.

22          Let me see if I can first connect it to the facility we are

23   discussing.

24          What would you say is the most significant logistical

25   hurdle in combatting illegal immigration in Florida?

94

1  A.   Presently, it's the ability to house and detain those that

2  have been apprehend under 287(g).

3  Q.   And generally, are Florida's detention facilities

4  experiencing overcrowding due to illegal immigration detention?

5       MS. BURKHARDT:  Your Honor, objection.  There is no

6  foundation and this goes to detention.  It's outside the scope

7  of what Director Kerner can speak to as someone who is the

8  Director of Florida Highway Patrol and DHSMV.

9       MR. PANUCCIO:  Your Honor, he is the director.  We have

10  brought the head of the agency that apprehends under 287(g)

11  agreements and brings them to detention facilities.

12       THE COURT:  Right.

13       MR. PANUCCIO:  He would have knowledge of whether these

14  facilities are turning people away, whether they are full,

15  where his troopers can go.

16       THE COURT:  No, no, and I'm going to allow it.  It is

17  circumscribed by sort of the self-defined parameters.

18       Again, there is a housing issue because nobody is being

19  given bond under the INA, but that's okay.  That's a different

20  conversation.

21       The conversation Mr. Panuccio is having with the

22  director has to do with the present iteration of detention and

23  whether or not there is overcrowding and, yes, you may explore

24  that.

25       MR. PANUCCIO:  Thank you, Your Honor.

App. 827

1  BY MR. PANUCCIO:

2  Q.  Are Florida's detention facilities experiencing

3  overcrowding due to illegal immigration?

4  A.  Can I clarify, if I may, Counselor?  Are you referring to

5  our State prison system and jail system, or are you referring

6  to the Federal capacity ability to hold?

7  Q.  Well, the places where your troopers can bring detained

8  aliens, are you facing an issue of overcrowding?

9          THE COURT:  So that would include Federal facilities, I

10  guess.

11          THE WITNESS:  Understood.  Thank you, Your Honor.

12          The way that I would evaluate that is if there is one

13  person held at Alligator Alcatraz, if that's what we are

14  calling it, then that means that the Federal capacity has been

15  exceeded.

16          I can also tell you that from the very start of our

17  efforts under 287(g), one of my principal duties in interfacing

18  with the Federal Government, particularly ICE and Border

19  Patrol, which are both part of the Department of Homeland

20  Security, is that we modulate how much effort we are putting

21  into our duties under 287(g) because we oftentimes, in a sense,

22  overrun the Federal capacity.

23  BY MR. PANUCCIO:

24  Q.  Are you familiar with the detention facility at the

25  Dade-Collier Training and Transition Airport, the TNT Site?

96

1    A.   Yes, sir.

2    Q.   How did you become familiar with it?

3    A.   I initially became acquainted with what wasn't a detention

4    facility at the time when I first visited it, but I was part of

5    a trip, if you will, with my colleagues in State government to

6    view the site in anticipation of Florida's need for additional

7    detention capacity for immigration.

8         So, I was there early on in the process to view the site

9    and to see if it would be an appropriate site and then,

10   thereafter, I was there for a press conference where the

11   governor and the president were present for that, I think a

12   couple months ago, and then I have been there more recently to

13   see the operations.

14        THE COURT:  When was that first trip, because I know

15   you were going to ask, Mr. Panuccio, I interrupted?

16        MR. PANUCCIO:  Your Honor, I can't give you a specific

17   date.  I would assume it was probably in April.

18        THE COURT:  April, okay.  Thank you.

19   BY MR. PANUCCIO:

20   Q.   Based on your experience in State government, both as a

21   representative, the head of Highway and Motor Vehicles, is the

22   detention facility a State-run facility?

23   A.   Absolutely.

24   Q.   Based on the apprehensions that your troopers are making

25   and then -- well, let me step back.

App. 829

97

1      Have your troopers apprehended people and then delivered

2  them to the facility for detention, the TNT facility?

3  A.  I don't think -- I don't think directly to that facility,

4  no, sir.  I can't be a hundred percent sure but there would

5  have to be a unique set of circumstances for a trooper to

6  choose to take them to that facility.

7  Q.  So who -- are people that were apprehend by your troopers,

8  do they ultimately end up at that facility?

9  A.  Yes, sir.

10  Q.  They just go through some kind of processing first?

11  A.  Yes, sir.

12  Q.  Are any of those individuals violent criminals?

13  A.  Yes, sir.

14      MS. BURKHARDT:  Objection, Your Honor.

15      THE COURT:  Pardon?

16      MS. BURKHARDT:  Objection, Your Honor.  Relevance.

17      THE COURT:  Well, I think it will be relevant if we get

18  a breakdown, if there is -- so I know in at least Federal

19  facilities, there is some breakdown as to drug offenders, other

20  offenders, and I'm assuming that's where you are going with the

21  director so --

22      MR. PANUCCIO:  Well, I'm actually going back to where

23  Your Honor said earlier which is to draw the connection between

24  the potential relationship between illegal immigration and

25  violent crime, public safety, and Your Honor had said you got

1    to bring it closer to this facility.

2        So what I'm trying to draw out is that the facility is,

3    in fact, housing people who are a danger to public safety and

4    if there were a preliminary injunction, it would be harmful to

5    the ability to detain those people.

6        THE COURT:  Well, there is the argument that anybody

7    who has violated the law is a challenge to public safety.  Of

8    course, that's not -- you know, in the criminal context that's

9    not really the way it's measured because people get bond, but

10   if it would be of moment, of course, if everybody, if all

11   thousand people out there were violent offenders, which is why

12   they are out there, of all places, as opposed to, you know, a

13   small cohort.  That's what I was saying.  I was assuming we

14   were going to have a breakdown.

15       MS. BURKHARDT:  Your Honor, if I may, we also object

16   because there has been no foundation that has been laid that

17   Director Kerner can speak to the population of the people

18   detained at the TNT Site.  He just testified that State

19   troopers don't transfer people there.

20       THE COURT:  Well, in the first instance, he said.  That

21   would be unique if they just encountered you, interdicted you

22   on the highway, and then took you there.  You go someplace else

23   first.

24       But on cross-examination, you, of course, if we do get

25   a breakdown can ask what current data the director has looked

App. 831

99

1   at as far as, you know, a detainee's criminal history and for

2   what and things of that nature.

3         So, go ahead, Mr. Panuccio.

4   BY MR. PANUCCIO:

5   Q.   Director Kerner, based on the experience of your troopers,

6   are there individuals who have committed violent crimes being

7   housed at the detention facility at the TNT site?

8         MS. BURKHARDT:  Objection.  Hearsay.

9         THE COURT:  I will sustain that objection.  That's

10  not -- based on the experience of his troopers.  If there is

11  data about the detainees, fine, and I absolutely assume the

12  director has that, but the trooper told him that this guy was

13  violent, that's not --

14        MR. PANUCCIO:  Your Honor, we had a witness that

15  plaintiffs' presented who testified about what an

16  administrative staffer at the Governor's office who answers the

17  citizens' services line said, and it was taken as evidence.

18        He is the head of the main law enforcement department

19  in the State, the Highway Patrol, and I'm asking him about his

20  knowledge of what is happening in the field with his troopers.

21        THE COURT:  Right.  So, if the director is going to

22  testify, as did the other witness about somebody who answered

23  the phone and we all agreed I would give that the weight it

24  deserved, the director has knowledge, being the director of

25  statistics, data and logs, he doesn't have to rely on a trooper

1    telling him, we have a violent person here.

2        But if that's what he is going to testify to, without

3    any numbers or other data, then I will give that the weight it

4    deserves as well.

5    BY MR. PANUCCIO:

6    Q.  In your role as the executive director, do you review the

7    business records of the Department?

8    A.  I do.

9    Q.  Do you generally review statistics on arrests?

10   A.  I do, particularly in the immigration space.

11   Q.  And based on your review, are your troopers detaining

12   illegal aliens who have also committed violent crimes?

13   A.  Yes, I can give one or two quick examples that are pretty

14   objective in evaluation, which would be --

15   Q.  Please.

16       THE COURT:  Well, I'm sorry, again, are we talking

17   about data from the TNT facility, about people at TNT?

18       MR. PANUCCIO:  I'm trying to get there, Your Honor.

19   I'm asking for the some latitude, the same latitude plaintiffs

20   have been given with multiple witnesses to draw out testimony.

21       THE COURT:  This is not -- no, no, no.  No, no, no.

22   You know, that doesn't work, oh, he did it too.

23       No, no.  You can get it by asking, is this data readily

24   available, business records of the facility that you have

25   reviewed?  The plaintiffs will then ask for the data.  We will

App. 833

1   go through that whole thing, but I just want to know if it's

2   about the facility.

3          MR. PANUCCIO:  Well, the first thing I'm doing, Your

4   Honor, is trying to understand who is getting detained

5   generally, and then my next question would be, okay, are those

6   people being sent to the facility.

7          But I need to be able to lay the groundwork for these

8   questions.

9          THE COURT:  People -- who is being detained, people who

10  aren't documented.  That's who is being detained.  That's not a

11  question.  Nobody has said that's a question.

12         MR. PANUCCIO:  And I'm asking if some number of those

13  people are also violent criminals.

14         Your Honor, I'm trying to show the equities on our side

15  of the case.  It is a necessary element of a preliminary

16  injunction.

17         THE COURT:  I know you are trying to do it,

18  Mr. Panuccio.  My question is, are you doing it in a way that

19  is relevant to the discussion as opposed to the entire

20  immigration situation, including Texas.

21         I just want to know about that one facility.

22         MR. PANUCCIO:  Well, the facility is housing people who

23  are getting detained in Florida.

24         THE COURT:  Right.

25         MR. PANUCCIO:  So the first thing I'd like to know is,

App. 834

1    are people who are illegally present who are getting detained

2    also a threat to public safety.  I'm asking the Director of

3    Highway Safety and Motor Vehicles that question.  It's within

4    his experience.

5         My next question will be, are some number of those

6    people being housed at the detention facility, based on your

7    troopers bringing them, and then they are getting processed

8    there or sent there.

9         THE COURT:  Okay.  Some number.  Could be one, could be

10   two but, all right, go ahead.

11   BY MR. PANUCCIO:

12   Q.  Generally speaking, when your troopers apprehend

13   individuals who are illegally present in the country, are some

14   of those people violent criminals?

15   A.  Yes, and we have encountered and apprehended people that

16   have active warrants for murder in other countries.

17   Q.  Do you know if any of those people have been sent to the

18   detention facility at the TNT Site?

19   A.  My belief is that, yes, they have been.

20   Q.  In your experience, is the TNT Site helping to alleviate

21   the overcrowding in detention facilities, generally?

22   A.  Absolutely.  I would go as far as to say without that

23   facility we, at the Florida Highway Patrol, would not have the

24   ability to enforce immigration laws as robustly as we would do

25   normally.

1    Q.  And if you didn't have that ability to detain, do you think

2    it would create an increased threat to public safety?

3    A.  I do.

4         MR. PANUCCIO:  Give me one moment, Your Honor.

5         THE COURT:  Sure.

6    BY MR. PANUCCIO:

7    Q.  Based on your experience at the detention facility at the

8    TNT Site, are there primarily State officers at the facility?

9    A.  Yes, sir, there are.

10   Q.  Are you aware of any federally-owned infrastructure at the

11   facility?

12   A.  Aside from some aviation assets that fly in and out of

13   there as part of the deportation process, I'm not aware of any.

14        MR. PANUCCIO:  Thank you, Your Honor.

15        THE COURT:  Thank you, Mr. Panuccio.

16        Should we have the Federal Defendants cross?

17        MR. GUSTAFSON:  We have no questions, Your Honor.

18        THE COURT:  And none from the county?

19        MR. MURRAY:  None, Your Honor.

20        THE COURT:  I keep forgetting.

21        All right.  Cross-examination.

22        MS. BURKHARDT:  Thank you, Your Honor.

23                         CROSS-EXAMINATION

24   BY MS. BURKHARDT:

25   Q.  Good afternoon, Director Kerner.  My name is Dominique

App. 836

1    Burkhardt.  I'm an attorney on behalf of the Friends of the

2    Everglades.

3        You testified on direct about detention some.  Correct?

4    A.  Yes.

5    Q.  You testified there are three types of facilities where

6    when troopers make an arrest they may take someone that they

7    have arrested to.

8        Is that correct?

9    A.  Yes, ma'am.

10   Q.  We know one of them would be a Federal ICE detention

11   facility.  Correct?

12   A.  Yes.

13   Q.  The other one would be a State or local facility that has

14   an Intergovernmental Services Agreement with ICE.

15       Is that correct?

16   A.  That's correct.

17   Q.  And then the third type would be a State or local facility

18   that has a basic ordering agreement with ICE.  Correct?

19   A.  Yes.

20   Q.  In all three of those facilities, someone who is

21   apprehended for a violation allegedly of immigration laws, they

22   are in Federal immigration custody.  Yes?

23   A.  I believe they are in the custody of the sheriff from a

24   detention standpoint being held on Federal substance.

25       I don't know if they are in the custody of ICE.

1   Q.  So, let's say there is no State or local charge, they are

2   being held at a county facility for an immigration violation.

3       In that scenario, they are in Federal immigration custody.

4   Yes?  They are in the custody of ICE?

5   A.  You know, I don't agree with that characterization.  I'm

6   not trying to be combative in any way but it seems like it's an

7   issue of fact that I can't determine on my own.

8       What I can tell you is that when you are in the custody of

9   a jail, you are in the custody of the sheriff and there are

10  common law duties that occur as a result of that detention that

11  are not delegable, that cannot be waived.

12      So from that context, I would say that they are in the

13  custody of whatever officer is holding them.

14  Q.  But for those facilities to have authority to hold someone

15  with an alleged ICE violation, they have to have an agreement

16  with ICE that we just talked about.  Yes?

17  A.  That's my understanding, yes.

18  Q.  Thank you.

19      Now, you stated on direct that the reason we need the

20  detention center at the TNT Site is because Federal capacity

21  has been exceeded at other immigration facilities?

22  A.  Correct.

23  Q.  Is it fair to say that you view the TNT Site as an overflow

24  facility for Federal immigration custody?

25  A.  I view it for what it is, which is an increase in our

1    ability to apprehend and deport people that are not in this

2    country lawfully.

3    Q.   You also provided testimony, it was somewhat limited, about

4    people with criminal backgrounds at the TNT Site.

5         Yes?

6    A.   Yes.

7    Q.   So you haven't provided any data for the Court today.

8         Is that correct?

9    A.   In terms of paper documents?

10   Q.   Yes.

11   A.   No, ma'am.

12   Q.   You haven't provided any statistics that you have -- any

13   studies that have been done?

14   A.   No.

15   Q.   You haven't looked at any reports on the population at the

16   TNT Site?

17   A.   No, I have only briefly provided my personal experience in

18   my position as executive director.

19   Q.   Thank you.

20        Now, you are testifying today on behalf of Florida

21   Department of Highway Safety and Motor Vehicles.  Correct?

22   A.   Yes.

23   Q.   So you are not employed with the Florida Division of

24   Emergency Management?

25   A.   No.

1    Q.   And so you are not testifying today on behalf of FDEM?

2    A.   I think I'm a representative of the State government.

3    Q.   But you don't work -- you just said that you don't work for

4    the Florida Division of Emergency Management?

5    A.   We work very closely with them.

6    Q.   But you do not work for that agency, you are not employed

7    by them?

8    A.   No.

9    Q.   So you testified that Florida Highway Patrol entered into a

10   287(g) agreement with ICE.

11        Yes?

12   A.   Yes.

13   Q.   And you are -- are you the person who signed that agreement

14   as the executive director?

15   A.   Yes.

16   Q.   Okay.  And so, the fact that you have signed it, you are

17   familiar with the contents of that agreement?

18   A.   Generally speaking, but I just want to clarify, if I may,

19   that it was on behalf of the Department of Homeland Security,

20   as a whole, not just ICE.

21        MS. BURKHARDT:  Thank you.

22        THE COURT:  I'm confused.  What?

23        THE WITNESS:  Yes, Your Honor.  So my recollection of

24   the Memorandum of Agreement between my department and the

25   Federal Government was between the Department of Homeland

 1   Security, not specifically ICE.

 2          ICE is an element of the Department of Homeland

 3   Security.

 4          THE COURT:  Okay.  Thank you.

 5          MS. BURKHARDT:  If we could please bring up State --

 6   Defendants' Exhibit 28?

 7          THE COURT:  Defendants'?

 8          MS. BURKHARDT:  Yes, Your Honor.

 9          Thank you, Sasha.  If we can please scroll to page 10

10   of this agreement.

11          (Defendants' Exhibit 28 was marked for identification.)

12   BY MS. BURKHARDT:

13   Q.  As you just testified, Director Kerner, that is your

14   signature on the left-hand side of the page?

15   A.  Yes.

16   Q.  This is the 287(g) agreement that you clarified is with DHS

17   and does state ICE as a signatory?

18   A.  Certainly, but in page 1 it says Department of Homeland

19   Security.

20          I don't know that it's even relevant.

21   Q.  Thank you.

22          THE COURT:  You don't know that the signature is

23   relevant, who signed it?

24          THE WITNESS:  Certainly that's relevant.  I just meant

25   the distinction between the Department of Homeland Security and

App. 841

1    a subordinate division of ICE within that department.

2          THE COURT:  Is this already in evidence?

3          MS. BURKHARDT:  No, Your Honor, we would like to move

4    this into evidence.

5          THE COURT:  Which number is it again?

6          MS. BURKHARDT:  This is State's Exhibit 28.

7          THE COURT:  Okay.  Any objection?

8          MR. PANUCCIO:  No objection.

9          THE COURT:  All right.  State's Exhibit 28 is admitted.

10          (Defense Exhibit 28 was admitted in evidence.)

11    BY MS. BURKHARDT:

12    Q.  So, Director Kerner, isn't it true, based on this

13    agreement, that if State troopers are acting with 287(g)

14    authority, they are acting under color of Federal law?

15          MR. PANUCCIO:  Objection.  Calls for a legal

16    conclusion.

17          THE COURT:  Well, why don't we go to the paragraph,

18    counselor?

19          MS. BURKHARDT:  Certainly, Your Honor.

20          If we can please go to Section 2, authority, that is on

21    page 1, and I would also just add, Your Honor, that Director

22    Kerner is the signatory to this agreement.

23          THE COURT:  Right.

24    BY MS. BURKHARDT:

25    Q.  Director Kerner, can you see in front of you, Section 2,

1    authority?

2    A.  Yes.

3    Q.  Is that a Federal law that this agreement is pursuant to?

4    A.  Yes.

5        MS. BURKHARDT:  Okay.  If we could also scroll to page

6    2, Section 5, designation of authorized functions.

7        So, if we look at page 2, and if we just -- Sasha, if

8    you can just bring it up a little bit maybe -- sorry, we are

9    going to go to Section 5, so if you can scroll down.

10   BY MS. BURKHARDT:

11   Q.  Director Kerner, this is the part of the agreement that

12   lays out the specific functions that State troopers may carry

13   out under 287(g) authority.

14       Is that correct?

15   A.  Yes.

16   Q.  If you look at each of these, so there are three bullets

17   here and then there's two more right below, do you see where

18   each -- well, more below.

19       Do you see where each of these cites to Federal law

20   regulation?

21   A.  I do.  And I would agree to delegation of Federal

22   authority.

23   Q.  Officers with 287(g) authority also operate under the

24   direction and supervision of ICE.  Correct?

25   A.  No.

App. 843

1  Q.   So your testimony is that they are not operating under the

2  direction and supervision of ICE?

3  A.   You'd have to more specifically define supervision and

4  direction.  I can tell you that there are some supervisory

5  roles that Homeland Security plays in helping us determine who

6  is here illegally or not, but they certainly, and I don't --

7  regardless of what this document says, they are not empowered

8  to control or direct troopers, State troopers under my

9  department.

10        THE COURT:  I'm sorry, you said your understanding of

11  your responsibilities and your troopers is regardless, meaning

12  not confined by this document?

13        THE WITNESS:  I'm sorry, can you clarify the question?

14        THE COURT:  Well, I think you said regardless of what

15  this document says, and I'm asking you if you are telling me

16  that your troopers are following any other protocol outside of

17  this document not defined by this document.

18        THE WITNESS:  If I may, Your Honor, there is concurrent

19  authority of the Department to control State troopers and

20  direct them.

21        THE COURT:  Right.  When they are doing traffic stops

22  and the like.

23        ICE doesn't have anything to do with that.

24        THE WITNESS:  Correct.  I think my larger point is

25  there is a supervisory role, but we have not delegated our

App. 844

1    inherent State sovereign authority to control our own agents to

2    the Federal Government.

3         THE COURT:  Just as it regards immigration.

4         THE WITNESS:  I don't think we have delegated our

5    authority of our troopers at all.  Now, there may be instances

6    where ICE would ask us to do something on their behalf but they

7    are not in our chain of command, if you will.

8         THE COURT:  Okay.  Is there any particular memo or MOU,

9    is there a -- oh goodness -- is there an ICE supervision and a

10   liability and responsibility section?

11        And I'm looking at Docket Entry 53-1, something that

12   was filed on February 7, 2025, signed by, I believe, the

13   director.

14        MS. BURKHARDT:  Your Honor, may I ask a question that

15   goes to that?

16        THE COURT:  Yes.

17        MS. BURKHARDT:  Okay.  If we could please scroll to

18   page 6 of this agreement, this is Section 11, ICE supervision.

19        THE COURT:  Okay.  This is the same document then.  I

20   just had it under a different number.  Sorry.

21   BY MS. BURKHARDT:

22   Q.  Director Kerner, can you read the entire paragraph?

23   A.  Yes, "ICE supervision.  Immigration enforcement activities

24   conducted by participating LEAs" -- which to me means law

25   enforcement agency -- "personnel will be supervised and

App. 845

1    directed by ICE.  Participating LEA personnel are not

2    authorized to perform immigration officer functions except when

3    working under the supervision or direction of ICE."

4    Q.  Thank you.

5         Now, you testified on direct that State troopers are not

6    actually transporting people to and from the TNT Site.

7    Correct?

8    A.  That's my understanding is that we don't do that.

9    Q.  If State troopers arrest someone who might be here

10   illegally, you typically notify ICE.  Right?

11   A.  Absolutely.

12   Q.  Would State troopers check the SAVE database to verify

13   someone's immigration status?

14   A.  We probably wouldn't check it directly.  We have worked

15   with the Federal Government to provide access to SAVE to State

16   troopers.  Obviously, my department has access to it on the

17   motor vehicle side, but we generally would work directly with

18   ICE through the Law Enforcement Assistance Center to determine

19   someone's legal status or with an ICE officer on the side of

20   the road.

21   Q.  Thank you.

22        So it's really ICE that would ultimately determine who

23   should be in immigration custody?

24   A.  That's correct, yes.

25   Q.  And that's the case even if it's State troopers who make

1    the initial arrest?

2    A.   Yes.  I would say that on every interaction or

3    apprehension, we would contact ICE to ensure that their legal

4    presence, or that they don't have legal presence.

5    Q.   So you stated earlier that people who are detained, I think

6    it might have been a little bit unclear, so I'm actually going

7    to ask the question.

8         Do you dispute that people detained at the TNT Site are in

9    Federal immigration custody?

10   A.   I think it's very similar to being in a jail, right, so

11   there is that dichotomy occurring where they are being held by

12   State actors but on Federal charges, and I don't think it's

13   unusual.

14   Q.   So detainees at the TNT Site, they are not there because of

15   pending State or local charges.  Correct?

16   A.   No.

17   Q.   They are not serving a State prison sentence?

18   A.   No.

19   Q.   They are not serving a county jail sentence?

20   A.   No.

21   Q.   And the State of Florida can't release anyone from custody

22   at the TNT Site.  Correct?

23   A.   I don't know what authorities exist or don't exist with

24   regard to that specific question or that action.

25   Q.   So it's DHS, ICE and Customs and Border patrol who are

1    transporting people to and from the TNT Site?

2    A.   Actually, I don't know who transports them there.  It could

3    be a contractor.

4    Q.   You mentioned that it's the Federal Government who is

5    deporting people from the TNT Site?

6    A.   Yes.

7    Q.   The State has no authority to deport people?

8    A.   No.

9    Q.   And DHS and ICE also decide whether a particular detention

10   facility is appropriate for immigration detention.

11        Correct?

12   A.   I don't know if appropriate is the right metric.

13        I know that there are standards that must be met.

14   Q.   These are ICE-DHS standards?

15   A.   I believe so, yes.

16   Q.   Now, you testified on direct about Governor DeSantis's

17   Executive Order 23-03.  In your view, how long has there been

18   an immigration crisis in Florida?

19   A.   I would defer to the Governor's execution of the order.

20   Q.   And so that initial order was signed in January 2023?

21   A.   I don't have the order in front of me.  There are a lot of

22   orders that are executed by the Governor, whether it's

23   hurricane-related or immigration-related or other national

24   disaster, but I do believe that there were prior executive

25   orders executed by the Governor on immigration prior to 2023.

1  Q.  If looking at the executive order, if you were to look at

2  it, would it help you to remember when it was signed?

3  A.  It would show me, sure.

4      I don't recall the question, though.

5      THE COURT:  Counsel wants to know if it would refresh

6  your memory as to the date.

7      MS. BURKHARDT:  Your Honor, we are bringing up State's

8  Exhibit 7.

9      THE COURT:  Okay.

10     (Defense Exhibit 7 was marked for identification.)

11     MS. BURKHARDT:  And if we could scroll to the last

12 page, I believe that's where the date is.

13 BY MS. BURKHARDT:

14 Q.  Director Kerner, do you recognize this document?

15 A.  Yes, I do.

16 Q.  And do you see where it states above Governor DeSantis's

17 signature that it was signed in 2023, January 2023?

18 A.  I see that, yes.

19 Q.  And when was the 287(g) agreement signed with DHS and ICE,

20 the one with FHP?

21     MS. BURKHARDT:  And we can take this down, thank you.

22     THE WITNESS:  I would defer to the best evidence, which

23 is the document itself.

24 BY MS. BURKHARDT:

25 Q.  And would you dispute if the document said that you signed

App. 849

1    it in February of 2025?

2    A.   No, I would not.

3    Q.   So, why was there a two-year delay from Governor DeSantis's

4    declaration of an emergency at the border in Texas or at the

5    border, I believe is what it says, and the signing of the

6    287(g) agreement?

7    A.   Generally speaking, because President Biden would not allow

8    State and local law enforcement to enter into these agreements.

9    Q.   So the State's immigration activities are dependent on

10   Federal policy?

11   A.   Not entirely, no.

12   Q.   But in this case, it was dependent on President Biden?

13   A.   It was dependent upon the secretary being given the

14   authority to delegate those authorities to us, which I would

15   assume would come from the president of the United States.

16   Q.   When you say secretary, you mean the secretary of DHS?

17   A.   Yes.

18   Q.   Now, under the 287(g) agreement, State troopers are

19   arresting, or they have the authority to apprehend people who

20   are allegedly removable.  Correct?

21   A.   They have the authority to enforce portions of Title 8 law,

22   yes.

23   Q.   And this would include people who are undocumented.

24        Yes?

25   A.   Yes.

```
1   Q.  Now, Director Kerner, you testified that you are an

2   immigration task force officer.

3       Yes?

4   A.  Yes.

5   Q.  And you also mentioned that you were formerly an elected

6   official in Florida.  Correct?

7   A.  Yes.

8   Q.  And you were also a police officer, are, were?

9   A.  I was, yes.

10  Q.  So, it's safe to say that with your background and current

11  role, you do have an understanding of immigration issues in

12  Florida?

13  A.  I believe so.

14  Q.  So, isn't it true that many people who are undocumented in

15  Florida are agricultural workers?

16  A.  I would assume so.

17  Q.  They might work in the construction industry?

18  A.  I think they can work in all facets of every profession.

19  Q.  So it's not the case that people are being detained for

20  violent crimes.  It might just be that they are undocumented?

21      MR. PANUCCIO:  Objection, Your Honor.  This is the same

22  type of general testimony that I was prevented from eliciting.

23  It is not tying back to the facility.  I was told you have to

24  tie this to the facility, not generally in the State.

25      THE COURT:  So, tie your question to are agricultural
```

1    and construction workers being held at TNT facility.

2    BY MS. BURKHARDT:

3    Q.  Director Kerner, you testified on direct that some people

4    at the TNT sites have criminal records?

5    A.  I don't recall testifying to that directly.  I know I gave

6    some examples of some of the crimes we have uncovered as part

7    of our enforcement efforts, and that those detainees would

8    eventually make it to Alligator Alcatraz or TNT.

9    Q.  So, it would follow, then, that people who are also

10   detained at the TNT Site, do not have criminal records?

11   A.  I don't know if that's true or not.

12   Q.  Isn't it true that not everyone in removal proceedings

13   needs to be detained?

14        MR. PANUCCIO:  Objection.

15        THE COURT:  Overruled.

16        THE WITNESS:  No, I believe they do.

17   BY MS. BURKHARDT:

18   Q.  The people previously would be able to obtain something

19   like supervised release or bond if they had removal

20   proceedings?

21   A.  Okay.  So, we are speaking about the Federal Government's

22   decision to not detain people?  I'm not clear on what your

23   question is.

24   Q.  My question is, if someone has an immigration violation,

25   they are here illegally, they don't necessarily have to be

1   detained while their case is being resolved.

2        Would you agree with that?

3        MR. PANUCCIO:  Objection.

4        THE WITNESS:  I don't have any knowledge of that.  I

5   just know that when we encounter somebody that is here

6   unlawfully that we are empowered and do take them into custody.

7        THE COURT:  But you mentioned Title 8 a few moments

8   ago.  Are you aware of any provision of Title 8 that allows for

9   bond for undocumented noncitizens.

10        THE WITNESS:  I really do not.  To be candid, no.

11        MS. BURKHARDT:  Your Honor, may I have a moment?

12        THE COURT:  Yes.

13   BY MS. BURKHARDT:

14   Q.  Director Kerner, are you aware that the State evacuation

15   plan for the TNT facility involves relocating detainees at that

16   site to State and county facilities?

17        MR. PANUCCIO:  Objection.  Outside the scope of direct.

18   Relevance.

19        MS. BURKHARDT:  Your Honor, if I may.

20        THE COURT:  Well, relevance, but I don't think the

21   director -- I don't think the director has testified he has any

22   expertise or awareness of the State emergency procedures.  I

23   think that would be the FDEM.  That would be Mr. Guthrie, I

24   assume.  Let me stop rambling.

25        Do you have an awareness of --

 1          THE WITNESS:  Not specifically, no.

 2          THE COURT:  Okay.  Well, then, let's move on.

 3          MS. BURKHARDT:  Your Honor, the last thing would be

 4    that we would just be moving to admit State's Exhibit 7.  That

 5    would be on the Executive Order 23-03 that we pulled up.

 6          MR. PANUCCIO:  No objection.

 7          THE COURT:  All right.  State's 7 is also admitted.

 8          (Defense Exhibit 7 was admitted in evidence.)

 9          MS. BURKHARDT:  Thank you, Your Honor.  No further

10    questions.

11          THE COURT:  Okay.

12          MR. FRIEDMAN:  May I?

13          THE COURT:  Yes, of course.

14          Director, do you have water?  Do you need water?

15          THE WITNESS:  Your Honor, I would take water if it was

16    offered.  Thank you.

17          MR. PANUCCIO:  Your Honor, I have a fresh bottle.

18          THE COURT:  Did you, like, take it from somebody?

19          MR. PANUCCIO:  Well, it was on our table.  It's one of

20    ours.

21          THE COURT:  Okay.

22          THE WITNESS:  Thank you, sir.

23          THE COURT:  Stealing other people's water.  That's just

24    low.

25                          CROSS-EXAMINATION

1    BY MR. FRIEDMAN:

2    Q.   Director Kerner, my name is Todd Friedman.  I represent the

3    Miccosukee Tribe.

4    A.   Yes, sir.

5    Q.   How are you doing?

6    A.   Very well, sir.  How are you?

7    Q.   The detention facility at the jetport, is that a temporary

8    facility or a permanent facility?

9    A.   I really couldn't speak to that.  I think that's more of a

10   question that pertains to things outside of my awareness.

11        For right now, it's permanent but if the Federal detention

12   capabilities don't increase at some point in the future, then

13   it's going to be a permanent facility.

14   Q.   And there are tents on-site?

15   A.   I don't know if I would describe them as tents.  They are

16   soft-sided facilities.

17   Q.   What would you describe them as?

18   A.   Soft-sided facilities.  I mean, they are pretty robust in

19   many ways but they are not concrete walls.

20   Q.   Okay.  Soft-sided is made out of what?

21   A.   I don't know.

22   Q.   Okay.  Do you know what the, if you will, the skeleton of

23   the structure is made out of?

24   A.   I don't.

25   Q.   Okay.  So, is it fair to say that you don't know whether or

App. 855

1    not the facilities at the jetport are permanent or temporary?

2    A.   Are we talking about the detention facilities or the

3    preexisting structure at the jetport?  I mean, it's a pretty

4    expansive facility.

5    Q.   Fair enough.

6         Is the detention facility at the jetport, is it fair to say

7    that you don't know whether those facilities are permanent or

8    temporary?

9    A.   Can you define the permanent and temporary?

10             THE COURT:  I think he is asking you to.

11             THE WITNESS:  I don't know how long it would take for

12   those items to be past their useful life to need to be

13   replaced.

14   BY MR. FRIEDMAN:

15   Q.   Okay.  Were you involved in looking at potential sites for

16   the detention facility that ultimately was constructed at this

17   jetport?

18             MR. PANUCCIO:  Objection.  Outside the scope of direct.

19             THE COURT:  Overruled.

20             THE WITNESS:  I was involved in looking at one site.

21   BY MR. FRIEDMAN:

22   Q.   Which site was that?

23   A.   TNT.

24   Q.   So that's the only site you looked at?

25   A.   The only site that I looked at, yes.

1    Q.   Okay.  So, you have no knowledge of whether there are

2    alternative suitable sites for this detention facility?

3    A.   I just know that that site was ideal.

4    Q.   Okay.  But you don't know if there is another ideal site

5    out there in the great State of Florida?

6    A.   I don't.

7          MR. FRIEDMAN:  Okay.  Nothing further.  Thank you.

8          THE COURT:  Thank you.

9          Any other -- just checking.

10          Redirect, Mr. Panuccio.

11          MR. PANUCCIO:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13   BY MR. PANUCCIO:

14   Q.   Thanks for sticking with us, Director Kerner.

15          Just a few questions here on redirect.  Let's start with

16   what you were just speaking to.

17          You don't run the TNT detention facility.  Correct?

18   A.   No, sir.

19   Q.   So you don't personally know whether the State's ultimate

20   plans for it are permanent or temporary?

21   A.   Correct.

22   Q.   But it was -- in your knowledge, it was constructed in

23   response to the Governor's emergency declaration?

24          MS. BURKHARDT:  Objection.  Leading.

25          THE COURT:  Overruled.

 1          THE WITNESS:  I think it was constructed more in line

 2     with our exceeding Federal capacity and needing a place to put

 3     detainees.

 4     BY MR. PANUCCIO:

 5     Q.  You said that the site was ideal.  Why was it ideal or why

 6     is it ideal?

 7     A.  It's not easily accessible by the public.  It's a detention

 8     facility so it's not easily -- it's far removed, I think, first

 9     and foremost, and it has a very long runway which is a very

10     critical piece of the deportation process.

11     Q.  FDEM, you were asked about FDEM and its role.  Generally,

12     FDEM is the coordinator of all State agencies during a state of

13     emergency.  Correct?

14     A.  They are by statute, yes, sir.

15     Q.  So it's typical for multiple State agencies to work with

16     FDEM in an emergency?

17     A.  It's required.  There is an ESF function called the

18     Emergency Support Function that is activated during an

19     emergency and the whole of government, both State and local,

20     will operate within that ESF.

21          For example, law enforcement is under ESF 16, and we will

22     have from municipal agencies all the way to the Florida Highway

23     Patrol and FDLE within that group, and we are coordinated by

24     FDEM, whatever the emergency is.

25     Q.  You testified that you have a -- your department has a

1    287(g) agreement with the Federal Government.

2         Who pays the salaries of your State troopers?

3    A.   Florida taxpayers.

4    Q.   So the State?

5    A.   Yes, sir.

6    Q.   Is that true even when they are exercising 287(g)

7    functions?

8    A.   Yes, sir.

9    Q.   Who buys their uniform?

10   A.   The State.

11   Q.   And who is responsible for hiring those troopers?

12   A.   I am.

13   Q.   The State?

14   A.   Yes.

15   Q.   Or you exercising the functions of the State?

16   A.   Yes.

17   Q.   And for firing those officers?

18   A.   Same.

19   Q.   And for disciplining those officers?

20   A.   Same.

21   Q.   Who sets the work hours for your troopers?

22   A.   It's consistent with the collective bargaining agreement

23   but, generally, the management leadership does.

24   Q.   And that collective bargaining agreement, is that signed by

25   the Federal Government?

1  A.  No, sir.

2  Q.  Who is it signed by?

3  A.  Representatives of the Department and representatives of

4  the union.

5  Q.  And who manages the day-to-day assignments of the State

6  troopers?

7  A.  The chain of command, but within the Department, the State

8  does.

9  Q.  That's true even if they are exercising 287(g) functions?

10  A.  Yes, sir.

11       MR. PANUCCIO:  No further questions, Your Honor.

12       THE COURT:  All right.  Thank you, Director Kerner, for

13  your patience.  You may step down.

14       THE WITNESS:  Thank you, Your Honor.

15       (Witness excused.)

16       THE COURT:  All right.  If I'm not mistaken, that was

17  our sole witness for the afternoon.

18       Is that correct?

19       MR. PANUCCIO:  That is correct, Your Honor, and I

20  believe --

21       MR. SCHWIEP:  We have a couple of exhibits, actually

22  four, that we need to talk about.

23       THE COURT:  Okay.  Here is what we will do for the time

24  being.  We will take a five-minute break.

25       We will go until five or so.  We are coming back

1    tomorrow.  Mr. Panuccio, ten worked out best with Brightline.

2         MR. PANUCCIO:  That was helpful, Your Honor, yes.  But

3    I can be here when the Court needs so.

4         THE COURT:  And our Federal compatriots, any flights

5    tomorrow that are going to be problematic?

6         MR. GUSTAFSON:  Your Honor, if we begin in the morning,

7    I think we will be fine.  Thank you.

8         THE COURT:  All right.  Then let's take five minutes

9    now, we will back and talk about additional exhibits and time

10   for any closing remarks and the like.

11        MR. PANUCCIO:  Thank you, Your Honor.

12        COURT SECURITY OFFICER:  All rise.

13        (Recess taken.)

14        COURT SECURITY OFFICER:  All rise.

15        THE COURT:  Please be seated.

16        Okay.  We can go until 5:00 today, actually, probably

17   5:15.  Before I forget, though, because it's fresh in my mind

18   and I've got all these different exhibit lists, the director

19   testified that there were three different facilities, an ICE

20   facility or a local facility that was operating under a BOA or

21   an intergovernmental agreement, but if it didn't have those

22   two, it was ICE.

23        Do I have that agreement for this facility in one of

24   these exhibit lists?

25        MR. GUSTAFSON:  Your Honor, there is no agreement for a

App. 861

1  facility.  These 287(g) agreements pertain to agencies and

2  personnel, but they don't pertain to this facility.

3       THE COURT:  Right.  I could be wrong.  I'll get the

4  transcript but that's what the director said, it was an ICE

5  facility or it was a facility with one of those two agreements

6  and so, I don't have one of those two agreements.

7       Do I have the 287(g) for this facility and DHS?

8       MR. SCHWIEP:  We haven't seen it, Your Honor, but we

9  have admitted into evidence Exhibit 106, which is the White

10  House Policy Advisor for Homeland Security Stephen Miller

11  saying that this is an ICE facility.  That's Plaintiffs'

12  Exhibit 106.

13      MR. PANUCCIO:  Your Honor, if I may, the 287(g)

14  agreements are between state law enforcement agencies and DHS,

15  not the facility itself.  So, the facility, you know, our

16  position is, is a State-constructed facility and there are

17  State law enforcement agencies operating there pursuant to

18  287(g) agreements, but there is not an agreement for the

19  facility itself, if that's what Your Honor is asking.

20      THE COURT:  Right.  Well, I was, but not for the

21  facility and who -- who is the on-site director of operations

22  because I want to make sure I got the 287(g) for the

23  operational component?  Who is the warden?

24      MR. PANUCCIO:  Again, it depends who you are talking

25  about because there are different things.

App. 862

1          The Department of Emergency Management is the

2     coordinator when the governor declares a state of emergency, so

3     they have a coordinating role there.  They generally coordinate

4     operations at the facility.  The detentions are pursuant to

5     287(g) agreements with multiple State of Florida law

6     enforcement agencies.

7          THE COURT:  Right.  You don't know who's the head

8     honcho out there?

9          MR. PANUCCIO:  Depends for what question, Your Honor.

10          THE COURT:  Well, I would imagine any question.  In any

11     agency, there is going to be a person where the buck stops.

12     So, who is it out there or is it a communal type of democratic

13     situation where everybody has equal voice and agency?

14          MR. PANUCCIO:  Well, I believe detention decisions are

15     made by, ultimately -- the decision to detain someone is the

16     Federal Government.  The operation of the facility is being

17     coordinated by FDEM.  Kevin Guthrie is the head of FDEM.

18          THE COURT:  But he is not out there right now.  He is

19     not out there at night.  There is somebody who goes to work

20     every day and is the director, the warden.

21          MR. PANUCCIO:  Oh, the single person.  I don't know the

22     name of that individual, Your Honor.

23          THE COURT:  Can I get that, please, so I know if that

24     person and his cohorts are under a 287(g)?

25          MR. PANUCCIO:  I can ask our client, Your Honor.

App. 863

1          THE COURT:  All right.  Where do you want to start,

2   Mr. Schwiep?

3          MR. SCHWIEP:  A couple of things.  One, we do have some

4   exhibits as to which there isn't an agreement that we admitted

5   -- I'm saying a couple, but it's four -- and those are on our

6   initial exhibit list, that's DE 81.  It was filed August 1st,

7   and the numbers on the left-hand column are 47, 48, 49.

8          THE COURT:  You know, I think this is all going to go

9   much easier if you give me something, if you give me a final

10  list of what it is that has been agreed to and admitted and

11  then we can talk about what you'd like admitted and what the

12  other side has an objection to.  Now, is that what we are

13  speaking of now, an objected-to exhibit?

14         MR. SCHWIEP:  Yes, and we are down to those four.  They

15  all fall into the same bucket.

16         THE COURT:  All right.

17         MR. SCHWIEP:  They are --

18         THE COURT:  You are going to have to give me a second

19  to find your bucket.

20         All right.  So it's Plaintiffs' 81?

21         MR. SCHWIEP:  No, 47.

22         THE COURT:  Plaintiffs' 47, a letter.

23         MR. SCHWIEP:  Yes, Your Honor, a June 23rd letter from

24  the Miami-Dade County mayor to Director Guthrie.

25         48 is another letter from the Miami-Dade County mayor

App. 864

1    to Director Guthrie.  It's dated July 7th.

2         49 is also a letter from the Miami-Dade County mayor to

3    the State, and then 58 is another letter from the mayor to the

4    State.

5         The county, Miami-Dade County has stipulated to the

6    authenticity and the State Defendant has a hearsay objection to

7    those four letters, which I can address.

8         We don't believe it is hearsay because it is a public

9    record.  Under 803.8 it should come in.  It reflects the

10   mayor's official acts.  There is no reason to question its

11   trustworthiness and the authenticity has been stipulated to.

12        THE COURT:  Okay.  And objection from the State?

13        MR. PANUCCIO:  Well, we have a hearsay objection, Your

14   Honor.  There is -- I assume they're submitting it for the

15   truth of the matter asserted in the letters.

16        We also have a relevance objection.  There has been no

17   explanation of what the relevance of letters from the mayor of

18   Miami have to do with this NEPA case.

19        THE COURT:  Well, they own the land, so that's kind of

20   relevant, and I think it's not only a public record but it

21   could represent between Mr. Guthrie and the mayor party

22   admissions because they are defendants to the case.

23        So, I'm going to allow, under those various theories,

24   47, 48, 49 and 58.

25        (Plaintiffs' Exhibit 47 was admitted in evidence.)

App. 865

```
 1              (Plaintiffs' Exhibit 48 was admitted in evidence.)

 2              (Plaintiffs' Exhibit 49 was admitted in evidence.)

 3              (Plaintiffs' Exhibit 58 was admitted in evidence.)

 4          THE COURT:  Does that take care of your submissions,

 5   Mr. Schwiep?

 6          MR. SCHWIEP:  That concludes our evidentiary

 7   presentation, Your Honor.

 8          THE COURT:  For the Tribe?

 9          MR. AJIZIAN:  Yes, Your Honor, we have the three

10   declarations of the Tribe's witnesses who didn't testify today.

11          THE COURT:  Okay.

12          MR. AJIZIAN:  For purposes of the exhibit list, Docket

13   Entry 111 has all of the Tribe's exhibits on it.

14          THE COURT:  Great.

15          MR. AJIZIAN:  Those are Exhibit Numbers 1, 3, 4, and 5.

16          THE COURT:  No, Mr. Bozas testified.

17          MR. AJIZIAN:  Yes, sorry.  1, 4 and 5.

18     (Tribe's Exhibits 1, 4 and 5 were marked for identification.)

19          THE COURT:  Right.  Is that part of the agreement that

20   all parties have reached about varying declarations from the

21   parties?

22          MR. AJIZIAN:  My understanding is the parties all have

23   an agreement that any declarations for witnesses who did not

24   testify live will go in, and then cross-examination exhibits

25   that the parties intended to use for those witnesses will also
```

1    go in without objection.

2            THE COURT:  Okay.

3            MR. SCHWIEP:  And I don't think there is any dispute

4    about this, the declaration of Mr. Kerner is not included since

5    he testified live.

6            THE COURT:  Correct, that seems to be what -- you've

7    agreed to the declarations of those persons who did not testify

8    live and you agreed to the cross-examination documents for

9    those persons who submitted via declaration.

10           MR. SCHWIEP:  Yeah.  That's correct, Your Honor, with

11   one asterisk is, for some of the witnesses that testified live,

12   for instance, Ms. Samples, the defendants introduced her

13   declaration and it was admitted, so that should be included.

14           THE COURT:  Oh, okay.  Well, if it came in through the

15   course of the -- then that's fine.

16           Is that your understanding, Mr. Panuccio?

17           MR. PANUCCIO:  Yes, Your Honor.

18           THE COURT:  All right.  So, yes, they will be at

19   admitted.

20           (Tribe's Exhibit 1 was admitted in evidence.)

21           (Tribe's Exhibit 4 was admitted in evidence.)

22           (Tribe's Exhibit 5 was admitted in evidence.)

23           MR. AJIZIAN:  Do you want to hear the cross-examination

24   exhibits or we can submit that to Your Honor in a separate --

25           THE COURT:  Yeah, why don't you -- if there is an

App. 867

1    agreement to it, why don't you submit it separately, give

2    opposing counsel time to look at it to confirm that, yes, this

3    is what we talked about, and then I can have a full record.

4            MR. AJIZIAN:  Understood.

5            For the record, I'm just going to read out the Tribe's

6    cross-examination exhibits are 9, 10, 12 through 15 and 19

7    through 21.

8    (Tribe Exhibit 9 was marked for identification.)

9    (Tribe Exhibit 10 was marked for identification.)

10   (Tribe Exhibit 12 was marked for identification.)

11   (Tribe Exhibit 15 was marked for identification.)

12   (Tribe Exhibit 19 was marked for identification.)

13   (Tribe Exhibit 21 was marked for identification.)

14           THE COURT:  9, 10, and 19 through 21.

15           THE COURT STENOGRAPHER:  Also 15, Judge.

16           THE COURT:  Oh, yes.  Thank you.

17           All right.  Mr. Panuccio.

18           MR. PANUCCIO:  We just want to move our declarations in

19   by exhibit number.

20           My colleague, Mr. Costello is going to do that.

21           MR. COSTELLO:  Yes, Your Honor.  Those are Exhibit

22   Numbers 31 --

23           THE COURT:  Wait, wait, I'm looking.  It's somewhere up

24   here.  And it's --

25           MR. COSTELLO:  These are defense exhibit numbers.

App. 868

1          THE COURT:  Okay.

2          MR. COSTELLO:  And that's 31.

3          THE COURT:  I got it.

4          MR. COSTELLO:  31, 32, 60, 62, 63, 30, 44, and

5    Plaintiffs' Exhibit 4, the Pruett declaration.

6          THE COURT:  Pruett?

7          MR. COSTELLO:  Yes, it's Keith Pruett and then, of

8    course, all exhibits attached thereto.

9          (Defense Exhibit 31 was marked for identification.)

10         (Defense Exhibit 32 was marked for identification.)

11         (Defense Exhibit 60 was marked for identification.)

12         (Defense Exhibit 62 was marked for identification.)

13         (Defense Exhibit 63 was marked for identification.)

14         (Defense Exhibit 30 was marked for identification.)

15         (Defense Exhibit 44 was marked for identification.)

16         (Plaintiffs' Exhibit 4 was marked for identification.)

17         THE COURT:  Thank you, Mr. Costello.

18         MR. SCHWIEP:  I suppose for the record I should do the

19   same for the plaintiffs.

20         The declaration of Ms. Betty Osceola, which is

21   Plaintiffs' Exhibit 10; the declaration of Kurt Bradley, which

22   is Plaintiffs' Exhibit 87; the declaration of Miranda Daviduk,

23   which is Exhibit 44; the declaration of Cooper Kass, which

24   is --

25         THE COURT:  That already came in.

App. 869

 1          MR. SCHWIEP:  Yes, Your Honor, I believe so.  I'm just

 2    going through the declarations just to make sure I've got all

 3    my I's dotted and T's crossed.

 4          THE COURT:  Okay.

 5          MR. SCHWIEP:  144 is Cooper Kass.  That's on our

 6    supplemental list.  146 is Kinnebrew declaration.  And then

 7    144 -- oh, I just mentioned that.  I think that's it.

 8          Oh, Plaintiffs' Exhibit 2, which is a declaration of

 9    Tierra Curry.

10          THE COURT:  Right.

11          Okay.  All right.

12    (Plaintiffs' Exhibit 10 was marked for identification.)

13    (Plaintiffs' Exhibit 87 was marked for identification.)

14    (Plaintiffs' Exhibit 44 was marked for identification.)

15    (Plaintiffs' Exhibit 144 was marked for identification.)

16    (Plaintiffs' Exhibit 146 was marked for identification.)

17    (Plaintiffs' Exhibit 2 was marked for identification.)

18          MR. GUSTAFSON:  Your Honor, we would also move for the

19    admission of Federal Defendant's Exhibit 7, which is the

20    Santiago Fuentes exhibit as well as the exhibit of Giles, which

21    is Exhibit 1 to Docket Entry 21-1 and 21-2.

22          THE COURT:  Is there an updated?

23          MR. GUSTAFSON:  I'm sorry, Your Honor?

24          THE COURT:  I thought there was an updated something

25    filed today but maybe it was the State.

App. 870

1          MR. GUSTAFSON:  That's the one I led with, Your Honor.

2     That's Exhibit 7, the Santiago Fuentes exhibit that was filed

3     today.

4          THE COURT:  Okay.

5     (Defense Exhibit 7 was marked for identification.)

6          THE COURT:  All right.  So, how long -- go ahead,

7     Mr. Schwiep.

8          MR. SCHWIEP:  Your Honor, you may have been

9     anticipating where I was going, which is with respect to how to

10    proceed from this point forward, because I think at this point

11    everyone's evidence is in.  I mean, we were, frankly, quite

12    surprised that the State elected not to call

13    Mr. Gadea-Guidicelli, I think that's how to pronounce his name,

14    and the Federal Government didn't call Mr. Fuentes.

15         I think the Court needs to evaluate, when looking at

16    those declarations, what weight to give them, given that those

17    witnesses didn't appear to be cross-examined, and with respect

18    to the declaration of Mr. Gadea-Guidicelli, it's just

19    significant hearsay, including he talks about what he was told

20    from folks that were on the site before he got there, what he

21    learned when he learned some report about flight information.

22    He even purports to talk about photos that he claims he took,

23    this is Composite Exhibit 5 of his declaration, but when you

24    look at the photos, they are just from Google Earth.

25         So, we don't think there is a lot of evidentiary value

1    there, and I think -- whatever would be helpful to the Court to

2    resolve.  It's a pretty large record.  There is almost two days

3    of testimony, lots of exhibits.  We are prepared to proceed in

4    whatever fashion is convenient and will assist the Court in

5    resolving the issues.

6        What I was going to suggest is that you give the

7    parties a little time to get the transcripts to go through the

8    exhibits.

9        The Court has to enter findings under Rule 52, I think

10   it's (a)(2) or (b)(2) because it's an injunction hearing, and

11   that we be afforded an opportunity to present proposed findings

12   and conclusions on an expedited basis.

13       MR. PANUCCIO:  Your Honor, if I may.

14       THE COURT:  Yes.

15       MR. PANUCCIO:  We had an agreement to admit the

16   declarations.  Of course, everything my friend just said about

17   any declaration is equally true of any declaration they have

18   put in without having the witness cross-examined.

19       But be that as it may, Your Honor, we are prepared to

20   proceed to closing tomorrow.  We have closing ready to go, and

21   then these proceedings would be over and we would look forward

22   to the Court's ruling.

23       We don't think that -- the briefing has been extensive,

24   Your Honor.  They have submitted multiple, I think we are up to

25   three briefs already from the plaintiffs on the merits.

1      We are content to close.  The closings can be long, but

2    we are prepared to present our closing on the law and facts

3    tomorrow, Your Honor.

4          MR. GUSTAFSON:  Your Honor, the Federal Defendants

5    agree that oral argument is the way to go here.  We wouldn't be

6    served by further briefing on this matter.

7          THE COURT:  Okay.  How long?

8          MR. PANUCCIO:  Well, I suppose that's up to the Court's

9    indulgence.

10          THE COURT:  Well, it always is up to the Court, but if

11    you tell me it's going to be six hours, I'm going to tell you

12    absolutely not.

13          Let's start negotiating.

14          MR. PANUCCIO:  Honest, I think I would be somewhere

15    close to, speaking for me, maybe increased by 25 percent of

16    where I was on the TRO.  I think I was about 20 to 30 minutes

17    on that.

18          THE COURT:  So an hour.

19          MR. PANUCCIO:  Yeah, right.

20          THE COURT:  And an hour for the Federal Defendants.

21          MR. GUSTAFSON:  I would say no more than that.

22          THE COURT:  The Tribe?

23          MR. AJIZIAN:  I can't imagine taking an hour, but let's

24    budget for 45 minutes.

25          MR. SCHWIEP:  And that's fine, Your Honor, we might do

App. 873

1    like 45 minutes and reserve 15 for rebuttal.

2         THE COURT:  Okay.  All right, then.

3         MR. SCHWIEP:  One scheduling note, because my colleague

4    Mr. Hiaasen is on vacation, I've got a case management

5    conference tomorrow at 8:30 with Judge Rebull.  It shouldn't

6    take long, but I do need to cover that.

7         THE COURT:  We are not going to start -- I think we

8    agreed that the Brightline, the ten o'clock time.  Would you

9    need a little longer than that?

10        MR. PANUCCIO:  I was going to say, Your Honor, if you

11   prefer, it sounds like this is about a three-hour argument in

12   total, and we may not even want get there.

13        So if Your Honor wanted to start after lunch, that's

14   still also okay with us, we would still get out normal time.

15        Whatever Your Honor wants, but if you want 10:00,

16   11:00, any of that is fine by me.

17        THE COURT:  Just saying you-all aren't accurate when it

18   comes to time, you will just have to indulge me a little in my

19   skepticism.

20        MR. PANUCCIO:  This is counsel argument, so it's

21   probably a little more closely controlled.

22        THE COURT:  Well, you never know.

23        Tell me what time, Mr. Schwiep, would give you a moment

24   to breathe.

25        MR. SCHWIEP:  Well, if we start at 10:00 that should be

App. 874

1    sufficient.

2          THE COURT:  Well, you know what, let's go crazy, 10:30

3    and I will monitor accordingly.

4          All right.

5          MR. SCHWIEP:  One final issue, Your Honor.

6          THE COURT:  Yes.

7          MR. SCHWIEP:  And I raise this reluctantly, but it's

8    important.

9          We have gotten -- as everyone knows, we've got clients

10   that are very invested on what's happening on that site, that

11   are camped out and observing vehicles coming in and out.

12         We got reports that there was additional of those

13   Sunbelt lightings being delivered to the site today, I've got

14   the photos, and that there was additional fencing materials

15   being delivered to the site today.

16         Looking at your temporary restraining order, I think

17   the positioning of equipment on the site isn't a problem.  We

18   just want to be assured that everyone on the defense side

19   understands that none of that should be built, constructed or

20   put up while the TRO is in place.

21         THE COURT:  It seems readily apparent from not only

22   this hearing last week, but the order.  So maybe it's -- I

23   don't know.

24         What say you, Mr. Panuccio?

25         MR. PANUCCIO:  Your Honor, we have the order.  We

App. 875

1    understand that the order has been conveyed.  I think the

2    defendants understand the order and are abiding by it.

3          I haven't heard anything that my colleague said that

4    violates the order.

5          THE COURT:  Any other matters before we recess for

6    tomorrow's closing argument?

7          I did -- this does need to be resolved, I think, in a

8    fairly efficacious manner and I appreciate the Defense position

9    about the closing.

10          So I was wondering, though, does that include a site

11    visit because I was invited, so I didn't hear anybody repeat

12    that today, but if the site visit -- you know, the marshals

13    have asked me not to talk about a time and place, but I -- you

14    know, if that is going to be part of this, then it has to be

15    done soon, so I just wanted to know.

16          MR. SCHWIEP:  Judge, the plaintiffs had requested an

17    opportunity for a site visit and that was denied, and your

18    order provided some limited expedited discovery.

19          Based on the events at last week's hearing, we renewed

20    that request.

21          THE COURT:  No, no, I was invited by the Attorney

22    General to visit the site.  I just wanted to know was that

23    contemplated within this week?

24          MR. SCHWIEP:  Not by the plaintiffs, Your Honor.

25          MR. PANUCCIO:  I'm sorry, Your Honor, I'm just not

App. 876

1    aware of the invite you are referring to.

2         THE COURT:  On August 8th, Mr. Uthmeier invited the

3    judges to visit the facilities as part of an interview he had

4    critiquing the order.  So, I'm ready, and the marshals are

5    ready, for the escort.  I just wanted to know if you

6    contemplated that for this week or not because --

7         MR. PANUCCIO:  We don't contemplate it for this case at

8    all, Your Honor.  This is a NEPA case.  A site visit is not

9    relevant to the case.

10        THE COURT:  Then why did the Attorney General ask me to

11   come?

12        MR. PANUCCIO:  I don't know which judges.  There are

13   multiple cases, Your Honor.  I don't know what he was referring

14   to.  It was also not in this court.  That was not admitted into

15   evidence in this court, Your Honor.  I think the presentation

16   of evidence has closed.  The plaintiffs have rested, and this

17   case is ready to proceed to a decision on the preliminary

18   injunction motion.

19        MR. SCHWIEP:  Judge, our position is if the Court

20   believes that it would assist the Court in a just and fair

21   resolution of this dispute, then we are not going to object,

22   obviously.  The only thing we would request is that we be

23   permitted to attend with Your Honor during any site visit.

24        THE COURT:  Well, of course you would attend because

25   that is how this works, but it appears that Mr. Uthmeier

App. 877

1    doesn't understand how this works and was -- what was that we

2    used in the other case, Mr. Panuccio, was engaging in puffery

3    when he said specifically, "I invite the judges to come visit

4    the facility."

5         So, clearly, he knew there is two of us with cases, and

6    this is part of the discussion, what's being trucked in today,

7    but my query was, in time for resolution, had the parties set

8    out a time?  I did.  I'm ready to go this week.

9         MR. PANUCCIO:  Your Honor, this is the first time this

10   is being brought up after the close of evidence.  It has not

11   been submitted into evidence.  The plaintiffs have rested.

12        THE COURT:  Okay.

13        MR. PANUCCIO:  Another case that has nothing to do with

14   this case, we object to that being brought up here, Your Honor.

15        This is a NEPA case.

16        THE COURT:  Oh, no distinction was made between the

17   cases.  It was an all-encompassing invitation, but I get your

18   meaning, Mr. Panuccio, the Attorney General had no intention of

19   allowing us out to the site, so I won't set aside time.

20        MR. SCHWIEP:  Judge, we would renew our request.  We

21   did request a site visit.  We requested it expedited

22   consideration of the site visit.  We renewed that request.

23        Our witnesses are being faulted for the lack of

24   information they have about what's actually occurring on the

25   site.  Meanwhile, we're not permitted access.

App. 878

```
 1              THE COURT:  Well, me, too, actually, it would appear,
 2    but no, I took it as a sincere request and it's not.
 3              So, okay.
 4              All right.  I will see everybody back here at 10:30.
 5              COURT SECURITY OFFICER:  All rise.
 6              (The proceedings were concluded at 4:55 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

App. 879

```
 1                  C E R T I F I C A T E

 2

 3            I hereby certify that the foregoing is an

 4    accurate transcription of the proceedings in the

 5    above-entitled matter.

 6

 7
      August 18, 2025       /s/Patricia Diaz_____
 8    DATE                  PATRICIA DIAZ, RPR, FPR, FCRR
                            Official Court Reporter
 9                          United States District Court
                            400 North Miami Avenue, Eleventh Floor
10                          Miami, Florida 33128
                            (305) 523-5178
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**'**

---

**'60s** [1] - 149:23

---

**/**

---

**/s/Patricia** [1] - 247:7

---

**0**

---

**025504** [1] - 2:25

---

**1**

---

**1** [9] - 1:8, 1:17, 208:18, 209:21, 233:15, 233:17, 233:18, 234:20, 237:21
**1,000** [1] - 76:23
**1,800** [1] - 181:25
**1,850** [1] - 182:1
**1,982** [1] - 181:25
**1-111** [1] - 13:17
**10** [12] - 5:3, 5:4, 5:4, 5:5, 5:5, 5:9, 208:9, 235:6, 235:9, 235:14, 236:21, 237:12
**106** [2] - 229:9, 229:12
**108** [1] - 178:4
**10:00** [4] - 1:6, 94:20, 241:15, 241:25
**10:30** [2] - 242:2, 246:4
**11** [1] - 212:18
**11-Mile** [2] - 29:13, 30:3
**1101** [1] - 2:4
**111** [2] - 43:25, 233:13
**115** [1] - 178:5
**11:00** [1] - 241:16
**11th** [1] - 3:4
**12** [4] - 1:5, 4:4, 235:6, 235:10
**1200** [2] - 2:10, 49:8
**12:15** [1] - 94:17
**12:30** [1] - 92:5
**13** [2] - 5:14, 49:14
**14** [2] - 5:14, 5:15
**144** [4] - 5:10, 237:5, 237:7, 237:15
**145** [2] - 4:8, 178:5
**146** [4] - 5:11, 178:6, 237:6, 237:16
**146-158** [2] - 5:6, 178:9
**147** [1] - 4:9
**15** [6] - 5:15, 123:5,

235:6, 235:11, 235:15, 241:1
**150** [1] - 2:21
**158** [1] - 178:6
**16** [3] - 5:15, 86:5, 225:21
**167** [1] - 4:9
**169** [1] - 4:8
**16th** [1] - 49:7
**17** [1] - 5:15
**178** [2] - 5:6, 5:6
**18** [1] - 247:7
**18,000** [1] - 47:16
**18.6** [2] - 144:6, 145:6
**180** [1] - 4:12
**19** [15] - 12:12, 31:19, 31:21, 32:15, 32:23, 33:11, 33:13, 64:10, 71:3, 75:18, 85:25, 235:6, 235:12, 235:14
**193** [3] - 56:9, 57:13, 57:21
**193-194** [2] - 5:17, 57:16
**194** [2] - 57:8, 57:13
**1960s** [1] - 151:2
**1:15** [1] - 95:14
**1st** [1] - 231:6

---

**2**

---

**2** [15] - 5:11, 5:14, 13:4, 13:5, 13:14, 13:21, 14:2, 14:8, 15:5, 209:20, 209:25, 210:6, 210:7, 237:8, 237:17
**20** [1] - 240:16
**200** [1] - 47:16
**2000** [1] - 48:3
**20002** [1] - 2:21
**2004** [1] - 182:8
**201** [1] - 1:20
**2010** [1] - 182:8
**2016** [1] - 46:4
**2018** [4] - 98:15, 98:16, 98:18, 98:19
**2019** [2] - 50:19, 96:19
**2022** [1] - 64:22
**2023** [8] - 64:19, 85:13, 180:16, 182:21, 215:20, 215:25, 216:17
**2024** [3] - 64:16, 67:14, 83:23
**2025** [60] - 1:5, 32:15, 33:2, 33:14,

65:16, 66:4, 66:10, 67:8, 67:14, 67:18, 68:24, 69:3, 70:4, 70:18, 71:5, 71:11, 71:16, 71:21, 71:24, 72:1, 73:13, 76:10, 76:13, 83:2, 83:19, 83:23, 90:20, 90:23, 128:16, 129:23, 133:11, 149:16, 150:22, 152:17, 152:21, 153:1, 153:5, 153:8, 155:7, 155:25, 156:6, 158:8, 159:14, 160:9, 160:13, 160:17, 165:20, 166:16, 166:24, 168:5, 171:17, 171:23, 172:11, 172:19, 175:6, 183:23, 212:12, 217:1, 247:7
**203** [1] - 4:12
**20530** [1] - 2:19
**208** [1] - 5:20
**209** [5] - 5:20, 43:23, 44:25, 45:16, 45:17
**209-211** [1] - 5:16
**21** [3] - 235:7, 235:13, 235:14
**21-1** [1] - 237:21
**211** [3] - 44:15, 44:25, 45:17
**213** [1] - 50:2
**213-215** [2] - 5:16, 50:14
**215** [1] - 50:2
**2155** [1] - 1:23
**216** [3] - 5:20, 52:13, 53:1
**216-219** [1] - 5:17, 53:7
**219** [2] - 53:1, 55:6
**22** [12] - 5:16, 5:16, 5:17, 43:23, 44:1, 44:24, 45:17, 50:2, 50:14, 50:19, 53:1, 53:7
**221** [1] - 5:20
**222** [1] - 4:13
**224** [1] - 4:12
**23** [5] - 5:17, 56:9, 56:10, 57:8, 57:16
**23-03** [2] - 215:17, 221:5
**232** [1] - 5:7
**233** [3] - 5:7, 5:8, 5:8
**236** [4] - 5:21, 5:21, 5:22, 5:22
**237** [6] - 5:9, 5:9,

5:10, 5:10, 5:11, 5:11
**238** [2] - 5:12, 5:23
**23rd** [1] - 231:23
**24** [7] - 9:24, 10:1, 10:4, 10:7, 21:13
**24-1** [1] - 9:24
**25** [1] - 240:15
**25-22896-CV-KMW** [1] - 1:2
**25-CV-22896** [1] - 6:2
**2601** [1] - 1:16
**28** [6] - 5:20, 208:6, 208:11, 209:6, 209:9, 209:10
**287** [1] - 183:19
**287(g** [29] - 183:5, 183:8, 183:11, 183:22, 184:7, 184:9, 184:18, 191:12, 194:10, 195:17, 195:21, 207:10, 208:16, 209:13, 210:13, 210:23, 216:19, 217:6, 217:18, 226:1, 226:6, 227:9, 229:1, 229:7, 229:13, 229:18, 229:22, 230:5, 230:24
**287(g)** [1] - 194:2
**2:15** [2] - 92:15, 123:7
**2l-2** [1] - 237:21

---

**3**

---

**3** [3] - 60:3, 60:5, 233:15
**3,000** [1] - 38:23, 76:18, 76:20, 76:21
**3,000-plus** [2] - 38:22, 76:24
**30** [6] - 5:22, 92:8, 121:17, 236:4, 236:14, 240:16
**305** [2] - 3:5, 247:10
**31** [4] - 235:22, 236:2, 236:4, 236:9
**31-32** [1] - 5:21
**32** [2] - 236:4, 236:10
**33102** [1] - 2:25
**33128** [2] - 3:4, 247:10
**33131** [1] - 2:5
**33132** [1] - 2:15
**33133** [1] - 1:17
**33134** [1] - 1:21
**33301** [1] - 2:11
**33440** [1] - 49:9
**33731-2155** [1] - 1:23

**34** [7] - 20:24, 26:7, 40:13, 74:12, 77:4, 135:11, 166:3
**3A** [44] - 19:23, 20:2, 21:19, 21:21, 21:22, 21:25, 24:8, 25:7, 28:10, 28:11, 74:16, 79:14, 79:15, 79:22, 79:23, 80:4, 80:6, 80:8, 80:11, 85:5, 85:8, 85:17, 85:20, 85:24, 86:4, 86:6, 86:7, 86:10, 86:11, 86:12, 97:16, 97:17, 98:4, 100:9, 102:9, 104:10, 107:1, 135:19, 136:13, 138:23, 138:24, 142:10, 174:8, 174:10

---

**4**

---

**4** [9] - 2:15, 5:12, 13:9, 233:15, 233:17, 233:18, 234:21, 236:5, 236:16
**4,000** [5] - 40:23, 41:2, 41:20, 61:4, 90:20
**4,500** [1] - 180:25
**40** [1] - 92:6
**400** [2] - 3:3, 247:9
**401** [1] - 2:10
**41** [6] - 14:12, 29:13, 29:22, 31:2, 122:21, 126:18
**43** [5] - 5:4, 9:17, 10:11, 10:13, 10:17
**44** [9] - 5:10, 5:16, 5:16, 5:17, 5:22, 236:4, 236:15, 236:23, 237:14
**45** [4] - 5:16, 92:9, 240:24, 241:1
**4500** [1] - 1:20
**47** [6] - 5:7, 231:7, 231:21, 231:22, 232:24, 232:25
**48** [5] - 5:7, 186:19, 231:7, 231:25, 232:24, 233:1
**49** [5] - 5:8, 231:7, 232:2, 232:24, 233:2
**4:55** [2] - 1:6, 246:6
**4th** [1] - 65:8

---

**5**

---

**5** [8] - 9:24, 210:6, 210:9, 233:15,

233:17, 233:18,
234:22, 238:23
**50** [1] - 5:16
**50/50** [3] - 29:1,
80:21, 81:11
**51** [5] - 5:5, 9:17,
10:11, 10:13, 10:18
**52** [6] - 5:5, 9:17,
10:12, 10:13, 10:19,
239:9
**523-5178** [2] - 3:5,
247:10
**53** [1] - 5:17
**53-1** [1] - 212:11
**56** [1] - 5:17
**57** [1] - 5:17
**58** [4] - 5:8, 232:3,
232:24, 233:3
**5:00** [1] - 228:16
**5:15** [1] - 228:17
**5th** [2] - 65:8, 65:11

## 6

**6** [9] - 5:15, 14:6,
14:7, 14:23, 15:3,
15:4, 31:11, 46:4,
212:18
**60** [3] - 5:21, 236:4,
236:11
**62** [3] - 5:21, 236:4,
236:12
**63** [4] - 4:5, 5:21,
236:4, 236:13
**67** [1] - 185:14
**6:30** [1] - 49:8
**6th** [1] - 65:10

## 7

**7** [24] - 5:3, 5:15,
5:20, 5:23, 9:17,
10:11, 10:13, 10:15,
16:16, 16:17, 17:1,
17:18, 17:21, 72:7,
103:21, 212:12,
216:8, 216:10, 221:4,
221:7, 221:8, 237:19,
238:2, 238:5
**700** [1] - 2:4
**747** [1] - 129:11
**78** [1] - 9:15
**7th** [1] - 232:1

## 8

**8** [10] - 22:23, 83:6,
83:8, 83:10, 83:11,
183:15, 187:16,
217:21, 220:7, 220:8

**80** [4] - 16:8, 24:10,
116:20, 192:10
**803.8** [1] - 232:9
**81** [9] - 10:4, 10:10,
120:18, 120:25,
145:25, 163:17,
163:20, 231:6, 231:20
**82** [1] - 13:20
**83** [1] - 15:5
**86** [1] - 4:5
**87** [3] - 5:9, 236:22,
237:13
**89** [1] - 4:4
**8:30** [1] - 241:5
**8th** [5] - 65:10,
65:11, 89:18, 178:5,
244:2

## 9

**9** [8] - 5:4, 9:17,
10:11, 10:13, 10:16,
235:6, 235:8, 235:14
**90** [1] - 17:18
**908** [1] - 17:19
**950** [1] - 2:18
**96** [1] - 4:8
**98** [1] - 178:5
**98-145** [2] - 5:6,
178:8
**99** [1] - 2:15
**9:00** [1] - 49:8

## A

**a)(2** [1] - 239:10
**a.m** [3] - 1:6, 94:17,
94:20
**abiding** [1] - 243:2
**ability** [11] - 37:11,
55:15, 132:13, 135:8,
185:4, 194:1, 195:6,
198:5, 202:24, 203:1,
206:1
**abiotic** [1] - 114:17
**able** [14] - 14:13,
93:3, 104:1, 132:14,
133:16, 134:4,
137:24, 138:2,
140:22, 155:14,
161:12, 179:17,
201:7, 219:18
**above-entitled** [1] -
247:5
**absence** [1] - 45:8
**absolutely** [6] -
190:6, 196:23,
199:11, 202:22,
213:11, 240:12
**abundancies** [3] -

97:8, 97:9, 97:12
**abundant** [1] - 39:23
**academy** [1] - 182:8
**accept** [2] - 55:10,
176:6
**acceptable** [1] -
176:3
**accepting** [1] - 50:18
**access** [60] - 36:8,
37:10, 37:14, 55:15,
55:16, 62:25, 72:20,
72:23, 73:1, 73:2,
73:10, 73:11, 73:12,
73:14, 103:13,
103:15, 122:19,
122:20, 122:24,
123:3, 124:11,
124:19, 124:24, 126:6,
126:21, 127:14,
127:15, 127:20,
127:25, 133:16,
133:18, 133:22,
137:24, 146:1,
151:23, 153:11,
153:19, 153:21,
153:22, 153:25,
154:2, 154:3, 154:4,
154:14, 154:15,
154:22, 157:19,
158:7, 164:17,
164:23, 164:25,
171:5, 175:6, 175:9,
178:23, 213:15,
213:16, 245:25
**accessed** [3] - 146:1,
156:7, 156:9
**accesses** [1] - 55:19
**accessible** [3] -
133:21, 146:11, 225:7
**accessing** [2] -
151:23, 175:6
**accompany** [1] -
141:15
**accord** [1] - 177:9
**accordance** [3] -
57:20, 57:22, 57:23
**accorded** [1] - 94:25
**accordingly** [1] -
242:3
**account** [2] - 95:6,
163:9
**accounted** [5] - 82:2,
82:4, 82:13, 82:18,
82:24
**accurate** [3] -
168:21, 241:17, 247:4
**accurately** [3] -
14:20, 16:23, 17:16
**acknowledge** [2] -
17:7, 51:19

**acknowledges** [1] -
51:16
**acquainted** [1] -
196:3
**acquiring** [1] - 101:7
**acres** [2] - 40:23,
41:2
**Act** [3] - 21:13,
57:23, 116:8
**ACTING** [1] - 2:17
**acting** [2] - 209:13,
209:14
**action** [4] - 114:22,
115:10, 133:6, 214:24
**actions** [1] - 118:7
**activated** [1] -
225:18
**active** [2] - 152:20,
202:16
**activities** [33] - 34:6,
47:4, 49:1, 54:25,
55:2, 62:18, 101:19,
102:16, 108:5,
118:13, 118:15,
118:24, 119:1,
122:24, 127:23,
130:3, 135:9, 139:20,
150:22, 150:25,
151:1, 152:15, 158:1,
158:6, 160:21,
170:10, 170:13,
170:16, 175:10,
212:23, 217:9
**activity** [44] - 29:8,
30:8, 32:16, 32:22,
32:23, 33:3, 33:10,
33:13, 33:15, 33:16,
37:25, 100:5, 115:14,
115:21, 115:23,
115:25, 120:16,
128:16, 128:18,
129:24, 130:2,
130:12, 131:8,
131:13, 131:19,
134:5, 134:10,
134:12, 147:6,
149:15, 150:21,
156:4, 156:14,
156:17, 157:25,
159:11, 163:3,
169:12, 170:21,
172:22, 172:23,
173:1, 174:23, 175:2
**actors** [1] - 214:12
**acts** [1] - 232:10
**actual** [3] - 101:10,
108:7, 159:13
**ADAM** [1] - 2:16
**Adam** [1] - 7:14
**add** [2] - 36:20,

209:21
**addition** [2] - 149:25,
170:25
**additional** [9] -
88:18, 127:3, 132:19,
165:2, 175:18, 196:6,
228:9, 242:12, 242:14
**address** [2] - 103:1,
232:7
**addressed** [1] -
45:20
**addressing** [1] -
134:23
**adduced** [1] - 179:1
**adjacent** [5] - 87:24,
111:15, 149:1,
160:15, 171:24
**administration** [3] -
34:23, 45:23, 80:14
**administrative** [2] -
99:21, 199:16
**admissibility** [1] -
44:9
**admissible** [1] -
17:17
**admission** [2] -
109:17, 237:19
**admissions** [3] -
45:9, 45:11, 232:22
**admit** [3] - 17:18,
221:4, 239:15
**admits** [1] - 187:10
**ADMITTED** [3] - 5:2,
5:13, 5:19
**admitted** [43] - 10:8,
10:14, 10:15, 10:16,
10:17, 10:18, 10:19,
14:2, 15:3, 15:4,
17:21, 20:25, 22:24,
45:17, 50:15, 53:8,
57:17, 93:15, 178:7,
178:8, 178:9, 178:12,
178:17, 209:9,
209:10, 221:7, 221:8,
229:9, 231:4, 231:10,
231:11, 232:25,
233:1, 233:2, 233:3,
234:13, 234:19,
234:20, 234:21,
234:22, 244:14
**admitting** [3] - 14:15,
17:5, 53:5
**advance** [3] - 35:25,
148:18, 169:11
**adversely** [1] -
146:25
**advise** [3] - 9:11,
61:10, 171:13
**Advisor** [1] - 229:10
**advocates** [1] -

165:11

**aerial** [3] - 163:17, 163:18, 163:22

**affect** [9] - 84:4, 84:7, 84:10, 84:14, 135:7, 146:16, 146:25, 169:20, 191:18

**affected** [2] - 155:25, 156:1

**affidavit** [1] - 13:8

**afford** [2] - 57:6, 137:3

**afforded** [1] - 239:11

**afield** [2] - 134:24, 189:1

**afternoon** [13] - 96:3, 145:12, 145:14, 145:15, 147:18, 147:19, 167:11, 175:25, 180:6, 180:7, 180:9, 203:25, 227:17

**agencies** [16] - 28:22, 29:1, 53:18, 100:21, 101:13, 183:13, 183:14, 183:15, 189:20, 225:12, 225:15, 225:22, 229:1, 229:14, 229:17, 230:6

**agency** [3] - 81:6, 183:7, 183:9, 183:18, 184:9, 185:10, 189:15, 194:10, 207:6, 212:25, 230:11, 230:13

**agents** [1] - 212:1

**ago** [13] - 12:19, 21:15, 71:2, 85:12, 85:15, 86:2, 96:14, 96:17, 99:17, 107:24, 160:11, 196:12, 220:8

**agree** [9] - 29:11, 93:25, 106:19, 152:6, 193:6, 205:5, 210:21, 220:2, 240:5

**agreed** [10] - 8:16, 176:7, 177:17, 178:1, 178:14, 199:23, 231:10, 234:7, 234:8, 241:8

**Agreement** [3] - 185:12, 204:14, 207:24

**agreement** [36] - 176:2, 176:19, 177:15, 183:8, 183:10, 183:11, 183:22, 184:7, 185:13, 204:18,

205:15, 207:10, 207:13, 207:17, 208:10, 208:16, 209:13, 209:22, 210:3, 210:11, 212:18, 216:19, 217:6, 217:18, 226:1, 226:22, 226:24, 228:21, 228:23, 228:25, 229:18, 231:4, 233:19, 233:23, 235:1, 239:15

**agreements** [8] - 194:11, 217:8, 229:1, 229:5, 229:6, 229:14, 229:18, 230:5

**agricultural** [8] - 22:16, 40:21, 77:12, 77:23, 78:5, 78:8, 218:15, 218:25

**ahead** [18] - 45:14, 53:6, 56:15, 56:18, 82:9, 118:4, 121:16, 122:5, 123:17, 124:3, 124:4, 125:5, 126:9, 154:12, 159:4, 199:3, 202:10, 238:6

**aim** [1] - 167:11

**aimed** [1] - 56:3

**air** [1] - 152:20

**airboat** [2] - 55:2, 80:14

**aircraft** [7] - 31:23, 32:1, 32:20, 129:10, 129:14, 129:16, 167:19

**airplane** [1] - 129:20

**airplanes** [2] - 87:19, 128:20

**airport** [21] - 32:8, 68:23, 70:4, 75:12, 75:22, 76:13, 76:15, 83:1, 87:12, 87:16, 149:23, 151:2, 152:15, 153:15, 155:24, 163:10, 163:11, 167:14, 171:25, 172:12, 172:18

**Airport** [4] - 89:4, 111:16, 111:20, 195:25

**aisle** [2] - 147:14, 178:13

**Ajizian** [1] - 6:21

**AJIZIAN** [70] - 2:3, 2:3, 4:8, 6:21, 92:1, 92:7, 92:12, 93:20, 95:19, 96:2, 103:21, 103:22, 104:5, 104:6,

109:22, 111:4, 111:5, 112:10, 117:8, 117:10, 118:5, 120:18, 120:25, 121:3, 121:19, 122:5, 122:7, 123:5, 123:9, 123:17, 123:19, 124:3, 124:5, 125:5, 125:6, 126:9, 126:11, 126:13, 127:10, 128:9, 128:10, 131:1, 131:6, 132:1, 135:1, 135:2, 135:11, 135:12, 136:24, 137:6, 137:7, 139:9, 139:10, 145:1, 145:3, 158:9, 168:23, 169:4, 172:16, 172:17, 175:12, 175:19, 233:9, 233:12, 233:15, 233:17, 233:22, 234:23, 235:4, 240:23

**akin** [1] - 162:9

**al** [4] - 1:4, 1:7, 6:3

**Alcatraz** [4] - 33:19, 33:21, 195:13, 219:8

**alerts** [1] - 129:21

**aliens** [6] - 184:7, 184:18, 184:21, 188:13, 195:8, 200:12

**alive** [1] - 19:4

**all-encompassing** [1] - 245:17

**alleged** [1] - 205:15

**allegedly** [2] - 204:21, 217:20

**alleviate** [1] - 202:20

**Alligator** [4] - 33:19, 33:21, 195:13, 219:8

**allow** [21] - 15:13, 22:16, 29:15, 31:4, 45:12, 57:5, 92:24, 93:5, 94:22, 110:16, 130:20, 136:6, 136:8, 138:10, 169:13, 172:14, 188:24, 191:1, 194:16, 217:7, 232:23

**allowed** [2] - 141:20, 152:3

**allowing** [1] - 245:19

**allows** [1] - 220:8

**almost** [2] - 12:23, 239:2

**alone** [1] - 184:15

**alternative** [1] - 224:2

**amount** [7] - 27:1, 39:23, 55:11, 112:6,

182:25, 191:13

**amounts** [2] - 40:6, 191:14

**Amy** [5] - 11:7, 11:9, 11:15, 12:6, 15:6

**AMY** [2] - 4:3, 11:15

**analogies** [1] - 162:23

**analyses** [2] - 99:8, 101:11

**analysis** [2] - 151:6

**analyze** [1] - 37:17

**Andres** [1] - 95:24

**ANDRES** [1] - 95:25

**animals** [4] - 113:23, 114:14, 115:14, 132:4

**announcement** [1] - 11:20

**answer** [17] - 48:24, 68:14, 68:15, 82:10, 87:7, 87:9, 103:3, 111:1, 117:8, 149:18, 156:25, 160:7, 170:6, 171:8, 180:19, 184:8, 188:25

**answered** [3] - 61:24, 168:25, 199:22

**answers** [2] - 53:16, 159:24, 199:16

**anthropologist** [2] - 134:16, 149:4

**anthropology** [1] - 134:15

**anticipate** [1] - 42:24

**anticipated** [1] - 160:20

**anticipating** [1] - 238:9

**anticipation** [1] - 196:6

**anyway** [1] - 17:19

**apologies** [1] - 139:14

**apparent** [1] - 242:21

**appear** [2] - 238:17, 246:1

**APPEARANCES** [1] - 1:13

**appearances** [1] - 6:4

**application** [7] - 108:15, 108:17, 109:6, 109:9, 110:1, 110:17

**applied** [1] - 41:13

**applies** [1] - 179:16

**apply** [7] - 93:6, 108:20, 109:2, 112:4, 115:7, 189:8, 189:11

**appointed** [2] -

180:24, 182:21

**appreciate** [1] - 243:8

**apprehend** [5] - 194:2, 197:7, 202:12, 206:1, 217:19

**apprehended** [5] - 187:16, 187:18, 197:1, 202:15, 204:21

**apprehends** [1] - 194:10

**apprehension** [6] - 184:25, 185:9, 185:19, 185:23, 188:4, 214:3

**apprehensions** [2] - 185:23, 196:24

**approach** [1] - 171:13

**appropriate** [9] - 94:1, 103:2, 115:10, 176:24, 189:2, 192:8, 196:9, 215:10, 215:12

**approval** [1] - 58:9

**approximate** [1] - 15:23

**April** [2] - 196:17, 196:18

**aquatic** [4] - 39:10, 42:11, 42:13, 42:15

**aquifer** [1] - 22:20

**Area** [24] - 21:22, 21:24, 24:8, 25:7, 79:14, 80:11, 85:5, 85:8, 85:17, 85:20, 85:24, 86:4, 86:10, 86:12, 97:16, 97:17, 97:18, 98:4, 100:9, 102:9, 104:10, 107:1, 174:8, 174:10

**area** [127] - 16:6, 16:7, 16:11, 16:13, 17:17, 19:23, 20:1, 20:14, 22:2, 22:11, 22:15, 24:6, 24:9, 25:19, 25:25, 26:21, 27:4, 27:12, 28:15, 30:11, 31:15, 33:8, 34:22, 35:8, 35:14, 38:6, 39:3, 39:7, 39:12, 39:14, 40:10, 41:6, 41:7, 41:19, 42:10, 43:3, 51:7, 55:18, 64:15, 64:18, 64:21, 64:24, 66:9, 74:16, 74:18, 74:20, 74:22, 79:15, 80:4, 80:6, 81:18, 86:9, 90:25, 97:10, 97:13, 100:13, 104:16,

104:20, 104:22, 105:1, 105:9, 105:25, 114:8, 118:20, 119:2, 119:18, 124:9, 124:17, 124:21, 124:23, 125:10, 130:14, 130:23, 130:25, 131:19, 131:20, 132:9, 133:14, 134:1, 134:13, 135:4, 139:7, 139:18, 139:23, 139:25, 140:12, 140:17, 140:20, 141:5, 141:8, 142:17, 143:10, 143:12, 143:14, 143:15, 143:19, 143:23, 143:25, 144:5, 144:8, 144:9, 144:10, 144:14, 144:23, 145:6, 146:8, 146:11, 151:12, 151:14, 151:17, 151:21, 152:2, 152:3, 152:18, 153:1, 159:1, 162:9, 163:1, 163:14, 170:20, 171:11, 171:20, 171:22, 172:8, 172:19, 174:24

**areas** [44] - 19:8, 22:13, 22:18, 22:19, 26:3, 42:4, 42:18, 80:8, 100:4, 104:3, 108:7, 112:7, 112:12, 113:7, 113:9, 131:13, 131:17, 132:12, 134:7, 137:14, 137:17, 137:21, 137:23, 137:24, 138:16, 138:23, 138:24, 139:18, 142:6, 145:25, 153:8, 157:23, 162:2, 162:5, 164:14, 166:4, 166:7, 166:8, 166:10, 170:4, 170:6, 170:9, 170:13, 170:15

**arena** [1] - 183:6
**argument** [7] - 93:11, 158:21, 198:6, 240:5, 241:11, 241:20, 243:6
**armed** [2] - 158:20, 171:14
**Army** [16] - 28:17, 29:2, 29:3, 30:19, 30:20, 44:13, 46:15, 49:17, 49:23, 52:16, 56:19, 62:7, 80:19,

80:21, 80:23, 81:6
**arrest** [5] - 185:1, 185:19, 204:6, 213:9, 214:1
**arrested** [1] - 204:7
**arresting** [1] - 217:19
**arrests** [1] - 200:9
**arriving** [1] - 143:15
**arrows** [2] - 27:15, 135:22
**articulate** [1] - 109:19
**ascribe** [1] - 18:25
**aside** [3] - 133:22, 203:12, 245:19
**aspects** [1] - 114:5
**asphalted** [1] - 124:9
**assembled** [1] - 46:19
**asserted** [1] - 232:15
**assessing** [1] - 102:11
**assessments** [1] - 36:12
**assets** [1] - 203:12
**assign** [1] - 45:13
**assigning** [1] - 102:1
**assignments** [1] - 227:5
**assist** [5] - 30:4, 101:6, 101:8, 239:4, 244:20
**Assistance** [1] - 213:18
**ASSISTANT** [1] - 2:17
**assistant** [1] - 99:21
**assisting** [1] - 183:4
**associated** [3] - 32:10, 191:25, 193:3
**assume** [9] - 152:9, 153:3, 171:8, 196:17, 199:11, 217:15, 218:16, 220:24, 232:14
**assuming** [3] - 61:1, 197:20, 198:13
**assured** [1] - 242:18
**asterisk** [1] - 234:11
**astronomy** [1] - 165:24
**attached** [3] - 17:8, 148:8, 236:8
**attempted** [1] - 171:5
**attend** [2] - 244:23, 244:24
**attended** [1] - 182:8
**attention** [1] - 129:16
**ATTORNEY** [1] -

2:17
**attorney** [3] - 147:22, 182:10, 204:1
**Attorney** [3] - 243:21, 244:10, 245:18
**ATTORNEY'S** [2] - 2:14, 2:24
**attorneys** [3] - 63:19, 63:21, 145:13
**Auditorium** [1] - 49:8
**August** [13] - 1:5, 23:1, 49:7, 65:8, 65:10, 65:11, 67:8, 178:5, 231:6, 244:2, 247:7
**authenticity** [2] - 232:6, 232:11
**authorities** [2] - 214:23, 217:14
**authority** [15] - 183:12, 205:14, 209:14, 209:20, 210:1, 210:13, 210:22, 210:23, 211:19, 212:1, 212:5, 215:7, 217:14, 217:19, 217:21
**authorized** [6] - 48:3, 48:14, 63:1, 181:25, 210:6, 213:2
**availability** [4] - 42:13, 57:24, 58:3, 146:17
**available** [6] - 26:25, 92:14, 93:1, 141:16, 179:11, 200:24
**Ave** [1] - 2:18
**Avenue** [4] - 2:4, 3:3, 49:9, 247:9
**aversion** [4] - 134:13, 170:20, 172:22, 173:3
**aviation** [1] - 203:12
**avoid** [3] - 131:13, 131:17, 132:12
**awaiting** [1] - 65:4
**aware** [25] - 35:18, 60:10, 101:21, 107:25, 113:11, 118:11, 118:19, 118:23, 120:7, 120:13, 142:17, 147:5, 151:21, 154:1, 170:9, 170:12, 171:3, 173:11, 173:19, 173:21, 203:10, 203:13, 220:8, 220:14, 244:1
**awareness** [3] -

220:22, 220:25, 222:10

## B

**b)(2** [1] - 239:10
**B-O-Z-A-S** [1] - 95:25
**bachelor** [1] - 12:9
**backfilled** [6] - 26:21, 26:22, 26:24, 27:3, 27:9, 27:11
**backflow** [3] - 25:6, 29:19, 84:4
**background** [1] - 218:10
**backgrounds** [1] - 206:4
**balance** [2] - 133:1, 190:11
**bargaining** [2] - 226:22, 226:24
**based** [20] - 54:19, 111:22, 121:7, 123:20, 130:12, 130:23, 131:15, 174:17, 186:10, 186:16, 191:7, 196:20, 196:24, 199:5, 199:10, 200:11, 202:6, 203:7, 209:12, 243:19
**baseline** [16] - 35:7, 35:12, 35:13, 35:20, 35:22, 35:25, 42:25, 64:13, 64:15, 64:18, 64:21, 64:24, 65:2, 65:12, 105:11, 169:13
**basic** [2] - 185:13, 204:18
**basins** [1] - 51:5
**basis** [10] - 17:5, 66:17, 101:22, 120:2, 159:17, 160:6, 160:16, 181:3, 193:2, 239:12
**bass** [1] - 119:25
**bat** [12] - 116:17, 132:8, 140:14, 141:3, 141:6, 141:18, 141:21, 143:5, 144:24, 146:17, 146:25, 162:20
**bathing** [1] - 61:18
**bats** [4] - 132:9, 146:13, 146:14, 162:20
**Bayshore** [1] - 1:16
**Beach** [1] - 182:13
**bear** [1] - 148:21

**bears** [1] - 148:23
**became** [3] - 22:18, 34:21, 196:3
**become** [6] - 99:16, 132:14, 132:25, 138:9, 173:11, 196:2
**becomes** [2] - 40:9, 133:4
**becoming** [1] - 182:4
**BEFORE** [1] - 1:10
**began** [6] - 69:3, 70:18, 71:20, 152:17, 153:4, 156:5
**begin** [1] - 228:6
**beginning** [9] - 49:6, 51:14, 54:12, 55:8, 58:13, 92:25, 122:23, 125:23, 125:25
**behalf** [15] - 6:7, 6:14, 6:19, 6:25, 7:1, 7:9, 43:14, 49:24, 180:23, 183:2, 204:1, 206:20, 207:1, 207:19, 212:6
**behavior** [2] - 118:8, 141:11
**behavioral** [1] - 114:5
**behind** [1] - 165:16
**belief** [2] - 55:13, 202:19
**beliefs** [2] - 19:9, 19:10
**believes** [1] - 244:20
**below** [4] - 23:14, 121:21, 210:17, 210:18
**bends** [1] - 107:13
**benefit** [1] - 116:3
**benefits** [1] - 51:22
**BENNETT** [3] - 1:22, 6:18, 63:11
**Bennett** [1] - 6:19
**berm** [1] - 88:5
**best** [10] - 62:19, 70:15, 89:19, 90:6, 97:13, 101:4, 109:13, 189:20, 216:22, 228:1
**better** [5] - 42:18, 58:22, 111:1, 114:7, 155:14
**Betty** [1] - 236:20
**between** [18] - 29:1, 40:18, 46:13, 53:17, 80:21, 113:23, 114:9, 115:22, 151:4, 159:14, 197:23, 197:24, 207:24, 207:25, 208:25, 229:14, 232:21,

245:16

**beyond** [7] - 89:24, 113:7, 134:16, 134:19, 136:22, 158:12, 184:14

**Biden** [2] - 217:7, 217:12

**bidirectional** [5] - 27:19, 27:21, 29:17, 136:1, 136:2

**bidirectionals** [2] - 28:21, 29:4

**Big** [60] - 20:6, 20:9, 24:4, 25:19, 28:9, 28:12, 34:21, 51:18, 52:1, 55:17, 72:15, 72:16, 72:22, 72:25, 73:1, 73:2, 73:4, 73:6, 73:11, 73:23, 74:1, 74:4, 74:8, 79:1, 79:4, 79:5, 79:21, 91:7, 100:16, 102:16, 102:18, 102:19, 103:7, 103:8, 103:9, 103:15, 106:8, 106:11, 108:9, 108:15, 108:20, 108:22, 108:24, 109:1, 109:4, 109:24, 110:19, 118:12, 118:19, 119:4, 127:17, 127:20, 128:3, 128:5, 128:6, 149:1, 153:24, 154:4, 165:2, 175:9

**big** [2] - 32:2, 142:3

**billions** [1] - 81:3

**biological** [4] - 36:12, 37:20, 37:21, 141:13

**Biological** [2] - 6:8, 6:19

**BIOLOGICAL** [1] - 1:22

**biologist** [6] - 98:22, 99:1, 99:3, 99:13, 160:25, 161:3

**biologists** [5] - 99:20, 99:24, 101:17, 101:22, 161:6

**bird** [2] - 142:3

**birds** [1] - 102:23

**Biscayne** [1] - 1:20

**bit** [7] - 69:12, 70:21, 87:12, 143:15, 153:10, 210:8, 214:6

**black** [6] - 17:24, 18:2, 31:2, 116:16, 141:25, 143:4

**blacked** [1] - 18:8

**blending** [1] - 163:12

**bless** [1] - 179:6

**blobs** [2] - 137:9, 138:7

**blocked** [3] - 171:20, 171:22, 172:8

**blue** [3] - 26:18, 104:11, 107:4

**blue-green** [1] - 104:11

**bluish** [1] - 19:22

**BMPs** [1] - 87:2

**BOA** [1] - 228:20

**board** [1] - 193:19

**BOIES** [1] - 2:9

**bond** [4] - 194:19, 198:9, 219:19, 220:9

**bonneted** [12] - 116:17, 132:8, 140:14, 141:3, 141:6, 141:18, 141:21, 143:5, 144:24, 146:13, 146:14, 162:20

**Border** [2] - 195:18, 214:25

**border** [5] - 183:1, 190:22, 190:24, 217:4, 217:5

**borders** [1] - 192:11

**born** [1] - 19:4

**botany** [1] - 99:22

**bottle** [1] - 221:17

**bottom** [6] - 16:4, 18:10, 19:25, 20:7, 20:13, 21:16

**Boulevard** [2] - 1:20, 2:10

**boundaries** [2] - 140:7, 157:6

**boundary** [11] - 86:7, 86:11, 91:12, 123:11, 124:10, 125:4, 151:11, 152:23, 152:24, 160:14, 160:15

**bowfin** [1] - 119:24

**Box** [2] - 1:23, 2:25

**boxed** [1] - 29:14

**boxes** [4] - 17:24, 18:2, 27:15, 135:22

**Boy** [1] - 49:8

**BOZAS** [1] - 4:7

**Bozas** [22] - 95:19, 95:20, 95:24, 96:3, 96:6, 103:23, 104:7, 111:6, 121:4, 121:20, 123:10, 124:6, 125:7, 126:14, 128:11, 145:12, 147:18,

158:11, 167:3, 167:10, 169:5, 233:16

**Bradley** [1] - 236:21

**breaching** [1] - 134:5

**break** [7] - 37:19, 92:10, 108:19, 110:9, 175:23, 176:9, 227:24

**breakdown** [4] - 197:18, 197:19, 198:14, 198:25

**breaks** [1] - 134:6

**breathe** [1] - 241:24

**breeding** [2] - 144:16, 144:20

**Brickell** [1] - 2:4

**bridges** [2] - 29:15, 31:3

**brief** [1] - 175:23

**briefing** [2] - 239:23, 240:6

**briefly** [1] - 206:17

**briefs** [1] - 239:25

**brighter** [1] - 130:10

**Brightline** [2] - 228:1, 241:8

**bring** [15] - 95:9, 185:2, 185:4, 185:10, 185:13, 185:14, 185:19, 186:2, 187:12, 188:3, 189:7, 195:7, 198:1, 208:5, 210:8

**bringing** [3] - 86:21, 202:7, 216:7

**brings** [3] - 40:20, 129:16, 194:11

**broader** [1] - 114:10

**brought** [5] - 187:16, 191:15, 194:10, 245:10, 245:14

**Broward** [6] - 18:18, 22:10, 98:5, 107:14, 107:17, 174:12

**brush** [1] - 158:22

**brushed** [1] - 158:25

**buck** [1] - 230:11

**bucket** [2] - 231:15, 231:19

**budget** [1] - 240:24

**buggies** [1] - 124:24

**building** [5] - 16:9, 34:23, 45:23, 80:14, 192:25

**built** [2] - 81:16, 242:19

**bullets** [1] - 210:16

**burden** [1] - 132:23

**BURKHARDT** [40] - 1:19, 4:12, 188:21, 190:23, 191:22,

192:4, 194:5, 197:14, 197:16, 198:15, 199:8, 203:22, 203:24, 207:21, 208:5, 208:8, 208:12, 209:3, 209:6, 209:11, 209:19, 209:24, 210:5, 210:10, 212:14, 212:17, 212:21, 216:7, 216:11, 216:13, 216:21, 216:24, 219:2, 219:17, 220:11, 220:13, 220:19, 221:3, 221:9, 224:24

**Burkhardt** [2] - 6:15, 204:1

**BURLINGTON** [2] - 1:15, 1:16

**business** [8] - 17:6, 53:5, 79:8, 79:10, 79:15, 80:10, 200:7, 200:24

**businesses** [3] - 80:13, 90:6, 90:9

**busy** [1] - 179:12

**but..** [1] - 48:21

**buys** [1] - 226:9

**BY** [139] - 3:1, 4:4, 4:5, 4:5, 4:8, 4:8, 4:9, 4:9, 4:12, 4:12, 4:13, 12:2, 13:6, 14:10, 14:19, 15:15, 16:19, 17:23, 21:4, 21:18, 22:25, 23:10, 26:11, 30:23, 31:8, 31:13, 33:9, 35:2, 37:2, 37:9, 38:20, 40:1, 40:14, 41:11, 44:10, 44:17, 45:19, 46:6, 47:6, 48:1, 49:4, 49:15, 50:16, 51:13, 52:14, 53:10, 53:24, 54:15, 55:7, 56:11, 56:17, 57:9, 57:18, 59:9, 59:25, 60:20, 61:12, 62:3, 63:15, 70:16, 73:19, 74:15, 75:10, 77:6, 77:11, 81:22, 82:12, 82:20, 83:4, 83:12, 85:4, 86:17, 87:11, 88:17, 89:9, 90:5, 96:2, 103:22, 104:6, 111:5, 112:10, 117:10, 118:5, 121:3, 121:19, 122:7, 123:9, 123:19, 124:5, 125:6, 126:13, 127:10, 128:10, 132:1, 135:2,

135:12, 137:7, 139:10, 145:11, 146:24, 147:4, 147:17, 157:16, 159:23, 167:9, 168:9, 169:4, 172:17, 180:5, 181:14, 184:3, 187:22, 189:5, 191:5, 191:24, 193:20, 195:1, 195:23, 196:19, 199:4, 200:5, 202:11, 203:6, 203:24, 208:12, 209:11, 209:24, 210:10, 212:21, 216:13, 216:24, 219:2, 219:17, 220:13, 222:1, 223:14, 223:21, 224:13, 225:4

---

# C

**C-3-208** [1] - 49:3

**C-3-209** [1] - 44:16

**C-3-212** [1] - 51:11

**C-A-S-T-A-N-E-D-A** [1] - 11:16

**cabinet** [1] - 180:23

**calculus** [1] - 9:3

**camera** [4] - 121:21, 142:22, 150:4, 161:10

**cameras** [1] - 97:6, 115:1, 142:22

**Camp** [1] - 127:2

**camp** [4] - 127:4, 127:11, 127:14, 158:20

**camped** [1] - 242:11

**camps** [2] - 19:6, 127:3

**canal** [16] - 26:16, 26:21, 26:24, 27:6, 27:8, 27:11, 28:14, 28:20, 40:24, 84:16, 84:21, 107:9, 107:10, 107:12, 135:20, 137:8

**Canal** [2] - 23:17, 25:9, 25:10, 25:12, 25:17, 25:21, 26:19, 27:2

**canals** [4] - 22:15, 25:18, 27:6, 40:17

**candid** [1] - 220:10

**cannot** [3] - 133:17, 156:7, 205:11

**canopy** [1] - 142:5

**capabilities** [1] - 222:12

**capacity** [8] - 108:2,

192:24, 195:6, 195:14, 195:22, 196:7, 205:20, 225:2

**capitalize** [1] - 116:4

**capture** [2] - 42:24, 150:17

**captured** [1] - 142:22

**car** [3] - 186:11, 186:15, 186:16

**Caracara** [1] - 116:16

**care** [1] - 233:4

**career** [1] - 182:4

**CARLOS** [1] - 2:14

**Carlos** [1] - 7:23

**carry** [2] - 184:23, 210:12

**carrying** [2] - 42:1, 101:8

**cars** [1] - 33:18

**case** [27] - 6:2, 8:15, 58:10, 63:18, 91:4, 93:2, 93:9, 131:21, 148:13, 169:20, 201:15, 213:25, 217:12, 218:19, 220:1, 232:18, 232:22, 241:4, 244:7, 244:8, 244:9, 244:17, 245:2, 245:13, 245:14, 245:15

**CASE** [1] - 1:2

**case-in-chief** [1] - 93:2

**cases** [3] - 244:13, 245:5, 245:17

**casino** [7] - 87:24, 88:3, 88:4, 88:6, 89:12, 89:15, 90:1

**Castaneda** [22] - 11:7, 11:9, 11:15, 11:17, 12:4, 12:6, 13:7, 14:11, 15:6, 15:10, 15:16, 16:20, 19:19, 20:1, 20:24, 44:12, 46:7, 49:16, 52:15, 63:16, 86:18, 92:2

**CASTANEDA** [1] - 4:3

**Castaneda's** [1] - 13:17

**categorical** [1] - 115:21

**cattail** [3] - 138:8, 166:13, 166:24

**cattails** [1] - 166:19

**caused** [2] - 60:14, 169:24

**causes** [4] - 39:3, 39:6, 62:24

**causing** [1] - 162:12

**cemented** [1] - 125:10

**center** [7] - 34:24, 104:10, 122:1, 145:22, 146:2, 172:18, 205:20

**Center** [8] - 6:7, 6:19, 10:22, 63:10, 95:5, 147:10, 175:20, 213:18

**CENTER** [1] - 1:22

**centered** [2] - 144:9, 144:11

**centers** [1] - 16:10

**Central** [1] - 112:18

**ceremonial** [6] - 108:4, 119:16, 120:17, 154:20, 155:13, 155:21

**CERP** [2] - 28:24, 28:25

**certain** [10] - 24:23, 25:5, 29:18, 35:24, 37:17, 93:25, 104:3, 112:6, 155:17, 171:20

**certainly** [8] - 94:12, 136:15, 162:8, 191:11, 208:18, 208:24, 209:19, 211:6

**certify** [1] - 247:3

**chain** [4] - 62:10, 189:19, 212:7, 227:7

**chain-link** [1] - 62:10

**Chairman** [4] - 45:21, 49:17, 49:18, 56:20

**Chairman's** [2] - 34:7, 45:22

**challenge** [1] - 198:7

**chances** [1] - 53:15

**change** [13] - 22:1, 24:21, 35:9, 62:24, 65:13, 65:15, 66:22, 69:2, 70:7, 70:17, 71:19, 90:24, 162:3

**changed** [13] - 21:23, 21:24, 22:6, 66:4, 66:9, 66:20, 67:18, 83:18, 83:22, 149:15, 149:22, 150:21, 151:1

**changes** [18] - 33:10, 35:11, 35:18, 42:25, 43:3, 62:23, 66:14, 66:15, 131:7, 133:9, 158:4, 161:4, 161:7, 161:13, 162:15, 163:11, 163:12

**chapter** [1] - 148:22

**chapters** [1] - 148:22

**characteristics** [1] - 114:17

**characterization** [4] - 126:24, 160:5, 161:20, 205:5

**characterizes** [1] - 117:24

**charge** [4] - 186:17, 187:4, 187:12, 205:1

**charged** [2] - 28:17, 186:17

**charges** [6] - 185:21, 186:2, 186:6, 189:10, 214:12, 214:15

**check** [3] - 110:22, 213:12, 213:14

**checked** [1] - 62:6

**checking** [1] - 224:9

**checkpoint** [10] - 151:22, 151:24, 151:25, 152:10, 152:11, 152:13, 153:10, 153:11, 153:14, 171:9

**checkpoints** [1] - 170:25

**chemistry** [1] - 137:22

**chief** [1] - 93:2

**choke** [1] - 138:11

**choose** [1] - 197:6

**chooses** [1] - 184:23

**choosing** [1] - 185:5

**Chris** [1] - 6:21

**Christopher** [1] - 8:1

**CHRISTOPHER** [3] - 2:3, 2:3, 2:24

**circle** [6] - 15:16, 20:1, 20:15, 20:17, 31:16, 127:6

**circumscribed** [1] - 194:17

**circumstance** [1] - 29:19

**circumstances** [1] - 197:5

**citation** [2] - 187:13, 187:14

**cite** [1] - 149:7

**cites** [1] - 210:19

**citizens** [1] - 192:12

**citizens'** [1] - 199:17

**civil** [2] - 64:1, 182:10

**claiming** [4] - 77:25, 78:2, 78:4, 78:7

**claims** [1] - 238:22

**clarification** [1] - 184:1

**clarified** [1] - 208:16

**clarify** [10] - 78:10, 78:22, 85:1, 183:20, 184:8, 184:25, 186:12, 195:4, 207:18, 211:13

**clarifying** [1] - 145:15

**clarity** [1] - 59:20

**clean** [1] - 41:22

**cleaning** [4] - 41:20, 61:19, 68:2, 68:3

**clear** [8] - 8:8, 20:24, 42:10, 46:7, 82:24, 86:8, 136:25, 219:22

**clearly** [3] - 11:19, 11:21, 245:5

**Clewiston** [1] - 49:9

**client** [1] - 230:25

**clients** [1] - 242:9

**close** [10] - 34:16, 85:11, 93:7, 136:7, 143:14, 147:20, 163:2, 240:1, 240:15, 245:10

**closed** [6] - 85:10, 85:13, 86:1, 93:9, 190:15, 244:16

**closely** [3] - 11:11, 207:5, 241:21

**closer** [4] - 92:8, 166:21, 181:7, 198:1

**closest** [1] - 34:22

**closing** [6] - 228:10, 239:20, 240:2, 243:6, 243:9

**closings** [1] - 240:1

**co** [2] - 100:16, 113:9

**co-steward** [1] - 113:9

**co-stewardship** [1] - 100:16

**code** [1] - 187:1

**COFFEY** [1] - 1:16

**cohort** [1] - 198:13

**cohorts** [1] - 230:24

**coli** [4] - 36:12, 37:23, 38:2, 38:8

**colleague** [5] - 6:10, 177:15, 235:20, 241:3, 243:3

**colleagues** [1] - 196:5

**collect** [1] - 155:14

**collected** [3] - 36:6, 99:7, 170:1

**collecting** [4] - 35:8, 36:9, 101:5, 173:10

**collection** [2] - 108:4, 118:17

**collective** [2] - 226:22, 226:24

**collects** [1] - 38:6

**College** [1] - 182:7

**Collier** [7] - 32:4, 62:6, 72:9, 72:11, 75:22, 164:12, 195:25

**colonies'** [1] - 144:20

**colony** [1] - 144:4

**color** [2] - 126:19, 209:14

**column** [1] - 231:7

**combative** [1] - 205:6

**combatting** [1] - 193:25

**coming** [28] - 9:5, 35:24, 36:2, 40:24, 69:14, 70:3, 70:22, 71:1, 71:6, 71:9, 71:12, 71:13, 71:17, 75:11, 76:6, 78:16, 78:17, 82:25, 88:3, 105:10, 116:18, 122:17, 135:22, 158:18, 167:18, 174:25, 227:25, 242:11

**command** [4] - 181:24, 189:19, 212:7, 227:7

**commenced** [1] - 8:6

**comment** [7] - 52:21, 52:22, 53:14, 53:21, 58:16, 58:19, 58:23

**commented** [1] - 58:6

**commercial** [3] - 54:24, 55:2, 129:11

**commissioner** [1] - 182:12

**commit** [1] - 193:9

**commitment** [2] - 51:4, 51:6

**committed** [3] - 51:8, 199:6, 200:12

**common** [3] - 114:25, 119:25, 205:10

**commonly** [1] - 115:19

**communal** [1] - 230:12

**communication** [1] - 118:21

**communications** [1] - 49:23

**community** [1] - 191:19

**comparable** [1] - 162:5

**compare** [2] - 33:13, 57:2

**compared** [2] - 83:22, 168:20

**compatriots** [1] - 228:4

**compensate** [1] - 55:11

**compete** [1] - 138:11

**competent** [1] - 169:23

**competitive** [1] - 131:22

**complete** [1] - 97:23

**completed** [1] - 96:13

**completely** [1] - 28:15

**component** [2] - 150:6, 229:23

**Composite** [1] - 238:23

**compound** [1] - 48:19

**Comprehensive** [1] - 28:24

**comprehensive** [2] - 48:5, 48:10

**compromise** [4] - 28:19, 28:21, 29:9, 29:11

**concentrated** [1] - 132:25

**concept** [2] - 46:25, 117:15

**concern** [3] - 38:7, 51:19, 133:4

**concerned** [1] - 133:25

**concerns** [7] - 48:24, 62:12, 68:6, 69:13, 78:10, 103:1, 133:24

**conclude** [2] - 178:11, 179:10

**concluded** [2] - 8:13, 246:6

**concludes** [3] - 9:22, 10:23, 233:6

**conclusion** [8] - 46:24, 47:24, 52:6, 59:13, 60:18, 73:17, 117:6, 209:16

**conclusions** [1] - 239:12

**concrete** [1] - 222:19

**concretely** [1] - 162:21

**concurrent** [2] -

**condition** [2] - 35:8, 115:11

**conditions** [6] - 24:21, 25:2, 42:8, 102:11, 111:9, 114:6

**conduct** [14] - 35:5, 35:13, 36:5, 64:8, 64:13, 64:21, 64:24, 65:11, 66:13, 90:9, 90:22, 97:15, 102:18, 169:11

**conducted** [7] - 17:6, 28:2, 35:21, 35:25, 47:8, 105:4, 212:24

**conducting** [3] - 60:2, 99:5, 169:6

**confer** [2] - 178:13, 179:3

**conference** [2] - 196:10, 241:5

**conferred** [1] - 9:10

**confined** [1] - 211:12

**confirm** [1] - 235:2

**confirmation** [1] - 186:7

**confrontation** [1] - 176:17

**confused** [4] - 10:3, 145:5, 158:15, 207:22

**confusion** [1] - 117:23

**Congress** [3] - 21:11, 48:3, 58:9

**conjunction** [1] - 164:5

**connect** [1] - 193:22

**connected** [3] - 47:15, 47:20, 91:10

**connection** [9] - 62:5, 97:1, 97:21, 105:15, 110:1, 113:23, 114:9, 118:6, 197:23

**connectivity** [2] - 27:4, 27:5

**connects** [1] - 193:12

**consequence** [1] - 41:8

**conservation** [8] - 12:10, 19:23, 22:11, 22:13, 22:18, 100:22, 101:2, 102:25

**Conservation** [16] - 21:22, 21:24, 24:8, 25:7, 79:14, 80:11, 97:16, 97:17, 97:18, 98:3, 100:9, 102:9, 104:10, 107:1, 174:7,

174:10

**conserve** [2] - 114:7, 117:13

**consider** [2] - 114:15, 129:9

**considerable** [1] - 51:19

**consideration** [1] - 245:22

**consistency** [1] - 33:2

**consistent** [6] - 33:4, 48:13, 94:4, 173:23, 174:23, 226:22

**consistently** [1] - 33:8

**constantly** [1] - 103:6

**constitutes** [1] - 57:24

**Constitution** [4] - 26:3, 51:8, 55:9, 55:10

**constructed** [6] - 153:18, 223:16, 224:22, 225:1, 229:16, 242:19

**construction** [28] - 31:9, 32:24, 33:11, 33:23, 35:14, 36:1, 36:4, 46:20, 47:8, 47:18, 48:12, 49:1, 49:11, 51:24, 55:14, 58:24, 60:15, 62:15, 62:18, 79:1, 86:25, 149:15, 149:22, 150:22, 151:1, 161:13, 218:17, 219:1

**consultation** [8] - 43:11, 45:8, 46:13, 46:22, 46:25, 47:7, 53:17, 141:22

**consulted** [1] - 169:19

**consults** [1] - 47:4

**contact** [4] - 33:24, 34:6, 187:11, 214:3

**contained** [1] - 88:6

**contaminant** [1] - 136:17

**contaminated** [1] - 136:12

**contemplate** [1] - 244:7

**contemplated** [2] - 243:23, 244:6

**content** [2] - 45:14, 240:1

**contents** [3] - 109:14, 110:12,

207:17

**context** [12] - 32:5, 40:5, 58:3, 59:10, 59:13, 59:14, 110:15, 119:15, 185:22, 189:2, 198:8, 205:12

**continuation** [2] - 8:5

**continue** [9] - 8:17, 15:13, 39:25, 43:3, 51:3, 53:4, 56:2, 113:8, 132:18

**contractor** [1] - 215:3

**contrast** [2] - 45:7, 57:2

**control** [6] - 136:1, 136:3, 136:13, 211:8, 211:19, 212:1

**controlled** [2] - 136:7, 241:21

**convenient** [2] - 9:13, 239:4

**conversation** [3] - 177:7, 194:20, 194:21

**conveyed** [1] - 243:1

**cooking** [5] - 41:20, 41:23, 61:18, 68:2, 68:3

**Cooper** [2] - 236:23, 237:5

**coordinate** [3] - 102:19, 103:10, 230:3

**coordinated** [2] - 225:23, 230:17

**coordinating** [1] - 230:3

**coordinator** [2] - 225:12, 230:2

**copy** [2] - 58:16, 148:5

**core** [6] - 139:17, 143:25, 144:9, 144:14, 144:21, 152:20

**corner** [6] - 19:17, 121:10, 121:11, 124:13, 124:15, 125:10

**Corps** [19] - 28:17, 29:2, 29:3, 30:19, 30:21, 44:13, 46:15, 49:6, 49:7, 49:17, 49:24, 51:16, 52:16, 56:19, 62:7, 80:19, 80:21, 80:23, 81:6

**correct** [240] - 8:12, 44:5, 45:9, 50:12, 59:17, 63:18, 63:24, 64:1, 64:3, 64:8,

64:13, 66:1, 66:20, 67:5, 67:18, 68:17, 68:18, 68:21, 68:22, 68:25, 69:4, 69:5, 69:10, 69:16, 69:19, 69:20, 70:5, 70:6, 70:19, 70:20, 70:23, 71:6, 71:10, 71:17, 71:18, 71:21, 71:22, 71:25, 72:18, 72:24, 73:20, 74:1, 74:5, 74:9, 74:10, 74:20, 74:21, 75:6, 75:7, 75:13, 75:19, 75:20, 76:1, 76:4, 76:5, 76:7, 76:8, 76:16, 76:17, 76:19, 76:21, 76:22, 76:23, 76:25, 77:13, 77:17, 77:18, 77:20, 77:21, 77:23, 78:1, 78:5, 78:8, 78:9, 78:13, 78:14, 78:17, 78:18, 78:24, 78:25, 79:16, 80:20, 80:24, 80:25, 81:1, 81:4, 81:7, 81:8, 81:14, 81:17, 82:5, 82:6, 82:7, 82:14, 82:22, 83:1, 83:3, 84:3, 84:6, 84:9, 84:12, 85:6, 85:7, 85:14, 85:18, 85:25, 86:1, 86:10, 86:12, 87:2, 87:3, 87:8, 87:25, 88:22, 91:5, 96:21, 96:25, 98:2, 98:14, 99:12, 101:25, 106:6, 106:14, 116:23, 123:4, 126:5, 126:8, 127:24, 133:20, 143:18, 143:21, 144:25, 145:8, 145:20, 145:21, 145:23, 146:5, 146:10, 147:2, 147:7, 148:3, 148:6, 148:8, 148:13, 148:16, 149:2, 149:3, 149:6, 149:12, 149:13, 149:16, 149:20, 149:23, 149:24, 150:2, 150:3, 151:6, 151:7, 151:10, 151:16, 151:17, 151:18, 152:7, 153:5, 153:8, 153:9, 153:12, 153:13, 153:15, 154:20, 154:21, 154:23, 154:24, 156:8, 156:12, 156:14, 156:17,

157:17, 157:20, 157:21, 157:22, 158:4, 158:5, 160:23, 161:4, 161:7, 161:8, 161:10, 161:11, 161:14, 161:15, 162:10, 162:24, 163:25, 164:6, 164:8, 164:9, 164:18, 164:21, 165:9, 165:11, 166:11, 166:12, 166:15, 166:20, 166:22, 168:22, 171:2, 172:20, 173:4, 181:23, 184:16, 187:25, 190:2, 204:3, 204:8, 204:11, 204:15, 204:16, 204:18, 205:22, 206:8, 206:21, 210:14, 210:24, 211:24, 213:7, 213:24, 214:15, 214:22, 215:11, 217:20, 218:6, 224:17, 224:21, 225:13, 227:18, 227:19, 234:6, 234:10

**corrected** [1] - 43:24

**correction** [1] - 86:3

**corrective** [1] - 133:6

**correctly** [1] - 183:17

**correspond** [1] - 120:17

**correspondence** [2] - 44:4, 50:8

**corresponding** [1] - 159:16

**cost** [1] - 29:1

**COSTELLO** [7] - 2:9, 7:11, 235:21, 235:25, 236:2, 236:4, 236:7

**Costello** [3] - 7:12, 235:20, 236:17

**couch** [1] - 190:21

**council** [1] - 48:23

**Council** [1] - 37:18

**counsel** [15] - 6:4, 9:10, 15:9, 91:24, 109:21, 130:22, 148:10, 158:16, 167:22, 167:23, 177:15, 180:8, 216:5, 235:2, 241:20

**Counsel** [4] - 11:24, 45:14, 50:11, 190:9

**counsel's** [1] - 45:6

**Counselor** [1] - 195:4

**counselor** [1] - 209:18

**counties** [3] - 98:3, 174:2, 185:14

**Counties** [1] - 98:5

**counting** [2] - 76:9, 76:12

**countries** [1] - 202:16

**country** [8] - 6:10, 173:20, 187:9, 191:16, 192:1, 192:10, 202:13, 206:2

**county** [20] - 16:13, 22:8, 25:22, 45:24, 107:10, 164:2, 164:10, 173:2, 174:10, 182:12, 182:13, 186:2, 188:7, 188:19, 189:6, 203:18, 205:2, 214:19, 220:16, 232:5

**County** [21] - 8:2, 16:14, 18:17, 18:18, 18:23, 22:9, 22:10, 24:14, 25:23, 45:25, 62:6, 72:9, 72:12, 98:5, 152:5, 182:13, 231:24, 231:25, 232:2, 232:5

**COUNTY** [2] - 2:23, 2:24

**couple** [25] - 7:18, 12:19, 37:5, 75:3, 75:4, 84:20, 84:21, 85:12, 85:15, 86:1, 86:19, 87:23, 88:18, 88:21, 107:2, 140:16, 140:17, 145:15, 145:25, 159:24, 170:1, 196:12, 227:21, 231:3, 231:5

**course** [17] - 75:18, 114:22, 115:10, 129:1, 131:15, 154:6, 168:8, 178:13, 192:6, 198:8, 198:10, 198:24, 221:13, 234:15, 236:8, 239:16, 244:24

**court** [12] - 11:12, 12:5, 64:5, 95:23, 121:18, 123:18, 126:10, 179:25, 181:15, 181:18, 244:14, 244:15

**COURT** [315] - 1:1, 6:12, 6:17, 6:20, 7:2, 7:5, 7:13, 7:18, 7:22, 7:25, 8:3, 8:16, 8:24,

9:8, 9:14, 9:19, 9:23, 10:2, 10:13, 10:21, 11:6, 11:8, 11:17, 11:24, 13:16, 13:21, 13:25, 14:15, 14:17, 14:25, 15:3, 15:5, 15:9, 17:3, 17:13, 21:1, 21:3, 30:22, 33:7, 36:22, 36:25, 37:6, 38:15, 38:19, 39:20, 44:2, 44:8, 45:6, 45:11, 46:2, 46:5, 47:1, 47:23, 47:25, 48:20, 50:5, 50:7, 50:13, 52:4, 52:7, 52:9, 53:2, 53:4, 53:12, 54:13, 56:15, 56:24, 57:2, 57:4, 57:14, 59:15, 59:18, 59:21, 59:23, 60:19, 60:25, 61:7, 61:9, 61:25, 62:2, 63:4, 63:7, 63:10, 63:12, 70:9, 70:11, 70:14, 73:16, 81:18, 82:9, 82:15, 82:17, 83:2, 83:10, 84:25, 85:3, 86:15, 87:9, 88:16, 89:7, 89:25, 90:4, 91:20, 91:24, 92:4, 92:10, 92:13, 92:19, 93:10, 93:21, 95:2, 95:14, 95:17, 109:21, 110:4, 110:8, 110:14, 110:21, 112:1, 112:9, 117:7, 117:25, 120:22, 121:2, 127:6, 130:20, 131:3, 134:20, 134:24, 136:25, 145:2, 145:4, 145:9, 146:19, 146:21, 147:13, 157:11, 157:13, 157:15, 158:14, 159:3, 159:8, 159:15, 159:18, 159:20, 159:22, 167:2, 167:6, 168:8, 168:24, 169:2, 172:14, 175:13, 175:17, 175:22, 176:5, 176:11, 176:15, 177:1, 177:6, 177:21, 178:3, 178:10, 178:19, 178:22, 179:6, 179:9, 179:18, 181:6, 181:9, 181:11, 183:17, 183:23, 183:25, 185:18, 186:4, 186:10, 186:13, 187:6, 187:18,

187:21, 188:24, 190:8, 190:18, 190:24, 191:23, 192:5, 192:17, 192:21, 193:6, 194:12, 194:16, 195:9, 196:14, 196:18, 197:15, 197:17, 198:6, 198:20, 199:9, 199:21, 200:16, 200:21, 201:9, 201:17, 201:24, 202:9, 203:5, 203:15, 203:18, 203:20, 207:22, 208:4, 208:7, 208:22, 209:2, 209:5, 209:7, 209:9, 209:17, 209:23, 211:10, 211:14, 211:21, 212:3, 212:8, 212:16, 212:19, 216:5, 216:9, 218:25, 219:15, 220:7, 220:12, 220:20, 221:2, 221:7, 221:11, 221:13, 221:18, 221:21, 221:23, 223:10, 223:19, 224:8, 224:25, 227:12, 227:16, 227:23, 228:4, 228:8, 228:12, 228:14, 228:15, 229:3, 229:20, 230:7, 230:10, 230:18, 230:23, 231:1, 231:8, 231:16, 231:18, 231:22, 232:12, 232:19, 233:4, 233:8, 233:11, 233:14, 233:16, 233:19, 234:2, 234:6, 234:14, 234:18, 234:25, 235:14, 235:15, 235:16, 235:23, 236:1, 236:3, 236:6, 236:17, 236:25, 237:4, 237:10, 237:22, 237:24, 238:4, 238:6, 239:14, 240:7, 240:10, 240:18, 240:20, 240:22, 241:2, 241:7, 241:17, 241:22, 242:2, 242:6, 242:21, 243:5, 243:21, 244:2, 244:10, 244:24, 245:12, 245:16, 246:1, 246:5

**Court** [32] - 3:2, 3:3, 6:1, 9:21, 26:15,

187:21, 188:24, 190:8, 190:18, 190:24, 191:23, 192:5, 192:17, 192:21, 193:6, 194:12, 194:16, 195:9, 196:14, 196:18, 197:15, 197:17, 198:6, 198:20, 199:9, 199:21, 200:16, 200:21, 201:9, 201:17, 201:24, 202:9, 203:5, 203:15, 203:18, 203:20, 207:22, 208:4, 208:7, 208:22, 209:2, 209:5, 209:7, 209:9, 209:17, 209:23, 211:10, 211:14, 211:21, 212:3, 212:8, 212:16, 212:19, 216:5, 216:9, 218:25, 219:15, 220:7, 220:12, 220:20, 221:2, 221:7, 221:11, 221:13, 221:18, 221:21, 221:23, 223:10, 223:19, 224:8, 224:25, 227:12, 227:16, 227:23, 228:4, 228:8, 228:12, 228:14, 228:15, 229:3, 229:20, 230:7, 230:10, 230:18, 230:23, 231:1, 231:8, 231:16, 231:18, 231:22, 232:12, 232:19, 233:4, 233:8, 233:11, 233:14, 233:16, 233:19, 234:2, 234:6, 234:14, 234:18, 234:25, 235:14, 235:15, 235:16, 235:23, 236:1, 236:3, 236:6, 236:17, 236:25, 237:4, 237:10, 237:22, 237:24, 238:4, 238:6, 239:14, 240:7, 240:10, 240:18, 240:20, 240:22, 241:2, 241:7, 241:17, 241:22, 242:2, 242:6, 242:21, 243:5, 243:21, 244:2, 244:10, 244:24, 245:12, 245:16, 246:1, 246:5

**Court** [32] - 3:2, 3:3, 6:1, 9:21, 26:15,

37:21, 40:4, 92:24, 93:5, 94:6, 94:8, 94:13, 94:22, 96:5, 109:15, 176:3, 178:21, 178:23, 188:1, 190:11, 190:13, 206:7, 228:3, 238:15, 239:1, 239:4, 239:9, 240:10, 244:19, 244:20, 247:8, 247:9

**Court's** [3] - 9:4, 239:22, 240:8

**COURTROOM** [7] - 6:2, 11:10, 11:14, 95:16, 95:21, 179:22, 179:24

**covariant** [1] - 163:14

**cover** [4] - 93:21, 102:23, 113:24, 241:6

**covered** [1] - 122:13

**crazy** [1] - 242:2

**create** [2] - 162:23, 203:2

**creation** [1] - 162:15

**Crested** [1] - 116:16

**crew** [3] - 101:10, 101:16, 101:21

**crime** [4] - 191:25, 192:12, 193:2, 197:25

**crimes** [7] - 193:9, 193:14, 193:19, 199:6, 200:12, 218:20, 219:6

**criminal** [7] - 187:3, 187:12, 198:8, 199:1, 206:4, 219:4, 219:10

**criminals** [4] - 192:25, 197:12, 201:13, 202:14

**crisis** [2] - 191:10, 215:18

**criteria** [5] - 108:18, 112:5, 141:7, 144:3, 165:13

**critical** [13] - 139:12, 139:15, 139:23, 139:25, 140:4, 140:12, 140:19, 141:1, 141:5, 141:7, 141:21, 144:23, 225:10

**critiquing** [1] - 244:4

**CROSS** [8] - 4:2, 63:14, 86:16, 145:10, 147:16, 167:8, 203:23, 221:25

**cross** [27] - 9:5, 9:7, 63:8, 93:2, 93:14,

94:15, 145:4, 146:19, 146:20, 146:21, 147:13, 167:6, 169:5, 173:5, 176:17, 177:24, 178:1, 180:10, 198:24, 203:16, 203:21, 233:24, 234:8, 234:23, 235:6, 238:17, 239:18

**cross-examination** [11] - 63:8, 94:15, 145:4, 176:17, 180:10, 198:24, 203:21, 233:24, 234:8, 234:23, 235:6

**CROSS-EXAMINATION** [7] - 63:14, 86:16, 145:10, 147:16, 167:8, 203:23, 221:25

**cross-examined** [2] - 238:17, 239:18

**cross-examining** [1] - 177:24

**crossed** [2] - 191:18, 237:3

**cultural** [30] - 19:9, 19:10, 54:18, 55:13, 106:3, 106:5, 106:7, 106:10, 119:12, 119:15, 120:4, 120:11, 127:25, 128:3, 134:7, 134:9, 134:10, 134:12, 148:25, 155:11, 155:18, 155:19, 155:22, 155:25, 170:20, 172:21, 172:24, 173:3, 173:9

**culturally** [3] - 118:18, 134:3, 156:10

**culture** [1] - 155:13

**culverts** [6] - 29:14, 30:4, 30:9, 30:24, 31:3

**cumulative** [1] - 177:3

**cup** [1] - 37:14

**current** [9] - 42:8, 82:23, 130:12, 175:2, 180:12, 182:14, 182:17, 198:25, 218:10

**curriculum** [1] - 148:6

**Curry** [1] - 237:9

**Curtis** [1] - 7:1

**curves** [1] - 124:14

**custody** [13] -

204:22, 204:23, 204:25, 205:3, 205:4, 205:8, 205:9, 205:13, 205:24, 213:23, 214:9, 214:21, 220:6

**Customs** [1] - 214:25

**cut** [1] - 41:5

**cutting** [1] - 107:15

**CV** [1] - 15:7

**Cypress** [61] - 20:6, 20:9, 24:4, 25:19, 28:9, 28:12, 34:21, 51:18, 52:1, 55:17, 72:15, 72:16, 72:22, 72:25, 73:1, 73:2, 73:4, 73:6, 73:11, 73:23, 74:1, 74:4, 74:8, 79:1, 79:4, 79:5, 79:21, 91:7, 100:17, 102:16, 102:18, 102:19, 103:7, 103:8, 103:9, 103:16, 106:8, 106:11, 108:9, 108:15, 108:20, 108:22, 108:24, 109:1, 109:4, 109:24, 110:19, 118:12, 118:19, 119:4, 123:25, 127:17, 127:20, 128:3, 128:5, 128:6, 149:1, 153:24, 154:4, 165:3, 175:9

## D

**Dade** [21] - 8:2, 16:14, 18:17, 22:9, 25:23, 32:4, 45:25, 62:6, 88:9, 98:5, 107:11, 107:12, 107:16, 152:5, 164:12, 174:12, 195:25, 231:24, 231:25, 232:2, 232:5

**DADE** [2] - 2:23, 2:24

**Dade-Collier** [2] - 32:4, 195:25

**daily** [2] - 100:2, 160:16

**danger** [1] - 198:3

**Dante** [2] - 7:8, 74:13

**DANTE** [1] - 2:8

**dark** [16] - 108:10, 108:16, 108:20, 109:9, 109:24, 110:21, 110:25, 112:1, 112:4, 112:7, 112:11, 165:5, 165:8, 165:11, 165:14,

165:17

**data** [42] - 35:12, 35:23, 66:3, 66:8, 66:14, 66:19, 67:12, 67:16, 68:19, 69:17, 71:8, 72:3, 87:15, 99:7, 99:8, 103:15, 103:17, 103:18, 142:21, 149:14, 149:21, 150:20, 150:25, 151:4, 159:13, 163:16, 167:15, 167:17, 168:3, 168:5, 168:21, 170:1, 174:17, 192:9, 198:25, 199:11, 199:25, 200:3, 200:17, 200:23, 200:25, 206:7

**database** [2] - 140:5, 213:12

**dataset** [1] - 149:17

**date** [7] - 46:2, 85:15, 148:9, 168:4, 196:17, 216:6, 216:12

**DATE** [1] - 247:8

**dated** [1] - 232:1

**dates** [1] - 66:16

**David** [3] - 7:11, 179:23, 180:2

**DAVID** [2] - 2:9, 4:11

**Daviduk** [1] - 236:22

**Davie** [1] - 50:21

**day-to-day** [7] - 59:24, 101:19, 101:22, 118:2, 180:24, 181:3, 227:5

**days** [3] - 37:5, 192:19, 239:2

**DC** [2] - 2:19, 2:21

**DE** [3] - 178:4, 178:5, 231:6

**deal** [2] - 8:18, 110:10

**deals** [2] - 17:9, 45:2

**decade** [2] - 48:5, 48:14

**decades** [1] - 85:22

**decide** [4] - 81:19, 94:13, 185:2, 215:9

**decided** [2] - 62:19, 67:8

**decides** [1] - 94:22

**decision** [4] - 37:18, 219:22, 230:15, 244:17

**decision-making** [1] - 37:18

**decisions** [1] - 230:14

**declaration** [30] - 13:17, 15:6, 15:7, 15:8, 17:8, 36:19, 86:20, 94:20, 148:2, 148:6, 148:8, 167:24, 176:13, 177:5, 217:4, 224:23, 234:4, 234:9, 234:13, 236:5, 236:20, 236:21, 236:22, 236:23, 237:6, 237:8, 238:18, 238:23, 239:17

**declarations** [32] - 9:5, 9:6, 15:11, 92:24, 92:25, 93:4, 93:5, 93:8, 93:15, 93:16, 93:22, 93:25, 94:6, 94:10, 94:11, 94:14, 94:17, 94:23, 94:24, 94:25, 176:2, 176:22, 177:17, 177:22, 233:10, 233:20, 233:23, 234:7, 235:18, 237:2, 238:16, 239:16

**declared** [1] - 190:1

**declares** [1] - 230:2

**decrease** [2] - 39:8, 42:12, 136:20

**decreases** [1] - 42:16

**deer** [2] - 115:2, 119:6

**defend** [1] - 97:2

**Defendant** [2] - 176:11, 232:6

**DEFENDANT** [2] - 2:6, 2:23

**Defendant's** [1] - 237:19

**Defendants** [17] - 7:15, 7:17, 7:21, 7:24, 45:10, 63:13, 92:14, 93:13, 94:20, 95:3, 110:4, 110:16, 111:2, 176:12, 203:16, 240:4, 240:20

**DEFENDANTS** [1] - 2:12

**defendants** [19] - 1:8, 44:6, 94:10, 94:23, 175:24, 177:25, 232:22, 234:12, 243:2

**Defendants'** [2] - 208:6, 208:11

**defendants'** [1] - 208:7

**Defense** [14] - 178:8, 178:9, 209:10, 216:10, 221:8, 236:9,

236:10, 236:11, 236:12, 236:13, 236:14, 236:15, 238:5, 243:8

**defense** [3] - 11:2, 235:25, 242:18

**DEFENSE** [1] - 5:19

**defer** [2] - 215:19, 216:22

**deference** [1] - 137:3

**define** [2] - 112:25, 211:3, 223:9

**defined** [2] - 155:1, 194:17, 211:17

**definitely** [1] - 24:4

**degradation** [1] - 136:19

**degree** [1] - 12:9

**delay** [1] - 217:3

**delegable** [1] - 205:11

**delegate** [1] - 217:14

**delegated** [2] - 211:25, 212:4

**delegation** [2] - 183:12, 210:21

**delivered** [3] - 197:1, 242:13, 242:15

**delivery** [3] - 46:11, 46:16, 46:19

**delta** [1] - 159:13

**democratic** [1] - 230:12

**demonstrate** [1] - 51:4

**denied** [2] - 62:11, 243:17

**dense** [1] - 142:4

**density** [1] - 97:12

**Department** [59] - 7:4, 7:7, 7:9, 7:12, 18:12, 18:14, 34:10, 50:20, 96:7, 98:10, 99:10, 99:18, 99:25, 100:6, 101:17, 102:14, 102:18, 102:21, 103:5, 113:16, 115:13, 116:6, 116:24, 117:3, 117:11, 132:23, 137:16, 138:14, 138:18, 138:20, 138:21, 147:23, 149:8, 169:23, 175:5, 180:14, 180:18, 180:25, 181:2, 181:21, 182:5, 182:20, 183:4, 183:13, 184:4, 184:20, 195:19,

200:7, 206:21, 207:19, 207:25, 208:2, 208:18, 208:25, 211:19, 227:3, 227:7, 230:1

**DEPARTMENT** [2] - 2:18, 2:20

**department** [15] - 35:6, 99:14, 101:2, 138:18, 150:4, 156:19, 180:19, 184:5, 191:25, 199:18, 207:24, 209:1, 211:9, 213:16, 225:25

**Department's** [5] - 114:21, 149:7, 149:11, 150:1, 191:8

**departments** [1] - 184:6

**dependent** [3] - 217:9, 217:12, 217:13

**depict** [5] - 14:20, 15:19, 16:23, 23:5, 106:7

**depicted** [8] - 14:21, 16:4, 19:24, 104:9, 106:1, 106:5, 106:13, 139:25

**deploy** [1] - 182:24

**deport** [2] - 206:1, 215:7

**deportation** [2] - 203:13, 225:10

**deporting** [1] - 215:5

**depths** [1] - 142:6

**DEPUTY** [7] - 6:2, 11:10, 11:14, 95:16, 95:21, 179:22, 179:24

**derivative** [2] - 74:4, 74:7

**DeSantis's** [3] - 215:16, 216:16, 217:3

**describe** [10] - 32:10, 32:16, 33:2, 65:18, 111:12, 128:18, 175:2, 192:3, 222:15, 222:17

**described** [4] - 65:2, 101:16, 102:16, 127:23

**describing** [3] - 66:16, 187:24, 188:2

**deserved** [1] - 199:24

**deserves** [2] - 50:9, 200:4

**deserving** [1] - 168:24

**designated** [4] -

112:11, 148:13, 163:1, 178:1

**designation** [11] - 108:10, 108:20, 109:9, 110:21, 110:25, 112:2, 112:4, 165:5, 165:14, 165:18, 210:6

**designed** [3] - 25:18, 38:22, 136:6

**designing** [1] - 101:7

**detain** [10] - 184:7, 184:12, 184:17, 184:20, 186:11, 194:1, 198:5, 203:1, 219:22, 230:15

**detained** [14] - 185:7, 195:7, 198:18, 201:4, 201:9, 201:10, 201:23, 202:1, 214:5, 214:8, 218:19, 219:10, 219:13, 220:1

**detainee's** [1] - 199:1

**detainees** [9] - 76:20, 76:21, 185:6, 189:8, 199:11, 214:14, 219:7, 220:15, 225:3

**detainer** [1] - 187:19

**detainers** [1] - 189:10

**detaining** [1] - 200:11

**detect** [2] - 150:18, 163:15

**detectable** [1] - 145:18

**detected** [5] - 116:20, 117:1, 142:12, 144:4, 144:15

**detention** [111] - 31:9, 33:11, 33:23, 34:14, 34:17, 35:15, 36:1, 36:4, 38:21, 41:16, 41:21, 41:25, 42:2, 46:20, 47:8, 47:19, 48:13, 49:12, 51:25, 54:8, 58:25, 60:11, 60:14, 60:15, 60:21, 60:24, 61:21, 62:5, 62:13, 62:16, 68:7, 68:17, 68:20, 69:3, 69:15, 69:18, 69:21, 70:8, 70:18, 70:23, 71:4, 71:6, 71:9, 71:20, 89:17, 89:19, 90:13, 90:18, 91:4, 91:17, 145:22, 146:2, 151:10,

152:16, 153:4, 156:6, 160:21, 161:13, 162:9, 162:16, 162:17, 163:10, 163:12, 167:13, 172:18, 172:25, 173:20, 173:22, 184:14, 184:17, 184:24, 188:3, 188:12, 188:13, 188:23, 189:1, 192:6, 192:24, 193:1, 194:3, 194:4, 194:6, 194:11, 194:22, 195:2, 195:24, 196:3, 196:7, 196:22, 197:2, 199:7, 202:6, 202:18, 202:21, 203:7, 204:3, 204:10, 204:24, 205:10, 205:20, 215:9, 215:10, 222:7, 222:11, 223:2, 223:6, 223:16, 224:2, 224:17, 225:7, 230:14

**Detention** [1] - 147:9

**detentions** [1] - 230:4

**detergents** [1] - 42:1

**determination** [4] - 51:17, 51:25, 93:8, 187:14

**determine** [11] - 91:16, 103:2, 115:9, 144:19, 169:24, 187:2, 187:11, 205:7, 211:5, 213:18, 213:22

**determined** [1] - 162:22

**develop** [2] - 169:13, 193:13

**developed** [1] - 22:19

**developing** [1] - 102:1

**Development** [1] - 21:13

**developments** [1] - 91:2

**DHS** [8] - 208:16, 214:25, 215:9, 215:14, 216:19, 217:16, 229:7, 229:14

**DHSMV** [1] - 194:8

**diagonal** [1] - 126:15

**Diaz** [1] - 247:7

**DIAZ** [2] - 3:2, 247:8

**dichotomy** [1] - 214:11

**die** [1] - 19:5

**differences** [1] -

67:13

**different** [31] - 19:16, 20:20, 24:19, 33:22, 37:19, 41:7, 41:15, 42:5, 45:2, 45:4, 46:17, 76:3, 99:8, 99:23, 100:20, 105:5, 112:22, 113:5, 113:11, 114:4, 114:9, 115:6, 123:24, 140:6, 184:10, 187:9, 194:19, 212:20, 228:18, 228:19, 229:25

**difficult** [1] - 138:2

**DIRECT** [4] - 4:2, 12:1, 96:1, 180:4

**direct** [24] - 84:1, 91:25, 118:20, 140:4, 148:15, 148:25, 151:8, 154:20, 156:14, 158:14, 160:19, 163:19, 164:13, 165:4, 174:17, 204:3, 205:19, 211:8, 211:20, 213:5, 215:16, 219:3, 220:17, 223:18

**directed** [2] - 189:18, 213:1

**directing** [1] - 182:22

**direction** [16] - 23:6, 23:20, 24:1, 24:7, 30:1, 30:4, 76:3, 84:2, 84:4, 84:8, 84:10, 123:15, 210:24, 211:2, 211:4, 213:3

**directions** [2] - 24:20, 76:1

**directly** [9] - 110:2, 113:13, 137:8, 163:6, 185:17, 197:3, 213:14, 213:17, 219:5

**director** [42] - 6:15, 18:13, 99:10, 99:16, 101:24, 103:19, 105:16, 110:2, 112:21, 180:13, 180:17, 182:5, 182:18, 189:14, 193:16, 194:9, 194:22, 197:21, 198:25, 199:5, 199:12, 199:21, 199:24, 200:6, 206:18, 207:14, 209:25, 210:11, 212:13, 212:22, 216:14, 219:3,

220:14, 220:21, 221:14, 222:2, 228:18, 229:4, 229:21, 230:20

**Director** [29] - 12:7, 12:20, 12:21, 12:24, 96:6, 100:24, 104:23, 111:25, 138:14, 139:11, 140:9, 158:11, 180:6, 188:22, 191:6, 193:4, 194:7, 194:8, 198:17, 202:2, 203:25, 208:13, 209:12, 209:21, 218:1, 224:14, 227:12, 231:24, 232:1

**disagreements** [1] - 179:3

**disappears** [1] - 121:11

**disaster** [1] - 215:24

**discharged** [1] - 67:23

**disciplining** [1] - 226:19

**disclosed** [1] - 36:21

**discovery** [1] - 243:18

**discrepancies** [1] - 179:3

**discuss** [2] - 46:17, 72:8

**discussed** [13] - 50:22, 53:20, 55:21, 72:6, 77:7, 77:22, 84:7, 84:16, 153:23, 164:5, 164:13, 164:17, 187:17

**discussing** [6] - 110:14, 164:11, 172:9, 181:20, 184:11, 193:23

**discussion** [7] - 35:3, 80:17, 93:13, 130:21, 179:14, 201:19, 245:6

**dishes** [2] - 41:22, 61:6

**dispersion** [3] - 132:3, 132:19, 135:7

**displaced** [1] - 41:6

**display** [2] - 18:22, 141:10

**displayed** [1] - 128:7

**dispute** [4] - 214:8, 216:25, 234:3, 244:21

**dissertation** [7] - 97:2, 97:4, 97:15, 97:20, 148:15,

148:18, 148:20
**dissolved** [7] - 36:10, 39:9, 42:9, 42:12, 42:16, 43:4, 136:20
**dissolves** [1] - 42:14
**distance** [2] - 15:23, 115:19
**distinction** [2] - 208:25, 245:16
**distribution** [4] - 97:8, 97:9, 97:10, 133:3
**distributions** [1] - 114:19
**DISTRICT** [3] - 1:1, 1:1, 1:11
**District** [7] - 3:3, 29:2, 29:4, 46:14, 80:22, 81:12, 247:9
**disturb** [1] - 118:7
**disturbance** [4] - 115:20, 115:25, 116:3, 163:6
**disturbs** [1] - 132:13
**diverse** [1] - 47:14
**Diversity** [2] - 6:8, 6:19
**DIVERSITY** [1] - 1:22
**divider** [1] - 107:16
**division** [2] - 109:1, 209:1
**Division** [3] - 181:4, 206:23, 207:4
**DIVISION** [1] - 1:2
**Docket** [9] - 10:4, 10:10, 13:16, 13:20, 15:5, 43:25, 212:11, 233:12, 237:21
**document** [34] - 14:11, 18:8, 18:10, 49:16, 49:19, 52:15, 52:18, 56:12, 56:16, 56:19, 56:21, 104:3, 104:7, 109:4, 109:14, 109:18, 109:19, 109:20, 110:5, 110:6, 110:10, 110:12, 110:17, 111:1, 211:7, 211:12, 211:15, 211:17, 212:19, 216:14, 216:23, 216:25
**documented** [1] - 201:10
**documents** [2] - 206:9, 234:8
**dollar** [2] - 48:5, 48:14
**dollars** [1] - 81:3

**domes** [1] - 123:25
**Dominiq** [1] - 6:15
**Dominique** [1] - 203:25
**DOMINIQUE** [1] - 1:19
**done** [16] - 11:21, 47:5, 52:12, 58:10, 64:10, 65:3, 65:9, 79:1, 92:3, 92:7, 92:21, 95:5, 97:20, 151:6, 206:13, 243:15
**dots** [3] - 15:19, 31:2, 105:21
**dotted** [1] - 237:3
**double** [1] - 123:6
**down** [35] - 7:19, 14:3, 16:15, 21:16, 22:22, 25:20, 26:6, 26:9, 27:14, 31:7, 34:8, 34:25, 37:19, 39:9, 41:10, 42:11, 52:11, 56:7, 59:8, 75:9, 91:20, 108:19, 115:3, 128:9, 130:4, 131:11, 139:9, 139:22, 153:22, 175:14, 181:19, 210:9, 216:21, 227:13, 231:14
**downstream** [9] - 36:6, 36:7, 66:20, 67:3, 67:6, 67:8, 67:13, 67:17, 70:24, 73:15, 167:3, 167:10
**draft** [4] - 57:25, 58:17, 58:19, 58:24
**drain** [2] - 22:16, 25:18
**Drang** [1] - 176:17
**drastically** [1] - 42:16
**draw** [6] - 14:13, 104:2, 140:22, 197:23, 198:2, 200:20
**dredged** [1] - 22:15
**drew** [1] - 144:24
**drinking** [1] - 22:20
**drive** [2] - 153:22, 178:25
**Drive** [1] - 1:16
**driven** [2] - 111:16, 130:8
**driver** [1] - 115:8
**drivers** [1] - 97:7
**driving** [2] - 61:19, 130:4
**drops** [1] - 42:16
**drug** [1] - 197:19

**drugs** [2] - 191:17, 193:3
**due** [8] - 40:23, 115:4, 145:19, 157:25, 170:20, 172:22, 194:4, 195:3
**duly** [3] - 11:9, 95:20, 179:23
**duration** [1] - 96:24, 97:25
**during** [7] - 66:4, 117:1, 163:19, 170:12, 225:12, 225:18, 244:23
**duties** [10] - 100:1, 100:7, 104:23, 181:3, 182:11, 183:3, 189:23, 195:17, 195:21, 205:10

## E

**early** [3] - 8:19, 177:19, 196:8
**earn** [1] - 112:7
**earning** [1] - 165:13
**Earth** [1] - 238:24
**earth** [1] - 96:11
**EARTHJUSTICE** [1] - 1:19
**easement** [1] - 73:14
**easier** [3] - 7:20, 139:3, 231:9
**easily** [2] - 225:7, 225:8
**East** [1] - 2:10
**east** [16] - 22:19, 24:24, 24:25, 27:5, 27:14, 27:24, 28:1, 28:6, 28:19, 30:5, 67:1, 107:3
**east-southeast** [1] - 67:1
**eastern** [6] - 116:16, 116:17, 123:11, 141:25, 142:10, 143:4
**eating** [2] - 40:8, 61:5
**echo** [1] - 132:13
**ecologically** [2] - 47:15, 47:19
**economic** [1] - 54:18
**ecosystem** [9] - 47:13, 48:7, 91:2, 91:10, 114:11, 114:15, 116:4, 133:1, 133:7
**ecotour** [1] - 79:15
**ecotourism** [2] - 79:8, 79:10

**edge** [1] - 121:8
**education** [2] - 12:8, 96:8
**educational** [1] - 154:6
**effect** [5] - 130:24, 132:3, 134:9, 136:14, 169:24
**effectively** [1] - 88:10
**effects** [13] - 51:23, 115:13, 115:17, 130:13, 130:16, 135:3, 135:4, 135:7, 136:24, 138:9, 169:7, 169:9, 190:16
**effectuated** [1] - 29:9
**efficacious** [1] - 243:8
**efficient** [3] - 176:20, 177:4, 177:7
**effort** [2] - 162:14, 195:20
**efforts** [9] - 56:3, 149:12, 150:1, 182:16, 189:20, 189:22, 191:12, 195:17, 219:7
**eight** [4] - 116:22, 128:12, 129:1, 174:24
**eight-zero** [1] - 116:22
**EIS** [2] - 58:7, 58:12
**either** [9] - 27:25, 43:4, 53:22, 93:2, 178:24, 180:19, 182:14, 185:11, 188:7
**elected** [3] - 182:11, 218:5, 238:12
**element** [2] - 201:15, 208:2
**Eleventh** [1] - 247:9
**elicit** [1] - 130:22
**eliciting** [1] - 218:22
**Elise** [1] - 6:18
**ELISE** [1] - 1:22
**embark** [1] - 48:4
**Emergency** [8] - 7:4, 7:7, 7:9, 7:12, 206:24, 207:4, 225:18, 230:1
**emergency** [11] - 182:22, 190:1, 190:4, 217:4, 220:22, 224:23, 225:13, 225:16, 225:19, 225:24, 230:2
**emission** [1] - 77:16
**emitted** [2] - 111:13, 162:18
**emitting** [1] - 77:25

**employed** [4] - 98:7, 98:9, 206:23, 207:6
**employees** [4] - 99:18, 99:19, 133:15, 181:1
**employment** [1] - 160:18
**empowered** [2] - 211:7, 220:6
**empowers** [1] - 183:15
**en** [1] - 157:3
**enclosed** [2] - 58:14, 58:16
**encompasses** [2] - 47:14, 114:16
**encompassing** [1] - 245:17
**encounter** [1] - 220:5
**encountered** [2] - 198:21, 202:15
**end** [5] - 25:22, 65:16, 98:21, 98:23, 197:8
**Endangered** [1] - 116:7
**endangered** [6] - 116:8, 116:21, 117:4, 117:12, 117:19, 131:12
**endeavoring** [2] - 44:4, 45:7
**ended** [2] - 28:10, 168:3
**ends** [2] - 122:23, 126:3
**energy** [1] - 133:3
**enforce** [5] - 183:15, 184:12, 189:23, 202:24, 217:21
**enforced** [2] - 155:10, 193:9
**Enforcement** [1] - 213:18
**enforcement** [20] - 175:3, 182:9, 182:15, 182:23, 183:5, 183:15, 185:10, 189:15, 190:17, 191:11, 199:18, 212:23, 212:25, 217:8, 219:7, 225:21, 229:14, 229:17, 230:6
**engaged** [1] - 103:5
**engagement** [1] - 51:3
**engaging** [3] - 78:4, 78:7, 245:2
**engine** [1] - 129:10

**engineer** [2] - 64:1, 64:3

**Engineers** [5] - 46:15, 52:17, 80:19, 80:24, 81:6

**enlarge** [1] - 21:17

**ensure** [1] - 214:3

**entail** [1] - 141:11

**enter** [2] - 217:8, 239:9

**entered** [1] - 207:9

**entering** [1] - 99:7

**entire** [11] - 19:25, 26:24, 44:3, 54:12, 54:17, 96:24, 97:25, 120:21, 129:2, 201:19, 212:22

**entirely** [3] - 28:20, 93:16, 217:11

**entirety** [1] - 107:12

**entities** [1] - 80:10

**entitled** [2] - 90:9, 247:5

**entity** [2] - 34:3, 169:23

**entrance** [2] - 33:17, 183:5

**entrances** [1] - 15:25

**Entry** [8] - 10:4, 10:10, 13:17, 13:20, 43:25, 212:11, 233:13, 237:21

**environment** [3] - 38:3, 60:16, 82:22

**Environmental** [3] - 57:23, 58:12, 58:19

**environmental** [8] - 34:8, 34:10, 48:24, 58:1, 60:13, 99:6, 114:6, 115:6

**environments** [2] - 100:5, 105:4

**equal** [1] - 230:13

**equally** [1] - 239:17

**equipment** [1] - 242:17

**equities** [2] - 190:10, 201:14

**ER** [1] - 247:1

**erected** [1] - 145:22

**ERO** [1] - 185:15

**ESA** [1] - 117:24

**escort** [1] - 244:5

**ESF** [3] - 225:17, 225:20, 225:21

**especially** [1] - 132:6

**ESQ** [17] - 1:15, 1:15, 1:18, 1:19, 1:22, 2:2, 2:3, 2:3, 2:7, 2:8, 2:8, 2:9, 2:14, 2:16, 2:17,

2:20, 2:24

**essentially** [7] - 97:5, 97:12, 139:17, 150:16, 167:18, 171:24, 183:12

**establish** [1] - 193:2

**established** [8] - 22:14, 30:18, 73:17, 131:10, 131:24, 132:10, 144:22, 156:23

**establishment** [1] - 173:12

**estate** [1] - 51:20

**et** [4] - 1:4, 1:7, 6:3

**etcetera** [3] - 91:7, 106:20

**eternal** [1] - 179:16

**eutrophication** [1] - 137:15

**evacuation** [1] - 220:14

**evaluate** [3] - 169:6, 195:12, 238:15

**evaluated** [1] - 162:15

**evaluating** [1] - 163:3

**evaluation** [1] - 200:14

**Evan** [1] - 7:6

**EVAN** [1] - 2:8

**Eve** [1] - 6:15

**event** [3] - 66:21, 66:22, 67:19

**events** [2] - 84:10, 243:19

**eventually** [3] - 24:1, 24:5, 219:8

**Everglades** [57] - 6:3, 6:7, 6:14, 8:9, 10:23, 20:7, 20:10, 21:8, 23:7, 24:5, 26:1, 26:4, 28:3, 28:25, 30:12, 40:7, 43:9, 43:21, 46:12, 47:13, 48:6, 48:7, 48:10, 48:15, 50:20, 50:21, 51:7, 51:9, 54:19, 54:20, 54:23, 55:1, 55:4, 56:3, 57:25, 60:6, 77:19, 87:25, 89:13, 89:14, 91:2, 91:10, 97:6, 97:16, 100:4, 100:16, 100:18, 100:21, 105:14, 114:10, 135:16, 145:13, 147:9, 148:21, 193:11, 204:2

**EVERGLADES** [1] - 1:4

**evidence** [49] - 10:15, 10:16, 10:17, 10:18, 10:19, 13:15, 14:2, 14:17, 14:24, 15:4, 15:13, 17:2, 17:17, 17:21, 20:25, 22:24, 44:25, 45:18, 50:2, 50:15, 53:1, 53:8, 57:1, 57:13, 57:17, 93:7, 109:13, 121:1, 178:8, 178:9, 199:17, 209:2, 209:4, 209:10, 216:22, 221:8, 229:9, 232:25, 233:1, 233:2, 233:3, 234:20, 234:22, 238:11, 244:15, 244:16, 245:10, 245:11

**evident** [1] - 130:9

**evidentiary** [5] - 94:6, 94:13, 159:17, 233:6, 238:25

**exact** [7] - 85:15, 105:4, 109:3, 161:24, 162:5, 165:15, 168:4

**exactly** [8] - 15:11, 60:25, 70:1, 79:7, 104:1, 112:19, 128:25, 140:18

**EXAMINATION** [14] - 4:1, 12:1, 63:14, 86:16, 89:8, 96:1, 145:10, 147:16, 167:8, 169:3, 180:4, 203:23, 221:25, 224:12

**examination** [15] - 63:8, 94:15, 145:4, 148:15, 148:25, 160:19, 163:19, 176:17, 180:10, 198:24, 203:21, 233:24, 234:8, 234:23, 235:6

**examine** [2] - 45:13, 93:3

**examined** [4] - 38:13, 163:18, 238:17, 239:18

**examining** [1] - 177:24

**example** [12] - 43:17, 114:24, 158:1, 161:3, 162:12, 162:19, 162:25, 178:24, 184:13, 187:5, 187:9, 225:21

**examples** [4] - 61:17, 116:15, 200:13, 219:6

**exceed** [1] - 112:5

**exceeded** [2] - 195:15, 205:21

**exceeding** [1] - 225:2

**except** [1] - 213:2

**exception** [1] - 177:19

**exclusively** [1] - 157:4

**excuse** [1] - 57:22

**excused** [3] - 91:23, 175:16, 227:15

**execute** [4] - 183:10, 183:18, 183:22, 184:9

**executed** [2] - 215:22, 215:25

**execution** [1] - 215:19

**executive** [2] - 6:15, 180:13, 180:17, 182:5, 182:17, 183:21, 189:14, 200:6, 206:18, 207:14, 215:24, 216:1

**Executive** [2] - 215:17, 221:5

**exemplar** [1] - 50:9

**exercise** [3] - 50:23, 54:4, 110:13

**exercising** [3] - 226:6, 226:15, 227:9

**Exhibit** [120] - 5:3, 5:4, 5:5, 5:5, 5:7, 5:7, 5:8, 5:8, 5:9, 5:9, 5:10, 5:10, 5:11, 5:11, 5:12, 5:14, 5:15, 5:15, 5:16, 5:16, 5:17, 5:17, 5:20, 5:20, 5:22, 5:22, 5:23, 10:15, 10:16, 10:17, 10:18, 10:19, 13:4, 13:5, 13:14, 14:2, 14:6, 14:7, 14:23, 15:4, 16:16, 16:17, 17:1, 17:21, 20:24, 22:23, 26:7, 31:11, 40:13, 43:23, 43:24, 44:1, 44:24, 45:17, 50:2, 50:14, 53:1, 53:7, 56:9, 56:10, 57:8, 57:16, 72:7, 74:12, 77:4, 83:6, 83:8, 103:21, 120:25, 145:25, 208:6, 208:11, 209:6, 209:9, 209:10, 216:8, 216:10, 221:4, 221:8,

229:9, 229:12, 232:25, 233:1, 233:2, 233:3, 233:15, 234:20, 234:21, 234:22, 235:8, 235:9, 235:10, 235:11, 235:12, 235:13, 235:21, 236:5, 236:9, 236:10, 236:11, 236:12, 236:13, 236:14, 236:15, 236:16, 236:21, 236:22, 236:23, 237:8, 237:12, 237:13, 237:14, 237:15, 237:16, 237:17, 237:19, 237:21, 238:2, 238:5, 238:23

**exhibit** [31] - 5:4, 10:4, 10:5, 10:10, 13:20, 44:3, 44:4, 45:3, 50:1, 57:12, 72:8, 77:7, 94:11, 120:24, 139:9, 148:13, 177:18, 178:2, 178:11, 178:23, 228:18, 228:24, 231:6, 231:13, 233:12, 235:19, 235:25, 237:20, 238:2

**exhibited** [1] - 63:19

**EXHIBITS** [4] - 5:1, 5:2, 5:13, 5:19

**exhibits** [19] - 8:14, 9:10, 9:12, 9:18, 10:11, 177:24, 178:1, 178:12, 179:7, 227:21, 228:9, 231:4, 233:13, 233:24, 234:24, 235:6, 236:8, 239:3, 239:8

**Exhibits** [9] - 5:6, 5:6, 5:21, 5:21, 178:5, 178:6, 178:8, 178:9, 233:18

**exist** [4] - 166:24, 184:10, 214:23

**existed** [1] - 155:24

**existing** [2] - 31:3, 172:11

**exotic** [2] - 116:2, 138:9

**expands** [1] - 114:16

**expansive** [1] - 223:4

**expect** [8] - 130:13, 130:24, 131:23, 132:19, 146:16,

# F

160:20, 169:15, 169:22
**expecting** [2] - 61:4, 132:18
**expedited** [3] - 239:12, 243:18, 245:21
**experience** [25] - 59:24, 110:24, 130:23, 137:3, 182:15, 182:19, 183:11, 184:22, 185:8, 185:10, 188:22, 189:14, 190:4, 190:22, 191:7, 191:20, 193:5, 193:18, 196:20, 199:5, 199:10, 202:4, 202:20, 203:7, 206:17
**experienced** [2] - 191:11, 191:25
**experiencing** [2] - 194:4, 195:2
**experimentation** [1] - 161:18
**expert** [11] - 36:17, 39:14, 39:18, 39:19, 47:24, 60:18, 130:18, 130:22, 134:16, 137:2, 165:22
**expertise** [5] - 17:10, 134:17, 136:23, 137:3, 220:22
**explain** [3] - 40:4, 97:9, 114:13
**explaining** [1] - 167:18
**explanation** [2] - 161:16, 232:17
**explore** [2] - 159:2, 194:23
**extend** [2] - 127:17, 174:7
**extending** [3] - 124:13, 125:9, 174:4
**extends** [1] - 100:18
**extensive** [1] - 239:23
**extent** [2] - 72:3, 83:14
**eye** [1] - 111:22
**EZRAY** [23] - 2:8, 4:5, 4:9, 7:6, 9:25, 33:5, 36:16, 38:12, 48:17, 86:17, 87:10, 87:11, 88:15, 88:17, 89:6, 89:23, 134:18, 134:21, 167:7, 167:9, 168:7, 168:9, 169:1
**Ezray** [2] - 7:6, 167:6

**facets** [1] - 218:18
**facilities** [39] - 55:3, 149:23, 161:14, 173:15, 173:16, 185:5, 185:6, 187:17, 188:2, 188:6, 188:7, 188:10, 188:12, 188:16, 188:18, 188:20, 189:6, 189:8, 189:11, 189:12, 194:3, 194:11, 194:14, 195:2, 195:9, 197:19, 202:21, 204:5, 204:20, 205:14, 205:21, 220:16, 222:16, 222:18, 223:1, 223:2, 223:7, 228:19, 244:3
**Facility** [1] - 32:4
**facility** [196] - 29:10, 31:10, 33:11, 33:23, 34:14, 34:17, 35:15, 35:19, 36:1, 36:4, 37:12, 38:9, 38:10, 38:13, 38:21, 41:16, 41:21, 41:25, 42:3, 46:20, 47:9, 47:19, 48:13, 48:25, 49:12, 51:25, 54:8, 55:15, 55:16, 55:17, 58:25, 60:11, 60:14, 60:16, 60:21, 60:24, 61:22, 62:5, 62:10, 62:13, 62:14, 62:16, 65:14, 65:16, 68:7, 68:11, 68:13, 68:17, 68:20, 68:23, 69:15, 69:18, 69:22, 70:4, 70:23, 71:5, 71:6, 71:9, 71:12, 71:14, 71:17, 71:24, 72:2, 75:12, 75:22, 76:13, 76:15, 77:25, 78:4, 78:7, 78:13, 78:17, 78:19, 78:24, 81:23, 83:1, 89:17, 89:19, 90:14, 90:18, 91:4, 91:17, 111:14, 111:15, 121:9, 122:19, 123:11, 124:10, 124:13, 125:4, 130:5, 130:8, 131:8, 151:10, 156:6, 156:23, 157:3, 157:4, 157:6, 160:2, 160:9, 160:10, 160:12, 160:17, 162:9, 162:11, 162:12, 162:16,
162:17, 162:18, 163:4, 163:10, 163:12, 165:19, 167:14, 169:14, 169:15, 170:14, 172:10, 172:25, 173:20, 173:22, 184:15, 185:15, 185:20, 186:18, 188:5, 189:1, 190:15, 192:6, 193:1, 193:22, 195:24, 196:4, 196:22, 197:2, 197:3, 197:6, 197:8, 198:1, 198:2, 199:7, 200:17, 200:24, 201:2, 201:6, 201:21, 201:22, 202:6, 202:18, 202:23, 203:7, 203:8, 203:11, 204:11, 204:13, 204:17, 205:2, 205:24, 215:10, 218:23, 218:24, 219:1, 220:15, 222:7, 222:8, 222:13, 223:4, 223:6, 223:16, 224:2, 224:17, 225:8, 228:20, 228:23, 229:1, 229:2, 229:5, 229:7, 229:11, 229:15, 229:16, 229:19, 229:21, 230:4, 230:16, 245:4
**facility's** [1] - 38:13
**facing** [2] - 121:8, 195:8
**fact** [12] - 39:18, 39:21, 101:24, 129:21, 132:10, 172:25, 176:24, 177:6, 193:2, 198:3, 205:7, 207:16
**factor** [1] - 109:24
**factors** [2] - 84:13, 114:18
**facts** [1] - 240:2
**factual** [1] - 17:10
**factually** [1] - 158:24
**fair** [41] - 56:25, 65:22, 66:8, 66:23, 67:12, 67:16, 68:10, 69:14, 73:20, 75:5, 81:9, 81:13, 84:13, 84:21, 98:1, 126:24, 131:6, 137:6, 148:20, 149:9, 150:23, 150:24, 151:3, 151:4, 151:15, 154:17, 156:11, 160:5, 161:1,
161:20, 161:21, 162:4, 163:21, 172:11, 173:2, 192:15, 205:23, 222:25, 223:5, 223:6, 244:20
**fairly** [3] - 14:20, 16:23, 243:8
**fall** [1] - 231:15
**familiar** [21] - 21:5, 23:3, 43:6, 43:8, 104:25, 108:9, 108:12, 112:21, 117:15, 122:8, 135:13, 139:11, 139:15, 141:25, 142:14, 142:25, 143:25, 165:13, 195:24, 196:2, 207:17
**familiarity** [2] - 118:1, 123:20
**far** [15] - 74:22, 75:1, 84:16, 84:18, 84:19, 106:25, 127:13, 127:16, 134:19, 134:22, 181:18, 182:20, 199:1, 202:22, 225:8
**fashion** [1] - 125:9, 239:4
**fast** [1] - 92:7
**faster** [1] - 92:2
**fastest** [1] - 167:11
**fate** [1] - 179:18
**faulted** [1] - 245:23
**fauna** [4] - 149:12, 149:14, 149:22, 149:25
**favor** [1] - 48:16, 48:25
**FCRR** [2] - 3:2, 247:8
**FDEM** [9] - 207:1, 220:23, 225:11, 225:12, 225:16, 225:24, 230:17
**FDEP** [1] - 62:6
**FDLE** [1] - 225:23
**fear** [1] - 28:18
**feature** [2] - 121:13, 122:16
**February** [2] - 212:12, 217:1
**feces** [5] - 36:12, 37:23, 38:2, 38:7, 38:8
**Federal** [81] - 5:23, 7:15, 7:17, 7:21, 7:24, 8:25, 9:18, 28:22, 29:1, 33:24, 40:16, 43:10, 45:10, 48:3,
52:22, 53:18, 59:5, 60:2, 63:13, 66:11, 66:13, 81:6, 81:10, 81:11, 81:14, 92:13, 93:13, 94:20, 95:3, 95:8, 100:11, 100:21, 104:13, 110:4, 110:16, 111:2, 169:19, 176:12, 184:5, 185:14, 186:7, 187:18, 188:5, 188:8, 188:19, 189:9, 195:6, 195:9, 195:14, 195:18, 195:22, 197:18, 203:16, 204:10, 204:22, 204:24, 205:3, 205:20, 205:24, 207:25, 209:14, 210:3, 210:19, 210:21, 212:2, 213:15, 214:9, 214:12, 215:4, 217:10, 219:21, 222:11, 225:2, 226:1, 226:25, 228:4, 230:16, 237:19, 238:14, 240:4, 240:20
**FEDERAL** [1] - 2:12
**federally** [2] - 48:14, 203:10
**federally-owned** [1] - 203:10
**feed** [1] - 146:14
**feet** [2] - 87:22, 88:22
**fence** [13] - 62:10, 151:12, 152:18, 152:19, 153:3, 153:4, 153:7, 155:1, 155:4, 155:7, 155:10, 158:19, 170:22
**fenced** [13] - 151:11, 151:14, 151:17, 151:21, 152:2, 152:3, 153:1, 153:8, 157:1, 157:8, 157:17, 159:1, 172:18
**fenced-in** [3] - 157:1, 157:8, 157:17
**fencing** [12] - 151:19, 151:25, 170:7, 170:10, 170:13, 170:15, 171:16, 171:19, 171:22, 172:8, 172:11, 242:14
**fertilizers** [2] - 41:14, 77:22
**few** [14] - 19:16,

30:13, 34:20, 74:23,
74:24, 103:23,
110:23, 120:19,
124:3, 180:9, 185:12,
188:1, 220:7, 224:15
**FHP** [2] - 188:23,
216:20
**FICARELLI** [3] - 2:8,
7:8, 83:7
**Ficarelli** [1] - 7:9
**field** [13] - 99:7,
100:1, 100:3, 101:10,
101:16, 101:21,
102:4, 102:6, 102:11,
128:14, 128:24,
129:5, 199:20
**fieldwork** [1] - 99:5
**figure** [3] - 114:3,
115:8, 186:22
**figures** [1] - 136:1
**file** [1] - 178:20
**filed** [6] - 94:20,
94:22, 212:12, 231:6,
237:25, 238:2
**fill** [7] - 26:25, 33:20,
86:21, 86:23, 86:25,
87:3, 87:6
**filled** [2] - 27:1, 27:7
**filling** [1] - 110:2
**final** [3] - 92:11,
231:9, 242:5
**finally** [1] - 174:14
**findings** [3] - 101:12,
239:9, 239:11
**fine** [7] - 93:6, 179:1,
199:11, 228:7,
234:15, 240:25,
241:16
**finish** [2] - 64:5,
179:17
**finished** [1] - 96:18
**firing** [1] - 226:17
**first** [34] - 12:13,
39:16, 46:9, 47:11,
49:5, 50:17, 51:14,
56:1, 57:19, 57:21,
59:2, 63:13, 67:21,
148:2, 160:6, 183:9,
183:18, 183:22,
184:9, 188:6, 188:19,
189:18, 190:20,
193:22, 196:4,
196:14, 197:10,
198:20, 198:23,
201:3, 201:25, 225:8,
245:9
**firsthand** [2] - 105:6,
171:4
**fish** [8] - 19:8, 42:17,
42:20, 55:18, 102:23,

104:25, 119:18,
138:13
**Fish** [20] - 96:7, 98:9,
99:10, 100:6, 100:24,
102:21, 104:23,
111:25, 138:14,
139:11, 139:13,
139:14, 140:5, 140:9,
141:22, 144:3, 149:8,
158:11, 169:20,
169:23
**fishing** [10] - 55:1,
108:3, 118:16,
118:17, 119:18,
119:23, 120:4, 151:9,
152:15, 173:10
**FIU** [2] - 97:1, 98:12
**five** [12] - 64:25,
93:19, 93:20, 96:17,
97:24, 99:19, 129:1,
177:10, 186:14,
227:24, 227:25, 228:8
**five-minute** [1] -
227:24
**fixed** [1] - 144:23
**FL** [1] - 1:23
**FLEXNER** [1] - 2:9
**flight** [11] - 163:22,
163:25, 164:6, 164:8,
167:14, 167:17,
168:21, 174:17,
174:20, 174:23,
238:21
**flights** [13] - 75:21,
76:6, 76:10, 87:15,
128:20, 167:18,
168:11, 168:13,
168:15, 174:15,
174:22, 174:25, 228:4
**flock** [1] - 144:13
**flood** [4] - 22:18,
28:17, 29:6, 82:2
**flooded** [1] - 28:18
**Floor** [2] - 3:4, 247:9
**flora** [4] - 149:12,
149:14, 149:21,
149:25
**FLORIDA** [1] - 1:1
**Florida** [91] - 1:4,
1:17, 1:21, 2:5, 2:11,
2:15, 2:25, 3:4, 6:22,
7:4, 7:7, 7:9, 7:12,
12:10, 17:14, 22:21,
29:2, 29:3, 46:14,
47:17, 47:20, 48:4,
49:9, 50:21, 68:11,
78:12, 78:15, 78:23,
80:22, 81:12, 81:16,
96:23, 98:11, 100:5,
112:12, 112:13,

112:15, 112:16,
112:18, 116:17,
119:24, 131:11,
131:12, 131:21,
132:2, 132:4, 132:8,
140:14, 141:6,
141:18, 141:21,
142:14, 161:25,
162:20, 177:3,
180:13, 181:4, 181:5,
182:6, 182:7, 185:7,
185:8, 185:12,
185:16, 186:10,
186:13, 188:12,
190:5, 191:3, 191:7,
191:12, 191:15,
193:25, 194:8,
201:23, 202:23,
206:20, 206:23,
207:4, 207:9, 214:21,
215:18, 218:6,
218:12, 218:15,
224:5, 225:22, 226:3,
230:5, 247:10
**Florida's** [3] - 194:3,
195:2, 196:6
**flow** [24] - 23:6, 24:3,
24:7, 24:14, 24:18,
24:19, 24:22, 24:24,
25:1, 27:4, 27:10,
27:13, 28:6, 29:15,
29:20, 29:25, 30:4,
34:1, 51:21, 58:11,
70:24, 136:6, 136:8,
190:12
**flowed** [1] - 25:6
**flowing** [7] - 23:18,
23:24, 83:14, 84:2,
84:8, 136:8, 136:12
**flows** [9] - 24:1, 25:4,
25:16, 28:19, 62:21,
83:5, 83:13, 83:18,
83:22
**flux** [1] - 40:8
**fly** [4] - 32:6, 75:25,
143:20, 203:12
**flying** [1] - 76:3
**focus** [1] - 157:24
**focused** [2] - 148:20,
148:22
**focusing** [1] - 154:10
**folks** [2] - 192:6,
238:20
**follow** [3] - 89:19,
90:6, 219:9
**following** [3] - 93:10,
147:25, 211:16
**food** [7] - 80:5, 80:6,
113:24, 133:3,
141:14, 146:17, 147:1

**footprint** [2] - 49:1,
81:25
**FOR** [8] - 1:15, 1:22,
2:1, 2:12, 2:23, 5:2,
5:13, 5:19
**forage** [1] - 144:7
**foraging** [9] - 39:8,
141:13, 143:25,
144:5, 144:7, 144:9,
144:14, 144:21, 145:6
**force** [5] - 184:9,
184:11, 184:14,
187:23, 218:2
**foregoing** [1] - 247:3
**foremost** [2] -
189:18, 225:9
**foresaw** [1] - 179:10
**Forest** [1] - 139:12
**forest** [1] - 142:6
**forget** [2] - 165:15,
228:17
**forgetting** [1] -
203:20
**formal** [1] - 102:15
**formally** [1] - 46:12
**formerly** [3] - 133:25,
152:5, 218:5
**forming** [1] - 167:13
**forward** [2] - 238:10,
239:21
**foundation** [9] -
30:18, 30:20, 33:5,
39:17, 60:22, 89:24,
158:10, 194:6, 198:16
**four** [7] - 97:24,
179:7, 192:19,
227:22, 231:5,
231:14, 232:7
**FPR** [2] - 3:2, 247:8
**frame** [6] - 75:16,
121:7, 123:14,
124:12, 125:8, 125:10
**Frank** [2] - 7:21,
147:22
**FRANK** [1] - 2:17
**frankly** [2] - 177:2,
238:11
**frequently** [1] -
46:17
**fresh** [2] - 221:17,
228:17
**Friday** [3] - 9:11,
37:5, 65:10
**Friedman** [3] - 6:24,
8:22, 222:2
**FRIEDMAN** [119] -
2:2, 2:2, 4:4, 4:13,
6:24, 8:23, 11:7,
11:23, 11:25, 12:2,
13:4, 13:6, 13:14,

13:19, 14:3, 14:8,
14:10, 14:16, 14:18,
14:19, 14:23, 15:8,
15:14, 15:15, 16:15,
16:18, 16:19, 17:1,
17:22, 17:23, 20:23,
21:2, 21:4, 21:16,
21:18, 22:22, 22:25,
23:8, 23:10, 26:6,
26:11, 30:23, 31:7,
31:8, 31:11, 31:13,
33:9, 34:25, 35:2,
36:24, 37:2, 37:9,
38:20, 40:1, 40:12,
40:14, 41:10, 41:11,
43:22, 44:5, 44:10,
44:15, 44:17, 44:24,
45:9, 45:15, 45:19,
46:4, 46:6, 47:6, 48:1,
49:2, 49:4, 49:14,
49:15, 50:1, 50:12,
50:16, 51:10, 51:13,
52:12, 52:14, 52:25,
53:9, 53:10, 53:24,
54:15, 55:6, 55:7,
56:8, 56:11, 56:17,
56:25, 57:3, 57:7,
57:9, 57:12, 57:15,
57:18, 59:7, 59:9,
59:17, 59:22, 59:25,
60:20, 61:12, 62:1,
62:3, 63:2, 63:5, 82:8,
89:9, 90:5, 91:19,
221:12, 222:1,
223:14, 223:21, 224:7
**friend** [2] - 178:13,
239:16
**friendly** [1] - 146:20
**FRIENDS** [1] - 1:4
**Friends** [10] - 6:2,
6:7, 6:14, 8:9, 10:22,
21:1, 95:5, 145:13,
175:20, 204:1
**frogging** [1] - 55:2
**front** [3] - 103:25,
209:25, 215:21
**Fuentes** [5] - 94:21,
177:25, 237:20,
238:2, 238:14
**fulfill** [1] - 104:22
**fulfilling** [1] - 100:7,
140:8
**full** [8] - 11:11,
11:14, 51:14, 95:22,
104:5, 179:24,
194:14, 235:3
**fully** [3] - 51:8,
51:16, 51:22
**function** [1] - 184:24,
225:17

**Function** [1] - 225:18
**functions** [7] -
138:19, 210:6,
210:12, 213:2, 226:7,
226:15, 227:9
**funding** [1] - 101:7
**funds** [1] - 28:23
**funnels** [4] - 29:13,
30:3, 30:6, 30:13
**future** [3] - 114:22,
117:14, 222:12

**G**

**Gadea** [4] - 94:19,
177:25, 238:13,
238:18
**Gadea-Guidicelli** [4]
- 94:19, 177:25,
238:13, 238:18
**Galloni** [2] - 6:13,
145:12
**GALLONI** [8] - 1:18,
4:8, 6:13, 145:11,
146:24, 147:3, 147:4,
147:12
**gar** [1] - 119:24
**gas** [3] - 79:18,
80:15, 89:16
**gate** [2] - 152:8,
152:10
**gather** [3] - 39:12,
55:18, 120:8
**gathering** [7] - 20:8,
54:25, 120:15,
151:13, 151:20,
152:1, 152:22
**General** [3] - 243:22,
244:10, 245:18
**general** [20] - 23:6,
23:20, 24:16, 24:18,
24:21, 26:2, 35:8,
79:13, 80:4, 99:9,
103:25, 115:24,
131:10, 132:5,
132:17, 137:3, 154:3,
167:19, 188:14,
218:22
**GENERAL** [1] - 2:17
**generally** [38] - 25:3,
29:19, 29:24, 30:1,
34:7, 34:9, 43:2,
104:20, 104:22,
112:15, 113:3,
115:22, 117:18,
132:3, 134:20,
140:19, 141:14,
141:23, 142:6,
143:24, 144:4,
158:12, 169:18,

185:4, 185:8, 193:13,
194:3, 200:9, 201:5,
202:12, 202:21,
207:18, 213:17,
217:7, 218:24,
225:11, 226:23, 230:3
**generate** [4] - 61:2,
61:5, 61:13, 61:15
**generated** [1] - 60:21
**generators** [1] - 42:2
**gentleman** [4] -
110:23, 136:25,
137:5, 159:8
**gentleman's** [1] -
118:1
**gentlemen** [2] - 7:13,
95:18
**geographic** [1] -
97:10
**geolocators** [1] -
150:7
**germane** [1] - 192:7
**gigging** [1] - 118:16
**Giles** [1] - 237:20
**given** [6] - 97:13,
163:15, 194:19,
200:20, 217:13,
238:16
**glasses** [1] - 46:3
**goal** [1] - 114:1
**goals** [1] - 102:25
**goodness** [1] - 212:9
**Google** [3] - 17:14,
17:15, 238:24
**Government** [27] -
15:9, 26:5, 33:24,
34:1, 43:10, 47:4,
48:4, 53:18, 60:2,
81:7, 81:10, 81:11,
95:8, 95:9, 182:21,
186:8, 190:1, 192:23,
195:18, 207:25,
212:2, 213:15, 215:4,
226:1, 226:25,
230:16, 238:14
**government** [15] -
16:9, 43:11, 46:13,
46:22, 46:24, 47:7,
196:5, 196:20, 207:2,
225:19
**Government's** [1] -
219:21
**government-to-
government** [5] -
43:11, 46:13, 46:22,
46:24, 47:7
**governmental** [1] -
34:3
**Governor** [7] -
180:23, 183:3,

215:16, 215:22,
215:25, 216:16, 217:3
**governor** [3] -
189:19, 196:11, 230:2
**Governor's** [3] -
199:16, 215:19,
224:23
**grade** [1] - 26:25
**graduated** [2] -
182:6, 182:7
**grandfathered** [1] -
34:20
**granted** [1] - 165:8
**grasses** [2] - 41:4,
142:5
**gray** [2] - 122:18,
124:16
**great** [5] - 96:4,
101:15, 181:19,
224:5, 233:14
**Greater** [3] - 51:7,
91:2, 100:17
**green** [10] - 40:22,
104:11, 123:24,
125:12, 125:16,
137:8, 138:7, 138:15,
166:4, 166:7
**ground** [2] - 118:3,
190:5
**grounds** [3] - 18:7,
45:1, 56:14
**groundwater** [1] -
22:20
**groundwork** [1] -
201:7
**group** [3] - 158:17,
158:18, 225:23
**grow** [1] - 39:6
**grows** [1] - 40:10
**growth** [3] - 40:23,
40:25, 41:1
**guard** [2] - 171:10,
182:24
**guarding** [1] -
158:20
**guards** [2] - 170:25,
171:14
**guess** [5] - 114:15,
138:22, 155:20,
186:20, 195:10
**guided** [1] - 55:3
**Guidicelli** [4] -
94:19, 177:25,
238:13, 238:18
**GUSTAFSON** [10] -
2:16, 7:14, 203:17,
228:6, 228:25,
237:18, 237:23,
238:1, 240:4, 240:21
**Gustafson** [1] - 7:15

**Guthrie** [5] - 220:23,
230:17, 231:24,
232:1, 232:21
**GUTHRIE** [1] - 2:6
**guy** [1] - 199:12

**H**

**habitat** [27] - 97:6,
104:25, 105:5,
113:24, 132:14,
137:21, 138:12,
139:12, 139:15,
139:18, 139:23,
139:25, 140:4,
140:12, 140:19,
141:1, 141:5, 141:7,
141:12, 141:17,
141:21, 142:7,
143:10, 144:21,
144:23, 162:6
**habitats** [5] - 99:6,
102:24, 113:21,
132:10, 142:10
**half** [3] - 21:17,
97:24, 180:16
**halt** [1] - 22:17
**hand** [12] - 19:17,
23:2, 41:5, 104:12,
122:17, 124:15,
125:2, 125:10, 126:3,
179:22, 208:14, 231:7
**happenstance** [2] -
129:20, 129:22
**happy** [1] - 94:1
**harassment** [5] -
117:19, 117:21,
118:4, 118:6, 118:7
**hard** [1] - 181:16
**harm** [10] - 86:23,
87:4, 117:19, 117:21,
118:4, 118:6, 118:7,
190:11, 190:20,
192:23
**harmful** [1] - 198:4
**harms** [2] - 60:14,
134:22
**harvest** [4] - 120:8,
134:7, 158:18, 159:9
**harvesting** [8] -
120:15, 154:19,
154:22, 154:25,
155:3, 155:6, 155:9,
155:12
**hash** [1] - 176:8
**head** [13] - 24:23,
28:5, 28:8, 75:23,
87:22, 125:23, 136:9,
182:20, 194:10,
196:21, 199:18,

230:7, 230:17
**heading** [4] - 123:15,
123:16, 124:14,
124:25
**heads** [1] - 172:6
**headwater** [1] -
24:20
**health** [5] - 16:10,
34:24, 38:5, 38:7,
114:15
**hear** [12] - 32:12,
32:13, 61:7, 87:19,
88:21, 88:23, 94:8,
177:10, 181:18,
183:17, 234:23,
243:11
**heard** [11] - 8:9,
38:22, 76:18, 76:20,
76:25, 87:20, 94:3,
94:24, 109:17,
117:25, 243:3
**HEARING** [1] - 1:10
**hearing** [6] - 86:6,
94:7, 129:18, 239:10,
242:22, 243:19
**hearsay** [7] - 13:23,
13:25, 199:8, 232:6,
232:8, 232:13, 238:19
**heavy** [1] - 175:3
**held** [9] - 19:21,
154:16, 189:9,
192:25, 195:13,
204:24, 205:2,
214:11, 219:1
**hello** [2] - 89:10,
89:11
**help** [4] - 22:18,
64:5, 133:6, 216:2
**helpful** [3] - 123:7,
228:2, 239:1
**helping** [2] - 202:20,
211:5
**helps** [1] - 104:2
**hereby** [1] - 247:3
**Hiaasen** [2] - 6:10,
241:4
**high** [1] - 137:14
**higher** [4] - 24:23,
24:25, 28:9, 28:11
**highest** [2] - 12:8,
96:8
**highlighted** [2] -
104:11, 138:23
**Highway** [19] -
180:14, 180:18,
180:20, 181:4, 181:5,
181:21, 184:6, 185:9,
186:10, 186:14,
193:4, 194:8, 196:21,
199:19, 202:3,

App. 895

202:23, 206:21, 207:9, 225:22

**highway** [3] - 181:2, 181:3, 198:22

**hired** [1] - 98:21

**hiring** [1] - 226:11

**historic** [2] - 73:12, 141:16

**historical** [2] - 54:18, 113:8

**historically** [6] - 67:3, 73:10, 85:8, 86:9, 131:18, 153:14

**history** [4] - 19:2, 19:7, 144:17, 199:1

**hit** [1] - 120:19

**hold** [6] - 15:1, 49:7, 98:25, 110:25, 195:6, 205:14

**holding** [1] - 205:13

**Homeland** [9] - 183:13, 195:19, 207:19, 207:25, 208:2, 208:18, 208:25, 211:5, 229:10

**homeland** [1] - 56:4

**homes** [4] - 34:20, 34:23, 79:3, 79:5

**honcho** [1] - 230:8

**honest** [2] - 110:7, 240:14

**Honor** [186] - 6:6, 6:13, 6:18, 6:21, 6:24, 7:3, 7:6, 7:8, 7:11, 7:14, 7:16, 7:21, 8:1, 8:12, 9:2, 9:13, 9:25, 10:9, 10:20, 10:25, 13:22, 15:2, 15:14, 17:4, 30:17, 36:16, 36:21, 36:24, 39:13, 43:23, 45:5, 45:15, 46:23, 47:21, 50:3, 52:3, 53:3, 53:9, 56:13, 59:12, 59:19, 60:17, 61:23, 63:3, 63:6, 63:9, 63:11, 84:24, 85:1, 86:14, 87:10, 88:15, 89:22, 92:1, 92:12, 92:23, 93:20, 94:4, 95:19, 109:12, 110:6, 117:6, 117:22, 120:19, 130:17, 131:1, 134:14, 134:18, 135:1, 136:21, 145:1, 146:18, 146:20, 147:3, 158:9, 158:25, 167:1, 167:7, 168:7, 168:23, 175:19, 175:21, 176:1,

176:13, 176:20, 177:5, 177:23, 178:18, 179:2, 179:21, 181:8, 183:20, 183:24, 184:2, 185:22, 186:12, 186:24, 187:20, 188:21, 189:4, 190:10, 190:19, 190:23, 191:22, 192:4, 192:16, 194:5, 194:9, 194:25, 195:11, 196:16, 197:14, 197:16, 197:23, 197:25, 198:15, 199:14, 200:18, 201:4, 201:14, 203:4, 203:14, 203:17, 203:19, 203:22, 207:23, 208:8, 209:3, 209:19, 209:21, 211:18, 212:14, 216:7, 218:21, 220:11, 220:19, 221:3, 221:9, 221:15, 221:17, 224:11, 227:11, 227:14, 227:19, 228:2, 228:6, 228:11, 228:25, 229:8, 229:13, 229:19, 230:9, 230:22, 230:25, 231:23, 232:14, 233:7, 233:9, 234:10, 234:17, 234:24, 235:21, 237:1, 237:18, 237:23, 238:1, 238:8, 239:13, 239:19, 239:24, 240:3, 240:4, 240:25, 241:10, 241:13, 241:15, 242:5, 242:25, 243:24, 243:25, 244:8, 244:13, 244:15, 244:23, 245:9, 245:14

**HONORABLE** [1] - 1:10

**hooked** [2] - 88:4, 88:9

**hope** [1] - 179:16

**hopefully** [2] - 37:5, 81:5

**hoping** [2] - 37:4, 92:1

**horizontal** [2] - 107:15, 126:14

**horizontally** [1] - 122:16

**horrible** [1] - 144:12

**hotel** [3] - 87:24, 88:3, 88:4

**hour** [5] - 92:9, 240:18, 240:20, 240:23, 241:11

**hours** [5] - 128:25, 129:1, 186:19, 226:21, 240:11

**house** [1] - 194:1

**House** [1] - 229:10

**housed** [3] - 193:10, 199:7, 202:6

**housing** [3] - 194:18, 198:3, 201:22

**human** [29] - 37:25, 38:7, 67:23, 111:21, 115:13, 115:20, 115:21, 115:23, 115:25, 118:7, 128:18, 129:23, 130:2, 130:12, 131:8, 131:13, 134:5, 134:9, 134:12, 147:5, 156:14, 156:17, 157:5, 163:5, 169:12, 170:21, 172:22, 173:1, 175:2

**humans** [3] - 41:4, 115:17, 116:4

**hundred** [3] - 87:23, 88:22, 197:4

**hundreds** [1] - 72:13

**hunt** [6] - 19:8, 39:12, 55:18, 119:12, 171:10, 171:14

**hunted** [1] - 26:5

**hunting** [20] - 20:8, 55:1, 73:20, 73:22, 73:23, 73:25, 108:3, 118:16, 119:4, 119:5, 119:9, 120:5, 133:25, 151:9, 151:13, 151:20, 152:1, 152:15, 152:21, 173:10

**hunts** [1] - 38:6

**hurdle** [1] - 193:25

**hurricane** [1] - 215:23

**hurricane-related** [1] - 215:23

**hybrid** [5] - 52:17, 54:2, 54:3, 58:11, 176:23

**hydrologic** [1] - 114:16

**hydrologically** [2] - 47:15, 47:19

**hydrologist** [1] -

63:24

**hydrology** [2] - 30:25, 136:22

**hypothesis** [2] - 161:18, 161:22

**hypothetical** [2] - 137:1, 163:2

**hypotheticals** [1] - 137:5

---

## I

**I's** [1] - 237:3

**ICE** [41] - 184:20, 185:15, 187:11, 188:12, 189:8, 195:18, 204:10, 204:14, 204:18, 204:25, 205:4, 205:15, 205:16, 207:10, 207:20, 208:1, 208:2, 208:17, 209:1, 210:24, 211:2, 211:23, 212:6, 212:9, 212:18, 212:23, 213:1, 213:3, 213:10, 213:18, 213:19, 213:22, 214:3, 214:25, 215:9, 215:14, 216:19, 228:19, 228:22, 229:4, 229:11

**ICE-DHS** [1] - 215:14

**ID** [3] - 5:2, 5:13, 5:19

**idea** [2] - 42:8, 65:25

**ideal** [5] - 224:3, 224:4, 225:5, 226:6

**identification** [29] - 13:5, 14:7, 16:17, 44:1, 56:10, 208:11, 216:10, 233:18, 235:8, 235:9, 235:10, 235:11, 235:12, 235:13, 236:9, 236:10, 236:11, 236:12, 236:13, 236:14, 236:15, 236:16, 237:12, 237:13, 237:14, 237:15, 237:16, 237:17, 238:5

**identified** [9] - 94:11, 122:15, 122:23, 124:19, 125:11, 125:25, 127:16, 133:18, 138:25

**identifies** [1] - 136:1

**identify** [4] - 25:12, 56:15, 104:2, 144:20

**identity** [1] - 54:19

**IGSA** [2] - 185:11, 185:20

**IGSAs** [1] - 186:20

**illegal** [13] - 184:7, 184:18, 188:13, 190:2, 190:5, 191:9, 192:13, 193:3, 193:25, 194:4, 195:3, 197:24, 200:12

**illegally** [6] - 192:1, 202:1, 202:13, 211:6, 213:10, 219:25

**illuminated** [1] - 132:9

**imagine** [4] - 48:22, 69:23, 230:10, 240:23

**immediate** [3] - 151:9, 151:11, 170:4

**immediately** [2] - 108:7, 111:14

**immigrants** [1] - 192:13

**immigration** [41] - 182:15, 183:16, 185:24, 187:19, 189:10, 189:15, 189:24, 190:2, 190:5, 191:10, 193:4, 193:8, 193:18, 193:25, 194:4, 195:3, 196:7, 197:24, 200:10, 201:20, 202:24, 204:21, 204:22, 205:2, 205:3, 205:21, 205:24, 212:3, 212:23, 213:2, 213:13, 213:23, 214:9, 215:10, 215:18, 215:23, 215:25, 217:9, 218:2, 218:11, 219:24

**immigration-related** [2] - 185:24, 215:23

**impact** [17] - 37:10, 38:2, 40:25, 47:18, 51:24, 55:14, 58:1, 60:16, 131:9, 139:20, 146:22, 157:23, 161:24, 162:12, 162:20, 163:5, 191:9

**Impact** [2] - 58:12, 58:19

**impacted** [6] - 115:25, 134:8, 152:25, 155:15, 155:18, 156:4

**impacting** [1] - 163:7

**impacts** [9] - 82:7,

82:13, 82:22, 82:25,
130:18, 157:25,
162:18, 162:21,
162:22
**impairing** [1] -
186:16
**impassioned** [1] -
95:10
**implement** [2] -
103:3, 133:6
**implementation** [2] -
58:1, 101:9
**Implementation** [2] -
58:8, 58:20
**implementing** [1] -
101:2
**importance** [1] -
22:17
**important** [8] - 94:8,
109:23, 111:23,
118:18, 139:18,
163:5, 189:14, 242:8
**improper** [1] - 68:16
**improperly** [2] -
68:20, 69:18
**improve** [2] - 115:11,
137:21
**improved** [1] -
164:14
**improvements** [3] -
152:20, 163:24, 164:2
**INA** [1] - 194:19
**inability** [1] - 37:10
**Inc** [1] - 6:3
**include** [17] - 54:25,
55:2, 68:4, 77:16,
82:21, 100:9, 100:11,
100:13, 100:15,
115:18, 151:24,
163:14, 168:5, 175:3,
195:9, 217:23, 243:10
**included** [5] - 36:18,
58:11, 113:18, 234:4,
234:13
**includes** [3] - 65:22,
69:6, 69:8
**including** [6] - 47:13,
54:18, 177:18,
182:23, 201:20,
238:19
**incorrect** [1] - 17:12
**increase** [12] -
129:23, 130:2,
131:23, 141:20,
156:13, 156:16,
156:20, 157:3,
159:13, 193:18,
205:25, 222:12
**increased** [10] -
115:4, 131:8, 132:8,

136:18, 136:19,
139:2, 147:5, 157:5,
203:2, 240:15
**increases** [1] -
120:17
**indeed** [1] - 160:4
**independent** [1] -
162:2
**index** [1] - 97:13
**INDEX** [2] - 4:1, 5:1
**Indians** [2] - 6:22,
46:14
**indicate** [1] - 178:16
**Indicating** [7] -
15:18, 19:20, 20:3,
20:12, 20:16, 20:19,
127:9
**indicating** [10] -
23:12, 25:15, 31:17,
44:21, 68:19, 69:17,
71:8, 104:19, 106:23,
140:25
**indication** [1] -
178:12
**Indigo** [1] - 116:17
**individual** [4] -
101:21, 150:17,
150:18, 230:22
**individuals** [9] -
51:3, 102:2, 141:10,
144:5, 185:19, 192:1,
197:12, 199:6, 202:13
**indulge** [1] - 241:18
**indulgence** [1] -
240:9
**industry** [1] - 218:17
**influence** [1] -
114:18
**influx** [2] - 37:25,
41:19
**inform** [1] - 114:21
**information** [10] -
35:23, 37:15, 68:12,
90:13, 90:17, 91:1,
101:5, 120:12,
238:21, 245:24
**infrastructure** [1] -
203:10
**inhabit** [1] - 142:7
**inherent** [1] - 212:1
**inherently** [1] - 86:23
**initial** [4] - 52:5,
214:1, 215:20, 231:6
**initiate** [1] - 46:12
**initiated** [2] - 182:21,
183:21
**Initiatives** [1] - 50:20
**INJUNCTION** [1] -
1:10
**injunction** [9] - 8:6,

94:5, 190:12, 190:16,
192:20, 198:4,
201:16, 239:10,
244:18
**input** [4] - 100:17,
100:19, 102:17, 176:6
**inquire** [1] - 110:16
**insects** [1] - 146:23
**inside** [3] - 152:23,
160:10, 160:14
**installed** [1] - 27:19
**instance** [2] -
198:20, 234:12
**instances** [5] - 25:5,
186:1, 186:4, 187:10,
212:5
**instruct** [1] - 184:20
**intend** [2] - 59:4,
92:18
**intended** [3] - 94:21,
177:24, 233:25
**intending** [1] - 44:6
**intention** [1] - 245:18
**interacting** [1] -
191:8
**interaction** [2] -
187:2, 214:2
**interacts** [1] - 187:7
**interceptor** [2] -
40:17, 40:20
**interdicted** [1] -
198:21
**interest** [12] - 16:24,
18:15, 18:20, 19:1,
55:20, 102:17,
103:10, 114:8,
152:23, 152:24,
163:16, 192:24
**interested** [1] -
103:11
**interests** [2] - 51:20,
109:24
**interfacing** [1] -
195:17
**intergovernmental**
[1] - 228:21
**Intergovernmental**
[2] - 185:11, 204:14
**interior** [1] - 153:24
**Interiors** [1] - 50:20
**intern** [1] - 98:20
**International** [5] -
89:4, 96:23, 98:11,
111:16, 111:19
**interpose** [1] - 158:9
**interrupted** [1] -
196:15
**Intervenor** [1] - 6:22
**INTERVENOR** [1] -
2:1

**interview** [1] - 244:3
**introduce** [5] - 12:4,
15:7, 44:7, 45:7, 96:5
**introduced** [3] -
43:1, 45:12, 234:12
**introducing** [3] -
44:2, 44:3, 45:6
**introduction** [1] -
54:11
**invasive** [5] - 116:1,
116:2, 124:1, 138:9
**inventoried** [1] -
76:6
**inventory** [1] - 158:6
**inventorying** [1] -
158:3
**invested** [1] - 242:10
**investigation** [1] -
191:17
**investigations** [1] -
191:16
**invitation** [2] - 50:18,
245:17
**invite** [3] - 46:10,
244:1, 245:3
**invited** [4] - 49:10,
243:11, 243:21, 244:2
**inviting** [1] - 44:13
**invoked** [1] - 11:1
**involve** [1] - 185:24
**involved** [9] - 26:1,
43:9, 43:13, 48:9,
49:23, 56:2, 60:9,
223:15, 223:20
**involvement** [1] -
81:14
**involves** [1] - 220:15
**involving** [1] - 162:2
**ish** [1] - 104:12
**island** [1] - 105:25
**islands** [26] - 16:21,
16:24, 18:3, 18:9,
18:15, 18:19, 18:21,
18:23, 18:25, 19:3,
19:4, 19:6, 19:24,
55:20, 55:23, 72:6,
72:9, 72:11, 72:13,
97:7, 104:14, 105:24,
106:7, 106:10, 128:1,
128:3
**isolate** [1] - 163:8
**isolated** [1] - 33:18
**issue** [13] - 9:21,
15:11, 54:4, 54:7,
92:24, 94:16, 190:8,
190:20, 190:21,
194:18, 195:8, 205:7,
242:5
**issues** [5] - 38:5,
193:3, 193:18,

218:11, 239:5
**item** [2] - 20:17,
190:20
**items** [1] - 223:12
**iteration** [1] - 194:22
**itself** [10] - 55:16,
90:10, 108:6, 109:20,
110:18, 157:22,
157:24, 216:23,
229:15, 229:19

---

## J

**Jacksonville** [1] -
46:14
**jail** [12] - 184:13,
185:11, 185:12,
185:13, 185:21,
186:2, 187:12, 195:5,
205:9, 214:10, 214:19
**January** [3] - 180:16,
215:20, 216:17
**JESSE** [2] - 2:7
**Jesse** [2] - 7:3, 180:8
**jet** [1] - 129:11
**Jetport** [4] - 72:20,
74:3, 74:7, 106:16
**jetport** [51] - 14:14,
15:17, 15:24, 20:17,
23:11, 23:22, 23:25,
24:14, 25:8, 25:10,
25:16, 28:18, 29:6,
29:8, 30:8, 31:4,
31:10, 31:14, 31:20,
31:24, 32:1, 32:3,
32:16, 32:22, 33:3,
33:17, 35:14, 37:10,
46:20, 47:9, 49:12,
54:9, 55:22, 55:23,
58:25, 82:2, 82:4,
82:7, 82:14, 82:22,
82:25, 90:14, 90:18,
90:22, 91:6, 143:14,
222:7, 223:1, 223:3,
223:6, 223:17
**job** [3] - 64:12,
65:25, 180:12
**John** [1] - 49:8
**joint** [2] - 103:10,
103:11
**JTP** [1] - 16:2
**JUDGE** [1] - 1:11
**judge** [1] - 181:17
**Judge** [10] - 6:11,
9:9, 95:1, 95:13,
177:13, 235:15,
241:5, 243:16,
244:19, 245:20
**judges** [3] - 244:3,
242:12, 245:3

**July** [2] - 46:4, 232:1
**June** [49] - 32:15, 33:2, 33:14, 65:16, 66:10, 67:18, 68:24, 69:3, 70:4, 70:18, 71:5, 71:11, 71:16, 71:21, 71:24, 72:1, 73:13, 76:10, 76:13, 83:2, 83:19, 90:20, 90:23, 128:16, 129:23, 133:10, 149:16, 150:22, 152:17, 152:21, 153:8, 155:7, 155:24, 156:6, 158:8, 159:14, 160:9, 160:13, 160:17, 165:20, 166:16, 166:24, 171:17, 171:23, 172:11, 172:19, 175:6, 231:23
**jurisdiction** [1] - 182:2
**Justice** [1] - 147:23
**JUSTICE** [2] - 2:18, 2:20

**K**

**K-E-R-N-E-R** [1] - 180:3
**Kass** [2] - 236:23, 237:5
**KATHLEEN** [1] - 1:10
**keep** [6] - 26:9, 54:21, 59:23, 125:20, 181:16, 203:20
**Keith** [1] - 236:7
**kept** [3] - 153:7, 156:19, 158:6
**KERNER** [1] - 4:11
**Kerner** [28] - 94:19, 177:20, 179:11, 179:23, 180:2, 180:6, 181:6, 190:24, 191:6, 193:17, 194:7, 198:17, 199:5, 203:25, 208:13, 209:12, 209:22, 209:25, 210:11, 212:22, 216:14, 218:1, 219:3, 220:14, 222:2, 224:14, 227:12, 234:4
**Kerner's** [1] - 188:22
**Kevin** [1] - 230:17
**kids** [1] - 19:7
**killing** [1] - 117:20
**kills** [1] - 42:17

**kind** [36] - 9:11, 32:1, 32:7, 32:8, 38:10, 59:18, 93:11, 101:13, 104:10, 104:12, 105:8, 107:13, 107:15, 108:14, 112:6, 112:8, 114:18, 116:4, 120:10, 121:11, 124:14, 129:8, 130:3, 132:17, 132:20, 133:1, 134:6, 142:5, 142:7, 148:13, 171:24, 185:6, 197:10, 232:19
**Kinnebrew** [1] - 237:6
**Kissimmee** [1] - 100:18
**kite** [1] - 116:16
**knockdown** [1] - 135:3
**knowing** [1] - 105:6
**knowledge** [20] - 17:10, 39:17, 68:10, 69:25, 70:1, 77:2, 110:3, 154:1, 156:21, 158:12, 173:16, 174:18, 174:19, 187:14, 194:13, 199:20, 199:24, 220:4, 224:1, 224:22
**known** [5] - 97:17, 104:14, 119:24, 131:9, 181:21
**knows** [3] - 137:5, 191:1, 242:9
**KRISTI** [2] - 1:7, 2:13
**Krome** [2] - 89:18, 185:17
**Kurt** [1] - 236:21

**L**

**L-28** [21] - 23:17, 25:12, 25:16, 25:20, 26:12, 26:15, 26:16, 26:19, 27:2, 27:20, 28:13, 40:17, 40:20, 74:25, 84:16, 84:21, 107:9, 107:10, 135:20, 137:8
**lab** [1] - 98:17
**label** [1] - 160:24
**lack** [5] - 59:20, 89:24, 155:14, 192:20, 245:23
**laid** [2] - 30:20, 198:16
**Lake** [1] - 47:13
**land** [13] - 41:7,

55:12, 72:17, 82:19, 82:21, 91:7, 120:14, 122:8, 123:21, 133:23, 135:8, 153:17, 232:19
**Land** [1] - 138:20
**landing** [5] - 31:23, 32:20, 75:21, 88:25, 128:21
**lands** [42] - 13:3, 14:5, 19:15, 19:16, 20:8, 20:20, 20:21, 23:22, 23:25, 24:2, 24:3, 34:7, 40:21, 47:5, 55:11, 55:15, 72:14, 72:21, 72:23, 72:25, 100:7, 100:9, 107:1, 112:23, 112:25, 113:4, 113:5, 113:12, 114:2, 115:14, 116:11, 116:13, 116:19, 116:21, 116:25, 118:23, 120:7, 132:21, 133:10, 148:21, 149:2, 170:22
**landscape** [4] - 51:21, 97:8, 121:21, 143:13
**landscapes** [1] - 47:14
**lanes** [1] - 186:14
**language** [2] - 109:3, 150:14
**large** [5] - 88:11, 119:25, 169:18, 191:12, 239:2
**larger** [2] - 189:24, 211:24
**Las** [1] - 2:10
**last** [26] - 6:9, 8:6, 55:8, 56:1, 57:3, 59:2, 65:5, 65:6, 65:7, 93:13, 95:25, 96:18, 102:6, 102:7, 159:5, 174:24, 176:17, 177:7, 179:10, 179:15, 180:2, 188:5, 216:11, 221:3, 242:22, 243:19
**late** [2] - 94:22, 148:14
**late-filed** [1] - 94:22
**latitude** [5] - 158:14, 189:3, 190:13, 200:19
**laundry** [8] - 41:24, 61:5, 61:19, 68:4, 69:6, 78:11, 78:16
**Law** [2] - 182:7, 213:18

**law** [25] - 175:3, 182:9, 182:23, 183:14, 183:16, 184:12, 185:25, 189:20, 189:24, 190:17, 198:7, 199:18, 205:10, 209:14, 210:3, 210:19, 212:24, 217:8, 217:21, 225:21, 229:14, 229:17, 230:5, 240:2
**lawful** [2] - 187:3, 187:15
**lawfully** [1] - 206:2
**laws** [3] - 185:25, 202:24, 204:21
**lawsuit** [1] - 148:3
**lawyer** [1] - 61:10
**lay** [2] - 19:5, 201:7
**layer** [1] - 140:4
**lays** [1] - 210:12
**LEA** [1] - 213:1
**lead** [2] - 125:16, 137:4
**leadership** [1] - 226:23
**leading** [4] - 146:18, 153:11, 172:13, 224:24
**leads** [3] - 136:19, 137:15, 157:8
**learned** [4] - 48:23, 65:15, 238:21
**learning** [1] - 32:6
**LEAs** [1] - 212:24
**leased** [1] - 22:3
**least** [5] - 81:9, 85:25, 86:5, 91:25, 197:18
**led** [2] - 193:18, 238:1
**left** [12] - 10:6, 10:9, 19:17, 19:25, 20:6, 20:15, 26:23, 104:11, 126:3, 208:14, 231:7
**left-hand** [4] - 19:17, 126:3, 208:14, 231:7
**legal** [13] - 46:24, 46:25, 51:20, 52:6, 59:12, 73:16, 117:5, 117:23, 186:8, 209:15, 213:19, 214:3, 214:4
**legally** [1] - 187:11
**legend** [1] - 135:25
**legislation** [1] - 21:11
**legislative** [1] - 17:15

**less** [1] - 86:1
**letter** [23] - 44:13, 44:18, 44:22, 45:3, 45:12, 45:20, 46:10, 49:17, 52:16, 52:20, 53:11, 53:22, 53:23, 53:25, 54:7, 56:19, 57:24, 231:22, 231:23, 231:25, 232:2, 232:3
**letters** [5] - 54:4, 54:5, 232:7, 232:15, 232:17
**levee** [8] - 26:16, 26:24, 27:8, 27:11, 27:20, 27:25, 28:14, 28:20
**levees** [2] - 27:6, 84:7
**level** [16] - 12:8, 13:2, 30:8, 32:22, 32:23, 33:3, 39:5, 51:6, 96:8, 128:15, 130:12, 143:16, 173:1, 175:2, 183:14, 191:20
**levels** [12] - 24:25, 27:24, 28:9, 28:10, 32:16, 33:14, 33:22, 43:1, 43:4, 84:1, 115:4, 137:14
**liability** [1] - 212:10
**license** [1] - 187:8
**life** [8] - 42:15, 54:12, 54:17, 113:16, 113:18, 114:5, 144:17, 223:12
**light** [11] - 39:9, 42:10, 112:6, 130:7, 130:9, 131:9, 132:8, 145:19, 166:4, 166:7, 176:24
**lighting** [6] - 109:8, 111:9, 111:13, 111:20, 111:22, 141:20
**lightings** [1] - 242:13
**likely** [1] - 147:6
**limitation** [2] - 152:21, 154:25
**limited** [7] - 130:21, 131:22, 152:15, 154:22, 168:17, 206:3, 243:18
**line** [28] - 23:14, 23:16, 26:18, 26:20, 36:17, 39:14, 40:22, 107:4, 107:6, 107:15, 110:24, 121:11, 121:20, 122:18,

126:14, 126:15,
126:19, 151:12,
155:1, 155:4, 155:7,
155:10, 158:19,
170:22, 192:7,
199:17, 225:1
**lines** [1] - 91:12
**link** [3] - 62:10,
178:20, 178:22
**list** [16] - 9:11, 9:15,
10:4, 10:5, 10:10,
13:20, 43:24, 94:11,
177:18, 178:2,
178:23, 231:6,
231:10, 233:12, 237:6
**listed** [1] - 117:20
**listening** [1] - 193:17
**lists** [5] - 120:24,
178:11, 178:16,
228:18, 228:24
**literally** [1] - 178:14
**literature** [9] - 105:7,
105:8, 105:15,
113:13, 131:24,
132:11, 161:23,
162:1, 162:2
**litigation** [1] - 182:10
**live** [29] - 8:13, 9:4,
9:22, 13:23, 13:24,
15:12, 15:21, 16:8,
94:7, 94:8, 94:9,
94:24, 95:4, 95:7,
95:9, 112:22, 142:4,
176:4, 176:12,
176:16, 176:18,
176:22, 177:20,
179:13, 233:24,
234:5, 234:8, 234:11
**lives** [1] - 24:10
**LLP** [1] - 2:9
**load** [1] - 62:23
**loading** [1] - 41:8
**loads** [1] - 86:21
**local** [12] - 183:14,
185:20, 185:21,
186:18, 189:19,
204:13, 204:17,
205:1, 214:15, 217:8,
225:19, 228:20
**locate** [2] - 110:10,
132:13
**located** [20] - 16:7,
16:13, 18:16, 18:17,
18:18, 22:8, 23:22,
25:10, 45:22, 75:5,
89:12, 89:14, 89:15,
97:11, 98:4, 118:9,
144:11, 164:3, 174:2,
174:11
**location** [5] - 115:20,

174:1, 184:21,
184:23, 185:16
**locations** [1] -
144:21
**log** [10] - 156:19,
158:6, 159:16,
159:20, 167:18,
167:21, 167:23,
168:1, 168:3, 175:5
**logged** [1] - 159:10
**logging** [1] - 158:3
**logistical** [2] - 101:8,
193:24
**logistics** [1] - 102:11
**logs** [5] - 160:18,
168:10, 174:20,
174:22, 199:25
**long-term** [2] -
35:21, 43:2
**look** [11] - 74:16,
75:23, 110:9, 115:6,
115:17, 210:7,
210:16, 216:1, 235:2,
238:24, 239:21
**looked** [7] - 15:5,
172:1, 172:3, 198:25,
206:15, 223:24,
223:25
**looking** [16] - 10:2,
10:5, 10:9, 37:21,
123:10, 124:8,
129:18, 145:24,
165:15, 212:11,
216:1, 223:15,
223:20, 235:23,
238:15, 242:16
**looks** [5] - 121:8,
121:14, 122:19,
123:11, 123:16
**Loop** [5] - 30:13,
30:24, 30:25, 31:1,
31:2
**Lord** [1] - 191:1
**lose** [1] - 155:21
**loss** [1] - 55:12
**lost** [2] - 27:4,
156:10
**loud** [2] - 89:2, 89:5
**low** [3] - 25:3, 40:7,
221:24
**lower** [3] - 124:14,
125:10, 127:5
**lunch** [7] - 92:3,
92:10, 92:20, 95:1,
95:11, 95:15, 241:13
**LYONS** [1] - 2:13

## M

**ma'am** [3] - 91:20,

204:9, 206:11
**main** [2] - 181:1,
199:18
**major** [1] - 131:7
**majority** [1] - 129:9
**makeup** [1] - 41:6
**manage** [9] - 88:2,
88:10, 92:7, 114:7,
117:13, 132:24,
137:20, 138:15, 139:3
**managed** [4] - 41:18,
68:13, 90:13, 183:2
**Management** [12] -
7:4, 7:7, 7:10, 7:12,
10:7, 29:2, 29:4,
80:22, 81:12, 206:24,
207:4, 230:1
**management** [18] -
26:2, 62:17, 62:19,
78:18, 89:19, 89:20,
90:7, 90:18, 100:17,
100:19, 100:22,
101:3, 102:17,
102:25, 133:4,
139:16, 226:23, 241:4
**Manager** [2] - 12:17,
12:18
**manages** [1] - 227:5
**managing** [2] -
68:11, 133:5
**manmade** [1] -
163:24
**manned** [1] - 152:8
**manner** [2] - 133:9,
243:8
**map** [55] - 14:12,
14:14, 14:20, 14:21,
15:16, 16:21, 16:23,
17:24, 18:22, 19:16,
19:24, 20:6, 20:10,
20:18, 21:5, 21:7,
21:8, 21:17, 23:2,
23:3, 23:5, 23:6,
23:11, 23:18, 23:24,
24:4, 25:12, 34:17,
61:25, 103:23, 104:9,
104:16, 105:20,
105:25, 106:1, 106:7,
106:13, 106:22,
107:3, 107:16, 113:1,
128:4, 128:5, 128:6,
128:7, 135:17,
138:25, 139:22,
139:24, 140:1, 140:6,
143:19, 164:6, 166:1,
166:4
**Marcel** [4] - 95:19,
95:20, 95:24, 96:6
**MARCEL** [2] - 4:7,
95:24

**Marissa** [2] - 7:16,
63:16
**MARISSA** [1] - 2:20
**mark** [6] - 19:19,
20:9, 104:18, 106:22,
150:16, 150:17
**marked** [35] - 13:5,
14:7, 16:17, 44:1,
44:16, 49:3, 51:11,
56:10, 74:16, 107:3,
163:17, 208:11,
216:10, 233:18,
235:8, 235:9, 235:10,
235:11, 235:12,
235:13, 236:9,
236:10, 236:11,
236:12, 236:13,
236:14, 236:15,
236:16, 237:12,
237:13, 237:14,
237:15, 237:16,
237:17, 238:5
**marsh** [4] - 26:25,
27:3, 142:3, 142:4
**marshals** [2] -
243:12, 244:4
**material** [1] - 26:23
**materials** [2] - 55:1,
242:14
**mates** [1] - 131:23
**math** [1] - 96:21
**matriculated** [1] -
96:12
**matter** [8] - 52:5,
103:25, 134:4,
156:21, 172:25,
232:15, 240:6, 247:5
**matters** [5] - 169:20,
172:24, 181:1, 193:8,
243:5
**mayor** [7] - 182:13,
231:24, 231:25,
232:2, 232:3, 232:17,
232:21
**mayor's** [1] - 232:10
**McDonald's** [1] -
40:8
**mean** [25] - 26:22,
27:23, 28:8, 35:7,
39:22, 59:11, 61:1,
67:22, 84:19, 85:22,
89:3, 90:1, 100:3,
100:19, 112:2,
117:21, 118:6,
122:13, 135:15,
183:14, 188:24,
217:16, 222:18,
223:3, 238:11
**meaning** [2] -
211:11, 245:18

**means** [11] - 27:24,
60:1, 93:22, 95:8,
110:25, 113:6, 116:9,
118:17, 160:7,
195:14, 212:24
**meant** [3] - 59:19,
118:2, 208:24
**meanwhile** [1] -
245:25
**measure** [1] - 163:8
**measured** [11] -
68:23, 69:2, 70:3,
70:7, 70:17, 71:16,
71:19, 83:13, 83:18,
162:20, 198:9
**measurements** [3] -
150:11, 150:13,
150:14
**measures** [1] -
115:21
**media** [1] - 33:20
**medicinal** [6] -
108:4, 118:17, 134:2,
134:3, 155:21, 173:10
**meet** [4] - 100:20,
147:24, 188:13,
188:15
**meeting** [3] - 49:7,
50:19, 91:17
**meetings** [4] - 49:10,
53:15, 100:20, 101:14
**meets** [2] - 46:17,
125:11
**member** [1] - 171:13
**members** [42] -
15:22, 16:8, 19:3,
19:5, 42:20, 51:2,
54:17, 54:23, 90:10,
107:25, 108:5,
118:12, 118:21,
118:23, 119:4, 120:7,
120:13, 122:22,
127:19, 127:25,
133:10, 133:15,
133:23, 133:24,
134:4, 137:24, 146:1,
146:11, 149:1, 151:9,
151:20, 152:1,
152:25, 153:7, 153:8,
154:16, 156:4,
158:13, 158:17,
170:9, 172:24, 175:9
**members'** [7] -
118:19, 119:9, 135:4,
135:8, 170:3, 170:21,
172:21
**memo** [1] - 212:8
**Memorandum** [1] -
207:24
**memory** [1] - 216:6

**mention** [1] - 120:6

**mentioned** [19] - 6:9, 21:19, 22:11, 77:12, 101:13, 133:24, 148:15, 152:8, 159:24, 178:22, 181:21, 188:5, 188:18, 189:7, 190:10, 215:4, 218:5, 220:7, 237:7

**merch** [1] - 33:21

**merits** [1] - 239:25

**mess** [1] - 133:3

**messed** [1] - 157:15

**messes** [1] - 132:13

**met** [1] - 215:13

**method** [1] - 175:8

**methods** [2] - 161:10, 161:12

**metric** [1] - 215:12

**MIAMI** [3] - 1:2, 2:23, 2:24

**Miami** [33] - 1:4, 1:17, 1:21, 2:5, 2:11, 2:15, 2:25, 3:3, 3:4, 8:2, 18:17, 22:9, 45:25, 62:6, 88:4, 88:9, 89:4, 98:5, 107:11, 107:12, 107:16, 111:16, 111:19, 152:5, 164:12, 174:12, 231:24, 231:25, 232:2, 232:5, 232:18, 247:9, 247:10

**MIAMI-DADE** [2] - 2:23, 2:24

**Miami-Dade** [17] - 8:2, 18:17, 22:9, 45:25, 62:6, 88:9, 98:5, 107:11, 107:12, 107:16, 152:5, 164:12, 174:12, 231:24, 231:25, 232:2, 232:5

**mic** [1] - 11:11

**Miccosukee** [30] - 6:22, 6:25, 16:6, 16:7, 16:11, 16:13, 18:11, 19:17, 19:22, 20:13, 21:24, 22:6, 22:8, 24:6, 24:7, 24:9, 31:15, 34:22, 46:13, 51:2, 55:9, 55:10, 56:2, 96:7, 97:18, 98:9, 100:11, 100:13, 104:16, 222:3

**Michael** [1] - 180:2

**microphone** [3] - 11:18, 11:22, 181:7

**middle** [8] - 19:22, 26:12, 54:13, 58:13, 95:25, 107:16, 140:14, 193:11

**might** [12] - 80:6, 82:13, 84:14, 110:16, 130:24, 181:11, 188:3, 213:9, 214:6, 218:17, 218:20, 240:25

**migration** [1] - 161:7

**mile** [1] - 15:25, 127:15

**miles** [15] - 47:16, 74:23, 74:24, 75:3, 75:4, 84:20, 84:22, 107:2, 127:18, 127:19, 144:6, 145:6, 164:20, 174:5

**military** [1] - 129:14

**Miller** [1] - 229:10

**million** [2] - 60:3, 60:5

**millions** [1] - 22:21

**mind** [3] - 40:2, 116:18, 228:17

**mine** [1] - 13:13

**minimal** [3] - 32:17, 32:21, 128:19

**minimum** [1] - 188:13

**minor** [1] - 30:10

**minute** [3] - 10:2, 63:2, 227:24

**minutes** [9] - 92:3, 92:6, 92:8, 123:5, 177:10, 228:8, 240:16, 240:24, 241:1

**Miranda** [1] - 236:22

**mistaken** [1] - 227:16

**misunderstanding** [1] - 155:16

**model** [5] - 115:7, 184:11, 184:13, 184:14, 187:23

**models** [3] - 115:18, 184:9, 184:10

**modify** [1] - 177:16

**modulate** [1] - 195:20

**moment** [6] - 84:24, 167:1, 198:10, 203:4, 220:11, 241:23

**moments** [1] - 220:7

**money** [2] - 55:11

**monitor** [7] - 65:18, 113:16, 116:6, 161:3, 161:6, 161:12, 242:3

**monitoring** [21] -

13:1, 13:2, 13:3, 35:22, 64:8, 65:22, 66:13, 100:7, 105:15, 114:25, 131:16, 132:18, 133:5, 139:20, 149:11, 150:1, 150:5, 150:6, 150:20

**Monroe** [2] - 18:23, 24:14

**monthly** [1] - 66:17

**months** [2] - 170:1, 196:12

**morning** [30] - 6:6, 6:13, 6:17, 6:18, 6:20, 6:21, 6:24, 7:2, 7:3, 7:5, 7:6, 7:8, 7:11, 7:13, 7:14, 7:16, 7:19, 7:20, 7:23, 7:25, 8:1, 8:3, 12:6, 63:16, 86:18, 87:13, 94:17, 94:19, 177:19, 228:6

**mortality** [1] - 131:23

**mosquito** [2] - 146:16, 147:6

**mosquitoes** [3] - 146:14, 146:22

**most** [8] - 13:16, 93:21, 144:18, 176:20, 183:4, 191:21, 192:19, 193:24

**motion** [1] - 244:18

**Motor** [8] - 180:14, 180:18, 180:20, 184:6, 193:4, 196:21, 202:3, 206:21

**motor** [2] - 181:2, 213:17

**MOU** [1] - 212:8

**mouth** [1] - 119:25

**move** [19] - 14:23, 17:1, 27:25, 42:18, 44:24, 49:14, 50:1, 52:13, 52:25, 56:25, 57:12, 73:18, 108:9, 111:24, 179:8, 209:3, 221:2, 235:18, 237:18

**moved** [2] - 12:16, 186:19

**movement** [2] - 97:5, 148:21

**moves** [3] - 13:14, 23:20, 24:1

**moving** [3] - 129:3, 129:4, 221:4

**MR** [379] - 4:4, 4:5, 4:8, 4:9, 4:9, 4:12, 4:13, 6:6, 6:21, 6:24, 7:3, 7:6, 7:8, 7:11,

7:14, 7:20, 7:23, 8:1, 8:12, 8:23, 9:2, 9:9, 9:17, 9:20, 9:25, 10:9, 10:20, 10:25, 11:4, 11:7, 11:23, 11:25, 12:2, 13:4, 13:6, 13:14, 13:19, 14:3, 14:8, 14:10, 14:16, 14:18, 14:19, 14:23, 15:8, 15:14, 15:15, 16:15, 16:18, 16:19, 17:1, 17:22, 17:23, 20:23, 21:2, 21:4, 21:16, 21:18, 22:22, 22:25, 23:8, 23:10, 26:6, 26:11, 30:23, 31:7, 31:8, 31:11, 31:13, 33:5, 33:9, 34:25, 35:2, 36:16, 36:24, 37:2, 37:9, 38:12, 38:20, 40:1, 40:12, 40:14, 41:10, 41:11, 43:22, 44:5, 44:10, 44:15, 44:17, 44:24, 45:9, 45:15, 45:19, 46:4, 46:6, 47:6, 48:1, 48:17, 49:2, 49:4, 49:14, 49:15, 50:1, 50:12, 50:16, 51:10, 51:13, 52:12, 52:14, 52:25, 53:9, 53:10, 53:24, 54:15, 55:6, 55:7, 56:8, 56:11, 56:17, 56:25, 57:3, 57:7, 57:9, 57:12, 57:15, 57:18, 59:7, 59:9, 59:17, 59:22, 59:25, 60:20, 60:22, 61:12, 62:1, 62:3, 63:2, 63:5, 63:9, 82:8, 83:7, 86:17, 87:10, 87:11, 88:15, 88:17, 89:6, 89:9, 89:23, 90:5, 91:19, 92:1, 92:7, 92:12, 92:17, 92:23, 93:20, 94:3, 95:13, 95:19, 96:2, 103:21, 103:22, 104:5, 104:6, 109:12, 109:22, 110:6, 110:9, 111:4, 111:5, 112:10, 117:5, 117:8, 117:10, 117:22, 118:5, 120:18, 120:25, 121:3, 121:19, 122:5, 122:7, 123:5, 123:9, 123:17, 123:19, 124:3, 124:5, 125:5, 125:6, 126:9, 126:11, 126:13, 127:10,

128:9, 128:10, 130:17, 131:1, 131:6, 132:1, 134:14, 134:18, 134:21, 135:1, 135:2, 135:11, 135:12, 136:21, 136:24, 137:6, 137:7, 139:9, 139:10, 145:1, 145:3, 146:18, 146:20, 147:17, 157:12, 157:14, 157:16, 158:9, 158:24, 159:11, 159:17, 159:19, 159:23, 167:1, 167:3, 167:7, 167:9, 168:7, 168:9, 168:23, 169:1, 169:4, 172:13, 172:16, 172:17, 175:12, 175:19, 175:20, 176:1, 176:8, 177:13, 177:22, 178:4, 178:18, 178:20, 179:2, 179:7, 179:15, 179:21, 180:5, 181:10, 181:14, 184:1, 184:3, 187:22, 189:4, 189:5, 190:10, 190:19, 191:5, 191:24, 192:15, 192:18, 192:22, 193:20, 194:9, 194:13, 194:25, 195:1, 195:23, 196:16, 196:19, 197:22, 199:4, 199:14, 200:5, 200:18, 201:3, 201:12, 201:22, 201:25, 202:11, 203:4, 203:6, 203:14, 203:17, 203:19, 209:8, 209:15, 218:21, 219:14, 220:3, 220:17, 221:6, 221:12, 221:17, 221:19, 222:1, 223:14, 223:18, 223:21, 224:7, 224:11, 224:13, 225:4, 227:11, 227:19, 227:21, 228:2, 228:6, 228:11, 228:25, 229:8, 229:13, 229:24, 230:9, 230:14, 230:21, 230:25, 231:3, 231:14, 231:17, 231:21, 231:23, 232:13, 233:6, 233:9, 233:12,

233:15, 233:17,
233:22, 234:3,
234:10, 234:17,
234:23, 235:4,
235:18, 235:21,
235:25, 236:2, 236:4,
236:7, 236:18, 237:1,
237:5, 237:18,
237:23, 238:1, 238:8,
239:13, 239:15,
240:4, 240:8, 240:14,
240:19, 240:21,
240:23, 240:25,
241:3, 241:10,
241:20, 241:25,
242:5, 242:7, 242:25,
243:16, 243:24,
243:25, 244:7,
244:12, 244:19,
245:9, 245:13, 245:20
**MS** [106] - 4:5, 4:8,
4:12, 6:13, 6:18, 7:16,
13:22, 15:2, 17:4,
30:17, 36:20, 39:13,
45:1, 46:23, 47:21,
47:24, 48:19, 50:3,
50:6, 52:3, 52:5, 52:8,
52:10, 53:3, 56:13,
59:12, 59:19, 60:17,
61:23, 63:11, 63:15,
70:10, 70:12, 70:15,
70:16, 73:19, 74:11,
74:15, 75:9, 75:10,
77:4, 77:6, 77:10,
77:11, 81:21, 81:22,
82:12, 82:16, 82:20,
83:4, 83:6, 83:8,
83:11, 83:12, 84:24,
85:1, 85:4, 86:14,
89:22, 89:24, 145:11,
146:24, 147:3, 147:4,
147:12, 176:13,
176:19, 177:2,
188:21, 190:23,
191:22, 192:4, 194:5,
197:14, 197:16,
198:15, 199:8,
203:22, 203:24,
207:21, 208:5, 208:8,
208:12, 209:3, 209:6,
209:11, 209:19,
209:24, 210:5,
210:10, 212:14,
212:17, 212:21,
216:7, 216:11,
216:13, 216:21,
216:24, 219:2,
219:17, 220:11,
220:13, 220:19,
221:3, 221:9, 224:24
**mudfish** [1] - 119:25

**multi** [2] - 48:5,
48:14
**multi-decade** [2] -
48:5, 48:14
**multiagency** [2] -
100:20, 101:13
**multibillion** [2] -
48:5, 48:14
**multiple** [7] - 109:24,
160:15, 200:20,
225:15, 230:5,
239:24, 244:13
**multiyear** [1] - 81:1
**municipal** [1] -
225:22
**murder** [1] - 202:16
**MURRAY** [1] -
203:19
**museum** [2] - 80:15,
80:16
**must** [4] - 179:11,
188:15, 190:11,
215:13
**mutual** [1] - 177:8

### N

**N.W** [1] - 2:18
**name** [23] - 7:19,
11:11, 11:14, 11:15,
12:6, 21:23, 22:1,
22:6, 32:3, 44:18,
57:10, 63:16, 95:22,
95:25, 96:6, 147:22,
179:25, 180:2,
203:25, 222:2,
230:22, 238:13
**names** [2] - 18:3,
18:9
**narcotics** [2] -
191:14
**narrow** [1] - 94:3
**nation** [3] - 47:3,
183:9, 183:18
**national** [4] - 112:7,
173:19, 182:24,
215:23
**National** [30] - 20:6,
20:7, 20:9, 20:10,
24:4, 24:5, 30:12,
51:18, 52:2, 57:22,
57:23, 73:23, 74:1,
79:2, 79:4, 79:6,
97:16, 100:16,
102:16, 102:19,
108:15, 108:24,
108:25, 109:1, 109:4,
109:18, 165:3, 165:4,
165:17
**native** [10] - 115:24,

116:4, 124:1, 124:2,
132:5, 132:15, 138:8,
138:12, 138:13,
192:12
**natural** [12] - 12:10,
51:21, 54:20, 54:24,
58:11, 96:11, 100:4,
108:7, 118:8, 141:17,
173:22, 173:23
**naturally** [1] - 138:4
**nature** [4] - 99:9,
115:5, 153:20, 199:2
**NE** [2] - 2:15, 2:21
**near** [7] - 34:6,
77:12, 79:10, 79:12,
111:8, 129:5, 164:17
**nearest** [1] - 115:20
**nearly** [1] - 100:2
**necessarily** [2] -
193:14, 219:25
**necessary** [4] -
41:23, 51:20, 163:15,
201:15
**need** [22] - 72:7,
90:22, 92:23, 93:15,
101:5, 131:3, 131:5,
133:5, 141:13,
150:24, 161:15,
179:1, 181:19, 196:6,
201:7, 205:19,
221:14, 223:12,
227:22, 241:6, 241:9,
243:7
**needed** [2] - 95:6,
103:13
**needing** [2] - 42:24,
225:2
**needs** [6] - 48:8,
102:25, 177:16,
219:13, 228:3, 238:15
**negative** [1] - 162:22
**negatively** [2] -
115:25, 146:23
**negotiating** [1] -
240:13
**NEPA** [21] - 43:5,
43:6, 43:13, 43:14,
43:17, 44:14, 50:24,
52:21, 53:11, 57:24,
59:10, 59:13, 59:16,
60:8, 60:9, 91:1,
134:19, 134:22,
232:18, 244:8, 245:15
**net** [1] - 157:3
**never** [1] - 241:22
**new** [6] - 29:14,
35:23, 36:21, 91:2,
105:10, 189:12
**New** [1] - 70:15
**next** [17] - 37:5, 48:2,

49:2, 51:1, 51:10,
55:24, 57:7, 58:13,
61:11, 89:15, 91:24,
95:18, 101:4, 115:10,
172:6, 201:5, 202:5
**nexus** [1] - 191:15
**nice** [2] - 6:12,
147:24
**nicely** [1] - 52:12
**night** [11] - 109:23,
111:7, 111:8, 111:10,
111:14, 111:17,
111:20, 111:22,
145:18, 145:19,
230:19
**nighttime** [1] - 130:9
**nitrogen** [2] - 36:11,
39:1
**NO** [1] - 1:2
**nobody** [3] - 156:21,
194:18, 201:11
**nocturnal** [4] -
132:6, 132:15,
141:18, 142:8
**Noem** [1] - 6:3
**NOEM** [2] - 1:7, 2:13
**noise** [10] - 32:10,
32:12, 130:6, 131:8,
132:12, 162:19,
162:21, 162:23,
162:25, 163:5
**non** [3] - 13:2, 127:3,
155:20
**non-point** [1] - 13:2
**non-Tribal** [2] -
127:3, 155:20
**noncitizens** [1] -
220:9
**nondetectable** [1] -
111:21
**none** [5] - 36:20,
63:10, 203:18,
203:19, 242:19
**nonprofits** [1] -
100:21
**normal** [3] - 129:6,
141:11, 241:14
**normally** [4] - 66:23,
124:21, 186:3, 202:25
**North** [3] - 3:3,
40:17, 247:9
**north** [13] - 23:16,
25:6, 29:15, 29:20,
29:25, 30:25, 40:22,
47:16, 67:1, 77:14,
77:15, 166:10, 166:14
**north-south** [1] -
23:16
**northern** [4] - 18:18,
22:9, 124:9, 125:4

**note** [2] - 43:3, 241:3
**noted** [2] - 164:20,
167:24
**nothing** [6] - 32:2,
61:9, 63:6, 91:19,
224:7, 245:13
**notice** [6] - 57:24,
58:3, 58:5, 115:1,
169:14, 169:15
**noticeable** [1] -
33:10
**noticed** [3] - 75:24,
133:9, 177:23
**notifications** [1] -
34:9
**notified** [1] - 44:5
**notify** [1] - 213:10
**notifying** [1] - 58:4
**November** [1] -
50:19
**nowadays** [2] -
105:10, 150:18
**NPS** [1] - 103:7
**NPS's** [1] - 109:9
**number** [27] - 8:14,
9:9, 9:12, 12:16,
12:19, 17:24, 19:3,
19:23, 34:16, 41:15,
51:2, 53:19, 70:25,
71:2, 76:10, 76:12,
76:25, 87:15, 163:24,
166:2, 174:22,
201:12, 202:5, 202:9,
209:5, 212:20, 235:19
**Numbers** [3] - 9:17,
233:15, 235:22
**numbers** [5] -
165:15, 180:25,
200:3, 231:7, 235:25
**numerous** [2] -
84:13, 177:23
**nutrient** [9] - 36:11,
38:4, 38:24, 40:7,
41:8, 43:4, 62:23,
137:15, 139:2
**nutrients** [15] - 39:5,
39:15, 40:2, 40:4,
40:6, 40:8, 40:19,
40:21, 40:24, 41:12,
41:19, 42:5, 133:4,
138:10, 141:15

### O

**o'clock** [1] - 241:8
**obese** [1] - 40:9
**object** [14] - 36:16,
39:13, 45:1, 47:21,
52:3, 56:13, 61:23,
109:12, 117:5,

130:17, 134:14, 198:15, 244:21, 245:14

**objected** [1] - 231:13
**objected-to** [1] - 231:13
**objection** [54] - 9:12, 9:18, 10:11, 13:21, 13:22, 13:25, 14:25, 15:1, 15:2, 17:3, 33:5, 38:12, 48:17, 50:3, 52:8, 60:17, 60:22, 82:8, 89:22, 89:23, 117:23, 118:3, 120:23, 130:21, 134:25, 146:18, 159:6, 168:23, 172:13, 179:8, 188:21, 190:23, 191:22, 192:4, 194:5, 197:14, 197:16, 199:8, 199:9, 209:7, 209:8, 209:15, 219:14, 220:3, 220:17, 221:6, 223:18, 224:24, 231:12, 232:6, 232:12, 232:13, 232:16, 234:1
**Objection** [1] - 218:21
**objections** [1] - 9:25
**objective** [1] - 200:14
**obligation** [2] - 117:3, 117:11
**obligations** [2] - 59:5, 104:23
**observation** [1] - 174:23
**observations** [3] - 168:16, 168:17, 168:20
**observe** [7] - 32:8, 32:18, 32:20, 76:4, 91:12, 119:1, 128:15
**observed** [14] - 31:23, 32:1, 70:22, 71:5, 75:8, 75:11, 75:14, 119:21, 127:19, 128:20, 129:16, 129:23, 130:1, 133:13
**observing** [4] - 75:21, 87:18, 159:12, 242:11
**obstacle** [2] - 151:19, 170:21
**obstacles** [3] - 152:1, 170:18, 171:3

**obtain** [1] - 219:18
**obtaining** [1] - 51:20
**obviously** [2] - 213:16, 244:22
**occasion** [2] - 31:20, 128:15
**occasions** [1] - 183:2
**occupancy** [7] - 20:8, 73:3, 73:5, 73:7, 73:8, 79:3, 113:8
**occupied** [1] - 180:15
**occur** [3] - 166:16, 185:23, 205:10
**occurred** [2] - 131:7, 152:16
**occurring** [2] - 214:11, 245:24
**occurs** [1] - 35:22
**OF** [6] - 1:1, 1:4, 2:18, 2:20, 4:1, 5:1
**off-road** [9] - 121:14, 121:24, 122:15, 124:11, 124:15, 125:7, 154:5, 154:7, 158:17
**offenders** [3] - 197:19, 197:20, 198:11
**offer** [1] - 110:4
**offered** [4] - 17:16, 95:4, 148:12, 221:16
**OFFICE** [2] - 2:14, 2:24
**Office** [1] - 50:20
**office** [14] - 31:14, 31:18, 32:13, 34:7, 34:10, 45:22, 75:1, 75:5, 87:19, 88:22, 88:23, 182:12, 199:16
**OFFICER** [3] - 228:12, 228:14, 246:5
**officer** [6] - 182:9, 205:13, 213:2, 213:19, 218:2, 218:8
**officers** [7] - 38:23, 76:19, 76:23, 203:8, 210:23, 226:17, 226:19
**offices** [1] - 34:8
**Official** [1] - 247:8
**official** [3] - 3:2, 218:6, 232:10
**officials** [1] - 188:10
**often** [3] - 103:5, 120:13, 170:15
**oftentimes** [3] - 115:17, 136:19, 195:21

**Okeechobee** [1] - 47:13
**Olas** [1] - 2:10
**old** [1] - 87:16
**on-site** [6] - 32:18, 34:14, 88:7, 90:20, 222:14, 229:21
**once** [11] - 22:16, 35:21, 43:2, 53:19, 53:21, 58:9, 92:11, 93:8, 101:3, 101:6, 144:20
**one** [81] - 7:20, 15:25, 20:17, 27:13, 32:2, 45:2, 52:8, 54:2, 57:3, 60:23, 62:9, 62:10, 66:21, 66:22, 67:19, 80:23, 85:1, 85:9, 88:15, 92:5, 99:21, 115:2, 125:5, 127:2, 127:4, 129:2, 129:7, 136:9, 136:12, 145:1, 145:4, 145:12, 147:3, 148:22, 150:6, 156:22, 158:22, 159:24, 160:8, 160:10, 160:14, 162:25, 163:6, 163:20, 163:21, 167:11, 168:7, 168:10, 172:6, 173:16, 173:17, 176:4, 176:9, 176:12, 176:13, 183:22, 184:10, 184:11, 186:19, 187:16, 192:16, 192:22, 195:12, 195:17, 200:13, 201:21, 202:9, 203:4, 204:10, 204:13, 216:20, 221:19, 223:20, 228:23, 229:5, 229:6, 231:3, 234:11, 238:1, 241:3, 242:5
**ones** [5] - 18:17, 18:21, 112:17, 116:18, 177:18
**ongoing** [1] - 43:12
**online** [1] - 108:13
**oops** [1] - 51:11
**open** [7] - 59:4, 121:18, 123:18, 124:21, 126:10, 136:8, 154:13
**opens** [1] - 53:22
**operate** [2] - 210:23, 225:20
**operated** [1] - 86:9
**operates** [2] - 80:11,

173:20
**operating** [10] - 42:2, 85:16, 85:20, 85:24, 86:4, 152:13, 155:24, 211:1, 228:20, 229:17
**operation** [11] - 47:18, 48:13, 49:11, 51:24, 55:14, 58:24, 60:15, 62:16, 165:19, 173:22, 230:16
**operational** [2] - 160:9, 229:23
**operations** [12] - 69:3, 70:18, 71:20, 152:16, 152:17, 152:20, 153:4, 160:3, 180:25, 196:13, 229:21, 230:4
**opine** [1] - 191:1
**opinion** [2] - 130:18, 130:22
**opinions** [1] - 167:13
**opportunity** [10] - 35:13, 36:5, 54:7, 58:18, 58:23, 90:17, 91:16, 169:11, 239:11, 243:17
**opposed** [4] - 10:5, 193:11, 198:12, 201:19
**opposing** [1] - 235:2
**opposite** [1] - 116:2
**option** [1] - 58:4
**oral** [1] - 240:5
**orange** [1] - 104:12
**orange-ish** [1] - 104:12
**Order** [3] - 6:1, 215:17, 221:5
**order** [19] - 27:5, 66:21, 92:18, 92:20, 163:1, 182:22, 183:21, 215:19, 215:20, 215:21, 216:1, 242:16, 242:22, 242:25, 243:1, 243:2, 243:4, 243:18, 244:4
**ordering** [2] - 185:13, 204:18
**orders** [2] - 215:22, 215:25
**ordinarily** [2] - 140:8, 141:20
**organization** [2] - 165:8, 165:11
**oriented** [1] - 14:5
**original** [5] - 13:19, 121:1, 149:22, 151:1, 151:2

**originally** [2] - 22:13, 28:13
**originated** [1] - 191:18
**Osceola** [3] - 7:1, 15:24, 236:20
**otherwise** [1] - 113:25
**ourselves** [1] - 155:20
**out-of-town** [1] - 8:25
**outside** [21] - 134:22, 151:13, 152:18, 152:24, 155:3, 155:6, 155:9, 159:1, 160:15, 170:9, 170:13, 170:15, 170:22, 188:21, 189:21, 191:15, 220:17, 222:10, 223:18
**outskirts** [1] - 89:14
**overabundance** [3] - 166:14, 166:16, 166:19
**overabundant** [1] - 166:23
**overall** [1] - 114:15
**overcrowding** [5] - 194:4, 194:23, 195:3, 195:8, 202:21
**overflow** [1] - 205:23
**overgrown** [4] - 138:3, 138:4, 138:16, 138:24
**overgrowth** [1] - 139:2
**overhead** [1] - 76:4
**overlap** [1] - 141:1
**overlaying** [1] - 140:5
**overrule** [3] - 14:1, 50:7, 130:21
**overruled** [12] - 30:22, 33:7, 36:25, 38:19, 39:25, 47:2, 48:22, 117:7, 146:21, 219:15, 223:19, 224:25
**overruling** [1] - 39:21
**overrun** [1] - 195:22
**oversee** [3] - 13:1, 64:7, 101:19
**overview** [2] - 163:25, 193:15
**Owen** [1] - 49:9
**own** [9] - 86:25,

91:14, 103:9, 152:6,
153:19, 191:11,
205:7, 212:1, 232:19
**owned** [1] - 203:10
**owns** [2] - 152:4,
153:17
**oxygen** [8] - 36:10,
39:9, 42:9, 42:12,
42:14, 42:16, 43:4,
136:20

## P

**P.A** [1] - 2:2
**p.m** [3] - 1:6, 49:8,
246:6
**P.O** [1] - 2:25
**pace** [1] - 181:16
**pacing** [1] - 181:10
**page** [23] - 13:9,
14:8, 43:23, 44:6,
44:15, 45:12, 49:2,
49:14, 51:10, 52:13,
55:6, 56:9, 57:7,
57:21, 178:14, 208:9,
208:14, 208:18,
209:21, 210:5, 210:7,
212:18, 216:12
**pages** [4] - 44:25,
50:2, 53:1, 57:13
**Pages** [5] - 1:8,
45:17, 50:14, 53:7,
57:16
**PAH** [2] - 36:12,
36:14
**Palm** [1] - 182:13
**Panther** [2] - 15:24,
127:2
**panther** [11] -
116:17, 127:4,
127:11, 127:13,
131:12, 131:21,
132:2, 132:4, 142:14,
142:17, 143:4
**panthers** [1] - 17:9
**Panuccio** [19] - 7:4,
11:6, 93:11, 179:10,
179:20, 180:8, 189:2,
194:21, 196:15,
199:3, 201:18,
203:15, 224:10,
228:1, 234:16,
235:17, 242:24,
245:2, 245:18
**PANUCCIO** [84] -
2:7, 4:12, 7:3, 9:2,
11:4, 92:23, 176:1,
176:8, 179:21, 180:5,
181:10, 181:14,
184:1, 184:3, 187:22,

189:4, 189:5, 190:10,
190:19, 191:5,
191:24, 192:15,
192:18, 192:22,
193:20, 194:9,
194:13, 194:25,
195:1, 195:23,
196:16, 196:19,
197:22, 199:4,
199:14, 200:5,
200:18, 201:3,
201:12, 201:22,
201:25, 202:11,
203:4, 203:6, 203:14,
209:8, 209:15,
218:21, 219:14,
220:3, 220:17, 221:6,
221:17, 221:19,
223:18, 224:11,
224:13, 225:4,
227:11, 227:19,
228:2, 228:11,
229:13, 229:24,
230:9, 230:14,
230:21, 230:25,
232:13, 234:17,
235:18, 239:13,
239:15, 240:8,
240:14, 240:19,
241:10, 241:20,
242:25, 243:25,
244:7, 244:12, 245:9,
245:13
**paper** [1] - 206:9
**paperwork** [1] -
63:20
**paragraph** [10] -
47:11, 47:12, 49:5,
51:14, 55:8, 56:1,
58:13, 59:3, 209:17,
212:22
**parameters** [9] -
35:24, 36:10, 37:17,
37:19, 37:21, 38:24,
42:7, 99:6, 194:17
**pardon** [1] - 197:15
**Park** [11] - 20:7,
20:11, 24:5, 30:12,
97:16, 100:16,
108:25, 109:1, 109:4,
165:4, 165:17
**parking** [3] - 124:23,
171:24, 172:4
**Parks** [1] - 109:18
**part** [36] - 8:14, 9:3,
13:17, 13:19, 22:9,
22:10, 26:17, 28:24,
29:6, 30:6, 40:16,
52:21, 60:8, 64:12,
81:10, 81:23, 91:1,

97:20, 98:21, 108:24,
143:19, 169:18,
171:25, 187:2,
189:22, 189:24,
191:16, 195:19,
196:4, 203:13,
210:11, 219:6,
233:19, 243:14,
244:3, 245:6
**part-time** [1] - 98:21
**participate** [5] -
44:14, 46:11, 50:19,
50:23, 183:7
**participated** [2] -
43:14, 43:18
**participates** [1] -
189:15
**participating** [2] -
212:24, 213:1
**participation** [1] -
49:18
**particular** [9] -
17:11, 66:16, 97:6,
115:2, 115:11, 129:2,
184:21, 212:8, 215:9
**particularly** [4] -
88:2, 110:13, 195:18,
200:10
**parties** [11] - 8:17,
176:20, 178:10,
178:15, 182:22,
233:20, 233:21,
233:22, 233:25,
239:7, 245:7
**parties'** [1] - 177:17
**partly** [1] - 138:22
**partners** [2] - 30:21,
59:6
**partnership** [1] -
48:4
**parts** [3] - 9:25,
46:18, 153:23
**party** [3] - 109:17,
184:17, 232:21
**pass** [1] - 21:11
**passed** [1] - 22:7
**passenger** [1] - 32:2
**passes** [1] - 164:12
**passively** [1] - 136:8
**passport** [1] - 187:9
**past** [9] - 31:20,
32:23, 50:10, 64:25,
105:12, 119:3,
131:15, 161:23,
223:12
**patch** [2] - 125:12,
125:16
**patches** [5] - 123:24,
139:1, 139:3, 166:18,
166:23

**patience** [1] - 227:13
**PATRICIA** [2] - 3:2,
247:8
**Patrol** [12] - 181:4,
181:5, 181:21, 185:9,
186:10, 186:14,
194:8, 195:19,
199:19, 202:23,
207:9, 225:23
**patrol** [1] - 214:25
**patterns** [1] - 161:7
**Paul** [1] - 6:6
**PAUL** [1] - 1:15
**pause** [7] - 8:19,
8:20, 122:5, 123:8,
125:5, 126:11
**paused** [2] - 122:6,
126:12
**Pautler** [1] - 6:18
**PAUTLER** [1] - 1:22
**paved** [2] - 42:4,
78:23
**pays** [1] - 226:2
**pending** [1] - 214:15
**penetrable** [1] - 41:3
**penetrate** [2] - 39:9,
42:11
**Pennsylvania** [1] -
2:18
**Penthouse** [1] - 1:17
**people** [68] - 19:5,
22:21, 32:18, 33:21,
34:13, 38:21, 41:20,
41:24, 61:2, 61:4,
61:13, 61:15, 62:16,
76:13, 90:20, 99:18,
99:22, 130:4, 152:9,
154:4, 156:23,
156:24, 157:4,
158:25, 159:20,
159:25, 160:8,
160:16, 191:13,
193:9, 193:10,
194:14, 197:1, 197:7,
198:3, 198:5, 198:9,
198:11, 198:17,
198:19, 200:17,
201:6, 201:9, 201:13,
201:22, 202:1, 202:6,
202:14, 202:15,
202:17, 206:1, 206:4,
213:6, 214:5, 214:8,
215:1, 215:5, 215:7,
217:19, 217:23,
218:14, 218:19,
219:3, 219:9, 219:18,
219:22
**people's** [1] - 221:23
**per** [1] - 110:22
**percent** [5] - 16:8,

24:10, 192:10, 197:4,
240:15
**percentage** [1] -
192:12
**perform** [3] - 100:1,
161:12, 213:2
**performing** [2] -
128:14, 138:19
**perhaps** [1] - 115:4
**perimeter** [1] - 88:6
**period** [7] - 17:15,
52:21, 53:14, 53:21,
144:17, 170:12,
182:13
**permanent** [7] -
222:8, 222:11,
222:13, 223:1, 223:7,
223:9, 224:20
**permission** [2] -
103:12, 103:13
**permit** [2] - 62:19,
69:23
**permits** [3] - 62:4,
62:9, 87:6
**permitted** [3] -
154:4, 244:23, 245:25
**permitting** [5] -
62:13, 62:14, 78:14,
87:5, 139:19
**perpetuity** [1] - 22:3
**person** [10] - 39:15,
99:21, 186:8, 186:17,
195:13, 200:1,
207:13, 230:11,
230:21, 230:24
**personal** [11] -
68:10, 77:2, 110:3,
168:15, 168:17,
168:20, 174:18,
174:19, 189:21,
191:20, 206:17
**personally** [4] -
107:21, 165:13,
183:1, 224:19
**personnel** [4] -
160:2, 212:25, 213:1,
229:2
**persons** [2] - 234:7,
234:9
**perspective** [3] -
111:20, 139:16,
189:21
**pertain** [2] - 229:1,
229:2
**pertains** [1] - 222:10
**pertinent** [2] - 193:7,
193:14
**pervious** [1] - 42:5
**pesky** [1] - 14:17
**Petersburg** [1] - 1:23

petroleum [1] - 42:5
Pgs [4] - 5:16, 5:16, 5:17, 5:17
Ph.D [9] - 96:9, 96:10, 96:12, 96:16, 96:24, 97:1, 97:25, 98:7, 104:20
phenomenon [2] - 132:6, 161:17
phone [1] - 199:23
phosphates [2] - 41:17, 42:1
phosphorus [6] - 36:11, 39:1, 77:16, 77:19, 78:1, 137:15
photograph [2] - 163:17, 163:18
photographs [1] - 150:18
photometry [1] - 165:22
photos [3] - 238:22, 238:24, 242:14
photosynthesis [1] - 42:11
photosynthesize [1] - 39:10
phrase [2] - 59:10, 190:21
physical [3] - 36:10, 42:7, 171:3
physically [1] - 156:9
physiological [2] - 141:14, 150:11
picture [3] - 17:13, 168:21, 189:24
pictured [1] - 113:7
pictures [2] - 17:15, 33:19
piece [2] - 44:3, 225:10
pieces [1] - 52:23
PIR [3] - 58:7, 58:8, 58:11
PIR/EIS [4] - 58:2, 58:5, 58:17, 58:24
Piropato [3] - 7:17, 7:18, 63:16
PIROPATO [59] - 2:20, 4:5, 7:16, 13:22, 15:2, 17:4, 30:17, 36:20, 39:13, 45:1, 46:23, 47:21, 47:24, 48:19, 50:3, 50:6, 52:3, 52:5, 52:8, 52:10, 53:3, 56:13, 59:12, 59:19, 60:17, 61:23, 63:15, 70:10, 70:12, 70:15, 70:16, 73:19, 74:11, 74:15,

75:9, 75:10, 77:4, 77:6, 77:10, 77:11, 81:21, 81:22, 82:12, 82:16, 82:20, 83:4, 83:6, 83:8, 83:11, 83:12, 84:24, 85:1, 85:4, 86:14, 89:22, 89:24, 176:13, 176:19, 177:2
pivoting [1] - 112:21
place [9] - 87:2, 87:3, 129:2, 132:23, 146:2, 177:8, 225:2, 242:20, 243:13
places [3] - 193:11, 195:7, 198:12
plaintiff [2] - 6:14, 8:21
PLAINTIFF [1] - 2:1
Plaintiff [3] - 6:23, 8:9, 145:13
Plaintiff's [1] - 21:1
Plaintiffs [3] - 1:5, 109:16, 192:18
plaintiffs [13] - 6:5, 93:1, 93:9, 175:17, 177:23, 200:19, 200:25, 236:19, 239:25, 243:16, 243:24, 244:16, 245:11
PLAINTIFFS [1] - 1:15
PLAINTIFFS' [1] - 5:2
plaintiffs' [6] - 9:15, 10:3, 10:7, 83:7, 199:15, 231:22
Plaintiffs' [34] - 10:4, 10:15, 10:16, 10:17, 10:18, 10:19, 15:4, 20:23, 26:7, 40:12, 74:11, 77:4, 83:8, 120:18, 120:25, 135:11, 145:25, 229:11, 231:20, 232:25, 233:1, 233:2, 233:3, 236:5, 236:16, 236:21, 236:22, 237:8, 237:12, 237:13, 237:14, 237:15, 237:16, 237:17
plan [15] - 28:2, 43:13, 52:17, 53:19, 53:21, 58:9, 58:10, 60:4, 60:6, 62:17, 78:18, 102:11, 120:21, 175:24, 220:15

Plan [5] - 21:8, 28:4, 28:25, 48:6, 48:10
plane [8] - 32:6, 75:23, 75:25, 76:3, 88:21, 88:24, 89:3, 168:18
planes [15] - 30:10, 32:2, 32:8, 32:9, 32:11, 32:13, 75:11, 75:14, 75:25, 88:19, 88:23, 89:5, 129:6, 129:8, 129:11
planned [2] - 26:17, 94:18
planning [2] - 48:9, 92:8
plans [3] - 26:21, 53:20, 224:20
plant [8] - 108:3, 113:16, 113:18, 114:1, 114:19, 116:19, 116:21, 140:16
plants [33] - 39:5, 113:22, 113:23, 113:24, 114:3, 114:10, 114:14, 115:14, 115:23, 116:25, 117:4, 117:12, 118:11, 118:18, 120:8, 120:10, 120:15, 134:2, 134:3, 134:7, 154:20, 154:23, 154:25, 155:3, 155:6, 155:9, 155:14, 155:17, 155:24, 155:25, 158:18, 159:9, 173:10
play [4] - 25:24, 100:21, 121:16, 123:17
played [3] - 121:18, 123:18, 126:10
plays [1] - 211:5
plea [1] - 95:10
pleasure [1] - 105:18
plural [1] - 175:18
plus [4] - 38:23, 76:24, 160:11, 192:9
PO [1] - 1:23
point [18] - 13:2, 14:14, 15:10, 39:11, 44:20, 45:6, 53:20, 55:25, 94:3, 162:14, 164:17, 177:4, 177:6, 190:15, 211:24, 222:12, 238:10
pointed [2] - 133:20, 145:25

points [9] - 16:24, 18:15, 18:19, 19:1, 55:20, 104:14, 120:20, 164:23, 164:25
police [2] - 182:8, 218:8
Policy [2] - 57:23, 229:10
policy [2] - 155:13, 217:10
polluted [1] - 136:12
pollution [1] - 112:6
polygon [2] - 104:11, 104:12
population [5] - 97:12, 115:2, 141:10, 198:17, 206:15
populations [2] - 114:19, 161:4
porous [1] - 192:11
portion [8] - 26:16, 97:19, 107:13, 141:1, 157:1, 157:8, 157:17, 159:7
portions [3] - 164:10, 164:13, 217:21
ports [1] - 192:11
position [14] - 12:13, 12:15, 48:12, 48:22, 92:25, 94:4, 98:25, 99:13, 173:11, 180:24, 206:18, 229:16, 243:8, 244:19
positioning [1] - 242:17
possible [3] - 74:13, 88:10, 92:8
possibly [2] - 57:6, 95:4
post [2] - 184:25
potential [6] - 9:2, 24:19, 51:23, 136:13, 197:24, 223:15
potentially [4] - 24:5, 38:8, 139:20, 180:10
practice [5] - 19:8, 55:12, 87:8, 119:10, 155:13
practices [14] - 19:10, 22:16, 40:22, 62:19, 77:12, 77:16, 78:5, 78:8, 89:20, 90:7, 134:7, 134:9, 134:10, 173:9
practicing [1] - 173:9
pre [3] - 167:13, 171:22, 172:11
pre-detention [1] -

167:13
pre-June [1] - 172:11
precise [3] - 69:25, 75:14, 75:16
precisely [1] - 179:1
predicated [2] - 186:5
predominant [1] - 192:12
preexisting [3] - 163:9, 189:11, 223:3
prefer [2] - 168:21, 241:11
PRELIMINARY [1] - 1:10
preliminary [10] - 8:6, 9:15, 10:3, 10:10, 94:5, 190:12, 190:16, 198:4, 201:15, 244:17
premise [2] - 112:8, 150:19
premises [1] - 165:16
prepare [1] - 97:2
prepared [4] - 171:14, 239:3, 239:19, 240:2
preschool [1] - 34:24
preschools [1] - 16:10
presence [13] - 115:22, 117:1, 118:8, 129:17, 142:17, 147:6, 170:14, 171:16, 175:3, 187:3, 187:15, 214:4
present [15] - 25:2, 51:2, 116:11, 116:13, 141:8, 146:3, 187:8, 192:1, 192:22, 194:22, 196:11, 202:1, 202:13, 239:11, 240:2
presentation [3] - 8:13, 233:7, 244:15
presented [2] - 94:7, 199:15
presenting [3] - 149:14, 149:18, 149:21
presently [1] - 194:1
preservation [2] - 54:20, 117:14
preserve [4] - 34:21, 173:19, 173:23
Preserve [23] - 20:6, 20:10, 24:4, 51:18, 52:2, 73:24, 74:1, 74:4, 74:8, 79:2, 79:4, 79:6, 79:8, 79:9,

79:11, 102:16, 102:20, 108:16, 108:24, 109:5, 110:19, 165:3, 173:20
**preserving** [1] - 25:24
**President** [3] - 183:21, 217:7, 217:12
**president** [2] - 196:11, 217:15
**press** [1] - 196:10
**pressure** [4] - 24:20, 24:23, 28:5, 28:8
**pretty** [15] - 30:10, 65:25, 89:2, 102:24, 105:10, 105:13, 111:21, 134:19, 134:22, 140:14, 181:11, 200:13, 222:18, 223:3, 239:2
**prevent** [1] - 133:18
**prevented** [1] - 218:22
**preventing** [1] - 13:23
**prevents** [2] - 151:20, 151:22
**previously** [2] - 156:22, 219:18
**prey** [1] - 132:13
**primarily** [8] - 100:4, 105:6, 108:3, 114:3, 137:15, 182:17, 185:9, 203:8
**primary** [4] - 116:18, 138:7, 175:8, 181:3
**principal** [1] - 195:17
**priorities** [1] - 101:4
**prioritizing** [1] - 101:1
**priority** [1] - 117:13
**prison** [2] - 195:5, 214:17
**pristine** [1] - 112:8
**privacy** [1] - 134:5
**private** [2] - 34:20, 165:8
**privity** [1] - 48:23
**probable** [1] - 186:16
**problem** [5] - 77:19, 93:12, 115:9, 139:2, 242:17
**problematic** [1] - 228:5
**procedures** [1] - 220:22
**proceed** [9] - 11:24, 17:20, 95:4, 176:21, 176:25, 238:10, 239:3, 239:20, 244:17

**proceeding** [2] - 176:22, 176:23
**proceedings** [6] - 45:14, 219:12, 219:20, 239:21, 246:6, 247:4
**process** [18] - 43:5, 43:6, 43:8, 43:17, 50:24, 53:11, 59:4, 60:8, 60:9, 60:10, 87:5, 91:1, 183:2, 186:21, 186:22, 196:8, 203:13, 225:10
**processed** [2] - 185:20, 202:7
**processes** [4] - 43:14, 52:21, 77:23, 87:3
**processing** [1] - 197:10
**produced** [1] - 103:15
**products** [1] - 42:6
**profession** [1] - 218:18
**professional** [2] - 189:21, 189:23
**proffering** [1] - 192:18
**profile** [1] - 29:14
**program** [11] - 43:2, 48:14, 80:19, 81:1, 81:3, 96:12, 96:16, 96:24, 97:1, 97:25, 98:7
**programs** [4] - 13:1, 64:8, 101:9, 169:19
**progress** [2] - 51:22, 177:14
**prohibiting** [1] - 155:12
**prohibition** [1] - 155:9
**prohibits** [1] - 55:10
**Project** [7] - 43:21, 46:12, 50:22, 57:25, 58:8, 58:20, 135:16
**project** [17] - 45:2, 45:4, 46:11, 46:16, 46:18, 46:19, 52:22, 52:23, 57:25, 58:20, 59:14, 59:15, 60:3, 60:4, 60:6, 80:23, 103:11
**projecting** [1] - 130:18
**projects** [5] - 26:2, 43:10, 43:12, 86:25, 101:1
**promoted** [1] - 12:20

**pronounce** [1] - 238:13
**pronouncing** [1] - 147:20
**properly** [1] - 113:20
**properties** [1] - 62:25
**property** [3] - 16:22, 91:12, 140:6
**propose** [2] - 137:4, 161:16
**proposed** [4] - 28:21, 29:4, 30:9, 239:11
**prosecutor** [1] - 182:10
**protect** [6] - 26:3, 48:6, 48:15, 51:9, 117:4, 117:12
**protected** [12] - 26:4, 116:6, 116:7, 116:13, 116:19, 116:24, 119:7, 132:20, 139:6, 143:2, 143:5, 172:12
**protecting** [1] - 25:24
**protection** [3] - 22:19, 28:17, 82:2
**protest** [1] - 158:1
**protestors** [1] - 33:20
**protocol** [2] - 169:18, 211:16
**provide** [6] - 92:17, 100:17, 100:19, 124:19, 148:2, 213:15
**provided** [12] - 9:10, 63:18, 63:21, 116:3, 148:5, 167:21, 167:23, 206:3, 206:7, 206:12, 206:17, 243:18
**provides** [1] - 126:6
**providing** [1] - 48:7
**provision** [1] - 220:8
**provisionally** [1] - 15:12
**proxies** [1] - 162:7
**proximity** [1] - 115:23
**Pruett** [3] - 236:5, 236:6, 236:7
**Public** [1] - 183:4
**public** [25] - 11:20, 18:8, 19:11, 49:7, 49:10, 59:4, 124:21, 154:1, 154:13, 154:16, 189:22, 189:24, 190:17, 191:9, 192:23, 193:3,

197:25, 198:3, 198:7, 202:2, 203:2, 225:7, 232:8, 232:20
**publications** [2] - 108:13, 108:14
**published** [1] - 18:12
**puffery** [1] - 245:2
**pull** [5] - 13:4, 14:6, 16:16, 20:23, 22:23, 26:7, 31:11, 40:12, 43:22, 56:8, 103:21, 181:6, 186:11
**pulled** [2] - 62:4, 69:23, 187:5, 221:5
**pulls** [1] - 187:1
**purple** [1] - 15:19
**purports** [1] - 238:22
**purpose** [5] - 13:24, 29:6, 46:10, 102:10, 114:6
**purposes** [11] - 108:4, 118:20, 119:12, 119:16, 120:4, 120:14, 120:17, 155:19, 172:24, 173:23, 233:12
**pursuant** [5] - 184:7, 184:18, 210:3, 229:17, 230:4
**pursue** [1] - 59:4
**purview** [1] - 73:17
**push** [3] - 28:10, 28:11, 132:8
**pushed** [2] - 131:18, 131:19
**put** [11] - 9:13, 56:7, 74:11, 77:4, 83:6, 139:24, 166:1, 178:25, 225:2, 239:18, 242:20
**putting** [1] - 195:20
**PX** [3] - 163:17, 163:20, 166:2

**Q**

**Quality** [3] - 12:14, 12:17, 12:18
**quality** [20] - 13:1, 25:25, 35:3, 35:5, 39:15, 65:23, 66:1, 66:4, 66:9, 66:14, 66:19, 67:13, 67:17, 86:23, 87:4, 88:2, 91:14, 136:20, 137:20, 137:21
**quantitative** [1] - 115:21
**quarter** [2] - 15:25,

92:5
**query** [1] - 245:7
**questioning** [2] - 36:17, 192:7
**questions** [32] - 53:15, 63:9, 81:19, 86:19, 88:18, 89:6, 90:12, 91:6, 103:2, 103:24, 110:23, 145:3, 145:16, 147:12, 147:25, 148:1, 167:4, 167:12, 169:1, 169:5, 172:3, 173:15, 174:14, 175:12, 180:9, 188:2, 188:25, 201:8, 203:17, 221:10, 224:15, 227:11
**quick** [2] - 92:4, 200:13
**quickly** [2] - 70:10, 70:13
**quiet** [2] - 30:11, 33:8
**quite** [2] - 95:6, 238:11

**R**

**R.F** [1] - 2:16
**radiotelemetry** [1] - 150:9
**radius** [2] - 144:6, 145:6
**rail** [4] - 116:17, 141:25, 142:10, 143:4
**rained** [2] - 71:11, 72:1
**raise** [2] - 179:22, 242:7
**rambling** [1] - 220:24
**ramifications** [1] - 139:19
**range** [3] - 102:23, 105:13, 141:16
**rarely** [2] - 32:19, 87:20
**rate** [1] - 39:6
**Raurell** [1] - 7:23
**RAURELL** [2] - 2:14, 7:23
**reached** [3] - 176:2, 177:15, 233:20
**read** [18] - 46:9, 48:2, 49:6, 49:22, 50:17, 51:1, 51:14, 54:16, 55:9, 55:24, 57:20, 58:6, 58:14, 59:2, 159:5, 159:7, 212:22, 235:5

**readily** [2] - 200:23, 242:21
**reading** [1] - 105:18
**ready** [7] - 43:12, 58:5, 239:20, 244:4, 244:5, 244:17, 245:8
**real** [1] - 51:20
**really** [18] - 17:4, 32:12, 41:5, 78:11, 93:18, 93:21, 111:13, 112:5, 150:13, 163:2, 176:15, 176:20, 192:13, 193:7, 198:9, 213:22, 220:10, 222:9
**reason** [6] - 39:24, 133:22, 175:5, 176:5, 205:19, 232:10
**Rebull** [1] - 241:5
**rebuttal** [1] - 241:1
**recapture** [1] - 150:16
**receive** [3] - 34:9, 37:15, 108:17
**received** [2] - 68:12, 148:1
**receiving** [1] - 165:5
**recent** [2] - 13:16, 142:22
**recently** [6] - 21:23, 43:18, 65:3, 183:5, 191:21, 196:12
**recess** [4] - 95:15, 177:12, 228:13, 243:5
**recharge** [1] - 22:19
**reclusive** [1] - 131:14
**recognition** [1] - 108:18
**recognize** [11] - 44:22, 49:19, 49:21, 52:18, 56:21, 59:5, 123:10, 123:12, 124:6, 125:7, 216:14
**recognized** [1] - 192:11
**recollection** [2] - 171:19, 207:23
**reconnect** [3] - 27:5, 28:19, 30:25
**record** [21] - 6:4, 9:13, 11:12, 17:6, 38:16, 61:9, 78:22, 82:24, 86:8, 95:22, 159:7, 166:2, 179:25, 191:8, 192:16, 232:9, 232:20, 235:3, 235:5, 236:18, 239:2
**records** [5] - 53:5, 200:7, 200:24, 219:4, 219:10

**recreational** [1] - 55:3
**rectangle** [3] - 19:17, 20:13, 124:16
**rectangular** [1] - 104:13
**red** [5] - 15:19, 20:13, 23:16, 26:20, 104:12
**redacted** [2] - 18:4, 18:6
**redirect** [5] - 89:7, 169:2, 191:6, 224:10, 224:15
**REDIRECT** [4] - 4:2, 89:8, 169:3, 224:12
**refer** [1] - 106:19
**reference** [2] - 35:11, 35:22
**referenced** [3] - 20:2, 156:13, 156:16
**referring** [11] - 106:17, 108:22, 108:23, 117:19, 118:16, 160:3, 184:4, 195:4, 195:5, 244:1, 244:13
**refers** [3] - 20:20, 60:3, 106:19
**reflecting** [1] - 121:25
**reflection** [1] - 122:3
**reflects** [1] - 232:9
**refresh** [1] - 216:5
**regard** [2] - 14:5, 214:24
**regardless** [3] - 211:7, 211:11, 211:14
**regards** [1] - 212:3
**region** [3] - 48:8, 142:23, 161:24
**regionally** [1] - 105:14
**regions** [1] - 100:18
**register** [1] - 108:16
**regular** [2] - 103:17, 149:11
**regularly** [2] - 17:6, 103:18
**regulated** [1] - 119:8
**regulation** [1] - 210:20
**related** [7] - 21:11, 48:8, 110:2, 158:1, 185:24, 215:23
**relation** [2] - 31:14, 60:10
**relationship** [4] - 40:18, 115:22, 115:24, 197:24

**relative** [2] - 97:8, 97:11
**relaxed** [1] - 94:5
**relay** [1] - 110:11
**relaying** [1] - 109:14
**release** [4] - 70:7, 70:17, 214:21, 219:19
**released** [1] - 69:18
**relevance** [15] - 45:1, 45:7, 45:13, 48:18, 50:4, 50:5, 53:2, 56:14, 57:5, 190:23, 197:16, 220:18, 220:20, 232:16, 232:17
**relevant** [10] - 45:4, 139:16, 162:11, 197:17, 201:19, 208:20, 208:23, 208:24, 232:20, 244:9
**reliable** [1] - 149:17
**relied** [1] - 94:9
**religious** [1] - 54:18
**relocating** [1] - 220:15
**reluctantly** [1] - 242:7
**rely** [6] - 54:23, 93:16, 94:6, 94:10, 176:14, 199:25
**remained** [1] - 32:23
**remaining** [1] - 48:7
**remains** [1] - 51:19
**remarks** [1] - 228:10
**remember** [10] - 68:8, 80:17, 160:22, 163:18, 163:20, 163:21, 166:2, 166:5, 168:3, 216:2
**remind** [1] - 118:15
**remittances** [1] - 191:17
**removable** [1] - 217:20
**removal** [2] - 219:12, 219:19
**removed** [3] - 26:17, 28:15, 225:8
**removing** [1] - 28:20
**renew** [1] - 245:20
**renewed** [2] - 243:19, 245:22
**repeat** [9] - 61:14, 70:12, 78:6, 82:11, 117:9, 135:6, 156:15, 173:8, 243:11
**repercussions** [1] - 158:19
**rephrase** [2] - 59:23, 189:6

**replaced** [1] - 223:13
**report** [2] - 58:1, 238:21
**Report** [2] - 58:8, 58:20
**REPORTED** [1] - 3:1
**reported** [1] - 156:3
**reporter** [6] - 11:12, 64:6, 95:23, 159:7, 179:25, 181:15
**Reporter** [2] - 3:2, 247:8
**reporting** [2] - 99:8, 101:12
**reports** [2] - 206:15, 242:12
**represent** [7] - 26:18, 26:20, 63:17, 105:21, 137:13, 222:2, 232:21
**representative** [4] - 46:11, 182:12, 196:21, 207:2
**representatives** [1] - 227:3
**represents** [4] - 17:17, 26:19, 107:6, 137:11
**reptiles** [1] - 102:23
**request** [6] - 243:20, 244:22, 245:20, 245:21, 245:22, 246:2
**requested** [4] - 2:7, 62:9, 243:16, 245:21
**require** [4] - 141:22, 142:4, 188:12, 189:23
**required** [3] - 119:16, 189:20, 225:17
**requirement** [1] - 189:22
**requirements** [1] - 188:14
**research** [9] - 98:17, 98:20, 101:2, 117:13, 128:14, 128:24, 131:16, 161:17, 162:14
**researched** [1] - 162:8
**Reservation** [12] - 19:18, 40:16, 65:23, 66:1, 66:4, 66:9, 66:11, 66:13, 83:15, 100:11, 104:13, 138:22
**reservation** [1] - 65:19
**reserve** [2] - 9:21, 241:1

**reserved** [11] - 16:6, 16:7, 16:11, 16:13, 20:14, 24:6, 24:9, 31:15, 34:22, 100:13, 104:16
**resolution** [2] - 244:21, 245:7
**resolve** [1] - 239:2
**resolved** [2] - 220:1, 243:7
**resolving** [1] - 239:5
**resource** [1] - 12:10
**resources** [3] - 96:11, 131:22, 141:14
**Resources** [10] - 12:7, 12:20, 12:21, 12:24, 18:12, 18:14, 21:13, 34:10, 138:20
**respect** [21] - 28:13, 46:19, 47:8, 49:11, 54:8, 58:20, 58:24, 61:21, 89:20, 102:15, 132:2, 134:9, 134:21, 137:17, 140:20, 169:9, 172:21, 184:17, 190:2, 238:9, 238:17
**respects** [1] - 51:16
**respond** [1] - 114:4
**response** [2] - 64:4, 224:23
**responsibilities** [9] - 99:4, 100:24, 103:18, 110:3, 140:9, 180:17, 180:22, 181:20, 211:11
**responsibility** [4] - 43:10, 102:1, 102:15, 212:10
**responsible** [6] - 100:6, 101:1, 133:5, 138:15, 180:24, 226:11
**rest** [5] - 19:5, 93:7, 143:20, 153:25, 179:19
**restaurant** [9] - 85:5, 85:9, 85:11, 85:13, 85:16, 85:20, 85:24, 86:4, 86:8
**restaurants** [8] - 79:20, 79:25, 80:1, 80:2, 80:3, 80:5, 85:8
**rested** [2] - 244:16, 245:11
**Restoration** [9] - 21:8, 28:3, 28:25, 43:21, 48:6, 48:10, 50:21, 57:25, 135:16
**restoration** [10] -

26:2, 43:9, 51:4, 51:7, 56:3, 60:2, 81:1, 100:22, 166:8, 166:10
**restore** [3] - 28:15, 48:6, 48:15
**restored** [1] - 27:12
**restraining** [1] - 242:16
**restriction** [2] - 155:3, 155:6
**restrictions** [1] - 109:8
**restroom** [1] - 61:18
**restrooms** [1] - 80:8
**result** [4] - 132:19, 136:14, 187:14, 205:10
**results** [6] - 36:18, 36:23, 37:1, 37:3, 65:4, 114:21
**retrieve** [1] - 110:17
**return** [1] - 51:20
**review** [15] - 58:16, 58:19, 58:23, 87:15, 103:18, 105:8, 105:9, 109:6, 167:14, 167:17, 168:1, 174:20, 200:6, 200:9, 200:11
**reviewed** [4] - 62:4, 110:1, 168:10, 200:25
**revoked** [1] - 165:18
**revving** [1] - 181:12
**reword** [1] - 66:6
**right-hand** [5] - 23:2, 122:17, 124:15, 125:2, 125:10
**rights** [17] - 20:8, 51:18, 52:1, 55:18, 73:3, 73:5, 73:7, 73:8, 73:20, 73:22, 73:23, 74:3, 74:4, 74:7, 74:8, 79:3, 154:2
**rise** [4] - 95:16, 228:12, 228:14, 246:5
**Road** [10] - 29:13, 30:3, 30:13, 30:24, 30:25, 31:1, 31:2, 72:20, 74:3, 74:7
**road** [52] - 29:16, 29:20, 29:21, 30:1, 30:13, 41:14, 67:24, 68:1, 72:20, 72:23, 73:2, 121:14, 121:24, 122:15, 122:19, 122:24, 123:3, 124:11, 124:14, 124:15, 125:2, 125:3, 125:4, 125:7, 125:12, 125:25, 126:4,

126:21, 127:14, 127:15, 130:4, 151:23, 153:11, 153:14, 153:15, 153:18, 153:21, 153:22, 154:2, 154:5, 154:7, 154:10, 154:15, 157:8, 157:19, 158:7, 158:17, 159:10, 185:1, 185:19, 213:20
**roads** [3] - 61:20, 146:1
**roadway** [1] - 111:14
**ROBERT** [1] - 1:15
**robust** [1] - 222:18
**robustly** [1] - 202:24
**role** [17] - 25:24, 98:19, 100:21, 105:16, 110:2, 110:15, 112:21, 139:11, 180:15, 180:22, 182:14, 182:17, 200:6, 211:25, 218:11, 225:11, 230:3
**roles** [2] - 182:14, 211:5
**roll** [3] - 92:21, 112:1, 121:4
**room** [2] - 11:3, 11:5
**roost** [8] - 144:4, 144:8, 144:9, 144:10, 144:11, 144:13, 144:14, 145:7
**roosting** [1] - 143:12
**roughly** [1] - 97:25
**round** [4] - 103:6, 120:16, 122:14, 170:17
**rounded** [1] - 105:13
**rounds** [1] - 148:1
**route** [1] - 157:3
**royal** [1] - 110:9
**RPR** [2] - 3:2, 247:8
**rule** [4] - 10:25, 14:17, 93:6, 132:5
**Rule** [1] - 239:9
**ruling** [1] - 239:22
**rulings** [1] - 9:4
**run** [2] - 196:22, 224:17
**running** [6] - 84:5, 84:11, 84:14, 99:8, 126:14, 188:10
**runoff** [19] - 41:14, 42:4, 42:5, 61:19, 61:21, 62:17, 62:18, 62:20, 62:21, 67:24, 68:1, 70:21, 70:22,

71:6, 71:9, 71:16, 71:24, 72:1, 72:4
**runoffs** [1] - 41:17
**runs** [3] - 107:4, 121:11, 122:16
**runway** [5] - 88:24, 108:7, 123:12, 171:24, 225:9
**résumé** [4] - 63:18, 63:21, 148:5, 148:9

## S

**sacred** [2] - 18:7, 19:14
**safe** [1] - 218:10
**Safety** [8] - 180:14, 180:18, 180:20, 183:4, 184:6, 193:4, 202:3, 206:21
**safety** [3] - 181:2, 181:4, 189:22, 189:25, 190:17, 191:9, 192:23, 193:3, 197:25, 198:3, 198:7, 202:2, 203:2
**Saint** [1] - 1:23
**sake** [1] - 134:5
**salaries** [1] - 226:2
**sampled** [1] - 37:23
**Samples** [1] - 6:15
**samples** [5] - 36:6, 36:9, 36:11, 36:13, 234:12
**sampling** [4] - 36:18, 66:21, 66:22, 67:19
**Santiago** [2] - 237:20, 238:2
**Sasha** [6] - 20:23, 23:8, 40:12, 56:8, 208:9, 210:7
**satisfaction** [1] - 177:9
**SAVE** [2] - 213:12, 213:15
**saw** [3] - 22:17, 128:4, 163:17
**scenario** [2] - 186:25, 205:3
**scheduling** [1] - 241:3
**SCHILLER** [1] - 2:9
**school** [2] - 34:24, 96:22
**schools** [2] - 16:9, 24:12
**SCHWIEP** [46] - 1:15, 6:6, 8:12, 9:9, 9:17, 9:20, 10:9, 10:20, 10:25, 60:22,

63:9, 92:17, 94:3, 95:13, 175:20, 177:13, 177:22, 178:4, 178:18, 178:20, 179:2, 179:7, 179:15, 227:21, 229:8, 231:3, 231:14, 231:17, 231:21, 231:23, 233:6, 234:3, 234:10, 236:18, 237:1, 237:5, 238:8, 240:25, 241:3, 241:25, 242:5, 242:7, 243:16, 243:24, 244:19, 245:20
**Schwiep** [9] - 6:6, 8:11, 63:8, 92:16, 92:20, 231:2, 233:5, 238:7, 241:23
**science** [3] - 12:9, 96:11, 105:10
**scientists** [2] - 160:24, 161:16
**scoop** [1] - 37:14
**scope** [6] - 89:24, 102:2, 188:22, 194:6, 220:17, 223:18
**Scott** [1] - 6:10
**scratch** [1] - 188:16
**screen** [15] - 14:13, 16:4, 26:12, 46:7, 59:3, 103:25, 104:5, 121:5, 121:10, 122:1, 122:17, 124:15, 125:24, 126:14, 140:15
**scroll** [11] - 13:9, 21:16, 26:9, 40:13, 57:7, 77:10, 208:9, 210:5, 210:9, 212:17, 216:11
**se** [1] - 110:22
**seal** [1] - 18:11
**season** [3] - 25:2, 25:3, 144:16
**seasonal** [2] - 99:19, 120:16
**seasonally** [2] - 122:14, 143:13
**seat** [3] - 11:10, 95:21, 179:24
**seated** [3] - 8:4, 95:17, 228:15
**second** [9] - 47:12, 55:8, 88:15, 108:8, 125:5, 145:1, 147:3, 168:7, 231:18
**seconds** [3] - 121:17, 123:5, 124:3
**secretary** [3] -

217:13, 217:16
**section** [2] - 172:12, 212:10
**Section** [5] - 209:20, 209:25, 210:6, 210:9, 212:18
**security** [3] - 158:19, 171:10, 171:13
**SECURITY** [3] - 228:12, 228:14, 246:5
**Security** [9] - 183:13, 195:20, 207:19, 208:1, 208:3, 208:19, 208:25, 211:5, 229:10
**sediment** [1] - 136:18
**sedimentation** [1] - 136:18
**see** [61] - 13:10, 17:25, 23:14, 26:12, 26:13, 27:15, 27:16, 30:13, 34:16, 35:23, 37:25, 44:8, 44:18, 46:2, 54:11, 57:10, 57:19, 66:22, 74:18, 75:25, 78:3, 87:20, 93:7, 104:12, 107:4, 110:10, 113:1, 121:4, 121:10, 121:20, 121:25, 124:11, 125:12, 126:22, 129:6, 132:18, 135:20, 135:22, 137:8, 140:6, 155:16, 156:22, 160:20, 168:18, 171:8, 176:5, 181:11, 189:22, 191:16, 191:17, 191:18, 193:22, 196:9, 196:13, 209:25, 210:17, 210:19, 216:16, 216:18, 246:4
**seeing** [7] - 97:7, 105:6, 123:21, 124:6, 125:24, 129:18, 157:23
**sees** [1] - 186:25
**selected** [4] - 43:13, 53:19, 53:21, 58:10
**self** [3] - 51:17, 51:25, 194:17
**self-defined** [1] - 194:17
**self-determination** [2] - 51:17, 51:25
**sell** [1] - 33:21
**sense** [5] - 39:23, 40:9, 138:11, 160:16, 195:21

sensitive [2] - 120:11, 134:3

sent [6] - 53:22, 53:23, 58:9, 201:6, 202:8, 202:17

sentence [16] - 46:9, 47:11, 48:2, 49:5, 50:17, 51:1, 54:11, 55:8, 55:24, 56:1, 57:19, 58:15, 59:2, 59:3, 214:17, 214:19

sentences [1] - 54:16

separate [4] - 13:18, 94:16, 118:11, 234:24

separately [1] - 235:1

September [1] - 143:15

septic [3] - 69:21, 69:24, 70:1

sequestration [1] - 11:1

serve [1] - 180:23

served [8] - 177:19, 178:4, 178:6, 182:8, 182:9, 182:10, 182:11, 240:6

Service [10] - 108:25, 109:1, 109:4, 139:12, 139:13, 140:5, 141:23, 144:3, 165:5, 185:11

service [10] - 11:20, 80:8, 153:15, 153:18, 153:21, 153:22, 154:2, 154:10, 154:15, 157:8

Service's [1] - 165:17

services [2] - 41:24, 199:17

Services [1] - 204:14

serving [2] - 214:17, 214:19

set [3] - 197:5, 245:7, 245:19

sets [1] - 226:21

setting [1] - 33:21

setup [1] - 101:8

seven [5] - 92:3, 99:2, 99:19, 105:5, 130:23

several [4] - 145:25, 178:16, 183:2, 184:10

severity [1] - 139:1

sewage [15] - 38:1, 38:11, 38:17, 38:18, 61:5, 67:24, 68:1, 69:12, 69:13, 69:14,

69:18, 70:3, 70:8, 70:17, 88:4

shallow [1] - 142:6

shaped [1] - 40:17

share [8] - 18:7, 19:10, 29:1, 37:18, 81:11, 101:12, 153:25, 178:20

shared [1] - 142:21

sharing [1] - 103:17

shelter [2] - 113:24, 141:12

sheriff [2] - 204:23, 205:9

shift [5] - 35:3, 38:4, 39:2, 39:3, 143:13

shifted [1] - 39:11

shifting [1] - 138:12

shop [1] - 89:16

short [2] - 142:4, 149:7

shorten [1] - 180:19

shortly [1] - 182:21

shout [1] - 48:20

show [9] - 23:18, 23:24, 103:23, 105:25, 120:21, 159:13, 168:13, 201:14, 216:3

showed [3] - 166:4, 168:10, 168:15

showering [8] - 41:16, 61:5, 61:18, 67:24, 68:1, 69:8, 78:11, 78:12

showing [1] - 14:12, 16:21, 66:3, 66:14, 66:19, 67:12, 67:17, 149:14, 149:21, 150:21, 150:25

shown [6] - 104:16, 140:20, 143:10, 143:19, 163:24, 174:22

shows [2] - 23:6, 23:20

shrubby [1] - 142:5

side [38] - 10:5, 10:6, 10:10, 19:25, 20:6, 23:2, 23:9, 24:24, 24:25, 25:1, 27:5, 27:13, 27:25, 29:15, 29:16, 29:20, 29:21, 30:25, 31:1, 33:18, 40:20, 122:17, 124:9, 125:2, 126:3, 135:23, 136:9, 147:13, 181:4, 185:1, 185:18, 201:14, 208:14, 213:17, 213:19,

231:12, 242:18

sided [3] - 222:16, 222:18, 222:20

sides [1] - 93:7

sign [1] - 33:19

signal [1] - 163:15

signatory [2] - 208:17, 209:22

signature [5] - 13:10, 13:12, 208:14, 208:22, 216:17

signed [11] - 207:13, 207:16, 208:23, 212:12, 215:20, 216:2, 216:17, 216:19, 216:25, 226:24, 227:2

significance [3] - 22:2, 62:15, 104:15

significant [8] - 81:13, 81:15, 156:13, 156:16, 156:19, 182:25, 193:24, 238:19

signing [1] - 217:5

similar [10] - 98:24, 111:19, 120:5, 131:25, 138:9, 152:19, 162:6, 173:16, 214:10

similarly [1] - 161:6

simply [1] - 187:13

sincere [1] - 246:2

SINGER [25] - 2:17, 4:9, 7:20, 109:12, 110:6, 110:9, 117:5, 117:22, 130:17, 134:14, 136:21, 146:18, 146:20, 147:17, 157:12, 157:14, 157:16, 158:24, 159:11, 159:17, 159:19, 159:23, 167:1, 167:3, 172:13

singer [1] - 147:15

Singer [3] - 7:21, 7:22, 147:22

single [3] - 129:9, 168:18, 230:21

sit [1] - 52:11

Site [132] - 23:19, 36:6, 64:16, 64:19, 64:22, 64:25, 66:18, 66:20, 66:24, 67:1, 67:2, 67:4, 67:7, 67:13, 67:17, 69:24, 70:24, 71:2, 72:14, 72:17, 73:3, 73:5, 73:6, 73:9, 73:10,

73:12, 73:15, 73:22, 74:22, 75:2, 75:6, 76:7, 76:9, 76:12, 81:16, 83:15, 84:17, 84:22, 86:21, 106:19, 106:25, 107:4, 107:19, 107:25, 108:6, 111:6, 111:9, 111:19, 111:21, 118:24, 119:2, 119:19, 120:8, 120:14, 122:9, 123:12, 124:17, 128:16, 128:21, 129:5, 129:24, 130:13, 133:10, 133:16, 133:23, 135:3, 135:5, 135:9, 141:2, 142:18, 145:17, 149:16, 149:23, 150:22, 151:2, 151:10, 152:2, 152:4, 152:16, 156:14, 156:17, 157:2, 157:8, 157:9, 157:17, 157:19, 158:8, 160:21, 161:14, 162:9, 162:16, 163:10, 164:2, 164:14, 164:18, 165:1, 166:11, 166:14, 166:21, 169:7, 169:12, 169:25, 170:4, 170:18, 170:21, 171:5, 171:17, 172:12, 172:19, 172:23, 173:12, 174:15, 175:3, 175:6, 175:8, 195:25, 198:18, 202:18, 202:20, 203:8, 205:20, 205:23, 206:4, 206:16, 213:6, 214:8, 214:14, 214:22, 215:1, 215:5, 219:10

site [47] - 23:22, 32:18, 34:14, 36:8, 37:10, 53:15, 76:19, 76:21, 88:7, 88:11, 90:20, 108:16, 115:19, 134:4, 147:9, 168:22, 171:20, 171:22, 196:6, 196:8, 196:9, 199:7, 220:16, 222:14, 222:20, 223:22, 223:24, 223:25, 224:3, 224:4, 225:5, 229:21, 238:20, 242:10,

242:13, 242:15, 242:17, 243:10, 243:12, 243:17, 243:22, 244:8, 244:23, 245:19, 245:21, 245:22, 245:25

sites [10] - 106:3, 106:5, 106:7, 106:10, 127:25, 128:3, 219:4, 223:15, 224:2

sitting [3] - 66:3, 69:25, 71:23

situated [1] - 121:7

situation [3] - 98:12, 201:20, 230:13

situations [1] - 24:23

six [3] - 99:2, 130:23, 240:11

size [1] - 89:3

skeleton [1] - 222:22

skepticism [1] - 241:19

skies [1] - 109:25

skimmed [1] - 148:18

sky [15] - 87:20, 108:10, 108:16, 108:20, 109:9, 110:21, 110:25, 112:1, 112:4, 112:11, 165:5, 165:8, 165:11, 165:14, 165:17

slightly [3] - 96:13, 107:24, 129:19

slow [1] - 181:19

slowly [4] - 11:12, 11:18, 11:21, 95:22

smack [1] - 140:14

small [11] - 29:10, 29:14, 30:10, 32:2, 32:9, 46:3, 75:11, 80:5, 80:6, 142:3, 198:13

smaller [4] - 129:9, 139:3, 166:18, 166:23

smuggled [1] - 191:14

snail [1] - 116:16

snake [1] - 116:18

soaps [1] - 41:17

soft [4] - 11:17, 222:16, 222:18, 222:20

soft-sided [3] - 222:16, 222:18, 222:20

soft-spoken [1] - 11:17

sole [1] - 227:17

**someone** [11] - 158:17, 158:20, 186:11, 188:3, 194:7, 204:6, 204:20, 205:14, 213:9, 219:24, 230:15

**someplace** [1] - 198:22

**sometime** [1] - 96:18

**sometimes** [1] - 189:7

**somewhat** [2] - 193:6, 206:3

**somewhere** [4] - 143:20, 153:11, 235:23, 240:14

**soon** [1] - 243:15

**sorry** [28] - 14:16, 32:7, 47:11, 52:10, 55:25, 56:1, 57:21, 59:19, 61:14, 66:6, 67:25, 70:9, 70:10, 78:6, 102:14, 157:14, 159:6, 183:17, 185:18, 190:24, 200:16, 210:8, 211:10, 211:13, 212:20, 233:17, 237:23, 243:25

**Sorry** [1] - 27:10

**sort** [8] - 33:16, 95:11, 102:14, 103:13, 133:6, 161:24, 185:15, 194:17

**sound** [2] - 36:17, 96:19

**sounds** [3] - 39:19, 96:20, 241:11

**source** [4] - 13:2, 41:15, 146:17, 147:1

**sources** [1] - 41:13

**South** [28] - 22:21, 23:17, 26:16, 26:19, 27:2, 27:20, 29:2, 29:3, 47:20, 49:8, 74:25, 80:21, 81:12, 98:4, 100:5, 100:9, 102:9, 104:10, 107:1, 112:12, 112:13, 131:11, 138:23, 138:24, 142:11, 161:25, 174:8, 174:10

**south** [20] - 16:3, 23:16, 23:20, 23:22, 25:10, 25:13, 25:17, 25:20, 27:14, 29:16, 29:20, 29:25, 30:1, 31:1, 31:4, 33:18, 47:16, 55:23, 125:23, 166:19

**southeast** [1] - 67:1

**Southern** [1] - 47:17

**SOUTHERN** [1] - 1:1

**southern** [4] - 18:17, 22:9, 86:7, 86:11

**southwest** [2] - 23:21, 30:2

**sovereign** [2] - 47:3, 212:1

**sovereignty** [2] - 51:17, 52:1

**space** [4] - 20:15, 131:22, 141:9, 200:10

**span** [2] - 149:17, 168:18

**spans** [1] - 151:4

**spatially** [1] - 114:5

**speaking** [11] - 25:4, 29:19, 134:20, 193:13, 202:12, 207:18, 217:7, 219:21, 224:16, 231:13, 240:15

**speaks** [1] - 109:20

**spearheaded** [1] - 81:9

**special** [3] - 154:2, 154:3, 182:9

**specialties** [1] - 99:23

**species** [59] - 41:4, 41:6, 42:11, 42:13, 97:11, 112:22, 113:11, 114:1, 114:4, 114:7, 114:10, 114:19, 115:11, 115:24, 116:1, 116:2, 116:6, 116:7, 116:11, 116:13, 116:19, 116:21, 117:4, 117:14, 117:19, 117:20, 117:24, 118:8, 119:7, 120:1, 120:11, 124:1, 131:11, 131:12, 132:2, 132:5, 132:7, 132:15, 132:20, 132:25, 138:7, 138:9, 138:10, 138:15, 139:7, 139:18, 140:13, 140:16, 140:17, 141:8, 141:9, 141:16, 141:17, 143:2, 143:6, 161:24, 163:7

**Species** [1] - 116:8

**specific** [14] - 44:6, 46:25, 71:15, 72:3, 103:2, 105:9, 120:11, 150:12, 150:17, 169:12, 172:23, 196:16, 210:12, 214:24

**specifically** [9] - 71:4, 72:17, 72:19, 99:22, 131:1, 208:1, 211:3, 221:1, 245:3

**specifics** [1] - 114:4

**speculation** [3] - 33:6, 38:12, 48:17

**speeding** [3] - 186:15, 187:5, 187:13

**spell** [4] - 11:12, 11:13, 95:22, 179:25

**spent** [4] - 60:5, 75:21, 182:25, 192:19

**spikes** [3] - 35:23, 35:24, 37:17

**spoken** [1] - 11:17

**sponsor** [1] - 80:21

**sponsored** [1] - 80:19

**sponsors** [1] - 80:23

**spot** [1] - 121:25

**spraying** [2] - 146:16, 147:7

**springs** [1] - 179:16

**square** [1] - 47:16

**squiggly** [1] - 40:22

**St** [1] - 2:21

**staff** [5] - 50:18, 51:2, 103:9, 103:14, 103:16

**staffer** [1] - 199:16

**stakeholders** [1] - 52:22

**stand** [3] - 21:9, 21:21, 94:23

**standards** [8] - 91:14, 91:17, 94:6, 188:13, 189:8, 189:11, 215:13, 215:14

**standing** [2] - 117:22, 118:3

**standpoint** [2] - 189:23, 204:24

**stands** [1] - 43:20

**start** [17] - 9:15, 9:16, 37:20, 43:2, 92:15, 98:18, 120:22, 143:15, 156:2, 181:12, 195:16, 224:15, 231:1, 241:3, 241:7, 241:13, 241:25

**started** [7] - 12:14, 95:3, 96:16, 96:19, 98:16, 98:18, 179:15

**starting** [4] - 6:5, 36:17, 98:7, 136:21

**starts** [1] - 41:3

**STATE** [1] - 2:6

**State** [105] - 5:20, 5:20, 5:21, 5:21, 5:22, 5:22, 8:25, 17:14, 22:5, 22:7, 28:22, 29:1, 34:1, 48:4, 52:22, 53:18, 78:12, 78:15, 78:23, 81:16, 92:13, 94:17, 95:9, 100:20, 169:19, 176:11, 180:8, 181:22, 182:12, 182:22, 182:23, 183:3, 183:14, 184:23, 185:7, 185:24, 185:25, 186:1, 186:5, 186:6, 186:7, 188:10, 188:19, 189:6, 189:19, 190:12, 190:16, 191:2, 191:7, 191:15, 192:25, 195:5, 196:5, 196:20, 196:22, 198:18, 199:19, 203:8, 204:13, 204:17, 205:1, 207:2, 208:5, 209:13, 210:12, 211:8, 211:19, 212:1, 213:5, 213:9, 213:12, 213:15, 213:25, 214:12, 214:15, 214:17, 214:21, 215:7, 217:8, 217:18, 218:24, 220:14, 220:16, 220:22, 224:5, 225:12, 225:15, 225:19, 226:2, 226:4, 226:10, 226:13, 226:15, 227:5, 227:7, 229:16, 229:17, 230:5, 232:3, 232:4, 232:6, 232:12, 237:25, 238:12

**State's** [9] - 177:10, 182:15, 209:6, 209:9, 216:7, 217:9, 221:4, 221:7, 224:19

**State-constructed** [1] - 229:16

**State-run** [1] - 196:22

**statement** [1] - 58:1

**Statement** [2] - 58:12, 58:19

**STATES** [3] - 1:1, 1:11, 2:14

**States** [5] - 3:3, 63:17, 186:9, 217:15, 247:9

**states** [1] - 216:16

**statewide** [1] - 182:2

**stating** [1] - 95:3

**station** [3] - 79:18, 80:15, 89:16

**statistical** [2] - 99:8, 115:7

**statistics** [3] - 199:25, 200:9, 206:12

**status** [5] - 62:12, 186:8, 186:18, 213:13, 213:19

**statute** [1] - 225:14

**statutory** [3] - 51:17, 52:1, 189:20

**stayed** [1] - 153:3

**stealing** [1] - 221:23

**STENOGRAPHER** [5] - 61:7, 70:9, 70:14, 157:15, 235:15

**STENOGRAPHICALLY** [1] - 3:1

**step** [4] - 91:20, 175:14, 196:25, 227:13

**Stephen** [1] - 229:10

**sternly** [1] - 95:6

**steward** [1] - 113:9

**stewardship** [1] - 100:16

**stick** [1] - 191:2

**sticking** [1] - 224:14

**still** [13] - 15:13, 19:3, 19:6, 46:3, 79:21, 113:1, 124:25, 146:3, 146:21, 158:22, 173:2, 241:14

**stipulated** [2] - 232:5, 232:11

**stop** [5] - 70:12, 121:16, 124:4, 136:7, 220:24

**stopping** [1] - 120:20

**stops** [4] - 186:15, 211:21, 230:11

**stork** [5] - 116:16, 142:25, 143:8, 144:4

**storks** [1] - 143:10

**storm** [1] - 84:10

**stormwater** [15] - 62:17, 70:21, 70:22,

71:5, 71:9, 71:11, 71:13, 71:16, 71:20, 71:24, 72:4, 78:23, 88:5, 88:6, 88:13

**story** [2] - 30:15, 30:24

**straight** [1] - 67:6

**strategies** [1] - 137:20

**street** [1] - 184:12

**Street** [2] - 2:15, 89:18

**strength** [1] - 163:15

**stretch** [2] - 157:6, 158:7

**strictly** [2] - 185:24, 189:9

**strike** [3] - 16:12, 111:23, 142:16

**strip** [1] - 108:7

**strips** [1] - 171:25

**strong** [1] - 51:4

**structural** [1] - 64:3

**structure** [5] - 136:3, 136:6, 136:7, 222:23, 223:3

**structures** [7] - 27:19, 27:21, 38:14, 126:22, 127:5, 136:1, 136:13

**studied** [2] - 131:10, 161:23

**studies** [6] - 105:12, 113:14, 128:15, 150:16, 162:19, 206:13

**study** [7] - 51:21, 97:15, 97:20, 97:23, 104:20, 113:20, 115:13

**studying** [8] - 96:22, 97:5, 98:8, 98:12, 101:4, 105:6, 113:13, 114:3

**stuff** [1] - 124:24

**Sturm** [1] - 176:16

**subject** [2] - 96:10, 181:1

**submissions** [1] - 233:4

**submit** [4] - 8:14, 9:20, 234:24, 235:1

**submitted** [12] - 36:19, 66:15, 93:19, 94:15, 94:17, 108:16, 148:9, 148:14, 176:14, 234:9, 239:24, 245:11

**submitting** [1] - 232:14

**subordinate** [1] - 209:1

**subsistence** [6] - 42:22, 54:24, 54:25, 119:10, 119:11, 120:2

**substance** [1] - 204:24

**substantial** [2] - 130:2, 159:12

**sufficient** [3] - 170:1, 192:24, 242:1

**suggest** [1] - 239:6

**suggesting** [1] - 158:16

**suitable** [2] - 141:12, 224:2

**Suite** [3] - 1:20, 2:4, 2:10

**suited** [1] - 42:19

**summer** [4] - 25:5, 98:20, 98:21, 98:23

**sun** [1] - 121:25

**sun's** [1] - 122:3

**Sunbelt** [1] - 242:13

**supervise** [1] - 64:7

**supervised** [2] - 212:25, 219:19

**supervision** [7] - 210:24, 211:2, 211:3, 212:9, 212:18, 212:23, 213:3

**supervisory** [2] - 211:4, 211:25

**Supplemental** [10] - 43:23, 43:24, 44:24, 50:1, 50:14, 53:1, 53:7, 56:9, 57:8, 57:16

**supplemental** [3] - 177:18, 178:1, 237:6

**supplemental's** [1] - 90:6

**supply** [1] - 22:20

**support** [14] - 52:20, 52:23, 53:11, 53:22, 53:23, 53:25, 54:5, 54:8, 54:24, 156:24

**Support** [1] - 225:18

**supporting** [1] - 52:17

**suppose** [3] - 91:24, 236:18, 240:8

**surfaces** [1] - 78:23

**surprised** [1] - 238:12

**surrounded** [1] - 26:20

**surrounding** [21] - 25:19, 35:14, 60:16, 118:23, 119:2,

119:18, 120:14, 122:9, 123:21, 131:20, 133:10, 133:23, 135:4, 135:8, 142:17, 142:23, 144:8, 151:12, 152:18, 170:4, 170:22

**survey** [8] - 103:5, 103:15, 113:16, 115:7, 115:13, 115:19, 116:6, 128:15

**surveyed** [1] - 139:21

**surveying** [5] - 101:10, 103:3, 103:8, 114:1, 144:17

**surveys** [13] - 99:5, 101:7, 102:12, 102:18, 102:21, 103:9, 105:4, 113:14, 114:21, 117:1, 128:24, 169:6, 169:11

**sustain** [3] - 90:9, 134:25, 199:9

**sustained** [5] - 47:23, 47:25, 52:7, 60:19, 191:23

**sustaining** [1] - 141:10

**swamp** [2] - 22:16, 124:24

**sworn** [3] - 11:9, 95:20, 179:23

**system** [9] - 47:14, 69:21, 69:24, 70:1, 86:5, 88:9, 96:11, 195:5

## T

**T's** [1] - 237:3

**table** [1] - 221:19

**tailed** [1] - 119:6

**taillight** [1] - 186:15

**talks** [1] - 238:19

**Tamiami** [23] - 23:15, 25:9, 25:10, 25:21, 29:22, 33:18, 85:9, 86:6, 86:9, 106:16, 106:20, 122:21, 126:6, 126:18, 153:11, 157:5, 157:9, 157:10, 157:19, 157:22, 157:24, 158:7

**tamiami** [2] - 157:11, 157:12, 157:13

**Tania** [2] - 6:13, 145:12

**TANIA** [1] - 1:18

**tanker** [1] - 33:19

**tape** [2] - 121:4, 121:16

**task** [5] - 184:9, 184:11, 184:14, 187:23, 218:2

**taxpayers** [1] - 226:3

**TDF** [1] - 10:7

**teach** [1] - 19:7

**team** [4] - 46:11, 46:16, 46:17, 46:19

**technical** [2] - 101:8, 109:3

**Technician** [1] - 12:14

**temperature** [3] - 36:10, 42:9, 114:17

**temporary** [6] - 222:7, 223:1, 223:8, 223:9, 224:20, 242:16

**tempting** [1] - 179:18

**ten** [3] - 129:1, 228:1, 241:8

**tend** [2] - 131:13, 181:3

**tens** [4] - 127:18, 127:19, 164:20, 174:5

**tent** [1] - 33:21

**tentatively** [2] - 43:13, 58:10

**tents** [5] - 146:4, 146:6, 146:9, 222:14, 222:15

**term** [9] - 35:7, 35:21, 43:2, 60:1, 106:16, 113:20, 117:18, 118:2, 155:14

**terminus** [1] - 122:16

**terms** [6] - 130:24, 139:19, 160:2, 163:4, 183:3, 206:9

**test** [8] - 35:20, 36:23, 37:1, 37:3, 42:25, 43:3, 78:2, 163:1

**tested** [2] - 39:1, 161:17

**testified** [39] - 60:23, 64:7, 64:12, 67:20, 68:6, 69:13, 74:20, 75:8, 75:11, 75:15, 84:1, 85:5, 87:18, 109:22, 145:17, 145:24, 146:4, 146:13, 148:25, 151:8, 166:13, 171:1, 188:19, 198:18, 199:15, 204:3, 204:5, 207:9, 208:13, 213:5, 215:16, 218:1, 219:3, 220:21, 225:25,

228:19, 233:16, 234:5, 234:11

**testify** [7] - 76:18, 177:20, 199:22, 200:2, 233:10, 233:24, 234:7

**testifying** [7] - 139:6, 171:16, 173:5, 174:4, 206:20, 207:1, 219:5

**testimony** [30] - 8:18, 9:22, 10:23, 13:23, 13:24, 36:18, 39:14, 39:19, 46:23, 68:8, 88:20, 88:21, 94:9, 134:16, 134:21, 159:15, 159:18, 159:19, 161:21, 173:8, 174:17, 178:15, 192:19, 200:20, 206:3, 211:1, 218:22, 239:3

**testing** [26] - 35:4, 35:5, 35:7, 35:13, 35:25, 36:5, 37:11, 37:12, 37:16, 38:15, 39:23, 43:3, 64:13, 64:15, 64:18, 64:21, 64:24, 65:2, 65:3, 65:12, 66:23, 67:1, 67:3, 67:6, 67:9, 90:22

**tests** [2] - 39:22

**Texas** [8] - 182:24, 183:1, 183:4, 190:22, 190:24, 190:25, 201:20, 217:4

**thanking** [1] - 49:18

**THE** [368] - 1:4, 1:10, 1:15, 6:12, 6:17, 6:20, 7:2, 7:5, 7:13, 7:18, 7:22, 7:25, 8:3, 8:16, 8:24, 9:8, 9:14, 9:19, 9:23, 10:2, 10:13, 10:21, 11:6, 11:8, 11:13, 11:15, 11:17, 11:24, 13:16, 13:21, 13:25, 14:15, 14:17, 14:25, 15:3, 15:5, 15:9, 17:3, 17:13, 21:1, 21:3, 30:22, 33:7, 33:8, 36:22, 36:25, 37:6, 38:15, 38:18, 38:19, 39:20, 44:2, 44:8, 45:6, 45:11, 46:2, 46:5, 47:1, 47:3, 47:23, 47:25, 48:20, 48:25, 50:5, 50:7, 50:13, 52:4, 52:7, 52:9, 53:2, 53:4, 53:12, 53:14,

54:13, 54:14, 56:15,
56:24, 57:2, 57:4,
57:14, 59:15, 59:18,
59:21, 59:23, 60:19,
60:25, 61:4, 61:7,
61:9, 61:25, 62:2,
63:4, 63:7, 63:10,
63:12, 70:9, 70:11,
70:14, 73:16, 81:18,
82:9, 82:11, 82:15,
82:17, 82:18, 83:2,
83:3, 83:10, 84:25,
85:3, 86:15, 87:9,
88:16, 89:7, 89:25,
90:3, 90:4, 91:20,
91:22, 91:24, 92:4,
92:10, 92:13, 92:19,
93:10, 93:21, 95:2,
95:14, 95:17, 95:24,
109:21, 110:4, 110:8,
110:14, 110:20,
110:21, 112:1, 112:3,
112:9, 117:7, 117:9,
117:25, 120:22,
121:2, 127:6, 127:7,
130:20, 131:3, 131:7,
134:20, 134:24,
136:25, 145:2, 145:4,
145:8, 145:9, 146:19,
146:21, 146:22,
147:13, 157:11,
157:13, 157:15,
158:14, 159:3, 159:8,
159:15, 159:18,
159:20, 159:21,
159:22, 167:2, 167:5,
167:6, 168:8, 168:24,
169:2, 172:14,
172:15, 175:13,
175:17, 175:22,
176:5, 176:11,
176:15, 177:1, 177:6,
177:21, 178:3,
178:10, 178:19,
178:22, 179:6, 179:9,
179:18, 180:2, 181:6,
181:8, 181:9, 181:11,
183:17, 183:20,
183:23, 183:24,
183:25, 185:18,
185:22, 186:4, 186:7,
186:10, 186:12,
186:13, 186:24,
187:6, 187:7, 187:18,
187:20, 187:21,
188:24, 190:8,
190:18, 190:20,
190:24, 191:23,
192:5, 192:17,
192:21, 193:6,
194:12, 194:16,

195:9, 195:11,
196:14, 196:18,
197:15, 197:17,
198:6, 198:20, 199:9,
199:21, 200:16,
200:21, 201:9,
201:17, 201:24,
202:9, 203:5, 203:15,
203:18, 203:20,
207:22, 207:23,
208:4, 208:7, 208:22,
208:24, 209:2, 209:5,
209:7, 209:9, 209:17,
209:23, 211:10,
211:13, 211:14,
211:18, 211:21,
211:24, 212:3, 212:4,
212:8, 212:16,
212:19, 216:5, 216:9,
216:22, 218:25,
219:15, 219:16,
220:4, 220:7, 220:10,
220:12, 220:20,
221:1, 221:2, 221:7,
221:11, 221:13,
221:15, 221:18,
221:21, 221:22,
221:23, 223:10,
223:11, 223:19,
223:20, 224:8,
224:25, 225:1,
227:12, 227:14,
227:16, 227:23,
228:4, 228:8, 228:15,
229:3, 229:20, 230:7,
230:10, 230:18,
230:23, 231:1, 231:8,
231:16, 231:18,
231:22, 232:12,
232:19, 233:4, 233:8,
233:11, 233:14,
233:16, 233:19,
234:2, 234:6, 234:14,
234:18, 234:25,
235:14, 235:15,
235:16, 235:23,
236:1, 236:3, 236:6,
236:17, 236:25,
237:4, 237:10,
237:22, 237:24,
238:4, 238:6, 239:14,
240:7, 240:10,
240:18, 240:20,
240:22, 241:2, 241:7,
241:17, 241:22,
242:2, 242:6, 242:21,
243:5, 243:21, 244:2,
244:10, 244:24,
245:12, 245:16, 246:1

**themselves** [1] -
94:15

**theories** [1] - 232:23
**thereafter** [1] -
196:10
**therefore** [1] -
146:25
**thereto** [1] - 236:8
**third** [4] - 49:5, 59:3,
188:18, 204:17
**thousand** [2] - 61:2,
198:11
**thousands** [3] -
41:24, 62:16, 156:24
**threat** [2] - 202:2,
203:2
**threatened** [5] -
116:8, 116:20, 117:4,
117:12, 117:18
**three** [32] - 12:23,
27:15, 59:10, 59:11,
60:1, 60:3, 60:4, 60:5,
60:9, 60:10, 93:22,
107:2, 126:22, 127:4,
131:9, 133:20,
135:22, 148:22,
188:2, 188:18,
192:19, 204:5,
204:20, 210:16,
228:19, 233:9,
239:25, 241:11
**three-by-three** [2] -
60:9, 60:10
**three-hour** [1] -
241:11
**thrive** [1] - 138:10
**throw** [1] - 133:1
**thumb** [1] - 178:25
**Thursday** [1] - 102:7
**tie** [2] - 218:24,
218:25
**tieback** [3] - 26:12,
26:15, 28:14
**tied** [1] - 114:14
**Tierra** [1] - 237:9
**time-wise** [1] -
128:25
**timeline** [2] - 75:14,
75:16
**Title** [5] - 183:15,
187:16, 217:21,
220:7, 220:8
**title** [2] - 112:6,
180:12
**TNT** [176] - 23:19,
36:6, 64:15, 64:18,
64:21, 64:24, 66:18,
66:20, 66:24, 67:1,
67:2, 67:4, 67:6,
67:13, 67:17, 68:11,
68:13, 68:17, 68:20,
69:15, 69:17, 69:24,

70:22, 70:24, 71:1,
71:4, 71:6, 71:9,
71:24, 72:14, 72:17,
73:3, 73:5, 73:6, 73:9,
73:10, 73:12, 73:15,
73:22, 74:22, 75:2,
75:6, 75:12, 76:7,
76:9, 76:12, 76:15,
77:25, 78:4, 78:7,
81:16, 81:23, 83:15,
84:17, 84:22, 86:21,
106:19, 106:25,
107:3, 107:19,
107:25, 108:5, 111:6,
111:9, 111:19,
111:21, 118:24,
119:2, 119:19, 120:8,
120:14, 121:9, 122:9,
122:19, 123:3,
123:11, 123:12,
123:21, 124:10,
124:13, 124:17,
126:4, 127:14,
128:16, 128:21,
129:5, 129:24,
130:12, 133:10,
133:16, 133:23,
135:3, 135:4, 135:8,
141:2, 142:18,
145:17, 149:16,
149:23, 150:22,
151:2, 151:10, 152:2,
152:4, 152:16,
153:15, 156:14,
156:17, 157:2, 157:8,
157:9, 157:17,
157:19, 158:8, 160:8,
160:12, 160:17,
160:21, 161:14,
162:9, 162:16,
163:10, 163:12,
164:2, 164:14,
164:18, 164:25,
166:11, 166:14,
166:21, 169:7,
169:12, 169:25,
170:4, 170:15,
170:18, 170:21,
171:5, 171:17,
172:10, 172:12,
172:19, 172:23,
173:12, 174:2,
174:15, 175:3, 175:6,
175:8, 195:25, 197:2,
198:18, 199:7,
200:17, 202:18,
202:20, 203:8,
205:20, 205:23,
206:4, 206:16, 213:6,
214:8, 214:14,
214:22, 215:1, 215:5,

219:1, 219:4, 219:8,
219:10, 220:15,
223:23, 224:17
**tobacco** [1] - 89:16
**today** [34] - 6:25,
8:23, 19:4, 37:5, 37:6,
51:6, 56:5, 66:3,
67:21, 69:25, 71:23,
73:8, 92:21, 113:9,
114:20, 137:2,
144:14, 148:19,
150:20, 176:14,
179:10, 179:16,
179:17, 206:7,
206:20, 207:1,
228:16, 233:10,
237:25, 238:3,
242:13, 242:15,
243:12, 245:6
**TODD** [3] - 2:2, 2:2,
2:13
**Todd** [2] - 6:24,
222:2
**together** [1] - 114:18
**tomorrow** [8] - 37:7,
92:22, 175:25, 228:1,
228:5, 239:20, 240:3,
241:5
**tomorrow's** [1] -
243:6
**took** [6] - 36:12,
95:5, 139:22, 198:22,
238:22, 246:2
**tool** [1] - 114:25
**tools** [1] - 161:9
**top** [4] - 19:17,
107:13, 121:10,
121:11
**topics** [2] - 102:23,
105:13
**total** [1] - 241:12
**touch** [1] - 104:1
**tourism** [1] - 55:3
**tours** [1] - 80:15
**toward** [1] - 51:4
**towards** [1] - 51:6
**towers** [1] - 55:3
**town** [1] - 8:25
**track** [2] - 96:11,
150:15
**traditional** [15] -
16:21, 19:6, 55:23,
108:3, 118:13,
118:15, 118:24,
122:24, 127:23,
135:9, 154:19,
170:10, 170:13,
170:16, 175:9
**traditionally** [1] -
73:2

**traffic** [9] - 87:12, 130:6, 131:8, 157:5, 186:14, 186:16, 186:25, 187:13, 211:21

**trafficked** [1] - 191:13

**trail** [20] - 41:5, 97:6, 115:1, 121:14, 121:24, 122:15, 122:22, 123:3, 124:15, 124:19, 125:11, 125:16, 125:25, 142:22, 164:5, 164:10, 164:12, 164:14, 172:6

**Trail** [16] - 23:15, 29:22, 33:19, 85:9, 86:6, 86:9, 122:21, 126:6, 126:18, 153:12, 157:5, 157:9, 157:19, 157:22, 157:24, 158:7

**trails** [23] - 124:11, 125:7, 127:16, 127:20, 127:25, 133:18, 133:20, 146:1, 146:3, 151:23, 153:23, 154:5, 154:7, 164:17, 164:20, 164:23, 164:24, 165:2, 174:2, 174:4, 174:7, 175:8

**training** [3] - 29:10, 30:10, 32:5

**Training** [3] - 32:4, 106:16, 195:25

**transcript** [1] - 229:4

**transcription** [1] - 247:4

**transcripts** [1] - 239:7

**transfer** [1] - 198:19

**Transition** [3] - 32:4, 106:16, 195:25

**transparent** [1] - 51:22

**transpired** [1] - 50:10

**transporting** [2] - 213:6, 215:1

**transports** [1] - 215:2

**trapping** [1] - 150:4

**trappings** [1] - 161:10

**travel** [2] - 118:21, 144:7

**traveling** [1] - 157:4

**travels** [1] - 25:20

**treated** [2] - 68:20, 78:24

**treating** [3] - 78:12, 78:15, 78:23

**treatment** [1] - 68:16

**tree** [25] - 16:21, 16:23, 18:3, 18:15, 18:19, 18:21, 18:23, 18:25, 19:2, 19:6, 19:23, 55:20, 72:6, 72:9, 72:11, 72:13, 97:7, 104:14, 105:24, 105:25, 106:7, 106:10, 128:1, 128:3, 148:21

**trend** [1] - 161:22

**trends** [2] - 132:17, 160:20

**trespass** [1] - 152:3

**trial** [2] - 147:22, 178:11

**triangle** [8] - 40:13, 40:15, 40:16, 40:18, 77:7, 77:13, 77:14, 77:15

**Tribal** [98] - 13:3, 14:5, 14:12, 14:20, 15:20, 15:21, 15:22, 16:8, 16:9, 16:22, 17:18, 19:3, 19:5, 19:15, 19:16, 20:20, 23:22, 23:25, 24:2, 24:3, 34:7, 34:16, 34:19, 34:23, 40:21, 42:20, 47:5, 48:23, 49:18, 52:22, 59:5, 72:14, 72:17, 72:20, 72:23, 72:25, 91:7, 100:7, 100:9, 102:17, 104:14, 106:3, 107:25, 108:5, 109:24, 112:22, 112:25, 113:3, 113:5, 113:12, 114:2, 115:14, 116:11, 116:13, 116:19, 116:21, 116:25, 118:11, 118:19, 118:23, 119:4, 119:9, 120:7, 120:13, 122:22, 127:3, 127:19, 127:25, 132:20, 133:9, 133:15, 133:23, 133:24, 134:4, 135:4, 135:8, 137:24, 146:1, 146:11, 149:1, 151:20, 152:1, 152:23, 152:25, 153:7, 155:11,

155:20, 156:4, 158:13, 170:3, 170:9, 170:21, 171:13, 172:21, 172:24, 175:9

**tribe** [1] - 15:3

**Tribe** [149] - 6:22, 6:25, 7:1, 8:23, 10:24, 11:7, 12:11, 12:12, 12:13, 12:22, 12:25, 13:14, 16:24, 18:7, 18:25, 19:2, 19:10, 19:21, 20:7, 22:2, 22:3, 22:7, 24:10, 25:24, 26:23, 27:2, 27:6, 28:13, 29:11, 33:24, 34:11, 34:13, 35:5, 35:25, 38:6, 39:11, 43:11, 43:13, 43:15, 43:17, 44:13, 46:14, 47:3, 47:4, 48:9, 48:16, 48:25, 49:10, 49:24, 50:23, 51:2, 51:6, 52:16, 52:25, 53:6, 53:18, 54:4, 54:7, 54:17, 54:21, 54:23, 55:10, 55:12, 55:16, 56:2, 56:9, 56:20, 58:4, 58:5, 58:18, 58:23, 62:24, 64:8, 71:3, 73:1, 73:3, 73:5, 73:6, 73:8, 73:10, 73:14, 73:22, 75:17, 79:1, 79:3, 79:8, 79:10, 80:10, 86:25, 87:5, 87:24, 88:2, 89:12, 90:1, 90:9, 90:17, 90:22, 91:1, 91:14, 91:16, 93:14, 93:23, 95:4, 95:6, 95:19, 97:21, 98:9, 98:13, 98:16, 98:19, 102:14, 109:17, 113:8, 117:3, 117:11, 128:11, 131:16, 132:23, 138:19, 151:8, 152:6, 153:7, 153:17, 153:25, 154:1, 154:3, 155:12, 158:3, 158:6, 158:10, 158:12, 158:17, 159:9, 169:19, 169:22, 173:5, 175:5, 175:19, 222:3, 233:8, 235:8, 235:9, 235:10, 235:11, 235:12, 235:13, 240:22

**Tribe's** [55] - 12:7, 13:4, 13:5, 13:19, 13:21, 14:2, 14:6, 14:7, 16:16, 16:17,

17:1, 17:21, 18:19, 22:23, 31:11, 43:9, 43:22, 43:24, 44:1, 44:24, 45:17, 48:12, 50:1, 50:14, 51:17, 51:25, 53:7, 55:15, 56:3, 56:10, 57:8, 57:16, 83:10, 83:11, 83:15, 90:6, 96:7, 103:21, 104:13, 107:1, 127:2, 149:8, 150:4, 153:21, 154:14, 156:19, 170:20, 172:21, 233:10, 233:13, 233:18, 234:20, 234:21, 234:22, 235:5

**TRIBE'S** [1] - 5:13

**trip** [2] - 196:5, 196:14

**TRO** [2] - 240:16, 242:20

**trooper** [5] - 186:25, 187:7, 197:5, 199:12, 199:25

**troopers** [38] - 181:22, 181:24, 182:22, 188:3, 189:7, 191:9, 191:20, 194:15, 195:7, 196:24, 197:1, 197:7, 198:19, 199:5, 199:10, 199:20, 200:11, 202:7, 202:12, 204:6, 209:13, 210:12, 211:8, 211:11, 211:16, 211:19, 212:5, 213:5, 213:9, 213:12, 213:16, 213:25, 217:18, 226:2, 226:11, 226:21, 227:6

**troopers'** [1] - 183:3

**trucked** [1] - 245:6

**trucks** [5] - 33:20, 80:5, 80:6, 86:21

**true** [12] - 56:5, 132:3, 132:15, 146:13, 188:16, 209:12, 218:14, 219:11, 219:12, 226:6, 227:9, 239:17

**truly** [1] - 17:16

**Trump** [1] - 183:21

**trust** [2] - 19:21, 43:10

**trustworthiness** [1] - 232:11

**truth** [1] - 232:15

**try** [4] - 108:19, 159:3, 181:16, 191:6

**trying** [15] - 15:6, 70:15, 138:15, 158:21, 158:24, 159:1, 186:22, 192:22, 193:1, 198:2, 200:18, 201:4, 201:14, 201:17, 205:6

**turbid** [2] - 42:10

**turbidity** [3] - 36:11, 42:9, 136:19

**turn** [7] - 10:24, 44:15, 51:10, 55:6, 67:20, 71:15, 72:6

**turning** [3] - 125:22, 130:5, 194:14

**two** [37] - 8:23, 27:15, 32:2, 39:18, 45:12, 54:16, 62:9, 93:17, 94:18, 107:2, 123:5, 127:2, 127:3, 135:22, 137:14, 138:7, 138:10, 138:25, 140:16, 148:1, 156:22, 159:24, 160:8, 168:11, 180:16, 181:1, 188:6, 188:19, 200:13, 202:10, 210:17, 217:3, 228:22, 229:5, 229:6, 239:2, 245:5

**two-page** [1] - 45:12

**two-year** [1] - 217:3

**tying** [1] - 218:23

**type** [10] - 61:2, 97:6, 134:22, 140:6, 162:6, 162:11, 167:19, 204:17, 218:22, 230:12

**types** [9] - 19:16, 20:21, 102:24, 105:5, 188:2, 188:16, 188:18, 191:14, 204:5

**typical** [4] - 118:17, 144:10, 186:24, 225:15

**typically** [11] - 118:16, 119:6, 119:24, 129:4, 141:8, 141:15, 143:14, 143:22, 144:16, 185:7, 213:10

**U**

**U.S** [15] - 2:18, 2:20, 14:12, 29:13, 29:22, 31:2, 46:14, 47:4,

48:3, 122:21, 126:18, 139:12, 139:13, 140:4, 144:3

**ue** [1] - 6:15
**ultimate** [1] - 224:19
**ultimately** [4] - 197:8, 213:22, 223:16, 230:15
**unanimous** [1] - 173:11
**unanimously** [3] - 156:3, 173:6, 173:9
**unaware** [3] - 148:14, 159:21, 165:21
**unclear** [1] - 214:6
**uncovered** [1] - 219:6
**uncrossed** [1] - 93:6
**under** [28] - 18:11, 28:2, 28:3, 28:25, 181:24, 183:21, 184:12, 187:16, 189:20, 194:2, 194:10, 194:19, 195:17, 195:21, 209:14, 210:13, 210:23, 211:1, 211:8, 212:20, 213:3, 217:18, 225:21, 228:20, 230:24, 232:9, 232:23, 239:9
**undergraduate** [1] - 98:10
**underlying** [3] - 186:1, 187:3, 187:12
**understood** [12] - 11:23, 87:7, 97:14, 105:8, 106:15, 118:10, 120:13, 151:5, 154:11, 162:1, 195:11, 235:4
**undocumented** [4] - 217:23, 218:14, 218:20, 220:9
**uniform** [2] - 187:13, 226:9
**union** [1] - 227:4
**unique** [2] - 197:5, 198:21
**United** [4] - 63:17, 186:9, 217:15, 247:9
**united** [1] - 3:3
**UNITED** [3] - 1:1, 1:11, 2:14
**University** [5] - 12:9, 96:23, 98:11, 182:6, 182:7
**university** [1] - 98:17
**unlawfully** [1] -

220:6
**unless** [4] - 41:5, 93:25, 95:4, 192:5
**unnatural** [7] - 39:5, 39:6, 40:10, 40:23, 40:25, 41:1, 138:6
**unnaturally** [3] - 137:14, 138:4, 138:5
**unpenetrable** [1] - 39:7
**unpermitted** [1] - 62:15
**unprotected** [1] - 132:20
**unusual** [1] - 214:13
**up** [64] - 9:15, 12:16, 13:4, 14:6, 16:16, 20:23, 22:23, 25:22, 26:7, 27:1, 28:16, 31:11, 33:21, 37:14, 40:12, 43:22, 53:20, 56:8, 72:8, 74:11, 75:23, 77:4, 77:10, 83:6, 88:4, 88:9, 92:5, 94:13, 95:1, 100:18, 101:3, 101:6, 102:21, 103:1, 103:21, 112:18, 120:6, 128:23, 129:18, 132:13, 133:3, 134:11, 137:23, 139:24, 143:9, 147:25, 157:9, 157:15, 158:18, 181:12, 192:25, 197:8, 208:5, 210:8, 216:7, 221:5, 235:23, 239:24, 240:8, 240:10, 242:20, 245:10, 245:14
**upcoming** [1] - 102:12
**updated** [2] - 237:22, 237:24
**upper** [1] - 104:11
**upstream** [2] - 66:17, 66:24
**uptake** [2] - 39:5, 42:13
**uptick** [1] - 191:12
**URL** [1] - 58:14
**usage** [1] - 118:19
**useable** [1] - 138:13
**useful** [2] - 110:13, 223:12
**uses** [2] - 86:25, 149:1
**Uthmeier** [1] - 244:2, 244:25
**utilize** [1] - 116:3

**utilized** [1] - 155:22

## V

**vacation** [3] - 6:10, 6:12, 241:4
**vague** [1] - 82:8
**valuable** [1] - 144:18
**value** [7] - 18:25, 94:14, 155:18, 155:22, 155:25, 156:10, 238:25
**vantage** [2] - 123:14, 125:21
**variable** [4] - 115:18, 163:4, 163:7, 163:16
**variables** [3] - 115:6, 162:3, 162:6
**varies** [1] - 129:1
**variety** [1] - 20:20
**various** [4] - 120:15, 127:16, 185:5, 232:23
**varying** [1] - 233:20
**vegetation** [14] - 38:4, 39:3, 39:10, 40:10, 40:23, 40:25, 41:1, 43:4, 62:23, 99:6, 138:3, 138:12, 166:7, 166:10
**Vehicle** [1] - 184:6
**vehicle** [9] - 121:14, 121:24, 122:15, 124:11, 124:15, 125:7, 125:25, 159:10, 213:17
**Vehicle's** [1] - 193:5
**Vehicles** [6] - 180:14, 180:18, 180:20, 196:21, 202:3, 206:21
**vehicles** [5] - 33:17, 42:2, 158:18, 181:2, 242:11
**venture** [1] - 136:21
**venturing** [3] - 130:18, 134:15, 134:18
**verbal** [1] - 64:4
**verify** [1] - 213:12
**versa** [1] - 24:25
**versus** [3] - 6:3, 50:10, 184:13
**vertical** [1] - 126:19
**vertically** [1] - 107:4
**via** [2] - 136:12, 234:9
**vice** [1] - 24:25
**vicinity** [4] - 55:21, 79:13, 151:9, 155:23
**video** [12] - 120:19,

120:21, 120:23, 122:23, 126:1, 133:19, 145:24, 163:22, 163:23, 164:8, 172:1
**Video** [5] - 121:18, 122:6, 123:18, 126:10, 126:12
**videos** [1] - 178:25
**view** [6] - 31:20, 196:6, 196:8, 205:23, 205:25, 215:17
**Village** [2] - 15:24, 16:2
**villages** [6] - 14:12, 14:21, 15:20, 15:21, 34:16, 34:19
**violated** [1] - 198:7
**violates** [1] - 243:4
**violation** [8] - 185:25, 186:5, 186:25, 204:21, 205:2, 205:15, 219:24
**violator** [3] - 187:1, 187:8, 187:10
**violent** [14] - 191:25, 192:11, 192:25, 193:2, 197:12, 197:25, 198:11, 199:6, 199:13, 200:1, 200:12, 201:13, 202:14, 218:20
**virtue** [2] - 101:24, 139:11
**visible** [1] - 111:13
**visit** [10] - 243:11, 243:12, 243:17, 243:22, 244:3, 244:8, 244:23, 245:3, 245:21, 245:22
**visited** [3] - 107:19, 160:12, 196:4
**visiting** [1] - 107:25
**visits** [1] - 53:15
**vitae** [1] - 148:6
**vitality** [2] - 114:9, 114:14
**voice** [1] - 230:13
**vs** [1] - 1:6

## W

**Wahl** [1] - 8:1
**WAHL** [2] - 2:24, 8:1
**wait** [6] - 10:2, 65:7, 65:11, 92:5, 235:23
**waived** [1] - 205:11
**walk** [1] - 24:25
**walls** [1] - 222:19
**wants** [2] - 216:5,

241:15
**warden** [2] - 229:23, 230:20
**warrants** [1] - 202:16
**Washington** [2] - 2:19, 2:21
**waste** [5] - 38:9, 38:10, 38:11, 38:16, 41:23
**Waste** [1] - 10:7
**wastewater** [17] - 37:25, 60:21, 61:5, 61:13, 61:15, 61:17, 62:18, 67:21, 67:22, 67:23, 68:7, 68:11, 68:16, 68:20, 69:2, 78:12, 78:16, 88:3, 88:8, 88:9, 88:10
**Water** [36] - 12:7, 12:14, 12:17, 12:18, 12:20, 12:21, 12:24, 18:12, 18:14, 21:13, 21:24, 24:7, 25:6, 29:2, 29:3, 34:10, 79:14, 80:11, 80:22, 81:12, 85:5, 85:16, 85:20, 85:24, 86:4, 86:10, 86:12, 97:18, 98:3, 100:9, 102:9, 104:10, 107:1, 138:20, 174:7, 174:10
**water** [117] - 13:1, 13:2, 19:22, 21:22, 22:11, 22:13, 22:18, 22:20, 23:6, 23:18, 23:24, 24:14, 24:18, 24:19, 24:22, 24:24, 24:25, 25:1, 25:3, 25:4, 25:6, 25:16, 25:19, 25:22, 25:25, 26:2, 27:8, 27:10, 27:13, 27:24, 27:25, 28:5, 28:9, 28:10, 28:11, 29:15, 29:19, 29:24, 30:4, 31:4, 35:3, 35:5, 37:14, 38:13, 39:10, 39:15, 41:22, 42:9, 42:10, 42:12, 42:14, 48:8, 51:21, 64:8, 65:18, 65:22, 66:1, 66:4, 66:9, 66:14, 66:19, 66:23, 67:3, 67:6, 67:13, 67:17, 67:23, 67:25, 68:12, 68:23, 70:24, 71:1, 78:18, 79:15, 80:6, 83:5, 83:13, 83:14, 83:18, 83:22, 84:1, 84:2, 84:4, 84:8, 84:10,

84:14, 86:23, 87:4, 88:2, 89:20, 90:13, 90:18, 91:12, 91:14, 91:17, 97:16, 97:17, 115:4, 122:13, 136:6, 136:7, 136:10, 136:12, 136:18, 136:20, 137:20, 137:21, 141:14, 142:6, 143:16, 221:14, 221:15, 221:23

**water-related** [1] - 48:8

**ways** [4] - 160:24, 161:3, 161:6, 222:19

**WC** [1] - 49:8

**WCA** [11] - 21:21, 22:6, 22:8, 74:16, 74:20, 135:19, 136:13, 138:22, 138:24, 142:10

**web** [1] - 133:3

**website** [2] - 110:18, 110:19

**websites** [1] - 62:7

**Wednesday** [3] - 65:9, 179:11, 179:15

**week** [13] - 6:9, 8:7, 65:5, 65:6, 65:7, 93:14, 176:17, 177:7, 179:10, 242:22, 243:23, 244:6, 245:8

**week's** [1] - 243:19

**weight** [6] - 50:8, 95:1, 168:24, 199:23, 200:3, 238:16

**well-being** [1] - 144:19

**well-established** [2] - 131:24, 132:10

**well-rounded** [1] - 105:13

**well-studied** [1] - 131:10

**wells** [1] - 62:10

**WERP** [33] - 21:9, 21:10, 21:12, 26:17, 28:3, 28:23, 28:24, 28:25, 30:6, 43:19, 43:20, 44:14, 46:12, 49:1, 49:18, 52:17, 57:25, 58:17, 59:19, 59:21, 80:17, 80:24, 81:1, 81:9, 81:13, 81:24, 81:25, 82:4, 82:13, 82:18, 82:24, 135:13, 166:1

**west** [17] - 24:24, 25:1, 27:5, 27:14,

27:25, 28:1, 28:6, 28:12, 28:19, 30:5, 31:5, 40:20, 123:16, 124:25

**Western** [7] - 21:8, 28:3, 43:21, 46:12, 50:21, 57:25, 135:16

**western** [2] - 51:5, 121:8

**wetland** [6] - 27:4, 40:7, 41:18, 42:6, 47:14, 122:11

**wetlands** [13] - 22:17, 25:18, 38:1, 38:2, 39:2, 40:11, 43:2, 47:20, 62:20, 62:21, 91:10, 123:22, 136:19

**whack** [1] - 133:2

**wheelhouse** [1] - 17:10

**whichever** [1] - 163:6

**White** [1] - 229:9

**white** [2] - 119:6, 121:25

**white-tailed** [1] - 119:6

**whole** [6] - 45:3, 176:21, 189:1, 201:1, 207:20, 225:19

**wide** [2] - 102:23, 105:13

**wildlife** [55] - 39:3, 39:7, 41:6, 42:18, 62:24, 98:22, 98:25, 99:3, 99:5, 99:13, 99:20, 99:24, 101:3, 101:17, 104:25, 112:22, 113:11, 113:19, 113:20, 113:21, 114:1, 114:4, 114:8, 114:10, 114:18, 115:18, 115:23, 115:24, 116:25, 117:4, 117:12, 118:11, 130:14, 130:19, 130:24, 131:9, 133:24, 133:25, 135:3, 135:7, 136:14, 138:1, 138:13, 150:1, 150:15, 150:21, 150:25, 160:20, 161:4, 161:7, 161:13, 162:3, 162:15, 169:9, 169:24

**Wildlife** [20] - 96:7, 98:10, 99:11, 100:6, 100:25, 102:22,

104:23, 111:25, 138:14, 139:12, 139:13, 139:14, 140:5, 140:9, 141:22, 144:3, 149:8, 158:11, 169:20, 169:23

**wildlife's** [1] - 97:5

**WILLIAMS** [1] - 1:10

**willing** [1] - 183:13

**willow** [4] - 138:8, 166:13, 166:19, 166:23

**winding** [1] - 121:20

**Winter** [1] - 190:11

**wise** [1] - 128:25

**wish** [2] - 51:22, 94:10

**wishes** [1] - 9:21

**withdraw** [1] - 59:22

**WITNESS** [55] - 4:2, 11:13, 11:15, 33:8, 38:18, 47:3, 48:25, 53:14, 54:14, 61:4, 82:11, 82:18, 83:3, 90:3, 91:22, 95:24, 110:20, 112:3, 117:9, 127:7, 131:7, 145:8, 146:22, 159:21, 167:5, 172:15, 180:2, 181:8, 183:20, 183:24, 185:22, 186:7, 186:12, 186:24, 187:7, 187:20, 190:20, 195:11, 207:23, 208:24, 211:13, 211:18, 211:24, 212:4, 216:22, 219:16, 220:4, 220:10, 221:1, 221:15, 221:22, 223:11, 223:20, 225:1, 227:14

**witness** [38] - 8:18, 10:3, 10:23, 11:9, 17:11, 17:16, 39:18, 39:21, 44:8, 59:24, 61:10, 85:2, 91:25, 92:4, 92:11, 94:21, 95:18, 95:20, 109:14, 109:19, 110:11, 134:15, 134:20, 136:22, 137:4, 176:4, 176:12, 176:18, 177:11, 178:15, 179:20, 179:23, 192:22, 199:14, 199:22, 227:17, 239:18

**Witness** [3] - 91:23,

175:16, 227:15

**witness's** [1] - 134:17

**witnessed** [3] - 86:20, 160:10, 174:25

**witnesses** [33] - 8:10, 8:13, 8:19, 8:21, 8:23, 8:25, 9:3, 11:2, 11:4, 15:12, 92:14, 92:18, 93:15, 93:17, 93:22, 94:7, 94:9, 94:14, 94:18, 95:4, 95:7, 175:18, 175:24, 176:16, 176:22, 179:13, 200:20, 233:10, 233:23, 233:25, 234:11, 238:17, 245:23

**won** [3] - 52:9, 52:10, 52:11

**wondering** [1] - 243:10

**wood** [6] - 116:16, 142:25, 143:8, 143:10, 144:4

**woody** [1] - 41:4

**word** [4] - 24:16, 24:18, 48:23, 58:14

**words** [1] - 60:5

**workers** [2] - 218:15, 219:1

**works** [5] - 104:1, 178:21, 188:23, 244:25, 245:1

**world** [1] - 94:5

**worth** [1] - 45:13

**wrapped** [1] - 92:5

**WRDA** [1] - 21:13

**written** [2] - 26:3, 82:18

## Y

**year** [17] - 21:15, 25:3, 96:13, 96:18, 99:17, 103:6, 107:24, 115:2, 120:16, 122:14, 143:16, 143:19, 143:20, 160:11, 167:20, 170:17, 217:3

**year-round** [4] - 103:6, 120:16, 122:14, 170:17

**years** [37] - 12:12, 12:16, 12:18, 12:19, 12:21, 12:23, 31:19, 31:21, 32:15, 32:23, 33:11, 33:13, 60:4, 60:6, 64:10, 64:25,

70:25, 71:2, 71:3, 75:18, 85:12, 85:15, 85:25, 86:1, 86:5, 96:17, 97:24, 99:2, 105:5, 128:12, 130:23, 142:23, 174:24, 180:16

**yellow** [2] - 23:14, 26:20, 104:14, 105:20, 138:23

**yesterday** [1] - 178:6

**Yorker** [1] - 70:15

**you-all** [3] - 95:11, 178:23, 241:17

**yourself** [5] - 12:4, 96:5, 133:16, 149:4, 171:5

## Z

**zero** [5] - 76:11, 76:14, 116:22, 129:7, 156:22

**zone** [6] - 140:12, 140:19, 141:1, 141:5, 141:21, 144:23

**zones** [4] - 139:12, 139:15, 139:23, 139:25

**zoom** [2] - 23:8, 135:19

# Tr. Vol. V

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                      CASE NO. 25-22896-CV-KMW
 3

 4   FRIENDS OF THE EVERGLADES, et al.,   Miami, Florida

 5        Plaintiffs,                      August 13, 2025

 6            vs.                          10:30 a.m. to 3:35 p.m.

 7   KRISTI NOEM, et al.,

 8        Defendants.                      Pages 1 to 171

 9   _____

10                  PRELIMINARY INJUNCTION HEARING
              BEFORE THE HONORABLE KATHLEEN M. WILLIAMS
11                 UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14

15   FOR THE PLAINTIFFS:      PAUL SCHWIEP, ESQ.
                              ROBERT BURLINGTON, ESQ.
16                            COFFEY BURLINGTON
                              2601 S. Bayshore Drive
17                            Penthouse 1
                              Miami, Florida 33133
18                                   -and-
                              TANIA GALLONI, ESQ.
19                            DOMINIQUE BURKHARDT, ESQ.
                              EARTHJUSTICE
20                            4500 Biscayne Boulevard
                              Suite 201
21                            Miami, Florida 33134
                                     -and-
22                            ELISE PAUTLER BENNETT, ESQ.
                              CENTER FOR BIOLOGICAL DIVERSITY
23                            PO Box 2155
                              Saint Petersburg, FL 33731-2155,

24

25
```

App. 916

```
 1   FOR INTERVENOR PLAINTIFF:

 2                             TODD R. FRIEDMAN, ESQ.
                              TODD R. FRIEDMAN, P.A.
 3                             CHRISTOPHER AJIZIAN, ESQ.
                              CHRISTOPHER AJIZIAN, ESQ.
 4                             1101 Brickell Avenue
                              Suite 700
 5                             Miami, Florida 33131

 6
     STATE DEFENDANT GUTHRIE:
 7
                              JESSE PANUCCIO, ESQ.
 8                             EVAN EZRAY, ESQ.
                              DANTE FICARELLI, ESQ.
 9                             DAVID COSTELLO, ESQ.
                              BOIES SCHILLER FLEXNER, LLP
10                             401 East Las Olas Boulevard
                              Suite 1200
11                             Miami, Florida 33301

12
     FOR FEDERAL DEFENDANTS
13   KRISTI NOEM and TODD LYONS:

14                             CARLOS J. RAURELL, ESQ.
                              UNITED STATES ATTORNEY'S OFFICE
15                             99 NE 4 Street
                              Miami, Florida 33132
16                                  -and-
                              ADAM R.F. GUSTAFSON, ESQ.
17                             ACTING ASSISTANT ATTORNEY GENERAL
                              FRANK SINGER, ESQ.
18                             U.S. DEPARTMENT OF JUSTICE
                              950 Pennsylvania Ave N.W.
19                             Washington, DC 20530
                                   -and-
20                             MARISSA A. PIROPATO, ESQ.
                              U.S. DEPARTMENT OF JUSTICE
21                             150 M St. NE
                              Washington, DC 20002
22
     FOR DEFENDANT MIAMI-DADE COUNTY:
23
                              CHRISTOPHER WAHL, ESQ.
24                             MIAMI-DADE COUNTY ATTORNEY'S OFFICE
                              P.O. Box 025504
25                             Miami, Florida 33102
```

App. 917

```
 1   STENOGRAPHICALLY REPORTED BY:

 2                            PATRICIA DIAZ, FCRR, RPR, FPR
                              Official Court Reporter
 3                            United States District Court
                              400 North Miami Avenue
 4                            11th Floor
                              Miami, Florida 33128
 5                            (305) 523-5178

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2

 3   CLOSING ARGUMENTS                            PAGE

 4
     MR. SCHWIEP                                   8
 5
     MR. AJIZIAN                                  36
 6
     MR. GUSTAFSON                                60
 7
     MR. PANUCCIO                                 85
 8
     MR. AJIZIAN (Rebuttal)                      130
 9
     MR. SCHWIEP (Rebuttal)                      132
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

App. 919

```
 1              (Call to the Order of the Court.)

 2              COURTROOM DEPUTY:  Calling case 25-CV-22896, Friends of

 3      the Everglades, Inc., et al. v. Noem, et al.

 4              Counsel, please state your appearances for the record,

 5      starting with the plaintiffs.

 6              MR. SCHWIEP:  Good morning, Your Honor.  Paul Schwiep

 7      on behalf of the Friends of the Everglades and Center for

 8      Biological Diversity.

 9              With me is Mr. Burlington.  Mr. Hiaasen remains in

10      Mexico.

11              MS. GALLONI:  Good morning, Your Honor.  Tania Galloni

12      from EarthJustice on behalf of plaintiff Friends of the

13      Everglades and I have with me Dominique Burkhardt.

14              THE COURT:  Good morning.

15              MS. BENNETT:  Good morning, Your Honor.  Elise Pautler

16      Bennett, appearing on behalf of the Center for Biological

17      Diversity.

18              THE COURT:  Good morning.

19              MR. AJIZIAN:  Good morning, Your Honor.  Chris Ajizian

20      on behalf of the Miccosukee Tribe of Indians of Florida, the

21      intervenor plaintiffs.

22              MR. FRIEDMAN:  Good morning, Your Honor.  Todd Friedman

23      also on behalf of the Miccosukee Tribe.  With us today is

24      Curtis Osceola, and I'd also just like to recognize Sasha

25      Hernandez from Coffey Burlington for helping us out this week.
```

1              THE COURT:  Yes, you really should.

2              Good morning.

3              And on behalf of the defendants?

4              MR. PANUCCIO:  Good morning, Jesse Panuccio for the

5    Florida Department of Emergency Management.

6              THE COURT:  Good morning.

7              MR. EZRAY:  Good morning, Your Honor.  Evan Ezray on

8    behalf of the Florida Department of Emergency Management.

9              MR. COSTELLO:  Good morning, Your Honor.  David

10   Costello for the Florida Department of Emergency Management.

11             MR. FICARELLI:  Good morning, Your Honor.  Dante

12   Ficarelli on behalf of the Florida Department of Emergency

13   Management.

14             THE COURT:  Good morning, gentlemen.

15             MR. GUSTAFSON:  Good morning, Your Honor.  Adam

16   Gustafson for the Federal Defendants.

17             MS. PIROPATO:  Good morning, Your Honor.  Marisa

18   Piropato for the Federal Defendants.

19             THE COURT:  Good morning.

20             MR. SINGER:  Good morning, Frank Singer for the Federal

21   Defendants.

22             MR. RAURELL:  Good morning, Carlos Raurell for the

23   Federal Defendants.

24             MR. WALL:  Good morning, Christopher Wall for

25   Miami-Dade County.

```
 1              THE COURT:  Good morning.
 2              Everyone may be seated.
 3              All right.  I just wanted to get the timing straight.
 4    I believe, I don't know who -- Mr. Friedman, are you speaking
 5    for the Tribe, which gentleman, I'm sorry?
 6              MR. AJIZIAN:  I will do it, Your Honor.
 7              THE COURT:  Okay.
 8              Mr. Schwiep, are you speaking for the Friends and the
 9    Center?
10              MR. SCHWIEP:  Yes, Your Honor.
11              THE COURT:  Okay.  So, 45, 45, and then each of the --
12    the Federal Defendant and the State Defendant wanted an hour.
13    Is that right or -- I'm only asking because I don't know if you
14    want me to give you some kind of a five-minute or ten-minute or
15    anything like that.  That's all.
16              MR. PANUCCIO:  I think for us, Your Honor, you are
17    saying an hour total for both?
18              THE COURT:  No.  No.
19              MR. PANUCCIO:  Oh, an hour each.
20              THE COURT:  For each, right.
21              MR. PANUCCIO:  Oh, yeah, I will certainly be done -- I
22    mean, depending on the Court's questions, of course, if I were
23    just presenting, I will be done in an hour.
24              THE COURT:  Okay.
25              MR. PANUCCIO:  I think even with questions I will be
```

App. 922

1    done in an hour.

2           MR. GUSTAFSON:  Likewise, Your Honor.

3           THE COURT:  All right.  Then, let's commence and,

4    Mr. Schwiep, it's your motion.

5           MR. SCHWIEP:  Your Honor, we have prepared a

6    PowerPoint, if I can share the screen.

7           THE COURT:  Okay.

8           MR. SCHWIEP:  Judge, just so I can be sure I've got my

9    time right, I've got 15 minutes for rebuttal?

10          THE COURT:  Yes.

11          MR. SCHWIEP:  May it please the Court, Paul Schwiep on

12   behalf of the plaintiffs.

13          Judge, just as an initial matter, we do want to thank

14   you so much for your time.  You've been very gracious and

15   accommodating to all the parties, and we appreciate it.

16          You are not done with us.  It's just a preliminary

17   injunction hearing.  So, unfortunately for you you will be

18   seeing more of us.  And I do want to thank my colleagues on the

19   other side for their professionalism.  They're superb lawyers

20   on that side and they've been accommodating as well, and we are

21   grateful for that.

22          The Court is aware of the injunction standards.  I

23   don't need to review those with you.

24          We are moving for a preliminary injunction on Counts 1

25   and Count 2.

1          Count 1 is our claim under NEPA, and Count 2 is a claim

2     under the APA.  In our motion at DE-5 we seek an injunction

3     against the Federal and State Defendants, prohibiting their use

4     of the TNT Site for immigration detention, unless and until

5     NEPA's procedural requirements are met.

6          So, what does NEPA require?

7          NEPA, Judge, is a procedural statute.  Its goals are

8     actually quite modest.  It's been described as a look before

9     you leap requirement.  It requires a hard look at the

10    environmental consequences of federal action, a broad

11    dissemination of public information about the action,

12    consideration of alternatives to the action.  For an action

13    that is likely to affect the environment, the preparation of an

14    Environmental Impact Statement, and where as here endangered or

15    threatened species may be affected, it requires consultation

16    with the Fish and Wildlife Service.

17         Importantly, because there are Tribal interests

18    involved in this case, the agency must invite the participation

19    of the Tribe, and I would refer the Court to the Tribe's

20    Exhibit Number 21, which are the DHS regulations on

21    implementation of NEPA where they make clear both how DHS

22    should comply with NEPA and, specifically, DHS's obligations to

23    consult with the Tribe.

24         Where NEPA is ignored, it's APA that provides the cause

25    of action, and under the Wild Earth decision, a violation of

1    NEPA is actionable under the APA.  The APA provides that a

2    court must hold unlawful and set aside any agency action that

3    is found to be arbitrary, capricious, an abuse of discretion or

4    otherwise not in accordance with law.

5         And it is arbitrary and capricious, and this is the

6    Sierra Club versus the Army Corps of Engineers' decision to

7    fail to follow NEPA procedures entirely.

8         This is an unusual case, Judge.  Typically, in NEPA

9    cases, many lawyers here have been involved in them, the battle

10   is over the adequacy and the robustness of the NEPA analysis,

11   did the Environmental Impact Statement consider all the right

12   factors, was it sufficiently thorough, but here it's conceded

13   that there was no thought whatsoever of complying with NEPA,

14   and NEPA wasn't followed at all.

15        And you've heard testimony from Eve Samples, the

16   executive director of Friends of the Everglades, how NEPA

17   actually has its genesis in exactly this site.  In 1969 there

18   was a proposal to build a six-runway jetport.  Marjorie

19   Stoneman Douglas, at the age of 79, having written the River of

20   Grass 20 years earlier, came out of retirement, founded Friends

21   of the Everglades, persuaded decision makers to take a pause

22   and conduct an environmental assessment of the impacts of that

23   project.  That was before NEPA was adopted, and in the Leopold

24   report, after the environmental impacts were assessed, guess

25   what?  Agency decision makers decided they should not go

1    forward with that project.

2          That Leopold report became the prototype of an

3    environmental statement and President Nixon signed NEPA into

4    law January 1, 1970, and here we are litigating the same site

5    56 years later.

6          Now, defendants pin their entire defense for their

7    failure to comply with NEPA on the argument that this entire

8    endeavor, the TNT detention center, the construction and

9    operation of this center, which is exclusively for immigration

10    detention, on argument that it's a state exercise that the

11    Federal Government neither controls nor influences.  And,

12    respectfully, Your Honor, we'd submit that that argument

13    doesn't even pass the blush test.

14          We agree that NEPA requires as a trigger federal

15    action, and if this were entirely a state enterprise, divorced

16    from federal involvement, NEPA would not apply.  But for NEPA

17    to apply, the Court doesn't have to find that a federal agency

18    was actually turning the shovels.  You do not have to find that

19    a federal agency created this facility as a federal facility.

20          This is the next slide.  What NEPA requires in terms of

21    deciding that federal action is involved is that a federal

22    agency has the authority to influence the non-federal activity

23    and the actual power to control the non-federal activity.

24          That's the United States versus South Florida Water

25    Management District case, that's Goos case that you cited in

1    the temporary restraining order, Bitterman Fund for Animals

2    versus Clark are all to that effect.

3          Now, what does the evidence that you're heard over the

4    past three days of hearing show?

5          First, admitted into evidence is Exhibit 45 is

6    Secretary Noem, a defendant in this case, stating that the idea

7    for this facility sprang up in her office when her General

8    Counsel, Jimmy Percival contacted the Florida Attorney General

9    to suggest this facility because it had an airstrip.

10         We heard from Director Kerner yesterday that in April

11   of this year he visited the site, even though there wasn't any

12   public notice about it until June.

13         Also in evidence, and this is the Division's Exhibit

14   Number 6, is Governor DeSantis's executive order from

15   two-and-a-half years ago, January of 2023, where he declares an

16   immigration emergency and calls for the Division, this is a

17   quote, to enter into agreements with the Federal Government to

18   respond to that emergency.

19         Exhibit 43 is the State Emergency Response Team's

20   Continuity of Operations Plan, where they say -- really in an

21   unguarded moment, Your Honor, this came into evidence -- that

22   DHS and FEMA requested that the state supplement capacity by

23   providing this facility.

24         At Exhibit 134, this is one of the exhibits we intended

25   to use in cross-examination are text messages from the ICE

1    assistant field officer, Israel Herrera, to the Division

2    regarding the compliance inspection that he intended and did

3    conduct on the facility to approve the facility.  And ICE did

4    approve the facility and ICE officials are on-site today.  That

5    is the Gadea-Guidicelli declaration that came in yesterday.

6         All of that evidence is consistent with the testimony

7    that you heard from Representative Eskamani when she toured the

8    facility, and she was followed by Director Guthrie, that the

9    facility was requested by ICE, approved by ICE, and meets ICE

10   standards, as it must, and that's at the hearing transcript

11   from August 6th, page 110.

12        So, Judge, you are left with this question, what is it

13   that the defendants would have you believe about this facility?

14   Is it just by coincidence or sheer luck that the Division on

15   its own built a facility that happens to comply, allegedly,

16   with ICE detention standards and that now holds individuals for

17   immigration violations, but there is no federal influence,

18   there is no federal control over that?

19        The weight of the evidence is that the facility was

20   built just as Governor DeSantis said -- and this is in our

21   Exhibit 144, at paragraph seven, "At the request of the Federal

22   Government to serve a federal function in partnership with the

23   Federal Government."

24        And that that the facility is performing a federal

25   function is a necessary legal conclusion because the state

App. 928

14

1   cannot enforce immigration laws, and Your Honor explained that

2   in the C.F.C. decision.  That's at 349 F.Supp 1236, and more

3   recently in Florida Immigrant Coalition versus Uthmeier.  Both

4   of those flow from Louisiana versus United States.

5        The Federal Government has occupied the field,

6   preempted state enforcement, and it is a federal function.

7        More than that, we talked about funding during the TRO

8   hearing.  This is Secretary Noem's post.  It's our Exhibit 144

9   paragraph seven, where she says, "Alligator Alcatraz will be

10  funded largely by FEMA, the Federal Government."

11       That post was also echoed by Director Guthrie, who told

12  Representative Eskamani that the facility would be funded by

13  ICE.

14       So what do we have?

15       We have evidence it was requested by ICE and DHS,

16  including from the defendants' own documents.  It was built for

17  ICE in compliance with ICE standards.  It's been inspected by

18  ICE to ensure compliance, and it exists as a matter of law only

19  for the purpose of federal immigration enforcement, which

20  brings me, Judge, to the defendants' disappearing witnesses.

21       You heard for a week that if witnesses were going to

22  provide testimony by declaration that they should come in and

23  be cross-examined on those declarations, and then literally in

24  the middle of the night, before we resumed yesterday, when we

25  were preparing to cross-examine the defendants' witnesses, we

1    received declarations from the State's witness,

2    Mr. Gadea-Guidicelli, and the defendants' witness, Mr. Fuentes,

3    and then we learned they aren't going to call those witnesses

4    at all, that they were not going to come to this courtroom to

5    answer our questions, much less Your Honor's.

6         And the decision, Judge, to pull them from the program

7    was made after we disclosed the exhibits we intended to use in

8    cross, and we were prepared for a vigorous cross-examination of

9    those witnesses.

10        I've mentioned from the beginning, this is, I think,

11   where the law lands, that the Court in a PI context can receive

12   declarations and rely on declarations, but the weight to give

13   those declarations is a separate matter.  And I'd refer the

14   Court to the Flores versus Town of Islip decision.  That's a

15   2019 WL 151291.  It's an Eastern District of New York case from

16   2019 where the Court said, declarations are admissible in a PI

17   context, but live testimony is preferable particularly as to

18   disputed issues of fact.

19        Mr. Gadea-Guidicelli's declaration is hearsay, within

20   hearsay.  He in his declaration purports to tell the Court

21   about what people told him about the historic use of the site,

22   about what people told him about flight data, about what he saw

23   in terms of fencing at the site.  He claims he took photos of

24   the site, and he attaches those photos, but they clearly came

25   from Google Earth.  Apparently, today, this morning there was

1    another declaration filed on that point to try to clear that

2    up.

3            THE COURT:  I was confused.  So, the pictures are from

4    Google Earth?

5            MR. SCHWIEP:  Yes, the declaration that was admitted

6    yesterday where he says, these are photos taken by me Composite

7    Exhibit 5, they say Google street view on them.

8            THE COURT:  Right.

9            MR. SCHWIEP:  So he wants to authenticate an expert

10   report regarding ecological impacts, that's hearsay within

11   hearsay.  He has no personal knowledge.

12           THE COURT:  Do we have the photos that he took?  That's

13   what I'm confused about.

14           MR. SCHWIEP:  I'm confused as well, Your Honor.

15           THE COURT:  Is there, within, you know, the seven

16   supplemental exhibit lists, is that a separately marked item or

17   no?  Do you know?

18           MR. SCHWIEP:  I gather there was a declaration filed

19   this morning.  I haven't read it, where he tries to clarify

20   what the situation is with the photos, and maybe counsel for

21   the Division can clear that up, but I don't know.

22           THE COURT:  Okay.

23           MR. SCHWIEP:  But with respect to that declaration, if

24   he testified live, he would not have been allowed to talk about

25   what some ecological assessment said or what somebody told him

App. 931

1    the site looked like before he got there.  That's all hearsay

2    within hearsay, and we don't think that declaration should be

3    accorded anyway.

4         Mr. Fuentes's declaration, which was actually filed

5    yesterday morning at 10:00 a.m. -- we continued until yesterday

6    to hear from these folks live and instead of hearing from them

7    live, we get a declaration.  He says, well, okay, under 287(g),

8    local legal enforcement agencies can perform immigration

9    functions, but he never explains which way 287(g) applies here.

10        He says that local enforcement agencies can detain non

11   citizens under the 287(g) but, again, nothing specific to this

12   facility.  He claims there is a 287(g) agreement with Collier

13   County.  I assume that relates to their venue argument, but

14   that's not been admitted into evidence, and critically, he

15   doesn't deny that the TNT Site was the product of some meeting

16   of the minds between ICE and the Division to build this

17   facility to provide immigration detention capacity.

18        THE COURT:  Could I ask, and I'm going back a little,

19   you talked about the Leopold report that led to legislation,

20   and in the interim, if there were any environmental studies

21   done of that area, where would I -- one, is there anything in

22   the record from 1970 to today, and two, if the entity had some

23   kind of study, who would that entity be?

24        MR. SCHWIEP:  With respect to the specific site?

25        THE COURT:  Right.  Would it be Miami-Dade?

App. 932

1    MR. SCHWIEP:  So, I don't know that I can answer that,

2    Judge.

3         Obviously, there has been a tremendous amount of

4    investment and energy in Everglades restoration and

5    specifically in restoration of the Western Everglades.  That

6    document has come in, the Western Everglades Restoration Plan,

7    but in terms of a study that concerns this specific site, I

8    mean, our view is, before building this detention center,

9    obviously, they should have performed this study.  They

10   haven't.

11        THE COURT:  Right, but who, what I'm trying to

12   understand is, would the property owner be the person that

13   would have any information about the property before there was

14   this construction?

15        MR. SCHWIEP:  I can't answer that, Judge.

16        THE COURT:  And that property owner is Miami-Dade

17   County?

18        MR. SCHWIEP:  Correct.

19        Among the mysteries in this case, Judge -- frankly,

20   I've never been involved in a case where the Court, and in this

21   case an Article III Judge, just pleads with the party for a

22   simple and straightforward answer to what is a pretty critical

23   question and the party just demurs.

24        So, from day one until yesterday afternoon, this

25   Honorable Court had this question, "Who is running the show

1   here?"

2          It's an important question and it seems straightforward

3   and that hasn't been answered and it wasn't answered by any of

4   the evidence that was presented, and the witnesses that might

5   have been able to address that question were kept away from

6   this courthouse.

7          And why is that?  We would suggest the reason is

8   obvious, it's because it's ICE that's running the show.  It has

9   to be.  It has to be because either this is some rogue state

10  endeavor outside of the immigration enforcement scheme, which

11  is exclusively a federal function, or it is a federal function.

12  The buck has to stop with ICE, and because the answer to that

13  question that Your Honor has posed from beginning to end of

14  this preliminary injunction hearing would have eviscerated the

15  defense that this doesn't involve federal action.

16         You didn't hear from those witnesses.

17         Under 1231(g), it is ICE.  This is a Title 8 U.S.C.

18  1231(g), it is ICE that is to make arrangements for appropriate

19  places of detention.  This is a ICE function, and that's what

20  happened here.  ICE has made a determination this is

21  appropriate.  That's federal action under 1103(a)(11)(b), DHS

22  can enter into cooperative agreements for the construction of a

23  detention center, and that's clearly what we've had here.

24         There was a meeting of the minds between ICE and DHS

25  and the State of Florida that if the Division would build a

1    facility, ICE would use it.

2         The suggestion, which may be the suggestion they are

3    making that the Division just built this as a drill or as an

4    exercise that they would build a facility and maybe ICE would

5    use it and it just happens, according to them, to meet ICE

6    standards doesn't pass the blush test.

7         This wasn't a drill.  It's not an exercise.  The

8    Division and DHS reached some accord, some meeting of the minds

9    that if the Division built this facility it would be used to

10   serve a function for ICE, and that makes this a federal action.

11        We have proved that.  We have Secretary Noem, and this

12   is at Plaintiffs' Exhibit 44, at nine, saying, at turbo speed

13   DHS worked with the State to expand facilities and bed space in

14   just days thanks to a partnership with the State of Florida.

15   She also posted on July 1 that the site will provide DHS with

16   beds and needed space for immigration detention.

17        And that same sentiment was echoed by the Division

18   saying that they built the facility in coordination with DHS

19   and ICE.  That's at Plaintiffs' 44, at four.  So clearly, at a

20   minimum, Your Honor, there has been a de facto agreement.  I

21   mean, they literally shook hands on this facility being

22   constructed, as ICE requested, to serve an ICE function.

23        And White House Policy Advisor Stephen Miller's

24   statement at 106, Plaintiff's Exhibit 106, were he says it's an

25   ICE facility should end any further inquiry on that point.

1          Again, it bears noting that not only have defendants

2     failed to present this Court with the promised witnesses who

3     would answer your questions, they also, quite pointedly,

4     withdrew yesterday the invitation to Your Honor to visit the

5     site.  Forget about the fact that the plaintiffs had been

6     asking for weeks for an opportunity to inspect the site.  The

7     State publicly invited this Honorable Court to visit, and when

8     Your Honor expressed interest in potentially visiting, suddenly

9     you're disinvited, and it's for this Court to draw whatever

10    conclusions you deem appropriate from that unwillingness to

11    allow a visit to the site.

12         We have presented evidence, we believe, of a clear and

13    cooperative agreement between DHS and the Division under

14    1103(a)(11)(B) to build this detention center, a determination

15    by ICE that it's an appropriate place to house detainees under

16    1231(g), that's federal action.

17         But it doesn't stop there, which brings me to the only

18    witness that the Defendants did call, Mr. David Kerner.  To be

19    clear, Judge, not for a moment am I denigrating his public

20    service, his law enforcement history, the work that he's done.

21    We're grateful for that, but it was these lawyers that put him

22    on the witness stand to tell the Court anecdotes about what he

23    heard from deputies about people being sent to the site.  He

24    was not asked to and therefore he didn't have --

25         THE COURT:  It was about people sent to the site.  It

1    was about people being interdicted for immigration matters.  I

2    don't think I ever got an answer of who was at the site.

3         MR. SCHWIEP:  Well, Judge, that's the point from the

4    evidence I wanted to make is that he was asked if the data

5    exists in terms of who is being held there, why, and he said it

6    does exist.  He just wasn't asked to collect it, and he wasn't

7    prepared to present it.

8         He admitted the data exists, and it seemed to us that

9    the defendants hoped to seed this record with evidence about

10   bad folks being held there, when the data is available to them

11   about precisely who is being there, but that was not presented

12   in this court.

13        In terms of the balance of equities, I suspect my

14   colleagues on the other side will point again to Winter.  It's

15   the U.S. Supreme Court case that involved the Navy sonar

16   testing to deal with submarines, and in that court -- in that

17   case the Court said okay, you must balance the equities.

18        Winters is an interesting case because the Navy did

19   follow NEPA in Winter, and the Navy presented evidence of a

20   national security need to do this anti-submarine sonar testing.

21        THE COURT:  Well, also in Winter, the area close to the

22   command center of the Navy where they were conducting the

23   sonar, it was a necessary correlation.  Here, I don't -- did

24   Director Kerner give us a reason why putting it far removed, as

25   he said, as opposed to every other facility in the state in a

1    populated area, why it was important it would be there?

2         MR. SCHWIEP:  I didn't hear that testimony, Your Honor.

3         I don't think the Court has been presented with any

4    data, none, regarding a need for this facility on this -- in

5    this location.

6         There was no discussion of alternatives that might have

7    been considered.  There was no discussion of a governmental

8    need to use this specific site as opposed to other options.

9         The, quote-unquote, emergency, which was declared

10   two-and-a-half years ago, that's Division's Exhibit 7, is one

11   of the defendants' own making.  So, in terms of balance of the

12   equity, we submit, on their side, it's just smoke and mirrors.

13   There is no evidence of need for this facility in that

14   location.  We presented evidence of actual harm.

15        By the way, Plaintiffs' Exhibit 129 and 130, which are

16   in evidence, are articles that speak to the fact that hundreds

17   of those detained at the site have no criminal record, have no

18   pending criminal charges.  Those are in evidence.

19        So, Mr. Kerner was presented with a 287(g) agreement

20   between ICE and the Florida Highway Patrol.  That's Division's

21   Exhibit 28.  That's the only 287(g) agreement that's been

22   introduced.

23        THE COURT:  I don't think I'm -- maybe I should ask

24   everyone, I don't think I'm bound -- I can take judicial notice

25   what has been docketed in Judge Ruiz's case, and there was in

App. 938

1    some report here -- it's all online.  All the 287(g)s are

2    online.  I mean, we have this one but they are all available

3    publicly.

4         MR. SCHWIEP:  Yes.

5         THE COURT:  What we don't have, unless you tell me and

6    counsel for the defendants, I wanted to know, that's what I

7    asked yesterday, who's running that show, whether someone

8    representing the facility and all the persons working had

9    entered a 287(g) particularly for this facility as they had

10   done in, I think, Orange County Jail was mentioned or someplace

11   else.  And I don't -- do we have a facility 287(g)?

12        MR. SCHWIEP:  I haven't seen it.

13        THE COURT:  Okay.

14        MR. SCHWIEP:  And, Judge, I agree a hundred percent,

15   there are many 287(g) agreements.  In this proceeding there was

16   one that was introduced, but Your Honor is correct, there are

17   other 287(g) agreements but none as between the Division and

18   ICE, and I think the reason is the Division is not a law

19   enforcement agency.  So it may not be capable of entering into

20   a 287(g) agreement.  However, there is a 287(g) agreement with

21   the Florida Highway Patrol, which Mr. Kerner talked about.

22        I have put on here on this slide a number of the

23   provisions, but they are all the same.  If it's -- whatever

24   state agency, law enforcement agency is operating under a

25   287(g) agreement -- I shouldn't say they are all the same,

App. 939

1    they're all the similar -- it's under the direction and control

2    of ICE.  The officers that are trained by ICE are acting under

3    color of federal law when they're engaged in immigration

4    enforcement functions.  And that coordinated agreement to

5    construct and operate a detention center under 287(g) agreement

6    by law, these have to be ICE functions.

7         And, Your Honor, we were surprised, as I think the

8    Court was, with Mr. Kerner's testimony that I think he said

9    regardless of what's in this agreement he believed his FHP

10   officers could enforce immigration law.  His opinion aside,

11   under the 287(g) agreements, this is federal action because

12   it's under color of federal law.

13        So, we're left, Your Honor, with a situation where

14   there is clearly sufficient federal nexus to trigger NEPA, and

15   the defendants' effort to cut and dice and slice that are

16   unavailing.

17        Incidentally, DHS knows how to do NEPA.  This is

18   Plaintiff's Exhibit 153, is a DHS NEPA document for a contract

19   that DHS entered into with a contractor, a private contractor

20   to build a detention center in Texas.  That's Plaintiffs' 153.

21        Plaintiffs' 154 is a DHS NEPA document to expand the

22   facility at Krome.  So, they can do it.  They just elected in

23   this case not to do it.

24        The second element is final agency action, and,

25   frankly, that's the easiest issue here.  Bennett versus Spears

1    just requires a decision that's other than preliminary,

2    tentative, interlocutory and then some concrete impact on the

3    ground, and we have that here in spades.  There's been a

4    decision and we see the impacts on the ground.

5          The 1252(g) issues and the 1251(f) issues that have

6    been raised by the defendants Your Honor dealt with in the

7    temporary restraining order at pages nine and ten.  1252(g)

8    strips the Court of jurisdiction in three narrow circumstances.

9    None of those apply here.

10         There is a bar on injunctions against immigration

11   enforcement, and we had been clear from day one to today, we

12   are not seeking to enjoin in any way apprehension, detention,

13   removal, any of the immigration functions that would be caught

14   up in the anti-injunction bar.

15         What we're asking is that the site cease operations

16   until NEPA compliance is achieved.

17         Let me just address quickly the venue issue, because I

18   suspect the defendants will reassert their newfound religion on

19   venue, a position that they adopted only after this matter was

20   reassigned to Your Honor.

21         On venue, the county has not objected as against the

22   federal defendants.  They are subject to venue in this court,

23   under 1391(e)(1)(C) because Plaintiffs, Friends of the

24   Everglades, is a resident of this district, and that's

25   sufficient under that subsection.

1          There was some argument about whether the carveout for

2     cases that involve real property would apply, and that's the

3     Earth Island case.  That carveout applies if the case is about

4     trying to vindicate some right, title, and interest in real

5     property, not as here where it's tangential to the claim.  This

6     is a NEPA case, not a case to enforce property rights.  So, we

7     have venue against the Federal Defendants.

8          And as to the State Defendants, there has been a clear

9     waiver.  And you asked me, Judge, when we were addressing

10    venue, whenever that was, I think a couple of weeks ago,

11    whether we believe that it was more important to conclude that

12    venue actually lies in this district or whether the waiver

13    issue was more important.  I said I think they're equally

14    important, but I think, frankly, the waiver issue is more

15    important because the State Defendant should not be rewarded

16    for gamesmanship and holding onto a venue objection and then

17    raising it when they did, after they filed four separate papers

18    in the Southern District of Florida, never raised venue, and I

19    put the DE sites here, 1628, 35 and 39, and then only after the

20    case gets reassigned do they suddenly conclude, oh, we need to

21    be in the Middle District or Northern District, not before Your

22    Honor.

23         The courts do not look kindly on that approach.

24         A venue objection the Court says is the easiest thing

25    in the world to raise, and you must raise it in your first

1    defensive pleading.  And that includes cases that hold, when

2    you oppose a PI motion, that's the time to raise a venue

3    objection if you have one.  Otherwise, you're just keeping that

4    card in your back pocket to play later, which you're not

5    allowed to do.

6            Regardless, there is venue over the State Defendants.

7            What we're required to show under 1392, 1391(b)(2) is

8    that a substantial part of the events or omissions occurred

9    here.

10           Now, the State Defendants are myopically focused on the

11   runway, but courts hold -- and this is language from Judge

12   Tjoflat's decision in Jenkins Brick, that there is play in the

13   joints on venue.  The statute was designed to give plaintiffs

14   options, and it is plaintiffs' option.  It doesn't have to be

15   that a majority of events or omissions occurred in this

16   district but that a significant number did.

17           Here where the precipitating event for all of this, the

18   reason why we are here, is the Division's commandeering of the

19   County's property.

20           And by the way, if you look at Exhibit 52, the

21   Division's letter is clear, they want the TNT Site, including

22   all associated land, one-third of which lands in Miami-Dade

23   County, and that is in the record at Plaintiffs' Exhibit 87.

24           You have letters from Mayor Danielle Levine Cava

25   raising the impacts in Miami-Dade County.  Those are

1    environmental impacts, drinking water supply.

2         The Division failed to confer with the Tribe in

3    Miami-Dade County.  You heard that testimony yesterday from

4    Ms. Castaneda, and conferred to -- failed to confer with the

5    County in Miami-Dade County.

6         You heard testimony from Dr. McVoy and Ms. Castaneda

7    that the water flow from the site is primarily to the south,

8    into Monroe and Miami-Dade County.  So, this case is no

9    different than the National Wildlife Federation versus Harvey

10   case, which is an ESA case, but it's similar, where the Court

11   found venue is proper due to impacts in South Florida to the

12   snail kite population here.

13        So, there are impacts in the Southern District of

14   Florida sufficient, including the omissions of the defendants,

15   sufficient to lie venue in this district.

16        Let me talk briefly to irreparable harm.

17        Well, I think I have ten minutes left, maybe.

18        THE COURT:  Could be five.

19        MR. SCHWIEP:  So, what we need to show is a likelihood

20   of injury.  There is a presumption that where NEPA is ignored

21   that real environmental harm will result from that violation,

22   and Courts have held that irreparable harm can be shown from

23   soil disturbance, from dust and light impacts, all of which

24   could harm endangered species.

25        We cite those cases in our prehearing brief at 7.  What

App. 944

1    we have here, Judge, and you heard testimony from Amber Crooks

2    and from Eve Samples, Friends of the Everglades and the Center

3    for Biological Diversity, and their members are dedicated to

4    protecting the Everglades and its biodiversity.  They have

5    members who have recreational, aesthetic, professional interest

6    in endangered species, including Florida panther and the

7    Florida bonneted bat.

8          You heard the testimony from Eve Samples, from

9    Dr. McVoy, from Amber Crooks, from Jessica Namath, all saying

10   how they recreate, they enjoy the aesthetic beauty of this area

11   and their enjoyment has been adversely impacted.

12         This, Judge, is a picture of what the site looked like

13   on February 21, 2025.  This is an evidence as Plaintiff's

14   Exhibit 82.

15         This was just a sleepy quiet training facility that

16   many of us drove by.  Nobody noticed it was there.

17         Ms. Castaneda, who worked two miles away from the

18   facility and has been there for 19 years, said occasionally she

19   would see a plane but didn't really hear any.  You heard the

20   same kind of testimony from Ms. Namath and Dr. McVoy.

21         If you can, go back one.  This picture, which is

22   Plaintiff's Exhibit 136 in evidence is what the western portion

23   of that site looks like on August 8th.  Dr. McVoy testified

24   about this.  It's 11 acres of fresh pavement over what was

25   previously unpaved and, therefore, pervious surface.

App. 945

31

1          Judge, Dr. McVoy counted.  There are 1,200 parking

2    spaces that have been built, and you could see here on this

3    picture from August 8th that nearly all of those parking spaces

4    are full.  That's what he called area one.

5          If you go to the next photo, this is what he called

6    area two, and you can see there is eight long diagonal tents

7    that Dr. McVoy was told hold 250 folks each, and then south of

8    that site is about seven acres, it looks like more on

9    August 8th, of additional pavement on that site.

10          You heard from Dillon Reio, who is a professional

11    geologist, that there is no storm water management system in

12    place.  That runoff from this pavement is likely to contain

13    contaminants from vehicles and traffic, including polycyclic

14    aromatic hydrocarbons, at a minimum from vehicles, and that

15    testimony was corroborated by Ms. Castaneda yesterday.

16          In Mr. Gadea-Guidicelli's declaration from yesterday at

17    12:15 a.m., he says there are about 800 to 1,000 contractors on

18    site, plus 150 state officials, plus ICE officials, not to

19    mention the detainees, however many there are right now.  So,

20    all of that in the middle of a national preserve, the Big

21    Cypress National Park, created in 1974 after the initial

22    jetport plan was shut down.

23          You heard testimony this is an interconnected system of

24    wetlands.  Frankly, Judge, the suggestion that this has no

25    environmental impact at all is absurd.

1          If we can just show the next slide.

2          Had we heard from Mr. Gadea-Guidicelli live, I was

3     prepared to cross him about this.  This is Plaintiffs' Exhibit

4     126.  This is their purchase order from the State Emergency

5     Response Team, where they are purchasing 200,000 square yards

6     of pavement, which is over 41 acres of pavement, at a cost of

7     $11 million, over 22,000 linear feet of fencing.  That's over

8     four miles of new fencing for the site, at a cost of nearly

9     $7 million.

10          By the way, all the contracts that we got from the

11    Division are in evidence and are cross exhibits.  None of them

12    are about the removal of any of this.  There is no contract to

13    remove lights or pavement or fencing or anything else.

14          So, clearly, the impact is real.  It is irreparable as

15    the law defines it because it cannot be compensated with money

16    damages.  Again, it's ironic that in this case the plaintiffs

17    have been faulted for not presenting empirical evidence of the

18    harm.  We have presented empirical evidence of the harm, but

19    that whole argument turns the law in its head.  It's these

20    agencies that are responsible under NEPA for evaluating the

21    impacts before acting.  That's the whole point.

22          The next slide shows Betty Osceola's photo.  This is

23    from 15 miles away, and the light pollution that this light has

24    visited in on the area.  This is at Big Cypress National

25    Preserve, you heard the testimony, is a recognized and

1    certified and dark sky park.  No more.  That harm is present

2    and it is existing right now.  It's affecting species and

3    Tribal members.

4         This picture, Your Honor, is from Mr. Kautz's

5    testimony.  This is Plaintiffs' 25 at 26.

6         THE COURT:  Five more minutes, Mr. Schwiep.

7         MR. SCHWIEP:  Pardon?

8         THE COURT:  Five more minutes.

9         MR. SCHWIEP:  Thank you, Judge.

10        It presents the telemetry data that shows the presence

11   of panther in the area.  He has had years of experience working

12   with the Fish and Wildlife Commission.  He testified to the

13   presence of panther in the area.  He testified how panther

14   would now avoid the site to 2,000 acres of lost habitat due to

15   the lighting and the fencing.  And he testified that because

16   they have been displaced from this area or moved into a narrow

17   area, that there is an increase risk of intraspecific

18   aggression that they will literally fight to the death over

19   territory, and that's at the hearing transcript from

20   August 6th, at 229 through 231.

21        That testimony was corroborated yesterday by Dr. Bozas.

22   He testified to increased risk of vehicular mortality because

23   of the increased traffic.  On cross-examination, he was

24   criticized for not having done the traffic study, not having

25   the traffic data.  Again, it's the agencies that are obliged to

1   do that.

2        THE COURT:  Did the doctor, the displacement, would

3   that mean that the panther would leave the area and go

4   elsewhere and then might also be subjected to vehicular

5   mortality, like two panther cubs on the road?

6        MR. SCHWIEP:  What he said was, there are two separate

7   causes of more mortality, intraspecific aggression because

8   they'll fight over territory, and they've lost 2,000 acres of

9   habitat as a consequence of the lighting and the activity in

10  this area, which is as they are forced out of that area and in

11  contact with other panthers, they will fight over that

12  territory.  That's the intraspecific aggression risk.

13       Separately, there is an increased risk of vehicular

14  mortality, which is the second leading death for panther, which

15  he testified about.

16       THE COURT:  But that would be not only the traffic

17  coming into the site but also if a panther family was displaced

18  or was pushed out of the area because of these factors in a new

19  area might also be vulnerable to vehicular mortality?

20       MR. SCHWIEP:  Yes, it's both being displaced from the

21  habitat and the increased traffic, and it doesn't take a Ph.D.

22  to conclude that when you build a facility with over a thousand

23  employees, traffic is going to increase.

24       You heard yesterday about bonneted bat from Mr. Bozas

25  as well.

 1          Just, if we can go to the next slide, this is the

 2    Western Everglades Restoration Plan map that was admitted as

 3    Plaintiffs' 83, at two, and you heard quite a bit of testimony

 4    about this, the bidirectional gates that are at the east side

 5    that let water flow in each direction.  The culverts that are

 6    on the west side on the 11-Mile Road and along the trail and

 7    along the Loop Road -- it's just absurd, Your Honor, I mean,

 8    it's just crazy that with billions of dollars being poured into

 9    Everglades restoration, including in this exact area by State

10    and Federal Governments, that the State and Federal Government

11    agree to build an immigration detention center right smack in

12    the middle of this without anyone giving a moment's pause to

13    whether this was consistent with Everglades restoration,

14    whether it's consistent with the fact this is a state area of

15    critical concern, what the environmental impacts are, what the

16    alternatives could be, what the impacts would be on species,

17    what impacts would be on a sovereign nation.  It just flies on

18    the face of what NEPA requires, which brings me to my final

19    slide.

20          THE COURT:  Okay.

21          MR. SCHWIEP:  And you just have to ask, so why here?

22          I mean, there are runways elsewhere.  It's not the

23    plaintiffs' burden to prove there are alternatives.

24          Why this site?  Why the jetport in this area?

25          Alligator Alcatraz, a name just meant to sound ominous

App. 950

1    and, Judge, I'd submit this is really just a public relations

2    stunt.  It's not serious policy.  Environmental laws stand in

3    equal dignity with immigration laws, and we just request that

4    the Court enforce environmental laws in this case.

5         THE COURT:  All right.

6         On behalf of the Tribe.

7         Thank you, Mr. Schwiep.

8         MR. AJIZIAN:  Good morning, Your Honor.  We have a

9    PowerPoint as well, but while we are getting set up, I just

10   want to echo what Mr. Schwiep said, thanking the Court for the

11   availability over the last two weeks and thanking my colleagues

12   on the other side, the plaintiffs with Friends of the

13   Everglades.  This is important work, and we all appreciate it,

14   the Tribe, everything that's been done.

15        In the interest of time, I don't think I need the

16   PowerPoint to make my introduction.

17        THE COURT:  Okay.

18        MR. AJIZIAN:  So, what I'll say, the record evidence is

19   more than sufficient to warrant entry of an injunction halting

20   all activities at the TNT Site.

21        You've heard about the standard for injunctive relief.

22   I'm not going to go over it, but what I want to focus on is the

23   evidence demonstrating irreparable harm to the Tribe, the

24   Tribe's substantial likelihood of success on the merits, as a

25   virtue thereof, and then I believe you are going to hear a lot

1    about the government's interest and the balancing the equities,

2    so I plan to address that in a fulsome manner.

3            I would like the slides at this point to address the

4    substantial likelihood of success on the merits.

5            THE COURT:  Is it us or is it you?

6            MR. FRIEDMAN:  I don't know, but if you could just give

7    me a moment, we are going to get it up on this other computer.

8            THE COURT:  I think lawyers should stay away from tech.

9            MR. FRIEDMAN:  Duly noted.

10           MR. AJIZIAN:  Tech and math, at least in my case.

11           THE COURT:  Let me ask you a few questions so I don't

12   interrupt you.

13           My understanding from the Tribe's witnesses yesterday

14   is that the Tribe Council or center of government is in

15   Miami-Dade County.  Is that right?

16           MR. AJIZIAN:  Entirely within Miami-Dade County.  It's

17   located on the Miccosukee Reserved Area, which was established

18   by the Miccosukee Reserved Area Act.  I can't remember the

19   exact date, but I want to say it was in the '80s.  It's cited

20   in our motion to intervene.  That establishes the Reserved Area

21   carved out of a portion of Everglades National Park.  The

22   entirety of that is located in Miami-Dade County, and the

23   administrative and governmental buildings, as well as schools,

24   health center, other infrastructure, all of that is located on

25   the MRA.

```
1            THE COURT:  Okay.  But even with that, I think the map
2      that we had, or one of the maps we had yesterday show various
3      other Tribal entities or, I don't know if they're homes or
4      just, but there is surrounding the jetport several significant
5      Tribal concerns or interests.
6            MR. AJIZIAN:  Are you referencing the map with the
7      yellow dots and the redactions?
8            THE COURT:  No, I wasn't -- I wasn't referencing that.
9      I was -- maybe if it's in your PowerPoint, it will remind me.
10           MR. AJIZIAN:  The maps are in there.  There are two
11     maps.  One is the map of the Tribal villages that are located
12     within three miles of the TNT Site.
13           THE COURT:  Okay.  That's what I was talking about.
14           MR. RAURELL:  I believe that's Plaintiffs' -- I'm
15     sorry, Tribe's Exhibit 6.
16           THE COURT:  Okay.
17           MR. AJIZIAN:  It's in my PowerPoint.
18           THE COURT:  What did you do?
19           MR. FRIEDMAN:  I won't say it on the record, but if we
20     could just have two minutes, I will be able to resolve this.
21           THE COURT:  All right.  You know what, it's been about
22     an hour, so why doesn't everybody take a rest break for about
23     five minutes.
24           MR. AJIZIAN:  Thank you, Your Honor.
25           (Recess.)
```

App. 953

1          MR. AJIZIAN:  For the record, Ms. Hernandez is still

2     batting a thousand.  This is all Mr. Friedman's fault.

3          THE COURT:  We all agree to that.

4          MR. AJIZIAN:  We briefly addressed the elements.  I'm

5     going to focus on the irreparable harm to the Tribe, the

6     Tribe's likelihood of success on the merits, and then focus

7     most of this on the balance of the equities and the public

8     interest.

9          If we can go to the substantial likelihood of success,

10    thank you.

11         So, what are the merits and what is success measured

12    against?  Let's take it from DHS.  This is Tribe's Exhibit 21.

13    It's the operative DHS NEPA policy, and one of the pages, it's

14    page V-3 in that document -- V being Section 5 -- provides a

15    flow chart.  I'm a visual learner, this kind of lays it all out

16    for me in a very clear way.

17         The agency identifies a need.  They prepare a proposal,

18    and in the case of DHS they have EPPM, which is an

19    environmental policy personnel manager, I think.  The

20    definition is in Section 1 of the document.

21         From there you have three options.  Either there is a

22    categorical exclusion, which there is no evidence here that

23    there is categorical exclusions.  The defendants haven't even

24    argued that the facility needs a categorical exclusion, so

25    that's off the table.

1        The other options are EA.  That's environmental

2   assessment under 4336.  EIS is Environmental Impact Study, also

3   an option under 4336.  And 4336 is 42 U.S.C 4336 --

4        THE COURT STENOGRAPHER:  Sorry, can you repeat that?

5        MR. AJIZIAN:  When I say 4336, I'm referring to 42

6   U.S.C. Section 4336, which is the procedural requirements under

7   the NEPA.

8        So, the evidence is clear here that none of the

9   defendants, Federal or State, have done anything to take even

10  the first step in complying with NEPA.

11       Go to the next slide, please.

12       DHS also recognizes the Tribe's entitlement to

13  consultation for projects that implicate NEPA.  You can see

14  here, this is page seven of Section 4 in the same document,

15  Tribe's Exhibit 21, Coordination with effective tribes, like

16  the Miccosukee Tribe here, is another requirement for DHS that

17  can be met in conjunction with NEPA public involvement.

18       What does coordination involve?  Well, in sub C here we

19  see that DHS, or any federal agency for that matter, should

20  consider the potential environmental impacts of the proposed

21  action, and they can look to other environmental analyses in

22  the geographical region where the action would occur for

23  assistance in getting that information.

24       That's important with reference to WERP, and we will

25  get to that in a second.

1          The evidence is clear none of this occurred.  You heard

2     from Ms. Castaneda yesterday.  No one has contacted the Tribe.

3     You've seen in the record the communications with respect to

4     WERP going back to 2016, almost nine years of consultation with

5     the Tribe for a $20 million project to enhance the environment.

6          Next slide, please.

7          Now, as the Court is aware, NEPA does not provide a

8     private right of action on its own.  We travel under the APA.

9          What does the APA require?

10         It's an arbitrary and capricious standard.

11         This is the Eleventh Circuit, Sierra Club v. Army Corps

12     295 F.3d 1209.  This is binding precedent, "Arbitrary and

13     capricious action includes any one of the following:"

14         Here, specifically, I want to draw the Court's

15     attention to the first option.  "The agency decision does not

16     rely on the factors that Congress intended the agency to

17     consider.  Those factors are, take a look at the environmental

18     impact before you implement agency policy," the

19     look-before-you-leap idea.

20         Two, which is very opposite to the facts here, "The

21     agency failed entirely to consider an important aspect of the

22     problem."

23         There is no evidence here that anyone involved

24     considered any environmental impact before they endeavored to

25     build a detention facility in the heart of the Everglades in

1    eight days.

2         So, with respect to access on the merits, respectfully,

3    it's not a likelihood of success.  The Tribe and the plaintiffs

4    will succeed because the evidence is undisputed that there is

5    no consideration of any environmental impact for this project.

6    There is no environmental impact study.  There is no

7    environmental assessment.  There is no consideration of

8    alternatives, no agency statement, no consultation with the

9    Tribe.  None of the things that are required under NEPA

10   happened.  And there is -- it's undisputed, uncontroverted.

11        Let's talk about Tribe to the harm.  I'm sorry, harm to

12   the Tribe.  You heard yesterday about four hours of testimony

13   from Amy Castaneda and Dr. Marcel Bozas.  Ms. Castaneda is the

14   water resources director for the Tribe.  Her testimony was

15   consistent with the plaintiffs' experts -- now, she does this

16   every day in her role as the director -- that the facility, the

17   operation of the facility and specifically the human activity

18   and presence at the facility presents a very substantial

19   likelihood of nutrient loading in wastewater storm runoff,

20   other emissions or effluent from the facility itself, and those

21   have a substantial likelihood of causing harm to both the

22   environment and human health.

23        With respect to the environment, these unnatural

24   discharges caused by human activity to the site can result in

25   unnatural vegetation overgrowth.  Ms. Castaneda discussed the

 1    current overgrowth on the Tribe's federal reservation north of

 2    the site and, again, this is part of WERP where they are trying

 3    to resolve or fix that problem.  That can occur near the

 4    jetport and on Tribal lands in Water Conservation Area 3A

 5    South.

 6          When that growth occurs, the unnatural overgrowth, it

 7    causes dissolved oxygen levels to decrease, which has knock-on

 8    effects, killing native species and -- native plant and animal

 9    species, specifically fish.

10          There is a loss of pervious surfaces.  We've seen

11    uncontroverted testimony in evidence that up to potentially

12    30 acres of additional asphalt has been laid, and these effects

13    can cause lack of access or the inability to access Tribal

14    lands.

15          Let's go to the next slide.

16          This is the WERP map that we've talked about several

17    times.  For the record, WERP, Western Everglades Restoration

18    Project.  The unfortunate reality of the situation we find

19    ourselves in is that the government has planned for a

20    $20 billion project, WERP, and that all of that was done prior

21    to the conception of the jetport.

22          So, all of the harms that Ms. Castaneda testified

23    about, and we just reviewed generally, the jetport being

24    installed right there in the middle of a major WERP project

25    area is like a nutrient-generating factory that's going to emit

1    into the local environment all of the effluent wastewater,

2    nutrient-loading substances that will cause harm to both the

3    Tribe and the Big Cypress area surrounding the jetport.

4           None of that was occurring at the time that WERP,

5    again, a major federal project planned over nine years and

6    enacted in January of this year.  Ms. Castaneda testified it

7    was sometime in November.  The House passed it in November.  It

8    was signed into law in January.  So, eight months ago, the

9    Federal Government said, this is important and we're

10   appropriating $20 billion for it.

11          So, things have changed in a material way and the

12   jetport is causing or will cause harm that's inconsistent with

13   the Federal Government's stated goals.

14          Next slide.

15          This is the Tribal village's map.  It's Tribe's

16   Exhibit 6.  Ms. Castaneda testified there are ten Tribal

17   villages within three miles of the jetport.  She identified it

18   on the screen.  It's not shown here, but you can see the

19   jetport property.  You can see the locations of the villages

20   with the pink dots located along Tamiami trail, and the

21   evidence is uncontroverted that the average flow of the

22   Everglades system will bring contaminants directly to the

23   doorstep of the residents who live in these villages.

24          Next slide.  Beyond that, the Miccosukee Reserved Area,

25   which again is located entirely within Miami-Dade County, is

1    where the Tribe has its administrative facilities, schools,

2    health facilities, and 80 percent of Tribal members reside on

3    the MRA.  Ms. Castaneda testified about that yesterday.

4         It's uncontroverted that, again, based on the water

5    flows that discharge, the environmental effects and potential

6    human health effects will be brought to the MRA, especially

7    once WERP is implemented with the bidirectional gates, which we

8    will get to in a second.

9         You also heard testimony about the presence of Tribal

10   cultural sites and tree islands in the area.  These are within

11   Miami-Dade County.  They are all located within Water

12   Conservation Area 3A South, and the environmental harm and

13   potential human health effects will be brought to these sites

14   as well.

15        I misspoke when I said all of these sites are in

16   Miami-Dade County.  You see the white line kind of across the

17   top here.  There's testimony from, I believe, Ms. Castaneda,

18   and definitely Dr. Bozas that that line is the line of

19   demarcation for Miami-Dade from Broward.  So everything below

20   that and east of the L-28 canal is in Miami-Dade County.

21        THE COURT:  So, if you would, the Western Everglades

22   Restoration Project signed into law January and, if I recall

23   the gentleman's testimony, they -- there were regular or maybe

24   it was Ms. Castaneda, but there were regular discussions with

25   the Tribe, and I think it was the Army -- is it the Army

App. 960

1    corporation on the WERP?

2         MR. AJIZIAN:  That's correct.

3         THE COURT:  Is there anything in the record that shows

4    that the Army Corps or DHS or ICE or anyone from the executive

5    in the Federal Government discussed the jetport conversion with

6    the Tribe?

7         MR. AJIZIAN:  There is no evidence, affirmative

8    evidence that the jetport conversion into what I presume is the

9    detention facility, while we're all here --

10         THE COURT:  Right.

11         MR. AJIZIAN:  -- there is no documentary evidence that

12    that was ever discussed.  Documentary evidence being, you know,

13    the letters that we saw between the Army Corps and the Tribe

14    with respect to WERP, and then there's testimonial evidence

15    that there have been no consultations with the Tribe for this

16    project.

17         There is the declaration of Dr. Jason Daniel.  That's

18    Tribe Exhibit 4, I believe.  I will confirm that but his

19    declaration says exactly that he is the Tribe's designated

20    representative for government-to-government consultation, and

21    his declaration says there's been no consultation.

22         THE COURT:  Okay.

23         MR. AJIZIAN:  So, the testimony is clear from

24    Ms. Castaneda that there is a substantial likelihood of

25    environmental harm, harm to human health as a result of the

1    human activity and presence on the TNT Site.  All of this could
2    have been avoided if there was any minimal effort to comply
3    with NEPA.

4         The Tribe had had no advanced notice.  There were no
5    environmental assessments or public meetings, public outreach.
6    The typical process was completely set aside for this project,
7    and in doing so there was a violation of NEPA.

8         You also heard yesterday from Dr. Bozas -- and for the
9    record, and so everything is clear, I will represent to you
10   that turkey is alive.  Dr. Bozas testified that the area --
11   first of all, he has worked in the area for eight plus years.
12   He studied the area at a Ph.D. level and he works there as
13   director of Fish and Wildlife.

14        He testified that the TNT Site sits within, at least in
15   part, a U.S. Fish and Wildlife Service, critical wildlife
16   habitat.

17        What does that mean?  The bonneted bat is protected by
18   the Federal Government and the area for that protection
19   includes part of the TNT Site, where they are operating the
20   detention facility.  He testified that the increased amount of
21   light will harm the bonneted bat in any number of ways and that
22   they haven't had enough time to figure out what those effects
23   are going to be.

24        So, in addition to the bonneted bat, you heard about
25   the Florida panther, the wood storks.  The wood storks he

1   testified have the core foraging area.  That's another Fish and

2   Wildlife designated protection, and those core foraging areas

3   he testified are determined when the wood storks return to the

4   area.  And when they roost, that sets the epicenter of the

5   foraging area.

6          They have not come back to roost yet because it's not

7   that time of year, so we don't know what this facility will

8   have, what effect it's going to have on the roosting positions

9   but we do know it's located right smack dab in the middle of

10  where they come back to roost.

11         Mr. or Dr. Bozas also testified that there are

12  currently physical barriers preventing Tribal members from

13  accessing the TNT Site.  Those are your checkpoints, the

14  guards, the fences.

15         This prevents them from reaching the trails into Big

16  Cypress that they often use to go out and conduct traditional

17  activities.  Traditional activities, he testified, includes

18  hunting, fishing, gathering and harvesting plants and herbs for

19  traditional, ceremonial, religious purposes.

20         THE COURT:  So maybe you could -- so, those are the

21  off-road trails that we saw on the map?

22         MR. AJIZIAN:  Yes, right here.

23         THE COURT:  So, was it Dr. Bozas' testimony that

24  persons would go into the area surrounding the jetport to

25  access other off-road trails or -- tell me what the

1    significance of that is.

2         MR. AJIZIAN:  Right.  Dr. Bozas testified that he had

3    occasion to visit the site and he has observed travel mentioned

4    using these trails.  There was an issue with what's on one side

5    of the fence, how much fencing was in place and where was that

6    fencing.

7         You can see the fence -- so, you see the trails that go

8    off to the right, you can see the fence line on the left.  You

9    see the line that kind of zigzags?

10        THE COURT:  Yep.

11        MR. AJIZIAN:  That was the fence line that was in place

12   prior to the detention facility.  So, on the right-hand side of

13   this -- from this vantage, on the right-hand side of that fence

14   and we specifically discussed the parking lot area there, on

15   the right side of that fence, that's completely or it used to

16   be publicly accessible.

17        So, the access road to the TNT Site from Tamiami Trail,

18   you pull onto it, you drive north, and then there is the big

19   bend.  This is kind of the end of that bend on the northbound

20   section of the TNT Site, from which there is a trailhead.

21   There is parking for the public right there at the trailhead

22   it's what you are seeing here.

23        We also showed the video flying westbound from this

24   location to the next trailhead where there was the green patch

25   of grass that was parking for access to another trail, a

1    separate trail.

2            THE COURT:  Right.

3            MR. AJIZIAN:  And then there was another trail that he

4    identified at the beginning of the video that connects directly

5    to the access road.  Those are trails that are open to the

6    public but also Tribal members use them often for these

7    specific purposes, traditional activities.

8            There is a federal and state -- federal and state

9    statutes recognize Tribal rights to use and occupy Big Cypress,

10   including specifically the right to hunt, fish, trap, and

11   conduct, quote-unquote, traditional ceremonials.

12           Dr. Bozas testified as to these trails.  It's the

13   primary means of access to Big Cypress for Tribal members and

14   if you take that away, you are effectively depriving them of

15   their federal and state rights.  Finally, Dr. Bozas testified

16   about the Tribe's cultural aversion to the area as a result of

17   the human presence there.

18           He testified it doesn't matter it's a detention center.

19   It could have been a carnival.  It could have been a Girl Scout

20   convention.  It doesn't matter, but when you have that level of

21   unnatural human activity in the area, for sacred and very

22   private reasons the Tribe will not go into those areas to

23   collect herbs or hunt for ceremonial purposes.

24           Back to the video, Dr. Bozas testified that of these

25   three structures, the one on the right-hand side below the

1    horizontal bisecting line there, that is Tribal village.  On

2    the Tribal villages map, which is Tribe's Exhibit 6, that

3    village is identified as the Panther Osceola Village.  He

4    confirmed that the horizontal bisecting line, that's Tamiami

5    Trail, obviously a public roadway, and the vertical line

6    running to the bottom, that is the TNT access road.

7         The next slide, as to light pollution, the Department

8    of Fish and Wildlife or the Tribe conducted their own light

9    study.  This is the Tribe's Exhibit 9.  The results of the

10   light study are disconcerting for a number of reasons.

11        We mentioned earlier, Dr. Bozas testified about the

12   bonneted bat.  Go to the next slide.

13        In the area you can see that the average light

14   pollution at Alligator Alcatraz, which is designated as, you

15   know, location letter I here, the amount of light pollution has

16   substantially increased.  I'm not an expert on the scale there

17   but I don't think you need to be an expert to see that the

18   orange line is far below the blue historical average.

19        Next slide, please.

20        With respect to the law on irreparable harm.  The law

21   is clear that environmental injury by its nature constitutes

22   irreparable harm and cannot be remedied with monetary damages.

23        The evidence that we've just run through presents a

24   substantial likelihood of irreparable harm by its nature.

25   Under binding precedent, that constitutes irreparable injury

1    sufficient to warrant the entry of an injunction.

2         So, I want to talk about the balancing of the equities

3    for a minute because I believe you're going to hear quite a bit

4    about this in closing from the defense.  According to the

5    defendants, the main case supporting their equities position is

6    Winter v. Natural Resources Defense Council.  That's 555 U.S.

7    7.  The relevant discussion really starts on page 23.

8         First of all, you're going to hear that the substantial

9    likelihood of environmental harm or harm to human health can't

10   be found here because all the evidence is speculative.  The

11   witnesses don't know what they're talking about because they

12   can't study the actual effects or, you know, they haven't taken

13   samples from next to the TNT Site.

14        Well, Winter says that NEPA's purpose is to do an EIS

15   so you know what's going to happen.  NEPA attempts to prevent,

16   in requiring an EIS, without one, there may be little, if any,

17   information about prospective environmental harms and potential

18   mitigating measures.  Here there has been no EIS.  There has

19   been no effort to even look into potential environmental harms,

20   and any speculative assumptions or analysis by the Tribe or the

21   plaintiffs' witnesses can only be faulted on the defendant.

22        Next slide, please.

23        Another core component of the Winter holding is the

24   accordant burden on the defendant there, which was the U.S.

25   Navy.  Here, the evidence is very clear that there is little to

App. 967

1    no burden on the defendants should an injunction be entered.

2         This runs into the next slide, but the evidence on

3    burden is that this is a temporary facility that was built in

4    eight days and it can be taken down in eight days.

5         THE COURT:  Well, we don't have any evidence about

6    that, do we?

7         I mean, I know you could call me -- I don't know, you

8    can say "Justice Williams."  That doesn't make it so.

9         Is there any documentation that it is temporary because

10   the vendor information is that it's permanent.

11        Did I not read that correctly?

12        MR. AJIZIAN:  I will tell you that the declaration of

13   Mr. Gadea-Guidicelli -- don't hold me to it -- makes it very

14   clear; this is a temporary facility.  Whether it can be taken

15   down in eight days, I will admit, that's my characterization of

16   it.  But it stands to reason things typically come down faster

17   than they come up.

18        THE COURT:  Right.  I mean, but that has to do with the

19   quality of the tents and the structure because it can be

20   removed once the operation cease.

21        Well, is that in perpetuity, and do we have a life and

22   being or do we have anything that tells us it's two months,

23   it's three months?  It's just -- you know, we just spent

24   $249 million, a quarter of a billion dollars, on something we

25   are going to take down in X months.

1       MR. AJIZIAN:  Right.  There is no evidence on the

2  precise amount of weeks, months, years, this facility is going

3  to be there.

4       Mr. Gadea-Guidicelli characterizes it as a temporary

5  facility.  You heard testimony from Mr. Kerner yesterday that

6  that's actually a permanent facility.  We have well permits

7  that were pulled on the site.  That's Tribe's Exhibit 20.

8  Dr. Castaneda testified about those.  You typically don't drill

9  wells for a temporary facility.

10      Go back to the declaration, please.

11      What I want to call the Court's attention to here is

12  the terminology, the language, which generally is very

13  carefully written through all of these, but Mr. Guidicelli

14  says, the infrastructure in the facility is temporary.  I read

15  that as the tents, the air-conditioning units, the lights.

16      The paving and everything is, obviously, permanent.

17  We're going to be left with that.  And the consequences of that

18  which are unknown because no one did any analysis, that is

19  there forever.  The infrastructure is the tents, the AC, the

20  lights, that can be taken down with ease, and it can be put

21  somewhere else.

22      There is no evidence that they need to do this at the

23  TNT Site.  The Krome Detention Center is just down street.  If

24  there is no beds there, there is vacant land.  They can put the

25  tents and AC units at an existing facility.  There is no

App. 969

1    evidence that they need the TNT Site to run this facility.

2          The evidence does show, as Mr. Kerner said yesterday,

3    the TNT Site is the only site that they looked at.  They looked

4    nowhere else.  This was the first and last stop on the analysis

5    train.  That's what the evidence does show.  I don't know how

6    long it's going to be there.  I don't think the defendants know

7    how long it's going to be there.

8          Back to Winter -- no, the active sonar.  Critically,

9    Winter found that -- there, if the Court is not familiar, the

10   agency action was military sonar training that could have

11   affected whales?

12         THE COURT:  Right, the dolphins and whales.

13         MR. AJIZIAN:  The critical piece of evidence in Winter

14   is active sonar is the only reliable technology for detecting

15   and tracking enemy submarines, and the president said we must

16   do this training.

17         There is no evidence here that the TNT Site is the only

18   site where the State or the Feds can build a detention center

19   and deportation infrastructure in the State of Florida, in

20   South Florida, in Miami-Dade County or in Collier County.

21   There is no evidence of that.

22         That takes Winter off the table, and it demonstrates

23   that the government interest in Winter we haven't even come

24   close to reaching that level of interest, public interest,

25   rather, not government interest.

1          Next slide.  As I noted, Mr. Kerner was very clear in

2   his testimony.  They considered no other sites other than the

3   jetport.  He testified based on personal knowledge but there is

4   no other evidence that, hey, we considered ten other sites.

5   This was the first and last stop.

6          He testified about the soft siding.  He doesn't know if

7   it's temporary or permanent.  He even asked for a definition of

8   temporary or permanent, so it seems to be that no one really

9   knows what's happening here but when you look at the temporary

10  infrastructure, as described in Mr. Guidicelli's affidavit or

11  declaration, that can be put somewhere else.

12         Now, of course, the Court must balance the public

13  interest against the Tribe's interest.  The Government's

14  interest here is very clear and well recognized.  These are --

15  this is Tribe's Exhibit 22.  These are the WERP letters from

16  the government, the Army Corps to the Tribe, describing the

17  Federal Government's interest in protecting and preserving over

18  a multi-decade and multi-billion dollars Comprehensive

19  Everglades Restoration Plan, the environment in which the TNT

20  Site is at the center.

21         So, this is one of the most protected areas in the

22  world and the government has engaged, in their words, a

23  multi-decade, multi-billion dollars restoration plan.  Now we

24  have a detention center, of which there has been no

25  environmental assessment, no impact studies, really nothing.

App. 971

1    The look before you leap, we just leapt, right in the middle of

2    a highly protected and an area where the government has spent a

3    lot of time and resources already.

4           In December of 2023, the Government stated these

5    interests or the public interest in accomplishing WERP very

6    clearly.  The purpose of WERP is to improve the quantity,

7    quality, timing and distribution of water needed to restore and

8    reconnect the Western Everglades ecosystem while maintaining

9    flood protection and ensuring that inflows meet applicable

10   water quality standards.

11          You heard from Ms. Castaneda yesterday, the Tribe has

12   their own water quality standards.  WERP is going to be moving

13   water from the jetport in Big Cypress across the L-28 canal

14   into Tribal land, it's Water Conservation Area 3A.  There has

15   been no evidence, again, no consultation, but no effort to even

16   inquire as to what the Tribe's water quality standards are, or

17   if anything being done at the facility will or possibly could

18   meet those standards.

19          Unlike the defendants here, the Army Corps intended to

20   engage in an open and public process for WERP.  This is the

21   Government's interest.  This is a $20 billion project just for

22   WERP, which is a carry-on or a location-specific component of

23   the Central Everglades Protection Plan.  You could run the

24   detention center for 40 years at the cost of what WERP is.

25   It's $20 billion.  The evidence is, the TNT Site is

1    half-a-billion a year.  That's 40 years of TNT deportation

2    center for the cost of WERP.  The public interest favors

3    conservation and not deportation in this area.

4         Next slide.

5         As for the Tribe's interest, well, the Tribe is a

6    sovereign nation.  It is entitled, as a matter of federal law,

7    to consultation when the Federal Government decides to do

8    something that's going to affect its sovereign interest.  This

9    is not news to anyone.  It's in DHS's NEPA compliance handbook.

10   Everyone knows, we're there, and we are entitled to certain

11   things, one of which is consultation.

12        At the very least, input, just notice, how about that.

13   There was no notice.  No one even bothered to tell the Tribe,

14   or anyone else for that matter, what's happening.  The Tribe

15   has a substantial interest in protecting its sovereignty.  It

16   is perhaps the most preeminent interest that there could be for

17   such a project.

18        Next slide.

19        The evidence is uncontroverted that the Tribe's

20   connection to the land is the vitality of its culture and its

21   people.

22        There is a direct correlation between the health of the

23   environment in this area and the Tribe's ability to continue

24   performing traditional activities, cultural and religious

25   practices.  It is the life blood of their community, their

1   history, and their identity, without which they -- it is

2   immeasurable the harm that could be caused if we lose these

3   invaluable resources.

4          So, for those reasons, Your Honor, we respectfully

5   submit that an injunction is warranted here.  Unlike the TRO

6   motion, the evidence is clear and uncontroverted that human

7   activities and human presence are causing environmental and

8   potential human harm.  As a result, it is respectfully our

9   position that the entire facility must be shut down until,

10  unless, and until NEPA is complied with.

11         Thank you.

12         THE COURT:  All right.  Thank you.

13         Let me ask this; do I have plane scheduling issues?

14         So, do you want to take an hour lunch which would take

15  us to 1:15.

16         Do you want to take a 45-minute lunch, a half hour?  I

17  mean, what is -- I mean, I want to accommodate as best I can

18  the schedule.

19         MR. PANUCCIO:  For the State, we're okay with the

20  Court's pleasure.

21         MR. GUSTAFSON:  An hour would be beneficial.  Thank

22  you, Your Honor.

23         THE COURT:  Okay.  So, we can come back at, after lunch

24  at 1:15, and will I hear from the State -- or maybe if our

25  federal Friends have planes, talk amongst yourselves about who

1    would go first.

2           MR. PANUCCIO:  Very good.

3           THE COURT:  Thank you.

4           COURT SECURITY OFFICER:  All rise.

5           (Recess.)

6           THE COURT:  All right.  Everyone may be seated.

7           All right.  Who of the defense teams will be first?

8           MR. GUSTAFSON:  I will be, Your Honor.

9           THE COURT:  All right.  Mr. Gustafson.

10          MR. GUSTAFSON:  Thank you, Your Honor.  Adam Gustafson

11   for the Federal Defendants.

12          THE COURT:  And if you would remember, of all of our

13   attorney friends, you are the most soft spoken, so if you

14   would, speak into the microphone.

15          MR. GUSTAFSON:  Thank you, Your Honor.

16          This case boils down to a question about control.  NEPA

17   does not apply because the construction and operation of

18   Florida's detention facility are controlled by Florida.

19          There is no federal final agency action here because

20   the Federal Government has no actual power to control the

21   non-federal activity.  That test, which plaintiffs expressly

22   adopt, comes from the Eleventh Circuit's opinion in the case

23   you cited in the TRO, South Florida Water Management District.

24          In that case, the Federal Government had negotiated and

25   executed an agreement requiring State remedial action.

1    Plaintiffs in that case argued that the ensuing state action

2    was federal, in effect, because the Federal Government had

3    negotiated the agreement with the State, had monitored the

4    State's compliance and could withhold consent to the State's

5    chosen remedy and forced dispute resolution, but the Eleventh

6    Circuit held that even in combination, all of those indicia of

7    federal involvement were not enough to federalize the remedial

8    action that followed, only actual federal control suffices.

9         Plaintiffs have cited and put on the screen today the

10   statement that the touchstone of major federal activity

11   constitutes a federal agencies authority to influence

12   non-federal activity, but that is not where the quote stops.

13        Look at -- the question is, what degree of influence is

14   required, and look at the very next sentence.  "The federal

15   agency must possess actual power to control the non-federal

16   activity."  That's the relevant test.

17        The Court held that mere influence isn't enough to

18   federalize federal activity for NEPA purposes.

19        THE COURT:  Let me ask you a question I asked

20   co-counsel last week.

21        If a State official, FDLE person at the facility said,

22   Bob Jones, you don't belong here, I'm going to let you go, is

23   that a legal action that can be done without the approval of

24   the Federal Government?

25        MR. GUSTAFSON:  So, under the 287(g) agreements that

App. 976

1    State law enforcement agencies have entered into with DHS, DHS

2    does exercise a supervisory function, but that supervisory

3    function is limited to immigration enforcement matters.

4         THE COURT:  But there is no other person -- there is no

5    other matter out there, and I asked -- I forget who I asked,

6    but nobody is housing anyone on a state charge.  No one is even

7    housing someone on a federal charge.  Instead of FDC, they're

8    using the detention facility.  They are all there on

9    immigration detainers.  So, if DHS has a supervisory authority

10   and obligation on the detainers --

11        MR. GUSTAFSON:  Well, the evidence you have heard, Your

12   Honor, is that Florida is responsible for all of the operations

13   of the facility.  The supervisory role that ICE has is in

14   advising on the legal status of the individuals, making sure

15   that they are detainable, confirming their immigration status.

16        If you look at paragraph 15 -- paragraph 19 of the

17   Fuentes declaration, it goes into detail about the specific and

18   limited roles that the Federal Government has in these

19   facilities.  So, those include signing off on charging

20   documents, reviewing detainers issued, running federal database

21   system checks, providing guidance any time immigration

22   authorities exercised.

23        But that does not mean that ICE is running the

24   facility.  To the contrary, Fuentes emphasized ICE did not

25   designate or plan the site as a detention facility.  ICE does

1  not direct or supervise construction or physical maintenance

2  activities.

3         Perhaps more importantly, Your Honor --

4         THE COURT:  Well, some -- but some federal -- so, not

5  ICE but DHS, because -- and just by the way, this is in

6  evidence, but it's more in the nature of I guess my asking

7  leading questions on cross.  In a case that Mr. Panuccio is

8  familiar with, there was a Docket Entry of an e-mail from an

9  ICE person.  We don't know who it is because it's kind of, you

10  know, redacted, but this ICE person was responding to

11  Congressional inquiry and said that -- what you said, it's not

12  a U.S. Immigration facility but funds were provided by FEMA

13  directly to the State of Florida.

14         So some -- maybe not ICE but some federal agency you

15  represent paid for it and --

16         MR. GUSTAFSON:  So that is not correct, and I believe

17  that has been corrected but the --

18         THE COURT:  Oh, so kind of like -- so some ICE person

19  who didn't know anything about the facility was responding to a

20  congressional inquiry and gave erroneous information.

21         MR. GUSTAFSON:  If I'm understanding how you're

22  describing the document, that would be incorrect because

23  federal funding has not been provided yet.

24         THE COURT:  Okay.

25         MR. GUSTAFSON:  And if we were in that situation, we'd

1  be having a different conversation.  The Federal Government

2  does routinely consider NEPA in appropriate circumstances where

3  federal funding is being made.  We are not at that point yet.

4      THE COURT:  Okay.  So, if this ICE person also said

5  that the authority under which people were held at the

6  detention was a Florida Statute that had been held

7  unconstitutional, that also would be inaccurate.

8      MR. GUSTAFSON:  That's correct, Your Honor.  These

9  detainees are held under immigration statutes, but that's an

10 important point because under the Immigration and

11 Naturalization Act, the courts are deprived of jurisdiction to

12 review discretionary immigration decisions.  That includes the

13 decision to enter into a 287(g) agreement with the State.  That

14 is a discretionary decision under this subchapter, that's 8

15 U.S.C. 1357(g), and you can confirm that looking at the text of

16 the 287(g) agreements themselves.  In the section dealing with

17 authority, they refer to the Federal Government's discretionary

18 delegation.

19     THE COURT:  But if people -- so, again, going back to

20 our FDLE person or whoever is out there, because it's not clear

21 to me who is, if that person -- if Officer Fill-in-the-Blank

22 got sued, the Federal Government is on the hook for that.

23 There is a provision there of liability.  Is that correct?

24     I think it's in all of 287(g).

25     MR. GUSTAFSON:  I would have to look at the specific

App. 979

1    agreement you're referring to.

2         THE COURT:  Okay.  I'll pull it up.

3         MR. GUSTAFSON:  So, mere influence is not enough.

4         The Court in that South Florida Water Management

5    District case expressly recognized the Government's power to

6    influence the State's action in that case in fulfillment of the

7    agreement that the Federal Government was a party to and found

8    that that was not enough to trigger NEPA.  The same for the

9    prospect of future federal funding.

10         And, likewise, for the federal advice and technical

11    consultation, which I would posit is directly analogous to the

12    kind of supervisory information that the ICE personnel provide

13    in this context, the same for monitoring, the same for -- the

14    Court concluded that as long as the state agency retains their

15    state law authority, it's not a federal action for purposes of

16    NEPA, and that's the situation we find ourselves in here.

17         The evidence that you have heard demonstrates that

18    Florida retains its state law authority over the personnel in

19    these facilities.

20         THE COURT:  But not the detainees.  I mean, South

21    Florida Water Management, and I think I touched upon this, but

22    I used the word last week, the sine qua non of that was the

23    local community managing its water resources at that level and

24    that -- the Federal Government didn't have any real role or

25    place in that traditionally.  The sin qua non on this is the

App. 980

1    federal immigration detainers on these people.

2            There is no other reason, correct, for this facility to

3    exist, save for the federal immigration detainees.

4            MR. GUSTAFSON:  Well, I would encourage you to look at

5    that case because the federal role was actually quite extensive

6    in the South Florida Water Management District case.  It's not

7    the case that the Federal Government had no influence.  The

8    Court was quite clear about the extensive influence that the

9    Federal Government had, but the Court held that it was actual

10   control that was required to make it, make the non-federal

11   action into a federal action for purposes of NEPA.

12           So, the plaintiffs identified two potential federal

13   hooks here.  They look at construction and detention.  We

14   talked a little bit about detention.  Let's look at

15   construction.

16           First, the plaintiffs say that the Federal Defendants

17   approved and authorized construction, but they have no evidence

18   for that proposition.  Chief Ian Gadea-Guidicelli explained

19   that the facility was entirely state constructed.  Florida did

20   not need DHS's permission to construct the facility, and the

21   287(g) agreements we've been discussing don't purport to

22   require or even authorize construction.  It's important to

23   understand that these 287(g) agreements do not pertain to

24   particular facilities.  They pertain to agencies.  They

25   delegate immigration enforcement authority to the personnel.

1      They don't purport to take control over state facilities.

2           The evidence shows that this was Florida's idea and

3      Florida's initiative.  There is a video from Secretary Fox --

4      Secretary Noem, an interview with Fox where she explains the

5      origin of this idea.  The idea came to us from the Attorney

6      General of Florida, who approached us with the idea.

7           Instead of evidence of control, plaintiffs point to

8      vague statements and social media posts from which they would

9      have you infer a meeting of the minds.

10          THE COURT:  Well, why are -- maybe you can answer that

11     question ultimately.  If these are vague statements to which a

12     court or the public should give no recognition or credence,

13     then why are officials making statements that confuse rather

14     than clarify the issue?  Why?

15          MR. GUSTAFSON:  Partly because of the importance of

16     this issues to the public.

17          THE COURT:  It's important to confuse us as to who is

18     actually responsible for this because you just said that

19     they're vague and, therefore, we should not be relying on it.

20          If they're vague and unreliable, then why are they

21     being advanced?

22          Why is the ultimate question not being answered?

23          MR. GUSTAFSON:  I think, Your Honor, the point that has

24     been made by all these social media posts is that this is an

25     important issue.  Florida is stepping up, assisting with a

App. 982

1    national problem.

2         THE COURT:  And that's fine.  And nobody here is taking

3    that issue on.  Whether or not immigration needs to be

4    addressed, those are all for another court and another time.

5    The only question is, why in the middle of the Everglades?

6         Why not tents at Krome?

7         Why not tends at TGK as we had during COVID?

8         Why not at an abandoned speedway?

9         Why the middle of the Everglades?

10        MR. GUSTAFSON:  That is an excellent question for

11   Florida.  This is Florida's decision.

12        THE COURT:  Well, they haven't answered it either.

13        MR. GUSTAFSON:  Well, I heard Florida's witness explain

14   that there is a benefit to having a remote location.  It's more

15   secure that way.

16        THE COURT:  No, I didn't hear that.

17        I heard that it was far removed as opposed to the four

18   or five other facilities which are clearly in populated areas,

19   but there has been no evidence as to why we have to have it in

20   the middle of the Everglades for carpenters and agricultural

21   workers and --

22        MR. GUSTAFSON:  There are all sorts of people from all

23   walks of life in that facility and there -- the evidence

24   demonstrates that there is a benefit to having an airport, an

25   airfield close by.

1          THE COURT:  But they are not going -- -- I mean,

2     they're just going -- they are going to Louisiana.  It's not as

3     if they're going to Guatemala or Mexico or anyplace else.

4     They're going to Louisiana.

5          We've got airports.  Florida is lousy with airports.

6     Why in the middle of the Everglades?

7          MR. GUSTAFSON:  Well, again, that is a question that

8     Florida made its decision on, and I think it is a question for

9     Florida to decide.  This is Florida's responsibility.  This is

10    their facility.

11         THE COURT:  So, you abdicate and have no role over the

12    facility, where it is, anything like that?

13         MR. GUSTAFSON:  That's right, Your Honor.

14         When the social media posts that the plaintiffs put up

15    refer to coordination, partnership, assistance.  These

16    demonstrate a general interest that the Federal Government has

17    in Florida's rising to the challenge to help deal with the

18    national problem and -- but this does not indicate federal

19    control.

20         Note that the plaintiffs have seemed to have walked

21    away from the hearsay evidence that they were previously

22    relying on, Representative Eskamani's erroneous statement in

23    her declaration that a state official said that the Federal

24    Government had requested this facility.  Note that she walked

25    back from that claim in cross-examination.  Instead, her

1  position was only that someone told her that the Federal

2  Government had requested a facility, and the third or fourth

3  level hearsay from an anonymous receptionist answering a public

4  phone number at the governor's office.

5      So, there really is no reliable evidence for the

6  plaintiffs' claim of federal control here of the construction

7  of a facility.

8      So, looking, again, at detention.  So, plaintiffs

9  allege that the State and Federal Defendants have undertaken a

10  partnership to detain.  And, again, I think the place to start

11  is the jurisdiction stripping provision which removes

12  discretionary detention-related questions, including the 287(g)

13  agreements from judicial review.  The APA likewise provides no

14  judicial review for agency actions committed to agency

15  discretion by law.

16      Second, those 287(g) agreements do not compel Florida

17  to detain aliens at all, much less to detain them in any

18  particular facility.  Those agreements confer enforcement

19  authority on state agencies, but they do not pertain to

20  individual facilities.

21      There is no 287(g) agreement, for example, for the

22  Orange County facility that you referenced.  287(g) agreements

23  involve ICE direction and supervision on questions of

24  immigration laws, as we discussed, but not control.

25      State officials retain authority to direct and support

1    their personnel in all respects not relating to that

2    immigration authority which is removed from judicial review.

3         THE COURT:  Except if they get sued, and then the

4    Federal Government is on the hook for that.

5         I need the 287(g) from yesterday.  If you're not aware

6    of that, Counsel, that's --

7         MR. GUSTAFSON:  I'll have to get back to you on that,

8    Your Honor.

9         THE COURT:  Okay.

10        MR. GUSTAFSON:  I'm not familiar with that particular

11   provision, I apologize.

12        THE COURT:  Under the Torts Claim Act, any lawsuit

13   brought against some state official under a 287(g) would be

14   defended by the Federal Government and the AG because they are

15   performing their duties under the supervision of the Attorney

16   General and the Federal Government.

17        MR. GUSTAFSON:  I see.  Thank you for the explanation,

18   Your Honor.

19        I would say that does not rise to the level of federal

20   control.  You know, it involves a relationship, again, a shared

21   responsibility relationship where the Federal Government, as

22   you described it, is taking on some of the risk that the State

23   would otherwise bear, but that does not indicate that the

24   states are giving up control over their facilities when they

25   entered into these 287(g) agreements.

App. 986

1        THE COURT:  So, let me ask you this:  So, I reference

2    the two AUSAs in Chicago that filed the pleading that this

3    facility would be funded by earmarked FEMA funds, which is

4    actually in this redacted e-mail.

5        So, what happens if everything goes steaming along and

6    this case is resolved and in six months et voilà, the check is

7    cut to the State of Florida.  Then do we resurrect these

8    claims?

9        MR. GUSTAFSON:  Then, presumably, the Federal

10   Government, before cutting that check, would initiate the

11   process of determining whether and how NEPA applies.  So, that

12   would be a different case from this one.  We are not in that

13   posture yet.

14       THE COURT:  So, you're saying that the Feds, the

15   Federal Government's obligation, in this scenario, would only

16   be precipitated by the actual cutting of the check, as it were?

17       MR. GUSTAFSON:  Correct, Your Honor, because -- and,

18   again, the South Florida Water Management District case is very

19   helpful on this point.  In that case, as here, there was what

20   the Court called a likely prospect of future federal funding,

21   and the Court held that that future, that prospect of future

22   federal funding was not sufficient to federalize the state

23   action.

24       THE COURT:  But this isn't a prospect.  This is a done

25   deal.  This is a you-can't-have-this-money, State of Illinois,

1    because we have given it to Florida.  I mean, that seems to me

2    to be fairly definitive, just when it's going to come into the

3    Florida coffers.  And, again, the now mistaken e-mail said it

4    was already sent, but that seems to me to be a fairly -- of all

5    the things I've heard, that's been the most definitive

6    statement as to the Federal Government's relationship to this.

7         MR. GUSTAFSON:  Which statement, Your Honor?

8         THE COURT:  That the funds have been earmarked in the

9    FEMA -- in the FEMA context, 600 something million, to come

10   here to defray or pay back the state for the --

11        MR. GUSTAFSON:  No final decisions have been made about

12   federal funding of this site.

13        THE COURT:  Okay.

14        MR. GUSTAFSON:  Florida, not the Federal Government,

15   ultimately controls who it will detain at this facility.

16   Florida has rejected some DHS detainees.  The Gadea-Guidicelli

17   declaration at paragraph 25 explains this, and Representative

18   Eskemani acknowledged that operation of a county jail doesn't

19   become a federal action even if, in her words, ICE required the

20   jail to detain unlawful immigrants.

21        Of course, ICE cannot require the jail to detain

22   unlawful immigrants, nor can ICE require this facility at issue

23   in this case to house unlawful immigrants.  But to the extent

24   that that happens, it does not federalize the facility.

25        THE COURT:  Well, you will agree with me, though, that

1    the -- that a county facility is for pretrial detainees who

2    have been accused of state crimes?

3          MR. GUSTAFSON:  Your Honor, I'd have to defer to

4    Florida on the ins and outs of Florida law, but that sounds

5    reasonable to me.

6          THE COURT:  Okay.  All right.

7          MR. GUSTAFSON:  Even if there were some federal final

8    agency action, it would not be a major federal action that

9    could trigger NEPA.  As amended in 2023, NEPA expressly

10   excludes non-federal action with minimal federal involvement

11   where the federal agency cannot control the outcome of the

12   project.  That's what we have here, a project driven by Florida

13   that the Federal Government cannot control.

14          It can't control the size of the facility.  It can't

15   control how many beds it has.  It can't control who it must

16   house.  It can't control when it will be built or who will

17   build it or what materials will be used to build it.

18          THE COURT:  You could say you wouldn't send people

19   there.  Correct?

20          I mean, that would be in the prerogative of the

21   executive, I do not want to send -- or Secretary Noem, I do not

22   want to send detainees to that facility.  That's entirely

23   within the Federal Government's prerogative.

24          MR. GUSTAFSON:  The scope of the 287(g) agreement is

25   within the Federal Government's prerogative.  It's

1   discretionary to the Federal Government, but the decision of

2   who to detain is Florida's decision, and Florida has exercised

3   that discretion to exclude classes of persons from the facility

4   and to make exceptions.

5        THE COURT:  Let's be clear.  Again, they're all federal

6   immigration detainees, all of them, and the only discretion

7   Florida has exercised is no women and children, no medically

8   compromised reasons, for obvious reasons.  They don't allow

9   that at FDC.

10       MR. GUSTAFSON:  I don't know, Your Honor, whether there

11  are other discretionary decisions that Florida has made.

12       THE COURT:  Okay.  We don't know on this record at

13  least.

14       MR. GUSTAFSON:  That's right, Your Honor.

15       THE COURT:  Okay.

16       MR. GUSTAFSON:  But looking, again, at major federal

17  action, financial assistance where the federal agency does not

18  exercise sufficient control and responsibility over the

19  subsequent use of such financial assistance or the effect of

20  the action, that is also an exception to the major federal

21  action definition under the 2023 amendments, another reason to

22  be cautious about how to understand anything in the record

23  about Florida's hopes for federal funding of this.

24       I'm going to turn to balance of equities and public

25  interest in the interest of time.  The alleged environmental

App. 990

1    harm in this case must be kept in perspective.  Florida's

2    facility is a temporary detention facility.

3         THE COURT:  How do I know that, and what does that

4    mean, temporary?

5         Director Kerner did not have insight into that.  I

6    didn't expect necessarily that he would.

7         MR. GUSTAFSON:  And I have no independent knowledge

8    other than how Florida has described this facility, Your Honor.

9         THE COURT:  Right.  So, there is nothing -- as I said

10   yesterday, I could call myself justice, but there is absolutely

11   nothing that would substantiate that to a reasonable person.

12        We have people saying the word but nothing to define

13   temporally what it means, like six months, eight months, a

14   year.

15        MR. GUSTAFSON:  I haven't heard a temporal limit to the

16   existence of the facility, but my point is, this is a

17   non-permanent facility.  It's built on an existing airfield

18   with its own buildings, lighting, paving and circling roads.

19        It's paved over land that's been previously filled and

20   leveled, and the State has described rigorous waste management

21   policy.  All of that I don't expect Your Honor to take to be

22   definitive, but it's relevant when considering the balance of

23   equities and the public interest at play here.

24        Even if one were to accept that plaintiffs' and

25   intervenor's alleged ecological and aesthetic interests are

1    both likely and irreparable, a balance of equities would still

2    favor Florida's facility.  The record reflects significant

3    public interest served by Florida's efforts.

4         Governor DeSantis declared the illegal immigration

5    crisis a statewide emergency.  DHS described the facility as

6    a force multiplier --

7         THE COURT:  He declared it two years ago.  Right?

8         So, two years ago and the suggestion was nothing

9    happened because the Federal Government wouldn't engage in the

10   287(g), which suggests the Federal Government runs the show.

11   Without the Federal Government feeding detainees into the

12   facility or signing the 287(g), there was nothing more that

13   Governor DeSantis could do other than recognize this decision.

14        But nobody here is quarreling with that as a concept.

15   What we want to know is why, why in the Everglades?

16        Why not adjacent to Krome, which already has a

17   facility?

18        Who told us why it had to be in the Everglades?

19        MR. GUSTAFSON:  I agree that's a relevant question for

20   Florida.  I think Florida has explained its choice here, but

21   that was a choice that Florida made based on the proximity to

22   an airfield, based on its remoteness and --

23        THE COURT:  As counsel for the Federal Government

24   arguing the balance of equities, why is remoteness important?

25        MR. GUSTAFSON:  Remoteness is relevant to the national

78

1    security and public safety interest at play here.

2          The record reflects --

3          THE COURT:  All of the facilities that exist are in

4    Homestead, Jacksonville, Boca Raton, and there is nothing to

5    indicate those facilities haven't operated appropriately.

6    There is a question of numbers.

7          MR. GUSTAFSON:  That's right, Your Honor.  There's

8    evidence that facilities are at capacity, that a new facility

9    relieves pressure on bed space in these other facilities.

10         THE COURT:  Yes, I agree.

11         MR. GUSTAFSON:  The record further -- DHS describes

12   this facility as a force multiplier for immigration

13   enforcement.

14         THE COURT:  What does that mean?

15         MR. GUSTAFSON:  Well, Your Honor, as the declaration

16   explains, this is the declaration of Santiago Fuentes, the

17   Federal Government is at capacity, and the additional bed space

18   that is made available by Florida's facility relieves pressure,

19   advances public safety by providing a place for these detainees

20   to be housed.

21         THE COURT:  Okay.  The force multiplier of bed space I

22   understand.  Why in the middle of a national preserve?

23         Why not at one of the many vacant commercial properties

24   in South Florida or North Florida or a decommissioned Air Force

25   Base.

1          MR. GUSTAFSON:  That is a question for Florida, but

2    relevant to the Florida's consideration of that I would suggest

3    is the former use of the airfield and the benefits of reducing

4    its use as an airfield and, you know, there are multiple

5    factors to be weighed here, even on the environmental front,

6    and this is something the federal government has not

7    undertaken.

8          This is a Florida facility and Florida has given good

9    reasons for its location of a facility where it chose to place

10   it.  The public interest in securing the southern border and

11   addressing unlawful immigration was decisively resolved at the

12   ballot box.

13         In electing Governor DeSantis and President Trump,

14   Floridians voted for an end to illegal immigration.

15         THE COURT:  Right.  And Governor DeSantis chastised his

16   legislature for not giving more money to preserving the

17   Everglades, and I think that also was part of the vote at the

18   ballot box.

19         Bringing me back again and again to my question, why

20   there?

21         MR. GUSTAFSON:  Well, no public interest, Your Honor,

22   is absolute.  So, any government --

23         THE COURT:  No public interest --

24         MR. GUSTAFSON:  Any government, State or Federal --

25         THE COURT:  -- is absolute, even the choice of where to

1     detain.

2          MR. GUSTAFSON:  Your Honor, the State is entitled to

3     weigh these considerations and -- pardon me just a moment.

4          The Tribe critiques the public interest here arguing

5     that it should have prioritized its ecological interest over

6     public safety or found an alternate site, but the public

7     interest is selected by the public's lawfully elected

8     representatives, and the Winter case is helpful in this regard.

9     The Winter court credited the ecological interests that were

10    threatened by the Navy's use of sonar.  It said those were

11    legitimate interest.

12         THE COURT:  But wasn't there an EA done there?

13         I mean, there were tests done there, and the Court said

14    this choice was necessary, but it was at the backdrop of many

15    EAs.  I don't know if this is there is any EIS, but there had

16    been a study of the area.

17         There has been no study here.  Isn't that the point of

18    all of this back and forth?

19         MR. GUSTAFSON:  Your Honor, there is no study here

20    because there is no federal action.

21         THE COURT:  Okay.

22         MR. GUSTAFSON:  Federal action is required.  It's a

23    necessary element in the decision whether to do a NEPA analysis

24    in the first place.

25         I mean, consider the question that we would confront if

1   we were initiating a NEPA analysis today.  We'd have to

2   understand what is the action that we are analyzing.

3          Is it the 287(g) agreement?  Is it the construction of

4   this facility?  Is it the detention of persons there?

5          All of those are, for the reasons I've expressed,

6   improper grounds for doing, for requiring a NEPA analysis.

7          In Winter the Court found that the balance of equities

8   tipped strongly in favor of the Navy, despite the valid

9   ecological interest.  The Court put the safety of the fleet

10  above an unknown number of marine mammals that the planning

11  study observed.  The balance should tip just as strongly in

12  favor of public safety here.

13         There are always alternatives.  The Navy could have

14  tested elsewhere.  It could have not tested.  It could have

15  done something else, but the Court recognized the Navy's

16  prerogative and the value of the public interest in national

17  security as overwhelming the other interest at play here.

18  Given the speculative nature of the environmental interest

19  identified in this case, the public safety interest clearly

20  outweighs them.

21         An injunction would harm the public interest in another

22  way, by weaponizing NEPA, a purely procedural statute.  Just

23  last term in a case called Seven County, the Supreme Court

24  issued what it calls a course correction to, quote, bring

25  judicial review under NEPA back in line with a statutory text

App. 996

1   and common sense.  The Court emphasized, NEPA status is a

2   purely procedural statute and said that Congress designed it to

3   help agencies and the public to understand whether an agency's

4   decision was reasonable and reasonably explained.

5       Of course, that presumes the existence of a final

6   federal agency action.

7       Congress did not design NEPA, the Court said, for

8   judges to hamstring new infrastructure and construction

9   project.  Thus, even when an agency has failed to comply with

10  NEPA, the Court said, that deficiency may not necessarily

11  require the Court to vacate the agency's ultimate approval of a

12  project, at least absent reason to believe the agency might

13  disapprove the project if it did more analysis.

14  THE COURT:  And you will agree, though, in Seven County

15  there was some review, some environmental review, and the

16  question was whether having done the environmental review, the

17  Court -- I think the language was, the Court could replace its

18  judgment with that of the agency, which, of course, is not

19  happening here because there has been no environmental review.

20  MR. GUSTAFSON:  And in this case the plaintiff said

21  that the agency didn't do an adequate NEPA analysis.

22  THE COURT:  Right, an adequate, but some analysis had

23  been done.  If I'm not remembering that case correctly, let me

24  know.

25  MR. GUSTAFSON:  You are correct, Your Honor.  Some

1  analysis had been done, and the plaintiff said it was

2  inadequate.  But by the same token, failure to do NEPA analysis

3  should not be enjoined, because there is no reason to believe

4  that DHS would not find the marginal environmental risks

5  outweigh the national security benefits of the project.

6      THE COURT:  I don't think the Court went so far as to

7  say, it's a foregone conclusion, so don't even bother to file

8  the lawsuit or engage the legislation.  And there is nothing

9  here that tells us that DHS would make such a pronouncement

10  because the Federal Government is giving $10 million to Western

11  Everglades Recovery Project, and you'd want to know that that's

12  money well spent.

13      MR. GUSTAFSON:  The cases are different, Your Honor.

14  They're in a different posture, but my point is that the Court

15  warns against the use of NEPA as a blunt and haphazard tool to

16  stop construction projects.

17      THE COURT:  Correct.

18      MR. GUSTAFSON:  That approach didn't survive the

19  Court's review in Seven County, and it shouldn't survive here.

20      Very briefly, I'd like to address venue.

21      THE COURT:  But you haven't -- I thought that the

22  Federal Defendants took no position as to venue.

23      MR. GUSTAFSON:  That's not correct, Your Honor.  We

24  argued venue.  We took the position that venue is improper in

25  this Court, and none of the relevant events and omissions the

84

1    plaintiffs have alleged occurred in the Southern District.  In

2    fact, this morning you heard plaintiffs can't even answer

3    whether Miami-Dade County would have had any information

4    relative to an environmental analysis of the project.

5         No activity occurred in the Southern District relevant

6    to this project.  Miami-Dade owned the property, but Florida

7    didn't need to go into Miami-Dade County to acquire title to

8    it.

9         The Harris County --

10        THE COURT:  But wouldn't they have had to go to

11   Miami-Dade -- I mean, you -- it strikes me as -- I'm not a

12   construction, but if you want to build on something, you want

13   to know any environmental study that's been there, the quality

14   of the airstrip, how long -- you want plans.  You want reports.

15   You want evidence, so that you can guide your whatever million

16   dollar investment.

17        Dade County is the owner.  Dade County would have that

18   information.  Dade County would be the person to go to.  Yes?

19        MR. GUSTAFSON:  Plaintiffs' response to that question

20   this morning was that Miami-Dade had no such evidence that they

21   are aware of.

22        THE COURT:  No, they said the plaintiffs weren't aware

23   of any evidence and that there is no evidence in this record.

24   To me that's a substantial omission.

25        MR. GUSTAFSON:  That's not how I understood their

1    response, Your Honor.

2            THE COURT:  Okay.

3            MR. GUSTAFSON:  If there are no further questions, then

4    I will conclude.

5            THE COURT:  Yes, please.

6            Thank you, Mr. Gustafson.

7            All right.  On behalf of the State, Mr. Panuccio.

8            MR. PANUCCIO:  Thank you, Your Honor.

9            In Winter versus Natural Resources Defense Council, the

10   Supreme Court explained, quote, a preliminary injunction is an

11   extraordinary remedy never awarded as of right, end quote.

12           Now that, I think, in modern litigation is not stressed

13   anymore, but preliminary relief is not the norm, and

14   government's carrying out their function should need to be

15   accorded latitude to do their work, especially in the areas of

16   law enforcement and international relations, both of which are

17   implicated by the detention and deportation of foreign

18   nationals illegally present in the United States.

19           To obtain the extraordinary remedy of preliminary

20   relief, the plaintiff has the heavy burden of making, quote, a

21   clear showing, this is from Winter, that he, or the plaintiffs,

22   are likely to succeed on the merits, that they are likely to

23   suffer irreparable harm in the absence of preliminary relief,

24   that the balance of the equities tips in the plaintiffs' favor

25   and that the injunction is in the public interest.

1    All of those words are important, Your Honor.  They are

2    all from Winter.  First, clear showing.  Clear showing, that is

3    a high bar, equivocal evidence, debatable evidence, speculative

4    evidence.  None of those are clear showing.

5    Two, the word likely -- what Winter said in a very

6    straightforward way, in multiple paragraphs, is that a showing

7    of only a possibility of success on the merits or a possibility

8    of harm is not enough, it must be likely for both.

9    The word preliminary, the harm must be attached to the

10   absence of immediate relief.  Harm that might occur years from

11   now is not enough.  Harm that might occur after the case is

12   concluded and fully litigated is not sufficient for a

13   preliminary injunction.

14   And finally, irreparable.  Temporary harm, fleeting

15   harm, reparable harm is not enough for a preliminary

16   injunction.  These are non-waivable requirements.  Each must be

17   cleared, and the burden is on the plaintiff to show them.

18   The absence of evidence in the record does not mean a

19   preliminary injunction should issue.  It means it should not

20   issue because plaintiffs didn't meet their burden.

21   Winter is binding on this Court, and as the Supreme

22   Court explained in that very case, failure to closely follow

23   these requirements in a NEPA action, is reversible error.

24   Plaintiffs have not met any of these requirements, and

25   I'll walk through each of them in turn.

1          Let me begin, Your Honor, with likelihood of success on

2     the merits.  First, and most importantly, plaintiffs have

3     utterly failed to make a clear showing that they are likely to

4     succeed on the merits of their claims against the State.

5          The Court heard multiple days of testimony from

6     plaintiffs' witnesses and received even more through exhibits

7     and declarations.  As long as that presentation was, Your

8     Honor, most of that presentation was aimed at harm, not the

9     actual merits and law of this case.

10         Now, there are many problems of harm evidence, and I'll

11    get to it towards the end of my presentation.  But the most

12    important problem with that evidence, again, is it doesn't

13    reach the merits of NEPA claims.

14         Plaintiffs have actually presented very little evidence

15    on the merits of their claims, and ask they cannot clear the

16    significant legal hurdles that bar their claim.

17         Let me begin, and I will be brief on this because we

18    had an argument on it, but I will start with venue because

19    that, of course, goes to likelihood of success on the merits.

20         So, the question is, have plaintiffs established venue.

21    They have not.  We renewed the arguments we made at the hearing

22    on venue and those are contained in our briefing, but I'd like

23    to add two additional points.

24         First, the additional evidence introduced during the

25    evidentiary hearing proves that no activity relevant to venue

1    is occurring in Miami-Dade County.  Mr. Gadea-Guidicelli,

2    averred that all relevant decisions and operations at or

3    relating to the detention facility occurred or are occurring on

4    site in Collier County or in Tallahassee.  But the Court

5    doesn't have to take our witnesses' word for it because

6    plaintiffs' own evidence makes this point.

7        Dr. McVoy testified that he likes to geolocate when he

8    goes on walks.  He uses his phone, and he puts up a map of his

9    geolocation.  We asked him about that.  We said where were you

10   at all these points when you visited the site.  All of those

11   points were in Collier County because all of the activity, the

12   whole facility is in Collier.

13       Plaintiffs' Exhibits 93 and 94 are site permits that

14   plaintiffs' witness Dillon Reio relied upon.  Those permits say

15   the location of the site is in Collier County, Florida.  So,

16   that leaves plaintiffs to rely on the assertion that at some

17   point in the distant future there might be an environmental

18   effect that flows out of Collier County and into this district.

19   That is not sufficient for venue, and indeed it would render

20   the venue statute all but meaningless, because the environment

21   is often interconnected sometimes hundreds of miles away.  You

22   don't have venue anywhere an environmental effect might flow.

23   And that is Jenkins Brick in the Eleventh Circuit, which we

24   cited in our briefing, and that expressly approved of the

25   Eighth Circuit case, Woodke versus Dahm, which said that a

1   wrongs effect and where it is felt is not the relevant act or

2   omission for venue purposes.  That's my quick point on venue.

3          My second final point on venue is that the Court, I

4   believe, in its TRO order made the point it has power to grant

5   preliminary relieve before making a venue determination.

6   Respectfully, I don't believe the case law supports that, Your

7   Honor.  I will cite a few case here, the Hendricks case out of

8   the 9th Circuit, 408 F.3d 1127 at 1135 states, "A district

9   court lacks authority to grant preliminary relief if venue is

10  improper."

11          Another case to the same effect is Procter & Gamble

12  versus Ranir, R-A-N-I-R.  That's 2017 WL 3537197 at star page

13  four, and a final case on that point is the Larsen case out of

14  the District of Nevada.  That's 2007, WL 81930 at star page

15  one.

16          Oh, I'm sorry, I guess I will give one more for the

17  benefit, District of New Jersey at U.S. Golf Association, 690

18  F.Supp 317, at 319.

19          And respectfully, the two cases cited by the Court in

20  its TRO order do not support granting a preliminary relief

21  without venue.  In one of the cases, Southern Visions, the

22  Court denied a preliminary injunction and then transferred it

23  and said it didn't have venue, but venue is a

24  defendant-protective concept, so denying a preliminary

25  injunction doesn't harm the defendant.

App. 1004

1        The other case was Arval Service, and in that case the

2    Court issued the preliminary injunction only because the

3    defendants conceded venue, and then the Court said, well, with

4    venue conceded I can move forward.

5        So, that's reason one, Your Honor.  It's an

6    insurmountable reason, we would submit, why plaintiffs have not

7    shown that they are likely to succeed on the merits, and the

8    Court should dismiss the case or transfer it to the Middle

9    District.

10       Aside from venue, let me move to the notion that even

11   if this Court did have venue -- I'm sorry, Your Honor, were you

12   going to say something?

13       THE COURT:  No.  No.  Was I reading and my lips were

14   moving at the same time?

15       MR. PANUCCIO:  You may have been, Your Honor.  I'm

16   sorry, I didn't know if I may have missed it because I was

17   looking down.

18       THE COURT:  I will keep it in mind.

19       MR. PANUCCIO:  Apologies.

20       Let's assume there is venue, we dispute that, but I

21   will move to the merits of the NEPA claim.

22       I said this before.  I said it at the TRO, so some of

23   this will be repetitive, but I'll put it in anyway.  NEPA

24   provides no private right of action in and of itself.  It must

25   be funneled through the APA.  Plaintiffs have conceded this in

1    their trial brief that they submitted, and I think in their

2    presentation today, that's why they are moving in both their

3    NEPA claim Count 1, and APA claim Count 2.  Count 1 cannot

4    travel alone.

5         THE COURT:  Right.

6         MR. PANUCCIO:  The APA does not apply to state

7    agencies.  That's the Doe case out of the Eleventh Circuit 261

8    F.3d 1037.  Thus, plaintiffs must identify to prevail, to be

9    likely to prevail on the merits, they must identify a final

10   federal agency action.  And as I said with the preliminary

11   injunction test, every word I just mentioned matters, final,

12   federal, and agency.

13        Plaintiffs -- I said this at the TRO, and I was hoping

14   to get some clarity.  I don't think we have.  Plaintiffs have

15   not been clear about exactly what they are identifying as the

16   federal action, but as then still true now, there remain only

17   three possibilities that they could point to.

18        Possibility one is federal funding.  Possibility two is

19   construction on the site, and possibility three is the decision

20   to detain or actual detention of persons at the site.

21        But the Court needs to analyze each of them

22   analytically, I think the Court needs to go through each of

23   them and say, is this a final federal agency action that is

24   cognizable in this court?

25        I get the sense that plaintiffs are somewhat relying on

App. 1006

1   just a gestalt that they want to invoke about what's happening

2   and what supports a NEPA claim.  That's not analytically

3   rigorous enough.  Each potential federal action needs to be

4   looked at.  So let me walk through each of those, Your Honor.

5       Let's start with funding.  Federal funding cannot

6   underlie a NEPA claim here because to date there has been no

7   federal funding for this site.  Now, that fact is averred to in

8   the Pruett declaration, the Richardson declaration, the

9   Gadea-Guidicelli declaration, and it is unrebutted.  In fact,

10  plaintiffs' own witness, Representative Eskemani, who said she

11  was testifying in her legislative capacity, with her

12  legislative knowledge, admitted that only state dollars have

13  been used to fund this facility.

14      Now, perhaps recognizing that fact at the TRO argument

15  counsel for plaintiffs said they're not relying on funding as

16  support for their NEPA claim.  But they've equivocated a bit on

17  that, and they have introduced hearsay statements from federal

18  officials about the possibility of federal reimbursement in the

19  future, in the future.

20      The Eleventh Circuit's holding on this is clear, and it

21  is binding.  Quote, the possibility that federal funding will

22  be provided in the future is not sufficient to federalize a

23  state project, even when such funding is likely, end quote.

24      And that's South Florida Water Management District 28

25  F.3d at 1573.  So that's --

1    THE COURT:  Do you do any federal -- well, do you know

2    what a NEBBIA hearing is?

3    MR. PANUCCIO:  NEBBIA?

4    THE COURT:  NEBBIA.

5    MR. PANUCCIO:  I'm not familiar with the shorthand,

6    Your Honor.  Perhaps --

7    THE COURT:  It's a hearing that is in criminal cases

8    where the government examines the money that's being put up for

9    a criminal defendants' bond, the idea being if that bond has to

10    mean you have some skin in the game.  If somebody is promising

11    to pay, you know, they will take care of it or it comes from

12    some, which is not the case here, it comes from some tainted

13    source.  But the idea is, you know, it's really you.

14    This is what I'm looking at here.  It's not the

15    possibility of funding.  Funding has been set aside.  It's

16    going to happen, so why -- when you talk about the gestalt, I

17    don't know why that, the rigorous analysis hasn't been brought

18    to that, why there hasn't been an acknowledgment.  Yes -- well,

19    there has been in Chicago, but, yes, this money is set aside.

20    It will go to the State of Florida for this facility.

21    MR. PANUCCIO:  I think there are multiple answers to

22    that, Your Honor.

23    THE COURT:  Okay.

24    MR. PANUCCIO:  First of all, again, I would just point

25    to the binding precedent, which is South Florida Water

App. 1008

1    Management District.  It says, even if the funding is likely,

2    that's not enough.  The funding has to flow.  Now, I should

3    say --

4        THE COURT:  Well, I'm making the distinction between

5    likely, and -- I think last week we talked about it -- and

6    there is a promise, there is a commitment, not like maybe but,

7    yes, this will happen.

8        MR. PANUCCIO:  Well, I don't -- this promise which I

9    don't concede has been made, I don't think it's the type of

10   promise where Florida can sue if the money doesn't flow.

11       As I understand it, there is an application process to

12   the Federal Government for reimbursement.  It is a funding

13   application.  The application must be submitted, approved, and

14   even then the money has to flow, and I guess I could say from

15   my own experience in government but also as a citizen, nothing

16   is certain in government until it happens.

17       And there is legally -- and, again, this is plaintiffs'

18   burden.  Plaintiffs haven't presented any evidence in this case

19   that says there has been federal funding or that federal

20   funding is legally guaranteed.  They've created -- they've put

21   statements of aspiration of federal officials, what federal

22   officials want to do, but there has been no formal process that

23   has been completed for that money, and at the end of the day if

24   that's the federal decision that they're pointing to, that is

25   nowhere near final agency action.

1      I don't know of any case where social media statements

2  or press conference statements of federal officials have been

3  held to be final federal agency action for a funding decision.

4  I believe there are levers of government, boxes that must be

5  checked, requirements that must be met legally before that

6  money can flow.

7      Again, the Court, for NEPA purposes, must have a final

8  federal agency action and funding just isn't that.  And, again,

9  at the TRO hearing, Mr. Schwiep said we are not relying on

10  federal funding as our action here.  I mean, I believe if we go

11  back and look at the transcript, he said that quite clearly,

12  and I think there is a reason they conceded that because they

13  know there has been no federal funding and their witness

14  conceded it.

15      So, Your Honor, if I may, I'd like to turn to the

16  second possibility.

17      THE COURT:  Yes.

18      MR. PANUCCIO:  So that's construction.  So, just to

19  recap, possibilities are funding, construction, or detention,

20  so I'm taking them in turn.

21      So, possibility two is construction.  Construction here

22  does not trigger NEPA because the evidence shows the decision

23  to construct this particular facility was planned, made,

24  executed and managed by Florida.  It was the State through FDEM

25  that commandeered the TNT Site under state emergency powers.

1    Mr. Gadea-Guidicelli averred that all construction

2    projects were paid for by the State, organized by the State,

3    and carried out by State contractors.

4    The Federal Government's witness, Mr. Fuentes,

5    explained that ICE did not designate or plan the site as a

6    detention facility, and ICE did not and has not ordered,

7    supervised, or directed the construction of the facility.

8    Now, that's the witnesses on our side, but the fact is

9    also backed by the plaintiffs' own evidence.  I would point the

10   Court to plaintiffs' exhibits 107 through 126.  These are

11   contracts for construction of the facility.  Every single one

12   of them is a contract executed by FDEM, not federal parties.

13   Representative Eskemani, again, purported to testify in

14   her legislative capacity as a state legislator, stated that no

15   federal funds were used to construct the facility.  She said,

16   quote, my understanding is right now it's state dollars being

17   expended, end quote.

18   THE COURT:  But she also asked Mr. Guthrie, and he told

19   her, but we're going -- we're going to get paid back because

20   then if not then the State of Florida with its budget, with its

21   commitment to Everglades restoration and all other state issues

22   said, we are giving a $245 million gift to the Federal

23   Government and we don't expect any reimbursement.

24   MR. PANUCCIO:  Well, again, expectations, likelihood,

25   promises are not enough under South Florida Water Management

1   District, but they are also not enough for finality, Your

2   Honor.  Even aside from the NEPA aspect of it, how much federal

3   involvement is there, the APA aspect of this is you must have

4   final federal agency action.

5        I would also note, just as an aside, the South Florida

6   Water Management District case did not say federal funding is

7   the be-all end-all.  Even federally funded products may not be

8   sufficient for NEPA.  Now, we're not there yet but perhaps six

9   months from now we will be having -- Your Honor had asked about

10  that.  My view on that question would be, we would have to see

11  whether NEPA would apply in that situation because the case law

12  says in some cases it could and in some cases it won't.

13       But let me just get back, because I'm focusing on

14  construction, and I guess I veered back to funding.  But

15  Representative Eskemani also admitted that although the Federal

16  Government inquired about additional detention capacity in

17  Florida, it did not request or direct the construction of this

18  specific site.  That was a State decision.

19       So, the decision to construct this detention facility

20  cannot be final federal agency action necessary for a NEPA

21  claim.

22       Now, in the TRO order, the Court stated there was,

23  quote, evidence that the facilities' construction was at the

24  request of DHS.  That was Docket Entry 104 at 11.

25  Respectfully, I think that's wrong factually, as we just

1    discussed, but it's also irrelevant legally.

2          Factually, let me just recap that, at most, the

3    evidence shows that a DHS official inquired whether Florida

4    could build, would build a facility, but it didn't request any

5    specific facility, and Florida made that choice.  One, to go

6    ahead and build it, and two, where to build it.  But let me

7    turn legally to the issue.

8          A request for voluntary action by the Federal

9    Government is not final federal agency action under the APA.

10   Final federal agency action must either, one, determine rights

11   or obligations, or, two, give rise to legal consequences.

12   That's the Bennett case, 520 U.S. at 177, 78.  It's also the

13   Hawkes case, 578 U.S. at 597, but it's also the standard, you

14   know, sort of the final agency action standard that's pretty

15   familiar in the law.

16         I note that my friend actually misstated that.  He just

17   said, I think something like for the second obligation,

18   something flows from it.  It's not something flows from it.

19   It's legal consequences flow, legal rights and obligations are

20   determined.  That's the standard, and a request from a federal

21   agency meets neither of those requirements.  Courts around the

22   country hold that voluntary requests are not final federal

23   agency action.

24         Again, South Florida Water Management District says

25   this.  At page 1572 it said, "The fact that proposals have been

App. 1013

1    made does not convert the proposed state measures into federal

2    responsibilities for NEPA purposes."

3          Another Eleventh Circuit case on this is Harbert,

4    H-A-R-B-E-R-T, 206 F.App'x at 908.  That case said,

5    "Obligations that are the result of voluntary actions, not the

6    result of binding agency action, are not the kind of legal

7    obligations with which the finality doctrine is concerned."

8          There are other similar cases in the DC circuit and the

9    Fourth Circuit, but I will suffice it to say that voluntary

10   action is not enough.  And, I should also note a voluntary

11   request does not trigger NEPA itself.  The impetus or even the

12   technical expertise for a project is insufficient under NEPA.

13   What matters is whether the Federal Government acts, not

14   whether a project was originally the federal Government's idea.

15         A site for this is National Organization for the Reform

16   of Marijuana, 545 F.Supp 981, at 984 and 85.  That's a DDC

17   case, a District of DC case, 1982, and it's actually quite on

18   point because on that case the Court held that although

19   spraying pesticides to kill marijuana crop was the Federal

20   Government's idea, there was no NEPA claim when Florida chose

21   to implement that idea.

22         Now, there has also been some suggestion that Florida's

23   choice to adhere to ICE's minimum standards for a detention

24   facility triggers NEPA.  That too is legally wrong.

25         First, NEPA relates to federal action, a federal

App. 1014

1  decision.  The decision to comply with a federal standard is a

2  state decision, not a federal decision.

3      Second, South Florida Water Management District says at

4  page 1573, "The rendering of federal advice and technical

5  consultation or to aid a project is not enough to trigger NEPA.

6  And if technical advice is not enough and consultation is not

7  enough, then the much more passive federal standards cannot be

8  enough."

9      And other cases make the same point, for example, the

10  Rattlesnake case in the Ninth Circuit, 509 F.3d at 1102 says,

11  "A local plan does not become a local federal action subject to

12  NEPA regulations merely upon its approval by a federal agency."

13      And the Atlanta Coalition case, 599 F.2d at 1345,

14  that's an Eleventh Circuit case, I believe.  It says, "The

15  adoption of certain federal standards and specifications cannot

16  transform a state or local project into a federal one."

17      Third, on this point, Your Honor, a State's decision to

18  adhere to federal standards logically cannot possibly trigger

19  NEPA because the consequences would be staggering.  Plaintiffs'

20  witness, again, Representative Eskemani, testified that the

21  Orlando jail was not a federal facility even though it holds

22  detainees under 287(g).  Likewise, Director Kerner explained

23  that every state and local jail in Florida abides by ICE's

24  minimum standards.  Nationwide, 822 law enforcement entities

25  have thus agreements and, thus, must have facilities that

1    comply.

2          If complying with ICE minimum standards alone made

3    state and local detention facilities federal, then nearly 1,000

4    state and local jails would require a NEPA analysis any time

5    they made a structural change to the facility.  And beyond

6    287(g), any state or local entity that a adhered to any federal

7    standard would thus become a project subject to NEPA, and that

8    is not what NEPA is, Your Honor.

9          THE COURT:  You are saying that the 287(g) doesn't make

10   a local jail federal, and they're saying that 287(g) doesn't

11   make a solely federal facility state because both extremes are

12   not viable under a reasonable application of the law.  Right?

13         Somewhere in the middle, somewhere in the middle with

14   appropriate reflection and reasonable answers would be the path

15   we would have to travel where we'd have that evidence, but,

16   yeah.

17         MR. PANUCCIO:  Let me make sure I understand.  I

18   understand your recap of what I said, and I agree with that.

19         THE COURT:  Okay.

20         MR. PANUCCIO:  I'm not sure I quite follow how the

21   Court has represented what they're saying, but let me see if I

22   can say something that will clear up my position at least.

23         THE COURT:  Okay.

24         MR. PANUCCIO:  The site, when it is built by a state,

25   whether it's mixed use or used solely for 287(g) purposes, is

1    still a state site.

2         The decision to detain, not to detain there, but the

3    individual, this person is going to be detained for immigration

4    violations and deportation, that's a federal decision, but that

5    does not transform a site that is state site owned by the

6    state, financed by the state, run by the state.  The detention

7    decision does not transform that site into a federal facility,

8    or more importantly, a final federal agency action.

9         THE COURT:  Right.  What makes that state a state

10   facility is the fact that it houses pretrial detainees who are

11   charged with state crimes in that facility.  That facility was

12   built for that, and that is what the majority of that facility

13   is.

14        This facility was not built for them, is not devoted to

15   that, has no relationship to state law, is entirely devoted to

16   a federal detainee populus.

17        MR. PANUCCIO:  I think that's where I depart with the

18   Court, respectfully, because at the end of the day if every

19   federal detainee left tomorrow, those soft-sided tents,

20   temporary bathrooms, fences, whatever was put up in recent

21   months are State property.  The State -- for example, there is

22   testimony that --

23        THE COURT:  Really, would there still be the emergency?

24        I thought the only reason it was State property is

25   because it was commandeered under emergency powers related to

App. 1017

1    the -- wait for it -- federal detainees.

2         MR. PANUCCIO:  Right.  May I just finish this other

3    point and then I will come back to that, Your Honor --

4         THE COURT:  Yes.

5         MR. PANUCCIO:  -- I just want to make this point before

6    I lose it.

7         Just follow my hypothetical, please.

8         If everyone left tomorrow, all the detainees left

9    tomorrow, it wouldn't be property of the Federal Government.  I

10   don't think they would say it is.  Those tents would be

11   property of someone else, not the Federal Government.

12        THE COURT:  And it wouldn't be the State's?  It would

13   be the gentleman over here.

14        MR. PANUCCIO:  I'm going to get to that.  Now, suppose

15   at the same time just days after that decision was made a

16   hurricane was coming, and we actually heard -- there is

17   testimony that that site has been considered as a staging area

18   for FDEM, that it can be used in a state of emergency,

19   commandeered by FDEM and used for a staging.

20        THE COURT:  For what?  No one ever explained that to me

21   because if you're in the middle of a hurricane, the last place

22   you want to be is a remote wetland.  My understanding of why it

23   was used for hurricane is if MIA was closed down and somebody

24   needed to land they could land there, not that they were going

25   to take people out there to either live or do anything else

1    because it was going to be flooded.

2         MR. PANUCCIO:  Well, it would all depend on where the

3    hurricane comes in and the path of it, and one of the reasons

4    they haven't used it as a hurricane in the past has just been

5    the past for our most recent history is the Gulf side.

6         THE COURT:  Right, coming across this way.

7         MR. PANUCCIO:  So, it would depend on what you have.

8    So what that facility could -- it is one of many places, but it

9    is a potential staging area for supplies, trucks, airplanes,

10   potentially people.

11        The only point I want to make, Your Honor, whether you

12   think it's sound hurricane policy or not, is if the State

13   tomorrow said, we don't want detainees here anymore, we're

14   switching it to hurricane use under a new emergency declaration

15   by the governor, the Federal Government would have no authority

16   to say, no, you're not.  That's a federal facility and you must

17   keep using it for detainees.

18        The State could say, it's ours.  We have a hurricane

19   coming, and we need to use it for that.

20        THE COURT:  Right.  But we wouldn't even -- but for the

21   nail the kingdom was lost, there wouldn't be 4,000 people

22   there.  There wouldn't be, you know, for some time, that nobody

23   will tell me what temporary means, trucks, vehicles.  It would

24   be an emergency with a lifespan of an emergency, and it

25   wouldn't be 4,000 permanent bodies with the accompanying waste

App. 1019

1    and water and laundry and whatnot.

2         MR. PANUCCIO:  Let me see if I can address that because

3    I know the Court has inquired about that.  I want to say two

4    things about that question.  One, I just want to make the point

5    that I was using that hypothetical just to make a point about

6    ownership and who did the construction and does it matter that

7    it is only federal detainees there for who owns it and who

8    constructed it.  And my hypothetical is, no, it doesn't, but to

9    the Court's questions about the temporary nature of this, my

10   response is state law governs the governor's ability to declare

11   emergencies.

12        I don't have the statute handy, Your Honor, but my

13   memory of it is there are requirements that the government must

14   meet to declare a state of emergency.  When he does, certain

15   powers are unlocked, mostly through FDEM but others as well.

16   It has to be renewed periodically.  Findings need to be made by

17   the governor.

18        So, by their nature, emergencies are temporary, and it

19   doesn't mean they can't be long.  They can last as long as the

20   governor makes the findings that are necessary, and that's

21   typical in our law, Your Honor, is that our executive officials

22   are charged because they are -- if we go back to the federalist

23   papers, the executive branch acts with agency and dispatch and

24   can meet emergencies.  That's precisely why legislatures

25   empower presidents and governors all over the country with

1   emergency power.  You can declare a state of emergency, make

2   the necessary findings, and then the state statutes vest the

3   government and agencies that answer to the governor with

4   emergency power.

5        So, I think my answer is the emergency lasts as long as

6   the state law allows it to last, Your Honor, and the governor

7   makes that finding.

8        Now, it's also quite possible a different governor will

9   make different findings, that happens, sometimes informed by

10  the electorate, sometimes informed by change in circumstances,

11  but that would be my answer to that question the Court has had.

12       THE COURT:  Okay.

13       MR. PANUCCIO:  Let me turn Your Honor to -- well, I've

14  lost track of time.  Do I still -- I have some more I'd like to

15  get through.

16       THE COURT:  You have about 20, 25 minutes.

17       MR. PANUCCIO:  Perfect.  I will endeavor to be done in

18  20, if I can.

19       THE COURT:  Okay.

20       MR. PANUCCIO:  So, I've gone through -- to recap, I've

21  said there is three possible final federal agency actions that

22  could be at issue.  We've discussed funding.  We've discussed

23  construction.  For reasons I've said, I don't think either of

24  them qualify, and I don't think plaintiffs have met their

25  burden to show likely success on those two things being final

1    federal action.

2          So, the third possibility is detention, Your Honor, and

3    there are five independently sufficient reasons why the

4    detention decision or the act of detention cannot be the basis

5    of their NEPA claim.  So, let me walk through each of those

6    five, Your Honor, as briefly as I can.

7          First, the -- if you look at the decision to detain at

8    a specific site, at this site, that's a state decision.  Every

9    witness with actual knowledge has said the same thing, that's a

10   state decision, Gadea-Guidicelli, Guiles, and Fuentes all say

11   the State of Florida decides ultimately if it will hold someone

12   there, take the detainee there, and it can reject any specific

13   detainee and it can reject classes of detainees.  And nothing

14   in the 287(g) agreement --

15         THE COURT:  But they're not -- nobody is picking these

16   people up just because they're undocumented because we were

17   trying to get Director Kerner to talk to us about that.  These

18   people are coming from other places, Krome, Boca, Baker, and

19   they have received or not immigration review, but it's not --

20   they're not just picking them up because they think they are

21   not here and undocumented.  They're coming from other

22   facilities is what I'm saying, and the State is making the

23   decision.  Under your theory, if Krome says, we've got X

24   people, the State says, we're not taking those women.  We'll

25   take those five guys.

1      MR. PANUCCIO:  I think that's right so far as I

2  understand it, Your Honor.  I guess I'm making the ultimate

3  point that, one, yes, the State has exercised its own

4  discretion to say we are not taking everyone you present.

5  There are whole classes of people we don't take and we reserve

6  the right on any individual to say no.

7      I believe they have said no when people have come and

8  fit into those classes they don't want to take.  So if you

9  classify or think about the detention decision as specific to

10  detain here, that's ultimately the State's call, yes or no on

11  the TNT Site.

12      And nothing in a 287(g) agreement overrides that.  A

13  287 doesn't require Florida to cooperate.  It allows Florida to

14  cooperate.  So, that's my first point, Your Honor, and I said I

15  have five.

16      Second, even if Florida is exercising federal power

17  when it decides where to detain, the APA turns on whether a

18  federal agency is making the decision not whether federal power

19  is being exercised.  And there is a few cases for this, Your

20  Honor.  The Lebron case, 513 U.S. at 392, and what Supreme

21  Court said there is, yes, Amtrak exercises federal power.

22      THE COURT:  Right.  It wasn't two governments.  It was

23  Amtrak and the Feds.

24      MR. PANUCCIO:  Oh, sure, but it's a government-created

25  corporation, and the Court said it's federal power.  It's not a

1    federal agency, and that's what the APA reaches.

2        You know, I guess another example, Your Honor, if I may

3    is, Federal District Court.  They exercise federal power, but

4    they are not federal agencies that are reached by the APA.  The

5    APA has a province, but it only goes that far.  It only goes so

6    far as it reaches and it reaches federal agencies.

7        Another case is the Ritter case, Your Honor.  This is a

8    Fourth Circuit case 33 F.3d at 327, and there the Circuit held

9    a local housing board administering a federal housing program,

10   so exercising that federal power, is not subject to the APA.

11       That's my second point, Your Honor.

12       My third point is if we expand beyond the decision of

13   where to detain.  So, I've said the decision where to detain is

14   safe.  So, if you just want to look at the decision to detain,

15   period, and I think Your Honor pointed to this where Your Honor

16   said, look, the decision of, is this person detainable and

17   should they be detained, that's a federal decision.  That's

18   something ICE decides.  Yes, that's true, Your Honor.

19       But the decision to detain generally, if that's what

20   this case comes down to, if that is the action, the final

21   federal agency action that plaintiffs say they are pointing to

22   and, by the way, I think they have said three or four times

23   it's not, that they don't want to rely on that.  There is a

24   reason they don't want to rely on that.  If that's what they

25   are relying upon, then this Court just does not have

1    jurisdiction over that decision, and let me go through two

2    statutes, Your Honor.

3         The first is 8 U.S.C. 1226.  1226(a) says the Federal

4    Government may detain an arrested alien pending removal.  Then

5    subsection 1226(e) says, the government's quote, discretionary

6    judgment regarding the application of this section shall not be

7    subject to review.  No court may set aside any action, any

8    action or decision under this section regarding the detention

9    of any alien, period.

10        So, I will just note that this particular statute was

11   not addressed in the TRO order, but I do think it is a

12   jurisdiction-stripping statute that is relevant here if

13   plaintiffs are relying on the decision to detain as the federal

14   action, the final federal action that they say triggers NEPA.

15        That's the first statute.

16        Let me turn to the second.  It's 8 U.S.C. 1252(f).

17   That statute states, no court, other than the Supreme Court,

18   shall have jurisdiction or authority to enjoin or restrain the

19   operation of the provisions of part four of this subchapter.

20        So, what's part four.  One thing in part four is

21   Section 1226, which authorizes detention.  So, Section 1252

22   withdraws the ability of a district court to restrain or enjoin

23   that decision.  The Supreme Court can do it, but not a district

24   court.

25        THE COURT:  So all ICE detention facilities are exempt

1    from NEPA?

2         MR. PANUCCIO:  The decision to detain, if that's what

3    they're challenging is there's no jurisdiction in this court to

4    restrain that decision.

5         So, if that is the decision that they are saying is the

6    basis -- if the -- pardon me.  Let me scratch that and go back.

7         If the final federal agency action that plaintiffs are

8    pointing to as the one that required NEPA review is detention,

9    then 1252(f) strips jurisdiction for consideration of that.

10        And I'd also like to point the Court to 1231(g).  That

11   is also in part four, and that's even more on point because it

12   grants the power, quote, to arrange for appropriate places of

13   detention for aliens detained pending removal or a decision on

14   removal, end quote.

15        So, again, the statute says no court shall have

16   jurisdiction to enjoin or restrain the operation of the

17   provisions of part four, and one of the provisions of part four

18   is arranging for appropriate places of detention.

19        Now, in the TRO order, the Court did address the

20   application of 1252(f), so I'd just like to try to meet that

21   analysis if I may, Your Honor, so it can be helpful to the

22   Court.

23        And I believe the Court's theory was plaintiffs do not

24   ask the Court to stop or suspend immigration enforcement or

25   detention and we actually heard that again.  Mr. Schwiep said

App. 1026

1    that again in his presentation today.

2              I have a few responses to that.  First, the question is

3    whether any federal decision triggers NEPA.  We've gone through

4    two that cannot trigger NEPA, funding and construction.  Those

5    are State decisions.  So all that's left is the decision to

6    detain.  So, I think that's, in fact, what they are

7    challenging.

8              So here I don't have to rely on logic, Your Honor.

9    Here is how I know that's what they're asking the Court to do.

10   They just asked the Court, that was the request of Mr. Schwiep

11   at the end of his presentation, and it's precisely the request

12   in the preliminary injunction motion and in the complaint.

13   Here is what it says.  This is Docket Entry 5, at page 14,

14   plaintiffs request that the Court, quote, restrain and enjoin

15   use of the TNT Site for purpose of immigration detention, the

16   same thing as at Docket Entry 1 at page 26 and it's almost as

17   if that request was draft crafted directly from the language of

18   1252(f), which says you cannot enjoin or restrain the

19   operations of part four, including detention.

20             So, I think that's precisely what plaintiffs are asking

21   the Court to do, and it's precisely what the statutes block the

22   Court from doing.  So, Your Honor, with that -- well, that's

23   only the third reason.  I have a fourth reason, a fourth and a

24   fifth reason why the detention decision can't trigger NEPA.

25             Even if the decision to detain at the site were a

1    federal decision and this Court were not stripped of

2    jurisdiction, the choice of where to detain would not be

3    subject to the APA because it is committed to agency discretion

4    by law, and a host of cases make this point, Your Honor.  We

5    have cited them in our briefing, but I will just give one, the

6    Jane case, 220 WL 10140953, at star one.

7         And my fifth reason, Your Honor, an individual decision

8    to detain is not a major federal action under NEPA, which

9    applies only to such major federal actions.  This is 42 U.S.C.

10   4336(e)(10)(B)(v), administrative, civil, or criminal

11   enforcement actions are definitionally not major federal

12   actions, and here detention is a civil enforcement matter.

13        So, for those five reasons, Your Honor, detention --

14   there are three possible final federal agency actions, funding,

15   construction, or detention.  For five different independently

16   sufficient reasons detention cannot be the basis for

17   plaintiffs' federal NEPA claims.

18        Let me turn to another one of the reasons Your Honor

19   where I know plaintiffs are not likely to succeed.  They have

20   to show they are likely to succeed on the merits, and this goes

21   back to what my colleague from the Federal Government,

22   Mr. Gustafson mentioned to the Court, which is the Seven County

23   case out of the Supreme Court, and what the Supreme Court said

24   there is that NEPA errors may not necessarily require a court

25   to vacate the agency's ultimate approval of a project, at least

1    absent reason to believe that the agency might disapprove the

2    project if it added more to the EIS.

3         So, in such cases, courts should remand back to the

4    agency to conduct a NEPA analysis without vacating the agency's

5    decision.  In other words, let me make sure I tie this out,

6    Your Honor.

7         THE COURT:  Wouldn't that be what I was doing?

8         I would be saying go do the EIS?

9         MR. PANUCCIO:  Right.  So, there is two ways a Court

10   could do that.  Way one is to set aside the decision or the

11   action and say don't continue in that action while you do the

12   EIS.  The other thing the Court could do is remand without

13   vacatur, and that's what the Supreme Court is saying in Seven

14   County.  So, the point I'm trying to make, Your Honor, is --

15        THE COURT:  What would that look like?

16        MR. PANUCCIO:  I'm sorry, go ahead.

17        THE COURT:  What would that look like?

18        MR. PANUCCIO:  What it would look like, the Court --

19   and the courts do this in APA cases sometimes.  Go do the EIS,

20   but you are not enjoined from continuing to do the thing you

21   are doing.  You just have to do the EIS.

22        The reason I'm making this point on the merits, Your

23   Honor, is, what the Court has to look at is at the end of the

24   case are plaintiffs likely to get their injunction.  So,

25   whether the Court would engage in remand with or without

1    vacatur is a merits question.

2         So, there are multiple reasons to think -- well, let me

3    step back.  What the Supreme Court said in Seven County is what

4    the Court needs to do in thinking about the remand without

5    vacatur question or with vacatur, is consider what is the

6    agency likely to do once it does the EIS.  And in this case, I

7    think, Your Honor, there is good evidence on the equities of

8    that.  One, if DHS was required to conduct an EIS it certainly

9    had reason to believe it wasn't because there was so much State

10   action.

11        So, this wasn't an egregious violation of, oh, we are

12   definitely required to do it and we are just not doing it.  We

13   are having this whole debate because we have, again,

14   uncertainty.  We think it's certain at State, but there is

15   uncertainty as to whether it's Federal.

16        Second, there is little reason to think that DHS will

17   reach a different result on remand given what it has said about

18   its view on immigration enforcement and the need for detention

19   facilities and easing the burden on federal detention

20   facilities.

21        THE COURT:  But don't I have to look at -- as you

22   pointed out earlier, the executive -- don't I have to look at

23   the executive as a whole, and the executive has committed

24   $10 million to Everglades restoration.  I would think a review

25   by DHS might yield, well, there might be a better way to

App. 1030

1  balance this such that that investment not only in money but in

2  the environment remains intact.

3       So, this isn't like Seven County or others where there

4  is no evidence that the executive has posited a very clear

5  interest in preserving the environment as it was before the

6  jetport.

7       MR. PANUCCIO:  Right, Your Honor.  So, this does bleed,

8  I guess, into the debate of where you think the harms comes

9  out.  But I think from DHS perspective, what they would likely

10  say is, one, we value very highly the ability to have extra

11  detention space, especially --

12       THE COURT:  And let me be clear, I don't gainsay that

13  at all.

14       MR. PANUCCIO:  No, I understand, Your Honor, and I

15  appreciate the Court saying that.

16       So, putting -- trying to get into the mind of DHS, what

17  they might say is this is important.  The facility is very

18  useful because it's a preexisting jetport, and in comparing the

19  potential harm we don't think the environmental harm is likely

20  that great especially compared to the baseline, because what

21  this was was an active jetport facility before all of the land

22  we have put the tents on and the paving was previously

23  disturbed land.  Nothing is new fresh wetlands or --

24       THE COURT:  Right, but that's -- the responsibility of

25  the court in a NEPA action, and let's be clear, is only to

App. 1031

1   guarantee that the agency, and I think the language made an

2   informed and rational decision.

3        So, DHS in the haste with which this is done, might

4   think, oh, well, it was already an active airport but that was

5   just people -- there weren't a thousand people there.  There

6   weren't trucks coming in and out.  There were just little

7   planes that were going to land.  They're learning how to fly,

8   and that is qualitatively, says the plaintiffs' expert, and

9   maybe DHS would, different from what's happening now.

10        So, I'm giving the benefit of the doubt that all of

11   that information wasn't available because the EIS wasn't done

12   and, therefore, the agency did not make an informed decision

13   about the equities.

14        MR. PANUCCIO:  So I'm going to turn to the equities in

15   full or the balancing of harms in just one moment, Your Honor.

16        Just to keep on remand with vacatur point, one thing

17   that is also to be considered is how would DHS balance the

18   disruption of stopping right now against continuing to go

19   forward right now while it finishes an EIS, and I think the

20   disruption of -- my guess is DHS would say closing this

21   facility, having to empty it out, find other space for these

22   people which we may not be able to do, so the alternative would

23   be release, is not viable to us.  This is an important national

24   priority, and our preference is to keep going if we are going

25   to complete an EIS.

App. 1032

1    And let me preface this by saying, I understand from

2    the Court's questioning of witnesses and comments to counsel,

3    you may disagree with me on this, I do want to try to make the

4    case on harm, except that --

5    THE COURT:  I'm testing.  I'm testing everybody's

6    theory.

7    MR. PANUCCIO:  Yes, I know, Your Honor.  I know you

8    are, Your Honor, and that's fine, but I do just want to get out

9    our position on this.

10    THE COURT:  Okay.

11    MR. PANUCCIO:  So, on harm -- our position is that

12    plaintiffs' claims of irreparable harm are quite speculative at

13    this point, and I want to go back to Winter.

14    At the end of the day, preliminary relief is absolutely

15    their burden.  Absence of evidence -- it's not the defendants'

16    obligation to come forward and say, here is what you're

17    missing, go evaluate it.  That's not how it works.

18    Remember, Winter was a NEPA case, and there is a whole

19    paragraph in NEPA where the Court goes through and says, you

20    know, there is a debate over the harm here, and you know, it

21    was not enough for the Ninth Circuit and the District Court to

22    say it's not possible.  The burden is you got to show it's

23    likely, not speculative, likely.  You have met that full

24    burden, and it's got to be a clear showing on top of that.  So,

25    both likely and clear.

App. 1033

1      And here is why -- and also irreparable, Your Honor, so

2  a tripartite showing, clear, irreparable, likely.  That's what

3  Winter says.  Our position is plaintiffs have not made that

4  tripartite showing on harm.

5      Neither of plaintiffs' experts, nor their fact

6  witnesses considered the environmental baseline in evaluating

7  the harm they say will come.  And the baseline, Your Honor --

8  just to be clear, there is the Kinnebrew declarations that came

9  in.  We both submitted Kinnebrew declarations.  They live

10 together.  They're not inconsistent with each other.  They are

11 just two different datasets, Your honor, and what Kinnebrew

12 said, was the second dataset uses something called Virtower

13 data.  That's V-I-R, Virtower, one word, and what Kinnebrew

14 says is, that's the most accurate data because that not only

15 tracks all landings and takeoffs but what they call touch and

16 goes, where you -- well, as it sounds, touch and go maybe

17 multiple times, but each one of those is still a landing and

18 takeoff.

19     Here is what that data shows, over six months,

20 including June and July where runway use went down to nothing

21 because it was being converted to a detention facility, but

22 even including those two dead months, if you will, from January

23 through July of this year, there were 28,000 separate flight

24 operations at that jetport.  This was no -- my friend

25 Mr. Schwiep said, he called it sleepy.

App. 1034

1      I think 28,000 flight operations is enough to wake

2 someone out of a comma, Your Honor.  That is a lot of airport

3 operations.

4      THE COURT:  Right.  But we are not talking, again,

5 about United flight 317 with 220 passengers.  We're talking

6 about people learning to fly planes.  They don't put them in

7 those big planes.  If they do, that business should be

8 de-licensed.

9      People learning, as you say, touch and go, I'm coming

10 in, I'm coming in, I'm nervous, up you go.  It's not the same

11 as an active La Guardia, MIA runway.

12      MR. PANUCCIO:  Well, let me speak to that, Your Honor

13 because, respectfully, I think I would disagree based on the

14 data.  So, 28,000 flights on average is about 140 flights a

15 day, and again, that's including the two dead months.  So, even

16 if we were only talking about little biplanes, that's a lot of

17 flights.  That's a lot of up and down.

18      I've been around small planes, Your Honor.  Those

19 propellers are quite loud, quite loud if you are close to them,

20 but we are not even really talking about that.

21      You may remember, one of plaintiffs' witnesses, and I'm

22 now forgetting but he showed a picture, and we said, what is

23 that in the picture there.  He said, that's a jet.  And I said

24 -- our cross was that's a large jet, and he said, yes, that's a

25 large jet.

App. 1035

1     And what does the data say about what's coming in and
2  out, yes, there are certainly those one or two-seaters coming
3  in and out.  But here is what's also coming in and out, Your
4  Honor.  Those 28,000 flights over six months, seven months,
5  included 4,500 multi-engine planes and 521 military planes.
6  They also included 199 military helicopters and 137 civilian
7  helicopters.

8     Now, I have never -- whatever the comparison is between
9  a two-seater biplane and a 737, in my life, I have never heard
10  a quiet helicopter, especially a quiet military helicopter.
11  Those are loud.  They are windy.  They are disruptive when they
12  land, and there was, you know, several hundred of them during
13  that period.

14     And Mr. Moore, we have a declaration from Mr. Moore, he
15  is an actual pilot who has used the airport many times.  He
16  averred that it was used by aircraft of all sizes, without any
17  noise abatement procedures whatsoever, unlike MIA, which has
18  multiple noise abatement procedures.

19     And it's undisputed, Your Honor, I think the Court even
20  said we can stipulate to it when I was questioning Ms. Samples
21  that, and she admitted, planes are loud, they are dirty, they
22  are disruptive to wildlife, they are bright and they disturb
23  animals.

24     Just some other things to note, Your Honor.  The
25  airport facility was already fenced, meaning it was not a

App. 1036

1   suitable habitat for animals that can't get through the fence

2   line and generally can't be on an active runway.

3        The facility was levelled long ago, and it featured a

4   two-mile long paved runway, meaning natural hydrology had

5   already changed from the original Everglades.  So, that's the

6   problem with baseline, Your Honor, and speculation of their

7   witnesses on harm.

8        But even if we assume a baseline, plaintiffs' harm

9   evidence is still speculative, not a clear showing of likely

10  harm.

11       Mr. Kautz testified that the combination of habitat

12  loss and global warning might harm panther populations by 2070,

13  but he did not study the relevant impacts this facility would

14  have.  Without study, the most he could say is this project

15  would have a small effect on any population level harm, and he

16  admitted he did not study whether this project would resolve in

17  any additional panther take above baseline.

18       Mr. Reio --

19       THE COURT:  I mean, doesn't that beg the question,

20  though, wouldn't an environmental challenge always lose if you

21  didn't have access to the site to study?  It's kind of a

22  self-perpetuating --

23       MR. PANUCCIO:  Well, I don't know, Your Honor.  I think

24  that Winters says the standard is in a NEPA case they need to

25  show likelihood of harm.  It cannot be assumed, and it cannot

App. 1037

1    just be possible.  So it's the plaintiffs' burden.

2         THE COURT:  Right.  They have to have some expert

3    testimony, something about what the habitat was, the light

4    pollution, and they have told us that.

5         MR. PANUCCIO:  Well, they have to have not some

6    testimony.  They have to have testimony that says it's likely

7    that harm will be irreparable.  And what I'm just trying to

8    show, Your Honor, is I don't think they've met that.  I don't

9    think they've met -- oh, and I'm sorry, irreparable before they

10   can get a permanent injunction and likely, because remember,

11   preliminary injunction isn't just you're entitled to

12   preliminary injunction because ten years from now there might

13   be harm.

14        It's, there will be harm that is so likely and so

15   serious now before you can get a final injunction that it

16   cannot be repaired, and it will happen presently, and I don't

17   think they have shown that, Your Honor.

18        Again, a lot of their projections are so far out in the

19   future that they have nothing to do with what will happen

20   between today and when this case will go to final judgment.

21        Another example of this is Mr. Reio.  He talked about a

22   hundred year 72-hour storm, and he opined such runoff might

23   increase PAH levels, but examined neither preexisting PAH

24   levels from runoff from operating the airport site, and he

25   didn't compare expected PAH production between airport and

1    detention facility uses.  So, again, it's speculation, Your

2    Honor.

3            Then finally, going back to my other point, all of

4    plaintiffs' evidence is quite long-tailed, meaning it's not

5    imminent.  To justify the preliminary injunction, the harm must

6    be imminent, not far off.

7            Finally, Your Honor, let me close with two points

8    because I realize I'm probably at or over maybe over my time,

9    but I'll be done very soon.

10           THE COURT:  That's all right.

11           MR. PANUCCIO:  But I will be done very soon.

12           So, balance of the equities, Winter, again, is

13    controlling here.  The Court held that district courts must

14    balance the competing claims of injury and must consider the

15    effect on each party.

16           On the potential harm to the Government, it's potential

17    harm to the government from a preliminary injunction, so what

18    would happen if the Court entered the preliminary injunction

19    that plaintiffs were requesting, two things would happen.

20           One, the government would have to empty the facility

21    now, and all people held there would have to be released and

22    other space would need to be found.  There is no evidence that

23    other space could be found.  In fact, what's likely to happen

24    is that individuals would have to be released, and that is

25    against the policy of the government right now, is that people

1    who are being detained are to be held until they're deported.

2         And on this question of whether that's a sufficient

3    government interest, I know the Court has said it's not

4    questioning that.  I do just want to read into the record what

5    the Supreme Court has said on this.

6         What the Supreme Court has said, quote -- this is

7    Demore v. Kim, 538 U.S. at 518 to 19, 2003-case, One of the

8    major causes of INS's failure to remove deportable criminal

9    aliens was the agency's failure to detain those aliens during

10   their deportation proceedings, end quote.

11        In other words, the Supreme Court -- it was referencing

12   a Congressional finding there, Your Honor, and what the Supreme

13   Court is saying the failure to be able to detain is serious and

14   has serious government interest to detain.

15        THE COURT:  But in that case the Supreme Court was

16   making a distinction between what constituted a situation where

17   there must be detention as opposed to those situations which

18   allowed for bond of some sort.  So, the Supreme Court, yes,

19   said what it did there, but it was also acknowledging that one

20   of the ways to handle the issue included persons like our

21   construction workers, our agricultural farm workers being

22   allowed to remain on the bond they were on when they came to

23   Immigration to renew their papers every year.

24        Isn't that the Demore case?

25        MR. PANUCCIO:  I don't remember all the details of

App. 1040

1    Demore, but what I would say, of course, is now we are

2    25ish years in the future, and the number of illegal aliens is

3    much, much higher.  We had multiple years of nonenforcement at

4    the border.  So, the Federal Government and the State

5    Government have declared and said, you know, our posture on

6    this has changed.  This is an emergency.

7          THE COURT:  But the law hasn't changed.  Congress

8    hasn't amended the INA about who is available to --

9          MR. PANUCCIO:  Yes.  But the decision makers who are in

10   the executive capacity and making these decisions about where

11   enforcement priorities are have said this is of the highest

12   order of priority right now.

13         Just another Supreme Court quote, Your Honor, quote,

14   the problems posed by illegal immigration from crime and safety

15   risk must not be underestimated.  That's the Arizona case, 567

16   U.S. at 2398.

17         And then finally, U.S. v. Texas.  This is 599 U.S. at

18   679, immigration enforcement implicates, quote, not only normal

19   domestic law enforcement priorities but also to foreign policy

20   objectives, end quote.

21         And the point I'm just making, Your Honor, is there are

22   serious equities on the government's side of this.  Governor

23   DeSantis has declared a state of emergency.  Those declarations

24   are in the record.

25         Both Kerner and Giles have testified to overcrowding

App. 1041

1    and the need for additional space and Your Honor has had some

2    questions about the importance of this facility, and let me

3    address that.

4         I believe what Director Kerner said was remoteness was

5    important for safety, but also an active available runway makes

6    this a very efficient process, a very safe process.  You have a

7    detention facility right next to a completely dedicated runway.

8         Now, I am sure that folks could quibble about that

9    policy choice, but I would say two things.  One, again,

10   plaintiffs' burden.  If plaintiffs want to say there are other

11   places you could get the same safety, the same efficiency, the

12   same, you know, solely dedicated runway.  It was not our burden

13   to come forward and say, here are all of the places where that

14   could also happen.  It was their burden to bring forward a

15   witness or evidence and say, here are other places that provide

16   everything you say you need.  They have not done that, Your

17   Honor.

18        THE COURT:  I understand their NEPA claim being cart

19   horse, that it was the defendants' obligation to ascertain

20   there are no other available alternatives that meet this,

21   therefore, we must go to the Everglades.

22        MR. PANUCCIO:  I understand the initial attractiveness

23   on that point, but I think we need to situate it in which

24   factor of a preliminary injunction we're talking about.

25        So, if they're saying on the merits, we had to do this,

1    again, we are on the merits of do you have final federal agency

2    action.  But if we're just balancing -- if we're in the harm,

3    at the end of the day, if they're going to show harm, they

4    can't just say, well, we could have known harm if you did the

5    NEPA but you didn't and therefore we get NEPA.

6         They have to say, here is the harm.  That is a Winter

7    factor and they have to bring the evidence forward.

8         THE COURT:  Okay.

9         MR. PANUCCIO:  Let me make -- I have my final point,

10   Your Honor, and it is very brief.  And that is if, and I don't

11   think the Court would do this, but if the Court enters a

12   preliminary injunction, I think it's fair to say that either

13   side may appeal this decision either way.

14        I would like to put forth now our request for a stay

15   pending appeal.  It's all of the same factors we just went

16   through, likelihood of success, irreparable harm.  I think my

17   argument would be much the same.  So, if the Court were to

18   issue a preliminary injunction, we would ask that the stay be

19   adjudicated in that same order, if possible, to streamline

20   things.  Although, let me wishcast, Your Honor, and say we hope

21   that eventuality doesn't come around because I think we have

22   shown there is no entitlement to a preliminary injunction.

23        THE COURT:  I'm not going to give -- I haven't even

24   decided this yet, so I won't give an advisory opinion.  But

25   should either side, I don't think they would, but if a stay is

App. 1043

1    requested, I would like that in writing.  But you can reference

2    all of the arguments that you have set forth here and in the

3    papers that you've submitted.

4         MR. PANUCCIO:  Great.

5         Thank you, Your Honor.  Thank you for your indulgence

6    on time.  I probably went over.  I appreciate you letting me

7    get through the whole presentation.

8         THE COURT:  All right.  But let's take -- since we are

9    going to hear a little further, let's just take a five-minute

10   break for everyone.

11        Are we still okay on --

12        MR. GUSTAFSON:  Your Honor, I just wanted to add that

13   the Federal Defendants join the State Defendants' request.

14        THE COURT:  But you're okay on time as far as travel?

15        MR. GUSTAFSON:  Yes, thank you.

16        (Recess.)

17        THE COURT:  All right.  Mr. Schwiep, are you doing

18   rebuttal for both the Tribe and the Friends?

19        MR. SCHWIEP:  No, Your Honor.  I will just have the

20   rebuttal for the plaintiffs Friends and Center for Biological

21   Diversity.  And then the Tribe lawyers will enter their own

22   rebuttal.

23        MR. AJIZIAN:  I have no more than two or three minutes.

24        THE COURT:  Okay.

25        Do you have two to three minutes, Mr. Schwiep, or more?

App. 1044

1    Why don't we have the Tribe go first.  I'm just looking

2    at time.  I'm trying to manage it as best I can, which thus far

3    hasn't been very good.

4    MR. AJIZIAN:  Thank you, Your Honor.

5    Before we can get to the screens, I can kind of take

6    this out of order.

7    The second point I was going to make, which I will do

8    first is you heard, apparently, the plaintiffs have not proved

9    irreparable harm.  I want to point out that in closing no one

10   mentioned that the Tribe failed to do anything or the Tribe's

11   witnesses didn't explain this, or that the Tribe's evidence was

12   speculative.

13   The evidence is clear that from the day the facility

14   started operating to today and every day that it remains open,

15   Tribal members will be barred from accessing their ancestral

16   homelands in Big Cypress and availing themselves of their

17   federal and statutory rights to do so.  That is harm to the

18   Tribe and its members.

19   The witnesses that you heard from yesterday,

20   Ms. Castaneda, Dr. Bozas were clear that the harm is also

21   flowing to the environment, and that those environmental harms

22   will, in turn, affect the Tribal members' rights to use and

23   access the land.

24   Let's pull up the document.

25   Your Honor has been asking about funding.  I'm not an

1    expert on the immigration analysis, it is admittedly not an

2    issue, but Your Honor keeps asking to about two attorneys in

3    Chicago and what they said.  The declaration of David

4    Richardson in this case, which is now on the record as part of

5    the parties agreement yesterday, my understanding it is it

6    answers the question here.

7         If you go to paragraph three, it should be at the top

8    of page two, "DHS/FEMA announced $600 million dollars in

9    federal funding for the detention support grant program.  The

10   DSGP will provide financial assistance through a federal award

11   to support sheltering of illegal aliens in a detention

12   environment and related activities to avoid overcrowding in

13   U.S. Customs and Border Protection short-term holding

14   facilities.

15        And what do you know, the only eligible applicant under

16   the DSGP is the Florida Division of Emergency Management.  So,

17   when it feels like a shell game and a hair-splitting exercise,

18   it is.

19        If this is allowed, effectively, the Federal Government

20   is laundering federal control or federal approval through a

21   grant program with only one applicant who's eligible to receive

22   the money.  And if that's allowed, then the APA is effectively

23   useless because you just put money in a grant program and you

24   let the State or whoever you want do the action and then there

25   is no consequences to the Federal Government.

1        So, respectfully, we submit that answers the financing

2   question and that's all we have for rebuttal.

3        Thank you, Your Honor.

4        THE COURT:  Thank you, sir.

5        Mr. Schwiep.

6        MR. SCHWIEP:  Thank you again, Your Honor, for your

7   time in this matter.  It's been a long day.  Everyone

8   appreciates the attention that you have given us and the time.

9        Let me just respond to the argument by both the Federal

10  and the State Defendant that there is no federal action here.

11       Mr. Gustafson argued, well, federal influence is not

12  sufficient.  What I would cite the Court to is the opinion that

13  you have already cited in the temporary restraining order, the

14  Goos case where the Court held that whether federal agency

15  exercises legal control over a non-federal action, that's the

16  touchstone for federal action under NEPA, Fund for Animals

17  versus Clark, that's 27 F.Supp 2d at 8.

18       It says, where the federal agency is intimately

19  involved in discussion and planning, in that case it was a

20  bison hunt, that's sufficient to trigger federal action.

21       Even though it's not the federal agency that undertakes

22  the action, even if it's not the federal agencies in this case

23  that built the facility, we acknowledge that.  It's not a

24  federal facility.  It is a federal -- Florida Division of

25  Emergency Management facility, but there can't be any serious

1    question, Your Honor.  They're asking you to suspend your

2    common sense and sense of belief to suggest that this facility

3    was built by the State of Florida for the State of Florida's

4    own purposes and just happened to be a facility that meets the

5    ICE standards and is now functioning as a single purpose entity

6    that does nothing else but provides immigration enforcement

7    detention.

8         It was built, this is the record evidence -- and in

9    listening to my colleague's argument, it struck me that it was

10   a great legal argument, but you've heard two days of evidence.

11   You have heard nine witnesses from the plaintiffs and the

12   intervenor plaintiffs and one witness from the defendants, and

13   the evidence, the evidence that we presented from witnesses

14   that were subject to cross-examination and from the defendants'

15   own words is that this was a facility that was requested by

16   ICE.  It was built and designed to meet ICE standards.  It is

17   compliant with ICE requirements.  ICE inspected it, that's

18   Plaintiffs' 135, to ensure that it complied with ICE standards.

19   ICE made a determination -- this is the federal action that

20   triggers NEPA, ICE made a determination that it complies with

21   ICE standards and, therefore, it is adequate to serve as a

22   federal detention facility for immigration violation and that

23   is the only purpose it exists.

24        So, the suggestion that the Division just happened to

25   do this without any federal involvement and it just by

1    coincidence meets ICE standards defies common sense, and it's

2    inconsistent with the actual evidence that you heard during the

3    course of this proceeding.  And just a couple of additional

4    cases, Fund for Animals versus Clark, if the agency is

5    intimately involved in discussion and planning, that's the

6    27 F.Supp case.

7         This is Scottsdale Mall versus Indiana 549 F.2d 484,

8    federal participation in programming, design, engineering,

9    that's sufficient to trigger NEPA.  That's what has occurred

10   here and, therefore, NEPA does apply.  This is federal action.

11        With respect to funding, in connection with

12   Mr. Gustafson's argument, he said, well, okay, the plaintiffs

13   introduced these social media posts, but those shouldn't be

14   taken seriously.  I would beg to differ, Your Honor, and

15   suggest that when the Secretary of the Department of Homeland

16   Security posts on need social media for all the world to see

17   what -- not the aspiration is, not a contingency plan, but she

18   posts that this will be funded.  There is no contingency to it.

19   It's a commitment that it will be funded by ICE, that she

20   should be taken seriously, as should the governor when he says

21   that it will be reimbursed by ICE, as should Director Guthrie,

22   who Representative Eskamani said in her experience has been

23   reliable and trustworthy.  She has dealt with him on other

24   occasions, and he told her it's going to be paid for by ICE.

25        So this isn't aspirational.  This isn't contingent.

 1    There is a commitment made by the Secretary to the world that

 2    it will be funded by ICE, it was built to meet ICE standards,

 3    it is compliant with ICE, and it serves one single function,

 4    and that is immigration detention, which as a matter of law is

 5    a federal function.

 6         That's why although the Division built it, the White

 7    House Policy Advisor on Homeland Security Stephen Miller wasn't

 8    wrong, and this is Plaintiffs' Exhibit 106, in describing it as

 9    an ICE facility because all it does is ICE services.

10         And, Your Honor, I will point out the 287(g) agreement,

11    and this is at Defendants' Exhibit -- State Defendant's

12    Exhibit 28, provides that individuals will be treated as being

13    in ICE custody even if in a state facility.  That's in the

14    287(g) agreement.

15         It goes on to say, and this is at page eight, that the

16    state law enforcement agency acting under 287(g) will be

17    considered acting under color of federal law.

18         So everything that is occurring there is under color of

19    federal law and the construction of the facility, and this is 8

20    U.S.C. Section 1103(a)(11)(B) was done by agreement between ICE

21    and the Division.

22         And that agreement is, again, evidence that was

23    presented to this Court during an evidentiary hearing that the

24    Secretary said it's in partnership, that she said this was

25    built to provide housing, bed space for ICE.

1            The Division said, and this is in exhibit -- it's

2     actually in evidence twice, Exhibit 43 and Exhibit 98, that's

3     the State Emergency Response Team's continuity of operations

4     document where they say this was requested by DHS, this

5     facility was requested by DHS.

6            So, I viewed State counsel's good argument as being

7     kind of divide and conquer.  So, instead of thinking about this

8     in terms of the totality and the reality of what's going on,

9     let's see if we can separate it out into five separate little

10    things and then suggest that none of those amount to federal

11    action.

12           And what I said with respect to funding when it came up

13    during the TRO argument is that you said funding is not the

14    sine qua non of federal action.  I said, Courts should look at

15    the totality of the circumstances to determine whether federal

16    action is involved, and I think when you look at Fund for

17    Animals versus Clark, the Goos case, Bitterman, South Florida

18    Water Management District, Your Honor, you'll conclude that

19    that's the right way to think of this, in the totality of the

20    circumstances does this action involve a federal action.  And

21    when you do that, there is no way of getting around the idea

22    that the Division built a facility for ICE that serves one

23    purpose, immigration detention, which is a federal function.

24           And you have held, so has the Federal Supreme Court,

25    and so, therefore, that's federal action.

App. 1051

1        In terms of substantial likelihood of success, there

2    has been zero NEPA compliance.  So, we're not in a Seven

3    County's world where we're thinking about whether the NEPA

4    analysis was sufficiently robust.  We're not thinking about

5    whether they evaluated all of the factors that they should have

6    under NEPA.  There is zero NEPA compliance, and step one in any

7    NEPA analysis is considering alternatives.

8        So, what's the record, and this relates, I think, to

9    the balance of harms argument on alternatives.  The defendants

10   presented none.  Mr. Kerner talked about sort of like

11   immigration problems generally, but never said anything about

12   why this facility in this location is necessary to meet the

13   immigration detention needs that the State or the Federal

14   Government have.

15       There wasn't any evidence that was presented to this

16   Court about why it was necessary to have this facility in that

17   location, as opposed to some other location.  And as Your Honor

18   rightly pointed out, there are lots of runways around the State

19   of Florida.  So, it's for the defendants under NEPA to evaluate

20   and consider alternatives that would achieve the objectives of

21   the project that might not pose the same environmental impacts

22   as the project itself.

23       So, we have presented evidence that the balance of

24   equities in this case favor an injunction because there is no

25   evidence on the other side that they will be harmed, that they

1    cannot fulfill these requirements in other places, and

2    meanwhile the environmental harm has been demonstrated.

3         And just to refer back for a moment, Your Honor, to

4    that continuity of operations plan, we put it in twice by

5    accident.  One of them is in color.  That's 98.  43 is black

6    and white, but it's a plan for what they would do in the event

7    of a hurricane or something.

8         And the State has no problem with planning out how

9    everyone at that facility in the event of a hurricane or some

10   other emergency could be readily accommodated in other space.

11   That's the point of that continuity of operations plan.  So,

12   for the defendants now to say, well, this would be extremely

13   disruptive, they already have the plan in place to move folks

14   into a different facility.  That already exists.  It's of

15   record.  It's been filed in this case.

16        In fairness, it's largely redacted which is, that's

17   fine.  It's appropriate.  The plan is, I suppose, somewhat

18   confidential but there is a plan that they have for how to do

19   that.

20        So, in terms of the balance of harms, they have a plan

21   in place to do that already.

22        We just briefly addressed the venue argument.  With

23   respect to the Federal Defendants' argument, we are not relying

24   on 1391(b), but we are relying on 1391(e)(1)(C) as against the

25   Federal Defendants, which grants venue if the plaintiff resides

1    in the district.  It has that carveout if it's a case where

2    real property interest are involved, we've argued that does not

3    apply here.

4         With regard to the State Defendant, I listened to the

5    presentation very carefully, one thing that was never addressed

6    was the waiver argument, which is, I think, where the Court

7    needs to start in considering the State's venue argument.

8         The rule isn't a three strikes you are out rule.  It's

9    a one strike you're out rule.  In this case, they had four

10   strikes.  That is, there were four different pleadings that

11   they submitted to this Court in this district never raising

12   venue until the point that the case was assigned to Your Honor

13   and then suddenly there was a venue objection, so it's been

14   waived.

15        In any event, on venue, in terms of substantial events

16   and omissions, what does the evidence show?

17        Mr. Panuccio talked about, well, Dr. McVoy had his

18   little blue trace line from when he was given a tour of the

19   facility.  Well, that's one piece of evidence, but more

20   important, Your Honor, is the substantial evidence of the

21   omissions of these defendants, which is part of our claim.

22   They didn't talk to Miami-Dade County, even though they

23   commandeered property that belongs to Miami-Dade County, a

24   third of which is within Miami-Dade County, and it will cause

25   impacts in Miami-Dade County, and that's in the record in the

1    mayor's letters saying this is going to cause a significant

2    impact on Miami-Dade County.

3            And you've got evidence of panther in Miami-Dade

4    County.  You've got evidence of surface water flows into

5    Miami-Dade County and Monroe County that came from Dr. McVoy as

6    well as Ms. Castaneda.  So there are substantial impacts and

7    substantial omissions in the Southern District of Florida to

8    give rise to venue here.

9            Let me look at my notes to see what I'm forgetting.

10           Respectfully, counsel's argument, this is counsel for

11   the State's argument, that you should predetermine what the

12   agencies would do after the NEPA process is concluded is

13   improper.  The whole point of NEPA is to permit a fulsome

14   assessment not only of impacts but of alternatives, and to

15   allow after those impacts are analyzed, informed

16   decision-making and to permit the agencies to decide whether to

17   go forward with an action after all the data has been

18   assembled, and this is in the Okeelanta case, Your Honor.

19           The noncompliance with NEPA's requirement is procedural

20   harm because we don't know what we don't know.  What would have

21   been evaluated, what would have been determined had the

22   agencies actually gone forward and conducted the analysis.

23   That is exactly what NEPA is designed to avoid.

24           It's not a ready, fire, aim approach.  You should

25   evaluate the impacts first.

App. 1055

 1          Let me address, briefly, the planes.

 2          You've heard a lot of discussions about the planes.

 3     What's interesting to me is, you've got two declarations from

 4     Mr. Kinnebrew, they are both dated the same day, and they can

 5     be reconciled.  I think they can be harmonized, in fairness,

 6     but what's interesting to me is you also heard from live

 7     witnesses who have spent a lot of time in that area and said,

 8     yeah, from time to time, we see a plane, but we didn't really

 9     notice it, it wasn't very active.

10          So what do the data show, and I spent too much time on

11     this, 80 percent of the flights are little planes, Cessna 152,

12     Cessna 150, Piper Warriors, Cirrus planes, and they would do

13     touch and goes.  So if you look at the Kinnebrew declaration

14     that we submitted, in 2023 it's like 1,700 flights.  And

15     flights is the wrong word to use because it's really counting

16     planes.

17          In 2025, because the County used a different system,

18     the Viratower system, if one plane came into the area and did

19     ten touch and goes, suddenly they would count that as 20

20     operations, and that's how you get to this wild number that the

21     State is relying on.

22          In fact, in terms of impacts on the ground, if you were

23     thinking about baseline, the only evidence you have had from

24     people that have spent a lot of time in the area is nobody

25     really noticed it.  So that's what the evidence shows about

App. 1056

1    planes.

2         But, beyond that, our irreparable harm argument isn't

3    about planes.  We presented evidence from a panther expert, not

4    about speculative conjectural harm, about the fact that this

5    activity at this site right now has displaced panther from

6    2,000 acres of habitat, and that that displacement will result

7    in intraspecific aggression because now panthers are going to

8    be huddled into a smaller area, and that's a problem, and it

9    also poses a risk of mortality from road impact.

10        That's not speculation.  That's evidence.

11        Dr. McVoy and Dillon Reio together, this isn't

12   speculation, documented 18 acres of new pavement with no storm

13   water management system that is experiencing storm water runoff

14   that will include, not speculation, to a degree of scientific

15   certainty, Mr. Reio, who is a professional geologist, testified

16   would include harmful contaminants.  It will flow into the

17   wetlands in the surrounding area and impact now, now the

18   environment.

19        So, our reparable harm argument isn't about

20   speculation.  It isn't about conjecture.  It's not likely.  It

21   is occurring right now with respect to panther, with respect to

22   wetlands, with respect to bonneted bats.

23        So, Your Honor, we don't at all apologize for

24   requesting a preliminary injunction.  We think it's the

25   appropriate place to go.  We've cited in our preliminary

1    pretrial hearing brief cases that, numerous cases that enter

2    injunctions, preliminary injunctions where there has been NEPA

3    compliance up to and until the defendants comply with NEPA.

4         That's the Save Greers case, 255 F.3d 498, from the

5    Eighth Circuit; the Hualapi Indian Tribe case, 755 F.Supp 3d,

6    1165.  Those cases are in our prehearing brief on that section.

7         So, what we would respectfully request is that the

8    Court maintain the TRO in place and also prohibit the

9    defendants, require the defendants to remove all fencing and

10   lighting from the facility, to remove all the waste, and to

11   then begin the process of winding down operations.  We would

12   request that occur within 14 days, that access to the site to

13   the Tribe, which will also then permit species to return, be

14   permitted.

15        So, just to make that a little more clear, to maintain

16   the TRO in place, remove the temporary fencing and lighting,

17   return access to the site to the Tribe and to species, and for

18   waste to be removed.

19        THE COURT:  Thank you, Mr. Schwiep.

20        MR. SCHWIEP:  Thank you, Your Honor.

21        THE COURT:  All right.  I'm not entering my order

22   today, and I appreciate all the time and effort of the parties

23   and their presentations, and I will be entering an order within

24   the time period of the TRO.

25        So, thank you all for being available, and I hope those

1   of you who have flights make it, and we are adjourned.

2            (Proceedings were concluded at 3:35 p.m.)

3

4

                   C E R T I F I C A T E
5

6

             I hereby certify that the foregoing is an
7
    accurate transcription of the proceedings in the
8
    above-entitled matter.
9

10

11
    August 18, 2025          /s/Patricia Diaz
12   DATE                     PATRICIA DIAZ, FCRR, RPR, FPR
                              Official Court Reporter
13                            United States District Court
                              400 North Miami Avenue, 11th Floor
14                            Miami, Florida 33128
                              (305) 523-5178
15

16

17

18

19

20

21

22

23

24

25

App. 1059

## $

**$10** [2] - 83:10, 115:24
**$11** [1] - 32:7
**$20** [5] - 41:5, 43:20, 44:10, 57:21, 57:25
**$245** [1] - 96:22
**$249** [1] - 53:24
**$600** [1] - 131:8

## '

**'80s** [1] - 37:19

## /

**/s/Patricia** [1] - 144:11

## 0

**025504** [1] - 2:24

## 1

**1** [10] - 1:8, 1:17, 8:24, 9:1, 11:4, 20:15, 39:20, 91:3, 112:16
**1,000** [2] - 31:17, 101:3
**1,200** [1] - 31:1
**1,700** [1] - 141:14
**10140953** [1] - 113:6
**1037** [1] - 91:8
**104** [1] - 97:24
**106** [3] - 20:24, 135:8
**107** [1] - 96:10
**10:00** [1] - 17:5
**10:30** [1] - 1:6
**11** [2] - 30:24, 97:24
**11-Mile** [1] - 35:6
**110** [1] - 13:11
**1101** [1] - 2:4
**1102** [1] - 100:10
**1103(a)(11)(b** [3] - 19:21, 21:14, 135:20
**1127** [1] - 89:8
**1135** [1] - 89:8
**1165** [1] - 143:6
**11th** [2] - 3:4, 144:13
**1200** [1] - 2:10
**1209** [1] - 41:12
**1226** [2] - 110:3, 110:21
**1226(a** [1] - 110:3
**1226(e** [1] - 110:5
**1231(g** [3] - 19:17, 19:18, 21:16
**1231(g)** [1] - 111:10

**1236** [1] - 14:2
**1251(f** [1] - 26:5
**1252** [1] - 110:21
**1252(f** [3] - 111:9, 111:20, 112:18
**1252(f)** [1] - 110:16
**1252(g** [2] - 26:5, 26:7
**126** [2] - 32:4, 96:10
**129** [1] - 23:15
**12:15** [1] - 31:17
**13** [1] - 1:5
**130** [1] - 23:15
**134** [1] - 12:24
**1345** [1] - 100:13
**135** [1] - 133:18
**1357(g** [1] - 64:15
**136** [1] - 30:22
**137** [1] - 121:6
**1391(b** [1] - 138:24
**1391(b)(2** [1] - 28:7
**1391(e)(1)(C** [2] - 26:23, 138:24
**1392** [1] - 28:7
**14** [2] - 112:13, 143:12
**140** [1] - 120:14
**144** [2] - 13:21, 14:8
**15** [3] - 8:9, 32:23, 62:16
**150** [3] - 2:21, 31:18, 141:12
**151291** [1] - 15:15
**152** [1] - 141:11
**153** [2] - 25:18, 25:20
**154** [1] - 25:21
**1572** [1] - 98:25
**1573** [2] - 92:25, 100:4
**1628** [1] - 27:19
**177** [1] - 98:12
**18** [2] - 142:12, 144:11
**19** [3] - 30:18, 62:16, 125:7
**1969** [1] - 10:17
**1970** [2] - 11:4, 17:22
**1974** [1] - 31:21
**1982** [1] - 99:17
**199** [1] - 121:6
**1:15** [1] - 59:15, 59:24

## 2

**2** [3] - 8:25, 9:1, 91:3
**2,000** [3] - 33:14, 34:8, 142:6
**20** [5] - 10:20, 54:7,

106:16, 106:18, 141:19
**200,000** [1] - 32:5
**20002** [1] - 2:21
**2003-case** [1] - 125:7
**2007** [1] - 89:14
**201** [1] - 1:20
**2016** [1] - 41:4
**2017** [1] - 89:12
**2019** [2] - 15:15, 15:16
**2023** [5] - 12:15, 57:4, 74:9, 75:21, 141:14
**2025** [4] - 1:5, 30:13, 141:17, 144:11
**20530** [1] - 2:19
**206** [1] - 99:4
**2070** [1] - 122:12
**21** [4] - 9:20, 30:13, 39:12, 40:15
**2155** [1] - 1:23
**22** [1] - 56:15
**22,000** [1] - 32:7
**220** [2] - 113:6, 120:5
**229** [1] - 33:20
**23** [1] - 52:7
**231** [1] - 33:20
**2398** [1] - 126:16
**25** [3] - 33:5, 73:17, 106:16
**25-22896-CV-KMW** [1] - 1:2
**25-CV-22896** [1] - 5:2
**250** [1] - 31:7
**255** [1] - 143:4
**25ish** [1] - 126:2
**26** [2] - 33:5, 112:16
**2601** [1] - 1:16
**261** [1] - 91:7
**27** [2] - 132:17, 134:6
**28** [3] - 23:21, 92:24, 135:12
**28,000** [4] - 119:23, 120:1, 120:14, 121:4
**287** [1] - 108:13
**287(g** [40] - 17:7, 17:9, 17:11, 17:12, 23:19, 23:21, 24:9, 24:11, 24:15, 24:17, 24:20, 24:25, 25:5, 25:11, 61:25, 64:13, 64:16, 66:21, 66:23, 70:12, 70:16, 70:21, 70:22, 71:5, 71:13, 71:25, 74:24, 77:10, 77:12, 81:3, 101:6, 101:9, 101:10, 101:25, 107:14,

108:12, 135:10, 135:14, 135:16
**287(g** [2] - 64:24, 100:22
**287(g)s** [1] - 24:1
**295** [1] - 41:12
**2d** [1] - 132:17

## 3

**30** [1] - 43:12
**305** [2] - 3:5, 144:14
**317** [2] - 89:18, 120:5
**319** [1] - 89:18
**327** [1] - 109:8
**33** [1] - 109:8
**33102** [1] - 2:25
**33128** [2] - 3:4, 144:14
**33131** [1] - 2:5
**33132** [1] - 2:15
**33133** [1] - 1:17
**33134** [1] - 1:24
**33301** [1] - 2:11
**33731-2155** [1] - 1:23
**349** [1] - 14:2
**35** [1] - 27:19
**3537197** [1] - 89:12
**39** [1] - 27:19
**392** [1] - 108:20
**3:35** [2] - 1:6, 144:2
**3A** [3] - 43:4, 45:12, 57:14
**3d** [1] - 143:5

## 4

**4** [3] - 2:15, 40:14, 46:18
**4,000** [2] - 104:21, 104:25
**4,500** [1] - 121:5
**40** [2] - 57:24, 58:1
**400** [2] - 3:3, 144:13
**401** [1] - 2:10
**408** [1] - 89:8
**41** [1] - 32:6
**42** [3] - 40:3, 40:5, 113:9
**43** [3] - 12:19, 136:2, 138:5
**4336** [6] - 40:2, 40:3, 40:5, 40:6
**4336(e)(10)(B)(v** [1] - 113:10
**44** [2] - 20:12, 20:19
**45** [3] - 7:11, 12:5
**45-minute** [1] - 59:16
**4500** [1] - 1:20
**484** [1] - 134:7

**498** [1] - 143:4

## 5

**5** [3] - 16:7, 39:14, 112:13
**509** [1] - 100:10
**513** [1] - 108:20
**518** [1] - 125:7
**52** [1] - 28:20
**520** [1] - 98:12
**521** [1] - 121:5
**523-5178** [2] - 3:5, 144:14
**538** [1] - 125:7
**545** [1] - 99:16
**549** [1] - 134:7
**555** [1] - 52:6
**56** [1] - 11:5
**567** [1] - 126:15
**578** [1] - 98:13
**597** [1] - 98:13
**599** [2] - 100:13, 126:17

## 6

**6** [4] - 12:14, 38:15, 44:16, 51:2
**600** [1] - 73:9
**679** [1] - 126:18
**690** [1] - 89:17
**6th** [2] - 13:11, 33:20

## 7

**7** [4] - 23:10, 29:25, 32:9, 52:7
**700** [1] - 2:4
**72-hour** [1] - 123:22
**737** [1] - 121:9
**755** [1] - 143:5
**78** [1] - 98:12
**79** [1] - 10:19

## 8

**8** [6] - 19:17, 64:14, 110:3, 110:16, 132:17, 135:19
**80** [2] - 45:2, 141:11
**800** [1] - 31:17
**81930** [1] - 89:14
**82** [1] - 30:14
**822** [1] - 100:24
**83** [1] - 35:3
**85** [1] - 99:16
**87** [1] - 28:23
**8th** [3] - 30:23, 31:3, 31:9

## 9

**9** [1] - 51:9
**908** [1] - 99:4
**93** [1] - 88:13
**94** [1] - 88:13
**950** [1] - 2:18
**98** [2] - 136:2, 138:5
**981** [1] - 99:16
**984** [1] - 99:16
**99** [1] - 2:15
**9th** [1] - 89:8

## A

**a.m** [3] - 1:6, 17:5, 31:17
**abandoned** [1] - 68:8
**abatement** [2] - 121:17, 121:18
**abdicate** [1] - 69:11
**abides** [1] - 100:23
**ability** [4] - 58:23, 105:10, 110:22, 116:10
**able** [4] - 19:5, 38:20, 117:22, 125:13
**above-entitled** [1] - 144:8
**absence** [4] - 85:23, 86:10, 86:18, 118:15
**absent** [2] - 82:12, 114:1
**absolute** [2] - 79:22, 79:25
**absolutely** [2] - 76:10, 118:14
**absurd** [2] - 31:25, 35:7
**abuse** [1] - 10:3
**AC** [2] - 54:19, 54:25
**accept** [1] - 76:24
**access** [13] - 42:2, 43:13, 48:25, 49:17, 49:25, 50:5, 50:13, 51:6, 122:21, 130:23, 143:12, 143:17
**accessible** [1] - 49:16
**accessing** [2] - 48:13, 130:15
**accident** [1] - 138:5
**accommodate** [1] - 59:17
**accommodated** [1] - 138:10
**accommodating** [2] - 8:15, 8:20
**accompanying** [1] - 104:25

**accomplishing** [1] - 57:5
**accord** [1] - 20:8
**accordance** [1] - 10:4
**accordant** [1] - 52:24
**accorded** [2] - 17:3, 85:15
**according** [2] - 20:5, 52:4
**accurate** [2] - 119:14, 144:7
**accused** [1] - 74:2
**achieve** [1] - 137:20
**achieved** [1] - 26:16
**acknowledge** [1] - 132:23
**acknowledged** [1] - 73:18
**acknowledging** [1] - 125:19
**acknowledgment** [1] - 93:18
**acquire** [1] - 84:7
**acres** [8] - 30:24, 31:8, 32:6, 33:14, 34:8, 43:12, 142:6, 142:12
**Act** [3] - 37:18, 64:11, 71:12
**act** [2] - 89:1, 107:4
**ACTING** [1] - 2:17
**acting** [4] - 25:2, 32:21, 135:16, 135:17
**action** [91] - 9:10, 9:11, 9:12, 9:25, 10:2, 11:15, 11:21, 19:15, 19:21, 20:10, 21:16, 25:11, 25:24, 40:21, 40:22, 41:8, 41:13, 55:10, 60:19, 60:25, 61:1, 61:8, 61:23, 65:6, 65:16, 66:11, 72:23, 73:19, 74:8, 74:10, 75:17, 75:20, 75:21, 80:20, 80:22, 81:2, 82:6, 86:23, 90:24, 91:10, 91:16, 91:23, 92:3, 94:25, 95:3, 95:8, 95:10, 97:4, 97:20, 98:8, 98:9, 98:10, 98:14, 98:23, 99:10, 99:25, 100:11, 102:8, 107:1, 109:20, 109:21, 110:7, 110:8, 110:14, 111:7, 113:8, 114:11, 115:10, 116:25, 128:2, 131:24, 132:10,

132:15, 132:16, 132:20, 132:22, 133:19, 134:10, 136:11, 136:14, 136:16, 136:20, 136:25, 140:17
**actionable** [1] - 10:1
**actions** [7] - 70:14, 99:5, 106:21, 113:9, 113:11, 113:12, 113:14
**active** [8] - 55:8, 55:14, 116:21, 117:4, 120:11, 122:2, 127:5, 141:9
**activities** [8] - 36:20, 48:17, 50:7, 58:24, 59:7, 63:2, 131:12
**activity** [16] - 11:22, 11:23, 34:9, 42:17, 42:24, 47:1, 50:21, 60:21, 61:10, 61:12, 61:16, 61:18, 84:5, 87:25, 88:11, 142:5
**acts** [2] - 99:13, 105:23
**actual** [13] - 11:23, 23:14, 52:12, 60:20, 61:8, 61:15, 66:9, 72:16, 87:9, 91:20, 107:9, 121:15, 134:2
**Adam** [2] - 6:15, 60:10
**ADAM** [1] - 2:16
**add** [2] - 87:23, 129:12
**added** [1] - 114:2
**addition** [1] - 47:24
**additional** [9] - 31:9, 43:12, 78:17, 87:23, 87:24, 97:16, 122:17, 127:1, 134:3
**address** [9] - 19:5, 26:17, 37:2, 37:3, 83:20, 105:2, 111:19, 127:3, 141:1
**addressed** [5] - 39:4, 68:4, 110:11, 138:22, 139:5
**addressing** [2] - 27:9, 79:11
**adequacy** [1] - 10:10
**adequate** [3] - 82:21, 82:22, 133:21
**adhere** [2] - 99:23, 100:18
**adhered** [1] - 101:6
**adjacent** [1] - 77:16
**adjourned** [1] - 144:1

**adjudicated** [1] - 128:19
**administering** [1] - 109:9
**administrative** [3] - 37:23, 45:1, 113:10
**admissible** [1] - 15:16
**admit** [1] - 53:15
**admitted** [9] - 12:5, 16:5, 17:14, 22:8, 35:2, 92:12, 97:15, 121:21, 122:16
**admittedly** [1] - 131:1
**adopt** [1] - 60:22
**adopted** [2] - 10:23, 26:19
**adoption** [1] - 100:15
**advanced** [2] - 47:4, 67:21
**advances** [1] - 78:19
**adversely** [1] - 30:11
**advice** [3] - 65:10, 100:4, 100:6
**advising** [1] - 62:14
**Advisor** [2] - 20:23, 135:7
**advisory** [1] - 128:24
**aesthetic** [3] - 30:5, 30:10, 76:25
**affect** [3] - 9:13, 58:8, 130:22
**affected** [2] - 9:15, 55:11
**affecting** [1] - 33:2
**affidavit** [1] - 56:10
**afternoon** [1] - 18:24
**AG** [1] - 71:14
**age** [1] - 10:19
**agencies** [17] - 17:8, 17:10, 32:20, 33:25, 61:11, 62:1, 66:24, 70:19, 82:3, 91:7, 106:3, 109:4, 109:6, 132:22, 140:12, 140:16, 140:22
**agency** [67] - 9:18, 10:2, 10:25, 11:17, 11:19, 11:22, 24:19, 24:24, 25:24, 39:17, 40:19, 41:15, 41:16, 41:18, 41:21, 42:8, 55:10, 60:19, 61:15, 63:14, 65:14, 70:14, 74:8, 74:11, 75:17, 82:6, 82:9, 82:12, 82:18, 82:21, 91:10, 91:12, 91:23, 94:25, 95:3, 95:8, 97:4,

97:20, 98:9, 98:10, 98:14, 98:21, 98:23, 99:6, 100:12, 102:8, 105:23, 106:21, 108:18, 109:1, 109:21, 111:7, 113:3, 113:14, 114:1, 114:4, 115:6, 117:1, 117:12, 128:1, 132:14, 132:18, 132:21, 134:4, 135:16
**agency's** [5] - 82:3, 82:11, 113:25, 114:4, 125:9
**aggression** [4] - 33:18, 34:7, 34:12, 142:7
**ago** [7] - 12:15, 23:10, 27:10, 44:8, 77:7, 77:8, 122:3
**agree** [9] - 11:14, 24:14, 35:11, 39:3, 73:25, 77:19, 78:10, 82:14, 101:18
**agreement** [26] - 17:12, 20:20, 21:13, 23:19, 23:21, 24:20, 24:25, 25:4, 25:5, 25:9, 60:25, 61:3, 64:13, 65:1, 65:7, 70:21, 74:24, 81:3, 107:14, 108:12, 131:5, 135:10, 135:14, 135:20, 135:22
**agreements** [15] - 12:17, 19:22, 24:15, 24:17, 25:11, 61:25, 64:16, 66:21, 66:23, 70:13, 70:16, 70:18, 70:22, 71:25, 100:25
**agricultural** [2] - 68:20, 125:21
**ahead** [2] - 98:6, 114:16
**aid** [1] - 100:5
**aim** [1] - 140:24
**aimed** [1] - 87:8
**Air** [1] - 78:24
**air** [1] - 54:15
**air-conditioning** [1] - 54:15
**aircraft** [1] - 121:16
**airfield** [5] - 68:25, 76:17, 77:22, 79:3, 79:4
**airplanes** [1] - 104:9
**airport** [7] - 68:24, 117:4, 120:2, 121:15, 121:25, 123:24,

123:25

**airports** [2] - 69:5

**airstrip** [2] - 12:9, 84:14

**Ajizian** [1] - 5:19

**AJIZIAN** [30] - 2:3, 2:3, 4:5, 4:8, 5:19, 7:6, 36:8, 36:18, 37:10, 37:16, 38:6, 38:10, 38:17, 38:24, 39:1, 39:4, 40:5, 46:2, 46:7, 46:11, 46:23, 48:22, 49:2, 49:11, 50:3, 53:12, 54:1, 55:13, 129:23, 130:4

**al** [4] - 1:4, 1:7, 5:3

**Alcatraz** [3] - 14:9, 35:25, 51:14

**alien** [2] - 110:4, 110:9

**aliens** [6] - 70:17, 111:13, 125:9, 126:2, 131:11

**alive** [1] - 47:10

**allege** [1] - 70:9

**alleged** [3] - 75:25, 76:25, 84:1

**allegedly** [1] - 13:15

**Alligator** [3] - 14:9, 35:25, 51:14

**allow** [3] - 21:11, 75:8, 140:15

**allowed** [6] - 16:24, 28:5, 125:18, 125:22, 131:19, 131:22

**allows** [2] - 106:6, 108:13

**almost** [2] - 41:4, 112:16

**alone** [2] - 91:4, 101:2

**alternate** [1] - 80:6

**alternative** [1] - 117:22

**alternatives** [11] - 9:12, 23:6, 35:16, 35:23, 42:8, 81:13, 127:20, 137:7, 137:9, 137:20, 140:14

**Amber** [2] - 30:1, 30:9

**amended** [2] - 74:9, 126:8

**amendments** [1] - 75:21

**amount** [5] - 18:3, 47:20, 51:15, 54:2, 136:10

**Amtrak** [2] - 108:21, 108:23

**Amy** [1] - 42:13

**analogous** [1] - 65:11

**analyses** [1] - 40:21

**analysis** [21] - 10:10, 52:20, 54:18, 55:4, 80:23, 81:1, 81:6, 82:13, 82:21, 82:22, 83:1, 83:2, 84:4, 93:17, 101:4, 111:21, 114:4, 131:1, 137:4, 137:7, 140:22

**analytically** [2] - 91:22, 92:2

**analyze** [1] - 91:21

**analyzed** [1] - 140:15

**analyzing** [1] - 81:2

**ancestral** [1] - 130:15

**anecdotes** [1] - 21:22

**animal** [1] - 43:8

**animals** [2] - 121:23, 122:1

**Animals** [4] - 12:1, 132:16, 134:4, 136:17

**announced** [1] - 131:8

**anonymous** [1] - 70:3

**answer** [12] - 15:5, 18:1, 18:15, 18:22, 19:12, 21:3, 22:22, 67:10, 84:2, 106:3, 106:5, 106:11

**answered** [4] - 19:3, 67:22, 68:12

**answering** [1] - 70:3

**answers** [4] - 93:21, 101:14, 131:6, 132:1

**anti** [2] - 22:20, 26:14

**anti-injunction** [1] - 26:14

**anti-submarine** [1] - 22:20

**anyplace** [1] - 69:3

**anyway** [2] - 17:3, 90:23

**APA** [20] - 9:2, 9:24, 10:1, 41:8, 41:9, 70:13, 90:25, 91:3, 91:6, 97:3, 98:9, 108:17, 109:1, 109:4, 109:5, 109:10, 113:3, 114:19, 131:22

**apologies** [1] - 90:19

**apologize** [2] - 71:11, 142:23

**appeal** [2] - 128:13,

128:15

**appearances** [1] - 5:4

**APPEARANCES** [1] - 1:13

**appearing** [1] - 5:16

**applicable** [1] - 57:9

**applicant** [2] - 131:15, 131:21

**application** [6] - 94:11, 94:13, 101:12, 110:6, 111:20

**applies** [4] - 17:9, 27:3, 72:11, 113:9

**apply** [9] - 11:16, 11:17, 26:9, 27:2, 60:17, 91:6, 97:11, 134:10, 139:3

**appreciate** [5] - 8:15, 36:13, 116:15, 129:6, 143:22

**appreciates** [1] - 132:8

**apprehension** [1] - 26:12

**approach** [3] - 27:23, 83:18, 140:24

**approached** [1] - 67:6

**appropriate** [10] - 19:18, 19:21, 21:10, 21:15, 64:2, 101:14, 111:12, 111:18, 138:17, 142:25

**appropriately** [1] - 78:5

**appropriating** [1] - 44:10

**approval** [5] - 61:23, 82:11, 100:12, 113:25, 131:20

**approve** [2] - 13:3, 13:4

**approved** [4] - 13:9, 66:17, 88:24, 94:13

**April** [1] - 12:10

**Arbitrary** [1] - 41:12

**arbitrary** [3] - 10:3, 10:5, 41:10

**area** [45] - 17:21, 22:21, 23:1, 30:10, 31:4, 31:6, 32:24, 33:11, 33:13, 33:16, 33:17, 34:3, 34:10, 34:18, 34:19, 35:9, 35:14, 35:24, 43:25, 44:3, 45:10, 47:10, 47:11, 47:12, 47:18, 48:1, 48:4, 48:5, 48:24, 49:14, 50:16,

50:21, 51:13, 57:2, 58:3, 58:23, 80:16, 103:17, 104:9, 141:7, 141:18, 141:24, 142:8, 142:17

**Area** [7] - 37:17, 37:18, 37:20, 43:4, 44:24, 45:12, 57:14

**areas** [5] - 48:2, 50:22, 56:21, 68:18, 85:15

**argued** [2] - 39:24, 61:1, 83:24, 132:11, 139:2

**arguing** [2] - 77:24, 80:4

**argument** [24] - 11:7, 11:10, 11:12, 17:13, 27:1, 32:19, 87:18, 92:14, 128:17, 132:9, 133:9, 133:10, 134:12, 136:6, 136:13, 137:9, 138:22, 138:23, 139:6, 139:7, 140:10, 140:11, 142:2, 142:19

**ARGUMENTS** [1] - 4:3

**arguments** [2] - 87:21, 129:2

**Arizona** [1] - 126:15

**Army** [8] - 10:6, 41:11, 45:25, 46:4, 46:13, 56:16, 57:19

**aromatic** [1] - 31:14

**arrange** [1] - 111:12

**arrangements** [1] - 19:18

**arranging** [1] - 111:18

**arrested** [1] - 110:4

**Article** [1] - 18:21

**articles** [1] - 23:16

**Arval** [1] - 90:1

**ascertain** [1] - 127:19

**aside** [10] - 10:2, 25:10, 47:6, 90:10, 93:15, 93:19, 97:2, 97:5, 110:7, 114:10

**aspect** [3] - 41:21, 97:2, 97:3

**asphalt** [1] - 43:12

**aspiration** [2] - 94:21, 134:17

**aspirational** [1] - 134:25

**assembled** [1] - 140:18

**assertion** [1] - 88:16

**assessed** [1] - 10:24

**assessment** [6] - 10:22, 16:25, 40:2, 42:7, 56:25, 140:14

**assessments** [1] - 47:5

**assigned** [1] - 139:12

**assistance** [5] - 40:23, 69:15, 75:17, 75:19, 131:10

**ASSISTANT** [1] - 2:17

**assistant** [1] - 13:1

**assisting** [1] - 67:25

**associated** [1] - 28:22

**Association** [1] - 89:17

**assume** [3] - 17:13, 90:20, 122:8

**assumed** [1] - 122:25

**assumptions** [1] - 52:20

**Atlanta** [1] - 100:13

**attached** [1] - 86:9

**attaches** [1] - 15:24

**attempts** [1] - 52:15

**attention** [3] - 41:15, 54:11, 132:8

**Attorney** [3] - 12:8, 67:5, 71:15

**ATTORNEY** [1] - 2:17

**attorney** [1] - 60:13

**ATTORNEY'S** [2] - 2:14, 2:24

**attorneys** [1] - 131:2

**attractiveness** [1] - 127:22

**August** [7] - 1:5, 13:11, 30:23, 31:3, 31:9, 33:20, 144:11

**AUSAs** [1] - 72:2

**authenticate** [1] - 16:9

**authorities** [1] - 62:22

**authority** [14] - 11:22, 61:11, 62:9, 64:5, 64:17, 65:15, 65:18, 66:25, 70:19, 70:25, 71:2, 89:9, 104:15, 110:18

**authorize** [1] - 66:22

**authorized** [1] - 66:17

**authorizes** [1] - 110:21

availability [1] - 36:11
available [8] - 22:10, 24:2, 78:18, 117:11, 126:8, 127:5, 127:20, 143:25
availing [1] - 130:16
Ave [1] - 2:18
Avenue [3] - 2:4, 3:3, 144:13
average [4] - 44:21, 51:13, 51:18, 120:14
averred [4] - 88:2, 92:7, 96:1, 121:16
aversion [1] - 50:16
avoid [3] - 33:14, 131:12, 140:23
avoided [1] - 47:2
award [1] - 131:10
awarded [1] - 85:11
aware [5] - 8:22, 41:7, 71:5, 84:21, 84:22

**B**

backdrop [1] - 80:14
backed [1] - 96:9
bad [1] - 22:10
Baker [1] - 107:18
balance [19] - 22:13, 22:17, 23:11, 39:7, 56:12, 75:24, 76:22, 77:1, 77:24, 81:7, 81:11, 85:24, 116:1, 117:17, 124:12, 124:14, 137:9, 137:23, 138:20
balancing [4] - 37:1, 52:2, 117:15, 128:2
ballot [2] - 79:12, 79:18
bar [4] - 26:10, 26:14, 86:3, 87:16
barred [1] - 130:15
barriers [1] - 48:12
Base [1] - 78:25
based [5] - 45:4, 56:3, 77:21, 77:22, 120:13
baseline [7] - 116:20, 119:6, 119:7, 122:6, 122:8, 122:17, 141:23
basis [1] - 107:4, 111:6, 113:16
bat [6] - 30:7, 34:24, 47:17, 47:21, 47:24, 51:12
bathrooms [1] -

102:20
bats [1] - 142:22
batting [1] - 39:2
battle [1] - 10:9
Bayshore [1] - 1:16
be-all [1] - 97:7
bear [1] - 71:23
bears [1] - 21:1
beauty [1] - 30:10
became [1] - 11:2
become [3] - 73:19, 100:11, 101:7
bed [5] - 20:13, 78:9, 78:17, 78:21, 135:25
beds [3] - 20:16, 54:24, 74:15
BEFORE [1] - 1:10
beg [2] - 122:19, 134:14
begin [3] - 87:1, 87:17, 143:11
beginning [3] - 15:10, 19:13, 50:4
behalf [11] - 5:7, 5:12, 5:16, 5:20, 5:23, 6:3, 6:8, 6:12, 8:12, 36:6, 85:7
belief [1] - 133:2
belong [1] - 61:22
belongs [1] - 139:23
below [3] - 45:19, 50:25, 51:18
bend [2] - 49:19
beneficial [1] - 59:21
benefit [4] - 68:14, 68:24, 89:17, 117:10
benefits [2] - 79:3, 83:5
BENNETT [2] - 1:22, 5:15
Bennett [3] - 5:16, 25:25, 98:12
best [2] - 59:17, 130:2
better [1] - 115:25
Betty [1] - 32:22
between [13] - 17:16, 19:24, 21:13, 23:20, 24:17, 46:13, 58:22, 94:4, 121:8, 123:20, 123:25, 125:16, 135:20
beyond [4] - 44:24, 101:5, 109:12, 142:2
bidirectional [2] - 35:4, 45:7
big [2] - 49:18, 120:7
Big [8] - 31:20, 32:24, 44:3, 48:15, 50:9, 50:13, 57:13,

130:16
billion [8] - 43:20, 44:10, 53:24, 56:18, 56:23, 57:21, 57:25, 58:1
billions [1] - 35:8
binding [6] - 41:12, 51:25, 86:21, 92:21, 93:25, 99:6
biodiversity [1] - 30:4
Biological [4] - 5:8, 5:16, 30:3, 129:20
BIOLOGICAL [1] - 1:22
biplane [1] - 121:9
biplanes [1] - 120:16
Biscayne [1] - 1:20
bisecting [2] - 51:1, 51:4
bison [1] - 132:20
bit [4] - 35:3, 52:3, 66:14, 92:16
Bitterman [2] - 12:1, 136:17
black [1] - 138:5
Blank [1] - 64:21
bleed [1] - 116:7
block [1] - 112:21
blood [1] - 58:25
blue [2] - 51:18, 139:18
blunt [1] - 83:15
blush [2] - 11:13, 20:6
board [1] - 109:9
Bob [1] - 61:22
Boca [2] - 78:4, 107:18
bodies [1] - 104:25
BOIES [1] - 2:9
boils [1] - 60:16
bond [4] - 93:9, 125:18, 125:22
bonneted [7] - 30:7, 34:24, 47:17, 47:21, 47:24, 51:12, 142:22
border [2] - 79:10, 126:4
Border [1] - 131:13
bother [1] - 83:7
bothered [1] - 58:13
bottom [1] - 51:6
Boulevard [1] - 1:20, 2:10
bound [1] - 23:24
Box [2] - 1:23, 2:24
box [2] - 79:12, 79:18
boxes [1] - 95:4

Bozas [13] - 33:21, 34:24, 42:13, 45:18, 47:8, 47:10, 48:11, 49:2, 50:12, 50:15, 50:24, 51:11, 130:20
Bozas' [1] - 48:23
branch [1] - 105:23
break [2] - 38:22, 129:10
Brick [2] - 28:12, 88:23
Brickell [1] - 2:4
brief [6] - 29:25, 87:17, 91:1, 128:10, 143:1, 143:6
briefing [3] - 87:22, 88:24, 113:5
briefly [6] - 29:16, 39:4, 83:20, 107:6, 138:22, 141:1
bright [1] - 121:22
bring [4] - 44:22, 81:24, 127:14, 128:7
bringing [1] - 79:19
brings [3] - 14:20, 21:17, 35:18
broad [1] - 9:10
brought [4] - 45:6, 45:13, 71:13, 93:17
Broward [1] - 45:19
buck [1] - 19:12
budget [1] - 96:20
build [17] - 10:18, 17:16, 19:25, 20:4, 21:14, 25:20, 34:22, 35:11, 41:25, 55:18, 74:17, 84:12, 98:4, 98:6
building [1] - 18:8
buildings [2] - 37:23, 76:18
built [21] - 13:15, 13:20, 14:16, 20:3, 20:9, 20:18, 31:2, 53:3, 74:16, 76:17, 101:24, 102:12, 102:14, 132:23, 133:3, 133:8, 133:16, 135:2, 135:6, 135:25, 136:22
burden [17] - 35:23, 52:24, 53:1, 53:3, 85:20, 86:17, 86:20, 94:18, 106:25, 115:19, 118:15, 118:22, 118:24, 123:1, 127:10, 127:12, 127:14
BURKHARDT [1] - 1:19

Burkhardt [1] - 5:13
BURLINGTON [2] - 1:15, 1:16
Burlington [2] - 5:9, 5:25
business [1] - 120:7
BY [1] - 3:1

**C**

C.F.C [1] - 14:2
canal [2] - 45:20, 57:13
cannot [21] - 14:1, 32:15, 51:22, 73:21, 74:11, 74:13, 87:15, 91:3, 92:5, 97:20, 100:7, 100:15, 100:18, 107:4, 112:4, 112:18, 113:16, 122:25, 123:16, 138:1
capable [1] - 24:19
capacity [8] - 12:22, 17:17, 78:8, 78:17, 92:11, 96:14, 97:16, 126:10
capricious [4] - 10:3, 10:5, 41:10, 41:13
card [1] - 28:4
care [1] - 93:11
carefully [2] - 54:13, 139:5
Carlos [1] - 6:22
CARLOS [1] - 2:14
carnival [1] - 50:19
carpenters [1] - 68:20
carried [1] - 96:3
carry [1] - 57:22
carry-on [1] - 57:22
carrying [1] - 85:14
cart [1] - 127:18
carved [1] - 37:21
carveout [3] - 27:1, 27:3, 139:1
CASE [1] - 1:2
case [108] - 5:2, 9:18, 10:8, 11:25, 12:6, 15:15, 18:19, 18:20, 18:21, 22:15, 22:17, 22:18, 23:25, 25:23, 27:3, 27:6, 27:20, 29:8, 29:10, 32:16, 36:4, 37:10, 39:18, 52:5, 60:16, 60:22, 60:24, 61:1, 63:7, 65:5, 65:6, 66:5, 66:6, 66:7, 72:6, 72:12, 72:18, 72:19, 73:23, 76:1, 80:8, 81:19,

81:23, 82:20, 82:23, 86:11, 86:22, 87:9, 88:25, 89:6, 89:7, 89:11, 89:13, 90:1, 90:8, 91:7, 93:12, 94:18, 95:1, 97:6, 97:11, 98:12, 98:13, 99:3, 99:4, 99:17, 99:18, 100:10, 100:13, 100:14, 108:20, 109:7, 109:8, 109:20, 113:6, 113:23, 114:24, 115:6, 118:4, 118:18, 122:24, 123:20, 125:15, 125:24, 126:15, 131:4, 132:14, 132:19, 132:22, 134:6, 136:17, 137:24, 138:15, 139:1, 139:9, 139:12, 140:18, 143:4, 143:5

**cases** [20] - 10:9, 27:2, 28:1, 29:25, 83:13, 89:19, 89:21, 93:7, 97:12, 99:8, 100:9, 108:19, 113:4, 114:3, 114:19, 134:4, 143:1, 143:6

**Castaneda** [19] - 29:4, 29:6, 30:17, 31:15, 41:2, 42:13, 42:25, 43:22, 44:6, 44:16, 45:3, 45:17, 45:24, 46:24, 54:8, 57:11, 130:20, 140:6

**categorical** [1] - 39:22, 39:23, 39:24

**caught** [1] - 26:13

**caused** [2] - 42:24, 59:2

**causes** [3] - 34:7, 43:7, 125:8

**causing** [3] - 42:21, 44:12, 59:7

**cautious** [1] - 75:22

**Cava** [1] - 28:24

**cease** [2] - 26:15, 53:20

**Center** [6] - 5:7, 5:16, 7:9, 30:2, 54:23, 129:20

**center** [17] - 11:8, 11:9, 18:8, 19:23, 21:14, 22:22, 25:5, 25:20, 35:11, 37:14, 37:24, 50:18, 55:18, 56:20, 56:24, 57:24, 58:2

**CENTER** [1] - 1:22

**Central** [1] - 57:23

**ceremonial** [2] - 48:19, 50:23

**ceremonials** [1] - 50:11

**certain** [5] - 58:10, 94:16, 100:15, 105:14, 115:14

**certainly** [3] - 7:21, 115:8, 121:2

**certainty** [1] - 142:15

**certified** [1] - 33:1

**certify** [1] - 144:6

**Cessna** [2] - 141:11, 141:12

**challenge** [2] - 69:17, 122:20

**challenging** [2] - 111:3, 112:7

**change** [2] - 101:5, 106:10

**changed** [4] - 44:11, 122:5, 126:6, 126:7

**characterization** [1] - 53:15

**characterizes** [1] - 54:4

**charge** [2] - 62:6, 62:7

**charged** [2] - 102:11, 105:22

**charges** [1] - 23:18

**charging** [1] - 62:19

**chart** [1] - 39:15

**chastised** [1] - 79:15

**check** [3] - 72:6, 72:10, 72:16

**checked** [1] - 95:5

**checkpoints** [1] - 48:13

**checks** [1] - 62:21

**Chicago** [3] - 72:2, 93:19, 131:3

**Chief** [1] - 66:18

**children** [1] - 75:7

**choice** [8] - 77:20, 77:21, 79:25, 80:14, 98:5, 99:23, 113:2, 127:9

**chose** [2] - 79:9, 99:20

**chosen** [1] - 61:5

**Chris** [1] - 5:19

**CHRISTOPHER** [3] - 2:3, 2:3, 2:23

**Christopher** [1] - 6:24

**circling** [1] - 76:18

**Circuit** [14] - 41:11,

61:6, 88:23, 88:25, 89:8, 91:7, 99:3, 99:9, 100:10, 100:14, 109:8, 118:21, 143:5

**circuit** [1] - 99:8

**Circuit's** [2] - 60:22, 92:20

**circumstances** [5] - 26:8, 64:2, 106:10, 136:15, 136:20

**Cirrus** [1] - 141:12

**cite** [3] - 29:25, 89:7, 132:12

**cited** [9] - 11:25, 37:19, 60:23, 61:9, 88:24, 89:19, 113:5, 132:13, 142:25

**citizen** [1] - 94:15

**citizens** [1] - 17:11

**civil** [2] - 113:10, 113:12

**civilian** [1] - 121:6

**claim** [17] - 9:1, 27:5, 69:25, 70:6, 87:16, 90:21, 91:3, 92:2, 92:6, 92:16, 97:21, 99:20, 107:5, 127:18, 139:21

**Claim** [1] - 71:12

**claims** [9] - 15:23, 17:12, 72:8, 87:4, 87:13, 87:15, 113:17, 118:12, 124:14

**clarify** [2] - 16:19, 67:14

**clarity** [1] - 91:14

**Clark** [4] - 12:2, 132:17, 134:4, 136:17

**classes** [4] - 75:3, 107:13, 108:5, 108:8

**classify** [1] - 108:9

**clear** [42] - 9:21, 16:1, 16:21, 21:12, 21:19, 26:11, 27:8, 28:21, 39:16, 40:8, 41:1, 46:23, 47:9, 51:21, 52:25, 53:14, 56:1, 56:14, 59:6, 64:20, 66:8, 75:5, 85:21, 86:2, 86:4, 87:3, 87:15, 91:15, 92:20, 101:22, 116:4, 116:12, 116:25, 118:24, 118:25, 119:2, 119:8, 122:9, 130:13, 130:20, 143:15

**cleared** [1] - 86:17

**clearly** [9] - 15:24, 19:23, 20:19, 25:14,

32:14, 57:6, 68:18, 81:19, 95:11

**close** [5] - 22:21, 55:24, 68:25, 120:19, 124:7

**closed** [1] - 103:23

**closely** [1] - 86:22

**CLOSING** [1] - 4:3

**closing** [3] - 52:4, 117:20, 130:9

**Club** [2] - 10:6, 41:11

**co** [1] - 61:20

**co-counsel** [1] - 61:20

**Coalition** [3] - 14:3, 100:13

**coffers** [1] - 73:3

**Coffey** [1] - 5:25

**COFFEY** [1] - 1:16

**cognizable** [1] - 91:24

**coincidence** [2] - 13:14, 134:1

**colleague** [1] - 113:21

**colleague's** [1] - 133:9

**colleagues** [3] - 8:18, 22:14, 36:11

**collect** [2] - 22:6, 50:23

**Collier** [7] - 17:12, 55:20, 88:4, 88:11, 88:12, 88:15, 88:18

**color** [5] - 25:3, 25:12, 135:17, 135:18, 138:5

**combination** [2] - 61:6, 122:11

**coming** [12] - 34:17, 103:16, 104:6, 104:19, 107:18, 107:21, 117:6, 120:19, 120:10, 121:1, 121:2, 121:3

**comma** [1] - 120:2

**command** [1] - 22:22

**commandeered** [4] - 95:25, 102:25, 103:19, 139:23

**commandeering** [1] - 28:18

**commence** [1] - 8:3

**comments** [1] - 118:2

**commercial** [1] - 78:23

**Commission** [1] - 33:12

**commitment** [4] -

94:6, 96:21, 134:19, 135:1

**committed** [3] - 70:14, 113:3, 115:23

**common** [3] - 82:1, 133:2, 134:1

**communications** [1] - 41:3

**community** [2] - 58:25, 65:23

**compare** [1] - 123:25

**compared** [1] - 116:20

**comparing** [1] - 116:18

**comparison** [1] - 121:8

**compel** [1] - 70:16

**compensated** [1] - 32:15

**competing** [1] - 124:14

**complaint** [1] - 112:12

**complete** [1] - 117:25

**completed** [1] - 94:23

**completely** [3] - 47:6, 49:15, 127:7

**compliance** [9] - 13:2, 14:17, 14:18, 26:16, 58:9, 61:4, 137:2, 137:6, 143:3

**compliant** [2] - 133:17, 135:3

**complied** [2] - 59:10, 133:18

**complies** [1] - 133:20

**comply** [8] - 9:22, 11:7, 13:15, 47:2, 82:9, 100:1, 101:1, 143:3

**complying** [3] - 10:13, 40:10, 101:2

**component** [2] - 52:23, 57:22

**Composite** [1] - 16:6

**Comprehensive** [1] - 56:18

**compromised** [1] - 75:8

**computer** [1] - 37:7

**concede** [1] - 94:9

**conceded** [6] - 6:12, 90:3, 90:4, 90:25, 95:12, 95:14

**concept** [2] - 77:14, 89:24

conception [1] - 43:21

concern [1] - 35:15
concerned [1] - 99:7
concerns [2] - 18:7, 38:5
conclude [5] - 27:11, 27:20, 34:22, 85:4, 136:18
concluded [4] - 65:14, 86:12, 140:12, 144:2
conclusion [2] - 13:25, 83:7
conclusions [1] - 21:10
concrete [1] - 26:2
conditioning [1] - 54:15
conduct [6] - 10:22, 13:3, 48:16, 50:11, 114:4, 115:8
conducted [2] - 51:8, 140:22
conducting [1] - 22:22
confer [3] - 29:2, 29:4, 70:18
conference [1] - 95:2
conferred [1] - 29:4
confidential [1] - 138:18
confirm [2] - 46:18, 64:15
confirmed [1] - 51:4
confirming [1] - 62:15
confront [1] - 80:25
confuse [2] - 67:13, 67:17
confused [3] - 16:3, 16:13, 16:14
Congress [4] - 41:16, 82:2, 82:7, 126:7
Congressional [2] - 63:11, 125:12
congressional [1] - 63:20
conjectural [1] - 142:4
conjecture [1] - 142:20
conjunction [1] - 40:17
connection [2] - 58:20, 134:11
connects [1] - 50:4
conquer [1] - 136:7
consent [1] - 61:4

consequence [1] - 34:9
consequences [6] - 9:10, 54:17, 98:11, 98:19, 100:19, 131:25
conservation [1] - 58:3
Conservation [3] - 43:4, 45:12, 57:14
consider [9] - 10:11, 40:20, 41:17, 41:21, 64:2, 80:25, 115:5, 124:14, 137:20
consideration [5] - 9:12, 42:5, 42:7, 79:2, 111:9
considerations [1] - 80:3
considered [8] - 23:7, 41:24, 56:2, 56:4, 103:17, 117:17, 119:6, 135:17
considering [3] - 76:22, 137:7, 139:7
consistent [4] - 13:6, 35:13, 35:14, 42:15
constituted [1] - 125:16
constitutes [3] - 51:21, 51:25, 61:11
construct [5] - 25:5, 66:20, 95:23, 96:15, 97:19
constructed [3] - 20:22, 66:19, 105:8
construction [31] - 11:8, 18:14, 19:22, 60:17, 63:1, 66:13, 66:15, 66:17, 66:22, 70:6, 81:3, 82:8, 83:16, 84:12, 91:19, 95:18, 95:19, 95:21, 96:1, 96:7, 96:11, 97:14, 97:17, 97:23, 105:6, 106:23, 112:4, 113:15, 125:21, 135:19
consult [1] - 9:23
consultation [12] - 9:15, 40:13, 41:4, 42:8, 46:20, 46:21, 57:15, 58:7, 58:11, 65:11, 100:5, 100:6
consultations [1] - 46:15
contact [1] - 34:11
contacted [2] - 12:8, 41:2
contain [1] - 31:12
contained [1] - 87:22

contaminants [3] - 31:13, 44:22, 142:16
context [4] - 15:11, 15:17, 65:13, 73:9
contingency [2] - 134:17, 134:18
contingent [1] - 134:25
continue [2] - 58:23, 114:11
continued [1] - 17:5
continuing [2] - 114:20, 117:18
Continuity [1] - 12:20
continuity [3] - 136:3, 138:4, 138:11
contract [3] - 25:18, 32:12, 96:12
contractor [2] - 25:19
contractors [2] - 31:17, 96:3
contracts [2] - 32:10, 96:11
contrary [1] - 62:24
control [24] - 11:23, 13:18, 25:1, 60:16, 60:20, 61:8, 61:15, 66:10, 67:1, 67:7, 69:19, 70:6, 70:24, 71:20, 71:24, 74:11, 74:13, 74:14, 74:15, 74:16, 75:18, 131:20, 132:15
controlled [1] - 60:18
controlling [1] - 124:13
controls [2] - 11:11, 73:15
convention [1] - 50:20
conversation [1] - 64:1
conversion [2] - 46:5, 46:8
convert [1] - 99:1
converted [1] - 119:21
cooperate [2] - 108:13, 108:14
cooperative [2] - 19:22, 21:13
coordinated [1] - 25:4
Coordination [1] - 40:15
coordination [3] - 20:18, 40:18, 69:15

core [3] - 48:1, 48:2, 52:23
corporation [2] - 46:1, 108:25
Corps [6] - 10:6, 41:11, 46:4, 46:13, 56:16, 57:19
correct [12] - 18:18, 24:16, 46:2, 63:16, 64:8, 64:23, 66:2, 72:17, 74:19, 82:25, 83:17, 83:23
corrected [1] - 63:17
correction [1] - 81:24
correctly [2] - 53:11, 82:23
correlation [2] - 22:23, 58:22
corroborated [2] - 31:15, 33:21
cost [4] - 32:6, 32:8, 57:24, 58:2
COSTELLO [2] - 2:9, 6:9
Costello [1] - 6:10
Council [3] - 37:14, 52:6, 85:9
Counsel [2] - 12:8, 71:6
counsel [8] - 5:4, 16:20, 24:6, 61:20, 77:23, 92:15, 118:2, 140:10
counsel's [2] - 136:6, 140:10
count [1] - 141:19
Count [6] - 8:25, 9:1, 91:3
counted [1] - 31:1
counting [1] - 141:15
country [2] - 98:22, 105:25
Counts [1] - 8:24
COUNTY [2] - 2:22, 2:24
county [3] - 26:21, 73:18, 74:1
County [47] - 6:25, 17:13, 18:17, 24:10, 28:23, 28:25, 29:3, 29:5, 29:8, 37:15, 37:16, 37:22, 44:25, 45:11, 45:16, 45:20, 55:20, 70:22, 81:23, 82:14, 83:19, 84:3, 84:7, 84:9, 84:17, 84:18, 88:1, 88:4, 88:11, 88:15, 88:18, 113:22, 114:14,

115:3, 116:3, 139:22, 139:23, 139:24, 139:25, 140:2, 140:4, 140:5, 141:17
County's [2] - 28:19, 137:3
couple [2] - 27:10, 134:3
course [9] - 7:22, 56:12, 73:21, 81:24, 82:5, 82:18, 87:19, 126:1, 134:3
COURT [169] - 1:1, 5:14, 5:18, 6:1, 6:6, 6:14, 6:19, 7:1, 7:7, 7:11, 7:18, 7:20, 7:24, 8:3, 8:7, 8:10, 16:3, 16:8, 16:12, 16:15, 16:22, 17:18, 17:25, 18:11, 18:16, 21:25, 22:21, 23:23, 24:5, 24:13, 29:18, 33:6, 33:8, 34:2, 34:16, 35:20, 36:5, 36:17, 37:5, 37:8, 37:11, 38:1, 38:8, 38:13, 38:16, 38:18, 38:21, 39:3, 40:4, 45:21, 46:3, 46:10, 46:22, 48:20, 48:23, 49:10, 50:2, 53:5, 53:18, 55:12, 59:12, 59:23, 60:3, 60:4, 60:6, 60:9, 60:12, 61:19, 62:4, 63:4, 63:18, 63:24, 64:4, 64:19, 65:2, 65:20, 67:10, 67:17, 68:2, 68:12, 68:16, 69:1, 69:11, 71:3, 71:9, 71:12, 72:1, 72:14, 72:24, 73:8, 73:13, 73:25, 74:6, 74:18, 75:5, 75:12, 75:15, 76:3, 76:9, 77:7, 77:23, 78:3, 78:10, 78:14, 78:21, 79:15, 79:23, 79:25, 80:12, 80:21, 82:14, 82:22, 83:6, 83:17, 83:21, 84:10, 84:22, 85:2, 85:5, 90:13, 90:18, 91:5, 93:1, 93:4, 93:7, 93:23, 94:4, 95:17, 96:18, 101:9, 101:19, 101:23, 102:9, 102:23, 103:4, 103:12, 103:20, 104:6, 104:20, 106:12, 106:16, 106:19, 107:15,

108:22, 110:25,
114:7, 114:15,
114:17, 115:21,
116:12, 116:24,
118:5, 118:10, 120:4,
122:19, 123:2,
124:10, 125:15,
126:7, 127:18, 128:8,
128:23, 129:8,
129:14, 129:17,
129:24, 132:4,
143:19, 143:21

**court** [17] - 10:2,
22:12, 22:16, 26:22,
67:12, 68:4, 80:9,
89:9, 91:24, 110:7,
110:17, 110:22,
110:24, 111:3,
111:15, 113:24,
116:25

**Court** [126] - 3:2, 3:3,
5:1, 8:11, 8:22, 9:19,
11:17, 15:11, 15:14,
15:16, 15:20, 18:20,
18:25, 21:2, 21:7,
21:9, 21:22, 22:15,
22:17, 23:3, 25:8,
26:8, 27:24, 29:10,
36:4, 36:10, 41:7,
55:9, 56:12, 61:17,
65:4, 65:14, 66:8,
66:9, 72:20, 72:21,
80:13, 81:7, 81:9,
81:15, 81:23, 82:1,
82:7, 82:10, 82:11,
82:17, 83:6, 83:14,
83:25, 85:10, 86:21,
86:22, 87:5, 88:4,
89:3, 89:19, 89:22,
90:2, 90:3, 90:8,
90:11, 91:21, 91:22,
95:7, 96:10, 97:22,
99:18, 101:21,
102:18, 105:3,
106:11, 108:21,
108:25, 109:3,
109:25, 110:17,
110:23, 111:10,
111:19, 111:22,
111:24, 112:9,
112:10, 112:14,
112:21, 112:22,
113:1, 113:22,
113:23, 114:9,
114:12, 114:13,
114:18, 114:23,
114:25, 115:3, 115:4,
116:15, 118:19,
118:21, 121:19,
124:13, 124:18,
125:3, 125:5, 125:6,

125:11, 125:13,
125:15, 125:18,
126:13, 128:11,
128:17, 132:12,
132:14, 135:23,
136:24, 137:16,
139:6, 139:11, 143:8,
144:12, 144:13

**Court's** [8] - 7:22,
41:14, 54:11, 59:20,
83:19, 105:9, 111:23,
118:2

**courthouse** [1] -
19:6

**COURTROOM** [1] -
5:2

**courtroom** [1] - 15:4

**Courts** [2] - 29:22,
136:14

**courts** [7] - 27:23,
28:11, 64:11, 98:21,
114:3, 114:19, 124:13

**COVID** [1] - 68:7

**crafted** [1] - 112:17

**crazy** [1] - 35:8

**created** [4] - 11:19,
31:21, 94:20, 108:24

**credence** [1] - 67:12

**credited** [1] - 80:9

**crime** [1] - 126:14

**crimes** [2] - 74:2,
102:11

**criminal** [6] - 23:17,
23:18, 93:7, 93:9,
113:10, 125:8

**crisis** [1] - 77:5

**critical** [4] - 18:22,
35:15, 47:15, 55:13

**critically** [2] - 17:14,
55:8

**criticized** [1] - 33:24

**critiques** [1] - 80:4

**Crooks** [2] - 30:1,
30:9

**crop** [1] - 99:19

**cross** [12] - 12:25,
14:23, 14:25, 15:8,
32:3, 32:11, 33:23,
63:7, 69:25, 120:24,
133:14

**cross-examination**
[5] - 12:25, 15:8,
33:23, 69:25, 133:14

**cross-examine** [1] -
14:25

**cross-examined** [1]
- 14:23

**cubs** [1] - 34:5

**cultural** [3] - 45:10,
50:16, 58:24

**culture** [1] - 58:20

**culverts** [1] - 35:5

**current** [1] - 43:1

**Curtis** [1] - 5:24

**custody** [1] - 135:13

**Customs** [1] -
131:13

**cut** [2] - 25:15, 72:7

**cutting** [2] - 72:10,
72:16

**Cypress** [8] - 31:21,
32:24, 44:3, 48:16,
50:9, 50:13, 57:13,
130:16

## D

**dab** [1] - 48:9

**Dade** [33] - 6:25,
17:25, 18:16, 28:22,
28:25, 29:3, 29:5,
29:8, 37:15, 37:16,
37:22, 44:25, 45:11,
45:16, 45:19, 45:20,
55:20, 84:3, 84:6,
84:7, 84:11, 84:17,
84:18, 84:20, 88:1,
139:22, 139:23,
139:24, 139:25,
140:2, 140:3, 140:5

**DADE** [2] - 2:22, 2:24

**Dahm** [1] - 88:25

**damages** [2] - 32:16,
51:22

**Daniel** [1] - 46:17

**Danielle** [1] - 28:24

**Dante** [1] - 6:11

**DANTE** [1] - 2:8

**dark** [1] - 33:1

**data** [14] - 15:22,
22:4, 22:8, 22:10,
23:4, 33:10, 33:25,
119:13, 119:14,
119:19, 120:14,
121:1, 140:17, 141:10

**database** [1] - 62:20

**dataset** [1] - 119:12

**datasets** [1] - 119:11

**DATE** [1] - 144:12

**date** [2] - 37:19, 92:6

**dated** [1] - 141:4

**DAVID** [1] - 2:9

**David** [3] - 6:9,
21:18, 131:3

**days** [10] - 12:4,
20:14, 42:1, 53:4,
53:15, 87:5, 103:15,
103:10, 143:12

**DC** [4] - 2:19, 2:21,
99:8, 99:17

**DDC** [1] - 99:16

**de** [2] - 20:20, 120:8

**DE** [1] - 27:19

**DE-5** [1] - 9:2

**de-licensed** [1] -
120:8

**dead** [2] - 119:22,
120:15

**deal** [3] - 22:16,
69:17, 72:25

**dealing** [1] - 64:16

**dealt** [2] - 26:6,
134:23

**death** [2] - 33:18,
34:14

**debatable** [1] - 86:3

**debate** [3] - 115:13,
116:8, 118:20

**decade** [2] - 56:18,
56:23

**December** [1] - 57:4

**decide** [2] - 69:9,
140:16

**decided** [2] - 10:25,
128:24

**decides** [4] - 58:7,
107:11, 108:17,
109:18

**deciding** [1] - 11:21

**decision** [69] - 9:25,
10:6, 10:21, 10:25,
14:2, 15:6, 15:14,
26:1, 26:4, 28:12,
41:15, 64:13, 64:14,
68:11, 69:8, 75:1,
75:2, 77:13, 80:23,
82:4, 91:19, 94:24,
95:3, 95:22, 97:18,
97:19, 100:1, 100:2,
100:17, 102:2, 102:4,
102:7, 103:15, 107:4,
107:7, 107:8, 107:10,
107:23, 108:9,
108:18, 109:12,
109:13, 109:14,
109:16, 109:17,
109:19, 110:1, 110:8,
110:13, 110:23,
111:2, 111:4, 111:5,
111:13, 112:3, 112:5,
112:24, 112:25,
113:1, 113:7, 114:5,
114:10, 117:2,
117:12, 126:9,
128:13, 140:16

**decision-making** [1]
- 140:16

**decisions** [6] -
64:12, 73:11, 75:11,
88:2, 112:5, 126:10

**decisively** [1] - 79:11

**declaration** [30] -
13:5, 14:22, 15:19,
15:20, 16:1, 16:5,
16:18, 16:23, 17:2,
17:4, 17:7, 31:16,
46:17, 46:19, 46:21,
53:12, 54:10, 56:11,
62:17, 69:23, 73:17,
78:15, 78:16, 92:8,
92:9, 104:14, 121:14,
131:3, 141:13

**declarations** [11] -
14:23, 15:1, 15:12,
15:13, 15:16, 87:7,
119:8, 119:9, 126:23,
141:3

**declare** [3] - 105:10,
105:14, 106:1

**declared** [5] - 23:9,
77:4, 77:7, 126:5,
126:23

**declares** [1] - 12:15

**decommissioned** [1]
- 78:24

**decrease** [1] - 43:7

**dedicated** [3] - 30:3,
127:7, 127:12

**deem** [1] - 21:10

**Defendant** [5] - 7:12,
27:15, 132:10, 139:4

**DEFENDANT** [2] -
2:6, 2:22

**defendant** [5] - 12:6,
52:21, 52:24, 89:24,
89:25

**Defendant's** [1] -
135:11

**defendant-
protective** [1] - 89:24

**defendants** [26] -
1:8, 6:3, 11:6, 13:13,
21:1, 22:9, 24:6, 26:6,
26:18, 26:22, 29:14,
39:23, 40:9, 52:5,
53:1, 55:6, 57:19,
90:3, 133:12, 137:9,
137:19, 138:12,
139:21, 143:3, 143:9

**Defendants** [16] -
6:16, 6:18, 6:21, 6:23,
9:3, 21:18, 27:7, 27:8,
28:6, 28:10, 60:11,
66:16, 70:9, 83:22,
129:13, 138:25

**DEFENDANTS** [1] -
2:12

**Defendants'** [3] -
129:13, 135:11,
138:23

defendants' [10] - 14:16, 14:20, 14:25, 15:2, 23:11, 25:15, 93:9, 118:15, 127:19, 133:14

defended [1] - 71:14

defense [4] - 11:6, 19:15, 52:4, 60:7

Defense [2] - 52:6, 85:9

defensive [1] - 28:1

defer [1] - 74:3

deficiency [1] - 82:10

defies [1] - 134:1

define [1] - 76:12

defines [1] - 32:15

definitely [2] - 45:18, 115:12

definition [3] - 39:20, 56:7, 75:21

definitionally [1] - 113:11

definitive [3] - 73:2, 73:5, 76:22

defray [1] - 73:10

degree [2] - 61:13, 142:14

delegate [1] - 66:25

delegation [1] - 64:18

demarcation [1] - 45:19

demonstrate [1] - 69:16

demonstrated [1] - 138:2

demonstrates [3] - 55:22, 65:17, 68:24

demonstrating [1] - 36:23

Demore [3] - 125:7, 125:24, 126:1

demurs [1] - 18:23

denied [1] - 89:22

denigrating [1] - 21:19

deny [1] - 17:15

denying [1] - 89:24

depart [1] - 102:17

Department [6] - 6:5, 6:8, 6:10, 6:12, 51:7, 134:15

DEPARTMENT [2] - 2:18, 2:20

deportable [1] - 125:8

deportation [6] - 55:19, 58:1, 58:3, 85:17, 102:4, 125:10

deported [1] - 125:1

deprived [1] - 64:11

depriving [1] - 50:14

deputies [1] - 21:23

DEPUTY [1] - 5:2

DeSantis [6] - 13:20, 77:4, 77:13, 79:13, 79:15, 126:23

DeSantis's [1] - 12:14

described [6] - 9:8, 56:10, 71:22, 76:8, 76:20, 77:5

describes [1] - 78:11

describing [3] - 56:16, 63:22, 135:8

design [2] - 82:7, 134:8

designate [2] - 62:25, 96:5

designated [3] - 46:19, 48:2, 51:14

designed [4] - 28:13, 82:2, 133:16, 140:23

despite [1] - 81:8

detail [1] - 62:17

details [1] - 125:25

detain [29] - 17:10, 70:10, 70:17, 73:15, 73:20, 73:21, 75:2, 80:1, 91:20, 102:2, 107:7, 108:10, 108:17, 109:13, 109:14, 109:19, 110:4, 110:13, 111:2, 112:6, 112:25, 113:2, 113:8, 125:9, 125:13, 125:14

detainable [2] - 62:15, 109:16

detained [5] - 23:17, 102:3, 109:17, 111:13, 125:1

detainee [4] - 102:16, 102:19, 107:12, 107:13

detainees [19] - 21:15, 31:19, 64:9, 65:20, 66:3, 73:16, 74:1, 74:22, 75:6, 77:11, 78:19, 100:22, 102:10, 103:1, 103:8, 104:13, 104:17, 105:7, 107:13

detainers [1] - 62:9, 62:10, 62:20, 66:1

detecting [1] - 55:14

detention [74] - 9:4, 11:8, 11:10, 13:16, 17:17, 18:8, 19:19, 19:23, 20:16, 21:14, 25:5, 25:20, 26:12, 35:11, 41:25, 46:9, 47:20, 49:12, 50:18, 55:18, 56:24, 57:24, 60:18, 62:8, 62:25, 64:6, 66:13, 66:14, 70:8, 70:12, 76:2, 81:4, 85:17, 88:3, 91:20, 95:19, 96:6, 97:16, 97:19, 99:23, 101:3, 102:6, 107:2, 107:4, 108:9, 110:8, 110:21, 110:25, 111:8, 111:13, 111:18, 111:25, 112:15, 112:19, 112:24, 113:12, 113:13, 113:15, 113:16, 115:18, 115:19, 116:11, 119:21, 124:1, 125:17, 127:7, 131:9, 131:11, 133:7, 133:22, 135:4, 136:23, 137:13

Detention [1] - 54:23

detention-related [1] - 70:12

determination [5] - 19:20, 21:14, 89:5, 133:19, 133:20

determine [2] - 98:10, 136:15

determined [3] - 48:3, 98:20, 140:21

determining [1] - 72:11

devoted [2] - 102:14, 102:15

DHS [44] - 9:20, 9:21, 12:22, 14:15, 19:21, 19:24, 20:8, 20:13, 20:15, 20:18, 21:13, 25:17, 25:18, 25:19, 25:21, 39:12, 39:13, 39:18, 40:12, 40:16, 40:19, 46:4, 62:1, 62:9, 63:5, 73:16, 77:5, 78:11, 83:4, 83:9, 97:24, 98:3, 115:8, 115:16, 115:25, 116:9, 116:16, 117:3, 117:9, 117:17, 117:20, 136:4, 136:5

DHS's [3] - 9:22, 58:9, 66:20

DHS/FEMA [1] - 131:8

diagonal [1] - 31:6

Diaz [1] - 144:11

DIAZ [2] - 3:2, 144:12

dice [1] - 25:15

differ [1] - 134:14

different [14] - 29:9, 64:1, 72:12, 83:13, 83:14, 106:8, 106:9, 113:15, 115:17, 117:9, 119:11, 138:14, 139:10, 141:17

dignity [1] - 36:3

Dillon [3] - 31:10, 88:14, 142:11

direct [4] - 58:22, 63:1, 70:25, 97:17

directed [1] - 96:7

direction [3] - 25:1, 35:5, 70:23

directly [5] - 44:22, 50:4, 63:13, 65:11, 112:17

director [4] - 10:16, 42:14, 42:16, 47:13

Director [9] - 12:10, 13:8, 14:11, 22:24, 76:5, 100:22, 107:17, 127:4, 134:21

dirty [1] - 121:21

disagree [2] - 118:3, 120:13

disappearing [1] - 14:20

disapprove [2] - 82:13, 114:1

discharge [1] - 45:5

discharges [1] - 42:24

disclosed [1] - 15:7

disconcerting [1] - 51:10

discretion [6] - 10:3, 70:15, 75:3, 75:6, 108:4, 113:3

discretionary [7] - 64:12, 64:14, 64:17, 70:12, 75:1, 75:11, 110:5

discussed [8] - 42:25, 46:5, 46:12, 49:14, 70:24, 98:1, 106:22

discussing [1] - 66:21

discussion [5] - 23:6, 23:7, 52:7, 132:19, 134:5

discussions [2] -

45:24, 141:2

disinvited [1] - 21:9

dismiss [1] - 90:8

dispatch [1] - 105:23

displaced [4] - 33:16, 34:17, 34:20, 142:5

displacement [2] - 34:2, 142:6

dispute [2] - 61:5, 90:20

disputed [1] - 15:18

disruption [2] - 117:18, 117:20

disruptive [3] - 121:11, 121:22, 138:13

dissemination [1] - 9:11

dissolved [1] - 43:7

distant [1] - 88:17

distinction [2] - 94:4, 125:16

distribution [1] - 57:7

district [11] - 26:24, 27:12, 28:16, 29:15, 88:18, 89:8, 110:22, 110:23, 124:13, 139:1, 139:11

District [28] - 3:3, 11:25, 15:15, 27:18, 27:21, 29:13, 60:23, 65:5, 66:6, 72:18, 84:1, 84:5, 89:14, 89:17, 90:9, 92:24, 94:1, 97:1, 97:6, 98:24, 99:17, 100:3, 109:3, 118:21, 136:18, 140:7, 144:13

DISTRICT [3] - 1:1, 1:1, 1:11

disturb [1] - 121:22

disturbance [1] - 29:23

disturbed [1] - 116:23

DIVERSITY [1] - 1:22

Diversity [4] - 5:8, 5:17, 30:3, 129:21

divide [1] - 136:7

Division [22] - 12:16, 13:1, 13:14, 16:21, 17:16, 19:25, 20:3, 20:8, 20:9, 20:17, 21:13, 24:17, 24:18, 29:2, 32:11, 131:16, 132:24, 133:24, 135:6, 135:21, 136:1, 136:22

**DIVISION** [1] - 1:2
**Division's** [5] -
12:13, 23:10, 23:20,
28:18, 28:21
**divorced** [1] - 11:15
**Docket** [4] - 63:8,
97:24, 112:13, 112:16
**docketed** [1] - 23:25
**doctor** [1] - 34:2
**doctrine** [1] - 99:7
**document** [9] - 18:6,
25:18, 25:21, 39:14,
39:20, 40:14, 63:22,
130:24, 136:4
**documentary** [2] -
46:11, 46:12
**documentation** [1] -
53:9
**documented** [1] -
142:12
**documents** [2] -
14:16, 62:20
**Doe** [1] - 91:7
**dollar** [1] - 84:16
**dollars** [7] - 35:8,
53:24, 56:18, 56:23,
92:12, 96:16, 131:8
**dolphins** [1] - 55:12
**domestic** [1] -
126:19
**Dominique** [1] - 5:13
**DOMINIQUE** [1] -
1:19
**done** [27] - 7:21,
7:23, 8:1, 8:16, 17:21,
21:20, 24:10, 33:24,
36:14, 40:9, 43:20,
57:17, 61:23, 72:24,
80:12, 80:13, 81:15,
82:16, 82:23, 83:1,
106:17, 117:3,
117:11, 124:9,
124:11, 127:16,
135:20
**doorstep** [1] - 44:23
**dots** [2] - 38:7, 44:20
**doubt** [1] - 117:10
**Douglas** [1] - 10:19
**down** [15] - 31:22,
53:4, 53:15, 53:16,
53:25, 54:20, 54:23,
59:9, 60:16, 90:17,
103:23, 109:20,
119:20, 120:17,
143:11
**Dr** [25] - 29:6, 30:9,
30:20, 30:23, 31:1,
31:7, 33:21, 42:13,
45:18, 46:17, 47:8,
47:10, 48:11, 48:23,

49:2, 50:12, 50:15,
50:24, 51:11, 54:8,
88:7, 130:20, 139:17,
140:5, 142:11
**draft** [1] - 112:17
**draw** [2] - 21:9,
41:14
**drill** [3] - 20:3, 20:7,
54:8
**drinking** [1] - 29:1
**Drive** [1] - 1:16
**drive** [1] - 49:18
**driven** [1] - 74:12
**drove** [1] - 30:16
**DSGP** [2] - 131:10,
131:16
**due** [2] - 29:11,
33:14
**duly** [1] - 37:9
**during** [8] - 14:7,
68:7, 87:24, 121:12,
125:9, 134:2, 135:23,
136:13
**dust** [1] - 29:23
**duties** [1] - 71:15

## E

**e-mail** [3] - 63:8,
72:4, 73:3
**EA** [2] - 40:1, 80:12
**earmarked** [2] - 72:3,
73:8
**Earth** [4] - 9:25,
15:25, 16:4, 27:3
**EarthJustice** [1] -
5:12
**EARTHJUSTICE** [1]
- 1:19
**EAs** [1] - 80:15
**ease** [1] - 54:20
**easiest** [2] - 25:25,
27:24
**easing** [1] - 115:19
**east** [2] - 35:4, 45:20
**East** [1] - 2:10
**Eastern** [1] - 15:15
**echo** [1] - 36:10
**echoed** [2] - 14:11,
20:17
**ecological** [6] -
16:10, 16:25, 76:25,
80:5, 80:9, 81:9
**ecosystem** [1] - 57:8
**effect** [10] - 12:2,
48:8, 61:2, 75:19,
88:18, 88:22, 89:1,
89:11, 122:15, 124:15
**effective** [1] - 40:15
**effectively** [3] -

50:14, 131:19, 131:22
**effects** [7] - 43:8,
43:12, 45:5, 45:6,
45:13, 47:22, 52:12
**efficiency** [1] -
127:11
**efficient** [1] - 127:6
**effluent** [2] - 42:20,
44:1
**effort** [5] - 25:15,
47:2, 52:19, 57:15,
143:22
**efforts** [1] - 77:3
**egregious** [1] -
115:11
**eight** [9] - 31:6, 42:1,
44:8, 47:11, 53:4,
53:15, 76:13, 135:15
**Eighth** [2] - 88:25,
143:5
**EIS** [15] - 40:2,
52:14, 52:16, 52:18,
80:15, 114:2, 114:8,
114:12, 114:19,
114:21, 115:6, 115:8,
117:11, 117:19,
117:25
**either** [9] - 19:9,
39:21, 68:12, 98:10,
103:25, 106:23,
128:12, 128:13,
128:25
**elected** [2] - 25:22,
80:7
**electing** [1] - 79:13
**electorate** [1] -
106:10
**element** [2] - 25:24,
80:23
**elements** [1] - 39:4
**Eleventh** [8] - 41:11,
60:22, 61:5, 88:23,
91:7, 92:20, 99:3,
100:14
**eligible** [2] - 131:15,
131:21
**Elise** [1] - 5:15
**ELISE** [1] - 1:22
**elsewhere** [3] - 34:4,
35:22, 81:14
**emergencies** [3] -
105:11, 105:18,
105:24
**emergency** [19] -
12:16, 12:18, 23:9,
77:5, 95:25, 102:23,
102:25, 103:18,
104:14, 104:24,
105:14, 106:1, 106:4,
106:5, 126:6, 126:23,

138:10
**Emergency** [9] - 6:5,
6:8, 6:10, 6:12, 12:19,
32:4, 131:16, 132:25,
136:3
**emissions** [1] -
42:20
**emit** [1] - 43:25
**emphasized** [2] -
62:24, 82:1
**empirical** [2] - 32:17,
32:18
**employees** [1] -
34:23
**empower** [1] -
105:25
**empty** [2] - 117:21,
124:20
**enacted** [1] - 44:6
**encourage** [1] - 66:4
**end** [18] - 19:13,
20:25, 49:19, 79:14,
85:11, 87:11, 92:23,
94:23, 96:17, 97:7,
102:18, 111:14,
112:11, 114:23,
118:14, 125:10,
126:20, 128:3
**end-all** [1] - 97:7
**endangered** [3] -
9:14, 29:24, 30:6
**endeavor** [1] - 11:8,
19:10, 106:17
**endeavored** [1] -
41:24
**enemy** [1] - 55:15
**energy** [1] - 18:4
**enforce** [4] - 14:1,
25:10, 27:6, 36:4
**enforcement** [26] -
14:6, 14:19, 17:8,
17:10, 19:10, 21:20,
24:19, 24:24, 25:4,
26:11, 62:1, 62:3,
66:25, 70:18, 78:13,
85:16, 100:24,
111:24, 113:11,
113:12, 115:18,
126:11, 126:18,
126:19, 133:6, 135:16
**engage** [4] - 57:20,
77:9, 83:8, 114:25
**engaged** [2] - 25:3,
56:22
**engine** [1] - 121:5
**engineering** [1] -
134:8
**Engineers'** [1] - 10:6
**enhance** [1] - 41:5
**enjoin** [6] - 26:12,

110:18, 110:22,
111:16, 112:14,
112:18
**enjoined** [2] - 83:3,
114:20
**enjoy** [1] - 30:10
**enjoyment** [1] -
30:11
**ensuing** [1] - 61:1
**ensure** [2] - 14:18,
133:18
**ensuring** [1] - 57:9
**enter** [5] - 12:17,
19:22, 64:13, 129:21,
143:1
**entered** [6] - 24:9,
25:19, 53:1, 62:1,
71:25, 124:18
**entering** [3] - 24:19,
143:21, 143:23
**enterprise** [1] -
11:15
**enters** [1] - 128:11
**entire** [3] - 11:6,
11:7, 59:9
**entirely** [8] - 10:7,
11:15, 37:16, 41:21,
44:25, 66:19, 74:22,
102:15
**entirety** [1] - 37:22
**entities** [2] - 38:3,
100:24
**entitled** [5] - 58:6,
58:10, 80:2, 123:11,
144:8
**entitlement** [2] -
40:12, 128:22
**entity** [4] - 17:22,
17:23, 101:6, 133:5
**Entry** [4] - 63:8,
97:24, 112:13, 112:16
**entry** [2] - 36:19,
52:1
**environment** [13] -
9:13, 41:5, 42:22,
42:23, 44:1, 56:19,
58:23, 88:20, 116:2,
116:5, 130:21,
131:12, 142:18
**environmental** [47] -
9:10, 10:22, 10:24,
11:3, 17:20, 29:1,
29:21, 31:25, 35:15,
36:2, 36:4, 39:19,
40:1, 40:20, 40:21,
41:17, 41:24, 42:5,
42:6, 42:7, 45:5,
45:12, 46:25, 47:5,
51:21, 52:9, 52:17,
52:19, 56:25, 59:7,

75:25, 79:5, 81:18, 82:15, 82:16, 82:19, 83:4, 84:4, 84:13, 88:17, 88:22, 116:19, 119:6, 122:20, 130:21, 137:21, 138:2
**Environmental** [3] - 9:14, 10:11, 40:2
**epicenter** [1] - 48:4
**EPPM** [1] - 39:18
**equal** [1] - 36:3
**equally** [1] - 27:13
**equities** [18] - 22:13, 22:17, 37:1, 39:7, 52:2, 52:5, 75:24, 76:23, 77:1, 77:24, 81:7, 85:24, 115:7, 117:13, 117:14, 124:12, 126:22, 137:24
**equity** [1] - 23:12
**equivocal** [1] - 86:3
**equivocated** [1] - 92:16
**erroneous** [2] - 63:20, 69:22
**error** [1] - 86:23
**errors** [1] - 113:24
**ESA** [1] - 29:10
**Eskamani** [3] - 13:7, 14:12, 134:22
**Eskamani's** [1] - 69:22
**Eskemani** [5] - 73:18, 92:10, 96:13, 97:15, 100:20
**especially** [5] - 45:6, 85:15, 116:11, 116:20, 121:10
**ESQ** [17] - 1:15, 1:15, 1:18, 1:19, 1:22, 2:2, 2:3, 2:3, 2:7, 2:8, 2:8, 2:9, 2:14, 2:16, 2:17, 2:20, 2:23
**established** [2] - 37:17, 87:20
**establishes** [1] - 37:20
**et** [5] - 1:4, 1:7, 5:3, 72:6
**evaluate** [3] - 118:17, 137:19, 140:25
**evaluated** [2] - 137:5, 140:21
**evaluating** [2] - 32:20, 119:6
**EVAN** [1] - 2:8
**Evan** [1] - 6:7
**Eve** [3] - 10:15, 30:2,

30:8
**event** [4] - 28:17, 138:6, 138:9, 139:15
**events** [1] - 28:8, 28:15, 83:25, 139:15
**eventuality** [1] - 128:21
**Everglades** [35] - 5:3, 5:7, 5:13, 10:16, 10:21, 18:4, 18:5, 18:6, 26:24, 30:2, 30:4, 35:2, 35:9, 35:13, 36:13, 37:21, 41:25, 43:17, 44:22, 45:21, 56:19, 57:8, 57:23, 68:5, 68:9, 68:20, 69:6, 77:15, 77:18, 79:17, 83:11, 96:21, 115:24, 122:5, 127:21
**EVERGLADES** [1] - 1:4
**evidence** [113] - 12:3, 12:5, 12:13, 12:21, 13:6, 13:19, 14:15, 17:14, 19:4, 21:12, 22:4, 22:9, 22:19, 23:13, 23:14, 23:16, 23:18, 30:13, 30:22, 32:11, 32:17, 32:18, 36:18, 36:23, 39:22, 40:8, 41:1, 41:23, 42:4, 43:11, 44:21, 46:7, 46:8, 46:11, 46:12, 46:14, 51:23, 52:10, 52:25, 53:2, 53:5, 54:1, 54:22, 55:1, 55:2, 55:5, 55:13, 55:17, 55:21, 56:4, 57:15, 57:25, 58:19, 59:6, 62:11, 63:6, 65:17, 66:17, 67:2, 67:7, 68:19, 68:23, 69:21, 70:5, 78:8, 84:15, 84:20, 84:23, 86:3, 86:4, 86:18, 87:10, 87:12, 87:14, 87:24, 88:6, 94:18, 95:22, 96:9, 97:23, 98:3, 101:15, 115:7, 116:4, 118:15, 122:9, 124:4, 124:22, 127:15, 128:7, 130:11, 130:13, 133:8, 133:10, 133:13, 134:2, 135:22, 136:2, 137:15, 137:23, 137:25, 139:16, 139:19, 139:20,

140:3, 140:4, 141:23, 141:25, 142:3, 142:10
**evidentiary** [2] - 87:25, 135:23
**eviscerated** [1] - 19:14
**exact** [2] - 35:9, 37:19
**exactly** [4] - 10:17, 46:19, 91:15, 140:23
**examination** [5] - 12:25, 15:8, 33:23, 69:25, 133:14
**examine** [1] - 14:25
**examined** [2] - 14:23, 123:23
**examines** [1] - 93:8
**example** [5] - 70:21, 100:9, 102:21, 109:2, 123:21
**excellent** [1] - 68:10
**except** [2] - 71:3, 118:4
**exception** [1] - 75:20
**exceptions** [1] - 75:4
**exclude** [1] - 75:3
**excludes** [1] - 74:10
**exclusion** [2] - 39:22, 39:24
**exclusions** [1] - 39:23
**exclusively** [2] - 11:9, 19:11
**executed** [3] - 60:25, 95:24, 96:12
**executive** [11] - 10:16, 12:14, 46:4, 74:21, 105:21, 105:23, 115:22, 115:23, 116:4, 126:10
**exempt** [1] - 110:25
**exercise** [7] - 11:10, 20:4, 20:7, 62:2, 75:18, 109:3, 131:17
**exercised** [5] - 62:22, 75:2, 75:7, 108:3, 108:19
**exercises** [2] - 108:21, 132:15
**exercising** [2] - 108:16, 109:10
**Exhibit** [33] - 9:20, 12:5, 12:13, 12:19, 12:24, 13:21, 14:8, 16:7, 20:12, 20:24, 23:10, 23:15, 23:21, 25:18, 28:20, 28:23, 30:14, 30:22, 32:3, 38:15, 39:12, 40:15, 44:16, 46:18, 51:2,

51:9, 54:7, 56:15, 135:8, 135:11, 135:12, 136:2
**exhibit** [2] - 16:16, 136:1
**Exhibits** [1] - 88:13
**exhibits** [5] - 12:24, 15:7, 32:11, 87:6, 96:10
**exist** [3] - 22:6, 66:3, 78:3
**existence** [2] - 76:16, 82:5
**existing** [3] - 33:2, 54:25, 76:17
**exists** [5] - 14:18, 22:5, 22:8, 133:23, 138:14
**expand** [3] - 20:13, 25:21, 109:12
**expect** [3] - 76:6, 76:21, 96:23
**expectations** [1] - 96:24
**expected** [1] - 123:25
**expended** [1] - 96:17
**experience** [3] - 33:11, 94:15, 134:22
**experiencing** [1] - 142:13
**expert** [7] - 16:9, 51:16, 51:17, 117:8, 123:2, 131:1, 142:3
**expertise** [1] - 99:12
**experts** [2] - 42:15, 119:5
**explain** [2] - 68:13, 130:11
**explained** [9] - 14:1, 66:18, 77:20, 82:4, 85:10, 86:22, 96:5, 100:22, 103:20
**explains** [4] - 17:9, 67:4, 73:17, 78:16
**explanation** [1] - 71:17
**expressed** [2] - 21:8, 81:5
**expressly** [4] - 60:21, 65:5, 74:9, 88:24
**extensive** [2] - 66:5, 66:8
**extent** [1] - 73:23
**extra** [1] - 116:10
**extraordinary** [2] - 85:11, 85:19
**extremely** [1] - 138:12

**extremes** [1] - 101:11
**EZRAY** [2] - 2:8, 6:7
**Ezray** [1] - 6:7

---

**F**

**F.2d** [2] - 100:13, 134:7
**F.3d** [7] - 41:12, 89:8, 91:8, 92:25, 100:10, 109:8, 143:4
**F.App'x** [1] - 99:4
**F.Supp** [6] - 14:2, 89:18, 99:16, 132:17, 134:6, 143:5
**face** [1] - 35:18
**facilities** [21] - 20:13, 45:1, 45:2, 62:19, 65:19, 66:24, 67:1, 68:18, 70:20, 71:24, 78:3, 78:5, 78:8, 78:9, 100:25, 101:3, 107:22, 110:25, 115:19, 115:20, 131:14
**facilities'** [1] - 97:23
**facility** [150] - 11:19, 12:7, 12:9, 12:23, 13:3, 13:4, 13:8, 13:9, 13:13, 13:15, 13:19, 13:24, 14:12, 17:12, 17:17, 20:1, 20:4, 20:9, 20:18, 20:21, 20:25, 22:25, 23:4, 23:13, 24:8, 24:9, 24:11, 25:22, 30:15, 30:18, 34:22, 39:24, 41:25, 42:16, 42:17, 42:18, 42:20, 46:9, 47:20, 48:7, 49:12, 53:3, 53:14, 54:2, 54:5, 54:6, 54:9, 54:14, 54:25, 55:1, 57:17, 59:9, 60:18, 61:21, 62:8, 62:13, 62:24, 62:25, 63:12, 63:19, 66:2, 66:19, 66:20, 68:23, 69:10, 69:12, 69:24, 70:2, 70:7, 70:18, 70:22, 72:3, 73:15, 73:22, 73:24, 74:1, 74:14, 74:22, 75:3, 76:2, 76:8, 76:16, 76:17, 77:2, 77:5, 77:12, 77:17, 78:8, 78:12, 78:18, 79:8, 79:9, 81:4, 88:3, 88:12, 92:13, 93:20, 95:23,

96:6, 96:7, 96:11, 96:15, 97:19, 98:4, 98:5, 99:24, 100:21, 101:5, 101:11, 102:7, 102:10, 102:11, 102:12, 102:14, 104:8, 104:16, 116:17, 116:21, 117:21, 119:21, 121:25, 122:3, 122:13, 124:1, 124:20, 127:2, 127:7, 130:13, 132:23, 132:24, 132:25, 133:2, 133:4, 133:15, 133:22, 135:9, 135:13, 135:19, 136:5, 136:22, 137:12, 137:16, 138:9, 138:14, 139:19, 143:10

**fact** [16] - 15:18, 21:5, 23:16, 35:14, 84:2, 92:7, 92:9, 92:14, 96:8, 98:25, 102:10, 112:6, 119:5, 124:23, 141:22, 142:4

**facto** [1] - 20:20

**factor** [2] - 127:24, 128:7

**factors** [7] - 10:12, 34:18, 41:16, 41:17, 79:5, 128:15, 137:5

**factory** [1] - 43:25

**facts** [1] - 41:20

**factually** [2] - 97:25, 98:2

**fail** [1] - 10:7

**failed** [7] - 21:2, 29:2, 29:4, 41:21, 82:9, 87:3, 130:10

**failure** [6] - 11:7, 83:2, 86:22, 125:8, 125:9, 125:13

**fair** [1] - 128:12

**fairly** [2] - 73:2, 73:4

**fairness** [2] - 138:16, 141:5

**familiar** [5] - 55:9, 63:8, 71:10, 93:5, 98:15

**family** [1] - 34:17

**far** [11] - 22:24, 51:18, 68:17, 83:6, 108:1, 109:5, 109:6, 123:18, 124:6, 129:14, 130:2

**farm** [1] - 125:21

**faster** [1] - 53:16

**fault** [1] - 39:2

**faulted** [2] - 32:17, 52:21

**favor** [5] - 77:2, 81:8, 81:12, 85:24, 137:24

**favors** [1] - 58:2

**FCRR** [2] - 3:2, 144:12

**FDC** [2] - 62:7, 75:9

**FDEM** [5] - 95:24, 96:12, 103:18, 103:19, 105:15

**FDLE** [2] - 61:21, 64:20

**featured** [1] - 122:3

**February** [1] - 30:13

**Federal** [83] - 6:16, 6:18, 6:20, 6:23, 7:12, 9:3, 11:11, 12:17, 13:21, 13:23, 14:5, 14:10, 27:7, 35:10, 40:9, 44:9, 44:13, 46:5, 47:18, 56:17, 58:7, 60:11, 60:20, 60:24, 61:2, 61:24, 62:18, 64:1, 64:17, 64:22, 65:7, 65:24, 66:7, 66:9, 66:16, 69:16, 69:23, 70:1, 70:9, 71:4, 71:14, 71:16, 71:21, 72:9, 72:15, 73:6, 73:14, 74:13, 74:23, 74:25, 75:1, 77:9, 77:10, 77:11, 77:23, 78:17, 79:24, 83:10, 83:22, 94:12, 96:4, 96:22, 97:15, 98:8, 99:13, 99:19, 103:9, 103:11, 104:15, 109:3, 110:3, 113:21, 115:15, 126:4, 129:13, 131:19, 131:25, 132:9, 136:24, 137:13, 138:23, 138:25

**federal** [197] - 9:10, 11:14, 11:16, 11:17, 11:19, 11:21, 11:22, 11:23, 13:17, 13:18, 13:22, 13:24, 14:6, 14:19, 19:11, 19:15, 19:21, 20:10, 21:16, 25:3, 25:11, 25:12, 25:14, 26:22, 40:19, 43:1, 44:5, 50:8, 50:15, 58:6, 59:25, 60:19, 60:21, 61:2, 61:7, 61:8, 61:10, 61:11, 61:12, 61:14, 61:15, 61:18, 62:7,

62:20, 63:4, 63:14, 63:23, 64:3, 65:9, 65:10, 65:15, 66:1, 66:3, 66:5, 66:10, 66:11, 66:12, 69:18, 70:6, 71:19, 72:20, 72:22, 73:12, 73:19, 74:7, 74:8, 74:10, 74:11, 75:5, 75:16, 75:17, 75:20, 75:23, 79:6, 80:20, 80:22, 82:6, 91:10, 91:12, 91:16, 91:18, 91:23, 92:3, 92:5, 92:7, 92:17, 92:18, 92:21, 93:1, 94:19, 94:21, 94:24, 95:2, 95:3, 95:8, 95:10, 95:13, 96:12, 96:15, 97:2, 97:4, 97:6, 97:20, 98:9, 98:10, 98:20, 98:22, 99:1, 99:14, 99:25, 100:1, 100:2, 100:4, 100:7, 100:11, 100:12, 100:15, 100:16, 100:18, 100:21, 101:3, 101:6, 101:10, 101:11, 102:4, 102:7, 102:8, 102:16, 102:19, 103:1, 104:16, 105:7, 106:21, 107:1, 108:16, 108:18, 108:21, 108:25, 109:1, 109:3, 109:4, 109:6, 109:9, 109:10, 109:17, 109:21, 110:13, 110:14, 111:7, 112:3, 113:1, 113:8, 113:9, 113:11, 113:14, 113:17, 115:19, 128:1, 130:17, 131:9, 131:10, 131:20, 132:10, 132:11, 132:14, 132:15, 132:16, 132:18, 132:20, 132:21, 132:22, 132:24, 133:19, 133:22, 133:25, 134:8, 134:10, 135:5, 135:17, 135:19, 136:10, 136:14, 136:15, 136:20, 136:23, 136:25

**FEDERAL** [1] - 2:12

**federalist** [1] - 105:22

**federalize** [5] - 61:7, 61:18, 72:22, 73:24,

92:22

**federally** [1] - 97:7

**Federation** [1] - 29:9

**Feds** [3] - 55:18, 72:14, 108:23

**feeding** [1] - 77:11

**feet** [1] - 32:7

**felt** [1] - 89:1

**FEMA** [6] - 12:22, 14:10, 63:12, 72:3, 73:9

**fence** [7] - 49:5, 49:7, 49:8, 49:11, 49:13, 49:15, 122:1

**fenced** [1] - 121:25

**fences** [2] - 48:14, 102:20

**fencing** [9] - 15:23, 32:7, 32:8, 32:13, 33:15, 49:5, 49:6, 143:9, 143:16

**few** [4] - 37:11, 89:7, 108:19, 112:2

**FHP** [1] - 25:9

**Ficarelli** [1] - 6:12

**FICARELLI** [2] - 2:8, 6:11

**field** [3] - 13:1, 14:5

**fifth** [2] - 112:24, 113:7

**fight** [3] - 33:18, 34:8, 34:11

**figure** [1] - 47:22

**file** [1] - 83:7

**filed** [6] - 16:1, 16:18, 17:4, 27:17, 72:2, 138:15

**Fill** [1] - 64:21

**Fill-in-the-Blank** [1] - 64:21

**filled** [1] - 76:19

**final** [31] - 25:24, 35:18, 60:19, 73:11, 74:7, 82:5, 89:3, 89:13, 91:9, 91:11, 91:23, 94:25, 95:3, 95:7, 97:4, 97:20, 98:9, 98:10, 98:14, 98:22, 102:8, 106:21, 106:25, 109:20, 110:14, 111:7, 113:14, 123:15, 123:20, 128:1, 128:9

**finality** [2] - 97:1, 99:7

**finally** [5] - 50:15, 86:14, 124:3, 124:7, 126:17

**financed** [1] - 102:6

**financial** [3] - 75:17,

75:19, 131:10

**financing** [1] - 132:1

**findings** [4] - 105:16, 105:20, 106:2, 106:9

**fine** [3] - 68:2, 118:8, 138:17

**finish** [1] - 103:2

**finishes** [1] - 117:19

**fire** [1] - 140:24

**first** [25] - 12:5, 27:25, 40:10, 41:15, 47:11, 52:8, 55:4, 56:5, 60:1, 60:7, 66:16, 80:24, 86:2, 87:2, 87:24, 93:24, 99:25, 107:7, 108:14, 110:3, 110:15, 112:2, 130:1, 130:8, 140:25

**fish** [2] - 43:9, 50:10

**Fish** [6] - 9:16, 33:12, 47:13, 47:15, 48:1, 51:8

**fishing** [1] - 48:18

**fit** [1] - 108:8

**five** [14] - 7:14, 29:18, 33:6, 33:8, 38:23, 68:18, 107:3, 107:6, 107:25, 108:15, 113:13, 113:15, 129:9, 136:9

**five-minute** [2] - 7:14, 129:9

**fix** [1] - 43:3

**FL** [1] - 1:23

**fleet** [1] - 81:9

**fleeting** [1] - 86:14

**FLEXNER** [1] - 2:9

**flies** [1] - 35:17

**flight** [4] - 15:22, 119:23, 120:1, 120:5

**flights** [8] - 120:14, 120:17, 121:4, 141:11, 141:14, 141:15, 144:1

**flood** [1] - 57:9

**flooded** [1] - 104:1

**Floor** [2] - 3:4, 144:13

**Flores** [1] - 15:14

**FLORIDA** [1] - 1:1

**Florida** [94] - 1:4, 1:17, 1:21, 2:5, 2:11, 2:15, 2:25, 3:4, 5:20, 6:5, 6:8, 6:10, 6:12, 11:24, 12:8, 14:3, 19:25, 20:14, 23:20, 24:21, 27:18, 29:11, 29:14, 30:6, 30:7, 47:25, 55:19, 55:20, 60:18, 60:23, 62:12,

63:13, 64:6, 65:4, 65:18, 65:21, 66:6, 66:19, 67:6, 67:25, 68:11, 69:5, 69:8, 69:9, 70:16, 72:7, 72:18, 73:1, 73:3, 73:14, 73:16, 74:4, 74:12, 75:2, 75:7, 75:11, 76:8, 77:20, 77:21, 78:24, 79:1, 79:8, 84:6, 88:15, 92:24, 93:20, 93:25, 94:10, 95:24, 96:20, 96:25, 97:5, 97:17, 98:3, 98:5, 98:24, 99:20, 100:3, 100:23, 107:11, 108:13, 108:16, 131:16, 132:24, 133:3, 136:17, 137:19, 140:7, 144:14

**Florida's** [16] - 60:18, 67:2, 67:3, 68:11, 68:13, 69:9, 69:17, 75:2, 75:23, 76:1, 77:2, 77:3, 78:18, 79:2, 99:22, 133:3

**Floridians** [1] - 79:14
**flow** [12] - 14:4, 29:7, 35:5, 39:15, 44:21, 88:22, 94:2, 94:10, 94:14, 95:6, 98:19, 142:16

**flowing** [1] - 130:21
**flows** [5] - 45:5, 88:18, 98:18, 140:4
**fly** [2] - 117:7, 120:6
**flying** [1] - 49:23
**focus** [3] - 36:22, 39:5, 39:6
**focused** [1] - 28:10
**focusing** [1] - 97:13
**folks** [5] - 17:6, 22:10, 31:7, 127:8, 138:13
**follow** [5] - 10:7, 22:19, 86:22, 101:20, 103:7
**followed** [3] - 10:14, 13:8, 61:8
**following** [1] - 41:13
**FOR** [5] - 1:15, 1:22, 2:1, 2:12, 2:22
**foraging** [3] - 48:1, 48:2, 48:5
**Force** [1] - 78:24
**force** [3] - 77:6, 78:12, 78:21
**forced** [2] - 34:10,

61:5
**foregoing** [1] - 144:6
**foregone** [1] - 83:7
**foreign** [2] - 85:17, 126:19
**forever** [1] - 54:19
**forget** [2] - 21:5, 62:5
**forgetting** [2] - 120:22, 140:9
**formal** [1] - 94:22
**former** [1] - 79:3
**forth** [3] - 80:18, 128:14, 129:2
**forward** [9] - 11:1, 90:4, 117:19, 118:16, 127:13, 127:14, 128:7, 140:17, 140:22
**founded** [1] - 10:20
**four** [16] - 20:19, 27:17, 32:8, 42:12, 68:17, 89:13, 109:22, 110:19, 110:20, 111:11, 111:17, 112:19, 139:9, 139:10
**Fourth** [2] - 99:9, 109:8
**fourth** [3] - 70:2, 112:23
**Fox** [2] - 67:3, 67:4
**FPR** [2] - 3:2, 144:12
**Frank** [1] - 6:20
**FRANK** [1] - 2:17
**frankly** [4] - 18:19, 25:25, 27:14, 31:24
**fresh** [2] - 30:24, 116:23
**FRIEDMAN** [6] - 2:2, 2:2, 5:22, 37:6, 37:9, 38:19
**Friedman** [2] - 5:22, 7:4
**Friedman's** [1] - 39:2
**friend** [2] - 98:16, 119:24
**friends** [1] - 60:13
**Friends** [12] - 5:2, 5:7, 5:12, 7:8, 10:16, 10:20, 26:23, 30:2, 36:12, 59:25, 129:18, 129:20
**FRIENDS** [1] - 1:4
**front** [1] - 79:5
**Fuentes** [6] - 15:2, 62:17, 62:24, 78:16, 96:4, 107:10
**Fuentes's** [1] - 17:4
**fulfill** [1] - 138:1
**fulfillment** [1] - 65:6
**full** [3] - 31:4, 117:15, 118:23

**fully** [1] - 86:12
**fulsome** [2] - 37:2, 140:13
**function** [14] - 13:22, 13:25, 14:6, 19:11, 19:19, 20:10, 20:22, 62:2, 62:3, 85:14, 135:3, 135:5, 136:23
**functioning** [1] - 133:5
**functions** [4] - 17:9, 25:4, 25:6, 26:13
**Fund** [4] - 12:1, 132:16, 134:4, 136:16
**fund** [1] - 92:13
**funded** [7] - 14:10, 14:12, 72:3, 97:7, 134:18, 134:19, 135:2
**funding** [37] - 14:7, 63:23, 64:3, 65:9, 72:20, 72:22, 73:12, 75:23, 91:18, 92:5, 92:7, 92:15, 92:21, 92:23, 93:15, 94:1, 94:2, 94:12, 94:19, 94:20, 95:3, 95:8, 95:10, 95:13, 95:19, 97:6, 97:14, 106:22, 112:4, 113:14, 130:25, 131:9, 134:11, 136:12, 136:13
**funds** [4] - 63:12, 72:3, 73:8, 96:15
**funneled** [1] - 90:25
**future** [10] - 65:9, 72:20, 72:21, 88:17, 92:19, 92:22, 123:19, 126:2

## G

**Gadea** [13] - 13:5, 15:2, 15:19, 31:16, 32:2, 53:13, 54:4, 66:18, 73:16, 88:1, 92:9, 96:1, 107:10
**Gadea-Guidicelli** [11] - 13:5, 15:2, 32:2, 53:13, 54:4, 66:18, 73:16, 88:1, 92:9, 96:1, 107:10
**Gadea-Guidicelli's** [2] - 15:19, 31:16
**gainsay** [1] - 116:12
**Galloni** [1] - 5:11
**GALLONI** [2] - 1:18, 5:11
**Gamble** [1] - 89:11
**game** [2] - 93:10,

131:17
**gamesmanship** [1] - 27:16
**gates** [2] - 35:4, 45:7
**gather** [1] - 16:18
**gathering** [1] - 48:18
**general** [1] - 69:16
**General** [4] - 12:7, 12:8, 67:6, 71:16
**GENERAL** [1] - 2:17
**generally** [5] - 43:23, 54:12, 109:19, 122:2, 137:11
**generating** [1] - 43:25
**genesis** [1] - 10:17
**gentleman** [2] - 7:5, 103:13
**gentleman's** [1] - 45:23
**gentlemen** [1] - 6:14
**geographical** [1] - 40:22
**geolocate** [1] - 88:7
**geolocation** [1] - 88:9
**geologist** [2] - 31:11, 142:15
**gestalt** [2] - 92:1, 93:16
**gift** [1] - 96:22
**Giles** [1] - 126:25
**Girl** [1] - 50:19
**given** [6] - 73:1, 79:8, 81:18, 115:17, 132:8, 139:18
**global** [1] - 122:12
**goals** [2] - 9:7, 44:13
**Golf** [1] - 89:17
**Google** [3] - 15:25, 16:4, 16:7
**Goos** [3] - 11:25, 132:14, 136:17
**government** [24] - 37:14, 43:19, 46:20, 55:23, 55:25, 56:16, 56:22, 57:2, 79:6, 79:22, 79:24, 93:8, 94:15, 94:16, 95:4, 105:13, 106:3, 108:24, 124:17, 124:20, 124:25, 125:3, 125:14
**Government** [56] - 11:11, 12:17, 13:22, 13:23, 14:5, 14:10, 35:10, 44:9, 46:5, 47:18, 57:4, 58:7, 60:20, 60:24, 61:2, 61:24, 62:18, 64:1,

64:22, 65:7, 65:24, 66:7, 66:9, 69:16, 69:24, 70:2, 71:4, 71:14, 71:16, 71:21, 72:10, 73:14, 74:13, 75:1, 77:9, 77:10, 77:11, 77:23, 78:17, 83:10, 94:12, 96:23, 97:16, 98:9, 99:13, 103:9, 103:11, 104:15, 110:4, 113:21, 124:16, 126:4, 126:5, 131:19, 131:25, 137:14
**Government's** [13] - 44:13, 56:13, 56:17, 57:21, 64:17, 65:5, 72:15, 73:6, 74:23, 74:25, 96:4, 99:14, 99:20
**government's** [4] - 37:1, 85:14, 110:5, 126:22
**government-created** [1] - 108:24
**government-to-government** [1] - 46:20
**governmental** [2] - 23:7, 37:23
**Governments** [1] - 35:10
**governments** [1] - 108:22
**governor** [7] - 104:15, 105:17, 105:20, 106:3, 106:6, 106:8, 134:20
**Governor** [7] - 12:14, 13:20, 77:4, 77:13, 79:13, 79:15, 126:22
**governor's** [2] - 70:4, 105:10
**governors** [1] - 105:25
**governs** [1] - 105:10
**gracious** [1] - 8:14
**grant** [5] - 89:4, 89:9, 131:9, 131:21, 131:23
**granting** [1] - 89:20
**grants** [2] - 111:12, 138:25
**grass** [1] - 49:25
**Grass** [1] - 10:20
**grateful** [2] - 8:21, 21:21
**great** [3] - 116:20, 129:4, 133:10
**green** [1] - 49:24
**Greers** [1] - 143:4

**ground** [3] - 26:3, 26:4, 141:22
**grounds** [1] - 81:6
**growth** [1] - 43:6
**guarantee** [1] - 117:1
**guaranteed** [1] - 94:20
**Guardia** [1] - 120:11
**guards** [1] - 48:14
**Guatemala** [1] - 69:3
**guess** [9] - 10:24, 63:6, 89:16, 94:14, 97:14, 108:2, 109:2, 116:8, 117:20
**guidance** [1] - 62:21
**guide** [1] - 84:15
**Guidicelli** [12] - 13:5, 15:2, 32:2, 53:13, 54:4, 54:13, 66:18, 73:16, 88:1, 92:9, 96:1, 107:10
**Guidicelli's** [3] - 15:19, 31:16, 56:10
**Guiles** [1] - 107:10
**Gulf** [1] - 104:5
**Gustafson** [6] - 6:16, 60:9, 60:10, 85:6, 113:22, 132:11
**GUSTAFSON** [61] - 2:16, 4:6, 6:15, 8:2, 59:21, 60:8, 60:10, 60:15, 61:25, 62:11, 63:16, 63:21, 63:25, 64:8, 64:25, 65:3, 66:4, 67:15, 67:23, 68:10, 68:13, 68:22, 69:7, 69:13, 71:7, 71:10, 71:17, 72:9, 72:17, 73:7, 73:11, 73:14, 74:3, 74:7, 74:24, 75:10, 75:14, 75:16, 76:7, 76:15, 77:19, 77:25, 78:7, 78:11, 78:15, 79:1, 79:21, 79:24, 80:2, 80:19, 80:22, 82:20, 82:25, 83:13, 83:18, 83:23, 84:19, 84:25, 85:3, 129:12, 129:15
**Gustafson's** [1] - 134:12
**Guthrie** [4] - 13:8, 14:11, 96:18, 134:21
**GUTHRIE** [1] - 2:6
**guys** [1] - 107:25

---

**H**

**habitat** [8] - 33:14, 34:9, 34:21, 47:16,

122:1, 122:11, 123:3, 142:6
**hair** [1] - 131:17
**hair-splitting** [1] - 131:17
**half** [4] - 12:15, 23:10, 58:1, 59:16
**half-a-billion** [1] - 58:1
**halting** [1] - 36:19
**hamstring** [1] - 82:8
**hand** [3] - 49:12, 49:13, 50:25
**handbook** [1] - 58:9
**handle** [1] - 125:20
**hands** [1] - 20:21
**handy** [1] - 105:12
**haphazard** [1] - 83:15
**Harbert** [1] - 99:3
**HARBERT** [1] - 99:4
**hard** [1] - 9:9
**harm** [72] - 23:14, 29:16, 29:21, 29:22, 29:24, 32:18, 33:1, 36:23, 39:5, 42:11, 42:21, 44:2, 44:12, 45:12, 46:25, 47:21, 51:20, 51:22, 51:24, 52:9, 59:2, 59:8, 76:1, 81:21, 85:23, 86:8, 86:9, 86:10, 86:11, 86:14, 86:15, 87:8, 87:10, 89:25, 116:19, 118:4, 118:11, 118:12, 118:20, 119:4, 119:7, 122:7, 122:8, 122:10, 122:12, 122:15, 122:25, 123:7, 123:13, 123:14, 124:5, 124:16, 124:17, 128:2, 128:3, 128:4, 128:6, 128:16, 130:9, 130:17, 130:20, 138:2, 140:20, 142:2, 142:4, 142:9
**harmed** [1] - 137:25
**harmful** [1] - 142:16
**harmonized** [1] - 141:5
**harms** [4] - 43:22, 52:17, 52:19, 116:8, 117:15, 130:21, 137:9, 138:20
**Harris** [1] - 84:9
**harvesting** [1] - 48:18
**Harvey** [1] - 29:9

**haste** [1] - 117:3
**Hawkes** [1] - 98:13
**head** [1] - 32:19
**health** [8] - 37:24, 42:22, 45:2, 45:6, 45:13, 46:25, 52:9, 58:22
**hear** [10] - 17:6, 19:16, 23:2, 30:19, 36:25, 52:3, 52:8, 59:24, 68:16, 129:9
**heard** [43] - 10:15, 12:3, 12:10, 13:7, 14:21, 21:23, 29:3, 29:6, 30:1, 30:8, 30:19, 31:10, 31:23, 32:2, 32:25, 34:24, 35:3, 36:21, 41:1, 42:12, 45:9, 47:8, 47:24, 54:5, 57:11, 62:11, 65:17, 68:13, 68:17, 73:5, 76:15, 84:2, 87:5, 103:16, 111:25, 121:9, 130:8, 130:19, 133:10, 133:11, 134:2, 141:2, 141:6
**HEARING** [1] - 1:10
**hearing** [14] - 8:17, 12:4, 13:10, 14:8, 17:6, 19:14, 33:19, 87:21, 87:25, 93:2, 93:7, 95:9, 135:23, 143:1
**hearsay** [9] - 15:19, 15:20, 16:10, 16:11, 17:1, 17:2, 69:21, 70:3, 92:17
**heart** [1] - 41:25
**heavy** [1] - 85:20
**held** [18] - 22:5, 22:10, 29:22, 61:6, 61:17, 64:5, 64:6, 64:9, 66:9, 72:21, 95:3, 99:18, 109:8, 124:13, 124:21, 125:1, 132:14, 136:24
**helicopter** [2] - 121:10
**helicopters** [2] - 121:6, 121:7
**help** [2] - 69:17, 82:3
**helpful** [3] - 72:19, 80:8, 111:21
**helping** [1] - 5:25
**Hendricks** [1] - 89:7
**herbs** [2] - 48:18, 50:23
**hereby** [1] - 144:6
**Hernandez** [2] -

5:25, 39:1
**Herrera** [1] - 13:1
**Hiaasen** [1] - 5:9
**high** [1] - 86:3
**higher** [1] - 126:3
**highest** [1] - 126:11
**highly** [2] - 57:2, 116:10
**Highway** [2] - 23:20, 24:21
**historic** [1] - 15:21
**historical** [1] - 51:18
**history** [3] - 21:20, 59:1, 104:5
**hold** [7] - 10:2, 28:1, 28:11, 31:7, 53:13, 98:22, 107:11
**holding** [4] - 27:16, 52:23, 92:20, 131:13
**holds** [2] - 13:16, 100:21
**Homeland** [2] - 134:15, 135:7
**homelands** [1] - 130:16
**homes** [1] - 38:3
**Homestead** [1] - 78:4
**honor** [1] - 119:11
**Honor** [152] - 5:6, 5:11, 5:15, 5:19, 5:22, 6:7, 6:9, 6:11, 6:15, 6:17, 7:6, 7:10, 7:16, 8:2, 8:5, 11:12, 12:21, 14:1, 16:14, 19:13, 20:20, 21:4, 21:8, 23:2, 24:16, 25:7, 25:13, 26:6, 26:20, 27:22, 33:4, 35:7, 36:8, 38:24, 59:4, 59:22, 60:8, 60:10, 60:15, 62:12, 63:3, 64:8, 67:23, 69:13, 71:8, 71:18, 72:17, 73:7, 74:3, 75:10, 75:14, 76:8, 76:21, 78:7, 78:15, 79:21, 80:2, 80:19, 82:25, 83:13, 83:23, 85:1, 85:8, 86:1, 87:1, 87:8, 89:7, 90:5, 90:11, 90:15, 92:4, 93:6, 93:22, 95:15, 97:2, 97:9, 100:17, 101:8, 103:3, 104:11, 105:12, 105:21, 106:6, 106:13, 107:2, 107:6, 108:2, 108:14, 108:20, 109:2, 109:7, 109:11, 109:15,

109:18, 110:2, 111:21, 112:8, 112:22, 113:4, 113:7, 113:13, 113:18, 114:6, 114:14, 114:23, 115:7, 116:7, 116:14, 117:15, 116:8, 117:8, 119:1, 119:7, 120:2, 120:12, 120:18, 121:4, 121:19, 121:24, 122:6, 122:23, 123:8, 123:17, 124:2, 124:7, 125:12, 126:13, 126:21, 127:1, 127:17, 128:10, 128:20, 129:5, 129:12, 129:19, 130:4, 130:25, 131:2, 132:3, 132:6, 133:1, 134:14, 135:10, 136:18, 137:17, 138:3, 139:12, 139:20, 140:18, 142:23, 143:20
**Honor's** [1] - 15:5
**Honorable** [2] - 18:25, 21:7
**HONORABLE** [1] - 1:10
**hook** [2] - 64:22, 71:4
**hooks** [1] - 66:13
**hope** [2] - 128:20, 143:25
**hoped** [1] - 22:9
**hopes** [1] - 75:23
**hoping** [1] - 19:13
**horizontal** [2] - 51:1, 51:4
**horse** [1] - 127:19
**host** [1] - 113:4
**hour** [9] - 7:12, 7:17, 7:19, 7:23, 8:1, 38:22, 59:14, 59:16, 59:21
**hours** [1] - 42:12
**house** [3] - 21:15, 73:23, 74:16
**House** [3] - 20:23, 44:7, 135:7
**housed** [1] - 78:20
**houses** [1] - 102:10
**housing** [5] - 62:6, 62:7, 109:9, 135:25
**Hualapi** [1] - 143:5
**huddled** [1] - 142:8
**human** [13] - 42:17, 42:22, 42:24, 45:6, 45:13, 46:25, 47:1, 50:17, 50:21, 52:9,

59:6, 59:7, 59:8
**hundred** [3] - 24:14, 121:12, 123:22
**hundreds** [2] - 23:16, 88:21
**hunt** [3] - 50:10, 50:23, 132:20
**hunting** [1] - 48:18
**hurdles** [1] - 87:16
**hurricane** [10] - 103:16, 103:21, 103:23, 104:3, 104:4, 104:12, 104:14, 104:18, 138:7, 138:9
**hydrocarbons** [1] - 31:14
**hydrology** [1] - 122:4
**hypothetical** [3] - 103:7, 105:5, 105:8

## I

**Ian** [1] - 66:18
**ICE** [78] - 12:25, 13:3, 13:4, 13:9, 13:16, 14:13, 14:15, 14:17, 14:18, 17:16, 19:8, 19:12, 19:17, 19:18, 19:19, 19:20, 19:24, 20:1, 20:4, 20:5, 20:10, 20:19, 20:22, 20:25, 21:15, 23:20, 24:18, 25:2, 25:6, 31:18, 46:4, 62:13, 62:23, 62:24, 62:25, 63:5, 63:9, 63:10, 63:14, 63:18, 64:4, 65:12, 70:23, 73:19, 73:21, 73:22, 96:5, 96:6, 101:2, 109:18, 110:25, 133:5, 133:16, 133:17, 133:18, 133:19, 133:20, 133:21, 134:1, 134:19, 134:21, 134:24, 135:2, 135:3, 135:9, 135:13, 135:20, 135:25, 136:22
**ICE's** [2] - 99:23, 100:23
**idea** [12] - 12:6, 41:19, 67:2, 67:5, 67:6, 93:9, 93:13, 99:14, 99:20, 99:21, 136:21
**identified** [5] - 44:17, 50:4, 51:3, 66:12, 81:19

**identifies** [1] - 39:17
**identify** [2] - 91:8, 91:9
**identifying** [1] - 91:15
**identity** [1] - 59:1
**ignored** [2] - 9:24, 29:20
**III** [1] - 18:21
**illegal** [5] - 77:4, 79:14, 126:2, 126:14, 131:11
**illegally** [1] - 85:18
**Illinois** [1] - 72:25
**immeasurable** [1] - 59:2
**immediate** [1] - 86:10
**Immigrant** [1] - 14:3
**immigrants** [3] - 73:20, 73:22, 73:23
**immigration** [48] - 9:4, 11:9, 12:16, 13:17, 14:1, 14:19, 17:8, 17:17, 19:10, 20:16, 22:1, 25:3, 25:10, 26:10, 26:13, 35:11, 36:3, 62:3, 62:9, 62:15, 62:21, 64:9, 64:12, 66:1, 66:3, 66:25, 68:3, 70:24, 71:2, 75:6, 77:4, 78:12, 79:11, 79:14, 102:3, 107:19, 111:24, 112:15, 115:18, 126:14, 126:18, 131:1, 133:6, 133:22, 135:4, 136:23, 137:11, 137:13
**Immigration** [3] - 63:12, 64:10, 125:23
**imminent** [2] - 124:5, 124:6
**Impact** [3] - 9:14, 10:11, 40:2
**impact** [11] - 26:2, 31:25, 32:14, 41:18, 41:24, 42:5, 42:6, 56:25, 140:2, 142:9, 142:17
**impacted** [1] - 30:11
**impacts** [22] - 10:22, 10:24, 16:10, 26:4, 28:25, 29:1, 29:11, 29:13, 29:23, 32:21, 35:15, 35:16, 35:17, 40:20, 122:13, 137:21, 139:25, 140:6, 140:14,

140:15, 140:25, 141:22
**impetus** [1] - 99:11
**implement** [2] - 41:18, 99:21
**implementation** [1] - 9:21
**implemented** [1] - 45:7
**implicate** [1] - 40:13
**implicated** [1] - 85:17
**implicates** [1] - 126:18
**importance** [2] - 67:15, 127:2
**important** [21] - 19:2, 23:1, 27:11, 27:13, 27:14, 27:15, 36:13, 40:24, 41:21, 44:9, 64:10, 66:22, 67:17, 67:25, 77:24, 86:1, 87:12, 116:17, 117:23, 127:5, 139:20
**importantly** [4] - 9:17, 63:3, 87:2, 102:8
**improper** [4] - 81:6, 83:24, 89:10, 140:13
**improve** [1] - 57:6
**INA** [1] - 126:8
**inability** [1] - 43:13
**inaccurate** [1] - 64:7
**inadequate** [1] - 83:2
**Inc** [1] - 5:3
**incidentally** [1] - 25:17
**include** [3] - 62:19, 142:14, 142:16
**included** [3] - 121:5, 121:6, 125:20
**includes** [5] - 28:1, 41:13, 47:19, 48:17, 64:12
**including** [12] - 14:16, 28:21, 29:14, 30:6, 31:13, 35:9, 50:10, 70:12, 112:19, 119:20, 119:22, 120:15
**inconsistent** [3] - 44:12, 119:10, 134:2
**incorrect** [1] - 63:22
**increase** [3] - 33:17, 34:23, 123:23
**increased** [6] - 33:22, 33:23, 34:13, 34:21, 47:20, 51:16
**indeed** [1] - 88:19
**independent** [1] -

76:7
**independently** [2] - 107:3, 113:15
**INDEX** [1] - 4:1
**Indian** [1] - 143:5
**Indiana** [1] - 134:7
**Indians** [1] - 5:20
**indicate** [3] - 69:18, 71:23, 78:5
**indicia** [1] - 61:6
**individual** [4] - 70:20, 102:3, 108:6, 113:7
**individuals** [4] - 13:16, 62:14, 124:24, 135:12
**indulgence** [1] - 129:5
**infer** [1] - 67:9
**inflows** [1] - 57:9
**influence** [10] - 11:22, 13:17, 61:11, 61:13, 61:17, 65:3, 65:6, 66:7, 66:8, 132:11
**influences** [1] - 11:11
**information** [10] - 9:11, 18:13, 40:23, 52:17, 53:10, 63:20, 65:12, 84:3, 84:18, 117:11
**informed** [1] - 106:9, 106:10, 117:2, 117:12, 140:15
**infrastructure** [6] - 37:24, 54:14, 54:19, 55:19, 56:10, 82:8
**initial** [3] - 8:13, 31:21, 127:22
**initiate** [1] - 72:10
**initiating** [1] - 81:1
**initiative** [1] - 67:3
**injunction** [35] - 8:17, 8:22, 8:24, 9:2, 19:14, 26:14, 36:19, 52:1, 53:1, 59:5, 81:21, 85:10, 85:25, 86:13, 86:16, 86:19, 89:22, 89:25, 90:2, 91:11, 112:12, 114:24, 123:10, 123:11, 123:12, 123:15, 124:5, 124:17, 124:18, 127:24, 128:12, 128:18, 128:22, 137:24, 142:24
**INJUNCTION** [1] - 1:10

**injunctions** [3] - 26:10, 143:2
**injunctive** [1] - 36:21
**injury** [4] - 29:20, 51:21, 51:25, 124:14
**input** [1] - 58:12
**inquire** [1] - 57:16
**inquired** [3] - 97:16, 98:3, 105:3
**inquiry** [3] - 20:25, 63:11, 63:20
**INS's** [1] - 125:8
**insight** [1] - 76:5
**inspect** [1] - 21:6
**inspected** [2] - 14:17, 133:17
**inspection** [1] - 13:2
**installed** [1] - 43:24
**instead** [5] - 17:6, 62:7, 67:7, 69:25, 136:7
**insufficient** [1] - 99:12
**insurmountable** [1] - 90:6
**intact** [1] - 116:2
**intended** [5] - 12:24, 13:2, 15:7, 41:16, 57:19
**interconnected** [2] - 31:23, 88:21
**interdicted** [1] - 22:1
**interest** [45] - 21:8, 27:4, 30:5, 36:15, 37:1, 39:8, 55:23, 55:24, 55:25, 56:13, 56:14, 56:17, 57:5, 57:21, 58:2, 58:5, 58:8, 58:15, 58:16, 69:16, 75:25, 76:23, 77:3, 78:1, 79:10, 79:21, 79:23, 80:4, 80:5, 80:7, 80:11, 81:9, 81:16, 81:17, 81:18, 81:19, 81:21, 85:25, 116:5, 125:3, 125:14, 139:2
**interesting** [3] - 22:18, 141:3, 141:6
**interests** [5] - 9:17, 38:5, 57:5, 76:25, 80:9
**interim** [1] - 17:20
**interlocutory** [1] - 26:2
**international** [1] - 85:16
**interrupt** [1] - 37:12
**intervene** [1] - 37:20
**INTERVENOR** [1] -

2:1
**intervenor** [2] - 5:21, 133:12
**intervenor's** [1] - 76:25
**interview** [1] - 67:4
**intimately** [2] - 132:18, 134:5
**intraspecific** [4] - 33:17, 34:7, 34:12, 142:7
**introduced** [5] - 23:22, 24:16, 87:24, 92:17, 134:13
**introduction** [1] - 36:16
**invaluable** [1] - 59:3
**investment** [3] - 18:4, 84:16, 116:1
**invitation** [1] - 21:4
**invite** [1] - 9:18
**invited** [1] - 21:7
**invoke** [1] - 92:1
**involve** [5] - 19:15, 27:2, 40:18, 70:23, 136:20
**involved** [10] - 9:18, 10:9, 11:21, 18:20, 22:15, 41:23, 132:19, 134:5, 136:16, 139:2
**involvement** [6] - 11:16, 40:17, 61:7, 74:10, 97:3, 133:25
**involves** [1] - 71:20
**ironic** [1] - 32:16
**irrelevant** [1] - 98:1
**irreparable** [20] - 29:16, 29:22, 32:14, 36:23, 39:5, 51:20, 51:22, 51:24, 51:25, 77:1, 85:23, 86:14, 118:12, 119:1, 119:2, 123:7, 123:9, 128:16, 130:9, 142:2
**Island** [1] - 27:3
**islands** [1] - 45:10
**Islip** [1] - 15:14
**Israel** [1] - 13:1
**issue** [16] - 25:25, 26:17, 27:13, 27:14, 49:4, 67:14, 67:25, 68:3, 73:22, 86:19, 86:20, 98:7, 106:22, 125:20, 128:18, 131:2
**issued** [3] - 62:20, 81:24, 90:2
**issues** [6] - 15:18, 26:5, 59:13, 67:16, 96:21
**item** [1] - 16:16

**itself** [4] - 42:20, 90:24, 99:11, 137:22

## J

**Jacksonville** [1] - 78:4
**Jail** [1] - 24:10
**jail** [6] - 73:18, 73:20, 73:21, 100:21, 100:23, 101:10
**jails** [1] - 101:4
**Jane** [1] - 113:6
**January** [6] - 11:4, 12:15, 44:6, 44:8, 45:22, 119:22
**Jason** [1] - 46:17
**Jenkins** [2] - 28:12, 88:23
**Jersey** [1] - 89:17
**JESSE** [1] - 2:7
**Jesse** [1] - 6:4
**Jessica** [1] - 30:9
**jet** [3] - 120:23, 120:24, 120:25
**jetport** [20] - 10:18, 31:22, 35:24, 38:4, 43:4, 43:21, 43:23, 44:3, 44:12, 44:17, 44:19, 46:5, 46:8, 48:24, 56:3, 57:13, 116:6, 116:18, 116:21, 119:24
**Jimmy** [1] - 12:8
**join** [1] - 129:13
**joints** [1] - 28:13
**Jones** [1] - 61:22
**JUDGE** [1] - 1:11
**Judge** [23] - 8:8, 8:13, 9:7, 10:8, 13:12, 14:20, 15:6, 18:2, 18:15, 18:19, 18:21, 21:19, 22:3, 23:20, 24:14, 27:9, 28:11, 30:1, 30:12, 31:1, 31:24, 33:9, 36:1
**judges** [1] - 82:8
**judgment** [3] - 82:18, 110:6, 123:20
**judicial** [5] - 23:24, 70:13, 70:14, 71:2, 81:25
**July** [3] - 20:15, 119:20, 119:23
**June** [2] - 12:12, 119:20
**jurisdiction** [10] - 26:8, 64:11, 70:11, 110:1, 110:12, 110:18, 111:3, 111:9,

111:16, 113:2
**jurisdiction-stripping** [1] - 110:12
**justice** [1] - 76:10
**JUSTICE** [2] - 2:18, 2:20
**Justice** [1] - 53:8
**justify** [1] - 124:5

## K

**KATHLEEN** [1] - 1:10
**Kautz** [1] - 122:11
**Kautz's** [1] - 33:4
**keep** [4] - 90:18, 104:17, 117:16, 117:24
**keeping** [1] - 28:3
**keeps** [1] - 131:2
**kept** [2] - 19:5, 76:1
**Kerner** [14] - 12:10, 21:18, 22:24, 23:19, 24:21, 54:5, 55:2, 56:1, 76:5, 100:22, 107:17, 126:25, 127:4, 137:10
**Kerner's** [1] - 25:8
**kill** [1] - 99:19
**killing** [1] - 43:8
**Kim** [1] - 125:7
**kind** [14] - 7:14, 17:23, 30:20, 39:15, 45:16, 49:9, 49:19, 63:9, 63:18, 65:12, 99:6, 122:21, 130:5, 136:7
**kindly** [1] - 27:23
**kingdom** [1] - 104:21
**Kinnebrew** [6] - 119:8, 119:9, 119:11, 119:13, 141:4, 141:13
**kite** [1] - 29:12
**knock** [1] - 43:7
**knock-on** [1] - 43:7
**knowledge** [5] - 16:11, 56:3, 76:7, 92:12, 107:9
**known** [1] - 128:4
**knows** [3] - 25:17, 56:9, 58:10
**KRISTI** [1] - 1:7, 2:13
**Krome** [6] - 25:22, 54:23, 68:6, 77:16, 107:18, 107:23

## L

**L-28** [2] - 45:20, 57:13

**lack** [1] - 43:13
**lacks** [1] - 89:9
**laid** [1] - 43:12
**land** [12] - 28:22, 54:24, 57:14, 58:20, 76:19, 103:24, 116:21, 116:23, 117:7, 121:12, 130:23
**landing** [1] - 119:17
**landings** [1] - 119:15
**lands** [4] - 15:11, 28:22, 43:4, 43:14
**language** [5] - 28:11, 54:12, 82:17, 112:17, 117:1
**large** [2] - 120:24, 120:25
**largely** [2] - 14:10, 138:16
**Larsen** [1] - 89:13
**Las** [1] - 2:10
**last** [10] - 36:11, 55:4, 56:5, 61:20, 65:22, 81:23, 94:5, 103:21, 105:19, 106:6
**lasts** [1] - 106:5
**latitude** [1] - 85:15
**laundering** [1] - 131:20
**laundry** [1] - 105:1
**law** [41] - 10:4, 11:4, 14:18, 15:11, 21:20, 24:18, 24:24, 25:3, 25:6, 25:10, 25:12, 32:15, 32:19, 44:8, 45:22, 51:20, 58:6, 62:1, 65:15, 65:18, 70:15, 74:4, 85:16, 87:9, 89:6, 97:11, 98:15, 100:24, 101:12, 102:15, 105:10, 105:21, 106:6, 113:4, 126:7, 126:19, 135:4, 135:16, 135:17, 135:19
**lawfully** [1] - 80:7
**laws** [5] - 14:1, 36:2, 36:3, 36:4, 70:24
**lawsuit** [2] - 71:12, 83:8
**lawyers** [5] - 8:19, 10:9, 21:21, 37:8, 129:21
**lays** [1] - 39:15
**leading** [2] - 34:14, 63:7
**leap** [3] - 9:9, 41:19, 57:1
**leapt** [1] - 57:1

**learned** [1] - 15:3
**learner** [1] - 39:15
**learning** [3] - 117:7, 120:6, 120:9
**least** [7] - 37:10, 47:14, 58:12, 75:13, 82:12, 101:22, 113:25
**leave** [1] - 34:3
**leaves** [1] - 88:16
**Lebron** [1] - 108:20
**led** [1] - 17:19
**left** [9] - 13:12, 25:13, 29:17, 49:8, 54:17, 102:19, 103:8, 112:5
**legal** [11] - 13:25, 17:8, 61:23, 62:14, 87:16, 98:11, 98:19, 99:6, 132:15, 133:10
**legally** [6] - 94:17, 94:20, 95:5, 98:1, 98:7, 99:24
**legislation** [2] - 17:19, 83:8
**legislative** [3] - 92:11, 92:12, 96:14
**legislator** [1] - 96:14
**legislature** [1] - 79:16
**legislatures** [1] - 105:24
**legitimate** [1] - 80:11
**Leopold** [3] - 10:23, 11:2, 17:19
**less** [2] - 15:5, 70:17
**letter** [2] - 28:21, 51:15
**letters** [4] - 28:24, 46:13, 56:15, 140:1
**letting** [1] - 129:6
**level** [7] - 47:12, 50:20, 55:24, 65:23, 70:3, 71:19, 122:15
**leveled** [1] - 76:20
**levelled** [1] - 122:3
**levels** [3] - 43:7, 123:23, 123:24
**levers** [1] - 95:4
**Levine** [1] - 28:24
**liability** [1] - 64:23
**licensed** [1] - 120:8
**lie** [1] - 29:15
**lies** [1] - 27:12
**life** [4] - 53:21, 58:25, 68:23, 121:9
**lifespan** [1] - 104:24
**light** [10] - 29:23, 32:23, 47:21, 51:7, 51:8, 51:10, 51:13, 51:15, 123:3

**lighting** [5] - 33:15, 34:9, 76:18, 143:10, 143:16
**lights** [3] - 32:13, 54:15, 54:20
**likelihood** [17] - 29:19, 36:24, 37:4, 39:6, 39:9, 42:3, 42:19, 42:21, 46:24, 51:24, 52:9, 87:1, 87:19, 96:24, 122:25, 128:16, 137:1
**likely** [31] - 9:13, 31:12, 72:20, 77:1, 85:22, 86:5, 86:8, 87:3, 90:7, 91:9, 92:23, 94:1, 94:5, 106:25, 113:19, 113:20, 114:24, 115:6, 116:9, 116:19, 118:23, 118:25, 119:2, 122:9, 123:6, 123:10, 123:14, 124:23, 142:20
**likewise** [4] - 8:2, 65:10, 70:13, 100:22
**limit** [1] - 76:15
**limited** [2] - 62:3, 62:18
**line** [13] - 45:16, 45:18, 49:8, 49:9, 49:11, 51:1, 51:4, 51:5, 51:18, 81:25, 122:2, 139:18
**linear** [1] - 32:7
**lips** [1] - 90:13
**listened** [1] - 139:4
**listening** [1] - 133:9
**lists** [1] - 16:16
**literally** [3] - 14:23, 20:21, 33:18
**litigated** [1] - 86:12
**litigating** [1] - 37:14
**litigation** [1] - 85:12
**live** [9] - 15:17, 16:24, 17:6, 17:7, 32:2, 44:23, 103:25, 119:9, 141:6
**LLP** [1] - 2:9
**loading** [2] - 42:19, 44:2
**local** [13] - 17:8, 17:10, 44:1, 65:23, 100:11, 100:16, 100:23, 101:3, 101:4, 101:6, 101:10, 109:9
**located** [8] - 37:17, 37:22, 37:24, 38:11, 44:20, 44:25, 45:11, 48:9

**location** [11] - 23:5, 23:14, 49:24, 51:15, 57:22, 68:14, 79:9, 88:15, 137:12, 137:17
**location-specific** [1] - 57:22
**locations** [1] - 44:19
**logic** [1] - 112:8
**logically** [1] - 100:18
**long-tailed** [1] - 124:4
**look** [31] - 9:8, 9:9, 27:23, 28:20, 40:21, 41:17, 41:19, 52:19, 56:9, 57:1, 61:13, 61:14, 62:16, 64:25, 66:4, 66:13, 66:14, 95:11, 107:7, 109:14, 109:16, 114:15, 114:17, 114:18, 114:23, 115:21, 115:22, 136:14, 136:16, 140:9, 141:13
**look-before-you-leap** [1] - 41:19
**looked** [5] - 17:1, 30:12, 55:3, 92:4
**looking** [6] - 64:15, 70:8, 75:16, 90:17, 93:14, 130:1
**looks** [2] - 30:23, 31:8
**Loop** [1] - 35:7
**lose** [3] - 59:2, 103:6, 122:20
**loss** [2] - 43:10, 122:12
**lost** [4] - 33:14, 34:8, 104:21, 106:14
**loud** [4] - 120:19, 121:11, 121:21
**Louisiana** [3] - 14:4, 69:2, 69:4
**lousy** [1] - 69:5
**luck** [1] - 13:14
**lunch** [3] - 59:14, 59:16, 59:23
**LYONS** [1] - 2:13

## M

**mail** [3] - 63:8, 72:4, 73:3
**main** [1] - 52:5
**maintain** [2] - 143:8, 143:15
**maintaining** [1] - 57:8
**maintenance** [1] - 63:1

**major** [10] - 43:24, 44:5, 61:10, 74:8, 75:16, 75:20, 113:8, 113:9, 113:11, 125:8
**majority** [2] - 28:15, 102:12
**makers** [3] - 10:21, 10:25, 126:9
**Mall** [1] - 134:7
**mammals** [1] - 81:10
**manage** [1] - 130:2
**managed** [1] - 95:24
**Management** [19] - 6:5, 6:8, 6:10, 6:13, 11:25, 60:23, 65:4, 65:21, 66:6, 72:18, 92:24, 94:1, 96:25, 97:6, 98:24, 100:3, 131:16, 132:25, 136:18
**management** [3] - 31:11, 76:20, 142:13
**manager** [1] - 39:19
**managing** [1] - 65:23
**manner** [1] - 37:2
**map** [9] - 35:2, 38:1, 38:6, 38:11, 43:16, 44:15, 48:21, 51:2, 88:8
**maps** [3] - 38:2, 38:10, 38:11
**Marcel** [1] - 42:13
**marginal** [1] - 83:4
**Marijuana** [1] - 99:16
**marijuana** [1] - 99:19
**marine** [1] - 81:10
**Marisa** [1] - 6:17
**MARISSA** [1] - 2:20
**Marjorie** [1] - 10:18
**marked** [1] - 16:16
**material** [1] - 44:11
**materials** [1] - 74:17
**math** [1] - 37:10
**matter** [15] - 8:13, 14:18, 15:13, 26:19, 40:19, 50:18, 50:20, 58:6, 58:14, 62:5, 105:6, 113:12, 132:7, 135:4, 144:8
**matters** [4] - 22:1, 62:3, 91:11, 99:13
**Mayor** [1] - 28:24
**mayor's** [1] - 140:1
**McVoy** [10] - 29:6, 30:9, 30:20, 30:23, 31:1, 31:7, 88:7, 139:17, 140:5, 142:11
**mean** [27] - 7:22, 18:8, 20:21, 24:2, 34:3, 35:7, 35:22,

47:17, 53:7, 53:18, 59:17, 62:23, 65:20, 69:1, 73:1, 74:20, 76:4, 78:14, 80:13, 80:25, 84:11, 86:18, 93:10, 95:10, 105:19, 122:19
**meaning** [3] - 121:25, 122:4, 124:4
**meaningless** [1] - 88:20
**means** [4] - 50:13, 76:13, 86:19, 104:23
**meant** [1] - 35:25
**meanwhile** [1] - 138:2
**measured** [1] - 39:11
**measures** [2] - 52:18, 99:1
**media** [6] - 67:8, 67:24, 69:14, 95:1, 134:13, 134:16
**medically** [1] - 75:7
**meet** [11] - 20:5, 57:9, 57:18, 86:20, 105:14, 105:24, 111:20, 127:20, 133:16, 135:2, 137:12
**meeting** [4] - 17:15, 19:24, 20:8, 67:9
**meetings** [1] - 47:5
**meets** [4] - 13:9, 98:21, 133:4, 134:1
**members** [9] - 30:3, 30:5, 33:3, 45:2, 48:12, 50:6, 50:13, 130:15, 130:18
**members'** [1] - 130:22
**memory** [1] - 105:13
**mention** [1] - 31:19
**mentioned** [7] - 15:10, 24:10, 49:3, 51:11, 91:11, 113:22, 130:10
**mere** [2] - 61:17, 65:3
**merely** [1] - 100:12
**merits** [21] - 36:24, 37:4, 39:6, 39:11, 42:2, 85:22, 86:7, 87:2, 87:4, 87:9, 87:13, 87:15, 87:19, 90:7, 90:21, 91:9, 113:20, 114:22, 115:1, 127:25, 128:1
**messages** [1] - 12:25
**met** [8] - 9:5, 40:17, 86:24, 95:5, 106:24,

118:23, 123:8, 123:9
**Mexico** [2] - 5:10, 69:3
**MIA** [3] - 103:23, 120:11, 121:17
**MIAMI** [3] - 1:2, 2:22, 2:24
**Miami** [41] - 1:4, 1:17, 1:21, 2:5, 2:11, 2:15, 2:25, 3:3, 3:4, 6:25, 17:25, 18:16, 28:22, 28:25, 29:3, 29:5, 29:8, 37:15, 37:16, 37:22, 44:25, 45:11, 45:16, 45:19, 45:20, 55:20, 84:3, 84:6, 84:7, 84:11, 84:20, 88:1, 139:22, 139:23, 139:24, 139:25, 140:2, 140:3, 140:5, 144:13, 144:14
**Miami-Dade** [30] - 6:25, 17:25, 18:16, 28:22, 28:25, 29:3, 29:5, 29:8, 37:15, 37:16, 37:22, 44:25, 45:11, 45:16, 45:19, 45:20, 55:20, 84:3, 84:6, 84:7, 84:11, 84:20, 88:1, 139:22, 139:24, 139:25, 140:2, 140:3, 140:5
**MIAMI-DADE** [2] - 2:22, 2:24
**Miccosukee** [6] - 5:20, 5:23, 37:17, 37:18, 40:16, 44:24
**microphone** [1] - 60:14
**Middle** [2] - 27:21, 90:8
**middle** [14] - 14:24, 31:20, 35:12, 43:24, 48:9, 57:1, 68:5, 68:9, 68:20, 69:6, 78:22, 101:13, 103:21
**might** [18] - 19:4, 23:6, 34:4, 34:19, 82:12, 86:10, 86:11, 88:17, 88:22, 114:1, 115:25, 116:17, 117:3, 122:12, 123:12, 123:22, 137:21
**mile** [1] - 122:4
**miles** [6] - 30:17, 32:8, 32:23, 38:12, 44:17, 88:21
**military** [4] - 55:10,

121:5, 121:6, 121:10
**Miller** [1] - 135:7
**Miller's** [1] - 20:23
**million** [10] - 32:7, 32:9, 41:5, 53:24, 73:9, 83:10, 84:15, 96:22, 115:24, 131:8
**mind** [2] - 90:18, 116:16
**minds** [4] - 17:16, 19:24, 20:8, 67:9
**minimal** [2] - 47:2, 74:10
**minimum** [5] - 20:20, 31:14, 99:23, 100:24, 101:2
**minute** [4] - 7:14, 52:3, 129:9
**minutes** [9] - 8:9, 29:17, 33:6, 33:8, 38:20, 38:23, 106:16, 129:23, 129:25
**mirrors** [1] - 23:12
**missed** [1] - 90:16
**missing** [1] - 118:17
**misspoke** [1] - 45:15
**misstated** [1] - 98:16
**mistaken** [1] - 73:3
**mitigating** [1] - 52:18
**mixed** [1] - 101:25
**modern** [1] - 85:12
**modest** [1] - 9:8
**moment** [6] - 12:21, 21:19, 37:7, 80:3, 117:15, 138:3
**moment's** [1] - 35:12
**monetary** [1] - 51:22
**money** [13] - 32:15, 72:25, 79:16, 83:12, 93:8, 93:19, 94:10, 94:14, 94:23, 95:6, 116:1, 131:22, 131:23
**monitored** [1] - 61:3
**monitoring** [1] - 65:13
**Monroe** [2] - 29:8, 140:5
**months** [15] - 44:8, 53:22, 53:23, 53:25, 54:2, 72:6, 76:13, 97:9, 102:21, 119:19, 119:22, 120:15, 121:4
**Moore** [2] - 121:14
**morning** [27] - 5:6, 5:11, 5:14, 5:15, 5:18, 5:19, 5:22, 6:2, 6:4, 6:6, 6:7, 6:9, 6:11, 6:14, 6:15, 6:17, 6:19, 6:20, 6:22, 6:24, 7:1, 15:25, 16:19, 17:5,

36:8, 84:2, 84:20
**mortality** [6] - 33:22, 34:5, 34:7, 34:14, 34:19, 142:9
**most** [12] - 39:7, 56:21, 58:16, 60:13, 73:5, 87:2, 87:8, 87:11, 98:2, 104:5, 119:14, 122:14
**mostly** [1] - 105:15
**motion** [6] - 8:4, 9:2, 28:2, 37:20, 59:6, 112:12
**move** [4] - 90:4, 90:10, 90:21, 138:13
**moved** [1] - 33:16
**moving** [4] - 8:24, 57:12, 90:14, 91:2
**MR** [181] - 4:4, 4:5, 4:6, 4:7, 4:8, 4:9, 5:6, 5:19, 5:22, 6:4, 6:7, 6:9, 6:11, 6:15, 6:20, 6:22, 6:24, 7:6, 7:10, 7:16, 7:19, 7:21, 7:25, 8:2, 8:5, 8:8, 8:11, 16:5, 16:9, 16:14, 16:18, 16:23, 17:24, 18:1, 18:15, 18:18, 22:3, 23:2, 24:4, 24:12, 24:14, 29:19, 33:7, 33:9, 34:6, 34:20, 35:21, 36:8, 36:18, 37:6, 37:9, 37:10, 37:16, 38:6, 38:10, 38:14, 38:17, 38:19, 38:24, 39:1, 39:4, 40:5, 46:2, 46:7, 46:11, 46:23, 48:22, 49:2, 49:11, 50:3, 53:12, 54:1, 55:13, 59:19, 59:21, 60:2, 60:8, 60:10, 60:15, 61:25, 62:11, 63:16, 63:21, 63:25, 64:8, 64:25, 65:3, 66:4, 67:15, 67:23, 68:10, 68:13, 68:22, 69:7, 69:13, 71:7, 71:10, 71:17, 72:9, 72:17, 73:7, 73:11, 73:14, 74:3, 74:7, 74:24, 75:10, 75:14, 75:16, 76:7, 76:15, 77:19, 77:25, 78:7, 78:11, 78:15, 79:1, 79:21, 79:24, 80:2, 80:19, 80:22, 82:20, 82:25, 83:13, 83:18, 83:23, 84:19, 84:25, 85:3, 85:8, 90:15, 90:19,

91:6, 93:3, 93:5, 93:21, 93:24, 94:8, 95:18, 96:24, 101:17, 101:20, 101:24, 102:17, 103:2, 103:5, 103:14, 104:2, 104:7, 105:2, 106:13, 106:17, 106:20, 108:1, 108:24, 111:2, 114:9, 114:16, 114:18, 116:7, 116:14, 117:14, 118:7, 118:11, 120:12, 122:23, 123:5, 124:11, 125:25, 126:9, 127:22, 128:9, 129:4, 129:12, 129:15, 129:19, 129:23, 130:4, 132:6, 143:20
**MRA** [3] - 37:25, 45:3, 45:6
**MS** [3] - 5:11, 5:15, 6:17
**multi** [5] - 56:18, 56:23, 121:5
**multi-billion** [2] - 56:18, 56:23
**multi-decade** [2] - 56:18, 56:23
**multi-engine** [1] - 121:5
**multiple** [8] - 79:4, 86:6, 87:5, 93:21, 115:2, 119:17, 121:18, 126:3
**multiplier** [3] - 77:6, 78:12, 78:21
**must** [32] - 9:18, 10:2, 13:10, 22:17, 27:25, 55:15, 56:12, 59:9, 61:15, 74:15, 76:1, 86:8, 86:9, 86:16, 90:24, 91:8, 91:9, 94:13, 95:4, 95:5, 95:7, 97:3, 98:10, 100:25, 104:16, 105:13, 124:5, 124:13, 124:14, 125:17, 126:15, 127:21
**myopically** [1] - 28:10
**mysteries** [1] - 18:19

---

**N**

**N.W** [1] - 2:18
**nail** [1] - 104:21
**Namath** [2] - 30:9,

30:20
**name** [1] - 35:25
**narrow** [2] - 26:8, 33:16
**nation** [2] - 35:17, 58:6
**national** [9] - 22:20, 31:20, 68:1, 69:18, 77:25, 78:22, 81:16, 83:5, 117:23
**National** [5] - 29:9, 31:21, 32:24, 37:21, 99:15
**nationals** [1] - 85:18
**Nationwide** [1] - 100:24
**native** [2] - 43:8
**natural** [1] - 122:4
**Natural** [2] - 52:6, 85:9
**Naturalization** [1] - 64:11
**nature** [6] - 51:21, 51:24, 63:6, 81:18, 105:9, 105:18
**Navy** [7] - 22:15, 22:18, 22:19, 22:22, 52:25, 81:8, 81:13
**Navy's** [2] - 80:10, 81:15
**NE** [2] - 2:15, 2:21
**near** [2] - 43:3, 94:25
**nearly** [3] - 31:3, 32:8, 101:3
**NEBBIA** [3] - 93:2, 93:3, 93:4
**necessarily** [3] - 76:6, 82:10, 113:24
**necessary** [9] - 13:25, 22:23, 80:14, 80:23, 97:20, 105:20, 106:2, 137:12, 137:16
**need** [25] - 8:23, 22:20, 23:4, 23:8, 23:13, 27:20, 29:19, 36:15, 39:17, 51:17, 54:22, 55:1, 66:20, 71:5, 84:7, 85:14, 104:19, 105:16, 115:18, 122:24, 124:22, 127:1, 127:16, 127:23, 134:16
**needed** [3] - 20:16, 57:7, 103:24
**needs** [8] - 39:24, 68:3, 91:21, 91:22, 92:3, 115:4, 137:13, 139:7
**negotiated** [2] -

60:24, 61:3
**NEPA** [121] - 9:1, 9:6, 9:7, 9:21, 9:22, 9:24, 10:1, 10:7, 10:8, 10:10, 10:13, 10:14, 10:16, 10:23, 11:3, 11:7, 11:14, 11:16, 11:20, 22:19, 25:14, 25:17, 25:18, 25:21, 26:16, 27:6, 29:20, 32:20, 35:18, 39:13, 40:7, 40:10, 40:13, 40:17, 41:7, 42:9, 47:3, 47:7, 52:15, 58:9, 59:10, 60:16, 61:18, 64:2, 65:8, 65:16, 66:11, 72:11, 74:9, 80:23, 81:1, 81:6, 81:22, 81:25, 82:1, 82:7, 82:10, 82:21, 83:2, 83:15, 86:23, 87:13, 90:21, 90:23, 91:3, 92:2, 92:6, 92:16, 95:7, 95:22, 97:2, 97:8, 97:11, 97:20, 99:2, 99:11, 99:12, 99:20, 99:24, 99:25, 100:5, 100:12, 100:19, 101:4, 101:7, 101:8, 107:5, 110:14, 111:1, 111:8, 112:3, 112:4, 112:24, 113:8, 113:17, 113:24, 114:4, 116:25, 118:18, 118:19, 122:24, 127:18, 128:5, 132:16, 133:20, 134:9, 134:10, 137:2, 137:3, 137:6, 137:7, 137:19, 140:12, 140:13, 140:23, 143:2, 143:3
**NEPA's** [3] - 9:5, 52:14, 140:19
**nervous** [1] - 120:10
**Nevada** [1] - 89:14
**never** [9] - 17:9, 18:20, 27:18, 85:11, 121:8, 121:9, 137:11, 139:5, 139:11
**New** [2] - 15:15, 89:17
**new** [7] - 32:8, 34:18, 78:8, 82:8, 104:14, 116:23, 142:12
**newfound** [1] - 26:18
**news** [1] - 58:9
**next** [21] - 11:20, 31:5, 32:1, 32:22,

35:1, 40:11, 41:6,
43:15, 44:14, 44:24,
49:24, 51:7, 51:12,
51:19, 52:13, 52:22,
53:2, 56:1, 58:18,
61:14, 127:7
**Next** [1] - 58:4
**nexus** [1] - 25:14
**night** [1] - 14:24
**nine** [5] - 20:12,
26:7, 41:4, 44:5,
133:11
**Ninth** [1] - 100:10,
118:21
**Nixon** [1] - 11:3
**NO** [1] - 1:2
**nobody** [7] - 30:16,
62:6, 68:2, 77:14,
104:22, 107:15,
141:24
**NOEM** [2] - 1:7, 2:13
**Noem** [5] - 5:3, 12:6,
20:11, 67:4, 74:21
**Noem's** [1] - 14:8
**noise** [2] - 121:17,
121:18
**non** [14] - 11:22,
11:23, 17:10, 60:21,
61:12, 61:15, 65:22,
65:25, 66:10, 74:10,
76:17, 86:16, 132:15,
136:14
**non-federal** [8] -
11:22, 11:23, 60:21,
61:12, 61:15, 66:10,
74:10, 132:15
**non-permanent** [1] -
76:17
**non-waivable** [1] -
86:16
**noncompliance** [1] -
140:19
**none** [12] - 23:4,
24:17, 26:9, 32:11,
40:8, 41:1, 42:9, 44:4,
83:25, 86:4, 136:10,
137:10
**nonenforcement** [1]
- 126:3
**norm** [1] - 85:13
**normal** [1] - 126:18
**north** [2] - 43:1,
49:18
**North** [3] - 3:3,
78:24, 144:13
**northbound** [1] -
49:19
**Northern** [1] - 27:21
**note** [7] - 69:20,
69:24, 97:5, 98:16,

99:10, 110:10, 121:24
**noted** [2] - 37:9, 56:1
**notes** [1] - 140:9
**nothing** [16] - 17:11,
56:25, 76:9, 76:11,
76:12, 77:8, 77:12,
78:4, 83:8, 94:15,
107:13, 108:12,
116:23, 119:20,
123:19, 133:6
**notice** [6] - 12:12,
23:24, 47:4, 58:12,
58:13, 141:9
**noticed** [2] - 30:16,
141:25
**noting** [1] - 21:1
**notion** [1] - 90:10
**November** [2] - 44:7
**nowhere** [2] - 55:4,
94:25
**Number** [2] - 9:20,
12:14
**number** [8] - 24:22,
28:16, 47:21, 51:10,
70:4, 81:10, 126:2,
141:20
**numbers** [1] - 78:6
**numerous** [1] -
143:1
**nutrient** [3] - 42:19,
43:25, 44:2
**nutrient-generating**
[1] - 43:25
**nutrient-loading** [1]
- 44:2

## O

**objected** [1] - 26:21
**objection** [4] - 27:16,
27:24, 28:3, 139:13
**objectives** [2] -
126:20, 137:20
**obligation** [5] -
62:10, 72:15, 98:17,
118:16, 127:19
**obligations** [4] -
9:22, 98:11, 98:19,
99:7
**Obligations** [1] -
99:5
**obliged** [1] - 33:25
**observed** [2] - 49:3,
81:11
**obtain** [1] - 85:19
**obvious** [2] - 19:8,
75:8
**obviously** [4] - 18:3,
18:9, 51:5, 54:16
**occasion** [1] - 49:3

**occasionally** [1] -
30:18
**occasions** [1] -
134:24
**occupied** [1] - 14:5
**occupy** [1] - 50:9
**occur** [5] - 40:22,
43:3, 86:10, 86:11,
143:12
**occurred** [7] - 28:8,
28:15, 41:1, 84:1,
84:5, 88:3, 134:9
**occurring** [5] - 44:4,
88:1, 88:3, 135:18,
142:21
**occurs** [1] - 43:6
**OF** [4] - 1:1, 1:4,
2:18, 2:20
**off-road** [2] - 48:21,
48:25
**OFFICE** [2] - 2:14,
2:24
**office** [2] - 12:7, 70:4
**officer** [1] - 13:1
**Officer** [1] - 64:21
**OFFICER** [1] - 60:4
**officers** [2] - 25:2,
25:10
**official** [5] - 3:2,
61:21, 69:23, 71:13,
98:3
**Official** [1] - 144:12
**officials** [10] - 13:4,
31:18, 67:13, 70:25,
92:18, 94:21, 94:22,
95:2, 105:21
**often** [3] - 48:16,
50:6, 88:21
**Okeelanta** [1] -
140:18
**Olas** [1] - 2:10
**ominous** [1] - 35:25
**omission** [2] - 84:24,
89:2
**omissions** [7] - 28:8,
28:15, 29:14, 83:25,
139:16, 139:21, 140:7
**on-site** [1] - 13:4
**once** [3] - 45:7,
53:20, 115:6
**One** [1] - 125:7
**one** [71] - 12:24,
17:21, 18:24, 23:10,
24:2, 24:16, 26:11,
28:3, 28:22, 30:21,
31:4, 38:2, 39:13,
39:13, 41:2, 41:13,
49:4, 50:25, 52:6,
54:18, 56:8, 56:21,
58:11, 58:13, 62:6,

72:12, 76:24, 78:23,
89:15, 89:16, 89:21,
90:5, 91:18, 96:11,
98:5, 98:10, 100:16,
103:20, 104:3, 104:8,
105:4, 108:3, 110:20,
111:8, 111:17, 113:5,
113:6, 113:18,
114:10, 115:8,
116:10, 117:15,
117:16, 119:13,
119:17, 120:21,
121:2, 124:20,
125:19, 127:9, 130:9,
131:21, 133:12,
135:3, 136:22, 137:6,
138:5, 139:5, 139:9,
139:19, 141:18
**one-third** [1] - 28:22
**online** [2] - 24:1,
24:2
**open** [3] - 50:5,
57:20, 130:14
**operate** [1] - 25:5
**operated** [1] - 78:5
**operating** [4] -
24:24, 47:19, 123:24,
130:14
**operation** [7] - 11:9,
42:17, 53:20, 60:17,
73:18, 110:19, 111:16
**operations** [12] -
26:15, 62:12, 88:2,
112:19, 119:24,
120:1, 120:3, 136:3,
138:4, 138:11,
141:20, 143:11
**Operations** [1] -
12:20
**operative** [1] - 39:13
**opined** [1] - 123:22
**opinion** [4] - 25:10,
60:22, 128:24, 132:12
**opportunity** [1] -
21:6
**oppose** [1] - 28:2
**opposed** [5] - 22:25,
23:8, 68:17, 125:17,
137:17
**opposite** [1] - 41:20
**option** [3] - 28:14,
40:3, 41:15
**options** [4] - 23:8,
28:14, 39:21, 40:1
**orange** [1] - 51:18
**Orange** [2] - 24:10,
70:22
**order** [15] - 12:1,
12:14, 26:7, 32:4,
89:4, 89:20, 97:22,

110:11, 111:19,
126:12, 128:19,
130:6, 132:13,
143:21, 143:23
**Order** [1] - 5:1
**ordered** [1] - 96:6
**Organization** [1] -
99:15
**organized** [1] - 96:2
**origin** [1] - 67:5
**original** [1] - 122:5
**originally** [1] - 99:14
**Orlando** [1] - 100:21
**Osceola** [2] - 5:24,
51:3
**Osceola's** [1] - 32:22
**otherwise** [3] - 10:4,
28:3, 71:23
**ourselves** [2] -
43:19, 65:16
**outcome** [1] - 74:11
**outreach** [1] - 47:5
**outs** [1] - 74:4
**outside** [1] - 19:10
**outweigh** [1] - 83:5
**outweighs** [1] -
81:20
**overcrowding** [2] -
126:25, 131:12
**overgrowth** [3] -
42:25, 43:1, 43:6
**overrides** [1] -
108:12
**overwhelming** [1] -
81:17
**own** [15] - 13:15,
14:16, 23:11, 41:8,
51:8, 57:12, 76:18,
88:6, 92:10, 94:15,
96:9, 108:3, 129:21,
133:4, 133:15
**owned** [2] - 84:6,
102:5
**owner** [3] - 18:12,
18:16, 84:17
**ownership** [1] -
105:6
**owns** [1] - 105:7
**oxygen** [1] - 43:7

## P

**P.A** [1] - 2:2
**p.m** [2] - 1:6, 144:2
**P.O** [1] - 2:24
**page** [12] - 13:11,
39:14, 40:14, 52:7,
89:12, 89:14, 98:25,
100:4, 112:13,
112:16, 131:8, 135:15

**PAGE** [1] - 4:3
**Pages** [1] - 1:8
**pages** [2] - 26:7, 39:13
**PAH** [3] - 123:23, 123:25
**paid** [4] - 63:15, 96:2, 96:19, 134:24
**panther** [15] - 30:6, 33:11, 33:13, 34:3, 34:5, 34:14, 34:17, 47:25, 122:12, 122:17, 140:3, 142:3, 142:5, 142:21
**Panther** [1] - 51:3
**panthers** [2] - 34:11, 142:7
**pANUCCIO** [1] - 128:9
**Panuccio** [4] - 6:4, 63:7, 85:7, 139:17
**PANUCCIO** [52] - 2:7, 4:7, 6:4, 7:16, 7:19, 7:21, 7:25, 59:19, 60:2, 85:8, 90:15, 90:19, 91:6, 93:3, 93:5, 93:21, 93:24, 94:8, 95:18, 96:24, 101:17, 101:20, 101:24, 102:17, 103:2, 103:5, 103:14, 104:2, 104:7, 105:2, 106:13, 106:17, 106:20, 108:1, 108:24, 111:2, 114:9, 114:16, 114:18, 116:7, 116:14, 117:14, 118:7, 118:11, 120:12, 122:23, 123:5, 124:11, 125:25, 126:9, 127:22, 129:4
**papers** [4] - 27:17, 105:23, 125:23, 129:3
**paragraph** [7] - 13:21, 14:9, 62:16, 73:17, 118:19, 131:7
**paragraphs** [1] - 86:6
**pardon** [3] - 33:7, 80:3, 111:6
**Park** [2] - 31:21, 37:21
**park** [1] - 33:1
**parking** [5] - 31:1, 31:3, 49:14, 49:21, 49:25
**part** [14] - 28:8, 43:2, 47:15, 47:19, 79:17,

110:19, 110:20, 111:11, 111:17, 112:19, 131:4, 139:21
**participation** [2] - 9:18, 134:8
**particular** [5] - 66:24, 70:18, 71:10, 95:23, 110:10
**particularly** [2] - 15:17, 24:9
**parties** [4] - 8:15, 96:12, 131:5, 143:22
**partly** [1] - 67:15
**partnership** [5] - 13:22, 20:14, 69:15, 70:10, 135:24
**party** [4] - 18:21, 18:23, 65:7, 124:15
**pass** [2] - 11:13, 20:6
**passed** [1] - 44:7
**passengers** [1] - 120:5
**passive** [1] - 100:7
**past** [3] - 12:4, 104:4, 104:5
**patch** [1] - 49:24
**path** [2] - 101:14, 104:3
**PATRICIA** [2] - 3:2, 144:12
**Patrol** [2] - 23:20, 24:21
**Paul** [2] - 5:6, 8:11
**PAUL** [1] - 1:15
**pause** [2] - 10:21, 35:12
**PAUTLER** [1] - 1:22
**Pautler** [1] - 1:15
**paved** [2] - 76:19, 122:4
**pavement** [7] - 30:24, 31:9, 31:12, 32:6, 32:13, 142:12
**paving** [3] - 54:16, 76:18, 116:22
**pay** [2] - 73:10, 93:11
**pending** [4] - 23:18, 110:4, 111:13, 128:15
**Pennsylvania** [1] - 2:18
**Penthouse** [1] - 1:17
**people** [28] - 15:21, 15:22, 21:23, 21:25, 22:1, 58:21, 64:5, 64:19, 66:1, 68:22, 74:18, 76:12, 103:25, 104:10, 104:21, 107:16, 107:18, 107:24, 108:5, 108:7, 117:5, 117:22, 120:6,

120:9, 124:21, 124:25, 141:24
**percent** [3] - 24:14, 45:2, 141:11
**Percival** [1] - 12:8
**perfect** [1] - 106:17
**perform** [1] - 17:8
**performed** [1] - 18:9
**performing** [3] - 13:24, 58:24, 71:15
**perhaps** [5] - 58:16, 63:3, 92:14, 93:6, 97:8
**period** [4] - 109:15, 110:9, 121:13, 143:24
**periodically** [1] - 105:16
**permanent** [8] - 53:10, 54:6, 54:16, 56:7, 56:8, 76:17, 104:25, 123:10
**permission** [1] - 66:20
**permit** [3] - 140:13, 140:16, 143:13
**permits** [3] - 54:6, 88:13, 88:14
**permitted** [1] - 143:14
**perpetuating** [1] - 122:22
**perpetuity** [1] - 53:21
**person** [13] - 18:12, 61:21, 62:4, 63:9, 63:10, 63:18, 64:4, 64:20, 64:21, 76:11, 84:18, 102:3, 109:16
**personal** [2] - 16:11, 56:3
**personnel** [5] - 39:19, 65:12, 65:18, 66:25, 71:1
**persons** [6] - 24:8, 48:24, 75:3, 81:4, 91:20, 125:20
**perspective** [2] - 76:1, 116:9
**persuaded** [1] - 10:21
**pertain** [3] - 66:23, 66:24, 70:19
**pervious** [2] - 30:25, 43:10
**pesticides** [1] - 99:19
**Petersburg** [1] - 1:23
**Ph.D** [2] - 34:21, 47:12
**phone** [2] - 70:4,

88:8
**photo** [2] - 31:5, 32:22
**photos** [5] - 15:23, 15:24, 16:6, 16:12, 16:20
**physical** [2] - 48:12, 63:1
**PI** [3] - 15:11, 15:16, 28:2
**picking** [2] - 107:15, 107:20
**picture** [6] - 30:12, 30:21, 31:3, 33:4, 120:22, 120:23
**pictures** [1] - 16:3
**piece** [2] - 55:13, 139:19
**pilot** [1] - 121:15
**pin** [1] - 11:6
**pink** [1] - 44:20
**Piper** [1] - 141:12
**PIROPATO** [2] - 2:20, 6:17
**Piropato** [1] - 6:18
**place** [15] - 21:15, 31:12, 49:5, 49:11, 65:25, 70:10, 78:19, 79:9, 80:24, 103:21, 138:13, 138:21, 142:25, 143:8, 143:16
**places** [9] - 19:19, 104:8, 107:18, 111:12, 111:18, 127:11, 127:13, 127:15, 138:1
**PLAINTIFF** [1] - 2:1
**plaintiff** [6] - 5:12, 82:20, 83:1, 85:20, 86:17, 138:25
**Plaintiff's** [4] - 20:24, 25:18, 30:13, 30:22
**Plaintiffs** [2] - 1:5, 26:23
**plaintiffs** [52] - 5:5, 5:21, 8:12, 21:5, 28:13, 32:16, 36:12, 42:3, 60:21, 61:1, 61:9, 66:12, 66:16, 67:7, 69:14, 69:20, 70:8, 84:1, 84:2, 84:22, 85:21, 86:20, 86:24, 87:2, 87:14, 87:20, 88:16, 90:6, 90:25, 91:8, 91:13, 91:14, 91:25, 92:15, 94:18, 106:24, 109:21, 110:13, 111:7, 111:23, 112:14, 112:20,

113:19, 114:24, 119:3, 124:19, 127:10, 129:20, 130:8, 133:11, 133:12, 134:12
**PLAINTIFFS** [1] - 1:15
**plaintiffs'** [25] - 28:14, 35:23, 42:15, 52:21, 70:6, 76:24, 84:19, 85:24, 87:6, 88:6, 88:14, 92:10, 94:17, 96:9, 96:10, 100:19, 113:17, 117:8, 118:12, 119:5, 120:21, 122:8, 123:1, 124:4, 127:10
**Plaintiffs'** [13] - 20:12, 20:19, 23:15, 25:20, 25:21, 28:23, 32:3, 33:5, 35:3, 38:14, 88:13, 133:18, 135:8
**plan** [14] - 31:22, 37:2, 56:23, 62:25, 96:5, 100:11, 134:17, 138:4, 138:6, 138:11, 138:13, 138:17, 138:18, 138:20
**Plan** [5] - 12:20, 18:6, 35:2, 56:19, 57:23
**plane** [4] - 30:19, 59:13, 141:8, 141:18
**planes** [15] - 59:25, 117:7, 120:6, 120:7, 120:18, 121:5, 121:21, 141:1, 141:2, 141:11, 141:12, 141:16, 142:1, 142:3
**planned** [3] - 43:19, 44:5, 95:23
**planning** [4] - 81:10, 132:19, 134:5, 138:8
**plans** [1] - 84:14
**plant** [1] - 43:8
**plants** [1] - 48:18
**play** [5] - 28:4, 28:12, 76:23, 78:1, 81:17
**pleading** [2] - 28:1, 72:2
**pleadings** [1] - 139:10
**pleads** [1] - 18:21
**pleasure** [1] - 59:20
**plus** [3] - 31:18, 47:11
**PO** [1] - 1:23
**pocket** [1] - 28:4
**point** [52] - 16:1,

20:25, 22:3, 22:14, 32:21, 37:3, 64:3, 64:10, 67:7, 67:23, 72:19, 76:16, 80:17, 83:14, 88:6, 88:17, 89:2, 89:3, 89:4, 89:13, 91:17, 93:24, 96:9, 99:18, 100:9, 100:17, 103:3, 103:5, 104:11, 105:4, 105:5, 108:3, 108:14, 109:11, 109:12, 111:10, 111:11, 113:4, 114:14, 114:22, 117:16, 118:13, 124:3, 126:21, 127:23, 128:9, 130:7, 130:9, 135:10, 138:11, 139:12, 140:13

**pointed** [3] - 109:15, 115:22, 137:18

**pointedly** [1] - 21:3

**pointing** [3] - 94:24, 109:21, 111:8

**points** [4] - 87:23, 88:10, 88:11, 124:7

**Policy** [2] - 20:23, 135:7

**policy** [9] - 36:2, 39:13, 39:19, 41:18, 76:21, 104:12, 124:25, 126:19, 127:9

**pollution** [5] - 32:23, 51:7, 51:14, 51:15, 123:4

**polycyclic** [1] - 31:13

**populated** [2] - 23:1, 68:18

**population** [2] - 29:12, 122:15

**populations** [1] - 122:12

**populus** [1] - 102:16

**portion** [2] - 30:22, 37:21

**pose** [1] - 137:21

**posed** [2] - 19:13, 126:14

**poses** [1] - 142:9

**posit** [1] - 65:11

**posited** [1] - 116:4

**position** [10] - 26:19, 52:5, 59:9, 70:1, 83:22, 83:24, 101:22, 118:9, 118:11, 119:3

**positions** [1] - 48:8

**possess** [1] - 61:15

**possibilities** [2] - 91:17, 95:19

**possibility** [11] - 86:7, 91:18, 91:19, 92:18, 92:21, 93:15, 95:16, 95:21, 107:2

**possible** [6] - 106:8, 106:21, 113:14, 118:22, 123:1, 128:19

**possibly** [2] - 57:17, 100:18

**post** [2] - 14:8, 14:11

**posted** [1] - 20:15

**posts** [6] - 67:8, 67:24, 69:14, 134:13, 134:16, 134:18

**posture** [3] - 72:13, 83:14, 126:5

**potential** [12] - 40:20, 45:5, 45:13, 52:17, 52:19, 59:8, 66:12, 92:3, 104:9, 116:19, 124:16

**potentially** [3] - 21:8, 43:11, 104:10

**poured** [1] - 35:8

**power** [14] - 11:23, 60:20, 61:15, 65:5, 89:4, 106:1, 106:4, 108:16, 108:18, 108:21, 108:25, 109:3, 109:10, 111:12

**PowerPoint** [5] - 8:6, 36:9, 36:16, 38:9, 38:17

**powers** [3] - 95:25, 102:25, 105:15

**practices** [1] - 58:25

**precedent** [3] - 41:12, 51:25, 93:25

**precipitated** [1] - 72:16

**precipitating** [1] - 28:17

**precise** [1] - 54:2

**precisely** [5] - 22:11, 105:24, 112:11, 112:20, 112:21

**predetermine** [1] - 140:11

**preeminent** [1] - 58:16

**preempted** [1] - 14:6

**preexisting** [2] - 116:18, 123:23

**preface** [1] - 118:1

**preferable** [1] - 15:17

**preference** [1] - 117:24

**prehearing** [2] - 29:25, 143:6

**preliminary** [33] - 8:16, 8:24, 19:14, 26:1, 85:10, 85:13, 85:19, 85:23, 86:9, 86:13, 86:15, 86:19, 89:5, 89:9, 89:20, 89:22, 89:24, 90:2, 91:10, 112:12, 118:14, 123:11, 123:12, 124:5, 124:17, 124:18, 127:24, 128:12, 128:18, 128:22, 142:24, 142:25, 143:2

**PRELIMINARY** [1] - 1:10

**preparation** [1] - 9:13

**prepare** [1] - 39:17

**prepared** [4] - 8:5, 15:8, 22:7, 32:3

**preparing** [1] - 14:25

**prerogative** [4] - 74:20, 74:23, 74:25, 81:16

**presence** [7] - 33:10, 33:13, 42:18, 45:9, 47:1, 50:17, 59:7

**present** [5] - 21:2, 22:7, 33:1, 85:18, 108:4

**presentation** [8] - 87:7, 87:8, 87:11, 91:2, 112:1, 112:11, 129:7, 139:5

**presentations** [1] - 143:23

**presented** [16] - 19:4, 21:12, 22:11, 22:19, 23:3, 23:14, 23:19, 32:18, 87:14, 94:18, 133:13, 135:23, 137:10, 137:15, 137:23, 142:3

**presenting** [2] - 7:23, 32:17

**presently** [1] - 123:16

**presents** [3] - 33:10, 42:18, 51:23

**preserve** [2] - 31:20, 78:22

**Preserve** [1] - 32:25

**preserving** [3] - 56:17, 79:16, 116:5

**President** [2] - 11:3, 79:13

**president** [1] - 55:15

**presidents** [1] - 105:25

**press** [1] - 95:2

**pressure** [2] - 78:9, 78:18

**presumably** [1] - 72:9

**presume** [1] - 46:8

**presumes** [1] - 82:5

**presumption** [1] - 29:20

**pretrial** [3] - 74:1, 102:10, 143:1

**pretty** [2] - 18:22, 98:14

**prevail** [2] - 91:8, 91:9

**prevent** [1] - 52:15

**preventing** [1] - 48:12

**prevents** [1] - 48:15

**previously** [4] - 30:25, 69:21, 76:19, 116:22

**primarily** [1] - 29:7

**primary** [1] - 50:13

**priorities** [2] - 126:11, 126:19

**prioritized** [1] - 80:5

**priority** [2] - 117:24, 126:12

**private** [4] - 25:19, 41:8, 50:22, 90:24

**problem** [8] - 41:22, 43:3, 68:1, 69:18, 87:12, 122:6, 138:8, 142:8

**problems** [3] - 87:10, 126:14, 137:11

**procedural** [6] - 9:5, 9:7, 40:6, 81:22, 82:2, 140:19

**procedures** [3] - 10:7, 121:17, 121:18

**proceeding** [2] - 24:15, 134:3

**proceedings** [3] - 125:10, 144:2, 144:7

**process** [9] - 47:6, 57:20, 72:11, 94:11, 94:22, 127:6, 140:12, 143:11

**Procter** [1] - 89:11

**product** [1] - 17:15

**production** [1] - 123:25

**products** [1] - 97:7

**professional** [3] - 30:5, 31:10, 142:15

**professionalism** [1] - 8:19

**program** [5] - 15:6,

109:9, 131:9, 131:21, 131:23

**programming** [1] - 134:8

**prohibit** [1] - 143:8

**prohibiting** [1] - 9:3

**project** [31] - 10:23, 11:1, 41:5, 42:5, 43:20, 43:24, 44:5, 46:16, 47:6, 57:21, 58:17, 74:12, 82:9, 82:12, 82:13, 83:5, 84:4, 84:6, 92:23, 99:12, 99:14, 100:5, 100:16, 101:7, 113:25, 114:2, 122:14, 122:16, 137:21, 137:22

**Project** [3] - 43:18, 45:22, 83:11

**projections** [1] - 123:18

**projects** [3] - 40:13, 83:16, 96:2

**promise** [3] - 94:6, 94:8, 94:10

**promised** [1] - 21:2

**promises** [1] - 96:25

**promising** [1] - 93:10

**pronouncement** [1] - 83:9

**propellers** [1] - 120:19

**proper** [1] - 29:11

**properties** [1] - 78:23

**property** [15] - 18:12, 18:13, 18:16, 27:2, 27:5, 27:6, 28:19, 44:19, 84:6, 102:21, 102:24, 103:9, 103:11, 139:2, 139:23

**proposal** [2] - 10:18, 39:17

**proposals** [1] - 98:25

**proposed** [2] - 40:20, 99:1

**proposition** [1] - 66:18

**prospect** [4] - 65:9, 72:20, 72:21, 72:24

**prospective** [1] - 52:17

**protected** [3] - 47:17, 56:21, 57:2

**protecting** [3] - 30:4, 56:17, 58:15

**Protection** [2] - 57:23, 131:13

**protection** [3] - 47:18, 48:2, 57:9

**protective** [1] - 89:24

**prototype** [1] - 11:2

**prove** [1] - 35:23

**proved** [2] - 20:11, 130:8

**proves** [1] - 87:25

**provide** [8] - 14:22, 17:17, 20:15, 41:7, 65:12, 127:15, 131:10, 135:25

**provided** [3] - 63:12, 63:23, 92:22

**provides** [7] - 9:24, 10:1, 39:14, 70:13, 90:24, 133:6, 135:12

**providing** [3] - 12:23, 62:21, 78:19

**province** [1] - 109:5

**provision** [2] - 64:23, 70:11, 71:11

**provisions** [4] - 24:23, 110:19, 111:17

**proximity** [1] - 77:21

**Pruett** [1] - 92:8

**public** [36] - 9:11, 12:12, 21:19, 36:1, 39:7, 40:17, 47:5, 49:21, 50:6, 51:5, 55:24, 56:12, 57:5, 57:20, 58:2, 67:12, 67:16, 70:3, 75:24, 76:23, 77:3, 78:1, 78:19, 79:10, 79:21, 79:23, 80:4, 80:6, 81:12, 81:16, 81:19, 81:21, 82:3, 85:25

**public's** [1] - 80:7

**publicly** [3] - 21:7, 24:3, 49:16

**pull** [4] - 15:6, 49:18, 65:2, 130:24

**pulled** [1] - 54:7

**purchase** [1] - 32:4

**purchasing** [1] - 32:5

**purely** [2] - 81:22, 82:2

**purport** [2] - 66:21, 67:1

**purported** [1] - 96:13

**purports** [1] - 15:20

**purpose** [7] - 14:19, 52:14, 57:6, 112:15, 133:5, 133:23, 136:23

**purposes** [11] - 48:19, 50:7, 50:23, 61:18, 65:15, 66:11, 89:2, 95:7, 99:2,

101:25, 133:4

**pushed** [1] - 34:18

**put** [18] - 21:21, 24:22, 27:19, 54:20, 54:24, 56:11, 61:9, 69:14, 81:9, 90:23, 93:8, 94:20, 102:20, 116:22, 120:6, 128:14, 131:23, 138:4

**puts** [1] - 88:8

**putting** [2] - 22:24, 116:16

---

## Q

**qua** [2] - 65:22, 65:25, 136:14

**qualify** [1] - 106:24

**qualitatively** [1] - 117:8

**quality** [6] - 53:19, 57:7, 57:10, 57:12, 57:16, 84:13

**quantity** [1] - 57:6

**quarreling** [1] - 77:14

**quarter** [1] - 53:24

**questioning** [3] - 118:2, 121:20, 125:4

**questions** [11] - 7:22, 7:25, 15:5, 21:3, 37:11, 63:7, 70:12, 70:23, 85:3, 105:9, 127:2

**quibble** [1] - 127:8

**quick** [1] - 89:2

**quickly** [1] - 26:17

**quiet** [3] - 30:15, 121:10

**quite** [4] - 9:8, 21:3, 35:3, 52:3, 66:5, 66:8, 95:11, 99:17, 101:20, 106:8, 118:12, 120:19, 124:4

**quote** [23] - 12:17, 23:9, 50:11, 61:12, 81:24, 85:10, 85:11, 85:20, 92:21, 92:23, 96:16, 96:17, 97:23, 110:5, 111:12, 111:14, 112:14, 125:6, 125:10, 126:13, 126:18, 126:20

**quote-unquote** [2] - 23:9, 50:11

---

## R

**R-A-N-I-R** [1] - 89:12

**R.F** [1] - 2:16

**raise** [3] - 27:25, 28:2

**raised** [2] - 26:6, 27:18

**raising** [3] - 27:17, 28:25, 139:11

**Ranir** [1] - 89:12

**rather** [2] - 55:25, 67:13

**rational** [1] - 117:2

**Raton** [1] - 78:4

**Rattlesnake** [1] - 100:10

**Raurell** [1] - 6:22

**RAURELL** [3] - 2:14, 6:22, 38:14

**reach** [2] - 87:13, 115:17

**reached** [2] - 20:8, 109:4

**reaches** [1] - 109:1, 109:6

**reaching** [2] - 48:15, 55:24

**read** [4] - 16:19, 53:11, 54:14, 125:4

**readily** [1] - 138:10

**reading** [1] - 90:13

**ready** [1] - 140:24

**real** [6] - 27:2, 27:4, 29:21, 32:14, 65:24, 139:2

**reality** [2] - 43:18, 136:8

**realize** [1] - 124:8

**really** [14] - 6:1, 12:20, 30:19, 36:1, 52:7, 56:8, 56:25, 70:5, 93:13, 102:23, 120:20, 141:8, 141:15, 141:25

**reason** [22] - 19:7, 22:24, 24:18, 28:18, 53:16, 66:2, 75:21, 82:12, 83:3, 90:5, 90:6, 95:12, 102:24, 109:24, 112:23, 112:24, 113:7, 114:1, 114:22, 115:9, 115:16

**reasonable** [5] - 74:5, 76:11, 82:4, 101:12, 101:14

**reasonably** [1] - 82:4

**reasons** [14] - 50:22, 51:10, 59:4, 75:8, 79:9, 81:5, 104:3, 106:23, 107:3, 113:13, 113:16, 113:18, 115:2

**reassert** [1] - 26:18

**reassigned** [2] - 26:20, 27:20

**Rebuttal** [2] - 4:8, 4:9

**rebuttal** [5] - 8:9, 129:18, 129:20, 129:22, 132:2

**recap** [4] - 95:19, 98:2, 101:18, 106:20

**receive** [2] - 15:11, 131:21

**received** [3] - 15:1, 87:6, 107:19

**recent** [2] - 102:20, 104:5

**recently** [1] - 14:3

**receptionist** [1] - 70:3

**Recess** [1] - 38:25

**recess** [2] - 60:5, 129:16

**recognition** [1] - 67:12

**recognize** [3] - 5:24, 50:9, 77:13

**recognized** [4] - 32:25, 56:14, 65:5, 81:15

**recognizes** [1] - 40:12

**recognizing** [1] - 92:14

**reconciled** [1] - 141:5

**reconnect** [1] - 57:8

**record** [26] - 5:4, 17:22, 22:9, 23:17, 28:23, 36:18, 38:19, 39:1, 41:3, 43:17, 46:3, 47:9, 75:12, 75:22, 77:2, 78:2, 78:11, 84:23, 86:18, 125:4, 126:24, 131:4, 133:8, 137:8, 138:15, 139:25

**Recovery** [1] - 83:11

**recreate** [1] - 30:10

**recreational** [1] - 30:5

**redacted** [3] - 63:10, 72:4, 138:16

**redactions** [1] - 38:7

**reducing** [1] - 79:3

**refer** [5] - 9:19, 15:13, 64:17, 69:15, 138:3

**reference** [3] - 40:24, 72:1, 129:1

**referenced** [1] -

70:22

**referencing** [3] - 38:6, 38:8, 125:11

**referring** [2] - 40:5, 65:1

**reflection** [1] - 101:14

**reflects** [2] - 77:2, 78:2

**Reform** [1] - 99:15

**regard** [2] - 80:8, 139:4

**regarding** [5] - 13:2, 16:10, 23:4, 110:6, 110:8

**regardless** [2] - 25:9, 28:6

**region** [1] - 40:22

**regular** [2] - 45:23, 45:24

**regulations** [2] - 9:20, 100:12

**reimbursed** [1] - 134:21

**reimbursement** [3] - 92:18, 94:12, 96:23

**Reio** [6] - 31:10, 88:14, 122:18, 123:21, 142:11, 142:15

**reject** [2] - 107:12, 107:13

**rejected** [1] - 73:16

**related** [3] - 70:12, 102:25, 131:12

**relates** [3] - 17:13, 99:25, 137:8

**relating** [2] - 71:1, 88:3

**relations** [2] - 36:1, 85:16

**relationship** [4] - 71:20, 71:21, 73:6, 102:15

**relative** [1] - 84:4

**release** [1] - 117:23

**released** [2] - 124:21, 124:24

**relevant** [13] - 52:7, 61:16, 76:22, 77:19, 77:25, 79:2, 83:25, 84:5, 87:25, 88:2, 89:1, 110:12, 122:13

**reliable** [3] - 55:14, 70:5, 134:23

**relied** [1] - 88:14

**relief** [8] - 36:21, 85:13, 85:20, 85:23, 86:10, 89:9, 89:20, 118:14

relieve [1] - 89:5
relieves [2] - 78:9, 78:18
religion [1] - 26:18
religious [2] - 48:19, 58:24
rely [6] - 15:12, 41:16, 88:16, 109:23, 109:24, 112:8
relying [10] - 67:19, 69:22, 91:25, 92:15, 95:9, 109:25, 110:13, 138:23, 138:24, 141:21
remain [2] - 91:16, 125:22
remains [3] - 5:9, 116:2, 130:14
remand [6] - 114:3, 114:12, 114:25, 115:4, 115:17, 117:16
remedial [2] - 60:25, 61:7
remedied [1] - 51:22
remedy [3] - 61:5, 85:11, 85:19
remember [6] - 37:18, 60:12, 118:18, 120:21, 123:10, 125:25
remembering [1] - 82:23
remind [1] - 38:9
remote [2] - 68:14, 103:22
remoteness [4] - 77:22, 77:24, 77:25, 127:4
removal [5] - 26:13, 32:12, 110:4, 111:13, 111:14
remove [5] - 32:13, 125:8, 143:9, 143:10, 143:16
removed [5] - 22:24, 53:20, 68:17, 71:2, 143:18
removes [1] - 70:11
render [1] - 88:19
rendering [1] - 100:4
renew [1] - 125:23
renewed [2] - 87:21, 105:16
repaired [1] - 123:16
reparable [2] - 86:15, 142:19
repeat [1] - 40:4
repetitive [1] - 90:23
replace [1] - 82:17
report [5] - 10:24,

11:2, 16:10, 17:19, 24:1
REPORTED [1] - 3:1
Reporter [2] - 3:2, 144:12
reports [1] - 84:14
represent [2] - 47:9, 63:15
Representative [8] - 13:7, 14:12, 69:22, 73:17, 92:10, 97:15, 100:20, 134:22
representative [2] - 46:20, 96:13
representatives [1] - 80:8
represented [1] - 101:21
representing [1] - 24:8
request [16] - 13:21, 36:3, 97:17, 97:24, 98:4, 98:8, 98:20, 99:11, 112:10, 112:11, 112:14, 112:17, 128:14, 129:13, 143:7, 143:12
requested [10] - 12:22, 13:9, 14:15, 20:22, 69:24, 70:2, 129:1, 133:15, 136:4, 136:5
requesting [2] - 124:19, 142:24
requests [1] - 98:22
require [10] - 9:6, 41:9, 66:22, 73:21, 73:22, 82:11, 101:4, 108:13, 113:24, 143:9
required [9] - 28:7, 42:9, 61:14, 66:10, 73:19, 80:22, 111:8, 115:8, 115:12
requirement [3] - 9:9, 40:16, 140:19
requirements [10] - 9:5, 40:6, 86:16, 86:23, 86:24, 95:5, 98:21, 105:13, 133:17, 138:1
requires [6] - 9:9, 9:15, 11:14, 11:20, 26:1, 35:18
requiring [3] - 52:16, 60:25, 81:6
reservation [1] - 43:1
reserve [1] - 108:5
Reserved [4] - 37:17, 37:18, 37:20, 44:24
reside [1] - 45:2

resident [1] - 26:24
residents [1] - 44:23
resides [1] - 138:25
resolution [1] - 61:5
resolve [3] - 38:20, 43:3, 122:16
resolved [2] - 72:6, 79:11
Resources [2] - 52:6, 85:9
resources [4] - 42:14, 57:3, 59:3, 65:23
respect [13] - 16:23, 17:24, 41:3, 42:2, 42:23, 46:14, 51:20, 134:11, 136:12, 138:23, 142:21, 142:22
respectfully [12] - 11:12, 42:2, 59:4, 59:8, 89:6, 89:19, 97:25, 102:18, 120:13, 132:1, 140:10, 143:7
respects [1] - 71:1
respond [2] - 12:18, 132:9
responding [2] - 63:10, 63:19
response [3] - 84:19, 85:1, 105:10
Response [3] - 12:19, 32:5, 136:3
responses [1] - 112:2
responsibilities [1] - 99:2
responsibility [4] - 69:9, 71:21, 75:18, 116:24
responsible [3] - 32:20, 62:12, 67:18
rest [1] - 38:22
restoration [7] - 18:4, 18:5, 35:9, 35:13, 56:23, 96:21, 115:24
Restoration [5] - 18:6, 35:2, 43:17, 45:22, 56:19
restore [1] - 57:7
restrain [6] - 110:18, 110:22, 111:4, 111:16, 112:14, 112:18
restraining [3] - 12:1, 26:7, 132:13
result [3] - 29:21, 42:24, 46:25, 50:16,

59:8, 99:5, 99:6, 115:17, 142:6
results [1] - 51:9
resumed [1] - 14:24
resurrect [1] - 72:7
retain [1] - 70:25
retains [2] - 65:14, 65:18
retirement [1] - 10:20
return [3] - 48:3, 143:13, 143:17
reversible [1] - 86:23
review [15] - 8:23, 64:12, 70:13, 70:14, 71:2, 81:25, 82:15, 82:16, 82:19, 83:19, 107:19, 110:7, 111:8, 115:24
reviewed [1] - 43:23
reviewing [1] - 62:20
rewarded [1] - 27:15
Richardson [2] - 92:8, 131:4
right-hand [3] - 49:12, 49:13, 50:25
rightly [1] - 137:18
rights [7] - 27:6, 50:9, 50:15, 98:10, 98:19, 130:17, 130:22
rigorous [3] - 76:20, 92:3, 93:17
rise [4] - 60:4, 71:19, 98:11, 140:8
rising [1] - 69:17
risk [7] - 33:17, 33:22, 34:12, 34:13, 71:22, 126:15, 142:9
risks [1] - 83:4
Ritter [1] - 109:7
River [1] - 10:19
road [7] - 34:5, 48:21, 48:25, 49:17, 50:5, 51:6, 142:9
Road [2] - 35:6, 35:7
roads [1] - 76:18
roadway [1] - 51:5
ROBERT [1] - 1:15
robust [1] - 137:4
robustness [1] - 10:10
rogue [1] - 19:9
role [5] - 42:16, 62:13, 65:24, 66:5, 69:11
roles [1] - 62:18
roost [3] - 48:4, 48:6, 48:10
roosting [1] - 48:8
routinely [1] - 64:2

RPR [2] - 3:2, 144:12
Ruiz's [1] - 23:25
rule [3] - 139:8, 139:9
run [4] - 51:23, 55:1, 57:23, 102:6
running [6] - 18:25, 19:8, 24:7, 51:6, 62:20, 62:23
runoff [5] - 31:12, 42:19, 123:22, 123:24, 142:13
runs [2] - 53:2, 77:10
runway [9] - 10:18, 28:11, 119:20, 120:11, 122:2, 122:4, 127:5, 127:7, 127:12
runways [2] - 35:22, 137:18

**S**

sacred [1] - 50:21
safe [2] - 109:14, 127:6
safety [9] - 78:1, 78:19, 80:6, 81:9, 81:12, 81:19, 126:14, 127:5, 127:11
Saint [1] - 1:23
Samples [3] - 10:15, 30:2, 30:8
samples [2] - 52:13, 121:20
Santiago [1] - 78:16
Sasha [1] - 5:24
save [1] - 66:3
Save [1] - 143:4
saw [3] - 15:22, 46:13, 48:21
scale [1] - 51:16
scenario [1] - 72:15
schedule [1] - 59:18
scheduling [1] - 59:13
scheme [1] - 19:10
SCHILLER [1] - 2:9
schools [2] - 37:23, 45:1
SCHWIEP [31] - 1:15, 4:4, 4:9, 5:6, 7:10, 8:5, 8:8, 8:11, 16:5, 16:9, 16:14, 16:18, 16:23, 17:24, 18:1, 18:15, 18:18, 22:3, 23:2, 24:4, 24:12, 24:14, 29:19, 33:7, 33:9, 34:6, 34:20, 35:21, 129:19, 132:6, 143:20

**Schwiep** [15] - 5:6, 7:8, 8:4, 8:11, 33:6, 36:7, 36:10, 95:9, 111:25, 112:10, 119:25, 129:17, 129:25, 132:5, 143:19
**scientific** [1] - 142:14
**scope** [1] - 74:24
**Scottsdale** [1] - 134:7
**Scout** [1] - 50:19
**scratch** [1] - 111:6
**screen** [3] - 8:6, 44:18, 61:9
**screens** [1] - 130:5
**seated** [2] - 7:2, 60:6
**seater** [1] - 121:9
**seaters** [1] - 121:2
**second** [15] - 25:24, 34:14, 40:25, 45:8, 70:16, 89:3, 95:16, 98:17, 100:3, 108:16, 109:11, 110:16, 115:16, 119:12, 130:7
**Secretary** [9] - 12:6, 14:8, 20:11, 67:3, 67:4, 74:21, 134:15, 135:1, 135:24
**section** [5] - 49:20, 64:16, 110:6, 110:8, 143:6
**Section** [7] - 39:14, 39:20, 40:6, 40:14, 110:21, 135:20
**secure** [1] - 68:15
**securing** [1] - 79:10
**Security** [2] - 134:16, 135:7
**security** [4] - 22:20, 78:1, 81:17, 83:5
**SECURITY** [1] - 60:4
**see** [23] - 26:4, 30:19, 31:2, 31:6, 40:13, 40:19, 44:18, 44:19, 45:16, 49:7, 49:8, 49:9, 51:13, 51:17, 71:17, 97:10, 101:21, 105:2, 134:16, 136:9, 140:9, 141:8
**seed** [1] - 22:9
**seeing** [2] - 8:18, 49:22
**seek** [1] - 9:2
**seeking** [1] - 26:12
**selected** [1] - 80:7
**self** [1] - 122:22
**self-perpetuating** [1] - 122:22

**send** [3] - 74:18, 74:21, 74:22
**sense** [5] - 82:1, 91:25, 133:2, 134:1
**sent** [3] - 21:23, 21:25, 73:4
**sentence** [1] - 61:14
**sentiment** [1] - 20:17
**separate** [7] - 15:13, 27:17, 34:6, 50:1, 119:23, 136:9
**separately** [2] - 16:16, 34:13
**serious** [6] - 36:2, 123:15, 125:13, 125:14, 126:22, 132:25
**seriously** [2] - 134:14, 134:20
**serve** [4] - 13:22, 20:10, 20:22, 133:21
**served** [1] - 77:3
**serves** [1] - 135:3, 136:22
**Service** [3] - 9:16, 47:15, 90:1
**service** [1] - 21:20
**services** [1] - 135:9
**set** [8] - 10:2, 36:9, 47:6, 93:15, 93:19, 110:7, 114:10, 129:2
**sets** [1] - 48:4
**Seven** [8] - 81:23, 82:14, 83:19, 113:22, 114:13, 115:3, 116:3, 137:2
**seven** [6] - 13:21, 14:9, 16:15, 31:8, 40:14, 121:4
**several** [3] - 38:4, 43:16, 121:12
**shall** [3] - 110:6, 110:18, 111:15
**share** [1] - 8:6
**shared** [1] - 71:20
**sheer** [1] - 13:14
**shell** [1] - 131:17
**sheltering** [1] - 131:11
**shook** [1] - 20:21
**short** [1] - 131:13
**short-term** [1] - 131:13
**shorthand** [1] - 93:5
**shovels** [1] - 11:18
**show** [20] - 12:4, 18:25, 19:8, 24:7, 28:7, 29:19, 32:1, 38:2, 55:2, 55:5, 77:10, 86:17, 106:25,

113:20, 118:22, 122:25, 123:8, 128:3, 139:16, 141:10
**showed** [2] - 49:23, 120:22
**showing** [10] - 85:21, 86:2, 86:4, 86:6, 87:3, 118:24, 119:2, 119:4, 122:9
**shown** [5] - 29:22, 44:18, 90:7, 123:17, 128:22
**shows** [8] - 32:22, 33:10, 46:3, 67:2, 95:22, 98:3, 119:19, 141:25
**shut** [2] - 31:22, 59:9
**side** [18] - 8:19, 8:20, 22:14, 23:12, 35:4, 35:6, 36:12, 49:4, 49:12, 49:13, 49:15, 50:25, 96:8, 104:5, 126:22, 128:13, 128:25, 137:25
**sided** [1] - 102:19
**siding** [1] - 56:6
**Sierra** [2] - 10:6, 41:11
**signed** [3] - 11:3, 44:8, 45:22
**significance** [1] - 49:1
**significant** [5] - 28:16, 38:4, 77:2, 87:16, 140:1
**signing** [2] - 62:19, 77:12
**similar** [3] - 25:1, 29:10, 99:8
**simple** [1] - 18:22
**sin** [1] - 65:25
**sine** [2] - 65:22, 136:14
**SINGER** [2] - 2:17, 6:20
**Singer** [1] - 6:20
**single** [3] - 96:11, 133:5, 135:3
**site** [84] - 9:4, 10:17, 11:4, 12:11, 13:4, 15:21, 15:23, 15:24, 17:1, 17:15, 17:24, 18:7, 20:15, 21:5, 21:6, 21:11, 21:23, 21:25, 22:2, 23:8, 23:17, 26:15, 28:21, 29:7, 30:12, 30:23, 31:8, 31:9, 31:18, 32:8, 33:14, 34:17, 35:24, 36:20, 38:12,

42:24, 43:2, 47:1, 47:14, 47:19, 48:13, 49:3, 49:17, 49:20, 52:13, 54:7, 54:23, 55:1, 55:3, 55:17, 55:18, 56:20, 57:25, 62:25, 73:12, 80:6, 88:4, 88:10, 88:13, 88:15, 91:19, 91:20, 92:7, 92:25, 96:5, 97:18, 99:15, 101:24, 102:1, 102:5, 102:7, 103:17, 107:8, 108:11, 112:15, 112:25, 122:21, 123:24, 142:5, 143:12, 143:17
**sites** [6] - 27:19, 45:10, 45:13, 45:15, 56:2, 56:4
**sits** [1] - 47:14
**situate** [1] - 127:23
**situation** [7] - 16:20, 25:13, 43:18, 63:25, 65:16, 97:11, 125:16
**situations** [1] - 125:17
**six** [6] - 10:18, 72:6, 76:13, 97:8, 119:19, 121:4
**six-runway** [1] - 10:18
**size** [1] - 74:14
**sizes** [1] - 121:16
**skin** [1] - 93:10
**sky** [1] - 33:1
**sleepy** [2] - 30:15, 119:25
**slice** [1] - 25:15
**slide** [19] - 11:20, 24:22, 32:1, 32:22, 35:1, 35:19, 40:11, 41:6, 43:15, 44:14, 44:24, 51:7, 51:12, 51:19, 52:22, 53:2, 56:1, 58:4, 58:18
**slides** [1] - 37:3
**smack** [2] - 35:11, 48:9
**small** [2] - 120:18, 122:15
**smaller** [1] - 142:8
**smoke** [1] - 23:12
**snail** [1] - 29:12
**social** [6] - 67:8, 67:24, 69:14, 95:1, 134:13, 134:16
**soft** [3] - 56:6, 60:13, 102:19
**soft-sided** [1] -

102:19
**soil** [1] - 29:23
**solely** [3] - 101:11, 101:25, 127:12
**someone** [6] - 24:7, 62:7, 70:1, 103:11, 107:11, 120:2
**someplace** [1] - 24:10
**sometime** [1] - 44:7
**sometimes** [4] - 88:21, 106:9, 106:10, 114:19
**somewhat** [2] - 91:25, 138:17
**somewhere** [4] - 54:21, 56:11, 101:13
**sonar** [7] - 22:15, 22:20, 22:23, 55:8, 55:10, 55:14, 80:10
**soon** [2] - 124:9, 124:11
**Sorry** [1] - 40:4
**sorry** [8] - 7:5, 38:15, 42:11, 89:16, 90:11, 90:16, 114:16, 123:9
**sort** [3] - 98:14, 125:18, 137:10
**sorts** [1] - 68:22
**sound** [2] - 35:25, 104:12
**sounds** [2] - 74:4, 119:16
**source** [1] - 93:13
**South** [18] - 11:24, 29:11, 43:5, 45:12, 55:20, 60:23, 65:4, 65:20, 66:6, 72:18, 78:24, 92:24, 93:25, 96:25, 97:5, 98:24, 100:3, 136:17
**south** [2] - 29:7, 31:7
**southern** [1] - 79:10
**SOUTHERN** [1] - 1:1
**Southern** [6] - 27:18, 29:13, 84:1, 84:5, 89:21, 140:7
**sovereign** [3] - 35:17, 58:6, 58:8
**sovereignty** [1] - 58:15
**space** [12] - 20:13, 20:16, 78:9, 78:17, 78:21, 116:11, 117:21, 124:22, 124:23, 127:1, 135:25, 138:10
**spaces** [2] - 31:2, 31:3
**spades** [1] - 26:3

speaking [2] - 7:4, 7:8

**Spears** [1] - 25:25

**species** [9] - 9:15, 29:24, 30:6, 33:2, 35:16, 43:8, 43:9, 143:13, 143:17

**specific** [13] - 17:11, 17:24, 18:7, 23:8, 50:7, 57:22, 62:17, 64:25, 97:18, 98:5, 107:8, 107:12, 108:9

**specifically** [7] - 9:22, 18:5, 41:14, 42:17, 43:9, 49:14, 50:10

**specifications** [1] - 100:15

**speculation** [6] - 122:6, 124:1, 142:10, 142:12, 142:14, 142:20

**speculative** [9] - 52:10, 52:20, 81:18, 86:3, 118:12, 118:23, 122:9, 130:12, 142:4

**speed** [1] - 20:12

**speedway** [1] - 68:8

**spent** [8] - 53:23, 57:2, 83:12, 141:7, 141:10, 141:24

**splitting** [1] - 131:17

**spoken** [1] - 60:13

**sprang** [1] - 12:7

**spraying** [1] - 99:19

**square** [1] - 32:5

**St** [1] - 2:21

**staggering** [1] - 100:19

**staging** [3] - 103:17, 103:19, 104:9

**stand** [2] - 21:22, 36:2

**standard** [8] - 36:21, 41:10, 98:13, 98:14, 98:20, 100:1, 101:7, 122:24

**standards** [21] - 8:22, 13:10, 13:16, 14:17, 20:6, 57:10, 57:12, 57:16, 57:18, 99:23, 100:7, 100:15, 100:18, 100:24, 101:2, 133:5, 133:16, 133:18, 133:21, 134:1, 135:2

**stands** [1] - 53:16

**star** [3] - 89:12, 89:14, 113:6

**start** [4] - 70:10,

87:18, 92:5, 139:7

**started** [1] - 130:14

**starting** [1] - 5:5

**starts** [1] - 52:7

**State** [67] - 7:12, 9:3, 12:19, 19:25, 20:13, 20:14, 21:7, 27:8, 27:15, 28:6, 28:10, 32:4, 35:9, 35:10, 40:9, 55:18, 55:19, 59:19, 59:24, 60:25, 61:3, 61:21, 62:1, 63:13, 64:13, 70:9, 71:22, 72:7, 72:25, 76:20, 79:24, 80:2, 85:7, 87:4, 93:20, 95:24, 96:2, 96:3, 96:20, 97:18, 102:21, 102:24, 104:12, 104:18, 107:11, 107:22, 107:24, 108:3, 112:5, 115:9, 115:14, 126:4, 129:13, 131:24, 132:10, 133:3, 135:11, 136:3, 136:6, 137:13, 137:18, 138:8, 139:4, 141:21

**STATE** [1] - 2:6

**state** [64] - 5:4, 11:10, 11:15, 12:22, 13:25, 14:6, 19:9, 22:25, 24:24, 31:18, 35:14, 50:8, 50:15, 61:1, 62:6, 65:14, 65:15, 65:18, 66:19, 67:1, 69:23, 70:19, 70:25, 71:13, 72:22, 73:10, 74:2, 91:6, 92:12, 92:23, 95:25, 96:14, 96:16, 96:21, 99:1, 100:2, 100:16, 100:23, 101:3, 101:4, 101:6, 101:11, 101:24, 102:1, 102:5, 102:6, 102:9, 102:11, 102:15, 103:18, 105:10, 105:14, 106:1, 106:2, 106:6, 107:8, 107:10, 126:23, 135:13, 135:16

**State's** [9] - 15:1, 61:4, 65:6, 100:17, 103:12, 108:10, 139:7, 140:11

**Statement** [2] - 9:14, 10:11

**statement** [7] - 11:3, 20:24, 42:8, 61:10,

69:22, 73:6, 73:7

**statements** [7] - 67:8, 67:11, 67:13, 92:17, 94:21, 95:1, 95:2

**states** [3] - 71:24, 89:8, 110:17

**States** [5] - 3:3, 11:24, 14:4, 85:18, 144:13

**STATES** [3] - 1:1, 1:11, 2:14

**statewide** [1] - 77:5

**stating** [1] - 12:6

**status** [3] - 62:14, 62:15, 82:1

**statute** [1] - 9:7, 28:13, 81:22, 82:2, 88:20, 105:12, 110:10, 110:12, 110:14, 110:17, 111:15

**Statute** [1] - 64:6

**statutes** [5] - 50:9, 64:9, 106:2, 110:2, 112:21

**statutory** [2] - 81:25, 130:17

**stay** [4] - 37:8, 128:14, 128:18, 128:25

**steaming** [1] - 72:5

**STENOGRAPHER** [1] - 40:4

**STENOGRAPHICALLY** [1] - 40:2

**step** [3] - 40:10, 115:3, 137:6

**Stephen** [2] - 20:23, 135:7

**stepping** [1] - 67:25

**still** [9] - 39:1, 77:1, 91:16, 102:1, 102:23, 106:14, 119:17, 122:9, 129:11

**stipulate** [1] - 121:20

**Stoneman** [1] - 10:19

**stop** [6] - 19:12, 21:17, 55:4, 56:5, 83:16, 111:24

**stopping** [1] - 117:18

**stops** [1] - 61:12

**storks** [3] - 47:25, 48:3

**storm** [5] - 31:11, 42:19, 123:22, 142:12, 142:13

**straight** [1] - 7:3

**straightforward** [3] -

18:22, 19:2, 86:6

**streamline** [1] - 128:19

**Street** [1] - 2:15

**street** [2] - 16:7, 54:23

**stressed** [1] - 85:12

**strike** [1] - 139:9

**strikes** [3] - 84:11, 139:8, 139:10

**stripped** [1] - 113:1

**stripping** [2] - 70:11, 110:12

**strips** [2] - 26:8, 111:9

**strongly** [2] - 81:8, 81:11

**struck** [1] - 133:9

**structural** [1] - 101:5

**structure** [1] - 53:19

**structures** [1] - 50:25

**studied** [1] - 47:12

**studies** [2] - 17:20, 56:25

**Study** [1] - 40:2

**study** [17] - 17:23, 18:7, 18:9, 33:24, 42:6, 51:9, 51:10, 52:12, 80:16, 80:17, 80:19, 81:11, 84:13, 122:13, 122:14, 122:16, 122:21

**stunt** [1] - 36:2

**sub** [1] - 40:18

**subchapter** [2] - 64:14, 110:19

**subject** [7] - 26:22, 100:11, 101:7, 109:10, 110:7, 113:3, 113:14

**subjected** [1] - 34:4

**submarine** [1] - 22:20

**submarines** [2] - 22:16, 55:15

**submit** [6] - 11:12, 23:12, 36:1, 59:5, 90:6, 132:1

**submitted** [6] - 91:1, 94:13, 119:9, 129:3, 139:11, 141:14

**subsection** [2] - 26:25, 110:5

**subsequent** [1] - 75:19

**substances** [1] - 44:2

**substantial** [16] - 28:8, 36:24, 37:4,

39:9, 42:18, 42:21, 46:24, 51:24, 52:8, 58:15, 84:24, 137:1, 139:15, 139:20, 140:6, 140:7

**substantially** [1] - 51:16

**substantiate** [1] - 76:11

**succeed** [6] - 42:4, 85:22, 87:4, 90:7, 113:19, 113:20

**success** [12] - 36:24, 37:4, 39:6, 39:9, 39:11, 42:3, 86:7, 87:1, 87:19, 106:25, 128:16, 137:1

**suddenly** [4] - 21:8, 27:20, 139:13, 141:19

**sue** [1] - 94:10

**sued** [2] - 64:22, 71:3

**suffer** [1] - 85:23

**suffice** [1] - 99:9

**suffices** [1] - 61:8

**sufficient** [18] - 25:14, 26:25, 29:14, 29:15, 36:19, 52:1, 72:22, 75:18, 86:12, 88:19, 92:22, 97:8, 107:3, 113:16, 125:2, 132:12, 132:20, 134:9

**sufficiently** [2] - 10:12, 137:4

**suggest** [6] - 12:9, 19:7, 79:2, 133:2, 134:15, 136:10

**suggestion** [6] - 20:2, 31:24, 77:8, 99:22, 133:24

**suggests** [1] - 77:10

**suitable** [1] - 122:1

**Suite** [3] - 1:20, 2:4, 2:10

**superb** [1] - 8:19

**supervise** [1] - 63:1

**supervised** [1] - 96:7

**supervision** [2] - 70:23, 71:15

**supervisory** [5] - 62:2, 62:9, 62:13, 65:12

**supplement** [1] - 12:22

**supplemental** [1] - 16:16

**supplies** [1] - 104:9

**supply** [1] - 29:1

**support** [5] - 70:25, 89:20, 92:16, 131:9,

131:11
  **supporting** [1] - 52:5
  **supports** [2] - 89:6,
92:2
  **suppose** [2] -
103:14, 138:17
  **Supreme** [19] -
22:15, 81:23, 85:10,
86:21, 108:20,
110:17, 110:23,
113:23, 114:13,
115:3, 125:5, 125:6,
125:11, 125:12,
125:15, 125:18,
126:13, 136:24
  **surface** [2] - 30:25,
140:4
  **surfaces** [1] - 43:10
  **surprised** [1] - 25:7
  **surrounding** [4] -
38:4, 44:3, 48:24,
142:17
  **survive** [2] - 83:18,
83:19
  **suspect** [2] - 22:13,
26:18
  **suspend** [2] -
111:24, 133:1
  **switching** [1] -
104:14
  **system** [7] - 31:11,
31:23, 44:22, 62:21,
141:17, 141:18,
142:13

**T**

  **table** [2] - 39:25,
55:22
  **tailed** [1] - 124:4
  **tainted** [1] - 93:12
  **takeoff** [1] - 119:18
  **takeoffs** [1] - 119:15
  **Tallahassee** [1] -
88:4
  **Tamiami** [3] - 44:20,
49:17, 51:4
  **tangential** [1] - 27:5
  **TANIA** [1] - 1:18
  **Tania** [1] - 5:11
  **Team** [1] - 32:5
  **Team's** [2] - 12:19,
136:3
  **teams** [1] - 60:7
  **tech** [2] - 37:8, 37:10
  **technical** [4] - 65:10,
99:12, 100:4, 100:6
  **technology** [1] -
55:14
  **telemetry** [1] - 33:10

  **temporal** [1] - 76:15
  **temporally** [1] -
76:13
  **temporary** [20] -
12:1, 26:7, 53:3, 53:9,
53:14, 54:4, 54:9,
54:14, 56:7, 56:8,
56:9, 76:2, 76:4,
86:14, 102:20,
104:23, 105:9,
105:18, 132:13,
143:16
  **ten** [7] - 7:14, 26:7,
29:17, 44:16, 56:4,
123:12, 141:19
  **ten-minute** [1] - 7:14
  **tends** [1] - 68:7
  **tentative** [1] - 26:2
  **tents** [9] - 31:6,
53:19, 54:15, 54:19,
54:25, 68:6, 102:19,
103:10, 116:22
  **term** [2] - 81:23,
131:13
  **terminology** [1] -
54:12
  **terms** [11] - 11:20,
15:23, 18:7, 22:5,
22:13, 23:11, 136:8,
137:1, 138:20,
139:15, 141:22
  **territory** [3] - 33:19,
34:8, 34:12
  **test** [5] - 11:13, 20:6,
60:21, 61:16, 91:11
  **tested** [2] - 81:14
  **testified** [32] - 16:24,
30:23, 33:12, 33:13,
33:15, 33:22, 34:15,
43:22, 44:6, 44:16,
45:3, 47:10, 47:14,
47:20, 48:1, 48:3,
48:11, 48:17, 49:2,
50:12, 50:15, 50:18,
50:24, 51:11, 54:8,
56:3, 56:6, 88:7,
100:20, 122:11,
126:25, 142:15
  **testify** [1] - 96:13
  **testifying** [1] - 92:11
  **testimonial** [1] -
46:14
  **testimony** [33] -
10:15, 13:6, 14:22,
15:17, 23:2, 25:8,
29:3, 29:6, 30:1, 30:8,
30:20, 31:15, 31:23,
32:25, 33:5, 33:21,
35:3, 42:12, 42:14,
43:11, 45:9, 45:17,

45:23, 46:23, 48:23,
54:5, 56:2, 87:5,
102:22, 103:17,
123:3, 123:6
  **testing** [4] - 22:16,
22:20, 118:5
  **tests** [1] - 80:13
  **Texas** [1] - 25:20,
126:17
  **text** [3] - 12:25,
64:15, 81:25
  **TGK** [1] - 68:7
  **thanking** [2] - 36:10,
36:11
  **THE** [170] - 1:4, 1:10,
1:15, 5:14, 5:18, 6:1,
6:6, 6:14, 6:19, 7:1,
7:7, 7:11, 7:18, 7:20,
7:24, 8:3, 8:7, 8:10,
16:3, 16:8, 16:12,
16:15, 16:22, 17:18,
17:25, 18:11, 18:16,
21:25, 22:21, 23:23,
24:5, 24:13, 29:18,
33:6, 33:8, 34:2,
34:16, 35:20, 36:5,
36:17, 37:5, 37:8,
37:11, 38:1, 38:8,
38:13, 38:16, 38:18,
38:21, 39:3, 40:4,
45:21, 46:3, 46:10,
46:22, 48:20, 48:23,
49:10, 50:2, 53:5,
53:18, 55:12, 59:12,
59:23, 60:3, 60:6,
60:9, 60:12, 61:19,
62:4, 63:4, 63:18,
63:24, 64:4, 64:19,
65:2, 65:20, 67:10,
67:17, 68:2, 68:12,
68:16, 69:1, 69:11,
71:3, 71:9, 71:12,
72:1, 72:14, 72:24,
73:8, 73:13, 73:25,
74:6, 74:18, 75:5,
75:12, 75:15, 76:3,
76:9, 77:7, 77:23,
78:3, 78:10, 78:14,
78:21, 79:15, 79:23,
79:25, 80:12, 80:21,
82:14, 82:22, 83:6,
83:17, 83:21, 84:10,
84:22, 85:2, 85:5,
90:13, 90:18, 91:5,
93:1, 93:4, 93:7,
93:23, 94:4, 95:17,
96:18, 101:9, 101:19,
101:23, 102:9,
102:23, 103:4,
103:12, 103:20,

104:6, 104:20,
106:12, 106:16,
106:19, 107:15,
108:22, 110:25,
114:7, 114:15,
114:17, 115:21,
116:12, 116:24,
118:5, 118:10, 120:4,
122:19, 123:2,
124:10, 125:15,
126:7, 127:18, 128:8,
128:23, 129:8,
129:14, 129:17,
129:24, 132:4,
143:19, 143:21
  **themselves** [2] -
64:16, 130:16
  **theory** [3] - 107:23,
111:23, 118:6
  **therefore** [9] - 21:24,
30:25, 67:19, 117:12,
127:21, 128:5,
133:21, 134:10,
136:25
  **thereof** [1] - 36:25
  **they've** [7] - 8:20,
34:8, 92:16, 94:20,
123:8, 123:9
  **thinking** [5] - 115:4,
136:7, 137:3, 137:4,
141:23
  **third** [7] - 28:22,
70:2, 100:17, 107:2,
109:12, 112:23,
139:24
  **thorough** [1] - 10:12
  **thousand** [3] - 34:22,
39:2, 117:5
  **threatened** [2] -
9:15, 80:10
  **three** [16] - 12:4,
26:8, 38:12, 39:21,
44:17, 50:25, 53:23,
91:17, 91:19, 106:21,
109:22, 113:14,
129:23, 129:25,
131:7, 139:8
  **tie** [1] - 114:5
  **timing** [2] - 7:3, 57:7
  **tip** [1] - 81:11
  **tipped** [1] - 81:8
  **tips** [1] - 85:24
  **Title** [1] - 19:17
  **title** [2] - 27:4, 84:7
  **Tjoflat's** [1] - 28:12
  **TNT** [24] - 9:4, 11:8,
17:15, 28:21, 36:20,
38:12, 47:1, 47:14,
47:19, 48:13, 49:17,
49:20, 51:6, 52:13,

54:23, 55:1, 55:3,
55:17, 56:19, 57:25,
58:1, 95:25, 108:11,
112:15
  **today** [12] - 5:23,
13:4, 15:25, 17:22,
26:11, 61:9, 81:1,
91:2, 112:1, 123:20,
130:14, 143:22
  **TODD** [3] - 2:2, 2:2,
2:13
  **Todd** [1] - 5:22
  **together** [2] -
119:10, 142:11
  **token** [1] - 83:2
  **tomorrow** [4] -
102:19, 103:8, 103:9,
104:13
  **took** [4] - 15:23,
16:12, 83:22, 83:24
  **tool** [1] - 83:15
  **top** [3] - 45:17,
118:24, 131:7
  **Torts** [1] - 71:12
  **total** [1] - 7:17
  **totality** [3] - 136:8,
136:15, 136:19
  **touch** [5] - 119:15,
119:16, 120:9,
141:13, 141:19
  **touched** [1] - 65:21
  **touchstone** [2] -
61:10, 132:16
  **tour** [1] - 139:18
  **toured** [1] - 13:7
  **towards** [1] - 87:11
  **Town** [1] - 15:14
  **trace** [1] - 139:18
  **track** [1] - 106:14
  **tracking** [1] - 55:15
  **tracks** [1] - 119:15
  **traditional** [6] -
48:16, 48:17, 48:19,
50:7, 50:11, 58:24
  **traditionally** [1] -
65:25
  **traffic** [5] - 31:13,
33:23, 33:24, 33:25,
34:16, 34:21, 34:23
  **trail** [5] - 35:6, 44:20,
49:25, 50:1, 50:3
  **Trail** [2] - 49:17, 51:5
  **trailhead** [3] - 49:20,
49:21, 49:24
  **trails** [7] - 48:15,
48:21, 48:25, 49:4,
49:7, 50:5, 50:12
  **train** [1] - 55:5
  **trained** [1] - 25:2
  **training** [3] - 30:15,

App. 1084

55:10, 55:16
**transcript** [3] -
13:10, 33:19, 95:11
**transcription** [1] -
144:7
**transfer** [1] - 90:8
**transferred** [1] -
89:22
**transform** [3] -
100:16, 102:5, 102:7
**trap** [1] - 50:10
**travel** [5] - 41:8,
49:3, 91:4, 101:15,
129:14
**treated** [1] - 135:12
**tree** [1] - 45:10
**tremendous** [1] -
18:3
**trial** [1] - 91:1
**Tribal** [20] - 9:17,
33:3, 38:3, 38:5,
38:11, 43:4, 43:13,
44:15, 44:16, 45:2,
45:9, 48:12, 50:6,
50:9, 50:13, 51:1,
51:2, 57:14, 130:15,
130:22
**Tribe** [44] - 5:20,
5:23, 7:5, 9:19, 9:23,
29:2, 36:6, 36:14,
36:23, 37:14, 39:5,
40:16, 41:2, 41:5,
42:3, 42:9, 42:11,
42:12, 42:14, 44:3,
45:1, 45:25, 46:6,
46:13, 46:15, 46:18,
47:4, 50:22, 51:8,
52:20, 56:16, 57:11,
58:5, 58:13, 58:14,
80:4, 129:18, 129:21,
130:1, 130:10,
130:18, 143:5,
143:13, 143:17
**Tribe's** [23] - 9:19,
36:24, 37:13, 38:15,
39:6, 39:12, 40:12,
40:15, 43:1, 44:15,
46:19, 50:16, 51:2,
51:9, 54:7, 56:13,
56:15, 57:16, 58:5,
58:19, 58:23, 130:10,
130:11
**tribes** [1] - 40:15
**tries** [1] - 16:19
**trigger** [12] - 11:14,
25:14, 65:8, 74:9,
95:22, 99:11, 100:5,
100:18, 112:4,
112:24, 132:20, 134:9
**triggers** [4] - 99:24,

110:14, 112:3, 133:20
**tripartite** [2] - 119:2,
119:4
**TRO** [16] - 14:7, 59:5,
60:23, 89:4, 89:20,
90:22, 91:13, 92:14,
95:9, 97:22, 110:11,
111:19, 136:13,
143:8, 143:16, 143:24
**trucks** [3] - 104:9,
104:23, 117:6
**true** [2] - 91:16,
109:18
**Trump** [1] - 79:13
**trustworthy** [1] -
134:23
**try** [3] - 16:1, 111:20,
118:3
**trying** [8] - 18:11,
27:4, 43:2, 107:17,
114:14, 116:16,
123:7, 130:2
**turbo** [1] - 20:12
**turkey** [1] - 47:10
**turn** [10] - 75:24,
86:25, 95:15, 95:20,
98:7, 106:13, 110:16,
113:18, 117:14,
130:22
**turning** [1] - 11:18
**turns** [2] - 32:19,
108:17
**twice** [2] - 136:2,
138:4
**two** [45] - 12:15,
17:22, 23:10, 30:17,
31:6, 34:5, 34:6, 35:3,
36:11, 38:10, 38:20,
41:20, 53:22, 66:12,
72:2, 77:7, 77:8, 86:5,
87:23, 89:19, 91:18,
95:21, 98:6, 98:11,
105:3, 106:25,
108:22, 110:1, 112:4,
114:9, 119:11,
119:22, 120:15,
121:2, 121:9, 122:4,
124:7, 124:19, 127:9,
129:23, 129:25,
131:2, 131:8, 133:10,
141:3
**two-and-a-half** [2] -
12:15, 23:10
**two-mile** [1] - 122:4
**two-seater** [1] -
121:9
**two-seaters** [1] -
121:2
**type** [1] - 94:9
**typical** [2] - 47:6,

105:21
**typically** [3] - 10:8,
53:16, 54:8

---

# U

**U.S** [16] - 2:18, 2:20,
22:15, 47:15, 52:6,
52:24, 63:12, 89:17,
98:12, 98:13, 108:20,
125:7, 126:16,
126:17, 131:13
**U.S.C** [8] - 19:17,
40:3, 40:6, 64:15,
110:3, 110:16, 113:9,
135:20
**ultimate** [4] - 67:22,
82:11, 108:2, 113:25
**ultimately** [4] -
67:11, 73:15, 107:11,
108:10
**unavailing** [1] -
25:16
**uncertainty** [2] -
115:14, 115:15
**unconstitutional** [1]
- 64:7
**uncontroverted** [6] -
42:10, 43:11, 44:21,
45:4, 58:19, 59:6
**under** [54] - 9:1, 9:2,
9:25, 10:1, 17:7,
17:11, 19:17, 19:21,
21:13, 21:15, 24:24,
25:1, 25:2, 25:5,
25:11, 25:12, 26:23,
26:25, 28:7, 32:20,
40:2, 40:3, 40:6, 41:8,
42:9, 51:25, 61:25,
64:5, 64:9, 64:10,
64:14, 71:12, 71:13,
71:15, 75:21, 81:25,
95:25, 96:25, 98:9,
99:12, 100:22,
101:12, 102:25,
104:14, 107:23,
110:8, 113:8, 131:15,
132:16, 135:16,
135:17, 135:18,
137:6, 137:19
**underestimated** [1] -
126:15
**underlie** [1] - 92:6
**understood** [1] -
84:25
**undertaken** [2] -
70:9, 79:7
**undertakes** [1] -
132:21
**undisputed** [3] -

42:4, 42:10, 121:19
**undocumented** [2] -
107:16, 107:21
**unfortunate** [1] -
43:18
**unfortunately** [1] -
8:17
**unguarded** [1] -
12:21
**UNITED** [3] - 1:1,
1:11, 2:14
**United** [5] - 11:24,
14:4, 85:18, 120:5,
144:13
**united** [1] - 3:3
**units** [2] - 54:15,
54:25
**unknown** [2] - 54:18,
81:10
**unlawful** [5] - 10:2,
73:20, 73:22, 73:23,
79:11
**unless** [3] - 9:4,
24:5, 59:10
**unlike** [3] - 57:19,
59:5, 121:17
**unlocked** [1] -
105:15
**unnatural** [4] -
42:23, 42:25, 43:6,
50:21
**unpaved** [1] - 30:25
**unquote** [2] - 23:9,
50:11
**unrebutted** [1] - 92:9
**unreliable** [1] - 67:20
**unusual** [1] - 10:8
**unwillingness** [1] -
21:10
**up** [23] - 12:7, 16:2,
16:21, 26:14, 36:9,
37:7, 43:11, 53:17,
65:2, 67:25, 69:14,
71:24, 88:8, 93:8,
101:22, 102:20,
107:16, 107:20,
120:10, 120:17,
130:24, 136:12, 143:3
**useful** [1] - 116:18
**useless** [1] - 131:23
**uses** [2] - 88:8,
119:12, 124:1
**Uthmeier** [1] - 14:3
**utterly** [1] - 87:3

---

# V

**V-3** [1] - 39:14
**vacant** [2] - 54:24,
78:23

**vacate** [2] - 82:11,
113:25
**vacating** [1] - 114:4
**vacatur** [5] - 114:13,
115:1, 115:5, 117:16
**vague** [4] - 67:8,
67:11, 67:19, 67:20
**valid** [1] - 81:8
**value** [2] - 81:16,
116:10
**vantage** [1] - 49:13
**various** [1] - 38:2
**veered** [1] - 97:14
**vegetation** [1] -
42:25
**vehicles** [3] - 31:13,
31:14, 104:23
**vehicular** [3] - 33:22,
34:4, 34:13, 34:19
**vendor** [1] - 53:10
**venue** [47] - 17:13,
26:17, 26:19, 26:21,
26:22, 27:7, 27:10,
27:12, 27:16, 27:18,
27:24, 28:2, 28:6,
28:13, 29:11, 29:15,
83:20, 83:22, 83:24,
87:18, 87:20, 87:22,
87:25, 88:19, 88:20,
88:22, 89:2, 89:3,
89:5, 89:9, 89:21,
89:23, 90:3, 90:4,
90:10, 90:11, 90:20,
138:22, 138:25,
139:7, 139:12,
139:13, 139:15, 140:8
**versus** [15] - 10:6,
11:24, 12:2, 14:3,
14:4, 15:14, 25:25,
29:9, 85:9, 88:25,
89:12, 132:17, 134:4,
134:7, 136:17
**vertical** [1] - 51:5
**vest** [1] - 106:2
**viable** [2] - 101:12,
117:23
**video** [4] - 49:23,
50:4, 50:24, 67:3
**view** [4] - 16:7, 18:8,
97:10, 115:18
**viewed** [1] - 136:6
**vigorous** [1] - 15:8
**village** [2] - 51:1,
51:3
**Village** [1] - 51:3
**village's** [1] - 44:15
**villages** [5] - 38:11,
44:17, 44:19, 44:23,
51:2
**vindicate** [1] - 27:4

violation [5] - 9:25, 29:21, 47:7, 115:11, 133:22
violations [2] - 13:17, 102:4
VIR [1] - 119:13
Viratower [1] - 141:18
Virtower [2] - 119:12, 119:13
virtue [1] - 36:25
Visions [1] - 89:21
visit [4] - 21:4, 21:7, 21:11, 49:3
visited [3] - 12:11, 32:24, 88:10
visiting [1] - 21:8
visual [1] - 39:15
vitality [1] - 58:20
voilà [1] - 72:6
voluntary [5] - 98:8, 98:22, 99:5, 99:9, 99:10
vote [1] - 79:17
voted [1] - 79:14
vs [1] - 1:6
vulnerable [1] - 34:19

**W**

WAHL [1] - 2:23
wait [1] - 103:1
waivable [1] - 86:16
waived [1] - 139:14
waiver [4] - 27:9, 27:12, 27:14, 139:6
wake [1] - 120:1
walk [3] - 86:25, 92:4, 107:5
walked [2] - 69:20, 69:24
walks [2] - 68:23, 88:8
WALL [1] - 6:24
Wall [1] - 6:24
wants [1] - 16:9
warning [1] - 122:12
warns [1] - 83:15
warrant [2] - 36:19, 52:1
warranted [1] - 59:5
Warriors [1] - 141:12
Washington [2] - 2:19, 2:21
waste [4] - 76:20, 104:25, 143:10, 143:18
wastewater [2] - 42:19, 44:1

water [16] - 29:1, 29:7, 31:11, 35:5, 42:14, 45:4, 57:7, 57:10, 57:12, 57:13, 57:16, 65:23, 105:1, 140:4, 142:13
Water [16] - 11:24, 43:4, 45:11, 57:14, 60:23, 65:4, 65:21, 66:6, 72:18, 92:24, 93:25, 96:25, 97:6, 98:24, 100:3, 136:18
ways [3] - 47:21, 114:9, 125:20
weaponizing [1] - 81:22
week [5] - 5:25, 14:21, 61:20, 65:22, 94:5
weeks [4] - 21:6, 27:10, 36:11, 54:2
weigh [1] - 80:3
weighed [1] - 79:5
weight [2] - 13:19, 15:12
wells [1] - 54:9
WERP [19] - 40:24, 41:4, 43:2, 43:16, 43:17, 43:20, 43:24, 44:4, 45:7, 46:1, 46:14, 56:15, 57:5, 57:6, 57:12, 57:20, 57:22, 57:24, 58:2
west [1] - 35:6
westbound [1] - 49:23
western [1] - 30:22
Western [7] - 18:5, 18:6, 35:2, 43:17, 45:21, 57:8, 83:10
wetland [1] - 103:22
wetlands [4] - 31:24, 116:23, 142:17, 142:22
whales [2] - 55:11, 55:12
whatnot [1] - 105:1
whatsoever [2] - 10:13, 121:17
white [1] - 45:16, 138:6
White [2] - 20:23, 135:6
whole [9] - 32:19, 32:21, 88:12, 108:5, 115:13, 115:23, 118:18, 129:7, 140:13
wild [1] - 141:20
Wild [1] - 9:25
wildlife [2] - 47:15,

121:22
Wildlife [7] - 9:16, 29:9, 33:12, 47:13, 47:15, 48:2, 51:8
Williams [1] - 53:8
WILLIAMS [1] - 1:10
winding [1] - 143:11
windy [1] - 121:11
Winter [24] - 22:14, 22:19, 22:21, 52:6, 52:14, 52:23, 55:8, 55:9, 55:13, 55:22, 55:23, 80:8, 80:9, 81:7, 85:9, 85:21, 86:2, 86:5, 86:21, 118:13, 118:18, 119:3, 124:12, 128:6
Winters [2] - 22:18, 122:24
wishcast [1] - 128:20
withdraws [1] - 110:22
withdrew [1] - 21:4
withhold [1] - 61:4
witness [13] - 15:1, 15:2, 21:18, 21:22, 68:13, 88:14, 92:10, 95:13, 96:4, 100:20, 107:9, 127:15, 133:12
witnesses [22] - 14:20, 14:21, 14:25, 15:3, 15:9, 19:4, 19:16, 21:2, 37:13, 52:11, 52:21, 87:6, 96:8, 118:2, 119:6, 120:21, 122:7, 130:11, 130:19, 133:11, 133:13, 141:7
witnesses' [1] - 88:5
WL [4] - 15:15, 89:12, 89:14, 113:6
women [2] - 75:7, 107:24
wood [3] - 47:25, 48:3
Woodke [1] - 88:25
word [8] - 65:22, 76:12, 86:5, 86:9, 88:5, 91:11, 119:13, 141:15
words [6] - 56:22, 73:19, 86:1, 114:5, 125:11, 133:15
workers [3] - 68:21, 125:21
works [2] - 47:12, 118:17
world [5] - 27:25, 56:22, 134:16, 135:1, 137:3

writing [1] - 129:1
written [2] - 10:19, 54:13
wrongs [1] - 89:1

**Y**

yards [1] - 32:5
year [8] - 12:11, 44:6, 48:7, 58:1, 76:14, 119:23, 123:22, 125:23
years [18] - 10:20, 11:5, 12:15, 23:10, 30:18, 33:11, 41:4, 44:5, 47:11, 54:2, 57:24, 58:1, 77:7, 77:8, 86:10, 123:12, 126:2, 126:3
yellow [1] - 38:7
yesterday [27] - 12:10, 13:5, 14:24, 16:6, 17:5, 18:24, 21:4, 24:7, 29:3, 31:15, 31:16, 33:21, 34:24, 37:13, 38:2, 41:2, 42:12, 45:3, 47:8, 54:5, 55:2, 57:11, 71:5, 76:10, 130:19, 131:5
yield [1] - 115:25
York [1] - 15:15
you-can't-have-this-money [1] - 72:25
yourselves [1] - 59:25

**Z**

zero [2] - 137:2, 137:6
zigzags [1] - 49:9

# Doc. 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No. _____**

FRIENDS OF THE EVERGLADES, INC., a Florida
501(c)(3) not-for-profit corporation, and CENTER
FOR BIOLOGICAL DIVERSITY, a 501(c)(3)
nonprofit organization,

       Plaintiffs,

vs.

KRISTI NOEM, in her official capacity
as Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT; KEVIN
GUTHRIE, in his official capacity as Executive
Director of the Florida Division of Emergency
Management; and MIAMI-DADE COUNTY, a
political subdivision of the State of Florida,

       Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     This is an action for declaratory and injunctive relief under the National
Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*; the Administrative Procedure Act
(APA), 5 U.S.C. § 701 *et seq.*; and applicable provisions of Florida law, to halt the unlawful
construction of a mass federal detention facility for up to 5,000 noncitizen detainees, which the
Defendants are calling "Alligator Alcatraz," at the Dade-Collier Training and Transition Airport

("TNT Site"), a limited-use pilot training facility within the Greater Everglades, the Big Cypress National Preserve and Big Cypress Area.

2.     The TNT Site is owned by defendant Miami-Dade County and located within or directly adjacent to the Big Cypress National Preserve and the Big Cypress Area, a nationally and State protected, and ecologically sensitive, area that serves as habitat for endangered and threatened species like the Florida panther, Florida bonneted bat, Everglade Snail kite, wood stork, and numerous other species.

3.     Defendant Florida Division of Emergency Management (the "Division"), through its Executive Director, has entered into an arrangement, the details of which have not been made public, with the Defendants U.S. Department of Homeland Security ("USDHS") and U.S. Immigration and Customs Enforcement ("ICE") to transform the TNT Site into a mass migrant detention and deportation center. The decision to construct a mass migrant detention and deportation center at the TNT Site was made without conducting any environmental reviews as required under NEPA, without public notice or comment, and without compliance with other federal statutes such as the Endangered Species Act, or state or local land-use laws.

4.     Defendant Miami-Dade County is a political subdivision of the State of Florida and is the owner of the TNT Site.

5.     Plaintiffs seek an injunction and declaratory relief to halt pre-construction activities, construction, and related operations at the TNT Site unless and until Defendants comply with NEPA and related state, federal and local environmental laws and regulations. Simultaneous with the filing of this Complaint, Plaintiffs have filed their Expedited Motion for Temporary Restraining Order and Preliminary Injunctive Relief under Rules 65(a) and (b), of the Federal Rules of Civil Procedure, and respectfully request its expedited consideration.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701–706 (APA), 42 U.S.C. § 4321 *et seq.* (NEPA), and supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims.

7.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b) & 1391(e)(1)(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and because the TNT Site is owned by defendant Miami-Dade County, which is located in this district.

## PARTIES

8.     Plaintiff, Friends of the Everglades, Inc., is a Florida non-profit organization with members and directors in Miami-Dade County, Florida. Its mission includes protecting and restoring the Greater Everglades ecosystem, including the Big Cypress National Preserve and Everglades National Park.

9.     Friends' members regularly visit and use the Big Cypress National Preserve for recreational, aesthetic, scientific, and spiritual purposes, and intend to continue using the area in this manner, and will suffer irreparable harm if the detention facility is constructed and operated at the TNT Site. Friends and its members will suffer procedural harm if the detention center is constructed without compliance with the procedural requirements of NEPA.

10.     Friends was founded in 1969 by Marjory Stoneman Douglas, a renowned journalist and environmental activist, to protect the Everglades from development and degradation. In an striking echo, the organization's founding focus was on stopping the construction of the proposed "Everglades Jetport" at the precise spot where the TNT is located. Since that time Friends' mission has expanded to include preserving, protecting, and restoring

the entire Everglades ecosystem. Now, history is repeating itself as Friends once again must act to prevent destructive development in the heart of the Everglades ecosystem in the same location. Just as Friends did in the 1960s to stop the ill-conceived Jetport, Friends now finds itself in a familiar fight—resisting renewed threats to the Everglades posed by the construction of a mass detention and deportation facility at the TNT Site.

11.     Ironically, the 1968 proposal to build the "Everglades Jetport"—now the TNT Site—contributed to the January 1, 1970 adoption of NEPA, and its requirement to evaluate reasonably anticipated environmental impacts that could result from federal action *before* acting. After construction on the Everglades Jetport commenced, and the environmental outcry— spearheaded by Friends' founder Marjory Stoneman Douglas—ensued, the Department of Interior commissioned a 1969 report led by ecologist Luna Leopold to assess the ecological impacts of the proposal. The report became one of the first *de facto* environmental impact statements assessing impacts of federal action, and illustrated the utility of evaluating environmental impacts *before* acting. Nathaniel "Nat" Reed, who served as then Florida Governor Claude Kirk's senior advisor, used the Leopold report to persuade the Governor, who had initially supported the Jetport plan, to reverse course and oppose the project—a position later adopted by President Richard Nixon. The Jetport plan was ultimately scuttled, and only the runway—which is expressly limited to use for aviation training—remains. The Nathaniel P. Reed Visitor Center at Big Cypress National Preserve now sits nearby the TNT Site.

12.     Friends' member and Executive Director Eve Samples has personally visited the site and is familiar with the area. Friends' members enjoy recreating in the Everglades and Big Cypress area, including in panther habitat. They enjoy hiking, camping, fishing, kayaking, canoeing, birdwatching, and viewing and photographing nature and wildlife. Since the proposal

to build a mass detention facility in the Big Cypress National Preserve first surfaced, an astonishing 18,000 supporters of Friends have voiced their opposition to the plan. This opposition springs from a desire to preserve and protect the Everglades, and the Big Cypress National Preserve specifically, among Friends' members who use, fish, recreate, observe wildlife or otherwise enjoy the area.

13.     Plaintiff Center for Biological Diversity (the "Center") is a national, nonprofit conservation organization that works through science, law, and policy to protect all species—great and small—hovering on the brink of extinction. The Center has offices throughout the United States, including in Florida, and more than 93,000 active members across the country.

14.     The Center's members and staff derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from visiting Big Cypress National Preserve and observing the ecosystems and species who live there. The Center's members and staff live near or regularly visit Big Cypress National Preserve and the Greater Everglades Ecosystem.

15.     For example, one Center member, Tierra Curry, is a scientist committed to protecting intact ecosystems and preventing biodiversity loss. She plans to visit Big Cypress National Preserve this fall 2025 to hike, paddle, and observe wildlife. Another Center member, Amber Crooks is a conservationist who regularly visits Big Cypress National Preserve to enjoy the quiet peace of nature, to observe wildlife like red-cockaded woodpecker, and to appreciate remarkably dark night skies—among the darkest east of the Mississippi.

16.     Friends of the Everglades' and the Center's members are being injured by Defendants' unlawful actions, which threaten the integrity of Big Cypress National Preserve's waters and pristine night skies, the wellbeing of the plants and wildlife living there, and thus the

Plaintiffs' interests in them. Friends and the Center are also injured by being deprived of critical information and a public process to analyze and address significant environmental impacts associated with the detention center. NEPA is a procedural statute and "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Okeelanta Corp. v. United States Army Corps of Eng'rs*, 132 F.4th 1320, 1332 (11th Cir. 2025) (quoting *Massachusetts v. E.P.A.,* 549 U.S. 497, 517 (2007)).

17.    The injuries described are actual, concrete injuries presently suffered by Plaintiffs and their members, and they will continue to occur unless this Court grants immediate relief. The relief sought herein would redress those harms. Plaintiffs have no other adequate remedy at law.

18.    Defendant Kevin Guthrie is the Executive Director of the Florida Division of Emergency Management and is sued solely in his official capacity.

19.    Defendants Secretary Kristi Noem, in her official capacity as Secretary of the United States Department of Homeland Security ("USDHS"), and Director Todd Lyons, in his official capacity as Director of the United States Immigration and Customs Enforcement ("ICE") agency, are federal officials responsible for immigration enforcement and detention and have authority over the arrangements for the use of the TNT Site as a mass detention center.

20.    Defendant Miami-Dade County (the "County") owns the TNT Site and, on information and belief, has acquiesced in the other Defendants transformation of the TNT Site into a mass detention center even though County rules do not permit use of the TNT Site for this purpose.

## COMMON ALLEGATIONS

21.     The Dade-Collier Training and Transition Airport is a publicly owned airfield located within environmentally sensitive lands at the border of Miami-Dade and Collier counties, within the Big Cypress National Preserve, and within the Big Cypress Area as defined in Fla. Stat. § 380.055. At over 17,000 acres, the TNT Site is the largest parcel of land within the Big Cypress National Preserve not owned by the federal government.

22.     The Big Cypress National Preserve was established in 1974, and has been expanded since its creation. *see* Big Cypress National Preserve Act, Pub. L. No. 93-440, as amended by Pub. L. No. 100-301 (the Big Cypress National Preserve Addition Act of 1988); 16 U.S.C. § 698f.  The Preserve was created "in order to assure the preservation, conservation and protection of the natural, scenic, hydrologic, floral and faunal and recreational values in the Big Cypress Watershed." Pub. L. No. 93-440(a). The Preserve is managed as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity' in accordance with the provisions of this Act and with the provisions of the Act of August 25, 1916 (39 Stat. 535; 16 U.S.C. 1-4), as amended and supplemented." Pub. L. No. 100-301 § 4(a), Big Cypress National Preserve Addition Act of 1988.

23.     The Big Cypress National Preserve area where the TNT Site is located is known for its wetlands, critical wildlife habitat, and protected species, including the threatened wood stork, and endangered Florida bonneted bat and the Florida panther. The Site is within an environmentally sensitive freshwater wetland ecosystem of ecological significance for wildlife habitat. The Site is important for drinking water supply and Everglades water quality.

24.     The Big Cypress Preserve is home to various listed threatened or endangered species including the Florida bonneted bat, the Florida panthers, wood stork, Everglade snail

kite, and others, as documented in the Big Cypress National Preserve website. *See*, https://www.nps.gov/bicy/learn/nature/animals.htm, last visited June 25, 2025. Florida panthers have been geolocated on the TNT Site on many occasions. The map below shows Florida panthers geolocated on the TNT Site:



25.     Florida bonneted bats have also been documented in the Big Cypress National Preserve. *See* 78 Fed. Reg. 61004, 61008, 61011 (Oct. 2, 2013).

26.     In the Big Cypress Conservation Act of 1973, Fla. Stat. § 380.055, the Florida Legislature determined that "the Big Cypress Area is an area containing and having a significant impact upon environmental and natural resources of regional and statewide importance and that designation of the area as an area of critical state concern is desirable and necessary to accomplish the purposes of 'The Florida Environmental Land and Water Management Act of 1972' and to implement s. 7, Art. II of the State Constitution." Fla. Stat. § 380.055(2).

27.     The TNT Site is within the Big Cypress National Preserve as illustrated below:



28.     The TNT Site's location within the Big Cypress National Preserve is further illustrated by the below GIS map:



29.     The TNT Site is also proximate to Everglades National Park, and part of the historic Everglades. Since the passage of the Comprehensive Everglades Restoration Plan ("CERP") in 2000, the federal government and the State of Florida have jointly committed to one of the most ambitious ecosystem restoration efforts in the world. Authorized by Section 601 of the Water Resources Development Act of 2000 (WRDA 2000), Pub. L. No. 106-541, 114 Stat. 2572, CERP provides a framework for restoring, preserving, and protecting the South Florida ecosystem, including the Everglades, over multiple decades. The Plan encompasses more than 60 projects designed to improve water quality, restore hydrologic flow, and protect critical habitat.

30.     Under CERP, the federal government, through the U.S. Army Corps and Engineers ("USACE") and the Department of the Interior ("DOI"), fund half the costs of restoration. The State of Florida contributes the other half, with each partner committing billions

of dollars to implementation. As of 2024, total appropriations for Everglades restoration from both federal and state sources exceed $20 billion—much of which has been allocated since 2019—reflecting a sustained, bipartisan commitment to safeguarding the ecological integrity of the Everglades and adjacent areas like Big Cypress National Preserve.

31.     These investments are reinforced by successive authorizations and appropriations through subsequent federal legislation, including the Water Resources Development Acts of 2007, 2014, 2016, 2018, 2020, 2022, and 2024 each of which reauthorized and expanded CERP components. The State of Florida has likewise demonstrated its ongoing commitment to Everglades restoration through substantial state funding, including over $3.5 billion committed between 2019 and 2024 alone under Florida's "Everglades Restoration Strategy." These efforts support not only environmental protection, but also flood control, drinking water supply, and biodiversity, and endangered species habitat preservation and conservation across South Florida.

32.     One recent component of CERP is the Western Everglades Restoration Plan ("WERP"), which will use a series of active and passive water management features, water quality features, and alterations to existing canals and levees with a goal of improving the quantity, quality, timing and distribution of water in the Western Everglades in the effort to re-establish ecological connectivity, reduce the severity and frequency of wildfires, and restore low nutrient conditions.  The TNT sits within the WERP footprint as illustrated below:



33.     The Dade-Collier Training and Transition Airport site, which is within and/or borders the Big Cypress National Preserve, lies within the broader Everglades ecosystem restoration footprint, and any development at that site that disrupts hydrologic connectivity or degrades environmental conditions threatens to undermine the very objectives that these federal and state investments were intended to achieve.

34.     The Division has recently entered into an arrangement with DHS to allow the use of the TNT Site as a mass detention facility for ICE.  DHS has advised that it intends to detain up to 5,000  for federal immigration purposes. In a statement, DHS advised that Federal Emergency Management Agency ("FEMA") shelter program funds would be used to pay the Division approximately $450 million a year to operate the detention centers, which the Division has dubbed "Alligator Alcatraz."

35.     During a press conference on June 25, 2025, Governor DeSantis noted that federal agencies would fully fund the detention center, stating: "This is fully funded by the federal government"; "This is something that was requested by the federal government, and this is something that the federal government is going to fully fund"; "From a state taxpayer perspective, we are implementing it ... but that will be fully reimbursed by the federal government." https://www.youtube.com/watch?v=gJfG7L9reHU&ab_channel=FOX35Orlando, (at 6:01 timemark), last visited June 27, 2025.

36.     As these public statements confirm, the Division is acting as the agent of federal immigration enforcement agencies in transporting and detaining noncitizens to the TNT Site, and facilitating the deportation of noncitizens from the Site.

37.     In correspondence with Miami-Dade County, Mr. Guthrie stated that the Division intends to use the Site "to assist the federal government with immigration enforcement." Florida

App. 1100

Attorney General James Uthemeier has been quoted that the TNT Site, with its runway, is intended to be used to "detain, deport and get people out of this country." In correspondence to the County, Division Executive Director Guthrie states that the Division, "has identified the [Site] as a critical asset for ongoing and future emergency response, aviation logistics, and staging operations," suggesting that the TNT Site will be used for deportation flights.

38.     The planned use of the TNT Site includes the installation of prefabricated housing, water and sewage infrastructure, security fencing, high-intensity security lighting, and other structures. In addition, numerous fill laden dump trucks have been observed entering the Site. As noted, the Division has also expressed a desire to utilize the runway in connection with receiving and deporting detainees from the Site.

39.     Construction on the detention center has unfolded at a breakneck pace, and is ongoing. The Division took control of the Site only on June 23, 2025. Since then kitchen facilities, restrooms, housing facilities, portable industrial lighting, and other infrastructure have been positioned on site, and heavy vehicular traffic on and out of the site has been observed, and is ongoing. A steady stream of fill-laden dump trucks have been observed entering and exiting the Site in recent days. State officials have publicly stated that they expect to begin housing detainees at the TNT Site by July 1, 2025.

40.     The photo below shows dump trucks with covered cargo entering the TNT Site earlier this week:



41.     Below is an image published in the *Miami Herald* and taken on or about June 24,

2025, of industrial, high intensity lighting units being delivered to the TNT site:



42.     Below are images of portable generators, also published in the *Miami Herald*, depicting industrial generators being delivered to the site:



43.     To Plaintiffs' knowledge, no environmental assessment or environmental impact statement has been prepared under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321, *et seq.*, nor has the Division conducted any environmental review under Florida law.

44.     Defendant Miami-Dade County, while unlawfully allowing its TNT Site to be occupied by agencies seeking to enforce federal immigration laws, has questioned the lack of any environmental analyses regarding the project. On June 23, 2025, Miami-Dade County Mayor Daniella Levine Cava wrote to the Division and stated: "With the federal and state government investing well over $10 billion since 2019 in Everglades restoration and protection, we would appreciate a detailed analysis and report on environmental impacts of this facility to the

Everglades. We would also value input from the appropriate federal agencies on their environmental reviews and analyses prior to proceeding."

45.     To Plaintiffs' knowledge, Defendants have not conferred with the USACE, DOI, U.S. Fish and Wildlife Service, or any other federal or local agency regarding potential impacts from the construction of a detention center for 5,000 individuals at the TNT Site.

46.     To Plaintiffs' knowledge, no categorical exclusion from NEPA has been invoked by the Defendants, nor does any apply.

47.     To Plaintiffs' knowledge, no exemption or waiver of NEPA requirements has been invoked by Defendants, and none exist.

48.     There is no emergency that would warrant departure from NEPA's requirements, as NEPA contains no exception for emergencies. Even if an emergency existed, none of the Defendants have made alternative arrangements as was required under NEPA regulations, which, in any event, have recently been withdrawn.

49.     No public notice or hearing has been conducted in connection with the use of the TNT Site for migrant detention.

50.     The property is subject to intergovernmental agreements and historical land use restrictions related to its location within the footprint of the Big Cypress National Preserve and State Big Cypress Area.

51.     The hasty transformation of the Site into a mass detention facility, which includes the installation of housing units, construction of sanitation and food services systems, industrial high-intensity lighting infrastructure, diesel power generators, substantial fill material altering the natural terrain, and provision of transportation logistics (including apparent planned use of the runway to receive and deport detainees) poses clear environmental impacts. The Defendants,

in their rush to build the center, have unlawfully bypassed the required environmental reviews. The direct and indirect harm to nearby wetlands, wildlife, and air and water quality, and feasible alternatives to the action, ***must*** be considered under NEPA ***before*** acting.

52.     The TNT Site is highly susceptible to flooding and no feasible plan has been studied to evacuate center detainees and personnel in the event of a hurricane or major flooding event.

53.     DHS also violated the Endangered Species Act by, among other things, failing to consult with USFWS.  Plaintiffs intend to amend this Complaint to add the ESA claims after the required 60-day pre-suit notice, 16 U.S.C. § 1540(g)(2)(A)(i), period has expired.

54.     Additionally, to Plaintiffs' knowledge, the Secretary of the Interior, acting through the Director of the National Park Service, has taken no action to regulate the use of the Big Cypress National Preserve in such manner and by such means that will leave the Preserve unimpaired by the environmental impacts of the TNT Site and associated operations.

55.     The National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)), states, "The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

56.     This "non-impairment" mandate was reaffirmed by Congress in the 1978 amendments to the Act. The 1978 Reaffirmation states: "Congress reaffirms, declares, and

directs that the promotion and regulation of the various System units shall be consistent with and founded in the purpose by subsection (a), to the common benefit of all the people of the United States.  The authorization of activities shall be construed and the protection, management, and administration of the System units shall be conducted in light of the high public value and integrity of the System and shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress."  54 U.S.C. § 100101(b).

57.    The Big Cypress National Preserve was established to "assure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral, and faunal, and recreational values of the Big Cypress Watershed in the State of Florida and to provide for the enhancement and public enjoyment thereof." Pub. L. No. 93-440(a).

58.    The TNT facility and associated operations will use and impair the Big Cypress National Preserve by causing direct and indirect harm to its wetlands, wildlife, and air and water quality. These impacts will result in the degradation of the natural, scenic, hydrologic, floral, and faunal, and recreational values for which the Preserve was created.

59.    The Secretary of the Interior and the National Park Service's apparent acquiescence in DHS and ICE's funding and operating the TNT facility in a manner that will result in significant environmental harm to the Preserve, does not comport with the Act's non-impairment mandate, is in derogation of the values and purposes for which the Preserve was established, and is not otherwise directly and specifically allowed by Congress. Plaintiffs reserve the right to amend this Complaint to add the Secretary of Interior.

60.    All conditions precedent to the maintenance of this action have occurred, been waived, or both.

## COUNT I
### (VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT (NEPA))
### (Against the DIVISION, DHS and ICE)

61.      Plaintiffs reallege the Common Allegations as if fully set forth herein.

62.      The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment, or an Environmental Assessment (EA) if the agency action does not have reasonably foreseeable significant effects on the human environment, or if the significance of such effect is unknown.

63.      Major federal actions include any action that is subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10).

64.      The construction of an immigration detention center is an action that is necessarily subject to federal control and responsibility. The State of Florida has no authority or jurisdiction to enforce federal immigration law. *See Arizona v. United States*, 567 U.S. 387 (2012) (holding federal law preempts state immigration law enforcement). In *Arizona*, the Supreme Court reaffirmed "the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409. The Court explained that "decision[s] on removability [of noncitizens] requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice." *Id.* (quoting *Galvan v. Press,* 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are ... entrusted exclusively to Congress ...")).

65.      In Fla. Stat. § 908.13, the Florida legislature authorized the Division to facilitate the transport of detainees on the condition that ICE "specifically request assistance from the

division with the transport of unauthorized aliens pursuant to specific federal legal authority." *Id.* § 908.13(2)(a). Additionally, ICE "must reimburse the state for the actual cost of assisting with the transport of unauthorized aliens." *Id.* § 908.13(2)(b). Any such transport "must occur under the ***direct control and supervision*** of" ICE. *Id.* § 908.13(2)(c) (emphasis added). Because state law requires that the Division's transportation of detainees to and from the detention center occur under the "direct control and supervision" of ICE, the TNT detention center project is statutorily required to be under "Federal control and responsibility," 42 U.S.C. § 4336e(10), thereby triggering NEPA. In this way, the Division is acting as agent for DHS and ICE.

66.     Florida Attorney General Uthmeier has announced that the TNT Site will be used "in support of the Trump administration" in federal immigration law enforcement. The Attorney General has posted on social media that "Alligator Alcatraz [is] the one-stop shop to carry out President Trump's mass deportation agenda." He accompanied the post with a video of the TNT Site runway. Governor DeSantis has been quoted as stating the TNT Site is to "facilitate the federal government in immigration enforcement."

67.     Under 42 U.S.C. § 4336e(10), Congress identified *non*-major federal actions as actions conducted with "no or minimal Federal funding." Conversely, infrastructure projects like this one that are funded and/or approved by the Federal government, require federal agencies to prepare an EIS for actions that significantly affect the quality of the human environment or an EA if the agency action does not have reasonably foreseeable significant effect on the human environment or if the significance of such effect is unknown. The evaluation must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects. NEPA is a procedural statute that requires federal agencies to prepare an environmental impact statement, or EIS, identifying significant environmental effects

of the projects, as well as feasible alternatives. The law ensures that the agency and the public are aware of the environmental consequences of proposed projects. Properly applied, NEPA helps agencies to make better decisions and to ensure good project management.

68.    Specifically, an EIS must include a "detailed statement" addressing the following: (i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented. 42 U.S.C. §§ 4332(C)((i)-(v).

69.    Moreover, NEPA requires that "[p]rior to making any detailed statement," the head of the lead agency "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* § 4332(C). Because actions associated with the construction and operation of the detention center at the TNT Site are within a national preserve that includes primary habitat for the Florida panther and critical habitat for the Florida bonneted bat, at a bare minimum federal law requires USDHS to consult with the National Park Service, and the U.S. Fish and Wildlife Service in assessing the environmental impacts of its proposed project.

70.     NEPA contains no exceptions for emergency actions, and no emergency exists. NEPA regulations provided that in cases of emergencies such as a hurricane, flood or wildfire, a federal agency should consult with the Council about alternative arrangements. These arrangements must be limited to actions necessary to control the immediate impacts of the emergency." 40 C.F.R. § 1506.12. These regulations, however, have been withdrawn. In any event, there is no emergency and, even if there was, no alternative arrangements have been implemented.

71.     The arrangements between the Division, USDHS and ICE to transform the TNT Site into a mass detention and deportation facility constitute major federal action, as it involves the use of federal authority, approvals, funding and resources, and will have significant environmental impacts on an ecologically sensitive area. Those impacts, which to date have gone unevaluated, could logically include impacts to listed species, impacts to wetlands and surface waters, impacts due to increased activities at the Site, including traffic to and from the Site, hurricane and flooding preparedness, etc.

72.     To Plaintiffs' knowledge, no EA or EIS has been prepared by DHS, ICE, the Division, or any cooperating agency.

73.     The failure to conduct the required environmental review under NEPA violates federal law and deprives the public and affected stakeholders, including Plaintiffs, of required procedures and procedural environmental protections.

74.     Plaintiffs are entitled to injunctive and declaratory relief requiring compliance with NEPA before any further activity occurs at the TNT Site.

## COUNT II
### (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (APA)
### (Against DHS and ICE))

75.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

76.     The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, permits judicial review of final agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

77.     USDHS and ICE have approved or are implementing the use of the TNT Site without providing Plaintiffs and the public with an opportunity for notice and comment, and without adhering to required environmental review procedures under NEPA and other federal laws, including the Endangered Species Act, and the National Park Service Organic Act of 1916, (16 U.S.C. § 1, amended and recodified in 54 U.S.C. § 100101(a) (2014)).

78.     The decision to proceed without notice, comment and without an EA or EIS constitutes final agency action and is subject to judicial review.

79.     Plaintiffs are entitled to a declaration that the agency's conduct is unlawful, directing vacatur of the agency action, as well as an injunction preventing further activity until NEPA compliance is achieved.

## COUNT III
### (ULTRA VIRES ACTION (Against the Division))

80.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

81.     The Division of Emergency Management is governed by Chapter 252, Florida Statutes.

82.     Nothing in Chapter 252 authorizes the Division to convert county-owned property into a federal detention center without legislative authority, environmental review, or compliance with local land use requirements.

83.     Moreover, Florida law requires that, before the State of Florida may construct a correctional facility, it must consult with local governments with jurisdiction over the proposed site to determine if the proposed facility would comply with applicable local land use laws.  Fla. Stat. § 944.095(2). Florida law further provides that local governments have 90 days to review any proposed correctional facility to determine if it complies with the applicable land use laws. The Division has not complied with these legal requirements.

84.     The Division has no independent legislative authority to construct and manage a correctional facility.  Under Florida law, a correctional facility means any "prison, road camp … prison forestry camp … prison farm [whether] temporary or permanent." Section 944.02(8), Fla. Stat. "Prisoner" includes any person "under civil or criminal arrest [and committed] to the custody of the department pursuant to lawful authority." *Id.* § 944.02(6). These provisions apply to the Florida Department of Corrections, however, not the Division which has no authority to detain persons under Florida law.

85.     Defendant's actions exceed the scope of authority granted by Florida law.

86.     Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201 that the Division's arrangement with DHS is *ultra vires* and void, and the construction of the TNT Site detention center is being conducted in derogation of state law.

87.     Plaintiffs are further entitled to injunctive relief preventing further construction or operation at the site.

## <u>COUNT IV</u>
**(Violation of Miami-Dade County Code and CDMP (against Miami-Dade County))**

88.     Plaintiffs reallege the Common Allegations as if fully set forth herein.

89.     Pursuant to the County's Operational Directive No. 15-02, the TNT Site is governed by Chapter 25 of the Miami-Dade County Code, pertaining to aviation operations.

90.     The TNT Site is permitted only for aviation uses including pilot flight training, pilot proficiency checks, and aircraft maintenance flight checks.

91.     In addition, the Site, or a portion of it, is designated Environmentally Protected Parks under Miami-Dade Counties Comprehensive Development Master Plan due to its environmental sensitivity.

92.     The Site is not permitted or authorized for use for non-flight purposes.

93.     The County's agreement or acquiescence in allowing the TNT Site for use as a mas detention center is in violation of the County code and permitting regimes.

94.     Plaintiffs are entitled to a declaration under 28 U.S.C. § 2201 that the County may not authorize or allow use of the TNT Site for purposes other than that allowed under the County Code and existing permits and authorizations.

## **PRAYER FOR RELIEF**

WHEREFORE, Friends of the Everglades respectfully requests that the Court:

A.     Declare that Defendants' actions violate NEPA and the APA;

B.     Enjoin any further pre-construction activities, construction, conversion, or use of the TNT Site for purposes of immigration detention unless and until Defendants comply with NEPA and the APA;

C.     Declare that Defendant Guthrie's actions exceed lawful authority under Florida law and violate state environmental and land use laws;

D.     Enjoin Defendant Guthrie from authorizing or permitting further development or use of the TNT Site for purposes related to a mass detention center;

E.     Enjoin the County from permitting the use of property limited to aviation activities as a mass detainment center.

F.     Award Plaintiffs their attorneys' fees and costs as allowed by law;

G.     Grant such other relief as the Court deems just and proper.

App. 1113

Dated:   June 27, 2025

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/   Tania Galloni_____
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No. 100309
    dburkhardt@earthjustice.org

*Counsel for Friends of Everglades*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/   Paul J. Schwiep_____
    Paul J. Schwiep, Fla. Bar No. 823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for All Plaintiffs*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

App. 1114

# Doc. 5

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity
as Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT; KEVIN
GUTHRIE, in his official capacity as Executive
Director of the Florida Division of Emergency
Management; and MIAMI-DADE COUNTY, a
political subdivision of the State of Florida,

        Defendants.

---

### PLAINTIFFS' EXPEDITED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Friends of the Everglades, Inc., and Center for Biological Diversity, Inc.

("Plaintiffs"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 65(a) and (b),

and S.D. Fla. L.R. 7.1(d), respectfully file this motion for expedited relief[1] seeking entry of a

temporary restraining order ("TRO") by July 1, 2025, and preliminary injunction to maintain the

---

[1] Expedited relief is required under Southern District of Florida L.R. 7.1(d)(2) because, as set
forth herein, Defendants have announced their intention to begin to detain noncitizens at the
detention site described herein as soon July 1, 2025.  Notice of this motion has been provided by
electronic mail to the United States Attorneys' Office for the Southern District, the Florida
Attorney General Office, and the Miami-Dade County Attorneys' Office.

status quo during the pendency of this action seeking declaratory and injunctive relief to enforce the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*; the Administrative Procedure Act (APA), 5 U.S.C. § 701; and state and local laws prohibiting the ongoing construction of an immigration detention center within the Big Cypress National Preserve in the Florida Everglades.

## I.    <u>INTRODUCTION</u>

With no notice to the public or opportunity for public input, the State of Florida's Division of Emergency Management (the "Division") has commenced construction of an immigrant detention center on property owned by Miami-Dade County and within the Greater Everglades ecosystem, pursuant to an undisclosed arrangement with the U.S. Department of Homeland Security ("DHS") to detain immigrants for U.S. Immigration and Customs Enforcement ("ICE"). Florida officials have stated publicly that they expect to have infrastructure in place at the site to begin detaining individuals for federal immigration purposes by July 1, 2025.  Florida's governor has stated that construction of the detention center was "requested by the federal government" and that it "is fully funded by the federal government." https://www.youtube.com/watch?v=gJfG7L9reHU&ab_channel=FOX35Orlando,    (at    6:01 timemark), last visited June 27, 2025.

The site of this detention center is the Dade-Collier Training and Transition Airport ("TNT Site"), a limited-use pilot training facility within the Big Cypress National Preserve. The TNT Site is located within or directly adjacent to the Big Cypress National Preserve, a nationally and state protected and ecologically sensitive area that serves as habitat for the threatened wood stork, the endangered Florida panther and Florida bonneted bat, and numerous other wildlife species. The site is proximate to Everglades National Park and within the historic Everglades,

including near areas where billions of dollars in federal and state funds have been allocated towards restoration and preservation. State and federal officials have indicated that they intend to use the TNT Site not only as a detention center to detain anywhere from 1,000 to 5,000 individuals, but also to utilize the existing runways for deportation flights – a "one-stop shop" to carry out "mass deportation." These activities necessarily require federal involvement since the State of Florida is not otherwise empowered to enforce federal immigration laws, and Florida law restricts immigration enforcement except under federal supervision and control.

Notably absent from the public statements of state and federal officials is any discussion of the significant environmental impacts that will inevitably result from the construction of a detention center within the Big Cypress National Preserve and on the edge of Everglades National Park. Given the *billions* of dollars the state and federal governments have devoted to preserving and restoring the Everglades and Big Cypress ecosystems – including the Western Everglades Restoration Project approved by Congress just six months ago – one would expect these government agencies to have seriously considered the potential environmental impacts from such an extraordinary project in arguably the most sensitive location in Florida.

In fact, federal law *demands* exactly that. The National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, requires federal agencies such as DHS to prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment. Major federal actions include any action that is subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A); *see also Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (defining a "major federal action" as "an action significantly affecting the quality of the human environment"). The construction of an Everglades immigration detention center is a major federal action undertaken to implement a

federal statutory program or executive directive, since the State of Florida has no authority or jurisdiction to enforce federal immigration law. *See Arizona v. United States*, 567 U.S. 387 (2012) (holding federal law preempts state immigration law enforcement); *Florida Immigrant Coal. v. Uthmeier*, ---F. Supp. 3d---, No. 25-21524-CV, 2025 WL 1423357, at *7-10 (S.D. Fla. Apr. 29, 2025) (same); *Farmworker Ass'n of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311, 1332-37 (S.D. Fla. 2024) (same). Under Florida law, the state may not engage in noncitizen transport except "under the direct control and supervision of the United States Immigration and Customs Enforcement." Fla. Stat. § 908.13(2)(c).

As the United States Supreme Court recently confirmed, for "certain infrastructure projects that are built, funded, or approved by the Federal Government, NEPA requires federal agencies to prepare an environmental impact statement, or EIS. The EIS must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1507 (2025). NEPA is a procedural statute that "requires federal agencies to prepare an environmental impact statement, or EIS, identifying significant environmental effects of the projects, as well as feasible alternatives. The law ensures that the agency and the public are aware of the environmental consequences of proposed projects. Properly applied, NEPA helps agencies to make better decisions and to ensure good project management." *Id.* at 1510.

To ensure compliance with NEPA, courts grant preliminary or permanent injunctive relief that requires federal agencies to prepare an adequate EIS before taking further action. *See, e.g., Miccosukee Tribe of Indians of Florida v. United States*, No. 08-21747-CIV, 2008 WL 11332080, at *10 (S.D. Fla. Nov. 14, 2008); *Florida Wildlife Fed'n v. U.S. Army Corps of Engineers*, 404 F. Supp. 2d 1352, 1366-67 (S.D. Fla. 2005). This is because a "fundamental

purpose of NEPA is to ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Florida Wildlife Fed'n*, 404 F. Supp. 2d at 1362 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) & *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1540 (11th Cir. 1990)).

At the request of the federal government, Florida officials, with notice to the public or opportunity for public comment, have commenced construction of the detention center, and DHS and ICE are expected to transport detained individuals to the TNT Site as early as July 1, 2025. Already housing units, sanitation and food services systems, lighting infrastructure, diesel power generators, substantial fill material, restroom facilities and other infrastructure have been moved on site. *See* Decl. of Eve Samples, attached hereto as Exhibit A, ¶ 16. Given the ongoing construction at the Site without NEPA review of potential environmental impacts, as required by law, immediate injunctive relief is particularly appropriate here. "If construction is not enjoined, these as yet unexamined effects would begin to take place, and no amount of subsequent environmental analysis would undo them." *Florida Wildlife Fed'n*, 404 F. Supp. 2d at 1362.

Accordingly, Plaintiffs respectfully request a temporary restraining order and preliminary injunction to prevent further irreparable harm to Plaintiffs and the fragile area where Defendants are building this detention center. Indeed, given the urgency of this Motion and the flagrancy with which Defendants have flouted NEPA, Plaintiffs request that the Court enter a temporary restraining order immediately without further notice to Defendants, to maintain the status quo until the Court can hold a preliminary injunction hearing.

## II.     ARGUMENT

To obtain a temporary restraining order, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005). These same elements must be established to obtain a preliminary injunction. *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018). "The purpose of a temporary restraining order, like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo*, 403 F.3d at 1231.

Applying these factors, Plaintiffs are entitled to a temporary restraining order and a preliminary injunction to halt the construction of the detention center and all related activity unless and until the DHS and its agents comply with NEPA.

### A. Plaintiffs Are Likely to Succeed on the Merits.

NEPA unambiguously requires all federal agencies, including DHS, to prepare an Environmental Impact Statement (EIS) for any major federal action significantly affecting the quality of the human environment. Major federal actions include any action that is subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A); *see also Van Antwerp*, 526 F.3d at 1360 (defining a "major federal action" as "an action significantly affecting the quality of the human environment"). The construction of a 1,000- to 5,000-person mass detention center under the direct control and supervision of DHS to detain individuals for ICE prior to their deportation by the federal government is a major federal action undertaken to

implement a federal statutory program or executive directive – namely, the current administration's mass deportation initiative.

The significant effect of this project on the environment is undeniable: The TNT Site is encompassed by Big Cypress National Preserve, which was established expressly to "assure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral and faunal, and recreational values of the Big Cypress Watershed in the State of Florida and to provide for enhancement and enjoyment thereof." 16 U.S.C. § 698f. The construction of a detention center and accompanying airport facility entails heavy construction traffic, artificial lighting, the use of massive generators, and the creation of significant , which will undoubtedly significantly impact the quality of the environment on the Site and the surrounding environment.  *See* Ex. A ¶ 15. Tierra Curry, a biologist at the Center for Biological Diversity, has concluded that the ongoing construction and proposed detention center will have "numerous negative environmental effects," and will likely cause harm to endangered Florida panthers, bonneted bats and Everglades snail kites, as well as threatened wood storks and Eastern indigo snakes.  Decl. of Tierra Curry, attached as Exhibit B, at ¶ 12-20.

For "certain infrastructure projects that are built, funded, or approved by the Federal Government, NEPA *requires* federal agencies to prepare an environmental impact statement, or EIS. The EIS must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects." *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1507 (emphasis added). Here, Defendants have not prepared an environmental impact statement *at all*, despite the unambiguous requirements of 42 U.S.C. § 4332(C).

Significantly, NEPA contains no exceptions for "emergency" actions, such as the one at issue here. Here, there is no emergency and, even if there were, no alternative arrangements have

been implemented. In short, there is no excuse for Defendants' failure to prepare an EIS as required under NEPA.

Plaintiffs' likelihood of success on its claims is patent.

**B.** <u>**Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief**</u>.

The irreparable harm to Plaintiffs and their members if construction of the detention center is not enjoined is also patent. *Ferrero v. Assoc. Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (an injury is "irreparable" if it cannot be undone through monetary remedies).

Plaintiff Friends of the Everglades, Inc. ("Friends"), is a Florida non-profit organization with members and offices in Miami-Dade County. Its mission includes protecting and restoring the Greater Everglades ecosystem, including the Big Cypress National Preserve. *See* Ex. A. Friends' members regularly visit and use the Big Cypress National Preserve for recreational, aesthetic, scientific, and spiritual purposes and will suffer irreparable harm if the detention facility is constructed and operated at the TNT Site. *Id.* Over 18,000 Friends supporters have voiced their opposition to the project. *Id.*

Plaintiff Center for Biological Diversity (the "Center") is a national, nonprofit conservation organization that works through science, law, and policy to protect all species—great and small—hovering on the brink of extinction. *See* Exhibit B. The Center has offices throughout the United States, including in Florida, and more than 93,000 active members across the country. *Id.* The Center's members and staff derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from visiting Big Cypress National Preserve and observing the ecosystems and species who live there. *Id.* The Center's members and staff live near or regularly visit Big Cypress National Preserve and the Greater Everglades Ecosystem. *Id.*

App. 1123

For example, Center member Amber Crooks regularly visits Big Cypress multiple times each year to enjoy the quiet peacefulness of being in a truly natural place where she can observe wildlife and gaze up at the night sky in one of the darkest places east of the Mississippi River. *See* Decl. of Amber Crooks, attached as Exhibit C, at ¶¶ 5-20. She has plans to continue visiting the preserve, with her most immediate plans this Saturday and longer-range plans to visit this fall for hiking, wildlife observation, and photography. *Id.* ¶¶ 6-8.

The Big Cypress area, including the TNT Site, is utilized by Plaintiffs' members to observe the flora and fauna that are found there, including critically endangered Florida panthers and Florida bonneted bats. *Id.* ¶¶ 12-19; Ex. B ¶ 14. Indeed, radio telemetry data shows the presence of Florida panthers (which have large home ranges) in and around the TNT Site. Ex. B ¶¶ 14-15. *See also* Ex. A at Ex. 1. The area's preserved wetlands, immediately adjacent to the Site, are also essential to maintaining South Florida's drinking water supply and provide hurricane resilience. Transportation, construction, and detention infrastructure for up to 5,000 individuals pose a grave risk to this ecosystem and the wildlife that rely on it. Exs. A & C.

These facts establish that Plaintiffs will at a minimum suffer aesthetic and recreational injuries as a result of the construction of the detention center, and they have suffered a procedural injuries, because there has been no opportunity for public notice, comment or environmental review as Congress intended. Ex. A ¶ 19; Ex. B ¶ 21; Ex. C ¶ 22. If DHS had sought and obtained an EIS as NEPA requires, the Site would have been found unsuitable for this purpose, given the proximity to a national preserve and a national park, the potential harmful effects on multiple endangered species, and the billions of public dollars that have been devoted to preserving and restoring the Everglades ecosystem. *Id.* Based on these facts, Plaintiffs clearly have a concrete and redressable injury. *See Ctr. for a Sustainable Coast v. U.S. Army Corps of*

*Eng'rs*, 100 F.4th 1349, 1356-57 (11th Cir. 2024);   *see also Miccosukee Tribe*, 2008 WL 11332080 at *11 ("the risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation") (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989)).  NEPA creates a procedural right. *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006) ("the plaintiffs were harmed when their procedural rights under NEPA were violated"); *Ctr. for a Sustainable Coast*, 100 F.4th at 1356-57 (same).  "For procedural rights cases, though injury in fact remains a firm requirement, standards for both causation and redressability are relaxed. So long as a plaintiff alleges that the challenged (or omitted) procedure protects a concrete interest, causation and redressability typically follow— even though we can't know whether that procedure, correctly performed, would have resulted in the substantive outcome that the plaintiff desires." *Ctr. for a Sustainable Coast*, 100 F.4th at 1353 (11th Cir. 2024).  Plaintiffs have done that here. *See* Exs. A-C.

Moreover, Plaintiffs' injuries are irreparable. Indeed, it is well established that "[i]rreparable harm results where environmental concerns have not been addressed by the NEPA process." *Miccosukee Tribe*, 2008 WL 11332080 at *11 (citing *Protect Key West, Inc. v. Cheney*, 795 F.Supp. 1552, 1563 (S.D. Fla. 1992)). "[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Marsh*, 872 F.2d at 500. A NEPA violation necessarily causes irreparable harm because once a federal agency decides to go forward with a major action without a NEPA-required environmental analysis, it is unlikely to change course later, even with the benefit of an EIS. *Id.* ("[o]nce large bureaucracies are committed to a course of action, it is difficult to change that course…it is this type of harm that plaintiffs seek to avoid, and it is the presence of this type of harm that courts have said can merit an injunction in an

appropriate case"). The very purpose of NEPA is to ensure that a government agency takes a "hard look at the environmental consequences of the proposed action," *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002), and the Defendants' failure to do so cannot be remedied without preliminary injunctive relief.

### C. **The Remaining Factors Weigh in Favor of Injunctive Relief.**

Where the government is the opposing party, the balance of equities and public interest factors merge. *Florida Immigrant Coal.*, 2025 WL 1423357 at *13; *Farmworker Ass'n of Fla.*, 734 F.Supp.3d at 1342. As the United States Supreme Court has recognized, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987). The balance of harms weighs in Plaintiffs' favor here.

In contrast to the significant environmental harms that will result from the construction of a detention center/airport in the middle of a national preserve, and the procedural harm from failing to comply with law requiring an assessment of such harms before proceeding, any harm Defendants may shoulder if enjoined would be minimal at best. DHS already has and contracts with multiple detention centers in Florida and across the United States. To the extent that DHS claims to have insufficient capacity to detain people in response to its own initiative to ramp up apprehensions, that lack of planning does not require or justify bypassing federal laws to develop a new facility within a national preserve and next to a national park. Indeed, part of the NEPA process requires federal agencies to review and consider all reasonable alternatives. *See* 42

U.S.C. § 4332(C). DHS and the State have evidently failed to consider other potential sites without such devastating environmental impacts, despite NEPA's mandate that they do so.

Defendants no doubt will invoke their interest in enforcement of immigration laws to oppose injunctive relief.  In taking control of the TNT Site, the State of Florida has invoked its "emergency" powers under a 2023 executive order of the Governor declaring immigration an "emergency" – an "emergency" now in its third year, with no discernible effort to develop a mass detention facility in the intervening years. Putting aside whether intractable political gridlock over immigration reform constitutes an "emergency," it does not give license to the state and federal governments to simply disregard the laws that govern federal projects affecting environmentally sensitive lands, essential waterways, national parks and preserves, and endangered species.  "[E]ven a 'legitimate' governmental interest can be outweighed by the harm" to a plaintiff arising from government actions in service of that interest, as in this case. *Farmworker Ass'n of Fla.*, 734 F.Supp.3d at 1342 (enjoining enforcement of state law aimed at immigration).

Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal citations omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* The federal immigration laws enjoy no privilege over NEPA, the APA, the Endangered Species Act, the National Park Service Organic Act, or the Big Cypress enabling statute. It is not too much to ask that the federal and state governments comply with the law – *all* laws – while fulfilling their duties. As the Supreme Court has said, "our system does not permit agencies to

act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 766 (2021).

The harm to Plaintiffs and to the environment that NEPA is designed to protect far outweighs the Defendants' interests in constructing a mass detention facility in a national preserve without the required environmental reviews. The public interest factors weigh in favor of injunctive relief.

## **CONCLUSION**

The facts contained in this Motion, the attached declarations, and the Complaint confirm that Plaintiffs will be irreparably harmed without immediate injunctive relief, particularly given the ongoing construction of the detention center on the Site and Defendants' intent to begin detaining individuals on the Site by July 1, 2025. Accordingly, Plaintiffs respectfully request that a temporary restraining order be entered by no later than July 1, 2025, pursuant to Rule 65(b) and Local Rule 7.1(d). Moreover, for the reasons stated herein, Plaintiffs respectfully request that the Court subsequently enter a preliminary injunction.

Plaintiffs also request that the Court's orders granting injunctive relief require a nominal bond of $100. *See BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (internal citations omitted) ("the amount of security required by the rule is a matter within the discretion of the trial court…and the court may elect to require no security at all").

WHEREFORE, Plaintiffs respectfully request that the Court:

A.      Temporarily restrain and enjoin Defendants Noem, Lyons and Guthrie any of their officers, agents, servants, employees, attorneys and any other persons who are in active concert or participation with any of the Defendants from engaging in any pre-construction

activities, construction, conversion, or use of the TNT Site for purposes of immigration detention unless and until Defendants comply with NEPA and the APA;

   B. Temporarily restrain and enjoin Defendants Noem, Lyons and Guthrie and any of their officers, agents, servants, employees, attorneys and any other persons who are in active concert or participation with any of the Defendants from authorizing or permitting further development or use of the TNT Site for purposes related to a noncitizen detention center;

   C. Temporarily restrain and enjoin Miami-Dade County and any of its officers, agents, servants, employees, attorneys and any other persons who are in active concert or participation with any of the Defendants from authorizing or otherwise allowing the use of the TNT Site limited to aviation activities as a detainment center for noncitizens or related activities.

   D. Grant such other relief as the Court deems just and proper.

   Pursuant to S.D. Fla. L.R. 7.1(a)(2), a proposed order as been filed and served via email to the Court in Word version.

Dated:  June 27, 2025

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/_ Tania Galloni_____
 Tania Galloni, Fla. Bar No. 619221
 tgalloni@earthjustice.org
 Dominique Burkhardt, Fla. Bar No. 100309
 dburkhardt@earthjustice.org

*Counsel for Friends of Everglades*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/_ Paul J. Schwiep_____
 Paul J. Schwiep, Fla. Bar No. 823244
 PSchwiep@CoffeyBurlington.com
 Scott Hiaasen, Fla. Bar No. 103318
 SHiaasen@CoffeyBurlington.com
 YVB@CoffeyBurlington.com
 LPerez@CoffeyBurlington.com
 service@CoffeyBurlington.com

*Counsel for All Plaintiffs*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

### REQUEST FOR HEARING

Pursuant to S.D. Fla. L.R. 7.1(b)(2), Plaintiffs respectfully request a hearing on this motion, which will assist the Court in considering the facts and legal issues raised in this case, which involves an issue of public importance.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 27, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

_____/s/   Paul J. Schwiep_____
Paul J. Schwiep

# Doc. 16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-JEM**

FRIENDS OF THE EVERGLADES, INC., et al.,

      Plaintiffs,

v.

KRISTI NOEM, et al.,

      Defendants.

_____/

**DEFENDANT KEVIN GUTHRIE'S OPPOSITION TO PLAINTIFFS' MOTION**
**FOR A TEMPORARY RESTRAINING ORDER**

Plaintiffs—two political advocacy organizations—challenge a State of Florida decision to establish a temporary detention and deportation facility on an airfield in the Everglades. But Plaintiffs bring their challenge under an environmental statute—the National Environmental Policy Act—that places obligations on *federal* agencies, not state agencies. Accordingly, Plaintiffs' motion for a temporary restraining order should be denied.

**BACKGROUND**

The federal government simply "does not possess the resources necessary to arrest or remove all of the noncitizens" that are released from prison or subject to a final order of removal. *United States v. Texas*, 599 U.S. 670, 680 (2023) (citing 8 U.S.C. §§ 1226(c), 1231(a)(2)). That is a problem that affects states like Florida because "deportable criminal aliens who remain[] in the United States often commit[] more crimes before being removed." *Demore v. Kim*, 538 U.S. 510, 518 (2003). Moreover, overcrowded facilities can pose "an immediate risk to the health and safety of [law enforcement] agents and officers, and to those detained." *Rosa v. McAleenan*, 583 F. Supp. 3d 850, 864 (S.D. Tex. 2019) (quotation marks omitted). While these harms have long been present, the immigration crisis has considerably worsened in recent years due to the prior federal

App. 1132

administration's open-border policies. The illegal immigrant population in the United States reached 11 million in 2022.[1] Encounters at the southern border reached a historic high of nearly 2.5 million in fiscal year 2023.[2]

In light of these unprecedented numbers, in January 2023, Governor Ron DeSantis declared a state of emergency arising from the migration of illegal aliens into Florida. Fla. Exec. Order No. 23-03 (Jan. 6, 2023). At that time, hundreds of thousands of illegal aliens were streaming across the Southwest border of the United States and over 8,000 migrants had been interdicted in Florida's territorial waters over the previous six months. *Id.* at 1. The state of emergency has repeatedly been extended, most recently on June 2, 2025, and it remains in effect. *See* Fla. Exec. Order No. 25-120 (June 2, 2025).

The new federal administration has also taken dramatic steps to address the immigration crisis. President Trump announced a national emergency at the southern border on his first day in office. *See* Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 20, 2025). U.S. Immigrations and Customs Enforcement (ICE) has made more than 100,000 arrests of illegal aliens through the first week of June—an average of 750 arrests per day, which is double the average over the prior decade.[3] And ICE is trying to increase its pace to 3,000 arrests a day.[4] As a result of these efforts, unlawful crossings are at historic lows. Since

---

[1] Jeffrey S. Passel & Jens Manuel Krogstad, *What we know about unauthorized immigrants living in the U.S.*, Pew Research Center (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/.

[2] Muzaffar Chisti et al., *Biden's Mixed Immigration Legacy*, Migration Policy Inst. (Dec. 10, 2024), https://www.migrationpolicy.org/article/biden-immigration-legacy.

[3] Ted Hesson, *Trump's immigration enforcement record so far, by the numbers* (June 17, 2025), https://www.reuters.com/world/us/trumps-early-immigration-enforcement-record-by-numbers-2025-03-04/.

[4] Brittany Gibson, *ICE's cash crisis deepens amid immigration crackdown*, Axios (June 16, 2025), https://www.axios.com/2025/06/16/ice-cash-crisis-immigration-crackdown-trump.

February, U.S. Customs and Border Patrol has reported the lowest monthly levels of arrests at the southern border since those figures began to be tracked in 2000.[5]  Compared to May 2024, May 2025 saw average daily apprehensions decrease by 93% nationwide, border encounters decrease by 88% (93% at the southwest border), encounters of unaccompanied minors decrease by 88%, and fentanyl seizures at the Southwest border decrease by 70%.[6]

But the arrests have resulted in a shortage of housing for detainees.  In February 2025, ICE facilities were at 109% capacity with 42,000 detainees, forcing ICE to release some detainees.[7]  ICE had 47,600 detainees in March.[8]  By April, detainees were reportedly sleeping on floors.[9]  And disorder in a Miami immigration facility led to a riot that had to be forcibly suppressed.[10]  As of June 24, ICE was holding around 59,000 detainees, about 140% of budgeted capacity.[11]

States—which often work with federal officials to detain illegal aliens who commit state crimes—are also facing problems with detention capacity.  For example, in just one recent

---

[5] Ted Hesson, *Trump's immigration enforcement record so far, by the numbers*, Reuters (June 17, 2025), https://www.reuters.com/world/us/trumps-early-immigration-enforcement-record-by-numbers-2025-03-04/.

[6] House Homeland GOP (@HomelandGOP), X (June 28, 2025, 12:35 PM), https://x.com/HomelandGOP/status/1938999585969500205.

[7] Camilo Montoya-Galvez, *ICE releases some migrant detainees as its detention facilities reach 109% capacity*, CBS News (Feb. 5, 2025), https://www.cbsnews.com/news/ice-releases-some-migrant-detainees-detention-facilities-reach-109-percent-capacity/.

[8] Gabe Whisnant & Dan Gooding, *ICE Seeks More Bed Space as Detainee Numbers Hit Maximum Capacity*, Newsweek (Mar. 12, 2025), https://www.newsweek.com/ice-seeks-more-bed-space-detainee-numbers-hit-maximum-capacity-2043662.

[9] Douglas MacMillan, *Immigrants forced to sleep on floors at overwhelmed ICE detention centers*, The Wash. Post (Apr. 20, 2025), https://www.washingtonpost.com/business/2025/04/18/immigrant-detention-overcrowding-trump-crackdown/.

[10] C. J. Ciaramella, *Overcrowding and Dysfunction Produced a Quiet Riot at a Miami Federal Prison Holding ICE Detainees*, Reason (May 27, 2025), https://reason.com/2025/05/27/overcrowding-and-dysfunction-produced-a-quiet-riot-at-a-miami-federal-prison-holding-ice-detainees/.

[11] Camilo Montoya-Galvez, *ICE holding a record 59,000 immigrant detainees, nearly half with no criminal record, internal data show*, CBS News (June 24, 2025), https://www.cbsnews.com/news/ice-record-59000-immigrant-detainees-half-no-criminal-record/.

enforcement operation, ICE and Florida law enforcement arrested more than one hundred illegal aliens, including one who is charged with four counts of assault on law enforcement officers and another who attempted to pull a weapon on officers.[12]  On June 20, Florida Attorney General James Uthmeier stated that "jails are filling up," creating a need for new detention sites.[13]  In a later interview, Attorney General Uthmeier cited the "illegal immigration crisis," explaining that Florida had recently arrested alien MS-13 gang members and human traffickers and that successful arrests were quickly filling up the jails.[14]

Florida is now responding to this crisis by seeking to enable new housing capacity for detainees awaiting deportation, including at the Dade-Collier Training and Transition Airport. Attorney General Uthmeier first publicly discussed the idea of a facility at the airfield on June 18.[15]  On June 19, he announced an "efficient, low-cost opportunity to build a temporary detention facility."[16]  As Attorney General Uthmeier explained, the Dade-Collier location had the advantage of an existing site, an eleven-thousand-foot runway, and the Everglades serving as a natural security perimeter.[17]

---

[12] U.S. Immigr. & Customs Enf't, *ICE arrests 100+ illegal aliens during targeted enforcement operation in Tallahassee* (June 13, 2025), https://www.ice.gov/news/releases/ice-arrests-100-illegal-aliens-during-targeted-enforcement-operation-tallahassee.  According to DHS, attacks on ICE officers have increased by more than 500%.  *See* House Homeland GOP, *supra*.

[13] James Uthmeier (@AGJamesUthmeier), X (June 20, 2025, 11:48 AM), https://x.com/AGJamesUthmeier/status/1936088689257447867.

[14] James Uthmeier (@AGJamesUthmeier), X (June 25, 2025, 5:11 PM), https://x.com/AGJamesUthmeier/status/1937982079276302682.

[15] Ana Ceballos, Romy Ellenbogen, & Alex Harris, *DeSantis used his emergency powers to get 'Alligator Alcatraz' built*, Tampa Bay Times (June 28, 2025), https://www.tampabay.com/news/florida-politics/2025/06/28/desantis-alligator-alcatraz-emergency-powers-immigration-detention-trump/.

[16] James Uthmeier (@AGJamesUthmeier), X (June 19, 2025, 12:49 PM), https://x.com/AGJamesUthmeier/status/1935741644101374271.

[17] James Uthmeier (@AGJamesUthmeier), X (June 20, 2025, 11:48 AM), https://x.com/AGJamesUthmeier/status/1936088689257447867.

By June 23, Florida had begun installation of temporary structures. Attorney General Uthmeier announced plans to have "5,000 beds by early July" across multiple facilities to help with the detainee housing shortage.[18] The Florida Division of Emergency Management (DEM) commandeered the airport under the state emergency authority triggered by Governor DeSantis's executive orders.[19] The detention facility is projected to hold around 3,000 detainees and to be ready for intake by July 1.[20] The State is currently funding the construction and operation of the facility. Decl. of Keith Pruett (Ex. 1) ¶ 2. While Florida plans to seek reimbursement from the federal government, it has not received any reimbursement, and "the precise source and amount of any such reimbursement is unknown." *Id.* ¶ 3.

The construction is taking place on the "existing footprint" of the airfield.[21] Governor DeSantis has stated, "It isn't permanent. This is temporary. There's no sewer being constructed. Environmental impact is zero."[22] Attorney General Uthmeier similarly stated that "there will be zero impact to the Everglades," explaining that the area was already developed in the 1960s and 1970s when the airport was built.[23] That airport has two buildings that are lit 24 hours a day, and

---

[18] James Uthmeier (@AGJamesUthmeier), X (June 23, 2025, 11:59 AM), https://x.com/AGJamesUthmeier/status/1937178826099798155, at 3:24 to 3:26; Dep't of Homeland Security (@DHSgov), X (June 23, 2025, 8:03 PM), https://x.com/DHSgov/status/1937300544575385790.

[19] Elizabeth Crisp, *'Alligator Alcatraz': What to know about Florida Everglades migrant detention site*, The Hill (June 25, 2025, 12:54 PM), https://thehill.com/homenews/state-watch/5368457-florida-alligator-alcatraz-migrant-detention-center/.

[20] Ron DeSantis (@GovRonDeSantis), X (June 27, 9:20 AM), https://x.com/GovRonDeSantis/status/1938588190450872598, at 0:48 to 0:54, 2:20 to 2:25.

[21] *Id.* at 1:25 to 1:28.

[22] Joan Murray, *"Alligator Alcatraz" immigrant detention center sparks outcry as DeSantis claims zero environmental impact*, CBS News (June 25, 2025), https://www.cbsnews.com/miami/news/alligator-alcatraz-migrant-facility-draws-fire-from-environmental-groups-in-the-everglades/.

[23] James Uthmeier (@AGJamesUthmeier), X (June 26, 2025, 5:15 PM), https://x.com/AGJamesUthmeier/status/1938345273115439397.

it continues to be used on a daily basis, including by large aircraft. Ex. 1 ¶¶ 4-5. About 28,000 flights have used the airfield in the last six months. *Id.* ¶ 4. As a result, DEM Executive Deputy Director Keith Pruett agrees that "any environmental impact" from the facility's construction or operation "is likely to be minimal." *Id.* ¶ 6.

On June 27, Friends of the Everglades and the Center for Biological Diversity filed a complaint and motion for a temporary restraining order (TRO) against DHS Secretary Kristi Noem, ICE Acting Director Todd Lyons, DEM Executive Director Kevin Guthrie, and Miami-Dade County. Doc. 1, 5. The TRO motion relies solely on the National Environmental Policy Act (NEPA). Doc. 5 at 1, 6-8.

## ARGUMENT

A temporary restraining order requires the plaintiff to establish all four of the following elements: "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015). A temporary restraining order "is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to each of the four prerequisites." *Wall v. Ctrs. for Disease Control & Prevention*, 543 F. Supp. 3d 1290, 1292 (M.D. Fla. 2021) (alteration and quotation omitted). If the plaintiff fails to show a substantial likelihood of success on the merits, a court need not address the other three factors. *S. Dade Land Corp. v. Sullivan*, 853 F. Supp. 404, 410 (S.D. Fla. 1993).

I.    **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS**

   A.    **Plaintiffs Have No NEPA/APA Claim Against DEM**

Plaintiffs allege that state officials "control" the site and are building the detention facility. *See* Doc. 1 ¶ 39.  In the TRO Motion, Plaintiffs thus ask the Court to "restrain and enjoin" DEM "from engaging in any pre-construction activities, construction, conversion, or use of the [Training and Transition Airport] Site for purposes of immigration detention unless and until Defendants comply with NEPA and the APA."  Doc. 5 at 14.  But NEPA and the APA do not apply to state agencies and thus cannot be the source for a federal TRO.

NEPA does not provide a cause of action.  *See Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355 n.2 (11th Cir. 2024); *Noe v. Metro. Atlanta Rapid Transit Auth.*, 644 F.2d 434, 439 (5th Cir. 1981).  Instead, "NEPA claims must be brought under the APA." *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007); *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1357 n.12 (11th Cir. 2023).  That alone merits denial of the TRO because Plaintiffs do not assert an APA claim against the State.  Doc. 1 ¶¶ 75-79.

In any event, state agencies are not subject to the APA.  The APA permits judicial review for persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," and defines "agency" as "each authority of the Government of the United States[.]" *See* 5 U.S.C. §§ 701(b)(1), 702.  By its own terms, then, the APA "clearly does not apply to state agencies." *Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1055 (11th Cir. 2001); *see also Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1035 (6th Cir. 1999) (collecting cases).  And because NEPA follows the APA, "NEPA," too, "applies only when there is federal decision-making, not merely federal involvement in nonfederal decision-making."  *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1573 (11th Cir. 1994); *cf. Shell Oil Co. v. Train*, 585

F.2d 408, 412-13 (9th Cir. 1978) (rejecting argument that federal agency "'coercion' transformed the actions of the state agency into federal agency action reviewable" as a "novel theory unsupported by any authority" and certain to cause "mischief," even when "qualifications for federal funding combined with the delegation of operational authority to the states have been tied to state compliance with federal policies and to ongoing federal-state consultations").  NEPA thus does not apply to the State's decision to erect a temporary detention facility—even if the federal government is somehow involved in that decision.

Plaintiffs ignore this fatal defect in their requested relief.  Instead, they generically note that "[f]or certain infrastructure projects that are built, funded, or approved by the Federal Government, NEPA requires federal agencies to prepare an environmental impact statement." Doc. 5 at 7.  Plaintiffs thus fail to show—other than by ipse dixit—that this project is a major federal action to which NEPA applies; they offer no specific argument or facts on the point.  Indeed, Plaintiffs' motion says nothing about NEPA's application to *this* project, which was approved by the *State* and is being built by the *State*.  When "as here, state and local agencies are solely responsible for the contents of the plan, the projects proposed, and the improvements recommended, and the adoption of the plan in no way obligates the federal government, the plan cannot be said to be 'federal' for the purposes of NEPA." *Atlanta Coal. on Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979); *see also Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001).  Instead, for NEPA to apply, the federal government "must possess actual power to control the nonfederal activity." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572 (citation omitted).

Plaintiffs offer no evidence that the federal government is controlling the State's construction on State land.  Nor does the chance of future federal funding invoke NEPA: "The

possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573; *see also Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 197 (D.C. Cir. 2003); *Atlanta Coal.*, 599 F.2d at 1347; *City of Highland Park v. Train*, 519 F.2d 681, 695 (7th Cir. 1975).

### B.    Plaintiffs' NEPA/APA Claim Against the Federal Government Is Likely to Fail

#### 1.    *Any Claim Based on Funding Is Not Ripe*

Even if the potential for federal funding alone were enough to raise a NEPA/APA claim, that claim would fail here because it is not ripe. Any such claim would turn on unknown contingencies that will drive the legal analysis. *See Core Const. Servs. Se., Inc. v. Crum & Forster Specialty Ins. Co.*, 2015 WL 3929696, at *1 (M.D. Fla. June 25, 2015) (a claim is not ripe when "contingent upon facts that have not yet materialized"); *Digit. Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) ("The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes."). For example, Plaintiffs' claim is contingent on funding decisions that have yet to be made. *See* Ex. 1 ¶ 3 (stating that the source and amount of federal reimbursement is unknown). To be sure, the federal government has suggested that it will use FEMA funds to reimburse Florida for construction.[24] But much of FEMA's work—including work funded under the Stafford Act—is exempt from NEPA. *See* 42 U.S.C. § 5159; *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 647 (9th Cir. 2014); *Hayne Blvd. Camps Pres. Ass'n, Inc. v. Julich*, 143 F. Supp. 2d 628, 635 (E.D. La. 2001). Until the federal government identifies which specific funds

---

[24] *See, e.g.*, Camilio Montoya-Galvez, *Florida to receive federal funds to build immigration detention sites, including "Alligator Alcatraz," Noem says*, CBS News (June 24, 2025), https://www.cbsnews.com/news/alligator-alcatraz-florida-immigration-detention-centers-dhs-secretary-noem/.

(if any) it will use to reimburse Florida, and the mechanism by which those funds will be used, there is no practical way to determine whether NEPA even applies to the federal government's hypothetical funding decision.

Moreover, under section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the DHS Secretary can "waive all legal requirements," including NEPA, when the waiver is "necessary to ensure expeditious construction of the barriers and roads." 8 U.S.C. § 1103, statutory note; *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 36 (D.D.C. 2020) (emphasizing § 1103's text "commit[s] the decision fully to the Secretary's ... subjective discretion"). Thus, if DHS funds were used to construct walls or roads, DHS could waive NEPA. Because adjudicating Plaintiffs' claim turns on that down-the-line contingency, the claim is not ripe.

### 2.     *Any Claim Based on Funding Is Not Final Agency Action*

The APA applies only to "final agency action." 5 U.S.C. § 704. Until there is final action, courts have no power of review. *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003). That rule applies equally to NEPA-based claims. *E.g.*, *Lakes & Parks All. of Minneapolis v. Fed. Transit Admin.*, 928 F.3d 759, 762 (8th Cir. 2019); *BRRAM, Inc. v. FAA*, 670 F. App'x 50, 52 (3d Cir. 2016).

Generally, there are two requirements for final agency action. "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* Plaintiffs' claim falters on the first requirement. Plaintiffs have not pointed to any final funding decision. Nor could they. Florida, not the federal

government, will initially pay for the construction of the detention facility and "then will submit a reimbursement request to FEMA and DHS."[25]  The reimbursement decision, in other words, has not yet been made.  For that reason, there cannot be final agency action.  *E.g.*, *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007) ("[T]he congressional appropriation to the EPA of funds for a particular project does not constitute a final agency action by the EPA until the EPA has reviewed a grant application and decided to disburse the funds."); *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (same).

In any event, DHS's decision to allocate reimbursement funds to Florida is committed to agency discretion by law.  An agency's decision to allocate funds in a particular way is an unreviewable exercise of discretion because the agency must be allowed to administer its statutory responsibilities "in what it sees as the most effective or desirable way."  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  Indeed, courts are not well equipped to review the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise: whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all."  *Id*. at 193.  Even when Congress has dictated that funds be spent for a specific purpose, so long as it "left to the [agency's] sole judgment" the determination of the allocation of funds, the APA prohibits judicial review of how

---

[25] Maria Briceño, *Florida's 'Alligator Alcatraz' immigration detention center isn't funded by FEMA hurricane money*, Politifact (June 26, 2025), https://www.politifact.com/article/2025/jun/26/Florida-Alligator-Alcatraz-funding-FEMA-hurricane/; *see also* Ex. 1  ¶ 3 ("Florida plans to seek reimbursement of its expenses from the federal government.  But Florida has yet to receive any such reimbursement and the precise source and amount of any such reimbursement is unknown.").

funds are allocated, *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002), if the allocation "meet[s] permissible statutory objectives," *Lincoln*, 508 U.S. at 193.

That is the case here. Congress allocated $650 million to FEMA "to support sheltering and related activities provided by non-Federal entities, in support of relieving overcrowding in short-term holding facilities of U.S. Customs and Border Protection." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, tit. II, 138 Stat. 460, 598 (March 23, 2024). Congress has allocated hundreds of millions more for additional immigration detention facilities. *See* DHS, *FY2025 Budget in Brief*, https://www.dhs.gov/sites/default/files/2024-04/2024_0311_fy_2025_budget_in_brief.pdf. Under *Lincoln* and *Milk Train*, DHS's decision on how to spend that money is discretionary and cannot be reviewed under the APA.

### 3.   *Any Claim Based on Detention Decisions Is Foreclosed*

To the extent Plaintiffs stray beyond funding and seek to enjoin the federal government's "use" of the facility for detention—as they do in their requested relief, Doc. 5 at 14—that use decision is not subject to judicial review. Indeed, state agencies often hold federal detainees. And yet, Plaintiffs cite no authority subjecting those detention decisions to judicial review. Nor could they. Both the APA and the Immigration and Nationality Act make clear that courts cannot review purely discretionary immigration decisions. *See* 5 U.S.C. § 701(a)(2); 8 U.S.C. § 1252(a)(2)(B)(ii). Those provisions foreclose review of any decision about where to detain aliens. After all, Congress vested the DHS Secretary with the power to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1); *see also* 6 U.S.C. § 557. That power includes the "discretionary power to transfer aliens from one locale to another, as she deems appropriate." *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999). Said differently, "Section 1231(g)(1) gives both 'responsibility' and 'broad

discretion' to the Secretary 'to choose the place of detention for deportable aliens.'"  *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (quoting *Com. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1441 (9th Cir. 1986)); *see also Sinclair v. Att'y Gen. of U.S.*, 198 F. App'x 218, 222 (3d Cir. 2006) ("the place of detention is left to the discretion of the [Secretary]").  And that discretionary power cannot be superintended by the courts.  *See Jane v. Rodriguez*, 2020 WL 10140953, at *1 (D.N.J. May 22, 2020); *Lway Mu v. Whitaker*, 2019 WL 2373883, at *5 (W.D.N.Y. June 4, 2019); *Salazar v. Dubois*, 2017 WL 4045304, at *1 (S.D.N.Y. Sept. 11, 2017); *Tercero v. Holder*, 2012 WL 8667571, at *3 (D.N.M. Oct. 4, 2012).  Absent a case-specific constitutional claim, courts will not supervise the Secretary's "daily exercise of his discretion to select the place of detention of aliens in his custody."  *Com. of Cent. Am. Refugees*, 795 F.2d at 1441; *see also Kapiamba v. Gonzalez*, 2007 WL 3346747, at *1 (W.D. Mich. Nov. 7, 2007).

### C.   Plaintiffs Are Unlikely to Receive the Injunction They Request

Plaintiffs request a broad injunction barring "any pre-construction activities, construction, conversion, or use of the TNT Site for purposes of immigration detention unless and until Defendants comply with NEPA and the APA."  Plaintiffs are unlikely to get that remedy because technical NEPA violations often call for remand without vacatur—a remedy that leaves the agency's policy in place while it fixes any NEPA violations.  *Ctr. for Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1357 n.8 (11th Cir. 2024); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015).

In deciding whether to vacate an agency action, courts balance two factors, "(1) the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly), and (2) the disruptive consequences of vacatur."  *City of Port Isabel v. FERC*, 130 F.4th

1034, 1036 (D.C. Cir. 2025).  Here, even if a NEPA/APA violation could be found, both factors

would strongly support remand without vacatur.

      <u>First</u>, any deficiency in DHS's decisionmaking was minor.  After all, the State—not DHS—

is the primary driver of the project.  To the extent DHS failed to do a NEPA review, it relates to

only a small piece of the broader state project.  "[W]e are not," in other words, "confronted with a

total and unjustifiable failure to follow NEPA's core procedures as to an entire project."  *City of

Port Isabel v. FERC*, 130 F.4th 1034, 1037 (D.C. Cir. 2025).  More than that, it is likely that on

remand DHS could "offer better reasoning and adopt the same rule."  *Ctr. for Biological Diversity

v. U.S. Bureau of Land Mgmt.*, 2025 WL 1669344, at *24 (9th Cir. June 13, 2025).  Indeed, the

detention facility will be a temporary facility on land that is still used for airfield and training

activities.  The specific site is not environmentally pristine land but is instead a working airfield,

with around 28,000 flights in the last six months.  Ex. 1 ¶ 4.  There is thus no reason to think that

any additional NEPA process will change the outcome, especially given that "NEPA imposes only

procedural requirements and does not dictate a substantive environmental result."  *Bicycle Trails

Council of Marin v. Babbitt*, 82 F.3d 1445, 1468 n.21 (9th Cir. 1996).

      <u>Second</u>, vacatur now would be deeply disruptive.  The project "is now either mid-

construction or operational.  In either case, vacating the … orders would be quite disruptive."

*Food & Water Watch v. FERC*, 28 F.4th 277, 292 (D.C. Cir. 2022).  And that disruption is

compounded by the emergency the State and federal government are facing.  Quite simply, and as

explained above, detention facilities are over capacity.  Halting construction now would put DHS

to an impossible choice: either release detainable aliens and take on the associated risk of flight

and crime, *see Demore*, 538 U.S. at 518 ("[D]eportable criminal aliens who remain[] in the United

States often commit[] more crimes before being removed."), or detain aliens in overcrowded

facilities, which poses "an immediate risk to the health and safety of DHS agents and officers, and to those detained," *Rosa*, 583 F. Supp. 3d at 864.  The APA does not require that impossible choice. Remand without vacatur would be the far more appropriate remedy.  *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (remanding without vacatur when the alternative would have stopped construction on a vital project).

## II.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM

Irreparable harm requires a showing that "irreparable injury is *likely* in the absence of an injunction"—a mere "possibility" of harm is inconsistent with the extraordinary remedy of injunctive relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Even if a plaintiff has a strong likelihood of successfully showing a NEPA violation, he still must separately show a *likelihood* of irreparable harm.  *See id.* at 21-24.  Thus, the Supreme Court explicitly rejected the idea that a NEPA violation should create a presumption of injunctive relief.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).  Instead, the court must independently find an irreparable injury to justify an extraordinary injunction.  *See id.* at 156, 158.

Plaintiffs' contrary argument is incorrect.  They cite *Miccosukee Tribe of Indians of Florida v. United States*, 2008 WL 11332080, at *11 (S.D. Fla. Nov. 14, 2008), for the proposition that "[i]rreparable harm results where environmental concerns have not been addressed by the NEPA process."  Doc. 5 at 10 (alteration in original).  But *Miccosukee Tribe*, which was decided within days of *Winter*, contradicts its holding.  The same is true for Plaintiffs' remaining pre-*Winter* case, *Sierra Club v. Marsh*, which held that an agency necessarily causes harm when it makes a decision without the proper NEPA analysis.  872 F.2d 497, 500 (1st Cir. 1989).  None of that is consistent with current caselaw.  A NEPA violation does not prove irreparable harm—a plaintiff must still show a likelihood that environmental harm will result.  *See Winter*, 555 U.S. at 22-23.

Without a thumb on the scale for injury, Plaintiffs' irreparable injury theories fail for two reasons. <u>First</u>, Plaintiffs point to harm that is too late to prevent. They worry that once the bureaucracy has "committed to a course of action," it will be "difficult to change that course … it is this type of harm that plaintiffs seek to avoid." Doc. 5 at 10 (citation omitted). But Florida has *already* committed to creating a facility at the Dade-Collier airport and construction is underway. That past harm is irrelevant to the irreparable harm analysis. *See Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005). Given the already-existing construction, "the principal relief available to plaintiffs would be further environmental mitigation, which could take place just as effectively in the future." *Pogliana v. U.S. Army Corps of Eng'rs*, 49 F. App'x 327, 329 (2d Cir. 2002); *see also Save the Wekiva River & Headwaters, Inc. v. U.S. Army Corps of Eng'rs*, 2017 WL 10086128 (M.D. Fla. Dec. 29, 2017). Plaintiffs' alleged harm is not irreparable.

<u>Second</u>, Plaintiffs have not sufficiently tied their claimed harm to their members. To show irreparable harm, it is not enough to point to a procedural defect or to general harm to the environment. Instead, plaintiffs must show environmental injury that affects the plaintiffs. *Nevada v. United States*, 364 F. Supp. 3d 1146, 1153 (D. Nev. 2019). And the irreparable harm must be "neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). Plaintiffs offer only mere speculation that harm to species would occur, let alone that it would affect them specifically. Plaintiffs' members are not likely to suffer an irreparable loss of enjoyment of Big Cypress National Preserve. The Preserve is massive, covering over 729,000 acres of the Everglades—"roughly the size of Rhode Island."[26] The planned detention center will not occupy the Preserve itself, but a small property less than 4% of

---

[26] Nat'l Park Serv., *Big Cypress*, https://www.nps.gov/bicy/learn/management/ statistics.htm (last accessed June 30, 2025).

its size toward the eastern border of the Preserve—and the facility will occupy the existing airport footprint.  None of the visitors state that they plan to visit the *airport* (except to protest).  Tierra Curry states her intention to visit Big Cypress generally.  Doc. 5-2 ¶ 11.  Amber Crooks plans to visit Shark Valley, which she calls "close to the location of the detention center."  Doc. 5-3 ¶ 7.  But the Shark Valley hiking trails are about ten miles away from the airport.[27]  And Eve Samples offers only the conclusory statement that construction will harm her aesthetic interests, which is especially suspect because there is already **an airfield** on the site.  Doc. 5-1 ¶ 13.  Such speculation does not establish a likelihood of irreparable harm.  *See Sierra Club v. U.S. Army Corps of Eng'rs*, 2020 WL 3268228, at *4 (M.D. Fla. Mar. 16, 2020).

Any harm to the cited animal populations is also highly speculative and unlikely.  For example, Curry raises concerns that panthers could avoid the airport, leading to panther infighting in other areas.  Doc. 5-2 ¶ 15.  Florida panthers apparently have been seen around the airport.  But the Florida Panther Telemetry map shows panthers frequent many parts of the large Preserve, and similarly dense panther visits have been seen in populated areas.[28]  It is unclear that a detention facility would in fact deter panthers more than the thousands of airplanes already using the facility.  *See* Ex. 1 ¶ 4. And even if panthers did avoid the area, they would still have much of the massive Preserve left to them.  Curry and Crooks also worry about more panthers being hit by cars.  Doc. 5-2 ¶ 15; Doc. 5-3 ¶¶ 15, 28.  But the objection is simply speculation; Plaintiffs make no effort to quantify the effect this would have on their enjoyment of the panther population.  Even under the

---

[27] *See* Google Maps, https://www.google.com/maps/@25.8221208,-80.8622897,24908m (last accessed June 30, 2025).

[28] Fla. Fish & Wildlife Conservation Comm'n, *Florida Panther Telemetry* (updated Aug. 19, 2024) https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/explore?location=26.186627%2C-81.639535%2C14.46; *compare id.*, https://geodata.myfwc.com/datasets/myfwc::florida-panther-telemetry/explore?location=25.850877%2C-80.898046%2C14.00.

App. 1148

status quo, Florida panthers are "reclusive" and "rarely seen by people,"[29] and the declarations do not claim that Curry or Crooks have *ever* seen a Florida panther in the Preserve.

Still more speculative are concerns about other animals, such as the bonneted bat. The bat's critical habitat covers 1.2 million acres in Florida, a much larger area than just the Preserve.[30] In addition, almost the entire Preserve was designated critical habitat (except for tribal land) with seemingly little effort to determine precisely where the bats were living. *See* Designation of Critical Habitat for Endangered Florida Bonneted Bat, 89 Fed. Reg. 16624, 16651 (Mar. 7, 2024). A previous survey found the "vast majority" of bonneted bat calls were at one remote pond. Endangered Species Status for the Florida Bonneted Bat, Fed. Reg. 61004, 61011 (Oct. 2, 2013). So it is unclear whether there are *any* bonneted bats within miles of the facility.

The declarations contain even fewer facts about the habitats of other supposedly threatened species. Curry states that the snail kite and wood stork live in the Big Cypress National Preserve, but she does not show that they live near the airport. Doc. 5-2 ¶¶ 18-19. Curry does not even confirm that the eastern indigo snake lives in the Preserve. *Id.* ¶ 20. The declaration thus fails to establish that the detention facility is likely to harm the survival or enjoyment of these species. *See Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgt.*, 516 F. Supp. 3d 943, 957 (D. Alaska 2021) ("The fact that some … construction is scheduled to occur partially within potential denning habitat falls short of establishing likely irreparable harm to the protected species.").

Crooks also objects to light pollution because she enjoys the stars. Doc. 5-3 ¶ 27. But the airport is already operational, so there is currently light pollution. *See* Ex. 1 ¶ 5. And anyway,

---

[29] Fla. State Parks, *Where to See the Florida Panther*, https://www.floridastateparks.org/learn/where-see-florida-panther (last accessed June 30, 2025).

[30] U.S. Fish & Wildlife Serv., *U.S. Fish and Wildlife Service Designates Critical Habitat for the Endangered Florida Bonneted Bat* (Mar. 6, 2024), https://www.fws.gov/press-release/2024-03/us-fish-and-wildlife-service-designates-critical-habitat-endangered-florida.

Crooks provides no concrete plan to enjoy the stars near the detention facility. She states that she once took a bicycle ride by moonlight at Shark Valley "a while ago," and that she "would like to do it again." Doc. 5-3 ¶ 27. Samples's declaration similarly does not explain when she intends to enjoy the night sky. Doc. 5-1 ¶ 13. Such uncertain plans also make any potential harm speculative. "The affiants' profession of an 'inten[t]' to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)

Finally, even if environmental harm is likely, such harm must be *irreparable* to warrant injunctive relief. The Eleventh Circuit has refused to find irreparable harm in the past despite testimony that wetland filling would prevent vegetation growth and impede the flow of food for fish and shrimp, and that a lake "was likely to be polluted unless preventive measures were taken." *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983). This testimony failed to "support a finding of injury that could not be remedied by relief following a decision on the merits." *Id.* In other words, the plaintiffs must show a likelihood *both* that the detention facility would harm enjoyment of the environment, and that the harm would be irreparable. But any effect on habitat will likely not be permanent. The detention facility will eventually shut down. Governor DeSantis has been clear that the facility is temporary, is being built on an existing airport, and will not require sewer lines.[31] In these circumstances, there are good reasons to expect a successful return of the status quo. *See Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 725 (E.D.

---

[31] Joan Murray, *"Alligator Alcatraz" immigrant detention center sparks outcry as DeSantis claims zero environmental impact*, CBS News (June 25, 2025), https://www.cbsnews.com/miami/news/alligator-alcatraz-migrant-facility-draws-fire-from-environmental-groups-in-the-everglades/.

Tex. 2020) ("Plaintiff offers little proof of the type of permanent, devastating impact on the environment that has convinced other courts to enjoin construction projects.").

III.   THE BALANCE OF THE EQUITIES DOES NOT SUPPORT A TRO

The balance of equities also cuts against a TRO.  As explained, any additional NEPA process is unlikely to change the facts on the ground given Plaintiffs failure to show any environmental impact of the temporary detention facility and the pressing need for more detention beds.  *See* Part I.C.  Quite simply, any agency considering Plaintiffs' claims would not credit them. The risks from delaying the detention facility, which include both imperiling critical immigration enforcement and endangering detainees in current facilities, overwhelm any incidental environmental harm caused by a temporary facility on an existing site.  NEPA, in short, does not prevent the states from engaging in critical, timely infrastructure projects.  *See, e.g.*, *Nickler v. Cnty. of Clark*, 648 F. App'x 601, 605 (9th Cir. 2016) (denying injunctive relief when "the balance of equities" "favors concerns of public safety").  That should not be a surprise.  "NEPA is not a game where project objectors can engage in unjustified obstructionism."   *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1517 (2025) (citations and quotation marks omitted).  Because that is all Plaintiffs offer, the equities tilt strongly against them.[32]

## CONCLUSION

For these reasons, the court should deny Plaintiffs' request for a TRO or an injunction.

---

[32] Plaintiffs also raise a state law claim in their complaint.  *See* Doc. 1 ¶¶ 80-87.  They rightly do not seek a TRO or preliminary injunction on that claim because federal courts cannot issue injunctions against state officials for violations of state law.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

Dated: June 30, 2025

Respectfully submitted,

s/ Jesse Panuccio
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
jpannucio@bsfllp.com

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa (FBN 110951)
  *Acting Solicitor General*
Nathan A. Forrester (FBN 1045107)
  *Chief Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
  *Assistant Solicitor General*
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2025, the foregoing was filed with the Clerk of Court using

CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

<u>s/ *Jesse Panuccio*</u>
Jesse Panuccio

# Doc. 21

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### No. 25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., et al.

      Plaintiffs,

v.

KRISTI NOEM, et al.,

      Defendants.

_____

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs ask this Court to halt Florida's construction and operation of a temporary detention facility on a state-owned airfield near the Everglades because the Department of Homeland Security[1] ("DHS") did not conduct an analysis that Plaintiffs allege was required under the National Environmental Policy Act ("NEPA"). Plaintiffs' motion fails on multiple independent grounds rooted in fundamental limits on federal court jurisdiction and the scope of federal environmental law.

First, Plaintiffs fail to identify any final agency action by a federal defendant. DHS has not implemented, authorized, directed, or funded Florida's temporary detention center. Florida is constructing and operating the facility using state funds on state lands under state emergency authority and a preexisting general delegation of federal authority to implement immigration functions. The "final agency action" that the Administrative Procedure Act ("APA") requires as a prerequisite to judicial review is entirely absent here.

---

[1] For ease of reference, this brief uses "DHS" to refer to both DHS, U.S. Immigration and Customs Enforcement ("ICE"), and the Federal Emergency Management Agency ("FEMA") unless specifically stated otherwise.

App. 1155

Second, any potential federal funding claims are unripe. Florida has received no federal funds, nor has it applied for federal funds related to the temporary detention center. Courts cannot adjudicate hypothetical future funding decisions or render advisory opinions on contingent scenarios that may never materialize.

Third, even if Florida's decision to detain aliens at its temporary detention center were deemed to be final agency action by DHS and aliens at the temporary detention center were deemed to be in ICE detention, the requested injunctive relief would be barred by 8 U.S.C. § 1252(f)(1).

Fourth, Plaintiffs demonstrate no irreparable harm. Under *Winter*, NEPA violations do not create presumptive irreparable injury. *Winter v. Natural Resources Defense Council*, 55 U.S. 7 (2008). Plaintiffs offer only speculation about impacts from a temporary facility on an already-developed airfield hosting more than 28,000 flights annually.

Each ground independently requires denial of emergency relief.

DHS generally agrees with the arguments raised in Defendant Kevin Guthrie's Opposition brief. Dkt. No. 16. But DHS's response below points the Court to salient facts provided by federal declarants—David Richardson of FEMA and Thomas Giles of Immigration and Customs Enforcement ("ICE"). These facts require denial of Plaintiffs' Motion.

## ARGUMENT

To make the required showing for issuance of a temporary restraining order—an "extraordinary and drastic remedy"—a Plaintiff must show: "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Gissendaner v.*

*Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015).  Plaintiffs fail to make any of these showings.

I.   **Plaintiffs are unlikely to succeed on the merits because they fail to challenge a final agency action or to bring a claim properly under this Court's jurisdiction.**

Plaintiffs' arguments against DHS fail on the merits for two reasons that preclude the Court's exercise of jurisdiction and demonstrate that they have failed to show a likelihood of success.

First, Plaintiffs' fail to allege a *federal* final agency action in connection with *Florida's* temporary detention and deportation facility.  Plaintiffs bring one of their NEPA claims against DHS through the APA, as they must.  Compl. ¶¶ 75-79 (Count II), Dkt. No. 1; *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1356 n.12 (11th Cir. 2023).  But the APA can only be used to challenge "final agency action."  5 U.S.C. § 704; *see Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003).  The Supreme Court has articulated a two-part test for determining whether agency action is "final" under the APA: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  The "core question" of finality "is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

Plaintiffs fail to identify a federal final agency action regarding construction of the temporary detention center.  Neither ICE nor FEMA has implemented, directed, or controlled the construction work at the temporary detention center.  Giles Decl. ¶ 5, attached as Exhibit 1.  And

Plaintiffs fail to identify any federal funding for the facility that could serve as a final agency action.  Neither ICE nor FEMA has sent any funds to Florida in connection with the temporary detention center.  *Id.* ¶¶ 5, 9-10 (explaining that ICE has not funded construction or purchased or procured any detention space from Florida for the detention of aliens at the temporary detention center); Richardson Decl. ¶ 4 (explaining that Florida has not received any grants from FEMA for the temporary detention center), attached as Exhibit 2.  Nor are there any pending funding applications from Florida to the federal government regarding the facility.  *Id.* (explaining that Florida has not applied for any FEMA grants for the temporary detention center).

Second, Plaintiffs' claims based on *potential* future funding decisions are not ripe.  *See Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) ("Strict application of the ripeness doctrine prevents federal courts from rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes."  (citation omitted)).  Citing a YouTube video, Plaintiffs suggest that the detention center is "fully funded by the federal government."  Dkt. No. 5 at 2.  But the federal government has not paid *any* money for the facility.  Several necessary steps would have to occur before Plaintiffs' claims could ripen: (1) Florida must apply for funding; (2) DHS must evaluate the request under the applicable legal standards; and (3) there must be a final decision on whether to award such funding.  None of these steps has occurred.  The ripeness doctrine thus counsels strongly against a temporary restraining order based on potential future funding.  *See Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) ("The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes.").

Third, to the extent Plaintiffs argue that the federal action is DHS's presumptive authorization of Florida's detention of aliens at the facility, that too fails because the decision to detain aliens

at the temporary detention center is not a federal final agency action. Florida's general authority to perform immigration functions is authorized by the federal government based on an agreement under subsection 287(g) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1357(g), which authorizes DHS to enter into agreements with state and local law enforcement agencies to delegate authority to carry out immigration functions. Giles Decl. ¶¶ 7-8. Thus, any decision to detain aliens under a § 1357(g) agreement at the temporary detention center would be Florida's decision, not DHS's. *See Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1174 (10th Cir. 2000) ("This document is merely a general agreement for state and federal agencies to work together in the future on specific projects and as such is not 'final agency action.'" (citation omitted)).

Even if detainees held by Florida pursuant to its § 287(g) authority were deemed to be in ICE custody, the injunctive relief Plaintiffs seek would be barred. Paragraph 242(f)(1) of the INA, deprives district courts of jurisdiction to enjoin ICE's detention authority except in a challenge to an individual alien's detention. 8 U.S.C. § 1252(f)(1).[2] The Supreme Court has repeatedly held that Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (*quoting Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)).

---

[2] Paragraph 242(f)(1) provides:

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of [the INA] … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). ICE's detention authority arises from 8 U.S.C. §§ 1225, 1226, and 1231—all provisions within Part IV of the INA.

App. 1159

Section 1252(f)(1) thus eliminates the Court's authority to issue coercive orders restraining implementation of Section 1225.

Plaintiffs' NEPA claim against Federal Defendants, Count I, Compl. ¶¶ 61-74, fails for an independent reason. They failed to bring it under the APA's cause of action. *Lowman*, 83 F.4th at 1356 n.12.

Plaintiffs have identified no final agency action on which their APA challenge can rely, so they have failed to show a likelihood of success on the merits.

**II.   Plaintiffs have not shown that they will suffer irreparable harm from the temporary detention center.**

A NEPA violation does not prove irreparable harm—a plaintiff must still show a likelihood that environmental harm will result. Dkt. No. 16 at 15 (citing *Winter*, 555 U.S. at 22–23); *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 145 S. Ct. 1497 (2025) ("[R]eviewing court[s] must account for the fact that NEPA is a *purely procedural statute*."). Plaintiffs fail to make that showing here because they do not explain how construction of the temporary detention center, or the detention of aliens there, will irreparably harm their concrete interests. *See Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1353 (11th Cir. 2024) (holding that plaintiffs must "allege[] that the challenged (or omitted) procedure *protects a concrete interest*." (emphasis added)).

Plaintiffs claim an interest in observing sensitive wildlife and enjoying "natural" environments, like preserved wetlands and the dark night sky. Dkt. No. 5 at 8-9. But Plaintiffs fail to show that this temporary detention center will irreparably harm these interests. Rule 65(b) requires a movant to set forth "specific facts" showing "imminent and irreparable injury" that will result before a party can be heard in opposition. Fed. R. Civ. P. 65(b)(1)(A); *see Carepatrol Franchise Systems, LLC v. Kirby Care, Inc.*, No. 20-cv-22662, 2020 WL 4464698, at **1-2 (S.D. Fla. July 1,

2020) (denying a motion for temporary restraining order and preliminary injunction because plaintiff did not comply with Rule 65's procedural requirements for the issuance of a temporary restraining order).  Plaintiffs do not meet this standard. They never identify what specific "[t]ransportation, construction, and detention infrastructure" connected with the facility will result in an irreparable injury to their interests in enjoying the flora and fauna of the existing airstrip.  ECF No. 5 at 9. Connecting these dots is crucial to establishing irreparable harm because the facility is temporary, and the existing airport makes for an already developed, largely unnatural landscape. *See* Dkt. No. 16 at 6 ("About 28,000 flights have used the airfield in the last six months); *see also id.* at 17-19.  Further, the existing airport provides no meaningful public access for wildlife viewing or enjoying nearby wetlands, and Plaintiffs have failed to explain how the challenged activities diminish their access to the area more than the status quo.

Without more, Plaintiffs' claims of irreparable harm are too speculative and conclusory to support a temporary restraining order.

## III.   The public interest and balance of the equities support denial of Plaintiffs' Motion.

When the government is opposing a motion for temporary restraining order, the balance of the equities and public interest factors merge.  *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020).  Here, the significant national interest in combatting unlawful immigration favors allowing Florida to continue the development and use of its facility.  *See* Giles Decl. ¶ 11 (explaining that the temporary detention center's use in detaining aliens operationally benefits ICE and furthers its immigration enforcement mission).  As the President explained:

> Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States.  The American people deserve a Federal Government that puts their interests first and a Government that understands

its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

Protecting the American People Against Invasion, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). If the facility is temporarily restrained, this critical national interest will be hindered. *See* Giles Decl. ¶ 11 (explaining that the operation of the temporary detention center will further ICE's immigration enforcement mission by decompressing other detention facilities used to house aliens throughout the United States). In comparison to the speculative, conclusory harms claimed by Plaintiffs, *see supra* Sect. II, the public interest and balance of the equities favor denial of Plaintiffs' Motion.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' request for a temporary restraining order.

Respectfully submitted on July 3, 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*s/  Hayley A. Carpenter*
HAYLEY A. CARPENTER (CA Bar No. 312611)
Trial Attorney
Natural Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0242
hayley.carpenter@usdoj.gov

*Counsel for Kristi Noem, in her official ca-
pacity as Director of Homeland Security; and
Todd Lyons, in his official capacity as Acting
Director of the United States Immigration and
Customs Enforcement*

# Doc. 24-3

# MEMORANDUM OF AGREEMENT

This Memorandum of Agreement (MOA) constitutes an agreement between United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and the Florida National Guard (FLNG)      , pursuant to which ICE delegates to nominate, trained, and certified officers or employees of the  FLNG     (hereinafter interchangeably referred to as "Law Enforcement Agency" (LEA)), to perform certain immigration enforcement functions as specified herein. The LEA represents        the Florida National Guard (FLNG) in the implementation and administration of this MOA.  The  Florida National Guard (FLNG) and ICE enter into this MOA in good faith and agree to abide by the terms and conditions contained herein. The ICE and LEA points of contact for purposes of this MOA are identified in Appendix A.

## I.    PURPOSE

The purpose of this MOA is to set forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and thereafter be approved by ICE to perform certain functions of an immigration officer under the direction and supervision of ICE within the LEA's jurisdiction. This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority granted under this MOA to participating LEA personnel shall occur only as provided in this MOA. This MOA also describes the complaint procedures available to members of the public regarding immigration enforcement actions taken pursuant to this agreement by participating LEA personnel.

## II.    AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1357(g), as amended by the Homeland Security Act of 2002, Public Law 107-276, authorizes the Secretary of Homeland Security, or her designee, to enter into written agreements with a State or any political subdivision of a State so that qualified officers and employees can perform certain functions of an immigration officer. This MOA constitutes such a written agreement.

## III.    POLICY

This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. It sets forth with specificity the duration of the authority conveyed and the specific lines of authority, including the requirement that participating LEA personnel be subject to ICE direction and supervision while performing delegated immigration officer functions pursuant to this MOA. For the purposes of this MOA, ICE officers will provide direction and supervision for participating LEA personnel only as to immigration enforcement functions as authorized in this MOA. The LEA retains supervision of all other aspects of the employment and performance of duties of participating LEA personnel.

Revised 02/12/2025

**IV.      TRAINING AND ASSIGNMENTS**

Before participating LEA personnel receive authorization to perform immigration officer functions granted under this MOA, they must successfully complete mandatory training on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed as provided by ICE instructors and thereafter pass examinations equivalent to those given to ICE officers. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE. Only participating LEA personnel who are nominated, trained, certified, and authorized, as set out herein, have authority pursuant to this MOA to conduct the delegated immigration officer functions, under ICE direction and supervision, enumerated in this MOA.

Upon the LEA's agreement, participating LEA personnel performing immigration-related duties pursuant to this MOA will be assigned to various units, teams, or task forces designated by ICE.

**V.      DESIGNATION OF AUTHORIZED FUNCTIONS**

For the purposes of this MOA, participating LEA personnel are authorized to perform the following functions pursuant to the stated authorities, subject to the limitations contained in this MOA:

- The power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(l)) and to process for immigration violations those individuals who have been arrested for State or Federal criminal offenses.

- The power and authority to arrest without a warrant any alien entering or attempting to unlawfully enter the United States in the officer's presence or view, or any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(2) and 8 C.F.R. § 287.5(c)(1). Subsequent to such arrest, the arresting officer must take the alien without unnecessary delay for examination before an immigration officer having authority to examine aliens as to their right to enter or remain in the United States.

- The power to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(4) and 8 C.F.R. § 287.5(c)(2).

- The power to serve and execute warrants of arrest for immigration violations under INA § 287(a) and 8 C.F.R. § 287.5(e)(3).

- The power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2)) to complete required alien processing to include fingerprinting, photographing, and interviewing, as well as the preparation of affidavits and the taking of

Revised 02/12/2025

App. 1166

sworn statements for ICE supervisory review.

- The power and authority to prepare charging documents (INA § 239, 8 C.F.R. § 239.1; INA § 238, 8 C.F.R § 238.1; INA § 241(a)(5), 8 C.F.R. § 241.8; INA § 235(b)(l), 8 C.F.R. § 235.3) including the preparation of the Notice to Appear (NTA) or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors.

- The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for aliens in categories established by ICE supervisors.

- The power and authority to take and maintain custody of aliens arrested by ICE, or another State or local law enforcement agency on behalf of ICE. 8 C.F.R. § 287.5(c)(6)

- The power and authority to take and maintain custody of aliens arrested pursuant to the immigration laws and transport (8 C.F.R. § 287.5(c)(6)) such aliens to ICE-approved detention facilities.

## VI.     RESOLUTION OF LOCAL CHARGES

The LEA is expected to pursue to completion prosecution of any state or local charges that caused the alien to be taken into custody. ICE may assume custody of aliens who have been convicted of a state or local offense only after such aliens have concluded service of any sentence of incarceration. The ICE Enforcement and Removal Operations Field Office Director or designee shall assess on a case-by-case basis the appropriate actions for aliens who do not meet the above criteria based on special interests or other circumstances after processing by the LEA.

After notification to and coordination with the ICE supervisor the alien who participating LEA personnel have determined to be a removable alien, the alien will be arrested on behalf of ICE by participating LEA personnel and be transported by the LEA on the same day to the relevant ICE detention office or facility.

## VII.    NOMINATION OF PERSONNEL

The chief officer of the LEA will nominate candidates for initial training and certification under this MOA. For each candidate, ICE may request any information necessary for a background check and to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA. All candidates must be United States citizens. All candidates must have at least two years of LEA work experience. All candidates must be approved by ICE and must be able to qualify for appropriate federal security clearances and access to appropriate DHS and ICE databases/systems and associated applications.

Should a candidate not be approved, a substitute candidate may be submitted if time permits such substitution to occur without delaying the start of training. Any subsequent expansion in the number of participating LEA personnel or scheduling of additional training classes may be based on an oral agreement of the parties but will be subject to all the requirements of this MOA.

Revised 02/12/2025

## VIII.   TRAINING OF PERSONNEL

ICE will provide participating LEA personnel with the mandatory training tailored to the immigration functions to be performed. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE.

Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy; (v) civil rights laws (vi) the detention of aliens; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law, including applicable treaties or international agreements, to make proper notification upon the arrest or detention of a foreign national.

Approximately one year after the participating LEA personnel are trained and certified, ICE may provide additional updated training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions, unless either party terminates this MOA pursuant to Section XVIII below. Local training on relevant issues will be provided on an ongoing basis by ICE supervisors or a designated team leader.

## IX.   CERTIFICATION AND AUTHORIZATION

ICE will certify in writing the names of those LEA personnel who successfully complete training and pass all required testing. Upon receipt of the certification, ICE will provide the participating LEA personnel with a signed authorization to perform specified functions of an immigration officer for an initial period of two years from the date of the authorization. ICE will also provide a copy of the authorization to the LEA. The ICE supervisory officer, or designated team leader, will evaluate the activities of all personnel certified under this MOA.

Authorization of participating LEA personnel to act pursuant to this MOA may be revoked at any time and for any reason by ICE or the LEA. Such revocation will require notification to the other party to this MOA within 48 hours. The chief officer of the LEA and ICE will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA, pursuant to Section XVIII below, shall constitute revocation of all immigration enforcement authorizations delegated herein.

## X.   COSTS AND EXPENDITURES

Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue material. Whether or not the LEA receives financial reimbursement for such costs through a federal grant or other funding mechanism is not material to this MOA.

ICE is responsible for the installation and maintenance of the Information Technology (IT) infrastructure. The use of the IT infrastructure and the DHS/ICE IT security policies are defined in the Interconnection Security Agreement (ISA). The ISA is the agreement between ICE's Chief Information Security Officer and the LEA's Designated Accreditation Authority.

Revised 02/12/2025

App. 1168

The LEA agrees that each of its sites using an ICE-provided network access or equipment will sign the ISA, which defines the DHS ICE 4300A Sensitive System Policy and Rules of Behavior for each user granted access to the DHS network and software applications. Failure to adhere to the terms of the ISA could result in the loss of all user privileges.

The LEA is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material used in the execution of the LEA's mission. ICE will provide instructors and training materials. The LEA is responsible for the salaries and benefits, including any overtime, of all its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating LEA personnel while they are receiving training. ICE is responsible for the costs of the LEA personnel's travel expenses while in a training status, as authorized by the Federal Travel Regulation and the ICE Travel Handbook. These expenses include housing, per diem and all transportation costs associated with getting to and from training. ICE is responsible for the salaries and benefits of all ICE personnel, including instructors and supervisors.

The LEA is responsible for providing all administrative supplies (e.g. paper, printer toner) necessary for normal office operations. The LEA is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints, etc.

## XI.    ICE SUPERVISION

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE.

When operating in the field, participating LEA personnel shall contact an ICE supervisor at the time of exercising the authority in this MOA, or as soon as is practicable thereafter, for guidance. The actions of participating LEA personnel will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for additional training or guidance for that specific individual.

For the purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law unless doing so would violate federal law.

Revised 02/12/2025

If a conflict arises between an order or direction of an ICE supervisory officer and LEA rules, standards, or policies, the conflict shall be promptly reported to ICE, and the chief officer of the LEA, or designee, when circumstances safely allow the concern to be raised. ICE and the chief officer of the LEA shall attempt to resolve the conflict.

Whenever possible, the LEA will deconflict all addresses, telephone numbers, and known or suspected identities of violators of the INA with ICE's Homeland Security Investigations or ICE's Enforcement and Removal Operations prior to taking any enforcement action. This deconfliction will, at a minimum include wants/warrants, criminal history, and a person's address, and vehicle check through TECS II or any successor system.

LEA participating personnel authorized pursuant to this MOA may be assigned and/or co-located with ICE as task force officers to assist ICE with criminal investigations.

## XII.      REPORTING REQUIREMENTS

The LEA will be responsible for tracking and maintaining accurate data and statistical information for their 287(g) program, including any specific tracking data requested by ICE. Upon ICE's request, such data and information shall be provided to ICE for comparison and verification with ICE's own data and statistical information, as well as for ICE's statistical reporting requirements and to assess the progress and success of the LEA's 287(g) program.

## XIII.     RELEASE OF INFORMATION TO THIRD PARTIES

The LEA may, at its discretion, communicate the substance of this agreement to the media and other parties expressing an interest in the law enforcement activities to be engaged in under this MOA. It is the practice of ICE to provide a copy of this MOA, only after it has been signed, to requesting media outlets; the LEA is authorized to do the same.

The LEA hereby agrees to coordinate with ICE prior to releasing any information relating to, or exchanged under, this MOA. For releases of information to the media, the LEA must coordinate in advance of release with the ICE Office of Public Affairs, which will consult with ICE Privacy Office for approval prior to any release. The points of contact for ICE and the LEA for this purpose are identified in Appendix C. For releases of information to all other parties, the LEA must coordinate in advance of release with the FOD or the FOD's representative.

Information obtained or developed as a result of this MOA, including any documents created by the LEA that contain information developed or obtained as a result of this MOA, is under the control of ICE and shall not be disclosed unless: 1) permitted by applicable laws, regulations, or executive orders; and 2) the LEA has coordinated in advance of release with (a) the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval, prior to any release to the media, or (b) an ICE officer prior to releases to all other parties. LEA questions regarding the applicability of this section to requests for release of information shall be directed to an ICE officer.

Revised 02/12/2025

Nothing herein limits LEA's compliance with state public records laws regarding those records that are solely state records and not ICE records.

The points of contact for ICE and the LEA for the above purposes are identified in Appendix C.

## XIV.   LIABILITY AND RESPONSIBILITY

Except as otherwise noted in this MOA or allowed by federal law, and to the extent required by 8 U.S.C. § 1357(g)(7) and (8), the LEA will be responsible and bear the costs of participating LEA personnel regarding their property or personal expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will be treated as Federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. *See* 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE authorized by this MOA will be considered acting under color of federal authority for purposes of determining liability and immunity from suit under federal or state law. *See* 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as personal-capacity defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. *See* 28 C.F.R. § 50.15. Absent exceptional circumstances, such requests must be made in writing. LEA personnel who wish to submit a request for representation shall notify the local ICE Office of the Principal Legal Advisor (OPLA) field location at ADDRESS. OPLA, through its headquarters, will assist LEA personnel with the request for representation, including the appropriate forms and instructions. Unless OPLA concludes that representation clearly is unwarranted, it will forward the request for representation, any supporting documentation, and an advisory statement opining whether: 1) the requesting individual was acting within the scope of his/her authority under 8 U.S.C. § 1357(g) and this MOA; and, 2) such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Tort Litigation Section, Civil Division, Department of Justice (DOJ). Representation is granted at the discretion of DOJ; it is not an entitlement. *See* 28 C.F.R. § 50.15.

The LEA agrees to cooperate with any federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and documents. Failure to do so may result in the termination of this MOA. Failure of any participating LEA employee to cooperate in any federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The LEA agrees to cooperate with federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and documents necessary to complete such compliance review. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

Revised 02/12/2025

As the activities of participating LEA personnel under this MOA derive from federal authority, the participating LEA personnel will comply with federal standards relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

The LEA and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. § 552a, DHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices regarding data collection and use of information under this MOA.

## XV.    COMPLAINT PROCEDURES

The complaint reporting and resolution procedure for allegations of misconduct by participating LEA personnel, regarding activities undertaken under the authority of this MOA, is included at Appendix B.

## XVI.    CIVIL RIGHTS STANDARDS

Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all applicable federal civil rights statutes and regulations.

Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA as needed.

## XVII.    MODIFICATION OF THIS MOA

Modifications of this MOA must be proposed in writing and approved by the signatories.

## XVIII.    EFFECTIVE DATE, SUSPENSION, AND TERMINATION OF THIS MOA

This MOA becomes effective upon signature of both parties and will remain in effect until either party terminates or suspends the MOA. Termination by the LEA shall be provided, in writing, to the local Field Office.

In instances where serious misconduct or violations of the terms of the MOA come to the attention of ICE, the ICE Director may, upon recommendation of the Executive Associate Director for Enforcement and Removal Operations, elect to immediately suspend the MOA pending investigation of the misconduct and/or violations.

Notice of the suspension will be provided to the LEA, and the notice will include, at a minimum, (1) an overview of the reason(s) that ICE is suspending the 287(g) agreement, (2) the length of the temporary suspension, and (3) how the LEA can provide ICE with information regarding the alleged misconduct and/or violations, as well as any corrective measures it has undertaken.

Revised 02/12/2025

ICE shall provide the LEA with a reasonable opportunity to respond to the alleged misconduct and/or violations and to take actions to implement corrective measures (e.g., replace the officer(s) who are the focus of the allegations). ICE will provide the LEA timely notice of a suspension being extended or vacated.

If the LEA is working to take corrective measures, ICE will generally not terminate an agreement. The termination of an agreement is generally reserved in instances involving problems that are unresolvable and detrimental to the 287(g) Program.

If ICE decides to move from suspension to termination, ICE will provide the LEA a 90-day notice in advance of the partnership being terminated. The notice will include, at a minimum: (1) An overview of the reason(s) that ICE seeks to terminate the 287(g) agreement; (2) All available data on the total number of aliens identified under the 287(g) agreement; and (3) Examples of egregious criminal aliens identified under the 287(g) agreement. ICE's decision to terminate a MOA will be published on ICE's website 90 days in advance of the MOA's termination.

This MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

**For the LEA:**

Date: _2 APRIL 2025_

Signature: _____
Major General John D. Haas

Title: _The Adjutant General_

**For ICE:**

Date: _April 2, 2025_

Signature: _____

Title: _Acting Director_

Revised 02/12/2025

App. 1173

**APPENDIX A**

**POINTS OF CONTACT**

The ICE and LEA points of contact for purposes of implementation of this MOA are:

For ICE:    Department of Homeland Security

Immigration and Customs Enforcement

Enforcement and Removal Operations

Assistant Director for Enforcement Washington DC


For the LEA:    The Adjutant General, MG John Haas, john.d.haas.mil@army.mil

State Aviation Officer, COL Brett Rhodenizer, brett.s.rhodenizer.mil@army.mil

General Counsel, Col Jeffrey Pozen, jeffrey.m.pozen.mil@army.mil

Revised 02/12/2025

App. 1174

**APPENDIX B**

**COMPLAINT PROCEDURE**

This MOA is an agreement between ICE and the                    , hereinafter referred to as the "Law Enforcement Agency" (LEA), in which selected LEA personnel are authorized to perform immigration enforcement duties in specific situations under federal authority. As such, the training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for individuals' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

If any participating LEA personnel are the subject of a complaint or allegation involving the violation of the terms of this MOA the LEA shall, to the extent allowed by state law, make timely notification to ICE.

Further, if the LEA is aware of a complaint or allegation of any sort that may result in that individual receiving professional discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall remove the designated LEA personnel from the program, until such time that the LEA has adjudicated the allegation.

The LEA will handle complaints filed against LEA personnel who are not designated and certified pursuant to this MOA but are acting in immigration functions in violation of this MOA. Any such complaints regarding non-designated LEA personnel acting in immigration functions must be forwarded to the ICE Office of Professional Responsibility (OPR) at ICEOPRIntake@ice.dhs.gov.

**1. Complaint Reporting Procedures**

Complaint reporting procedures shall be disseminated as appropriate by the LEA within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that individuals are aware of the availability of such procedures. Complaints will be accepted from any source (e.g., ICE, LEA, participating LEA personnel, inmates, and the public).

Complaints may be reported to federal authorities as follows:

     A.   Telephonically to the ICE OPR at the toll-free number 1-833-4ICE-OPR; or

     B.   Via email at ICEOPRIntake@ice.dhs.gov.

Complaints may also be referred to and accepted by any of the following LEA entities:

     A.   The LEA Internal Affairs Division; or
     B.   The supervisor of any participating LEA personnel.

Revised 02/12/2025

**2. Review of Complaints**

All complaints (written or oral) reported to the LEA directly, which involve activities connected to immigration enforcement activities authorized under this MOA, will be reported to the ICE OPR. The ICE OPR will verify participating personnel status under the MOA with the assistance of ICE. Complaints received by any ICE entity will be reported directly to the ICE OPR as per existing ICE policies and procedures.

In all instances, the ICE OPR, as appropriate, will make an initial determination regarding DHS investigative jurisdiction and refer the complaint to the appropriate office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to the ICE OPR will be shared with the LEA's Internal Affairs Division when the complaint involves LEA personnel. Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

**3. Complaint Resolution Procedures**

Upon receipt of any complaint the ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting requirements. As stated above the ICE OPR will adhere to existing ICE reporting requirements as they relate to the OHS OIG and/or another legally required entity. Complaints will be resolved using the existing procedures, supplemented as follows:

A. Referral of Complaints to LEA Internal Affairs Division.

The ICE OPR will refer complaints, as appropriate, involving LEA personnel to the LEA's Internal Affairs Division for resolution. The Internal Affairs Division Commander will inform ICE OPR of the disposition and resolution of any complaints referred by ICE OPR.

B. Interim Action Pending Complaint Resolution

Whenever any participating LEA personnel are under investigation and subject to interrogation by the LEA for any reason that could lead to disciplinary action, demotion, or dismissal, the policy requirements of the LEA shall he honored. If appropriate, an individual may he removed from participation in the activities covered under the MOA pending resolution of an inquiry.

C. Time Parameters for Resolution of Complaints

It is expected that any complaint received will be resolved within 90 days. However, this will depend upon the nature and complexity of the substance of the complaint itself.

Revised 02/12/2025

App. 1176

D. Notification of Resolution of a Complaint

ICE OPR will coordinate with the LEA's Internal Affairs Division to ensure notification as appropriate to the subject(s) of a complaint regarding the resolution of the complaint.

Revised 02/12/2025

App. 1177

**APPENDIX C**

**PUBLIC INFORMATION POINTS OF CONTACT**

Pursuant to Section XIII of this MOA, the signatories agree to coordinate any release of information to the media regarding actions taken under this MOA. The points of contact for coordinating such activities are:

**For the LEA:**

Executive Officer, COL (Ret) Allison Reinwald, allison.reinwald2.nfg@army.mil

Public Affairs Officer, Lt Col Caitlin Brown, mary.c.brown26.mil@army.mil

**For ICE:**

Department of Homeland Security
Immigration and Customs Enforcement
Office of Public Affairs

Revised 02/12/2025

App. 1178

# Doc. 25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-22896-JEM**

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

    Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

    Defendants.

**PLAINTIFFS' NOTICE OF FILING**
**DEFENDANT KRISTI NOEM'S SOCIAL MEDIA POST**

   This Notice is filed in support Plaintiffs' *Expedited* Motion for a Temporary Restraining

Order and Preliminary Injunction (D.E. 5), and relates to the Federal Defendants' Opposition to

Plaintiffs' Motion (D.E. 21), wherein the Federal Defendants state: "DHS has not … funded

Florida's temporary detention center. Florida is constructing and operating the facility using state

funds…." (*Id.* at 1.) In the social media post attached as Exhibit 1, Defendant Noem states: "[The

detention center] will be funded largely by FEMA's Shelter and Services Program…."

Dated:  July 7, 2025

App. 1180

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/   Tania Galloni_____
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No. 100309
    dburkhardt@earthjustice.org
    Alisa Coe, Fla. Bar No. 10187
    acoe@earthjustice.org

*Counsel for Friends of the Everglades*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/   Paul J. Schwiep_____
    Paul J. Schwiep, Fla. Bar No. 823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on July 7, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

    _____s/   Paul J. Schwiep_____

App. 1181

| Service List | |
|---|---|
| **Nathan A. Forrester**<br>    Chief Deputy Solicitor General<br>nathan.forrester@myfloridalegal.com<br>**Robert S. Schenck**<br>    Assistant Solicitor General<br>robert.schenck@myfloridalegal.com<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida  32399-1050<br>Telephone:  (850) 414-3300<br>jenna.hodges@myfloridalegal.com<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* | BOIES SCHILLER FLEXNER LLP<br>**Jesse Panuccio, Esq.**<br>jpanuccio@bsfllp.com<br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 356-0011<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* |
| GERALDINE BONZON-KEENAN<br>Miami-Dade County Attorney<br>**Christopher J. Wahl**<br>    Assistant County Attorney<br>wahl@miamidade.gov<br>**David M. Murry**<br>    Assistant County Attorney<br>dmmurray@FlyMIA.com<br>Stephen P. Clark County<br>111 Northwest 1st Street, Suite 2810<br>Miami, Florida  33128<br>Telephone:  (305) 375-5151<br>kgriffin@FlyMIA.com<br>victor.rodriguez3@miamidade.gov<br><br>*Counsel for Miami-Dade County* | HAYDEN P. O'BYRNE<br>United States Attorney<br>**Carlos J. Raurell**<br>    Assistant U.S. Attorney<br>carlos.raurell@usdoj.gov<br>99 Northeast 4th Street<br>Miami, Florida  33132<br>Telephone:  (305) 961-9243<br>melissa.Jiminson@usdoj.gov<br>_____<br><br>ADAM R.F. GUSTAFSON<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Peter M. Torstensen, Jr.**<br>    Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Hayley A. Carpenter**<br>    Trial Attorney<br>hayley.carpenter@usdoj.gov<br>Natural Resources Section<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Telephone:  (202) 305-0242<br><br>*Counsel for Kristi Noem, in her official* |

App. 1182

|  | *capacity as Secretary, United States Department of Homeland Security, and Todd Lyons, in his official capacity as Acting Director, United States Immigration and Customs Enforcement* |
|---|---|

# Doc. 26

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., a Florida not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,

       Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; KEVIN GUTHRIE, in his official capacity as Executive Director of the Florida Division of Emergency Management; and MIAMI-DADE COUNTY, a political subdivision of the State of Florida,

       Defendants.

## PLAINTIFFS' NOTICE OF FILING THE DECLARATION OF RALPH ARWOOD

    Plaintiffs, through undersigned counsel, hereby give notice of filing the Declaration of Ralph Arwood, attached as Exhibit 1.

Dated:  July 7, 2025

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/___Tania Galloni_____
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No. 100309
    dburkhardt@earthjustice.org
    Alisa Coe, Fla. Bar No. 10187
    acoe@earthjustice.org

*Counsel for Friends of the Everglades*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/___Paul J. Schwiep_____
    Paul J. Schwiep, Fla. Bar No. 823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 7, 2025, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this

day on all counsel of record on the Service List below via transmission of Notice of Electronic

Filing generated by CM/ECF.

___s/___Paul J. Schwiep_____

App. 1186

| Service List | |
|---|---|
| **Nathan A. Forrester**<br>    Chief Deputy Solicitor General<br>nathan.forrester@myfloridalegal.com<br>**Robert S. Schenck**<br>    Assistant Solicitor General<br>robert.schenck@myfloridalegal.com<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida  32399-1050<br>Telephone:  (850) 414-3300<br>jenna.hodges@myfloridalegal.com<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* | BOIES SCHILLER FLEXNER LLP<br>**Jesse Panuccio, Esq.**<br>jpanuccio@bsfllp.com<br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 356-0011<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* |
| GERALDINE BONZON-KEENAN<br>Miami-Dade County Attorney<br>**Christopher J. Wahl**<br>    Assistant County Attorney<br>wahl@miamidade.gov<br>**David M. Murry**<br>    Assistant County Attorney<br>dmmurray@FlyMIA.com<br>Stephen P. Clark County<br>111 Northwest 1ˢᵗ Street, Suite 2810<br>Miami, Florida  33128<br>Telephone:  (305) 375-5151<br>kgriffin@FlyMIA.com<br>victor.rodriguez3@miamidade.gov<br><br>*Counsel for Miami-Dade County* | HAYDEN P. O'BYRNE<br>United States Attorney<br>**Carlos J. Raurell**<br>    Assistant U.S. Attorney<br>carlos.raurell@usdoj.gov<br>99 Northeast 4ᵗʰ Street<br>Miami, Florida  33132<br>Telephone:  (305) 961-9243<br>melissa.Jiminson@usdoj.gov<br>_____<br><br>ADAM R.F. GUSTAFSON<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Peter M. Torstensen, Jr.**<br>    Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Hayley A. Carpenter**<br>    Trial Attorney<br>hayley.carpenter@usdoj.gov<br>Natural Resources Section<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Telephone:  (202) 305-0242<br><br>*Counsel for Kristi Noem, in her official* |

App. 1187

| | *capacity as Secretary, United States Department of Homeland Security, and Todd Lyons, in his official capacity as Acting Director, United States Immigration and Customs Enforcement* |
| --- | --- |

# Doc. 27

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

       Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

       Defendants.

### PLAINTIFFS' NOTICE OF FILING THE
### <u>DECLARATION OF CHRISTOPHER W. McVOY, Ph.D.</u>

Plaintiffs, through undersigned counsel, hereby give notice of filing the Declaration of

Christopher W. McVoy, Ph.D., attached as Exhibit 1.

Dated:  July 8, 2025

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/___Tania Galloni_____
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No. 100309
    dburkhardt@earthjustice.org
    Alisa Coe, Fla. Bar No. 10187
    acoe@earthjustice.org

*Counsel for Friends of the Everglades*


CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/___Paul J. Schwiep_____
    Paul J. Schwiep, Fla. Bar No. 823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for Plaintiffs*


## <u>CERTIFICATE OF SERVICE</u>

       I HEREBY CERTIFY that on July 8, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

                     ___s/___Paul J. Schwiep_____

App. 1191

| Service List | |
|---|---|
| **Nathan A. Forrester**<br>    Chief Deputy Solicitor General<br>nathan.forrester@myfloridalegal.com<br>**Robert S. Schenck**<br>    Assistant Solicitor General<br>robert.schenck@myfloridalegal.com<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida  32399-1050<br>Telephone:  (850) 414-3300<br>jenna.hodges@myfloridalegal.com<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* | BOIES SCHILLER FLEXNER LLP<br>**Jesse Panuccio, Esq.**<br>jpanuccio@bsfllp.com<br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 356-0011<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* |
| GERALDINE BONZON-KEENAN<br>Miami-Dade County Attorney<br>**Christopher J. Wahl**<br>    Assistant County Attorney<br>wahl@miamidade.gov<br>**David M. Murry**<br>    Assistant County Attorney<br>dmmurray@FlyMIA.com<br>Stephen P. Clark County<br>111 Northwest 1st Street, Suite 2810<br>Miami, Florida  33128<br>Telephone:  (305) 375-5151<br>kgriffin@FlyMIA.com<br>victor.rodriguez3@miamidade.gov<br><br>*Counsel for Miami-Dade County* | HAYDEN P. O'BYRNE<br>United States Attorney<br>**Carlos J. Raurell**<br>    Assistant U.S. Attorney<br>carlos.raurell@usdoj.gov<br>99 Northeast 4th Street<br>Miami, Florida  33132<br>Telephone:  (305) 961-9243<br>melissa.Jiminson@usdoj.gov<br>_____<br><br>ADAM R.F. GUSTAFSON<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Peter M. Torstensen, Jr.**<br>    Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Hayley A. Carpenter**<br>    Trial Attorney<br>hayley.carpenter@usdoj.gov<br>Natural Resources Section<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Telephone:  (202) 305-0242<br><br>*Counsel for Kristi Noem, in her official* |

|  | *capacity as Secretary, United States Department of Homeland Security, and Todd Lyons, in his official capacity as Acting Director, United States Immigration and Customs Enforcement* |
|--|--|

# Doc. 31

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

        Defendants.

### PLAINTIFFS' EXPEDITED MOTION FOR RULING ON MOTION FOR A
### TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs respectfully move for the entry of an order ruling on their June 27, 2025,

Expedited Motion for a Temporary Restraining Order and Preliminary Injunction, (D.E. 5,

hereinafter the "PI Motion"), which has been fully briefed since July 3, 2025. Plaintiffs respectfully

request that the Court rule on the PI Motion, or refer the matter to the Magistrate Judge for

expedited resolution, by no later than Friday, July 18, 2025. Should the Court believe it helpful,

Plaintiffs will appear at the Court's convenience to present argument in support of the PI Motion.

In support of this motion, Plaintiffs state as follows:

App. 1195

**Introduction**

During the week of June 16, 2025, Florida Attorney General James Uthmeier announced that Florida would commandeer the Dade-Collier Training and Transition Airport ("TNT Site") from Miami-Dade County under the Governor's emergency powers to construct a mass detention center to detain noncitizens in partnership with the federal government. To Plaintiffs' knowledge, work commenced on the site during the week of June 22, 2025. The Federal Government has promised to pay for the work. (D.E. 25.)

On June 27, 2025, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief (D.E. 1) and their PI Motion. (D.E. 5.)[1] The Complaint and PI Motion demonstrate that the Defendants' activities on the TNT Site require compliance with the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA"), and alleged that Defendants failed to comply with NEPA's requirements. Among other things, NEPA requires an assessment of alternatives to the action, and the preparation of an environmental impact statement, after public participation, to evaluate the environmental effects of the project. *See generally Okeelanta Corp. v. United States Army Corps of Eng'rs*, 132 F.4th 1320, 1344 (11th Cir. 2025) ("NEPA requires that federal agencies consider in an EIS the environmental effects of proposed major actions, which include actions that an agency permits. NEPA is 'essentially procedural, designed to ensure 'fully informed and well-considered decision[s]' by federal agencies.") (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)).

All Defendants have responded in opposition to the PI Motion, with the final response received from the Federal Defendants on July 3, 2025. (D.E. 21.) Defendants' responses all but

---

[1] The PI Motion requested issuance of a temporary restraining order under Rule 65. As all Defendants have now appeared, preliminary injunctive relief is requested.

concede that no NEPA evaluation has occurred, instead arguing that the action is exempt from NEPA. Within 24 hours of receiving the final opposition memorandum from the Federal Defendants, Plaintiffs filed a consolidated reply memorandum addressing the opposition briefs received from the Federal Defendants, the State, and Miami-Dade County.[2] (D.E. 24, filed July 3, 2025.)

Plaintiffs' PI Motion requested an expedited ruling and noted that DHS and ICE had publicly stated they intended to commence detaining individuals at the TNT Site as early as July 1, 2025. (D.E. 5, at 5.) In fact, the Federal Defendants or their agents have transported immigration detainees to the TNT Site.[3] The conditions at the TNT Site have been described as inhumane and unsanitary, and ignited a public outcry.[4] Elected State officials have been denied access to the Site.[5] The Miami-Dade County Mayor has expressed "grave concerns" over conditions at the Site and requested an opportunity to inspect it, which has been denied.[6]

The environmental impacts from work at the Site and ongoing operations are patent, and include filling and paving of previously open areas, *see* D.E. 27, and ongoing light pollution from operation of a mass detention center, *see* D.E. 24-4, which is significant because this is an unprecedented use of the TNT Site within the Big Cypress National Preserve, which is home to

---

[2]  Plaintiffs are no longer seeking injunctive relief as against the County.

[3]   *See*   https://www.pbs.org/newshour/nation/first-immigration-detainees-arrive-at-alligator-alcatraz-in-florida-everglades.

[4]   *See, e.g.,*   https://www.newsweek.com/immigration-migrant-alligator-alcatraz-ice-detained-2096868; https://www.cbsnews.com/miami/news/alligator-alcatraz-detainees-allege-inhumane-conditions-at-immigration-detention-center/; https://www.yahoo.com/news/alligator-alcatraz-detainees-describe-spoiled-230853523.html; https://www.miamiherald.com/news/local/immigration/article310130645.html.

[5]   *See* https://www.cbsnews.com/miami/news/democratic-lawmakers-denied-entry-to-alligator-alcatraz-immigration-detention-site/

[6]   https://www.nbcmiami.com/news/local/mayor-critical-of-alligator-alcatraz-told-she-cannot-access-facility/3654765/

federally protected nocturnal species and an internationally recognized dark sky park.[7]   As discussed further below, other environmental harms continue to occur, as well as harms to Plaintiffs' procedural rights under NEPA.

## Argument

The PI Motion, which has been pending now for two weeks, is urgent—which is why Plaintiffs requested expedited relief.[8]   In *In re Fort Worth Chamber of Commerce,* 100 4.th 528 (5th Cir. 2024), the Fifth Circuit explained that delay in resolving a motion for preliminary injunction can be considered an effective denial under certain circumstances. *Id.* at 534. There, the plaintiff requested expedited review of its motion for preliminary injunction and advised the district court that the plaintiff would consider the motion denied absent a ruling within three days. The district court denied the request for expedited review. The plaintiff appealed arguing that the failure to rule was effective denial, appealable under 28 U.S.C. § 1292(b). The Court of Appeals found that indeed the District Court had effectively denied preliminary injunctive relief "by not properly ruling on it." *Id.* at 535. The Court explained that while a plaintiff "cannot simply say they need an expedited ruling and then appeal by claiming effective denial when they don't get on

---

[7]  *See* https://www.nps.gov/bicy/planyourvisit/astronomy-programs.htm ("Big Cypress National Preserve [is] home to some of the last remaining dark skies in the country and [is] committed to protecting the night sky resource.").

[8] Plaintiffs did not designate their motion as an "emergency" under S.D. Fla. L.R. 7.1(d)(1), as local rules preclude such a designation where the motion would become moot if not resolved within seven days. Plaintiffs' PI Motion did not meet this criterion, and it is not moot as the NEPA violation is ongoing and may be remedied by putting a halt to further and on-going activity at the TNT Site. *See, e.g., Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) (where Court halted construction of a dam that had been "virtually completed" based on a NEPA violation); *Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1357 (S.D. Fla. 2005) (wherein court granted the plaintiffs' request for injunctive relief and enjoined ongoing construction on wetlands in Palm Beach County); *Manatee Cty. v. Gorsuch*, 554 F. Supp. 778, 795 (M.D. Fla. 1982) (enjoining further dumping of dredged material, even when the defendants argued it would "cause serious contractual difficulties and would substantially increase the cost of the project.").

their preferred timeline," where there is a basis for urgency and a diligent plaintiff, the failure to rule is effective denial. *Id.*; *see also Amazon.com Servs. LLC v. Nat'l Lab. Rels. Bd.*, 136 F.4th 577, 582 (5th Cir. 2025) (holding that a plaintiff claiming effective denial of preliminary injunctive relief based on failure to rule must demonstrate diligence in requesting a ruling). Accordingly, Plaintiffs respectfully request that the Court act on the PI Motion no later than July 18.

Here, Plaintiffs requested ruling on their PI Motion, which included a TRO request, by July 1, 2025, to preserve the status quo before detained persons were transferred to the site and it commenced operation, which causes further harm. (D.E. 5, at 5.) After Defendants responded in opposition to the TRO motion, Plaintiffs filed their reply within 24 hours, late in the evening before the July 4 holiday. Meanwhile, with each passing day there is ongoing harm to Plaintiffs' procedural rights under NEPA, *see Okeelanta Corp.*, 132 F.4th at 1337 (explaining the "special nature of … injury [arising from] failure to follow NEPA …."), and material and significant harm to environmental resources. These harms include harm to Plaintiffs' members' recreational, aesthetic, and other interests in the environment, as demonstrated in the declarations attached to the PI Motion. (DE 5-1, 5-2 & 5-3.)  These harms are ongoing and warrant immediate consideration.

WHEREFORE, Plaintiffs respectfully request that the Court rule on their PI Motion, or refer the matter to the Magistrate Judge for expedited resolution, by no later than Friday, July 18, 2025. Plaintiffs are prepared to appear at the Court's convenience to address any questions the Court may have.

Dated:   July 11, 2025

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/   Tania Galloni_____
   Tania Galloni, Fla. Bar No. 619221
   tgalloni@earthjustice.org
   Dominique Burkhardt, Fla. Bar No.
   100309
   dburkhardt@earthjustice.org
   Alisa Coe, Fla. Bar No. 10187
   acoe@earthjustice.org

*Counsel for Friends of the Everglades*

CENTER FOR BIOLOGICAL DIVERSITY
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

By:_____s/   Elise Pautler Bennett_____
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org

*Counsel for Center for Biological Diversity*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/   Paul J. Schwiep_____
   Paul J. Schwiep, Fla. Bar No. 823244
   PSchwiep@CoffeyBurlington.com
   Scott Hiaasen, Fla. Bar No. 103318
   SHiaasen@CoffeyBurlington.com
   YVB@CoffeyBurlington.com
   LPerez@CoffeyBurlington.com
   service@CoffeyBurlington.com

*Counsel for Plaintiffs*

App. 1200

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 11, 2025, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this

day on all counsel of record on the Service List below via transmission of Notice of Electronic

Filing generated by CM/ECF.

s/   Paul J. Schwiep

| Service List | |
|---|---|
| **Nathan A. Forrester**<br>    Chief Deputy Solicitor General<br>nathan.forrester@myfloridalegal.com<br>**Robert S. Schenck**<br>    Assistant Solicitor General<br>robert.schenck@myfloridalegal.com<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida  32399-1050<br>Telephone:  (850) 414-3300<br>jenna.hodges@myfloridalegal.com<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* | Boies Schiller Flexner LLP<br>**Jesse Panuccio, Esq.**<br>jpanuccio@bsfllp.com<br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 356-0011<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* |
| Geraldine Bonzon-Keenan<br>Miami-Dade County Attorney<br>**Christopher J. Wahl**<br>    Assistant County Attorney<br>wahl@miamidade.gov<br>**David M. Murry**<br>    Assistant County Attorney<br>dmmurray@FlyMIA.com<br>Stephen P. Clark County<br>111 Northwest 1st Street, Suite 2810<br>Miami, Florida  33128<br>Telephone:  (305) 375-5151<br>kgriffin@FlyMIA.com<br>victor.rodriguez3@miamidade.gov<br><br>*Counsel for Miami-Dade County* | Hayden P. O'Byrne<br>United States Attorney<br>**Carlos J. Raurell**<br>    Assistant U.S. Attorney<br>carlos.raurell@usdoj.gov<br>99 Northeast 4th Street<br>Miami, Florida  33132<br>Telephone:  (305) 961-9243<br>Adam R.F. Gustafson<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Peter M. Torstensen, Jr.**<br>    Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Hayley A. Carpenter** |

| | Trial Attorney |
|---|---|
| | hayley.carpenter@usdoj.gov |
| | Natural Resources Section |
| | Ben Franklin Station |
| | P.O. Box 7611 |
| | Washington, D.C. 20044-7611 |
| | Telephone:  (202) 305-0242 |
| | |
| | *Counsel for Kristi Noem, in her official capacity as Secretary, United States Department of Homeland Security, and Todd Lyons, in his official capacity as Acting Director, United States Immigration and Customs Enforcement* |

# Doc. 33

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC.,
a Florida 501(c)(3) not-for-profit corporation,
and   CENTER   FOR   BIOLOGICAL
DIVERSITY, a 501(c)(3) nonprofit organization,

     Plaintiffs,                CIVIL DIVISION

vs.                        CASE NO. 25-CV-22896-JEM

KRISTI NOEM, in her official capacity as
Secretary   of   the   UNITED   STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director   of   the   UNITED   STATES
IMMIGRATION   AND   CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his
official capacity as Executive Director of the
FLORIDA   DIVISION   OF   EMERGENCY
MANAGEMENT;   and   MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

     Defendants.

_____/

## <u>MOTION TO INTERVENE</u>

Interested Party the Miccosukee Tribe of Indians of Florida (the "Tribe"), hereby moves to

intervene[1] as an Intervenor-Plaintiff in the action styled *Friends of the Everglades, Inc., et al. v.*

*Noem, et al.*, Case No. 25-CV-22896-JEM (the "Action") as a matter of right pursuant to Federal

Rule of Civil Procedure 24(a) or, in the alternative, as a permissive intervenor pursuant to Federal

Rule of Civil Procedure 24(b). The original plaintiffs and defendants seek relief which pose direct

and serious impacts to the Tribe's interests.

---

[1] In doing so, the Tribe does not waive its sovereign immunity. *See Oklahoma Tax Com'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509-10 (1991).

## INTRODUCTION

The Miccosukee people have lived in and cared for the land now known as the Big Cypress National Preserve (the "Preserve") since time immemorial. For generations, the Miccosukee people made pilgrimages from north Florida to the Everglades, including the Preserve, to fish, hunt, trap, and hold sacred ceremonies. Following the First and Second Seminole Wars, the Miccosukee people were relocated to approximately 2.5 million acres of land at the southernmost point of their traditional range that was reserved as Indian Territory in or about 1845. However, the truce was broken and the United States attempted to remove the Miccosukee from these reserved lands, forcing the Miccosukee people deeper into the Everglades. Eventually, under the leadership of Abiaki (Sam Jones), the Miccosukee living within the Everglades retreated to the tree islands and cypress strands inside the contemporary borders of the modern Everglades National Park, Big Cypress National Preserve, Miccosukee Federal Reservation, and Miccosukee Water Conservation Area 3-A (the "MWCA"), where they remain today.

For over a century, the State of Florida has recognized the Tribe's right to use and enjoy these lands, including the Preserve. The Acts of 1917 of the State of Florida created a 99,200-acre reservation for the Miccosukee and Seminole people, known as the State Seminole Indian Reservation, to provide a residence for the Native peoples living in the southern Everglades. However, the reservation was terminated to establish the Everglades National Park, which resulted in the eviction of then-active traditional family camps and villages, many of which moved north onto lands that presently comprise the Preserve.

Disputes regarding the State reservation were settled in 1982, guaranteeing to the Tribe a perpetual lease of State lands along the eastern boundary of the Preserve and TNT Site,[2] known as the MWCA, and preserving individual Miccosukee and Seminole member aboriginal use and occupancy rights throughout the State. *See* P.L. 97-399; 25 U.S.C. § 1741 *et seq*. (Florida Indian Land Claims Settlement Act of 1982) (settling claims, outlining Tribal rights within the WCA 3-A, and preserving tribal rights); FFWCC Regulations Summary and Area Map (July 01, 2025-June 30, 2026)[3] (designating Tribal lands in Water Conservation Area 3-A as "Miccosukee WCA 3-A"); Fla. Stat. §§ 285.17-18 (designating the Tribe as governing authority of a Special Improvement District surrounding these lands; designating Miccosukee Police Department as a "criminal justice agency" of Florida).

After Everglades National Park was established in 1947, several Miccosukee settlements along the Tamiami Trail continued their occupancy in Everglades National Park under special-use permits. Several traditional villages were incorporated into the Miccosukee Reserved Area through the Miccosukee Reserved Area Act of 1998. *See* P.L. 105-313 §§2-3; 16 U.S.C. § 410. Consistent with the Miccosukee people's primordial connection to this land and the Tribe's longstanding stewardship of same, the Tribe has for decades lead efforts to restore the land and revitalize its presence thereon. As a result, the Miccosukee people continue to live in traditional villages within the Preserve and routinely hunt, fish, trap, gather plants, hold sacred rituals, and lay their deceased to rest in the Preserve.

---

[2]     The Tribe adopts the usage of "TNT Site" in the Complaint in this action (*See* DE 1, ¶ 1) (defining TNT Site as the Dade-Collier Training and Transition Airport).

[3]     Available at <https://ocean.floridamarine.org/HGMSearch/BrochureDetails.aspx?srctype=pfs&title=everglades%20and%20francis%20s.%20taylor> (last accessed July 14, 2025).

App. 1206

I.        **The Tribe's Interests in Big Cypress Preserve.**

The area now known as the Preserve is a core piece of the Tribe's homeland. Today, all of the Tribe's active ceremonial sites and a significant majority of the Tribe's traditional villages (sometimes known as "clan camps") are located within the Preserve. Indeed, the Tribe played a significant role in the creation of the Preserve as part of the sustained campaign to prevent the further development of the TNT Site. As a direct result of this campaign, Congress passed the Big Cypress Enabling Act, which created the Preserve and specifically recognized the Tribe's rights to use and occupy the land therein. The Act provides: "members of the Miccosukee Tribe of Indians of Florida . . . shall be permitted . . . to continue their usual and customary use and occupancy of Federal or federally acquired lands and waters within the preserve and the Addition, including hunting, fishing, and trapping on a subsistence basis and traditional tribal ceremonials." P.L. 93-440; 16 U.S.C. § 698j (Big Cypress Enabling Act).

Congress also recognized the Tribe's right to use and occupy the lands surrounding the Preserve when it passed the Everglades National Park Act (the "ENP Act") and the Miccosukee Reserved Area Act (the "MRA Act"). Specifically, the ENP Act provides that "Nothing in this Act shall be construed to lessen any existing rights of the [Miccosukee][4] Indians which are not in conflict with the purposes for which the Everglades National Park is created." 16 U.S.C. §410b. The MRA Act similarly provides: "Nothing in this Act shall affect any rights of the Tribe under Federal law, including the right to use other lands or waters within the [ENP] including any

---

[4]        The ENP Act uses the term "Seminole" to describe all of the native peoples living in the area. As confirmed in a 1982 NPS report and other documents, "An Ethnohistory of Big Cypress National Preserve, Florida," the term "Seminole" refers to all of the Native Americans living in ENP then, which included Miccosukee Indians. (*See generally* Paige, J., van Horn, Lawrence, *An Ethnohistory of Big Cypress National Preserve, Florida*, National Park Service, U.S. Dept. of Interior            (1982)            accessible            at <https://www.nps.gov/parkhistory/online_books/bicy/ethnohistory.pdf>

App. 1207

additions to that Park for other purposes, including, fishing, boating, hiking, camping, cultural activities, or religious observances." P.L. 105-313, §5(e).

The State of Florida also has passed legislation to codify the Tribe's protectable rights and interests in the Preserve. Specifically, section 380.055, Florida Statutes (the "FL Big Cypress Conservation Act of 1973"), provides: "[M]embers of the Miccosukee Tribe of Indians of Florida . . . may continue their usual and customary use and occupancy of lands and waters within the Big Cypress Area, including hunting, fishing, and trapping on a subsistence basis and traditional tribal ceremonials." Fla. Stat. § 380.055(8). *See also* Fla. Stat. § 285.09 ("It is lawful for members of the Miccosukee Tribe and members of the Seminole Tribe to take wild game and fish at any time within the boundaries of their respective reservations and in the exercise of hunting, fishing, and trapping rights within the Big Cypress Preserve . . . .").

At all times material, before and after the aforementioned legislation, the Tribe and its members have maintained the usual and customary use and occupancy of the land within the Preserve and continue to exercise and protect these rights and interests today. The aforementioned federal and state legislation clearly recognizes the Tribe's protectable rights to use and occupy the lands within the Preserve and those adjacent thereto, including Everglades National Park, the Miccosukee Reserved Area, and the MWCA. Further, the Tribe has an interest in protecting and preserving the land where its members reside and traditional hunting grounds and ceremonial sites are located.

## II.    The Tribe's Use and Occupancy of Big Cypress and the Surrounding Area.

As noted above, the lands comprising Everglades National Park and the Preserve are the traditional home of the Tribe and hold significant cultural and religious value. Today, there are

fifteen active traditional villages in the Preserve.[5] All of these villages are home to Tribal families, and are located along the Miccosukee Indian School's bus route. These villages, and their traditional precursors, have been located in the Preserve for at least a century prior to the Preserve's legislative creation.

Additionally, many of the Tribe's sacred cultural sites, ceremonial grounds, and burial grounds are located within or adjacent to the Preserve. The use and occupancy rights of Tribal members, including village residents, ensure they are able to access these and other sites and perform traditional ceremonies. There also are dozens of Tribal sites and villages located on Tribal lands west of the TNT Site and adjacent to the Preserve.[6] Further, Tribal members and village residents rely on and routinely exercise their rights to hunt, fish, and trap within the Preserve on a subsistence basis.

### III.   Tribal Efforts to Protect and Preserve these Lands.

The Tribe is dedicated to preserving its members' rights, including its members who reside on land within the Preserve. For example, the Department of Interior recently proposed a potential wilderness designation which would have limited Tribal use and access to large sections of the Preserve. To combat the potential loss of use and access, on June 27, 2024, Chairman of the Miccosukee Tribe of Indians of Florida, Talbert Cypress testified before the U.S. House of Representatives on behalf of the Tribe in support of H.R. 8206. H.R. 8206 would have prohibited the designation of wilderness for Preserve lands used and occupied by Tribal members for centuries. The past administration subsequently withdrew their wilderness proposal.

---

[5] Attached hereto as Exhibit 1 is a map showing the location of Tribal villages in area.
[6] Attached hereto Exhibit 2 is a map showing the location of Tribal sites and villages in area adjacent to the TNT Site.

Additionally, the Tribe defends its members' statutory interests in, and the safety, subsistence, and community health of the Tribal residences within the Preserve. The Tribal administration conservatively estimates that the Tribe spent at least $2 million over the past decade on infrastructure within the Preserve, including but not limited to installation of water systems, septic systems, bridges, culverts, and support for the construction of traditional chickees and homes. Such investments are designed to improve Tribal member residences and maintain or enhance accessibility to traditional sites, all in a manner that protects the Preserve's fragile environment.

## IV.    Adverse Effects of the Facility's Construction and Operation.

The TNT Site is surrounded on all sides by the Preserve or lands perpetually leased to the Tribe under the Florida Indian Land Claims Settlement Act of 1982. The facility's proximity to the Tribe's villages, sacred and ceremonial sites, traditional hunting grounds, and other lands protected by the Tribe raises significant concerns about environmental degradation and potential impacts to same caused by the construction and operation of a detention facility at the TNT Site. Aside from a 1974 environmental impact study that found additional airstrip infrastructure in the area would have significant negative impacts on the Everglades ecosystem, there have been no environmental impact studies conducted regarding the construction and operation of the detention facility or its effects on the environment generally.

The anticipated 1,000-5,000 occupants at the facility will, at minimum, more than double the residential density in the area. Despite this, there have been *zero studies or analyses* to determine if constructing and operating a detention facility at the TNT Site will have an adverse effect on the residents of nearby tribal villages or community members who live and work on the Miccosukee Reserved Area, including students attending the Miccosukee Indian School, all of

whom are located downstream[7] of the TNT Site. Further, Tribal members' rights to use the Preserve for traditional and ceremonial purposes, including hunting, fishing, and trapping within the immediate vicinity of the TNT Site, likely will be impaired by the operation of a federal detention facility thereon.

There are ten Tribal villages within a three-mile radius of the TNT Site. One of which, a Panther Clan village known by distinction as the Panther-Osceola Camp, is located approximately 1,000 feet from the boundary of the detention facility. (*See* Ex. 1.) Residents of the Panther-Osceola Village have lived within the Preserve and at their traditional village site since before the Preserve's creation in 1974. This village and its residents routinely uses the land immediately adjacent to and surrounding the TNT Site to hunt, fish, and trap and to perform traditional and religious ceremonies. At present, residents report that ingress and egress to their village have been impacted by increased traffic flow along US-41. Further, given the village's proximity to the facility, residents are concerned about impacts to their freedom to hunt and fish in the immediate area adjacent to a securitized federal detention and immigration facility, as well as the possibility of a facility escape posing a security risk for their community.

Additionally, the residents of the P.O. Village, (*see* Ex. 1), located southeast of the Panther-Osceola Camp, have lived within the National Preserve for generations and well before its creation in 1974. This traditional village is approximately two miles from the facility's entrance and roughly one mile from its closest boundary. The residents of this village host many cultural

---

[7] Attached hereto as Exhibit 3 is a true and correct copy of a map depicting the average monthly flow vectors during the wet and dry seasons for the relevant area. The Exhibit is taken from a South Florida Water Management District, Hydrologic and Environment Systems Modeling Section Report that is accessible at the following link: < https://www.sfwmd.gov/sites/default/files/documents/nsrsm_v3_5_2_documentation.pdf> (last accessed on July 14, 2025).

activities that are unique to the Tribe and which involve persons from all clans. There is a bona fide doubt and concern that such cultural activities will not be allowed to proceed due to the environmental effects of the facility's operation and construction, as well as attendant concerns related to the health, safety, and security of residents and community members. Additionally, the facility is located immediately upstream from several Tribal villages such that potential contamination or pollution from the facility will have a direct and adverse effect on potable water quality for residents and the surrounding environment.

To the immediate southeast of the P.O. Village is another village, designated as the B.L. Village, (*see* Ex. 1), whose residents have lived in the Preserve for generations and well before its creation in 1974. This traditional Panther Clan village is approximately 2.3 miles from the boundary of the TNT Site. Residents here also worry about downstream impacts from construction, interruption to endangered Florida panther and Florida bonneted bat habitat, increased traffic, and the resulting water quality, health and safety, and subsistence impacts which are unknown due to the failure to initiate environmental studies and/or assessments prior to the facility's construction and the failure to obtain permitting for such construction.

Environmental impact studies or evaluations are needed to determine the potential impacts to the residents of nearby Tribal villages in close proximity to the TNT Site. Further, there are multiple Tribal villages and the Miccosukee Reserved Area community and infrastructure, including the Miccosukee Indian School, Miccosukee Health Department, Miccosukee Tribal Court, Miccosukee Water & Fire Departments, are located downstream of the TNT Site. The construction and operation of a detention facility without necessary environmental studies potentially poses a substantial threat to the rights and interests of the Tribe and the livelihood of Tribal members who live adjacent thereto. Additionally, the unknown environmental impacts of

the detention facility's construction and operation may affect the number and quality of game and/or fish stocks such that Tribe's traditional rights – guaranteed by federal and state law – are rendered meaningless. Finally, residents of Tribal villages depend on the two-lane Tamiami Trail as the sole means of ingress and egress from their homes, which also serves as the sole evacuation route during inclement weather or wildfires.

For these reasons, the Tribe seeks to intervene in this action to protect the aforementioned rights by seeking a declaration that Defendants are required to obtain environmental impact studies and/or environmental assessments, including studies or assessments of potential impacts on residents of Tribal villages and Miccosukee Reserved Area community members, as required under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* The Tribe also moves to intervene in this action to seek a declaration that allowing the construction and operation of the detention facility to proceed without first obtaining environmental impact studies and/or environmental assessments is violative of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.* and, in turn, is  determinantal to the rights and interests of the Tribe and its members.

## ARGUMENT

The Tribe is entitled to intervene pursuant to Rule 24, which sets forth two alternative bases for intervention. Rule 24(a) provides for intervention of right while Rule 24(b) provides for permissive intervention. Under either alternative, an order granting intervention is proper.

### I.    Rule 24(a) - Intervention of Right

Rule 24(a)(2) allows a third party to intervene as of right when it "claims an interest relating to the property of transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

App. 1213

The Eleventh Circuit has reconfigured the Rule into four elements:

(1) the movant's application to intervene is timely;
(2) she has an interest relating to the property or transaction which is the subject of the action;
(3) she is so situated that disposition of the action, as a practical matter, may impede or impair her ability to protect that interest; and
(4) her interest is represented inadequately by the existing parties to the suit.

*Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) (quoting *Athens Lumber Co., Inc. v. Federal Election Comm.*, 690 F.2d 1364, 1366 (11th Cir. 1982)),

The Tribe satisfies all four elements.

### a. The Motion is Timely.

First, this motion is timely. This action commenced on June 27, 2025, and the Tribe filed this motion within a matter of weeks thereafter. (*See* DE 1.) Discovery has not commenced. Defendants have not responded to the operative complaint. And even more, Plaintiffs' complaint alleges that it will seek to amend the complaint to add a claim that requires 60-days' pre-suit notice to ripen. (*See* DE 1, at ¶53.) Given the infancy of this case, and the lack of any discovery or responses, there can be no dispute that the Tribe's motion is timely.

"In determining whether a motion to intervene was timely, we consider (1) the length of time during which the proposed intervenor knew or reasonably should have known of the interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties as a result of the proposed intervenor's failure to move for intervention as soon as it knew or reasonably should have known of its interest; (3) the extent of prejudice to the proposed intervenor if the motion is denied; and (4) the existence of unusual circumstances militating either for or against a determination that their motion was timely." *In re Martinez*, 736 F. Supp. 3d 1189, 1200 (S.D. Fla. 2024) (quoting *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259 (11th Cir. 2002)). "[W]e must also keep in mind that timeliness is not a word of exactitude or of precisely measurable

dimensions. The requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice." *Id.*

Here, the length of time during which the Tribe knew or reasonably should have known of its interest in the case is short by any measure. There is no prejudice to the existing parties; in fact, plaintiffs do not oppose intervention and Defendants have not responded to the operative complaint or conducted any discovery. The Tribe will suffer prejudice if intervention is denied because, as set forth above, it is an adjacent property owner whose rights are infringed by the actions of the Defendants. At bottom, the Tribe seeks access to the Court to have an opportunity to be heard with respect to the subject matter of the federal government's action. Given the swiftness with which the Tribe has sought this relief, there are no unique circumstances militating against a determination that this motion is timely. Ultimately the flexible rule of timeliness and the Tribe's prompt action requires a determination that the Tribe has met its burden on this element. *In re Pons*, No. Case No. 1:19-MC-23236, 2020 WL 5355967, at *5 (S.D. Fla. Sept. 7, 2020) ("The motion to intervene regarding the applicant's motion for leave to issue additional subpoenas is timely because it was filed within two weeks of the applicant's filing of the motion for leave."); *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) ("We believe that the detainees' motion to intervene was timely. It was filed only seven months after Senator Chiles filed his original complaint, three months after the government filed its motion to dismiss, and before any discovery had begun.").

### b. The Tribe has an Interest Relating to the Property and Transaction at Issue.

Second**,** the Tribe has an interest relating to the property or transaction at issue. The Eleventh Circuit explained that this element must "be supported by a 'direct, substantial, legally protectible interest in the proceeding.'" *Chiles*, 865 F.2d at 1213-14. (quoting *Athens Lumber*, 690

F.2d at 1366). The movant's interest need not "be of a legal nature identical to that of the claims asserted in the main action." *Id.* (quoting *Diaz v. Southern Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir. 1970)). The court's inquiry on a motion for intervention of right is "a flexible one, which focuses on the particular facts and circumstances" of each such motion. *Id.* at 1214 (citing *United States v. Perry Cnty. Board of Educ.*, 567 F.2d 277, 279 (5th Cir. 1978)). Accordingly, "[w]here a party seeking to intervene in an action claims an interest in the very property and very transaction that is the subject of the main action, the potential *stare decisis* effect may supply that practical disadvantage which warrants intervention as of right." *Id.* (citing *Atlantis Dev. Corp. v. United States*, 379 F.2d 818, 829 (5th Cir. 1967)).

Here, the Tribe has a "direct, substantial, legally protectible interest in the proceeding" because both federal and Florida legislation recognize continuing Miccosukee rights to use and occupy the Preserve. *See Chiles*, 865 F.2d at 1213-14. As some of the only residents on the land surrounding the detention facility, the Tribe and its members have direct, substantial, and legally protectible interests in the outcome of this action, *i.e.*, the determination of environmental impacts caused by the facility's construction and/or operation, which necessarily will affect the Tribe's rights to use and occupy the traditional villages and Preserve lands in close proximity to the detention facility, as well as those villages and the Miccosukee Reserved Area located farther downstream. Because the Tribe's interest relates to the "very property and very transaction that is the subject of the main action" – *i.e.*, the Preserve and the detention facility's operation in an enclave thereof – the *stare decisis* effect of this Court's rulings in this action can and likely will impair or impede the Tribe's rights as a practical matter.

### c. The Tribe is so Situated that Disposition of the Action, as a Practical Matter, May Impede or Impair its Ability to Protect that Interest.

Third, the Tribe is so situated that disposition of the action, as a practical matter, may impede or impair its ability to protect that interest. "If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Cascade Nat. Gas Corp. v. El Paso Nat. Gas Co.*, 386 U.S. 129, 134 n.3 (1967). "All that is required under Rule 24(a)(2) is that the would-be intervener be practically disadvantaged by his exclusion from the proceedings." *Huff v. Comm'r of IRS*, 743 F.3d 790, 800 (11th Cir. 2014) (citing *Chiles,* 865 F.2d at 1214). The Eleventh Circuit "has found that the potential for a negative stare decisis effect "*may* supply that practical disadvantage which warrants intervention of right." *Stone v. First Union Corp.*, 371 F.3d 1305, 1309–10 (11th Cir. 2004) (quoting *Chiles,* 865 F.2d at 1214).

Here, the Tribe will face practical impairment if it is not afforded an adequate opportunity to protect its interests in this action. The Tribe and its members are adjacent land holders and the subject-matter of this action concerns questions of environmental health and safety and land use within Big Cypress, where the Tribe and its members live and conduct a broad range of activities. If the Tribe is not permitted an opportunity to protect its members' interests, then the Court may adjudicate issues that impact the Tribe and its members, at which time, the parties may claim that the Tribe is estopped from seeking relief under a *res judicata* theory or some other similar legal doctrine of estoppel. The Tribe must have an opportunity to be heard at this juncture, before any issues are adjudicated.

### d. The Tribe's Interest is Inadequately Represented by the Existing Parties.

Finally, the Tribe's interests are inadequately represented by the existing parties to the suit. The Court's decision in this action concerns a property surrounded by or in close proximity to

traditional villages inhabited by Tribal members who live in the Preserve, Miccosukee ceremonial grounds in the Preserve, Miccosukee lease lands in the MWCA, and the community who live and work on the Miccosukee Reserved Area, including the Miccosukee Indian School, Miccosukee Health Department, Miccosukee Tribal Court, Miccosukee Water & Fire Departments, among many other departments of the Tribal government's administration and community infrastructure. In addition, the Tribe is unique from the Plaintiffs in that the Tribe has been expressly bestowed certain rights, interests, and privileges in various federal and Florida laws, discussed above, whereas the Plaintiffs do not share those same unique rights, interests, or privileges.

Any remedies or settlements fashioned in this case must consider the interests of the Tribe and its members' property rights, which are unique to the Tribe and its members. *See e.g. Satellite Dev. Corp. v. Tortoise Island Homeowner's Ass'n, Inc.*, 487 So. 2d 1157, 1158 (Fla. 5th DCA 1986) ("Rezoning, or even replatting, of property does not deprive an owner of his individual property rights."); *Spencer v. Wiegert*, 117 So. 2d 221, 225 (Fla. 2d DCA 1959) ("The right of a purchaser to such easement is a property right of which he cannot be deprived without due process of law.").

Moreover, the Tribe may not share the ultimate goals and objectives as the Plaintiffs. For example, a result other than ceasing further development and operation of the "Alligator Alcatraz" facility would be unacceptable to the Tribe and its members, whereas other remedies might be acceptable to the existing parties. Alternatively, the Court or the existing parties might fashion a remedy that is even more objectionable to the Tribe and its members than the current situation.

The fact that the parties may have good faith disagreements regarding potential methods of resolving issues raised by this action is sufficient to satisfy the requirement that Intervenor show its interests will not be adequately represented by other parties. *Natural Resources Defense*

*Council v. Castle*, 561 F.2d 904, 912 (D.C. Cir. 1977). The Eleventh Circuit has found that "[a]ny doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervention because it allows the court to resolve all related disputes in a single action." *Federal Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993). Because of the nature of the parties involved, this Court should follow the Eleventh Circuit's liberal treatment of this requirement and find that Intervenor's interests are not adequately represented by other parties.

## II.    Rule 24(b) – Permissible Intervention.

In the alternative, an order granting permissive intervention is proper.

Rule 24(b)(1) provides, "On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact.

"The requirements for permissive intervention are less stringent, requiring only: 1) timely application to intervene; and 2) over a claim that has a question of law or fact in common with the main action." *Adana Investing, Inc. v. Forrest Capital Partners, Inc.*, No. 15-24038-CIV, 2016 WL 7438832, at *2 (S.D. Fla. July 12, 2016) (citing *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989)). Here, the Tribe shares with the main action a common question of law or fact. Where permissive intervention "involves adjudication of an additional claim on the merits," it requires the "intervenors to establish an independent basis for jurisdiction." *Aeroplate Corp. v. United States*, 111 Fed. Cl. 298, 300 (2013) (citations omitted).

First, the Tribe has a claim for violation of the National Environmental Policy Act (NEPA) against the Defendants. *See* 42 U.S.C. §4321, *et seq.* In sum, NEPA requires federal agencies to prepare an environmental impact statement for any major federal action significantly affecting the

quality of the human environment, or an environmental assessment if the federal agency does not

reasonably foresee significant effects on the human environment and/or if the significance of such

effect is unknown, among other substantive and procedural requirements designed to use all

practical means and measures to foster and promote the general welfare and maintain conditions

under which humankind and the nature can exist in productive harmony, while fulfilling the social

and economic goals of present and future generations. *See* 42 U.S.C. ¶4331(a). Yet, here,

Defendants did not prepare an environmental impact statement or environmental assessment

before constructing and operating the subject facility. (*See* DE 1, ¶¶ 38-59.)

Second, the Tribe has a claim for violation of the Administrative Procedure Act (APA).

*See* 5 U.S.C. § 701, *et seq*. In sum the APA permits judicial review of agency actions that are

arbitrary, capricious, abusive of discretion, or otherwise contrary to law. Here, Defendants

approved and are operating a detention facility without providing the Tribe with any opportunity

for notice and comment, among failing to comply with many other substantive and procedural

rules before implementing this development.

"Permissive intervention only requires an interest sufficient to support a legal claim or

defense." *Sargeant v. Maroil Trading Inc.*, 2017 WL 11705183, at *1 (S.D. Fla. Nov. 7, 2017)

(quoting *Selective Ins. Co. of the Se. v. William P. White Racing Stable, Inc.*, No. 15-21333-CIV,

2015 WL 11237014, at *5 (S.D. Fla. Dec. 22, 2015)).

Since the Tribe has shown an interest sufficient to support a legal claim, it has met its

burden to intervene under Rule 24(b)(1).

### III.    Notice Pursuant to Rule 24(c)

Rule 24(c) provides that a motion to intervene "must state the grounds for intervention

and be accompanied by a pleading that sets out the claim or defense for which intervention is

sought."

While some "courts of appeals have denied intervention to movants who have failed strictly to heed the requirements of Rule 24(c) . . . the majority of circuits, including [the Eleventh Circuit], has not, choosing instead to disregard nonprejudicial technical defects." *Piambino v. Bailey*, 757 F.2d 1112, 1121 (11th Cir. 1985) (citations omitted). Rather, the "purpose of requiring an intervenor to file a pleading is to place the other parties on notice of the position, claim, and relief sought by the intervenor." *Danner Const. Co., Inc. v. Hillsborough Cnty.*, 2009 WL 2525486, at *2 (M.D. Fla. Aug. 17, 2009) (quoting *WJA Realty Limited Partnership v. Nelson,* 708 F.Supp. 1268 (S.D.Fla.1989)).

Here, the Tribe seeks to intervene to assert two claims against the Defendants: (1) violations of the NEPA and (2) violations of the Administrative Procedure Act. These claims can be found in counts I-II of the operative complaint. Not only do plaintiffs not object to the Tribe's intervention request, in paragraph 53 of the operative complaint, plaintiffs advised that they "intend to amend this Complaint to add the ESA claims after the required 60-day pre-suit notice, 16 U.S.C. §1540(g)(2)(A)(i), period has expired." (*See* DE 1.)

Accordingly, upon obtaining the relief requested herein, the Tribe intends to join the amended complaint as an intervenor-plaintiff. In doing so, the Tribe expressly does not intend to waive its rights or limit itself to joining counts I-II in the forthcoming amended complaint. As a result, the Tribe has provided Defendants with sufficient notice of its position, its claims, and the relief it seeks. Moreover, there is no prejudice to Defendants in light of the forthcoming amendment to the operative complaint. *See Nat. Res. Def. Council v. Serv.*, 2016 WL 5415127, at *5 (M.D. Fla. Sept. 28, 2016) ("the Court finds that the Colliers meet the requirements of Rule 24(c), and orders the Colliers to file a responsive pleading to Plaintiffs' Complaint (Doc. 1) within fifteen (15) days of this Order.")

App. 1221

## <u>CERTIFICATE OF CONFERRAL</u>

I certify that on July 14, 2025 at 10:30 a.m., the undersigned counsel emailed counsel for

Defendants regarding the relief requested in this motion. As of the time of the filing of this motion,

Defendants have not responded regarding whether they object to the relief requested.

By: <u>/s/ *Christopher Ajizian*   </u>
Christopher Ajizian, Esq.

## <u>CONCLUSION</u>

Based upon the foregoing, the Miccosukee Tribe of Indians of Florida requests entry of an

order granting intervention, whether by right or by permission, in this action, and allowing the

Tribe the opportunity to file its claims for relief at the time the Plaintiffs' amended complaint is

due.

Dated: July 14, 2025

Respectfully submitted,

**CHRISTOPHER AJIZIAN, P.A.**

By: <u>/s/ *Christopher Ajizian*   </u>
Christopher Ajizian, Esq.
Florida Bar No. 1010170
chris@ajizianlaw.com
1101 Brickell Avenue
Suite S-700
Miami, FL 33131
Tel: (305) 699-5001

-and-

**TODD R. FRIEDMAN, P.A.**

Todd R. Friedman, Esq.
Fla. Bar No. 97919
1101 Brickell Avenue
Suite S-700
Miami, Florida 33131
786-536-7190
todd@toddfriedmanpa.com
*Counsel for Intervenor-Plaintiff*

App. 1222

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 14, 2025 a true and correct copy of the foregoing was filed on the

Court's CM/ECF filing system and thereby served by email on counsel of record.

By: <u>/s/ *Christopher Ajizian*</u>

# Doc. 34

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., a Florida not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; KEVIN GUTHRIE, in his official capacity as Executive Director of the Florida Division of Emergency Management; and MIAMI-DADE COUNTY, a political subdivision of the State of Florida,

        Defendants.

### PLAINTIFFS' NOTICE OF FILING THE
### DECLARATION OF DR. ANNA V. ESKAMANI

        Plaintiffs hereby provide notice of the filing of the Declaration of Dr. Anna V. Eskamani, member Florida House of Representatives, District 42, which is attached as Exhibit 1. The declaration of Hon. Dr. Anna V. Eskamani relates to Defendant Kevin Guthrie's argument that "Plaintiffs offer no evidence that the federal government is controlling" the State's activities at the TNT Site. (D.E. 16, at 8.)

Dated:   July 15, 2025

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/   Tania Galloni_____
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No. 100309
    dburkhardt@earthjustice.org
    Alisa Coe, Fla. Bar No. 10187
    acoe@earthjustice.org

*Counsel for Friends of the Everglades*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/   Paul J. Schwiep_____
    Paul J. Schwiep, Fla. Bar No. 823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for Plaintiffs*

App. 1226

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 15, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

_s/  Paul J. Schwiep_____

| Service List | |
|---|---|
| **Nathan A. Forrester**<br>    Chief Deputy Solicitor General<br>nathan.forrester@myfloridalegal.com<br>**Robert S. Schenck**<br>    Assistant Solicitor General<br>robert.schenck@myfloridalegal.com<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida  32399-1050<br>Telephone:  (850) 414-3300<br>jenna.hodges@myfloridalegal.com<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* | BOIES SCHILLER FLEXNER LLP<br>**Jesse Panuccio, Esq.**<br>jpanuccio@bsfllp.com<br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 356-0011<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* |
| GERALDINE BONZON-KEENAN<br>Miami-Dade County Attorney<br>**Christopher J. Wahl**<br>    Assistant County Attorney<br>wahl@miamidade.gov<br>**David M. Murry**<br>    Assistant County Attorney<br>dmmurray@FlyMIA.com<br>Stephen P. Clark County<br>111 Northwest 1st Street, Suite 2810<br>Miami, Florida  33128<br>Telephone:  (305) 375-5151<br>kgriffin@FlyMIA.com<br>victor.rodriguez3@miamidade.gov<br><br>*Counsel for Miami-Dade County* | HAYDEN P. O'BYRNE<br>United States Attorney<br>**Carlos J. Raurell**<br>    Assistant U.S. Attorney<br>carlos.raurell@usdoj.gov<br>99 Northeast 4th Street<br>Miami, Florida  33132<br>Telephone:  (305) 961-9243<br>melissa.Jiminson@usdoj.gov<br><br>_____<br><br>ADAM R.F. GUSTAFSON<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Peter M. Torstensen, Jr.** |

|  | Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>United States Department of Justice<br>**Hayley A. Carpenter**<br>Trial Attorney<br>hayley.carpenter@usdoj.gov<br>Natural Resources Section<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Telephone:  (202) 305-0242<br><br>*Counsel for Kristi Noem, in her official capacity as Secretary, United States Department of Homeland Security, and Todd Lyons, in his official capacity as Acting Director, United States Immigration and Customs Enforcement* |
|---|---|

# Doc. 37

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number: 25-22896-CIV-MARTINEZ**

FRIENDS OF THE EVERGLADES, INC.,
*et al.*,

      Plaintiffs,

v.

KRISTI NOEM, *et al.*,

      Defendants.

_____/

## ORDER OF RECUSAL

The undersigned Judge, to whom the cause was assigned, hereby recuses himself and refers

this matter to the Clerk of Court for permanent reassignment pursuant to 28 U.S.C. § 455.

**DONE AND ORDERED** in Miami, Florida, this 16 day of July, 2025.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All Counsel of Record

# Doc. 38

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., a Florida not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; KEVIN GUTHRIE, in his official capacity as Executive Director of the Florida Division of Emergency Management; and MIAMI-DADE COUNTY, a political subdivision of the State of Florida,

        Defendants.

## <u>PLAINTIFFS' NOTICE OF FILING NOTICE OF INTENT TO SUE</u>

Plaintiffs hereby provide notice of the filing of Plaintiffs Friends of the Everglades and Center for Biological Diversity's July 11, 2025 "Notice of Violations of Endangered Species Act Sections 7 and 9, Clean Water Act Section 404, the National Park Service Organic Act, and Implementing Regulations, Relating to Federal and State Agencies' Actions in Furtherance of the Construction and Operation of a Mass Detention Center in the Everglades and Their Effects on Public Lands, Endangered and Threatened Species, and Clean Water," along with supporting

appendices A-H, a copy of which is attached as Exhibit 1 (the "Notice of Violation"). A copy of the Notice of Violation has been delivered to the addressees in the Notice.

Dated:  July 16, 2025

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/   Tania Galloni_____
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No. 100309
    dburkhardt@earthjustice.org
    Alisa Coe, Fla. Bar No. 10187
    acoe@earthjustice.org

*Counsel for Friends of the Everglades*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/   Paul J. Schwiep_____
    Paul J. Schwiep, Fla. Bar No. 823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for Plaintiffs*

App. 1233

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 16, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

s/  Paul J. Schwiep

| Service List | |
|---|---|
| **Nathan A. Forrester**<br>    Chief Deputy Solicitor General<br>nathan.forrester@myfloridalegal.com<br>**Robert S. Schenck**<br>    Assistant Solicitor General<br>robert.schenck@myfloridalegal.com<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida  32399-1050<br>Telephone:  (850) 414-3300<br>jenna.hodges@myfloridalegal.com<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* | BOIES SCHILLER FLEXNER LLP<br>**Jesse Panuccio, Esq.**<br>jpanuccio@bsfllp.com<br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 356-0011<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* |
| GERALDINE BONZON-KEENAN<br>Miami-Dade County Attorney<br>**Christopher J. Wahl**<br>    Assistant County Attorney<br>wahl@miamidade.gov<br>**David M. Murry**<br>    Assistant County Attorney<br>dmmurray@FlyMIA.com<br>Stephen P. Clark County<br>111 Northwest 1st Street, Suite 2810<br>Miami, Florida  33128<br>Telephone:  (305) 375-5151<br>kgriffin@FlyMIA.com<br>victor.rodriguez3@miamidade.gov<br><br>*Counsel for Miami-Dade County* | HAYDEN P. O'BYRNE<br>United States Attorney<br>**Carlos J. Raurell**<br>    Assistant U.S. Attorney<br>carlos.raurell@usdoj.gov<br>99 Northeast 4th Street<br>Miami, Florida  33132<br>Telephone:  (305) 961-9243<br>melissa.Jiminson@usdoj.gov<br><br>ADAM R.F. GUSTAFSON<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Peter M. Torstensen, Jr.** |

App. 1234

|  | Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Hayley A. Carpenter**<br>    Trial Attorney<br>hayley.carpenter@usdoj.gov<br>Natural Resources Section<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Telephone:  (202) 305-0242<br><br>*Counsel for Kristi Noem, in her official*<br>*capacity as Secretary, United States*<br>*Department of Homeland Security, and Todd*<br>*Lyons, in his official capacity as Acting*<br>*Director, United States Immigration and*<br>*Customs Enforcement* |

App. 1235

# Doc. 40

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-22896-KMW

FRIENDS OF THE EVERGLADES, INC., a Florida not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; KEVIN GUTHRIE, in his official capacity as Executive Director of the Florida Division of Emergency Management; and MIAMI-DADE COUNTY, a political subdivision of the State of Florida,

        Defendants.

### PLAINTIFFS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND REQUEST FOR EVIDENTIARY HEARING

Plaintiffs, by undersigned counsel, hereby renew their prior Expedited Motion for a Temporary Restraining Order (D.E. 5), and request an evidentiary hearing on Plaintiffs' Expedited Motion for a Preliminary Injunction within 14 days of the TRO.

### BACKGROUND

More than three weeks ago, on June 27, 2025, Plaintiffs filed their Complaint for injunctive and declaratory relief, accompanied by an Expedited Motion for Temporary Restraining Order and Preliminary Injunction. (D.E. 5, the "PI Motion.")  As demonstrated in the

PI Motion, the State has constructed, and continues to expand, an immigration detention facility within the Big Cypress National Preserve at breakneck pace to detain noncitizens for alleged immigration violations. The PI Motion requested a TRO prior to July 1, 2025, the date the State announced it intended to begin housing detainees at the facility. *Id.* Regrettably, the Court, which identified a conflict under 28 U.S.C. 455 (*see* D.E. 37), was unable to take up the TRO request, and the State and Federal Defendants commenced transporting immigration detainees to the TNT Site. State officials have publicly claimed that as many as 900 people are now being detained at the Site, and the State has plans to expand the number of detainees to as many as 4,000. *See* D.E. 34-1. Operations to support the detention center (which currently has capacity for 1,000 contractors on site) and its expansion are ongoing. This expansion inevitably will result in significant environmental impacts that have not been evaluated and assessed as a result of Defendants' failure to comply with the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA).

Plaintiffs have made the requisite showing for immediate injunctive relief based on the irreparable harms to their procedural rights, the environment, and their members' interests. *See* D.E. 5, 34 & 38. The need for immediate injunctive relief has become even more obvious and urgent since hundreds of detainees have been moved to the Site. Every day there are disturbing reports of inhumane and chaotic conditions at the Site.[1] There are allegations that detainees, the majority of whom reportedly do not have criminal convictions or pending criminal charges,[2] are

---

[1] *See*  https://www.nytimes.com/2025/07/16/us/the-chaotic-early-days-inside-floridas-alligator-alcatraz-detention-center.html;  https://www.washingtonpost.com/nation/2025/07/16/alligator-alcatraz-conditions/;   https://elpais.com/us/migracion/2025-07-10/sin-agua-para-banarse-y-solo-sandwiches-para-comer-afloran-las-primeras-denuncias-por-las-malas-condiciones-en-alligator-alcatraz.html.

[2]  https://www.wlrn.org/light/immigration/2025-07-16/the-chaotic-early-days-inside-floridas-alligator-alcatraz-detention-center.

being denied access to counsel and due process,[3] which has prompted another lawsuit. *See C.M. et al. v. Noem*, et al., Case No. 1:25-cv-23182, filed U.S. Dist. Ct. S.D. Fla. July 16, 2025 (attached as Ex. 1). As demonstrated by the Miccosukee Tribe of Indians of Florida (the "Tribe") in its Motion to Intervene (D.E. 33), Tribal members have been directly and adversely impacted by the operation of the Site. These impacts to human health and the public interests are factors to be evaluated under NEPA. *See* 42 U.S.C. § 4321 (NEPA is intended to "to promote efforts which will prevent or eliminate damage to the environment and biosphere *and stimulate the health and welfare of man*.") (emphasis added).

And, significantly, Plaintiffs have introduced evidence of the ongoing and material environmental harms posed by operations on the Site, *see* D.E. 38-6 (Impacts of the Big Cypress Detention Center on the Florida Panther and Its Habitat, by Randy Kautz); D.E. 38-8 (Opinion on Impacts of Construction and Operation of Migrant Detention Facility on the Endangered Florida Panther, by Rober A. Frakes, Ph.D); and D.E. 38-10 (Report: Strategic Searches for Florida Bonneted Bat Roosts in Big Cypress National Preserve).

Importantly, while the State has operated under an Executive Order claiming an emergency pertaining to immigration, Governor DeSantis recently announced that he was suspending plans to build a second immigration detention center at the Florida National Guard training site at Camp Blanding because of a lack of need.[4] In addition, according to published reports, the TNT Site is receiving detainees from *out of state*, suggesting that the detention center is not, in fact, serving a Florida emergency.[5]

---

[3]   https://www.miamiherald.com/news/local/immigration/article310625140.html ("" A Black Hole': Attorneys Say They Still Can't Reach Clients and Alligator Alcatraz")
[4]   *See* https://floridaphoenix.com/2025/07/16/is-desantis-slowing-down-plan-for-a-second-migrant-detention-center-at-camp-blanding/
[5]   *See*   https://www.elnuevodia.com/english/news/story/they-keep-transferring-people-

In their oppositions to the PI Motion, the State and Federal Defendants make no pretense of even attempting to comply with federal environmental laws in opening and operating the TNT Site. Instead, they argue—in the teeth of numerous contrary public statements—that the entire project is a State endeavor with no federal involvement. As demonstrated in Plaintiffs' Reply in support of the PI Motion (D.E. 24), and further explained in the amicus brief of the Florida Immigrant Coalition (D.E. 36-1), however, there is no legal authority for the State to detain individuals for federal immigration violations without federal authorization, direction and control. *See, e.g., Florida Immigrant Coal. v. Uthmeier*, ---F. Supp. 3d---, No. 25-21524-CV, 2025 WL 1423357, at *7-10 (S.D. Fla. Apr. 29, 2025). Moreover, contrary to the declarations submitted in opposition to Plaintiffs' Motion, State and Federal officials have repeatedly conceded in public statements that the detention center is a federal facility managed by ICE. *See, e.g.,* D.E. 25-1; D.E. 34-1. Indeed, just one day ago, White House Deputy Chief of Staff Stephen Miller declared on national television that the detention center at the TNT Site is an "ICE facility."[6]

Plaintiffs submit that the evidence will show the TNT Site is, at an irreducible minimum, a Federal and State partnership or joint venture sufficient to trigger NEPA obligations. *See Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974); *see also Goos v. I.C.C.*, 911 F.2d 1283, 1294 (8th Cir. 1990) (holding that whether an agency action or project is a major federal action for NEPA purposes turns on legal control: whether some federal action "is a legal condition precedent to accomplishment of an entire nonfederal project"); *Fund For Animals v. Clark*, 27 F.Supp.2d 8, 12–13 (D.D.C. 1998) (federal action found where federal defendants "had

immigrants-detained-in-puerto-rico-end-up-at-the-feared-alligator-alcatraz/
[6] https://x.com/Acyn/status/1945647869513678982.

a hand in developing the bison management plan" along with state agency, and state agency engaged "federal defendants to seek their help in developing a plan to manage the bison [such that] having become so intimately involved in the discussion and planning of the hunt, the federal defendants cannot now claim to have no responsibility under NEPA with respect to the hunt or the supplemental feeding programs"). This partnership includes that the construction of this mass detention center was allegedly specifically requested by the federal government, that it will be "fully funded" by the federal government, and that the facility is to be used to detain individuals in the custody of United States Immigration and Customs Enforcement (ICE).

Where NEPA has been violated, injunctive relief is proper. *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) (where Court halted construction of a dam that had been "virtually completed" based on a NEPA violation); *Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1357 (S.D. Fla. 2005) (wherein court granted the plaintiffs' request for injunctive relief and enjoined ongoing construction on wetlands in Palm Beach County); *Manatee Cty. v. Gorsuch*, 554 F. Supp. 778, 795 (M.D. Fla. 1982) (enjoining further dumping of dredged material, even when the defendants argued it would "cause serious contractual difficulties and would substantially increase the cost of the project").

### A TRO and Expedited Evidentiary Hearing Are Appropriate in This Case

"The purpose of a temporary restraining order, like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005). Given Defendants' ongoing expansion of the TNT Site – and their undisputed failure to comply with NEPA and the APA – a TRO is urgently needed in this case to preserve the status quo, to prevent further injury to Plaintiffs' established interests, and to allow this Court to reach a

decision on the merits of Plaintiffs' claims. Accordingly, for the reasons stated herein and in their original Expedited Motion (D.E. 5), Plaintiffs respectfully request that the Court:

1. Enter a Temporary Restraining Order with notice (as all Defendants have notice) pursuant to Federal Rule of Civil Procedure 65 to halt any further construction at the TNT Site, including filling, paving, lighting and installation of additional infrastructure, pausing the transport of additional detainees to the Site, and ceasing any operations related to detaining or preparing for the detention of anyone not detained at the Site as of the date of the Court's TRO order; and

2. Schedule an expedited evidentiary hearing pursuant to Rule 65(b)(3), with an expedited schedule to exchange exhibit[7] and witness lists and provide those exhibits to be used at the hearing.

Dated:   July 17, 2025.

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/  Tania Galloni_____
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No. 100309
    dburkhardt@earthjustice.org
    Alisa Coe, Fla. Bar No. 10187
    acoe@earthjustice.org

*Counsel for Friends of the Everglades*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/   Paul J. Schwiep_____
    Paul J. Schwiep, Fla. Bar No. 823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for Plaintiffs*

---

[7] Plaintiffs have served requests for records on State and Federal agencies under FOIA and the Florida Public Records Act, Fla. Stat. § 119.01 *et seq.*, but have yet to receive any documents.

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone: (727) 755-6950

*Counsel for Center for Biological Diversity*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 17, 2025, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this

day on all counsel of record on the Service List below via transmission of Notice of Electronic

Filing generated by CM/ECF.

s/ Paul J. Schwiep

| Service List | |
|---|---|
| **Nathan A. Forrester** <br>  Chief Deputy Solicitor General <br> nathan.forrester@myfloridalegal.com <br> **Robert S. Schenck** <br>  Assistant Solicitor General <br> robert.schenck@myfloridalegal.com <br> Office of the Attorney General <br> The Capitol, PL-01 <br> Tallahassee, Florida 32399-1050 <br> Telephone: (850) 414-3300 <br> jenna.hodges@myfloridalegal.com <br> <br> *Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* | BOIES SCHILLER FLEXNER LLP <br> **Jesse Panuccio, Esq.** <br> jpanuccio@bsfllp.com <br> **Evan Ezray, Esq.** <br> eezray@bsfllp.com <br> 401 East Las Olas Boulevard, Suite 1200 <br> Fort Lauderdale, Florida 33301 <br> Telephone: (954) 356-0011 <br> <br> *Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* |

<div style="display: flex;">
<div>

GERALDINE BONZON-KEENAN
Miami-Dade County Attorney
**Christopher J. Wahl**
    Assistant County Attorney
wahl@miamidade.gov
**David M. Murry**
    Assistant County Attorney
dmmurray@FlyMIA.com
Stephen P. Clark County
111 Northwest 1st Street, Suite 2810
Miami, Florida  33128
Telephone:  (305) 375-5151
kgriffin@FlyMIA.com
victor.rodriguez3@miamidade.gov

*Counsel for Miami-Dade County*

</div>
<div>

HAYDEN P. O'BYRNE
United States Attorney
**Carlos J. Raurell**
    Assistant U.S. Attorney
carlos.raurell@usdoj.gov
99 Northeast 4th Street
Miami, Florida  33132
Telephone:  (305) 961-9243
melissa.Jiminson@usdoj.gov

_____

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment and Natural Resources Division
    United States Department of Justice
**Peter M. Torstensen, Jr.**
    Deputy Assistant Attorney General
Environment and Natural Resources Division
    United States Department of Justice
**Hayley A. Carpenter**
    Trial Attorney
hayley.carpenter@usdoj.gov
Natural Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone:  (202) 305-0242

*Counsel for Kristi Noem, in her official capacity as Secretary, United States Department of Homeland Security, and Todd Lyons, in his official capacity as Acting Director, United States Immigration and Customs Enforcement*

</div>
</div>

App. 1244

# Doc. 47

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-22896-JEM**

---

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

        Defendants.

and

THE MICCOSUKEE TRIBE OF INDIANS,

        Proposed Intervenors.

---

**PLAINTIFFS' NOTICE OF FILING THE**
**DECLARATION OF JESSICA NAMATH**

Plaintiffs hereby provide notice of the filing of the Declaration of Jessica Namath, which

is attached as Exhibit 1. The declaration, and the video authenticated therein, relates to the

Federal and State Defendants' contention that the TNT Site is not operating in cooperation with

the ICE and DHS. Exhibit A to the declaration is a video clip taken by the declarant, which

App. 1246

Plaintiffs are simultaneously seeking leave to conventionally file. The actual video clip referred to as Exhibit A will be filed upon the entry of an order permitting conventional filing, along with a notice of conventional filing.

Dated:   July 18, 2025

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/  Tania Galloni_____
     Tania Galloni, Fla. Bar No. 619221
     tgalloni@earthjustice.org
     Dominique Burkhardt, Fla. Bar No. 100309
     dburkhardt@earthjustice.org
     Alisa Coe, Fla. Bar No. 10187
     acoe@earthjustice.org

*Counsel for Friends of the Everglades*


CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Center for Biological Diversity*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/  Paul J. Schwiep_____
     Paul J. Schwiep, Fla. Bar No. 823244
     PSchwiep@CoffeyBurlington.com
     Scott Hiaasen, Fla. Bar No. 103318
     SHiaasen@CoffeyBurlington.com
     YVB@CoffeyBurlington.com
     LPerez@CoffeyBurlington.com
     service@CoffeyBurlington.com

*Counsel for Plaintiffs*

App. 1247

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 18, 2025, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

s/   Paul J. Schwiep

| Service List | |
|---|---|
| **Nathan A. Forrester**<br>    Chief Deputy Solicitor General<br>nathan.forrester@myfloridalegal.com<br>**Robert S. Schenck**<br>    Assistant Solicitor General<br>robert.schenck@myfloridalegal.com<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida  32399-1050<br>Telephone:  (850) 414-3300<br>jenna.hodges@myfloridalegal.com<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* | BOIES SCHILLER FLEXNER LLP<br>**Jesse Panuccio, Esq.**<br>jpanuccio@bsfllp.com<br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 356-0011<br><br>*Counsel for Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management* |
| GERALDINE BONZON-KEENAN<br>Miami-Dade County Attorney<br>**Christopher J. Wahl**<br>    Assistant County Attorney<br>wahl@miamidade.gov<br>**David M. Murry**<br>    Assistant County Attorney<br>dmmurray@FlyMIA.com<br>Stephen P. Clark County<br>111 Northwest 1st Street, Suite 2810<br>Miami, Florida  33128<br>Telephone:  (305) 375-5151<br>kgriffin@FlyMIA.com<br>victor.rodriguez3@miamidade.gov<br><br>*Counsel for Miami-Dade County* | HAYDEN P. O'BYRNE<br>United States Attorney<br>**Carlos J. Raurell**<br>    Assistant U.S. Attorney<br>carlos.raurell@usdoj.gov<br>99 Northeast 4th Street<br>Miami, Florida  33132<br>Telephone:  (305) 961-9243<br>melissa.Jiminson@usdoj.gov<br><br>ADAM R.F. GUSTAFSON<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Peter M. Torstensen, Jr.** |

|  | Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>United States Department of Justice<br>**Hayley A. Carpenter**<br>Trial Attorney<br>hayley.carpenter@usdoj.gov<br>Natural Resources Section<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Telephone: (202) 305-0242<br><br>*Counsel for Kristi Noem, in her official capacity as Secretary, United States Department of Homeland Security, and Todd Lyons, in his official capacity as Acting Director, United States Immigration and Customs Enforcement* |
| **Todd R. Friedman, Esq.**<br>todd@toddfriedmanpa.com<br>TODD R. FRIEDMAN, P.A.<br>1101 Brickell Avenue<br>Suite S-700<br>Miami, Florida 33131<br>Telephone: (786) 536-7190<br><br>*Counsel for The Miccosukee Tribe of Indians* |  |

App. 1249

# Doc. 49

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

        Defendants.

and

THE MICCOSUKEE TRIBE OF INDIANS,

        Proposed Intervenors.

**PLAINTIFFS' NOTICE OF FILING JULY 21, 2025**
**DECLARATION OF CHRISTOPHER W. McVOY, Ph.D.**

Plaintiffs, through undersigned counsel, hereby give notice of filing the July 21, 2025

Declaration of Christopher W. McVoy, Ph.D., attached as Exhibit A.

Dated:  July 21, 2025

App. 1251

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida 33137
Telephone: (305) 440-5432

By:_____s/ Tania Galloni_____
Tania Galloni, Fla. Bar No. 619221
tgalloni@earthjustice.org
Dominique Burkhardt, Fla. Bar No. 100309
dburkhardt@earthjustice.org
Alisa Coe, Fla. Bar No. 10187
acoe@earthjustice.org

*Counsel for Friends of the Everglades*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No. 871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone: (727) 755-6950

*Counsel for Center for Biological Diversity*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, Florida 33133
Telephone: (305) 858-2900

By:_____s/ Paul J. Schwiep_____
Paul J. Schwiep, Fla. Bar No. 823244
PSchwiep@CoffeyBurlington.com
Scott Hiaasen, Fla. Bar No. 103318
SHiaasen@CoffeyBurlington.com
YVB@CoffeyBurlington.com
LPerez@CoffeyBurlington.com
service@CoffeyBurlington.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 21, 2025, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this

day on all counsel of record on the Service List below via transmission of Notice of Electronic

Filing generated by CM/ECF.

_____s/ Paul J. Schwiep_____

App. 1252

| Service List | |
|---|---|
| **Nathan A. Forrester**<br>    Chief Deputy Solicitor General<br>nathan.forrester@myfloridalegal.com<br>**Robert S. Schenck**<br>    Assistant Solicitor General<br>robert.schenck@myfloridalegal.com<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, Florida  32399-1050<br>Telephone:  (850) 414-3300<br>jenna.hodges@myfloridalegal.com<br>_____<br><br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>BOIES SCHILLER FLEXNER LLP<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 377-4237<br><br>*Counsel for Defendant Kevin Guthrie, in his*<br>*official capacity as Executive Director of the*<br>*Florida Division of Emergency Management* | BOIES SCHILLER FLEXNER LLP<br>**Jesse Panuccio, Esq.**<br>jpanuccio@bsfllp.com<br>**Evan Ezray, Esq.**<br>eezray@bsfllp.com<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida  33301<br>Telephone:  (954) 356-0011<br><br>*Counsel for Defendant Kevin Guthrie, in his*<br>*official capacity as Executive Director of the*<br>*Florida Division of Emergency Management* |
| GERALDINE BONZON-KEENAN<br>Miami-Dade County Attorney<br>**Christopher J. Wahl**<br>    Assistant County Attorney<br>wahl@miamidade.gov<br>**Monica Rizo Perez**<br>    Assistant County Attorney<br>Monica.Rizo@miamidade.com<br>Stephen P. Clark County<br>111 Northwest 1st Street, Suite 2810<br>Miami, Florida  33128<br>Telephone:  (305) 375-5151<br>Victor.Rodriguez3@miamidade.gov<br>Madalis.Gonzalez@miamidade.gov<br><br>*Counsel for Miami-Dade County* | HAYDEN P. O'BYRNE<br>United States Attorney<br>**Carlos J. Raurell**<br>    Assistant U.S. Attorney<br>carlos.raurell@usdoj.gov<br>99 Northeast 4th Street<br>Miami, Florida  33132<br>Telephone:  (305) 961-9243<br>melissa.Jiminson@usdoj.gov<br>_____<br><br>ADAM R.F. GUSTAFSON<br>Acting Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Peter M. Torstensen, Jr.**<br>    Deputy Assistant Attorney General<br>Environment and Natural Resources Division<br>    United States Department of Justice<br>**Hayley A. Carpenter**<br>    Trial Attorney |

App. 1253

|  | hayley.carpenter@usdoj.gov<br>Natural Resources Section<br>Ben Franklin Station<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Telephone:  (202) 305-0242<br><br>*Counsel for Kristi Noem, in her official capacity as Secretary, United States Department of Homeland Security, and Todd Lyons, in his official capacity as Acting Director, United States Immigration and Customs Enforcement* |
|---|---|
| **Todd R. Friedman, Esq.**<br>todd@toddfriedmanpa.com<br>Todd R. Friedman, P.A.<br>1101 Brickell Avenue<br>Suite S-700<br>Miami, Florida 33131<br>Telephone:  (786) 536-7190<br><br>*Counsel for The Miccosukee Tribe of Indians* |  |

# Doc. 50

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### No. 25-cv-22896-KMW

FRIENDS OF THE EVERGLADES, INC., et al.

      Plaintiffs,

v.

KRISTI NOEM, et al.,

      Defendants.

## DEFENDANT KEVIN GUTHRIE'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' REQUESTS FOR A TEMPORARY RESTRAINING ORDER

      Defendant Kevin Guthrie ("FDEM") files this supplemental response to Plaintiffs' request for a temporary restraining order or preliminary injunction, which Plaintiffs have repeatedly supplemented or amended since filing their initial motion. *See* Doc. 5 (motion filed on June 27, 2025); Doc. 25 (supplemental notice on July 7, 2025); Doc. 26 (supplemental notice on July 7, 2025); Doc. 27 (supplemental notice on July 8, 2025); Doc. 31 (expedited motion for ruling on July 11, 2025); Doc. 34 (supplemental notice on July 15, 2025); Doc. 38 (supplemental notice on July 16, 2025); Doc. 40 (amended motion on July 17, 2025); Doc. 49 (supplemental notice on July 21, 2025). In addition to the reasons already stated, Doc. 16, which FDEM incorporates here, Plaintiffs are not likely to succeed on the merits because, as Plaintiffs' recent filings confirm, venue is not proper in this Court.

      The federal venue statute provides that "[a] civil action may be brought in":

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).[1] Here, Plaintiffs cannot satisfy paragraph (1) because the Federal Defendants do not reside in the State. *E.g.*, *Trujillo v. Garland*, 2023 WL 2374445, at *6 (S.D. Fla. Mar. 6, 2023) (collecting cases); *Rogers v. Civil Air Patrol*, 129 F. Supp. 2d 1334, 1338 (M.D. Ala. 2001) (residence of federal officer was in Washington, D.C. or Virginia). Thus, for venue to be proper, Plaintiffs must show either that a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District or that "a substantial part of property that is the subject of the action is situated" here. 28 U.S.C. § 1391(b)(2); *see Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). (statute "emphasizes the importance of the place where the wrong has been committed"). Plaintiffs cannot demonstrate either.

Plaintiffs' claim is that defendants made the "decision to construct a mass migrant detention and deportation center … without conducting any environmental reviews as required under NEPA." Doc. 1 at ¶ 3. *See also id.* ¶ 73 (Count I, stating "[t]he failure to conduct the required environmental review under NEPA violates federal law"); *id.* ¶ 77 (Count II, stating that "USDHS and ICE have approved or are implementing the use of the TNT Site without providing Plaintiffs and the public with an opportunity for notice and comment, and without adhering to required environmental review procedures under NEPA and other federal laws"); *id.* ¶ 82 (Count III, alleging that FDEM "convert[ed] county-owned property into a federal detention center without

---

[1] A separate provision, section 1391(e), governs venue over federal officials. But it is of no moment here. "[I]f suit is sought to be maintained not only against a federal defendant embraced within Section 1391(e) but also against an [a]dditional person[], there must be proper venue as specified in the pertinent statutes as to each." *Little v. King*, 768 F. Supp. 2d 56, 65 n.7 (D.D.C. 2011) (alterations in original) (quotation omitted). That is, Plaintiffs must independently satisfy venue for FDEM. *E.g.*, *Scott v. Chastain*, 2010 WL 2673283, at *7 n.5 (D. Minn. 2010).

legislative authority, environmental review, or compliance with local land use requirements"); *id.* ¶ 93 (Count IV, alleging that Miami-Dade County agreed or acquiesced "in allowing the TNT Site for use as a mass detention center").[2]   But the address of the TNT Site is in Ochopee, an unincorporated community in Collier County, which is in the Middle District of Florida, not the Southern District.  *See* Dade-Collier Training and Transition Airport (TNT), https://www.miami-airport.com/dade_collier.asp.  And *all* the detention facilities, *all* the buildings, and *all* the paving at issue are sited in Collier County, not Miami-Dade.  *See* Ex. 1 (Gadea-Guidicelli Decl.) ¶ 2.[3] Indeed, Plaintiffs concede this point in their own declarations, which state that all the facilities, pavement, and activity at the site are in Collier County.  *See* Decl. of R. Arwood at Photos 31 & 35 (Doc. 26-1 at 11, 16).

Nor do Plaintiffs allege any Miami-Dade-based decisionmaking related to their claims.  *See Awad v. Mayorkas*, 2022 WL 1215521, at *2 (M.D. Fla. Apr. 7, 2022) ("For purposes of determining where a claim arose in a case brought under the APA, courts generally focus on where the decisionmaking process occurred." (quotation omitted)).  On the contrary, Plaintiffs' theory

---

[2] Count IV does not justify venue in this District for three reasons.  *First*, Plaintiffs appear to have abandoned it.  They now say they are not seeking an injunction against Miami-Dade County.  Doc. 31 at 3 n.2.  *Second*, even if Count IV might properly allow claims against Miami-Dade to be filed here, it would not permit claims against the other Defendants in this District. "[V]enue must be proper for each party.  The fact that a claim for some of the plaintiffs or against some of the defendants arose in a particular district does not make that district a proper venue for parties as to whom the claim arose somewhere else."  Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3807 (4th ed.); *see also Burger King Corp. v. Thomas*, 755 F. Supp. 1026, 1029 (S.D. Fla. 1991) ("When multiple claims are pled, venue must be proper for each claim.").  *Third*, even as to Miami-Dade itself, the claim did not substantially occur in the County.  As the County explains, it did not make any decision related to the detention center because, under State law, Miami-Dade had no authority to reject the State's emergency declaration or submit it to county law.  Doc. 12 at 6-9.  Thus, all the decisions at issue in Count IV were made by State officials in either Tallahassee or Collier County.

[3] Within the site, only a tiny sliver of unpaved runway is situated in Miami-Dade County. No portion of the detention facility lies on that sliver of extended runway.  Gadea-Guidicelli Decl. ¶ 3.

App. 1258

hinges on proving a Federal-State partnership.  *E.g.*, Doc. 24 at 1-2.  When a cause of action challenges government policy, venue is proper where the policy was made, not where the effects of the policy were felt.  *E.g.*, *Stanton-Negley Drug Co. v. Pa. Dep't of Pub. Welfare*, 2008 WL 1881894, at *5 (W.D. Pa. Apr. 24, 2008) ("While Plaintiffs may feel the impact of those polices in the Western District of Pennsylvania, their due process and equal protection claims are directed at the policies and policymakers.  Here, the polices are implemented and the policymakers reside in the Middle District of Pennsylvania.").  Here, all relevant decisionmaking was made or is being made by officials in Washington, DC; in Tallahassee, Florida; or onsite at the facility in Collier County, Florida.  *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 128-29 (D.D.C. 2018) (venue to challenge immigration policy proper in District of Columbia where immigration policy was made); *Harvard v. Inch*, 408 F. Supp. 3d 1255, 1262-63 (N.D. Fla. 2019) (venue to challenge statewide policy was in Tallahassee because State policy was set there).[4]  No relevant decisionmaking is occurring in Miami-Dade County. *See Pres. Soc'y of Charleston v. U.S. Army Corps Corps of Eng'rs*, 893 F. Supp. 2d 49, 55 (D.D.C. 2012) (transferring NEPA case to the forum "wherein the project itself, the decisionmakers, and the affected community are all located, thus giving [that District Court] a strong interest in the outcome"); Gadea-Guidicelli Decl. ¶ 5.

Plaintiffs' only factual allegation to support venue in the Southern District is that "the TNT Site is owned by defendant Miami-Dade County."  Doc. 1 ¶ 7.  But Miami-Dade's ownership has nothing to do with the claims.  *See* Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3806 (4th ed.) (explaining that venue must be analyzed with respect to the specific claim at issue).  As Plaintiffs themselves explain, FDEM "took control of the Site."  Doc. 1 ¶ 38.  The County, in other words,

---

[4] As FDEM previously explained, the relevant decisions are being made by the State in Tallahassee or onsite in Collier County.  Doc. 16.  FDEM incorporates those arguments here.

no longer controls what happens there. And thus nothing done or currently occurring in Miami-Dade bears a substantial nexus to the claims. The County's activities, said otherwise, "do not have a close nexus with the cause of action … and they are therefore irrelevant." *Jenkins Brick Co.*, 321 F.3d at 1373. Indeed, Plaintiffs have abandoned a Miami-Dade nexus to their claims: although they originally sued Miami-Dade County, Doc. 1, they have recently made clear that they are not seeking an injunction against the County, Doc. 31 at 3 n.2.

This case, in short, is about State policy decisions made in Tallahassee affecting property located in Collier County. Because Plaintiffs have not shown a likelihood of success in proving venue, they are unlikely to succeed on the merits, which justifies denying a TRO or preliminary injunction. *See Crenshaw v. Antokol*, 238 F. Supp. 2d 107, 113-14 (D.D.C. 2002). If the Court concludes that venue is improper in this District, the proper procedure would be to transfer the case to the Middle District or to dismiss. *See* 28 U.S.C. § 1406.[5]

Dated: July 21, 2025

Respectfully submitted,

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa (FBN 110951)
  *Acting Solicitor General*
Nathan A. Forrester (FBN 1045107)
  *Chief Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
  *Assistant Solicitor General*
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

s/ *Jesse Panuccio*
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
jpannucio@bsfllp.com

*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

---

[5] Defendant FDEM intends to further raise its venue challenge in its forthcoming motion to dismiss. *See* Doc. 44.

App. 1260

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2025, the foregoing was filed with the Clerk of Court using

CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

<u>s/ *Jesse Panuccio*          </u>
Jesse Panuccio

# Doc. 54

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 25-22896-CV-WILLIAMS**

FRIENDS OF THE EVERGLADES, INC., *et al.*,

      Plaintiffs,

v.

KRISTI NOEM, *et al.*,

      Defendants.

_____/

### <u>OMNIBUS ORDER</u>

**THIS MATTER** is before the Court following the July 21, 2025 Status Conference in this matter. (DE 52). For the reasons set forth at the Hearing, it is **ORDERED AND ADJUDGED** as follows:

1. Florida Immigrant Coalition's Motion for Leave to File Amicus Brief in Support of Plaintiffs (DE 36) is **DENIED WITHOUT PREJUDICE.**

2. A Hearing on the venue issues raised in Defendant Guthrie's Supplemental Response to Plaintiffs' Requests for a Temporary Restraining Order ("***TRO***") (DE 50) ("***Supplemental Response on Venue***") is **SET** for <u>**July 30, 2025 at 10:00 a.m.**</u> before the Honorable Kathleen M. Williams in Room 11-3 of the Wilkie D. Ferguson, Jr. United States Courthouse, located at 400 North Miami Avenue in Miami, Florida.

3. Plaintiffs shall file any consolidated response to Defendant Guthrie's Supplemental Response on Venue on or before <u>**July 25, 2025 at 5:00 p.m.**</u> Defendant Guthrie may file any reply on or before <u>**July 29, 2025 at 3:00 p.m.**</u>

4. Defendants Noem and Lyons ("***Federal Defendants***") may file any

consolidated response to Defendant Guthrie's Supplemental Response on Venue on or before **July 25, 2025 at 5:00 p.m.** Plaintiffs may file any reply on or before **July 29, 2025 at 3:00 p.m.**

5. Defendants shall file a consolidated response to Interested Party Miccosukee Tribe of Indians of Florida's ("***Tribe***") Motion to Intervene on or before **July 25, 2025 at 5:00 p.m.** Any reply by the Tribe shall be filed on or before **July 29, 2025 at 3:00 p.m.**

6. A Hearing on Plaintiffs' Expedited Motion for TRO and Preliminary Injunction (DE 5) and Plaintiffs' Renewed Motion for TRO (DE 40) is **SET** for **August 6, 2025 at 9:00 a.m.** before the Honorable Kathleen M. Williams in Room 11-3 of the Wilkie D. Ferguson, Jr. United States Courthouse, located at 400 North Miami Avenue in Miami, Florida.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>21st</u> day of July, 2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

App. 1264

# Doc. 58

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### No. 25-cv-22896-KMW

FRIENDS OF THE EVERGLADES, INC., et al.

       Plaintiffs,

v.

KRISTI NOEM, et al.,

       Defendants.

---

## DEFENDANT FDEM'S OPPOSITION TO
## THE MICCOSUKEE TRIBE'S MOTION TO INTERVENE

Defendant Guthrie ("FDEM") opposes the Motion to Intervene filed by the Miccosukee

Tribe of Indians (the "Tribe"), Doc. 33, and in support states:

### INTRODUCTION

The Tribe's bid to intervene as of right fails in one of two ways.  If, on the one hand, the

Tribe is adopting Plaintiffs' claims in toto (as the Tribe says it is, Doc. 33 at 18), then the Tribe

fails to show it is inadequately represented.  If, on the other hand, the Tribe seeks to assert different

claims or relief than that sought by Plaintiffs (as the Tribe—to avoid failing the inadequacy

prong—says it might, Doc. 33 at 15), then the Tribe must show it independently has standing.  *See*

*Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439–40 (2017).  This, the Tribe has not done.

Whichever path the Tribe chooses, the destination is the same: no intervention of right.

As for permissive intervention, the Tribe's entry into the case would be entirely duplicative

and tax party and judicial resources and delay adjudication of the issues.  Such intervention would

be especially problematic now, as the parties are fully engaged in preparing for an evidentiary

hearing less than two weeks away.  The Tribe's injection into the case would risk prolonging the single-day hearing set by the Court and delaying adjudication of the preliminary injunction.[1]

## I.    THE TRIBE HAS NO RIGHT TO INTERVENTION OF RIGHT

A party may intervene of right only if its interest is inadequately represented by existing parties to the lawsuit.  *See Kennedy v. DeSantis*, No. 22-cv-21827-Williams/Sanchez, 2023 WL 11804228, at *3 (S.D. Fla. Mar. 29, 2023).  A party that seeks to assert the exact same claims, and seeks the exact same relief, as an existing party is *not* inadequately represented.  *See Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 910–11 (11th Cir. 2007) (denying intervention when proposed intervenor did not propose additional claim or defense and sought same objective as party); *Meadowfield Apartments, Ltd. v. United States*, 261 F. App'x 195, 196 (11th Cir. 2008) (denying intervention when proposed intervenor sought same relief and made substantially same arguments).  And if the party is inadequately represented—that is, if the party seeks "additional relief beyond that which the plaintiff requests"—then an "intervenor of right must demonstrate Article III standing." *Town of Chester*, 581 U.S. at 440 ("In sum, an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing.").  The Tribe cannot simultaneously pass both of these tests.

### A.    To the Extent the Tribe Seeks to Mimic Plaintiffs' Allegations and Claims, It Is Adequately Represented

A putative intervenor must include with its motion "a pleading that sets out the claim … for which intervention is sought."  Fed. R. Civ. P. 24(c).  The Tribe asserts that it should be excused from this "technical requirement" because its "purpose … is to place the other parties on notice of

---

[1] Of course, to even consider intervention, the Court must first conclude that venue in this District is proper.  As FDEM has explained, venue is not proper in the Southern District of Florida and the case should be transferred to the Middle District.  *See* Doc. 50 at 2-5.  The Middle District can then take up the intervention motion.

the position, claim, and relief sought by the intervenor"—and the Tribe, it says, seeks "to assert …
two claims … found in counts I-II of [Plaintiffs'] operative complaint." Doc. 33 at 18. Moreover,
if the Plaintiffs amend their complaint, "the Tribe intends to join the amended complaint." *Id.*
Thus, the Tribe reasons, it "has provided Defendants with sufficient notice of its position, its
claims, and the relief it seeks." *Id.* Put differently, the Tribe asserts that it has provided sufficient
notice because it will *exactly copy* Plaintiffs' allegations, claims, and requested relief.

But if that is so, then the Tribe cannot claim to be inadequately represented, and its bid for
intervention of right fails. If the Tribe seeks simply to mimic Plaintiffs in every particular, then
Plaintiffs—who are already vigorously litigating this case—adequately represent the Tribe's
interests. *See Sierra Club*, 488 F.3d at 910–11 (denying intervention when proposed intervenor
did not propose additional claim or defense and sought same objective as party); *Athens Lumber
Co., Inc. v. Fed. Election Comm'n*, 690 F.2d 1364, 1366 (11th Cir. 1982) (denying intervention
when plaintiff and proposed intervenor both sought to uphold constitutionality of statute);
*Meadowfield Apartments*, 261 F. App'x at 196 (denying intervention because "Intervenors seek
exactly the same relief as does the United States"); *Blake v. Batmasian*, 2016 WL 7447253, at *9
(S.D. Fla. Sept. 15, 2016) ("There is a presumption of adequate representation where an existing
party seeks the same objectives as the interveners.").

In an attempt to avoid this obvious conclusion, the Tribe claims that it has property rights
that go beyond Plaintiffs' interests. Doc. 33 at 15. Yet the Tribe does not purport to have rights to
the airport property itself, and it does not intend to bring any claim invoking its property rights, so
the "factual differences" in how Plaintiffs and the Tribe are situated are "not germane" to the
relevant legal issues concerning NEPA and the APA. *Blake*, 2016 WL 7447253, at *9.

App. 1268

The Tribe next posits that it "may not share the ultimate goals and objectives as the Plaintiffs" and that Plaintiffs may be willing to settle when the Tribe is not, but it points to precisely zero facts supporting that rank speculation. Doc. 33 at 15. Contrary to this unsupported speculation, the record shows that Plaintiffs are at least as determined as the Tribe to obstruct the construction and operation of the detention facility. Elise Bennett, an attorney for the Center for Biological Diversity, has called the facility a "reckless attack on the Everglades" and "particularly despicable."[2] Tania Galloni, an attorney for Friends of the Everglades, Inc., claimed, "[w]e will use every legal tool to protect America's Everglades."[3] Indeed, while the Tribe sat on the sidelines, Plaintiffs filed suit and have gone to great lengths to press the Court for expedited relief. *See* Doc. 50 at 1 (listing Plaintiffs' many filings). The Tribe has presented no factual allegations or evidence indicating that either Plaintiff will accept a settlement that does not provide the Tribe with all the relief it seeks. Its contrary speculation is plainly insufficient to meet the Tribe's burden. *See Sierra Club*, 488 F.3d at 911 (rejecting unsupported hypothesis that party was "more likely to settle"); *A.R. v. Dudek*, 2014 WL 12519764, at *3 (S.D. Fla. Apr. 7, 2014) (finding "speculation that a claim may be settled, however 'fails to demonstrate that intervention … is warranted.'" (quoting *Williams Island Synagogue, Inc. v. City of Aventura*, 222 F.R.D. 554, 556–57 (S.D. Fla. 2004))); *League of United Latin Am. Citizens, Council # 4434 v. Clements*, 884 F.2d 185, 189 (5th Cir. 1989) (proposed intervenor "must 'produce something more than speculation as to the purported inadequacy.'" (quoting *Moosehead Sanitary Dist. v. S.G. Phillips Corp.*, 610 F.2d 49, 54 (1st Cir.

---

[2] *Groups sue to protect Everglades from reckless detention center*, Friends of the Everglades (June 27, 2025), https://www.everglades.org/wp-content/uploads/2025/06/FOE-Alligator-Alcatraz-Press-Release.pdf.

[3] *Legal Warning: Everglades ICE Facility Causing More Damaging Environmental Violations*, Ctr. for Biological Diversity (July 11, 2025), https://biologicaldiversity.org /w/news/press-releases/legal-warning-everglades-ice-facility-causing-more-damaging-environmental-violations-2025-07-11/.

App. 1269

1979))).  And to the extent the Tribe seeks to rely on some as-yet unidentified "dispute over litigation strategy or tactics," that does not justify intervention as of right.  *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 954 (9th Cir. 2009).

**B.    To the Extent the Tribe Seeks to Assert Unspecified, Different Claims or Relief than Plaintiffs, It Has Failed to Show Entitlement to Intervention of Right**

Perhaps sensing that its bid for intervention of right is doomed because of its failure to meet the inadequacy-of-representation prong, the Tribe hedges.  Even though the Tribe claims it is adopting Plaintiffs' complaint—and will adopt any amended complaint (even without seeing it)—the Tribe also claims that it "may not share the ultimate goals and objectives as the Plaintiffs," and it "does not intend to waive its rights or limit itself to joining counts I-II in the forthcoming amended complaint."  Doc. 33 at 15, 18.  What, exactly, this means is anyone's guess.  But one thing is certain: these vague disclaimers are insufficient to "'place the other parties on notice of the position, claim, and relief sought by the intervenor,'" and thus the Tribe cannot claim an exception to Rule 24(c)'s requirement that it file a complaint in intervention that identifies its different claims or requests for relief.  Doc. 33 at 18 (quoting *Danner Const. Co., Inc. v. Hillsborough Cnty.*, 2009 WL 2525486, at *2 (M.D. Fla. Aug. 17, 2009)).  Having failed to meet that requirement, the Tribe cannot base its intervention on different claims or different relief.

Moreover, where an intervenor of right seeks to pursue claims or relief "that is different from that which is sought by a party with standing," that intervenor must demonstrate standing "for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester*, 581 U.S. at 439–40.  But having failed to even specify any different claim or form of relief it will seek, the Tribe cannot possibly demonstrate standing for such a claim or form of relief.  *See Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994) (courts must "require every plaintiff to file a complaint which contains sufficient allegations of standing"); *Tsao v. Captiva MVP Rest.*

App. 1270

*Partners, LLC*, 986 F.3d 1332, 1337 (11th Cir. 2021) (a plaintiff has the burden of "alleging facts

that 'plausibly' demonstrate each element" of standing).[4]

### C.        The Tribe's Interests Are Not Protected By NEPA

A putative intervenor must "claim[] an interest relating to the property or transaction that

is the subject of the action." Fed. R. Civ. P. 24(a)(2).  Courts have interpreted Rule 24(a)'s language

to require a "legally protectable interest." *E.g.*, *ManaSota-88, Inc. v. Tidwell*, 896 F.2d 1318, 1322

(11th Cir. 1990).  To show a sufficient interest, a prospective plaintiff-intervenor must show

statutory standing, which includes satisfying the zone-of-interests test.  *In re Vitamins Antitrust*

*Class Actions*, 215 F.3d 26, 28–29 (D.C. Cir. 2000); *see also United States v. Hampton Corp.*, 502

F. Supp. 3d 1376, 1379–80 (D.N.D. 2020) ("A party seeking to intervene under Rule 24(a)(1) must

establish, in addition to the requirements of that Rule, both Article III standing and statutory

standing.").  The zone-of-interests test requires a court to "discern the interests arguably to be

protected by the statutory provision" and then to "inquire whether the plaintiff's interests affected

by the agency action in question are among them." *Hollywood Mobile Ests. Ltd. v. Seminole Tribe*

*of Fla.*, 641 F.3d 1259, 1269 (11th Cir. 2011) (alteration omitted) (citation and internal quotation

marks omitted).

The interests that NEPA protects are environmental interests.  *See Town of Stratford v. Fed.*

*Aviation Admin.*, 285 F.3d 84, 88 (D.C. Cir. 2002) (NEPA "cannot be used as a handy stick by a

party with no interest in protecting against an environmental injury to attack a defendant.").  But

the Tribe cannot show an environmental interest because its environmental allegations are too

vague to plausibly show a concrete risk of harm.  The Tribe states that its members are "worr[ied]"

---

[4] The Tribe has not demonstrated standing even for the claims and forms of relief it seeks
to copy from Plaintiffs.  Nor have Plaintiffs, as FDEM will explain in its forthcoming motion to
dismiss.

or "concerned" about "interruption to endangered Florida panther and Florida bonneted bat habitat"; "potential" water pollution from the facility; and "unknown" environmental impacts. Doc. 33 at 8–10. But circumspect "worr[ies]" of "potential" and "unknown" "possibil[ities]" that "may" one day occur are not concrete claims of injury. *See Bycko v. State Farm Mut. Auto. Ins. Co.*, 2023 WL 7411752, at *7 (D.N.J. Nov. 9, 2023).

The Tribe also states that the facility's operation will impair its members' "rights" and "freedom" to use the Big Cypress National Preserve for hunting, fishing, trapping, and other traditional and ceremonial purposes. Doc. 33 at 8–9. That alleged harm is similarly too speculative. *See La Cuna De Aztlan Sacred Sites Protec. Circle Advisory Comm. v. U.S. Dep't of Interior*, 2012 WL 2884992, at *8 (C.D. Cal. July 13, 2012) (finding denial of access claim "unduly speculative" because plaintiffs had not shown they were barred from site or threatened with arrest).

And beyond these speculative and vague claims of environmental interests, the Tribe points only to alleged interests that are not environmental at all. The Tribe claims that it fears "the possibility of a facility escape posing a security risk for their community." Doc. 33 at 8. NEPA has nothing to do with promoting the security of a community. In any event, the whole point of the detention facility is to *promote* the security of all Floridians and Americans by helping to facilitate and streamline the detention of the huge influx of criminal aliens who illegally entered the country in the last several years. Closing the facility (as the Tribe desires) would thus impair its claimed security interest, not enhance it. If security is the Tribe's concern, it should be seeking to participate in support of Defendants, not Plaintiffs.

The Tribe finally alleges the inconvenience of increased traffic. Doc. 33 at 8–10. But again, traffic is not an environmental harm to be mitigated by NEPA. *See Canyon Park Bus. Ctr. Owners' Ass'n v. Buttigieg*, 2022 WL 2317059, at *4 (W.D. Wash. June 28, 2022) ("As Canyon

Park fails to allege any specific environmental impacts that the increased traffic and congestion could cause, it has not alleged an injury within NEPA's zone of interests."); *Our Money Our Transit v. Fed. Transit Admin.*, 2014 WL 3543535, at *8 (W.D. Wash. July 16, 2014) ("Moreover, although Plaintiffs argue that the EA fails to fully account for impacts to traffic, Plaintiffs do not set forth any possible *environmental* impacts that were potentially overlooked or that would render the EA inadequate for NEPA purposes."). Any harm or annoyance the Tribe may experience from increased traffic congestion is, at most, economic and psychological. *See Borough of Carlstadt v. U.S. Army Corps of Eng'rs*, 2006 WL 305314, at *7 (D.N.J. Feb. 8, 2006) (finding plaintiff's interest was economic and plaintiff lacked prudential standing despite emphasis on traffic). So even if the Tribe has Article III standing to assert a traffic-based harm, that harm is not a legally protectable interest under NEPA.

*     *     *

For all these reasons, the Tribe has failed to demonstrate it meets the strict requirements for intervention as of right. Its application under Rule 24(a) must therefore be denied.

## II.   THE COURT SHOULD DENY PERMISSIVE INTERVENTION BECAUSE INTERVENTION WOULD ADD UNNECESSARY DELAY AND BURDEN

The Tribe also seeks permissive intervention. Doc. 33 at 16–17. A court "may permit anyone to intervene" who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). But the district court has full discretion to deny permissive intervention. *E.g.*, *West Virginia v. U.S. Dep't of Treas.*, 571 F. Supp. 3d 1229, 1248 (N.D. Ala. 2021), *aff'd on other grounds*, 59 F.4th 1124 (11th Cir. 2023); *United States v. S. Fla. Water Mgt. Dist.*, 922 F.2d 704, 712 (11th Cir. 1991); *see also* 7C Fed. Prac. & Proc. Civ. § 1913 (3d ed.) ("[E]ven though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied, the court may refuse to allow intervention."). In exercising that

discretion, courts must consider the possibility of undue delay and prejudice in deciding whether to grant permissive intervention. Fed. R. Civ. P. 24(b)(3). Adding parties "inevitably delays proceedings," *Athens Lumber*, 690 F.2d at 1367, because, for example, they add "more discovery requests," *South Carolina v. North Carolina*, 558 U.S. 256, 287–88 (2010) (Roberts, J., concurring in the judgment in part and dissenting in part). Here, the Court should deny permissive intervention because the Tribe would inject into the case additional briefing and discovery that would seriously burden the existing parties and the Court. The Tribe will have its own ideas and desired discovery requests. It may need to present witnesses of its own. It will file additional briefs and require additional courtroom time at hearings and oral arguments. All this will hinder the parties, prolong discovery, lengthen briefing timelines, and consume precious court resources.

The additional delay and burden of intervention strongly favor denial because the putative intervenor is already represented adequately by Plaintiffs. The Tribe asserts duplicative claims, so it is "unlikely that any new light will be shed on the issues to be adjudicated." *Chiles v. Thornburgh*, 865 F.2d 1197, 1215 (11th Cir. 1989). Because the Tribe "will add nothing of substance to the resolution"—it is, after all, seeking to raise identical claims to Plaintiffs— permissive intervention should be denied "in the interest of avoiding undue delay." *Fla. Clean Water Network Inc. v. EPA*, 2009 WL 10674045, at *2 (N.D. Fla. Sept. 29, 2009); *see also League of United Latin Am. Citizens*, 884 F.2d at 189 (courts should consider adequate representation in deciding requests for permissive intervention); *Gumm v. Jacobs*, 2020 WL 1322575, at *6 (M.D. Ga. Mar. 20, 2020) (indicating that permissive intervention is not granted when the proposed intervenor "add[s] nothing to the case, meaning she is likely adequately represented and her presence will just slow things down" (citation omitted)).

App. 1274

All of this is especially true given the posture of the case.  The parties are litigating at a breakneck pace toward an evidentiary hearing in less than two weeks.  Increasing the number of Plaintiffs now will interject complication and delay with no added benefit.  *Cf. Serv. Emps. Int'l Union Loc. 1 v. Husted*, 515 F. App'x 539, 542–43 (6th Cir. 2013) (affirming denial of permissive intervention in part because of "significant risk of upsetting the expedited schedule necessitated by the upcoming election"); *United States v. Borge*, 249 F.R.D. 387, 389 (S.D. Fla. 2008) (finding prejudice when discovery cut-off and trial were "fast approaching").  Consider, on that score, just the management of the hearing itself.  If the Tribe is a party, it will presumably want witnesses and the opportunity to examine adverse witnesses.  Expanding the number of parties will thus expand the scope of the hearing, potentially risking the single-day schedule the Court has permitted.  And that does not even consider the additional burden on the parties of preparing to confront new exhibits and witnesses that have yet to be aired.  The Tribe's intervention now, in short, risks confusion, delay, and prejudice.  Permissive intervention should be denied.

## CONCLUSION

The Court should deny the Tribe's Motion to Intervene.

Dated: July 25, 2025

Respectfully submitted,

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa (FBN 110951)
  *Acting Solicitor General*
Nathan A. Forrester (FBN 1045107)
  *Chief Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
  *Assistant Solicitor General*
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

s/ *Jesse Panuccio*
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
jpannucio@bsfllp.com


*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

App. 1275

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 25, 2025, the foregoing was filed with the Clerk of Court using

CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

<u>s/ *Jesse Panuccio*</u>
Jesse Panuccio

# Doc. 65

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., et al.,

     Plaintiffs,

v.

KRISTI NOEM, et al.,

     Defendants.

**DEFENDANT FDEM'S SUPPLEMENTAL REPLY IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

## INTRODUCTION

Judge Altman has twice held that the Southern District is not "the proper venue" for challenges related to the detention facility because it is in "Ochopee, [Florida], Ochopee is in Collier County, and Collier County is in the Middle District of Florida." *Garcia v. Guthrie*, No. 25-cv-23136 (S.D. Fla.), Doc. 5 at 1 (citing *Castillo v. U.S. Immigr. & Customs Enf't*, No. 25-cv-23022 (S.D. Fla.), Doc. 7 at 1). Plaintiffs point to no other facts making venue proper here: all the detention, construction, and decisionmaking they challenge occurred elsewhere. A decision holding otherwise would be contrary to the venue statute and threaten an unworkable intra-district split that the Eleventh Circuit would need to quickly resolve. This Court does not have venue and should transfer the case to the Middle District of Florida, just as Judge Altman has twice done.

## ARGUMENT

### I. FDEM DID NOT WAIVE ITS VENUE DEFENSE

FDEM has not waived its challenge to venue, which was filed as part of FDEM's first defensive move and before the Court held even its first status conference in this matter.

*First*, Plaintiffs misstate the facts. This Court accepted FDEM's supplemental brief (and all of Plaintiffs' supplemental filings) at the status conference. *See* Transcript of Status Conference (Ex. 1) at 7 ("So everyone's supplement is going to be recognized[.]"). FDEM's venue argument is now part of its first filing, such that there can be no possible waiver (even if a TRO response could constitute a waiver, which it cannot). *Cf. Wiggins v. Jedson Engr., Inc.*, 2020 WL 6993840, at *1 (E.D. Tenn. Apr. 29, 2020) (collecting cases holding that a court can allow "amendment of a Rule 12(b) motion to include a previously omitted defense"); *Jenny Yoo Collection, Inc. v. Watters Design Inc.*, 2017 WL 4997838, at *6 (S.D.N.Y. Oct. 20, 2017); *Vanslambrouck v. Fairfield Indus. Inc.*, 2011 WL 2435947, at *2 (M.D. Fla. June 15, 2011); *Polaroid Corp. v. Feely*, 889 F. Supp. 21, 24 (D. Mass. 1995). An amendment becomes part of the original filing, purging any possible waiver. *See Seal v. Riverside Fed. Sav. Bank*, 825 F. Supp. 686, 692 n.10 (E.D. Pa. 1993).[1]

*Second*, even if the supplemental filing was not incorporated into the original TRO opposition, the filing of such an opposition did not waive a venue defense under the Federal Rules of Civil Procedure. Waiver occurs only if venue is omitted from either a "responsive pleading" or

---

[1] Even if the Court had not already accepted the supplement to the TRO opposition, it would be free to do so now. As with a responsive pleading, leave to amend "should freely give leave when justice so requires." Fed. R. Civ. P. 15. That is especially true because Plaintiffs do not argue prejudice and the Court has permitted further briefing and will hold a hearing on venue.

1

App. 1279

a Rule 12 motion. Fed. R. Civ. P. 12(h)(1)(B)(ii); *Lane v. XYZ Venture Partners, LLC*, 322 F. App'x 675, 678 (11th Cir. 2009). An opposition to a motion for an emergency TRO asking the Court to enter immediate relief is neither a Rule 12 motion nor a responsive pleading. Fed. R. Civ. P. 7(a); *see Lane*, 322 F. App'x at 678; *Odouk v. St. Leo Univ.*, 2010 WL 11507608, at *3 (N.D. Ga. Mar. 10, 2010). Simply put, nothing in the text of the Rules mandates or permits waiver of a venue objection when a defendant merely opposes a motion for an immediate TRO.

*Third*, principles of equity counsel against waiver. Courts have repeatedly refused to find waiver based on TRO proceedings. *See Lithia Ramsey-T, LLC v. City Line Auto Sales, LLC*, 2023 WL 1883355, at *5 (D.N.J. Feb. 9, 2023) (rejecting waiver argument when defendants filed response to show cause order and appeared at preliminary-injunction hearing); *Pickett v. City of Houston*, 2009 WL 1158842, at *2 (S.D. Tex. Apr. 29, 2009) ("The City's mere attendance at the TRO hearing does not constitute waiver."); *Johnson v. Masselli*, 2008 WL 111057, at *3 (N.D. Ind. 2008) (rejecting waiver argument when venue was raised after TRO order, hearings, and discovery); *Friedberg v. Mut. Holdings, Ltd.*, 2005 WL 1213282, at *3 (E.D. Pa. May 19, 2005) (rejecting waiver argument when motion to dismiss was filed after six months and after grant of TRO); *see also Bartlett v. Bartlett*, 2017 WL 106043, at *2 (N.D. Ill. Jan. 11, 2017) (finding motion to disqualify did not waive venue defense). TROs are, by nature, fast-moving motions, and parties often must respond without adequate time to investigate the facts and law. Faced with the possibility of imminent court action at Plaintiffs' behest, a defendant should reasonably be allowed to respond (and supplement its response) "without losing its right to object" to venue. *See Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010) (finding personal-jurisdiction defense was not waived by motion for expedited discovery and to continue preliminary-injunction hearing).

That approach tracks Eleventh Circuit law. In the analogous arbitration context, the Eleventh Circuit has explained that the "waiver doctrine is typically implicated when parties have 'invoked the litigation machinery' before reversing course and claiming that arbitration was the proper avenue all along." *Payne v. Savannah Coll. of Art & Design, Inc.*, 81 F.4th 1187, 1201 (11th Cir. 2023).[2] Here, FDEM did not invoke litigation in this District. *See id.* (requiring "extensive use of the litigation process" to find waiver). On the contrary, FDEM's limited action

---

[2] Relatedly, opposing a TRO does not waive arbitration. *E.g.*, *Hupala v. Tianhai C. Air Conditioning Co.*, 2023 WL 1824441, at *1 (W.D. Wash. Jan. 3, 2023).

App. 1280

prior to raising venue was a defensive response to Plaintiffs' request for an immediate TRO, *see Johnson*, 2008 WL 111057, at *3, and FDEM raised its venue defense at an "early stage," permitting Plaintiffs and the Court to manage the litigation appropriately, *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018); *see also Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgt., Ltd.*, 364 F.3d 884, 887 (7th Cir. 2004) ("[I]mproper venue must be pleaded early, but not at the earliest possible opportunity."). Plaintiffs filed their complaint and moved for a TRO on Friday, June 27, 2025. Docs. 1, 5. FDEM worked over the weekend to file a TRO opposition and an accompanying declaration on Monday, June 30. Docs. 16, 16-1. After Plaintiffs amended their motion to clarify that this case has no real connection to Miami-Dade County, Doc. 31 at 3 n.2, FDEM supplemented its response with the venue issue *before* there was any hearing on the TRO or even a status conference in the case, Docs. 50, 52. Under the circumstances, FDEM "moved quickly enough" and has not waived its venue argument. *See Johnson*, 2008 WL 111057, at *3.[3]

Waiver is especially inappropriate absent unfairness to Plaintiffs or the Court. Plaintiffs "allege no prejudice" stemming from learning of the venue defects prior to even having a status conference before the Court. *Broad. Co. of the Carolinas v. Flair Broad. Corp.*, 892 F.2d 372, 378 (4th Cir. 1989); *see also Bartlett*, 2017 WL 106043, at *2. Nor have significant judicial resources been expended. *See Rosati's Fran., Inc. v. Fire It Up, LLC*, 2015 WL 3961703, at *4 (N.D. Ill. June 29, 2015) ("Defendants did not ... cause the Court to spend unnecessary time on the case before asserting these defenses."). Fairness thus does not require waiver. Rather, because the parties are briefing the matter and the Court is conducting a hearing, it would waste resources if the defense *were* found waived. *See* Doc. 54.

*Fourth*, the cases cited by Plaintiffs are inapt. In those cases, months had passed, or significant judicial resources were expended, before a venue defense was asserted. *United States v. Dardashti* is a good example. There, the defendant challenged service four months after proof of service was filed, despite clear knowledge of the suit, and only after the plaintiff had moved for

---

[3] Plaintiffs make the unfounded and false accusation that because the venue objection was raised after reassignment of the case, FDEM was "holding back" the venue defense "to find out which way the wind was blowing." Doc. 61 at 3. Regardless of the judge assigned, the State is raising the venue issue in *every* detention-facility case wrongly filed in this District if the Court does not recognize the venue defect sua sponte. *Compare C.M. v.* Noem, No. 25-cv-23182 (S.D. Fla., Doc. 26 (raising venue objection in case before Judge Ruiz), *with Garcia*, No. 25-cv-23136 (S.D. Fla.), Doc. 5 at 1 (Judge Altman sua sponte recognizing venue defect and transferring case).

App. 1281

default judgment, the defendant had filed two long motions to set aside the default judgment, and the court had held a hearing. *See* 2016 WL 6561480, at *1-3 (S.D. Fla. Apr. 15, 2016). Plaintiffs' other cases are similar.[4] Tellingly, Plaintiffs cite no case like this one, where the venue defect was raised quickly, before the hearing or decision on injunctive relief, and before *any* judicial proceedings had occurred. In such circumstances, there is no waiver.

## II.   VENUE IS IMPROPER IN THIS DISTRICT

### A.   Venue in this District Is Not Proper Under Section 1391(e)

Plaintiffs' lead argument is that venue is proper in this District under section 1391(e) because Friends of the Everglades has its principal place of business in Stuart and it sued a federal official. Doc. 61 at 3-4.[5] That argument is belied by reading to the end of the statute. Even when a federal official is sued, "[a]dditional persons may be joined as parties" only "in accordance with … such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party." 28 U.S.C. § 1391(e)(1). The statute is thus "wholly irrelevant for suits brought against state officials." Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3815 (4th ed.); *see also Rogers v. Civil Air Patrol*, 129 F. Supp. 2d 1334, 1337 (M.D. Ala. 2001) ("[R]eliance on section 1391(e) to justify venue over … a non-federal defendant[] is misplaced."). Instead, "a plaintiff distressed by official misconduct who sues both a federal and a nonfederal defendant who participated in the activity undergirding the lawsuit must press his claim in a district having venue with respect to the nonfederal defendant by authority other than [section] 1391(e)."

---

[4] *See Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund*, 967 F.2d 688, 691 (1st Cir. 1992) (defense raised two months after complaint and following stipulated order concerning discovery); *Gulf States Regl. Ctr., LLC v. Jaddou*, 2024 WL 3553533, at *1, *4 (E.D. La. July 25, 2024) (defense raised two months after preliminary-injunction motion and after hearing and decision on injunctive relief); *Neb. Data Ctrs., LLC v. Khayet*, 2018 WL 2184456, at *2-3 (D. Neb. May 10, 2018) (defense raised more than two months after complaint and after two hearings); *TLC Vision (USA) Corp. v. Freeman*, 2013 WL 2181267, at *5 (E.D. Mo. May 20, 2013) (defense raised after two months of litigation, two hearings, and multiple court orders); *Bautista-Perez v. Holder*, 681 F. Supp. 2d 1083, 1091-92 (N.D. Cal. 2009) (defense raised after decision on preliminary injunction); *George Wash. Univ. v. DIAD, Inc.*, 1996 WL 470363, at *1 (D.D.C. Aug. 9, 1996) (defense raised eight weeks after complaint and after two hearings on injunctive relief); *Barnstead Broad. Corp. v. Offshore Broad. Corp.*, 869 F. Supp. 35, 37-39 (D.D.C. 1994) (defense raised after ruling on injunctive relief).

[5] Left unexplained is why FoE seemingly forum-shopped around its home division in Fort Pierce and filed the suit 107 miles south of its residence. *Cf.* S.D. Fla. IOP 2.02.00 (implementing a rule to keep cases in the division that will "reduc[e] the expense and inconvenience to litigants and counsel associated with holding and attending court in distant locations").

*Lamont v. Haig*, 590 F.2d 1124, 1130 n.36 (D.C. Cir. 1978). Put differently, venue for the claim against FDEM must be determined "as if" the Federal Defendants "were not" parties. *Hensley v. U.S. Dist. Ct. E. Dist. of Cal.*, 2008 WL 480000, at *5 (E.D. Cal. Feb. 19, 2008); *see also Knight v. Corp. for Nat. & Cmty. Serv.*, 2004 WL 2415079, at *3 (E.D. Pa. Oct. 28, 2004); Doc. 50 at 2 n.2. Plaintiffs must accordingly ground venue against FDEM, if at all, in section 1391(b).

In any case, Plaintiffs are wrong that venue against the Federal Defendants is proper under section 1391(e). Venue for claims against federal officials follows the plaintiff's residence only "if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Citing out-of-circuit district court cases, Plaintiffs say real property is "involved" only in suits about "real property interests." Doc. 61 at 3-4. But Plaintiffs do not explain how that limitation follows from the text. *See Ferguson v. Lieurance*, 565 F. Supp. 1013, 1015 (D. Nev. 1983) (rejecting Plaintiffs' construction as "legal sophistry"); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 2009 WL 1025606, at *3 (N.D. Cal. Apr. 14, 2009) (same and holding that real property was involved in action challenging federal management of land). The ordinary understanding of a suit that "involves" real property surely encompasses a suit where, as here, real property is "central" to the case: Plaintiffs' contention is that a parcel in Collier County cannot be used as a detention facility because of environmental concerns on that parcel. *FPL Energy, LLC v. United States*, 2008 WL 4097664, at *1 n.1 (S.D. Fla. Aug. 29, 2008). Regardless, even under Plaintiffs' test, real property interests are involved: Plaintiffs allege Defendants wrongfully commandeered Miami-Dade's property, Doc. 1 ¶¶ 44, 93, which no doubt "concern[s]" "right, title or interest in [the] real property," *Earth Island Inst. v. Quinn*, 56 F. Supp. 3d 1110, 1116 (N.D. Cal. 2014).

## B.    Plaintiffs Are Also Mistaken That Venue Is Proper Under Section 1391(b)

Plaintiffs also err in contending that "a substantial part of the events or omissions giving rise to the claim[s] occurred" in the Southern District. 28 U.S.C. § 1391(b)(2). That standard calls for "a two-part inquiry." *NuTek Int'l, Inc. v. Moxley-W.*, 2014 WL 12623811, at *4 (M.D. Fla. Mar. 26, 2014) (citing *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371-72 (11th Cir. 2003)). "First, a court should identify the nature of the claims and the acts or omissions" that "gave rise" to them. *Id*. Second, the court should ask "whether a substantial part of those acts took place in this District." *Id*. In that effort, "the Court must ask what acts or omissions *by the defendant* gave rise to the lawsuit and consider where they occurred"—Plaintiffs' actions are irrelevant. *Rodriguez–Diaz v. Donald*, 2015 WL 11217234, at *2 (S.D. Fla. Apr. 1, 2015) (Williams, J.) (discussing

5

App. 1283

*Jenkins*, 321 F.3d at 1372).  The court should also "take seriously the adjective 'substantial.'"  *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005).  "[O]nly those acts and omissions [with] a close nexus to the [alleged] wrong" will suffice.  *Jenkins*, 321 F.3d at 1372.

Plaintiffs allege three main wrongs: the federal government did not conduct an environmental impact study before the State built the detention facility (Counts I-II); FDEM commandeered the Dade-Collier Training and Transition Airport without satisfying certain state law requirements (Count III); and Miami-Dade County "acquiesce[d]" to FDEM's actions (Count IV).  Doc 1 ¶¶ 61-94.[6]  Yet the "events or omissions giving rise to th[ose] claim[s] occurred" outside this District.  28 U.S.C. § 1391(b)(2).  As Plaintiffs do not dispute, the federal government's decisionmaking (to the extent there is any) occurred in the District of Columbia; FDEM's decision to commandeer the airport occurred in Tallahassee; and all detention activities are occurring in Collier County.  *See* Doc. 50 at 4.  For just that reason, Judge Altman has twice held that the Southern District is not "the proper venue" for challenges to the detention facility: That facility is in "Ochopee, [Florida], Ochopee is in Collier County, and Collier County is in the Middle District of Florida."  *Garcia*, No. 25-cv-23136, Doc. 5 at 1 (citing *Castillo*, No. 25-cv-23022, Doc. 7 at 1).  "[T]he Middle District" is thus the "appropriate venue" for challenges to the facility, *id.* at 2, and a decision holding otherwise would threaten an untenable intra-district split.

Plaintiffs' attempts to sidestep this analysis fail.  They first claim that venue is proper because a tiny sliver of the commandeered parcel is "located in" Miami-Dade County.  Doc. 61 at 4.  Yet Plaintiffs' claims do not turn on the airport parcel writ large; they turn on the *detention facility* that exists on the parcel.  And no portion of that facility sits in Miami-Dade.  Doc 50-1 ¶¶ 2, 3 (depicting Collier County on the left side of the bisecting line and Miami-Dade County on the right side).  The Miami-Dade sliver of the parcel forms no part of Plaintiffs' claims, "much less a substantial part of them."  *Wholesale, LLC v. Travelers Indem. Co. of Conn.*, 2012 WL 1991456, at *2 (S.D. Fla. May 29, 2012) (Williams, J.).  That sliver is thus, at best, tangential to "the heart of the dispute."  *Robey v. JPMorgan Chase Bank, N.A.*, 343 F. Supp. 3d 1304, 1317 (S.D. Fla.

---

[6] Plaintiffs sometimes suggest Miami-Dade's "acquiescence" to FDEM's commandeering decision occurred in Miami-Dade.  Doc. 61 at 6.  Later they abandon that claim, asserting "it is the State and Federal Defendants whose actions and omissions implicated Miami-Dade County."  *Id.* at 8 n.4.  Regardless, FDEM's initial response remains true: Miami-Dade did not yield anything because it could not stop the FDEM's action, and Plaintiffs' "acquiescence" theory would at most establish venue against the County, not FDEM.  *See* Doc. 50 at 3 n.2.

6

# App. 1284

2018); *see Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 190 (D.D.C. 2018) ("Peripheral and tangential events occurring in the district will not establish venue.").

Plaintiffs next say that Miami-Dade County "own[s]" the Collier County parcel that houses the detention center.  Doc. 61 at 4.  But venue depends on where the "events or omissions … occurred," not on where the landowner lives.  28 U.S.C. § 1391(b)(2).  Were it otherwise, a defendant to a battery charge occurring at a Target store in Aventura could be "haled into" the District of Minnesota—"a remote district having no real relationship to the dispute"—merely because the Target corporation resides in Minneapolis.  *Rodriguez–Diaz*, 2015 WL 11217234, at *2.  That is not the law.  *Cf. Pittsburgh Logistics Sys., Inc. v. Glen Rose Transp. Mgmt.*, 2020 WL 7406848, at *3 (W.D. Pa. Dec. 17, 2020) (venue existed at trademark owners' residence not because owner lived there, but because it was "the location of the property" driving the dispute).

Plaintiffs are also wrong that venue lies in the Southern District because the "omi[tted]" NEPA report would have "review[ed] … environmental impacts in the Southern District."  Doc. 61 at 8-9.  In a NEPA case like this one, the relevant government action is the decision not to conduct the NEPA study.  *See Friends of Earth v. Haaland*, 2022 WL 185196, at *2-4 (D.D.C. Jan. 20, 2022).  Venue is therefore proper in the district where that decision was made, but it is not proper in a district simply because parts of the district would have been studied in the report.  *Id. Friends of Earth* bears that out.  There, Louisiana argued that venue existed in the Western District of Louisiana because an omitted NEPA report would have "consider[ed]" both "locations in the Western District" and "research that would have partially occurred in [the] district."  *Id.* at *4. That argument, the court held, misunderstood the "relevant omission" in a NEPA case: The "lack of a decision to conduct or consider further research."  *Id.*  That principle stems from the basic premise that, in APA cases, "courts generally focus on where the decisionmaking process occurred to determine where the claims arose."  *Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009) (collecting cases).[7]  And since the decision not to conduct a NEPA study was made in agency offices in the District of Columbia and the Eastern District of Louisiana, venue in the Western District was improper.  *Friends of Earth*, 2022 WL 185196, at *4, *7.

That reasoning governs here.  Plaintiffs' NEPA and APA claims challenge the federal

---

[7] *Accord Awad v. Mayorkas*, 2022 WL 1215521, at *2 (M.D. Fla. Apr. 7, 2022); *Mashpee Wampanoag Tribe v. Zinke*, 2019 WL 2569919, at *7 (D.D.C. June 21, 2019); *Home Builders Ass'n of N. Cal. v. U.S. Fish & Wildlife Serv.*, 2005 WL 8176727, at *3 (E.D. Cal. July 7, 2005).

App. 1285

government's failure to conduct a NEPA study.  Doc. 1 ¶¶ 61-79.  But Plaintiffs have alleged no facts suggesting that the government's decision not to conduct the study was made in this District.  Nor have Plaintiffs disputed FDEM's point that the "decision[]" not to conduct a study was made either in "Tallahassee, Washington, D.C., or on site" in Collier County.  Doc. 61 at 6.

To sidestep that problem, Plaintiffs say they are not challenging the "decision-making about the detention facility," but rather "Defendants' failure to comply with federal environmental laws."  Doc. 61 at 6.  The only environmental law that Plaintiffs cite, though, is NEPA.  *See* Doc. 1 ¶¶ 61-74.  And the federal government violates NEPA only by declining to conduct a NEPA study before engaging in a major federal action.  42 U.S.C. § 4332.  The alleged "relevant omission" is thus the government's "decision" to press forward with a project before conducting a NEPA study.  *See Friends of Earth*, 2022 WL 185196, at *2-4.  That decision was not made in this District.[8]

Plaintiffs claim next that even if all Defendants' actions occurred outside this District, venue is proper because those actions will "impact" people, places, and things within the District.  Doc. 61 at 5, 8-10.  Plaintiffs posit that Miami-Dade residents enjoy dark skies and ecological areas that are "downstream" of and allegedly "threatened" by the detention facility.  *Id.* at 8-10.  Plaintiffs even suggest that venue lies anywhere the "endangered Florida panther" roams, *see id.* at 9—a roughly 400-mile stretch that spans from Monroe County to Fort Myers to Georgia's Okefenokee Swamp.  *See* Fla. Fish & Wildlife Conservation Comm., Description and Range, https://myfwc.com/wildlifehabitats/wildlife/panther/description/ (explaining that a panther ventured to "western Georgia").  Those arguments rest on a mistaken premise—that Plaintiffs' injuries are relevant "actions or omissions" under the venue statute.  They are not.  Section 1391(b)(2) focuses on where the "acts or omissions [of] *the defendant*" occurred, *Rodriguez–Diaz*, 2015 WL 11217234, at *2, not on where Plaintiffs, Intervenors, or a host of roaming animals may "feel[] the effects of a defendant's conduct," *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1048 (S.D. Tex. 2000) (citing *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995)).

*Woodke* is instructive.  *See Rodriguez–Diaz*, 2015 WL 11217234, at *2 n.1 (noting that the Eleventh Circuit has "explicitly endorsed [*Woodke*'s] interpretation of the venue statute").  In

---

[8] For the same reasons, it does not matter if the NEPA report would have required "research to be undertaken" in Miami-Dade.  *Friends of Earth*, 2022 WL 185196, at *4; *see* Doc. 61 at 9 (implying that fact might be relevant).  Again, the "relevant omission" in a NEPA claim is "the lack of a decision to conduct or consider further research."  *Friends of Earth*, 2022 WL 185196, at *4.  And Plaintiffs have alleged no facts showing that decision occurred in this District.

App. 1286

*Woodke*, the owner of an infringed trademark asserted venue "in the district of his residency because that [wa]s" where he would feel the infringement's "ultimate effect." 70 F.3d at 985. The Eighth Circuit rejected the claim. The statute's "focus," the court explained, is the "relevant activities of the defendant, not of the plaintiff" (or anyone else for that matter). *Id.* The court thus held that a wrong's "effect" is not a relevant "action or omission" when assessing venue. *See id.* "[I]f Congress had wanted to lay venue where the plaintiff was residing when he was injured, it could have said so expressly." *Id.*; *see also Abramoff v. Shake Consulting, LLC*, 288 F. Supp. 2d 1, 5 (D.D.C. 2003) ("[T]hat the plaintiff may feel damages in [a district] does not create venue.").

That reasoning has foreclosed Plaintiffs' "impact" theory in cases much like this one. In *Friends of Earth*, for example, Louisiana argued that venue was proper in the Western District of Louisiana because "the impacts of the challenged administrative action [would] be felt" there. 2022 WL 185196, at *5. The court agreed that the district would "certainly feel some of the impacts" of the agency's decision, yet it still spurned the claim because "impacts alone cannot create proper venue." *Id.* Nor does *Friends of Earth* stand alone. The Central District of California reached a similar result in a case challenging a land regulation on "critical habitat[s]." *Home Builders Ass'n*, 2005 WL 8176727, at *1-3. The relevant "actions or omissions" for venue purposes, held the court, were the "Defendants' rule-making activities," not the "the critical habitat determinations that [were] the product of the rule[.]" *Id.* at *3.

This case falls squarely within those precedents. Plaintiffs protest that they and others in Miami-Dade will feel the impacts of Defendants' actions. Doc. 61 at 7-8. But those effects are not the "focus" of the venue statute. *Woodke*, 70 F.3d at 985. The statute instead "focus[es] on relevant activities of the defendant[s]," none of which occurred in the Southern District. *Id.*

Plaintiffs three contrary citations are unpersuasive. *See* Doc. 61 at 7. In two of them, the defendant's action and the plaintiff's injury occurred in the same place. *See Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 46 (D.D.C. 2006) (management of a water facility in Florida harmed snail kite population in Florida); *C2F, Inc. v. Bee Paper Co.*, 2008 WL 4791012, at *9 (D. Or. Oct. 28, 2008) (negotiations in Oregon harmed business in Oregon). Venue was proper in those cases because the defendant's offensive act *also* occurred in the relevant district. *See Friends of Earth*, 2022 WL 185196, at *5 (distinguishing those cases from cases, like this one, in which the action and the injury do not occur in the same district). Plaintiffs' remaining citation did find venue proper in a district that would feel the effects of actions taken in another district. *See W. Org. of*

*Res. Councils v. U.S. Bureau of Land Mgmt.*, 2021 WL 718857, at *4 (D. Mont. Feb. 24, 2021). But as Plaintiffs' own citation makes clear, *see C2F*, 2008 WL 4791012, at *9, that district court was bound by Ninth Circuit precedent rejecting *Woodke*'s holding that courts must "focus on relevant activities of the defendant, not the plaintiff," *id.* (explaining that the Ninth Circuit has rejected *Woodke*). This Court, by contrast, is bound by *Jenkins*, which has "explicitly endorsed [*Woodke*'s] interpretation of the venue statute." *Rodriguez–Diaz*, 2015 WL 11217234, at *2 n.1.

Plaintiffs' "impact" theory fails for another reason: The impacts it hypothesizes have not yet occurred. Its response speculates that the detention facility "threaten[s]" future harms to land, people, and animals in Miami-Dade. *See* Doc. 61 at 5, 8-10. But section 1391(b)(2) refers in the past tense to events that have already "occurred." It thus excludes venue choices based on speculative future injuries, like those Plaintiffs imagine here. *See Reuben H. Donnelly Corp. v. FTC*, 580 F.2d 264, 268 (7th Cir. 1978) ("To base a venue determination on the possibility of some future administrative ruling approaches the question backwards.").

In their final bid, Plaintiffs—incredibly—ask this Court to ignore the limits on its power and enter a preliminary injunction even if it lacks venue. Doc. 61 at 3 n.2. That would be serious error. The key to preliminary relief is likely success on the merits. A case without proper venue will not succeed on the merits. *See Fla. Hometown Democracy, Inc. v. Browning*, 2008 WL 3540607, at *1 (S.D. Fla. Aug. 12, 2008) (denying a preliminary injunction because venue was improper). Plaintiffs' citations do not hold otherwise. Their first case holds that venue is not "jurisdictional," so a court can "adjudicate" a claim if venue has been waived. *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1349 (11th Cir. 1982). In their second case, a court issued a preliminary injunction despite a pending transfer motion, but only because the motion *conceded* venue and asked only for discretionary transfer to another division. *See Arval Serv. Lease S.A. v. Clifton*, 2014 WL 12614422, at *1 (M.D. Fla. Nov. 21, 2014); *Arval Serv. Lease S.A. v. Clifton*, No. 3:14-cv-1047, Doc. 29. Finally, the court in their third case *denied* an injunction on the merits and transferred the case for lack of venue. *S. Visions, LLP v. Red Diamond, Inc.*, 2018 WL 8221528, at *8 (N.D. Ga. Dec. 10, 2018). That in no way supports the novel premise that courts may grant sweeping interim relief even when venue is improper and disputed.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion a temporary restraining order or preliminary injunction because venue is improper in this District.

App. 1288

Dated: July 29, 2025

Respectfully submitted,

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa (FBN 110951)
  *Acting Solicitor General*
Nathan A. Forrester (FBN 1045107)
  *Chief Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
  *Assistant Solicitor General*
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

s/ *Jesse Panuccio*
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
David Costello (FBN 1004952)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
jpanuccio@bsfllp.com

*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2025, the foregoing was filed with the Clerk of Court using CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

s/ *Jesse Panuccio*
Jesse Panuccio

11

App. 1289

# Doc. 65-1

# Exhibit 1

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                    CASE NUMBER 25-22896-CV-KMW
 3
     Friends of the Everglades, et al
 4                        Plaintiffs

 5

            vs.
 6
     Kristi Noem, et al
 7
                    Defendants
 8
 _____

 9               ZOOM HEARING HELD 7-21-2025
            BEFORE THE HONORABLE KATHLEEN M.  WILLIAMS
10               UNITED STATES DISTRICT COURT JUDGE

 _____
11
 _
12   APPEARANCES:

13   FOR THE PLAINTIFFS:     Paul Schwiep, Esq.
                             Scott Hiaasen, Esq.
14                           Robert Burlington, Esq.
                             Elise Bennett, Esq.
15                           Jason Totoiu, Esq.
                             Tanya Galloni, Esq.
16
     FOR THE DEFENDANTS:     Carlos Raurell, A.U.S.A.
17                           Jesse Panuccio, Esq.
                             Evan Ezray, Esq.
18                           Jeffrey DeSousa, Esq.
                             David Murray, Esq.
19

20   FOR THE INTERVENOR:     Chris Ajizian, Esq.

21

22   REPORTED BY:           PATRICIA SANDERS, RPR
                            United States Court Reporter
23                           400 North Miami Avenue, Suite 11-3
                            Miami, FL  33128
24                           T: 305.523.5528
                             patricia_sanders@flsd.uscourts.gov.
25
```

App. 1292

```
 1

 2              THE COURT:  The Court calls Case No. 25-22896;

 3    Friends of the Everglades, et al versus Kristi Noem, et al.

 4              Counsel, please announce your appearances starting

 5    with the Plaintiff.

 6              You have to un-mute yourself.

 7              MR. SCHWIEP:  Oh, okay, now I'm un-muted.

 8              THE COURT:  I can hear you now.

 9              MR. SCHWIEP:  Good afternoon, Your Honor, Paul

10    Schwiep, Scott Hiaasen and Bob Burlington from Coffey

11    Burlington on behalf of Plaintiffs Friends of the Everglades

12    and Center for Biological Diversity.

13              And I'll let counsel for the Center of Biological

14    Diversity and Earthjustice introduce themselves.

15              THE COURT:  Good afternoon.

16              MS. BENNETT:  Good afternoon, Your Honor, Elise

17    Bennett and Jason Totoiu appearing on behalf of the Center for

18    Biological Diversity.

19              THE COURT:  Good afternoon.

20              MS. GALLONI:  Good afternoon, Your Honor, this is

21    Tanya Galloni from Earthjustice, appearing on behalf of

22    Plaintiff Friends of the Everglades.

23              THE COURT:  Good afternoon.  All right.  And if the

24    defendants could announce their appearances as well.

25
```

1            MR. RAURELL:  Good afternoon, Your Honor, Carlos

2    Raurell from the U.S. Attorney's Office in Miami for the

3    Federal Defendants, Secretary Noem and the ICE Director.  And

4    in the waiting room -- I don't know if they're allowed access

5    -- from Main Justice are Marissa Piropato and Peter Torstensen.

6    From the Environmental and Natural Resources Division of DOJ.

7            THE COURT:  All right.  I'll see if we can get them

8    into the Zoom proceeding.  As I said, we had only allowed those

9    lawyers who were of record, but now that we have names, we'll

10   see if we can admit them.

11           MR. RAURELL:  Thank you, Your Honor.

12           THE COURT:  All right.

13           MR. PANUCCIO:  Good afternoon, Your Honor.  This is

14   Jesse Panuccio for Defendant Kevin Guthrie in his official

15   capacity as the Executive Director of the Florida Division of

16   Emergency Management, the State defendant in the case.

17           THE COURT:  Good afternoon.

18           MR. PANUCCIO: With me is Evan Ezray and Jeffrey DeSousa

19   from the State Solicitor General's Office.

20           THE COURT:  Good afternoon, gentlemen.

21           MR. PANUCCIO:  Good afternoon.

22           THE COURT:  All right. And is there anyone here for

23   Miami-Dade?

24           MR. MARIE:  David Murray, County Attorney's Office, on

25   behalf of Miami Dade County, Your Honor.

App. 1294

```
 1            THE COURT:  Good afternoon.
 2            All right.  I think we everyone's appearance.
 3            MR. AJIZIAN:  Your Honor.
 4            THE COURT:  My apologies.
 5            MR. AJIZIAN:  Your Honor, if I may, Chris Ajizian on
 6   behalf of the Miccosukee Tribe of Indians of Florida.  I should
 7   have spoken up earlier with the Plaintiffs.
 8            We're a proposed intervener Plaintiff, our motion is
 9   still pending, and so we're not in as yet.
10            THE COURT:  Oh, yes.  Thank you, Mr. Ajizian.
11            There are so many people on the Zoom, and so I did
12   not see everyone on my screen.
13            I do see Ms. Sharpless, who is a "proposed" amicus.
14            Is there anyone else who hasn't been acknowledged or
15   announced their appearance?
16            All right.  Before we begin, I want to remind everyone
17   on Zoom, as well as any parties, press and public that are
18   listening in, that it is prohibited to record these proceedings
19   in any way.
20            I also want to remind the lawyers that if you have
21   something to say you must please identify yourself, because of
22   the array of boxes on the screen; so that my court reporter Ms.
23   Sanders can identify who is speaking.
24            And I would ask that you speak clearly, slowly and into
25   the microphone so that Ms. Sanders can make an accurate record
```

App. 1295

1    of what is being said.  All right.  Before we begin I will give

2    a very brief, factual and procedural background.

3          This is a suit for declaratory and injunctive relief

4    under the National Environmental Policy Act, the Administrative

5    Procedure Act, Florida Statutes and Miami-Dade County Code.

6          This case was filed, I believe, in June of this year.

7    The Plaintiffs claim that the Florida and Federal Governments

8    have collaborated to construct an Immigration Detention

9    Facility at the Dade-Collier Training and Transition Airport,

10   TNT, without preparing the appropriate environmental impact

11   statement as is required by NEPA and other State and County

12   laws.

13          The TNT is located within the Everglades adjacent to

14   the Big Cyprus National Preserve, which is a Nationally and

15   State protected area, that is a habitat for endangered and

16   threatened species.

17          On June 27th Plaintiffs filed their expedited motion

18   for a TRO and a preliminary injunction.

19          On July 11th they again filed an expedited motion for

20   ruling on the TRO and PI.

21          Between June the 30th and July the 18th Plaintiffs

22   supplemented their filings, I believe, with eight notices.

23   Defendant Guthrie objected to the notices, which I think got

24   mooted out this morning when the defendant filed his own

25   supplement; and we'll get to that later.

1            On July 14th, the Miccosukee Tribe filed a motion to

2     intervene.  And on July 16th Judge Martinez recused, and I was

3     then reassigned the case.

4            On that same day, Ms. Sharpless on behalf of Florida

5     Immigration Coalition filed a request to be allowed to file an

6     amicus brief.

7             I then scheduled this status conference in order to

8     calendar matters and see what we could resolve.

9            I did last Friday, I believe it was, grant the

10    unopposed motion for extension of time for -- I think it was

11    Defendant Guthrie's answer.  That leaves various other motions

12    I would like to discuss.

13           The first one I am going to take up is yours, Ms.

14    Sharpless.  While I very much appreciate the effort and the

15    interest you have in our case, as you can see from our

16    assembled counsel, I do not need any additional perspective on

17    this case; I do need resolution.

18           And so at this point, Ms. Sharpless, I am going to deny

19    without prejudice to renew at a later time your request to

20    appear as amicus.

21           Again, I appreciate the time and effort, but I would

22    like to straighten out what I have right now before I bring any

23    other folks into the case.

24           But I know you're there, and so if I need your

25    assistance I will advise you of that.

App. 1297

```
 1            That brings us to the motion to intervene.  I am going
 2    to ask that the defendants file their response by this Friday,
 3    the 25th, since that needs to be addressed.
 4            I don't believe in light of everything that has
 5    transpired that we can wait much longer.
 6            That leads to the other motions I am now going to take
 7    up, including the one that was filed a couple of hours ago --
 8    and that is Defendant Guthrie's supplemental response -- which
 9    is really not a supplement, just as the Plaintiffs' supplements
10    were not technically supplements.
11             So everyone's supplement is going to be recognized,
12    but Plaintiffs, I need for you to respond to this by Friday.
13    It raises a venue issue, which I think is rather important.
14            I knew that TNT was in Collier County, and I thought
15    that -- well, I don't know what I thought about the parties'
16    agreement or perspective on this -- but I do need this issue to
17    be teed up.
18            And so I am going to set a hearing on this issue for
19    Wednesday July 30th at 10 o'clock.  And that means if the
20    Defendants wish to file a reply, they may, but in light of the
21    fact that we're going to have oral argument on the 30th it is
22    not necessary; but I leave that to your good offices.
23            MR. PANUCCIO:  Your Honor, may I just ask -- and this
24    is Jesse Panuccio for the State Defendant -- will that be an
25    in-person hearing; just to clarify?
```

App. 1298

```
1              THE COURT:  I prefer that it be in person because,
2    you know, "technology"; although everyone is a big fan.  But
3    getting everybody on can be quite difficult.
4              And so for this type of a hearing I believe it is
5    better held in person.
6              MR. PANUCCIO:  Just to clarify, Your Honor, in person
7    is fine for the State.
8              THE COURT:  All right.
9              MR. PANUCCIO:  I just wanted to make sure that I knew
10   in terms of making arrangements.
11             Thank you, Your Honor, I appreciate it.
12             THE COURT:  You're welcome.  All right.  So that
13   takes care of that issue.
14             Let's turn now to the -- the temporary restraining
15   order and preliminary injunction. I really don't know, counsel,
16   what to do with that.
17             I was going to schedule a hearing for next Friday, but
18   I don't know that this venue issue will be fully addressed --
19   and it may be -- but I think we probably need to have a
20   hearing.
21             Mr. Schwiep, will you be handling pretty much of our
22   discussion here today?
23             MR. SCHWIEP:  Yes, Your Honor.
24             THE COURT:  All right. Before we move forward let me
25   address something for the record.
```

1          Because I think it is important in a proceeding like

2     this to be transparent.

3          Mr. Hiaasen worked for me 11, 12 years ago -- a long

4     time ago -- as a law clerk.  I have reviewed the code of

5     conduct, the appropriate statutes, and I do not believe that is

6     a real conflict.

7           So I just wanted to put that on the record before we

8     proceeded.  I am assuming since you all have been dealing with

9     each other for over a month now and know each other, that there

10    is no issue, but I am always mindful of being transparent.

11         So, Mr. Schwiep, if I were to schedule this preliminary

12    injunction how long do you think the hearing would take?

13         Are we talking about a number of witnesses?  What is

14    your thinking? Let me hear from you on that issue first, and

15    then I will turn to the lawyer from the Department and then to

16    Mr. Panuccio.

17          MR. SCHWIEP:  Thank, Your Honor.  We have been able

18    to discuss that issue -- with counsel -- and we do believe that

19    the preliminary injunction hearing will be able to be conducted

20    in a day.

21         We do think the Court would benefit from hearing from

22    witnesses.  It looks like there are some mixed factual legal

23    issues, especially in connection with the Federal and State

24    Defendants' position that the operation of this facility is

25    entirely a State endeavor.

App. 1300

1          So we have suggested, and we put this in our renewed

2    motion, that the preliminary injunction hearing be scheduled

3    within 14 days.

4          And that the Court then set up a schedule for the

5    parties to exchange those exhibits they intend to introduce at

6    that hearing, and also to provide a witness list.

7          We also, Judge, feel very strongly, apart from the

8    venue issue -- which we think there is venue in this

9    District -- a substantial portion of the events did occur here,

10   including that the property was commandeered from Miami-Dade

11   County.

12         Not to suggest that venue couldn't also have been laid

13   also in Collier County but a substantial portion of the events

14   occurred here; a portion of the property is in Miami-Dade

15   County.

16         But apart from that -- and we understand you want

17   further briefing on it -- you are going to conduct a hearing.

18         There was no suggestion that Your Honor does not have

19   jurisdiction now.  In the initial responses to our initial TRO

20   motion, there wasn't any issue raised about venue.

21         We've renewed that motion.  We weren't aware -- and

22   none of us were aware of Judge Martinez's conflict -- but

23   apparently there was one; and he was unable to take up the TRO

24   motion.

25

```
 1          But, Judge, we think a TRO should be entered today -- a

 2   limited narrowly tailored TRO -- we've laid out what we think

 3   that should look like in our renewed motion; and then a hearing

 4   set within 14 days.

 5          If Your Honor ultimately concludes that there is a

 6   venue -- none of the Defendants have moved to dismiss or to

 7   transfer this case if there ultimately is a venue issue -- but

 8   that would not moot or end this case; even if there were a

 9   venue issue.

10          Again, we do not believe that there is one.  But for

11   that reason, we think that a TRO should be entered today, this

12   Court has jurisdiction as of today; and then an injunction

13   hearing be set within the next 14 days.

14          THE COURT: All right.  Well, I am not going to enter

15   a TRO today.  I have read all of the papers.  And I am aware,

16   as you point out counsel, that there are some mixed factual and

17   legal issues -- not as perhaps straightforward as some of the

18   cases cited by both sides -- and in light of that I wanted to

19   have a hearing.

20          I certainly do not want to have a hearing necessarily

21   right on the heels of hearing about the venue issue.  While I

22   understand the Plaintiffs have been waiting to have a hearing

23   in front of a Judge -- and have been emphatic about the need

24   for a quick resolution.

25
```

1      But, again, Judge Martinez's conflict arose with some

2  later filed pleadings; nobody saw that. I needed time to look

3  this over -- and that is why I wanted to talk to you all -- but

4  then the venue issue was raised.

5      So I guess, Mr. Schwiep, I am asking you in terms of

6  time -- how long after our hearing next week would you like to

7  be heard on the TRO and the PI?  I think at this point, it's

8  all of a piece.

9      MR. SCHWIEP:  Judge, we would request a hearing at

10  the Court's earliest convenience.

11      Again, we think the venue issue will be easily resolved

12  because it doesn't -- under 13912 it doesn't have to be that

13  all the events occurred in this District.

14      Venue can lay in two separate Districts.  So long as a

15  substantial portion of the events occurred in this District

16  Your Honor will have venue.

17      So we don't think that belatedly raised issue -- and it

18  wasn't in the initial responses -- and so we are going to argue

19  waiver.  We believe it will be easily resolved; and so we would

20  request a hearing at ideally the end of that week.

21      THE COURT:  That is what I had originally thought --

22  before the venue issue came up -- would be a good time.  But I

23  do think I will need some time to take in your arguments before

24  we proceed.

25

```
1          So in as much as you still feel it needs to be resolved
2    quite quickly, I will set a hearing for August the 4th at 10
3    o'clock.
4          If in reviewing the venue arguments you have great
5    qualms I will postpone or reset; but I would like everyone to
6    have some direction in going forward.
7           And in terms of logistics, that hearing will be held
8    in person as well.
9          MR. PANUCCIO:  Your Honor, if I may.
10         THE COURT:  Yes.
11         MR. PANUCCIO:  Again, Jesse Panuccio for the State
12   Defendant.
13         I do unfortunately -- and I apologize because it is
14   something I cannot move -- I have something on the fourth in
15   Tallahassee.  If I could move it, I would.
16         I can do later in the week, the sixth, the seventh or
17   even the eighth -- I could potentially move something -- but
18   the fourth would be very difficult for me.  And I do apologize
19   for that.
20         THE COURT:  So, the matter you'll be in Tallahassee
21   on, you think your business may run over to the fifth, is that
22   what I'm hearing?
23         MR. PANUCCIO:  Your Honor, I also have a deposition
24   that day, and so I'll be leaving -- but I'll need to get into
25   the deposition -- so I apologize for that, Your Honor.
```

App. 1304

```
 1              THE COURT:  All right.  Then what I'll set it down

 2   for the sixth starting at nine o'clock.

 3              That should hopefully work for you, Mr. Panuccio.

 4              MR. PANUCCIO:  That does scheduling wise, Your Honor;

 5   thank you.  As a matter of substance, however, I did wish to be

 6   heard briefly.

 7              THE COURT:  All right.

 8              MR. PANUCCIO: It is our position, Your Honor, that a

 9   full-blown evidentiary hearing right now is unnecessary.

10              I understand the Court is going to take up the venue

11   issue -- and that be resolved one way or the other -- but if

12   assuming the Court were to say or conclude that venue is proper

13   here, we still have other jurisdictional arguments -- as to why

14   this case cannot go forward.

15              For example, that Immigration detention decisions are

16   not subject to Judicial review.

17              THE COURT:  Okay.

18              MR. PANUCCIO:  And so we believe that it would be a

19   tremendous use of party -- and Court resources -- to call in

20   witnesses, to prepare for essentially a full blown evidentiary

21   hearing when it could be this case is not -- the Court will

22   conclude the case is not Constitutional at all.

23              And so we believe that attorney argument on those other

24   issues should precede any sort of an evidentiary hearing, Your

25   Honor.
```

```
 1              THE COURT:  I think what you're referring to,

 2   counsel, is the Title VIII provision.  I do not believe that

 3   has really anything to do with what I would be deciding here in

 4   this particular action since I am not wading into decisions

 5   about Immigration.

 6         What I am wading into -- no pun intended -- where this

 7   Detention Center has been put out in the middle of the

 8   Everglades.

 9         Which, again, while I did very much appreciate Ms.

10   Sharpless' request to assist the Court -- my focus is NEPA, APA

11   and not the use of the land.

12         Although I am sure that does go to the State and Ms.

13   Noem's arguments about why in a matter of weeks this facility

14   needed to be created out at TNT.

15          But I have reviewed everyone's submissions and I do

16   not see any other legal issue that would prevent me from having

17   an evidentiary hearing.

18         I understand at that hearing the question of, is it

19   Federal or is it State, is going to be very much contested and

20   discussed -- that I fully expect -- but I do believe that such

21   a hearing is appropriate.

22         With the exception of the venue issue -- which has been

23   raised -- I think we are clear to go ahead and have the parties

24   present their arguments and whatever evidence it is they wish

25   to adduce.
```

App. 1306

```
 1              And Mr. Schwiep -- or maybe it was Mr. Panuccio -- I
 2     know you said you had been discussing how the proceeding might
 3     go forward.
 4              I know that there are some pictures that have been
 5     submitted as attachments and the like; and so I would urge you
 6     both to continue to have those conversations.
 7              And I think that would be helpful in terms of at least
 8     looking at if there are some things that could be streamlined
 9     with some of the exhibits.
10              MR. SCHWIEP:  Your Honor, this is Paul Schwiep on
11     behalf of the Plaintiffs.
12              To be clear, the Plaintiffs are not seeking any sort of
13     an injunction against the Federal Defendants' obligations under
14     Title VIII; that is detention, removal, deportation -- all of
15     those decisions -- we're not seeking to enjoin any of those
16     activities.
17              In terms of the hearing, the whole Federal, State issue
18     does raise -- as has been mentioned here -- a mix of factual
19     issues and law.
20              And just to clarify for the record, Your Honor, when I
21     had referred to discussions earlier, I meant internally within
22     the Plaintiffs' counsel team.
23              THE COURT:  Oh, okay.
24              MR. SCHWIEP:  But we do, Your Honor, believe that some
25     exchange of documents would be helpful.
```

App. 1307

17

```
 1              And if I could just provide one example.

 2              THE COURT:  All right.

 3              MR. SCHWIEP: In the Kevin Giles' declaration that was

 4    attached to the Federal Defendants' response, there was a

 5    reference to a 287(g) agreement -- which I know Your Honor is

 6    familiar with.

 7              But it's unclear from that declaration -- and it's been

 8    unclear from the Defendants' fillings -- whether, for instance,

 9    there is such an agreement as between Defendant Division of

10    Emergency Management and any of the Federal Defendants.

11              So that is why I would suggest in advance of the

12    hearing that -- it would be useful if the parties could

13    exchange some exhibits or documents they attempt to...

14              THE COURT REPORTER:  Judge...

15              THE COURT:  Slow down if you would.

16              MR. SCHWIEP:  On our side, Judge, we have sent FOIA

17    requests to the Federal agencies, and we've sent public records

18    requests under the Sunshine Act to the State agencies.

19              We haven't gotten documents back, and so we're a little

20    bit of -- flying blind -- and that is why I think it would be

21    useful to have some exchange of whatever materials the Federal

22    and State Defendants are going to rely on -- in support of the

23    argument that this is entirely a State initiative without any

24    Federal involvement or entanglement.

25
```

App. 1308

     1          MR. PANUCCIO:  Your Honor, if I may briefly respond

     2   just to make sure the record is clear.

     3          THE COURT:  All right.

     4          MR. PANUCCIO:  So, on the one hand my friend says

     5   that they're not seeking to enjoin anything related to the

     6   Immigration -- that's just not true, Your Honor -- this is

     7   their docket entry 40.

     8          The relief they request is as follows:  A temporary

     9   restraining order enjoining the Defendants from -- requiring

    10   Defendants from causing the transport of additional detainees

    11   to the site and ceasing any operations related to detaining or

    12   preparing for the detention of anyone not detained at the site.

    13          I mean, Your Honor, that is quintessential Immigration

    14   related activity.

    15          THE COURT:  Well, I think that would be like -- and I

    16   cannot think of an exact -- but let's say you had a training

    17   center out "there" for Immigration agents and you were busing

    18   them in from around the country.

    19          That doesn't have anything to do with what's happening

    20   with Immigration; it has to do with the fact that this is

    21   happening out in the middle of the Everglades without an

    22   appropriate EIS.

    23          I cannot order and I am not here to weigh in on the

    24   decision one way or another.

    25

19

```
1       I am here to determine if the appropriate protocol was
2  entered into before the decision was made to put the facility
3  there.
4       So while I understand that you are focusing on that
5  language, Mr. Panuccio, it would be whatever activity was
6  happening out there that the Plaintiffs would be asking to
7  enjoin so there would be no additional environmental impact or
8  some unknown environmental impact because there has been no
9  environmental assessment.
10      And, Mr. Schwiep, if I am putting words in your mouth
11  then please let me know.
12      You are not addressing the detention decision itself;
13  you are not asking me to get into Immigration matters as to
14  detention decision or anything like that?
15      MR. SCHWIEP:  No, Your Honor, we certainly do not
16  intend that.  We are well aware of the limitations on -- the
17  limits on injunctive relief that apply to the Court under
18  1231(f).
19      And we're certain that the Court could craft an
20  injunction that in no way restrains the Federal Defendants'
21  ability to continue to enforce Title VIII in terms of any
22  apprehension decisions, detention decisions, removability
23  determinations or deportations.
24      All of that can occur, just not at this site, without
25  compliance with equally important Federal laws.
```

```
1              Including the National Environmental Policy Act.

2              THE COURT:  Mr. Panuccio does bring up a good point I

3    think.  Your renewed motion at docket entry 40 -- and I am not

4    entirely clear -- have you changed somewhat or modified your

5    original request at docket entry five?

6              MR. SCHWIEP:  Yes, Your Honor -- and that's a good

7    question -- at the time that we filed at docket entry five on

8    June 27th there were no detainees that were being held at the

9    site; it was all prospective at that time.

10             And what we sought -- along with the proposed order

11   that we submitted with docket entry five -- was to prevent the

12   Federal Defendants in the State from transporting non-citizens

13   onto that site and to stop any further construction activities

14   at the site until there was NEPA compliance.

15             Recognizing, Your Honor, that since the time we filed

16   at docket entry five -- our original TRO motion -- things have

17   changed.  It appears to us -- and based on reported accounts --

18   that non-citizens have been surged into that site.

19             The latest number we heard was around 900; with a view

20   towards possibly moving 3000 folks onto the site.

21             We limited and tried to narrowly tailor the request

22   that we're seeking today.  And so I have heard Your Honor --

23   but this would be what we request -- that no further detainees

24   be brought onto the site and that no further construction

25   activities be permitted at the site.
```

App. 1311

```
 1          So essentially, Your Honor, we would just hold the

 2   status quo as of today; and then allow us to go forward with

 3   our injunction hearing within 14 days.

 4          And if I could just very briefly say two things about

 5   that, Your Honor...

 6          THE COURT: No one ever means that -- ever in the

 7   history of litigation -- no one ever means briefly.

 8          MR. SCHWIEP:  Of course.

 9          THE COURT:  All right -- I am somewhat teasing you --

10   but I just wanted to let you know that I am onto you all.

11          MR. SCHWIEP:  Your Honor, I believe that there has

12   been -- the change in circumstance is of course significant --

13   and so I believe bears noting this afternoon.

14          As I said, it has been widely reported that since the

15   time of our filing at least 900 detainees have been moved onto

16   the site; and the reporting has been that the situation for

17   those detainees is dire.

18          There have been reports about flooded facilities and

19   toilets that do not work, food that spoils, sweltering heat,

20   non-potable water...

21          THE COURT:  Let me stop you, counsel, because that is

22   not before me.  To the extent that any of the sewage is not

23   being contained appropriately and is going into the water

24   supply and affecting the aquifer, then that is something this

25   lawsuit would address.
```

22

```
1           But as to the conditions of the migrants, I believe

2     Judge Ruiz, who is right across the hall from me, he has the

3     lawsuit addressing those issues; and so those arguments would

4     best be directed to him.

5           But I do understand, Mr. Schwiep, that we are at a

6     different place now than when you first filed suit. There were

7     no individuals out there at that time and no construction had

8     been had as of yet.

9           But this is the case that I have, and I think the

10    schedule that I have proposed addresses all of the issues that

11    I have been given to review in as quickly a timeframe as

12    humanly possible.

13          MR. SCHWIEP:  Thank you, Your Honor.

14          MR. RAURELL:  Your Honor, this is Carlos Raurell for

15    the Federal Defendants.

16          May I be heard very briefly?  And I do mean, very

17    briefly.

18           THE COURT:  Sure.

19          MR. RAURELL:  I don't have that much, Your Honor, but

20    I would just like to put on record that the Federal Defendants

21    will be availing themselves of an opportunity to file a reply

22    on the issue of venue--

23           THE COURT:  Stop, stop, stop. You need to slow down,

24    Mr. Raurell, because you are a very rapid speaker.  Ms. Sanders

25    needs to be able to take down what it is you are saying.
```

 1            MR. RAURELL:  My apologies to Ms. Sanders.

 2            THE COURT:  You may proceed; but slowly.

 3            MR. RAURELL:  Your Honor, the Federal Government

 4    Defendants will be availing themselves of the opportunity to

 5    file a reply on the issue of venue.

 6            And just to somewhat expand upon the preliminary

 7    jurisdictional issues that Mr. Panuccio cited -- and that have

 8    been teed up by the papers -- we believe really obviate or at

 9    least we believe should be answered, should be resolved before

10    there's an evidentiary hearing; whether there has been a final

11    agency action that could be reviewed under the APA.

12            And you had discussed impact just a moment ago.  The

13    appropriate impact cannot be decided without determining what

14    the final agency action was.

15            So I just wanted to say that the Federal Defendants

16    think that an evidentiary hearing is premature potentially both

17    for the venue reason, but also because there is this important

18    issue about a final agency action.

19            Thank you, Your Honor.

20            THE COURT:  Thank you, Mr. Raurell.  I do note that

21    that has been raised in the papers.

22            As to your reply to venue, I would also ask that you

23    file by the 25th, this Friday, so that I have a fully ripe

24    motion to discuss with all of you on the 28th.

25

24

1        The final agency action I believe is subject to

2   discussion -- which is why a hearing is necessary -- and as I

3   said, I am sure I will be given either witness testimony or

4   some exhibits which go to the positions of the parties.

5        So to repeat, I would ask that the replies by either

6   Co-defendants or the Plaintiffs on venue be filed by the 25th,

7   and I will see all of you here on the 28th at 10 o'clock to

8   discuss venue.

9        The preliminary injunction hearing will be scheduled

10  for August sixth at nine o'clock unless you hear otherwise from

11  me.  Other than those matters, everyone can take a moment and

12  refrain from supplements and the like.

13       If the Eleventh Circuit -- well, no, I guess they're on

14  vacation -- if a "Circuit" comes out with a decision you feel

15  is squarely on point, obviously I am interested in that.

16       But otherwise, I would like all of your focus to be on

17  the issues we already have fully briefed.

18       MR. SCHWIEP: Did Your Honor say the venue hearing was

19  being held on the 28th or the 30th?

20       THE COURT:  I'm sorry if I misspoke; on the 30th.

21       MR. SCHWIEP:  Thank you, Your Honor.

22       THE COURT:  The 30th is the Wednesday, yes?

23       MR. SCHWIEP:  Yes, Your Honor.

24       MR. PANUCCIO:  And, Your Honor, I also have just one

25  clarification if I might.

```
 1              THE COURT:  Of course.
 2              MR. PANUCCIO:  I thought you said -- I thought earlier
 3     you had indicated that the Plaintiffs would file their papers
 4     on venue and then it was optional if we wanted to reply.
 5              We do not have to; is that right?
 6              THE COURT:  You are correct.
 7              MR. PANUCCIO:  And I thought I heard you say -- maybe
 8     everything would be due on the 25th -- I just wanted to clarify
 9     that Plaintiffs would file on the 25th and then we would file
10     later?
11              THE COURT: Plaintiffs will file their response and
12     then Codefendant, Federal Defendants, will file their response
13     reply.
14              You are not obligated to file a reply, because I will
15     be seeing you Wednesday morning, but if you decide to do so
16     then if you could get it to me by Tuesday afternoon so that I
17     can actually read it that would be great.
18              MR. PANUCCIO:  Understood, Your Honor.
19              MR. SCHWIEP:  Your Honor, if we receive the Federal
20     Defendants' position on venue on the 25th -- the Plaintiffs
21     receive it on the 25th -- should we deem it necessary may we
22     have until Tuesday afternoon to submit our reply to the Federal
23     Defendants' position?
24              THE COURT:  Yes, yes.  But, again, I am going to be
25     seeing everybody on Wednesday the 30th.
```

App. 1316

```
1              But, yes, you may do so.  Let me clear, Tuesday the
2    29th, if anyone has anything more to say, I will need that
3    filed on Tuesday the 29th by three o'clock.
4              MR. PANUCCIO:  Thank you, Judge.
5              MR. SCHWIEP:  Thank you.
6              THE COURT:  All right. Let me say this, I am hopeful
7    that I will have a decision well before August 6th, but in the
8    eventuality I allow the Miccosukee to join, I will expect them
9    to be present at the August 6th preliminary injunction hearing.
10             I can take up -- depending on when I make a decision
11   about intervention -- I can take up the issue of allowing the
12   Tribe to give their position on the PI; but it will be quick,
13   it will be fast.
14             UNIDENTIFIED SPEAKER:  Your Honor, are you planning
15   to hear any argument on the intervention papers or are you
16   going to decide it on the papers?
17             THE COURT:  No, I am just going to decide it on the
18   papers.
19             Oh, I see counsel waving his hand.  I think you need to
20   un-mute.
21             MR. AJIZIAN:  Can you hear me now?
22             THE COURT:  Yes; you are un-muted.
23             MR. AJIZIAN: Your Honor, if the Tribe is permitted to
24   intervene, then we will be available on August 6th.
25
```

App. 1317

27

1          THE COURT: And if I grant the Tribe's motion, then I

2   suggest in the interim -- if there is some particular area that

3   you think unique to the Tribe or some position that hasn't been

4   emphasized sufficiently -- I would ask you immediately file a

5   motion to present your position; and I'll give you a timeline.

6          MR. AJIZIAN:  Thank you, Your Honor.

7          THE COURT:  All right.  Thank you all for being

8   available this afternoon.

9          I'm sorry about the glitches in getting everyone up on

10  Zoom, but I thought it important for us to set out a schedule

11  and that Zoom was the fastest way to get it accomplished.

12         So, we now have our schedule, and I look forward to

13  hearing from the parties this Friday, and perhaps Tuesday, and

14  seeing you all next Wednesday at 10 o'clock.

15         We are adjourned.

16

17

18

19

20

21

22

23

24

25

```
1                        -   -   -

2                C E R T I F I C A T E

3        I hereby certify that the foregoing is an accurate

4   transcription of proceedings in the above-entitled matter.

5

6                                  /S/PATRICIA SANDERS

7   _____              _____

8   DATE FILED              PATRICIA SANDERS, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## /

**/S/PATRICIA** [1] - 28:6

## 1

**10** [4] - 7:19, 13:2, 24:7, 27:14
**11** [1] - 9:3
**11-3** [1] - 1:23
**11th** [1] - 5:19
**12** [1] - 9:3
**1231(f)** [1] - 19:18
**13912** [1] - 12:12
**14** [4] - 10:3, 11:4, 11:13, 21:3
**14th** [1] - 6:1
**16th** [1] - 6:2
**18th** [1] - 5:21

## 2

**25-22896** [1] - 2:2
**25-22896-CV-KMW** [1] - 1:2
**25th** [7] - 7:3, 23:23, 24:6, 25:8, 25:9, 25:20, 25:21
**27th** [2] - 5:17, 20:8
**287(g** [1] - 17:5
**28th** [3] - 23:24, 24:7, 24:19
**29th** [1] - 26:2, 26:3

## 3

**3000** [1] - 20:20
**305.523.5528** [1] - 1:24
**30th** [7] - 5:21, 7:19, 7:21, 24:19, 24:20, 24:22, 25:25
**33128** [1] - 1:23

## 4

**40** [2] - 18:7, 20:3
**400** [1] - 1:23
**4th** [1] - 13:2

## 6

**6th** [3] - 26:7, 26:9, 26:24

## 7

**7-21-2025** [1] - 1:9

## 9

**900** [2] - 20:19, 21:15

## A

**A.U.S.A** [1] - 1:16
**ability** [1] - 19:21
**able** [3] - 9:17, 9:19, 22:25
**above-entitled** [1] - 28:4
**access** [1] - 3:4
**accomplished** [1] - 27:11
**accounts** [1] - 20:17
**accurate** [2] - 4:25, 28:3
**acknowledged** [1] - 4:14
**Act** [4] - 5:4, 5:5, 17:18, 20:1
**action** [5] - 15:4, 23:11, 23:14, 23:18, 24:1
**activities** [3] - 16:16, 20:13, 20:25
**activity** [2] - 18:14, 19:5
**additional** [3] - 6:16, 18:10, 19:7
**address** [2] - 8:25, 21:25
**addressed** [2] - 7:3, 8:18
**addresses** [1] - 22:10
**addressing** [2] - 19:12, 22:3
**adduce** [1] - 15:25
**adjacent** [1] - 5:13
**adjourned** [1] - 27:15
**Administrative** [1] - 5:4
**admit** [1] - 3:10
**advance** [1] - 17:11
**advise** [1] - 6:25
**affecting** [1] - 21:24
**afternoon** [16] - 2:9, 2:15, 2:16, 2:19, 2:20, 2:23, 3:1, 3:13, 3:17, 3:20, 3:21, 4:1, 21:13, 25:16, 25:22, 27:8
**agencies** [2] - 17:17, 17:18
**agency** [4] - 23:11, 23:14, 23:18, 24:1
**agents** [1] - 18:17
**ago** [4] - 7:7, 9:3, 9:4, 23:12

**agreement** [3] - 7:16, 17:5, 17:9
**ahead** [1] - 15:23
**Airport** [1] - 5:9
**AJIZIAN** [5] - 4:3, 4:5, 26:21, 26:23, 27:6
**Ajizian** [3] - 1:20, 4:5, 4:10
**al** [4] - 1:3, 1:6, 2:3
**allow** [2] - 21:2, 26:8
**allowed** [3] - 3:4, 3:8, 6:5
**allowing** [1] - 26:11
**amicus** [3] - 4:13, 6:6, 6:20
**announce** [2] - 2:4, 2:24
**announced** [1] - 4:15
**answer** [1] - 6:11
**answered** [1] - 23:9
**APA** [2] - 15:10, 23:11
**apart** [2] - 10:7, 10:16
**apologies** [1] - 4:4, 23:1
**apologize** [3] - 13:13, 13:18, 13:25
**appear** [1] - 6:20
**appearance** [2] - 4:2, 4:15
**appearances** [3] - 1:12, 2:4, 2:24
**appearing** [2] - 2:17, 2:21
**apply** [1] - 19:17
**appreciate** [4] - 6:14, 6:21, 8:11, 15:9
**apprehension** [1] - 19:22
**appropriate** [6] - 5:10, 9:5, 15:21, 18:22, 19:1, 23:13
**appropriately** [1] - 21:23
**aquifer** [1] - 21:24
**area** [2] - 5:15, 27:2
**argue** [1] - 12:18
**argument** [4] - 7:21, 14:23, 17:23, 26:15
**arguments** [6] - 12:23, 13:4, 14:13, 15:13, 15:24, 22:3
**arose** [1] - 12:1
**arrangements** [1] - 8:10
**array** [1] - 4:22
**assembled** [1] - 6:16
**assessment** [1] - 19:9
**assist** [1] - 15:10
**assistance** [1] - 6:25
**assuming** [2] - 9:8,

14:12
**attached** [1] - 17:4
**attachments** [1] - 16:5
**attempt** [1] - 17:13
**attorney** [1] - 14:23
**Attorney's** [2] - 3:2, 3:24
**August** [5] - 13:2, 24:10, 26:7, 26:9, 26:24
**available** [2] - 26:24, 27:8
**availing** [2] - 22:21, 23:4
**Avenue** [1] - 1:23
**aware** [4] - 10:21, 10:22, 11:15, 19:16

## B

**background** [1] - 5:2
**based** [1] - 20:17
**bears** [1] - 21:13
**begin** [2] - 4:16, 5:1
**behalf** [7] - 2:11, 2:17, 2:21, 3:25, 4:6, 6:4, 16:11
**belatedly** [1] - 12:17
**benefit** [1] - 9:21
**Bennett** [2] - 1:14, 2:17
**BENNETT** [1] - 2:16
**best** [1] - 22:4
**better** [1] - 8:5
**Between** [1] - 5:21
**between** [1] - 17:9
**Big** [1] - 5:14
**big** [1] - 8:2
**Biological** [2] - 2:12, 2:13, 2:18
**bit** [1] - 17:20
**blind** [1] - 17:20
**blown** [2] - 14:9, 14:20
**Bob** [1] - 2:10
**boxes** [1] - 4:22
**brief** [2] - 5:2, 6:6
**briefed** [1] - 24:17
**briefing** [1] - 10:17
**briefly** [6] - 14:6, 18:1, 21:4, 21:7, 22:16, 22:17
**bring** [2] - 6:22, 20:2
**brings** [1] - 7:1
**brought** [1] - 20:24
**Burlington** [3] - 1:14, 2:10, 2:11
**business** [1] - 13:21
**busing** [1] - 18:17
**BY** [1] - 1:22

## C

**calendar** [1] - 6:8
**cannot** [5] - 13:14, 14:14, 18:16, 18:23, 23:13
**capacity** [1] - 3:15
**care** [1] - 8:13
**Carlos** [3] - 1:16, 3:1, 22:14
**Case** [1] - 2:2
**case** [13] - 1:2, 3:16, 5:6, 6:3, 6:15, 6:17, 6:23, 11:7, 11:8, 14:14, 14:21, 14:22, 22:9
**cases** [1] - 11:18
**causing** [1] - 18:10
**ceasing** [1] - 18:11
**Center** [4] - 2:12, 2:13, 2:17, 15:7
**center** [1] - 18:17
**certain** [1] - 19:19
**certainly** [2] - 11:20, 19:15
**certify** [1] - 28:3
**change** [1] - 21:12
**changed** [2] - 20:4, 20:17
**Chris** [2] - 1:20, 4:5
**Circuit** [2] - 24:13, 24:14
**circumstance** [1] - 21:12
**cited** [2] - 11:18, 23:7
**citizens** [2] - 20:12, 20:18
**claim** [1] - 5:7
**clarification** [1] - 24:25
**clarify** [4] - 7:25, 8:6, 16:20, 25:8
**clear** [5] - 15:23, 16:12, 18:2, 20:4, 26:1
**clearly** [1] - 4:24
**clerk** [1] - 9:4
**Co** [1] - 24:6
**Co-defendants** [1] - 24:6
**Coalition** [1] - 6:5
**Code** [1] - 5:5
**code** [1] - 9:4
**Codefendant** [1] - 25:12
**Coffey** [1] - 2:10
**collaborated** [1] - 5:8
**Collier** [3] - 5:9, 7:14, 10:13

**commandeered** [1] - 10:10
**compliance** [1] - 19:25, 20:14
**conclude** [2] - 14:12, 14:22
**concludes** [1] - 11:5
**conditions** [1] - 22:1
**conduct** [2] - 9:5, 10:17
**conducted** [1] - 9:19
**conference** [1] - 6:7
**conflict** [3] - 9:6, 10:22, 12:1
**connection** [1] - 9:23
**Constitutional** [1] - 14:22
**construct** [1] - 5:8
**construction** [3] - 20:13, 20:24, 22:7
**contained** [1] - 21:23
**contested** [1] - 15:19
**continue** [2] - 16:6, 19:21
**convenience** [1] - 12:10
**conversations** [1] - 16:6
**correct** [1] - 25:6
**Counsel** [1] - 2:4
**counsel** [9] - 2:13, 6:16, 8:15, 9:18, 11:16, 15:2, 16:22, 21:21, 26:19
**country** [1] - 18:18
**County** [8] - 3:24, 3:25, 5:5, 5:11, 7:14, 10:11, 10:13, 10:15
**couple** [1] - 7:7
**course** [3] - 21:8, 21:12, 25:1
**COURT** [52] - 1:1, 1:10, 2:2, 2:8, 2:15, 2:19, 2:23, 3:7, 3:12, 3:17, 3:20, 3:22, 4:1, 4:4, 4:10, 8:1, 8:8, 8:12, 8:24, 11:14, 12:21, 13:10, 13:20, 14:1, 14:7, 14:17, 15:1, 16:23, 17:2, 17:14, 17:15, 18:3, 18:15, 20:2, 21:6, 21:9, 21:21, 22:18, 22:23, 23:2, 23:20, 24:20, 24:22, 25:1, 25:6, 25:11, 25:24, 26:6, 26:17, 26:22, 27:1, 27:7
**Court** [12] - 1:22, 2:2, 9:21, 10:4, 11:2,

14:10, 14:12, 14:19, 14:21, 15:10, 19:17, 19:19
**court** [1] - 4:22
**Court's** [1] - 12:10
**craft** [1] - 19:19
**created** [1] - 15:14
**Cyprus** [1] - 5:14

## D

**Dade** [6] - 3:23, 3:25, 5:5, 5:9, 10:10, 10:14
**Dade-Collier** [1] - 5:9
**DATE** [1] - 28:8
**david** [1] - 3:24
**David** [1] - 1:18
**days** [4] - 10:3, 11:4, 11:13, 21:3
**dealing** [1] - 9:8
**decide** [3] - 25:15, 26:16, 26:17
**decided** [1] - 23:13
**deciding** [1] - 15:3
**decision** [7] - 18:24, 19:2, 19:12, 19:14, 24:14, 26:7, 26:10
**decisions** [5] - 14:15, 15:4, 16:15, 19:22
**declaration** [2] - 17:3, 17:7
**declaratory** [1] - 5:3
**deem** [1] - 25:21
**Defendant** [7] - 3:14, 5:23, 6:11, 7:8, 7:24, 13:12, 17:9
**defendant** [2] - 3:16, 5:24
**defendants** [3] - 2:24, 7:2, 24:6
**Defendants** [14] - 1:7, 3:3, 7:20, 11:6, 17:10, 17:22, 18:9, 18:10, 20:12, 22:15, 22:20, 23:4, 23:15, 25:12
**DEFENDANTS** [1] - 1:16
**Defendants'** [7] - 9:24, 16:13, 17:4, 17:8, 19:20, 25:20, 25:23
**deny** [1] - 6:18
**Department** [1] - 9:15
**deportation** [1] - 16:14
**deportations** [1] - 19:23
**deposition** [2] - 13:23, 13:25

**DeSousa** [2] - 1:18, 3:18
**detained** [1] - 18:12
**detainees** [5] - 18:10, 20:8, 20:23, 21:15, 21:17
**detaining** [1] - 18:11
**detention** [6] - 14:15, 16:14, 18:12, 19:12, 19:14, 19:22
**Detention** [2] - 5:8, 15:7
**determinations** [1] - 19:23
**determine** [1] - 19:1
**determining** [1] - 23:13
**different** [1] - 22:6
**difficult** [2] - 8:3, 13:18
**dire** [1] - 21:17
**directed** [1] - 22:4
**direction** [1] - 13:6
**Director** [2] - 3:3, 3:15
**discuss** [4] - 6:12, 9:18, 23:24, 24:8
**discussed** [2] - 15:20, 23:12
**discussing** [1] - 16:2
**discussion** [2] - 8:22, 24:2
**discussions** [1] - 16:21
**dismiss** [1] - 11:6
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [3] - 10:9, 12:13, 12:15
**Districts** [1] - 12:14
**Diversity** [3] - 2:12, 2:14, 2:18
**DIVISION** [1] - 1:2
**Division** [3] - 3:6, 3:15, 17:9
**docket** [6] - 18:7, 20:3, 20:5, 20:7, 20:11, 20:16
**documents** [3] - 16:25, 17:13, 17:19
**DOJ** [1] - 3:6
**down** [4] - 14:1, 17:15, 22:23, 22:25
**due** [1] - 25:8

## E

**earliest** [1] - 12:10
**Earthjustice** [2] - 2:14, 2:21
**easily** [2] - 12:11,

12:19
**effort** [2] - 6:14, 6:21
**eight** [1] - 5:22
**eighth** [1] - 13:17
**EIS** [1] - 18:22
**either** [2] - 24:3, 24:5
**Eleventh** [1] - 24:13
**Elise** [2] - 1:14, 2:16
**Emergency** [2] - 3:16, 17:10
**emphasized** [1] - 27:4
**emphatic** [1] - 11:23
**end** [2] - 11:8, 12:20
**endangered** [1] - 5:15
**endeavor** [1] - 9:25
**enforce** [1] - 19:21
**enjoin** [3] - 16:15, 18:5, 19:7
**enjoining** [1] - 18:9
**entanglement** [1] - 17:24
**enter** [1] - 11:14
**entered** [3] - 11:1, 11:11, 19:2
**entirely** [3] - 9:25, 17:23, 20:4
**entitled** [1] - 28:4
**entry** [6] - 18:7, 20:3, 20:5, 20:7, 20:11, 20:16
**Environmental** [3] - 3:6, 5:4, 20:1
**environmental** [4] - 5:10, 19:7, 19:8, 19:9
**equally** [1] - 19:25
**especially** [1] - 9:23
**Esq** [11] - 1:13, 1:13, 1:14, 1:14, 1:15, 1:15, 1:17, 1:17, 1:18, 1:18, 1:20
**essentially** [2] - 14:20, 21:1
**et** [4] - 1:3, 1:6, 2:3
**Evan** [2] - 1:17, 3:18
**events** [4] - 10:9, 10:13, 12:13, 12:15
**eventuality** [1] - 26:8
**Everglades** [7] - 1:3, 2:3, 2:11, 2:22, 5:13, 15:8, 18:21
**evidence** [1] - 15:24
**evidentiary** [6] - 14:9, 14:20, 14:24, 15:17, 23:10, 23:16
**exact** [1] - 18:16
**example** [2] - 14:15, 17:1
**exception** [1] - 15:22
**exchange** [4] - 10:5,

16:25, 17:13, 17:21
**Executive** [1] - 3:15
**exhibits** [4] - 10:5, 16:9, 17:13, 24:4
**expand** [1] - 23:6
**expect** [2] - 15:20, 26:8
**expedited** [2] - 5:17, 5:19
**extension** [1] - 6:10
**extent** [1] - 21:22
**Ezray** [2] - 1:17, 3:18

## F

**facilities** [1] - 21:18
**facility** [3] - 9:24, 15:13, 19:2
**Facility** [1] - 5:9
**fact** [2] - 7:21, 18:20
**factual** [4] - 5:2, 9:22, 11:16, 16:18
**familiar** [1] - 17:6
**fan** [1] - 8:2
**fast** [1] - 26:13
**fastest** [1] - 27:11
**Federal** [21] - 3:3, 5:7, 9:23, 15:19, 16:13, 16:17, 17:4, 17:10, 17:17, 17:21, 17:24, 19:20, 19:25, 20:12, 22:15, 22:20, 23:3, 23:15, 25:12, 25:19, 25:22
**fifth** [1] - 13:21
**file** [13] - 6:5, 7:2, 7:20, 22:21, 23:5, 23:23, 25:3, 25:9, 25:11, 25:12, 25:14, 27:4
**filed** [13] - 5:6, 5:17, 5:19, 5:24, 6:1, 6:5, 7:7, 12:2, 20:7, 20:15, 22:6, 24:6, 26:3
**FILED** [1] - 28:8
**filing** [1] - 21:15
**filings** [1] - 5:22
**fillings** [1] - 17:8
**final** [4] - 23:10, 23:14, 23:18, 24:1
**fine** [1] - 8:7
**first** [3] - 6:13, 9:14, 22:6
**five** [4] - 20:5, 20:7, 20:11, 20:16
**FL** [1] - 1:23
**flooded** [1] - 21:18
**Florida** [5] - 3:15, 4:6, 5:5, 5:7, 6:4

**FLORIDA** [1] - 1:1
**flying** [1] - 17:20
**focus** [2] - 15:10, 24:16
**focusing** [1] - 19:4
**FOIA** [1] - 17:16
**folks** [2] - 6:23, 20:20
**follows** [1] - 18:8
**food** [1] - 21:19
**FOR** [3] - 1:13, 1:16, 1:20
**foregoing** [1] - 28:3
**forward** [6] - 8:24, 13:6, 14:14, 16:3, 21:2, 27:12
**fourth** [2] - 13:14, 13:18
**Friday** [6] - 6:9, 7:2, 7:12, 8:17, 23:3, 27:13
**friend** [1] - 18:4
**Friends** [4] - 1:3, 2:3, 2:11, 2:22
**front** [1] - 11:23
**full** [2] - 14:9, 14:20
**full-blown** [1] - 14:9
**fully** [4] - 8:18, 15:20, 23:23, 24:17

### G

**Galloni** [2] - 1:15, 2:21
**GALLONI** [1] - 2:20
**General's** [1] - 3:19
**gentlemen** [1] - 3:20
**Giles'** [1] - 17:3
**given** [2] - 22:11, 24:3
**glitches** [1] - 24:23
**Government** [1] - 23:3
**Governments** [1] - 5:7
**grant** [2] - 6:9, 27:1
**great** [2] - 13:4, 25:17
**guess** [2] - 12:5, 24:13
**Guthrie** [2] - 3:14, 5:23
**Guthrie's** [2] - 6:11, 7:8

### H

**habitat** [1] - 5:15
**hall** [1] - 22:2
**hand** [2] - 18:4, 26:19
**handling** [1] - 8:21
**hear** [5] - 2:8, 9:14, 24:10, 26:15, 26:21
**heard** [6] - 12:7, 14:6, 20:19, 20:22, 22:16, 25:7
**hearing** [39] - 7:18,

7:25, 8:4, 8:17, 8:20, 9:12, 9:19, 9:21, 10:2, 10:6, 10:17, 11:3, 11:13, 11:19, 11:20, 11:21, 11:22, 12:6, 12:9, 12:20, 13:2, 13:7, 13:22, 14:9, 14:21, 14:24, 15:17, 15:18, 15:21, 16:17, 17:12, 21:3, 23:10, 23:16, 24:2, 24:9, 24:18, 26:9, 27:13
**HEARING** [1] - 1:9
**heat** [1] - 21:19
**heels** [1] - 11:21
**HELD** [1] - 1:9
**held** [4] - 8:5, 13:7, 20:8, 24:19
**helpful** [2] - 16:7, 16:25
**hereby** [1] - 28:3
**Hiaasen** [3] - 1:13, 2:10, 9:3
**history** [1] - 21:7
**hold** [1] - 21:1
**Honor** [50] - 2:9, 2:16, 2:20, 3:1, 3:11, 3:13, 3:25, 4:3, 4:5, 7:23, 8:6, 8:11, 8:23, 9:17, 10:18, 11:5, 12:16, 13:9, 13:23, 13:25, 14:4, 14:8, 14:25, 16:10, 16:20, 16:24, 17:5, 18:1, 18:6, 18:13, 19:15, 20:6, 20:15, 20:22, 21:1, 21:11, 22:13, 22:14, 22:19, 23:3, 23:19, 24:18, 24:21, 24:23, 24:24, 25:18, 25:19, 26:14, 26:23, 27:6
**Honor..** [1] - 21:5
**HONORABLE** [1] - 1:9
**hopeful** [1] - 26:6
**hopefully** [1] - 14:3
**hours** [1] - 7:7
**humanly** [1] - 22:12

### I

**ICE** [1] - 3:3
**ideally** [1] - 12:20
**identify** [2] - 4:21, 4:23
**immediately** [1] - 27:4
**Immigration** [9] - 5:8, 6:5, 14:15, 15:5, 18:6, 18:13, 18:17, 18:20, 19:13

**impact** [5] - 5:10, 19:7, 19:8, 23:12, 23:13
**important** [5] - 7:13, 9:1, 19:25, 23:17, 27:10
**in-person** [1] - 7:25
**including** [3] - 7:7, 10:10, 20:1
**Indians** [1] - 4:6
**indicated** [1] - 25:3
**individuals** [1] - 22:7
**initial** [3] - 10:19, 12:18
**initiative** [1] - 17:23
**injunction** [1] - 5:18, 8:15, 9:12, 9:19, 10:2, 11:12, 16:13, 19:20, 21:3, 24:9, 26:9
**injunctive** [2] - 5:3, 19:17
**instance** [1] - 17:8
**intend** [2] - 10:5, 19:16
**intended** [1] - 15:6
**interest** [1] - 6:15
**interested** [1] - 24:15
**interim** [1] - 27:2
**internally** [1] - 16:21
**intervene** [3] - 6:2, 7:1, 26:24
**intervener** [1] - 4:8
**INTERVENOR** [1] - 1:20
**intervention** [2] - 26:11, 26:15
**introduce** [2] - 2:14, 10:5
**involvement** [1] - 17:24
**issue** [25] - 7:13, 7:16, 7:18, 8:13, 8:18, 9:10, 9:14, 9:18, 10:8, 10:20, 11:7, 11:9, 11:21, 12:4, 12:11, 12:17, 12:22, 14:11, 15:16, 15:22, 16:17, 22:22, 23:5, 23:18, 26:11
**issues** [8] - 9:23, 11:17, 14:24, 16:19, 22:3, 22:10, 23:7, 24:17
**itself** [1] - 19:12

### J

**Jason** [2] - 1:15, 2:17
**Jeffrey** [2] - 1:18, 3:18

**Jesse** [4] - 1:17, 3:14, 7:24, 13:11
**join** [1] - 26:8
**Judge** [10] - 6:2, 10:7, 10:22, 11:1, 11:23, 12:1, 12:9, 17:16, 22:2, 26:4
**JUDGE** [1] - 1:10
**Judge..** [1] - 17:14
**Judicial** [1] - 14:16
**July** [5] - 5:19, 5:21, 6:1, 6:2, 7:19
**June** [4] - 5:6, 5:17, 5:21, 20:8
**jurisdiction** [2] - 10:19, 11:12
**jurisdictional** [2] - 14:13, 23:7
**Justice** [1] - 3:5

### K

**KATHLEEN** [1] - 1:9
**Kevin** [2] - 3:14, 17:3
**Kristi** [2] - 1:6, 2:3

### L

**laid** [2] - 10:12, 11:2
**land** [1] - 15:11
**language** [1] - 19:5
**last** [1] - 6:9
**latest** [1] - 20:19
**law** [2] - 9:4, 16:19
**laws** [2] - 5:12, 19:25
**lawsuit** [2] - 21:25, 22:3
**lawyer** [1] - 9:15
**lawyers** [2] - 3:9, 4:20
**lay** [1] - 12:14
**leads** [1] - 7:6
**least** [3] - 16:7, 21:15, 23:9
**leave** [1] - 7:22
**leaves** [1] - 6:11
**leaving** [1] - 13:24
**legal** [3] - 9:22, 11:17, 15:16
**light** [3] - 7:4, 7:20, 11:18
**limitations** [1] - 19:16
**limited** [2] - 11:2, 20:21
**limits** [1] - 19:17
**list** [1] - 10:6
**listening** [1] - 4:18
**litigation** [1] - 21:7
**located** [1] - 5:13
**logistics** [1] - 13:7
**look** [3] - 11:3, 12:2,

27:12
**looking** [1] - 16:8
**looks** [1] - 9:22

### M

**Main** [1] - 3:5
**Management** [2] - 3:16, 17:10
**MARIE** [1] - 3:24
**Marissa** [1] - 3:5
**Martinez** [1] - 6:2
**Martinez's** [2] - 10:22, 12:1
**materials** [1] - 17:21
**matter** [4] - 13:20, 14:5, 15:13, 28:4
**matters** [6] - 6:8, 19:13, 24:11
**mean** [2] - 18:13, 22:16
**means** [3] - 7:19, 21:6, 21:7
**meant** [1] - 16:21
**mentioned** [1] - 16:18
**mIAMI** [1] - 1:2
**Miami** [8] - 1:23, 1:23, 3:2, 3:23, 3:25, 5:5, 10:10, 10:14
**Miami-Dade** [4] - 3:23, 5:5, 10:10, 10:14
**Miccosukee** [3] - 4:6, 6:1, 26:8
**microphone** [1] - 4:25
**middle** [2] - 15:7, 18:21
**might** [2] - 16:2, 24:25
**migrants** [1] - 22:1
**mindful** [1] - 9:10
**misspoke** [1] - 24:20
**mix** [1] - 16:18
**mixed** [2] - 9:22, 11:16
**modified** [1] - 20:4
**moment** [2] - 23:12, 24:11
**month** [1] - 9:9
**moot** [1] - 11:8
**mooted** [1] - 5:24
**morning** [2] - 5:24, 25:15
**motion** [16] - 4:8, 5:17, 5:19, 6:1, 6:10, 7:1, 10:2, 10:20, 10:21, 10:24, 11:3, 20:3, 20:16, 23:24, 27:1, 27:5
**motions** [2] - 6:11, 7:6
**mouth** [1] - 19:10
**move** [4] - 8:24, 13:14, 13:15, 13:17

**moved** [2] - 11:6, 21:15
**moving** [1] - 20:20
**MR** [50] - 2:7, 2:9, 3:1, 3:11, 3:13, 3:18, 3:21, 3:24, 4:3, 4:5, 7:23, 8:6, 8:9, 8:23, 9:17, 12:9, 13:9, 13:11, 13:23, 14:4, 14:8, 14:18, 16:10, 16:24, 17:3, 17:16, 18:1, 18:4, 19:15, 20:6, 21:8, 21:11, 22:13, 22:14, 22:19, 23:1, 23:3, 24:18, 24:21, 24:23, 24:24, 25:2, 25:7, 25:18, 25:19, 26:4, 26:5, 26:21, 26:23, 27:6
**MS** [2] - 2:16, 2:20
**Murray** [2] - 1:18, 3:24
**must** [1] - 4:21
**mute** [2] - 2:6, 26:20
**muted** [2] - 2:7, 26:22

**N**

**names** [1] - 3:9
**narrowly** [2] - 11:2, 20:21
**National** [3] - 5:4, 5:14, 20:1
**Nationally** [1] - 5:14
**Natural** [1] - 3:6
**necessarily** [1] - 11:20
**necessary** [3] - 7:22, 24:2, 25:21
**need** [6] - 6:16, 6:17, 6:24, 7:12, 7:16, 8:19, 11:23, 12:23, 13:24, 22:23, 26:2, 26:19
**needed** [2] - 12:2, 15:14
**needs** [3] - 7:3, 13:1, 22:25
**NEPA** [3] - 5:11, 15:10, 20:14
**next** [4] - 8:17, 11:13, 12:6, 27:14
**nine** [2] - 14:2, 24:10
**nobody** [1] - 12:2
**Noem** [3] - 1:6, 2:3, 3:3
**Noem's** [1] - 15:13
**non** [3] - 20:12, 20:18, 21:20
**non-citizens** [1] - 20:12, 20:18
**non-potable** [1] -

21:20
**none** [2] - 10:22, 11:6
**North** [1] - 1:23
**note** [1] - 23:20
**notices** [2] - 5:22, 5:23
**noting** [1] - 21:13
**Number** [1] - 1:2
**number** [2] - 9:13, 20:19

**O**

**o'clock** [7] - 7:19, 13:3, 14:2, 24:7, 24:10, 26:3, 27:14
**objected** [1] - 5:23
**obligated** [1] - 25:14
**obligations** [1] - 16:13
**obviate** [1] - 23:8
**obviously** [1] - 24:15
**occur** [2] - 10:9, 19:24
**occurred** [3] - 10:14, 12:13, 12:15
**OF** [1] - 1:1
**Office** [3] - 3:2, 3:19, 3:24
**offices** [1] - 7:22
**official** [1] - 3:14
**one** [11] - 6:13, 7:7, 10:23, 11:10, 14:11, 17:1, 18:4, 18:24, 21:6, 21:7, 24:24
**operation** [1] - 9:24
**operations** [1] - 18:11
**opportunity** [2] - 22:21, 23:4
**optional** [1] - 25:4
**oral** [1] - 7:21
**order** [5] - 6:7, 8:15, 18:9, 18:23, 20:10
**original** [2] - 20:5, 20:16
**originally** [1] - 12:21
**otherwise** [2] - 24:10, 24:16
**own** [1] - 5:24

**P**

**PANUCCIO** [19] - 3:13, 3:18, 3:21, 7:23, 8:6, 8:9, 13:9, 13:11, 13:23, 14:4, 14:8, 14:18, 18:1, 18:4, 24:24, 25:2, 25:7, 25:18, 26:4
**Panuccio** [10] - 1:17, 3:14, 7:24, 9:16, 13:11, 14:3, 16:1,

19:5, 20:2, 23:7
**papers** [7] - 11:15, 23:8, 23:21, 25:3, 26:15, 26:16, 26:18
**particular** [2] - 15:4, 27:2
**parties** [6] - 4:17, 10:5, 15:23, 17:12, 24:4, 27:13
**parties'** [1] - 7:15
**party** [1] - 14:19
**PATRICIA** [2] - 1:22, 28:8
**patricia_sanders@ flsd.uscourts.gov** [1] - 1:24
**Paul** [3] - 1:13, 2:9, 16:10
**pending** [1] - 4:9
**people** [1] - 4:11
**perhaps** [2] - 11:17, 27:13
**permitted** [2] - 20:25, 26:23
**person** [5] - 7:25, 8:1, 8:5, 8:6, 13:8
**perspective** [2] - 6:16, 7:16
**Peter** [1] - 3:5
**PI** [3] - 5:20, 12:7, 26:12
**pictures** [1] - 16:4
**piece** [1] - 12:8
**Piropato** [1] - 3:5
**place** [1] - 22:6
**Plaintiff** [3] - 2:5, 2:22, 4:8
**Plaintiffs** [16] - 1:4, 2:11, 4:7, 5:7, 5:17, 5:21, 7:12, 11:22, 16:11, 16:12, 19:6, 24:6, 25:3, 25:9, 25:11, 25:20
**PLAINTIFFS** [1] - 1:13
**Plaintiffs'** [2] - 7:9, 16:22
**planning** [1] - 26:14
**pleadings** [1] - 12:2
**point** [5] - 6:18, 11:16, 12:7, 20:2, 24:15
**Policy** [2] - 5:4, 20:1
**portion** [4] - 10:9, 10:13, 10:14, 12:15
**position** [7] - 9:24, 14:8, 15:20, 25:23, 26:12, 27:3, 27:5
**positions** [1] - 24:4
**possible** [1] - 22:12
**possibly** [1] - 20:20
**postpone** [1] - 13:5

**potable** [1] - 21:20
**potentially** [2] - 13:17, 23:16
**precede** [1] - 14:24
**prefer** [1] - 8:1
**prejudice** [1] - 6:19
**preliminary** [8] - 5:18, 8:15, 9:11, 9:19, 10:2, 23:6, 24:9, 26:9
**premature** [1] - 23:16
**prepare** [1] - 14:20
**preparing** [2] - 5:10, 18:12
**present** [3] - 15:24, 26:9, 27:5
**Preserve** [1] - 5:14
**press** [1] - 4:17
**pretty** [1] - 8:21
**prevent** [2] - 15:16, 20:11
**procedural** [1] - 5:2
**Procedure** [1] - 5:5
**proceed** [2] - 12:24, 23:2
**proceeded** [1] - 9:8
**proceeding** [3] - 3:8, 9:1, 16:2
**proceedings** [2] - 4:18, 28:4
**prohibited** [1] - 4:18
**proper** [1] - 14:12
**property** [2] - 10:10, 10:14
**proposed** [4] - 4:8, 4:13, 20:10, 22:10
**prospective** [1] - 20:9
**protected** [1] - 5:15
**protocol** [1] - 19:1
**provide** [2] - 10:6, 17:1
**provision** [1] - 15:2
**public** [2] - 4:17, 20:10
**pun** [1] - 15:6
**put** [5] - 9:7, 10:1, 15:7, 19:2, 22:20
**putting** [1] - 19:10

**Q**

**qualms** [1] - 13:5
**quick** [2] - 11:24, 26:12
**quickly** [2] - 13:2, 22:11
**quintessential** [1] - 18:13
**quite** [2] - 8:3, 13:2
**quo** [1] - 21:2

**R**

**raise** [1] - 16:18
**raised** [5] - 10:20, 12:4, 12:17, 15:23, 23:21
**raises** [1] - 7:13
**rapid** [1] - 22:24
**rather** [1] - 7:13
**RAURELL** [6] - 3:1, 3:11, 22:14, 22:19, 23:1, 23:3
**Raurell** [5] - 1:16, 3:2, 22:14, 22:24, 23:20
**read** [2] - 11:15, 25:17
**real** [1] - 9:6
**really** [4] - 7:9, 8:15, 15:3, 23:8
**reason** [2] - 11:11, 23:17
**reassigned** [1] - 6:3
**receive** [2] - 25:19, 25:21
**recognized** [1] - 7:11
**Recognizing** [1] - 20:15
**record** [8] - 3:9, 4:18, 4:25, 8:25, 9:7, 16:20, 18:2, 22:20
**records** [1] - 17:17
**recused** [1] - 6:2
**reference** [1] - 17:5
**referred** [1] - 16:21
**referring** [1] - 15:1
**refrain** [1] - 24:12
**related** [3] - 18:5, 18:11, 18:14
**relief** [3] - 5:3, 18:8, 19:17
**rely** [1] - 17:22
**remind** [2] - 4:16, 4:20
**removability** [1] - 19:22
**removal** [1] - 16:14
**renew** [1] - 6:19
**renewed** [4] - 10:1, 10:21, 11:3, 20:3
**repeat** [1] - 24:5
**replies** [1] - 24:5
**reply** [8] - 7:20, 22:21, 23:5, 23:22, 25:4, 25:13, 25:14, 25:22
**reported** [2] - 20:17, 21:14
**REPORTED** [1] - 1:22
**reporter** [1] - 4:22
**Reporter** [1] - 1:22
**REPORTER** [1] - 17:14

**reporting** [1] - 21:16
**reports** [1] - 21:18
**request** [9] - 6:5, 6:19, 12:9, 12:20, 15:10, 18:8, 20:5, 20:21, 20:23
**requests** [2] - 17:17, 17:18
**required** [1] - 5:11
**requiring** [1] - 18:9
**reset** [1] - 13:5
**resolution** [2] - 6:17, 11:24
**resolve** [1] - 6:8
**resolved** [5] - 12:11, 12:19, 13:1, 14:11, 23:9
**Resources** [1] - 3:6
**resources** [1] - 14:19
**respond** [2] - 7:12, 18:1
**response** [5] - 7:2, 7:8, 17:4, 25:11, 25:12
**responses** [2] - 10:19, 12:18
**restraining** [2] - 8:14, 18:9
**restrains** [1] - 19:20
**review** [2] - 14:16, 22:11
**reviewed** [3] - 9:4, 15:15, 23:11
**reviewing** [1] - 13:4
**ripe** [1] - 23:23
**Robert** [1] - 1:14
**room** [1] - 3:4
**RPR** [2] - 1:22, 28:8
**Ruiz** [1] - 22:2
**ruling** [1] - 5:20
**run** [1] - 13:21

## S

**sanders** [4] - 4:23, 4:25, 22:24, 23:1
**SANDERS** [3] - 1:22, 28:6, 28:8
**saw** [1] - 12:2
**schedule** [6] - 8:17, 9:11, 10:4, 22:10, 27:10, 27:12
**scheduled** [3] - 6:7, 10:2, 24:9
**scheduling** [1] - 14:4
**Schwiep** [9] - 1:13, 2:10, 8:21, 9:11, 12:5, 16:1, 16:10, 19:10, 22:5
**SCHWIEP** [19] - 2:7,

2:9, 8:23, 9:17, 12:9, 16:10, 16:24, 17:3, 17:16, 19:15, 20:6, 21:8, 21:11, 22:13, 24:18, 24:21, 24:23, 25:19, 26:5
**Scott** [2] - 1:13, 2:10
**screen** [2] - 4:12, 4:22
**Secretary** [1] - 3:3
**see** [9] - 3:7, 3:10, 4:12, 4:13, 6:8, 6:15, 15:16, 24:7, 26:19
**seeing** [3] - 25:15, 25:25, 27:14
**seeking** [4] - 16:12, 16:15, 18:5, 20:22
**sent** [2] - 17:16, 17:17
**separate** [1] - 12:14
**set** [7] - 7:18, 10:4, 11:4, 11:13, 13:2, 14:1, 27:10
**seventh** [1] - 13:16
**sewage** [1] - 21:22
**sharpless** [1] - 6:18
**Sharpless** [3] - 4:13, 6:4, 6:14
**Sharpless'** [1] - 15:10
**side** [1] - 17:16
**sides** [1] - 11:18
**significant** [1] - 21:12
**site** [11] - 18:11, 18:12, 19:24, 20:9, 20:13, 20:14, 20:18, 20:20, 20:24, 20:25, 21:16
**situation** [1] - 21:16
**sixth** [3] - 13:16, 14:2, 24:10
**slow** [2] - 17:15, 22:23
**slowly** [2] - 4:24, 23:2
**Solicitor** [1] - 3:19
**somewhat** [3] - 20:4, 21:9, 23:6
**sorry** [2] - 24:20, 27:9
**sort** [2] - 14:24, 16:12
**sought** [1] - 20:10
**sOUTHERN** [1] - 1:1
**speaker** [1] - 22:24
**SPEAKER** [1] - 26:14
**speaking** [1] - 4:23
**species** [1] - 5:16
**spoils** [1] - 21:19
**spoken** [1] - 4:7
**squarely** [1] - 24:15
**starting** [2] - 2:4, 14:2
**State** [16] - 3:16, 3:19, 5:11, 5:15, 7:24, 8:7, 9:23, 9:25, 13:11, 15:12, 15:19, 16:17, 17:18, 17:22, 17:23,

20:12
**statement** [1] - 5:11
**STATES** [2] - 1:1, 1:10
**States** [1] - 1:22
**status** [2] - 6:7, 21:2
**statutes** [1] - 9:5
**Statutes** [1] - 5:5
**still** [3] - 4:9, 13:1, 14:13
**Stop** [1] - 22:23
**stop** [4] - 20:13, 21:21, 22:23
**straighten** [1] - 6:22
**straightforward** [1] - 11:17
**streamlined** [1] - 16:8
**strongly** [1] - 10:7
**subject** [2] - 14:16, 24:1
**submissions** [1] - 15:15
**submit** [1] - 25:22
**submitted** [2] - 16:5, 20:11
**substance** [1] - 14:5
**substantial** [3] - 10:9, 10:13, 12:15
**sufficiently** [1] - 27:4
**suggest** [3] - 10:12, 17:11, 27:2
**suggested** [1] - 10:1
**suggestion** [1] - 10:18
**suit** [2] - 5:3, 22:6
**Suite** [1] - 1:23
**Sunshine** [1] - 17:18
**supplement** [3] - 5:25, 7:9, 7:11
**supplemental** [1] - 7:8
**supplemented** [1] - 5:22
**supplements** [3] - 7:9, 7:10, 24:12
**supply** [1] - 21:24
**support** [1] - 17:22
**surged** [1] - 20:18
**sweltering** [1] - 21:19

## T

**tailor** [1] - 20:21
**tailored** [1] - 11:2
**Tallahassee** [2] - 13:15, 13:20
**Tanya** [2] - 1:15, 2:21
**team** [1] - 16:22
**teasing** [1] - 21:9
**technically** [1] - 7:10
**technology** [1] - 8:2
**teed** [2] - 7:17, 23:8

**temporary** [2] - 8:14, 18:8
**terms** [6] - 8:10, 12:5, 13:7, 16:7, 16:17, 19:21
**testimony** [1] - 24:3
**THE** [54] - 1:9, 1:13, 1:16, 1:20, 2:2, 2:8, 2:15, 2:19, 2:23, 3:7, 3:12, 3:17, 3:20, 3:22, 4:1, 4:4, 4:10, 8:1, 8:8, 8:12, 8:24, 11:14, 12:21, 13:10, 13:20, 14:1, 14:7, 14:17, 15:1, 16:23, 17:2, 17:14, 17:15, 18:3, 18:15, 20:2, 21:6, 21:9, 21:21, 22:18, 22:23, 23:2, 23:20, 24:20, 24:22, 25:1, 25:6, 25:11, 25:24, 26:6, 26:17, 26:22, 27:1, 27:7
**themselves** [3] - 2:14, 22:21, 23:4
**thinking** [1] - 9:14
**threatened** [1] - 5:16
**three** [1] - 26:3
**timeframe** [2] - 22:11
**timeline** [1] - 27:5
**Title** [3] - 15:2, 16:14, 19:21
**TNT** [4] - 5:10, 5:13, 7:14, 15:14
**to..** [1] - 17:13
**today** [7] - 8:22, 11:1, 11:11, 11:12, 11:15, 20:22, 21:2
**toilets** [1] - 21:19
**Torstensen** [1] - 3:5
**Totoiu** [2] - 1:15, 2:17
**towards** [1] - 20:20
**Training** [1] - 5:9
**training** [1] - 18:16
**transcription** [1] - 28:4
**transfer** [1] - 11:7
**Transition** [1] - 5:9
**transparent** [2] - 9:2, 9:10
**transpired** [1] - 7:5
**transport** [1] - 18:10
**transporting** [1] - 20:12
**tremendous** [1] - 14:19
**Tribe** [5] - 4:6, 6:1, 26:12, 26:23, 27:3
**Tribe's** [1] - 27:1
**tried** [1] - 20:21

**TRO** [10] - 5:18, 5:20, 10:19, 10:23, 11:1, 11:2, 11:11, 11:15, 12:7, 20:16
**true** [1] - 18:6
**Tuesday** [5] - 25:16, 25:22, 26:1, 26:3, 27:13
**turn** [2] - 8:14, 9:15
**two** [2] - 12:14, 21:4
**type** [1] - 8:4

## U

**U.S** [1] - 3:2
**ultimately** [2] - 11:5, 11:7
**un-muted** [2] - 2:6, 26:20
**un-muted** [2] - 2:7, 26:22
**unable** [1] - 10:23
**unclear** [2] - 17:7, 17:8
**under** [6] - 5:4, 12:12, 16:13, 17:18, 19:17, 23:11
**Understood** [1] - 25:18
**unfortunately** [1] - 13:13
**UNIDENTIFIED** [1] - 26:14
**unique** [1] - 27:3
**UNITED** [1] - 1:1
**United** [1] - 1:22
**uNITED** [1] - 1:10
**unknown** [1] - 19:8
**unless** [1] - 24:10
**unnecessary** [1] - 14:9
**unopposed** [1] - 6:10
**up** [13] - 4:7, 6:13, 7:7, 7:17, 10:4, 10:23, 12:22, 14:10, 20:2, 23:8, 26:10, 26:11, 27:9
**urge** [1] - 16:5
**useful** [2] - 17:12, 17:21

## V

**vacation** [1] - 24:14
**various** [1] - 6:11
**venue** [28] - 7:13, 8:18, 10:8, 10:12, 10:20, 11:6, 11:7, 11:9, 11:21, 12:4, 12:11, 12:14, 12:16,

12:22, 13:4, 14:10, 14:12, 15:22, 22:22, 23:5, 23:17, 23:22, 24:6, 24:8, 24:18, 25:4, 25:20

**versus** [1] - 2:3
**view** [1] - 20:19
**VIII** [3] - 15:2, 16:14, 19:21
**vs** [1] - 1:5

## W

**wading** [2] - 15:4, 15:6
**wait** [1] - 7:5
**waiting** [2] - 3:4, 11:22
**waiver** [1] - 12:19
**water** [1] - 21:23
**water..** [1] - 21:20
**waving** [1] - 26:19
**Wednesday** [5] - 7:19, 24:22, 25:15, 25:25, 27:14
**week** [3] - 12:6, 12:20, 13:16
**weeks** [1] - 15:13
**weigh** [1] - 18:23
**welcome** [1] - 8:12
**whole** [1] - 16:17
**widely** [1] - 21:14
**WILLIAMS** [1] - 1:9
**wise** [1] - 14:4
**wish** [3] - 7:20, 14:5, 15:24
**witness** [2] - 10:6, 24:3
**witnesses** [3] - 9:13, 9:22, 14:20
**words** [1] - 19:10

## Y

**year** [1] - 5:6
**years** [1] - 9:3
**yourself** [2] - 2:6, 4:21

## Z

**Zoom** [5] - 3:8, 4:11, 4:17, 27:10, 27:11
**ZOOM** [1] - 1:9

App. 1325

# Doc. 73

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 25-22896-CV-WILLIAMS**

FRIENDS OF THE EVERGLADES, INC., *et al.*,

      Plaintiffs,

v.

KRISTI NOEM, *et al.*,

      Defendants.

_____/

**<u>OMNIBUS ORDER</u>**

**THIS MATTER** is before the Court following the July 30, 2025 Hearing in this matter. (DE 72). For the reasons stated at the Hearing, it is **ORDERED AND ADJUDGED** as follows:

1. The Miccosukee Tribe of Indians of Florida's Motion to Intervene (DE 33) is **GRANTED.**

2. The Court accepts all supplements that have been filed as of the date of this Order, (DE 14; DE 20; DE 25; DE 26; DE 27; DE 28; DE 34; DE 35; DE 38; DE 47; DE 49; DE 50; DE 57; DE 61; DE 65; DE 66; DE 70; DE 71), for the purposes of considering Plaintiffs' Expedited Motion for TRO and Preliminary Injunction (DE 5) and Plaintiffs' Renewed Motion for TRO (DE 40).

3. Plaintiffs shall disclose to Defendants their witness and exhibit lists for the August 6, 2025 Hearing on or before **<u>August 1, 2025 at 11:59 p.m.</u>** Defendants shall disclose to Plaintiffs any witness and exhibit lists for that Hearing on or before **<u>August 4, 2025 at 5:00 p.m.</u>**

App. 1327

**DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>30th</u> day of July, 2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# Doc. 102

This is an Automatic e-mail Message Generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**Southern District of Florida**

**Notice of Electronic Filing**

The following transaction was entered on 8/7/2025 at 10:41 AM EDT and filed on 8/6/2025

| | |
|---|---|
| **Case Name:** | Friends of the Everglades, Inc. et al v. Noem et al |
| **Case Number:** | 1:25-cv-22896-KMW |
| **Filer:** | |
| **Document Number:** | 102(No document attached) |

**Docket Text:**
**PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams.**

**Miscellaneous Hearing held on 8/6/2025. Court heard witness testimony and reviewed admitted exhibits. Court adjourned. Hearing will reconvene on 8/7/2025 at 9:00 am.**

**Counsel of record present.**

**Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov.**

**(mso)**


**1:25-cv-22896-KMW Notice has been electronically mailed to:**

Adam R.F. Gustafson     adam.gustafson@usdoj.gov

Alisa Ann Coe     acoe@earthjustice.org, acorrea@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Carlos Javier Raurell     carlos.raurell@usdoj.gov, melissa.Jiminson@usdoj.gov, USAFLS-HQDKT@usdoj.gov

Christopher Ara Ajizian     chris@ajizianlaw.com

Christopher J. Wahl     wahl@miamidade.gov, victor.rodriguez3@miamidade.gov

David Marion Murray     dmmurray@miami-airport.com, dmurr@miamidade.gov, rmartin@miami-airport.com

David Matthew Costello     dcostello@bsfllp.com

Dominique Rebecca Kate Burkhardt     dburkhardt@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Elise Pautler Bennett     ebennett@biologicaldiversity.org, 1629923420@filings.docketbird.com

Evan Matthew Ezray     eezray@bsfllp.com

Hayley A. Carpenter     hayley.carpenter@usdoj.gov

Jason Alexander Totoiu     jtotoiu@biologicaldiversity.org

Jeffrey Paul DeSousa     jeffrey.desousa@myfloridalegal.com

Jesse Michael Panuccio     jpanuccio@bsfllp.com, jesse-panuccio-7320@ecf.pacerpro.com

Marissa A. Piropato     marissa.piropato@usdoj.gov

Monica Rizo     rizo@miamidade.gov, IlianaG@miamidade.gov, klw@miamidade.gov, madalis.gonzalez@miamidade.gov

Nathan Andrew Forrester     nathan.forrester@myfloridalegal.com

App. 1330

Paul Joseph Schwiep     pschwiep@coffeyburlington.com, service@coffeyburlington.com, yvb@coffeyburlington.com

Rebecca Ann Sharpless     rsharpless@law.miami.edu, destrabao@law.miami.edu, rdominguez@law.miami.edu

Robert Scott Schenck     robert.schenck@myfloridalegal.com, jenna.hodges@myfloridalegal.com

Scott Andrew Hiaasen     shiaasen@coffeyburlington.com, lperez@coffeyburlington.com, service@coffeyburlington.com

Tania Galloni     tgalloni@earthjustice.org, acorrea@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Todd Rapp Friedman     todd@toddfriedmanpa.com

**1:25-cv-22896-KMW Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

# Doc. 103

This is an Automatic e-mail Message Generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

USCA11 Case: 25-12570    Document: 80-1    Date Filed: 10/16/2025    Page: 150 of 160B

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**Southern District of Florida**

**Notice of Electronic Filing**

The following transaction was entered on 8/7/2025 at 5:40 PM EDT and filed on 8/7/2025

| | |
|---|---|
| **Case Name:** | Friends of the Everglades, Inc. et al v. Noem et al |
| **Case Number:** | 1:25-cv-22896-KMW |
| **Filer:** | |
| **Document Number:** | 103(No document attached) |

**Docket Text:**
**PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams.**

**Miscellaneous Hearing held on 8/7/2025. Court heard witness testimony, reviewed admitted exhibits and oral arguments of counsel. Court adjourned. Hearing to reconvene on Tuesday, 8/12/2025 at 10:00 am.**

**Counsel of record present.**

**Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov.**

**(mso)**


**1:25-cv-22896-KMW Notice has been electronically mailed to:**

Adam R.F. Gustafson    adam.gustafson@usdoj.gov

Alisa Ann Coe    acoe@earthjustice.org, acorrea@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Carlos Javier Raurell    carlos.raurell@usdoj.gov, melissa.Jiminson@usdoj.gov, USAFLS-HQDKT@usdoj.gov

Christopher Ara Ajizian    chris@ajizianlaw.com

Christopher J. Wahl    wahl@miamidade.gov, victor.rodriguez3@miamidade.gov

David Marion Murray    dmmurray@miami-airport.com, dmurr@miamidade.gov, rmartin@miami-airport.com

David Matthew Costello    dcostello@bsfllp.com

Dominique Rebecca Kate Burkhardt    dburkhardt@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Elise Pautler Bennett    ebennett@biologicaldiversity.org, 1629923420@filings.docketbird.com

Evan Matthew Ezray    eezray@bsfllp.com

Hayley A. Carpenter    hayley.carpenter@usdoj.gov

Jason Alexander Totoiu    jtotoiu@biologicaldiversity.org

Jeffrey Paul DeSousa    jeffrey.desousa@myfloridalegal.com

Jesse Michael Panuccio    jpanuccio@bsfllp.com, jesse-panuccio-7320@ecf.pacerpro.com

Marissa A. Piropato    marissa.piropato@usdoj.gov

Monica Rizo    rizo@miamidade.gov, IlianaG@miamidade.gov, klw@miamidade.gov, madalis.gonzalez@miamidade.gov

Nathan Andrew Forrester    nathan.forrester@myfloridalegal.com

Paul Joseph Schwiep    pschwiep@coffeyburlington.com, service@coffeyburlington.com, yvb@coffeyburlington.com

Rebecca Ann Sharpless    rsharpless@law.miami.edu, destrabao@law.miami.edu, rdominguez@law.miami.edu

Robert Scott Schenck    robert.schenck@myfloridalegal.com, jenna.hodges@myfloridalegal.com

Scott Andrew Hiaasen    shiaasen@coffeyburlington.com, lperez@coffeyburlington.com, service@coffeyburlington.com

Tania Galloni    tgalloni@earthjustice.org, acorrea@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Todd Rapp Friedman    todd@toddfriedmanpa.com

**1:25-cv-22896-KMW Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

# Doc. 104

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 25-22896-CV-WILLIAMS

FRIENDS OF THE EVERGLADES, INC., *et al.*,

     Plaintiffs,

v.

KRISTI NOEM, *et al.*,

     Defendants.

_____/

### <u>ORDER</u>

**THIS MATTER** is before the Court on Plaintiffs Friends of the Everglades, Inc. ("**Friends**") and Center for Biological Diversity's ("**CBD**") (together, "**Plaintiffs**") Renewed Motion for TRO (DE 40). Also before the Court are Defendant Executive Director Kevin Guthrie ("**Guthrie**" or the "**State**") and Defendants Secretary Kristi Noem and Acting Director Todd Lyons' (together, "**Federal Defendants**") venue challenges. (DE 50; DE 60). The Renewed Motion for TRO and the improper venue challenge are fully briefed.[1] For the reasons set forth below and stated on the record during the August 7, 2025 Hearing, Plaintiffs' Renewed Motion for TRO (DE 40) is **GRANTED IN PART AND DENIED IN PART**.[2]

---

[1] All Defendants responded in opposition to Plaintiffs' Motion for Preliminary Injunction, (DE 12; DE 16; DE 21), which addresses the arguments reiterated in Plaintiffs' Renewed Motion for TRO, and Plaintiffs replied (DE 24). Defendant Guthrie and the Federal Defendants responded to Plaintiffs' Renewed Motion for TRO specifically, (DE 50; DE 60), and Plaintiffs replied (DE 45; DE 46).

[2] A more comprehensive recitation of the proceedings and the case authority supporting injunctive relief will follow in a supporting memorandum.

I.    **BACKGROUND**

The Court provides an abbreviated background meant to contextualize this Order. On June 23, 2025, the Florida Division of Emergency Management ("**FDEM**") took control of the Dade-Collier Training and Transition Airport ("**TNT**"), in order to construct a mass migrant detention and deportation facility ("**Facility**"). (DE 1 ¶¶ 1, 39). Two days later, Florida Governor Ron DeSantis announced that the Facility "is fully funded by the federal government . . . [and] was requested by the federal government." (*Id*. ¶ 35). Pre-construction and construction activities at TNT began that week. (*Id*. ¶¶ 40–42). According to Plaintiffs, no environmental assessment or impact statement as required by law was prepared prior to building on this protected land. (*Id*. ¶ 43).

On June 27, 2025, non-profit environmental organizations Friends and CBD filed this suit seeking declaratory and injunctive relief to halt the Facility's construction and operation until the project complied with certain relevant federal, state, and local laws. (*Id*. ¶¶ 1, 8, 13). Most notably, Plaintiffs claim the project is being built and operated in violation of the National Environmental Policy Act ("**NEPA**"), which requires that major federal actions significantly affecting the human environment undergo environmental review processes. (*Id*. ¶¶ 61–74) (Count I). Because no such review has been done, Plaintiffs claim, the approval and use of the Facility by the United States Department of Homeland Security ("**DHS**"), including Immigration and Customs Enforcement ("**ICE**"), is unlawful under the Administrative Procedure Act ("**APA**"). (*Id*. ¶¶ 75–79) (citing 5 U.S.C. § 701 *et seq.*) (Count II).[3]

---

[3] Plaintiffs further claim the State's participation in the project through FDEM exceeds the department's authority under Florida Statutes Chapters 252 and 944. (DE 1 ¶¶ 80–87) (Count III). Finally, Plaintiffs allege Defendant Miami-Dade County ("**Miami-Dade**")

On the same day, Plaintiffs filed their Motion for Preliminary Injunction (DE 5), requesting that the Court enjoin the State and the Federal Defendants from developing or using the TNT site as an immigration detention facility "unless and until Defendants comply with NEPA and the APA." (DE 5 at 1–2, 14). Within the following week, all Defendants responded, (DE 12; DE 16; DE 21), among other arguments, and Plaintiffs replied. (DE 24).

The Federal Defendants attached a declaration from Thomas Giles, Acting Deputy Executive Associate Director for ICE's Enforcement and Removal Operations (DE 21-1). Among other things, Giles declared that any detentions at the Facility would be pursuant to "section 287(g) of the Immigration and Nationality Act [("*INA*")], codified at 8 U.S.C § 1357(g)." (DE 21-1 ¶ 7).

A few weeks later, Plaintiffs filed a Renewed Motion for TRO, explaining that since they filed suit, the "State and Federal Defendants commenced transporting immigration detainees to the TNT [s]ite," that, according to State officials, "as many as 900 people are now being detained at the [s]ite, and [that] the State has plans to expand the number of detainees to as many as 4,000." (DE 40 at 2). Given the completion of the Facility's first phase of construction and its ongoing operations, Plaintiffs altered their request for injunctive relief, now seeking a "halt [to] any further construction on the TNT [s]ite . . ., [a] pause[ to] the transport of additional detainees to the [s]ite, and [the] ceasing [of] any

unlawfully acquiesced in allowing their property, TNT, to be used as a detention facility without the proper permits and in violation of county code. (*Id.* ¶¶ 88–94) (Count IV). These last two counts are not part of the basis for Plaintiffs' requests for injunctive relief.

operations related to detaining or preparing for the detention of anyone not [already] detained at the [s]ite[.]" (*Id.* at 6).[4]

On July 21, 2025, the State filed a Supplemental Response to Plaintiffs' Requests for a Temporary Restraining Order ("***Supplemental Response on Venue***"), arguing for the first time that "venue is not proper in this Court." (DE 50 at 1).  At a Status Conference the next day, the Court set a briefing schedule on the issue and oral arguments for July 30, 2025. (DE 54). The Court also set an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction ("***Preliminary Injunction Hearing***") for August 6, 2025. (*Id.*). The Court heard oral arguments regarding venue on July 30, 2025, (DE 72 ("***Hearing on Venue***")), at which time Plaintiffs renewed their motion for a TRO. In light of the upcoming evidentiary hearing, the Court denied the ore tenus motion.

In the days leading up to the Preliminary Injunction Hearing, the Parties exchanged exhibit and witness lists. (DE 81; DE 82; DE 87; DE 90; DE 91). The Parties estimated the Preliminary Injunction Hearing would require one day. On August 6, 2025, the Court began the Hearing, and heard testimony from Friends Executive Director Eve Samples, State Representative Anna Eskamani, Friends member Jessica Namath, CBD member Amber Crooks, and retired United States Fish and Wildlife and Florida Fish and Wildlife ecologist Randy Kautz, who specializes in panther habitat and population dynamics. Among other testimony, the Court heard from Representative Eskamani that during her tour of the TNT site on July 12, 2025, Defendant Guthrie informed her that this Facility was the result of a written request from DHS to open a detention facility in the state.

---

[4] The case was originally assigned to Judge Jose Martinez, (DE 2), but was reassigned to this Court on July 16, 2025. (DE 37).

Crooks, Namath, and Samples discussed their use of the area around the TNT site for outdoors activities and the harm to their enjoyment of the area that has resulted from road closures, increased lighting, and increased traffic due to the project. In particular, Plaintiffs introduced photos from Namath showing industrial lighting and heavy construction machinery entering the site. She also testified that the artificial lighting brought in for the project significantly increased the brightness from the site for miles compared to her recent nighttime trips to the area just months before the project. Namath further testified that in the few days prior to the Preliminary Injunction Hearing, she had seen multiple trucks conveying equipment and paving materials entering the site, along with trucks and vans bearing ICE and CBP insignias. Finally, Namath testified that each time she had called Governor DeSantis' office to inquire about the project, she was told this was a federal project and she would need to speak with her United States senators. Kautz discussed serious risks to the endangered Florida panther from the site, including a loss of around 2,000 acres of habitat due to the increased artificial lighting. Kautz opined that he would have expected U.S. Fish and Wildlife to have conducted a review of the project prior to its construction.

Although the Court heard testimony into the early evening, the Parties agreed the Preliminary Injunction Hearing would not conclude that day. At that time, counsel for the State and Federal Defendants informed the Court that they had scheduling conflicts which would preclude resumption of the proceedings until the following Tuesday. After some discussion with the Court, the Parties agreed that the Hearing could proceed the next day for just a half day and would then resume the following Tuesday.

The Court reconvened the case on August 7, 2025, and heard testimony from wetland ecologist, hydrologist, and soil physics expert Dr. Christopher McVoy and hydrogeologist Dillon Reio. Both witnesses opined that at least 20 acres of the site had been newly paved with asphalt. Both also testified that this 800,000 square feet of paving presented risks off runoff into the surrounding, unique wetland ecosystem, which could impede the natural flow of and introduce contaminants into the natural water system around the site. According to both witnesses, despite the possible presence of silt fencing on site, the lack of a stormwater management system risked harm to the habitat and animals.

At the close of the day's testimony, Plaintiffs renewed their request for a limited TRO, citing new fears that Defendants planned to add paving and other infrastructure over the weekend, while the Hearing was in recess. Plaintiffs based these fears, in part, on Ms. Namath's testimony that she watched paving and construction materials entering the site that week. Specifically, Plaintiffs requested that the Court prevent any additional industrial-style lighting, paving, filling, excavating, site preparation, or fencing. The Court inquired as to whether Defendants would agree that no such construction would take place over the five-day hiatus. Defendants were unwilling to make this representation.

Consequently, the Court heard argument on Plaintiffs' request. During argument, the Federal Defendants conceded that the project was operating under a 287(g) agreement between the Florida Department of Law Enforcement ("**FDLE**"), whose federally deputized officers operate the Facility, and ICE or DHS. As the Court noted, when "performing a function under" a 287(g) agreement, "an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of

the Attorney General." § 1357(g)(3). In other words, by law, the federal government, through DHS or ICE, has "the authority to influence" the State's operation of the Facility. *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994) (calling "a federal agency's authority to influence nonfederal activity" the "touchstone of major federal activity," which would trigger NEPA). After hearing argument on the motion, the Court granted Plaintiffs' narrow request for a TRO.

## II.   LEGAL STANDARD

Rule 65 of the Federal Rules of Civil Procedure authorizes courts to grant a preliminary injunction or temporary restraining order before final judgment in limited circumstances. The purpose of this injunctive relief is to "preserve the status quo until the [Court] renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005). The primary difference between a preliminary injunction and a TRO is that a TRO "may be entered before the defendant has an adequate opportunity to respond." *Dragados USA, Inc. v. Oldcastle Infrastructure, Inc.*, No. 20-cv-20601, 2020 WL 733037, at *2 (S.D. Fla. Feb. 13, 2020). As such, the duration of a TRO is limited to fourteen days, absent an extension for good cause. Fed. R. Civ. P. 65(b)(2).

To merit a TRO, as with a preliminary injunction, Plaintiffs must show:

(1) a substantial likelihood of success on the merits; (2) that the [TRO] is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the [TRO] would cause the other litigant; and (4) that the [TRO] would not be averse to the public interest.

*Gissendaner v. Comm'r, Ga. Dept. of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015) (quoting *Wellons v. Comm'r, Ga. Dept. of Corr.*, 754 F.3d 1260, 1263 (11th Cir. 2014)); *see also Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010) (explaining that "the

four criteria for obtaining a preliminary injunction are identical to those for issuance of a temporary restraining order").

## III.   DISCUSSION

The Court will begin by briefly addressing Defendants' arguments regarding venue and the Court's jurisdiction to enjoin Defendants' conduct under 8 U.S.C. § 1252. The State and Federal Defendants each argue that venue in the Southern District of Florida is improper.[5] (DE 50 at 1; DE 60 at 1). While the Court will take up Defendants' challenges in due course, "[v]enue is not a jurisdictional prerequisite and its presence or absence does not affect [the] [C]ourt's authority to adjudicate" Plaintiffs' request. *Harris Corp v. Nat'l Iranian Radio and Television*, 691 F.2d 1344, 1349 (11th Cir. 1982). Federal Defendants agreed with this assessment during the Hearing on Venue. (DE 89 at 46 (agreeing the Court was "correct" that "venue isn't a jurisdictional question")). Given the urgency Defendants' actions create, and the possibility of additional evidence being adduced relevant to the Court's venue analysis, the Court will withhold ruling on the venue challenge pending the conclusion of the Preliminary Injunction Hearing. *See S. Visions, LLP v. Red Diamond, Inc.*, No. 18-cv-04566, 2018 WL 8221528, at *4–5 (N.D. Ga. Dec. 10, 2018) (deciding that venue was improper and the case would be transferred, but nonetheless ruling on plaintiff's motion for preliminary injunction "in the interest of justice and judicial economy"); *Arval Serv. Lease S.A. v. Clifton*, No. 14-cv-1047, 2014 WL 12614422, at *1 (M.D. Fla. Nov. 14, 2014) (deferring ruling on defendants' motion to transfer venue until after resolving plaintiff's motion for preliminary injunction due to the "urgency of the issues").

[5] Defendant Miami-Dade County has not challenged venue.

While Defendants' § 1252 challenge is framed as jurisdictional, the Court concludes it is without merit. Section 1252 governs "Congress's comprehensive scheme for judicial review of removal orders." *Canal A Media Holding, LLC v. U.S. Citizenship and Immigr. Servs.*, 964 F.3d 1250, 1256–57 (11th Cir. 2020). As relevant here, section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter[.]" In other words, "[i]t prohibits federal courts from granting classwide injunctive relief" against certain provisions of the INA, specifically §§ 1221–1231. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999).

Similarly, section 1252(g) bars judicial review over "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien[.]" 28 U.S.C. § 1252(g). It "is specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." *A.A.D.C.*, 525 U.S. at 487. "[Section] 1252(g) is not to be construed broadly as a 'zipper' clause applying to the full universe of deportation-related claims, but instead as applying narrowly to only the three 'discrete' governmental actions enumerated in that subsection." *Wallace v. Sec'y, U.S. Dep't of Homeland Sec.*, 616 F. App'x 958, 960 (11th Cir. 2015) (citing *A.A.D.C.*, 525 U.S. at 472–73). "And although many other decisions or actions may be part of the deportation process, only claims that arise from one of the covered actions are excluded from [a court's] review[.]" *Camarena v. Dir., Immigr. and Customs Enf't*, 988 F.3d 1268, 1272 (11th Cir. 2021) (internal citations and quotations omitted).

Plaintiffs are not challenging the Attorney General's decision to commence or adjudicate removal proceedings. And they do not challenge the Attorney General's decision or action to execute any removal order. Instead, Plaintiffs challenge the continued operation of a facility they allege violates NEPA requirements. Thus, Plaintiffs' claims are not barred by § 1252(g). *See Canal A Media Holding, LLC*, 946 F.3d at 1257–58 (claim was not barred by § 1252(g) where action did not fall into one of three categories as "[w]hen asking if a claim is barred by § 1252(g), courts must focus on the action being challenged").

Further, Plaintiffs are not asking this Court to stop or suspend immigration enforcement, such that § 1252(f)(1) would be triggered. Indeed, the injunctive relief they seek is compliance with NEPA requirements, and in the interim, a cessation of construction activities on the TNT site. At most, that relief could have "some collateral effect on the operation of" the government's immigration detention efforts under § 1231, which does not trigger § 1252(f)(1). *Texas v. U.S. Dep't of Homeland Sec.,* 123 F.4th 186, 209 (5th Cir. 2024) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022)). In short, because Plaintiffs do not seek to "enjoin or restrain the operation" of any immigration statute, § 1252(f) is inapplicable.

Turning to the TRO factors, the Court addressed Plaintiffs' likelihood of success on the merits at some length in open court. But "NEPA requires federal agencies to prepare an environmental impact statement, or EIS" before constructing or operating "projects that are built, funded, or approved by the Federal Government." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1507, 1507 (2025). At this early stage, the Court finds that, at minimum, the Federal Defendants' legal control over the Facility's

operations, evidence that the Facility's construction was at the request of DHS, and the regular inspections of the site by ICE officials, combined with the undisputed lack of any prior environmental assessment pursuant to NEPA, create a sufficient likelihood of success on Plaintiffs' APA claim based on NEPA. *See S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572; *Goos v. I.C.C.*, 911 F.2d 1283, 1294 (8th Cir. 1990) ("While we must consider both legal and factual control, whether an agency action or project is part of some other concededly major federal action depends largely on whether the agency exercises legal control over the allegedly non-federal action or project.").

"A fundamental purpose of NEPA is 'to ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise case.'" *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1362 (S.D. Fla. 2005) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). If further expansion of the site is not temporarily paused, "these as yet unexamined effects [c]ould begin to take place, and no amount of subsequent environmental analysis would undo them." *Id.* (citing *Protect Key West, Inc. v. Cheney*, 795 F. Supp. 1552, 1563 (S.D. Fla. 1992) ("Irreparable harm results where environmental concerns have not been addressed by the NEPA process")).

For similar reasons, the balance of equities and the public interest favor granting a TRO. "These two factors merge when, as here, the government is the opposing party." *Farmworker Ass'n of Fla. v. Moody,* 734 F. Supp. 3d 1311, 1342 (S.D. Fla. 2024) (internal quotations omitted). The harm to Defendants from briefly suspending expansion of the Facility is minimal, especially given that the Court is not enjoining continued operations of the site nor even preventing additional detainees from being brought to the site if

current capacity allows.[6] Meanwhile, if the site is expanded over the next several days, "it is difficult to change that course" if the Court eventually decides NEPA statements are required. *Sierra Club v. Marsh*, 872 F.2d 497, 500, 505 (1st Cir. 1989) (vacating district court's denial of preliminary injunction related to NEPA claim and remanding).

## IV.   CONCLUSION

For the reasons set forth above and in open court, it is **ORDERED AND ADJUDGED** as follows:

1.  Plaintiffs' Renewed Motion for TRO (DE 40) is **GRANTED IN PART AND DENIED IN PART**.

2.  The Court **ENTERS** a Temporary Restraining Order prohibiting the State and Federal Defendants and their officers, agents, employees, attorneys, and any person who is in active concert or participation with them from installing any additional industrial-style lighting (described by witnesses as "Sunbelt" lighting); or doing any paving, filling, excavating, or fencing; or doing any other site expansion, including placing or erecting any additional buildings, tents, dormitories, or other residential or administrative facilities on the TNT site. This TRO shall last **fourteen (14) days** from the date of this Order or until the Court enters an order as to Plaintiffs' Motion for Preliminary Injunction. The TRO shall include among those "who are in active concert or participation with" the State or Federal Defendants or their officers, agents, employees, or attorneys, and thus prohibited from conducting

---

[6] As Governor DeSantis observed following today's Hearing, "Operations at [the Facility] are ongoing and deportations continuing." @GovRonDeSantis, X (August 7, 2025, 4:53 PM), https://x.com/GovRonDeSantis/status/1953560188461654357.

the activities specified above, any contractors, subcontractors, or any other individuals or entities authorized to conduct work on the TNT site. S*ee* Fed. R. Civ. P. 65(d)(2)(C) (including "other persons who are in active concert or participation with" the parties or the parties' officers, agents, servants, employees, and attorneys among those bound by any injunction).

3. Plaintiffs' Expedited Motion for Ruling on Motion for TRO (DE 31) is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 7th day of August, 2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

App. 1348

# Doc. 119

This is an Automated e-mail Message Generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**Southern District of Florida**

**Notice of Electronic Filing**

The following transaction was entered on 8/12/2025 at 5:34 PM EDT and filed on 8/12/2025

| | |
|---|---|
| **Case Name:** | Friends of the Everglades, Inc. et al v. Noem et al |
| **Case Number:** | 1:25-cv-22896-KMW |
| **Filer:** | |
| **Document Number:** | 119(No document attached) |

**Docket Text:**
**PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams.**

**Miscellaneous Hearing held on 8/12/2025. Court heard further witness testimony, reviewed admitted exhibits. Court adjourned. Hearing will reconvene Wednesday, 8/13/2025 at 10:30 am.**

**Counsel of record present.**

**Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov.**

**(mso)**

**1:25-cv-22896-KMW Notice has been electronically mailed to:**

Adam R.F. Gustafson      adam.gustafson@usdoj.gov

Alisa Ann Coe      acoe@earthjustice.org, acorrea@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Carlos Javier Raurell      carlos.raurell@usdoj.gov, melissa.Jiminson@usdoj.gov, USAFLS-HQDKT@usdoj.gov

Christopher Ara Ajizian      chris@ajizianlaw.com

Christopher J. Wahl      wahl@miamidade.gov, victor.rodriguez3@miamidade.gov

Dante C. Ficarelli      dficarelli@bsfllp.com

David Marion Murray      dmmurray@miami-airport.com, dmurr@miamidade.gov, rmartin@miami-airport.com

David Matthew Costello      dcostello@bsfllp.com

Dominique Rebecca Kate Burkhardt      dburkhardt@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Elise Pautler Bennett      ebennett@biologicaldiversity.org, 1629923420@filings.docketbird.com

Evan Matthew Ezray      eezray@bsfllp.com

Hayley A. Carpenter      hayley.carpenter@usdoj.gov

Jason Alexander Totoiu      jtotoiu@biologicaldiversity.org

Jeffrey Paul DeSousa      jeffrey.desousa@myfloridalegal.com

Jesse Michael Panuccio      jpanuccio@bsfllp.com, jesse-panuccio-7320@ecf.pacerpro.com

Marissa A. Piropato      marissa.piropato@usdoj.gov

Monica Rizo      rizo@miamidade.gov, IlianaG@miamidade.gov, klw@miamidade.gov, madalis.gonzalez@miamidade.gov

App. 1350

Nathan Andrew Forrester    nathan.forrester@myfloridalegal.com

Paul Joseph Schwiep    pschwiep@coffeyburlington.com, service@coffeyburlington.com, yvb@coffeyburlington.com

Rebecca Ann Sharpless    rsharpless@law.miami.edu, destrabao@law.miami.edu, rdominguez@law.miami.edu

Robert Scott Schenck    robert.schenck@myfloridalegal.com, jenna.hodges@myfloridalegal.com

Scott Andrew Hiaasen    shiaasen@coffeyburlington.com, lperez@coffeyburlington.com, service@coffeyburlington.com

Tania Galloni    tgalloni@earthjustice.org, acorrea@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Todd Rapp Friedman    todd@toddfriedmanpa.com

**1:25-cv-22896-KMW Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

# Doc. 121

**This is an Automatic e-mail Message Generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Southern District of Florida

**Notice of Electronic Filing**

The following transaction was entered on 8/13/2025 at 5:48 PM EDT and filed on 8/13/2025

**Case Name:** Friends of the Everglades, Inc. et al v. Noem et al
**Case Number:** 1:25-cv-22896-KMW
**Filer:**
**Document Number:** 121(No document attached)

**Docket Text:**
**PAPERLESS Minute Entry for proceedings held before Judge Kathleen M. Williams.**

**Miscellaneous Hearing held on 8/13/2025. Court heard oral arguments.**

**Counsel of record present.**

**Court Reporter: Patricia Diaz, 305-523-5178 / Patricia_Diaz@flsd.uscourts.gov.**

**(mso)**

**1:25-cv-22896-KMW Notice has been electronically mailed to:**

Adam R.F. Gustafson    adam.gustafson@usdoj.gov

Alisa Ann Coe    acoe@earthjustice.org, acorrea@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Carlos Javier Raurell    carlos.raurell@usdoj.gov, melissa.Jiminson@usdoj.gov, USAFLS-HQDKT@usdoj.gov

Christopher Ara Ajizian    chris@ajizianlaw.com

Christopher J. Wahl    wahl@miamidade.gov, victor.rodriguez3@miamidade.gov

Dante C. Ficarelli    dficarelli@bsfllp.com

David Marion Murray    dmmurray@miami-airport.com, dmurr@miamidade.gov, rmartin@miami-airport.com

David Matthew Costello    dcostello@bsfllp.com

Dominique Rebecca Kate Burkhardt    dburkhardt@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Elise Pautler Bennett    ebennett@biologicaldiversity.org, 1629923420@filings.docketbird.com

Evan Matthew Ezray    eezray@bsfllp.com

Hayley A. Carpenter    hayley.carpenter@usdoj.gov

Jason Alexander Totoiu    jtotoiu@biologicaldiversity.org

Jeffrey Paul DeSousa    jeffrey.desousa@myfloridalegal.com

Jesse Michael Panuccio    jpanuccio@bsfllp.com, jesse-panuccio-7320@ecf.pacerpro.com

Marissa A. Piropato    marissa.piropato@usdoj.gov

Monica Rizo    rizo@miamidade.gov, IlianaG@miamidade.gov, klw@miamidade.gov, madalis.gonzalez@miamidade.gov

Case: 25-13858

Paul Joseph Schwiep      pschwiep@coffeyburlington.com, service@coffeyburlington.com, yvb@coffeyburlington.com

Rebecca Ann Sharpless      rsharpless@law.miami.edu, destrabao@law.miami.edu, rdominguez@law.miami.edu

Robert Scott Schenck      robert.schenck@myfloridalegal.com, jenna.hodges@myfloridalegal.com

Scott Andrew Hiaasen      shiaasen@coffeyburlington.com, lperez@coffeyburlington.com, service@coffeyburlington.com

Tania Galloni      tgalloni@earthjustice.org, acorrea@earthjustice.org, efile@earthjustice.org, flcaseupdates@earthjustice.org

Todd Rapp Friedman      todd@toddfriedmanpa.com

**1:25-cv-22896-KMW Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

# Doc. 131

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 25-22896-CV-WILLIAMS

FRIENDS OF THE EVERGLADES, INC., *et al.*,

     Plaintiffs,

v.

KRISTI NOEM, *et al.*,

     Defendants.

_____/

## OMNIBUS ORDER

**THIS MATTER** is before the Court on Plaintiffs Friends of the Everglades, Inc. ("***Friends***") and Center for Biological Diversity's ("***CBD***") (together, "***Plaintiffs***") Expedited Motion for Preliminary Injunction (DE 5) ("***Motion for Preliminary Injunction***"). The Court will also address Defendant Kevin Guthrie (the "***State***") and Defendants Kristi Noem and Todd Lyons' (together, "***Federal Defendants***") venue challenges. (DE 50; DE 60; DE 65).[1] Both Motions are fully briefed.[2] On July 30, 2025, the Parties presented oral argument on the State and Federal Defendants' improper venue challenge, (DE 72) ("***Hearing on Venue***"), and on August 6, 7, 12, and 13, 2025, the Parties presented evidence and oral argument on the merits of Plaintiffs' request for injunctive relief.

---

[1] Though Defendants' venue challenges were advanced in the form of supplemental briefings to Plaintiffs' Renewed Motion for TRO, the Court "will treat Defendants' response[s] as a 12(b)(3) motion to dismiss based on 'improper venue.'" *Doe 1 v. Bondi*, -- F. Supp. 3d --, 2025 WL 1482733, at *4 (N.D. Ga. May 2, 2025).

[2] All Defendants responded in opposition to Plaintiffs' Motion for Preliminary Injunction, (DE 12; DE 16; DE 21), and Plaintiffs replied (DE 24). Plaintiffs also replied to Defendants' improper venue Motions. (DE 61; DE 66).

(DE 102; DE 103; DE 119; DE 121 (together, the "**Preliminary Injunction Hearing**")). For the reasons set forth below, the Court finds that venue in the Southern District of Florida ("**S.D. Fla.**") is proper as to the State and Federal Defendants, and the Motion for Preliminary Injunction (DE 5) is **GRANTED IN PART AND DENIED IN PART**.

## I.   BACKGROUND

According to the Complaint, on June 23, 2025, the Florida Division of Emergency Management ("**FDEM**") took control of the Dade-Collier Training and Transition Airport ("**TNT**"), in order to construct a mass migrant detention and deportation camp. (DE 1 ¶¶ 1, 39).[3] Two days later, Florida Governor Ron DeSantis announced that the detention center was requested and would be fully funded by the federal government. (*Id.* ¶ 35). Pre-construction and construction activities at TNT began that week, (*Id.* ¶¶ 40–42), according to Plaintiffs, without any environmental assessment or impact statement having been prepared. (*Id.* ¶ 43).

The TNT site is located within the Big Cypress National Preserve ("**BCNP**") and the Big Cypress Area, which the Florida legislature has designated as "an area of critical state concern" with the intention to "conserve and protect the [area's] natural resources and scenic beauty." Fla. Stat. § 380.055(1)–(2); (DE 1 ¶¶ 21–22). The project site is "within an environmentally sensitive freshwater wetland ecosystem of ecological significance for wildlife," such as the "threatened wood stork, and the endangered Florida bonneted bat and the Florida panther." (DE 1 ¶ 23). The site is also "near Everglades National Park and part of the historic Everglades," and within the footprint of the Western

---

[3] Throughout this Order, the Court will refer to the detention facility at the TNT site as "facility" or "camp." The Court declines to use the moniker "Alligator Alcatraz."

Everglades Restoration Plan ("**WERP**"). (*Id.* ¶¶ 29, 32). The WERP is part of a multi-billion dollar joint federal-state effort to "restor[e], preserv[e], and "protect[] the South Florida ecosystem," and uses a complex network of active and passive water management features to "re-establish ecological connectivity, reduce the severity and frequency of wildfires, and restore low nutrient conditions" in the Western Everglades. (*Id.* ¶¶ 29–32). According to Plaintiffs, the detention camp's construction and operation risks harming the wetlands, wildlife, aquifer, and air and water quality in this sensitive area, and degrading the "natural, scenic, hydrologic, floral, and faunal, and recreational values for which the Preserve was created." (*Id.* ¶ 58).

On June 27, 2025, non-profit environmental organizations Friends and CBD filed this suit seeking declaratory and injunctive relief to halt the camp's construction and operation until the project complied with federal, state, and local laws. (*Id.* ¶¶ 1, 8, 13). Most notably, Plaintiffs claim the project is being built and operated in violation of the National Environmental Policy Act ("**NEPA**"), which requires that major federal actions significantly affecting the human environment undergo environmental review processes. (*Id.* ¶¶ 61–74) (Count I). Because no such review had been done, Plaintiffs claim, the approval and use of the camp by the United States Department of Homeland Security ("**DHS**"), including Immigration and Customs Enforcement ("**ICE**"), should be held unlawful under the Administrative Procedure Act ("**APA**"). (*Id.* ¶¶ 75–79) (citing 5 U.S.C. § 701 *et seq.*) (Count II). Plaintiffs further claim the State's participation in the project through FDEM exceeds the department's authority under Florida Statutes Chapters 252 and 944. (*Id.* ¶¶ 80–87) (Count III). Finally, Plaintiffs allege Defendant Miami-Dade County ("**Miami-Dade**") unlawfully acquiesced in allowing its property, TNT, to be used as a

detention camp without the proper permitting and in violation of county code. (*Id.* ¶¶ 88–94) (Count IV). The case was initially assigned to another judge in this district. (DE 2).

On that same day, Plaintiffs filed their Motion for Preliminary Injunction (DE 5), requesting that the Court enjoin the State and the Federal Defendants from developing or using the TNT site as an immigration detention camp "unless and until Defendants comply with NEPA and the APA." (DE 5 at 1–2, 14).[4] Within the following week, all Defendants responded, challenging Plaintiffs' likelihood of success on the merits, (DE 12; DE 16; DE 21), *inter alia*, and Plaintiffs replied. (DE 24). No Defendant raised venue as an issue.

The State's response included an affidavit from Keith Pruett, the FDEM Deputy Executive Director, stating that Florida is funding the project, though it expects to seek reimbursement from the federal government, and that the project's environmental impact is likely to be minimal,[5] as TNT was already an active airfield with two buildings on site lit

---

[4] In their Motion for Preliminary Injunction, Plaintiffs also requested that the Court enjoin the State and Federal Defendants "from authorizing or permitting further development or use of the TNT [s]ite for purposes related to a noncitizen detention center," regardless of what procedures they follow. (DE 5 at 14). That request is apparently tied to Count III, which challenges the FDEM's authority to build and operate a correctional camp. (DE 1 ¶¶ 82–85). However, Plaintiffs did not develop any arguments nor provide any evidence related to Count III in the Motion for Preliminary Injunction, their subsequent briefing, or during the Preliminary Injunction Hearing. Therefore, Plaintiffs have waived this request. *See Fernandez v. Hotwire Commc'ns, Ltd.*, No. 21-cv-60115, 2022 WL 4598638, at *17 (S.D. Fla. Sept. 30, 2022) (holding plaintiffs had waived their disparate impact theory by failing to advance any arguments on the issue at summary judgment (citing *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue")). Similarly, Plaintiffs initially sought injunctive relief against Miami-Dade but subsequently withdrew that request. (DE 31 at 3 n.2). Consequently, the Court considers only Plaintiffs' request for an injunction tied to their NEPA allegations.

[5] Director Pruett's declaration provided no background regarding his education, prior work experience, or familiarity with environmental sciences, the Everglades ecosystem, or NEPA. (DE 16-1 at 2–3). It is entirely unclear in what capacity Director Pruett purports to

24-hours a day. (DE 16-1). For their part, the Federal Defendants attached declarations from Thomas Giles, Acting Deputy Executive Associate Director for ICE's Enforcement and Removal Operations ("**ERO**"), (DE 21-1), and David Richardson, acting Administrator of the Federal Emergency Management Agency ("**FEMA**"). (DE 21-2).[6] Giles stated that ICE's role in the development of the detention camp has been "limited to touring the camp to ensure compliance with ICE detention standards, and meeting with officials from the State of Florida to discuss operational matters." (DE 21-1 ¶ 5). He further declared Florida would have final decision-making authority over who to detain at the camp, but that any detentions at the camp would be pursuant to "section 287(g) of the Immigration and Nationality Act [("**INA**")], codified at 8 U.S.C § 1357(g)." (*Id.* ¶¶ 6–7). Even so, Richardson admitted that the facility would be funded by the federal government, stating that "DHS/FEMA announced $600 million in federal funding for the Detention Support Grant Program [("**DSGP**")]" and that "[t]he only eligible applicant under the DSGP is [FDEM]." (DE 21-2 ¶ 3).

Over the next two weeks through July 16, 2025, the Parties filed notices with additional affidavits and other evidence, and they made additional arguments on the merits of Plaintiffs' preliminary injunction request. *See* (DE 14; DE 20; DE 25; DE 26; DE 27; DE 34; DE 35; DE 38; DE 47; DE 48). This included two filings by the State, which, in part, reiterated its merits argument that "NEPA does not apply" to the TNT camp.

---

possess the knowledge required to determine the likely environmental impacts of a detention center on the Everglades.

[6] Throughout this Order, the Court will identify exhibits either through reference to their docket entry numbers or their exhibit numbers on the Parties' Final Lists of Admitted Exhibits (DE 123; DE 124). When doing the latter, Plaintiffs' exhibits will be identified as "Pl. Ex. #", the Tribe's exhibits as "Tribe Ex. #", and Defendants' exhibits as "D. Ex. #".

(DE 28 at 2; DE 35 at 1 ("No matter how many times Plaintiffs poke and prod at the Court, they are unable to show their complaint presents a justiciable controversy under NEPA.")). Still, no Defendant challenged or raised the question of venue.

Also during that period, on July 14, 2025, the Miccosukee Tribe of Indians of Florida ("*Tribe*") moved to intervene as plaintiffs based on its long-standing ties to the lands around TNT and the environmental risks the project poses to the Tribe's food and water supply.[7] (DE 33). Then on July 16, 2026, the presiding judge recused from the case, and it was reassigned to the undersigned. (DE 37).

The next day, Plaintiffs filed a Renewed Motion for TRO, explaining that since they filed suit, the "State and Federal Defendants commenced transporting immigration detainees to the TNT [s]ite," that, according to State officials, "as many as 900 people are now being detained at the [s]ite, and that the State has plans to expand the number of detainees to as many as 4,000." (DE 40 at 2). Given the completion of the detention camp's first phase of construction and its ongoing operations, Plaintiffs modified their request for injunctive relief, now seeking a "halt to any further construction on the TNT [s]ite . . ., [a] pause[ to] the transport of additional detainees to the [s]ite, and [the] ceasing [of] any operations related to detaining or preparing for the detention of anyone not [already] detained at the [s]ite[.]" (*Id.* at 6).

On July 21, 2025, the State filed a Supplemental Response to Plaintiffs' Requests for a Temporary Restraining Order ("**Supplemental Response on Venue**") arguing for

---

[7] Only the State opposed the Tribe's intervention in the suit. *See* (DE 58; DE 59). The Court granted the Tribe's request on July 30, 2025. (DE 73). The Tribe has since filed an Intervenor Complaint, (DE 84), and joined Friends and CBD's Motion for Preliminary Injunction. (DE 85).

the first time that "venue is not proper in this Court." (DE 50 at 1). At a Status Conference that day, the Court set a briefing schedule on the issue and oral arguments for July 30, 2025. (DE 54). "'Where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue,' district courts must hold an evidentiary hearing on the propriety of injunctive relief." *Farmworker Ass'n of Fla. v. Moody*, 734 F. Supp. 3d 1311, 1320–21 (S.D. Fla. 2024) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998). Therefore, the Court also set an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction for August 6, 2025. (DE 54).

### A. *Preliminary Injunction Hearing*

Over four days of evidentiary presentation and oral argument between August 6 and August 13, 2025, the Court heard testimony from ten witnesses and viewed over a hundred exhibits. Plaintiffs first called Friends Executive Director Eve Samples, who spoke both of her personal, and the 50,000-member organization's commitment to preserving the Everglades and the procedural harms they have faced due to Defendants' failure to consult with Friends before building the detention camp. State Representative Anna Eskamani recounted a July 12, 2025 tour of the facility led by Director Guthrie. She testified that on the tour, Director Guthrie informed her that the facility was the product of a DHS request, that there would be a federal reimbursement to the state for the facility's costs, that detainees are dropped off at the site by federal agents, and that ICE inspects the facility. CBD member Amber Crooks described hiking, camping, stargazing, and animal-watching in the preserved areas around the TNT site, shared her fears that the light pollution, increased traffic, and wastewater associated with the project will frustrate

her future enjoyment of the area, and stated her readiness to engage with any future NEPA process. Next, 27-year veteran of the Florida Fish and Wildlife Conservation Commission, ecologist, and panther expert Randy Kautz explained how increased light, sound, vehicular traffic, and other human activity from the project risks loss of habitat and increased mortality for the estimated 120 to 230 remaining Florida panthers. The final witness on August 6 was Friends member Jessica Namath, an avid outdoorswoman and animal watcher, who described regularly hiking and driving in the areas surrounding the TNT site before the camp's construction. Since then, Ms. Namath testified to spending nearly every day at the access gate to the TNT site to bear witness to its transformation. She described the site's industrial lighting and her observation of heavy construction materials and machinery coming and going to and from the site, and of federal law enforcement vehicles entering the site daily.

On August 7, Plaintiffs called soil physicist, hydrologist, and wetland ecologist Dr. Christopher McVoy. After touring the project with site Incident Commander Dr. Frank E. Lumm, and reviewing photos and soil reports, Dr. McVoy opined that over 800,000 square feet of new paving had been introduced at the site, which risked disrupting the nutrient balance of the surrounding, connected wetlands by increasing runoff. Next, former Miami-Dade County Department of Environmental Regulatory Management geologist Dillon Reio presented an analysis concluding that the Defendants' 800,000 square feet of new paving could lead to large increases in runoff contaminated with polycyclic aromatic hydrocarbons ("**PAH**") and other carcinogens into the surrounding wetlands. He also testified that the project did not appear to have any meaningful stormwater management system, based on his review of permitting databases and the camp's engineering plans.

On August 12, the Tribe called two members of its environmental team, Director of Water Resources Amy Castaneda and Fish and Wildlife Department Director Dr. Marcel Bozas.[8] Castaneda testified that eighty percent of the Tribe's residences, two schools, and the Tribal governmental building, are all located in the Miccosukee Reserved Area a few miles southeast of the TNT site in Miami-Dade County. She explained that any uncontained wastewater or run-off leaving the TNT site will likely flow into the BCNP, Everglades National Park, and eventually into the Miccosukee Reserved Area. She further testified that the multi-billion-dollar water management projects associated with the recently enacted WERP—which was the culmination of an almost decade-long planning—were based on the TNT site's old usage as a training airport, and that WERP's preservation efforts in the area could be hindered by high-nutrient runoff from the detention camp. Dr. Bozas testified about the site's current and potential harmful impacts on the environment and the Tribe's use of the lands. He testified about the Tribe's traditions of hunting, fishing, and collection of medicinal or other culturally important plants around the site. He pointed out off-road trails with trailheads on the camp's fence line, which had served as the Tribe's access points to BCNP and which are now inaccessible. He also discussed how the increased human activity, traffic, noise, and light from the project is likely to disrupt wildlife in the area, including the endangered panther, bonneted bat, and wood stork.

The only witness called by Defendants was Florida Department of Highway Safety

---

[8] Castaneda earned a bachelor's degree of science in natural resource conservation and has worked in the Tribe's Water Resources Division for nineteen years. (DE 129 at 12). Dr. Bozas holds a Ph.D. in earth system science and natural resources and conducted a study for his dissertation of wildlife movement in the Miccosukee Water Conservation Area and Everglades National Park. (*Id.* at 96–97).

and Motor Vehicles ("*FDHSMV*") Executive Director David Kerner. Director Kerner, who also oversees the Florida Highway Patrol ("*FHP*"), discussed FHP's coordination with ICE under their 287(g) agreement. He explained how FHP troopers contact ICE to make a detention determination after stopping an individual on state law violations and then suspecting that individual of lacking lawful status. He said that it is federal agencies and agents, not FHP troopers, who transport detainees to the TNT site, and federal agencies who carry out deportations using federal aircraft. Director Kerner also discussed the importance of immigration enforcement in Florida generally, referencing an uptick in human and narcotics trafficking across the border, and the importance of increasing detention capacity to those enforcement priorities. Director Kerner testified that his knowledge of who was being detained at the TNT site was limited, though he knew all detainees were there solely on immigration violations, none on state criminal charges. Finally, Director Kerner said he had been on a tour of the facility before it became operational and that he was not aware of any other sites that had been considered for the facility. Defendants also introduced evidence that the TNT site had been in active use as a training airport for decades before the project, and questioned witnesses about how risk of harms from its use as a detention camp compare to those of its prior use facilitating training flights. And throughout the Hearing, Defendants cross-examined witnesses about their failure to collect data proving that the detention camp was having the harmful effects they described in their testimony.

Although the Court heard testimony into the early evening of August 6, the Parties agreed the Preliminary Injunction Hearing would not conclude that day. At that time, counsel for the State and Federal Defendants informed the Court that they had absolute

scheduling conflicts which would preclude resumption of the proceedings until the following Tuesday. After some discussion with the Court, the Parties agreed that the Hearing could proceed the next day for just a half day, to be resumed the following Tuesday.

At the close of the half day of testimony on August 7, Plaintiffs renewed their request for a limited TRO, citing evidence suggesting that Defendants planned to add paving and other infrastructure over the weekend, while the Hearing was in recess. Specifically, Plaintiffs requested that the Court prevent any additional industrial-style lighting, paving, filling, excavating, site preparation, or fencing from being introduced to the site. The Court inquired as to whether Defendants would agree that no such construction would take place over the five-day hiatus. Defendants were unwilling to make this representation. Consequently, after hearing additional argument, the Court granted Plaintiffs' narrow request for a TRO, halting further expansion of the site for fourteen days. (DE 104). The Court then concluded the evidentiary presentation on August 12, 2025, and heard closing remarks the following day.

### B. *287(g) Agreements*

"For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power." *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024). However, "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer[,]" such as through a formal agreement under § 1357(g)(1). *Arizona v. United States*, 567 U.S. 387, 408–09 (2012). As mentioned above, the Federal Defendants concede that the camp operates pursuant to such "287(g)" agreements

between DHS (through ICE) and relevant Florida law enforcement agencies, along with the aid of on-site federal agents. (DE 105 at 34). In a separate case raising constitutional challenges to particular practices at the camp, the State and Federal Defendants produced several of the operative 287(g) agreements, including those between ICE and nine Florida agencies: Florida Department of Alcoholic Beverages and Tobacco Bureau of Law Enforcement ("*FDABT*"); Florida Department of Corrections ("*FDOC*"); Florida Department of Law Enforcement ("*FDLE*"); Florida Department of Financial Services Criminal Investigations Division ("*DFS*"); FDHSMV, Division of FHP; Florida Fish & Wildlife Conservation Commission ("*FWC*") (DE 53-1 at 78), Florida Department of Lottery Division of Security ("*FDL*"), the Florida National Guard ("*FNG*"), and Florida Department of Environmental Protection Division of Law Enforcement ("*FDEP*"). *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 53-1 at 2, 17, 32, 47, 62, 78, 93, 108, 123 (collectively, the "*287(g) Agreements*").[9] Each of those agreements contains essentially identical sections, titled "Ice Supervision" and "Liability and Responsibility". *Id.* at 6–9, 19–20, 29, 36–39, 51–54*,* 67–70, 82–85, 97–100, 112–15, 127–30. Those sections include the following language:

### XI. ICE SUPERVISION

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized

---

[9] "A district court may take judicial notice of public records within its files relating to the particular case before it or other related cases." *Cash Inn of Dade, Inc. v. Metro. Dade Cnty.*, 938 F.2d 1239, 1243 (11th Cir. 1991); *see also Lockett v. Experian Info. Sols., Inc.*, 2021 WL 4815898, at *1, *12 n.9 (N.D. Ga. June 30, 2021) ("The Court may take judicial notice of public records, such as court filings on public dockets.") (citing *Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006))); *Ohio Cas. Ins. Co. v. Beall*, No. 23-cv-00060, 2024 WL 3993851, at *5 (M.D. Ga. Aug. 29, 2024) (explaining contract was not hearsay because its language was legally operative, not used to prove the truth of another matter).

to perform immigration officer functions except when working under the supervision or direction of ICE.

For the purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy.

**XIV. LIABILITY AND RESPONSIBILITY**

Participating LEA personnel will be treated as Federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(I), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. See 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. **In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE authorized by this MOA will be considered acting under color of federal authority for purposes of determining liability and immunity from suit under federal or state law. See 8 U.S.C. § 1357(g)(8).**

These provisions are replete with express references to the statutory framework that governs 287(g) agreements. Section 1357(g) allows states or localities to enter into agreements with the Attorney General to deputize state or local officers to perform functions of federal immigration officers when they are "determined by the Attorney General to be qualified to perform" those functions after receiving training and certification "regarding the enforcement of relevant Federal immigration laws." § 1357(g)(1)–(2). When acting under a 287(g) agreement, the deputized officer "shall be subject to the direction and supervision of the Attorney General." § 1357(g)(3). Further, any 287(g) agreement must specify the deputized officer's powers and duties, the duration of delegated authority, and the federal agency official who is "required to supervise and direct the individual[.]" § 1357(g)(5). Finally, the deputized officer is treated as a federal

App. 1368

employee for purposes of compensation for injury and tort liability, and the officer "shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit[.]" § 1357(g)(7)–(8).

## II.   LEGAL STANDARDS

"Under Federal Rule of Civil Procedure 12(b)(3), a party may assert the defense of improper venue." *Hemispherx Biopharma, Inc. v. MidSouth Capital, Inc.*, 669 F. Supp. 2d 1353, 1356 (S.D. Fla. 2009). When a defendant does, "the plaintiff bears the burden of showing that the venue selected is proper." *Id.* (citing *Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988)); *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004) ("On a motion to dismiss based on improper venue, the plaintiff has the burden of showing that venue in the forum is proper."). A court "must accept all allegations of the complaint as true, unless contradicted by the defendants' evidence, and the court "may examine facts outside of the complaint" when factual disputes arise. *Id.* (citations omitted). In reviewing the allegations and evidence, "the court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Hemispherx*, 669 F. Supp. 2d at 1356; *see also Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990) (when reviewing a Rule 12(b)(3) motion and the parties' "affidavits conflict, the court is inclined to give greater weight to the plaintiff's version of the jurisdictional facts and to construe such facts in the light most favorable to the plaintiff."). Finally, "venue must be proper as to each defendant and each claim." *Doe 1 v. Congregation of the Sacred Heart of Jesus and Mary*, No. 23-cv-5294, 2024 WL 4276174, at *2 (E.D.N.Y. Sept. 24, 2024); *see also Williams v. Apple Inc.*, No. 23-3901, 2024 WL 2721630, at *2 (D.D.C. May 27, 2024) ("Where a case involves more than one

cause of action, as is true here, 'venue must be proper as to each claim[.]'") (quoting *Relf v. Gasch*, 511 F.2d 804, 807 n.12 (D.C. Cir. 1975)).

Even if venue is proper, a court may transfer a case to another district in which venue lies "in the interest of justice." 28 U.S.C. § 1404. The court should consider "convenience of parties and witnesses, the 'locus of operative facts,' and other concerns related to 'trial efficiency[.]'" *Bryant v. Sheriff, Saint Lucie Cnty., Fla.*, 2024 WL 4458382, at *8 (11th Cir. Oct. 10, 2024) (quoting *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005)). Additionally, the court should weigh "various public-interest considerations," including "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 62 n.6 (2013) (internal quotations omitted).

Rule 65 of the Federal Rules of Civil Procedure authorizes courts to grant a preliminary injunction before final judgment in limited circumstances. The purpose of this injunctive relief is to "preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005) (citation omitted). To merit a preliminary injunction, Plaintiffs must show:

> (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest.

*Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015) (quoting *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1263 (11th Cir. 2014)).

Plaintiffs "bear[] the burden of persuasion to clearly establish all four of these prerequisites." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotations omitted).

## III. DISCUSSION

Defendants levy several objections to the propriety of the Court's adjudication of this matter. First, Defendants argue that 8 U.S.C. 1252(a) and (f) strip the Court of subject-matter jurisdiction over any aspect of Plaintiffs' NEPA claim that relates to federal immigration detention activities. (DE 16 at 12; DE 21 at 5–6). Next, Defendants contest whether the S.D. Fla. is the proper district for Plaintiffs' claims against Defendant Guthrie and the Federal Defendants. The Court will address these threshold issues before discussing the merits of the Motion for Preliminary Injunction.[10]

---

[10] Although Defendants do not contest Plaintiffs' standing, a "district court [is] not empowered to reach any merits question" without first establishing its jurisdiction. *See Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1311 (11th Cir. 2024). So, the Court will briefly address Plaintiffs' standing to seek injunctive relief. Plaintiffs may establish standing through either their own injury in fact or through associational standing by virtue of injuries posed to or suffered by their members. *City of S. Mia. v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023). "To establish associational standing, an organization must prove that its members 'would otherwise have standing to sue in their own right.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020) (citations omitted). To this end, Plaintiffs must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Here, Plaintiffs allege (and have supported through evidence) that their members' aesthetic, conservational, and recreational interests are adversely impacted by the detention camp's operations. From light pollution affecting members' ability to observe the night skies, to noise pollution impacting members' ability to observe and interact with wildlife, the Court finds that Plaintiffs have sufficiently alleged the injuries to their members and, therefore, have established associational standing. *See Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170–73 (11th Cir. 2006) (plaintiff environmental groups "easily" had associational standing when alleging that an agency "shirked its duties under NEPA . . ., with the result that already vulnerable species and their habitats are now more vulnerable," and the group's members use the area to recreate and engage with the environment).

**A. Section 1252 does not strip the Court of subject-matter jurisdiction over this NEPA claim.**

**1. Section 1252(a)(2)(B)(ii)**

Section 1252(a)(2)(b)(ii) provides that "[n]o court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subsection to be in the discretion of the Attorney General or the Secretary of Homeland Security[.]" The statute "precludes [the Court's] review of discretionary decisions of the [Secretary] in *only* th[os]e specific circumstances." *Zafar v. United States Attorney General*, 461 F.3d 1357, 1360 (11th Cir. 2006) (emphasis in original); *see also Bakran v. Sec'y United States Dep't of Homeland Sec.*, 894 F.3d 557, 562 (3d Cir. 2018) ("The INA's jurisdiction-stripping language . . . applies not to all decisions the [Secretary] is entitled to make, but to a narrower category of decisions where Congress has taken the additional step to specify that the sole authority for the action is in the [Secretary]'s decision.") (citations and quotations omitted). "The statute requires us to look at the *particular* decision being made and to ascertain whether *that* decision is one that Congress has designated to be discretionary." *Mejia Rodriguez v. United States Dep't of Homeland Sec.*, 562 F.3d 1137, 1143 (11th Cir. 2009) (emphasis in original).

As the Eleventh Circuit has clarified, "[t]he phrase 'specified under this subchapter' refers to subchapter II of Chapter 12, 8 U.S.C. §§ 1151–1378." *Zafar*, 461 F.3d at 1360. "Thus, to avoid judicial review, the [government] must rely on an explicit, Congressionally-defined, discretionary *statutory* power . . . articulated within sections 1151 through 1378[.]" *Belegradek v. Gonzales*, 523 F. Supp. 2d 1364, 1367 (N.D. Ga. 2007) (emphasis in original; citation and quotations omitted).

Defendants rely on §§ 1226 and 1231, which address the Attorney General's authority to detain and remove noncitizens. However, Plaintiffs challenge neither the fact nor the manner of detention or removal. Rather, Plaintiffs seek injunctive relief compelling Defendants to comply with NEPA, which ensures "federal agencies . . . adequately assess the environmental impacts of actions they undertake." *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir. 2005). This relief does not implicate, much less interfere with, any decision "specified . . . to be in the discretion" of the Secretary or the Attorney General. Because NEPA compliance is not a decision specified to be in the discretion of the Attorney General or Secretary, § 1252(a)(2)(b)(ii) simply does not apply. Defendants conflate two very distinct types of relief. An injunction requiring NEPA compliance would, at most, prevent the use of the facility until a lawful NEPA review is done. This is not the same thing as the Court dictating where or how the government must house immigration detainees, which Congress has specified to be within the Secretary's discretion. Plaintiffs seek only the former type of relief.[11]

Defendants' cited cases—nearly all of which feature individual plaintiffs challenging their own detentions or removals—confirm this distinction. Defendants selectively quote language from these cases to suggest that § 1252(a)(2)(b)(ii) is broader than it is. Plaintiffs do not dispute that the Attorney General and Secretary possess authority over detention and removal as those cases recognize. But those decisions arose in entirely different factual and legal contexts. None address NEPA, none involve the

---

[11] In *C.M. v. Noem*, the court drew a similar conclusion when analyzing whether another jurisdiction-stripping provision of the INA, § 1252(g), precluded review of claims by detainees at the TNT site alleging the manner of their detentions unduly restricted their access to counsel. 25-cv-23182 (S.D. Fla.), ECF 86 at 31–32; *see also infra* n.14.

APA, and none interpret § 1252(a)(2)(B)(ii) in a way that would bar review of Plaintiffs' claims. *See, e.g.*, *Sinclair v. Att'y Gen. of United States*, 198 F. App'x 218, 222 (3d Cir. 2006) (reaffirming attorney general's discretion under § 1231(g)(1) to determine place of detention); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (holding district court lacked jurisdiction to enjoin attorney general's discretionary transfer of aliens in a Bivens class action); *Comm. of Cent. Am. Refugees v. Immigr. & Naturalization Serv.*, 795 F.2d 1434, 1441 (9th Cir. 1986) (confirming that district court could not supervise attorney general's day-to-day discretion over detention placement); *Jane v. Rodriguez*, No. 20-5922, 2020 WL 10140953, at *2 (D.N.J. May 22, 2020) (recognizing DHS' discretion to detain and set detention locations and transfers during COVID-19); *Lway Mu v. Whitaker*, 18-cv-06924 2019 WL 2373883, at *5 (W.D.N.Y. June 4, 2019) (declining to order DHS to house petitioner in a specific facility, citing § 1231(g)(1)); *Salazar v. Dubois*, 17-cv-2186, 2017 WL 4045304, at *1 (S.D.N.Y. Sept. 11, 2017) (same, absent constitutional violation); *Tercero v. Holder*, No. 12-cv-0246, 2012 WL 8667571, at *3 (D.N.M. Oct. 4, 2012) (court lacked jurisdiction under § 1231(g)(1) over attorney general's decision to detain aliens in New Mexico pending proceedings in Texas); *Kapiamba v. Gonzalez*, No. 07-cv-335, 2007 WL 3346747, at *1 (W.D. Mich. Nov. 7, 2000) (finding that attorney general's decision to detain petitioner in a particular facility unreviewable under § 1231(g)(1)); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (neither discussing § 1252 nor the APA).

At best, Defendants' cases establish that § 1252(a)(2)(b)(ii) bars judicial review over individual detention and removal decisions, issues that are not present here. To expand § 1252(a)(2)(B)(ii) to NEPA-based claims unspecified in the statute would expand

its reach far beyond what Congress explicitly intended and legislated. *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 488 (11th Cir. 2015) ("As the Supreme Court has instructed time again, courts presume Congress says in a statute what it means and means in a statute what it says there.") (citations and quotations omitted); *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) ("We will not do to the statutory language what Congress did not do with it, because the role of the judicial branch is to apply statutory language, not to rewrite it.") (citations omitted).

### 2. Section 1252(f)(1)

Defendants also rely on § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." In other words, "[i]t prohibits federal courts from granting classwide injunctive relief" against certain provisions of the INA, specifically §§ 1221–1231. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999); *see also Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) ("§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."). "Those provisions charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Id.* at 549–50.

Here, Plaintiffs' requested relief does not fall within that bar. They do not seek to halt, suspend, or alter the "operation" of any INA provision, nor do they challenge the Defendants' authority to implement or enforce immigration laws. An order compelling NEPA compliance does not "enjoin or restrain" immigration operations; it simply requires

Defendants to follow the environmental procedures that Congress imposed. *See generally Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 401 F. Supp. 3d 1298, 1309 (S.D. Fla. 2005) ("NEPA establishes important action-forcing procedures to ensure that the broad national commitment to protecting and promoting environmental quality is infused into the actions of the federal government.") (citations and quotations omitted). Thus, to the extent Defendants argue otherwise based on detention decisions under § 1226, that reliance is misplaced. Plaintiffs do not challenge any detention decision, and § 1226 contains no language suggesting that NEPA compliance is shielded from judicial review. "Congress legislated which sections are covered by § 1252(f)(1). The Executive Branch does not get to propose additions." *Texas* v. *U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 210 (5th Cir. 2024).

And if NEPA compliance has a "collateral effect" on immigration operations, that is insufficient to trigger § 1252(f)(1). *Id.* at 209 ("[A] court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision.") (emphasis in original; citation omitted); *see also United Farm Workers v. Noem*, -- F. Supp. 3d -- 2025 WL 1235525, at *22 (E.D. Cal. Apr. 29, 2025) ("Courts maintain authority to enter injunctions addressing other provisions of the INA even if there may be collateral effects upon a provision covered by Section 1252(f)(1) . . . . Thus, even if an injunction could have a collateral effect on the provisions identified by Defendants, the Court has the jurisdiction and the authority to issue an injunction."). Therefore, neither § 1252(a)(2)(B)(ii) nor § 1252(f)(1) deprive the Court of jurisdiction to require Defendants' compliance with NEPA.

App. 1376

**B.  *The Southern District of Florida is the appropriate venue for this suit.***

Next, the State and Federal Defendants each argue that venue in the S.D. Fla. is improper.[12] (DE 50 at 1; DE 60 at 1). Plaintiffs assert that the State waived its venue challenge. Plaintiffs go on to argue that regardless, venue in the S.D. Fla. is proper as to the Federal Defendants under § 1391(e)(1)(B) and § 1391(e)(1)(C), (DE 66 at 3), and is proper as to the State under 28 U.S.C. § 1391(b)(2). (DE 61 at 8). The Court will address each issue in turn.

**1.  Waiver**

Plaintiffs initially argue that the State waived any venue challenge by litigating this case on the merits for almost a month—including filing three merits briefs in opposition to Plaintiffs' requests for injunctive relief—before raising venue. (DE 16; DE 28; DE 35). "A party waives [improper venue] by . . . failing to . . . include it in a responsible pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course." Fed. R. Civ. P. 12(h)(1)(B)(ii). It may also be waived by other "conduct amounting to waiver as a matter of law." *Manley v. Engram*, 755 F.2d 1463, 1468 (11th Cir. 1985). "Because a motion to dismiss for lack of venue . . . can be raised so easily, [courts] strictly apply the waiver rule[.]" *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Indus. Fund*, 967 F.2d 688, 692 (1st Cir. 1992) (describing Rule 12 as requiring venue to be raised in a defendant's "first defensive move" and affirming a finding of waiver when defendant had requested a hearing on plaintiff's TRO motion, moved to appear *pro hac vice*, and stipulated to expedited discovery and preliminary injunction hearing without raising venue). An "opposition to a motion for preliminary injunction can be such a 'first

---

[12] Defendant Miami-Dade County has not challenged venue.

responsive pleading' or defensive move." *Bautista-Perez v. Holder*, 681 F. Supp. 2d 1083, 1091 (N.D. Cal. 2009) (venue was waived when defendants filed two opposition motions to plaintiff's preliminary injunction request, including a declaration on the case's merits).

Here, the State filed notices of appearance on the same day the Complaint was filed. (DE 10; DE 11). Then, over the course of almost a month, the State filed three merits briefs, including a declaration from FDEM Executive Director Guthrie. (DE 16; DE 28; DE 35). The State also filed a motion for extension of time to respond to the Complaint in order to align its deadline with the Federal Defendants', all without mentioning venue. (DE 39). In short, the State failed to raise venue in any of its first *three* defensive moves, despite the opportunity. This is sufficient for a finding of waiver.

The State argues that the above cited cases are distinguishable because in those cases preliminary injunction hearings were held without mention of waiver. (DE 65 at 4–5). But none of those courts discuss that fact as relevant to their decisions. The State then offers a series of inapposite cases where courts rejected waiver in completely different scenarios to the one presented here. See *Lithia Ramsey-T, LLC v. City Line Auto Sales, LLC*, No. 22-03592, 2023 WL 1883355, at *5 (D.N.J. Feb. 9, 2023) (personal jurisdiction was not waived by complying with the court's order to show cause and appear for preliminary injunction hearing a week after complaint filed); *Bartlett v. Bartlett*, No. 16-cv-6595, 2017 WL 106043, at *2 (N.D. Ill. Jan. 11, 2017) (filing motion to disqualify opposing counsel, followed by 12(b)(3) motion before briefing closed on the disqualification motion, did not waive venue defense); *Pickett v. City of Houston*, No. H-08-2734, 2009 WL 1158842, at *2 (S.D. Tex. Apr. 29, 2009) (insufficient service defense not waived by appearing at TRO hearing the morning after complaint filed and

then moving to dismiss in its first filing); *Johnson v. Masselli*, No. 2:07-cv-214, 2008 WL 111057, at *3 (N.D. Ind. 2008) (rejecting waiver argument after defendant appeared at TRO hearing, briefed the non-merits issue of necessity of a security bond for the TRO, and then raised venue in their first merits pleadings—their answer and a motion to dismiss); *Friedberg v. Mut. Holdings, Ltd.*, No. 02-3193, 2005 WL 1213282, at *3 (E.D. Pa. May 19, 2005) (defendants' 12(b)(6) motion based on forum selection clause was not waivable, but even if construed as a 12(b)(3) motion, no waiver when defendants stipulated to TRO as a part of settlement negotiations and did not litigate on the merits).

In sum, for a month, Defendants disregarded an issue they now describe as obviously correct, "an important issue," and a "leading legal argument." DE 89 at 13–14, 16 (arguing "it would be impossible to say" venue is valid under 1391(e)(1)(C) and any arguments for venue under 1391(b)(2) are "easily dispatched"). Though Defendants' waiver of venue is sufficient to foreclose venue as an issue, the Court addresses the merits of all Defendants' venue challenges, as both Parties requested.

## 2. Section 1391(e)(1)(C)

When "a defendant is an officer or employee of the United States or any agency thereof" a civil action may "be brought in any judicial district in which . . . the plaintiff resides if no real property is involved in the action." § 1391(e)(1)(C). For venue purposes, a plaintiff entity resides "only in the judicial district in which it maintains its principal place of business[.]" § 1391(c)(2). Friends has its principal place of business in Stuart, FL, within the S.D. Fla. (DE 61-1). The Federal Defendants do not dispute that this satisfies the first requirement of § 1391(e)(1)(C). They argue that "Plaintiffs' suit centers on the temporary detention center, which is a collection of buildings and pavement on real property[,]" and

"[t]hus, real property is a center component of this action[.]" (DE 60 at 4). But the Federal Defendants' far-reaching interpretation runs counter to decades of authority and the purpose of § 1391(e), which is "to broaden the venue of civil actions" against federal defendants. *Schlanger v. Seamans*, 401 U.S. 487, 490 n.4 (1971). As Judge Constance Baker Motley sagely wrote:

> Gravity being what it is, the vast bulk of human activities take place on the face of the earth. Consequently, almost any dispute over public or private decisions will in some way "involve real property," taken literally. The touchstone for applying § 1391(e)(4) [(the prior, identical version of § 1391(e)(1)(C))] cannot sensibly be whether real property is marginally affected by the case at issue. Rather, the action must center directly on the real property, as with actions concerning the right, title or interest in real property.

*Nat. Res. Def. Council, Inc. v. Tenn. Val. Auth.*, 340 F. Supp. 400, 406 (S.D.N.Y. 1971) (holding NEPA challenge to federally-owned utility's practice of buying strip-mined coal did not involve real property, despite the suit affecting "contracts with third-parties for production of coal," because the plaintiffs did "not seek an adjudication of the validity of defendants' title, leases, or mineral rights"), *rev'd on other grounds*, 459 F.2d 255 (2d Cir. 1972); *see also Env. Defense Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 325 F. Supp. 728, 732 (E.D. Ark. 1971) (NEPA challenge to dam project met prior version of § 1391(e)(1)(C) because "[n]othing need[ed] to be done in [t]he action with respect to the real estate under and adjacent to the [river] or upon which defendants contemplated[] constructing the dam[, and] [t]he action d[id] not put in issue the title to, or possession of, such lands, or any interest therein").

Other courts nationwide have echoed Judge Motley's statutory interpretation and held that NEPA suits similar to Plaintiffs' did not involve real property within the meaning of § 1391(e)(1)(C). For example, in *Earth Island Institute v. Quinn*, the court held real

App. 1380

property was not involved in a NEPA challenge to a federal restoration project to "conduct salvage harvest of fire-killed trees, remove hazardous trees, and engage in tree planting in areas affected by" recent fires. *Earth Island Inst. v. Quinn*, 56 F.Supp.3d 1110, 1112, 1116 (N.D. Cal. 2014). The court began its analysis by pointing out that, "by using the legal term 'real property[]' . . . Congress seems to have indicated that it intended mainly to cover disputes over legal interests in real property." *Id.* at 1115–16. Indeed, the court found, "[m]ost authority appears to have followed [Judge Motley's] logic, generally finding that actions 'involve real property' when they involve disputes over real property interests—and perhaps not even then if the real property dispute is peripheral to the central cause of action." *Id.* at 1116 (first citing Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3815 n.33 (4th ed.); and then *Animal Legal Def. Fund v. U.S. Dep't of Agric*, No. 12-cv-4407, 2013 WL 120185, at *2 (N.D. Cal. Jan. 8, 2013)). Even though the case related to the use of "a specific area of land," the court concluded this was insufficient to bring the suit within the category of real property disputes triggering the exception, as it was more centrally a suit about "personal property interests in timber and regulatory and environmental policy issues." *Id.* at 1116.

Next, in *Western Watersheds Project v. Schneider*, the court reaffirmed its interpretation of "§ 1391(e)(1)(C) to mean that 'real property' is not 'involved' in a lawsuit challenging an agency's compliance with NEPA[.]" *W. Watersheds Project v. Schneider,* 2019 WL 4863483, at *2–3 (D. Id. Oct. 2, 2019) (citing *WWP v. Salazar*, No. 08-0516, 2009 WL 1299626 (D. Id. May 7, 2009)). Before the court was a challenge to Bureau of Land Management ("**BLM**") land-use plans in several western states, which Plaintiffs say unlawfully "relax[ed] restrictions on oil and gas development in sage grouse habitat." *Id.*

at *1. Though plaintiff's suit implicated third-party property rights as an ancillary matter, plaintiffs were not disputing any party's "right, title or interest in real property." *Id.* at *3. Instead, the court held, like the court in *Earth Island v. Quinn*, that plaintiffs were merely "challeng[ing] an agency's compliance with statutory mandates." *Id.*

Here, Plaintiffs' suit likewise centers on non-compliance with "statutory mandates"—namely the Federal Defendants' approval, construction, funding, and use of the detention camp without conducting environmental analyses required by NEPA—*not* who possesses any given property right to the TNT site. Therefore, even though the suit involves real property in a colloquial sense, it does not fit within the meaning of § 1391(e)(1)(C).

Resisting this conclusion, Defendants point to a single case in which a court held a suit under NEPA involved real property within § 1391(e)(1)(C). (DE 65 at 6 (citing *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 08-05646, 2009 WL 1025606, (N.D. Cal. Apr. 14, 2009)); DE 89 at 10, 51 (same)). But that single authority relied on another case in which "the plaintiff alleged that [BLM] improperly rejected [its] oil and gas lease applications." *Ctr. for Biological Diversity,* 2009 WL 1025606, at *2 (citing *Ferguson v. Lieurance*, 565 F. Supp. 1013, 1015 (D. Nev. 1983)). In that distinguishable context— where "the obvious and undeniable purpose" of plaintiff's action was to "acquire the real property interest he seeks"—the *Ferguson* court reasoned that the action did involve real property. *Id.* (quoting *Ferguson*, 565 F. Supp. at 1015). The *Center for Biological Diversity* court may have been swayed by the sheer "range of real property issues" at play in the challenged plan before it, "including access to public and private lands, rights of way and easements across these lands, land withdrawals, and land exchanges and acquisitions."

*Id.* at \*1. Consequently, several courts have since found the *Center for Biological Diversity* court's decision is confined to its facts and inapplicable in the NEPA context. *See Earth Island Inst. v. Nash*, No. 19-cv-05792, 2019 WL 11023709, at \*5 (N.D. Cal. Oct. 7, 2019) (finding *Center for Biological Diversity* "is distinguishable" from the case at hand, where "[p]laintiffs' lawsuit certainly involves public land, [but] the claims focus on compliance with NEPA and other environmental statutes"); *W. Watersheds*, 2019 WL 4863483, at \*2 (finding *Earth Island v. Quinn* "more persuasive" than *Center for Biological Diversity*). This Court does as well.[13]

Therefore, the Court finds that this suit does not involve real property within the meaning of § 1391(e)(1)(C), and the S.D. Fla. is a proper venue for this suit with regard to the Federal Defendants under that subsection. The Court will now address whether this district is a proper venue for the State and Federal Defendants as a locus of the substantial part of the events or omissions giving rise to their claims.[14]

---

[13] Finally, Defendants argue that even accepting the stricter interpretation of the phrase, this action *does* involve real property, because Count IV challenges Miami-Dade's acquiescence to the State's use of the TNT site for the project. (DE 89 at 11, 49–52; DE 65 at 6 ("[E]ven under Plaintiffs' test, real property interests are involved: Plaintiffs allege Defendants wrongfully commandeered Miami-Dade's property[.]")). But again, Plaintiffs are not seeking to vindicate any property right of Miami-Dade's or their own—they object to the site's use as a detention camp in violation of certain procedural mandates. *See* (DE 1 ¶ 93 (claiming "[Miami-Dade's] agreement or acquiescence in allowing the TNT [s]ite for use as a mas[s] detention center is in violation of the County code and permitting regimes")).

[14] Defendants filed a Notice of Supplemental Authority (DE 128) citing an order in *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 86. The undersigned is aware that an esteemed colleague recently issued this order in a separate litigation involving detainees housed at the TNT facility. In that case, Plaintiffs raised First and Fifth Amendment constitutional challenges to their conditions of confinement at the facility. As Defendants point out, the order recognizes the "distinct procedural posture" of this case in its discussion of venue, *C.M.*, 25-cv-23182, ECF 86 at 33 n.14, although it should be noted that the Federal Defendants claim that venue was improper pursuant to § 1391(e) was resoundingly rejected in the *C.M.* order. *Id.* at 35–38. In any event, because, as acknowledged in that

### 3.  Sections 1391(b)(2) and (e)(1)(B)

"A civil action may [also] be brought in [any] judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]" § 1391(b)(2); *see also* § 1391(e)(1)(B) (providing transactional venue for federal defendants on the same basis). Venue is not confined to one district but may be proper "in two or more districts." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). "Only the events that directly give rise to a claim are relevant[,]" and "of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered." *Id.*

However, the Court "is not required to weigh the events that occurred in" a plaintiff's chosen district "against those that took place in" other districts and "choose which venue is more proper; rather, even though 'a substantial part of the events or omissions giving rise to' the claim" may have occurred in another district, "so long as the same can be said as to" a plaintiff's chosen district, "venue is proper" there. *Goodwyn, Mills & Canood, Inc. v. Black Swamp, Inc.*, 956 F. Supp. 2d 1323, 1326 (M.D. Ala. 2012); *see also Morgan v. N. MS Medical Ctr., Inc.*, 403 F. Supp. 2d 1115, 1123 (S.D. Ala. 2005) ("[A] plaintiff does not have to select the venue with the *most* substantial nexus to the dispute, as long as she chooses a venue where a substantial part of the events giving rise to the claim occurred.").[15] Further, "'[s]ubstantiality' for venue purposes is more a qualitative than a

---

order, the legal and procedural postures of the two cases are entirely distinct, the determination as to venue in *C.M.* does not control or subvert the analysis here.

[15] Therefore, it is irrelevant to the §1391(b)(2) analysis that the Middle District of Florida, where the majority of the detention camp is located, would also have been a proper venue for Plaintiffs' suit.

App. 1384

quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Russo v. Raimondo*, No. 24-0186, 2024 WL 4571431, *5 (S.D. Ala. Oct. 24, 2024) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432–33 (2d Cir. 2005)).

Plaintiffs argue that there are substantial events and omissions which occurred in this district, making venue here a proper choice. Specifically, they point to: (1) TNT's partial location in[16] and ownership by Miami-Dade, (DE 61 at 9–10 (citing DE 12-3; DE 12-4; DE 12-5)); (2) the State and Federal Defendants' failure to conduct environmental assessments and provide opportunity for notice and comment regarding the environmental impacts of the project, which would have taken place, in large part, in Miami-Dade, (*id.* at 10–11); and (3) the current and feared impacts of the project on Miami-Dade, its residents, threatened and endangered species within the county, and Tribal sites and activities within Miami-Dade. (*Id.* at 13–15).

Defendants argue that a substantial part of the events or omissions here could not have taken place in the S.D. Fla. because "all the detention facilities, all the buildings, and all the paving at issue" are located in Collier County, in the Middle District of Florida ("*M.D. Fla.*"), and "all relevant decision[-]making was made or is being made by officials in Washington, DC; in Tallahassee, Florida; or onsite at the camp [.]" (DE 50 at 3–4); *see*

---

[16] Through dueling GIS maps and expert affidavits, the Parties aggressively dispute what percentage of the property is within Miami-Dade, 2% or 28%. (DE 79; DE 80; DE 86). It does appear that around 2% of the jetport is in Miami-Dade, while 28% of the total developed and as yet undeveloped land is within Miami-Dade. The real disagreement is over which areas within the property are relevant to Plaintiffs' claims and to what degree. But, as will be explained, the answer to that question impacts venue little, so the Court will not wade into this contestation.

*also* (DE 60 at 1). Defendants reject the notion that Miami-Dade's ownership of the property has any relevance to the analysis, because, since "FDEM took control of the [s]ite . . . [Miami-Dade's] activities . . . 'do not have a close nexus with the cause of action.'" (DE 50 at 4–5 (quoting *Jenkins Brick*, 321 F.3d at 1373)). Finally, Defendants insist that only Defendants' actions, not Plaintiff's injuries, should be taken into account. (DE 65 at 9–11).

Much of the dispute stems from the Parties' disagreement over how *Jenkins Brick*—the Eleventh Circuit's most detailed discussion of transactional venue—should be understood. The decision in *Jenkins Brick* arose from a dispute involving a breach of a non-compete agreement between an Alabama-based company and a Georgia-based employee. 321 F.3d at 1368. The contract had been executed in Georgia, was intended to be performed in Savannah, Georgia to protect the Alabama-based company's emerging Georgia activities, and was breached when the Georgie employee was hired by a competitor in Savannah. *Id.* at 1372. Arguing that venue was nonetheless proper in Alabama, the plaintiff-employee noted that sales and training meetings had been held in Alabama, his salary and benefits came from Alabama, and the executed non-compete agreement had been sent by the plaintiff back to Alabama. *Id.* at 1372–73. The Eleventh Circuit discounted these connections to Alabama, finding "they did not have a close nexus with the cause of action for breach of contract." *Id.* at 1373. Because "all of the events 'giving rise to'" the claims occurred in Georgia, the court held Alabama was an improper forum. *Id.*

In its analysis, the Eleventh Circuit cited an Eighth Circuit case, *Woodke v. Dahm*, 70 F.3d 983 (8th Cir. 1995), in which a plaintiff who sold and designed semi-trailers

claimed the defendant was passing off trailers under an identical trademark. *Id.* at 1371. The plaintiff filed the case "in the state of his residency, Iowa, even though he had no evidence of wrongdoing in that state." *Id.* (citing *Woodke* 70 F.3d at 985). To support venue in Iowa, the plaintiff argued Iowa is "the location of the ultimate effect of the passing off." *Woodke*, 70 F.3d at 985. He also proffered the fact that the trailers were manufactured in Iowa, before having the trademarks altered elsewhere. *Id.* Assessing the venue claim, the *Woodke* court found the initial manufacturing of the trailers was too causally remote from "the kinds of events that give rise to a claim" to be factored into the analysis. *Id.* Without any other relevant connections to Iowa, the court "reject[ed the plaintiff's] argument that venue lies in [Iowa] simply because that was where he was residing when the passing off occurred." *Id.* As the *Woodke* court explained,

> While the present venue statute was certainly intended to expand the number of venues available to a plaintiff, we are reluctant to impute to Congress an intent to abandon altogether the protection of defendants as a relevant consideration in venue matters. We think it far more likely that . . . Congress meant to require courts to focus on relevant activities of the defendant, not the plaintiff.

*Id.*

Two guiding principles emerge from a more than cursory review of these cases and their reasoning. First, while the Court must "focus" the inquiry on the acts and omissions of the Defendant, these cases do not stand for the drastic proposition that the Court must "ignore the place of injury altogether. They simply hold that the place of . . . injury is not *alone* sufficient to create venue." *Am. Action Network, Inc. v. Cater Am., LLC*, No. 12-cv-1972, 2014 WL 12675253, at *2 (D.D.C. Feb. 12, 2014) (discussing *Jenkins Brick and Woodke*, among other cases). Indeed, courts within the Eleventh Circuit have regularly factored the location of injury into their analyses since *Jenkins Brick* was

decided. *See e.g., Exist Inc. v. Starr Indem. & Liab. Co.*, No. 23-cv-61511, 2023 WL 11969904 at *1, *3 (S.D. Fla. Nov. 2, 2023) (venue for suit challenging New York-based insurer's denial of claim was proper in Florida because "one of the losses giving rise to" the claim occurred there); *AutoNation, Inc. v. Hall*, No. 19-cv-60291, 2019 WL 3712008, at *8 (S.D. Fla. May 29, 2019) (stating that courts have "held that substantial events occurred within a venue when harm or injury was suffered in that venue" (quoting *Mobile Diagnostic Imaging, Inc. v. Gormezano,* No. 12-cv-60888, 2012 WL 3244664, at *2 (S.D. Fla. Aug. 9, 2012))); *United States v. Sec'y, Fla. Dep't of Corr.*, No. 12-cv-22958, 2012 WL 6626818, at *2 (Dec. 19, 2012) (in suit challenging a Florida policy—decided in Tallahassee—to deny kosher meals to prisoners, venue was proper in the Southern District of Florida because "several prisoners in [the district] ha[d] been denied kosher meals[, and] [t]hus, harm ha[d] occurred" there).[17]

Second, for acts or omissions to "give rise to a claim," they must "have a close nexus to the wrong," but they need not be wrongful acts (or omissions) themselves. *Jenkins Brick*, 321 F.3d at 1373. In *Jenkins Brick*, the court found relevant the location where the non-compete agreement was executed and intended to be performed. *Id*. As long as the events are not too causally remote from the wrongful acts, these events are

---

[17] The *Jenkins Brick* court acknowledged that harm may be relevant, when discussing Congress's rationale for amending the venue statute. The court noted that "[t]he old language was problematic because it was oftentimes difficult to pinpoint the single district in which a 'claim arose.'" *Jenkins Brick*, 321 F.3d at 1371. The court gave the example of "a toxic tort case in which the defendant's factories in Colorado and Missouri pollute a river, causing injury to Arkansas and Louisiana citizens who ingest the water." *Id.* Under the old statute allowing venue in only one district, a court would have been forced to "pick a district in an arbitrary fashion," since any of the locations provide a reasonable forum. *Id.* The court's identification of Arkansas and Louisiana—districts where the harm occurred in the hypothetical—as examples of possible venues, indicates the court's understanding that harm is not wholly irrelevant to the analysis.

App. 1388

relevant as "part of the 'historical predicate' of the claim." *MacDermid Printing Sols., LLC v. Clear Stamp, Inc.*, 2013 WL 3176887, at *5 (N.D. Ind. June 21, 2013). For example, in *North MS Medical Center*, the court held venue for an Emergency Medical Treatment and Active Labor Act ("EMTALA") claim was appropriate in Alabama, even though the decedent was injured, hospitalized, treated, and eventually prematurely discharged in Mississippi. 403 F. Supp. 2d at 1123. The court found that the hospital's transportation of the decedent in an ambulance back to his home in Alabama, where he later died of untreated injuries, bore a "close nexus to the wrong," even though "the alleged EMTALA violation may have been satisfied the moment that [the defendant] wheeled [the decedent] out the front door of the [h]ospital[.]" *Id.* In part, this was because the Alabama occurrences would be part of "the proof at trial." *Id.*

Turning back to this case, Plaintiffs' Complaint alleges that Defendants' construction and operation of the TNT site as an immigration detention camp violates various federal, state, and county laws. The NEPA claim asserts that because the project creates major environmental impacts and is subject to significant federal control, Defendants were required to conduct certain environmental reviews beforehand and did not. These claims implicate a broad range of Defendants' conduct, and the scope of relevant acts and omissions is equally broad, and includes: Defendants' efforts to take control of the TNT site and failure to obtain critical information from the site's owner; aspects of Defendants' decision-making process regarding the facilities' construction and operations; and, critically, any of Defendants' detainee transportation, detention, and deportation activities related to the project. A substantial portion of these events took place and are taking place in Miami-Dade, within the S.D. Fla.

First, because Miami-Dade owns the TNT site, Director Guthrie began the project's execution by sending a notice of intent to purchase the TNT site and associated lands to Miami-Dade Mayor Daniella Levine Cava. (DE 12-3). Defendant Miami-Dade, through Mayor Levine Cava, responded by alerting Director Guthrie to Miami-Dade's concerns that Defendants must "understand the scope and scale of the proposed use of the site and what will be developed, as the impacts [on] the Everglades ecosystem could be devastating." (DE 12-4 at 1). The State did not heed Miami-Dade's warnings or ask for any additional information from Miami-Dade to educate itself on scope, scale, and impacts. This interaction was an initial act—or failure to act—in the joint, multi-step decision-making process by Defendants, which is a necessary predicate to NEPA compliance, and which gave rise to Plaintiffs' NEPA claim. *See Russo*, 2024 WL 4571431, at *2–4 (in APA claim challenging a final rule promulgated by a federal agency, an antecedent meeting and vote by a regional council to send a proposed rule to the agency for approval "qualifies as an event that directly g[a]ve[] rise to the plaintiff's claims" even though it was not the actionable event). The State then responded to Miami-Dade's letter, notifying the County of the State's intent to commandeer the property for use as a detention camp. (DE 12-5).

Next, Defendants' use of the site includes actions currently taking place in the S.D. Fla. Most importantly, ICE's Miami field office is responsible for coordinating and supervising immigration enforcement functions conducted by deputized state law enforcement agency officials. (DE 21-1 ¶ 5, 8 (declaration from ICE Interim Assistant Director of Field Operations Thomas Giles confirming that the detention camp operates under Florida agencies' 287(g) agreements with ICE); DE 118-1 ¶ 9 (declaration from ICE

Miami field office director stating that he oversees the relevant 287(g) agreements)). In a different case raising constitutional challenges to detainee treatment on the TNT site, the Federal Defendants filed a declaration by another ICE Miami field office official, Juan Lopez Vega, in which he attested that his responsibilities "include overseeing [Enforcement and Removal Operations], and detention facility operations within the Miami [Area of Responsibility], including those at the South Florida Soft Sided Facility South (SFSSFS). . . . which is also known as Alligator Alcatraz." *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 50-1 ¶¶ 3–4.[18] Given that the sole use of the site is to detain those in federal immigration custody, all activities on the site are supervised and directed by the Miami ICE field office. *See supra* Section I.B. (quoting language from 287(g) agreements stating, "[i]mmigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE."). Additionally, the Federal Defendants bring detainees from other Miami-Dade detention facilities to the TNT site. (DE 114 at 312–14). In fact, in another case involving the detention camp, Federal Defendants recently filed a notice that "the Executive Office for Immigration Review (EOIR) has designated Krome North Service Processing Center (Krome) as the immigration court with administrative responsibility over the Alligator Alcatraz detention facility." *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 83. These core actions are alone sufficient to make venue proper in the S.D. Fla. *See Managed Care Sols., Inc. v. Cmty Health Sys., Inc.*, No. 10-cv-60170, 2011 WL 6024572 at *3–4 (S.D. Fla. Dec. 2, 2011) (in a breach of contract case, venue was

---

[18] *See Cash Inn of Dade*, 938 F.2d at 1243 ("A district court may take judicial notice of public records within its files relating to the particular case before it or other related cases); *Lockett,* 2021 WL 4815898, at *1, *12 n.9 ("The Court may take judicial notice of public records, such as court filings on public dockets.") (citing *Universal Express, Inc.*, 177 F. App'x at 53)).

proper in the district where the parties performed the contract, even though the defendant's operations were not based there and that may not be "the venue with the most substantial nexus to the dispute") (internal quotations omitted).

However, Defendants' allegedly wrongful omissions in this case also have close ties to this district. When conducting a NEPA-triggering project in the Everglades area, the federal government is required to coordinate with the Tribe, who has occupancy rights in BCNP, conducts preservation and restoration activities in the area, and historically has aided federal agencies with their environmental reviews. *See* (Tribe Ex. 21 at IV-7; Tribe Ex. 22 at 209, 213, 216; Tribe Ex. 23 at 193; DE 129 at 73, 113 (testifying about the Tribe's occupancy rights in BCNP and the Everglades National Park)). Over the past decade, the Army Corps of Engineers has faithfully followed these protocols during the planning and execution of WERP. When notices of NEPA projects go to the Tribe, they are sent to the Tribe's administration building, located in Miami-Dade County. The Tribe's environmental divisions work out of that building in coordination with federal agencies to create environmental impact statements ("***EIS***"). The same holds true for ICE's consultation of other relevant environmental groups. *See* (Pl. Ex. 154 (describing ICE's consultation with the Everglades National Park regarding its proposed expansion of the ICE Krome SPC detention facility)). In this case, proof of the facts that no EIS was created and the Tribe was never consulted comes from the testimony of Tribal members and employees, whose employment is based in Miami-Dade. (DE 129 at 33–34, 45 (testifying to Defendants' failure to contact the Tribe before moving forward with the project, in contrast to agencies' usual protocol of consultation)). *See Morgan*, 403 F. Supp. 2d at 1123 (recognizing that the source of the proof at trial is an indicator of the location of

substantial events and omissions giving rise to a claim).

Next, though not a dispositive consideration on its own, the locus of possible environmental harms within this district is relevant, particularly where Plaintiffs must show that the project "significantly affect[s] the quality of the human environment" in order to prevail on their NEPA claim. *S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994) (quoting § 4332(a)(C)). To begin with, increased runoff from the 800,000 square feet of new paving and any wastewater from the site is likely to flow southeast, where just a few miles from the site in Miami-Dade, eighty percent of Tribal members reside, Tribal schools are located, and the Tribe's administration building sits. (DE 113 at 24, 79; DE 129 at 16, 34, 45; Tribe Ex. 6 (tribal villages map)). This increased runoff creates risks of carcinogens entering the Tribe's water supply and of sediment and nutrients impacting the plant and wildlife in the areas within Miami-Dade that the Tribe uses for hunting, fishing, and gathering certain plants. (DE 113 at 79; DE 129 at 107–08, 118–19). This change to the quantity and consistency of runoff also risks disrupting the $20 billion WERP, which involves culverts and other infrastructure to manage the flow of water into sensitive wetlands conservation areas in Miami-Dade and Broward Counties. (Pl. Ex. 34; DE 129 at 22–30).

Other harms in Miami-Dade include light pollution from the camp's intense industrial lighting, which obstructs views of the night sky in Miami-Dade. *See* (DE 24-4 (depicting the light emanating from the site from 15 miles away in Miami-Dade); DE 114 at 309 ("it looks like we have a sports stadium in our backyard now"); Tribe Ex. 9 at 8–35 (measuring and documenting the increased sky brightness due to the project)). This light pollution impacts the endangered bonneted bat's critical habitat zone, which is located

partially in Miami-Dade. (DE 129 at 132, 138–41). Further, since Defendants have altered the site's use, Tribal members have also been unable to access the main trails leading into the BCNP lands within Miami-Dade for hunting and cultural and ceremonial activities, as those trailheads are directly adjacent to the site. (*Id.* at 122–27, 133, 164, 175). These harms and others giving rise to Plaintiffs' NEPA claim, are relevant to the request for injunctive relief, and support venue in this district.

Defendants argue that *Friends of Earth v. Haaland*, counsels against this result. (DE 65 at 8 (discussing *Friends of Earth v. Haaland*, 2022 WL 185196, at *2-4 (D.D.C. Jan. 20, 2022))). As that court noted, "[i]n cases brought under the APA, courts generally focus on where the decision[-]making process occurred to determine where claims arose." *Friends of Earth*, 2022 WL 185196, at *3. But in that case, as in most NEPA cases, the court was reviewing a single discrete agency decision—a Record of Decision made in Washington, D.C. rescinding agency approval for new oil and natural gas leases in the Gulf of Mexico—and its relationship to the Western District of Louisiana. *Id.* at *1. Also in that case, as in most NEPA cases, the court was tasked with reviewing a significant record of meetings, studies, and EIS's to decide whether the decision-making process was sufficient under NEPA. *Id.* at *3–4 (discussing the locations of the agency's public comment process, issuances of multiple EISs and a Record of Decision, and of dozens of studies). Under those circumstances, because nearly all of the acts comprising the NEPA process took place outside of the district in question, the court in *Friends of Earth* concluded venue there was improper. *Id.* at *4.

But this case is *not* the usual NEPA case. Here, Plaintiffs do not challenge a new rule or Record of Decision, which may be traceable to discrete moments of decision-

making, but a project comprised of many "systematic and connected agency decisions[.]" 40 C.F.R. § 1508.18(3) (describing the adoption of programs as a category of major federal action). Here, there is no record of a NEPA process taking place in other districts because Defendants did not engage with a single step of the environmental review process in any district. Consequently, the Court's review under NEPA necessarily focuses on where studies should have been done and where interested parties should have been consulted but were not.[19]

Defendants say the Court's inquiry should be confined to Defendants' decisions about project construction, which they say took place in either Washington D.C., Tallahassee, Florida, or Collier County. This may be true (though the only supporting evidence Defendants have provided is one conclusory statement from a FDEM employee saying "[a]ll substantial decision-making about the detention facility has occurred at either State offices in Tallahassee, Florida, or on-site in Collier County, Florida"). (DE 50-1 ¶ 4 (declaration of Ian Gadea-Guidicelli)). Yet other decisions relating to the setup of the camp and its ongoing operations likely took place and continue to take place at the Miami field office, which coordinates ICE's oversight of the project's immigration functions and

---

[19] Defendants' reliance on *Rodriguez-Diaz v. Donald* is similarly misplaced. (DE 65 at 6, 8, 9, 11 (citing *Rodriguez-Diaz v. Donald*, No. 14-cv-23055, 2015 WL 11217234 (S.D. Fla. Apr. 1, 2015)). In that copyright infringement case, this Court applied in a straightforward manner the rule from *Jenkins Brick* that the focus of a Court's inquiry under § 1391(b)(2) should be on a defendant's actions with a close nexus to the wrong. *Rodriguez-Diaz*, 2015 WL 11217234, at *2. And because the defendant DJ had performed and sold records in the S.D. Fla. while using an allegedly infringing nickname, venue was proper even though those actions comprised a small share of the DJ's overall sales and performances. *Id.* *1–2. Similarly, here, the Court has identified numerous actions and omissions by Defendants with a close nexus to the alleged NEPA violation, making venue proper even while many other aspects of the claim took place in other districts.

the facilities' compliance with ICE standards. *See infra* pp. 35–36.

Finally, it is noteworthy that the *Friends of Earth* court did credit the location of the impact of the agency's decision as relevant, but said "impacts alone cannot create proper venue. . . .[,] [p]articularly . . .  where the impacts of any decision will be felt nationwide." *Id.* at 5. In this case, impacts are localized to Miami-Dade (and some other counties), and these impacts are but one of the many relevant ties to the district. Therefore, the Court finds that Plaintiffs' claims against the State and Federal Defendants are properly in this district.

### 4.  Discretionary transfer under section 1404(a)

Federal Defendants alternatively ask the Court to transfer the case to the M.D. Fla., where the majority of the TNT site is located. (DE 60 at 6). They rightly argue that venue is also appropriate there under § 1391(e)(1). (*Id.* at 6–7). But Federal Defendants are wrong in their assertions that the only important factor to weigh is "the local interest in having localized controversies decided at home," (*id.* at 7 n.4), and that this factor cuts in favor of venue in M.D. Fla. (*Id.* at 8).

"[A] plaintiff's choice of forum should be honored so long as venue is proper there, unless substantial countervailing considerations militate to the contrary." *Bartronics, Inc. v. Power-One, Inc.*, 510 F. Supp. 2d 634, 637 (S.D. Ala. 2007) (citing *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.")); *see also Managed Care Sols.*, 2011 WL 6024572 at *4 ("In the Eleventh Circuit, the plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations.") (citation omitted). When considering transferring a case, the court

should consider "convenience of parties and witnesses, the 'locus of operative facts,' and other concerns related to 'trial efficiency[.]'" *Bryant*, 2024 WL 4458382, at *8 (quoting *Convergys Corp.*, 430 F.3d at 1135 n.1). Additionally, the court should weigh "various public-interest considerations," including "the administrative difficulties flowing from court congestion [and] the local interest in having localized controversies decided at home[.]" *Atl. Marine Constr. Co.*, 571 U.S. at 62 n.6 (2013) (internal quotations omitted).

Federal Defendants argue that NEPA cases "are resolved on an [a]dministrative [r]ecord and therefore" convenience of parties and witnesses and other trial efficiency considerations "do not play a significant role for purposes of the venue analysis." (DE 60 at 7 n.4). That may be true in a typical NEPA case, where the Parties agree that a given agency action was subject to NEPA, and the agency conducted some environmental analysis under NEPA, so there is an administrative record for the Court's review. But again, this is not a typical NEPA case. Here, the Parties dispute whether the project is even a federal action, and no Defendant conducted any environmental analysis prior to building and operating the project; the merits of the NEPA claim will require fact-finding as there is no administrative record to rely upon. Additionally, Plaintiffs request permanent injunctive relief. As the case progress, Plaintiffs will need to marshal testimony from witnesses and other discovery related to irreparable harm and equities, making convenience of witnesses and access to evidence relevant considerations. And both of these considerations—convenience and access—weigh in favor of keeping the case in the S.D. Fla. For one, the S.D. Fla. provides the closest federal courthouse to the TNT

site by 50 miles.[20] Moreover, eighty percent of Tribal members live in Miami-Dade and their environmental resources division and tribal headquarters are based here. (DE 129 at 16, 34, 45; Tribe Ex. 6). Much of the evidence of environmental harms would also be derived from Miami-Dade. Further, Miami-Dade County owns the TNT site; property records, past site plans, ecological studies, and surveys are presumably located in Miami-Dade.

Next, Defendants posit, without any support, that "the resolution of this case . . . will have the *greatest* impact on the people and local governments of the Middle District[.]" (DE 60 at 8). But this is far from clear. Miami-Dade and other adjacent counties in the S.D. Fla. have similar, if not more compelling interests in the resolution of this case. Again, it cannot be overstated that Miami-Dade **owns** the site and certainly has a strong interest in how it is used. Some Miami-Dade residents live relatively close to the site and use the surrounding areas for recreation. Tribal members have perhaps the most compelling interest of any one demographic in how these claims are decided, and they are almost entirely local to Miami-Dade. This is not to say that residents in Collier County may not also have a stake in the proceedings, but this factor does not clearly cut in favor of venue in the M.D. Fla.

Given that the S.D. Fla. is undoubtedly the more convenient forum and public-

---

[20] According to a google maps search, the closest M.D. Fla. courthouse is 103 miles from TNT, while the closest S.D. Fla. courthouse is 54 miles away. Driving Directions from the Ft. Myers Division U.S. Courthouse & Federal Building to the TNT site and from the Wilkie D. Ferguson Jr. U.S. Courthouse to the TNT site, Google Maps, http://maps.google.com. *See Borozny v. Inn*, No. 19-cv-112-J-39PDB, 2019 WL 13272267, at *2 n.2 (M.D. Fla. Feb 25, 2019) ("Courts routinely rely on and take judicial notice of Google Maps." (citing *Perimeter v. Fedex Freight, Inc.,* No. 14-cv-104, 2016 WL 878496, at *2 (M.D. Ga. Mar. 7, 2016)).

interest considerations are in equipoise, the Court will not disturb Plaintiffs' choice of venue in the S.D. Fla. Having established that the case will remain in this district, the Court will proceed to analyze the merits of Plaintiffs' request for a preliminary injunction.

### C. *Plaintiffs have met the criteria for issuance of a preliminary injunction.*

As stated above, to succeed on a motion for preliminary injunction Plaintiffs must show: "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Gissendaner*, 779 F.3d at 1280 (citation omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction [in a NEPA case] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.") (citations omitted). The Court addresses each requirement in turn.

### 1. Likelihood of success on the merits

Plaintiffs base their request for preliminary injunctive relief solely on their NEPA claim,[21] encompassed within Counts I and II.[22] *See supra* n.4. NEPA does not contain a

---

[21] Though the APA provides the cause of action for the relevant claim, for ease and consistency, the Court will refer to the claim as a "NEPA claim," since it hinges on whether Defendants complied with NEPA.

[22] Plaintiffs originally requested injunctive relief against Miami-Dade but withdrew that request. (DE 31 at 3 n.2). Therefore, the Court will not address Miami-Dade's response. (DE 12).

"private right of action." *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355 n.2 (11th Cir. 2024). Instead, a plaintiff must sue under the APA provision, "5 U.S.C. § 706(2)(A), which provides a cause of action to challenge final agency action as (among other things) arbitrary and capricious." *Id.* (citing *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 1130 (2014) (explaining that the APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action")); *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1356 n.12 (11th Cir. 2023) ("NEPA challenges are brought under the [APA]"); *see also* § 706(2)(A) (requiring a "reviewing court [to] . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

NEPA was passed in recognition of "the profound impact of [hu]man[] activity on the interrelations of all components of the natural environment[.]" 42 U.S.C. § 4331(a). It is meant, among other goals, to "fulfill the responsibilities of each generation as trustee of the environment[,]" and "preserve important historic, cultural, and natural aspects of our national heritage[.]" § 4331(b)(1),(4). To those ends, NEPA requires that any "major Federal action significantly affecting the quality of the human environment" be preceded by and EIS, which studies foreseeable environmental impacts of the project, feasible alternatives, and other factors impacting the balance between NEPA's objectives and the benefits of the project. § 4332(C).[23] The EIS process must be done in consultation with

---

[23] The agency may prepare a less intensive "environmental assessment [("*EA*")]" for "proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown[.]" § 4336(b)(2). But even when an EA is appropriate, the decision to prepare an EA along with the reasons for making this decision, must be articulated and published. *Id.* (providing

any Federal agency with expertise relevant to any environmental impact involved in the project, must seek comments from relevant State and local agencies, and must release all these views and comments to the public. *Id.*

Tying together the statutory language, the NEPA claim requires Plaintiffs to show that the construction and/or use of the detention camp involves (1) a final agency action, and (2) a major Federal action, (3) without Defendants conducting a compliant EIS. *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (describing a court's "review of agency decisions" under APA and NEPA as "determin[ing] whether the action to be taken constitutes a 'major Federal action'—that is, an action 'significantly affecting the quality of the human environment'"— and reviewing for the presence and sufficiency of an EIS under the APA's arbitrary and capricious standard); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025) (describing a NEPA claim as "argu[ing] that an agency action was arbitrary and capricious due to a deficiency in an EIS").

Defendants do not dispute that the camp and its operations have a sufficient impact on the quality of the human environment to be considered "major," justifying the need for an EIS. Indeed, the Court reviewed plans and photos showing that operation of the camp, to date, has involved paving approximately 800,000 square feet of land, installation of industrial lighting impacting the night sky at least 20 to 30 miles away, and enough residential infrastructure to house thousands of detainees and on-site staff. (Pl. Exs. 22, 90–92 (Dr. McVoy report of new asphalting and TNT site plans); Tribe Ex. 9

that an EA "shall be a concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary").

(lighting report)). The camp employs as many as 1,000 staff members, many of whom reside on site, and can house multiple thousands of detainees at any given time. (DE 113 at 28, 33–34). Additionally, the project involves the daily movement of human waste, sewage, jet fuel, and significant vehicular traffic. (DE 38-5 (TDF Waste Management Plan)). In fact, several environmental experts opined that they expect the project will have considerable environmental impacts and would have required review by relevant federal agencies, such as the U.S. Fish and Wildlife Service. (DE 113 at 49 (Dr. McVoy opining that he would have expected an EIS to be done before the facility's construction based on his experience with NEPA); DE 114 at 240 (testimony from Kautz that he "would have expected consultation with the U.S. Fish and Wildlife Service for impacts, potential impacts on the Florida panther, as well as other listed species in the area."); DE 129 at 130, 141 (testimony from Dr. Bozas that he expects there to be "effects on wildlife in the area" based "on the current level of human activity at the TNT [s]ite" and that the project's increased lighting would have required review by Fish and Wildlife Service due to its impact on the bonneted bat's critical habitat zone)); *see also Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir. 1972) (rejecting GSA's claim that a 450-person jail, even though not constructed in one of the country's most protected environments, would have "no adverse effects on the environment" and requiring it to undergo a proper NEPA evaluation).

Next, Defendants do not purport to have produced an EIS or conducted any environmental assessment prior to constructing or commencing operations of the camp. The fact of this failure to act is supported by testimony from Friends staff and Tribe employees who are routinely notified of new projects in the area, so they can consult and collaborate during the NEPA process. These witnesses unanimously attest to the fact that

they were never notified of the project until news of the site became public. (Tribe Ex. 4 ¶¶ 3–4 (declaration of Jason Daniel) ("I am responsible for receiving, and responding to consultation requests submitted by federal and state agencies with respect to proposed undertakings on or affecting historic properties or lands . . . which are culturally significant to the Miccosukee people. . . . [T]o the best of my knowledge, I have not received a request from any governmental agency . . . with respect to the project or undertaking located at TNT [s]ite."); DE 129 at 169 (Dr. Bozas stating that he "had no notice of the facility" even though "it is generally part of the protocol when there is large State or Federal programs that the Tribe is consulted with"); DE 129 at 33–34 (Tribal Water Resources Director testifying that no governmental entity contacted her before construction of the camp)). Avoiding a discussion of environmental impacts and notice, the Defendants instead say that there has been no <u>final</u> <u>federal</u> agency action. The Court takes up these two issues next.

a. *Final Agency Action*

Courts employ a two-part test to determine whether an agency action is "final" (and therefore reviewable) under the APA. "First, the action must mark the consummation of the agency's decision[-]making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted). To be a final agency action, the challenged action must be one that represents "the agency's definitive position, affects the parties' legal rights or obligations, and immediately impacts the regulated parties' daily operations." *RB Jai Alai, LLC v. Sec'y of Fla. Dep't of Transp.*, 47 F. Supp. 3d 1353, 1365

(M.D. Fla. 2014); *see also Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003) ("The finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." (quoting *Darby v. Cisneros*, 509 U.S. 137, 144 (1993))); *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question" in the finality determination is whether the result of the agency's decision[-]making process "will directly affect the parties"); *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 288 (5th Cir. 1999) (characterizing a non-final decision "as one that does not itself adversely affect [a plaintiff] but only affects his rights adversely on the contingency of future administrative action"). A decision with an impact that is "sufficiently direct and immediate" or with a "direct effect on day-to-day business" qualifies as a final agency action. *Franklin*, 505 U.S. at 797 (alterations accepted and internal quotations omitted). The question before the Court is whether the decision-making process, with respect to the detention camp, has advanced to the point where it has had a sufficiently direct and immediate impact on the parties' rights and therefore qualifies as a reviewable final agency action. As discussed below, the Court concludes that it has.

As a threshold matter, the construction of the camp does not represent a preliminary, procedural, or intermediate agency action or ruling. Although it apparently lacks basic forethought in many ways, the facility has undergone substantial construction and is currently operational. Indeed, as Plaintiffs allege, the State and Federal Defendants coordinated to "construct a mass migrant detention and deportation center" and have completed "the installation of housing units, construction of sanitation and food services systems, industrial high-intensity lighting infrastructure, [and] diesel power generators."

(DE 1 at 17).

Prior to such construction, however, the Defendants were required, under NEPA, to issue an EIS or conduct an EA. The Defendants chose not to do so. Under the APA, the "failure to act" qualifies as an "agency action." 5 U.S.C. § 551(13). The Defendants' decision to refrain from issuing an EIS or conducting an EA, and then building a detention camp, represents a determinative position on the matter and has adversely affected Plaintiffs' recreational, conservational, and aesthetic interests. Accordingly, the Defendants' decision to not issue an EIS or conduct an EA and then construct a detention camp qualifies as a final agency action. *See Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001) (explaining that a "decision not to prepare an EIS is a final agency action"); *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998) ("We review an agency's decision not to prepare an EIS under an 'arbitrary and capricious' standard of review."); *Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (alleged failure to comply with NEPA constitutes "final agency action"); *Citizens for Clean Energy v. U.S. Dep't of the Interior*, 384 F. Supp. 3d 1264, 1280–81 (D. Mont. 2019) ("Federal Defendants further initiated a final agency action in their decision not to begin the NEPA process."); *Dine Citizens Against Ruining Our Env't v. Klein*, 676 F. Supp. 2d 1198, 1214 (D. Colo. 2009) (explaining that an agency's failure to prepare an environmental assessment or "failure to otherwise comply with NEPA constitutes final agency action"); *San Juan Citizens' Alliance v. Babbitt*, 228 F.Supp.2d 1224, 1229 (D. Colo. 2002) ("A failure to prepare an EIS is a final agency action within the meaning

of the APA.").[24]

The decision to construct and operate the detention camp, despite Defendants' characterization of the camp as "temporary," cannot be considered "merely tentative or interlocutory" because the EIS or EA must **precede** any "major Federal actions significantly affecting the quality of the human environment." § 4332(C). Under the statutory language, the Defendants cannot put the cart before the horse—they cannot construct a facility and, then only in response to litigation such as the instant case, decide to fulfill their legal obligations.

Next, the decision not to issue an EIS or conduct an EA has directly impacted the rights of the Parties in this matter. As part of the EIS process, members of the public are afforded opportunities to comment on the proposed environmental action. During the Preliminary Injunction Hearing, Friends members and Tribe employees emphatically stated that they would have provided such comments. Instead, they lost the right to do so when Defendants refused to comply with their statutory obligations. *See* (DE 114 at

---

[24] Under wholly disparate circumstances, some courts have stated that an "agency's decision not to prepare an EIS pursuant to the NEPA does not constitute a final agency action." *Karst*, 403 F. Supp. 2d at 81 n.3 (citing *Pub. Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992)); *see also Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 196 n.6 (D.C. Cir. 2003) (when challenged Metrolink project had not yet been built or federally funded, Federal Transit Administration's decision not to conduct an environmental review did not "itself" constitute a final agency action). These cases stand for the unremarkable proposition that an EIS alone is not a final agency action where no "NEPA-triggering" major federal action has already occurred and where administrative processes are ongoing. *Citizens for Clean Energy*, 384 F. Supp. 3d at 1280–81; *see Public Citizen*, 970 F.2d at 918 (Trade Representative's failure to conduct an EIS prior to engaging in trade negotiations was "not itself a final agency action" in the absence of some "specific proposal for legislation or other action at least arguably triggering the agency's obligation to prepare an impact statement") (internal quotation omitted). By contrast, here, the detention camp's construction and existence are undisputed. In this context, the decision not to issue an EIS or conduct an EA is a final agency action.

55–56, 74). Besides this lost engagement opportunity, Plaintiffs' relationship to the Preserve—recreationally, or as conservationists—was also compromised by Defendants' failure to issue an EIS or conduct an EA. For example, Plaintiffs' expert, Randy Kautz testified that the Florida panther has lost 2,000 acres of habitat as a result of the facility's construction and use of intense lights disturbing the habitats of these nocturnal creatures. *See* (DE 114 at 232). Moreover, several witnesses testified about how the facility's light pollution has adversely affected their ability to observe the night sky.[25] (*Id.* at 34). Accordingly, because the decision to construct the detention camp without issuing an EIS or conducting an EA is a definitive position which has caused actual, concrete injury to the Plaintiffs' recreational and conservational interests, the Court finds that the action was a final agency action.

No Defendant has endeavored to explain their decision to abstain from issuing an EIS or conducting an EA. Instead, the Federal Defendants contend that "[n]either ICE nor FEMA has implemented, directed, or controlled the construction work at the temporary detention center." (DE 21 at 3). This contention runs contrary to significant evidence Plaintiffs have adduced that the facility's construction was requested and fully funded by the federal government. *See infra* Section III.C.1.b. Instead of addressing the failure to issue an EIS or conduct an EA as a final agency action, Defendants attempt to reframe the issue as one involving the detention camp's ultimate funding. Defendants point to the fact that the detention camp's construction costs have been initially shouldered by Florida

---

[25] Big Cypress National Preserve is recognized as an International Dark Sky Park and offers visitors a unique opportunity to observe the Milky Way with their naked eyes. *Big Cypress International Dark Sky Place*, FLORIDA NAT'L PARKS ASS'N, https://perma.cc/6CWV-KBC6; *see also* (DE 114 at 34).

to be submitted to the federal government for reimbursement. Accordingly, Defendants argue that the "reimbursement decision . . . has not yet been made . . . [and] there cannot be final agency action." (DE 16 at 11). However, the Court does not, and is not, compelled to focus on the funding decision, since the lack of an EIS and EA qualifies as final agency action given Federal Defendants' intimate involvement in, and control over, the detention facility. *See Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 279 (6th Cir. 2001) ("major federal actions need not be federally funded to invoke NEPA requirements").

   b.  *Major Federal Action*

   Section 4336e(10) of NEPA defines "major federal action" as an action that "is subject to substantial Federal control and responsibility." It excludes non-federal action "with no or minimal Federal funding" and "no or minimal Federal involvement where a Federal agency cannot control the outcome of the project[.]" 42 U.S.C. § 4336e(10)(B)(i). NEPA implementing regulations promulgated by the Council on Environment Quality reiterate this definition in the affirmative, defining "Major Federal action [as] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. §1508.18. According to that regulation, federal actions "include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies[.]" § 1508.18(a).

   Though "federal courts have not agreed on the amount of federal involvement necessary to trigger the applicability of NEPA," the Eleventh Circuit has had occasion to analyze the issue. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572. In that case, the Eleventh Circuit analyzed whether the Federal government negotiating and administering a

settlement agreement with Florida agencies responsible for insuring water quality in the Everglades constituted major federal action. *Id.* at 1568, 1572 ("We must determine whether . . . sufficient federal involvement exists in what is proposed in the Settlement Agreement to constitute major federal action affecting the environment under NEPA."). The focus of the court's analysis was "on the federal agencies' control and responsibility over material aspects of the specific project." *Id.* at 1572. As the court explained, "[t]he touchstone of major federal activity constitutes a federal agency's authority to influence nonfederal activity. 'The federal agency must possess actual power to control the nonfederal activity.'" *Id.* (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988)); *see also Goos v. I.C.C.*, 911 F.2d 1283, 1294 (8th Cir. 1990) ("In deciding whether a federal agency exercises legal control, we must therefore consider whether some federal action is a legal condition precedent to accomplishment of an entire nonfederal project.") (internal quotations omitted).

The Eleventh Circuit rejected the notion that the federal government's power to influence state action through "advocacy and negotiation" in litigation or "invok[ing] dispute resolution mechanisms" in resulting settlements is "synonymous with a federal agency's authority to exercise control over a nonfederal project." *Id.* at 1572–73. Instead, what matters is whether the "state agencies retain their state law authority to make the decisions concerning the project," or, in other words, whether project or program in question is implemented "pursuant to existing authority under Florida law[.]" *Id.* at 1573.

Defendants argue that the decision in *S. Fla. Water Mgmt. Dist.* advises against finding major federal action here because the Federal Defendants have not yet reimbursed the State for construction costs of the project and "Plaintiffs offer no evidence

that the federal government is controlling the State's construction on State land." (DE 16 at 8). The Court will discuss the Defendants' untenable claims regarding funding shortly. *See infra* pp. 62–64. But more critically, Defendants ignore the reality that all immigration enforcement activities associated with the camp—key drivers of the project's environmental impact—are entirely under federal control and pursuant to federal law.[26]

Given that the camp acts exclusively as "an immigration detention facility," (DE 105 at 18), any state officials working on site with detainees are doing so as deputized federal immigration officers pursuant to 287(g) agreements. *See* (Pl. Ex. 144 at 5 (official post of *FDHSMV* announcing 287(g) agreement and deputized FHP troopers "ICE Task Force Officers")). Those officers "are not authorized to perform immigration officer functions except when working under the supervision and direction of ICE personnel." *Supra* Section I.B. Under the agreements, the actions of those officials "will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures." *Id.* This alone provides the requisite "federal authority" over the project required under *S. Fla. Water Mgmt. Dist.*

---

[26] To the extent Defendants seek to disaggregate the camp's initial authorization and construction from its ongoing operations and argue that the project is not federal if the initial aspects of the project were state-run, NEPA's pragmatic paradigm does not allow for evasion of responsibility by parsing agency actions in this artificially atomistic way. *See e.g.*, *Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, 132 F.4th 1320, (11th Cir. 2025) ("An agency cannot evade its responsibilities under [NEPA] by artificially dividing a major federal action into smaller components") (internal quotations omitted); *Chilkat v. Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 825 F. App'x 425,429 (9th Cir. 2020) (considering whether the exploration for and construction of a mine were "connected actions" under NEPA and explaining that "[t]he critical question is whether each of two projects would have taken place with or without the other") (internal quotations omitted); 40 C.F.R. § 1508.18(3) (including "programs, such as a group of concerted actions to implement a specific policy or plan" and "systematic and connected agency decisions" among the types of major federal actions); § 1508.25 (defining "connected actions" and requiring an EIS to discuss all connected actions).

Additional facts support this conclusion. The camp operates using "ICE detention standards." (DE 21-1 ¶ 5); *see also supra* Section I.B. (documenting the requirement in the operative 287(g) agreements that "the policies and procedures to be utilized by the participating [state] personnel in exercising [immigration functions] shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy"); *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 57 at 272 (facility's visitation policy stating it adheres to ICE/ERO policy and operates in "in coordinate with ICE/ERO's public affairs objectives). In all of its 287(g) agreements with Florida agencies, ICE is also "responsible for the installation and maintenance of the Information Technology (IT) infrastructure" and requires that any agency with access to its systems follow its "Sensitive System Policy and Rules of Behavior." *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 53-1 at 5, 19, 50, 66, 81, 96, 111, 126. Consequently, the IT systems at the camp were installed by ICE and are under federal control.

Further, ICE directs arresting law enforcement officers whether to take people into custody on suspicion of immigration violations, (DE 129 at 187, 213); ICE "makes decisions regarding transfer into [the facility] based on the posture of aliens' immigration proceedings," *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 50-1 ¶ 6 (declaration of Juan Lopez Vega); ICE "maintains custody" of the detainees, (Pl. Ex. 43 at 4 (SERT South Florida Detention Facility Continuity of Operations Plan)); and it is federal officials who physically transport detainees on and off site and conduct deportations using federally-owned aircraft. *See* (DE 114 at 97 (testimony of Representative Eskamani that she observed ICE vehicles dropping off detainees and that Director Guthrie confirmed this was the standard protocol); *id.* at 312–14 (testimony of Jessica Namath that she observed

App. 1411

ICE-contracted and Customs and Border Protection vehicles transporting between ICE Krome SPC detention facility and the TNT site); DE 129 at 203, 214–15 (testimony of Director Kerner that either federal agencies or contractors, not state agencies, transport detainees to and from the TNT site, and federal agencies are conducting the deportations using federally-owned airplanes); Pl. Ex. 59 (video of Customs and Border Protection vans leaving the site); DE 24-2 (photo of DHS transport bus exiting the TNT site)).

That the deputized officers' regular salaries are paid, required uniforms are bought, and standard work hours are controlled by their state agency supervisors is not germane to questions involving the TNT facility, because their status there as deputized officers and their activities at the camp are controlled by ICE. *See e.g.,* (DE 129 at 225–27 (testimony of Director Kerner); DE 118-1 ¶ 13 (describing the ways in which state agency supervisors retain control for non-immigration aspects of deputized officers' employment); DE 118-1 ¶ 12 ("DHS provides credentials and guidance to local law enforcement partners, and signs warrants for service as needed. DHS is required to provide direction and supervision to local law enforcement officers when taking immigration enforcement actions")); *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 53-1 at 32–33 ("ICE officers will provide direction and supervision for participating LEA personnel only as to the immigration enforcement functions . . . . The LEA retains supervision of all other aspects of the employment and performance of duties of participating LEA personnel."); *id.* at 33 (providing that deputized officers "performing immigration-related duties pursuant to [the 287(g) agreement] will be assigned to various units, teams, or task forces designated by ICE"); *id.* at 34 (requiring that all candidates to become deputized immigration officers "must be approved by ICE"); *id.* at 35 ("The ICE supervisory officer . . . will evaluate the

activities of all personnel certified under [a 287(g)].").

Nationwide, Courts have recognized the legal and practical reality that "'ICE is in complete control of detainees' admission and release,' while the [287(g) agreement] 'places the [deputized state agents] in the role of a mere functionary.'" *Masingene v. Martin*, 424 F. Supp. 3d 1298, 1302–03 (S.D. Fla. 2020) (quoting *Calderon v. Sessions*, 330 F. Supp. 3d 944, 952 (S.N.D.Y. 2018) (holding that the proper respondent to plaintiff's habeas petition is the Director of the Miami Field Office for ICE, who is responsible for supervising federal immigrant detainees at a county detention center); *see also Roman v. Ashcroft*, 340 F.3d 314, 320 (6th Cir. 2003); *Khody v.* Adduci, 697 F. Supp. 3d 774, 776 (E.D. Mich. 2010); Abner *v. Sec'y of Dep't of Homeland Sec.*, No. 06CV308, 2006 WL 1699607 at *3–4 (D. Conn. June 19, 2006); *Zabadi v. Chertoff*, No. 05-01796, 2005 WL 1514122, at *3 (N.D. Cal. June 17, 2005).

Defendants next claim that "the ultimate decision of who to detain at the" camp "belongs to Florida," and this precludes the project from being a federal action. (DE 21-1 ¶ 6); DE 105 at 18 (positing that the State can "turn down anyone they want")). For one, to be a major federal action, a project need not be under complete control by federal authorities in all respects, but merely "subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10(B)(i). In fact, NEPA's statutory language contemplates projects that are led in large part by state entities but still trigger NEPA. § 4332 (G)(i) (allowing an EIS for certain "major Federal action[s]" to be prepared by a state agency official if "the State agency or official has statewide jurisdiction and has the responsibility for such action[.]"). Second, it is ICE that decides whether and where an apprehended person will be detained for not having legal status. (DE 129 at 187). And if

Florida began unilaterally rejecting large swaths of detainees, ICE is contractually authorized to terminate the 287(g) agreement, which would lead to the shuttering of the facility. *See e.g.*, (DE 24-3 at 8–9 (287(g) agreement with FHP detailing the process for ICE to terminate the agreement)). Even if Florida has some authority to reject a prospective detainee, the fact that the federal government is responsible for selecting the pool of prospective detainees and transporting them to the camp gives the federal government significant control over who is housed there.

Defendants make a few additional arguments in their ill-considered attempt to avoid the implications of the project's federal activities, but each fails. First, Defendants say the detention activities are not reviewable under the APA, § 702(a)(2), because DHS secretary has discretion over detainees' detention locations under 8 U.S.C. § 1231(g)(1). (DE 16 at 12). But "[t]he question for §701(a)(2) purposes is whether there is 'no law to apply' *for the exercise of discretion being challenged*." *Mass. Coal. for Immgr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 37 (D.D.C. 2023). It "does not matter whether the Government has discretion [over detention locations] or not. That question is not before the Court" in a NEPA claim. *Id.* "What is before the Court is the decision *not to comply with NEPA*" . . . . [a]nd on that, the Government has no discretion." *Id.* (citing *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)).

Next, Defendants argue the operations of the site fall into a NEPA exemption for "bringing judicial or administrative civil or criminal enforcement actions[.]" § 4336e(10)(B)(v); *see also* (DE 105 at 21). The construction and operation of an immigration detention facility is plainly not an enforcement action. *Compare Mass. Coal.*

*for Immgr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 20 (D.D.C. 2023) (DHS's "return to Mexico" immigration policy did not meet the NEPA "enforcement action[]" exemption because it "goes well beyond the decision whether to enforce the law in individual cases"), *with Sierra Club v. Penfold*, 857 F.2d 1037, 1313 (9th Cir. 1988) (describing the agency's right to "issue notices of noncompliance" and then "commence enforcement proceedings" as coming within the enforcement action exemption), Civil Action, Black's Law Dictionary (10th ed. 2014) (a legal action "brought to enforce, redress, or protect a private or civil right"). In recognition of this, in 2024 DHS performed a NEPA evaluation before ICE's expansion of the Krome detention facility. *See* (Pl. Ex. 154).

Finally, Defendants argue that "even if Florida is exercising federal power when it decides where to detain, the APA turns on whether a federal agency is making the decision not whether federal power is being exercised." (DE 130 at 108). But Defendants' premise fails. The evidence and legal framework governing deputized state law enforcement agents' immigration activities make clear that they are not only exercising federal authority; their conduct is controlled by ICE. Consequently, the cases Defendants cite have no bearing on the issue. Neither applies NEPA's major federal action standard nor discusses the state-federal relationship in immigration enforcement. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397, 399 (1995) (holding Amtrak was "part of the Government for purposes of the First Amendment"); *Ritter v. Cecil Cnty. Off. of Hous. and Comm. Dev.*, 33 F.3d 323, 327–28 (4th Cir. 1994) (interpretation of HUD regulation by local housing board is reviewed under something like *Skidmore* deference, not the APA's arbitrary and capricious standard). Defendants attempt to seize on dicta, in which Justice Scalia mentioned that an entity's status as a federal agency *can* be defined by

statute "for purposes of . . . whether it is subject to statutes that impose obligations or confer powers upon Government entities, such as the [APA][.]" *Id.* at 392. The closest analog to this situation is § 1357(g)(7)–(8), where Congress specified that deputized officers *are* "acting under color of Federal authority" when performing immigration functions under a 278(g) agreement. But it is worth noting Justice Scalia's pronouncement in *Lebron* that "[i]t surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Lebron*, 513 U.S. at 397.

The Federal Defendants' control over operations at the camp should suffice to end the analysis. However, evidence that the project was built at the Federal Defendants' request and that federal funding has been committed to the State for the entire cost of the project both support the conclusion that the Federal Defendants were "so intimately involved in the discussion and planning" of the project that they "cannot now claim to have no responsibility under NEPA[.]" *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 13 (D.D.C. 1998).

FDEM has acknowledged in its own written materials about the camp that it was built after "DHS and [FEMA] request[ed] the State of Florida to supplement [its immigration enforcement] capacity with a temporary detention facility." (Pl. Ex. 43 at 4). According to Representative Eskamani, Director Guthrie confirmed to her directly while leading a tour of the camp that the project was the result of DHS's written request. (DE 114 at 96). These statements align with those of other high level public officials. ICE Field Officer Director Garrett Rippa described the project as "state, local, and federal partners working in unison, working as one" and promised that ICE "will continue to utilize

th[e] facility." (Pl. Ex. 61 at 0:25–1:01). DHS Secretary Noem explained that the project was conceived when her general counsel "called up Florida's Attorney General and Governor" and requested they partner with DHS to build the detention center. (Pl. Ex. 63 at 0:05–0:32). Governor DeSantis said the same: the project was "requested by the federal government."[27] Defendants argue that "a local plan does not become a major federal action subject to NEPA regulations merely upon its approval by a federal agency." *Rattlesnake*, 509 F.3d at 1102. But Defendants fail to recognize that the situation in *Rattlesnake*—"[t]he development and improvement of sewage treatment by a municipality[—]is intrinsically a local matter under the responsibility of local government." *Id.* Here, it is beyond peradventure that the detention of undocumented persons and decision as to their ongoing status is a uniquely federal question under the authority, control, and supervision of the federal government.

Additionally, the Federal Defendants acknowledge that DHS "announced $600 million in federal funding for the Detention Support Grant Program" and the "**only eligible applicant** . . . is the Florida Division of Emergency Management." (DE 21-2 at 2) (declaration of David Richardson) (emphasis added). Governor DeSantis confirmed that the federal government will "fully fund" the facility.[28] And Secretary Noem posted on social media that "Alligator Alcatraz will be funded largely by FEMA's Shelter and Services

---

[27] Fox 35 Orlando, 'Alligator Alcatraz': Florida Gov. DeSantis speaks on immigration project, YOUTUBE (June 25, 2025), https://www.youtube.com/watch?v=gJfG7L9reHU. *See Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 nn.4, 6–7 (N.D. Cal. 2017) (taking notice of government officials' statements during press conferences and interviews); *McLoughlin v. People's United Bank, Inc.*, 586 F. Supp. 2d 70, 73 (D. Conn. 2008) ("The Court may take judicial notice of the press releases of government agencies.").

[28] *See supra* n.27.

Program." (Pl. Ex. 144 ¶ 5). Furthermore, Assistant United States Attorneys made representations in court that "[t]he Everglade[s] detention facility is being funded from a continuing resolution for [fiscal year] 2025" of the Shelter and Services Program. *See City of Chicago v. DHS*, 25-cv-05463 (N.D. Ill.), ECF 35 at 1–2.

Despite these clear and unequivocal public assertions of federal funding, Defendants would have this Court find that a "reimbursement decision . . . has not yet been made." To reach this conclusion, however, would require the Court to disregard these unambiguous statements from government representatives. Instead, taking all of this context into consideration, it is apparent that the reimbursement funding decision has in fact been made.

In *Scottsdale Mall v. State of Indiana*, the court had no difficulty in concluding the highway project at issue was a major federal action when "the record indicate[d] federal participation in the programming, location, design, preliminary engineering, and right of way acquisition stages." *Scottsdale Mall v. Indiana*, 549 F.2d 484, 489 (7th Cir. 1977). In that case, the state claimed it would "refund" monies to the federal government that had been committed to a segment of the project. *Id.* at 487. This, the state argued, gave it the "prerogative to avoid compliance with NEPA." *Id.* at 488. The court rejected this argument, noting that "[s]uch accounting transfer of federal funds from one state project to another under the guise of 'refund' have been viewed with disfavor[.]" *Id.* at 487 n.5. The court found that where a state takes "substantial steps" to program a project for federal assistance, it cannot "withdraw the program from federal funding consideration with a resulting avoidance of complying with federal environmental statutes." *Id.* at 488. Similarly, the Defendants' legal legerdemain regarding funding does not convince the

Court. As the Tribe's counsel argued: "If this is allowed, effectively, the [f]ederal [g]overnment is laundering federal control or federal approval through a grant program with only one applicant who's eligible to receive the money. And if that's allowed, then [NEPA] is effectively useless[.]" (DE 130 at 131).

In light of the conclusion that the funding decision has been made, the Defendants' cases are unpersuasive. In *S. Fla. Water Mgmt. Dist.*, for example, the Eleventh Circuit stated, "[t]he possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely." 28 F.3d at 1573. Thus, Defendants argued at the Preliminary Injunction Hearing that the *possibility* of federal funding for the detention camp precludes any finding of a reviewable, final federal agency action. As the Court explained *supra*, however, the instant matter goes well beyond a possibility. Unlike *S. Fla. Water Mgmt. Dist.*, this case does not involve hypothetical proposals that may never materialize. Instead, the evidence demonstrates that the detention camp was constructed at the request of the federal government, with its cooperation and counsel, and with specifically earmarked funds to reimburse any state expenditures. The instant matter is not a situation where the State is applying to a general program from which it may or may not receive reimbursement since, as the "only eligible applicant," the only "competition" they face in receiving the award is the State's decision on when it will be conferred.[29]

---

[29] Defendants point the Court to cases involving grant programs that were generally open to applicants and instances where the grantors had not made final decisions as to the grants. *See, e.g.*, *Karst Envtl. Educ. & Prot., Inc. v. EPA,* 403 F. Supp. 2d 74, 81 (D.D.C. 2005) (concluding that there was no final agency action where HUD had yet to consider and approve a grant application for disbursal of appropriated funds because "the federal money is but an expectancy that has not yet materialized") (citation and internal quotation marks omitted); *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103 (9th Cir. 2007)

Defendants essentially tell the Court that the project is purely state action because its employees (presumably) wear uniforms bearing state agency logos, and because the federal government seems to have held back on sending its reimbursement until some unidentified impediment (perhaps, this litigation) has abated. Meanwhile, the project was requested by the federal government; built with a promise of full federal funding; constructed in compliance with ICE standards; staffed by deputized ICE Task Force Officers acting under color of federal authority and at the direction and supervision of ICE officials; and exists for the sole purpose of detaining and deporting those subject to federal immigration enforcement. Detainees are brought onto the site by federal agents and deported from the site by federal agents on federally owned aircraft. In concluding the camp is a major federal action, the Court will "adhere to the time-tested adage: if it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck." *Van Antwerp*, 526 F.3d at 1359.

Defendants make a final argument that, even if the Court finds Defendants have violated NEPA, Plaintiffs should not receive the injunction they request because the Court may "call for a remand without vacatur." (DE 16 at 13–14). "[V]acatur is the ordinary APA

(explaining that "[t]he congressional appropriation to the EPA of funds for a particular project does not constitute a final agency action by the EPA until the EPA has reviewed a grant application and decided to disburse the funds.") The Court finds that these cases are factually inapposite. *Karst*, for instance, involved the award of a federal grant to a state agency for the purpose of developing an industrial complex. In *Karst*, HUD representatives explained that "it had taken some action with respect to the grant application, but that it ha[d] not yet 'obligated' the money." *Karst*, 403 F. Supp.2d at 81. Accordingly, the federal funding was "but an expectancy that [had] not yet materialized." *Id.* Unlike the instant case, however, that grant program did not appear to be designed specifically for the grantee but was a general program from which the grantee sought disbursement. In the instant case, there is not just an "expectancy" of federal funding— elected officials stated in unambiguous terms that the reimbursement *would* happen.

App. 1420

remedy," but the Court has discretion to remand an agency action without vacatur, leaving the agency's action in place while it completes a satisfactory NEPA evaluation. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (alterations accepted) (quoting *Antwerp*, 526 F.3d at 1369). The considerations courts weigh in this decision make clear why a vacatur without remand is inappropriate here. Those are "the seriousness of the [agency] order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.*

Here, there weren't "deficiencies" in the agency's process. There was no process. The Defendants consulted with no stakeholders or experts and did no evaluation of the environmental risks and alternatives from which the Court may glean the likelihood that the agency would choose the same course if it had done a NEPA-compliant evaluation. It will come as no surprise that every case Defendants cite where the court remanded without vacatur involved a meaningful evaluative process by the agency before their final action. *See e.g.*, *Port Isabel v. Fed. Energy Regul. Comm'n*, 130 F.4th 1034, 1037 (D.C. Cir. 2025) ("The Commission has already issued extensive final environmental impact statements reflecting more than three years of review and public comment."); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1012, 1015 (9th Cir. 2025) ("BLM conducted a biological assessment of several listed species" and "only failed to explain whether or why its adopted alternative complied with the full field development standard at the ROD stage"); *Cal. Cmtys. Against Toxics v. E.P.A.*, 688 F.3d 989, 993–94 (9th Cir. 2012) (EPA conducted a rulemaking process but had "flaws in its reasoning"). Further, given Defendants' commitments to protecting the Everglades,

backed by tens of billions of dollars in funding for preservation and restoration projects near the TNT site, the Court assumes a thorough review of environmental impacts and alternatives could yield meaningful insights.

### 2. Irreparable injury

Even when Plaintiffs show they likely suffered the procedural harm of a NEPA violation, they must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). "An injury is irreparable only if it cannot be undone through monetary remedies." *Ferrero v. Assoc. Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (internal quotation omitted). And "[o]ngoing harm to the environment[,]" including "when a project may significantly degrade some human environmental factor," "constitutes irreparable harm warranting an injunction." *Env. Prot. Inf. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (internal quotation omitted); *see also Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable.").

Plaintiffs identify a myriad of risks from the project to the wetlands and endangered species whose habitats include the area around the site. Plaintiffs also proved that runoff and wastewater discharge from the camp risks polluting the water supply in the Miccosukee Reserved Area—where eighty percent of Tribe members reside—just a few miles downstream from the TNT site, and beyond. Finally, Plaintiffs show ongoing harms to organizational and Tribal members' enjoyment of the preserved areas due to the project's industrial lighting, noise, traffic, and security perimeter.

First, the creation of 800,000 square feet of new impervious surface will increase

runoff into the surrounding, interconnected wetlands, which threatens the "extremely sensitive . . .[,] low nutrient" hydrology of the Everglades. (DE 113 at 46–47). Dr. McVoy testified that the Everglades and BCNP are peculiar and particularly sensitive in at least two ways: first they are interconnected wetlands that require "sheet flow," meaning water flows with little obstruction across large areas, impacting the entire ecosystem;[30] and second, they are "naturally very low nutrient level, and when you introduce nutrients, particularly . . . phosphorous, nitrogen, potassium, it disturbs the ecosystem drastically." (*Id.*). According to Dr. McVoy, the legal requirement for water introduced into the wetlands is quite low and that requirement is the result of "a lot of science that clearly demonstrated the link that anything higher than that disturbs the system." (*Id.* at 47). With the newly paved surface, "anything that falls in th[ose] 20 acres will go directly into the wetlands." (*Id.* at 49). The possible contaminants in any runoff come "from a number of different sources" on the site. (DE 129 at 41). It could come from the paved material itself, from petroleum products on-site to fuel generators, from the vehicles and from thousands of detainees and staff doing laundry, cooking, cleaning, using restrooms. (*Id.* at 41–42). Beyond contaminants entering the water, "increased sediment . . . in the wetlands oftentimes leads to increased turbidity . . . [and] decrease[d] dissolved oxygen," which can kill aquatic animals. (DE 129 at 42, 136); *see also* (DE 5-2 ¶ 18 (declaring that the endangered Everglade snail kite relies on the "preserve's aquatic ecosystem for survival" and would be harmed by the project's wastewater and runoff)).

Defendants argue that they have mitigated these risks by installing silt fencing.

---

[30] Plaintiffs introduced aerial footage of the natural wetlands surrounding the TNT site, which followed the unbreaking sheen of contiguous water below the thin layer of swamp vegetation, until the natural landscape was interrupted by TNT site. (Pl. Ex. 145).

But multiple Plaintiffs' experts provided unrebutted testimony that that silt fencing "is not suitable in the long-term to be able to reduce any storm water runoff that could potentially affect neighboring areas." (DE 113 at 108). Especially in a large storm event, those "temporary structures . . . could be easily . . . toppled and allow for sediment and storm water to pass through." (*Id.* at 118). Given Defendants' complete lack of other stormwater management features, silt fencing is not "an appropriate substitute for a soil geologist designed storm water management system." (*Id.*). Defendants also quibble with geologist Dillon Reio's calculation that the 800,000 square feet of new pavement would increase runoff by almost "10 million gallons over a 72-hour, 100-year storm event[,]" attacking his assumptions regarding how permeable the now-paved area had originally been, given that some of that area was compacted when the jetport was originally built. (*Id.* at 80, 95–104). But even if Defendants are correct that the true increase in peak discharge could be some unknown lesser amount, there is sufficient likelihood that the increased runoff will harm the surrounding wetlands given the ecosystem's interconnectedness and sensitivity to warrant preliminary injunctive relief. Plaintiffs are not required to prove harms of a particular probability or quantity, as "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." *Winter*, 555 U.S. at 23; *see also Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1352, 1362 (S.D. Fla. 2005) ("A fundamental purpose of NEPA is to ensure that important effects will not be overlooked or underestimated only to be discovered after resources have been

committed or the die otherwise cast.") (internal quotations omitted).[31] To make matters worse, it appears Defendants have imminent plans to expand this paving significantly, as they have already contracted to purchase 1.8 million square feet of asphalt. (Pl. Ex. 126 at 1 (purchase order for 200,000 square yards of asphalt)).[32]

These risks impact the wetlands ecosystem, but they also present direct risks to communities who depend on water from the Everglades for their water supply, including the Tribe. As the Court has discussed, the overwhelming majority of Tribal life is enjoyed and experienced just a few miles southeast of the TNT site. Based on the general direction of water flow in the area around the project, water from TNT site is likely to flow into the Tribe's water supply, risking contaminating the water of Tribal residences, schools, the Tribe's government building, and businesses. Water also "flows from the jetport into Monroe County" and "Dade County" due to the connective features of the L28 Canal that were built under WERP. (DE 129 at 24–25).

Next, the project creates irreparable harm in the form of habitat loss and increased mortality to endangered species in the area. For example, Dr. Bozas testified that the

---

[31] Defendants repeat this same argument with regard to nearly every harm Plaintiffs identify. Defendants cross-examined Plaintiffs' witnesses on the fact that few had data showing baselines from before the site was constructed or data showing developments since the project came online. Of course, because Defendants did not consult with Plaintiffs or any other research group before constructing the project in eight days, there was no opportunity to collect baseline data. And since Defendants have refused access to nearly everyone seeking to visit the site, Plaintiffs' experts have been unable to take any samples or collect other data useful for empirical study. Further, the harms Plaintiffs fear take time to accrue; and time and access for study is precisely what NEPA procedures are meant to afford. *See Fund for Animals v. Rice*, 85 F.3d 535, 546 (11th Cir. 1996) ("NEPA 'works' by requiring that the environmental consequences of an action be studied before the proposed action is taken.").

[32] This and other evidence of Defendants' expansion plans undermines Defendants' argument that "Plaintiffs point to harm that is too late to prevent[.]" (DE 16 at 16).

endangered eastern black rail has been detected in the area around the site and that the TNT site is within the bonneted bat's critical habitat zone.[33] (DE 129 at 142). Both of these species are nocturnal, and the increased lighting from the project "will push" those animals "out of the area. They do not use illuminated habitats." (*Id.* at 132). Moreover, the increased noise from additional construction and ongoing human activity on the site also disrupts the bats' "ability to [echolocate] prey." (*Id.*)

Additionally, the lighting from the site immediately reduces the panther habitat by 2,000 acres, as studies suggest panthers are unlikely to come within 500 meters of a large artificial light source. (DE 114 at 232). Defendants dismiss this habitat loss as merely a minuscule share of the total few 3.11 million acres of significant panther habitat. (*Id.* at 262). But 2,000 acres is "hardly a de minimus injury" from one project to those hoping to see panthers in the area and to preserve and maintain panthers' habitats. *Alliance for the Wild Rockeies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (loss of 1,652 acres of forest caused sufficient irreparable harm to plaintiffs' ability to enjoy the area undisturbed to warrant injunction, despite representing only 6% of the relevant area); *see* (DE 114 at 158–60 (Amber Crooks testimony about her efforts to track panthers in the area); *id.* at 229–34 (Kautz testifying that a 2,000-acre loss may well reduce the panther population due to, among other impacts, inter-species aggression)). Further, vehicular strikes are the number one cause of panther mortality, and stretches of the highway close to the TNT site are known "hot spots" for panther strikes. (DE 114 at 161, 194; DE 38-6 at 24–25 (showing that 20 to 35 Florida panthers die per year from roadkills and documenting the

---

[33] Critical habit zones are a "formal designation that the U.S. Fish and Wildlife makes for some listed species." (DE 114 at 243).

mortality records near the site)).[34]

The ongoing light pollution from the project also harms Plaintiff members' enjoyment of the night sky—for which BCNP has received certification as an International Dark Sky Park. *See supra* n.25; (DE 113 at 20–21 (describing what is required to maintain a dark sky designation); DE 114 at 34 (discussing the impact the site will have on area's dark sky designation); *id.* at 303 (describing the "pitch black darkness with beautiful [views of the] Milky Way and sky where you can see all of the stars")). As the Court has discussed, Plaintiffs provide empirical data proving that the project meaningfully increases the brightness for miles around the site. *See e.g.,* (Tribe Ex. 9 at 8–35). This data factors in the prior existence of a few small, lit buildings on the jetport site.

Finally, the Tribe provided testimony that Tribal members have lost access to the off-road trails leading into the BCNP lands for hunting and other activities due to the camp's operations. (DE 129 at 122–27, 133 164, 175). Furthermore, Tribal members had previously harvested plants from the areas directly adjacent to the TNT site for ceremonial and medicinal purposes, but the camp's new human activity erodes the cultural

---

[34] Defendants also maintain that telemetry data acquired by tracking a sample of panthers' movements over time, suggest that panthers have not been seen within a few miles of the site for many years. (Pl. Ex. 25 at 19, 26). In Defendants' view, this proves that no panther-related harm will be caused by the project, as the area was not in use by the panther population even before the project's construction. Defendants distort the significance of this data. Only some unknown fraction of the panther population was affixed with tracking collars, as researchers' goal was "not to monitor every place within the range of panthers that panthers occur." (DE 114 at 279). Collection of data from the radio collars also ceased in 2014 due to budget cuts. (*Id.* at 275). And several of Plaintiffs' witnesses had either seen panthers in the area or knew others who had. *See e.g.,* (DE 129 at 143 (testifying to having captured recent panther presence in the area of the site on trail cameras)). The fact that the data shows that panthers were detected within a four-mile radius of the TNT site 1,164 times in the few decades between 1982 and 2014 proves that the area was a functioning panther habitat despite airport activity at the TNT site. (Pl. Ex. 25 at 19).

significance of the plant life. (*Id.* at 120, 134, 155–56); *see also Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 524, 536 (D.C. Cir. 2018) (reversing agency finding of no irreparable harm where tribe challenged uranium mining project that risked destruction of cultural, historical, and religious sites in the project area); *Hualapai Indian Tribe v. Haaland*, 755 F. Supp. 3d 1165, 1197 (D. Az. 2024) (holding that plaintiff Indian tribe met the irreparable harm requirement "because it has shown that damage to . . . a culturally significant site for the [t]ribe[] is likely").[35]

Defendants' rejoinder to all this is that the TNT site was already in use as a training airport, and Plaintiffs have not proven that the detention camp creates harms above and beyond those already wrought by the site's prior use. Specifically, Defendants point to flight logs showing that over the seven months starting in January 2025, there were about 28,000 "flight operations" from the site, or 137 per day. (DE 116-1 ¶ 11). In other words, over that period there were approximately 14,000 takeoffs and landings each. (*Id.* at 34).

---

[35] The *Hualapai* case is particularly instructive. The Hualapai tribe filed for a preliminary injunction to enjoin drilling for lithium on property adjacent to a sacred hot spring, "Ha'Kamwe'." *Hualapai*, 755 F. Supp. 3d at 1173. The tribe alleged that BLM failed to consider any reasonable alternative before approving the project; prematurely terminated its consultation process with the tribe; and failed to take a hard look at impacts in its EA by not analyzing geologic faults that could pollute the aquifers feeding Ha'Kamwe'. *Id.* at 1186. The court decided an injunction was appropriate, finding that under NEPA "[c]onsideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account *all* possible approaches to, and potential environmental impacts of, a particular project." *Id.* at 1192 (internal quotation omitted). As the court explained, the defendants had failed to consider alternatives, such as approving fewer drilling sites located farther away from Ha'Kamwe'. *Id.* at 1193. Finally, the court found the tribe was likely to suffer irreparable harm if the drilling project went forward "through its impact to Ha'Kamwe's character." *Id.* at 1198–99 (citing *Winter*, 555 U.S. at 22). The decision in *Hualapai* supports the entry of a preliminary injunction in this case where no reasonable alternatives were considered, no environmental assessment of any kind was conducted and no consideration of any type of impact was undertaken. In sum, not only did Defendants fail to take a "hard look" as required by NEPA, they failed to take any look.

Almost 80% of these were by single engine aircraft. (*Id.*) Defendants say these aircrafts surely would have been sufficiently noisy to scare off animals and impede any recreation in the nearby areas. (DE 16 at 5–6). Plaintiffs present their own flight data from 2020-2024, documenting around 11,600 flights total, or about 6 per day (not double-counting takeoffs and landings). (Pl. Ex. 33).

The Court need not parse which Party's interpretation of the flight data presents a more accurate picture of the site's prior activity, because even Defendants' version of the data does not support the notion that the airport use caused similar harms as those posed by the detention camp. For one, several witnesses testified under oath that they worked or recreated in that area for years leading up to the camp's construction and noticed little or no noise from the airport. *E.g.*, (DE 114 at 176–77; DE 129 at 32, 87, 130). Defendants discount these individual experiences as less accurate than flight data, but this misconstrues the import of these eyewitnesses' testimony. An irreparable harm inquiry is focused on how an event, in this case noise, impacts the effected individuals. Beyond this, many harms separate from noise undisputably were created or are exacerbated by the detention camp. The light pollution is far worse now than before the camp's construction. (Tribe Ex. 9). The addition of 800,000 square feet of asphalt paving (with another 1 million planned) increases harmful water runoff relative to the areas previously paved. (Pl. Exs. 22, 90–92, 126 at 1). The frenetic human activity, including vehicular traffic and wastewater from thousands of people daily, was essentially absent prior to the detention camp's construction. *See* (DE 113 at 27 (Dr. McVoy recounting a statement by the TNT site's Incident Commander Dr. Frank E. Lumm that prior to the detention center the airport had "four employees, most of whom were involved in mowing the grass")). In

short, Plaintiffs have provided substantial evidence to prove that irreparable harm from the detention camp is ongoing and likely to worsen absent injunctive relief. The Court will next consider the balance between these harms and the Government's interest in continuing detention operations at this site before conducting the required NEPA analysis.

### 3.   Balance of equities and public interest

For similar reasons, the balance of equities and the public interest favor granting a preliminary injunction. "These two factors merge when, as here, the government is the opposing party." *Farmworker Ass'n of Fla. v. Moody,* 734 F. Supp. 3d 1311, 1342 (S.D. Fla. 2024) (internal quotations omitted). The Court has discussed the ongoing and possible future irreparable harms caused by Defendants' NEPA violation. When irreparable environmental harms are sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Vill. of Gambell,* 480 U.S. at 545. The Court acknowledges Defendants' unchallenged position that the government's interest in immigration enforcement is significant. Immigration is at the forefront of national and state politics: as the swell of people seeking refuge and opportunities in our nation steadily increases, the government is under a corresponding pressure to respond and regulate.

The Federal Defendants argue that "the significant national interest in combatting unlawful immigration favors allowing Florida to continue the development and use of [the detention camp]." (DE 21 at 7). To this end, the Federal Defendants rely on Thomas Giles' declaration that the detention camp's function in detaining aliens "operationally benefits ICE and furthers its immigration enforcement mission." *Id.* Giles goes on to state that the detention camp serves to "decompress other detention facilities used to house aliens

App. 1430

throughout the United States." (DE 21-1 at 5).

This position, however, flounders when confronted with the weight of evidence as to the irreparable harm posed by Defendants' flouting NEPA protocols. Plaintiffs have provided extensive evidence supporting their claims of significant ongoing and likely future environmental harms from the project. *See supra* Section III.C.2. By contrast, while the Defendants repeatedly espouse the importance of immigration enforcement, they offered little to no evidence why this detention camp, in this particular location, is uniquely suited and critical to that mission. Director Kerner did state that his troopers "have encountered and apprehended people that have active warrants for murder in other countries" and offered his belief that some of those individuals might be detained at the detention camp. (DE 129 at 202). Director Kerner could not, however, offer any statistics or reports specifying how many individuals actually housed at the facility had such a criminal background. (*Id.* at 206). He could not directly testify that even one of the detainees had a criminal record, much less a record of violent crimes necessitating their seclusion from society in the Everglades. (*Id.* at 206, 219).

Director Kerner further asserted that the detention camp is necessary because other immigration facilities are at capacity. (*Id.* at 205). This need, however, again fails to explicate the decision to place the detention camp in the Everglades.[36] Counsel for the

---

[36] Any detention capacity issue also appears will be mitigated by the State's recent announcement of a second temporary immigration detention facility with "the same services as Alligator Alcatraz" also with costs to be "reimbursed by federal partners." Press Release, Executive Office of the Governor, Governor Ron Desantis Announces Expansion of Florida's Capacity to Detain and Deport Illegal Aliens (Aug. 14, 2025), https://perma.cc/3HXE-73VY. *See Santa Clara*, 250 F. Supp. 3d at 520 nn.4, 6–7 (taking notice of government officials' statements during press conferences and interviews); *McLoughlin*, 586 F. Supp. 2d at 73 ("The Court may take judicial notice of the press releases of government agencies."); *Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins.*

Federal Defendants opined that the detention camp housed "all sorts of people from all walks of life" and claimed that the camp's remoteness is "relevant to the national security and public safety interest at play here." (DE 130 at 68, 77-78). When pressed by this Court, however, the Federal Defendants conceded that they actually had no opinion on the efficacy of the detention camp's location, saying that the location "is a question for Florida to decide." (*Id.* at 69). The Federal Defendants further conceded that there was no issue with the operation of other ICE detention facilities in populated areas like Jacksonville and Boca Raton. (*Id.* at 78). Thus, at least for the Federal Defendants, the remoteness of the detention camp seems to be an inconsequential consideration.

The State Defendants also insisted that the detention camp's remoteness was an important consideration. The State presented testimony from Director Kerner that the detention camp's site was "ideal" because "first and foremost," it is "far removed." (DE 129 at 225). Director Kerner also pointed to the site's "very long runway[,] which is a very critical piece of the deportation process." (*Id.*) But aside from their use of adjectives, neither the State nor Director Kerner could explain why such a place needs to be in the Everglades. What is apparent, however, is that in their haste to construct the detention camp, the State did not consider alternative locations. Indeed, Director Kerner testified that the current detention camp is the "only site that [he] looked at." (*Id.* at 223).

Allowing the detention camp to continue expanding its infrastructure and operations poses an even more formidable challenge than maintaining the status quo because "it is difficult to change that course" if the Court eventually decides that NEPA

*Co.*, 309 F. Supp. 3d 1216, 1220 n.4 (S.D. Fla. 2018). ("The Court may take judicial notice of government publications and website materials.").

App. 1432

assessments are required. *Sierra Club v. Marsh*, 872 F.2d 497, 500, 505 (1st Cir. 1989) (vacating district court's denial of preliminary injunction related to NEPA claim and remanding). Defendants brush aside this concern by pointing to Justice Kavanaugh's remark in *Seven County* that "NEPA has transformed from a modest procedural requirement into a blunt and haphazard tool employed by project opponents." 145 S. Ct. at 1513. But while the *Seven County* case cited by counsel for the State is instructive, it is not for the phrases parsed by counsel. While the Court did discuss how NEPA requisites could sometimes be an impediment to critical projects, the comment was made in the context of that particular case: a 3,600-page EIS generated over a year-long period with the input of six public meetings and more than 1,900 public comments. *Id.* at 1508. This is hardly a meaningful guide in a matter where there was no consultation with the public and no reports of any page length regarding a project that was erected in eight days. Instead, this case exemplifies why NEPA's modest mandate that an "agency [take] a 'hard look' at the environmental consequences of [a] proposed action" before saddling communities and future generations with unknown environmental risks is still an important procedural check. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) ("Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."). In light of the foregoing, the Court finds that the equities weigh in favor of granting a preliminary injunction.

Nonetheless, the Court recognizes the unique and unprecedented situation

presented by this case. The Court fully understands the interests of the Defendants and the importance of a well-ordered transition while Defendants modify the facility to perform the necessary environmental assessments. The construction of the facility may have taken only eight days, but the capacity of the Defendants to remedy the NEPA violations outlined will involve a longer period of time. The Court has endeavored to provide that temporal accommodation in its Order.

## IV.    CONCLUSION

In 1947, President Harry Truman dedicated Everglades National Park observing:

> Not often in these demanding days are we able to lay aside the problems of the time, and turn to a project whose great value lies in the enrichment of the human spirit. Today we make the achievement of another great conservation victory. We have permanently safeguarded an irreplaceable primitive area. We have assembled to dedicate to the use of all people for all time, the Everglades National Park.[37]

Twenty years later, a proposal for construction of the world's largest jetport—at the site discussed in this case—was abandoned, and the Big Cypress National Preserve was created to protect this area.[38] Since that time, every Florida governor, every Florida senator, and countless local and national political figures, including presidents, have publicly pledged their unequivocal support for the restoration, conservation, and protection of the Everglades. This Order does nothing more than uphold the basic requirements of legislation designed to fulfill those promises.

---

[37] Harry S. Truman, Address on Conservation at the Dedication of Everglades National Park (Dec. 6, 1947), https://perma.cc/C392-4LE4.

[38] *Worlds Largest Jetport*, Big Cypress, NAT'L PARK SERV. (last visited Aug. 21, 2025), https://perma.cc/6BHR-X25W.

App. 1434

For the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. For the purposes of Defendants becoming compliant with their obligations under NEPA, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for a Preliminary Injunction (DE 5), as follows:

2. The Court **ENTERS** a Preliminary Injunction prohibiting the State and Federal Defendants[39] and their officers, agents, employees, attorneys, and any person who is in active concert or participation with them from **(1)** installing any additional industrial-style lighting (described by witnesses as "Sunbelt" lighting); or doing any paving, filling, excavating, or fencing; or doing any other site expansion, including placing or erecting any additional buildings, tents, dormitories, or other residential or administrative facilities on the TNT site; and **(2)** bringing any additional persons onto the TNT site who were not already being detained at the site at the time of this Order going into effect. The Preliminary Injunction does not prohibit modification or repairs to existing facilities, which are solely for the purpose of increasing safety or mitigating environmental or other risks at the site.

3. The Preliminary Injunction shall include among those "who are in active concert or participation with" the State or Federal Defendants or their officers, agents, employees, or attorneys, and thus prohibited from conducting the activities specified above, any contractors, subcontractors, or any other individuals or

---

[39] Though state agencies are not subject to the APA, when "state and federal [actions] are sufficiently interrelated," the Court may enjoin state entities from acting in violation of NEPA. *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (citation omitted) (exercising jurisdiction over the Florida Department of Transportation Secretary in a NEPA case because the project in question featured FDOT "working in tandem with federal agencies").

entities authorized to conduct work on the TNT site or provide detainee transportation or detention services. *See* Fed. R. Civ. P. 65(d)(2)(C) (including "other persons who are in active concert or participation with" the parties or the parties' officers, agents, servants, employees, and attorneys among those bound by any injunction).

4. No later than **sixty (60)** days from the date of this order, and once the population attrition allows for safe implementation of this Order,[40] the Defendants shall remove 1) the temporary fencing installed by Defendants to allow Tribe members access to the site consistent with the access they enjoyed before the erection of the detention camp; 2) the Sunbelt lighting fixtures and any additional lighting installed for the use of the property as a detention facility; and 3) all generators, gas, sewage, and other waste and waste receptacles that were installed to support this project.

5. Finally, Plaintiffs shall post a bond of $100. See *BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (internal citations omitted) ("the amount of security required by the rule is a matter within the discretion of the trial court").

---

[40] Based on Defendants' representation that the site is currently being used as a transportation spoke to other facilities, the Court is relying on programmatic attrition of the camp's population within the next sixty days. See *C.M. v. Noem*, 25-cv-23182 (S.D. Fla.), ECF 50-1 ¶¶ 10 (stating that the detention facility on the TNT site "provides short-term housing while longer term housing or removal arrangements are secured for aliens"). This attrition will allow Defendants time to remove the newly installed fencing, lighting, and other fixtures and utilities apparatus in a safe, humane, and responsible manner. The housing and detention dormitory facilities may remain and be maintained to prevent deterioration or damage.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>21st</u> day of August, 2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# Doc. 136

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-JEM**

FRIENDS OF THE EVERGLADES, INC., et al.

      Plaintiffs,

and

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA,

      Plaintiff-Intervenor,

v.

KRISTI NOEM, et al.,

      Defendants.

_____

**<u>FEDERAL DEFENDANTS' NOTICE OF INTERLOCUTORY APPEAL</u>**

    Federal Defendants Kristi Noem and Todd Lyons, in their official capacities, hereby give

notice that they appeal under 28 U.S.C. § 1292(a)(1) to the United States Court of Appeals for the

Eleventh Circuit from the Order issued in this case on August 21, 2025, Dkt. 131. A copy of the

August 21, 2025 Order is attached as Exhibit 1.

    Respectfully submitted on August 23, 2025.

                    ADAM R.F. GUSTAFSON
                    Acting Assistant Attorney General

                    PETER M. TORSTENSEN, JR.
                    Deputy Assistant Attorney General

                    *s/   Hayley A. Carpenter*
                    HAYLEY A. CARPENTER
                    (CA Bar No. 312611)
                    Trial Attorney
                    Natural Resources Section
                    Environment and Natural Resources
                    Division

United States Department of Justice
Ben Franklin Station

P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0242
hayley.carpenter@usdoj.gov

*Counsel for Kristi Noem, in her official
capacity as Director of Homeland
Security; and Todd Lyons, in his official
capacity as Acting Director of the United
States Immigration and Customs
Enforcement*

# Doc. 137

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., et al.,

      Plaintiffs,

v.

KRISTI NOEM, et al.,

      Defendants.

**DEFENDANT FDEM'S EXPEDITED MOTION TO STAY**
**PRELIMINARY INJUNCTION PENDING APPEAL**

      Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida

Division of Emergency Management ("FDEM"), moves to stay the Court's preliminary injunction

entered on August 21, 2025, Doc. 131, pending appeal, and in support states:

      1.     During closing argument at the preliminary-injunction hearing, FDEM requested

that if the Court granted a preliminary injunction, it also grant a stay because FDEM's legal

arguments and factual showings satisfied the stay factors. *See* Hr'g Tr. at 128:14–22 (Aug. 13,

2025). The Court deferred ruling on the motion, requesting that it be renewed in writing should

the Court grant Plaintiffs' motion for a preliminary injunction. *Id.* at 128:23–129:1. The Court

stated that the renewed motion could reference the arguments made at the preliminary-injunction

hearing. *Id.* at 129:1–3.

      2.     On August 21, 2025, this Court entered an Order granting in part Plaintiffs' Motion

for Preliminary Injunction. Doc. 131.

      3.     FDEM has appealed that Order. Doc. 132.

App. 1442

4.     For the reasons articulated in FDEM's briefing on this issue (Docs. 16, 28, 35, 50, 65, 71, 79, 128), and for the reasons articulated on the record at the evidentiary hearing held on August 6, 7, 12, and 13, 2025, FDEM respectfully requests that the Court stay its preliminary injunction pending appeal.  For the reasons already articulated, the stay factors are met: (1) FDEM is likely to succeed on the merits of its appeal; (2) FDEM and the public interest will suffer irreparable injury, including but not limited to (i) immediate and significant disruption of the State's law-enforcement response to a declared state of emergency, *see also* Ex. 1, and (ii) significant financial losses that cannot be recovered and have not been secured by the insufficient bond, *see also* Ex. 2, and (3) there is no potential for substantial injury to Plaintiffs because they have not demonstrated near-term irreparable harm.

5.     Because an immediate stay is necessary to avoid irreparable harm to the State, FDEM requests that the Court rule on this renewed motion by **5:00 P.M. on Monday, August 25, 2025**, so that, should the Court deny the stay, the matter can be timely considered by the U.S. Court of Appeals for the Eleventh Circuit.

## **<u>CONCLUSION</u>**

For the foregoing reasons, FDEM requests that the Court stay enforcement of its preliminary injunction, Doc. 131, pending appeal.  Counsel for FDEM has conferred with counsel for Plaintiffs and Intervenor-Plaintiff about the relief sought herein.  They oppose the requested relief, so the parties have been unable to resolve the issues raised in this motion.

App. 1443

Dated: August 23, 2025

Respectfully submitted,

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa (FBN 110951)
  *Acting Solicitor General*
Nathan A. Forrester (FBN 1045107)
  *Chief Deputy Solicitor General*
Robert S. Schenck (FBN 1044532)
  *Assistant Solicitor General*
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

<u>s/ *Jesse Panuccio*</u>
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
David Costello (FBN 1004952)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
jpanuccio@bsfllp.com

*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

App. 1444

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 23, 2025, the foregoing was filed with the Clerk of Court

using CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

<u>s/ *Jesse Panuccio*</u>
Jesse Panuccio

# Doc. 137-1

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### No. 25-cv-22896-KMW

FRIENDS OF THE EVERGLADES, INC., et al.,

      Plaintiffs,

v.

KRISTI NOEM, et al.,

      Defendants.

## **DECLARATION OF JOSEPH C. HARRISON**

I, Joseph C. Harrison, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct based upon my personal knowledge and review of the relevant records:

1.      I am a Lieutenant Colonel and Deputy Director of the Office of Executive Officer to the Colonel of the Florida Highway Patrol (FHP).  I am over 18 years of age and, if called, I could and would testify to the information provided herein.

2.      I have served in FHP for over twenty years, initially as a patrol officer, and more recently as a member of FHP's leadership team.  Among other responsibilities in my current role as Deputy Director, I supervise FHP's administrative functions and coordinate with federal officials to ensure FHP is supporting federal immigration enforcement to the greatest possible extent.  I regularly communicate with our state troopers regarding their interactions in the field and review FHP's business records regarding arrests.

3.      As Governor DeSantis detailed in Executive Order 23-03, declaring a state of emergency under Florida law, Florida is suffering an immigration crisis of unprecedented

App. 1448

magnitude.  To help alleviate this emergency, FHP has executed a "task force model" 287(g) agreement with U.S. Immigration and Customs Enforcement.  That agreement allows FHP officers to perform federal immigration functions in the field.  FHP's mission—in line with both President Trump's immigration policy and Governor DeSantis's Executive Order—is to lawfully apprehend as many illegal aliens in Florida as possible and transmit them to ICE for removal proceedings.  In 2025 alone, FHP apprehended in excess of 3,400 illegal aliens in Florida.

4.     Beyond violating the nation's immigration laws, some illegal aliens have also committed serious and violent crimes, both internal and external of the United States.  FHP has apprehended such individuals, including persons accused or convicted of egregious crimes like weapons violations, armed robbery, human trafficking of a child, homicide, and more.

5.     Given the estimated millions of illegal aliens residing in the country and the estimated hundreds of thousands of illegal aliens residing in Florida, it is critical that immigration officials have maximal detention space available to house illegal aliens pending deportation. Without detention, immigration enforcement is largely ineffective.  Based on my experience working with FHP's federal immigration partners, however, the increase in state and federal immigration apprehensions—necessitated by years of federal non-enforcement between 2021 and 2024—has left federal immigration detention facilities short for beds and detention space.  In fact, before the detention facility at the Dade-Collier Training and Transition Airport was established, ICE regularly informed FHP officers that the federal government lacked sufficient detention capacity to detain illegal aliens intercepted by FHP.  In those instances, FHP was forced to let those illegal aliens go.

6.     Without sufficient beds and detention space, federal officials will be unable to hold the many illegal aliens, including criminal illegal aliens, that FHP intercepts on a routine basis, exacerbating the risk that lawbreakers will be released back into the community.

Executed on August 22, 2025, in Jackson County, Florida.

_Joseph C. Harrison_
Joseph C. Harrison
Deputy Director, Executive Officer
Florida Highway Patrol

# Doc. 137-2

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### No. 25-cv-22896-KMW

FRIENDS OF THE EVERGLADES, INC., et al.,

      Plaintiffs,

v.

KRISTI NOEM, et al.,

      Defendants.

## DECLARATION OF IAN GADEA-GUIDICELLI

I, Ian Gadea-Guidicelli, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct based on my personal knowledge. I am over 18 years old and, if called, I could and would testify to the information provided herein.

1.     I am the State Emergency Response Team (SERT) Chief and Bureau Chief of Response at the Florida Division of Emergency Management (FDEM). I am charged with supervising and coordinating FDEM's day-to-day operations at the detention facility located within the Dade-Collier Training and Transition Airport (TNT). My duties require that I be intimately familiar with FDEM's financial obligations related to the TNT detention facility.

2.     On August 21, 2025, FDEM was ordered to remove "1) the temporary fencing installed by Defendants to allow Tribe members access to the site consistent with the access they enjoyed before the erection of the detention camp; 2) the Sunbelt lighting fixtures and any additional lighting installed for the use of the property as a detention facility; and 3) all generators, gas, sewage, and other waste and waste receptacles that were installed to support this project." Doc. 131 at 81.

3.      Based on my experience with FDEM's financing of the facility and conversations with FDEM's vendors, I anticipate that complying with those requirements will cost roughly $15-20 million.  And if FDEM is ultimately permitted to reopen the facility, I anticipate that FDEM would again need to spend about $15-20 million to reinstall the structures it was forced to remove under the district court's order.

4.      In addition, FDEM was prohibited from "**(1)** installing any additional industrial-style lighting (described by witnesses as "Sunbelt" lighting); or doing any paving, filling, excavating, or fencing; or doing any other site expansion, including placing or erecting any additional buildings, tents, dormitories, or other residential or administrative facilities on the TNT site; and **(2)** bringing any additional persons onto the TNT site who were not already being detained at the site at the time of this Order going into effect."  Doc. 131 at 80.  That order will eventually cause all detention operations at the site to cease.  In that event, FDEM will lose most of the value of the $218 million it invested to make TNT suitable for detention operations.

5.      As a result, the $100 that Plaintiffs have been required to post as a bond will not cover the costs of complying with the injunction.

Executed on August 23, 2025, in Tallahassee, Florida.

_____
Ian Gadea-Guidicelli
SERT Chief and Bureau Chief of Response
Florida Division of Emergency Management

# Doc. 138

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-JEM**

FRIENDS OF THE EVERGLADES, INC., et al.

      Plaintiffs,

and

MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

      Plaintiff-Intervenor,

v.

KRISTI NOEM, et al.,

      Defendants.

_____

**FEDERAL DEFENDANTS' EXPEDITED MOTION TO STAY PRELIMINARY**
**INJUNCTION PENDING INTERLOCUTORY APPEAL**

      Federal Defendants Kristi Noem and Todd Lyons, in their official capacities, move to stay the Court's preliminary injunction entered on August 21, 2025, Dkt. 131, pending interlocutory appeal, and in support state:

      1.     During closing argument at the preliminary injunction hearing, Defendant Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management ("FDEM") requested that, if the Court granted a preliminary injunction, it would also grant a stay of that preliminary injunction because FDEM's legal arguments and factual showings demonstrated that a stay was warranted. *See* Hr'g Tr. at 128:14-22 (Aug. 13, 2015). Federal Defendants joined in this request. *Id*. at 129:12-13. The Court deferred ruling on the motion, requesting that it be renewed in writing should the Court grant Plaintiffs' motion

for a preliminary injunction. *Id*. at 128:23-129:1. The Court states that the renewed motion could reference the arguments made at the preliminary injunction hearing and in filings. *Id* at 129:1-3.

2.   On August 21, 2025, this Court entered an Order granting in part Plaintiffs' Motion for Preliminary Injunction. Dkt. 131.

3.   Federal Defendants have appealed that Order. Dkt. 136.

4.   For the reasons articulated in Federal Defendants' briefing on the Motion for Preliminary Injunction and Temporary Restraining Order (Dkt. 21, 60), during the evidentiary hearing held on August 6, 7, 12, and 13, 2025, and in FDEM's Motion for Stay Pending Appeal (Dkt. 137), Federal Defendants respectfully request that the Court stay its preliminary injunction pending appeal. For the above reasons, the stay factors are met: (1) Federal Defendants are likely to succeed on the merits of their appeal; (2) Federal Defendants and the public interest will suffer irreparable injury, including but not limited to imminent and significant disruption of the Federal Government's ability to enforce immigration laws, safeguard public safety, protect national security, and maintain border security, *see also* Declaration of Garrett Ripa, attached as Exhibit 1; and (3) there is no potential for substantial injury to Plaintiffs because they have not demonstrated imminent, irreparable harm.

5.   Because an immediate stay is necessary to avoid irreparable harm to Federal Defendants, Federal Defendants request that the Court rule on this renewed motion by **5:00 P.M. on Monday, August 25, 2025**, so that, should the Court deny the stay, the matter can be timely considered by the U.S. Court of Appeals for the Eleventh Circuit.

## CONCLUSION

For the foregoing reasons, Federal Defendants request that the Court stay enforcement of the preliminary injunction, Dkt. 131, pending interlocutory appeal. Counsel for Federal Defendants have conferred with counsel for Plaintiffs and Intervenor-Plaintiff about the relief sought herein. They oppose the requested relief, so the Parties have been unable to resolve the issues raised in this motion.

Respectfully submitted on August 23, 2025.

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General

PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General

*s/   Hayley A. Carpenter*
HAYLEY A. CARPENTER (CA Bar No. 312611)
Trial Attorney
MARISSA A. PIROPATO
Deputy Section Chief
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0242 (Carpenter)
(202) 305-0470 (Piropato)
hayley.carpenter@usdoj.gov
marissa.piropato@usdoj.gov

*Counsel for Kristi Noem, in her official capacity as Director of Homeland Security; and Todd Lyons, in his official capacity as Acting Director of the United States Immigration and Customs Enforcement*

# Doc. 138-1

# Exhibit 1
# Declaration of Garrett Ripa

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

---

FRIENDS OF THE EVERGLADES, INC., and
CENTER FOR BIOLOGICAL DIVERSITY,

          *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his
official capacity as Executive Director of the
Florida Division of Emergency Management,
and MIAMI-DADE COUNTY, a political
subdivision of the State of Florida

          *Defendants*.

Civil Action No. 1:25-cv-22896

---

## DECLARATION OF GARRETT RIPA

       Pursuant to the authority of 28 U.S.C. § 1746, I, Garrett Ripa, declare that, to the best of

my knowledge, information, and belief, the following is true and correct:

1.     I am the Field Office Director (FOD) for the U.S. Department of Homeland Security (DHS),

U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO)

Miami field office (ERO Miami). I have been the FOD of ERO Miami since September of 2022.

App. 1461

2.      As the FOD, I am responsible for managing ERO Miami, encompassing a total of 652 authorized positions, 16 sub-offices, and four detention facilities.  ERO Miami's area of responsibility (AOR) covers enforcement operations throughout the State of Florida, Puerto Rico, and the U.S. Virgin Islands, as well as the Migrant Operations Center in Guantanamo Bay, Cuba.

3.      I began my federal career in 1996 with legacy Immigration and Naturalization Service (INS) as a Detention Enforcement Officer in Miami, Florida.  I was promoted to a Deportation Officer (DO) in 2002, and after the formation of DHS and ICE in March 2003, I rose through the ranks of ERO with promotions to Supervisory Detention and Deportation Officer (SDDO), Assistant FOD (AFOD), Deputy FOD (DFOD), and FOD of ERO Miami.  In 2022, I became a member of the Senior Executive Service as FOD for ERO Miami.  In January 2025, I held the position of Acting Assistant Director for ICE Field Operations.  From February 2025 through May 2025, I served as the Acting Deputy Executive Associate Director for ICE ERO.  Responsible for a budget of approximately $5.1 billion dollars, I directed the operations of more than 7,800 employees assigned to 25 ERO field offices and headquarters, in over 180 domestic locations and 30 overseas locations. In June 2025, I resumed my role as FOD for ERO Miami.

4.      I am familiar with the allegations made by Plaintiffs in the instant lawsuit regarding the South Florida Soft-Sided Facility South (SFSSFS) Detention Center.  Additionally, I am familiar with immigration enforcement activities and programs nationwide, including detention facility capacities and their operational impacts.

5.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records and other DHS and ICE employees in the regular course of business.

### Operational Impact of the Closure of the SFSSFS Detention Center

6.      Although only one of ERO's 25 AORs, ERO Miami consistently accounts for 10-15 percent of all ICE arrests nationwide.

7.      ERO Miami oversees one of the largest non-detained ICE dockets in the nation, managing approximately 1.5 million active cases involving aliens in various stages of the immigration process.

8.      ICE ERO, specifically ERO Miami also maintains a network of detention beds throughout its AOR, through a mixture of ICE-owned, privately owned, and state and local facilities.

9.      Since January 2025, all detention facilities under ERO Miami have been operating at or above their maximum capacity.

10.      ERO Miami strives to maintain sufficient bedspace to support its law enforcement operations, including the arrests of aliens with criminal histories (criminal aliens) from prisons and jails, as well as aliens at-large who pose threats to national security and public safety within the United States.   Additionally, ERO Miami accommodates fluctuating referrals from U.S. Customs and Border Protection.   What sets ERO Miami apart from other ERO field offices is its dual responsibility of managing interior arrests while also addressing the unpredictable nature of maritime ventures, which can result in hundreds of arrests at a time.

11.      The expanded detention capacity Florida created with SFSSFS Detention Center is essential for ERO Miami's operations, as it permits ERO Miami to keep pace with increased and often unpredictable detention needs. Its removal would compromise the government's ability to enforce immigration laws, safeguard public safety, protect national security, and maintain border security.

12.      Without access to the 2,000 detention beds at the SFSSFS Detention Center, ERO Miami

would lose the ability to detain criminal aliens (to include aliens with violent criminal records), as all of the aforementioned ERO Miami facilities are at or above capacity. The SFSSFS Detention Center is a critical component necessary to prevent operational failure and potentially avert a national crisis.

13.     A disruption in the use or suspension of the SFSSFS Detention Center would also severely impact coordination with State, County, and Federal partners, who hold Title 8 (immigration enforcement) authority and maintain daily immigration arrest rates comparable to ERO Miami. Without sufficient bedspace, these partners would ostensibly lose the ability to carry out arrests, significantly affecting the various task forces focusing on apprehending criminal aliens, gang members, wanted fugitive felons, and individuals with prior criminal removals. This would pose a substantial risk to community safety.

14.     The United States, including ERO Miami, is legally required to detain certain aliens. Eliminating the use of the SFSSFS Detention Center would result in delays or the inability to pursue arrests of criminal aliens solely due to insufficient bedspace. This would severely undermine the consistent enforcement of immigration laws.

15.     The SFSSFS Detention Center is thus a vital tool for maintaining a lawful immigration process and detention environment. Before its establishment, ERO Miami faced significant overcrowding in its detention facilities, which placed the government in a challenging position to ensure compliance with ICE detention standards. The SFSSFS Detention Center has effectively alleviated these issues.

16.     The cornerstone of ICE's enforcement mission is the promotion of public safety through the removal of criminal aliens from the United States. The ability to detain criminal aliens ensures ICE's ability to eventually effectuate their removal from our communities. Continued strain on detention capacity greatly increases the possibility that criminal aliens, a priority target

for immigration enforcement, will remain at large and able to continue committing crimes. Aliens detained at the SFSSFS Detention Center included those with serious crimes to include robbery with a deadly weapon, sexual battery, and lewd and lascivious molestation of a child.

17.     The SFSSFS Detention Center has been instrumental in supporting the government's robust immigration enforcement efforts by enabling the detention of criminal aliens.  Without this facility and its detention capacity, many of these individuals would either be released back into the community or not arrested at all, placing significant strain on local communities.  The inability to detain criminal aliens due solely to a lack of detention space creates a serious public safety risk. Notably, it is estimated that among the millions of aliens who entered the United States under the previous administration, one in four provided a release address in the State of Florida.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 23rd day of August, 2025

GARRETT
J RIPA

_____
Garrett Ripa
Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# Doc. 147

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 25-22896-CV-WILLIAMS**

FRIENDS OF THE EVERGLADES, INC., *et al.*,

      Plaintiffs,

v.

KRISTI NOEM, *et al.*,

      Defendants.

_____/

**<u>OMNIBUS ORDER</u>**

**THIS MATTER** is before the Court on Defendant Kevin Guthrie's Expedited Motion to Stay Preliminary Injunction Pending Appeal (DE 137) and Defendants Kristi Noem and Todd Lyons' (together "***Federal Defendants***" and collectively with Defendant Guthrie, "***Defendants***") Expedited Motion to Stay Preliminary Injunction Pending Interlocutory Appeal (DE 138) (together "***Motions for Stay***"). Plaintiffs filed a Response in Opposition (DE 144) ("***Response***"). Also before the Court is Plaintiffs' Motion to Strike Late-Filed Declarations ("***Motion to Strike***") (DE 141). For the reasons set forth below, the Motions for Stay and Motion to Strike (DE 137; DE 138; DE 141) are **DENIED**.

**I.   BACKGROUND**

In this case, Plaintiffs Friends of the Everglades, Inc. ("***Friends***"), Center for Biological Diversity ("***CBD***"), and the Miccosukee Tribe of Indians of Florida ("***Tribe***") (collectively, "***Plaintiffs***") filed suit against Defendants and Miami-Dade County related to Defendants' use of the Dade-Collier Training and Transition Airport ("***TNT***") to construct and operate a mass migrant detention and deportation camp. (DE 1 ¶ 1; DE 84). Plaintiffs allege, in part, that Defendants failed to conduct the environmental assessments required

by the National Environmental Policy Act ("**NEPA**") before constructing and operating the project. (DE 1 ¶¶ 61–79) (Counts I and II). The same day they filed suit, Plaintiffs requested a preliminary injunction to prevent the project's construction and operation until Defendants complied with NEPA. (DE 5; DE 85). As the litigation got underway, Defendants completed and began operating the detention camp, so Plaintiffs altered their request for injunctive relief, seeking a "halt to any further construction on the TNT [s]ite . . ., [a] pause[ to] the transport of additional detainees to the [s]ite, and [the] ceasing [of] any operations related to detaining or preparing for the detention of anyone not [already] detained at the [s]ite[.]" (DE 40 at 6).

After a four-day Preliminary Injunction Hearing over the course of eight days, on August 21, 2025, the Court granted in part Plaintiffs' Motion for Preliminary Injunction. (DE 131). Specifically, the Court enjoined Defendants and others from doing a range of activities to expand the site's infrastructure and detainee/employee population, and the Court required Defendants to remove much of the site's infrastructure over the next sixty days once attrition of the camp's population allowed for it to be done in a "safe, humane, and responsible manner." (DE 131 at 80–82). The Court did not require Defendants to remove any housing or detention dormitory facilities, allowing Defendants to maintain those facilities to prevent deterioration or damage. (*Id.* at 82 n.40). It also did not prescribe any specific processes for how Defendants must remove the other infrastructure from the site. At no time during the Preliminary Injunction Hearing, did Defendants provide the Court with any evidence or argument regarding the costs of deconstructing the camp in any particular way, nor did Defendants request the Court to craft an injunction in any

App. 1468

particular way to avoid unnecessary costs, should the Court choose to enter a preliminary injunction.

After the injunction was issued, Defendants filed notices of appeal. (DE 132; DE 136). Then on August 23, 2025, Defendants filed Motions for Stay. (DE 137; DE 138). In their motions, Defendants included declarations from Deputy Director of the Florida Highway Patrol Joseph C. Harrison, Ian Gadea-Guidicelli, Bureau Chief of Response at the Florida Division of Emergency Management ("**FDEM**"), and ICE Miami Field Office Director Garrett Ripa. (DE 137-1–2; DE 138-1). Harrison and Ripa largely repeated general statements about the importance of having sufficient detention capacity to support immigration enforcement activities, statements that were made during the Preliminary Injunction Hearing. Gadea-Guidicelli, who Defendants chose not to call as a witness at the Preliminary Injunction Hearing, but who provided three other declarations during the preliminary injunction proceedings, (DE 86-1; DE 120-1; 116-1), said that he anticipates that complying with the Court's preliminary injunction will cost Defendants "roughly $15-20 million" based on his "experience with FDEM's financing of the facility and conversations with FDEM's vendors." (DE 137-2 ¶ 3). He also stated without elaboration or explanation that FDEM will lose most of the "value" of the money it invested in the project if required to cease operations on the site. (*Id.* ¶ 4).

Plaintiffs also attach two declarations to their Response. First, United States Representative Maxwell Frost described what he saw and heard on an August 20, 2025 tour of the facility. Representative Frost mentioned seeing diesel fuel tankers, propane tanks, and generators stored alongside natural wetlands without a silt fence buffer and water leaking from a trailer onto the pavement. (DE 144-1). Mr. Frost was told by a

contractor employed as the TNT site manager that around 350 detainees remain on site, that ICE has advised that it now only has need for 72-hour holds of detainees, and that ICE decides "everything" occurring at the facility. (*Id.*). Finally, a CBD social media strategist provided a declaration attaching a variety of news articles and videos related to the facility and this litigation. (DE 144-2).[1]

## II.   LEGAL STANDARD

"A stay [pending appeal] is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotations omitted). Instead, it is "an exercise of judicial discretion," and the "party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34 (internal quotations omitted). The factors a Court must weigh when analyzing a request for a stay pending appeal have "substantial overlap" with those "governing preliminary injunctions." *Id.* at 434. They are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure

---

[1] With regard to all declarations filed after the conclusion of the Preliminary Injunction Hearing, the Court will exercise its discretion to consider the declarations and afford their contents whatever weight they are entitled to. *See Trial Laws. Coll. v. Gerry Spence Trial Laws. Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1273–74 (10th Cir. 2022) (affirming trial court's decision to consider additional evidence after the preliminary injunction hearing had concluded); *Nalco Chem. Co. v. Hydro Techs., Inc.*, 149 F.R.D. 686, 689 (E.D. Wis. 1993) ("When a party requests reconsideration of a previous interlocutory order such as one denying preliminary injunctive relief, the court is 'free in its discretion to grant a reargument based either on all the evidence then of record or only the evidence before the court when it rendered its interlocutory decision, or to reopen the case for further evidence.'" (quoting *Marconi Wireless Tel. Co. of Am. v. United States*, 320 U.S. 1. 48 (1943))); *Amadi v. Dep't of Child. and Fams.*, 245 F. Supp. 3d 316, 319 (D. Mass. 2017) ("In the preliminary injunction context . . . a court has broad discretion with respect to the evidence that it may consider.") (internal quotation omitted).

the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434.

### III.   DISCUSSION

Days ago, the Court discussed these exact issues in an 82-page Order granting in part Plaintiffs' request for a preliminary injunction. (DE 131). The Court found Plaintiffs were likely to succeed on their NEPA claim because the project was adversely impacting the environment and was controlled in large part by the federal government, and Defendants had done no environmental analysis at all before building and commencing operations of the facility. (*Id.* at 44–66). The Court described substantial evidence provided by Plaintiffs of several kinds of ongoing and likely future irreparable harm from the project, including to the surrounding wetlands, endangered species, and those who live, recreate, research in, and work to preserve the area. (*Id.* at 67–75). Finally, the Court found Plaintiffs' and the public's interest in preventing these harms outweighed Defendants' interest in continuing to operate the detention facility while undergoing the NEPA review process, given that Defendants "offered little to no evidence why this detention camp, in this particular location, is uniquely suited and critical" to Defendants' immigration enforcement mission. (*Id.* at 75–79).

In their Motions for Stay, Defendants simply reiterate their arguments "articulated in [their] briefing  . . . [and] on the record at the evidentiary hearing[.]" (DE 137 at 2); *see also* (DE 138 at 2 (relying in its request for a stay on "the reasons articulated in Federal Defendants' briefing . . . [and] during the evidentiary hearing")). Accordingly, for the reasons discussed in the Court's August 21, 2025 Order, the Court finds these same arguments—the arguments rejected in the Order—do not establish a strong showing of

likelihood of success on the merits of their appeal. This "factor is the most important" here, where the balance of equities do not weigh heavily in favor of granting a stay. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986).

To the contrary, the remaining stay factors also counsel against granting a stay pending appeal. Again, as noted in the Order, Defendants constructed the facility in eight days and have repeatedly emphasized that the facility was designed and constructed to be temporary. (DE 16 at 4–5, 14, 19–20; DE 16-1 ¶ 2; DE 21 at 6–7). Further, during the preliminary injunction proceedings, Defendants made no argument related to the cost of deconstructing the facility, ceasing its operations, or reinstalling infrastructure, despite Plaintiffs' specific request for relief encompassing these actions. The Court gives little weight to the after-the-fact, fourth declaration from Mr. Gadea-Guidacelli, claiming in conclusory fashion that Defendants will incur the costs he identifies if required to cease operations on the site.[2] *See White Cap, L.P. v. Heyden Enterprises, LLC*, No. 23-cv-14248, 2024 WL 3738925, at *8 (S.D. Fla. July 19, 2024) (discounting declarations containing hearsay and speculation when those declarants were not called "to the stand to testify or be subject to cross-examination"). In any event, these speculative comments do not outweigh Defendants' weak showing of likelihood of success on the merits or the ongoing harms Plaintiffs documented during the Preliminary Injunction Hearing. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1007–08 (9th Cir. 2020) (denying motion to stay injunction pending appeal based on the "government's declarations contain[ing] only

---

[2] Moreover, the declaration fails to include any off-sets Defendants will realize by ceasing operations at this unique site.

estimates, assumptions, and projections," and given that "the government's asserted harm is largely self-inflicted").[3]

Finally, Defendants rehash the same general arguments about the importance of immigration enforcement they presented during the Preliminary Injunction Hearing. As Defendants provide no new evidence or argument about the particular dangerousness of the detainee population at the TNT site or the need for a detention facility in this particular location, the Court will not repeat the shortcomings of Defendants' claims here. *See* (DE 131 at 76–77). But the Court notes that evidence that the detainee population was dwindling at the site even before the preliminary injunction was entered and that ICE now has need for only 72-hour holds are signs that Defendants' immigration enforcement goals will not be thwarted by a pause in operations at the TNT site.

[3] Had Defendants requested a modification of the proposed injunction, such as a requirement to turn off, rather than remove the lighting, the Court would have seriously entertained this option to minimize the costs of complying with the injunction.

IV.    **CONCLUSION**

For the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Guthrie's Expedited Motion to Stay Preliminary Injunction Pending Appeal (DE 137) is **DENIED**.

2. Federal Defendants' Expedited Motion to Stay Preliminary Injunction Pending Interlocutory Appeal (DE 138) is **DENIED**.

3. Plaintiffs' Motion to Strike Late-Filed Declarations (DE 141) is **DENIED**.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 27th day of August, 2025.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

App. 1474

# Fed. Ex. 7

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC., and
CENTER FOR BIOLOGICAL DIVERSITY,

      *Plaintiffs*,

    v.

KRISTI NOEM, in her official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his
official capacity as Executive Director of the
Florida Division of Emergency Management,
and MIAMI-DADE COUNTY, a political
subdivision of the State of Florida

      *Defendants*.

Civil Action No. 1:25-cv-22896

## DECLARATION OF SANTIAGO FUENTES

      Pursuant to the authority of 28 U.S.C. § 1746, I, Santiago Fuentes, declare that, to the best of my knowledge, information, and belief, and under the penalty of perjury, the following is true and correct:

1.      I am the Assistant Field Office Director (AFOD) for the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal

App. 1476

Operations (ERO) Miami field office. I have been the AFOD of ERO Miami since 2024.

2.      As the AFOD, I oversee the Criminal Alien Program (CAP), ERO Criminal Prosecutions (ECP), and 287(g) programs for the Miami area of responsibility.

3.      I began my federal career in June 2003 as a clerk with U.S. Citizenship and Immigration Services in the Miami office. In February 2004, I was a Customs and Border Protection Officer in Miami, Florida. In March 2006, I entered on duty with ICE as an Immigration Enforcement Agent and was promoted to Deportation Officer and then Supervisory Detention and Deportation Officer in 2016.

4.      I am familiar with the allegations made by plaintiffs in the instant lawsuit regarding the South Florida Soft-Sided Facility South detention center (SFSSFS).

### Overview of the 287(g) Program

5.      Since 1996, 8 U.S.C. § 1357 (g) has authorized ICE to delegate immigration enforcement authority to state and local law enforcement by way of an agreement between the state law enforcement agency and ICE, to perform certain immigration functions as outlined in the agreement. Practically this means that local law enforcement can perform immigration enforcement actions under the direction and supervision of ICE.

6.      The purpose of the 287(g) program is to enhance the safety and security of communities by identifying and processing for removal criminal aliens who pose a threat to public safety or a danger to the community. This collaboration fosters better communication between federal and state/local law enforcement agencies. This coordinated enforcement effort allows for the swift and safe removal of dangerous criminal aliens.

7.      ICE implemented the first 287(g) agreement in 2002. Since then, to participate in the 287(g) program, local law enforcement officers must be nominated by a chief officer of the law enforcement agency, must have at least two years of law enforcement work experience, complete a training and certification program, be approved by ICE, and be able to qualify for appropriate

federal security clearances. The mandatory training focuses on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed, followed by an examination. Officers who are nominated and successfully complete the training and certification are authorized to participate in the 287(g) program for a period of two years from the date of authorization. After this, local training on relevant issues are provided on an ongoing basis by ICE supervisors or a designated team leader.

8.    There are currently 167 Florida entities that have entered 287(g) agreements since President Trump took office, including the Florida National Guard and several Florida law enforcement entities.

9.    Since 2024, I have overseen the 287(g) agreements in the Miami area of responsibility. Those agreements, including the date they were signed, are available on ICE's website. The agreements generally authorize those entities to detain aliens under federal immigration laws.

10.    287(g) agreements have several different models, the Task Force Model, the Jail Enforcement Model and Warrant Service Officer model. The Task Force Model authorizes designated state or local law enforcement officers to perform immigration enforcement functions in the field, such as during patrols or traffic stops, allowing them to question individuals about immigration status and initiate removal proceedings outside of a custodial setting. In contrast, the Jail Enforcement Model limits these functions to the secure environment of a jail or correctional facility, where trained officers screen individuals already under arrest to determine immigration status, lodge detainers, and commence removal proceedings. The Warrant Service Officer Model restricts designated officers to serving ICE administrative warrants and detainers on individuals already in their custody, without granting the broader investigative or processing authority available under the Jail Enforcement Model.

**Implementation of 287(g)**

11.    When a state enters into a 287(g) program, state and local law enforcement are given the authority to serve and execute immigration administrative warrants of arrest, to arrest without a warrant any alien entering or attempting to unlawfully enter the United States in the officers view, any alien unlawfully present in the United States with probable cause if the alien is likely to escape before a warrant can be obtained, or any person committing an immigration related felony with probable cause if the alien is likely to escape before a warrant can be obtained. They may also prepare charging documents for the signature of an ICE officer, process arrested aliens for immigration violations, issue immigration detainers, take and maintain custody of aliens arrested by ICE or another local law enforcement agency on behalf of ICE, and transport arrested aliens to ICE approved facilities.

12.    DHS provides credentials and guidance to local law enforcement partners, and signs warrants for service as needed. DHS is required to provide direction and supervision to local law enforcement officers when taking immigration enforcement actions.

13.    State and local law enforcement officers make the decision to detain an alien under the authority given to them through the 287(g) agreements. DHS does not have the authority to order any state to detain an alien, however, DHS will confirm an alien is amenable to arrest and provide direction and supervision on questions of immigration law, as required under the 287(g) agreement. The authority to direct and supervise law enforcement officers acting under a 287(g) agreement in all matters aside from those described above, to include personnel and employment matters and operational concerns pertaining to Florida detention facilities, are retained by the State of Florida. For example, the 287(g) law enforcement agency partner is responsible for providing officer salaries, benefits, uniforms; responsible for all personnel decisions such as hiring, firing, and any disciplinary actions; sets work hours, manages officer assignments, assigns supervisors; and sets policies and procedures for their agency.

### South Florida Soft-Sided Facility South Detention Facility

14.     The SFSSFS detention facility is in Collier County, Florida. DHS and Collier County have had a 287(g) agreement since 2007. This agreement confers federal immigration authority onto Collier County law enforcement officials per the terms of the agreement, as generally explained under paragraph 11.

15.     Collier County currently has two 287(g) agreements, to include the Jail Enforcement Model and the Task Force Management model.

16.     When ICE procures detention space from a state or local entity, it pays for that space via its appropriation for Operations and Support, which includes funding for enforcement, detention and removal operations. When it does so, the aliens are detained by the state or local entity or their contractor on behalf of ICE.

17.     ICE did not and has not purchased or otherwise procured any detention space from Florida for the detention of illegal aliens at the SFSSFS detention facility. ICE did not and has not ordered, supervised, or directed the construction of the facility. ICE did not and has not weighed in on the number of detainees to be held at the facility.

18.     The State of Florida has complete discretion in deciding who is detained at this facility.

19.     ICE continues to provide supervision to local law enforcement at the SFSSFS detention facility for delegated immigration officer functions as required under the 287(g) program. This includes signing off on charging documents, reviewing detainers issued, running federal database system checks, and providing guidance any time immigration authority is exercised.  ICE did not designate or plan the site as a detention facility.  ICE does not direct or supervise construction or physical maintenance activities at the SFSSFS detention facility.

20.     Deportation Officers normally assigned to various units throughout South Florida have been temporarily reassigned to intermittently perform work at the SFSSFS facility. This reassignment

includes first line supervisors as well as deportation officers. Officers interact with detained aliens as needed. Visits to the facility by ICE personnel are conducted several times a week but may occur as often as daily.

Signed this 12th day of August 2025.

SANTIAGO R FUENTES

Digitally signed by SANTIAGO R FUENTES
DN: cn=SANTIAGO R FUENTES, o=U.S. Government, ou=People, email=Santiago.R.Fuentes@ice.dhs.gov, c=US
Date: 2025-08-12T09:57:02-0400

Santiago Fuentes
Assistant Field Office Director
 Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

App. 1481

# FDEM Ex. 7

# STATE OF FLORIDA

## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 23-03
### (Emergency Management – Illegal Migration)

**WHEREAS**, on September 28, 2021, I issued Executive Order 21-223, directing state law enforcement agencies and other state agencies to take necessary actions to protect Floridians from the dangerous impacts of the Biden Border Crisis; and

**WHEREAS**, in recent months, the numbers of individuals attempting to come to the United States and unauthorized alien interdictions in and around Florida have risen to alarming levels not seen for decades; and

**WHEREAS**, in the first two months of the current fiscal year, U.S. Customs and Border Protection (CBP) has encountered over 460,000 persons attempting entry along the Southwest Border;

**WHEREAS**, during the last fiscal year, over 2.3 million encounters with unauthorized aliens occurred at the Southwest Border; and

**WHEREAS**, as the lawlessness at the Southwest Border continues unabated and the Biden Administration has repeatedly demonstrated its ineptitude at managing the crisis it created, more migrants are seeking entry into the United States; and

**WHEREAS**, from August 2022 to the present, federal, state, and local officials have interdicted approximately 8,042 migrants in Florida's territorial waters alone; and

**WHEREAS**, approximately 300 unauthorized aliens unlawfully entered the Dry Tortugas National Park in the Florida Keys on January 1, 2023; and

County Exhibit A

1

App. 1483

**WHEREAS**, reports indicate an additional 45 unauthorized aliens unlawfully entered Key West on the evening of January 5, 2023; and

**WHEREAS**, intelligence reports reveal additional vessels are en route to Florida shores; and

**WHEREAS**, such a mass migration of unauthorized aliens, including the associated abandonment of vessels, without appropriate support from the federal government, has created an unmanageable strain on local resources and will continue to overburden the capabilities of local governments throughout the state; and

**WHEREAS**, mass migration by sea or land is extremely dangerous and must be discouraged; and

**WHEREAS**, the response from the Biden Administration on this crisis is inadequate and presents an undue burden on local law enforcement to prevent the mass migration that is now occurring and only likely to worsen; and

**WHEREAS**, given the magnitude of this situation, which is further exacerbated by the Biden Administration's failure to secure the border, central coordination, direction, and state resources are needed to identify and respond to the anticipated large influx of unauthorized aliens immigrating from foreign countries to Florida; and

**WHEREAS**, Florida's history of assisting refugees, including Cubans and others fleeing communist regimes, has previously involved support from the federal government and a coordinated effort among federal, state, and local governments; and

**WHEREAS**, as Governor, I am responsible to meet the dangers presented to Florida and its people by this emergency.

**NOW, THEREFORE, I, RON DESANTIS**, as Governor of Florida, by virtue of the authority vested in me by Article IV, Section 1(a) of the Florida Constitution and by the Florida

App. 1484

Emergency Management Act, as amended, and all other applicable laws, promulgate the following Executive Order, to take immediate effect:

Section 1. Because of the foregoing conditions, I hereby find that the migration of unauthorized aliens to the State of Florida is likely to constitute a major disaster. I therefore declare that a state of emergency exists in the State of Florida.

Section 2. I designate the Director of the Division of Emergency Management as the State Coordinating Officer for the duration of this emergency and direct him to execute the State's Comprehensive Emergency Management Plan and other response, recovery, and mitigation plans necessary to cope with the emergency. Pursuant to section 252.36(1)(a), Florida Statutes, I delegate to the State Coordinating Officer the authority to exercise those powers delineated in sections 252.36(6)-(12), Florida Statutes, which he shall exercise as needed to meet this emergency, subject to the limitations of section 252.33, Florida Statutes. In exercising the powers delegated by this Executive Order, the State Coordinating Officer shall confer with the Governor to the fullest extent practicable.  The State Coordinating Officer shall also have the authority to:

A. Invoke and administer the Emergency Management Assistance Compact ("EMAC") (sections 252.921-252.9335, Florida Statutes) and other compacts and agreements existing between the State of Florida and other states, and the further authority to coordinate the allocation of resources from such other states that are made available to Florida under such compacts and agreements so as to best meet this emergency.

B.  Seek direct assistance and enter into agreements with any and all agencies of the federal government as may be needed to meet this emergency.

C. Direct all state, regional, and local governmental agencies, including law enforcement agencies, to identify personnel needed from those agencies to assist in meeting the response, recovery, and mitigation needs created by this emergency, and to place all such personnel

3

App. 1485

under the direct command and coordination of the State Coordinating Officer to meet this emergency.

     D.  Direct the actions of any state agency as necessary to implement the Federal Emergency Management Agency's National Disaster Recovery Framework.

     E.  Designate Deputy State Coordinating Officers and Deputy State Disaster Recovery Coordinators, as necessary.

     F.  Suspend the effect of any statute, rule, or order that would in any way prevent, hinder, or delay any mitigation, response, or recovery action necessary to cope with this emergency. In accordance with section 252.3611(1), Florida Statutes, any order, declaration, or other action suspending a statute or rule shall specify each statute or rule being amended or waived, if applicable, and the expiration date for the order or action.

     G.  Enter orders as may be needed to implement any of the foregoing powers; however, the requirements of sections 252.46 and 120.54(4), Florida Statutes, do not apply to any such orders issued by the State Coordinating Officer. No such order shall remain in effect beyond the expiration of this Executive Order, including any extension thereof.

   Section 3. I order the Adjutant General to activate the Florida National Guard, as needed, to deal with this emergency.

   Section 4. I find that the special duties and responsibilities resting upon some state, regional, and local agencies and other governmental bodies in responding to this emergency may require them to suspend or waive the effect of certain statutes, rules, ordinances, and orders they administer. Therefore, I issue the following authorizations:

     A.  Pursuant to section 252.36(6)(a), Florida Statutes, the Executive Office of the Governor may suspend all statutes and rules affecting budgeting to the extent necessary to provide budget authority for state agencies to cope with this emergency.  The requirements of sections

4

App. 1486

252.46 and 120.54(4), Florida Statutes, do not apply to any such suspension issued by the Executive Office of the Governor. No such suspension shall remain in effect beyond the expiration of this Executive Order, including any extension thereof.

B.  Each state agency may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of that agency, if strict compliance with the provisions of any such statute, order, or rule would in any way prevent, hinder, or delay necessary action in coping with the emergency.  This includes, but is not limited to, the authority to suspend any and all statutes, rules, ordinances, or orders which affect leasing, printing, purchasing, travel, and the condition of employment and the compensation of employees. In accordance with section 252.3611(1), Florida Statutes, any agency order, declaration, or other action suspending a statute or rule shall specify each statute or rule being amended or waived, if applicable, and the expiration date for the order or action.  The requirements of sections 252.46 and 120.54(4), Florida Statutes, shall not apply to any such suspension issued by a state agency. No such suspension shall remain in effect beyond the expiration of this Executive Order, including any extension thereof.

C.  In accordance with section 252.38(3), Florida Statutes, each political subdivision within the State of Florida may waive the procedures and formalities otherwise required of the political subdivision by law pertaining to:

1)  Performance of public work and taking whatever prudent action is necessary to ensure the health, safety, and welfare of the community;

2)  Following local procurement and contracting policies;

3)  Entering into contracts; however, political subdivisions are cautioned against entering into time and materials contracts without a ceiling as defined by 2 C.F.R. 200.318(j) or cost plus percentage contracts as defined by 2 C.F.R. 200.324(d);

5

App. 1487

4)  Incurring obligations;

5)  Employment of permanent and temporary workers;

6)  Utilization of volunteer workers;

7)  Rental of equipment;

8)  Acquisition and distribution, with or without compensation, of supplies, materials, and facilities; and

9)  Appropriation and expenditure of public funds.

D.  All agencies whose employees are certified as disaster service volunteers within the meaning of section 110.120(2)(d), Florida Statutes, may, in accordance with section 110.120(3), Florida Statutes, release any such employees for such service as requested by the employee to meet this emergency.

Section 5.  I find that the demands placed upon funds specifically appropriated to state and local agencies for disaster relief or response are unreasonably great and that such funds may be inadequate to pay the costs of coping with this emergency.  In accordance with section 252.37(2)(b), Florida Statutes, I direct that sufficient funding be made available, as needed, by transferring and expending moneys from the Emergency Preparedness and Response Fund created under section 252.3711, Florida Statutes.

In accordance with section 252.37(2)(a), Florida Statutes, state agencies responding to this emergency must first spend funds specifically appropriated for disaster relief or response. If no specifically appropriated funds exist, or if funds specifically appropriated are exhausted, state agencies are authorized to spend funds from the Emergency Preparedness and Response Fund through the procedures outlined in Memorandum No. 22-046, Emergency Preparedness and Response.

6

App. 1488

Section 6.  All state agencies entering emergency orders, emergency declarations, or other emergency actions in response to this emergency shall advise the State Coordinating Officer contemporaneously or as soon as practicable thereafter, and, pursuant to section 252.36(3)(b), Florida Statutes, shall submit the order or declaration to the Division of Administrative Hearings within five days of issuance.

Section 7.  Medical professionals and workers, social workers, and counselors with good and valid professional licenses issued by states other than the State of Florida may render such services in Florida during this emergency for persons affected by this emergency with the condition that such services be rendered to such persons free of charge, and with the further condition that such services be rendered under the auspices of the American Red Cross or the Florida Department of Health.

Section 8.   All actions taken by the Director of the Division of Emergency Management with respect to this emergency before the issuance of this Executive Order are ratified.

Section 9.   This Executive Order is effective immediately and shall expire sixty (60) days from this date unless extended.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Florida to be affixed, at Tallahassee, this 6th day of January, 2023.

RON DESANTIS, GOVERNOR

ATTEST:

SECRETARY OF STATE

App. 1489

# FDEM Ex. 30

# Exhibit 1
# Giles Declaration

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| FRIENDS OF THE EVERGLADES, INC., and CENTER FOR BIOLOGICAL DIVERSITY, | |
| *Plaintiffs*, | Civil Action No. 1:25-cv-22896 |
| v. | |
| KRISTI NOEM, in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; KEVIN GUTHRIE, in his official capacity as Executive Director of the Florida Division of Emergency Management, and MIAMI-DADE COUNTY, a political subdivision of the State of Florida | |
| *Defendants*. | |

## DECLARATION OF THOMAS P. GILES

Pursuant to the authority of 28 U.S.C. § 1746, I, Thomas P. Giles, declare that, to the best of my knowledge, information, and belief, and under the penalty of perjury, the following is true and correct:

1.      I am currently both the Acting Deputy Executive Associate Director (D-EAD) for the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement

1

App. 1492

(ICE), Enforcement and Removal Operations (ERO) and the Interim Assistant Director for Field Operations within ERO. I have been the Acting D-EAD of ERO since June 30, 2025, and the Interim Assistant Director for Field Operations since May 2025.

2.     As the Acting D-EAD of ERO, I oversee the mission of ERO's eight headquarters divisions: Enforcement, Removal, Non-Detained Management, Custody Management, Field Operations, ICE Health Service Corps, Law Enforcement Systems and Analysis, and Operations Support. As the interim Assistant Director for Field Operations, I oversee and direct all ERO field operations activities nationwide and ensure coordination among all ERO field offices. I have principal oversight over the full scope of immigration enforcement activities and programs through which ERO identifies, arrests, refers for prosecution, and removes illegal aliens from the United States.

3.     I began my career in federal law enforcement in 2001 as a Deportation Officer in the Seattle field office and was eventually promoted to Supervisory Detention and Deportation Officer and Assistant Field Office Director. In 2012, I was selected to serve as a Deputy Chief of Staff for ERO at ICE headquarters in Washington, D.C., and the following year, I served as the Chief of Staff. Following that, I served as the Field Office Director for the Atlanta and Los Angeles ERO field offices. In the Los Angeles field office, I oversaw 505 authorized positions and managed an annual budget of $110 million dollars. Prior to serving as the Acting Assistant Director for Field Operations, I served as the Assistant Director for the Non-Detained Management Division within ERO.

4.     I am familiar with the allegations made by plaintiffs in the instant lawsuit regarding the detention facility being constructed at the Dade-Collier Training and Transition Airport near the Big Cypress National Preserve (TNT Detention Facility).

App. 1493

5.      ICE is not providing any funding for the construction of the TNT Detention Facility. The State of Florida is responsible for the funding and construction of the facility. ICE's role concerning the development of the TNT Detention Facility has been limited to touring the facility to ensure compliance with ICE detention standards, and meeting with officials from the State of Florida to discuss operational matters.

6.      The ultimate decision of who to detain at the TNT Detention Facility belongs to Florida.

7.      If Florida decides to detain any illegal aliens at the TNT Detention Facility, they would do so under the authority delegated pursuant to section 287(g) of the Immigration and Nationality Act, codified at 8 U.S.C. § 1357(g).

8.      Many Florida entities have entered 287g agreements since President Trump took office, including the Florida National Guard and several Florida law enforcement entities. Those agreements, including the date they were signed, are available on ICE's website. *See* participatingAgencies07012025pm.xlsx. The agreements generally authorize those entities to detain aliens under the immigration laws. ICE's understanding is that Florida intends to operate its 287(g) facilities under those existing agreements.

9.      When ICE procures detention space from a state or local entity, it pays for that space via its appropriation for Operations and Support, which includes funding for enforcement, detention and removal operations. When it does so, the aliens are detained by a contractor on behalf of ICE.

10.      ICE has not purchased or otherwise procured any detention space from Florida for the detention of illegal aliens at the TNT Detention Facility.

11.      While the TNT Detention Facility is a concern of the State of Florida, its use in detaining aliens operationally benefits ICE as it will maximize detention capacity in furtherance of ICE's

3

App. 1494

immigration enforcement mission. Ultimately, the TNT Detention Facility will serve to decompress other detention facilities used to house aliens throughout the United States.

Signed this 2nd day of July, 2025.



THOMAS P GILES
Digitally signed by THOMAS P GILES
DN: cn=THOMAS P GILES, o=U.S.
Government, ou=People,
email=Thomas.P.Giles@ice.dhs.gov,
c=US
Date: 2025-07-02T21:17:38-0400

Thomas P. Giles
Acting Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

4

# FDEM Ex. 31

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., et al.

      Plaintiffs,

v.

KRISTI NOEM, et al.,

      Defendants.

**DECLARATION OF IAN GADEA-GUIDICELLI IN SUPPORT OF DEFENDANT**
**KEVIN GUTHRIE'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' MOTION**
**FOR A TEMPORARY RESTRAINING ORDER**

      I, Ian Gadea-Guidicelli, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct based upon my personal knowledge and review of the relevant records maintained in the ordinary course of business:

      1.     I am the State Emergency Response Team Chief and Response Bureau Chief.  I make this declaration in support of Defendant Kevin Guthrie's response to Plaintiffs' motion for a temporary restraining order.  If called as a witness, I could and would competently testify to the matters set forth herein.

      2.     All facilities, buildings, and paving related to the detention facility at the Dade-Collier Training and Transition Airport are, and will remain, in Collier County, Florida.

      3.     As shown below, the vast majority of the site, including all buildings and pavement, is located in Collier County.  There is a small, unpaved extension of the runway that juts slightly into Miami-Dade County.  But that runway extension has not been, and is unlikely to be, used to support facilities or operations at the detention center.

1

App. 1498



4.      All substantial decision-making about the detention facility has occurred at either State offices in Tallahassee, Florida, or on-site in Collier County, Florida.

5.      No substantial decision-making about the detention facility has occurred in Miami-Dade County.

Executed on July 21st , 2025, in Tallahassee, Florida.

Ian Paul Gadea Guidicelli
_____
Ian Gadea-Guidicelli, SERT Chief

2

App. 1499

# FDEM Ex. 44

# Exhibit 2
# Richardson Declaration

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| FRIENDS OF THE EVERGLADES, *et al.*, <br><br>      Plaintiffs, <br><br> *v.* <br><br> KRISTI NOEM in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br>      Defendants. | Civil Action No. <br> 1:25-cv-22896-JEM |

**DECLARATION OF DAVID RICHARDSON**

I, David Richardson, declare as follows:

1. I am the Senior Official Performing the Duties of the Administrator at the Federal Emergency Management Agency ("FEMA" or "agency"). FEMA is a component within the U.S. Department of Homeland Security ("DHS"). As the Senior Official Performing the Duties of the FEMA Administrator, I am the DHS official responsible for being the principal advisor to the President and Secretary of Homeland Security ("Secretary") for all matters related to emergency management in the United States. I am also vested with the authority to manage and administer the various grant programs assigned to FEMA directly by statute or through delegation from the Secretary. I am familiar with the grant programs administered by FEMA and the policies and procedures governing these programs.

2. My statements in this Declaration are based on my personal knowledge, on information provided to me in my official capacity; on reasonable inquiry; information obtained from various records, systems, databases, DHS, or FEMA employees and information portals maintained and relied upon by the DHS in the regular course of business; and on my evaluation of that information.

3. DHS/FEMA announced $600 million in federal funding for the Detention Support Grant Program (DSGP). The DSGP will provide financial assistance through a federal award to support sheltering of illegal aliens in a detention environment and related activities to avoid overcrowding in U.S. Customs and Border Protection short-term holding facilities. The only eligible applicant under the DSGP is the Florida Division of Emergency Management.

4. Once the DSGP is finalized, DHS/FEMA will send the Florida Division of Emergency Management a grant notification letter. The grant notification letter is the official communication from DHS/FEMA that explains the grant application process and will include proposed terms and conditions of the grant including allowable costs. The Florida Department of Emergency Management must then apply for a DSGP federal award. The Florida Department of Emergency Division has not yet applied for a DSGP award, and DHS/FEMA has not yet approved a federal award.  I am not aware of any other grant applications that Florida has submitted to FEMA in connection with the temporary detention center at issue in this case.

5. Costs for constructing new, permanent buildings are not allowable under the DSGP.

        I, David Richardson, declare under penalty of perjury that the foregoing is true and correct.

Executed on July 2 2025

*Richardsonde*
_____
David Richardson
Senior Official Performing the Duties of the
Administrator
Federal Emergency Management Agency