Supp. App. 0805

# VOLUME III

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement (MOA) constitutes an agreement between United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and the Florida National Guard (FLNG)   , pursuant to which ICE delegates to nominated, trained, and certified officers or employees of the FLNG   (hereinafter interchangeably referred to as "Law Enforcement Agency" (LEA)), to perform certain immigration enforcement functions as specified herein. The LEA represents      the Florida National Guard (FLNG) in the implementation and administration of this MOA. The   Florida National Guard (FLNG) and ICE enter into this MOA in good faith and agree to abide by the terms and conditions contained herein. The ICE and LEA points of contact for purposes of this MOA are identified in Appendix A.

### I.    PURPOSE

The purpose of this MOA is to set forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and thereafter be approved by ICE to perform certain functions of an immigration officer under the direction and supervision of ICE within the LEA's jurisdiction. This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority granted under this MOA to participating LEA personnel shall occur only as provided in this MOA. This MOA also describes the complaint procedures available to members of the public regarding immigration enforcement actions taken pursuant to this agreement by participating LEA personnel.

### II.    AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1357(g), as amended by the Homeland Security Act of 2002, Public Law 107-276, authorizes the Secretary of Homeland Security, or her designee, to enter into written agreements with a State or any political subdivision of a State so that qualified officers and employees can perform certain functions of an immigration officer. This MOA constitutes such a written agreement.

### III.    POLICY

This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. It sets forth with specificity the duration of the authority conveyed and the specific lines of authority, including the requirement that participating LEA personnel be subject to ICE direction and supervision while performing delegated immigration officer functions pursuant to this MOA. For the purposes of this MOA, ICE officers will provide direction and supervision for participating LEA personnel only as to immigration enforcement functions as authorized in this MOA. The LEA retains supervision of all other aspects of the employment and performance of duties of participating LEA personnel.

Revised 02/12/2025

Exhibit C

Supp. App.0807

**IV.    TRAINING AND ASSIGNMENTS**

Before participating LEA personnel receive authorization to perform immigration officer functions granted under this MOA, they must successfully complete mandatory training on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed as provided by ICE instructors and thereafter pass examinations equivalent to those given to ICE officers. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE. Only participating LEA personnel who are nominated, trained, certified, and authorized, as set out herein, have authority pursuant to this MOA to conduct the delegated immigration officer functions, under ICE direction and supervision, enumerated in this MOA.

Upon the LEA's agreement, participating LEA personnel performing immigration-related duties pursuant to this MOA will be assigned to various units, teams, or task forces designated by ICE.

**V.    DESIGNATION OF AUTHORIZED FUNCTIONS**

For the purposes of this MOA, participating LEA personnel are authorized to perform the following functions pursuant to the stated authorities, subject to the limitations contained in this MOA:

- The power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(l)) and to process for immigration violations those individuals who have been arrested for State or Federal criminal offenses.

- The power and authority to arrest without a warrant any alien entering or attempting to unlawfully enter the United States in the officer's presence or view, or any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(2) and 8 C.F.R. § 287.5(c)(1). Subsequent to such arrest, the arresting officer must take the alien without unnecessary delay for examination before an immigration officer having authority to examine aliens as to their right to enter or remain in the United States.

- The power to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(4) and 8 C.F.R. § 287.5(c)(2).

- The power to serve and execute warrants of arrest for immigration violations under INA § 287(a) and 8 C.F.R. § 287.5(e)(3).

- The power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2)) to complete required alien processing to include fingerprinting, photographing, and interviewing, as well as the preparation of affidavits and the taking of

Revised 02/12/2025

**Exhibit C**

sworn statements for ICE supervisory review.

- The power and authority to prepare charging documents (INA § 239, 8 C.F.R. § 239.1; INA § 238, 8 C.F.R § 238.1; INA § 241(a)(5), 8 C.F.R § 241.8; INA § 235(b)(l), 8 C.F.R. § 235.3) including the preparation of the Notice to Appear (NTA) or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors.

- The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for aliens in categories established by ICE supervisors.

- The power and authority to take and maintain custody of aliens arrested by ICE, or another State or local law enforcement agency on behalf of ICE. 8 C.F.R. § 287.5(c)(6)

- The power and authority to take and maintain custody of aliens arrested pursuant to the immigration laws and transport (8 C.F.R. § 287.5(c)(6)) such aliens to ICE-approved detention facilities.

## VI.    RESOLUTION OF LOCAL CHARGES

The LEA is expected to pursue to completion prosecution of any state or local charges that caused the alien to be taken into custody. ICE may assume custody of aliens who have been convicted of a state or local offense only after such aliens have concluded service of any sentence of incarceration. The ICE Enforcement and Removal Operations Field Office Director or designee shall assess on a case-by-case basis the appropriate actions for aliens who do not meet the above criteria based on special interests or other circumstances after processing by the LEA.

After notification to and coordination with the ICE supervisor the alien who participating LEA personnel have determined to be a removable alien, the alien will be arrested on behalf of ICE by participating LEA personnel and be transported by the LEA on the same day to the relevant ICE detention office or facility.

## VII.    NOMINATION OF PERSONNEL

The chief officer of the LEA will nominate candidates for initial training and certification under this MOA. For each candidate, ICE may request any information necessary for a background check and to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA. All candidates must be United States citizens. All candidates must have at least two years of LEA work experience. All candidates must be approved by ICE and must be able to qualify for appropriate federal security clearances and access to appropriate DHS and ICE databases/systems and associated applications.

Should a candidate not be approved, a substitute candidate may be submitted if time permits such substitution to occur without delaying the start of training. Any subsequent expansion in the number of participating LEA personnel or scheduling of additional training classes may be based on an oral agreement of the parties but will be subject to all the requirements of this MOA.

Revised 02/12/2025

Exhibit C

## VIII.    TRAINING OF PERSONNEL

ICE will provide participating LEA personnel with the mandatory training tailored to the immigration functions to be performed. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE.

Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy; (v) civil rights laws (vi) the detention of aliens; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law, including applicable treaties or international agreements, to make proper notification upon the arrest or detention of a foreign national.

Approximately one year after the participating LEA personnel are trained and certified, ICE may provide additional updated training on relevant administrative, legal, and operational issues related to the performance of immigration officer functions, unless either party terminates this MOA pursuant to Section XVIII below. Local training on relevant issues will be provided on an ongoing basis by ICE supervisors or a designated team leader.

## IX.    CERTIFICATION AND AUTHORIZATION

ICE will certify in writing the names of those LEA personnel who successfully complete training and pass all required testing. Upon receipt of the certification, ICE will provide the participating LEA personnel with a signed authorization to perform specified functions of an immigration officer for an initial period of two years from the date of the authorization. ICE will also provide a copy of the authorization to the LEA. The ICE supervisory officer, or designated team leader, will evaluate the activities of all personnel certified under this MOA.

Authorization of participating LEA personnel to act pursuant to this MOA may be revoked at any time and for any reason by ICE or the LEA. Such revocation will require notification to the other party to this MOA within 48 hours. The chief officer of the LEA and ICE will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA, pursuant to Section XVIII below, shall constitute revocation of all immigration enforcement authorizations delegated herein.

## X.    COSTS AND EXPENDITURES

Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue material. Whether or not the LEA receives financial reimbursement for such costs through a federal grant or other funding mechanism is not material to this MOA.

ICE is responsible for the installation and maintenance of the Information Technology (IT) infrastructure. The use of the IT infrastructure and the DHS/ICE IT security policies are defined in the Interconnection Security Agreement (ISA). The ISA is the agreement between ICE's Chief Information Security Officer and the LEA's Designated Accreditation Authority.

Revised 02/12/2025

Exhibit C

The LEA agrees that each of its sites using an ICE-provided network access or equipment will sign the ISA, which defines the DHS ICE 4300A Sensitive System Policy and Rules of Behavior for each user granted access to the DHS network and software applications. Failure to adhere to the terms of the ISA could result in the loss of all user privileges.

The LEA is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material used in the execution of the LEA's mission. ICE will provide instructors and training materials. The LEA is responsible for the salaries and benefits, including any overtime, of all its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating LEA personnel while they are receiving training. ICE is responsible for the costs of the LEA personnel's travel expenses while in a training status, as authorized by the Federal Travel Regulation and the ICE Travel Handbook. These expenses include housing, per diem and all transportation costs associated with getting to and from training. ICE is responsible for the salaries and benefits of all ICE personnel, including instructors and supervisors.

The LEA is responsible for providing all administrative supplies (e.g. paper, printer toner) necessary for normal office operations. The LEA is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints, etc.

## XI.    ICE SUPERVISION

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE.

When operating in the field, participating LEA personnel shall contact an ICE supervisor at the time of exercising the authority in this MOA, or as soon as is practicable thereafter, for guidance. The actions of participating LEA personnel will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for additional training or guidance for that specific individual.

For the purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law unless doing so would violate federal law.

Revised 02/12/2025

Exhibit C

If a conflict arises between an order or direction of an ICE supervisory officer and LEA rules, standards, or policies, the conflict shall be promptly reported to ICE, and the chief officer of the LEA, or designee, when circumstances safely allow the concern to be raised. ICE and the chief officer of the LEA shall attempt to resolve the conflict.

Whenever possible, the LEA will deconflict all addresses, telephone numbers, and known or suspected identities of violators of the INA with ICE's Homeland Security Investigations or ICE's Enforcement and Removal Operations prior to taking any enforcement action. This deconfliction will, at a minimum include wants/warrants, criminal history, and a person's address, and vehicle check through TECS II or any successor system.

LEA participating personnel authorized pursuant to this MOA may be assigned and/or co-located with ICE as task force officers to assist ICE with criminal investigations.

## XII.    REPORTING REQUIREMENTS

The LEA will be responsible for tracking and maintaining accurate data and statistical information for their 287(g) program, including any specific tracking data requested by ICE. Upon ICE's request, such data and information shall be provided to ICE for comparison and verification with ICE's own data and statistical information, as well as for ICE's statistical reporting requirements and to assess the progress and success of the LEA's 287(g) program.

## XIII.    RELEASE OF INFORMATION TO THIRD PARTIES

The LEA may, at its discretion, communicate the substance of this agreement to the media and other parties expressing an interest in the law enforcement activities to be engaged in under this MOA. It is the practice of ICE to provide a copy of this MOA, only after it has been signed, to requesting media outlets; the LEA is authorized to do the same.

The LEA hereby agrees to coordinate with ICE prior to releasing any information relating to, or exchanged under, this MOA. For releases of information to the media, the LEA must coordinate in advance of release with the ICE Office of Public Affairs, which will consult with ICE Privacy Office for approval prior to any release. The points of contact for ICE and the LEA for this purpose are identified in Appendix C. For releases of information to all other parties, the LEA must coordinate in advance of release with the FOD or the FOD's representative.

Information obtained or developed as a result of this MOA, including any documents created by the LEA that contain information developed or obtained as a result of this MOA, is under the control of ICE and shall not be disclosed unless: 1) permitted by applicable laws, regulations, or executive orders; and 2) the LEA has coordinated in advance of release with (a) the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval, prior to any release to the media, or (b) an ICE officer prior to releases to all other parties. LEA questions regarding the applicability of this section to requests for release of information shall be directed to an ICE officer.

Revised 02/12/2025

Exhibit C

Nothing herein limits LEA's compliance with state public records laws regarding those records that are solely state records and not ICE records.

The points of contact for ICE and the LEA for the above purposes are identified in Appendix C.

## XIV.    LIABILITY AND RESPONSIBILITY

Except as otherwise noted in this MOA or allowed by federal law, and to the extent required by 8 U.S.C. § 1357(g)(7) and (8), the LEA will be responsible and bear the costs of participating LEA personnel regarding their property or personal expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will be treated as Federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. *See* 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE authorized by this MOA will be considered acting under color of federal authority for purposes of determining liability and immunity from suit under federal or state law. *See* 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as personal-capacity defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. *See* 28 C.F.R. § 50.15. Absent exceptional circumstances, such requests must be made in writing. LEA personnel who wish to submit a request for representation shall notify the local ICE Office of the Principal Legal Advisor (OPLA) field location at ADDRESS. OPLA, through its headquarters, will assist LEA personnel with the request for representation, including the appropriate forms and instructions. Unless OPLA concludes that representation clearly is unwarranted, it will forward the request for representation, any supporting documentation, and an advisory statement opining whether: 1) the requesting individual was acting within the scope of his/her authority under 8 U.S.C. § 1357(g) and this MOA; and, 2) such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Tort Litigation Section, Civil Division, Department of Justice (DOJ). Representation is granted at the discretion of DOJ; it is not an entitlement. *See* 28 C.F.R. § 50.15.

The LEA agrees to cooperate with any federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and documents. Failure to do so may result in the termination of this MOA. Failure of any participating LEA employee to cooperate in any federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The LEA agrees to cooperate with federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and documents necessary to complete such compliance review. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

Revised 02/12/2025

Exhibit C

As the activities of participating LEA personnel under this MOA derive from federal authority, the participating LEA personnel will comply with federal standards relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

The LEA and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. § 552a, DHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices regarding data collection and use of information under this MOA.

## XV.    COMPLAINT PROCEDURES

The complaint reporting and resolution procedure for allegations of misconduct by participating LEA personnel, regarding activities undertaken under the authority of this MOA, is included at Appendix B.

## XVI.    CIVIL RIGHTS STANDARDS

Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all applicable federal civil rights statutes and regulations.

Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA as needed.

## XVII.    MODIFICATION OF THIS MOA

Modifications of this MOA must be proposed in writing and approved by the signatories.

## XVIII.    EFFECTIVE DATE, SUSPENSION, AND TERMINATION OF THIS MOA

This MOA becomes effective upon signature of both parties and will remain in effect until either party terminates or suspends the MOA. Termination by the LEA shall be provided, in writing, to the local Field Office.

In instances where serious misconduct or violations of the terms of the MOA come to the attention of ICE, the ICE Director may, upon recommendation of the Executive Associate Director for Enforcement and Removal Operations, elect to immediately suspend the MOA pending investigation of the misconduct and/or violations.

Notice of the suspension will be provided to the LEA, and the notice will include, at a minimum, (1) an overview of the reason(s) that ICE is suspending the 287(g) agreement, (2) the length of the temporary suspension, and (3) how the LEA can provide ICE with information regarding the alleged misconduct and/or violations, as well as any corrective measures it has undertaken.

Revised 02/12/2025

Exhibit C

Supp. App.0814

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 10 of 273
Case 1:25-cv-22896-JEM    Document 24-3    Entered on FLSD Docket 07/03/2025    Page 9 of 14

ICE shall provide the LEA with a reasonable opportunity to respond to the alleged misconduct and/or violations and to take actions to implement corrective measures (e.g., replace the officer(s) who are the focus of the allegations). ICE will provide the LEA timely notice of a suspension being extended or vacated.

If the LEA is working to take corrective measures, ICE will generally not terminate an agreement. The termination of an agreement is generally reserved in instances involving problems that are unresolvable and detrimental to the 287(g) Program.

If ICE decides to move from suspension to termination, ICE will provide the LEA a 90-day notice in advance of the partnership being terminated. The notice will include, at a minimum: (1) An overview of the reason(s) that ICE seeks to terminate the 287(g) agreement; (2) All available data on the total number of aliens identified under the 287(g) agreement; and (3) Examples of egregious criminal aliens identified under the 287(g) agreement. ICE's decision to terminate a MOA will be published on ICE's website 90 days in advance of the MOA's termination.

This MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents it is fully authorized to enter into this MOA, accepts the terms, responsibilities, obligations, and limitations of this MOA, and agrees to be bound thereto to the fullest extent allowed by law.

**For the LEA:**                                              **For ICE:**

Date: _2 APRIL 2025_                              Date: _April 2, 2025_

Signature: _____                     Signature: _____

Major General John D. Haas

Title: _The Adjutant General_                     Title: _Acting Director_

Revised 02/12/2025

Exhibit C

**APPENDIX A**

**POINTS OF CONTACT**

The ICE and LEA points of contact for purposes of implementation of this MOA are:

For ICE:        Department of Homeland Security

Immigration and Customs Enforcement

Enforcement and Removal Operations

Assistant Director for Enforcement Washington DC

For the LEA:    The Adjutant General, MG John Haas, john.d.haas.mil@army.mil

State Aviation Officer, COL Brett Rhodenizer, brett.s.rhodenizer.mil@army.mil

General Counsel, Col Jeffrey Pozen, jeffrey.m.pozen.mil@army.mil

Revised 02/12/2025

Exhibit C

## APPENDIX B

## COMPLAINT PROCEDURE

This MOA is an agreement between ICE and the                              , hereinafter referred to as the "Law Enforcement Agency" (LEA), in which selected LEA personnel are authorized to perform immigration enforcement duties in specific situations under federal authority. As such, the training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for individuals' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

If any participating LEA personnel are the subject of a complaint or allegation involving the violation of the terms of this MOA the LEA shall, to the extent allowed by state law, make timely notification to ICE.

Further, if the LEA is aware of a complaint or allegation of any sort that may result in that individual receiving professional discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall remove the designated LEA personnel from the program, until such time that the LEA has adjudicated the allegation.

The LEA will handle complaints filed against LEA personnel who are not designated and certified pursuant to this MOA but are acting in immigration functions in violation of this MOA. Any such complaints regarding non-designated LEA personnel acting in immigration functions must be forwarded to the ICE Office of Professional Responsibility (OPR) at ICEOPRIntake@ice.dhs.gov.

### 1. Complaint Reporting Procedures

Complaint reporting procedures shall be disseminated as appropriate by the LEA within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that individuals are aware of the availability of such procedures. Complaints will be accepted from any source (e.g., ICE, LEA, participating LEA personnel, inmates, and the public).

Complaints may be reported to federal authorities as follows:

  A.    Telephonically to the ICE OPR at the toll-free number 1-833-4ICE-OPR; or

  B.    Via email at ICEOPRIntake@ice.dhs.gov.

Complaints may also be referred to and accepted by any of the following LEA entities:

  A.    The LEA Internal Affairs Division; or
  B.    The supervisor of any participating LEA personnel.

Revised 02/12/2025

Exhibit C

## 2. Review of Complaints

All complaints (written or oral) reported to the LEA directly, which involve activities connected to immigration enforcement activities authorized under this MOA, will be reported to the ICE OPR. The ICE OPR will verify participating personnel status under the MOA with the assistance of ICE. Complaints received by any ICE entity will be reported directly to the ICE OPR as per existing ICE policies and procedures.

In all instances, the ICE OPR, as appropriate, will make an initial determination regarding DHS investigative jurisdiction and refer the complaint to the appropriate office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to the ICE OPR will be shared with the LEA's Internal Affairs Division when the complaint involves LEA personnel. Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

## 3. Complaint Resolution Procedures

Upon receipt of any complaint the ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting requirements. As stated above the ICE OPR will adhere to existing ICE reporting requirements as they relate to the OHS OIG and/or another legally required entity. Complaints will be resolved using the existing procedures, supplemented as follows:

A. Referral of Complaints to LEA Internal Affairs Division.

The ICE OPR will refer complaints, as appropriate, involving LEA personnel to the LEA's Internal Affairs Division for resolution. The Internal Affairs Division Commander will inform ICE OPR of the disposition and resolution of any complaints referred by ICE OPR.

B. Interim Action Pending Complaint Resolution

Whenever any participating LEA personnel are under investigation and subject to interrogation by the LEA for any reason that could lead to disciplinary action, demotion, or dismissal, the policy requirements of the LEA shall he honored. If appropriate, an individual may he removed from participation in the activities covered under the MOA pending resolution of an inquiry.

C. Time Parameters for Resolution of Complaints

It is expected that any complaint received will be resolved within 90 days. However, this will depend upon the nature and complexity of the substance of the complaint itself.

Revised 02/12/2025

Exhibit C

D. Notification of Resolution of a Complaint

ICE OPR will coordinate with the LEA's Internal Affairs Division to ensure notification as appropriate to the subject(s) of a complaint regarding the resolution of the complaint.

Revised 02/12/2025

Exhibit C

**APPENDIX C**

**PUBLIC INFORMATION POINTS OF CONTACT**

Pursuant to Section XIII of this MOA, the signatories agree to coordinate any release of information to the media regarding actions taken under this MOA. The points of contact for coordinating such activities are:

**For the LEA:**

Executive Officer, COL (Ret) Allison Reinwald, allison.reinwald2.nfg@army.mil

Public Affairs Officer, Lt Col Caitlin Brown, mary.c.brown26.mil@army.mil

**For ICE:**

Department of Homeland Security
Immigration and Customs Enforcement
Office of Public Affairs

Revised 02/12/2025

Exhibit C

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity
as Secretary of the UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida;

        Defendants.

## DECLARATION OF BETTY OSCEOLA

1. My name is Betty Osceola and I make this declaration based on my personal
knowledge. If called as a witness, I could and would competently testify to the facts set forth
herein.

2. I am a member of the Miccosukee Tribe of Indians of Florida. I grew up in the
Everglades not far from the Dade-Collier Training and Transition Airport (the "TNT Site"), and
continue to live in the area.

3. The Big Cypress National Preserve is known for the beauty of its dark night skies.
When I learned of the proposal to transform the TNT Site into a mass detention center, among
my concerns, with the impact of light pollution from the facility. The TNT site historically was
dark at night.

4. Attached hereto as Exhibit 1 is a true and accurate photograph I took on
7/2/25 using my iphone13 camera. I was physically present when the photograph
was taken and it fairly and accurately depicts what I saw at the time. I have not altered or edited
the image in any way.

5. The photograph was taken at near MM 30.5 approximately 15 miles from the
TNT Site and depicts the light pollution emanating from the Site. The distance between where
I was when I took the photograph and the TNT Site is depicted below:



I declare under penalty of perjury that the foregoing is true and correct and was executed July 3, 2025, in Miami-Dade County, Florida.

Betty Osceola

Exhibit D

Supp. App.0822



Exhibit D

Supp. App.0823

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 19 of 273
Case 1:25-cv-22896-JEM   Document 24-5   Entered on FLSD Docket 07/03/2025   Page 1 of 13

<u>**DECLARATION OF LAURA REYNOLDS AND RA SCHOOLEY**</u>

1.      My name is Laura Reyolds, and I make this declaration on personal knowledge.

2.      My name is Ra Schooley, and I make this declaration on personal knowledge

3.      Attached hereto as Exhibit 1 and is a true and accurate video of the Dade-Collier Training and Transition Airport ("TNT Site") as it appeared in a timeline series from June 21, 2025. These screenshots and video show the site prior to the start of this project.  The video was taken by Ra Schooley using a GoPro Camera.  We were the only ones handling the footage and hereby confirm that it has not been altered and it accurately represents the condition of the TNT Site on June 21, 2025.

4.      Attached hereto as Exhibit 2 and are true and accurate photographs of the Dade-Collier Training and Transition Airport ("TNT Site") as it appeared on June 26, 2025.  The photographs were taken using an iPhone by Colton Randell a pilot who we asked to take photographs, and we hereby confirm that we did not alter the images and that the photographs accurately represent the condition of the TNT Site on June 26, 2025.

5.      Attached hereto is Exhibit 3 are true and accurate photographs of the Dade-Collier Training and Transition Airport ("TNT Site") as it appeared on June 29, 2025. The Photographs were taken using a Cannon 40 D Digital Camera by Ra Schooley.  We were the only one handling the footage and hereby confirm they were not altered, and they accurately represent the condition of the TNT Site on June 29, 2025.

6.      Attached hereto is Exhibit 4 are true and accurate photographs of the Dade Collier Training and Transition Airport ("TNT Site") as it appeared on July 3,2025.  The Photographs were taken by Laura Reynolds using a Cannon 40D Digital Camera. We were the only one handling the

Exhibit E

Supp. App.0824

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2016    Page: 20 of 273
Case 1:25-cv-22896-JEM    Document 24-5    Entered on FLSD Docket 07/03/2025    Page 2 of 13

footage and hereby confirm they were not altered, and they accurately represent the condition of the TNT Site on July 3, 2025.

    7.    Comparison of the photos demonstrates significant filling and paving of areas that had been unpaved open areas prior to the start of this project. In our estimation approximately 13 acres or 600,000 square feet of filling and paving continues to occur as of July 3, 2025 at the TNT Site.  There is also expansion and paving of the runway light access road, and impacts to the swale areas along existing runway and pad areas, all of which can be clearly seen by the photographs attached in the exhibits below.

    I, Laura Reynolds, declare under penalty of perjury under the laws of the United States of America that I requested Mr. Schooley take the photographs that are attached to this Declaration, and he did so in response to my request.  Executed on July 3, 2025.

Verified by pdfFiller
07/03/2025

*Laura Reynolds*
Laura Reynolds

    I, Ra Schooley declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I have no opinion on this matter and volunteered to help Ms. Reynolds take ariel photos of the area. Executed on July 3, 2025.

Verified by pdfFiller
07/03/2025

*Ra Schooley*
Ra Schooley

Exhibit E

Supp. App.0825

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 21 of 273
Case 1:25-cv-22896-JEM   Document 24-5   Entered on FLSD Docket 07/03/2025   Page 3 of 13

**EXHIBIT 1:** Pre-Project Start





**Fig 1**- Both Images are screenshots from a video linked below of the approach end of runway 09 looking East, notice condition of clearing to the right of runway on June 21, 2025.  The area depicted with red circle.  Video Attached.

Exhibit E

Supp. App.0826

**EXHIBIT 2:** Project Start



**Fig 2**-Runway Looking West, notice fill pile at end of Runway 27, or the approach end of 09, condition on June 26, 2025.  The area depicted with red circle.

Exhibit E

**EXHIBIT 3:** Impacted Areas-Flight 1



**Fig 3**-Areas off existing pad, showing impacted greenspace along all connecting roadways. These

areas depicted with red circles.

Exhibit E

Supp. App. 0828



**Fig 4-**Area off Runway showing impacted swales from FEMA trucks and generators.  These areas depicted with red circles.

Exhibit E

Supp. App. 0829

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2016    Page: 25 of 273
Case 1:25-cv-22896-JEM    Document 24-5    Entered on FLSD Docket 07/03/2025    Page 7 of 13



**Fig 5-** Close up of impacted Swale off Runway. The area depicted with red circle.

Exhibit E

Supp. App. 0830

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2016    Page: 26 of 273
Case 1:25-cv-22896-JEM    Document 24-5    Entered on FLSD Docket 07/03/2025    Page 8 of 13



**Fig 6-** New Paved Area shows impact on June 29th, as compared to image from June 21st in Fig 1, Exhibit 1.  In addition access road to service runway lights impacted by large fill trucks.  These areas depicted with red circles.

Exhibit E

Supp. App.0831



**Fig 7-** Close up of newly paved area, can see impact from trucks to swale area.  Compare this image to Figure 1, which shows the original condition of the area on June 21st, 2025.  This image was taken on June 29th, 2025.

Exhibit E

Supp. App. 0832

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 28 of 273
Case 1:25-cv-22896-JEM    Document 24-5    Entered on FLSD Docket 07/03/2025    Page 10 of 13

**EXHIBIT 4:** Impacted Areas-Continued





**Fig 8-** Continued expansion of newly paved pad from 2 different angles, compare these images to

Figure 1, which shows the original condition and Fig 7, to see continued expansion.  This image

was taken on July 3, 2025.  The area depicted with red circle.

Exhibit E

Supp. App. 0833

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2046   Page: 29 of 273
Case 1:25-cv-22896-JEM   Document 24-5   Entered on FLSD Docket 07/03/2025   Page 11 of 13



**Fig 9-** Newly paved Road and adding a second road at the west end of runway 09. This image was taken on July 3, 2025.   The area depicted with a red circle.

Exhibit E

Supp. App.0834



**Fig 10-** Start of newly paved road, that appears in Fig 9.  This image was taken on July 3, 2025.

The area depicted with red circle.

Exhibit E

Supp. App.0835

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2016    Page: 31 of 273
Case 1:25-cv-22896-JEM    Document 24-5    Entered on FLSD Docket 07/03/2025    Page 13 of 13



**Fig 11**-Swale Impacts July 3, compare to Fig 2, June 21, 2025 to see the area before impacts, area in red shows new impacts to swale.

Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

           Plaintiffs,

vs.

KRISTI NOEM, in her official capacity
as Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; et
al.;

           Defendants.

## DECLARATION OF RALPH ARWOOD

1.    My name is Ralph Arwood and I make this declaration based on my personal

knowledge. If called as a witness, I could and would competently testify to the facts set

forth herein.

2.    I am a private pilot. On Saturday, July 5, 2025, I flew over the Dade-Collier

Training and Transition Airport (the "TNT Site"), which goes by the International Civil

Aviation Organization code KTNT.

3.    Using a GoPro HERO 13 Black camera I took several photographs of the TNT

Site.

1

Exhibit 1

4.     Attached to this declaration is report by Dr. Christopher McVoy reproducing

eighteen photographs.  The photographs in the report were taken by me and truly and

accurately depict what they purport to show, that is, various angles of the TNT Site as it

appeared on July 5, 2025.  The photographs have not been altered or edited in any way.

I declare under penalty of perjury that the foregoing is true and correct and was executed

on July 7, 2025, in Collier County, Florida.

Ralph Arwood

2

Exhibit 1

# Oblique Aerial Photos of Ongoing Construction at Dade Collier T&T Airport

Photographed 5 July 2025

Photos courtesy of Ralph Arwood

Text by Christopher McVoy

Exhibit 1

**Newly Paved (Asphalted) Area**

Exhibit 1  2

Supp. App.0840



Photo 23,
Looking S.

Dark
rectangle
is new con-
struction.

Exhibit 1 3

Detail of Photo 23.

Dark rectangle is new construction (compare with June 2025 Google Earth satellite imagery). Dark is almost certainly asphalt. Light sandy brown area to east and north of asphalt is newly scrapped area. Red alignment lines were used to estimate extent of assumed paved area (next slide).

Exhibit 1  4



Untilted, unrotated Google Earth image used to estimate area of the paved region shown in Photo 23.  Alignment lines shown in previous slide were used to locate eastern and northern boundaries; vegetation rows to estimate location of southern and western boundaries.  This newly paved area estimated to be 11+ acres.

Exhibit 1

5



Photo 11, Looking W.

Dark blue-ish rectangle on L side is the newly asphalted area.

Exhibit 1

6



Detail of Photo 11.

Dark, blue-ish rectangle is new construction (can
confirm by comparison with June 2025 Google
Earth satellite imagery), almost certainly asphalt.
Light sandy brown appears to be newly scrapped
area.

Exhibit 1  7

## Detainee Area
## (on existing tarmac)

Exhibit 1   8

Supp. App.0846



Photo 31, Looking E.

Detention Area (Block of 7 white tents in LRH corner).

Exhibit 1 9



Detail of Photo 31.

Detention Area on previously existing tarmac.

