Supp. App.1639

# VOLUME VI

**DEPARTMENT OF HOMELAND SECURITY**
**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**ENVIRONMENTAL ASSESSMENT**
**FOR THE PROPOSED CONTRACT DETENTION FACILITY IN THE**
**HOUSTON, TEXAS AREA OF OPERATIONS**

29 December 2016

---

Lead Agency:     Department of Homeland Security
U.S. Immigration and Customs Enforcement
500 12th Street Southwest
Washington, DC 20536

Points of Contact:     Trina Fisher
Contracting Officer, Detention Compliance and Removals Division
DHS ICE Office of Acquisition Management
801 I Street NW, Room 9143
Washington, DC 20536-5750

Elizabeth Kennett
Energy, Environmental, and Sustainability Program Manager
DHS ICE Office of Asset and Facilities Management
500 12th Street SW, Mail Stop 5703
Washington, DC 20536

**EXECUTIVE SUMMARY**                                                                          **6**

**ACRONYMS AND ABBREVIATIONS**                                                     **8**

**PROJECT BACKGROUND**                                                                      **11**

1.1      Introduction                                                                                        11

1.2      Purpose and Need                                                                                 11

1.3      Scope and Content of the Analysis                                                       12

1.4      Interagency Coordination, Consultation and Public Involvement          12

1.5      Description of the Proposed Action and Alternatives                           13
  1.5.1 Proposed Action                                                                                    13
  1.5.2 No Action Alternative                                                                          13
  1.5.3    Proposed Action Alternative 1 – Renovations to HPC                      14
  1.5.4       Proposed Action Alternative 2 – New Facility in Montgomery County    15
  1.5.5    Summary of Alternatives Considered but Eliminated                       15

**AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES**        **17**

2.1      Geology, Soils, Topography and Seismicity                                          21
  2.1.1      Affected Environment                                                                      21
  2.1.2      Environmental Consequences                                                         24
  2.1.3      Mitigation and BMPs                                                                        25

2.2      Hydrology and Water Resources                                                          25
  2.2.1      Affected Environment                                                                      25
  2.2.2      Environmental Consequences                                                         28
  2.2.3      Mitigation and BMPs                                                                        31

2.3      Biological Resources                                                                             31
  2.3.1      Affected Environment                                                                      31
  2.3.2      Environmental Consequences                                                         36
  2.3.3      Mitigation and BMPs                                                                        37

2.4      Cultural Resources and Historic Properties                                          37
  2.4.1      Affected Environment                                                                      37
  2.4.2      Environmental Consequences                                                         38
  2.4.3      Mitigation and BMPs                                                                        39

2.5      Aesthetics/Visual Impacts                                                                   40
  2.5.1      Affected Environment                                                                      40
  2.5.2      Environmental Consequences                                                         41

|  |  |  |  |
|---|---|---|---|
| | 2.5.3 | Mitigation and BMPs | 41 |
| 2.6 | | Hazardous Materials and Waste | 41 |
| | 2.6.1 | Affected Environment | 42 |
| | 2.6.2 | Environmental Consequences | 43 |
| | 2.6.3 | Mitigation and BMPs | 44 |
| 2.7 | | Social Environment and Environmental Justice | 44 |
| | 2.7.1 | Affected Environment | 44 |
| | 2.7.2 | Environmental Consequences | 47 |
| | 2.7.3 | Mitigation and BMPs | 49 |
| 2.8 | | Human Health and Safety | 49 |
| | 2.8.1 | Affected Environment | 49 |
| | 2.8.2 | Environmental Consequences | 51 |
| | 2.8.3 | Mitigation and BMPs | 52 |
| 2.9 | | Land Use | 52 |
| | 2.9.1 | Affected Environment | 52 |
| | 2.9.2 | Environmental Consequences | 53 |
| | 2.9.3 | Mitigation and BMPs | 54 |
| 2.10 | | Utilities and Infrastructure | 54 |
| | 2.10.1 | Affected Environment | 54 |
| | 2.10.2 | Environmental Consequences | 56 |
| | 2.10.3 | Mitigation and BMPs | 57 |
| 2.11 | | Traffic and Transportation Systems | 57 |
| | 2.11.1 | Affected Environment | 57 |
| | 2.11.2 | Environmental Consequences | 59 |
| | 2.11.3 | Mitigation and BMPs | 60 |
| 2.12 | | Air Quality | 60 |
| | 2.12.1 | Affected Environment | 61 |
| | 2.12.2 | Environmental Consequences | 62 |
| | 2.12.3 | Mitigation and BMPs | 66 |
| 2.13 | | Greenhouse Gas and Climate Change | 66 |
| | 2.13.1 | Affected Environment | 67 |
| | 2.13.2 | Environmental Consequences | 68 |
| | 2.13.3 | Mitigation and BMPs | 70 |
| 2.14 | | Noise | 70 |
| | 2.14.1 | Affected Environment | 71 |
| | 2.14.2 | Environmental Consequences | 71 |
| | 2.14.3 | Mitigation and BMPs | 72 |

## CUMULATIVE AND INDIRECT IMPACTS                                                 73

3.1 No Action Alternative                                                          74

3.2 Proposed Action Alternative 1                                                  74

3.3 Proposed Action Alternative 2                                                  75

## IRREVERSIBLE AND IRRETRIEVABLE COMMITMENTS OF RESOURCES          75

## SUMMARY OF ANTICIPATED IMPACTS, REQUIRED MITIGATION, AND BEST MANAGEMENT PRACTICES                                                         76

## REFERENCES CONSULTED IN PREPARING THE EA                          81

A.   Documents                                                                     81

B.   Personal Communications                                                       85

## LIST OF PREPARERS                                                 86

## Appendices

Appendix A – Federal, State, and Local Scoping
Appendix B – Other Relevant Correspondence
Appendix C – Phase I Cultural Resources Assessment Survey
Appendix D – Phase I Environmental Site Assessments (Alternative 1 and 2)
Appendix E – Traffic Analysis Report
Appendix F – Air Emission Calculations
Appendix G – Site Photographs
Appendix H – Alternative 2 Site Rendering

## Tables

Table 1 – Resource Areas and Anticipated Impacts..................................................................18
Table 2 – Soil Limitations for Building Site Development ......................................................22
Table 3 – Listed, Proposed, and Candidate Federal and Species for Harris County, Texas......................32
Table 4 – Listed, Proposed, and Candidate Federal and Species for Montgomery County, Texas.............33
Table 5 – Selected Demographic Characteristics: 2014 U.S. Census Community Facts Estimates ..........45
Table 6 – Housing Units ...........................................................................................................47
Table 7 – National Ambient Air Quality Standards ................................................................60
Table 8 – Construction Air Emission Estimates.......................................................................64
Table 9 – New Commuter Activities Air Emission Estimates ................................................65
Table 10 – Emergency Generator Air Emission Estimates ......................................................65
Table 11 – Natural Gas Boilers Air Emission Estimates..........................................................65
Table 12 – Annual Estimated Criteria Pollutant Emissions .....................................................66
Table 13 – A-Weighted (DBA) Sound Levels of Construction Equipment and Modeled Attenuation at Various Distances.......................................................................................................................71
Table 14 – Resource Areas – Proposed Mitigation and BMPs .................................................77

## Figures

Figure 1 – Alternative #1 & Alternative #2 Site Location ........................................................88
Figure 2 – Alternative #1 Site Location ...................................................................................89
Figure 3 – Alternative #1 Aerial Photograph ...........................................................................90
Figure 4 – Alternative # 1 Site Plan .........................................................................................91
Figure 5 – Alternative #2 Site Location  ..................................................................................92
Figure 6 – Alternative #2 Aerial Photograph ...........................................................................93
Figure 7 – Alternative #2 Site Plan ..........................................................................................94
Figure 8 – Alternative #1 Soil Survey Map...............................................................................95
Figure 9 – Alternative # 1 Topography Map .............................................................................96
Figure 10 – Alternative #2 Soil Survey Map.............................................................................97
Figure 11 – Alternative #2 Topographic Map ...........................................................................98
Figure 12 – Alternative # 1 FEMA Flood Hazard Map.............................................................99
Figure 13 – Alternative #2 FEMA Flood Hazard Map............................................................100
Figure 14 – Alternative #2 FEMA Insurance Map ..................................................................101
Figure 15 – Alternative #1 National Wetland Inventory Map..................................................102
Figure 16 – Alternative #2 National Wetland Inventory Map..................................................102

Supp. App. 1645

# EXECUTIVE SUMMARY

### Introduction

United States (U.S.) Immigration and Customs Enforcement (ICE) is the principal investigative arm of the U.S. Department of Homeland Security (DHS) and the second largest investigative agency in the Federal government. ICE's primary mission is to promote homeland security and public safety through criminal and civil enforcement of Federal laws governing border control, customs, trade, and immigration. Created in 2003 through a merger of the investigative and interior enforcement elements of the U.S. Customs Service, and the Immigration and Naturalization Service, ICE now has more than 19,000 employees in offices in all 50 states and 47 foreign countries. To ensure ICE's primary mission is achieved, ICE proposes to award a contract for a Contractor-Owned/Contractor-Operated detention facility (CDF) to house detainees under the jurisdiction of ICE. This effort is critical to the effective and efficient operations associated with detention and removal in and around ICE's Houston Field Office (HFO) Area of Operations (AO).

In accordance with the National Environmental Policy Act of 1969 (NEPA) (42 U.S. Code 4321-4347), ICE has prepared an Environmental Assessment (EA) of its proposed action to award a contract for the construction, renovation, and operation of a CDF. This facility would have a minimum operational capacity of 1,000 beds, a minimum of 25 Short-Stay/Medical beds, and a maximum of 1,200 beds including all support beds (Short-Stay/Medical, Segregation, Vulnerable Population, and Processing). ICE administration, processing, and legal services would be provided at the facility. Furthermore, the facility is required to be located on a parcel of land located within a 50-mile radius of the ICE HFO at 126 Northpoint Drive, Houston, Texas, 77060. ICE is evaluating three alternatives, including the no action alternative, for the siting and operation of the detention facility.

### Description of Proposed Action

The Proposed Action consists of awarding a new contract to construct/renovate, and operate a CDF with a minimum operational capacity of 1,000 beds, a minimum of 25 Short-Stay/Medical beds, and a maximum of 1,200 beds including all support beds (Short-Stay/Medical, Segregation, Vulnerable Population, and Processing) to support ICE administration, processing, and court rooms on a parcel of land located within a 50-mile radius of the ICE Houston Field Office located at 126 Northpoint Drive, Houston, Texas, 77060. Under the Proposed Action, the contractor selected would be responsible for ensuring that the facility is operated in a manner consistent with the mission of ICE and state and federal laws and regulations. This EA serves to evaluate the potential impacts of the Proposed Action Alternatives, including the No Action Alternative, as stipulated by NEPA.

### Alternatives Considered

Multiple alternatives were analyzed during the planning stages of the proposed project; however, after alternatives were eliminated, which are further discussed in the EA, only three alternatives were carried forward. The three alternatives include the following:

- The No Action Alternative;

Supp. App. 1646

- Proposed Action Alternative 1 – renovation, new construction, and continued operation of the Houston Processing Center (HPC); and
- Proposed Action Alternative 2 – construction and operation of a facility proposed to be located on an undeveloped parcel of land in Conroe, Montgomery County, Texas.

The No Action Alternative would preclude the awarding of a contract for the construction, renovation, and operation of a CDF. Operations in the HFO would continue in their current state at the HPC under a bridge contract. The bridge contract cannot be renewed indefinitely, and the No Action Alternative would ultimately result in a lapse of contract service. Thus, under the No Action Alternative, ultimately, the HFO would be unable to fulfill the necessary requirements in accordance with ICE detention standards. The HFO would not have the needed Short-Stay/Medical bed capacity, nor have the appropriate processing and courtroom space. For these reasons, HFO operations would be ineffective and inefficient under the No Action Alternative.

**Affected Environment and Consequences**

A full description of the potential impacts on the human environment resulting from implementation of the Proposed Action and Alternatives is presented in the EA. A summary of the issues and resource areas examined in the EA and anticipated impacts is provided in **Table 1**.

**Findings and Conclusions**

No significant adverse impacts are anticipated for any resource categories analyzed in the EA. Therefore, no further analysis or documentation (i.e., an EIS) is warranted. ICE, in implementing the chosen alternative, would employ all practicable means to minimize any potential adverse impacts on the human environment.

7

# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **ACS** | American Community Survey |
| **APE** | Area of Potential Effect |
| **AST** | Aboveground storage tank |
| **B&A** | Bleyl & Associates |
| **BGEPA** | Bald and Golden Eagle Protection Act |
| **BMP** | Best Management Practice |
| **CAA** | Clean Air Act |
| **CCA** | Corrections Corporation of America |
| **CDF** | Contractor Owned/Contractor Operated Detention Facility |
| **CEQ** | Council on Environmental Quality |
| **CFR** | Code of Federal Regulations |
| **CH4** | Methane |
| **CO** | Carbon Monoxide |
| **CO2** | Carbon Dioxide |
| **COO** | Certificate of Occupancy |
| **CWA** | Clean Water Act |
| **dB** | Decibel |
| **dBA** | A-weighted decibel |
| **DHS** | Department of Homeland Security |
| **DNL** | Day-night average sound level |
| **EA** | Environmental Assessment |
| **EIS** | Environmental Impact Statement |
| **EMS** | Emergency Medical Situations |
| **ENSA** | Environmental Site Assessment |
| **EO** | Executive Order |
| **ERO** | Enforcement and Removal Operations |
| **EOIR** | Executive Office of Immigration Review |
| **ESA** | Endangered Species Act |
| **°F** | Degrees Fahrenheit |
| **FAA** | Federal Aviation Administration |
| **FEMA** | Federal Emergency Management Agency |
| **FHWA** | Federal Highway Administration |
| **FONSI** | Finding of No Significant Impact |
| **FOU** | Field Operation Unit |
| **GEO Group** | The GEO Group, Inc. |
| **GHG** | Greenhouse Gases |
| **GMA** | Groundwater Management Area |
| **HFC** | Hydrochlorofluorocarbons |
| **HFO** | Houston Field Office |
| **HPC** | Houston Processing Center |
| **HFD** | Houston Fire Department |
| **IAH** | George Bush Intercontinental Airport |
| **ICE** | Immigration and Customs Enforcement |
| **IPaC** | Information for Planning and Conservation |
| **IPCC** | Intergovernmental Panel on Climate Change |
| **JMT** | Johnson, Mirmiran, and Thompson |

Supp. App. 1648

| | |
|---|---|
| **JPATS** | Justice Prisoner and Alien Transport System |
| **LEED** | Leadership in Energy and Environmental Design |
| **LGBT** | Lesbian, Gay, Bisexual, and Transgender |
| **µg/m3** | Micrograms per cubic meter |
| **mg/m3** | Milligrams per cubic meter of air |
| **MGD** | Million Gallons Per Day |
| **MOVES** | Mobile Vehicle Emission Simulator |
| **NAAQS** | National Ambient Air Quality Standards |
| **NAGPRA** | Native American Graves Protection and Repatriation Act |
| **NEPA** | National Environmental Policy Act |
| **NMFS** | National Marine Fisheries Service |
| **NO2** | Nitrogen Dioxide |
| **Nos** | Nitrous Oxides |
| **NOA** | Notice of Availability |
| **NOAA** | National Oceanic and Atmospheric Administration |
| **NOI** | Notice of Intent |
| **NPDES** | National Pollutant Discharge Elimination System |
| **NPS** | National Park Service |
| **NRCS** | Natural Resources Conservation Service |
| **NRHP** | National Register of Historic Places |
| **NWI** | National Wetland Inventory |
| **O3** | Ozone |
| **OPLA** | Office of the Principal Legal Advisors |
| **PBNDS** | Performance Based National Detention Standards |
| **PCB** | Polychlorinated biphenyls |
| **PM-10** | Particulate matter less than 10 microns |
| **PM-2.5** | Particulate matter less than 2.5 microns |
| **PPB** | Parts per billion |
| **PPM** | Parts per million |
| **PTE** | Potential to emit |
| **PWS** | Performance Work Statement |
| **RCRA** | Resource Conservation and Recovery Act |
| **RECs** | Recognized Environmental Conditions |
| **RFI** | Request for Information |
| **RFP** | Request for Proposal |
| **ROI** | Region of Influence |
| **SDC** | Seismic Design Categories |
| **SEARCH** | Southeastern Archaeological Research, Inc. |
| **SHPO** | Texas State Historic Preservation Officer |
| **SO2** | Sulfur dioxide |
| **SOC** | Species of Concern |
| **SPCCP** | Spill Prevention, Control, Countermeasures Plan |
| **SWPPP** | Stormwater Pollution Prevention Plan |
| **T.A.C.** | Texas Administrative Code |
| **TCEQ** | Texas Commission on Environmental Quality |
| **TPW** | Texas Parks and Wildlife |
| **TPWD** | Texas Parks and Wildlife Department |
| **TIA** | Traffic Impact Analysis |
| **TXU** | TXU Energy |
| **USACE** | United States Army Corps of Engineers |

9

| | |
|---|---|
| **USC** | United States Code |
| **USDA** | United States Department of Agriculture |
| **USEPA** | United States Environmental Protection Agency |
| **USFWS** | United States Fish and Wildlife Service |
| **USGS** | United States Geological Survey |
| **UST** | Underground storage tank |
| **VOC** | Volatile Organic Compounds |
| **WOUS** | Waters of the United States |

Supp. App. 1650

# PROJECT BACKGROUND

## 1.1    Introduction

This Environmental Assessment (EA) evaluates the environmental impacts of the Proposed Action and the No Action Alternative to award a new contract for a Contractor-Owned/Contractor-Operated detention facility (CDF) with a minimum operational capacity of 1,000 beds to support ICE administration, processing, and court rooms on a parcel of land located within a 50-mile radius of the ICE Houston Field Office (HFO) located at 126 Northpoint Drive, Houston, Texas, 77060.  In addition, the facility selected would be within the appropriate proximity, and have access to, emergency services including medical care, fire protection, and law enforcement.  ICE would assign low to minimum, medium, and maximum security adult male and female detainees to the selected facility. All detainees' housing and transportation services and programs are developed and implemented to comply with contract requirements and all applicable Federal, State and local laws and regulations.  This EA serves to evaluate the potential impacts of the Proposed Action (including all alternatives), and the "No Action" Alternative, as stipulated by NEPA.

## 1.2    Purpose and Need

The purpose of the Proposed Action is for the timely and immediate award of a contract to provide a CDF with sufficient detention services, armed transportation services, on-call guard services, administrative and office space services, and parking spaces at the CDF to effectively and efficiently accomplish ICE's mission authority of fulfilling orders for the securing and departure activities of detainees who are designated in removal proceedings and for arranging the detention of detainees when necessary and prescribed by law. The need for a timely and immediate award of a contract for a CDF is because the capacity to support the effective detention of persons in the area within ICE owned facilities or as a result of other leased space in local prisons, county jails, etc. has been reached, and there exists an immediate need for a facility that can provide for a minimum of 1,000 beds, a minimum of 25 Short-Stay/Medical beds, and a maximum of 1,200 beds including all support beds (Short-Stay/Medical, Segregation, Vulnerable Population, and Processing).

The ICE contract at the Houston Processing Center (HPC) is expiring and the bridge contract that would be in place under the No Action Alternative cannot be renewed indefinitely. In addition, ICE detention standards have been modified to include new requirements, and the existing facility does not meet ICE's new requirements. Subsequently, ICE has an immediate need for a space to house existing detainees that provides the required capacity and is in accordance with revised ICE standards. The proposed detention facility would be designed and operated to process and house adult male and female detainees, including the full range of criminal and non-criminal cases. The facility would also provide both transportation and guard services in a manner consistent with the 2011 Performance Based National Detention Standards (PBNDS) and civil detention reform initiatives. The proposed detention facility would also provide minimum, medium, and maximum security case beds for low, medium, and high risk detainees.  ICE has the ultimate responsibility to comply with the full range of environmental laws regarding implementation. This EA serves to evaluate the potential impacts of the proposed action and alternatives, including the No Action Alternative, as stipulated by NEPA.

It would take a substantial amount of time to design and construct an ICE owned facility because ICE does not have construction authority and there is not an existing design contract in place for such a facility. In addition, ICE does not have adequate staff to operate an owned facility in the HFO Area of Operation (AO). Therefore, construction of an ICE owned facility is not a viable option.

The EA includes:

- The individual proposed CDF location (along with the facility footprint) and the environmental impacts of each alternative;
- An analysis of the "No Action Alternative;"
- Mitigation: If the project requires mitigation a detailed description of mitigation that would be performed prior to, during, and/or after the contract award; and
- A listing of the documents and persons consulted in the preparation of the EA and those responsible for preparation of the EA.

## 1.3    Scope and Content of the Analysis

The scope of this EA includes the analysis of environmental impacts resulting from the construction, operation, and maintenance of the proposed renovations and/or newly constructed facilities as part of the proposed action and alternatives. This EA has been prepared in accordance with NEPA (42 United States Code [USC] 4321-4347), the Council on Environmental Quality (CEQ) regulations for implementing NEPA (40 Code of Federal Regulations [CFR] 1500-1508), and the NEPA implementing procedures contained in DHS Directive 023-01, Rev. 01, Environmental Planning Program. As part of the preparation of this EA, ICE evaluated all of the potentially affected resource categories with the potential for impacts as a result of the extent of construction of a new detention facility or the renovations to the existing HPC. No potentially applicable resource categories were dismissed as part of the preparation of the EA.

## 1.4    Interagency Coordination, Consultation and Public Involvement

ICE conducted a comprehensive regulatory, stakeholder, and public involvement process to identify and evaluate potential impacts and concerns related to the proposed project. ICE consulted with U.S. Environmental Protection Agency (USEPA) Region 6, the Natural Resources Conservation Service (NRCS), U.S. Fish and Wildlife Service (USFWS), the Texas Parks and Wildlife Department (TPWD), the Texas Historical Commission (THC), the Texas Commission on Environmental Quality (TCEQ), the Texas Department of Transportation, the Texas General Land Office, the Texas Water Development Board, the Tribal Historical Preservation Officers (THPO) of the Comanche Nation, Wichita and Affiliated Tribes, Tonkawa Tribe of Oklahoma, and the Mescalaro and Lipan Apache Tribes of Texas and Oklahoma, and elected officials for Harris and Montgomery Counties and the cities of Houston and Conroe, Texas. Hard copies of the draft EA were made available to the public for review for a period of 30 days at the Central Houston Public Library, Jesse H. Jones Building and the Conroe (Montgomery County) Public Library. The notice of availability of the EA at the public libraries was publicized in one Montgomery County newspaper, the MONTGOMERY COUNTY NEWS and in one Houston newspaper, the HOUSTON CHRONICLE.  The notice of availability was also provided in Spanish, in the daily print and online Houston Spanish-language newspaper SEMANA NEWS. The final EA and FONSI is available to the public on the DHS website at https://www.dhs.gov/national-environmental-policy-act.

## 1.5    Description of the Proposed Action and Alternatives

### 1.5.1 Proposed Action

ICE is responsible for the detention, health, welfare, transportation and deportation of illegal aliens in removal proceedings and aliens subject to final order of removal from the United States. ICE houses detainees in a variety of federal, state, local, and private facilities. ICE requires a facility and operator to fulfill the transportation, detention, and guard portions of ICE's mission in the HFO AO. The proposed detention facility would be designed and operated to process and house adult male and female detainees, including the full range of criminal and non-criminal cases. The facility would also provide both transportation and guard services in a manner consistent with the 2011 Performance Based National Detention Standards (PBNDS) and civil detention reform initiatives. The proposed detention facility would also provide minimum, medium, and maximum security case beds for low, medium, and high risk detainees.

The Proposed Action consists of the timely and immediate award of a new contract to construct and/or renovate, and operate a CDF.  This facility would have a minimum operational capacity of 1,000 beds, a minimum of 25 Short-Stay/Medical beds, and a maximum of 1,200 beds including all support beds (Short-Stay/Medical, Segregation, Vulnerable Population, and Processing). ICE administration, processing, and legal services would be provided at the facility.  Furthermore, the facility is required to be located on a parcel of land located within a 50-mile radius of the ICE HFO at 126 Northpoint Drive, Houston, Texas, 77060. The 50-mile radius is required so that ICE personnel at the field office can make routine visits to the facility or make visits on short notice without routinely expending undue resources or travel time. ICE is evaluating three alternatives, including the No Action Alternative, for the contract award of the detention facility.

### 1.5.2 No Action Alternative

The No-Action Alternative would mean that no new contract is awarded for the construction/renovation of a CDF. In this case, ICE would continue with the existing bridge contract in place at the HPC, which is an existing CDF in the Houston area that currently houses ICE detainees. Therefore, there would be no new environmental effects because there would be no changes to the current state of operations under the bridge contract.  However, the bridge contract that is in place cannot be renewed indefinitely and the existing facility no longer meets ICE detention facility standards. The No Action Alternative does not address ICE's need for a timely and immediate contract award for a detention facility that has a minimum capacity of 1,000 beds, a maximum capacity of 1,200 beds, and is in accordance with ICE facility standards. The No Action Alternative would not support ICE's mission and requirements for detention of persons in the region and is therefore not viable.  Inclusion of the No-Action Alternative is prescribed by CEQ regulations (40 CFR 1502.14) as the benchmark against which proposed Federal actions are evaluated.  For this reason, though the No-Action Alternative is not viable, analysis of it is carried forward through this EA. In the event the No Action Alternative resulted in a termination of the existing bridge contract at the HPC, and existing personnel and detainees would be required to be moved to another location. ICE does not have a specific operational plan for this scenario because of the importance of the Houston AOR in the lawful, timely, and efficient processing of detainees.

Two sites in the Houston area of operation were considered to meet the Purpose and Need: new construction, renovations, and modifications to the HPC in Houston, Texas, and a new detention facility to be built on approximately 24.9 acres off Hilbig Road in Conroe, Montgomery County, Texas.  These alternatives are

discussed in more detail below and the respective locations within the greater Houston metropolitan area are presented in **Figure 1**.

### 1.5.3    Proposed Action Alternative 1 – Renovations to HPC

The HPC is an existing facility located at 15850 Export Plaza Drive in Houston (**Figure 2**). The facility has been operated since 1984. The property includes the main detention center and two warehouse buildings with access off Greens Road, Vickery Drive and Export Plaza Drive (**Figure 3 & Figure 4**). The facility currently includes 1,013 General Population beds, and 16 Short-Stay/Medical beds. The warehouse buildings are partially occupied by a lessee, administrative offices, and warehouse space. Under the Proposed Action Alternative 1, the HPC would undergo new construction as well as renovations, and would be used to provide a capacity of 1,045 General Purpose and Vulnerable Population beds and would include 25 Short-Stay/Medical beds. Short-Stay/Medical beds are not calculated in the General Purpose bed total; if a detainee occupies a Short-Stay/Medical bed, his or her bed in the General Population is maintained. The facility would undertake minor additions to the adjacent administrative offices/warehouse building to achieve the required contract requirements. Because of the renovations that are needed to meet the revised and current ICE standards, the renovated facility will include a total of 1,070 total beds, which is 45 more than required by the proposed action (1,000 beds not including the 25 Short-Stay/Medical beds). The 1,070 total beds is within the maximum of 1,200 total beds including all support beds described in the Purpose and Need. The renovations will add another 9 Short-Stay/Medical beds to match the required 25 Short-Stay/Medical beds as discussed in the purpose and need. A description of the proposed renovations, new construction, and repurposing of the HPC under Alternative 1 includes the following and is depicted in **Figure 4:**

- New 14,903 square foot (sq. ft.) male processing center/medical center;
- New 8,675 sq. ft. female detainee building with new segregated recreation enclosures;
- New soccer field with artificial turf;
- New 6,635 sq. ft. indoor basketball court/gymnasium;
- New recreation yards and sidewalk for short stay housing;
- Renovation of existing kitchen, commissary, visitation area, processing/courts building, law libraries, and dining areas and expanded kitchen by 804 sq. ft. for new cooler and freezer;
- Laundry renovation/expansion;
- Renovation of holding/processing space;
- Medical/dental renovation;
- Interior renovation of the southern warehouse building to create new offices, maintenance, additional warehouse spaces, training spaces, and ICE office spaces;
- Possible rehabilitation/repaving of the existing parking lot at the administrative /warehouse building; and
- Dedicating and creating secure parking spaces for ICE staff.

The total area of new construction and expansion is 31,017 sq. ft. Compared to the existing square footage for the facility as well as adjacent warehouses of 625,822 sq. ft., the new construction component of the Proposed Action Alternative 1 would contribute less than a 5% increase to the overall facility footprint. Awarding the contract to utilize the existing HPC with the renovations and construction identified above would meet the purpose and need by providing a minimum capacity of 1,000 beds and 25 Short-Stay/Medical beds that are required. In addition, the renovations/new construction at the HPC would meet all ICE requirements and standards. The facility is

currently served by public water and sewer services.  No off-site improvements of utilities, roads, or other infrastructure would be required to meet ICE's conditions or standards.  Under the Proposed Action Alternative 1, no new facility would be constructed at the Proposed Action Alternative 2 (described below).

### 1.5.4    Proposed Action Alternative 2 – New Facility in Montgomery County

Under the Proposed Action Alternative 2, a new detention center would be constructed, operated, and maintained in the Houston, Texas, area of operation on an approximately 24.9 acre parcel of land located off Hilbig Road in Conroe, Montgomery County, Texas **(Figure 5 & Figure 6)**. The facility would provide recreation areas, services areas, and parking. The facility would contain a total of 1,125 beds and would include the required 25 Short-Stay/Medical beds. The facility would also include support beds such as segregation beds and vulnerable population beds that meet all ICE requirements and standards. The built-for-purpose facility would total approximately 310,000 sq. ft. and would include indoor and outdoor recreation facilities, all required ICE functional areas and ICE holding/processing areas, service yards and a landscaped site. The processing facility would employ 190 full-time ICE employees and 250 contract facility employees.

The facility would include approximately 500 parking spaces for visitors (which is significant and includes detainee family members, attorneys, and other persons), contractor and ICE staff, and buses for transporting detainees. The parking breakdown is 173 spaces for ICE employees, 30 spaces for ICE vehicles, 4 spaces for buses, 30 spaces for ICE visitors, and 60 spaces for CDF visitors. In addition, 177 spaces will be provided for contractor employees (parking is provided for two back-to-back shifts and non-shift employees at one time), and 26 space spaces. An area for ICE's emergency fuel storage would be provided within the ICE secured parking lot. A depiction of the proposed construction site is included as **Figure 7**.

Under the Proposed Action Alternative 2, the existing HPC would remain operational, but would not undergo renovations/construction to fulfill ICE's requirements. ICE personnel, detainees, and all equipment at the former HPC would be moved to the Proposed Action Alternative 2 site once construction is complete. The facility would find another tenant to occupy the existing space in this scenario and could choose to leave the structures as is or conduct renovations/alterations or construction.

### 1.5.5    Summary of Alternatives Considered but Eliminated

**New Facility Construction – City of Shepherd, Texas**

A proposed detention facility to be constructed on an approximate 101 acre tract of land located near the intersection of Farm-to-Market (FM) 223 and U.S. Highway (US) 59 within of the City of Shepherd, San Jacinto County, Texas, was eliminated as an alternative. The planned site development would have included a secure bed detention facility for a minimum of 1,000 total beds (not exceeding the maximum of 1,200 beds) and would have included two separate dormitories, 75,050 sq. ft. and 38,000 sq. ft. in size. In addition, a separate administration and visitation building, dining building, medical building, information processing center building, and a maintenance building were proposed. These structures were to surround a large recreation area to include a soccer field, track, volleyball courts, and basketball courts. In addition, a separate women's recreational yard was proposed to be located outside of housing unit 2. The planned facility was to include bus parking, visitor and employee parking, a patrol road, and two access roads, one for public access and one secured access.

Supp. App. 1655

A biological survey conducted for the proposed facility site identified both wetlands and ephemeral streams that could have potentially been impacted by the construction of the facility and could have triggered the need for a Nationwide Permit (NWP) from the United States Army Corps of Engineers (USACE). Due to the lack of a clearly defined impact on wetland or stream areas that could have foreseeably occurred as a result of changes to the facility layout, a NWP-39 may not have been appropriate or feasible for the site, and/or further consultations with USACE may have identified the need for a different or additional NWP. Both of these scenarios, along with required mitigation of wetland impacts, would have potentially added significant delays to the process of awarding a contract for the project.

A cultural resources study (which included a historic records review) identified a historical Native American village that had been inhabited by the Coushatta Tribe located approximately 1.5 miles from the project area. A full cultural resources field survey, including a thorough pedestrian survey and shovel testing, along with additional tribal consultation, was recommended for the site to identify any potential cultural resources of significance within the existing footprint. The results of the field survey would have potentially added significant delays to the contract award process, as part of the Section 106/Tribal consultation process or as a result of cultural resources monitoring that could potentially be required during construction. In addition, based on the results of the field survey and consultation, additional siting considerations for the facility may have been required within the project area and which may have subsequently impacted the adjacent wetland areas and ephemeral streams as noted above.

Furthermore, there were a number of concerns for the proposed utilities and infrastructure requirements for a newly constructed facility in the area. No information was provided by the vendor regarding the length of the proposed water or sewer lines, or where they would have been located. Potential project delays would have arisen if the lines travelled across another property not owned by the vendor, through wetlands or streams, or if they required negotiating a new right-of-way. There were also other concerns related to wastewater treatment, access roads, and water supply meeting demand, all of which could have resulted in delays to awarding a contract.

These three resource categories posed sufficient concerns that could have resulted in significant delays of a timely and immediate contract award as outlined in the Purposed and Need. Subsequently, the new facility in the City of Shepard, San Jacinto County was eliminated as a viable alternative because it would not allow for a timely award of a contract.

**Other Facilities Not Meeting ICE Requirements**

The ICE detention center must be designed as an essential Government Facility built to resist a Category V hurricane, and have 100% emergency back-up power; therefore, other possible existing facilities were eliminated from consideration since they could not meet these requirements. An ICE owned facility would take a significant amount of time to design and construct because ICE does not own any land suitable for new construction and would need to acquire it, there is not an existing design contract in place for such a facility, and ICE does not have construction authority. In addition, ICE does not have adequate staff to operate an owned facility in the HFO AO. Subsequently, constructing an ICE owned facility is not a viable option because it does not satisfy the Purpose and Need for a timely and immediate award of a contract for a minimum 1,000 bed facility with a minimum of 25 Short-Stay/Medical beds and a maximum of 1,200 total beds including all support beds. Additional facilities construction and/or renovation projects were proposed during the planning process, but because these alternatives

16

were for General population and Short-Stay/Medical bed counts of substantially more than allowed (1,200 total) by the purpose and need, this EA does not include a discussion of these alternatives proposed by the vendor because they do not fit the purpose and need for the project or ICE.

## AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES

This section of the EA describes the natural and human environment that exists within the project areas and region of influence (ROI), and the potential impacts of the No Action, or Proposed Action Alternatives 1 and 2 outlined in **Section 1.0** of this document. The ROI for this project generally is the City of Conroe, Montgomery County Texas and the City of Houston, Harris County, Texas. However, different resource categories may apply a different ROI (i.e., more limited or more extensive) as appropriate based on the nature of individual resource category. In addition, only those parameters that have the potential to be affected by the alternatives are described, as per CEQ guidance (40 CFR 1501.7 [3]).

Impacts (consequences or effects) can be either beneficial or adverse, and can be either directly related to the action or indirectly caused by the action.  Direct impacts are those effects that are caused by the action and occur at the same time and place (40 CFR 1508.8[a]).  Indirect impacts are those effects that are caused by the action and are later in time or further removed in distance, but that are still reasonably foreseeable (40 CFR 1508.8[b]). As discussed in this section, the alternatives may create temporary (lasting the duration of the project construction), short-term (up to three years), long-term (three to ten years following construction), or permanent effects. Effects can be either adverse or beneficial depending on the individual resource category and the nature of impacts.

Impacts on each resource can vary in degree or magnitude from a slightly noticeable change to a total change in the environment.  For the purpose of this analysis, the intensity of impacts are being classified as negligible, minor, moderate, or significant. The intensity thresholds are defined as follows:

- Negligible: A resource would not be affected or the effects would be at or below the level of detection, and changes would not result in any measurable or perceptible consequences.
- Minor: Effects on a resource would be detectable, although the effects would be localized, small, and of little consequence to the sustainability of the resource.  Mitigation measures, if needed to offset adverse effects, would be simple and achievable.
- Moderate: Effects on a resource would be readily detectable, long-term, localized, and measurable. Mitigation measures, if needed to offset adverse effects, would be extensive and likely achievable.
- Significant: Effects on a resource would be obvious, long-term, and would have substantial consequences on a regional scale. Extensive mitigation measures to offset the adverse effects would be required, and success of the mitigation measures would not be guaranteed.

ICE's review of the proposed action demonstrates that no significant environmental impacts would result from the proposed action or alternatives in any analyzed resource category.  Figures depicting the Proposed Action Alternatives are included in the Figures section after the references.  **Table 1** provides a summary of the findings for the environmental areas of concern that ICE typically reviews.  The site-specific analyses of selected resource categories follow **Table 1**.

