IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 25-12873
DISTRICT COURT DOCKET NO. 25-22896-CV-WILLIAMS

---

FRIENDS OF THE EVERGLADES, INC., et al.,

*Plaintiffs-Appellees,*

v.

EXECUTIVE DIRECTOR, FLORIDA DIVISION OF EMERGENCY
MANAGEMENT, et al.

*Defendants-Appellants.*

---

**BRIEF OF APPELLEE
THE MICCOSUKEE TRIBE OF INDIANS OF FLORIDA**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

---

Elliot B. Kula
Elaine D. Walter
William D. Mueller
KULA & ASSOCIATES, P.A.
12000 Biscayne Blvd., Ste. 221
Miami, Florida 33181
Telephone: (305) 354-3858
eservice@kulalegal.com
elliot@kulalegal.com
william@kulalegal.com
elaine@kulalegal.com

Christopher Ajizian
CHRISTOPHER AJIZIAN P.A.
1101 Brickell Ave., Ste. 700
Miami, Florida 33131
Telephone: (305) 699-5001
chris@ajizianlaw.com

Todd R. Friedman
TODD R. FRIEDMAN P.A.
1101 Brickell Ave., Ste. S-700
Miami, Florida 33131
Telephone: (786) 536-7190
todd@toddfriedmanpa.com

*Co-Counsel for The Miccosukee Tribe of Indians of Florida*

*FRIENDS OF THE EVERGLADES, INC., ET AL. V. FDEM, ET AL.*

CASE NO. 25-12873

**CERTIFICATE OF INTERESTED PERSONS
AND
CORPORATE DISCLOSURE STATEMENT**

Plaintiff-Appellee, The Miccosukee Tribe Of Indians Of Florida, submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this review:

1. Ajizian, Christopher, Esq.

2. Bennett, Elise Pautler, Esq.

3. Boies Schiller Flexner LLP

4. Bonzon-Keenan, Geraldine

5. Brabender, Allen M., Esq.

6. Burkhardt, Dominique, Esq.

7. Carpenter, Hayley A., Esq.

8. Center for Biological Diversity

9. Chris Ajizian P.A.

10. Coe, Alisa, Esq.

11. Coffey Burlington P.L.

12. Costello, David M., Esq.

13. Crockett, Jeffrey B., Esq.

14. DeSousa, Jeffrey Paul, Esq.

*FRIENDS OF THE EVERGLADES, INC., ET AL. V. FDEM, ET AL.*

CASE NO. 25-12873

**CERTIFICATE OF INTERESTED PERSONS
AND
CORPORATE DISCLOSURE STATEMENT**
(Continued)

15.  Earthjustice

16.  Ezray, Evan M., Esq.

17.  Ficarelli, Dante, Esq.

18.  Florida Division of Emergency Management

19.  Forrester, Nathan A., Esq.

20.  Friedman, Todd R., Esq.

21.  Friends of the Everglades, Inc.

22.  Galloni, Tania, Esq.

23.  Golembiewski, Kevin A., Esq.

24.  Gustafson, Adam R.F., Esq.

25.  Guthrie, Kevin

26.  Hiaasen, Scott, Esq.

27.  Kula & Associates, P.A.

28.  Kula, Elliot B, Esq.

29.  Lyons, Todd

30.  Martinez, Hon. Jose E.

31.  Miami-Dade County

*FRIENDS OF THE EVERGLADES, INC., ET AL. V. FDEM, ET AL.*

## CASE NO. 25-12873

## CERTIFICATE OF INTERESTED PERSONS
## AND
## CORPORATE DISCLOSURE STATEMENT
(Continued)

32.  Miccosukee Tribe of Indians

33.  Murray, David M., Esq.

34.  Mueller, William D., Esq.

35.  Noem, Kristi

36.  O'Byrne, Hayden P., Esq.

37.  Panuccio, Jesse Michael, Esq.

38.  Perez, Monica Rizo

39.  Piropato, Marissa, Esq.

40.  Raurell, Carlos J., Esq.

41.  Rizo, Monica, Esq.

42.  Quiñones, Jason A. Reding, Esq.

43.  Sanchez, Hon. Eduardo I.

44.  Schenck, Robert S., Esq.

45.  Schwiep, Paul J., Esq.

46.  Singer, Frank

47.  Stander, Robert, Esq.

48.  Todd R. Friedman P.A.

***FRIENDS OF THE EVERGLADES, INC., ET AL. V. FDEM, ET AL.***

**CASE NO. 25-12873**

**CERTIFICATE OF INTERESTED PERSONS
AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**
(Continued)

49.  Torres, Hon. Edwin G.

50.  Torstensen, Peter M., Esq.

51.  Totoiu, Jason Alexander, Esq.

52.  United States Department of Homeland Security

53.  United States Immigration and Customs Enforcement

54.  Uthmeier, James, Esq.

55.  Wahl, Christopher J., Esq.

56.  Walter, Elaine D., Esq.

57.  Williams, Hon. Kathleen M.

Pursuant to Federal Rule of Appellate Procedures 26.1 and Eleventh Circuit Rules 26.101 through 26.1-3, Plaintiff-Appellee, The Miccosukee Tribe Of Indians Of Florida, makes the following statement as to corporate ownership: No publicly traded company or corporation has an interest in the outcome of this case or appeal.

<u>/s/ Elliot B. Kula</u>
Elliot B. Kula

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument for the week of April 6, 2026.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF CONTENTS............................................................................................ ii

TABLE OF CITATIONS ........................................................................................iv

JURISDICTIONAL STATEMENT ..........................................................................1

STATEMENT OF THE CASE....................................................................................1

    I.     COURSE OF PROCEEDINGS. ...........................................................1

    II.    STATEMENT OF THE FACTS...........................................................2

         A.    Tribal Lands. ........................................................................2

         B.    Dade-Collier Training and Transition Facility. ........................5

         C.    Disruption of Tribal Land. ...........................................................7

         D.    Commencement of the Litigation. ..............................................9

         E.    Preliminary Injunction Proceedings..........................................10

         F.    Evidence. ....................................................................................13

         G.    Preliminary Injunction (Omnibus Order). ................................18

STANDARD OF REVIEW. ....................................................................................25

SUMMARY OF ARGUMENT ................................................................................27

ARGUMENT ..........................................................................................................28

    I.     THE DISTRICT COURT PROPERLY EXERCISED
         ITS DISCRETION IN DENYING THE VENUE

# TABLE OF CITATIONS
## (Continued)

**Page**

    CHALLENGE. ...................................................28

    A.    Defendants' Waived Objection to Venue. .................28

    B.    Waiver aside, Competent Substantial Evidence
        Supports the Venue Choice...................................29

    C.    Waiver aside, the District Court Properly
        Exercised its Discretion Under Section 1404. ..........32

II.    COMPETENT, SUBSTANTIAL EVIDENCE
    SUPPORTS THE PRELIMINARY INJUNCTION. ..........33

    A.    The Standard for Issuing a Preliminary Injunction,
        and this Court's Constrained (Deferential) Review.................33

    B.    Defendants Failed to Show the Irreparable Harm
        Findings are Clearly Erroneous. .................................36

    C.    Defendants Likewise Failed to Show Any Abuse
        of Discretion in the Likelihood of Success on the
        Merits Finding...........................................................41

    D.    The District Court's Weighing of the Equities is
        Equally Unassailable..................................................54

CONCLUSION .....................................................................57

CERTIFICATE OF COMPLIANCE .......................................58

CERTIFICATE OF SERVICE ...............................................58

iii

# TABLE OF CITATIONS

**Page**

### *Cases*

*Baragona v. Kuwait Gulf Link Transp. Co.*,
  594 F.3d 852 (11th Cir. 2010) ...................................................................28

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................44

*Cafe 207, Inc. v. St. Johns Cnty.*,
  989 F.2d 1136 (11th Cir. 1993) ..................................................................42

*City of Port Isabel v. FERC*,
  130 F.4th 1034 (D.C. Cir. 2025) .................................................................53

*Ctr.for Biological Diversity v. U.S. Bureau of Land Mgmt*,
  08-05646 JSW,2009 WL 1025606 (N.D. Cal. Apr. 14, 2009) ...........................32

*Cumulus Media, Inc. v. Clear Channel Communications, Inc.*,
  304 F.3d 1167 (11th Cir. 2002) ..................................................................34

*Fla. Ag. for Health Care Admin. v. Adm'r for
  the Ctrs. for Medicare & Medicaid Servs.*,
  161 F.4th 765 (11th Cir. 2025) ..................................................................42

*Ford Motor Credit Co. v. Owens*,
  807 F.2d 1556 (11th Cir. 1987) ..................................................................35

*In re Rasbury*,
  24 F.3d 159 (11th Cir. 1994) ......................................................................35

*Jenkins Brick Co. v. Bremer*,
  321 F.3d 1366 (11th Cir. 2003) ..................................................................30

*Jysk Bed'N Linen v. Dutta-Roy*,
  810 F.3d 767 (11th Cir. 2015) ....................................................................35

*McDonald's Corp. v. Robertson*,
  147 F.3d 1301 (11th Cir. 1998) ..................................................................25

iv

# TABLE OF CITATIONS
### (Continued)

**Page**

*Mills v. Hamm*,
  102 F.4th 1245 (11th Cir. 2024) ................................................... 34, 36

*Munaf v. Geren*,
  553 U.S. 674 (2008) ...................................................................... 42, 54

*Murphy v. Travelers Ins. Co.*,
  534 F.2d 1155 (5th Cir. 1976) ............................................................28

*Nat'l Treasury Employees Union v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025) .................................................... 46, 47

*Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen.,*
  *Florida Dep't of Health*,
  50 F.4th 1126 (11th Cir. 2022) ..........................................................33

*Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*,
  128 F.4th 1089 (9th Cir. 2025) ..........................................................44

*Pub. Citizen v. Office of U.S. Trade Representatives*,
  970 F.2d 916 (D.C. Cir. 1992) ...........................................................45

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ..................................................................... 43, 48

*S.E.C. v. Lauer*,
  478 Fed. Appx. 550 (11th Cir. 2012) .................................................28

*San Francisco Herring Ass'n v. Dep't of the Interior*,
  946 F.3d 564 (9th Cir. 2019) .............................................................45

*Seal v. Riverside Fed. Sav. Bank*,
  825 F. Supp. 686 (E.D. Pa. 1993) ......................................................29

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
  605 U.S. 168 (2025).................................................... 43, 51, 52, 53

*Sierra Club v. Marsh*,
  872 F.2d 497 (1st Cir. 1989) ....................................................... 43, 44

