# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

FRIENDS OF THE EVERGLADES, INC., et al.,
*Plaintiffs-Appellees*,

v.

EXECUTIVE DIRECTOR,
FLORIDA DIVISION OF EMERGENCY MANAGEMENT,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:25-cv-22896-KMW
(Hon. Kathleen M. Williams, Dist. Judge)

## APPELLEES' ANSWER BRIEF

Tania Galloni, FBN 619221
Dominique Burkhardt, FBN 100309
**EARTHJUSTICE**
4500 Biscayne Boulevard, Suite 201
Miami, Florida 33137
Telephone: (305) 440-5434
tgalloni@earthjustice.org
dburkhardt@earthjustice.org

*Counsel for Friends of the Everglades*

Paul J. Schwiep, FBN 823244
Scott A. Hiaasen, FBN 103318
Jeffrey B. Crockett, FBN 347401
**COFFEY BURLINGTON, P.L.**
2601 S. Bayshore Drive, PH-1
Miami, Florida 33133
Telephone: (305) 858-2900
pschwiep@coffeyburlington.com
shiaasen@coffeyburlington.com
jcrockett@coffeyburlington.com
yvb@coffeyburlington.com
service@coffeyburlington.com

*Counsel for Appellees*

Case No. 25-12873

Elise Pautler Bennett, FBN 106573
Jason Alexander Totoiu, FBN 871931
**CENTER FOR BIOLOGICAL
  DIVERSITY**
Post Office Box 2155
St. Petersburg, Florida  33731
Telephone:  (727) 623-9797
ebennett@biologicaldiversity.org
jtotoiu@biologicaldiversity.org

*Counsel for Center for Biological
Diversity*

## <u>CERTIFICATE OF INTERESTED PERSONS</u><br><u>AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Appellees, FRIENDS OF THE EVERGLADES, INC., a Florida not-for-profit corporation, and CENTER FOR BIOLOGICAL DIVERSITY, a 501(c)(3) nonprofit organization, hereby state the following individuals and entities have an interest in the outcome of this appeal:

1. Ajizian, Christopher, Esq.

2. Bailey, Andrew, Esq.

3. Bennett, Elise Pautler, Esq.

4. Bird, Brenna, Esq.

5. Boies Schiller Flexner LLP

6. Bonzon-Keenan, Geraldine

7. Brabender, Allen M., Esq.

8. Burkhardt, Dominique, Esq.

9. Carpenter, Hayley A., Esq.

10. Bird, Brenna, Esq.

11. Carr, Christopher M., Esq.

12. Center for Biological Diversity

13. Chris Ajizian P.A.

14. Coe, Alisa, Esq.

15. Coffey Burlington P.L.

16. Coleman, Russel, Esq.

17. Commonwealth of Kentucky

18. Costello, David M., Esq.

19. Crockett, Jeffrey B., Esq.

20. Curran, Rachael

21. DeNardi, Betsy, Esq.

22. DeSousa, Jeffrey Paul, Esq.

23. Drummond, Gentner F., Esq.

24. Earthjustice

25. Ezray, Evan M., Esq.

26. Ficarelli, Dante, Esq.

27. Florida Division of Emergency Management

28. Florida Wildlife Federation

29. Forrester, Nathan A., Esq.

30. Friedman, Todd R., Esq.

31. Friends of the Everglades, Inc.

32. Galloni, Tania, Esq.

33. Golembiewski, Kevin A., Esq.

34. Griffin, Tim, Esq.

35. Gustafson, Adam R.F., Esq.

36. Guthrie, Kevin

37. Hiaasen, Scott, Esq.

38. Hilgers, Michael T., Esq.

39. Izaak Walton League of America, Florida Keys Chapter

40. Jackley, Marty, Esq.

41. Kautz, Keith G., Esq.

42. Knudsen, Austin, Esq.

43. Kobach, Kris, Esq.

44. Kula & Associates, P.A.

45. Kula, Elliot B., Esq.

46. Labrador, Raúl, Esq.

47. Lopez, Jaclyn, Esq.

48. Lyons, Todd

49. Marshall, Steve, Esq.

50. Martinez, Hon. Jose E.

51. McCuskey, John B., Esq.

52. Miami-Dade County

53. Miccosukee Tribe of Indians

54. Murray, David M., Esq.

55. Murrill, Liz, Esq.

56. Noem, Kristi

57. O'Byrne, Hayden P., Esq.

58. Panuccio, Jesse Michael, Esq.

59. Paxton, Ken, Esq.

60. People's Economic and Environmental Resiliency Group, Inc.

61. Perez, Monica Rizo, Esq.

62. Piropato, Marissa, Esq.

63. Quiñones, Jason A. Reding, Esq.

64. Raurell, Carlos J., Esq.

65. Rokita, Theodore E., Esq.

66. Sanchez, Hon. Eduardo I.

67. Schenck, Robert S., Esq.

68. Schwiep, Paul J., Esq.

69. Sierra Club

70. Singer, Frank

71. Skrmetti, Jonathan, Esq.

72. Stander, Robert, Esq.

73. State of Alabama

74. State of Alaska

75. State of Arkansas

76. State of Florida

77. State of Georgia

78. State of Idaho

79. State of Iowa

80. State of Kansas

81. State of Louisiana

82. State of Missouri

83. State of Montana

84. State of Nebraska

85. State of North Dakota

86. State of Ohio

87. State of Oklahoma

88. State of South Carolina

89. State of South Dakota

90. State of Tennessee

91. State of West Virginia

92. State of Wyoming

93. Stetson University, Inc. College of Law's Jacobs Public Interest Law Clinic for Democracy and the Environment

94. Taylor, Treg, Esq.

95. Todd R. Friedman P.A.

96. Torres, Hon. Edwin G.

97. Torstensen, Peter M., Esq.

98. Totoiu, Jason Alexander, Esq.

99. Tropical Audubon Society

100. United States Department of Homeland Security

101. United States Immigration and Customs Enforcement

102. University of Miami School of Law's Environmental Justice Clinic

103. Uthmeier, James, Esq.

104. VoteWater, Inc.

105. Wahl, Christopher J., Esq.

106. Walter, Elaine D., Esq.

107. Williams, Hon. Kathleen M.

108. Wilson, Alan, Esq.

109. Wrigley, Drew H., Esq.

110. Yost, David A., Esq.

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure, there is no parent corporation or publicly held corporation that owns more than 10% of stock of either Appellees.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Court has scheduled oral argument for the week beginning April 6, 2026.

# **TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS1 AND CORPORATE DISCLOSURE STATEMENT ...........................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS................................................................................. ii

TABLE OF CITATIONS ................................................................................ v

STATEMENT OF JURISDICTION ................................................................ xvii

STATEMENT OF THE ISSUES .................................................................... xvii

INTRODUCTION ......................................................................................... 1

STATEMENT OF THE CASE ....................................................................... 2

   I. Statutory Background .......................................................................... 2

      A. The National Environmental Policy Act................................................ 2

      B. The Administrative Procedure Act ...................................................... 3

   II. Procedural History ............................................................................. 5

   III.Factual Background ............................................................................ 8

      A. The Big Cypress National Preserve...................................................... 8

      B. Plaintiff Friends of the Everglades ...................................................... 9

      C. The Ecological Importance of the TNT Site...........................................10

      D. Defendants Partner to Build and Operate a Federal Immigration Detention Center with Federal Funding. ..............................................11

      E. The Facility Is a Federal Immigration Detention Center. ......................13

      F. Environmental Consequences of Transforming Limited Use Site Into Mass Immigration Detention Center. ...................................................14

      G. The District Court Ruled Venue Was Proper and Granted the Motion for Preliminary Injunction. .......................................................................15

STANDARD OF REVIEW ............................................................................17

SUMMARY OF THE ARGUMENT ................................................................18

ARGUMENT.................................................................................................18

   I. THE DISTRICT COURT DID NOT ERR IN FINDING THAT FRIENDS ARE LIKELY TO SUCCEED ON THE MERITS....................................18

A. Venue Is Not Jurisdictional and Therefore Provides No Basis to Reverse the Preliminary Injunction on Appeal. ...................................18

B. Appellants' Detention Facility Constitutes a Major Federal Action. .....19

    1. Statutory Definition of Major Federal Action. ...............................20

    2. State-Federal Major Federal Action. .............................................22

    3. More Than Minimal Federal Funding. ...........................................28

    4. There is No Deference Due to an Agency's Failure to Act. ............31

C. The Construction and Operation of the Detention Center is Final Agency Action Under the APA. ......................................................................32

D. The INA Does Not Defeat Appellees' Claims. ....................................38

    1. Section 1226(e) Does Not Apply to This Action. ...........................38

    2. Section 1252(a)(2)(B)(ii) Does Not Strip the Court of Jurisdiction. 39

    3. Section 1252(f) Is Inapplicable. ....................................................41

E. Appellants' Vacatur Arguments are Misplaced and Incorrect. .............42

II. THE DISTRICT COURT'S FACTUAL FINDINGS OF IRREPARABLE HARM WERE NOT CLEARLY ERRONEOUS. ......................................47

A. Irreparable Harm to Waters and Wetlands ...........................................48

B. Irreparable Harm to Wildlife, Including Endangered Species ...............52

C. Irreparable Harm to Tribal and Public Access. ....................................57

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE BALANCE OF THE EQUITIES FAVORED THE PRELIMINARY INJUNCTION. ..............................................................59

IV. THE SCOPE OF INJUNCTIVE RELIEF WAS PROPER AND NOT AN ABUSE OF DISCRETION. ...............................................................63

A. The District Court Carefully Tailored the Preliminary Injunction. ........64

B. The District Court Is Authorized to Enjoin Nonfederal Actors Constructing and Operating the Federal Detention Facility. ..................66

C. Regardless, Appellants Forfeited Any Argument Regarding the Scope of the Preliminary Injunction. .................................................................68

V. VENUE IS PROPER IN THE SOUTHERN DISTRICT OF FLORIDA. ....68

A. The Court Lacks Interlocutory Appellate Jurisdiction Over the District Court's Venue Ruling. ........................................................................69

B.  The District Court Did Not Abuse Its Discretion in Finding the Venue Objection Waived. ..................................................................71

C.  Venue is Proper in the Southern District of Florida. .............................75

    1.  Venue As to Federal Appellants. ......................................................75

    2.  Venue As to All Appellants. ..........................................................78

CONCLUSION ..................................................................................88

CERTIFICATE OF COMPLIANCE ....................................................90

CERTIFICATE OF SERVICE .............................................................91

# <u>TABLE OF CITATIONS</u>

Page(s)

Cases

*A1A Burrito Works, Inc. v. Sysco Jacksonville, Inc.*,
    87 F.4th 1280 (11th Cir. 2023)....................................................69

*Abramoff v. Shake Consulting, L.L.C.*,
    288 F. Supp. 2d 1 (D.D.C. 2003)................................................85

*Access Now, Inc. v. Sw. Airlines Co.*,
    385 F.3d 1324 (11th Cir. 2004)........................................24, 31, 68

*Adams v. Bordeau Metals Se. LLC*,
    No. 24-11572, 2025 WL 1122444 (11th Cir. Apr. 15, 2025)...........64

*Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*,
    357 F.3d 62 (D.C. Cir. 2004) ....................................................40

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011).....................................................52

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
    No. 25-1411, 2025 WL 1249608 (4th Cir. 2025) ...........................4

*Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*,
    364 F.3d 884 (7th Cir. 2004) ....................................................73

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 (1987).......................................................47, 58, 59

ante ...............................................................................64, 76

ante. Id. ...............................................................................65

*Arizona v. United States*,
    567 U.S. 387 (2012)...............................................................14, 27

*Barber v. Gov. of Ala.*,
    73 F.4th 1306 (11th Cir. 2023).....................................................30

*Bd. of License Comm'rs of Town of Tiverton v. Pastore*,
    469 U.S. 238 (1985) ............................................................36

*Bennett v. Spear*,
    520 U.S. 154 (1997) .........................................................4, 32

*Biderman v. Morton*,
    497 F.2d 1141 (2d Cir. 1974) ..............................22, 23, 26

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
    781 F.3d 1271 (11th Cir. 2015) ................................43, 44

*Bonillo v. Sec'y, U.S. Dept. of Homeland Sec.*,
    497 Fed. Appx. 913 (11th Cir. 2012) ............................40

*Canal Auth. of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ............................64, 65, 66

*Carillon Imps., Ltd. v. Frank Pesce Int'l Grp.*,
    112 F.3d 1125 (11th Cir. 1997) ......................................68

*Catron Cnty. Bd. of Comm'rs v. FWS*,
    75 F.3d 1429 (10th Cir. 1996) ........................................34

*Centennial Bank v. ServisFirst Bank Inc.*,
    No. 8:16-cv-88-T-36JSS, 2016 WL 4238766 (M.D. Fla. Aug. 11, 2016) ..........50

*Center. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    No. C 08-05646, 2009 WL 1025606 (N.D. Cal. Apr. 14, 2009) ......................76

*Chapman v. Procter & Gamble Distrib., LLC*,
    766 F.3d 1296 (11th Cir. 2014) ......................................55

*Citizens for Smart Growth v. Sec'y of Dept. of Transp.*,
    669 F.3d 1203 (11th Cir. 2012) ........................22, 66, 67

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .......................................................24

*City Of Oxford, Ga. v. F.A.A.*,
    428 F.3d 1346 (11th Cir. 2005) ....................................... 3

*City of Port Isabel v. FERC*,
130 F.4th 1034 (D.C. Cir. 2025) .................................................. 43, 44, 45, 46

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,
942 F.3d 1119 (Fed. Cir. 2019) ..................................................71

*Ctr. for Biological Diversity v. Ross*,
480 F. Supp. 3d 236 (D.D.C. 2020)............................................44

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*,
304 F.3d 1167 (11th Cir. 2002) ..................................................17

*Delaware v. Bender*,
370 F. Supp. 1193 (D. Del. 1974) ...............................................77

*Dimanche v. Brown*,
783 F.3d 1204 (11th Cir. 2015) ..................................................61

*Earth Island Inst. v. Quinn*,
56 F. Supp. 3d 1110 (N.D. Cal. 2014)......................................75, 77

*Fla. Immigrant Coal. v. Attorney Gen.*,
No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025)............................62

*Fla. Immigrant Coal. v. Uthmeier*,
780 F. Supp. 3d 1235 (S.D. Fla. 2025) ........................................72

*Fla. Key Deer v. Brown*,
386 F. Supp. 2d 1281 (S.D. Fla. 2005) ........................................47

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)............................................................4, 33

*Friends of Earth v. Haaland*,
No. CV 21-2317, 2022 WL 185196 (D.D.C. Jan. 20, 2022)........................82, 87

*Fritiofson v. Alexander*,
772 F.2d 1225 (5th Cir. 1985)..................................................67

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ............................................................ 4

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022) ...................................................................42

*Garner v. Wolfinbarger*,
   433 F.2d 117 (5th Cir. 1970) ...............................................xvii, 69

*Georgia v. President of the U.S.*,
   46 F.4th 1283 (11th Cir. 2022) ...................................................63

*Gonzales v. Dep't of Homeland Sec.*,
   508 F.3d 1227 (9th Cir. 2007) ....................................................42

*Gonzalez v. Gov. of Ga.*,
   978 F.3d 1266 (11th Cir. 2020) ...................................................47

*Goodwyn, Mills & Canood, Inc. v. Black Swamp, Inc.*,
   956 F. Supp. 2d 1323 (M.D. Ala. 2012) ...........................................79

*Goos v. I.CC.*,
   911 F.2d 1283 (8th Cir. 1990) ....................................................23

*Greater Yellowstone Coal. v. Flowers*,
   321 F.3d 1250 (10th Cir. 2003) ...............................................53, 54

*Grippa v. Rubin*,
   133 F.4th 1186 (11th Cir. 2025) ..................................................70

*Gulf States Reg'l Ctr., LLC v. Jaddou*,
   No. 23-CV-1354, 2024 WL 3553533 (E.D. La. July 25, 2024) ........................72

*Gutierrez v. Wells Fargo Bank, NA*,
   889 F.3d 1230 (11th Cir. 2018) ...................................................74

*Haitian Refugee Ctr., Inc. v. Nelson*,
   872 F.2d 1555 (11th Cir. 1989) ...................................................65

*Hajro v. U.S. Citizenship & Immigr. Servs.*,
   811 F.3d 1086 (9th Cir. 2016) ....................................................40

*Hanly v. Mitchell*,
   460 F.2d 640 (2d Cir. 1972) ......................................................56

*Harris Corp. v. Nat'l Iranian Radio & Television*,
   691 F.2d 1344 (11th Cir. 1982) ..........................................................19

*Hill v. Boy*,
   144 F.3d 1446 (11th Cir. 1998) ..........................................................34

*Hodges v. United States*,
   78 F.4th 1365 (11th Cir. 2023) ...........................................................18

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) .................................................................................62

*Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*,
   641 F.3d 1259 (11th Cir. 2011) ..........................................................65

