Case No. 25-12873

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

FRIENDS OF THE EVERGLADES, INC., et al.,
*Plaintiffs-Appellees*,

v.

EXECUTIVE DIRECTOR,
FLORIDA DIVISION OF EMERGENCY MANAGEMENT,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:25-cv-22896-KMW
(Hon. Kathleen M. Williams, Dist. Judge)

## APPELLEES' RESPONSE TO FEDERAL APPELLANTS' CROSS-MOTION FOR LEAVE TO SUPPLEMENT THE RECORD ON APPEAL AND REPLY IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD ON APPEAL

Tania Galloni, FBN 619221
Dominique Burkhardt, FBN 100309
**EARTHJUSTICE**
4500 Biscayne Boulevard, Suite 201
Miami, Florida 33137
Telephone: (305) 440-5434
tgalloni@earthjustice.org
dburkhardt@earthjustice.org

*Counsel for Friends of the Everglades*

Paul J. Schwiep, FBN 823244
Scott A. Hiaasen, FBN 103318
Jeffrey B. Crockett, FBN 347401
**COFFEY BURLINGTON, P.L.**
2601 S. Bayshore Drive, PH-1
Miami, Florida 33133
Telephone: (305) 858-2900
pschwiep@coffeyburlington.com
shiaasen@coffeyburlington.com
jcrockett@coffeyburlington.com
yvb@coffeyburlington.com
service@coffeyburlington.com

*Counsel for Appellees*

Case No. 25-12873

Elise Pautler Bennett, FBN 106573
Jason Alexander Totoiu, FBN 871931
**CENTER FOR BIOLOGICAL
    DIVERSITY**
Post Office Box 2155
St. Petersburg, Florida  33731
Telephone:  (727) 623-9797
ebennett@biologicaldiversity.org
jtotoiu@biologicaldiversity.org

*Counsel for Center for Biological
Diversity*

Case No. 25-12873

## **INTRODUCTION**

In their opening briefs, Florida and Federal Appellants opened the door to this Motion to Supplement the Record on Appeal by alluding to a September 2025 approval of federal funding while continuing to withhold related information that pre-dated the district court's preliminary injunction and should have been disclosed to the district court, the motions panel, and the merits panel. Appellants also continued to rely heavily on factual conclusions from this Court's stay order, which were based on a record that Appellants distorted, by withholding and failing to correct information, despite having a duty and every opportunity to do so.

The evidence, as confirmed by the supplemental records Friends ask the Court to consider, demonstrate that DHS: (1) decided to federally fund this detention center from the start; (2) allocated $608.4 million federal dollars for that purpose; (3) received FDEM's formal application, and instructed FDEM on the use of those funds, all before the district court issued its preliminary injunction, and (4) has since issued the formal Award Letter.

Federal Appellants implausibly claim the information was not material or post-dates the injunction and that federal funding still remains only a "possibility" and is not specific to this facility. In the alternative, they selectively ask the Court to consider additional records that are misleading and rife with irregularities.

1

But most importantly, Appellants attempt to confuse the issues before the Court by conflating what constitutes a final agency action for purposes of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, with what constitutes a major federal action under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h. In the interests of justice, Friends' motion should be granted.

## I. Appellants Conflate Final Agency Action with Major Federal Action to Obscure That the Records Are Material to a Question Before the Court.

As the district court found, the final agency action in this case is "the Defendants' decision to not issue an EIS or conduct an EA and then construct a detention camp." ECF No. 83-1 at 1405, 1406 n.24 (the final agency action is "the detention camp's construction and existence" without NEPA compliance). Despite "Defendants['] attempt to reframe the issue," the final agency action at issue is *not* "the detention camp's ultimate funding." *Id.* at 1406. Put differently, Friends are not challenging a funding decision. They are challenging the construction and operation of an ICE detention facility that was undertaken without NEPA review—an action that, as the district court found, is final.

Thus, Appellants' narrow focus on the question of *when* the committed federal funding will finally disburse (or when, in their view, the funding decision itself becomes a "final agency action"), ECF No. 104 at 6–7 (discussing finality in terms

of disbursement);[1] ECF No. 105 at 3, 6–9 (discussing final agency action with force of law), is pure misdirection.[2] Though not dispositive, the issue of federal funding is material to Appellants' argument that the detention center was a purely state enterprise rather than a "major federal action" requiring NEPA compliance. ECF No. 83-1 at 1417–18. A major federal action requiring NEPA compliance is, by definition, not final, as NEPA applies when a federal agency considers a *proposed* action, not when the action occurs. 42 U.S.C. § 4332(2)(C).[3]

As the district court found, there were two independent bases to find that Appellants' decision to build and operate this facility constituted a major federal action requiring NEPA compliance. First and foremost, the district court cited the fact that the facility is exclusively an immigration detention center operating under federal immigration authority and control. ECF No. 83-1 at 1408–16, 1420 ("[T]he project was requested by the federal government; built with a promise of full federal

---

[1] Citations to "Doc." refer to docket entries in the district court. Citations to "ECF No." refer to entries in the Circuit Court docket.

[2] As with its opening brief, Florida continues to cite the expedited stay order as though it is dispositive, ECF No. 105 at 6–7, even though that order is not binding on the merits panel, which will have the benefit of time and a full review of the record on which the district court relied. *Mamani v. Berzain*, 825 F.3d 1304, 1308-09 (11th Cir. 2016) (citing 11th Cir. R. 27-1(g)).

[3] For purposes of the APA, agency action is "final" if "[i]t marks the consummation of the agency's decisionmaking process" *and* is an action "'by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997) (citation modified).

Case No. 25-12873

funding; constructed in compliance with ICE standards; staffed by deputized ICE Task Force Officers acting under color of federal authority and at the direction and supervision of ICE officials; and exists for the sole purpose of detaining and deporting those subject to federal immigration enforcement. Detainees are brought onto the site by federal agents and deported from the site by federal agents on federally owned aircraft."). Second, the district court cited the fact that DHS had committed to federally fund the project. *Id*. at 1416–19.

Seizing on language from the stay order, however, Appellants have now argued for the first time on appeal that *both* federal control *and* a final federal funding action were required to trigger NEPA, and further that funding must also have been *disbursed* before environmental impacts must be considered—if ever. ECF No. 82 at 15–16, 50–51, 53–54; ECF No. 86 at 11–12, 24–25. Florida continues to insist that a "legally binding payment decision" was required, ECF No. 105 at 5 (citing Stay Order) even though it is not the funding action that Friends are challenging.

Because Appellants raised these arguments for the first time on appeal, they have been waived. ECF No. 103 at 20–22. The arguments also lack merit. As the district court found, the final agency action at issue in this case is not the funding itself, it is the decision to build and operate a federal immigration center in the Everglades without undertaking NEPA review. NEPA compliance is required when

4

a major federal action is proposed, not when it is finalized. 42 U.S.C. § 4332(2)(C) (requiring an environmental impact statement (EIS) on any *proposal* for a major federal action significantly affecting the human environment; EIS must examine foreseeable environmental effects of "proposed" agency action). The finality here materialized when Appellants proceeded with the detention center without complying with NEPA.

The cases on which Appellants rely are inapposite. *Rattlesnake Coalition v. EPA*, for example, assessed final agency action and involved the congressional appropriation of funds for an entirely local wastewater treatment project, requiring the city to then apply for those funds from the EPA. 509 F.3d 1095, 1103 (9th Cir. 2007). Here, funding is not the final agency action, and it is DHS itself that allocated federal funds to Florida for an ICE detention facility which operates "entirely under federal control and pursuant to federal law." ECF No. 83-1 at 1410. In *Rapid Transit Advocates, Inc. v. Southern California Rapid Transit District*, 752 F.2d 373, 378 (9th Cir. 1985), the issue before the court was one of standing, not final or major federal action. Another case involved the deliberation and subsequent denial of federal grant funding, *Am. Airlines, Inc. v. Transp. Sec. Admin.*, 665 F.3d 170, 174 (D.C. Cir. 2011), not the commitment, allocation, and award of federal funding, as here. That case also did not involve the question of major federal action.

Case No. 25-12873

## II. The Records Confirm That the District Court's Factual Finding That a Funding Decision Had Been Made Was Not Clearly Erroneous.

The supplemental records submitted by Friends confirm that the district court's factual finding that a funding decision had been made could not have been clearly erroneous because DHS's plainly stated commitment to funding the facility has now materialized. Florida concedes that "the federal government has now granted" funding for the detention center. ECF No. 82 at 54. Federal Appellants' continued hedging about the import of the letter is belied by the September 30, 2025, Award Letter itself, which on its face confirms a DHS grant of $608.4 million (not an "eligibility" determination from a "nonparty," as Federal Appellants claimed in their brief, ECF No. 86 at 9 n.3).[4] In the proceedings below, the evidence showed that:

- On June 23, 2025, Appellant DHS Secretary Kristi Noem admitted publicly—and unequivocally—that "thanks to our partnership with Florida," DHS would "expand facilities and bed space in just days," and that these "facilities will in large part be funded by FEMA's Shelter and Services Program[.]" ECF No. 92-4 at 1018.

---

[4] Contrary to their opening brief, Federal Appellants now concede that "federal defendants" issued the letter. ECF No. 104 at 5–6.

Case No. 25-12873

- On July 1, 2025, Secretary Noem specifically admitted publicly—and, again, unequivocally—that "Alligator Alcatraz will be funded largely by FEMA's Shelter and Services Program[.]" *Id*. at 1017.

- During a July 1 tour of the facility, President Donald J. Trump confirmed, in the presence of Secretary Noem, who did not dispute his remarks, that "we took the FEMA money . . . hundreds of millions of dollars . . . and we used it to build this project." *See* ECF No. 92-8 at 2306, https://www.youtube.com/watch?v=IUOYJxklevg, at 55:28–40.

- On July 2, 2025, DHS Official David Richardson attested that "DHS/FEMA announced $600 million in federal funding for the Detention Support Grant Program (DSGP)" for which FDEM is "[t]he only eligible applicant." ECF No. 83-1 at 1502–03 ¶¶ 1, 3.

- On July 14, 2025, counsel for DHS acknowledged in another case that "'[t]he Everglade[s] detention facility is being funded from a continuing resolution for [fiscal year] 2025' of the Shelter and Services Program." *Id*. at 1418 (quoting *City of Chicago v. DHS*, 25-cv-05463 (N.D. Ill.), ECF No. 35 at 1–2).

Based on this, the district court's finding that DHS had decided to federally fund the detention center, *Id*. at 1417–18, could not have been clearly erroneous.

7

Case No. 25-12873

The records belatedly disclosed by FDEM in response to public records requests are material because they confirm the district court did not clearly err: (1) the June 20, 2025, email from "DHS leadership" confirmed DHS's agreement to partner on the detention center *with* a commitment federal funding, ECF No. 91, Exh. 1 at 2, which Florida relied on to "immediately get to work" building this detention center;[5] (2) the August 7, 2025, email confirmed that Florida submitted its formal application for that funding to FEMA while this matter was pending at the district court, ECF No. 91, Exh. 2 at 2, although Appellants continued to claim otherwise; and (3) FEMA instructed FDEM on the use of those funds, which had already been allocated to FDEM's detention facility *by the agency*, on or about August 15, 2025, ECF No. 91, Exh. 3 at 6. Contrary to Federal Appellants' argument, none of this information post-dates the preliminary injunction, ECF No. 104 at 1, 3, which issued on August 21.

