No. 25-12873

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FRIENDS OF THE EVERGLADES and CENTER FOR BIOLOGICAL
DIVERSITY,
*Plaintiffs/Appellees*,

v.

KRISTI NOEM, Secretary of the Department of Homeland Security, et al.,
*Defendants/Appellants*.

Appeal from the United States District Court for the Southern District of Florida
No. 1:25-cv-22896 (Hon. Kathleen M. Williams)

**REPLY BRIEF FOR THE FEDERAL DEFENDANTS**

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT STANDER
*Deputy Assistant Attorney General*

MARISSA A. PIROPATO
HAYLEY A. CARPENTER
ALLEN M. BRABENDER
*Attorneys*
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, DC 20044
(202) 532-3281
allen.brabender@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................i

TABLE OF AUTHORITIES .....................................................................................iii

INTRODUCTION .......................................................................................................1

ARGUMENT ...............................................................................................................2

I.    The district court committed numerous legal errors when concluding that Plaintiffs are likely to succeed on the merits................................2

    A.    There is no reviewable federal agency action. ..............................................2

        1.    Plaintiffs fail to challenge final agency action. ...................................2

        2.    There is no proposed major federal action at issue. ........................6

        3.    Potential future funding is not a major federal action and any challenge to future funding is not ripe. ...............................9

        4.    The decisions to enter 287(g) agreements are not major federal actions or reviewable under the APA.....................14

    B.    The district court's injunction violates *Seven County*....................................16

    C.    Venue does not belong in the Southern District of Florida. ...................19

        1.    This Court has appellate jurisdiction to decide venue...................19

        2.    The defendants did not waive their venue objection. ....................21

        3.    The district court erred in concluding that venue lies in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1)(B)......................................23

        4.    28 U.S.C. § 1391(e)(1)(C) does not confer venue in the Southern District of Florida. .........................................25

II.    The district court abused its discretion by failing to require
       Plaintiffs to prove a likelihood of irreparable harm. ...............................28

III.   The equitable factors overwhelmingly weigh against an injunction. ...................31

CONCLUSION ..................................................................................................34

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................ 30

*Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*,
  364 F.3d 884 (7th Cir. 2004) .............................................................. 23

*Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*,
  599 F.2d 1333 (5th Cir. 1979) ............................................................ 14

*Bank of Nova Scotia v. United States*,
  487 U.S. 250 (1988) .......................................................................... 22

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................... 3, 4, 5, 11

*Biden v. Texas*,
  597 U.S. 785 (2022) ......................................................................... 4, 5

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2005) ...................................................... 18-19

*Citizens United v. FEC*,
  558 U.S. 310 (2010) .......................................................................... 31

*City of Port Isabel v. FERC*,
  130 F.4th 1034 (D.C. Cir. 2025) ........................................................ 19

*Connecticut Nat. Bank v. Germain*,
  503 U.S. 249 (1992) ...................................................................... 6, 26

*Earth Island Inst. v. Quinn*,
  56 F. Supp. 3d 1110 (N.D. Cal. 2014) ............................................... 27

*Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
  441 F.2d 560 (5th Cir. 1971) ............................................................. 31

*Florida Power & Light, Co. v. Lorion*,
  470 U.S. 729 (1985) .......................................................................... 10

*Fort Bend Cnty. v. Davis*,
  587 U.S. 541 (2019) .......................................................................... 20

*Fund for Animals v. Frizell,*
    530 F.2d 982 (D.C. Cir. 1975) ....................................................... 30

*Fund for Animals, Inc. v. BLM,*
    460 F.3d 13 (D.C. Cir. 2006) ......................................................... 10

*Garner v. Wolfinbarger,*
    433 F.2d 117 (5th Cir. 1970) ......................................................... 20

*Greater Yellowstone Coalition v. Flowers,*
    321 F.3d 1250 (10th Cir. 2003) ..................................................... 30

*In re MDL-1824 Tri-State Water Rights Litig.,*
    644 F.3d 1160 (11th Cir. 2011) ..................................................... 34

*Indus. Customers of Nw. Utilities v. Bonneville Power Admin.,*
    408 F.3d 638 (9th Cir. 2005) ......................................................... 11

*Jenkins Brick Co. v. Bremer,*
    321 F.3d 1366 (11th Cir. 2003) ................................................. 24, 25

*Karst Env't Educ. & Prot., Inc. v. EPA,*
    475 F.3d 1291 (D.C. Cir. 2007) ..................................................... 17

*Kennedy v. Lubar,*
    273 F.3d 1293 (10th Cir. 2001) ..................................................... 20

*Klay v. United Healthgroup, Inc.,*
    376 F.3d 1092 (11th Cir. 2004) ..................................................... 29

*Leroy v. Great W. United Corp.,*
    443 U.S. 173 (1979) ....................................................................... 25

*Lozman v. City of Riviera Beach.,*
    119 F.4th 913 (11th Cir. 2024) ..................................................... 12

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) .................................................................... 4, 16

*Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund,*
    967 F.2d 688 (1st Cir. 1992) ......................................................... 22

*Manley v. Engram,*
    755 F.2d 1463 (11th Cir. 1985) ..................................................... 22

*Matter of Macon Uplands Venture,*
    624 F.2d 26 (5th Cir. 1980) ........................................................................ 20

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) .................................................................. 16

*Middlebrooks v. Smith,*
    735 F.2d 431 (11th Cir. 1984) .................................................................. 20

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ............................................................................ 29, 33

*Munaf v. Geren,*
    553 U.S. 674 (2008) ................................................................................. 34

*Myers v. Gilman Paper Corp.,*
    544 F.2d 837 (5th Cir. 1977) .................................................................... 20

*Nat'l Audubon Soc. v. Hoffman,*
    132 F.3d 7 (2d Cir. 1997) ......................................................................... 10

*New Mexico Dep't of Game & Fish v. Interior,*
    854 F.3d 1236 (10th Cir. 2017) ................................................................ 12

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ..................................................................................... 4

*NRDC v. TVA,*
    340 F. Supp. 400 (S.D.N.Y. 1971) ........................................................... 27

*NTEU v. Vought,*
    149 F.4th 762 (D.C. Cir. 2025) .................................................................. 4

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce,*
    128 F.4th 1089 (9th Cir. 2025) ................................................................ 11

*Rattlesnake Coal. v. EPA,*
    509 F.3d 1095 (9th Cir. 2007) ............................................................ 11, 14

*Sabine River Auth. v. U.S. Dep't of Interior,*
    745 F. Supp. 388 (E.D. Tex. 1990) .......................................................... 15

*Sampson v. Murray,*
    415 U.S. 61 (1974) ................................................................................... 31

*San Carlos Apache Tribe v. U.S. Forest Serv.*,
No. 21-68, 2025 WL 2377321 (D. Ariz. Aug. 15, 2025) ........................................... 17

*Schultz v. Alabama*,
42 F.4th 1298 (11th Cir. 2022) ................................................................... 21

*Seven County Infrastructure Coalition v. Eagle County, Col.*
605 U.S. 168 (2025) .......................................................8, 10, 16, 17, 18, 19

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) ............................................................ 30, 32

*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) .................................................................. 10

*Stelly v. Emps. Nat. Ins. Co.*,
431 F.2d 1251 (5th Cir. 1970) .................................................................... 20

