No. 25-12873

# In the United States Court of Appeals for the Eleventh Circuit

FRIENDS OF THE EVERGLADES, INC., ET AL.,
*Plaintiffs-Appellees,*

V.

EXECUTIVE DIRECTOR, FLORIDA DIVISION OF
EMERGENCY MANAGEMENT, ET AL.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Florida
No. 25-cv-22896-KMW

## APPELLANT FDEM'S REPLY BRIEF

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa
  *Acting Solicitor General*
Nathan A. Forrester
  *Chief Deputy Solicitor General*
Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

February 24, 2026

Jesse Panuccio
Evan Ezray
David Costello
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL  33301
jpanuccio@bsfllp.com

*Counsel for Kevin Guthrie, in
his official capacity as
Executive Director of the
Florida Division of Emergency
Management*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION ................................................................................ 1

ARGUMENT ..................................................................................... 3

I.    Appellees Are Unlikely to Succeed on the Merits ........................... 3

      A.    The District Court Lacked Venue ........................................ 4

      B.    Appellees' NEPA Claim Fails ........................................... 23

            1.    Appellees Failed to Prove Final Agency Action ........... 23

                  a.    Potential Federal Funding Is Not Final
                        Agency Action ...................................... 24

                  b.    Construction Was Not Final Agency Action ....... 26

                  c.    ICE's General Role in Immigration
                        Enforcement Does Not Trigger NEPA ............... 28

            2.    The District Court Erred in Finding "Major"
                  Federal Action ............................................ 31

      C.    Appellees Are Unlikely to Receive the Injunction They
            Requested ............................................................ 38

II.   Appellees Did Not Show Irreparable Harm ................................. 39

III.  The Balance of Equities Does Not Support an Injunction ............. 44

CONCLUSION ................................................................................ 47

CERTIFICATE OF COMPLIANCE ....................................................... 48

CERTIFICATE OF SERVICE ............................................................. 49

i

# TABLE OF AUTHORITIES

**Cases**                                                                **Page**

*(888) Justice, Inc. v. Just Enters., Inc.*,
  2007 WL 2398504 (S.D.N.Y. Aug. 22, 2007).......................................13

*Abbott v. Perez*,
  585 U.S. 579 (2018) ...............................................................................39

*Am. Chem. Paint Co. v. Dow Chem. Co.*,
  161 F.2d 956 (6th Cir. 1947) ..........................................................15, 18

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ..............................................................................40

*\*Arizona v. United States*,
  567 U.S. 387 (2012) ........................................................27, 28, 44-46

*Atl. Coal. on Transp. Crisis, Inc. v. Atl. Reg'l Comm'n*,
  599 F.2d 1333 (5th Cir. 1979) ..............................................................36

*Baragona v. Kuwait Gulf Link Transp. Co.*,
  594 F.3d 852 (11th Cir. 2010) ..............................................................22

*Biderman v. Morton*,
  497 F.2d 1141 (2d Cir. 1974)................................................................35

*Big Bend Conservation All. v. FERC*,
  896 F.3d 418 (D.C. Cir. 2018)...............................................................23

*Bigham v. Envirocare of Utah, Inc.*,
  123 F. Supp. 2d 1046 (S.D. Tex. 2000) ..................................................5

*C.M. v. Noem*,
  796 F. Supp. 3d 1198 (S.D. Fla. 2025) ........................................5, 9, 11

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,
  942 F.3d 1119 (Fed. Cir. 2019)..............................................................20

*Cottman Transmission Sys., Inc. v. Martino*,
    36 F.3d 291 (3d Cir. 1994) ............................................................ 6, 9, 14

*Day v. Shalala*,
    23 F.3d 1052 (6th Cir. 1994) ................................................................ 28

*Fla. Agency for Health Care Admin. v. Adm'r for Ctrs. for Medicare & Medicaid Servs.*,
    161 F.4th 765 (11th Cir. 2025) ............................................................... 3

*Fla. Immigrant Coalition v. Att'y Gen.*,
    2025 WL 1625385 (11th Cir. June 6, 2025) ......................................... 47

*Flowers Indus., Inc. v. FTC*,
    835 F.2d 775 (11th Cir. 1987) ......................................... 12, 15, 16, 18

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) .............................................................. 18

*Frank v. Univ. of Toledo*,
    2006 WL 1555986 (E.D. Mich. June 2, 2006) ...................................... 12

*Friends of Earth v. Haaland*,
    2022 WL 185196 (D.D.C. Jan. 20, 2022) ......................................7-9, 14

*\*Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.* (*FOE*),
    2025 WL 2598567 (11th Cir. Sept. 4, 2025) ............................................
    ........................................................... 2, 5, 16, 20, 21, 31, 33, 36, 39

*Garcia v. Guthrie*,
    No. 25-cv-23136 (S.D. Fla. July 16, 2025) ............................................. 5

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ............................................................................. 31

*Garner v. Wolfinbarger*,
    433 F.2d 117 (5th Cir. 1970) ............................................................... 16

*Gulf Ins. Co. v. Glasbrenner*,
    417 F.3d 353 (2d Cir. 2005) ................................................................ 14

iii

*Gulf States Reg'l Ctr. v. Jaddou*,
 2024 WL 3553533 (E.D. La. July 25, 2024) ........................................ 23

*Harris Corp. v. Nat'l Iranian Radio & Television*,
 691 F.2d 1344 (11th Cir. 1982) ........................................................... 15

*Hendricks v. Bank of Am., N.A.*,
 408 F.3d 1127 (9th Cir. 2005) ............................................................. 15

*Hillis v. Heineman*,
 626 F.3d 1014 (9th Cir. 2010) ............................................................. 22

*Holder v. Humanitarian L. Project*,
 561 U.S. 1 (2010) ................................................................................ 46

*Hoyt v. Lane Constr. Corp.*,
 927 F.3d 287 (5th Cir. 2019) ............................................................... 19

*Hussein v. Oshkosh Motor Truck Co.*,
 816 F.2d 348 (7th Cir. 1987) ............................................................... 19

*In re Macon Uplands Venture*,
 624 F.2d 26 (5th Cir. 1980) ................................................................. 16

*In re Wild*,
 994 F.3d 1244 (11th Cir. 2021) ........................................................... 21

*Ivax Corp. v. B. Braun of Am., Inc.*,
 286 F.3d 1309 (11th Cir. 2002) ........................................................... 19

*\*Jenkins Brick Co. v. Bremer*,
 321 F.3d 1366 (11th Cir. 2003) .................................................. 4-12, 14

*Jones v. InfoCure Corp.*,
 310 F.3d 529 (7th Cir. 2002) ............................................................... 16

*Jorgenson v. Volusia Cnty.*,
 846 F.2d 1350 (11th Cir. 1988) ........................................................... 19

*Kolev v. Sessions*,
 2019 WL 1748436 (S.D.N.Y. Apr. 16, 2019) ...................................... 11

iv

*Lamont v. Haig*,
  590 F.2d 1124 (D.C. Cir. 1978) ............................................................. 5

*Lane v. XYZ Venture Partners*,
  322 F. App'x 675 (11th Cir. 2009) ...................................................... 21

*Leroy v. Great W. United Corp.*,
  443 U.S. 173 (1979) ............................................................ 7, 10, 14

*Manley v. Engram*,
  755 F.2d 1463 (11th Cir. 1985) .......................................................... 21

*Maybelline Co. v. Noxell Corp.*,
  813 F.2d 901 (8th Cir. 1987) ................................................. 15, 17, 18

*McCray v. Fid. Nat. Title Ins. Co.*,
  682 F.3d 229 (3d Cir. 2012) ............................................................... 19

*Middlebrooks v. Smith*,
  735 F.2d 431 (11th Cir. 1984) ........................................................... 16

*Morgan v. Sundance, Inc.*,
  596 U.S. 411 (2022) ........................................................................... 19

*Murphy v. Travelers Ins. Co.*,
  534 F.2d 1155 (5th Cir. 1976) ........................................................... 22

*Nat'l Ass'n of Home Builders v. EPA*,
  675 F. Supp. 2d 173 (D.D.C. 2009) ..................................................... 7

*Nat'l Org. for the Reform of Marijuana L. v. DEA*,
  545 F. Supp. 981 (D.D.C. 1982)........................................................... 28

*Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*,
  760 F.2d 312 (D.C. Cir. 1985)..................................................... 15, 18

*Nw. Ctr. for Alts. to Pesticides v. DHS*,
  552 F. Supp. 3d 1078 (D. Or. 2021) ................................................... 30

*Okeelanta Corp. v. U.S. Army Corps of Eng'rs*,
  132 F.4th 1320 (11th Cir. 2025)......................................................... 24

*Pillsbury v. PBF Energy, Inc.*,
  2021 WL 12319890 (D.N.J. Mar. 24, 2021) ........................................ 11

