# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## No. 25-12873

---

Friends of the Everglades, Inc., *et al.*,
*Plaintiffs-Appellees*,

v.

Executive Director,
Florida Division of Emergency Management,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of Florida, No. 1:25-cv-22896-KMW

---

## BRIEF OF AMERICAN IMMIGRATION LAWYERS ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE

---

Rebecca Sharpless
Andrea Jacoski
**Immigration Clinic**
**University of Miami**
**School of Law**
1311 Miller Drive, Suite B400
Coral Gables, FL 33146
Tel: (305) 284-3576
rsharpless@law.miami.edu
ajacoski@law.miami.edu

Jonathan Weinberg*
**Wayne State University Law School**
471 West Palmer Street
Detroit, MI 48202
Tel: (313) 577-4015
weinberg@wayne.edu

*Attorneys for Amicus Curiae*

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, American Immigration Lawyers Association, hereby states the following individuals and entities have an interest in the outcome of this appeal:

1. Ajizian, Christopher, Esq.

2. American Immigration Lawyers Association

3. Bailey, Andrew, Esq.

4. Bennett, Elise Pautler, Esq.

5. Bird, Brenna, Esq.

6. Boies Schiller Flexner LLP

7. Bonzon-Keenan, Geraldine

8. Brabender, Allen M., Esq.

9. Burkhardt, Dominique, Esq.

10. Carpenter, Hayley A., Esq.

11. Bird, Brenna, Esq.

12. Carr, Christopher M., Esq.

13. Center for Biological Diversity

14. Chris Ajizian P.A.

15. Coe, Alisa, Esq.

16. Coffey Burlington P.L.

17. Coleman, Russel, Esq.

18. Commonwealth of Kentucky

19. Costello, David M., Esq.

20. Crockett, Jeffrey B., Esq.

21. Curran, Rachael

22. DeNardi, Betsy, Esq.

23. DeSousa, Jeffrey Paul, Esq.

24. Drummond, Gentner F., Esq.

25. Earthjustice

26. Ezray, Evan M., Esq.

27. Ficarelli, Dante, Esq.

28. Florida Division of Emergency Management

29. Florida Wildlife Federation

30. Forrester, Nathan A., Esq.

31. Friedman, Todd R., Esq.

32. Friends of the Everglades, Inc.

33. Galloni, Tania, Esq.

C-2

34. Golembiewski, Kevin A., Esq.

35. Griffin, Tim, Esq.

36. Gustafson, Adam R.F., Esq.

37. Guthrie, Kevin

38. Hiaasen, Scott, Esq.

39. Hilgers, Michael T., Esq.

40. Izaak Walton League of America, Florida Keys Chapter

41. Jackley, Marty, Esq.

42. Jacoski, Andrea, Esq.

43. Kautz, Keith G., Esq.

44. Knudsen, Austin, Esq.

45. Kobach, Kris, Esq.

46. Kula & Associates, P.A.

47. Kula, Elliot B., Esq.

48. Labrador, Raúl, Esq.

49. Lopez, Jaclyn, Esq.

50. Lyons, Todd

51. Marshall, Steve, Esq.

52. Martinez, Hon. Jose E.

53. McCuskey, John B., Esq.

54. Miami-Dade County

55. Miccosukee Tribe of Indians

56. Murray, David M., Esq.

57. Murrill, Liz, Esq.

58. Noem, Kristi

59. O'Byrne, Hayden P., Esq.

60. Panuccio, Jesse Michael, Esq.

61. Paxton, Ken, Esq.

62. People's Economic and Environmental Resiliency Group, Inc.

63. Perez, Monica Rizo, Esq.

64. Piropato, Marissa, Esq.

65. Quiñones, Jason A. Reding, Esq.

66. Raurell, Carlos J., Esq.

67. Rokita, Theodore E., Esq.

68. Sanchez, Hon. Eduardo I.

69. Schenck, Robert S., Esq.

70. Schwiep, Paul J., Esq.

71. Sharpless, Rebecca, Esq.

72. Sierra Club

73. Singer, Frank

74. Skrmetti, Jonathan, Esq.

75. Stander, Robert, Esq.

76. State of Alabama

77. State of Alaska

78. State of Arkansas

79. State of Florida

80. State of Georgia

81. State of Idaho

82. State of Iowa

83. State of Kansas

84. State of Louisiana

85. State of Missouri

86. State of Montana

87. State of Nebraska

88. State of North Dakota

89. State of Ohio

90. State of Oklahoma

91. State of South Carolina

92. State of South Dakota

93. State of Tennessee

94. State of West Virginia

95. State of Wyoming

96. Stetson University, Inc. College of Law's Jacobs Public Interest Law Clinic for Democracy and the Environment

97. Taylor, Treg, Esq.

98. Todd R. Friedman P.A.

99. Torres, Hon. Edwin G.

100. Torstensen, Peter M., Esq.

101. Totoiu, Jason Alexander, Esq.

102. Tropical Audubon Society

103. United States Department of Homeland Security

104. United States Immigration and Customs Enforcement

105. University of Miami School of Law's Environmental Justice Clinic

106. University of Miami School of Law's Immigration Clinic

107. Uthmeier, James, Esq.

108. VoteWater, Inc.

109. Wahl, Christopher J., Esq.

110. Walter, Elaine D., Esq.

111. Weinberg, Jonathan, Esq.

