**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

—————————————

No. 25-12873

—————————————

FRIENDS OF THE EVERGLADES, INC.,
  a Florida 501(c)(3) not-for-profit corporation,
CENTER FOR BIOLOGICAL DIVERSITY,
  a 501(c)(3) nonprofit organization,

*Plaintiffs-Appellees,*

MICCOSUKEE TRIBE OF INDIANS OF
FLORIDA,

*Plaintiff-Intervenor-Appellee,*

*versus*

SECRETARY OF THE UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,
ACTING DIRECTOR, OF THE UNITED STATES
IMMIGRATION AND CUSTOMS ENFORCEMENT,
EXECUTIVE DIRECTOR, OF THE FLORIDA DIVISION
OF EMERGENCY MANAGEMENT,

*Defendants-Appellants,*

MIAMI-DADE COUNTY,

  a political subdivision of the State of Florida,

*Defendant.*

---

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:25-cv-22896-KMW

---

Before WILLIAM PRYOR, Chief Judge, and BRASHER and ABUDU, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide if the National Environmental Policy Act governs a facility constructed by the State of Florida to assist in federal immigration enforcement. Using state employees and state funds, Florida officials, on their own initiative, constructed a detention center at an airport on state property in the Florida Everglades. After federal authorities inspected the facility for compliance with federal standards, they started using it as a detention facility. Environmental advocates, joined by the Miccosukee Tribe, sued state and federal officials for failing to conduct an environmental review under the Act. The district court preliminarily enjoined the officials to stop construction and to undo some of the work that had already been completed, and it enjoined the detention of illegal aliens there. Because the environmentalists and Tribe failed to prove either a final agency action or federal control, and because the injunction, in part, violates a statutory prohibition of enjoining immigration enforcement, we vacate and remand.

## I. BACKGROUND

On January 6, 2023, Governor Ron DeSantis of Florida declared a state of emergency. He stated that "alarming levels" of illegal immigration in Florida in preceding months had imposed "an unmanageable strain on local resources." He designated the Executive Director of the Division of Emergency Management to coordinate the response to the crisis. And he instructed the Director to "[s]eek direct assistance and enter into agreements" with the federal government to address the crisis and direct state and local governmental agencies to respond to the emergency.

Before 2025, the Dade-Collier Training and Transition Airport was a small airport in Big Cypress National Preserve in the Florida Everglades. On June 23, 2025, the Director used his emergency powers to commandeer the airport. The Director planned to build a temporary immigration detention facility on the site, called the South Florida Soft-Sided Facility South.

State officials constructed the facility using state funds. Immigration and Customs Enforcement officials completed a "post-construction compliance check" to ensure that the site meets federal standards for immigration detention. Florida officials planned to "seek reimbursement of its expenses from the federal government," but when the district court entered its injunction, Florida had received no federal funding.

Florida manages the facility using state law enforcement officers. Several state agencies have agreements with the federal government allowing them to assist in immigration enforcement.

These section 287(g) agreements allow the Secretary of Homeland Security to delegate immigration enforcement to state and local agencies. *See* 8 U.S.C. § 1357(g). Under the agreements, state and local authorities may "perform a function of an immigration officer," such as investigating, detaining, or transporting aliens. *Id.* § 1357(g)(1). When doing so, state and local authorities act subordinately to federal officials. *Id.* § 1357(g)(3). Federal immigration officials transport detainees to the facility. They turn the aliens over to state officials who have the discretion to decide "who is detained at th[e] facility." Although hundreds of state officials and contractors were onsite every day when the district court entered its injunction, only four federal officers were present to coordinate the transportation and detention of aliens.

On June 27, 2025, two environmental advocacy groups, Friends of the Everglades and the Center for Biological Diversity, sued the Secretary of Homeland Security, the Director of Immigration and Customs Enforcement, the Executive Director of the Florida Division of Emergency Management, and Miami-Dade County in the Southern District of Florida. Friends is a nonprofit organization with more than 50,000 members. The Center "is a national, nonprofit conservation organization" with more than 93,000 members nationwide. Their complaint alleged that the state and federal defendants violated the Administrative Procedure Act by constructing an immigration detention center without assessing its environmental impact under the National Environmental Policy Act and violated state law. The environmentalists moved for a temporary restraining order and a preliminary injunction. On July 15, the

Miccosukee Tribe of Indians of Florida, which has a reservation near the facility, moved to intervene as a plaintiff. Its complaint alleged a nearly identical claim under the Environmental Policy Act along with two other claims. The district court granted the Tribe's motion.

The district court issued a preliminary injunction against the officials. It ruled that the environmentalists and Tribe were likely to succeed on the merits. It first concluded that venue was proper in the Southern District of Florida. It then decided that construction of the facility without performing an environmental analysis was a final agency action under the Administrative Procedure Act and a "major federal action" under the Environmental Policy Act. It ruled that federal officials exercised substantial control over the facility and committed to fund it. It reasoned that the officials' undisputed failure to comply with the Environmental Policy Act meant that the environmentalists and Tribe were likely to succeed on the merits. The district court also ruled that the environmentalists and Tribe were likely to suffer irreparable harm and that the environmental harm outweighed any benefits the officials received from detaining aliens at the facility.

The district court enjoined the officials from "installing any additional industrial-style lighting . . . or doing any paving, filling, excavating, or fencing; or doing any other site expansion." It also prohibited them from "bringing any additional persons onto the . . . site who were not already being detained" there. Without the addition of new detainees and with the "population attrition" of

the current detainees, the district court assumed the "camp's population" would "programmatic[ally]" fall and gave the officials 60 days to remove "temporary fencing," "lighting fixtures," and "all generators, gas, sewage, and other waste and waste receptacles that were installed to support this project." A motions panel stayed the injunction and the underlying action pending this appeal.