According to Incident Commander Dr. Frankie Lumm, the four long tents each hold 250 detainees for a total of 1,000.

Total site capacity as of July 5, 2025 is 1,000 detainees, 2,000 less than the stated goal of 3,000.

Exhibit 1 <sub>10</sub>

Supp. App.0848



Photo 18, Looking N.

Detention Area and portion of employee housing (trailers).

Exhibit 1  11

Detail of Pho

Detention A
previously e
tarmac.

The light bro
area S and E
tarmac is ne
leveled/scra

Exhibit 1    12

## Employee Housing & Services Area
## (on existing taxiway tarmac)

Exhibit 1 13

Photo 35, Looking E.

The many white structures on taxiway (N strip) are all employee housing and/or services.

Exhibit 1 14



Detail of Photo 35.

The many white structures on taxiway (N strip) are all trailers housing employees and/or services.

The right strip is the main runway, which the Incident Commander indicated was being kept unimpeded for use as runway.

Exhibit 1 15



Photo 3, Looking W.

Main runway (left) and employee housing (right).

Exhibit 1   16



Detail of Photo 3, Looking W.

Employee housing (numerous white blocks) on previously existing taxiway.

Exhibit 1 17

## Several Areas of New Road Construction/Asphalting

Exhibit 1 18

Supp. App. 0856

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 52 of 273

Case 1:25-cv-22896-JEM    Document 26-1    Entered on FLSD Docket 07/07/2025    Page 21 of 25.



Detail of Photo 3, Looking W.  New road, turnaround and asphalting of same at east end of taxiway.

<span style="color:red">Exhibit 1</span> 19



Detail of Photo 11, Looking W.  Two areas of new road and asphalting.

Exhibit 1 20



Detail of Photo 18, Looking N.  White diagonal line on LHS is new road, not yet asphalted.

Exhibit 1 21

Supp. App.0859

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 35 of 273
Case 1:25-cv-22896-JEM    Document 26-1    Entered on FLSD Docket 07/07/2025    Page 24 of 25



Detail of Photo 22, looking S. Western portions and "Y" split of newly paved entrance road from main N-S entrance road.

Exhibit 1 22

Supp. App.0860

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Panel 36 of 273
Case 1:25-cv-22896-JEM    Document 26-1    Entered on FLSD Docket 07/07/2025    Page 25 of 25



Detail of Photo 23, looking S. Western portion of newly paved entrance road from main N-S entrance road.

Exhibit 1 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-22896-JEM

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

        Plaintiffs,

vs.

KRISTI NOEM, in her official capacity
as Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; et
al.;

        Defendants.

## DECLARATION OF CHRISTOPHER W. McVOY, Ph.D.

    1.    My name is Christopher W. McVoy, Ph.D. and I make this declaration based on my personal knowledge. If called as a witness, I could and would competently testify to the facts set forth herein.

    2.    I have visited the Big Cypress National Preserve on numerous occasions, and am familiar with the area. On June 22, 2025, I specifically visited the entrance to the Dade-Collier Training and Transition Airport (the "TNT Site"). I returned to the TNT Site on June 28, 2025 at which time construction to convert the TNT Site into a mass detention center was under way. I requested and was granted a tour of the site in the late afternoon of June 28, 2025. While I did not take photographs, seeing the construction completed to that time allowed unequivocal recognition of features seen in the oblique aerial photographs taken by Ralph Arwood on July 5, 2025.

1

Exhibit 1

3.    I am an expert in the environmental and hydrological aspects of Everglades restoration, with nearly 30 years of professional experience. I trained as a soil physicist and ecologist and I am the prime author of the book, *Landscapes and Hydrology of the Pre-Drainage Everglades* (McVoy et al. 2011), which is an authoritative treatment of the Everglades prior to drainage and development.

4.    I reviewed numerous aerial photographs taken by Mr. Arwood on July 5, 2025.

5.    Attached hereto as Exhibit 1 is a report summarizing my observations based on my review of the aerial photographs taken by Mr. Arwood.

6.    Among other things, my report concludes that approximately 11+ acres of new impervious pavement pad has been laid on the TNT Site in in an area that was previously undeveloped. It is unclear from these photographs what arrangements have been made for drainage and stormwater management from the fresh impervious pavement pad. The 11+ acre newly filled paved pad is depicted on pages 3-7 of the attached report.

7.    In addition, new roads have been constructed on the TNT Site, some of which have recently been paved and others appear to be awaiting the application of asphalt. These new roads are depicted on pages 19-23 of the attached report.

I declare under penalty of perjury that the foregoing is true and correct and was executed on July 7, 2025, in Miami-Dade County, Florida.

Christopher W. McVoy, Ph.D.

2

Exhibit 1

# Oblique Aerial Photos of Ongoing Construction at Dade Collier T&T Airport

Photographed 5 July 2025

Photos courtesy of Ralph Arwood

Text by Christopher McVoy

Exhibit 1

## Newly Paved (Asphalted) Area

Exhibit 1  2



Photo 23, Looking S.

Dark rectangle is new con-struction.

Exhibit 1

3

Supp. App.0866

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 62 of 273
Case 1:25-cv-22896-JEM    Document 27-1    Entered on FLSD Docket 07/08/2025    Page 6 of 25



Detail of Photo 23.

Dark rectangle is new construction (compare with June 2025 Google Earth
satellite imagery). Dark is almost certainly asphalt. Light sandy brown area to
east and north of asphalt is newly scrapped area. Red alignment lines were
used to estimate extent of assumed paved area (next slide).

Exhibit 1   4



Ruler

| Line | Path | Polygon | Circle | 3D path | |
|------|------|---------|--------|---------|--|

Measure the distance or area of a geometric shap

| Perimeter: | 3,030.53 | Feet |
| Area: | 11.20 | Acres |

☑ Mouse Navigation    Sav

Untilted, unrotated Google Earth image used to estimate area of the paved region shown in Photo 23. Alignment lines shown in previous slide were used to locate eastern and northern boundaries; vegetation rows to estimate location of southern and western boundaries. This newly paved area estimated to be 11+ acres.

Exhibit 1

5



Photo 11, Looking W.

Dark blue-ish rectangle on L side is the newly asphalted area.

Exhibit 1

6

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 65 of 273

Case 1:25-cv-22896-JEM    Document 27-1    Entered on FLSD Docket 07/08/2025    Page 9 of 25



Detail of Photo 11.

Dark, blue-ish rectangle is new construction (can confirm by comparison with June 2025 Google Earth satellite imagery), almost certainly asphalt. Light sandy brown appears to be newly scrapped area.

Exhibit 1   7

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2026   Page: 66 of 273   Supp. App.0870

Case 1:25-cv-22896-JEM   Document 27-1   Entered on FLSD Docket 07/08/2025   Page 10 of 25

# Detainee Area
# (on existing tarmac)

Exhibit 1   8



Photo 31, Looking E.

Detention Area (Block of 7 white tents in LRH corner).

© Ralph Arwood PHOTOGRAPHY

Exhibit 1    9



Detail of Photo 31.

Detention Area on previously existing tarmac.

According to Incident Commander Dr. Frankie Lumm, the four long tents each hold 250 detainees for a total of 1,000.

Total site capacity as of July 5, 2025 is 1,000 detainees, 2,000 less than the stated goal of 3,000.

Exhibit 1 10

Supp. App.0873

USCA11 Case: 25-12873 Document: 92-4 Date Filed: 01/08/2026 Page: 69 of 273
Case 1:25-cv-22896-JEM Document 27-1 Entered on FLSD Docket 07/08/2025 Page 13 of 25

Photo 18, Looking N.

Detention Area and portion of employee housing (trailers).



Exhibit 1

Detail of Ph

Detention A
previously e
tarmac.

The light bro
area S and E
tarmac is ne
leveled/scra

Exhibit 1  12

**Employee Housing & Services Area
(on existing taxiway tarmac)**

Exhibit 1 13



Photo 35, Looking E.

The many white structures on taxiway (N strip) are all employee housing and/or services.

Exhibit 1 14



Detail of Photo 35.

The many white structures on taxiway (N strip) are all trailers housing employees and/or services.

The right strip is the main runway, which the Incident Commander indicated was being kept unimpeded for use as runway.

Exhibit 1 15

Supp. App.0878



Photo 3, Looking W.

Main runway (left) and employee housing (right).

Exhibit 1 16



Detail of Photo 3, Looking W.

Employee housing (numerous white blocks) on previously existing taxiway.

Exhibit 1 17

## Several Areas of New Road Construction/Asphalting

Exhibit 1 18

Case 1:25-cv-22896-JEM    Document 27-1    Entered on FLSD Docket 07/08/2025    Page 21 of 25

Supp. App.0881



Detail of Photo 3, Looking W.  New road, turnaround and asphalting of same at east end of taxiway.

Exhibit 1 19

Supp. App.0882



Detail of Photo 11, Looking W.  Two areas of new road and asphalting.

Exhibit 1 <sub>20</sub>



Detail of Photo 18, Looking N.  White diagonal line on LHS is new road, not yet asphalted.

Exhibit 1 21



Detail of Photo 22, looking S. Western portions and "Y" split of newly paved entrance road from main N-S entrance road.

Exhibit 1 22

Supp. App.0885



Detail of Photo 23, looking S. Western portion of newly paved entrance road from main N-S entrance road.

Exhibit 1 23

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 82 of 273
Supp. App. 0886

Case 1:25-cv-22896-KMW   Document 49-1   Entered on FLSD Docket 07/21/2025   Page 1 of 20

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-22896-KMW**

---

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

       Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

       Defendants.

and

THE MICCOSUKEE TRIBE OF INDIANS,

       Proposed Intervenors.

---

## DECLARATION OF CHRISTOPHER W. McVOY, Ph.D.

    1.    My name is Christopher W. McVoy, Ph.D, and I make this declaration based on

my personal knowledge. If called as a witness, I could and would competently testify to the

facts set forth herein.

1

Exhibit A

2.    I am an expert in the environmental and hydrological aspects of Everglades restoration, with nearly 30 years of professional experience. I trained as a soil physicist and ecologist and I am the prime author of the book, *Landscapes and Hydrology of the Pre-Drainage Everglades* (McVoy et al. 2011), which is an authoritative treatment of the Everglades prior to drainage and development.

3.    I have visited the Big Cypress National Preserve, and I am familiar with the area. Since June 22, 2025, I have visited the entrance to the Dade-Collier Training and Transition Airport (the "TNT Site") on numerous occasions. I requested and was granted a tour of the site in the late afternoon of June 28, 2025. While I did not take photographs during this tour, seeing the construction completed to that time allowed unequivocal recognition of features seen in historic satellite imagery and oblique aerial photographs of the Site.

4.    I have analyzed many oblique aerial and satellite photographs of the TNT Site, including numerous photos taken over the past few weeks by Mr. Ralph Arwood.  I have analyzed recent aerial photography of the Site and historic satellite imagery and other photographs in order to evaluate the extent of new paving at the Site since June 22, 2025.

5.    Based on my comparison of historical photographs of the TNT Site, against recent aerial photography, approximately 20+ acres of new pavement has been applied at the Site. This new pavement consists of an approximately 11-acre parking area, an additional approximately 7-acre tent pad, and new roads and smaller newly paved areas.

6.    I have seen statements from the Deputy Director of Communications for the Florida Division of Emergency Management to the effect that all new pavement was applied over "a pre-existing cement pad [as to it] a thin layer of dirt and grass had settled." I could find

2

Exhibit A

no evidence to support this statement. Rather, in my expert opinion, new pavement has been applied in areas that had been previously cleared and mowed.

      7.    Attached hereto as Exhibit 1 is a report summarizing my observations based on my review of the historic satellite imagery and recent aerial photographs taken by Mr. Arwood.

     I declare under penalty of perjury that the foregoing is true and correct and was executed on July 21, 2025, in Miami-Dade County, Florida.

                                           Christoper W. McVoy, Ph.D.

3

Exhibit A

Supp. App. 0889

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 83 of 273
Case 1:25-cv-22896-KMW    Document 49-1    Entered on FLSD Docket 07/21/2025    Page 4 of 20

# Analysis of Possible Areas of New Pavement at the Dade Collier Training & Transition Airport

Dr. Christopher McVoy

July 20, 2025

This report analyzes recent aerial photography and historical satellite imagery to address the following three questions:

1) Has new [asphalt] paving occurred as part of construction of a mass detention center, informally referred to as "Alligator Alcatraz," at 54575 Tamiami Trail E, Ochopee, FL 34141, site of the Dade Collier Training & Transition Airport?
2) If so, where, and approximately how many acres?
3) If so, what underlies the new paving – (a) the original geology and soils native to the Big Cypress National Preserve; or (b) cement pads dating to the original late 1960's construction of the TNT airport, then known as the Jetport; or (c) something else?

## Executive Summary

Three dates of aerial photography from July 2025, along with recent and historical satellite imagery, were examined for evidence of new asphalt paving as part of the construction of a new mass detention facility on the site of the Dade Collier Training & Transition Airport. There is clear indication that in one area approximately 11 acres of new pavement have been identified, and in another area approximately 7 acres of new pavement have been identified. Also a number of newly paved roadways and smaller newly paved areas have been identified. The total amount of new pavement is approximately 20 acres.

The possibility that the areas of new pavement had been placed on top of pre-existing areas of cement pad was also investigated. No indication of pre-existing cement pads was found. Instead, it seemed most likely that the new paving was placed on top of the original soil substrate. This soil might have been partially leveled in the late 1960's, but sufficient substrate depth was present to grow substantial vegetation. This conclusion was supported by a linear E-W pattern, suggestive of vegetation mowing, that was visible in all historical photos.

<span style="color:red">Exhibit 1</span>

Supp. App. 0890



**Fig. 1.** West end of main runway of Dade Collier Training & Transition Airport, looking west on November 2, 2005. Note surface water present on the many wetlands present within the airport. Source: Ralph Arwood Photography, photo KTNT 11-02-2005 51684.



**Fig. 2.** Aerial view of Dade Collier Training & Transition Airport, looking east on July 18, 2025. Foreground is Big Cypress National Preserve, which surrounds the airport. The bright spot in foreground center is reflection of sun from surface water, present at this time throughout the area. Minute 0:10 of Video KTNT 07-18-2025 01, courtesy Ralph Arwood Photography.

Exhibit 1

Supp. App 0891



**Fig. 3.** Satellite image of Dade Collier Training & Transition Airport and surrounding portion of Big Cypress National Preserve. Note texture of native wetland landscape, both within and surrounding the airport. Source: Google Earth, Feb 21, 2025 image.



**Fig. 4.** Locator diagram for areas of asserted new paving. The two large areas, Area 1 (11+ acres) and Area 2 (7+ acres) are analyzed separately; Areas 3-7 are mostly newly paved roadways and are noted but not quantified.

Exhibit 1

Supp. App. 0892

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 88 of 273
Case 1:25-cv-22896-KMW    Document 49-1    Entered on FLSD Docket 07/21/2025    Page 7 of 20

### Analysis of Area 1

Area 1, here referred to as the "Southwest Parking Area," is the closest area to the entrance on Tamiami Trail (U.S. 41), being reached by the east-west road ("4" on the locator diagram in Fig. 4) where paving was already in progress on June 28, 2025. Its location near the west end of the runway as well as shapes of surrounding features make it easy to locate unambiguously. Fig. 5 shows the progression from a brown colored open area to paved area, to paved area with markings, and finally to paved area with many vehicles parked in the markings.



**Fig. 5.** Newly paved east-west road ("4" on the locator diagram in Fig. 4) is in center of this eastward looking photo and leads to Area 1. Source: Minute 0:09 of Video KTNT 07-11-2025 03, courtesy Ralph Arwood Photography.

Exhibit 1

Supp. App. 0893

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 07/08/2026   Page: 89 of 273
Case 1:25-cv-22896-KMW   Document 49-1   Entered on FLSD Docket 07/21/2025   Page 8 of 20





Feb 21, 2025          July 05, 2025




July 11, 2025          July 18, 2025

**Fig. 6.** Area 1, "Southwest Parking Area." Time sequence of area's appearance. Sources: <u>Feb 21</u>: Google Earth; <u>Jul 05</u>: Video KTNT 07-05-2025 03, Minute 3:40; <u>Jul 11</u>: Video KTNT 07-11-2025 03, Minute 0:39; <u>Jul 18</u>: Photo 07-18-2025 KTNT 06  25,51.721N  80,54.869W (portion). All July imagery courtesy Ralph Arwood Photography.

Exhibit 1

Supp. App. 0894

The spatial extent of Area 1, the "Southwest Parking Area," was estimated by finding landmarks corresponding to the pavement edges seen in the aerial photographs, marking the same edges on Google Earth, then using the Google Earth "Ruler" tool.



**Fig. 7.** Based on the time sequence seen in Fig. 6, the dark rectangle is assumed to newly placed asphalt. Light sandy brown area to east and north of asphalt is newly scrapped (or filled) area. Red alignment lines were used to estimate extent of assumed paved area. Photo source: 07-05-2025 KTNT 23  25,51.796N  80,54.529W (portion), courtesy Ralph Arwood Photography.

Exhibit 1

Supp. App. 0895

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 07/08/2026    Page: 91 of 273
Case 1:25-cv-22896-KMW    Document 49-1    Entered on FLSD Docket 07/21/2025    Page 10 of 20



**Fig. 8.** Untilted, unrotated Google Earth image used to estimate area of the paved region shown in Fig. 7. Alignment lines shown in Fig. 7 were used to locate eastern and northern boundaries; vegetation rows to estimate location of southern and western boundaries. This newly paved area is estimated to be 11+ acres.

Exhibit 1

Supp. App. 0896

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 07/08/2026    Page: 92 of 273
Case 1:25-cv-22896-KMW   Document 49-1   Entered on FLSD Docket 07/21/2025   Page 11 of 20

**Analysis of Area 2**

Area 2, the "Tent Expansion Area" is an expansion of a large rectangular area that was paved in the late 1960s as part of the original Jetport.



**Fig. 9.** Area 2, the "Tent Expansion Area." Source: Photo 07-11-2025 KTNT 19 25,51.904N 80,53.699W (portion). Courtesy Ralph Arwood Photography.

Exhibit 1

Supp. App. 0897




Feb 21, 2025                          July 05, 2025




July 11, 2025                         July 18, 2025

**Fig. 10.** Area 2, "Tent Expansion Area." Time sequence of area's appearance. Sources: <u>Feb 21</u>: Google Earth; <u>Jul 05</u>: Photo 07-05-2025 KTNT 08 25,51.938N 80,53.692W (portion); <u>Jul 11</u>: Photo 07-11-2025 KTNT 36 25,52.013N 80,53.704W (portion); <u>Jul 18</u>: Photo 07-18-2025 KTNT 26 25,52.018N 80,53.752W (portion). All July imagery courtesy Ralph Arwood Photography.

Exhibit 1

Supp. App. 0898

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 94 of 273
Case 1:25-cv-22896-KMW    Document 49-1    Entered on FLSD Docket 07/21/2025    Page 13 of 20

The spatial extent of Area 2, the "Tent Expansion Area," was estimated by finding landmarks corresponding to the pavement edges seen in the aerial photographs, marking the same edges on Google Earth, then using the Google Earth "Ruler" tool.



**Fig. 11.** Untilted, unrotated Google Earth image used to estimate extent of paved Area 2. This newly paved area is estimated to be 7+ acres.

Exhibit 1

Supp. App. 0899

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/06/2026   Page: 95 of 273
Case 1:25-cv-22896-KMW   Document 49-1   Entered on FLSD Docket 07/21/2025   Page 14 of 20

**Smaller Paved Areas**

(Areas 3-7)



**Fig. 12.** Locator diagram for Areas 3-7, which are mostly newly paved roadways and are noted here but were not not quantified.





| Area 3 | Area 4 (west) | Area 4 (east) |

Exhibit 1

Supp. App 0900



Area 5                     Area 6                     Area 7

**Fig. 13.** Smaller areas of new paving.

Exhibit 1

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 97 of 273
Case 1:25-cv-22896-KMW   Document 49-1   Entered on FLSD Docket 07/21/2025   Page 16 of 20

Supp. App. 0901

**Assertion of Pre-Existing Cement Pad Underlying Newly Asphalted Area(s)**

It has been asserted that the paving of Area 1 would have minimal environmental impact because the asphalt was placed on top of a pre-existing cement pad that had been constructed in the late 1960's as part of the original Jetport. Additionally, it was implied that the cement pad was not currently visible due to accumulation of soil and vegetation on top of the reputed cement pad. For example, Stephanie Hartman, Deputy Director of Communications at the Florida Division of Emergency Management asserted in a July 7, 2025 email that, "The area referenced consisted of a preexisting cement pad that was installed more than 50 years ago. Over time, a thin layer of dirt and grass had settled on top."

I can find no evidence to support the statement by Ms. Stephanie Hartman indicating a pre-existing cement pad. Instead, all the historical imagery I found suggests that the area was cleared of vegetation, and perhaps also leveled, probably at the same time that the runway was constructed (ca. 1968-70). Patterns in the historical imagery suggest systematic traversing of the area by equipment, likely by large mowers or brush hogs. A "thin layer of dirt and grass" on top of a cement pad would be unlikely to need mowing and would be very unlikely to produce the patterns seen. Additionally, the high rainfall intensity of South Florida thunderstorms would likely prevent the accumulation of anything more than a few millimeters of unconsolidated sediments on a cement pad. A layer that thin would not support sufficient growth to require mowing.

Examination of multiple years of historical imagery suggests that the newly asphalted areas (Areas 1 and 2) most likely were areas of original soil, cleared of brush and trees around 1970, and subsequently kept to low vegetation by periodic mowing. While there might well have been an original intent to cover with a cement pad, there is no indication that such a pad was ever installed.

The following figures identify the location in question, show multiple years of historical satellite images, and an oblique aerial photograph from 1970, taken during the time of initial construction.

Similar mowing patterns are visible for Area 2, the "Tent Expansion Area" (location: Fig. 4) in historical satellite imagery. Figs. 18 and 19 show two examples.

Exhibit 1

Supp. App. 0902

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 98 of 273
Case 1:25-cv-22896-KMW    Document 49-1    Entered on FLSD Docket 07/21/2025    Page 17 of 20



**Fig. 14.** Area 1, the "Southwest Parking Area." Satellite image from Feb 21, 2025 (prior to any detention center construction). Note the N-S and E-W patterning, which is likely from equipment such as mowers or brush hogs criss-crossing this area. Vegetation that needed mowing would not grow on top of cement. The red oval identifies an actual, very small cement pad.



**Fig. 15.** Area 1, the "Southwest Parking Area," seen in an oblique aerial photo, looking WSW. The red oval indicates an actual, very small cement pad, seen also in the satellite imagery (Fig. 14).

Exhibit 1

Supp. App. 0903



**Fig. 16.** Area 1, the "Southwest Parking Area." Satellite image from 2014. Note the E-W patterning, which is likely from mowing equipment. Vegetation that needed mowing would not grow on top of cement.



**Fig. 16.** Area 1, the "Southwest Parking Area." Satellite image from 2009. Note the E-W patterning, which is likely from mowing equipment. Vegetation that needed mowing would not grow on top of cement.

Exhibit 1

Supp. App. 0904



**Fig. 16.** Area 1, the "Southwest Parking Area." Satellite image from 1995. Even in this low resolution image, an indication of the E-W patterning, likely from mowing, is apparent.



**Fig. 17.** "1970 - aerial view of the Dade County Training & Transition Airport under construction." Red oval is indicates the location of Area 1. There is no indication that Area 1 was a cement pad in 1970, the year construction was halted. Source: https://pbase.com/donboyd/image/165484225

Exhibit 1

Supp. App. 0905

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 07/08/2026    Page: 101 of 273
Case 1:25-cv-22896-KMW    Document 49-1    Entered on FLSD Docket 07/21/2025    Page 20 of 20



**Fig. 18.** Area 2, the "Tent Expansion Area." Satellite image from 2024. Note the mostly E-W patterning, which is likely from mowing equipment. Source: Google Earth.



**Fig. 19.** Area 2, the "Tent Expansion Area." Satellite image from 2010. Mowing pattern is particularly visible in this year. Source: Google Earth.

Exhibit 1

## DECLARATION OF DR. ANNA V. ESKAMANI

1.    My name is Dr. Anna V. Eskamani, and I make this declaration on personal knowledge.

2.    I serve as a member of the Florida House of Representatives, representing State House District 42, which is in Orange County, Florida. I hold a doctorate in Public Administration.

3.    Since its opening, I, along with other elected officials, have attempted but been denied unannounced access to the mass detention center at the Dade-Collier Training and Transition Airport (the "TNT Site").

4.    On Saturday, July 12, 2025, I participated in a tour of the detention center that was organized for federal and state elected officials.

5.    On arriving at the Site, we were wanded and then transported by bus over what I observed to be freshly paved roads to a main parking area.

6.    We were then moved to smaller vans, being told that "this is an active construction zone and we need smaller vehicles to maneuver."

7.    There does not appear to be any running water or power lines at the Site, and all power appears to be supplied by generators while water is trucked onto the Site. Parts of the camp appeared to be still under construction.

8.    We were told that there are about 900 people currently detained at the Site, and that the goal is to provide capacity for 4,000 detainees by the end of August 2025.

9.    Kevin Guthrie, the Executive Director of Florida's Division of Emergency Management, helped guide the tour. During the tour, Director Guthrie stated that all the detainees were in custody to be removed by Immigration and Customs Enforcement agency ("ICE").

Exhibit 1

10.     Director Guthrie stated on more than one occasion that construction of the facility was "requested" by the federal Department of Homeland Security ("DHS"). He said that the facility is being operated in conjunction with ICE, and under ICE guidelines. Director Guthrie said that ICE guidelines for operation of the facility have been implemented "at the request of DHS."

11.     Director Guthrie also stated that every "inmate"—his word—at the facility has a file maintained by ICE, which facility staff has available.  I was told I could not speak to any detainee, even with their consent.

12.     At one point during the tour, I was permitted to gaze into a tent holding detainees. The tent contained eight interconnected fenced cages with 32 beds per cage. Each cage had three toilets with the sink attached such that 32 adult men shared three toilets with attached sinks.  When they saw our group, the men began chanting "libertad," yelling their names at us, pointing to water cups to say the water was bad, trying to do anything to get our attention and ask for help.

13.     Director Guthrie said emergency services are called to the Site at least once a day.

14.     We were told many times that DHS requested that this facility be built, that ICE inspects the facility, and that they are running this operation with ICE.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 14, 2025.

Dr. Anna V. Eskamani

Exhibit 1

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 104 of 273    Supp. App.0908

Case 1:25-cv-22896-KMW    Document 38-4    Entered on FLSD Docket 07/16/2025    Page 1 of 13

# Brief Analysis of Assertion of Pre-Existing Cement Pad Underlying Newly Asphalted Area at Jetport Site

July 8, 2025

Christopher McVoy, Ph.D.

Appendix B to Exhibit 1

Supp. App.0909

In response to questions as to whether any new milling or paving had been authorized and/or had occurred at the Dade Collier Training and Transition Airport, Ms. Stephanie Hartman of the Florida Division of Emergency Management has provided the following statement:

**From:** Stephanie Hartman <stephanie.hartman@em.myflorida.com>
**Sent:** Monday, July 7, 2025 7:48 PM
**To:** Hardesty, Brock <BHardesty@firstcoastnews.com>
**Cc:** FEMA-R4-NewsDesk@fema.dhs.gov <FEMA-R4-NewsDesk@fema.dhs.gov>; WTLV-NEWS <news@firstcoastnews.com>
**Subject:** Re: STATEMENT REQUEST - FIRST COAST NEWS

The area referenced consisted of a preexisting cement pad that was installed more than 50 years ago. Over time, a thin layer of dirt and grass had settled on top.

Stephanie Hartman
Deputy Director of Communications
Florida Division of Emergency Management
Stephanie.Hartman@em.myflorida.com

Appendix B to Exhibit 1

Response from Dr. Christopher McVoy, (soil science):

While the above statement by Ms. Stephanie Hartman might possibly be true, I can find no evidence to support it. Instead, all historical imagery I found suggests that the area was cleared of vegetation, and perhaps also leveled, probably at the same time that the runway was constructed (ca. 1968-70). Patterns in the historical imagery suggest systematic traversing of the area by equipment, likely by large mowers or brush hogs. A "thin layer of dirt and grass" on top of a cement pad would be unlikely to need mowing and would be very unlikely to produce the patterns seen. Additionally, the high rainfall intensity of South Florida thunderstorms would likely prevent the accumulation of anything more than a few millimeters of unconsolidated sediments on a cement pad. A layer that thin would not support sufficient growth to require mowing.

The more probable explanation of the imagery from this location is an area of original soil, cleared of brush and trees around 1970, and subsequently kept to low vegetation by periodic mowing. While there might well have been an original intent to cover with a cement pad, there is no indication that such a pad was ever installed.

The following slides identify the location in question, show multiple years of historical satellite images, and an oblique aerial photograph from 1970, taken during the time of initial construction.

Appendix B to Exhibit 3

Supp. App.0911



Photo 23,
Looking S.

Dark
rectangle
is new con-
struction
(asphalt
pad).

Appendix B to Exhibit 1

Supp. App.0912



Detail of Photo 23. Dark rectangle is new construction (compare with June 2025 Google Earth satellite imagery). Dark is almost certainly asphalt paving. Light sandy brown area to east and north of asphalt is newly scrapped area. Red alignment lines were used to estimate extent of assumed paved area (next slide).

Note that the light sandy brown area (i.e., unasphalted area) gives no indication of being "a thin layer of dirt" on a pre-existing cement pad.



Untilted, unrotated Google Earth image used to estimate area of the paved region shown in Photo 23. Alignment lines shown in previous slide were used to locate eastern and northern boundaries; vegetation rows to estimate location of southern and western boundaries. This newly paved area estimated to be 11+ acres.

Appendix B to Exhibit 1



Google Earth Imagery, 2025 (prior to any detention center construction). Note the N-S and E-W patterning, which is likely from equipment such as mowers or brush hogs criss-crossing this area. Vegetation that needed mowing would not grow on top of cement.

Appendix B to Exhibit 1

Supp. App.0915



Google Earth historical imagery, 2014. Note the E-W patterning, which is likely from mowing equipment. Vegetation that needed mowing would not grow on top of cement.

Appendix B to Exhibit 1

Supp. App.0916



Google Earth historical imagery, 2009. Note the E-W patterning, which is likely from mowing equipment. Vegetation that needed mowing would not grow on top of cement.

Appendix B to Exhibit 1

Supp. App.0917



Google Earth historical imagery, 1995. Note the E-W patterning, which is likely from mowing equipment. Vegetation that needed mowing would not grow on top of cement.