17

Table 1. Resource Areas and Anticipate Impacts

| Section Number | Resource/Area of Evaluation | Anticipated Impacts |
|---|---|---|
| 2.1 | Geology, Soils & Seismicity | There would be negligible adverse impacts under the No Action Alternative or Proposed Action Alternative 1.<br><br>Construction of the detention center as part of the Proposed Action Alternative 2 would permanently impact approximately 24.9 acres of land. Although these impacts are long-term, they would be negligible on a regional scale due to the small amount of soils lost relative to the large quantity of the same soils in the area. |
| 2.2 | Hydrology and Water Resources | There would be negligible adverse impacts under the No Action Alternative.<br><br>There would be minor, adverse long-term impacts from increased stormwater runoff from additional impervious area under the Proposed Action Alternative 1.<br><br>The Proposed Action Alternative 2 would maintain Stewarts Creek and the associated floodplain bottomland forests in an undeveloped condition; therefore negligible impacts to water resources are expected. |
| 2.3 | Biological Resources | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action Alternative 1.<br><br>The Proposed Action Alternative 2 would maintain Stewarts Creek and the associated floodplain bottomland forests in an undeveloped condition; the remainder of the site has been historically impacted by logging therefore impacts to other vegetation communities would be minimal. No threatened or endangered species are known to occur on the site therefore negligible adverse impacts to threatened and endangered species are expected. |
| 2.4 | Cultural Resources and Historic Properties | There would be negligible adverse impacts to historic properties under the No Action Alternative or the Proposed Action Alternative 1.<br><br>Based on the cultural resources evaluation conducted for the Proposed Action Alternative 2, negligible impacts are anticipated. |
| 2.5 | Aesthetics/Visual Impacts | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action |

| Section Number | Resource/Area of Evaluation | Anticipated Impacts |
|---|---|---|
| | | Alternative 1.<br><br>Under the Proposed Action Alternative 2, based on the building architecture and surrounding areas (institutional and commercial), negligible adverse impacts are anticipated. |
| 2.6 | Hazardous Materials and Waste | There would be no increase in the use and disposal of hazardous materials and subsequently negligible adverse impacts are anticipated for both the No Action Alternative and Proposed Action Alternative 1.<br><br>Under the Proposed Action Alternative 2, there is a potential for minor, adverse temporary impacts during construction related to the fuel and construction equipment that would be present at the site. There are no known hazardous materials located on the site. |
| 2.7 | Social Environment and Environmental Justice | Under the No Action Alternative and the Proposed Action Alternative 1, there would be minor, beneficial long-term impacts to the local economy from continued employment, taxes, and expenditures as a result of the continued operation of the HPC.<br><br>Under the Proposed Action Alternative 2, the construction of the proposed detention center would result in minor, beneficial long-term impacts on the region's economy from an increase in the hiring of local workers for construction projects, permanent operations, and other related activities associated with goods and services delivered to the detention center. |
| 2.8 | Human Health and Safety | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action Alternative 1.<br><br>Under the Proposed Action Alternative 2, negligible adverse impacts are anticipated. The public service personnel interviewed during the evaluation process indicated that the operation and construction of the detention center would not hinder their ability to provide services to the detention center and the community. |
| 2.9 | Land Use | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action Alternative 1.<br><br>The Proposed Action Alternative 2 site land use is compatible with the City's comprehensive plan and the land use of the surrounding area; therefore, there |

19

Supp. App. 1659

| Section Number | Resource/Area of Evaluation | Anticipated Impacts |
|---|---|---|
| | | would be negligible adverse impacts on land use in the area. |
| 2.10 | Utilities and Infrastructure | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action Alternative 1 because the facility is currently tied to the existing utilities and infrastructure, and would not materially increase utility demands beyond the present capacity.<br><br>Under the Proposed Action Alternative 2, the increase in demand on utilities in the area where the site would be located is within present capacity; therefore, there would be minor, adverse long-term impacts. |
| 2.11 | Traffic and Transportation Systems | There would be no significant increases in traffic that would impact traffic and transportation patterns in the area under the No Action Alternative or the Proposed Action Alternative 1. There could be minor, adverse short-term impacts to traffic and transportation under the No Action Alternative. The Proposed Action Alternative 1 would result in negligible impacts to traffic and transportation.<br><br>Adverse impacts on roads and traffic would be minor and long-term. The capacity exists in the current transportation system to accommodate the demand created by the Proposed Action Alternative 2. |
| 2.12 | Air Quality | There may be minor, adverse temporary impacts to air quality as a result of the No Action Alternative in the event that detainees at the HPC need to be transported to another facility.<br><br>Temporary minor adverse impacts on air quality (dust) would occur during construction and renovation activities under the Proposed Action Alternative 1. All emissions would be below the Federal *de minimis* standard.<br><br>Temporary minor adverse impacts on air quality (dust) would occur during construction under the Proposed Action Alternative 2. There would be intermittent temporary minor adverse impacts post development in association with back-up generator testing. All emissions would be below the Federal *de minimis* standard. |
| 2.13 | Greenhouse Gas and Climate Change | Adverse impacts would be minor, temporary and below the CEQ reporting threshold for the No Action Alternative and the Proposed Action Alternative 1. |

| Section Number | Resource/Area of Evaluation | Anticipated Impacts |
|---|---|---|
| | | Minor, beneficial long-term impacts would likely be realized from the incorporation of sustainable practices, materials, and design under the Proposed Action Alternative 2. |
| 2.14 | Noise | There would be negligible adverse impacts to noise as a result of the No Action Alternative.

Minor adverse impacts and temporary increases in noise would occur from construction and renovation activities under the Proposed Action Alternative 1.

Minor, adverse temporary increases in noise would occur during construction of the detention facility under the Proposed Action Alternative 2. Due to lack of sensitive receptors within 500 feet of the proposed construction area, negligible adverse noise impacts are anticipated from construction or operation of the facility. |

## 2.1    Geology, Soils, Topography and Seismicity

### 2.1.1    Affected Environment

The Proposed Action Alternative 1 is located in the City of Houston in Harris County, Texas. The Proposed Action Alternative 2 is located in the City of Conroe in Montgomery County, Texas. While both of these locations are considered to be generally within the same geographic area, the slight differences related to geology, soils, topography, and seismicity and their impacts are discussed below.

*Proposed Action Alternative 1: City of Houston and Harris County*

Geology
According to United States Geological Survey (USGS), the facility lies on the Beaumont Formation from the Late Pleistocene.  This formation is dominantly clay and mud of low permeability with high-water holding capacity, high compressibility, high to very high shrink-swell potential, poor drainage, and level to depressed relief, low shear strength and high plasticity.  The geologic units include inter-distributary muds, abandoned channel-fill muds, and overbank fluvial muds. The coastal plain in this region (in which the HPC site is located) has a complex tectonic geology, several major features of which are: Gulf Coastal geosyncline, salt domes, and major sea level fluctuations during the glacial stages, subsidence and faulting activities.  Most of these geologic faulting activities ceased millions of years ago, but some are still active.

Soil
According to the US Department of Agriculture's (USDA) Natural Resources Conservation Service (NRCS) Soil Survey for Harris County, soils on the site consist of Clodine fine sandy loam, zero to one percent slopes and Gessner fine sandy loam, zero to one percent slopes, ponded (**Figure 8**).

Clodine fine sandy loam is somewhat poorly drained with a depth to the water table of about zero to 30 inches and a moderate permeability. The soil profile is a fine sandy loam from a depth of zero to nine inches, then a loam from nine to 80 inches below ground level. The parent material is loamy fluviomarine deposits derived from igneous, metamorphic and sedimentary rock. Gessner fine sandy loam is a hydric soil that is poorly drained with a water table near the surface and with moderate permeability. Hydric soils are one indicator of the possible presence of wetlands. This soil series consists of deep, slightly acid to moderately alkaline, nearly level, loamy soils. They are typically found in low depressions of the coastal prairie and are loamy throughout.

Prime farmland is defined by the USDA as land that has the best combination of physical and chemical characteristics for producing food, feed, fiber, forage, oileed, and other agricultural crops with minimal inputs of fuel, fertilizer, pesticides, and labor, and without intolerable soil erosion. If drained, the Gessner fine sandy loam is considered prime farmland. Clodine, however, is not prime farmland.

Important farmland consists of soils that are important to the agricultural resource base in the counties but do not meet the requirements for prime farmland. According to the NRCS, there are no prime farmland soils on the property (Alan Stahnke, State Soil Scientist at the USDA-NRCS, personal communication).

A hydric soil is one that formed under conditions of saturation, flooding, or ponding of sufficient duration during the growing season to develop anaerobic conditions in the upper part. Hydric soils are one condition that indicates a potential for a wetland. Gessner fine sandy loam is considered hydric.

**Table 2** lists limitations for development, as identified in the Harris County Soil Survey.

**Table 2. Soil Limitations for Building Site Development**

| Soil Type | Shallow Excavations | Small Commercial Buildings | Local Roads and Streets | Prime Farmland | Hydric Soil |
|-----------|--------------------|-----------------------------|--------------------------|----------------|-------------|
| Clodine | Severe wetness | Severe wetness, corrosive | Severe wetness | No | No |
| Gessner | Severe wetness | Severe wetness, corrosive | Severe wetness, low strength | Yes, if drained | Yes |

Source: NRCS Soil Survey for Harris County, Texas (1976)

Topography

The HPC is located within the Western Gulf Coastal Plain Level III Ecoregion and the Northern Humid Gulf Coastal Prairies Level IV Ecoregion. Although the facility is located in an urban environment, the principal distinguishing characteristics of the Western Gulf Coastal Plain are its relatively flat topography and mainly grassland natural vegetation. Inland from this region the plains are older, more irregular, and have mostly forest or savanna-type vegetation. Largely because of these characteristics, a higher percentage of the land is designated as cropland than in bordering ecological regions. Rice, grain sorghum, cotton, and soybeans are the principal crops. Urban and industrial land uses within both Ecoregions have expanded greatly in recent decades, and oil and gas production is common.

Quaternary-age deltaic sands, silts, and clays underlie much of the Northern Humid Gulf Coastal Prairies on this gently sloping coastal plain. The original vegetation was mostly grasslands with a few clusters of oaks, known as oak mottes or maritime woodlands. Little bluestem, yellow Indiangrass, brownseed paspalum, gulf muhly, and switchgrass were the dominant grassland species, with some similarities to the grasslands of Ecoregion 32. Almost all of the coastal prairies have been converted to cropland, rangeland, pasture, or urban land uses. The exotic Chinese tallow tree and Chinese privet have invaded large areas in this region. Some Loblolly Pine occurs in the northern part of the region in the transition to Ecoregion 35. Within the region, there are some differences from the higher Lissie Formation to the lower Beaumont Formation, both of Pleistocene age. The Lissie Formation has lighter colored soils, mostly Alfisols with sandy clay loam surface texture, while darker, clayey soils associated with Vertisols are more typical of the Beaumont Formation. Annual precipitation varies from 37 inches in the southwest portion to 58 inches in the northeast, with a summer maximum. The topography of the site and the surrounding parcels is relatively flat with little to no slope.  The elevations average between 75 and 80 feet above mean sea level (msl) (**Figure 9**).

<u>Seismicity</u>

According to the Federal Emergency Management Agency (FEMA) SDC's map of the "Eastern United States for low-rise Occupancy Category I and II Structures Located on Sites with Average Alluvial Soil Conditions," Harris County is located in an area with a very small probability of experiencing damaging earthquake effects. The Long Point–Eureka Heights fault system is a system of geologic faults in Houston that runs beneath the city from the southwest to the northeast. This fault system, as well as others located in nearby parts of Texas, is believed to have formed millions of years ago during the formation of the Gulf of Mexico. No significant earthquakes have occurred on these faults in recorded history, but slow seismic movement has been observed.

*Proposed Action Alternative 2: City of Conroe and Montgomery County*

<u>Geology</u>

The site is located on the Willis Formation, the oldest formation of the Houston Group. The Willis Formation was deposited early in the Pleistocene epoch, during the Aftonian Interglacial Stage.  This formation is fluviatile, consisting of sands, silts, and clays in approximately equal amounts and is approximately 200 feet thick in full section.  The formation grades generally from coarse sands at its basal contact with the soils of the older Fleming Group to sandy clays near its contact with the overlying lower Lissie (Bently) Formation. Indurations of ferrous particles and siliceous gravel are frequent.  Siliceous and ferrous compounds also serve as cementing agents in many of the sandy clay strata.

The clays are deeply weathered lateritic soils and have been highly over-consolidated, apparently by a process of desiccation.  The sands are generally coarser and better graded than those of younger formations nearer the coast.

Similar to the Proposed Action Alternative 1, the coastal plain in this region (in which the parcel of land for the proposed detention center is located) has a complex tectonic geology, several major features of which are: Gulf Coastal geosyncline, salt domes, and major sea level fluctuations during the glacial stages, subsidence and faulting activities.  Most of these geologic faulting activities ceased millions of years ago, but some are still active.

23

Soil

The soils within the parcel of land for the Proposed Action Alternative 2 site consist of Conroe loamy fine sand, zero to five percent slopes (**Figure 10**). This nearly level to gently sloping soil occupies broad ridges and has convex slopes. The areas are usually irregular and ten to 500 ac in size. This soil contains a brittle layer at a depth of about 39 inches that prevents tap roots of pine trees from penetrating. Included with this soil are small areas of Gunter fine sand, Blanton fine sand, Fuquay loamy fine sand, and Conroe loamy fine sand, five to 12 percent slopes (USDA 1972).

In addition, the site contains Bibb soils, frequently flooded. These soils have slopes of less than one percent and occupy the flood plain of streams draining sandy and loamy soils. They occur along stream channels and between the natural levees of the channels and the uplands. About 25 percent of the unit is soils like Bibb except for browner colors, and 20 percent is soils that have clay loam to sandy clay loam at a depth of 10 to 40 inches. These included areas are next to the upland on the large flood plains and in the lowest parts of the smaller flood plains (USDA 1972).

The subsurface native soils at the site consist of predominantly silty sands, clayey sands, and poorly graded sands containing various amounts of silt, with occasional layers of silty clayey sands, fat clays and lean clays with variable amounts of sand that extended to about five to 25 feet below existing grade (Terracon 2013).

Topography

The United States Geological Survey (USGS) 7.5-minute series Conroe, Texas topographic map was reviewed for topographic information and drainage patterns. Topographic data indicates that the site is located at an elevation approximately 200-225 feet above msl (**Figure 11**). Topographic relief appears to gently slope to the east towards Stewart Creek.

Seismicity

According to FEMA SDC's map of the "Eastern United States for low-rise Occupancy Category I and II Structures Located on Sites with Average Alluvial Soil Conditions," Montgomery County is located in an area with a very small probability of experiencing damaging earthquake effects.

### 2.1.2    Environmental Consequences

#### 2.1.2.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. Therefore, there would be negligible direct or indirect impacts to geology, soils, topography, or seismicity under the No Action Alternative.

#### 2.1.2.2 Proposed Action Alternative 1

The HPC facility is already in operation and only minor exterior construction/renovation/expansion is proposed. The property is already graded and the proposed construction for the new buildings and recreational facilities would require minimal additional grading. The footprint of the new buildings would convert about 30,000 sq. ft. (0.69 ac) of maintained lawn into impervious building and would require pouring of concrete and minor

24

Supp. App. 1664

excavation for slab construction to serve as the foundation of the new buildings. In addition, the proposed design and construction would be completed in adherence to appropriate geotechnical, City of Houston Standard Specifications for Source Controls for Erosion and Sedimentation, stormwater management regulations including the City of Houston's Stormwater Quality Management Plan, and seismic engineering practices.  Therefore, there would be negligible adverse impacts to geology, soils, topography, or seismicity due to the Proposed Action Alternative 1.

There is one area designated as a prime farmland within the boundaries of the Proposed Action Alternative 1 footprint; however, the site is not regulated under the Federal Farmland Protection Act because the property is already developed and the soils are not available for agricultural use due to the existing developed nature of the property. Therefore, there would be no conversion of prime farmland or soils of statewide importance and the Proposed Action Alternative 1 would be in compliance with the Federal Farmland Protection Policy Act.

### 2.1.2.3 Proposed Action Alternative 2

The Proposed Action Alternative 2 would permanently develop approximately 24.9 acres of land.  Although these impacts are long-term, they would be negligible on a regional scale due to the small amount of soils lost relative to the large quantity of the same soils in the area.  Best Management Practices (BMPs) to reduce soil erosion, as outlined in the mitigation and BMPs section below, would be utilized during construction activities.  Earthwork has been conducted at the proposed parcel and the portion of the site where the new detention would be located following construction has been previously cleared and graded. Construction of the proposed detention center would not affect any prime farmlands, as none of the soils found within the project area are considered prime farmland soils (NRCS 2012).  Thus, the development of the Proposed Action Alternative site would be in compliance with the Farmland Protection Policy Act (as implemented by 7 CFR Part 658) and would not require completion of a Farmland Conversion Impact Rating assessment. Geologic resources include physical surface and subsurface features of the earth, such as geological formations and the seismic activity of the area.  Construction of the proposed detention center would not disturb the subsurface geologic resources of the area, because only surface modifications would be implemented.  For these reasons, construction of the new detention center under the Proposed Action Alternative 2 would have negligible adverse impacts to geology, soils, topography, or seismicity.

### 2.1.3    Mitigation and BMPs

No mitigation measures are warranted for the No Action Alternative. Appropriate BMPs would be implemented for construction activities under the Proposed Action Alternatives 1 and 2 through an approved Erosion and Sediment Control Plan prepared by the Contractor, approved Stormwater Quality Management Plans and Permits from the TCEQ, and site specific geotechnical and seismic engineering practices as applicable. The terms and conditions of the CDF contract that ICE awards would contain any minimization, mitigation and BMPs so as to ensure such measures are completed.

## 2.2    Hydrology and Water Resources

### 2.2.1    Affected Environment

*Existing Conditions; Gulf Coast Aquifer: Harris and Montgomery Counties*

Supp. App. 1665

Both Harris and Montgomery Counties are located within the Texas Water Development Board Groundwater Management Area (GMA) 14. The principal source of useable groundwater in this GMA is the Gulf Coast aquifer. The Gulf Coast aquifer consists of four subdivisions, of which three are water-bearing and recognized as aquifers in their own right: the Chicot aquifer; the Evangeline aquifer; and the Jasper aquifer.  The Burkeville confining zone separates the Evangeline and Jasper aquifers.  The water-bearing subdivisions of the Gulf Coast aquifer consist of semi-consolidated or unconsolidated sands with interbedded clays from one or more geologic formations.  Clay zones may separate the water-bearing zones in each subdivision of the Gulf Coast aquifer.  The Burkeville confining zone is the largest of the clay zones separating water-bearing units in the Gulf Coast aquifer. In some areas, however, this subdivision consists of clay with interbedded sands that allow the passage of water. The Chicot aquifer is the youngest of the Gulf Coast aquifer subdivisions, followed by the Evangeline aquifer and the Burkeville confining zone.  The maximum total sand thickness of the Gulf Coast Aquifer ranges from 700 feet in the south to 1,300 feet in the north. Freshwater saturated thickness averages about 1,000 feet.

Water quality varies with depth and locality. It is generally good in the central and northeastern parts of the aquifer, where the water contains less than 500 milligrams per liter of total dissolved solids, but declines to the south, where it typically contains 1,000 to more than 10,000 milligrams per liter of total dissolved solids. This is also the area where the Gulf Coast Aquifer productivity decreases. High levels of radionuclides, thought mainly to be naturally occurring, are found in some wells in Harris County. The aquifer is used for municipal, industrial, and irrigation purposes. In Harris, Galveston, Fort Bend, Jasper, and Wharton counties, water level declines of as much as 350 feet have led to land subsidence in some areas.

*Proposed Action Alternative 1: City of Houston*

<u>Groundwater</u>

The HPC lies within the Harris-Galveston Subsidence District, which is a special purpose district created by the Texas Legislature in 1975. The district was created to provide for the regulation of groundwater withdrawal throughout Harris and Galveston Counties for the purpose of preventing land subsidence, which leads to increased flooding.

<u>Surface Water</u>

Section 404 of the Clean Water Act (CWA) establishes a program to regulate the discharge of fill materials into Waters of the United States (WOUS) including wetlands. Activities in WOUS regulated under this program include fill for development, water resource projects, infrastructure development (such as highways and airports) and mining projects. Section 404 requires a permit before dredged or fill material may be discharged into WOUS. No perennial or intermittent streams or other waterbodies are located on the HPC property that would be classified as a WOUS.  There are grassed stormwater ditches along the northern boundary of the property.  These eventually connect to a roadside ditch along Greens Road, which appears to drain to the east and ultimately into Reinhardt Bayou about one mile from the facility. The southern portion of the detention facility drains to the City of Houston stormwater system along Export Plaza Drive and the warehouse/administrative buildings drain into the City of Houston stormwater system along Vickery Drive and Greens Road. The HPC is within the Garners Bayou subwatershed (HUC 120401040602).

According to the USEPA and 2012 Texas Integrated Report Index of Water Quality Impairments, two sections of Garners Bayou are impaired due to bacteria.  The impaired sections are located approximately 2.7-3 miles to the

Supp. App. 1666

east of the facility.  There is no Total Maximum Daily Load (TMDL) adopted by the TCEQ or USEPA for this impaired segment.

The National Wild and Scenic Rivers System was created by Congress in 1968 (Public Law 90-542; 16 U.S.C. 1271 et seq.) to preserve certain rivers with outstanding natural, cultural, and recreational values in a free-flowing condition for the enjoyment of present and future generations. The Act is notable for safeguarding the special character of these rivers, while also recognizing the potential for their appropriate use and development. There are no federally designated Wild and Scenic Rivers near the HPC. The Rio Grande River is listed as a US Wild and Scenic River, but is located approximately 350 miles from the subject site.

Surface drainage on the property flows into a network of drop inlets and stormwater pipes. The rooftops of the buildings drain through a series of downspouts to the ground, where it either infiltrates into the ground or enters into the storm system. On the northern boundary of the property, a wet grassy ditch along Greens Road collects surface runoff and drains from west to east. Stormwater within the administrative offices and warehouses drains west and north to the city stormwater system that runs along Vickery Drive (42-inch stormwater line) and Greens Road (ditches). Stormwater from the northern section of the detention center collects and drains to a rip-rap lined stormwater detention basin and underground detention tanks before it is discharged to the ditch along Greens Road. The southern portion of the facility and southern parking lots drain to the storm system (24-inch line) along Export Plaza Drive.

The facility is located in the Harris County Flood Control District. The district is a special purpose district created by the Texas legislature in 1937 primarily to provide flood damage reduction in partnership with USACE.  A scoping letter was sent to the Texas Water Development Board soliciting comment on the project. The Texas Water Development Board provided scoping comments on August 21, 2015, which stated that the City of Houston manages the National Flood Insurance program and has approval authority for proposed projects within its jurisdiction. Based on a FEMA Flood Insurance Rate Map (48201C0480M), the existing facility is not located in any 500-year or 100-year FEMA designated Flood Zones as shown in (**Figure 12**).

The Texas Coastal Zone Management Program (CZMP), funded by the National Oceanic and Atmospheric Administration (NOAA), helps ensure the long-term environmental and economic health of the Texas coast through management of the state's coastal natural resource areas. The program is managed by the Texas General Land Office. Although portions of Harris County are located in the CZMP, the HPC is not located within the Texas CZMP.

*Proposed Action Alternative 2: City of Conroe*

Groundwater

The proposed parcel of land for the Proposed Action Alternative 2 site lies within the Lone Star Groundwater Conservation District (LSGCD), which was created by the Texas Legislature in 2001 and confirmed by local voters.  Unlike Subsidence Districts which hold the authority to regulate groundwater production and prevent land subsidence, Texas Groundwater Conservation Districts hold the authority to levy taxes or fees on groundwater extraction as approved by the district's residents.

Surface Water

The Proposed Action Alternative 2 site is located in San Jacinto River Basin. Stewarts Creek flows through the southeast portion of the property and eventually into the San Jacinto River Stewarts Creek and is considered a WOUS by virtue of this downstream connection with the San Jacinto River and would be subject to the CWA Section 404 requirements in the event construction or operation of the detention center would result in discharges to the creek. The average depth of Stewarts Creek in this area is about six inches deep and the average width is approximately two feet. The side slopes of the creek are at least 2:1 throughout the length of the creek. The East and West Forks of the San Jacinto River merge in the headwaters of Lake Houston. The San Jacinto River flows approximately 20 miles from Lake Houston to its confluence with the Houston Ship Channel, then flows another ten miles to Galveston Bay. This basin includes a portion of the Houston Ship Channel and associated tributaries. Total basin drainage area is 5,600 square miles. Approximately 92 percent of the basin population resides in Harris County, and Houston is the largest city in the basin. Other principal cities include Pasadena and Bellaire in Harris County and Conroe in Montgomery County.

A portion of the property is below the 100-year flood elevation, and consists of forested bottomland hardwoods contiguous with Stewarts Creek located along the eastern boundary of the property. The earthwork (consisting of clearing and grading) already conducted at the site was outside of the floodway of Stewarts Creek. A FEMA Flood Insurance Map (48339C0380G) for the project location is provided as **Figure 13**. Stewarts Creek and contiguous bottomland hardwood habitat within the floodway of Stewarts Creek are regulated under the jurisdiction of the USACE, but are not considered wetlands.

## 2.2.2   Environmental Consequences

### 2.2.2.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. There would be negligible impacts relative to water resources or stormwater runoff. In addition, continued operation of the HPC would have negligible impacts to floodplains and would be consistent with Executive Order (EO) 11988 on "Floodplain Management and the Coastal Zone Management Act." Furthermore, the long-term demand on regional water supplies would not change. Therefore, there would be negligible adverse direct or indirect impacts to hydrology/water resources under the No Action Alternative.

### 2.2.2.2 Proposed Action Alternative 1

Water Consumption

The HPC currently uses approximately 93 gallons per day (gpd) per detainee (Kate Spirk, Corrections Corporation of America (CCA) Director of Energy Management, personal communication). Water demand generated by the Proposed Action Alternative 1 is projected to be about 99,510 gpd if the facility was filled to capacity, based on the total count of 1,070 beds. This would represent an increase of about 3,907 gpd above the water demand from the existing facility at full capacity, which results in a less than 4% increase above the existing condition and which would result in minor adverse long-term impacts. The City of Houston's water system would not be impacted by this minor increase in demand, and additional discussion is provided in Section 2.10.1, Utilities and Infrastructure. The City of Houston would evaluate whether the minor increase and the proposed minor increase in housing and expansion of the kitchen and dining hall could require impact fees payable to the City to mitigate for the increased water use. A utility capacity analysis was requested from the City of Houston on September 20, 2015. The City of Houston responded with a response on December 3, 2015;

however, the request was made based on a scenario of adding 450 beds which exceeds the maximum allowable bed total of 1,200 identified in the Purpose and Need. The City of Houston determined that capacity was available through the Export Plaza Drive water main and that an impact fee was warranted for the 450 bed expansion scenario. Given the minor increase in additional beds (to a total of 1,070) and the proposed kitchen renovations for the current proposal, CCA expects a small impact fee would be assessed to the project.

<u>Surface Water Impacts</u>

Stormwater from the existing HPC drains to the City of Houston's drainage system along Green's Road, Export Plaza Drive, and Vickery Drive. The roads have the capacity to handle runoff from the facility. Only a minor increase of about 30,000 square feet of additional impervious area would occur under the Proposed Action Alternative 1 due to the construction of the new buildings and recreation yards.

Alternative 1 would require a building plan be submitted to the Department of Public Works and Engineering for approval, and would include a storm drainage plan that is consistent with the requirements of the Harris County Flood Control District. The Contractor would obtain a stormwater availability letter from the City of Houston, which would identify any needed stormwater improvements and/or impact fees. If additional stormwater management or storm drainage improvements were required by the City, then it would be designed and constructed in accordance with the City's requirements. If the total area of land disturbance exceeded one acre, the Contractor would prepare a Stormwater Quality Management Plan Permit and Stormwater Quality Management Plan in accordance with the City's requirements and the Texas Pollutant Discharge Elimination System regulations (TPDES). The contractor would also prepare a Stormwater Pollution Prevention Plan (SWPPP) in this case and file a Notice of Intent (NOI) with the TCEQ and the USEPA. The stormwater from the facility discharges into the City of Houston's Municipal Separate Storm Sewer System (MS4) regulated system. The City has an MS4 permit from the TCEQ under the National Pollutant Discharge Elimination System Permit program. ICE consulted with Mr. Gregg Easley of the TCEQ Office of Water on March 25, 2016 and received a notification on March 28, 2016 of no adverse effect to surface water resources.

Because the Proposed Action Alternative 1 is not located within the Texas CZMP a consistency determination would not be required from the Texas General Land Office (TGLO). ICE submitted a scoping letter to the TGLO on March 15, 2016 and received a response on March 23, 2016 indicating that there would be no impacts to the Coastal Zone and no additional permits or easements would be required from the TGLO for the project. Furthermore, the HPC is not located in a 100-year or 500-year floodplain, and the use of this facility by ICE would be consistent with E O 11988. Because of the small increase in impervious area and for the reasons discussed above, the Proposed Action Alternative 1 would have minor adverse, long-term direct impacts on Hydrology and Water Resources. There would be no indirect impacts.

*2.2.2.3 Proposed Action Alternative 2*

<u>Water Consumption</u>

Construction of the proposed detention center under the Proposed Action Alternative 2 would result in minor increases to demands on water supplies during the construction period. Water would be needed for a variety of construction activities including, but not limited to, drinking water supply for construction crews, wetting the

29

construction site for dust suppression, and concrete mixing. These increases would be temporary in duration and limited in extent.

Water usage by staff and detainees at the proposed detention center during operation would slightly increase groundwater consumption and long-term demand on regional water supplies. The contractor estimates that the water demand projected to be generated by the Proposed Action Alternative 2 during operations would be approximately 123,750 gpd based on a conservative estimate of 110 gpd/detainee (1,125 beds). Impacts associated with this usage and demand would be considered minor due to the capacity of the local aquifer and the City of Conroe's ability to handle this increase in demand. Section 2.10.1, Utilities and Infrastructure, presents additional information on the City of Conroe water supply.

<u>Surface Water Impacts</u>

The Proposed Action Alternative 2 would not be located within a FEMA Flood Hazard Zone. The existing earthwork (i.e., clearing and grading) conducted at the site is outside the FEMA Flood Hazard Zone as shown in **Figure 13**. The maximum 100-year floodplain elevation for the Proposed Action Alternative 2 is approximately 195 feet above msl. The finished floor elevation for the Proposed Action Alternative 2 is between 200-220 feet. above msl, or at least five feet above the 100-year floodplain. No dredge and fill impacts are anticipated within Stewarts Creek within the 100-year floodplain, 500-year floodplain, and floodway of Stewarts Creek as part of the Proposed Action Alternative 2 (**Figure 7**). A FEMA Flood Insurance Map for the project location is provided as **Figure 14**. Compliance with state water quality standards would be evaluated under a Section 401 certification review by the TCEQ. Since the facility would be designed "Critical," it is required to be located above the 500-year floodplain. The maximum 500-year floodplain elevation according to the FEMA Flood Hazard Map is 196 ft. above msl. Finished floor elevation would be above the 500-year floodplain by at least four feet. Under the Proposed Action Alternative 2, up to 24.9 ac of soil would be susceptible to erosion during construction activities. The proposed detention center would result in an increase to the amount of impervious surfaces at the site.

The parcel of land for the Proposed Action Alternative 2 in the City of Conroe is adjacent to Stewarts Creek, which is a water body that has an approved TMDL for bacteria. However, the construction and operation of the facility would not likely contribute as a source of bacteria to the creek. In addition, the detention center would remain outside of the floodway of Stewarts Creek and therefore would not have any impact on Stewarts Creek or its floodway. The Stewarts Creek and San Jacinto River Basin watershed could be affected by stormwater runoff and suspended sediments resulting from precipitation events during construction activities. A drainage/stormwater system is currently present at the cleared and graded site. The stormwater system was designed and constructed to perform in a manner that would have no negative effects on the development, the surface water elevation, and/or the adjacent properties. The design of the stormwater system would not alter the natural flow of surface water, discharge water upon adjacent properties at a more rapid rate or in greater quantities, or discharge water to a different location than would result from the pre-development natural flow of surface waters (B&A 2013). Because the construction area would be greater than one acre, a NPDES Stormwater Discharge permit would be required prior to construction. A SWPPP would be prepared and a NOI would be filed with the TCEQ and the USEPA. ICE consulted with Mr. Gregg Easley of the TCEQ Office of Water on March 25, 2016 and received a notification on March 28, 2016 of no adverse effect to Stewarts Creek or other surface water resources.

Supp. App. 1670

Therefore, under the Proposed Action Alternative there would be negligible adverse impacts on water resources and there would be minor adverse long-term impacts on surface waters, wetlands, or floodplains as a result of an increase in impervious surfaces at the Proposed Action Alternative 2 site. There would be no indirect impacts.

### 2.2.3    Mitigation and BMPs

No mitigation measures are warranted for the No Action Alternative. Facility modifications at the existing HPC under the Proposed Action Alternative 1 would be conducted in accordance with the City's Building Plan and infrastructure design requirements and the City's Stormwater Quality Management Plan requirements. In addition, the contractor would prepare a SWPPP in the event more than one ac of land was disturbed. Implementation of specific erosion and sedimentation controls and other BMPs post construction for both Proposed Action Alternatives 1 and 2, such as the strategic placement of hay bales and silt fencing, would limit the amount of erosion that occurs on-site and restrict potential impacts on surface water following construction activities for both alternatives. Incorporation of post-construction stormwater controls, including a retention basin, would minimize long-term impacts on surface waters and allow for groundwater recharge.

## 2.3    Biological Resources

### 2.3.1    Affected Environment

Threatened and Endangered Species

The Endangered Species Act (ESA) of 1973[16 U.S.C. 1532 et. seq.], as amended, was enacted to provide a program for the preservation of endangered and threatened species, and to provide protection for the ecosystems upon which these species depend for their survival. All federal agencies are required to implement protection programs for designated species and to use their authorities to further the purposes of the ESA.  The United States Fish and Wildlife Service (USFWS) and the NOAA Fisheries are the primary agencies responsible for implementing the ESA. The USFWS is responsible for birds, terrestrial, and freshwater species, while the NOAA Fisheries is responsible for non-bird marine and anadromous species. The USFWS's responsibilities under the ESA include: (1) the identification of threatened and endangered species; (2) the identification of critical habitats for listed species; (3) implementation of research on, and recovery efforts for, these species; and (4) consultation with other federal agencies concerning measures to avoid harm to listed species. The ESA also calls for the conservation of "Critical Habitat" – the areas of land, water, and air space that an endangered species needs for survival. Critical habitat also includes such things as food and water, breeding sites, cover or shelter, and sufficient habitat area to provide for normal population growth and behavior.

The Texas Parks and Wildlife Department (TPWD) is the primary state agency responsible for implementing the laws and regulations pertaining to endangered or threatened animal species listed in Chapters 67 and 68 of the Texas Parks and Wildlife (TPW) Code and Sections 65.171 - 65.176 of Title 31 of the Texas Administrative Code (T.A.C.).  Laws and regulations pertaining to endangered or threatened plant species are also enforced by TPWD through Chapter 88 of the TPW Code and Sections 69.01 - 69.9 of the T.A.C.

ICE submitted a letter describing the proposed action alternatives and associated figures to the USFWS and the TPWD on March 15, 2016. USFWS requested that ICE review and utilize the Information for Planning and

Conservation (IPaC) system for identifying threatened and endangered species, fish, and wildlife for the proposed project area. According to TPW and USFWS databases, along with information received during the consultation process, there are 33 listed threatened or endangered species listed within Harris County, Texas and that could be present in the area or in surrounding areas.  The species are listed below in **Table 3**. According to the same sources there are 21 listed threatened or endangered species within Montgomery County, Texas. They are listed in **Table 4**.

**Table 3. Listed, Proposed, and Candidate Federal and State Species for Harris County, Texas**

| Species/Scientific name/group | Status | |
|---|---|---|
| | **Federal** | **States** |
| Houston Toad/*Anaxyrus houstonensis*/Amphibians | N | E |
| American Peregrine Falcon/*Falco peregrinus anatum*/Birds | N | T |
| Attwater's Greater Prairie-chicken/*Tympanuchus cupido attwateri*/Birds | E | N |
| Bald Eagle/*Haliaeetus leucocephalus*/Birds | N | T |
| Least Tern/*Sterna antillarum*/Birds | E* | N |
| Peregrine Falcon/*Falco peregrinus*/Birds | N | T |
| Piping Plover/*Charadrius melodus*/Birds | T* | T |
| Red Knot/*Calidris canutus rufa*/Birds | T* | N |
| Red-cockaded Woodpecker/*Picoides borealis*/Birds | E | E |
| White-faced Ibis/*Plegadis chihi*/Birds | N | T |
| White-tailed Hawk/*Buteo albicaudatus*/Birds | N | T |
| Whooping Crane/*Grus americana*/Birds | E | E |
| Wood Stork/*Mycteria americana*/Birds | N | T |
| Louisiana Pigtoe/*Pleurobema Riddellii*/Clams | N | T |
| Sandbank pocketbook/*Lampsilis Satura*/Clams | N | T |
| Smooth Pimpleback/*Quadrula houstonensis*/Clams | C | N |
| Texas Fawnsfoot/*Truncilla macrodon*/Clams | C | N |
| Texas Pigtoe/*Fusconaia askewi*/Clams | N | T |
| Creek Chubsucker/*Erimyzon oblongus*/Fishes | N | T |
| Smalltooth Sawfish/*Pristis pectinata*/Fishes | N | E |
| Texas Prairie Dawn-Flower/*Hymenoxys texana*/Flowering Plants | E | E |
| Louisiana Black Bear/*Ursus americanus luteolus*/Mammals | N | T |
| Rafinesque's big-eared bat/*Corynorhinus rafinesquii*/Mammals | N | T |
| Red Wolf/*Canis rufus*/Mammals | E | E |
| West Indian Manatee/*Trichechus manatus*/Mammals | E | N |

| Species/Scientific name/group | Status | |
|---|---|---|
| | Federal | States |
| Alligator Snapping Turtle/*Macrochelys temminckii*/Reptiles | N | T |
| Green Sea Turtle/*Chelonia mydas*/Reptiles | N | T |
| Hawksbill Sea Turtle/*Eretmochelys imbricata*/Reptiles | E | E |
| Kemp's Ridley Sea Turtle/*Lepidochelys kempli*/Reptiles | E | E |
| Leatherback Sea Turtle/*Dermochelys coriacea*/Reptiles | E | E |
| Loggerhead Sea Turtle/*Caretta caretta*/Reptiles | T | T |
| Texas Horned Lizard/*Phrynosoma cornutum*/Reptiles | N | T |
| Timber Rattlesnake/*Crotalus horridus*/Reptiles | N | T |

*This species is considered conditionally endangered or threatened in cases where wind energy development is occurring.

Sources: Texas Parks and Wildlife County List of Rare Species and USFWS iPAC database; Accessed August 11, 2016.

T - Listed as Threatened.
E - Listed as Endangered.
C - Federal Candidate Species.
N – No Listing

**Table 4. Listed, Proposed, and Candidate Federal and State Species for Montgomery County, Texas**

| Species/Scientific name/group | Status | |
|---|---|---|
| | Federal | States |
| American Peregrine Falcon/*Falco peregrinus anatum*/Birds | N | T |
| Bald Eagle/*Haliaeetus leucocephalus*/Birds | N | T |
| Least Tern/*Sterna antillarum*/Birds | E* | N |
| Peregrine Falcon/*Falco peregrinus*/Birds | N | T |
| Piping Plover/*Charadrius melodus*/Birds | T* | T |
| Red Knot/*Calidris canutus rufa*/Birds | T* | N |
| Red-cockaded Woodpecker/*Picoides borealis*/Birds | E | E |
| White-faced Ibis/*Plegadis chihi*/Birds | N | T |
| Whooping Crane/*Grus americana*/Birds | E | E |
| Wood Stork/*Mycteria americana*/Birds | N | T |
| Rafinesque's big-eared bat/*Corynorhinus rafinesquii*/Mammals | N | T |
| Timber Rattlesnake/*Crotalus horridus*/Reptiles | N | T |
| Louisiana Pigtoe/*Pleurobema Riddellii*/Clams | N | T |
| Sandbank pocketbook/*Lampsilis Satura*/Clams | N | T |
| Smooth Pimpleback/*Quadrula houstonensis*/Clams | C | N |

Supp. App. 1673

| Species/Scientific name/group | Status | |
|---|---|---|
| | **Federal** | **States** |
| Texas Fawnsfoot/*Truncilla macrodon*/Clams | C | N |
| Texas Pigtoe/*Fusconaia askewi*/Clams | N | T |
| Creek Chubsucker/*Erimyzon oblongus*/Fishes | N | T |
| Paddlefish/*Polyodon spathula*/Fishes | N | T |
| Navasota Ladies'-tresses/*Spiranthes parksil*/Flowering Plants | E | N |
| Texas Prairie Dawn-Flower/*Hymenoxys texana*/Flowering Plants | E | N |

*This species is considered conditionally endangered or threatened in cases where wind energy development is occurring.

Sources: Texas Parks and Wildlife County List of Rare Species and USFWS iPAC database; Accessed August 11, 2016.