# TABLE OF CITATIONS
### (Continued)

**Page**

*Sierra Club v. U.S. Army Corps of Engineers*,
  803 F.3d 31 (D.C. Cir. 2015) ...............................................................47

*\*Southern Mills, Inc. v. Nunes*,
  586 Fed.Appx. 702 (11th Cir. 2014) ....................................................25

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*,
  985 F.3d 1032 (D.C. Cir. 2021) ............................................................53

*Stansell v. Revolutionary Armed Forces of Colombia*,
  771 F.3d 713 (11th Cir. 2014) ..............................................................28

*Stout by Stout v. Jefferson Cnty. Bd. of Educ.*,
  882 F.3d 988 (11th Cir. 2018) ..............................................................35

*Swain v. Junior*,
  958 F.3d 1081 (11th Cir. 2020) ............................................................34

*United States v. Lanzon*,
  639 F.3d 1293 (11th Cir. 2011) ............................................................30

*United States v. S. Florida Water Mgmt. Dist.*,
  28 F.3d 1563 (11th Cir. 1994) ...................................................... 50, 51

*United States v. Smith*,
  918 F.2d 1551 (11th Cir. 1990) ..................................................... 25, 30

*Vill. of Bald Head Island v. U.S. Army Corps of Engineers*,
  714 F.3d 186 (4th Cir. 2013) ................................................................45

*Wood v. Fla. Dep't of Educ.*,
  142 F.4th 1286 (11th Cir. 2025) ...........................................................42

## TABLE OF CITATIONS
(Continued)

**Page**

### *Statutes*

28 U.S.C. § 1391 ........................................................................... 10, 31, 32

42 U.S.C. §4332 .................................................................................... 43

42 U.S.C. § 4336e ........................................................................... 48, 53

### *Rules*

Fed. Civ. P. 12 ..................................................................................... 28

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE CASE

The Miccosukee Tribe of Indians of Florida (the Tribe) ask the Court to affirm the district court's preliminary injunction.  DE:131.[1]  In its 82-page Omnibus Order, upon extensive findings of fact and conclusions of law, the district court granted a preliminary injunction requiring Defendants-Appellants to wind down operations on the Dade-Collier Training and Transition Airport site (the TNT Site) in the Everglades (commonly referred to as Alligator Alcatraz).

## I.    COURSE OF PROCEEDINGS.

Appellees, Friends of the Everglades, Inc. (Friends) and Center for Biological Diversity (Center) (collectively, Environmental Groups), filed a complaint against Kristi Noem as Secretary of the United States Department of Homeland Security (DHS), Todd Lyons as Acting Director of the United States Immigration and Customs Enforcement (ICE) (collectively, Federal Defendants), as well as Kevin Guthrie as Executive Director of the Florida Division of Emergency Management (FDEM) and Miami Dade County (County).  DE:1.  The complaint included a request for injunctive relief.  DE:1:26.  The Environmental Groups also moved for

---

[1] District court docket items are referred to as "DE:" and this Court's docket items are referred to a as "Doc.No."  The Supplemental Appendix filed with the Environmental Groups' Brief is referred to as "Supp.App."  Citations also refer to Defendants' joint appendix.

a temporary restraining order (TRO) or preliminary injunction (PI) on an expedited basis.  DE:5.

Federal Defendants, FDEM, and the County opposed any TRO or PI.  DE:12, 16, 21.  The Environmental Groups replied.  DE:24.[2]

And the Tribe, with leave to intervene, DE:33, 73, filed its intervenor complaint and joined the Environmental Groups' complaint and expedited motion. DE:84, 85.

The district court held a hearing on venue on July 30, 2025.  DE:72; 89.  The Tribe appeared and adopted the Environmental Groups' arguments.  DE:89:27.

The district court then held a four-day hearing on the PI request (*see* DE:114; 113; 129; 130), following which the district entered the 82-page Omnibus Order (*see* DE:131), ruling on venue and granting in part the PI.

This appeal followed.  DE:132; 136.[3]

## II.   STATEMENT OF THE FACTS

### A.   Tribal Lands.

The Tribe maintains enduring cultural, residential, and sovereign ties to a broad and interconnected expanse of land in South Florida.  The map on the next page represents the traditional tree islands on Tribal property.

---

[2] The Environmental Groups withdrew any request for PI relief against the County.

[3] The district court denied a stay pending appeal.  DE:137; 138; 147.  This Court granted the stay.  *See* Doc.No.:9-1, 20, 70.



DE:33-2.[4]

The rectangular area in the top left-hand corner represents the Miccosukee

Federal Reservation (MFR), which is held in trust for the Tribe.  DE:129:19.

---

[4] The Tribe redacted the tree island names, *e.g.*, DE:33-2, "[b]ecause they are sacred" and it "doesn't usually share their sacred grounds."  DE:129:18.

The area in the middle of the map (dark green/blue), is the Miccosukee Water Conservation Area 3A (MWCA) and is leased to the Tribe in perpetuity by Florida. DE:129:19, 21–22. The southern portion of MWCA lies in the County, while the northern portion extends into Broward County. DE:129:18.

To the west lies Big Cypress National Preserve (Big Cypress), and to the south is Everglades National Park. DE:129:16. The Tribe has occupancy, hunting, and gathering rights in these federally managed lands. DE:129:20. The Department of Fish and Wildlife conducts "co-stewardship in Everglades National Park, Big Cypress, and … provide[s] management input across the Greater Everglades regions, which extends up into Kissimmee." DE:129:100.

The Miccosukee Reserved Area (MRA), located in Miami-Dade County along U.S. 41 (bottom of the map), is where most Tribal members make their home. DE:129:16, 24. Indeed, "80 percent of the Tribal members live" in this area, along with "the Tribal government building," "the schools, the preschools and the health centers." DE:129:16; DE:129:34, 45.

Several Tribal villages dot the landscape along U.S. 41 (the Tamiami Trail). DE:129:14. And beyond the villages, "there is a few private homes that were grandfathered into Big Cypress before it became a preserve," and "after that, the closest [to Alligator Alcatraz] would be the [MRA] where there is more Tribal homes." DE:129:34.

Tree islands scattered across Tribal lands hold profound cultural and spiritual meaning for the Miccosukee people. "[T]he Tribe has a long history with these and many more tree islands," and that "[t]here are still a number of Tribal members that

were … born on the islands." DE:129: 19. The islands serve as sacred burial grounds. DE:129:19. Many Tribal members "still have traditional camps on them," where "[t]hey take their kids out to teach them their history." DE:129:19. And Islands are used for hunting, fishing, and practicing cultural beliefs. DE:129:19.

### B. Dade-Collier Training and Transition Facility.

The TNT Site or "jetport"—sits in close proximity to Tribal lands. In fact, the TNT Site is "[a] couple miles, two, three, maybe" from the Tribe's lands in MWCA. DE:129:107. Here's a visual (red arrow depicting TNT):



DE:33-2. The L-28 Canal (depicted above), runs vertically just east of the TNT Site in Miami-Dade County (with the top portion bending into Broward County). DE:129:107.

Tribal tree islands "are south of the jetport", as well as several villages, as depicted below:



DE:33-1:2. *And see* DE:129:55 (testimony).

Big Cypress, where the TNT Site is located, is considered Tribal land because "the Tribe has access to Big Cypress and the Tribe traditionally used that access road as access into Big Cypress." DE:129:73. Big Cypress lies to the south of the jetport, too.

Before June 2025, the TNT Site operated as a small training airport with minimal activity. DE:129:32. The airport featured "[s]mall planes, one, two passenger… [n]othing big" flying out daily with "[r]arely any" individuals on-site. DE:129:32, 159–160. The noise was negligible. DE:129:32 ("You don't really hear the noise."). "Consistently," it was "a quiet area." DE:129:30, 33.

Nighttime conditions were equally unremarkable. No "visible lighting … emitted from the facility at night" even "from the roadway immediately adjacent the

facility." DE:129:111. "[T]he TNT Site is pretty much nondetectable to the human eye based off lighting at night." DE:129:111. This mattered because Big Cypress holds a "dark sky" designation that "national areas earn for being very dark and being very pristine." DE:129:112.

Tribal members visited the TNT Site and the surrounding area "primarily for traditional hunting, fishing and plant collection for medicinal and ceremonial purposes." DE:129:108. These activities occurred not on the runway itself but in the "natural areas … [i]mmediately around the actual runway strip." DE:129:108, 119. When Tribal members hunt in Big Cypress, they typically hunt for white-tailed deer for subsistence and for ceremonial purposes. DE:129:119. They fish for "Florida gar, bowfin, … and large mouth bass," likewise for subsistence and cultural reasons. DE:129:119–120. Gathering of plants occurs "year-round" but increases seasonally to "correspond to ceremonial purposes." DE:129:120.

The Tribe's constitutional commitment to this land runs deep: "It's written into their Constitution to protect the Everglades because the Everglades protected them when they were being hunted by the Government." DE:129:26.

### C.   Disruption of Tribal Land.

The TNT Site's conversion to Alligator Alcatraz was swift and dramatic. After June 2025, where there had once been "zero to maybe one or two people," the facility was now "established" to "support thousands of people." DE:129:156, 160. The quiet training airport gave way to constant motion: "Vehicles going in and out of the entrance of the jetport ... tanker trucks in and out, fill trucks in and out,

protestors, media, people setting up a tent to sell merch for Alligator Alcatraz, just different levels." DE:129:33.

There is no dispute that this upheaval occurred without any notice to the Tribe. Before the advent of the detention facility, no one from the Federal Government contacted the Tribe. DE:129:33. Neither did the State Government. DE:129:34. The Tribe "had no notice of the facility," despite the fact that "[i]t's generally part of the protocol when there is large State or Federal programs that the Tribe is consulted with for matters that would affect" the Tribe. DE:129:169.

The physical barriers erected around the facility now block Tribal members' primary access to Big Cypress for traditional activities. DE:129:175. Checkpoints and guards stand where open land once welcomed Tribal hunters, fishers, and gatherers. DE:129:170–71. Tribal members now face the inadvisable prospect of "approach[ing] the security guards armed prepared for hunt." DE:129:171.

Even beyond the fenced perimeter, the land has been rendered culturally unusable. Tribal members have "unanimously" ceased "practicing cultural practices there, hunting, fishing, collecting medicinal plants." DE:129:173. The plants that Tribal members once harvested for medicinal and ceremonial purposes have lost their sacred value—not because they cannot be physically reached, but because the human activity has stripped them of their cultural significance. DE:129:154–55. "The fact that it's a detention facility does not matter. It's just the [new] level of human activity" brought on by the larger population level coupled with increased pollution. DE:129:172–73.