*Home Ins. Co. v. Thomas Indus., Inc.*,
   896 F.2d 1352 (11th Cir. 1990) ..........................................................75

*Hurley v. Moore*,
   233 F.3d 1295 (11th Cir. 2000) ..........................................................60

*In re Macon Uplands Ventures*,
   624 F.2d 26 (5th Cir. 1980) ................................................................70

*Jenkins Brick Co. v. Bremer*,
   321 F.3d 1366 (11th Cir. 2003) .....................................................passim

*Jim Walter Res., Inc. v. Fed. Mine Safety & Health Rev. Comm'n*,
   920 F.2d 738 (11th Cir. 1990) ............................................................76

*Johnson v. Comm'n on Presidential Debates*,
   202 F. Supp. 3d 159 (D.D.C. 2016) ....................................................61

*Jones v. InfoCure Corp.*,
   310 F.3d 529 (7th Cir. 2002) ..............................................................71

*Keener v. Convergys Corp.*,
   342 F.3d 1264 (11th Cir. 2003) ..........................................................66

*Kucana v. Holder*,
   558 U.S. 233 (2010) .............................................................................39

*Lauro Lines s.r.l. v. Chasser,*
490 U.S. 495 (1989)..................................................................................70

*Leroy v. Great W. United Corp.,*
443 U.S. 173 (1979)..................................................................................83

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,*
51 F.3d 982 (11th Cir. 1995)................................................................50, 52

*Lowman v. FAA,*
83 F.4th 1345 (11th Cir. 2023)................................................................58

*Mahmoud v. Taylor,*
606 U.S. 522 (2025)..................................................................................17

*Mamani v. Berzain,*
825 F.3d 1304 (11th Cir. 2016)................................................................30

*Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied
Indus. Fund,*
967 F.2d 688 (1st Cir. 1992)................................................................72

*Manley v. Engram,*
755 F.2d 1463 (11th Cir. 1985)................................................................71, 74

*Marsh v. Oregon Natural Res. Council,*
490 U.S. 360 (1989)..................................................................................45

*Martinez v. Mathews,*
544 F.2d 1233 (5th Cir. 1976)................................................................65

*Md. Conservation Council, Inc. v. Gilchrist,*
808 F.2d 1039 (4th Cir. 1986)................................................................22, 25, 30

*Meghrig v. KFC Western, Inc.,*
516 U.S. 479 (1996)..................................................................................64

*Middlebrooks v. Smith,*
735 F.2d 431 (11th Cir. 1984)................................................................69

*Mills v. Hamm,*
102 F.4th 1245 (11th Cir. 2024)................................................................8, 47

*Myers v. Gilman Paper Corp.*,
 544 F.2d 837 (5th Cir. 1977) ..............................................................70

*Named Individual Members of San Antonio Conservation Soc'y v. Tex. Highway Dep't*,
 446 F.2d 1013 (5th Cir. 1971) ............................................................66

*Nat'l Audubon Soc. v. Hoffman*,
 132 F.3d 7 (2d Cir. 1997) ...................................................................24

*Nat'l Labor Rels. Bd. v. Gaylord Chem. Co., LLC*,
 824 F.3d 1318 (11th Cir. 2016) ..........................................................41

*Nat'l Mining Ass'n v. United Steel Workers*,
 985 F.3d 1309 (11th Cir. 2021) .....................................................31, 32

*Nat'l Treasury Employees Union v. Vought*,
 149 F.4th 762 (D.C. Cir. 2025) ...........................................................30

*New Jersey Conservation Foundation v. FERC*,
 111 F.4th 42 (D.C. Cir. 2024) .............................................................46

*Nielsen v. Preap*,
 586 U.S. 392 (2019) ............................................................................38

*NRDC v. Tenn. Val. Auth.*,
 340 F. Supp. 400 (S.D.N.Y. 1971) ......................................................75

*Okeelanta Corp. v. U.S. Army Corps of Eng'rs*,
 132 F.4th 1320 (11th Cir. 2025) .........................................................24

*Ouachita Watch League v. Jacobs*,
 463 F.3d 1163 (11th Cir. 2006) ............................................................4

*PDVSA U.S. Litig. Tr. v. LukOil Pan Americas LLC*,
 65 F.4th 556 (11th Cir. 2023) .............................................................83

*Powers v. Sec'y, Fla. Dep't of Corr.*,
 691 F. App'x 581 (11th Cir. 2017) ......................................................65

*Public Citizen v. Office of U.S. Trade Representatives*,
 970 F.2d 916 (D.C. Cir. 1992) ............................................................34

*Pulsifer v. United States*,
601 U.S. 124 (2024)......................................................................20

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)....................................................................3, 46

*Robinson v. Giarmarco & Bill, P.C.*,
74 F.3d 253 (11th Cir. 1996)........................................................75

*Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*,
626 F.3d 973 (7th Cir. 2010).........................................................71

*Rumsfeld v. Padilla*,
542 U.S. 426 (2004)......................................................................87

*San Luis Valley Ecosystem Council v. FWS*,
657 F. Supp. 2d 1233 (D. Col. 2009).............................................47

*Sapuppo v. Allstate Floridian Ins. Co.*,
739 F.3d 678 (11th Cir. 2014).......................................................69

*Schiavo ex rel. Schindler v. Schiavo*,
403 F.3d 1223 (11th Cir. 2005).....................................................74

*Schultz v. Alabama*,
42 F.4th 1298 (11th Cir. 2022)......................................................70

*Scottsdale Mall v. Indiana*,
549 F.2d 484 (7th Cir. 1977).........................................................23

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
605 U.S. 168 (2025).................................................................passim

*Sierra Club v. Martin*,
71 F. Supp. 2d 1268 (N.D. Ga. 1996)............................................53

*Sierra Club v. U.S. Army Corps of Eng'rs*,
295 F.3d 1209 (11th Cir. 2002)....................................................... 3

*Steen v. Murray*,
770 F.3d 698 (8th Cir. 2014).........................................................85

*Stelly v. Employers Nat'l Ins. Co.*,
   431 F.2d 1251 (5th Cir. 1970)................................................................69

*Swint v. Chambers Cnty. Comm'n*,
   514 U.S. 35 (1995)................................................................................70

*Texas v. U.S. Dep't of Homeland Sec.*,
   123 F.4th 186 (5th Cir. 2024)..........................................................41, 42

*Ukiah Adventist Hosp. v. FTC*,
   981 F.2d 543 (D.C. Cir. 1992) ...........................................................71

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) .........................................................63

*United States v. Lopez*,
   562 F.3d 1309 (11th Cir. 2009) .........................................................69

*United States v. Ramirez-Chilel*,
   289 F.3d 744 (11th Cir. 2002)............................................................47

*United States v. Rojas*,
   429 F.3d 1317 (11th Cir. 2005) .........................................................69

*United States v. S. Fla. Water Mgmt. Dist.*,
   28 F.3d 1563 (11th Cir. 1994).....................................................passim

*United States v. Sigma Int'l, Inc.*,
   300 F.3d 1278 (11th Cir. 2002) .........................................................30

*United States v. Snipes*,
   512 F.3d 1301 (11th Cir. 2008) .........................................................70

*Venetian Casino Resort, L.L.C. v. E.E.O.C.*,
   530 F.3d 925 (D.C. Cir. 2008) ..........................................................4

*W. Watersheds Project v. Salazar*,
   No. CIV 08-0516, 2009 WL 1299626 (D. Idaho May 7, 2009) ..............77

*W. Watersheds Project v. Schneider*,
   No. 1:16-CV-83, 2019 WL 4863483 (D. Id. Oct. 2, 2019) ..................75

*Wilson v. Apfel*,
   179 F.3d 1276 (11th Cir. 1999) ........................................................60

*Winter v. NRDC*,
   555 U.S. 7 (2008) ...........................................................48, 61, 62

*Woodke v. Dahm*,
   70 F.3d 983 (8th Cir. 1995) ............................................................85

*Younge v. Fulton Jud. Cir. Dist. Attorney's Off., Georgia*,
   No. 23-11418, 2025 WL 974309 (11th Cir. Apr. 1, 2025)................71

*Zafar v. U.S. Atty. Gen.*,
   461 F.3d 1357 (11th Cir. 2006) ........................................................40

Statutes

5 U.S.C. § 551(13) ...........................................................................32

5 U.S.C. § 704 .................................................................................32

5 U.S.C. § 706(2) .........................................................................4, 33

5 U.S.C. §§ 701 ............................................................................ xvii

8 U.S.C. § 1226(e) ...........................................................................38

8 U.S.C. § 1231(g) ........................................................................... 1

8 U.S.C. § 1252(a)(2)(B)(ii) .......................................................39, 40

8 U.S.C. § 1357(g)(3) .................................................................14, 27

8 U.S.C. §§ 1151-1378 ....................................................................40

16 U.S.C. § 698f(a)........................................................................8, 9

16 U.S.C. § 698j .......................................................................10, 12

16 U.S.C. § 1538(a)(1)(B) ..............................................................53

28 U.S.C. § 1292(a)(1).............................................................xvii, 69

28 U.S.C. § 1391(b)(2) & (e)(1)(B) ...............................................78

28 U.S.C. § 1391(e)(1)(C) ...................................................................75

42 U.S.C. § 4332(2)(C) ................................................................58, 86

42 U.S.C. § 4332(2)(C)(v) .....................................................79, 80, 86

42 U.S.C. § 4332(C) ........................................................1, 3, 19, 34

42 U.S.C. § 4336(a)(1) ...................................................................32

42 U.S.C. § 4336e(10)(A) .....................................................20, 25, 31

42 U.S.C. § 4336e(10)(B) ..............................................................20

42 U.S.C. § 4336e(10)(B)(ii)-(iii) ...................................................21

42 U.S.C. § 4336e(10)(B)(iii) .........................................................21

42 U.S.C. § 4336e(10)(B)(v) ..........................................................32

42 U.S.C. §§ 4321 ...................................................................... xvii

Pub. L. No. 118-272, § 1401, 138 Stat. 2992, 3171 (2025) ..................... 9

Rules

11th Cir. R. 27-1(g)......................................................................30

Eleventh Circuit Rule 26.1-1 .......................................................... 1

Fed. R. App. P. 32(g)(1)...............................................................90

Fed. R. Civ. P. 52(a)(6)................................................................18

Fed. R. Evid. 201(b), (c)(2), (d) ....................................................61

Federal Rule of Appellate Procedure 26.1 ....................................1, 6

Federal Rule of Appellate Procedure 32(a)(5)................................90

Federal Rule of Appellate Procedure 32(a)(6)................................90

Federal Rule of Appellate Procedure 32(f)....................................90

Regulations

50 C.F.R. § 17.3.............................................................................................53

## STATEMENT OF JURISDICTION

This Court has interlocutory jurisdiction to review the district court's preliminary injunction. 28 U.S.C. § 1292(a)(1). The Court, however, lacks interlocutory appellate jurisdiction to review the district court's venue ruling. *Garner v. Wolfinbarger*, 433 F.2d 117, 120 (5th Cir. 1970). Appellants' statement of jurisdiction failed to articulate a basis for interlocutory jurisdiction over the venue ruling.

## STATEMENT OF THE ISSUES

(1)      Whether the district court's factual findings, including that the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"), applied, were clearly erroneous?

(2)      Whether the district court abused its discretion in entering a preliminary injunction to prevent irreparable harm to the environment and Tribal rights where Appellants presented no evidence that their immigration enforcement objectives could not be achieved otherwise?

(3)      Whether this Court has jurisdiction over the district's court ruling on venue, and, if so, whether the district court abused its discretion in finding that Appellants waived their venue objection and in finding venue existed?

## **INTRODUCTION**[1]

In June 2025, Florida and federal officials announced a joint plan to erect an immigration detention center, which the federal government would fund, in the heart of the Everglades. No environmental review was conducted. NEPA, however, prohibits implementation of a proposed federal action before its environmental impacts are considered. 42 U.S.C. § 4332(C).

After Friends sued, Appellants pivoted and asserted in court that the facility constituted purely state action and that NEPA was therefore inapplicable. As a matter of law, however, DHS's decision to authorize and fund an immigration detention facility constituted final agency action for purposes of the APA and major federal action for purposes of NEPA. Congress requires DHS to "arrange for appropriate places" of immigration detention, 8 U.S.C. § 1231(g), and states have no legal authority to operate immigration detention centers absent federal authorization and control.

---

[1] On January 14, 2026, the Court granted Friends' motion for an extension of time, making their response brief due January 20, 2026. ECF 96. The order did not address Friends' January 6, 2026, motion for leave to file a consolidated response brief with excess words, which attached the proposed brief. ECF 90. In an abundance of caution, Friends now submit that brief in accordance with the Court's deadline.

The district court entered a preliminary injunction after concluding that Friends were likely to succeed on the merits of their claim that Appellants violated NEPA and the APA by failing to consider the environmental impacts of building and operating an immigration detention center in a uniquely sensitive ecosystem. The district court considered the testimony of ten live witnesses, and more than 100 exhibits, to find that the detention center was likely to cause irreparable harm to waters, wetlands, endangered species, and the interests of the Miccosukee Tribe, and that the balance of the equities clearly favored injunctive relief when weighed against unsubstantiated claims of harm to public safety.

The district court also correctly found venue proper in the Southern District of Florida based on Friends' place of residence and evidence showing that substantial events and omissions giving rise to the claims occurred there. Additionally, that objection was waived, and is not subject to review in this Court.

## STATEMENT OF THE CASE

### I.     Statutory Background

### A.     The National Environmental Policy Act

"NEPA was the first of several landmark environmental laws enacted by Congress in the 1970s," which include the Clean Air Act, Clean Water Act, and the Endangered Species Act. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 172 (2025). For projects "that are built, funded, or approved by the

Federal Government, NEPA requires federal agencies to prepare an environmental impact statement, or EIS, identifying the significant environmental effects of the projects as well as feasible alternatives." *Id.* at 177; *see also* 42 U.S.C. § 4332(C). NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cnty.*, 605 U.S. at 177.

NEPA establishes "a set of 'actionforcing' procedures that require that agencies take a 'hard look' at environmental consequences'" and "that provide for broad dissemination of relevant environmental information" before agencies act. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted); *see also Sierra Club v. U.S. Army Corps of Eng'rs,* 295 F.3d 1209, 1216 (11th Cir. 2002). Failure to review a project's environmental consequences beforehand risks "that important effects will ... be overlooked or underestimated only to be discovered after ... the die [has been] cast." *Robertson*, 490 U.S. at 349.

While NEPA "does not mandate particular results" it does "prescribe[] the necessary process." *Seven Cnty.*, 605 U.S. at 177. "NEPA's procedural mandate helps 'to insure a fully informed and well-considered decision." *Id.* at 185; *id.* at 177 (NEPA ensures agencies and the public are made aware of a proposed project's environmental consequences). It is this Court's role "to ensure that these procedures are followed." *City Of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1359 (11th Cir. 2005).

### B.    The Administrative Procedure Act

"[P]laintiffs challenging an agency action based on NEPA must do so under the Administrative Procedure Act." *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006). Under the APA, federal courts are to "set aside" a final agency action "found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

Agency action is "final" for purposes of APA review when (1) "the action ... mark[s] the consummation of the agency's decision-making process ... —it must not be of a merely tentative or interlocutory nature;" and (2) is "one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997) (citation modified).

The "core question" is whether the decision-making process has advanced to the point that it "will directly affect the parties." *Franklin v. Massachusetts,* 505 U.S. 788, 797 (1992). Decisions that are "tentative" or preliminary are not final, while decisions that have a "direct effect on ... day-to-day business" are reviewable. *Id.* (quoting *AbbottLabs. v. Gardner,* 387 U.S. 136, 152 (1967)). Finality is interpreted "pragmatic[ally]." *FTC v. Standard Oil Co. of Cal.,* 449 U.S. 232, 239 (1980).

Agency decisions need not to be reduced to writing to be reviewable final agency action. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *52 (4th Cir. 2025); *Accord Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 930 (D.C. Cir. 2008).

4

## II.    Procedural History

On June 27, 2025, Friends filed a Complaint to stop irreparable environmental harm from a rushed project to build a mass immigration detention center in the Everglades—actions undertaken without environmental review.[2] App.1088-89, 1105-06, 1109, 1112. Friends filed an expedited motion for a temporary restraining order and preliminary injunction, requesting an order to enjoin construction until the state and federal defendants complied with NEPA and the APA. App.1116.

Federal Defendants, Florida, and Miami-Dade County filed responses in opposition to Friends' motion. App.1132, 1155; Supp.App.2-35. Over the next three weeks, Friends filed supplemental evidence in support of the motion. App.1180-1201. Florida submitted more filings in opposition. Supp.App.122-25, 151-52.

On July 13, 2025, the Miccosukee Tribe of Indians moved to intervene to protect their use and occupancy of affected areas in the Preserve and Tribal members' environmental and cultural interests. App.1204-33. Supp.App.126-50. The court granted the motion. App.1327.