Given the unequivocal statements by Appellant DHS Secretary Noem (and others) that this facility would be federally funded, and further evidence confirming

---

[5] Florida argues that the June 20, 2025, email is not "newly discovered or disclosed" because Friends submitted it to the Court in opposing Appellants' stay motion. ECF No. 105 at 6, 7. But Appellants do not, and cannot, deny that they did not disclose this exchange during the district court proceedings. FDEM produced the exchange only *after* the injunction issued and only in response to a public records request by a state legislator. ECF No. 91, Exh. 1.

that commitment before the facility was constructed and demonstrating formal notice of the award thereafter, Federal Appellants' continued characterization of federal funding as only a "possibility," ECF No. 104 at 4, and description of the letter as only relating to FDEM's "eligibility," *id.* at. 2, defies credulity. Richardson's July 2, 2025, declaration established that FDEM was the only eligible detention center grant applicant from the start. The Award Letter to FDEM plainly states:

> Congratulations on behalf of the Department of Homeland Security, *your application* submitted for the Fiscal Year 2025 Detention Support Grant Program, *has been approved* in the amount of $608,400,000.00 in Federal funding.

ECF No. 91, Exh. 3 at 2 (emphasis added).

### III.     Florida's Formal Application to FEMA Is Material.

Federal Appellants argue that evidence that Florida submitted an application for that funding while the district court proceeding was underway is "immaterial." *Id.* But in seeking a stay of the preliminary injunction, Federal Appellants considered the fact material, expressly representing to the Court that no funding application had been submitted. ECF No. 20 at 12.

Federal Appellants brazenly insist that Friends took their statement "out of context," that it was simply part of a hypothetical, and that they "did not state that Florida had not filed an application." ECF No. 104 at 5 & n.1. This is the statement:

9

> Certainly, after Florida seeks federal funding, then a NEPA analysis may inform that decision. But until that funding request is made or there is some other need for a federal decision, undertaking a costly and time-consuming NEPA analysis is a wasteful endeavor.

ECF No. 20 at 12. The motions panel repeatedly relied on the representation that Florida had not submitted an application in granting a stay. *See* ECF No. 91 at 4.[6] The Court specifically cited the no-longer-true Richardson declaration. ECF No. 42 at 6–7, 18, 20. Yet Appellants still did not advise the Court otherwise. Federal Appellants' obstinance in avoiding candor to the Court undermines the administration of justice and should not be rewarded.

## IV.    FEMA's Instructions to FDEM on the Use of Funds Is Material.

Federal Appellants' suggestion that the September 30, 2025, Award Letter describes funds allocated *by Congress* (and therefore is not an agency action), ECF No. 104 at 7, is contradicted by the Richardson declaration, which states that "DHS/FEMA" (not Congress) "announced $600 million in federal funding for the Detention Support Grant Program (DSGP)," for which FDEM was the "only eligible

---

[6] "Florida has not filed an application for federal funds …." *Friends of the Everglades, Inc. v. Sec'y of United States Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *2 (11th Cir. Sept. 4, 2025) (citing (outdated) Richardson Declaration, Doc. 21-2 ¶ 4); "DHS has not received … any applications for funding [for] the Facility." *Id*. at *7 (citing Doc. 21-2 ¶ 3–4); "To receive funding … [FDEM] will need to send an application to FEMA …." *Id*. at *8 (citing Doc. 21-2 ¶ 4); "Without an application, there is simply nothing on which a decision can be made." *Id.* "There may come a time when [FDEM] applies for FEMA funding." *Id*. at 9.

applicant." ECF No. 83-1 at 1503 ¶ 3. The Award Letter further states that the allocation to FDEM is under the *agency's* grant program. ECF No. 91, Exh. 3 at 2. It was therefore the *agency*, not Congress, that allocated the funding for this facility, just as DHS Secretary Noem (and President Trump) stated from the start.

Federal Appellants' argument that the Award Letter is not specific to any facility, ECF No. 104 at 7–8, defies credulity when considered against all the evidence that was before the district court, none of which Federal Appellants dispute or even acknowledge. Appellants put forward no evidence of any immigration detention facility proposed by FDEM other than the one at issue here.

The Award Letter resolved FEMA's August 15, 2025, request that FDEM modify its request to match the $608.4 million allocated to FDEM under the grant program as early as July 2, 2025. ECF No. 91, Exh. 3 at 6; ECF No. 83-1 at 868–69, 1502–1503. Florida's suggestion that this amount was only "allocated" as of September 30, 2025, ECF No. 105 at 10 n.6, flies in the face of this evidence. FDEM's recent production of a July 31, 2025, "Notice of Award Allocation" also confirms the funding was allocated by the agency long before the Award Letter, Exh. B, and directly contradicts FDEM's assertion.

## V. Federal Appellants' Additional Records Are Irregular, Misleading and Incomplete.

Federal Appellants do not dispute the contents or authenticity of the records Friends ask to be made part of this appeal. But, arguing that additional records would

11

provide "context and background," Federal Appellants ask the Court to consider: (1) a "Record of Environmental Consideration" they claim reflects NEPA review related to the grant program, which is not specific to this facility; (2) an exchange between FEMA and the U.S. Fish and Wildlife Service which they claim constitutes informal consultation under the Endangered Species Act; and (3) grant program guidance. ECF No. 104 at 8–9.

But the "Record of Environmental Consideration" Federal Appellants offer is unsigned and undated. ECF No. 104, Exh. 1 at 2.[7] It also conflicts with a similar form titled "Record of Environmental Consideration," produced to Friends *after* the filing of this motion and in response to a public records lawsuit,[8] which is signed and dated August 21, 2025—the day the preliminary injunction issued—and specifically indicates that the DHS grant is for *this* facility, identifying the Project Name as "FL Detention Center (Alligator Alcatraz)." Exh. A at 1–2.

The letters between FEMA and U.S. Fish and Wildlife Service purporting to constitute informal consultation between agencies under the Endangered Species Act are patently immaterial to this NEPA appeal. They also oddly bear the same date

---

[7] A footer at the bottom of the document bears the date September 30, 2025, but the section for "Reviewer and Approval" signatures with dates is blank.

[8] *Friends of the Everglades v. Fla. Division of Emergency Mgmt.*, Case No. 2025-CA-1972, pending in Circuit Court in and for Leon County, Florida.

as each other and as the Award Letter, September 30, 2025, with U.S. Fish and Wildlife Service's letter being unsigned.[9] ECF No. 104, Exh. 2, 3.

Records also suggest that over time FDEM and Federal Appellants have worked together to alter the program guidance and the method and timing of federal funding—though not the grant amount—to conform to their litigation positions in this case. For example, the program guidance recently produced in Friends' public records litigation prohibited reimbursement of costs for permanent buildings, but not temporary structures such as those used at this facility. Exh. C at 8, Section B. (prohibiting costs for "constructing new, permanent buildings, or modifications/renovations to existing facilities") (highlighting added). The version Federal Appellants have submitted prohibits both. ECF No. 104 at 9, Section B.1.b. (prohibiting costs for "constructing new, permanent buildings *or temporary facilities*") (emphasis added). Federal Appellants now rely on the altered language to claim that there was never a decision to contribute to construction costs, ECF No. 104 at 10, a representation at odds with public statements by federal officials at the time.

---

[9] The signature on FEMA's September 30, 2025, letter is also time-stamped 17:25:55, suggesting it was signed after hours. ECF No. 104, Exh. 2 at 2.

But how the federal funding is ultimately used is also immaterial. What matters is that DHS agreed to provide federal funding for the detention center, one basis for finding that the project constitutes a major federal action. Contrary to Federal Appellants' suggestion, the preliminary injunction against further construction was not tied to the use of federal funding, it was tied to the harms caused by building a federal immigration detention center in a National Preserve without first complying with NEPA.

The irregularities in Appellants' documents are better left to sorting out before the district court. But suffice it to say that this Court should not rely on them to draw any conclusions as to the facts.

## VI.    Florida's Attempts to Shift Blame to Friends Fail.

Florida claims Friends could have discovered the application and funding actions "simply by calling state and federal witnesses." ECF No. 105 at 17. This line of argument is ironic where Florida continued to improperly cite and rely upon a misleading declaration without informing Friends, the district court or this Court that the claims in declaration were no longer true, leading the motions panel to err.

Florida's claim is also revisionist. The preliminary injunction hearing, which commenced August 6, 2025, ECF No. 83-1 at 31, was continued to August 12, 2025, to accommodate *Appellants'* witnesses' travel schedules. *Id*. at 361:11–15. Appellants said they would call three witnesses, one for Federal Appellants and two

Case No. 25-12873

for Florida. *Id*. at 277:24–278:3. However, when the hearing resumed, Appellants reversed course. Federal Appellants announced they would not put on a witness *at all*, and Florida put on a single witness—David Kerner, the director of Florida's Department of Highway Safety and Motor Vehicles, *id*. at 813:13–14. In this way, Appellants withheld critical information, misled the Court by continuing to rely upon a stale declaration, and kept out of court witnesses who might contradict its false narrative.

Florida also complains that Friends should have brought these records immediately to the Court's attention in the days before the Court stayed the litigation due to the lapse in appropriations. ECF No. 105 at 20. But aside from the impossible timing, Friends could not have anticipated that Appellants would not disclose the information themselves until they filed their opening briefs. And indeed, Appellants chose to disclose only that the Award Letter issued on September 30, 2025, requiring Friends to provide the rest.

As shown in Friends' Motion to Supplement, Appellants withheld material information from the district court, the motions panel, and the merits panel related to Florida's formal application for federal funding. ECF No. 91. They should not be permitted to continue relying on conclusions the motions panel drew based on a record that Appellants distorted and failed to correct in their opening briefs.

Case No. 25-12873

## **CONCLUSION**

Based on the foregoing, Friends respectfully request that their motion, ECF No. 91, be GRANTED, and that Federal Appellants' cross-motion, ECF No. 104, be DENIED. Should the Court grant Federal Appellants' cross-motion, Friends respectfully request that the record on appeal be further SUPPLEMENTED with the attachments to this response.

Respectfully submitted,

EARTHJUSTICE
4500 Biscayne Boulevard, Suite 201
Miami, Florida  33137
Telephone:  (305) 440-5432

By:_____s/   Tania Galloni_____
    Tania Galloni, Fla. Bar No. 619221
    tgalloni@earthjustice.org
    Dominique Burkhardt, Fla. Bar No.
    100309
    dburkhardt@earthjustice.org

*Counsel for Appellee Friends of the Everglades*

COFFEY BURLINGTON, P.L.
2601 South Bayshore Drive
Penthouse One
Miami, Florida  33133
Telephone:  (305) 858-2900

By:_____s/   Paul J. Schwiep_____
    Paul J. Schwiep, Fla. Bar No.
    823244
    PSchwiep@CoffeyBurlington.com
    Scott Hiaasen, Fla. Bar No. 103318
    SHiaasen@CoffeyBurlington.com
    Jeffrey B. Crockett, Fla. Bar No.
    347401
    YVB@CoffeyBurlington.com
    LPerez@CoffeyBurlington.com
    service@CoffeyBurlington.com

*Counsel for Plaintiffs-Appellees*

CENTER FOR BIOLOGICAL DIVERSITY
Elise Pautler Bennett, Fla. Bar No. 106573
ebennett@biologicaldiversity.org

16

Jason Alexander Totoiu, Fla. Bar No.
871931
jtotoiu@biologicaldiversity.org
Post Office Box 2155
St. Petersburg, FL 33731
Telephone:  (727) 755-6950

*Counsel for Appellee Center for
Biological Diversity*

Case No. 25-12873

## CERTIFICATE OF COMPLIANCE

1.    This document, which is a consolidated response and reply, complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 4,121 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Paul J. Schwiep*
Paul J. Schwiep

Case No. 25-12873

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 27, 2026, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Paul J. Schwiep*
Paul J. Schwiep

19

# EXHIBIT A

Disaster/Emergency/Program/Project Title: GPD Detention Support Program
Sub-Grantee/Sub-Recipient: FL Department of Emergency Management

1

# Record of Environmental Consideration

See FEMA Directive 108-1 and FEMA Instruction 108-1-1.