*Swint v. Chambers Cnty. Comm'n.*,
514 U.S. 35 (1995) ................................................................................. 21

*Toilet Goods Ass'n v. Gardner.*,
387 U.S. 158 (1967) ................................................................................ 11

*Trader Joe's Co. v. Trader Joe's United*,
150 F.4th 1040 (9th Cir. 2025) ................................................................. 23

*United States v. S. Fla. Water Mgmt. Dist.*,
28 F.3d 1563 (11th Cir. 1994) ........................................................... 8-9, 12

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) .......................................................................... 23, 24

*Lauro Lines s.r.l. v. Chasser*,
490 U.S. 495 (1989) ................................................................................ 21

*Village of Bald Head Island v. U.S. Army Corps of Eng'rs*,
714 F.3d 186 (4th Cir. 2013) .................................................................. 3, 4

*Waterkeeper Alliance v. Dep't of Defense*,
271 F.3d 21 (1st Cir. 2001) ...................................................................... 30

*Western Watersheds Project v. Burgum*,
No. 1:18-cv-00187, 2025 WL 3853055 (D. Id. Dec. 29, 2025)............................ 26, 28

*Winter v. NRDC,*
    555 U.S. 7 (2008) ......................................................................... 29, 32, 33

*Yee v. City of Escondido,*
    503 U.S. 519 (1992) ............................................................................ 6

## Statues

5 U.S.C. § 551 ...................................................................................... 2, 3

5 U.S.C. § 552 ......................................................................................... 7

5 U.S.C. § 704 ...................................................................................... 2, 3

8 U.S.C. § 1252 ...................................................................................... 15

28 U.S.C. § 1292 .................................................................................... 19

28 U.S.C. § 1391 .......................................................................... 25, 26, 28

42 U.S.C. § 4336e ....................................................................... 6, 10, 13

## Rules and Regulations

Fed. R. Civ. P. 7 .................................................................................... 21

Fed. R. Civ. P. 12 ............................................................................ 21, 22

## INTRODUCTION

The district court turned the National Environmental Policy Act (NEPA) into a veto power that the Act does not confer and exercised jurisdiction the Administrative Procedure Act (APA) does not allow. Without identifying any discrete, final or major federal agency action, the district court ordered the dismantling of a state-owned, state-funded immigration detention facility based on speculation, a "walks like a duck test," and a generalized sense that the project felt federal enough. That is not judicial review; it is judicial invention.

The Supreme Court has repeatedly warned that NEPA is purely procedural, that the APA requires a discrete and final federal agency action, and that courts may not police projects in the abstract by aggregating routine government activity into an imagined decision. Plaintiffs, the Miccosukee Tribe, and the district court ignore those limits. They treat the absence of a NEPA document as actionable federal conduct, infer federal control where none exists, and advocate for extraordinary coercive relief untethered from any identified federal decision. In doing so, they ask this Court to resurrect the form of aggressive NEPA enforcement *Seven County* has repudiated.

The injunction is especially indefensible because it targets a state project the federal defendants do not control and have not yet funded or approved. Congress amended NEPA in 2023 to foreclose exactly this sort of challenge to a non-federal project that lacks federal funding, yet the district court aggressively pressed forward

1

anyway—ordering the shutdown and dismantling of state funded and controlled infrastructure based on hypothetical future funding events.

The errors do not stop there. The district court improperly accepted venue in the Southern District when the detention center is in the Middle District, incorrectly found irreparable harm under the wrong legal standard, and inverted the balance of equities to elevate speculative, reversible environmental concerns over concrete and immediate harms to core governmental functions. Each error independently warrants reversal. Together, they confirm that this preliminary injunction cannot stand.

## ARGUMENT

**I.    The district court committed numerous legal errors when concluding that Plaintiffs are likely to succeed on the merits.**

### A.    There is no reviewable federal agency action.

#### 1.    Plaintiffs fail to challenge final agency action.

"Agency action," as used in the APA, is a term of art, referring to an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); U.S. Br. 16-20. And the APA limits review of "agency action" to "final agency action." *Id.* § 704. Plaintiffs failed to challenge any discrete, affirmative final agency action, leading the district court erroneously to conclude that the agency action is the failure to prepare an Environmental Assessment (EA) or Environmental Impact Statement (EIS). App.1405. That conclusion is indefensible. U.S. Br. 17-18.

Plaintiffs recast the final agency action as the supposed federal "construction" of a detention camp. Plfs' Br. 32-38. That formulation fails too, as the APA does not allow for judicial review at such a level of informality. *See Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). Physical activity on the ground—especially where, as here, it is undertaken exclusively by the state—does not itself constitute federal "agency action." *Id.*; 5 U.S.C. § 551(1) (defining agency as certain authorities of the *federal* government). Plaintiffs never identify any federal rule, order, permit, approval, or record of decision authorizing the construction or operation of the state-detention facility. 5 U.S.C. § 551(13).

Instead, Plaintiffs and the Tribe ask this Court to infer such a decision from a constellation of everyday agency functions or plans. Tribe Br. 43-48. Much of Plaintiffs' argument addresses when a nonfederal project may be considered "federalized" for NEPA purposes. Plfs' Br. 22-30. But that discussion overlooks that there must first be a reviewable "agency action" under the APA. *See* 5 U.S.C. § 704. NEPA does not supply jurisdiction on its own. Courts may not review a project in the abstract, no matter how "federal" it appears, absent a discrete federal agency action that marks the consummation of decision-making and determines rights or obligations. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

As noted, the district court never identified such an action. Implementing existing 287(g) agreements, transporting detainees, ensuring compliance with detention standards, operating federal databases, or expressing support for additional

detention capacity are everyday agency functions, not "rule[s], order[s], license[s], sanction[s], or relief." *Village of Bald Head Island*, 714 F.3d at 193. Neither Plaintiffs nor the Tribe explain how any one of these acts independently satisfies *Bennett*.

Plaintiffs' and the Tribe's principal argument is that the district court permissibly considered the totality of federal involvement and rejected the federal defendants' supposed atomization of agency conduct. Plfs' Br. 23-28; Tribe Br. 48-51. That argument conflicts with *Lujan v. National Wildlife Federation*, 497 U.S. 871, 893 (1990) (*NWF*), and its progeny. The APA prohibits bundling discrete actions to manufacture judicial review of an alleged programmatic decision. 497 U.S. at 893; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64-65 (2004) (*SUWA*).

This point does not depend solely on *NTEU v. Vought*, 149 F.4th 762 (D.C. Cir. 2025). Although that decision was vacated pending en banc review, its reasoning remains highly persuasive and, critically, it rests on binding Supreme Court authority—most notably, *Biden v. Texas*, which rejected review of "abstract decision[s] apart from specific agency action." 597 U.S. 785, 809 (2022). Neither Plaintiffs nor the Tribe grapple with *NWF, SUWA, Biden*, or the APA's discreteness requirement.

Plaintiffs and the Tribe rely heavily on asserted federal funding commitments, but the premise is wrong. The funding decision-making remains ongoing and is not yet "consummated"—it is not final agency action under *Bennett*. 520 U.S. at 177-78. A state's submission of a grant application initiates analysis; it does not consummate decision-making. No federal obligation of funds for construction has occurred, and

4

reimbursement-based, per-detainee operational funding—if approved—would not federalize the facility's construction or siting. Post-injunction developments cannot retroactively create final agency action, and, in any event, they confirm that the district court wrongly acted at a pre-decisional stage.