*Pittsburgh Logistics Sys., Inc. v. Glen Rose Transp. Mgmt.*,
  2020 WL 7406848 (W.D. Pa. Dec. 17, 2020) ....................................... 13

*Proctor & Gamble Co. v. Ranir, LLC*,
  2017 WL 3537197 (S.D. Ohio Aug. 17, 2017) ..................................... 16

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
  128 F.4th 1089 (9th Cir. 2025) .......................................................... 27

*Rattlesnake Coalition v. EPA*,
  509 F.3d 1095 (9th Cir. 2007) ........................................................... 24

*Ritter v. Cecil Cnty. Off. of Hous. & Cmty. Dev.*,
  33 F.3d 323 (4th Cir. 1994) ............................................................... 28

*Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*,
  626 F.3d 973 (7th Cir. 2010) ............................................................. 16

*Salcedo v. Decker*,
  2019 WL 339642 (S.D.N.Y. Jan. 28, 2019) ........................................ 11

*Schultz v. Alabama*,
  42 F.4th 1298 (11th Cir. 2022) .......................................................... 17

*Sec'y, U.S. Dep't of Lab. v. Preston*,
  873 F.3d 877 (11th Cir. 2017) ........................................................... 32

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
  605 U.S. 168 (2025) ........................................................... 1, 33, 35, 38

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) ......................................................... 42

*Stansell v. Revolutionary Armed Forces of Colombia*,
  771 F.3d 713 (11th Cir. 2014) ........................................................... 22

*Steen v. Murray*,
  770 F.3d 698 (8th Cir. 2014) ............................................................... 8

*Stelly v. Emps. Nat'l Ins. Co.*,
   431 F.2d 1251 (5th Cir. 1970) ........................................................ 16

*Stout ex rel. Stout v. Jefferson Cnty. Bd. of Educ.*,
   882 F.3d 988 (11th Cir. 2018) ....................................................... 40

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020) ........................................................ 3

*USGA v. U.S. Amateur Golf Ass'n*,
   690 F. Supp. 317 (D.N.J. 1988) ..................................................... 17

*Ukiah Adventist Hosp. v. FTC*,
   981 F.2d 543 (D.C. Cir. 1992) ....................................................... 16

*United States v. Brignoni-Ponce*,
   422 U.S. 873 (1975) ..................................................................... 46

*United States v. Moss*,
   34 F.4th 1176 (11th Cir. 2022) ...................................................... 24

*United States v. O'Steen*,
   133 F.4th 1200 (11th Cir. 2025) .................................................... 21

*United States v. S. Fla. Water Mgmt. Dist.*,
   28 F.3d 1563 (11th Cir. 1994) ........................................... 24, 36, 37

*United States v. Sineneng-Smith*,
   590 U.S. 371 (2020) ..................................................................... 17

*Webster v. Fall*,
   266 U.S. 507 (1925) ..................................................................... 21

*Winter v. Nat'l Res. Def. Council*,
   555 U.S. 7 (2008) .................................................................... 44, 45

*Woodke v. Dahm*,
   70 F.3d 983 (8th Cir. 1995) ................................................ 8, 10, 11

*Younge v. Fulton Jud. Cir. Dist. Att'ys Off.*,
   2025 WL 974309 (11th Cir. Apr. 1, 2025) ..................................... 19

## Statutes

5 U.S.C. § 706 ................................................................31

8 U.S.C. § 1231(g) ..........................................................31

8 U.S.C. § 1357(g) ....................................................28, 36

16 U.S.C. § 1532(19) .......................................................43

28 U.S.C. § 1391(b)(2) .....................................................13

42 U.S.C. § 4336e(10) ..............................................31-33, 35

## Rules

Fed. R. Civ. P. 12 .....................................................21, 22

## Other Authorities

Fla. Fish & Wildlife Conservation Comm., *Description and Range*,
    https://perma.cc/3DDC-A8DJ (last visited Feb. 17, 2026) ....................6

Miccosukee Casino & Resort,
    https://perma.cc/YK38-P4M2 (last visited Feb. 24, 2026) ..................44

Trevor Hunnicutt, *Trump Tours 'Alligator Alcatraz' as He Pushes for
    More Deportations*, Reuters (July 1, 2025),
    https://www.reuters.com/world/us/trump-play-up-alligator-alcatraz-
    deportations-florida-ahead-bill-deadline-2025-07-01/ .........................45

U.S. Fish & Wildlife Serv., *About Wood Storks in the Everglades
    Headwaters*,
    https://perma.cc/24WH-Q45V (last visited Feb. 17, 2026)....................6

Wright & Miller, Fed. Prac. & Proc. § 3921.1 .........................................18

## INTRODUCTION

The State of Florida and the federal government, supported by the other states in the Circuit and another twenty-two states, ask this Court to reverse the decision below. That broad coalition highlights the danger of the district court's decision. Ignoring its lack of venue, the district court issued a sweeping injunction to shut down a fully operational immigration detention facility—one that had become critical in achieving the law-enforcement priority of safely and efficiently detaining and deporting illegal aliens, many of whom have violent criminal backgrounds. The district court's unprecedented decision transforms a modest procedural law concerning *federal* agency action into "a blunt and haphazard tool" that can be "employed by project opponents … to stop" all manner of *state* "construction projects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 183 (2025). In fact, under the district court's reasoning, no local law-enforcement agency that has a 287(g) agreement may construct or modify a jail without preparing an EIS (and navigating the lawsuits from advocacy groups that typically follow). Worse still, the district court held that NEPA overrides the strong jurisdiction-stripping provisions of federal immigration law, which are

meant to avoid just such interference with executive branch action in areas central to foreign affairs and border security.

At the stay stage, this Court explained that because "no federal dollars have been expended on the construction or use of the Facility," and because "[t]he Facility is a site built, led, operated, and funded unilaterally by a state government—in accordance with the state's laws—at which the state retains discretionary control over who is detained at the facility," NEPA did not apply. *Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec. (FOE)*, 2025 WL 2598567, at *7, *9 n.7 (11th Cir. Sept. 4, 2025). Moreover, the Court explained that it was "skeptical of" the district court's "cursory analysis of the merits of the venue issue," *id.* at *10—yet another reason why the preliminary injunction should not have been granted.

The Court was correct in September, and it remains correct today. Because the district court's order is deeply flawed and imposes substantial harm on both Florida and the federal government, this Court should reverse.

## ARGUMENT

## I.    APPELLEES ARE UNLIKELY TO SUCCEED ON THE MERITS

Appellees do not defend the district court's merits analysis as such. Instead, they spend pages arguing that, although the district court may have gotten it wrong, the analysis was not so wrong to merit reversal. PB.17-18, 24; TB.41-42.[1]  That considerably overstates the standard of review.  To be sure, preliminary-injunction decisions are reviewed for abuse of discretion.  *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020).  But underlying legal conclusions are reviewed de novo.  *Id.*  And this case is replete with legal questions:  What is the proper test for venue and waiver?  What constitutes a final federal agency action?  What constitutes a major federal action?  What is the standard for assessing irreparable harm in an injunction?  *See Fla. Agency for Health Care Admin. v. Adm'r for Ctrs. for Medicare & Medicaid Servs.*, 161 F.4th 765, 776 n.1 (11th Cir. 2025) (citing "a wall of our precedent expressly holding" that on appeal from a preliminary injunction "we review constituent legal determinations de novo").  And de novo review here reveals that the

---

[1] FDEM's Opening Brief is cited as "OB," the Original Plaintiffs' ("Plaintiffs") Answer Brief is cited as "PB," Plaintiff-Intervenor's (the "Tribe") Answer Brief is cited as "TB," district-court filings are cited by "Doc." number, and filings in this Court are cited by "ECF No."

proper course is to reverse and remand with instructions to transfer venue.  But even if review were for abuse of discretion, given the magnitude of the district court's errors, reversal would still be warranted for all the reasons explained below and in FDEM's Opening Brief.

## A.    The District Court Lacked Venue

**1.** Appellees challenge only "the construction and operation of [a] detention facility that was undertaken without NEPA review." *See* ECF No. 110 at 2.  And they do not seriously contest that the core acts at issue (FDEM's construction, operation, and related decisionmaking), or the core omission (the decision to act without an EIS), occurred outside the Southern District.  *See* OB.22.  Any other events they identify—like immigration operations in Miami-Dade, a notice letter sent to Miami-Dade officials, or Appellants' so-called "failure to consult" with various individuals—do not "directly give rise" to the NEPA claim and thus are not "relevant" to venue. *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003).  And even if those matters were marginally relevant, they are "insubstantial" compared to the foundational acts of building the facility, running it, and deciding whether to conduct NEPA review. *Lamont v. Haig*, 590 F.2d 1124, 1134 n.62 (D.C. Cir. 1978); *see also*

*Jenkins Brick*, 321 F.3d at 1371 ("[O]nly those locations hosting a 'substantial part' of the events are to be considered."). The Southern District is thus the wrong venue for facility-related challenges, as two Southern District judges have held, and as this Court suggested at the stay stage. *See C.M. v. Noem*, 796 F. Supp. 3d 1198, 1225-32 (S.D. Fla. 2025); *Garcia v. Guthrie*, No. 25-cv-23136 (S.D. Fla. July 16, 2025), Doc. 5 at 1; *FOE*, 2025 WL 2598567, at *9-10 & n.9.[2]

Appellees' attempts to undermine this analysis fail.