112. Williams, Hon. Kathleen M.

113. Wilson, Alan, Esq.

114. Wrigley, Drew H., Esq.

115. Yost, David A., Esq.

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure, there is no parent corporation or publicly held corporation that owns more than 10% of stock of Amicus Curiae American Immigration Lawyers Association.

Dated: January 27, 2026                     /s/ Rebecca Sharpless
                                            REBECCA SHARPLESS

                                            *Attorney for Amicus Curiae*

# **TABLE OF CONTENTS**

Table of Contents ....................................................................................i

Table of Authorities...............................................................................ii

Interest of Amicus Curiae ......................................................................1

Statement of the Issue ...........................................................................2

Summary of the Argument .....................................................................2

Argument.................................................................................................5

    I.    TNT is an Immigration Detention Facility. ...............................6

    II.   Only the Federal Government Can Arrange for an Immigration Detention Center................................................8

    III.  Section 1357(g) Does Not Empower Florida to Arrange for TNT as an Immigration Detention Center. .......................................15

Conclusion ............................................................................................20

Certificate of Compliance.....................................................................22

Certificate of Service ............................................................................23

i

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*, 567 U.S. 387 (2012)..........................................5, 8

*Clark v. Suarez Martinez*, 543 U.S. 371 (2005) ...........................................9

*CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467 (D.N.J. 2023) .................14

*DeCanas v. Bica*, 424 U.S. 351 (1976)........................................................8

*Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) ............................10

*Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025) ............................................10

## Statutes

8 U.S.C. § 1101(a)(18) .............................................................................6, 15

8 U.S.C. § 1103(a)(1) ...................................................................................5

8 U.S.C. § 1103(a)(10) ......................................................................... 16, 17

8 U.S.C. § 1103(a)(11) ..................................................................... 11, 12, 13

8 U.S.C. § 1103(g) .......................................................................................5

8 U.S.C. § 1226(a) .......................................................................................5

8 U.S.C. § 1231(a) .......................................................................................5

*8 U.S.C. § 1231(g) ..................................... 2, 3, 5, 6, 8, 9, 10, 11, 12, 14, 18, 19

8 U.S.C. § 1231(g)(1) ...................................................................................2

8 U.S.C. § 1231(g)(2) ...................................................................................2

8 U.S.C. § 1252(c) (1952) ...................................................................9

8 U.S.C. § 1252c ........................................................................ 16, 17

8 U.S.C. § 1324(c)...............................................................................16

8 U.S.C. § 1357(a) ................................................................................5

8 U.S.C. § 1357(a)(2) ........................................................................15

8 U.S.C. § 1357(a)(4) ........................................................................15

8 U.S.C. § 1357(b) .............................................................................16

*8 U.S.C. § 1357(g) ........................................... 3, 4, 15, 16, 17, 18, 19