## II. STANDARDS OF REVIEW

Two standards govern our review. We "review for abuse of discretion a ruling on a motion for a preliminary injunction." *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1288 (11th Cir. 2022). "[B]ut we review *de novo* the legal conclusions" that support the injunction. *Upside Foods Inc. v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, No. 24-13640, slip. op. at 10 (11th Cir. Mar. 23, 2026) (citation and internal quotation marks omitted). And "[w]e review questions of statutory interpretation *de novo*." *Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1157 (11th Cir. 2021).

The Tribe suggests that our review must offer the district court wide discretion in "the application of law to facts." But this theory "runs headlong into a wall of our precedent expressly holding" that we review "constituent legal determinations *de novo*." *Fla. Agency for Health Care Admin. v. Adm'r for Ctrs. for Medicare & Medicaid Servs.*, 161 F.4th 765, 776 n.1 (11th Cir. 2025) (italics added). So we review the legal conclusions, including the application of law to fact, *de novo*. *Cf. United States v. Barsoum*, 763 F.3d 1321, 1328 (11th Cir. 2014).

### III. DISCUSSION

We divide our discussion into two parts. First, we explain that the district court abused its discretion by entering the injunction. Second, we explain that the injunction also violates a statutory bar on enjoining immigration enforcement.

A.  *The District Court Abused Its Discretion by Entering the Injunction.*

Last year, the Supreme Court made clear that the National Environmental Policy Act "is a procedural cross-check, not a substantive roadblock," designed to "inform agency decisionmaking." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1507 (2025). The Act requires agencies responsible for "certain infrastructure projects" to "prepare an environmental impact statement" that "address[es] the significant environmental effects of a proposed project and identif[ies] feasible alternatives that could mitigate those effects." *Id*. It creates no cause of action. So the environmentalists and Tribe proceed "under the Administrative Procedure Act," *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006) (citation and internal quotation marks omitted), which provides relief only from a "final agency action." 5 U.S.C. § 704.

A preliminary injunction "is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (citation and internal quotation marks omitted). To win an injunction, a plaintiff

must prove he "has a substantial likelihood of success on the merits," that he will suffer "irreparable injury . . . unless the injunction issues," that "the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party," and that "the injunction would not be adverse to the public interest." *Id*. The failure to establish any of these requirements is fatal. *Id*.

The environmentalists and the Tribe failed to prove a likelihood of success for two reasons. First, they failed to challenge a final agency action under the Administrative Procedure Act. Second, they failed to prove a major federal action under the Environmental Policy Act.

### 1. The Environmentalists and Tribe Failed to Prove a Final Agency Action.

The Administrative Procedure Act permits federal courts to review only a "final agency action." 5 U.S.C. § 704. The environmentalists and Tribe argue that "the decision not to issue an [environmental impact statement] or conduct an [environmental assessment] and then construct a detention camp qualifies as final agency action." We disagree.

The Administrative Procedure Act permits review only of "circumscribed, discrete agency actions." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). It does not allow federal courts to review "flaws in [an agency's] entire program" of decisionmaking. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892–93 (1990) (internal quotation marks omitted). It instead requires courts to follow a "case-by-case approach" that reviews challenged actions one at a

time. *Id*. at 894. Courts may not infer "an abstract decision apart from specific agency action." *Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022).

Florida, not federal, officials constructed the facility. They control the land and "entirely" built the facility at state expense. The only *federal* action the environmentalists can identify is the decision not to conduct an environmental review. And that decision alone, as all parties agree, is not final agency action. *See Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) ("[A]n agency's failure to prepare an [environmental impact statement], by itself, is not sufficient to trigger [Administrative Procedure Act] review in the absence of identifiable substantive agency action.").

The district court circumvented this problem by finding "significant evidence . . . that the facility's construction was requested and fully funded by the federal government." But an agency request is not a final agency action. *See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (holding that an agency's "request for voluntary corrective action . . . do[es] not constitute final agency action"). A request cannot determine rights or obligations until another party acts on it, and when it does, that decision then becomes "legally binding." *Id*. at 732. The *agency* has taken no action to fund the project. Even congressional appropriation of funds for a project will not allow challengers to an agency's use of those funds to obtain relief "until the [agency] has reviewed a grant application and decided to disburse the funds." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095,

1103 (9th Cir. 2007). Until Homeland Security officials decide to fund the facility, no final agency action occurs.

Nor do federal detention criteria and the decision to enter into section 287(g) agreements constitute final agency action. Adoption of federal standards cannot "transform a state or local project into a federal one." *Atlanta Coal. on Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1347 (5th Cir. 1979) (quoting *City of Boston v. Volpe*, 464 F.2d 254, 258 (1st Cir. 1972)). The adoption of those standards is a *state* action, not a federal one: compliance with the standards was a consequence of the decision of Florida officials to build a detention facility on state property using state funds and employees. And the Secretary's decision to enter into an agreement that complies with section 287(g) appears to be "committed to agency discretion by law," under the Administrative Procedure Act. 5 U.S.C. § 701(a)(2); *see also* 8 U.S.C. § 1357(g)(1) (stating that the Secretary "*may* enter into a written agreement with a State" to assist in immigration enforcement (emphasis added)); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (explaining that a matter is committed to agency discretion when "a court would have no meaningful standard against which to judge the agency's exercise of discretion"). Federal law also provides that "no court shall have jurisdiction to review . . . any other decision or action of . . . the Secretary . . . the authority for which is specified under this subchapter to be in the discretion of . . . the Secretary." 8 U.S.C. § 1252(a)(2)(B)(ii). Because section 287 falls under "this subchapter," *see Zafar v. U.S. Att'y Gen.*, 461 F.3d 1357, 1361 (11th Cir. 2006), the decision to enter into an agreement under that section appears

to fall within this jurisdictional bar. Perhaps for these reasons, the district court did not enjoin the officials from entering into an agreement under section 287.