Appendix B to Exhibit 1

Supp. App.0918



Google Earth historical imagery, 1985 (from Landsat). Resolution too coarse to be of use

Appendix B to Exhibit 1

Supp. App.0919

https://pbase.com/donboyd/image/165484225



1970 - aerial view of the Dade County Training & Transition Airport under construction

Appendix B to Exhibit 1



https://pbase.com/donboyd/image/165484225

"1970 - aerial view of the Dade County Training & Transition Airport under construction."

Red oval is area of new (2025) paving. It does not at all look covered with cement in 1970, the year construction was halted.

Appendix B to Exhibit 1

## CHRISTOPHER W. McVOY
(561) 398-6115
cmcvoy@gmail.com

QUALIFI-
CATIONS

Ecohydrologist, Everglades expert, science-based environmental advocate, educator, book author, and seven-term elected official. Excellent communicator of science to policymakers and general audiences. Internationally experienced in environmental and agricultural research. Multi-lingual, multi-cultural sensitivity. Empiricist trained in systems analysis and simulation modeling.

EDUCATION

CORNELL UNIVERSITY, Ithaca, New York
Ph.D. in Soil, Crop and Atmospheric Sciences, 1994. "Measurement of Temporal and Spatial Variability of Soil-Water in a Grass Meadow." Minors in Agricultural Economics and Environmental Quality. Designed, built and installed autonomous field-based soil-water monitoring system.

UNIVERSITY of FLORIDA, Gainesville, Florida
M.S. in Soil Physics, 1985. "Water and Solute Movement in an Aggregated Tropical Soil: Use of Iodide and Dyes for a Morphological Characterization." Fieldwork at the Center for Tropical Agricultural Research and Teaching (CATIE), Turrialba, Costa Rica.

CORNELL UNIVERSITY, Ithaca, New York
B.A. in Biology, 1980. Concentration in Systems Ecology/Modeling.

WORK
EXPERIENCE

ELECTED OFFICIAL (City Commissioner), City of Lake Worth, Florida. 2010-2017, 2021-present. Annual budget of $200M.

LEAD ENVIRONMENTAL SCIENTIST, South Florida Engineering and Consulting. Lake Worth, FL. NEPA Environmental Impact Statements and Assessments; Management Plans.

CONSULTANT, U.S. Dept. of Interior. 2012-2014. Prepare and present technical materials in support of U.S. Army Corps of Engineers "Central Everglades Planning Project." Audience: public meetings; stakeholders, policymakers, scientists.

SENIOR ENVIRONMENTAL SCIENTIST, South Florida Water Management District, Everglades Division, West Palm Beach, FL. 1996-2011. Researched and wrote book on original, pre-development ecohydrology of the Everglades. Provided scientific leadership to state-led "River of Grass" restoration effort. Multidisciplinary field and remote sensing research of current Everglades hydrology, geomorphology and landscape ecology in support of one of the world's largest ecosystem restoration projects. Managed external contracts, supervised research staff; maximum annual budget: $110K.

STAFF SCIENTIST, Environmental Defense Fund, New York, NY. 1995-1996. Validated a regional hydrological model of the Everglades by synthesizing soil, vegetation, surveying, and historical data. Developed supporting research for Minimum Flows and Levels for the Everglades. Advised Everglades Coalition on technical hydrologic issues. Served on Technical Advisory Committee to Governor's

Commission for a Sustainable South Florida.

POST-DOC. ASSOC., Dept. of Soil Science and Systems Ecology, Technical University of Braunschweig; Braunschweig, Germany. 1991-1994. Quantified root water uptake, modeled 2-dimensional water flow in soils for long-term ecological project, "Water and Solute Transport in Agroecosystems." Editor for international workshop on modeling water, plant, nitrogen dynamics and pesticides in agro-ecosystems. Improved groundwater simulation model for nitrates. Peer reviewer: Soil Sci. Soc. Am. Journal; Journal Environ. Quality; Modelling Geo-Biosphere Processes.

WATER RESOURCES SPECIALIST, New York State Water Resources Institute. Ithaca, NY, 1990. Improved computer program for training landuse planners. Reviewed simulation models. Presented talks on groundwater contamination to NY state and NE regional audiences.

APPLICATIONS PROGRAMMER, Department of Economics, International Center for Maize and Wheat Improvement (CIMMYT), El Batán, México, 1981. Rewrote user oriented statistical package. Optimized code for inter-platform portability.

GRANTS        U.S. Geological Survey, $40,000, 1996. John D. and Catherine T. MacArthur Foundation, $75,000, 1995-6. Elizabeth Ordway Dunn Foundation, $25,000, 1995-6.

TEACHING      INVITED LECTURER, University of Florida, Florida International University,
EXPERIENCE    University of Miami, Florida Atlantic University, Arthur Marshall Foundation
              Internship program, 1997-present.

TEACHING ASSISTANT, Cornell University. Dept. of Soil, Crop and Atmospheric Sciences: Environmental Biophysics, 1988. Dept. of Ecology & Systematics: Systems Ecology, 1984.

LEADERSHIP TRAINING INTERN, rural recreation, Folklore Village Farm, Wisconsin. (Intermittent, 1980-1989). Organized and taught international folk dances.

SKILLS/       • Strong analytical skills based on systems approach
INTERESTS     • Ease of communication with people of varied interests and backgrounds
              • Fluency in French, German, Dutch, and Spanish; elementary Portuguese
              • IoT ecological monitoring: sensor interfacing, datalogger programming (Arduino, Campbell Scientific CR1000, Onset), network configuration
              • Digital and analog electronic circuit design
              • Design and application of hands-on electricity and magnetism youth teaching tools
              • Graphics design and layout
              • Mechanical, plumbing, and carpentry skills
              • Design and installation of off-grid residential solar energy
              • Rainwater harvesting and graywater reuse
              • Modern architecture, regional planning, Scandinavian folk music and dance, cooking, choral singing

Supp. App. 0923

# Publications

Kominoski, J.S., Pachón, J., Brock, J.T., McVoy, C. and Malone, S.L., 2021. Understanding drivers of aquatic ecosystem metabolism in freshwater subtropical ridge and slough wetlands. *Ecosphere*, *12*(12), p.e03849.

Kominoski, J., Rehage, J., Boucek, B.A., Briceño, H., Bush, M., Dreschel, T., Heithaus, M., Jaffé, R., Larsen, L., Matich, P. and McVoy, C., 2019. Legacies and Future Implications of a Restored Everglades. *The Coastal Everglades: The Dynamics of Social-Ecological Transformation in the South Florida Landscape*, p.71.

Rivero, R. G., Grizzle, B. J., Mahmoudi, M., McVoy, C., Naja, G. M., & Van Lent, T. (2019). A Historical Perspective on Water Levels and Storage Capacity of Lake Okeechobee, Florida: Pre- and Early Drainage Periods. *Annals of the American Association of Geographers*, *110*(1), 242–258.

Dreschel, T.W., Hohner, S., Aich, S. and McVoy, C.W., 2017. Peat soils of the Everglades of Florida, USA. In *Peat*. IntechOpen.

Nungesser, M., Saunders, C., Coronado-Molina, C., Obeysekera, J., Johnson, J., McVoy, C. and Benscoter, B., 2015. Potential effects of climate change on Florida's Everglades. *Environmental management*, *55*(4), pp.824-835.

S. Aich, C. W. McVoy, T. W. Dreschel, F. Santamaria. 2013. Estimating soil subsidence and carbon loss in the Everglades Agricultural Area, Florida using geospatial techniques. Agriculture, Ecosystems and Environment 171: 124–133.

McVoy, C. W., W. P. Said, J. Obeysekera, J. VanArman, and T. W. Dreschel. 2011. Landscapes and hydrology of the predrainage Everglades. University Press of Florida. 576 pp.

Larsen, L., N. Aumen, C. Bernhardt, V. Engel, T. Givnish, S. Hagerthey, J. Harvey, et al. 2011. Recent and historic drivers of landscape change in the Everglades ridge, slough, and tree island mosaic. Critical Reviews in Environmental Science and Technology 41: 344-381.

F. H. Sklar, M. J. Chimney, S. Newman, P. McCormick, D. Gawlik, S. Miao, C. McVoy, W. Said, J. Newman, C. Coronado, G. Crozier, M. Korvela, K. Rutchey. 2005. The ecological–societal underpinnings of Everglades restoration. Frontiers in Ecology and the Environment 3:161-169.

Sklar, F.H., C. McVoy, R. Van Zee, D. E. Gawlik, K. Tarboton, D. Rudnick, S. Miao, and T. Armentano. 2001. The effects of altered hydrology on the Everglades. In: The Everglades, Florida Bay and Coral reefs of the Florida Keys: An Ecosystem Sourcebook. Porter and Porter (eds). CRC Press, 39-82, Boca Raton, FL.

Sklar, F.H., H.C. Fitz, Y. Wu, R. Van Zee and C. McVoy. 2001. The design of ecological landscape models for Everglades restoration. Ecological Economics 37: 379-401.

SE Ingebritsen, C. McVoy, B. Glaz, W. Park. 1999. Florida Everglades: Subsidence threatens agriculture and complicates ecosystem restoration. In: Land Subsidence in the United States. Circ. 1182. U.S. Geol. Survey.

Supp. App 0924

A. Pollex, D. Krug, C.W. McVoy, H. Sponagel, B. Diekkrüger and O. Richter. 1996. Soil-water behaviour in a push terminal moraine: comparison of one- and two-dimensional simulations based on intensive regional field observations. Geoderma 69:249-263.

C.W. McVoy, K.C. Kersebaum, M. Arning, P. Kleeberg, H. Othmer and U. Schröder. 1995. A data set from north Germany for the validation of agroecosystem models: documentation and evaluation. Ecol. Modelling 81:265-300.

B. Diekkrüger, D. Söndgerath, K.C. Kersebaum and C.W. McVoy. 1995. Validity of agroecosystem models a comparison of results of different models applied to the same data set. Ecol. Modelling 81:3-29.

Supp. App 0925

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 121 of 273
Case 1:25-cv-22896-KMW    Document 38-5    Entered on FLSD Docket 07/16/2025    Page 1 of 3

# Appendix C

TDF Waste Management Plan Overview



# TDF Waste Management Plan Overview



## Overview

This plan if for the initial waste management of the temporary detention facility and will be expanded as site build out allows for more comprehensive permanent solutions to be implemented. The goal of the Division and contracted vendors is to ensure a robust, proactive logistics and installation plan that fully eliminates the potential for environmental issues related to waste production, solid waste management, recycling, construction and demolition debris, and potable water management for all on-site restroom, shower, and laundry trailers by integrating high-capacity containment, secure plumbing, secondary spill containment, solid waste management, recycling, construction and demolition debris handling, and robust monitoring, this plan addresses and eliminates environmental risks, ensuring compliance and safe conditions for site occupants.

### Monitoring, Evaluation and Compliance

On-site personnel will monitor biowaste and solid waste storage, potable water systems, dumpster, recycling, and C&D debris areas for leaks, spills, overflow, or contamination. Preventive maintenance schedules will be followed, including pump-outs of frac tanks and timely waste, recycling, and debris hauling. All procedures will comply with federal, state, and local environmental regulations.

## Wastewater and Potable Water

### Wastewater

Shower, restroom, and laundry units, as well as administrative and billeting trailers produce graywater, blackwater, and lint waste. Each waste-producing trailer will be hard-plumbed directly to designated 22,000-gallon frac tanks, reducing frequency of tank exchanges and minimizing transfer points. Frac tanks will be maintained at less than 50% of capacity. To secure connection points, all waste discharge lines will utilize 2-inch camlock connections. All connection points, hoses, and storage tanks will be within containment trays for spill protection. A trained team will inspect all plumbing and containment systems daily to maintain zero environmental impact.

### Potable Water

Potable water will be delivered by 2,000-gallon and 6,000-gallon tanker trucks and transferred via secure plumbing to ensure safe transport and storage. To provide sealed connections, all potable water hookups will use 2-inch camlock fittings for a closed system. Water tanks will be sanitized, flushed, and water quality tested regularly.

## Solid Waste

Appropriately sized roll-off dumpsters will be strategically placed throughout the site to handle all solid waste generated by operations and personnel. All dumpsters will be equipped with lids or tarps to prevent littering, wind dispersal, and animal intrusion. Dumpsters will be placed on stable ground with adequate clearance for truck access. A daily swap schedule for removal and replacement will be maintained to prevent overflow and ensure site cleanliness. Waste haulers will be responsible for safe transport and disposal at permitted facilities.

### Recycling

Clearly marked recycling containers will be placed next to general waste dumpsters and throughout common areas to encourage source separation of recyclable materials. Materials such as cardboard, plastic, metal, and paper will be collected separately to reduce contamination and maximize recycling efficiency. A dedicated recycling hauler will collect and transport recyclable materials to an approved recycling facility on a routine schedule.

Appendix C to Exhibit 1

Supp. App. 0927

**C&D Debris Management**

Dedicated roll-off containers will be provided specifically for construction and demolition debris to avoid mixing with general waste and recyclables. Materials such as wood, metal, concrete, and drywall will be separated where practical to facilitate recycling and reuse opportunities. All C&D debris will be removed by licensed haulers and transported to permitted disposal or recycling facilities in compliance with local regulations.

## Biowaste

Health and Medical vendor will ensure biohazard waste management involves proper containment, labeling, segregation, and disposal to prevent the spread of infection and environmental contamination. This includes using designated leak-proof, puncture-resistant containers, ensuring proper labeling with the biohazard symbol, and following specific disposal protocols for different types of biohazardous materials, such as sharps and liquid waste.

*Containment*

Biohazard waste will be placed in sturdy, leak-proof containers that are resistant to punctures. Sharps will be disposed of in designated sharps containers.

*Labeling*

All containers must be clearly labeled with the universal biohazard symbol and appropriate warnings, such as "Biohazardous Waste" or "Infectious Waste".

*Segregation*

Different types of biohazardous waste (e.g., sharps, liquid waste, pathological waste) will be segregated into separate containers to minimize risks and facilitate proper treatment.

*Disposal*

Biohazard waste from the site will be picked up by a certified and registered Biohazard disposal company and disposed of in accordance with Florida regulations.

Supp. App. 0928

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 124 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 1 of 28

# Appendix D

Kautz 2025 - Impacts of the Big Cypress Detention Center on the Florida Panther
and Its Habitat

Appendix D to Exhibit 1

# Impacts of the Big Cypress Detention Center on the Florida Panther and Its Habitat

July 10, 2025



## Randy S. Kautz

Randy Kautz Consulting LLC
2625 Neuchatel Drive
Tallahassee, FL 32303

Appendix D to Exhibit 1

Supp. App. 0930

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 126 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 3 of 28

1

**Impacts of the Big Cypress Detention Center on the
Florida Panther and Its Habitat**

Randy S. Kautz,
Randy Kautz Consulting LLC
2625 Neuchatel Drive, Tallahassee, FL 32303
July 10, 2025

## INTRODUCTION

The Big Cypress Detention Center is a mass immigration detention facility that is being constructed on the Dade-Collier Training and Transition Airport site inside Big Cypress National Preserve near Ochopee, Florida.  The project site originally was intended to become the largest airport in the world with six runways covering 39 square miles.  Construction began in 1968 but was halted in 1970 due to environmental concerns after completion of just one 10,500-foot runway.  The site has since seen limited use as a training facility for commercial aircraft.

The Big Cypress Detention Center is designed to provide temporary housing for up to 3,000 detainees and accommodate a staff of 1,000 that would include over 400 security guards plus legal advisors, medical personnel, clergy, laundry and maintenance workers, and administrative support.  Infrastructure installed on the site includes air-conditioned tents to house detainees, housing and offices for guards and administrative staff, generators, portable toilets, fencing, night lighting, and other necessary features.  Development of the site has included placing fill dirt in several locations as a base for new infrastructure and the construction of new access roads.

The project site is within the Primary Zone of the Panther Focus Area (PFA) (Figure 1).  The PFA is an area identified by the U.S. Fish and Wildlife Service (USFWS) as habitats used by the endangered Florida panther (*Puma concolor coryi*), and it defines the geographic limits of the USFWS consultation area for projects that potentially affect panthers and their habitats.  The Primary Zone is a region of suitable habitats occupied by Florida panthers, and it supports the only known breeding population of panthers in the wild.  Lands within the Primary Zone are important to the long-term viability and persistence of panthers in the wild (Kautz et al. 2006).  Proposed projects in the PFA are typically reviewed by USFWS to assess potential impacts on panthers and their habitats and to determine mitigation requirements, if any.  The purpose of this report is to review the development plans for the Big Cypress Detention Center and to assess panther habitat impacts of the project.

## PANTHER STATUS AND BIOLOGY

**Panther Legal Status**:  The Florida panther is a wide-ranging predator listed as endangered under the U.S. Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*) (ESA).  The ESA

Appendix D to Exhibit 1

Supp. App. 0931

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/06/2026    Page: 127 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 4 of 28

2

defines endangered as any species that is in danger of extinction throughout all or a significant portion of its range.  The ESA protects endangered species and their habitats by prohibiting the "take" of listed animals except under a Federal permit.  Take is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct."  The Florida Fish and Wildlife Conservation Commission [FFWCC] lists the Florida panther as a Federally-designated Endangered Species (68A-27.003, *Florida Administrative Code*), which is defined by the State of Florida as "species of fish or wild animal life, subspecies or isolated populations of species or subspecies, whether vertebrate or invertebrate, that are native to Florida and classified as Endangered and Threatened under Commission rule by virtue of designation by the United States Departments of Interior or Commerce as endangered or threatened under the Federal Endangered Species Act, 16 U.S.C. § 1532 et seq. and rules thereto…" (68A-27.001(2) *Florida Administrative Code*).  State rules pertaining to take are similar to those defined in the ESA.

**Panther Distribution**: The range of the Florida panther includes all counties of peninsular Florida south of I-4 plus Flagler, St. Johns, and Putnam counties along the northeast coast based on Very High Frequency (VHF) and Global Positioning System (GPS) telemetry records, mortality records, verified sightings, and wildlife camera detections.  Most panthers are members of a single breeding population located in southern Florida, and they comprise the only breeding population of pumas east of the Mississippi River (Kautz et al. 2006, USFWS 2008, Frakes et al. 2015).  Until recently, panthers that had been documented north of the Caloosahatchee River had been dispersing adult and sub-adult males.  However, two adult female panthers, one with kittens, were confirmed north of the Caloosahatchee River in 2017, one on Babcock Ranch Preserve (BRP) (Charlotte County) and one on Platt Branch Wildlife and Environmental Area (Highlands County).  These were the first times that females had been confirmed north of the Caloosahatchee River since a female was captured in Glades County in 1973 (Nowak and McBride 1973, FFWCC 2017).  While the absence of the original female at BRP has been confirmed, wildlife cameras detected a new female in eastern BRP, another female was photographed at Fisheating Creek (FEC) in Glades County, and a dependent-aged panther was confirmed at Bob Janes Preserve in Lee County (Kelly and Onorato 2021).  Males were photographed in the company of the females in spring 2020, a likely indication of reproduction.  If current levels of panther activity are sustained and recruitment can be documented at BRP and FEC, it would suggest that eastern Charlotte County and western Glades County may support a reproductively viable portion of the panther population (Kelly and Onorato 2021).

**Population Size**: The current panther population consists of 120 to 230 adults and subadults (FFWCC 2024).  Panthers were widely distributed throughout the southeastern United States prior to European colonization.  However, by the late 1980s and early 1990s, the Florida panther population had been reduced to 20-30 animals south of the Caloosahatchee River following two centuries of persecution, bounty hunting, and habitat loss (Onorato et al. 2010).  Fearing that the small and inbred panther population was in imminent danger of extinction, 8 female pumas from Texas were introduced into the south Florida population in 1995 to restore the genetic viability of the panther population.  The project has been deemed a success as evidenced by restored genetic

Supp. App. 0932

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2026   Page: 128 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 5 of 28

3

vigor and the increasing size of the panther population (Johnson et al. 2010, Hostetler et al. 2013, van de Kerk et al. 2019, Onorato et al.  2024).

**Population Viability**: Recent population viability analysis (PVA) models assessed the likelihood that the current population of panthers could survive for the next 100 years (Hostetler et al. 2013, van de Kerk et al. 2019). Both models indicated that (1) the panther population is characterized by a positive growth rate, (2) population growth rate is most sensitive to survival, especially kitten survival, and (3) probability of quasi-extinction in the next 100 years was 7.2% (Hostetler et al. 2013) and 1.4% (van de Kerk et al. 2019) when demographic factors alone are considered. However, quasi-extinction rose to 17% in the next 100 years when incorporating the impacts of genetic erosion (van de Kerk et al. 2019).  Quasi-extinction occurs when the modeled population reaches a critical size below which recovery is so unlikely that the population will eventually go extinct.  The critical population size for quasi-extinction in the PVA models was set at 10 individuals.  Releasing 5-10 female western pumas into the Florida population every 20-40 years was found to be the most cost-effective means to combat the effects of inbreeding depression (van de Kerk et al. 2019).  Both models assumed that current conditions remain stable in the future and neither accounted for risks associated with loss of habitat.

The van de Kerk et al. (2019) PVA models used a starting population of 146 panthers.  The population was projected to increase to 182 adults and subadults after 9 years; the population grew to a projected size of 187 adults and subadults (142–218, 95% CI) with a cumulative probability of quasi-extinction (PQE) ($N$ = 10 panthers) of 0.72 percent (0–0.31 5th and 95th percentiles) by 2070; and the population remained stable at a projected 188 adults and subadults after 200 years.  These results can be interpreted as showing that the current population would grow by approximately 28% in 10 years and would persist with a very low PQE for the next 50 (2070) years and beyond, should conditions remain constant.  A panther population of 146-187 adults and subadults should have a high probability of persistence per the results of van de Kerk et al. (2019) assuming no further loss of habitat or the occurrence of catastrophic events (e.g., disease).

Although these PVA models present a favorable picture for the future of the panther in South Florida, recent real-world evidence suggests that there are reasons to be concerned.  In response to the effort to restore genetic diversity, the panther population increased steadily from 1995 to 2016.  However, the population peaked in 2016, and panther numbers declined between 2016 and 2020 (Onorato et a. 2024).

**Cover Types Used by Panthers**: All types of upland and wetland forest comprise the primary land cover type used by panthers (Belden et al. 1988, Maehr and Cox 1995, Comiskey et al. 2002, Cox et al. 2006, Kautz et al. 2006, Land et al. 2008, Onorato et al. 2011).  Florida panthers use forest patches of all sizes regardless of type (Kautz et al. 2006, Onorato et al. 2011).  Panthers may use the edge of forested habitat as stalking cover to ambush white-tailed deer (*Odocoileus virginianus*) or feral hogs (*Sus scrofa*) feeding in open areas and then drag the kill into forests or other types of dense cover to feed (Onorato et al. 2011).   Non-forest but densely vegetated habitats also provide sufficient cover for panthers (Onorato et al. 2011).  Examples of these cover types range from thick patches of tall sawgrass (*Cladium jamaicense*) to expanses of mature saw palmetto (*Serenoa*

Appendix D to Exhibit 1

Supp. App. 0933

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 129 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 6 of 28

4

*repens*) adjacent to pine (*Pinus* spp.) or oak (*Quercus* spp.) forests (McBride 2001, Onorato et al. 2011).

In addition to forested habitats, panthers selected dense vegetative cover types including herbaceous wetlands, shrub swamp wetlands, and prairie grassland habitats based on GPS telemetry data (Onorato et al. 2011). Panthers also used agricultural and other habitats in proportion to their availability (Onorato et al. 2011).

**Distance Metrics**: GPS telemetry data revealed that 41 percent of panther locations occurred outside of forest cover; 74 percent of locations were within 100 m of forest cover; and 85 percent of locations were within 200 m (Onorato et al. 2011). The mean spatial error of VHF telemetry locations was 123.9 m (SE = 13.9, *n* = 45, range = 9.1–363.4) (Land et al. 2008). Pumas in California dragged carcasses of large mammals 0–80 m from kill sites to cover to feed, and in one case a puma dragged a carcass 350 m before feeding (Beier et al. 1995). Pumas in Alberta, Canada, demonstrated strong avoidance for habitat <270 m from buildings during the day, but at night pumas avoided areas <210 m from buildings (Knopff et a. 2014). Building developments where the distance between buildings is <210 m will likely restrict puma use of the area (Knopff et al. 2014). Mean daily travel distances for Florida panthers ranged from 2.62–6.70 km depending on gender and season (Criffield et al. 2018).

**Landscape Used by Panthers in South Florida**: A large landscape south of the Caloosahatchee River covering approximately 12,588 km$^2$ (3.11 million acres) was identified by Kautz et al. (2006) as regionally significant panther habitats (Figure 1). This region included three specific areas: (1) a Primary Zone defined as occupied high-quality panther habitats covering 9189 km$^2$ (2.27 million acres); (2) a Secondary Zone of lower quality landscapes occasionally used by transient animals (3287 km$^2$ [0.81 million acres]); and (3) a Dispersal Zone, a wildlife corridor of 113 km$^2$ (27,880 acres) leading into Central Florida. Kautz et al. (2006) recommended that assessments of potential impacts of proposed developments within the Primary Zone should strive to achieve no net loss of landscape function or carrying capacity for panthers within the Primary Zone and that the total areal extent of the Primary Zone should be maintained. A smaller area that functions as the core range of breeding-age adult panthers comprises approximately 5579 km$^2$ (1.38 million acres), most of which is within the Primary Zone south of the Caloosahatchee River (Figure 2) (Frakes et al. 2015).

**Threats to Panther Survival**: Habitat loss associated with an expanding human population has been identified as a key factor affecting the long-term survival and recovery of the Florida panther (Maehr 1992, USFWS 2008, Onorato et al. 2010, van de Kerk et al. 2019). Specific types of habitat loss frequently mentioned include conversion of natural lands, particularly forest cover, to agriculture or urban development, road construction, dredging of artificial surface water drainage systems, and mining. These types of human activities not only destroy panther habitats, but they also degrade the quality of remaining habitats, or they fragment and isolate remining patches such that they are smaller, farther apart, and isolated from areas panthers may use. Other factors that threaten the continued existence of the panther include collisions with motor vehicles; removal from the wild of panthers that prey on hobby animals, livestock, or domestic pets; panther-human

Supp. App. 0934

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2026   Page: 130 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 7 of 28

5

conflicts and human intolerance due to public safety concerns; diseases and environmental contaminants; and illegal shootings.

**Pumas and Roads**: Pumas utilize fire roads, dirt roads, and other low-speed or low use roadways, and have been observed crossing two-lane paved roads (Dickson et al. 2005, Wilmers et al. 2013). Florida panthers use old logging trams, swamp buggy ruts, and fire breaks (McBride et al. 2008). Puma movements are limited by high-speed roadways, highways, and interstates (Dickson et al. 2005, Wilmers et al. 2013, Knopff et al. 2014, Gray et al. 2016), but pumas in wilderness areas of Alberta, Canada, switched from avoiding areas of high road density during the day to selecting them at night (Knopff et al. 2014).

High-speed highways are often considered to be a source of habitat fragmentation and a leading cause of puma road mortality (Onorato et al. 2010, Frakes et al. 2015). Wildlife crossings have been installed in strategic locations along some interstates and other high-volume roadways in Florida to reduce road mortality of panthers and other species of wildlife (e.g., Interstate 75 [I-75], I-4, Suncoast Expressway, State Road 29, and State Road 46). Underpasses or overpasses have been installed on many high-speed highways to maintain farm connectivity on either side of the highway, and panthers have the potential to use these crossings to avoid collisions with motor vehicles. Mowed rights-of-way along road corridors, cleared land around buildings, agricultural fields, and gardens often provide prime foraging habitat for ungulates, especially white-tailed deer, a primary prey species of panthers (Rea 2003). In summary, although high-speed roadways present a higher risk of mortality to panthers on the move, such roads are nonetheless somewhat permeable, may allow for some panther movements that maintain connectivity among potentially suitable habitats throughout Florida, and may attract prey to open roadside edges.

Pumas, including Florida panthers, have demonstrated a negative response to increasing road density (i.e., length of roads per unit area) (Burdett et al. 2010, Wilmers et al. 2013, Knopff et al. 2014, Frakes et al. 2015, Yovovich et al. 2023). Frakes et al. (2015) found that, out of 15 variables, human population density followed by wetland forest had the greatest influence on probability of panther occurrence whereas road density was of medium importance to predicting the suitability of panther habitats in Florida.

**Road and Highway Mortality**: From February 10, 1982, through February 28, 2018, the leading cause of mortality of **radio-collared** panthers was intraspecific aggression, which accounted for 40% of recorded mortalities (Onorato et al. 2010). During this period, the second leading cause of mortality of **radio-collared** panthers was collisions with motor vehicles, which accounted for 21% of known mortalities. However, when records of radio-collared and uncollared panthers are pooled, vehicle collisions accounted for 60% of all panther mortalities recorded during this period (FFWCC unpublished data). Vehicle mortalities have risen since 2000 as the panther population has increased following the introduction of 8 female pumas from Texas into South Florida in the mid-1990s. Prior to 2000, panther roadkills were 4 or fewer per year, but since 2000, these numbers have ranged from 6 to 34 annually (Figure 3). The deadliest year for panther roadkills was 2016 when 34 vehicle mortalities were documented. In 2024, 28 panthers died by collisions with motor vehicles.

Appendix D to Exhibit 1

Supp. App. 0935

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 131 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 8 of 28

6

Multiple roadkill mortalities have been recorded along US 41 (Tamiami Trail) west and south of the project site (Figure 4).  Least cost path modeling has been used by FFWCC to identify travel pathways likely to be followed by panthers moving from Big Cypress National Preserve to Everglades National Park (Swanson et al. 2008).  This work identified several priority road segments along US 41 that might be candidates for construction of road crossings to minimize the likelihood of panther roadkills in the future.  Several priority road segments occur in the vicinity of the project site (Figure 4).

**Puma Response to Human Developments**:  Pumas have been shown to respond to a gradient of human development in regions as diverse as Washington state; Alberta, Canada; the front range of the Colorado Rockies; the Santa Cruz and Santa Monica Mountains of California; and South Florida (Kertson et. al 2013, Wilmers et al. 2013, Knopff et al. 2014, Frakes et al. 2015, Moss et al. 2016, Maletzke et al. 2017, Blecha et al. 2018, Alldredge et al. 2019, Yovovich et al. 2020, Riley et al. 2021).  A comprehensive literature review of human-puma interactions revealed that puma use of areas with residential development is commonplace, but interactions with people occur infrequently relative to the intensity of this use.  As residential density increases, puma use decreases and home range size increases.  Puma use of highly urban landscapes is rare.