T - Listed as Threatened.
E - Listed as Endangered.
C - Federal Candidate Species.
N – No Listing

*Proposed Action Alternative 1: City of Houston*

<u>Wetlands and Vegetation</u>

The HPC is located within the Western Gulf Coastal Plain Level III ecoregion and the Northern Humid Gulf Coastal Prairies Level IV Ecoregion. The site property is completely developed and vegetation consists of landscaped grasses, shrubs, and trees. The majority of the site consists of paved and/or impervious surfaces. According to the USFWS National Wetland Inventory (NWI) Digital Wetlands Mapper website, no wetlands are mapped on the facility site (**Figure 15**).

A field reconnaissance of WOUS on the facility property was completed on July 27, 2015.  The wetland and WOUS investigation was made in accordance with the 1987 Corps of Engineers Wetland Delineation Manual (Environmental Laboratory, 1987) and augmented with the Regional Supplement to the Corps of Engineers Wetland Delineation Manual:  Atlantic and Gulf Coastal Plain (USACE, 2012).  A formal wetland delineation was not performed during the field reconnaissance and the USACE was not contacted to provide a confirmation of the results of the field reconnaissance. Based on field reconnaissance, ICE verified the NWI map and no jurisdictional wetlands or streams were observed on the site.  The grassed ditches did not have ordinary high water mark indicators, were constructed in uplands, and appear to have an ephemeral flow regime dependent on precipitation; therefore, they would not be considered jurisdictional features.

<u>Wildlife Resources</u>

The HPC is located in an area that contains mainly industrial and mixed-use land developments. The property is completely developed with buildings and other impervious surfaces and/or recreational areas. The HPC is surrounded by a perimeter fence, and the adjacent properties in the area also consist of completely developed, fenced properties and warehouses. There is no wildlife habitat or habitat suitable for threatened or endangered species present on the property.

Supp. App. 1674

*Proposed Action Alternative 2: City of Conroe*

<u>Wetlands and Vegetation</u>

The Proposed Action Alternative 2 is located within the USEPA South Central Plains Level III Ecoregion and the Southern Tertiary Uplands Level IV Ecoregion. The Southern Tertiary Uplands Level IV Ecoregion covers the remainder of longleaf pine range north of the Flatwoods Level IV Ecoregion located between the City of Houston and the City of Conroe. Longleaf pine often occurs on sand ridges and uplands within this ecoregion, but open forests are also found on other soil types and locations. On more mesic sites, some American beech or magnolia-beech-loblolly pine forests occur.

A portion of the Proposed Action Alternative site (approximately 7.5 ac of Parcel R30089) consists of deciduous woodlands and temporarily flooded bottomland hardwood forest. The canopy is comprised primarily of loblolly pine (*Pinus taeda*), water oak (*Quercus nigra*), cherrybark oak (*Quercus pagoda*), red maple (*Acer rubrum*), sweetgum (*Liquidambar styraciflua*), black cherry (*Prunus serotina*), dahoon holly (*Ilex cassine*) and southern magnolia (*Magnolia grandiflora*). The understory consists primarily of Chinese privet (*Ligustrum sinense*)(an invasive exotic species); yaupon holly (*Ilex vomitoria*), farkleberry (*Vaccinium arboreum*), and occasional dwarf palmetto (*Sabal minor*). Tree species observed are of relatively few age classes represented by older pine and oak species, and younger growth of sweetgum, maple, and black cherry. Evidence of logging (stumps) of larger pine species was common throughout the site. The surrounding vegetated areas consist of maintained turf grasses and similar tree species remaining on adjacent developed lands. The NWI Digital Wetlands Mapper does not indicate any wetlands occurring on the site, however, Stewarts Creek and contiguous bottomland hardwood habitat within the floodway of Stewarts Creek are regulated under the jurisdiction of the USACE as a WOUS (**Figure 16**).

<u>Wildlife Resources</u>

The parcel of land of the Proposed Action 2 Alternative site possesses limited connectivity with other larger and more regionally significant wildlife habitats. Because of this habitat isolation due to adjacent development, a limited variety of wildlife species is expected to inhabit the area. A qualitative evaluation of available wildlife habitat on the site was conducted on Parcel R30130 on February 25 and 26, 2013 to identify habitat that may support the various life stages for wildlife common to the region. During the survey, direct observations of wildlife occurrences and indications of wildlife occurrences such as scat, tracks, dens, nests, and other refugia were documented. Direct wildlife observations included American crow (*Corvus brachyrhynchos*), northern cardinal (*Cardinalis cardinalis*), and rufous-sided towhee (*Pipilo erythrophthalmus*). Indications of other wildlife occurrences included white-tailed deer tracks (*Odocoileus virginianus*), eastern cottontail rabbit droppings (*Sylvilagus floridanus alacer*), raccoon tracks (*Procyon lotor*) and ground disturbance assumed to be caused by feral hogs (*Sus scrofa*). Several small burrows and refugia located beneath tree stumps were observed and expected to be used by small mammals such as raccoon and rabbit. Canopy trees and understory vegetation provide cover and a variety of hard and soft mast food sources for most omnivores and herbivores expected to occur in the area. Although no herpetofauna were encountered, common snakes, lizards, frogs, toads, and turtles are expected to occur in upland areas at the site. Habitat suitable for amphibians is limited to Stewarts Creek and other riparian areas adjacent to Stewarts Creek. The average depth of Stewarts Creek in this area is about six inches deep and the average width is approximately two feet. The side slopes of the creek are at least 2:1 throughout the length of the creek. The general steepness of side slopes provides limited habitat for non-amphibian wildlife. Access to Stewarts Creek for foraging by wading birds is limited due to canopy coverage along most of Stewarts Creek adjacent to the site. Because of limited depth and access, aquatic fauna within

Stewarts Creek is expected to be limited to small freshwater fish species including mosquito fish, killifish, and top minnows. Lack of aquatic vegetation and other productive habitats limit the diversity of aquatic invertebrates found in Stewarts Creek.

### 2.3.2   Environmental Consequences

#### 2.3.2.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. A no affect determination has been made for the No Action Alternative under Section 7 of the ESA because no construction would occur and no special status species or designated critical habitat supporting those species would be impacted. There would be negligible direct or indirect adverse impacts on vegetative communities, and wildlife resources as a result of the No Action Alternative.

#### 2.3.2.2 Proposed Action Alternative 1

Proposed Action Alternative 1 would not directly impact jurisdictional wetlands or streams, and no Section 404 Permit from the USACE and/or Section 401 Water Quality Certificate from the TCEQ would be required for the Proposed Action Alternative. The Proposed Action Alternative 1 would be consistent with EO 11990 "Protection of Wetlands."

The site reconnaissance did not identify any threatened or endangered species or suitable habitat for those species. ICE submitted consultation packages to the USFWS and TPWD on March 15, 2016. Information from USFWS and TPWD was consulted to evaluate the listing of species as identified in the Affected Environment section above and a site reconnaissance survey was conducted at the site. No wildlife habitat or threatened and endangered species habitat was observed during the site reconnaissance and the IPaC system did not identify any critical habitat in the area. In addition, no migratory birds or habitat suitable for migratory birds was identified. TPWD indicated that because the Proposed Action Alternative 1 would utilize an existing facility, only minimal impacts would occur to natural resources. In addition, because the area that is proposed for expansion is already disturbed and developed, it is unlikely that a pre-construction/renovation/expansion survey for threatened and endangered species would be required by the USFWS as part of the Proposed Action Alternative 1. Furthermore, because the surrounding areas also consist of developed land, is it unlikely that any minor temporary impacts from construction or noise would impact any potential wildlife or T&E species in the surrounding areas. Therefore, ICE finds that there would be no effect to threatened or endangered species (including migratory birds) or designated critical habitat as a result of the Proposed Action Alternative 1, and ESA compliance is complete.

There would be a negligible impact to streams from the increased stormwater runoff due to the small increase in impervious surface from the additional 31,017 sq. ft of new space under the Proposed Action Alternative 1. For these reasons, there would be negligible adverse impacts on vegetative communities, wildlife resources, or threatened and endangered species as a result of the Proposed Action Alternative 1.

#### 2.3.2.3 Proposed Action Alternative 2

Under the Proposed Action Alternative 2, minor clearing and grubbing of a portion of the existing forested (Parcel R30130) areas would occur. The currently cleared and graded portion was not cleared for ICE, and the site would

Supp. App. 1676

remain in its current state. All activities at the proposed locations would be conducted within a secure fence surrounding the perimeter and there would be no impacts to areas outside of the fence line. Prior to clearing, the site had been historically logged and as a result, invasive understory species (privet) have displaced much of the native understory community structure. Vegetation within riparian habitats adjacent to Stewarts Creek would not be impacted under the Proposed Action Alternative 2.  Because the Proposed Action Alternative 2 would only include ground disturbance within areas that were historically logged and that exhibit an understory dominated by invasive exotic species, the resource is not expected to be affected or the effects would be at or below the level of detection, and changes would not result in any measurable or perceptible consequences.

Under the Proposed Action Alternative 2, Stewarts Creek and all forested bottomland riparian areas and forested bottomland floodplain areas surrounding the site would remain undeveloped, and any minor changes would not result in any measurable or perceptible impacts to potential habitat. In addition, the forested area consists of a small, fragmented, previously disturbed area consisting of a total of approximately 7.5 acres of land not suitable for any T&E species. ICE submitted consultation packages to the USFWS and the TPWD on March 15, 2016 which discussed the proposed project and identified the cleared portion of the parcel of land that would be utilized for the construction of the detention center. USFWS requested that ICE review and utilize the IPaC system for identifying threatened and endangered species for the proposed project area. This information is included in the affected environment section above – there is no critical habitat for T&E species within the project area. The TPWD indicated that the timber rattlesnake and Rafinnesque's big-eared bat could potentially occur within the study area if suitable habitat exists. According to TPWD, timber rattlesnakes utilize a variety of habitats including swamps, floodplains, lowland forests, upland pine and deciduous woodlands, riparian areas, thickets, and abandoned farmland. A biological survey was not conducted that specifically reviewed habitat for Rafinnesque's big-eared bat or Timber Rattlesnake, but the qualitative evaluation of available wildlife habitat on the site that was conducted at the parcel on February 25 and 26, 2013 identified indicators of wildlife that are common to the region, but nothing that would constitute habitat suitable for any T&E species. Subsequently, ICE finds that there would be no effect to threatened or endangered species (including migratory birds) or designated critical habitat as a result of the Proposed Action Alternative 2, and ESA compliance is complete.

### 2.3.3    Mitigation and BMPs

No mitigations measures are warranted for either the No Action Alternative or the Proposed Action Alternatives 1 or 2.

## 2.4    Cultural Resources and Historic Properties

The Area of Potential Effect (APE) for the Proposed Action Alternatives 1 and 2 is determined to be the limits of the proposed construction/alterations/renovations for archaeological and cultural resources and the one half-mile surrounding the area that would be within the viewshed of the facility for historic architectural or cultural resources.

### 2.4.1    Affected Environment

*Proposed Action Alternative 1: City of Houston*

37

Supp. App. 1677

A National Register of Historic Places (NRHP) records search was conducted and the Texas State Historic Preservation Officer (SHPO) of the Texas Historic Commission (THC) was consulted for the Proposed Action Alternative 1 APE pursuant to Section 106 of the National Historic Preservation Act of 1966 (NHPA), and its implementing regulations, 36 CFR Part 800. The review identified no listed historic properties or properties eligible for listing on the NRHP within one half-mile of the existing HPC nor is the HPC itself listed or eligible . Because the existing HPC footprint has been previously disturbed on a number of occasions, and the project would require only minor ground disturbance associated with the new construction and expansion at the site, a formal archaeological survey was not completed. Therefore, to determine the presence or likelihood of cultural resources within or near the project APE, historic literature and background research was conducted in conjunction with the SHPO consultation. A Section 106 consultation package was submitted to the THC on March 28, 2016 and the package is included in **Appendix A**

*Proposed Action Alternative 2: City of Conroe*

In February 2013, Southeastern Archaeological Research, Inc. (SEARCH) completed a Phase I cultural resource survey of approximately 23.75 ac (Parcel R30130) in Montgomery County, Texas, **(Appendix C)** as it related to the Proposed Action Alternative 2 site. The purpose of the archaeological survey was to identify and record any cultural resources within the undeveloped project parcel. This work was required pursuant to NHPA, Section 106, The survey included a literature and documents review, archaeological pedestrian survey and judgmental shovel testing, and technical report. Eight shovel test pits were excavated to aid in the identification of archaeological resources and evaluate the potential for subsurface deposits. No cultural resources were discovered during the Phase I survey. In addition, a Section 106 consultation package was submitted to the THC on March 28, 2016.

## 2.4.2    Environmental Consequences

### 2.4.2.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. Furthermore, ongoing operations of the HPC would be compliant with the NHPA. Therefore, there would be negligible direct or indirect impacts on cultural, archaeological, or resources of Tribal cultural significance as a result of the No Action Alternative.

### 2.4.2.2 Proposed Action Alternative 1

The continued operation of the existing facility would not affect known architectural or archaeological resources. Minor ground disturbance would occur for the construction and expansion of the facility within the existing facility footprint. However, these areas have already been graded and disturbed by the original construction of the facility and have been further disturbed on a number of occasions. The original construction of the facility did not uncover any cultural or archaeological resources. Therefore, it is unlikely that the proposed construction/renovations/expansion would uncover any new archaeological, historic, or cultural resources within the facility footprint.

ICE submitted a comprehensive Section 106 consultation letter to the THC on March 28, 2016 requesting information about the effect of the Proposed Action Alternative 1 on historic properties or archaeological sites that are listed or eligible for listing on the NRHP. The THC replied on April 18, 2016 to ICE indicating that no historic properties would be impacted by the Proposed Action Alternative 1. ICE also submitted consultation

packages to the Tribal Historical Preservation Officers (THPOs) of the Comanche Nation, Wichita and Affiliated Tribes, Tonkawa Tribe of Oklahoma, and the Mescalero and Lipan Apache Tribes of Texas and Oklahoma on March 15, 2016. No responses were received from any Tribal entities regarding the Proposed Action Alternative 1. Based on the fact that there would be only minor ground disturbance at the site from the minor renovations and construction activities, and that it would be located within the existing facility footprint that has been graded and previously disturbed, ICE finds that the Proposed Action Alternative 1 would have negligible direct or indirect impacts to historic properties under 36 CFR Part 800.4[d][1].

### 2.4.2.3 Proposed Action Alternative 2

The cultural resources investigation conducted by SEARCH as part of the Phase I cultural resources survey at the Proposed Action Alternative 2 site failed to locate cultural material. During the field survey, SEARCH identified a mobile home and a private residence located within the project area. Neither building is recorded with the Montgomery Central Appraisal District, nor are the buildings visible on the 1958 USGS aerial photograph that includes the property (USGS 1958). Only the private residence is visible on the 1971 USGS aerial (USGS 1971). Based on the construction materials, style, and historic aerials, the private residence was likely constructed in the late 1960s or early 1970s while the mobile home was likely manufactured in the 1980s. Neither structure is older than 50 years; therefore, neither structure is considered historic.

ICE submitted a comprehensive Section 106 consultation letter to the THC on March 28, 2016 requesting information about the effect of the Proposed Action Alternative 2 on historic properties or archaeological sites that are listed or eligible for listing on the NRHP. The THC replied on April 18, 2016 to ICE indicating that no historic properties would be impacted by the Proposed Action Alternative 2. ICE also submitted consultation packages to the THPOs of the Comanche Nation, Wichita and Affiliated Tribes, Tonkawa Tribe of Oklahoma, and the Mescalero and Lipan Apache Tribes of Texas and Oklahoma on March 15, 2016. A response was received from the Tonkawa Tribe of Oklahoma requesting a copy of the Phase I cultural resource survey completed for the Proposed Action Alternative 2 site – ICE submitted a copy of the report on April 8, 2016. The Tonkawa tribe responded via email on May 4, 2016 indicating that the Tonkawa Tribe has no specifically designated historical or cultural sites identified in the Proposed Action Alternative 2 project area. The THPO indicated that if any human remains, funerary objects, or other evidence of historical or cultural significance are inadvertently discovered, then the Tonkawa Tribe would be interested in proper disposition thereof. Based on the fact that the Phase I cultural resources survey revealed no cultural or historic material, the building/residences are less than 50 years old, and ICE received a letter of no adverse effect from the THC SHPO and Tonkawa Tribe of Oklahoma, ICE finds that the Proposed Action Alternative 2 would have negligible direct or indirect impacts to historic properties under 36 CFR Part 800.4[d][1].

### 2.4.3   Mitigation and BMPs

No mitigation measures are warranted for the No Action Alternative or the Proposed Action Alternatives 1 or 2. ICE would coordinate with the THC SHPO and THPOs during the course of the project to ensure compliance with Section 106 of the NHPA. In the event any cultural, archaeological, or historic resources are uncovered (e.g. human remains, funerary objects, or other evidence of historical or cultural significance) construction or renovation work would cease and both the THC SHPO and applicable THPOs would be contacted, consulted, and coordinated with.

## 2.5    Aesthetics/Visual Impacts

Visual perception is an important component of environmental quality that can be impacted through changes created by construction projects. Visual impacts occur as a result of the relationship between people and the physical environment. In addition, public concern over adverse visual impacts can be a major source of project opposition. Understanding the importance of sensitive visual resources and/or receptors is as important as understanding the physical environment and proposed project actions. The aesthetics analysis presented below describes the existing and proposed conditions of the aesthetic and visual quality in the Proposed Action Alternatives 1 and 2 project areas, evaluates the aesthetic characteristics of each site, and assesses the impacts that have the potential to occur as a result of the Proposed Action Alternatives 1 and 2, along with the No Action Alternative.

### 2.5.1    Affected Environment

*Proposed Action Alternative 1: City of Houston*

The existing HPC under the Proposed Action Alternative 1 is situated in a predominantly industrial and commercial setting characterized by large commercial warehouses and parking lots.  The land directly to the north of the facility on the north side of Greens Road is undeveloped and wooded.  Residences are located near the eastern boundary of the processing center and are separated by a small forested parcel. Most of the surrounding area to the west and south has commercial or industrial development. Residential development exists to the east of the facility, but it is buffered by a narrow forested area along the eastern boundary of the processing center. The facility itself is composed of one-story housing and administrative buildings within the secure fence, and one-story warehouse buildings outside the security fence as depicted in **Figure 3**.  There is little landscaping surrounding the existing facility, with mainly mowed grassy roadside areas, exercise yards, and a few shrubs.  For the purposes of security, landscaping is confined to turf grasses and low-lying shrubs, with no tall shrubs or trees that could block the security line of sight.  The facility uses low-mast lighting to minimize visual impacts during the night. There are no identified scenic resources of regional or national importance in the project viewshed. Furthermore, the existing HPC is located at an elevation of approximately 75-80 feet above msl and all of the surrounding parcels are located at similar elevations (i.e., the Processing Center is not located on an elevated area that would provide any significant views to the surrounding areas). While the low relief of the project area provides views to the horizon, the lack of topography, notable geologic features, historic features, and sensitive land uses results in a low-key scenic environment without distinct or dramatic features.  Furthermore, the general area is not a well-established destination for any feature of visual interest.

*Proposed Action Alternative 2: City of Conroe*

The location of the Proposed Action Alternative 2 site is bounded to the north by Hilbig Road and by an auto salvage property and commercial properties, to the east by Stewarts Creek, to the south by vacant land and a portion of the Montgomery County Mental Health Treatment Facility, and to the west by the Montgomery County Mental Health Treatment Facility, Joe Corley Detention Facility, and the existing Montgomery County Jail as depicted in **Figure 6**. The project area is currently undeveloped and located in an area that does not contain elements that would create any well-established destination for any feature of visual interest. The parcel of land is located at an elevation of approximately 200-225 feet above msl and all of the surrounding parcels are located at similar elevations (i.e., the parcel is not located on an elevated area that would provide any significant views to

the surrounding areas). Furthermore, there are no identified scenic resources of regional or national importance in the project viewshed.

### 2.5.2    Environmental Consequences

#### 2.5.2.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovation/alterations to the HPC and no construction of a new facility. Subsequently, there would negligible direct or indirect impacts, beneficial or adverse, on aesthetics or views as a result of the No Action Alternative.

#### 2.5.2.2 Proposed Action Alternative 1

The Proposed Action Alternative 1 would result in only a minimal change in the existing visual environment. Because only minor construction and expansion would occur at the existing HPC under the Proposed Action Alternative 1, the only visual impacts would include a slight increase in building square footage, minor increases to truck/construction vehicle traffic on surrounding roads, and a small increase in the number of cars in the facility's parking lot. As part of the renovation/construction/expansion, a wrought iron fence and secure entrance gate around a portion of the warehouse/administrative building would be erected **(See Figure 4)**.  This "decorative" fencing would improve the aesthetic and architectural features of the property.  Existing low mast security lighting would continue to be used at the facility during normal operations.  Because of the lack of aesthetic elements within the project viewshed, and the fact that only minor construction and renovation would occur within the existing facility footprint, there would be negligible direct or indirect impacts to aesthetic/visual resources from the construction/expansion/renovations or operation under the Proposed Action Alternative 1.

#### 2.5.2.3 Proposed Action Alternative 2

The design and aesthetics of the proposed detention center to be constructed on the vacant parcel of land under the Proposed Action Alternative 2 would be controlled by the facility's use as a detention center.  The design of the proposed detention center would include a heavy line of trees at the back of the facility (Stewarts Creek) and Hilbig which would block direct views of the facility from surrounding areas.  A rendering of the facility is provided in **Appendix H**. Because the area surrounding the parcel of land consists of Montgomery County Mental Health Treatment Facility, Joe Corley Detention Facility, and the existing Montgomery County Jail and commercial areas, and that fact that there are no visual or aesthetic features of importance in the area, there would be negligible direct or indirect impacts to aesthetic/visual resources from the construction and operation of the facility under the Proposed Action Alternative 2.

### 2.5.3    Mitigation and BMPs

No mitigations measures are warranted for either the No Action Alternative or the Proposed Action Alternatives 1 or 2.

## 2.6    Hazardous Materials and Waste

Hazardous materials and wastes are regulated in Texas by the USEPA and the TCEQ under the Resource Conservation and Recovery Act (RCRA). Hazardous materials are substances that cause human physical or health

hazards (29 CFR 1910.1200). Materials that are physically hazardous include combustible and flammable substances, compressed gases, and oxidizers. Health hazards are associated with materials that cause acute or chronic reactions, including toxic agents, carcinogens, and irritants.

### 2.6.1    Affected Environment

*Proposed Action Alternative 1: HPC*

A Phase I Environmental Site Assessment (ENSA) was performed at the HPC on July 27, 2015 to determine if any recognized environmental conditions (RECs) exist at or near the site (**Appendix D**). Although the investigation identified hazardous materials which are being used, stored, handled, or disposed of on-site (or have been in the past), the Phase I ENSA revealed no RECs in connection with the existing facility.  In addition, there were no visual signs on the exterior of the facility of stained soils, stressed vegetation, unusual mounds, or other indications of the use, handling, storage, or disposal of hazardous material on the site.

Hazardous materials that are used at the existing HPC include janitorial supplies; laundry detergents and sanitizers; maintenance materials including chemicals, compressed gases, and paint; and some pesticides.  All of these chemicals were observed during the Phase I ENSA to be properly managed and stored in labeled, locked, fireproof cabinets, or in locked cages at different locations throughout the facility.  A spill kit is maintained in on-site administrative offices in the event of a spill.  Appropriate Safety Data Sheets (SDS) are available at all chemical storage areas within the facility footprint.

The HPC contracts with a private commercial collection firm, for the disposal of solid waste generated at the facility.  All of the solid waste is stored in bins/dumpsters, which are picked up by commercial private collection firms transported to an outside disposal facility and follow (name local or state solid waste disposal mandate). The HPC also generates medical waste from the health care units (medical and dental) at the site.  The facility contracts with a private commercial company that provides medical waste containers and waste disposal for the medical waste generated at the site. The medical unit also stores compressed gas in cylinders and operates a dental and medical X-ray unit.

Two emergency generators are located within the secured fenced area.  Diesel fuel for the generators is supplied by built-in aboveground storage tanks (ASTs).  The facility also stores kitchen grease in an underground grease trap.  The sizes and locations of the tanks are as follows:

- Two 4000-gallon diesel fuel ASTs located in a secured fenced area. These ASTs provide fuel for the two emergency generators.
- One kitchen grease underground trap, located near one of the emergency generators and just to the north of the southeastern parking lot.

Both of the diesel ASTs have double-walled tanks.  The facility currently has a Spill Prevention Control and Countermeasure (SPCC) Plan dated April 2015.  This plan is required by the USEPA because the aggregate petroleum aboveground storage capacity at the facility exceeds 1,320 gallons.

There are multiple pole-mounted electric transformers at the facility.  All but one is labeled as having non-PCB containing mineral oil.  One pole mounted transformer near the security hut on the warehouse property was not labelled. No staining was observed on or below the electrical transformers during the Phase I ENSA.

*Proposed Action Alternative 2: Conroe Parcel*

A Phase I ENSA was conducted on July 13, 2015 for the Proposed Action Alternative 2 site to determine if any RECs exist at or near the site (**Appendix D**). The results of the Phase I ENSA identified no RECs at the site. There are no hazardous materials or waste used at the site because there is no development and the portion of the parcel where the detention center would be constructed is cleared and vacant. Prior to clearing and grading the area consisted of the same deciduous woodland and temporarily flooded bottomland hardwood forest habitat as exists on the eastern portion of the site.

## 2.6.2    Environmental Consequences

### 2.6.2.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. The HPC would continue to practice proper management, use, storage, and disposal of hazardous materials in accordance with all applicable local, state, and federal laws and regulations. Because of this, and since no construction of a new facility would occur under the Proposed Action Alternative 2, there would be negligible adverse impacts to hazardous materials or waste under the No Action Alternative.

### 2.6.2.2 Proposed Action Alternative 1

Operation of the facility under the Proposed Action Alternative 1 would require the routine use of substances classified as hazardous materials and compressed gases.  Hazardous materials that would continue to be used at the facility include janitorial supplies, laundry detergents and sanitizers, maintenance materials, paint, fuel for emergency generators and landscape equipment, lubricants, and some pesticides.  The facility would continue to practice proper management, use, storage, and disposal of hazardous materials in accordance with all applicable local, state, and federal laws and regulations. The facility would also encourage opportunities for environmentally preferable purchases wherever possible. Although fuel consumption would increase slightly for the Contractor's emergency generator because of the slight increase in the number of beds, no additional emergency generators or fuel storage tanks would be required at the facility under the Proposed Action Alternative 1. A Contractor-supplied emergency fuel AST may be located on site – but this tank would be operated in the same manner as other tanks at the site. Furthermore, the facility has a current SPCC Plan dated April 2015, which provides a plan for controlling and containing a petroleum spill. Because of this, and the fact that the Phase I ENSA did not identify RECs at the site, the Proposed Action Alternative 1 would have negligible adverse direct or indirect impacts to hazardous materials or waste.

### 2.6.2.3 Proposed Action Alternative 2

Under the Proposed Action Alternative 2, a diesel AST associated with a backup generator for the proposed detention center construction would be installed in accordance with all applicable federal, state and local regulations. The minimum size AST needed for safe operation of the facility and/or in conformance with the requirements for emergency power would be selected.  The facility would not generate hazardous materials or wastes. Hazardous materials that would likely be used at the facility would be similar to those identified for the Proposed Action Alternative 1, and would include janitorial supplies, laundry detergents and sanitizers, maintenance materials, paint, fuel for emergency generators and landscape equipment, lubricants, and some

43

pesticides. The facility would manage, use, store, and dispose of hazardous materials in accordance with all applicable local, state, and federal laws and regulations, and encourage opportunities for environmentally preferable purchases wherever possible. Because of this, and the fact that the Phase I ENSA did not identify RECs within the vacant parcel site boundaries the construction of the detention center under the Proposed Action Alternative 2 would have negligible adverse direct or indirect impacts to hazardous materials or waste.

### 2.6.3   Mitigation and BMPs

No mitigation measures are warranted for either the No Action Alternative or the Proposed Action Alternatives 1 or 2. Storage and handling of hazardous materials at both sites would be conducted in accordance with local, state and federal laws and regulations. Hazardous material handling and storage is also outlined in the HPC's SPCC plan. An SPCC would be developed as part of the Proposed Action Alternative 2 if the diesel AST storage capacity would exceed 1,320 gallons.

## 2.7   Social Environment and Environmental Justice

According to the USEPA, Environmental Justice is the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies.

EO 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, calls on federal agencies to incorporate environmental justice as part of their missions. It directs them to address, as appropriate, disproportionately high and adverse human health or environmental effects of their actions, programs, or policies on minority and low-income populations. For purposes of EO 12898, a low-income population is defined as a group of individuals living in geographic proximity to one another, or a geographically dispersed or transient (migrant) group of individuals that have household incomes at or below poverty level.

A low-income or minority population can be identified where either:

- Low-income or minority individuals constitute more than 50% of the population of the project area; or
- The percentage of low-income or minority individuals in an affected area is twice that as the county or state as a whole (for example: 30% of the project area is low income but only 15% of the county is low-income) Individuals who are members of the following population groups are considered minorities: American Indian or Alaskan Native, Asian or Pacific Islander, Black (not of Hispanic origin), or Hispanic. (USEPA 1998)

Under EO 13045 "Protection of Children from Environmental Health Risks and Safety Risks," "to the extent permitted by law and appropriate, and consistent with the agency's mission, each Federal agency: (a) shall make it a high priority to identify and assess environmental health risks and safety risks that may disproportionately affect children; and (b) shall ensure that its policies, programs, activities, and standards address disproportionate risks to children that result from environmental health risks or safety risks."

### 2.7.1   Affected Environment

Because the Proposed Action Alternatives 1 and 2 are both located in the greater Houston, Texas metropolitan area, a summary of the population, economics, and demographics is set out below for both Harris and Montgomery Counties. Evaluations for housing and labor force and employment are evaluated individually based on the Proposed Action Alternative 1 or 2 site because the detailed analysis is different for each site.

### *Population/Economics/Demographics*

According to the 2014 Census, Houston's population was 2,167,988, while Conroe's population was 61,268. The population for Harris County as of 2014 was 4,269,608, while Montgomery County's population was 487,028. Selected socioeconomic data for Houston, Harris County, and the State of Texas are presented in **Table 5**.

**Table 5. Selected Demographic Characteristics: 2014 U.S. Census Community Facts Estimates**

| Characteristic | City of Houston | City of Conroe | Harris County | Montgomery County | Texas | USA |
|---|---|---|---|---|---|---|
| Population | 2,167,988 | 61,268 | 4,269,608 | 487,028 | 27,511,104 | 327,700,571 |
| Percent Non-Hispanic White | 25.5 | 50.8 | 32.1 | 69.8 | 43.9 | 62.1 |
| Percent Non-Hispanic Black/African American | 22.8 | 10.0 | 18.5 | 4.2 | 12.1 | 12.9 |
| Percent Hispanic of Any Race | 43.9 | 37.7 | 41.4 | 21.7 | 38.4 | 17.5 |
| Percent Non-Hispanic Other Races (All Combined) | 7.8 | 1.6 | 8.0 | 4.3 | 5.7 | 7.5 |
| Percent of population under 18 of age | 25.3 | 26.7 | 27.5 | 27.2 | 26.8 | 23.7 |
| Percent of population age 65 and older | 9.5 | 10.4 | 8.7 | 11.3 | 11.4 | 14.2 |
| Mean household income | $73,063 | $63,420 | $79,900 | $93,694 | $73,913 | $74,596 |
| Median Household Income | $45,728 | $46,109 | $53,822 | $68,840 | $52,576 | $53,482 |

Supp. App.1685

| Characteristic | City of Houston | City of Conroe | Harris County | Montgomery County | Texas | USA |
|---|---|---|---|---|---|---|
| Percent Individuals whose income in the past 12 months is below the Poverty Level (2014) | 22.9% | 20.4% | 18.4% | 12.3% | 17.7% | 15.6% |

*Source:  2014 US Census Data and Census "American Fact Finder"*
*http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=CF*

Data from the 2014 census indicates that the percentage of Non-Hispanic Black and Hispanic of any race was higher in Houston than the surrounding county and state. The percentage of Non-Hispanic Other Races (All Combined except White) was almost the same as the surrounding county and higher than the state. Data from the 2014 census indicates that the percentage of individuals living below the poverty level was higher in Houston than in the county or the state. Data from the 2014 census indicates that the median income was lower in Houston than the surrounding county or state.

Data from the 2014 census indicates that the percentage of Non-Hispanic Black and Hispanic of any race was higher in Conroe than the surrounding county, but lower than those for the state.  The percentage of Non-Hispanic Other Races (All Combined except White) was lower than both the surrounding county and state. Data from the 2014 census indicates that the percentage of individuals living below the poverty line was higher in Conroe than in the county or the state. Data from the 2014 census indicates that the median income was lower in Conroe than the surrounding county or state.

*Proposed Action Alternative 1: City of Houston and Harris County*

**Housing**
The overall population of the City of Houston and Harris County is very large compared to the number of employees at the HPC facility and that live in the surrounding area. Therefore, overall housing prices would not be impacted by the minor construction/expansion of an existing facility originally built in 1984. For this reason, a detailed evaluation of housing metrics, including a comparison of rental vs. owned units and vacancy rates, is not evaluated for the Proposed Action Alternative 1.

**Labor Force and Employment**
According to the Texas Workforce Commission, as of June 2016 the civilian labor force in Harris County was 2,261,659, and the unemployment rate was 5.5 percent.

*Proposed Action Alternative 2: City of Conroe and Montgomery County*

**Housing**

Due to the overall population and size of the City of Conroe and Montgomery County, and because housing prices could potentially be impacted by the Proposed Action Alternative 2, a housing evaluation was performed and the results are presented in **Table 6** below. According to the 2009-2013 American Community Survey (ACS) 5-Year Estimates presented below, the homeowner vacancy rate for the City of Conroe and Montgomery County is on par with the national average.  ACS estimates that there are about 22,000 housing units in Conroe, approximately 10.9 percent of which are vacant or for rent.

**Table 6. Housing Units**

| Geographic Area | Total Housing Units | Occupied | | | Homeowner Vacancy Rate* | Rental Vacancy Rate** | Vacant Housing Units |
|---|---|---|---|---|---|---|---|
| | | Units | Owner Occupied | Renter Occupied | | | |
| **City of Conroe** | 22,697 | 20,222 | 49.7% | 50.3% | 1.7 | 12.1 | 2,475 |
| **Montgomery County** | 181,294 | 163,462 | 72.9% | 27.1% | 1.7 | 9.5 | 17,832 |
| **Texas** | 10,070,703 | 8,886,471 | 63.3% | 36.7% | 2.0 | 9.2 | 1,184,232 |
| **United States** | 132,057,804 | 115,610,216 | 64.9% | 35.1% | 2.2 | 7.3 | 16,447,588 |

2009-2013 American Community Survey
*Homeowner vacancy rate is the proportion of the homeowner inventory that is vacant "for sale."
** Rental vacancy rate is the proportion of the rental inventory that is vacant "for rent."

**Labor Force and Employment**
According to the Texas Workforce Commission, as of June 2016 the civilian labor force in Montgomery County was 258,295, and the unemployment rate was 5.2 percent.

### 2.7.2    Environmental Consequences

#### 2.7.2.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. The HPC would continue to be operated, but it would not be renovated or expanded. The No Action Alternative would be in compliance with EO 12898  and EO 13045.  The No Action Alternative would continue to provide the current number of jobs and result in continued payment of property taxes to the surrounding municipality. Furthermore, there would be no changes in population, employment or use of area resources under the No Action Alternative. Thus, there would be minor, beneficial long-term impacts to the social environment in the area.

#### 2.7.2.2 Proposed Action Alternative 1

Overall, the City of Houston has a higher percentage of minorities and a higher percentage of impoverished individuals than Harris County and the State of Texas.  However, the proposed use of the existing correctional

47

Supp. App. 1687

facility within the community would not have a disproportionate impact on these segments of the population, nor on the community as a whole, because the Proposed Action Alternative 1 is currently operating as a detention center.  No households would be displaced by the use of the existing facility and the subsequent minor new construction/renovation/expansion. The Proposed Action Alternative 1 would increase employment opportunities and commerce, while maintaining the tax revenue to the benefit of the community as a whole.  The facility would continue to contribute about $884,000 annually in property tax revenue to the Aldine Independent School District and Harris County; would continue to spend approximately $1.7 million annually for goods and services to operate the facility, and the annual payroll of approximately $13-$14 million would increase due to the increase in staffing as a result of the Proposed Action Alternative 1 to between $19 and $20 million.  Approximately 27-47 additional jobs would be added under the Proposed Action Alternative 1 and the existing 298 jobs would be continued, providing a high-quality source of income in the area.

The location of the HPC does not impose adverse traffic or excessive noise impacts on the community, and does not create a physical barrier that divides or segments any portion of the community. The HPC has been operating within the community since 1984 and there have been no issues with neighbors.  The health and well-being of children within the community and the viability of facilities and programs serving children would not be impacted.  Based on these factors, the Proposed Action Alternative 1 would not cause a disproportionate and adverse impact on minorities or impoverished individuals, and would be in compliance with EO 12898 EO 13045.

The construction/renovation/expansion of the HPC under the Proposed Action Alternative 1 would further strengthen the Center's positive economic impact on the City of Houston and Harris County.  The expected annual payroll would increase from the current value of approximately $13-$14 million to between $19 and $20 million, the expected property taxes would be about $884,000 per year and the purchase of goods and services would continue to be about $1.7 million annually. In addition, the proposed renovations and construction would cost about $18,500,000 which would create a temporary demand for construction materials and generate construction jobs.  For these reasons, the Proposed Action Alternative 1 would have minor, beneficial, long-term impacts to the socio-economic environment in the area.

### 2.7.2.3 Proposed Action Alternative 2

Overall, the City of Conroe has a higher percentage of minorities than Montgomery County but lower than that for the state. In addition, the City of Conroe has a higher percentage of impoverished individuals than Montgomery County and the state.  The percentage poverty rate in Conroe is not twice the poverty rate of the state or the County; thus, a low-income population is not present in Conroe. Therefore, the construction and operation of the proposed detention center does not have disproportionate adverse effects on minority or low-income individuals, nor on the community as a whole, because the proposed parcel of land for the proposed detention center is located in a sparsely populated area with an existing detention center (Joe Corley Detention Facility) nearby. Furthermore, the likelihood of exposing children to environmental health risks or safety risks as part of the evaluation under EO 13045 is low based on the sparsely populated location for the siting of the proposed detention center.  The parcel of land for the proposed detention center under the Proposed Action Alternative 2 is not in the vicinity of schools, daycare facilities, playgrounds, or other places where children are concentrated; therefore, no adverse effects on children are anticipated.

The Proposed Action Alternative 2 would provide positive socioeconomic impacts to the City of Conroe and surrounding Montgomery County due to job creation of 440 permanent positions, a large amount of tax revenue for the county, increases in the purchases of goods and services, and the creation of temporary demand for construction materials and construction jobs as a result of developing the detention center on the existing parcel of land. No additional lands are being acquired other than the existing cleared and graded parcel of land, thus surrounding property values are not expected to be impacted by the proposed action. The construction of the proposed detention center would result in temporary minor beneficial impacts from an increase in the hiring of local workers for the construction, permanent operation of the facility, and other related activities associated with goods and services delivered to the detention center.