The Tribe now finds itself unable to access lands it used for generations, practice traditions that predate the State of Florida, or protect resources it is constitutionally committed to preserving—all because of a facility constructed in days without a single word of consultation.

### D.  Commencement of the Litigation.

The Environmental Groups sued FDEM and Federal Defendants (Defendants), seeking declaratory and injunctive relief (i) declaring that Defendants' actions violate the National Environmental Policy Act (NEPA) and the Administrative Procedures Act (APA); and (ii) enjoining any further pre-construction activities, construction, conversion, or use of the TNT Site for immigration detention without first complying with NEPA and the APA.  DE:1.

With leave, the Tribe filed its intervenor complaint and joined in the Environmental Groups' pending motions.  DE: 33; 73; 84; 85.

Pertinent to the Tribe's interest here, the Tribe, aside from adopting the Environmental Groups' claims, alleged specifically that the Federal Defendants violated the National Historic Preservation Act (NHPA).  DE:84:7–10.  And it alleged that DHS and ICE undertook the construction and operation of the Alligator Alcatraz detention facility within the Tribe's ancestral homelands.  DE:84:7–10.  It further alleged that the facility constitutes a federal undertaking affecting historic and culturally significant Tribal properties.  DE:84:7–10.  According to the Tribe, the Federal Defendants failed to engage in the mandatory government-to-government consultation process required by the NHPA, despite longstanding

federal recognition that the entirety of Big Cypress is an area of potential effect containing numerous protected ceremonial, religious, and cultural sites of profound significance to the Tribe.  DE:84:7–10.

Like the Environmental Groups, the Tribe asked the district court enjoin further activity at the TNT Site until Defendants complied with applicable laws.

### E.   Preliminary Injunction Proceedings.

#### (1) Motions.

The Environmental Groups moved for an expedited TRO and PI, seeking to restrain and enjoin Defendants from performing or authorizing any construction, development, or operational use of the TNT Site as an immigration detention center until they satisfy their obligations under NEPA and the APA.  DE:5; DE:13; DE:14. The Tribe joined those requests.  DE:85; DE:99.

#### (2) Oppositions.

Both FDEM and the Federal Defendants opposed the PI and TRO request in various filings.  DE:12; DE:16; DE:21; DE:28; DE:60.  Note: No Defendant raised venue in their initial responses to the TRO motion.  *See* DE:16 (FDEM's Opposition); DE:21 (Federal Defendants' Opposition).

Nearly a month later, venue was raised for the first time in FDEM's "Supplemental Response to Plaintiffs' Requests for a [TRO]," arguing venue was improper under 28 U.S.C. § 1391 because (i) the Federal Defendants do not reside in Florida and (ii) no "substantial part of the events or omissions giving rise to the claim" occurred in the Southern District of Florida, and no "substantial part of

property that is the subject of the action" is located there.  DE:50:1–2.  According to FDEM, because Alligator Alcatraz is in Ochopee, an unincorporated area of Collier County and "[a]ll the detention facilities, all the buildings, and all the paving at issue are sited in Collier County," venue was required in the Middle District.  DE:50:2–3.

FDEM also contended that all relevant decision-making occurred either in Washington, D.C., in Tallahassee, Florida, or on-site in Collier County.  *See* DE:50:3–4.  *See also* DE:50-1:¶¶ 2, 4–5 (Declaration of Ian Gadea-Guidicelli, SERT Chief).

Federal Defendant, likewise raising venue for the first time, argued (i) they're not Florida residents, (ii) the buildings, pavement, and activities at the temporary detention center are in Collier County, and (iii) the case could be and was more appropriately brought in the Middle District.  DE:60:3–5.  And invoking the federal officer venue provision, they argued that (i) neither Federal Defendant resides in the Southern District, (ii) no substantial part of the events, omissions, or property at issue is situated there, and (iii) "real property is a central component" of the venue analysis, but the detention facility was "a collection of buildings and pavement on real property."  DE:60:4–5.

### (3) Evidentiary Hearing.

The district court presided over a **four-day evidentiary hearing**, during which the Tribe called two witnesses and admitted over eighteen documents into evidence.  DE:123; 127.

**Witness One**.  Amy Castaneda has served the Tribe for nineteen years, beginning as a Water Quality Technician then Water Quality Manager and ultimately as Water Resources Director.  DE:129:12.  As Director, she oversees monitoring of the Tribe's water quality, water level, and non-point source programs on Tribal lands.  DE:129:13.  Her office is located in the MRA.  DE:129:31.

**Witness Two**.  Dr. Marcel Bozas holds a Ph.D. in Earth System Science with a natural resources track.  DE:129:96.  His dissertation involved studying wildlife movement using trail cameras in the Everglades, examining what drives species distribution and population density across the landscape.  DE:129:97.  He conducted that study in MWCA and Everglades National Park, in connection with the Tribe, for close to five years.  DE:129:97.  Dr. Bozas began working for the Tribe in May 2018 as an intern, was hired as a part-time wildlife biologist at the end of that summer, held that position for six to seven years, and became Director of Fish and Wildlife approximately one year ago.  DE:129 at 98–99.

Together, Castaneda and Bozas described the irreparable harm the Tribe faced because of the Alligator Alcatraz facility.  They described the (i) complete failure of federal and state authorities to consult with the Tribe before constructing the facility; (ii) threat that contaminated runoff poses to Tribal water supplies; (iii) loss of access to lands to the Tribe; and (iv) cultural harm inflicted by the sudden and overwhelming human presence.

###### F.  Evidence.

###### (1) Failure to Consult with the Tribe.

The witnesses established that the Tribe routinely participates in environmental review processes for projects affecting the Greater Everglades but was not consulted here.  Castaneda, who has personally participated in NEPA processes on behalf of the Tribe, testified that "[t]he Tribe's involved in a lot of Everglades restoration projects and the Federal Government has a trust responsibility to the Tribe for government-to-government consultation," so "whenever any of those projects are ongoing and ready for a tentatively selected plan, the Tribe is involved in those NEPA."  DE:129:43.

Castaneda used the Western Everglades Restoration Project ("WERP") as an instructive example.[5]  She identified a July 2016 letter from the Army Corps inviting the Tribe "to participate on the project delivery team" and "to formally initiate government-to-government consultation between" the Tribe and the Corps. DE:129:46.  The Tribe was invited to public meetings.  DE:129:49.  The Tribe received notice of availability for the draft Environmental Impact Statement and Project Implementation Report, with opportunity "for … review and comment." DE:129:57–58.  The Corps acknowledged in writing that it "fully … respects the Tribe's self-determination, sovereignty and statutory rights within Big Cypress…." DE:129:51.  *See also* TribeEx.22 (Supp.App.:3116, Doc.No.:39-2:2868).

No such process occurred here.

---

[5] More on this Project to follow.

Before putting up Alligator Alcatraz, no one from the Federal Government contacted the Tribe. DE:129:33. No one from the State Government contacted the Tribe. DE:129:34. No governmental entity of any kind contacted the Tribe. DE:129:34. No project delivery team was assembled. DE:129:46. No government-to-government consultation occurred. DE:129:47. The Tribe was not invited to any public meetings. DE:129:49. No opportunity to review and comment on an Environmental Impact Statement existed. DE:129:58. No opportunity to issue a letter of support or opposition happened. DE:129:54.

Bozas confirmed the complete absence of notice. He had no opportunity to conduct baseline wildlife surveys in advance of the facility's construction: "We had no notice of the facility." DE:129:169.

### (2) Threat to Tribal Water Resources.

Castaneda testified extensively about water flow patterns in the Everglades and the risk that runoff from Alligator Alcatraz poses to Tribal lands. Using a map depicting the general direction of water flow, she explained that water from the TNT Site "moves in the general direction of south-southwest" and "eventually flows through the Tribal lands." DE:129:23–24. That water flows to "Big Cypress …, eventually making its way potentially into the [MRA] and, depending on the direction of flow, could be to the [MWCA]." DE:129:24. The MRA—where eighty percent of Tribal members live, where two schools are located, and where the government building sits—lies just a few miles southeast of the TNT Site. DE:129:16, 24.

14

Castaneda explained the Everglades ecosystem's acute sensitivity to nutrient contamination: "[t]he Everglades is a low nutrient wetland so if there is a flux of nutrients, it's like eating McDonald's all day, every day, it's not good for you and it becomes obese in a sense." DE:129:40. When excess nutrients enter the wetlands, "[t]he vegetation in that area grows in an unnatural way" and becomes "basically unpenetrable [sic] by the wildlife" due to lack of "foraging." DE:129:39–40. Over 4,000 acres of the Tribe's Federal Reservation has been degraded by "unnatural vegetation growth due to those nutrients coming into the canal" from agricultural practices to the north. DE:129:40–41.

A detention facility housing thousands of people generates the wastewater that threatens this fragile ecosystem, leading Castaneda to identify several sources of concern: showering ("Soaps usually have phosphates [that] make it into the wetland [with] an influx of nutrients"), cooking and cleaning ("clean[ing] dishes and water is necessary for cooking and with that comes waste"), laundry ("detergents, again, carry[] phosphates"), and vehicles and generators ("runoff from paved areas ... petroleum products … make its way into the wetland"). DE:129:41–42.

The Tribe has no information about how—or whether—the facility manages this wastewater.[6] Castaneda checked the permitting databases for Miami-Dade County, Collier County, FDEP, and the Corps, and found that only two permits had been requested: "one for a chain-link fence around the facility, and one for wells and

---

[6] Castaneda has attempted to collect samples downstream of the TNT Site, but the Tribe lacks access to the site itself. DE:129:36. "Without access we can't scoop up a cup of water." DE:129:37.

both were denied." DE:129:62.  Based on the available evidence, she concluded: "It seems like there is no permitting for the facility."  DE:129:62. Without permits, "[t]here is no management plan for stormwater runoff, wastewater runoff," no "best management practices," and "all of that runoff makes its way into the wetlands." DE:129:62.

These risks are magnified by the facility's location within the footprint of the WERP—a multi-billion dollar, federally authorized effort to restore the Greater Everglades ecosystem.  DE:129:20–21.  WERP was authorized by Congress in the Water Resources Development Act of 2024 and operates as a 50/50 cost share between the Corps and the South Florida Water Management District.  DE:129:20–21, 28–29.  The project represents years of scientific study, public comment, and interagency coordination—precisely the process that was bypassed here.