On July 17, 2025, Friends filed a renewed motion for a preliminary injunction, acknowledging that partial construction had been completed and that approximately

---

[2] Appellants' Appendix (ECF 83) is cited throughout as "App." Appellees' Supplemental Appendix is cited as "Supp.App."

900 individuals were detained at the center. App.1237-38. Friends asked the district court to enjoin further construction, additions to the population, and operations harming the environment. *Id.*

Nearly four weeks into the preliminary injunction litigation—and only after the case was reassigned to Judge Kathleen Willliams—Florida objected to venue. App.1256-60. At a July 21, 2025, status conference, Friends argued that venue was not jurisdictional and urged the court to enter a limited TRO without delay. App.1301.

Judge Williams declined to enter the TRO, App.1302:14-15, and instead scheduled argument on venue and an evidentiary hearing on the motion for a preliminary injunction, App.1263-64. Federal Defendants subsequently joined Florida's objection to venue. Supp.App.313-24. Defendant Miami-Dade County did not. App.1377.

At the July 30, 2025, hearing on venue, Federal Defendants agreed with the district court that venue was not jurisdictional. Supp.App.436:23-437:23. The court heard argument from all parties and took the issue under advisement.

The preliminary injunction hearing began on August 6, 2025. App.31. After the parties agreed the hearing would not end in one day, Defendants asked for a continuance to due to "significant attorney and witness issues." App.357:13. Defendants intended to call three live witnesses. App.277:20-278:24.

Friends did not object to a short delay but, noting evidence of another uptick in construction activity, renewed their TRO request until the court could rule on the preliminary injunction. App.534:24. When Defendants would not agree to pause new construction, the court heard argument on Friends' request for a limited TRO and granted it. App.538-42, 566-633, 1365-66.

The court resumed the injunction hearing on August 12, 2025, and concluded it on August 13, 2025. App.1366. Friends called seven fact and expert witnesses and submitted more than 100 exhibits. App.1362-63. The Miccosukee Tribe called two witnesses, including additional expert testimony, and submitted nearly two dozen exhibits. App.1364-65.

Florida called one witness, David Kerner, executive director of the Florida Department of Highway Safety and Motor Vehicles, and Federal Defendants called none. App.1364-65. Florida submitted eleven exhibits; Federal Defendants submitted one. Supp.App.642-44.

On August 21, 2025, the district court issued an 82-page order granting the preliminary injunction and finding venue to be proper. App.1356-1437. The court ordered a wind-down of environmentally harmful operations over a period of 60 days until Defendants complied with NEPA. App.1435-36. The court imposed a $100 bond, App.1436, an amount Friends proposed in briefing and Defendants did not oppose.

Defendants filed an interlocutory appeal, App.1439, and moved the district court for a stay of the preliminary injunction pending appeal, App.1441-65, which the court denied. App.1466-74. Appellants then moved for a stay in this Court. ECF 9, 20. Friends and the Miccosukee Tribe responded in opposition to that motion on September 2, 2025. ECF 35, 37.

On September 4, 2025, a divided motion panel of this Court stayed the preliminary injunction and all further district court proceedings pending appeal. ECF 42-1. Friends moved the Court to reconsider the stay of district court proceedings. ECF 43. That motion became ripe on September 22, 2025, ECF 57, and remains pending.

## III. Factual Background

The district court's preliminary injunction was based on fact findings, which may only be set aside if clearly erroneous. *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir. 2024).

### A. The Big Cypress National Preserve

Congress established the Big Cypress National Preserve in 1974 "to assure the ... protection of the natural, scenic, hydrologic, floral and faunal, and recreational values of the Big Cypress Watershed ... and to provide for the enhancement and public enjoyment thereof." 16 U.S.C. § 698f(a). The Preserve was created in

response to public outcry over a plan to construct a jetport within the Everglades watershed. App.1434.

The jetport plan was scuttled after an "environmental impact report" chronicled the environmental impacts the plan would cause. *Id. See* App.52:8-20. A single legacy runway remained, restricted to pilot training to limit further environmental consequences. *Id.*; App.71:24-72:3. Miami-Dade County owns the property, known as the Dade-Collier Training and Transition Airport ("TNT Site").

**B.    Plaintiff Friends of the Everglades**

Friends was founded in 1969 by Marjory Stoneman Douglas, author of *The Everglades: River of Grass* (Alfred A. Knopf 1947), in response to the jetport plan. App.51-52. To this day, Friends has advocated to protect, preserve and restore the Everglades, including Big Cypress. App.53.

Friends participated in the decades-long planning process for the "Western Everglades Restoration Plan" ("WERP"), which has received ***$2.115 billion*** in congressional funding for restoration projects near the Preserve. Pub. L. No. 118-272, § 1401, 138 Stat. 2992, 3171 (2025). *See also* App.60-61.

Friends is headquartered in the Southern District of Florida. App.1379. Members of Friends frequently visit Big Cypress—including the entrance road to the TNT Site—for recreational activities such as hiking, camping, bird watching, and observing wildlife. App.53-55, 330-31, 1363.

9

**C.    The Ecological Importance of the TNT Site**

The TNT Site straddles Collier and Miami-Dade Counties and is located within the footprint of the federal Big Cypress National Preserve and state Big Cypress Area within the Everglades. App.54-55. The Site sits within "an environmentally sensitive freshwater wetland ecosystem of ecological significance for wildlife [including the] threatened wood stork, and the endangered Florida bonneted bat and Florida panther." App.1357.

The TNT Site is also important to the water supplies of the surrounding Everglades, Miami-Dade County residents, and the Miccosukee Tribe, whose traditional rights to hunt, fish, trap and observe tribal religious ceremonies were expressly preserved in the Preserve's enabling legislation and practiced currently. App.1425; Supp.App.1019-22; Supp.App.1030-31; 16 U.S.C. § 698j. The Site is near Everglades National Park and within the WERP footprint:



Supp.App.1075. *See also* App.1357-58. The Preserve is a recognized International

Dark Sky Park. App.1407.

**D.    Defendants Partner to Build and Operate a Federal Immigration
Detention Center with Federal Funding.**

On June 23, 2025, FDEM commandeered the TNT Site from Miami-Dade

County to construct a mass immigration detention and deportation center,

notwithstanding the County's environmental concerns.[3] App.1357; Supp.App.1019-22. Three days earlier, DHS's assistant general counsel confirmed that the federal government would reimburse Florida, and that assurance was forwarded to FDEM so the agency could proceed. Supp.App.734-35.

Florida and federal officials publicly confirmed that the federal government would fund the facility. *See* App.1417 (Governor's June 25, 2025, announcement that federal government would "fully fund" the facility; DHS Secretary Kristi Noem stated that facility would be funded by federal grants). DHS created a $600 million "Detention Support Grant Program" ("DSGP") for which FDEM was the "only eligible applicant." *Id.* Construction began immediately without any consideration of the facility's environmental impacts, consideration of alternatives, or opportunity for notice and comment as NEPA and APA require. App.1362, 1402-03, 1421, 1434.

The district court reasonably relied on the officials' unequivocal public statements, and the creation of a $600 million immigration detention grant program with FDEM as its only eligible applicant, to conclude that a funding decision had been made. The district court's factual findings have now been confirmed by evidence Appellants have failed to disclose: that FDEM applied for the grant on

---

[3] For this authority, Florida relied on a 2023 order declaring a state immigration emergency, App.1483-89, and directing FDEM to "enter into agreements with any and all" federal agencies "as may be needed to meet this emergency," App.1485.

August 7, that FDEM was instructed by FEMA regarding the use of these funds on August 15, and that Appellant DHS issued the award for a grant period beginning June 1, made effective September 30.[4] *See* Motion for Leave to Supplement Record on Appeal. The federal government followed through on its commitment to fund the facility—just as Secretary Noem and Governor DeSantis announced they would— and as DHS demonstrated by at the same time creating an immigration detention "grant program" with FDEM as its only eligible applicant.

### E.    The Facility Is a Federal Immigration Detention Center.

The facility "acts exclusively as an immigration detention facility." App.1410. DHS and ICE are solely responsible for transporting detainees to and from the facility. App.1362, App.1390-91. The facility was built to ICE standards and guidelines and was inspected by ICE officials to ensure compliance. App.1411, App.1420. ICE ultimately determines who may be detained at the facility, as federal law requires. App.1413-14.

---

[4] In their opening brief, Federal Appellants acknowledge a September 30, 2025, grant to FDEM by citing a news article, but fail to attach the document. ECF 86 at 9 n.3. The document, titled "Award Letter," states that the award is from Appellant DHS, for a grant period that began June 1. It also states that FEMA provided FDEM with instructions related to the use of these allocated funds on August 15. *See* Motion to Supplement.

State law enforcement officers on Site operate pursuant to a 287(g) agreement with ICE, under which state officers may perform immigration-enforcement functions only under the supervision of ICE officers. App.1367-69. Indeed, state officers "are **not** authorized to perform immigration officer functions **except** when working under the supervision and direction of ICE." App.1367-68 (emphasis added).[5] Any state officer deputized under 287(g) "is treated as a federal employee" and "acting under color of Federal authority." App.1368.

Any charging document for a detainee held at the Site must be signed by an ICE officer, and local law enforcement may only detain individuals at "ICE-approved detention facilities." App.1167. The only court with jurisdiction over detainees at the facility is the federal immigration court at the Krome Processing Center. App.1391.

### F.    Environmental Consequences of Transforming Limited Use Site Into Mass Immigration Detention Center.

To build the facility, Florida applied approximately 800,000 square feet (roughly 20 acres) of new pavement over compacted grassy areas, erected miles of new fencing, installed high-wattage industrial lighting visible from more than 20

---

[5] *See also* 8 U.S.C. § 1357(g)(3) (governing 287(g) agreements); *Arizona v. United States*, 567 U.S. 387, 408 (2012) ("Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer.").

miles away, and moved hundreds of workers, and thousands of detainees, onto the Site. App.338-39, App.947, App.1424-27, App.1572. The Tribe's access to trails leading from the Site to areas historically hunted by the Tribe was cut-off. App.1427-29. Electricity is provided by portable diesel generators utilizing fuel trucked in on a daily basis, while sewage is trucked out from temporary bathrooms. App.123-24, 1402. Prior to construction of the facility, the TNT Site had four employees on Site, responsible for mowing grass. App.1429.

At the preliminary injunction hearing, Plaintiffs presented evidence of irreparable environmental harm through the testimony of Randy Kautz, a renowned panther expert; Dr. Marcel Bozas, director of the Miccosukee Tribe's Fish and Wildlife Department; Dr. Christopher McVoy, a soil physicist, hydrologist, and wetlands ecologist with expertise on the Everglades; Dillon Reio, a geologist; and Amy Castaneda, the Miccosukee Tribe's director of water resources. App.1363-64. Their testimony was unrebutted; Defendants called no experts.

Defendants' failure to attempt NEPA compliance is undisputed. App.1402.

G.     **The District Court Ruled Venue Was Proper and Granted the Motion for Preliminary Injunction.**

Regarding venue, the district court found Defendants waived the objection by failing to raise it for a month while otherwise litigating against Friends' preliminary injunction motion. App.1377-79. The court also found that the evidence supported venue in the Southern District based on: (1) Friends' place of residence; (2) the site's

15

partial location in Miami-Dade County, which owns the site; (3) Defendants' failure to evaluate the facility's impacts on: (a) waters, wetlands, and endangered species in the Southern District; (b) Miami-Dade County residents; and (c) Tribal members in Miami-Dade County; and (4) Defendants' failure to consult with the Tribe and other federal agencies, or provide an opportunity for public comment to those affected in the Southern District. App.1379-96.

On the motion for preliminary injunction, the district court found Friends was likely to succeed on the merits of their NEPA claims where Defendants' decision to construct an immigration detention facility—at Federal Defendants' request and with the commitment of federal funding, and without conducting any of the review required by NEPA—constituted final agency action. App.1403-08, App.1435. This also constituted a major federal action under NEPA because "all immigration enforcement activities associated with the camp—key drivers of the project's environmental impact—are entirely under federal control and pursuant to federal law," App.1410. The court credited the evidence, including Defendants' own public admissions, showing that a federal funding decision had been made. App.1416-18.

The district court found that Plaintiffs established irreparable harm via increased pollution runoff from new paving at the site into surrounding wetlands and the Tribe's drinking-water supply, denial of Tribal access to preserved areas used for ceremonial and traditional activities, and the ongoing loss of prime habitat for

endangered species, including the Florida panther, from light pollution and increased human activity. App.1422-30.

In balancing the equities, the district court found the evidence demonstrating irreparable harm to Friends was "extensive," while Defendants "offered little to no evidence why this detention camp, in this particular location, is uniquely suited and critical to" immigration enforcement. App.1431.

## STANDARD OF REVIEW

In seeking a preliminary injunction from the district court, Friends needed to "show that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction would be in the public interest." *Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025).

A district court's preliminary injunction is reviewed "only for an abuse of discretion" and in doing so the "Court will not review the intrinsic merits of the case." *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171-72 (11th Cir. 2002) (internal quotations omitted). The Court reviews legal determinations de novo and will not disturb factual findings "unless they are clearly erroneous." *Id.* at 1171.

A district court's factual findings cannot be clearly erroneous "[w]here there are two permissible views of the evidence"; this Court must instead have a "definite

and firm conviction that a mistake has been committed" after it views all the evidence. *Hodges v. United States*, 78 F.4th 1365, 1374 (11th Cir. 2023). *Accord* Fed. R. Civ. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility").

## SUMMARY OF THE ARGUMENT

After a four-day evidentiary hearing involving testimony from Plaintiffs' nine witnesses and more than 100 exhibits, and a dozen exhibits and only one witness on behalf of Defendants, the district court entered a preliminary injunction that was firmly rooted in the evidence and law. Appellants have failed to show that the district court abused its discretion or that any material factfinding was clearly erroneous. Appellants also improperly rely on several arguments not made to the district court and conclusory declarations prepared for this appeal, none of which have merit. The district court's order should therefore be affirmed.

## ARGUMENT

### I. THE DISTRICT COURT DID NOT ERR IN FINDING THAT FRIENDS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A. Venue Is Not Jurisdictional and Therefore Provides No Basis to Reverse the Preliminary Injunction on Appeal.

Appellants objected to venue only after this case was transferred to Judge Williams. The district court did not abuse its discretion in finding venue proper. That finding was amply supported as a matter of fact and law. Regardless, as Part V of

this brief demonstrates, that the issue is not properly part of this interlocutory appeal, was waived below, and lacks merit.

For purposes of this interlocutory appeal, the salient point is that "[v]enue is not a jurisdictional prerequisite and its presence or absence does not affect a court's authority to adjudicate." *Harris Corp. v. Nat'l Iranian Radio & Television,* 691 F.2d 1344, 1349 (11th Cir. 1982).

Florida's characterization of venue as a "threshold issue of judicial power," Fla.Br.6, is therefore flat wrong. Federal Appellants properly conceded below that their request that the court resolve venue before considering preliminary relief was a matter of preference, not jurisdiction. Supp.App.437-38.

Appellants' venue objection therefore had no bearing on the district court's jurisdiction over Friends' NEPA claim, Friends' likelihood of success on the merits, or the district court's authority to enter the preliminary injunction now on appeal. Venue is therefore no basis to reverse.

## B. Appellants' Detention Facility Constitutes a Major Federal Action.

NEPA requires the federal government to assess the environmental impacts of any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The district court did not abuse its discretion in finding that Appellants' agreement to build an immigration detention center—at the request of DHS, with the (now fulfilled) promise of funding from DHS, and to hold

detainees on behalf of DHS—constitutes a major federal action under NEPA. App.1408-20.

### 1. Statutory Definition of Major Federal Action.

Appellants misread NEPA's definition of major federal action, trying to find a loophole in the statute that its text and context does not allow. Fed.Br.24-25; Fla.Br.50. The 2023 amendments defined "major federal action" to exclude "a non-federal action—(I) with no or minimal Federal funding; or (II) with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project." 42 U.S.C. § 4336e(10)(B). Although they did not raise this issue below (and thus waived it), Appellants now read this language to mean that a non-federal action must have both (1) more than minimal federal funding *and* (2) federal agency control over the outcome of the project. But that reading cannot be squared with the text or context of NEPA. *See Pulsifer v. United States*, 601 U.S. 124 (2024) (statutory construction can depend on "text in its legal context").

NEPA *first* defines a major federal action as one that "is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). Appellants provide no explanation for why Congress would begin with that definition and then exclude a non-federal action that clearly meets it solely because there has been no federal funding. Under Appellants' farfetched reading, even total federal control over an action, or an entirely federally funded action, would not constitute a major federal

action under NEPA. Appellants' reading would also exclude major actions where a non-federal actor has carried out action in agreement with a federal agency, but conveniently timed the provision of federal funds (or, as here, reimbursement) until after the action is completed.