**Project Name/Number:** FL Detention Center (Alligator Alcatraz)

**Project Location:** 25.865451, -80.898731

**Project Description:**
DSGP will reimburse the recipient at an agreed upon rate/detainee per night for providing the following activities:

- Shelter in a detention setting pursuant to 287(g) requirements
- Basic food and nutrition
- Necessary medical care
- A trained, equipped staff to care for and secure detainees

## National Environmental Policy Act (NEPA) Determination

☐ Statutorily excluded from NEPA review. **(Review Concluded)**
☒ Categorical Exclusion -  **A1, A6**  Type Single Project
   ☒ No Extraordinary Circumstances exist.
      Are project conditions required? ☐ YES (see section V)  ☒ NO  **(Review Concluded)**
   ☐ Extraordinary Circumstances exist (See Section IV).
      ☐ Extraordinary Circumstances mitigated.  (See Section IV comments)
        Are project conditions required? ☐ YES (see section V) ☐ NO  **(Review Concluded)**
      ☐ Environmental Assessment required. See FONSI for determination, conditions and approval.
☐ Environmental Assessment required. See FONSI for determination, conditions and approval.

> *Comments:* **A1** Personnel, fiscal, management, and administrative activities, such as recruiting, processing, paying, recordkeeping, resource management, budgeting, personnel actions, and travel.
> **A6** Procurement of non-hazardous goods and services, and storage, recycling, and disposal of non-hazardous materials and wastes, that complies with applicable requirements and is in support of routine administrative, operational, or maintenance activities. Storage activities must occur on previously disturbed land or in existing facilities.
>
> *Conditions:*

## Reviewer and Approvals

FEMA Environmental Reviewer
Name:  Portia Ross

PORTIA M ROSS   Digitally signed by PORTIA M ROSS
Date: 2025.08.21 15:38:28 -04'00'
Signature/Date_____

FEMA Historic Preservation Reviewer
Name:  Portia Ross

PORTIA M ROSS   Digitally signed by PORTIA M ROSS
Date: 2025.08.21 15:39:00 -04'00'
Signature/Date _____

Record of Environmental Consideration

08/21/25

Exhibit 5

Disaster/Emergency/Program/Project Title: GPD Detention Support Program
Sub-Grantee/Sub-Recipient: FL Department of Emergency Management

**2**

FEMA Environmental Officer Reviewer or delegated approving official
Name: Donna Defrancesco

Signature/Date _Donna DeFrancesco_    8/21/25

# I.    Compliance Review for Environmental Laws (other than NEPA)

## A. National Historic Preservation Act

☒ Not type of activity with potential to affect historic properties. **(Review Concluded)**
☐ Applicable executed Programmatic Agreement. Activity meets Programmatic Allowance (enter date and # in comments). . .
    ☐ Activity meets Programmatic Allowance # _____
        Are project conditions required?  ☐ YES (see section V) ☐ NO **(Review Concluded)**
☐ Applicable executed Programmatic Agreement (enter date in comments) **(Review Concluded)**
☐ Standard Section 106 Review

### HISTORIC BUILDINGS AND STRUCTURES

☐ No properties in the project area are 50 years or older or listed on the National Register **(Review Concluded)**
☐ Building or structure 50 years or older or listed on the National Register in the project area and activity not exempt from review.
    ☐ Determination of No Historic Properties Affected  (FEMA finding/SHPO/THPO concurrence on file)
        Are project conditions required?  ☐ YES (see section V) ☐ NO **(Review Concluded)**
    ☐ Determination of Historic Properties Affected (FEMA finding/SHPO/THPO concurrence on file)
        ☐ Property a National Historic Landmark and National Park Service was provided early notification during the consultation process. If not, explain in comments
        ☐ No Adverse Effect Determination (FEMA finding/SHPO/THPO concurrence on file).
            Are project conditions required?  ☐ YES (see section V) ☐ NO **(Review Concluded)**
        ☐ Adverse Effect Determination (FEMA finding/SHPO/THPO concurrence on file)
            ☐ Resolution of Adverse Effect completed. (MOA on file)
            Are project conditions required ☐ YES (see section V)  ☐ NO  **(Review Concluded)**

### ARCHEOLOGICAL RESOURCES

☐ Project affects only previously disturbed ground. **(Review Concluded)**
☐ Project affects undisturbed ground.
    ☐ Project area has no potential for presence of archeological resources.
        ☐ Determination of no historic properties affected (FEMA finding/SHPO/THPO concurrence or consultation on file). **(Review Concluded)**
    ☐ Project area has potential for presence of archeological resources.
        ☐ Determination of no historic properties affected (FEMA finding/SHPO/THPO concurrence on file).
        Are project conditions required? ☐ YES (see section V) ☐ NO  **(Review Concluded)**
        ☐ Determination of historic properties affected.
            ☐ NR eligible resources not present (FEMA finding/SHPO/THPO concurrence on file).
            Are project conditions required ☐ YES (see section V)  ☐ NO  **(Review Concluded)**
            ☐ NR eligible resources present in project area. (FEMA finding/SHPO/THPO concurrence on file)
                ☐ No Adverse Effect Determination. (FEMA finding/ SHPO/THPO concurrence on file)
                Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**
                ☐ Adverse Effect Determination. (FEMA finding/ SHPO/THPO concurrence on file)
                    ☐ Resolution of Adverse Effect completed. (MOA on file)
                    Are project conditions required? ☐ YES (see section V) ☐ NO
                    **(Review Concluded)**

---

*Comments:* FEMA funding is only for administrative actions and services.

---

2

Record of Environmental Consideration

**Exhibit 5**

Disaster/Emergency/Program/Project Title: GPD Detention Support Program
Sub-Grantee/Sub-Recipient: FL Department of Emergency Management

3

## B. Endangered Species Act

☐ No listed species and/or designated critical habitat present in areas affected directly or indirectly by the federal action. **(Review Concluded)**

☒ Listed species and/or designated critical habitat present in areas affected directly or indirectly by the federal action.
  ☒ No effect to species or designated critical habitat. (See comments for justification) **(Review Concluded)**
  ☐ May affect, but not likely to adversely affect species or designated critical habitat. (FEMA determination/USFWS/NMFS concurrence on file) **(Review Concluded)**
  ☐ Likely to adversely affect species or designated critical habitat.
     ☐ Formal consultation concluded. (Biological Assessment and Biological Opinion on file)
        Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**

| |
|---|
| *Comments:* FEMA funding is only for administrative actions and services. |
| *Correspondence/Consultation/References:* |
| *Conditions:* |

## C. Coastal Barrier Resources Act

☒ Project is not on or connected to a Coastal Barriers Resource System Unit or Otherwise Protected Area. **(Review Concluded)**

☐ Project is on or connected to CBRA Unit or Otherwise Protected Area.
  ☐ Proposed action an exception under Section 3505.a.6? **(Review Concluded)**
  ☐ Proposed action not excepted under Section 3505.a.6.
     Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**

| |
|---|
| *Comments:* |
| *Correspondence/Consultation/References:* |
| *Conditions:* |

## D. Clean Water Act

☒ Project would not affect any water of the U.S. **(Review Concluded)**

☐ Project would affect waters, including wetlands, of the U.S.
  ☐ Project exempted as in kind replacement or other exemption. **(Review Concluded)**
  ☐ Project requires Section 404/401/or Section 9/10 (Rivers and Harbors Act) permit, including qualification under Nationwide Permits.
     Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**

| |
|---|
| *Comments:* FEMA funding is only for administrative actions and services. |
| *Correspondence/Consultation/References:* |
| *Conditions:* |

## E. Coastal Zone Management Act

☒ Project is not located in a coastal zone area and does not affect a coastal zone area. **(Review concluded)**

☐ Project is located in a coastal zone area and/or affects a coastal zone:
  ☐ State administering agency does not require consistency review. **(Review Concluded)**
  ☐ State administering agency requires consistency review.
     Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**

| |
|---|
| *Comments:* |
| *Correspondence/Consultation/References:* |
| *Conditions:* |

## F. Fish and Wildlife Coordination Act

☒ Not applicable for financial assistance. **(Review Concluded)**

| |
|---|
| *Comments:* |
| *Correspondence/Consultation/References:* |
| *Conditions:* |

Record of Environmental Consideration

08/21/25

**Exhibit 5**

Disaster/Emergency/Program/Project Title: GPD Detention Support Program
Sub-Grantee/Sub-Recipient: FL Department of Emergency Management

4

## G. Clean Air Act

☒ Project will not result in permanent air emissions. **(Review Concluded)**
☐ Project is located in an attainment area. **(Review Concluded)**
☐ Project is located in a non-attainment area.
  ☐ Coordination required with applicable state administering agency.
    Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**

*Comments:* FEMA funding is only for administrative actions and services.
*Correspondence/Consultation/References:*
*Conditions:*

## H. Farmlands Protection Policy Act

☒ Project does not affect prime or unique farmland. **(Review Concluded)**
☐ Project causes unnecessary or irreversible conversion of prime or unique farmland.
  ☐ Coordination with Natural Resource Conservation Commission required.
    ☐ Farmland Conversion Impact Rating, Form AD-1006, completed.
      Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**

*Comments:*
*Correspondence/Consultation/References:*
*Conditions:*

## I. Migratory Bird Treaty Act

☐ Project not located within a flyway zone. **(Review Concluded)**
☒ Project located within a flyway zone.
  ☒ Project does not have potential to take migratory birds. **(Review Concluded)**
  ☐ Project has potential to take migratory birds.
    ☐ Contact made with USFWS
      Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**

*Comments:* FEMA funding is only for administrative actions and services.
*Correspondence/Consultation/References:*
*Conditions:*

## J. Magnuson-Stevens Fishery Conservation and Management Act

☒ Project not located in or near Essential Fish Habitat. **(Review Concluded)**
☐ Project located in or near Essential Fish Habitat.
  ☐ Project does not adversely affect Essential Fish Habitat. **(Review Concluded)**
  ☐ Project adversely affects Essential Fish Habitat. (FEMA determination/USFWS/NMFS concurrence on file)
    ☐ NOAA Fisheries provided no recommendation(s). **(Review Concluded).**
    ☐ NOAA Fisheries provided recommendation(s).
      ☐ Written reply to NOAA Fisheries recommendations completed.
        Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**

*Comments:*
*Correspondence/Consultation/References:*
*Conditions:*

## K. Wild and Scenic Rivers Act

☒ Project is not along and does not affect Wild and Scenic River. - **(Review Concluded)**
☐ Project is along or affects Wild and Scenic River.
  ☐ Project adversely affects WSR as determined by NPS/USFS. **FEMA cannot fund the action.**
    (NPS/USFS/USFWS/BLM consultation attached.)
  ☐ Project does not adversely affect WSR. (NPS/USFS/USFWS/BLM consultation attached.)
    Are project conditions required? ☐ YES (see section V) ☐ NO **(Review Concluded)**

*Comments:*

Record of Environmental Consideration                                    08/21/25

Exhibit 5

Disaster/Emergency/Program/Project Title: GPD Detention Support Program
Sub-Grantee/Sub-Recipient: FL Department of Emergency Management

5

> Correspondence/Consultation/References:
> Conditions:

## L. Other Relevant Laws and Environmental Regulations

> Identify relevant law or regulations, resolution and any consultation/references such as EO 13112 Invasive Species, RCRA or State Soil & Water Conservation Laws and include any conditions by law/EO N/A

# II. Compliance Review for Executive Orders

## A. E.O. 11988 - Floodplains

☐ Outside Floodplain and No Effect on Floodplains/Flood levels. **(Review Concluded)**
☒ Located in Floodplain or Effects on Floodplains/Flood levels.
    ☒ No adverse effect on floodplain ad not adversely affected by the floodplain. **(Review Concluded)**
    ☐ Beneficial Effect on Floodplain Occupancy/Values. **(Review Concluded)**
    ☐ Possible adverse effects associated with investment in floodplain, occupancy or modification of floodplain environment.
        ☐ 8 Step Process Complete - documentation attached. **(Review Concluded)**

> Comments: FEMA funding is only for administrative actions and services.
> Correspondence/Consultation/References:
> Conditions:

## B. E.O. 11990 - Wetlands

☒ No Effects on Wetlands and Project Outside Wetlands. **(Review Concluded)**
☐ Located in Wetlands or effects on Wetlands.
    ☐ Beneficial Effect on Wetland. **(Review Concluded)**
    ☐ Possible adverse effect associated with constructing in or near wetland.
        ☐ Review completed as part of floodplain review.
        ☐ 8 Step Process Complete – documentation attached. **(Review Concluded)**

> Comments: FEMA funding is only for administrative actions and services.
> Correspondence/Consultation/References:
> Conditions:

# III. Other Environmental Issues

**Identify other potential environmental concerns in the comment box not clearly falling under a law or executive order (see environmental concerns scoping checklist for guidance).**

> Comments: N/A
> Correspondence/Consultation/References:
> Conditions:

# IV. Extraordinary Circumstances

**Based on the review of compliance with other environmental laws and Executive Orders, and in consideration of other environmental factors, review the project for extraordinary circumstances.**

Record of Environmental Consideration

08/21/25

Exhibit 5

Disaster/Emergency/Program/Project Title: GPD Detention Support Program
Sub-Grantee/Sub-Recipient: FL Department of Emergency Management

6

\* A "Yes" under any circumstance may require an Environmental Assessment (EA) with the exception of (ii) which should be applied in conjunction with controversy on an environmental issue. If the circumstance can be mitigated, please explain in comments. If no, leave blank.