Plaintiffs also failed to respond to the federal defendants' argument that whether conduct constitutes "final agency action" is a legal question reviewed de novo, not a factual one insulated by clear-error review. U.S. Br. 20. The district court's improper evidentiary hearing in this APA case and "duck test" do not cure the absence of an identifiable federal agency decision. Courts may not infer an unwritten, unrecorded decision from a collection of lawful, routine activities. *See Biden*, 597 U.S. at 809 (if the court "understood itself to be reviewing an abstract decision apart from specific agency action, as defined in the APA, that was error.").

Moreover, the APA does not permit courts to infer finality from the intensity of involvement. Finality turns on legal consequences—whether the agency has bound itself or altered rights or obligations of another. *Bennett*, 520 U.S. at 178. None of the activities alleged here—oversight, coordination, or operational assistance—had legal consequences for FDEM's ability to construct or operate the facility. FDEM could proceed, modify, or abandon the project unilaterally without federal involvement.

While Plaintiffs allege federal involvement writ large, they never identify a discrete, final agency action with legal consequences tied to this facility. Without one,

the APA deprives the courts of jurisdiction, and the district court's effort to assemble a final agency action from a mosaic of everyday federal functions was legal error.

### 2.    There is no proposed major federal action at issue.

Even if the APA provides jurisdiction and a cause of action, Plaintiffs claims still fail because NEPA applies only to proposals for "major Federal action." There was no such proposal when the district court enjoined the state's facility.

In 2023, Congress excluded from "major Federal action" a non-federal action "(I) with no or minimal Federal funding; or (II) with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project." 42 U.S.C. § 4336e(10)(B)(i). "Or" is disjunctive. Under ordinary rules of statutory interpretation, satisfaction of either condition independently triggers the exclusion. *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there"). Thus, the lack of federal funding for this facility alone is sufficient to exclude this project from NEPA. U.S. Br. 25-27.[1]

Plaintiffs argue that a plain text "disjunctive" reading of subsection (B) conflicts with subsection 4336e(10)(A)'s general definition of "major Federal action"

---

[1] Plaintiffs' statement that this issue is forfeited is groundless. Plfs' Br. 20. The federal defendants consistently have argued that a possible future funding decision is not final or major federal action. *See*, *e.g.*, App.990; 11th Cir. DE 20 at 8-9. A party does not forfeit an issue by citing additional statutory authority in support of a consistent argument. *See Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).

as one "subject to substantial Federal control and responsibility." Plfs' Br. 20. But subsection (B) is an express carve-out from that general definition. Congress routinely defines a category broadly and then narrows it through exclusions. *See*, *e.g.*, Freedom of Information Act, 5 U.S.C. § 552(a)(3)(A) (broad mandate), *id.* § 552(b)(1)-(9) (narrowing exclusions). Giving effect to subsection (B) does not nullify subsection (A); it limits it, exactly as Congress intended. Sections 4336e(10)(A) and (B) work together, not against each other.

Plaintiffs ignore the statute's structure in contending that giving the statute a plain text reading is "farfetched" because it supposedly means that "even total federal control" could evade NEPA absent funding. Plfs' Br. 20. Subsection (B) applies only to "non-Federal action[s]." A project subject to total federal control is unlikely to be a "non-Federal action" in the first place and thus would never reach the exclusion. The supposed absurdity disappears once the statute is read as written. Indeed, the stay panel read the statute as written and arrived at the same plain text interpretation as the federal defendants. 11th Cir. DE 42-1 at 13-16.

Plaintiffs argue that a plain text interpretation of subsection (B)(i) would render subsections (B)(ii)–(iii) to be "superfluous." Plfs' Br. 21. The opposite is true. Those provisions address situations where federal funds or guarantees exist but federal agencies lack control over their use—distinct scenarios from subsection (B)(i)(I), which applies when there is no or minimal federal funding at all. Each provision has independent work to do, consistent with a disjunctive scheme.

Plaintiffs' appeal to "decades of interpretative caselaw" proves too much. Plfs' Br. 22. Congress deliberately chose the disjunctive when amending the statute against the well-known backdrop, later recognized in *Seven County*, that some courts had expanded "major Federal action" beyond its intended bounds. *See Seven Cnty.*, 605 U.S. at 179 ("some courts have assumed an aggressive role in policing agency compliance with NEPA"); *id.* at 183 ("Some courts have strayed and not applied NEPA with the level of deference demanded by the statutory text and this Court's cases"). While *Seven County* noted that the amendments reinforced NEPA's core principles, it did not suggest that courts may disregard new statutory limits. Congress cabined NEPA's reach where federal funding or control is absent by establishing subsection 4336e(10)(B)'s disjunctive exclusions, and the plain meaning of this provision controls here.

Plaintiffs are incorrect that the Court need not reach the statutory interpretation question because the district court found both "substantial federal funding" and "more than minimal federal involvement." Plfs' Br. 21. The lack of federal funding is determinative; thus, the Court must reach that question.

Moreover, even if subsection 4336e(10)(B) is not given a plain text disjunctive reading, NEPA still does not apply. The federal defendants lacked control over core project decisions—size, location, construction, materials, and operation—placing this case squarely within this Court's precedent requiring "actual control" for NEPA to apply. *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994).

8

Federal "control" over immigration enforcement is not control over this facility. Plaintiffs and the Tribe emphasize that immigration enforcement is exclusively federal and that ICE controls who is initially detained. But even if true, it does not establish federal control over the construction or operation of this facility. NEPA asks whether the federal agency has "actual control" over the project alleged to cause environmental harm, not over the broader regulatory field. *Id.* ("The focus in this case is on the federal agencies' control and responsibility over material aspects of the *specific* project.") (emphasis added). Routine supervision under 287(g), use of ICE standards, or ICE's authority to approve detention locations does not convert a state-funded construction project into a "major Federal action." *Id.* Otherwise, every state or local jail housing federal detainees would trigger NEPA.

In sum, the statute's text is clear. Because the detention facility is a non-federal action with no federal funding—and, independently, because federal agencies lacked control over its outcome—it is excluded from NEPA's definition of "major Federal action." The district court's contrary conclusion rests on a misreading of NEPA's definition of "major Federal action" and should be reversed.

### 3.    Potential future funding is not a major federal action and any challenge to future funding is not ripe.

Left with a plain text reading that makes the lack of federal funding dispositive, Plaintiffs and the Tribe do backflips trying to create the impression of federal funding. But their gymnastics only confirm the fundamental defects in the district court's

9

ruling. Their arguments rest on bombast, social media, and post-hoc developments, not on a reviewable federal action existing at the time of the injunction.