**a.** Appellees cite the various "environmental harm[s]" that the district court speculated might travel over the county line. PB.81-83; TB.31. But venue "focus[es] on relevant activities of the defendant," *Jenkins Brick*, 321 F.3d at 1371-72, not on where Appellees may "feel[] the effects of a defendant's conduct," *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1048 (S.D. Tex. 2000); *see Cottman Transmission*

_____

[2] Plaintiffs try to confine *C.M.* and *Garcia* as "habeas or conditions-of-confinement cases" where the harms occurred within the Middle District. PB.87. But those cases reflect a broader principle: In challenges related to the facility, the relevant conduct is that of state actors running the facility, not federal actors in Miami-Dade. *C.M.* also rejected many of Appellees' venue arguments, like the notion that federal officials in Miami-Dade set facility "policy" or "review" its operation, and that Florida's 287(g) agreements established venue in the Southern District. 796 F. Supp. 3d at 1231-33.

*Sys., Inc. v. Martino*, 36 F.3d 291, 295 (3d Cir. 1994) (venue lied in district where defendant failed to send payment, not where plaintiff failed to receive it). After all, the "relevant" acts under the venue statute are those that "directly give rise" to the plaintiff's claim. *Jenkins Brick*, 321 F.3d at 1371. Yet harms flowing *from* a NEPA violation cannot "give rise" *to* that NEPA violation; they are the result of it.

Plaintiffs' reliance on the panther chart proves the wisdom of that rule. PB.82. They claim that venue lies in the Southern District because panthers "affected" by the facility might roam there. But panthers roam as far as Georgia.[3] Does venue lie there, too? And what of the other animals that the facility allegedly affects, like the wood stork (a migratory bird that travels as far west as Mississippi and as far north as North Carolina)?[4] Does venue soar to wherever the stork flies? Appellees' migratory theory of venue would "subject … officials to suit in … every district" that might feel some impact from the facility's operation. *Leroy v. Great W. United Corp.*, 443 U.S. 173, 186-87 (1979).

---

[3] *See* Fla. Fish & Wildlife Conservation Comm., *Description and Range*, https://perma.cc/3DDC-A8DJ (last visited Feb. 17, 2026).

[4] U.S. Fish & Wildlife Serv., *About Wood Storks in the Everglades Headwaters*, https://perma.cc/24WH-Q45V (last visited Feb. 17, 2026).

That boundless assertion of venue is exactly what the activities-of-the-defendant rule aims to prevent.  *See Jenkins Brick*, 321 F.3d at 1371-72.[5]

Plaintiffs claim this is "not a usual NEPA case" in which the government compiles an evidentiary record before acting.  PB.84.  But that reality only narrows the universe of "relevant" acts that could "give rise" to Appellees' NEPA claims.  *Jenkins Brick*, 321 F.3d at 1371-72. When the government conducts a NEPA review that is allegedly inadequate, the acts comprising that review arguably bear a "close nexus" to the NEPA claim.  *Id.* at 1372; *see Friends of Earth v. Haaland*, 2022 WL 185196, at *3-4 (D.D.C. Jan. 20, 2022) (venue was proper where EIS was issued).  But when, as here, the government *declines* to conduct a NEPA review, the relevant events are the asserted major federal action and the "lack of a decision to conduct" NEPA review.  *Friends of Earth*, 2022 WL 185196, at *4; *see also Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009) (APA cases "generally focus on where the decisionmaking process occurred to determine where the claims arose." (collecting cases)).  Any other view would compel this Court to

---

[5] Plaintiffs note (at 82-83) that the district court's venue ruling did not rely on "impacts alone."  But the other events the court cited do not establish venue either.  *Infra* 8-11.

speculate over what steps the government might have taken, and where it might have taken them, had it engaged in NEPA review. *See Friends of Earth*, 2022 WL 185196, at \*4 (rejecting argument that venue over a NEPA claim was proper in district where NEPA studies theoretically could have occurred).[6]

**b.** Next, Plaintiffs assert that federal immigration operations in the Southern District are relevant to this NEPA case because they are supposedly "necessary to operat[e]" the TNT facility. PB.80-81 & n.35. Yet venue does not lie wherever any "necessary event" in a "causal" chain has occurred. *Jenkins Brick*, 321 F.3d at 1372 (quoting *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995)); *see Steen v. Murray*, 770 F.3d 698, 704 (8th Cir. 2014) (acts are not relevant to venue "simply because the alleged wrongful conduct would have been impossible without [them]"). The event must have a "close nexus to the wrong" asserted. *Jenkins Brick*, 321 F.3d at 1372. And here, the "wrong" asserted is that Appellants built

---

[6] Similarly, Plaintiffs claim that the district court "correctly treated the locus of the environmental harm as relevant" because the NEPA claim "arises from Appellants' failure to consider the environmental impacts." PB.81. That is wrong, too: The "relevant omission" is the "lack of a decision to conduct" NEPA review, not every hypothetical failure to take a water sample or conduct a land survey. *Friends of Earth*, 2022 WL 185196, at \*4.

and operated a detention facility in the Middle District of Florida without "deci[ding] to conduct" an environmental review. *Friends of Earth*, 2022 WL 185196, at \*4; *see* ECF No. 110 at 2. Federal immigration operations outside that facility bear no more than a "tangential connection" to that alleged environmental wrong. *Cottman*, 36 F.3d at 294; *see C.M.*, 796 F. Supp. 3d at 1231-33 (rejecting arguments that immigration actions in the Southern District gave rise to a challenge to the TNT facility); OB.28-29. Both Plaintiffs and the district court made similar points below. *See* App.1306 (District court: "I am not wading into decisions about immigration. What I am wading into … is NEPA[.]"); App.1309-10 (District court: "I cannot order and I am not here to weigh in on the decision one way or another [about immigration]. I am here to determine if the appropriate [NEPA] protocol was entered into[.]"); App.576 (Plaintiffs: "We are not seeking a TRO to enjoin any immigration enforcement activities.").[7]

---

[7] Appellees assert that Miami-based immigration operations are relevant because they "rely on" the TNT facility for detention space. TB.31; PB.80. But it is the "activities of the defendant" that count, *Jenkins Brick*, 321 F.3d at 1371-72, not the activities of those who might "rely on" the defendant. Plus, facilities "throughout the United States" rely on TNT for population "decompress[ion]." App.1494-95 ¶ 11.

To support their necessary-is-enough theory, Plaintiffs try to manufacture a split between *Jenkins Brick* and Eighth Circuit cases like *Woodke v. Dahm*, 70 F.3d 983 (8th Cir. 1995)—an odd assertion given that *Jenkins Brick* praised *Woodke* for its "good interpretation of [the venue] statute." *See* 321 F.3d at 1372. On Plaintiffs' telling, *Woodke* holds that only allegedly "wrongful" acts are relevant in the venue analysis, while *Jenkins Brick* purportedly holds that the relevant acts need not "be wrongful in and of themselves." PB.85 (last quote attributed to *Jenkins Brick*, 321 F.3d at 1372). This argument falls apart upon scrutiny.

Tellingly, Plaintiffs' purported quotation from *Jenkins Brick* is a hallucination. It appears nowhere in *Jenkins Brick* (nor in any case undersigned counsel could find on Westlaw).[8] Indeed, *Jenkins Brick* explained that *Woodke*'s reference to "wrongful" events simply means those with "a close nexus to the wrong"—the standard this Court "approve[d]." 321 F.3d at 1371-72. So there is no divide between *Jenkins*

---

Appellees' theory would impermissibly vest venue in all those districts too. *Contra Leroy*, 443 U.S. at 186-87.

[8] It is thus unclear whether Plaintiffs' brief reflects output copied from artificial intelligence.

*Brick* and *Woodke*.    That Plaintiffs must resort to fabricating case language confirms that Miami-based immigration operations do not "give rise" to the NEPA claim.    *Id.* at 1372.