8 U.S.C. § 1357(g)(1) ................................................................... 17, 18

8 U.S.C. § 1357(g)(2) ........................................................................18

8 U.S.C. § 1357(g)(3) ........................................................................18

8 U.S.C. § 1357(g)(5) ........................................................................18

18 U.S.C. § 4001(b)(1) .......................................................................9

18 U.S.C. § 4086..................................................................................9

Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. C. Title

II, § 213, 138 Stat. 603 (2024) ....................................................7

Consolidated Appropriations Act, 2026, H.R. 7147, 119th Cong. § 213

(2026).............................................................................................7

Consolidated Security, Disaster Assistance, and Continuing

    Appropriations Act of 2009, Pub. L. No. 110-329, Div. D., Tit. II, 122

    Stat. 3574, (2008) ...................................................................................7

Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

    Pub. L. No. 104-208, Div. C. §§ 305 & 306, 110 Stat. 3009-546 (1996)

    ...............................................................................................................9

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,

    Pub. L. No. 104-208, Div. C, §§ 373, 110 Stat. 3009-546 & 305(a)(3),

    110 Stat. 3009-598 (1996)......................................................................12

Immigration and Nationality Act, Pub. L. No. 82-414, Ch. 477, § 242(c),

    66 Stat. 163 (1952) ................................................................................9

**Regulation**

8 C.F.R. § 235.3(e)...................................................................................14

**Other Authorities**

2025 National Detention Standards, U.S. Immigration and Customs

    Enforcement ...........................................................................................7

84 Cong. Rec. 5177 (1939)................................................................... 10, 11

Alina Das, *The Law and Lawlessness of U.S. Immigration Detention*,

    138 Harv. L. Rev. 1186, (2025)........................................................ 10, 11

**Interest Of Amicus Curiae**

The American Immigration Lawyers Association (AILA), founded in 1946, is a national, nonpartisan, nonprofit association with more than 18,000 members throughout the United States and abroad, including lawyers and law school professors who practice and teach in the field of immigration and nationality law. AILA seeks to promote justice, advocate for fair and reasonable immigration law and policy, and advance the quality of immigration and nationality law and practice. AILA's members practice regularly before the Department of Homeland Security, immigration courts, the Board of Immigration Appeals, and the Office of the Chief Administrative Hearing Officer, as well as before the federal courts. AILA has participated as amicus curiae in numerous cases before the U.S. Courts of Appeals and the U.S. Supreme Court.

AILA is providing this brief to share its expertise in immigration law as it relates to this environmental suit. Specifically, AILA writes to explain the sweeping nature of the federal government's control over immigration and that TNT can only serve as a place of immigration detention *after* a decision by the federal government to designate that

1

location as a place of immigration detention under section 241(g) of the Immigration and Nationality Act, 8 U.S.C. § 1231(g).[1]

## Statement of the Issue

Whether Florida could set up an immigration detention center without the federal government having first authorized it as a place of detention under its exclusive and sweeping power over immigration.

## Summary of the Argument

The people detained at Dade-Collier Training and Transition Airport (TNT) are in federal civil immigration detention pending their removal by federal authorities or a decision on their removal by a federal immigration judge. Federal law gives the Secretary of Homeland Security the exclusive authority "to arrange for appropriate places of detention" for those individuals. 8 U.S.C. § 1231(g)(1). The Secretary may exercise that authority by "purchas[ing] or leas[ing]" detention facilities from states or private actors, *id.* § 1231(g)(2), but the statute maintains immigration detention as a federal responsibility. Under § 1231(g), a

---

[1] No party or counsel for a party funded the preparation or submission of this brief or took part in the drafting of it.

decision by the Department of Homeland Security (DHS) arranging for the federal government's use of TNT for detention purposes is a prerequisite to its being a lawful "place[] of [immigration] detention."