Having failed to challenge an individual agency action, the Tribe tries to assemble a constellation of agency choices and transform them into final agency action. In its telling, "a single federal decision" was "carried out in sequence." But the Administrative Procedure Act allows plaintiffs to challenge only agency actions, not decisions. For a decision to amount to an agency action, it must be instantiated in an "agency statement . . . designed to implement that decision." *Biden*, 142 S. Ct. at 2545 (internal quotation marks omitted) (quoting 5 U.S.C. § 551(4)). Without that agency statement, a decision—no matter how firm—is not final agency action.

Because the environmentalists and Tribe did not challenge a final agency action, the district court abused its discretion when it entered the preliminary injunction. Our precedents treat this issue as "jurisdictional." *Fla. Agency for Health Care Admin.*, 161 F.4th at 776; *see also Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236, 1240 (11th Cir. 2003) (holding that "federal jurisdiction is . . . lacking when the administrative action in question is not 'final'"). But at least one circuit has held that the issue is not jurisdictional. *See Trudeau v. FTC*, 456 F.3d 178, 183–85 (D.C. Cir. 2006) (holding that because the Administrative Procedure Act does not "confer" or "restrict[]" jurisdiction, the failure to satisfy a statutory cause of action cannot "deprive a federal court of any jurisdiction it otherwise has"). Nevertheless, whether the issue is jurisdictional or not,

the environmentalists and Tribe failed to prove a likelihood of success on the merits.

## 2. The Environmentalists and Tribe Failed to Prove a Major Federal Action.

The Environmental Policy Act applies only to "major [f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). And it defines "major [f]ederal action" as "an action that the agency carrying out such action determines is subject to substantial [f]ederal control and responsibility." *Id.* § 4336e(10)(A). In 2023, Congress amended the Act to exclude "non-[f]ederal action[s]" "with no or minimal [f]ederal funding; or . . . with no or minimal [f]ederal involvement where a [f]ederal agency cannot control the outcome of the project." Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321, 137 Stat. 10, 45 (codified at 42 U.S.C. § 4336e(10)(B)(i)).

The 2023 amendments clarified that a non-federal action, like a state construction of a facility, may be converted into a federal action only when both federal funding and federal control are present. When a statute joins two conditions with "or," we treat it as a "disjunctive list." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 12, at 116 (2012). The use of a disjunctive to join two items "signal[s] that the two are alternatives and not a linked pair." *Dacostagomez-Aguilar v. U.S. Att'y Gen.*, 40 F.4th 1312, 1316 (11th Cir. 2022). So a non-federal action is excluded if it either received "no or minimal [f]ederal funding" or was subject to "no or minimal [f]ederal involvement." 42

U.S.C. § 4336e(10)(B)(i). To qualify as a major federal action, it must receive more than minimal federal funding *and* be subject to more than minimal federal control.

The environmentalists contest this reading. They insist that any action, including a non-federal action, that is "subject to substantial [f]ederal control and responsibility" under subsection (10)(A), must satisfy the Act. But that general definition addresses federal actions, not non-federal actions. It refers to an "agency carrying out [an] action" and leaves the determination whether the agency exercises substantial control to the agency itself. *Id.* § 4336e(10)(A). This definition would not encompass an action not undertaken by a federal agency. As the 2023 amendments confirm, the rules for non-federal actions are different.

The environmentalists protest that requiring both federal funding and federal control would "upend decades of interpretive caselaw." Yet, the amendments sought to correct misinterpretations by federal courts. As the Supreme Court has explained, the amendments "reinforce[d] the basic principles that [the Act], correctly interpreted, already embodied but that have been too often overlooked." *Seven Cnty.*, 145 S. Ct. at 1512 n.3.

The environmentalists and Tribe must prove both that the facility was federally funded and that it was subject to federal control. But they failed to do so because the facility is not federally controlled. As a result, we need not address whether it was federally funded.

The action the environmentalists and Tribe challenge is the *construction* of the facility. Their complaints allege that the "construction of an immigration detention center" is the major federal action they attack. The environmentalists admit the same in their brief.

The facility was constructed "with no or minimal [f]ederal involvement," and Homeland Security could not "control the outcome of the project." 42 U.S.C. § 4336e(10)(B)(i)(II); *see also United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1573 (11th Cir. 1994) (holding that a project cannot be called federal "when the state agencies retain their state law authority to make the decisions concerning the project"). As the Secretary explains, Florida officials retained final authority over every decision regarding the project, from "the size of the detention facility" and "how many beds it has" to "who will build it, or what materials will be used." Indeed, if Florida officials decided to stop building or to dedicate the land to addressing a new emergency, such as hurricane relief, federal officials could not overrule them. Federal authority is, at most, indirect: it is involved in the construction only insofar as it sets the terms for which the facility may be used for detention of aliens, but *Florida* officials dedicated its land to that use. The Environmental Policy Act applies "only when there is federal decision-making." *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573. Federal officials made no construction decision capable of triggering the Act.

The district court disregarded this fact and instead reasoned that "any state officials working on site with detainees are doing so

as deputized federal immigration officers." It subsumed the construction of the facility—the "action" done without an environmental review—into its later operation. In doing so, it relied on the anti-segmentation rule, which condemns "artificially dividing a major federal action into smaller components, each without a 'significant' impact," to evade the Act. *Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, 132 F.4th 1320, 1344 (11th Cir. 2025) (citation and internal quotation marks omitted). But invoking it here is an exercise in bootstrapping: the rule "does not require the aggregation of federal and non-federal actions." *Big Bend Conservation All. v. FERC*, 896 F.3d 418, 424 (D.C. Cir. 2018). In other words, ineligible federal actions and ineligible state actions will not add up to eligible federal actions.