Landscaped open spaces within developed areas, such as cemeteries, golf courses, or parks, may be avoided, perhaps due to a lack of cover (Riley et al. 2021).  Greater amounts of forest, increased proximity to wildlands and open space, greater terrain complexity, and fewer houses or greater distance to residential development were consistently associated with increased puma presence in developed portions of the landscape (Human-Cougar Interactions Science Review Team et al. 2022).  However, pumas in the Santa Monica Mountains of southern California selected areas closer to development than expected by chance, likely related to the presence of mule deer (*Odocoileus hemionus*) or other prey in or adjacent to urbanization (Riley et al. 2021).  Additionally, pumas can and do find their way through some intensively developed areas often using thin strips of vegetation.

Numerous studies in the western United States cited above have assessed puma use of the landscape according to a scale of residential density developed by Theobald (2005), who defined the following categories of land development: (1) urban lands have >10 dwelling units per ha, (2) suburban lands have 1.47–10 dwelling units per ha, (3) exurban lands have 0.062–1.47 dwelling units per ha, and (4) rural areas have <0.062 dwelling units per ha.  Burdett et al. (2010) added a fifth category of undeveloped lands which have zero dwelling units per ha.

In general, these studies found that pumas generally occur in landscapes with a dwelling unit density of <0.062 dwelling units per ha (i.e., areas characterized as undeveloped or rural by Theobald et al. [2005]).  Pumas that did occur in exurban areas were at greater risk of mortality, were more likely to be younger than 5 years of age, were more likely to approach housing as hunger increased, and were more likely to include synanthropic wildlife (i.e., species that live near humans and benefit from human-modified environments) and domestic species in their diet.  Florida panthers regularly occur in the exurban residential landscape of the 230-km$^2$ Golden Gate Estates (GGE) in Collier County where there is an average of 0.40 residences per ha.  The occurrence of

Supp. App. 0936

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2026   Page: 132 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 9 of 28

7

panthers in this area is a continuing source of human-panther conflicts and depredations on domestic pets and livestock (Interagency Florida Panther Response Team 2017).  Puma occurrence in suburban or urban environments is uncommon.

**Puma Response to Artificial Lighting**: Pumas tend to avoid areas with artificial light, especially bright or unpredictable lighting.  Studies using trail cameras have shown that puma activity decreases near well-lit areas, especially in regions close to human development.  Work in southern California showed a pronounced avoidance of artificial lighting within 500 m of the light source; however, there is marked individual variation in tolerance (Barrientos et al. 2023).  In contrast to artificial lighting, neither sky glow nor moonlight significantly affect habitat selection.  In a study in the intermountain Southwest, mule deer were drawn to light-rich areas near human developments, but hunting by pumas was restricted to darker areas (Ditmer et al. 2020).


### POPULATION GROWTH AND SEA LEVEL RISE 2070

**Future Growth and Development in Southwest Florida**: The population of Lee, Collier, and Hendry counties where most of the occupied panther habitat occurs is expected to increase from 1,233,723 to 2,252,721 residents between 2022 and 2070, a projected increase of 1,018,998 new residents (Carr and Zwick 2016, BEBR 2023).  To identify areas of Florida most likely to absorb future growth, the University of Florida Center for Landscape Conservation Planning and 1000 Friends of Florida [CLCP-1000 FOF] (2023) developed models of future growth through 2070 assuming current development patterns continue, and no additional land conservation occurs.

**Sea Level Rise**:  Relative sea level along the contiguous United States coastline is expected to rise on average as much over the next 30 years (0.25–0.30 m between 2020–2050) as it has over the last 100 years (1920–2020).  Scenarios of sea level rise by 2100 relative to a baseline of the year 2000 were reported for coastal regions of the U.S. by Sweet et al. (2022).  The median sea level rise for the Intermediate scenario for the Eastern Gulf coast, which includes the Southwest Florida study area, was 1.2 m (low 0.6 m – high 2.2 m) by 2100.

**Estimates of Panther Habitat Loss in South Florida by 2070**: Kautz et al. (in preparation) created a model of panther habitats in Southwest Florida (Figure 5) for inclusion in the Florida Panther Species Status Assessment Version 2.0 (FWS in review).  The CLCP-1000 FOF (2023) model of future growth in Florida was overlain on the panther habitat model for South Florida to predict loss of panther habitat by 2070.   A separate model was used to estimate loss of panther habitat due to sea level rise of 0.9 m by 2070.  The results of these analyses were combined to calculate the total loss of panther habitats due to population growth and sea level rise in south Florida through 2070.

The 2070 growth model would result in the loss of 487 km$^2$ (9.8 percent) of the area mapped as panther habitat in Southwest Florida by Kautz et al. (in preparation).  Sea level rise of 0.9 m by 2070 would result in the loss of 151 km$^2$ (3.6 percent) of panther habitat in Southwest Florida.  The combined effects of population growth and sea level rise models predict the loss of 638 km$^2$ (12.9 percent) of panther habitat in Southwest by 2070.

Supp. App. 0937

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 133 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 10 of 28

8

Habitat loss may result in fragmentation, which is the subdivision of a single large area of habitat into several smaller areas with the remaining areas becoming farther away from one another or even isolated (i.e., loss of connectivity) (Lindenmayer and Fischer 2006).  An analysis of fragmentation effects on habitat patches remaining after habitat loss revealed that the Corkscrew Regional Ecosystem Watershed habitat area will become too small and isolated to support panthers, and remaining habitat patches in Southwest Florida will be reduced by 19 percent of the area existing in 2022.  Consequently, remaining habitat patches in 2070 would have the capacity to support 55-162 panthers (Kautz et al. in preparation).  These numbers may be compared to the current estimated population of 120-230 panthers (FWC 2024) and to the range of 146-187 panthers needed for a viable population based on the models of van de Kerk et al. (2019).  If habitats remaining in 2070 are of high quality, the future panther population may remain viable.  However, if lower quality habitats remain, the future number of panthers may be so low that persistence of the panther population is in doubt.


**BIG CYPRESS DETENTION CENTER PROJECT SITE AND PANTHER OCCURRENCE**

**Big Cypress Detention Center and Surrounding Landscape**: Prior to construction of the detention center, the project site consisted of 350.65 acres of paved runway, taxiways, and adjacent grassy edges based on the polygon of the site extracted from the Cooperative Land Cover database version 3.8, December 2024, downloaded from the FWC website.  The project site is in the Big Cypress Swamp province of the Southwestern Flatwoods physiographic district (Brooks 1981).  This area is described as a rockland and marl plain with elevations largely below 16 feet and vegetation dominated by wet to dry prairies, marshes, and stunted cypress (Brooks 1981).  Soils within 1 mile of the project site are dominated by types that typically support herbaceous freshwater marsh species (73%) with scattered low ridges that support oaks (*Quercus* spp.), tropical hardwoods, cabbage palms (*Sabal palmetto*) and other species in their native state (Table 1).  Land cover types within 1 mile of the site are dominated by wetlands, primarily freshwater marsh (90%) but also include human-derived features associated with the project site (7%), rockland hammock (1.6%), and water in borrow pits (1%) (Table 2).

**Panther Occurrences Near the Big Cypress Detention Center Site**: The Big Cypress Detention Center site is in the southeastern corner of an expansive region of Southwest Florida that is occupied by Florida panthers based on data collected since 1982 (Figure 4).  Panther use of the site and surrounding area was assessed by using a 6701 m buffer (i.e., the mean daily distance traveled by male panthers during the dry season [Criffield et al. 2018]) to select VHF telemetry records collected by FFWCC, Big Cypress National Preserve, and Everglades National Park biologists between 1982 and 2014 (Table 3, Figure 5).  These panthers would have a high likelihood of easily traveling to the site in a single day.

Telemetry records within the buffer include 1164 points representing 12 male panthers, 10 females, and 1 Texas female introduced into the southwest Florida population as part of the effort to restore genetic diversity to the population in the 1990s.  In addition, there are records of 4

Appendix D to Exhibit 1

Supp. App. 0938

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2026   Page: 134 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 11 of 28

9

panther dens within 12 km to the northwest, west, and southwest of the site (Figure 5). These data indicate that panthers have occurred consistently in the landscape immediately surrounding the site for over a 30-year period since data collection first began in 1982. The lack of records since 2014 is not because panthers no longer occur in the area but because federal budget constraints led to discontinuous monitoring by BCNP staff beginning in March 2013 (FFWCC 2020). Limited monitoring of some panthers in BCNP continued through June 2018 but the panthers that were monitored were not in the vicinity of the project site between 2014 and 2018. The panthers that have used the area around the site during the period of record are represented by all age classes of both sexes from juvenile to older adults (Table 3), indicating that the surrounding landscape has supported a stable and reproducing population of panthers over many years.

Although no panthers have been recorded on the paved areas of the project site, 3 individuals have occurred within 70-300 m of the site. Moreover, the minimum convex polygon home ranges of 8 of 11 males and 4 of 10 females overlap the site. These data suggest that it is very likely that panthers traverse the paved areas during periods of movement based on evidence that they readily cross paved roads, often use unpaved roads as travelways, and multiple home ranges defined by telemetry records overlap the site.


**IMPACTS OF BIG CYPRESS DETENTION CENTER PROJECT ON FLORIDA PANTHERS**

**Increased Human Presence**: The Big Cypress Detention Center will increase the presence of humans in a landscape that is relatively wild and that is part of the range of the only viable population of Florida panthers on earth. Studies in Florida and elsewhere have demonstrated that the presence of pumas decreases with increasing human presence as measured by either residential density or human population density. Although it is difficult to determine how the human population of the detention center compares with data on residential density, it is highly likely that the increased density of humans will reduce the value of natural areas surrounding the site as panther habitat. Studies have shown that pumas in Canada avoided areas within 270 m of buildings during the day, but at night avoided areas within 210 m of buildings. Thus, natural habitats within 210 m of the project site, a total area of 1024 acres including the previously paved areas, may receive less use by panthers than occurs without the presence of the detention facility. However, individual panthers may well approach more closely, particularly at night or in pursuit of prey based on panther/puma behavior observed in Florida and elsewhere.

**Fencing**: Although panthers and their primary prey species, white-tailed deer, can leap 4-foot-high farm field fencing, chain link fencing 6 feet and higher precludes use of bounded areas by panthers and deer, especially when topped by barbed wire outriggers or razor wire. Thus, all areas of the Big site enclosed by fencing will become unusable by panthers and their prey. Although paved areas would not normally be considered as panther habitats, panthers nevertheless likely cross the paved areas of the site in search of prey or during their normal movement patterns. In their reviews of the construction of solar electric generating facilities in the Panther Focus Area, USFWS

Supp. App 0939

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2026   Page: 135 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 12 of 28

10

biologists regard all areas surrounded by 6-foot chain link fencing as a complete loss of habitat, and mitigation is recommended at a ratio of 2:1 for impacts within the Primary Zone.

**Artificial Lighting**: A key security feature of the Big Cypress Detention Center is the installation of bright artificial night lighting throughout the site.  Studies in California and the intermountain West have shown that pumas typically avoid areas within 500 m of bright sources of artificial lighting, but there is individual variation in puma response.  This information suggests that panthers may not venture within 500 m of the Big Cypress Detention Center site during the periods when they are most actively searching for prey.  The total affected area within a 500 m buffer around the site covers 1895 acres including the paved area of the site.

**Road Mortality**: Highway traffic associated with guards, administrative staff, detainees, food service personnel, maintenance workers, portable toilet services, etc., traveling to and from the site will increase.  The increase in highway traffic on US 41 and other highways leading to the site, such as SR 29, is likely to increase the number of panthers killed in collisions with motor vehicles. Panther highway mortality rates are higher on major roads, such as I-75, US 41 and SR 29, than on minor roads (e.g., residential streets, unpaved roads, trails) (Schwab and Zandbergen 2011).  Data downloaded from the Florida Department of Transportation web site shows that Average Annual Daily Traffic (AADT) on US 41 west of the project site ranged 3,400-3,800 AADT but east of the site 6,300 vehicles per day were documented in 2024.  Smith (2019) reported that panther-vehicle collisions occurred on roads with 450 AADT but mortality rates were higher on roads with 4,400-7,800 AADT.  US 41 lacks dedicated wildlife crossings that would prevent or reduce the risk of additional mortalities.  Collisions with motor vehicles are the most significant factor affecting the survival of individual panthers.  Approximately 13-25% of the estimated population of 120-230 panthers die each year in collisions with motor vehicles.  Increased vehicular traffic to and from the site, particularly from the west, is likely to increase the danger to panthers in a road segment that already has AADT rates that put panthers at risk to traffic-related mortality.

**Cumulative Loss of Panther Habitat 2070**: Panther habitat, human population growth, and sea level rise models indicate the loss of 19 percent of panther habitat in Southwest Florida by 2070. This amount of habitat loss has the potential to jeopardize the persistence of panthers in the future depending on the quality of remaining habitats.  High quality habitats have the potential to support a small but viable population by 2070, but, if lower quality habitats remain, the future persistence of the panther population is in doubt.  The Big Cypress Detention Center project has the potential to result in the loss of approximately 1000-2000 acres of habitat in a remote area of occupied panther habitat in South Florida due to the effects increased human presence and artificial lighting extending into surrounding natural habitats.  The project would, thus, contribute to the cumulative loss and degradation of panther habitat into the future.

**SUMMARY**

Supp. App. 0940

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 136 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 13 of 28

11

The Big Cypress Detention Center is being constructed in a remote area of South Florida home to the only population of endangered Florida panthers in the world. Panther use of the area immediately surrounding the site is well documented. The project is likely to adversely affect panther use of existing natural habitats in an area of at least 1024-1895 acres surrounding the site because of loss of habitat to panthers due to indirect impacts associated with human presence and artificial lighting. Increased traffic to and from the site is likely to increase panther roadkill mortality adding further strain to a population that appears to be in decline. This project will contribute to the cumulative loss, fragmentation, and degradation of panther habitats predicted by available models of future growth and development, sea level rise, and panther habitats. The combined effects of habitat loss, degradation, and fragmentation have the potential to jeopardize the viability of the panther population in the future depending on the quality of habitats remaining by 2070.

## LITERATURE CITED

Alldredge, M. W., F. E. Buderman, K. A. Blecha. 2019. Human-cougar interactions in the wildland-urban interface of Colorado's front range. Ecology and Evolution 9(18):10415–10431.

Barrientos, R., W. Vickers, T. Longcore, E. S. Abelson, J. Dellinger, D. P. Waetjen, G. Fandos, and F. M. Shilling. 2023. Nearby night lighting, rather than sky glow, is associated with habitat selection by a top predator in human-dominated landscapes. Philosophical Transactions of the Royal Society B 378:20220370. https://doi.org/10.1098/rstb.2022.0370.

Beier, P., D. Choate, and R. H. Barrett. 1995. Movement patterns of mountain lions during different behaviors. Journal of Mammalogy 76(4):1056-1070.

Belden, R. C., W. B. Frankenberger, R. T. McBride, and S. T. Schwikert. 1988. Panther habitat use in southern Florida. The Journal of Wildlife Management 52:660–663.

Blecha, K. A., R. B. Boone, M. W. Alldredge. 2018. Hunger mediates apex predator's risk avoidance response in wildland–urban interface. Journal of Animal Ecology 87:609–622.

Brooks, H. K. 1981. Physiographic divisions of Florida. Map, Institute of Food and Agricultural Sciences, University of Florida, Gainesville.

Burdett, C. L., K. R. Crooks, D. M. Theobald, K. R. Wilson, E. E. Boydston, L. M. Lyren, R. N. Fisher, V. T. Winston, S. A. Morrison, and W. M. Boyce. 2010. Interfacing models of wildlife habitat and human development to predict the future distribution of puma habitat. Ecosphere 1:1–21.

Bureau of Economic and Business Research. 2023. Projections of Florida population by county, 2025–2050, with estimates for 2022. Bureau of Economic and Business Research, University of Florida, Florida Population Studies, Bulletin 195.

Appendix D to Exhibit 1

Supp. App. 0941

Carr, M. H., and P. D. Zwick. 2016. Florida 2070: mapping Florida's future--alternative patterns of development in 2070. Technical Report. A research project prepared for Florida Department of Agriculture and Consumer Services and 1000 Friends of Florida. Geoplan Center at the University of Florida, Gainesville, Florida

Center for Landscape Conservation Planning and 1000 Friends of Florida (CLCP-1000 FOF). 2023. Florida's Rising Seas - Mapping our Future: Sea Level 2040. Technical report. UF Center for Landscape Conservation Planning (Gainesville) and 1000 Friends (Tallahassee).

Comiskey, E. J., O. L. Bass, Jr., L. J. Gross, R. T. McBride, and R. Salinas. 2002. Panthers and forests in south Florida: an ecological perspective. Conservation Ecology 6(1): 18.

Cox, J. J., D. S. Maehr, and J. L. Larkin. 2006. Florida panther habitat use: new approach to an old problem. The Journal of Wildlife Management 70:1778–1785.

Criffield, M., M. van de Kerk, E. Leone, M. W. Cunningham, M. Lotz, M. K. Oli, and D. P. Onorato. 2018. Assessing impacts of intrinsic and extrinsic factors on Florida panther movements. Journal of Mammalogy 99:702–712.

Dickson, B. G., J. S. Jenness, and P. Beier. 2005. Influence of vegetation, topography, and roads on cougar movement in southern California. Journal of Wildlife Management 69(1):264–276.

Ditmer, M. A., D. C. Stoner, C. D. Francis, J. R. Barber, J. D. Forester, D. M. Choate, K. E. Ironside, K. M. Longshore, K. R. Hersey, R. T. Larsen, B. R. McMillan, D. D. Olson, A. M. Andreasen, J. P. Beckmann, P. B. Holton, T. A. Messmer, and N. H. Carter. 2020. Artificial nightlight alters predator-prey dynamics of an apex carnivore. Ecography 44:149-161. doi: 10.1111/ecog.05251

Florida Fish and Wildlife Conservation Commission. 2017. Annual report on the research and management of Florida panthers: 2016–2017. Fish and Wildlife Research Institute and Division of Habitat and Species Conservation, Naples, Florida.

Florida Fish and Wildlife Conservation Commission. 2020. Annual report on the research and management of Florida panthers: 2019–2020. Fish and Wildlife Research Institute and Division of Habitat and Species Conservation, Naples, Florida.

Florida Fish and Wildlife Conservation Commission (FWC). 2024. Annual report on the research and management of Florida panthers: 2023-2024. Technical report. Fish and Wildlife Research Institute and Division of Habitat and Species Conservation, Naples, FL.

Frakes, R. A., R. C. Belden, B. E. Wood, and F. E. James. 2015. Landscape analysis of adult Florida panther habitat. PLoS One 10:e0133044.

Appendix D to Exhibit 1

Supp. App. 0942

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2026   Page: 138 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 15 of 28

13

Gray M., C. C. Wilmers C. C., S. E. Reed, and A. M. Merenlender. 2016. Landscape feature-based permeability models relate to puma occurrence. Landscape and Urban Planning 147:50–58.

Hostetler, J. A., D. P. Onorato, D. Jansen, and M. K. Oli. 2013. A cat's tale: the impact of genetic restoration on Florida panther population dynamics and persistence. Journal of Animal Ecology 82:608–620.

Human-Cougar Interactions Science Review Team. 2022. Human-Cougar Interactions: A Literature Review Related to Common Management Questions. Washington Department of Fish and Wildlife, Olympia, Washington, USA.

Interagency Florida Panther Response Team. 2017. Annual Report: 2017. Florida Fish and Wildlife Conservation Commission, U.S. Fish and Wildlife Service, and National Park Service.

Johnson, W. E., D. P. Onorato, M. E. Roelke, E. D. Land, M. W. Cunningham, R. C. Belden, R. McBride, D. Jansen, M. Lotz, D. Shindle, J. Howard, D. E. Wildt, L. M. Penfold, J. A. Hostetler, M. K. Oli, and S. J. O'Brien. 2010. Genetic restoration of the Florida panther. Science 329:1641–1645.

Kautz, R. S., R. Kawula, T. Hoctor, J. Comiskey, D. Jansen, D. Jennings, J. Kasbohm, F. Mazzotti, R. McBride, L. Richardson, and K. Root. 2006. How much is enough? Landscape-scale conservation for the Florida panther. Biological Conservation 130:118–133.

Kautz, R. S., D. Shindle, D. Onorato, and E. D. Land.  In preparation.  Habitat model for Florida panthers and projections of habitat loss through 2070.

Kelly, B., and D. Onorato. 2021. Assessment of the distribution of Florida panthers north of the Caloosahatchee River.  Central Florida panther study final report, 1 March 2019 – 1 March 2021.  Fish and Wildlife Research Institute, Florida Fish and Wildlife Conservation Commission, Naples, FL.

Kertson, B. N., R. D. Spencer, and C. E. Grue. 2013. Demographic influences on cougar residential use and interactions with people in western Washington. Journal of Mammalogy 94(2):269–281.

Knopff, A. A., K. H. Knopff, M. S. Boyce, and C. C. St. Clair. 2014. Flexible habitat selection by cougars in response to anthropogenic development. Biological Conservation 178:136–145.

Land, E. D., D. B. Shindle, R. J. Kawula, J. F. Benson, M. A. Lotz, and D. P. Onorato. 2008. Florida panther habitat selection analysis of concurrent GPS and VHF telemetry data. The Journal of Wildlife Management 72:633–639.

Supp. App. 0943

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 139 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 16 of 28

14

Lindenmayer, D. B., and J. Fischer. 2006. Habitat fragmentation and landscape change: an ecological and conservation synthesis. Island Press, Washington, DC.

Maletzke, B., B. Kertson, M. Swanson, G. Koehler, R. Beausoleil, R. Wielgus, and H. Cooley. 2017. Cougar response to a gradient of human development. Ecosphere 8:e01828.

McBride, R. 2001. Current panther distribution, population trends, and habitat use. Report of field work: Fall 2000 – Winter 2001. Prepared for Florida Panther SubTeam of MERIT. U.S. Fish and Wildlife Service, South Florida Ecosystem Office, Vero Beach, Florida.

McBride, R. T., R. T. McBride, R. M. McBride, and C. E. McBride. 2008. Counting pumas by categorizing physical evidence. Southeastern Naturalist 7:381–400.

Maehr, D. S. 1992. Florida panther. Pages 176–189 *in* S. R. Humphrey, editor. Rare and endangered biota of Florida. Volume I: mammals. University Press of Florida, Gainesville, Florida.

Maehr, D. S., and J. A. Cox. 1995. Landscape features and panthers in Florida. Conservation Biology 9:1008–1019.

Moss, W. E., M. W. Alldredge, K. A. Logan, and J. N. Pauli. 2016. Human expansion precipitates niche expansion for an opportunistic apex predator (*Puma concolor*). Scientific Reports 6:39639. https://doi.org/10.1038/srep39639

Nowak, R. M., and R. McBride. 1974. Status survey of the Florida panther. Pages 237–242 *in* P. Jackson, editor. World Wildlife Yearbook 1973–74. World Wildlife Fund, 1110 Morges, Switzerland.

Onorato, D., C. Belden, M. Cunningham, D. Land, R. McBride, and M. Roelke. 2010. Long-term research on the Florida panther (*Puma concolor coryi*): historical findings and future obstacles to population persistence. Pages 453-469 *in* D. Macdonald and A. Loveridge, editors. Biology and conservation of wild felids. Oxford University Press.

Onorato, D. P., M. Criffield, M. Lotz, M. W. Cunningham, R. McBride, E. H. Leone, O. L. Bass, and E. C. Hellgren. 2011. Habitat selection by critically endangered Florida panthers across the diel period: implications for land management and conservation. Animal Conservation 14:196–205.

Onorato, D. P., M. W. Cunningham, M. Lotz, M. Criffield, D. Shindle, A. Johnson, B. C. F. Clemons, C. P. Shea, M. E. Roelke-Parker, W. E. Johnson, B. T. McClintock, K. L. Pilgrim, M. K. Schwartz, and M. K. Oli. 2024. Multi-generational benefits of genetic rescue. Scientific Reports (2024)14:17519. https://doi.org/10.1038/s41598-024-67033-6.

Supp. App. 0944

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 140 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 17 of 28

15

Rea, R. V. 2003. Modifying roadside vegetation management practices to reduce vehicular
      collisions with moose *Alces alces*. Wildlife Biology 9(2):81-91.

Riley, S. P. D., J. A. Sikich, and J. F. Benson.  2021. Big cats in the big city: spatial ecology of
      mountain lions in greater Los Angeles.  Journal of Wildlife Management 85(8):1527-1542.

Schwab, A. C., and P. A. Zandbergen.  2011. Vehicle-related mortality and road crossing behavior of
      the Florida panther.  Applied Geography 31:859-870.

Smith, D. J., M. Hall, and J. Sharpe 2018.  Assessing the value of current movement pathways of
      Florida panthers that intersect Keri and Corkscrew roads: identifying location and need for
      safe crossing measures.  Final report.  University of Central Florida, Department of Biology,
      Orlando, FL.

Swanson, K., D. Land, R. Kautz, and R. Kawula.  2008. Use of least-cost pathways to identify key
      road segments for Florida panther conservation.  FWRI technical report TR-13.  Fish and
      Wildlife Research Institute, Florida Fish and Wildlife Conservation Commission, St.
      Petersburg, FL.

Sweet, W. V., B. D. Hamlington, R. E. Kopp, C. P. Weaver, P. L. Barnard, D. Bekaert, W. Brooks, M.
      Craghan, G. Dusek, T. Frederikse, G. Garner, A. S. Genz, J. P. Krasting, E. Larour, D. Marcy, J.
      J. Marra, J. Obeysekera, M. Osler, M. Pendleton, D. Roman, L. Schmied, W. Veatch, K. D.
      White, and C. Zuzak.  2022.  Global and regional sea level rise scenarios for the United
      States: updated mean projections and extreme weather level probabilities along U.S.
      coastlines.  NOAA Technical Report NOS 01.  National Oceanic and Atmospheric
      Administration, National Ocean Service, Silver Spring, MD.

Theobald, D. M.  2005. Landscape patterns of exurban growth in the USA from 1980 to 2020.
      Ecology and Society 10(1):32.  URL: http://www.ecologyandsociety.org/vol10/iss1/art32

U.S. Fish and Wildlife Service.  2008. Florida panther recovery plan (*Puma concolor coryi*). Third
      revision.  U.S. Fish and Wildlife Service, Atlanta, GA.

U.S. Fish and Wildlife Service.  In review.  Species status assessment for the Florida panther.
      Version 2.0 Technical report.  Vero Beach, FL.

van de Kerk, M., D. P. Onorato, J. A. Hostetler, B. M. Bolker, and M. K. Oli. 2019. Dynamics,
      persistence, and genetic management of the endangered Florida panther population.
      Wildlife Monographs 203:3-35. DOI: 10.1002/wmon.1041.

Wilmers, C. C., Y. Wang, B. Nickel, P. Houghtaling, Y. Shakeri, M. L. Allen, J. Kermish-Wells, V.
      Yovovich, and T. Williams. 2013. Scale dependent behavioral responses to human
      development by a large predator, the puma. PLoS ONE 8(4):
      e60590.  doi10.1371/journal.pone.0060590.

Supp. App. 0945

Yovovich, V., M. L. Allen, L. T. Macaulay, and C. C. Williams. 2020. Using spatial characteristics of apex carnivore communication and reproductive behaviors to predict responses to future human development.  Biodiversity and Conservation.  https://doi.org/10.1007/s10531-020-01990-y.

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 142 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 19 of 28

Supp. App. 0946

17

**Table 1.** Soil type within 1 mile of the Big Cypress Detention Center and types of vegetation typically supported by each.

| Soil Type | Acres | Percent | Vegetation/Land Cover |
|---|---|---|---|
| Biscayne-Rock Outcrop Complex | 4,596.62 | 72.76 | Freshwater marsh with limestone outcrops |
| Ravenwood-Boca-Urban Land Complex | 1,183.04 | 18.73 | Fill areas on poorly drained wetlands |
| Rattlesnake Ridge-Shark Valley-Hallandale Complex | 282.36 | 4.47 | Mixed freshwater marsh, wet flatwoods |
| Rattlesnake Ridge | 158.05 | 2.50 | Low oak-cabbage palm hammock |
| Cooper Town-Perrine-Rattlesnake Ridge Complex | 97.47 | 1.54 | Freshwater marsh, pond apple, cypress |
| **Total** | **6,317.54** | **100.00** | |

Supp. App. 0947

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 143 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 20 of 28

18

**Table 2.** Land use/land cover types within 1 mile of the Big Cypress Detention Center based on data contained in the Cooperative Land Cover database version 3.8 (December 2024) downloaded from the Florida Fish and Wildlife Conservation Commission website.

| Land Cover Type | Acres | Percent |
|---|---|---|
| **Wetlands** | **5,708.30** | **90.36** |
| Glades Marsh | 4,275.08 | 67.67 |
| Cypress | 1,129.97 | 17.89 |
| Mixed Scrub-Shrub Wetland | 134.28 | 2.13 |
| Isolated Freshwater Swamp | 59.70 | 0.94 |
| Mixed Hardwood-Coniferous Swamps | 30.14 | 0.48 |
| Marshes | 22.96 | 0.36 |
| Cypress/Pine/Cabbage Palm | 17.34 | 0.27 |
| Other Hardwood Wetlands | 12.47 | 0.20 |
| Marl Prairie | 11.09 | 0.18 |
| Prairie Hydric Hammock | 7.79 | 0.12 |
| Cypress/Tupelo (including mixed Cypress/Tupelo) | 7.49 | 0.12 |
| | | |
| **Uplands** | **103.00** | **1.63** |
| Rockland Hammock | 103.00 | 1.63 |
| | | |
| **Cultural** | **440.74** | **6.98** |
| Transportation | 364.05 | 5.76 |
| Vegetative Berm | 40.81 | 0.65 |
| Rural Open | 13.46 | 0.21 |
| Extractive | 13.00 | 0.21 |
| Exotic Plants | 9.41 | 0.15 |
| | | |
| **Water** | **65.47** | **1.04** |
| Artificial Impoundment/Reservoir | 65.47 | 1.04 |
| | | |
| **Grand Total** | **6,317.51** | **100.00** |

Appendix D to Exhibit 1

Supp. App. 0948

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 144 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 21 of 28

19

**Table 3.** Florida panther VHF-telemetry records within 6701 m of the Big Cypress Detention Center in Collier County, FL. Records are from 12 male and 10 female panthers and 1 female Texas panther from the genetic restoration effort in the 1990s.

| Cat ID | Sex | Points | First Date | Last Date | Age |
|--------|-----|--------|------------|-----------|-----|
| FP007 | M | 13 | 1982-06-09 | 1982-10-26 | 6-7 yr |
| FP016 | M | 112 | 1989-08-03 | 1994-10-06 | 3-9 yr |
| FP023 | F | 116 | 1990-03-17 | 2000-05-31 | 2-12 yr |
| FP038 | F | 85 | 1990-02-18 | 1994-05-26 | 4-8 yr |
| FP042 | M | 22 | 1991-09-13 | 1994-11-11 | 2-5 yr |
| FP079 | M | 32 | 1999-04-19 | 2005-11-16 | 3-9 yr |
| FP086 | F | 8 | 2001-01-08 | 2001-10-17 | 1.5-2 yr |
| FP087 | F | 3 | 2000-07-03 | 2001-06-15 | 1.3-2 yr |
| FP088 | F | 22 | 2001-05-04 | 2002-10-18 | 1-2.3 yr |
| FP091 | F | 1 | 2001-03-16 | 2001-03-16 | 9 mo |
| FP103 | F | 375 | 2001-05-27 | 2007-07-11 | 9 mo-7 yr |
| FP104 | M | 166 | 2002-01-16 | 2006-03-08 | 1.5-5 yr |
| FP108 | M | 55 | 2002-03-04 | 2002-11-13 | 2-2.5 yr |
| FP124 | F | 22 | 2004-03-29 | 2008-03-28 | 4-8 yr |
| FP125 | M | 6 | 2004-03-29 | 2004-05-10 | 9-11 mo |
| FP126 | M | 12 | 2004-03-29 | 2004-05-26 | 9-11 mo |
| FP127 | M | 51 | 2006-03-31 | 2008-02-16 | 6-8 yr |
| FP129 | F | 21 | 2004-02-25 | 2006-02-22 | 3-5 yr |
| FP152 | M | 23 | 2007-05-04 | 2008-10-12 | 5-6 yr |
| FP169 | M | 5 | 2009-05-06 | 2009-11-30 | 5-5.5 yr |
| FP192 | F | 2 | 2014-03-31 | 2014-08-28 | 5-5.5 yr |
| FP230 | M | 1 | 2014-04-14 | 2014-04-14 | 6 yr |
| TX103 | F | 11 | 1998-08-21 | 1999-07-09 | - |
| **Total** | | **1,164** | | | |

Appendix D to Exhibit 1

Supp. App. 0949

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 145 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 22 of 28

20



**Figure 1**. The Big Cypress Detention Center is in the Primary Zone of the U.S. Fish and Wildlife Service's Panther Focus Area.