### 2.7.3   Mitigation and BMPs

No mitigation measures are warranted for either the No Action Alternative or the Proposed Action Alternatives 1 or 2.

## 2.8   Human Health and Safety

### 2.8.1   Affected Environment

The Proposed Action Alternative 1 is located in the City of Houston in Harris County, Texas. The Proposed Action Alternative 2 is located in the City of Conroe in Montgomery County, Texas. Emergency services are provided by the city and county at their respective locations.

<u>Fire Department</u>

*Proposed Action Alternative 1: City of Houston*

The HPC is serviced by Houston Fire Department (HFD) Station 64, which is located at 3000 Greens Rd, Houston, Texas 77032. An Incident Response Plan for the existing facility was submitted to the HFD on January 12, 2015. The Fire Marshal acknowledged that the plan meets national fire safety codes. The HFD would not divulge specific information about the equipment and staff resources that they have available to service the facility in the event of a fire, but did acknowledge that they have sufficient equipment and resources to respond to a fire or incident at the facility (Perez 2015).

Some of the HPC's employees are trained to act as initial responders in the event of a fire at the facility. The responsibility of facility responders is to extinguish small confined fires and to remove all detainees and staff from affected areas until the fires are extinguished. Additionally, the facility was constructed with fire suppression sprinklers and extinguishers.

*Proposed Action Alternative 2: City of Conroe*

113 professional firefighters and four civilian employees staff the City of Conroe Fire Department. The department offers service from six strategically located fire stations and the administrative offices at City Hall. The Conroe Fire Department has one 2006 Pierce Quantum, one 2002 Pierce Dash Fire Engine and two 1993 Pierce Arrow Fire Engines on the front line. The department also has one 1993 Pierce Arrow Engine and a 1990 and a1988 Pierce Arrow Pumpers as reserve engines. Among the other vehicles are a 2004 Booster Truck, a 2005 Heavy Duty Rescue truck with a cascade system that carries most of the hazardous materials equipment, a 1998

Supp. App. 1689

Utility Truck, a 2002 Utility Truck, a 1998 Rescue Trailer filled with Trench Rescue Equipment, a 1948 Antique Hose Truck, a rescue boat, and seven staff vehicles. There is a utility pickup assigned to each station (Kreger 2015).

In 2012, the department received 6,551 calls of which 3,669 were medical calls.  Emergency Management is under the jurisdiction of the Fire Department. Fire Chief Ken Kreger is the Fire Chief and Emergency Management Coordinator for the City of Conroe. The detention center would be serviced by Fire Station 2 located at 425 N. Loop 336 East in Conroe Texas.

<u>Police Department</u>

*Proposed Action Alternative 1: City of Houston*

The closest police station to the HPC is the Northeast Station at 2202 St Emanuel St, Houston, Texas 77003. The facility does not have an existing Memorandum of Understanding with the Houston Police Department for a Special Threat Situation. However, as the January 23, 2015 memo states the Police Department acknowledged that they do provide police services to the facility and surrounding area. The Police Department, due to security concerns, would not divulge information about the equipment and staff resources they have to respond to an incident at the facility, but acknowledged that they have the responsibility to respond to an incident (Martinez 2015).

*Proposed Action Alternative 2: City of Conroe*

The Conroe Police Department is comprised of 128 sworn officers, 40 civilian employees, 11 Reserve Police Officers and numerous civilian volunteers. Chief Philip Dupuis oversees the direction of the Department with the assistance of two Bureau Chiefs, Deputy Chief Jeff Christy and Deputy Chief Russell Reynolds. The average response time for high priority calls is approximately 2 minutes and for low priority 5 minutes. The Montgomery County Sheriff's Department is comprised of 463 officers and responds to calls in Montgomery County, but outside of Conroe. The average response time for emergencies is approximately 9 minutes (McDaniel 2015).

<u>Health Care</u>

*Proposed Action Alternative 1: City of Houston*

Routine medical and dental care is provided within the facility through an agreement with the US Public Health Service. The US Public Health Service has full-time and part-time social workers, medical doctors, nurse practitioners, registered nurses, pharmacists, dental assistants, and dentists employed at the facility for routine medical and dental requirements. All detainees who have medical requirements beyond the capabilities of the facility would be treated at outside facilities. The US Public Health Service has agreements with nearby hospitals for medical care beyond the capability of the facility. There are numerous hospitals within a 30 minute travel time of the facility. The Memorial Hermann Hospital is 4.3 miles away and is approximately a 10-minute drive from the facility. The HFD Emergency Medical Service (EMS) transports detainees in emergency situations to the local hospital.

*Proposed Action Alternative2: City of Conroe*

Routine medical and dental care would be provided through a similar agreement with the US Public Health Service and would consist of both full-time and part-time social workers, medical doctors, nurse practitioners,

Supp. App. 1690

registered nurses, pharmacists, dental assistants, and dentists employed at the facility for routine medical and dental requirements. All detainees who have medical requirements beyond the capabilities of the facility would be treated at the Conroe Regional Medical Center which is a comprehensive, full-service hospital. The hospital has 328 beds, 1,200 employees, more than 400 physicians on staff and is currently going through an expansion. Among the services provided are emergency services, heart care, neurosciences, pediatric care, rehabilitation therapy, sleep center, surgery, weight loss services, women's services, and wound care. The hospital is located approximately 6.3 miles (approximately 15 minutes travel time) from location of the proposed detention center to be constructed under the Proposed Action Alternative 2.

### 2.8.2    Environmental Consequences

#### 2.8.2.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. Therefore, there would be negligible adverse impacts on the emergency services provided by the operator of the contract detention facility or the local community.

#### 2.8.2.2 Proposed Action Alternative 1

The housing and transportation of a detainee population at the HPC under the Proposed Action Alternative 1 would not create an increased need for police or fire protection services or outside medical support because the facility housing capacity would not change significantly (i.e., only an additional 9 Short-Stay/Medical beds and 32 Vulnerable Population beds would be added bringing the facility total to 1,070 beds). No increase in response time for police, fire, rescue, or other emergency vehicles serving public safety would be expected as a result of the Proposed Action Alternative 1. The facility is equipped to handle most emergency situations and would continue to rely on its staff for the majority of the institutional safety. The facility is serviced by the City Police and Fire Department for emergency fire or security related incidents. Thus, there would be negligible adverse impacts to the local police and fire departments, or hospitals as a result of the Proposed Action Alternative 1.

#### 2.8.2.3 Proposed Action Alternative 2

Under the Proposed Action Alternative 2, the operation and construction of the detention center would not hinder the area's police, fire, rescue, or other emergency responders' ability to provide services to the detention center and the community. The public service personnel interviewed during the evaluation of potential impacts indicated that the operation and construction of the detention center would not result in an increase in response time for police, fire, rescue, or other emergency vehicles serving public safety. According to Conroe Fire Chief Ken Kreger, the Fire Department currently responds to a similar contract detention facility in the proposed area and has a good relationship with the facility Safety Coordinator. The fire chief also stated that as long as all fire codes were followed during the construction and operation of the facility, the fire department would not have any issues providing services (Kreger 2015). In addition, according to Lieutenant Lee Tipen, the construction and operation of the detention center would not have an impact on the Conroe Police Department (Tipen 2015). Chief Deputy Randy McDaniel of the Montgomery County Sheriff Department stated that the construction and operation of the detention center would not impact the Sheriff Department services to the County because the proposed location is not in the Department's jurisdiction (McDaniel 2015). Most detainee medical services would be provided at the new detention facility and would not be a burden on the Conroe Regional Medical Center. Therefore, negligible adverse impacts are anticipated as a result of the Proposed Action Alternative 2.

Supp. App. 1691

### 2.8.3   Mitigation and BMPs

No mitigation measures are warranted for either of the Proposed Action Alternatives or the "No Action" Alternative.

## 2.9   Land Use

Both proposed action alternatives are considered to be within the greater Houston Metropolitan area and their impacts on land use are discussed in this context below.

### 2.9.1   Affected Environment

*Proposed Action Alternative 1: City of Houston*

The HPC is located in a predominantly industrial and commercial area of the city. According to the City of Houston, there are no zoning regulations in the city.  The operator of the HPC currently has a Certificate of Occupancy (COO) for the site.  Adjacent land use is primarily industrial and commercial to the west and south, and residential to the east. The property to the north of Greens Road is forested land owned by the George Bush Intercontinental Airport (IAH). **Figure 3** shows the general industrial and commercial area surrounding the facility. The warehouse property is part of the World Houston International Business Center, which includes over 39 buildings and 3 million sq. ft. of building space.

The site has a frontage and entrances along Greens Road to the north, Vickery Drive to the west, and Export Plaza Drive to the southwest. The detention center has one secure entrance along Greens Road and one public entrance along Export Plaza Drive. The administrative/warehouse buildings have three entrances off Vickery Drive and two off Greens Road.

The facility is located within the George Bush Intercontinental Airport Hazard Area (AHA) Zone.  According to the City's Ordinance No. 09-1301, § 2, 12-16-09, eff. 3-1-2010, Sec. 9-751, "any proposed structure or any proposed permanent or temporary improvement to any existing structure that, as described by plans, specifications, application for building permit or other information, would, if constructed or erected, penetrate any airport hazard notification surface, shall constitute a potential airport hazard and would require an AHA permit." The HPC is located in the City's Airport Compatible Land Use Tier 3 overlay.  According to City of Houston, Texas Ordinance No. 08-1052, § 2, 12-3-08, Sec. 9-405, a new nonresidential use or enlargement of a nonresidential use is permitted in the IAH tier three overlay zone, subject to a determination upon application for a building or development permit that it is not subject to additional restrictions and is handled during the building permit process. No airport Land Use permit would be required because the facility is in Tier 3.  Preliminary airport airspace analysis indicates the building height would be restricted to less than 157 feet, which would not pose any problem to the proposed construction.

*Proposed Action Alternative 2: City of Conroe*

The 24.9-ac Proposed Action Alternative 2 site consists of two generally vacant parcels (Parcels R30089 and Parcel R30130) located approximately three miles northeast of the central business district of Conroe, Texas.  The Site is bounded to the north by Hilbig Road followed by an auto salvage property and commercial properties, to the east by Stewarts Creek, vacant land and a single family subdivision, to the south by vacant land and a portion of the Montgomery County Mental Health Treatment Facility, and to the west by the Montgomery County Mental

Supp. App. 1692

Health Treatment Facility as shown in **Figure 6**.  The Montgomery County Mental Health Treatment Facility is a forensic facility with 100 beds, designed to treat patients who are determined by the court system to be incompetent to proceed with their trial.

According to City of Conroe Public Works Department - Planning Division web site, the City of Conroe does not have a Zoning Ordinance, although several land use guidelines and controls have been adopted by the City Council for residential and commercial developments within certain geographical areas.  The proposed detention center site currently has a Texas State Code Description of A-1 Residential Single Family. According to the 2006 City of Conroe Comprehensive Plan; Figure 6-1: "Existing Land Use," the proposed detention center site has a land use as vacant/rural.  Figure 6-4: "Development Pattern," also in the Comprehensive Plan, notes a commercial permit at the proposed detention center location.

## 2.9.2   Environmental Consequences

### 2.9.2.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. Therefore, there would be negligible direct or indirect impacts on land use under the No Action Alternative.

### 2.9.2.2 Proposed Action Alternative 1

The Proposed Action Alternative 1would not conflict with surrounding land uses since the facility has been operating in the area since 1984 and there have been no issues with neighbors. No zoning change would be required for the facility because there are no zoning requirements in Houston.

The proposed construction of the male processing/medical center, female detainee housing building, gymnasium, recreation facilities, and interior renovations to the warehouse building and the detention center would be submitted to and approved by the City of Houston Department of Public Works and Engineering and Department of Planning and Development through the Building Permit process.  The Building Permit process would require a site plan, storm drainage plan, and potentially a landscaping plan and would be reviewed by the City Engineer and other City departments for consistency to the City Codes and Ordinances. The proposed improvements would be designed and constructed in accordance with the City's Infrastructure Design Manual 2015, which includes standards for water and wastewater infrastructure, stormwater drainage, geotechnical engineering, and survey and plat maps. Conformance with these standards and required verifications would ensure that no land use issues result.

In addition, the vendor would coordinate with the City for the AHA permit by submitting a Form 7460-1 for proposed improvements to the Federal Aviation Administration (FAA) in accordance with the requirements of section 77.17 of Part 77 and obtain a determination from the FAA as provided in section 77.35 of Part 77.  In addition, if a crane is used for any construction, the vendor would coordinate with airport operations at least 72 hours in advance. The contractor would also coordinate with the FAA through the completed FAA Form 7460-1 and would make the appropriate notifications and employ appropriate hazard mitigation should a crane be necessary. Therefore, the Proposed Action Alternative 1 would have negligible adverse direct or indirect impacts to land use.

### 2.9.2.3 Proposed Action Alternative 2

Under the Proposed Action Alternative 2, land use would remain as described in the 2006 City of Conroe Comprehensive Plan; Figure 6-4, "Development Pattern" and would be the same as the land use of the surrounding area. Thus, construction of a new facility under the Proposed Action Alternative 2 would have negligible adverse impacts on land use in the area.

### 2.9.3   Mitigation and BMPs

For the HPC construction/renovations/alterations, appropriate design and construction standards would be employed in accordance with the City's Building Plan requirements and the City's Infrastructure Design Manual 2015. The contractor would coordinate with the FAA, the airport and the City through the completion of FAA Form 7460-1 and would make the appropriate notifications and employ appropriate airport hazard measures. Through the Building Permit process, the facility would ensure the proposed facility modifications are in conformance with the City's Compatible Land Use Tier 3 requirements. Because land use at the Proposed Action Alternative 2 parcel would remain the same as described in the 2006 City of Conroe Comprehensive Plan, no specific mitigation measures would be required for the new construction activities. Subsequently, no mitigation measures are warranted for either of the Proposed Action Alternatives or the "No Action" Alternative.

## 2.10   Utilities and Infrastructure

Both the Proposed Action Alternative 1 and 2 are considered to be within the greater Houston Metropolitan area and their operational impacts on the local utilities and infrastructure in their respective communities and region are summarized below. Maintaining efficient utility usage is important at all ICE contract facilities.

### 2.10.1  Affected Environment

*Proposed Action Alternative 1: City of Houston*

The owner of the facility has already installed low flow restrictors on all shower heads at the facility and replaced 23 rooftop HVAC units and two boilers with more energy efficient units. The following additional actions would be considered at the HPC under the Proposed Action Alternative 1:

- Conduct a LED facility retrofit audit; and
- Contract to conduct an audit to look for additional Energy Conservation Measures

<u>Water Supply</u>

The HPC uses potable water from the City of Houston's system. The northern part of the detention facility is connected to the City's water system via an 8-inch fire line and a 4-inch water line that connect to a 16-inch water main along Greens Road. The southern half of the detention center is connected to the City's system via a four inch water line that connects into a 12-inch water main along Export Plaza Drive. The warehouse/administrative buildings are connected to the City system along Vickery Drive (10-inch water main), and there is a backflow preventer located on the property along the Vickery Drive.  The water demand projected to be generated by the Proposed Action Alternative 1 is about 99,510 gpd, based on average operational water demand of 93 gpd/detainee (1,070 beds), All of the existing water system improvements for the facility were designed and

54

constructed in accordance with the City's standards and codes at the time of construction. Based on a letter from the City of Houston, Department of Public Works & Engineering to CCA dated January 9, 2015, the potable water supplied by the City met all applicable TCEQ and Safe Drinking Water Act requirements for 2014.

Wastewater Treatment

The City of Houston provides for sanitary sewer service to the facility.  Sewage from the detention facility flows via an 8-inch sanitary sewer line to a 10-inch city sewer line located along Export Plaza Drive.  The sewage from the administrative/warehouse building flows via a 6-inch sanitary sewer to an 8-inch sanitary sewer line city sewer line located along Vickery Drive. The facility is served by the city's Northbelt System, and the sewage flow from the facility is projected to be about 89,559 gpd following the proposed expansion.

Heating Fuel/Electric Power Supply

The facility is air conditioned with rooftop HVAC units. Water is heated by six gas-fired boilers.  The facility has a boiler certificate of operation from the Texas Department of Licensing for each of the six boilers.  The certificates were issued at staggered times from 2013 through 2015 and are valid for a period of three years. The emissions from the boilers are below the threshold that requires a permit from the TCEQ. Electric power is supplied by Liberty Power. Gas is supplied by Centerpoint Energy Services. The facility has two whole-building emergency generators that are capable of providing back-up power to the entire facility.

Telecommunications

A range of telecommunications services serve the facility.  Cellular phone service is provided by Verizon; phone service for the facility's offices is provided by AT&T.

Solid Waste Disposal

The Houston facility contracts with WCA for the disposal of solid waste generated at the site. All solid waste generated at the facility is stored in dumpsters, and picked-up by the private contractor  for transport to the disposal facility.  Electronic waste and batteries are removed by Pomeroy, which is the vendor that provides these goods. The solid waste is disposed of in one of the 14 permitted landfills in Harris County.

*Proposed Action Alternative 2: City of Conroe*

Water Supply

The Water Department for the City of Conroe operates 18 water wells and is capable of delivering an average of 10 million gallons of water per day (mgd) to customers.  They are permitted for 10 mgd and they are under contract with San Jacinto River Authority for 6 mgd. Currently, the City of Conroe is delivering an average of approximately nine mgd to customers (City of Conroe 2015).  The water from the City of Conroe meets USEPA and TCEQ quality standards. Water service extends to the parcel of land for the proposed detention center. The water demand projected to be generated by the Proposed Action Alternative 2 following occupation is approximately 123,750 gpd based on an estimate of 110 gpd/detainee (1,125 beds).

Wastewater

Supp. App. 1695

The Treatment Department of the City of Conroe Wastewater Department utilizes a modified activated sludge process with a belt press to safely manage wastewater. The facility is permitted for a maximum flow of 10 mgd under TCEQ and is currently averaging seven mgd (City of Conroe 2015). The city is in the design process for a new 6 mgd wastewater plant. The current service area and wastewater collection system extends to the proposed detention center. It is anticipated that the detention center would generate wastewater at a rate of approximately 85 percent of the anticipated daily water consumption or approximately 93,500 gpd.

Electric Power

TXU Energy (TXU), a Texas-based company and a subsidiary of Energy Future Holdings, regulates the electrical service to residential, commercial and industrial customers in the City of Conroe. TXU would likely provide electricity for the proposed detention center.

Telecommunications

Consolidated Communications is a family of companies providing advanced communications services to both residential and business customers in 11 states and is the 13th largest independent local telephone company in the nation (Consolidated Communications 2015). Consolidated Communications provides communication services to businesses in Conroe, Texas through underground and overhead lines and would likely provide communications to the proposed detention center.

Solid Waste Disposal

The City of Conroe contracts with a commercial waste management company as the waste collecting contractor for the entire City of Conroe. Solid waste is delivered to Waste Management Security Landfill in Cleveland, Texas, approximately 23 miles east of Conroe, Texas.

## 2.10.2  Environmental Consequences

### 2.10.2.1          No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. The cities of Houston and Conroe are currently meeting all demands for utilities and would continue to meet these demands under the No Action Alternative. Therefore, there would be negligible adverse impacts to utilities and infrastructure under the No Action Alternative.

### 2.10.2.2          Proposed Action Alternative 1

Under the Proposed Action Alternative 1, no off-site water and sewer system improvements would be required because the facility is already connected off-site to the Houston water and sewer system and has a water demand and sewage generation that is almost identical to that of the current operation. Houston's water and sewer system is adequate to serve the needs of the facility operation (see December 3, 2015 letter from Rudy Moreno, Houston Deputy Assistant Director of Utility Analysis Section). According to Ann Marie Stone Sheridan, Supervising Engineer in the city's Department of Public Works and Engineering, the water and sewer lines in this area were designed for future growth (personal communication, 2015) and the increase of 41 beds (resulting in a total of 1,070 beds) would be well within the existing capacity. The city would evaluate whether the minor increase in housing and the proposed minor new construction/expansion and renovation of the kitchen and dining hall would

Supp. App. 1696

require impact fees payable to the city to compensate for the increased water use and sewage flow. A utility capacity analysis was requested from the city on September 20, 2015. The city provided a response on December 3, 2015; however, the request was made based on a scenario of adding 450 beds rather than the addition of 41 which exceeds the maximum allowable capacity of 1,200 as stated in the Purposed and Need. The City determined that capacity was available through the Export Plaza Drive water main and the Export Plaza Drive 10 inch sewer line and that an impact fee was warranted for the 450 bed expansion scenario. Given the minor increase in additional beds (41 beds) and the proposed kitchen renovations for the current proposal, it is expected that a small impact fee would be assigned to the project for the additional water and sewage. All of the waterline and sanitary sewer improvements for the existing facility were completed in accordance with Houston's Infrastructure Design Manual. In addition, the landfills in the area have available capacity to handle the facility solid waste needs. Therefore, negligible adverse impacts to utilities and infrastructure would occur under the Proposed Action Alternative 1.

### 2.10.2.3 *Proposed Action Alternative 2*

Under the Proposed Action Alternative 2, water, sewer, and electric utilities would be connected to the facility via an existing utility corridor. Secure fiber-optic lines would also be installed. There would be a slight increase in the demands placed on city utilities. Utility service would be necessary 24 hours a day year-round and must be sufficient to accommodate 1,000 detainees plus staff. There are existing 12-inch waterlines along Loop 336 to the north and on the east side of the property across the creek. According to the project's civil engineering firm, these lines should provide adequate capacity to handle both domestic and fire water needs. A public 12-inch sewer line running through the adjacent Montgomery County Mental Health Treatment Facility property parallel to the Site's west boundary line has adequate capacity for the proposed facility.

The City of Conroe and other providers are currently able to meet demands for potable water, electric power, wastewater treatment, and solid waste disposal, and can accommodate the increased demands placed on it by the proposed detention center. There would be minor adverse long-term impacts to utilities and infrastructure would occur under the Proposed Action Alternative 2.

### 2.10.3 Mitigation and BMPs

No mitigation measures are warranted for either the Proposed Action Alternatives or the No Action Alternative.

## 2.11 Traffic and Transportation Systems

Both of the proposed action alternative locations are considered to be within the greater Houston Metropolitan area and their operational impacts on the local transportation systems in their respective communities and the surrounding area is summarized below.

### 2.11.1 Affected Environment

*Proposed Action Alternative 1: City of Houston*

The HPC is located near a system of primary and interstate roads that offer excellent transportation options. The Processing Center has access onto Greens Road and onto Export Plaza Drive. The warehouse property has access

Supp. App. 1697

onto Vickery Drive and Greens Road. Greens Road is a major east-west thoroughfare, which connects with the Eastex Freeway (Route 59) to the east, and with Interstate 45 (I-45), to the west.   The facility is about one mile from the Sam Houston Parkway, which is located to the south of the facility.  Commercial air travel is served by IAH located approximately 2 miles north of the facility, an airport that served nearly 43 million passengers in 2015. **Figure 2** shows the HPC and the surrounding roads and airport facilities described above.

The City of Houston, the Federal Highway Administration (FHWA) and the Texas Department of Transportation have programmed improvements for Greens Road from US 59 to John F. Kennedy Boulevard, which includes the section of Greens Road where the detention center is located.  According to the 2016-2020 Capital Improvement Plan for the City of Houston, acquisition of right of way for the project is scheduled for 2016 and construction has been scheduled for 2017.  A traffic impact report was not required by the City of Houston when the facility was built.

The City of Houston conducted traffic counts along various segments of Greens Road in 2012. The section of the road between JFK Boulevard and Lee Drive, in which the facility is located, had an average daily traffic count of 8,298 vehicles according to the City's records (www.gims.houstontx.gov/trafficcounts/Reports.aspx).

*Proposed Action Alternative 2: City of Conroe*

The primary transportation arteries through Conroe are I-45 and Highway 75, which both run north-south through Conroe. Conroe is surrounded by Loop 336. The proposed location of the detention center would be bounded to the north by Hilbig Road.  Hilbig Road is a 20-foot wide, two-lane, asphalt pavement in a 60-foot right-of-way. The road has a posted speed limit of 35 mph, does not have any improved shoulders, and uses grass lined ditches for drainage routing. The road services a few commercial developments as well as the larger county facilities (Montgomery County Mental Health Treatment Facility and Joe Corley Detention Center) by providing access to First Street and West Cartwright Road.  These roads ultimately access State Highway Loop 336 located 1,000 feet to the north, and State Highway 105 located 1.5 miles to the south of Hilbig Road. In addition, the proposed detention facility would be located approximately 34 miles (45-minute surface commute time) from IAH.  **Figure 5** shows the general location of the Proposed Action Alternative 2 parcel of land and the surrounding roads and transportation networks described above.

A Traffic Impact Analysis (TIA) dated September 2013 at the request of owner of the property and the City of Conroe determined the impact that a development would have on the traffic operations of Hilbig Road and the site vicinity. Two pneumatic traffic counters were placed to complement the shift schedules of the county facilities in the area to better analyze trip generation and distribution for all of the facilities. These counters were placed for 24-hours on the same day that turning movement counts were conducted. One counter was placed on Holloman Street to record traffic volume exiting Hilbig at that intersection. Another counter was placed on Hilbig Road near Holloman to differentiate the remaining traffic on Hilbig from the traffic exiting at Holloman. The results of the TIA are discussed in the environmental consequences section below. A copy of the Traffic Analysis report is provided as **Appendix E**.  No substantial changes to the traffic conditions around the proposed detention center were noted in a May 10, 2016 letter (**Appendix B**).  Thus, an updated traffic study is not required.

58

## 2.11.2 Environmental Consequences

### 2.11.2.1       No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. There could be minor, adverse short-term impacts to traffic conditions, patterns or flow in and around the HPC under the no action alternative.

### 2.11.2.2       Proposed Action Alternative 1

No new roads, traffic studies, parking expansion, or roadway improvements would be needed for the Proposed Action Alternative 1.  The existing parking lots at the administrative/warehouse building may need re-paving. The vendor would create dedicated parking spaces and secure parking for ICE, but no expansion of the parking lots is planned. There could be a very minor increase in traffic related to detainee transport and visitation, because of the increase in 41 beds.  There would be a minor increase in construction-related traffic under the Proposed Action Alternative 1. The existing entrances to the Processing Center and the administrative/office buildings should not need to be modified, but may be modified as a result of the Greens Road improvements.

Because the proposed detainee population would not significantly increase, there would not be a significant increase in traffic from the current levels. In addition, the visitation experienced at this facility would not change significantly from the 15,000 visitations that typically occur each year.  Additionally, most of the visitation associated with the Proposed Action Alternative 1 is anticipated to occur on weekends and in the evenings, during off-peak hours, and therefore would likely cause more limited impacts than if visitation were to occur during peak hours.  The facility transports detainees on a regular basis to the courts, to medical facilities, and in some cases out of the country via bus for deportation. The typical number of trips is about 60 per day for detainee court related activities and 80 per month for medical related activities. The number of detainee transports would not materially increase under the Proposed Action Alternative 1, and passenger traffic at IAH would also not be impacted by the small increase in detainee population. The employee traffic generated by operation of the facility would not change significantly from current levels. Employee traffic would be spread across three shifts, thus reducing traffic demand during the peak travel times in the morning and evening. Therefore, there would be negligible adverse impacts to transportation routes or traffic patterns due to the Proposed Action Alternative 1.

### 2.11.2.3       Proposed Action Alternative 2

Under the Proposed Action Alternative 2, there would be approximately 440 employees (190 full-time ICE employees and approximately 250 contract facility employees) at the facility which would be operated 24 hours a day year-round. It is assumed that the employees would work in three, eight-hour shifts per day. Parking for these workers and other contractors would be provided at the proposed detention center and no additional parking beyond the facility footprint would be required. Because of the approximately 43 million passengers served as noted above in the affected environment, the minimal number of additional IAH passengers related to the proposed detention center would not adversely affect airport operations.  The TIA conducted to determine the impact the detection center would have on the traffic operations of Hilbig Road and the site vicinity concluded that the intersection of Hilbig Road and First Street and all its approaches would continue to operate at designed level of service after the proposed detention center is constructed. Therefore, no improvements are necessary at this intersection due to the generated traffic volumes of the proposed site. The traffic conditions in the vicinity of

the proposed detention center have not changed substantially since the TIA was prepared in 2013; thus, a revised TIA is not required. Thus, there would be minor, adverse long-term impacts to transportation routes or traffic patterns due to the Proposed Action Alternative 2.

### 2.11.3  Mitigation and BMPs

No mitigation measures are warranted for either of the Proposed Action Alternatives or the "No Action" Alternative.

## 2.12  Air Quality

According to the USEPA listing of "Current Non-Attainment Counties for All Criteria Pollutants," both proposed action alternative locations are considered to be in the *Houston-Galveston-Brazoria, Texas* area.

The USEPA established National Ambient Air Quality Standards (NAAQS) for specific pollutants determined to be of concern with respect to the health and welfare of the general public. Ambient air quality standards are classified as either "primary" or "secondary." The major pollutants of concern, or criteria pollutants, are carbon monoxide (CO), sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter less than ten microns (PM-10), particulate matter less than 2.5 microns (PM-2.5), and lead. NAAQS represent the maximum levels of background pollution that are considered safe, with an adequate margin of safety, to protect the public health and welfare. The NAAQS are included in **Table 7.**

**Table 7. National Ambient Air Quality Standards**

| Pollutant | Primary Standards | | Secondary Standards | |
|---|---|---|---|---|
| | Level | Averaging Time | Level | Averaging Times |
| Carbon Monoxide | 9 ppm (10 mg/m$^3$) | 8-hour [1] | None | |
| | 35 ppm (40 mg/m$^3$) | 1-hour [1] | | |
| Lead | 0.15 µg/ m$^{3(2)}$ | Rolling 3- month average | Same as Primary | |
| | 1.5 µg/ m$^3$ | Quarterly Average | Same as Primary | |
| Nitrogen Dioxide | 53 ppb[3] | Annual (Arithmetic Average) | Same as Primary | |
| | 100 ppb | 1-hour [4] | None | |
| Particulate Matter (PM-10) | 150 µg/ m$^3$ | 24-hour [5] | Same as Primary | |
| Particulate Matter (PM-2.5) | 15.0 µg/ m$^3$ | Annual [6] (Arithmetic Average) | Same as Primary | |
| | 35 µg/ m$^3$ | 24-hour [7] | Same as Primary | |
| Ozone | 0.075 ppm (2008 std) | 8-hour [8] | Same as Primary | |
| | 0.08 ppm (1997 std) | 8-hour [9] | Same as Primary | |
| | 0.12 ppm | 1-hour [10] | Same as Primary | |
| Sulfur Dioxide | 0.03 ppm | Annual (Arithmetic Average) | Same as Primary | |
| | 0.14 ppm | 24-hour [1] | 0.5 ppm | 3-hour [1] |
| | 75 ppb [11] | 1-hour | None | |

(1) Not to be exceeded more than once per year.

(2) Final rule signed October 15, 2008.

(3) The official level of the annual NO2 standard is 0.053 parts per million (ppm), equal to 53 parts per billion (ppb), which is shown here for the purpose of clearer comparison to the 1-hour standard

(4) To attain this standard, the 3-year average of the 98th percentile of the daily maximum 1-hour average at each monitor within an area must not exceed 100 ppb (effective January 22, 2010).

(5) Not to be exceeded more than once per year on average over 3 years.

(6) To attain this standard, the 3-year average of the weighted annual mean PM2.5 concentrations from single or multiple community-oriented monitors must not exceed 15.0 micrograms per cubic meter (μg/m3).

(7) To attain this standard, the 3-year average of the 98th percentile of 24-hour concentrations at each population-oriented monitor within an area must not exceed 35 μg/m3 (effective December 17, 2006).

(8) To attain this standard, the 3-year average of the fourth-highest daily maximum 8-hour average ozone concentrations measured at each monitor within an area over each year must not exceed 0.075 ppm. (effective May 27, 2008)

(9) (a) To attain this standard, the 3-year average of the fourth-highest daily maximum 8-hour average ozone concentrations measured at each monitor within an area over each year must not exceed 0.08 ppm.

(b) The 1997 standard (std)—and the implementation rules for that standard—would remain in place for implementation purposes as USEPA undertakes rulemaking to address the transition from the 1997 ozone standard to the 2008 ozone standard.

(c)USEPA is in the process of reconsidering these standards (set in March 2008).

(10) (a) USEPA revoked the 1-hour ozone standard in all areas, although some areas have continuing obligations under that standard ("anti-backsliding").

(b) The standard is attained when the expected number of days per calendar year with maximum hourly average concentrations above 0.12 ppm is < 1.

(11) (a) Final rule signed June 2, 2010. To attain this standard, the 3-year average of the 99th percentile of the daily maximum 1- hour average at each monitor within an area must not exceed 75 ppb.

Areas that do not meet these NAAQS standards are called non-attainment areas; areas that meet both primary and secondary standards are known as attainment areas. The Federal Conformity Final Rule (40 CFR Parts 51 and 93) specifies criteria and requirements for conformity determinations of federal projects. The Federal Conformity Rule was first promulgated in 1993 by the USEPA, following the passage of Amendments to the Clean Air Act (CAA) in 1990. The rule mandates that a conformity analysis be performed when a federal action generates air pollutants in a region that has been designated a non-attainment or maintenance area for one or more NAAQS.

A conformity analysis is the process used to determine whether a federal action meets the requirements of the General Conformity Rule. It requires that the responsible federal agency evaluate the nature of a proposed action and associated air pollutant emissions and calculates emissions that may result from the implementation of the federal action. If the emissions exceed established limits, known as *de minimis* thresholds, the proponent is required to perform a conformity determination and implement appropriate mitigation measures to reduce air emissions.

A description of the current and potential activities under the Proposed Action Alternatives 1 and 2, a discussion of General Conformity Rule analysis, and an evaluation of impacts to air quality from construction and operations for the Proposed Action Alternatives 1 and 2 on the affected counties are discussed below.

### 2.12.1  Affected Environment

*Proposed Action Alternative 1: Harris County*

Harris County is designated as an attainment area for all criteria pollutants under the CAA, with the exception of the 8-hour ozone standard. The county is listed as marginal non-attainment for the 8-hour ozone standard.

*Proposed Action Alternative 2: Montgomery County*

Montgomery County has been designated non-attainment for USEPA's health-based standards for 8-hour ozone pollution (marginal) (USEPA 2015b). The county is in attainment for all other criteria pollutants.

## 2.12.2  Environmental Consequences

**Construction Activities**

Construction activities often cause fugitive dust emissions that may have a temporary impact on local air quality. Emissions during building construction are associated with land clearing, ground excavation, grading, and the construction of the building itself.  Dust emissions may vary substantially from day to day, depending upon the level of activity, specific type of activity, and weather conditions. The quantity of dust emissions from construction operations is proportional to the area of land where the activity is taking place, as well as the level of construction activity.

**Operational Activities**

Air emissions during operations of the facilities for the Proposed Action Alternative 1 or 2 would also occur from transportation of commuting workers, processing of persons, delivery trucks, visitors to the proposed detention center, heating boilers, and testing and maintenance of the emergency generator as well as running the generator for back-up power in emergency situations. Emissions from automobiles for residents, staff, and visitors were estimated using the USEPA's preferred on-road vehicle emission model MOVES2014a.

### 2.12.2.1          No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility.  There may be minor, adverse temporary impacts to air quality as a result of the No Action Alternative.

### 2.12.2.2          Proposed Action Alternative 1

Under the Proposed Action Alternative 1 air pollution emissions would be generated during the construction/renovations/expansion/operation of the HPC by:

- Temporary use of construction vehicles and equipment during the construction of the proposed detention center;
- emissions from worker commuting vehicles;
- emissions from supply vehicles;
- emissions from the vehicles of visitors to the proposed detention center;
- emissions from heating boilers located at the facility; and
- regular testing and maintenance of the emergency generator as well as operation of the generator for back-up power in emergency situations.

During construction and/or renovations, reasonable steps would be taken to reduce the likelihood or airborne fugitive particulate matter (PM) emissions – which are anticipated to be very minor since the majority of the existing facility is already paved over and because clearing and grading is the main contributor to fugitive dust and PM emissions. The HPC has a Texas Department of Licensing issued certificate of operation for six gas-fired boilers that are used for production of the facility's hot water. The certificates were issued at staggered times from

62

2013 through 2015, are valid for a period of three years, and would be re-inspected and/or relicensed by the Contractor as long as they are in operation. The emissions for the boilers are below the level that requires an air permit from the TCEQ.

The existing detention facility uses HVAC units for heating and cooling and boilers for hot water.  The boiler emission levels are below the level that requires a TCEQ permit. Two diesel-powered emergency generators are run for one hour per month in order to maintain operational conditioning. The emergency generators do not require a permit from the TCEQ for emissions because they are used for emergency situations only.

Under Proposed Action Alternative 1, there would be no significant increase in emissions of air pollutants.  There would be no change in the use of the generators which already provide emergency power to the entire facility. This equipment would continue to be operated by knowledgeable staff in accordance with applicable regulations. There would be no significant increase in emissions from this equipment or traffic associated with Proposed Action Alternative 1.

In addition, the Proposed Action Alternative 1 would be consistent with the General Conformity rule of the CAA, which is applicable because the facility is located in Harris County, an ozone non-attainment area. The air emissions would not change significantly from the Proposed Action Alternative 1 because no air emission sources would change substantially from the No Action Alternative (Jamie Vech, TCEQ, personal communication, 2016). The minor increases in emissions from the operation of the facility would be well under the *de minimis* levels that trigger a conformity determination. The operator of the facility has sent a letter to the TCEQ to confirm this determination, but a response has not been received as of the date of this EA.  Thus, the Proposed Action Alternative 1 would have minor, adverse temporary impacts to air quality (dust), would be compliant with the CAA, and all emissions would be below the Federal *de minimis* standard.

### 2.12.2.3    *Proposed Action Alternative 2*

Under the Proposed Action Alternative 2 air pollution emissions would be generated by:

- Temporary use of construction vehicles and equipment during the construction of the proposed detention center;
- fugitive dust emissions from ground disturbance during construction;
- emissions from worker commuting vehicles;
- emissions from supply vehicles;
- emissions from the vehicles of visitors to the proposed detention center;
- emissions from heating boilers located at the facility; and
- regular testing and maintenance of the emergency generator as well as running the generator for back-up power in emergency situations.

During construction activities, reasonable steps would be taken to reduce the likelihood of airborne fugitive PM emissions and are discussed in the Mitigation and BMPs section below.

Because the parcel of land for the proposed detention center is located in Montgomery County, a nonattainment area for ozone, and because the Proposed Action Alternative 2 consists of new construction in a county where the

existing parcel is undeveloped, emissions calculations were performed to determine if emissions would be under the *de minimis* levels set by the USEPA and in accordance with the General Conformity Rule.

Uncontrolled fugitive dust emissions were estimated using an emission factor of 0.19 ton per ac per month for PM-10 as presented in USEPA 450-R-99-001 "*Estimating Particulate Matter Emissions From Construction Operations: Final Report.*" A multiplier of 0.15 to PM-10 was employed to estimate the corresponding uncontrolled PM-2.5 emissions.