Critically, WERP's infrastructure was designed around the TNT Site's prior use as a small training airport.  Castaneda explained that during WERP planning, the Tribe advocated for the complete removal of the L-28 canal and levee to restore natural water flow.  DE:129:27–30.  The Corps instead proposed a compromise: bidirectional culverts that would reconnect east-west water flows while still providing flood protection for the jetport, a "compromise to reconnect the east and west flows without removing entirely the canal and the levee.".  DE:129:28–30.

WERP's design "accounted for the jetport" as it existed "at the time" ("[m]inor training, small planes in and out… a pretty quiet area")—not as a sprawling detention facility housing thousands of people generating continuous

wastewater and stormwater runoff now threatening the Tribe's primary residence due, in part, to WERP.  DE:129:61, 81–82; DE:129:48–49.

### (3) Loss of Access to Traditional Lands.

Before Alligator Alcatraz's erection, the lands surrounding the TNT Site served as a gateway to Big Cypress for Tribal hunters, fishers, and gatherers.  Bozas testified that off-road vehicle trails with trailheads adjacent to the TNT Site provided "the primary method by which Tribal members access Big Cypress for traditional activities."  DE:129:175.  That access has been revoked: "[t]he Tribe can no longer access the facility itself and around the facility. That's within Big Cypress. They have rights to hunt and gather and fish in the area so they no longer have those accesses."  DE:129:55.  There are no other access points to those trails.  DE:129:164. Bozas described the physical obstacles in place: checkpoints and guards now stand where the trails once began.  DE:129:170–171.

Pre-June 2025 fencing was limited to "the runway and the adjacent kind of parking lot and strips that are part of the airport."  DE:129:171. Areas outside that fencing—including the trailheads and the land Tribal members used—remained accessible.  DE:129:172.  That is no longer the case.

### (4) Cultural Harm from Human Activity.

Even if physical access were restored, Bozas testified that Tribal members "unanimously" ceased "practicing cultural practices there, hunting, fishing, collecting medicinal plants" since Alligator Alcatraz opened.  DE:129:173.  This cessation is not a matter of inconvenience but reflects a fundamental cultural

17

principle: plants Tribal members once harvested for medicinal and ceremonial purposes "lose their medicinal or ceremonial or cultural value, [and] can no longer be utilized."  DE:129:155.  The prohibition from using the now-tainted plants is enforced by "the culture and ceremonial practice."  DE:129:155.

The harm is ongoing: the longer the facility operates at its current intensity, the larger the zone of cultural contamination grows.  DE:129:131, 155–156, 173.

### G.   Preliminary Injunction (Omnibus Order).

The district court—after a four-day evidentiary hearing—entered its 82-page Omnibus Order with extensive findings of fact based upon the evidence presented and discussion of law, ruling venue is proper and granting the preliminary injunction (the PI) in part.  DE:131.  Here's a synthesis of the district court's rulings.

#### (1) Venue Ruling.

*Waiver*.  The district court found that FDEM waived its venue challenge by "litigating this case on the merits for almost a month—including filing three merits briefs in opposition to Plaintiffs' requests for injunctive relief—before raising venue." DE:131:22.  It also filed a "declaration from FDEM Executive Director Guthrie" and "a motion for extension of time to respond to the Complaint … all without mentioning venue."  DE:131:23.  The district court concluded that "is sufficient for a finding of waiver."  DE:131:24.

*The Merits*.  The district court denied the venue challenge on the merits, too. DE:131:24–43.[7]

First, the court determined the suit did not "involve real property" within the meaning of section 1391(e)(1)(C), because "Plaintiffs' suit ... centers on non-compliance with 'statutory mandates'—namely the Federal Defendants' approval, construction, funding, and use of the detention camp without conducting environmental analyses required by NEPA—not who possesses any given property right to the TNT [S]ite."  DE:131:27.

Second, the court found venue proper under sections 1391(b)(2) and (e)(1)(B) because a substantial part of the events giving rise to the claims occurred in the Southern District of Florida, identifying the following connections:

- Miami-Dade County owns the TNT Site and received correspondence from the State regarding the project;

- "ICE's Miami field office is responsible for coordinating and supervising immigration enforcement functions conducted by deputized state law enforcement agency officials,"

- "the Federal Defendants bring detainees from other Miami-Dade detention facilities to the TNT [S]ite,"

- the Tribe—which should have been consulted under NEPA—is headquartered in Miami-Dade; and

---

[7] The district court's merits analysis spans 20 pages, far from a "cursory analysis" as suggested by this Court in its stay order and not deserving of the Court's "skeptical" view.  DE:131:26–27.

▪ the locus of environmental harms, including "increased runoff" likely to "flow into the Tribe's water supply" and "light pollution from the camp's intense industrial lighting," occurs within Miami-Dade County.

DE:131:36–39.

Finally, the district court declined to transfer the case under section 1404(a), noting "the S.D. Fla. provides the closest federal courthouse to the TNT [S]ite by 50 miles," "eighty percent of Tribal members live in Miami-Dade," and "[m]uch of the evidence of environmental harms would also be derived from Miami-Dade." DE:131:43.

### (2) Injunction Ruling.

#### IRREPARABLE HARM

The district court made extensive findings regarding irreparable harm, to both the Environmental Groups and the Tribe, based on "substantial evidence" presented at the evidentiary hearing.  DE:131:75.[8]

That is, based on "substantial evidence," the district court found Tribe members suffered procedural harm through loss of the right to comment during the (nonexistent) NEPA process.  DE:131:51–52.  The Tribe employees "are routinely notified of new projects in the area, so they can consult and collaborate during the NEPA process," yet "were never notified of the project until news of the site became public."  DE:131:47–48.  Members "emphatically stated that they would have

---

[8] The Tribe joined the Environmental Groups' assertions of harm in the district court, but here will focus on the harms specific to the Tribe.

provided such comments" and instead "lost the right to do so when Defendants refused to comply with their statutory obligations."  DE:131:51–52.

There was "substantial evidence" of ongoing environmental harms that would affect the Tribe.  The "creation of 800,000 square feet of new impervious surface will increase runoff into the surrounding, interconnected wetlands, which threatens the 'extremely sensitive…low nutrient' hydrology of the Everglades."  DE:131:67–68.  The district court credited expert testimony that "anything that falls in th[ose] 20 acres will go directly into the wetlands" and Defendants' silt fencing "is not suitable in the long-term" and "not 'an appropriate substitute for a soil geologist designed storm water management system.'"  DE:131:68–69.

Those environmental concerns directly impact the Tribe.  First, the project threatens the Tribe's water supply: "Based on the general direction of water flow in the area around the project, water from TNT [S]ite is likely to flow into the Tribe's water supply, risking contaminating the water of Tribal residences, schools, the Tribe's government building, and businesses" located just "a few miles downstream from the TNT [S]ite" in the MRA where "eighty percent of Tribal members reside."  DE:131:67, 70.

Second, Tribal members "have lost access to the off-road trails leading into the BCNP lands for hunting and other activities due to the camp's operations" and the camp's new human activity "erodes the cultural significance of the plant life."  DE:131:72–73.  The district court specifically credited testimony that the Tribe's "traditions of hunting, fishing, and collection of medicinal or other culturally important plants around the site" have been disrupted.  DE:131:9.

21

## LIKELIHOOD OF SUCCESS ON THE MERITS

The district court found a substantial likelihood of success on the NEPA claim.

**Final agency action**.  The court determined that Defendants' "decision to refrain from issuing an [environmental impact statement] or conducting an [environmental assessment], and then building a detention camp, represents a determinative position on the matter and has adversely affected Plaintiffs' recreational, conservational, and aesthetic interests."  DE:131:50–51.  The court explained that the "construction of the camp does not represent a preliminary, procedural, or intermediate agency action," because "the facility has undergone substantial construction and is currently operational." DE:131:49.  Citing precedent, the court concluded that "an agency's decision not to prepare an EIS is a final agency action" and "the decision not to issue an EIS or conduct an EA and then construct a detention camp qualifies as a final agency action." DE:131:50.

**Major federal action**.  The court then found the project constitutes a "major Federal action" subject to NEPA, focusing its analysis "on the federal agencies' control and responsibility over material aspects of the specific project," as follows:

- "[A]ll immigration enforcement activities associated with the camp— key drivers of the project's environmental impact—are entirely under federal control and pursuant to federal law." DE:131:55.

- "Given that the camp acts exclusively as 'an immigration detention facility,' any state officials working on site with detainees are doing so as deputized federal immigration officers pursuant to 287(g)

agreements," and those officers "are not authorized to perform immigration officer functions except when working under the supervision and direction of ICE personnel." DE:131:55.

- The camp "operates using 'ICE detention standards,'" that "ICE directs arresting law enforcement officers whether to take people into custody," and that "federal officials … physically transport detainees on and off site and conduct deportations using federally-owned aircraft." DE:131:56.

**Federal request and funding**.  The court found that the project was built at federal request and with committed federal funding.  The court credited "substantial evidence" that FDEM's own written materials acknowledged the facility was built after "DHS and [FEMA] request[ed] the State of Florida to supplement [its immigration enforcement] capacity with a temporary detention facility." DE:131:61.  The court also found that federal funding had been committed, noting that "DHS 'announced $600 million in federal funding for the Detention Support Grant Program' and the 'only eligible applicant ... is the [FDEM].'"  DE:131:62. The court, "taking all of this context into consideration," DE:131:63, summarized the project evidence as follows:

> [T]he project was requested by the federal government; built with a promise of full federal funding; constructed in compliance with ICE standards; staffed by deputized ICE Task Force Officers acting under color of federal authority and at the direction and supervision of ICE officials; and exists for the sole purpose of detaining and deporting those subject to federal immigration enforcement.

DE:131:65.

**Conclusion**.  "Defendants do not purport to have produced an EIS or conducted any environmental assessment prior to constructing or commencing operations of the camp."  and "do not dispute that the camp and its operations have a sufficient impact on the quality of the human environment to be considered 'major,' justifying the need for an EIS."  DE:131:46; DE:131:47.  Based on its findings that Defendants' actions constituted a final federal action, the court concluded that Plaintiffs demonstrated a likelihood of success on their NEPA claim.

### BALANCE OF EQUITIES

The court found the balance of equities favored Plaintiffs, noting "Plaintiffs have provided extensive evidence supporting their claims of significant ongoing and likely future environmental harms from the project," while "Defendants offered little to no evidence why this detention camp, in this particular location, is uniquely suited and critical to that mission."  DE:131:75–76.  The court credited testimony that "the current detention camp is the 'only site that [Director Kerner] looked at'" and found that testimony dispositive of Defendants' intentions to get this project done quickly irrespective of the environmental, cultural, and local costs.  DE:131:77.