The Court need not address whether Congress intended such a counterintuitive result given the district court's factual findings that here there is *both* substantial federal funding *and* more than minimal federal involvement. Also, the statutory text does not require that federal funds have been *disbursed*, but rather, takes a broad view of federal financial commitment; for example, another provision broadly refers to "loan guarantees" and "other forms of financial assistance." 42 U.S.C. § 4336e(10)(B)(iii). Appellants' argument also ignores the exceptions from the "major federal action" definition for "funding assistance in the form of general revenue sharing funds *which do not provide … responsibility over the subsequent use of such funds*" and "loan guarantees, or other forms of financial assistance where a Federal agency *does not exercise sufficient control and responsibility over the subsequent use of such financial assistance or the effect of the action*." 42 U.S.C. § 4336e(10)(B)(ii)-(iii) (emphasis added). These exceptions only make sense if situations where the federal government *does* control whether funds are earmarked for a particular purpose or project (as here) is sufficient to trigger NEPA's applicability.

To adopt Appellants' reading would also upend decades of interpretative caselaw and longstanding agency interpretation—under which federal control or funding could render a project major federal action—that there is no evidence Congress intended to eviscerate. *Seven Cnty.*, 605 U.S. at 181 n.3 (2023 amendments to NEPA simply "reinforce[d] the basic principles that 'NEPA, correctly interpreted, already embodied'").

### 2.    State-Federal Major Federal Action.

"Major federal action can exist when the primary actors are not federal agencies." *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994). A "federal agency's authority to influence" nonfederal activity is "the touchstone of major federal activity." *Id.* ("The federal agency must possess actual power to control the nonfederal activity.") (citation modified). *See also Citizens for Smart Growth v. Sec'y of Dept. of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (party "working in tandem with federal agencies" may be enjoined for NEPA violation).

Where "non-federal entities have entered into a partnership or joint venture with the Federal Government," they are subject to NEPA and may be enjoined for violating it. *Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974). Under this standard, "a nonfederal project is considered a 'federal action' if it cannot 'begin or continue without prior approval by a federal agency.'" *Md. Conservation Council,*

*Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir. 1986). *Accord Goos v. I.CC.,* 911 F.2d 1283, 1294 (8th Cir. 1990) (holding that "federal action" for NEPA purposes may be found if federal action "is a legal condition precedent to accomplishment of an entire nonfederal project").

"There are no clear standards for defining the point at which federal participation transforms a state project into federal action" for NEPA purposes. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572. In making this determination, courts examine whether the federal agency exercises "legal and factual control" over the project. *Goos*, 911 F.2d at 1294. Ultimately, where a project is "sufficiently federal in character," NEPA applies. *Scottsdale Mall v. Indiana*, 549 F.2d 484, 489 (7th Cir. 1977).

The district court correctly applied these authorities and found that the creation of this immigration detention facility was the result of a "joint, multi-step decision making process" that constituted major federal action. *See* App.1390, 1408-09. *See also Biderman*, 497 F.2d at 1147 ("joint venture" with federal government is major federal action). The court credited evidence that: (1) the facility was constructed to serve "exclusively as an immigration detention facility" and operated under the supervision and control of ICE under 287(g) agreements; (2) the facility follows "ICE detention standards" and employs technology systems installed and maintained by ICE; (3) ICE decides who is subject to detention for immigration

violations and who may be housed at the site, and transporting detainees to and from the facility; (4) the facility was "built at the Federal Defendants' request"; and (5) the Federal Defendants promised to federal fund the project. App.1410-20. While Appellants attempt to minimize the evidence, they cannot show that the factual findings were clearly erroneous.[6]

Appellants attempt to disassemble the district court's factual findings into granular parts to try to avoid NEPA's reach. But, as the district court said, "NEPA's pragmatic paradigm does not allow for evasion of responsibility by parsing agency actions in this artificially atomistic way." App.1410 (citing *Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, 132 F.4th 1320, 1344 (11th Cir. 2025) ("An agency cannot evade its responsibilities under [NEPA] by artificially dividing a major federal action into smaller components") (citations omitted)).

---

[6] Contrary to Federal Appellants' argument (never raised below), the district court was not required to "remand the matter" to DHS for an "explanation" given the absence of any administrative record. *See Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (holding that the court may look beyond administrative record "where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice" and noting that "[d]eviation from this 'record rule' occurs with more frequency in the review of agency NEPA decisions") (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Regardless, Federal Appellants waived this issue. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

Appellants insist that Florida alone was responsible for construction and operation of the facility and therefore it is excluded from the definition of "major Federal action" under NEPA. Fla.Br.50-53; Fed.Br.25. This myopic argument would require the Court to ignore the express and only *purpose* for which the facility was built: to house individuals detained *by and for ICE* for alleged violations of *federal* immigration laws pursuant to federal legal authority. As the district court found, "Defendants ignore the reality that all immigration enforcement activities associated with the camp—key drivers of the project's environmental impact—are entirely under federal control and pursuant to federal law." App.1410.

Appellants also ignore the applicable standard: NEPA applies to actions "subject to *substantial* Federal control and responsibility," not *absolute* control. 42 U.S.C. § 4336e(10)(A) (emphasis added). Where a federal agency has "control and responsibility over *material* aspects of the specific project," NEPA applies. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572 (emphasis added). The immigration functions of the facility—its sole purpose—are material, and they are necessarily under the exclusive direction and control of ICE and DHS. Without federal authorization, the facility would not operate, making this federal action. *See Gilchrist,* 808 F.2d at 1042 (finding federal action based on "inevitability of the need for at least one federal approval").

Indeed, Florida has no legal authority to operate an immigration detention center without federal approval, necessarily making this federal action subject to NEPA. *See S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572 (where federal approval is a "legal precondition for implementation," NEPA applies); *Biderman*, 497 F.2d at 1147 (where non-federal entity "would be acting unlawfully" absent federal approval, its conduct constitutes federal action).

It is undisputed that the facility "acts exclusively as an immigration detention facility.'" App.1410. In fact, it cannot operate as anything ***other*** than an immigration detention facility, as Florida commandeered the land pursuant to an executive order specifically addressing an immigration "emergency."[7] App.1483-89. Thus, DHS controls the "outcome" of the project, as its approval is required to operate the facility for the purposes for which it exists.

While Appellants insist that Florida alone determines who is detained at the facility, the evidence proved otherwise: Florida's sole witness at the injunction hearing confirmed that DHS ultimately determines who may be held in custody for immigration violations. App.846. The evidence showed that Federal officials select and transport detainees to the facility, and Florida officials are not even informed of

---

[7] Florida's claim that the facility evades NEPA's reach because it could "change the facility's use at any time," Fla.Br.52, ignores that its only authority to commandeer the property was for immigration enforcement, App.1483-89.

the identities of those detainees until they are delivered to the facility for detention. App.127-28, App.139, App.342-43. The district court correctly relied on this evidence in finding significant federal control. App.1362, App.1365, App.1410-14. Surely the district court was not required to ignore this evidence or give dispositive weight to the self-serving, conclusory declarations of individuals whom Appellants refused to call to the witness stand and subject to cross-examination, as Appellants urge.

Appellants assert that detention at the facility occurs pursuant to 287(g) agreements with ICE. Fla.Br.3; Fed.Br.7-8. *See* App.1390-91. As the district court found, these functions are performed under the supervision and direction of federal officers under federal law. App.1366-69, App.1391. *See* 8 U.S.C. § 1357(g)(3) ("[i]n performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General") (governing 287(g) agreements); *Arizona*, 567 U.S. at 408. This is because immigration enforcement is "***exclusively*** a federal power." App.1366.

Moreover, the 287(g) agreements expressly state that "[i]mmigration enforcement activities … will be supervised and directed by ICE," and any such agreement must specifically identify the "federal agency official who is required to supervise and direct" local law enforcement officers. App.1368. Any local officer

deputized under a 287(g) agreement "is treated as a federal employee" and "shall be considered to be acting under color of Federal authority." App.1368-69. And local law enforcement may only detain individuals at "ICE-approved detention facilities." App.1167. Based on these factors, the district court correctly found that Federal Appellants maintain sufficient control of the detention center operations to meet the definition of a "major Federal action." Appellants' proposed fiction that there are non-immigration (and therefore non-federal) functions performed at the detention center fails, since there is no legal authority for **any** person to be detained there (and therefore for the detention center to operate at all) other than under federal immigration law.

3.    More Than Minimal Federal Funding.

Appellants insist that the district court erred in finding that DHS agreed to fund the project.[8] *See* Fla.Br.10. But the record fully supports the district court's

---

[8] Federal Appellants misleadingly suggest that a funding decision is some future event rendering Appellees' claims unripe. Fed.Br.25-27. But the district court reasonably found that a decision had already been made. To the extent that Appellants suggest that this funding is somehow beyond federal control and thus exempt from NEPA, Fla.Br.54; Fed.Br.4, or "not specific to this facility," Fed.Br.9 n.3, these bald assertions of disputed factual issues beyond the record are improper and should be disregarded. Based on the record, the district court reasonably found that the federal government committed to fund *this* facility; notably, there was no evidence in the record of any other facility operated by FDEM to which the detention grant program would apply.

finding that the facility was "built with a promise of full federal funding." App.1420. This finding was based not on what the "state may want," *cf.* ECF 42-1 at 19, but rather on Federal Appellant Noem's own admission that the facility "will be funded" by a federal grant—for which FDEM was the "***only eligible applicant***," App.1417-19; App.1581-82. Governor DeSantis confirmed that the federal government will "fully fund" the facility. App.1417. Based on these public statements, including by a federal party opponent, the district court found that "the reimbursement funding decision has in fact been made." App.1418.

As the district court explained, these facts are distinguishable from *South Florida Water Management District*, Fla.Br.52, where federal action was premised on "the ***possibility*** of federal funding" and "instances where the grantors had not made final decisions as to the grants." App.1419 & n.29.

Indeed, DHS has now honored the commitment and approved FDEM's $600 million funding application, an application Appellants failed to disclose was submitted and under review by August 7, during the preliminary injunction hearing. *See* Fla.Br.10. *See also* Motion to Supplement. The award document further shows that FEMA provided FDEM instructions on the use of those allocated funds as early as August 15. *Id.* Given these facts, the district court's finding was at the very least "plausible" based on the record at the time and could not have been clearly

erroneous. *Barber v. Gov. of Ala.*, 73 F.4th 1306, 1317 (11th Cir. 2023) (factual finding not clearly erroneous if "plausible in light of the full record").[9]

Federal Appellants' argument that the preliminary injunction was a "premature" intrusion on their authority to make "future" funding decisions, Fed.Br.26-27, fails for the same reason, as it assumes (contrary to the record before the district court) that the decision had not already been made; the district court found, as a factual matter, that it had.[10] App.1418.

As the district court recognized, adopting Appellants' rationale would allow Appellants to "launder[] federal control or federal approval" to evade the reach of NEPA. App.1419. "Nonfederal actors may not be permitted to evade NEPA by completing a project without an EIS and then presenting the responsible federal agency with a *fait accompli*." *Gilchrist*, 808 F.2d at 1042.

---

[9] While the motions panel opined that Secretary Noem's public statements were insufficient evidence of a "legally binding" funding decision, it is beyond dispute that Noem is DHS's ultimate decisionmaker and that Florida relied on the commitment of federal funding to "get to work" building the detention center. Supp.App.735. Moreover, the motions panel ruling on the stay motion is not binding on this panel. *Mamani v. Berzain*, 825 F.3d 1304, 1308-09 (11th Cir. 2016) (citing 11th Cir. R. 27-1(g)).

[10] In support of this argument, Federal Appellants rely primarily on *Nat'l Treasury Employees Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025), which has been *vacated* and therefore has no legal effect. *Nat'l Treasury Emps. Union v. Vought*, No. 20-12649, 2025 WL 3659406, at *1 (D.C. Cir. Dec. 17, 2025). *See also United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (a vacated opinion has "no legal effect whatever").

4. <u>There is No Deference Due to an Agency's Failure to Act</u>.

Lastly, Federal Appellants argue that by holding an evidentiary hearing and making factual findings based on the evidence the district court failed to show sufficient "deference" to DHS. Fed.Br.23. But Federal Appellants never raised this issue in the court below and therefore waived it. *Access Now*, 385 F.3d at 1331.

Moreover, DHS presented no evidence that it had made **any** threshold "determination" under 42 U.S.C. § 4336e(10)(A) for the district court to consider, let alone show deference to. *Seven County*, cited by Federal Appellants, discusses judicial deference to the **scope** of an agency's environmental assessment **after** determining that NEPA applies; it is inapplicable here.

It was DHS's burden to show that it "examine[d] the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," and it failed to do so. *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1321 (11th Cir. 2021) (citations omitted). At bottom, DHS's argument is circular: there was no administrative record because there was no major federal action, Fed.Br.24, and the **absence** of an administrative record reflects that a determination was made, to which the district

court had to defer without even being able to review it. This does not "survive arbitrary and capricious review." *Nat'l Mining Ass'n*, 985 F.3d at 1321.[11]

## C.   The Construction and Operation of the Detention Center is Final Agency Action Under the APA.

The APA (which governs NEPA claims) provides that "final agency action" is subject to judicial review. 5 U.S.C. § 704. *See* 42 U.S.C. § 4336(a)(1). The district court correctly found that the federal/state agreement to open an immigration detention center is obvious final agency action. "Agency action includes the whole or part of an agency rule, order, license, sanction, relief, or the equivalent denial thereof" and applies to a "failure to act." 5 U.S.C. § 551(13).

In *Bennett*, the Supreme Court adopted a two-part test for finding "final agency action": "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" 520 U.S. at 177-78

---

[11] As the district court correctly found, 42 U.S.C. § 4336e(10)(B)(v) is also inapplicable as by its terms it only excludes the ***bringing*** of an enforcement action from the definition of major Federal action. App.1414-15. Appellants do not squarely address this finding on appeal. Fla.Br.55-56; Fed.Br.30. This strained argument fails.

(citations omitted); *Franklin,* 505 U.S. at 797 (core question is whether agency has completed decisionmaking and whether result will directly affect the parties).

The district court applied *Bennett* and found that "the construction of the camp does not represent a preliminary, procedural or intermediate agency action or ruling." App.1404. Rather, the facility has been substantially constructed and is "currently operational." *Id.* This immigration detention facility was requested by DHS to serve as a federal detention center compliant with ICE criteria, operated under the direction and supervision of ICE under 287(g) agreements, and funded by the federal government—funding that was committed and has now been memorialized. *See* App.1390 (describing Appellants' "joint, multi-step decision making process"); App.1515 (Florida's admission that the facility was built under an immigration emergency declaration under which Florida sought "direct assistance [and] enter[ed] into agreements with … agencies of the federal government"). The decision was hardly "tentative"; it has resulted, literally, in concrete impact. App.1406-07. Based on the ample evidence in the record, the district court's finding of final agency action was not clearly erroneous. App.1404-08.

While Appellants claim confusion over the precise "final agency action" addressed in the order, the court was clear: the "decision to not issue an EIS or conduct an EA and then construct a detention camp qualifies as final agency action." App.1405 (emphasis added); 5 U.S.C. § 706(2). Contrary to Appellants' arguments,

this is not a case where the failure to prepare an EIS alone, or in the abstract, constituted the final agency action. The failure to comply with NEPA in connection with the undisputably final decision to build and operate a detention center also constitutes agency action that has been "unreasonably delayed and unlawfully withheld" in contravention of section 706(1) of the APA, qualifying as another reviewable final agency action. *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998) (agency decision not to prepare EIS reviewed under arbitrary and capricious standard); *Catron Cnty. Bd. of Comm'rs v. FWS*, 75 F.3d 1429, 1434 (10th Cir. 1996) (alleged failure to comply with NEPA constitutes "final agency action").

This is distinguishable from *Public Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916 (D.C. Cir. 1992), *cited in* Fed.Br.17, where plaintiffs challenged the negotiation of NAFTA without preparation of an EIS. There, the circuit court affirmed dismissal because the mere negotiation of a trade agreement did not "trigger" NEPA obligations. 970 F.2d at 919. By contrast, the district court here correctly found that the federal decision to partner with Florida in the construction and operation of an immigrant detention facility within a National Preserve was "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), yet was done without following NEPA. App.1406-07.

Florida's argument that NEPA is not triggered here because "the State is pursuing its own sovereign ends," Fla.Br.43, misses that "the power to control immigration—the entry, admission, and removal of noncitizens—is ***exclusively*** a federal power," *Texas*, 97 F.4th at 278-79, *cited in* App.1366. Put simply, Florida lacks sovereign authority over immigration detention.

Factually, the court found that the facility here "was requested and fully funded by the federal government." App.1407. By relying on its immigration emergency as authority to commandeer the property from Miami-Dade, Florida itself directed FDEM to reach agreements with the federal government related to immigration enforcement. The court also rightly took the Governor and Secretary Noem at their word when they announced—preconstruction—that the federal government would pay for the facility—a commitment that has now come to fruition. The district court was entitled to credit these representations, which were corroborated by the fact that funds were earmarked for this purpose. The court's finding that federal funding was committed certainly cannot be characterized as clearly erroneous when the promised funding has come to fruition.