**Yes**

- ☐ (i) A potentially significant effect on public health or safety;
- ☐ (ii) A potentially significant effect on species or habitats protected by the ESA, Marine Mammal Protection Act, Migratory Bird Treaty Act, Magnuson-Stevens Fishery Conservation and Management Act, or other law protecting a species or habitat;
- ☐ (iii) A potentially significant effect on historic properties (e.g., districts, sites, buildings, structures, or objects) that are listed in or eligible for listing in the National Register of Historic Places, affects traditional cultural properties or sacred sites, or leads to the loss or destruction of a significant scientific, cultural, or historical resource;
- ☐ (iv) A potentially significant effect on an environmentally sensitive area;
- ☐ (v) A potential or threatened violation of a Federal, State, or local law or requirement imposed to protect the environment. Some examples of other requirements to consider are: a local noise control ordinance; the requirement to conform to an applicable State Implementation Plan for air quality standards; Federal, Tribal, State, or local requirements to control hazardous or toxic substances; and environmental permits;
- ☐ (vi) An effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks. This also includes effects that may result from the use of new technology or unproven technology. Controversy over, including public opposition to, a proposed action absent any demonstrable potential for significant environmental impacts does not itself constitute an extraordinary circumstance;
- ☐ (vii) Extent to which a precedent is established for future actions with significant effects;
- ☐ (viii) Significantly greater scope or size than normally experienced for this particular category of action;
- ☐ (ix) Potential for significant degradation of already existing poor environmental conditions. Also, initiation of a potentially significant environmental degrading influence, activity, or effect in areas not already significantly modified from their natural condition;
- ☐ (x) Whether the action is related to other actions with individually insignificant, but cumulatively significant impacts.

| Comments: Project does not trigger any Extraordinary Circumstances |
| --- |

Record of Environmental Consideration                                                08/21/25

Exhibit 5

Disaster/Emergency/Program/Project Title: GPD Detention Support Program
Sub-Grantee/Sub-Recipient: FL Department of Emergency Management

7

## V. Environmental Review Project Conditions

General comments: N/A

Project Special Conditions: N/A

Standard Conditions:
1. Any change to the approved scope of work will require re-evaluation for compliance with NEPA and other Laws and Executive Orders.
2. This review does not address all federal, state and local requirements. Acceptance of federal funding requires recipient to comply with all federal, state and local laws. Failure to obtain all appropriate federal, state and local environmental permits and clearances may jeopardize federal funding.
3. If ground disturbing activities occur during construction, applicant will monitor ground disturbance and if any potential archeological resources are discovered, will immediately cease construction in that area and notify the State and FEMA.

Monitoring Requirements: None

Record of Environmental Consideration                                08/21/25

Exhibit 5

# Fiscal Year 2025 Detention Support Grant Program

8

## Grant ID: EMW-2025-DS-05000

Period of performance: **06/01/2025** to **07/31/2027**          Federal resources awarded: **$608,400,000.00**

## Amendment request 4

| Amendment request narrative | The Florida Division of Emergency Management (FDEM) is requesting to remove the Environmental Planning and Historic Preservation (EHP) Compliance terms and conditions. FDEM is requesting the removal of the EHP terms and conditions as the detention center utilized is not a permanent structure, as such funding should not be restricted to the limitations of the EHP review and compliance. This is further noted in the Record of Environmental Consideration with no extraordinary circumstances being noted in the reviews, and no monitoring requirements needing to be maintained. All costs associated with the reimbursement of the detention center are for detainee costs, and temporary facility costs as deemed eligible by FEMA. |
|---|---|

### Attachments

| Filename | Date uploaded | Uploaded by | Label | Description | Action |
|---|---|---|---|---|---|
| REC 2025-DS-05000.pdf | 12/03/2025 | brittany.adams@em.myflorida.com | Amendment request documentation | *No description given.* | |

<span style="color:red">Exhibit 5</span>

**EXHIBIT B**

Chanda D. Jenkins, FCCM
Deputy Bureau Chief of Preparedness
Bureau of Preparedness
Florida Division of Emergency Management
Office: (850) 815-4342
Mobile: (850) 528-4847
[www.FloridaDisaster.org](www.FloridaDisaster.org)



---

**From:** FEMA-DSGP <[fema-dsgp@fema.dhs.gov](mailto:fema-dsgp@fema.dhs.gov)>
**Sent:** Thursday, July 31, 2025 12:52 PM
**To:** Chanda Jenkins <[Chanda.Jenkins@em.myflorida.com](mailto:Chanda.Jenkins@em.myflorida.com)>
**Cc:** FEMA-DSGP <[fema-dsgp@fema.dhs.gov](mailto:fema-dsgp@fema.dhs.gov)>; Felicia Pinnock <[Felicia.Pinnock@em.myflorida.com](mailto:Felicia.Pinnock@em.myflorida.com)>
**Subject:** FY 2025 Detention Support Grant Program – Notice of Award Allocation

> Some people who received this message don't often get email from [fema-dsgp@fema.dhs.gov](mailto:fema-dsgp@fema.dhs.gov). [Learn why this is important](#)

> **CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Greetings,

The Department of Homeland Security announced today the Fiscal Year (FY) 2025 Detention Support Grant Program (DSGP). FY 2025 DSGP makes $608.4 million available in federal funds to the Florida Division of Emergency Management (FDEM) to shelter detainees in a detention environment until they are transferred to United States Immigrations and Customs Enforcement (ICE).

The FY 2025 DSGP application period opens on July 31, 2025, at 4 PM ET. The application period will close on August 30, 2025, at 5 PM ET. The FDEM must submit its application through [FEMA's Grants Outcomes](#) (FEMA GO) system by the application deadline.

The FDEM may make subawards to subrecipients under the FY 2025 DSGP. For specific information regarding FY 2025 DSGP programmatic guidelines, please see FDEM's award package in [FEMA GO](#). For technical assistance or questions related to DSGP, please contact [FEMA-DSGP@fema.dhs.gov](mailto:FEMA-DSGP@fema.dhs.gov).

Thank you,

Detention Support Grant Program
Detention Support Grant Program Branch | National Programs Division | Office of Grants
Administration | Resilience
FEMA-DSGP@fema.dhs.gov

Federal Emergency Management Agency
fema.gov



Under Florida law, correspondence with the Florida Division of Emergency Management
concerning agency business that is neither confidential nor exempt pursuant to Florida Statutes is
a public record and will be made available to the public upon request.

**EXHIBIT C**

U.S. Department of Homeland Security
Washington, DC  20472



# The Department of Homeland Security

# Fiscal Year 2025 Detention Support Grant Program Guidance

**Assistance Listing Number**: 97.158

# Contents

Program Summary ................................................................................................................ 4
A.   Summary Description of Program ............................................................................... 4
B.   Budget ......................................................................................................................... 5
C.   FY 2025 Detention Support Grant Program Specific Terms and Conditions ............ 5
Appendix A: Required Services and Other Allowable Activities ................................... 6
A. Required Detention and Related Services ..................................................................... 6
B.   Allowable Costs .......................................................................................................... 7
C.   Addition of Required Services .................................................................................... 7
Appendix B – FY 2025 Detention Support Grant Program (DSGP) Guidance ............ 8
A.   Performance Measures and Targets ............................................................................ 8
B.   Program-Specific Unallowable Costs ........................................................................ 8
C.   General Funding Requirements ................................................................................... 9
D.   Pre-Award Costs ......................................................................................................... 9
E.   Beneficiaries and Participants .................................................................................... 10
F.   Budget Period ............................................................................................................. 10
G.   Prohibition on Covered Equipment or Services ......................................................... 10
H.   Required Documentation ............................................................................................ 10
I.   Program-Specific Required Documents and Information ............................................ 10
Agreement Articles ........................................................................................................... 11
A.   Agency Contact .......................................................................................................... 11
B.   Requirement Description and State Single Point of Contact ...................................... 11
C.   Financial Integrity Criteria ......................................................................................... 12
D.   Supplemental Financial Integrity Criteria and Review .............................................. 12
E.   Notice of Award .......................................................................................................... 12
F.   Pass-Through Requirements ........................................................................................ 13
G.   Note Regarding Pre-Award Costs ............................................................................... 13
H.   Obligation of Funds .................................................................................................... 13
I.   Notification to Unsuccessful Applicants ..................................................................... 13
J.   Administrative and National Policy Requirements ...................................................... 13
K.   DHS Standard Terms and Conditions ......................................................................... 13
L.   Immigration Conditions .............................................................................................. 14
M.   Financial Reporting Requirements ............................................................................. 14
N.   Programmatic Performance Reporting Requirements ................................................. 14
O.   Closeout Reporting Requirements .............................................................................. 15
P.   Disclosing Information per 2 C.F.R. § 180.335 .......................................................... 16
Q.   Reporting of Matters Related to Recipient Integrity and Performance ...................... 16
R.   Single Audit Report .................................................................................................... 17
S.   Monitoring and Oversight ........................................................................................... 17
T.   Program Evaluation ..................................................................................................... 17
U.   Termination ................................................................................................................. 18
V.   Best Practices .............................................................................................................. 20
W.   Payment Information ................................................................................................... 20
X.   Period of Performance Extension ............................................................................... 22
Y.   Other Information ........................................................................................................ 23

**Program Summary**

**A.  Summary Description of Program**

The Detention Support Grant Program (DSGP) will provide financial assistance through a grant to a non-federal entity to support detaining illegal aliens in a detention environment and related activities until transfer to U.S. Immigration and Customs Enforcement (ICE), in support of relieving overcrowding in short-term holding facilities of the U.S. Customs and Border Protection (CBP). This will further the Department's immigration enforcement plans and complement ICE's operational priorities. The recipient will be authorized to use funding for the required services and other allowable activities identified in Appendix A.

**Goals and Objectives**

The program goal is to support detention activities carried out by non-federal entities pursuant to an Immigration and Nationality Act Section 287(g) agreement and increase the detention capacity of States and local governments.

The objectives are:
1. Relieve the overcrowding in short-term holding facilities of CBP.
2. Increase the number of detained illegal aliens.
3. Decrease the expense and burden borne by non-federal entities in detaining illegal aliens.