The district court lacked authority to find that the existence of a funding proposal triggering NEPA had been made. U.S. Br. 22-24. NEPA reserves that determination for the agency, 42 U.S.C. § 4336e(10)(A), and it can only be overturned under the APA's arbitrary-or-capricious standard based on the administrative record.[2] As an APA claim, whether an agency has taken major or final agency action is a legal determination—it is not a question appropriate for judicial fact-finding drawn from public statements. *See, e.g., Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (reviewing de novo the district court's finding that an FTC staff letter was final agency action). In other words, the district court could not convert nonbinding expressions of intent into major federal agency action by mislabeling them a "promise of full federal funding," App.1420. *See Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 18-22 (D.C. Cir. 2006) (agency plan is unreviewable insofar as it reflects only a

---

[2] The federal defendants preserved this issue by informing the district court when disputing venue that the federal action issue must be resolved on the administrative record. App.1397. The court rejected that view in favor of "fact-finding." *Id.* That was error. If the record was unclear on the existence of federal action, the appropriate remedy was a remand for explanation, not de novo fact-finding. U.S. Br. 24 (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)). Plaintiffs ask this Court to create a NEPA exception to the record rule based on *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7 (2d Cir. 1997). Plfs' Br. 24 n.5. But *Hoffman* is an outlier that conflicts with *Seven County* and 42 U.S.C. § 4336e(10)(A), both of which confirm that NEPA review is procedural and agencies—not courts—decide whether a project triggers review, leaving no role for de novo fact-finding.

nonbinding statement of something the agency intends to do in the future). As the stay panel observed, "obtaining funding from the federal government for a state project requires *completing* a formal and technical application process; a governor cannot apply for FEMA aid via press conference, and a Facebook post does not somehow transfer funds from the federal fisc to Florida." 11th Cir. DE 42-1 at 21 (emphasis added, internal citations omitted).

At the time of the injunction, no federal funds had been awarded, obligated, or disbursed, and no agency had completed the decision-making process required to do so. *Bennett*, 520 U.S. at 177-78. To the contrary, at most, the State had applied for potential funding—an act that, as a matter of law, initiates agency review rather than concludes it. *See Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646-47 (9th Cir. 2005) (a decision is not a final agency action when it merely serves to initiate the proceedings); *see also* 11th Cir. DE 42-1 at 19 (citing cases). An application—even one under review—is the paradigmatic example of nonfinal agency action. Until the agency determines the source, amount, rate, duration, conditions, and purpose of funding, judicial review is premature. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967); *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007) (NEPA claim unripe until agency decides whether to disburse funds). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as

anticipated, or indeed may not occur at all." *See Lozman v. City of Riviera Beach.*, 119 F.4th 913, 917 (11th Cir. 2024) (citation and internal quotation marks omitted).[3]

Plaintiffs' reliance on extra-record evidence and events occurring after the district court's order only underscores the lack of funding at the time the injunction issued on August 21, 2025. For instance, Plaintiffs rely on a September 30 letter from FEMA approving FDEM's eligibility for financial assistance under the Detention Support Grant Program. Plfs' Br. 29, 36. Judicial review of a preliminary injunction is based on the record before the district court at the time of the decision, not on later developments marshaled to salvage an unlawful injunction. *See New Mexico Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1240 n.1 (10th Cir. 2017).[4]

Plaintiffs' claim that FEMA "provided instructions on the use of allocated funds" is factually inaccurate. Plfs' Br. 29, 36. The identified statement concluded that

---

[3] *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089 (9th Cir. 2025), was wrongly decided. *See Prutehi*, 128 F.4th at 1120-33 (Van Dyke, J., dissenting). It is the subject of a pending petition for a writ of certiorari. S. Ct. No. 25-579. Moreover, in *Prutehi*, the Air Force allegedly acted by applying for a permit renewal for decades long conduct, which readily distinguishes *Prutehi* from the inaction of not preparing an EA or EIS that the district court thought constituted final agency action here.

[4] Although this Court denied Plaintiffs' motion to supplement the record (11th Cir. DE 119), Plaintiffs' arguments rely on documents that this Court has determined should not be considered. Plfs' Br. 12-13, 29, 36. This Court should disregard these arguments entirely. The federal defendants nevertheless respond to the arguments because they appear in Plaintiffs' brief. The federal defendants responded to Plaintiffs' groundless claim that they had a duty to inform the court of the state's application in their opposition to the motion to supplement. 11th Cir. DE 104, 105, 118. In short, there is no duty because the mere filing of a state application is immaterial to the ultimate question of finality.

12

flaws in the state's application *precluded* the agency from making a final decision to disburse funds. In any event, merely giving potential grantees advice does not establish a funding decision, much less federal control over a state-funded construction project. *See S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573 ("The rendering of advice and technical consultation . . . does not significantly affect the environment and does not federalize the State activities."). Agencies routinely provide procedural and compliance guidance during grant review without committing to funding or approving any specific project. Such guidance does not satisfy *Bennett*'s finality requirements or convert state action into a "major Federal action."

Fourth and critically, while Plaintiffs rely on post-hoc events in an attempt to save the unlawful injunction, they never grapple with the likely actual structure of the potential future "funding decision." Any potential future federal funding is reimbursement-based, calculated per detainee, and available only for operational costs—not construction or facility modification. *See* Motion to Supplement, 11th Cir. DE 91, Exh. 3 at 4, 6. As it likely will be structured, there will be no potential federal funding of the facility's design, siting, maintenance, or construction, and no federal approval authority over whether the facility is built at all.

That distinction is dispositive. NEPA is not triggered by the possibility that a federal agency may later reimburse discrete operational expenses under a formula-based program that does not control the underlying project. *See* 42 U.S.C. § 4336e(10)(B)(iii) (excluding assistance where the agency lacks sufficient control over

13

subsequent use); *Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599

F.2d 1333, 1347 (5th Cir. 1979). Plaintiffs' theory would improperly federalize any

state facility—like county jails—merely because it might later house individuals whose

care is partially reimbursable by the federal government. *See Rattlesnake Coalition*, 509

F.3d at 1101 (even before the 2023 amendments to NEPA, federal funding without

sufficient federal control of a state project is insufficient). Although Florida may be

the "only eligible applicant" that does not mean this facility is the only eligible facility.

Finally, Plaintiffs never respond to the argument that, if the reviewable action

were a federal funding decision, the only permissible remedy would be to set aside

that decision—not to enjoin state-funded construction and operations unrelated to

any final federal action. U.S. Br. 27. They have forfeited the opportunity to provide

any response to that argument.

### 4. The decisions to enter 287(g) agreements are not major federal actions or reviewable under the APA.

Neither Plaintiffs nor the Tribe argue, at least directly, that the final or major

federal action before the Court are the decisions to enter the various 287(g)

agreements with state agencies. For good reason, such agreements—which apply to

the signatory state agencies generally and not to any specific facility operated by those

agencies—merely delegate to state agencies the notional authority to fulfill certain

immigration functions on behalf of DHS. They do not themselves authorize any

ground-disturbing actions or "change the status quo of the physical environment."

14

*Sabine River Auth. v. U.S. Dep't of Interior*, 745 F. Supp. 388, 393 (E.D. Tex. 1990), *affirmed*, 951 F.2d 669 (5th Cir. 1992). And even assuming a final decision to enter into a particular 287(g) agreement could be a major federal action, any failure to perform a NEPA analysis on that final decision is not judicially reviewable under the APA. As explained in the U.S. Opening Brief at pages at 28-29, the decision to enter a 287(g) agreement is not reviewable by federal courts under 8 U.S.C. § 1252(a)(2)(B)(ii).