For their next move, Plaintiffs insist that ICE's Miami field office "supervis[es]" the facility's immigration enforcement operations, apparently relying on the State's applicable 287(g) agreements.    PB.80. But venue does not lie wherever anyone with supervisory authority resides.    *See C.M.*, 796 F. Supp. 3d at 1231-33 (venue in Southern District was improper in challenge to TNT facility, despite claimed federal policies emanating from Southern District, because on-site actors were not acting "pursuant to the Federal Defendants' instructions"); *see also Kolev v. Sessions*, 2019 WL 1748436, at *1-2 & n.1 (S.D.N.Y. Apr. 16, 2019) (supervisory authority under 287(g) was insufficient to establish venue in New York where ICE officials did not exercise "day-to-day control" over detainees in New Jersey detention facility); *Salcedo v. Decker*, 2019 WL 339642, at *2 (S.D.N.Y. Jan. 28, 2019) (similar); *Pillsbury v. PBF Energy, Inc.*, 2021 WL 12319890, at *2 (D.N.J. Mar. 24, 2021) (relying on *Jenkins Brick*'s progeny to conclude "the decision to reduce the workforce, like many supervisory decisions, only indirectly

11

gives rise to the claims at-issue"). Again, venue lies where the "relevant" events that "give rise" to the claim occurred. *Jenkins Brick*, 321 F.3d at 1371-72. And here, "ICE officers" in Miami-Dade "do not control the site," nor did they "construct[]" it. App.1521-22 ¶¶ 21, 24-25.

Lastly, Plaintiffs cannot dispute that detention operations at the facility—including any so-called "coordinati[on] and supervis[ion]" in the Southern District, PB.80—began only *after* they filed this case. Yet "venue must be determined based on the facts at the time of filing." *Flowers Indus., Inc. v. FTC*, 835 F.2d 775, 776 n.1 (11th Cir. 1987). Thus, ICE's Miami-based operations cannot establish venue.

**c.** Plaintiffs contend that venue lies in the Southern District because that is where Miami-Dade officials were "noti[ified]" of the State's decision to commandeer the TNT airport. PB.85. But the mere act of notifying Miami-Dade officials about the commandeering did not "give rise" to Plaintiffs' NEPA claim—the "relevant" act was the actual commandeering of the land on which the facility sits. *Jenkins Brick*, 321 F.3d at 1371; *see Frank v. Univ. of Toledo*, 2006 WL 1555986, *3 (E.D. Mich. June 2, 2006) ("Plaintiff has not cited any authority for the proposition that venue is proper in a district where a party 'learns of' the

conduct that gives rise to a claim."); *(888) Justice, Inc. v. Just Enters., Inc.*, 2007 WL 2398504, *6 (S.D.N.Y. Aug. 22, 2007) (notice of injury was not "material" to claim).  That commandeering decision was made in Tallahassee and executed in the Middle District.  App.1499 ¶ 4.[9]

**d.**  Appellees assert that FDEM's so-called "failure[s] to consult" with individuals in the Southern District gave rise to the NEPA claim.  PB.86-87; TB.30.  They protest that a contrary holding would "turn NEPA on its head [by] allowing agencies to decide an environmental statement is not required before obtaining relevant information."  *See* PB.87.

That argument conflates the merits with venue.  In the venue analysis, only omissions that "directly give rise" to the alleged violation

---

[9] Appellees argue that the "land at the center of the dispute crosses district boundaries."  PB.87; TB.30-31.  They are mistaken.  The relevant land is that on which the facility sits, not unused airport property that Miami-Dade may own.  App.1516 ¶ 6.  And the facility sits entirely on land in the Middle District.  App.1517-18 ¶¶ 9-10.

The Tribe further notes that Miami-Dade County "own[s]" the TNT airport.  TB.30.  But venue turns on where the "events or omissions … occurred," not on where the landowner lives.  28 U.S.C. § 1391(b)(2); *cf. Pittsburgh Logistics Sys., Inc. v. Glen Rose Transp. Mgmt.*, 2020 WL 7406848, at *3 (W.D. Pa. Dec. 17, 2020) (venue existed at trademark owners' residence not because owner lived there, but because it was "the location of the property" driving the dispute).

are "relevant." *Jenkins Brick*, 321 F.3d at 1371. And in a NEPA case, the relevant "omission" that gives rise to the violation is the "lack of a decision to conduct" a NEPA review. *Friends of Earth*, 2022 WL 185196, at *4. Any failures to consult during the NEPA process are either downstream effects of that omission or, at most, "tangential" omissions that are irrelevant. *Cottman*, 36 F.3d at 294; *see also Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) (courts must "take seriously" the adjective "substantial" and not treat venue like "minimum contacts"). A contrary view would improperly "subject … officials to suit in" virtually "every district" where NEPA research could take place, *Leroy*, 443 U.S. at 186-87, and force this Court to guess at where the government might have conducted NEPA studies, *contra Friends of Earth*, 2022 WL 185196, at *4.[10]

**2.** Unable to win on the merits of venue, Appellees retreat to procedure. Those arguments are equally hollow.

---

[10] Plaintiffs say *Friends of Earth* is distinguishable because there only "a handful of studies" were not considered, while here "all impacts were ignored." PB.87. That distinction makes no difference. *Friends of Earth* set out a clear holding: The failure to conduct "additional [NEPA] research" is not a "relevant omission" in a NEPA claim. 2022 WL 185196, at *4. The relevant omission is instead "the lack of a decision to conduct or consider further research." *Id.*

14

**a.** Plaintiffs claim venue is irrelevant to merits success because it "is not a jurisdictional prerequisite." PB.19. But jurisdictional or not, a district court "lack[s] authority to grant relief if" "venue [i]s improper" and has been challenged. *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1135 (9th Cir. 2005). Accordingly, this Court and others have vacated injunctions for improper venue. *See Flowers*, 835 F.2d at 778; *Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 907 (8th Cir. 1987); *Am. Chem. Paint Co. v. Dow Chem. Co.*, 161 F.2d 956, 960 (6th Cir. 1947); *cf. Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*, 760 F.2d 312, 317 (D.C. Cir. 1985) (vacating denial of preliminary injunction on the merits with instructions to dismiss for lack of venue).

*Harris Corp. v. National Iranian Radio & Television*, 691 F.2d 1344 (11th Cir. 1982), is not to the contrary. That case stands for the unremarkable premise that "[v]enue is not a jurisdictional prerequisite"—like, say, subject-matter jurisdiction. *Id.* at 1349. Because it is not jurisdictional, defendants may "waive" venue objections, and the "presence or absence" of proper venue will "not affect a court's authority to adjudicate." *Id.* But where, as here, the defendant properly asserts a venue defense, "it is *reversible error* to address injunctive relief

15

prior to a claim of improper venue." *Proctor & Gamble Co. v. Ranir, LLC*, 2017 WL 3537197, at *4 (S.D. Ohio Aug. 17, 2017) (emphasis in original) (collecting cases); *see Flowers*, 835 F.2d at 778 (vacating injunctive relief for lack of venue).

**b.** Plaintiffs claim that this Court lacks jurisdiction to review the venue issue while reviewing the preliminary-injunction order.  PB.69-71. This Court rightly rejected that argument at the stay stage.  *FOE*, 2025 WL 2598567, at *9 n.8.  Most of Plaintiffs' "inapposite" citations did not even involve the appeal of a preliminary injunction.  *Id.*[11]  And in the rest, the defendant did not challenge the plaintiff's likelihood of success for improper venue, but sought parallel review of a discrete discretionary transfer order.[12]

Plaintiffs' citations thus stand for the unremarkable proposition that rulings on motions to dismiss or to transfer for lack of venue are

---

[11] *See Middlebrooks v. Smith*, 735 F.2d 431, 432 (11th Cir. 1984); *Stelly v. Emps. Nat'l Ins. Co.*, 431 F.2d 1251, 1252-54 (5th Cir. 1970); *Garner v. Wolfinbarger*, 433 F.2d 117, 120 (5th Cir. 1970).