Florida's claim that "DHS inquired whether Florida would build *a* facility; Florida decided to build *this* facility," Dkt. 82 at 54, misses the mark. The Immigration and Nationality Act (INA) requires that DHS, not a state agency, decide whether a particular place can serve as a place of immigration detention. 8 U.S.C. § 1231(g). Under federal law, Florida had no power to designate TNT as a "place[] of [immigration] detention." *Id.*

The State does not contest this characterization of the federal government's power. It concedes that TNT cannot be used as a detention facility unless *the federal government* "deem[s] the TNT facility an 'appropriate place[] of detention.'" Dkt. 82 at 61. It concedes that U.S. Immigration and Customs Enforcement (ICE) made a "general decision to detain the aliens housed at the TNT facility." *Id.* at 59-60.

At the same time, Florida asserts that the decision to set up TNT as an immigration detention center was its own, citing to 8 U.S.C. § 1357(g) as the source of its authority. Dkt. 82 at 58 (citing App.1410); *see*

3

*also id*. 25, 66. That is incorrect, for two reasons. First, neither § 1357(g) nor any other statute authorizes a state to establish a place as a federal immigration detention facility. Section 1357(g) and other authorities provide instances in which individual state or local officers are permitted to exercise particular, specified, immigration officer powers under federal supervision. They have no bearing on the selection or siting of immigration detention facilities. Second, individual state officers can exercise § 1357(g) authority only pursuant to explicit grants of authority in executed contracts with the federal government, and Florida can point to no contract containing a relevant grant of authority.

In the field of immigration, states and localities may act only when authorized by the federal government under narrowly tailored federal statutes that permit collaboration under conditions of strict federal supervision. State and local governments have no sovereign authority to engage in immigration detention or to enforce immigration law. The legality of the TNT facility thus rests on the federal government's decision to make it a place of immigration detention.

4

## Argument

The Immigration and Nationality Act is the "system Congress created" for the immigration arrest, detention, and removal process. *Arizona v. United States*, 567 U.S. 387, 407-09 (2012). This federal scheme assigns the responsibility for immigration enforcement—including "arrang[ing] for appropriate places of detention for aliens detained pending removal or a decision on removal"—to federal authorities. 8 U.S.C. § 1231(g); *see also* 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens[.]"); *id.* at § 1103(g) (authority to issue regulations and instructions necessary to carry out immigration enforcement). Federal officers—not state or local officials—are tasked with investigating, arresting, and detaining people suspected of violating immigration law. 8 U.S.C. § 1357(a); *see also* 8 U.S.C. § 1226(a) (federal authority to detain noncitizens pending a decision on their removal proceedings); 8 U.S.C. § 1231(a) (federal authority to detain a noncitizen who is subject to a final order of removal).

5

The federal government may authorize individual state and local officers to carry out certain, specified functions otherwise performed by federal "immigration officers," including investigating and arresting people suspected of violating immigration law. *See infra* Part III; 8 U.S.C. § 1101(a)(18) (making plain that only a federal employee can be an "immigration officer"). But *no* federal law authorizes states or local governments to "arrange for appropriate places of detention." 8 U.S.C. § 1231(g). Only the federal government can do that.

## I. TNT is an Immigration Detention Facility.

The makeshift jail at TNT is a "place[] of detention" within the meaning of 8 U.S.C. § 1231(g). The sole purpose of creating the jail at TNT was to operate as an immigration detention center. Everyone detained at TNT is in civil federal immigration detention; no one at TNT is in a different type of custody. The cages and tents were erected to hold people in immigration detention and have only ever held immigrants. The State understands that, as an immigration detention center, TNT

must meet ICE's National Detention Standards. Dkt. 82 at 55.[2] These standards, consisting of 232 pages, were reissued in 2025 and address specifications ranging from the size of "hold rooms in detention facilities" to "law libraries and legal materials."[3] In the "State of Florida Immigration Enforcement Operations Plan"—a pitch to the federal government to deem the TNT and other Florida sites as appropriate to house immigrant detainees—the State promised that "[e]ach detention center would adhere to ICE's National Detention Standards." Dist. Ct. Dkt. 24-1 at 13. Despite that assurance, the State noted that "DHS could issue waivers for … select ICE detention standards—such as requirements for barber services or dining facilities that do not meet