The federal supervision of and support for immigration enforcement at the facility is not the subject of the claim under the Environmental Policy Act; the construction of the Facility is. Ongoing control of operations—and the provision of technical support for those operations—is irrelevant to whether the construction of the facility required an environmental review.

The environmentalists insist that immigration enforcement is the "purpose for which the facility was built." And "immigration enforcement is exclusively a federal power." But states have sovereign power to choose to assist federal law enforcement. *See Arizona v. United States*, 567 U.S. 387, 411 (2012) ("Consultation between federal and state officials is an important feature of the immigration system.").

Congress recognized this state power in creating section 287(g) agreements. That a state program aims to assist the federal government in its exercise of sovereign power does not render the program subject to federal control. The state may change its policy and dedicate its resources to another purpose, as it may withdraw from section 287(g) agreements in its discretion.

The environmentalists argue that because "federal authorization" is required for the facility to "operate [as] an immigration detention center," the Secretary of Homeland Security controls the outcome of the project. But the need for federal approval to use a project for a purpose does not establish federal control; the nonfederal actor still chooses the purpose of its project. A property owner who builds an office building must comply with the Americans with Disabilities Act, but his compliance with federal law does not make it a federal building. Because Florida "retain[ed its] state law authority to make the decisions concerning the project," the facility was not subject to federal control and its construction did not trigger the Act. *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573.

Because the environmentalists and Tribe failed to prove a likelihood of success on the merits of their claim, we do not discuss whether they proved irreparable harm or whether the balance of the equities favored an injunction. We also do not address the district court's ruling that venue was proper in the Southern District of Florida. The expedited nature of these proceedings created a limited record insufficient to support a decision on venue. On remand,

Florida and the Secretary may object to venue in a motion to dismiss or a responsive pleading and may compile an appropriate record. The district court will then need to address venue in the light of that more capacious record.

The district court erroneously concluded that the officials had waived their venue objection by conduct. Extraordinary circumstances might permit a court to rule that parties waived their venue objections by conduct despite raising them more than 30 days before the Rule 12 deadline. The circumstances here—where Florida and the Secretary were faced with significant and time-sensitive matters immediately once litigation commenced—do not support waiver. But because we conclude that the environmentalists and the Tribe are unlikely to succeed on the merits, we leave the venue issue to the district court.

### B. *The District Court's Injunction Violated the Statutory Bar on Enjoining Immigration Enforcement.*

Even if the environmentalists and Tribe were likely to succeed on their claim, we would still vacate a portion of the injunction. The district court enjoined federal officials from "bringing any additional persons onto the . . . site who were not already being detained" there. The injunction conflicts with a provision of the Illegal Immigration Reform and Immigrant Responsibility Act that strips the "authority" of district courts "to enjoin or restrain the operation of [sections 1221–1231 of Title 8 of the United States Code] . . . other than with respect to the application of such provisions to

an individual alien." 8 U.S.C. § 1252(f)(1); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

The injunction required federal officials "to refrain from actions that . . . in the Government's view . . . are allowed" by the covered sections. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). The Secretary has the authority to "arrest[] and detain[]" aliens pending removal proceedings. 8 U.S.C. § 1226(a). After a final order of removal is issued, he *must* detain them pending removal. *See id.* § 1231(a)(2). He must also "arrange for appropriate places of detention" for the aliens he detains. *Id.* § 1231(g)(1). An injunction that prevents him from detaining aliens in a place of his choosing "enjoin[s] or restrain[s] the operation[s]" of sections 1231(g) and 1226(a).

The district court concluded that "[a]n order compelling [Environmental Policy Act] compliance . . . simply requires Defendants to follow the environmental procedures that Congress imposed." It acknowledged that compliance might have a "collateral effect on immigration operations," but it reasoned that the effect does not amount to a restraint on operations in violation of section 1252(f).

This logic could work only if the district court had issued a different injunction. If, for instance, it had enjoined federal construction of a non-operational detention facility pending compliance with the Act, any impact on immigration enforcement would be collateral. But the injunction it issued bars the Secretary from

25-12873                Opinion of the Court                19

detaining aliens at a facility he designates. The restrictions on immigration enforcement are not collateral.

The environmentalists insist, quoting *Texas v. Department of Homeland Security*, that section 1252(f) is not triggered because it "does not encompass an injunction against statutes it does not cross-reference." 123 F.4th 186, 209 (5th Cir. 2024). Because section 1252(f)(1) does not refer to the Environmental Policy Act, the environmentalists say the injunction must be permissible. But the statute itself defeats this theory.

Section 1252(f)(1) applies "[r]egardless of the nature of the action or claim." *Aleman Gonzalez*, 142 S. Ct. at 2066 (internal quotation marks omitted) (holding that "the reach of [section] 1252(f)(1)" does not "depend on the nature of the claim in question"). The question is whether the injunction restrains the operation of sections 1226 or 1231, which this injunction expressly does. Section 1252(f)(1) leaves us no choice but to vacate this portion of the injunction regardless of the merits of the underlying federal claims.

## IV. CONCLUSION

We **VACATE** the preliminary injunction and **REMAND** for further proceedings.

25-12873               ABUDU, J., Dissenting                    1

ABUDU, Circuit Judge, Dissenting:

While the grant of a preliminary injunction is an "extraordinary and drastic remedy," *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1291 (11th Cir. 2022) (citing *Forsyth Cnty. v. U.S. Army Corps of Eng'rs,* 633 F.3d 1032, 1039 (11th Cir. 2011)), once granted, a party seeking vacatur of such an injunction bears the heavy burden of showing that the district court abused its discretion. Here, the Department of Homeland Security ("DHS"), the Director of the U.S. Immigration and Customs Enforcement ("ICE"), and the other Defendant-Appellants do not meet that burden. Nevertheless, a majority of this court has once again relied upon its own factual findings and interpretation of this record to determine that the district court abused its discretion for reaching a different outcome than the panel itself would have.