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 146 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 23 of 28

Supp. App. 0950

21



**Figure 2**.  The Big Cypress Detention Center is in an area mapped as adult breeding habitat by Frakes et al. (2015).

Supp. App. 0951

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 147 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 24 of 28

22



**Figure 3**.  Number of Florida panthers killed in collisions with motor vehicles each year between 1981 and 2024.  Data are inclusive of panthers of all age groups from dependent kittens to adults.

Supp. App. 0952

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/06/2026    Page: 148 of 273
Case 1:25-cv-22896-KMW   Document 38-6   Entered on FLSD Docket 07/16/2025   Page 25 of 28

23



**Figure 4**.  The Big Cypress Detention Center is near US 41 (Tamiami Trail) in an area where roadkill mortalities have been recorded and where priority road segments for reducing roadkill mortality based on least cost path modeling (Swanson et al. 2008).  Average daily traffic on US 41 west of the site was 3,400-3,800 vehicles per day and east of the site was 6,300 vehicles per day in 2024.

Supp. App. 0953

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 149 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 26 of 28

24



**Figure 5.** Big Cypress Detention Center project site in relation to panther habitat as modeled by Kautz et al. (in preparation) for the Florida Panther Species Status Assessment Version 2.0 (USFWS in review).

Supp. App. 0954

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/06/2026    Page: 150 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 27 of 28

25



**Figure 6**.  The Big Cypress Detention Center is in an area with many documented occurrences of panther since 1982.

Supp. App. 0955

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 151 of 273
Case 1:25-cv-22896-KMW    Document 38-6    Entered on FLSD Docket 07/16/2025    Page 28 of 28

26



**Figure 7**. VHF-telemetry records of Florida panthers collected between 1982 and 2014 within 6701 m (i.e., mean daily travel distance of male panthers in the dry season) of the Big Cypress Detention Center.

# Appendix E

Curriculum Vitae of Randy Kautz

Appendix E to Exhibit 1

Supp. App. 0957

**Curriculum Vitae**

**RANDY S. KAUTZ**
2625 Neuchatel Drive
Tallahassee, FL 32303
Cell: (850) 443-3014
Email: randykautz@gmail.com

**Areas of Specialization:**

Ecology of threatened and/or endangered (T&E) species of wildlife; application of geographic information system (GIS) technology to modeling and mapping wildlife and their habitats; land use and land cover mapping using remotely sensed data; and landscape-scale habitat conservation planning.

**Experience:**

Biological Consultant, Florida Power & Light (FPL), Juno Beach, Florida.  2014 to 2025.

- Provided technical assistance to FPL pertaining to issues involving the endangered Florida panther (*Puma concolor coryi*).

- Researched and developed panther-friendly site designs for new solar electric generating facilities within the range of the Florida panther.

- Assessed panther-related impacts and mitigation requirements for multiple solar electric generating facilities in South Florida and coordinated with state and federal agencies and stakeholders.

Biological Consultant, U.S. Fish and Wildlife Service, Naples, FL.  2022-2025.

- Drafted text, tables, figures, and literature citations to update the US Fish and Wildlife Service's (USFWS) Florida Panther Species Status Assessment to Version 2.0.

- Created a new GIS model of panther habitats statewide in Florida.

- Performed GIS analyses to evaluate the effects of habitat loss due to human population growth and development and sea level rise on panther habitats through 2040 and 2070 and evaluated effects of habitat loss on future panther population viability.

Biological Consultant, The Nature Conservancy, Tallahassee, Florida.  September 2020.

- Completed a scientifically based overview of potential impacts to Florida panthers and other imperiled species associated with the proposed Southwest Florida Expressway project through Central and South Florida.

- Provided a written report with text, tables, maps, and literature citations to TNC.

- Provided public comments at the September 2020 MCORES Southwest Corridor meeting.

Biological Consultant, Florida Fish and Wildlife Conservation Commission, Naples, FL.  2018-2020.

- Conducted literature review and drafted 11 chapters of the USFWS Florida Panther Species Status Assessment Version 1.0, including text, tables, figures, and literature citations.

Supp. App. 0958

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 154 of 273
Case 1:25-cv-22896-KMW    Document 38-7    Entered on FLSD Docket 07/16/2025    Page 3 of 13

**Randy S. Kautz, B.S.**                                                                      **Page 2**

- Chapters included legal status of the species; historical causes of decline; physical description; distribution; life history; ecology and habitat characteristics; abundance, trend, and distribution; habitat suitability analysis; stressors (factors influencing viability); existing conservation measures; and landscape-factors which could impact future populations.

- Completed GIS analyses of a statewide panther habitat model; calculated potential loss of habitat through 2040 and 2070 associated with human population growth and development and sea level rise; and evaluated effects of future conditions on panther population viability.

Senior Scientist, Breedlove, Dennis & Associates, Inc. (BDA), Tallahassee, Florida.  2005 to 2014.

- Created spatially explicit GIS-based landscape-scale plans for conservation of wildlife and biodiversity.

- Conducted reviews of GIS databases for records of occurrence of T&E species of plants and animals and their habitats on sites proposed for development.

- Created and maintained an Access database of listed species of wildlife by county in Florida.

- Drafted assessments of impacts of proposed development projects on T&E species with a focus on the Florida panther, Florida black bear (*Ursus americanus floridanus*), Florida scrub jay (*Aphelocoma coerulescens*), Florida sandhill crane (*Grus canadensis pratensis*), crested caracara (*Caracara cheriway*), Florida grasshopper sparrow (*Ammodramus savannarum floridanus*), gopher tortoise (*Gopherus polyphemus*), and sand skink (*Neoseps reynoldsi*).

- Conducted field surveys for the presence of T&E species of wildlife.

- Conducted reviews of the potential need for wildlife crossings or underpasses based on species needs and site conditions.

Director, Office of Data Portal, Florida Fish and Wildlife Conservation Commission (FWC), Tallahassee, Florida.  2004 to 2005.

- Provided leadership, direction, and administrative oversight for the office.

- Coordinated with agency executive staff, partners and stakeholders, and the public.

- Planned and implemented enterprise data integration efforts.

- Evaluated, selected, and implemented portal software.

- Implemented Web-based access to GIS data.

- Participated in agency efforts to convert paper data records and technical reports to digital format.

Supp. App. 0959

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 155 of 273
Case 1:25-cv-22896-KMW   Document 38-7   Entered on FLSD Docket 07/16/2025   Page 4 of 13

**Randy S. Kautz, B.S.**                                                                                                 **Page 3**

Habitat Protection Planning Section Leader, Office of Environmental Services, FWC (formerly the Florida Game and Fresh Water Fish Commission [FGFWFC]), Tallahassee, Florida.  1984 to 2004.

- Planned, developed and managed budget, and implemented habitat protection efforts of Florida's Nongame Wildlife Program.

- Supervised and conducted environmental impact assessments, endangered species surveys, and incidental take permitting for endangered species in the Florida Keys.

- Developed and published guidelines for the protection of listed species and their habitats on lands slated for development.

- Supervised agency staff responsible for coordinating Partners in Flight.

- Identified priority lands for protection of Florida's biodiversity using Landsat satellite imagery, wildlife occurrence databases, and GIS technology.

- Provided GIS technical assistance to agency staff, other governmental agencies, private conservation organizations, private consultants, and the public.

- Implemented miscellaneous efforts to coordinate nongame habitat protection functions with other sections of the Nongame Wildlife Program, other agencies, and the public.

Biological Scientist, Office of Environmental Services, FGFWFC, Tallahassee, Florida.  1977 to 1984.

- Conducted field inspections and commented on the impacts of dredge and fill projects, public works projects, Developments of Regional Impact, mined land reclamation projects, National Pollutant Discharge Elimination System permits, etc., on fish and wildlife resources in northeast Florida.

- Coordinated agency review of proposed power plants, transmission lines, and sewage treatment plants statewide.

- Developed and published data concerning the effects of eutrophication and habitat change on fishery resources.

Environmental Specialist, Department of Environmental Engineering Sciences, University of Florida, Gainesville, Florida.  1976 to 1977.

- Served as Research Project Manager (PM) for a $300,000 study of human radiation exposure associated with Florida phosphate industry activities.

- Planned and implemented field studies of the occurrence of various radionuclides in homes, industrial facilities, and soils.

- Analyzed data and drafted reports.

- Supervised graduate student studies associated with the project.

Radiological Consultant, Earth Resources Development Corporation, Gainesville, Florida.  1977.

- Surveyed and reported on radiation levels in and around a proposed limestone mine in central Florida.

Supp. App. 0960

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 156 of 273
Case 1:25-cv-22896-KMW    Document 38-7    Entered on FLSD Docket 07/16/2025    Page 5 of 13

**Randy S. Kautz, B.S.**                                                                  **Page 4**

Wildlife Biologist, School of Forest Resources and Conservation, University of Florida, Gainesville, Florida. 1974 to 1976.

- Served as Research PM for a study of an urban pond owned by the National Park Service in Jacksonville, Florida.

- Planned and implemented field studies of small mammals, birds, reptiles, amphibians, fishes, hydrology, water quality, and vegetation communities.

- Provided modeling and computer simulation of the impacts of proposed management schemes.

- Drafted a management plan.

Whitewater Guide, Nantahala Outdoor Center, Bryson City, North Carolina. 1974 to 1974.

- Guided members of the public on whitewater rafting trips down the Nanatahala River.

- Provided lessons in whitewater safety and ensured the safety of the public during whitewater experiences.

Lab Assistant, School of Forest Resources and Conservation, University of Florida, Gainesville, Florida. 1973 to 1974.

- Conducted Soil and vegetation sampling, water level mapping, controlled burning in freshwater marsh and in pine (*Pinus* sp.) flatwoods ecosystems, hydrologic modeling, and computer simulation

Lab Assistant, Soils Department, University of Florida, Gainesville, Florida. 1973.

- Collected, prepared, and analyzed soil samples for nitrogen content.

Field Assistant: Eco-Impact, Inc., Gainesville, Florida. 1973.

- Installed bird nest boxes in developing areas.

- Revegetated manmade ponds.

- Sampled estuarine sediments and macroinvertebrates.

- Assisted in the preparation of environmental impact statements.

**Education:**

Graduate Coursework. University of Florida, Gainesville. 1976-1977. Environmental Biology.

B.S.                    University of Florida, Gainesville, 1974. Wildlife Ecology (Cum Laude).

A.A.                    Daytona Beach, Florida, Community College, 1971. Pre-engineering Curriculum.

Supp. App. 0961

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 157 of 273
Case 1:25-cv-22896-KMW    Document 38-7    Entered on FLSD Docket 07/16/2025    Page 6 of 13

**Randy S. Kautz, B.S.**                                                                                          **Page 5**

---

**Journal Articles and Book Chapters:**

Bolch, W.E., N. Desai, C.E. Roessler, and **R.S. Kautz**.  1980.  *Determinants of radon flux from complex media: virgin and reclaimed lands in the Florida phosphate region*.  Pages 1673-1681 in T.F. Gesell and W.M. Lowder, editors.  Natural radiation environment III, Volume 2.  Technical Information Center, U.S. Dept. of Energy, Springfield, Virginia.

Enries, M., T. Gilbert, and **R. Kautz**.  2003.  *Environmental planning in Florida: Mapping wildlife needs in Florida: The integrated wildlife habitat ranking system*.  Pages 525-534 in Irwin, C.L., P. Garrett, and K.P. McDermott, editors.  2003 Proceedings of the international conference on ecology and transportation.  Center for Transportation and the Environment, North Carolina State University, Raleigh, North Carolina.

Estevez, E.D., B.J. Hartman, **R.S. Kautz**, and E.D. Purdum.  1984.  *Ecosystems of surface waters*.  Pages 92-107 in E. A. Fernald, editor.  Water resources atlas of Florida.  Florida State University, Tallahassee, Florida.

Gilbert, T., **R. Kautz**, T. Eason, R. Kawula, and C. Morea.  2001.  *Prioritization of statewide black bear roadkill problem areas in Florida*.  Pages 574-579 in Evink, Gary, editor.  Proceedings of the International Conference on Ecology and Transportation.  Center for Transportation and Environment, North Carolina State University, Raleigh, NC.

**Kautz, R.S.** 1980.  *Effects of eutrophication on the fish communities of Florida lakes*.  Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 34:67-80.

**Kautz, R.S.** 1981.  *Fish populations and water quality in North Florida rivers*.  Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 35:495-507.

**Kautz, R.** 1992.  *Wildlife habitats*.  Pages 70-71 in E.A. Fernald and B.D. Purdum, editors.  Atlas of Florida.  University Press of Florida, Gainesville, Florida.

**Kautz, R.S.** 1984.  *Criteria for evaluating the impacts of development on wildlife habitats*.  Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 38:121-136.

**Kautz, R.S.** 1993.  *Trends in Florida wildlife habitat 1936-1987*.  Florida Scientist 56(1):7-24.

**Kautz, R.S.** 1998.  *Land use and land cover trends in Florida 1936-1995*.  Florida Scientist 61(34):171-187.

**Kautz, R.S.** and J.A. Cox. 2001.  *Strategic habitats for biodiversity conservation in Florida*.  Conservation Biology 15(1):55-77.

**Kautz, R.S.**, D.T. Gilbert, and G.M. Mauldin.  1993.  V*egetative cover in Florida based on 1985-1989 Landsat Thematic Mapper imagery*.  Florida Scientist 56(3): 135-154.

**Kautz, R.S.**, T. Gilbert, and B. Stys. 1999.  *A GIS plan to protect fish and wildlife resources in the Big Bend area of Florida*.  Pages 193-208 in Evink, G.L., P. Garrett, and D. Zeigler, editors.  Proceedings of the third international conference on wildlife ecology and transportation.  FL-ER-73-99.  Florida Department of Transportation, Tallahassee, Florida.

**Kautz, R.S.**, K. Haddad, T.S. Hoehn, T. Rogers, E.D. Estevez, and T. Atkeson.  1998. *Natural systems*.  Pages 82-113 in E.A. Fernald and E.D. Purdum, editors.  Water resources atlas of Florida.  Florida State University, Tallahassee, Florida.

**Kautz, R.**, R Kawula, T. Hoctor, J. Comiskey, D. Jansen, D. Jennings, J. Kasbohm, F. Mazzotti, R McBride, L. Richardson, and K. Root.  2006.  *How much is enough?  Landscape-scale conservation for the Florida panther*.  Biological Conservation 130:118-133.

---

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/05/2026    Page: 158 of 273
Case 1:25-cv-22896-KMW    Document 38-7    Entered on FLSD Docket 07/16/2025    Page 7 of 13

Supp. App. 0962

**Randy S. Kautz, B.S.**                                                                                    **Page 6**

**Kautz, R.**, B. Stys, and R. Kawula.  2007.  *Florida vegetation 2003 and land use change between 1985-89 and 2003*.  Florida Scientist 70(1):12-23.

Roessler, C.E., **R. Kautz**, W.E. Bolch, Jr., and J.A. Wethington, Jr. 1980.  *The effect of mining and land reclamation on the radiological characteristics of the terrestrial environment of Florida's phosphate regions*.  Pages 1476-1493 *in* T.F. Gesell and W.M. Lowder, editors.  Natural radiation environment III, Volume 2.  Technical Information Center, U.S. Dept. of Energy, Springfield, Virginia.

Stys, B., and **R. Kautz**.  1993.  *Habitat protection guidelines for species threatened by large-scale development*.  Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 47:311-319.

Swanson, K., D. Land, **R. Kautz**, and R. Kawula.  2005.  *Use of least cost pathways to identify key highway segments for Florida panther conservation*.  Pages 191-200 *in* Beausoleil, R. A., and D. A Martorello, editors.  Proceedings of the Eighth Mountain Lion Workshop, Washington Department of Fish and Game, Olympia, WA.

Tear, T. H., P. Kareiva, P. L. Angermeier, P. Comer, B. Czech, **R. Kautz**, L. Landon, D. Mehlman, K. Murphy, M. Ruckelshaus, J. M. Scott, and G. Wilhere.  2005.  *How much is enough? The recurrent problem of setting measureable objectives in conservation*.  BioScience 55(10):835-849.

Williams, V.P., D.E. Canfield, Jr., M.M. Hale, W.E. Johnson, **R.S. Kautz**, J.T. Krummrich, F.H. Langford, K. Langland, S.P. McKinney, and D.M. Powell.  1985.  *Lake habitat and fishery resources of Florida*.  Pages 43-120 *in* W. Seaman, Jr., editor.  Florida aquatic habitat and fishery resources.  Florida Chapter of the American Fisheries Society, Kissimmee, Florida.

**Technical Reports:**

Endries, M., T. Gilbert, and **R. Kautz**.  2008.  *The integrated wildlife habitat ranking system 2008*.  Technical report.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Endries, M., B. Stys, G. Mohr, G. Kratimenos, S. Langley, K. Root, and **R. Kautz**.  2009.  *Wildlife habitat conservation needs in Florida: updated recommendations for strategic habitat conservation areas*.  FWRI Technical Report TR-15.  Florida Fish and Wildlife Conservation Commission, Tallahassee, FL.

Cox, J., D. Inkley, and **R. Kautz**.  1987.  *Ecology and habitat protection needs of gopher tortoise (Gopherus polyphemus) populations found on lands slated for large-scale development in Florida*.  Florida Game and Fresh Water Fish Commission, Nongame Wildlife Program Technical Report No. 4, Tallahassee, Florida.

Cox, J., **R. Kautz**, M. MacLaughlin, and T. Gilbert.  1994.  *Closing the gaps in Florida's wildlife habitat conservation system*.  Florida Game and Fresh Water Fish Commission, Tallahassee, Florida.

Cox, J., **R. Kautz**, M. MacLaughlin, and T. Hoehn.  1998.  *Preservation 2000 Act study: biodiversity conservation analysis*.  Office of Environmental Services, Florida Game and Fresh Water Fish Commission, Tallahassee, Florida.

Cox, J.A., and **R.S. Kautz.**  2000.  *Habitat conservation needs of rare and imperiled wildlife in Florida*.  Office of Environmental Services, Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida.

**Kautz, R.S.** 1990.  *Use of a geographic information system in wildlife habitat protection planning in Florida*.  Pages 45-50 *in* J.E. Reynolds, III, and K.D. Haddad, editors.  Report of the workshop on geographic information systems as an aid to managing habitat for West Indian manatees in Florida and Georgia.  Florida Marine Research Publications No. 49, Florida Marine Research Institute, St. Petersburg, Florida.

**Randy S. Kautz, B.S.**                                                        **Page 7**

**Kautz, R.** 1994. *Historical trends within the range of the Florida panther*. Pages 285-296 *in* D.B. Jordan, editor. Proceedings of the Florida panther conference. Florida Panther Interagency Committee, Ft. Myers, Florida.

**Kautz, R.S.** and J.A. Cox. 1993. *Identification of critical Florida wildlife habitats using GIS technology*. Proceedings of the Fourth Annual USFWS GIS Workshop. Lafayette, Louisiana.

**Kautz, R.** and J. Krummrich. 1985. *Fishery resources*. Pages 128-156 *in* L. Ross, editor. Limnology of the Suwannee River, Florida. Biology Section, Florida Department of Environmental Regulation, Tallahassee, Florida.

**Kautz, R.**, J. Cox, M. MacLaughlin, and J. Stys. 1994. *Mapping wetland habitats of high priority to endangered and threatened species on Florida*. Final project report to U.S. Environmental Protection Agency (EPA). Office of Environmental Services, Florida Game and Fresh Water Fish Commission, Tallahassee, Florida.

**Kautz, R.**, J. Cox, and M. MacLaughlin. 1998. *Status of biodiversity conservation in Florida*. Natural resources forum 98: Linkages in ecosystem science, management, and restoration. University of Florida, Gainesville, Florida.

**Kautz, R.**, T. Gilbert, and B. Stys. 1998. *Big Bend coastal lowlands ecological resource assessment recommendations*. Office of Environmental Services, Florida Game and Fresh Water Fish Commission, Tallahassee, Florida.

**Kautz, R.S.** and R. Reddy. 1996. *Land-based ecosystems workgroup results*. L. Berry, editor. Proceedings of the Florida Department of Environmental Protection/State University System ecosystem research needs workshop. Center for Environmental Studies, Florida Atlantic University, Boca Raton, Florida.

**Kautz, R.**, B. Stys, and D. Reed. 2004. *A change detection analysis for Florida: 1985-89 to 2003*. Final report to U.S. Fish and Wildlife Service (USFWS), Wildlife Conservation and Restoration Program Grant R -1-1. FWC, Tallahassee, Florida

Stys, B., **R. Kautz**, D. Reed, M. Kertis, R Kawula, C. Keller, and A. Davis. 2004. *Florida vegetation and land cover data derived from 2003 Landsat ETM+ Imagery*. Final report to USFWS, Wildlife Conservation and Restoration Program Grant R-l-l. Florida Fish and Wildlife Conservation Commission, Tallahassee, Florida.

Swanson, K., D. Land, **R. Kautz**, and R. Kawula. 2008. *Use of least-cost pathways to identify key road segments for Florida panther conservation*. Fish and Wildlife Research Institute Technical Report TR-13, Florida Fish and Wildlife Conservation Commission, St. Petersburg, FL.

**Popular Articles:**

**Kautz, R.**, J. Cox, T. Gilbert, and M. MacLaughlin. 1994. *Strategic habitat conservation areas for Florida wildlife*. Keep Florida Beautiful Magazine (Winter/Spring 1994):18-21.

**Kautz, R.S.** 1991. *Space age habitat mapping*. Florida Wildlife 45(3):30-33.

**Kautz, R.S.** 1994. *Closing the gaps: a plan to protect Florida's biodiversity*. Florida Wildlife 8(5):24-26.

**Kautz, R.S.** 1990. *Florida wildlife habitat, the last 50 years*. Florida Wildlife 44(5):2-6.

**Kautz, R.**S. 1992. *Satellite imagery and GIS help protect wildlife habitats in Florida*. GeoInfoSystems 2(1):37-42.

Supp. App. 0964

USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2026   Page: 160 of 273
Case 1:25-cv-22896-KMW   Document 38-7   Entered on FLSD Docket 07/16/2025   Page 9 of 13

**Randy S. Kautz, B.S.**                                                                          **Page 8**

---

**Invited Speaker Presentations:**

Carnivores 2006.  November 15, 2006.  St. Petersburg, Florida.  *Functional Habitat for Florida Panthers.*

Florida Panther Recovery Team.  April 20, 2005.  Orlando, Florida.  *Landscape-scale Conservation Planning for the Florida Panther: Results of the Panther Sub-team of MERIT.*

Florida Dry Prairie Conference.  October 5-7, 2004.  Sebring, Florida.  *Prairie Birds.*

Southeastern Association of Fish and Wildlife Agencies, State Wildlife Grants Ad Hoc Committee.  July 12-14, 2004.  Atlanta, GA.  *Utilizing GIS for Landscape Level Planning.*

State Road (SR) 40 Environmental Feasibility Study, Task Force Meeting.  December 11, 2003.  Silver Springs, Florida.  *Biodiversity Conservation Planning: SR 40 Ocala - Ormond Beach.*

National Gap Analysis Program Annual Meeting.  October 6-9, 2003.  Ft. Collins, CO.  *Applications of Habitat Models to Decision-Making Processes Affecting Land Use in Florida.*

Defenders of Wildlife, Workshop on the Next 100 Years of the National Wildlife Refuge System.  May 29-30, 2003.  Washington, D.C.  *Biodiversity Conservation Planning in Florida.*

US Fish and Wildlife Service, State Wildlife Grants Program, Comprehensive Wildlife Conservation Strategy Workshop for Southeastern States.  April 21-23, 2003.  Atlanta, GA.  *Applications of Biodiversity Conservation Planning Data in Florida.*

Greater Everglades Ecosystem Restoration Annual Conference.  April 15, 2003.  Palm Harbor, Florida.  *Florida Panther: Habitat and Landscape Linkage Modeling.*

US Fish and Wildlife Service, Conservation Data Workshop.  April 1-2, 2003.  Panama City, Florida.  *Biodiversity Conservation Planning in Florida.*

Florida Public Interest and Environment Annual Conference.  February 28, 2003.  Gainesville, Florida.  *Biodiversity Conservation Planning in Florida.*

Florida Land Acquisition Partnership Annual Conference.  November 20-22, 2002.  Howey-in-the-Hills, Florida.  *Florida Panther: Habitat and Landscape Linkage Modeling.  Moderator: Wildlife Corridors Session.*

International Association for Landscape Ecology, 17th Annual Symposium.  April 23-26, 2002.  Lincoln, Nebraska.  *Identification and Protection of Landscapes Important to Biodiversity Conservation in Florida.*

Environmental Law Institute's National Biodiversity Symposium.  January 17-18, 2001.  Washington, D.C.  *Florida's Closing the Gaps Project.*

Florida Land Acquisition Partnership Annual Conference.  November 15-17, 2000.  Haines City, Florida.  *Are We Protecting Florida's Most Critical Resources?*

Florida Chapter of the Wildlife Society, Spring Meeting.  April 11, 2000.  Daytona Beach, Florida.  *Strategic Habitats and Habitat Loss in Florida.*

Florida Forever Advisory Council Meeting.  October 20, 1999.  Tallahassee, Florida.  *Habitat Conservation Planning in Florida.*

Society for Conservation Biology Annual Meeting, Regional-scale Conservation Planning Symposium.  June 20, 1999.  College Park, Maryland.  *When Public Lands Aren't Enough: Identifying Strategic Habitats on Private Lands in Florida.*

---

Supp. App. 0965

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 161 of 273
Case 1:25-cv-22896-KMW   Document 38-7   Entered on FLSD Docket 07/16/2025   Page 10 of 13

**Randy S. Kautz, B.S.**                                                                                      **Page 9**

GIS at Work in Florida's Environment Conference.  June 5-6, 1997.  Tallahassee, Florida.  *Overview of GIS Programs at the Florida Game and Fresh Water Fish Commission.*

Ecosystem Management Society of Japan, Florida Tour.  May 19, 1997.  Wakulla Springs, Florida.  *Closing the Gaps in Florida's Wildlife Habitat Conservation System.*

Southeastern States Natural Heritage Programs Annual Conference.  Keynote Address.  April 21, 1997.  Tallahassee, Florida.  *Closing the Gaps in Florida's Wildlife Habitat Conservation System.*

Florida Department of Transportation (FDOT) Annual Environmental Issues Conference.  April 3-4, 1997.  Archbold Biological Station, Lake Placid, Florida.  *Environmental Impact Assessment Using GIS and 'Closing the Gaps' Report Data.*

Florida Institute of Park Personnel 133rd Annual Fall Conference.  November 6, 1996.  Tallahassee, Florida.  *Wildlife Corridors - Urban to Rural.*

The Nature Conservancy (TNC) Annual Trustee Meeting (The Science of Portfolio Design Workshop).  September 25-28, 1996.  Washington, DC.  *Implementation of Florida's 'Closing the Gaps' Project.*

FGFWFC, Division of Wildlife Annual Meeting.  August 29, 1996.  St. Augustine, Florida.  Title: *Closing the Gaps in Florida's Wildlife Habitat Conservation System.  GIS Workshop.*

Florida Native Plant Society Annual Meeting.  May 30-June 2, 1996.  Sarasota, Florida.  *Habitat Fragmentation.*

Pinellas Chapter of the Florida Native Plant Society.  March 6, 1996.  Largo, Florida.  *Closing the Gaps in Florida's Wildlife Habitat Conservation System.*

South Carolina State Mapping Advisory Committee Biennial Conference.  January 23-24, 1996.  Columbia, South Carolina.  *Florida Gap Analysis.*

Florida Chamber of Commerce Environmental Permitting Short Course.  Orlando, Florida.  January 17-18, 1996.  *Endangered and Threatened Species.  Title: Ecosystem Management Progress Report.*

Florida Biotic Information Consortium, Annual Meeting.  Gainesville, Florida.  November 8-9, 1995.  *GIS Data Layers Available from the Florida Game and Fresh Water Fish Commission.*

Florida Department of Environmental Protection (FDEP)/State University System Ecosystem Research Needs Workshop.  St. Petersburg, Florida.  June 13-14, 1995.  Facilitator:  Land-based Ecosystems Work Group.

Florida Youth Environmental Summit.  Orlando, Florida.  April 30-May 2, 1995.  Invited Panelist:  Habitat Pizza-Who Gets a Slice?