Combustion emissions from typical construction equipment were estimated using USEPA's NONROAD2008a, which has been incorporated into the USEPA's Mobile Vehicle Emission Simulator (MOVES) model. MOVES2014a is USEPA's preferred model for estimating mobile source emissions and was used to calculate emissions related to construction worker's commutes. Details of the air emission calculations are provided in **Appendix F**.

**Table 8** shows the total estimated emissions from proposed construction activities, as compared to the *de minimis* thresholds, for a rolling 12 month period. This includes fugitive dust emissions, construction equipment emissions, and on-road commuter emissions. *De minimis* thresholds are for major sources as defined in 40 CFR Sections 51.165 and 51.166.

**Table 8. Construction Air Emission Estimates**

| Pollutant | Emission Totals (tons/year) | *De Minimis* Thresholds (tons/year) |
|---|---|---|
| Carbon Monoxide (CO) | 14.76 | 250 |
| Volatile Organic Compounds (VOCs) | 2.68 | 100 |
| Nitrogen Oxides (NO$_x$) | 27.31 | 100 |
| PM-10 | 30.13 | 250 |
| PM-2.5 | 5.95 | 250 |
| Sulfur Dioxides (SO$_2$) | 0.04 | 250 |
| Carbon Dioxide Equivalent (CO$_2$e) | 414.69 | 75,000 |

During operation of the proposed detention center, employees are expected to commute from Conroe, and perhaps even the greater Houston area. Delivery trucks and visitors are also expected to arrive from nearby towns. **Table 9** shows estimated mobile source emissions at the proposed detention center for a rolling 12 month period.

**Table 9. New Commuter Activities Air Emission Estimates**

**(Rolling 12 Months)**

| Pollutant | Emission Totals (tons/year) | *De Minimis* Thresholds (tons/year) |
|---|---|---|
| Carbon Monoxide (CO) | 10.02 | 250 |
| Volatile Organic Compounds | 0.29 | 100 |

| Pollutant | Emission Totals (tons/year) | De Minimis Thresholds (tons/year) |
|---|---|---|
| Nitrogen Oxides (NO$_x$) | 1.63 | 100 |
| PM-10 | 0.04 | 250 |
| PM-2.5 | 0.03 | 250 |
| Sulfur Dioxides (SO$_2$) | 0.03 | 250 |
| Carbon Dioxide Equivalent (CO$_2$e) | 1,457.10 | 75,000 |

The proposed detention center is expected to have one 2,500 kW diesel generator to provide backup power. This generator would produce emissions of NO$_x$, CO, VOCs, SO$_2$, and PM during regular testing and emergency operations. Emissions from the generator were estimated using USEPA's AP-42 emissions factors for large stationary diesel engines and are presented in **Table 10**. Hours of operation were based on 30 T.A.C. Section 106.511 that limits maximum annual operating hours for internal combustion engines used only for portable, emergency, and/or standby service.

**Table 10. Emergency Generator Air Emissions Estimates**

| Total Ru8n Time (hrs/yr) | NO$_x$ (tons/year) | VOC (tons/yr) | CO (tons/yr) | PM-10 (tons/yr) | PM2.5 (tons/yr) | SO$_2$ (tons/yr) | CO$_2$ (tons/yr) |
|---|---|---|---|---|---|---|---|
| 876 | 35.24 | 1.10 | 8.08 | 0.59 | 0.57 | 3.56 | 1,703.37 |

Three natural gas fired commercial boilers would be located at the facility, each with a heat input capacity of 3 million British thermal units per hour. These boilers are equipped with low NO$_x$ burners. Two boilers would operate continuously while the third boiler functions as a standby unit to substitute for one of the other two during a maintenance outage. However, in order to estimate the potential to emit (PTE) it was assumed that all three boilers would operate continuously for a rolling 12 month period. The PTE was estimated using USEPA's AP-42 emissions factors for natural gas combustion and are presented in **Table 11**.

**Table 11. Natural Gas Boilers Air Emissions Estimates**

| Total Run Time (hrs/yr) | NO$_x$ (tons/year) | VOC (tons/yr) | CO (tons/yr) | PM-10 (tons/yr) | PM2.5 (tons/yr) | SO$_2$ (tons/yr) | CO$_2$ (tons/yr) |
|---|---|---|---|---|---|---|---|
| 8,760 | 1.93 | 0.21 | 3.25 | 0.29 | 0.29 | 0.02 | 4,637.65 |

## Total Emissions

As shown below in **Table 12**, the estimated emissions for the Proposed Action Alternative 2 would be below the *de minimis* levels as required by the USEPA and would be consistent with the General Conformity Rule under the CAA. As such, no further study of the impacts of the air emissions was performed for the Proposed Action Alternative 2. A negligible increase in air emissions would result from the Proposed Action Alternative 2, but should not generate concentrations greater than those sanctioned by the NAAQS. Therefore, construction of a new

facility under the Proposed Action Alternative 2 would have minor, adverse temporary (from construction) and long-term (from operation) impacts to air quality, would be compliant with the CAA, and would be below the Federal *de minimis* standard.

**Table 12. Annual Estimated Criteria Pollutant Emissions**

| Year | Pollutant | Emission Totals (tons/year) | *De Minimis* Thresholds (tons/year) |
|------|-----------|------------------------------|--------------------------------------|
| During Construction | Carbon Monoxide (CO) | 14.76 | 250 |
| | Volatile Organic Compounds | 2.68 | 100 |
| | Nitrogen Oxides (NO$_x$) | 27.31 | 100 |
| | PM-10 | 30.13 | 250 |
| | PM-2.5 | 5.95 | 250 |
| | Sulfur Dioxides (SO$_2$) | 0.04 | 250 |
| | Carbon Dioxide Equivalent | 414.69 | 75,000 |
| During Operations | Carbon Monoxide (CO) | 21.34 | 250 |
| | Volatile Organic Compounds | 1.60 | 100 |
| | Nitrogen Oxides (NO$_x$) | 38.81 | 100 |
| | PM-10 | 0.92 | 250 |
| | PM-2.5 | 0.89 | 250 |
| | Sulfur Dioxides (SO$_2$) | 3.61 | 250 |
| | Carbon Dioxide Equivalent | 7,798.11 | 75,000 |

### 2.12.3  Mitigation and BMPs

No mitigation measures are warranted for the No Action Alternative. Precautions taken during construction activities for both the Proposed Action Alternatives 1 and 2 to reduce the likelihood of airborne fugitive PM emissions, and to limit fugitive dust impacts to temporary, minimal health or environmental effects may include a number of air quality best management practices, including the following:

- Watering down active construction areas to reduce fugitive dust emissions;
- Stabilizing exposed or graded areas as soon as possible upon completion of grading;
- Properly covering trucks hauling fill material or maintaining at least two feet of free-board;
- Limiting truck speeds on unpaved areas of the site to 15 miles per hour or less;
- Grading sites in phases, thereby limiting the time that disturbed soil is exposed; and
- Temporarily halting construction activities when winds exceed 25 miles per hour.

## 2.13  Greenhouse Gas and Climate Change

Greenhouse Gases (GHG) are gases in the lower atmosphere that absorb infrared radiation emitted from the earth's surface and then radiate most of this energy back to the earth's surface, allowing average atmospheric temperatures to be about 60°F warmer than they would otherwise be (USEPA 2014c). As concentrations of GHGs have increased over the past century, average global temperatures have increased as well. However, concentrations of naturally occurring GHGs have remained relatively constant for thousands of years, while

concentrations of anthropogenic (human-generated) GHGs have sharply increased in the last 300 years. The primary sources of increased anthropogenic GHG emissions are the burning of fossil fuels (contributing more than 50 percent of global anthropogenic GHG emissions) and deforestation (contributing almost 20 percent of global anthropogenic GHG emissions) (IPCC 2007).

USEPA has issued a finding that the changes in our climate caused by increased concentrations of atmospheric greenhouse gas emissions endanger public health and welfare. Adverse health effects and other impacts caused by elevated atmospheric concentrations of greenhouse gas occur via climate change. The effects of climate change observed to date and projected to occur in the future include more frequent and intense heat waves, more severe wildfires, degraded air quality, and more heavy downpours and flooding (CEQ 2016).

<u>Regulations and Guidance</u>

In response to these challenges, the TCEQ has promulgated Rule §116.164(b) in the T.A.C., which requires GHG emissions to be subject to Prevention of Significant Deterioration review under certain conditions. The rule requires that non-major new stationary sources or existing stationary sources that undertake a physical change or change in the method of operations that includes emissions of GHGs are not required to obtain authorization from TCEQ for construction or change in method of operation. However, owners or operators of these sources must keep records sufficient to demonstrate the amount of emissions of GHGs from the source as a result of construction, a physical change or a change in method of operation. Records must be made available at the request of personnel from the commission or any local air pollution control agency having jurisdiction. Records must be maintained for a minimum of five years from the date of the construction, physical change, or change in method of operation.

The GHG covered by the TCEQ and USEPA regulations are $CO_2$, $CH_4$, $N_2O$, HFC, perfluorocarbons, and sulfur hexafluoride. These GHG have varying heat-trapping abilities and atmospheric lifetimes. $CO_2$ equivalency ($CO_2e$) is a measuring methodology used to compare the heat-trapping impact from various GHG relative to $CO_2$. Some gases have a greater global warming potential than others. Nitrous oxides (NOx), for instance, have a global warming potential that is 310 times greater than an equivalent amount of $CO_2$, and $CH_4$ has a global warming potential 21 times greater than an equivalent amount of $CO_2$.

The CEQ has issued "Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews" on August 1, 2016. The CEQ guidance states that agencies should consider:
"(1) The potential effects of a proposed action on climate change as indicated by assessing GHG emissions (e.g., to include, where applicable, carbon sequestration); and, (2) The effects of climate change on a proposed action and its environmental impacts."

ICE believes that the CEQ guidance and TAC §116.164(b) provide a useful benchmark from which GHG emissions can be analyzed.

### 2.13.1  Affected Environment

*Proposed Action Alternative 1: City of Houston*

The HPC currently contributes minor sources of GHG emissions. These include personal staff vehicles, security vehicles, detainee transport buses, HVAC equipment, six gas-fired boilers, and emergency generators. The facility's electrical use could also be considered an indirect source of GHG because the electricity is largely generated from fossil fuels, albeit those burned by other companies. The facility is not considered a major source of GHG or non-GHG emissions. The location of the HPC is located in an area that is not considered vulnerable to climate change. The facility is not located within the 500 year flood plain nor is it likely to be vulnerable to sea level rise.

*Proposed Action Alternative 2: City of Conroe*

The parcel of land to be used for the construction of the detention center under the Proposed Action Alternative 2 is cleared and currently does not contribute any GHG emissions to the surrounding area. In addition, the parcel is located in an area that is not considered vulnerable to specific effects of climate change, such as increasing sea level or other ecological change.

### 2.13.2 Environmental Consequences

#### 2.13.2.1    *No Action Alternative*

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. Thus, there would be no change to the GHG emission levels currently emitted by the HPC or the cleared parcel of land. There may be minor, adverse temporary impacts to GHG as a result of the No Action Alternative in the event that detainees at the HPC need to be transported to another facility if the bridge contract expires.

#### 2.13.2.2    *Proposed Action Alternative 1*

The Proposed Action Alternative 1 would not significantly affect GHG emissions, non-GHG emissions, or climate change because only minor renovations/expansion/alterations would occur at the facility. Emissions from vehicular traffic, boilers, and use of emergency generators would not significantly increase as a result of the Proposed Action Alternative 1. However, during construction, the facility may experience a slight temporary increase in construction/operations vehicle traffic and subsequent GHG emissions.

The facility has recently completed energy savings and GHG emission reductions through a number of facility wide initiatives. Since 2013, 23 HVAC units and two boilers were replaced at the facility with more energy efficient units. In the future as HVAC units wear out, the units would be replaced by more energy efficient models. The facility also has planned a future LED lighting audit, during which some or all lighting at the facility would be switched to LED lighting to reduce electrical use and therefore GHG emissions. As a result of these energy efficient upgrades, future direct and indirect GHG emissions are likely to remain near current levels, or decrease even with the increase in facility capacity.

ICE did not quantify GHG emissions from Proposed Alternative 1 because they would be nearly identical to the No Action Alternative. In addition, future HVAC and lighting upgrades could potentially lower GHG emissions below their current level. Without the results from the future LED lighting audit, ICE would be unable to make a reasonable estimate of future GHG emissions. Since the facility is currently and would continue to be a minor stationary source of GHG emissions, ICE would also conform to the TCEQ regulations on prevention of significant deterioration applicability for GHG sources according to Rule §116.164 in the TAC.

68

The effects of climate change on the Proposed Action Alternative 1 would be minor, adverse temporary and would not impact the facility's operations. Although climate change would likely cause an increase in heatwaves and rain downpours in the area, the facility and the surrounding areas infrastructure would be able to handle the impacts. The facility has already upgraded its stormwater drainage system and would be able to handle heatwaves through regular HVAC upgrades if necessary. The facility's location is not vulnerable to wildfires or sea level rise.

### 2.13.2.3        *Proposed Action Alternative 2*

Under the Proposed Action Alternative 2, GHG emissions would be both (temporary generated during construction activities) and annual (recurring from operation of the detention center).

Construction

Emissions during building construction are associated with land clearing, ground excavation, grading, and the construction of the building itself.  As previously referenced in **Table 8**, Section 2.12.2.3, GHG emissions from construction activity are estimated to be 414.69 tons/year of $CO_2$e.

Operations

GHG emissions during operation of the proposed detention center would also occur from transportation of commuting workers, processing of persons, delivery trucks, visitors to the proposed detention center, heating boilers, and testing and maintenance of the emergency generator as well as running the generator for back-up power in emergency situations. Employees of the detention center are expected to commute from Conroe, and perhaps even the greater Houston area. Delivery trucks and visitors are also expected to arrive from nearby towns. The proposed detention center is expected to have one 2,500 kW diesel generator to provide backup power.  This generator would produce GHG emissions during regular testing and emergency operations. Three natural gasfired commercial boilers would be located at the facility, each with a heat input capacity of 3 MBTU per hour. As previously referenced in **Table 12**, Section 2.12.2.3 GHG emissions from operational activities are estimated to be 7,798.11 tons/year of $CO_2$e. This is well below what the USEPA considers the *de minimis* threshold for a major stationary source of emissions. As a non-major new stationary source, ICE would also conform to the TCEQ regulations on prevention of significant deterioration applicability for greenhouse gases sources according to rule §116.164 in the TAC.

During operations, the facility would continue to improve its environmental, transportation, and energy-related activities in support of its missions through sustainability and greening practices, to the greatest extent practicable.

The proposed detention center would be constructed to meet the LEED silver level of certification. In accordance with EO 13693 "Planning for Federal Sustainability in the Next Decade," ICE would incorporate practices in an environmentally, economically, and fiscally sound, integrated, continuously improving, efficient and sustainable manner in support of their mission. The vendor for the proposed detention center implements general practices throughout the organization for similar projects to: 1) improve energy efficiency and reduce GHG emissions, 2) implement renewable energy projects, 3) reduce water consumption, 4) incorporate sustainable environmental practices such as recycling and the purchase of recycled-content products, and 5) reduce the quantity of toxic and hazardous materials used and disposed.

69

Additionally, the proposed facility construction would comply with the Guiding Principles for Federal Leadership in High Performance and Sustainable Buildings set forth in the Federal Leadership in High Performance and Sustainable Memorandum of Understanding. The vendor would also reduce total consumption of petroleum products, as set forth in the executive order, and use environmentally sound practices with respect to the purchase and disposition of electronic equipment.

The effects of climate change on the Proposed Action Alternative 2 would be minimal and would not impact the facility's operations. Although climate change would likely cause an increase in heatwaves and rain downpours in the area, the facility would be able to handle the impacts. The facility would be constructed with onsite stormwater drainage ponds and would be designed and operated to minimize GHG emissions. The facility's location is not vulnerable to wildfires or sea level rise. Therefore, minor adverse temporary impacts to GHG emissions and climate change would occur under the Proposed Action Alternative 2, but GHG emissions would be below the CEQ reporting threshold. Minor, beneficial long-term impacts would likely be realized from the incorporation of sustainable practices, materials, and design under the Proposed Action Alternative 2.

### 2.13.3  Mitigation and BMPs

No mitigation measures are warranted for either the Proposed Action Alternatives or the No Action Alternative.

## 2.14   Noise

Noise is generally described as unwanted sound, which can be based either on objective effects (i.e., hearing loss, damage to structures, etc.) or subjective judgments (e.g., community annoyance).  Sound is usually represented on a logarithmic scale with a unit called the decibel (dB).  Sound on the decibel scale is referred to as sound level. The threshold of human hearing is approximately 3 dB, and the threshold of discomfort or pain is around 120 dB. The A-weighted decibel (dBA) is a measurement of sound pressure adjusted to conform to the frequency response of the human ear.  The dBA metric is most commonly used for the measurement of environmental and industrial noise.

Noise levels occurring at night generally produce a greater annoyance than do the same levels occurring during the day. In general, people tend to perceive intrusive noise at night as being approximately 10 dBA louder than the same level of intrusive noise during the day, at least in terms of its potential for causing community annoyance. This perception is largely because background environmental sound levels at night in most areas are also about 10 dBA lower than those during the day.

Long-term noise levels are computed over a 24-hour period and adjusted for nighttime annoyances to produce the day-night average sound level (DNL).  DNL is the community noise metric recommended by the USEPA and has been adopted by most federal agencies (USEPA 1974). A DNL of 65 dBA is the level most commonly used for noise planning purposes and represents a compromise between community impact and the need for activities like construction.

Sensitive noise receptors are generally humans engaged in noise sensitive activities, such as sleeping, convalescing, or studying, or land uses such as residential dwellings, hotels, motels, hospitals, nursing homes, education facilities, and libraries. Noise-sensitive receptors may also include noise-sensitive animal species that

are nesting or breeding, or species habitat. Commercial, office, and industrial land uses are not considered noise sensitive by most definitions.

### 2.14.1  Affected Environment

Construction and renovation activities for either the Proposed Action Alternatives 1 or 2 would require the use of common construction equipment. Anticipated sound levels at 50 feet from various types of construction equipment range from 76 dBA to 84 dBA, based on data from the FHWA (2007). In addition, **Table 13** presents noise emission levels for construction equipment expected to be used during construction activities at the Proposed Action Alternative 1 and 2 sites.

**Table 13. A-Weighted (DBA) Sound Levels of Construction Equipment and Modeled Attenuation at Various Distances[1]**

| NOISE SOURCE | 50 Feet | 100 feet | 200 feet | 500 feet | 1,000 feet |
|---|---|---|---|---|---|
| Backhoe | 78 | 72 | 66 | 58 | 51 |
| Crane | 81 | 75 | 69 | 61 | 54 |
| Dump Truck | 76 | 70 | 64 | 56 | 49 |
| Excavator | 81 | 75 | 69 | 61 | 54 |
| Concrete mixer truck | 79 | 73 | 67 | 59 | 52 |
| Bulldozer | 84 | 78 | 72 | 64 | 57 |
| Front-end loader | 82 | 76 | 70 | 62 | 55 |

Source: FHWA 2006. "Highway Construction Noise Handbook"
[1]The dBA at 50 feet is a measured noise emission. The 100- to 1,000-foot results are modeled estimates.

*Proposed Action Alternative 1: City of Houston*

The City of Houston has adopted a noise ordinance to prevent disturbing and unnecessary noise. In addition to the Ordinance's prohibition on general noise disturbance, there are specific noise levels permitted depending on the land use. For non-residential properties such as the HPC, noise levels may not exceed 68 dBA at the property line. During construction, noise levels cannot exceed 85 dBA and the standard construction noise levels are limited to the hours between 7 a.m. and 8 p.m.

*Proposed Action Alternative 2: City of Conroe*

No specific noise ordinances exist in the city of Conroe that would be applicable to the Proposed Action Alternative 2.

### 2.14.2  Environmental Consequences

#### 2.14.2.1        No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. There would be negligible adverse noise impacts from the No Action Alternative and no change would occur in the noise environment from current conditions.

#### 2.14.2.2        Proposed Action Alternative 1

71

Supp. App. 1711

The Proposed Action Alternative 1 would involve continued operation of an existing facility which would result in low levels of noise due to traffic and routine operations. The proposed construction would increase noise levels temporarily and would be conducted in accordance with the City's Noise Ordinance. Since most of the construction activity would be renovations and additions to buildings, the use of heavy machinery would be limited as compared to a typical construction site. The closest sensitive receptors are the residences to the east of the facility. The closest residence is approximately 100 feet from the edge of the facility. This would allow for only minor amount of construction noise to dissipate if it occurred alongside the shared property line. Construction operations that were to occur near the property line would need to be in compliance with the City of Houston's noise ordnance of 85 dBA for construction activities. The detention center and residences have been neighbors for more than 30 years so it is anticipated that no adverse noise impacts with routine facility operations and the minor construction activities proposed. The facility would continue to follow the requirements of the Houston Noise Ordinance. Thus, there would be negligible adverse noise impacts from the Proposed Action Alternative 1 because construction and operations would follow the City's noise ordinance.

### 2.14.2.3        *Proposed Action Alternative 2*

Construction activities associated with the Proposed Action Alternative 2 would temporarily increase environmental noise levels in the area. These activities would involve the use of heavy equipment, such as backhoes, bulldozers, and excavators, which typically generate noise levels of 85 to 100 dBA at the source. Noise levels dissipate as the distance from the noise source increases; this is known as attenuation. **Table 13** illustrates the noise level attenuation of various construction equipment at various distances based on a study by the FHWA.

There is residential housing approximately 650 feet to the east of the project area (east of Stewart Creek), and commercial businesses exist in the project vicinity. All areas within 500 feet of the project corridor would not experience noise levels exceeding 65 dBA. The construction activities would be expected to create temporary noise impacts above 65 dBA within 500 feet of the project corridor. Noise generated by the construction activities would be intermittent and last for approximately 16 months, after which noise levels would return to ambient levels. Stewarts Creek and all forested bottomland riparian areas and forested bottomland floodplain area would remain undeveloped under the Proposed Action Alternative 2, therefore federally or state listed species are not expected to be affected by a temporary minor increase in noise related to construction activity. Due to the relatively small size of available suitable habitat, common avian species and small to medium sized mammals in the area are expected to be transitory in nature, and would not likely experience a long term exposure to noise levels that would disrupt successful nesting, denning or breeding behavior. Furthermore, noise impacts from the facility would be limited to inside the fence and generator testing.

Due to the lack of sensitive receptors in the area and for the reasons discussed above, noise impacts from construction activities would be considered minor and temporary and there would be negligible adverse impacts to receptors in the area from noise under the Proposed Action Alternative 2. Noise measurements were not performed as part of this evaluation due to the lack of sensitive receptors, and the fact that the noise environment should not change with the operation of the detention center as part of the Proposed Action Alternative 2.

### 2.14.3  Mitigation and BMPs

For the Proposed Action Alternative 1, noise from construction activities could not exceed the City Noise Ordinance of 85 dBA. Activities that generate over 85 dBA would be uncommon for renovations and minor

Supp. App. 1712

additions to the facility but could occur on a temporary basis. Sound mitigation measures may be necessary if construction activity was to occur near the property boundary.

## CUMULATIVE AND INDIRECT IMPACTS

This section of the EA addresses the potential cumulative impacts associated with implementation of the Proposed Action Alternatives with other projects/programs that are planned for the region. The CEQ defines a cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions regardless of what agency (federal or non-federal) or person undertakes such other actions (40 CFR 1508.7)." This section continues, "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."

This section presents an analysis of the potential cumulative impacts from past, present, and reasonably foreseeable future projects known at the time this EA was prepared, regardless of the project's sponsor. For the purposes of this analysis, ICE has defined the ROI for the evaluation of cumulative impacts and evaluation of projects that could contribute to cumulative impacts in the area to encompass both sites (located approximately 28 miles apart).

As previously stated, both projected locations are located within the greater Houston metropolitan area and the evaluation of reasonably foreseeable future projects was taken in the context of the general growth of the Houston metropolitan area. Even with the recent decline in oil prices, metro Houston remains the fastest growing region of the nation adding approximately 159,000 residents between July 1, 2014 and July 1, 2015 according to the U.S. Census Bureau. This includes adding 40,032 residents to the city of Houston between July 1, 2014 and July 1, 2015. The U.S. Census Bureau also estimates that the city of Conroe's 2015 population to be 68,602 residents – which is an increase of approximately 12,395 residents from the 2010 census population of 56,207. Forecasts predict that the Houston metropolitan area will remain one of the fastest growing regions of the country because of continued strong job growth. As a result of this population and job growth, upgrades to the infrastructure in the city of Houston and the surrounding area, along with new developments, are occurring on an ongoing basis. Construction and upgrading the area's infrastructure is expected to cause short-term impacts to air quality and traffic congestion. The long term impacts from infrastructure development will depend on how the state and local governments address the impacts from continued population and job growth. Predicting where development will occur in metro Houston is difficult because of relaxed zoning restrictions in the area compared to other metropolitan regions.

During the drafting of this EA, ICE reviewed projects that were identified in strategic planning documents and other infrastructure-related development sources to identify existing and planned projects in both the area of Houston where the processing center is located and the city of Conroe as a whole. Based upon these reviews, ICE identified two specific infrastructure projects that were near the existing HPC. One large development was identified in Conroe, TX near the location of Proposed Action Alternative 2.  Though other development may and likely will occur, only these two projects are far enough along in the planning process to provide a reasonable certainty of their impacts.

73

The projects near the existing HPC include the proposed widening and drainage improvements along Greens Road, which is scheduled to begin in 2017 and the World Houston Business Center Park expansion. The city of Houston has programmed improvements to Greens Road from U.S. Route 59 to JFK Boulevard, which includes the area where the facility is located.  According to the City's 2016-2020 Capital Improvement Plan, the construction is planned for 2017 and would include additional right-of-way, widening to 4 lanes, curb and gutter, underground utility re-location, street lighting, and drainage improvements – the project would have an overall positive impact. The World Houston Business Center Park planned expansion was made possible by the City selling additional property to the World Houston Business Partners, which indicates the City's support and backing for the continued growth of the business park. The World Houston Business Center Park expansion would increase traffic and development in the area to the west of the HPC. The improvements would be designed and constructed in accordance with all infrastructure and building plan requirements of the City of Houston.

The project identified in Conroe, TX near the Proposed Action Alternative 2 is the Grand Central Park development. This development will occur on the southwest edge of Conroe, TX and will occupy 2,046 acres. The development is being constructed via a phased approach, with phase I currently in active construction. Conceptual plans for additional phases are still in preliminary development and a planned construction start date has not yet been determined. The development calls for a mixture of offices, housing, and retail and will preserve a large portion of the property as open parkland. The project would have an overall positive impact on the community and attract more jobs, housing, and retail to the area.  The Grand Central Park development would increase traffic and development in the area throughout much of Conroe, TX, but would be located approximately 4.5 miles southwest of the Proposed Action Alternative 2.

## 3.1 No Action Alternative

Under the No Action Alternative, there would be no construction/renovations/alterations to the HPC and no construction of a new facility. Subsequently, no adverse cumulative or indirect impacts would occur to the current condition of the natural environment. In addition, the No Action Alternative would not contribute any beneficial impacts to the socio-economic environment from the increase in local employment or tax revenue from the expansion to the HPC or the construction of a new detention center.

## 3.2 Proposed Action Alternative 1

The area surrounding the HPC is predominantly industrial and commercial in nature with a well-developed transportation and infrastructure network, and the facility is similar to other development in the area. The proposed site plan and any stormwater drainage improvements would be completed in a manner that was compatible with the proposed drainage and stormwater improvements along Greens Road. In addition, the Proposed Action Alternative 1 would not contribute to any cumulative adverse impacts to natural or cultural resources because it would not cause any new development in the area beyond the existing facility footprint. Because the World Houston Business Center Park's development has been planned into the City's growth, infrastructure, and land use, the proposed renovations and new construction would not contribute adverse cumulative impacts. Furthermore, the Proposed Action Alternative 1 would result in only minor increases in water consumption, sewage flow, traffic, air emissions, and noise at the facility and would not increase the likelihood of cumulative impacts in the area when added to other past, present, and reasonably foreseeable actions and developments described above. Houston Intercontinental Airport has operated in the area since 1969 and generates a large quantity of noise. However, because the renovations/construction would produce only minor,

adverse temporary noise impacts, the combination of noise from the facility and the airport would result in negligible cumulative impacts. The Proposed Action Alternative 1 would have beneficial impacts upon socio-economic resources in the region, through the continuation of and slightly increased demand for goods and services in the community for the construction of the facility and with the addition of staff for the expanded facility.

## 3.3 Proposed Action Alternative 2

The area surrounding the plot of land proposed under the Proposed Action Alternative 2 contains prison facilities and undeveloped land where there are no currently planned activities that would change the patterns of regional development or introduce inconsistencies with local land use plans. Therefore the construction of the detention center under the Proposed Action Alternative 2 would not contribute to the potential for cumulative impacts to the area. The Grand Central Park development discussed above would not contribute to increased adverse impacts to geology/soils, hydrology/water resources, biological resources, cultural/historic resources, hazardous materials and waste, social environment and environmental justice, land use, utilities and infrastructure, air quality, GHG and climate change, or noise in close proximity to the proposed parcel. Traffic in Conroe, TX is likely to increase with the Grand Central Park Place development, but it could also provide local housing and retail options for employees of the proposed detention center. Secondary expenditures for goods and services associated with the employees at the proposed detention center and service of proposed detention center and equipment would also be a beneficial effect for the community. Additional beneficial cumulative impacts would occur from the increase in jobs and services to the area, as well as tax revenue.  No residences or businesses would be displaced, and compared to other reasonably foreseeable development and projects in the immediate surrounding area as the Proposed Action Alternative 2, the cumulative effects are considered to be only a minor benefit. Furthermore, drinking water resources in the City of Conroe are sufficient for the Proposed Action Alternative 2 so the additional water demand from the detention center would not interact with any other development to produce cumulative impacts.


## IRREVERSIBLE AND IRRETRIEVABLE COMMITMENTS OF RESOURCES


An irreversible commitment of resources is defined as the loss of future options. It applies primarily to non-renewable resources, such as minerals or cultural resources, and to those factors that are renewable only over long time spans, such as soil productivity.  Irretrievable commitments represent the loss of production, harvest, or use of renewable resources.  These opportunities are foregone for the period of the proposed action, during which other resource utilization cannot be realized.  These decisions are reversible, but the utilization opportunities foregone are irretrievable.

There is negligible adverse effect on irreversible or irretrievable commitments of resources anticipated as a result of the construction, renovation, and current or future operation of the HPC or the construction of the new detention center because no irreversible or irretrievable resources would be impacted. The award of the contract for either of the Proposed Action Alternative 1 or 2 will not be made until the EA is complete and FONSI signed.

# SUMMARY OF ANTICIPATED IMPACTS, REQUIRED MITIGATION, AND BEST MANAGEMENT PRACTICES

It is Federal policy to mitigate adverse impacts through the sequence of avoidance, minimization, and compensation. Compensation varies, and includes activities such as restoration of habitat in other areas, acquisition of lands, etc., and is typically coordinated with the USFWS and other appropriate federal and state resource agencies. No formal mitigation measures are required for the Proposed Action Alternatives 1 or 2 or the No Action Alternative. Proposed BMPs would be coordinated by the Contractor through the appropriate agencies and construction managers/administrators, as required. **Table 14** below summarizes the potential anticipated impacts and discusses the proposed BMPs for each resource category that are required or recommended.

*Proposed Action Alternative 1:*

The HPC has been operating with the surrounding community since 1984. Only limited construction/expansion/renovation of the existing facility is proposed and, therefore, no significant adverse direct or indirect impacts to the human or natural environment would occur from the Proposed Action Alternative 1. Proper erosion and sediment control and stormwater management measures would be implemented to ensure that no adverse impacts occur. No significant change to water and sewer demand and traffic levels would be created by the Proposed Action Alternative 1. Community services including fire, police, medical, education, and housing are sufficient to support the continuation of facility operations and minor construction/expansion at the HPC under the Proposed Action Alternative 1.

*Proposed Action Alternative 2:*

BMPs would be implemented as standard operating procedures during construction activities, such as proper handling, storage, and/or disposal of hazardous and/or regulated materials. To minimize potential impacts from hazardous and regulated materials, fuels, waste oils, and solvents would be collected and stored in tanks or drums within a secondary containment system that consists of an impervious floor and bermed sidewalls capable of containing the volume of the largest container stored therein. Suitable fencing would be installed around the perimeter of the facility to contain vehicles and people and prevent accidental impacts on soils on adjacent properties. Vehicular traffic associated with the construction activities and operational support activities would remain on established roads to the maximum extent practicable. A SWPPP would be prepared prior to construction activities, and BMPs described in the SWPPP would be implemented to reduce erosion. Furthermore, all areas not immediately developed would be landscaped in such a way as to minimize erosion. In the event any cultural resources are identified during excavation and construction, the Contractor would stop work immediately and notify the Texas SHPO and appropriate THPOs. Furthermore, the Contractor would develop measures to ensure that impacts on traffic flow are minimized would be considered. Additional vehicular entrances, speed zones, traffic signals or signs would be reviewed as measures to ease the impacts of traffic. Finally, the Contractor would coordinate with the City of Conroe to address any traffic or safety impacts associated with the Proposed Action Alternative 2.

Table 14. Resource Areas – Proposed Mitigation and BMPs

| Affected Environment | Anticipated Impacts | Proposed Mitigation and BMPs |
|---|---|---|
| Geology, Soils & Seismicity | There would be negligible adverse impacts under the No Action Alternative or Proposed Action Alternative 1.<br><br>Construction of the detention center as part of the Proposed Action Alternative 2 would permanently impact approximately 24.9 acres of land. Although these impacts are long-term, they would be negligible on a regional scale due to the small amount of soils lost relative to the large quantity of the same soils in the area. | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.<br><br>BMPs would include city approved Erosion and Sediment Control Plan, Stormwater Management Plan and Building Permit, and site specific geotechnical engineering practices for proposed modifications.<br><br>BMPs to reduce the impacts from soil erosion would be utilized during construction, renovation, and expansion activities. |
| Hydrology and Water Resources | There would be negligible adverse impacts under the No Action Alternative.<br><br>There would be minor, adverse long-term impacts from increased stormwater runoff from additional impervious area under the Proposed Action Alternative 1.<br><br>The Proposed Action Alternative 2 would maintain Stewarts Creek and the associated floodplain bottomland forests in an undeveloped condition; therefore negligible impacts to water resources are expected. | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.<br><br>BMPs would include compliance with the Houston Stormwater Quality Management Permit. The Stormwater Quality Management Plan and SWPPPs would be prepared by the contractor as applicable in accordance with the City's requirements and the Texas Pollutant Discharge Elimination System regulations (TPDES). |
| Biological Resources | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action Alternative 1.<br><br>The Proposed Action Alternative 2 would maintain Stewarts Creek and the associated floodplain bottomland forests in an undeveloped condition; the remainder of the site has been historically impacted by logging therefore impacts to other vegetation communities would be minimal. No threatened or endangered species are known to occur on the site therefore negligible adverse impacts to threatened and endangered species are expected. | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.<br><br>No BMPs would be warranted for the Proposed Action Alternative 1.<br><br>BMPs identified by the TPWD as part of the consultation response received on April 26, 2016 would be followed as appropriate with site conditions and as is feasible within the confines of facility construction in accordance with the PBNDS and site security requirements. |
| Cultural Resources and | There would be negligible adverse impacts to historic properties under the | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the |

| Affected Environment | Anticipated Impacts | Proposed Mitigation and BMPs |
|---|---|---|
| Historic Properties | No Action Alternative or the Proposed Action Alternative 1.<br><br>Based on the cultural resources evaluation conducted for the Proposed Action Alternative 2, negligible impacts are anticipated. | No Action Alternative.<br><br>ICE would coordinate with the THC SHPO and THPOs during the course of the project to ensure compliance with Section 106 of the NHPA. In the event any cultural, archaeological, or historic resources are uncovered (e.g. human remains, funerary objects, or other evidence of historical or cultural significance) construction or renovation work would cease and both the THC SHPO and applicable THPOs would be contacted, consulted, and coordinated with. |
| Aesthetics/Visual Impacts | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action Alternative 1.<br><br>Under the Proposed Action Alternative 2, based on the building architecture and surrounding areas (institutional and commercial), negligible adverse impacts are anticipated. | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.<br><br>The design includes heavy trees at the back of the facility (Stewarts Creek) and Hilbig which would block a view of the facility under the Proposed Action Alternative 2. |
| Hazardous Materials and Waste | There would be no increase in the use and disposal of hazardous materials and subsequently negligible adverse impacts are anticipated for both the No Action Alternative and Proposed Action Alternative 1.<br><br>Under the Proposed Action Alternative 2, there is a potential for minor, adverse temporary impacts during construction related to the fuel and construction equipment that would be present at the site. There are no known hazardous materials located on the site. | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.<br><br>BMPs would be implemented as standard operating procedures during all construction activities to minimize impacts. The HPC would continue to comply with its SPCC Plan under the Proposed Action Alternative 1. |
| Social Environment and Environmental Justice | Under the No Action Alternative and the Proposed Action Alternative 1, there would be minor, beneficial long-term impacts to the local economy from continued employment, taxes, and expenditures as a result of the continued operation of the HPC.<br><br>Under the Proposed Action Alternative 2, the construction of the proposed detention | No mitigation or BMPs would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative. |

| Affected Environment | Anticipated Impacts | Proposed Mitigation and BMPs |
|---|---|---|
| | center would result in minor, beneficial long-term impacts on the region's economy from an increase in the hiring of local workers for construction projects, permanent operations, and other related activities associated with goods and services delivered to the detention center. | |
| Human Health and Safety | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action Alternative 1.

Under the Proposed Action Alternative 2, negligible adverse impacts are anticipated. The public service personnel interviewed during the evaluation process indicated that the operation and construction of the detention center would not hinder their ability to provide services to the detention center and the community. | No mitigation or BMPs would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative. |
| Land Use | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action Alternative 1.

The Proposed Action Alternative 2 site land use is compatible with the City's comprehensive plan and the land use of the surrounding area; therefore, there would be negligible adverse impacts on land use in the area. | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.

BMPs under the Proposed Action Alternative 1 would include design and construction for the facility modifications in accordance with the City of Houston Building Plan, Houston Infrastructure Design Manual. In addition, it would include coordination with the FAA and IAH. The facility would coordinate any necessary forms (e.g., Form 7460) for potential navigation obstructions in the Houston Airport Hazard Area. |
| Utilities and Infrastructure | There would be negligible adverse impacts under the No Action Alternative or the Proposed Action Alternative 1 because the facility is currently tied to the existing utilities and infrastructure, and would not materially increase utility demands beyond the present capacity.

Under the Proposed Action Alternative 2, the increase in demand on utilities in the area where the site would be located is within present capacity; therefore, there | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.