#     #     #

The district court enjoined the following conduct:

**(**1) installing any additional industrial-style lighting (described by witnesses as "Sunbelt" lighting); or doing any paving, filling, excavating, or fencing; or doing any other site expansion, including placing or erecting any additional buildings, tents, dormitories, or other residential or administrative facilities on the TNT [S]ite; and (2) bringing any additional persons onto the TNT [S]ite who were not

already being detained at the site at the time of this Order going into effect.

DE:131:80.  And the court directed the following actions within 60 days:

> Defendants shall remove 1) the temporary fencing installed by Defendants to allow Tribe members access to the site consistent with the access they enjoyed before the erection of the detention camp; 2) the Sunbelt lighting fixtures and any additional lighting installed for the use of the property as a detention facility; and 3) all generators, gas, sewage, and other waste and waste receptacles that were installed to support this project.

DE:131:81.

## STANDARD OF REVIEW.

"A transfer of venue is completely within the discretion of the trial court and the decision to deny a change of venue request will be reversed only for abuse of discretion."  *United States v. Smith*, 918 F.2d 1551, 1556 (11th Cir. 1990).  *See also Southern Mills, Inc. v. Nunes*, 586 Fed.Appx. 702, 706 n.3 (11th Cir. 2014) ("We review the district court's decision declining to transfer a case for a clear abuse of discretion.").

The Court also reviews "a district court's order granting or denying a preliminary injunction for abuse of discretion."  *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).  This Court has expounded on that deferential standard in the preliminary injunction context:

> A district court abuses its discretion when its factual findings are clearly erroneous, when it follows improper procedures, when it applies the incorrect legal standard, or when it applies the law in an unreasonable or incorrect manner.  But as its name implies, the abuse-of-discretion standard allows a range of choices for the district court,

25

so long as any choice made by the court does not constitute a clear error of judgment.

Appellate review of a preliminary injunction decision in particular is exceedingly narrow because of the expedited nature of the proceedings in the district court. Our review is deferential since a district court often must make difficult judgments about the viability of a plaintiff's claims based on a limited record and without the luxury of abundant time for reflection. So a plaintiff faces … a tough road in establishing four prerequisites to obtain a personal injunction in the first instance, but, on appeal, [Defendants] must … overcome the steep hurdles of showing that the district court clearly abused its discretion in its consideration of each of the four prerequisites.

*Id.* at 1247-48 (internal citations and quotation marks omitted).

## SUMMARY OF ARGUMENT

This case has nothing to do with immigration policy or politics; it has only to do with a failure to comply with environmental safeguards in the haste to commence "Alligator Alcatraz" operations. As the record reflects, the nature of the project is secondary to its impact: "It could have been a carnival. It could have been a Girl Scout convention. It doesn't matter," the harms here have resulted because "you have that level of unnatural human activity in the area." DE:130:50. This Court should not allow political rhetoric to tilt it from the constraining and highly deferential standard of review.

To the point, the district court did not abuse its discretion in granting a preliminary injunction after a four-day evidentiary hearing produced extensive, unrebutted evidence of environmental risk. The district court credited concrete, ongoing irreparable harms—including the displacement of Tribal access to ancestral lands and the threat of contaminated runoff—finding that the federal government bypassed the environmental review required by NEPA. These findings of fact, arrived at from the district court's more favorable vantage point, are plausible and well-supported by the record. Any "skeptic[ism]" this Court might have necessarily cedes to the district court's exercise of its rightful discretion; this Court should resist acting as a "trial-level factfinder exercising discretion in the first instance" and adhere to the "deferential" standard of review. Doc.42-1 at 26, 44.

27

## ARGUMENT

## I. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN DENYING THE VENUE CHALLENGE.

The Federal Defendants and FDEM challenge the district court's venue ruling. Federal Defendants' Brief:35-43; FDEM's Brief:21-34.

### A. Defendants' Waived Objection to Venue.

"A party waives [improper venue] by . . . failing to . . . include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course." Fed. Civ. P. 12(h)(1)(B)(ii). And this Court has been consistent in its application of the waiver rule. *See S.E.C. v. Lauer*, 478 Fed. Appx. 550, 554–55 (11th Cir. 2012) (approving waiver where defendant "submitt[ed] to the court's authority on a number of occasions before contesting venue") (citing *Baragona v. Kuwait Gulf Link Transp. Co.*, 594 F.3d 852, 854 (11th Cir. 2010)); *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713 (11th Cir. 2014) (recognizing that voluntary appearance "waiv[ed] any potential defects founded on service or venue problems").

Now consider this case. Defendants generally appeared (DE:10; 11; 13; 18; 19; 45), participating in substantial litigation (DE:16; 21; 28; 35; 39), and then first raising a venue challenge in their supplemental responses to the TRO motion. (DE:50; 60). Then on, venue shows up. DE:50; 60; 65; 89; 113; 114; 129; 130. But by submitting to the district court's authority—without any venue challenge— Defendants waived the issue. *Lauer*, 478 Fed. Appx. at 554-55; *Stansell*, 771 F.3d at 746; *Murphy v. Travelers Ins. Co.*, 534 F.2d 1155, 1159 (5th Cir. 1976).

FDEM's suggestion that its supplemental filings in opposition to the TRO, which the district court recognized (and where FDEM first challenged venue) qualifies as its "first appearance."  *See* FDEM's Brief:24 (citing *Seal v. Riverside Fed. Sav. Bank*, 825 F. Supp. 686, 692 n.10 (E.D. Pa. 1993), for the proposition that merged into the initial response).  But that misses the point, and breaches this Court's standard of review.  That is, while the district court in *Seal* may have exercised its discretion to accept new grounds to a previously filed motion to dismiss, it does not follow that the supplemental filings in this litigation had to be treated as part and parcel of FDEM's first defensive volley or cure of any waiver.  Nor does it follow that the trial court's exercise of discretion here, finding waiver, was an abuse.

The waiver finding stands unassailable as a proper exercise of discretion.

## B.  Waiver aside, Competent Substantial Evidence Supports the Venue Choice.

Section 1391(b)(2) on venue in general, states that a civil action "may be brought in … a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."  And under section 1391(e)(1)(B), "[a] civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which … a **substantial part of the events or omissions giving rise to the claim** occurred, or a **substantial part of property** that is the subject of the action is situated . . . ."  And, venue may be proper in "two or

more districts" where the district court considers "[o]nly the events that directly give rise to a claim" along with where a "substantial part" of "the events have taken place." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003).

It's beyond peradventure the district court was not required to weigh the events that occurred in Plaintiffs' chosen district against the events occurring in the district to which Defendants want venue to be transferred; it only had to find events or omissions that occurred in the chosen district venue to support venue, because "[a] transfer of venue is completely within the discretion of the trial court and the decision to deny a change of venue request will be reversed only for abuse of discretion." *United States v. Smith*, 918 F.2d 1551, 1556 (11th Cir. 1990). And to establish abuse of discretion, it must be shown "that there is no competent evidence in the record to support" the district court's determination. *See United States v. Lanzon*, 639 F.3d 1293, 1301 (11th Cir. 2011).

Here's the evidence supporting the finding:[9]

❖ The TNT site's partial location in and ownership by Maimi-Dade County, DE:12-3; DE:12-4; DE:61:9-10;[10]

❖ The State and Federal Defendants' failure to conduct any environmental assessment, provide opportunity for notice and comment

---

[9] Invoking the so-called "party participation" principle, *see* Federal Defendants' Brief:37, is nothing more than an attempt to cast a negative "label," which is laid bare when confronted with the record evidence. This is just more rhetoric to tilt the scale.

[10] The parties disputed what amount of the TNT Site is located in Miami-Dade County—2% or 28%. DE:131:30, n.16. The district court made the factual finding.

30

regarding environmental impact of the project, much of which would have taken place in Miami-Dade County, DE:61:10–11; and

❖ Current (and future) impacts of the project on the County, its residents, threatened and endangered species within the County, and—most importantly for the Tribe—Tribal sites and activities, some of which are currently unavailable to the Tribe due to the activities being conducted at the TNT site.  DE:61:13–15.

And the district court permissibly relied on implicated conduct by the government actors in Miami Dade County:

❖ ICE's Miami Enforcement and Removal Operations (ERO) field office accounts for 10-15% of ICE arrests nationwide, DE:138-1:3–4; and

❖ The ICE Miami ERO rely on the TNT Site to help it keep pace with detention needs, i.e., detainees are being transported there from Miami-Dade County.  DE:138-1:4.

Don't let the negative "participation principle" label, see n.9, supra, distract from the record review.

The district court, reflecting its comprehensive venue analysis, also considered section 1391(e)(1)(C), *see* DE:131:24–28, which provides for venue with the Federal Defendants in any judicial district in which "the plaintiff resides if no real property is involved in the action."  28 U.S.C. § 1391(e)(1)(C).  The Federal Defendants make the conclusory argument that the action involves real property, so that Plaintiffs' residence is of no moment in the venue analysis.  *See* Federal Defendants' Brief:39-43.  The argument fails to address the crux recognized by the

31

district court, which is that "courts nationwide have echoed Judge Motley's statutory interpretation and held that NEPA suits similar to Plaintiffs' did not involve real property within the meaning of § 1391(e)(1)(C)." *See* DE:25-28. And the district court made its point all the clearer by distinguishing *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, C 08-05646 JSW, 2009 WL 1025606 (N.D. Cal. Apr. 14, 2009), noting that the action there expressly involved issues directed to the real property. At bottom, there's no evidence that real property is involved.

That leaves us back to the Plaintiffs' residency. The Tribe's members are located in Miami-Dade County (80%) with its administrative buildings and schools are also located in the County. DE:113:79; 129:107–08, 118–18; TribeEx.:6 (Supp.App.:1868, Doc.No.38-6:1638). And Friends' members and directors reside in Miami-Dade County, while its principal place of business is in Stuart. DE:1:3; DE:61:3-4; DE:61-1.

## C. Waiver aside, the District Court Properly Exercised its Discretion Under Section 1404.

The district court's final basis for denying the venue transfer was Section 1404. Subpart (a) states that a district court "may"— need not—order a change in venue "[f]or the convenience of parties and witnesses, in the interest of justice" to any other district or division where it might have been brought. The "may" denotes discretion. *See* Bryan A. Garner, A Dictionary of Modern Legal Usage (2d ed.).