Particularly troubling is Appellants' failure to disclose to the district court and then to this Court that Florida's funding application was submitted and under review

by the federal government well before the district court entered its injunction,[12] followed by Florida's argument that the Court should now ignore the federal funding determination itself. Fla.Br.37-39. *See Bd. of License Comm'rs of Town of Tiverton v. Pastore*, 469 U.S. 238, 240 (1985) (holding officers of the court have a "continuing duty to inform the Court of any development which may conceivably affect the outcome"). Although the July 2 representation that no funding application had been submitted was accurate when made, that statement became materially misleading once the State applied for federal funding on August 7, while the preliminary injunction hearing was ongoing and federal involvement and funding was a central issue.

Established principles of candor and equity required Defendants to update the court. Appellants cannot simultaneously (1) deny federal involvement, (2) fail to disclose a pending funding request to the district court, which was followed by instructions on the use of the funds, (3) continue to rely on an outdated and misleading declaration, (4) fail to notify the motions panel when it relied on that

---

[12] In staying the preliminary injunction, the motions panel relied heavily on Appellants' representations that Florida had not yet applied for federal funds. *See, e.g.*, ECF 42-1 at 6, 18, 20, 21, representations now proven untrue. *See* Motion to Supplement.

outdated and no longer accurate information, and then (5) invoke record-based appellate limitations to withhold facts.

That the physical work at the site was conducted by private contractors for the State is of no moment. NEPA does not require that the federal government to perform construction or operations. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572 ("federal action can exist when the primary actors are not federal agencies"). This Court has long held that NEPA applies where a project is federally funded, approved, *or* controlled—even if state agencies or private contractors perform all physical work. *See id.* The dispositive question is whether the federal agency possesses "authority to influence nonfederal activity." *Id.* Appellants' reliance on *Karst Environmental Education and Protection, Inc. v. E.P.A.*, is misplaced because, there, local governments partnered on a transportation hub to serve a local purpose, built to local plans, while EPA only provided "advice." 475 F.3d 1291, 1294 (D.C. Cir. 2007). This case more closely resembles *Prutehi Litekyan: Save Ritidian v. U.S. Department of Air Force*, in which the military disregarded NEPA entirely before requesting a permit to dispose of hazardous materials on an environmentally sensitive beach. 128 F.4th 1089, 1099, 1108 (9th Cir. 2025). The *Prutehi Litekyan* court held that this established final agency action. *Id.* at 1108-10.

Here, the district court found that the federal government requested a detention facility to serve a federal purpose, ensured that the facility complied with

federal standards, promised to—and did—fund the facility, authorized and supervised the detention of individuals there under federal law, and that the facility exists exclusively to serve a federal function—immigration enforcement. Even under Appellants' reasoning, these actions triggered NEPA.

**D.** **The INA Does Not Defeat Appellees' Claims.**

Appellants argue that the district court improperly enjoined immigration enforcement "operations" or "detention" decisions in violation of INA provisions governing ***individual*** detention and removal decisions. These arguments mischaracterize the injunction and misapprehend the INA.

1.  Section 1226(e) Does Not Apply to This Action.

Florida argues that the creation of the facility is a discretionary "detention decision" precluded from judicial review under 8 U.S.C. § 1226(e). Fla.Br.45-46. By its terms, § 1226 governs the "[a]pprehension and detention of aliens." As confirmed by the very authority Florida cites, § 1226(e) "applies only to 'discretionary' decisions about the 'application' of § 1226 to particular cases. It does not block lawsuits over the extent of the Government's detention authority under the 'statutory framework' as a whole." *Nielsen v. Preap*, 586 U.S. 392, 401 (2019).

The district court correctly rejected § 1226(e)'s application here: "Plaintiffs do not challenge any detention decision, and § 1226 contains no language suggesting

that NEPA compliance is shielded from judicial review." App.1376.[13] Notably, not even Federal Appellants—who are in charge of immigration enforcement—have advanced Florida's misinterpretation of this statutory provision.

>    2.    Section 1252(a)(2)(B)(ii) Does Not Strip the Court of Jurisdiction.

Federal Appellants assert that the district court lacked jurisdiction by virtue of 8 U.S.C. § 1252(a)(2)(B)(ii). Fed.Br.28-29. This argument—referenced just once in passing at the injunction hearing—fails too.

As its title states, § 1252 addresses "judicial review of orders of removal." 8 U.S.C. § 1252. Section 1252(a)(2)(B) concerns "denials of discretionary relief." 8 U.S.C. § 1252(a)(2)(B). *See also Kucana v. Holder*, 558 U.S. 233, 244-47 (2010). Section 1252(a)(2)(B)(i) limits jurisdiction over certain "substantive decisions ... that involve whether aliens can stay in the country or not." *Id.* at 247. Section 1252(a)(2)(B)(ii), on which Federal Appellants rely, is a "catchall" provision that shields from judicial review other decisions "of a like kind" specified by statute "to be in the discretion of" DHS. *Id.* at 247-48.

---

[13] Florida's claim that the district court "ignored" this issue, Fla.Br.45, is incorrect.

Federal Appellants attempt to shoehorn this case into § 1252(a)(2)(B)(ii) by falsely claiming that the district court enjoined their "decision to enter [into] 287(g) agreements."[14] Fed.Br.28-29. The district court's order does no such thing.

Rather, the district court held that § 1252(a)(2)(B)(ii) limits only those *specific* discretionary statutory powers referenced in subchapter II of Chapter 12, 8 U.S.C. §§ 1151-1378. App.1372 (citing *Zafar v. U.S. Atty. Gen.*, 461 F.3d 1357, 1360 (11th Cir. 2006)). And the injunctive relief here "does not implicate, much less interfere with" Federal Appellants' discretionary authority to "detain and remove noncitizens." App.1373. "Because NEPA compliance is not a decision specified to be in the discretion of the Attorney General or Secretary, § 1252(a)(2)(b)(ii) simply does not apply." *Id. See Bonillo v. Sec'y, U.S. Dept. of Homeland Sec.*, 497 Fed. Appx. 913, 916 (11th Cir. 2012) (§ 1252(a)(2)(B)(ii) did not strip court of jurisdiction to determine whether agency complied with its own mandatory regulations). The district court correctly rejected this argument.

---

[14] Federal Appellants' reliance on *Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62 (D.C. Cir. 2004), Fed.Br.28, is grossly misplaced. *Albrecht* concerned the Tucker Act, which governs the Court of Federal Claims' jurisdiction over *contract* claims for *money damages*. *Id.* at 67-68. *See also Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1101 n.9 (9th Cir. 2016). Neither *Albrecht* nor the Tucker Act applies to Appellees' NEPA claim.

3. <u>Section 1252(f) Is Inapplicable.</u>

Finally, Florida argues that Appellees' claim for injunctive relief is barred under 8 U.S.C. § 1252(f).[15] Fla.Br.46-48.

As discussed above, § 1252 addresses "judicial review of orders of removal." 8 U.S.C. § 1252. The Section "prohibits federal courts from granting classwide injunctive relief against certain provisions of the INA, specifically §§ 1221-1231." App.1375. Florida attempts to expand this provision beyond its text to effectively exempt its co-Defendants from NEPA.

Florida's expansive view of § 1252(f)(1) is wrong. The anti-injunction provision "does not encompass an injunction against statutes it does not cross-reference." *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 209 (5th Cir. 2024). It only prevents orders enjoining the "operation of any of the provisions listed in § 1252(f)(1)." *Id.*

As the district court correctly found: "An order compelling NEPA compliance does not 'enjoin or restrain' immigration operations; it simply requires Defendants to follow the environmental procedures that Congress imposed." App.1375-76. Even if the injunction has a "collateral effect" on statutory provisions within § 1252(f)(1),

---

[15] Federal Appellants made only a passing reference to § 1252(f) without argument and therefore failed to preserve this issue. *Nat'l Labor Rels. Bd. v. Gaylord Chem. Co., LLC*, 824 F.3d 1318, 1333 (11th Cir. 2016).

this does not preclude injunctive relief. App.1376. *See also Texas*, 123 F.4th at 210 (citing *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022)); *Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007) (where the effect on operations within § 1252(f)(1) is "one step removed from the relief sought," injunction is not barred).

Tellingly, Federal Appellants' award letter states that NEPA applies to the detention center. *See* Motion to Supplement. Moreover, the fact that Federal Defendants have elsewhere complied with NEPA in constructing detention facilities, App.1415; Supp.App.1640-1729, is a tacit acknowledgment that Florida's interpretation of the INA is misguided. The district court did not err in rejecting these arguments.

### E. Appellants' Vacatur Arguments are Misplaced and Incorrect.

Appellants argue that Friends are unlikely to obtain permanent relief in the form of vacatur. Fla.Br.56-58; Fed.Br.33-34. But an appellate court's interlocutory jurisdiction is not an invitation to predetermine remedies before the litigation, including discovery, on all claims has been decided on the merits by the district court. Even assuming questions of ultimate relief could be relevant at the preliminary injunction stage, Appellants are wrong.

Appellants lean on a snippet from *Seven County*, in which the Court suggested that "if an EIS falls short in some respects, that deficiency may not require a court

to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cnty.*, 605 U.S. at 185. Fed.Br.33-34; Fla.Br. 56-58. To start, this was dicta; the issue of the remedy for a NEPA violation was not before the Court. And even on its own terms, it does not apply here. This is not a case where an agency attempted to comply with NEPA's requirements. In such a case, questions about how additional information might have caused an agency to modify a project to mitigate environmental effects or disapprove a project to avoid environmental effects might be relevant. Here, there was no NEPA compliance *at all*. App.1406-07, 1418.

In any event, "vacatur ... is the ordinary APA remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). Courts depart from this remedy only after consideration of "'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Id*. Appellants falter on both steps.

As Appellants' cited cases make clear, "when an agency bypasses a fundamental procedural step," courts "assess the seriousness of an order's deficiencies by asking 'not whether the ultimate action could be justified, but whether the agency could, with further explanation, justify its decision to skip that procedural step.'" *City of Port Isabel v. FERC*, 130 F.4th 1034, 1037 (D.C. Cir.

2025); Fla.Br.56. Otherwise, agencies would have "an incentive to 'build first and conduct comprehensive reviews later." *Id.* The district court concluded there was zero NEPA compliance, App.1421, and thus the first factor "weighs in favor of vacatur when there is no way for an agency to rehabilitate its decision to skip a procedural step." *Port Isabel*, 130 F.4th at 1037.

Appellants' argument that their failure to comply with NEPA "was minor" because they "had good reason to believe NEPA did not apply," Fla.Br.58, fails. The severity of a violation does not turn on what a defendant *believed*, but rather on the seriousness of omitting the procedural requirements Congress has guaranteed. *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 245 (D.D.C. 2020) (complete disregard of statutory mandate cannot be cured on remand for additional explanation regardless of whether agency believed its course of action was preferable).

Appellants' suggestion that "additional NEPA process" would not "change the outcome" because they are committed to operating a detention facility in the Everglades regardless of the environmental impacts, Fla.Br.58; Fed.Br.33-34, gets the vacatur analysis backwards. Courts evaluate "the extent of doubt as to whether the agency chose correctly" in view of the seriousness of the legal violation, *Black Warrior Riverkeeper*, 781 F.3d at 1290—not the extent of doubt as to whether the agency has the common-sense benefit from this process by giving impacts and alternatives good-faith consideration. "[E]ven if the additional procedure is unlikely

to change the agency's bottom line," vacatur is required where the agency skipped required fundamental steps. *City of Port Isabel*, 130 F.4th at 1037-39. Having failed to study the environmental consequences of their actions, explore reasonable alternatives to the action, and consider the input of the affected public, Appellants have no basis to claim such information would not impact the action.

*Seven County* does not require a different approach. Appellants claim it held that NEPA errors do "not justify coercive sanctions like vacatur or an injunction ... 'at least absent reason to believe that the agency might disapproved the project if it' undertook additional NEPA process.'" Fed.Br.33-34 (quoting *Seven Cnty.*, 605 U.S. at 185). But they cut the quote short. The Supreme Court said that errors "may not *necessarily* require" such a result when the agency has completed an EIS, unless there is "reason to believe that the agency might disapprove the project *if it added more to the EIS*." 605 U.S. at 185 (emphasis added). The total lack of any NEPA analysis here, App.1421, for a project in the heart of an environmentally sensitive national preserve, is a far cry from the 3,600-page EIS conducted in *Seven County*, as the district court noted. App.1433.

It would flip NEPA on its head to presume that the bypassed NEPA review could have no effect. Rather, there is every reason to believe that NEPA review will have an effect, by "focusing ... attention on the environmental effects of the proposed action." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989);

*Roberston*, 490 U.S. at 349. NEPA's entire point is to prevent the premeditated "overlook[ing] or underestimat[ing]" of the "environmental consequences of a proposed project" that Appellants propose here. *Robertson*, 490 U.S. at 349. There is nothing in *Seven County* that would—or could—support such an extreme result. 605 U.S. at 180 (affirming obligation to prepare an adequate report). NEPA has never allowed agencies to skirt their obligations just by claiming they would proceed with their preferred course regardless of the process.

Given this fundamental error, claims of disruptive consequences generally could not save the action from vacatur. *See City of Port Isabel*, 130 F.4th at 1037-38; *New Jersey Conserv. Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024) ("Where a pervasively deficient agency action is remanded, only in rare instances do the disruptive consequences alone determine whether the order is vacated").

Even so, Appellants presented no credible evidence in the district court to demonstrate that vacatur, or winding down the facility, "forces Florida and DHS to release detainees or send them to overcrowded facilities." Fla.Br.57; *see* App.1430-31. Indeed, Florida's suggestion that the district court did not "disagree" with its suggestion of disruptive consequences, Fla.Br.57, makes no sense given that the district court twice determined—first in granting the preliminary injunction and second in denying a stay—that Defendants had not established that halting the project would cause them harm. App.1430-32, App.1471-73.

## II.   THE   DISTRICT   COURT'S   FACTUAL   FINDINGS   OF IRREPARABLE HARM WERE NOT CLEARLY ERRONEOUS.

A district court's determination of irreparable harm is reviewed for abuse of discretion. *See Gonzalez v. Gov. of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020); *see also United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (appellate court should not interfere with the "province of the fact finder"). The Court "must accept the findings of fact if they are 'plausible,' even if [the Court] would weigh the evidence differently." *Mills*, 102 F.4th at 1248.

When defining irreparable harm, the Supreme Court explained that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Irreparable harm exists in a NEPA action where a project will cause "soil disturbance and dust" impacting water resources, noise and "bright lights" impacting aesthetic interests, and potential adverse impact on endangered species. *San Luis Valley Ecosystem Council v. FWS*, 657 F. Supp. 2d 1233, 1240 (D. Col. 2009). And "where injury to an endangered species is threatened, legal remedies are necessarily inadequate." *Fla. Key Deer v. Brown*, 386 F. Supp. 2d 1281, 1285 (S.D. Fla. 2005), *aff'd sub. nom.*, *Fla. Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008).

Here, contrary to Appellants' assertions, Fed.Br.44; Fla.Br.62, the district court applied the correct legal standard, App.1422 (in addition to providing

procedural harm, plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction" (citing *Winter v. NRDC*, 555 U.S. 7, 22 (2008))). The district court made multiple factual findings of actual and imminent irreparable harm to wetlands and waters, endangered species, and the Miccosukee Tribe's access to Big Cypress National Preserve—any one of which ***standing alone*** would support the preliminary injunction—and which collectively the district court properly found to be "extensive." App.1431.

### A.    Irreparable Harm to Waters and Wetlands

First, the court found irreparable harm to waters and wetlands surrounding the site, as well as resources and people situated downstream. The court credited testimony from expert soil physicist, hydrologist, and wetland ecologist Dr. Christopher McVoy that 800,000 square feet (more than 18 acres) of new pavement will "increase runoff into the surrounding, interconnected wetlands, which threatens the 'extremely sensitive . . .[,] low nutrient' hydrology of the Everglades," and threaten[] nearby communities' water supply. App.1393; App.1423 ("[A]nything that falls in th[ose] 20 acres will go directly into the wetlands").

The court credited expert geologist Dillon Reio's testimony that, based on his review of site plans and the absence of any permits in public databases, the detention facility "did not appear to have any meaningful stormwater management system," and that the new paving "risked disrupting the nutrient balance of the surrounding,

connected wetlands by increasing runoff," and "could lead to large increases in runoff contaminated with polycyclic aromatic hydrocarbons ... and other carcinogens into the surrounding wetlands." App.1363; App.490:1-6, App.492:5-21 (permitting); App.492:24-493:6 (plans); Supp.App.975-76.