**Program Rationale**

DSGP supports Executive Order "Securing Our Borders," issued on January 20, 2025, which provides the policy framework for redirecting resources toward immigration enforcement priorities, under which DSGP was announced in July 2025. State and local law enforcement agencies are essential partners in safeguarding national security and public safety. Pursuant to Executive Order "Protecting the American People Against Invasion," it is the policy of the United States to enforce immigration laws against all inadmissible and removable aliens—particularly those who threaten the safety or security of the American people. This includes the efficient execution of these laws through lawful incentives and enhanced detention capabilities.

In alignment with the Executive Orders referenced above, along with a related proclamation "Declaring a National Emergency at the Southern Border" issued on January 20, 2025, DSGP supports border security measures such as detention facilities.

At the direction of the Department of Homeland Security, FEMA and ICE redesigned the Shelter and Services Program (SSP) into DSGP to provide federal financial assistance through grants to shelter illegal aliens in a detention environment until transfer to ICE in support of relieving overcrowding in CBP short-term holding facilities. This will also further the Department's immigration enforcement plans and complement ICE operational priorities.

**A.  Period of Performance**

The period of performance for a grant award is June 1, 2025, through July 31, 2027.

**B.   Budget**
The budget for the federal award is as follows:

- Required Detention and Related Services – The entire budget of $608,400,000 million should be allocated to provide the required detention and related services at the burdened rate detailed in Appendix A.

- Additional Allowable Costs – Additional costs are only allowed in extraordinary circumstances and under the conditions detailed in Appendix A.

**C.  FY 2025 Detention Support Grant Program Specific Terms and Conditions**

The federal award will be subject to the terms and conditions outlined in Appendix B - FY 2025 Detention Support Grant Program Guidance, which is incorporated herein by reference. These terms provide detailed requirements and guidance applicable to this specific grant program.

**Appendix A: Required Services and Other Allowable Activities**

**A. Required Detention and Related Services**

All detention operations requiring federal immigration law enforcement authority must be carried out by a non-federal entity pursuant to an Immigration and Nationality Act Section 287(g) agreement with the U.S. Immigration and Customs Enforcement ("ICE"). Such detention operations may be conducted by state agencies other than the recipient conducting work under the award and subrecipients under subawards. The recipient will provide the following services in a manner consistent with a 287(g) agreement:

1. Secure Housing. Provide secure housing for detainees in a facility owned or operated by the recipient ("Facility").

2. Clothing and Bedding. Provide clean clothing, bedding, and personal hygiene items to detainees.

3. Feeding Services. Provide three balanced meals per day for detainees.

4. Medical Care. Provide necessary medical, mental health, and dental care to detainees, including access to examinations, treatments, and medications.

5. Safety and Security. Maintain a secure and orderly environment for both detainees and staff, to include the following:

    i. Monitoring and securing the facility 24/7;

    ii. Managing and monitoring access points;

    iii. Developing and implementing an incident response plan; and

    iv. Conducting routine patrols

6. Visitation. Allow detainees to receive visits at the Facility.

7. Access to Legal Services. Ensure detainees have access to legal services at the Facility, including communicating with and receiving visits from legal representatives.

8. Communications. Provide detainees with access to communication methods, such as telephones and mail services.

9. Transportation. Securely transport detainees as required, including transporting detainees to and from the recipient's facility to a DHS detention facility, hearings, points of departure from the United States, and other locations.

10. Recordkeeping. Maintain accurate records concerning the performance of work under the federal award, including the following:

        i. Detailed records of all detainees, including personal information and dates of detention.

       ii. Detailed records about significant incidents involving detainees, such as use of force and medical emergencies.

## B. Allowable Costs

1. Burdened Rate

        i. The recipient may charge to the federal award the agreed upon burdened rate of <mark>$XXX</mark> per detainee per day.

       ii. The "burdened rate" includes all direct and indirect costs associated with the provision of all services in paragraph A. This includes, but is not limited to, labor costs, overhead, administrative expenses, materials, supplies, contractual services, and any other costs necessary to carry out the required services.

      iii. FEMA, in its sole discretion, may adjust the burdened rate upon request of the recipient. Such changes will be considered as within the scope of the federal award.

2. Additional Costs

        i. The recipient, in extraordinary circumstances, may submit a written request for approval of additional categories of allowable costs to FEMA in addition to the burdened rate above that details the nature and amount of the costs and the justification for paying such costs in addition to the burdened rate. This could include, for example, extraordinary transportation costs or extraordinary training costs. Such changes will be considered as within the scope of the federal award.

       ii. The amount of the federal award will not increase if FEMA adds additional categories of allowable costs.

## C. Addition of Required Services

1. Future Service Requirements. FEMA may add additional required services beyond those detailed in paragraph A as necessary to address evolving needs and circumstances. Such changes will be considered as within the scope of the federal award.

2. Increasing Burdened Rate. FEMA, in adding future service requirements, will negotiate with the recipient to determine whether an adjustment to the burdened rate is appropriate.

3. Federal Funding. The amount of the federal award will not increase if FEMA adds required services. The federal funding for DSGP is specially allocated for the performance and budget period from June 1, 2025, through July 31, 2027.

**Appendix B – FY 2025 DSGP Guidance**

**A.  Performance Measures and Targets**

The recipient is required to collect data to allow  FEMA to measure performance of the federal award. To measure performance, FEMA may request information throughout the period of performance. In its final performance report submitted at closeout, the recipient must submit sufficient information to demonstrate it has met the performance goals as stated in its federal award. FEMA will measure the recipient's performance by using the following programmatic metrics.

1. Number of detainees sheltered

2. Number of detainees transported

3. Number of detainees provided acute medical care

4. Number of meals provided to detainees

5. Number of officials attending approved training necessary for staff to perform detention operations and related activities

6. Number of additional beds available for operational needs

7. Number of employees/contractors carrying out detention operations

FEMA will calculate and analyze the above metrics through a review of performance progress reports and award monitoring to ensure that the funds are expended for their intended purpose and achieve the stated outcomes in the grant application.

**B.  Program-Specific Unallowable Costs**

This applies to the recipient and subrecipients. Grant funds may NOT be used for the following purposes:

- Facilities

  - Shelter and/or space at facilities with existing ICE Intergovernmental Support Agreements (IGSA) are not an allowable cost.

  - Costs for constructing new, permanent buildings, or modifications/renovations to existing facilities are not allowable.

- Transportation

  - The chartering of aircraft, watercraft, or another vehicle not specifically stated in this guidance document is not allowable.

  - International transportation of the detainee is not allowable. Only transportation within the contiguous United States (lower 48 states and Washington, D.C.) is allowable.

- o Transportation of a detainee from one DHS detention facility to another DHS detention facility's location is not allowable.

- o The use of DSGP funds to support foreign travel expenses for applicant personnel is not allowable..

- o Travel and relocation expenses for labor (personal services) costs are not allowable.

- Other

  - o The recipient and subrecipients may not use grant funds for the following activities:

    - Profit/Fee for the recipient and subrecipients.

    - Funding for direct reimbursement of proposal development.

    - Incentive or gift cards.

    - Costs of organized fundraising to raise capital or obtain contributions.

    - Insurance.

    - Contingency Operations.

## C.  General Funding Requirements

Costs charged to federal awards (including federal and non-federal cost share funds) must comply with applicable statutes, rules and regulations, policies, Award Summary, and the terms and conditions of the federal award. This includes, among other requirements, that costs must be incurred, and products and services must be delivered within the budget period. 2 C.F.R. § 200.403(h).

The recipient and subrecipients may not use federal funds for the following activities:

1. Matching or cost sharing requirements for other federal grants and cooperative agreements (see 2 C.F.R. § 200.306).

2. Lobbying or other prohibited activities under 18 U.S.C § 1913 or 2 C.F.R. § 200.450.

3. Prosecuting claims against the federal government or any other government entity (see 2 C.F.R. § 200.435).

There is no cost share requirement for this award.

## D.  Pre-Award Costs

Pre-award costs are costs incurred before the effective date of the federal award. Pre-award costs are allowable if the applicant includes them in the grant application, FEMA approves them when making the grant award, and the pre-award costs comply with the terms and conditions of the federal award. When requesting pre-award costs in the grant application, the applicant must identify the total amount of pre-award costs requested, explain what the pre-award costs are for, and provide a detailed budget break-out of the pre-award costs.

**E.  Beneficiaries and Participants**

This federal award creates no rights or causes of action for any beneficiary or participant.

**F.  Budget Period**

There will be a single budget period which matches the same start and end dates as the period of performance.

**G.  Prohibition on Covered Equipment or Services**

The recipient, subrecipients, and their contractors or subcontractors must comply with the prohibitions set forth in Section 889 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019, which restrict the purchase of covered telecommunications and surveillance equipment and services. Please see 2 C.F.R. §§ 200.216, 200.327, 200.471, and Appendix II to 2 C.F.R. Part 200, and FEMA Policy #405-143-1 - Prohibitions on Expending FEMA Award Funds for Covered Telecommunications Equipment or Services for more information.

**H.  Required Documentation**

The following forms or information are required to be submitted via FEMA GO. The Standard Forms (SF) are also available at Forms | Grants.gov

- SF-424, Application for Federal Assistance
- Grants.gov Lobbying Form, Certification Regarding Lobbying
- SF-424A, Budget Information (Non-Construction)
- SF-424B, Standard Assurances (Non-Construction)
- SF-LLL, Disclosure of Lobbying Activities

**I.  Program-Specific Required Documents and Information**

Not applicable.

## Agreement Articles

**Assistance Listing Number**: 97.158 – Detention Support Grant Program

### A.   Agency Contact

**DSGP Program Office Contact**
FEMA is the programmatic lead for the DSGP. For questions related to project design and other required elements of the program, please contact the DSGP Program Branch at FEMA-DSGP@fema.dhs.gov. Normal hours of operation are Monday through Friday, 9:00AM - 4:30 PM ET.

Guidance documents such as Fact Sheets, and Frequently Asked Questions (FAQs) will also be provided to further explain DSGP.

**FEMA Grants News**
This channel provides general information on all FEMA grant programs and maintains a comprehensive database containing key personnel contact information at the federal, state, and local levels. FEMA Grants News Team is reachable at fema-grants-news@fema.dhs.gov OR (800) 368-6498, Monday through Friday, 9:00 AM – 5:00 PM ET.

**Grant Programs Directorate (GPD) Award Administration Division**
GPD's Award Administration Division (AAD) provides support regarding financial matters and budgetary technical assistance.  AAD can be contacted at ASK-GMD@fema.dhs.gov.

**Civil Rights**
Consistent with Executive Order 14173, Ending Illegal Discrimination & Restoring Merit-Based Opportunity, the FEMA Office of Civil Rights is responsible for ensuring compliance with and enforcement of federal civil rights obligations in connection with programs and services conducted by FEMA. They are reachable at FEMA-CivilRightsOffice@fema.dhs.gov.

**Environmental Planning and Historic Preservation**
The FEMA Office of Environmental Planning and Historic Preservation (OEHP) provides guidance and information about the EHP review process to FEMA programs and recipients and subrecipients. Send any inquiries regarding compliance for FEMA grant projects under the Award Summary to FEMA-OEHP-NOFOQuestions@fema.dhs.gov.

**Payment Information**
FEMA uses the Direct Deposit/Electronic Funds Transfer (DD/EFT) method of payment to recipients. Payment requests are submitted through FEMA GO.

**FEMA GO**
For technical assistance with the FEMA GO system, please contact the FEMA GO Helpdesk at.femago@fema.dhs.gov or (877) 585-3242, Monday through Friday, 9:00 AM – 6:00 PM ET.

### B.   Requirement Description and State Single Point of Contact

An intergovernmental review may be required. Applicants must contact their state's Single Point of Contact (SPOC) to comply with the state's process under Executive Order 12372.