Plaintiffs fail to rebut this point. Instead, Plaintiffs misrepresent the statutory language as only precluding review of discretionary decisions "of like kind" to removal actions. Plfs' Br. 39. In fact, the statute divests courts of their jurisdiction to review "any other decision or action of [the Secretary] the authority for which is specified under this subchapter to be in the discretion of [the Secretary]." 8 U.S.C. § 1252(a)(2)(B)(ii). The discretionary decision to enter a 287(g) agreement plainly qualifies for this exemption from review. U.S. Br. 28-29.

Plaintiffs' attempted rebuttal is also smoke and mirrors, wrongly alleging that the federal defendants claimed the district court enjoined their decisions to enter 287(g) agreements. Plfs' Br. 40. The federal defendants made no such claim.

The lack of an injunction restraining 287(g) agreements is both irrelevant and telling. The question here is whether the agreements themselves can serve as the jurisdictional hook for APA or NEPA review. They cannot, and the lack of an injunction restraining 287(g) agreements says nothing about a court's jurisdiction under § 1252(a)(2)(B)(ii) to review those discretionary decisions for their alleged lack

15

of NEPA compliance. And the lack of an injunction further does not alter the fact 287(g) agreements are contracts that also are not reviewable by district courts under the APA for independent reasons.[5] And if the decisions to enter the various 287(g) agreements are the reviewable final agency actions on which the district court grounded its jurisdiction, Plaintiffs fail to rebut the argument that the district court should have directed its remedy at those existing agreements and not the sovereign state government's independent actions to construct or operate the facility on its own land. *See NWF*, 497 U.S. at 891 (the "agency action" limitation of APA § 706 prevents plaintiffs from "seek[ing] wholesale improvement of [a] program by court decree").

Ultimately, neither Plaintiffs nor the Tribe contend that DHS's decisions to enter 287(g) agreements with certain state agencies themselves are the reviewable final or major federal action providing jurisdiction here. That ends the inquiry.

### B.    The district court's injunction violates *Seven County*.

The district court's decision runs counter to *Seven County* in multiple ways. U.S. Br. 30-35. For instance, the district court found that the lack of an EA or EIS qualifies as final agency action. App.1405. But *Seven County* emphasizes that "review of an

---

[5] Plaintiffs' response that their claims arise under NEPA fails to recognize the problem. Plfs' Br. 40 n.13. NEPA is not independently reviewable. If the jurisdictional hook for APA review is the 287(g) agreements, then their NEPA claim seeking to enjoin those contracts is impliedly precluded by the Tucker Act, which waives the government's immunity only for contract claims seeking money damages. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). The APA does not authorize relief precluded by other statutes. *Id.* at 970-71.

agency's EIS is not the same thing as review of the agency's final decision concerning the project." 605 U.S. at 184; *see also id.* at 180 ("the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained."). Thus, the failure to prepare a NEPA document cannot alone be the final agency action subject to review under the APA—a separate final agency action must be challenged. *Id.*; *see also Karst Env't Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007) ("NEPA claims must … allege final agency action" separate from the "decision" to conduct NEPA review.); *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 21-68, 2025 WL 2377321, at *19 (D. Ariz. Aug. 15, 2025).

The district court erroneously brushed aside *Seven County*, stating that it "is hardly a meaningful guide in a matter" where no EIS was prepared. App.1433. Plaintiffs and the Tribe also contend that *Seven County* was just a mere frolic applicable only to a challenge to the sufficiency of a completed EIS. Plfs' Br. 43, 45, Tribe Br. 51-53. But in fact, *Seven County* explicitly ordered a "course correction" to bring NEPA review "back in line with the statutory text and common sense." *Seven Cnty.*, 605 U.S. at 184. *Seven County* emphasized that the judiciary owes substantial deference to agency decisions on "*whether* and to what extent to prepare an EIS." *Id.* at 181 (emphasis added). Deference to the decision of "whether" to prepare an EIS includes deference to decisions to wait to perform a NEPA analysis until a major federal action such as a request for payment is proposed. The district court's disregard of *Seven*

*County*, its usurpation of agency discretion on this scope and timing question, and its forced NEPA analysis on an unidentified federal action justifies reversal.

The district court also ignored *Seven County*'s instruction that NEPA deficiencies do not justify coercive sanctions like vacatur or an injunction of agency action, "at least absent reason to believe that the agency might disapprove the project if it" undertook additional NEPA process. 605 U.S. at 185. This recognition does not "flip NEPA on its head." Plfs' Br. 45. It puts NEPA in its rightful place as a "purely procedural statute." *Seven Cnty.*, 605 U.S. at 180. And it correctly rejects the improper use of NEPA injunctions that "hinder[] infrastructure development 'under the guise' of just a little more process." *Id.* at 184.

Plaintiffs' attempt to evade *Seven County* by labeling its remedial guidance "dicta." Plfs' Br. 43. That is incorrect. *Seven County* did not opine abstractly on remedies; it articulated a limiting principle governing when courts may impose coercive sanctions for NEPA errors, and that reasoning was essential to the Court's holding that the court of appeals "did not afford the Board the substantial judicial deference required in NEPA cases." 605 U.S. at 179-85. Lower courts are bound to apply that principle, particularly where—like here—the granted relief is an extraordinary injunction halting a state project.

Plaintiffs' and the Tribe's pre-*Seven County* cases discussing vacatur in "ordinary" cases had no occasion to address *Seven County*'s vacatur-limiting principle and are uninformative here. Plfs' Br. 43-44 (citing *Black Warrior Riverkeeper, Inc. v. U.S.*

*Army Corps of Eng'rs*, 781 F.3d 1271 (11th Cir. 2005), and *City of Port Isabel v. FERC*, 130 F.4th 1034 (D.C. Cir. 2025); Tribe Br. 53. In an "ordinary" case of ordinary subject matter, NEPA review might have an effect by focusing the decisionmaker on the environmental effects of the proposed action. **But this is not the ordinary case**. Both the President and Secretary of Homeland Security have expressed unwavering support for Florida's project such that it defies all logic to conclude that "the agency might disapprove the project" after further analysis by agency underlings. *Seven Cnty.*, 605 U.S. at 185. *Seven County* instructs that, in precisely these circumstances, coercive relief is unwarranted. *Id.* The district court's injunction transforms a procedural statute into a substantive veto, and it must be vacated.

### C.    Venue does not belong in the Southern District of Florida.

The preliminary injunction also should be reversed and vacated because the Southern District of Florida is an improper venue for this suit. This suit belongs in the Middle District of Florida where the facility is located.

#### 1.    This Court has appellate jurisdiction to decide venue.

The Court has appellate jurisdiction to review the venue ruling because that ruling is inseparable from—and antecedent to—the preliminary injunction this Court unquestionably has jurisdiction to review under 28 U.S.C. § 1292(a)(1). This Court's precedent has long recognized that, on interlocutory review of an injunction, appellate courts may consider "other aspects of the order" when they bear on the injunction's

validity. *See Myers v. Gilman Paper Corp.*, 544 F.2d 837, 847 (5th Cir. 1977). Venue here is such a question. 11th Cir. DE 42-1 at 24 n.8.