[12] *In re Macon Uplands Venture*, 624 F.2d 26, 27-28 (5th Cir. 1980); *Jones v. InfoCure Corp.*, 310 F.3d 529, 532, 536-37 (7th Cir. 2002); *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 548 (D.C. Cir. 1992); *Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010).

ordinarily not appealable because they are non-final. Yet when, as here, plaintiffs move for a preliminary injunction and improper venue is asserted as a reason for why they are unlikely to succeed on the merits, App.1256-61, 1278-89, the venue determination is part of the appealable preliminary-injunction order, *e.g.*, *USGA v. U.S. Amateur Golf Ass'n*, 690 F. Supp. 317, 319 (D.N.J. 1988) ("In measuring … a preliminary injunction, the Court must first determine if plaintiff has adequately set forth jurisdiction and venue when it is challenged.").[13] That tracks how courts treat other procedural defenses during the preliminary-injunction

---

[13] The district court purported to construe FDEM's venue argument as a motion to dismiss, rather than as a response to Plaintiffs' injunction motion. App.1356 n.1. But Plaintiffs agree that FDEM "filed no … motion [to dismiss]." PB.73. Nor could the district court have erased the venue argument from FDEM's response to the TRO/preliminary-injunction motion. *Cf. United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (courts must resolve "the case shaped by the parties rather than the case designed by the [court]"). Even if the court could have alchemized FDEM's TRO response into a dismissal motion, this Court would have "pendent appellate jurisdiction" over the order on the dismissal motion. *Schultz v. Alabama*, 42 F.4th 1298, 1313 (11th Cir. 2022). In *Schultz*, this Court "exercise[d] … pendent appellate jurisdiction" over two issues raised in a motion to dismiss—"standing and failure to state a claim"—because both were "require[d] … to obtain [the] preliminary injunction." *Id.* The same is true for venue. *E.g.*, *Maybelline*, 813 F.2d at 903 n.1 (reviewing dismissal for lack of venue alongside denial of preliminary injunction); *Am. Chem. Paint Co.*, 161 F.2d at 958 (similar); *Noxell*, 760 F.2d at 317 (similar).

stage, like lack of subject-matter jurisdiction. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("[T]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction.").

Circuit courts thus regularly consider venue in reviewing a preliminary-injunction order. *See, e.g.*, *Flowers*, 835 F.2d at 778 (vacating preliminary injunction for lack of venue); *Maybelline*, 813 F.2d at 907 (same); *Am. Chem. Paint Co.*, 161 F.2d at 960 (same); *cf. Noxell*, 760 F.2d at 317 (vacating preliminary-injunction denial with instructions to also dismiss for lack of venue); *see also* Wright & Miller, Fed. Prac. & Proc. § 3921.1 (many "matters have been reviewed as within the proper scope of an interlocutory injunction appeal," including "venue"). In fact, Plaintiffs conceded during stay briefing that this Court has exercised jurisdiction over a venue ruling while reviewing a preliminary injunction. ECF No. 35 at 14 n.8; *see Flowers*, 835 F.2d at 778. Yet Plaintiffs now inexplicably omit this binding, on-point precedent from their Answer Brief, despite the duty of candor to notify the Court of "adverse, controlling precedent." *Jorgenson v. Volusia Cnty.*, 846 F.2d 1350, 1351-52 (11th Cir. 1988).

In a final bid, Plaintiffs contend that because FDEM did not explain why this Court has "interlocutory appellate jurisdiction" in its Opening Brief, it "should not be permitted to do so on reply." PB.69 n.24. Nonsense. An "appellant is not required to anticipate and rebut in his opening brief every possible ground for affirmance that the defendant might (or might not) raise." *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 359 (7th Cir. 1987) (Posner, J., concurring and dissenting in part); *see also Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 295 n.2 (5th Cir. 2019) (same); *McCray v. Fid. Nat. Title Ins. Co.*, 682 F.3d 229, 241 (3d Cir. 2012) (same).

**c.** Appellees also fail to show waiver.[14] Plaintiffs first contend that FDEM's venue defense "cannot be deemed part of its original motion …

---

[14] Plaintiffs say (at 71) that this Court reviews venue-waiver rulings for abuse of discretion. But waiver rulings are generally "legal question[s]" that this Court reviews "de novo." *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1316 n.18 (11th Cir. 2002), *abrogated in part on other grounds by Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022). Neither of Plaintiffs' citations prove otherwise. *See Younge v. Fulton Jud. Cir. Dist. Att'ys Off.*, 2025 WL 974309, at *4 (11th Cir. Apr. 1, 2025) (unpublished opinion dealing with affirmative defenses, not Rule 12 defenses); *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1132 (Fed. Cir. 2019) (non-binding and unreasoned). The Court should thus review the waiver ruling de novo. Regardless, the district court committed reversible error under any standard.

because [it] filed no prior motion." PB.73. True, but irrelevant. The venue defense "merged into FDEM's initial TRO response," not some unfiled motion. OB.24. Plaintiffs respond that the district court's mere "recogni[tion]" of FDEM's supplemental filings "did not cure [any] waiver." PB.74. But that gloss is irreconcilable with the court's assurance that "everyone's supplement is going to be recognized," *FOE*, 2025 WL 2598567, at *9, and its subsequent analysis of the merits of venue, App.1379-99. Moreover, Plaintiffs themselves filed multiple supplements submitting new evidence to support their TRO motion and similarly relied on the district court's assurance that this evidence had been "recognized," *see* Docs. 25-27, 31, 34, 40, 49, so they can hardly claim the goose's sauce cannot be used on the gander.

Plaintiffs next argue that Rule 12(h) does not foreclose other methods of forfeiting a venue defense. PB.74. But as the Court held in the stay order, *FOE*, 2025 WL 2598567, at *10, Rule 12 lists just two ways to forfeit venue, and "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc). That is why this Court held, even before the stay proceedings, that "waiver is

*only* accomplished if the defense is not asserted in the first motion made under Rule 12 or responsive pleading." *Lane v. XYZ Venture Partners*, 322 F. App'x 675, 678 (11th Cir. 2009).

*Manley v. Engram*, 755 F.2d 1463 (11th Cir. 1985), does not hold otherwise. *Manley* stated that "the right to object to improper venue may be waived … by express waiver, by conduct amounting to waiver as a matter of law, or by failure to interpose a timely and sufficient objection." *Id.* at 1468. Yet that "language" must "be read in light of the facts presented." *United States v. O'Steen*, 133 F.4th 1200, 1233 n.4 (11th Cir. 2025) (Jordan, J., separate majority joined by Lagoa, J.). And in *Manley*, the issue was whether a *plaintiff* had waived venue by filing suit in a district. *See* 755 F.2d at 1468. Because Rule 12 does not apply to plaintiffs, *see* Fed. R. Civ. P. 12 (describing "defenses" to claims), *Manley* neither "considered" nor "decided" whether Rule 12 displaces other methods of waiving venue, *Webster v. Fall*, 266 U.S. 507, 511 (1925). It thus does not "constitute[ a] precedent[]" on the issue, *id.*, so the Court

should follow Rule 12's plain text (as it did at the stay stage), *see FOE*, 2025 WL 2598567, at *10.[15]

The Tribe cites several cases that it claims support waiver. TB.28-29. None do. *SEC v. Lauer* did not "approve[]" a venue waiver. *Id.* That unpublished case said waiver was "arguabl[e]," but then it proceeded to the merits. 478 F. App'x 550, 555 (11th Cir. 2012). Other Tribe citations involved personal jurisdiction and service of process, not venue. *See Baragona v. Kuwait Gulf Link Transp. Co.*, 594 F.3d 852, 854 (11th Cir. 2010); *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 745-46 (11th Cir. 2014). And its remaining case arose in the unique context of interpleader, and even there, the relevant litigants did not contest venue. *Murphy v. Travelers Ins. Co.*, 534 F.2d 1155, 1159 (5th Cir. 1976).

---

[15] Even if the Court were to "imply [a conduct] exception where [Rule 12's] text does not supply one," that exception should govern only in "the most compelling of" circumstances. *Hillis v. Heineman*, 626 F.3d 1014, 1017 (9th Cir. 2010). It should not apply when, as here, the defendant omits a venue argument in immediately responding to emergency TRO filings. *See* OB.26 (collecting cases holding that responses to fast-moving TRO proceedings are not defensive moves triggering waiver).

As for Plaintiffs' citations, FDEM has already explained why *Manchester Knitted Fashions* does not apply. OB.26 n.9. Nor does *Gulf States Regional Center v. Jaddou* move the needle. 2024 WL 3553533, at *4 (E.D. La. July 25, 2024). That case did not involve a TRO, and defense counsel orally argued the preliminary-injunction motion before raising venue. *Id.* By contrast, this case involved a fast-moving TRO, and FDEM challenged venue weeks before the preliminary-injunction hearing. App.1256-61; *see* OB.25-26 (collecting similar cases finding no waiver).

## B.    Appellees' NEPA Claim Fails

### 1.    *Appellees Failed to Prove Final Agency Action*

Appellees concede they must satisfy the APA's final-agency-action requirement. Yet, like the district court, Appellees refuse to "pars[e] agency actions" and instead resort to a sum-is-more-than-the-whole-of-its-parts approach. PB.24; TB.47. But the anti-segmentation principle "does not require the aggregation of federal and non-federal actions." *Big Bend Conservation All. v. FERC*, 896 F.3d 418, 424 (D.C. Cir. 2018). Plaintiffs' lone citation on this point is not to the contrary. It reinforces that the rule prohibits "dividing a major *federal* action into smaller

components." *Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, 132 F.4th 1320, 1344 (11th Cir. 2025). But that says nothing of *state* actions.