---

[2] 2025 National Detention Standards, U.S. Immigration and Customs Enforcement, *available at https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf.*

[3] *Id.* (standards 2.5 and 6.3). After Congressional hearings investigating the lack of adequate medical care in immigration detention centers, Congress passed a provision barring ICE from funding contracts for detention facilities that fail two consecutive overall performance evaluations. *See* Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Pub. L. No. 110-329, Div. D., Tit. II, 122 Stat. 3574, 3658-59 (2008). Since 2008, Congress has renewed this provision many times. *See, e.g.,* Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. C. Title II, § 213, 138 Stat. 603 (2024); *see also* Consolidated Appropriations Act, 2026, H.R. 7147, 119th Cong. § 213 (2026) (as passed by the House of Representatives on Jan. 22, 2026).

7

current federal specifications" in order to "streamline the setup of detention facilities." *Id.* From its inception, the TNT jail has only ever been an immigration detention center.

## II. Only the Federal Government Can Arrange for an Immigration Detention Center.

States have no inherent authority to regulate in the immigration field. *See Arizona v. United States*, 567 U.S. 387, 395 (2012) ("The federal power to determine immigration policy is well settled."); *DeCanas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."). Congress has occupied the field and hence has foreclose[d] any state regulation" except as expressly authorized by federal law. *Id.* at 401.[4]

The INA provision granting the federal government the power to authorize places of immigration detention, 8 U.S.C. § 1231(g), is labeled "Places of Detention," and states:

---

[4] Contrary to the suggestion of Appellant, the State could not have arranged for TNT to serve as an immigration jail pursuant to its "own sovereign authority." Dkt. 81 at 40 (citing App.1493-94, 1503); *see also* 82 at 56 (referring to immigration detention as a State "sovereign purpose").

8

> The Attorney General[5] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal.

This provision has been part of the INA since its original enactment in 1952 and mirrors other statutes that make the federal government responsible for people in federal detention.[6] *See* 18 U.S.C. § 4001(b)(1) ("The control and management of Federal penal and correctional institutions ... shall be vested in the Attorney General, who shall promulgate rules for the government thereof ..."); 18 U.S.C. § 4086 ("United States marshals shall provide for the safe-keeping of any person arrested, or held under authority of any enactment of Congress pending commitment to an institution."). Courts have recognized that the authority to "arrange for appropriate places of detention" under section

---

[5] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean "DHS Secretary." *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n. 1 (2005).

[6] The provision was originally codified at 8 U.S.C. § 1252(c) (1952), Immigration and Nationality Act, Pub. L. No. 82-414, Ch. 477, § 242(c), 66 Stat. 163, 210 (1952). The provision was reenacted and moved to its current location at section 1231(g) as part of a reorganization of the statute under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. Pub. L. No. 104-208, Div. C. §§ 305 & 306, 110 Stat. 3009-546, 3009-597 to 3009-612 (1996).

9

1231(g) is solely a federal power. *See, e.g., Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 762 (9th Cir. 2022) ("Congress sought to delegate to the DHS Secretary the responsibility to 'arrange for appropriate places of detention.'"). The statute "uses the obligatory 'shall' rather than a permissive 'may.'" *Ozturk v. Hyde*, 136 F.4th 382, 395 (2d Cir. 2025).