In doing so, the majority absolves both the state and federal defendants of their collective responsibility to the human beings currently detained in the Facility, the Tribe members, and the Big Cypress National Preserve ("BCNP") simply because (1) the federal government failed to formalize its agreement with Florida in a manner the majority deems sufficient, and (2) one day in the unknown future the state of Florida could decide it no longer wants to participate in the detention scheme. It cannot, and should not, be the case that the federal government, which all parties agree has exclusive control over the detention of migrants, can abdicate its responsibility to exercise that control in a way that is consistent

2                    ABUDU, J., Dissenting                    25-12873

with federal law simply because, here, Florida has supported DHS and ICE in carrying out this endeavor.

As Judge Jordan explained in his well-reasoned dissent from the prior panel's order staying the preliminary injunction, the district court did not abuse its discretion in issuing the preliminary injunction, as it "did not clearly err in its factual findings or otherwise commit a 'clear error of judgment' in concluding (a) that the plaintiffs (i) demonstrated a substantial likelihood of success on their" National Environmental Protection Act ("NEPA") "claim and (ii) showed that they would likely suffer irreparable harm absent preliminary injunctive relief, and (b) that the balance of equities and the public interest favored the plaintiffs." *Friends of the Everglades v. Sec'y of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *17 (11th Cir. Sept. 4, 2025) (unpublished) (Jordan, J., dissenting) (internal citation omitted) (quoting *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (*en banc*)).

In addition to the reasons identified in Judge Jordan's dissent, the majority opinion also errs by minimizing the federal government's role and responsibility in immigration detention, while mischaracterizing the scope of the district court's injunction on the federal government's ability to exercise control over said detention. For these reasons, I respectfully dissent.

### I.    Our evaluation of the district court's preliminary injunction must be grounded in an appropriate application of the standard of review.

We review a district court's ruling on a motion for preliminary injunction for abuse of discretion. *Vital Pharms.*, 23 F.4th at 1288. "This scope of review will lead to reversal only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." *Forsyth Cnty.*, 633 F.3d at 1039 (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005)). Even when we review legal conclusions, including the application of law to fact, *de novo*, that does not prevent us from affording the district court's factual findings the appropriate level of deference required under the abuse of discretion and clear error standards. *Id.* ("[A]n abuse of discretion standard recognizes there is a range of choice within which we will not reverse the district court even if we might have reached a different decision." (quoting *Schiavo*, 403 F.3d at 1226)). When we review factual findings for clear error, our review is very deferential. *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002) ("We begin our [preliminary injunction] review by noting how deferential it is. . . . [T]he trial court is in a far better position than this Court to evaluate that evidence, and we will not disturb its factual findings unless they are clearly erroneous."). We may not set aside a finding of fact when it is supported by the testimony of witnesses who "told a coherent and facially plausible story

that is not contradicted by extrinsic evidence." *OHI Asset (VA) Martinsville, SNF, LLC v. Wagner (In re Wagner)*, 115 F.4th 1296, 1303 (11th Cir. 2024) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575-76, (1985)); *see also United States v. Saingerard*, 621 F.3d 1341, 1343 (11th Cir. 2010) (explaining when a factfinder chooses between two permissible views of the evidence, its findings are not clearly erroneous).

The majority expands the scope of our review of the district court's injunction under the guise of evaluating the district court's legal conclusions, but in doing so, does not grapple with the ongoing trend in this circuit to "ignor[e] and/or revis[e] the district court's factual findings and fail[ ] to apply the clear error standard . . . ." *Fla. Decides Healthcare, Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, at *9 (11th Cir. Sept. 9, 2025) (Abudu, J., dissenting) (quoting *Otto v. City of Boca Raton*, 41 F.4th 1271, 1285 (11th Cir. 2022) (Jordan, J., dissenting)). We are not supposed to redetermine the facts for ourselves. Today, by vacating the district court's preliminary injunction, the majority ignores the district court's careful and extensive fact finding, attributing fault and error where there was none.

> **II.    Florida's agreement to help manage the facility does not preclude the logical conclusion that DHS and ICE's involvement constitutes a final federal agency action.**

The district court employed the two-part test outlined in *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), to conclude that there

was a final agency action.  In doing so, the district court reasonably relied on its factual findings made during the four-day evidentiary hearing.  In relevant part, the district court, after reviewing "plans and photos showing [the] operation of the camp" found that it already "involved paving approximately 800,000 square feet of land, installation of industrial lighting impacting the night sky at least 20 to 30 miles away, and enough residential infrastructure to house thousands of detainees and on-site staff."  As for the scale of the facility's operation, the district court found that it "employs as many as 1,000 staff members . . . and can house multiple thousands of detainees at any given time."  Based on this evidence, the district court determined that "the facility has undergone substantial construction and is currently operational."  Next, relying on testimony from members of the environmental group and the Tribe's employees, the district court found that failure to issue an Environmental Impact Statement ("EIS") prior to constructing the facility unlawfully denied the environmentalists and the Tribe an opportunity to submit comments on the facility.  Based on these factual findings, the district court concluded that the decision not to issue an EIS prior to the completion of the facility constituted a final agency action, as it "represent[ed] a determinative position on the matter and . . . adversely affected Plaintiffs' recreational, conservational, and aesthetic interests."  This is consistent with the requirements that a final agency action "mark[s] the consummation of the agency's decisionmaking process" and is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Id.* at 178 (first quoting *Chi. & S. Air*

*Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113 (1948); and then quoting *Port of Bos. Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71 (1970)).