FDOT Annual Environmental Conference.  April 19-21, 1995.  Orlando, Florida.  *GIS Data Layers Available from the Florida Game and Fresh Water Fish Commission.*

National Gap Analysis Principal Investigators Annual Workshop, Silverdale, Washington.  1994.  *Modeling techniques used to predict vertebrate species distributions in Florida.*

Biodiversity of the Southern Appalachians Conference.  March 18-19, 1994.  Asheville, North Carolina.  *Closing the Gaps Study in Florida.*

FGFWFC's 1993 Florida Fish and Wildlife Conference.  November 5-7, 1993.  Haines City, Florida.  *Habitat Protection Planning for Florida Wildlife.*

Supp. App. 0966

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 162 of 273
Case 1:25-cv-22896-KMW   Document 38-7   Entered on FLSD Docket 07/16/2025   Page 11 of 13

**Randy S. Kautz, B.S.**                                                                                      **Page 10**

**Committee Appointments:**

Florida Natural Areas Inventory and University of Florida GeoPlan Center, Critical Lands and Waters Identification Project, Technical Advisory Group Member.  2007 to Present.

Florida Fish and Wildlife Conservation Commission (FWC), MyFWC.com Design Guidelines and Review Standing Team.  August 2004 to February 2005.

FWC, Data Standards Issue Team.  December 2003 to February 2005.

FWC, Records Management Issue Team.  November 2003 to February 2005.

FWC, US Fish and Wildlife Service (USFWS) State Wildlife Grants Issue Team.  September 2003 to February 2005.

FWC, Senior Leadership Team.  July 2003 to February 2005.

FWC, Information Technology Steering Committee.  June 2003 to February 2005.

The Nature Conservancy, Workshop on Setting Quantitative Ecological Goals in Regional Planning Efforts, Seattle, Washington.  June 2002 to February 2005.

Florida Natural Areas Inventory, Florida Forever Conservation Needs Assessment, Expert Technical Advisory Group Member.  February 2002 to Present.

USFWS, South Florida Multi-species Ecosystem Recovery Implementation Team Member and Florida Panther Sub-team Member.  October 1999 to February 2005.

FWC, Information Technology Council.  October 1999 to July 2001.

Florida Keys Carrying Capacity Study, Species Workgroup Member, GIS Workgroup Member.  June 1999 to February 2005.

Key Deer Habitat Conservation Plan Steering Committee.  January 1999 to February 2005.

St. Johns River Water Management District, Cumulative Impacts of Wetlands Loss Committee.  August 1998 to August 2000.

State of Florida, Geographic Information Advisory Council.  1996 to 2000.

Southern Appalachians Forest Coalition.  Southern Appalachians Biodiversity Project "Kitchen Cabinet," Member.  March 1996.

FDEP/State University System. Ecosystem Management Research Needs Workshop Steering Committee.  1995 to 1996.

Florida Greenways Commission.  System Design Committee, Member.  1995 to 1997.

FDEP.  Ecosystem Management Implementation Steering Committee, Member.  Science and Technology Subcommittee, Co-chair.  1994 to 1996.

Florida Environmental Risk Assessment.  Ecology Technical Advisory Committee, Member.  1994 to 1995.

Florida Preservation 2000 Needs Assessment.  Data Inventory and Assessment Committee, Member.  1990.

Supp. App. 0967

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 163 of 273
Case 1:25-cv-22896-KMW    Document 38-7    Entered on FLSD Docket 07/16/2025    Page 12 of 13

**Randy S. Kautz, B.S.**                                                                                      **Page 11**

---

Florida Keys Resource Planning and Management Committee, Member.  Appointed by Governor Bob Martinez, 1990 to 1992.

Growth Management Data Network Coordinating Council, Alternate Council Member, Staff Advisory Committee Member. 1990 to 1995.

FGFWFC, Nongame Wildlife Program, Contracted Research Selection Committee Member, January 1985 to August 2001; March to April 2004.

**Contracts and Grants:**

Project Manager (PM).  USFWS, State Wildlife Grants program grant to implement a data warehouse within the FWC and to publish fish and wildlife GIS data via the internet.  2004 to 2005.

PM.  USFWS, Wildlife Conservation and Restoration Program grant to update the FWC's Landsat-based land cover database from 1985 to 89 through 2003.  $108,000 contract amount.  2001 to 2004.

PM.  Wildlife Foundation of Florida grant to update the FWC's Landsat-based land cover database from 1985 to 89 through 2003.  $36,000 contact amount.  2001 to 2003.

PM.  U.S. Geological Survey, Biological Resources Division, grant to the FWC to develop a GIS database of Florida's freshwater fishes and post results on the Internet.  $56,000 contract amount.  1999 to 2000.

PM.  Florida Game and Fresh Water Fish Commission (FGFWFC) subcontract with the Cooperative Fish and Wildlife Research Unit at the University of Florida to update a digital vegetation map of north central Florida and the Florida panhandle using Landsat Thematic Mapper imagery and ancillary databases. $170,539 contract amount.  1996 to 2000.

PM.  EPA cooperative agreement with the FGFWFC to update a digital vegetation map of north central Florida and the Florida panhandle using Landsat Thematic Mapper imagery and ancillary databases.  $170,539 contract amount.  1996 to 2001.

PM.  USFWS cooperative agreement with the FGFWFC to perform specific recovery actions for the Lower Keys marsh rabbit (*Sylvilagus palustris hefneri*), silver rice rat (*Oryzomys argentatus*), and Stock Island tree snail (*Orthalicus reses*) in the Florida Keys.  $50,000 contract amount.  1994 to 1996.

Principal investigator/PM.  EPA cooperative agreement with the FGFWFC to map Florida wetlands used by wetland-dependent species of wildlife listed as endangered, threatened, and species of special concern by the State of Florida.  $76,000 contract amount.  1993 to 1994.

PM.  FGFWFC contract with FDOT to produce a digital map of vegetation and land cover in Florida using Landsat Thematic Mapper imagery.  $300,000 contract amount.  1987 to 1990.

**Awards:**

Osprey Award:  Recognizing Extraordinary Effort to Protect and Preserve Florida's Environment.  1998.  Florida Chapter of the Sierra Club.

Excellent Informational Poster Award.  1998.  FDEP, Third Annual GIS Workshop.

---

Supp. App 0968

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 164 of 273
Case 1:25-cv-22896-KMW   Document 38-7   Entered on FLSD Docket 07/16/2025   Page 13 of 13

**Randy S. Kautz, B.S.**                                                                                     **Page 12**

**Certifications:**

    Certified in the use of the USFWS' Habitat Evaluation Procedures.  1986.

**Associations:**

    Florida Ornithological Society (1988-2011)

    Society for Conservation Biology (1988-2011)

    The Nature Conservancy (2006-2011)

    Florida Academy of Sciences (1993-2011)

    The Wildlife Society (2009-2011)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**No. 25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., et al.

     Plaintiffs,

v.

KRISTI NOEM, et al.,

     Defendants.

**DECLARATION OF IAN GADEA-GUIDICELLI IN SUPPORT OF DEFENDANT**
**KEVIN GUTHRIE'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' MOTION**
**FOR A TEMPORARY RESTRAINING ORDER**

     I, Ian Gadea-Guidicelli, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of

perjury that the following is true and correct based upon my personal knowledge and review of the

relevant records maintained in the ordinary course of business:

     1.    I am the State Emergency Response Team Chief and Response Bureau Chief.  I

make this declaration in support of Defendant Kevin Guthrie's response to Plaintiffs' motion for

a temporary restraining order.  If called as a witness, I could and would competently testify to the

matters set forth herein.

     2.    All facilities, buildings, and paving related to the detention facility at the Dade-

Collier Training and Transition Airport are, and will remain, in Collier County, Florida.

     3.    As shown below, the vast majority of the site, including all buildings and pavement,

is located in Collier County.  There is a small, unpaved extension of the runway that juts slightly

into Miami-Dade County.  But that runway extension has not been, and is unlikely to be, used to

support facilities or operations at the detention center.

1



4.    All substantial decision-making about the detention facility has occurred at either State offices in Tallahassee, Florida, or on-site in Collier County, Florida.

5.    No substantial decision-making about the detention facility has occurred in Miami-Dade County.

Executed on July 21st , 2025, in Tallahassee, Florida.

Ian Paul Gadea Guidicelli

_____
Ian Gadea-Guidicelli, SERT Chief

2

Supp. App. 0971

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-22896-KMW

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

       Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

       Defendants.

and

THE MICCOSUKEE TRIBE OF INDIANS,

       Proposed Intervenors.

## DECLARATION OF JOSEPH KINNEBREW

1. I am an Airport Manager for the Miami-Dade Aviation Department, with responsibilities

   over the Dade-Collier Training and Transition Airport ("TNT"). I am over 18 years old and

   have personal knowledge of the matters set forth in this declaration.

2.  The attached spreadsheet is a true, complete and correct copy of data maintained by the Miami-Dade Aviation Department  regarding arrivals and departures (the "Arrivals and Departures Information") of aircraft at the Dade-Collier Training and Transition Airport ("TNT") from January 1, 2020, through December 31, 2024.

3.  The Arrivals and Departures Information is based on data available to the Miami-Dade Aviation Department through a software provider called ANOMS, which is used generally by the Miami-Dade Aviation Department to address noise abatement issues at Miami International Airport but which the Miami-Dade Aviation Department also generally used to track arrivals and departures from TNT from January 1, 2020, through December 31, 2024.

4.  To the best of my knowledge and understanding, the ANOMS software uses (and the Arrivals and Departures Information in the attached spreadsheet is based on) data recorded by FAA radar located at Miami International Airport, which radar is able to track aircraft arriving and departing TNT using the signal broadcasted by an aircraft's ADS-B transponder provided that the aircraft's ADS-B transponder was operational at the time of the arrival or departure.

5.  The ANOMS data does have a limitation, however.  Sometimes, an aircraft will practice numerous runway landings and takeoffs without leaving the airport's immediate airspace. To the best of my knowledge and understanding, the ANOMS data would capture that as only one arrival/departure.

6.  Each line in the Arrivals and Departure Information in the attached spreadsheet represents a single arrival into and departure from TNT's traffic pattern based on the information captured from the ANOMS software as described above.

7. These records were made at or near the time of the events set forth therein by people with knowledge of those matters.

8. It is the regular practice of the Miami-Dade Aviation Department to make and maintain these records.

9. These records were kept and maintained in the regular course of the business activity of the Miami-Dade Aviation Department.

10. These records also constitute official records of Miami-Dade County.

11. The attached records show the following number of arrivals and departures at TNT by year as follows:

    a. 4,154 in 2024
    b. 1,785 in 2023
    c. 1,656 in 2022
    d. 2,693 in 2021
    e. 1,293 in 2020

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 5, 2025.

/s/ Joseph Kinnebrew
Joseph Kinnebrew
Airport Manager
Miami-Dade Aviation Department



WERP
RECOMMENDED
PLAN

**LEGEND**

- Seminole Tribe of Florida
- Miccosukee Tribe of Indians
- South Florida Water Management District Feeder Canal Basin Water Quality Program
- ● Existing Culverts
- ● Existing Structures
- ╱ Existing Canals
- ╲ Existing Roads

**WERP FEATURES**
(not to scale; not representative of final placement)

- Water Treatment
- Treated Water
- Spreader Canal
- Embankment
- Canal Backfill
- Canal Backfill/ Degrade Levee
- Canal Modifications
- Plug
- Plug with Levee Tie-In
- Pump
- Inline Weir
- Gated Culvert
- Culvert
- Bi-Directional Control Structure
- Ditch Backfill
- McCormack's Landing Restoration
- Vegetation Restoration



**WESTERN EVERGLADES RESTORATION PROJECT (WERP)**

COMPREHENSIVE EVERGLADES RESTORATION PLAN PROJECT | FOR ADDITIONAL INFORMATION : WWW.SAJ.USACE.ARMY.MIL/WERP/     April 2024

**SCS ENGINEERS**



## DILLON N. REIO, P.G.

### Education

MS – Environmental Studies, Florida International University, 2017
BS – Geosciences, Florida International University, 2015

### Professional Licenses

Professional Geologist, Florida License No. PG3168

### Publications

Reio, D. N., Price, R. M., Melesse, A. M., & Ross, M. (2023). Quantification of Evapotranspiration and Water Chemistry in a Remediated Wetland in Everglades National Park, USA. Water, 15(4), 611. https://doi.org/10.3390/w15040611

### Specialty Certifications

OSHA 40 Hour Hazardous Waste Site Worker, Certificate No. 600003195.17

### Professional Experience

Dillon has been an environmental professional since 2017 with experience in field sampling, reporting, assessment, and remediation of contaminated sites. He typically works on large-scale commercial and residential redevelopment projects, but also has experience working on municipal (i.e., Miami-Dade) and governmental (i.e., South Florida Water Management District and Florida Department of Transportation projects). He has a thorough understanding of local and state regulations due to his time spent as a local regulator. Dillon works collaboratively with clients to address regulatory requirements and ultimately obtain their desired regulatory closure.

Notable projects that he has been involved in are described below.

**Stein Family Assemblage, Miami, Florida.** Project Manager responsible for preparing cost budgets and detailed scopes of work to assess 40-acre nursery. Coordinated access with client, subcontractors, and multiple property owners while nursery was still operational. Obtained soil management plan and drainage design approval, allowing site development to progress. Utilized statistical analysis to obtain a background determination for naturally occurring marl below two-feet, saving client significant time and money on additional assessment.

**NW Dade Logistic Center II, Miami, Florida.** Project Manager responsible for preparing cost budgets and detailed scopes of work to assess former lakefill. Obtained soil management plan and drainage design approval, allowing development to progress. Coordinated with civil engineers to obtain design approval for methane gas management system.

**Bridge Point Gratigny, Miami, Florida.** Project Manager responsible for preparing cost budgets and detailed scopes of work to assess current wetland (former Department of Defense shooting range). Developed sampling strategy and coordinated with subcontractors to gain access to assessment locations through dense vegetation. Worked with Miami-Dade Aviation Department and local regulators to obtain soil management plan and drainage design approval, allowing development to

**SCS ENGINEERS**

progress. Site was vacant for numerous year due to contamination and now will have productive use, generating income and tax revenue for Miami-Dade County.

**Presidential Golf Course, Miami, Florida.** Project Manager responsible for oversight and coordination of the following: groundwater and soil sampling, strategy development, and report generation at a former golf course. Site is complex in that drainage design required groundwater modeling to demonstrate no adverse impacts from groundwater plume. Drainage design was approved in 2025 after working with client, lawyers, and regulators to find a solution. The site will be closed with no further action with conditions, where soil and groundwater usage are restricted. As a result, engineering control plans, engineering control maintenance plans, health and safety plans, and dust control plan are required.

Supp. App 0977



# South Florida Detention Facility
# Continuity of Operations Plan

This plan focuses on the need for a full-scale evacuation and relocation due to a tropical cyclone but may be utilized for all-hazards

# Table of Contents

Introduction ...................................................................................................................... 4

   Purpose and Scope ...................................................................................................... 4

   Objectives .................................................................................................................... 5

   Planning Assumptions ................................................................................................. 5

   Authorities and References .......................................................................................... 6

      Authorities ............................................................................................................. 6

      References ............................................................................................................. 6

   Confidential and Exempt .............................................................................................. 6

██████████████████ ............................................................................................. 7

   ████████████ ....................................................................................................... 7

   ████████████████ ........................................................................................... 7

   ██████████████ .................................................................................................. 9

████████████████ ................................................................................................ 10

   Activation Procedures ................................................................................................. 10

      ████████████ ............................................................................................... 10

      ██████████████████ ............................................................................... 10

      ██████████████ ......................................................................................... 11

      ████████████ ............................................................................................... 11

   ████████ .............................................................................................................. 11

   ████████████ ....................................................................................................... 12

   ████████████ ....................................................................................................... 12

   ██████████ ........................................................................................................... 13

   ████████████ ....................................................................................................... 13

   ██████████████ .................................................................................................. 13

   ██████████████ .................................................................................................. 14

Essential Functions ........................................................................................ 14

███████████ ........................................................................................ 15

█████████████████████ ........................................................................................ 15

████████ ........................................................................................ 15

Annex A: ████████████████ ........................................................................................ 17

Annex B: Delegations of Authority & Orders of Succession ................................ 19

Annex C: ███████████ ████████ ........................................................................................ 20

Annex D: ████████████████████ ........................................................................................ 27

████████ ........................................................................................ 27

███████████ ........................................................................................ 27

████████████ ........................................................................................ 27

████████████ ........................................................................................ 28

████████████ ........................................................................................ 28

████████████ ........................................................................................ 29

████████████ ........................................................................................ 29

ATPF Planning Considerations ........................................................................................ 30

█████████████████ ........................................................................................ 30

Essential Functions and Critical Staffing ............................................... 30

ATPF Leadership Functions ........................................................................................ 31

Annex E: ████████████████ ........................................................................................ 32

███████████ ........................................................................................ 32

█████████████████████ ........................................................................................ 33

# Introduction

Upon the implementation of EO 14159, the State of Florida integrated with the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) to augment current law enforcement activities throughout the State. ICE Enforcement Removal Operations (ERO) maintains custody of this transient and diverse population. The detainees are housed in facilities nationwide under civil detention authorities pending the adjudication of their immigration cases or their departure from the United States. ERO exceeded its detention capacity in Florida, leading DHS and the Federal Emergency Management Agency (FEMA) to request the State of Florida to supplement this capacity with a temporary detention facility.

The South Florida Detention Facility (SFDF) has been established at the Dade-Collier Training and Transition (TNT) Airport, within the Florida Everglades, in unincorporated Collier County, Florida. The geography of this location, while ideal for integrated detention operations in support of the DHS – ICE initiatives, is vulnerable to tropical weather. The Florida Division of Emergency Management (FDEM), in coordination with State Emergency Response Team (SERT) partners, will maintain continuous plan refinement efforts in preparation for the potential evacuation of the facility to ensure SFDF Continuity of Operations (COOP).

## Purpose and Scope

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████ This plan provides a summary of necessary actions, considerations, and courses of action for State of Florida leadership to consider when determining the need to establish continuity operations for the SFDF due to hazardous conditions threatening the primary facility.

███████████████████████████████████████████████
███████████████████████████████ All vendors have developed individual continuity planning procedures to include the level of staffing necessary to support the SFDF concurrently with evacuation and relocation of detainees to alternate facilities, alternate operations, and reconstitution. This plan outlines procedures applicable to all courses of action to include ████████████████████████████████████████████
███████████

4

Supp. App. 0981

## Objectives

- Maintain secure custody of all detainees during evacuation, relocation, continuity operations, and reconstitution
- Ensure continuity of all essential services for detainees; to include, but not limited to:
    - Medical care
    - Food service
    - Emergency services
    - Sanitation and waste management
    - Security and communication systems
- Ensure health, safety, and dignity of all detainees at primary and alternate facilities and during transportation
- Reconstitute operations at the SFDF as quickly as possible post-landfall
- Maintain communication between detention facility operations and the SEOC
- Protect critical detainee records and legal documentation
- Maintain operations to support detainee legal processes through alternate operations
- Continue to augment federal immigration detention capacity

## Planning Assumptions

- The primary temporary detention facilities are expected to operate for a year or more in locations vulnerable to impact from natural, man-made or technological hazards that may require relocation of the populations at the facility
- Local, state, and federal agencies, and vendors will collaborate effectively to support the operation of the primary and alternate facilities, including contributions from law enforcement, emergency services, and health departments. Mutual aid agreements are expected to be in place to facilitate resource sharing and personnel support across jurisdictions
- A tropical cyclone that has the potential to cause the evacuation of SFDF also has the potential to exceed the capabilities of counties or state agencies, and the Governor, by executive order or proclamation, will declare a state of emergency for those impacted areas or areas in which the emergency or disaster is anticipated as defined in Section 252.36, Florida Statutes
- Multiple alternate facilities may be used in concurrence upon the decision to evacuate the primary facility; the order of preference is:
    - ████████████████████
    - ██████████████████████
    - ████████████████████████

5

Supp. App. 0982

- ○ ████████████████████
  - ○ ████████████████████
- The SEOC will be staffed by the SERT, available to provide support for SFDF operations

- ████████████████████████████████
  ████████████████████████████████
- ████████████████████████████████
- ████████████████████████████████
  ████████████████████

## Authorities and References

### Authorities

- State of Florida Executive Order 23-03
- Florida Division of Emergency Management Agency Order 2023-001
- Florida Division of Emergency Management Agency Order 2023-002
- Florida Division of Emergency Management Agency Order 2023-003
- Florida Division of Emergency Management Agency Order 2023-004
- Chapter 252, Emergency Management, Florida Statutes
- Chapter 908 Federal Immigration Enforcement, Florida Statutes
- Chapter 23 Part 1 Florida Mutual Aid Act, Florida Statutes
- Chapter 943 Section 3 Department of Law Enforcement, Florida Statutes
- 2024 State of Florida Comprehensive Emergency Management Plan

### References

- ████████████████████████████ (DRAFT)
- ████████████████ (DRAFTS)
- 2025 Florida Model Jail Standards
- Non-Dedicated Intergovernmental Service Agreement
- Border Protection Standards on Transport, Escort, Detention, and Search 2015
- Florida Department of Corrections Continuity of Operations Plan
- Florida Department of Corrections Hurricane Plan

## Confidential and Exempt

This is a confidential and exempt document. In accordance with sections 119.071(2)(d) and 119.071(3), Florida Statutes, this document is confidential and exempt from section 119.07(1), Florida Statutes and § 24(a), Art. I of the State Constitution. Thus, it is exempt from standard distribution.

6

# Roles and Responsibilities

## Command and Control

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████

## State Emergency Response Team

███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████.

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

Supp. App 0984



Supp. App. 0985

## Contracted Vendors



USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/06/2026    Page: 182 of 273

Supp. App. 0986

# Concept of Operations

## Activation Procedures

Monitoring and Activation

[redacted]

Evacuation and Relocation Decision

[redacted]

Should evacuation be required:

- [redacted]
- [redacted]
- [redacted]
- [redacted]

Supp. App. 0987



## Initial Actions

███████████████████████████████████
███████████████████████

███████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

███████████

## Detainee Transportation

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

███████████

| Number of Buses | Seating Capacity | Bus Drivers need for rotation | LE Escort |
|---|---|---|---|
| █ | █ █ █ | █ | █ |
| █ | █ █ █ | █ | █ |

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

██████████████

Supp. App. 0989





are designated with the authority necessary to conduct operations



Supp. App 0992



Supp. App 0993

## Annex A: ██████████

██████████████████████████████████
██████████████████████████████████
████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████████████████

Records will also be redundantly backed up and maintained during a continuity of operations in accordance with:

- Chapter 119, Florida Statutes
- The Florida Department of State General Records Schedule GS1-SL for State and Local Governments
- General Records Schedule GS2 for Law Enforcement, Correctional Facilities, District Medical Examiner
- General Records Schedule GS4 for Public Hospitals, Health Care Facilities and Medical Providers.



Supp. App 0994



Supp. App 0995

# Annex B: Delegations of Authority & Orders of Succession



## Annex C:



Supp. App 0997



Supp. App 0998



Supp. App 0999



Supp. App. 1000



Supp. App. 1001





## Annex D: █████████████████









**Planning Considerations**





## Annex E: 

Supp. App. 1009



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

       Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

       Defendants.

and

THE MICCOSUKEE TRIBE OF INDIANS,

       Intervenors.

## DECLARATION OF MIRANDA DAVIDUK

1.      My name is Miranda Daviduk, and I make this declaration on personal knowledge.

2.      I am a social media strategist at the Center for Biological Diversity (Center) and manage the Center's social media accounts.

3.      On July 30, 2025, I visited the Florida Department of Emergency Management's (FDEM) official X account and took a screenshot of a post made by that account on July 3, 2025,

Supp. App. 1011

which can be found at the following link: https://x.com/FLSERT/status/1940800991340970006.

That screenshot is attached as Exhibit 1.

    4.       On July 30, 2025, I visited the U.S. Department of Homeland Security (DHS)

Secretary Kristi Noem's official X account and took a screenshot of a post made by that account

on July 1, 2025, which can be found at the following link:

https://x.com/Sec_Noem/status/194023794284951026. That screenshot is attached as Exhibit 2.

    5.       On July 30, 2025, I visited the DHS's official X account and took a screenshot of

a post made by that account on July 8, 2025, which can be found at the following link:

https://x.com/DHSgov/status/1942732631394668678. That screenshot is attached as Exhibit 3.

    6.       On July 30, 2025, I visited the U.S. Immigration and Custom Enforcement's

(ICE) official X account and took a screenshot of a post made by that account on July 10, 2025,

that reshared the posted described in paragraph 5, above, and which can be found at the

following link: https://x.com/ICEgov/status/1943383028010508403. That screenshot is attached

as Exhibit 4.

    7.       On July 30, 2025, I visited DHS Secretary Noem's official Facebook page and

took a screenshot of a post made by that account on July 1, 2025, which can be found at the

following link: https://www.facebook.com/share/p/18PmqPMQm3/. That screenshot is attached

as Exhibit 5.

    8.       On July 31, 2025, I visited DHS Secretary Noem's official X account and took a

screenshot of a post made by that account on June 23, 2025, which can be found at the following

link: https://x.com/Sec_Noem/status/1937305539370713168. The screenshot is attached as

Exhibit 6.

Supp. App. 1012

9.      On July 31, 2025, I watched a video of remarks given by DHS Secretary Noem at a July 1, 2025 roundtable President Trump held at Alligator Alcatraz with Governor DeSantis and Secretary Noem, posted on YouTube on July 1, 2025, by Forbes Breaking News at the following link: https://www.youtube.com/watch?v=v9NV-XQb7QU.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 31, 2025.

*Miranda Daviduk*
Miranda Daviduk

**Exhibit 1**



**Exhibit 2**



**Exhibit 3**



**← Post**

**Homeland Security** ✓
@DHSgov

It's SHAMEFUL that the fake news media continues to peddle the false narrative of criminal illegal aliens convicted of rape, homicide, and child sex crimes.

ICE has higher detention standards than most U.S. prisons that hold actual U.S. citizens.

All detainees are provided with proper meals, medical treatment, and have opportunities to communicate with lawyers and their family members.

> **Ana Ceballos** ✓ @anaceballos_ · Jul 8
> NEW: The calls from Alligator Alcatraz's first detainees brought distressing news: Toilets that didn't flush. Temperatures went from freezing to sweltering. A hospitalization. And little or no access to showers, much less confidential calls w/ attorneys.
> ...

4:48 PM · Jul 8, 2025 · **168.2K** Views

💬 380          🔁 566          ♡ 2.3K          🔖 52          ⬆️

💬 Read 380 replies

**Exhibit 4**



**Exhibit 5**



**Exhibit 6**



**Secretary Kristi Noem** ✓ 🏛
@Sec_Noem

Under President Trump's leadership, we are working at turbo speed to deliver cost-effective and innovative ways to deliver on the American people's mandate for mass deportations of criminal illegal aliens. We will expand facilities and bed space in just days, thanks to our partnership with Florida.

These new facilities will in large part be funded by FEMA's Shelter and Services Program, which the Biden administration used as a piggy bank to spend hundreds of millions of American taxpayer dollars to house illegal aliens, including at the Roosevelt Hotel that served as a Tren de Aragua base of operations and was used to shelter Laken Riley's killer.

nytimes.com/2025/06/23/us/...

5:23 PM · Jun 23, 2025 · **260.4K** Views

798        2.7K        14K        149

Read 798 replies

Supp. App. 1019



## DANIELLA LEVINE CAVA
MAYOR
MIAMI-DADE COUNTY

June 23, 2025

Kevin Guthrie
Director, Florida Division of Emergency Management
Tallahassee, FL 32399

**RE: Response To Letter of Intent for Purchase of TNT**

Dear Director Guthrie,

I am writing in response to the Letter of Intent (LOI) issued by the Florida Division of Emergency Management (FDEM) regarding the Dade-Collier Training and Transition Airport (TNT) site owned by Miami-Dade County. After our initial internal review and consultation with our public safety, legal, emergency management, and environmental teams, we are requesting additional information and details particularly regarding environmental safeguards prior to proceeding with a final response to the LOI.

We have always been committed to strong collaboration with the State of Florida and FDEM on all matters of emergency preparedness, response, and resilience. Due to the location of this parcel in a critical area, the conveyance of this parcel requires considerable review and due diligence before actions can be taken that could have significant long-term impact on our community. In addition, I appreciate that you have cited Emergency Executive Orders issued by the Governor, and of course Miami-Dade County will comply with such orders and state and federal laws. However, it is also imperative that we fully understand the scope and scale of the proposed use of the site and what will be developed, as the impacts to the Everglades ecosystem could be devastating.

Therefore, we would appreciate additional information regarding three specific areas of concern as we work with your team to fully evaluate the LOI.

**Environmental Impacts and Mitigation**: With the federal and state government investing well over $10 billion since 2019 in Everglades restoration and protection, we would appreciate a detailed analysis and report on environmental impacts of this facility to the Everglades. We would also value input from the appropriate federal agencies on their environmental reviews and analyses prior to proceeding. As a long-time champion of our Everglades and clean drinking water, I am committed to ensuring we continue bipartisan protections for our greatest natural resource – which is the cornerstone of our regional economy – and firmly believe that every decision made must properly weigh impacts on the short- and long-term consequences to the area. In fact, the County had previously negotiated in good faith a possible sale of the TNT site to the state in order to support our shared Everglades restoration goals.

**Financial Analysis and Proper Appraisals for Land Value:** While we appreciate the letter of intent includes an offer to purchase the site for $20 million, this amount is significantly lower than the most recent appraisal; the latest available appraisal, prepared by the firm Urban Economics, values the total site to be worth at least $190 million. The potential sale requires a full updated appraisal and a deeper financial analysis to ensure the County is continuing to act as a responsible steward of taxpayer assets,

Supp. App. 1020



# DANIELLA LEVINE CAVA
MAYOR
MIAMI-DADE COUNTY

particularly in light of current budgetary challenges. Miami-Dade County is facing significant strains on our resources as we prepare for the coming fiscal year. Continued financial pressure from proposed state budget reductions and  new demands on local revenue create further fiscal constraints, making it even more critical that we don't undervalue this important and unique piece of property. It is imperative that we maximize the value of all taxpayer assets as we are actively in the midst of streamlining operations and finding savings to better leverage public dollars and conserve county resources.

**Public Safety and Security:** Finally, we request a deeper understanding of the security measures that will be put in place to ensure the safety of our community in light of these planned operations. This facility was not designed or set up to operate as a detention center and it is important that our residents understand protocols and policies in place to ensure public safety.

I understand there is an intention to begin work on the site as early as Monday. There has not been sufficient time to fully discuss these matters, and we thank you for your attention to these concerns given the rapid pace of the state's effort. I trust we will continue to work in partnership on initiatives that ensure the safety and wellbeing of all Floridians.