BMPs for the Proposed Action Alternative 1 would include any design of water and sewer lines in accordance with the Houston Infrastructure Design Manual and payment of any impact fees to the City of Houston. |

| Affected Environment | Anticipated Impacts | Proposed Mitigation and BMPs |
|---|---|---|
| | would be minor, adverse long-term impacts. | |
| Traffic and Transportation Systems | There would be no significant increases in traffic that would impact traffic and transportation patterns in the area under the No Action Alternative or the Proposed Action Alternative 1. There could be minor, adverse short-term impacts to traffic and transportation under the No Action Alternative. The Proposed Action Alternative 1 would result in negligible impacts to traffic and transportation.<br><br>Adverse impacts on roads and traffic would be minor and long-term. The capacity exists in the current transportation system to accommodate the demand created by the Proposed Action Alternative 2. | No mitigation or BMPs would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative. |
| Air Quality | There may be minor, adverse temporary impacts to air quality as a result of the No Action Alternative in the event that detainees at the HPC need to be transported to another facility.<br><br>Temporary minor adverse impacts on air quality (dust) would occur during construction and renovation activities under the Proposed Action Alternative 1. All emissions would be below the Federal *de minimis* standard.<br><br>Temporary minor adverse impacts on air quality (dust) would occur during construction under the Proposed Action Alternative 2. There would be intermittent temporary minor adverse impacts post development in association with back-up generator testing. All emissions would be below the Federal *de minimis* standard. | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.<br><br>The contractor would obtain a determination of General Conformity from the TCEQ prior to construction for the Proposed Action Alternatives 1 and 2. |
| Greenhouse Gas and Climate Change | Adverse impacts would be minor, temporary and below the CEQ reporting threshold for the No Action Alternative and the Proposed Action Alternative 1.<br><br>Minor, beneficial long-term impacts would likely be realized from the incorporation of sustainable practices, | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.<br><br>BMPs under the Proposed Action Alternative 1 would include operation of the boilers in accordance with the TCEQ air permits and continued implementation |

| Affected Environment | Anticipated Impacts | Proposed Mitigation and BMPs |
|---|---|---|
| | materials, and design under the Proposed Action Alternative 2. | of the facility's energy conservation measures. |
| Noise | There would be negligible adverse impacts to noise as a result of the No Action Alternative.

Minor adverse impacts and temporary increases in noise would occur from construction and renovation activities under the Proposed Action Alternative 1.

Minor, adverse temporary increases in noise would occur during construction of the detention facility under the Proposed Action Alternative 2. Due to lack of sensitive receptors within 500 feet of the proposed construction area, negligible adverse noise impacts are anticipated from construction or operation of the facility. | No mitigation would be warranted for the Proposed Action Alternatives 1 or 2, or the No Action Alternative.

BMPs for the Proposed Action Alternatives 1 and 2 would include compliance with the City of Houston and Conroe's Noise ordinances for construction and operations. |

# REFERENCES CONSULTED IN PREPARING THE EA

## A. Documents

Bleyl & Associates Traffic Impact Analysis Montgomery County Detention Center, September 2013

Bleyl & Associates Drainage Report, Montgomery County Detention Center, May 2013

City of Conroe – Public Works Planning Division. Internet URL: http://www.cityofconroe.org/Public-Works/public-works-department.html

City of Conroe – Fire Department http://www.cityofconroe.org/departments/fire-department-home-page

City of Conroe Floodplain Information. Internet URL: http://www.cityofconroe.org/Public-Works/cd-floodplain/Effective-FIRM-Maps.html

City of Conroe – Police Department http://www.cityofconroe.org/departments/police-department-home-page

Conroe Regional Medical Center http://conroeregional.com/about/meet-our-leadership.dot

Supp. App. 1721

Conroe Detention Center Facility, Montgomery County, Texas April 2013 SEARCH Project Number #2947-13031

Council on Environmental Quality Greenhouse gas Emissions and Climate Change Guidance Document, December 2014

Council on Environmental Quality.  Revised Draft Guidance on the Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Reviews.
https://www.whitehouse.gov/sites/default/files/docs/nepa_revised_draft_ghg_guidance_searchable.pdf.  Last Accessed November 17, 2015.

Consolidated Communications, Angel Mattox, April 2013
Ecoregions of Texas (EPA).  The Encyclopedia of Earth. http://www.eoearth.org/view/article/152207/.  Accessed August 7, 2015.

Federal Emergency Management Agency.  National Flood Hazard Layer Mapper.
http://fema.maps.arcgis.com/home/webmap/viewer.html?webmap=cbe088e7c8704464aa0fc34eb99e7f30.  Last Accessed August 7, 2015.

Fly2houston.  Airport Hazard Regulations. http://fly2houston.com/about-hazard-area-regulations.  Last Accessed November 17, 2015.

Geologic Atlas of Texas, Houston Sheet.  Revised 1982.  The University of Texas at Austin, Bureau of Economic Geology.

Gulf Coast Aquifer.  Texas Water Development Board.
https://www.twdb.texas.gov/groundwater/aquifer/majors/gulf-coast.asp.  Accessed August 6, 2015.

Harris County Flood Control District http://www.hcfcd.org/

Harris-Galveston Subsidence District. http://hgsubsidence.org/  Accessed August 6, 2015

Hydric Soils of Texas.
http://media.swf.usace.army.mil/pubdata/environ/regulatory/other/links/soillinks/hydricsoilslistfortexas.htm
Accessed August 4, 2015.  Fort Worth District Army Corps of Engineers

Houston, Texas – Code of Ordinances.  Supplement 78.  September 25, 2015.
https://www.municode.com/library/tx/houston/codes/code_of_ordinances.  Last Accessed November 17, 2015.

Houston, Texas Department of Public Works. http://www.publicworks.houstontx.gov/home

Houston, Texas On-line Traffic Count Information. http://www.gims.houstontx.gov/trafficcounts/Reports.aspx

Houston, Texas Noise Ordinance. http://www.noisefree.org/cityord/houston.pdf

Supp. App. 1722

Houston, Texas Infrastructure Design Manual. http://edocs.publicworks.houstontx.gov/all-documents/3024-city-of-houston-infrastructure-design-manual.html?path=

Houston Texas Site Development Forms.
http://www.houstontx.gov/planning/Forms/devregs/devsite_plan_req_2012.pdf

Houston Texas Airport Overlay Land Use Regulations. http://www.fly2houston.com/about-land-use-and-regulations

Intergovernmental Panel on Climate Change. 2007 Climate Synthesis Report.
https://www.ipcc.ch/pdf/assessment-report/ar4/syr/ar4_syr_full_report.pdf

Long Star Groundwater Conservation District; Groundwater Management Plan; Re-adopted October 14, 2008
National Park Service.  National Register of Historic Places. http://www.nps.gov/nr/. Last Accessed August 7, 2015.

Southeastern Archaeological Research, Inc., Phase I Cultural Resources Assessment Survey of the Proposed


Terracon Consultants, Inc. Conroe, Texas, Geotechnical Engineering Report - Montgomery County Detention Facility, Hilbig Road, Montgomery County, Texas; April 1, 2013. Terracon Project No. 97135010

Texas Commission on Environmental Quality; Atlas of Texas Surface Waters Maps of the Classified Segments of Texas River and Costal Basin; August 2004

Texas Commission on Environmental Quality.  2012 Texas Integrated Report of Surface Water Quality for Clean Water Act Sections 305(b) and 303(d).  http://www.tceq.state.tx.us/waterquality/assessment/12twqi/twqi12.  Last Accessed November 18, 2015.

Texas Commission on Environmental Quality.  Greenhouse Gas Permitting.
https://www.tceq.texas.gov/permitting/air/guidance/newsourcereview/ghg/ghg-permitting.html.  Last Accessed November 17, 2015.

Texas General Land Office, Texas Coastal Management Program.  Texas Coastal Boundary Map.
http://www.glo.texas.gov/coast/coastal-management/forms/files/CoastalBoundaryMap.pdf.  Last Accessed November 18, 2015.

Texas Historical Commission.  http://www.thc.state.tx.us/.  Last Accessed August 5, 2015.

Texas Parks and Wildlife.  Rare, Threatened, and Endangered Species of Texas by County.
http://tpwd.texas.gov/gis/rtest/.  Last Accessed August 7, 2015.

Texas Secretary of State.  Texas Administrative Code.  http://www.sos.state.tx.us/tac/.  Last Accessed November 18, 2015.Texas Parks and Wildlife Department, the Texas Natural Diversity Database (TXNDD).

US Department of Agriculture Prime Farmland – Texas Criteria; February 2007

Supp. App. 1723

US Department of Agriculture and Soil Conservation Services and Forestry Services; Soil Survey, Montgomery County Texas; October 1972

US Department of Agriculture and Soil Conservation Services and Forestry Services; Supplement to the Soil Survey, Montgomery County Texas; October 1972

U.S. Bureau of Economic Analysis (BEA), 2011, Local Area Personal Income, Internet URL (accessed February 2013):
http://www.bea.gov/iTable/iTable.cfm?ReqID=70&step=1&isuri=1&acrdn=5

U.S. Bureau of Labor Statistics, 2011, Local Area Unemployment Statistics, Labor Force Data by County, 2011 Annual Averages, Internet URL
ftp://ftp.bls.gov/pub/special.requests/la/laucnty11.txt.

U.S. Census Bureau, 2015 http://factfinder2.census.gov/.

U.S. Census Bureau, 2010b, American Community Survey (ACS), 5-Year Estimates, 2009-2013. Internet URL:
http://factfinder2.census.gov/

US Climate Data http://www.usclimatedata.com/climate/conroe/texas/united-states/ustx0286

USEPA 1998, "Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses (1998)." https://www.epa.gov/sites/production/files/2015-04/documents/ej-guidance-nepa-compliance-analyses.pdf

USEPA 2012a, National Ambient Air Quality Standards, Internet URL:
http://www.epa.gov/air/criteria.html

USEPA 2015b, Welcome to the Green Book Nonattainment Areas for Criteria Pollutants
Internet URL: www.epa.gov/oar/oaqps/greenbk.

USEPA, 2013 Clean Air Interstate Rule Internet URL:
http://www.epa.gov/airmarkets/progsregs/cair/tx.html

USFWS, National Wetland Inventory. Internet

USFWS.  IPaC Trust Resource Report.  Accessed August 7, 2015.

USFWS.  National Wetlands Inventory.  Wetlands Mapper.  http://www.fws.gov/wetlands/data/mapper.HTML.
Last Accessed August 7, 2015.

URL: http://www.fws.gov/wetlands/Data/Mapper.html

U.S. Geological Survey (USGS), 1998, Hydrological Atlas, Regional
http://www.epa.gov/airmarkets/progsregs/cair/tx.html

USGS- Texas Geology Web Map Viewer. http://txpub.usgs.gov/dss/texasgeology/.  USGS Texas Water Science Center.  Accessed August 4, 2015.

## B. Personal Communications

(Aebie 2015). Aebie, Timothy AIA, Sr. Director, Project Development. Corrections Corporation of America (CCA), Real Estate Development, August and November 2015.

(Blevins 2015). Blevins, Amber, Research Analysts, Greater Conroe Economic Development Council, September 2015.

(Daugette 2015). Daugette, Bill, Superintendent, City of Conroe Public Works, August 2015.

(Dye 2015). Dye, Andrew, Manager, Site Acquisition, Corrections Corporation of America (CCA).  July and August 2015.

(Gill 2015). Gill, Jodi, Safety Manager. HPC, July 2015.

(Gottfried 2013). Gottfried, Bob, Texas Parks and Wildlife - Wildlife Division, April 2013.

(Hilderbrand 2015). Hilderbrand, Sandy, City of Conroe Development Coordinator, July 2015.

(Horne 2015). Horne, Lindsay. Maintenance Supervisor, HPC, July and November 2015.

(Kelly 2015). Kelly, Mike, Project Manager, Bleyl & Associates, September 2015.

(Kreger 2015). Kreger, Ken, Fire Chief and Emergency Management Coordinator, City of Conroe Fire Department, September 2015.

(Martinez 2015). Martinez, Starlyn, Sergeant, Houston Police Department Northeast Patrol Station, August 2015

(McDaniel 2015). McDaniel, Randy, Chief Deputy, Montgomery Sheriff Department, September 2015.

(Miller 2013). Miller, Jason, City of Conroe Public Works, February 2013.

(Mosciski). Mosciski, Philip Mosciski, Vice President, Project Development, The GEO Group, Inc.

(Perez 2015). Perez, Captain, Houston Fire Department, Station 64. August 2015.

(Price 2015). Price, David, Assistant warden. HPC, July 2015.

(Satar 2013). Satar, Rubina, U.S. Immigrations and Customs Enforcement, May 2013.

(Sheridan 2015). Sheridan, Ann Marie Stone, Supervising Engineer Houston Department of Public Works and Engineering, August 2015

(Smith). Smith, Joe, Warden Joe Corley Detention Facility, The Geo Group, Inc.

Supp. App. 1725

(Stahnke 2015). Stahnke, Alan, State Soil Scientist at the USDA-Natural Resources Conservation Service. Personal Communication with Tamara Doucette.  November 2015.

(Tipen 2015). Tipen, Lee, Lieutenant, City of Conroe Police Department, September 2015.

(Vech 2016). Vech, Jamie, Air Section TCEQ. May 2016.

(Wierdsma 2015). Wierdsma, Thomas, Senior Vice President Project Development, The GEO Group, Inc., July 2015.

(Wiggins 2015). Wiggins, Brad Senior Director, Site Acquisition, Corrections Corporation of America (CCA). July, August, September and November 2015.

## LIST OF PREPARERS

**The following people were primarily responsible for preparing this EA**

| Name | Agency/Organization | Discipline/Expertise | Experience | Role in Preparing EA |
|---|---|---|---|---|
| Elizabeth Kennett | ICE, Office of Facilities Administration | ICE Environmental, Energy, and Sustainability Program Manager | 10 years of NEPA, Environmental Site Assessment, and Cultural Resources Experience | ICE project manager and EA review |
| Blake Hamilton | ICE Contract Support, Office of Facilities Administration | Environmental Planning/NEPA | 9 years of Environmental Compliance, NEPA, Environmental Site Assessment, and Cultural Resources Compliance Experience | EA Technical Review – all resource categories |
| David Frenkel | ICE Contract Support, Office of Facilities Administration | Environmental Compliance/Air/Noise/ Hazardous Waste | 10 years of Environmental Compliance, NEPA, and Environmental Auditing Experience | EA Technical Review support – all resource categories |
| Ian Champ | ICE Contract Support, Office of Facilities Administration | Natural Resources and Policy | 3 years of Environmental Policy and Management | Appendices, Figures, Tables, Formatting, Public Involvement Coordinator |

| Name | Agency/Organization | Discipline/Expertise | Experience | Role in Preparing EA |
|---|---|---|---|---|
| Flormari Blackburn, P.E. | E Sciences | Environmental Engineering | 23 years | E Sciences Project Manager; Land Use, Soil, Water Resources, Socioeconomics Road and Traffic, and Sustainability and Greening |
| Scott G. Evanson, P.G. | E Sciences | Geologist | 27 years | Hazardous Materials |
| David M. Mahnken | E Sciences | Ecology, Environmental Science | 25 years | Water Resources, Vegetation, Wildlife Resources, and Threatened and Endangered Species |
| Jason P. Cicchetti | E Sciences | Environmental Engineer | 7 years | Utilities and Infrastructure |
| Esteban Lopez, P.E. | E Sciences | Environmental Engineer | 15 years | Air Quality |
| Ian G. Frost, CEP, AICP, LEED | JMT | Vice President | 37 years | JMT Project Manager; EA Review |
| Tamara M. Doucette | JMT | Environmental Scientist | 9 years | EA Development & Support – All Resource Categories |

U.S. Department of Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Final Notice and Public Explanation of a Proposed Activity in a 100-Year Floodplain- Dormitory Construction at Immigration and Customs Enforcement Krome Service Processing Center - Miami, Florida

**En español**

To: All interested floodplain residents of Miami, residents of Miami-Dade County, elected officials, agencies, groups, and individuals

This is to give notice that the Department of Homeland Security (DHS) Immigration and Customs Enforcement (ICE), as guided by Executive Order 13690 Establishing a Federal Flood Risk Management Standard (FFRMS) and a Process for Further Soliciting and Considering Stakeholder Input and Executive Order 11988, Floodplain Management, as amended, has conducted an evaluation to determine the potential affect that its activity in the floodplain will have on the human environment. The proposed project is located at 18201 SW 12th St in Miami, Florida, 33194.

## Proposed Action

ICE is proposing to construct a one-story dormitory on the property of the ICE Krome Service Processing Center (SPC), located at 18201 SW 12th St in Miami, Florida, 33194. The property is located directly adjacent to Everglades National Park and the majority of land surrounding the parcel is wetlands, with the exception of an access road and adjacent state-owned facilities. No impacts on wetlands are anticipated. The property consists of 110 acres, 36 acres of which is developed land. The new dormitory would be sited and constructed where an artificial turf soccer field currently exists within the fenced portion of the existing Krome SPC located at the north corner of the developed portion of the property. The purpose of the project is to house detainees who are awaiting an immigration status determination or who are awaiting deportation or repatriation in support of the homeland security mission in Florida. The building footprint would be 166' x 150' (24,900 sq. ft). In addition to the dormitory, ICE is proposing to create concrete walkways connecting the new dormitory to the existing walkways on the property which will add impervious surface to the property. The proposed new dormitory is planned to replace an existing dormitory on the Krome SPC property that is slated for demolition. The Proposed Action was reviewed as part of a Programmatic Environmental Assessment in 2010 that evaluated 17 new construction, demolition, and repair projects planned at the Krome SPC. Since it has been more than 5 years since the original EA was completed, ICE re-evaluated portions of the analysis to ensure compliance with current laws, regulations, and policies.

Utilizing the Federal Emergency Management Agency (FEMA) floodplain maps and National Flood Hazard Layer Flood Insurance Rate maps, ICE identified that the Proposed Action would be located within the 100-year floodplain, specifically within the AH zone (designated as the low-lying flood zone). The limit of disturbance for the Proposed Action in its entirety is approximately 0.6 acres, all of which is located in the 100-year floodplain and would be permanently impacted by the Proposed Action. The Base Flood Elevation (BFE) of the site is 8 feet above mean sea level. The proposed location for the new dormitory has been backfilled to approximately 10.75 feet NGVD (National Geodetic Vertical Datum), which is higher than the 8 feet BFE and incorporates the minimum of two feet of freeboard value required by the FFRMS for non-critical actions. ICE also completed a site visit on August 23, 2023, and determined that the soccer field area is bordered by wetland swales, which are a natural solution to aid in the conveyance of stormwater runoff from the property. To mitigate current and future flood risk within the 100-year floodplain, ICE proposes to construct the new dormitory such that the finished floor elevation is above BFE, in accordance with FEMA and Miami-Dade County regulations and thereby complying with current FFRMS. ICE will build the new dormitory at the existing 10.75 feet which is slightly above the vertical and horizontal FFRMS Floodplain (10 feet) at this location. Additionally, the wetland swale areas would not be altered, and no construction would occur in these areas.

Construction of the project as proposed, in accordance with all applicable local, state, and federal floodplain requirements, is anticipated to impact site topography and floodwater conveyance and storage on the project site, due to the additional impervious surfaces and land grading associated

Supp. App. 1728

with the project. ICE would use minimal grading requirements during construction and save as much of the site from compaction as possible. ICE would grade the site to provide positive drainage from the detention center to the surrounding area, which includes wetland swales and an onsite retention pond northeast of the construction area. Erosion and sedimentation would be minimized as much as possible during all proposed construction by utilizing erosion control measures, such as siltation control, silt fences, and permanent retention of fill material. The surrounding wetland areas or swales would not be directly affected by the construction.

## Alternatives

The entirety of the Krome SPC Facility and the surrounding wetland area are within the AH flood zone (100-year floodplain), therefore there are no practical site alternatives on the property that would be more suitable for construction of the dormitory. Off-site alternatives are not feasible due to security and operational requirements associated with the dormitory. As stated previously, the Preferred Alternative (the Proposed Action) would create a minor impact to the floodplain as a result of an increase of impervious area due to the construction of the new dormitory. However, ICE proposes to build the structure according to FFRMS regulations such that the finished floor elevation is more than two feet above BFE, thereby minimizing both flood risk to federal assets and impacts on floodplains. Additionally, potential impacts from an increase in stormwater runoff would be minimized to the greatest extent practicable by grading the site to provide positive drainage from the detention center to the surrounding area, as mentioned above.

ICE also considered the No Action Alternative, under which the current land use within the area of the Proposed Action (recreational soccer field) would continue, and no construction would occur. There would be no impacts to the floodplain or to the environment, however the purpose and need for the Proposed Action would not be satisfied. Therefore, ICE has eliminated the No Action Alternative from consideration.

ICE has reevaluated the alternatives to building in the floodplain and has determined that it has no practicable alternative. Environmental files that document compliance with steps 3 through 6 of Executive Order 11988 are available for public inspection, review, and copying upon request at the email address delineated in the last paragraph of this notice for receipt of comments. ICE will comply with all state and local floodplain protection procedures, including consulting with the appropriate agencies prior to implementing the Proposed Action.

This activity will have no significant impact on the environment for the following reasons:

- The Project area is located within a developed portion of the Krome SPC property and would be contained to an existing artificial turf recreational soccer field. The Project area is not adjacent to any homes; therefore, ICE anticipates no impacts on environmental justice communities.
- ICE determined that the Proposed Action would have no adverse effect on the neighboring Everglades National Park, as the Proposed Action would be confined to the existing soccer field area on the developed portion of the property. There are wetland swale areas directly adjacent to the soccer field, however no construction will occur in those areas. ICE consulted with Everglades National Park, which concurred on November 30, 2023, that the proposed action is not anticipated to have measurable effects on adjacent wetlands, floodplains, and other resources within Everglades National Park.
- The Proposed Action does not include disturbance of potentially contaminated areas and is not likely to cause a release of chemicals to the environment.
- The Proposed Action will not result in a significant increase in the amount of wastewater generated or potable water demand. The new dormitory is planned to replace an existing dormitory of similar capacity, which is slated for demolition. Therefore, any change in wastewater generated or potable water demand, should a change occur, would be insignificant.
- Based on the U.S. Fish and Wildlife Service's (USFWS) Information Planning and Consultation (IPaC) Review of the project area, ICE identified 36 threatened and endangered species in the local area and in the vicinity of the Project Area. However, as stated previously, the Proposed Action is located on previously disturbed land that is currently used as a recreational artificial turf soccer field within a fenced site, which has limited suitable habitat for threatened or endangered species. ICE determined that the Proposed Action could have indirect, negligible, and short-term effects on five of the listed threatened and endangered species identified through IPaC. The five species were the Eastern Black Rail, the Eastern Indigo Snake, the Everglade Snail Kite, the Florida Bonneted Bat, and the Wood Stork. Although it is unlikely that the listed species reside on the premises or breed within the developed portion of Krome SPC, the potential for indirect impacts to these species does exist. Indirect impacts to wildlife species or migratory birds that may be found in the area during project activities may also occur; however, most of these species are highly mobile. Animals that feel threatened by any of the proposed activities could easily leave the site temporarily. The site is also surrounded by fencing which would prevent some animals from entering the Project Area. Because of the wetlands, retention pond, and other undeveloped habitats immediately adjacent to the project site, these species would be able to find refuge as frequently as needed. Therefore, potential impacts to wildlife and migratory birds due to the Proposed Action would be negligible and temporary. There are no critical habitats in the vicinity of the Project area. On September 28, 2023, ICE requested concurrence from USFWS under Section 7 of the Endangered Species Act (ESA) on its "May Affect, Not Likely to Adversely Affect" determination for the five species identified through IPaC. On December 19th, 2023, ICE received concurrence from the USFWS that the Proposed Action is not likely to adversely affect any federally listed species or designated critical habitat protected by the ESA, as amended (16 U.S.C. 1531 eq. seq). The consultation fulfills the requirements of Section 7 of the ESA and

further action is not required. ICE has determined that the Proposed Action would have no effect for species protected under the Marine Mammal Protection Act, the Magnuson-Stevens Fishery Conservation Management Act, the Bald and Golden Eagle Protection Act, or the Migratory Bird Treaty Act.

- No negative impacts to recreational or educational values of the floodplain are anticipated to occur due to the project's location on government-owned land and the relatively small footprint of the Proposed Action.
- Best management practices will be utilized to decrease erosion and sedimentation that could result from the Proposed Action, including siltation control/silt fences and permanent retention of fill material.
- ICE consulted with the Florida Department of Environmental Protection Clearinghouse on September 15, 2023. The Clearinghouse distributes the Project proposal for review to appropriate state agencies, water management districts, regional planning councils, local governments, and the Governor's Office of Planning and Budget to streamline the consultation process at the state level and ensure proposals are in accordance with state plans, policies, programs, objectives, and procedures. This consultation allows multiple stakeholders to confirm if a proposed project is environmentally sound and to determine if the project will have any adverse effects on Florida's natural resources, wildlife, historical or archaeological sites or artifacts. ICE received a response from the Clearinghouse, and advised ICE that an Environmental Resource Permit from the South Florida Water Management District is required for this project. The Clearinghouse also stated that "the state has no objections to allocation of federal funds for the subject project and, therefore, the funding award is consistent with the Florida Coastal Management Program (FCMP). The state's final concurrence of the project's consistency with the FCMP will be determined during any environmental permitting processes, in accordance with Section 373.428, Florida Statutes, if applicable." ICE will obtain all necessary federal and state permits prior to commencement of project activities.

There are three primary purposes for this notice. First, people who may be affected by activities in floodplains and those who have an interest in the protection of the natural environment should be given an opportunity to express their concerns and provide information about these areas. Second, an adequate public notice program can be an important public educational tool. The dissemination of information about floodplains can facilitate and enhance Federal efforts to reduce the risks associated with the occupancy and modification of these special areas. Third, as a matter of fairness, when the Federal government determines it will participate in actions taking place in floodplains, it must inform those who may be put at greater or continued risk.

Any individual, group, or agency wishing to comment on the project may do so via email at icesustainability@ice.dhs.gov (mailto:icesustainability@ice.dhs.gov?subject=RE%3A%20Final%20Notice%20and%20Public%20Explanation%20of%20a%20Proposed%20Activity%20-%20Krome). Comments must be received by the Department of Homeland Security on or before January 10, 2024. This notice is posted on the DHS NEPA website (/national-environmental-policy-act).

## Keywords

ARCHIVE (/KEYWORDS/ARCHIVE)

Last Updated: 05/12/2025

 An official website of the United States government

**Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.

**Secure .gov websites use HTTPS**
A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

🌐 En Español    Contact Us    🔗 Quick Links

 **U.S. Immigration and Customs Enforcement**

Search

Call **1-866-DHS-2-ICE**    Report Crime

ICE    NEWSROOM

APRIL 2, 2025 • MIAMI, FL • ENFORCEMENT AND REMOVAL

# ICE expands detention capacity with Glades County Jail in Florida

MIAMI – U.S. Immigration and Customs Enforcement announced today the reinstatement of the intergovernmental service agreement with the Glades County Board of County Commissioners to house ICE detainees at the Glades County Jail in Moore Haven, Florida. This agreement reestablishes the federal immigration processing and detention center and creates up to 500 additional beds.



> "The Glades County Jail center will serve as a staging area and allow greater capacity to address our immigration enforcement mission," said acting Miami ICE Field Office Director Juan Agudelo. "The central location streamlines logistics and helps facilitate the timely processing of illegal aliens in our custody that are subject to arrest, detention and removal from our country."

The facility will expand ICE's detention capacity in Florida, enhancing the agency's ability to manage the region's growing enforcement and removal operations.

Updated: 04/03/2025

MEDIA INQUIRIES

For media inquiries about ICE activities, operations, or policies, contact the ICE Office of Public Affairs at ICEMedia@ice.dhs.gov.

**About Us**

**Combating Transnational Crime**

**Immigration Enforcement**

**Newsroom**

    





 **U.S. Immigration and Customs Enforcement**

**ICE Contact Center**

Report suspicious activity: 1-866-DHS-2-ICE

ICE.gov
**An official website of the U.S. Department of Homeland Security**

| | | |
|---|---|---|
| About ICE | Archive | Inspector General |
| Accessibility | No FEAR Act Data | The White House |
| FOIA Requests | Site Links | DHS Components |
| Privacy Policy | Performance Reports | USA.gov |
| DHS.gov | | |

**National Terrorism Advisory System**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| FRIENDS OF THE EVERGLADES, INC., a Florida 501(c)(3) not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization,<br><br>     Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, in his official capacity as Acting Director of the UNITED STATES IMMIGRATION CUSTOMS ENFORCEMENT; KEVIN GUTHRIE, in his official capacity as Executive Director of the Florida Division of Emergency Management; and MIAMI-DADE COUNTY, a political subdivision of the State of Florida<br><br>     Defendants. | Civil Case No. 1:25-cv-22896 |

## DECLARATION OF MATTHEW LUCHINS

1. My name is Matthew Luchins and I make this declaration based on my personal knowledge. If called as a witness, I could and would competently testify to the facts set forth herein.

2. On August 7, 2025 and August 8, 2025, I visited the area of the Dade-Collier Training and Transition Airport ("TNT") which now operates as the detention center known as "Alligator Alcatraz." I was specifically situated on Tamiami Trail at the entrance of the roadway leading to TNT.

3.   During such August 7th through August 8th visit, I observed various vehicles with construction related materials, or that potentially carried construction related materials, entering TNT.

4.   All such observations described in paragraph 4 and detailed further below were either captured by myself, Matthew Luchins, with my iPhone, or Debby Vajda, who I observed taking the photos with her iPhone.

5.   On August 7, 2025 at 3:11pm, I observed a truck carrying a bulldozer arrive at TNT. Exhibit A attached to this declaration is the photo I captured with meta data in connection with such observation.

6.   On August 8, 2025 at 11:36am, I observed a truck carrying construction equipment arrive at TNT.  At 12:17pm, I observed such vehicle with said equipment leaving TNT.  Exhibit B attached to this declaration contains the photos I captured with meta data in connection with such observations.

7.   On August 8, 2025 at 11:46am, I observed a truck carrying equipment arrive at TNT.  I did not see such vehicle leave while I was present at TNT, which was until approximately 5pm. Exhibit C attached to this declaration is the photo I captured with meta data in connection with such observation.

8.   On August 8, 2025 at 12:04pm, I observed a truck carrying fencing and construction equipment arrive at TNT.  I did not see such vehicle leave while I was present at TNT, which was until approximately 5pm.  Exhibit D attached to this declaration is the photo I captured with meta data in connection with such observation.

9.  On August 8, 2025 at 1:16pm, I observed a truck carrying wood planks arrive at TNT.  At 3:38pm, I observed such vehicle leaving TNT with an empty flatbed.  Exhibit E attached to this declaration contains the photos I captured with meta data in connection with such observations.

10. On August 8, 2025 at 1:41pm, I observed a truck carrying fencing or similar materials arrive at TNT.  At 4:40pm, I observed such vehicle leaving TNT with an empty flatbed.  Exhibit F attached to this declaration contains the photos captured with meta data in connection with such observations.  The first three such images included in Exhibit F showing the truck arriving were taken by myself, Matthew Luchins, and the last three images showing the truck leaving were taken by Debby Vajda.

11. On August 8, 2025 at 2:53pm, I observed an electrical contractor truck arrive at TNT.  I did not see such vehicle leave while I was present at TNT, which was until approximately 5pm.  Another witness read the name on the truck which I entered into Google and such Google search yielded the company's logo that matched that of the truck.  Exhibit G attached to this declaration is the photo I captured with meta data in connection with such observation as well as screenshots of my Google results.

12. On August 8, 2025 at 3:18pm, I observed a truck carrying wood and tires arrive at TNT.  I did not see such vehicle leave while I was present at TNT, which was until approximately 5pm.  Exhibit H attached to this declaration contains the photos along with meta data captured by Debby Vajda in connection with such observation.

13. On August 8, 2025 at 3:53pm, I observed a power dispatch truck arrive at TNT.  I did not see such vehicle leave while I was present at TNT, which was until approximately 5pm.  Exhibit I attached to this declaration contains the photos along with meta data captured by Debby Vajda in connection with such observation.

14.  On August 8, 2025 at 3:56pm, I observed a Sunbelt truck arrive at TNT.  I did not see such vehicle leave while I was present at TNT, which was until approximately 5pm.  Exhibit J attached to this declaration is the photo along with meta data captured by Debby Vajda in connection with such observation.

15. On August 8, 2025 at 4:03pm, I observed a truck carrying a metal structure arrive at TNT.  I did not see such vehicle leave while I was present at TNT, which was until approximately 5pm.  Exhibit K attached to this declaration contains the photos along with meta data captured by Debby Vajda in connection with such observation.

16. On August 8, 2025 at 4:26pm, I observed a Central Transport Truck arriving at TNT.  I did not see such vehicle leave while I was present at TNT until approximately 5pm.  Exhibit L attached to this declaration is the photo along with meta data captured by Debby Vajda in connection with such observation.

I declare under penalty of perjury that the foregoing is true and correct and was executed on August 10, 2025 in Miami-Dade County, Florida.

*Matthew Luchins*
Matthew Luchins

Supp. App. 1736

# EXHIBIT A

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



A truck pulls a bulldozer into Alligator Alcatraz after the federal court ruling.

Thursday • Aug 7, 2025 • 3:11 PM     Adjust

IMG_3380

| Apple iPhone 16 Plus | | HEIF | |
|---|---|---|---|

Fusion Camera — 26 mm ƒ1.6

24 MP • 4284 × 5712 • 4.2 MB    STANDARD

| ISO 50 | 26 mm | 0 ev | ƒ1.6 | 1/3623 s |
|---|---|---|---|---|



Ochopee ›      Adjust

Supp. App. 1738

# EXHIBIT B

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50

Supp. App. 1739





Add a Caption

Friday • Aug 8, 2025 • 11:36 AM                    Adjust
☁ TC_00091

| Apple iPhone 11 | JPEG ⚡ |
|---|---|

Wide Camera — 26 mm ƒ1.8
12 MP • 3024 × 4032 • 5.1 MB

| ISO 40 | 26 mm | 0 ev | ƒ1.8 | 1/55556 s |



Ochopee ›                                          Adjust



e2eb6ac9271cd9e8ac6f50

Supp. App. 1742



5 at 12:18:15 PM

Add a Caption

Friday • Aug 8, 2025 • 12:18 PM                    Adjust

TC_00132

| Apple iPhone 11 | | JPEG ⚡ |
| --- | --- | --- |
| Wide Camera — 26 mm ƒ1.8 | | |
| 12 MP • 3024 × 4032 • 4.9 MB | | |
| ISO 40 | 26 mm | 0 ev | ƒ1.8 | 1/28571 s |



TAMIAMI TRAIL E
41

Ochopee ›                                           Adjust

e2eb6ac9271cd9e8ac6f50



Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50





e2eb6ac9271cd9e8ac6f50

# EXHIBIT C

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption

Friday • Aug 8, 2025 • 11:46 AM          Adjust

TC_00099

| Apple iPhone 11 | JPEG ⚡ |
|---|---|
| Wide Camera — 26 mm ƒ1.8 | |
| 12 MP • 3024 × 4032 • 5 MB | |

| ISO 32 | 26 mm | 0 ev | ƒ1.8 | 1/14286 s |



Ochopee ›                          Adjust

Supp. App. 1748

# EXHIBIT D

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption

Friday • Aug 8, 2025 • 12:04 PM                                    Adjust

TC_00116

| Apple iPhone 11 | JPEG |
| --- | --- |

Wide Camera — 26 mm ƒ1.8

12 MP • 3024 × 4032 • 5.3 MB

| ISO 40 | 26 mm | 0 ev | ƒ1.8 | 1/55556 s |

Doc ID: 11c1fc58b0fd8980e2eb6ac9271cd9e8ac6f50

Supp. App. 1750

# EXHIBIT E

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption

Friday • Aug 8, 2025 • 1:16 PM                    Adjust
IMG_3475

Apple iPhone 16 Plus                          HEIF  ◉

Fusion Camera — 26 mm ƒ1.6
24 MP • 4284 × 5712 • 4.7 MB                   STANDARD

| ISO 50 | 26 mm | 0 ev | ƒ1.6 | 1/2639 s |



Ochopee >                                        Adjust



Add a Caption

Friday • Aug 8, 2025 • 3:38 PM                                    Adjust

IMG_3562

| Apple iPhone 16 Plus | HEIF ◉ |
|---|---|
| Fusion Camera — 26 mm ƒ1.6 | |
| 12 MP • 3024 × 4032 • 2.5 MB | STANDARD |

| ISO 32 | 77 mm | 0 ev | ƒ1.6 | 1/586 s |



Ochopee ›                                                        Adjust



Add a Caption

Friday • Aug 8, 2025 • 3:39 PM          Adjust

IMG_3564

| Apple iPhone 16 Plus | HEIF |
|---|---|

Fusion Camera — 26 mm ƒ1.6

12 MP • 4032 × 3024 • 1.4 MB          STANDARD

| ISO 50 | 77 mm | 0 ev | ƒ1.6 | 1/430 s |



Ochopee  >                              Adjust

Supp. App. 1754

# EXHIBIT F

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption

Friday • Aug 8, 2025 • 1:41 PM                                    Adjust
IMG_3490

| Apple iPhone 16 Plus | HEIF |
| --- | --- |

Ultra Wide Camera — 13 mm ƒ2.2
12 MP • 4032 × 3024 • 2.2 MB                          STANDARD

| ISO 50 | 14 mm | 0 ev | ƒ2.2 | 1/3546 s |



Ochopee                                              Adjust



Add a Caption

Friday • Aug 8, 2025 • 1:41 PM                    Adjust

IMG_3491

| Apple iPhone 16 Plus | | HEIF ◎ |
| --- | --- | --- |
| Fusion Camera — 26 mm ƒ1.6 | | |
| 24 MP • 4284 × 5712 • 3.2 MB | | STANDARD |

| ISO 50 | 47 mm | 0 ev | ƒ1.6 | 1/6993 s |
| --- | --- | --- | --- | --- |



Ochopee ›                                          Adjust



Add a Caption

Friday • Aug 8, 2025 • 1:41 PM                          Adjust

IMG_3492

| Apple iPhone 16 Plus | | HEIF | ◎ |
| --- | --- | --- | --- |

Fusion Camera — 26 mm ƒ1.6

24 MP • 4284 × 5712 • 3.1 MB                     STANDARD

| ISO 50 | 47 mm | 0 ev | ƒ1.6 | 1/6993 s |
| --- | --- | --- | --- | --- |



Ochopee ›                                          Adjust

Supp. App. 1758



Add a Caption

Friday • Aug 8, 2025 • 1:41 PM      Adjust

IMG_3493

| Apple iPhone 16 Plus | HEIF ◎ |
|---|---|

Fusion Camera — 26 mm ƒ1.6

12 MP • 3024 × 4032 • 1.1 MB    STANDARD

| ISO 50 | 266 mm | 0 ev | ƒ1.6 | 1/3636 s |
|---|---|---|---|---|



Ochopee ›       Adjust



Add a Caption



Friday • Aug 8, 2025 • 4:40 PM                    Adjust

IMG_3606

| Apple iPhone 11 | JPEG |
|---|---|

Wide Camera — 26 mm ƒ1.8

12 MP • 3024 × 4032 • 4.7 MB

| ISO 32 | 26 mm | 0 ev | ƒ1.8 | 1/912 s |



Add a Caption

Friday • Aug 8, 2025 • 4:41PM                    Adjust

IMG_3607





Add a Caption



Friday • Aug 8, 2025 • 4:41 PM          Adjust

IMG_3608

| Apple iPhone 11 | | JPEG |
| --- | --- | --- |

Wide Camera — 26 mm ƒ1.8

12 MP • 3024 × 4032 • 5.9 MB

| ISO 32 | 26 mm | 0 ev | ƒ1.8 | 1/728 s |
| --- | --- | --- | --- | --- |

TAMIAMI TRAIL E        41

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50

Supp. App. 1762

# EXHIBIT G

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption

Friday • Aug 8, 2025 • 2:53 PM                    Adjust
IMG_3540

| Apple iPhone 16 Plus | | HEIF ◎ |
| --- | --- | --- |
| Fusion Camera — 26 mm f1.6 | | |
| 12 MP • 3024 × 4032 • 894 KB | | STANDARD |

| ISO 40 | 266 mm | 0 ev | f1.6 | 1/1517 s |
| --- | --- | --- | --- | --- |



Ochopee >                                          Adjust

e2eb6ac9271cd9e8ac6f50



Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50

Supp. App. 1766

# EXHIBIT H

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption

Friday • Aug 8, 2025 • 3:18 PM                    Adjust

IMG_3557

| Apple iPhone 16 Plus | HEIF ⊙ |
| --- | --- |

Fusion Camera — 26 mm ƒ1.6

12 MP • 3024 × 4032 • 766 KB          STANDARD

| ISO 40 | 266 mm | 0 ev | ƒ1.6 | 1/1082 s |



Ochopee ›                                  Adjust



e2eb6ac9271cd9e8ac6f50

Supp. App. 1769

# EXHIBIT I

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption



Friday • Aug 8, 2025 • 3:53 PM          Adjust

IMG_3576

| Apple iPhone 11 | | JPEG |
|---|---|---|

Wide Camera — 26 mm ƒ1.8

12 MP • 3024 × 4032 • 4.8 MB

| ISO 32 | 26 mm | 0 ev | ƒ1.8 | 1/194 s |
|---|---|---|---|---|

TAMIAMI TRAIL E          41

Supp. App. 1771



Add a Caption

Friday • Aug 8, 2025 • 3:53 PM                    Adjust

IMG_3577

| Apple iPhone 11 | | JPEG |
| Wide Camera — 26 mm ƒ1.8 | | |
| 12 MP • 3024 × 4032 • 5.4 MB | | |

| ISO 32 | 26 mm | 0 ev | ƒ1.8 | 1/515 s |



TAMIAMI TRAIL E    41

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50

Supp. App. 1772

# EXHIBIT J

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption



Friday • Aug 8, 2025 • 3:56 PM                    Adjust

IMG_3580

| Apple iPhone 11 | | JPEG ◎ |
| --- | --- | --- |
| Wide Camera — 26 mm ƒ1.8 | | |
| 12 MP • 3024 × 4032 • 5.6 MB | | |

| ISO 32 | 26 mm | 0 ev | ƒ1.8 | 1/499 s |
| --- | --- | --- | --- | --- |

TAMIAMI TRAIL E      41

Supp. App. 1774

# EXHIBIT K

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption



Friday • Aug 8, 2025 • 4:03 PM                    Adjust
IMG_3591

Apple iPhone 11                                    JPEG

Wide Camera — 26 mm ƒ1.8
12 MP • 3024 × 4032 • 5.3 MB

ISO 32    |    26 mm    |    0 ev    |    ƒ1.8    |    1/350 s

TAMIAMI TRAIL E        41

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption



Friday • Aug 8, 2025 • 4:03 PM                                    Adjust

IMG_3592

Apple iPhone 11                                                  JPEG

Wide Camera — 26 mm ƒ1.8
12 MP • 3024 × 4032 • 4.7 MB

ISO 32    |    26 mm    |    0 ev    |    ƒ1.8    |    1/313 s

Supp. App. 1777

# EXHIBIT L

Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Add a Caption

Friday • Aug 8, 2025 • 4:26 PM                    Adjust

☁ IMG_3594

| Apple iPhone 11 | JPEG ◎ |

Wide Camera — 26 mm ƒ1.8

12 MP • 3024 × 4032 • 5.4 MB

| ISO 32 | 26 mm | 0 ev | ƒ1.8 | 1/623 s |



Doc ID: 11c1fc58b9fd898960e2eb6ac9271cd9e8ac6f50



Watch 24/7

 

**ALLIGATOR ALCATRAZ**

# Venezuelan influencer is alive after he fainted at 'Alligator Alcatraz': DHS

Detainee's attorney dispute DHS' account, saying their client suffered a more serious medical emergency.