After finding that venue was proper in the Southern District, the district court noted that this was not a typical NEPA case where convenience of the parties and witnesses and trial efficiency considerations don't play a significant role in a venue

analysis.  DE:131:42.  Here, there is no administrative record because there was a complete failure to comply with NEPA or to do any environmental analysis whatsoever.  Thus, the merits of the claims will require witness testimony and discovery, largely within the Southern District where:  80% of the Tribe lives in Miami-Dade County, the Tribe's environmental resources division and tribal headquarters are based in that County, much of the evidence of environmental harm will be derived from the County, and the County owns the TNT Site, such that the property records, previous site plans, ecological studies, and surveys should already be housed there—a possible reason why the County did not oppose venue in the Southern District.  DE:129:16, 34, 45; TribeEx.:6 (Supp.App.:1868, Doc.No.:38-8:1638).  Lastly, the Southern District houses the closest Federal courthouse to the TNT Site.

## II.  COMPETENT, SUBSTANTIAL EVIDENCE SUPPORTS THE PRELIMINARY INJUNCTION.

### A.  The Standard for Issuing a Preliminary Injunction, and this Court's Constrained (Deferential) Review.

Securing a preliminary injunction requires the movant to satisfy four elements: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  *Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Florida Dep't of Health*, 50 F.4th 1126, 1134–35 (11th Cir. 2022).

33

And this Court must approach its review guided by a highly deferential standard, "examin[ing] the district court's grant of the preliminary injunction for abuse of discretion, reviewing de novo any underlying legal conclusions and for clear error any findings of fact." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020). This is because preliminary injunctions "are, by their nature, products of an expedited process often based upon an underdeveloped and incomplete evidentiary record," which "often creates not only limits on the evidence available but also pressure to make difficult judgments without the luxury of abundant time for reflection." *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002). And "[t]hose judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them." *Id.*

"As is usually the case, the trial court is in a far better position than this Court to evaluate that evidence, and we will not disturb its factual findings unless they are clearly erroneous." *Id.* Under this deferential standard, "the district court may reach a 'range' of permissible conclusions," and the Court must "accept the findings of fact if they are 'plausible,' even if [it] would weigh the evidence differently." *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir. 2024).

Given the aggressive recasting of the evidence examined by the district judge by the State and Federal Defendants, and the Court's motions panel's inclination to do the same in affording Defendants a stay, the standard bears even more repetition.

34

The application of an abuse of discretion review recognizes that this Court may not agree with the district court's ultimate decision *and that's okay*—:

> As we have stated previously, the abuse of discretion standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.

*In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994) (internal citations omitted).

In this deferential context, a district court only "abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 773–74 (11th Cir. 2015) (citations omitted). Significantly, a finding is "clearly erroneous" only when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir. 1987). At bottom, where the district court's account of the evidence is "plausible" in light of the record viewed in its entirety, the Court should not reverse even if it would have weighed the evidence differently. *See Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018).

Suffice to say, the factual findings in the 82-page Omnibus Order, supported by citations to the evidence throughout, should be unassailable on appeal. It's certainly not for this Court, with its constrained standard of review, to take a skeptical or contrary view of the evidence.

### B.   Defendants Failed to Show the Irreparable Harm Findings are Clearly Erroneous.

Both FDEM and the Federal Defendants demonstrate a misunderstanding of the reviewing standard.  Neither party makes a case that the district court's findings were clearly erroneous; rather, they allege that the district "place[d] its thumb on the scale," apparently by elevating Plaintiffs' evidence over theirs.  Federal Defendants' Brief:44.  We get it, they don't like the "the district court's … permissible conclusions," but they have failed to show how those conclusions are "[im]plausible" given the evidence presented.  *Mills*, 102 F.4th at 1248.

Both parties instead devote considerable effort to attacking the Environmental Group's expert testimony on potential long-term environmental impacts to the South Florida area, offering (attorney conjured) impeachment of the evidence that was already rejected (based on the evidence) by the district court.  Federal Defendants' Brief:45–47; FDEM's Brief:59–63.  Those *arguments* are not supported by countervailing *evidence* below.  And more notably, absent from either brief, is any meaningful engagement with the distinct and immediate harms the Tribe established at the evidentiary hearing.  That omission is dispositive.  The Tribe's harms were established through live testimony; they are present, concrete, and ongoing; and they remain unrebutted—both in the district court and now on appeal.

First, the detention facility's operation deprives Tribal members of access to their ancestral lands.  The Tribe demonstrated that its members have been physically barred from accessing Big Cypress through their primary access points.  And Tribal members historically used the Dade-Collier Jetport Road and surrounding trailheads

36

as the "primary method" by which to "access Big Cypress … for traditional activities."  DE:129:175.  These well-tread paths lead north from the Jetport Road into the Preserve, where Tribal members hunt, forage for medicinal plants, and visit cultural sites.  DE:129:119–20, 127–28, 133–34, 155–56, 170.  *And see below*:



The access once seen above no longer exists.

The presence of law enforcement, newly installed checkpoints, and additional fencing and gates have physically precluded Tribal members from reaching these trailheads.  DE:129:122–27, 133, 151, 164–65, 170-71, 175.  FDEM dismissively asserts that other access points to the 729,000-acre Preserve exist and questions why the Tribe needs access "closest to a busy airport."  FDEM's Brief:64.  But FDEM ignores the undisputed testimony that these blocked trailheads are the Tribe's *primary* access points—and that "there are no other alternative access points aside from the trailheads near the facility."  DE:129: 164–65, 175.

The harm found by the district court is not hypothetical—the Tribe presented evidence that its members have already been excluded from traditional practices on their ancestral lands and the district court credited that testimony and evidence.  *See, e.g.,* DE:129:170–71.

Second, the detention facility introduced substantial light pollution into what was previously an International Dark Sky designated area.  DE:129:129–33, 139–41, 145.  This light pollution is visible from the Miccosukee Reserved Area, where 80 percent of Tribal members reside.  TribeEx.:9 (Supp.App.:1846, Doc.No.:38-6:1660).  The impacts are multifold: the lighting harms the Tribe's ecotourism businesses, causes wildlife to flee the area, burdens the Tribe's management of adjacent landholdings, and impairs self-subsistence hunting.  DE:129:129–33.

The light pollution from the facility is visible from the MRA, as shown below:



TribeEx.:9 (Supp.App.:1846, Doc.No.:38-6:1660).

Both Defendants minimize the TNT Site's impact leaning in on the fact that it was previously an active airport. FDEM's Brief:64; Federal Defendants' Brief:45. But while the airport was active, it was hardly a disturbance. Where there had once been "zero to maybe one or two people," the facility was now "established" to "support thousands of people." DE:129:156, 159. The quiet training airport has given way to constant motion: "Vehicles going in and out of the entrance of the jetport... tanker trucks in and out, fill trucks in and out, protestors, media, people setting up a tent to sell merch for Alligator Alcatraz, just different levels." DE:129:33. The district court heard testimony about the *differential* impact that change has had: the detention facility operates continuously, with industrial lighting burning through the night, unlike periodic airport operations. The baseline argument does not absolve the concrete, present harm the Tribe has established.

Third, the detention facility sits upstream from the Miccosukee Reserved Area. Water from the TNT site flows toward the Tribe's water supply, which serves Tribal residences, schools, the Tribe's government building, and businesses.

DE:129:24–25;  TribeEx.:8  (Supp.App.:1871–1872,  Doc.No.:38-6:1641–1642). The MWCA also supplies underground aquifers providing drinking water for millions of South Florida residents.  DE:129:22.  The introduction of phosphorous, nitrogen, and potassium—inevitable byproducts of supporting thousands of detainees and staff—"disturbs the ecosystem drastically because it is an extremely sensitive area with low nutrient hydrology."  DE:113:46–47.  That's a plausible finding *supported by the evidence*.  DE:129:41–42, 136.

Several Tribal villages lie within close proximity of the detention facility— some as close as 400 meters—underscoring the harms. TribeEx.:6 (Supp.App.:1868, Doc.No.:38-6:1638).  The Panther-Osceola Village is "about a quarter mile away" from the facility:



DE:129:15–16, 126–27.  *See also* DE:129:15–16 (confirming that Panther-Osceola Village is "about a quarter mile away" from the facility), 126–27 (testifying that it is "not even [] a mile" from the facility).

Adding insult to injury is that these harms were entirely avoidable. Had the Defendants engaged in meaningful consultation with the Tribe, as required under NEPA and NHPA, the Tribe's objections could have surfaced earlier and the Tribe could have proposed alternatives before harm occurred (as it did with WERP). The harms now suffered by the Tribe can be directly traced to the Defendants' breach of NEPA—the problems are all of their making.

#    #    #

Under the highly deferential abuse of discretion standard, this Court does not reweigh evidence or second-guess permissible factual determinations; it asks only whether the district court's findings are plausible and supported by the record. They are: the district court credited live testimony and documentary evidence establishing immediate, concrete, and ongoing harms to the Tribe. Not one of the court's findings has been shown to be clearly erroneous, if even addressed at all.

## C. Defendants Likewise Failed to Show Any Abuse of Discretion in the Likelihood of Success on the Merits Finding.

Defendants advance three primary arguments for why NEPA does not apply: (1) there is no "final agency action" reviewable under the APA; (2) there is no "major Federal action" triggering NEPA; and (3) even if NEPA applies, *Seven County* precludes injunctive relief. Each argument fails.

Before delving into the merits, however, it must be again noted that even though the merits of Plaintiffs' claims require the application of law to facts, the standard for reviewing the district court's determination of a substantial likelihood of success on the merits remains discretionary. That is, rather than determining

whether the district court is right or wrong, this Court is constrained to determining whether "the record before [it] indicates no abuse of discretion." *Cafe 207, Inc. v. St. Johns Cnty.*, 989 F.2d 1136, 1137 (11th Cir. 1993). *And see Fla. Ag. for Health Care Admin. v. Adm'r for the Ctrs. for Medicare & Medicaid Servs.*, 161 F.4th 765 (11th Cir. 2025) (Jordan, J., concurring, and stating that "the general (and better) rule is that on review of a preliminary injunction an appellate court reviews the substantial likelihood of success prong for abuse of discretion even if it turns on a legal issue").