The court also found that contamination, including nutrient pollution, could come "from a number of different sources on the site ... from the paved material itself, from petroleum products on-site to fuel generators, from the vehicles and from thousands of detainees and staff doing laundry, cooking, cleaning, using restrooms." App.1423 (citation modified); App.674-75 (describing nutrient-pollution sources); App.1551-52. These contaminants, along with "increased sediment ... in the wetlands oftentimes leads to increased turbidity ... [and] decrease[d] dissolved oxygen, which can kill aquatic animals" that endangered species like the Everglade snail kite need to eat to survive. App.1423 (citation modified).

The court found this contamination not only threatens irreparable harm to the wetland ecosystems, but also to Tribal members. The court found "uncontained wastewater or run-off leaving the TNT [S]ite will likely flow into the [Big Cypress National Preserve], Everglades National Park, and eventually into the Miccosukee Reserved Area," where "residences, two schools, and the Tribal governmental building, are all located ... a few miles southeast of the TNT [S]ite in Miami-Dade County." App.1364, App.1422-23.

Defendants, on the other hand, presented *no* testimony on the environmental impacts of the facility. The district court was well within its discretion not to credit self-serving declarations from FDEM employees who, though listed as witnesses, never testified and never purported to be environmental experts.

Appellants' complaint that "none [of the experts] faced a *Daubert* inquiry," Fla.Br.20, falls flat given that Appellants presented no contrary testimony and that, "at the preliminary injunction stage, the evidentiary rules are relaxed." *Centennial Bank v. ServisFirst Bank Inc.*, No. 8:16-cv-88-T-36JSS, 2016 WL 4238766, at *2 (M.D. Fla. Aug. 11, 2016) (citing *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)).

The district court dispensed with Appellants' "quibble[s]" with the expert's storm-runoff calculations, *see* Fla.Br.60-61; Fed.Br.45, finding "there is sufficient likelihood that increased runoff will harm the surrounding wetlands given the ecosystem's interconnectedness and sensitivity,"[16] App.1424. Appellant's myopic focus on the use of a 100-year, 72-hour storm event in the expert model is mere misdirection. The model estimates the "peak" runoff volume and is ancillary to the main testimony demonstrating ongoing pollution runoff from added pavement and

---

[16] Measuring in acres rather than square feet, Fed.Br.46, would not change this outcome. Nor would previous leveling of the land. *Id.*; App.1393.

activity as explained by Plaintiffs' expert geologist, Mr. Reio. App.494:7-10; App.1424. App.507:8-10.[17] Reliance on modeling work of a civil engineer to predict runoff is typical. App.527:19-530:24.

The district court also found Appellants' conclusory claim that silt fencing would mitigate the contamination risk were refuted by expert testimony that, "[g]iven Defendants' complete lack of other stormwater management features," is not "an appropriate substitute for a soil geologist-designed storm water management system." App.1422-24; App.521-522; App.531-532. Moreover, Appellants now admit that there is no stormwater management system, only mere "***plans*** to build a drainage basin to further prevent wetland impacts." Fed.Br.46 (emphasis added). Likewise, the court rightly dismissed Florida's so-called "rigorous waste management policy," Fla.Br.10, a *one-and-a-half-page* document describing how FDEM intends to manage waste at the Site that was unsupported by any testimony or other evidence about waste management at the site, *see* App.1551-52.

The substantial evidence of ongoing and imminent contamination of wetlands and waters of the Everglades and Big Cypress National Preserve, along with Appellants' "imminent plans" to lay down significantly more asphalt paving onsite,

---

[17] Although Mr. Reio did not prepare the model himself, Fla.Br.61, he testified that he reviewed the model and assumptions made in it and, in his expert opinion, found them reasonable, App.517:12-21, 526:6-19.

App.1425, which would only add to the runoff, supported the court's conclusion that "there is sufficient likelihood that increased runoff will harm the surrounding wetlands," App.1424.

### B. Irreparable Harm to Wildlife, Including Endangered Species.

The district court also found ongoing and imminent irreparable harm to wildlife and endangered species. Specifically, the court found that increased human activity, including 24-hour "industrial lighting, noise, traffic, and [a fenced] security perimeter," App.1422, resulted in habitat loss and increased mortality for endangered species including the Florida panther, App.1425-27.

The court relied on the expert testimony of Randy Kautz, a 27-year veteran of the Florida Fish and Wildlife Conservation Commission, ecologist, and panther expert for the U.S. Fish and Wildlife Service, Supp.App.956-968, to find that the 24-hour industrial illumination of the detention facility, alone, "immediately reduces the panther habitat by 2,000 acres,"[18] App.1426 (citing App.262). The court explained that this loss was "hardly a de minimis injury" for "those hoping to see panthers in the area and to preserve and maintain panthers' habitats." *Id.*; *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (loss of 1,652 acres of

---

[18] Plaintiffs established that the TNT Site sits within the Florida panther's primary habitat and the bonneted bat's critical habitat. Supp.App.929-55.

forest constituted irreparable harm); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1257-58 (10th Cir. 2003) (finding irreparable harm from adverse impacts on bald eagles' aquatic habitat); *Sierra Club v. Martin*, 71 F. Supp. 2d 1268, 1327 (N.D. Ga. 1996). The court also credited testimony that increased vehicular traffic and habitat loss from increased human activity at the facility "risks ... increased mortality for the estimated 120 to 230 remaining Florida panthers," App.1363, on "stretches of the highway close to the TNT site [that] are known 'hot spots' for panther [vehicular] strikes," App.1426 (citing App.191, 224 and Sup.App.929-55). There was no evidence to support Appellants' argument that the risk would be mitigated by "speed bumps to slow traffic" at the site. Fed.Br.46.

Appellants argue that the irreparable harm to panthers from habitat loss is speculative because there are other factors that threaten panthers in the long-term and because Plaintiffs' expert did not quantify "take" that would result from this project. Fla.Br.59-60. But the "take" standard for liability under the Endangered Species Act (ESA) is not applicable to this NEPA claim.[19] 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 17.3; *Greater Yellowstone Coal.*, 321 F.3d at 1257-58

---

[19] Although Friends was not required to show harm at a species-wide level, *Greater Yellowstone Coal.*, 321 F.3d at 1256-58, they presented evidence that the habitat loss from the facility's operation adversely affects the sole remaining panther population's viability. App.328:4-7.

(distinguishing irreparable harm under NEPA from harm under the ESA). Appellants also overlook Mr. Kautz's testimony that *actual and ongoing* habitat loss from the detention center increases the likelihood of panther deaths through intraspecific aggression, and that increased traffic around the TNT site increases the risk of deaths by vehicular strikes, the number one cause of panther mortality.[20] App.1426.

The court also found irreparable harm in the form of habitat loss and increased mortality for the endangered Florida bonneted bat, crediting testimony from Dr. Bozas that the site is "within the bonneted bat's critical habitat," and that "the increased lighting from the project 'will push' those [nocturnal] animals 'out of the area.'" App.1425-26 (citing App.765, 775). The court also found that "increased noise from additional construction and ongoing human activity on the site also disrupts the bats' 'ability to [echolocate] prey.'" *Id.* (citing App.765).

---

[20] *See, e.g.*, App.247:13-17 (protecting primary zone "essential" to panther conservation); App.256:10-257:25 (prior to detention center, panthers were present and thriving in the area); App.261:22-263:7 (lighting causes immediate habitat loss); App.265:7-24 (threat of vehicle mortality from increased traffic); App.268:18-25 (detention center immediately reduces available habitat, increases risk of intraspecific aggression from displacement); App.269:14-20 (high likelihood that panthers will avoid about 2,000 acres of habitat); App.297:15-19 (change in illumination evident from NASA images before and after detention center); App.326:15-327:25 (effects of increase of human activity, traffic; habitat loss is number one threat); App.328:4-7 (habitat loss affects population viability).

The district court correctly gave no weight to a "preliminary" report referenced by Federal Appellants, Fed.Br.46 (citing App.1520), which consisted of **_three-and-a-quarter pages_** of conclusory statements authored by an individual who did not testify in court, disclose his methods, or provide qualifications and a foundation to opine on these issues, *see* App.1556-59.

Pointing to the detention facility site's prior use as a training airport, Appellants incorrectly assert that "none of [Plaintiffs'] witnesses considered the baseline ecological impacts" at the site. Fed.Br.45; Fla.Br.62. But Plaintiffs' witnesses **_explicitly_** explained that the facility's activities increased the intensity and types of impacts to the surrounding environment beyond the baseline conditions at the site.[21] *See, e.g.*, App.665:10-666:25 (witness describing "minimal" noise, human activity, and human population at the site before construction of the facility, compared with "much more activity" after construction commenced). Based on this evidence, the district court observed an intensification of human presence and use, finding that "operation of the camp ... has involved paving approximately 800,000 square feet of land, installation of industrial lighting impacting the night sky at least

---

[21] Because Plaintiffs' experts relied on information regarding changed conditions at the site when compared to conditions prior to construction, Florida's citation to *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1307-08 (11th Cir. 2014), is inapposite. Fla.Br.62.

20 to 30 miles away, and enough residential infrastructure to house thousands of detainees and on-site staff, App.1401 (citing Supp.App.908-20, Supp.App.1873-1909). The court observed a human population explosion, finding that the facility hosts "as many as 1,000 staff members, many of whom reside on site, and can house multiple thousands of detainees at any given time." App.1402 (citing App.442, App.447-48). The court found that the facility "involves the daily movement of human waste, sewage, jet fuel, and significant vehicular traffic." App.1402 (citing App.1551-52).

This rapid and significant intensification of use at the site stands in stark contrast to its prior use, mainly by training pilots who would "land and then take off again without coming to a complete stop or deplaning," App.1519, and overseen by four employees, App.1429. Appellants did not present any evidence that activities of the same nature and intensity were occurring on the site prior to construction. *See Hanly v. Mitchell*, 460 F.2d 640, 647-48 (2d Cir. 1972) (rejecting GSA's claim that a 450-person jail would have "no adverse effects on the environment" and requiring NEPA compliance).

Although Appellants attempt to downplay the impacts of artificial lighting, Fla.Br.8; Fed.Br.45, the district court credited evidence that construction and operation of the detention facility lit up the night sky for dozens of miles around—a phenomenon not previously observed at the Site, App.1393 (citing Supp.App.106-

08 (depicting the light emanating from the Site from 15 miles away in Miami-Dade); App.339 ("[I]t looks like we have a sports stadium in our backyard now"); Supp.App.1873-1907 (documenting the increased sky brightness due to the project); Supp.App.0177 (satellite imagery of light pollution). Appellants' argument that the new lights "can be turned off" at some point in the future, Fed.Br.45, does not upend the district court's finding that as long as the intense lights operate they are causing irreparable harm to endangered species that require dark skies.

Federal Appellants' claim that the site was "very loud" before the facility's construction, relying on a declaration, Fed.Br.45 (citing App.1519), is contradicted by live testimony from multiple witnesses that they generally did not notice or hear planes using the air strip despite their long-term proximity to the site. App.77:1-3; App.206:14-207: 2; App.333:14-24; App.352:5-7; App.435:23-436: 4; App.663:8-11; App.665:10-21. The court was well within its discretion to reject Appellants' uncross-examined assertions that the facility's impacts were "minimal" when compared to the site's prior use, and to credit the live witnesses' testimony to the contrary.

## C.    Irreparable Harm to Tribal and Public Access.

The district court also found that more than four miles of new fencing and increases in human activity associated with the detention facility's operations are

interfering with the Tribe's preexisting access to trails, hunting, and medicinal and other traditional activities. App.1364, App.1427-28.

The court credited testimony from Friends member Jessica Namath, "an avid outdoorswoman and animal watcher, who described regularly hiking and driving in the areas surrounding the TNT site before the camp's construction," App.1363, activities no longer possible because of the detention center.[22]

Appellants' argument that the Plaintiffs' cultural and recreational interests are somehow beyond the scope of NEPA, Fla.Br.63, is logically bankrupt where these interests are unquestionably tied to "the quality of the human environment," 42 U.S.C. § 4332(2)(C). *See Lowman v. FAA*, 83 F.4th 1345, 1353 & n.10 (11th Cir. 2023) (describing a NEPA analysis of "environmental effects" including "Historical, Architectural, Archeological, and Cultural Resources").

The irreparable harm the court found to waters, wetlands, wildlife, and Tribal and public access represent the very types of environmental harm that cannot be remedied absent an injunction. *See Amoco*, 480 U.S. at 545. The district court's factual findings were not clearly erroneous and should therefore not be reversed.

---

[22] The court further found that the increased light pollution harms Plaintiffs' enjoyment of the night sky, undermining Big Cypress Preserve's International Dark Sky Park designation. App.1427.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE BALANCE OF THE EQUITIES FAVORED THE PRELIMINARY INJUNCTION.

Notwithstanding scattershot references to detention capacity, public safety, and national security, Appellants' equities and public interest arguments fail because they offered "little to no evidence" of how the detention facility at the TNT site is "uniquely suited and critical to [their immigration enforcement] mission." App.1431. On the other side of the ledger are the district court's findings of myriad irreparable harms to the unique surrounding Big Cypress environment, endangered species and their habitats, and Miccosukee tribal interests. App.1422-30; *supra* Section II. When irreparable environmental harms are sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545.

The district court did not abuse its discretion in weighing the equities and public interest in Friends' favor, particularly given the dearth of evidence to support Appellants' claims. For instance, Appellants failed to demonstrate how this is the only facility that could "decompress other detention facilities" in Florida. Fla.Br.67; App.1430-31. Contrary to Florida's new assertion that the injunction would bring the state's detention system to a "breaking point," Fla.Br.67, Federal Appellants conceded no operational issues with ICE's detention facilities in other populated areas of Florida, App.1432. Undermining another belated claim that the facility is

mission "essential," Fed.Br.48, the district court took judicial notice of a new immigration detention facility at a correctional institution in Florida, mitigating "[a]ny detention capacity issue" here, App.1431 n.36.

Aware of the lack of evidence to support their claims, Appellants improperly seek to bolster their public interest arguments with new assertions regarding Florida's detention system and declarations prepared *after* the district court issued the injunction. *See* Fed.Br.47-49; Fla.Br.67 (citing declarations of Garrett Ripa and Joseph Harrison, attached to Appellants' respective motions to stay the injunction). Indeed, virtually all of Federal Appellants' public interest arguments rely on Mr. Ripa's declaration—despite neither calling him to testify, nor seeking to introduce his declaration at the injunction hearing. *See* Fed.Br.47-49. The Court should reject these post-hearing arguments and untested declarations. *Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000) ("Arguments raised for the first time on appeal are not properly before this court."); *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999) (declining to consider new material not in evidence below).

Appellants further failed to establish that the TNT facility is essential to "taking violent criminals off the street," Fed.Br.49, providing *no* evidence at the injunction hearing about the criminal backgrounds of the individuals detained there, App.1365, 1431. Federal Appellants instead conceded the detention facility housed "all sorts of people from all walks of life." App.1432. Proving this point, Friends

introduced evidence regarding individuals detained at the facility, the majority (about two-thirds) of whom had no criminal records.[23] Of the minority who did, offenses ranged from serious to minor, e.g., traffic violations. Supp.App.1445-62.

Finally, Appellants were unable to answer the central question of why they required this particular immigration detention facility in the middle of a national preserve, as opposed to elsewhere. Rather, Federal Appellants conceded "they had actually no opinion on the efficacy of the detention camp's location," App.1432, and Florida's sole testifying witness could not answer the question either. *Id*.

Thus, Appellants' reliance on *Winter* is wholly misplaced. In *Winter*, the active sonar used in Navy training was "the only reliable technology for detecting and tracking enemy diesel-electric submarines," and training with this technology was accordingly "'essential to national security.'" *Winter,* 555 U.S. at 26. Appellants

---

[23] This record evidence has generally remained unchanged. As of December 3, 2025, ICE's detention statistics for the TNT site show that less than one-quarter of detainees had criminal convictions, whereas 71% of detainees were assigned "no ICE threat level" because they had no criminal convictions. ICE Detention Statistics, FY 2026, "Facilities" Tab, Florida Soft-Sided Facility & "Footnotes" Tab, https://www.ice.gov/doclib/detention/FY26_detentionStats12032025.xlsx (https://perma.cc/FS3L-24AP) (Dec. 3, 2025).

Friends respectfully requests that the Court take judicial notice of ICE's detention statistics. Fed. R. Evid. 201(b), (c)(2), (d). *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017) (judicial notice may be taken of verifiable "statistical facts" and reliable government documents); *Dimanche v. Brown*, 783 F.3d 1204, 1213 n.1 (11th Cir. 2015) (taking judicial notice of a government agency's statistical report).

have come nowhere close to demonstrating why this facility, in this location, is of the same singular and crucial importance to national security as the Navy training in *Winter*. *See Fla. Immigrant Coal. v. Attorney Gen.*, No. 25-11469, 2025 WL 1625385, at *6 (11th Cir. June 6, 2025) (denying stay of preliminary injunction where state could not show that its enjoined immigration law was a "decisive part" of mitigating the effects of illegal immigration in Florida).