(See https://www.archives.gov/federal-register/codification/executive-order/12372.html)

## C.    Financial Integrity Criteria

Before making an award, FEMA is required to review OMB-designated databases for applicants' eligibility and financial integrity information. This is required by the Payment Integrity Information Act of 2019 (Pub. L. No. 116-117, § 2 (2020)), 41 U.S.C. § 2313, and the "Do Not Pay Initiative" (31 U.S.C. 3354). For more details, please see 2 C.F.R. § 200.206.

Thus, the Financial Integrity Criteria may include the following risk-based considerations of the applicant:

1. Financial stability.
2. Quality of management systems and ability to meet management standards.
3. History of performance in managing federal awards.
4. Reports and findings from audits.
5. Ability to effectively implement statutory, regulatory, or other requirements.

## D.    Supplemental Financial Integrity Criteria and Review

Before making an award expected to exceed the simplified acquisition threshold (currently a total federal share of $250,000) over the period of performance:
1. FEMA is required by 41 U.S.C. § 2313: to review or consider certain information found in SAM.gov. For details, please see 2 C.F.R. § 200.206(a)(2).
2. An applicant may review and comment on any information in the responsibility/qualification records available in SAM.gov.
3. Before making decisions in the risk review required by 2 C.F.R. § 200.206, FEMA will consider any comments by the applicant.

## E.    Notice of Award

The Authorized Organization Representative (AOR) should carefully read the federal award package before accepting the federal award. The federal award package includes instructions on administering the federal award as well as terms and conditions for the award.

By submitting an application, applicants agree to comply with the prerequisites stated in this document and the material terms and conditions of the federal award, should they receive an award.

FEMA will provide the federal award package to the applicant electronically via FEMA GO. Award packages include an Award Letter, Award Summary, Agreement Articles, Appendix A – Required Services and Other Allowable Activities, Appendix B – FY 2025 Detention Support

Grant Program Guidance and Obligating Document. An award package notification email is sent via FEMA GO to the submitting AOR.

The Recipient must accept its award no later than 15 days from the award date. The recipient shall notify FEMA of their intent to accept the award and proceed with work via the FEMA GO system.

Funds will remain on hold until the recipient accepts the award via FEMA GO and all other conditions of the award have been satisfied, or until the award is otherwise rescinded. Failure to accept a grant award within the specified timeframe may result in a loss of funds.

**F.   Pass-Through Requirements**

FEMA encourages the recipient to pass through funds to eligible subrecipients.

**G.   Note Regarding Pre-Award Costs**

Even if pre-award costs are allowed, beginning performance is at the applicant and/or sub-applicant's own risk.

**H.   Obligation of Funds**

Grant funds are obligated upon the offer of grant award in the FEMA GO system. The recipient must accept its award no later than 15 days from the award date. Acceptance of the award is confirmation of the obligation. The recipient shall notify FEMA of its intent to accept and proceed with work under the award through the FEMA GO system. Funds will remain on hold until the recipient accepts the award through the FEMA GO system and all other conditions of the award have been satisfied or until the award is otherwise rescinded. Failure to accept a grant award within the specified timeframe may result in a loss of funds. The recipient may request additional time to accept the award if needed.

**I.   Notification to Unsuccessful Applicants**

FEMA and FEMA GO will provide a turndown notification to all applicants who do not receive a FY 2025 DSGP award after September 30, 2025.

**J.   Administrative and National Policy Requirements**

Subrecipient Monitoring and Management

Pass-through entities must comply with the requirements for subrecipient monitoring and management as set forth in 2 C.F.R. §§ 200.331-333.

**K.   DHS Standard Terms and Conditions**

A recipient must comply with the FY 2025 DHS Standard Terms and Conditions, v.3. The DHS Standard Terms and Conditions, v. 3 are available DHS Standard Terms and Conditions |

Homeland Security. For continuation awards, the terms and conditions for the initial federal award will apply unless otherwise specified in the terms and conditions of the continuation award. The specific version of the DHS Standard Terms and Conditions applicable to the federal award will be in the federal award package.

**L.    Immigration Conditions**
1.Materiality of Pending Immigration Condition

An immigration term and condition, including those in the DHS Standard Terms and Conditions, may be material to the Department of Homeland Security's decision to make this grant award, and the Department of Homeland Security may take any remedy for noncompliance, including termination, if the state or territorial recipient or any local government subrecipient fails to comply with this term and condition. No final agency determination has been made as of the date of this publication.

**M.    Financial Reporting Requirements**

1. Recipients must report obligations and expenditures through a federal financial report. The Federal Financial Report (FFR) form, also known as Standard Form 425 (SF-425), is available online at: SF-425 OMB #4040-0014.
2. Recipients must submit the FFR quarterly throughout the period of performance (POP) as detailed below; including partial calendar quarters, as well as in periods where no grant award activity occurs.
3. The FFR must be submitted through FEMA GO.
4. The final FFR is due within 120 calendar days after the end of the POP.

| Reporting Period | Report Due Date |
|---|---|
| October 1 – December 31 | January 30 |
| January 1- March 31 | April 30 |
| April 1- June 30 | July 30 |
| July 1-September 30 | October 30 |

FEMA may withhold future federal awards and cash payments if the recipient does not submit timely financial reports, or the financial reports submitted demonstrate lack of progress or provide insufficient detail.

**N.    Programmatic Performance Reporting Requirements**

1. A Performance Report must be submitted quarterly throughout the POP as detailed below, including partial calendar quarters, as well as in periods where no grant award activity occurs, through FEMA GO.
2. A Performance Report must include:

a. Number of detainees sheltered

b. Number of detainees transported

c. Number of detainees provided acute medical care

d. Number of meals provided to detainees

e. Number of officials attending approved training necessary for staff to perform detention operations and related activities

f. Number of additional beds available for operational needs

g. Number of employees/contractors carrying out detention operations

3. Quantitative data for all applicable DSGP performance measures.
4. The Performance Report must be submitted through FEMA GO.
5. The final Performance Report is due within 120 calendar days after the end of the POP.

The following reporting periods and due dates apply for the PPR:

| Reporting Period | Report Due Date |
|---|---|
| October 1 – December 31 | January 30 |
| January 1- March 31 | April 30 |
| April 1- June 30 | July 30 |
| July 1-September 30 | October 30 |

FEMA may withhold future federal awards and payments if the recipient does not submit timely progress reports, or the progress reports submitted demonstrate lack of progress or provide insufficient detail.

## O.  Closeout Reporting Requirements

Within 120 days after the end of the period of performance, or after an amendment has been issued to close out a federal award, the recipient must submit the following:
1. The final request for payment, if applicable.
2. The final FFR (SF-425).
3. The final progress report detailing all accomplishments.
4. A qualitative narrative summary of the impact of those accomplishments throughout the period of performance.
5. Other documents required by the Award package, terms and conditions of the federal award, or other FEMA Component guidance.

After FEMA approves these reports, it will issue a closeout notice. The notice will indicate the period of performance as closed, list any remaining funds to be de-obligated, and address the record maintenance requirement. Unless a longer period applies, such as due to an audit or litigation, for equipment or real property used beyond the period of performance, or due to other

circumstances outlined in 2 C.F.R. § 200.334, this maintenance requirement is three years from the date of the final FFR.

Also, pass-through entities are responsible for closing out those subawards as described in 2 C.F.R. § 200.344; subrecipients are still required to submit closeout materials within 90 calendar days of the subaward period of performance end date. When a subrecipient completes all closeout requirements, pass-through entities must promptly complete all closeout actions in time for the recipient to submit all necessary documentation and information to FEMA during the closeout of their prime award. The recipient is responsible for returning any balances of unobligated or unliquidated funds that have been drawn down that are not authorized to be retained per 2 C.F.R. § 200.344(e).

Administrative Closeout

Administrative closeout is a mechanism for FEMA to unilaterally execute closeout of an award. FEMA will use available award information in lieu of final recipient reports, per 2 C.F.R. § 200.344(h)-(i). It is an activity of last resort, and if FEMA administratively closes an award, this may negatively impact a recipient's ability to obtain future funding.

## P.   Disclosing Information per 2 C.F.R. § 180.335

Before entering into a federal award, the applicant must notify FEMA if it knows that the applicant or any of the principals (as defined at 2 C.F.R. § 180.995) for the federal award:
1. Are presently excluded or disqualified;
2. Have been convicted within the preceding three years of any of the offenses listed in § 180.800(a) or had a civil judgment rendered against you for one of those offenses within that time period;
3. Are presently indicted for or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with the commission of any of the offenses listed in § 180.800(a); or
4. Have had one or more public transactions (Federal, State, or local) terminated within the preceding three years for cause or default.

This requirement is fully described in 2 C.F.R. §180.335.

Additionally, 2 C.F.R. § 180.350 requires recipients to provide immediate notice to FEMA at any time after entering a federal award if:

1. The recipient learns that either it failed to earlier disclose information as required by 2 C.F.R. § 180.335;
2. Due to changed circumstances, the applicant or any of the principals for the federal award now meet the criteria at 2 C.F.R. § 180.335 listed above.

## Q.    Reporting of Matters Related to Recipient Integrity and Performance

Appendix XII to 2 C.F.R. Part 200 states the terms and conditions for recipient integrity and performance matters used for this funding opportunity.

If the total value of all active federal grants, cooperative agreements, and procurement contracts for a recipient exceeds $10,000,000 at any time during the period of performance:

1.  The recipient must maintain the currency of information reported in SAM.gov about civil, criminal, or administrative proceedings described in paragraph 2 of Appendix XII;
2.  The required reporting frequency is described in paragraph 4 of Appendix XII.

## R.   Single Audit Report

A recipient expending $1,000,000 or more in federal awards (as defined by 2 C.F.R. § 200.1) during its fiscal year must undergo an audit. This may be either a single audit complying with 2 C.F.R. § 200.514 or a program-specific audit complying with 2 C.F.R. §§ 200.501 and 200.507. Audits must follow 2 C.F.R. Part 200, Subpart F, 2, C.F.R. § 200.501, and the U.S. Government Accountability Office (GAO) Generally Accepted Government Auditing Standards.

## S.   Monitoring and Oversight

Per 2 C.F.R. § 200.337, FEMA and its authorized representatives have the right of access to any records of the recipient or subrecipient pertinent to a federal award to perform audits, site visits, and any other official use. The right also includes timely and reasonable access to the recipient's or subrecipient's personnel for the purpose of interview and discussion related to such documents or the federal award in general.

Pursuant to this right and per 2 C.F.R. § 200.329, FEMA may conduct desk reviews and make site visits to review and evaluate project accomplishments and management control systems as well as provide any required technical assistance. Recipients and subrecipients must respond in a timely and accurate manner to FEMA requests for information relating to a federal award.

## T.   Program Evaluation

Title I of the Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435 (2019) (Evidence Act), urges federal agencies to use program evaluation as a critical tool to learn, improve delivery, and elevate program service and delivery across the program lifecycle. Evaluation means "an assessment using systematic data collection and analysis of one or more programs, policies, and organizations intended to assess their effectiveness and efficiency." Evidence Act, § 101 (codified at 5 U.S.C. § 311). OMB A-11, Section 290 (Evaluation and Evidence-Building Activities) further outlines the standards and practices for evaluation activities. Federal agencies are required to specify any requirements for recipient participation in program evaluation activities (2 C.F.R. § 200.301). Program evaluation activities incorporated from the outset in the Award package and program design and implementation allow recipients and agencies to meaningfully document and measure progress and achievement towards program goals and objectives, and identify program outcomes and lessons learned, as part of demonstrating recipient performance (2 C.F.R. § 200.301).