Plaintiffs' contrary position rests on an overbroad reading of cases involving discretionary transfers, not statutory venue defects.[6] Plfs' Br. 69 (citing *Stelly v. Emps. Nat. Ins. Co.*, 431 F.2d 1251, 1253 (5th Cir. 1970); *Garner v. Wolfinbarger*, 433 F.2d 117 (5th Cir. 1970); *Matter of Macon Uplands Venture*, 624 F.2d 26 (5th Cir. 1980); *Middlebrooks v. Smith*, 735 F.2d 431 (11th Cir. 1984)). *Stelly*, *Middlebrooks*, *Garner*, and *Macon Uplands* involved interlocutory review of discretionary transfer or consolidation decisions—matters explicitly committed to district court discretion and collateral to the merits of injunctive relief. *See, e.g., Garner*, 433 F.2d at 120 (warning against pendent review of "a judge's discretion in granting or denying transfers").

Unlike discretionary transfer decisions, venue here is a threshold statutory constraint on the district court's power to issue any injunction at all, regardless of whether it is "jurisdictional." *See Fort Bend Cnty. v. Davis*, 587 U.S. 541, 549 (2019) (a rule may be mandatory without being jurisdictional); Supp.App.438 ("ruling on the merits of the preliminary injunction before deciding venue . . . would not be appropriate."). If venue was improper, the district court lacked authority to enter

---

[6] Plaintiffs seek to prevent the defendants from replying to this jurisdictional challenge. Plfs' Br. 69 n.23. It is entirely appropriate for an appellant in a reply brief to respond to a jurisdictional challenge first made in a response brief. *See Kennedy v. Lubar*, 273 F.3d 1293, 1301 (10th Cir. 2001).

injunctive relief in the Southern District. Appellate review of the injunction is therefore analytically and legally intertwined with review of whether the court was empowered to issue it. *See Schultz v. Alabama*, 42 F.4th 1298, 1313 (11th Cir. 2022) (analyzing *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 50 (1995)). This Court therefore has appellate jurisdiction to review the venue question.[7]

### 2.    The defendants did not waive their venue objection.

The district court's waiver ruling rests on a legal error, not a discretionary judgment call. U.S. Br. 35-36. Venue was timely preserved under the rules because the state and federal defendants objected to venue in the Southern District *before* any responsive pleading or Rule 12 motion was due.

Rule 12 provides the exclusive mechanism for waiving venue at this stage. A defendant waives a venue objection only by failing to raise it "by motion" or "in a responsive pleading." Fed. R. Civ. P. 12(h)(1)(B). Rule 7, in turn, defines an exclusive list of what counts as a "pleading," and an opposition to a temporary restraining order or preliminary injunction is not one. Fed. R. Civ. P. 7(a). That is why this Court, in granting a stay, concluded that the district court "misapplied the law" in finding waiver based on emergency briefing. 11th Cir. DE 42-1 at 24-27.

---

[7] Plaintiffs err in relying on *Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495(1989). Plfs' Br. 70. The federal defendants do not rely on the collateral-order doctrine. But even if that doctrine were relevant, venue errors in cases involving land are not meaningfully remediable after final judgment when the injunction has already dictated land use, compelled removal of fixtures, and barred development.

Plaintiffs and the Tribe do not dispute the text of Rules 7 or 12. Instead, they ask the Court to sanction a free-floating, equitable waiver doctrine that overrides the rules' carefully calibrated timing provisions. Plfs' Br. 71-75; Tribe Br. 28-29. That approach cannot be reconciled with the federal rules, which are "as binding as any statute," *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988), and displace judge-made procedural doctrines to the contrary.

Plaintiffs' reliance on *Manley v. Engram* is misplaced. Plfs' Br. 74. *Manley* involved a defendant who failed to object to venue and then sought to transfer venue. 755 F.2d 1463, 1468-69 (11th Cir. 1985). Nothing in *Manley* holds that a court may deem venue waived by conduct before the Rule 12 deadline has even arrived, or because a party complied with a court-ordered, expedited injunction schedule.

The First Circuit decision in *Manchester Knitted* is inconsistent with Rule 12's text and this Court's stay order. 11th Cir. DE 42-1 at 24-27. *Manchester Knitted*'s suggestion that venue must be raised in the "first defensive move," including during emergency injunction briefing, not only conflicts with Rule 12, it violates basic fairness. *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund*, 967 F.2d 688, 692 (1st Cir. 1992). Emergency injunction practice is not a substitute for pleadings. Courts routinely require defendants to respond to temporary restraining orders within days—sometimes hours—without the benefit of a developed record or full briefing. The rules do not require defendants to assert Rule 12 defenses in that posture, and no Eleventh Circuit precedent says otherwise. Here, the state and federal defendants

22

raised venue objections early in the litigation—weeks before any answer was due and while preliminary injunction proceedings were ongoing. App.19-21, 28, 1256–60. That is exactly what Rule 12 contemplates. *See Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 887 (7th Cir. 2004) ("The defendant . . . has a right to wait until he files his answer . . . he needn't object at the earliest possible opportunity").

### 3.    The district court erred in concluding that venue lies in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1)(B).

On the merits, the district court's venue ruling cannot stand. U.S. Br. 36-39. It rests on legal theories Plaintiffs never advanced and on conduct too attenuated from the alleged NEPA violation.

*First*, the district court violated the party-presentation principle by grounding venue on theories Plaintiffs did not argue—such as ICE's Miami Field Office supervision, detainee transportation from Miami facilities, and the location of immigration courts. Plaintiffs never contended that any of those facts established venue, nor did they litigate them as venue theories. A court may not rescue a case by supplying new legal grounds for a party's position. *See United States v. Sineneng-Smith*, 590 U.S. 371, 379 (2020); *Trader Joe's Co. v. Trader Joe's United*, 150 F.4th 1040, 1054 (9th Cir. 2025) (district court improperly raised affirmative defense sua sponte). Plaintiffs' and the Tribe's recasting of this error as mere reliance on record evidence misses the point. Evidence supporting an unasserted legal theory does not cure the

23

absence of adversarial presentation. *Sineneng-Smith*, 590 U.S. at 379 (remanding for reconsideration "bearing a fair resemblance to the case shaped by the parties").

*Second*, the only acts or omissions that can "give rise" to Plaintiffs' NEPA claim are those constituting the alleged violation itself—namely, the alleged decision to proceed with construction and operation of the facility without preparing an EIS. That omission necessarily occurred where the alleged decision-making took place, not where downstream operational consequences may later unfold. Administrative supervision by ICE, transportation of detainees, receipt of correspondence in Miami, and alleged failures to consult neither formed part of the challenged decision-making process nor caused the failure to prepare an EIS; at most, they followed from it. Such post-decision implementation activities lack the required "close nexus" to the NEPA claim. *See Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371-72 (11th Cir. 2003).

Plaintiffs' reliance on *Jenkins Brick*'s observation that venue-relevant events need not be "wrongful in themselves" does not salvage the ruling. Plfs' Br. 85. That principle applies only to events that are integral to the alleged wrong—that is, events that form part of the decision-making process giving rise to the claimed NEPA violation. It does not extend to facts that merely supply background context (such as general immigration conditions, the existence of broader state–federal relationships, or the Tribe's interests); to post-decision implementation activities that would occur regardless of whether an EIS had been prepared (such as ICE supervision of

operations, detainee transportation, or immigration courts exercising jurisdiction); or to downstream environmental effects (such as water quality or wildlife impacts).