And without state actions, Appellees have little left. They hardly respond to FDEM's explanations for why construction, funding, supervision, or federal aims are not cognizable under the APA. And without a single final federal agency action, Appellees' penchant for lists of so-called key conduct, PB.23-24, 37-38; TB.49, adds nothing: "Zero times a thousand is still zero." *United States v. Moss*, 34 F.4th 1176, 1193 (11th Cir. 2022).

### a. Potential Federal Funding Is Not Final Agency Action

**i.** Appellees do not dispute that even likely federal funding does not trigger NEPA. *See* PB.29; TB.50; *United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1573 (11th Cir. 1994) ("likely" funding not enough). Plaintiffs try to distinguish this precedent by asserting that funding here was not just likely but "promise[d]" in "public statements." PB.29; *see* TB.50. That distinction makes no difference—promised funds are still only "likely." Appellees have not pointed to any legal, enforceable right the State had to the "promised" funds. And, regardless, Appellees cannot avoid *Rattlesnake Coalition v. EPA*, which held that even funds

24

appropriated by Congress do not trigger NEPA until they are disbursed by an agency.  509 F.3d 1095, 1103-04 (9th Cir. 2007).  If a statutory appropriation does not trigger NEPA, a DHS Facebook post does not either.

Moreover, Appellees fail to explain how an unsatisfied promise is *final* agency action.  After all, a promise indicates *future* action, and the federal government could (i) break the promise, or (ii) fully comply with NEPA before taking final action to fulfill it.  *See id.* at 1104.  Until the formal promise is completed, Plaintiffs cannot invoke NEPA.

Plaintiffs next rehash the district court's assertion that failing to apply NEPA to state actions would permit the federal government to "launder[] federal control or federal approval" through states.  PB.30.  But that is just another way of saying NEPA does not apply to states.  There is no federal control to launder.  If the federal government chooses not to provide funding and assert control in advance, then it assumes the risks that states will make their own choices.  Just so here.  The State constructed and operated the facility, and the federal government had no say in whether or how the State proceeded.  The State took the risk (and

still does) that federal funding will not materialize. That is not laundering; it is federalism.

**ii.** Perhaps recognizing that the trial court's rationale is foreclosed by this Court's precedent, Plaintiffs pivot and argue that this Court should affirm based on extra-record evidence. PB.29-30, 36-38. Incredibly, Plaintiffs make this argument in open defiance of this Court's denial of Plaintiffs' motion to supplement the record with the exact information they cite. ECF No. 119. Accordingly, these portions of Plaintiffs' brief should be stricken. In any event, Plaintiffs are wrong about the import of what they cite because, as explained in FDEM's opposition to the motion to supplement, the evidence shows that at the time of the injunction, no funding decision had been made. *See* ECF No. 105 at 5-10. Plaintiffs' own document proves that immediately before the district court's injunction, the federal government denied Florida's funding application because the budget "exceed[ed] the available" grant funds. ECF No. 105 at 8. That is the opposite of a final funding decision.

#### b.    <u>Construction Was Not Final Agency Action</u>

Appellees further contend that the "decision to build and operate a detention center" was final agency action. PB.34; *see* TB.44 (claiming the

"[o]pening of the TNT Site facility" was the final decision).  But there was no such decision.  Instead, the federal government merely requested that Florida build "*a* temporary detention facility."  App.1416.  Florida decided to build, and built, *this* facility.  And Appellees have no response to the cases supporting FDEM's argument that a federal request followed by voluntary state action is not federal agency action.  *See* OB.40-41.

Appellees do not contend that the federal government ran or provided permits for construction.  *See, e.g.*, TB.50 (physical work was done by State contractors).[16]  Instead, they argue that a federal purpose converted state action into federal action.  PB.25, 37-38; TB.50-51.  If such a theory were to take root, it would transform the APA into perhaps the most far-reaching intrusion into state government ever enacted by Congress—and one that would surely violate the Tenth Amendment.  Across the nation, thousands of state and local governments establish innumerable programs and facilities consistent with, or even because of, federal priorities.  But no court has held the APA (or NEPA) reaches those actions.  *E.g.*, *Ritter v. Cecil Cnty. Off. of Hous. & Cmty. Dev.*, 33

---

[16] That distinguishes *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, where the federal agency was seeking a permit for its own activities.  128 F.4th 1089, 1108 (9th Cir. 2025).

F.3d 323, 327 (4th Cir. 1994); *Day v. Shalala*, 23 F.3d 1052, 1064 (6th Cir. 1994).  The State, as a sovereign, can choose to support federal policies, but that does not turn the State into an agency of the federal government.  *See Nat'l Org. for the Reform of Marijuana L. v. DEA*, 545 F. Supp. 981, 984-85 (D.D.C. 1982).

That leaves Plaintiffs to argue that immigration is different because it is an "exclusive[]" federal power.  PB.35.  But if that were true, then the State could not be involved in immigration at all.  Instead, Congress has authorized States to aid in federal immigration enforcement.  8 U.S.C. § 1357(g).  And "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012).

The bottom line is this: NEPA governs federal actions, not federal purposes.  When a State chooses to assist the federal government, the State is still the entity that acts, and so federal procedural law does not apply.

### c.    ICE's    General    Role    in    Immigration Enforcement Does Not Trigger NEPA

Plaintiffs make much of ICE's supervisory role under section 287(g).  PB.26-28, 35.  But Plaintiffs do not specify which supervisory

action is supposedly the "final agency action" triggering NEPA here. Such specificity is necessary because hundreds of local law-enforcement agencies have 287(g) agreements, and Plaintiffs previously insisted their theory does not reach "every local jail that also houses immigration detainees." ECF No. 35 at 28 n.19. If mere ICE supervision of detention—the same supervision applied to local jails—does not trigger NEPA (and it does not, *see* OB.41), then something else must. Yet Plaintiffs fail to say what.

To be sure, the federal government provides its "approval" to enter a 287(g) agreement (as does the State), PB.26, and the federal government must ask Florida to detain illegal aliens at *a* Florida facility (although Florida decides whether to say yes). But Appellees do not dispute that those types of detention decisions cannot ground a NEPA claim because they are committed to agency discretion by law. *See* OB.48-49. Likewise, Appellees barely dispute that detention decisions are not "major federal actions" because they are enforcement decisions.[17]

---

[17] In a footnote, Plaintiffs admit that section 4336(e)(10)(B)(v) excludes "from the definition of major Federal action" the "bringing of an enforcement action." PB.32 n.11. The decision to detain is part of the decision to bring an enforcement action, as the phrase is used in NEPA.

Indeed, Plaintiffs insist they are not challenging any discretionary detention decision under section 1226. PB.38. These concessions doom their claim because Plaintiffs are not challenging the *only* federal decision at issue—the decision to detain. And if Plaintiffs really are challenging that decision, their suit is barred by section 1226(e).

Plaintiffs also have no answer for section 1252(f)'s prohibition of the injunction. Plaintiffs' defense of the district court ignores the injunction they sought and received. PB.41-42. Plaintiffs asked for an order enjoining "use of the TNT Site for purposes of immigration detention." App.1128-29. And they received it. *See* App.1435 (prohibiting "bringing any additional persons onto the TNT site"). That injunction falls into the teeth of section 1252(f) because it requires officials "to refrain from actions that (… in the Government's view) are allowed by § 1231[]." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 551 (2022). It bars federal

---

*See, e.g., Nw. Ctr. for Alts. to Pesticides v. DHS*, 552 F. Supp. 3d 1078, 1091 (D. Or. 2021). So when Plaintiffs say they are not challenging enforcement, they disclaim a challenge to detention. The Tribe embraces that point. It says: "The Federal governments [sic] enforcement of immigration policy isn't being challenged here—it's the construction of a specific facility that is." TB.53-54. If that is true, and it must be to avoid the NEPA exclusion, then the down-the-line decision to detain (or to detain in Florida) can play no role in the NEPA analysis. *But see* TB.51 (relying on detention decisions to attempt to show federal control).

officials from using the facility for detention—a direct restraint on the ability to designate appropriate places for detention.  8 U.S.C. § 1231(g).

Section 1252(f) does not, as Plaintiffs fret, exempt DHS from NEPA.  PB.41.  A lower court could still require NEPA compliance through remand without vacatur.  5 U.S.C. § 706.  But it cannot issue an injunction restraining enforcement of the immigration laws.  That is a choice Congress made, and a district court cannot override it.