Legislative history shows that Congress worded § 1231(g) as it did "to ensure that noncitizens are detained in the appropriate type of civil detention facility, rather than in punitive camps or farms." Alina Das, *The Law and Lawlessness of U.S. Immigration Detention*, 138 Harv. L. Rev. 1186, 1251 (2025). This sentiment was bipartisan. An earlier version of the bill had referenced "detention farms," and Members on both sides of the aisle were emphatic that such facilities should be forbidden. Representative William Lemke, a Republican, characterized them as "un-American," akin to "concentration camps." 84 Cong. Rec. 5177 (1939).[7]

---

[7] *See also* Das, *supra,* at 1227 n. 328 (citing *Crime to Promote the Overthrow of Government: Hearing on H.R. 5138 Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 76th Cong. 40 (1939) (statement of Ralph Emerson, Rep., Maritime Unions of the Committee for Industrial Organizations) ("opposing detention language '[i]nsofar as [it] would go towards setting up any specific concentration camps' and stating: '[W]e would hate to see this country adopt a law that would in any way follow the example of Nazi Germany. . . . I think we can take other measures to

Representative Orrice Abram Murdock, Jr., a Democrat, saw them as "transplant[ing] to the free soil of America the vilest weed of fascism." *Id.* at 5171. Ultimately, Congress satisfied itself that "the new [enacted] version of the bill had eliminated authorization for such objectionable places of confinement." Das, *supra*, 138 Harv. L. Rev. at 1229.

The federal government need not operate every detention facility using its own personnel. Rather, once the federal government has decided to "arrange" for a particular "place of detention" under 8 U.S.C. § 1231(g), it may enter into agreements with states for that detention. Under 8 U.S.C. § 1103(a)(11), ICE may contract out its detention responsibilities "with a State or political subdivision of a State" for "persons in administrative detention in non-Federal institutions." Even when a state operates an immigration detention facility under contract, though, the statute is explicit that the people held in the facility are "detained *by the*

---

take care of them if they are deportable, without regimenting them in such camps as that, which I would not want to see any human being in'"); (statement of Read Lewis, Rep., Foreign Language Information Service) (opposing the same language as authorizing the detention of immigrants "in a concentration camp for the rest of [their] li[ves]")(internal quotations omitted)).

*Service* [the Immigration and Naturalization Service, now DHS] *pursuant to Federal law* under an agreement with a State or political subdivision of a State." 8 U.S.C. § 1103(a)(11) (emphasis added). Congress enacted that provision contemporaneously with recodifying the 8 U.S.C. § 1231(g) language requiring that places of immigration detention be "arrange[d]" by the federal government.[8]

---

[8] *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, §§ 373, 110 Stat. 3009-546, 3009-647 & 305(a)(3), 110 Stat. 3009-598 (1996) (enacting and codifying current § 1103(a)(11) at § 1103(a)(9) and recodifying 8 U.S.C. § 1252(c) (1952) to its current location at § 1231(g)). Section 1103(a)(11) states in its entirety:

> The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—
>
> (A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons *detained by the Service* pursuant to Federal law under an *agreement* with a State or political subdivision of a State; and
>
> (B) to enter into a cooperative *agreement* with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons *detained by the Service.*

Under these provisions, a state, or a political subdivision of a state, cannot itself authorize a place of immigration detention. Rather, *after* the federal government arranges for a place for immigration detention, the state can act under section 1103(a)(11), but it must do so pursuant to an agreement with the federal government. After all, people held in immigration detention are still "detained by the [Immigration and Naturalization] Service." 8 U.S.C. § 1103(a)(11); *see also* Dkt. 82 at 16-17 (Florida acknowledging that TNT is a "immigration detention and deportation facility" that is "used for immigration functions").

Federal immigration regulations implement the statutory scheme and underscore the need for federal approval *prior to* the state taking action:

> Whenever an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service *shall have been approved for such use* by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention. *Under no circumstances shall an alien be detained in facilities not meeting*

(Emphasis added).

13

*the four mandatory criteria for usage.* 8 C.F.R. § 235.3(e) (emphasis added).