The majority maintains that there is no final agency action here because: (1) an agency request to build the Facility cannot be a final agency action; (2) Florida built the Facility, not the federal government; (3) the district court lacked authority to review Florida's decision to enter into the 287(g) agreements; and (4) there was no agency statement. In doing so, the majority relies on the unsupported position that so long as the state actually built the facility, it does not matter that the federal government requested the state build it. The majority misconstrues and minimizes the significance of the federal government's request to Florida in this context.

The agreement between Florida, DHS, and ICE is not an exercise in cooperative federalism; it is a clear and classic delegation of federal authority. *Cf. Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 701–02 (6th Cir. 2014) (evaluating NEPA violation relating to scheme established by the Surface Mining Control and Reclamation Act of 1977 which "set up system of 'cooperative federalism,' in which state governments could opt in to regulating coal surface mining in their states so long as they establish agencies to enact and administer their own regulatory programs" (citing and quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289 (1981))). As the district court found, the record shows that the federal government enlisted Florida to

25-12873                ABUDU, J., Dissenting                7

assist in executing its immigration detention practices, not as an equal participant in the scheme, but instead as a deputy of the federal government operating at its request. The facility would not, and could not, have been built and used as an immigration detention center without the federal defendants' request, as DHS and ICE retained "exclusive jurisdiction over the regulation of [immigration] on non-federal lands" and maintained oversight of the state's actions. *Id.* at 702 (quoting and discussing 30 U.S.C. § 1253(a)). Accordingly, the district court did not violate the anti-segmentation rule when it based its conclusion that the environmentalists and the Tribe had proven that a final agency action existed on evidence that DHS and ICE asked Florida to build the facility and committed to funding it.

It is true that in some contexts, "an agency request is not a final agency action." Maj. Op. at 10 (citing *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003)). However, in *Reliable Automatic Sprinkler Company*, the Consumer Product Safety Commission ("CPSC") requested that the appellant manufacturer voluntarily address a significant hazard with one of its products—automatic sprinkler heads—through corrective action. 324 F.3d at 731 (finding no final federal agency action where the agency's conduct simply "amount[ed] to 'an investigation of appellant's sprinkler heads, a statement of the agency's intention to make a preliminary determination that the sprinkler heads present a substantial product hazard, and a request for voluntary corrective action"). DHS and ICE, on the other hand, en-

tered into a bilateral agreement that allows Florida to assist in carrying out this otherwise purely federal function by housing individuals solely under the federal government's responsibility. Federal "legal consequences" arose from Florida's completion of the facility, per its agreement with DHS and ICE, and the federal government's related decision not to issue an EIS—namely, the environmentalists and the Tribe were deprived of their right to comment. *See Bennett*, 520 U.S. at 178 (explaining that final agency action is an action "from which 'legal consequences' will flow" (quoting *Rederiaktiebolaget Transatlantic*, 400 U.S. at 71)). "The TNT site is located within Big Cypress National Preserve ("BCNP") and the Big Cypress Area, which the Florida legislature has designated as 'an area of critical state concern' with the intention to 'conserve and protect the [area's] natural resources and scenic beauty.'" The location of the facility creates environmental concerns that the district court found should have been addressed in an EIS. Without an EIS, the environmentalists and the Tribe did not have an avenue to express their concerns about the environmental impact to this protected region prior to it being built.

Perhaps the clearest evidence of federal agency action here are the 287(g) agreements. While the majority opines that the "[a]doption of federal standards cannot 'transform a state or local project into a federal one'" Maj. Op. at 10 (quoting *Atlanta Coal. on Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F2d 1333, 1347 (5th Cir. 1979)), here, the 287(g) agreements show that Florida did not adopt such standards in the mere "hope of qualifying for federal assistance." *Atlanta Coal. on Transp. Crisis,* 599 F.2d at 1347 (quoting

*City of Boston v. Volpe,* 464 F.2d 254, 258 (1st Cir. 1972)).[1] Unlike the federal funds at issue in *Atlanta Coalition*, which were limited to the planning process, DHS and ICE's promise to Florida was tied to the completion of the detention facility, "impl[ying] a commitment by [a] federal agency to fund [the detention facility]." *Id.* The 287(g) agreements show that DHS is committed to the detention facility beyond the planning stage. Additionally, the project was "presented to the appropriate federal agency," in this case DHS, and, therefore, the relevant decision makers were not just the state defendants, but also the federal defendants. *Id.* The majority's minimization of DHS and ICE's involvement in the decision to build and operate the detention facility is directly controverted by the district court's factual findings which, in the absence of any clear error, are owed deference.

## III.     DHS and ICE do not relinquish all control and responsibility simply by delegating some of their authority to the state.

The majority once again improperly replaces the district court's extensive factual findings with its own to conclude that the environmentalists and the Tribe failed to prove that the facility was federally funded and subject to federal control. The majority also heavily relies on the possibility that one day Florida may choose to

---

[1] Decisions of the Fifth Circuit prior to the close of business on September 30, 1981, "shall be binding as precedent in the Eleventh Circuit." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

opt-out of the detention scheme as evidence that there is insufficient federal control.  The majority's reasoning is problematic on so many levels, but a few especially are in desperate need of attention.

First and foremost, NEPA does not require a complete absence of state involvement in order for substantial federal control to exist.  See *United States v. S. Fla. Water. Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994) ("There are no clear standards for the defining point at which federal participation transforms a state project into federal action.").  Instead, Section 4336e(10) of NEPA defines "major federal action" as an action that "is subject to *substantial* Federal control and responsibility."  42 U.S.C. § 4336e(10)(A) (emphasis added).  Contrary to the majority's assertion, the fact that a state retains the ability to decide one day to opt-out of this exercise of federal control by no longer volunteering to serve as an arm of the federal government is not sufficient to extinguish "substantial" federal control here.  In fact, the majority cannot point to any statutory language or case law to support such a rigid requirement.  The majority thus rewrites the term "substantial" in NEPA to mean complete and forevermore.  *But see Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1296 (11th Cir. 1999) ("It is not the business of courts to rewrite statutes . . . ."); *Blount v. Rizzi*, 400 U.S. 410, 419 (1971) ("[I]t is for Congress, not this Court, to rewrite the statute.").