Sincerely,

*Daniella Levine Cava*

Daniella Levine Cava
Mayor, Miami-Dade County



### DANIELLA LEVINE CAVA
MAYOR
MIAMI-DADE COUNTY

July 8, 2025

The Honorable James Uthmeier
Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050

**RE: Request for Monitoring Access to the Alligator Holding Facility ("Alligator Alcatraz")**

Attorney General Uthmeier,

As you know, Miami-Dade taxpayers are the rightful property owner of the Training and Transition Airport (TNT) site in the Everglades that the state of Florida has commandeered through powers granted to the State through the Governor's Executive Order 23-03, extended by Executive Order 25-120. Though the state is in total control of the site, I am writing to formally request that Miami-Dade County be granted monitoring access to the state-managed facility referred to as "Alligator Alcatraz."

Given the critical environmental significance of this area and the deep-rooted commitment Miami-Dade has made to properly protecting and preserving our treasured Everglades, it is imperative that local authorities maintain clear transparency in all stages of their handling. Further, although the federal government has declared their focus is on removing violent criminals and returning them to their home countries, continued reports offer a stark contrast to this mission – national data shows the majority of those in ICE custody today have no criminal convictions, and 93% have no violent record. We are particularly troubled by reports of dangerous conditions at ICE facilities nationwide and of multiple deaths that have occurred in federal facilities in our community, and the TNT site is further located in a remote area with poor access to hospitals and emergency services creating additional challenges. Therefore, given our land ownership of the site, we believe our request for monitoring access is warranted.

Specifically, we seek:
- **Weekly Site Reports** summarizing conditions of the facility.
- **Remote Video Monitoring Access.**
- **Scheduled Site Visits** by a small oversight team for compliance and safety assurance as well as visibility into all environmental impacts.

Our community will be informed through this process to ensure that these sensitive operations remain both humane and secure, as we continue to comply with all state and federal laws. I look forward to your response and am available to discuss any adjustments necessary to facilitate this request in alignment with state regulations.

Thank you for your time and consideration.

Respectfully,

*Daniella Levine Cava*

Daniella Levine Cava
Mayor, Miami-Dade County

Supp. App. 1022



# DANIELLA LEVINE CAVA
MAYOR
MIAMI-DADE COUNTY

July 10, 2025

Kevin Guthrie
Executive Director
Florida Division of Emergency Management
2555 Shumard Oak Boulevard
Tallahassee, FL 32399

**RE: Request for Monitoring Access to the Alligator Holding Facility ("Alligator Alcatraz")**

Director Guthrie,

Following my conversation this week with Attorney General Uthmeier, per his recommendation, I am submitting the below requests to you and your team for further visibility and transparency regarding operations at the state-managed facility referred to as "Alligator Alcatraz" on behalf of Miami-Dade taxpayers.

In addition to these requests seeking ongoing monitoring access, I also understand that state lawmakers have recently been invited to visit the site. I also request the opportunity to conduct an in-person visit to ensure full transparency on behalf of our local community.

Given the critical environmental significance of this area and the deep-rooted commitment Miami-Dade has made to protecting and preserving our treasured Everglades, it is imperative that local authorities maintain clear transparency in all stages of their handling. Further, although the federal government has declared their focus is on removing violent criminals and returning them to their home countries, continued reports offer a stark contrast to this mission – national data shows the majority of those in ICE custody today have no criminal convictions, and 93% have no violent record. We are particularly troubled by recent ongoing reports of unsafe and inhumane conditions at the facility since it became operational just over a week ago. Given the County remains the property owner of the site, we believe our request for monitoring access is warranted.

Specifically, we are requesting:
- **Weekly Site Reports** summarizing conditions of the facility.
- **Remote Video Monitoring Access.**
- **Scheduled Site Visits** by a small oversight team for compliance, safety assurance, and visibility into all environmental impacts, as well as the **opportunity to conduct an in-person visit**.

Our community will be informed through this process to ensure that these sensitive operations remain both humane and secure, as we continue to comply with all state and federal laws. I thank you for your consideration and am available to discuss any adjustments necessary to facilitate this request.

Respectfully,

*Daniella Levine Cava*

Daniella Levine Cava
Mayor, Miami-Dade County




# STATE OF FLORIDA
## DIVISION OF EMERGENCY MANAGEMENT

**Ron DeSantis,** *Governor*                                              **Kevin Guthrie,** *Executive Director*

**VIA ELECTRONIC MAIL**

June 23, 2025

The Honorable Daniella Levine Cava
Mayor, Miami-Dade County
Stephen P. Clark Center
111 NW 1st Street
Miami, FL 33128

**Re: Notice of Intent to Utilize the Dade-Collier Training and Transition Airport (TNT)**

Dear Mayor Levine Cava,

I am in receipt of your "Response to Letter of Intent for Purchase of TNT" dated June 23, 2025. On behalf of the State of Florida and the Florida Division of Emergency Management (the "Division"), this letter serves as notice that the Division intends to utilize the Dade-Collier Training and Transition Airport, located at 54575 Tamiami Trail E, Ochopee, Florida, 34141 (the "Property"), pursuant to Governor DeSantis's emergency powers under section 252.36(6)(b) and (i), Florida Statutes, and delegated to me as the State Coordinating Officer in Executive Order 23-03, which remains in effect and was most recently extended by Executive Order 25-120. The Division's utilization of the Property will last no longer than the duration of the state of emergency.

While the negotiations to purchase the property are underway, the Division will begin immediate utilization of the improved area of the site, as I now deem it necessary to meet the Division's current operational demands in coping with the emergency. Time is of the essence. We must act swiftly to ensure readiness and continuity in our statewide operations to assist the federal government with immigration enforcement. The Division remains committed to working collaboratively with all appropriate authorities.

I appreciate your support of statewide emergency operations and your commitment to our shared mission to safeguard the people of Florida. I request that your team coordinate with the Division's General Counsel, Stephanie Houp, Esq., should there be any questions or concerns regarding this matter.

Thank you for your partnership and prompt attention.

Sincerely,

**Kevin Guthrie**
**Executive Director**
Florida Division of Emergency Management
Kevin.Guthrie@em.myflorida.com
(850) 294-8250

Supp. App. 1024




# STATE OF FLORIDA
# DIVISION OF EMERGENCY MANAGEMENT

**Ron DeSantis**, *Governor*                                          **Kevin Guthrie**, *Executive Director*

**VIA ELECTRONIC MAIL**

The Honorable Daniella Levine Cava
Mayor, Miami-Dade County
Stephen P. Clark Center
111 NW 1st Street
Miami, FL 33128

The Honorable Rick LoCastro
Chair, Collier County Board of County Commissioners
3299 Tamiami Trail E, Suite 303
Naples, FL 34112

**Re: Letter of Intent to Purchase the Dade-Collier Training and Transition Airport (TNT)**

Dear Mayor Levine Cava and Commissioner LoCastro,

On behalf of the State of Florida and the Florida Division of Emergency Management (the "Division"), this letter serves as a formal Letter of Intent ("LOI") to purchase of the Dade-Collier Training and Transition Airport ("TNT"), located at 54575 Tamiami Trail E, Ochopee, Florida 34141 (the "Property").

The Division has identified the airport as a critical asset for ongoing and future emergency response, aviation logistics, and staging operations. Given the strategic location and infrastructure of the TNT facility, the State intends to secure long-term ownership to support statewide emergency operations.

**Proposed Terms**

While this LOI is non-binding and subject to negotiation and formal agreement, the State anticipates the following general terms:

- **Purchaser**: State of Florida, by and through the Florida Division of Emergency Management

- **Sellers**: Miami-Dade County and Collier County (joint owners)

- **Property**: Entirety of the Dade-Collier Training and Transition Airport and associated land, facilities, and rights-of-way

- **Purchase Price**: The State is prepared to offer Twenty Million Dollars ($20,000,000), subject to a final appraisal, mutually agreed the mutual agreement of the parties.

- **Due Diligence Period**: To be defined in the final purchase agreement

- **Closing**: Subject to approval by all governing authorities and in accordance with applicable state and local laws, except those waived or suspended pursuant to the state of emergency.

**D I V I S I O N   H E A D Q U A R T E R S**
2555 Shumard Oak Boulevard
Tallahassee, FL 32399-2100

Telephone: 850-815-4000
www.FloridaDisaster.org

**S T A T E   L O G I S T I C S   R E S P O N S E   C E N T E R**
2702 Directors Row
Orlando, FL 32809-5631

This letter reflects the State's intent to move forward in good faith with the acquisition of the Property by emergency procurement authorized by Executive Order 23-03, as extended by Executive Order 25-103, and Agency Emergency Order 2023-001. The Division intends to work collaboratively with both Miami-Dade and Collier Counties to complete the transaction in an expedient manner to meet the needs of this emergency.

We appreciate your continued cooperation and request that your respective teams coordinate with the Division's General Counsel and Deputy State Coordinating Officers to begin discussions on the terms and procedures necessary to complete this purchase.

Sincerely,

**Kevin Guthrie**
**Executive Director**
Florida Division of Emergency
Management
Kevin.Guthrie@em.myflorida.com
(850) 294-8250



USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 222 of 273



USCA11 Case: 25-12873 Document: 92-4 Date Filed: 01/08/2026 Page: 224 of 273



USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 225 of 273



**DANIELLA LEVINE CAVA**
MAYOR
MIAMI-DADE COUNTY

July 25, 2025

Mr. Kevin Guthrie
Director
Florida Division of Emergency Management
2555 Shumard Oak Boulevard
Tallahassee, FL 32399

**Re: Request for Immediate Access and Oversight Authority –Training and Transition Site ("Alligator Alcatraz")**

Dear Director Guthrie,

As you know, Miami-Dade taxpayers are the rightful property owners of the Training and Transition Airport (TNT) site in the Everglades that the state of Florida has commandeered through powers granted to the State through the Governor's Executive Order 23-03, most recently extended by Executive Order 25-120. Pursuant to our past communications, I am requesting immediate access to the site, dubbed "Alligator Alcatraz" by the State, which is located on land wholly owned by Miami-Dade County.

As the legal property owner of this site, the County is entitled to conduct inspections and assert oversight over any ongoing operations, including those initiated under emergency declarations. This is particularly urgent given the repeated news stories exposing troubling and dangerous conditions at the site, and the confirmation that the facility housed minors. Furthermore, continued reports confirm extreme health conditions leading to inhumane treatment of detained individuals. As we head further into hurricane season, we remain concerned for the safety of both staff and detainees, and the State's ability to quickly evacuate this temporary facility in the face of an oncoming storm. As I've previously stated, we also continue to have significant concerns regarding environmental impacts to this extremely sensitive ecosystem.

To that end, I am requesting the following actions be taken without further delay:

1. **Immediate access to the site where I can visit within 48 hours, in addition to designated County officials,** including staff from the Department of Environmental Resources Management (DERM), County Attorneys, and representatives from the Department of Emergency Management.
2. **A comprehensive briefing from your agency on current operations**, including the nature of any agreements with contractors, timelines for construction, and the anticipated population growth and security protocols. This also includes a copy of any policies for onsite medical care and medical evacuation for detainees.

STEPHEN P. CLARK CENTER · 111 N.W. FIRST STREET · 29ᵀᴴ FLOOR · MIAMI, FLORIDA 33128 · (305) 375-1880 · (305) 375-1262



**DANIELLA LEVINE CAVA**
MAYOR
MIAMI-DADE COUNTY

3. **Weekly reporting to the County on environmental impacts, security incidents, and population data.**
4. **Remote video monitoring or third-party access for ongoing observation** in compliance with federal and state environmental and human rights regulations.

While I understand the State may be operating under an emergency framework, such declarations do not negate Miami-Dade County's ownership of the land or our responsibility to our residents, our responsibility to ensure the humane treatment of individuals, our duty to protect the natural environment and our drinking water supply, and our obligations to tribal neighbors.

The County received no formal communication from your office prior to the development and deployment of this facility, and repeated efforts to seek transparency have been ignored or rebuffed. Our residents deserve full accountability for operations taking place on County-owned property.

I am hopeful that we can work together to restore cooperation, transparency, and lawful oversight. Please respond by **no later than Monday, July 28, 2025**, to coordinate access and initiate dialogue.

Sincerely,

Daniella Levine Cava
Mayor, Miami-Dade County

Friends of the Everglades et al.

v.

Noem, et al.


United States District Court
Southern District of Florida

Case No.: 25-cv-22896


Expert Disclosure Report

Dillon N. Reio, M.S., P.G.


August 2, 2025

Friends of the Everglades et al., v. Noem, et al. Expert Declaration

Dillon N. Reio, M.S., P.G., Professional Geologist

August 2, 2025

I.    Summary of Qualifications

I was a Hydrogeologist II in Miami-Dade County, Florida for the Regulatory and Environmental Resources – Division of Environmental Resources Management from July 2017 to May 2019. In this role, I was responsible for reviewing myriad technical reports, ranging from Tank Closure Assessment Reports to Site Assessment and Remediation Reports. My job was to evaluate the reports for sufficiency according to Chapter 24 Code of Miami-Dade County and Chapter 62-780, Florida Administrative Code. Subsequently, in May 2019, I transitioned into the private sector with SCS Engineers (SCS), an environmental consulting firm, where I am currently a Project Manager. During the past 6 years with SCS, I conducted, designed, and organized site assessments and corresponding data analysis for various development projects ranging from agricultural, golf course, lake fills, and landfills. The primary focus of these investigations is evaluating surface water, groundwater, soil vapor, and soil quality to verify the presence of contaminants and, if detected, to determine the spatial extent (i.e., horizontal and vertical) in order to select the appropriate risk-based corrective actions pursuant to local or state environmental codes.

I am a licensed Professional Geologist in the State of Florida (PG3168), meaning I have the necessary experience and expertise to perform and direct geological investigations in Florida. Further, I have authored dozens of reports evaluating, analyzing, characterizing, and summarizing contamination resultant from historical anthropogenic activities. Moreover, I have worked with civil engineers reviewing and creating plan sheets, particularly in reference to the design of stormwater management systems. My involvement with the design of stormwater management systems is focused on mitigating the potential movement of existing groundwater contamination under severe storm events. To that end, I have also participated in the development of a steady-state groundwater flow model for a complex golf course redevelopment project, which incorporated surface water and groundwater data to determine whether there was a potential for downgradient impacts.

My curriculum vitae is attached.

All of my opinions expressed herein I hold to a reasonable degree of scientific certainty.

All of my opinions as set forth herein are based upon information provided to date. I reserve the right to revise or supplement my opinions based upon subsequently received information.

Supp. App. 1034

II.   Disclosures

I have not testified via deposition or court testimony before a jury. I am being compensated in this case at a rate of $205/hour.


III.   Summary of Key Opinions

A. Based on the information in case materials (see attached list), for case number: 1:25-cv-22896-KMW approximately 20-acres of new pavement was applied at the Site to facilitate the development of the Detention Center. It was asserted that the new pavement was applied over, "a pre-exisiting cement pad [as to it] a thin layer of dirt and grass had settled." However, based on review of the provided soil profiles (July 22, 2025), there is no indication of a cement pad. Instead, the soil profiles indicate an approximately 2-foot limerock sand layer, which is permeable and porous, consistent with historical fill material when the airport was originally constructed. Further, the spacing of the soil borings used to complete the soil profile were acceptable to evaluate any potential soil heterogeneity.

B. During development projects, proper permitting (i.e., environmental, construction, etc.) with the various local, state, and federal agencies is typically required. The focus of environmental permitting during development, in the context of contamination, is to verify that the proposed development does not irrevocably alter the current state of the Site, does not create a situation for the potential release of contamination, or does not lead to contamination exacerbation (if already present). In the State of Florida, there are regulations (i.e., Chapter 62-301, Florida Administrative Code) governing the permits needed for filling and construction of stormwater management systems in wetlands, specifically an Environmental Resources Permit (ERP). Based on review of the publicly available databases (FDEP, SFWMD, USACOE), it does not appear that an ERP was submitted prior initiation of construction activities. This contrasts with previous work conducted at the Site. For instance, ERP permits for construction of a 1,753-square foot concrete pad (2005) and a wireless tower (2008) were applied for by Dade-Collier Training and Transition Airport and Miami-Dade Aviation Department, respectively. The current development is approximately 180 times larger in scale than the previous improvements, which suggests that an ERP would be needed. Further, the Paving, Grading, and Drainage notes (i.e., Sheet C100, Comment #18) from the provided engineering plans (June 30, 2025, July 7, 2025, and July 8, 2025) references the ERP.

C. Another critical component of development is stormwater management. When there is a transition from pervious to impervious surface, natural rainwater infiltration into the subsurface is restricted. The restricted water builds up on the impervious surface and begins to flow after a short period of time as runoff. Runoff is known to transport potentially harmful chemicals from vehicular traffic into soils and groundwater. To mitigate the effects of this process, stormwater management systems "[are] designed and constructed or implemented to control discharges which are necessitated by rainfall

events, incorporating methods to collect, convey, store, absorb, inhibit, treat, use, or reuse water to prevent or reduce flooding, over drainage, environmental degradation, and water pollution or otherwise affect the quantity and quality of discharges from the system [Sections 373.403(1) and 403.031(16), F.S.]" (Environmental Resource Permit Applicant's Handbook Volume I, 2024, pp. 30-31). To that end, the June 30, 2025 engineering plans referred to several dry retention basins in the vicinity of the pavement areas; however, in subsequent plan revisions (i.e., July 7, 2025 and July 8, 2025) the proposed dry retention areas were removed. Further, based on the aerial photographs observed from July 25, 2025, it does not appear that the dry retention areas have been constructed, even though the pavement appears substantially complete.

D. A preliminary Interconnected Channel and Pond Routing (ICPR) model was completed to evaluate the effects of the additional impervious surface on stormwater discharge and runoff, which incorporated a pre (i.e., existing) and a post-development scenario. The analysis indicated that there is a substantial increase in both peak discharge (169.44 cubic feet per second) and runoff volume (10,460,264 gallons) resultant from the newly paved surfaces. This is contrary to the requirements of the South Florida Management District (SFWMD) stormwater regulations, which state that post-development peak discharge and volume shall not exceed pre-development conditions.

E. The published and scientific literature reviewed on the topic of environmental contamination resultant from Polycyclic Aromatic Hydrocarbons (PAHs) (one of the primary components of asphalt pavement) suggests the following:

   i. Increased vehicular traffic is associated with occurrence of these chemicals into the environment and are known to correlate with land-uses that have higher traffic densities
   ii. PAHs are hydrophobic and like to adsorb onto suspended sediments, soil, and organic matter, contributing to their persistence and bio-accumulation in aquatic ecosystems
   iii. Runoff can transport soil bound PAHs into water bodies
   iv. In lakes and wetlands PAHs accumulate in sediments due to slower water movement
   v. PAHs have the potential to leach from asphalt pavement
   vi. Strong hydrological connectivity between surface and groundwater systems facilitates the migration of PAHs, particularly in closely linked systems

Considering the data presented in these studies, it is reasonable to expect a degree of PAH environmental impact in the immediate vicinity of the newly paved areas, although this would need to be empirically confirmed by the collection and analytical testing of soil, sediment, and groundwater samples.

F. Based on statements made by Florida officials, there is a 5,000-gallon above ground storage tank (AST) of jet fuel on the Site. Jet fuel, and other fuels (i.e., diesel, gas, etc.)

are regulated by FDEP under Chapter 62-762, Florida Administrative Code. These fuels are potentially harmful to human health and the environment and as such require specific controls to ensure leakages do not occur, and if they do, they are appropriately managed. With respect to ASTs, they are typically required to be either double-walled or placed in secondary containment, so as to minimize the risk of potential leakages. Further, due to the size of the tank, it likely requires registration with the State of Florida for tracking and inspection purposes.

Supp. App. 1037

**References:**

Berríos-Rolón, P. J., Cotto, M. C., & Márquez, F. (2025). Polycyclic aromatic hydrocarbons (PAHs) in freshwater systems: A comprehensive review of sources, distribution, and ecotoxicological impacts. *Toxics, 13*(4), 321. https://doi.org/10.3390/toxics13040321

Bowden, J. A., Townsend, T., & Lin, A. (2022). *Environmental impacts of reclaimed asphalt pavement (RAP).* University of Florida, Hinkley Center for Solid and Hazardous Waste Management. https://faculty.eng.ufl.edu/timothytownsend/research/beneficial-use-of-waste-materials/understanding-the-environmental-impacts-of-reclaimed-asphalt-pavement/

Bradner, A., McPherson, B. F., Miller, R. L., Kish, G., & Bernard, B. (2005). Quality of ground water in the Biscayne aquifer in Miami-Dade, Broward, and Palm Beach Counties, Florida, 1996–1998, with emphasis on contaminants (Open-File Report 2004-1438). *U.S. Geological Survey.* https://pubs.usgs.gov/of/2004/1438/

Burant, A., Selbig, W., Furlong, E. T., & Higgins, C. P. (2019). Trace organic contaminants in urban runoff: Associations with urban land use. *Environmental Pollution, 242*, 2068–2077. https://doi.org/10.1016/j.envpol.2018.07.089

Florida Department of Environmental Protection. (2025, June 19). *Chapter 62-330: Environmental resource permitting.* Florida Administrative Code. http://flrules.elaws.us/fac/62-330[1](http://flrules.elaws.us/fac/62-330/)

Florida Department of Environmental Protection. (2015). *Construction Generic Permit (CGP): Stormwater discharge from large and small construction activities* (DEP Document No. 62-621.300(4)(a)). https://floridadep.gov/water/stormwater/documents/construction-generic-permit-cgp

Florida Department of Environmental Protection. (2025, June 19). *Chapter 62-762: Aboveground storage tank systems.* Florida Administrative Code. http://flrules.elaws.us/fac/62-762

Heintzman, L. J., Anderson, T. A., Carr, D. L., & McIntyre, N. E. (2015). Local and landscape influences on PAH contamination in urban stormwater. *Landscape and Urban Planning, 142*, 29–37. https://doi.org/10.1016/j.landurbplan.2015.05.009

Markiewicz, A., Björklund, K., Eriksson, E., Kalmykova, Y., Strömvall, A.-M., & Siopi, A. (2017). Emissions of organic pollutants from traffic and roads: Priority pollutants selection and substance flow analysis. *Science of the Total Environment, 580*, 1162–1174. https://doi.org/10.1016/j.scitotenv.2016.12.074

Yang, Q., Yin, H., He, X., Chen, F., Ali, A., Mehta, Y., & Yan, B. (2020). Environmental impacts of reclaimed asphalt pavement on leaching of metals into groundwater. *Transportation Research Part D: Transport and Environment, 85*, 102415. https://doi.org/10.1016/j.trd.2020.102415

**Documents Considered:**

Documents considered include:

| Date | Title |
|---|---|
| July 21, 2025 | Plantiffs' Notice of Filing July 21, 2025 Declaration of Christopher W. McVoy, Ph.D. |
| July 25, 2025 | Aerial Photographs 1 through 54 of Dade-Collier Training and Transition (TNT) Airport |
| June 30, 2025 | Emergency Infrastructure at TNT Dade-Collier Airport |
| July 7, 2025 | Emergency Infrastructure at TNT Dade-Collier Airport |
| July 8, 2025 | Emergency Infrastructure at TNT Dade-Collier Airport |
| July 22, 2025 | Soil Profiles Dade Collier TNT Airport |
| July 27, 2025 | Catch Basin Drainage Pipe |
| 2005 and 2008 | Previous ERP permits at TNT Airport |
| June 28, 2024 | Environmental Resource Permit Applicant's Handbook Volume I (General and Environmental) |
| August 1, 2025 | Dade-Collier TNT Pre & Post Stormwater Report |

**PRE-DEV**

| Name | Acreage | CN | Acreage X CN | Comments |
|---|---|---|---|---|
| Total Basin Area | 1517.862 | _ | | |
| paved road1 | 6.300102 | 98 | 617.41 | |
| parking | 25.38728 | 98 | 2487.954 | |
| NS paved road2 | 1.358289 | 98 | 133.1123 | |
| dirt road1 | 0.245779 | 50 | 12.28893 | |
| dirt road2 | 0.185876 | 50 | 9.293788 | |
| dirt road3 | 0.144081 | 50 | 7.204054 | |
| dirt road4 | 0.446201 | 50 | 22.31005 | |
| paved road2 (to Runway) | 2.383768 | 98 | 233.6093 | |
| Runway | 120.7319 | 98 | 11831.72 | |
| paved road3 | 3.168372 | 98 | 310.5005 | |
| Slab | 0.173611 | 98 | 17.01389 | |
| Pervious | 1357.336 | 50 | 67866.82 | |

comp CN =                 55.04

**POST-DEV**

| Name | Acreage | CN | Acreage X CN | |
|---|---|---|---|---|
| Total Basin Area | 1517.862 | _ | | |
| paved road1 | 6.300102 | 98 | 617.41 | |
| parking | 25.38728 | 98 | 2487.954 | |
| RE-PAVED NS paved road2 | 1.469163 | 98 | 143.978 | Prop N-S Road Widening to 30'/Repaving Existing |
| dirt road1 | 0.245779 | 50 | 12.28893 | |
| dirt road2 | 0.185876 | 50 | 9.293788 | |
| dirt road3 | 0.144081 | 50 | 7.204054 | |
| dirt road4 | 0.446201 | 50 | 22.31005 | |
| RE-paved road2 (to Runway) | 4.16445 | 98 | 408.1161 | Prop E-W Road Widening to 30'/Repaving Existing |
| Runway | 120.7319 | 98 | 11831.72 | |
| paved road3 | 3.168372 | 98 | 310.5005 | |
| South Parking Lot | 18.3367 | 98 | 1796.997 | Prop Asphalt |
| N Paved Area | 6.988593 | 98 | 684.8821 | Prop Asphalt |
| NE Paved Area | 0.423642 | 98 | 41.51694 | Prop Asphalt |
| Maint Road1 | 3.151237 | 98 | 308.8213 | Prop 20' wide; N of Runway |
| Maint Road2 | 0.644727 | 98 | 63.18321 | Prop 20' wide; Middle of Runway 1 |
| Maint Road3 | 0.335826 | 98 | 32.91097 | Prop 20' wide; Middle of Runway 2 |
| NE Turnaround | 0.18 | 98 | 17.64 | Prop NE Turnaround |
| Pervious | 1337.282 | 50 | 66864.09 | |

comp CN =                 56.44



NOAA's National Weather Service
**Hydrometeorological Design Studies Center**
Precipitation Frequency Data Server (PFDS)



Home      Site Map      Organization          Search      ● NWS  ○ All NOAA  Go

## NOAA ATLAS 14 POINT PRECIPITATION FREQUENCY ESTIMATES: FL

**General Information**
- Homepage
- Progress Reports
- FAQ
- Glossary

**Precipitation Frequency**
- Data Server
- GIS Grids
- Maps
- Time Series
- Temporals
- Documents

**Probable Maximum Precipitation**
- Documents

**Miscellaneous**
- Publications
- Storm Analysis
- Record Precipitation

**Contact Us**
- Inquiries



**Data description**

Data type: Precipitation depth ▾   Units: English ▾   Time series type: Partial duration ▾

**Select location**

1) Manually:

   a) By location (decimal degrees, use "-" for S and W):  Latitude: [        ]  Longitude: [        ]  [Submit]

   b) By station (list of FL stations): Select station [        ▾]

   c) By address  [dade collier airport    ✕]  [🔍]

2) Use map:



a) **Select location**
Move crosshair or double click

b) **Click on station icon**
☐ Show stations on map

Location information:
**Name:** Ochopee, Florida, USA*
**Latitude:** 25.8658°
**Longitude:** -80.8942°
**Elevation:** 7 ft **

* Source: ESRI Maps
** Source: USGS

### POINT PRECIPITATION FREQUENCY (PF) ESTIMATES
WITH 90% CONFIDENCE INTERVALS AND SUPPLEMENTARY INFORMATION
NOAA Atlas 14, Volume 9, Version 2

PF tabular      PF graphical      Supplementary information                    🖨 Print page