By NBC6 • Published August 7, 2025 • Updated on August 8, 2025 at 12:36 pm

Log in or create a free profile to save articles

Attorneys for a Venezuelan man who collapsed inside "Alligator Alcatraz" are accusing the facility of failing to provide adequate care for sick detainees. NBC6's Amy Viteri reports

Supp. App. 1780

The Department of Homeland Security denied on Wednesday night the death of Luis Manuel Rivas Velásquez, a Venezuelan influencer known as "Luis Frío," detained at the center known as "Alligator Alcatraz."

"Rivas Velásquez fainted and was taken to the hospital out of precaution. ICE takes its commitment to protecting those in its custody very seriously. We ensure illegal aliens have access to adequate medical care," said DHS's assistant secretary for public affairs, Tricia McLaughlin, in a written statement.

## Watch NBC6 free wherever you are

WATCH HERE

## 'ALLIGATOR ALCATRAZ' LATEST



**AUG 6**
State denies claims of disturbance after caller reports abuse at 'Alligator Alcatraz'



**AUG 5**
EXCLUSIVE: Former 'Alligator Alcatraz' worker describes 'inhumane' conditions inside

McLaughlin responded to the claims of Rivas Velásquez's family members, who alleged they had received information about his death.

## Get local news you need to know to start your day with NBC 6's News Headlines newsletter.

SIGN UP

On Thursday morning, upon learning of the authorities' response, Rivas Velásquez's sister and girlfriend demanded in a public post on their Instagram accounts that they be provided with "proof of life."

"If the information given to us this morning is false and he is well and alive, I apologize to everyone and the U.S. government, we just want proof of life, and for them to stop playing and not speculate on

things that are not true! We want good news, please," they wrote.

In a statement later Thursday, attorneys for Velásquez confirmed he was alive and back at "Alligator Alcatraz" after he'd been taken to Kendall Hospital.

"Until this morning, we feared the worst, and we were obviously hoping we would get some good news, and we did. But the family basically believed their loved one was dead until this morning," said James Hollis, an attorney for the family.

Velásquez's girlfriend said his immigration attorney was able to confirm with authorities that he was transported to the hospital, but she didn't have details about what happened.

Hollis said Velásquez reported he had a high fever, shortness of breath, and chest pain.

"He had tried to seek medical attention from the facility itself and was continually told, hey, we can't help you, hey, we can't help you," Hollis said.

The Medical Examiner's Offices in Miami-Dade and Collier counties told NBC6 Thursday they didn't have any deceased under that name.



*Luis Frío / Instagram*

This article tagged under:

**ALLIGATOR ALCATRAZ**

---

HOMEBUDDY | SPONSORED

**Here's The Price of a 1-Day Walk-in Shower In 2025**

Learn More

HOMEBUDDY | SPONSORED

**Here's The Estimated Cost of a 1-day Gutter Guards Installation**

Click Here

MEMORY HEALTH | SPONSORED

**Dementia Has Been Linked To a Common Habit. Do You Do It?**

Click Here

YOUR HEALTH | SPONSORED

**She Mixed Pink Salt With This - Now She Can't Stop Losing Weight**

THE HERITAGE JOURNAL | SPONSORED

**After 35 Years, Her Jewelry Is Nearly Gone**

Read More

**Weather Forecast**

**MIAMI, FL**

# 80°

Mostly Cloudy
3.09% Precip

TONIGHT

81°

TOMORROW

91°

## Subscribe to our Newsletters

Sign up to receive breaking news alerts in your inbox.

Enter your email

Sign up

PRIVACY POLICY


**SOUTH FLORIDA**

**ABOUT NBC 6**

**OUR NEWS STANDARDS**

**SUBMIT TIPS FOR INVESTIGATIONS**

**NEWSLETTERS**

**CONTACT US**

**XFINITY: INTERNET, TV, STREAMING, MORE**

WTVJ Public Inspection File
WTVJ Accessibility
WTVJ Employment Information
FCC Applications
Terms of Service
Advertise with us
Send Feedback
Privacy Policy
    Your Privacy Choices
CA Notice
Ad Choices

Copyright © 2025 NBCUniversal Media, LLC. All rights reserved

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:25-cv-22896-KMW**

FRIENDS OF THE EVERGLADES, INC., a Florida
not-for-profit corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit
organization,

    Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as Secretary
of the UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TODD LYONS, in his
official capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his official
capacity as Executive Director of the Florida Division
of Emergency Management; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

    Defendants.

and

THE MICCOSUKEE TRIBE OF INDIANS,

    Intervenors.

## <u>DECLARATION OF MIRANDA DAVIDUK</u>

1.  My name is Miranda Daviduk, and I make this declaration on personal

knowledge.

2.  I am a social media strategist at the Center for Biological Diversity (Center) and

manage the Center's social media accounts.

3.      On August 11, 2025, I visited the LinkedIn page of Dave Kerner, which can be found at https://www.linkedin.com/in/dkerner.

4.      I created a PDF document of Dave Kerner's LinkedIn page by printing the page to PDF, which allows me to save the page as PDF document.

5.      The PDF document, attached hereto as Exhibit 1, is a true and accurate depiction of the LinkedIn page found at the above webpage.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 11, 2025.


*Miranda Daviduk*
_____

Miranda Daviduk

Supp. App. 1786

# EXHIBIT 1

      Home    My Network    Jobs    Messaging    Notifications    Me ▾    For Business ▾    Try for $0



**Dave Kerner** · 3rd

County Mayor Palm Beach County

- Schuler, Halvorson, Weisser, and Zoeller, P.A.



- University of Florida - Fredric G. Levin College of Law

Lake Worth, Florida, United States · Contact info

233 connections

Message      More

## About

I currently am employed as a civil trial lawyer for the law firm of Schuler, Halvorson, Weisser, & Zoeller, FA. I handle trials related to plaintiff personal injury and wrongful death, and also litigate several class action suits.

I was recently elected to the Florida House of Representatives-District 87. My term runs from November 2012-November 2014.

I graduated from the University of Florida Levin College of Law in 2010. I was a member of Florida Blue Key. I served as the Chief Justice of the University of Florida Supreme Court, Vice-President of the Law College Council, and in various other positions.

In 2010 I was selected by State Attorney Michael McAuliffe as one of six private practice civil trial attroneys to serve in the 5th Class of Palm Beach County Special Prosecutors. I served as a Special Assistant State Attorney for the 15th Judicial Circuit State Attorney's Office, in West Palm Beach. I served in this position from August 2010-Decemeber 2010. This program was created by State Attorney Michael McAuliffe in 2006 and is designed to call upon the civil trial bar to assist the State Attorney in his mission of prosecuting criminal cases within Palm Beach County. This program is a partnership between the civil trial bar and the State Attorney and so I will essentially be on loan from my firm during this time, but will still be employed and working on firm cases contemporaneously.

I also completed my undergraduate work at UF in Political Science and Criminology. I served as a police officer in the City of Alachua (North Florida) for 4 years prior to my entry into law school. I earned the Police Officer of the Year award in 2006 and have remained employed part-time as a police officer since the start of law school. I recently resigned from the Florida Wildlife Commission as a part-time police officer so that I could serve in the Florida House. I was employed there, part-time, since 2007.

## Activity

270 followers

**Dave hasn't posted yet**

Recent posts Dave shares will be displayed here.

---

Show all activity →

## Experience

**Civil Trial Attorney**
Schuler, Halvorson, Weisser, and Zoeller, P.A.
Jan 2009 - Present · 16 yrs 8 mos
West Palm Beach, Florida, United States

Civil trial attorney, working only on in-suit personal injury cases and multi-jurisdiction class action prosecutions.

---

 **Representative**
Florida House of Representatives
Aug 2012 - Present · 13 yrs 1 mo
Tallahassee Metropolitan Area

Elected on August 14th, 2012, to represent Florida's 87th District: West Palm Beach, Lake Worth, Greenacres, Palm Springs, Lake Clarke Shores, Cloud...

---

**Part-time Police Officer**
Florida Fish and Wildlife Conservation Commission
Mar 2008 - Aug 2012 · 4 yrs 6 mos
Palm Beach County

Part-time/volunteer service as a police officer for the Florida Wildlife Commission-Division of Law Enforcement. I primarily patrolled state lands, parks, preserves, wildlife management areas, hunting areas, and waterways to ensure the safety and protection of the generl public. This position entails the enforcement of the criminal and traffic laws of the state, involves making arrests and the bearing of arms.

---

**Chief Justice of the Student Body**
UF Supreme Court
Aug 2008 - Apr 2010 · 1 yr 9 mos

Appointed by Student Body President to preside over disputes, violations of the student statutes, and to interpret and apply the UF Constitution and statutes. The University of Florida student government is one of the nations largest, and controls a budget of over 14 million dollars.

---

**Summer Law Clerk**
Fourth District Court of Appeal
Apr 2008 - Aug 2008 · 5 mos

Served as a summer law clerk to the Honorable Mark E. Polen, District Court Judge for the Fourth District.

## Education

 **University of Florida - Fredric G. Levin College of Law**
Juris Doctor, Law
2007 - 2010

 **University of Florida**
BA, Political Science
2003 - 2006

## Skills

**Civil Litigation**

 7 endorsements

---

Litigation

 Endorsed by John Cannizzaro who is highly skilled at this

 9 endorsements

Show all 6 skills →

## Organizations

**Florida House of Representatives**
Representative · Aug 2012 - Present

Elected to the Florida House of Representatives - 87th District. Proud to represent the
cities of West Palm Beach, Lake Worth, Greenacres, Palm Springs, Lake Clarke Shore...

## Interests

**Top Voices**    Companies    Schools

 **Kim Kaupe** [in] · 3rd
Founder at Bright Ideas Only, Keynote Speaker & Moderator, LinkedIn
Learning Instructor & Host of Coffee With Kim a LIVE Weekly Podcast
69,589 followers

+ Follow

Ad ···

 Hire smarter on Upwork.

Read real reviews and see past work.

Post for free

**More profiles for you**

 **Michael Brevda** [in] · 3rd
Managing Partner at Senior Justice Law Firm | Nursing Home Abuse &
Medical Malpractice

+ Follow

 **Mack Bernard** · 3rd
Florida Senator

Message

 **Daren Isla, FPC** · 3rd
Software Specialist at UKG (Ultimate Kronos Group)

Message

 **Molly Best Thorp** [in] · 3rd
Deputy Press Secretary

+ Follow

 **Kimberly Berg** · 3rd
Deputy Staff Director, Ways and Means Committee at Florida House of
Representatives



Message

Show all

**Explore Premium profiles**

Hannah Kaufman · 3rd
Sports Marketing and Communications Coordinator at Exos
Message

Shauna Garland · 3rd
Marketing and website management
Message

Alexis Lincoln · 3rd
Marketing Manager at Rynse
Message

Ashley Garrett · 3rd
Marketing & Communications Coordinator at NYU
Message

**People you may know**
From Dave's industry

Chelsea Tu
Program Director, California Rural Legal Assistance
Connect

Camilla Getz
Assists state and local governments in implementing cutting-edge climate and equity policies and programs.
Connect

Lauren Choplin
Communications Director
Connect

Heather Busby
Lawyer, nonprofit manager, world traveller
Connect

Vicki Beechler
Director of Operations at OUR HEN HOUSE
Connect

Show all

Promoted •••



**A New Way to Manage Work**
Discover a work platform that your team
at monday.com will actually love.

**AI Writing Assistant**
Eliminate errors and work seamlessly
across multiple platforms and devices.

**Flexible, part-time work**
Earn money helping teach AI chatbots at
home. Apply to DataAnnotation now.

About                                    Accessibility

Professional Community Policies          Careers

Privacy & Terms ▾                        Ad Choices

Sales Solutions                          Mobile

Safety Center

Talent Solutions

Marketing Solutions

Advertising

Small Business

**Questions?**
Visit our Help Center.

**Manage your account and privacy**
Go to your Settings.

**Recommendation transparency**
Learn more about Recommended Content.

Select Language

English (English)

LinkedIn Corporation © 2025

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement (MOA) constitutes an agreement between United States Immigration and Customs Enforcement (ICE), a component of the Department of Homeland Security (DHS), and the Florida Department of Highway Safety and Motor Vehicles, Division of Highway Patrol, pursuant to which ICE delegates to nominated, trained, and certified officers or employees of the Florida Department of Highway Safety and Motor Vehicles, Division of Highway Patrol (hereinafter interchangeably referred to as "Law Enforcement Agency" (LEA)), to perform certain immigration enforcement functions as specified herein. The LEA represents the Florida Department of Highway Safety and Motor Vehicles, Division of Highway Patrol in the implementation and administration of this MOA. The Florida Department of Highway Safety and Motor Vehicles, Division of Highway Patrol and ICE enter into this MOA in good faith and agree to abide by the terms and conditions contained herein. The ICE and LEA points of contact for purposes of this MOA are identified in Appendix A.

## I.    PURPOSE

The purpose of this MOA is to set forth the terms and conditions pursuant to which selected LEA personnel (participating LEA personnel) will be nominated, trained, and thereafter be approved by ICE to perform certain functions of an immigration officer under the direction and supervision of ICE within the LEA's jurisdiction. This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. Nothing contained herein shall otherwise limit the jurisdiction and powers normally possessed by participating LEA personnel as members of the LEA. However, the exercise of the immigration enforcement authority granted under this MOA to participating LEA personnel shall occur only as provided in this MOA. This MOA also describes the complaint procedures available to members of the public regarding immigration enforcement actions taken pursuant to this agreement by participating LEA personnel.

## II.    AUTHORITY

Section 287(g) of the Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1357(g), as amended by the Homeland Security Act of 2002, Public Law 107-276, authorizes the Secretary of Homeland Security, or her designee, to enter into written agreements with a State or any political subdivision of a State so that qualified officers and employees can perform certain functions of an immigration officer. This MOA constitutes such a written agreement.

## III.    POLICY

This MOA sets forth the scope of the immigration officer functions that DHS is authorizing the participating LEA personnel to perform. It sets forth with specificity the duration of the authority conveyed and the specific lines of authority, including the requirement that participating LEA personnel be subject to ICE direction and supervision

1

while performing delegated immigration officer functions pursuant to this MOA. For the purposes of this MOA, ICE officers will provide direction and supervision for participating LEA personnel only as to immigration enforcement functions as authorized in this MOA. The LEA retains supervision of all other aspects of the employment and performance of duties of participating LEA personnel.

IV.    TRAINING AND ASSIGNMENTS

Before participating LEA personnel receive authorization to perform immigration officer functions granted under this MOA, they must successfully complete mandatory training on relevant administrative, legal, and operational issues tailored to the immigration enforcement functions to be performed as provided by ICE instructors and thereafter pass examinations equivalent to those given to ICE officers. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE. Only participating LEA personnel who are nominated, trained, certified, and authorized, as set out herein, have authority pursuant to this MOA to conduct the delegated immigration officer functions, under ICE direction and supervision, enumerated in this MOA.

Upon the LEA's agreement, participating LEA personnel performing immigration-related duties pursuant to this MOA will be assigned to various units, teams, or task forces designated by ICE.

V.    DESIGNATION OF AUTHORIZED FUNCTIONS

For the purposes of this MOA, participating LEA personnel are authorized to perform the following functions pursuant to the stated authorities, subject to the limitations contained in this MOA:

- The power and authority to interrogate any alien or person believed to be an alien as to his right to be or remain in the United States (INA § 287(a)(1) and 8 C.F.R. § 287.5(a)(l)) and to process for immigration violations those individuals who have been arrested for State or Federal criminal offenses.

- The power and authority to arrest without a warrant any alien entering or attempting to unlawfully enter the United States in the officer's presence or view, or any alien in the United States, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(2) and 8 C.F.R. § 287.5(c)(1). Subsequent to such arrest, the arresting officer must take the alien without unnecessary delay for examination before an immigration officer having authority to examine aliens as to their right to enter or remain in the United States.

- The power to arrest without warrant for felonies which have been committed and which are cognizable under any law of the United States regulating the

admission, exclusion, expulsion, or removal of aliens, if the officer has reason to believe the alien to be arrested is in the United States in violation of law and is likely to escape before a warrant can be obtained. INA § 287(a)(4) and 8 C.F.R. § 287.5(c)(2).

• The power to serve and execute warrants of arrest for immigration violations under INA § 287(a) and 8 C.F.R. § 287.5(e)(3).

• The power and authority to administer oaths and to take and consider evidence (INA § 287(b) and 8 C.F.R. § 287.5(a)(2)) to complete required alien processing to include fingerprinting, photographing, and interviewing, as well as the preparation of affidavits and the taking of sworn statements for ICE supervisory review.

• The power and authority to prepare charging documents (INA § 239, 8 C.F.R. § 239.1; INA § 238, 8 C.F.R § 238.1; INA § 241(a)(5), 8 C.F.R § 241.8; INA § 235(b)(l), 8 C.F.R. § 235.3) including the preparation of the Notice to Appear (NTA) or other charging document, as appropriate, for the signature of an ICE officer for aliens in categories established by ICE supervisors.

• The power and authority to issue immigration detainers (8 C.F.R. § 287.7) and I-213, Record of Deportable/Inadmissible Alien, for aliens in categories established by ICE supervisors.

• The power and authority to take and maintain custody of aliens arrested by ICE, or another State or local law enforcement agency on behalf of ICE. 8 C.F.R. § 287.5(c)(6)

• The power and authority to take and maintain custody of aliens arrested pursuant to the immigration laws and transport (8 C.F.R. § 287.5(c)(6)) such aliens to ICE-approved detention facilities.


VI.    DETENTION ISSUES

The LEA is expected to pursue to completion prosecution of any state or local charges that caused the alien to be taken into custody. ICE may assume custody of aliens who have been convicted of a state or local offense only after such aliens have concluded service of any sentence of incarceration. The ICE Detention and Removal Field Office Director or designee shall assess on a case-by-case basis the appropriate actions for aliens who do not meet the above criteria based on special interests or other circumstances after processing by the LEA.

If ICE determines that it is necessary, the LEA shall, to the extent it operates a detention facility or facilities meeting the standards described herein, enter into an Inter-Governmental Service Agreement (IGSA) with ICE, pursuant to which the LEA shall provide, for a fee, detention of incarcerated aliens in LEA facilities, upon the completion of their sentences. The LEA facility shall meet that state's requirements for detention facilities used for United States citizens. Under no circumstances shall the eligibility requirements for the LEA to enter into an IGSA with ICE for the detention of aliens be higher than the state standard applicable for the detention of United

States citizens in that state. The LEA, however, must comply with the Prison Rape Elimination Act, including DHS's implementing regulations, 6 C.F.R. pt. 115, unless the LEA already complies with the Department of Justice's substantially equivalent standards. Nothing in this agreement excuses the LEA from complying with applicable federal laws.

After notification to and coordination with the ICE supervisor and upon completion of processing and release from LEA detention facilities of an alien who participating LEA personnel have determined to be a removable alien, the alien will be arrested on behalf of ICE by participating LEA personnel and be transported by the LEA on the same day to the relevant ICE detention office or facility. In the alternative, if ICE determines that continued incarceration at the LEA's detention facility is preferable, with the consent of the LEA, ICE may direct the participating LEA personnel to arrest the alien on behalf of ICE and continue detaining the alien at the detention facility of the LEA, thereafter treating the alien as being in the custody of ICE though held under the state's detention standards. Further, any contracting done by the state in support of satisfying their delegated mission shall follow the state's standards for contract rewards.

VII.    NOMINATION OF PERSONNEL

The chief officer of the LEA will nominate candidates for initial training and certification under this MOA. For each candidate, ICE may request any information necessary for a background check and to evaluate a candidate's suitability to participate in the enforcement of immigration authorities under this MOA. All candidates must be United States citizens. All candidates must have at least two years of LEA work experience. All candidates must be approved by ICE and must be able to qualify for appropriate federal security clearances and access to appropriate DHS and ICE databases/systems and associated applications.

Should a candidate not be approved, a substitute candidate may be submitted if time permits such substitution to occur without delaying the start of training. Any subsequent expansion in the number of participating LEA personnel or scheduling of additional training classes may be based on an oral agreement of the parties, but will be subject to all the requirements of this MOA.

VIII.    TRAINING OF PERSONNEL

ICE will provide participating LEA personnel with the mandatory training tailored to the immigration functions to be performed. The mandatory training may be made available to the LEA in both in-person and online, recorded or virtual-meeting formats, as determined by ICE.

Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy; (v) civil rights laws (vi) the detention of aliens; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law, including applicable treaties or international agreements, to make proper notification upon the arrest or detention of a foreign national.

Approximately one year after the participating LEA personnel are trained and certified, ICE may provide additional updated training on relevant administrative, legal, and operational

4

**Supp. App. 1796**

issues related to the performance of immigration officer functions, unless either party terminates this MOA pursuant to Section XX below. Local training on relevant issues will be provided on an ongoing basis by ICE supervisors or a designated team leader.

IX.     CERTIFICATION AND AUTHORIZATION

ICE will certify in writing the names of those LEA personnel who successfully complete training and pass all required testing. Upon receipt of the certification, the ICE Special Agent in Charge and the ICE Field Office Director will provide the participating LEA personnel with a signed authorization to perform specified functions of an immigration officer for an initial period of two years from the date of the authorization. ICE will also provide a copy of the authorization to the LEA. The ICE supervisory officer, or designated team leader, will evaluate the activities of all personnel certified under this MOA.

Authorization of participating LEA personnel to act pursuant to this MOA may be revoked at any time and for any reason by ICE or the LEA. Such revocation will require notification to the other party to this MOA within 48 hours. The chief officer of the LEA and the ICE Special Agent in Charge and the relevant ICE Field Office Director will be responsible for notification of the appropriate personnel in their respective agencies. The termination of this MOA, pursuant to Section XX below, shall constitute revocation of all immigration enforcement authorizations delegated herein.

X.     COSTS AND EXPENDITURES

Participating LEA personnel will carry out designated functions at the LEA's expense, including salaries and benefits, local transportation, and official issue material. Whether or not the LEA receives financial reimbursement for such costs through a federal grant or other funding mechanism is not material to this MOA.

ICE is responsible for the installation and maintenance of the Information Technology (IT) infrastructure. The use of the IT infrastructure and the DHS/ICE IT security policies are defined in the Interconnection Security Agreement (ISA). The ISA is the agreement between ICE's Chief Information Security Officer and the LEA's Designated Accreditation Authority. The LEA agrees that each of its sites using an ICE-provided network access or equipment will sign the ISA, which defines the DHS ICE 4300A Sensitive System Policy and Rules of Behavior for each user granted access to the DHS network and software applications. Failure to adhere to the terms of the ISA could result in the loss of all user privileges.

The LEA is responsible for personnel expenses, including, but not limited to, salaries and benefits, local transportation, and official issue material used in the execution of the LEA's mission. ICE will provide instructors and training materials. The LEA is responsible for the salaries and benefits, including any overtime, of all of its personnel being trained or performing duties under this MOA and of those personnel performing the regular functions of the participating LEA personnel while they are receiving training. ICE is responsible for the costs of the LEA personnel's travel expenses while in a training status, as authorized by

5

the Federal Travel Regulation and the ICE Travel Handbook. These expenses include housing, per diem and all transportation costs associated with getting to and from training. ICE is responsible for the salaries and benefits of all ICE personnel, including instructors and supervisors.

The LEA is responsible for providing all administrative supplies (e.g. paper, printer toner) necessary for normal office operations. The LEA is also responsible for providing the necessary security equipment, such as handcuffs, leg restraints, etc.

ICE and the LEA may separately enter into an Inter-Governmental Service Agreement (IGSA) for the provision of and payment for detention, transportation, and related services for aliens incarcerated in LEA facilities pursuant to this MOA.

XI.    ICE SUPERVISION

Immigration enforcement activities conducted by participating LEA personnel will be supervised and directed by ICE. Participating LEA personnel are not authorized to perform immigration officer functions except when working under the supervision or direction of ICE.

When operating in the field, participating LEA personnel shall contact an ICE duty officer at the time of exercising the authority in this MOA, or as soon as is practicable thereafter, for guidance. The actions of participating LEA personnel will be reviewed by the ICE supervisory officers on an ongoing basis to ensure compliance with the requirements of the immigration laws and procedures and to assess the need for additional training or guidance for that specific individual.

For the purposes of this MOA, ICE officers will provide supervision of participating LEA personnel only as to immigration enforcement functions. The LEA retains supervision of all other aspects of the employment of and performance of duties by participating LEA personnel.

In the absence of a written agreement to the contrary, the policies and procedures to be utilized by the participating LEA personnel in exercising these authorities shall be DHS and ICE policies and procedures, including the ICE Use of Force Policy. However, when engaged in immigration enforcement activities, no participating LEA personnel will be expected or required to violate or otherwise fail to maintain the LEA's rules, standards, or policies, or be required to fail to abide by restrictions or limitations as may otherwise be imposed by law unless doing so would violate federal law.

If a conflict arises between an order or direction of an ICE supervisory officer and LEA rules, standards, or policies, the conflict shall be promptly reported to the ICE Special Agent in Charge and ICE Field Office Director, or designees, and the chief officer of the LEA, or designee, when circumstances safely allow the concern to be raised. The Special Agent in Charge, the ICE Field Office Director, and the chief officer of the LEA shall attempt to resolve the conflict.

Whenever possible, the LEA will deconflict all addresses, telephone numbers, and known or suspected identities of violators of the INA with ICE's Homeland Security

6

Investigations (HSI) or ICE's Enforcement and Removal Operations (ERO) prior to taking any enforcement action. This deconfliction will, at a minimum include wants/warrants, criminal history, and a person's address, and vehicle check through TECS II or any successor system.

LEA participating personnel authorized pursuant to this MOA may be assigned and/or co-located with ICE as task force officers to assist ICE agents with criminal investigations.

XII.   REPORTING REQUIREMENTS

The LEA will be responsible for tracking and maintaining accurate data and statistical information for their 287(g) program, including any specific tracking data requested by ICE. Upon ICE's request, such data and information shall be provided to ICE for comparison and verification with ICE's own data and statistical information, as well as for ICE's statistical reporting requirements and to assess the progress and success of the LEA's 287(g) program.

XIII.  RELEASE OF INFORMATION TO THIRD PARTIES

The LEA may, at its discretion, communicate the substance of this agreement to the media and other parties expressing an interest in the law enforcement activities to be engaged in under this MOA. It is the practice of ICE to provide a copy of this MOA, only after it has been signed, to requesting media outlets; the LEA is authorized to do the same.

The LEA hereby agrees to coordinate with ICE prior to releasing any information relating to, or exchanged under, this MOA. For releases of information to the media, the LEA must coordinate in advance of release with the ICE Office of Public Affairs, which will consult with ICE Privacy Office for approval prior to any release. The points of contact for ICE and the LEA for this purpose are identified in Appendix C. For releases of information to all other parties, the LEA must coordinate in advance of release with the FOD or the FOD's representative.

Information obtained or developed as a result of this MOA, including any documents created by the LEA that contain information developed or obtained as a result of this MOA, is under the control of ICE and shall not be disclosed unless: 1) permitted by applicable laws, regulations, or executive orders; and 2) the LEA has coordinated in advance of release with (a) the ICE Office of Public Affairs, which will consult the ICE Privacy Office for approval, prior to any release to the media, or (b) an ICE officer prior to releases to all other parties. LEA questions regarding the applicability of this section to requests for release of information shall be directed to an ICE officer.

Nothing herein limits LEA's compliance with state public records laws regarding those records that are solely state records and not ICE records.

The points of contact for ICE and the LEA for the above purposes are identified in Appendix C.

7

XIV.  LIABILITY AND RESPONSIBILITY

Except as otherwise noted in this MOA or allowed by federal law, and to the extent required by 8 U.S.C. § 1357(g)(7) and (8), the LEA will be responsible and bear the costs of participating LEA personnel with regard to their property or personal expenses incurred by reason of death, injury, or incidents giving rise to liability.

Participating LEA personnel will be treated as Federal employees for purposes of the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), 2671-2680, and worker's compensation claims, 5 U.S.C. § 8101 et seq., when performing a function on behalf of ICE as authorized by this MOA. *See* 8 U.S.C. § 1357(g)(7); 28 U.S.C. § 2671. In addition, it is the understanding of the parties to this MOA that participating LEA personnel performing a function on behalf of ICE authorized by this MOA will be considered acting under color of federal authority for purposes of determining liability and immunity from suit under federal or state law. *See* 8 U.S.C. § 1357(g)(8).

Participating LEA personnel named as personal-capacity defendants in litigation arising from activities carried out under this MOA may request representation by the U.S. Department of Justice. *See* 28 C.F.R. § 50.15. Absent exceptional circumstances, such requests must be made in writing. LEA personnel who wish to submit a request for representation shall notify the local ICE Office of the Principal Legal Advisor (OPLA) field location at ADDRESS. OPLA, through its headquarters, will assist LEA personnel with the request for representation, including the appropriate forms and instructions. Unless OPLA concludes that representation clearly is unwarranted, it will forward the request for representation, any supporting documentation, and an advisory statement opining whether: 1) the requesting individual was acting within the scope of his/her authority under 8 U.S.C. § 1357(g) and this MOA; and, 2) such representation would be in the interest of the United States, to the Director of the Constitutional and Specialized Tort Litigation Section, Civil Division, Department of Justice (DOJ). Representation is granted at the discretion of DOJ; it is not an entitlement. *See* 28 C.F.R. § 50.15.

The LEA agrees to cooperate with any federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and documents. Failure to do so may result in the termination of this MOA. Failure of any participating LEA employee to cooperate in any federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The LEA agrees to cooperate with federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and documents necessary to complete such compliance review. It is understood that information provided by any LEA personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

As the activities of participating LEA personnel under this MOA derive from federal authority, the participating LEA personnel will comply with federal standards relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

8

**Supp. App. 1800**

The LEA and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. § 552a, DHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices with regard to data collection and use of information under this MOA.

XV.    COMPLAINT PROCEDURES

The complaint reporting and resolution procedure for allegations of misconduct by participating LEA personnel, with regard to activities undertaken under the authority of this MOA, is included at Appendix B.

XV.    CIVIL RIGHTS STANDARDS

Participating LEA personnel who perform certain federal immigration enforcement functions are bound by all applicable federal civil rights statutes and regulations.

Participating LEA personnel will provide an opportunity for subjects with limited English language proficiency to request an interpreter. Qualified foreign language interpreters will be provided by the LEA as needed.

XVI.    COMMUNITY OUTREACH

The LEA, in coordination with the local ICE Field Office, will engage, as necessary, in Steering Committee meetings to enhance support for the 287(g) mission, and to ensure compliance with the terms of this MOA.

XIX.    MODIFICATION OF THIS MOA

Modifications of this MOA must be proposed in writing and approved by the signatories.

XX.    DURATION AND TERMINATION OF THIS MOA

This MOA will be in effect from the date of signing until it is terminated by either party. Either party, upon written notice to the other party, may terminate the MOA at any time. A termination notice shall be delivered personally or by certified or registered mail, and termination shall take effect immediately upon receipt of such notice.

Either party, upon written or oral notice to the other party, may temporarily suspend activities under this MOA when resource constraints or competing priorities necessitate. Notice of termination or suspension by ICE shall be given to the chief officer of the LEA. Notice of termination or suspension by the LEA shall be given to the ICE Special Agent in Charge and the ICE Field Office Director. However, any alien detained by an LEA pursuant to this agreement shall only be released to ICE and at the earliest convenience to all signatories.

9

Supp. App. 1801

Except for the provisions contained in Section XIII, this MOA does not, is not intended to, shall not be construed to, and may not be relied upon to create, any rights, substantive or procedural, enforceable at law by any person in any matter, civil or criminal.

By signing this MOA, each party represents that it is fully authorized to agree to this MOA, and accepts the terms, responsibilities, obligations, and limitations of this MOA, and consents to be bound thereto to the fullest extent allowed by law.

For the LEA:                                    For ICE:

Date: 2/7/2025                                  Date:   2/7/2025

Signature:                                      Signature:

Title: Executive Director                       Title:   Acting Director, ICE

10

Supp. App. 1802

**APPENDIX        A**

**POINTS OF CONTACT**

The ICE and LEA points of contact for purposes of implementation of this MOA are:

For ICE:                    _____

                           _____

                           _____

                           _____

                           _____


For the LEA:               Florida Highway Safety and Motor Vehicles

                           Attn: Office of the Executive Director

                           2900 Apalachee Parkway,

                           Tallahassee, FL 32399

                           _____

**APPENDIX B**

**COMPLAINT PROCEDURE**

This MOA is an agreement between ICE and the Florida Department of Highway Safety and Motor Vehicles, Division of Highway Patrol, hereinafter referred to as the "Law Enforcement Agency" (LEA), in which selected LEA personnel are authorized to perform immigration enforcement duties in specific situations under federal authority. As such, the training, supervision, and performance of participating LEA personnel pursuant to the MOA, as well as the protections for individuals' civil and constitutional rights, are to be monitored. Part of that monitoring will be accomplished through these complaint reporting and resolution procedures, which the parties to the MOA have agreed to follow.

If any participating LEA personnel are the subject of a complaint or allegation involving the violation of the terms of this MOA or a complaint or allegation of any sort that may result in that individual receiving professional discipline or becoming the subject of a criminal investigation or civil lawsuit, the LEA shall, to the extent allowed by state law, make timely notification to an ICE officer within 48 hours of the LEA receiving notice of the complaint or allegation, excluding weekends, of the existence and nature of the complaint or allegation. The results of any internal investigation or inquiry connected to the complaint or allegation and the resolution of the complaint shall also be reported to an ICE officer, as soon as practicable, but no later than 30 days from the date of the resolution. It is the responsibility of the ICE officer to ensure notification is made to the ICE Office of Professional Responsibility (OPR) at ICEOPRIntake@ice.dhs.gov.

The LEA will also handle complaints filed against LEA personnel who are not designated and certified pursuant to this MOA but are acting in immigration functions in violation of this MOA. Any such complaints regarding non-designated LEA personnel acting in immigration functions must be forwarded to an ICE officer within 48 hours of the LEA receiving notice of the complaint. It is the responsibility of the ICE officer to ensure notification is made to the OPR.

1. Complaint Reporting Procedures

Complaint reporting procedures shall be disseminated as appropriate by the LEA within facilities under its jurisdiction (in English and other languages as appropriate) in order to ensure that individuals are aware of the availability of such procedures. Complaints will be accepted from any source (e.g., ICE, LEA, participating LEA personnel, inmates, and the public).

Complaints may be reported to federal authorities as follows:

    A.    Telephonically to the ICE OPR at the toll-free number 1-833-4ICE-OPR; or

    B.    Via email at ICEOPRIntake@ice.dhs.gov.

Supp. App. 1804

Complaints may also be referred to and accepted by any of the following LEA entities:

    A.    The LEA Internal Affairs Division; or

    B.    The supervisor of any participating LEA personnel; or


2. Review of Complaints

All complaints (written or oral) reported to the LEA directly, which involve activities connected to immigration enforcement activities authorized under this MOA, will be reported to the ICE OPR. The ICE OPR will verify participating personnel status under the MOA with the assistance of the ICE Special Agent in Charge and the ICE Field Office Director. Complaints received by any ICE entity will be reported directly to the ICE OPR as per existing ICE policies and procedures.