Of course, the Court "has the *authority* to decide the ultimate merits of a claim in an appeal of the grant or denial of a preliminary injunction," but that authority "is typically exercised" only "where it is clear that the plaintiff cannot possibly succeed on her claim." *Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286, 1296 (11th Cir. 2025) (Jordan, J., dissenting; emphasis supplied). And keep in mind that "[a]djudication of the merits is most appropriate if the injunction rests on a question of law *and it is plain* that the plaintiff cannot prevail." *Munaf v. Geren*, 553 U.S. 674, 691 (2008) (emphasis added). Which circles to the point that, while there are overarching legal questions that require interpretation of the APA and NEPA, the parties do not dispute the meaning of those statutory terms but instead jostle over the terms' application to the facts evinced at the evidentiary hearing. That's not a pure legal question; it's inherently factual and invokes a discretionary sheen.

### (1) Reviewable *Final* Agency Action Exists.

Defendants argue Plaintiffs cannot identify a discrete "final agency action" subject to APA review.  They contend that the mere failure to prepare an EIS is not itself final agency action, and that the various federal activities related to the TNT facility are too diffuse to constitute reviewable action.  The district court correctly rejected these arguments based on the evidence presented.

There is no disputing that NEPA was passed precisely to address a situation where a federal agency acts with "inadequate foresight and deliberation."  *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989).  "NEPA was the first of several landmark environmental laws enacted by Congress in the 1970s."  *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168 (2025).  "NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal citation omitted).  The process simply requires taking the opportunity to identify and evaluate "adverse environmental effects."  *Id*.  *See also* 42 U.S.C. §4332(C) (requiring the head of the lead agency to consult with and obtain comments from pertinent agencies and make those comments publicly available throughout the agency review processes).

In furtherance of that objective, NEPA "requires federal agencies to prepare an environmental impact statement, or EIS. The EIS must address the significant environmental effects of a proposed project and identify feasible alternatives that could mitigate those effects."  *Seven County Infrastructure Coalition*, 605 U.S. 168.  The point is to take the time to prepare the statement and consider the possible

environmental ramifications. Other factors may ultimately outweigh those considerations, but NEPA was passed precisely because "environmental harm will occur through inadequate foresight and deliberation." *Sierra Club*, 872 F.2d at 504.

Just like in the district court, Defendants attempt to disaggregate federal involvement into isolated components—a funding decision, a transportation decision, a 287(g) agreement—and then argue that none individually constitutes final agency action. Federal Defendants' Brief:17–22. Nothing would constitute a final action under their "atomistic" approach. DE:131:55, n.26. Finality does not turn on whether each operational step could be challenged independently. Rather, it turns on whether the agency has completed its decision-making process and whether that decision carries legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). Both elements are easily satisfied here.

Opening of the TNT Site facility was a "decision [that] marked an endpoint, not a starting point" for both the State and Federal Defendants. *Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1109 (9th Cir. 2025). Federal officials requested that Florida build detention capacity. The TNT facility was constructed to federal specifications. ICE officers are now present at the site and coordinating detention operations. Detainees are being transported to the facility by federal authorities and held pursuant to federal immigration law. This is not a proposal, a pilot program, or an interim measure. It began as a rarely used airport; it is now an active, fully operational federal detention program.

While Defendants correctly note that the failure to prepare an EIS may not, standing alone, constitute final agency action, that principle does not help them here

44

given the breadth of other action already taken. Federal Defendants' Brief:17-18. This is not a situation where an agency is in the midst of negotiating a trade agreement that may or may not be consummated, *e.g. Pub. Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992), or has deviated from implementing a project following its initial consummation, *e.g.*, *Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 195 (4th Cir. 2013). Here, the federal government took final action—deciding to operate a detention facility at TNT—without conducting any NEPA analysis. The EIS failure was the windup— the decision to build and operate the facility was the ball crossing the plate.

"[T]he final agency action requirement is to prevent premature intrusion into the agency's deliberations; it is not to require regulated parties to keep knocking at the agency's door when the agency has already made its position clear." *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 579 (9th Cir. 2019). As the district court recognized below, the Federal Defendants have made their "position clear" here: the TNT facility was opened to be, and will continue to be, a detention facility. *Id*. The Federal Defendants tell us as much on appeal: "There is a significant national interest in combatting unlawful immigration, which favors allowing Florida *to continue the development and use of its facility*." Federal Defendants' Brief:47.

The district court did not treat the absence of an EIS as freestanding final agency action; it reviewed the federal government's failure to comply with NEPA before undertaking a major federal action. DE:131:49 ("As a threshold matter, the construction of the camp does not represent a preliminary, procedural, or

intermediate agency action or ruling.  Although it apparently lacks basic forethought in many ways, the facility has undergone substantial construction and is currently operational.")  The failure of the Federal Defendants to prepare an EIS is now reviewable in connection with opening of the TNT facility and its continued use. *See* DE:131:50 ("Defendants' decision to refrain from issuing an EIS or conducting an EA, *and then building a detention camp*, represents a determinative position on the matter and has adversely affected Plaintiffs' recreational, conservational, and aesthetic interests") (emphasis added).

The Federal Defendants rely heavily on *Nat'l Treasury Employees Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025) for the proposition that an APA challenge may not consist of several "bundle[d] … discrete actions in order to challenge them all together."  Federal Defendants' Brief:20.  But *NTEU* was vacated and rehearing en banc granted,  *see* 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025), so it's of no precedential value.

It's also of no comparable value.  In the vacated *NTEU* opinion, the plaintiffs challenged the President's mandate to downsize the Consumer Financial Protection Bureau—a mandate that obviously involved many individual "actions to suspend or terminate CFPB's statutorily mandated activities—including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease" of the agency headquarters.  *Nat'l Treasury Emps. Union*, 149 F.4th at 789.  Those individual actions may each have been subject to APA review—the inverse of terminate a lease could be seen as establishing a facility like

46

TNT—but the plaintiffs in that case chose to "dress up these 'many individual actions' as a single decision in order to challenge all of them at once." *Id.* at 784.

FDEM takes a different view, invoking the "anti-segmentation rule" discussed in *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 50 (D.C. Cir. 2015). *See* FDEM's Brief:35–36. But the district court did not engage in any segmenting at all. The doctrine prevents an agency from slicing related federal actions into smaller pieces to avoid NEPA. It does not apply where, as here, there is a single federal decision carried out in sequence. The obligation to prepare an EIS is the procedural predicate to the federal government's decision to construct and operate the TNT detention facility; it is not a freestanding "action" being aggregated with something else. (Indeed, Defendants' own framing occasionally moves in the opposite direction—attempting to insulate the TNT facility from NEPA review by recasting it as merely one component of a broader national immigration strategy rather than a discrete federal project.)

The district court therefore did not rely on instinct or "gestalt"—it identified one operative federal action: the federal government's decision to proceed with construction and operation of the facility without first completing the required NEPA review. That is not segmentation; it is NEPA's basic structure. There's a single action being challenged here that began with the failure to prepare an EIS and concluded with the establishment of Alligator Alcatraz.

Moreover, the consummation of Defendants' work (first, their failure to prepare an EIS then, the opening of Alligator Alcatraz) caused concrete harm that has affected the rights of Plaintiffs. Multiple witnesses testified they would have

participated in the EIS proceedings had the federal government initiated them—providing information about panther habitat, water quality, and cultural resources that might have informed the agency's decision.  DE:114:55–56, 74.  Defendants' refusal to initiate any NEPA process deprived Plaintiffs of the opportunity to be heard—precisely the procedural injury NEPA was enacted to prevent.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  And the opening of Alligator Alcatraz has caused substantive harm—materially affecting the Tribe's "relation to the Preserve" in all the aforementioned ways.  *See* Argument II. B. (detailing the irreparable harms being suffered by the Tribe).

Here's the crux of it.  The district court did not abuse its discretion in crediting the undisputed evidence of Defendants' failure to engage in EIS review, the evidence regarding Alligator Alcatraz's encampment, the Tribe's testimony of the harm, and finding final agency action that engendered a cognizable harm.

### (2) A Major *Federal* Action Exists.

Section 4336e(10) of NEPA defines "major federal action" as an action that "is subject to substantial Federal control and responsibility."  The definition excludes non-federal actions with "no or minimal Federal funding" or "no or minimal Federal involvement where a Federal agency cannot control the outcome of the project." 42 U.S.C. § 4336e(10)(B)(i).  Here, Defendants latch on to that text and protest that Florida—not the federal government—built and operates the facility.  Federal Defendants' Brief:22 ("Florida alone built this facility on its own land, using its own funds, and the state operates the facility under its own sovereign authority.");

48

FDEM's Brief:39-42.  Defendants' protestations, however, as recognized by the district court, are not sustained by evidence.

At the federal government's request, Florida built a detention facility to ICE-mandated specifications, ICE officers are now present and coordinating operations, detainees are being held under federal immigration authority, and the result is not a tentative arrangement but a fully operative federal detention program.  Defendants insisted below that the facility had received no federal funding.  The district court found otherwise, crediting specific evidence that:

- DHS Secretary Noem publicly announced the federal government would fund the facility through "FEMA's Shelter and Services Program." PlaintiffEx.144, ¶5 (Supp.App.:1486–1491, Doc.No.:38-5:1271–1276).

- Governor DeSantis confirmed the federal government would "fully fund" the facility.  DE:21-2:2.

- Assistant United States Attorneys represented to the court that the "Everglade[s] detention facility is being funded from continuing resolution for [fiscal year] 2025."  *City of Chicago v. DHS*, 25-cv-05463 (N.D. Ill.), ECF 35 at 1–2.

- FEMA has since approved a grant for reimbursement.  DE:21-2:¶3.

DE:131:62–63.  Likewise, Florida State Representative Eskamani testified that FDEM Director Guthrie confirmed DHS requested the facility, the federal government would reimburse Florida, and ICE would conduct compliance inspections.  DE:114:96; DE:131:61.  Director Kerner testified that federal agencies

transport detainees to the facility and conduct deportations using federal aircraft. DE:131:10, 56.

This is not the speculative "possibility" of future funding that this Court found insufficient in *United States v. S. Florida Water Mgmt. Dist.*, 28 F.3d 1563 (11th Cir. 1994). In *S. Florida Water Mgmt. Dist.*, the Court rejected the claim that Florida's own water-management and environmental enforcement program was under Federal control because the federal government never made, approved, or controlled the operative decisions of the project. *Id*. at 1572-73. The extent of the federal government's input there was "advice and technical consultation" and the possibility of federal funding was just that—a mere "possibility." *Id*.

In contrast, the "possibility" of funding here is *not* speculative. The district court credited public commitments by cabinet officials, Florida representatives, representations to Congress, and admissions in judicial proceedings. There is no view of the evidence in which one can conclude that the district court clearly erred in crediting this evidence and finding that federal funding was committed to the facility unless statements by public officials are deemed to no longer have any meaning.