The notion that Appellants' arguments are entitled to deference because they invoke national security fails to overcome the glaring lack of evidence to substantiate their claims. *See* Fla.Br.67-68 (citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010)). *Holder* involved the question of what constituted material support to terrorist groups, centered on two specific groups studied by the government, and involved the Executive's analysis and conclusions that were supported by congressional findings. 561 U.S. at 9, 33-34. Such specificity, evidence, and analysis are lacking here.

Even deferring to the "unchallenged position that the government's interest in immigration enforcement is significant," App.1430, Appellants' position on the equities "flounder" in comparison to the "extensive evidence" of "significant ongoing and likely future environmental harms from the project," App.1431. Unlike the limited and speculative "harm to an unknown number of marine mammals" in *Winter*, 555 U.S. at 26, the district court here found "significant ongoing and likely

future environmental harms" to the surrounding Big Cypress wetlands, various endangered species and their habitats, and Tribal rights of access to lands for sacred and traditional activities. App.1422-31; *supra* Section II. The woefully inadequate "mitigation" steps Appellants tout come nowhere close to overcoming the environmental harms Friends and the Tribe established, nor can they reasonably be deemed a substitute for the NEPA process. *See* Fed.Br.49; *supra* Section II.

Moreover, "[f]rustration of federal statutes"—here, NEPA—"[is] not in the public interest." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012). Rather, **compliance** with NEPA is in the public interest, especially considering the "**billions of dollars** in [government] funding for preservation and restoration projects near the TNT site" through WERP—"the culmination of an almost decade-long planning" process. App.1364, App.1422 (emphasis added). *See also* App.1357-58, App.1393.

The district court carefully weighed the record evidence and made thorough, well-reasoned findings that the equities weigh decidedly in Friends' favor. Under an abuse of discretion standard, that decision is entitled to deference. *See Georgia v. President of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022).

## IV. THE SCOPE OF INJUNCTIVE RELIEF WAS PROPER AND NOT AN ABUSE OF DISCRETION.

Appellants' arguments challenging the scope of the injunction fail because the district court, in its sound discretion, carefully tailored the injunction to maintain the

status quo ante and prevent proven, substantial irreparable harm to Friends. Further, Appellants' arguments were not presented to the district court.

## A. The District Court Carefully Tailored the Preliminary Injunction.

The district court's injunction contained both prohibitory and mandatory relief. App.1435-36. *See Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996) (describing the difference). Appellants do not directly challenge the part of the order that prohibits further construction, nor the part that prohibits transporting more people to the site. Fed.Br.47. And they fail to demonstrate that the carefully tailored mandatory provisions of the district court's preliminary injunction were an abuse of discretion, particularly given Friends' strong likelihood of success on the merits and extensive evidence of irreparable environmental harm. *See* Fed.Br.47. Appellants' extreme position—one where no injunction could ever issue—would read NEPA out of existence, allowing federal agencies and their nonfederal partners to bypass Congress' prudent mandate without consequence.

This Court reviews the scope of a preliminary injunction for abuse of discretion. *Adams v. Bordeau Metals Se. LLC*, No. 24-11572, 2025 WL 1122444, at *3 (11th Cir. Apr. 15, 2025). Preliminary injunctions are intended "to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). The scope of injunction must match that purpose. Often, "this purpose is furthered

by preservation of the status quo, but not always." *Id.* For instance, if the "existing status quo" is causing irreparable injury, the court must "alter the situation so as to prevent the injury," which may include restoring the status quo ante. *Id.* Thus, mandatory preliminary relief may issue where "the facts and law clearly favor the moving party." *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017) (citation modified). *Accord Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1267 (11th Cir. 2011) (relief under the APA may include a mandatory injunction).

Courts have upheld mandatory injunctions where, as here, plaintiffs demonstrated strong likelihood of success on the merits and significant irreparable harm. *See, e.g.*, *Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1562-63 (11th Cir. 1989) (upholding mandatory preliminary injunction); *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (same).

Both the prohibitory and mandatory parts of the injunction are supported by the court's findings of Friends' strong likelihood of success on the merits; substantial evidence of irreparable harm to wildlife, wetlands, and Tribal interests; and that the balance of the equities and public interest weighed in Appellees' favor. App.1356-37. The court then carefully tailored the injunction to prevent particularized irreparable environmental harms from construction, industrial lighting, and contaminants. App.1435-36.

Specifically, the court ordered Appellants to "remove ... temporary fencing ... to allow Tribe members access to the site consistent with the access they enjoyed before the erection of the detention camp" and to remove lighting fixtures, generators, gas, sewage, and other waste and waste receptacles, which were causing ongoing and imminent irreparable harm to wildlife and wetlands. App.1436. It did not require Appellants to remove pavement or housing structures, and it provided sixty days to wind down harmful activities "in a safe, humane, and responsible manner," allowing the facilities to "remain and be maintained to prevent deterioration or damage." App.1436 n.40.

The district court's preliminary injunction did not grant Friends complete relief from Appellants' actions; it was "limited in scope to the extent necessary to protect the interests of the parties" in protecting the surrounding environment, *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003), and "preserve[d] the court's ability to render a meaningful decision on the merits" by partly "returning to the last uncontested status quo between the parties," *Callaway*, 489 F.2d at 576.

## B.    The District Court Is Authorized to Enjoin Nonfederal Actors Constructing and Operating the Federal Detention Facility.

Contrary to Appellants' suggestion, a district court may enjoin nonfederal actors where, as here, "federal and state projects are sufficiently interrelated to constitute a single federal action for NEPA purposes." *Citizens for Smart Growth*, 669 F.3d at 1210 (citation modified). *Accord Named Individual Members of San*

*Antonio Conservation Soc'y v. Tex. Highway Dep't*, 446 F.2d 1013, 1015-17, 1027-28 (5th Cir. 1971) (enjoining state construction of highway project approved for federal funding, even after state committed to construct the project with only state funds); *Fritiofson v. Alexander*, 772 F.2d 1225, 1249 (5th Cir. 1985), *abrogated on other grounds by Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669 (5th Cir. 1992) (upholding injunction against private housing developer pending NEPA compliance by the Corps).

In a case arising under the APA and NEPA, this Court found that a district court "properly exercised its jurisdiction" over the Secretary of the Florida Department of Transportation ("FDOT") where "FDOT's substantial role [wa]s well documented" and the Secretary for the U.S. Department of Transportation called FDOT a "'party working in tandem with federal agencies.'" *Citizens for Smart Growth*, 669 F.3d at 1210. And here, as in *Citizens*, the district court found that Florida has a substantial role in constructing and operating the federal immigration detention facility under the authority of the federal government. App.1410-12; *supra* Section I.B.

The facility was not constructed for some state purpose and then made available for use by the federal government. It was constructed for the very purpose of its current use: a federal immigration detention facility. A federal-state joint venture of this kind is unquestionably enjoinable under federal law.

### C.  Regardless, Appellants Forfeited Any Argument Regarding the Scope of the Preliminary Injunction.

"This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." *Access Now*, 385 F.3d at 1331 (citation modified) (collecting cases). Here, Federal Appellants' arguments regarding the scope of the injunction, Fed.Br.47, were not raised in the district court. The Court should not waste judicial resources considering an issue the district court never had a chance to examine. This is particularly true where the scope of the injunction is highly specific and fact-based, thus obviating any of the discrete situations in which the Court *may* consider arguments raised for the first time on appeal. *Access Now*, 385 F.3d at 1332, 1335 (no review of argument first raised on appeal absent "special conditions"). *See Carillon Imps., Ltd. v. Frank Pesce Int'l Grp.*, 112 F.3d 1125, 1127 (11th Cir. 1997) (finding no abuse of discretion where "no objection was made in the district court as to sufficiency of the bond").

## V.  VENUE IS PROPER IN THE SOUTHERN DISTRICT OF FLORIDA.

The district court did not abuse its discretion in finding venue proper in the Southern District of Florida. The Court, however, need not reach that question because Congress' authorization of interlocutory appeals over injunctions does not extend to interlocutory review of venue here, and, in any event, Appellants waived the objection below.

## A. The Court Lacks Interlocutory Appellate Jurisdiction Over the District Court's Venue Ruling.

The Court must not "exercise power ... over disputes Congress has not given [it] authority to decide." *United States v. Rojas*, 429 F.3d 1317, 1320 (11th Cir. 2005). An interlocutory appeal of a district court's venue ruling is such a dispute. *See Stelly v. Employers Nat'l Ins. Co.,* 431 F.2d 1251, 1253 (5th Cir. 1970); *Middlebrooks v. Smith*, 735 F.2d 431, 432 (11th Cir. 1984).

Appellate jurisdiction over the district court's preliminary injunction, 28 U.S.C. § 1292(a)(1), does not extend to the district court's venue ruling.[24] Although "[t]he temptation is great when an interlocutory appeal is properly taken from one order ... to consider everything on a sort of ad hoc pendent jurisdiction basis," interlocutory appellate "review is inappropriate for challenges to a judge's discretion in granting or denying transfers." *Garner v. Wolfinbarger*, 433 F.2d 117, 120 (5th Cir. 1970). This longstanding Circuit precedent has not been overruled by the Court sitting en banc and the Court is duty-bound to follow it. *United States v. Lopez,* 562 F.3d 1309, 1312 (11th Cir. 2009).

---

[24] Appellants' opening briefs did not articulate any argument supporting interlocutory appellate jurisdiction over the district court's venue ruling and should not be permitted to do so on reply. *A1A Burrito Works, Inc. v. Sysco Jacksonville, Inc.*, 87 F.4th 1280, 1290 (11th Cir. 2023); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682-83 (11th Cir. 2014).

The Court lacks interlocutory appellate jurisdiction over the venue ruling even though it appears in the same order as the preliminary injunction. *See In re Macon Uplands Ventures*, 624 F.2d 26, 27-28 (5th Cir. 1980) (on appeal of district court order addressing transfer, consolidation, and injunction, appellate Court had interlocutory jurisdiction to review injunction but not transfer and consolidation); *contra* ECF 42-1 at 24 n.8 (describing *Macon* as involving separate orders).[25]

The two narrow exceptions to Congress' express limits on interlocutory jurisdiction do not apply here. *Grippa v. Rubin*, 133 F.4th 1186, 1194-95 (11th Cir. 2025). *Accord Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 43, 49, 51 (1995). A decision on forum does not meet the collateral doctrine test because it can still be vindicated after final judgment, even if imperfectly or at additional expense. *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 499 (1989); *United States v. Snipes*, 512 F.3d 1301, 1302 (11th Cir. 2008). Pendent appellate jurisdiction is unavailable because the issues relating to venue and the preliminary injunction were not "inextricably intertwined."[26] *Cf. Schultz v. Alabama*, 42 F.4th 1298, 1313 (11th Cir. 2022)

---

[25] Thus, the broad statement that an appellate court with "jurisdiction over an interlocutory order containing injunctive relief may reach and decide other aspects of that order" is not absolute. *Myers v. Gilman Paper Corp.*, 544 F.2d 837, 847 (5th Cir. 1977) (relying on cases that fall into recognized exceptions or involved dispositive issues).

[26] The venue determination involved Friends' residence, whether real property was involved, and where a substantial part of the events or omissions giving rise to the

(citation modified) (pendent jurisdiction where otherwise non-appealable rulings necessary for preliminary injunction to issue). *See Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 548 (D.C. Cir. 1992) (no interlocutory appellate jurisdiction where venue ruling addressed proper court whereas injunction implicated scope of unrelated statute).[27]

## B. The District Court Did Not Abuse Its Discretion in Finding the Venue Objection Waived.

"[V]enue ... is merely a privilege of the parties" and a venue objection "may be waived," including "by express waiver, by conduct amounting to waiver as a matter of law, or by failure to interpose a timely and sufficient objection." *Manley v. Engram*, 755 F.2d 1463, 1468 (11th Cir. 1985). The Court reviews the district court's waiver finding for abuse of discretion. *See Younge v. Fulton Jud. Cir. Dist. Attorney's Off., Georgia*, No. 23-11418, 2025 WL 974309, at *4 (11th Cir. Apr. 1,

---

claim occurred. The preliminary injunction involved whether Friends were likely to succeed on their claim that the state-federal partnership to build and operate an immigration detention center constituted a final and major federal action triggering NEPA, whether preliminary injunctive relief was necessary to prevent irreparable harm, and whether a balancing of the equities favored relief.

[27] *Compare Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010) (venue and preliminary injunction inextricably intertwined where both hinged on whether litigation should occur in Illinois or Virginia), *with Jones v. InfoCure Corp.*, 310 F.3d 529, 537 (7th Cir. 2002) (no appellate jurisdiction where venue and injunction could be "resolved without reference to each other").

2025); *see also Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1132 (Fed. Cir. 2019).

Because an objection to venue "can be raised so easily," courts "strictly apply the waiver rule" and require that defendants raise venue in their "first defensive move," including in response to a motion for injunctive relief. *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund*, 967 F.2d 688, 692 (1st Cir. 1992). *Accord Gulf States Reg'l Ctr., LLC v. Jaddou*, No. 23-CV-1354, 2024 WL 3553533, at *4 (E.D. La. July 25, 2024) (failure to raise venue objection over period of two weeks while litigating preliminary injunction constituted waiver).

Here, the district court found that Florida made several defensive moves without objecting to venue. *See* App.1377-79. It was not until nearly four weeks into vigorously litigating against Friends' motion for a preliminary injunction—and after Florida filed *three* opposition briefs (addressing merits, ripeness, finality, justiciability, remedy, irreparable harm, and balance of the equities)—that Florida for the first time raised what it now claims was a "threshold question of judicial power" issue, so fundamental that Florida claims it is even dispositive of this appeal.

Fla.Br.6, 17. Notably, Florida raised the venue objection only *after* the case was reassigned to Judge Kathleen Williams. App.18; App.1256-60.[28]

Appellants urged the district court to resolve the last-raised venue issue *first*, effectively seeking to delay resolution of Friends' urgent request for preliminary relief to prevent imminent irreparable harm. Based on this record, it was not an abuse of discretion for the district court to conclude that Florida calculatedly "stall[ed] in pleading improper venue" to "find out which way the wind [was] blowing," making "conventional principles of waiver and equitable estoppel" apply. *Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 888 (7th Cir. 2004).

Florida's belated venue objection cannot be deemed part of its "original motion," Fla.Br.24, because Florida filed no prior motion.[29] And although the district court treated the objections as 12(b)(3) motions to dismiss, App.1356 n.1, it nevertheless found that Appellants' preceding *conduct* (making multiple defensive moves without objecting to venue) amounted to waiver.[30] That the district court

---

[28] Just three months earlier, Judge Williams in a different case had granted a preliminary injunction against Florida's efforts to enforce state immigration laws finding these to be likely preempted by federal law. *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235 (S.D. Fla. 2025).

[29] Florida disclaims that its venue objection was a motion to dismiss. Fla.Br.25 n.8 (citing App.1260 n.5).

[30] The district court did not treat the several filings in opposition to Friends' motion for a preliminary injunction as "responsive pleadings." *Contra* Fla.Br.24-25;

"recognized" everyone's supplemental filings, Fla.Br.24, meant only that the court would consider them. It did not cure the waiver.

Appellants' Rule 12 argument fails. Fla.Br.24-25; Fed.Br.35-36. Although Rule 12(h) provides that a party "waives" a venue objection if the party fails to raise it by motion or in a responsive pleading, nothing in the rule states that this is the *only* way venue may be waived. In fact, this Circuit's precedent separately recognizes Rule 12 waiver ("failure to interpose a timely and sufficient objection") from waiver that results from "conduct amounting to waiver as a matter of law." *Manley*, 755 F.2d at 1468. The district court properly relied on this precedent, App.1377, but neither Appellant's brief even mentions it. None of the unpublished decisions Appellants cite (including the stay order) address this binding precedent either.

The district court applied the relevant precedent; its determination could not "conflict," Fla.Br.25, with unrelated precedent on the entirely different issue of arbitration agreements. Fla.Br.25-26. *See Gutierrez v. Wells Fargo Bank, NA,* 889 F.3d 1230, 1235-36 (11th Cir. 2018) (waiver of arbitration involves heavy burden because federal law favors arbitration). Likewise, the out-of-circuit district court cases Florida cites, Fla.Br.25-26, are inapposite and were distinguished by the

_____

Fed.Br.36. Rather, it treated those actions as "defensive moves" (i.e., conduct) that failed to raise a venue objection, thus waiving it. App.1378.

district court. App.1378-79. Even if another court were to consider similar circumstances and reach a different conclusion, this would not constitute an abuse of discretion. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005).

## C. Venue is Proper in the Southern District of Florida.

Appellants have not shown that the district court clearly abused its discretion in finding venue to be proper. *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 255 (11th Cir. 1996) ("[D]istrict court's refusal to change venue will only be disturbed for a clear abuse of discretion."). *Accord Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990).