As such, recipients and subrecipients are required to participate in a Program Office (PO) or a DHS Component-led evaluation, if selected. This may be carried out by a third-party on behalf of the PO or the DHS Component. Such an evaluation may involve information collections including but not limited to, records of the recipients; surveys, interviews, or discussions with individuals who benefit from the federal award, program operating personnel, and award recipients; and site visits or other observation of recipient activities, as specified in a DHS Component or PO-approved evaluation plan. More details about evaluation requirements may be provided in the federal award, if available at that time, or following the award as evaluation requirements are finalized. Evaluation costs incurred during the period of performance are allowable costs (either as direct or indirect) in accordance with 2 C.F.R. § 200.413.

Recipients and subrecipients are also encouraged, but not required, to participate in any additional evaluations after the period of performance ends, although any costs incurred to participate in such evaluations are not allowable and may not be charged to the federal award.

**U.    Termination**

1. Paragraph C.XL of the FY 2025 DHS Standard Terms and Conditions, v.3 sets forth a term and condition entitled "Termination of a Federal Award". The termination provision condition listed below applies to the grant award and the term and condition in Paragraph C.XL of the FY 2025 DHS Standard Terms and Conditions, v.3 does not.

2. Termination of the Federal Award by FEMA
FEMA may terminate the federal award in whole or in part for one of the following reasons identified in 2 C.F.R. § 200.340:

    a. If the recipient or subrecipient fails to comply with the terms and conditions of the federal award.

    b. With the consent of the recipient, in which case FEMA and the recipient must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated.

    c. If the federal award no longer effectuates the program goals or agency priorities. Under this provision, FEMA may terminate the award for these purposes if any of the following reasons apply:

      i. If FEMA, in its sole discretion, determines that a specific award objective is ineffective at achieving program goals as described in the Award package;

      ii. If FEMA, in its sole discretion, determines that an objective of the award as described in the Award package will be ineffective at achieving program goals or agency priorities;

     iii. If FEMA, in its sole discretion, determines that the design of the grant program is flawed relative to program goals or agency priorities;

     iv. If FEMA, in its sole discretion, determines that the grant program is not aligned to either the DHS Strategic Plan, the FEMA Strategic Plan, or successor policies or documents;

    v.   If FEMA, in its sole discretion, changes or re-evaluates the goals or priorities of the grant program and determines that the award will be ineffective at achieving the updated program goals or agency priorities; or

   vi.   For other reasons based on program goals or agency priorities described in the termination notice provided to the recipient pursuant to 2 C.F.R. § 200.341.

  vii.   If the awardee falls out of compliance with the Agency's statutory or regulatory authority, award terms and conditions, or other applicable laws.

3. Termination of a Subaward by the Pass-Through Entity

The pass-through entity may terminate a subaward in whole or in part for one of the following reasons identified in 2 C.F.R. § 200.340:

   a.   If the subrecipient fails to comply with the terms and conditions of the federal award.

   b.   With the consent of the subrecipient, in which case the pass-through entity and the subrecipient must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated.

   c.   If the pass-through entity's award has been terminated, the pass-through recipient will terminate its subawards.

4. Termination by the Recipient or Subrecipient

The recipient or subrecipient may terminate the federal award in whole or in part for the following reason identified in 2 C.F.R. § 200.340: Upon sending FEMA or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if FEMA or pass-through entity determines that the remaining portion of the federal award will not accomplish the purposes for which the federal award was made, FEMA or pass-through entity may terminate the federal award in its entirety.

5.   Impacts of Termination

   a.   When FEMA terminates the federal award prior to the end of the period of performance due to the recipient's material failure to comply with the terms and conditions of the federal award, FEMA will report the termination in SAM.gov in the manner described at 2 C.F.R. § 200.340(c).

   b.   When the federal award is terminated in part or its entirety, FEMA or pass-through entity and recipient or subrecipient remain responsible for compliance with the requirements in 2 C.F.R. §§ 200.344 and 200.345.

6.   Notification requirements

   a.   FEMA or the pass-through entity must provide written notice of the termination in a manner consistent with 2 C.F.R. § 200.341. The federal award will be terminated on the date of the notification unless stated otherwise in the notification.

7.   Opportunities to Object and Appeals

   a.   Where applicable, when FEMA terminates the federal award, the written notification of termination will provide the opportunity and describe the process to object and provide information challenging the action, pursuant to 2 C.F.R. § 200.342.

8. Effects of Suspension and Termination
   a. The allowability of costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient during a suspension or after the termination of a federal award are subject to 2 C.F.R. § 200.343.

## V. Best Practices

While not a requirement in the DHS Standard Terms and Conditions, as a best practice: Entities receiving funds through this program should ensure that cybersecurity is integrated into the design, development, operation, and maintenance of investments that impact information technology (IT) and/or operational technology (OT) systems.

## W. Payment Information

Recipients will submit payment requests in FEMA GO for FY25 awards under this program.

### Instructions to Grant Recipients Pursuing Payments

FEMA reviews all grant payments and obligations to ensure allowability in accordance with 2 C.F.R. § 200.305. These measures ensure funds are disbursed appropriately while continuing to support and prioritize communities who rely on FEMA for assistance. Once a recipient submits a payment request, FEMA will review the request. If FEMA approves a payment, recipients will be notified by FEMA GO and the payment will be delivered pursuant to the recipient's SAM.gov financial information. If FEMA disapproves a payment, FEMA will inform the recipient.

### Processing and Payment Timeline

FEMA must comply with regulations governing payments to grant recipients. See 2 C.F.R. § 200.305. For grant recipients other than States, 2 C.F.R. § 200.305(b)(3) stipulates that FEMA is to make payments on a reimbursement basis within 30 days after receipt of the payment request, unless FEMA reasonably believes the request to be improper. For state recipients, 2 C.F.R. § 200.305(a) instructs that federal grant payments are governed by Treasury-State Cash Management Improvement Act (CMIA) agreements ("Treasury-State agreement") and default procedures codified at 31 C.F.R. part 205 and Treasury Financial Manual (TFM) 4A-2000, "Overall Disbursing Rules for All Federal Agencies." See 2 C.F.R. § 200.305(a).

Treasury-State agreements generally apply to "major federal assistance programs" that are governed by 31 C.F.R. part 205, subpart A and are identified in the Treasury-State agreement. 31 C.F.R. §§ 205.2, 205.6. Where a federal assistance (grant) program is not governed by subpart A, payment and funds transfers from FEMA to the state are subject to 31 C.F.R. part 205, subpart B. Subpart B requires FEMA to "limit a funds transfer to a state to the minimum amounts needed by the state and must time the disbursement to be in accord with the actual, immediate cash requirements of the state in carrying out a federal assistance program or project. The timing and amount of funds transfers must be as close as is administratively feasible to a state's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs." 31 C.F.R. § 205.33(a). Nearly all FEMA grants are not "major federal assistance

programs." As a result, payments to states for those grants are subject to the "default" rules of 31 C.F.R. part 205, subpart B.

If additional information is needed, a request for information will be issued by FEMA to the recipient; recipients are strongly encouraged to respond to any additional FEMA request for information inquiries within three business days. If an adequate response is not received, the request may be denied, and the entity may need to submit a new reimbursement request; this will re-start the 30-day timeline.

**Submission Process**

All non-disaster grant program reimbursement requests must be reviewed and approved by FEMA prior to drawdowns.

For all non-disaster reimbursement requests (regardless of system), please ensure submittal of the following information:

1. Grant ID / Award Number
2. Total amount requested for drawdown
3. Purpose of drawdown and timeframe covered (must be within the award performance period)
4. Subrecipient Funding Details (if applicable).
   - Is funding provided directly or indirectly to a subrecipient?
     o If **no,** include statement "This grant funding is not being directed to a subrecipient."
   - If **yes**, provide the following details:
     o The name, mission statement, and purpose of each subrecipient receiving funds, along with the amount allocated and the specific role or activity being reimbursed.
     o Whether the subrecipient's work or mission involves supporting aliens, regardless of whether FEMA funds support such activities.
     o Whether the payment request includes an activity involving support to aliens.
     o Whether the subrecipient has any diversity, equity, and inclusion practices.

Supporting documentation is required to demonstrate that expenses are allowable, allocable, reasonable, and necessary under 2 C.F.R. Part 200 and in compliance with the grant's Award package, award terms, and applicable federal regulations. As a prerequisite of DSGP approval for reimbursement payment requests, the recipient shall have an active SAM.gov registration.

In accordance with U.S. Department of Treasury regulations at 31 C.F.R. Part 205, if applicable, the recipient shall maintain procedures to minimize the time elapsing between the transfer of funds and the disbursement of said funds.

The recipient must use the DSGP Payment Submission form for all payment requests and must submit the following information at time of payment request:

- If the drawdown request includes money for a subrecipient, specify the subrecipient and allowable activities the funding covers.
- Provide as part of the DSGP Payment Submission form a list of detainees serviced along with their First and Last Name, Alien Number (A#), Date of Arrival, and Date of Departure. To calculate the total amount expended per detainee multiply the number of nights by the burdened rate of $XXX. To calculate the total reimbursable amount, multiply the total

number of detainees by the total number of nights detainees were serviced by the burdened rate of $XXX.

- The recipient must ensure that full names and accurate dates of service are provided.

The recipient should keep detailed records of all transactions involving the grant. FEMA may at any time request copies of any relevant documentation and records. See, 2 C.F.R. §§ 200.318(i), 200.334, 200.337.

## X.    Period of Performance Extension

Extensions to the period of performance (POP) for this program may be permitted only with prior written approval from FEMA. The recipient must request an extension prior to the expiration of the POP. Extensions to the POP identified in the award will only be considered through formal, written requests to the recipient's FEMA Program Analyst or other relevant FEMA position and must contain specific and compelling justifications as to why an extension is required. The recipient is advised to coordinate with the FEMA Program Analyst or other relevant FEMA position as needed when preparing an extension request.

All extension requests must address the following:
   a. The grant program, fiscal year, and award number;
   b. Reason for the delay –including details of the legal, policy, or operational challenges that prevent the final outlay of awarded funds by the deadline;
   c. Current status of the activity(ies);
   d. Approved POP termination date and new project completion date;
   e.  Amount of funds drawn down to date;
   f. Remaining available funds, both federal and, if applicable, non-federal;
   g. Budget outlining how remaining federal and, if applicable, non-federal funds will be expended;
   h. Plan for completion, including milestones and timeframes for achieving each milestone and the position or person responsible for implementing the plan for completion; and
   i. Certification that the activity(ies) will be completed within the extended POP without any modification to the original statement of work and as approved by FEMA.

Extension requests will be granted only due to compelling legal, policy, or operational challenges. Extension requests will only be considered for the following reasons
- Contractual commitments by the recipient or subrecipient with vendors prevent completion of the project, including delivery of equipment or services, within the existing POP;
- The project must undergo a complex environmental review that cannot be completed within the existing POP;
- Projects are long-term by design, and therefore acceleration would compromise core programmatic goals; or
- Where other special or extenuating circumstances exist.

The recipient should submit all proposed extension requests to FEMA for review and approval at least 120 days prior to the end of the POP to allow sufficient processing time. Extensions may be granted one time for up to 120 days. Extensions are typically granted for no more than a six-month period.

## Y. Other Information

### a. *Environmental Planning and Historic Preservation (EHP) Compliance*

FEMA is required to consider effects of its actions on the environment and historic properties to ensure that activities, grants and programs funded by FEMA, comply with federal EHP laws, Executive Orders, regulations, and policies.

Recipients and subrecipients proposing projects with the potential to impact the environment or cultural resources, such as the modification or renovation of existing buildings, structures, and facilities, and/or new construction and/or replacement of buildings, structures, and facilities, must participate in the FEMA EHP review process. This includes conducting early engagement to help identify EHP resources, such as threatened or endangered species, historic properties, or communities with environmental concerns; submitting a detailed project description with supporting documentation to determine whether the proposed project has the potential to impact EHP resources; and, identifying mitigation measures and/or alternative courses of action that may lessen impacts to those resources.