Accepting Plaintiffs' argument would allow venue to rest on context, consequences, or operational realities rather than on the defendants' acts or omissions giving rise to the claim. Under Plaintiffs theory, venue would lie wherever a completed decision is administered or felt, collapsing the venue analysis into an effects-based standard that this Court has expressly rejected. *See Jenkins Brick*, 321 F.3d at 1371-72 (venue turns on "relevant activities of the defendant," not where effects are felt); *see also Leroy v. Great W. United Corp.*, 443 U.S. 173, 186 (1979).

Because no substantial part of the acts or omissions giving rise to the alleged NEPA violation occurred in the Southern District of Florida, the district court's venue ruling should be reversed.

### 4.    28 U.S.C. § 1391(e)(1)(C) does not confer venue in the Southern District of Florida.

Next, the district court misread 28 U.S.C. § 1391(e)(1)(C) to apply only to disputes regarding title to, or possession, of land. U.S. Br. 39-44. Plaintiffs double down on the same atextual narrowing that led the district court astray. Nothing in 28 U.S.C. § 1391(e)(1)(C) limits "involve[ing]" real property to disputes over title or possession. That limitation appears nowhere in the statute and cannot be squared with either the text Congress enacted, or the relief ordered here.

Section 1391(e)(1)(C) does not ask whether the action adjudicates title or possession; it asks whether "real property is involved in the action." Congress chose an expansive, ordinary-language formulation, not a term of art such as "quiet title" or "property interest." This is in direct contrast with Congress's choice in the immediately preceding sub-paragraph, which refers to property that is the "subject of the action." 28 U.S.C. § 1391(e)(1)(B); *see W. Watersheds Project v. Burgum*, No. 1:18-cv-00187, 2025 WL 3853055, at *12 (D. Idaho Dec. 29, 2025) ("The ordinary meaning of 'subject of the action' in § 1391(e)(1)(B)—and its close proximity to 'involved in the action' in § 1391(e)(1)(C)—strongly suggest that Congress purposely intended to distinguish between the two concepts and for 'involved' to be read more broadly, and according to its ordinary dictionary meaning."). Plaintiffs' insistence that only disputes over title or possession rights qualify reads "involved" out of the statute.

As explained in the U.S. Opening Brief at page 41, "involve" means to include or entangle. *See also id.* (involved means "to be a part of, included in, or associated with"). A case need not adjudicate ownership to involve land. Plaintiffs and the Tribe never grapple with that textual point. Plfs' Br. 75-78; Tribe Br. 31-32. Instead, they invoke decades-old district court decisions that adopted without textual analysis the same "dubious statutory interpretation," which "no circuit court has endorsed or adopted." *W. Watersheds*, 2025 WL 3853055, at *14; *see also Connecticut Nat. Bank*, 503 U.S. at 253-54 ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there").

26

Moreover, this case does not merely "affect" land in the abstract; it regulates its use and physical condition. Plaintiffs attempt to recharacterize the action as purely procedural under NEPA and the injunction as merely preserving the "status quo." Plfs' Br. 76. That description ignores what the injunction actually does. The injunction prohibits use of the land as a detention facility; forbids further development of the land; bars paving, filling, excavation, lighting, and fencing; and affirmatively orders the removal of existing fencing, lighting, sewage, and other infrastructure from the land. App.1435-36. An order dictating what may be built on land, how it may be used, and what fixtures must be removed is quintessentially about real property. Calling that clearly substantive relief "procedural" does not make it so.

Nor does it matter that NEPA imposes only procedural obligations on federal agencies. Venue turns on whether real property is involved in the action, not on whether the underlying statute is procedural or substantive. And the preliminary injunction that Plaintiffs sought and obtained is not procedural—it blocks certain uses of real property and requires actions directly impacting real property.

The district court and Plaintiffs rely almost entirely on a handful of out-of-circuit district court decisions. None involved an injunction like this one—one that prohibits land use, forbids improvements, and compels removal of fixtures. Several expressly emphasized the absence of any effect on property interests or land use. *See, e.g.*, *NRDC v. TVA,* 340 F. Supp. 400, 406 (S.D.N.Y. 1971) (no effect on mineral rights); *Earth Island Inst. v. Quinn*, 56 F. Supp. 3d 1110, 1116 (N.D. Cal. 2014) (no

dispute over real property interests). Here, by contrast, the injunction squarely governs land use and physical alteration of the site. And a recent well-reasoned decision addressing subparagraph 1391(e)(1)(C) rejects these cases for their lack of textual analysis. *See W. Watersheds*, 2025 WL 3853055, at \*13-\*14.

Finally, Plaintiffs assert—without citation or analysis—that venue would still be proper because the land crosses into Miami-Dade County. Plfs' Br. 77-78. But the tiny sliver of land in Miami-Dade does not have any facility infrastructure and thus the injunction does not "involve" that land. That sliver does not make venue appropriate in the Southern District. This case unquestionably is one "involve[ing]" real property in the Middle District under § 1391(e)(1)(C). Venue is therefore improper in the Southern District, and the district court's contrary conclusion should be reversed.

## II.    The district court abused its discretion by failing to require Plaintiffs to prove a likelihood of irreparable harm.

Separately, the district court improperly relaxed the irreparable-harm standard, treating speculative and long-tailed impacts as sufficient simply because this is a NEPA case. U.S. Br. 44-45. Plaintiffs and the Tribe emphasize the district court's discretion (Plfs' Br. 47-58; Tribe Br. 36-41), but that framing ignores the court's conclusion that Plaintiffs "are not required to prove harms of a particular probability or quantity." App.1424. That conclusion contradicts Supreme Court precedent holding that NEPA violations do not carry a presumption of irreparable harm, that the harm must be likely not merely possible, and that courts may not place a "thumb

on the scale" simply because environmental interests are implicated. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *Winter v. NRDC*, 555 U.S. 7, 22 (2008). No amount of after-the-fact rationalizing can cure a court's express rejection of governing law. A district court abuses its discretion when it makes an error of law. *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004).

The district court lowered the irreparable-harm threshold because Plaintiffs' and the Tribe's evidence could not satisfy the correct one. For instance, Plaintiffs' evidence on wetlands and water impacts rest on pure speculation, not likely and imminent harm. At most, Plaintiffs' experts testified that increased runoff "could" occur under certain assumptions, "could" carry nutrients or contaminants, and may "eventually" affect downstream waters over time. App.1423-24. Such possibilities do not support findings of irreparable harm. *Winter*, 555 U.S. at 22. The court itself acknowledged that the feared harms "take time to accrue" and were "long-term." App.1424-25 n.31. That acknowledgment forecloses preliminary relief under *Winter*.

This is especially true because Plaintiffs' possibilities rely on modeling of a 100-year storm event, which has only 1% probability of occurring each year. App.507. Plaintiffs counter that this prediction was "peak" runoff. But the other event their model analyzed was a 25-year event, *id.*, which only has a 4% probability each year. Such low probabilities fall far short of "likely" harm under *Winter*.