### 2.  *The District Court Erred in Finding "Major" Federal Action*

**a.** In 2023, Congress amended NEPA to specifically exclude from "major federal action" any "non-federal action–(I) with no or minimal Federal funding; or (II) with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project."  42 U.S.C. § 4336e(10)(B)(i).[18]  As this Court held in the stay order, the plain text of the statute means that *both* federal funding and federal control are necessary to transform a non-federal action into a "major federal action."  *FOE*, 2025 WL 2598567, at *6.  Plaintiffs argue that "or" should be

---

[18] Plaintiffs say this argument was waived.  PB.20.  Not so.  FDEM argued that there was no "major federal action" below.  App.1139.  It is thus free to present any argument in support of that theory here.  *See Sec'y, U.S. Dep't of Lab. v. Preston*, 873 F.3d 877, 883 n.5 (11th Cir. 2017).

interpreted as "and"—i.e., that both funding and control must be lacking for the statutory exception to apply. PB.20-21. They say this reading flows from the general definition because it is keyed to "substantial Federal control," 42 U.S.C. § 4336e(10)(A), and thus lack of federal funding cannot be dispositive. But that simply ignores that the general definition is about "an action that the *agency* is carrying out"—i.e., when the "major federal action" is an agency's own act, then control is all that matters. When the alleged "major federal action" is, as here, "non-Federal" then more is required: both control of the outcome *and* funding. That distinction makes sense because NEPA is about *federal* agency action, and it rightfully takes much to transform non-federal actors into federal actors.

Plaintiffs object to that plain-meaning analysis because, in their view, the 2023 NEPA amendments were not meant to change the law. PB.22. Plaintiffs can make that argument only by eliding controlling precedent. *Seven County* explains that the 2023 amendments "reinforce[] the basic principles that NEPA, correctly interpreted, already embodied but that have been too often overlooked." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 181 n.3 (2025). Plaintiffs omit the

32

final seven words, but they are critical: the 2023 amendment was meant to *correct* judicial misinterpretations of the statute. It did so by clarifying and limiting the definition of "major Federal action."

Plaintiffs insist that the exceptions for certain funding prove their statutory point. PB.21. But they prove the opposite. The exceptions for federal funding without control, 42 U.S.C. § 4336e(10)(B)(ii)-(iii), mean that even a federal agency's *own funding decision* does not require NEPA review when such funding is not coupled with control. If some *federal* decisions require both funding and control, then surely *non-federal* actions require at least as much.

Plaintiffs contend that the Court need not reach the definition of major federal action because the district court found funding. PB.21. But the district court did not find that there *had* been funding, it found that there *will* be funding. App.1417-19. Such a prediction does not fit the statute. The text requires actual funding—the project action must be one "with" funding—not possible funding. *See FOE*, 2025 WL 2598567, at *7.

Plaintiffs point to the slippery slope and claim that under the stay order's interpretation, the federal government could, at the extremes, launder federal projects through states by controlling them while holding

33

back funding. PB.20. There are two easy answers. First, even assuming a federal agency would be *willing* to operate in this way (it did not here because it never had control), it is unlikely to be effective because, as the old saying goes, he who pays the piper calls the tune. If non-federal actors are fronting money, they will be very unlikely to cede complete control on a promise of reimbursement, especially when federal priorities shift wildly from administration to administration. Second, it is always easy to hypothesize boogie-men edge cases. But that can be done in the other direction, too: the slope slips on both sides. And here, the slope's other side is steeper and more dangerous: using NEPA to effectively federalize everything that a federal dollar or priority touches. The question, then, is which rule more likely captures Congress's general concern. The plain text provides the answer, and there is no judicial warrant to stray beyond it. But even looking to congressional purpose, the 2023 amendment was aimed at *reining in* the reach of NEPA, not leaving it or expanding it, as Plaintiffs suggest by chopping off the quote from *Seven County*.

Plaintiffs further question how Congress could permit "an entirely federally funded action" to escape NEPA's clutches, PB.20, but as

34

Plaintiffs acknowledge on the very next page of their brief, Congress enacted *several* exclusions providing for exactly that.   42 U.S.C. § 4336e(10)(B)(ii)-(iii).   And the policy choice found in the statute's text makes sense—not that such a justification is needed to follow the law— because federal funding is pervasive in modern American society and NEPA is not meant to govern everything we do.

**b.** Even if control alone were sufficient, Plaintiffs cannot establish it.  They argue that Florida and the federal government have "entered into a partnership or joint venture."  PB.21.  But the dated, out-of-circuit case Plaintiffs cite does not use the term "partnership or joint venture" in the loose sense of a shared purpose. *See Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974).   Instead, *Biderman* addressed formal, completed funding arrangements where the state was the "recipient[] of federal funding." *Id*.  Plaintiffs do not dispute that Florida has yet to enter such an arrangement.  PB.23-24.  And, regardless, in this Circuit (prior to the 2023 amendment), even federal funding was "just one factor in the analysis of whether there is sufficient federal control over, responsibility for, or involvement with an action to require preparation

of an EIS." *Atl. Coal. on Transp. Crisis, Inc. v. Atl. Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979).

Without a viable partnership theory, Plaintiffs must prove that the federal government "possess[es] actual power to control the nonfederal activity." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1572. That test is strict and is failed if "state agencies retain their state law authority to make the decisions concerning the project." *Id.* at 1573. Here, Plaintiffs point to nothing overriding Florida's "state law authority." Florida, after all, commandeered the land under state law and constructed the facility using its own funds, with its own designs, and with its own contractors. And Florida decides whether to cooperate with the federal government on immigration. *See* 8 U.S.C. § 1357(g)(9). Consistent with that power, Florida ultimately decides whether any detainee is admitted to its facility. App.1522. All that shows Florida controls the facility. As the stay order explained: "The Facility is a site built, led, operated, and funded unilaterally by a state government—in accordance with the state's laws—at which the state retains discretionary control over who is detained at the facility, all of which adds up to *state* control over the project's outcome, not federal control." *FOE*, 2025 WL 2598567, at *9 n.7.

36

Plaintiffs do not really dispute those facts. Instead, they contend that the federal government controls Florida's facility because it is an immigration facility. PB.26-27. But states have the power to cooperate with the federal government on immigration enforcement, *Arizona*, 567 U.S. at 411, and Plaintiffs cite no facts showing that Florida gave up its "state law authority to make the decisions" about its cooperation. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573; *see supra* 36.

Plaintiffs pivot to arguing that 287(g) agreements give the federal government the relevant control. PB.27-28. That is sleight of hand. No one doubts that the federal government has "control" over aspects of immigration enforcement. The salient question, however, is whether the federal government has "control" over the final agency action at issue. Nothing in 287(g) permits the federal government to superintend a state's decision to build a detention facility or house detained immigrants. If it did, then Plaintiffs' theory would make every state jail that houses immigrants under section 287(g) a NEPA project. *See supra* 28-29.

### C.    Appellees Are Unlikely to Receive the Injunction They Requested

NEPA errors "may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cnty.*, 605 U.S. at 185.  Appellees  attempt to limit *Seven County*, as if the Supreme Court granted certiorari to address just the facts of that case and not set a broader precedent.  PB.42-43; TB.52-53.   On Plaintiffs' view, *Seven County* suggests remand only when the plaintiff alleges that a "3,600-page EIS" was deficient.  PB.45.  That myopic reading cannot be squared with the opinion.  *Seven County* stressed remand without vacatur because NEPA review "is not the same thing as review of the agency's final decision."  605 U.S. at 184.  Rather, because NEPA is "a purely procedural statute," courts should ensure that their remedies sweep no more broadly than necessary to fix the procedural violation.  *Id.*

Here, that counsels in favor of remand without vacatur.  More fulsome environmental review would not change DHS's decision.  That does not, as Plaintiffs submit, permit agencies "to skirt their obligations." PB.46.  It simply recognizes the extraordinary importance of this project

when weighed against procedural requirements unlikely to change the substantive decision. It is the rare federal project that receives the in-person support of both the President and the DHS Secretary, serves vital national security interests, and risks minimal environmental harm. *FOE*, 2025 WL 2598567, at *11-12. The fact that *this* extraordinary project does not require vacatur does not mean no project will.

## II. Appellees Did Not Show Irreparable Harm

**A.** Plaintiffs concede that a preliminary injunction requires the movant to demonstrate that irreparable injury is "likely." PB.48. They nonetheless argue that the district court applied that standard by once quoting it. PB.47. That is wrong. Paying the proper standard the "briefest lipservice," is not the same as applying it. *Abbott v. Perez*, 585 U.S. 579, 611 (2018). And here, when it came to actual application, the district court disclaimed the correct standard, explaining that "Plaintiffs are not required to prove harms of a particular probability or quantity." App.1424.

Plaintiffs contend that environmental injury is often irreparable. PB.47. But their own case rejected irreparable environmental injury because such harm was "not at all probable." *Amoco Prod. Co. v. Vill. of*

*Gambell,* 480 U.S. 531, 545 (1987).  That is the precise test the district court refused to apply—it failed to identify "likely" harm.  App.1424.  The district court thus applied the wrong law.  And, contra Plaintiffs' clear-error mantra, basing factual findings on an "erroneous view of the law" is itself clear error.  *Stout ex rel. Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1005 (11th Cir. 2018).