"[T]he 'purpose and intended effects' of these statutes [and] the federal regulations promulgated under them, is to . . . . 'give[] both responsibility and broad discretion to the Secretary to choose the place of detention for deportable aliens.'" *CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467, 490–91 (D.N.J. 2023) (internal citations omitted). Thus, although the federal government can enter into agreements with a state to provide bedspace for people in federal immigration detention, the federal regulatory scheme bars a state from assuming the federal government's authority to "arrange places of detention." 8 U.S.C. § 1231(g). Indeed, if the federal government purported to delegate that authority—allowing a state, as Florida suggests, to hold detainees at any location of its choice, see Dkt. 82 at 54—that delegation would be invalid. The statute assigns the DHS Secretary, and no one else, the "responsibility . . . to choose the place of detention for deportable aliens." *CoreCivic,* 690 F.Supp.3d at 491.

14

### III.    Section 1357(g) Does Not Empower Florida to Arrange for TNT as an Immigration Detention Center.

Florida seeks to answer all this by urging that its agreements under 8 U.S.C. § 1357(g) empowered it to set up TNT as an immigration jail. Dkt. 82 at 25, 58, 66; *see also* Dkt. 81 at 25. This is incorrect. To be sure, § 1357(g) empowers the federal government to enter into contracts with state and local governments so that individual state officers can receive training and be deputized to take on the duties of immigration officers. But it does not empower a state to arrange for an immigration jail at TNT or anywhere else.

The INA places its enforcement in the hands of designated federal "immigration officers," who must be federal employees. *See* 8 U.S.C. § 1101(a)(18) (defining "immigration officer" as "any employee or class of employees *of the Service or of the United States* designated by the Attorney General … to perform the functions of an immigration officer specified by this chapter or any section of this title") (emphasis added). Section 1357 of Title 8 outlines the powers of "immigration officers," including the authority to arrest people for civil and criminal immigration violations. *See, e.g.*, 8 U.S.C. §§ 1357(a)(2) and 1357(a)(4);

15

*id.* at § 1357(b) (power to take evidence regarding entry and right to remain).

In limited circumstances, the federal government may delegate these powers to specific state or local officers—but only with express authorization. State officers may engage in immigration enforcement only in four narrow situations, each defined and limited by federal statute. These four provisions—8 U.S.C. §§ 1324(c), 1252c, 1103(a)(10), and 1357(g)—all have to do with deputizing particular state officers to carry out the work of individual "immigration officers" by investigating and arresting people for immigration violations. None of the provisions touch on the power to arrange for places of immigration detention.

Of the four provisions, three require specific federal authorization before a state officer may act. The only exception—8 U.S.C. § 1324(c)— permits state and local officers to arrest individuals for the *criminal* immigration offenses of transporting, smuggling, or harboring unauthorized noncitizens, but only if their regular duties include enforcing criminal laws. Section 1324(c) does not authorize state officers to create an immigration detention center or even detain people for *civil*

16

immigration violations. The other three provisions—each of which requires express federal authorization—are as follows:

> 1.    8 U.S.C. § 1252c permits state and local law enforcement to arrest previously deported noncitizens with felony convictions who are suspected of illegal reentry under federal law. However, such arrests must be based on "appropriate confirmation" of immigration status from federal authorities and are permitted only for the time necessary for federal officials to take custody.
>
> 2.    8 U.S.C. § 1103(a)(10) allows the Attorney General to temporarily authorize state and local officers to enforce immigration law, but only in the event of "an actual or imminent mass influx of aliens" and only under strict federal control.
>
> 3.    8 U.S.C. § 1357(g)—cited by Florida as the source of state power in this case (Dkt. 82 at 25, 58, 66)—provides the most detailed framework for state involvement, as explained below.

Section 1357(g) reaffirms that arrest and other immigration enforcement actions are "function[s] of an immigration officer" that belong to the federal government. 8 U.S.C. § 1357(g)(1). For state officers to perform those functions, the state or local government entity must first enter into a written agreement with the U.S. Attorney General. This document is commonly referred to as a "287(g) agreement," referencing the placement of § 1357(g) within the INA.