Next, relegating the federal government's involvement here to no more than a removed supervisor or supporter of state action

25-12873               ABUDU, J., Dissenting                    11

grossly understates DHS and ICE's role in the creation and operation of the detention facility.  This is most evident in the majority's weak analogy to the relationship between a property owner constructing an office building and having to comply with federal standards that ensure people in wheelchairs or who have other mobility issues can still access the building.  Aside from the obvious distinction that the *state* of Florida is not a *private* actor, the state defendants have partnered with DHS and ICE in carrying out the President's immigration detention goals which he gets to set prior to any necessary judicial constraints.  If anything, the majority's analogy highlights that the private property owner's building must be accessible to all members of the public.  Here, the detention facility's only goal is to house thousands of people under DHS and ICE's control, in a secluded area, away from the public, without any accountability.  If not for its partnership with DHS and ICE, Florida's housing of these individuals (and in some cases families) would be more akin to kidnapping and, at its most extreme, perhaps human trafficking.  The state cannot detain a non-citizen without the proper authority to do so. *Arizona v. United States*, 567 U.S. 387, 410 (2012) ("There may be some ambiguity as to what constitutes cooperation under the federal law; but no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government."); *see also Menocal v. GEO Grp., Inc.*, 635 F. Supp. 3d 1151, 1189–90 (D. Colo. 2022) (in lawsuit brought by former detainees at a private immigration detention center alleging violations of the

Trafficking Victims Protection Act's ("TVPA") forced labor provision, concluding that plaintiffs sufficiently demonstrated that they labored under the threat of serious harm when they were threatened with 72 hours in segregation for failure to work); *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278–80 (11th Cir. 2020) (in class action brought by current and former detainees at federal immigration detention facility alleging violations of TVPA from forced labor program, holding that TVPA applies to private for-profit contractors operating federal immigration detention facilities); Jennifer Safstrom, *Thirteenth Amendment Litigation in the Immigration Context*, 26 MICH. J. RACE & L. 205, 220–26 (2020) (analyzing lawsuits brought by detained immigrants alleging violations of the TVPA forced labor provision).

The evidence of federal control perhaps is most apparent when we acknowledge that immigration remains uniquely and exclusively within the federal government's domain, *see Hines v. Davidowitz*, 312 U.S. 52, 66–67 (1941), hence the need for the 287(g) agreements. The Executive Branch also is responsible for protecting the federal rights and safety of the growing thousands of individuals forcibly detained as a result of the partnership. For example, immigrants detained at the facility have Fifth Amendment rights to be free from unlawful conditions of confinement and these claims would be appropriately directed at the federal government, not the state. *Alexis v. U.S. Att'y Gen.*, 431 F.3d 1291, 1295 n.3 (11th Cir. 2005) (acknowledging that even "excludable aliens" are "entitled under the due process clause to be free of 'gross physical

abuse' at the hands of state or federal officers" (citing *Lynch v. Can-natella*, 810 F.2d 1363, 1374 (5th Cir. 1987))); *cf. Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir. 2015) (explaining that Fifth Amendment "protects a citizen's rights against infringement by the federal government, not by the state government"); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments.").

While the federal government is authorized "to enter into a cooperative agreement. . . for the necessary construction . . . required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service," 8 U.S.C. § 1103(a)(11)(B), the federal government may not discharge its responsibility to protect the constitutional rights of detained immigrants to the states. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 291 (2023) (reinforcing that Congress may impose ancillary requirements on states without violating the Tenth Amendment because "[s]uch requirements do not offload the Federal Government's responsibilities onto the States . . . ." (quoting *Murphy v. NCAA*, 584 U.S. 453, 474 (2018))). *See also United States v. Feng Tao*, 107 F.4th 1179, 1198 (10th Cir. 2024) (Briscoe, J., dissenting) ("Even if a federal agency delegates primary authority to a state agency to discharge some of its duties, a 'grant of primary authority is not a grant of exclusive authority' . . . [and] the federal government re-

14                    ABUDU, J., Dissenting                    25-12873

tains jurisdiction . . . to enforce its regulations and ensure that 'federal funds are properly spent.'" (quoting *United States v.* Wright, 988 F.2d 1036, 1038–39 (10th Cir. 1993))).  Nor do DHS and ICE share that responsibility with the state of Florida in this instance.  That is because, factually, the 287(g) agreements expressly provide that the state officials responsible for the day-to-day operations of the facility are to be "considered acting under color of *federal authority* for purposes of determining liability and immunity from suit under federal or state law."  *Friends of the Everglades, Inc. v. Noem*, 796 F. Supp.3d 1234, 1251 (S.D. Fla. 2025) (emphasis added) (quoting 287(g) agreement).

It is not dispositive that these officials are *state* officials by name.  What matters is that these officials are "given powers (or perform functions) that are 'traditionally the *exclusive* prerogative'" of the federal government.  *Harvey v. Harvey*, 949 F.2d 1127, 1131 (11th Cir. 1992) (emphasis in original) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)).  When state officials exercise federal power, under a federal statute, at the behest of federal officials, to perform a uniquely federal function, the state/federal project easily involves "substantial" federal control.[2]

---

[2] Perhaps a counterexample shows why the majority's contrary decision makes no sense.  When an Article III federal court solicits the help of a non-Article III decisionmaker to determine the rights and obligations of litigants, and then that non-Article III decisionmaker renders a decision—under the supervision of the Article III court that is constitutionally entrusted with the de-