#### PDS-based precipitation frequency estimates with 90% confidence intervals (in inches)[1]

| Duration | Average recurrence interval (years) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 5 | 10 | 25 | 50 | 100 | 200 | 500 | 1000 |
| 5-min | 0.542 (0.437-0.685) | 0.624 (0.503-0.789) | 0.754 (0.605-0.956) | 0.858 (0.685-1.09) | 0.996 (0.767-1.31) | 1.10 (0.829-1.47) | 1.20 (0.875-1.66) | 1.30 (0.909-1.85) | 1.42 (0.959-2.10) | 1.51 (0.997-2.28) |
| 10-min | 0.794 (0.641-1.00) | 0.914 (0.736-1.16) | 1.10 (0.886-1.40) | 1.26 (1.00-1.60) | 1.46 (1.12-1.92) | 1.61 (1.21-2.16) | 1.76 (1.28-2.42) | 1.90 (1.33-2.71) | 2.08 (1.40-3.07) | 2.21 (1.46-3.34) |
| 15-min | 0.969 (0.781-1.22) | 1.11 (0.897-1.41) | 1.35 (1.08-1.71) | 1.53 (1.22-1.95) | 1.78 (1.37-2.34) | 1.96 (1.48-2.63) | 2.14 (1.56-2.96) | 2.31 (1.62-3.30) | 2.53 (1.71-3.74) | 2.69 (1.78-4.08) |
| 30-min | 1.56 (1.26-1.97) | 1.77 (1.42-2.24) | 2.10 (1.69-2.67) | 2.37 (1.90-3.03) | 2.73 (2.11-3.60) | 3.00 (2.27-4.03) | 3.27 (2.39-4.52) | 3.53 (2.48-5.04) | 3.86 (2.61-5.71) | 4.10 (2.71-6.21) |
| 60-min | 2.06 (1.88-2.95) | 2.33 (1.88-2.95) | 2.78 (2.23-3.52) | 3.14 (2.51-4.01) | 3.64 (2.81-4.81) | 4.03 (3.04-5.41) | 4.41 (3.22-6.10) | 4.79 (3.37-6.86) | 5.30 (3.59-7.85) | 5.68 (3.75-8.59) |
| 2-hr | 2.56 (2.08-3.21) | 2.90 (2.34-3.64) | 3.45 (2.78-4.35) | 3.91 (3.14-4.96) | 4.55 (3.54-5.98) | 5.05 (3.84-6.75) | 5.55 (4.08-7.64) | 6.06 (4.59-9.92) | 6.73 (4.59-9.92) | 7.25 (4.82-10.9) |
| 3-hr | 2.78 (2.26-3.48) | 3.15 (2.56-3.95) | 3.78 (3.06-4.75) | 4.32 (3.48-5.46) | 5.09 (3.98-6.69) | 5.70 (4.36-7.63) | 6.33 (4.68-8.72) | 6.99 (4.97-9.95) | 7.88 (5.40-11.6) | 8.58 (5.73-12.9) |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **6-hr** | **3.16** (2.58-3.93) | **3.60** (2.93-4.47) | **4.38** (3.56-5.46) | **5.08** (4.11-6.38) | **6.15** (4.86-8.12) | **7.04** (5.43-9.43) | **8.00** (5.97-11.0) | **9.03** (6.49-12.9) | **10.5** (7.26-15.4) **11.7** (7.85-17.4) |
| **12-hr** | **3.59** (2.95-4.43) | **4.09** (3.35-5.06) | **5.05** (4.12-6.26) | **5.98** (4.85-7.45) | **7.44** (5.96-9.88) | **8.73** (6.80-11.7) | **10.1** (7.65-14.0) | **11.7** (8.50-16.7) | **14.0** (9.78-20.6) **15.9** (10.8-23.5) |
| **24-hr** | **4.09** (3.37-5.01) | **4.68** (3.85-5.74) | **5.85** (4.80-7.21) | **7.02** (5.73-8.69) | **8.92** (7.21-11.8) | **10.6** (8.33-14.2) | **12.5** (9.49-17.2) | **14.6** (10.7-20.7) | **17.7** (12.5-25.9) **20.3** (13.8-29.8) |
| **2-day** | **4.72** (3.91-5.75) | **5.41** (4.48-6.60) | **6.78** (5.59-8.29) | **8.15** (6.68-10.0) | **10.4** (8.43-13.7) | **12.3** (9.75-16.4) | **14.6** (11.1-19.9) | **17.0** (12.5-24.1) | **20.7** (14.7-30.1) **23.8** (16.3-34.7) |
| **3-day** | **5.30** (4.40-6.43) | **5.97** (4.95-7.25) | **7.33** (6.06-8.94) | **8.72** (7.17-10.7) | **11.0** (8.97-14.4) | **13.0** (10.3-17.3) | **15.3** (11.8-20.9) | **17.9** (13.2-25.2) | **21.8** (15.5-31.5) **25.0** (17.2-36.3) |
| **4-day** | **5.85** (4.87-7.08) | **6.47** (5.38-7.84) | **7.77** (6.44-9.44) | **9.12** (7.52-11.1) | **11.4** (9.32-14.9) | **13.4** (10.7-17.8) | **15.7** (12.1-21.4) | **18.4** (13.6-25.8) | **22.3** (15.9-32.2) **25.6** (17.7-37.1) |
| **7-day** | **7.28** (6.08-8.76) | **7.80** (6.51-9.39) | **8.95** (7.45-10.8) | **10.2** (8.44-12.4) | **12.4** (10.2-16.1) | **14.4** (11.5-18.9) | **16.7** (12.9-22.5) | **19.3** (14.4-26.9) | **23.3** (16.7-33.4) **26.6** (18.5-38.3) |
| **10-day** | **8.47** (7.09-10.2) | **9.02** (7.55-10.8) | **10.2** (8.52-12.3) | **11.5** (9.53-13.9) | **13.6** (11.2-17.6) | **15.6** (12.5-20.3) | **17.8** (13.8-23.9) | **20.4** (15.2-28.2) | **24.2** (17.4-34.5) **27.4** (19.0-39.3) |
| **20-day** | **11.6** (9.74-13.8) | **12.6** (10.6-15.1) | **14.5** (12.1-17.3) | **16.1** (13.4-19.3) | **18.4** (15.0-23.1) | **20.4** (16.2-26.0) | **22.4** (17.3-29.5) | **24.6** (18.3-33.4) | **27.6** (19.9-38.8) **30.0** (21.0-42.8) |
| **30-day** | **14.2** (12.0-16.8) | **15.7** (13.2-18.6) | **18.0** (15.2-21.5) | **20.0** (16.7-24.0) | **22.6** (18.4-28.0) | **24.6** (19.6-31.0) | **26.6** (20.5-34.5) | **28.6** (21.3-38.3) | **31.1** (22.4-43.2) **33.0** (23.2-46.9) |
| **45-day** | **17.6** (14.9-20.8) | **19.5** (16.5-23.0) | **22.4** (18.9-26.6) | **24.7** (20.7-29.5) | **27.7** (22.5-33.9) | **29.8** (24.3-37.3) | **31.8** (24.6-41.0) | **33.7** (25.1-44.9) | **36.0** (25.9-49.6) **37.6** (26.5-53.2) |
| **60-day** | **20.6** (17.5-24.3) | **22.7** (19.2-26.8) | **26.0** (22.0-30.8) | **28.5** (24.0-34.0) | **31.8** (25.8-38.8) | **33.4** (27.2-42.4) | **36.2** (28.0-46.4) | **38.2** (28.5-50.6) | **40.5** (29.2-55.6) **42.0** (29.8-59.3) |

[1] Precipitation frequency (PF) estimates in this table are based on frequency analysis of partial duration series (PDS).

Numbers in parenthesis are PF estimates at lower and upper bounds of the 90% confidence interval. The probability that precipitation frequency estimates (for a given duration and average recurrence interval) will be greater than the upper bound (or less than the lower bound) is 5%. Estimates at upper bounds are not checked against probable maximum precipitation (PMP) estimates and may be higher than currently valid PMP values.

Please refer to NOAA Atlas 14 document for more information.

Estimates from the table in CSV format: Precipitation frequency estimates ⌄  Submit

Main Link Categories:
Home | OWP

100yr-72hr storm

US Department of Commerce
National Oceanic and Atmospheric Administration
National Weather Service
Office of Water Prediction (OWP)
1325 East West Highway
Silver Spring, MD 20910
Page Author: HDSC webmaster
Page last modified: April 21, 2017

Map Disclaimer
Disclaimer
Credits
Glossary

Privacy P
Abou
Career Opportun

PRE-DEVELOPMENT ICPR ANALYSIS
INPUT & OUTPUT

PRE-DEVELOPMENT BASIN
SCHEMATIC



Supp. App. 1044

1

| Simple Basin: PRE-DEV basin | |
|---|---|
| Scenario: | Scenario1 |
| Node: | Offsite Discharge |
| Hydrograph Method: | NRCS Unit Hydrograph |
| Infiltration Method: | Curve Number |
| Time of Concentration: | 10.0000 min |
| Max Allowable Q: | 0.00 cfs |
| Time Shift: | 0.0000 hr |
| Unit Hydrograph: | UH256 |
| Peaking Factor: | 256.0 |
| Area: | 1517.8616 ac |
| Curve Number: | 55.0 |
| % Impervious: | 0.00 |
| % DCIA: | 0.00 |
| % Direct: | 0.00 |
| Rainfall Name: | |

Comment: Assumed conservative Tc = 10 min for pre and post
Assumed same pre and post basin area for simplication to compare pre-vs post and obtain required additional retention area due to proposed developments.
comp CN from "Everglades Pre & Post.xlsx"
Basin areas from "Everglades pre & post basins.dwg"

■ ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ ■

| Node: Offsite Discharge | |
|---|---|
| Scenario: | Scenario1 |
| Type: | Time/Stage |
| Base Flow: | 0.00 cfs |
| Initial Stage: | 0.00 ft |
| Warning Stage: | 15.10 ft |
| Boundary Stage: | |

| Year | Month | Day | Hour | Stage [ft] |
|---|---|---|---|---|
| 0 | 0 | 0 | 0.0000 | 8.00 |
| 0 | 0 | 0 | 999.0000 | 8.00 |

Comment: Assume elev for offsite discharge (pond)

■ ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ ■

| Simulation: 100yr-72hr | |
|---|---|
| Scenario: | Scenario1 |
| Run Date/Time: | 8/1/2025 6:45:01 PM |
| Program Version: | ICPR4 4.07.08 |

| General |
|---|
| Run Mode: | Normal |

| | Year | Month | Day | Hour [hr] |
|---|---|---|---|---|
| Start Time: | 0 | 0 | 0 | 0.0000 |
| End Time: | 0 | 0 | 0 | 100.0000 |

| | Hydrology [sec] | Surface Hydraulics [sec] | Groundwater [sec] |
|---|---|---|---|
| Min Calculation Time: | 60.0000 | 0.1000 | 900.0000 |
| Max Calculation Time: | | 30.0000 | |

## Output Time Increments

### Hydrology

| Year | Month | Day | Hour [hr] | Time Increment [min] |
|---|---|---|---|---|
| 0 | 0 | 0 | 0.0000 | 15.0000 |

### Surface Hydraulics

| Year | Month | Day | Hour [hr] | Time Increment [min] |
|---|---|---|---|---|
| 0 | 0 | 0 | 0.0000 | 15.0000 |

### Groundwater

| Year | Month | Day | Hour [hr] | Time Increment [min] |
|---|---|---|---|---|
| 0 | 0 | 0 | 0.0000 | 60.0000 |

### Restart File

Save Restart:    False

## Resources & Lookup Tables

| Resources | Lookup Tables |
|---|---|
| Rainfall Folder: | Boundary Stage Set: |
| Reference ET Folder: | Extern Hydrograph Set: |
| Unit Hydrograph Folder: | Curve Number Set: |
| | Green-Ampt Set: |
| | Vertical Layers Set: |
| | Impervious Set: |
| | Roughness Set: |
| | Crop Coef Set: |
| | Fillable Porosity Set: |
| | Conductivity Set: |
| | Leakage Set: |

## Tolerances & Options

| | | | |
|---|---|---|---|
| Time Marching: | SAOR | IA Recovery Time: | 24.0000 hr |
| Max Iterations: | 6 | ET for Manual Basins: | False |
| Over-Relax Weight | 0.5 dec | | |

|  | Fact: |  |  |
|---|---|---|---|
| dZ Tolerance: | 0.0010 ft | Smp/Man Basin Rain Opt: | Global |
| Max dZ: | 1.0000 ft | OF Region Rain Opt: | Global |
| Link Optimizer Tol: | 0.0001 ft | Rainfall Name: | ~SFWMD-72 |
|  |  | Rainfall Amount: | 15.30 in |
| Edge Length Option: | Automatic | Storm Duration: | 72.0000 hr |
| Dflt Damping (2D): | 0.0050 ft | Dflt Damping (1D): | 0.0050 ft |
| Min Node Srf Area (2D): | 100 ft2 | Min Node Srf Area (1D): | 100 ft2 |
| Energy Switch (2D): | Energy | Energy Switch (1D): | Energy |

Comment: from NOAA precip map for dade-collier airport

1

Node Max Conditions [Scenario1]

| Node Name | Sim Name | Warning Stage [ft] | Max Stage [ft] | Min/Max Delta Stage [ft] | Max Total Inflow [cfs] | Max Total Outflow [cfs] | Max Surface Area [ft2] |
|---|---|---|---|---|---|---|---|
| Offsite Discharge | 100yr-72hr | 15.10 | 8.00 | 0.0000 | 7713.74 | 0.00 | 0 |

MAX. DISCHARGE RATEPRE-DEV

PRE-DEV

TOTAL DISCHARGE VOLUME



USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 244 of 273

POST-DEVELOPMENT ICPR ANALYSIS
INPUT & OUTPUT

USCA11 Case: 25-12873    Document: 92-4    Date Filed: 01/08/2026    Page: 246 of 273

POST-DEVELOPMENT BASIN
SCHEMATIC



Prop E-W Road Widening to
30'/Repaving Existing

Prop N-S Road Widening to
30'/Repaving Existing

Prop NE Turnaround

Prop Asphalt

Prop 20' wide- N of Runway

Prop 20' wide- Middle of
Runway 2

Prop Asphalt

Prop 20' wide- Middle of
Runway 1

1

### Simple Basin: PRE-DEV basin

|  |  |
|---|---|
| Scenario: | Scenario1 |
| Node: | Offsite Discharge |
| Hydrograph Method: | NRCS Unit Hydrograph |
| Infiltration Method: | Curve Number |
| Time of Concentration: | 10.0000 min |
| Max Allowable Q: | 0.00 cfs |
| Time Shift: | 0.0000 hr |
| Unit Hydrograph: | UH256 |
| Peaking Factor: | 256.0 |
| Area: | 1517.8616 ac |
| Curve Number: | 56.4 |
| % Impervious: | 0.00 |
| % DCIA: | 0.00 |
| % Direct: | 0.00 |
| Rainfall Name: | |

Comment: Assumed conservative Tc = 10 min for pre and post
Assumed same pre and post basin area for simplication to compare pre-vs post and obtain required additional retention area due to proposed developments.
comp CN from "Everglades Pre & Post.xlsx"
Basin areas from "Everglades pre & post basins.dwg"

### Node: Offsite Discharge

|  |  |
|---|---|
| Scenario: | Scenario1 |
| Type: | Time/Stage |
| Base Flow: | 0.00 cfs |
| Initial Stage: | 0.00 ft |
| Warning Stage: | 15.10 ft |
| Boundary Stage: | |

| Year | Month | Day | Hour | Stage [ft] |
|---|---|---|---|---|
| 0 | 0 | 0 | 0.0000 | 8.00 |
| 0 | 0 | 0 | 999.0000 | 8.00 |

Comment: Assume elev for offsite discharge (pond)

### Simulation: 100yr-72hr

|  |  |
|---|---|
| Scenario: | Scenario1 |
| Run Date/Time: | 8/1/2025 7:20:59 PM |
| Program Version: | ICPR4 4.07.08 |

### General

|  |  |
|---|---|
| Run Mode: | Normal |

2

|  | Year | Month | Day | Hour [hr] |
|---|---|---|---|---|
| Start Time: | 0 | 0 | 0 | 0.0000 |
| End Time: | 0 | 0 | 0 | 100.0000 |

|  | Hydrology [sec] | Surface Hydraulics [sec] | Groundwater [sec] |
|---|---|---|---|
| Min Calculation Time: | 60.0000 | 0.1000 | 900.0000 |
| Max Calculation Time: |  | 30.0000 |  |

## Output Time Increments

### Hydrology

| Year | Month | Day | Hour [hr] | Time Increment [min] |
|---|---|---|---|---|
| 0 | 0 | 0 | 0.0000 | 15.0000 |

### Surface Hydraulics

| Year | Month | Day | Hour [hr] | Time Increment [min] |
|---|---|---|---|---|
| 0 | 0 | 0 | 0.0000 | 15.0000 |

### Groundwater

| Year | Month | Day | Hour [hr] | Time Increment [min] |
|---|---|---|---|---|
| 0 | 0 | 0 | 0.0000 | 60.0000 |

### Restart File

Save Restart:    False

## Resources & Lookup Tables

| Resources | Lookup Tables |
|---|---|
| Rainfall Folder: | Boundary Stage Set: |
| Reference ET Folder: | Extern Hydrograph Set: |
| Unit Hydrograph Folder: | Curve Number Set: |
|  | Green-Ampt Set: |
|  | Vertical Layers Set: |
|  | Impervious Set: |
|  | Roughness Set: |
|  | Crop Coef Set: |
|  | Fillable Porosity Set: |
|  | Conductivity Set: |
|  | Leakage Set: |

## Tolerances & Options

| | | | |
|---|---|---|---|
| Time Marching: | SAOR | IA Recovery Time: | 24.0000 hr |
| Max Iterations: | 6 | ET for Manual Basins: | False |
| Over-Relax Weight | 0.5 dec | | |

| | | | |
|---|---|---|---|
| Fact: | | | |
| dZ Tolerance: | 0.0010 ft | Smp/Man Basin Rain Opt: | Global |
| Max dZ: | 1.0000 ft | OF Region Rain Opt: | Global |
| Link Optimizer Tol: | 0.0001 ft | Rainfall Name: | ~SFWMD-72 |
| | | Rainfall Amount: | 15.30 in |
| Edge Length Option: | Automatic | Storm Duration: | 72.0000 hr |
| Dflt Damping (2D): | 0.0050 ft | Dflt Damping (1D): | 0.0050 ft |
| Min Node Srf Area (2D): | 100 ft2 | Min Node Srf Area (1D): | 100 ft2 |
| Energy Switch (2D): | Energy | Energy Switch (1D): | Energy |

Comment: from NOAA precip map for dade-collier airport

1

Node Max Conditions [Scenario1]

| Node Name | Sim Name | Warning Stage [ft] | Max Stage [ft] | Min/Max Delta Stage [ft] | Max Total Inflow [cfs] | Max Total Outflow [cfs] | Max Surface Area [ft2] |
|---|---|---|---|---|---|---|---|
| Offsite Discharge | 100yr-72hr | 15.10 | 8.00 | 0.0000 | 7883.18 | 0.00 | 0 |

MAX. DISCHARGE
RATEPOST-DEV

POST-DEV

TOTAL DISCHARGE VOLUME



USCA11 Case: 25-12873   Document: 92-4   Date Filed: 01/08/2026   Page: 251 of 273

**PRE VS. POST DEVELOPMENT STORMWATER COMPARISON**

Based on the stormwater analysis provided, the post-development condi. on results in a significant increase in both peak discharge and runoff volume compared to the pre-development condition:

- **Peak Discharge Increase (Qpost - Qpre):** 169.44 cfs

- **Runoff Volume Increase (Vpost - Vpre):** 32.69 ac-ft

These increases clearly demonstrate that the proposed development will result in substantially greater offsite discharge, contrary to the requirements of the South Florida Water Management District (SFWMD) stormwater regulations, which mandate that post-development peak discharge and volume not exceed pre-development conditions.

The civil design plans titled *"2025.07.08 - Rev_TNT Dade-Collier Airport_Full Civil Set.pdf"* (prepared by Kimley-Horn, dated 07/08/2025) do **not** include any stormwater management controls such as retention ponds, swales, or conveyance ditches. Additionally, the design does not account for water quality treatment of the "first flush" runoff volume, as required by SFWMD for pollutant removal and downstream protection.

Further, the proposed re-paving and widening of the roadway from 20 feet to 30 feet appears to be occurring without the inclusion of any roadside ditches, swales, or documentation of adjacent wetland lines. The proposed parking areas are also lacking a defined SWMS and appear to sheet flow directly into potential wetland areas, with no pre-treatment or control measures provided.

No Environmental Resource Permit (ERP) appears to have been obtained or referenced, and no surveyed wetland delineation has been provided. The absence of these critical components is a serious regulatory oversight.

**In summary**, the proposed development as currently reviewed from the *"2025.07.08 - Rev_TNT Dade-Collier Airport_Full Civil Set.pdf"*, lacks a compliant SWMS and fails to meet basic regulatory standards for peak discharge control, runoff volume attenuation, water quality treatment, and wetland protection.

# Analysis of Possible Areas of New Pavement at the Dade Collier Training & Transition Airport

Dr. Christopher McVoy

July 20, 2025

This report analyzes recent aerial photography and historical satellite imagery to address the following three questions:

1) Has new [asphalt] paving occurred as part of construction of a mass detention center, informally referred to as "Alligator Alcatraz," at 54575 Tamiami Trail E, Ochopee, FL 34141, site of the Dade Collier Training & Transition Airport?
2) If so, where, and approximately how many acres?
3) If so, what underlies the new paving – (a) the original geology and soils native to the Big Cypress National Preserve; or (b) cement pads dating to the original late 1960's construction of the TNT airport, then known as the Jetport; or (c) something else?

## Executive Summary

Three dates of aerial photography from July 2025, along with recent and historical satellite imagery, were examined for evidence of new asphalt paving as part of the construction of a new mass detention facility on the site of the Dade Collier Training & Transition Airport. There is clear indication that in one area approximately 11 acres of new pavement have been identified, and in another area approximately 7 acres of new pavement have been identified. Also a number of newly paved roadways and smaller newly paved areas have been identified. The total amount of new pavement is approximately 20 acres.

The possibility that the areas of new pavement had been placed on top of pre-existing areas of cement pad was also investigated. No indication of pre-existing cement pads was found. Instead, it seemed most likely that the new paving was placed on top of the original soil substrate. This soil might have been partially leveled in the late 1960's, but sufficient substrate depth was present to grow substantial vegetation. This conclusion was supported by a linear E-W pattern, suggestive of vegetation mowing, that was visible in all historical photos.

Supp. App. 1058



**Fig. 1.** West end of main runway of Dade Collier Training & Transition Airport, looking west on November 2, 2005. Note surface water present on the many wetlands present within the airport. Source: Ralph Arwood Photography, photo KTNT 11-02-2005 51684.



**Fig. 2.** Aerial view of Dade Collier Training & Transition Airport, looking east on July 18, 2025. Foreground is Big Cypress National Preserve, which surrounds the airport. The bright spot in foreground center is reflection of sun from surface water, present at this time throughout the area. Minute 0:10 of Video KTNT 07-18-2025 01, courtesy Ralph Arwood Photography.

Supp. App. 1059



**Fig. 3.** Satellite image of Dade Collier Training & Transition Airport and surrounding portion of Big Cypress National Preserve. Note texture of native wetland landscape, both within and surrounding the airport. Source: Google Earth, Feb 21, 2025 image.



**Fig. 4.** Locator diagram for areas of asserted new paving. The two large areas, Area 1 (11+ acres) and Area 2 (7+ acres) are analyzed separately; Areas 3-7 are mostly newly paved roadways and are noted but not quantified.

Supp. App. 1060

**Analysis of Area 1**

Area 1, here referred to as the "Southwest Parking Area," is the closest area to the entrance on Tamiami Trail (U.S. 41), being reached by the east-west road ("4" on the locator diagram in Fig. 4) where paving was already in progress on June 28, 2025. Its location near the west end of the runway as well as shapes of surrounding features make it easy to locate unambiguously. Fig. 5 shows the progression from a brown colored open area to paved area, to paved area with markings, and finally to paved area with many vehicles parked in the markings.



**Fig. 5.** Newly paved east-west road ("4" on the locator diagram in Fig. 4) is in center of this eastward looking photo and leads to Area 1. Source: Minute 0:09 of Video KTNT 07-11-2025 03, courtesy Ralph Arwood Photography.

Supp. App. 1061



Feb 21, 2025                    July 05, 2025




July 11, 2025                    July 18, 2025

**Fig. 6.** Area 1, "Southwest Parking Area."  Time sequence of area's appearance. Sources: <u>Feb 21</u>: Google Earth; <u>Jul 05</u>: Video KTNT 07-05-2025 03, Minute 3:40; <u>Jul 11</u>: Video KTNT 07-11-2025 03, Minute 0:39; <u>Jul 18</u>: Photo 07-18-2025 KTNT 06  25,51.721N  80,54.869W (portion). All July imagery courtesy Ralph Arwood Photography.

5 of 17

Supp. App. 1062

The spatial extent of Area 1, the "Southwest Parking Area," was estimated by finding landmarks corresponding to the pavement edges seen in the aerial photographs, marking the same edges on Google Earth, then using the Google Earth "Ruler" tool.



**Fig. 7.** Based on the time sequence seen in Fig. 6, the dark rectangle is assumed to newly placed asphalt. Light sandy brown area to east and north of asphalt is newly scrapped (or filled) area. Red alignment lines were used to estimate extent of assumed paved area. Photo source: 07-05-2025 KTNT 23  25,51.796N  80,54.529W (portion), courtesy Ralph Arwood Photography.

Supp. App. 1063



**Fig. 8.** Untilted, unrotated Google Earth image used to estimate area of the paved region shown in Fig. 7. Alignment lines shown in Fig. 7 were used to locate eastern and northern boundaries; vegetation rows to estimate location of southern and western boundaries. This newly paved area is estimated to be 11+ acres.

Supp. App. 1064

## Analysis of Area 2

Area 2, the "Tent Expansion Area" is an expansion of a large rectangular area that was paved in the late 1960s as part of the original Jetport.



**Fig. 9.** Area 2, the "Tent Expansion Area." Source: Photo 07-11-2025 KTNT 19 25,51.904N 80,53.699W (portion). Courtesy Ralph Arwood Photography.




Feb 21, 2025                           July 05, 2025




July 11, 2025                          July 18, 2025

**Fig. 10.** Area 2, "Tent Expansion Area." Time sequence of area's appearance. Sources: <u>Feb 21</u>: Google Earth; <u>Jul 05</u>: Photo 07-05-2025 KTNT 08 25,51.938N 80,53.692W (portion); <u>Jul 11</u>: Photo 07-11-2025 KTNT 36 25,52.013N 80,53.704W (portion); <u>Jul 18</u>: Photo 07-18-2025 KTNT 26 25,52.018N 80,53.752W (portion). All July imagery courtesy Ralph Arwood Photography.

Supp. App. 1066

The spatial extent of Area 2, the "Tent Expansion Area," was estimated by finding landmarks corresponding to the pavement edges seen in the aerial photographs, marking the same edges on Google Earth, then using the Google Earth "Ruler" tool.



**Fig. 11.** Untilted, unrotated Google Earth image used to estimate extent of paved Area 2. This newly paved area is estimated to be 7+ acres.

**Smaller Paved Areas**

(Areas 3-7)



**Fig. 12.** Locator diagram for Areas 3-7, which are mostly newly paved roadways and are noted here but were not not quantified.







| Area 3 | Area 4 (west) | Area 4 (east) |



Area 5    Area 6    Area 7

**Fig. 13.** Smaller areas of new paving.

**Assertion of Pre-Existing Cement Pad Underlying Newly Asphalted Area(s)**

It has been asserted that the paving of Area 1 would have minimal environmental impact because the asphalt was placed on top of a pre-existing cement pad that had been constructed in the late 1960's as part of the original Jetport. Additionally, it was implied that the cement pad was not currently visible due to accumulation of soil and vegetation on top of the reputed cement pad. For example, Stephanie Hartman, Deputy Director of Communications at the Florida Division of Emergency Management asserted in a July 7, 2025 email that, "The area referenced consisted of a preexisting cement pad that was installed more than 50 years ago. Over time, a thin layer of dirt and grass had settled on top."

I can find no evidence to support the statement by Ms. Stephanie Hartman indicating a pre-existing cement pad. Instead, all the historical imagery I found suggests that the area was cleared of vegetation, and perhaps also leveled, probably at the same time that the runway was constructed (ca. 1968-70). Patterns in the historical imagery suggest systematic traversing of the area by equipment, likely by large mowers or brush hogs. A "thin layer of dirt and grass" on top of a cement pad would be unlikely to need mowing and would be very unlikely to produce the patterns seen. Additionally, the high rainfall intensity of South Florida thunderstorms would likely prevent the accumulation of anything more than a few millimeters of unconsolidated sediments on a cement pad. A layer that thin would not support sufficient growth to require mowing.

Examination of multiple years of historical imagery suggests that the newly asphalted areas (Areas 1 and 2) most likely were areas of original soil, cleared of brush and trees around 1970, and subsequently kept to low vegetation by periodic mowing. While there might well have been an original intent to cover with a cement pad, there is no indication that such a pad was ever installed.

The following figures identify the location in question, show multiple years of historical satellite images, and an oblique aerial photograph from 1970, taken during the time of initial construction.

Similar mowing patterns are visible for Area 2, the "Tent Expansion Area" (location: Fig. 4) in historical satellite imagery. Figs. 18 and 19 show two examples.

Supp. App. 1070



**Fig. 14.** Area 1, the "Southwest Parking Area." Satellite image from Feb 21, 2025 (prior to any detention center construction). Note the N-S and E-W patterning, which is likely from equipment such as mowers or brush hogs criss-crossing this area. Vegetation that needed mowing would not grow on top of cement. The red oval identifies an actual, very small cement pad.



**Fig. 15.** Area 1, the "Southwest Parking Area," seen in an oblique aerial photo, looking WSW. The red oval indicates an actual, very small cement pad, seen also in the satellite imagery (Fig. 14).

14 of 17



**Fig. 16.** Area 1, the "Southwest Parking Area." Satellite image from 2014. Note the E-W patterning, which is likely from mowing equipment. Vegetation that needed mowing would not grow on top of cement.



**Fig. 16.** Area 1, the "Southwest Parking Area." Satellite image from 2009. Note the E-W patterning, which is likely from mowing equipment. Vegetation that needed mowing would not grow on top of cement.

Supp. App. 1072



**Fig. 16.** Area 1, the "Southwest Parking Area." Satellite image from 1995. Even in this low resolution image, an indication of the E-W patterning, likely from mowing, is apparent.



**Fig. 17.** "1970 - aerial view of the Dade County Training & Transition Airport under construction." Red oval is indicates the location of Area 1. There is no indication that Area 1 was a cement pad in 1970, the year construction was halted. Source: https://pbase.com/donboyd/image/165484225

Supp. App. 1073



**Fig. 18.** Area 2, the "Tent Expansion Area." Satellite image from 2024. Note the mostly E-W patterning, which is likely from mowing equipment. Source: Google Earth.



**Fig. 19.** Area 2, the "Tent Expansion Area." Satellite image from 2010. Mowing pattern is particularly visible in this year. Source: Google Earth.

# Western Everglades Restoration Project

The Western Everglades Restoration Plan (WERP) [is a component of the Comprehensive Everglades Restoration Plan (CERP) that] seeks to use a series of active and passive water management features and water quality features, and make alterations to existing canals and levees. The goals of the project are to improve the quantity, quality, timing and distribution of water in the Western Everglades in the effort to re-establish ecological connectivity, reduce the severity and frequency of wildfires, and restore low nutrient conditions.



**WERP STUDY OBJECTIVES**

1. Restore freshwater flow paths, flow volumes and timing, seasonal hydroperiods, and historic distributions of sheetflow to re-establish ecological connectivity and ecological resilience of the wetland/upland mosaic.

2. Restore water levels to reduce wildfires associated with altered hydrology, which damage the geomorphic and associated ecological conditions of the western Everglades.

3. Restore aquatic low nutrient (oligotrophic) conditions to reestablish and sustain native flora and fauna.





https://www.saj.usace.army.mil/WERP/

Supp. App. 1076

## C. McVoy Tour of Pre-opening Detention Center at Dade-Collier TNT Airport

June 28, 2025

In the late afternoon of June 28, 2025, Dr. Christopher McVoy was given a vehicle-based tour of the detention center by Dr. Frank E. Lumm, Incident Commander. Some of the items described and pointed out by Dr. Lumm were:

- Four tents; 250 detainees/tent; 32 detainess/unit; bunk beds
- Eventual goal 3,000 detainees
- Trailers for 1,000 on-site employees
- All on taxiway tarmac; runway to be kept free
- Medical staff & tent; ambulances
- Fire trucks
- Laundry
- Mobile cell towers: Verizon, AT&T, T-Mobile, ?
- Mobile air conditioning units
- Portable generators
- Large collapsible rubber[?] water "bladders"
- Then active paving of southern E-W access road (to Runway)



From green pin north, blue trace traces the route of the tour.

Supp. App. 1077

The following images are from an aerial photograph taken by Ralph Arwood on July 5, 2025. While this is approximately one week after the tour, the structures shown here closely resemble what I saw on June 28.



Taxiway (narrower East-West strip to north) and Runway (wider strip to south)



Upper left: Four long tents said to house 250 detainees each



Employee Trailers on Taxiway