In all instances, the ICE OPR, as appropriate, will make an initial determination regarding DHS investigative jurisdiction and refer the complaint to the appropriate office for action as soon as possible, given the nature of the complaint.

Complaints reported directly to the ICE OPR will be shared with the LEA's Internal Affairs Division when the complaint involves LEA personnel. Both offices will then coordinate appropriate investigative jurisdiction, which may include initiation of a joint investigation to resolve the issue(s).

3. Complaint Resolution Procedures

Upon receipt of any complaint the ICE OPR will undertake a complete review of each complaint in accordance with existing ICE allegation criteria and reporting require1nents. As stated above the ICE OPR will adhere to existing ICE reporting requirements as they relate to the OHS OIG and/or another legally required entity. Complaints will be resolved using the existing procedures, supplemented as follows:

   A. Referral of Complaints to LEA Internal Affairs Division.

   The ICE OPR will refer complaints, as appropriate, involving LEA personnel to the LEA's Internal Affairs Division for resolution. The Internal Affairs Division Commander will inform ICE OPR of the disposition and resolution of any complaints referred by ICE OPR.

   B. Interim Action Pending Complaint Resolution

   Whenever any participating LEA personnel are under investigation and subject to interrogation by the LEA for any reason that could lead to disciplinary action, demotion, or dismissal, the policy requirements of the LEA shall he honored. If appropriate, an individual may he removed from participation in the activities covered under the MOA pending resolution of an inquiry.

   C. Time Parameters for Resolution of Complaints

   It is expected that any complaint received will be resolved within 90 days. However, this will depend upon the nature and complexity of the substance of the complaint itself.

   D. Notification of Resolution of a Complaint

   ICE OPR will coordinate with the LEA's Internal Affairs Division to ensure notification as appropriate to the subject(s) of a complaint regarding the resolution of the complaint.

**APPENDIX C**

**PUBLIC INFORMATION POINTS OF CONTACT**

Pursuant to Section XVIII of this MOA, the signatories agree to coordinate any release of information to the media regarding actions taken under this MOA. The points of contact for coordinating such activities are:

For the LEA:

FLHSMV Executive Director
davekerner@flhsmv.gov

For ICE:

_____
_____
_____
_____
_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC.,
a Florida 501(c)(3) not-for-profit corporation,
and CENTER FOR BIOLOGICAL
DIVERSITY, a 501(c)(3) nonprofit organization,

      Plaintiffs,               CIVIL DIVISION

vs.                             CASE NO. 25-CV-22896-JEM

KRISTI NOEM, in her official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
TODD LYONS, in his official capacity as Acting
Director of the UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his
official capacity as Executive Director of the
FLORIDA DIVISION OF EMERGENCY
MANAGEMENT; and MIAMI-DADE
COUNTY, a political subdivision of the State of
Florida,

      Defendants.

_____/

## DECLARATION OF KEVIN DONALDSON

I, Kevin Donaldson, make the following declaration:

1.     I am over the age of 21 and competent to testify in this matter.

2.     I make the statements in this Declaration based on my personal knowledge.

3.     My name is Kevin Donaldson and I serve as the Director of Land Resources for the

Miccosukee Tribe of Indians of Florida ("the Tribe"), a position I have held for the past 15 years.

Prior to that time, I worked as an Associate Environmental Scientist.

4.     As the Director of the Land Resources for the Tribe, I oversee, supervise, and conduct a

variety of real estate services on behalf of the Tribe, including Tribal historic preservation services,

land use and management services, permitting, planning, engineering, and other services related

to Tribal lands.

5.      Many of the Tribe's members live, use, and occupy lands in direct proximity to the Dade-Collier Training and Transition Airport ("TNT Site"). **Exhibit 1** is a true and accurate copy of Tribal villages on the U.S. 41 corridor. The information contained in this map was collected at or near the time it was created by Tim Lamm, an employee within the Land Resources Department, who is charged with the responsibility of recording the locations of Tribal villages and other Tribal sites. This map was kept in the course of regularly conducted activity of the Tribe and the Land Resources Department. Making this map is a regular practice of the Tribe. As Director of Land Resources, I certify that this copy is a true and accurate copy of the map reflected in **Exhibit 1**.

6.      Many of the Tribe's cultural sites are located in close proximity to the TNT Site. **Exhibit 2** is a true and accurate copy of Tribal sites on the U.S. 41 corridor. The information contained in this map was collected at or near the time it was created by Timm Lamm, an employee within the Land Resources Department, who is charged with the responsibility of recording the locations of Tribal villages and other Tribal sites. This map was kept in the course of regularly conducted activity of the Tribe and the Land Resources Department. Making this map is a regular practice of the Tribe. As Director of Land Resources, I certify that this copy is a true and accurate copy of the map reflected in **Exhibit 2**.

7.      The Tribe's villages, cultural sites, and lands are located in close proximity to the TNT Site. For example, Miccosukee Reserved Area is situated less than 16 kilometers from the TNT Site.

8.      As another example, certain Tribal villages are located as close as 400 meters from the TNT Site.

9.      At one Tribal village, the operators of the TNT Site have placed an FDOT electronic sign, near the resident's waste disposal dumpster with a camera, in front of the Tribal camp.

Supp. App. 1809

10.     Tribal members routinely use and occupy the lands surrounding the TNT Site for hunting, gathering, trapping, as well as cultural, spiritual, and religious observances.

11.     The Tribe's cultural, spiritual, and religious observances and practices are deeply private and sacred.

12.     The presence of the TNT Site has directly and indirectly infringed upon the Tribe's use, enjoyment, and occupancy of the adjacent Tribal lands, Big Cypress National Preserve, and Everglades National Park.

13.     For example, once a site or location is developed, the Tribe's members will not be able to practice their religion or culture as intended and will avoid  the area until the natural environment is restored.

14.     The Tribal lands located near the TNT Site are commonly frequented by Tribal members for a variety of cultural, historic, religious, and spiritual purposes.

15.     The Tribe's practices are deeply sacred and private.

16.     As a result of the new activity at the TNT Site, Tribal members are effectively limited from using and enjoying their cultural sites in a customary and heretofore unrestricted mannerand limited from observing their cultural and religious practices or ceremonies.

17.     In addition, the light pollution from the TNT Site threatens the Tribe's economic interests. As one example, the Tribe leases certain tree islands, known as the Miccosukee Camp Permit Systems, to ecotourists, as part of a business designed to foster the Tribe's pride, heritage, and connection to the land. The new and profound light-polluting activity from the TNT Site threatens the Tribe's ecotourism business.

18.     In addition, the TNT Site threatens the Tribe's self-reliance and self-subsistence. Tribal members hunt, gather, and trap in the lands proximate to the TNT Site. However, the Tribe and its

-3-

members now have limited access to the lands, hunting grounds, and fishing holes surrounding the TNT Site on which they rely for subsistence, cultural, and religious purposes. .

19.     For example, Tribal members routinely use the Dade-Collier Jet Port Road to access northern portions of the Big Cypress National Preserve.

20.     The Dade-Collier Jet Port road has been inaccessible to the Tribe, depriving Tribal members from accessing the preserve.

21.     In addition, the lands proximate to the TNT Site are common grounds for wildlife hunting among Tribal members.

22.     However, the operations at the TNT Site have caused wildlife to flee from the lands.

23.     The presence of large light poles, loud diesel generators, people, and vehicle traffic have caused wildlife to relocate.

24.     The relocation of wildlife will have second-order effects.

25.     For example, some animals are territorial, such as the Florida panther. If a panther relocates into the territory of another panther, then a lethal battle could ensue.

I declare under the penalty of perjury that the above and foregoing is true and correct.

Dated: August 1, 2025                    By:  *Kevin Donaldson*
                                              Kevin Donaldson
                                              Director, Land Resources

-4-

Supp. App. 1811

# EXHIBIT 1

Case 1:25-cv-22896-JEM Document 33-1 Entered on FLSD Docket 07/14/2025 Page 2 of 2



# Indian Villages on U.S. 41

Miami-Dade and Collier County

Map Produced by Miccosukee Real Estate Service

# EXHIBIT 2

Supp. App.1814



# MICCOSUKEE TRIBE OF INDIANS OF FLORIDA

Legend:

- Miccosukee Indian Reservation
- Miccosukee WCA 3A
- Miccosukee Reserved Area
- 80 Acres
- Resort/Lambick/SEMA
- Traditional Tree Islands and Points of Interest
- Main Water Control Structures
- Canals
- Oil Pipeline
- Main Roads

Produced by the Water Resources Department
2024

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC.,
a Florida 501(c)(3) not-for-profit
corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3)
nonprofit organization,

      Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY;
TODD LYONS, in his official capacity as
Acting
Director of the UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in
his official capacity as Executive Director of
the FLORIDA DIVISION OF
EMERGENCY MANAGEMENT; and
MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,

      Defendants.

_____/

CIVIL DIVISION

CASE NO. 25-CV-22896-JEM

## DECLARATION OF AMY CASTANEDA

I, AMY CASTANEDA, make the following declaration:

1.     I am over the age of 21 and competent to testify in this matter.

2.     I make the statements in this Declaration based on my personal knowledge.

3.     My name is Amy Castaneda, and I serve as the Director of Water Resources for the Miccosukee Tribe of Indians of Florida ("the Tribe"), a position I have held for the past 19 years.

4.     As Director of the Water Resources Department for the Tribe, I oversee, supervise, and conduct a variety of water monitoring programs throughout Tribal lands on behalf of the Tribe.

Supp. App. 1816

5.    **Exhibit 1** is a true and accurate copy of a map showing the average and general water flow in the Greater Everglades, including the Tribal villages on the U.S. 41 corridor between 1966-2005.  The information contained in this map uses a Natural System Regional Simulation Model ("NSRSM") to portray historic flows by the South Florida Water Management District.  Using a model such as the NSMRM is a common practice to illustrate water movement in the Everglades.  As Director of Water Resources, I certify that this copy is a true and accurate copy of the map published in the *Hydrologic Simulation of the Predrainage Greater Everglades Using the Natural System Regional Simulation Model v3.5.2* reflected in **Exhibit 1**.

6.    The use, construction, and operation of the Dade-Collier Training and Transition Airport ("TNT Site") could potentially harm and threaten the water in the Everglades.

7.    For example, I have witnessed many trucks bringing loads of fill to the TNT Site for construction purposes for weeks.

8.    As another example, I have been informed that many portable restrooms are being used at the TNT Site.

9.    These and other developments at the TNT Site threaten and harm water quality, the Everglades, and the Tribe.

10.    For example, the TNT Site was designed to house 3,000 people, meaning there are hundreds, if not thousands of people at the TNT Site on a daily basis creating wastewater, including sewage.

11.    Wastewater, including sewage treatment, is a complex and important process that has significant impacts on the Tribe. The Tribe has had no involvement in whether the wastewater is being pumped and transported from the TNT Site or whether it is being dumped into the adjacent

-2-

wetlands, and if it is being dumped into the adjacent wetlands, whether it is being managed and treated prior.

12.    Tribal members regularly consume fish and other wildlife that consume the water adjacent to the TNT Site.

13.    Improper treatment of wastewater, including sewage, could result in disease and ill health among Tribal members.

14.    As another example, stormwater runoff also threatens and harms water quality and the Tribe.

15.    The water running off the TNT Site flows onto lands that Tribal members regularly access for hunting, gathering, and observing cultural practices.

16.    The runoff from the TNT Site will exclude Tribal members from impacted areas, create environmental impacts, such as nutrient loading and blockage, among other impacts.

17.    The Tribe is not permitted access to the TNT Site. As a result, there is no visibility into any containment or prevention methods to minimize the impact of the TNT Site.

18.    For example, I have not witnessed the so-called best management practices used in connection with the construction at the TNT Site near a wetland, such as a berm, silt screen, turbidity barrier, pumping and trucking off hazardous or polluted water, or the installation of a septic system.

19.    In addition, I am not aware that the TNT Site obtained any permits to ensure that construction and operation of the facility is permitted and regulated. For example, I am unaware of any permits issued by Miami-Dade County, Collier County, Florida Department of Environmental Protection, or the Army Corps of Engineers, for use, occupancy, construction, environmental resource plans, or wetlands related issues.

-3-

20.     The construction and operation of the TNT Site threatens long-lasting harm to the Tribe and the lands, such as loss of balanced vegetation and wildlife, changes in water quality, and other degradation that have lasting impacts once disturbed.

21.     The operation of the TNT Site excludes Tribal members from access to lands where they have lived and survived for thousands of years.

Pursuant to Fla. Stat. § 92.525, under Penalty of Perjury, I declare that I have read the foregoing Declaration, and the facts stated in it are true and correct and based upon my personal knowledge.

Dated: August 1, 2025                                              By: _____

# EXHIBIT 1



Dry Season (December - April)



Wet Season (June - October)

**Figure 95.** NSRSM v3.5.2 long-term (1966-2005) average of monthly flow vectors for the dry and wet seasons.

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

FRIENDS OF THE EVERGLADES, INC.,
a Florida 501(c)(3) not-for-profit corporation,
and   CENTER   FOR   BIOLOGICAL
DIVERSITY,   a   501(c)(3)   nonprofit
organization,

      Plaintiffs,                                   CASE NO. 25-CV-22896-KMW

vs.

KRISTI NOEM, in her official capacity as
Secretary   of   the   UNITED   STATES
DEPARTMENT   OF   HOMELAND
SECURITY; TODD LYONS, in his official
capacity as Acting Director of the UNITED
STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in his
official capacity as Executive Director of the
FLORIDA DIVISION OF EMERGENCY
MANAGEMENT;   and   MIAMI-DADE
COUNTY, a political subdivision of the State
of Florida,

      Defendants,

and

THE MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA,

      Intervenor-Plaintiff.

_____/

**SWORN DECLARATION OF JASON M. DANIEL**

I, Jason M. Daniel, hereby affirm, subject to penalty of perjury, as follows:

1.     I currently serve as the Tribal Historic Preservation Officer for the Miccosukee Tribe of Indians of Florida.

2.     I submit this affidavit in support of Intervenor-Plaintiff the Miccosukee Tribe of Indians of Florida's (the "Tribe") Complaint and Motion for Preliminary Injunction filed in the above styled action.

3.     As the Tribal Historic Preservation Officer, I am responsible for receiving, reviewing, and responding to consultation requests submitted by federal and state governmental agencies with respect to proposed undertakings on or affecting historic properties or sites on Tribal lands or which are culturally significant to the Miccosukee people.

4.     To date, to the best of my knowledge, I have not received a request for consultation from any governmental agency, whether federal or state, with respect to the project or undertaking located at the TNT Site.

I declare under the penalty of perjury that the above and foregoing is true and correct.

Executed on the 1 of August 2025.

By: _Jason M. Daniel_____
        Jason M. Daniel,
        Tribal Historic Preservation Officer

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

FRIENDS OF THE EVERGLADES, INC.,
a Florida 501(c)(3) not-for-profit
corporation, and CENTER FOR
BIOLOGICAL DIVERSITY, a 501(c)(3)
nonprofit organization,

      Plaintiffs,

vs.

KRISTI NOEM, in her official capacity as
Secretary of the UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY;
TODD LYONS, in his official capacity as
Acting
Director of the UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; KEVIN GUTHRIE, in
his official capacity as Executive Director of
the FLORIDA DIVISION OF
EMERGENCY MANAGEMENT; and
MIAMI-DADE COUNTY, a political
subdivision of the State of Florida,

      Defendants.

_____/

CIVIL DIVISION

CASE NO. 25-CV-22896-JEM

### DECLARATION OF MELANY FLINT

I, MELANY FLINT, make the following declaration:

1.      I am over the age of 21 and competent to testify in this matter.

2.      I make the statements in this Declaration based on my personal knowledge.

3.      My name is Melany Flint and I serve as a Biologist and Botanist with the Fish and Wildlife

Department for the Miccosukee Tribe of Indians of Florida ("the Tribe"), a position I have held

since March 2025.

-1-

4.      The Tribe's villages, cultural sites, and other lands are located in close proximity to the Dade-Collier Training and Transition Airport ("TNT Site").

5.      As a result, I conducted a survey designed to measure the light in the area proximate to the TNT Site at 10 different locations, from the intersection of U.S. Route 41 (Tamiami Trail) and Florida State Road 997 (Krome Avenue), moving westward to the entrance of the TNT Site at the intersection of Tamiami Trail and the Dade-Collier Jet Port Road.

6.      A true and correct copy of my findings from my survey are contained in the report attached as **Exhibit 1**.

7.      I took all measurements with the Sky Quality Meter-Ethernet device (SQM-LE).

8.      I took all photographs in the survey with an  iPhone 16 Pro.

9.      The measurement and photography equipment is maintained and calibrated in accordance with the manufacturer's factory calibration procedures, as documented in the calibration report supplied with the device. Calibration includes light and dark offset measurements aligned with the principles of traceability to National Institute of Standards Technology (NIST).

10.     The measuring equipment was calibrated on July 8th, 2025. A true and correct copy of the calibration results are attached as **Exhibit 2**.

11.     In advance of data collection, I created a plan to ensure accurate readings and collect data in an efficient and orderly manner. My test plan proceeded as follows:

12.     First, I conducted extensive research on different methods and tools to measure sky brightness. After thorough review and technical advice from the Dark Sky Conservancy, I decided the best tool would be the SQM-LE.

13.     Second, I analyzed the data from the World Atlas 2015 obtained from lightpollutionmap.info, a mapping application that displays artificial light sky brightness related

-2-

content produced by the Light Pollution Science and Technology Institute and reviewed The New World Atlas of Artificial Night Sky Brightness (Falchi et al. 2016).

14.     Third, I planned my survey points along Old Tamiami Trail to get a broad picture of sky brightness in relation to light pollution from different sources in comparison to the facility.

15.     Fourth, I scheduled the measurements for a night with the perfect weather conditions for getting an accurate SQM-LE reading as described by the manual.

16.     I was able to control for light pollution coming from the Miami-Dade metropolitan area by beginning my measurements at the Krome Avenue/Tamiami Trail intersection. Using this starting point, I was able to assess what impact light pollution from the Miami-Dade metropolitan area has on the area surveyed.

17.     As a result, I conducted the survey on July 30, 2025 over the span of 3 ½ hours and consequently, was able to compare my results to the results of the 2015 World Atlas, which is a fair and accurate comparator.

18.     I also observed numerous large light poles throughout the TNT Site (main entrance and on the facility grounds), both personally during my survey, as well as after reviewing aerial photographs taken within the past month of the TNT Site.

19.     In conclusion, I determined that, on average, the night sky in the survey area is 2.54 times brighter than it was 10 years ago.

20.     At the point tested closest to the facility, the night sky is 9.68 times brighter than it was in 2015.

21.     The introduction of light from the TNT Site has a direct and consequential impact on all aspects of Tribal life.

22.    Tribe members value their right to privacy. They seek to observe their practices and maintain their way of life without surveillance or interference. I observed a surveillance video camera installed near one Tribal village. Tribal desire to pursue their connection with the land in its natural form, without artificial elements, such as large light poles, that disturb the natural environment.

23.    The introduction of material amounts of light pollution causes Tribal members to avoid large stretches of land in their ancestral homeland. They cannot live in peace, observe their practices, or connect with the land with the introduction of the light pollution emanating from the TNT Site.

24.    In addition, the light pollution from the TNT Site threatens the Tribe's economic interests. As one example, the Tribe managed to obtain certification from DarkSky International, certifying that Big Cypress National meets the stringent requirements necessary for inclusion as an International Dark Sky Place. Through this certification, the Tribe is able to promote its ecotourism business. The light pollution from the TNT Site threatens the Tribe's ecotourism business.

25.    In addition, light pollution threatens the Tribe's self-reliance and self-subsistence. Tribal members hunt, gather, and trap in the lands proximate to the TNT Site. However, light pollution disrupts wildlife behavior. As one example, insects are attracted to light, which means changes to and disruption of food sources and insect behaviors. Meanwhile, other animals, such as the endangered Florida Bonneted Bat, the White-Tail Deer, and other wildlife,  will avoid the areas impacted by these light sources. As a result, large swaths of land previously used for hunting and trapping, will be vacated of wildlife. The Tribe's members will not be able to use these lands to sustain themselves.

-4-

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 26, 2025.

Dated: August 1, 2025                                    By: _____

                                                                          Melany Flint

Supp. App. 1828

# EXHIBIT 1

Supp. App.1829



Measuring Light along Old Tamaimi Trail

Supp. App.1830

Zenith sky brightness
magnitude/arc second$^2$

22.0   21.9   21.7   20.6   18.5   <17.5

*22 mag/arcsec$^2$ is the highest reading an SQM can produce. Higher number = Darker/clearer sky = less light pollution.

17   18   19   20   21   22   23

Map of light pollution from World Atlas 2015
www.lightpollutionmap.info

Supp. App.1831



| Color Magnitude | Bortle Class | Sky Brightness mag/arcsec$^2$ | Artifi./Natural |
|---|---|---|---|
| 7.6 - 8.0 | 1 | >21.90 | <0.01 |
| 7.1 - 7.5 | 2 | 21.90 - 21.50 | 0.01 - 0.11 |
| 6.6 - 7.0 | 3 | 21.50 - 21.30 | 0.11 - 0.33 |
| 6.3 - 6.5 | 4 | 21.30 - 20.80 | 0.33 - 1.00 |
| 6.1 - 6.3 | 4.5 | 20.80 - 20.10 | 1.00 - 3.00 |
| 5.6 - 6.0 | 5 | 21.1 - 19.10 | 3.00 - 9.00 |
| 5.0 - 5.5 | 6,7 | 19.1 - 18.00 | 9.00 - 27.0 |
| <4.5 | 8,9 | <18.00 | >27.0 |

Supp. App.1832



Map of light pollution from World Atlas 2015
www.lightpollutionmap.info

Supp. App.1833

# New aerial images of the facility from a helicopter taken on July 4th, 2025



Large light poles widely dispersed throughout the facility are visible in these images.



Supp. App.1834

Big Cypress Wildlife Management Area - Corn.

Big Cypress Wildlife Management Area

Alligator Alcatraz

Survey Points

Everglades & Francis S. Taylor Wildlife

East Coast Buffer Water Preserve Area

J  I  H  G  F  E  D  C  B  A

Data collection information
Date: 07.30.25
Time: 11:30 pm-3:15 am
Sky brightness measured using Unihendron SQM-LE
Tracks and points recorded on Avenza
Pictures taken on iPhone 16 Pro
(Night mode 1x, Night mode 0.5x, Regular 1x)

Image Landsat / Copernicus
Image © 2025 Airbus

Google Earth

Supp. App.1835

# Conditions of the night

- **Temperature:** about 81ºF

- **Clarity:** Clear skies, little to no cloud cover

- **Moon phase:** 36.7% waxing crescent
  - Could not be seen at any point during the sqm-le measurements
    - Position at the beginning of the readings:
      - Azimuth 326.92º
      - Altitude: -38.88º



**Moon: 36.7%**
Waxing Crescent



Supp. App.1836

# Point A



**Coordinates:** 25.761107, -80.476696
**Distance from detention center:** 44.6 km

**Zenith Sky Brightness (2015):** 19.06 mag/arcsec^2
**SQM-LE reading: 18.22 mag/arcsec^2**



Supp. App.1837

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1838

# Point B



**Coordinates:** 25.760914, -80.520035
**Distance from detention center:** 40.4 km

**Zenith Sky Brightness (2015):** 19.76 mag/arcsec^2
**SQM-LE reading: 19.00 mag/arcsec^2**



Supp. App.1839

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1840

# Point C



**Coordinates:** 25.760990, -80.60042
**Distance from detention center:** 32.8 km

**Zenith Sky Brightness (2015):** 20.55 mag/arcsec^2
**SQM-LE reading: 19.73 mag/arcsec^2**



Supp. App.1841

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1842

# Point D



**Coordinates:** 25.762061, 80.695053
**Distance from detention center:** 24.1 km

**Zenith Sky Brightness (2015):** 21.05 mag/arcsec^2
**SQM-LE reading: 20.25 mag/arcsec^2**



Supp. App.1843

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1844

# At this point, skyglow from the facility is visible to the naked eye from the road





Note: The camera does not do it justice without night mode. It is a significant source of light pollution. Very shocking to see how far the lights can be seen. For reference, the Miccosukee reservation was much closer in distance and no visible skyglow could be seen from this distance.

Supp. App.1845

# Point E



**Coordinates:** 25.761921, -80.801153
**Distance from detention center:** 15.6 km

**Zenith Sky Brightness (2015):** 21.04 mag/arcsec^2
**SQM-LE reading: 20.01 mag/arcsec^2**



Supp. App.1846

# Photos facing east

The Miccosukee administration
building can be seen on the right





Night mode 1x

Night mode 0.5x

1x

# Photos facing the detention facility



Night mode



Regular

Supp. App.1848

# Point F



**Coordinates:** 25.791948, -80.859181
**Distance from detention center:** 9.3 km

**Zenith Sky Brightness (2015):** 21.53 mag/arcsec^2
**SQM-LE reading: 20.70 mag/arcsec^2**



Supp. App.1849

# Photos facing east

At this point, the skyglow from the city is subtle to the human eye (mine). Also entered, an area dominated by bald cypress, making a clear view of the horizon and the actual extent of skyglow a little more challenging to gauge. Even more difficult for the iPhone camera.



Night mode 1x



Night mode 0.5x



1x

# Photos facing the detention facility



Night mode



Regular

Supp. App.1851

# Point G



**Coordinates:** 25.815256, -80.884508
**Distance from detention center:** 5.9 km

**Zenith Sky Brightness (2015):** 21.55 mag/arcsec^2
**SQM-LE reading: 20.64 mag/arcsec^2**



Supp. App.1852

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1853

# Photos facing the detention facility

Night mode


Regular


Supp. App.1854

# Point H



**Coordinates:** 25.842217, -80. 916082
**Distance from detention center:** 2.61 km

**Zenith Sky Brightness (2015):** 21.66 mag/arcsec^2
**SQM-LE reading: 19.60 mag/arcsec^2**



Supp. App.1855

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1856

# Photos facing the detention facility





Supp. App.1857



It is a little hard to tell in this photot but lights from the facility can be seen standing on the main road

(My first attempt at capturing this, you can see the light source better here)

Supp. App.1858

# Point I



Coordinates: 25.846036, -80.925430
Distance from detention center: 2.68 km

Zenith Sky Brightness (2015): 21.66 mag/arcsec^2
**SQM-LE reading: 17.85 mag/arcsec^2**

*AT THE ENTRANCE GATE OF THE FACILITY ON THE MAIN ROAD*



Supp. App.1859

# Photos facing the facility (NE)



Night mode 1x



Night mode 0.5x



1x

Supp. App.1860

# Entrance to the facility was a long road lined with tall, large and extremely bright industrial lights.



I regrettably did not snap an image of what the entrance looked like head on, but I did take a picture of the light it shed onto the vegetation on the other side of the road.





Supp. App.1861

# Point J



**Coordinates:** 25.847607, -80.941144
**Distance from detention center:** 3.55 km

**Zenith Sky Brightness (2015):** 21.70 mag/arcsec^2
**SQM-LE reading: 20.75 mag/arcsec^2**



Supp. App.1862

# Photos facing the city (east)

Light pollution from the facility and the city combine to make an even larger skyglow



Night mode 1x



Night mode 0.5x



1x

Supp. App.1863





Supp. App.1864

# In summary...

- On average, the night sky is brighter today than it was in 2015 by 1.281 mag/arcsec^2.

- A decrease in 1 mag/arcsec^2 means the sky is 2.54 times brighter (Night sky becomes washed).

- Meaning the night sky today is 3.25% brighter than it was 10 years ago.

- At the point nearest to the detention facility, there was a difference of 3.81 mag/arcsec^2, meaning the night sky is now 9.68 times brighter than it was in 2015.

Supp. App.1865

# Why is this a problem?

- Big Cypress has been designated an International Dark Sky Place since 2016—a title earned through a rigorous accreditation process. However, Alligator Alcatraz poses a direct threat to that designation.

- Light pollution can interfere with wildlife behavior. This facility sits right in the heart of the Everglades, which is home to a wide variety of birds, reptiles, mammals and amphibians, including the Endangered Florida panther.

## Some of the direct impacts on flora and fauna:

- Plants and pollinators rely on light cues to know how to behave and when to carry out those behaviors. Plants have photoreceptors that absorb near-infrared light from the moon and stars and several that absorb UV light. By artificially extending daylight hours, these photoreceptors can be needlessly triggered to where the plant's flowering pattern is disturbed.

- Many moths are drawn to light sources; they may spend a great amount of energy trying to reach a light source, which diminishes energy that should be used to forage or seek refuge.

- Bats actively avoid illuminated areas while their insect prey are attracted to them, disrupting a delicate balance. Excess light may delay or prevent emergence from roosts in bats and nocturnal birds, resulting in reduced foraging time.

- Light reflecting on clouds can be disorienting for migrating birds.

Supp. App. 1866

# EXHIBIT 2

| SQM-LE Calibration data | |
|---|---|
| Report Date | 2025-07-08 |
| Serial Number | 7904 |
| MAC | 0080A344776A |
| Model Number | 3 (SQM-LE) |
| Feature version | 84 |
| Protocol version | 4 |
| Light calibration offset | 19.94  mags/arcsec$^2$ |
| Light calibration temperature | 22.5  °C |
| Dark calibration period | 231.004  seconds |
| Dark calibration temperature | 28.6  °C |
| Calibration offset | 8.71 mags/arcsec$^2$ |

Scanned with
CamScanner

*Exhibit 1*



# Indian Villages on U.S. 41

Miami-Dade and Collier County
Map Produced by Miccosukee Real Estate Service

USCA11 Case: 25-12873   Document: 92-7   Date Filed: 01/08/2026   Page: 231 of 271

Supp. App.1870



**MICCOSUKEE TRIBE OF INDIANS OF FLORIDA**

Legend:

- Miccosukee Indian Reservation
- Miccosukee WCA 3A
- Miccosukee Reserved Area
- 80 Acres
- Resort/Lambick/SEMA
- Traditional Tree Islands and Points of Interest
- Main Water Control Structures
- Canals
- Oil Pipeline
- Main Roads

Produced by the Water Resources Department
2024

*Exhibit 3*

USCA11 Case: 25-12873   Document: 92-7   Date Filed: 01/08/2026   Page: 234 of 271



**Figure 95.** NSRSM v3.5.2 long-term (1966-2005) average of monthly flow vectors for the dry and wet seasons.

Supp. App.1873



Measuring Light along Old Tamaimi Trail

Supp. App.1874



Zenith sky brightness
magnitude/arc second$^2$

22.0  21.9  21.7  20.6  18.5  <17.5

*22 mag/arcsec$^2$ is the highest reading an SQM can produce. Higher number = Darker/clearer sky = less light pollution.

17  18  19  20  21  22  23

Map of light pollution from World Atlas 2015
www.lightpollutionmap.info

Supp. App.1875



Bortle Scale

| Color Magnitude | Bortle Class | Sky Brightness mag/arcsec² | Artifi./Natural |
|---|---|---|---|
| 7.6 - 8.0 | 1 | >21.90 | <0.01 |
| 7.1 - 7.5 | 2 | 21.90 - 21.50 | 0.01 - 0.11 |
| 6.6 - 7.0 | 3 | 21.50 - 21.30 | 0.11 - 0.33 |
| 6.3 - 6.5 | 4 | 21.30 - 20.80 | 0.33 - 1.00 |
| 6.1 - 6.3 | 4.5 | 20.80 - 20.10 | 1.00 - 3.00 |
| 5.6 - 6.0 | 5 | 21.1 - 19.10 | 3.00 - 9.00 |
| 5.0 - 5.5 | 6,7 | 19.1 - 18.00 | 9.00 - 27.0 |
| <4.5 | 8,9 | <18.00 | >27.0 |

Supp. App.1876



Zenith sky brightness
magnitude/arc second²

22.0  21.9  21.7  20.6  18.5  <17.5

Alligator Alcatraz

15.5 km

Miccosukee Indian
Reservation

Miccosukee Casino
and Resort

Map of light pollution from World Atlas 2015
www.lightpollutionmap.info

Supp. App.1877

# New aerial images of the facility from a helicopter taken on July 4th, 2025



Large light poles widely dispersed throughout the facility are visible in these images.



Supp. App.1878

Alligator Alcatraz

Survey Points

J  I  H  G  F  E  D  C  B  A

Data collection information
Date: 07.30.25
Time: 11:30 pm-3:15 am
Sky brightness measured using Unihendron SQM-LE
Tracks and points recorded on Avenza
Pictures taken on iPhone 16 Pro
(Night mode 1x, Night mode 0.5x, Regular 1x)

Supp. App.1879

# Conditions of the night

- Temperature: about 81ºF

- Clarity: Clear skies, little to no cloud cover

- Moon phase: 36.7% waxing crescent
  - Could not be seen at any point during the sqm-le measurements
    - Position at the beginning of the readings:
      - Azimuth 326.92º
      - Altitude: -38.88º



**Moon: 36.7%**
Waxing Crescent



Supp. App.1880

# Point A



**Coordinates:** 25.761107, -80.476696
**Distance from detention center:** 44.6 km

**Zenith Sky Brightness (2015):** 19.06 mag/arcsec^2
**SQM-LE reading: 18.22 mag/arcsec^2**



Supp. App.1881

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1882

# Point B



**Coordinates:** 25.760914, -80.520035
**Distance from detention center:** 40.4 km

**Zenith Sky Brightness (2015):** 19.76 mag/arcsec^2
**SQM-LE reading:** 19.00 mag/arcsec^2



Supp. App.1883

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1884

# Point C



**Coordinates:** 25.760990, -80.60042
**Distance from detention center:** 32.8 km

**Zenith Sky Brightness (2015):** 20.55 mag/arcsec^2
**SQM-LE reading: 19.73 mag/arcsec^2**



Supp. App.1885

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1886

# Point D



**Coordinates:** 25.762061, 80.695053
**Distance from detention center:** 24.1 km

**Zenith Sky Brightness (2015):** 21.05 mag/arcsec^2
**SQM-LE reading: 20.25 mag/arcsec^2**



Supp. App.1887

# Photos facing east





Night mode 1x

Night mode 0.5x

1x

# At this point, skyglow from the facility is visible to the naked eye from the road





Note: The camera does not do it justice without night mode. It is a significant source of light pollution. Very shocking to see how far the lights can be seen. For reference, the Miccosukee reservation was much closer in distance and no visible skyglow could be seen from this distance.

Supp. App.1889

# Point E



**Coordinates:** 25.761921, -80.801153
**Distance from detention center:** 15.6 km

**Zenith Sky Brightness (2015):** 21.04 mag/arcsec^2
**SQM-LE reading: 20.01 mag/arcsec^2**



Supp. App.1890

# Photos facing east

The Miccosukee administration
building can be seen on the right







Night mode 1x
Night mode 0.5x
1x

Supp. App.1891

# Photos facing the detention facility

Night mode


Regular


Supp. App.1892

# Point F



Coordinates: 25.791948, -80.859181
Distance from detention center: 9.3 km

Zenith Sky Brightness (2015): 21.53 mag/arcsec^2
**SQM-LE reading: 20.70 mag/arcsec^2**



Supp. App.1893

# Photos facing east

At this point, the skyglow from the city is subtle to the human eye (mine). Also entered, an area dominated by bald cypress, making a clear view of the horizon and the actual extent of skyglow a little more challenging to gauge. Even more difficult for the iPhone camera.



Night mode 1x



Night mode 0.5x



1x

# Photos facing the detention facility





Supp. App.1895

# Point G



**Coordinates:** 25.815256, -80.884508
**Distance from detention center:** 5.9 km

**Zenith Sky Brightness (2015):** 21.55 mag/arcsec^2
**SQM-LE reading: 20.64 mag/arcsec^2**



Supp. App.1896

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

Supp. App.1897

# Photos facing the detention facility



Night mode



Regular

Supp. App.1898

# Point H



**Coordinates:** 25.842217, -80. 916082
**Distance from detention center:** 2.61 km

**Zenith Sky Brightness (2015):** 21.66 mag/arcsec^2
**SQM-LE reading: 19.60 mag/arcsec^2**



Supp. App.1899

# Photos facing east



Night mode 1x



Night mode 0.5x



1x

# Photos facing the detention facility



Night mode



Regular

Supp. App.1901



Supp. App.1902

# Point I



**Coordinates:** 25.846036, -80.925430
**Distance from detention center:** 2.68 km

**Zenith Sky Brightness (2015):** 21.66 mag/arcsec^2
**SQM-LE reading: 17.85 mag/arcsec^2**

**\*AT THE ENTRANCE GATE OF THE FACILITY ON THE MAIN ROAD\***



Supp. App.1903

# Photos facing the facility (NE)



Night mode 1x



Night mode 0.5x



1x

Supp. App.1904

# Entrance to the facility was a long road lined with tall, large and extremely bright industrial lights.



I regrettably did not snap an image of what the entrance looked like head on, but I did take a picture of the light it shed onto the vegetation on the other side of the road.





Supp. App.1905

# Point J



**Coordinates:** 25.847607, -80.941144
**Distance from detention center:** 3.55 km

**Zenith Sky Brightness (2015):** 21.70 mag/arcsec^2
**SQM-LE reading: 20.75 mag/arcsec^2**



Supp. App.1906

# Photos facing the city (east)

Light pollution from the facility and the city combine to make an even larger skyglow



Night mode 1x



Night mode 0.5x



1x

Supp. App.1907

# Difference in sky brightness





Supp. App.1908

# In summary...

- On average, the night sky is brighter today than it was in 2015 by 1.281 mag/arcsec^2.

- A decrease in 1 mag/arcsec^2 means the sky is 2.54 times brighter (Night sky becomes washed).

- Meaning the night sky today is 3.25% brighter than it was 10 years ago.

- At the point nearest to the detention facility, there was a difference of 3.81 mag/arcsec^2, meaning the night sky is now 9.68 times brighter than it was in 2015.

Supp. App.1909

# Why is this a problem?

- Big Cypress has been designated an International Dark Sky Place since 2016—a title earned through a rigorous accreditation process. However, Alligator Alcatraz poses a direct threat to that designation.

- Light pollution can interfere with wildlife behavior. This facility sits right in the heart of the Everglades, which is home to a wide variety of birds, reptiles, mammals and amphibians, including the Endangered Florida panther.

## Some of the direct impacts on flora and fauna:

- Plants and pollinators rely on light cues to know how to behave and when to carry out those behaviors. Plants have photoreceptors that absorb near-infrared light from the moon and stars and several that absorb UV light. By artificially extending daylight hours, these photoreceptors can be needlessly triggered to where the plant's flowering pattern is disturbed.

- Many moths are drawn to light sources; they may spend a great amount of energy trying to reach a light source, which diminishes energy that should be used to forage or seek refuge.

- Bats actively avoid illuminated areas while their insect prey are attracted to them, disrupting a delicate balance. Excess light may delay or prevent emergence from roosts in bats and nocturnal birds, resulting in reduced foraging time.

- Light reflecting on clouds can be disorienting for migrating birds.