That the physical work at the TNT Site was conducted by private contractors for the State is of no moment. "Major federal action can exist when the primary actors are not federal agencies." *United States v. S. Florida Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994). The dispositive question is whether the federal agency possesses "authority to influence nonfederal activity." *Id.* Here, the facility exists solely to serve federal purposes, operates under federal authority, federal

50

officers direct its core function, and receives federal funds. Under these circumstances, the district court correctly found sufficient federal involvement to constitute final agency action.

The facility is not a standalone state operation that happens to house some federal detainees; it is a node in the federal detention network. Defendants respond that Florida "ultimate decides" over who is detained at the facility while cheekily admitting in a footnote that "ICE has a role to play… [it] ask[s] Florida to detain in the first instance." FDEM's Brief:52-53 n.13. ICE makes the calls ("authority to influence nonfederal activity"); Florida does the work ("primary *actors* are not federal agencies"). *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572. To be sure, a state contractor that operates a federal prison retains day-to-day operational authority, but no one would suggest the prison is therefore not a federal facility. What matters is whether the federal government exercises "substantial control and responsibility"— not whether it micromanages every operational detail.[11]

The district court synthesized the evidence: "if it walks like a duck, quacks like a duck, and looks like a duck, then it's a duck." DE:131:42. Under the totality of the evidence, the district court did not abuse its discretion in finding substantial federal control and responsibility.

### (3) *Seven County Infrastructure Coal* Is Not Dispositive.

The Federal Defendants, in particular, rely on *Seven County Infrastructure Coalition*, 605 U.S. 168 to upend the district court's analysis. *See* Federal

---

[11] Defendants failed to provide any evidence of Florida refusing to house even one federally detained individual in the facility.

Defendants' Brief:1, 15, 17, 23, 30-34. In *Seven County*, the Supreme Court reviewed the adequacy of an EIS that had already been prepared for a federally approved rail line, addressing whether the Surface Transportation Board improperly cabined its analysis of reasonably foreseeable upstream oil drilling and downstream oil refining effects associated with the project. *Id*. at 168-69. The focus of the case was the *scope* of environmental review required for a concededly final federal approval following a multi-year NEPA process. It's apparent even from that basic retelling that *Seven County*—a case about how far an EIS must reach—has little to say about whether the federal action here, where an EIS was never even issued, was final in the first place.

Like a Magic Mirror on the Wall, the Federal Defendants glean from *Seven County* only what they want to see. Unlike in *Seven County*, here the district court could not usurp federal agency discretion because no discretion was exercised. The district court did not dictate the form, scope, or outcome of the Federal Defendants' NEPA review—it simply held that Defendants violated NEPA by constructing and operating a major detention facility without first conducting environmental review and enjoined continued activity until compliance occurred.

*Seven County* stands for the proposition that agencies retain discretion over how to comply with NEPA—whether to prepare an EA or EIS, what alternatives to consider, and what conclusions to reach. *See Seven Cnty.*, 605 U.S. at 181. They do not retain discretion over whether to comply. The district court respected that line.

Defendants' remedial argument fares no better. *Seven County*'s observation that vacatur of the agency project may be inappropriate absent reason to believe an

agency might disapprove a project addressed cases where an agency prepared an EIS that was later found deficient. *Id*. at 185. It has no application where, as here, the agency bypassed NEPA entirely. When an agency skips a fundamental procedural step, courts assess not whether the ultimate action could be justified, but whether the agency could justify its decision to skip the procedure itself. Vacatur (or here at least an injunction) of the agency action is the favored approach "when there is no way for an agency to rehabilitate its decision to skip a procedural step, even if the additional procedure is unlikely to change the agency's bottom line." *City of Port Isabel v. FERC*, 130 F.4th 1034, 1037 (D.C. Cir. 2025).

"[I]f you can build first and consider environmental consequences later, NEPA's action-forcing purpose loses its bite." *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (internal citations omitted). *Seven County* did not address that problem because it had no occasion to do so, which is precisely why it offers no guidance in a case of complete NEPA noncompliance.

### (4) Defendants' Remaining Arguments Similarly Lack Merit.

*Enforcement action exclusion does not apply*. Defendants argue that immigration detention is an "enforcement action" excluded from NEPA under 42 U.S.C. § 4336e(10)(B)(v). FDEM's Brief:55-56. But that provision precludes challenging the "bringing [of] judicial or administrative civil or criminal enforcement actions"—*i.e.*, the initiation of legal proceedings. The Federal governments enforcement of immigration policy isn't being challenged here—it's

the construction of a specific facility that is. Building a detention center is not "bringing an enforcement action"; it is creating infrastructure. NEPA applies.

*State sovereignty is not implicated*. FDEM suggests that applying NEPA to the TNT facility intrudes on Florida's sovereignty. *See* FDEM's Brief:42-43, 45. NEPA is clear. When the federal government decides to fund, authorize, and utilize a detention facility, that federal involvement triggers federal environmental obligations. Florida remains free to build whatever facilities it chooses using state funds for state purposes. What Florida cannot do is participate in a federal program while claiming immunity from the federal laws that govern that program.

#    #    #

At bottom, the district court's conclusion that Plaintiffs demonstrated a substantial likelihood of success on the merits rests on credited testimony, documentary evidence, and a faithful application of settled law. Even if this Court might view the ultimate merits differently, that is not the inquiry at this stage. As the Supreme Court has cautioned, "[a]djudication of the merits is most appropriate if the injunction rests on a question of law and it is plain that the plaintiff cannot prevail." *Munaf*, 553 U.S. at 689. Where, as here, the district court's ruling reflects a plausible view of the facts and a correct understanding of the law, it falls well within the bounds of discretion and should be affirmed.

### D.  The District Court's Weighing of the Equities is Equally Unassailable.

Here's the key point. Defendants offer sweeping assertions about the critical importance of *this* facility in *this* location, but the record tells a different story. No

evidence established why this particular location—in the heart of the Everglades, adjacent to Tribal villages, upstream from Tribal water supplies, and in the midst of a multi-billion-dollar federal-state restoration effort—was uniquely suited or necessary for immigration detention. The State's own representative testified that the TNT Site was "[t]he only site that [he] looked at." DE:129:223–24.

To be sure, Director Kerner testified that his troopers "have encountered and apprehended people that have active warrants for murder in other countries" and offered his belief that some such individuals might be detained at the facility. DE:129:202. But he could not explain the purported urgency of establishing a location to house those violent criminals *in this specific location*. Why this location was chosen over others rests entirely on speculation, not evidence.

The district court's conclusion that the equities favored Plaintiffs followed undisputed testimony that no governmental entity consulted the Tribe before constructing the detention facility—despite established protocols requiring such consultation. DE:129:169; DE:129:33–34; TribeEx.:4 (Supp.App.:1821–1822, Doc.No.:38-6:1591–1592).

Not to be overlooked, Defendants' equities calculus ignores the substantial federal and state investment in protecting and restoring this precise area. Recall, WERP represents a "multi-billion, multi-decade" commitment—funded 50/50 by the federal and state governments—to restore natural water flow through this region. DE:129:28–29. WERP's planning assumed that the TNT site would remain a "low-use, low activity training facility, where single turbine aircraft are used to train pilots." DE:129:28-30. The detention facility's introduction of 800,000 square feet

of impervious asphalt—with another one million planned—directly undermines these carefully calibrated restoration efforts. PlaintiffEx.:22, 90–92 (Supp.App.:908–920, 1153–1181, Doc.No.:38-3:693–705, DocNo.:38-4:938–966); DE:126:1.

And Defendant's claim that the PI will "bring the State's already stressed and overcrowded system to a breaking point," FDEM's Brief:67, like much of their claims, is hyperbole without evidence. *See* DE:129:195 (testimony that immigration efforts have always been "modulate[d]" in order to not "overrun the Federal capacity"). To the contrary, the only evidence they offered was Director Kerner's testimony that he only looked at a single facility site, nothing else, which seems illogical if there was an immediate need for more detention capacity. DE:129:223.

Detention capacity exists elsewhere. There are "various facilities" to bring apprehended individuals at the State's "choosing", including "an IGSA jail," or a "basic ordering agreement jail, which … all 67 counties have that, or … a Federal facility of some sort, whether it would be an ICE ERO facility or it could be, depending on location in Florida, it could be even Krome directly." DE:129:186–87. Nor could Defendants' own witnesses establish that any specific detainee required housing at this particular facility rather than another location.

At bottom, the equities do not favor Defendants' preferred outcome simply because they assert, without evidentiary support, that immigration enforcement would suffer. This is not political theater; here, the district court weighed the evidence and made plausible conclusions based on that evidence. That was well within its discretion.

## CONCLUSION

The Court should affirm the PI in all respects.

Respectfully submitted,

Elliot B. Kula
Florida Bar No. 003794
William D. Mueller
Florida Bar No. 120124
Elaine D. Walter
Florida Bar No. 873381
KULA & ASSOCIATES, P.A.
12000 Biscayne Blvd., Ste. 221
Miami, Florida 33181
Telephone: (305) 354-3858
eservice@kulalegal.com
elliot@kulalegal.com
elaine@kulalegal.com

By: /s/ Elliot B. Kula
Elliot B. Kula

By: /s/ William D. Mueller
William D. Mueller

By: /s/ Elaine D. Walter
Elaine D. Walter

Christopher Ajizian
Florida Bar No. 1010170
CHRISTOPHER AJIZIAN P.A.
1101 Brickell Ave., Ste. 700
Miami, Florida 33131
Telephone: (305) 699-5001
chris@ajizianlaw.com

By: /s/ Christopher Ajizian
Christopher Ajizian

Todd R. Friedman
Florida Bar No. 97919
TODD R. FRIEDMAN P.A.
1101 Brickell Ave., Ste. S-700
Miami, Florida 33131
Telephone: (786) 536-7190
todd@toddfriedmanpa.com

By: /s/ Todd R. Friedman
Todd R. Friedman

*Co-Counsel for The Miccosukee Tribe of Indians of Florida*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  This brief uses Times New Roman 14-point typeface and contains <u>12,968/13000</u> words.

<u>/s/ Elliot B. Kula</u>
Elliot B. Kula

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 13, 2026, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system.  I also hereby certify that the foregoing document is being served this day on all counsel of record identified on the Service List in the manner specified, via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>/s/ Elliot B. Kula</u>
Elliot B. Kula