### 1. Venue As to Federal Appellants.

In actions against federal officers, venue is proper where "the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1)(C). Friends resides in the Southern District of Florida, a fact that no Appellant disputes. App.1379. The district court correctly concluded that no "real property is involved in the action" because that provision refers only to disputes over real property interests, such as title, leases, and mineral rights. App.1379-83. *See NRDC v. Tenn. Val. Auth.*, 340 F. Supp. 400, 406 (S.D.N.Y. 1971), *rev'd on other grounds*, 459 F.2d 255 (2d Cir. 1972) (NEPA action seeking injunctive relief did not involve "real

property" for purposes of venue); *W. Watersheds Project v. Schneider*, No. 1:16-CV-83, 2019 WL 4863483, at *2-3 (D. Id. Oct. 2, 2019); *Earth Island Inst. v. Quinn*, 56 F. Supp. 3d 1110, 1112, 1116 (N.D. Cal. 2014). Courts have consistently endorsed this longstanding interpretation, App.1379-83, and Federal Appellants cite no contrary authority, Fed.Br.39-43.[31]

Federal Appellants' argument that this action involves real property for purposes of venue because it affects land use, Fed.Br.39-40, fails. Friends challenge Appellants' failures to comply with the public notice, public engagement, environmental review, and alternatives analysis NEPA requires before major federal action is undertaken that will have significant environmental impacts. As a procedural statute, NEPA does not dictate an outcome, but it does mandate a process. *Seven Cnty.*, 605 U.S. at 177. The preliminary injunction to preserve the status quo ante pending the litigation (and/or Appellants' compliance with NEPA) does not determine land use rights either. *Cf. Jim Walter Res., Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 920 F.2d 738, 744 (11th Cir. 1990).

---

[31] Below, Federal Appellants cited a single case in support of their position: *Center for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. C 08-05646, 2009 WL 1025606, at *3 (N.D. Cal. Apr. 14, 2009). The district court found the case distinguishable because it presented a direct challenge to a land use plan governing several real property rights, App.1382-83, including rights of way, easements, and land withdrawals, exchanges and acquisitions, 2009 WL 1025606, at *3. The district court noted that other courts too found the case to be confined to its facts. App.1383.

Federal Appellants claim that the complaint's allegations against *other* defendants for *non*-NEPA violations mean that venue for the NEPA claim against them involves real property. Fed.Br.40. But venue is claim- and defendant-dependent, App.1369-70, and venue for Friends' NEPA claim against Federal Appellants was proper.[32] *See Delaware v. Bender*, 370 F. Supp. 1193, 1200 (D. Del. 1974) (NEPA challenge to bridge permit did not involve "real property" for venue purposes even though "the decision may determine whether or in what manner the ... bridge will be constructed"); *W. Watersheds Project v. Salazar*, No. CIV 08-0516, 2009 WL 1299626, at *2 (D. Idaho May 7, 2009).

Federal Appellants urge that a plain reading of the venue provision compels an interpretation different from the one endorsed by courts for decades. Fed.Br.41-42. They argue that the term "involved" is broad and cite Florida real estate and tenant law to claim that the district court misunderstood "real property" under the Federal Rules of Civil Procedure. Fed.Br.42. But the district court's reading was soundly supported by decades of caselaw interpreting the same terms and therefore was not an abuse of discretion. *See Earth Island Inst. v. Quinn*, 56 F. Supp. 3d 1110, 1115-16 (N.D. Cal. 2014) (by using legal term "real property" Congress "intended

---

[32] As the district court correctly found, Friends' allegations against *another* defendant for *other* violations does not seek to vindicate property rights either. App.1383 n.13.

mainly to cover disputes over legal interests in real property"). Even if the Court were to break with this overwhelming weight of authority, venue would still be proper in the Southern District of Florida since the land at issue crosses the boundary between Collier and Miami-Dade Counties.



Supp.App.867. *See also* Supp.App.864-66.

2.    Venue As to All Appellants.

Venue is also proper in "any" district where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2) & (e)(1)(B). To "give rise to a claim," these events or omissions must have "a close nexus to the wrong," but need not be wrongful themselves. *Jenkins Brick Co. v. Bremer*, 321 F.3d

1366, 1372 (11th Cir. 2003) (finding venue in breach of contract claim not only where contract was breached, but also where it was executed and intended to be performed).

Section 1391 "contemplates some cases in which venue will be proper in two or more districts." *Id.* at 1371. The Court "is not required to weigh the events" that occurred in one district versus another or "choose which venue is more proper." *Goodwyn, Mills & Canood, Inc. v. Black Swamp, Inc.*, 956 F. Supp. 2d 1323, 1326 (M.D. Ala. 2012).

Here, the district court found several events ***and*** omissions in the Southern District which gave rise to Friends' NEPA claim. App.1389-94. These included: Florida's notice to Miami-Dade County commandeering the site for use as an immigration detention center, App.1390; Florida's failure to obtain critical information from Miami-Dade County (the property owner) regarding the project's environmental impacts or respond to the County's environmental concerns, *id.*; Federal Appellants' failure to engage with the Miccosukee Tribe, which has occupancy and other rights in the Preserve and is headquartered in Miami-Dade County, App.1392; and the failure to consult with other federal entities, including

Everglades National Park, *id.*[33] *See also* 42 U.S.C. § 4332(2)(C)(v); App.270. Contrary to Appellants' argument, these acts and omissions all took place *before* the complaint was filed. *Cf.* Fed.Br.38; Fla.Br.28.

The district court further found other actions in the Southern District gave rise to Friends' NEPA claim as they were necessary to operating the immigration detention center from which Friends' environmental harms flow. These include that: ICE's Miami Field Office is "responsible for coordinating and supervising immigration enforcement functions" at the facility, App.1390-91; the Krome immigration court in Miami has jurisdiction over individuals held there, App.1391; and Federal Appellants "bring detainees from other Miami-Dade detention facilities to the TNT site," *id.* The state-federal agreement to set up and operate this detention center, which necessarily required transporting individuals to be detained there, also predated the complaint. *See* Fed.Br.6-7 (describing justification for the facility as arising from the "particularly acute" "problems in Miami" creating "a shortage of bedspace at detention facilities in the Miami area").[34]

---

[33] *See* Everglades National Park, Nat'l Park Serv., https://www.nps.gov/ever/index.htm (headquartered in Miami-Dade).

[34] Florida's reliance on a self-serving declaration to deny ties to Miami, Fla.Br.28, fails. The district court was entitled to make its own factual findings, giving other evidence more weight than hearsay prepared for purposes of litigation.

Florida's objection to the district court's reliance on these actions, Fla.Br.28-30, is misplaced. Federal Appellants do not deny that *this* facility operates based on (and because of) immigration-related decision-making that occurs in the Southern District. Fed.Br.37-38. That individual immigration enforcement decisions may not be reviewable has no bearing on the fact that these actions collectively form the sole basis for the detention center's existence and operation, giving rise to Friends' NEPA claim.[35]

Because Friends' NEPA claim specifically arises from Appellants' failure to consider the environmental impacts of a major federal action, the district court also correctly treated the locus of the environmental harm as relevant, though not dispositive. App.1393. These harms included: runoff from 800,000 square feet of new pavement threatening wetlands, wildlife, and water quality in Miami-Dade, where 80% of Tribal members also reside; harm to the massive state-federal investment in WERP; light pollution into Miami-Dade from "intense industrial lighting" adversely affecting protected species and other interests; and the disruption of access to trails the Tribe uses for hunting, cultural, and ceremonial activities.

---

[35] Appellants' complaint that ICE's supervision of the facility occurred after the filing of the complaint, *e.g.*, Fla.Br.28, falls flat. ICE's supervision and coordination was necessary to the state's ability to operate an immigration detention facility at all.

App.1393-96, 1407 n.25, 1422. As shown below, a substantial portion of the affected panther population, alone, was also present in the Southern District.



Supp.App.955. *See also* App.255:15-256:24 (expert expected data to reflect present-day panther presence because population had been stable over period of thirty years).

Federal Appellants' claim that "impacts alone" cannot supply venue is irrelevant, Fed.Br.39, since the district court found events, omissions, *and* impacts

all supported venue. *Cf. Friends of Earth v. Haaland*, No. CV 21-2317, 2022 WL 185196, at *5 (D.D.C. Jan. 20, 2022) (where impacts will be felt nationwide, more is needed to create a substantial nexus to the claim for purposes of venue). The cases on which Florida relies, Fla.Br.32, fare no better. *See, e.g.*, *Leroy v. Great W. United Corp.*, 443 U.S. 173, 184 (1979) (Idaho was only proper venue for constitutional challenge to enactment of Idaho statute in Idaho—where all relevant witnesses and evidence were also located).

Appellants' argument that the district court relied on "acts and omissions that Plaintiffs never raised," Fed.Br.37; Fla.Br.26-27, fails. The court summarized Plaintiffs' arguments, App.1385, relied on evidence adduced at the evidentiary hearing, *see, e.g.*, App.943:10-944:15, App.952:13-25, App.955:12-956:5, App.959:15-960:20, App.1054:15-1055:8 (closing arguments describing evidence), and cited Appellants' own admissions, App.1390-91 (citing federal filings and declarations). The court did not violate the party presentation rule or deprive Appellants of the opportunity to respond. *Contra* Fla.Br.26-27. In fact, this Court "may affirm on any ground supported by the record." *PDVSA U.S. Litig. Tr. v. LukOil Pan Americas LLC*, 65 F.4th 556, 562 (11th Cir. 2023) (citation modified). And the record firmly establishes events and omissions in the Southern District that gave rise to Friends' NEPA claim.

Appellants' objection that the district court did not focus solely on "the locus of the decision-making," Fed.Br. 37; Fla.Br. 22-23, 27-28, ignores that this is not a usual NEPA case, App.1394, where agencies proceed in an orderly, public fashion to compile a record and review it prior to making and committing decisions to writing. Rather, in their haste to act, Defendants moved heaven and earth first and left process, if any, for later.[36]

Instead of looking to events and omissions, Appellants ask the Court to focus myopically on brick and mortar. Fed.Br.36; Fla.Br.21-23, 31-32. But the venue statute was specifically amended to allow "for additional play in the venue joints." *Jenkins Brick Co.*, 321 F.3d at 1371. In *Jenkins Brick*, this Court illustrated how the principle could play out in the context of environmental harm:

> Consider a toxic tort case in which the defendant's factories in Colorado and Missouri pollute a river, causing injury to Arkansas and Louisiana citizens who ingest the water. If one had to pick a ***single*** district in which the ... claim "arose," each scenario would require the district court ... to pick a district in an arbitrary fashion.

---

[36] Appellants have not been transparent about how and where the relevant decisions were made, have not produced an administrative record, and objected to early discovery. Below, Appellants vaguely claimed that any decision-making occurred in Tallahassee, Collier County, or Washington, D.C., but submitted only a conclusory declaration claiming that "[a]ll substantial decision-making" occurred in Tallahassee or Collier County. App.1395. As the district court found, the evidence suggested that decision-making likely also occurred in Miami, where the ICE office with oversight over the facility is located. App.1395-96.

*Id.* (emphasis added). Thus, the court was not required to determine that venue could only be proper in the Middle District where most of the physical structure is located.

Appellants' argument that the acts and omissions the district court relied on lack a "close nexus" to Friends' NEPA claim, Fed.Br.37-39; Fla.Br.27-32, is without merit. Florida's commandeering of the site was not mere correspondence reflecting an abstract decision made in Tallahassee, *cf.* Fla.Br.30; Fed.Br.38. It noticed the state's takeover of Miami-Dade County property for the purpose of building a federal immigration detention center at this particular site, with consequences for the County and its residents, as articulated by the County Mayor, and without conducting any environmental review, thereby giving rise to Friends' NEPA claim. App.1390. Federal Appellants' argument that Florida itself is not subject to the APA or NEPA conflates the actionable claim with where the events or omissions giving rise to that claim occurred. *See* Fed.Br.38.

Because in this Circuit events and omissions bearing a "close nexus to the wrong" need not "be wrongful in and of themselves," *Jenkins Brick*, 321 F.3d at 1372, Florida is wrong to rely on *Steen v. Murray*, 770 F.3d 698, 703-704 (8th Cir. 2014) (excluding event that was not itself wrongful from venue analysis), and *Abramoff v. Shake Consulting, L.L.C.*, 288 F. Supp. 2d 1, 5 (D.D.C. 2003) (same). *See* Fla.Br.29.

This Court's approval of *Woodke v. Dahm,* 70 F.3d 983 (8th Cir. 1995), was therefore not absolute, but rather approved the decision's analytical framework, looking to events and omissions with a "close nexus" to the wrong for venue. *Jenkins Brick*, 321 F.3d at 1371-72.

Florida is wrong to argue that Appellants' failure to consult with Miami-Dade and the Tribe were not relevant to the NEPA claim. Fla.Br.30-31. The evidence showed that Miami-Dade County raised concerns about environmental impacts to its water quality and that the Tribe was typically consulted by federal agencies undertaking major federal actions in the area. Consulting with those entities would have demonstrated that the proposed action "significantly affect[s] the quality of the human environment," thereby requiring an EIS and giving rise to Friends' NEPA claim. 42 U.S.C. § 4332(2)(C). Moreover, Appellants also failed to consult with Everglades National Park and U.S. Fish and Wildlife Service,[37] App.1340, both of which are based in the Southern District. *Id.* § 4332(2)(C)(v).

---

[37] USFWS' Ecological Service Office with jurisdiction over Miami-Dade and Collier Counties is based in Vero Beach. Florida Ecological Services Office, USFWS, https://www.fws.gov/office/florida-ecological-services (last visited Jan. 5, 2026) (Florida Ecological Services Office is primary Service office in Florida on matters of federal threatened and endangered species); How to Reach Us, USFWS, https://www.fws.gov/office/florida-ecological-services/contact-us (last visited Jan. 5, 2026) (Vero Beach location serves Miami-Dade and Collier Counties).

Florida's argument that the failure to consult was "at best, the *result* of the decision not to conduct an EIS" would turn NEPA on its head, allowing agencies to decide an environmental statement is not required before obtaining relevant information. The decision in *Friends of Earth*, 2022 WL 185196 at *4, is wholly inapposite. There, the court found that the failure to consider a handful of studies that mentioned a project's potential impacts on the Western District of Louisiana, out of dozens of studies that mentioned impacts nationally and even globally, was not sufficient to confer venue there. *Id.* Here, all impacts were ignored, including immediate, direct, and irreparable impacts in the Southern District.

Lastly, Appellants' reliance on the transfer of habeas or conditions-of-confinement cases fails. *See, e.g.*, Fla.Br.23. In *C.M. v. Noem*, an access-to-counsel case, the parties agreed that the plaintiffs were physically detained in the Middle District of Florida and the alleged harms all occurred within the Middle District. 796 F. Supp. 3d 1198, 1229-33 (S.D. Fla. 2025). And habeas cases may only be brought in the district of confinement. *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004).

This, by contrast, is an environmental case. Substantial events, omissions, and impacts giving rise to the NEPA claim occurred in the Southern District of Florida. And land at the center of the dispute crosses district boundaries.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated herein, the district court's order should

be AFFIRMED, the stay VACATED, and the matter remanded to the district court

for further proceedings on the merits of Friends' claims.[38]

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida 33137
Telephone: (305) 440-5432

By:_____s/   Tania Galloni_____
　　Tania Galloni, Fla. Bar No. 619221
　　tgalloni@earthjustice.org
　　Dominique Burkhardt, Fla. Bar No.
　　100309
　　dburkhardt@earthjustice.org

*Counsel for Appellee Friends of the
Everglades*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive
Penthouse One
Miami, Florida 33133
Telephone: (305) 858-2900

By:_____s/   Paul J. Schwiep_____
　　Paul J. Schwiep, Fla. Bar No.
　　823244
　　PSchwiep@CoffeyBurlington.com
　　Scott Hiaasen, Fla. Bar No. 103318
　　SHiaasen@CoffeyBurlington.com
　　Jeffrey B. Crockett, Fla. Bar No.
　　347401
　　YVB@CoffeyBurlington.com
　　LPerez@CoffeyBurlington.com
　　service@CoffeyBurlington.com

---

[38] Federal Appellants' requests to "enter judgment" and to "transfer the remaining or future counts," Fed.Br.50, ignores that this is a limited interlocutory appeal, and, in any event, makes no legal sense. Accordingly, they should be denied.

*Counsel for Plaintiffs-Appellees*

CENTER FOR BIOLOGICAL
DIVERSITY
Elise Pautler Bennett, Fla. Bar No.
106573
ebennett@biologicaldiversity.org
Jason Alexander Totoiu, Fla. Bar No.
871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Appellee Center for
Biological Diversity*

# **CERTIFICATE OF COMPLIANCE**

1.     Excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains <u>19,201</u> words. Fed. R. App. P. 32(g)(1). This document contains fewer words than requested in Appellees' Renewed Motion for Leave to File Consolidated Answer Brief with Excess Words, which was filed January 6, 2026, and remains pending. ECF 90.

2.     This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Paul J. Schwiep*
Paul J. Schwiep

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 20, 2026, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Paul J. Schwiep*
Paul J. Schwiep