FEMA is sometimes required to consult with other regulatory agencies and the public in order to complete the review process. Federal law requires EHP review to be completed before federal funds are released to carry out proposed projects. FEMA may not be able to fund projects that are not in compliance with applicable EHP laws, Executive Orders, regulations, and policies. FEMA may recommend mitigation measures and/or alternative courses of action to lessen impacts to EHP resources and bring the project into EHP compliance.

EHP guidance is found at Environmental Planning and Historic Preservation. The site contains links to documents identifying agency EHP responsibilities and program requirements, such as implementation of the National Environmental Policy Act and other EHP laws, regulations, and Executive Orders. DHS and FEMA EHP policy is also found in the EHP Directive & Instruction.

All FEMA actions, including grants, must comply with National Flood Insurance Program (NFIP) criteria or any more restrictive federal, state, or local floodplain management standards or building code (44 C.F.R. § 9.11(d)(6)). For actions located within or that may affect a floodplain or wetland, the following alternatives must be considered: a) no action; b) alternative locations; and c) alternative actions, including alternative actions that use natural features or nature-based solutions. Where possible, natural features and nature-based solutions shall be used. If not practicable as an alternative on their own, natural features and nature-based solutions may be incorporated into actions as minimization measures.

The GPD EHP screening form is located at

https://www.fema.gov/sites/default/files/documents/fema_ehp-screening_form_ff-207-fy-21-100_3-31-2026.pdf

### b. Procurement Integrity

When purchasing under a FEMA award, recipients and subrecipients must comply with the federal procurement standards in 2 C.F.R. §§ 200.317-200.327. To assist with determining whether an action is a procurement or instead a subaward, please consult 2 C.F.R. § 200.331. For detailed guidance on the federal procurement standards, recipients and subrecipients should refer to various materials issued by FEMA's Procurement Disaster Assistance Team (PDAT), Additional resources, including an upcoming trainings schedule can be found on the PDAT Website: https://www.fema.gov/grants/procurement.

Under 2 C.F.R. § 200.317 when procuring property and services under a federal award, States (including territories) and Indian Tribes, must follow the same policies and procedures they use for procurements from their non-federal funds; additionally, states and Indian Tribes must now follow 2 CFR §200.322, regarding domestic preferences for Procurements and 2 CFR§ 200.327 regarding required contract provisions. States, but not Indian Tribes, must also follow 2 C.F.R. § 200.323 regarding procurement of recovered materials.

Local government and nonprofit recipients or subrecipients must have and use their own documented procurement procedures that reflect applicable State, Local, Tribal, and Territorial (SLTT) laws and regulations, provided that the procurements conform to applicable federal law and the standards identified in 2 C.F.R. Part 200.

1. Important Changes to Procurement Standards in 2 C.F.R. Part 200

On April 22, 2024, OMB updated various parts of Title 2 of the Code of Federal Regulations, among them the procurement standards. These revisions apply to all FEMA awards with a federal award date or disaster declaration date on or after October 1, 2024, unless specified otherwise. The changes include updates to the federal procurement standards, which govern how FEMA award recipients and subrecipients must purchase under a FEMA award.

More information on OMB's revisions to the federal procurement standards can be found in Purchasing Under a FEMA Award: 2024 OMB Revisions Fact Sheet.

2. Competition and Conflicts of Interest

2 CFR §200.319(b), applicable to local government and nonprofit recipients or subrecipients, requires that contractors that develop or draft specifications, requirements statements of work, or invitations for bids or requests for proposals must be excluded from competing for such procurements. FEMA considers these actions to be an organizational conflict of interest and interprets this restriction as applying to contractors that help a recipient or subrecipient develop its grant application, project plans, or project budget. This prohibition also applies to the use of former employees to manage the grant or carry out a contract when those former employees worked on such activities while they were employees of the recipient or subrecipient. Under this prohibition, unless the recipient or subrecipient solicits for and awards a contract covering both development and execution of specifications (or similar elements as described above), and this contract was procured in compliance with 2 C.F.R. §§ 200.317-200.327, federal funds cannot be used to pay a contractor to carry out the work if that contractor also worked on the development of those specifications. This rule applies to all contracts funded with federal grant funds, including pre-award costs, such as grant writer fees, as well as post- award costs, such as grant management fees.

In addition to organizational conflicts of interest, situations considered to be restrictive of competition include, but are not limited to:

- Placing unreasonable requirements on firms for them to qualify to do business;
- Requiring unnecessary experience and excessive bonding;
- Noncompetitive pricing practices between firms or between affiliated companies;
- Noncompetitive contracts to consultants that are on retainer contracts;
- Specifying only a "brand name" product instead of allowing "an equal" product to be offered and describing the performance or other relevant requirements of the procurement; and
- Any arbitrary action in the procurement process.

Under 2 C.F.R§ 200.318(c)(1) , local government and nonprofit recipients or subrecipients are required to maintain written standards of conduct covering conflicts of interest and governing the actions of their employees engaged in the selection, award, and administration of contracts. **No employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest. Such conflicts of interest would arise when the employee, officer or agent, any member of  his or her immediate family, his or her partner, or an organization that employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract. The officers, employees, and agents of the recipient or subrecipient may neither solicit nor accept gratuities, favors, or anything of monetary value from contractors or parties to subcontracts. However, the recipient or subrecipient may set standards for situations in which the financial interest is not substantial, or the gift is an unsolicited item of nominal value. The recipient's or subrecipient's standards of conduct must provide for disciplinary actions to be applied for violations of such standards by officers, employees, or agents.** Under 2 C.F.R. 200.318(c)(2), if the local government and nonprofit recipient or subrecipient has a parent, affiliate, or subsidiary organization that is not a SLTT government, the recipient or subrecipient must also maintain written standards of conduct covering organizational conflicts of interest. Organizational conflict of interest means that because of a relationship with a parent company, affiliate, or subsidiary organization, the recipient or subrecipient is unable or appears to be unable to be impartial in conducting a procurement action involving a related organization. The recipient or subrecipient must disclose in writing any potential conflicts of interest to FEMA or the pass-through entity in accordance with applicable FEMA policy.

3. Supply Schedules and Purchasing Programs

Generally, a recipient or subrecipient may seek to procure goods or services from a federal supply schedule, state supply schedule, or group purchasing agreement.

Information about General Services Administration (GSA) programs for states, Indian Tribes, and local governments, and their instrumentalities, can be found at Purchasing Resources and Support for State and Local Governments.pdf

Help for state, local, and tribal governments to make multiple award schedule (MAS) buys | GSA and https://www.gsa.gov/buying-selling/purchasing- programs/gsa-schedules/schedule-buyers/state-and-local-governments.

4. Procurement Documentation

Per 2 C.F.R.§ 200.318(i), local government and nonprofit recipients or subrecipients are required to maintain and retain records sufficient to detail the history of procurement covering at least the rationale for the procurement method, selection of contract type, contractor selection or rejection, and the basis for the contract price. States and Indian Tribes are reminded that in order for any cost to be allowable, it must be adequately documented per 2 CFR §200.403(g).
Examples of the types of documents that would cover this information include but are not limited to:

- Solicitation documentation, such as requests for quotes, invitations for bids, or requests for proposals;
- Responses to solicitations, such as quotes, bids, or proposals;
- Pre-solicitation independent cost estimates and post-solicitation cost/price analyses on file for review by federal personnel, if applicable;
- Contract documents and amendments, including required contract provisions; and
- Other documents required by federal regulations applicable at the time a grant is awarded to a recipient.

### c. Financial Assistance Programs for Infrastructure

1. Build America, Buy America Act
Recipients and subrecipients must comply with FEMA's implementation requirements of the Build America, Buy America Act (BABAA), which was enacted as part of the Infrastructure Investment and Jobs Act §§ 70901-70927, Pub. L. No. 117-58 (2021); and Executive Order 14005, Ensuring the Future is Made in All of America by All of America's Workers. See also 2 C.F.R. Part 184, Buy America Preferences for Infrastructure Projects and Office of Management and Budget (OMB), Memorandum M-24-02, Implementation Guidance on Application of Buy America Preference in Federal Financial Assistance Programs for Infrastructure.

None of the funds provided under this program may be used for a project for infrastructure unless the iron and steel, manufactured products, and construction materials used in that infrastructure are produced in the United States.

The Buy America preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project but are not an integral part of the structure or permanently affixed to the infrastructure project.

To see whether a particular FEMA federal financial assistance program is considered an infrastructure program and thus required to implement FEMA's Build America, Buy America

requirements, please see Programs and Definitions: Build America, Buy America Act | FEMA.gov

2. Waivers

When necessary, recipients (and subrecipients through their pass-through entity) may apply for, and FEMA may grant, a waiver from these requirements.

A waiver of the domestic content procurement preference may be granted by the agency awarding official if FEMA determines that:

- Applying the domestic content procurement preference would be inconsistent with the public interest, or

- The types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality, or

- The inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25%.

The process for requesting a waiver from the Buy America preference requirements can be found on FEMA's website at: "Buy America" Preference in FEMA Financial Assistance Programs for Infrastructure | FEMA.gov.

3. Definitions

For definitions of the key terms of the Build America, Buy America Act, please visit Programs and Definitions: Build America, Buy America Act | FEMA.gov.

**d. *Mandatory Disclosures***

The non-federal entity or applicant for a federal award must disclose, in a timely manner, in writing to the federal awarding agency or pass-through entity all violations of federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the federal award, 2 C.F.R. § 200.113.

**e. *Adaptive Support***

Pursuant to Section 504, of the Rehabilitation Act of 1973 , recipients of FEMA financial assistance must ensure that their programs and activities do not discriminate against qualified individuals with disabilities.

**f. *Record Retention***

1. Record Retention Period

Financial records, supporting documents, statistical records, and all other non-federal entity records pertinent to a federal award generally must be maintained for at least three years from the date the final FFR is submitted. *See* 2 C.F.R. §200.334. Further, if the recipient does not submit a final FFR and the award is administratively closed, FEMA uses the date of administrative closeout as the start of the general record retention period.

The record retention period **may be longer than three years or have a different start date** in certain cases.

2. Types of Records to Retain

FEMA requires that the recipient and subrecipients maintain the following documentation for federally funded purchases:

- Specifications
- Solicitations
- Competitive quotes or proposals
- Basis for selection decisions
- Purchase orders
- Contracts
- Invoices
- Cancelled checks

**g.** *Actions to Address Noncompliance*

Non-federal entities receiving financial assistance funding from FEMA are required to comply with requirements in the terms and conditions of their awards or subawards, including the terms set forth in applicable federal statutes, regulations, Award Summaries, and policies. Throughout the award lifecycle or even after an award has been closed, FEMA or the pass-through entity may discover potential or actual noncompliance on the part of a recipient or subrecipient.

In the case of any potential or actual noncompliance, FEMA may place special conditions on an award per 2 C.F.R.§ 200.208 and 2 C.F.R.§ 200.339. FEMA may place a hold on funds until the matter is corrected, or additional information is provided per 2 C.F.R.§ 200.339. or it may do both. Similar remedies for noncompliance with certain federal civil rights laws are authorized pursuant to 44 C.F.R. Part 7 and 44 C.F.R. Part 19 or other applicable regulations. If the noncompliance is not able to be corrected by imposing additional conditions or the recipient or subrecipient refuses to correct the matter, FEMA may take other remedies allowed under 2 C.F.R.§ 200.339.

**h.** *Audits*

FEMA grant recipients are subject to audit oversight from multiple entities including the DHS Office of Inspector General (OIG), the Government Accountability Office (GAO), the pass-through entity, or independent auditing firms for single audits, and may cover activities and costs incurred under the award. Auditing agencies such as the DHS OIG, the GAO, and the pass-through entity (if applicable), and FEMA in its oversight capacity, must have access to records pertaining to the FEMA award.