Plaintiffs and the Tribe also dismiss baseline conditions as irrelevant, but that is wrong as a matter of logic. Without a baseline, the court cannot determine whether

any incremental harm is attributable to the challenged activity at all—much less whether it is irreparable. The site's undisputed history as an active, lit, noisy airport is not a "quibble"; it is the starting point for any credible harm analysis.

The wildlife findings suffer from the same defect, as they lack baseline assessments and conflate long-term population concerns with imminent harm. Plaintiffs and the Tribe emphasize habitat loss and increased risk, but risk is not irreparable harm unless it is likely to materialize *before* final judgment. *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Mr. Kautz's testimony did not establish imminent injury. He conceded that the facility's effect on panther populations would be "small," that no panthers had been detected near the site for years, and that any population-level impacts would manifest decades into the future. App.315-17. Predictions extending to 2070 cannot justify a preliminary injunction in 2025.

The lack of population-level impacts is dispositive. Irreparable harm requires more than unquantified disturbance to a few individuals; it must be meaningful at the species level. *See Fund for Animals v. Frizell*, 530 F.2d 982, 987 (D.C. Cir. 1975); *Waterkeeper Alliance v. Dep't of Defense*, 271 F.3d 21, 34 (1st Cir. 2001).

Plaintiffs' reliance on *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011), and *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250 (10th Cir. 2003), is misplaced. Each case involved substantial, irreversible physical alterations to the landscape such as logging. But the only alleged harms here that are even arguably imminent and concrete are entirely reversible. Lighting can be extinguished, fencing

30

can be removed, and the Tribe's access can be restored at final judgment. The district court sidestepped this problem by diluting the irreparable-harm standard, rather than by finding truly irreparable harms. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("the key word . . . is irreparable. Mere injuries, however substantial . . . are not enough").

Finally, even if Plaintiffs and Tribe had shown some likelihood of harm— which they did not—that showing falls far short of what is required to justify mandatory relief altering the status quo. *See Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971). This Court already recognized as much when it stayed the injunction. 11th Cir. DE 42-1 at 30.[8]

In sum, the preliminary injunction rests on the wrong legal standard, speculative evidence, and reversible conditions. The district court abused its discretion, and the preliminary injunction should be vacated.

## III. The equitable factors overwhelmingly weigh against an injunction.

Finally, the district court discounted compelling public interests based on an unduly narrow evidentiary demand. U.S. Br. 47-50. On cue, Plaintiffs assert that the federal defendants offered "little to no evidence" that the facility is "uniquely suited"

---

[8] Plaintiffs fault the defendants for failing to anticipate the scope of the injunction's unlawfulness. Plfs' Br. 68. A party cannot be expected to anticipate a legal error *before* the court commits it. Because the defendants' arguments respond directly to the district court's reasoning, they are entitled to raise them. *See Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010) (a party on appeal may make "a new argument to support what has been a consistent claim") (cleaned up).

or "critical." Plfs' Br. 59. But *Winter* does not require the government to prove that an enjoined activity is the only conceivable means of advancing a public interest. It requires courts to weigh the likely harms of an injunction against the harms of denying relief. 555 U.S. at 24-26. The district court inverted that inquiry by demanding proof of exclusivity—*i.e.*, that no other detention capacity anywhere in Florida could possibly mitigate the injunction's effects. That was legal error. *Siegel*, 234 F.3d at 1176 (injunction proponents bear burden).

The record evidence established that detention capacity in South Florida is strained, that DHS's Miami field office accounts for a disproportionate share of national arrests, and that the facility's up to 2,000 beds materially alleviate overcrowding and operational bottlenecks. App.1463-65. The fact that another facility may exist elsewhere in Florida—or that other facilities are not yet at crisis levels— does not negate the concrete, imminent harm caused by shuttering this facility within 60 days. Courts assessing equitable harm do not require the government to wait until systems collapse before crediting the harm. *See Winter*, 555 U.S. at 26 (crediting harms to readiness and training even absent immediate catastrophe).

Plaintiffs conflate the nature of detainees with the nature of the public interest and thus their emphasis on detainees' criminal histories misses the point. The public interest at stake is not limited to incapacitating violent offenders; it includes the government's ability to enforce immigration law, execute removal orders, maintain detention flexibility, and coordinate with state and local law enforcement. App.1463-

32

65. Reduced detention capacity necessarily impairs those functions regardless of the precise mix of detainees at a given facility. The district court erred by treating the absence of evidence about individual criminal records as dispositive of the equities, rather than focusing on systemwide operational harms.

The district court further erred by treating asserted environmental harms—many of which were prospective, mitigable, and dependent on future construction decisions—as categorically outweighing countervailing public interests. That approach is especially problematic here, where the injunction does not merely pause a discrete project but affirmatively orders the dismantling of an existing facility and prohibits its use, improvement, and maintenance. The resulting harms to immigration enforcement, public safety, and intergovernmental operations are immediate and concrete. Treating compliance with NEPA as automatically dispositive of the public interest collapses the equitable analysis into a merits determination, contrary to *Winter*.

Plaintiffs' attempt to distinguish *Winter* fails. Plfs' Br. 61-62. The lesson of *Winter* is not that only activities labeled "national security" merit weight, but that courts must give serious consideration to the Executive's assessment of harms to core governmental functions and must not discount them based on speculative countervailing harms. 555 U.S. at 26. A court abuses its discretion when it gives insufficient weight to the public interest, *id.*, or treats environmental harms as presumptively controlling, *Monsanto*, 561 U.S. at 157. The district court did both. It minimized concrete, imminent harms to the public interest while elevating speculative

33

and process-based environmental concerns, effectively creating a NEPA-first presumption that the Supreme Court has repeatedly rejected.

In sum, the equities analysis here is not a close call. The balance of equities and the public interest weigh decisively against the preliminary injunction.

## CONCLUSION

For the foregoing reasons and those in the U.S. Opening Brief, the order granting the preliminary injunction should be reversed and vacated. This case should be remanded to the district court with instructions directing the district court either to dismiss Counts I and II for lack of subject-matter jurisdiction, *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1181 (11th Cir. 2011), or, alternatively, to enter judgment for the defendants on those counts, *Munaf v. Geren*, 553 U.S. 674, 691 (2008). Plaintiffs cite no authority that such relief is not proper, and their assertion that such relief "makes no legal sense" cannot overcome settled precedent. Plfs' Br. 88 n.37. The Court should also instruct the district court to transfer the remaining or future counts to the Middle District of Florida.

Respectfully submitted,

/s/ *Allen M. Brabender*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT STANDER
*Deputy Assistant Attorney General*

MARISSA A. PIROPATO
HAYLEY A. CARPENTER
ALLEN M. BRABENDER
*Attorneys*
U.S. Department of Justice
Environment and Natural Resources Division
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3281
allen.brabender@usdoj.gov

February 24, 2026
DJ # 90-1-4-17960

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.    This document complies with the type-volume limitation of this Court's Order dated February 5, 2026 (DE 119) because, excluding the parts of the document exempted by Rule 32(f), this document contains 8,872 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Garmond font.

/s/ *Allen M. Brabender*
ALLEN M. BRABENDER
*Counsel for the Federal Defendants*

## CERTIFICATE OF SERVICE

I certify that on February 24, 2026, this brief was filed with the Clerk of the Court through the appellate CM/ECF system, which will send notice to all registered CM/ECF users.

/s/  *Allen M. Brabender*