**B.**  In any event, the district court's factual findings were clearly erroneous.

**1.**  Appellees open by pointing to alleged harm to water and wetlands.  PB.48-52; TB.39-40.  Aquatic harm could happen only if the waters were polluted—adding clean water works no harm—and the only pollutant Appellees introduced evidence about was polycyclic aromatic hydrocarbons (PAH).  App.519.  But Appellees offered no evidence that PAH levels would increase because of the detention center.  Indeed, Appellees failed to establish a baseline PAH level, App.502:17-503:1; did not compare PAH production between airport and detention-facility uses, App.503:5-14; and did not demonstrate any actual PAH contamination at the site, App.519:20-24.  Appellees, in short, offered no evidence that the

construction or operation of the detention facility would likely increase water pollution.[19]

Additionally, Appellees' evidence demonstrated minimal increases in water runoff. Plaintiffs' expert opined that in a 100-year, 72-hour storm (a historical outlier meant to increase projected runoff), runoff would increase over prior use by only two percent. App.519:2-4. Plaintiffs dismiss that math as "quibbles." PB.50. But it was Plaintiffs' burden to demonstrate irreparable harm. And showing a mild increase in water runoff during a Genesis-level flood falls far short of demonstrating *likely* injury.

**2.** Plaintiffs' species-related harm fares no better. Plaintiffs have no response to the dispositive point that their alleged species-related harm is not imminent. *See* OB.62-63. For example, Plaintiffs' expert opined that panther populations *might* be affected by the facility in *2070*. App.315:22-316:3. And the district court found that Plaintiffs' alleged

---

[19] The Tribe worries that "phosphorous, nitrogen, and potassium" could enter the water. TB.40. But the testimony it cites says nothing about the detention facility introducing those nutrients; it links them to "fertilizers that you put on agricultural fields." App.460-61. The detention center is not a farm and obviously, someone else's pollution cannot ground irreparable harm.

41

harms "take time to accrue." App.1425 n.31. Those concessions render impossible any finding of "imminent" harm, which is required for a preliminary injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Harm in *2070* is the opposite.

Nor did Plaintiffs show "likely" harm. They seize on the claim that the facility will reduce potential panther habitat by 2,000 acres. PB.52. But they presented *no* evidence that such a theoretical loss would harm any actual panthers. To the contrary, the undisputed evidence showed *no* panthers were detected within four miles of the site during a five-year period of intense tracking by radio collars. App.305:8-22. Nor was there any evidence that *this* facility would harm panthers. Plaintiffs speculate that the facility would increase risks of traffic-related fatalities. PB.53. Yet Plaintiffs must show that harm is "likely," not merely a "risk." And their own expert did not examine whether *this* facility would "take" any panther, much less conclude that it was likely to do so. App.317:10-12. Plaintiffs object that "take" is an Endangered Species Act concept. But take "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect," an endangered species. 16 U.S.C. § 1532(19). That concept is equally applicable to irreparable harm: without analyzing

42

take, Plaintiffs are trying to show irreparable harm to panthers without showing that any panther will be harassed, harmed, or killed. That is impossible.

Plaintiffs next rely on alleged harm to the bonneted bat. PB.54. But again, Plaintiffs presented no evidence "showing how flora and fauna" changed after the site was constructed. App.782. At most, Plaintiffs presented a theory: increased noise and light *might* harm the bat. But the bonneted bat lives well in urban environments, so that theory is far from likely. App.1557. Without evidence that any bats would be affected by the facility, Plaintiffs' showing fell short.

**3.** The Tribe emphasizes—using "Night mode" photos that artificially enhance light—that the detention center causes light pollution. TB.38-39. But there was light pollution before from the TNT Airport's runway lights. App.524. And there are other sources of light pollution, too—the Miccosukee Tribe itself runs a Casino and Resort "in the heart of the Everglades." *See* Miccosukee Casino & Resort, https://perma.cc/YK38-P4M2 (last visited Feb. 24, 2026). Given that background, the notion that temporary lights cause irreparable harm does not withstand scrutiny.

43

**4.** That leaves Appellees' claim that the facility harms access to tribal lands. PB.57; TB.36. The theory hinges on the argument that the Tribe lost access to a handful of trailheads. But there was *no* evidence that moving some trailheads would compromise overall access to tribal lands. Indeed, the evidence showed the opposite. Despite the Tribe's single zoomed in image, TB.37, multiple other undisturbed trailheads permitted access to the same lands. App.1838.

## III. THE BALANCE OF EQUITIES DOES NOT SUPPORT AN INJUNCTION

In *Winter*, the Supreme Court held that, in balancing the equities, national security outweighs "harm to an unknown number of the marine mammals." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 26 (2008). That holding governs. Even if Appellees' meager showing constituted irreparable harm, the speculative, far-off concerns about dark skies or the bonneted bat pale in comparison to the very real public-safety and national-security crisis created by years of a free-for-all at the border. Both State and federal officials made clear that the detention facility is critical to combatting the "crime" and "safety risks" caused by illegal immigration. *Arizona*, 567 U.S. at 398.

Plaintiffs say that *Winter*'s harm analysis turned on the fact that SONAR was "the only reliable technology." PB.61. But the Court also emphasized that the President had determined that "training with active sonar is 'essential to national security,'" 555 U.S. at 26; that "senior Navy officers" had offered "specific, predictive judgments about how the preliminary injunction would reduce the effectiveness of the Navy's SOCAL training exercises," *id.* at 27; and the weightier importance of security matters. All those facts are equally present here: The President has explained that the facility is a model for other States;[20] senior officials have made predictive judgments about how the injunction will cause harm, App.1494; and the importance of immigration enforcement "must not be underestimated," *Arizona*, 567 U.S. at 398.

Appellees and the district court question whether the immigration-enforcement professionals are correct that this specific facility is important. PB.62; TB.54-55. But their major criticism—that other facilities could have been built in other places, *see* PB.59-60; TB.55—

---

[20] Trevor Hunnicutt, *Trump Tours 'Alligator Alcatraz' as He Pushes for More Deportations*, Reuters (July 1, 2025), https://www.reuters.com/world/us/trump-play-up-alligator-alcatraz-deportations-florida-ahead-bill-deadline-2025-07-01/.

misses the point: there is a need for beds now, and this facility already exists, so when it comes to balancing harm, the question is what is the harm from losing *this* facility, not whether some other hypothetical facility could have done just as well. App.835:20-25. In any event, in areas of "national security and foreign" affairs, the "evaluation of the facts by the Executive … is entitled to deference." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33-34 (2010). Plaintiffs distinguish *Holder* because it involved terrorism. PB.62. But the Supreme Court has held that immigration enforcement, like anti-terrorism efforts, is critical to the public interest. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). That leaves Plaintiffs with the argument that *Holder* involved Congressional findings. But *Holder* is about deference to the "Executive," not Congress. 561 U.S. at 33-34. And *Holder* teaches that courts must defer to the executive branch on national-security judgments. So too here, when it comes to evaluating whether *this* facility serves critical immigration policies. *See Arizona*, 567 U.S. at 398.

Plaintiffs invoke *Florida Immigrant Coalition v. Attorney General,* 2025 WL 1625385 (11th Cir. June 6, 2025). PB.62. But that case only proves Florida's harm. There, the Court held the State did not show

irreparable harm from its own inability to enforce immigration law because the State could still enforce the law under its 287(g) agreements. *Id.* at *6. Here, however, the district court's injunction directly limits the effectiveness of those 287(g) agreements by shutting down the State's detention facility.

## CONCLUSION

For these reasons, the Court should reverse and remand with instructions to transfer the case to the Middle District of Florida.

Dated: February 24, 2026

James Uthmeier
  *Attorney General of Florida*
Jeffrey Paul DeSousa (FBN 110951)
  *Acting Solicitor General*
Nathan A. Forrester (FBN 1045107)
  *Chief Deputy Solicitor General*
**Office of the Attorney General**
The Capitol, PL-01
Tallahassee, FL 32399
jeffrey.desousa@myfloridalegal.com

Respectfully submitted,

s/ *Jesse Panuccio*
Jesse Panuccio (FBN 31401)
Evan Ezray (FBN 1008228)
David Costello (FBN 1004952)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, FL 33301
jpanuccio@bsfllp.com

*Counsel for Kevin Guthrie, in his official capacity as Executive Director of the Florida Division of Emergency Management*

47

## CERTIFICATE OF COMPLIANCE

**1.** This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's order enlarging the word count for FDEM's reply brief because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 9,721 words.

**2.** This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

s/ *Jesse Panuccio*
Jesse Panuccio

## CERTIFICATE OF SERVICE

I certify that on February 24, 2026, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

s/ <em>Jesse Panuccio</em><br>
Jesse Panuccio