The 287(g) agreement does not confer blanket authority. To be valid, it must specify the "specific powers and duties that may be, or are

17

required to be, exercised or performed by" each individual covered by the agreement. 8 U.S.C. § 1357(g)(5). The agreement must also incorporate a certification that those individuals have received adequate training in federal immigration law. *See* 8 U.S.C. § 1357(g)(2).

Finally, the statute emphasizes that those individuals remain subject to the control and supervision of federal authorities. *See* 8 U.S.C. § 1357(g)(3) (providing that any exercise of power "by an officer or employee of a State" under a 287(g) agreement "shall be subject to the direction and supervision of the Attorney General"). Section 1357(g) grants no authority to state officials to arrest anyone under federal immigration law absent a valid agreement that meets the statutory requirements. And the provision goes no further than authorizing individual state employees to "perform the function[s] of an immigration officer." 8 U.S.C. § 1357(g)(1). It does not delegate any other powers the statute lodges in the Secretary of Homeland Security. It does not delegate the power under 8 U.S.C. § 1231(g) to arrange for places of immigration detention.

Florida's attempt to rely on § 1357(g) thus runs into two key obstacles. First, no 287(g) agreement could grant Florida the authority it

claims, because § 1357 (g) does not extend that far. The powers delegated by 287(g) agreements are specific and enumerated. They do not, and could not, include the authority to establish a place of immigration detention at TNT. Although deputized state officers under 8 U.S.C. § 1357(g) have considerable authority to investigate civil and criminal immigration violations, their power does not extend to setting up a place of detention. That power lies exclusively with the Secretary of Homeland Security under 8 U.S.C. § 1231(g).

Second, Florida in any event has not produced any 287(g) agreement purporting to grant it that authority. The Florida Division of Emergency Management (FDEM) does not have a 287(g) agreement with DHS. The State notes that other Florida law enforcement agencies have 287(g) agreements, Dkt. 82 at 25, but nothing in those agreements purports to authorize those agencies to designate places of immigration detention.

The Florida National Guard, for example, has a 287(g) agreement. App.1164. But nothing in that agreement references the power to arrange for places of detention. On the other hand, the agreement emphasizes *federal* control over the Florida National Guard's performance of

19

immigration functions. It states: "[T]he activities of participating LEA [law enforcement agency] personnel under this MOA derive from federal authority." App.1172. The document lays out the supervision authority of the federal government as follows: "Immigration enforcement activities conducted by participating LEA personnel will be *supervised and directed* by ICE. Participating LEA personnel are *not* authorized to perform immigration officer functions except when working under the supervision or direction of ICE. App.1169 (emphasis added).

## Conclusion

Florida could not have set up the TNT jail without the federal government having first arranged for it as a place of detention under its exclusive and sweeping power over immigration. American Immigration Lawyers Association urges the Court to uphold the decision of the district court.

Respectfully submitted,

/s/ Rebecca Sharpless
Rebecca Sharpless
Andrea Jacoski
**Immigration Clinic**
**University of Miami School of Law**
1311 Miller Drive, Suite B400

20

Coral Gables, FL 33146
Tel: (305) 284-3576
rsharpless@law.miami.edu
ajacoski@law.miami.edu

Jonathan Weinberg*
**Wayne State University Law School**
471 West Palmer Street
Detroit, MI 48202
Tel: (313) 577-4015
weinberg@wayne.edu

*Attorneys for Amicus Curiae*

\* *Not admitted in the U.S. Court of Appeals for the Eleventh Circuit*

21

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 3970 words, excluding the parts that may be excluded under Federal Rule of Appellate Procedure 32(f). This amicus brief also complies with Federal Rule of Appellate Procedure 32(a)(5)-(6) because it has been prepared in a proportionally spaced font using Microsoft Word in 14-point Century Schoolbook font.

<u>/s/ Rebecca Sharpless</u>
REBECCA SHARPLESS

*Attorney for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on January 27, 2025, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Rebecca Sharpless
REBECCA SHARPLESS

*Attorney for Amicus Curiae*