25-12873                ABUDU, J., Dissenting                15

More terrifying, especially given the documented instances of abuse in immigration facilities, *see, e.g.*, *Gayle v. Meade*, 614 F.Supp. 3d 1175, 1203–05 (S.D. Fla. 2020) (granting preliminary injunction, in part, after determining that immigration detainees held by ICE were likely to succeed on merits of Fifth Amendment claims for violations of detention standards and right to reasonable safety), is the majority's open-door invitation to eliminate the federal government's duty to immigrants in its care wherever they are housed. That cannot stand. Yet, that is the exact outcome the majority's decision promotes. The opinion, even if unintentionally, further encourages the federal government to abandon its constitutional and statutory responsibilities for the care and safety of the human beings detained at this facility simply because Florida supported these efforts and may one day choose to no longer do so. The majority acknowledges that the Secretary of Homeland Security delegated immigration enforcement authority to the state through Sec-

---

cision-making authority—and that decision has real-world effects on the federal rights of litigants, it would be almost ridiculous to say that the decisions were not made under substantial Article III control. *See Fowler v. Jones*, 899 F.2d 1088, 1093 (11th Cir. 1990). Indeed, this is essentially the structure which allows Federal magistrate judges to act consistent with "the constitutional requirement that the judicial power of the United States must be vested in Article III courts." *Id.*; *see also* 28 U.S.C. § 636. The same rationale clearly applies when the federal government, vested with the obligation to enforce immigration laws, solicits Florida's assistance in requisitioning and maintaining a federal detention center, and that center is, in fact, built and used to house federal detainees, the project is one under substantial federal control.

tion 287(g) agreements.  However, by denying the existence of federal control, the majority opinion implies that these contractual agreements, which states are free to terminate, can be used to completely offload the federal government's immigration authority to states.  That position contradicts the very purpose of these agreements, which are limited to permitting state and local authorities to perform immigration functions "subject to the direction and supervision of the Attorney General."  8 U.S.C. § 1357(g)(3).

Federal immigration authorities "do[] not vest power over detained [non-citizens] in the wardens of detention facilities" simply by relying "on state and local governments to house federal [immigrant] detainees."  *Roman v. Ashcroft*, 340 F.3d 314, 320 (6th Cir. 2003).  To the extent state and local governments exercise any "daily control . . . over federal [immigrant] detainees, they have that control solely pursuant to the direction of" immigration authorities.  *Id.*  Permitting DHS and ICE to abdicate their responsibility will have dangerous, and sometimes deadly, consequences for detainees who are being abused by officers who, with no state authority or federal supervision, engage in rogue behavior.  The majority's opinion also raises concerns about the federal government's commitment to upholding its obligations under international law.  *See, e.g., Ali v. Ashcroft*, 394 F.3d 780, 790 (9th Cir. 2005) ("The international obligation our nation agreed to share when we enacted the Refugee Convention into law knows no such limits."

25-12873                    ABUDU, J., Dissenting                    17

(citing Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (the "Refugee Act")).[3]

Furthermore, the ability of the state to one day opt-out does not change the fact that so long as it remains a willing participant in the immigration detention scheme, it must submit to the federal government's exclusive control over the detention of migrants, as it may only perform delegated immigration functions under "the direction and supervision of the Attorney General." 8 U.S.C. § 1357(g)(3); *see also Arizona*, 567 U.S. at 413 ("[I]t would disrupt the federal framework to put state officers in the position of holding [undocumented individuals] in custody for possible unlawful presence without federal direction and supervision."). To the extent that the state of Florida presently is operating in the immigration space, it must do so in a way that respects the federal government's authority. *See Doe v. Rose*, 499 F.2d 1112, 1116 (10th

---

[3] *See also Zadvydas v. Davis*, 533 U.S. 678, 721 (2001) (Kennedy, J., dissenting) ("Still, both removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious. Where detention is incident to removal, the detention cannot be justified as punishment nor can the confinement or its conditions be designed in order to punish. This accords with international views on detention of refugees and asylum seekers." (first citing *Wong Wing v. United States*, 163 U.S. 228 (1896); then citing Report of the United Nations Working Group on Arbitrary Detention, U.N. Doc. E/CN.4/2000/4 (Dec. 28, 1999) [https://perma.cc/RA44-LMJP]; and then citing United Nations High Commissioner for Refugees, Guidelines on Applicable Criteria and Standards Relating to the Detention of Asylum–Seekers (Feb. 10, 1999) [https://perma.cc/DYB7-K5RT])).

18                    ABUDU, J., Dissenting                    25-12873

Cir. 1974) ("[O]nce a state elects to participate in a federal . . . program, it must follow federal statutes and regulations and must also administer the program in a constitutional manner."). The state is "precluded from regulating conduct" in this field, as "Congress, acting within its proper authority, has determined [it] must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399; *cf. Kentuckians for the Commonwealth*, 746 F.3d at 701 (finding that Army Corps of Engineers did not violate NEPA by limiting scope of environmental analysis where statute granted state exclusive jurisdiction over regulation of mining in the state, under certain conditions and subject to minimum federal standards). So long as Florida remains a willing participant in the federal government's immigration detention scheme, it subjects itself to the federal government's substantial control over the parties' joint efforts, which is the necessary trigger for NEPA's application in this case.

In sum, the majority, under the guise of *de novo* review, disregards the district court's well-supported factual findings in favor of its own, thereby blurring in more than just an idiosyncratic way, the important distinction between legal conclusions and factual findings. In doing so, the majority has rendered the people actually detained in the facility and Florida's cherished environment protected by no one, and vulnerable to the whims of anyone. The extensive record in this case and a proper application of the law support the district court's conclusion that irreparable injury to the environment and the humans (detained and free persons) impacted by the facility will likely occur in the absence of an injunction.

25-12873                ABUDU, J., Dissenting                19

Therefore, the majority's decision to vacate the district court's order is just plain wrong.

I dissent.